<pre>
1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                             )
4        Plaintiff,          )
                             )
5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                             )
6   JAMES MICHAEL WELLS,     )
                             )
7        Defendant.          )
    _____)
8

9              TRANSCRIPT OF TRIAL BY JURY - DAY 2
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10              September 10, 2019; 8:37 a.m.
                    Anchorage, Alaska
11

12  FOR THE GOVERNMENT:
        Office of the United States Attorney
13      BY:  STEVEN SKROCKI
        BY:  CHRISTINA M. SHERMAN
14      BY:  KELLEY L. STEVENS
        222 West 7th Avenue, #9
15      Anchorage, Alaska 99513
        (907) 271-5071
16

    FOR THE DEFENDANT:
17      Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
18      601 West 5th Avenue, Suite 800
        Anchorage, Alaska 99501
19      (907) 646-3400

20      Camiel & Chaney, P.S.
        BY:  PETER A. CAMIEL
21      520 Pike Street, Suite 2500
        Seattle, Washington 98101
22      (206) 624-1551
</pre>

---

<pre>
                 SONJA L. REEVES, RMR-CRR
24           Federal Official Court Reporter
               222 West 7th Avenue, #4
25              Anchorage, Alaska 99513
        Transcript Produced from the Stenographic Record
</pre>

1                        I N D E X

2                September 10, 2019, Trial Day 2

3

4    Jury Sworn                              Page 75

5    Court's Preliminary Jury Instructions   Page 76

6    Government Opening Statement            Page 85

7    Defense Opening Statement               Page 96

8

9    Witnesses:        Direct    Cross    Redirect      Recross

10   Scott Reckner      132        --        --          --

11

12                     E X H I B I T   I N D E X

13   Exhibit                                         Page

14   1            Google Map of Kodiak Base          154

15   2            Google Map of COMMSTA              156

16   3            Google Map of Bell's Flats          161

17   4            Aerial View of Area from Airport    163
18                to Rigger Shop

19   5            Aerial View of COMMSTA             163

     6            Aerial View of Rigger Shop and      163
20                Water Treatment Plant

21   7            Aerial View of Rigger Shop          163
                  Showing Entrances
22
     7A           Aerial View of Rigger Shop Showing  163
23                Entrances with Marked Changes by
                  W-5
24
     8            Aerial View of Back of Rigger Shop  163
25

| | | |
|---|---|---|
| 9 | Aerial View of Anton Larson Road and Rigger Shop | 163 |
| 10 | COMMSTA Organizational Chart | 163 |
| 11 | Rigger Shop Organizational Chart | 172 |
| 12 | Rigger Shop Sign | 175 |
| 13 | Rigger Shop Diagram | 175 |
| 14 | Rigger Shop Diagram, Zoomed to Office and Break Room | 175 |
| 15 | Jim Hopkins | 140 |
| 16 | Rich Belisle | 140 |
| 17 | Jim Wells Rigger | 140 |
| 18 | Rigger Shop with View of Garage Doors | 193 |
| 19 | Rigger Shop Showing the Vehicles | 193 |
| 20 | Side of Rigger Shop Near Road | 193 |
| 21 | Back of Rigger Shop Showing Windows | 193 |
| 22 | Back of Rigger Shop Showing Doors and Equipment | 193 |
| 23 | Camera on Exterior of Rigger Shop | 193 |
| 24 | Camera on Exterior of Rigger Shop | 193 |
| 25 | Keycard Entrance Door to Rigger Shop | 193 |
| 26 | Entrance Door to Rigger Shop | 193 |
| 27 | Rigger Shop Door Open | 193 |
| 28 | View from Entrance Door Facing Right | 193 |
| 29 | View from Entrance Door Facing Left | 193 |

| | | |
|---|---|---|
| 30 | View from Entrance Door Facing 45 Degrees to the Left | 193 |
| 31 | View from Hallway of Entrance to Office | 193 |
| 32 | Wells' Desk | 193 |
| 35 | Memo of Expectations and Clarification Dated April 2011 | 223 |
| 220 | Photo of Belisle on Tower | 140 |
| 222 | Overview of COMMSTA | 145 |
| 235 | Wells, Hopkins, Belisle on Shemya | 212 |
| 236 | Rigger Shop 3D Diagram | 182 |
| 252 | Tower Training | 140 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

     1            (Call to Order of the Court at 8:37 a.m.)

     2            (Prospective jurors absent)

     3            DEPUTY CLERK:  All rise.  Her Honor, the Court,

     4   the United States District Court for the District of

     5   Alaska is now in session, the Honorable Sharon L.

     6   Gleason presiding.

     7            Please be seated.

     8            THE COURT:  Good morning.  We're back on record

     9   in *United States versus Wells*.  And Judge Burgess was

    10   going to look at the new door and then got, I think,

    11   taken aback by all of you when he opened the door.

    12            But in any event, I received the e-mail that

    13   you sent to Emily and, yes, I believe that was an

    14   oversight to ask whether any of the jurors knew either

    15   Mr. Belisle or Mr. Hopkins.  Have I pronounced that

    16   correctly?  Thank you for the phonetic assistance.  It

    17   was appreciated.

    18            Regrettably, we received a phone call this

    19   morning from Juror No. 35, who was in a motor vehicle

    20   accident this morning, is my understanding, correct?

    21            DEPUTY CLERK:  Uh-huh.

    22            THE COURT:  And that's all I know.  I don't

    23   know the seriousness of it, but she -- I have her phone

    24   number, and is she available to talk?

    25            DEPUTY CLERK:  She said that it was just -- it

1    was noninjury, the police were there, and that she was

2    going to get here as soon as possible.

3            THE COURT:  All right.  Did you all hear that?

4            MR. SKROCKI:  Yes.

5            THE COURT:  So then we don't need to call her?

6            DEPUTY CLERK:  I don't think so.

7            THE COURT:  Very good.  We could call her back

8    and say we'll wait for her, would be my thought,

9    assuming --

10           MR. SKROCKI:  Yes, please.

11           THE COURT:  Very good.  Then that takes care of

12   that.  Juror No. 47, I'll do some follow-up questions

13   regarding her financial hardship issues.  And anything

14   else to take up?

15           MR. SKROCKI:  Is it all right, Your Honor, just

16   for evening time that we proceed with e-mailing Emily

17   like we did?

18           THE COURT:  Yes.  I'm fine with that if you

19   copy each other.  Seems efficient.

20           Mr. Colbath, anything to take up?

21           MR. COLBATH:  I don't think at this point, Your

22   Honor.  We're just going to stand in recess until we get

23   notified of our juror's appearance?  Is the Court going

24   to replace the folks that we discussed at the end of the

25   evening last night?  I think we had four or five.

1    THE COURT:  We have five, by my accounting.

2  22, 17, 32, 72 and 34.

3    MR. COLBATH:  Would it be your intent to

4  inquire of Juror No. 47 first in the event that she's

5  replaced, then she would be added to that group, and

6  then we fill in that and have them read their

7  questionnaires?

8    THE COURT:  Yes, I will address 47 first.  I'll

9  ask the whole group about does anyone know either of the

10  victims.  And then we'll proceed to call either five or

11  six more names, depending on the resolution of 47.  And

12  if we need to have a sidebar on 47 after the

13  questioning, I would ask if Mr. Wells is willing to

14  waive his presence on that discussion just over here,

15  and then you could confer with him first or before and

16  after.

17    MR. COLBATH:  Sure, Your Honor.  I think that

18  would be fine, because he will have heard the Court's

19  inquiry and understand the discussion, so, yeah, that's

20  fine.

21    THE COURT:  Very good.  Anything further on

22  these tentative rulings on the motion?  I realized that

23  since you hadn't seen the diverter clarification order,

24  that explains more the reason that the Pacheco motion

25  was filed, because I thought I made myself clear but you

1  hadn't seen the order, so there you go.  Anything

2  further on that?

3          MR. SKROCKI:  No, Your Honor.  We'll abide by

4  the Court's ruling.

5          THE COURT:  We couldn't find the CD yesterday

6  evening, so I haven't listened to that.  I'm sure it's

7  somewhere in the front.  We just haven't tracked it

8  down.

9          MR. SKROCKI:  Would you like us to get a copy?

10          THE COURT:  No, I'll let you know.  I'll go ask

11  the clerk now if it's available.  Anything further?

12          MR. COLBATH:  Not from us, Your Honor.

13          THE COURT:  I'm going to talk to our clerk's

14  office.  I had forgotten about the policy here on the

15  sealed orders not being put on the docket.  And I really

16  don't understand the rationale for that, especially in

17  the midst of trial.  It's got to bog things down here,

18  so I will try to look into why that is the case going

19  forward.

20          And we'll try to remember if we issue more

21  sealed orders in the course of this to get them to you

22  here in the courtroom in any event.

23          If there is nothing further, we'll give you an

24  update when we have one.  We'll go off record.

25          DEPUTY CLERK:  All rise.  This matter now

1    stands in a brief recess.

2              (Recessed from 8:42 a.m. to 9:18 a.m.)

3              DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court is again in session.

5              (Prospective jurors absent)

6              THE COURT:  All right.  We are back on record

7    here.  And I understand Juror No. 47, as it turns out,

8    asked to speak privately with us, so I think she's on

9    her way.

10             (Prospective Juror No. 47 enters courtroom)

11             THE COURT:  Good morning.  If you could come up

12   to the jury box.

13             All right.  Well, I understand that there was

14   something you wanted to share with us; is that correct?

15             PROSPECTIVE JUROR NO. 47:  Yes.  Do you want me

16   to use this?

17             THE COURT:  Yeah, that helps, because she can

18   hear better.

19             PROSPECTIVE JUROR NO. 47:  I just wanted to

20   kind of explain myself further on the last question of

21   the jury questionnaire.  After having gone home last

22   night and looked at things and thought about things, the

23   hardship on my family being on this jury would actually

24   be more difficult than I had thought.

25             If this was a case that was going to be only

for one or two weeks, I could basically just suck it up.

But my husband and I have very little outside help with

our children, and so daycare alone, my three-year-old

would be at daycare for five days versus the usual

three, which will -- the cost.  And then the after

school care, the before school care for my other two

children, I am primarily the transport to and from

school because they go to a lottery school.

Not to mention the extra cost.  My work will

pay me for only the days that I am scheduled to work,

and as a 12-hour scheduler, I will only get paid for two

days, which means I will end up being here for five days

and then I will have to work on the weekends to make up

the rest of my pay, which as a juror is going to leave

me exhausted and distracted.

I have some help with my stepdaughter, but

she's not reliable.  She has a toddler of her own.

She's 21.  And just -- I am concerned that I will -- it

will be difficult for me to pay attention like I should

in a case like this.

THE COURT:  Well, I appreciate that you thought

about that.  Actually, we were going to follow up with

you, so we were somewhat on the same page.

Mr. Skrocki, questions?

MR. SKROCKI:  No, Your Honor.

1        MR. COLBATH:  Same with me, no.

2        THE COURT:  Why don't you give the microphone

3   here -- you can actually just leave it right there, go

4   back to the jury assembly room, let me talk with the

5   lawyers and we'll get back with you.  And thank you for

6   your service.

7        (Prospective Juror No. 47 exits courtroom)

8        THE COURT:  All right.  Well, I have been

9   informed that all of the remaining jurors are here,

10  including 35, so that's good news.

11       What's the government's view on Juror No. 47?

12       MR. SKROCKI:  Hardship application, Your Honor.

13       THE COURT:  Any objection?

14       MR. COLBATH:  No, Your Honor.  We would join.

15       THE COURT:  All right.  Then we'll excuse 47 as

16  well.  And so you could inform Jerri, if you would.  And

17  then we can bring the rest of the jurors back here, so

18  we'll call in six new people from the back.

19       With that said, they are on their way down.

20       (Pause)

21       THE COURT:  I did, by the way, find the CD and

22  got it to work.  Well, I didn't get it to work, but a

23  law clerk did.

24       MR. COLBATH:  Your Honor, when you have the

25  attorneys do voir dire, are you going to have us at the

1  lectern?

2          THE COURT:  You can be in the well, just

3  respect -- I'm sure you will, Mr. Colbath.

4          MR. COLBATH:  My question is this:  No matter

5  -- as I look at this, no matter where I stand, I have

6  got my back to jurors, because we're going to have from

7  36 -- once we get 36 and the attorneys begin to

8  question, I was wondering even if we could get them all

9  in that direction.

10          THE COURT:  I think that's a good idea.

11          MR. COLBATH:  Then if I stood in the well, we

12  could see, as opposed to go over here with the

13  microphone and over there with the microphone.

14          THE COURT:  Good morning, please come in.

15          (Prospective jurors present)

16          THE COURT:  Go back to your same seats, if you

17  remember them.  Please be seated, everyone.  Everybody

18  should be back in the seat they were in at the end of

19  the day yesterday.

20          I'm glad Juror No. 35 is okay.  I'm glad you're

21  doing okay.

22          PROSPECTIVE JUROR NO. 35:  Thank you, ma'am.

23          THE COURT:  I have excused, with the

24  concurrence of the parties, several individuals.  And at

25  this point, we are going to call up six more names from

1   the people remaining in the back.  And we'll direct you

2   to the seat you will go to.  Go ahead, please, Madam

3   Clerk.

4           DEPUTY CLERK:  In seat number three will now be

5   Juror No. 37.

6           THE COURT:  Three is in the back row.  Very

7   good.

8           DEPUTY CLERK:  Seat number six will now be

9   Juror No. 4.

10          Seat number eight will now be Juror No. 69.

11          Seat number 14 will now be Juror No. 60.

12          Seat number 26 will now be Juror No. 29.

13          Seat number 28 will now be Juror No. 53.

14          Then there are the papers -- if somebody could

15  hand back the papers to those jurors.

16          THE COURT:  All right.  Beginning with Juror

17  No. 37, we'll get you a sheet of paper and a microphone.

18  And if you could read your answers to those questions,

19  that would be great.

20          PROSPECTIVE JUROR NO. 37:  Juror No. 37.  Place

21  of residence is Chickaloon, Alaska.  Length of residence

22  in Alaska, total about 35 years.

23          Occupation:  I'm a sales manager for Alaska

24  Communications.  I have worked there for the past five

25  years.  Highest level of education is some college.

1    I'm married.  My spouse's occupation is she

2  owns a candy store and takes care of our children.  I

3  have three children.  One is still a minor, two are

4  grown.  My oldest daughter was a trial clerk in the

5  Duvall County court system, and my middle daughter is a

6  vet tech for Pet Emergency.

7    Hobbies:  I'm a falconer.  I like hunting and

8  fishing.  I do own a gun.  I try to avoid getting any

9  news at all, but get it through social media.

10    I was in the United States Coast Guard back in

11  the late eighties.  Have no prior jury service.  And I

12  have no reason why I can't serve.

13    THE COURT:  All right.  Thank you.  I'm not

14  sure that microphone is on.  If we could pass this down

15  to Juror No. 4.

16    PROSPECTIVE JUROR NO. 4:  Juror No. 4.  I live

17  in Sterling, Alaska.  I have lived in Alaska since 2002.

18    I am a physical therapist and mostly work with

19  First Choice in Soldotna.  I have been doing this for

20  the last five years.  And I also do short-term fill-in

21  throughout the state.

22    I have a master's in physical therapy.  I am

23  married.  My husband is retired from LKSD out in Bethel.

24  He was a site administrator and technology director.

25    We have no children, but I do have a retired

husband.  Hobbies:  Reading, writing, cycling.  We are
both gun owners.  I get my news over the internet, and
then when the weather permits, on antenna TV.

No military service.  I was called for jury
duty in Bethel, but did not serve.  And then I do have
plane tickets to leave the state.  I could forego that
trip.  It would be a financial loss, but not a hardship.

THE COURT:  What are your dates of your planned
trip?

PROSPECTIVE JUROR NO. 4:  23rd to the 18th.

THE COURT:  So leaving September 23rd?

PROSPECTIVE JUROR NO. 4:  Yes.

PROSPECTIVE JUROR NO. 69:  I am Juror No. 69.
I live in Wasilla, Alaska.  I have lived in Alaska for
13 years.

I am a shelf stocker at Wal-Mart for the past
year.  No prior work before that.  I graduated from high
school.  I am not married.  Do not have any children.

My hobbies include robotics and writing code.
I am not a gun owner, nor is anyone in my household.  I
mostly get my news from social media.

My father was in the Navy until I was two and
is currently a contractor with the Department of
Defense.  I have not served prior on a jury.  And I can
only think of transportation issues getting to the

courthouse from Wasilla as a reason I cannot serve on this jury.

THE COURT:  All right.  And so did a family member drive you in again today?

PROSPECTIVE JUROR NO. 69:  Yes.

THE COURT:  Thank you.  On to 60, I believe.

PROSPECTIVE JUROR NO. 60:  Juror No. 60.  Place of residence is Willow, Alaska.  Length of residency, 39 years.

Occupation:  Semiretired, volunteer fire department.  Currently though with the Mat-Su Borough. So work history past five years is taking care of mama. She loves that.  Highest level of education is some college.

Marital status, I am married.  Wife is employed.  She's a nurse at Maple Springs Extended Care in Wasilla.  Children:  Have five children, all adults. The oldest works for Odem here in Anchorage.  The second is a secretary here in Anchorage.  The third is a son and he is currently unknown, long story.  Fourth is bank teller in Fairbanks.  And the fifth is a barista/musician and songwriter.  Covers the gambit there.

Hobbies:  Fishing, hunting.  Gun owner, yes. Get news through television and internet.  Military

service, yes, Army.  Rank at discharge E-1.  Prior jury

service, yes, but never sat on a panel.  And is there

any reason?  Yes, I'm closing on the house and I got a

little bit more details.

We do a walkthrough on Thursday and then we

close on Friday.  And then after that, Your Honor, in

this deal with the house, I'm doing the remodel on it,

and if I'm not doing that, mama is not going to be

happy.  And I'm kind of a proponent of happy wife, happy

life, so if you want to talk to her.

THE COURT:  I could do that.  All right.  So

the walkthrough on Thursday is relatively brief, would

be my --

PROSPECTIVE JUROR NO. 60:  That would be my

guess as well.

THE COURT:  And then close on Friday.  And

that's this week or next week?

PROSPECTIVE JUROR NO. 60:  It would be next

week.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR NO. 29:  Juror No. 29.  My

place of residence is Anchorage.  Length of residence in

Alaska, 42 years.

I'm an aircraft mechanic for Federal Express,

and I have worked for them for 18 years.  My highest

1  level of formal education was a GED and trade schools.

2          And the marital status is married.  My

3  children, I have three boys, 36, 34, 32.  The oldest one

4  is quality assurance at Southcentral Foundation for

5  medical.  And the other one is the security here for the

6  federal building, contracting.  And the youngest one is

7  a small engine mechanic.  And then my wife's daughter is

8  security for Lockheed Martin CEO.

9          I have no hobbies.  I like airplanes, little

10  airplanes and motorcycles.  I am a gun owner.  And I

11  watch the news on TV.

12          I was U.S. Navy four years.  I was an E-4 when

13  I was discharged.  I did have prior jury service for a

14  criminal case, and at that time of the deliberation I

15  was picked as the alternate juror and they let me go.

16          THE COURT:  That happens.

17          PROSPECTIVE JUROR NO. 29:  A verdict was

18  reached.  I have never served on the grand jury.  And I

19  was not the foreperson on the other one.  There is no

20  reason I can think of to not serve on this jury.

21          PROSPECTIVE JUROR NO. 53:  I'm No. 53.  I live

22  in Anchorage.  I have lived here for 31 years.

23          I work for Northrim Bank.  I'm in the

24  operations support department.  My highest education is

25  high school.

1          I am married.  My husband is a security
2     director for a local credit union.  I have six adult
3     children.  They are unemployed, high speed copy operator
4     in Oregon, custom furniture maker, two credit unions and
5     a drug rehab.
6          I like to camp and fish.  I am a gun owner.  I
7     mostly get my news from TV and sometimes the radio.  I
8     have very short military service, discharged during
9     basic training.  No prior jury service.  And I have no
10    reason I can't serve.
11         THE COURT:  Thank you very much.  Counsel, can
12    we go forward here?
13         MR. SKROCKI:  Yes, Your Honor.
14         THE COURT:  Yes?  We can have a brief sidebar
15    if you would like, Mr. Colbath, that's fine.
16         MR. COLBATH:  No, that's fine, Your Honor.
17         THE COURT:  All right, ladies and gentlemen.
18    We're at the next stage of our jury selection process.
19    And at this point, I'm going to allow each of the
20    lawyers up to about 15 minutes here to ask any follow-up
21    questions either of the panel as a whole or individual
22    jurors.
23         And there was a request about having the people
24    that are at this side move over to the other side, but I
25    think actually the easiest is if you feel free to move

about the courtroom.  And you can -- I don't mind if you

have your back to me, Mr. Colbath, that's fine or

Mr. Skrocki.  Let's give that a try.  Then we don't have

to relocate people.

Ms. Stevens, go right ahead, please.  Like I

say, you can stand wherever you're comfortable.

MS. STEVENS:  Sure.  Thank you.

Good morning, everyone.  So I'm going to start

with some general questions for the group, and then

we'll go into some specifics here.

So how many of the members have social media

accounts that you guys visit and post on at least twice

a week?  Facebook -- okay.

Everybody hear me all right?  I'll try to speak

up as loud as I can.

That was a lot of hands.  Let's narrow it down

just a little bit.  How many of the folks that raised

their hands post more than -- post every day?  Okay.

So essentially what we would like to know for

the two gentlemen that raised your hands, No. 69, when

you post, is it -- are you posting articles or is it

status updates?  Can you walk us through kind of what

posts you put on social media?

PROSPECTIVE JUROR NO. 69:  Correspondence with

friends.  Not much news articles.  Not any really.

 1          MS. STEVENS:  Do you post about your feelings
 2    about the day, things like that?
 3          PROSPECTIVE JUROR NO. 69:  Yes.
 4          MS. STEVENS:  In a case like this, will you be
 5    able to not post things about how you feel about the
 6    case?  Are you going to be able to exercise that
 7    restraint?
 8          PROSPECTIVE JUROR NO. 69:  Yes, ma'am.
 9          MS. STEVENS:  And Juror No. 18, same questions.
10          PROSPECTIVE JUROR NO. 18:  I post a little bit
11    of everything.  I have two YouTube channels going.
12          MS. STEVENS:  Can you tell us more about that?
13          THE COURT:  Can we get the microphone for that?
14          PROSPECTIVE JUROR NO. 18:  What do you want to
15    know?
16          MS. STEVENS:  You said you have YouTube
17    channels?
18          PROSPECTIVE JUROR NO. 18:  Yes.  My wife has a
19    channel and then I have one.
20          MS. STEVENS:  What are the content of those
21    channels?
22          PROSPECTIVE JUROR NO. 18:  My wife does reborn
23    dolls, and mine is just random video art type stuff.
24          MS. STEVENS:  Can you explain what that is to
25    me, the video art?

1          PROSPECTIVE JUROR NO. 18:  Music videos, stop

2     action photography, just random stuff like that.

3          MS. STEVENS:  Do you have a big following?

4          PROSPECTIVE JUROR NO. 18:  No.

5          MS. STEVENS:  Do you rely on that for income or

6     anything?

7          PROSPECTIVE JUROR NO. 18:  No.

8          MS. STEVENS:  So not being able to do that for

9     the next five weeks, is that going to pose an issue?

10         PROSPECTIVE JUROR NO. 18:  My wife's channel is

11    getting bigger.  We're trying to grow it, but not

12    really.

13         MS. STEVENS:  That's helpful.  Thanks.

14         Let's see here.  Okay.  And then just to

15    capture everybody else that raised their hands, any of

16    other folks that post on social media, do you feel like

17    it will be difficult to refrain from doing status

18    updates during the course of the trial?

19         If anybody has any reservations about that, you

20    can raise your hand and we can explore that a little

21    more.  Doesn't look like there is.

22         All right.  Let's see here.  Sort of on the

23    same vein, folks that just like to surf the internet.

24    Do we have folks who like to explore the internet?

25         Now, do the folks that raised their hand, do

you think that you would have a problem maybe coming

across something that looks like it's related to the

case and, gosh, you really want to open that up and see

what it's about?

Anybody feel like they may be tempted?  Just

raise your hand.  It's okay if you're tempted by it.

No. 18.  Anybody else.  So help me understand,

you know, your thought process as you see something

related to the case.  What do you think you will do?

PROSPECTIVE JUROR NO. 18:  I believe I would go

ahead and ignore it, but you said tempted, yeah, always

curiosity killed the cat, right.

MS. STEVENS:  I appreciate your honesty.  So if

the judge indicates we have got five weeks or however

long this is going to take and you're not to do any

research, are you going to be able to follow that

instruction?  Okay.

THE COURT:  This is Steven.  He's is going to

help move the microphone around.

MS. STEVENS:  For the record, that was 18.

THE COURT:  Very good.  Thank you.

MS. STEVENS:  Crime shows.  Do we have any big

fans of CSI?  All right.  We got a couple hands.

All right.  Let's start with No. 11.  Can you

explain some of the crime shows that you're interested

1    in?

2              PROSPECTIVE JUROR NO. 11:  Mine Hunter.

3              MR. COLBATH:  She's not one of your 36.

4              THE COURT:  That's all right.  We're not going

5    to ask you because you're not in our front group.  Thank

6    you.  You're paying careful attention.

7              MS. STEVENS:  That's a good show, by the way.

8    Anybody else that's -- No. 16.

9              PROSPECTIVE JUROR NO. 25:  CSI.  It's been a

10   while since I watched it, but yeah.

11             PROSPECTIVE JUROR NO. 16:  No. 16.  I enjoy the

12   NCI shows.

13             MS. STEVENS:  NCIS?  What about those shows do

14   you enjoy?

15             PROSPECTIVE JUROR NO. 16:  Sometimes the

16   military background stuff that they get wrong.  We get a

17   kick out of it.  The action.  I'm an action person, so I

18   like the action.  All of that.  I don't know.  Just

19   pretty good shows generally.

20             MS. STEVENS:  Do you like the forensic aspects

21   of those shows?

22             PROSPECTIVE JUROR NO. 16:  They make -- they

23   are fun, you know.

24             MS. STEVENS:  Would you expect that every

25   criminal case would have some sort of forensics

1  involved?

2          PROSPECTIVE JUROR NO. 16:  Oh, no.

3          MS. STEVENS:  Tell me more about what you mean

4  by that.

5          PROSPECTIVE JUROR NO. 16:  Being in nursing for

6  so long, I seen how they brought it up on TV where then

7  it wasn't in the court case or like they will have DNA

8  at the drop of a hat.  It don't quite work quite that

9  fast.  And things like that.  I know it will take a lot

10  longer than what a one-hour TV show says.  Just logical

11  stuff.

12          MS. STEVENS:  So if there was a lack of

13  forensics, that wouldn't sway you in any way in thinking

14  that the case was less important or anything like that?

15          PROSPECTIVE JUROR NO. 16:  Oh, no.

16          MS. STEVENS:  Some other folks, crime shows?

17  No. 29.

18          PROSPECTIVE JUROR NO. 29:  I watch all of the

19  factual ones.  They are interesting because it's amazing

20  what people do.

21          MS. STEVENS:  Okay.  Same questions as 16, do

22  you like the forensic piece of it?

23          PROSPECTIVE JUROR NO. 29:  Absolutely.

24          MS. STEVENS:  Do you expect that every criminal

25  case should have forensics?

1          PROSPECTIVE JUROR NO. 29:  No, not necessarily.

2          MS. STEVENS:  Tell me more about why you think

3   that.

4          PROSPECTIVE JUROR NO. 29:  Well, there is

5   several cases in the past that were proven without any

6   type of evidence per se.

7          MS. STEVENS:  Forensic evidence?

8          PROSPECTIVE JUROR NO. 29:  And it's obvious

9   that's what happened.

10          MS. STEVENS:  Anybody else that raised -- No.

11   70.

12          PROSPECTIVE JUROR NO. 70:  I like NCIS and CSI.

13   I watch it for the humor.

14          MS. STEVENS:  We're lawyers, so don't -- and

15   what -- forensics, same thing, do you expect there

16   should be forensics in every case?

17          PROSPECTIVE JUROR NO. 70:  There is not going

18   to be forensics in everything.

19          MS. STEVENS:  No. 66.

20          PROSPECTIVE JUROR NO. 66:  I like NCIS and Blue

21   Bloods.  I watch it for the characters, not necessarily

22   for the factual aspect, but I like the characters.

23          MS. STEVENS:  Okay.  And then same thing about

24   forensics, do you feel strongly about there needing to

25   be forensics in a criminal case?

1          PROSPECTIVE JUROR NO. 66:  I don't know.  It's

2     TV.

3          MS. STEVENS:  Who else over here?  All right.

4     No. 15.

5          PROSPECTIVE JUROR NO. 15:  I watch pretty much

6     all of them, Blue Bloods, NCIS, CSI.

7          MS. STEVENS:  What do you like about those

8     shows?

9          PROSPECTIVE JUROR NO. 15:  Just there is

10    action.

11         MS. STEVENS:  Do you like the forensic piece of

12    it?

13         PROSPECTIVE JUROR NO. 15:  Some of it can be

14    interesting.

15         MS. STEVENS:  Would you be disappointed or

16    would you feel the case was not important if there was a

17    lack of forensics?

18         PROSPECTIVE JUROR NO. 15:  No, I wouldn't think

19    so.

20         MS. STEVENS:  I believe you had your hand up as

21    well.

22         PROSPECTIVE JUROR NO. 18:  I like watching

23    Criminal Minds and Law and Order a lot, and mainly

24    because I work in counseling, psychology, especially the

25    darker psychology I guess you would call it.  And I do

1   think forensics is important.

2           MS. STEVENS:  What can you tell us about the

3   psychology piece of it?  Tell us about that.

4           PROSPECTIVE JUROR NO. 18:  It's just

5   interesting, behavioral science, where you can totally

6   draw who the person is without even seeing them just

7   with the evidence placed out, the motives behind it and

8   just the whole psychological one thing leads to another

9   type of situation.

10          MS. STEVENS:  Do you have training in that

11  area?

12          PROSPECTIVE JUROR NO. 18:  Moderately.

13          MS. STEVENS:  Assuming that there was testimony

14  from individuals with specialized knowledge in certain

15  areas, maybe not psychology, but in other areas, would

16  you be able to rely on that as evidence and not replace

17  it with your own specialized knowledge?

18          PROSPECTIVE JUROR NO. 18:  Oh, yeah.  I'm not

19  an expert.

20          PROSPECTIVE JUROR NO. 20:  There is too many to

21  name, but I usually like to watch it because I want to

22  figure out who did it.

23          MS. STEVENS:  The same forensic question.

24          PROSPECTIVE JUROR NO. 20:  No.

25          MS. STEVENS:  Now I'm going to move to some of

the -- oh, just real quick before we move to specific
questions. Does anybody in the group here have issues
with tactics that law enforcement may use, although
legal, like you may disagree with them?

Does anybody have any issues with law
enforcement and the fact that they may be able to
interview people and do certain types of searches that
are legal under the law, but you may actually personally
disagree with it? No. 65.

PROSPECTIVE JUROR NO. 65: I mean I feel like
that might need some clarification. I mean, just like
any group of people, there is always some people that
can do stuff that are dubiously ethical and some people
that can do things that are within the letter of the
law.

