```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7          Defendant.         )
     _____)
 8

 9               TRANSCRIPT OF TRIAL BY JURY - DAY 3
         BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10                September 11, 2019; 8:32 a.m.
                        Anchorage, Alaska
11

12   FOR THE GOVERNMENT:
             Office of the United States Attorney
13           BY:  STEVEN SKROCKI
             BY:  CHRISTINA M. SHERMAN
14           BY:  KELLEY L. STEVENS
             222 West 7th Avenue, #9
15           Anchorage, Alaska 99513
             (907) 271-5071
16

17   FOR THE DEFENDANT:
             Office of the Federal Public Defender
             BY:  GARY GEORGE COLBATH
18           601 West 5th Avenue, Suite 800
             Anchorage, Alaska 99501
19           (907) 646-3400

20           Camiel & Chaney, P.S.
             BY:  PETER A. CAMIEL
21           520 Pike Street, Suite 2500
             Seattle, Washington 98101
22           (206) 624-1551

23   _____
                     SONJA L. REEVES, RMR-CRR
24               Federal Official Court Reporter
                     222 West 7th Avenue, #4
25                   Anchorage, Alaska 99513
         Transcript Produced from the Stenographic Record
```

1        I N D E X

2        September 11, 2019, Trial Day 3

3

4    Witnesses:        Direct    Cross    Redirect    Recross

5    Scott Reckner        12       118       213         217

6    Nicola Belisle      220       --        --          --

7    Cody Beauford       247       --        --          --

8                  E X H I B I T   I N D E X

9
     Exhibit                                          Page
10
     33          Voicemail from Wells to Reckner      101
11
     34          Wells 2010-2011 Performance          123
12               Evaluation

13   36          Memo of Expectations Dated            22
                 November 2011
14
     37          Letter of Caution Dated January       35
15               2012

16   67          T2 at 4/12/12 - 8:23:20-8:26:52       79

17   221         Google Earth View of Bells Flats     231

18   227         Air Compressor in Rigger Shop        102

19   229         Rigger Shop Garage with View         102
                 of Door and Air Compressor
20
     230         Inside Rigger Shop Showing Jack      102
21
     DE-115      Wells Evaluation 2011-2012           129
22
     DE-124      Wells Leave Summary                  146
23
     DE-168      2011-2012 Pay Period Calendar        152
24               (PowerPoint not to Jury)

25

```
 1   DE-168A      2011-2012 Pay Period Calendar     219
                  with Marked Changes
 2
     DE-209       E-Mail Dated 3/21/12              184
 3
     DE-210       Tower Training Agenda 2012        185
 4
```

```
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          (Call to Order of the Court at 8:32 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court for the District of

5    Alaska is now in session, the Honorable Sharon L.

6    Gleason presiding.

7          Please be seated.

8          THE COURT:  Good morning.  We're back on record

9    here in *United States versus Wells*.  Emily brought in

10   e-mails that were exchanged yesterday.

11         Mr. Skrocki, anything to add on this subject?

12         MR. SKROCKI:  No, Your Honor.  Thank you for

13   considering our argument.

14         THE COURT:  Mr. Camiel?

15         MR. CAMIEL:  No, not unless the Court has

16   questions.

17         THE COURT:  Is the -- what's the defense

18   position on an order that would prohibit either side

19   from referencing the time that it has taken to take this

20   case to trial?

21         MR. CAMIEL:  Your Honor, we don't have an

22   objection to that.  We just don't want to be limited in

23   terms of, for example, questioning -- there were some

24   witnesses who were interviewed back in 2012 or 2013, and

25   then have been recently interviewed and said different

things, and we want to make sure we can do that, get

into that.

            THE COURT:  No objection to that I assume?

            MR. SKROCKI:  No, Your Honor.

            THE COURT:  And so an order that would preclude

argument or questioning that focuses on this seven-year

time gap I'm hearing both sides agree not to go down

that road.

            Mr. Skrocki, that's the government's request?

            MR. SKROCKI:  It is.

            THE COURT:  And the defense agrees to that?

            MR. CAMIEL:  Yes.

            THE COURT:  And if there are questions -- if

there are topics that you seek to explore and you're not

sure whether or not it would fall within that order,

then you could certainly request a sidebar and we can

clarify that outside the presence of the jury, because

people are going to be referencing dates.  That's just

part of the process.

            Any other topics to -- I don't see the need,

unless either side requests it, for these e-mails to be

part of the record.  I mean if you seek to have your

limiting instruction in the record, then certainly you

indicated you might file a motion in that regard, and

that's fine, if you sought to have a record of it.

Right now, it's not in the official record.

MR. SKROCKI: All right.

THE COURT: Take that under advisement, Mr. Skrocki.

MR. SKROCKI: Yes, Your Honor.

THE COURT: Other topics to take up?

MR. SKROCKI: Well, we had -- we believe strongly that the Court should consider an admonition as to the defense's opening statement yesterday, because it really was beyond the pale in terms of an opening statement. It was more of an opening argument.

And we understand certainly that those things happen on occasion, but, Judge, to argue to this jury that it took seven years for the government to get here is inaccurate, it's not fair, it's inappropriate, particularly because of delays in the trial, joint motions to continue, defense motions to continue that were not objected to, and that leaves the jury, one or all, with the very clear impression that this was all government conduct.

And we have a copy of the transcript, and maybe the Court has looked at it already or heard it again from yesterday, but I believe the jury needs to have some sort of an instruction that says you're not to consider the amount of time or penalize the government

for the amount of time, because that's exactly what they
were doing.  If you go back to the voir dire, this was a
complete setup.  Mr. Colbath's questions to the jury
about wouldn't it be bad if somebody was wrongly
accused, and then they segue into this opening argument
statement.  It was a plan from the beginning.  And
that's very clear to us.

And I think the Court needs to take a very
careful look at the voir dire and the opening statement,
because they fit hand in glove.  And to say that it took
seven years, as Mr. Camiel did, to get here is
completely wrong.  And blame the government for it,
that's the bigger issue.

THE COURT:  I read your e-mail to not --
perhaps you should file a motion so that it's clear what
you're requesting, because I read it more as a
suggestion rather than -- because should this Court find
that a limiting instruction is an appropriate remedy,
you submit the following.  If you have one to submit, by
all means, I'll consider it, Mr. Skrocki.

MR. SKROCKI:  We'll file something this
evening.

THE COURT:  I'll note for the record, I mean,
it was the Court had requested the e-mail, and you did
that, but if you could put it in a formal request, I'll

1  take it up.  And I could do that during the lunch hour

2  if I get it this morning.  We can take it up.

3          I guess my initial thought is to say that for

4  the defense to argue that Mr. Wells is the wrong man and

5  falsely accused seems a reasonable defense strategy.

6  It's the seven years to attribute to the government that

7  is troubling to the Court, so maybe that would help

8  focus on where --

9          MR. SKROCKI:  Absolutely, I understand.  We'll

10  focus on that part.  There are -- we have our rules,

11  they have some of theirs, and we understand that.  So we

12  are willing to accommodate and be flexible, as we have

13  been, understanding the situation we're all in.  We're

14  abiding by the Court's rules scrupulously.

15          THE COURT:  And I appreciate that.

16          MR. SKROCKI:  So I hear what you're saying and

17  we will try to tailor something to the seven-year piece.

18          THE COURT:  What I was thinking about

19  yesterday, and it's more musings than anything else, is

20  that something that would instruct the jury that they

21  are -- that this case, as the parties -- as the jury is

22  aware, the homicides occurred in early 2012, and they

23  are not to speculate as to why we are here in 2019 at

24  trial.

25          That's something along the lines of what I am

considering, and not to try to ascribe blame or
responsibility for that fact.  It's just a fact and
don't worry about it.  That's something along the lines
of what I was considering.

MR. SKROCKI:  Yes.  I will add to the record
that earlier on in this case I said words matter.  Those
were words that need not have been uttered.

THE COURT:  I understand your frustration and
concern with it, Mr. Skrocki.  I do.  And that's why I
am inclined to give a limiting instruction that focuses
-- it's not really limiting.  It focuses or directs the
jury not to focus on why we are here in 2019.

MR. SKROCKI:  I understand.  We'll craft
something like that.  While I have the podium briefly,
the jurors are walking by both parties in the hallway.
I know Judge Sedwick used to give a cautionary
instruction that, hey, we're not being rude.  We just
don't want to make eye contact or say hello.

THE COURT:  I normally do that, and I neglected
to and I will do that.

MR. SKROCKI:  We're passing them daily, so we
would appreciate that.

THE COURT:  That you're not a rude person, none
of you are.  Very good.

MR. SKROCKI:  Thank you, Judge.

1        THE COURT:  Yes.  Very good.  Mr. Colbath,

2   Mr. Camiel, anything else to take up?  In theory, does

3   an instruction along those lines -- it looked as if the

4   defense was not necessarily averse to something along

5   those lines.

6        MR. CAMIEL:  The Court's instruction about the

7   jury not to speculate about the reason for the delay or

8   the time passage, we don't have any objection to that.

9   That's perfectly appropriate.

10       The Court has already instructed the jury that

11  what counsel says isn't evidence, so they have got that

12  as well.

13       THE COURT:  Anyway, we can take that up during

14  the lunch hour.  If the government has a proposal, I'm

15  happy to look at that, and perhaps we can reach

16  agreement.  If not, I'll issue a ruling on that.

17       Anything else?  Do we have extra time?

18       MR. SKROCKI:  Nothing from the government, Your

19  Honor.

20       THE COURT:  Nothing else, Mr. Colbath?

21       MR. COLBATH:  No, Your Honor.

22       THE COURT:  Very good.  We'll go off record.

23       DEPUTY CLERK:  All rise.  Court stands in a

24  brief recess.

25       (Recessed from 8:42 a.m. to 8:53 a.m.)

```
 1              (Jury present)

 2              THE COURT:  Please be seated, everyone.  Good

 3    morning, ladies and gentlemen.  I want to commend you.

 4    Some juries take a few days to get the lineup and you

 5    were here and have mastered that quite well.

 6              I wanted to tell you something I neglected to

 7    say, and that is although the rules that I've applied

 8    for you all and instructed you on are not to talk about

 9    the case, but certainly feel free to converse with each

10    other on other subjects.

11              There's a different set of rules that applies

12    to the individuals that are at the counsel table, the

13    lawyers and their assistants, and Mr. Wells.  And that

14    is that they are prohibited from having any

15    communication at all with you.  So if you pass them in

16    the hall and they don't acknowledge you, it's not

17    because they're being rude.  They are all very pleasant

18    people.  But they are following my directive not to have

19    any communication with you at all.

20              With that said, I'll remind you, sir, that

21    you're still under oath from yesterday's proceeding.

22    And Mr. Skrocki, go ahead, please.

23              MR. SKROCKI:  Thank you, Your Honor.

24                    DIRECT EXAMINATION

25                 (of Scott Reckner continued)
```

```
 1    BY MR. SKROCKI:

 2        Q.  Good morning, Mr. Reckner.

 3        A.  Good morning, sir.

 4        Q.  If we could have the lights, Madam Clerk.

 5            If we can go back to Exhibit No. 235, please.

 6    Mr. Reckner, yesterday you talked about this photograph.

 7    Where was it taken, and what work does it depict?

 8        A.  That was taken on Shemya, Alaska.  And that's I

 9    believe their tension unit guy wire which connects to a

10    tower.

11        Q.  And who's depicted in that photograph again?

12        A.  ET3 Beauford, ET1 Jim Hopkins, Mr. Rich Belisle

13    and Mr. Jim Wells.

14        Q.  If we can have the lights, please.  Thank you.

15            Mr. Reckner, were you on that trip?

16        A.  I was.

17        Q.  How long were you folks down there?

18        A.  About four weeks, maybe a little bit more.

19        Q.  Mr. Wells was on that trip?

20        A.  He was.

21        Q.  Did you have occasion to be involved in an

22    initial meeting with Mr. Wells present before the work

23    in Shemya started?

24        A.  Yeah.  So we meet -- oh, sorry.

25        Q.  Who was present at the meeting?
```

1      A.   So once the second wave showed up on island, it

2   was myself, Mr. Wells, Mr. Belisle, ET1 Hopkins, Seaman

3   Pacheco, ET3 Beauford and then we also had some staff

4   who came in from other places in the country, Coast

5   Guard petty officers who came and helped us and I don't

6   recall all their names at this time.  But there was

7   probably 10 or 12, 14 of us, something like that.

8      Q.   Were there people from other agencies there as

9   well, other departments?

10     A.   Other Coast Guard units.

11     Q.   Units.  Okay.  And there was a meeting that was

12  held?

13     A.   There was.

14     Q.   How did that meeting start out?

15     A.   It was kind of a kickoff meeting, a

16  meet-and-greet.  And we were all introducing ourselves.

17     Q.   And did Mr. Wells introduce himself?

18     A.   He did.

19     Q.   Did he add anything to that introduction?

20     A.   He did.  So when Mr. Wells introduced himself, he

21  introduced himself as Jim Wells, and he said, "Call me

22  Jim."  We don't use first names on Shemya.  And I kind

23  of interjected and said, "Actually, I'm Chief Reckner."

24          There were a lot of lower enlisted folks.  It's

25  not appropriate for lower enlisted folks to call a chief

1    their first name.  So I just kind of interjected that I

2    would be addressed as Chief or Chief Reckner.

3        Q.   You mentioned that you don't use first names

4    here.  That's what you said?

5        A.   That's what Mr. Wells said, but we will use first

6    names here.

7        Q.   Mr. Wells said what?

8        A.   He said --

9            MR. COLBATH:  Your Honor -- excuse me,

10   Mr. Reckner.  Your Honor, I'm going to object and ask to

11   approach.

12           THE COURT:  All right.  Let's do so.

13           (Begin bench conference.)

14           MR. COLBATH:  Thank you.  I would object.

15   We're talking about a Shemya trip.  We're talking about

16   incidents prior to the fuel card.  This is a specific

17   act of conduct.  And it's a workplace bad act.  It would

18   fall under --

19           THE COURT:  I was wondering the same thing.

20           MR. SKROCKI:  It's not a work -- the testimony

21   is going to be that Mr. Wells tried to take control of

22   the meeting, and Mr. Reckner said, I'm more in charge

23   here in the Coast Guard protocol, and that's all I'm

24   going to go into.

25           THE COURT:  Well, I really tried to make clear

```
1    that the fuel card incident is the demarkation line.
2    And this predates that by one month is my understanding.
3              MR. SKROCKI:  Correct.  One month.  But there's
4    nothing more than -- there's no conflict here.  It's
5    just a question of Mr. Wells is exceeding Coast Guard --
6              THE COURT:  So what all do you want to cover
7    besides the first name issue?
8              MR. SKROCKI:  That's it.  Essentially what he
9    said already.
10             THE COURT:  So you're just going to get out
11   this one thing, what he said about we use first names
12   here and Chief Reckner disagreed?
13             MR. SKROCKI:  Correct.
14             THE COURT:  I'll let one more question, and
15   then we'll move on.
16             MR. SKROCKI:  Permission to lead?
17             THE COURT:  Yes.  All right.  Clear there?
18             MR. COLBATH:  Well, I'm clear.  I mean I want
19   my objection to be reflected.
20             THE COURT:  Your objection is --
21             MR. COLBATH:  And this wasn't part of his
22   testimony last time.  It's not in any more of the
23   discovery.  The man was interviewed 14 times, 14 law
24   enforcement interviews, and I've never heard this
25   mentioned until right here.  So it's --
```

1          THE COURT:  Okay.

2          MR. SKROCKI:  I don't think that's an accurate

3    statement of the discovery.

4          THE COURT:  The reason for the ruling, just to

5    be clear, is that the witness has said two different --

6    he's trying to articulate this point.  It's already in

7    the record without objection, and allowing it to be

8    clarified for leading question, it's helpful to the

9    jury.

10         MR. COLBATH:  If that gets us out of here --

11         MR. SKROCKI:  One more just to let you know

12   where we're going next.  We're going to the tree

13   collaring memorandum and tree collaring issue.

14         THE COURT:  Just consistent with the ruling?

15         MR. SKROCKI:  Correct.  And then we're going to

16   the fuel card from there.  And then we'll be going from

17   fuel card to date of the murders after that.

18         THE COURT:  That's very good.

19         (End bench conference.)

20         MR. SKROCKI:  Thank you, Judge.  Permission to

21   lead.

22         THE COURT:  Certainly.  Go right ahead.

23   BY MR. SKROCKI:

24     Q.  Mr. Reckner, a couple of leading questions.  When

25   this meeting began, what did Mr. Wells say?

1    A.   So what he said was, "On the island, we don't use

2  rank here."  That's what I took exception here.

3    Q.   And what did you say in response?

4    A.   And I said, "Actually, I'm Chief Reckner and" --

5  getting out that I will be the chief on the island, not

6  Scott.

7    Q.   If I can move you forward to August of 2011.

8  Okay.  When was the Shemya trip?

9    A.   Shemya was June I think to July of 2011.

10   Q.   In August of 2011, did you have occasion to

11  become involved in an issue involving some trees on

12  Coast Guard property in Kodiak?

13   A.   Yes.

14   Q.   Can you tell the jury what that issue was?

15   A.   So the shop was working down at the receive site

16  clearing some brush around one of the antennas.  I drove

17  down just to check on them.  And as I was walking

18  through the site, I noticed a bunch of rings cut in the

19  bottom, the bases of a bunch of trees on the property.

20  And so I asked what that was about.

21        And I was informed that that was the process or

22  procedure called tree collaring.  And I asked why we

23  would do that, because I didn't know anything about

24  that.  And I was told that it was -- I understood that

25  it was slowly to kill the tree, dry it out, so that you

1     could then take it for firewood later on.

2         Q.   So how did you become aware of -- and what you

3     saw, how did you get to where you were when you saw this

4     tree collaring?

5         A.   So I took one of the vehicles and drove down.

6         Q.   Drove down to where?

7         A.   Drove down to the receive site from the building

8     we saw yesterday, from the -- we call it the transmit

9     site, down to the receive site.  It's probably 12 to

10    15 miles or something like that.

11        Q.   Can you describe to the jury what you saw with

12    respect to this tree collaring?

13        A.   Yep.  So all over the property in areas that were

14    nowhere near any antenna gate road, any asset, the base

15    of the tree maybe this high or so off the ground, was a

16    small chain saw-type width cut all the way around and

17    maybe a few inches in.

18        Q.   Had you ever heard of that practice before?

19        A.   I had never heard of that before.

20        Q.   When you observed that, was anybody in the field

21    with you at the time?

22        A.   So I was with ET1 Jim Hopkins, and the non-rates

23    were there as well, but they were working.

24        Q.   Anybody else?

25        A.   So after I discovered it --

1    Q.  Do you remember anybody else at that time?

2    A.  No.

3    Q.  Okay.  What did you do after you discovered that

4    practice?

5    A.  So after I discovered it, I went back to the T-1

6    and I went and talked to the executive officer Dave

7    Pizzurro, and I told him what I found.

8    Q.  What did you do then?

9    A.  He wanted to see it.  So it was towards the end

10   of the workday.  ET1 Hopkins had already gone home.  But

11   he was living at Aviation Hill, so it was on the way.

12   So I gave him a call and said, "Hey, XO and I are on our

13   way to pick you up.  We're going to go down to the

14   receive site and take a look."

15   Q.  How many of you went to take a look at the

16   receive site?

17   A.  Three of us.

18   Q.  How many?

19   A.  Three of us.

20   Q.  And when you got there, what did you do?

21   A.  I took Lieutenant Pizzurro through the site and

22   showed him what I had seen.  I had kind of taken him to

23   the far end of the site where there was no asset,

24   antenna gate road or anything.  And trees all in that

25   area that had been collared for no purpose that would

1    serve our mission.

2        Q.   And why did you make that assessment that there

3    was no purpose to serve your mission?  Can you describe

4    some detail why you made that decision?

5        A.   Right.  So again, they were quite a distance away

6    from any asset, and then also, the practice itself

7    doesn't make any sense when you're talking about antenna

8    maintenance or clearing brush, because at that point,

9    you don't have any control when that tree might fall.

10   So if you kill it slowly and it falls, you won't be

11   there to see it.  You wouldn't know it.  You could

12   potentially, if it was near an asset, damage something

13   with an uncontrolled tree fall.

14       Q.   Was it a concern of yours?

15       A.   It was.

16       Q.   Did you elevate that concern to others in your

17   management?

18       A.   I did.  So obviously, I took the executive

19   officer down, he's number two, and he saw it for

20   himself.  And then we discussed it with Bill Reed, the

21   engineering officer, a day later, I would think.  Yeah.

22       Q.   Did you have your own internal sort of

23   deliberations as to what you wanted to do with this and

24   took action thereafter?

25       A.   So we discussed it, and we decided that the

1  appropriate measure would be to do another memo
2  outlining the practice of taking trees and how we would
3  do that procedure-wise.
4      Q.  And did you create a memo to do that?
5      A.  I did.
6      Q.  What was the scope of the memorandum?
7      A.  So again, it was outlining how and when we take
8  trees, strictly forbidding any tree collaring at all and
9  again reiterating the fact that any wood taken down on
10  COMMSTA property would be available to the whole crew if
11  they went out and got it out after work hours with their
12  own equipment.
13     Q.  If we could have the lights please and for
14  foundation for Mr. Reckner, Exhibit 36.
15         There are two pages to that memorandum.
16  Mr. Reckner, if you could take a look at the first page.
17  Do you see that?
18     A.  I do.
19     Q.  Is that something you authored, sir?
20     A.  It is.
21     Q.  And the second page?
22     A.  Yep.
23     Q.  That's what you authored as well?
24     A.  Yes, sir.
25     Q.  And that reflects a memorandum given to one of

1    the people you supervise, correct?

2        A.   It does, yes.

3        Q.   During the timeframe in question and on the issue

4    we just spoke about for tree collaring?

5        A.   Yes.

6             MR. SKROCKI:  Move to admit Exhibit 36.

7             THE COURT:  Any objection?

8             MR. COLBATH:  Your Honor, in light of our prior

9    record, no.

10            THE COURT:  All right.  Then 36 is admitted.

11            (Exhibit No. 36 admitted.)

12   BY MR. SKROCKI:

13       Q.   If we could publish, please.

14            Mr. Reckner, this is a memorandum.  What's the

15   date of that, sir?

16       A.   2 November 2011.

17       Q.   And who is it to?

18       A.   It's to Mr. Wells.

19       Q.   Now, was Mr. Wells the only one who received this

20   memorandum?

21       A.   No.

22       Q.   Who else received it?

23       A.   We also gave one to Mr. Rich Belisle.

24       Q.   Why did you give it to both these men?

25       A.   So again, we didn't want to single one of them

out.  We had two civilians, so we wanted to make sure we
were setting the expectations for both of them.

Q.  Were you aware that Mr. Wells was tree collaring
as well as others?

A.  I was aware that Mr. Wells was tree collaring,
and I understood that Rich might have been, but I don't
know he was for sure.

Q.  So the purpose of this memorandum was for what,
sir?

A.  Again, it was to set the expectations on when
we'll take wood from -- when we'll cut down trees from
the COMMSTA, what practice we don't do, i.e., tree
collaring, no more of that.  Only take trees that pose
some sort of risk to an asset, an antenna, a fence, a
road.  And also, we asked Mr. Wells to draft a policy on
tree cutting.

Q.  Did he ever do that?

A.  He did not.

Q.  If we could turn to the second page, please.
There's a date on that.  Do you see that there,
Mr. Reckner?

A.  I do.

Q.  What's the date?

A.  2 November 2011.

Q.  Blair, if we could take that to the side and then

1    pull up Exhibit 35, page two.  Thank you.

2         Mr. Reckner, do you see the dates are the same?

3    A.   I do.

4    Q.   And the Exhibit 35, what was that again?

5    A.   I'm not sure what 35 is.  Is that the right or

6    left?

7    Q.   To the right.  Sorry about that.

8    A.   So that's the EO expectation and clarifications

9    memo that we gave Mr. Wells in April of 2011.

10   Q.   So you had him sign it that day?

11   A.   I did.  HR policy dictated we needed to have a

12   signature stating that he received it.

13   Q.   So you presented him both memorandums that day?

14   A.   Correct.

15   Q.   When you presented the memorandums, who was there

16   in the room with you?

17   A.   When we did this, it was -- on 2 November, it was

18   just me and him.  We had a discussion earlier in August

19   after I discovered the tree collaring with both

20   Mr. Belisle and Mr. Wells in my office where I told them

21   tree collaring was done, we're not doing it anymore and

22   then the memo followed later.

23   Q.   So you had a conversation with him prior to that?

24   A.   Correct.

25   Q.   During that conversation, what was Mr. Belisle's

1  response?

2   A.  Mr. Belisle said, "Yep, makes sense, no problem."

3   Q.  And Mr. Wells' response was what?

4   A.  So the conversation with Mr. Wells was different.

5  He tried to defend the practice saying that it was

6  preemptive, it was necessary for maintenance.  And when

7  I replied back that there's no reason to preemptively

8  kill a tree, it's actually dangerous, he kind of stopped

9  talking and didn't argue back after that.

10   Q.  We can take those down, Blair.  Thank you.  If we

11  could have the lights, Madam Clerk.

12       Mr. Reckner, did you have occasion to discuss

13  with Mr. Wells another supervision matter with him

14  around that timeframe?

15   A.  I did.

16   Q.  Can you tell the jury just basically what that

17  conversation was about.  Let me rephrase that.  It's

18  inartfully proposed.

19       If you could describe for the jury the general

20  nature of what the conversation was about with

21  Mr. Wells.

22   A.  Sure.  So we had a fuel card that came up

23  missing, and the card was kept in Mr. Wells' desk and --

24   Q.  When you say fuel card, describe what its purpose

25  was for your Communications Station.

1     A.  So this fuel card was a fuel card that we would

2 use at the gas pump on base for the big yellow line

3 truck, I think the bulldozer, and then like regular gas

4 for the gas power chain saws and that kind of stuff,

5 ATVs.

6     Q.  When was that fuel card reported to you as being

7 missing?

8     A.  It was in September, late August or early

9 September, I believe.  It was right before we were going

10 on another trip to Shemya.

11     Q.  Do you know where that fuel card was kept?

12     A.  I do.

13     Q.  Where was it kept?

14     A.  It was kept in Mr. Wells' desk.

15     Q.  So you mentioned Shemya again.  Was there another

16 trip to Shemya at that time?

17     A.  Yes.  We were going back out in September to

18 finish up some of the things.  We had an electrical

19 connection to work on and some other things that needed

20 to be attended to.

21     Q.  Who was going on that trip to Shemya this time?

22     A.  It was myself, Rich Belisle, and a few of the

23 other people in the shop.  I think maybe Pacheco went

24 and a couple other folks.  We had some folks on leave

25 and some in training too.

1     Q.   What was the timeframe about your trip to Shemya

2   and when you became aware of this fuel card matter?

3     A.   It was a day or two before we were getting ready

4   to leave that I was informed that the fuel card was

5   missing.

6     Q.   Was Mr. Wells going to Shemya on this trip?

7     A.   He was not.

8     Q.   Where was he going?

9     A.   He was going up to Anchorage.  I believe he had a

10  VA appointment.  And then he was going on to Denali.

11    Q.   Do you know what vehicle he was taking or how he

12  was getting to Denali Park?

13    A.   He was going to take his personal vehicle.

14    Q.   What kind of personal vehicle does he own?

15    A.   He had a Dodge, white Dodge pickup truck, diesel.

16    Q.   The timing you mentioned was before you were

17  going to Shemya, Mr. Wells was going to Denali and

18  Anchorage for a VA appointment.  How did you become

19  aware this card was missing?

20    A.   ET1 Hopkins came up and told me that it was

21  missing.  They were needing it to go fuel up some

22  equipment.  I don't recall what.  They let me know it

23  was gone.

24         At that point in time, I only had a vague

25  understanding of what the fuel card was.  I didn't

1  really -- I was not really involved in that level of
2  work.  But I told them that we will shelve this for now,
3  we're getting ready to go to Shemya, and we'll deal with
4  it when we get back.
5      Q.  Did you do that?
6      A.  We did.
7      Q.  As you were leaving for Shemya, did you come up
8  seeing anybody you supervised?
9      A.  Yes.
10     Q.  Who was that?
11     A.  So we were over at the passenger terminal
12 standing by to board the C-130 and Mr. Wells came over.
13     Q.  Did he have a conversation with you?
14     A.  So I met him in the parking lot and we walked in
15 together.  And we just had a brief conversation that he
16 was just coming in to say goodbye to the crew, I guess.
17 And a few minutes after that we got call that it was
18 time to board and we left.
19     Q.  Where was this meeting in terms of the Kodiak map
20 we saw before, yesterday?
21     A.  On the air station, so adjacent to the tarmac, I
22 guess.
23     Q.  How long was your conversation with Mr. Wells?
24     A.  Just a few minutes.
25     Q.  You went to Shemya?

1      A.   Went to Shemya.

2      Q.   How did the trip go?

3      A.   Went well.

4      Q.   You came back?

5      A.   Came back, yeah.

6      Q.   What did the Coast Guard management do with

7  respect to this fuel card issue that you're speaking

8  about?

9      A.   So it made it -- so when we came back, ET1 came

10 up and told me that the card was back in Mr. Wells'

11 desk.  And at that point, it seemed suspicious, so I

12 informed the command, the executive officer, and they --

13 the XO and the CO initiated an administrative

14 investigation.

15     Q.   And the XO is who?  For the jury, please, XO and

16 CO are who?

17     A.   Yeah.  So the XO is Dave Pizzurro, and the CO was

18 Peter Van Ness.

19     Q.   Who was in charge of the investigation?

20     A.   SKC Steven Cartier was put in charge of the

21 investigation.

22     Q.   How long did the investigation take?

23     A.   I don't remember.  A couple weeks maybe.  I

24 honestly don't remember.

25     Q.   In a general sense, without going into too much