MS. STEVENS: Specifically with regard to
agents and investigators, if they are legally allowed to
proceed to policy and the law, the statute, the
Constitution, allowed to do some sort of investigatory
tactic, if you don't necessarily agree with that tactic,
but it's legal, would you hold that against them?

PROSPECTIVE JUROR NO. 65: No. That's not what
I meant then.

MS. STEVENS: All right. Anybody else? Okay.

THE COURT: Just a heads-up, about two or three

1    minutes.

2              MS. STEVENS:  No. 2.

3              PROSPECTIVE JUROR NO. 2:  I'm going to say

4    there is a difference between moral and legal, and that

5    it is -- it would be hard to not hold that against

6    somebody if there was something that I deemed unethical.

7    There are exceptions, I'm sure, but moral legal things,

8    tough for me sometimes.

9              MS. STEVENS:  I appreciate that.  Thank you.

10             I have got specific questions for, let's see,

11   are you No. 42?  So you made some statements about being

12   a tire technician.

13             PROSPECTIVE JUROR NO. 42:  Yes.

14             MS. STEVENS:  This case may have some evidence

15   regarding a tire and whether a tire was working

16   properly.  So tell us what your experience working with

17   tires is.

18             PROSPECTIVE JUROR NO. 42:  My experience about

19   tires is --

20             THE COURT:  Let's take about a ten-minute break

21   here and we'll coordinate with our IT to get the

22   microphone fixed.  Sorry.  You have two minutes when we

23   come back, and then we'll hear from Mr. Colbath.

24   Remember my admonition not to discuss the case or do any

25   research during our short break.  We'll take about ten

1  minutes here.  We'll go off record.

2          (Recessed from 9:53 a.m. to 10:11 a.m.)

3          (Prospective jurors absent)

4          DEPUTY CLERK:  All rise.  Her Honor, the Court,

5  the United States District Court is again in session.

6          THE COURT:  All right.  I think we have solved

7  our problem for the moment.  I understand there is a

8  topic.  Ms. Stevens, go ahead.

9          MS. STEVENS:  Yes, Your Honor.  So at this

10 point, the United States is going to make application to

11 strike or to remove one of the members for cause.  We

12 were just kind of doing a little bit of research during

13 the break, and No. 18 has been posting Facebook status

14 updates about his participation in jury duty and about

15 different reasons to try to get out of jury duty, things

16 like that.

17         And so we think that that is sufficient

18 evidence to show that he probably is not ready to take

19 this job seriously, and we have concerns about his

20 ability to not make statements during the course of a

21 five-week trial.

22         We do have the screen shots of the things we

23 found.  We're happy to show them to the defense at this

24 time, but at this point, we would like to move to have

25 him removed for cause.

```
 1              THE COURT:  Do you want to see the screen
 2     shots?
 3              MR. COLBATH:  Yes, Your Honor, absolutely.
 4              THE COURT:  This is a first for me, I'm just
 5     saying.
 6              MS. STEVENS:  We'll read them into the record
 7     as well, and then I'll bring them over to you, Gary.
 8              MS. STEVENS:  It says, "Sitting here in jury
 9     duty, and I got to tell you it's not as exciting as it
10     looked on Law and Order."
11              And then, "12 angry men?  No, just one bored
12     man."
13              THE COURT:  When were these?  Can you tell the
14     time?
15              MS. STEVENS:  It appears they were taken
16     yesterday.  And then the comments -- so this is in
17     response to the statement, this is another person making
18     this statement, "I always tell them I don't believe in
19     the American justice system as it stands, and, poof, no
20     more jury duty.  Been 12 years now.  LOL."
21              And then the juror responded, "I told them when
22     I was 18 that I was hard of hearing.  It worked for
23     about 35 years until now.  LOL."  This was yesterday.
24     It doesn't say the time.
25              THE COURT:  All right.  Mr. Colbath, what's the
```

1   defense position on excusing No. 18 for cause?

2          MR. COLBATH:  Your Honor, my position is that a

3   couple of things.  First of all, from what I can see

4   from the timing of these, some of the comments that were

5   read were other people's and then his response to some

6   of those comments.  From the timing of these, it appears

7   to me that those were posts that were made either

8   outside the courtroom or prior to him yesterday being

9   called as one of our 36, so he was just sitting in the

10  back at the time he made them.

11         Since the time of those posts, Ms. Stevens has

12  directly inquired of him about his social media use.

13  He's the one with the YouTube channel.  And she

14  specifically asked him, "Do you think that you would be

15  able to not post, if we actually select you as a juror,

16  do you think you would be able to not post."  He said

17  that he could.

18         "Do you understand that you couldn't give

19  detailed information about the case," or whatever?  He

20  certainly represented that he could.  He wasn't asked if

21  he had been posting, and he wasn't up until now, I don't

22  think been told that he was under any restriction, other

23  than to talk about the case.  There is nothing in any of

24  the posts that talk -- that reference the case, that

25  reference the kind of case, that reference any detail

about the case, other than a comment that he's called in
for jury duty or going through some jury selection
process.

So based on his actual answers to the specific
inquiries here just a few minutes ago, I don't think
there is cause to remove him.

THE COURT:  All right.  Here is what I'll do:
I will give the government up to five minutes to have
further questions.  So I'm not going to grant the motion
now, but if you want to explore this issue with that
juror -- it's hard because I don't know the exact
timing, it sounds like, which I understand we know it's
yesterday, but was it before or after the Court's
admonitions.  And I did not give the long admonition
which goes on and on about social media in proceedings
yesterday.

So I'll give you that time.  If you seek to do,
Ms. Stevens, if you seek to do that, bring him in by
himself, you can do that.  If you want to waive that,
that's fine, but that's my ruling at this time on the
motion.

MS. STEVENS:  Okay, Your Honor.  So just to be
clear, would it be permissible for me to just have an
additional no more than five minutes to ask the whole
panel so that he's not being singled -- I don't want to

1   single him out and embarrass him.

2           THE COURT:  I understand that.  So your request

3   is five minutes to explore postings on social media with

4   the whole panel?

5           MS. STEVENS:  Essentially the length of it will

6   be has anyone here posted during their time here, and,

7   if so, what are those posts?  And do you feel --

8           THE COURT:  Posted about jury duty?

9           MS. STEVENS:  Correct.

10          THE COURT:  I'll do that.  And then I'll give

11  you 20 minutes, Mr. Colbath, to even it up.  All right.

12          Are we ready to proceed?

13          DEPUTY CLERK:  What was that juror number?

14          THE COURT:  18.  Ready to proceed?

15          (Pause)

16          (Prospective jurors present)

17          THE COURT:  Welcome back, everyone.  Go ahead

18  and please be seated.  All right.  So welcome back.  And

19  it took a little longer.

20          Before we go on with Ms. Stevens finishing up

21  her questions, I meant to ask something yesterday of the

22  panel and I forgot to do so, or neglected to do so, and

23  that is I asked you if you knew the parties, if you knew

24  the lawyers, if you knew the court staff, but I did not

25  ask if anyone is familiar with either of the victims

here, and that would be Mr. Richard Belisle and James Hopkins.

Anybody know either of them or their families? No. All right. Good. That was my question there.

Juror No. 42, I just received a note. Is there a subject we need to take up privately with you?

PROSPECTIVE JUROR NO. 42: Yes, please.

THE COURT: Hold that thought and I'll come back to it later, and I can take that up with counsel as well. Why don't we have a brief sidebar.

(Begin bench conference)

THE COURT: So I haven't spoken to the jury clerk directly, but he evidently had a death in the family today, can stay through the day, but has indicated, this is triple hearsay, what I'm hearing is he's not available.

MR. SKROCKI: This is the one you're inquiring?

MS. STEVENS: Yeah.

THE COURT: If you want, I can excuse him.

MR. COLBATH: He was more than willing up until this, but --

MS. STEVENS: I don't know how we make him stay given that.

THE COURT: So everybody is okay with excusing him now? Or I can follow up. I haven't spoken to him

1    directly, but I have no reason to doubt him.

2              MS. STEVENS:  Right.

3              MR. SKROCKI:  Right.

4              THE COURT:  Are you okay with that?

5              MR. COLBATH:  I am.

6              THE COURT:  Do you need to confer with

7    Mr. Wells first?

8              MR. COLBATH:  I don't.

9              (End bench conference)

10             THE COURT:  My understanding from the jury

11   clerk is that Juror No. 42 has had a loss in the family

12   and is unable to serve; is that correct?

13             PROSPECTIVE JUROR NO. 42:  Yes.

14             THE COURT:  Sorry for that news.  I have

15   conferred with the lawyers and you will be excused from

16   the jury.  That's what I understand you need to do.  You

17   can be excused at this time.

18             If you need a statement for your work, you can

19   go and get one from the jury clerk.  Thank you for your

20   service.  You take care, sir.

21             PROSPECTIVE JUROR NO. 42:  Thank you.

22             THE COURT:  That brings us to drawing another

23   name, Madam Clerk.

24             DEPUTY CLERK:  Seat number five will now be

25   Juror No. 27.

1       THE COURT: Good morning. If you could have a

2 seat in seat five, get settled, and then we'll get you

3 the sheet of paper and a microphone. Do we have a

4 microphone that this juror could use? Once you're

5 settled, if you could answer the questions there. Go

6 right ahead.

7       PROSPECTIVE JUROR NO. 27: I am Juror No. 27.

8 I live here in Anchorage. I have lived in Alaska my

9 whole life, for 22 years.

10       My occupation is tire and lube tech, and I also

11 work at UPS. And my past five-year work history is

12 working at a deli and also working at UPS. Highest

13 education is high school diploma.

14       I am single. No children. Hobbies are

15 snowboarding, long-boarding, and that's it. I'm not a

16 gun owner. I get my news from the internet.

17       No military service. I was -- I had jury duty

18 and I was released. And only the reason why I can't be

19 on -- or the only reason why I can't serve on the jury

20 is I can't afford to have five weeks off of work.

21       THE COURT: So you're not -- your employers

22 won't cover?

23       PROSPECTIVE JUROR NO. 27: Yeah, they won't

24 cover for me being to jury duty.

25       THE COURT: Can I confer with counsel here

```
 1    briefly?

 2              (Begin bench conference)

 3              THE COURT:  Any objection to excusing this

 4    juror?

 5              MR. SKROCKI:  No.

 6              MR. COLBATH:  No.

 7              (End bench conference)

 8              THE COURT:  I want to say at the start of the

 9    day the microphone worked fine and the little extra

10    microphone worked fine, and it's 11:00 and here we are.

11              I am going to thank and excuse Juror No. 27 for

12    the reasons that you have articulated, and so you can be

13    excused at this time.  Thank you, sir.

14              DEPUTY CLERK:  No. 45.

15              THE COURT:  Good morning. Once you get settled,

16    if you can go ahead and answer the sheet, I'd appreciate

17    it.

18              PROSPECTIVE JUROR NO. 45:  I am Juror 45.  I

19    live in Anchorage.  I have been a resident for 46 years.

20              My occupation is a licensing worker for Office

21    of Children's Services.  I have been doing that for four

22    months.  Before that, I worked for 20 years for Catholic

23    Social Services.  I have my bachelor's and halfway to my

24    master's in social work.

25              I'm married.  My husband works for the
```

Anchorage Pioneer Home. We have two children, two adult children. One is a freshman in college and the other works in public relations. Hobbies, clubs or organizations: We like to camp and travel.

My husband is a gun owner. I get my news from the internet. No military service.

I've served on three juries, one criminal -- two criminal, one civil. Criminal case, a verdict was reached. Another criminal, it was a mistrial. The civil case was settled. I was not the foreperson. And I have served on a grand jury. And there is no reason I should not serve on this jury.

THE COURT: All right. Thank you. So we're going to pick up with Ms. Stevens was in the middle of her questions about five to seven more minutes, so go ahead, Ms. Stevens, whenever you're ready.

MS. STEVENS: Thank you, Your Honor. Just one last question for the group. Before I switched over to the prior questions from No. 42, which are now moot, we talked about some social media stuff. So just want to get back into that just a little bit.

So who here while they have been here serving as prospective jurors have actually posted status updates online? Just a couple. Let's start with 35. So ma'am, if you can just give us an idea of what those

1    updates were in regard to.

2          PROSPECTIVE JUROR NO. 35:  It was just in

3    reference to the accident today.  It was just generic so

4    I can let all my family members know instead of getting

5    individual phone calls.

6          MS. STEVENS:  Thank you.  No. 15, did I see --

7          PROSPECTIVE JUROR NO. 15:  No.

8          MS. STEVENS:  Anybody else?

9          PROSPECTIVE JUROR NO. 18:  Yesterday I just

10   mentioned that I was in jury duty.

11         MS. STEVENS:  That was posted like on social

12   media?

13         PROSPECTIVE JUROR NO. 18:  Yes.

14         MS. STEVENS:  Can you tell us what you posted?

15         PROSPECTIVE JUROR NO. 18:  This is a lot more

16   boring than Law and Order.

17         MS. STEVENS:  Okay.  Great.  Thank you.  And

18   then anybody else?

19         PROSPECTIVE JUROR NO. 20:  Does that include

20   texts, or are you talking about posting to the --

21         MS. STEVENS:  More publicly, unless it's like a

22   large group text.  Was it about the case?

23         PROSPECTIVE JUROR NO. 20:  It was not about the

24   case.  It was about sitting and waiting.

25         MS. STEVENS:  I think I saw No. 69.  Can you

1   pass that all the way down to the end, please?

2           PROSPECTIVE JUROR NO. 69:  Yes, I have posted

3   just in regards to being on a jury, not in direct

4   regards to the contents of the case.

5           MS. STEVENS:  Okay.  Was it as entertaining as

6   No. 18's?

7           PROSPECTIVE JUROR NO. 69:  Not at all.

8           PROSPECTIVE JUROR NO. 70:  All I posted before

9   I even came was just "jury duty."  That's all I posted.

10          MS. STEVENS:  Did I see one more hand over

11  here?

12          PROSPECTIVE JUROR NO. 16:  In my case, it

13  wasn't social media, just texts letting the youngins

14  know that I'm still here, still alive.

15          MS. STEVENS:  Your Honor, those are all the

16  questions I have.

17          THE COURT:  Mr. Colbath, whenever you're ready.

18          MR. COLBATH:  So how many of you -- I presume

19  everybody heard when Judge Gleason announced yesterday

20  the nature of the case, right, the charges, those

21  things.  Anybody did not hear that?  Okay.

22          How many of you felt that?  Not heard it, but

23  felt something physically when you heard it was a double

24  homicide case involving what it involves?

25          We'll just start on this end and I guess work

```
 1   our way around that way.  So I'll just ask the feeling,
 2   not -- I know everybody heard it, but the feeling.
 3            PROSPECTIVE JUROR NO. 69:  The idea that
 4   someone would kill multiple people does not sit well
 5   with me, not a good feeling.  Going to lunch was not an
 6   enjoyable experience.
 7            MR. COLBATH:  Just hearing about it triggered
 8   something in you?
 9            PROSPECTIVE JUROR NO. 69:  Just hearing about
10   it.
11            MR. COLBATH:  We'll work our way this way.
12            PROSPECTIVE JUROR NO. 4:  Just kind of like
13   wow, okay, this might be interesting.
14            PROSPECTIVE JUROR NO. 45:  I just felt sad that
15   people lost their lives.
16            PROSPECTIVE JUROR NO. 37:  It was more just
17   surprise.  I wasn't expecting to hear it.
18            MR. COLBATH:  Sure.  Anybody in the front row?
19            PROSPECTIVE JUROR NO. 33:  I also felt
20   surprised, sad, wanted to understand more of what
21   happened, why, all of that.  I couldn't really have more
22   emotions until I understood more.
23            MR. COLBATH:  Sure.  Here in this group?  Do we
24   have anybody in the front row?  Okay.
25            PROSPECTIVE JUROR NO. 2:  Kind of first a tinge
```

of recognition and then sort of like that kind of cringy

feeling that came. As the day went on, it seemed more

like a responsibility and just a little overwhelmed, but

responsibility in a case like that.

MR. COLBATH: Cringy, uncomfortable?

PROSPECTIVE JUROR NO. 2: Yes, certainly.

PROSPECTIVE JUROR NO. 18: I was just surprised

because I remember reading about it in the paper and

surprised it was still going on and it hadn't been

resolved. I thought it had.

MR. COLBATH: Brought back that, oh?

PROSPECTIVE JUROR NO. 18: The shock of it. I

remember the paper and everything, and the fact that

it's been this long since it happened, I was just

surprised.

MR. COLBATH: Okay. I'll go this way for folks

that felt something.

PROSPECTIVE JUROR NO. 29: Anyway, just exactly

the same, just surprised that it hasn't been settled and

it is unnerving though, you know, in a small population

like we have.

MR. COLBATH: Say more about unnerving for me,

if you would.

PROSPECTIVE JUROR NO. 29: Well, the population

of the state, and then in a remote area, you wonder what

1   happened to cause that.

2           MR. COLBATH:  Okay.

3           PROSPECTIVE JUROR NO. 25:  I just felt sad that

4   people had lost their lives and like everyone else kind

5   of like just felt bad.

6           PROSPECTIVE JUROR NO. 16:  Just sadness for

7   both parties, for all included.  The ones who lost their

8   lives and the ones that are involved and their families,

9   what hardship they will have to go through.  So it's

10  just sadness in both sections.  It seems like a really

11  tough road for both families.

12          MR. COLBATH:  You said "both," and you're

13  referring to both of the gentlemen that were killed as

14  well as both of those families?  Is that the "both" that

15  you're referring to?

16          PROSPECTIVE JUROR NO. 16:  No.  I also mean

17  Mr. Wells, everything him and his family must have gone

18  through and is going through as well as the people that

19  lost their lives and their families.

20          MR. COLBATH:  Say more about -- certainly it's

21  understandable to me about sadness or feeling for the

22  folks that have lost their lives.  That's obvious to me.

23  Say more, if you will, about your feelings for Mr. Wells

24  or this side of the courtroom.

25          PROSPECTIVE JUROR NO. 16:  Every action has a

1   reaction.  And we had someone in the family that did a

2   burglary, it's a cousin, way back in Tennessee, and I

3   just remember what we all went through.  It wasn't just

4   Mr. Wells, but our family went through trying to cope

5   with what had happened.

6          And so when I hear about this, I also -- you

7   think about not just the family that was hurt, but he

8   also and his family.  I'm not explaining very well, am

9   I?

10         MR. COLBATH:  As the judge has said a number of

11  times, there is no right or wrong answer, and I

12  understand.  That helps me.

13         PROSPECTIVE JUROR NO. 43:  I felt surprised.

14  Like I heard it in the news at the time and recognition

15  of the case.  And then just the weight of it, the

16  gravity of it, the seriousness of it, because up to that

17  point you're not really sure why you're here, and all of

18  a sudden you realize why you're here.

19         MR. COLBATH:  It's not a car theft?

20         PROSPECTIVE JUROR NO. 43:  Correct.  I have

21  been on jury duty before for a theft case.  I realized

22  the gravity, the seriousness of the situation, what

23  you're asked to do, decide someone's fate.  It's a big

24  deal.

25         MR. COLBATH:  Sure.  Thank you.  Did I miss

1  anybody?

2          PROSPECTIVE JUROR NO. 23:  I guess I just felt

3  a sense of heaviness when I -- when it was announced

4  what the case is.

5          MR. COLBATH:  The same as Juror 43, that

6  heaviness, that weight of we really couldn't get much

7  more serious, could we?

8          PROSPECTIVE JUROR NO. 23:  Exactly, yes.

9          MR. COLBATH:  Thank you.

10          PROSPECTIVE JUROR NO. 44:  Kind of like 18

11  there, I was surprised it hasn't been resolved already,

12  but I remember when I read about it, it just seemed like

13  a mystery, because it was like how -- it wasn't a

14  robbery.  It was two young men, you know, and on Kodiak

15  island.  I was like what's going on there.  So yeah.

16          MR. COLBATH:  Surprise?

17          PROSPECTIVE JUROR NO. 44:  Surprise.

18          MR. COLBATH:  Now did we get everybody?  Okay.

19  So like hearing the charges, make me sure that you all

20  heard one of the things -- early on I think one of the

21  things that Judge Gleason said was that Mr. Wells is

22  presumed innocent, and she read the instruction or the

23  sort of standard language on that.  First of all, was

24  there anybody who had not heard the term "presumed

25  innocent" or realized in a criminal case people are

presumed innocent before Judge Gleason told you about
that?  That was not unfamiliar to any of you, I presume?
Okay.

         And everybody heard her say that that's
certainly the case in this case, right?  So help me
understand how we do that given the weight and the
cringy feeling of a double homicide case and whatnot,
because it's pretty easy in some situations, but it's
not human nature, I think.

         And the more serious it seems the harder in my
experience, and I was wondering if that is any of your
experiences.  Or have you thought about that?  Who would
be willing to share with me about whether or not that's
going to be difficult in a --

         PROSPECTIVE JUROR NO. 65:  I think honestly --
I think for anybody when you're dealing with something
of this level of gravity, it puts more pressure on you,
but I don't think it's impossible for many people to
separate themselves enough from the situation to
recognize that for something that's this important you
need to take it seriously and that means trying to be
impartial.  I think that there is a way to do that, a
way to separate yourself from it enough to try to make
sure that the correct decision is made, not just a
decision based on emotion.

1      MR. COLBATH:  Everybody heard that?  Do we

2  agree with that?  Is there people that feel different,

3  feel the same?

4      PROSPECTIVE JUROR NO. 65:  I'm 65.

5      MR. COLBATH:  Thank you, sir.  Let me just ask:

6  You talked about evaluating -- given the seriousness, we

7  have to work hard to be impartial and sort of go the

8  extra mile to make sure, given the gravity, that we're

9  serious.  I don't want to put words in your mouth, but

10  did I summarize that right?

11      PROSPECTIVE JUROR NO. 65:  Yes, that's correct.

12      MR. COLBATH:  Is having to do that -- because

13  normally, not that we wouldn't follow the rules, but

14  normally just in our everyday life, outside the

15  courtroom, we don't start solving problems by presuming

16  things innocent, right, by presuming one way or the

17  other necessarily things that we don't know about.

18      So that does take work.  Is there anybody that

19  operates in their normal daily life and when you're

20  confronted with a problem -- we all make judgment calls

21  or decisions every day.

22      Is there anybody in their normal life that

23  that's how they start their decision-making, did

24  somebody do something or not, did something happen or

25  not, by starting with a strictly one-sided presumption

1   and working the other way?  Who in their life starts

2   like that?

3           PROSPECTIVE JUROR NO. 21:  My son, for example,

4   if something is broken, automatically, he's the one I

5   lead to without any proof.

6           MR. COLBATH:  Do I remember that you have

7   several kids, including a couple that are less well

8   behaved than others?

9           PROSPECTIVE JUROR NO. 21:  Yes.  Also, that is

10  another thing that I forgot to mention in my original

11  thing.  I do have two stepchildren.  The stepdaughter is

12  -- I didn't mention.  I have a total of two step and

13  three biological.  Yes, the one step is a rule breaker.

14          MR. COLBATH:  All right.  And so in your house,

15  as opposed to court, some enjoy better presumptions than

16  others it sounds like?

17          PROSPECTIVE JUROR NO. 21:  Yeah.

18          MR. COLBATH:  And your son does not get the

19  benefit of being presumed innocent, even though it may

20  not -- this time around he may not be the responsible

21  party?

22          PROSPECTIVE JUROR NO. 21:  Well, because of the

23  age gap, right now, he's the only one there.  It's

24  either him or the dog.  But in the past, yes, I

25  automatically went to the one that was naughty to assume

1  that had done the wrong.

2          MR. COLBATH:  And that's because of your

3  experience?

4          PROSPECTIVE JUROR NO. 21:  Right.

5          MR. COLBATH:  A little bit of human nature of

6  just knowing the way your world operates?

7          PROSPECTIVE JUROR NO. 21:  Uh-huh.

8          MR. COLBATH:  Specific past experience with him

9  and whatever the situation was?

10          PROSPECTIVE JUROR NO. 21:  Right.  Yes.

11          MR. COLBATH:  Does everyone agree that that's

12  sort of how in normal affairs we operate?  So I want to

13  go back to my question to see if anybody will, besides

14  Juror 65 here, share with me.

15          How hard is it in a case, in a double homicide

16  case to not instantly -- I mean I assume there is a

17  reason Juror 16 feels a little bit of compassion for

18  Mr. Wells, but that's also some -- to feel that, there

19  has got to be some belief that there is something other

20  than him sitting here to feel compassionate for.  How

21  many felt that?

22          PROSPECTIVE JUROR NO. 44:  Well, it would be

23  one thing if you were caught with a smoking gun, but on

24  the other hand, to be falsely accused is, to have been

25  there, and it's like she was saying she presumed that he

1   was the one, but when he wasn't, but he's accused of it,

2   then that's where I feel compassion for him.  Because

3   you know, it's like I didn't do it and nobody believes

4   you.

5           MR. COLBATH:  It would certainly be horrendous

6   to have committed a double homicide, right, but --

7           PROSPECTIVE JUROR NO. 44:  Yeah.  I was going

8   -- I couldn't imagine what the two up there at the radio

9   station at work, young, I think they were 18 or 20,

10  could have done that would have justified being killed.

11          MR. COLBATH:  That would be terrible.

12          PROSPECTIVE JUROR NO. 44:  It would be like a

13  random just drive-by shooting for no reason, and that's

14  -- I find that difficult to fathom.

15          MR. COLBATH:  As difficult as that would be to

16  fathom, how difficult is it to fathom sitting in that

17  chair being falsely accused of that thing?

18          PROSPECTIVE JUROR NO. 44:  Yeah, just the same.

19  Yeah.

20          MR. COLBATH:  How about that?  Who agrees that

21  that is equally almost as difficult as being responsible

22  for it is being wrongly held responsible for it?

23          So I'm going to try one last time, because

24  that's where I find myself when I -- I always sit at

25  this table, not that table.  And so I know the rule is

always presume my client innocent, but the problem

always is it's not the way it works.

          And so when it is this heavy and serious,

that's my concern.  And I want to make sure that you

just didn't hear the judge's instruction and say, "Oh,

yeah, the presumption of innocence, I have heard that

before I know that," but that I have thought about it

knowing both those things.  It's this kind of case.  And

that's my duty.

          It's that, I think you not only described

uncomfortable, but the responsibility level just went

way up.  And I want to make sure everybody can assure

all of us that we're going to follow that.

          Okay.  That our original reaction to just react

was one thing, but that you have all thought about that

more.  Okay.

          Two other quick subjects, if I can get to them.

How many have had a serious medical condition where you

had to -- I don't need the details of the medical

condition -- but where you had to have surgery that you

took a week or more off work, or you had an illness that

put you down for a week or more or had to go through

some recovery, things like that, or a close family

member?

          Oh, so I don't know how I can follow up.  I'm

1  not even going to try to follow up on that.  How many

2  two weeks or more?

3          How many had recurring, either leading up to

4  that, were sick for a while or bad symptoms or coming

5  out of it, it took longer than you wished to recover or

6  had complications or conditions that lingered?  Keep

7  your hands up for a minute just so I can -- hopefully my

8  team is taking notes because I have no way to talk to

9  all of you at one time.  Troublesome, yeah.

10         Then I'm going to just go to another topic.

11 Show me again, because I know you all read, but I don't

12 have my notes obviously, the folks who either own guns

13 themselves or have lived with somebody -- have guns in

14 your household.

15         Once again, I don't have a chance -- how many

16 have handguns?  I can't visit with you all, so I'm going

17 to randomly pick just a few folks.  Share for me just

18 the reason, in a word or two, the reason that you have

19 guns, hiking, self/home protection, bears, love guns,

20 whatever the answer is.  Just anybody willing to share

21 for me.

22         No. 14.  Sir, I haven't talked to you yet.

23         PROSPECTIVE JUROR NO. 14:  I got handguns,

24 shotguns, rifles, stuff like that.

25         MR. COLBATH:  The handguns are for?

1          PROSPECTIVE JUROR NO. 14:  I usually carry it

2     out when I'm riding my dirt bike, snow machining.  I

3     shoot ptarmigan, stuff like that, me and my boys.

4          MR. COLBATH:  Somebody else in this row while

5     we've got the microphone.

6          PROSPECTIVE JUROR NO. 53:  My husband and I

7     both have guns, mostly for target shooting.  When my

8     husband goes fishing, he carries his down river.  I very

9     rarely even touch them.

10          MR. COLBATH:  Anybody here farther over?  Sir,

11     let's go all the way to the end if I could.

12          Juror No. 62, down there on the Peninsula,

13     probably to protect the garden I'm going to say.

14          PROSPECTIVE JUROR NO. 62:  I own several guns,

15     mainly for hunting and for home defense.

16          MR. COLBATH:  Handguns as well?

17          PROSPECTIVE JUROR NO. 62:  Long guns, no

18     pistols.

19          THE COURT:  About one more minute, Mr. Colbath.

20          MR. COLBATH:  I'll conclude with this:  I hate

21     to make you run around, but let's try a couple of these

22     folks over here.  Juror 12, I saw you raise your hand.

23          PROSPECTIVE JUROR NO. 12:  I have both long

24     guns, shotguns, handguns.  I carry the handguns for bear

25     protection.  I have done some hunting in the past.

```
 1            MR. COLBATH:  I saw the article the other day
 2   that the gentleman in Kincaid Park had to shoot a moose
 3   that came after him with his little boy, so carry them,
 4   similar-type reasons when you're out and about in the
 5   woods?
 6            PROSPECTIVE JUROR NO. 12:  Yes.
 7            MR. COLBATH:  Did I see you, sir, raise your
 8   hand?
 9            PROSPECTIVE JUROR NO. 60:  You didn't, but I'll
10   answer.
11            MR. COLBATH:  Out there in Willow, right?
12            PROSPECTIVE JUROR NO. 60:  Out in Willow, and,
13   yes, I do carry a gun every time I go on my walks in the
14   morning with my dog for bear protection, and I also have
15   handguns for basically protection of others.
16            MR. COLBATH:  So not only if you get in
17   trouble, but if you're around and somebody else is in
18   apparent trouble?
19            PROSPECTIVE JUROR NO. 60:  That's the main
20   thing.
21            MR. COLBATH:  One person from the back row if
22   somebody wants to volunteer.  I'm going to do two of
23   you.
24            PROSPECTIVE JUROR NO. 4:  For Constitutional
25   reasons and then my husband is a hunter.
```

1          MR. COLBATH:  I love that answer.  Let's go to

2     Chickaloon, Juror No. 37.

3          PROSPECTIVE JUROR NO. 37:  I have long guns for

4     hunting, as well as pistols that I carry and handguns.

5     Mostly because I live in Chickaloon.  My driveway is a

6     wildlife refuge.

7          MR. COLBATH:  I assumed living in Chickaloon

8     that was going to be the answer.  Thank you.

9          I guess I asked too easy of a question as far

10    as topic, because there's too many answers.  My time

11    prohibits me from going any further, and I appreciate

12    everybody's answers to those questions I had.

13         Thank you, Your Honor.

14         THE COURT:  All right.  Thank you.

15         Pass for cause?

16         MR. COLBATH:  To this group of 36, yes.

17         THE COURT:  Pass for cause?

18         MR. SKROCKI:  Yes.

19         THE COURT:  So ladies and gentlemen, what we're

20    going to do is the following:  Each side has the right

21    to exercise what we call peremptory challenges, and I'm

22    going to give each of these teams an opportunity to

23    discuss among themselves what they are going to do in

24    that regard and then have you back in.  And at that

25    point, I'm going to thank and excuse everybody but the

16 jurors that will be on the case.