```
 1   detail, the results of the investigation and the facts
 2   of the investigation showed what with respect to
 3   Mr. Wells' conduct and this missing fuel card?
 4      A.  Yes.  So it was apparent that the fuel card was
 5   used on the same day that we went to Shemya and the same
 6   day that he was going off on a ferry to the mainland.
 7   And --
 8      Q.  How much?  For how much money?
 9      A.  It was 230 -- $240.  It was like 40-some-odd
10   gallons, I think.
11      Q.  Gallons of what?
12      A.  Diesel fuel.
13      Q.  And how was that timeline established?
14      A.  So they had gate guard footage coming onto the
15   base, and so you could see Mr. Wells' truck coming onto
16   the base and that was consistent to the time that we
17   were -- that we met around that time in the parking lot
18   and we were going to the passenger terminal.
19           And then his truck also left the base.  And it
20   was all consistent with the time that the fuel was taken
21   when they went and got the receipts and the data from
22   the fuel pumps on when the diesel was taken.
23      Q.  Did you review that evidence and information?
24      A.  I didn't.  I saw the final memo, but I wasn't
25   involved in the investigation.  Once it became an
```

administrative investigation, I was a witness at that
point in the investigation matter.  So no, I was not
involved in that.

Q.  Explain to the jury why you were a witness.

A.  Well, because I ran the shop and it was reported
to me that the card was missing.  And so in the course
of the investigation, I would not be the right person to
conduct the investigation.  They got someone else in the
command who wasn't connected to the rigger shop to do
that.

Q.  Are you aware of an explanation or -- by
Mr. Wells as to what that use of the card could have
been?

A.  I am.

Q.  What was that?

A.  I believe he said he must have filled up the big
line truck.

Q.  Was there any evidence the big line truck had
moved?

A.  No, there was no evidence the big line truck went
into the gate that day.

Q.  Nothing on the video?

A.  Nothing on the video.

Q.  Why was -- why were they looking for the fuel
card in the first place?

1    A.  Again, they were going to fuel some equipment up.

2    I don't recall exactly what it was.  It could have been

3    chain saws.  It could have been ATVs.  I can't remember.

4    Q.  Did you have a conversation with Mr. Wells

5    yourself as a manager with respect to this activity?

6    A.  I did.

7    Q.  And other activity as well?

8    A.  Yes.

9    Q.  Can you tell the jury when that conversation

10   happened?

11   A.  It was on 2 November 2011.

12   Q.  The same dates we just saw these documents up on

13   the screen?

14   A.  Yes, sir.

15   Q.  35 and 36?

16   A.  Yes, sir.

17   Q.  Please tell the jury why you elected to have a

18   conversation with Mr. Wells about this.

19   A.  Yeah.  So at that point, it was getting apparent

20   Mr. Wells was taking stuff from the COMMSTA, trees and

21   now fuel.  And so I wanted to let him know that we were

22   aware of these things and they weren't going to be

23   tolerated, that the fuel card incident didn't look good,

24   that there was going to be paperwork coming on that.

25          And I told him that, you know, he's an important

member of the crew, we need him and he needed to get on
board with the program, essentially.

Q.   You said paperwork coming on that?

A.   Yes.

Q.   Was there?

A.   There was.

Q.   During this conversation, did you have any
conversation with Mr. Wells about his future?

A.   Well, only that, you know, if he -- I said
something to the effect of, you know, "If you don't want
to be here, just retire," or, you know, "If you can't
get with the program you should just retire," or
something like that.

Q.   What was his reaction to your conversation?

A.   So initially, we got a little bit heated.  The
voices in my office were raised.  I was up in T-1, my
office up there.  Some of the petty officers out on the
ET deck could hear us, kind of raised voices.  They
asked me about it later.

     But then in the end, when I told him that if we
had had video at the pump of him actually taking the
fuel, he would be fired, but we didn't, we didn't have
cameras at the pump, but it didn't look good, it was
obvious that he had taken it and it's not good,
paperwork was coming, he actually thanked me for being

1    honest with him at that time.

2        Q.   From a manager's perspective, Mr. Reckner, what

3    is your goal from June to the fuel card issue with

4    respect to Mr. Wells?

5        A.   Again, so I never went looking for any of this

6    stuff.  I discovered it in the normal course of managing

7    the crew.  Whenever you have issues with an employee, it

8    takes a lot of time and effort from a manager's job.  It

9    takes away from other aspects of the job.

10            This is certainly not something I wanted to do.

11   And in the end, you know, we valued Jim Wells'

12   experience and expertise when it came to antennas.  We

13   wanted to retain that.

14       Q.   Did you make efforts to do that?

15       A.   We did.

16       Q.   If we could have the lights, please, Madam Clerk,

17   and Exhibit 37.

18            Mr. Reckner, there's two pages to this document.

19   Please take your time with your water.

20            Can you see that document, sir?

21       A.   Yes, sir.

22       Q.   If we can go to the second page, Blair.

23            Thank you.

24            That's the second page of that document?

25       A.   It is.

1    Q.   Are you familiar with the contents of that

2  document?

3    A.   I am.

4    Q.   And is that part of Mr. Wells' personnel file?

5    A.   It is.

6    Q.   That's something you had access to?

7    A.   Yes.

8    Q.   Coast Guard relied on it in managing Mr. Wells

9  and had it in his personnel file for a record?

10    A.   Yes.

11    Q.   And it reflects the memorandum issued to him

12  concerning the fuel card issue?

13    A.   It does.

14         MR. SKROCKI:  Move to admit Exhibit 36.

15         THE COURT:  37, I believe.

16         MR. SKROCKI:  37, yes.

17         THE COURT:  Any objection?

18         MR. COLBATH:  Your Honor, not sub- -- not other

19  than subject to my already ruled-on motion by the Court.

20         THE COURT:  All right.  With that I will admit

21  37.  Go ahead.

22         (Exhibit No. 37 admitted.)

23  BY MR. SKROCKI:

24    Q.   If you could go back to the first page, please,

25  and publish.

1          The date of this, Mr. Reckner, if you can see

2    that?

3       A.   January 4, 2012.

4       Q.   And this is directed to Mr. Wells?

5       A.   It is.

6       Q.   Does it have a summary of the investigation

7    concerning the fuel card?

8       A.   It does.

9       Q.   That's on the first page?

10      A.   It is.

11      Q.   That lists the paragraph B.  If we could expand

12   that, Blair.  Yeah.  Thank you.

13           These are the facts concerning the Coast Guard's

14   investigation, correct?

15      A.   Yes.

16      Q.   And the amount of diesel fuel was how much?

17      A.   47.641 gallons.

18      Q.   And the cost to the government?

19      A.   $232.44.

20      Q.   And I'm just going to block this for just a

21   moment at the bottom.  Is that the reflection of

22   Mr. Wells' explanation?

23      A.   Yes.

24      Q.   What was the Coast Guard's view of that

25   explanation?

1    A.   Well, there was no evidence that supported it.

2    The line truck never moved, so...

3    Q.   Okay, Blair.   Thank you.   And if we can go down

4    to page two.

5         Mr. Reckner, who was the ultimate signatory from

6    the Coast Guard as to this letter of caution as it says?

7    A.   So that was commanding officer, Peter Van Ness.

8    Q.   And the title is Letter of Caution.   Can you

9    explain that to the jury, what that means?

10   A.   Yeah.   So once you move up to the letter of

11   caution range, I guess, it's more serious.   This would

12   go in his file.   If the behavior was repeated it could

13   be grounds for being fired.

14   Q.   Blair, if you could -- paragraph three at the

15   top, if you can expand that.

16        Can you read that for the jury, please,

17   Mr. Reckner?

18   A.   Sure.   "You have been employed as a civilian with

19   the Coast Guard and COMMSTA Kodiak for 20-plus years,

20   and you were also retired from the Coast Guard as a

21   chief petty officer.   You have a responsibility to both

22   properly use and properly safeguard this government fuel

23   card.   This unauthorized purchase and supporting

24   evidence of misuse severely undermines my confidence in

25   you.

1      "You are a fiduciary steward of the taxpayers'

2   moneys, and you did not fulfill your basic

3   responsibilities.  This letter of caution is imposed to

4   impress upon you the seriousness of these offenses and

5   to serve as a warning that any future misconduct will

6   result in more severe disciplinary action."

7      Q.  Okay, Blair.  Thank you.

8          If you could expand paragraph four.

9          If you could read that to the jury, please,

10  Mr. Reckner.

11     A.  Sure.  "Your conduct was unacceptable and will

12  not be tolerated.  I consider this letter of caution to

13  be the very minimum action necessary to correct your

14  behavior and maintain good order and discipline in the

15  organization.  Any further misuse of government charge

16  cards under your control or any further instances of

17  misconduct may result in disciplinary action being taken

18  against you up to and including removal from federal

19  service."

20     Q.  Thank you.  And paragraph five.

21     A.  "It is the policy of the U.S. Coast Guard to

22  offer counseling to employees who may be experiencing

23  personal problems affecting their work performance,

24  attendance or conduct.  If you believe that the employee

25  assistance program could be of assistance, you are urged

1   to contact a counselor at 1 (800) 222-0364.  The EAP is

2   a confidential, free and voluntary program."

3      Q.  Why was that put in there?

4      A.  So if Mr. Wells was having difficulty in his

5   personal life, he could go to EAP, talk to them and they

6   have some mechanisms to help members out.

7      Q.  Number six, please.  Just the first couple of

8   words there.

9      A.  "This letter is nondisciplinary and will not be

10   placed in your official personnel record.  However, it

11   will be retained in your supervisor's employee working

12   folder and may be relied upon if future action is

13   necessary."

14      Q.  It says nondisciplinary?

15      A.  Right.

16      Q.  Is that true?

17      A.  It is.  It is.

18      Q.  We can go back to the first page, but does this

19   letter of caution every directly state Mr. Wells did it?

20      A.  It doesn't.

21      Q.  Why is that?

22      A.  Again, because there were no cameras at the pump.

23   And if there were, he would have been let go, but it was

24   apparent that he was the only one who could have used it

25   at that time.

1      Q.  Were you present when this letter was given to

2  Mr. Wells?

3      A.  I was.

4      Q.  And if we could have the lights, Madam Clerk.

5          I'm sorry.  I jumped ahead too quick.  The date

6  on page two?

7          MR. COLBATH:  Your Honor -- I'm sorry to

8  interrupt, Mr. Skrocki.  Could we approach?  I need to

9  make an objection, and it's better if I --

10         THE COURT:  All right.  That's fine.

11         Feel free to stand and stretch, ladies and

12  gentlemen.

13         (Begin bench conference.)

14         THE COURT:  Go ahead.

15         MR. COLBATH:  Thank you, Your Honor.  I'm going

16  to ask that the Court strike two questions ago

17  Mr. Reckner testified in response to was the letter

18  nondisciplinary.

19         THE COURT:  Uh-huh.

20         MR. COLBATH:  He said it was nondisciplinary,

21  but it was apparent that Mr. Wells did it.  By my count

22  that was the third time he said Mr. Wells stole the fuel

23  directly.

24         In the Court's order on this, you indicated the

25  government should not argue that Mr. Wells definitively

stole or misused the fuel card. And the jury -- I mean
Reckner has now said directly three times, when he was
describing the November meeting he had with Mr. Wells,
he said, "I know you stole the fuel."

And then later in describing the letter, he
says -- he says for the second time that Mr. Wells
directly stole the fuel. He said, "The letter doesn't
say that, but I'm saying that."

THE COURT: So how about if you were to ask
this witness -- can I see this -- "You cannot say that
Mr. Wells definitively stole -- the misuse of fuel
card."

MR. SKROCKI: I can do it right now.

THE COURT: I think that would --

MR. COLBATH: To clear something up.

THE COURT: Just want to clear up that we
cannot definitively say Mr. Wells -- because he didn't
have -- there is no camera at the pump.

MR. COLBATH: I just want to make sure that the
Court's order is complied with and we don't have
argument later because the argument -- under the
evidence, the argument would now be appropriate because
he's said he stole the fuel.

MR. SKROCKI: You can cross examine him on it,
but we're in compliance with the Court order.

1          MR. COLBATH:  I don't want to cross examine

2     him.

3          MR. SKROCKI:  For the record, we're in

4     compliance with the Court.

5          THE COURT:  Correct.  But ask him the follow-up

6     question:  You cannot definitively say that.  Just

7     parallel the language in my order.  And if you need to

8     confer with him --

9          MR. SKROCKI:  I would like just to make sure.

10         THE COURT:  Why don't we take our morning

11    break, and you can show him the order and do that

12    clarifying question.

13         MR. COLBATH:  Do you want this?

14         MR. SKROCKI:  No.

15         (End bench conference.)

16         THE COURT:  Ladies and gentlemen, we're a

17    little early for a morning break, but that is what we're

18    going to do is take about 10 to 15 minutes here and come

19    back shortly and then continue with the testimony.  So

20    please leave your notepads here.  Remember my admonition

21    not to discuss the case.  We'll see you back here in

22    about 10 or 15 minutes.  We'll go off record.

23         (Recessed from 9:39 a.m. to 9:49 a.m.)

24         (Jury absent)

25         DEPUTY CLERK:  All rise.  Her Honor, the Court,

1    the United States District Court is again in session.

2            THE COURT:  Please be seated.  We're back on

3    record.  And I understand the topic to take up.

4            MR. COLBATH:  Your Honor, it occurred to me as

5    we were talking about this that we are going to ask the

6    Court to give -- and I'm just struggling a little bit

7    with the timing of it.  Of course we're going to ask the

8    Court to give a limiting instruction on the testimony

9    about the tree collaring, about the letters of caution,

10   about the different topics here.

11           THE COURT:  So what's your proposal on that?

12           MR. COLBATH:  Well, my proposal is this:  That

13   my first inclination was to -- as each topic is broached

14   that the Court read it, but since there's going to be a

15   number of topics and a number of witnesses, that may

16   seem -- that may be cumbersome and more than is

17   necessary.

18           So my thought would be that the Court -- that

19   we craft one instruction that says, you know, you've

20   heard evidence related to these issues.  And just track

21   the points in the Court's 404(b) order, you know, 2011

22   tree collaring, November 2011 letter of expectation.

23   You just have a list of these issues.  You've heard

24   evidence of --

25           THE COURT:  I'm looking at the pattern 2.13,

evidence for limited purpose.

MR. COLBATH:  And I left mine down -- I apologize.  I left mine down on my table down in the office.  The pattern --

THE COURT:  I can give you a copy of it, but I assume we could agree on this.

MR. COLBATH:  The pattern is sufficient, other than you've heard evidence, and then I think we need a list of these topics to sort of compartmentalize the evidence for the jury.  And then my request would be -- I saw at one point that the government proposed or said they wouldn't object, you know, to the pattern or that it was appropriate to give the pattern.

The only thing I will say about the pattern is it's not an instruction to give the laundry list of permissible 404(b) reasons that the jury can consider it.  The case law I think is clear in the Ninth Circuit that when evidence under 404(b) is put forth by a proponent, the proponent has to identify the grounds, the Court has to find grounds upon which it's being offered that make it admissible under the rule, and then it's that grounds upon which it can be considered.

And so this is clearly -- for instance, none of this evidence is offered to eliminate -- it's not offered under accident or some kind of mistake.  It's

1    offered as motive evidence.

2              So the instruction --

3              THE COURT:  Why don't we look at 2.13 and take

4    that up.

5              MR. SKROCKI:  Propose something.  Write

6    something out and we can all talk about it.

7              THE COURT:  Right.  So if you want to write it

8    up, I will read that.  And it would seem that we can use

9    the 2.13 and fill that out.  And would the government

10   agree that this instruction says, "I instruct you that

11   this evidence is admitted only for the limited purpose

12   of," bracket, describe purpose, motive.

13             MR. SKROCKI:  We'll take this on, Judge.  We'll

14   produce the first draft and we'll circulate it.

15             THE COURT:  Wonderful.  So that would be where

16   I would be inclined to go is with 2.13 and list out the

17   evidence which also the model instruction contemplates

18   bracketing, "Describe evidence to be received for

19   limited purpose."  Can we take that up in due course

20   now?

21             MR. COLBATH:  We can, Your Honor.  And perhaps

22   if we could resolve it maybe at a break between -- at

23   the conclusion of the direct exam.  I mean --

24             THE COURT:  That's fine.

25             MR. COLBATH:  -- there are topics that haven't

1    yet been discussed, so it's not appropriate.

2            THE COURT:  Well, we need a draft of the

3    limited -- of the instruction.  So I hear the government

4    may propose one, but really I think my order envisioned

5    that defense would, but either way.

6            MR. SKROCKI:  Yeah.  Ms. Sherman is working on

7    it right now.

8            THE COURT:  Very good.  I think we can use 2.13

9    and get that done.  And when it's ready to go, at the

10   next break, perhaps.

11           MR. SKROCKI:  Wonderful.  Thank you.

12           THE COURT:  We're ready to proceed on the

13   question?

14           MR. SKROCKI:  Start with Mr. Reckner with your

15   question --

16           THE COURT:  Right.

17           MR. SKROCKI:  -- and we're ready to go.

18           THE COURT:  All right.  Very good.  Then let's

19   bring in the jury.

20           (Pause)

21           THE COURT:  I wouldn't recommend using that.

22   That's the 2010.  We have substantially -- it's online.

23           MR. COLBATH:  I see that.  But I don't have any

24   of that ability right here.

25           THE COURT:  Or maybe that one's newer.

```
 1           MS. SHERMAN:  2010 addition is online.

 2           THE COURT:  It looks like it's 2010, but it's

 3    not.  If you scroll down you'll see all the updates.

 4           MS. SHERMAN:  Updated 2019 June.

 5           THE COURT:  Yeah.  And we're about to update

 6    even more.  We are going to have different closing

 7    instructions.

 8           MR. SKROCKI:  Oh, really?  Can you give us an

 9    advance of that?

10           THE COURT:  They're not substantive changes.

11    We tweaked chapter three and chapter seven.

12           MR. SKROCKI:  It's noble work, Judge.

13           THE COURT:  You have to be a grammar

14    aficionado, which we all are.

15           (Jury present)

16           THE COURT:  Very good.  Please be seated,

17    everyone.

18           And I believe we're ready to proceed.

19    Mr. Skrocki, go ahead, please.

20           MR. SKROCKI:  Yes, Your Honor.  Thank you.

21    BY MR. SKROCKI:

22       Q.  Mr. Reckner, with respect to this fuel card

23    investigation, did you or the Coast Guard have any

24    definitive proof that Mr. Wells used the card on the day

25    in question?
```

1    A.  We did not.

2    Q.  Before the break we were moving into a meeting.

3  Can you tell -- on this fuel card memorandum.  And

4  please tell the jury where the meeting occurred, roughly

5  when and who was present.

6    A.  Sure.  So in February of 2012, the commanding

7  officer wanted to have a meeting to present the letter

8  of caution to Mr. Wells.  We had that meeting in his

9  office.  So the commanding officer, Pete Van Ness, was

10 there.  The executive officer, Lieutenant Pizzurro, was

11 there.  The master chief, Command Master Chief Troy

12 Lowdermilk was there.  The engineering officer, Bill

13 Reed, was there.  I was there and Mr. Wells was there.

14   Q.  In terms of Coast Guard hierarchy significance,

15 how important was this meeting?

16   A.  It's pretty important.  If you're getting called

17 into the commanding officer's office to discuss, you

18 know, something of this magnitude, it's serious.

19   Q.  And the commanding officer again was who, sir?

20   A.  Peter Van Ness.

21   Q.  And who led the meeting?

22   A.  He did.

23   Q.  And you were present?

24   A.  I was.

25   Q.  Was this letter delivered to Mr. Wells?

1      A.   It was.

2      Q.   Was there a general explanation to Mr. Wells

3  about the letter?

4      A.   So the commanding officer explained the letter to

5  him.  Explained that he was disappointed and that the

6  level of trust that he once had with Mr. Wells was no

7  longer the same.

8      Q.   What did Mr. Wells say or do during the course of

9  this meeting in response to what you just said?

10     A.   So Mr. Wells kept repeating, "You guys think I'm

11  a thief.  You know, you guys think I'm a thief."  And he

12  also kept repeating, "It just doesn't sit well.  It just

13  doesn't sit well."

14     Q.   How long did the meeting take place?

15     A.   Probably somewhere between 15 minutes and a half

16  hour, if I had to guess.  It's been a while.

17     Q.   Was there a request made to Mr. Wells with

18  respect to authenticating or signing the letter?

19     A.   Yes.  So again, from the HR department of the

20  base, we needed a signature just to identify that he

21  received the letter.  And so I asked him if he could

22  sign it, but he didn't at that time.

23     Q.   He did not?

24     A.   Not at that time.

25     Q.   Was there some sort of -- did you have a chance

to observe anything with respect to the not signing

portion of this conversation?

    A.  Well, so after a period of a few minutes, the

commanding officer stood up and said, "Okay, let's

break."  So we all got up and I left.  I went back to my

office.  I called the HR person over at the base, Stacy

Hoffler, and I told her that Mr. Wells wouldn't sign the

letter.  And she said, "That's okay."

        MR. COLBATH:  Your Honor, I'm going to object

as to hearsay.

        THE COURT:  That's sustained.

BY MR. SKROCKI:

    Q.  Remember what other people say --

    A.  Got it.

    Q.  Did Mr. Wells ultimately sign the letter?

    A.  He did.  So after I got off the phone, I went

back to tell Captain Van Ness what I was informed.  And

at that point, the captain told me that Mr. Wells did in

fact sign the letter.  And so I took the letter back to

my office and put it in the appropriate folder.

    Q.  And if we could have 37 back up, please, Blair.

And the lights, Madam Clerk.  Thank you.

        The letter says Letter of Caution up under the

subject.  It's dated -- what's the date there,

Mr. Reckner?

1      A.   January 4th, 2012.

2      Q.   If we can go to the second page, Blair.

3           Can you see the date where it's been -- there's a

4    date there under Date?

5      A.   I can.

6      Q.   Which date is that?

7      A.   24 February 2012.

8      Q.   Do you recognize the signature on the left?

9      A.   I do.

10     Q.   Whose is that?

11     A.   That's Jim Wells'.

12     Q.   Why the delay from January to February?

13     A.   So the commanding officer, Pete Van Ness, drafted

14   the letter.  And then his schedule and Mr. Wells'

15   schedule were just not aligned.  Captain Van Ness had

16   left the island for some leave or some business, I don't

17   remember which, but he was off island.

18          Mr. Wells was sick and had some procedures done I

19   think around the same time.  So it was just a scheduling

20   issue to get both of them at the station at the same

21   time to present the letter.

22     Q.   If we could have the lights, Madam Clerk.  Thank

23   you, Blair.

24          You mentioned there, Mr. Reckner, about some

25   medical issues with Mr. Wells.  Do you have a

1    recollection of when these started?

2        A.    So I first remember hearing about them I want to

3    say late summer or early fall of 2011.  And they

4    continued through the winter of 2012.

5        Q.    Of 2012?

6        A.    Yeah.

7        Q.    If you could just tell the jury, in a general

8    sense did it have an impact on his work and his

9    attendance?

10       A.    It did.  So he was absent a lot.  He was going to

11   medical appointments.  Or he would come in, then he

12   wouldn't feel well, he would leave early, or he wouldn't

13   come in at all.  And so he was gone a lot between

14   personal leave and sick leave in the fall and early

15   winter of 2011 and 2012.

16       Q.    As a manager were you monitoring that?

17       A.    I was.

18       Q.    Did you have any concerns about the amount of

19   leave being used and, if so, what did you do?

20       A.    So I didn't.  You know, it was his leave.  He

21   wasn't feeling well.  If he wanted to take it he was

22   certainly entitled, both the personal and the sick

23   leave.  The fall, winter, is a slow time for us anyway.

24   I wanted him to get well, and I wanted him to do what he

25   needed to do to get well.

          So we were giving him the time he needed.  In
fact, I believe he dipped into his -- he had used all
his sick leave and was dipping into his next year sick
leave, and we were okay with that.

     Q.   You were okay with that?

     A.   We were okay with that.

     Q.   During that timeframe, are you aware of whether
he was placed on a certain type of duty?

     A.   So after his surgery, I believe it was in
February, he was on a limited duty due to the surgery
for a period of time.

     Q.   Do you recall what the surgery was for?

     A.   A gallbladder removal and a hernia.  So they
removed his gallbladder and repaired a hernia at the
same time.

     Q.   From there is that where the light duty came
from?

     A.   Yes.

     Q.   Did that change at some point in time?

     A.   At some point in time, after he had healed a
certain point, you know, the light duty would have
expired or the doctor would have said, "You're good to
go for full duty."  So that happened at some point.  I
don't remember when.

     Q.   With respect to Mr. Wells' paperwork concerning

his illnesses and his leave and after the turn of the
year, 2012 up till April of 2012, can you describe that
for the jury?  Was he compliant?

    A.  So he was.  He was getting his personal leave
slips in before he was going to take leave, which had
been an issue in the past.  And his sick leave, he was
submitting those slips when he came back into the office
after being sick, though I still wasn't getting phone
calls or notifications if he wasn't coming in the office
regularly.

    Q.  You call a sick leave or vacation leave chit?

    A.  In Coast Guard parlance, that's a chit.  Leave
chit.  A slip.  A procedure.  The form we fill out, if
you will.

    Q.  Yeah, we don't call it that, but -- that's a new
one for me.  Leave chit or sick leave chit.

        Okay.  With respect to the operational side of
the rigger shop, how involved or how present was
Mr. Wells during the timeframe of January to April?

    A.  Not very.  So he was out a lot obviously, because
he was sick and he took some personal time.  And beyond
that, while we were in the office discussing the day's
work or upcoming projects, I mentioned yesterday we had
a lot of damaged antennas that needed to be fixed, and
so we were starting to preplan some of that stuff.

1       Mr. Wells would sit in the office at his desk

2  with his back to myself, ET1 Hopkins and Mr. Belisle.

3  In an effort to engage him, reengage him in our

4  business, I would ask him questions.  I would say things

5  like, "How does that sound, Jim?  Are we on the right

6  track?"

7       We're going down the road trying to get him

8  involved in the conversation.  What I got back was

9  mostly one-word answers and not a whole lot of energy.

10     Q.  Did you as a manager rely on other people with

11  Mr. Wells at that time with the sick leave and not being

12  around, things of that nature?

13     A.  Yes.

14     Q.  And if you did, who were they?

15     A.  So ET1 Hopkins, Jim Hopkins, and Mr. Rich Belisle

16  stepped up.  They were learning more.  They were

17  figuring out what it was we were going to do to get

18  these antennas fixed.  I told the executive officer with

19  Mr. Wells' absences that we weren't going to not work,

20  we were going to continue to work.  We may make some

21  mistakes.  If we make mistakes I'll bring those to his

22  attention.  But we were not going to -- we weren't going

23  to stop work just because Mr. Wells wasn't in the

24  office.

25     Q.  Did that in fact occur?

1    A.  It did.

2    Q.  Who led that?

3    A.  So it was mostly Rich Belisle was stepped in and

4 was taking over that antenna mechanic role, if you will.

5    Q.  If we could have the lights, please.  And Blair,

6 if you could pull up Exhibit No. 4.  Blair, if you could

7 look over the screen, if you could enlarge that segment.

8        A little fuzzy there, Mr. Reckner, but can you

9 see a structure off to the left-hand side of the

10 building in Exhibit No. 4?

11   A.  I can.

12   Q.  I want to talk to you a little bit about that for

13 a few minutes.  What is that structure?

14   A.  That right there is the warehouse, the COMMSTA

15 warehouse.

16   Q.  If we -- thank you.  If we could have the lights,

17 Madam Clerk.

18        You mentioned the Communications Station

19 warehouse?

20   A.  Yes, sir.

21   Q.  And with respect to that warehouse, what's its

22 function for your Communications Station?

23   A.  Right.  So we use it to store parts, antenna

24 parts, pieces, gear.  There's a lot of things in there.

25   Q.  And what was Mr. Wells' relationship with that

1  warehouse?

2    A.   So he had been around for a long time.  And so he

3  was putting, you know, storing stuff in the warehouse

4  pretty regularly.  Not just COMMSTA property, but also

5  personal property.

6    Q.   Was there a command decision made as to what to

7  be done with that warehouse and its condition?

8    A.   Yes.

9    Q.   Who made that decision?

10    A.   The CO, Commander Van Ness.

11    Q.   What was the decision?

12    A.   He wanted the warehouse cleaned out.

13    Q.   Who was in charge of implementing that from the

14  Van Ness side?  It all goes downhill, right?

15    A.   Right.

16    Q.   Okay.  So who was next in line downhill?

17    A.   So after the captain, he mentioned it.  It was in

18  a meeting, one of our meetings I was in.  So the

19  engineering officer was there, and I was there.  It was

20  understood that my shop, my warehouse, the rigger shop

21  was going to do that.

22         And so I went to Mr. Wells, asked him to lead

23  that as the guy who had the most time at the station and

24  who was familiar with what we had in there to give us a

25  hand and get that thing cleaned out.

1    Q.   Did he ever do that?

2    A.   He did not.  Very limited role.

3    Q.   Now, the contents of the warehouse, in a general

4    sense, what was in there, in a general sense?

5    A.   Again, antenna pieces and parts, tools, boxes of,

6    I don't know, all kinds of stuff.  I didn't know what it

7    was because I'm not an antenna mechanic.  But it was a

8    lot of stuff that was outdated and we no longer needed,

9    and it was strewn about everywhere.  There was no

10   cataloguing or organization to it.  There was stuff --

11   there was -- it was hard to walk around in there, there

12   was so much stuff.  And it just looked really bad.

13   Q.   And was there an effort done to do what with this

14   equipment?

15   A.   To clean it out, to go through it, ascertain what

16   was good that we would need in the future.

17   Q.   Did you do that?

18   A.   So the team did.  I didn't personally, but yes,

19   we did it.

20   Q.   So you made an effort what was going to go and

21   what was going to stay?

22   A.   Yes.

23   Q.   And to be fair, some things stayed and some

24   things went?

25   A.   That's correct.

1    Q.  Did you have any personal experience with

2  Mr. Wells while this warehouse cleanout was going on?

3    A.  I did.

4    Q.  What was that?

5    A.  So there were occasions when Rich and ET1 and the

6  crew were down at the warehouse going through it.  They

7  would come across something that they couldn't identify

8  and would ask Jim to come down, Jim Wells to come take a

9  look at it and tell us what it was.

10    Q.  Did he do that?

11    A.  He did once or twice.

12    Q.  Did he seem pleased with this project from your

13  observation?

14    A.  Not at all.

15    Q.  How long did this project take?

16    A.  I heard about it -- I reported it in 2010, and

17  the first time I heard that the commanding officer

18  wanted that cleaned out was probably fall of 2010.  You

19  know, it was one of those projects that didn't need to

20  happen tomorrow.  But it was an ongoing project that the

21  CO wanted done before he transferred out in the summer

22  of 2012.

23    Q.  And with respect to the rigger shop

24  Communications Station, who was the point person for the

25  warehouse clean-out?

1       A.   So the point person -- who became the point

2   person was Rich Belisle.

3       Q.   You have your managers and they take

4   responsibility for the success, but the person on the

5   ground is the one doing the work?

6            MR. COLBATH:  Your Honor, I'm going to object

7   as to leading.

8            THE COURT:  It is sustained.

9   BY MR. SKROCKI:

10      Q.   At the time of the murders in April of 2012, was

11  this project finished?

12      A.   It was not.

13      Q.   Mr. Reckner, are you aware of a conference called

14  NATE?

15      A.   I am.

16      Q.   What is that conference?

17      A.   So NATE stands for the National Association of

18  Tower Erectors.  It's an industry, tower industry

19  conference that is held every year.  It rotates through

20  six or seven cities around the country every year.

21  Every year a different city.

22      Q.   Did you have occasion to attend this conference

23  at a point in time?

24      A.   I did.

25      Q.   Tell the jury when.

1      A.   My first NATE was in February of 2011.

2      Q.   And subsequent to that, did you have occasion to

3 attend a NATE conference?

4      A.   Yes.

5      Q.   When was that?

6      A.   I went again in 2012 and 2013.

7      Q.   Can you explain to the jury the general nature of

8 the NATE conference and what it does, how long, that

9 type of thing?  Why is it important to what you do?

10     A.   Sure.  So again, it's a gathering of folks in the

11 tower industry, if you will.  We have training.  There's

12 a series of training seminars throughout the whole week.

13 And there's also vendors, so a large exhibition hall

14 with vendor booths that you walk through and you can

15 talk to vendors and see what the new equipment is out

16 there, new climbing gear or whatever the new technology

17 is.

18     Q.   Do things change technologically in the tower

19 industry?

20     A.   They do I think mostly with the safety gear.

21 They update that a lot.

22     Q.   In 2011, you mentioned you went to one of these

23 conferences?

24     A.   I did.

25     Q.   Who did you go with?

1    A.   I went with Mr. Wells and Mr. Belisle.

2    Q.   How long were you gone?

3    A.   A week.

4    Q.   Did Mr. Wells seem to enjoy the week at the NATE

5    conference?

6    A.   He always looked forward to it.  He did very

7    much.

8    Q.   To your understanding, had Mr. Wells always

9    attended these over the years when he was at the

10   Communications Station?

11   A.   Yes.

12   Q.   Did there come a time in the spring of 2012,

13   where you had a conversation with Mr. Wells about the

14   2012 NATE conference?

15   A.   It was actually in the winter.  It was January or

16   early February that I had the conference.

17   Q.   In the winter, you had the conversation?  Okay.

18   So when you had that conversation in January or

19   February, where were you when you had this conversation?

20   A.   So we were in the office down in T-2.  It was

21   just him and I.  He had been out sick for a while, had

22   just come back.  He asked me what we were doing about

23   the NATE conference that year.  And I told him that we

24   already made a decision and that myself, ET1 Hopkins and

25   Mr. Rich Belisle would be going this year.

1    Q.  Who made that decision?

2    A.  So I made the decision and the executive officer,

3    I had a conversation with Dave Pizzurro who supported

4    it.

5    Q.  And how much funding did you have to send people

6    for the 2012 conference?

7    A.  The XO told me we could only take three.

8    Q.  And you communicated this to Mr. Wells?

9    A.  I did when he asked, yes.

10    Q.  Can you explain how the ask happened?

11    A.  So again, we were sitting in the office, just him

12    and I down in T-2.  He was at his desk, and I was

13    sitting at Jim Hopkins' desk for some reason.  I don't

14    remember why.  And he said, "So what are we doing about

15    NATE this year?"  I said, "It's already planned.  XO

16    said we can take three, so myself, ET1 Hopkins and Rich

17    Belisle will be going this year."

18    Q.  And his reaction to what you said was?

19    A.  He was angry.

20    Q.  Please elaborate on that for the jury.

21    A.  So he was angry.  He pointed at ET1 Hopkins' desk

22    and said, "Why is he going?"  And I explained to him

23    that ET1 had, you know, done great work this year, he

24    really stepped up, he was the sailor of the year.  He

25    extended for a year, so he chose to spend another year

1    at COMMSTA.  We had a lot of work coming up in 2012, and

2    we could use him to gain the knowledge he would get at

3    NATE to bring that back.  So that's why I decided that

4    ET1 Hopkins would go.

5        Q.  Did he make any comment as to Mr. Belisle's

6    attendance of the NATE conference with you and

7    Mr. Hopkins?

8        A.  So after I explained why ET1 Hopkins was going,

9    he pointed to Rich's chair and he said, "Why is he

10   going?  He's just a fucking rigger."

11       Q.  Those were his words?

12       A.  Those were his words.

13       Q.  What was your response to that?

14       A.  Again, so I explained to him that Rich, same

15   story, had really stepped up this year in Mr. Wells'

16   absence.  And I said that "As far as an antenna mechanic

17   goes, Rich isn't that far from you, knowledge-wise."

18       Q.  Did he have a response to that?

19       A.  So he glared at me, kind of glaring and staring

20   at me for a period of -- it felt like a long time, over

21   30 seconds.

22       Q.  How did you feel about that?

23       A.  I felt intimidated.

24       Q.  Why?

25       A.  I felt like he was trying to intimidate me, that

he was angry he wasn't going and, you know, you saw the diagram in the office. I'm sitting in the back of the office. He's sitting by the door, you know. He's a strong man. The look on his face was intimidating.

Q. How long was this exchange going on, Mr. Reckner?

A. Again, I don't know for sure, but I would say around 30 seconds or maybe longer. It seemed like a while.

Q. What ultimately broke the staring?

A. He turned around and went back to work and started typing on his desk, and I did the same thing.

Q. When you had this conversation, was there any mention by Mr. Wells of any kind of surgery he had coming up?

A. No.

Q. Was there any mention of him doing other work for the Communications Station?

A. No.

Q. In connection with this conference?

A. No.

Q. Had there been a fourth slot, would you have selected him to go?

A. I would not have.

MR. SKROCKI: One moment, Judge.

THE COURT: Certainly.

1          (Pause)

2     BY MR. SKROCKI:

3          Q.   Thank you, Judge.

4          Mr. Reckner, I want to turn your attention to

5     April 11th of 2012.  Do you recall kind of the workday

6     that day?

7          A.   I do.

8          Q.   And do you recall any interaction with Mr. Wells

9     the morning of the 11th?

10         A.   I do.

11         Q.   What do you recall?

12         A.   He disappeared.  Around 9:00 in the morning, we

13    were both in the office.  He told me he was heading up

14    the hill toward T-1.  I had a meeting up there in a few

15    minutes.  I said, "Roger that, I'll see you up there."

16    And I didn't see him again for -- until after lunch.

17         Q.   Did you make attempts to try to locate him?

18         A.   I did.

19         Q.   Were those attempts successful?

20         A.   They were not.

21         Q.   What did you try to do?  Without telling us what

22    people said, what did you try to do to locate Mr. Wells

23    during that morning of April 11th?

24         A.   I called up to the T-1, to the ET deck and I

25    asked one of the ETs to go look for him.  I believe it

1    was Cody Beauford.

2        Q.   Anybody find him?

3        A.   No, we did not find him.

4        Q.   Was there any business work conducted in the

5    afternoon of the 11th that you were involved in?

6        A.   Yeah.  So we had a temporary antenna that the DoD

7    was asking us to install.  So we went up onto the roof

8    of the T-1 building, it was a small little antenna, to

9    look at location, and also to discuss how we would run

10   the transmission line from the roof down to the

11   operations deck where the radio and the gear would

12   actually be.

13       Q.   Who was part of that conversation?

14       A.   I was there.  Rich Belisle.  Mr. Wells was there.

15   Cody Beauford was there.  I think Seaman Coggins was

16   there and maybe one or two of the ETs from the ET deck.

17       Q.   And the point of the meeting or the conversation

18   was to do what kind of work?

19       A.   To locate a spot on the roof to put the antenna

20   and then to discuss how we would run that transmission

21   line.

22       Q.   What was the -- in terms of transmission line,

23   what was the concern of the location?  Why was that

24   important?

25       A.   Well, so I mean we got to get into the building

1   down to the equipment.  So as we discussed it, there

2   were really only two options to get it into the

3   building.  We could run it down along the shingles and

4   down to the ground and then in, or there was like an

5   attic space or a void space, right adjacent to the

6   antenna.  So the other option was to run it in that

7   space and then down through the building and then get it

8   to the equipment.

9   Q.   Who made what suggestion?

10  A.   So Mr. Wells suggested that we run it on the

11  outside along the shingles, and Mr. Belisle suggested we

12  run it inside through the building.

13  Q.   Was there discussion amongst you all about that?

14  A.   So we discussed it and, you know, as a guy who

15  made the decision, to me, it made sense to run it inside

16  the building.  At the time, the installation was

17  supposed to be temporary, but often these things became

18  permanent.  Made sense to do the work now and get it

19  inside and protect the cable.  Obviously, Kodiak weather

20  is harsh.  If we could keep it protected on the inside

21  it would last longer.

22  Q.   The equipment that would sort of do the data,

23  where was that located?

24  A.   Down in the operations deck.

25  Q.   The operations deck, if you can explain that to

1  the -- that was yesterday.  Can you explain that one

2  more time?

3     A.  The operations deck is where the operations

4  specialists work, the folks who listen to the radios

5  24 hours.  And we have a bunch of equipment down there,

6  radios and other stuff.  This piece of equipment was

7  going to be placed into the operations deck.

8     Q.  Who ultimately made the decision about where the

9  line was going to be run?

10    A.  I did.

11    Q.  What did you decide?

12    A.  I decided we would run it inside the building.

13    Q.  Who was -- who did you communicate that to?

14    A.  So I communicated to everybody as we were

15  standing there.  I said, "We're going to run it inside."

16  I said, "Rich, great idea.  We're going to run it

17  inside."  And that was it.

18    Q.  Is the operations deck the same location where

19  surveillance cameras are located?

20    A.  It is.

21    Q.  Did Mr. Wells ever tell you -- what did Mr. Wells

22  tell you about where he was that whole morning?

23    A.  I never knew.  He never told me.  I was going to

24  have a conversation with him about it on April 12th, but

25  April 12th, Rich and Jim were murdered, so I never got a

1   chance.

2       Q.   The next day?

3       A.   Yes.

4       Q.   Mr. Reckner, when's the last time you saw

5   Mr. Belisle alive?  Go ahead.

6            (Pause)

7       A.   April 11th.

8       Q.   What were you doing with him?

9       A.   So after the antenna discussion regarding the

10  cable that we just talked about, it was near the end of

11  the day.  I think we probably hit quarters and he left.

12      Q.   How about Mr. Hopkins?

13      A.   So Jim and I --

14           THE COURT:  Do you want to take a few minutes,

15  or are you okay?

16      A.   So ET1 and I were interviewing that day for the

17  summer positions.

18      Q.   Who were you interviewing?

19      A.   They're generally high school students.  We bring

20  in one or two a year to help us with the summer work,

21  the clearing of the antenna fields and whatnot.  So we

22  had three interviews that day.  And one of them was

23  running late.

24           So we were heading down to the rigger shop, and

25  the young man was pulling in.  He kind of got lost

1    getting to the COMMSTA.  And so we said, "Okay, just

2    follow us down to the rigger shop and we'll interview

3    you down there."  And so we did.  And then he left.

4         And ET1 and I went into the office to discuss the

5    candidates and we made a decision on who we were going

6    to hire that summer.  And I drafted an e-mail and sent

7    it to Stacy Hoffler, the HR at the base, to tell her who

8    our candidates were.

9    Q.  Before we get to the next segment of your direct

10   exam, can I see you for just a moment with a sidebar?

11              THE COURT:  Certainly.

12              (Begin bench conference.)

13              MR. SKROCKI:  So in opening statement, there

14   was a conversation about Mr. Reckner focusing on

15   Mr. Wells.  There were several statements that have been

16   produced in discovery and Mr. Reckner's interviews about

17   what he thought the morning of the 12th when he got a

18   phone call.  His verbal response was, "I hope Jim Wells

19   didn't do something stupid."

20              I don't -- I could inquire on it because of the

21   defense's opening the door on Mr. Reckner, and that's

22   what I would like to do along with what he thought about

23   it.

24              THE COURT:  You want to get that statement in?

25              MR. SKROCKI:  I do.  I think it's an excited

utterance.  He thought it, and then he uttered it.

THE COURT:  Any objection?

MR. COLBATH:  First of all, I don't think that
we can open the door till we present evidence.  That's
my first thought.  My second thought is that being said,
I don't necessarily have an objection to the statement
as an excited utterance.

The explanation of why he thought that or his
belief that Mr. Wells -- the underlying reason for his
belief that Mr. Wells committed the crime is, one, not
relevant and, two, I think objectionable, not
appropriate.  That's an opinion on the issue before the
jury, why Wells would have committed the murder.

And so if there's any testimony or -- the
government can't put in the statement and then ask,
well, why did you say that or why did you think that.
The why question is where I really have a problem.

THE COURT:  Are you going to ask that?

MR. SKROCKI:  No.  I'm not going to ask him
why.

THE COURT:  Just the statement?

MR. SKROCKI:  Just the statement.

THE COURT:  I hear no objection to the
statement as an excited utterance.

MR. COLBATH:  To the statement that he said to

somebody, because I'm not sure who, but he said to
somebody at the initial scene there, "I hope Jim Wells
didn't do something stupid."

        MR. SKROCKI:  And I actually prepped him that I
wasn't going to do it.  I'd like to have a moment with
him.  And then I will caution him I'm not going to be
asking questions about the why.  That wasn't part of our
direct anyway.  If you hear questions like, what were
you thinking about Mr. Wells, not about -- his
statements going to be -- just a moment.  His statements
are going to be -- I will say, were you concerned about
Mr. Wells and he will answer yes.  Just so you know,
we're not going there.

        THE COURT:  You're not going to reexplore the
basis for his opinion?

        MR. SKROCKI:  Correct.

        THE COURT:  Just the opinion?

        MR. SKROCKI:  Uh-huh.

        THE COURT:  I hear no objection to that.

        MR. COLBATH:  If we don't go to the basis or
the why.

        MR. SKROCKI:  No.  May I have a moment with him
briefly.

        THE COURT:  Yes.  Do you need me to excuse the
jury?