Before I do all of that, is there anybody that thought of something else that they wish they had told us yesterday? I know we got the additional children, yes. And this is your last chance to do so.

PROSPECTIVE JUROR NO. 21: One more thing. Also, I forgot to put in another place that I fill in sometimes, which is Family First Treasure Thrift Store in Palmer. That's all.

THE COURT: And if you can pass the microphone down.

PROSPECTIVE JUROR NO. 20: I said I worked for Conoco, which I do, but I'm actually contracted out to Conoco, so my actual employer is Bergaila Engineering.

THE COURT: Thank you. I think there were a few in the back that had additional points to be raised.

PROSPECTIVE JUROR NO. 18: I'm sorry to bring this up. My situation changed from yesterday. And my employment where I work at, they had lost a counselor, and there is no way they can cover me for the next month. I have weekly clients, things of that nature.

So I'm sorry I didn't bring it up sooner, but it happened. I found out yesterday.

THE COURT: All right. Hold that thought. Anybody else?

1          PROSPECTIVE JUROR NO. 15:  My dad was a cargo

2     master in the Air Force.  I forgot to mention that.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR NO. 44:  My father was a

5     major in the Air Force, F-4 pilot, 22 and a half years.

6     I had forgot to mention his military service.

7          THE COURT:  That's fine.  Anybody else?  All

8     right.  Then why don't I have a brief sidebar before we

9     excuse you all.

10          (Begin bench conference)

11          THE COURT:  Juror No. 18.

12          MR. SKROCKI:  Move for cause.

13          MR. COLBATH:  I have the same concerns that I

14     did last time and would object.

15          THE COURT:  Well, this is more now he's raised

16     the hardship, which in any event, I will grant the

17     motion.  I do see, first of all, as I understand it, I

18     did not specifically instruct not to post and posting he

19     had jury duty, It's not on that basis, but I do find

20     that the hardship that he raised with regard to his

21     employment is similar to the other individuals that I

22     did excuse.  And we still have a few more people

23     remaining in the back, so I will grant that.  And we'll

24     excuse him and have somebody come in, we can do quickly,

25     and go through the sheet.  And then I'll give you each

1    two or three minutes with that one individual.

2          MR. COLBATH:  Just any follow-up to anything we

3    asked?

4          THE COURT:  Yes.

5          (End bench conference)

6          THE COURT:  All right.  I am going to thank and

7    excuse Juror No. 18 because of his work situation that

8    has changed, so Juror No. 18 is excused.  That would

9    have our courtroom deputy draw one more name.

10          DEPUTY CLERK:  Juror No. 58.

11          PROSPECTIVE JUROR NO. 18:  Sorry for the

12    inconvenience.

13          THE COURT:  That's fine.

14          All right.  Juror No. 58, do you have a sheet

15    of paper with the questions on it?

16          PROSPECTIVE JUROR NO. 58:  I am Juror No. 58.

17    I have lived in Anchorage, Alaska for the last 29 years.

18          I have worked for Providence for the last seven

19    and a half years as general customer service.  I have a

20    bachelor's degree.

21          I am divorced with no children.  I enjoy

22    outdoor recreation, baking, traveling, training my dog

23    to be a therapy animal.  I am a gun owner.  I generally

24    get my news from local websites, but I'm generally part

25    of the crowd that I avoid the news.

```
 1          Let's see.  I have never served in the
 2   military.  I have previously been called for jury
 3   service, but I was not needed.  And I have no reasons
 4   why I cannot serve.
 5          THE COURT:  Thank you.  I'm going to allow each
 6   of the lawyers -- each side, not all the lawyers, to ask
 7   you a few questions.
 8          Ms. Stevens, questions of this juror?
 9          MS. STEVENS:  No questions, Your Honor.
10          THE COURT:  Mr. Colbath, go ahead.
11          MR. COLBATH:  Just briefly.  Thank you.  You
12   were that close to making it, just almost out of here.
13          First of all, you were able to hear the
14   questions that I asked of this group?
15          PROSPECTIVE JUROR NO. 58:  Yes, sir.
16          MR. COLBATH:  Feelings about the significance
17   of our situation here?
18          PROSPECTIVE JUROR NO. 58:  I had no initial
19   reaction.  I'm kind of looking at this objectively.  My
20   civic duty is to be here neutrally and determine things
21   based on evidence presented to me.
22          MR. COLBATH:  Handguns or long guns?
23          PROSPECTIVE JUROR NO. 58:  I have a handgun
24   that I generally use as target practice, fun, and
25   secondarily, as the option of home defense.
```

1          MR. COLBATH:  Medical conditions in your life

2    that have caused you -- extended illnesses or missing

3    work, surgeries kind of thing?

4          PROSPECTIVE JUROR NO. 58:  Personally, no.

5    Direct family, yes.

6          MR. COLBATH:  They were direct enough that you

7    watched that go on or experienced some of that or were

8    aware of how it happened?

9          PROSPECTIVE JUROR NO. 58:  Yes, sir.

10          MR. COLBATH:  No further questions of her.

11    Thank you, ma'am.

12          THE COURT:  Pass for cause?

13          MR. SKROCKI:  Yes.

14          MR. COLBATH:  Yes, Your Honor.

15          THE COURT:  Very good.  Then ladies and

16    gentlemen, what I'm going to do is take, I know didn't I

17    say 11:00 I would excuse you and I was inaccurate,

18    because I'm going to send you out here for about

19    20 minutes.  And then when we come back, I will thank

20    and excuse everybody except for the individuals that are

21    going to serve on the jury.

22          And so if you could go back to jury assembly.

23    Remember my admonition not to discuss the case or do any

24    research during this break, and we'll have you all back

25    in 20 minutes.

1          I'll come back in 10 or 15 and do peremptories

2     on the record in about 10 to 15 minutes.

3          (Prospective jurors absent)

4          THE COURT:  Please be seated, everyone.  Just

5     to run through the peremptory challenge.  So we have got

6     36 people that have been passed for cause, so the

7     government has a total of eight peremptory challenges,

8     the defense has a total of 12, because there are four

9     alternates that I'll be seating.

10          And so that will, assuming they are all

11     exercised, end us up with 16.  If you don't exercise all

12     of your peremptories, then we would excuse the last

13     number, whoever was in seat 36.  So we should get those

14     numbers, 36, 35, 34.

15          DEPUTY CLERK:  Say that one more time.

16          THE COURT:  Whoever is in seat 36 is who I

17     would excuse if a party does not exercise all of its

18     peremptory challenges.  And then 35.  So who would those

19     three, last three be?

20          DEPUTY CLERK:  So seat 36 is Juror No. 23.

21          THE COURT:  23.

22          DEPUTY CLERK:  And then 35 is Juror No. 44.

23     And then juror 34 would be Juror No. 66.

24          THE COURT:  Are you in agreement there?

25          MR. COLBATH:  So it's not the last folks that

were called?

THE COURT: It's the seat, the last seat that was called. So everybody clear on that? It's not this one that was just called, because she wasn't called for seat 36, so it's 36, 35, 34.

So those are -- we can go back further if need be, but that is the order that I would do it if the challenges are not all exercised. The way I do them is not simultaneous. I begin with the defense because the defense has more, so you will exercise one on the record. Then the government. Back and forth, until the government has used its eight or has indicated not to. And then the defense can exercise its remaining.

MR. COLBATH: Once we pass, we pass for good?

THE COURT: You're done, yes.

MR. SKROCKI: It's very clear, Judge.

THE COURT: I'm trying to think how else you would do it. Once you pass, then if you pass and you're at ten, then I'm going to excuse 36 and 35, assuming the government used all eight. Clear on that?

Very good. Let's take a short break, and no more than ten minutes, please. We'll go off record.

DEPUTY CLERK: All rise. Court stands in a brief recess.

(Recessed from 11:05 a.m. to 11:20 a.m.)

1          (Prospective jurors absent)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3  the United States District Court is again in session.

4          Please be seated.

5          THE COURT:  All right.  We're back on record

6  without the jury present.  And we are going to do

7  peremptory challenges beginning with the defense.  Go

8  ahead, please, Mr. Colbath.

9          MR. COLBATH:  Juror 21.

10         THE COURT:  21.  So now just so we're all on

11 the exact same page -- Mr. Colbath, do you need a

12 minute?

13         So this is -- when you say 21, you're saying

14 the juror that is in seat ten, but 21, we're going by

15 the numbers on their clothing?

16         MR. COLBATH:  Right.  I don't have the first

17 idea where the seats are, Your Honor.  I am going --

18         THE COURT:  That's good.  I want to confirm

19 that we're talking 21.

20         MR. COLBATH:  The numbers on the badge is the

21 only way I have to refer.

22         MS. SHERMAN:  37.

23         THE COURT:  All right.

24         DEPUTY CLERK:  Can we slow down for just a

25 minute because I have got to find them.

1           MS. SHERMAN:  37 was in seat three.

2           THE COURT:  Don't say the seat, but I do see

3    that.  Thank you.

4           Go ahead, Mr. Colbath.

5           MR. COLBATH:  73.

6           THE COURT:  73.  Okay.

7           And for the government?

8           MS. SHERMAN:  69.

9           THE COURT:  69.  Okay.

10          For the defense?

11          MR. COLBATH:  8.

12          THE COURT:  8.

13          MS. SHERMAN:  65.

14          THE COURT:  65.

15          And Mr. Colbath?

16          MR. COLBATH:  35.

17          THE COURT:  35.

18          MS. SHERMAN:  15.

19          THE COURT:  15.

20          Mr. Colbath?

21          MR. COLBATH:  Just one second.  While we're

22    there, 16.

23          THE COURT:  16.  Okay.

24          MS. SHERMAN:  2.

25          THE COURT:  2.

1          MR. COLBATH:  29, Your Honor.

2          THE COURT:  29.  All right.

3          MS. SHERMAN:  44.

4          THE COURT:  44.

5          For the defense?

6          MR. COLBATH:  43.

7          THE COURT:  43.

8          This is number seven for the government.

9          MS. SHERMAN:  30.

10          THE COURT:  30.  Okay.

11          MR. COLBATH:  45.

12          THE COURT:  45.  All right.

13          Last one for the government.

14          MS. SHERMAN:  We have no more.

15          THE COURT:  So that would be then 23 would be

16  excused.

17          All right.  That leaves four more, up to four

18  more for the defense.

19          MR. COLBATH:  I'm sorry, Your Honor.  Could I

20  have a minute to mark that?  So Juror No. 23.

21          THE COURT:  Is excused.

22          MR. COLBATH:  Was the last, because that person

23  was sitting in that last seat?

24          THE COURT:  Correct.

25          MR. COLBATH:  So Juror No. 10.

1          THE COURT:  10.  Okay.

2          MR. COLBATH:  And 25.

3          THE COURT:  25.

4          MR. COLBATH:  I already said 45, correct?

5          THE COURT:  Correct.

6          MR. COLBATH:  So Juror No. 70.

7          THE COURT:  70.  Okay.  And one more.

8          MR. COLBATH:  If I could have --

9          THE COURT:  Take a moment.

10          MR. COLBATH:  Your Honor, what would be number

11  -- the person --

12          THE COURT:  Since 44 was challenged, I would

13  show 66, if you did not exercise anymore, would be

14  excused.

15          MR. COLBATH:  That's fine.  We'll pass or allow

16  66 to be dismissed.

17          THE COURT:  66 to be excused.  Any *Batson*

18  challenges by either party?

19          MS. SHERMAN:  No.

20          MR. COLBATH:  Additional cause?

21          THE COURT:  No, *Batson*.

22          MR. COLBATH:  No.  I'm sorry, Your Honor.

23          THE COURT:  Too late for additional cause.

24          MR. COLBATH:  That's why I was surprised at the

25  question.

1          THE COURT:  Very good.  So let's take a few

2    minutes here.  I'll get the list of the 16.  We'll make

3    sure we're all on the same page there and then have the

4    jury come back.

5          MR. COLBATH:  Your Honor, while we're doing

6    that, it is the Court's intent at the end of trial and

7    the close of all evidence to do a random, just out of

8    the box selection and dismissal --

9          THE COURT:  Sometimes the parties stipulate to

10   a certain individual if there is a problem, but absent

11   something of that nature, yes, the four would be

12   randomly drawn.

13         MR. COLBATH:  All right.

14         (Pause)

15         THE COURT:  I think I have the 16.  Do you have

16   your list?

17         DEPUTY CLERK:  Not yet.

18         (Pause)

19         THE COURT:  While she's finishing up there,

20   we're going to finish here, send people out.  It will be

21   about 11:40.

22         Then I have about ten minutes of instruction,

23   preliminary instructions to read.  And I anticipate a

24   joint motion to have openings after lunch.

25         MS. SHERMAN:  Yes, Your Honor.

1    MR. SKROCKI:  So moved.

2    MR. CAMIEL:  I'm happy to go now or after.

3    THE COURT:  All right.  Well, I think the jury

4 would probably prefer to go now and then have lunch.

5    Are you ready, Ms. Stevens [sic], could we do

6 that?

7    MS. SHERMAN:  I am, Your Honor.  We have to set

8 up the computer and those sorts of things.

9    THE COURT:  That's fine.  I mean, we're at no

10 more than 20 minutes is my recollection per side; is

11 that correct?

12    MS. SHERMAN:  You had said 30.

13    THE COURT:  Oh, did I?  Well, then say, "No,

14 that's not correct."  I stand corrected.  Up to 30.

15 Okay.  That's fine.

16    And likewise, Mr. Camiel, up to 30?

17    MR. CAMIEL:  Yes.

18    THE COURT:  All right.  Well, why don't we --

19 I'll ask the 16 people if they are ready to proceed with

20 the openings before lunch, and, if they are, we'll go

21 ahead and you could start setting up now, if that's

22 easier.

23    All right.  So I have got my list.  Do you have

24 yours?

25    DEPUTY CLERK:  Well, I do, but I'm short one.

For No. 1 I have Juror No. 33.

       Juror No. 2 would be 46.

       Juror No. 3 would be No. 20.

       Juror No. 4 would be No. 4.

       Juror No. 5 would be No. 5.

       THE COURT:  What are the odds of that.  Yes.

       DEPUTY CLERK:  Juror No. 6 would be No. 12.

       Juror No. 7 would be 51.

       Juror No. 8 would be 60.

       Juror No. 9 would be 62.

       THE COURT:  No, 54.

       DEPUTY CLERK:  54.  Okay, that's where I got mixed up.  54.

       And then 10 would be 62.

       And then 11 would be 9.

       12 would be 19.

       13 would be 63.

       14 would be No. 14.

       THE COURT:  No, 14 is 53.

       DEPUTY CLERK:  53?

       THE COURT:  So 13 is 63.  14 is 53.

       DEPUTY CLERK:  15 would be 14.

       THE COURT:  Correct.  And then 16 --

       DEPUTY CLERK:  Then the next one would be --

       THE COURT:  58.

1          DEPUTY CLERK:  -- 58.

2          THE COURT:  And that's it.  Did everybody hear

3    that list?  Concur?

4          DEPUTY CLERK:  And then No. 23 would be excused

5    for cause, or just not used.

6          THE COURT:  23 and 66 were not used.  Agreed?

7    Did you hear those numbers?  Do you need to hear them

8    again?

9          MS. STEVENS:  We agree, yes, ma'am.

10         THE COURT:  Mr. Colbath, did you hear those or

11   do you need to hear them again?

12         MR. COLBATH:  No, I heard them.  I was just

13   checking them off, but I agree.

14         THE COURT:  So that's our jury then.

15         DEPUTY CLERK:  I'll type up a list.

16         THE COURT:  We can bring them back and they can

17   sit in the back.

18         MR. SKROCKI:  Your Honor, Madam Clerk, do you

19   mind if I move the podium into the well?

20         DEPUTY CLERK:  Yes, that's fine.

21         THE COURT:  Oh, that podium.  That one is fine,

22   yes.

23         (Pause)

24         MS. SHERMAN:  For the Court's information, I

25   provided a copy of my PowerPoint to counsel yesterday,

1    and he just told me, "I have no objections."

2              THE COURT:  Very good.

3              (Prospective jurors present)

4              THE COURT:  Go ahead and have a seat anywhere

5    in the back, ladies and gentlemen.  I'm going to call up

6    16 names here in just a moment.  Please be seated

7    everyone else too here.

8              Well, the lawyers have exercised the peremptory

9    challenges, and so, at this point, I'm going to call

10   forward 16 numbers which will be the trial jury in this

11   case.  And then I will thank and excuse the rest of you

12   who have been such really great participants in this

13   process.

14             All right.  I will call forward first Juror 33.

15   You can make your way forward.  It's like an instant

16   promotion.  You're now Juror No. 1.

17             Juror 46.

18             Juror 20.

19             Juror 4.

20             Juror 5.

21             Juror 12.

22             Juror 51.

23             Juror 60.

24             Juror 54.

25             Juror 62.

1          Juror 9.

2          Juror 19.

3          Juror 63.

4          Juror 53.

5          Juror 14.

6          And Juror 58.

7          And that will constitute the trial jury here.

8     And I am going to thank and excuse everybody in the back

9     of the courtroom for your participation in this process.

10          As you know from what I have said to other

11     individuals, you can get a letter from our jury clerk if

12     you need it.  You are a key part of our justice system.

13     Thank you, all.  And you may all be excused.  And you're

14     free to talk about the case and/or research.  Google

15     away, as they say.

16          Please be seated, everyone.  Thank you.

17          All right.  Ladies and gentlemen, well, you are

18     going to be the trial jury in this case.  A couple of

19     housekeeping matters.  First of all, if anybody has back

20     issues or for whatever reason seeks to stand at any

21     time, that's absolutely fine.  You can let Caroline know

22     during a break and she can put you in the back row so

23     you won't block, but some people are more comfortable

24     standing sometimes and that's fine.

25          I also noted we have these hearing assistive

devices any of you are welcome to try at any time.  I
want you all to be as comfortable as possible, so if at
any time somebody needs a break for any reason, just
raise your hand.  If I don't see it, feel free to speak
up and say, "Excuse me, Judge," and we'll make sure that
you have -- that you're as comfortable as possible.

With all of that said, I'm going to go ahead
and ask the courtroom deputy here to administer the oath
to you.  So Madam Clerk?

(Oath administered to the jury)

THE COURT:  So ladies and gentlemen, I'm going
to read a number of instructions to you.  At the end of
the case, I'm going to have more instructions and you'll
get a copy of them at that time.  These instructions are
much briefer, and I won't be giving you out a copy but
simply have you listen along with me.

And then after we're done with that, which is
about 10 to 15 minutes, it will be close to noon.  And
your first issue to decide is the lawyers are then going
to do opening statements.  And we could either, if
everybody is ready to go, do that before lunch break and
take a later lunch, or take your lunch break then.  So
ponder that as well, but first I'm going to read these
instructions to you.

You're now the jury in this case, and I want to

take a few minutes to tell you something about your
duties as jurors and to give you some preliminary
instructions.  At the end of the trial, I'll give you
more detailed instructions that will control your
deliberations.

When you deliberate, it will be your duty to
weigh and to evaluate all the evidence received in the
case, and, in that process, to decide the facts.  To the
facts as you find them, you will apply the law as I give
it to you whether you agree with the law or not.  You
must decide the case solely on the evidence and the law
before you.

Perform these duties fairly and impartially.
Do not allow personal likes or dislikes, sympathy,
prejudice, fear or public opinion to influence you.  You
should also not be influenced by any person's race,
color, religion, national ancestry or gender.

This is a criminal case brought by the United
States government.  The government charges the defendant
with murder in the first degree in violation of 18
U.S.C. Sections 1111 and 7 with murder of an officer or
employee of the United States in violation of 18 U.S.C.
Sections 1111 and 1114, and with using and carrying a
firearm during and in relation to a crime of violence in
violation of 18 U.S.C. 924.

The charges against the defendant are contained in the indictment. The indictment simply describes the charges the government brings against a defendant. The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant has the right to remain silent and never has to prove innocence or present any evidence.

The evidence you are to consider in deciding what the facts are consist of:

One, the sworn testimony of any witness.

Two, the exhibits which are received in evidence.

And three, any fact to which the parties agree.

The following things are not evidence and you must not consider them as evidence in deciding the facts of the case:

One, statements and arguments of the attorneys.

Two, questions and objections of the attorneys.

Three, testimony that I instruct you to disregard.

And four, anything you may see or hear when the court is not in session, even if what you see or hear is

done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence. That is it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It's for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit in evidence and a lawyer on the other side thinks that it's not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

One, the witness's opportunity and ability to see or hear or know the things testified to.

Two, the witness's memory.

Three, the witness's manner while testifying.

Four, the witness's interest in the outcome of the case, if any.

Five, the witness's bias or prejudice, if any.

Six, whether other evidence contradicted the witness's testimony.

Seven, the reasonableness of the witness's testimony in light of all the evidence.

And eight, any other factors that bear on believability.

The weight of the evidence as to a fact does

1   not necessarily depend on the number of witnesses who

2   testify about it.  What is important is how believable

3   the witnesses are and how much weight you think their

4   testimony deserves.

5          I'll now say a few words about your conduct as

6   jurors.  First, keep an open mind throughout the trial

7   and do not decide what the verdict should be until you

8   and your fellow jurors have completed your deliberations

9   at the end of the case.

10          Second, because you must decide this case based

11  only on the evidence received in this case and on my

12  instructions as to the law that applies, you must not be

13  exposed to any other information about the case or to

14  the issues it involves during the course of your jury

15  duty.

16          Thus, until the end of this case or unless I

17  tell you otherwise, do not communicate with anyone in

18  any way and do not let anyone else communicate with you

19  in any way about the merits of the case or anything to

20  do with it.  This includes discussing the case in

21  person, in writing, by phone or electronic means, via

22  e-mail, via text messaging or any internet chat room,

23  blog, website or application, including but not limited

24  to Facebook, YouTube, Twitter, Instagram, LinkedIn,

25  Snapchat, or any other form of social media.

1          This applies to communicating with your fellow

2     jurors until I give you the case for deliberation, and

3     it applies to communicating with everyone else,

4     including your family members, your employer, the media

5     or press, and the people involved in the trial.

6          Although you may notify your family and your

7     employer that you have been seated as a juror in the

8     case and how long you expect the trial to last.  But if

9     you are asked or approached in any way about your jury

10    service or anything about this case, you must respond

11    that you have been ordered not to discuss the matter,

12    and you should then report that contact to the Court.

13         Because you will receive all of the evidence

14    and legal instruction you properly may consider to

15    return a verdict, do not read, watch or listen to any

16    news or media accounts or commentary about the case or

17    anything to do with it.  And also, do not do any

18    research, such as consulting dictionaries, searching the

19    internet or using other reference materials.  And do not

20    make any investigation or in any other way try to learn

21    about the case on your own.

22         Do not visit or view any place discussed in the

23    case.  And do not use internet programs or other devices

24    to search for or view any place discussed during the

25    trial.

1        Also, do not do any research about this case,

2   the law or the people involved, including the parties,

3   the witnesses or the lawyers until you have been excused

4   as jurors.  If you happen to read or hear anything

5   touching on this case in the media, please turn away

6   from that and report that contact or your exposure to

7   that as soon as possible.

8        These rules protect each party's right to have

9   this case decided only on evidence that has been

10  presented here in court.  Witnesses here in court take

11  an oath to tell the truth and the accuracy of their

12  testimony is tested through the trial process.

13       If you do any research or investigation outside

14  the courtroom or gain any information through improper

15  communications, then your verdict may be influenced by

16  inaccurate, incomplete or misleading information that

17  has not been tested by the trial process.

18       Each of the parties is entitled to a fair trial

19  by an impartial jury, and if you decide the case based

20  on information not presented in court, you'll have

21  denied the parties a fair trial.

22       Remember you have taken this oath to follow the

23  rules, and it is important that each of you do so.  A

24  juror who violates these restrictions jeopardizes the

25  fairness of these proceedings.  So if any juror is

1    exposed to outside information, please notify the Court

2    immediately.

3          At the end of the trial, you will have to make

4    your decision based on what you recall of the evidence.

5    You will not have a written transcript of the trial, so

6    I urge you to pay close attention to the testimony as

7    it's given.

8          If you wish, you may take notes to help you

9    remember the evidence.  If you do take notes, please

10   keep them to yourself until you and your fellow jurors

11   go to the jury room to decide the case.  Do not let note

12   taking district you from being attentive.  When you

13   leave court for recesses, your notes should be left in

14   the courtroom.  No one will read your notes.

15         Whether or not you take notes, you should rely

16   on your own memory of the evidence.  Notes are only to

17   assist your memory.  You should not be overly influenced

18   by your notes or those of your fellow jurors.

19         The next phase of the trial will soon begin

20   here.  And first, each side may make an opening

21   statement.  An opening statement is not evidence.  It is

22   simply an outline to help you understand what that party

23   expects the evidence will show.  A party is not required

24   to make an opening statement.  The government will then

25   present evidence and counsel for the defendant may cross

examine.  Then if the defendant chooses to offer
evidence, counsel for the government may cross examine.

     After the evidence has been presented, I'll
instruct you on the law that applies to the case and the
attorneys will make their closing arguments.  And after
that, you will go to the jury room to deliberate on your
verdict.

     So that concludes my opening instructions,
ladies and gentlemen.  And why don't I see a show of
hands, who would seek to proceed right now with opening
statements, or have lunch?  Lunch?  All right.  You're
outvoted, and this is not unanimous.  Are you okay to
proceed?

     With that, Ms. Stevens, I understand you're
going to be --

          MS. SHERMAN:  Ms. Sherman.

          THE COURT:  I'm sorry.

          MS. SHERMAN:  That's okay.  There is a lot of
S's at this table.

          THE COURT:  I was looking at you, but said the
wrong name.


               OPENING STATEMENT BY GOVERNMENT

          MS. SHERMAN:  May it please the Court, counsel,
ladies and gentlemen of the jury.  On the morning of

1   April 12, 2012, the defendant executed a carefully

2   constructed plan.  He got up that morning.  He got in

3   his white truck.  He drove to the Kodiak airport.  He

4   got into his wife's blue SUV.  It was parked there

5   because she was out of town.

6          He drove that blue SUV up to the COMMSTA, up to

7   the rigger shop where he worked.  He entered that

8   building, and he murdered Rich Belisle and Jim Hopkins

9   with a .44 caliber revolver.

10          He got back in that blue SUV, went back to the

11  airport, got back in his white truck, drove home and

12  constructed an alibi.

13          This case takes place on the Island of Kodiak.

14  This is a map of the general area.  A big part of the

15  community in Kodiak is the Coast Guard.  There's a main

16  base.  There's quite a few Coast Guard members.  And the

17  base actually has two areas.  As you can see, there is

18  the main base, and then there is also the COMMSTA.

19          So COMMSTA is short for Communication Station.

20  You're going to here a lot of the Coast Guard witnesses

21  testify that they worked at the COMMSTA.  So there is

22  the main base and the COMMSTA, and those are the two

23  areas that you're going to hear quite a bit about.

24          In between those is the airport.  Now, if you

25  were to take West Rezanof Drive up, you're going to end

up up here.  That's where the city of Kodiak is.  If you take West Rezanof down it turns into the Chiniak Highway, and that's a residential areas known as Bells Flats, and that's going to become important as well.

The COMMSTA is small.  It's just two buildings. It's where mariners can call in distress calls and they can dispatch out assistance.  Communications, that's their primary function.

There is the main building, which is this longer white building, and you will hear that referred to as T-1.  It's the main building.  It has offices in it.  It has a lot of electronic equipment.  It also has an operations deck where there is security cameras and they are taking the calls.  All of that is in this large building.

As you can see, there is antennas, and those are maintained by the individuals who work here in the rigger shop.  It's a smaller building.  It has a lot of tools, has a lot of heavy machinery to address snow and grass and has chain saws, things to take care of and maintain the antenna fields.  It also has rigging equipment for when they had to climb the towers.

There is several security cameras.  You're going to hear about a camera right about here.  It points this way and it captures the back of the rigger

shop and a portion of the road.

          And you're going to hear about another camera
that's actually on the rigger shop itself and it points
out this way.

          This is the rigger shop.  This is the front
area.  As you can see, the antennas are still in the
background.  It has a couple garages.  You can pull in
there.  They can work on equipment in there.

          This building is where Rich Belisle and Jim
Hopkins were murdered on April 12, 2012.

          There were quite a few people who worked up in
T-1, but the group of people who worked in the rigger
shop was much smaller.  And you're going to hear me and
everyone else say rigger shop, T-2.  That's the same
building, that's this building.

          Scott Reckner was the chief and he actually had
an office up in T-1, but because of issues that were
going on with the defendant, he actually moved down and
had a desk in the rigger shop.  He was the chief.  He
was the big boss in charge of this group.

          The supervisor of the rigger shop was Jim
Hopkins.  This is him.  Jim Hopkins was a hard worker.
You're going to hear he'd work alongside his men.  He
won enlisted person of the year for the Coast Guard for
2011.

1          You will also hear about Cody Beauford who

2    worked in the rigger shop.  He was an electronic

3    technician third class, and his job was to supervise the

4    non-rates.  He was 19 years old, but he supervised four

5    individuals.  The non-rates are individuals who are new

6    to the Coast Guard.  They are often known as seamen.

7    They are brand-new, and they haven't gone to a school so

8    they haven't been given a rating yet.  And there were

9    four, and those four you're going to hear from as well.

10          The defendant worked in the rigger shop.  He

11   had worked there for a couple decades.  He was a retired

12   chief.  And the other civilian was Rich Belisle.  This

13   is Rich Belisle.  He was a civilian.  He had worked

14   there about eight years.

15          The morning of April 12, 2012 started like any

16   other morning.  Rich Belisle got up, he made his wife

17   coffee, he poured his coffee into his silver and green

18   Stanley mug like he did every day, and he rapped on the

19   window as if to say good-bye as he headed off to work.

20   He arrived in the rigger shop at 7:00 a.m.

21          The timeline in this case is going to be very

22   important.  Rich Belisle arrived at 7:00 a.m. to the

23   rigger shop and he entered through this door.  There is

24   a keycard, a swipe card required, and the first person

25   who had arrived that day, often Rich, would go in

through that door.  And then he walked around and he
unlocked this door.  And everyone who arrived after him
would enter through this door to start their workday.
He went to work on his computer in the office, started
checking his e-mail.

Jim Hopkins, the supervisor, got up like every
other morning and drove to work in his family's vehicle.
He arrived at the rigger shop at 7:08.  He entered
through that unlocked door right here.  And he was in
the Coast Guard, and, at that time, they had a blouse
and you had to roll your sleeves a certain way.  The
best place for him to do that was in the break room at
the table.

The defendant also headed to work that morning.
He drives a white truck.  It has a canopy.  It has three
windows.  You're going to hear everyone could identify
everyone else's car.  It's common in a small workplace.
You know everyone who is working there.

He headed to work.  At 6:48, he passes the main
base gate.  That's his vehicle.  We'll talk about the
time on there, but at 6:48 a.m., he passes the main base
gate, before Rich Belisle, before Jim Hopkins, and he
heads up to the COMMSTA -- or heads to the airport,
excuse me.  He passes that gate, goes to the airport,
gets in his wife's blue SUV.  And at 7:09, that blue SUV

heads towards the rigger shop. This is the camera we were talking about that looks at those back windows. That's at 7:09.