```
 1            MR. SKROCKI:  No.

 2            MR. COLBATH:  Could he come to you?  So don't

 3  have a conversation there.

 4            (End bench conference.)

 5            THE COURT:  Sir, would you mind going and

 6  talking with Mr. Skrocki for just a moment.

 7            Everyone doing okay?  Anyone need a break or

 8  anything?  Should be just a minute here.

 9               (Pause)

10  BY MR. SKROCKI:

11     Q.  Thank you, Your Honor.

12         All set, Mr. Reckner?

13     A.  Yes, sir.

14     Q.  All right.  When we broke you were interviewing a

15  high school student for some summer work?

16     A.  Yes.

17     Q.  And where did you go after that?

18     A.  I went home.

19     Q.  You spent the night at home?

20     A.  I did.

21     Q.  And do you have a family?

22     A.  I do.

23     Q.  Describe your family.

24     A.  I have a wife and three children.

25     Q.  And you woke up the next morning?
```

1    A.   I did.

2    Q.   What did you intend to do that day?

3    A.   We were scheduled to climb one of the

4  300-footers, change the lights.  So I woke up thinking

5  we were going to climb that day.

6    Q.   And this is April 12th, the day of the murders?

7    A.   Yes, sir.

8    Q.   At some point did you receive any information

9  concerning something about the Communications Station?

10   A.   I did.

11   Q.   What did you receive?

12   A.   I got a phone call from SK --

13        (Pause)

14   A.   I got a phone call from SKS Cartier asking me if

15  I knew what was going on at the rigger shop.  He said

16  there were a bunch of emergency vehicles there.  He just

17  drove by.  And I told him I did not.  I hung up with

18  him.

19   Q.   Let me stop you there.  Take a drink.

20        You hung up the phone?

21   A.   I did.

22   Q.   Did you have a thought after that?

23   A.   I did.

24   Q.   What was your thought?

25   A.   I hope Jim Wells didn't go fucking crazy.

1    Q.  Did you say anything to that effect after that

2  thought?

3    A.  I did.

4    Q.  What did you say?

5    A.  I said just what I said.

6    Q.  Okay.  What did you do next?

7    A.  I called the watch on the operations deck, and I

8  asked them what was happening down at the rigger shop.

9    Q.  Did you receive any information about that?

10   A.  I was informed that Rich and ET1 Hopkins had been

11 found down.  I said, "What do you mean down?"  And I was

12 informed down, and then the conversation ended.

13   Q.  Did that word down have any significance to you?

14   A.  It sounded serious to me.

15   Q.  Your reaction to that was what, sir?

16   A.  I got ready.  I was in my truck, and I was

17 driving to the COMMSTA.

18   Q.  Where were you living at the time?

19   A.  Aviation Hill.

20   Q.  How long did it take you to get to the

21 Communications Station?

22   A.  Less than five minutes.

23   Q.  When you got there, let me -- I'm sorry.

24      Did you have any conversations with anybody

25 between the time you left your home and the time you

1  arrived at the Communications Station?

2      A.  I did.

3      Q.  With who?

4      A.  I called ET3 Cody Beauford.  I said, "Cody,

5  what's going on?"  He said he found Rich and Jim down.

6  And I said, "Cody, what do you mean down?"  And he said

7  he found them dead.

8      Q.  Take a moment.  Okay?

9          When you received that phone call, Mr. Reckner,

10  where were you in the transit from your home to the

11  Communications Station?

12     A.  I was on Anton Larsen.

13     Q.  About how far away?

14     A.  Minutes.  A minute maybe.  I was not far.

15     Q.  How were you feeling then?

16     A.  I was scared.  I was nervous.  I was upset.  I

17  wanted to get there and find out where my guys were,

18  what happened.  So I was trying to get there as fast as

19  I could.

20     Q.  You were their manager?

21     A.  They were my guys, yes.

22     Q.  And at some point, did you pull up to the

23  Communications Station and specifically the rigger shop?

24     A.  I did.

25     Q.  Can you describe what you saw there?

1    A.   When I drove up, I made that turn off the bridge,

2   I came up, I could see emergency vehicles, State

3   Troopers, CGPD, Coast Guard Police Department.  And so I

4   parked where I -- the only place I could, which is near

5   the flagpole.  I jumped out of my vehicle intending to

6   go into the rigger shop.

7    Q.   Let's stop you there.  We showed you an exhibit

8   before your testimony today.  It's a video clip.  Take

9   all the time you need.

10    A.   Okay.

11    Q.   Do you recall that clip, Mr. Reckner?

12    A.   I do.

13    Q.   Madam Clerk, if we can have the lights.  And

14   Blair, Exhibit 67 for foundational purposes.  If you

15   could just begin to play.  Just stop it there for

16   Mr. Reckner.

17        Is this the video clip we showed you prior to

18   your testimony, Mr. Reckner?

19    A.   It is.

20    Q.   It depicts the scene in front of the rigger shop

21   the morning of Mr. Belisle and Mr. Hopkins' murder?

22    A.   It does.

23    Q.   And you recognize the vehicles that are depicted

24   in that video clip?

25    A.   I do.

 1    Q.   Do you see your own vehicle in that video clip?

 2    A.   I do.

 3         MR. SKROCKI:  Move for the admission of United

 4    States 67.

 5         MR. COLBATH:  I have no objection, Your Honor.

 6         THE COURT:  All right.  67 is admitted.

 7         (Exhibit No. 67 admitted.)

 8    BY MR. SKROCKI:

 9    Q.   Blair, if you can go -- yeah, thank you.  Go to

10    the beginning.  And just for Mr. Reckner and for Blair,

11    I'll be interrupting this at certain points along the

12    way for explanation of things.

13         So let's just post for the jury, please.

14    Mr. Reckner, do you know the field of view of this

15    camera and where it's located?

16         (Exhibit 67 playing in open court)

17    A.   I do.

18    Q.   Where was that?

19    A.   It's the camera that's located on T-2.

20    Q.   It's facing -- there's an item there in the

21    distance.  Do you see what that is?

22    A.   I do.

23    Q.   What is that, Mr. Reckner?

24    A.   That's the Kodiak water treatment plant.

25    Q.   In the center right there, could you tell us what

1  that is?

2      A.   I can.  That's the flagpole.

3      Q.   Where is your vehicle in this image, Mr. Reckner?

4      A.   Mine is right behind this white one, right there,

5  the dark-colored truck right there.

6      Q.   Are there any other vehicles in this frame of the

7  image that you see that you recognize?

8      A.   There is.

9      Q.   Could you point them out for the jury?

10     A.   That's -- I believe that's Joe Sturgis's, maybe.

11  I think it's CGIS.  That's an emergency vehicle,

12  emergency vehicle.  And that is Senior Chief Reed's van.

13     Q.   Can you explain to the jury -- you said CGIS.

14  Just let them know what that means.

15     A.   Coast Guard Investigative Service.

16     Q.   Blair, we can go ahead and forward it.  If you

17  could stop it right there, please.

18          Do you recognize that white truck on the

19  right-hand side that just came into view, Mr. Reckner?

20     A.   I do.

21     Q.   What is it?  Who do you associate that with?

22     A.   That's Jim Wells' truck.

23     Q.   Prior to this event here, had you received any

24  communication directly from Mr. Wells as to his

25  whereabouts?

 1      A.   No.

 2      Q.   Keep going, Blair.

 3           If you can stop right there, please.  And maybe

 4  just a little bit further.  Stop.  Thank you.  Let's go

 5  to the right-hand side, Mr. Reckner.  A truck that had

 6  come into view.  Do you see that?

 7      A.   Right there?

 8      Q.   Yes.

 9      A.   Yes.

10      Q.   Whose vehicle is that?

11      A.   That's Commanding Officer Peter Van Ness's.

12      Q.   And Mr. Wells's truck is to the left now in the

13  frame?

14      A.   Correct.

15      Q.   Do you know the identity of the person that's

16  near the left front tire?

17      A.   I think that's me.

18      Q.   Did you have a conversation with Mr. Wells at

19  that period of time or close to it?

20      A.   I did.

21      Q.   Please tell the jury what you conversed about.

22      A.   Mr. Wells pulled up and asked me what was going

23  on.  I said, "Someone shot Jim and Rich."  He said,

24  "Shit.  I had a flat tire."

25      Q.   Is that near -- that conversation exchange near

1    this frame here?

2        A.   Pretty soon, I think, yeah.

3        Q.   Did he say anything else?

4        A.   Not that I recall.

5            Oh, yeah, he did.  He said, "I tried to call.  I

6    called -- tried to call.  I can't get ahold of Jim and

7    Rich," is what he said.  "I can't get ahold of Jim and

8    Rich."  And I think he said, "I left messages at your

9    voicemail," or something to that effect.

10       Q.   If we can keep going, Blair.

11           If we could stop.  There is an individual in a

12   red jacket on the right-hand side of the frame.  Who is

13   that person?

14       A.   Right there?

15       Q.   Yes.

16       A.   That's the Captain, Peter Van Ness.

17       Q.   We can keep going.  And stop there, please.

18           Can you identify any other individuals in the

19   frame, please?

20       A.   Yeah.  So that's Cody Beauford, and that's me and

21   that's Mr. Wells.

22       Q.   Proceed.  Stop there.

23           Is that you putting your hands down on your

24   knees, Mr. Reckner?

25       A.   It is.

1    Q.   Who is that coming up to give you a hug?

2    A.   Captain Peter Van Ness.

3    Q.   Commander?

4    A.   Commanding officer.

5    Q.   How was your mental state at the time, sir?

6    A.   I was a wreck.  I was in a bad place.  I couldn't

7  breathe.  I was crying.  Some of my guys were dying in

8  my building, in my office.  I was destroyed.

9    Q.   Did you try to keep it together?

10   A.   I was trying.

11   Q.   Keep going, Blair.

12        Stop the frame.

13        Who's that in the orange shirt?

14   A.   That's Mr. Wells.

15   Q.   Do you recall any part of the conversation you

16  had with him there, if there was any?

17   A.   Not anything that I hadn't already just said.

18   Q.   Proceed.  Thank you.

19        We can stop it there, please.

20        So this is at 8:24 on that camera frame.  What

21  time does Mr. Wells usually show up for work, in your

22  experience?

23   A.   7:00.

24   Q.   Thank you.  There's no audio to that camera, to

25  your knowledge?

1   A.  Not to my knowledge, no.

2   Q.  We can stop the frame.

3       Do you know that individual there at the bottom

4   of the screen that just turned around?

5   A.  I don't.  I'm assuming law enforcement, but I

6   don't know.

7   Q.  If we can keep going, Blair.  Thank you.

8           (Exhibit 67 playing in open court)

9   BY MR. SKROCKI:

10  Q.  Was there any exchange between you and Mr. Wells

11  there that you recall that's being depicted on that

12  video?

13  A.  Not that I can recall.

14  Q.  Okay.  Thank you.

15      If you want to see the whole thing we can play

16  the whole thing.  It's close to the end.  How much time

17  is left on that clip, Blair?

18      Since it's an exhibit, let's just finish the

19  play.

20          (Exhibit 67 playing in open court)

21  BY MR. SKROCKI:

22  Q.  Mr. Reckner, during this point in time, as

23  manager of the rigger shop, what did you want to do?

24  A.  I wanted -- I remember wanting to go in.  I mean

25  I wanted to go in and check on my people.  I wanted

1   to -- yeah.

2       Q.  Were you allowed to do that?

3       A.  No.

4       Q.  What are you doing now as you go from screen left

5   to screen right?

6       A.  Walking over -- I'm not sure whose vehicle that

7   is, but talking to whoever that is.  Probably telling

8   them what happened.

9       Q.  Okay.  That concludes the playing of Exhibit 67.

10          If we could have the lights, Madam Clerk.

11          Mr. Reckner, you testified that Mr. Wells told

12  you about leaving some messages.

13      A.  That's correct.

14      Q.  At the time, how did that strike you?

15      A.  It was unusual.  It was suspicious, I guess.  He

16  never left me messages, very rarely.  I wouldn't say

17  never.  Not very often.

18      Q.  How many messages did he say he left?

19      A.  He told me he left a message on ET1 Hopkins'

20  voicemail, on Rich Belisle's voicemail and on my

21  voicemail.

22      Q.  Did you ultimately at some point later hear that

23  voicemail?

24      A.  Yes, later in the morning, I went up to my office

25  in T-1 and I played the message.

1    Q.  We'll get to that.

2        What was your objective as manager after this

3    traumatic event in terms of functionality of the

4    Communications Station?

5    A.  On that day?

6    Q.  Yes.

7    A.  It was to take care of my crew, the people who

8    work for me.  I mean I was, you could see, I was

9    emotionally distraught.

10   Q.  Let me interrupt you there and ask you, during

11   the day, how were you able to handle this?

12   A.  So I mean I don't know that I was.  We -- I went

13   up the hill.  I'm not sure at what point after that

14   video I went up the hill to T-1.  They had the rigger

15   shop folks in the conference room along with ET1 Matt

16   Gross who was the ET shop manager or ET1.

17   Q.  Emotionally, what happened to you during the day?

18   A.  I mean I would cry.  When I walked into the

19   conference room, Matt Gross was crying.

20   Q.  Were you able to control it?

21   A.  I was not able to control it, no.

22   Q.  How about the other folks you observed, just the

23   people you observed, please tell the jury what you

24   observed that morning, the reactions of other people to

25   this event?

1    A.   Everybody for the most part, especially the

2    people who worked in the rigger shop or who knew the

3    people in the rigger shop well, you could tell they were

4    crying.   Their faces were all red.   Their eyes were all

5    red and puffy.   It was obvious that those folks were in

6    distress.

7    Q.   When do you recall heading up to the T-1 building

8    after this video, just roughly?

9    A.   I don't know for sure, because again, I was

10   emotionally a wreck.   It was very traumatic.   I was

11   probably in shock.   I would say approximately an hour

12   after that video, but I don't know for sure.

13        MR. SKROCKI:   Your Honor, in terms of timing,

14   when do you wish to take the morning break?

15        THE COURT:   Whenever is a convenient time is

16   fine.

17        MR. SKROCKI:   This would be good.   I have one

18   more application to make.   So maybe we could do that

19   outside the presence of the jury.

20        THE COURT:   That sounds very good.   Why don't

21   we take about 15 minutes, ladies and gentlemen.   Leave

22   your notepads here.   If you would remember my admonition

23   not to discuss the case or do any research.   We'll see

24   you back shortly after the top of the hour.

25        (Jury absent)

1          THE COURT:  Please be seated, everyone.  Sir,

2     you can be excused from the witness stand.

3          All right.  Go ahead.

4          MR. SKROCKI:  My application is as follows:

5     There is provided in discovery statements by others that

6     Mr. Reckner uttered, "Jim Wells did it."  My application

7     would be to you is that I would like to ask him that

8     question.  His answer is going to be, "I don't recall.

9     It's possible, but I don't recall."

10          Inasmuch as I'm sure this will come up on cross

11    examination, and the defense theory is that Mr. Reckner

12    is focused solely on Mr. Wells from the beginning, I

13    think it's fair to elicit that on direct and have it

14    come from him from our line of questioning.  I think

15    it's appropriate given his mental state and his

16    emotional state that morning.

17          THE COURT:  All right.  Mr. Colbath?

18          MR. COLBATH:  Your Honor, my position is the

19    same position that I took in the sidebar conference that

20    we had.  And if Mr. Skrocki, especially in light of what

21    I anticipate -- well, accepting Mr. Skrocki at his word

22    that the answer he anticipates is, "I don't recall

23    saying that," then I don't have an objection to

24    Mr. Skrocki asking that question, so long as -- my

25    concern is if I follow up on it or there are other

questions about it, that somehow it's alleged that the
door is open for him to explain why he might think Jim
Wells did it.  And of course his reasoning, speculation
or opinion that Mr. Wells committed the murders would
not be relevant and would go to the ultimate issue and
would not be admissible.

So I'm not going to ask him that certainly.  I
may not even follow up on it if he says he doesn't
remember making that statement.

THE COURT:  In any event, there is no objection
to that question, and I appreciate you making the
application outside the presence of the jury.

I'm wondering if we can craft this limiting
instruction.

MS. SHERMAN:  I have crafted one but have not
run it by Mr. Skrocki yet.

MR. SKROCKI:  I have total confidence.  Go
ahead.

MS. SHERMAN:  I went through the Court's 404(b)
order and mentioned everything in there, including the
ones that the Court said aren't actually 404(b), but if
they could seen as 404(b).

What I have drafted is:  You have heard
evidence that the defendant received a general memo of
expectation, a memo of expectation regarding tree

collaring, and a letter of caution regarding the misuse

of the fuel card.  You have also heard evidence of the

defendant's response regarding limitations put on work

travel, meetings with supervisors, the warehouse

cleaning project, the April 11, 2012, satellite antenna

wire discussion, and general workplace disagreements.  I

instruct you that this evidence is admitted only for the

limited purpose of proving defendant's motive, and,

therefore, you must consider it only for the limited

purpose and not for any other purpose.

      THE COURT:  Any objection to that, or do you

want to see it in writing?

      MR. COLBATH:  I would like to see it in

writing.

      MS. SHERMAN:  I can e-mail it.  Will that work?

      MR. COLBATH:  Yeah.  I will have to look at it

on my phone.

      MS. SHERMAN:  Would the Court like me to send

it to --

      THE COURT:  Send it to Emily if you would.

Send it to the proposed orders box, if you could, and

then we can print it out.

      MR. SKROCKI:  Can we have an address for the

proposed order box?

      THE COURT:  You can send it to Caroline, would

```
1    probably be easier, so then she could print it.

2           THE COURT:  Why don't we take about five

3    minutes and you can confer on that.

4           MR. COLBATH:  If I have a printed copy, I'll

5    just make a note.

6           THE COURT:  That sounds fine.  Very good.

7    Thank you.

8           DEPUTY CLERK:  All rise.  Court stands in a

9    brief recess.

10          (Recessed from 10:53 a.m. to 11:03 a.m.)

11          (Jury absent)

12          DEPUTY CLERK:  All rise.  Her Honor, the Court,

13   the United States District Court is again in session.

14          THE COURT:  Please be seated, everyone.  And

15   did you come to an agreement on this limiting

16   instruction?

17          MR. COLBATH:  Your Honor, I have some proposed

18   changes to the one that Ms. Sherman drafted.

19          THE COURT:  All right.

20          MR. COLBATH:  So the first sentence is fine.

21   "You have heard evidence that the defendant" -- well,

22   yeah, I believe the first sentence is fine.  "You have

23   heard evidence that the defendant received a general

24   memo of expectation, a memo of expectation regarding

25   tree collaring and a letter of caution regarding misuse
```

1    of" -- that should say "a fuel card," I think.

2          "You have also heard evidence that" -- first of

3    all, I think all of this should say "Mr. Wells," not

4    "defendant."

5          THE COURT:  All right.  Do you have your

6    proposed changes or should we take this up at lunch?

7          MR. SKROCKI:  We haven't seen them.

8          MR. COLBATH:  I have no means to type this.  So

9    I mean I have it written on the printed out e-mail.

10         THE COURT:  If you have it written on the

11   printed out e-mail, that's fine.

12         MR. COLBATH:  I can make -- I don't know how

13   long Mr. Skrocki has left on direct examination.  I

14   don't know how long cross will take, but we may not

15   conclude before lunch.  So we may be able --

16         THE COURT:  Get this fine-tuned at lunch.

17         MR. COLBATH:  I can get it drafted over lunch,

18   if we have the lunch break, or I can give somebody

19   copies of my handwritten, either one.

20         MR. SKROCKI:  We should be done with direct

21   close to noon.  If we're close, I would ask leave to go

22   over a little bit so we could have time to prepare.

23         MR. COLBATH:  If we're going to go through more

24   direct and get us close to noon, then I would just

25   propose I can clean this up and I think we'll get

probably an agreement or close to it.  And I can provide
the Court a written, typed copy.

        THE COURT:  During the lunch hour?

        MR. COLBATH:  Yes.

        THE COURT:  What I would like to avoid is
having the exchange occur when the jury is told to come
back after lunch.  Try to do it during the lunch hour.

        MR. COLBATH:  I'll do it immediately.  I'll do
it before I take lunch.  As soon as we break, I'll go do
it and have it to them in 15 minutes and the Court in
15 minutes.

        THE COURT:  So noted.  Then we're ready to
proceed?

        MR. SKROCKI:  Yes.

        THE COURT:  Ready to proceed now then,
Mr. Colbath?

        MR. COLBATH:  Yes.

        THE COURT:  Very good.

        (Jury present)

        THE COURT:  All right.  Please be seated
everyone.  Welcome back, ladies and gentlemen.  And
whenever you're ready, Mr. Skrocki.  Thank you.

        MR. SKROCKI:  We're all set, Your Honor.  Thank
you.

BY MR. SKROCKI:

1    Q.   Ready, sir?

2    A.   Yes, sir.

3    Q.   Mr. Reckner, that day was an emotional day for

4    you?

5    A.   It was.

6    Q.   When we broke for the morning break, you were

7    discussing observations of other individuals you had

8    seen in the T-1 building after the murders?

9    A.   Yes.

10   Q.   And did you have occasion to see Mr. Wells that

11   morning or at any time that day?

12   A.   I did.  I saw him up in the conference room.

13   Q.   What was he doing?

14   A.   For a large part of the time, he was reading a

15   book.

16   Q.   Did you ever see him shed a tear or anything like

17   that?

18   A.   No.

19   Q.   That morning, Mr. Reckner, did you have occasion

20   to speak with people just about the murders and things,

21   your reactions to them as well?

22   A.   I did.

23   Q.   Did you tell anybody that Jim Wells did it?

24   A.   You asked me if I ever said Jim Wells did it?

25   Q.   Yes, that morning.

1     A.   I never did.

2     Q.   Is it possible you may have said that?

3     A.   It's possible.  I don't recall ever saying that.

4     Q.   Mr. Wells was supposed to arrive to work what

5  time that morning as to your understanding?

6     A.   7:00.

7     Q.   He showed up at what time?

8     A.   8:30.

9     Q.   Did you advise law enforcement of that?

10     A.   I did.

11     Q.   At some point in time that day, were you

12  interviewed by law enforcement?

13     A.   I was.

14     Q.   Who interviewed you, law enforcement?

15     A.   I was interviewed by the FBI and the Coast Guard

16  Investigative Services.

17     Q.   About how many times were you interviewed, do you

18  recall?

19     A.   For the whole case or just that day?

20     Q.   Just that day.

21     A.   Just the one time.

22          (Cell phone ringing.)

23          THE COURT:  Mr. Skrocki, you're not the first,

24  it's okay, and you won't be the last either.

25  BY MR. SKROCKI:

1    Q.   With respect to the entire investigation, do you

2  recall the number of times you were interviewed or spoke

3  to law enforcement?

4    A.   In total?

5    Q.   Best you can.

6    A.   8, 9, 10 times, I guess.  I had several

7  interviews, multiple interviews with law enforcement.

8    Q.   On that day, do you recall leaving the

9  Communications Station complex?

10   A.   I do.

11   Q.   And why did you leave?

12   A.   We were released, so --

13   Q.   Released meaning what?

14   A.   So immediately after the murders, we were

15  instructed that we had to stay in around the T-1

16  building.  So we did.

17   Q.   What was your understanding as to why?

18   A.   I mean we just had two of our people murdered.

19  We had investigators on the way, and they wanted to keep

20  us all together and make sure we were safe and to make

21  sure we were available for law enforcement when they

22  arrived.

23   Q.   At some point during that day, Mr. Reckner, did

24  you sort of shift into management mode at all?

25   A.   I did some.

1    Q.  Can you tell the jury how you did that and what

2  you did?

3    A.  So we were in the conference room and I was

4  asking if anybody needed anything, if everybody was

5  okay, that kind of thing.

6    Q.  Do you recall if the Coast Guard did things to

7  take care of the people who were there during the day in

8  T-1?

9    A.  I do.

10   Q.  What did they do?

11   A.  They brought us food and drink.

12   Q.  After you left the Communications Station

13  complex, where did you go?

14   A.  I went to Debbie Hopkins' house.

15   Q.  Who's Debbie Hopkins?

16   A.  Jim's wife.  ET1 Hopkins' wife.

17   Q.  Why did you go there?

18   A.  Because my wife was there along with two of the

19  other wives from the station sitting with Mrs. Hopkins

20  during the day.

21   Q.  Any other family members present?

22   A.  Yes.

23   Q.  Who?

24   A.  ET1 Hopkins' son.

25   Q.  How old was he?

```
 1      A.   He was a teenager, 15, 16, 17.

 2      Q.   How long did you stay there, Mr. Reckner?

 3      A.   A while.  I remember coming in the door and

 4   telling Debbie how sorry I was.  And then I went

 5   upstairs.  Patrick was up in his room, and as a father

 6   myself and ET1's boss, I wanted to talk to him.

 7      Q.   Did you do that?

 8      A.   I did.

 9      Q.   How long did you spend with Patrick?

10      A.   Probably 10 or 15 minutes, maybe a half hour.

11      Q.   After that conversation, did you do anything else

12   with respect to the Hopkins family?

13      A.   So earlier in the day, my wife and the other

14   wives had taken all the guns out of the house and put

15   them in my wife's van.  So then we left, and we

16   transported all the guns to my house.

17      Q.   Why did you do that?

18      A.   Well, in the interest I guess of everyone's

19   safety.  I don't know.  There were a lot of guns there,

20   and so we just took them.

21      Q.   Did you get any sleep that night?

22      A.   I did not.

23      Q.   When you got home, what did you do?

24      A.   I hugged my children.

25      Q.   The next morning, do you recall getting ready for
```

1    work?

2        A.  I don't.  Again, very traumatic.  There are

3    stretches of time that I don't recall what happened.  I

4    know I went to work, because I was there on the 13th.

5        Q.  Did there come a point in time when you were

6    contacted by law enforcement?

7        A.  I was contacted by law enforcement several times.

8        Q.  How about with respect to anything you told them

9    the day before?

10       A.  It's possible.  I don't recall specifically an

11   interview on the 13th, but it's possible.

12       Q.  Okay.  Do you recall you mentioned earlier in

13   your testimony a voicemail?

14       A.  Yes.

15       Q.  Did you make law enforcement aware of that

16   voicemail?

17       A.  Yes.  That was on the 12th.

18       Q.  That was on the 12th?

19       A.  Yes.

20       Q.  My apologies.  About how early in the morning?

21       A.  It was like -- I had my first interview -- well,

22   what are you asking me?  How early in the morning?

23       Q.  On the 12th with this -- let's start.  Ready?

24   We'll go backwards.

25              So on the 12th, did you have contact with law

1    enforcement about that voicemail?

2        A.   I did.

3        Q.   Okay.  Did you take them to your phone?

4        A.   I did.

5        Q.   Did you have occasion to listen to that before

6    coming into court today?

7        A.   Yes.

8        Q.   Was there a voicemail left on your machine?

9        A.   There was.

10       Q.   Who left the voicemail?

11       A.   Mr. Wells.

12       Q.   And have you had occasion to listen to

13   Exhibit 33, the voicemail from Mr. Wells left on your

14   machine?

15       A.   I have.

16       Q.   Is it authentic as to what was on the machine at

17   the time?

18       A.   It is.

19       Q.   Do you recognize Mr. Wells' voice?

20       A.   Yes.

21       Q.   And your voice?

22       A.   Yes.

23            MR. SKROCKI:  Move for the admission of 33.

24            THE COURT:  Any objection to 33?

25            MR. COLBATH:  It's the recording?

```
1              MR. SKROCKI:  Yes.

2              MR. COLBATH:  No.

3              THE COURT:  All right.  33 is admitted.

4              (Exhibit No. 33 admitted.)

5    BY MR. SKROCKI:

6        Q.  All set?  Okay.  Go ahead.

7              (Exhibit 33 playing in open court.)

8              (Exhibit 33 terminated.)

9    BY MR. SKROCKI:

10       Q.  That was Mr. Wells' voice, Mr. Reckner?

11       A.  It was.

12       Q.  He mentioned a flat tire in the truck?

13       A.  He did.

14       Q.  Did he ever show you that tire?

15       A.  I never saw it.

16       Q.  Did he ever talk to you about what caused the

17   flat?

18       A.  He never talked to me about the flat at all other

19   than when he pulled up and said he had a flat tire.

20       Q.  I want to ask you some questions about the rigger

21   shop.  Are there things in the rigger shop to assist

22   with tires and things of that nature?