At 7:10, we know Rich Belisle was checking his e-mail for the very last time. At 7:12, Don Rudat was out for a morning walk, and at 7:12, he hears a sound that sounds like a metal grate dropping on concrete.

Between 7:10 and 7:14, Rich Belisle is shot by the defendant multiple times with a bullet lodging in his neck. And Rich is shot here in the office. Jim Hopkins is shot here. Near to the door, facing his killer, he's shot in the face.

At 7:14, that same blue vehicle heads away from the rigger shop and it returns to the airport. It parks in an area that was different from where the vehicle was initially. When his wife left town, the vehicle was closer to the Alaska Airlines area, and you will hear that that vehicle had moved.

The defendant heads home. He's seen heading into Bells Flats. He passes the main gate at 7:22. From 6:48 to 7:22 is 34 minutes that are going to become very important in this case.

He's seen at about 7:25 driving into Bells Flats. And at 7:30 he's calling Jim Hopkins, who is already dead, claiming he had a flat tire. And he

1  leaves a similar message for Scott Reckner.

2          And around the same time he's leaving these

3  voicemails, the other Coast Guard members start to show

4  up.  19-year-old Cody Beauford shows up to work, walks

5  into the rigger shop, and he sees Jim Hopkins on the

6  ground and there is a lot of blood.  And his first

7  thought is they must be playing a prank on me.  So he

8  goes to the office and he finds Rich Belisle facedown

9  and he's not moving.

10          Cody thinks this has to be a prank because it

11  can't possibly really be happening.  In fact, he meets

12  Aaron Coggins, one of the non-rates, at the door and

13  says, "Is this a prank," but it wasn't a prank.  It was

14  real.  Real blood, real gunshot wounds, and the real

15  smell of gun powder hanging in the air of the rigger

16  shop.

17          Cody Beauford calls up to T-1 for help.  And

18  the medics arrive and announce what Cody already knows,

19  both men are dead.

20          The defendant was supposed to be at work that

21  morning but he wasn't.  And when his colleagues were

22  murdered, everyone wanted to know where he had been.

23          Now, over the course of the last year, in 2011,

24  the defendant had been having issues in the rigger shop.

25  He had received a memo of expectation because he wasn't

complying with the rules.  He had received a letter of
caution relating to an investigation on the misuse of a
fuel card.  He was being counseled by his supervisors
who were trying to get him to fall in line and he was
being resistant.

During that same period of time, he was gone
for a while.  And while he was gone, Jim Hopkins and
Rich Belisle and the other rigger shop employees stepped
up and they learned to do his job, and they could do his
job without him.

In fact, just the day before the murders, there
was a conversation on the top of T-1, and you will get
to see part of that.  And the defendant makes a
suggestion on how they should run a wire and Rich
Belisle makes a suggestion as well, and the defendant's
idea is dismissed and Rich Belisle's idea chosen.

On the morning of April 12, 2012, the defendant
finally shows back up to the COMMSTA at 8:30 in his
white truck, and, at that time, he would tell anyone who
would listen his alibi.  When he arrived on scene and he
is told his colleagues are dead, his response, "I had a
flat tire."

He told the investigators his tire was low and
he turned around near the airport, and even brought a
tire with him that had a nail in it in the back of his

1  truck.

2          Now, investigators saw this blue car and one of

3  them thought maybe someone is trying to get off the

4  island.  It's Kodiak, it's small and isolated and the

5  only way to get off the island is by an airplane or the

6  ferry.  So he drives down to the airport and he starts

7  taking photos of all the blue vehicles at the airport.

8          And he finds one of those vehicles is the

9  Wells' 2001 blue Honda CR-V.  It's parked not where it

10  was on April 10th.  It's parked further away.

11          You're also going to hear that on the morning

12  of the murders that security footage you saw, they

13  looked at it and they were able to identify every single

14  vehicle that drove past that camera that morning except

15  for that blue SUV.  A lot of them are Coast Guard

16  members.  There was a guy who was going to check the

17  snow at the golf course.  Everyone is identified except

18  that blue SUV.

19          When the investigators asked the defendant to

20  explain what he was doing in that 34-minute gap, in his

21  trips past the main base gate, why it took 34 minutes

22  for him to realize his tire was low, stop, check it and

23  drive home, his response, and you will hear it, "I don't

24  have a reasonable explanation for that," and he didn't.

25          But you will hear how his explanation has

expanded and changed over time.  You're going to hear from some witnesses who weren't involved in this case initially, but who were asked to review the evidence, who were asked to do some testing.  Their job is going to be to help you interpret the evidence.

And one of those is Gary Bolden.  Gary Bolden is a tire guy.  He's going to tell you he took a look at that tire, and he's going to tell you in his opinion that nail was never driven on.

And you will hear from Brett Mills, an FBI forensic analyst, and he's going to tell you that that nail appears to have been inserted manually by a nail gun.

You're also going to hear from individuals who analyzed the video, who looked closely at those images, and they are going to tell you that the vehicle, that blue vehicle, is consistent with the Wells' 2001 blue Honda CR-V.

You're going to hear in this case about the depth of the investigation, how many interviews were done, the sheer volume of the vehicles they looked at, that they looked everywhere for the gun that the defendant had ditched.  You're also going to hear that everyone else involved in that rigger shop was able to explain what they were doing that morning in great

detail.

You're going to hear that all the evidence points to the defendant as the murderer. Now, this isn't CSI. There is not going to be bloody footprints or bloody fingerprints that tie the defendant to the murder. Like I said, you won't see the gun. But what you are going to hear is fact upon fact upon fact that overwhelmingly proves beyond a reasonable doubt that the defendant committed these murders.

At the conclusion of this case, my colleague will stand before you and he's going to explain how when you take the facts and you apply the law that the judge will give you the defendant is in fact guilty. He's guilty of the murders of Rich Belisle and Jim Hopkins. And at that point, we will ask you to find him guilty on each and every count.

Thank you.

THE COURT: Thank you, Ms. Sherman.

Mr. Camiel, do you -- are you going to go forward?

MR. CAMIEL: Yes.

THE COURT: All right. Very good.

JUROR: Can we have a short break?

THE COURT: Sure. You need a few minutes. Caroline will show you back to the jury room. We'll

1    take about five to ten minutes, Mr. Camiel, and come

2    back.  We'll go off record.

3              (Recessed from 12:13 p.m. to 12:28 p.m.)

4              (Jury present)

5              DEPUTY CLERK:  All rise.  Her Honor, the Court,

6    the United States District Court is again in session.

7              Please be seated.

8              THE COURT:  All right.  Welcome back, ladies

9    and gentlemen.

10             And Mr. Camiel, whenever you're ready.

11             MR. CAMIEL:  Thank you, Your Honor.

12                   OPENING STATEMENT BY DEFENSE

13             MR. CAMIEL:  It's been seven years.  The

14   government has had seven years to investigate Jim Wells

15   for these murders.  Seven years.

16             And what you're going to hear is that this was

17   an investigation of Jim Wells, not an investigation of

18   the murders of Jim Hopkins and Rich Belisle.  And there

19   is a difference, and you're going to hear about that

20   difference and what it means when you do a suspect-based

21   investigation, rather than an evidence-based

22   investigation.

23             And what you're going to hear is that in those

24   seven years, the government has come up with no forensic

25   evidence to connect Jim Wells to these murders, none.

1  No physical evidence to connect him to those murders.

2  No eyewitnesses.

3          You heard about this car switch at the airport.

4  There is not going to be any witness that comes in and

5  sits in that chair, because that's where the evidence

6  comes from, and tells you that Jim Wells was at the

7  airport that morning switching into his wife's car.

8          No witness that saw Jim Wells by the T-2 rigger

9  shop that morning or at the airport.  No firearm

10 connecting Jim Wells to this murder.  Now, he had

11 firearms.  He had a .44 revolver.  They tested it.  It's

12 not the firearm that fired the bullets that killed those

13 two men.  No shell casings.

14         You're going to see pictures, and I'm sorry

15 you're going to have to see them, they're graphic, that

16 show this was a very bloody crime scene.

17         And the reason you need to see them is because

18 there is no blood that connects Jim Wells to these

19 murders, not on his clothes, not in his wife's car, not

20 in his car, not in his home.  None.

21         No hair, no fiber, no DNA, no fingerprints.

22 They took his cell phone.  They looked in his computer.

23 They dug up his backyard.  They went in his septic tank.

24 They went to the landfill.  They executed about 25

25 search warrants in this case on Jim's home, many, many

times, on his vehicles.  They took swabs and swabbed the
steering wheel, the floorboards.  They vacuumed his
vehicles out.

You're going to see pictures of his truck.  He
hadn't cleaned out that truck probably since he bought
it.  They found nothing connecting him to those murders.
All of the searches over all of those years and they
came up with nothing connecting him to those murders.
But the government wasn't going to take no for an
answer.

Now, I want to talk to you about the actual
evidence in this case, not speculation, not inferences,
not guesses, not assumptions, the actual evidence.

And let's start with Jim Wells.  Now, Jim is
about 68.  I think he just turned 68.  Out of high
school, joined the U.S. Navy.  Eight years in the U.S.
Navy, honorably discharged.  Then he went over to the
Coast Guard.  Another 12 years in the Coast Guard,
became a Chief.

Had to take a medical discharge after 12 years.
He had tinnitus, a severe ringing of the ears.  He had
idiopathic anaphylaxis, which is like an allergic
reaction that made it hard for him to do his job, and so
he got a disability rating and they let him go.

But he wasn't gone long.  They wanted him back,

1 and they rehired him as a civilian in less than a year.

2 And for the next 24 years, Jim worked as an antenna

3 mechanic on Kodiak. He raised his kids there, three

4 adult kids. His wife Nancy, married 47 years. They had

5 their home in Bells Flats in Kodiak.

6 Jim had some medical problems over the years.

7 He's diabetic. He had other medical problems. But as

8 you get closer to the time 2011, 2012, particularly

9 about the summer of 2011, he started to get really sick

10 and they couldn't figure out what the problem was and he

11 started to miss lots of work.

12 By October, he's missing more and more work.

13 He's hardly there at all in November. He's not there at

14 all in December. Come January, he's back for just a few

15 days. They can't figure out what the problem is. And

16 finally in February, they figure out he's got to have

17 gallbladder removed, February of 2012.

18 February 9th is when he had the surgery. He

19 doesn't get back to work until about February 24th, just

20 a couple months before these murders. Even after he got

21 back to work, he wasn't well. He is still recovering.

22 He was on light duty.

23 And one of things you're going to hear about in

24 terms of the problems that Jim was having, both well

25 before the surgery and after the surgery, was he had

problems, gastrointestinal problems. And you will hear

a number of the employees when -- it was almost a joke,

when they talk about "where is Jim," he's always in the

bathroom for long periods of time. If you couldn't find

Jim, he was in the bathroom, both before and after the

surgery. And that becomes an important fact as we get

into the story and get into the evidence.

Let me talk for a minute about where these

murders occurred. There is no dispute that these men

were murdered. No dispute that it happened with a .44

-caliber. No dispute it was a bloody crime scene. No

dispute that it happened on April 12th.

But one of the things you need to understand

about the building where this happened, the T-2 rigger

shop, is that it was not a secure building. Now, the

T-1 building that was up the hill, you saw a picture of

it in the antenna field, that bigger building, that had

a fence around it, a security gate.

But the T-2 building sat right on Anton Larsen

Bay Road, and this is a public road. And if you keep

going up the road, you get to a golf course. You go up

a little further, you get to a ski area. You go up

further, there is a little area of some house -- not

houses, but kind of cabins called the Red Cloud Ranch.

You go even further up the road and there is a

boat dock and people park their cars there and live out
in some of the remote areas.  So this is a public
traveled road.  The building is not fenced in.  There is
not a guard there when you show up.  There is not a
gate.

Now, there are security cameras and they do
rounds, and the cameras are all controlled by the folks
up in the T-1 building.

Some other things you need to know about that
building and what was going on at that building around
the time of these murders:  The night before, at about
7:00 p.m., a Coastguardsman, one of the watch officers
named Jason Bullis, is showing up for his shift.  He has
the 7:00 p.m. to 7:00 a.m. shift, 12-hour shift.  Before
he goes up the hill to the rigger shop -- excuse me, to
T-1, he stops at the rigger shop.  He actually goes in
the building, goes through it to make sure it's secure.
Goes around back, checks all the doors.  He found all
the doors, all the doors appeared to be closed, nothing
was ajar, nothing was amiss.

And then he went upstairs -- up the road and
went to work in T-1.  While he's up there that night,
they have got this operations deck.  That's where he
works.  It's a secure area in the building where they
can watch all the security cameras.

        And something happened that night that became
important to him the next morning in particular after he
found out about the murders.

        About 10:30 that night, he noticed on the
camera that looks -- the T-2 building camera, a white
truck showed up.  Not Jim Wells' truck.  There is no
argument about that.  Everybody agrees it was not Jim
Wells' truck.  And it did something very unusual.  That
truck showed up, drove around near the flagpole and
left.

        And there's a video of it that we're going to
show you.

        (Video playing in open court)

        MR. CAMIEL:  You see the headlights.  You see
it pull in near the flagpole, turn around and leave.

        Now, that was strange enough, because people
aren't up there that time of night, but six minutes
later, the truck came back.

        (Video playing in open court)

        MR. CAMIEL:  Here it comes again.  This time
not just by the flagpole, but pulls all the way in, goes
around the building.  You won't hear about any
investigation that was done of that truck, which is not
Jim Wells' truck, but it was important enough that the
watch officers made a note of it and reported it.  And

it's never been identified as to who is up there going
around that shop at 10:30 at night the night before the
murders.

    That same watch officer when he left his shift
about 7:00 -- a little after 7:00 a.m., getting towards
7:30, he drives down the road, past the T-2 building,
and he looked off to his right toward the building and
he saw something else that caught his eye, it was an
older model black truck.  That's the way he described
it, an older model black truck.  And it wasn't parked
where any of the employees parked.  And none of the
employees had an older model black truck like that.

    And he reported it, after he found out about
the murders, to his supervisors, but he was told, "Don't
worry about it, it belonged to a guy named Nate
Pacheco," except that's not who it belonged to because
Pacheco wasn't even on the island and that's not where
he would park.  But he wasn't the only one who saw that
truck.

    That morning after 7:00 a.m., you're going to
hear about a guy named Don Rudat.  And Mr. Rudat was
walking up the road from the airport.  He was a
contractor who had come into town, come into Kodiak to
do some work.  He was staying down at the Comfort Inn,
which is the hotel at the airport.  And he, every

morning, would take a walk.  He would walk for one hour,
30 minutes one way, 30 minutes back.

        And he decided that morning to walk from the
airport up past the rigger shop up to the golf course
and then back.  When he was walking back, there is some
very important observations that he made.  He's on
video, and you're going to see him as he walks up and as
he walks back, because he was captured on the T-1
camera, and so you will get to actually see him.

        When he was walking up and walking back, the
one thing he didn't see was any blue SUV near the rigger
shop.  Never saw that.  But when he was walking back, he
saw that same black truck that Jason Bullis, the
Coastguardsman, had seen, and he saw it parked right out
by the rigger shop.  And later that evening after the
murders when they questioned him, he told the FBI what
he saw.  You're not going to hear about any
investigation of that black truck or who it belonged to.

        Let's talk for a minute about the days leading
up to April 12th.  April 10th, Jim's wife, Nancy, she
works for -- she works in Kodiak.  She works for the
Kodiak Area Native Association.  And she had a
conference taking place in Anchorage, and she flew off
to Anchorage.

        Jim is at work on the 10th.  On the 11th, Jim

goes into work, regular day, does his job. One of the things you're going to hear is that the Wells at their home in Bells Flats had been having problems with their septic tank, having problems with it failing over the winter.

And when Jim got home on the evening of the 11th, he had got a call that day from the septic guy who said, "Hey, we're going to finally be able to get out there and pump your tank." So Jim had to, on the 11th, in the evening after work, dig out the opening to his septic tank so the guy could come and pump it.

So he spent hours the night before the murders, not planning some murder, not preparing some alibi, but digging out his septic tank and standing there with the septic guy as he pumped out his tank.

Then you get to April 12th. And Jim gets up, regular day, going to go to work. Leaves in his white truck. He's had that truck for quite a while. As he's headed to work, after he passes the main gate camera, he notices that the truck is not driving right, it's pulling to the right. He knows that truck. He's had it for a while. Something is going on.

He's going to pull over and he's going to take a look at what's wrong with his truck. About the same time, Jim's stomach isn't feeling very good. He needs

to get to the bathroom and he needs to get to a bathroom

quickly.  He pulls over, he jumps out of his truck, he

takes a quick look at the tire, it's really low, not

flat, but it's low.

But he doesn't spend any time looking for it

because he's got to run to the bathroom, which is what

he does, by the airport.  He didn't make it to the

bathroom in time.  He soiled himself.  He had to sit in

there a while, clean himself up.

He gets out of the bathroom, goes back to his

truck, takes another look at the tire.  Decides I better

go home, I can make it home, change the tire.  It's

almost -- you know, this is April, mid-April.  It's

about time to change over your tires.  You got to change

from the studs to your summer tires.

Jim had his summer tires sitting outside the

house ready to go.  He was ready to change over.  That

was going to happen pretty soon.

So he heads on home.  Gets home, goes up in the

house, got to use the bathroom again, except their

septic tank had been pumped out, so they are using a

bucket.  He's got to put on his rain pants.  He goes

out, takes a look at the tire, tries to get the lugs

off.  It's taking longer than he thought.  Makes a

couple calls into work, leaves messages, "I'm going to

1  be late, I got a flat tire."

2          Finally gets the lugs off, pulls the tire, sees

3  he's got a nail in it.  Throws the tire in the back of

4  his truck, puts on one of his summer tires and heads off

5  to work.

6          Well, while Jim is headed to work, he gets a

7  call.  There has been an incident at the T-2 rigger

8  shop.  "We need you to come in."  He says, "I'm on my

9  way.  Had a flat tire."  He shows up at the rigger shop.

10  There are police there.  There are ambulances there.

11  There are Coastguardsman blocking the road.

12          He gets out and they tell him what happened.

13  And you're going to hear the description that he was

14  shocked, just like everybody else.  Jim was told to go

15  up to the main building with everybody else.  He was

16  told to wait there.  He spent about 12, 13 hours there.

17  12 or 13 hours waiting as the authorities came and

18  started interviewing people.

19          What Jim didn't know was that Chief Reckner,

20  Jim's supervisor, his boss, had already arrived.  And

21  when he found out Jim wasn't present, this is what

22  happened.  This is how we got here in this room today.

23  This is how Jim Wells is sitting in that chair.

24          When Chief Reckner arrived, before any

25  investigation had been done, within 30 minutes of the

discovery of Mr. Hopkins and Mr. Belisle, within
30 minutes, before anybody had been interviewed, any
searches had been conducted, Chief Reckner was accusing
Jim Wells of doing this, telling everybody who was
there, anybody who would listen, "Jim Wells did this.
Jim Wells was responsible."

And from that point forward, in the next hours
and days and weeks and years, what happened was the
government focused its investigation on Jim Wells.  And
that's not how you do an investigation, and you are
going to hear about that.

But as Jim is sitting at the T-1 building on
April 12th, they want to interview him, and he's
actually interviewed four times on the 12th.  He
cooperates.  He tells them where he was.  He tells them
about the tire.  They ask, "Hey, can we look in your
truck?"  He signs a consent to let them search his
truck.  "Can we look at your phone?"  He consents to
them looking at his phone.

He's there for hours.  They record their
interviews with him.  Third interview, they call him
back in and they say, "Hey, we want to do a gunshot
residue test on you," where they swab your hands,
sometimes your clothes to look for gunshot residue.  Jim
says, "No problem," and consents to the test.

What Jim doesn't know is it's all a trick, it's a ruse, just to see how we would react. They pretend to do the test on him, but they never tested it. It was all just an FBI trick. But Jim didn't have any problem going along with that test.

Now, to Jim, when he was interviewed, he didn't tell them he had had diarrhea, he didn't tell them he had soiled himself. At the time he was being interviewed what was important was him telling them that he had the flat tire, that's why he didn't get to work on time, that he had to go home and change the tire.

But you're going to hear, they are going to make a big deal about him not telling them about this embarrassing episode of soiling himself.

Next day Jim comes back, they ask him to come back. He sits there again. They interview him again. This time they start telling him about times. 6:48 your truck goes this way. 7:22 your truck is going this way. He doesn't know if their times are accurate. All he knows is he turned around at the airport after finding the low tire, after going to the bathroom, and he went home. And he never made it to the rigger shop that morning until later when he came back.

At one point Jim finally says, "Are you accusing me?" And they say, "Well, yeah, we are." He

says, "Well, then this needs to end." It didn't end.
They took Jim's truck. He tries to go home. They won't
let him in his house. They are searching his house.
You're going to hear they went back to his house with
search warrants about nine times. You're going to hear
that there were -- you're going to hear some more about
the rigger shop and you're going to hear more about the
investigation that was done there.

I told you it was a very bloody crime scene. I
told you there is no evidence of any blood found on Jim
or any of his property or vehicles or home or clothes.
But you're going to hear some other things. Remember I
told you that that one officer who showed up the night
before and checked all the doors and everything seemed
to be secure. Well, when the police came that morning,
that wasn't the case.

Around the back, there is a room to the boiler
room. There is an outside door that leads into the
boiler room. When the police went around there, as they
first began conducting their investigation, that door
was ajar, and it was actually unlocked and it wasn't
supposed to be unlocked.

There is actually a picture of that. You can
see the door isn't quite seated. When the officer the
night before had done his rounds, that door was seated.

Now, he'll say he can't remember whether he checked to see if it was actually locked, but he knows it was seated when he went around back.

So next morning it wasn't, and not only wasn't it seated, it was unlocked. And not only was it unlocked, but when they went into the boiler room and looked around, there is another door that leads into the main building.

Now, that door was still locked. But there was something on that door that was very important. It was a boot print right about the level of the door handle. And they took a picture of it, but their investigation of the boot print never went anywhere else. Their investigation of the unlocked back door never went anywhere else.

So the government has kind of hitched its wagon, their whole case to this video that you're going to hear about, April 12th from the T-1 camera. This is a camera that sits about a fifth of a mile from the road. And the government decided -- see, you know, in a murder case, you got to decide who did it, how they did it, and why they did it.

Well, they decided it was Jim Wells within 30 minutes without any investigation. Now they had to figure out how could he have done it because his truck

1 wasn't seen up near the rigger shop.  So they came up

2 with this idea that maybe he did this switch at the

3 airport and maybe he used his wife's car.

4 And all they had to support that, because there

5 are no witnesses at the airport who saw anything like

6 that, all they had to support that was a video, and it's

7 a low resolution, extremely blurry video.  So the

8 government took that video, and it's literally about one

9 second of video each direction, and that video shows a

10 vehicle driving up past the rigger shop.

11 It doesn't show it stopping at the rigger shop.

12 There is no evidence that vehicle had anything to do

13 with the murders.  There is no video showing it pulling

14 into the parking area.  It's just a video of a vehicle,

15 a blurry vehicle going by in one direction, and then

16 several minutes later, a vehicle going the other way.

17 It's not even clear it's the same vehicle.

18 But the government locked in on that video, and

19 they took that video, the only evidence they thought

20 they had in the case, to the FBI.  They went to the

21 forensic audio-visual image analysis unit.  These are

22 folks back east who their job is to look at videos like

23 that and see if they can figure out, either enhance or

24 interpret, figure out what's on the video.

25 And they took that video to a guy named Chris

Iber, one of the best in the field, works for the FBI.
And Iber and his team, he worked with another guy named
Emil, they looked at the video. And they went back to
the FBI and they said, "I can't" -- because they said
can you give us the make and model of the vehicle on
that video. And Iber said, "We can't do it. It's too
blurry. It's too low resolution. You can't do a
make/model determination of whatever vehicle that is."

Well, the government didn't take no for an
answer, didn't like that answer, so they went back to
him again. And they said, "Look, is it a Honda CR-V?
Can you look at it again," and he gave them the same
answer. And his supervisor, George Skaluba, (phonetic)
reviewed his report, same answer, can't tell you the
make or model of that vehicle, can't enhance the video.
It is what it is.

Well, the government didn't like that answer,
didn't take that answer. It's not what they wanted to
hear so they went to another recently retired FBI guy,
Gerald Richards, another guy back east, sent him the
video, asked him to take a look at it. He didn't --
now, Mr. Richards did not consult with Mr. Iber and his
team. He independently looked at the video. Guess
what? Same results. Too blurry, low resolution, can't
tell you the make or model of the vehicle.

          Well, the government didn't like that answer.

They went back to Mr. Richards again, actually flew to

his house and talked to him to see if he could change

his opinion, and he said, "No, can't do it."  He's a

scientist.  He said, "You can't do a make or model

determination of that video because of the quality of

the video."

          Well, the government wasn't going to take no

for an answer, so then they went to the next guy, a guy

named named Richard Vorder Bruegge, another former FBI

guy, asked him to look at the video.  Guess what?  Same

answer.  He tells them, "Can't tell you the make or

model of the vehicle.  Can't do it, too low resolution."

The only thing he could do is he said, "I could do some

photogrammetry and give you some rough dimensions of the

vehicle."

          So what he comes up with is, well, it's

somewhere between 167 and 187 inches in length of the

vehicle, 20-inch range.  And the height is somewhere

between 61 and 71 inches, ten inches.  Now, those

dimensions basically would cover almost all the

passenger vehicles that are made, but that's the best he

could do.

          The government didn't like that answer, wasn't

going to take that answer.  They decided to leave the

law enforcement people, and so then they go to a Honda
guy, a guy who works for Honda, not somebody who has any
experience looking at videos, doing forensic work on
videos, trying to identify vehicles from video, just a
guy who works for Honda, Honda-engineer type.

And they say, "Here, take a look at this
video." They have to go back to that guy four times.
And they tell him what they are looking for. They say,
"Is this a Honda CR-V?" They even give him the VIN
number so he can look up the color.

Well, after four trips to this guy, he finally
tells them, well, I'm 70 percent sure it's a Honda CR-V,
but it could be a Ford escape, could be a Rav4, could be
a Hyundai. Well, that's not getting government
anywhere, so they decide they need to do something
different.

So now they go totally outside the field of
video analysis or the forensic people who work in law
enforcement and they go to a couple accident
reconstruction guys. These are guys who in personal
injury cases, that kind of thing, they get hired. You
get one car that hits another car at an intersection,
and they will put something together to explain how the
accident happened. They are working with known
vehicles.

But the government tells them exactly what they want to know.  They say, "Is this this Honda CR-V," actually give them a picture of Nancy Wells' Honda CR-V, pay these guys a large amount of money, probably over $100,000, and the best they can get out of those guys is, "Well, it's consistent with -- there are some things that are consistent with the vehicle."

That's what the government did in this case. So you have got the who decided within 30 minutes.  You have got the how, which is this theory about switching of a blue Honda, Nancy's blue Honda at the airport, but they had to come up with a why, a motive.  There was no evidence of any threats by Jim Wells toward either one of the victims, none, never.

So what they came up with was the few things that you're going to hear about.  You're going to hear that at one point Jim was cautioned about not taking better care of a fuel card that was used in the rigger shop to buy diesel fuel, but the caution didn't come from either one of the victims, it came from the commander.

You're going to hear that Jim was cautioned about taking firewood from trees that were in the antenna field.  Mr. Belisle received the same caution because he was doing the same thing.  You're going to

hear that they cautioned Jim about his use of sick leave because he had used a lot of sick leave. Or that Jim was told at one point he couldn't go to a conference.

There was what's called a NATE conference, which is an association of tower erectors, these people who climb these towers like Jim Wells does, except you're going to hear that when Jim was told he couldn't go to that conference, it didn't matter, he was having surgery right when that conference was taking place. That conference was February 7th to February 9th. Jim's surgery was February 9th. He wasn't going to that conference anyway.

Those are the things they came up with to try to put together a motive for this crime. Seven years to come up with a motive, and that's what they got.

I want to talk about one more thing, and that's the airport, the Kodiak airport. The Kodiak airport is like the center of activity in Kodiak, particularly on a weekday morning, particularly on a morning like April 12th of 2012.

That morning about 7:00, you have got an Alaska Airlines flight that's landing from Anchorage and letting off a planeload of passengers. You have got all those people coming off the plane. You have got people there to pick them up, people going through the parking

lot to their cars. You have got another whole group of
people coming through that parking lot or being dropped
off who are going to catch that plane back to Anchorage.

You have got a construction crew in the airport
parking lot because they are redoing the parking lot.
They have got the asphalt torn up.

You have got the Comfort Inn, the hotel right
next to the airport, with guests coming and going. You
have got the coffee shop. You have got a couple other
smaller airlines. You have got Alaska Airlines cargo,
the cargo place where people are dropping off and
picking up. So there are at least 200 people, if not
more, around that airport parking lot at the time the
government claims Jim Wells was switching to his wife's
car to go up and do the murders, and not one person saw
him anywhere near his wife Nancy's car, not one.

But here is the thing, and this is important:
There were two people, two witnesses, and you're going
to hear from, who did see Nancy's car parked there.
They saw Nancy's car parked at the Kodiak airport right
when the government claims it should be up the road at
the T-2 rigger shop. One witness, she drives in to the
airport. She knows Nancy Wells, she knows her car. She
sees the car. She tells the FBI she saw the car.

You got another witness, he doesn't know Nancy

Wells, he doesn't know Jim Wells.  He was at the airport

to pick up some passengers who were coming off that 7:00

flight, that 7:00 a.m. flight.  He parked right in front

of the Alaska Airlines terminal.  He went into the

terminal, he picked up his passengers, helped them with

their luggage, come out to his car, and as he's driving

off, he sees the blue Honda CR-V right about 7:09, 7:10

in the morning, right at the time the government claims

it should have been up the hill.

How do we know about this witness?  Because the

FBI interviewed him.  They talked to him.  They showed

him a picture of Nancy Wells' car and said -- because

they knew he had been at the airport -- said, "Did you

see this car?"  He said, "Yeah, I did.  I remember the

taillights."

THE COURT:  Mr. Camiel, I'm going to interrupt

and say it's been about 37 minutes, so if you could wrap

up in just a few.

MR. CAMIEL:  I'm just about done, Your Honor.

THE COURT:  Very good.  Thank you.

MR. CAMIEL:  The car was right -- the car was

seen by those witnesses right where the police found it.

It had nothing to do with the murders.  That car has a

complete alibi, and so does Jim Wells.

Look, April 12th was a terrible day.  Two

innocent men were murdered.  That's a tragic, horrible

thing.  But it's also a horrible thing to be falsely

accused of a crime.  And on April 12th, Jim Wells was

falsely accused.  And up to now, the government hasn't

taken no for an answer, no forensics, no witnesses, no

physical evidence.

Well, it's time to tell the government no, and

it's time to return a verdict of not guilty.

Thank you.

THE COURT:  Thank you, Mr. Camiel.  So ladies

and gentlemen, what we're going to do is take a lunch

break here for about one hour, so 2:05.

We never go after 5:00, so usually around

4:30 or 5:00 is when we'll wrap up for the day.  If we

need to end early some day or somebody has a medical

appointment that is difficult, I really want to try to

accommodate that with as much notice as possible.

As I said, we're always going to stop by the

noon hour on Friday.  I have authorized the jury clerk

to have people that live out of town go home on the

weekend and the court will cover that expense as well.