23       A.  There is.

24       Q.  Will you describe that to the jury?

25       A.  So we have pneumatic lug nut wrenches to take the
```

1  lugs off.  We have floor jacks to lift your car up.  We

2  have jack stands to hold the car in place while you

3  change the tire.  In fact, we allowed the crew to use

4  the rigger shop to put their winter tires on and switch

5  out their all-seasons.  So when winter came, you could

6  put your winter tires on.  In spring you could put your

7  all-seasons as a way to just kind of save people money.

8     Q.  If we could have the lights, Madam Clerk.

9        Blair, if you could for identification and

10 foundation for Mr. Reckner, 227, 229, 230.

11       Mr. Reckner, do you recognize the things depicted

12 in those photographs?

13    A.  I do.

14    Q.  Are they from the inside of the rigger shop?

15    A.  They are.

16    Q.  Do they concern themselves with -- you have

17 familiarity with them, you know what they are?

18    A.  I do.

19        MR. SKROCKI:  Move for the admission of 227,

20 229 and 230.

21        THE COURT:  Any objection?

22        MR. COLBATH:  Yeah, I have no objection.

23        THE COURT:  No objection.  All right.  Those

24 three will be admitted.

25            (Exhibit Nos. 227, 229 and 230 admitted.)

BY MR. SKROCKI:

Q.   Publish 227.  Mr. Reckner, do you recognize where that photo is in the rigger shop?

A.   I do.

Q.   Where is that?

A.   It's in the Bobcat garage.

Q.   There's a -- what is that that I just circled that with my finger, that drum?

A.   That's a hose reel for pneumatic air, and that right there is an air chuck.

Q.   An air chuck?

A.   Yeah, that's where you connect to the hose to connect to your tire to put air in the tire.

Q.   So that was available for people to use in the rigger shop?

A.   Yes.

Q.   Did people avail themselves of those things?

A.   Yes.

Q.   If we could look at 229.  On the wall there on the right-hand side of 229, what do you see there?

A.   Same thing.  It's the hose reel, and you can see the air chuck hanging down here.

Q.   All right.  And 230.  A little dark but, Blair, can you enlarge that, please.

     What's that, Mr. Reckner?

1    A.   That's a floor jack.

2    Q.   You yourself have experience in working on tires

3    in the rigger shop?

4    A.   I work on my truck in the rigger shop and I

5    changed the tires on my wife's van.

6    Q.   Change the tires on your wife's van.

7         How about other people, to your knowledge, do

8    they avail themselves of the things in the rigger shop

9    to change tires or swap tires out?

10   A.   Yes.  We allowed the crew to use the shop for

11   that purpose.

12   Q.   That was a permissible use?

13   A.   Yes.

14   Q.   Madam Clerk, the lights, please, if you could.

15        I want to ask a couple questions about the

16   voicemail that Mr. Wells left you about the flat tire

17   and the lug nuts.

18        In your experience as his manager, supervisor,

19   what was your view of the voicemail in terms of pattern?

20   A.   So it was out of character.  I thought it was

21   strange and suspicious that I would get a voicemail at

22   7:30 in the morning from Mr. Wells if he was only going

23   to be a few minutes late.  It was not a regular

24   occurrence.

25   Q.   What about voicemails in general about being

late?

    A.   Right.  Generally, I didn't get them.  I remember one other time where I got a voicemail from Mr. Wells when the ferry was coming in late.  That's the only time I can remember.  That and the day of the murders were the two voicemails I can remember about him being late.

    Q.   Did you have occasion to see Mr. Wells on the 13th of April?

    A.   I did.

    Q.   Can you describe the circumstances of that to the jury?

    A.   Sure.  So they brought in some grief counselors for the crew.  They split us up by work center, by shop. So the rigger shop, we went down in the basement along with OS1 Mike Haselden.  He was with us that day due to what he witnessed on the 12th.  Mr. Wells was there.  I was there.  Seaman Pacheco, Seaman Upchurch, Seaman Henry, Seaman Coggins and ET3 Cody Beauford and the counselor.

    Q.   Can you describe the nature of what this counseling session was?

    A.   So it was an effort to allow us to kind of grieve and talk about it and discuss it amongst ourselves, you know, this traumatic event that happened to us.

    Q.   Did you speak?

1     A.   I did.

2     Q.   What did you say?

3     A.   I don't remember exactly.  Again, it was still

4  very traumatic.  I remember saying things like, you

5  know, they were great guys and stuff like that.  But

6  honestly, I can't recall the details.

7     Q.   Do you recall the general emotional state of the

8  people you were with in that circle?

9     A.   Yes, it was similar to the day before.  You know,

10 it was obvious that everybody was upset, crying with

11 their puffy faces, tired.  Didn't look like anybody got

12 any sleep.

13    Q.   How about Mr. Wells, what did you observe of him?

14    A.   I never observed any emotion coming from

15 Mr. Wells during the entire process, the entire time.

16    Q.   Were the people in the circle contributing to the

17 conversation?

18    A.   Everybody was speaking, you know, crying, trying

19 to support each other, that kind of thing.

20    Q.   Do you recall Mr. Wells making any statement

21 during the grief counseling session?

22    A.   I do.

23    Q.   Please tell the jury what you recall him saying.

24    A.   He said, "If I only didn't have a flat tire maybe

25 I could have done something."

```
 1          MR. SKROCKI:  One moment, Judge.
 2          THE COURT:  Certainly.
 3   BY MR. SKROCKI:
 4     Q.  Mr. Reckner, what kind of vehicle did Mr. Wells
 5   drive to work every day?
 6     A.  He drove a Dodge, a white Dodge diesel truck.
 7     Q.  Do you know what kind of car his wife drove?
 8     A.  She drove a blue Honda CR-V.
 9          MR. SKROCKI:  Those are the questions I have
10   for Mr. Reckner's direct exam.
11          THE COURT:  All right.  Ready to proceed,
12   Mr. Colbath?
13          MR. COLBATH:  Yes.  I guess I didn't know if
14   the Court wanted to take up that instruction matter.
15          THE COURT:  Well, we could take that up.  Well,
16   what's your preference?
17          MR. COLBATH:  I mean if we break early, I would
18   certainly be ready to restart early.
19          THE COURT:  Okay.
20          MR. COLBATH:  I'd just take a little bit
21   earlier lunch hour, and we could get that -- my
22   preference would be to have that completed.  Yeah, I
23   think have that completed and proceed in that.
24          THE COURT:  Any objection to that approach?
25          MR. SKROCKI:  None at all.
```

1            THE COURT:  So ladies and gentlemen, there's an

2    instruction that I started working on with the lawyers

3    that I want to give to you at this point in time, but we

4    have not fine-tuned some of the language.  I need to

5    work more with the lawyers on that.

6            So we'll give you an early lunch break, if

7    you're okay with that, and have you back here at

8    12:30 p.m.  Would that give us sufficient time?  Does

9    that work for everybody, ladies and gentlemen?

10           So please leave your notepads here.  Remember

11   my admonition not to do any research or discuss the

12   case, and we'll see you back here at 12:30 p.m.  I hope

13   you have a pleasant lunch.

14           (Jury absent)

15           THE COURT:  Please be seated everyone so we can

16   have you back at 12:30 p.m.

17           THE WITNESS:  Thank you.

18           THE COURT:  And have you filed it --

19   Ms. Sherman, have you been working away on the other

20   issue, the one from this morning?

21           MS. SHERMAN:  I have had assistance and have

22   just received it to review so it will be filed shortly.

23           THE COURT:  Would 15 minutes be enough to get

24   the limiting instruction and the revised version of the

25   other instruction that you seek on the --

```
 1              MS. SHERMAN:  Yes, we'll be able to file the
 2    motion.
 3              THE COURT:  So 15 minutes.  Mr. Colbath, does
 4    that give you enough time?
 5              MR. COLBATH:  Yeah, I think so, Your Honor.
 6              THE COURT:  Or we could do 20.  Let's do 20.
 7              MR. COLBATH:  Yeah.
 8              THE COURT:  Very good.  We'll come back in
 9    20 minutes.  We'll go off record.
10              DEPUTY CLERK:  All rise.  Court stands in a
11    brief recess.
12              (Recessed from 11:28 a.m. to 12:21 p.m.)
13              (Jury absent)
14              DEPUTY CLERK:  All rise.  Her Honor, the Court,
15    the United States District Court is again in session.
16              THE COURT:  Please be seated, everyone.  I must
17    say when I saw it was 34 pages I thought my goodness,
18    the government has been busy, but it's four pages plus
19    the transcript.
20              Please be seated.  I'm sorry.  I have read --
21    first of all, I understand there is agreement on the
22    limiting instruction as modified by the defense.
23              MS. SHERMAN:  That's correct.  I have no
24    objections.
25              THE COURT:  Very good.  I will read that.  And
```

```
 1    then with regard to the proposed instruction on page
 2    four of Docket 1233, what's the defense position there?
 3            MR. CAMIEL:  Your Honor, we believe that the
 4    instruction should end after the third sentence with the
 5    word "trial."  The jury is not to speculate about the
 6    reason why this case is now proceeding to trial.
 7            Anything after that invites the jury to
 8    speculate.  It talks about there are many reasons a case
 9    could take years.  And the Court telling the jury not to
10    speculate after the first two sentences covers what the
11    government's concern is and doesn't invite them to start
12    thinking about what are all the different reasons that
13    it could take so long.
14            THE COURT:  Who am I going to hear from, Mr.
15    Skrocki?
16            MR. SKROCKI:  That just leaves the same playing
17    field, Your Honor.  It doesn't do anything to account
18    for the opening statement and seven years repeated
19    multiple times.  So I think cutting it where they wish
20    to cut it doesn't really do anything to solve that
21    issue.  It leaves it unbalanced as to the government's
22    side.
23            THE COURT:  The part I have the most -- I
24    actually think it's quite -- I like the last two
25    sentences.  What troubles me is the second clause of the
```

1  "after trial," on line four.  "And the fact that there

2  has been a period of time between the crimes and this

3  trial should not be a factor in your deliberations."

4  Point of fact, like my credibility instruction talks

5  about the length of time, as people's memories fade over

6  time, and so I mean I'm not sure that's an accurate

7  statement.

8          But I understand Mr. Camiel's point that this

9  invites them to speculate, but perhaps if it was

10  reordered, it would -- to read, "It is now 2019," so the

11  first two lines are fine.  "It is now 2019.  There are

12  many reasons why criminal trials can take years to

13  proceed to trial.  Each of these reasons is grounded on

14  the overriding principle that the criminal trial should

15  be fair and that the interests of justice are served

16  through such delays."

17          And then, "The jury is not to speculate about

18  the reason why this case is proceeding to trial at this

19  time."

20          MR. SKROCKI:  Works for us.

21          THE COURT:  That, to some extent, Mr. Camiel, I

22  think addresses your point by not putting "don't

23  speculate," and then saying "there are a lot of

24  reasons."  I think it's better to say "so don't

25  speculate."  Can you live with that?

```
 1            MR. CAMIEL:  Yes.

 2            THE COURT:  Let me make sure I got that

 3   accurately recorded here.

 4            MR. COLBATH:  Your Honor, you're eliminating

 5   the second clause?

 6            THE COURT:  Eliminating the second clause,

 7   "should not be a factor in your deliberations," because

 8   I do see that at some level it is fair to consider

 9   people's memories fade over time.

10            MR. SKROCKI:  Yes, ma'am.

11            THE COURT:  So I will read it then.  I'll grant

12   the motion at 1233 as modified on the record here.  So I

13   would read through, "It is now 2019."  Then I would read

14   the last two sentences in their entirety.  And then I

15   would read the first half of the sentence about not

16   speculating.  Both sides agree with that?

17            MR. SKROCKI:  Yes, Your Honor.

18            MR. CAMIEL:  Yes.

19            THE COURT:  Then I realized I gave tentative

20   rulings on these motions the other day.  I have now

21   listened to the portion of Ms. Kiele's interview from

22   December 2013 that was provided to me.  I listened to

23   that half hour portion that was designated in the

24   motion.

25            And with regard to the motion at Docket 1221 by
```

the defense with regard to the 404(b) evidence regarding
Nathan Pacheco, I do intend -- I will deny at this time
because it predates this fuel card incident.

MR. COLBATH:  Your Honor, so you'll grant the
motion to exclude it?  I made a motion to exclude it.

THE COURT:  I misstated.  There is a notice --
yes, I misstated that.  Thank you for correcting it.
I'm granting the motion to exclude, yes.  The motion on
the fear of Mr. Wells I will grant unless application is
made outside the presence of the jury with regard to
Mr. Reed, Terry Kiele and Mr. Reckner.

And with regard to Ms. Terry, I will grant now,
but as I indicated the other day, the government can
make application to address that witness outside the
presence of the jury.  I would be -- I didn't understand
her whole sequencing of events.  And so you could
present that evidence or make an offer of proof outside
the presence of the jury.

MR. SKROCKI:  Yes, Your Honor.

THE COURT:  And then the motion to limit the
testimony of Ms. Kiele, I'll rule as I indicated I was
inclined to do the other day, which is to deny as to the
motion at 1219 as to all of the testimony.  I think it's
a fair subject for the defense to explore at cross,
should it choose to do so.

1          Certain of the topics were clearly discussed

2     with the agent in December of 2013 on the portion that I

3     listened to.

4          I will grant the motion with regard to this

5     change in behavior issue.  I didn't hear that on the

6     portion that I listened to of Ms. Kiele, but, there

7     again, if the government seeks to make application on

8     that issue outside the presence of the jury when that

9     witness is available, then I can take that up at that

10    time, preferably at the beginning or end of the day and

11    not in the middle.

12         Questions or clarification on those?  I believe

13    that addresses all of those outstanding motions.

14         MR. SKROCKI:  No.

15         THE COURT:  Anything else to address before we

16    bring in the jury?

17         MR. COLBATH:  Just procedurally, it would make

18    sense to me that the Court read the limiting instruction

19    now, but perhaps in between witnesses read the timing of

20    -- I'm not going to talk to Mr. Reckner, and I know

21    Mr. Skrocki didn't talk to him on direct, the issue of

22    the timing of the prosecution or anything to do with the

23    timing.

24         THE COURT:  The other instruction?

25         MR. COLBATH:  Right, the other instruction.

The timing of case does not relate to Mr. Reckner.  I'm
certainly not going to have any questions for him about
that, and rather than have the jury think it's somehow
limited to his testimony or related directly to his
testimony, it made sense to me to read the limiting
instruction now.

          And then in between witnesses, before the very
next witness starts, the Court could say, "There is an
additional instruction I want to give you," and give it
at that point.  And it may have a better effect or make
more sense is all my thought.

          THE COURT:  Mr. Skrocki, what's the
government's view?

          MR. SKROCKI:  You need to read them both now.
The further away we get while this argument is still
fresh in their mind I think is not helpful.  There is
really no prejudice in reading them now.

          THE COURT:  I will read them both now, but I
will give a little lead-in, and that is to say, first of
all, with regard to Mr. Reckner's testimony, then I'll
read the limiting instruction.  "And I have also worked
with the parties to craft a general instruction that I'm
going to give you at this time," so I will try to
address it in that way.  I told them we were working on
these so they are anticipating them.

1          MR. COLBATH:  That was my only concern.

2          THE COURT:  I will do that.  Anything else

3    before we bring in the jury from the government?

4          MR. SKROCKI:  No.

5          DEPUTY CLERK:  They're not quite ready.

6          THE COURT:  They're not ready.  We'll take just

7    a couple minutes.

8          DEPUTY CLERK:  All rise.  Court stands in a

9    brief recess.

10         (Recessed from 12:31 p.m. to 12:35 p.m.)

11         (Jury present)

12         THE COURT:  All right.  Please be seated,

13   everyone.  Welcome back, ladies and gentlemen.  And

14   before we resume with this witness, I have not one, but

15   two instructions for you.

16         The first relates to the testimony of this

17   witness, Mr. Reckner.  You heard evidence that Mr. Wells

18   received a general memo of expectation, a memo of

19   expectation regarding tree collaring and a letter of

20   caution regarding the misuse of a fuel card.

21         You've also heard evidence of Mr. Wells'

22   response regarding limitations put on his work travel to

23   a NATE conference, meetings with supervisors, a

24   warehouse cleaning project, the April 11, 2012,

25   satellite antenna wire discussion and general workplace

1    disagreements.

2            I instruct you that this evidence is admitted

3    only for the limited purpose of your consideration of

4    whether or not Mr. Wells may have had a motive to commit

5    one or more of the crimes charged.  Therefore, you must

6    consider it only for that limited purpose and not for

7    any other purpose.

8            That was my first instruction.

9            And my second instruction is a more general

10   instruction, ladies and gentlemen.  And it is as

11   follows:  The jury has heard that the crimes alleged in

12   the indictment occurred in 2012.  The defendant was

13   indicted for these crimes on February 19, 2013.  It is

14   now 2019.

15           There are many reasons why criminal trials can

16   take years to proceed to trial.  Each of those reasons

17   is grounded on the overriding principle that criminal

18   trials should be fair and that the interests of justice

19   are served through such delays.  The jury is not to

20   speculate about the reason why this case is now

21   proceeding to trial.

22           Those are my two instructions.  And with that,

23   Mr. Colbath, are you ready to proceed?

24           MR. COLBATH:  I am, Your Honor.  I'm getting

25   there.  Thank you.

```
1              THE COURT:  That's fine.
2                    CROSS EXAMINATION
3   BY MR. COLBATH:
4       Q.  Good afternoon, Mr. Reckner.  My name is Gary
5   Colbath.  I don't think you and I have ever met.
6       A.  We have not.
7       Q.  I have some questions to follow up on these
8   things asked to you by Mr. Skrocki, as I'm sure somebody
9   has told you would.
10      A.  Yes.
11      Q.  The transfer to Kodiak, Alaska in 2010, was not
12  only your first experience in Kodiak, Alaska, but it was
13  your first job as a chief?
14      A.  That's correct.
15      Q.  And when you arrived there, you said you had
16  been -- so you didn't have experience in running a
17  rigger shop or an antenna maintenance-type facility,
18  that kind of work?
19      A.  That's also correct.
20      Q.  I heard you mention that you, prior to getting
21  there though, were qualified, got yourself qualified to
22  climb towers at least up to 300 feet?
23      A.  Yes.
24      Q.  Was it Jim Wells by chance that qualified you?
25      A.  It was not.
```

1    Q.   Now, you learned that that was something --
2    qualifying people like you and others, that was
3    something Mr. Wells had done for years prior to your
4    arrival in 2010?
5    A.   Yeah, that's true.
6    Q.   And he continued to do some of that?
7    A.   Yes.
8    Q.   Those types of trainings, right?
9    A.   Training climbers?
10   Q.   Yes.
11   A.   Yes.
12   Q.   And three -- in the grand scheme of the Coast
13   Guard, 300-foot is a tall tower but not nearly as tall
14   as you folks at times had to climb?
15   A.   That's correct.
16   Q.   There were some that were a thousand feet or
17   better?
18   A.   That's also correct.
19   Q.   Mr. Wells was qualified on all of those, not only
20   to climb them but to train others and qualify others to
21   be able to climb those kind of towers?
22   A.   He was.
23   Q.   And so in the first year, one of the first things
24   I guess I want to talk to you about is -- could you pull
25   up government Exhibit No. 10?

1          So in this chart, you are right here, correct?

2     A.  Yes.

3     Q.  And so you had the rigger shop, the stuff that's

4  in the circle and highlighted in blue underneath you,

5  and then you had a couple of other IT1 and IT2, some

6  additional folks to supervise that whole unit, right?

7     A.  I did.

8     Q.  And this chart in general depicts a hierarchy, I

9  guess, if you will, in the ranking command?

10     A.  It's the diagram of the chain of command at

11  Communications Station Kodiak at the time of the

12  murders, yes.

13     Q.  That was the word I was looking for is chain of

14  command, not hierarchy.

15          So the civilians, Mr. Belisle, Mr. Wells, they

16  were at the bottom of that.  There was nobody beneath

17  them.  They didn't have authority or a place in the

18  chain of command where they commanded anybody, did they?

19     A.  That's true.  They had no real leadership

20  responsibilities.

21     Q.  So as you took over in 2010, Mr. Skrocki asked

22  you some questions about the evaluation process,

23  evaluating your employees.  That was one of the jobs you

24  did as a chief?

25     A.  Yes.

1      Q.   And one of the -- you discussed Mr. Wells'
2   evaluations.  I think perhaps the first one you
3   discussed was his 2010 to 2011 evaluation.  Do you
4   recall that?
5      A.   I do.  I think it was the second one we
6   discussed, actually.
7      Q.   There was one prior to that?
8      A.   The '09, '10.
9      Q.   In '09 and '10, in each of the areas that
10  Mr. Wells was evaluated and he was found to exceed
11  expectations?
12     A.   That's true.  I didn't rate him on that.  I
13  wasn't his rating official in '09 and '10.
14     Q.   Right.  And so my understanding is when you would
15  have -- well, first of all, let's do this.  The
16  evaluation periods ran April 1 to March 31 of year to
17  year?
18     A.   Correct.
19     Q.   So it wasn't a calendar year type of evaluation.
20  It wasn't January to December.  It was that April to
21  March period.  And you came in the middle of or actually
22  probably towards the tail end of an evaluation period?
23     A.   I came in in -- I came in in July of 2010.  So
24  that period would have started in April 2010, so a few
25  months.

1    Q.  The evaluation and the rating business that was

2  done for the '09-'10 was done by the chief that preceded

3  you?

4    A.  That's correct.

5    Q.  So back to my -- I think I heard your answer, but

6  my question then for that evaluation '09, '10, Mr. Wells

7  evaluated to exceed expectations in the different

8  categories he was evaluated in?

9    A.  That's correct.  My predecessor evaluated him

10  that way.

11    Q.  And then for civilian employees, one of the

12  things in addition or as a result of the evaluation they

13  get, they can be recommended for a compensation stipend

14  or some type of either a pay increase or a pay

15  bonus-type thing.  And Mr. Wells was recommended to

16  receive that in '09-'10?

17    A.  Yes.  It's called a cash award, I believe.

18    Q.  And the maximum -- the recommended amount was

19  simply maximum amount allowable?

20    A.  That's correct.

21    Q.  And then it would have been you that did the

22  2010, April 2010 to April -- March of 2011, because that

23  would have been a full year or a full period at which

24  you had familiarity with or mostly?

25    A.  So -- right.  So I came in in July, and that one

kicked off in April.  So I had him from July till March.

From April to July was not under my purview.

     Q.  I would like you just for foundational purposes

to look at the screen here at what I've had pulled up as

government Exhibit 34.  You see that first page.  I

think that has -- I can't read for sure, but I think

that has your signature on it there.

     A.  It does.

     Q.  All right.  And just page through that for

Mr. Reckner so he can make sure he's -- slow down just a

little.  Okay.

          MR. SKROCKI:  No objection.

BY MR. COLBATH:

     Q.  First of all, you're familiar with Exhibit 34?

     A.  Yes, sir, I am.

          MR. COLBATH:  Your Honor, I'm going to move to

admit Exhibit 34.

          THE COURT:  There's no objection; is that

correct?

          MR. SKROCKI:  Correct.

          THE COURT:  All right.  34 is admitted.

          (Exhibit No. 34 admitted.)

BY MR. COLBATH:

     Q.  You can publish that first page if you would.

          And this is in fact the 2010-2011 evaluation that

1    Mr. Skrocki asked you about?

2        A.   Yes, it is.

3        Q.   In the rating official signature block down below

4    where the date is, 29 April 2011, that's your signature?

5        A.   It is.

6        Q.   Can you flip to the next page and highlight that

7    second set of boxes there.

8             So with respect to job knowledge and skills,

9    again, like the year prior, Mr. Wells exceeded

10   expectations?

11       A.   He did.

12       Q.   And then go down two blocks there to the next

13   one.  Now, the one -- before you highlight that, the one

14   immediately after the one we just looked at, there's no

15   boxes checked.  He wasn't being evaluated for

16   supervisory leadership.  He wasn't a supervisor of

17   anybody, right, so that didn't apply?

18       A.   That's correct.

19       Q.   The forms here, the evaluation plan and

20   performance, this is a -- performance plan and

21   evaluation.  This is a form that gets used with not just

22   Mr. Wells, it wasn't particular to him, but a regular

23   Coast Guard evaluation form that you had used with

24   others?

25       A.   It's standard throughout the Coast Guard for

1    Coast Guard civilians.

2        Q.   All right.  Now, the bottom box if you could.

3            In teamwork, you found the rating was that he

4    meets expectations?

5        A.   Yep.

6        Q.   Which meant that he was -- created an environment

7    of open communication, mutual respect, innovation and

8    shared vision.  That's one of their criteria there?

9        A.   Yes.

10       Q.   He was -- actively involved other team members in

11   decisions and problem solving?

12       A.   So yes.

13       Q.   He effectively communicated information on

14   performance, work status, changes, things like those?

15       A.   Correct.

16       Q.   You can go to the next page for me.

17           For quality of work, like the year before, there

18   really was not much question about Mr. Wells' work

19   abilities, just from a pure work standpoint, was there?

20       A.   He was the antenna mechanic, technical expert,

21   and in that respect, he was good at that.

22       Q.   As a matter of fact, both him -- now, besides

23   being an antenna mechanic, that was his main position,

24   right?

25       A.   That was his job title.

1    Q.   Okay.  But he was also -- because of the years he

2  had done it and his experience on antennas, he was also

3  a highly skilled rigger like Mr. Belisle.  Mr. Wells

4  could rig and perform all the functions of a rigger as

5  well, certainly, couldn't he?

6    A.   I would agree with that, yes.

7    Q.   All right.  While I'm thinking about it, both

8  Mr. Wells and Mr. Belisle, would it be fair to say that

9  really they were doing for their job positions, both of

10 them were talented enough that they were doing more than

11 probably their position descriptions required?

12   A.   They were doing more than their position

13 descriptions.  Yes, I would agree with that.

14   Q.   Let's go to that next -- the bottom block there.

15        For safety, Mr. Wells exceeded.  That was almost

16 a pet peeve with Mr. Wells about safety and having folks

17 who climbed and worked on the antennas be safe?

18   A.   I would agree with that, yes.

19   Q.   Actually, that was an environment -- it's life or

20 death on those antennas when you're up 100 feet in the

21 air with somebody, and so safety was in your unit

22 extremely important?

23   A.   Yes.

24   Q.   We saw the picture of you in fact with

25 Mr. Belisle and Mr. Newby out training.  You were doing

1   a rescue training right there in front of the building.

2   That was one of the pictures we saw?

3       A.  Yes, it is.

4       Q.  You guys were constantly working on training for

5   safety, safety equipment and making sure everyone was

6   knowledgeable how to do that?

7       A.  We would -- it wasn't something that was

8   regularly scheduled.  If we were having training, which

9   in that case, we were training new climbers, so it was a

10  good opportunity to get some extra training on the

11  safety part.  But it wasn't something that was on the

12  calendar regularly.  It was something that we did

13  periodically, I guess, when needed.

14      Q.  Do the next page, would you?

15          This page just comes up with a work plan overall.

16  We'll highlight that a little bit so it's a little bit

17  easier.  This is an outline of sort of the expectations

18  for Mr. Wells in the -- over the evaluation period of

19  what's expected, what he's supposed to be doing, right?

20      A.  Yes, it is.

21      Q.  And then that next page.

22          And then you do periodic reviews with the

23  employees.  And this one you reviewed with Mr. Wells

24  August 27, 2010, a couple of months after you had gotten

25  there?

1      A.   That's right.

2      Q.   And so initially, it appeared to you no

3  performance issues with Mr. Wells?

4      A.   Initially, that's correct.

5      Q.   Okay.  Can we go to -- now, there was also an

6  evaluation Mr. Skrocki asked you about which was the

7  performance evaluation that would have been from the one

8  immediately following this, 2011 to 2012, correct?

9      A.   Yes.

10     Q.   I'm not sure -- I don't have a number for that.

11  You can take that one down and let's see if we can get

12  the next one.  I apologize.  I didn't write my number

13  down.  Again, you were the one, Mr. Reckner, that

14  performed the following year's evaluation?

15     A.   I initiated '11-'12, yes.

16     Q.   And if you will look at your screen, I'll show

17  you Defense Exhibit No. 115.  Does that appear to be --

18  I'll tell you all the full pages of the evaluation

19  appear to follow that.  Is that the document for the

20  year we're talking about?

21     A.   It is.

22     Q.   Contains your signature there?

23     A.   It does.

24          MR. COLBATH:  Your Honor, I'm going to move

25  115.

1           MR. SKROCKI:  No objection.

2           THE COURT:  All right.  115 -- Defense 115 is

3   admitted.

4               (Defense Exhibit No. 115 admitted.)

5   BY MR. COLBATH:

6     Q.  So this again covers that initial period.  It

7   would have been reviewed with Mr. Wells at the start in

8   April of 2011.  That's why his signature appears at that

9   date on the front?

10    A.  That's correct.

11    Q.  Go to that next page.

12          There's a -- we see in the applied job skills,

13  it's a meets expectation?

14    A.  So actually, this was never finished.  It says

15  meets, but that's probably just because I clicked the

16  box, you know, as I was working with the document or

17  whatever.  If you'll notice as you go on, none of the

18  other metrics have been marked because we didn't have an

19  opportunity to mark Mr. Wells for 2011-2012 because he

20  was no longer working at the COMM station after

21  April 12th.

22    Q.  And the evaluation period would have -- this was

23  dated April 29th?

24    A.  So that's when it kicked off.

25    Q.  Right.

```
 1    A.   That was the initial kickoff, and then we
 2  wouldn't have marked him until March of 2012.
 3    Q.   Sure.  Okay.
 4         And go down below.
 5         So again, this one, when it's marked meets --
 6  now, you have periodic reviews throughout the year,
 7  correct?
 8    A.   So we do.  Yeah.
 9    Q.   And you're saying that when you did your periodic
10  reviews, you didn't mark these?
11    A.   So this is the 2011 to 2012, right?
12    Q.   Correct.  That's what you told me.
13    A.   So I don't believe I marked him at all on that.
14  So even this meets, I don't recall marking him in 2012.
15    Q.   Okay.
16    A.   As a matter of fact, I think the times that we
17  were supposed to meet, we didn't meet because he was out
18  sick.  I don't know if we did any mid mark counseling,
19  mid mark review, because he was not in the office.
20    Q.   Well, this document is something you maintained
21  in his supervisor's work file, correct?
22    A.   That's correct.
23    Q.   And you would have been the one in charge of the
24  document?
25    A.   That's correct.
```

1    Q.  And do you know if you turned that over to law

2    enforcement?  Is that how law enforcement got it?

3    A.  Correct.  They took his entire folder.

4    Q.  And then they probably turned it over to these

5    folks who turned it over to me.  So do you know if you

6    didn't mark meets who would have marked meets?

7    A.  I don't have an answer for that.  I don't know.

8    Q.  Let's just look at a couple other pages here.

9    A.  Sure.

10   Q.  Now, here it appears -- go ahead and highlight --

11   yeah, all three of those, or four of those, yeah.  Yeah.

12        So I think -- maybe this will refresh your

13   recollection, because I recalled Mr. Skrocki asking you

14   about it yesterday.

15        In the middle -- in two of these here, not the

16   first one, the second, quality of work, not the third,

17   but the fourth, safety, those we saw on the past

18   evaluation and they were marked then and they're marked

19   here meets.  You see that?

20   A.  I do.

21   Q.  Yesterday Mr. Skrocki asked you, were there a

22   couple of other things in this second year of your

23   experience with Mr. Wells that you were going to

24   evaluate him on, and you said, if I recall, and you

25   correct me if I'm wrong, there were.  You marked

1    communication and timeliness, quantity of work.  You

2    recall that testimony yesterday?

3        A.  I do.  So we added those metrics, those were two

4    metrics we wanted to observe and mark him on for that

5    year.

6        Q.  All right.  And at least as we've got it, he

7    meets in all of these, as reflected on his evaluation

8    anyway?

9        A.  These are marked meets.  Again, I don't recall

10   ever marking -- doing a final marking for him because he

11   wasn't available to do it.

12       Q.  Flip the next page for me.  And this is -- you

13   don't have to highlight that.

14           This is a pre-made, typed-out sheet of

15   expectations.  Here's all of the things, the job

16   performance that's planned for the next year, what we

17   expect of you, correct?

18       A.  Yeah.  And it outlines the six metrics we're

19   going to mark him on.

20       Q.  Those are the six boxes we just highlighted that,

21   at least at that point, appeared to be marked meets?

22       A.  Yes, sir.

23       Q.  And then the last page here.  Now, you reviewed

24   this in -- you signed this in October of 2011, right?

25       A.  Yes.

1    Q.  So that was after its creation, after you sat

2   down and met with Mr. Wells in April of 2011, because we

3   saw his and your signature on the front page.  You went

4   over the expectations with him and whatnot.  And then it

5   appears you sat down or intended to review it in

6   October.  You made a note he wasn't available.

7          But at that point, in anticipation, isn't it true

8   that in anticipation of that meeting with him, had he

9   been there, you would have shown him you had marked

10  meets in those requirements or categories and discussed

11  it with him?

12   A.  So that's not true.  I wouldn't have marked any

13  of the boxes in the performance evaluation.  We would

14  have discussed his performance on all of those metrics.

15  But the marking, I wouldn't have done until it was final

16  in April.

17   Q.  So you signed off here saying he wasn't available

18  in October on a form that wasn't yet marked?

19   A.  That's correct.  This was a progress review, so

20  through the year, a review of his progress through that

21  year.  And so October is when I did that.

22   Q.  So when you were -- you did a final evaluation or

23  let's call it a final rating here.  And why don't you

24  just read that to us?

25   A.  Sure.  "Mr. Wells was absent for several long