So please leave your notepads here in the

courtroom.  Nobody looks at them.  And make sure you

remember my admonition not to discuss the case or do any

research.  We'll see you in one hour at 2:05.

```
 1                (Jury absent)
 2                THE COURT:  All right.  Please be seated,
 3     everyone.
 4                Anything we need to take up before the lunch
 5     break, Mr. Skrocki?
 6                MR. SKROCKI:  Not at this time.
 7                THE COURT:  Mr. Colbath?
 8                MR. COLBATH:  Not from us, Your Honor.
 9                THE COURT:  Then I'll see you back at 2:05.
10     We'll go off record.
11                (Recessed from 1:08 p.m. to 2:09 p.m.)
12                (Jury absent)
13                DEPUTY CLERK:  All rise.  Her Honor, the Court,
14     the United States District Court is again in session.
15                Please be seated.
16                THE COURT:  All right.  We're back on record
17     without the jury.  And somebody has an issue.  I don't
18     know who.  Looks like you, Mr. Skrocki.  Go ahead,
19     please.
20                MR. SKROCKI:  Thank you, Judge.  Good
21     afternoon.
22                First, it's a day of electronics, so our laptop
23     had some issues.
24                THE COURT:  It's not even Friday the 13th.
25                MR. SKROCKI:  I know, it's not good, but it's
```

being worked on.  I just found that out, but the more

important discussion I would like to have with the Court

concerns a couple of things with the defense opening.

First being this constant haranguing of seven

years.  I'm not sure how you took that.  I think it's

very problematic, and we would like at least to discuss

an order to defense not to use that phrase or the age of

this to some extent.

It is problematic, because it didn't have to be

uttered, but this conviction was April 25, 2014.  It was

a long time ago, and so, of course, the investigation

ceased for many years.  And yes, admittedly it picked

up, further investigation during the retrial, so we

finessed a few things, as did the defense.  They had the

same opportunity.

So when I first heard this, I thought how are

we going to massage this, but the more I think about it,

the more it's very problematic to try to work our way

out of that after Pandora's box has been opened by that

phrase.  So that's one thing I would like to -- and

maybe we need some time to develop a limiting

instruction overnight, have you consider it.

I think for today at least we have an order

from the Court that prohibits mentioning of the age of

this case and how long it's been, seven years, that type

of thing.

The second issue is, and we may not get to this today, because Chief Reckner, who is our first witness, will be on the stand for quite a while, so we may not get to him on this issue today, but the fuel card issue, which is part of his testimony, was, if we're correct, was quote-unquote "misplaced." And maybe if we need to have Madam Clerk or the transcriber --

THE COURT: You mean the fuel card issue was misplaced?

MR. SKROCKI: He says the fuel card was misplaced.

THE COURT: I thought the issue was misplaced.

MR. SKROCKI: The fuel card was misplaced. That's not really an accurate characterization of the fuel card issue. So in some respects, we're trying to be conservative here, but it seems to us that opens the door to further inquiry.

We had a team meeting after lunch, and we have some other issues that came up with respect to things that were said about various pieces of evidence. We're going to get a copy of the defense opening statement and we'll make application as the issue becomes closer, but there were just so many mischaracterizations that we feel we have a right to respond.

1          THE COURT:  On the fuel card, what specifically

2    is the relief that you're seeking at this time?

3          MR. SKROCKI:  Looking to go into much more

4    detail.  In terms of we had video recording.

5          THE COURT:  What's the docket number for my

6    order on that?

7          MR. SKROCKI:  That's the binder I didn't bring

8    with me.

9          MR. CAMIEL:  1081.

10          THE COURT:  1081.  Thank you.

11          MR. SKROCKI:  While you're looking, we don't

12    have any intention of bringing the investigator on to

13    talk about who they interviewed, things of that nature,

14    but I think a little bit more leeway as to what was

15    found.

16          THE COURT:  The issue -- I'm reading now from

17    1081 at pages seven through eight, that lack of

18    conclusive evidence about who actually used the fuel

19    card was the issue that I was concerned about going

20    into.  Is it that topic that you wish to go into?

21          MR. SKROCKI:  I'm not going to go into what was

22    different than what the Coast Guard wrote and what they

23    resolved.  They didn't attribute it to Mr. Wells, but

24    Mr. Reckner, I'll tell you, will testify he told

25    Mr. Wells, you know, "If we had seen you on video, we

would have fired you," which is sort of an ancillary
point.

THE COURT:  I said, "The government shall not
argue that Mr. Wells definitively stole or misused the
fuel card," which is consistent with what the letter
said about it.

MR. SKROCKI:  Correct.

THE COURT:  Are you seeking to argue that now,
that it was him that stole it, or just --

MR. SKROCKI:  No.

THE COURT:  Then I think we're fine.

MR. SKROCKI:  We'll go into some more detail,
and if the defense wants to object, we'll hash it out in
front of the jury.  That's what I intend to do, just to
give you notice, because of that statement.

But I do think that seven years bell is going
to be very difficult to unring since it was rung so
much.

THE COURT:  I appreciate you putting the issue
out there, Mr. Skrocki.

Mr. Camiel, are you going to respond on that or
Mr. Colbath?

MR. CAMIEL:  I'm happy to respond, Your Honor.

First of all, we have been told that the
investigation by the government is continuing even as

this trial is going on, investigation is still going on.
They are still re-interviewing witnesses. We're still
getting new evidence.

        And I don't think there is anything
inappropriate about the fact that they had a long time
to investigate this case. And obviously, what I tell
the jury in opening isn't evidence, and the Court is
going to instruct the jury as to that.

        I don't know what kind of a limiting
instruction or what relief they are seeking yet, so I
don't have anything directly to respond to, but I don't
think there was anything inappropriate about my saying
that seven years have gone by, they have had seven years
to investigate because in fact they have.

        THE COURT: What I'm going to do is the
following: Instruct the defense that with regard to
cross examination of the one witness that you're
anticipating today not to stress the fact that it's been
seven years, and then we can take it up in the morning.

        And I would give consideration to a limiting
instruction or a cautionary instruction from the
government that the defense could look at.

        The problem I'm struggling with, and I didn't
think about this during the lunch hour, I got
preoccupied with other matters, is the implication that

1  a juror could draw that the government has been dragging
2  its feet, so to speak, for seven years and why are we
3  having this, in their mind, first trial seven years
4  after the fact.  And that is troublesome to me to put
5  that as an implication that it's been seven years
6  without getting into the reasons why.

7         But I think we can go forward this afternoon,
8  not stress that point.  If the defense seeks to stress
9  that point at some point based on the direct that's
10  presented of this witness, then you could make
11  application outside the presence of the jury on that
12  topic, depending on what the direct is.  But for now,
13  let's table the subject and I look forward to whatever
14  the government might propose in that regard.

15         It's not evidence, opening statement, but it
16  does plant the seed of why has it been seven years, and
17  we have all agreed and the Court has ordered that we're
18  not talking about why it has been seven years, and so
19  there is -- to this jury.  That's the struggle.

20         MR. SKROCKI:  I just want to put one more point
21  on it, that a big part of this argument was "you got the
22  wrong guy," so he's been under this specter for seven
23  years, so that needs to be addressed as well.

24         THE COURT:  Well, you can ponder that.  I would
25  guess that there are reported decisions that have

addressed this same issue in the context of retrials.  I

mean this is not totally a unique event here.

MR. SKROCKI:  True.

THE COURT:  That other courts have struggled

with this issue, and I would certainly be interested in

what other judges may have done in comparable settings.

MR. COLBATH:  Your Honor, could I address the

other issue that Mr. Skrocki brought up?  It bears more

relevance to what we're going to do here this afternoon.

THE COURT:  The fuel card?

MR. COLBATH:  Yes, the fuel card.  First of

all, that is more easily explainable as far as

Mr. Camiel in opening made a passing reference to it.

You will hear he got talked to about the fuel card.  I

don't remember the word "misplaced."  If that's what was

said, that's what was said, sure, that's fine, but none

of that is evidence.

And so we can't open the door -- without

presenting evidence, we can't open the door to let new

evidence in, but your finding was not focused on

Mr. Wells being just the problem of the implication that

Mr. Wells took the fuel card, because what you actually

found was that the evidence of -- the evidence of the

fuel card and the information related to the fuel card,

the underlying investigation and the details of it and

the actual even the misuse, whether it was misplaced,

misused, whether it was stolen, whatever, you said that

the misuse of the fuel card and the details of the

investigation are not relevant to support the motive

theory.

It's Mr. Wells' reaction.  Whether he was

counseled because he misplaced it, because he stole it,

because he used it, because he was or wasn't seen on

video, that's not relevant.  The government's theory is

that he didn't like being admonished for whatever

happened.

THE COURT:  I'm reading that paragraph as well.

MR. COLBATH:  And so whether we state -- the

point is he had this meeting where they say he poorly

reacted, and I don't think that just based on this one

reference in opening, now we get to suddenly go into,

even if it's only to talk more about the details with

Chief Reckner, the details aren't any more relevant to

their motive theory.

It's not relevant whether it was misplaced and

he got admonished about that, whether he misused it,

whether there was equivocal evidence about that.  That's

not the case.  And so I don't think anything should

change, certainly nothing in opening.  I don't see how

it could, it's not evidence, could change your order.

1    Certainly doesn't change the government's

2 motive theory.  I would ask that the Court stand on this

3 order.

4    THE COURT:  Well, I do, but I think your

5 interpretation is slightly different than mine.  That

6 order says that the fuel card and the details standing

7 alone are not relevant, but then I say that that

8 information can be presented to the jury to explain the

9 reaction or the response.

10    That's how the relevance is established.  I

11 don't -- then the next paragraph I hope makes clear that

12 the Court finds that there is sufficient evidence to

13 allow a jury to find that Mr. Wells used the fuel card,

14 and that is the evidence that I intend to allow to be

15 presented, and then clarify to say, "The government

16 shall not argue that he stole -- that he definitively

17 stole or misused the fuel card."

18    I did not intend this order to preclude

19 testimony about what happened to the fuel card, because

20 I found that giving that background would help explain

21 Mr. Wells' reaction to being given the letter of

22 caution.  That's how I intended it.

23    If it's not clear, I hope I have clarified it

24 here, which is to say that allowing no explanation of

25 the potential misuse of the card would leave this letter

of caution in some kind of a vacuum.  So they can bring

in evidence of how the card was perhaps misused in order

to put in context Mr. Wells' reaction, which is, as I

said in that order, the primary focus.

So I think we have covered the issue enough

that the government can go forward, ask its questions,

and the defense can interpose objections as warranted.

MR. COLBATH:  Thank you.

THE COURT:  Very good.  And we're clear on the

tabling of the seven-year issue, and we can take that up

in the morning.  Anything else from the government to

address here?

MR. SKROCKI:  We're almost there.

THE COURT:  You need a few more minutes?

MR. SKROCKI:  I think she does.

THE COURT:  That's fine.  Anything else to take

up at this time?

MR. COLBATH:  No.  I wouldn't intend to ask

this witness -- I assume this witness is not going to

make any comments about the length of the investigation

anyway.  He's not one of the investigators.  I wouldn't

go into that in any event.

THE COURT:  We can think more about it and take

it up in the morning.  Let's take a short break.  Let us

know whenever you're ready, and we'll go off record.

1        DEPUTY CLERK:  All rise.  Court stands in a

2  brief recess.

3        (Recessed from 2:23 p.m. to 2:30 p.m.)

4        (Jury present)

5        THE COURT:  Please be seated, everyone.

6  Welcome back, ladies and gentlemen.  I believe we are

7  ready for the government's first witness.

8        MR. SKROCKI:  We're all set.  The United States

9  calls Scott Reckner.

10        THE COURT:  All right.  Good afternoon, sir.

11  If you would come up to the witness stand and when you

12  get up here, remain standing and the clerk will

13  administer an oath to you.

14        (Oath administered to the witness)

15        DEPUTY CLERK:  For the record, can you please

16  state your full name and then spell your full name.

17        THE WITNESS:  Scott Allen Reckner, S-c-o-t-t

18  A-l-l-e-n, R-e-c-k-n-e-r.

19        SCOTT RECKNER, GOVERNMENT WITNESS, SWORN

20                   DIRECT EXAMINATION

21  BY MR. SKROCKI:

22    Q.  Good afternoon, Mr. Reckner.

23    A.  Good afternoon.

24    Q.  Sir, if you could tell the jury who you work for.

25    A.  United States Coast Guard.

1    Q.  And please tell them how long you've worked for

2    the Coast Guard.

3    A.  23 years altogether.

4    Q.  And how did you start in the Coast Guard, sir?

5    A.  I came in in 2003 after being prior service Navy

6    and Army.

7    Q.  And how long in both Army and Navy collectively?

8    A.  Three years in the Navy, four years in the Army.

9    Q.  And you went into the Coast Guard after that?

10   A.  I did.

11   Q.  About what year?

12   A.  2003.

13   Q.  Sir, did you find yourself in Kodiak in April of

14   2012?

15   A.  I did.

16   Q.  How did you get your -- how did you get to Kodiak

17   in terms of your Coast Guard assignment?

18   A.  Yep.  So I made chief petty officer in 2010 and

19   got orders to communication station Kodiak.

20   Q.  Are you nervous, Mr. Reckner?

21   A.  Say that again.

22   Q.  Are you nervous?

23   A.  A little bit.

24   Q.  You're speaking really fast, so I'm going to ask

25   you to slow down.

1      A.   Okay.

2      Q.   All right.  And what were you doing in the Coast

3  Guard prior to going to Kodiak?  What was your

4  assignment?

5      A.   I was stationed at Electronics Support Detachment

6  Cape Cod.

7      Q.   In Electronics Support Detachment, what were you

8  doing for them?

9      A.   Doing IT work.  Computers, networks, and phones.

10     Q.   And what -- why Kodiak, Alaska?

11     A.   My first pick was taken by another chief, so

12 Kodiak was my second.  I figured when am I ever going to

13 get an opportunity to go to Alaska and let the Coast

14 Guard send me.  So that's what we decided.

15     Q.   Who did you bring with you to your Kodiak

16 assignment?

17     A.   My wife and three children.

18     Q.   And how old were your kids?

19     A.   At the time, we had a junior high and two

20 high-schoolers.

21     Q.   How did they take it?

22     A.   My middle daughter, when we told her at dinner,

23 stood up and ran to the bathroom crying.  She was not

24 thrilled.

25     Q.   When you were heading to Kodiak, what was your

understanding of your assignment and responsibilities when you got there?

A. Yes. So I knew I would have the IT shop and also the rigger shop.

Q. So you mentioned two different things?

A. Yes.

Q. Let's talk about the IT shop briefly first, please. Tell the jury what the IT shop was all about.

A. Sure. So I had two ITs, an IT1 and IT2, E6 and E5. And their responsibility at the station was the computers and networks, telephones, that kind of thing.

Q. And you mentioned the rigger shop?

A. Yeah. So I also had the rigger shop. And that was -- the responsibility of the rigger shop was primarily the antenna fields, the antenna structures, maintaining those structures in the field, that kind of thing.

Q. Was this your first assignment to a Communications Station?

A. It was.

Q. And prior to that, did you get any kind of training to deal with towers and maintenance and things of that nature?

A. Sure. Before I left Cape Cod, I got qualified to climb to 300 feet.

1    Q.  That's a long ways up.

2    A.  It's pretty high.  We have higher, but it's

3 pretty high.

4    Q.  When you arrived at the Kodiak Communications

5 Station -- and I want to focus on the rigger shop.  What

6 was your rank, first of all?

7    A.  So I was the chief petty officer.  I was E7.

8    Q.  Did that change while you were there, or is that

9 the rank you kept?

10   A.  No, I left as a chief petty officer, E7.

11   Q.  Can you briefly tell the jury the distinction

12 between a chief petty officer and a lower rank would be?

13   A.  Sure.  So when you achieve the rank of chief

14 petty officer in the Coast Guard or the Navy or seagoing

15 services, you reach a higher level of responsibility,

16 not so much technical.  You are technical, but more of

17 taking care of your people, mentoring the folks that

18 work under you and training the next batch of chief

19 petty officers.

20   Q.  Is that something you took seriously?

21   A.  I did.

22   Q.  Were there men that you supervised in the rigger

23 shop when you arrived there in -- what year was that

24 when you arrived?

25   A.  2010.

1    Q.  So 2010 were the people you supervised when you

2  arrived in the rigger shop?

3    A.  Can you repeat that?

4    Q.  Sure.  As a -- you mentioned managing the rigger

5  shop?

6    A.  Yes.

7    Q.  Who were the men you supervised?

8    A.  So when I arrived, I had two civilians, Mr. Wells

9  and Mr. Belisle.  I had an ET1, Jim Hopkins.  I had an

10  ET3, Cody Beauford.  Then I had four, we call them

11  non-rates because they're not rated yet, four non-rates.

12    Q.  As to the non-rates, do they have a military

13  equivalent in some other branch?

14    A.  They would be like privates, you know, E2, E3s.

15    Q.  So non-rates would be a private, lower level?

16    A.  Right.

17    Q.  Okay.  You mentioned Mr. Hopkins, and you used

18  the term ET1.

19    A.  Yes.

20    Q.  Is that part of the Coast Guard vernacular as to

21  rank?

22    A.  Yeah.  So that's an abbreviation for electronics

23  technician, ET.

24    Q.  How long did you work with Mr. Belisle and

25  Mr. Hopkins?

1    A.   Almost two years.

2    Q.   Whenever you need to take a drink, go ahead.

3         And you worked with Jim Wells as well?

4    A.   Yes.

5    Q.   Do you see Mr. Wells here in court today?

6    A.   I do.

7    Q.   Where is he seated?

8    A.   Right there.

9    Q.   Pointing towards the defendant, end of the table?

10   A.   Yeah.  Right there in the white shirt.

11        MR. SKROCKI:  Let the record reflect

12   identification, Your Honor.

13        THE COURT:  So noted.

14        MR. SKROCKI:  If we could have the lights,

15   Madam Clerk.  Counsel, I'm going to put up four

16   exhibits.  For identification only, Blair.  15, 16, 220,

17   252, and I might as well add one more for 17.

18   BY MR. SKROCKI:

19   Q.   Mr. Reckner, did you have a chance to scan those

20   photos as they came up on your screen?

21   A.   I did.

22   Q.   Are you familiar with those photographs and what

23   they depict, sir?

24   A.   I am.

25   Q.   And you've seen those before coming into court

1    today?

2        A.   I have.

3        Q.   As to Exhibit 15 and 16, do you recognize

4    individuals in those photographs?

5        A.   I do.

6        Q.   Who are they?

7        A.   That one is ET1 Jim Hopkins and Rich Belisle.

8        Q.   And then 220, individual on the tower?

9        A.   That was a picture of Mr. Belisle that I took.

10       Q.   Okay.  And 252, what does that depict?

11       A.   252, can I see it again?  So that's myself,

12   Mr. Belisle and IT1 Newby doing tower training.

13       Q.   Let's go forward to 17, please, Blair.

14            Recognize the person in that photograph?

15       A.   I do.

16       Q.   And does that reflect Mr. Wells as he looked in

17   2012?

18       A.   Yes, sir, it does.

19       Q.   In the time that you supervised him from 2010 to

20   2012?

21       A.   Yes, sir, it does.

22            MR. SKROCKI:  Move for the admission of 15, 16,

23   17, 220 and 252.

24            MR. COLBATH:  I have no objection to any of

25   those, Your Honor.

1          THE COURT:  Those five will be admitted.  Go

2    ahead, please.

3          (Exhibit Nos. 15, 16, 17, 220 and 252

4    admitted.)

5          THE COURT:  You can go ahead and publish.

6          MR. SKROCKI:  Thank you, Judge.

7    BY MR. SKROCKI:

8    Q.   If we can put up number 15, please, Blair.

9         You recognize that man, sir?

10   A.   I do.

11   Q.   And who is that?

12   A.   That's ET1 Jim Hopkins.

13   Q.   And how long did you say you supervised him?

14   A.   Almost two years.

15   Q.   How much interaction did you have with

16   Mr. Hopkins in your day-to-day work during those two

17   years?

18   A.   So almost daily.  Not every day, but almost

19   daily.

20   Q.   In terms of -- you were his manager, as I

21   understand it?

22   A.   I was.

23   Q.   In terms of you being his manager, could you tell

24   the jury what kind of employee he was like, what was he

25   like to manage, how was he with the people downstream of

him?

    A.   Sure.  So ET1 Hopkins was prior Navy like myself,
so we had that in common.  I thought he knew what he was
doing.  He was capable.  He was a good leader.  We
were -- I was mentoring on some things, but for the most
part, I was satisfied.

    Q.   Was he the type of guy who would get his hands
dirty with the people he supervised?

    A.   Yeah.  Jim Hopkins was the first guy in the
trench or a hole with a shovel or taking out rock or
whatever -- whatever the dirty work was, ET1 was not
afraid to get in there with the troops and get it done.

    Q.   In terms of his management experience, prior to
becoming ET1 at the rigger shop, what kind of management
experience did he have?

    A.   I think he worked -- you know, he had some
technicians who worked under him at some other units.
I'm not 100 percent familiar.  I know he was on the wave
for a while, so he definitely would have had some
technicians working for him on the cutter.  So he
definitely had supervisory experience.  This wasn't his
first time.

    Q.   Did he struggle in this position with the rigger
shop to some extent?

    A.   I wouldn't say struggle.  He was a little gruff

1    sometimes with the non-rates.  But you know, I looked

2    into it and, I didn't think there was anything there.

3        Q.  And if we go to 16, please.

4            And who is this, Mr. Reckner?

5        A.  That's -- that's Mr. Rich Belisle.

6        Q.  And you familiar with his work ethic and how he

7    conducted himself on the job?

8        A.  I am.

9        Q.  Would you explain that to the jury, please?

10       A.  Sure.  Rich was a retired chief and, you know, he

11   took it -- he took it seriously.  He was a mentor to the

12   crew.  We had a lot of younger folks down there, and he

13   took it upon himself to work with them, help them,

14   whether it was rigger shop business or just in their

15   Coast Guard career in general.

16       Q.  If we could look at 220, please, Blair.

17           I believe you mentioned you took this paragraph,

18   Mr. Reckner?

19       A.  I did.  That's my foot.

20       Q.  That's your foot.  Okay.  Where were you when you

21   took this photograph?

22       A.  We were in the tower.  We were climbing.  I can't

23   remember which tower, but we were climbing that day.

24   Rich was just down below me, and I took my cell phone

25   out and snapped a shot.

1    Q.  And that's Mr. Belisle?

2    A.  That's Mr. Belisle smiling.

3    Q.  In a T-shirt?

4    A.  Yes.

5    Q.  Weather always that nice on Kodiak?

6    A.  It was not.  That must have been a particularly

7    nice day.

8    Q.  Exhibit No. 252, please.

9        So can you explain to the jury what's going on

10   here in 252?

11   A.  Sure.  So that's a tower training class that Rich

12   was giving.  That's me in the red helmet performing a

13   rescue on IT1 Newby.  That's why he looks like a victim.

14   I'm kind of taking him down the tower safely under

15   Rich's supervision.

16   Q.  I want to give you a little bit of practice and

17   test with the laser pointer we have up on the desk just

18   to make sure.  We've already tested it once, but it's

19   one of these electronic days.  So let's have you point

20   out who's who in that photograph as a test, please.

21   A.  Yeah, that's me.  That's IT1 Newby, and that's

22   Mr. Rich Belisle.

23   Q.  Where was this photograph taken?  Where is this

24   training taking place?

25   A.  So there's a smaller tower right in front of

1  building T-1, the COMMSTA, and that's where we did that

2  training that day.

3      Q.  Go to Exhibit 17, please.

4          What's that's a photograph of, sir?

5      A.  That's Mr. Wells.

6      Q.  And how long were you -- you said you were a

7  supervisor for two years?

8      A.  Almost two years.  Yes, sir.

9      Q.  What kind of interaction did you have with them

10  on a daily basis for those two years?

11      A.  Again, almost daily.

12      Q.  Is there a reason, if we go back to 252,

13  Mr. Belisle is in a line-green shirt.  Do you have any

14  idea about that?

15      A.  I don't, no.

16      Q.  If we can turn off the jury's view, please, and

17  go for a foundational question with Mr. Reckner.  Show

18  him Exhibit No. 222.

19          Mr. Reckner, for foundational purposes, Exhibit

20  No. 222, are you familiar with that?

21      A.  I am.

22      Q.  What's depicted there?

23      A.  I am.

24      Q.  Does that depict the two buildings that comprise

25  the Communications Station on Kodiak when you were

1    there?

2        A.   It does.

3             MR. SKROCKI:  Move to admit 222.

4             THE COURT:  Any objection?

5             MR. COLBATH:  No, Your Honor.

6             THE COURT:  222 is admitted.

7             (Exhibit No. 222 admitted.)

8             MR. SKROCKI:  If we could publish.  I'm sorry,

9    Judge.  Do you want to do the publish or --

10            THE COURT:  No, you can go ahead and publish.

11   Once it's admitted you don't need to make that request

12   unless you need to to your staff.  That's fine.

13            MR. SKROCKI:  Yes, ma'am.

14   BY MR. SKROCKI:

15       Q.   Mr. Reckner, if you could grab the laser pointer

16   now that you're an expert with it.

17            Good.  On the right-hand side, there's a long

18   white building.  Do you see that?

19       A.   This one right here?

20       Q.   Yes.  Can you explain to the jury what that is?

21       A.   So that's what we call the T-1 building.  That's

22   where the command staff was, the OSs, the operators who

23   ran the radios.  We had an operations deck there.  So

24   they were.  And also the ETs had a shop up there.  Those

25   were the guys who worked on the radios, and ITs were up

1  there as well.

2      Q.  About how many people worked in that building,

3  roughly?  I'm not asking you for --

4      A.  On any given day, probably somewhere between 30

5  and 40.  We had 65 altogether at the COMMSTA, but some

6  of those were watch standards so they weren't always

7  there.  They had a rotation.

8      Q.  And where was your office when you first started?

9      A.  Sure.  When I first reported, I had an office up

10 in T-1.

11     Q.  That would be the building on the right?

12     A.  Yep.  This one right here.

13     Q.  Okay.  And you mentioned Communications Station.

14 Can you tell the jury what the role of the

15 Communications Station was then.

16     A.  Sure.  In a nutshell, Communications Station

17 Kodiak was kind of like the 911 of the Bering and the

18 Alaska area of responsibility.  So they would take calls

19 from mariners in distress.  They would take calls

20 communicating with Coast Guard aircraft and other

21 military aircraft, C-130s and helicopters as they were

22 transiting throughout the Alaska AOR.

23     Q.  So if there was a fishing boat in trouble on the

24 Bering and they did a Mayday, it would be received here?

25     A.  More than likely, yes.

1    Q.  So is there -- there are two components to the

2    communication parts of this.  What are they?

3    A.  Can you repeat the question?

4    Q.  Sure.  Someone sends in a Mayday, right, so you

5    receive?

6    A.  Yep.

7    Q.  Do you transmit as well?

8    A.  Correct.  So we had two sites.  That's the

9    transmission site, and it's the T.  We also had a

10   receive side, R2, and we had antennas that would

11   receive.  Then we had a microwave shot from R2 that

12   transmitted that radio signal over to this backboard

13   right there and it would -- the microwave would hit that

14   and then bounce down here somewhere to a receiver, and

15   then the operators could hear the call coming in.  When

16   they transmitted, they would use the towers that are out

17   here.  That call -- these calls would go out of these

18   towers.

19   Q.  There's several towers depicted there, correct?

20   A.  Yes.

21   Q.  And do you know the respective heights?  Do you

22   recall what they were?

23   A.  Sure.  So these four are 300 feet.  That one is

24   600.  And then these are 100, maybe 120, somewhere in

25   there.

1    Q.   And do they require maintenance?

2    A.   They do.

3    Q.   And what part of the Communications Station was

4    responsible for the maintenance?

5    A.   So that was the rigger shop's responsibility.

6    Q.   Can you identify where the rigger shop is on this

7    photograph?

8    A.   I can.  So that's T-2, otherwise known as the

9    rigger shop.

10   Q.   So you're still speaking pretty quick.  So I want

11   to slow you down a little bit.

12   A.   Okay.

13   Q.   Can you for the jury -- they're going to be

14   hearing a lot of names over the next couple of weeks --

15   list, when you were there, particularly in April of

16   2012, the names of the individuals that were employed in

17   the rigger shop?

18   A.   Okay.  So when I arrived, like I said earlier,

19   Mr. Wells; Mr. Belisle; ET1 Hopkins; ET3 Beauford, Cody

20   Beauford; Seaman Upchurch; Seaman Henry; Seaman Coggins

21   and Seaman Pacheco.

22   Q.   And as to the respective sort of layers of

23   responsibility, working your way from the top down, who

24   was doing what job?

25   A.   So ET1 Hopkins was the shop supervisor, so

1  everybody worked for him.  And he worked for me.  And

2  then you had the ET3 who mostly worked the non-rates and

3  made sure that they were doing what they needed to do.

4      Q.  Who was the ET3?

5      A.  ET3 Cody Beauford.  And then we had our technical

6  experts.  Mr. Wells and Mr. Belisle were our technical

7  experts.  They didn't have any supervisory

8  responsibilities.

9      Q.  Okay.  As to Mr. Hopkins and Mr. Belisle -- I'm

10 sorry.  Let me rephrase that -- Mr. Wells and

11 Mr. Belisle, let's start with Mr. Belisle, what was his

12 responsibilities?

13     A.  So Mr. Belisle was our master rigger.

14     Q.  Can you explain what that means?  It may be

15 self-explanatory, but please tell them what it means in

16 your world.

17     A.  Sure.  So he was the guy who, if we were going to

18 hoist something, strap something down, you know, we

19 would carry our lights up or any parts and stuff up the

20 towers, and he was primarily the guy who would make sure

21 everything was rigged properly and safely.

22     Q.  So I want to talk to you for a few minutes about

23 Mr. Wells.  If we could leave the lights down because

24 we'll be doing a lot of photographs if that's all right

25 with everybody.

1        Mr. Wells, you worked with him for two years.

2   Tell the jury how long you knew about his work

3   experience with the Coast Guard.

4      A.   Yeah.   So right when I reported, you know, I

5   was -- I understood that he was probably the technical

6   expert for antennas and towers in the Coast Guard.   Had

7   a wealth of knowledge, had been doing it a long time.

8   And so I understood he was our antenna expert, if you

9   will.

10     Q.   And did that come to pass in your experience with

11  him that he was quite knowledgeable?

12     A.   It did.

13     Q.   Can you explain to the jury about that?

14     A.   Well, so Mr. Wells' antenna theory, anything that

15  had to do with that, he knew about.   He had constructed

16  many antennas was my understanding.   So he knew about

17  construction, about building antennas.   If they broke --

18  Kodiak is a pretty harsh place -- he knew about how to

19  repair those things.   So my understanding, and I relied

20  on that expertise when he worked for me, was that he was

21  our expert.

22     Q.   Do you have an understanding of his rank when he

23  left the Coast Guard?

24     A.   He was a retired chief petty officer.

25     Q.   Like you?

1    A.  Like I was at the time.  I'm a chief warrant

2  officer now.

3    Q.  Chief warrant officer.

4        If we could have, for foundational purposes,

5  Blair, Exhibit No. 173.

6        Mr. Reckner, have you seen that map before?

7    A.  I have.

8    Q.  In preparing for today's testimony?

9    A.  Yes.

10    Q.  Are you familiar with the locations that are on

11  that map?