```
 1    periods this year due to sickness and other reasons.
 2    Core competencies were merely meets and some barely.  He
 3    did perform well in Shemya with the exception of
 4    communication.  Mr. Wells is argumentative at times
 5    making some tasks and evolutions more difficult than
 6    they need to be.  His performance overall was
 7    inconsistent.  Mr. Wells is unavailable to review and
 8    sign this evolution -- evaluation."
 9        Q.  You typed that, didn't you?
10        A.  I did.
11        Q.  You typed it in the section that read "Final
12    Rating"?
13        A.  I did.
14        Q.  So that was the end of the review period.  That
15    would have been typed by you at some interim period?
16        A.  You're right, yeah.
17        Q.  You typed he -- in core competencies, that's the
18    six categories we talked about --
19        A.  Yeah, that's correct.
20        Q.  -- you typed that he meets.  So it was you that
21    checked the boxes?
22        A.  I guess it was.  I don't recall doing it.  So
23    when I said I didn't recall doing it, I didn't recall
24    doing it.
25        Q.  Let's go to the last page.  Maybe next to the
```

1    last page.

2          And then there wasn't a recommendation for the

3    cash bonus.  Mr. Wells was -- this was done after

4    April 12th, the final.  As you said, it happened at the

5    end.  So Mr. Wells was no longer with the Coast Guard.

6    He had been suspended from his position?

7        A.   That's correct.

8        Q.   So he wasn't -- he wouldn't have been receiving

9    any type of pay bonus or anything like that?

10       A.   He was receiving pay, but he was receiving no

11   bonus.

12       Q.   Okay.  I want to go to, if I can, government

13   Exhibit 35 and ask you a few questions.  I want to move

14   back to some of the time period during that evaluation

15   period that we just talked about.

16         And you can just pull that up.  You remember -- I

17   have some questions about this letter here.

18         This is the letter that you testified about,

19   about setting of expectations for leave and travel and

20   those kind of things.  You said this was I guess

21   prompted or I think you said it was prompted by a

22   circumstance where you came to work and found out that

23   Mr. Belisle and Mr. Wells were going to be traveling in

24   the next, like, week, and you hadn't been aware of it,

25   and then that ultimately culminated after discussions in

1   this letter being written, or that was one of the things

2   that contributed to this?

3       A.   Yes.  So --

4       Q.   I'm just asking you if that's one of the things

5   that contributed.

6       A.   Yeah.  So that's why the EO, Mr. Bill Reed,

7   drafted this letter, correct.

8       Q.   All right.  That was travel for Mr. Belisle and

9   Mr. Wells.  They often traveled together, be it

10  training, be it a conference function, be it work?

11      A.   They did often travel together.

12      Q.   All right.  And you believed that this was

13  presented to Mr. Wells.  Initially, you talked to him

14  and Mr. Belisle.  First of all, they both got the

15  identical letter, I think you said?

16      A.   That's true.

17      Q.   And they both were talked to about it on

18  April 29th?

19      A.   I know Mr. Wells was for sure.  I can't remember

20  if Rich was, but I think he was.  We talked to them both

21  at the same time.

22      Q.   And if you can just highlight the A2 there,

23  section A2.

24           So with regard to sick leave or vacation time,

25  first of all, the Coast Guard had a procedure where if

you had built up leave, whether it's sick leave or
annual leave, you would fill out the chit, you called it
I think, and send that in, and a supervisor would
approve it or not approve it, I guess as the case may
be, and then there would be a paper trail of the leave?

A.   That's correct.

Q.   And you -- in the rigger shop, you were the
person who signed off on those?

A.   I was.

Q.   And this was a direction to Mr. Wells and
Mr. Belisle -- this was really an establishment of a
policy for leave -- well, for all the things identified
in the letter.  It was really an establishment of the
civilian policy on these issues, wasn't it?

A.   Yes.  It was reestablishing, rebaselining the
policy that already exists that they should follow when
it comes to these things.

Q.   Now, this paragraph we're looking at here, it
says, "When reasonably able to do so, notify the rigger
shop supervisor in advance, and when it's not possible,
you can notify by telephone, e-mail or notify" -- CWO is
who?

A.   So that stands for the chief watch officer, so
that would be the OS chief watch officer on the
operations deck.  That was a 24-hour manned,

1    seven-days-a-week position.

2        Q.   And then they could pass along a message?

3        A.   Exactly.

4        Q.   The rigger shop supervisor, would that be

5    Mr. Hopkins?

6        A.   Yes.

7        Q.   All right.  You can take that down.  And then on

8    travel, just do those next two.

9            So with respect to travel, first of all, in order

10   for the civilians to travel at Coast Guard expense, or

11   to -- for Coast Guard purposes, in order to have that

12   paid for, there had to be a request and an approval for

13   that to happen, didn't there?

14       A.   So normally, the normal procedure would be there

15   would be a TDY request.  That's true.

16       Q.   Okay.  So if civilians were to travel on their

17   own without requesting approval or whatnot and they paid

18   for it on their own, if they submitted paperwork and it

19   wasn't approved, they wouldn't be reimbursed, would

20   they?

21       A.   I wouldn't say they wouldn't be.  I mean if they

22   were totally on their own, they just did it without --

23   for any official business, then that's correct.  You

24   know, if the paperwork wasn't done, you know, sometimes

25   in the Coast Guard, we have like hurricanes and people

1   go and do stuff and the paperwork follows.  So I don't

2   know that's 100 percent true.

3       Q.  You can't show us here or point to us a specific

4   example of Mr. Wells ever traveling on the Coast Guard's

5   dime and not being -- not having approval or before the

6   fact or after the fact just traveling on his own?

7       A.  Like I said before, the reason that's in there is

8   because a trip was scheduled that we didn't know about.

9   I don't know what happened to the approval or where it

10  was, but it never came through the chain of command.

11  But I can't point to any specific document that would

12  prove that.

13      Q.  So Mr. Reckner, this will go faster if you listen

14  to the questions I asked and answer those questions.  I

15  asked --

16          MR. SKROCKI:  Objection.

17          THE COURT:  Let's hear your question.  Go

18  ahead, Mr. Colbath.

19          MR. SKROCKI:  I think he's being very

20  responsive, Your Honor.

21          THE COURT:  Well, reasonable minds can differ

22  on that, the two of you.  It's for you all to evaluate

23  the testimony.  Let's hear your next question,

24  Mr. Colbath.

25          MR. COLBATH:  Yeah.  I'll re-ask the last one

1    so that we have an --

2              THE COURT:  Let's just --

3    BY MR. COLBATH:

4       Q.  You don't have any examples of Mr. Wells

5    traveling when he wasn't approved to travel, do you?

6       A.  I do not.

7       Q.  Thank you.

8              If you can go to the second page of this.  Well,

9    I'm sorry.  Back up one page.  Highlight D there.

10             Now, there was later in your testimony, I guess

11   it was this morning, you talked about some tree

12   collaring issues.  But there was a separate memo written

13   about the collaring of trees and the taking of trees and

14   whatnot.  But this also addressed the taking of wood off

15   COMMSTA property to some extent, didn't it?

16      A.  It did.

17      Q.  And in fact, when you came in 2010, you found it

18   to be a practice or policy of the COMMSTA that as trees

19   were cleared as necessary for the COMMSTA work, after

20   hours, all employees, all COMMSTA employees could come

21   and on their own time remove those, take them off the

22   property, use them for their personal firewood use or

23   crafts or whatever they were going to use that wood for.

24   That had been a practice that had been going on for a

25   long time?

1    A.   That's true, yes.

2    Q.   And this was simply letting these two civilians

3 know that that in fact was the policy but that it

4 applied to not only them, all of COMMSTA, first come,

5 first serve?

6    A.   So this was put in there because there was an

7 issue with some trees that had been taken down that I

8 guess Mr. Wells had earmarked for himself, and he was

9 upset that some of the ETs went out and grabbed the

10 wood.  So the EO, Bill Reed, put that in there to

11 specifically outline that once again.  So yes.

12    Q.   If you'd go to the next page.

13         So both Mr. Belisle and Mr. Wells I think you

14 said were former chiefs?

15    A.   That's correct.

16    Q.   So they had, each of them in different units and

17 at different times, held the position that you had just

18 moved into there at the rigger shop.  They had held that

19 years before you, not at the rigger shop but in other

20 areas?

21    A.   That's correct.

22    Q.   So they had spent time doing these management

23 functions and working with people underneath them as

24 enlisted Coast Guard chiefs well prior to your getting

25 there as chief?

1     A.  So I don't know what their leadership

2   responsibilities were prior.  I'm not sure how many

3   folks they had under them at any given time before this

4   period, but as chiefs, I would expect that's true.  They

5   would have probably had folks, subordinates working for

6   them.

7     Q.  Well, it was certainly believed because they were

8   directed here to support, assist and mentor the rigger

9   shop supervisor, Mr. Hopkins?

10    A.  Yes.

11    Q.  And it was presumed that because of their past

12  work with the Coast Guard and their past status as

13  chiefs, they had the ability to do that?

14    A.  Yes.

15    Q.  All right.  That's fine with that exhibit.

16        Now, when we were talking about that letter,

17  Mr. Skrocki asked you, he said that Mr. Wells'

18  performance didn't seem to get better over time on the

19  travel and notification issues.  I think you said that

20  was the case.

21        MR. SKROCKI:  Could you repeat that?

22        THE COURT:  Could we hear the question again,

23  Mr. Colbath?

24        MR. COLBATH:  Sure.

25  BY MR. COLBATH:

1    Q.  I heard you say yesterday that you did not feel

2    that after the issue of this, which in part we'll start

3    with travel and notification, that after it was issued,

4    Mr. Wells did not get better on those issues?

5    A.  Largely, that's correct, yeah.  I wasn't getting

6    the phone calls and the advance notice.

7    Q.  And -- all right.  Can we go to Exhibit No. 124?

8    DEPUTY CLERK:  Is that plaintiff or defense?

9    MR. COLBATH:  I'm sorry.  Defense 124.

10   BY MR. COLBATH:

11   Q.  Actually, before you pull that up on the screen,

12   let me ask you this.

13   That letter we just looked at, that was April of

14   2011, correct, April 29, 2011?

15   A.  Yes.

16   Q.  And there's been some discussion about a big

17   project the summer of 2011, spring, summer and you said

18   all the way until end of September of 2011, for

19   replacement of two antennas or movement of two antennas

20   out on Shemya?

21   A.  Yes.

22   Q.  And that project started probably May, spring

23   sometime, but around May of 2011 where the travel

24   started, and there were a number of trips out to Shemya

25   all the way through a trip you took in September; is

1    that right?

2        A.   So the project actually started the year before

3    in 2010 with moving temporary antennas over to Shemya so

4    we still had coverage.   And then also the logistics

5    flights I spoke of, that happened '10 and '11.   And

6    then, as you stated, June, July, and then we went back

7    in September.

8        Q.   So as the weather got better I assume in 2011 and

9    you could travel out there, it was a little better

10   conditions, probably not great, but a little better

11   condition for work, the 2011 work was June, July, out

12   through September?

13       A.   Yes.   That was the actual construction phase, if

14   you will.

15       Q.   Mr. Wells, in the June, July, those trips, not

16   the September trip, but the summer trips, he went out

17   there on and off a number of times with the crew.   I

18   think we saw a picture of him working out there.

19       A.   So he was out there for the entire time of the

20   June, July trip.   He was there for the whole event.

21       Q.   All right.   And those -- that would have been

22   roughly how long between those two events?

23       A.   So the initial construction phase in June, July,

24   I think went on for four or five weeks and then we went

25   back in September.

1    Q.  So now go to Defense Exhibit No. 124.  Go to the

2    second page.

3         So Mr. Reckner, I'm just going to have her real

4    quickly page through these for you and just see if you

5    are familiar with those.  I believe they each have

6    your -- all the forms are the same and they all I think

7    have your signature on them.

8         You're familiar with those forms --

9    A.  I am.

10    Q.  -- what they are.  And in fact, you signed them

11    all?

12    A.  I did.

13         MR. COLBATH:  Your Honor, I'm going to move --

14    well, and then if you can go back to page one.

15    Q.  So can you just look at that, Mr. Reckner, and

16    I'll tell you that -- maybe you need to blow it up a

17    little bit.

18         I have summarized them all there.  Are those

19    records all records that you would have maintained in

20    Mr. Wells' file or the Coast Guard would have maintained

21    in Mr. Wells' file related to leave in 2011, 2012?

22    A.  So those are not records that would have been

23    maintained in his working folder, which is what I had

24    access to.

25    Q.  After you signed them, they would have been

1    passed on somewhere else, probably the payroll office or

2    somebody else who would have maintained them?

3        A.  Yes.

4        Q.  Okay.  But you're familiar nonetheless because

5    prior to getting to the office that maintained them, you

6    reviewed them and signed them?

7        A.  Yes, I would have sent them to the timekeeper to

8    implement.

9            MR. COLBATH:  I'll move the admission of 124,

10   Your Honor.

11           MR. SKROCKI:  There is no objection.

12           THE COURT:  Defense 124 is admitted.

13           (Defense Exhibit No. 124 admitted.)

14   BY MR. COLBATH:

15       Q.  Publish starting the second page, if you would.

16           And so Mr. Reckner, I'm going to just go through

17   the first and the last one here.  So this is -- well,

18   this is a leave request made by Jim Wells, and the dates

19   are a little difficult to read, but it's submitted

20   August 24th.  And it's for some annual leave that he was

21   planning for September?

22       A.  Yes.

23       Q.  And so he submitted it ahead of time, you

24   reviewed it, you signed, you approved that leave?

25       A.  That's correct.

1     Q.  If you'll just page until you get to the last
2  one.
3          And so if I go down to the final page, there's
4  about 18 or 19 of these, this final one is a March
5  request for some leave that was coming up in April, a
6  few days later.  Do you see that?
7     A.  I do.
8     Q.  Again, you approved that?
9     A.  I did.
10    Q.  So let's back up to the first page.  If you'll
11 just highlight that whole block.
12          What I've done, Mr. Reckner, is those 19 leave
13 requests, I've summarized those, or had them summarized
14 here.  And first of all, in the column in the middle
15 where it shows here sick leave and annual leave, all the
16 numbers that run down below there are all the leave
17 periods from just August of 2011 to April that Mr. Wells
18 was gone.  You said he was gone a long time; is that
19 correct?
20    A.  He was gone a large part of the time during that
21 time period.
22    Q.  Where I would like to focus is really from here
23 to here.  Mr. Wells, do you recall him being gone, where
24 it really began heavy was in October, the months of
25 October, November, December?

1    A.   Yes.

2    Q.   Okay.  If we start right here beginning in

3    October and go down there, there's -- he's gone for --

4    well, far more than he's at work; isn't that true?

5    A.   I don't know that for sure, but it could be,

6    yeah.  I haven't added it all up.

7    Q.   Well, we'll look at that in a minute.  It's fair

8    to say that of all these leave requests, first of all,

9    more than half of them, and I don't know if you want to

10   count, but they're requested ahead of time, just like

11   the memo says you're supposed to request?

12   A.   Yes.

13   Q.   And on ones that are not requested ahead of time,

14   they're submitted the day he gets back to work.  In

15   other words, if he's sick and asks to go home or it's an

16   unplanned illness, he can't come in, they're submitted

17   timely, within a day or two of returning to work, aren't

18   they?

19   A.   So for the sick leave, yes, they would be after

20   he came back.  I wasn't getting phone calls ahead of

21   time or at the time of the sickness saying, "I'm sick,

22   I'm not coming in today."  So then he would come into

23   work or he would contact someone later on, and then we

24   would do the paperwork afterward.

25   Q.   So my question was, Mr. Reckner:  The leave

1  requests were submitted after Mr. Wells got back to

2  work?

3      A.   The sick leave requests, yes.

4      Q.   And of course you don't know on any given

5  occasion whether Mr. Wells called and told the shop

6  supervisor he wasn't coming in on any given day?

7      A.   If he called ET1 Hopkins or anybody I would have

8  been notified.

9      Q.   You don't know that for sure, Mr. Reckner,

10  because if you didn't know if -- if he called and talked

11  to anybody, if he called and talked to Mr. Hopkins, if

12  he called and talked to Mr. Beauford and they either

13  forgot to call you, they were busy, there was some

14  circumstance that prevented them or they just chose not

15  to call you, you would have no way to know whether that

16  happened, would you?

17          MR. SKROCKI:  Objection, argumentative and

18  compound.

19          THE COURT:  Well, I'll allow the question.  Go

20  ahead.

21      A.   So that scenario would be unlikely.  It would be

22  unlikely that ET1 Hopkins or ET3 Beauford or Rich or

23  someone would say -- wouldn't not tell me that Jim

24  wasn't coming in today.

25      Q.   His instruction in the April letter was to call

1    the shop supervisor?

2        A.   That was the instruction, yes.

3        Q.   And in -- there's no instances where I was able

4    to find that Mr. Wells took leave that wasn't approved.

5        A.   Well, you only went back to August, and he worked

6    for me -- August 2011, he worked for me from July 2010

7    through April of 2012.  So for this period that you

8    covered, sir, yes, I would agree with that.

9        Q.   Right.  The questions I was asking about were you

10   gave him -- or discussed with him on April 29, 2011,

11   here's how we work the leave, here's the expectations.

12   And then going forward, I went forward till April 12th,

13   the time of the homicides and then the day after he no

14   longer works there.  And for that period of time, there

15   was no unapproved leave, was there?

16       A.   So this period of time is from August through

17   April.  Is that what you're saying, August through

18   April?

19       Q.   Well, that's what this period is.  Yes, I'm --

20   no, but I'm asking you -- April of 2011 to April of

21   2012, can you tell me of a circumstance where Mr. Wells

22   took leave and it wasn't approved?

23       A.   I can't recall that that's the case, no.

24       Q.   There wasn't much leave going on before August of

25   2011, because almost all of June and July, he was out on

1    Shemya with the rest of the crew working.  That's what

2    you just told me.

3        A.   Well, he was on Shemya, yes, that's correct.

4        Q.   So he wasn't on leave?

5        A.   Not during that period, no.

6        Q.   And he was approved to be on Shemya.  He was

7    supposed to be on Shemya?

8        A.   He was.

9        Q.   So while we've got this up there, I want to look

10   at -- can you highlight -- let's go to the calendar.

11   Let's take this one down.

12        Mr. Reckner, you were paid in the military on

13   paychecks every two weeks, correct, pay periods every

14   two weeks?

15        A.   No.  In the military it's the 1st and 15th of the

16   month.

17        Q.   Oh, I'm sorry.  I guess my question related more

18   to Mr. Wells.  The civilians were every two weeks?

19        A.   Yes.

20        Q.   All right.  And so could you pull up Exhibit

21   No. 168.

22        So I'm going to have you look at this Defense

23   Exhibit No. 168 and ask if you can see that that's just

24   a military biweekly pay period calendar for 2011.  Does

25   that appear to be what that is?

1      A.   That does appear to be what that is, yes.

2      Q.   The second page -- or does it go to a second

3   page?  I'm sorry.  Hold on just a minute.  Okay.

4           MR. COLBATH:  I'll move to admit I guess 168.

5   The second page just continues with 2012.  It's just a

6   blank calendar.

7           THE COURT:  Any objection to Defense 168?

8           MR. SKROCKI:  No, Your Honor.

9           THE COURT:  All right.  That's admitted.

10          (Defense Exhibit No. 168 admitted.)

11  BY MR. COLBATH:

12     Q.   So can you publish that, and do you have a way to

13  put that leave summary, Defense Exhibit No. 124, back up

14  there next to this one?  And then can you -- all right.

15  And then can you highlight just from 21 to February --

16  through February.

17          So Mr. Reckner, if you'll look at this block that

18  she's highlighting -- just slide it over so we can see

19  the dates just a little bit more.  Or will it not let

20  you go any more?  The challenges of technology.  If you

21  can't highlight it, that's fine.

22          I'm going to have you look at that summary,

23  Mr. Reckner, and see if we can't figure out some exact

24  dates for Mr. Wells.

25          Starting here up on the 21st pay period, these

numbers are pay periods, correct?  They correspond with
the pay period numbers over here on the calendar.  21
deals with this.  What was the period of leave that
Mr. Wells was gone in that pay period, that October 10th
to October 22nd?  Can you see the dates requested off?
They're in the column right next to it.

     A.  I don't know if I understand the question.

     Q.  Sure.  Can you tell me what days you approved
Mr. Wells for leave during that pay period 21?

     A.  Is that the 10-05-11 through 10-22-11?  I don't
know what the header is up top.

     Q.  That's the pay period, and right next to it is
the approved leave.  Or the leave requested.  They're
all approved, so it's the leave requested and leave
approved.

          MR. SKROCKI:  If Mr. Colbath can get the header
so he can identify what point he's talking about, I
think that would help.

     Q.  There it is.

     A.  Can you maybe point to the date you're talking
about?

     Q.  Sure.  What leave was approved during that --
that's the leave that's requested.  That's what that
column is.

     A.  Okay.

1    Q.   And I will tell you that you've already told us

2    they were all approved.  So what were the dates in pay

3    period 21 that were requested?

4    A.   The 14th of October 2011, and then looks like the

5    20th and 21st.

6    Q.   Actually, I'm going to start right above that as

7    I see here because it starts earlier.  Right above that,

8    he was also gone -- you had approved him to be gone

9    October 3rd through the 12th, didn't you?

10   A.   Yes.

11   Q.   So on Exhibit No. 168 next door, can you just --

12   do you have a way to mark those dates off?  That would

13   be October 3rd through October 21st.

14        Then next, do you agree with me that you approved

15   him to be gone October 26, 7 and 8 and November 4.  Do

16   you agree with that, Mr. Reckner?

17   A.   October 6th, 7th and 8th?

18   Q.   I'm sorry.  October 26, 7 and 8 and November 4?

19   A.   Yes.

20   Q.   Can you mark those?

21        November 7th then through November 14th, that

22   period?

23   A.   Yes.

24   Q.   November 21st through December 9th?

25   A.   Yes.

1    Q.  I want to stop and ask you -- well, let's just

2    finish out December.  Then there's a second request

3    again November -- it's requested the second time, I

4    guess, November 21st through the 9th, but December 12th

5    through the 16th?

6    A.  Yes.

7    Q.  And then 19th to the 28th of December and

8    December 29 all the way through January 4?

9    A.  Yes.

10   Q.  So if I look next door on this calendar over

11   here, it looks to me like Mr. Wells only worked like

12   three days in October, or very few days in October.  Let

13   me just look.  He worked seven days of the five weeks in

14   October.  Do you see that?

15   A.  I do.

16   Q.  And in November, he worked the 1st, 2nd and 3rd

17   and the 15th, 16th, 17th and 18th.  He worked seven days

18   there?

19   A.  That's correct.

20   Q.  And from the 18th of October all the way until

21   the end of the year, gone every day?

22             THE COURT:  Did you mean to say November?

23             MR. COLBATH:  Yes, Your Honor.

24   BY MR. COLBATH:

25   Q.  From November 18th all the way till the end of

1    the year, didn't work anymore?

2        A.  That's correct.

3        Q.  So 13 days in four months, October, November,

4    December, those four months?

5        A.  Yes.

6        Q.  Now, you had testified that you were -- you --

7    during December of 2011, you actually had a desk put in

8    for you down in T-2 in the rigger shop?

9        A.  That's correct.

10       Q.  Normally, when you arrived as chief up to

11   December of 2011, you had your office up in T-1?

12       A.  That's correct.

13       Q.  That's the regular COMMSTA building?

14       A.  Yes.

15       Q.  And that's where you started your day, and that's

16   where you spent at least a portion of your day most

17   days, T-1, up until December of 2011?

18       A.  That's not completely accurate.  I would spend

19   time down in the rigger shop.  I just didn't have an

20   office down there.  So I was between both buildings,

21   depending on what was going on during the workday.

22       Q.  Sure.  Then you had this desk moved down there.

23   And the fact of the matter is you had it moved down

24   there because work was not going on as it should in

25   December of 2011?

1    A.   That's not accurate, no.

2    Q.   Well, in -- Mr. Wells was gone a lot during that

3 timeframe, wasn't he?

4    A.   He was.

5    Q.   And one of the things that happened is you had a

6 conversation with the XO where you told the XO, "Look,

7 Mr. Wells is not here, work needs to happen, and we're

8 going to figure it out, we're going to do work even in

9 Mr. Wells' absence, we can't wait, we're not going to

10 wait for him to get back"?

11    A.   That's correct.

12    Q.   And so you were going to figure it out with

13 Mr. Hopkins, with Mr. Belisle, with the rest of the

14 shop, even if it meant making some mistakes or not doing

15 as good a job as you did when Jim Wells was there?

16    A.   That's correct.

17    Q.   And moving a desk down there and being available

18 in the office was going to assist in that?

19    A.   I thought it would, yes.

20    Q.   When you moved down there, I noticed from the

21 schematic that you and Mr. Skrocki went over, you didn't

22 put your desk next to Mr. Wells where Mr. Belisle was,

23 you put it at the other end of the office?

24    A.   I did and that's because of where there was

25 space.

Q.  Nothing was fixed in there.  I mean you could
have ordered the entire room emptied and reordered or
rearranged, certainly.

A.  I could have, but that seems a little bit
extreme.

Q.  Okay.  I want to talk about the -- well, let's
just finish this.

We went up to January.  Now, in January of 2012
then, Mr. Wells was gone the 1st -- from the 1st -- we
had talked about the 1st through the 4th.  Now, the 5th
to the 9th.  You see that, 5th of January to the 9th?

A.  I do.

Q.  And the 10th to the 13th, both of those weeks in
that pay period there?

A.  Yes.

Q.  And then the 19th and 20th -- the 19th all the
way down to the 30th?

A.  Yes.

Q.  The 31st of January and 1st and 2nd of February?

A.  Yes.

Q.  And on the 5th of February, the very week after
the week that Mr. Wells came back to work, that was the
week of the NATE conference, wasn't it?  Do you recall
that?

A.  I don't recall the dates specific, but if that's

what it was, then I wouldn't disagree with that.

Q.  If I told you that I believed it was the 7th, 8th
and 9th of February, the latter half of that week, the
week of February 5th, 2011, would you have any reason to
disagree with me?

MR. SKROCKI:  Objection, Your Honor.

THE COURT:  That's sustained.

BY MR. COLBATH:

Q.  Mr. Wells then was gone February 8th and 9th --
well, 8th all the way to the 13th?

A.  Are you asking me?

Q.  Is that correct?

A.  Yes.

Q.  And then the 14th all the way down to Friday,
February 24th.  So in January, I only see him there on
the 16th, 17th and 18th, just three days in January.

A.  Okay.

Q.  And again in February, I only see him there on
the 3rd and the 6th and the 7th, three days in February.
Do you agree with that?

A.  Well, he was there the 24th, the 27th, 28th --

Q.  Oh, I'm sorry.  Up to February 24th?

A.  Yes.

Q.  Now, do you remember you discussed with
Mr. Skrocki that Mr. Wells had gallbladder surgery and

1    hernia surgery in February?

2        A.  I do recall that.

3        Q.  Leading up to that for these months where he had

4    been gone and either not at work for a whole month at a

5    time or just at work for a few days, he was struggling

6    with that illness that led up to that surgery, wasn't

7    he?

8        A.  Yeah.  To my understanding, he was not well.

9        Q.  He didn't appear well to you?

10       A.  He did not.

11       Q.  And you knew that there was quite a period of

12   time where neither Mr. Wells nor his doctors knew what

13   was wrong with him?

14       A.  That's also true.

15       Q.  It appeared it was taking them a while to figure

16   it out?

17       A.  It did appear that that was taking some time,

18   yes.

19       Q.  And ultimately, he had his surgery -- do you

20   remember it being the 9th of February, or do you

21   remember the date?

22       A.  I do not remember the date, no.

23       Q.  But it was February 24th when he came back to

24   work?

25       A.  That's what it looks like here, yes.  I don't

1    recall it specifically.

2        Q.   Because -- all right.  If you will take the 168

3    down and leave the summary.  Get me the rest of that

4    document.  Just the bottom of it.  Just do that bottom

5    area, bottom four through the end.  Yeah, do that.

6            After coming back from surgery there on

7    February 24th, you said earlier in answer to one of

8    Mr. Skrocki's questions that Mr. Wells came to work on

9    light duty, correct?

10       A.   That's what I recall, yes.

11       Q.   So do you recall -- then I assume you recall that

12   he had physical -- some physical limitations as far as

13   lifting with the hernia surgery and the recovery and

14   just there were some abilities, certainly couldn't

15   climb, things like that, during that light-duty period?

16       A.   That's correct.  Yes.

17       Q.   You don't remember how long that period was?

18       A.   I do not.

19       Q.   But even despite the light duty and having missed

20   most of the last previous six months at work, Mr. Wells

21   then worked all of -- worked the rest of February, all

22   of the month of March with no leave until the very --

23   well, until March 25th, he had a period of time off

24   there, two days off, 16 hours?

25       A.   Yes.

Q.   And also two days in April, April 2nd and 3rd.
Do you know what those were?

A.   I don't, no.

Q.   Okay.  So let's look real briefly at that tree
collaring memo, if we could.  That is I think government
Exhibit 36, maybe.

     And as far as a letter given to Mr. Wells here,
this would have been in November of 2011?

A.   So yes, that's when -- that's right.

Q.   And this was also given like the last letter of
expectation, given to Mr. Belisle?

A.   That's correct.

Q.   And this was on one of those four days in the
month of November that Mr. Wells was not out sick, he
had been at work?

     MR. SKROCKI:  Objection to the testimonial
nature of some of these questions, Your Honor.

     THE COURT:  That particular question?

     MR. SKROCKI:  There's testimony being elicited
prior to the question.

     THE COURT:  Well, and this was one of the four
days in the month of November that Mr. Wells was not out
sick.  He had been at work.  I think he covered that in
his questions earlier with this witness.  So I'll allow
that question.  Go right ahead.

1          MR. COLBATH:  Thank you.

2    BY MR. COLBATH:

3      Q.  Would you go to the second page?

4          Mr. Wells signed the letter like you requested?

5      A.  That's correct.

6      Q.  He didn't protest or disagree with the --

7    receiving the letter?

8      A.  With receiving the letter?  He signed it.

9      Q.  Correct.  Now, you had told him that this new

10   practice, new to you practice you observed of tree

11   collaring, you did not feel was appropriate.  That was

12   not going to be allowed?

13     A.  So yeah, it wasn't going to be allowed.  There's

14   no reason for it.  It was completely unnecessary.

15     Q.  In fact, backing up before this letter, you had

16   told him that in August when you first discovered it,

17   because that's what the whole issue of tree collaring --

18   was not in November, it was in August?

19     A.  That's correct.

20     Q.  You had a meeting with Mr. Wells and he -- you

21   told him, there's no purpose, this is not a good

22   practice, we don't want you to do this?

23     A.  So we had a meeting with Mr. Wells, Mr. Belisle

24   and ET1 Hopkins was in the room at the same time, yes,

25   in August.

1    Q.   And now, before you ever got to COMMSTA in

2    2012 -- well, first of all, you knew Mr. Wells had been

3    there for 20-plus years?

4    A.   So I got the COMMSTA in 2010.

5    Q.   I'm sorry.

6    A.   I did -- I did know -- I don't think I knew that

7    before I got there.  I found that out after I arrived,

8    that he had been there for that long, yes.

9    Q.   And did you know that even many of the antennas

10   that they had when you got there in 2010 they didn't

11   have 20 years ago, or they weren't in the locations that

12   they were at 20 years ago?

13   A.   So I was not aware of that.

14   Q.   Some of the antenna lines, the lines that ran

15   from the antennas across the ground, you described one

16   covered with tiles, and ran into the COMMSTA building,

17   those lines were put in within the 20 years preceding

18   you arriving.  Did you know that?

19   A.   I did not know that, no.  They were there for a

20   long time.  I don't know when they were installed.  I

21   couldn't say.

22   Q.   Sure.  All of the antennas in the area -- you

23   said the antenna field was quite large, covered many,

24   many acres around the COMMSTA facility?

25   A.   It's a big field, yes.

1    Q.   And the rigger shop cleared those areas, mowed

2  those areas, cut brush in those areas, all those things?

3    A.   Yes.  That's what the rigger shop did.

4    Q.   If you didn't know it when you got there, you

5  learned that Mr. Wells had been a part of that for the

6  past 20 years?

7    A.   That's true.

8    Q.   And so when you met with him in August and talked

9  about this tree collaring, one of the things he told you

10  was that -- well, you said he disagreed with you about

11  tree collaring.  He said there was a reason for it.  It

12  was preemptive, I believe is the word you used.

13    A.   He said something to that effect, yeah.

14    Q.   And preemptive, he said, "Look, some areas don't

15  need to be cleared today, but we know they're going to

16  be cleared later for future antennas, future work,

17  future things, and the trees are easier to take down if

18  we collar them ahead of time preemptively and take them

19  down later."  That's what he said to you.  That was his

20  explanation, wasn't it?

21    A.   I don't recall that, those being his words, no.

22    Q.   He certainly said they were collared for

23  preemptive measures?

24    A.   He said they were collared for preemptive

25  measures.  He never mentioned new locations for new

1    antennas.  I never heard that.

2       Q.  You told him that preemptive or not, that was not

3    part of the mission as you saw it, and tree collaring

4    wasn't going to be allowed?

5       A.  Yes.  It's an unnecessary practice.  New location

6    or not, you would just go in there and take those trees.

7    You're certainly not going to create some kind a

8    dangerous situation.

9       Q.  And then later -- well, after you told him that,

10   after he gave his explanation and you told him that, he

11   didn't argue further with you?

12      A.  He did not.

13      Q.  And then you didn't ask him at that time to sign

14   that letter?

15      A.  Because the letter wasn't drafted in August.

16   So --

17      Q.  Ah.  Well, obviously, you didn't ask him to sign

18   it then.  You later drafted this letter that we're

19   looking at and discussed it again with him or showed

20   him, outlined it, whatever on November 2nd?

21      A.  That's correct.

22      Q.  And on November 2nd, he didn't argue then with

23   you because you already had the discussion.  There was

24   no further argument about this.  Mr. Wells signed it as

25   requested?

1    A.  So on that day, we did have an argument.  As I

2  told Mr. Skrocki, voices were elevated and the guys out

3  on the deck could hear it through the door.

4    Q.  But it wasn't about the practice of tree

5  collaring?

6    A.  I don't recall exactly what was it about.  I

7  think it was about his whole attitude at the COMMSTA in

8  general with the collaring and the fuel card and all of

9  that just kind of coming together.

10    Q.  Well, it wasn't about the tree collaring?

11    A.  I don't remember specifically if it was or not.

12    Q.  Okay.  From August 2011 until he left in April of

13  2012, Mr. Wells did not collar a single tree on COMMSTA

14  property, did he, to your knowledge?

15    A.  To my knowledge, he did not.

16    Q.  Which would have been in compliance with the

17  instruction you gave him in August at the meeting?

18    A.  If he did not collar any trees during that time

19  period, he would have been in compliance, yes.

20    Q.  All right.  In thinking about those days that

21  were gone, you talked about the warehouse that was down

22  the road from the COMMSTA, the warehouse, do you recall

23  that?

24    A.  I do.

25    Q.  And the cleanup of that warehouse was part of a

1    Kodiak main base and COMMSTA area-wide sort of cleanup,

2    wasn't it?

3        A.   I don't recall the main base being involved in

4    that.

5        Q.   And maybe I'm wrong about that.  Because I

6    overstated that.  The COMMSTA area-wide cleanup?

7        A.   Well, it was the warehouse specifically because

8    Captain Van Ness -- Commander Van Ness wanted it cleaned

9    out.

10       Q.   And the warehouse cleanup was part of an overall

11   cleanup of COMMSTA, which included the interior of

12   certain portions of T-1 building, the actual COMMSTA,

13   the antenna fields, a number of different areas.  The

14   warehouse was just one part of that, correct?

15       A.   That's not correct, no.

16       Q.   Okay.  Specifically, the warehouse you said

17   was -- the cleanup of that was going to be the

18   responsibility of the rigger shop?

19       A.   That's correct.

20       Q.   And the cleanup functions started around the end

21   of January or early February and continued into March

22   and actually April of 2012, didn't it?

23       A.   So it actually started before then.  We were

24   given the direction from the captain before then.  Real

25   work didn't start on it until Rich Belisle took over,

1    and that would have been in the timeframe you just

2    outlined, sir, yes.

3        Q.   In late -- in February of 2012?

4        A.   Probably January.  December, January, they might

5    have even been down there in the fall of 2011 while

6    Mr. Wells was out, just initiating, starting.  They

7    would go down there periodically.

8            Again, like I said earlier, it wasn't something

9    that was start today, finish tomorrow.  It was, get it

10   done, you got some time, when you're not doing other

11   stuff, go down there and get it done.  So in the

12   wintertime, we had more downtime and so that's when they

13   kind of ramped it up.

14       Q.   Now, Mr. Wells -- Mr. Reckner, you've provided, I

15   think you said, a number of different interviews with

16   law enforcement in this case, haven't you?

17       A.   Yes.  I've been interviewed several times.

18       Q.   In fact, you actually testified in an earlier

19   hearing that we had about some of the issues in this

20   case.  You recall that?

21       A.   I did.

22       Q.   And you've met with these attorneys and other

23   attorneys for the government at times to talk about your

24   knowledge of this whole circumstance?

25       A.   I have.

1    Q.  And you've not said before that you -- here in

2  court said before that you ever told Mr. Wells he was in

3  charge of the warehouse cleanup, have you?

4    A.  I don't know if that's true.  If I haven't -- if

5  I didn't say it in court or hearing, I would have said

6  it in an interview.

7    Q.  Well, you can't recall any specific person you

8  would have said that to?

9    A.  I cannot.

10    Q.  That's because the warehouse project really

11  didn't start till Mr. Wells was gone.  So he couldn't

12  have been in charge of it, he wasn't there?

13    A.  That's not correct.  That's untrue.

14    Q.  Let me see -- you've certainly been asked about

15  it before, haven't you?

16    A.  I have been asked about it, yes.

17    Q.  All right.  I'm going to have him if you can --

18  Counsel, I'm going to show him that prior hearing

19  starting at 934 and let him -- 933 -- well, 934 is where

20  it starts.

21      Can you just show him 934?

22      I'm going to have her show you -- because I know

23  it's been a while, so have her show you some questions

24  and answers that were asked.

25          THE COURT:  What I'd like to do is show the

```
 1    opposing counsel what you plan to -- so if the way to
 2    show it is you need to pull it up off your iPad or
 3    whatever, then I'll give the other side an opportunity
 4    to do that.
 5            MR. COLBATH:  Sure.  Thank you.  I'm just going
 6    to go to 934 to -- do you have an ability to do that?  I
 7    can show --
 8            THE COURT:  Why don't we do this:  Let's take a
 9    short break.  I will excuse the jury and have you back
10    here in about 10 or 15 minutes.  Please leave your
11    notepads here.  Remember my admonition not to discuss
12    the case, and we'll have you back here shortly.
13            (Jury absent)
14            THE COURT:  All right.  You can be excused if
15    you would like.  Please be seated, everyone.  And we'll
16    have you back shortly.
17            I just thought before we start putting things
18    up on the screen that we get these issues worked out.
19            MR. COLBATH:  I appreciate that, Your Honor.
20    I'm sorry.  We'll try to get that straightened away.
21    It's two pages.  I'll have Mr. Reckner review it
22    physically rather than try to do the screen review.
23            THE COURT:  I think that's a much safer way to
24    go.  The reason I -- I didn't want it to say "trial
25    transcript" or something across the top.
```

1          MR. COLBATH:  And I was only going to have it

2    displayed on his monitor for him to refresh his

3    recollection, not displayed to anybody else.

4          MS. SHERMAN:  Just for the Court's information,

5    it just has a docket number at the bottom.  There is no

6    reference to trial.  The only reference would be if

7    someone said "in this trial."

8          THE COURT:  So --

9          MR. COLBATH:  And those pages do not contain

10   that.

11         THE COURT:  It's just for the rule of

12   completeness in case that issue arises that in these

13   proceedings I would like you to give the government an

14   opportunity to pull up any page, and then I would afford

15   the same to the defense when you're seeking to impeach.

16         MR. SKROCKI:  I couldn't hear the last part of

17   your sentence.

18         THE COURT:  I don't know which part you didn't

19   hear, but that in order to allow each side to make sure

20   that we're complying with the rule of completeness,

21   that's why I require you to give the opposing party the

22   cite and have an opportunity to read it before it is

23   presented to the witness.

24         And same would be obviously the case in the

25   event of a defense witness that the government sought to

```
 1    impeach.  Very good.