12    A.  Yes, I am.

13    Q.  Are they accurately marked on that exhibit as to

14  locations with respect to Kodiak Island as they're

15  depicted?

16    A.  Yes, they are.

17        MR. SKROCKI:  Move for the admission of 173.

18        THE COURT:  Any objection?

19        MR. COLBATH:  No, Your Honor.

20        THE COURT:  173 is admitted.

21        (Exhibit No. 173 admitted.)

22  BY MR. SKROCKI:

23    Q.  So some geography, Mr. Reckner, if you could grab

24  the laser pointer.  Thank you.  Could you show the jury

25  where the Communications Station is on Exhibit No. 173?

1    A.  Sure.  So that's right there.

2    Q.  All right.  And there's a location down below for

3  Kodiak Airport.

4    A.  Yes, sir.

5    Q.  That's self-explanatory.  Now, can you tell the

6  jury where you lived in relation to the Communications

7  Station and the airport?

8    A.  Sure.  So the first two years I was there, I

9  lived in Aviation Hill right there.

10   Q.  The first two years?

11   A.  First two years.

12   Q.  Then after that where did you live?

13   A.  After that we moved behind the fence line to the

14  base proper, and it's kind of obscured by this, but over

15  here.

16   Q.  And when you lived in Aviation Hill -- and that's

17  between the two, main base Kodiak and the airport?

18   A.  Yes, sir.

19   Q.  -- how long was your commute?

20   A.  To the COMMSTA?

21   Q.  Correct.

22   A.  Five to eight minutes, I guess.  Not far.

23   Q.  We could take that one down, please.  I'm sorry,

24  not yet.  My mistake.

25       Let's go down further south down the road.

 1    There's another location down at the bottom left-hand

 2    side.

 3        A.   Yeah, this location here?

 4        Q.   Is there -- what do you remember that being

 5    called?

 6        A.   That's Kodiak -- it's a bedroom community in

 7    Kodiak called Bells Flats.

 8        Q.   Bells Flats?  Okay.  Is that accurate generally

 9    as to where Mr. Belisle's residence was and Mr. Wells'

10    residence was?

11        A.   Yes, it is.

12        Q.   Okay.  Blair, take that down.  If we could show

13    Mr. Reckner Exhibit No. 1.  We'll try to move these

14    forward.

15            See Exhibit No. 1, Mr. Reckner?

16        A.   I do.

17        Q.   We'll spend some time with that.  Are you

18    familiar with what's being depicted in Exhibit No. 1, in

19    the Google Earth image?

20        A.   I am.

21            MR. SKROCKI:  Move for the admission of Exhibit

22    No. 1.

23            THE COURT:  Any objection?

24            MR. COLBATH:  No objection.

25            THE COURT:  All right.  1 is admitted.

1          (Exhibit No. 1 admitted.)

2          MR. SKROCKI:  Publish.

3     BY MR. SKROCKI:

4     Q.  And just briefly, can you show the jury where

5     Aviation Hill is where you lived?

6     A.  Yes, sir.  So that's Aviation Hill right there,

7     Coast Guard housing.

8     Q.  All right.  And down below at the bottom of the

9     screen, do you see some like tarmac and some white

10    rectangles?

11    A.  I do.

12    Q.  Can you tell the jury what that is?

13    A.  So this is the air station.  So these are the

14    hangars, the air station.  There's a taxiway here that

15    gets to the airport so they can use the runways of the

16    airport.

17    Q.  And what kind of aviation equipment did the Coast

18    Guard have at the main station here?

19    A.  We had Coast Guard C-130s.  We had Coast

20    Guard HH-60s, and those are helicopters, and HH-65s,

21    also helicopters.

22    Q.  And if you go past the main base station, is that

23    where you were working you said the last two years of

24    your deployment?

25    A.  Say that again.

1    Q.  I'm sorry.  Is that where you were living the

2 last two years of your deployment?

3    A.  My last two years, so I was on the base proper

4 behind the fence line right over here somewhere.

5    Q.  That yellow line on the road -- yellow line

6 depicts a road?

7    A.  Yes.

8    Q.  What road is that?

9    A.  That's Rezanof.  That's what takes you back to

10 Kodiak or down to the Flats, Bells Flats.

11    Q.  Bells Flats.  So if on the upper right, if you

12 keep going, you go to sort of Kodiak city?

13    A.  Up here.  If you kept going, yes, sir.

14    Q.  Kodiak town.  Okay.  And if you go past the

15 airport runway, there's a road that veers to the left.

16 Can you tell the jury about that, please.  Orient them

17 as to what that is.

18    A.  This one right here?

19    Q.  Yes.

20    A.  Yep.  So that's Anton Larsen Road.  That's the

21 road that led to COMMSTA Kodiak.

22    Q.  That would be your commute?

23    A.  Yes.  So I would come out here and turn left

24 there and go to work.

25    Q.  If we could remove that and for identification

```
 1    Exhibit No. 2.
 2          Mr. Reckner, this is a satellite view of the
 3    Communications Station area.  Does that accurately
 4    reflect what it looked like at the time you were there
 5    2010 to 2014?
 6        A.  Yes, it does.
 7            MR. SKROCKI:  Move for the admission of Exhibit
 8    No. 2.
 9            MR. COLBATH:  No objection.
10            THE COURT:  2 is admitted.
11            (Exhibit No. 2 admitted.)
12    BY MR. SKROCKI:
13        Q.  I'm just going to do the laser pointer myself,
14    Mr. Reckner.  But if you go to the bottom where that
15    yellow road is --
16        A.  Right here?
17        Q.  Correct.  Thank you.  What road is that?
18        A.  That's Anton Larsen Road.
19        Q.  And if you proceeded down that yellow road, where
20    would you ultimately end up?
21        A.  If you went down the sheet, you would end up back
22    at the Rezanof over near the airport.
23        Q.  About how far of a drive from -- minutes from T-1
24    to the airport would that be, roughly?
25        A.  Roughly, less than five I would say.
```

 1     Q.  So let's -- since we're down at the bottom sort
 2  of, let's start at the bottom, move our way up.  On the
 3  bottom left-hand side of Anton Larsen, as you described
 4  it, there's a facility there.  Do you see that?
 5     A.  This one right here?
 6     Q.  Yes, sir.  Can you tell the jury what that is.
 7     A.  Yes.  That's the Kodiak water treatment plant.
 8     Q.  And if you proceed from the plant you cross a
 9  body of water?
10     A.  Yeah.  Right here you cross the Buskin River.
11     Q.  And is there fish in that river?
12     A.  There is.
13     Q.  Did you ever fish it?
14     A.  I have.
15     Q.  You're under oath, so where's your favorite spot?
16     A.  Give away all my secrets.  Right here there's a
17  point on the COMMSTA that we could fish right there.
18  They would hold there before they ran up to the lake.
19     Q.  What kind of salmon, sir?
20     A.  All four species.
21     Q.  All right.  And if you keep crossing the bridge,
22  I want to run your route to T-1 if you could.
23     A.  Sure.  So I would come in, cross the bridge, and
24  then right here's the driveway up to T-1.  There's a
25  gate right there with a card reader.  Badge in, the gate

1    opens and I would park about right there.

2        Q.   Can you tell the jury what kind of gate that is.

3        A.   Like a sliding gate.  It was a badge reader and

4    also a call box, so you could talk to the watch if you

5    didn't have a badge.  It was normally closed.  You just

6    swipe a badge, and it would kind of go like that, slide

7    open.

8        Q.   All right.  So let's back ourselves to the bridge

9    over the Buskin River.

10       A.   Okay.

11       Q.   And if you go and follow the yellow line to the

12   left, then there's a couple of lighter gray

13   road-ish-type things.  Can you describe what they are?

14       A.   Yep.  So that's a gravel driveway and that's a

15   gravel driveway.  And then you just kind of led into the

16   P-2 parking area right there.

17       Q.   And if you kept going past T-2 up to the upper

18   left along the yellow road there, or what's got the

19   yellow line in it, there's another road up behind that's

20   gray.  Do you see that?

21       A.   Yes.  That one right there?

22       Q.   Thank you.  Yes, please.  Can you tell the jury

23   what that is and the other gray ones as well.

24       A.   Yep.  So this one here and this one here, these

25   back here, those are all roads that led to the antenna

1    field.  They were all gated.  So there would be a gate

2    here.  There was a gate right here.  And then we had a

3    gate here and one over in this area, I believe.

4        Q.  When you say antenna field, is this where -- what

5    occurred there?

6        A.  So that's where we had the antennas.  It's a

7    large piece of property.  The antennas had to have some

8    separation.  So it was a lot of real estate, and there

9    was antennas, you know, all back there.

10       Q.  And what kind of, if you recall, physical

11   maintenance is required for the field itself?

12       A.  Right.  So what we did was probably the biggest

13   thing was in the summertime was to make sure the

14   vegetation was cut back.  So all the tall grass and any

15   trees that might be grown up near an antenna or a guide

16   or anything like that around the structure, our

17   non-rates, our ET3, ET1 would go out there and cut those

18   back.

19           Then we also had some large like -- I wouldn't

20   call them lawn areas, but large open areas near the

21   antennas where Mr. Wells and Mr. Belisle would use --

22   primarily those two guys would use a tractor and go and

23   mow those down with a tractor.

24       Q.  And did you have equipment to do that?

25       A.  We did.

 1    Q.  Where was that equipment stored and maintained
 2  and/or serviced?
 3    A.  So it was all in T-2 right there.
 4    Q.  On that image, the Google image, you see a red
 5  roof on the T-2?
 6    A.  I do.
 7    Q.  Is that all there is to that structure?
 8    A.  Right here?
 9    Q.  Yeah.
10    A.  No.  There's a -- it's like an L-shape building,
11  so it's kind of grayed out because it kind of gets
12  blurry in the image.  But it's there.
13    Q.  We can take that down and move Exhibit No. 3 for
14  foundation.
15        Do you recognize what's depicted on that map,
16  Mr. Reckner?
17    A.  I do.
18    Q.  What is depicted there?
19    A.  Bells Flats.
20        MR. SKROCKI:  Move to admit Exhibit No. 3.
21        MR. COLBATH:  That's fine, Your Honor.
22        THE COURT:  All right.  3 is admitted.
23        (Exhibit No. 3 admitted.)
24  BY MR. SKROCKI:
25    Q.  And the yellow road there that's highlighted on

1   the right, what road would that be?

2       A.   That's Rezanof.  West Rezanof I think they call

3   it.

4       Q.   Do you recall there's an -- off of Rezanof in the

5   upper right is an open area.  Upper right and to your

6   right of the road.  You just had it.

7       A.   Right here?

8       Q.   Yep.

9       A.   Okay.

10      Q.   Do you know what that is?

11      A.   I think that's the fairgrounds, right?  Yeah,

12  that's the fairgrounds.

13      Q.   And generally, to your understanding, Mr. Wells

14  and Mr. Belisle lived in Bells Flats?

15      A.   That's correct.

16      Q.   From the airport, how far of a drive is it to get

17  there, roughly?

18      A.   Again, five, maybe less than ten minutes would be

19  my guess.

20      Q.   Blair, if we can take that down.

21           Now, what I'm going to do, Mr. Reckner, to try to

22  move through these photos quicker is we're going to pull

23  up, Counsel, 4, 5, 6, 7, 8, 9 and 10.  Slowly.

24           Okay.  Take a look at that one, Mr. Reckner.

25  Okay?

1    A.   Yes.

2    Q.   Are you oriented to what that image depicts?

3    A.   I am.

4    Q.   Segments of Kodiak and the Communications

5    Station?

6    A.   Yes.

7    Q.   Move to No. 5, please.  That depicts the

8    Communications Station and T-1 and T-2 buildings,

9    correct?

10    A.   It does.

11    Q.   No. 6, please.  Lower -- reflects -- Exhibit

12    No. 6 reflects the T-2 building and the water treatment

13    plant and Anton Larsen Road, correct?

14    A.   Yes.

15    Q.   7.  Close-up aerial shot of the T-2 building.

16    A.   Yes.

17    Q.   Is that accurate?

18    A.   Yes, it is.

19    Q.   8.  Aerial view from behind the T-2 building.  Is

20    that accurate?

21    A.   It is.

22    Q.   9.  A little further back higher elevation of the

23    back of the T-2 building?

24    A.   Yes, sir.

25    Q.   And 10.  That one -- can you see that,

Mr. Reckner, in terms of the data in the line diagram on

that exhibit?

    A.   I can.

    Q.   Is that an accurate depiction of the

Communications Station organizational system in April of

2012?

    A.   Yes, it is.

    Q.   And the images that you just looked at Exhibits 4

through 9, are they accurate as to around the day or two

of the murders of Mr. Belisle and Mr. Hopkins?

    A.   They are.

            MR. SKROCKI:  Move for the admission of 4

through 10, Your Honor.

            THE COURT:  Any objection?

            MR. COLBATH:  No.

            THE COURT:  All right.  4 through 10 are

admitted.

            (Exhibit Nos. 4, 5, 6, 7, 8, 9 and 10

admitted.)

BY MR. SKROCKI:

    Q.   If we could have 4, Blair.

            You got that laser pointer, Mr. Reckner?

    A.   I do.

    Q.   Okay.  Can you find where the airport is on

Exhibit No. 4?

1    A.  I can.  That would be right there.

2    Q.  And if you could walk -- or do the laser pointer

3 down Anton Larsen towards the Communications Station.

4    A.  Yes.  So you come down here, down this way,

5 across the bridge right here.  And then you would come

6 in.  There's T-2 and there's T-1.

7    Q.  All right.  I want to go back up Anton Larsen

8 Road.  Is there a piece of infrastructure on the road

9 that is connected to the Communications Station that you

10 can see?

11    A.  There is.  So right there is the -- was the

12 warehouse.  We had a warehouse there.

13    Q.  You recall it was a warehouse?

14    A.  The warehouse.

15    Q.  And what was stored in that warehouse?

16    A.  It had a lot of old parts, pieces of antenna,

17 some personal property.  Mr. Wells was there.

18    Q.  We'll get to that.  And then the -- point out the

19 water treatment plant.

20    A.  Sure.  Right there.

21    Q.  Exhibit No. 5.  Just an aerial view, and that's

22 looking up toward the T-2 and T-1 complex?

23    A.  It is.

24    Q.  Exhibit No. 6.  And again, just because it's a

25 closer image, can you point out the water treatment

1   plant?

2     A.  Sure.  Right there.

3     Q.  I want to focus just briefly your attention onto

4   T-2.  And there's -- you could see different color

5   roofs?

6     A.  Yes.  So you can see the gray roof I was talking

7   about earlier and the red roof there.

8     Q.  And behind the building, sir, can you describe

9   what the topography is behind the T-2 building?  Go to

10   the bottom left corner.

11     A.  Yep.  So this is a hill that goes down this way.

12   It slopes down towards the backside of T-2, so it would

13   be pretty hilly right there.

14     Q.  You can see a line there in the vegetation,

15   bottom left-hand corner?

16     A.  Yes, sir, I see it.

17     Q.  Can you tell the jury what that is?

18     A.  So this line right here, it's a transmission

19   cable, and we cover it with large cement or concrete

20   tiles to try to keep the bears around from the

21   transmission cables.  For some reason, they like to bite

22   into them.

23     Q.  They like to bite into them?

24     A.  Yeah, they do.

25     Q.  Do they survive the bite?

1    A.   They do.  They like it.  Yeah, it's crazy.

2    Q.   Fair enough.  No. 7, please.  I want to direct

3 your attention, Mr. Reckner, to that circled area there.

4    A.   Yes, sir.

5    Q.   Can you describe the equipment you see there and

6 its location in reference to the T-2 building?

7    A.   Sure.  So we have two snowcats there.  Another

8 snowcat there.  That's a bulldozer.  This red building

9 is like a Conex storage like you'd see on backs of

10 trucks or on trains sometimes.  Then we have what we

11 call the big line truck, that yellow thing right there.

12   Q.   When you say the big line truck, how big is it?

13   A.   It's pretty big.  I had a Ford F-350 crew cab,

14 and the line truck was bigger than that.

15   Q.   And, Mr. Reckner, do you recognize a vehicle in

16 this photograph in the front of T-2?

17   A.   I recognize -- yeah.

18   Q.   Where?

19   A.   In front.  So there's these here and this one

20 there.

21   Q.   And with respect to the vehicles, these white

22 ones here, can you tell the jury what those are?

23   A.   Yeah.  So the two white ones, one we called the

24 little line truck and the other one was the dually,

25 because it was a Ford dually, and that dark shaped truck

1    is Mr. Belisle's truck.

2        Q.  That one there?

3        A.  Yes, sir.

4        Q.  When was this photograph taken?

5        A.  I would say that photograph was taken the day of

6    or the day after the murders.

7        Q.  Exhibit No. 8.  Mr. Reckner, I want to focus your

8    attention first to the area behind the rigger shop, or

9    T-2 as we're calling it.  Do you see that area there?

10       A.  I do.

11       Q.  I want to get my circle out of there for you.

12           Okay.  I want to move from the left of that

13   building forward.  So on the left, you see an overhang

14   right there?

15       A.  I do.

16       Q.  What is that, sir?

17       A.  That's the door that goes into the boiler room

18   and the equipment room or boiler room of T-2.

19       Q.  We'll get to that in a little bit once we move

20   inside the building.  How about this right there, that

21   alcove-looking item?

22       A.  That's another door that goes into the repair

23   area of T-2.

24       Q.  Is this the line truck you were talking about?

25       A.  It is.

1    Q.   How much space is back here in terms of vehicle

2  access?

3    A.   Sir, quite a bit.  You can drive all the way

4  around it.  And really even with that snowcat there, you

5  can still get around it.

6    Q.   9.  Mr. Reckner, when you worked at these

7  buildings, what time did you usually arrive?

8    A.   I usually arrived somewhere between 8:00 and

9  8:30.

10    Q.   This is the Buskin River here that we talked

11  about before?

12    A.   Yes, sir.

13    Q.   When you came down the bridge I'm drawing on

14  Exhibit No. 9, you would veer to the right?

15    A.   Correct.

16    Q.   At some point, were you able to see as you came

17  down here who was parked in front of T-2?

18    A.   You could.

19    Q.   What would you see every morning?

20    A.   Well, pretty much when you came around this

21  corner, there's some vegetation here, but once you came

22  around here, you had a pretty good shot.  And for sure

23  once you were orientated with the bridge here, you could

24  see the parking lot and you would have a good idea of

25  who was in work that day.

1    Q.   Would you be able to do that as you drove by

2    every day going to T-1?

3    A.   Yeah.  So I would come through, take a glance,

4    see, you know, who's in the shop and just keep going up

5    to my desk up at T-1.

6    Q.   Any way for you to see behind T-2 when you

7    accessed T-1 --

8    A.   No.

9    Q.   -- through that -- as you headed up towards T-1?

10   A.   You could this way, I suppose.  If you turned to

11   the left you would be able to kind of see the back side

12   and some of this, not so much over here though.

13   Q.   I want to focus your attention on these two, I'm

14   just going to call them gravel, for lack of any other

15   point.  What are those for?

16   A.   So those are gravel driveways in order to get,

17   you know, equipment in and out.  Or if we were going to

18   go to the gate I showed you down the screen here, you

19   would just come out this way.  You know, why would you

20   go this way when you can go this way, right?

21        Same thing when you're coming back.  You come in

22   this way.  This one wasn't used as much, but it was.

23   People came in and out of that occasionally.

24   Q.   And is the access from here to there something an

25   automobile could drive on?

1    A.   Yes.

2    Q.   What was the composition of it?

3    A.   Gravel.

4    Q.   All of this?  I'm circling the holes.

5    A.   Yes.  Everything you see that's kind of a darker

6    gray than the road, than the paved road is all gravel.

7    Yes, sir.

8    Q.   And drivable?

9    A.   And drivable, yes, sir.

10   Q.   My colleague points out there's a structure on

11   the wall in the back of T-2.  Can you see that,

12   Mr. Reckner?  We can blow it out for you if you wish.

13   A.   Yeah, could you?

14   Q.   Blair, could you blow out -- there you go.

15   Perfect.  Thank you.  Let me get rid of that one.

16        What is that object, sir?

17   A.   That's the window that looks into the office

18   area.

19   Q.   Okay.  Do you recall, is it something that --

20   like I'm 6-1.  Is this something I could look out?

21   A.   It was pretty high when you were in the office,

22   and the orientation was pretty much up and out.  So if

23   you're sitting in the office, you're going to look up

24   and out towards the hill.  You would see the hill.  If

25   you stood right next to it and kind of stood like that,

1    then you could kind of look out.  But if you were just

2    in there, you would just see the back of the hill.

3        Q.  This alcove here, how is that secured, do you

4    recall?

5        A.  I do.  On the inside, it's locked on the inside.

6        Q.  Then there was a -- we've blown it up quite a

7    bit.  You mentioned this is the boiler room door?

8        A.  Yes.

9        Q.  How was that secured?

10       A.  So that was secured with a key.  There was

11   another door on the other side of the boiler room that

12   was secured by dead bolt.

13       Q.  We'll talk about that a little later on.  Inside

14   the building, it was secured with a dead bolt?

15       A.  Yes, sir.

16       Q.  Blair, you can take that one down.

17            We're going to put 10 up briefly.  It's the big

18   organizational diagram.  Just for a moment.  Then we'll

19   move onto No. 11.

20            Is that an accurate -- I'm just going to call it

21   wiring diagram because that's what I call these things

22   of the Communications Station?

23       A.  Yes, that's an accurate depiction of the chain of

24   command of COMMSTA Kodiak at the time.

25       Q.  Up at the top, who was the commanding officer

1  then?

2      A.  At the time it was Commander Pete Van Ness.

3      Q.  He had some -- beneath him he had an executive

4  officer?

5      A.  Yes, he did.

6      Q.  Who was that?

7      A.  Lieutenant David Pizzurro.

8      Q.  If we could remove that and for foundation show

9  Mr. Reckner No. 11.

10         Is that a little more streamlined organizational

11  chart concerning the Communications Station and the

12  organization of the rigger shop?

13     A.  Yes, that's -- yes, it is.

14         MR. SKROCKI:  Move to admit Exhibit No. 11.

15         MR. COLBATH:  That's fine, Your Honor.

16         THE COURT:  11 is admitted.

17         (Exhibit No. 11 admitted.)

18  BY MR. SKROCKI:

19     Q.  All right.  So I guess we'll start at the top.

20  And the commanding officer?

21     A.  Commander Pete Van Ness.

22     Q.  He has an executive?

23     A.  Lieutenant Dave Pizzurro.

24     Q.  There's an engineering officer?

25     A.  Yeah, that was Senior Chief William Reed.

1      Q.   And who's that there?

2      A.   That's me.

3      Q.   How did the interaction between you and Mr. Reed

4   work in terms of managerial hierarchy?

5      A.   Sure.  So the engineering department you can kind

6   of see in the last diagram consisted of the ETs and the

7   rigger shop and the IT shop.  And so we had two chiefs.

8   I was one.  There was an ET chief who ran the ETs.  So I

9   worked with Bill Reed daily.  He was my direct

10  supervisor.  He was in charge of the entire engineering

11  department.

12     Q.   Thank you.  So you're here in IT in charge.

13  There's your name, Scott Reckner.  Underneath you who's

14  there?

15     A.   That's ET1 Jim Hopkins.

16     Q.   Then we move over to this side.  I've circled the

17  bottom left-hand side.  Can you explain the managerial

18  hierarchy with where it says ET3 Cody Beauford?

19     A.   Sure.  So ET3, Cody Beauford.  And then the four

20  non-rates, Pacheco, Coggins, Upchurch and Henry.  And

21  he -- day-to-day interactions with -- with them were get

22  out and do work, right?  So that's kind of what he

23  supervises that front-line work.

24     Q.   And on the right-hand side, we have who?

25     A.   That's Mr. Wells and Mr. Belisle.

1    Q.   And directly supervised by which individual?

2    A.   By ET1 Jim Hopkins.

3    Q.   Let's try to authenticate foundational purposes,

4    Blair.  Show Mr. Reckner, 12, 13 and 14.

5         Recognize that sign there, Mr. Reckner?

6    A.   I do.

7    Q.   And where did that sign appear?

8    A.   That was on the rigger shop.

9    Q.   Exhibit No. 13, please.  That's an interior

10   diagram, Mr. Reckner?

11   A.   It is.

12   Q.   And is that accurate as to the interior of the

13   Communications Station, rigger shop?

14   A.   Yes, it is.

15   Q.   And Exhibit No. 14.  That's an enlargement of the

16   sort of work area of the rigger shop; is that accurate?

17   A.   Yes, sir.

18   Q.   So were all these accurate as to the time of the

19   murders of Mr. Belisle and Mr. Hopkins on April 12th of

20   2012?

21   A.   Yes.

22        MR. SKROCKI:  Move for the admission of 12, 13

23   and 14, Judge.

24        MR. COLBATH:  That's fine, Your Honor.

25        THE COURT:  12, 13 and 14 are admitted.

```
 1              (Exhibit Nos. 12, 13 and 14 admitted.)
 2              MR. SKROCKI:  One moment.  Those are admitted,
 3    Your Honor?
 4              THE COURT:  Yes.
 5              MR. SKROCKI:  Thank you.  Thank you so much.
 6    BY MR. SKROCKI:
 7       Q.  Exhibit No. 12, please, Blair.
 8              Mr. Reckner, where was this sign located where it
 9    says "COMMSTA Kodiak Rigger Shop"?
10       A.  It was on the front side of the rigger shop when
11    you drove in.
12       Q.  Under the red roof side or the gray roof side?
13       A.  Under the red roof side.
14       Q.  Okay.  Thank you.  Let's look at Exhibit No. 13.
15    Since we're going to focus another exhibit on this area
16    here, we're going to skip that for a moment,
17    Mr. Reckner, and focus on repair shop, wood shop, garage
18    areas.  Okay?
19       A.  Okay.
20       Q.  So just to orient the jury, the line truck and
21    the Bobcat area or what we saw on those photos earlier,
22    where would they be on this diagram?
23       A.  So we didn't see the Bobcat.  We saw the line
24    truck.  And the snowcats were in this area, yeah.
25       Q.  Back in the back?
```

1     A.   Right.

2     Q.   So this would be B for back, correct?

3     A.   Yes.

4     Q.   That's not working at all.

5     A.   The hill would be going up in this direction.

6     Q.   Upper right?

7     A.   Up that way, right.  So the line truck was there.

8  The Bobcat was there.  There was like a Conex here.  The

9  hill in this area.

10    Q.   Okay.  There's -- what are these two items here

11 that I circled?

12    A.   Those are our garage doors.

13    Q.   So what would come into this repair shop here in

14 terms of rigger shop activity?

15    A.   So we would use that to stage antennas if we're

16 going to do work.  Or if we're going to go climb, we

17 would stage our climbing gear.  And if we're going to

18 change the light, the light.  The tools we would need,

19 that kind of stuff.  We could drive vehicles in there if

20 we needed to and work on them.  We had our snowplows

21 sometimes in there.  A lot of stuff.  A lot of stuff we

22 used to do our job.

23    Q.   I want to direct your attention to what I'm

24 circling in blue on the upper center of Exhibit No. 13.

25    A.   Okay.

1    Q.  Can you identify what those two items represent

2    there?

3    A.  So that's the door, and then that's the vestibule

4    that I pointed out earlier.

5    Q.  How about in terms of what you call the locking

6    arrangements for both of those doors?

7    A.  So this door would be dead bolted.  And this door

8    was like a screen door or storm door, I think.  I don't

9    think we normally locked that.  But this one was

10   definitely dead bolted.

11   Q.  Sticking with the repair shop a little bit more,

12   circling a door down below at the bottom left of -- the

13   bottom of the repair shop in the diagram, Exhibit

14   No. 13.  Can you talk about that?

15   A.  Sure.  So that door is key carded, so you need to

16   have a key card to get into it or a key.  A key would

17   also open it, but most people I guess used the key card.

18   Q.  And just for foundational purposes, Mr. Reckner,

19   you mentioned you had an office in T-1.  At some point,

20   did that change?

21   A.  It did.

22   Q.  When did that change?

23   A.  In December of 2011.

24   Q.  What happened in December of 2011 just in terms

25   of your office?

     A.   So I had the ET3 non-rates put a desk down in the
office for me.

     Q.   So did you have access and go into the T-2 on a
daily basis during that time?

     A.   I did.  And before then I had access to it.  But
I was there daily.

     Q.   Did you develop an understanding about how the
employees there would access the rigger shop when they
started their workday?

     A.   I did.

     Q.   Can you tell the jury what your understanding was
about their access, please?

     A.   So this is kind of the parking area right here
where you saw the trucks.  The first person in would go
through this door, come up this ramp here and go to this
door.  This door was dead bolted from the inside, and
they would open that door.  And then everybody else who
came in would just go through that door mostly.

     Q.   How is this door controlled?

     A.   It was a dead bolt.

     Q.   And then you talked about parking, correct?

     A.   Yes.

     Q.   So I want to focus your attention on this area
here.  Is that where people would park?

     A.   Generally, yes.

1    Q.  Did you have an understanding about how people

2  parked?  Is there sort of a parking hierarchy of the

3  rigger shop, would have been at the time you were there?

4    A.  Yes.

5    Q.  Is that fair, sort of accurate that the blue

6  rectangle covered the parking area?

7    A.  It is.

8    Q.  Okay.  If you could tell the jury then, fill in

9  the gaps on who's parking where as you understood.

10    A.  So generally, Mr. Wells would be here.  When I

11  say generally, I mean always.  He always parked there if

12  he was coming in to work.  Right here is Rich Belisle,

13  and then we had our two trucks, our two line trucks

14  here.

15        And then on the other side of that would be

16  everybody else.  So usually ET1 Hopkins, because he

17  would be usually the next guy in.  And then the

18  non-rates over here.  And then I usually parked down on

19  this side of the building over here.

20    Q.  So how did you get the longest walk being the

21  boss?

22    A.  You know, that's a good question.  I don't know

23  the answer to that.

24    Q.  So the non-rates would be to the far left,

25  correct?

```
 1      A.   Yes.   They would be generally over here in this
 2   area.
 3      Q.   All right.
 4           MR. SKROCKI:  May I have a moment to confer
 5   with Counsel?
 6           THE COURT:  Certainly.
 7           (Pause)
 8           THE COURT:  Anybody want to stand and stretch,
 9   feel free to, ladies and gentlemen, if you'd like.  Or
10   not.
11           MR. SKROCKI:  Can we take a stretch break.  We
12   have an exhibit that we're bringing in that's kind of
13   bulky.
14           MR. COLBATH:  Can I look at it real quick?
15   We'll just let everybody stand up.  We'll be one minute.
16           THE COURT:  One minute, I'm going to hold you
17   to that.
18           (Pause)
19           THE COURT:  Are we ready?
20           MR. SKROCKI:  Did I beat the clock?
21           THE COURT:  Pretty good, yeah.  I didn't check.
22   I guess I should have.
23           MR. SKROCKI:  We're all set.
24           THE COURT:  Very good.  Everybody ready to
25   proceed?  Anybody need a break?  No?  All right.  Very
```

1   good.

2           MR. SKROCKI:  Just for the record, Your Honor,

3   Counsel has had a chance to observe this.  We've spoken

4   about it.  We're just going to move to admit it, have

5   Mr. Reckner authenticate it briefly.  It's very bulky.

6   We would do better if it was just up on the screen, I

7   think.  And then we'll just wheel it out of the way.