 2             So let's take a few minutes.  And anything else

 3    we need to take up?

 4             MR. SKROCKI:  Nothing.

 5             THE COURT:  Mr. Colbath?

 6             MR. COLBATH:  No.

 7             THE COURT:  Very good.  We'll go off record.

 8             DEPUTY CLERK:  Court stands in a brief recess.

 9             (Recessed from 1:53 p.m. to 2:09 p.m.)

10             (Jury present)

11             THE COURT:  Welcome back.  Please be seated,

12    ladies and gentlemen, everyone.  And we're ready to

13    proceed.

14             MR. COLBATH:  Your Honor, I do want to have --

15    rather than try with the technology, I just have a brief

16    couple of pages of transcript to see if Mr. Reckner --

17             THE COURT:  All right.  And counsel is aware of

18    what you're referring to?

19             MR. SKROCKI:  Yes, ma'am.  I have it right

20    here.

21             THE COURT:  Very good.  Go right ahead.

22             MR. COLBATH:  May I approach?

23             THE COURT:  Yes.

24             (Mr. Colbath approaches witness.)

25             MR. COLBATH:  I'll let you read that.
```

1          (Pause)

2    BY MR. COLBATH:

3      Q.   Mr. Reckner, it's true that you had previously

4    said Mr. Belisle was the lead on the project to clean

5    out the warehouse, correct?

6      A.   I have said that Mr. Belisle, from that document

7    you showed me, was the lead because at that time he had

8    taken it over.

9      Q.   You've asked -- and you asked Mr. Wells to assist

10   Mr. Belisle, not the other way around?

11     A.   Well, this is after Mr. Wells came back from his

12   sickness.  Mr. Belisle, like I said, had taken over the

13   project, so Rich was doing -- he was leading the project

14   at that point.  I did ask Mr. Wells if he can go down

15   periodically to look at boxes or whatever the crew

16   didn't know what it was.

17     Q.   Mr. Wells did that a couple of times?

18     A.   A couple of times.

19     Q.   But otherwise, that was at the time he was on

20   light duty?

21     A.   That was at the time he was on light duty, that's

22   correct.

23     Q.   Because it was really going on in February and

24   March while he was gone and then right after he came

25   back?

1    A.   That's when it started to ramp up.  Like I said

2    earlier, it started earlier than that, ramped up in the

3    wintertime, downtime.  Mr. Wells was gone, but we did

4    previously ask him to take charge of that project.

5    Q.   And Mr. Wells did not complain to you about the

6    warehouse clean-out project?

7    A.   So he didn't complain to me, but --

8    Q.   That's the question I asked.

9    A.   Yep.

10   Q.   Now, you had said that Mr. Wells had some

11   personal property stored in that warehouse?

12   A.   He had personal property stored in the warehouse

13   and actually at T-2 as well.

14   Q.   And that was permissible?

15   A.   I wouldn't say it was permissible, no.

16   Q.   Mr. Belisle had at times personal property stored

17   in the warehouse?

18   A.   If that's the case I wasn't aware of it.

19   Q.   You weren't aware that he had a boat stored in

20   the warehouse at one point?

21   A.   I don't remember a boat.

22   Q.   Stacks of tires?

23   A.   I don't remember that either.

24   Q.   Other individuals, other Coast Guard employees

25   had materials stored in the warehouse?

1    A.   It's possible.  I just don't recall.

2    Q.   At times also in T-2?

3    A.   I definitely don't recall in T-2.  I just don't

4    recall that.

5    Q.   You don't recall other people keeping ATVs there

6    at times?

7    A.   Personal ATVs?

8    Q.   Yes.

9    A.   I don't recall.

10   Q.   Tires and other vehicle materials?

11   A.   Again, I just don't recall.

12   Q.   The warehouse had not only antenna parts and

13   antenna things, but also lots of old things from T-1,

14   the COMMSTA?

15   A.   That is true.

16   Q.   Office furniture, all things that were at one

17   point supposed to be disposed of or in line to be

18   disposed of?

19   A.   I think some of it was earmarked to be disposed

20   of.  Some of it was storage.  I know one of the desks

21   came out of there and went up to the new commanding

22   officer's office when he took over after Captain Van

23   Ness left.  He liked the wood desk, and so we brought it

24   up for him.

25   Q.   Let me ask you about a conversation you had

1    before Mr. Wells came back from his surgery.  That's

2    that conversation you had about the NATE conference.

3    You recall that, Mr. Skrocki asking you about that?

4        A.   I do recall that.

5        Q.   Now, Mr. Wells was only at work a couple of days

6    during the month of January.  Do you recall that it

7    would have been on one of those days that you had that

8    conversation?

9        A.   I would say that's probably true.  I don't

10   remember exact -- the exact date we had the

11   conversation, no.

12       Q.   Let's see if we can orient you.  The conference

13   was in February, and Mr. Wells' surgery was in February,

14   so it would have been before that, because it was a

15   discussion about the conference.

16       A.   Right.  At the time we had a discussion, he

17   didn't have his surgery scheduled, to my knowledge.

18       Q.   I didn't ask you about the scheduling of the

19   surgery.  I asked you about the timing of the

20   conference.  It would have been before February?

21       A.   I apologize.  I heard you say schedule.  That's

22   what I thought you were talking about.

23       Q.   It would have been before February?

24       A.   The conversation?

25       Q.   Yes.

 1    A.   It would have been before February, yes.

 2    Q.   And it wouldn't have been in December, because we

 3 looked at the calendar, Mr. Wells didn't work in

 4 December.  He didn't come to work one day in the month

 5 of December?

 6    A.   It was not in December, no.

 7    Q.   So it was sometime on one of those few days in

 8 January then that he came to work?

 9    A.   That sounds correct.

10    Q.   And his inquiry to you, if I heard you right,

11 was, "What are we going to do about NATE this year?"

12    A.   That sounds accurate to what he said, yes.

13    Q.   And you informed him that -- now, he had not

14 discussed it at all with you up till that point?

15    A.   Not that I can recall.

16    Q.   In the prior -- the immediate prior year, you, he

17 and Mr. Belisle had attended?

18    A.   That's correct.

19    Q.   Prior to that, did you know that he and

20 Mr. Belisle had attended for a number of years leading

21 up to 2011, the year you attended?

22    A.   That was my understanding, that Rich and

23 Mr. Wells went to several of those previously.

24    Q.   And in this year, when he inquired of you about

25 what you were doing, you were the one that approved or

1    made the arrangements for people to go?

2         A.  I approved it.

3         Q.  And Mr. Wells hadn't made any arrangements or

4    submitted any paperwork to you prior to that

5    conversation for him to go?

6         A.  He had not.

7         Q.  And you told him that there were three spots

8    available.  Upon his inquiry, you told him there were

9    three spots available?

10        A.  I don't remember ever telling him there were only

11   three spots available, but I did tell him who was going

12   that year.

13        Q.  The three spots you told him that were going to

14   be filled or go would be yourself again, Mr. Belisle and

15   Mr. Hopkins?

16        A.  Yes.

17        Q.  And that was primarily based on the fact that

18   Mr. Wells had been gone for a period of time, or it was

19   partly based on the fact that Mr. Wells had been gone

20   for a long period of time and really not done much

21   rigger shop work for many, many months leading up to

22   that time period?

23        A.  So I had a conversation with the executive

24   officer on why Mr. Wells wasn't going that year.  And

25   part is true, it was based on the fact that he was gone

for a large part of that year, but it was also some of
those issues we were having with him throughout the
year.

Q.   Part of it was based on the fact you only had
three spots?

A.   Well, that's true.

Q.   And after this conversation, you and Mr. Wells --
after he disagreed and you had the conversation that you
described to us earlier, he just looked at you and you
looked at him back and the two of you had that staring
match there in the office, as you described?

A.   Right.

Q.   And a minute or two later, he turned to his desk.
It's just the two of you, right, in the room?

A.   That's correct.

Q.   And you went back to work, he went back to work?

A.   That's correct.

Q.   He didn't have further conversation with you
about the NATE conference or concerns of his or trying
to find another way that he could go?

A.   I don't remember any conversation like that, no.

Q.   Okay.  Now, certainly it wasn't punitive, you
weren't trying to be punitive to Mr. Wells and not let
him go?

A.   I didn't feel like he deserved to go that year.

1    Q.  Well, so is the answer to my question you were

2  being punitive to him?

3    A.  I don't know if punitive is the right word.  It

4  was all of that year in totality and all of the things

5  we had been going through, including his sickness, and

6  those other things we wrote memos about.  It was all

7  factored into the decision that was made, yes.

8    Q.  Well, Mr. Wells was still a valued member of the

9  team?

10    A.  That's true.

11    Q.  He was important to the rigger shop?

12    A.  That's true.

13    Q.  You still had those feelings?

14    A.  I did.

15    Q.  You wanted him to continue to be part of the

16  rigger shop?

17    A.  I did.

18    Q.  You never told him that he was being disciplined,

19  and that's why he couldn't go to the NATE conference?

20    A.  I did not tell him that.

21    Q.  You didn't have plans to further uninvolve him in

22  the business of the rigger shop, as you were uninvolving

23  him in going to the NATE conference, as he had before,

24  right?  You didn't plan to curtail his involvement?

25    A.  No, quite the opposite.

1    Q.  Right.  That was going to be my next question.

2  In fact, at that time, from what I heard you say

3  earlier, your plan was to get him back involved?

4    A.  That's true.

5    Q.  Could you bring up one -- Defense Exhibit

6  No. 209, 210 maybe.  210.  209 and 210.  And just show

7  them for foundation to Mr. Reckner.

8        And then 210, if you would.  Did you have a

9  chance to look at those, Mr. Reckner?

10   A.  I did.

11   Q.  Those are things you're familiar with?

12   A.  I am now.  I had forgotten about them, but yeah.

13   Q.  Right.  But they refresh your recollection on the

14 topics that they talked about?

15   A.  They do.

16   Q.  I want to ask you a couple questions before I get

17 to those.  So in addition to this, you said that NATE

18 conference happened annually, correct?

19   A.  That's correct.

20   Q.  And that wasn't so much a Coast Guard specific

21 conference, but a tower erectors conference that also

22 dealt with civilian towers, could be, you know, cell

23 phone towers, other kind of towers, communications

24 towers, not just to deal with the Coast Guard?

25   A.  That's correct.  Including wind turbines and

1    anything tall like that, yes.

2        Q.  The Coast Guard also had an annual tower

3    conference and tower training that it conducted at

4    different spots, didn't it?

5        A.  They did, though I don't think I ever attended

6    one.

7        Q.  There was in fact right around the time of the

8    NATE conference or just after in the -- there was a tall

9    tower conference in New Orleans for the Coast Guard that

10   was coming up scheduled at the end of April, wasn't

11   there?

12       A.  Yes, that's true.

13       Q.  And in preparation for that, you made plans to --

14   for yourself and part of the rigger shop crew to attend?

15       A.  I did.

16       Q.  Equipment was sent or things were sent ahead of

17   time to assist in activities at the project?

18       A.  It was.

19       Q.  All right.

20       A.  Or we would have.  I don't know if we actually

21   sent it.  I can't remember.  But we were making plans to

22   send it, yes.

23       Q.  All right.  So let's look at Exhibit No. 209.

24           MR. COLBATH:  Your Honor, I'd move the

25   admission -- well, first of all, I'll ask a question.

1    Q.  This 209, you looked at this.  This appears to be

2  an e-mail drafted by yourself regarding the preparations

3  you just described; is that true?

4    A.  That is true.

5         MR. COLBATH:  I'm going to move 209.

6         THE COURT:  Any objection to 209?

7         MR. SKROCKI:  No.

8         THE COURT:  All right.  Defense 209 is

9  admitted.

10         (Defense Exhibit No. 209 admitted.)

11  BY MR. COLBATH:

12    Q.  Could you just blow that up and show the jury?

13         This is -- Chief Reed, that's your immediate

14  supervisor?

15    A.  So no, this is actually addressed to Senior Chief

16  Don Reed, which is why I put Don, not Bill.  If you'll

17  look at the "To" line, there's Donald Reed ETCS, and

18  then I cc'd my boss, the EO William Reed.  So there were

19  two Reeds in the Coast Guard at the time, both ETs, not

20  senior chiefs, though.

21    Q.  The Don Reed, not your supervisor's general

22  function was what?

23    A.  I don't remember exactly.  I think he was -- he

24  was COMMSTA New Orleans EO perhaps, if I remember

25  correctly.  Something like that.  He was definitely out

of New Orleans.

Q.  And the e-mail refers to SK1, contact your SK.
As I understand it, in the Coast Guard, SK is
storekeeper?

A.  That's correct.

Q.  The people that handle the money and the payments
of things?

A.  And the shipments of things.  So I was going to
have my supply guy contact his supply guy to coordinate
the sending of the material, correct.

Q.  So can we look at Exhibit No. 210, just with
Mr. Reckner first.  I'm going to move, Your Honor, the
admission of --

You've looked at this one as well?  You looked at
that earlier, Mr. Reckner?

A.  Yes, sir.

MR. COLBATH:  All right.  I'm going to move the
admission of 210.

MR. SKROCKI:  No objection.

MR. COLBATH:  Defense 210.

THE COURT:  All right.  Defense 210 is admitted
as well.

(Defense Exhibit No. 210 admitted.)

BY MR. COLBATH:

Q.  Can you just show the jury that?  Now -- can you

1    blow it up?  Yeah.  A little easier to read.

2         So the tall tower training was going to be

3    April 30th to May 3rd.  You, Mr. Belisle and Mr. Wells

4    were going to attend, correct?

5        A.  That's correct.

6        Q.  And I think we've got a second page here.

7             But one of the things that was going to happen --

8    the planning started back in March or much earlier.

9    This was a conference, this annual Coast Guard

10   conference was something Mr. Wells also attended

11   regularly, like the NATE conference, right?

12       A.  It was.  I didn't have -- I wasn't as familiar

13   with this conference as the other one, but yes.

14       Q.  And Mr. Belisle too, the two of them went?

15       A.  I would agree with that, yes.

16       Q.  And in fact, at this one, like in years past,

17   both Mr. Belisle and Mr. Wells were scheduled to not

18   only attend, but they were going to actually be

19   presenting or doing part of the training of the Coast

20   Guard-wide group that was planned to happen then?

21       A.  Yes.  They were both going to be instructors for

22   a block of instruction each, yes.

23       Q.  And that's fine.  You can take that down if you

24   will, and we can have the lights again.

25             So although he wasn't going to the NATE

1    conference, Mr. Wells certainly would have known -- you

2    also discussed or you would have been aware that these

3    plans were being made.  You said they were made in

4    March, and he would have been attending that conference

5    as normal to conduct training?

6        A.  That's correct.

7        Q.  I want to switch gears and ask you about

8    something that Mr. Skrocki didn't ask you about.  And

9    that is the Coast Guard policy about having firearms,

10   personal firearms in the workplace.  Okay?

11       A.  Okay.

12       Q.  First of all, the Coast Guard and COMMSTA

13   specifically had a policy not allowing there to be

14   personal firearms in the workplace, correct?

15       A.  That's true.

16       Q.  And originally, the main base had a policy and

17   then that was adopted by COMMSTA, and it did not allow

18   guns in the facility buildings?

19       A.  I don't know -- I don't know how that process

20   worked, but it sounds accurate to me, so I'll say sure.

21       Q.  Okay.  Could not have them within the secured

22   perimeter fences?

23       A.  Yes, that's true.

24       Q.  And could not have them in the COMMSTA property

25   building, so I suppose that would be the T-1, the T-2,

1    the warehouse, structures owned by the Coast Guard?

2        A.   That's correct.

3        Q.   Nor carry on your person or carry in your vehicle

4    while on Coast Guard property, that was also prohibited

5    by the policy?

6        A.   That's correct.

7        Q.   And at times, after you became the chief down at

8    the rigger shop in 2010 going up till April of 2012,

9    there were times where people had guns at work that

10   you're aware of?

11       A.   So yeah, if someone bought a weapon and wanted to

12   show it off, they would bring it in.  I bought a double

13   barrel shotgun from Rich Belisle.  He brought it in, I

14   paid for it and I put it in my truck.  So it happened

15   occasionally.

16       Q.   Now, when someone you're talking about -- there

17   was a couple of things in that answer.  If somebody

18   bought a new gun, say, at the Sportsman Warehouse store,

19   and they wanted to show it to their co-workers, they

20   might bring it.  There were occasions where people

21   brought it into the building, showed it to everybody,

22   put it back in their car, something like that.  Is that

23   what you're saying?

24       A.   Actually, more often they bought it from the

25   Coast Guard exchange on base and bring it in.

1    Q.  There were circumstances, it sounds like a

2  circumstance anyway, where Mr. Belisle brought one of

3  his personal firearms to work that you were purchasing

4  from him, and you bought it there inside the T-2

5  building, took it then out to your car, put it in your

6  car?

7    A.  So that's not accurate.  He brought it into the

8  building, I paid him for it, I took it out and put it in

9  my car.

10    Q.  Right.  I'm sorry if I misstated it.  That's the

11  way I understood what you said.  Sure.

12        And so you didn't communicate or get approval for

13  that, those things to be going on with either your

14  immediate supervisor, Bill Reed, or the XO or the CO?

15    A.  That's correct.  I did not.

16    Q.  And of course those are direct violations of

17  Coast Guard policy, even if they're minimal, as you've

18  described?

19    A.  Even if it was quite commonplace, which it was on

20  Kodiak, Alaska, for weapons to be around, it was a

21  violation of policy.

22    Q.  And the Coast Guard doesn't make rules that they

23  have unwritten exceptions to that it's okay here and not

24  okay there, they have rules and the rules are meant to

25  be followed, right?

1    A.  That's true.

2    Q.  I want to ask you about the fuel card incident if

3 I could.  I think that's Exhibit 37.  Go to the second

4 page for me.  Now, the -- you described the meeting --

5 the day that Mr. Wells got this document was the same

6 day that he signed it, right?

7    A.  Yes.  24 February.

8    Q.  And 24 February we also have already discussed

9 was the day that Mr. Wells returned after having had his

10 surgery?

11    A.  That's where you showed it, so yes, looks like

12 it.

13    Q.  And so other than those few days in January, he

14 had been out since November 21st.  I think you said in

15 an answer to Mr. Skrocki's questions, he and the

16 commander's schedules had not permitted this discussion

17 until this day?

18    A.  That's correct.

19    Q.  This was the first thing then or one of the first

20 things that happened when Mr. Wells arrived back?

21    A.  Yes.

22    Q.  Could you just highlight number six there for me.

23 Again, I just want to make sure.  This was clearly

24 conveyed to Mr. Wells that this was not a disciplinary

25 letter, right?

1      A.   That's correct.

2      Q.   And nor were the other letters that we've talked

3   about, none of these things, not a single thing that

4   you've testified about so far, I guess save maybe for

5   your feeling about the conference, were disciplinary,

6   meant to be disciplinary to Mr. Wells?

7           MR. SKROCKI:  Objection.  I would move to

8   strike that question as to disciplinary.  That wasn't

9   his testimony --

10          THE COURT:  Well --

11          MR. SKROCKI:  -- with respect to the NATE

12  conference.  Rephrase the question would be my

13  objection.

14          THE COURT:  Just a moment.  The witness can

15  answer whether any of the other letters that we've

16  talked about were disciplinary.  So go ahead.  Do you

17  understand the question?

18          THE WITNESS:  I do, yes, ma'am.

19          THE COURT:  Go ahead.

20     A.   So they were not disciplinary.  They could have

21  been used if the behavior wasn't corrected to take

22  disciplinary action up to and including dismissal from

23  federal service.

24     Q.   But Mr. Wells was specifically told each time,

25  this is -- this letter is not meant to be disciplinary,

```
 1    like this one, or this is a letter of expectations, this

 2    is not disciplinary.  It's being given to you and

 3    Mr. Belisle.  Those things were communicated each time,

 4    right?

 5        A.  They were.

 6        Q.  That's good.  I don't need this anymore.  Now, in

 7    the meeting that you had with the other folks that were

 8    involved, when Mr. Wells was given this letter, he did

 9    not respond aggressively, did he?

10        A.  Are you talking about this letter specifically?

11        Q.  Yes.  This letter we just looked at.  The

12    February 24th meeting, you're in the commander's office.

13    It's you and the other folks you described, the XO, the

14    CO, Senior Chief Reed, those folks that you described.

15            And Mr. Wells is given the letter.  And -- well,

16    first of all, he disagreed with it?

17            MR. SKROCKI:  I object to the form of the

18    question.

19            THE COURT:  That's sustained.  Break it down.

20    BY MR. COLBATH:

21        Q.  The letter we just looked at, you know which one

22    I'm referring to, about the fuel card?

23        A.  I do.

24        Q.  It was presented to Mr. Wells at a meeting?

25        A.  It was.
```

1    Q.  There was six people there?

2    A.  That sounds right, yeah.

3    Q.  You remember the meeting?

4    A.  I do.

5    Q.  You remember Mr. Skrocki asking you about the

6 meeting?

7    A.  I do.

8    Q.  You remember during the meeting that the

9 commander gave Mr. Wells the letter?

10    A.  I do.

11    Q.  You remember watching Mr. Wells' reaction?

12    A.  I do.

13    Q.  You remember Mr. Skrocki asking you about it?

14    A.  I do.

15    Q.  Mr. Wells said over and over, "You think I'm a

16 thief.  You think I'm a thief."

17    A.  That's correct.

18    Q.  Mr. Wells said, "That doesn't sit well with me.

19 That's not -- that doesn't sit well.  That just doesn't

20 sit well"?

21    A.  "It doesn't sit well" is what he said, yes.

22    Q.  "It doesn't sit well."  But it was after "You

23 think I'm a thief."  So your perception was that's what

24 he was referring to?

25    A.  That's correct.

Q. Mr. Wells wasn't aggressive toward the commander, I mean physically aggressive towards the commander or any other person in the room that you observed?

A. No, he was not. That's correct.

Q. He wasn't hostile?

A. No.

Q. He was disagreeable, certainly?

A. Yes.

Q. When the discussion continued, Mr. Wells studied the letter as he was saying those things; is that a fair assessment?

A. I don't recall that specifically. He looked at the letter. I don't know if he was studying it as he was saying those words. I don't recall that.

Q. At some point the commander asked him, you know, told him, "You need to sign this acknowledging receipt"?

A. That's correct.

Q. And Mr. Wells just stared at that letter, just stared at that letter. I guess you don't know whether he was studying it or not?

A. I do not. That's correct.

Q. And as time passed, you said a couple minutes passed and he did not sign it, and the commander said, "All right then" and stood up?

A. Yes.

1    Q.  And you and the other officers in the room stood

2  up then and exited the room?

3    A.  That's correct.

4    Q.  And you learned later that before Mr. Wells left

5  the room, after a short conversation with the commander,

6  Mr. Wells signed the letter, took the letter, left the

7  office?

8    A.  So I don't know anything about a conversation

9  they may have had.  The commander didn't brief me on

10  that, but he did sign the letter.

11    Q.  Now, this -- the presentation of these letters of

12  expectation to Mr. Belisle or to Mr. Wells or this fuel

13  card letter, those would have been what are called

14  counsel sessions, right?  It's as if somebody is

15  counseled and they're given information.  That's a term

16  I've seen referred to from the Coast Guard?

17    A.  I guess you could call it a counseling.  The

18  paperwork is important because that creates a paper

19  trail.

20    Q.  Okay.  And after Mr. Wells -- the timing here was

21  Mr. Wells was just back from surgery and this long

22  absence, and this fuel card incident happened.  And then

23  Mr. Wells was back at work, right?  Those two things

24  happened simultaneously.  He came back from surgery and

25  a long absence, and on the day back, he got the fuel

card letter.  Those happened at the same time, correct?

    A.  Yes.  He came back from surgery, and he was
presented the letter.

    Q.  After this fuel card letter, your intention was
to try to get him back involved in the work flow of T-2,
having been gone so long?

    A.  Yes.  We were paying him to do a job, and we
needed him to do that job.  So that was my intention.

    Q.  One of the things you tried to do over the next
several weeks' period of time was -- or next couple of
weeks was to involve Mr. Wells through having
conversations with him down at the office?

    A.  So we would have conversations as a group talking
about that day's work or the planning, future planning
for work.  And Mr. Wells would be in the room, and I
would ask him questions, trying to draw him into the
conversation to engage him.  So if that's the question,
then the answer is yes.

    Q.  And by the way, when you took over originally,
when did you go to your new chief's training?

    A.  So I went to chief's academy in March, April;
March, April 2011, something like that.

    Q.  Okay.  After you had these conversations with
Mr. Wells trying to bring him back into the fold, talk
with him and whatnot, your assessment was that went

1    pretty well, I mean he was starting to come around?

2        A.   Repeat that.

3        Q.   Sure.  You just said that you would have these

4    group conversations, and what you would try to do is you

5    would try to move things forward by asking him his

6    advice on things or how you should do things, those kind

7    of things.  And as you tried those tactics to get him

8    back involved, that went pretty well, didn't it?

9        A.   So I would say that's not true, no.

10       Q.   I'm going to have you just review another one of

11   these transcripts.

12            MR. COLBATH:  Your Honor, may I approach?

13            THE COURT:  Yes.  What are you -- is there --

14            MR. COLBATH:  I'm certainly going to let him

15   know here.

16   BY MR. COLBATH:

17       A.   Mr. Reckner, I'm going to show you an interview

18   that was done with you on April 12th of 2012 between you

19   and a member of law enforcement and just ask if -- I'm

20   going to let you review a page of this and ask if it

21   refreshes your recollection, and then I'm going to have

22   a question.

23            (Pause)

24            MR. COLBATH:  I apologize, Your Honor.  I have

25   two transcripts here, and I've got to get between the

1    two of them.

2            (Pause)

3            MR. COLBATH:  Let me do it this way, Your

4    Honor.

5    BY MR. COLBATH:

6    Q.  Moving forward to April 11th -- and we'll talk

7    more about your conversations with Mr. Wells.  Moving

8    forward to April 11th, most days when you came into

9    work, you started your day up at T-2 or I mean down at

10   T-2 or up at T-1, which?

11   A.  So initially, when I first reported, I would go

12   up to T-1.  Once I moved my desk down to T-2, I would

13   normally go to T-2 first unless there was an early

14   morning meeting or something scheduled up at T-1.

15   Q.  And on April 11th of 2012, you and Mr. Wells were

16   in the office it sounds like about 9:00 a.m.?

17   A.  That's accurate.

18   Q.  And the other workers in the office were out

19   doing other tasks, correct?  So you and Mr. Wells were

20   there alone?

21   A.  That's correct.

22   Q.  And he notified you that he was leaving T-2 to go

23   up to T-1?

24   A.  That's correct.

25   Q.  And then after that, there was a period of time

1  where later that morning, you had not seen Mr. Wells

2  come back down to T-2; is that true?

3      A.  That's true.  Like I said earlier, we lost track

4  of him for three hours.

5      Q.  Okay.  And had you been up in that interim to

6  T-1?

7      A.  I believe I went up because I had a meeting not

8  long after he left.  I had a meeting -- I was on the

9  phone when he left.  I had a meeting up at T-2 -- up at

10  T-1.  I actually think I said to him, great, something

11  like, great, I'll be right behind you or something like

12  that.  So I was up there.

13      Q.  Where was your meeting?

14      A.  I don't recall.

15      Q.  Would it have been -- there's an ET desk or an ET

16  deck and an ops deck, two different decks?

17      A.  That's correct.

18      Q.  What are the differences?

19      A.  So the ET deck is where all the ETs sit.  Those

20  are the guys who work on the radios, the electronics

21  technicians.  And then just out the door and to the

22  right there's maybe five paces out the door is the door

23  to the ops deck.  That's a secure space, and that's

24  where the ops deck is.

25      Q.  Your meeting could have been in either one of

 1    those places or in some other place in the building?

 2        A.   That's true.  We had an unclassified conference

 3    room, a classified conference room and then other

 4    offices.

 5        Q.   All right.  And regardless, at some point yet

 6    that morning, you were back down at T-2 and you -- it

 7    sounds like you made a telephone call up to T-1 because

 8    you were looking for Mr. Wells?

 9        A.   That's right.  At some point I made a phone call

10    looking for him.  I don't remember when exactly it was.

11        Q.   You called one of your employees, Mr. Beauford,

12    Cody Beauford, and you asked him to look for Mr. Wells

13    and specifically asked him to look for Mr. Wells in the

14    restroom, correct?

15        A.   I did, yeah.

16        Q.   The reason for that was many of the times

17    Mr. Wells disappeared, it was to the restroom or he

18    spent a large amount of time in the restroom?

19        A.   I don't remember that, no.

20        Q.   There were times, many times, frequently, he

21    would leave T-1 -- T-2 down the hill and walk up the

22    hill just for the sole purpose of using the restroom up

23    there?

24        A.   I don't recall that ever happening.

25        Q.   The T-1 building had a single small restroom, one

1  restroom facility?

2      A.  That is correct.

3      Q.  You had, if everyone was there, eight employees,

4  both male and female?

5      A.  That's correct.

6      Q.  And the bathroom was a single-use bathroom?

7      A.  Yes, that's correct.

8      Q.  And even though you didn't know that Mr. Wells

9  spent time in the bathroom, you called there and

10 specifically had somebody go look for him in the

11 bathroom just out of the blue?

12     A.  So I called them and I said, "Hey, do you see

13 Mr. Wells around?"  And they said, "No, we haven't seen

14 him."  I said, "Send someone to the restroom or go to

15 the restroom just to see if he's in there," because we

16 were trying to cover all the bases.

17     Q.  So you didn't spend enough time down in the T-2

18 shop to know whether or not Mr. Wells spent an

19 inordinate amount of time in the bathroom?

20     A.  I wouldn't -- I did not know Mr. Wells' bathroom

21 habits, no.

22     Q.  Okay.

23         MR. COLBATH:  Just give me a minute if I could,

24 Your Honor.

25         (Pause)

BY MR. COLBATH:

Q.  Can we look at government Exhibit 67.

I want to talk to you a little bit, Mr. Reckner, about April 12th of 2012.  And they showed the exhibit of you arriving that morning.  Do you recall that?

A.  I do.

Q.  Okay.  I'd like to ask you a few questions about that, so we'll try to get that pulled up.

(Exhibit No. 67 playing in open court)

MR. COLBATH:  If you could stop it there.  I'm going to have you -- just like Mr. Skrocki, I'm going to have you stop this in a number of places.

BY MR. COLBATH:

Q.  Now, I believe you said -- can you take the laser pointer again and show me your truck.

A.  Right there.  You can kind of see it behind this white truck.

Q.  I thought that.  And -- as we see the screen here, you're out of your truck and off to the left-hand side of the view out of the camera, correct?

A.  That's correct.

Q.  And you are conversing with others and whatnot, but have not been let into the T-2 building?

A.  That's correct.

Q.  And do you know who you were talking to up in

1    that area?

2        A.  I believe it was Senior Chief Reed.  I don't

3    remember who else.  There might have been other people

4    there, but I don't recall.

5        Q.  Okay.  And law enforcement?

6        A.  There was a law enforcement officer over there.

7    I don't remember talking to her at any great length, but

8    she was in the area.

9        Q.  It was a female law enforcement officer, as you

10   recall?

11       A.  The CGPD officer that I first encountered was

12   female, yes.

13       Q.  If you can just play this forward.

14           (Exhibit No. 67 playing in open court)

15       Q.  Stop there.

16           Is that you that's walked into the screen?

17       A.  Yeah.  I don't think that is me.  I think I

18   testified earlier it was me, but I don't believe that is

19   me.

20           MR. COLBATH:  Okay.  So let it run.

21               (Exhibit No. 67 playing in open court)

22           MR. COLBATH:  I'm going to have you stop it

23   there.

24               (Exhibit No. 67 stopped)

25   BY MR. COLBATH:

1      Q.   Who do you believe it is?

2      A.   Now looking at it again, I think it's Senior

3  Chief Reed.  It looks like he's walking over to his van.

4      Q.   That's his van right behind Mr. Wells' truck?

5      A.   Yes.

6           MR. COLBATH:  Go ahead.

7           (Exhibit No. 67 playing in open court)

8           MR. COLBATH:  All right.  You can stop there.

9           (Exhibit No. 67 stopped)

10 BY MR. COLBATH:

11     Q.   Is that you that walked into the screen with your

12 hands in your pockets?

13     A.   Right here?

14     Q.   Yes.

15     A.   Yes.

16     Q.   Okay.

17          MR. COLBATH:  All right.  Let it run there.

18          (Exhibit No. 67 playing in open court)

19 BY MR. COLBATH:

20     Q.   Now, Mr. Wells walked up and asked you right

21 there what happened, correct?  He spoke first?

22     A.   Yes.

23     Q.   Okay.  And law enforcement is checking his ID

24 there, Mr. Wells.  So Mr. Wells handed them something?

25     A.   That's what it looked like.  I don't remember