8           THE COURT:  Okay.

9           MR. SKROCKI:  Okay.

10          THE COURT:  And what's the exhibit number?

11          MR. SKROCKI:  No. 236.

12          THE COURT:  236.  And there's no objection?

13          MR. COLBATH:  There's not any objection, Your

14  Honor.

15          THE COURT:  All right.  So are you seeking to

16  admit it?

17          MR. SKROCKI:  Please.

18          THE COURT:  All right.  No objection to its

19  admission?

20          MR. COLBATH:  No objection.

21          THE COURT:  All right.  236 is admitted.  Go

22  ahead.

23          MR. SKROCKI:  Thank you.

24          (Exhibit No. 236 admitted.)

25  BY MR. SKROCKI:

1     Q.  Mr. Reckner, if you could stand up.  Thank you.

2  And you've seen this before?

3     A.  I have.

4     Q.  And it's a replica of the inside of the rigger

5  shop office space area, correct?

6     A.  It is.

7     Q.  Without the wood shop or the repair shop?

8     A.  Correct.

9     Q.  Is anything else missing on that in terms of

10 structures?

11    A.  No, I don't think so.

12    Q.  Okay.

13    A.  Looks good.

14    Q.  All right.  Very good.

15         MR. SKROCKI:  That's all the questions I have

16 on that exhibit.

17         THE COURT:  On 236.  Okay.

18 BY MR. SKROCKI:

19    Q.  I believe we were on Exhibit No. 13.  If we could

20 move on to Exhibit No. 14, please.  Mr. Reckner, this is

21 an enlargement of what we had in Exhibit 13 without the

22 wood shop and everything else, correct?

23    A.  Yes, it is.

24    Q.  It's kind of self-explanatory, but on the wood

25 shop part of the T-2 building, what was done there?

1      A.  So we had woodworking equipment, saws, drill

2  presses.  We would use that to work with wood if we

3  needed to, and sometimes we needed to.

4      Q.  In a general sense, the machinery and the

5  equipment, things that you used in the rigger shop, can

6  you sort of give a laundry list?  Were they big?  Were

7  they small?  What kind of equipment was in there?

8      A.  In the rigger shop totally?

9      Q.  Yes.

10      A.  We had a lot of both, honestly.  So we had almost

11  any tool you can think of to do all of the work with the

12  antennas and some of our vehicle maintenance.  We had

13  ropes and chains and straps that we used for rigging.

14  We had air.  We had pneumatic air throughout the whole

15  shop, definitely the two garages.

16          We had pneumatic tools.  So for like taking lug

17  nuts off our ATVs or vehicles if we needed to.  We had

18  jacks, jack stands, again for vehicle maintenance and

19  stuff.  We stored some of our snowplows in there.  Some

20  of the brush hogs, which kind of we used for clearing

21  brush, attached them to the back of equipment, that kind

22  of stuff.

23      Q.  How about you mentioned something about air.  I

24  didn't quite catch it.

25      A.  So we had an air compressor in the building, and

1    we had pneumatic air both in the repair garage and in

2    the Bobcat garage, which we haven't talked about yet.

3        Q.  Do you want to go back to 13 and talk about the

4    Bobcat garage?

5        A.  I can explain it, sure.

6        Q.  Let's go back to 13.  You mentioned Bobcat

7    garage?

8        A.  So here's the wood shop we talked about.  And

9    then this was the Bobcat garage.  It had another garage

10   door there.  This is where we kept the Bobcat and the

11   Bobcat parts.  We had a couple of snowplows for it.  We

12   had a brush hog that could take down a small boulder.

13   Actually pretty cool.  We had all our straps and chains

14   were on the wall here.  And we had pneumatic air in this

15   area.  We had pneumatic air in this area.

16       Q.  Briefly, Mr. Reckner, I want to focus your

17   attention on the back side of this wall here.  These

18   white structures that I just sort of covered over with

19   ink, do you see what those are?

20       A.  I do.

21       Q.  What are those?

22       A.  So they're windows.  That's a window, window,

23   window, window, window, window.  And then on this side

24   too, there's a window there.

25       Q.  So you can do outside -- inside looking out,

1  correct?

2      A.  Inside looking out, yes.

3      Q.  And if you were on the other side looking in,

4  what's the height of those windows?

5      A.  So again, those windows are pretty tall.  Even if

6  you're on the inside, they're tall.  And then on the

7  outside, you could step up to go in, they're even

8  taller.  So you'd have to kind of really get up there if

9  you wanted to look in.

10     Q.  14, please, Blair.

11         Let's sort of work our way from bottom to top,

12  Mr. Reckner.  Where it says locker room there, can you

13  describe what's going on there with respect to the

14  rigger shop to the jury, please?

15     A.  I can.  So these are the doors to the wood shop

16  we saw earlier.  And then we had some lockers here that

17  we used for storing some climbing gear.  I think there

18  was some cold weather gear in there.  Some of the

19  non-rates stored some of their personal stuff in those

20  lockers as well.

21     Q.  And this door there, access is where?

22     A.  That's the door that accesses out into the

23  parking lot.

24     Q.  Let's talk about this area here.  Can you talk

25  about that function for the jury, please, how that area

1  functioned?

2     A.   Sure.   So this was the break room, or I call it

3  the bullpen.   That's where the ET3 and the non-rates

4  sat.   We had two computers that they shared.   We had

5  some more locker space for them in there for their

6  personal belongings or their work gear, safety gear,

7  that kind of stuff.   A table, they can eat lunch.   We

8  have a refrigerator, microwave and then a bathroom.

9     Q.   So I want to focus your attention along that

10  route I just drew with my finger from what you're

11  calling the bullpen, break room past through that door

12  and through that open area and through this door into

13  this area here that I marked with a circle.

14     A.   Okay.

15     Q.   What is this area here I marked with a circle?

16     A.   So that's the boiler room.

17     Q.   Again, this is self-explanatory.   But you got to

18  tell it to the jury.   What's in the boiler room?

19     A.   So the heating the HVAC stuff.   Honestly, I

20  don't -- I'm not 100 percent sure.   But I know that it

21  heated the building and that kind of stuff.

22     Q.   There's an access door to the boiler room,

23  correct?

24     A.   Yes.   Right there.

25     Q.   How is that secured?

1      A.   By a key.

2      Q.   Now, I want to move back towards the bullpen

3  break room area.  There's a door there that's marked on

4  the diagram; is that accurate?

5      A.   It is.

6      Q.   Can you explain to the jury here how that door

7  was secured and how it functioned?

8      A.   Yep.  So that's the door obviously the access

9  into the boiler room area, and that would be dead

10 bolted.  So part of the nightly routine would shut that

11 dead bolt closed.

12     Q.   When you say dead bolted, you'll have to give us

13 on what side of the door.

14     A.   Well, I don't recall exactly, but I know you

15 threw it.  There was like a -- it had like a little

16 handle, and you kind of threw it over.

17     Q.   From this side here?  On the break room side of

18 the door to lock it?

19     A.   Yeah.  I'm sorry.  Yes.  On the break room side

20 of the door, yes.

21     Q.   Okay.  So door would be shut, someone slap the

22 bolt and off you go?

23     A.   Correct.

24     Q.   Let's focus our attention to what's described as

25 the office space.  Do you see that there, sir?

1     A.   I do.

2     Q.   So you mentioned that at some point, you moved an

3   office down into the T-2 building?

4     A.   Right.

5     Q.   We'll talk about that later.  Can you show the

6   jury where your workplace was and at what point and time

7   you started working in this office?

8     A.   Sure.  So in December of 2011, I had a desk put

9   in right there.

10     Q.   So that would be your desk?

11     A.   Yes, sir.

12     Q.   Mr. Hopkins' desk?

13     A.   Right there.

14     Q.   Upper left of the office place -- the office

15   space?

16     A.   Yes.

17     Q.   Then how about Mr. Hopkins?

18     A.   Mr. Hopkins was there.  I was there, and

19   Mr. Hopkins was there.

20     Q.   I'm sorry.  Mr. Belisle?

21     A.   Mr. Belisle was there.

22     Q.   And then this red object, what is that?

23     A.   That's a couch.

24     Q.   Where did Mr. Wells work?

25     A.   He sat right there.

1    Q.   Right here?

2    A.   Yes.  By the door.

3    Q.   There was a door in place at the time of the

4    murders, sir?

5    A.   Yes.

6    Q.   Where it says "Ramp Up," can you explain to the

7    jury what that is?

8    A.   Yeah.  So this part of the building was a

9    different level than the repair part of the building.

10   So there was just a ramp.  Instead of steps they put a

11   ramp in.

12   Q.   If we could leave this up for just a few more

13   minutes.

14        Can you tell the jury your recollection of how

15   the rigger shop was secured morning, evening, things of

16   that nature, in between shifts?

17   A.   Sure.  So in the evening, the last person in the

18   shop would go around and make sure all the doors were

19   locked.  And that was part of routine.  Whoever the last

20   one was in there would make sure those were all locked

21   and then go out through the key card door.  And then

22   that was key carded.

23        And then periodically -- well, not periodically.

24   On a scheduled visit, the chief watch officer up the

25   hill would do walkthroughs of the building.  So I know

1  for sure at one point in the morning, one in the

2  evening, and they might have done one overnight as well

3  to check security of the building.

4      Q.  That's sort of standard operating procedure?

5      A.  Yes, sir.

6      Q.  In a general sense, in the year 2012, do you have

7  an understanding about who would arrive first and then

8  after that?

9      A.  Yes.  So the civilians arrived first.  They

10  started work at 0700.

11      Q.  Tell the jury who the civilians were.

12      A.  Mr. Wells and Mr. Belisle.

13      Q.  They started at 7:00?

14      A.  At 7:00.

15      Q.  Okay.

16      A.  And then the rest of the crew started officially

17  at 8:00, but ET1 Hopkins would generally be there

18  earlier than that, oftentimes around the same time the

19  civilians came in. And then the non-rates and

20  ET3 Beauford would come in.  We did colors every day, so

21  they would actually often come in but go up the hill to

22  get the flags.  We kept the flags in the basement of T-1

23  for safekeeping.  And then they'd bring the flags down

24  and stand by for colors.

25      Q.  So some of us may not be familiar with when you

say colors and stand by for colors.  Was there a routine

with that?

     A.   Right.  So --

     Q.   Yes?

     A.   Yes.

     Q.   Okay.  And tell them what the routine was on a

daily basis.

     A.   Okay.  So colors is the American flag.  And if

it's not -- if the flagpole isn't lit, then you have to

do colors at 0800 and again at sunset.  At the time we

were having issues with that, the lights that were

shining on the flag.  So we were doing colors every day.

     Q.   So backing up as to the arrival of people at work

in the morning, who would be the first three to arrive?

     A.   Mr. Wells, Mr. Belisle, and, generally speaking,

ET1 Hopkins.

     Q.   If we could pull up Exhibit No. 8, briefly, which

I believe is already admitted.  Yes?

          THE COURT:  Yes.

     Q.   With respect to the parking arrangement -- we

have the live photo as opposed to the diagram -- could

you show the jury your understanding of who was parking

there, and if you see someone's vehicle in that image.

     A.   Yeah.  So you can see a gap here between Rich's

vehicle and the building.  That's where Mr. Wells would

1    generally park -- well, always park.

2       Q.   The same orientation, nose in?

3       A.   Nose in, yeah.  Yeah, always nose in.  So

4    Mr. Wells always parked there.  Mr. Belisle would always

5    park there.  And then here are the two, our two

6    government vehicles, our two trucks.  And then

7    ET3 Beauford and the non-rates would kind of just park

8    like right here, like in a row.  And then I would park

9    on this side of the building.

10      Q.   There's a black truck.  Do you see that in the

11   photograph?

12      A.   This one right there?

13      Q.   What appears to be a black truck.  Do you know

14   whose vehicle that is?

15      A.   Yeah.  It's a blue truck.  It's Mr. Belisle's

16   truck.

17      Q.   If we could have exhibit -- remove this one for

18   me, Blair, please.

19           I'm going to try to save some time with some

20   exhibits here.

21           THE COURT:  Certainly.  Everybody doing okay?

22   Anyone need a break?

23           (Pause)

24           MR. SKROCKI:  We have agreed Exhibits 18 to 32

25   admitted by stipulation.

1           THE COURT:  Is that correct, Mr. Colbath?

2           MR. COLBATH:  That's correct, Your Honor.

3    They're all photos.

4           THE COURT:  All right.  18 through 32 are all

5    admitted.

6           (Exhibit Nos. 18-32 admitted.)

7           THE COURT:  Go ahead, please.

8    BY MR. SKROCKI:

9    Q.  Mr. Reckner, what does this photograph depict?

10   A.  So that's the gravel driveway going up to the

11   repair shop area of the T-2.

12   Q.  All right.  And on the left-hand side, there's a

13   vehicle there.  Do you see that vehicle?

14   A.  I do.

15   Q.  What is that?

16   A.  That's a snowcat.

17   Q.  And then further back, what's that vehicle there?

18   A.  That would be the large line truck.

19   Q.  There's two doors that you see here.  Those lead

20   to where, sir?

21   A.  Those lead into the repair shop.

22   Q.  Do you recognize these two vehicles here that

23   I've circled there, the silver and what looks like a

24   black vehicle in my screen?

25   A.  I do.

1    Q.   Whose vehicles are they?

2    A.   So that is Seaman Henry's vehicle.

3    Q.   That's the silver one, for the record?

4    A.   Yes, sir.

5    Q.   Leah Henry?

6    A.   Leah Henry, yes.

7    Q.   And next to it?

8    A.   That's Aaron Coggins' vehicle.

9    Q.   Is this the hill behind T-2 you were talking

10   about earlier?

11   A.   Yes, sir.

12   Q.   19.  What does that depict?

13   A.   That's the parking lot on the day of the murders.

14   Q.   Do you recognize two vehicles that are parked

15   there towards the gray roof side of the T-2 rigger shop

16   building?

17   A.   I do.

18   Q.   Whose vehicles are those, sir?

19   A.   So the blue one here is ET1 Jim Hopkins, and the

20   other blue one here is Mr. Rich Belisle's.

21   Q.   Do you see on that photograph, sir, where you

22   mentioned the key card assess was to get into the T-2

23   rigger shop building?

24   A.   I do.  It's kind of washed out, but you can kind

25   of see the brown boarding of the top or border at the

1  top.  That would be it right there.

2      Q.  20.  Thank you, Blair.

3          And the orientation on this photograph,

4  Exhibit 20, has changed a little bit, Mr. Reckner?

5      A.  Can you repeat that?

6      Q.  Sure.  The orientation of the photograph has

7  changed a little bit?

8      A.  Yes.

9      Q.  So where is the photographer in this photograph?

10     A.  He's standing on the road leading up to T-1.

11     Q.  On the -- this is the backside of the T-2

12  building?

13     A.  It is.

14     Q.  And are these the windows you described earlier?

15     A.  Yes.

16     Q.  And their height is approximately how high?

17     A.  I'm five-eleven, and they're at least head high

18  to me, so --

19     Q.  21, please.

20         And that's the entire back of the T-2 building,

21  sir?

22     A.  Yes.

23     Q.  Let's go from left to right.  Left to right.

24     A.  Yep.

25     Q.  If you can describe the windows and what they

1    access all the way from left to right, please.

2        A.   Sure.  So that window is the wood shop area

3    window.  I'm sorry.  That window is the Bobcat garage

4    shop area, so where we kept the Bobcat.  That's the wood

5    shop.  That is also the wood shop.  And then here,

6    actually, that's not the wood shop.  That's the break

7    room.  That's the break room.  So these two are break

8    room.  That's the bathroom.  I'm sorry.  I'm not seeing

9    it very well.

10       Q.   Want us to blow it up?

11       A.   Yeah, could you, please?

12       Q.   We're already on it.  Thank you.  Go ahead.

13       A.   That's better.  Let me start over.  Bobcat.  Wood

14   shop.  Wood shop.  So those two are wood shop.  Break

15   room, break room.  So those two look into the break

16   room.  That is the restroom.  That's a fan right there

17   that blows out.  And that is the boiler room area.

18       Q.   If we could reduce that, Blair.  Thank you.

19            And Mr. Reckner -- Blair, if you could enlarge

20   that.

21            I'm highlighting the enlargement there, the

22   cutout, Mr. Reckner.  On the distance, can you tell what

23   that object is?

24       A.   Right there?

25       Q.   Yes.

1    A.  Looks like snow.

2    Q.  And below that?

3    A.  Right here?  Looks like snow.

4    Q.  Is there an access point?

5    A.  There is.  So the driveway, I think the middle

6  driveway would be over in this area.

7    Q.  Thank you, Blair.

8        22.  That's an enlargement of the back of the

9  rigger shop, Mr. Reckner?

10    A.  Yes, it is.

11    Q.  Is this part of the T-2 equipment, this

12  bulldozer?

13    A.  It is.

14    Q.  And this larger vehicle here next to the

15  building, what's that?

16    A.  That's the large line truck I described earlier.

17    Q.  And this door in the vestibule, secured or

18  unsecured, sir?

19    A.  That's secured.  Are you talking about that

20  little one right there?

21    Q.  Yes.

22    A.  That's a screen door.  I think there was a little

23  lock on it.  Sometimes it would be locked.  I don't

24  remember if it was always locked.  But the one on the

25  other side of that was definitely locked.

1    Q.  Mr. Reckner, were there, at the time you were

2    there in the rigger shop before the murders, any video

3    cameras in the back of that building?

4    A.  No.

5    Q.  Do you know why that is?

6    A.  I don't.

7    Q.  Were there video cameras on the T-2 rigger shop

8    building?

9    A.  There was.

10   Q.  Where would that have been located?

11   A.  On the other side of that picture.

12   Q.  23, please.

13        Is that the video camera?

14   A.  Yes, sir, it is.

15   Q.  Where is that located in terms of the orientation

16   of the T-2 building?

17   A.  So this right here is the mechanism for those

18   large garage doors that go into the repair area.  And so

19   the camera is right here, directly adjacent to it.

20   Q.  Can I have 18, please.

21        If you could manage with this Exhibit 18, where

22   is the video camera?

23   A.  It would be right here.  In the last picture, you

24   could kind of see the top of this wood barricade going

25   under the fence, going around the dumpster.  It's like

1  right there.

2      Q.  Okay.  Let's go to 19.  There we go.

3          Can you point it out now?

4      A.  Sure.  Right there.

5      Q.  Right there?

6      A.  That's it, yes, sir.

7      Q.  Mr. Reckner, while you there, did you have an

8  understanding of sort of the field of view of this

9  camera?

10     A.  I did, yeah.

11     Q.  What was it used for?

12     A.  It was usually used to keep an eye on the flag in

13 that direction of the flagpole and keep an eye on the

14 flag.

15     Q.  Why?

16     A.  A couple reasons.  One, they actually -- so at

17 0800 when you blow colors, they would actually do that

18 up at the T-1 ops deck.  And so he could see that the

19 non-rates were in position, ready to do the flag right

20 at 0800.  And also to see if it was lit.  Sometimes

21 those lights would go off.  And then after that, it was

22 general security.  You could kind of see the road going

23 out that way.

24     Q.  And with respect to that camera, where was the

25 line for viewing run?

1    A.   So the camera was controlled up on the ops deck

2    in T-1.

3    Q.   So not being in the Coast Guard myself, could you

4    explain ops deck to the jury?

5    A.   Yeah.  I kind of talked about it earlier.  So up

6    in T-1, we have the operations deck, and that's where

7    the operations specialists work, and they're the ones

8    who are manning the radios.  So there's a bunch of

9    booths and work areas for them to listen to the radios

10   to catch that call when it comes in.  And there's a

11   chief watch officer, and he's in charge of the watch.

12   And he's the one who would be manipulating the cameras

13   around the station when he needed to.

14   Q.   Another self-explanatory question, but what does

15   blow colors mean?

16   A.   So again -- so at 0800, if you've ever been on a

17   military base, you'll hear like a cannon go off maybe or

18   a whistle or something like that.  So when we talk about

19   blow colors, it's usually a whistle or something like

20   that.

21   Q.   For the colors going up?

22   A.   Right.  So going up and down, right.

23   Q.   Okay.

24   A.   That gives the cue of the folks manning the

25   flagpole when to go up and when to go down.

1    Q.   Blair, if we can have 24, please.

2         Another -- what's -- yeah, take your time.

3    Swallow your water.

4    A.   Thanks.

5    Q.   Mr. Reckner, what does that depict?

6    A.   So that is the camera.

7    Q.   The camera we've been talking about at the end of

8    T-2?

9    A.   Yes, sir.

10   Q.   Roughly how high in the air is it?

11   A.   That's got to be 10, 12 feet off the ground

12   probably.  That's pretty high.

13   Q.   Was there any equipment in the rigger shop that

14   you could view what was being recorded on that camera?

15   A.   There was not.

16   Q.   Were you generally familiar with the field of

17   view and what that camera could do in terms of rotation

18   or up and down?

19   A.   Generally.

20   Q.   Generally.  What do you recall?

21   A.   Well, I recall that it could go left or right.

22   That's what I can recall.  I don't remember if it goes

23   up and down.  It may have, but I know it can definitely

24   be panned left and right.

25   Q.   Do you know if it could go straight down?

1    A.   I don't -- honestly don't know.

2    Q.   Can we have Exhibit 25, Blair.  Can you do a

3    little bit of magic and pop up 13 with it.  Thank you.

4         So Mr. Reckner, can you, Exhibit 25, orient the

5    jury as to what door this is and how it's accessed?

6    A.   Sure.  So that's the key card door.  And that's

7    this door right here.  And you can see the card reader

8    right there.  So that's where you would take your badge

9    and badge it.

10   Q.   Is there another way to access that door without

11   using the card reader?

12   A.   There is.  This handle right there had a keyhole

13   in it.  And if you had the key, which some of us did,

14   you could use that.

15   Q.   Could you show the jury where Exhibit No. 25 is

16   on Exhibit No. 13?

17   A.   Yes.  Right there.

18   Q.   Here?

19   A.   Yes, sir.

20   Q.   And with respect to the key card reader that you

21   could see in 25, was that information collected to your

22   knowledge?

23   A.   There was a log that all of the -- any time

24   anybody swiped their badge on it, it would be logged up

25   the hill in T-1.

1    Q.  And to your knowledge, who would have keys to

2  that door where that door locked?

3    A.  To my knowledge, I had one.  Mr. Wells and

4  Mr. Belisle each had one.  ET1 Hopkins had one.  I don't

5  know if -- I think we had one on the duty key ring, so I

6  don't think ET3 and the non-rates had one.  They may

7  have, but I don't recall them having one.

8    Q.  Do you recall how long Mr. Wells had worked in

9  this building, in the T-2 rigger shop building?

10    A.  20 years.  Close to 20.

11    Q.  Do you know if he had keys to other parts of the

12  building?

13    A.  He had keys to all of our gates.  He had keys

14  to -- he had keys to the building.  Definitely that key

15  and perhaps other keys too.

16    Q.  Blair, can we leave 13 up and substitute 26?

17       Thank you.

18       Same thing, Mr. Reckner, if you could look at

19  Exhibit 26 and the door that's there.  Where does that

20  correspond to the access point on Exhibit No. 13?

21    A.  Sure.  So that's this door right here.

22    Q.  All right.  And do you know how this door was

23  accessed?

24    A.  Yes.  That was a dead bolt from the inside.

25    Q.  In terms of your prior testimony about how the

1    work flow of the morning worked, which door would be

2    accessed first and which door would be opened?

3        A.   So this door would be the only door you could get

4    into from the outside.  And you would come around here,

5    and you would unlock this door.

6        Q.   That's the one we see here?

7        A.   Correct.

8        Q.   In Exhibit 26?

9        A.   You could actually -- let me just back up.  You

10   could get into this door with the key card, but it

11   was -- I remember the key card being broken, so we never

12   used it.

13       Q.   Down here in the wood shop?

14       A.   Uh-huh.

15       Q.   If we could leave 13 up, Blair, and go to 27.

16            So this is kind of a new orientation,

17   Mr. Reckner.  Can you tell the jury what we see in 27?

18   Let's start maybe with our back and then move our way

19   forward towards the door.

20       A.   Okay.  So what you see here would be this wall

21   right here.  You can see the lockers on either side, so

22   there's those lockers there.

23       Q.   If you keep moving forward.  Yeah, just like

24   that.

25       A.   Okay.  So this door is the door here.  And then

1  you can see the bolt from the inside right there.

2    Q.  And Blair, can you enlarge that for us just

3  briefly?

4      That's the bolt you were talking about that would

5  be pushed back to open in the morning by whoever got

6  there first with the card?

7    A.  Yes, it is.

8    Q.  28, Blair, please.  Let's leave 13 up.

9      So what are we looking at here in terms of the

10  diagram on our left, Exhibit No. 13?  So what does this

11  tell us?

12    A.  So this is the door we just saw.  You just

13  stepped in, and you're looking to the right to the wood

14  shop area.

15    Q.  So there's some -- Blair, can you enlarge that

16  for me.  Thank you.

17      So if we go to look through that green frame,

18  what are we seeing back there?

19    A.  Sure.  So you see some Vidmars right there.

20  We're storing like saw blades, that kind of stuff in

21  there.  You can kind of see some woodworking equipment

22  back there.

23    Q.  Vidmars?

24    A.  Yeah.  Vidmar is just a term for like storage

25  locker, like drawers.

1      Q.   Is that a Coast Guard phrase?

2      A.   I think we called them Vidmars in the Navy too.

3      Q.   I'll go home and try that.  Okay.

4           So we're looking the wood shop then down here, so

5      through those double doors on Exhibit No. 13?

6      A.   Yes.

7      Q.   Seems like a little bit of a maze in there,

8      Mr. Reckner.

9      A.   It is.

10     Q.   Blair, we're going to skip 29.  If we could have

11     Exhibit 30, and leave 13 up, please.

12          And again, Mr. Reckner, if you could orient the

13     jury as to where this is on Exhibit No. 13.

14     A.   Sure.  So you're just inside the door here, and

15     you're now looking left into this area.

16     Q.   So you walked in this way and looked up that way?

17     A.   Correct.

18     Q.   And so with that point of reference, what we're

19     seeing here in Exhibit 30 on this wall here --

20     A.   Yes, sir.

21     Q.   -- and what are we seeing -- I'm marking

22     Exhibit 30 to the right of the green frame.  What are we

23     seeing there?

24     A.   That's the bookshelf right there in front of the

25     office door, adjacent to the office door.

1    Q.  Do you recall how many steps it would take for

2    you, Mr. Reckner, to get from the locker room entrance

3    to this point in front of that bookcase right there?

4    A.  I never counted, but five maybe.  Six.  Should be

5    pretty close.

6    Q.  Five or six?

7    A.  Yeah.

8    Q.  And if -- and if from this vantage point, and I'm

9    looking at Exhibit No. 13, okay, if you turn to the

10   right, what do you see -- where does that take you in

11   terms of the break room?

12   A.  Yeah.  So it would take you right to the break

13   room area right near this, the water fountain here.  So

14   from that vantage point, you should be able to see the

15   refrigerator here and the microwave in this area.  You'd

16   be able to see all of that.

17   Q.  You mentioned a water fountain.  Can you show the

18   jury where that is again, please?

19   A.  Yep.  So that's the water fountain right there.

20   Q.  This bookcase in Exhibit 30, is it reflected on

21   Exhibit No. 13?

22   A.  It is.

23   Q.  Where?

24   A.  Right there.

25   Q.  And from -- I'm going to mark sort of to the

```
 1  right of the ramp up.  How far to the doorway to your
 2  office space?
 3      A.   From where you marked this mark here?
 4      Q.   Yes, sir.
 5      A.   Two steps.  You're standing right there at that
 6  point.
 7      Q.   Two steps?
 8      A.   Yep.
 9      Q.   And you would be into the office space or see
10  inside it?
11      A.   Yes, sir.
12      Q.   So where could you see inside that office space
13  from that point of view?
14      A.   You would see the whole thing.
15      Q.   Could you stand here in Exhibit No. 13, look that
16  direction and look that direction and have a clear field
17  of view?
18      A.   You could.
19      Q.   How much distance between the water fountain
20  roughly into the edge of that bookcase, do you recall,
21  Mr. Reckner, roughly?
22      A.   Roughly, 20 feet, 30 feet maybe.
23           MR. SKROCKI:  How are we doing on --
24           THE COURT:  We are at 4:00 p.m.  Ladies and
25  gentlemen, can everybody -- is everyone doing okay?
```

 1    Anyone want a break?  I normally take a break about

 2    every hour, hour and a half.

 3            MR. COLBATH:  Your Honor, I would appreciate a

 4    restroom break just for ten minutes.

 5            MR. SKROCKI:  No objection.

 6            THE COURT:  There you go.  They made the

 7    decision for you.  Let's take about 10 or 15 minutes,

 8    and we'll come back on record.  We'll go off record.

 9            (Recessed from 4:01 p.m. to 4:16 p.m.)

10            (Jury present)

11            THE COURT:  All right.  Welcome back, everyone.

12    Please be seated, ladies and gentlemen.  And ready to

13    proceed?

14            MR. SKROCKI:  Yes, ma'am.

15            THE COURT:  All right.  Mr. Skrocki, go ahead,

16    please.

17            MR. SKROCKI:  Thank you.  Madam Clerk, if we

18    could have the lights.

19    BY MR. SKROCKI:

20      Q.  Mr. Reckner, let me go back just on a couple of

21    exhibits briefly.  Blair, if we could have Exhibit 19.

22            Do you recognize that photograph, Mr. Reckner?

23      A.  I do.

24      Q.  I want to turn your attention to this green

25    dumpster.  What's that behind there?  What's the

1  structure behind the green dumpster?

2      A.  That's a wood fence.

3      Q.  Okay.  Perfect, Blair.

4          And with respect to the location of this side of

5  the wood fence, where is it oriented and how close is it

6  to the building, T-2?

7      A.  There's enough space for a person to walk between

8  the wall of T-2 and that fence.

9      Q.  Did you ever do that yourself?

10     A.  I have.

11     Q.  If we can pull up 31 briefly.  If you can bring

12 back 13.

13         So before we broke for the afternoon break,

14 Mr. Reckner, we were looking at this area here, correct?

15     A.  Yes.

16     Q.  And maybe even a little further this way, looking

17 that way.

18     A.  Yes.

19     Q.  So Mr. Reckner, with respect to the diagram on 13

20 and the office space, you got a diagram here, but tell

21 the jury what the actual physical size of it was, width

22 and length.

23     A.  So the office was long and narrow like you see

24 there.  There wasn't a lot of space once the desks were

25 in place to walk down that aisle up to my desk area.  So

1    to walk this path here, you know, you'd kind of be like,

2    excuse me, and people have to pull their chairs in kind

3    of thing.  So it was pretty tight.

4        Q.  Blair, can you pull up 14?  That may need an

5    enlargement.

6            Great.  Thank you.

7            So you're saying this is pretty tight space?

8        A.  Yes, sir.

9        Q.  How about this space from here to there?

10       A.  So coming through here, you know, there was space

11   to walk, but still it's pretty tight.  But if you're

12   standing obviously this area here, which is right here,

13   is really tight.  And then this area here would also be

14   pretty tight.

15       Q.  With respect to the photograph you've got in

16   Exhibit No. 31, can you orient the jury as to where

17   that's depicted in Exhibit No. 14?

18       A.  So the person who took this picture is probably

19   standing right about this area looking this way.