```
 1    that.
 2              MR. SKROCKI:  Objection as to foundation.
 3              THE COURT:  That's sustained.
 4              MR. COLBATH:  Stop the tape.  Can you back it
 5    up?
 6    BY MR. COLBATH:
 7       Q.  Watch this, please, Mr. Reckner.  Stop right
 8    there.  So you were standing there and you're looking at
 9    Mr. Wells, and Mr. Wells hands the law enforcement
10    officer something.  You saw him hand him his ID, didn't
11    you?
12              MR. SKROCKI:  Objection as to foundation, Your
13    Honor.
14              THE COURT:  Well, he can answer yes or no.  Did
15    you see what was handed?
16              THE WITNESS:  I don't remember seeing what was
17    handed, no.
18    BY MR. COLBATH:
19       Q.  But you do remember -- do you even remember
20    standing there?
21       A.  I don't remember a lot of that.  It was pretty
22    traumatic.  I don't remember that event that you just
23    described or we've just seen in any detail.
24       Q.  But you remember details about specific things
25    Mr. Wells said?
```

1       A.  I remember details about what Mr. Wells said, and

2   I remember details about what I said to the captain when

3   he came over, yes.

4       Q.  Okay.  But not some of the other things you may

5   have said?

6       A.  I don't remember everything I said that day or in

7   that specific moment, no.

8               MR. COLBATH:  You can let that go forward.

9                   (Exhibit No. 67 playing in open court)

10              MR. COLBATH:  Stop it there.

11                  (Exhibit No. 67 stopped)

12  BY MR. COLBATH:

13      Q.  Now, Mr. Wells has stepped away from that

14  officer, and there's the man in the red jacket.  You

15  said that was the commander.  He's now talking to the

16  officer, or appears to be.  Would you agree with me?

17      A.  I would agree, yeah.

18      Q.  Mr. Wells has moved over, and he's talking again

19  to you.  Do you see that?

20      A.  I don't know that he was talking.  I don't

21  recall.

22      Q.  Well, I'm going to just let this run so we can

23  move this along.

24      A.  Okay.

25      Q.  But you watch as you and Mr. Wells stand over the

next minute together.  And on the tape, you see you look

at each other a number of times.  Mr. Wells both looks,

gestures and motions towards you, in my observation.  I

would like you to see if you think it appears that

Mr. Wells talks to you during this next minute or so,

has quite a conversation with you.

             MR. SKROCKI:  Objection as to the form of the

question entirely.

             THE COURT:  Why don't you strike the last

phrase.  Go ahead.

             MR. COLBATH:  Can you play that?

                 (Exhibit No. 67 playing in open court)

BY MR. COLBATH:

   Q.  That's Mr. Wells has moved up back by you.

That's you, correct, he's by?

   A.  That's correct.

   Q.  All right.  That's good.  You can take that down.

        Mr. Reckner, as to any further conversation after

the initial conversation, I understand you don't

remember further conversation with Mr. Wells?

   A.  That's correct.  I don't recall any conversation.

   Q.  All right.

             MR. COLBATH:  Can I have one minute, Your

Honor?

             THE COURT:  Certainly.

1          (Pause)

2    BY MR. COLBATH:

3        Q.   After the events here, after the murders and all

4    of the law enforcement investigation of the process

5    began, all of the rigger shop personnel was up at T-1,

6    did I hear you say, in the conference room?

7        A.   So not everybody was up there, no.

8        Q.   Okay.  Who wasn't there?

9        A.   Seaman Coggins, ET3 Cody Beauford and Seaman Nate

10   Pacheco were not in the conference room.

11       Q.   Where were they?

12       A.   Seaman Pacheco was on the C-130 coming home from

13   Shemya.

14       Q.   He hadn't been involved in any of the activities

15   the 11th or 12th of April because he was a member of the

16   rigger shop that was away on a different duty?

17       A.   That's correct.

18       Q.   Okay.  And then who else?  Mr. Coggins you said

19   wasn't there.  Where was Seaman Coggins?

20       A.   Seaman Coggins was over at CGPD, so the Coast

21   Guard Police Department.

22       Q.   Being interviewed by law enforcement about the

23   events of that day?

24       A.   That's what I would assume.  I don't have any

25   firsthand knowledge though.

1    Q.  And you said also there was a third individual

2  that wasn't there, Mr. --

3    A.  Mr. Cody Beauford, ET3 Cody Beauford.

4    Q.  Where was Mr. Beauford?

5    A.  At CGPD as well.

6    Q.  And then as time went by, at some point on the

7  12th, you were interviewed by law enforcement?

8    A.  I was.

9    Q.  Also on the 13th?

10   A.  I was.

11   Q.  Okay.  And a number of times thereafter, but at a

12  minimum, those two days, the 12th and 13th?

13   A.  Yes.

14   Q.  One of the observations you made on the 12th

15  there while you were waiting in that conference room was

16  that Mr. Wells was reading a book.  You remember saying

17  that?

18   A.  I do.

19   Q.  Now, you knew Jim Wells to frequently carry a

20  book with him throughout the workday?

21   A.  I don't know that I knew that, no.

22   Q.  Okay.  Had you observed him that he had some type

23  of small paperback, book or novel of some kind, some

24  kind of reading material frequently with him?

25   A.  I don't recall it specifically.  It's possible,

1    but I don't recall picking up that detail.

2        Q.   There wasn't work going on in the conference

3    room, nobody was expected to be doing work activities.

4    It was a holding place, if I understand it, correct?

5        A.   It was a place for us to be away from the rest of

6    the crew, yes.

7        Q.   And there was no other activities going on other

8    than visiting with one another, consoling one another,

9    just being away?

10       A.   Just being away from --

11       Q.   The work center?

12       A.   Yes, that's correct.

13       Q.   Mr. Wells calling you that morning and letting

14   you know that he was going to be late, that was

15   something you had instructed him to do?

16       A.   It is.

17       Q.   And the reason perhaps you would have been

18   getting a call is he told you he couldn't get ahold of

19   the rigger shop supervisor, that he had also tried to

20   call and leave him a message, but he couldn't get ahold

21   of him?

22       A.   That's correct.

23            MR. COLBATH:  If I can have just a moment, Your

24   Honor.

25            THE COURT:  All right.

1           (Pause)

2     BY MR. COLBATH:

3         Q.   Mr. Reckner, at that time, on the -- when you

4     were all in the conference room and whatnot, you came

5     and went.  Because you were the chief and had other

6     things to attend to in some respects, you came and went

7     some from the conference room, correct?

8         A.   I did.  I traveled between the conference room

9     and my office, the ET deck, the ops deck.

10        Q.   How long were -- generally was the crew required

11    to stay there on April 12th?

12        A.   Stay at the COMMSTA?

13        Q.   Yeah.

14        A.   I think we were released somewhere around 9:00,

15    9:30 at night.  I don't remember exactly, but it was

16    something like that.

17        Q.   So 12, 13 -- everyone was staged there for 12,

18    13 hours, having arrived early that morning and -- 9:00

19    or later that night?

20        A.   That's correct.

21        Q.   All right.  And instructed to report the

22    following day as well, on the 13th?

23        A.   That's correct.

24        Q.   And law enforcement investigation and interviews,

25    that was going on throughout that time, your

1    observation?

2        A.   That's correct.  Yeah.

3        Q.   And one of the instructions that the Coast Guard

4    gave to all of you folks was to not visit about the

5    investigation or visit with others about details of the

6    investigation.  Do you recall that?

7        A.   That's correct.  We weren't generally supposed to

8    talk about it to each other.  That's correct.

9        Q.   And within the workweek following that, following

10   April 12th, that started to happen, didn't it?  People

11   started to talk about things and talk about what might

12   have happened and how it all happened and all of those

13   things?

14       A.   I don't recall the exact timeframe of that.  But

15   eventually, it did start to happen, yes.

16       Q.   All right.

17            MR. COLBATH:  I think that's all -- but just

18   give me one second.

19            THE COURT:  Certainly, take a moment.

20            (Pause)

21            MR. COLBATH:  At this point, Your Honor, I

22   think that's all I'm going to ask Mr. Reckner.

23            THE COURT:  Redirect?

24            MR. SKROCKI:  Yes.  Do you want to take an

25   afternoon break real quick?

 1          THE COURT:  How is everybody doing?  Take a
 2     break now or continue on?  Anybody need a break?  No.
 3     Ready to proceed?
 4          MR. SKROCKI:  Yes, ma'am.
 5          THE COURT:  All right.  Very good.
 6                    REDIRECT EXAMINATION
 7     BY MR. SKROCKI:
 8     Q.  Mr. Reckner, just a couple questions for you,
 9     sir.  You were asked a lot of questions by Mr. Colbath
10     about the performance evaluations of Mr. Wells.
11     A.  I was.
12     Q.  And one of those -- a lot of questions about
13     meets expectations, things like that.  You remember
14     those questions?
15     A.  I do.
16     Q.  Then there's -- Mr. Wells at some point in time
17     exceeded and then he went to meets in one reflecting
18     teamwork?
19     A.  That's correct.
20     Q.  Is there rules about dropping an employee from
21     one level to another?
22     A.  There is.  You can't go --
23     Q.  Explain.
24     A.  So you can't go from exceeds straight down to not
25     meets.  There has to be a process of going from exceeds

to meets, having a conversation with the employee, do documentation, as we did, and then allowing that employee to correct the behavior.  If they don't correct the behavior or their performance doesn't improve, then you can drop from meets to not meets.  That's how it was explained to me by the HR rep.

Q.   In terms of the teamwork piece that was dropped from exceeds to meets, would you have gone lower if you could?

A.   I would have gone lower if I could.  I was told I couldn't.

MR. COLBATH:  Your Honor, I'm going to object to the hearsay nature of the last two answers.

MR. SKROCKI:  It's not going to the truth. It's why he did what he did.

THE COURT:  Well, in any event, I will allow the testimony to stand, but we're going to move to a new topic?

MR. SKROCKI:  Yes, we are.

THE COURT:  Then the objection is overruled. Go ahead.

BY MR. SKROCKI:

Q.   Mr. Reckner, there were some questions about light duties.  You remember those questions?  Both Mr. Colbath and I asked you those questions.

1    A.  I do.

2    Q.  At the day of the murder, April 12th, was

3  Mr. Wells still on light duty?

4    A.  He was not.

5    Q.  How far back was he off of light duty?

6    A.  I don't recall.  I think he was fully qualified

7  to work in every aspect of his job a couple of weeks

8  before that, but I honestly don't know exactly when his

9  light duty chit would have expired.

10   Q.  You were asked some questions about the other

11 antenna conference the Coast Guard sponsored.  Do you

12 recall those questions?

13   A.  I do.

14   Q.  I apologize for jumping around.  Did that

15 conference ever occur?

16   A.  We did not attend.  I honestly don't remember if

17 they went on without us, but obviously, two of our guys

18 are dead and one was suspended, so we didn't go.

19   Q.  Mr. Colbath asked you some questions about the

20 circumstances of the fuel card meeting and whether

21 Mr. Wells was aggressive and what people in the room

22 were doing, things of that nature.  Do you recall those

23 questions?

24   A.  I do.

25   Q.  And you mentioned at the end of meeting everybody

1   stood up.  Commander Van Ness stood up.  And what did

2   everybody else do?

3      A.   So Commander Van Ness stood up.  And when the CO

4   is in the room and he stands up, you stand up too.

5      Q.   What did Mr. Wells do?

6      A.   Mr. Wells stayed seated.

7      Q.   For how long?

8      A.   I don't know.  I left and came back, and he was

9   gone.  But I couldn't tell you.

10      Q.   You were asked some questions about the phone

11   call you received and Mr. Wells telling you about phone

12   calls that he made to the rigger shop, Mr. Belisle,

13   Hopkins and you.  Do you recall those questions?

14      A.   I do.

15      Q.   When Mr. Wells told you that, what was your

16   reaction to that?

17      A.   I was surprised.

18      Q.   Why?

19      A.   Because it just never happened.  I cannot

20   remember any other instance where all three of us got a

21   phone call that he was going to be late.  It never

22   happened in almost a year that I was there.

23            MR. SKROCKI:  No further questions.

24            THE COURT:  All right.  Any topics at all?

25   Nothing to explore?  Nothing new?

 1          MR. COLBATH:  Nothing new there.  I would have

 2    a question about that last -- one question about the

 3    last question, and then that's it.

 4          THE COURT:  One question.  Go ahead.

 5          MR. COLBATH:  Thank you, Your Honor.

 6                    RECROSS EXAMINATION

 7    BY MR. COLBATH:

 8       Q.  You and Mr. Belisle and Mr. Hopkins never all got

 9    a call but the -- Mr. Wells was only instructed to call

10    you if he couldn't get ahold of the shop supervisor,

11    Mr. Hopkins.  That's what the prior instruction was,

12    right?

13       A.  The instruction was to call any of us.  We didn't

14    care who he called as long as he called somebody.

15          THE COURT:  Thank you.

16          MR. COLBATH:  The letter said the shop

17    supervisor.

18          MR. SKROCKI:  Objection.

19          THE COURT:  Mr. Colbath, we've covered this

20    topic.  Very good.  Thank you, sir.  You may be excused.

21          (Witness excused)

22          THE COURT:  Why don't we take about 10 to

23    15 minutes here and then hear from the government's next

24    witness.

25          MR. SKROCKI:  Yes, Your Honor.

```
1              THE COURT:  Very good.  We'll go off record.
2              He can be released from the subpoena?
3              MR. COLBATH:  I was going to confer with
4    Mr. Skrocki about that.  The jury can be excused.
5              (Jury absent)
6              THE COURT:  Please be seated.  Sir, if you
7    could not exit the courtroom quite yet.  Let me see what
8    their thoughts are.
9              MR. SKROCKI:  We're conferring about
10   Mr. Reckner.
11             THE COURT:  Whether or not to release him?
12             MR. SKROCKI:  And other mechanics.
13             THE COURT:  Okay.
14             (Pause)
15             MR. COLBATH:  Your Honor, I think it was the
16   government's intention to release him.  That's what I
17   heard Mr. Skrocki say and that would be fine with us.
18             THE COURT:  You are seeking to have him
19   released?
20             MR. SKROCKI:  Yes.
21             THE COURT:  Mr. Reckner is free to go.  Very
22   good then.  We're off record.
23             DEPUTY CLERK:  All rise.  Court stands in
24   recess.
25             (Recessed from 3:11 p.m. to 3:26 p.m.)
```

1          (Jury absent)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3   the United States District Court is again in session.

4          THE COURT:  All right.  Please be seated,

5   everyone.  We're back on record.  And I understand there

6   is an exhibit topic to take up.

7          MR. COLBATH:  Your Honor, as I went through

8   with Mr. Reckner the calendar there and we marked the

9   days that were off, I admitted the blank calendar, 168.

10  I'll print and have for the record 168A, which is the

11  one after he marked it.  I neglected to, after we marked

12  it, I neglected to offer it, so I will offer 168A as

13  just the calendar with the dots on it marking the days

14  off.

15         THE COURT:  Any objection?

16         MR. SKROCKI:  No.

17         THE COURT:  Defense 168A is admitted.

18         (Defense Exhibit No. 168A admitted.)

19         (Jury present)

20         THE COURT:  All right.  Welcome back, ladies

21  and gentlemen.  Please be seated.  And who is the

22  government's next witness?

23         MS. STEVENS:  The government calls

24  Mrs. Belisle.

25         THE COURT:  All right.  Good afternoon.  If you

could come forward to the witness stand and when you get

up there, if you would remain standing just a moment,

the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please

state your full name and then spell your full name.

THE WITNESS:  Nicola Anne Belisle, N-i-c-o-l-a,

Anne, Belisle.

NICOLA ANNE BELISLE, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. STEVENS:

    Q.  Good afternoon, Mrs. Belisle.  You have got a bit

of accent there.  Can you tell the members where you're

from?

    A.  Originally, I'm from England.

    Q.  And we've met before; is that correct?

    A.  We have.

    Q.  And what have you done today or before today to

prepare for your testimony?

    A.  I have reviewed previous statements --

    Q.  Okay.

    A.  -- that I have made.

    Q.  And tell the members of the jury where you live

now?

    A.  I live in my RV.  I bought an RV.  I'm traveling

1  the country in the Lower 48.

2    Q.  And before you did that, where were you residing?

3    A.  In Kodiak.

4    Q.  Where specifically in Kodiak?

5    A.  Bells Flats.  We had a house there for nearly 20

6  -- over 20-something years.

7    Q.  Mrs. Belisle, tell the members how it was that

8  you got to the United States.

9    A.  I was working in an English pub in the country of

10 Bahrain, which is a little island off of Saudi Arabia.

11 And I had been working in bars and -- well, pubs, not

12 bars, pubs, there's a difference, in England.  And I was

13 offered a position running an English pub in the Middle

14 East, so I went.

15   Q.  And Mrs. Belisle, are you married?

16   A.  I am widowed, but I am still married.

17   Q.  Who are you married to?

18   A.  Rich, Richard W. Belisle.

19   Q.  And how did -- did you meet him working at that

20 bar?

21   A.  Pub.

22   Q.  Pub.

23   A.  I did, yes.  Of all the bars in all the world, he

24 walked into mine.  And he was on temporary assigned duty

25 to Bahrain.  He was stationed at a tactical law

enforcement detachment out of San Diego, and he had been
sent to Bahrain for a three-month time period.  And the
duties were they were teaching the Bahrain Coast Guard
and the Bahrain defense force defensive tactics and how
to guard their coast.

    Q.  And at some point after that, you guys got
married?

    A.  Well, a little while later, yeah, we did.  Rich
came into my pub and there was a Saudi Arabian customer
who was -- he was trying to purchase me for the evening.
And I was refusing, and he kept offering more money, and
I kept refusing.  And he kept offering more money and
more money, and I kept refusing.

        And Rich was standing at the bar, and this Saudi
Arabian gentleman eventually gave up and he spat at me
because I refused him.  And Rich grabbed him by the
scruff of his dress thing and marched him out of the pub
and threw him out.

    Q.  And it was love after that?

    A.  Oh, he was my knight in shining armor.

    Q.  All right.  So eventually you guys get married
and have some children, right?

    A.  Children, and then we got married.  We had twins,
and then we got married in January of '93.

    Q.  And walk the members through some of the

1  assignments you had as a Coast Guard family prior to

2  Kodiak.

3      A.  Okay.  Well, Rich was at San Diego for another

4  two years after me and our twins arrived.  And he went

5  to places such as -- he was always gone for that two

6  years.  He was in Bosnia.  He went back to the Red Sea.

7  He was on Navy ships for three months at a time.  He

8  would be home for a couple of weeks and then be gone for

9  another couple of months.

10         That was up until I think late '93, and then he

11  was transferred to Tillamook, Oregon to the motor life

12  boat station.  Rich was a surfman, which was the guys

13  that drive the motor life boats.  They are certified in

14  some of the -- well, the worst weather that the motor

15  life boats will go out in.

16         Rich was the boat driver.  He was the captain for

17  those.  We were in Tillamook for four years while he did

18  that job, which I didn't know which was worse, him going

19  across the bar in 30-foot seas to go save people or

20  being out in the Middle East or not hearing from him for

21  three months, but all of it was pretty nerve racking.

22      Q.  I bet.

23         Blair, can you put up what has already been

24  introduced as Government Exhibit 16.

25         Do you recognize him?

1   A.   Oh, yeah.  Yep, that's Rich.  That picture was a

2   set of family photos we had done the Thanksgiving before

3   he was killed.

4   Q.   And these are family photos, so I imagine he was

5   ordered to smile?

6   A.   Oh, no, he was just smiling.  He had his girls.

7   He had all three of our daughters, so he was smiling,

8   grinning like a fool.

9   Q.   Blair, No. 220, please.  Do you recognize that

10  picture?

11  A.   Oh, yeah.  Yep.  Rich said he had the best office

12  in the world.  He absolutely loved what he did.

13  Q.   Do you recognize the shirt that he's wearing in

14  that photo?

15  A.   Yeah.  It's from the NATE conference.  He

16  collected T-shirts from everywhere he went.  And I think

17  it was like three -- well, about three weeks before he

18  was killed, I made him cull a whole bunch, but he kept

19  that one because it was recent.  That logo was from the

20  NATE conference.  He got swag bags that they give away.

21  Q.   Was he pretty proud of his -- of what he did for

22  the Coast Guard?

23  A.   Absolutely.

24  Q.   Can you tell us a little bit more about what you

25  observed how he was with his job.

1     A.   Well, Rich retired as a chief.  He -- he really

2   didn't want to, but it was either move from Kodiak with

3   our three daughters, two of which were in middle school,

4   and go to -- he had a choice of going to what he called

5   down range Detroit or to Alameda on a big cutter where

6   he would be gone for another three months at a time.

7           And he decided that he wasn't going to do that,

8   that he wanted to be with his family, wanted to stay in

9   Kodiak.  And so he turned down making senior chief to

10  stay, and he always regretted that because one of the

11  things he loved to do was to teach, to mentor.

12          Part of what he loved working at the COMMSTA and

13  the rigger shop was working with the non-rates.  He

14  loved to teach them stuff.  He wanted to be the crusty

15  old chief that -- the old salty sailor that the

16  youngsters all talked about and that they would go to

17  for help and direction and just how do we do this,

18  what's this tool for.

19    Q.   So safe to say he took a lot of pride in that

20  mentorship role?

21    A.   Absolutely.  Actually, he was working with the

22  school district at the time that he was killed.  We were

23  running a program for young adults through the Kodiak

24  Island Borough School District called the Construction

25  Academy, and Rich was teaching the rigging part of it.

1    I was teaching a part on employability skills, and there

2    were people teaching carpentry and plumbing and

3    electrical and all these different sections.  And we had

4    12 young adults that were learning all these aspects so

5    they could go on and get jobs in the construction

6    industry and be qualified.  And Rich was teaching the

7    rigging section.

8         So that teaching part and the mentoring part, it

9    was just so very, very important to him.

10   Q.  Blair, can you pull up 252.

11        I want to talk about a couple things with regards

12   to this photo.  What's he doing here?

13   A.  Teaching.

14   Q.  Okay.  And again, looks like he's smiling there?

15   A.  Grinning, yeah.  I mean, he was very -- Rich was

16   so laid back, so happy.  Pretty much 99 percent of the

17   time, Rich was a happy guy.  He was so -- everything was

18   just weather.  "It's just weather."  If stuff is -- if

19   tides are tough, if situations are happening, "It's just

20   weather, it's going to blow over.  It's just weather,

21   you can't control it, so just" --

22   Q.  Mrs. Belisle, before we move on to the next

23   question, what color is that shirt that he's wearing?

24   A.  Lime green.

25   Q.  And why is he wearing such a bright shirt?

1    A.   Safety color.  It's a bright safety color.

2    Q.   So tell the members more about that.

3    A.   Rich was all about safety.  Nobody took one foot

4  off the ground without you got to be roped off, you got

5  to be tied off.  He did it with our kids when he taught

6  them how to mow the lawn.  You got to do things this

7  particular way and it's by the book.

8    Q.   So the bright shirt was a safety precaution?

9    A.   It's a safety thing so you can see him.

10    Q.   When he's --

11    A.   When he's climbing and when they are outside

12  running the equipment, when he was doing stuff at home,

13  yeah, safety color.

14    Q.   You just mentioned that "it's just weather, it

15  blows over."  Was there a time in his time at the

16  COMMSTA where maybe the weather was getting to him a

17  little bit?

18    A.   Yeah.  Yes.

19    Q.   Okay.  Let's spend some time on that.  So you

20  mentioned that he was generally happy.  When he would

21  come home, before this weather rolled in, when he would

22  come home, what was his general disposition?

23    A.   He was a happy guy.  He would -- Rich was the

24  primary cook.  I hated to cook and I had a full-time

25  job.  He was home before me.  I would come home from

work at 5:30, 6:00 and Rich would have music blasting
and he would be dancing around the living room with one
of our kids.  It was Grateful Dead, some heavy-metal
with one of our kids, or Frank Sinatra with another one
of our daughters, she loved Frank, and they would be
waltzing around the living room.

    And I would come in and noise blasting, and I was
the killjoy, because it's, "Okay, we got to do homework,
go pick up your shoes."  It's like, no, we have more fun
with Dad.

    Q.  Did that happy demeanor change?

    A.  It did.

    Q.  All right.  Let's spend some time on that.  Can
you try to explain to the jury how it changed when he
would come home from work?

    A.  He would -- well, the dancing stopped.  And more
often than not, I would come home and he would be
sitting in his big old easy chair in the corner of the
living room with a drink and running his fingers through
his hair and just quiet.  He just got really, really
quiet.  And he wasn't -- he wasn't interacting with our
kids.  He wasn't joking around.  He got to be pretty
silent.

    Q.  About what time, if you can remember, did this
shift in behavior come about?

1    A.   During the ramp-up to the Shemya job.

2    Q.   Okay.  And was that roughly the summer and fall

3  of 2011; is that accurate?

4    A.   I think so, yeah.

5    Q.   And Shemya, can you just tell them -- tell the

6  jury what that was.  I think they have heard it before,

7  but your understanding of what it was.

8    A.   My understanding was they were decommissioning

9  Attu, where Rich was actually stationed at one time, and

10  putting up two new towers on the island of Shemya.

11    Q.   Did you have any understanding of this shift in

12  behavior from your husband when he came home?

13         MR. COLBATH:  Your Honor, I'm going to object

14  as to calling for hearsay.

15         THE COURT:  It does seem you're going to be

16  eliciting hearsay.

17         MS. STEVENS:  I'll move on.

18  BY MS. STEVENS:

19    Q.   Let's move on to some of -- some interesting

20  topics, not necessarily related with his demeanor that

21  we were talking about.

22         So was your husband involved with illegal drug

23  use or anything like that?

24    A.   No.  No.  Absolutely not.

25    Q.   What about violent criminals?

1    A.  No.

2    Q.  And what about any gangs or illegal

3 organizations?

4    A.  No, I think the biggest gangs we could talk about

5 would be how he would run the Girl Scouts over to Woody

6 Island.  That's the biggest gang that he knew.

7    Q.  Did he have any debts that he may have had

8 outside of what you knew about with your finances?

9    A.  No.

10   Q.  Where did you guys live in Kodiak?

11   A.  Out in Bells Flats.  We did have a house in town,

12 but then we moved out to the flats in '03.

13   Q.  I'm going to show you what, for foundational

14 purposes, Your Honor, government exhibit for

15 identification 221.

16       Do you recognize that?

17   A.  Yep, that's the flats.

18   Q.  Okay.  And that's the neighborhood that you lived

19 in?

20   A.  Yes.

21   Q.  Does this aerial satellite map accurately

22 represent that neighborhood when you lived there?

23   A.  Yes.

24       MS. STEVENS:  Your Honor, we move for its

25 introduction.

1          MR. COLBATH:  221 is fine, Your Honor.

2          THE COURT:  Government's 221 is admitted.

3          (Exhibit No. 221 admitted.)

4     BY MS. STEVENS:

5      Q.  So I think there is a pointer up there,

6     Mrs. Belisle.  If not, we can bring you one.  Okay.

7     Great.

8          Can you go ahead and point out for the jury where

9     your residence was located.

10     A.  So this is Womens Bay Drive.

11     Q.  Are you a little nervous?

12     A.  Just a little.  So this is Womens Bay Drive.  And

13    my house is, golly, it's like right there.  More this

14    way.  A little bit further this way.  It's like next to

15    that red roof.  There is that red roof, and it's like

16    right there with that clearing of the trees.  Yeah,

17    right there.

18     Q.  All right.  And with your shaky hand, if you can,

19    to the best of your ability, can you identify the --

20    were you aware of where the defendant lived?

21     A.  Yes.

22     Q.  Okay.  Are you able to identify his house in

23    relation to your house on this map?

24     A.  There.  Right opposite.

25     Q.  Is that accurate?

1    A.   Yes.

2    Q.   Did I get that correct?

3    A.   Yes.  Hang on a second.  No, I'm sorry.  I'm

4    sorry.  I think it's that one right there.  I got to

5    just double-check.  Because I think that's the

6    Levinson's house.  That's my house right there.

7    Q.   All right.

8    A.   Because that's the new warehouse thing, so there,

9    that's the house.

10    Q.   And were you able to see the Wells' residence

11    from your property?

12    A.   Yes, from like 270 degrees, from every single

13    window except the side that faces my driveway I could

14    see their house.

15    Q.   Okay.  Do you know who else resided at the Wells'

16    residence?

17    A.   His wife.

18    Q.   Is she present here in court today?

19    A.   She is.

20    Q.   All right.  Can you point to her, please?

21    A.   Right behind you.

22    Q.   Okay.

23    A.   Second row in.

24    Q.   All right.

25    A.   Second seat in.

1    Q.   And did you have any interaction with any of the
2    Wells family members prior to the murders?
3    A.   I did.
4    Q.   Can you explain what those were to the members of
5    the jury?
6              MR. COLBATH:  Your Honor, I'm sorry.  Excuse
7    me, Ms. Belisle.  I don't mean to interrupt.  Could we
8    have a timeframe so I could gauge relevance?
9              THE COURT:  Could you give us a timeframe?
10             MS. STEVENS:  Just right before the murders.
11             THE COURT:  If you could specify the year or
12   the month.
13   BY MS. STEVENS:
14   Q.   How about from fall of 2011 up to April 12, 2012,
15   did you know any of the members of the Wells' household?
16   A.   I did.
17   Q.   How so?
18   A.   Mrs. Wells and I interacted through our work.
19   She was -- she ran the infant learning program through
20   the Kodiak Area Native Association.  And she was also --
21   I don't know if she was on the board, but she was
22   associated with an agency that provided services for
23   people with disabilities, as was I.
24             We were the week -- it was either a week or two
25   weeks before my husband was killed, we were both on the

Kodiak Island Borough School District budget advisory committee.  There was a meeting I think two weeks before my husband was killed, and it started at 6:30 at night.  Normally, they started at 4:30, 5:00, and she called me and asked me if I wanted to ride in with her from the flats into town.

Q.  So not just acquaintances, you knew her also through the work experience that you had?

A.  I was the -- when I worked with her closely the most, I was the regional director for Hope Community Resources in Kodiak.  That's an agency that provides services and support for people with disabilities.

And through Nancy's position at infant learning, we had a lot of the same clients, so we interacted frequently.

Q.  Did you come to learn through that interaction what type of vehicle she drove, what color vehicle?

A.  Yeah.  It was a small blue SUV.

Q.  Okay.  And at any point prior to while Rich was assigned to the rigger shop, did you and your husband host people from the T-2 building to come over to your house?

A.  We did.  It wasn't just the people from T-2 or T-1.  It was everybody we knew.  Part of the English tradition at Christmas is the day after Christmas is

Boxing Day.  And that traditionally is the day where you

go visiting.  You take your leftovers to someone -- to

other people's houses so you can get rid of them.  Back

in the days of fiefdoms and lords of the manor, it was

the day that all the staff got the day off and boxes of

-- like they would open the poor boxes at church and

hand it out to everybody.  That's how it got its name.

         We would have people over on Boxing Day primarily

to get rid of our leftovers and just visit with friends,

because being a military family, in Kodiak, you don't

have any of your own family, so you make family.  So our

house would be packed on Boxing Day.

     Q.  And did that invitation, that open invitation for

the island of Kodiak, did that include the Wells family?

     A.  It was an open invitation.  Everybody was

invited.  I printed up a flier.  Rich would put it up at

the COMMSTA.  He would hand it out to people, and, yeah,

he invited them.

     Q.  Did they ever attend?

     A.  I think once, but I couldn't tell you what year

it was, but I know it was just once.

     Q.  How long was your husband a co-worker of the

defendant?

     A.  I think he started there in 2007.  I think, yeah,

2007.