20       Q.  Is this structure in Exhibit No. 31 here I'm

21   circling reflected in Exhibit No. 14, and if so where?

22       A.  Yes, sir.  It's the ramp right here.

23       Q.  This is the door in Exhibit No. 31 that enters

24   the office space on 14?

25       A.  Correct.

1    Q.  Blair, if we could take that down and then move

2  to Exhibit No. 235 for identification.

3        Mr. Reckner, I'm going to direct your attention

4  to the summer of 2011.  All right?

5    A.  Okay.

6    Q.  Was this photograph taken during that time?

7    A.  It was.

8    Q.  Do you recognize the people depicted in that

9  photograph?

10    A.  I do.

11    Q.  Who would they be?

12    A.  ET3 Cody Beauford, ET1 Jim Hopkins, Mr. Rich

13  Belisle and Mr. Wells.

14        MR. SKROCKI:  Move for the admission of 235.

15        THE COURT:  Any objection?

16        MR. COLBATH:  No.

17        THE COURT:  235 is admitted.

18        (Exhibit No. 235 admitted.)

19  BY MR. SKROCKI:

20    Q.  Mr. Reckner, you identified some individuals in

21  the photograph for identification.  So do it now for the

22  jury so they know who you're talking about.

23    A.  Sure.  In the red hat, that's ET3 Cody Beauford.

24  That's ET1 Jim Hopkins.  That's Mr. Rich Belisle.  And

25  that's Mr. Jim Wells.

1      Q.   Mr. Wells in the plaid jacket here?

2      A.   Yes, sir.

3      Q.   All right.  And this is Mr. Belisle?

4      A.   Yes.

5      Q.   So Mr. Reckner, who's the boss of this operation

6   here that's going on right now?

7      A.   So this is a technical operation going on, so

8   Mr. Wells is overseeing the technical aspects of

9   tightening up this guy wire.

10      Q.   So I want to use the phrase technical.  Explain

11   to the jury what you mean by technical.

12      A.   Sure.  So again, I kind of explained earlier.  So

13   Mr. Wells and Mr. Belisle were our technical experts

14   when it came to towers.  Tactically, or those in charge

15   of the operation were myself.  If I wasn't there, then

16   it would be ET1 Hopkins.

17      Q.   So Mr. Hopkins is here working with his men here?

18      A.   In this situation, he's in there working with his

19   men.  He's taking direction from Mr. Wells and getting

20   the job done, yes, sir.

21      Q.   You mentioned -- who is this individual in the

22   red?

23      A.   That's ET3 Cody Beauford.

24      Q.   Do you recall how old he was at the time of the

25   murder, sir?

1    A.   19.

2    Q.   Where was this photograph taken?

3    A.   That was taken on Shemya, Alaska.

4    Q.   And what were you doing down there and at what

5    time?

6    A.   It was summer 2011, June.  We were erecting two

7    new antennas out on Shemya.

8    Q.   How come?

9    A.   So we had recently closed down land station 2,

10   which was a manned station.  And we had some assets

11   there, and since it was going to be demanned, there

12   wasn't going to be anyone there anymore, we moved it

13   over to Shemya, which is also Eareckson Air Force

14   Station.  So that is manned with Air Force personnel,

15   and it had the real estate to hold our antennas.

16   Q.   And what agency was in charge of this operation?

17   A.   It was COMMSTA Kodiak.

18   Q.   How far of a flight is it from Kodiak to Shemya?

19   A.   So if you take a direct flight -- well, a direct

20   flight.  The Coast Guard C-130, it could be -- it would

21   be six hours if you didn't go out and do a mission,

22   which the air station often would schedule a mission, so

23   you would go fly the main boundary line, which is the

24   fishing line out there.  That could be 12 hours.

25   Q.   12-hour flight?

1    A.   Absolutely.

2    Q.   And what would you have -- with respect to this

3  operation, what was taken out there to get this done?

4    A.   So we had a lot of parts.  We sent two or three

5  C-130s full of antenna parts, the antennas themselves

6  and all the parts and pieces to go with that.  I think

7  we had two Coast Guard and an Air Force contracted

8  flight.  And then we also had a barge with a bunch of

9  concrete on it that also went out there.

10    Q.   And how many towers did you erect?

11    A.   We erected two.

12    Q.   How tall?

13    A.   The Voba was 88 feet, and the TCI was 120 feet,

14  thereabouts.

15    Q.   I'm sure you had good weather the whole time?

16    A.   We did not.

17    Q.   And who was in charge of this operation from the

18  Communications Kodiak's perspective?

19    A.   So that would be me.

20    Q.   Anybody else you relied upon?

21    A.   So ET1 Hopkins went out on the first wave.  We

22  sent personnel out there in two waves.  So ET1 Hopkins

23  would have been in charge on the ground until I got

24  there.

25    Q.   What did Mr. Hopkins do with respect to

1    organizing this project in Shemya?

2      A.   So he was very important.   He was instrumental in

3    helping coordinate the logistics.   It's not easy.   You

4    would think we're all Coast Guard, it's easy to grab an

5    airplane and put stuff on it.   It's not.   It takes a lot

6    of planning and working with the air station to grab

7    that asset, or the plane in this case, put a bunch of

8    parts on it and get it sent out to Shemya.

9      Q.   And as his supervisor, did you have a chance to

10   examine his work, and did you do anything in response to

11   seeing what he did?

12     A.   I did.   So in 2011, I nominated ET1 Hopkins for

13   sailor of the year.   Enlisted Coast Guard person of the

14   year is how I think they -- the official title.   So I

15   nominated him for that.

16     Q.   Did he receive an award?

17     A.   He did.

18     Q.   What did he receive?

19     A.   Well, he was the COMMSTA Kodiak enlisted sailor

20   of year.   He was also looked at to be the D17, which is

21   all of Alaska.   All Coast Guard members in Alaska,

22   sailor of the year, he competed for that as well.

23     Q.   Did you see potential in Mr. Hopkins' work with

24   respect to the Coast Guard and future advancements?

25     A.   I did.   I talked to him several times about

studying for the E7 test, the chief test, becoming a
chief.  I told him I thought he was ready for that step,
and I thought that if he didn't attain E7 and retired
before then, he would regret it.  So I encouraged him to
take that path.

Q.  Are you aware of some discussion at some point
about Mr. Hopkins thinking about retiring from the Coast
Guard?

A.  So he mentioned it.  And honestly, anybody -- I'm
retirement eligible, and I talk about it.  Anybody who
is retirement eligible talks about it.  But he never sat
down with me in any serious way and said that he was
going to drop his letter and retire.

Q.  What do you mean drop his letter?

A.  So when you retire, you actually fill out a piece
of paper stating your intentions, I plan to retire on
this date.

Q.  Mr. Reckner, I want to turn your attention to
when you first arrived at the Communications Station in
Kodiak.

A.  Okay.

Q.  Can you tell the jury what expectations you had
as a manager, what your philosophy was going to be when
you got there and sort of what you were going to do
first time you arrived?

1    A.   Sure.  So my leadership style was not to make

2  drastic changes from day one.  I like to come in, get a

3  sense of operation, how the crew is working together,

4  how the command is structured, right?  Is it -- do we

5  have good top level support from the command on down?

6        Get a sense of all of that.  Get a sense of my

7  boss.  Get a sense of my subordinates and get a sense of

8  the overall shop and how it's running before I will make

9  any changes.  So that's always my plan going into any

10  new unit.

11    Q.   And how long did that plan last when you got to

12  the Communications Station as a manager of the rigger

13  shop?

14    A.   About three or four months.

15    Q.   So let me stop you there.

16    A.   Sure.

17    Q.   And Madam Clerk, if you want to put the lights

18  back on, we're done for a little bit with the overhead,

19  please.

20        So three or four months.  During that time, did

21  you take an assessment about the people and

22  circumstances you were going to be supervising?

23    A.   I did.

24    Q.   Would you please tell the jury what you did and

25  what you observed?

1    A.   Sure.  So initially, I was told that the rigger

2  shop was pretty hands off.  And I wouldn't -- they

3  wouldn't need much oversight.  I found that not to be

4  the case.  So I started to insert myself in the process

5  more to have the chief presence in the shop, which I

6  did.  And then over the course of that year and a half,

7  I guess that increased a bit.

8    Q.   Where was your office when you first arrived?

9    A.   So I had an office up in T-1 on the T deck.

10   Q.   Did there come a point in time you became aware

11  of some issues with both of the civilians working in the

12  rigger shop, namely Mr. Belisle and Mr. Wells?

13   A.   I did.

14   Q.   What were those issues?

15   A.   So I guess the catalyst, the thing that kicked it

16  off was I found out a week before Mr. Belisle and

17  Mr. Wells were going to take a TID trip, a temporary

18  trip to another unit or somewhere in the Lower 48, I

19  think.  But we didn't have any prior knowledge of that.

20  So I went and talked to the engineering officer.

21   Q.   Who would that have been?

22   A.   That was Bill Reed, Senior Chief Reed.  I let him

23  know that I just found this out.  And he said, "We need

24  to fix that," so we did.

25   Q.   Were there other issues besides that lack of

1  notice as to a trip that you became aware of?

2      A.  So that was the trip I was just speaking of.  I

3  wasn't aware of that trip.

4      Q.  What about other issues in terms of office

5  comings and goings, things of that nature?

6      A.  So the other issue that we were having was I

7  would ask ET1 where Mr. Wells was, and he often wouldn't

8  have an answer to that.  So again, I brought that to

9  Bill Reed, my boss.  And he wanted to address that.

10          MR. COLBATH:  Your Honor, I'm going to object

11  as to hearsay conversations.

12          THE COURT:  All right.  That's sustained.  Go

13  ahead.

14  BY MR. SKROCKI:

15      Q.  Were you aware of other issues in general,

16  without what people told you --

17      A.  Yes.

18      Q.  -- as a supervisor that you wanted to remedy?

19      A.  Yeah.  It was my experience that work, the

20  workday wasn't starting or work wasn't starting until

21  Mr. Wells was ready to start work.

22      Q.  Did that result in some activity from the

23  management perspective of the Coast Guard to Mr. Wells

24  and Mr. Belisle?

25      A.  It did.

1    Q.   What was the result of that?

2    A.   So Bill Reed, Senior Chief Reed drafted a letter

3  of expectations.  And in that letter was a memo, spelled

4  out notification processes, procedures, leave processes

5  and procedures, any advanced -- any trips, we were going

6  to have advanced notice of that.  And so we gave that to

7  Mr. Belisle and Mr. Wells.

8    Q.   If we could pull up Exhibit 35, please, for

9  identification for Mr. Reckner.

10         There's two pages to that, Mr. Reckner.  Do you

11  recognize the first page of that document?

12    A.   I do.

13    Q.   If you can go to the next page, Blair.

14         Do you recognize the second page and the

15  signature at the end?

16    A.   I do.

17    Q.   Is that the memo of expectations you spoke about?

18    A.   It is.

19         MR. SKROCKI:  Move to admit Exhibit 35.

20         THE COURT:  Any objection to 35?

21         MR. COLBATH:  Your Honor, my -- I object as --

22  I believe it's hearsay.

23         MR. SKROCKI:  Let me ask him as part of

24  Mr. Wells -- let me get a further foundation.

25         THE COURT:  All right.

BY MR. SKROCKI:

Q. Is this something you're familiar with the drafting of?

A. Say that again.

Q. Are you familiar with the drafting of this?

A. So I didn't draft it. Senior Chief Reed drafted it. I helped him with some of the verbiage.

Q. Okay. So you're familiar with it, correct?

A. Yes.

Q. Did you review it?

A. I did.

Q. Was this part of Mr. Wells' personnel file?

A. It is.

Q. Is this something you relied on and communicated with Wells as an employee?

A. It is.

Q. Is this something you communicated to the upper chain of management in dealing with Mr. Wells and Mr. Belisle on this issue?

A. Can you say that again?

Q. Sure. Did you talk to the higher-ups about this letter?

A. Yes.

Q. And this is part of Mr. Wells' personnel file?

A. It is.

1     Q.   You had access to that personnel file as his

2   supervisor?

3     A.   I did.  It was in my office.

4     Q.   And this was relied upon by you in the ordinary

5   course of business --

6     A.   Yes.

7     Q.   -- with the Coast Guard?

8     A.   Yes.

9         MR. SKROCKI:  Move for the admission of 35.

10        THE COURT:  As a business record?

11        MR. SKROCKI:  Yes.

12        THE COURT:  That's what I heard.

13        MR. COLBATH:  Yes, with that additional

14   foundation, Your Honor, I won't object to 35.

15        THE COURT:  All right.  Then 35 is admitted.

16        (Exhibit No. 35 admitted.)

17        MR. SKROCKI:  If we could have the lights,

18   please.

19   BY MR. SKROCKI:

20     Q.   First thing, Mr. Reckner, I want to direct your

21   attention to the "To" section.  This says, "To Rich

22   Belisle."  Do you see that?

23     A.   I do.

24     Q.   Then I want you to -- Blair, if we can go to the

25   second page.

1          The second page, whose signature is that?

2      A.   That's Mr. Wells'.

3      Q.   And the date?

4      A.   2 November 11.

5      Q.   Let's go back to the first page.

6          So why is there a difference between that first

7   page and the second page?  Can you explain that to the

8   jury?

9      A.   I can.  So that's a clerical error on my part.

10  The two letters are exactly identical with the exception

11  of the names at the top.  So when I had them both in my

12  office and we were discussing the letter and I put them

13  in their files, I just mixed up the top pages.  So

14  that's why Mr. Belisle's name is on this, but the one in

15  Rich's folder says Jim Wells on it.

16     Q.   So let's go back to the date of letter.  Do you

17  see the upper left-hand -- upper right-hand side?

18     A.   Yeah.

19     Q.   What date is that?

20     A.   29 April 2011.

21     Q.   It's reflected in paragraph one the same date?

22     A.   Yes.

23     Q.   Is that the date you had a sit-down with these

24  two men?

25     A.   It is.

Q.   Describe what happened during the course of the
meeting.   Who was there during the meeting?

A.   So it was Senior Chief Reed, my boss; myself and
ET1 Hopkins; Mr. Belisle and Mr. Wells.   Senior Chief
led the meeting, and he went through the letter and
discussed it with both Mr. Belisle and Mr. Wells.

Q.   So we're going to go through this piece by piece.
There's a section here on sick time and vacation time.
Do you see that?

A.   I do.

Q.   Generally, Mr. Reckner, why is that there?

A.   So --

Q.   About sick and vacation time?

A.   So we weren't getting notification, advance
notification to this point of vacation time, and we
weren't getting phone calls from Mr. Wells when he was
sick.

Q.   What does it ask for both these men to do?

A.   So it's asking them when reasonably able to do
so, to notify their supervisor, ET1 Hopkins, in advance,
and then also to notify ET1 Hopkins, myself, the EO, who
was Bill Reed, by phone or e-mail if they're going to be
sick.   Or they could also call the chief watch officer
and let him know that he wouldn't be in.

Q.   Thank you.

1         When you say ET1 throughout this whole afternoon

2    and maybe tomorrow, you mean Mr. Hopkins?

3       A.  I'm always referring to Jim Hopkins.

4       Q.  And then look at the second section on travel,

5    please.  Why was that there?

6       A.  So again, we were kind of caught off-guard there

7    when they had a trip scheduled and we didn't know about

8    it.  So Senior Chief Reed wanted to have advanced

9    knowledge of that, and he wanted to be the approval

10   authority of any travel that the civilians were taking.

11   In addition, he wanted them to be able to explain how

12   their travel would benefit the Coast Guard.

13      Q.  Thank you.

14          Let's go to subsection C, Blair.

15          Why did you put that section in the letter?

16      A.  So again, it was my experience I observed ET1

17   Hopkins wasn't being respected as the shop supervisor.

18   He wasn't setting the work schedule.  It was Mr. Wells

19   setting the work schedule, and work wasn't getting done

20   until Mr. Wells wanted to do it.

21          And in addition to that, my boss, Bill Reed would

22   ask me what the civilians were doing or where they are

23   and I couldn't answer him.  So I asked ET1 the same

24   question, and he couldn't answer it.  So we weren't

25   being notified of his whereabouts.  So Senior Chief Reed

1  wanted to have that in writing saying, You need to let

2  us know where you are and that ET1 is the boss.

3     Q.  Thank you.  I want to generally, just generally

4  talk about the trees in paragraph D.  You don't need to

5  blow it up, Blair.

6        Was that something that you felt needed to be

7  communicated to all the staff?

8     A.  Yes.

9     Q.  Okay.  So to all the staff, what was the point of

10 paragraph D with this tree cutting?

11    A.  So in the normal course of business, the antenna

12 field maintenance I spoke of earlier, we take down

13 trees.  So if a tree is being too close to an asset, an

14 antenna, a guy line or road or a fence or something like

15 that, then we'll take that tree down.

16       Once the tree is on the ground and it's been

17 safed, if you will, limbed and in a safe state so it

18 can't hurt anybody, after that the wood was available to

19 anybody on the Communications Station.  So first come,

20 first serve after hours, you could go out and grab some

21 of that wood and take it home for personal use.

22    Q.  And did people do that?

23    A.  People did that, yes.

24    Q.  How did Mr. Wells heat his home?

25    A.  By wood, primarily, my understanding.

1     Q.   Other people heat their house with wood?

2     A.   I think other people did heat their house with

3  wood.  I don't know specifically everybody who did.  But

4  I do know Mr. Wells did because it was discussed.

5     Q.   So this was just generally like, here's how we're

6  going to do this?

7     A.   Yes.

8     Q.   Okay.  In this subsection C, I want a weekly work

9  list e-mailed to Mr. Hopkins and these other folks.  CC

10  is who?

11     A.   CC to myself and to Bill Reed, the EO.

12     Q.   Got it.  Okay.  Next page, please.  And if you

13  could enlarge this entire section, Blair.

14          Could you read that section to the jury, please,

15  Mr. Reckner?

16     A.   I can.  "I have high expectations of you as a

17  former chief in the Coast Guard.  Mainly I expect you to

18  support, assist and mentor the ET1, assigned as the

19  rigger shop supervisor.  I recognize your knowledge and

20  experience and require you to utilize it and share it in

21  order to further the goals and support the mission of

22  the rigger shop.  I expect you to bring up concerns or

23  issues you may have.  I expect you to support the

24  decisions of the command and supervisors, especially in

25  front of the non-rates and junior petty officers in the

rigger shop."

Q.   So let's take a step back from this, Mr. Reckner.
What was the genesis or the reasoning for putting this
paragraph at the end of this memo of expectations?

A.   So I kind of mentioned earlier both Mr. Wells and
Mr. Belisle were retired chief petty officers in the
Coast Guard.  And in our organization, we take attaining
a rank of chief petty officer pretty seriously.  We have
a saying, once a chief, always a chief.

And so what we're trying to achieve here is to
let Mr. Wells know that as a former chief in the Coast
Guard, part of your not official duty, but part of your
brotherhood, I guess, in the chiefs' mess is to mentor
the ET1 as a chief in training and also the other folks
in the shop.  So that's what we're trying to get out of
that.

Q.   So I'm going to direct your attention to the
second line.

That's what you mean, this support, assist and
mentor Mr. Hopkins?

A.   Yes.

Q.   What do you do next -- what do you do with the
next sentence?  What are you telling Mr. Wells here and
Mr. Belisle, for that matter?

A.   We're telling them both, because we gave this to

both of them, that we recognize that their knowledge and experience is valuable to the organization and we need it to perform the job that the rigger shop needed to perform.  In order to get the mission done, we were going to rely on both these men and their knowledge, expertise to get that done.

Q.  This was in April of 2011.  Finish your water. Please take your time.

A.  So yes, April 2011 is when we gave that to them.

Q.  And Mr. Belisle's reaction to receiving this letter?

A.  So Rich grabbed it, said everything in here seems reasonable, no issues, and that was that.

Q.  What was Mr. Wells' reaction to it?

A.  Mr. Wells didn't react.  He didn't really say anything.  It was more of a body language, I guess. There was no positive reaction for sure.  Not in any palpable way that I could see.

Q.  I want to ask a couple of questions on some things you said.  You said, number one, Mr. Wells was a civilian?

A.  Yes.

Q.  Not part of the Coast Guard anymore?

A.  Well, he was a civilian member of the Coast Guard.

1    Q.  Correct.  But again, not a uniformed member of
2  the Coast Guard?
3    A.  No.  It's still subjected to the UCMJ in some
4  cases.
5    Q.  Is that why these expectations were listed out in
6  this memorandum?
7    A.  Yeah.  So again, I go back to the first line as a
8  former chief, that being a chief in the chief's mess,
9  you know, we take that seriously in our organization.
10 We accept retired chiefs into the mess.  When we have
11 mess meetings, they're not excluded.  They're certainly
12 invited.  We value their expertise, their experience.
13 We call that in the chief's mess.  So every chief's mess
14 I ever went to at Kodiak always had civilian members of
15 the Coast Guard there as well and sometimes who weren't
16 civilians.  They were just retired or work in town.  So
17 that's what we're getting at there.
18   Q.  I want to take you back one more step.
19   A.  Sure.
20   Q.  So you said chief's mess.  Can you describe what
21 that is for the jury?
22   A.  Sure.  So as an organization, you know, all the
23 chiefs are part of the mess, so -- and then even down to
24 the unit.  So we had a COMMSTA Kodiak chief's mess, and
25 all the chiefs were part of that.  And the command would

1   come to us with certain issues or things that they

2   wanted us to take on, usually dealing with leadership or

3   mentoring.

4       And then there was a larger Kodiak chief's mess

5   that all of the chiefs in -- stationed at Kodiak would

6   be a member of or belong to.  And kind of the same thing

7   where the chief of the mess would interface with the

8   command at a higher level if there's any issues that

9   command wanted to bring down for the chiefs to handle

10  and kind of to attend to, they would.  And plus, we did

11  a lot of charitable stuff as well.

12      Q.  Like what?

13      A.  We raised money for Coastguardsmen/women who

14  maybe had a relative die, and we would send them flowers

15  or send flowers to the funeral home of the relative.  Or

16  if a baby was born, we would buy smaller gifts for the

17  mother and the baby.  And then if someone was in dire

18  straits, financial issues, some house burning down or

19  they lost their house or something, we would gather the

20  money and donate to them for that kind of stuff too.

21      Q.  In terms of participation, was Mr. Belisle active

22  in the chief's mess?

23      A.  He was active.  He went to CCTI.  That's another

24  thing.  Chiefs called to initiation, which is a big --

25  when you become a chief, you go through a process as a

new chief being mentored by seasoned chiefs.  And that

process is called CCTI, and Rich was at the CCTI dinner.

Q.  Mr. Wells participate in the chief's mess?

A.  I never saw him there.  In fact, when I was going

through CCTI, we would submit words of wisdom, a sheet

of paper, to chief petty officers, experienced, seasoned

chief petty officers, and request their words of wisdom.

So I gave one to each of them.  I received one back.

Q.  Each of them?

A.  Both Mr. Wells and Mr. Belisle.  I received one

back from Mr. Belisle, but not from Mr. Wells.  I still

have it.

Q.  With respect to the date here signed by

Mr. Wells, what's the date there, sir?

A.  That's 2 November 11.

Q.  Why the discrepancy between April and November?

A.  So we were working with the base HR rep while we

were creating these things.  We weren't doing any of

this stuff in a vacuum.  The command was involved.  HR

was involved.

Q.  What were you advised to do?

A.  We were advised to --

MR. COLBATH:  Your Honor, I'm going to object

as to hearsay, what somebody else advised him.

THE COURT:  That's sustained as to hearsay.

BY MR. SKROCKI:

Q. When you submitted the -- had the sit-down in April with Mr. Wells, did he sign it?

A. He did not.

Q. Did you resubmit this to him for signature?

A. I did.

Q. When did you do that?

A. On 2 November 2011.

Q. For what purpose? Without telling us what anybody said, for what purpose?

A. We needed to have his signature on the document, and it just signified that he received it.

Q. If you could take that down, Blair. If we can go back to the first page.

Mr. Reckner, as a supervisor of the rigger shop and the IT section of T-1, do you have an understanding about the various levels of, for lack of a better word, discipline or managerial recommendations to employees in the Coast Guard?

A. I do.

Q. And their various levels of severity?

A. Yes.

Q. This letter or memo of expectations, where does that fall on that spectrum of severity?

A. This wouldn't be disciplinary at all. It's an

1    expectation letter letting the employee know what we

2    expect of them.

3        Q.    After receipt of that memo of expectations in

4    April of 2011, did Mr. Belisle's conduct change as you

5    noticed?

6        A.    Well, I never had an issue with Rich's conduct.

7    We gave it to both of them in the interest of fairness,

8    but we had issues with Mr. Wells' conduct.

9        Q.    Did he ever respond or change as to the requests

10   made in the memo of expectations?

11       A.    Mr. Wells?

12       Q.    Yes.

13       A.    Not that I observed.

14       Q.    Were you Mr. Wells' rating official for his

15   performance for the years 2010 to 2011, 2011 to 2012?

16       A.    Yes.

17       Q.    Is that when it first started 2010, 2011?

18       A.    Yes.

19       Q.    The year prior to that, were you his performance

20   rating official?

21       A.    I was not.

22       Q.    Are you familiar with as a supervisor his

23   performance rating for the years 2009 and 2010?

24       A.    I am.

25       Q.    And that was not done by you?

1    A.   It was not.

2    Q.   But it is in his file?

3    A.   It is.

4    Q.   His rating overall was what, sir?

5    A.   It was exceeds.

6    Q.   Exceeds.  Exceeds what?

7    A.   Exceeds expectations.

8    Q.   Generally, can you tell the jury in that rating

9    year of '09 and '10 what areas Mr. Wells exceeded?

10   A.   So he exceeded in job performance.  What was

11   that, '09/'10, you said?

12   Q.   Yes.

13   A.   So job performance, teamwork.  I can't remember

14   the other two.

15   Q.   But he exceeded.  So that's the highest rating

16   you could get?

17   A.   I mean, I didn't rate him.  Someone else did.

18   But yes.

19   Q.   I'm sorry.  Just to be clear, that was the

20   highest rating you could get?

21   A.   Yes.

22   Q.   When you rated him for the year 2010/2011, do you

23   recall what you rated him as his rating official?

24   A.   I do.

25   Q.   What did you rate him as?

1    A.   So I rated him -- in two of the markings, I rated

2    him -- in two of the metrics exceeds and one in meets.

3    Q.   Two is exceeds and one in meets?

4    A.   Yes.

5    Q.   Which one was meets?

6    A.   Teamwork.

7    Q.   Teamwork?

8    A.   Yes.

9    Q.   What was the sort of general characteristic for

10   teamwork?

11   A.   Everything you would think that that term

12   entails.  Are you a good member of the team?  You know,

13   do you support the team?  That kind of thing.

14   Q.   You his rating official for 2011 and 2012?

15   A.   I was.

16   Q.   And before giving a yearly evaluation, do you do

17   anything with an employee you supervise for what's

18   expected for the upcoming year?

19   A.   Yeah.  We do what we call mid-mark evaluations.

20   So somewhere in the middle of that marking period,

21   they'll sit down and just have a discussion with the

22   member.

23   Q.   Did you have a sit-down with Mr. Wells to that

24   effect?

25   A.   We did not in '11/'12.

1    Q.   How about in 2010/2011 -- or 2011?   Excuse me.

2    A.   We did in 2011.

3    Q.   Okay.   For the upcoming year, 2012?

4    A.   Yes.

5    Q.   And did you -- what did you tell him when you sat

6    down with him?

7    A.   So I think what we are referring to is the end of

8    2010/11 and the beginning of '12 -- of '11/'12, right?

9    So when we sat down and reviewed the old one, we review

10   the old one and then we go over the new one.   So the

11   past, we discuss that, and then we also discuss what

12   we're going to be looking at in the next future for the

13   next marking period.

14   Q.   Did you take any steps as a manager with respect

15   to Mr. Wells' performance plan for 2012?

16   A.   Yes.

17   Q.   Did you make changes?

18   A.   Yes.

19   Q.   Please tell the jury what changes you made as a

20   manager.

21   A.   So we added two more metrics.   We wanted to grade

22   him on timeliness and quality of work and communication.

23   Q.   Why those factors, sir?

24   A.   Because those were two of the factors we were

25   having issues with.

1      Q.   Communication in what respect?

2      A.   Again, not getting updates on his whereabouts,

3    not getting timely leave forms, that sort of stuff.

4      Q.   And then timeliness, what was the issue with

5    that?

6      A.   So quality of work and timeliness or timeliness

7    of quality of work.  So projects, work had been assigned

8    to him and we weren't seeing any results.

9      Q.   As a manager, what was your basis for doing these

10   things with Mr. Wells?

11     A.   Just to correct the deficiencies and get

12   Mr. Wells on board with the process because he was an

13   important part of the organization.  And so, you know,

14   we had -- we needed to kind of address the issues we

15   were having, but at the same time, you're also creating

16   a paper trail.  If the behavior doesn't change, then you

17   have something to go fall back on.

18     Q.   From your perspective as his manager, did you

19   value him as an employee because of his experience and

20   skill and knowledge?

21     A.   I absolutely did.

22     Q.   Did you need it?

23     A.   We needed it, absolutely.

24     Q.   To do the mission of the Communications Station?

25     A.   Yes, especially that year in 2012.

1    Q.   Why is that?  Why that particular year?

2    A.   So winter of 2012 on Kodiak was exceptionally

3    harsh.  We got a lot of snow, and we had bad weather

4    starting early in winter and it just kept up all winter

5    long.  We lost -- somewhere around eight antennas were

6    either broken or damaged in some way, no longer working.

7         So we had a lot of work that we were going to

8    need to do in the summer of 2012 to get all of these

9    assets working again.  So we needed him on board

10   100 percent.

11        MR. SKROCKI:  Judge, this would be a good time

12   to break before we go into --

13        THE COURT:  Is this a good time?

14        MR. SKROCKI:  -- yeah.  Before we go into a

15   long subject.  So is that all right with you?

16        THE COURT:  All right.  That sounds fine.  Is

17   that all right with you all?  All right.  Very good.

18        Leave your notepads here, ladies and gentlemen.

19   Remember my admonition not to discuss the case with

20   family or friends or not to do any research.

21        And we will see you tomorrow at 9:00 a.m.  I'll

22   meet with the lawyers at 8:30, so hopefully we'll be

23   ready to go right at 9:00.  Have a pleasant evening, and

24   thank you for your careful attention.  You can all be

25   excused.

1          (Jury absent)

2          THE COURT:  All right.  Please be seated,

3    everyone.  Sir, 9:00 a.m. tomorrow.  We'll see you then.

4    You may be excused.  Thank you.

5          Mr. Skrocki, any topics we can take up today in

6    our remaining minutes?

7          MR. SKROCKI:  Not from us, Your Honor.  Thank

8    you.

9          THE COURT:  Very good.  Mr. Colbath?

10          MR. COLBATH:  No.

11          THE COURT:  Nothing else?  All right.  Very

12    good.  Then I'll see you all at 8:30.  If you get

13    something drafted and can e-mail it to Emily and your

14    opposing counsel, that would be great on this one topic.

15    We'll go off record.

16          (Recessed at 4:54 p.m.)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
3    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
4    original stenographic record in the above-entitled
     matter and that the transcript page format is in
5    conformance with the regulations of the Judicial
     Conference of the United States.

6

7       Dated this 28th day of April, 2020.

8

                         /s/ Sonja L. Reeves
9                        SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25