```
1       Q.  Okay.

2       A.  Was it 2007?  I think so.

3       Q.  Six, seven years?

4       A.  Yeah.

5       Q.  Real quick, I know we just kind of skipped off of

6   it, but Boxing Day, the ambience of that get-together,

7   can you just talk about that real quick.

8           MR. COLBATH:  Your Honor, I'm going to object

9   as to relevance, beyond the description she already

10  gave.

11          THE COURT:  I'll sustain that.

12  BY MS. STEVENS:

13      Q.  Let's move on then to April 12, 2012.

14      A.  Okay.

15      Q.  Do you remember this morning, Mrs. Belisle?

16      A.  Yes.

17      Q.  Did you and your husband both leave for work that

18  morning?

19      A.  We did.

20      Q.  And at this point I want you to tell the jury

21  about that morning before both of you left.

22      A.  Rich got up first, he always did, and he would

23  let the dogs out first.  He just got a puppy, a

24  chocolate lab.  And so he would go let the dogs out and

25  then he would make the coffee.  He would feed the dogs
```

1    and come in.  And this is what he did that morning.

2         He brought me a cup of coffee and he closed the

3    bedroom door so that the dogs stayed out because his

4    puppy would jump on the bed and spill my coffee.  He got

5    in the shower, and he used my towel, which I didn't

6    realize until later that his towel was wet on the

7    bedroom floor and he had used mine, so mine was wet.

8         And he stood there in the bedroom and he got

9    dressed.  And he put on long underwear, navy blue long

10   underwear and big thick wool socks.  And I said, "You

11   don't need those today, it's going to be 50 degrees.

12   It's a beautiful day today.  I just checked the weather.

13   It's going to be 50."

14        He said, "We're climbing the 300-footer today.

15   It's not going to be warm at 300 feet."  And then he

16   stood there in the bedroom, and he did a pirouette in

17   his T-shirt and long blue underwear.

18        My husband was not -- he didn't have a Madonna's

19   physique.  Anyway, he got dressed.  And we were talking

20   about a new cleaner we had just hired to have her come

21   clean the windows inside and out, and he said -- he kept

22   on, "Don't forget to ask Erica to do the windows."  "No,

23   no, I'll call her, don't worry."

24        He left the bedroom.  He went out to the arctic

25   entry, and he was putting on his boots, and his boots

had like 13 eyelets on them.  He's doing up his boots.
I got up, went in the shower.  As I walked into the
bathroom, he said, "Don't forget to call Erica."  "No, I
won't forget to call Erica."

        And our bedroom is at the front of the house, and
then like the front door.  And I walked into the
bathroom, I got the shower running, and he would walk in
front of the bedroom along the deck past the bathroom
and off the deck, but every time he left, he would bang
on the window of the bathroom to tell me that he was
leaving.  And that was -- he never came home.

    Q.  So what was the last thing you said to your
husband that morning?

    A.  "You used my towel."  I was bitching at him that
he used my towel.

    Q.  When he left that morning, did he leave with
anything?

    A.  He had an apple, a piece of string cheese and his
coffee.  He had a Stanley tools coffee mug.

    Q.  Do you remember what color it was?

    A.  Silver with a green lid, Stanley.

    Q.  Do you remember what time he left?

    A.  It was about 6:45, 6:50, something like that.  He
always had to leave first.  He was always gone by -- he
had to be there at 7:00.

1    Q.  And after he left, I assume you got ready for

2  work and left as well?

3    A.  Yep.

4    Q.  Do you remember what time you left?

5    A.  I had to be at work by 8:00, and I was generally

6  late, but I probably left about 7:30, 7:35.

7    Q.  Where is your office in relation to your house?

8    A.  At the time, I was working in town.  I was

9  working at the job center, and so I had to drive up

10  Rezanof and drive into town, which was about a 20-,

11  25-minute drive from the flats.

12    Q.  And from your house in the flats to the road

13  leading up to the COMMSTA, you would pass that?

14    A.  Yes, absolutely, and the base and the airport and

15  then Anton Larsen and then into town.

16    Q.  So how long would it take generally for you to

17  get from your house to the entrance leading up Anton

18  Larsen Road?

19    A.  Ten minutes maybe.

20    Q.  And on your drive into work that morning, do you

21  remember anything notable?

22    A.  Just as I approached Deadman's Curve, which is an

23  area where it's a big cliff with a road around it and

24  then it's down to the ocean, right as I was coming up

25  there, it was about ten until 8:00, it was a state

1    trooper and an ambulance, sirens going, and they were

2    going hell for leather.  They screamed past me.

3        Q.  Why was that notable to you?

4        A.  My grandma taught me that, taught all of us that

5    when you see one of the first responders, you always say

6    a quick prayer, you always cross yourself and you say a

7    quick prayer for whoever is involved and just hope that

8    everything is okay.

9        Q.  Did you say a prayer?

10       A.  I did.

11       Q.  After you said that prayer, do you recall what

12   time that was?

13       A.  It was about ten until 8:00.

14       Q.  And later that morning, you learned that your

15   husband was murdered that morning?

16       A.  It was about 9:30, yeah, that morning.

17       Q.  Do you remember who informed you of that?

18       A.  It was State Trooper Dupras, Pete Van Ness,

19   Captain Moore from -- he's the CO of the base, and a

20   Coast Guard chaplain.  They walked into my office.

21           I had been trying to get ahold of Rich all

22   morning.  My youngest, she was 16, she texted me about

23   8:30 and she said, "Have you heard from Dad?  Something

24   is going on on Base and I can't get ahold of him."  And

25   no, I hadn't heard anything.

1      And I called his desk phone.  There was no

2 answer.  And I called his cell phone and I texted him.

3 And I e-mailed him.  And he didn't answer.

4      And I called a friend of his who worked on Base

5 and I said, "Have you heard from Rich?"  And he said,

6 "No, I'll see what I can find out."

7      And then I called military police, because Rich

8 always, always let me know if he was going to be late or

9 if something was going on and he wasn't going to make it

10 home in time.  And --

11      MR. COLBATH:  Your Honor -- excuse me, ma'am.

12 I apologize for interrupting.  I'm going to ask for

13 another question.  The question was who notified her.

14      THE COURT:  Go ahead.  Ms. Belisle, can you

15 answer the question of who notified you?  I think she

16 answered that.

17      MR. COLBATH:  She did.  I was objecting to the

18 continuing narrative without another question.

19      THE COURT:  Would you like to take a break?

20 Are you doing okay, or take a break, ma'am?

21      Mrs. Belisle, would you like to take a short

22 break?  Why don't we do that.  I think that will be

23 good.  We'll go off record.

24      (Recessed from 4:04 p.m. to 4:18 p.m.)

25      (Jury present)

1          THE COURT:  Please be seated, everyone.  Go

2    ahead, whenever you're ready.

3    BY MS. STEVENS:

4        Q.  So welcome back.  Let's talk about the evening of

5    April 12, 2012.  Did you receive any visitors that

6    night?

7        A.  I did, yes, lots.

8        Q.  Who came by?

9        A.  Lots of neighbors.  So many of our friends.

10   There was, oh, God, I want to say at one point there

11   must have been, I don't know, a dozen people.  I mean

12   people were just coming in all afternoon.

13          And then later on in the evening, some of the

14   non-rates came by.

15       Q.  The non-rates from where?

16       A.  From the COMMSTA.  Leah Henry and Para Upchurch

17   came by.

18       Q.  How did they appear that night?  What did they

19   look like?

20       A.  They were devastated.  They were absolutely

21   devastated.

22       Q.  Did the defendant come by?

23       A.  No.

24       Q.  At any point after your husband was murdered, did

25   you have an occasion to run into the defendant?

1    A.   Yes.

2    Q.   Tell the members of the jury about that incident.

3    A.   It was voting day 2012.  I was the precinct chair

4  for Bells Flats.  I had done that for about, I think

5  since we moved out to the flats.  And so -- I don't know

6  how many years, but anyway, when the State asked me if I

7  would do it again, I said that I would open the polls

8  and I would close the polls, but I didn't want to be

9  there during the day, because my husband's murder was --

10  everybody was talking about it all of the time.  And I

11  just -- I just couldn't -- people asking me questions

12  all the time, I just couldn't stand it.

13        So the polls open at 7:00 a.m. and they close at

14  8:00 p.m.  This was the presidential election.  And at

15  quarter until 7:00, he and his wife walked in to the

16  fire hall.  They walked right up to me smiling and

17  grinning and said, "Oh, good morning.  How are you?"

18    Q.   How did that make you feel?

19    A.   I was terrified.  And I -- I just started

20  screaming.  I just -- I lost it.  I was just screaming.

21    Q.   And you had worked at the polling place for many,

22  many years in a row?

23    A.   I think about seven years.

24    Q.   Did you have the ability working those seven

25  years to know when people in the neighborhood typically

1    voted?

2        A.   Yes.

3        Q.   And for the Wells, the defendant and his wife, at

4    what point in the years preceding that incident did they

5    normally vote?

6             MR. COLBATH:  Your Honor, I'm going to object

7    both as to relevance and as to foundation.

8             THE COURT:  I heard she was there.  She knows.

9    I'll allow the question.  Go ahead.

10            MR. COLBATH:  Your Honor, can we approach?

11            THE COURT:  Yes.  That's fine.

12            (Begin bench conference.)

13            MR. COLBATH:  A foundational concern was there

14   is no way that the Wells would have known that she was

15   there necessarily.

16            THE COURT:  Well, if she's been there all seven

17   years.

18            MR. COLBATH:  It was post the murders, and she

19   even said herself that she had changed what she had done

20   before.  She opened and did not stay throughout the day.

21   So I would -- number one, I don't think they knew.

22   Number two, I don't think -- I guess I don't know that

23   there is foundation or relevance to establish their -- I

24   just don't see the relevance of the years' past voting

25   habits.

1        THE COURT:  I would agree that it is not of a

2   high magnitude of relevance, but you also see there is

3   some relevance that they -- and maybe you could lay a

4   better foundation.

5        MS. STEVENS:  This is the last question.

6        THE COURT:  In any event, I will allow the

7   topic to be explored because I don't see, in addition to

8   the development, 403 is also substantially outweighing

9   the probative value that there is, so I will allow it.

10  And it's the last question?

11       MS. STEVENS:  Yeah, and for the record, the

12  basis for this is the guilty conscience of the

13  defendant.  We're not using it to prove obviously that

14  he committed the act, but we're showing this to prove he

15  had a guilty conscience by intimidating her, who is a

16  witness in this case.

17       THE COURT:  In any event, you can explore your

18  concern on cross and I'll allow that.

19       (End bench conference.)

20  BY MS. STEVENS:

21    Q.  Mrs. Belisle, the question I asked was:  In the

22  years leading up to this incident, when you worked at

23  the polling booth, did you have an opportunity to

24  observe the normal voting times for the defendant and

25  his wife?

1    A.  I did.

2    Q.  And what were those times?

3    A.  She would normally come in after work, so later

4  in the afternoon.  And he either came in at lunchtime or

5  after work, which was -- they normally got off at like

6  3:30, because Rich would be close behind him or in front

7  of him.

8          MS. STEVENS:  Thank you.  No more questions.

9          THE COURT:  All right.  Questions, Mr. Camiel

10  or Mr. Colbath?

11          MR. COLBATH:  Neither actually, Your Honor.  We

12  don't have any questions for Mrs. Belisle.

13          THE COURT:  Thank you.  You may be excused.

14  She can be released from any subpoena?  From the

15  government's perspective, yes?

16          MS. STEVENS:  Yes, Your Honor.

17          MR. COLBATH:  Yes, certainly.

18          (Witness excused)

19          THE COURT:  All right.  Your next witness.  Do

20  we have time for one more witness?

21          MS. SHERMAN:  We can get started.  We certainly

22  won't get through him.

23          THE COURT:  Everybody doing okay?  Yes?  Let's

24  get started.

25          MS. SHERMAN:  The government calls Cody

1    Beauford.

2            THE COURT:  Good afternoon.  If you could come

3    all the way up to the witness chair there.  When you get

4    up there, remain standing just a moment and the clerk

5    will administer an oath to you.

6            (Oath administered to the witness)

7            DEPUTY CLERK:  For the record, can you please

8    state your full name and then spell your full name.

9            THE WITNESS:  Full name is Cody Jay Beauford,

10   C-o-d-y, J-a-y, B-e-a-u-f-o-r-d.

11       CODY BEAUFORD, GOVERNMENT WITNESS, SWORN

12                    DIRECT EXAMINATION

13   BY MS. SHERMAN:

14   Q.  Good afternoon, Mr. Beauford.  Where do you work?

15   A.  I work at ANT Kodiak.

16   Q.  Who do you work for?

17   A.  The Coast Guard.

18   Q.  How long have you been with the Coast Guard?

19   A.  Just a little over ten years.

20   Q.  You currently work in Kodiak.  Have you been in

21   Kodiak that entire time?

22   A.  No, I have not.

23   Q.  Tell us where you -- what part of the Coast Guard

24   in Kodiak you work for now.

25   A.  I work for the Aids to Navigation Team.

1    Q.   What is that?

2    A.   We service mostly day boards and day beacons and

3    such throughout a good chunk of Alaska to aid mariners

4    in navigation.

5    Q.   So the beacons that direct them so they don't hit

6    the shore, it that what you're talking about?

7    A.   Yes.

8    Q.   Where were you stationed before?

9    A.   Before ANT, I was stationed on the Coast Guard

10   cutter Frank Drew in Portsmouth, Virginia.

11   Q.   Before that?

12   A.   I was briefly stationed at electronic support

13   detachment, Portsmouth.

14   Q.   Before that?

15   A.   I was stationed on the Coast Guard cutter

16   Vigorous.

17   Q.   And before that?

18   A.   I was stationed at COMMSTA Kodiak.

19   Q.   How long were you stationed at COMMSTA Kodiak?

20   A.   I was stationed at COMMSTA Kodiak for just a

21   little over three years.

22   Q.   And what was your role at the COMMSTA?

23   A.   I was an electronics technician, so I serviced

24   the radios, the big transmitters, receivers, and I also

25   worked on the towers and general grounds maintenance as

1  well.

2      Q.  Did you know how to climb the towers?

3      A.  I did.

4      Q.  In that three years, we have learned that there

5  are two buildings at the COMMSTA.  Where were you

6  stationed within that?

7      A.  In the beginning, I was stationed at T-1, the

8  main building.  And then later on, I moved down to T-2,

9  the rigger shop.

10     Q.  Do you remember about what time you moved down to

11  T-2?

12     A.  It would have been spring 2011.  I think March,

13  thereabouts.

14     Q.  What was your role in the rigger shop when you

15  got down there?

16     A.  When I got down there, I would have been the

17  direct supervisor of the non-rates who worked there.

18     Q.  What's a non-rate?

19     A.  It's somebody who has joined the Coast Guard but

20  hasn't gone to a technical trade school yet, and they

21  are going to be E-2s or E-3s, and they just do general

22  tasks as directed by petty officers.

23     Q.  Were you a non-rate at one point?

24     A.  Briefly.  I went from boot camp to a trade school

25  right away so I wasn't one for very long.

1     Q.   How old were you when you joined the Coast Guard?

2     A.   17.

3     Q.   How old were you when you working down in the

4     rigger shop as a supervisor?

5     A.   I would have gone down there just before I turned

6     19, I think.

7     Q.   Where were you living at the time you were

8     working in the rigger shop?

9     A.   I was living on Larch Street in the City of

10    Kodiak.

11    Q.   So your path to get to work would be what?

12    A.   So it would have been Larch street is off of Mill

13    Bay, which is kind of one branch of a Y.  There is not a

14    whole lot of roads there, so come down Mill Bay on to

15    West Rezanof, the one main road between Base and town,

16    and then turn right onto Anton Larsen.

17    Q.   How long would it take you to get to work in the

18    morning?

19    A.   Ten minutes approximately.

20    Q.   Were you living in an apartment, barracks?

21    A.   No, I was in a house.

22    Q.   Did you live there by yourself?

23    A.   I did not.  I had two roommates.

24    Q.   Who were they?

25    A.   They were Hernando Acosta and Jacob Schaeffer.

1    Q.   How did you know them?

2    A.   I worked with them at the COMMSTA.

3    Q.   Did they work in the rigger shop?

4    A.   No, they did not.

5    Q.   Where did they work?

6    A.   Hernando Acosta worked in T-1.  He was an

7    electronics technician as well.  He worked on the

8    transmitters and general electronic stuff.  And Jacob

9    Schaeffer was an operations specialist, so he worked on

10   the operations deck.

11   Q.   What's the operations deck?

12   A.   So it's a secure part of the building, and that's

13   where all the coms come into as far as the actual listen

14   to the radio and speaking on the radio.

15   Q.   Did you own a vehicle at that time?

16   A.   I did.

17   Q.   What was it?

18   A.   It was a 1985 Chevy K10.

19   Q.   Let's talk about your work in the rigger shop.

20   You said you supervised the non-rates.  What were you

21   doing day-to-day down there?  What were the tasks?

22   A.   Day-to-day tasks is just monitoring antenna

23   field.  A lot of that is just consisting of doing rounds

24   of like air pressures and stuff for the transmission

25   lines, general grounds maintenance, anything from

plowing to shoveling to chipping ice.  And then in the
summer it's going to be mowing grass, cutting down
trees, doing that kind of stuff.

Q.  What time did you normally come into work?

A.  I normally came in around 7:30.

Q.  Did you come in in uniform?

A.  No, I did not.

Q.  What would you wear into work?

A.  Just regular civilian clothes, so jeans, T-shirt,
hoody.

Q.  So you would arrive around you said 7:30?

A.  Approximately, yeah.

Q.  So you arrived at 7:30.  Tell the jury where you
would go, what you would do when you got to the rigger
shop.

A.  When I arrived at 7:30, generally I just walk in
and say hi to everybody and just kind of, you know,
general morning greetings and have some coffee, and do
that kind of thing.  And then after that, I would change
into a uniform.

Q.  Where would you change into your uniform?

A.  In the boiler room.

Q.  Who was normally there when you got there?

A.  Normally who would be there is ET1 Hopkins, Rich
Belisle and Jim Wells.  And then a lot of times, me and

1    Nathan Pacheco would arrive right around the same time.

2        Q.  I want to talk for a minute.  You said you would

3    change into your uniform?

4        A.  Yes.

5        Q.  A certain time of year did you have to roll your

6    sleeves a certain way?

7        A.  Yes.  Starting in, I think April 1st, the sleeves

8    got rolled up like this instead of being down.

9            MS. SHERMAN:  Your Honor, can I have him stand

10   just for a moment?

11           THE COURT:  Sure.

12       Q.  If you could just stand up.  So in April, you

13   would be rolling your sleeves like that?

14       A.  Yes.

15       Q.  Are those long sleeves?

16       A.  They are long.

17       Q.  You can go ahead and sit down.

18       A.  Sorry.

19       Q.  Can you describe how that process is?

20       A.  So when they are down, you turn them inside out

21   up to where your shoulder is, and then you roll the

22   fabric up and then you cuff what would be the cuff back

23   down onto the top of it.

24       Q.  Does that make it easy to pull the sleeves down?

25       A.  Yes, so that way if you need to.

1    Q.  Is that a process you can do while wearing --

2    well, what is the outer shirt that you're wearing

3    called?

4    A.  This is called a blouse.

5    Q.  Is that a process, rolling your sleeves, is that

6    something you can do while wearing the uniform?

7    A.  I have never seen anybody do it while wearing it,

8    no.

9    Q.  So how would you normally do it?

10   A.  You would take it off, and I mean a lot times the

11   easiest way is going to be to hang it over a back of a

12   chair or hanger, so that way you can see how it hangs

13   when you're cuffing your sleeves.  That way you can get

14   the length right.

15   Q.  When you were working in the rigger shop, where

16   would you roll your sleeves?

17   A.  Normally do it in the break room or like where my

18   desk was in there.

19        THE COURT:  When do you go back to long

20   sleeves?

21        THE WITNESS:  I think it was October.  They

22   have actually changed it since then.  Now it's kind of

23   more up to the discretion.  The commands can do it or

24   individuals can do it.  It's been a while.  I actually

25   don't remember anymore, in all honesty.

1    THE COURT:  Fair enough.

2  BY MS. SHERMAN:

3    Q.  Why don't we go ahead and pull up Exhibit No. 13.

4  It's already been admitted, if we could.

5       So you said you would do this at your desk.

6  There should be a laser pointer up there.  Why don't you

7  use that, if you could, and show us where your desk was.

8    A.  Okay.  Right there.

9    Q.  So that's where you would lay out your blouse and

10  roll your sleeves?

11    A.  Yeah, I would put it over the back of a chair.

12  You can do it with it laid down as well, but generally,

13  I had a chair there, put it over the back of the chair.

14    Q.  When you would arrive to work, what door would

15  you normally enter through?

16    A.  The door off the locker room, so this one right

17  here.

18    Q.  So you said you'd come in and you'd say hi to

19  everybody.  Where would people normally be in the

20  morning?

21    A.  Normally they would be in the office, so up here.

22    Q.  Why don't you go ahead and tell us whose desks

23  were where in that office?

24    A.  Okay.  This one to the right of the door was Jim

25  Wells.  Next one up was Rich Belisle.  The other wall,

 1    that was ET1 Hopkins.  And then across the way there was

 2    Chief Reckner's.

 3        Q.  You call him ET1 Hopkins.  Is that what you would

 4    call him at work?

 5        A.  Yeah, ET1 Hopkins, or just ET1 for short.

 6        Q.  Did you ever call him Jim?

 7        A.  No.

 8        Q.  Why not?

 9        A.  It's unprofessional, especially with the rank

10    difference.  You refer to people as their title.  It's

11    fairly general practice in the Coast Guard.

12        Q.  When you would address Chief Reckner, how would

13    you address him?

14        A.  Just as Chief.

15        Q.  So did you have a computer at your desk?

16        A.  I did not at the time.

17        Q.  Okay.  Are there a few other desks in that same

18    break room area?

19        A.  Yes.  There was one over here.  Okay.

20        Q.  Who sat at that desk?

21        A.  The non-rates would share those desks.

22        Q.  There is how many non-rates?

23        A.  Three at the time.

24        Q.  And in April 2012, how many non-rates were there?

25        A.  Three.

1    Q.  Okay.  Why don't you name them for us.  Who were

2    the non-rates working there?

3    A.  There was Leah Killingsworth or Henry.  I can't

4    remember if her name had changed by that point.  And

5    then Para Upchurch and Nathan Pacheco.

6    Q.  Did you have a newer non-rate there?

7    A.  I'm so sorry.  There was four.  Aaron Coggins.

8    I'm sorry about that.

9    Q.  How long had Aaron Coggins been there?

10   A.  Not very long at all.  A couple months.

11   Q.  So the four of them would share those desks?

12   A.  Yes.

13   Q.  When you would log on to a computer, how would

14   you do that?

15   A.  You have, on your military ID, it's called a

16   common access card or CAC card, there is a chip that it

17   reads and it has your information on it.  It allows you

18   to log in with a pin number.

19   Q.  What sort of tools were in the rigger shop?

20   A.  There was a lot of tools.  We had the rigging

21   tools, such as snatch blocks, chain line.  And then we

22   had, over in the big shop, we had just general

23   mechanical tools, ratchets, wrenches, sockets.  And then

24   basic power tools, sawzalls, drills.

25   Q.  Did you have heavy machinery?

1    A.   We had heavy vehicles, yes.

2    Q.   How many?

3    A.   Give me one second.  We had the bulldozer.  We

4    had two tractors, snowcat, line truck.  I think we had

5    the Bobcat at that time.  That's all I can think of

6    right now.

7    Q.   Were there tools there to fix or replace tires?

8    A.   Yes.

9    Q.   Did you ever do that while at the rigger shop?

10   A.   I think I had a tire off a trailer once, but I

11   don't think I had one off a vehicle.

12   Q.   Did you ever help anyone else work on tires or

13   work on vehicles there?

14   A.   I helped Nathan Pacheco do an alignment on a

15   Jeep.

16   Q.   How would your day -- Madam Clerk, we can have

17   lights.  Thank you.

18        How would your day normally start at the shop?

19   A.   It would normally start -- just a lot of times

20   when I would come in in the morning and say hi, I would

21   get -- we talk about what the plan was for the day, and

22   that could vary; anything from doing antenna maintenance

23   or troubleshooting or just doing general rounds or

24   inspections to clean up, you know, to clean up work or

25   it was pretty varied.

1    Q.   What was the first thing -- so your day started

2    at what time?

3    A.   Work started at 0800.

4    Q.   So 8:00 in the morning for the rest of us?

5    A.   Sorry.

6    Q.   What would be the first thing you would do at

7    8:00 a.m.?

8    A.   Normally, colors.  There was lights on the flag

9    pole, but they were broken fairly often.

10   Q.   What is colors?

11   A.   Just raising the American flag, and then I think

12   we had like unit award as well.  I think we had a unit

13   award pennant that went up.  It's just a multi-colored

14   pennant, and then the POW and Coast Guard went up as

15   well.

16   Q.   Who would do morning colors, raise those flags?

17   A.   Generally, the non-rates.

18   Q.   Where were the flags kept?

19   A.   They were kept up in T-1.  Normally they were in

20   the basement, if I remember correctly.

21   Q.   Do you know why they were kept up there?

22   A.   Because evening colors was later after our

23   workday, so the watch standards on the operations deck

24   would do it.

25   Q.   So when up -- they worked in T-1 so they'd take

1  the flags with them, is that what you mean?

2      A.  Yes.  When they took the flags down, they took

3  them back up the hill to T-1.

4      Q.  Whose job was it to retrieve those flags in the

5  morning?

6      A.  The non-rates, generally whichever one got there

7  first.

8      Q.  At the end of the day, what time did the day end?

9      A.  2:00.

10     Q.  So 8:00 to 2:00.  Would anyone lock up at the end

11  of the day?

12     A.  It would generally be whoever was the last person

13  leaving.

14     Q.  Who was -- was that the same person every day?

15     A.  No, not always.

16     Q.  What doors would you check?

17     A.  The ones -- so it would be the ones in what was

18  labeled the wood shop.

19     Q.  Why don't we bring up 13 again.  Would that help

20  you?

21     A.  Yes, it would.  Thank you.

22     Q.  So what doors would you check?

23     A.  So these are our overhead doors, so those are

24  fairly clear that they're locked.  It would be all the

25  external doors, so that would be this one, this one,

1    this one, and the one off the back of the boiler room

2    there.  And then this door was magnetic key, so as long

3    as it was shut behind, then it was locked.

4        Q.  Did you ever lock up any interior doors?

5        A.  I don't remember.

6        Q.  Okay.  What about the door to the boiler room,

7    can you describe that door for us?

8        A.  That's just -- it was like a steel storm door.

9    I'm pretty positive we locked that one too, but it's

10   been a long time.

11       Q.  How was that door locked?

12       A.  I don't remember.

13       Q.  Okay.  Madam Clerk, we can take that down.

14           Let's talk about Mr. Hopkins for a moment.  How

15   was he as a boss?

16       A.  He was a good boss.  He was very knowledgeable,

17   especially about general military stuff.  He had been in

18   a long time.  He was prior Navy, so he was a good boss.

19           Definitely, you know, he was older and he was a

20   little gruff, but he was fair and he had a lot of

21   knowledge.

22       Q.  Do you know what he drove to work?

23       A.  At that time, he was driving a blue one-ton

24   Dodge.

25       Q.  He would give you your assignments, that's what

1    you had said?

2       A.   Yes.

3       Q.   Would he ever pitch in?

4       A.   Yeah, he would help do stuff, just depending on

5    what it was.

6       Q.   Let's talk about Mr. Belisle.  How would you

7    describe him?

8       A.   In some ways he was similar to ET1.  He had also

9    spent a lot of time in the military and was older.  He

10   really enjoyed teaching.

11      Q.   What sort of things would he teach you?

12      A.   It could be anything from rigging stuff to stuff

13   about equipment and then a lot of just general military

14   stuff or that kind of thing.

15      Q.   Did you ever pull pranks on ET1 Hopkins?

16      A.   I don't remember pulling pranks on ET1 Hopkins,

17   no.

18      Q.   Did you ever pull any pranks on Rich?

19      A.   Yeah.

20      Q.   Why don't you tell us about that.

21      A.   Rich was very conservative, so this was back when

22   we found -- it was a pin or sticker, I can't remember

23   which one, but it was like Veterans for Obama thing.  We

24   put it on his desk there.

25      Q.   What was his reaction to that?

 1     A.   He left a note that said, "Kick Cody's butt."

 2     Q.   Did you ever spend time with Mr. Belisle outside

 3  of work?

 4     A.   I think just once we went to Boxing Day at his

 5  home.

 6     Q.   Did you know what Boxing Day was?

 7     A.   I didn't before he told me, no.

 8     Q.   Who all went from the rigger shop?

 9     A.   I think it was -- there was me.  There was ET1

10  Hopkins.  Leah was there.  Nathan Pacheco was there.

11  Chief was there.

12     Q.   Chief Reckner?

13     A.   Sorry.  Yes.  I can't remember off the top of my

14  head if Para Upchurch was there or not.

15     Q.   And what year was that?

16     A.   That would have been 2011.

17     Q.   How was -- you said Mr. Belisle taught you

18  things.  How was he working with the non-rates?

19     A.   He was the same way.  Of course we were all

20  young, so he enjoyed -- he taught all of us stuff.

21     Q.   What did he drive to work?

22     A.   He had a dark blue F-150.

23     Q.   Let's talk for a minute about the defendant.  Had

24  you ever spent time with him outside of work?

25     A.   No.

1    Q.   Do you know what he drove to work?

2    A.   He had a white one-ton Dodge.

3    Q.   Did it have anything on the back of it?

4    A.   It had like a topper on the back.

5    Q.   Did he ever drive anything else to work?

6    A.   I saw him drive a blue car only a couple times.

7    Q.   Can you describe that blue -- you called it a

8    blue car?

9    A.   It's like a small SUV.

10   Q.   How would you describe the defendant in terms of

11   his work space?

12   A.   The desk was very cluttered.

13   Q.   Did that extend to other areas relating to the

14   rigger shop?

15   A.   Yeah.

16   Q.   What other areas?

17   A.   The garage, the big garage was -- a lot of times

18   it would be disorganized.

19   Q.   Anywhere else on COMMSTA property?

20   A.   The warehouse was really disorganized.

21   Q.   What was your understanding of what was in the

22   warehouse?

23   A.   A lot of it was stuff that we probably didn't

24   really need.

25   Q.   Did you -- how would the defendant respond when

1  you would ask him questions at work?

2      A.   He would answer.   He had -- I mean he worked

3  there a long time and he was -- he worked before us so

4  there was a lot of knowledge.

5      Q.   Did he ever come up and start a conversation with

6  you?

7      A.   Not that I can remember.

8      Q.   Did that bother you?

9      A.   No.

10          MR. CAMIEL:   Your Honor, I'm going to object to

11  the relevance of that.

12          THE COURT:   On relevance, I'll sustain that.

13  BY MS. SHERMAN:

14      Q.   When you all would discuss towers, how was the

15  defendant's participation in those conversations,

16  particularly when you started down at the rigger shop?

17      A.   He was very involved when I started down there.

18      Q.   Would those -- can you describe those

19  discussions, how he would give his input?

20      A.   He would -- I mean very direct for sure.   Like I

21  said, he had the knowledge to give.

22      Q.   Were there times that he disagreed or people

23  disagreed about how something should be done?

24      A.   Early on, I don't remember it so much, but not --

25  I mean it was like I knew less at that point to be able

1   to disagree.

2       Q.   Would you observe disagreements among others in

3   the group at the rigger shop?

4       A.   I don't remember early on, no.

5               MS. SHERMAN:  Your Honor, it's 4:50.

6               THE COURT:  Is this a good place?

7               MS. SHERMAN:  I think it's probably a good time

8   to end for today.

9               THE COURT:  Then let's do that.  And could I be

10  optimistic and tell the jury 8:45 tomorrow?

11              MR. COLBATH:  I think that's fine with us.

12              THE COURT:  Still have them here at 8:30, but

13  we were a little bit early.  Is that convenient for

14  everyone to start a little bit earlier?

15              Leave your notepads here.  Please remember my

16  admonition not to discuss the case with family or

17  friends or do any research.  And I hope you all have a

18  pleasant evening.  We'll see you tomorrow.

19              (Jury absent)

20              THE COURT:  All right.  Please be seated.  And,

21  sir, you can be excused.  We'll see you back here

22  tomorrow at 8:45.

23              All right.  Mr. Skrocki, from the government's

24  perspective, any topics we need to take up here?

25              MR. SKROCKI:  I don't think so, Your Honor.

1          THE COURT:  That's good news.  Don't think of
2    any tonight either.

3          Mr. Colbath, likewise, any topics?
4          MR. COLBATH:  No.
5          THE COURT:  All right.  Then I will see you at
6    8:30.  And if we can -- if we don't have any topics,
7    that's fine.  I would urge -- I wanted to mention one
8    thing.  If you anticipate impeachment, and sometimes you
9    never know and I understand that, but if you anticipate
10   impeachment, it would be very helpful in my mind to have
11   four copies, one for the government, one for the Court,
12   one for the witness and one for you.

13         MR. COLBATH:  We will do that in the future.
14         THE COURT:  I realize sometimes you just can't
15   predict, but to the extent you can, that would be
16   helpful.

17         All right.  We will go off record.
18         DEPUTY CLERK:  All rise.  This matter is in
19   recess until tomorrow at 8:30 a.m.

20         (Recessed at 4:52 p.m.)
21
22
23
24
25

CERTIFICATE

　　I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
original stenographic record in the above-entitled
matter and that the transcript page format is in
conformance with the regulations of the Judicial
Conference of the United States.

　　Dated this 29th day of April, 2020.


　　　　　　　　　　　/s/ Sonja L. Reeves
　　　　　　　　　　SONJA L. REEVES, RMR-CRR
　　　　　　　　　　FEDERAL OFFICIAL COURT REPORTER