```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
 2

 3  UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5  vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
 6  JAMES MICHAEL WELLS,       )
                              )
 7          Defendant.        )
    _____)
 8
```

```
 9            TRANSCRIPT OF TRIAL BY JURY - DAY 4
      BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10              September 12, 2019; 8:47 a.m.
                    Anchorage, Alaska
11

12  FOR THE GOVERNMENT:
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16
    FOR THE DEFENDANT:
17        Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551

23  _____

              SONJA L. REEVES, RMR-CRR
24          Federal Official Court Reporter
              222 West 7th Avenue, #4
25             Anchorage, Alaska 99513
       Transcript Produced from the Stenographic Record
```

1                    I N D E X

2           September 12, 2019, Trial Day 4

3

4    Witnesses:        Direct    Cross    Redirect    Recross

5    Cody Beauford        5        35        55          58

6    Aaron Coggins       59        81        89          --

7    Donald Rudat        90       110       123         125

8    Kelly Brockett     126       146       163          --

9    Andrew DeVries     165       173        --          --

10   Daniel Smith       174        --        --          --

11   William Weth       184        --        --          --

12   Willard Ellis      191       209       226         227

13   Joshua Honour      228       237       242          --

14   Michael Haselden   244        --        --          --

15

16               E X H I B I T   I N D E X

17   Exhibit                                          Page

18   40         View from Entrance Door Facing         22
                Break Room Entrance
19
     41         View of Doorway of Office Showing       26
20              Belisle's Legs

21   43         Beauford's Call to Ops Deck             31

22   44         Vehicles Parked in Front of            18
                Rigger Shop
23
     45         Blue Dodge Ram Parked in Front         18
24              of Rigger Shop

25

| 46 | Blue Ford F150 Parked in Front of Rigger Shop | 18 |
|----|-----------------------------------------------|----|
| 47 | Government Vehicle Parked in Front of Rigger Shop | 18 |
| 48 | Second Government Vehicle Parked in Front of Rigger Shop | 18 |
| 49 | Jeep Parked in Front of Rigger Shop | 18 |
| 52 | View of Belisle Showing where Smith Moved Chair | 181 |
| 53 | View of Belisle - where Smith Originally Saw Chair | 179 |
| 55 | T-1 Front Gate at 4/11/12 9:02:19-9:02:52 | 253 |
| 56 | T-1 Front Gate at 4/11/12 9:16:00-9:16:10 | 255 |
| 57 | Back Gate T-1 at 4/11/12 Screen Shot Only 9:16:00 | 256 |
| 59 | Back Gate at 4/11/12 Screen Shot Only 11:51:34 | 257 |
| 60 | Back Gate T-1 at 4/11/12 13:15:10-13:17:22 | 258 |
| 61 | T-1 Back at 4/11/12 13:19:00-13:20:00 | 261 |
| 62 | Back Gate T-1 at 4/12/12 6:59:00-7:38:28 | 264 |
| 73 | Back of Rigger Shop | 154 |
| 74 | Exterior Boiler Room Door | 155 |
| 87 | Front View of CR-V Located at the Airport | 204 |
| 88 | Overview Photo of CR-V Located at the Airport | 204 |

| | | |
|---|---|---|
| 89 | Side View of CR-V Located at the Airport | 204 |
| 91 | Aerial Photo of Kodiak Airport Showing Servant Air and Island Air | 199 |
| 93 | Detailed Vehicle Record - Blue SUV | 207 |
| 105 | List of Vehicles on the T-1 and T-2 Video | 74 |
| 118 | Break Room with Blouse with Rolled Sleeve | 137 |
| 126 | Door to Boiler Room from Interior | 6 |
| 127 | Boiler Room | 157 |
| 128 | Boiler Room Showing Exterior Door | 158 |
| 253 | Servant Air | 203 |
| DE-28 | Vehicle at Airport | 218 |
| DE-29 | Vehicle at Airport | 218 |
| DE-30 | Vehicle at Airport | 218 |
| DE-159 | CD T-2 Video 4/11/12 | 224 |
| DE-160 | CD T-2 Video 4/11/12 | 225 |
| DE-217 | Report Re W-11 | 240 |
| DE-247 | Photo of Outside of Building | 153 |
| DE-248 | Photo of Outside of Building | 152 |
| DE-249 | Photo of Outside of Building | 151 |
| DE-250 | Photo of Vehicles | 218 |

```
 1              (Call to Order of the Court at 8:47 a.m.)

 2              (Jury present)

 3              THE COURT:  Good morning, everyone.  Please be

 4    seated.

 5              And we're back on record and ready to proceed?

 6              MS. SHERMAN:  Yes, Your Honor.

 7              THE COURT:  All right.  Good morning.  I'll

 8    remind you you're still under oath from yesterday's

 9    proceeding.

10              THE WITNESS:  Okay.  Good morning.

11                       DIRECT EXAMINATION

12                   (of Cody Beauford continued)

13    BY MS. SHERMAN:

14       Q.  I neglected to ask you yesterday, you have a

15    beard, is that Coast Guard regulation?

16       A.  It is.

17       Q.  Why is that?

18       A.  So after I left COMMSTA, I got a little older and

19    also was on a cutter, so I had to shave every day for a

20    long period of time, and I started getting really bad

21    ingrown hairs, so medical gives waivers in cases like

22    that.

23       Q.  So you have a waiver?

24       A.  Yes.

25       Q.  I want to talk to you -- we were talking about
```

1    the boiler room door yesterday.  I would like to put up

2    for foundation Exhibit No. 126.  Do you recognize that?

3        A.  Yes.

4        Q.  What is that?

5        A.  That's the boiler door.

6        Q.  Okay.  Is that a fair and accurate depiction of

7    that door as it appeared in the time you worked in the

8    rigger shop up until the day of the murders?

9        A.  Yes.

10           MS. SHERMAN:  I move for the admission of 126.

11           MR. COLBATH:  No objection.

12           THE COURT:  126 admitted.

13           (Exhibit No. 126 admitted.)

14       Q.  Madam Clerk, if we could display that, and also

15   put up Exhibit No. 13.

16           Can you -- you have a laser pointer up there

17   still?

18       A.  I do.

19       Q.  If you could point to where 126 is located on the

20   diagram, No. 13.

21       A.  I can.  That door is this door right here.

22       Q.  Okay.  And Blair, can you blow up the door to the

23   boiler room?  I'm sorry, on 126.  My apologies.  I

24   should have circled it.  Just the door.

25           Okay.  Do you see how that door is secured?

1    A.  Yes, the dead bolt.

2    Q.  Can you point that out for us?

3    A.  I can.

4    Q.  So when you all would lock up for the day, would

5    someone throw that?

6    A.  Yes.

7    Q.  So if that dead bolt was locked and you were in

8    the boiler room, could you get back into the rigger

9    shop?

10   A.  No, you could not.

11   Q.  Thank you, Blair.  You can take all of those

12   down.

13        I want to talk -- we had talked about the

14   defendant was gone for a period of time.  Before he was

15   gone in 2011 and you had arrived working in the rigger

16   shop, did you have a chance to observe conversations

17   between the other rigger shop employees about how to do

18   things on the tower or how to tackle a project?

19   A.  Yes.

20   Q.  Can you describe how the defendant would respond

21   in those situations?

22   A.  He was very involved, and I mean I would say

23   invested in the discussions.

24   Q.  Did he ever disagree with how something should be

25   done?

1    A.   Yes, and he was -- I mean very knowledgeable and

2    insistent on the way it should be done.

3    Q.   And he was gone -- I believe you said yesterday

4    he was gone for a period of time?

5    A.   Yes.

6    Q.   When he was gone, who in the rigger shop did his

7    work?

8    A.   Rich Belisle really stepped up, but in that time

9    period a lot of us got a little more experience just

10   because you have a workplace with one less person, so

11   everybody kind of has to learn a little bit.

12   Q.   Did you learn a lot during that period of time?

13   A.   I would like to think so, yes.

14   Q.   When the defendant came back after being gone for

15   a period of time, did you have occasion to view

16   conversations about how something should be done in

17   terms of a project?

18   A.   Yes, I did.

19   Q.   How was his reaction after he had been gone for a

20   period of time?

21   A.   A lot less insistent and invested in discussions

22   I would say.

23   Q.   When there would be a discussion and he would

24   disagree, would he express that?

25   A.    I mean initially, and then just kind of let it

go.

Q.  How would you describe his role in the rigger
shop after he came back from that longer period of
leave?

A.  I would say lessened just because at that point
it had been long enough people had gotten used to him
being gone.

Q.  When he was gone, were you all able to cover the
work that he was supposed to be doing?

A.  Yes.

Q.  Did he ever talk to you about firearms or
ammunition?

A.  The only time I can remember is about reloading.

Q.  All right.  What's reloading?

A.  It's taking the normally already spent case and
putting in new primer and powder and a bullet and just
making it usable ammunition again.

Q.  Did you ever do that?

A.  I don't think I had done it when the conversation
happened, other than when I was younger back home.  I
hadn't done it in Kodiak.

Q.  Did he talk about if he had ever reloaded
ammunition?

A.  Yes.

Q.  Do you recall what caliber he would talk about?

A.   The only one I remember off the top of my head was 45 ACP.

Q.   And how long before the murders was that conversation?

A.   Not real long.  Maybe a week or two.

Q.   Do you remember the exact date of that conversation?

A.   I don't, no.

Q.   And did you initiate that conversation?

A.   I think I was talking to somebody else in the room about it.

Q.   Did you notice the defendant doing anything at work to pass the time?

A.   A lot of times after people left he would -- he would always have a book.

Q.   Was there an occasion that you ran into him in the boiler room?

A.   Yes.

Q.   Can you describe that to the jury?

A.   So I think that was the same day as doing an alignment on Nate Pacheco's Jeep.  And I hadn't changed out when we did it, so it was a while after we would normally leave work.

     And I went back in the boiler room because that's a lot of times where I changed in and out of uniform to

change out, and Jim Wells was in the boiler room in a
chair kind of towards the back.

Q. What did he do when he saw you?

A. Just kind of jumped up and left.

Q. Did he say anything?

A. No, not that I remember.

Q. Let's talk about the warehouse project. What
sort of things were in the warehouse?

A. Mostly just old stuff. It's hard to remember
anything specific, but it wasn't -- I think there was
some parts from transmitters from up the hill, just kind
of random stuff.

Q. So how was that project -- what was your
understanding of what you all were going to be doing in
the warehouse?

A. Getting rid of a lot of stuff and then trying to
organize what we didn't get rid of.

Q. Madam Clerk -- I'm sorry. Blair, could you bring
up Exhibit No. 4.

Can you point out for us on Exhibit No. 4 where
the warehouse is located?

A. Yes. I believe it's this right here.

Q. Okay. We can take that down. Who ran -- from
your understanding, who was running the project of
cleaning out the warehouse?

1    A.   ET1 Hopkins.

2    Q.   Who did a lot of the actual work?

3    A.   Rich Belisle, along with us, me and the

4    non-rates.

5    Q.   Who would you take your direction from?

6    A.   ET1 Hopkins.

7    Q.   Was ET1 Hopkins down there every day?

8    A.   Not every day, no, but especially like in the

9    beginning to give us an idea of kind of what the vision

10   was, I guess.

11   Q.   Was Rich Belisle down there every day when you

12   were working on it?

13   A.   For the most part, yes.

14   Q.   Did anyone who worked in the rigger shop not

15   participate?

16   A.   I don't think anybody didn't participate at all,

17   but Jim Wells I think was down there only a couple times

18   for the most part.

19   Q.   Let's talk about April 11th, 2012, the day before

20   the murders.  Do you recall seeing Mr. Wells around very

21   much that day?

22   A.   Not a lot, no.

23   Q.   Do you recall being asked to go find him?

24   A.   I don't recall that, no.

25   Q.   I want to talk about -- do you remember what you

1   all were doing that afternoon?

2       A.   I remember we were on the roof of T-1.

3       Q.   What were you doing up there?

4       A.   Looking to where we were going to mount a -- it

5   was kind of -- it was like a temporary install to test

6   out like a sat comm antenna system for, I think it was

7   like video chat kind of thing.

8       Q.   What's sat comm?

9       A.   Satellite communications.

10      Q.   And what was the crux of the conversation?

11      A.   Where and how to mount -- it was a big aluminum

12  kind of cage.  Where to mount it and how it would go on

13  the roof.

14      Q.   Were there different opinions on how it should be

15  mounted or how wires should be run?

16      A.   Yes.

17      Q.   Can you tell us who had what idea?

18      A.   Jim Wells wanted to mount it and run the cable

19  along the roof.  And Rich Belisle wanted to run the

20  cable up through the attic and then make an opening onto

21  the roof.

22      Q.   Do you recall issuing -- giving your opinion on

23  how it should be done?

24      A.   Not exactly, no.

25      Q.   Would that be something that you as the ET3 would

1   jump in on those conversations?

2       A.   Yeah.

3       Q.   Who made the final decision on how it would be

4   done?

5       A.   Chief Reckner.

6       Q.   Do you recall what he decided?

7       A.   He decided to run it up through the attic.

8       Q.   And whose idea was that?

9       A.   Rich Belisle's.

10      Q.   How was the defendant's reaction to his idea not

11  being taken?

12      A.   He just kind of left.

13      Q.   Do you recall if the next day, April 12th, was

14  supposed to be a climbing day?

15      A.   Yes, it was.

16      Q.   When there is going to be a climb, what sort of

17  conversations do you all have?

18      A.   General safety stuff, the scope of work, weather,

19  who's going to participate and kind of just assigning

20  jobs.

21      Q.   Was the -- did those conversations occur on

22  April 11th?

23      A.   I don't specifically remember them, but if it was

24  planned, then we talked about those kind of things.

25      Q.   Do you recall if the defendant -- is your memory

1   clear enough to talk about whether the defendant
2   participated in that?
3       A.   No.
4       Q.   Okay.  Let's move forward to April 12th.  I'm
5   going to start with where were you living at that time?
6       A.   1515 Larch Street in the City of Kodiak.
7       Q.   Same place you had described yesterday?
8       A.   Yes.
9       Q.   Describe for us what you did that morning.  What
10  time did you wake up?
11      A.   Honestly, I don't remember what time I woke up.
12  I generally would shower the night before, so probably
13  not super early.
14      Q.   What time did you plan to be at work that day?
15      A.   About 7:30.
16      Q.   Is that the normal time you try and get to work?
17      A.   Yes.
18      Q.   Even if you didn't have to work until 8:00?
19      A.   Yes.
20      Q.   So if you showered the night before, you wake up,
21  what do you do then?
22      A.   Just get clothes on, make sure I have all the
23  stuff I'm going to need for the day, and then at that
24  point, because I was getting a ride, just get with my
25  roommate, Acosta, and make sure everything was still

 1    good and get ready to head out.

 2        Q.   Why were you getting a ride?

 3        A.   My truck was in the shop.

 4        Q.   Had it been in the shop for a while?

 5        A.   I don't remember what it was in the shop for at

 6    the time.

 7        Q.   What was your truck again?

 8        A.   It was an '85 Chevy K10.

 9        Q.   So you said you put on clothes.  Did you get

10    dressed in your uniform?

11        A.   No.

12        Q.   So you said you spoke with Acosta about getting a

13    ride.  Was he going to give you a ride?

14        A.   Yes.

15        Q.   Describe what happened next for the jury.

16        A.   We head in to work.  We decided to stop for

17    coffee on the way.  Stopped at the one down on, I think

18    it's Shelikof Street.  I believe it's called Harbor

19    Side, just a small coffee shop in town.

20            And then we headed the normal way we go to work,

21    down Rezanof and took a right on to Anton Larsen and

22    headed up to COMMSTA.  I think he forgot to drop me off

23    at first and then backed up and pulled in.

24        Q.   Did you notice anything when you were driving in

25    to the COMMSTA?

```
 1    A.   I remember seeing a jogger on the road.

 2    Q.   About where did you see him?

 3    A.   I think it was farther up the road by the

 4  warehouse kind of.

 5    Q.   Do you recall what time you arrived at work?

 6    A.   It would have been just probably a little after

 7  7:30.

 8    Q.   So you said Acosta had to back up.  Where was he

 9  heading?

10    A.   He was heading up to T-1 because that's where he

11  works, and he just forgot.

12    Q.   Does his workday start the same time as yours?

13    A.   Yes.

14    Q.   When you pulled up to T-2, what did you see?

15  When you got out of Acosta's car, what did you see?

16    A.   I saw Coggins heading up towards T-1 walking, and

17  I saw ET1 Hopkins' truck, Rich Belisle's truck and

18  Coggins' Jeep, and then the two GVs that were part of

19  the rigger shop equipment really.

20    Q.   What a GV?

21    A.   Sorry.  It's a government vehicle.

22    Q.   Go back for a second.  What direction was the

23  jogger that you saw heading?

24    A.   He was heading towards Rezanof.

25    Q.   So he was walking towards you?
```

1    A.   Yes.

2    Q.   As you were driving toward COMMSTA?

3    A.   I believe so, yes.

4    Q.   I want to have you look through some exhibits.  I

5    think you've looked through them before.  If we could

6    show him -- we'll start with 44 through 50.  We'll have

7    you look at those and then see if you recognize all of

8    those.   Actually, we'll stop at 49.

9         Do you recognize all of those?

10   A.   Yes.

11   Q.   And are they -- what are they?

12   A.   They are the people I just described.  So you

13   have ET1 Hopkins' truck, you have Rich Belisle's truck,

14   the two government vehicles and Coggins' Jeep.

15   Q.   Fair and accurate depiction of what you saw on

16   the morning of April 12, 2012 when you arrived at work?

17   A.   Yes.

18        MS. SHERMAN:  I move for the admission of 44

19   through 49.

20        MR. CAMIEL:  No objection.

21        THE COURT:  Was it 49 or 50?

22        MS. SHERMAN:  49.

23        THE COURT:  44 through 49 are all admitted.

24        (Exhibit Nos. 44 - 49 admitted.)

25   BY MS. SHERMAN:

1    Q.  We can display 44.

2        We see an additional vehicle here on the end from

3    what you had described.  Do you know whose vehicle that

4    is on the end?

5    A.  Yes, that's Leah Killingsworth or Henry.  Like I

6    say, I can't remember if she was married yet at the

7    time.

8    Q.  Can you just point out which vehicle was hers?

9    A.  Yes, the silver Xterra.

10   Q.  Did you see -- when you were dropped off, did you

11   see -- that vehicle was not there when you got there?

12   A.  No.

13   Q.  Did you see any other vehicles there when you

14   arrived?

15   A.  No.

16   Q.  Let's go to 45.

17       And whose vehicle is this?

18   A.  That's ET1 Hopkins' truck.

19   Q.  And would that be his normal parking spot?

20   A.  Not normally, no.

21   Q.  Who would normally park there?

22   A.  Normally, Jim Wells.

23   Q.  When would Mr. Hopkins park there?

24   A.  If that spot wasn't taken when he got to work.

25   Q.  Let's go to 46.

1        Whose vehicle is that?

2     A.   That's Rich Belisle's truck.

3     Q.   And 47.

4        What's this?

5     A.   That's a government vehicle.

6     Q.   Did someone drive those vehicles to work, the

7  government vehicles?

8     A.   No.

9     Q.   So would they be there all the time?

10    A.   Yes.

11    Q.   48.

12       What are we seeing here?

13    A.   That is the other government vehicle.

14    Q.   We see some wood off to the left of the photo.

15  What is that?

16    A.   That's just like a fence around a dumpster.

17    Q.   And if we could go to 49.

18       Whose vehicle is that?

19    A.   That is Coggins' Jeep.

20    Q.   And you said you saw his Jeep there, but you saw

21  him walking up the hill.  Do you know where he was

22  going?

23    A.   He was going to get the flags for colors.

24    Q.   When you showed up at work, were there any

25  vehicles that you thought should have been there but

1  weren't?

2      A.  I thought that Jim Wells was back, but he had

3  been gone in and out some, so I wasn't like overly

4  confused.

5      Q.  So you thought you might -- you thought you

6  probably should have seen his vehicle, but maybe not?

7      A.  Yeah.

8      Q.  Based on the vehicles you saw that morning, who

9  did you think was in the building?

10     A.  ET1 Hopkins and Rich Belisle.  And then I knew

11 Coggins was headed up the hill, so I knew he wasn't

12 there.

13     Q.  Let's go to Exhibit No. 13 if we could.

14         So you saw the vehicles.  And if you could just

15 on 13 show us where that row of vehicles was.

16     A.  It would have been right along here.

17     Q.  So you saw all those vehicles, and where did you

18 go?

19     A.  I went into the building through this door here.

20     Q.  Was that normal for you?

21     A.  Yes.  If people are already there, then whoever

22 got there first would have unlocked that door.

23     Q.  How often would you be the first one at work?

24     A.  Almost never.

25     Q.  So you walked in that door.  And how were you

1  feeling at that point when you -- it's a little after

2  7:30 in the morning.  How are you feeling that morning?

3      A.  I'm just a little tired, you know.  It's early.

4  I'm not a huge morning person, so --

5      Q.  So you walk in and tell us what you see?

6      A.  I saw -- first, I saw blood over here.

7      Q.  And at the point you saw blood, did you realize

8  it was blood?

9      A.  No, I mean not really right at first.  That

10  wasn't my first thought.  I kind of just saw a mess, I

11  guess.

12     Q.  Why don't we take that down.  And for foundation,

13  why don't we show Mr. Beauford Exhibit 40.

14         Can you tell us if this is what you saw that

15  morning?

16     A.  Yes.

17     Q.  Fair and accurate depiction of what you saw on

18  the morning of April 12th?

19     A.  Yes.

20         MS. SHERMAN:  I'm going to move the admission

21  of Exhibit 40.

22         MR. CAMIEL:  No objection.

23         THE COURT:  40 is admitted.

24         (Exhibit No. 40 admitted.)

25     Q.  So this is what you saw right when you walked in

1    the door.

2            Can we put up 13 as well, please.

3            Where were you standing when you saw the blood,

4    first saw the blood?  If you could show us on 13.

5        A.  So I walked in and just started heading this way,

6    like I always do, so I mean it probably wouldn't have

7    been like right in the doorway, but right after, just

8    because --

9        Q.  Okay.  We can take 40 down, but leave 13 up, if

10   possible.

11           When you saw the blood, what did you do?

12       A.  I went over and tried talking to him to try to

13   get a response from him.

14       Q.  Where was the blood coming from?

15       A.  It was coming from ET1 Hopkins.

16       Q.  Can you show us on 13 where he was?

17       A.  Yes, right in here.

18       Q.  What was the first thing you noticed when you

19   walked in that morning, other than the blood?

20       A.  I noticed it smelled like gunpowder.

21       Q.  Are you familiar with the gunpowder smell?

22       A.  Yes.

23       Q.  You said you didn't really know what was going

24   on, you tried to talk to him.  What was going through

25   your head at that point?

1    A.  My first thought was it had to be they were

2  messing with me or something.  It just seemed like -- it

3  didn't seem like that could have happened.

4    Q.  Did you think it was a prank?

5    A.  At first, yeah.

6    Q.  Why would it be a prank?

7    A.  I was getting ready to transfer back up to T-1

8  and rotate out of the rigger shop, so I thought maybe

9  before I left they were going to do a prank or

10  something.

11    Q.  Would that have been out of the norm in the

12  rigger shop to pull little pranks on each other?

13    A.  No.

14    Q.  Which way did you go when you tried to make

15  contact and speak to Mr. Hopkins?

16    A.  I went -- so coming into the locker room door

17  through the left.

18    Q.  Why don't you use the laser pointer.

19    A.  First, I was right over here when I tried to talk

20  to him.

21    Q.  Near the doorway?

22    A.  Yeah.

23    Q.  And then where did you go?

24    A.  And then I went towards the office.

25    Q.  Okay.  Why did you go towards the office?

1    A.   To try to ask Rich what was going on.

2    Q.   Was Rich normally in the office in the morning?

3    A.   Yes.

4    Q.   When you got to the office, what did you see?

5    A.   Rich laying on the floor.

6    Q.   Can you show us where on here he was laying on

7    the floor?

8    A.   Yes.  Right here.

9    Q.   Whose desk is that?

10   A.   Jim Wells.

11   Q.   I'm going to have you look at Exhibit 41 for

12   foundation.

13        Can you tell us if this is what you saw as you

14   were near the office door that morning?

15   A.   Not exactly.  I think he had been moved before

16   that picture was taken.

17   Q.   Could you see his legs though?

18   A.   Yeah.

19   Q.   But you say that before this photo was taken, his

20   legs are facing a different direction?

21   A.   Yes.

22   Q.   Everything else in the photo the same as what you

23   saw that morning?

24   A.   Yes, just about.  I mean, I don't see anything

25   else.

1    Q.   You don't see anything else that's different,
2  just the direction of his legs?
3    A.   Yeah.
4         MS. SHERMAN:  I'm going to move for the
5  admission of 41.
6         MR. CAMIEL:  I don't object.
7         THE COURT:  41 is admitted.
8         (Exhibit No. 41 admitted.)
9    Q.   Can you point out for us what you saw that
10 morning?
11   A.   When I saw Rich, he was approximately there, but
12 oriented a little bit different.
13   Q.   We can go ahead and put that down.
14        Can we put up Exhibit No. 13 again.
15        What did you notice about the way Mr. Belisle was
16 laying?
17   A.   He was kind of on his side and his -- like his
18 head was more towards the door like he had fallen that
19 way.
20   Q.   Are you talking about Mr. Belisle or Mr. Hopkins?
21   A.   Mr. Belisle.
22   Q.   Okay.  After you saw Rich Belisle, what did you
23 do?
24   A.   I think after that I went back around the long
25 way to the break room to see if there was just something

1  that I had missed from --

2     Q.  Show us your path for us.

3     A.  It would have been back around the long way.

4     Q.  Why did you go the long way?

5     A.  Because there was blood in the way of the

6  doorway.

7     Q.  So you go around that way and what do you do?

8     A.  Just try to see what had happened.  I still

9  wasn't sure.

10    Q.  Did you notice anything about Mr. Hopkins'

11 uniform?

12    A.  He didn't have his blouse on, or shirt.

13    Q.  Did you notice his blouse?  Did you see it there?

14    A.  Yeah.  I believe it was on the back of one of the

15 chairs.

16    Q.  Okay.  So you saw a blouse on the back of one of

17 the chairs?

18    A.  Yes.

19    Q.  That's your recollection?

20    A.  Yes.

21    Q.  So when you were with Mr. Belisle, did you say

22 anything to him?

23    A.  I just -- I did the same thing I did with ET1,

24 tried to talk to him and tried to get a response.

25    Q.  Did you shake him at all?

```
 1      A.   No.

 2      Q.   You go back to Mr. Hopkins and what do you do at

 3   that point?

 4      A.   Just at that point just try to keep trying and

 5   see if I can see anything that happened.

 6      Q.   Were either of them moving?

 7      A.   No.

 8      Q.   What's going through your head at this point?

 9      A.   I'm just trying to figure out what exactly

10   happened.  I still hadn't really realized it yet,

11   because it definitely isn't your first thought.  I was

12   kind of just trying to figure out what just happened.

13      Q.   Do you think you were in shock?

14      A.   I was definitely, you know, really, really upset,

15   but probably, yeah.

16      Q.   Did you notice anything out of place in the

17   rigger shop or missing?

18      A.   No.

19      Q.   What did you do next?

20      A.   I went --

21      Q.   Sure.  If you can show us.

22      A.   At that point, I went back out around this way,

23   and I was still just trying to think of what was really

24   going on.

25      Q.   Okay.  Did someone else come in?
```

1    A.   Yes.

2    Q.   Where was -- where did that person enter?

3    A.   Through the same door I did, right here.

4    Q.   Who was that?

5    A.   That was Aaron Coggins.

6    Q.   Did you say anything to him?

7    A.   I asked him if he knew anything about what was

8    going on, what is this basically, you know.

9    Q.   Do you recall asking him if they were playing a

10   prank on you?

11   A.   I think I did, yeah.

12   Q.   Did he seem to have any idea what you were

13   talking about?

14   A.   No.

15   Q.   So what did you do at that point?

16   A.   I showed him what I was talking about.

17   Q.   And then what did you decide to do?

18   A.   Decided to call up the hill to the command center

19   and then have them call emergency services.

20   Q.   Did you -- when you saw Mr. Hopkins and

21   Mr. Belisle, did it appear to you that they were alive?

22   A.   No.

23   Q.   Did it appear that a quick call to 911 was going

24   to help them?

25   A.   No.

1    Q.  So you said you called the ops deck.  Why did you

2  call the ops deck?

3    A.  Just because that seemed the proper way to do

4  things, because that way the COMMSTA was aware of what

5  was happening, because I mean it's one of those things

6  where the command and the other people in the unit need

7  to know.

8    Q.  Where did you make that call from?

9    A.  My desk.  Do you want me to point to it?

10    Q.  Where is your desk again for us?

11    A.  Right here.

12    Q.  How far away from Mr. Hopkins were you when you

13  were making that phone call?

14    A.  Probably a couple feet.

15    Q.  Have you reviewed that call you made to the ops

16  deck?

17    A.  Yes, I have heard it replayed.

18    Q.  And that's Exhibit 43.  When you listened to

19  that, was that -- you heard your voice?

20    A.  Yes.

21    Q.  And was that a fair and accurate recording of the

22  conversation you had with the ops deck?

23    A.  Yes.

24        MS. SHERMAN:  I move for the admission of 43.

25        THE COURT:  Any objection?

1          MR. CAMIEL:  No.

2          THE COURT:  Government 43 is admitted.

3          (Exhibit No. 43 admitted.)

4     Q.  We're going to go ahead and play this and then

5   I'll ask you some questions.

6          (Exhibit 43 playing in open court.)

7   BY MS. SHERMAN:

8     Q.  Mr. Beauford, you sound incredibly calm on that

9   call.  Do you recall being calm?

10    A.  I don't recall being that calm, but I know that I

11  wasn't like hysterical.

12    Q.  Are you an emotional person?

13    A.  Not overly.

14    Q.  Do you think at that point it was sinking in what

15  was going on at that point?

16    A.  Yeah.

17    Q.  Did you notice at any point while you were in

18  there going back and forth and making this call anything

19  that perhaps gave you an indication of what had

20  happened?

21         MR. CAMIEL:  Your Honor, we're going to object

22  as speculation at this point, no foundation.

23         THE COURT:  I'll allow that question.  Did you

24  notice anything, any observations.

25    A.  One thing I do remember noticing was a hole in

1    the trash can that combined with the gunpowder smell

2    started to kind of make me think that it had been

3    something like that.

4         Q.  After your call to the ops deck, what did you do?

5         A.  I went back around to the door, both me and

6    Coggins came in and waited.

7         Q.  By the door, that you had entered that morning?

8         A.  Yeah.

9         Q.  Did you talk to anyone that day?  I guess what

10   happened after you go back to the door?

11        A.  I don't recall the order.  I know that Haselden

12   came in, and also Para and Leah did.  I don't remember

13   the order that they came in right now.

14        Q.  Did you show them the bodies?

15        A.  I did Haselden, and then Para and Leah I turned

16   away and told to go up the hill.

17        Q.  Why would you show Haselden?

18        A.  Because in the phone call they said that they

19   were going to send him down, so --

20        Q.  Was he a higher rank than you?

21        A.  He was.

22        Q.  Did anyone else show up that morning?

23        A.  You mean after?

24        Q.  Yes, after you showed Haselden Mr. Hopkins and

25   Mr. Belisle.

1    A.   Mil pol did.

2    Q.   What's Mil pol?

3    A.   Military police.

4    Q.   And did the troopers show up at some point?

5    A.   Yes, I think after the military police showed up,

6    but yes.

7    Q.   What did the trooper have you do?

8    A.   I remember him asking me questions.  I don't

9    remember exactly.

10    Q.   Where was he asking you those questions?

11    A.   I think it was in the parking lot.

12    Q.   Were you talking to a lot of people when you were

13    standing out in that parking lot, if you recall?

14    A.   I don't recall talking to a lot of people, no.

15    Q.   Did you think you were a suspect?

16    A.   At first I was a little worried, just because I

17    was the first one and the only one there at first.  So I

18    mean I was a little worried that maybe, you know, they

19    would think about me since I was the one who was there,

20    you know.

21    Q.   Did you -- we have heard testimony people went up

22    the hill and stayed up in T-1 most of the day.  Were you

23    up there?

24    A.   I was not.

25    Q.   Where did you go?

```
1      A.   To the military police building on Base Kodiak.

2      Q.   So the main base?

3      A.   Yes.

4      Q.   Were you the only one that went there?

5      A.   No, me and Coggins.

6      Q.   Where did you go in there?

7      A.   It was just like a conference room.

8      Q.   How long were you in that conference room?

9      A.   Most of the day.

10     Q.   Were you in handcuffs?

11     A.   I was not.

12     Q.   Were you asked to write a statement?

13     A.   I was.

14     Q.   At one point, did you ask if you could call

15 anybody?

16     A.   I don't remember what time it was.  I had been

17 there I think a little bit at that point, long enough to

18 like have the thought that, you know, that I'm sure it

19 might have hit the news by now.

20     Q.   And what did you do then?

21     A.   I called -- I think I called my mom.

22     Q.   Why did you call your mom?

23     A.   I wanted to let her know that I was okay.

24          MS. SHERMAN:  Those are all the questions I

25 have for you, Mr. Beauford.
```

1          THE COURT:  Mr. Camiel?

2          MR. CAMIEL:  Thank you, Your Honor.  Your

3    Honor, I don't know if we're going to need these, but I

4    thought I would pass them out now just in case.

5          THE COURT:  If you'd like, that's fine.

6          (Pause)

7                    CROSS EXAMINATION

8    BY MR. CAMIEL:

9    Q.  Good morning, Mr. Beauford.

10   A.  Good morning.

11   Q.  So you said you joined -- you were 17 when you

12   joined the Coast Guard?

13   A.  I was.

14   Q.  And during the time period that we have been

15   talking about in your testimony when you were at

16   COMMSTA, you were about 19 years old?

17   A.  Yes.

18   Q.  And so you're 19 and you start working with the

19   people in T-2, including Jim Wells, who's in his

20   sixties, right?

21   A.  Yes.

22   Q.  And so he's, as you understood it, he's been in

23   the service, either the Navy or the Coast Guard, in one

24   way or another probably twice as long as you have been

25   alive?

1   A.  Yes.

2   Q.  In fact, you would joke, maybe not to his face,

3   but when you would talk about him, you would describe

4   him as being 120, right?

5   A.  I don't specifically remember saying that, but I

6   knew he was old.

7   Q.  So I wanted to ask you, you mentioned a couple

8   things in terms of the duties when you were working at

9   COMMSTA.  One of the things you talked about was

10  checking pressure gauges.  Can you tell us about that?

11  A.  The transmission lines for most of the antennas

12  were aired by electric, which means they had air

13  pressure in them to keep out water intrusion.

14  Q.  And so to check those, where would you go?

15  A.  T-1.

16  Q.  Would you go down to the basement at T-1?

17  A.  Yes.

18  Q.  And that's where the gauges were?

19  A.  Yes.

20  Q.  And how often did they need to be checked?

21  A.  I'm pretty sure it was daily.

22  Q.  And so somebody from T-2 would have to come up to

23  T-1 to do that?

24  A.  Yes.

25  Q.  You were asked some questions about April 11th,

which was the day before the murders.  I wanted to ask
you a couple questions about that as well.

        You didn't recall getting a call that morning
from Chief Reckner to go look for Mr. Wells?

    A.  I don't specifically remember it, no.

    Q.  Sometimes when Mr. Wells couldn't be found, Jim
Wells couldn't be found, he could be found in the
bathroom; is that right?

    A.  I mean, yeah.

    Q.  You knew that he was often in the bathroom,
right?

    A.  Yes.

    Q.  And for long periods of time?

    A.  Yes.

    Q.  And that was pretty commonly known throughout
T-2?

    A.  Yes.

    Q.  Because there is only one bathroom in T-2 off the
break room, right?

    A.  That's correct.

    Q.  And it's a one-person bathroom?

    A.  It is.

    Q.  And there were eight of you that had to share
that bathroom?

    A.  That's correct.

1   Q.   Including two women?

2   A.   Yes.

3   Q.   And sometimes the bathroom was tied up because

4   Mr. Wells was in there?

5   A.   Yes.

6   Q.   And sometimes, if somebody else was using the

7   bathroom, Mr. Wells would go up to T-1 to use the

8   bathroom, and you knew about that as well?

9   A.   I don't specifically remember that.

10  Q.   You kind of talked about the routine in the

11  morning at T-2 when you arrived for work.  And you

12  indicated you were almost never the first one to arrive.

13  A.   That's correct.

14  Q.   So when you would arrive, it was almost always

15  either the civilians, Rich Belisle and Jim Wells, along

16  with ET1 Hopkins who would be there before you?

17  A.   Yes.

18  Q.   And the first one who arrived would unlock the

19  card swipe door, right, or they would go in the card

20  swipe door and unlock the other door; is that right?

21  A.   Yes.

22  Q.   When they unlocked that door, that meant when you

23  showed up, you could just walk in?

24  A.   Yes.

25  Q.   You didn't have to use a key?

```
1      A.   Nope.

2      Q.   Didn't have to use a card?

3      A.   No.

4      Q.   Just pull the door open?

5      A.   Yes.

6      Q.   Didn't have to knock and have anybody let you in?

7      A.   No.

8      Q.   And there wasn't any kind of a camera system

9   inside T-2 to see who was at the door?

10     A.   Not inside.

11     Q.   So once that door was unlocked, anybody could

12  come and pull that door open and walk into the building?

13     A.   Yes.

14     Q.   It was different up at T-1; isn't that right?  To

15  get in that building, you couldn't just pull the door

16  open, could you?

17     A.   You could not.

18     Q.   What did you have to do there?

19     A.   Swipe a card.

20     Q.   All right.  And that's because the door was

21  locked?

22     A.   Yes.

23     Q.   And even before you got up to the door of T-1 --

24  T-1, that building is fenced in, right?

25     A.   It is.
```

1    Q.   And there is a gate?

2    A.   There is.

3    Q.   And there is a man door to go through?

4    A.   Yes.

5    Q.   And that's locked, right?

6    A.   I think a lot of times during the workday the

7  gate was open.

8    Q.   If it wasn't, what would you have to do?

9    A.   Swipe a card.

10    Q.   And that gate was a sliding gate?

11    A.   It was sliding.

12    Q.   But there was nothing like that around the T-2

13  building, right?

14    A.   There was not.

15    Q.   No fence?

16    A.   No.

17    Q.   No sliding gate?

18    A.   No.

19    Q.   No man door through a fence to get to the

20  building?

21    A.   No.

22    Q.   In 2011, you and members of the crew spent a lot

23  of time over at Shemya; is that right?

24    A.   That's correct.

25    Q.   And where is that?  Can you tell us where that

1  is?

2    A.  Shemya is in the Aleutian Chain.  It's near Attu,

3  kind of out towards the end basically.

4    Q.  Toward the end of the Aleutian Chain?

5    A.  That's correct.

6    Q.  And so is it a quick trip out there?

7    A.  It is not.

8    Q.  How long does it take?

9    A.  It depended, because a lot of times we would take

10  a C-130 so it depended if they were doing anything else,

11  but if my memory is correct, it was at least six to

12  eight hours.

13    Q.  Am I right that this is in the spring and summer

14  of 2011 that you started working out there?

15    A.  I'm not 100 percent on the dates just because it

16  was long ago.

17    Q.  When you did go out there, was it just one time

18  or was there several times?

19    A.  I remember going out twice.

20    Q.  When you went out, how long did you stay?

21    A.  The second time I think was five weeks.  And the

22  first time was shorter, but I don't remember an exact

23  time period.

24    Q.  And Jim Wells was out there?

25    A.  Yes.

1    Q.   And he was involved in the work you were doing

2   out there?

3    A.   Yes.

4    Q.   Turning back to April 11th, you talked about --

5   you were asked some questions about some work that the

6   T-2 crew was doing up on the roof of T-1 regarding

7   planning for the installation of this satellite or

8   antenna; is that right?

9    A.   Yes.

10   Q.   And so this -- your understanding was that what

11  was being put up on the roof there was going to be some

12  kind of a temporary installation; is that right?

13   A.   That was my understanding, yes.  I think it was

14  going to be not like -- I mean it was not going to be up

15  there like a day.  It was going to be kind of a test for

16  it I think.

17   Q.   Not some kind of a permanent fixture to the

18  building?

19   A.   Most likely it wouldn't be, no.

20   Q.   And who all was up there?

21   A.   It was myself, ET1 Hopkins, Jim Wells, Rich

22  Belisle and Chief Reckner.

23   Q.   And how did you get up there?

24   A.   I think -- I don't remember exactly how we got up

25  there.

Q.  Did you have to -- do you recall having to put a
ladder against a building to get up there?

A.  Not specifically, no.

Q.  And you said part of the discussion involved
which way to run the wire or the cable that was going to
connect to whatever it was you were going to temporarily
mount on the roof?

A.  That's correct.

Q.  And so there were a couple different ideas that
were floated.  Rich Belisle had the idea of punching a
hole in the roof and running the wire up through the
attic?

A.  If I remember correctly, there was like a
ventilation structure up there that it was planned to go
through, not just like straight up through.

Q.  But up through the roof as opposed to around the
building and up?

A.  I mean basically, yes.

Q.  And Jim Wells, isn't it true, he thought it
wasn't a good idea to be putting another hole in a
perfectly good roof in Kodiak for a temporary
installation?

A.  I don't know exactly why he didn't want to do it
that way.

Q.  In any event, after Chief Reckner decided to do

1  it by running it up through the roof, in fact, Mr. Wells

2  had no reaction, right?

3      A.  I remember him leaving.

4      Q.  But did he argue?

5      A.  No.

6      Q.  Raise his voice?

7      A.  Not that I remember.

8      Q.  Any hand gestures?

9      A.  I don't remember.

10     Q.  Any cussing?

11     A.  I don't remember that.

12     Q.  Okay.  You knew that Jim Wells had been sick for

13  quite a while in the fall and winter of 2011, right?

14     A.  I knew he had been gone and it was medical stuff.

15     Q.  You didn't know exactly what it was?

16     A.  Not that I remember, no.

17     Q.  But he had been gone quite a lot?

18     A.  Yes.

19     Q.  There were weeks and week where he wasn't there?

20     A.  Yes.

21     Q.  And even before he left, he looked ill, didn't

22  he?

23     A.  I don't remember.

24     Q.  Do you recall that he didn't get back to work

25  until about February 24th?

1     A.   I don't remember the date or anything.

2     Q.   All right.  You recall -- you do recall he was

3  gone in the winter, right?

4     A.   Yeah, he had been gone for a while before that

5  spring, so yeah.

6     Q.   And during the winter, that's when you talked

7  about the crew having to figure out how to get along

8  without him?

9     A.   Yeah.

10    Q.   Isn't it true that you don't do any climbing in

11  the winter, right, tower climbing?

12    A.   No.

13    Q.   You don't climb in the winter, right?

14    A.   No.

15    Q.   Okay.  So there were no climbs planned while

16  Mr. Wells was gone?

17    A.   Not that I remember.

18    Q.   And the people who would climb when you did have

19  climbs, were you one of the people qualified to climb?

20    A.   I was.

21    Q.   Okay.  And Mr. Belisle?

22    A.   Yes.

23    Q.   Okay.  How about ET1 Hopkins?

24    A.   He was not qualified to climb at the time.

25    Q.   All right.  And so the first climb was going to

1  be on April 12th, right, the first climb of the year?

2      A.  Yes.

3      Q.  Hadn't climbed since the previous year?

4      A.  I think we may have done training, but I don't

5  remember specifically.

6      Q.  One of the things that you were asked some

7  questions about was this warehouse, and you pointed to

8  us -- you showed us where it was, and this cleaning out

9  of the warehouse, right?

10     A.  Yes.

11     Q.  And in addition to old, used or extra Coast Guard

12 property that was in there, people stored personal stuff

13 in there too as well, right?

14     A.  Not everybody, no.

15     Q.  But some people stored their own personal

16 property in there?

17     A.  Yes.

18     Q.  You were aware, for example, that Mr. Belisle

19 stored a boat in there?

20     A.  For a little bit, yes.

21     Q.  And even up at T-2, people stored personal

22 property there?

23     A.  I mean, yeah.  It's a workplace, so there is

24 going to be personal stuff there.

25     Q.  Well, in addition to maybe their work gear, their

```
 1   personal work gear, people stored things like their
 2   personal snowmachines?
 3       A.   Yes.
 4       Q.   Or their ATVs?
 5       A.   Yes.
 6       Q.   Tires?
 7       A.   I don't particularly remember tires.
 8       Q.   Car parts?
 9       A.   I don't remember specifically car parts.
10       Q.   When Jim Wells got back after being sick for a
11   long time, you talked about how he was quieter.
12       A.   Yes.
13       Q.   Were you aware of the fact that he had had
14   surgery?
15       A.   No.
16       Q.   Did you know anything about the nature of the
17   illness that he had that kept him out of work for
18   months?
19       A.   No.
20       Q.   Did you know that when he returned to work he was
21   on light duty?
22       A.   No.
23       Q.   All you knew was he had a lot of medical
24   appointments and then he was gone for a long period of
25   time?
```

1    A.   Yes.

2    Q.   You also knew that the climb that was going to

3 happen on April 12th, he was going to participate in

4 that climb, right?

5    A.   I think so.  I don't remember like a list of

6 people, but I believe he was going to.

7    Q.   Because if there was going to be a climb, he

8 would be one of the people climbing?

9    A.   Normally.

10   Q.   He was the most experienced climber in T-2?

11   A.   I mean I don't know how long exactly everybody

12 had been doing it.

13   Q.   How long had you been doing it?

14   A.   Just like a year.

15   Q.   And ET1 didn't climb?

16   A.   Not at COMMSTA.  I don't know if he had before.

17   Q.   One of the things you talked about was a

18 conversation you had with Mr. Wells and sounds like with

19 some other people at the shop about reloading

20 ammunition?

21   A.   Yes.

22   Q.   And sounds like the conversation you had with

23 Mr. Wells was about reloading .45-caliber ammunition?

24   A.   Yes.

25   Q.   Let me just go back to the warehouse for a

1    minute.  That project, the cleaning out of the

2    warehouse, started in the winter when Mr. Wells was

3    gone?

4        A.  Yeah, it would have been in the winter.  I don't

5    remember if he was there or not when it started.

6        Q.  Well, you know he was gone in the winter, right?

7        A.  Right.

8        Q.  So if it started in the winter, he wouldn't have

9    been there, right?

10       A.  Like I said, I don't remember specifically if it

11   was right before he left or not.

12       Q.  The Coast Guard has -- they have a regulation or

13   at least there was a regulation on Kodiak COMMSTA that

14   you couldn't bring any firearms onto the base, right,

15   your personal firearms?

16       A.  Yes, I think so.

17       Q.  In fact, that was a regulation, don't you recall

18   that?

19       A.  Not specifically.

20       Q.  Do you recall people bringing firearms into the

21   T-2 building?

22       A.  Yes.

23       Q.  Who brought firearms in?

24       A.  I think Rich had once and also ET1 Hopkins had

25   once.  That's all I remember off the top of my head.

1    Q.  What do you recall about them bringing their

2  firearms into the building?

3    A.  What do you mean?

4    Q.  Well, let's start with ET1 Hopkins.  He brought a

5  firearm into the building and showed it to people?

6    A.  Yes.

7    Q.  And it was his personal firearm?

8    A.  Yeah.

9    Q.  Did he do that when Chief Reckner was there?

10   A.  I don't remember.

11   Q.  And Mr. Pacheco did the same thing?

12   A.  I don't remember that.

13   Q.  You have a transcript in front of you, I believe,

14 from a prior hearing, or you will in a minute.

15             (Mr. Colbath approaches witness.)

16             MR. CAMIEL:  Your Honor, I'm going to be

17 looking at pages 505, 506.

18             THE COURT:  All right.

19 BY MR. CAMIEL:

20   Q.  Mr. Beauford, if you could turn to page 505.

21 There is a page number in the top right corner.

22   A.  Yes.

23   Q.  And does this appear to be some testimony you

24 gave at a prior hearing?

25   A.  Yes.

1    Q.   And I wanted you to look at the middle of the

2    page first about line 13 to see if this refreshes your

3    recollection about whether there was a regulation about

4    -- that prohibited bringing firearms into the building

5    at the rigger shop.

6    A.   I still don't remember reading that like in a

7    manual anywhere.

8    Q.   All right.  Whether you read it or not, does this

9    refresh your recollection about whether or not you

10   believed there was a regulation that prohibited firearms

11   from the T-2 building?

12   A.   I believe there was.

13   Q.   There was a regulation that prohibited it?

14   A.   Right.  I just can't -- I couldn't remember like

15   reading that in the manual or what manual it would be

16   in.

17   Q.   I'm not asking you to cite the regulation number,

18   but you were aware of that?

19   A.   Yes.

20   Q.   And in fact, you testified at a prior hearing

21   that you were aware of that?

22   A.   Yes.

23   Q.   And I want you to stay still on page 505.

24   A.   Okay.

25   Q.   And further down the page, see if your memory is

refreshed about whether or not Seaman Pacheco brought

firearms into the building.

    A.  It doesn't refresh it, no.  I still can't

remember the specific time.

    Q.  Okay.  Did you previously testify that

Mr. Pacheco was one of the people who brought firearms

into the building?

    A.  Yes.

    Q.  And was Mr. Belisle also somebody who brought

firearms into the building?

    A.  I think so, yes.

    Q.  How about Mr. Reckner?

    A.  I don't remember that.

    Q.  And you don't remember Mr. Wells ever bringing a

firearm in?

    A.  No.

    Q.  Now, after Mr. Wells returned from surgery, from

his medical leave, after he got back to work, would it

be fair to say that in terms of your observations of

him, he barely moved out of his chair?

    A.  I mean, he would walk around I remember.  I mean,

I don't -- he could move around.

    Q.  I understand, but do you recall during an

interview with law enforcement telling them about your

observations of Mr. Wells, and your observation was

that, "Ever since he got back from being sick, I barely

seen him move out of his chair"?

    A.  I don't recall it specifically, no.

    Q.  Let's have you take a look at -- there is a

transcript, an interview transcript that's going to be

put in front of you.

            (Mr. Colbath approaches witness.)

            MR. CAMIEL:  Your Honor, I'm going to be

looking at page 33.

            THE COURT:  All right.  Thank you.

BY MR. CAMIEL:

    Q.  It's page 33.  The page numbers are on the very

bottom.  I want to make sure --

            MR. CAMIEL:  Your Honor, can I check to make

sure he's on the right page?

            THE COURT:  Certainly.

            (Mr. Camiel approaches witness.)

            MR. CAMIEL:  Thank you.

BY MR. CAMIEL:

    Q.  So I don't want to have you flipping around a

lot, but this is an interview you did on April 23rd of

2012, right?  If you look on the first page you see a

date.

    A.  Yes.

    Q.  And it was an interview you did with law

1    enforcement?

2        A.   Yes.

3        Q.   So April 23rd, so that's about 11 days after the

4    murders?

5        A.   Yes.

6        Q.   And what you told law enforcement was, "I don't

7    know.   I don't talk to him much, but ever since he got

8    back from being sick, I barely seen him move out of his

9    chair."   That's what you said, right?

10       A.   Yes.

11       Q.   Now, on April 12th, when you got dropped off at

12   the rigger shop by your roommate, Mr. Acosta, and you

13   didn't see Mr. Wells' car or truck there, you weren't

14   surprised, because he had been gone so much his truck

15   often wasn't there, right?

16       A.   Yes.

17       Q.   And if Mr. Wells wasn't going to be in, then

18   Mr. -- or wasn't in by the time Mr. Hopkins arrived,

19   Mr. Hopkins would park in that spot?

20       A.   Yes.

21       Q.   I just wanted to return again to the conversation

22   about reloading.   Is it true that the way that

23   conversation was initiated was that you brought in a .45

24   and that's what initiated the conversation?

25       A.   I don't remember that.

1          MR. CAMIEL:  Your Honor, that's all I have.

2          THE COURT:  All right.  Redirect?  Go ahead,

3  please.

4                    REDIRECT EXAMINATION

5  BY MS. SHERMAN:

6     Q.  When Mr. Wells came back and he would sit at his

7  desk, did he appear sickly to you?

8     A.  I don't really remember, but I never remember

9  being struck by like sickliness, if that makes sense.

10     Q.  So if he would barely get out of his chair, was

11  he really participating in a lot of things happening in

12  the rigger shop after his return?

13     A.  Not really, no.

14     Q.  In your opinion, was he an essential piece of the

15  shop at that point?

16     A.  I don't think so.

17     Q.  Where did people purchase firearms on Kodiak,

18  military people?

19     A.  You could get them from the Coast Guard Exchange

20  or in town, or I mean you could buy it off somebody as

21  well.

22     Q.  Was the Coast Guard Exchange on base?

23     A.  Yes.

24     Q.  You were asked some questions about Mr. Wells'

25  bathroom habits.  Were you -- was Mr. Wells able to get

through a climb of one of those 300-foot towers without
having to take a bathroom break?

    A.   One second.  Let me think how to -- I don't
remember seeing him climb after I remembered the
bathroom stuff, so I guess I don't really know.

    Q.   Did he store anything in the warehouse?

    A.   Concrete.

    Q.   Were there -- while he was gone, were there --
who was qualified to climb towers that winter?

    A.   It would have been myself, Seaman Pacheco, and I
can't remember who else was at the time qualified.

    Q.   Was Mr. Belisle?

    A.   Yes.

    Q.   So if there was some sort of emergency and
something had to be fixed on the antenna and you had to
climb in the winter, would the shop have been able to
have handled that?

    A.   We had enough personnel.

    Q.   You were asked questions about April 11th, the
conversations on top of T-1.  Do you remember those?

    A.   Yes.

    Q.   Was Mr. Wells' reaction of just walking away, was
that different than what you would have expected prior
to his period of leave?

    A.   Yes.

1    Q.   What would you have expected him to do?

2    A.   To make his case stronger on why we should do it

3    the other way.

4    Q.   While you were working out in Shemya with

5    Mr. Wells, do you remember him being limited physically

6    to what he was able to do?

7    A.   No.

8    Q.   He was able to participate?

9    A.   Yes.

10   Q.   How often -- you were asked questions about T-2

11   and anyone being able to walk in.  How often would

12   someone not associated with the COMMSTA just wander into

13   T-2?

14   A.   I don't remember that ever happening.

15   Q.   You were asked questions at the beginning about

16   pressure gauges and checking those gauges in the

17   basement.  Did you ever go check those gauges?

18   A.   Rarely.  Normally the non-rates would check them.

19   Q.   So this was something the non-rates would do?

20   A.   Yes.

21   Q.   Would it take them a long time to do that?

22   A.   No.

23   Q.   How long would it take to check the pressure

24   gauges?

25   A.   I don't know.  Including the trip back and forth,

1  15, 20 minutes maybe.

2          MS. SHERMAN:  No further questions.

3          THE COURT:  Anything new there?

4          MR. CAMIEL:  Just one if I could.

5          THE COURT:  Go ahead.

6                    RECROSS EXAMINATION

7  BY MR. CAMIEL:

8      Q.  Mr. Beauford, the work that was done out at

9  Shemya, that was all done before Mr. Wells was gone for

10  that long period of time when he was sick?

11     A.  Yes, I think so.

12         MR. CAMIEL:  Thank you.

13         THE COURT:  Thank you, sir.  You may be

14  excused.  This witness can be excused?

15         MS. SHERMAN:  From the government's

16  perspective, yes.

17         THE COURT:  Mr. Colbath?

18         MR. COLBATH:  Yes.

19         (Witness excused)

20         THE COURT:  Why don't we take our morning

21  break, ladies and gentlemen.  Come back in 15 minutes.

22         Please remember my admonition not to discuss

23  the case, leave your notepads here, and we'll see you in

24  15 minutes.  We'll go off record.

25               (Recessed from 9:56 a.m. to 10:12 a.m.)

1          (Jury present)

2          THE COURT:  Please be seated, everyone.  And

3   ready for your next witness.

4          MS. SHERMAN:  Yes, Your Honor.  The government

5   calls Aaron Coggins.

6          THE COURT:  All right.  Very good.

7          (Pause)

8          THE COURT:  Good morning.  If you could come

9   all the way forward to the witness stand here.  When you

10  get up there, if you would remain standing, the clerk

11  will administer an oath to you.

12         (Oath administered to the witness)

13         DEPUTY CLERK:  For the record, can you please

14  state your full name and then spell your full name.

15         THE WITNESS:  Aaron Scott Coggins, A-a-r-o-n,

16  S-c-o-t-t, C-o-g-g-i-n-s.

17        AARON COGGINS, GOVERNMENT WITNESS, SWORN

18                    DIRECT EXAMINATION

19  BY MS. SHERMAN:

20      Q.  Mr. Coggins, how old are you?

21      A.  27.

22      Q.  When did you join the military?

23      A.  September 20th, 2011.

24      Q.  When did you graduate high school?

25      A.  May 2011.  I don't remember the exact day.

1    Q.  So you graduated and went right into the Coast

2  Guard?

3    A.  Yes, ma'am.

4    Q.  You said September.  What were you doing first in

5  the Coast Guard?

6    A.  I was a non-rate at the COMMSTA.

7    Q.  Did you go to basic training?

8    A.  I did.

9    Q.  When was basic training?

10    A.  From September 2011 until November 2011.

11    Q.  You said you went to the COMMSTA.  Do you

12  remember when you arrived at the COMMSTA in 2011?

13    A.  It was the day before Thanksgiving in 2011,

14  November 20-something, 23rd.

15    Q.  You said you were a non-rate.  Is there another

16  term for that?

17    A.  Seaman, E-3.

18    Q.  What was your job as the -- were you the newest

19  non-rate then at the COMMSTA when you were there?

20    A.  I was, yes.

21    Q.  What was your job as the newest non-rate assigned

22  to the COMMSTA?

23    A.  It was the same as all the other non-rates,

24  plowed snow, shoveled snow, cut the grass.

25    Q.  You arrived in the middle of winter.  What were

1    your day-to-day tasks and who would give you those?

2        A.   ET3 Beauford was my direct supervisor.  He would

3    be the one that would tell us what to do, and depending

4    on how much snow there was in the morning, we would plow

5    it, shovel it.  Right away at 8:00, we would do morning

6    colors, and then they would give us the work list for

7    the day.

8        Q.   Who would give you that work list?

9        A.   ET3 Beauford.

10       Q.   Did you ever take orders from ET1 Hopkins?

11       A.   If Beauford wasn't there.

12       Q.   In basic training, did they teach you how to

13   prepare your uniform?

14       A.   Yes.

15       Q.   Is rolling your sleeves on your uniform, is that

16   an easy task?

17       A.   Yes.

18       Q.   Did you do it -- when you say it's easy, is it

19   easy to do while you're wearing your blouse?

20       A.   No.

21       Q.   So how would you roll your sleeves?

22       A.   You would have to take it off, and then you

23   invert the sleeve and then roll it up and then flip the

24   cuff down.

25       Q.   Where were you living when you arrived in Kodiak

1  in November 2011?

2       A.   I was living in the barracks on base.

3       Q.   On the main base?

4       A.   Yes.  Yes, ma'am.

5       Q.   Did T-1 have barracks?

6       A.   No.

7       Q.   You said you did morning colors.  What is that?

8       A.   Every morning at 8:00 we would have to put the

9  national flag, the Coast Guard flag, the POW/MIA flag,

10 and then we had an award pennant that we also run up the

11 flagpole.

12       Usually they would stay up all week, but the

13 flagpole had a light and the light bulb was burned out,

14 so we had to do it every day.

15       Q.   What part of morning colors was your job?

16       A.   It depended.  Between the two people that would

17 do it, sometimes like one person would run up one flag,

18 some person would run up the other, but every day we put

19 the flags up the pole.

20       Q.   Who would get the flags in the morning?

21       A.   Whoever was there first, which was usually me.

22       Q.   Would you get dressed before you get to work or

23 did you change at work?

24       A.   I changed in my barracks room and then went to

25 work in uniform.

1    Q.   What time was your shift?

2    A.   From 8:00 to 2:00, or 1400.

3    Q.   So how far was your barracks on base to work, how

4    long was your drive?

5    A.   Five, ten minutes at most.

6    Q.   If you worked at 8:00, what time would you

7    normally arrive?

8    A.   7:30-ish.

9    Q.   What would you normally do when you arrived at

10   the rigger shop?

11   A.   I would normally go in the building first, say

12   good morning to everybody, and then I would go up and

13   get the flags.

14   Q.   And as a non-rate, how much time did you actually

15   spend inside in the shop during a workday?

16   A.   It depended on the time of year.  In the

17   wintertime, we were inside most of the time just doing

18   maintenance and stuff like that, but in the summer, we

19   were out in the field cutting all day.

20   Q.   What sort of tools and equipment were in the

21   rigger shop?

22   A.   Pretty much any tool you could think of was

23   there.

24   Q.   What kind of heavy equipment?

25   A.   In the shop, not as much in the shop, but around

1   on the grounds there was bulldozer, Bobcat, that kind of

2   thing.

3       Q.  Were there any tools that could be used to change

4   tires?

5       A.  Uh-huh.  Yes, ma'am.

6       Q.  What sort of tools?

7       A.  Wrenches, sockets, that kind of thing.

8       Q.  Did you have an air compressor?

9           MR. CAMIEL:  Your Honor, I'm going to object to

10  leading.

11          THE COURT:  All right.  I'll allow the question

12  about the air compressor, and then go forward.

13      A.  I actually don't recall if there was an air

14  compressor there.

15      Q.  Who at the rigger shop, if you know, or who did

16  you ever see changing tires at the rigger shop?

17      A.  I personally didn't see anybody, but --

18      Q.  Okay.  Did you have a desk in the rigger shop?

19      A.  No, ma'am.

20      Q.  Did the other non-rates have a desk?

21      A.  Technically, we had one that we all shared, but I

22  was new so I didn't get to use it.

23      Q.  So is that -- can you describe that a little more

24  to us, how you fit in the rigger shop?

25      A.  I was the brand-new guy, so I mean they didn't

1  treat me bad, but I was the new guy, so I didn't get all

2  the privileges that some others did.

3       Q.  Did you ever go hang out in the office and chat

4  with the individuals who worked in the office?

5       A.  Not very often, no.

6       Q.  Why not?

7       A.  You just didn't do that because we were supposed

8  to be working, so you didn't go in there and hang out

9  with them.  If you got time to lean, you got time to

10 clean.

11      Q.  All right.  Can you tell us a little bit about

12 what it was like working for ET1 Jim Hopkins?

13      A.  I enjoyed working with him.  I had no problems.

14      Q.  Can you describe his work ethic to us?

15      A.  Oh, he was a very hard worker.  There were times

16 where he would tell us to do something that wasn't

17 necessarily the best job and he would be down there

18 doing it with us when he didn't necessarily have to.

19      Q.  Do you recall what kind of car he drove or

20 vehicle he drove?

21      A.  He drove a Dodge Ram.

22      Q.  What was it like working with Rich Belisle?

23      A.  Same, great guy, had no issues working with him,

24 taught me a lot.

25      Q.  What sort of things did he teach you?

1    A.  Just what different tools were, because when I

2  first got there, I didn't know anything about doing

3  anything mechanically.

4    Q.  You arrived around Thanksgiving.  Did you go home

5  for Christmas that year?

6    A.  I did not, no.

7    Q.  Did you -- what did you do the day after

8  Christmas?

9    A.  We went over to the Belisle household for Boxing

10 Day.

11   Q.  Who invited you?

12   A.  I honestly don't remember.

13   Q.  All right.  Did you know what Boxing Day was?

14   A.  No.  I just remember seeing it on the calendar

15 all the time, but I didn't know what it meant.

16   Q.  So who all went to Boxing Day from the rigger

17 shop that you remember?

18   A.  As far as I remember, everyone was there, but

19 it's been so long I don't remember.

20   Q.  What kind of vehicle did Mr. Belisle drive?

21   A.  A blue F150, Ford.

22   Q.  I'm going to talk about the defendant for a

23 moment.  How much interaction did you have with him in

24 the four months you were working in the rigger shop

25 before the murders?

1    A.  Not a lot.

2    Q.  Why was that?

3    A.  When I first reported, he was not at work, I

4  believe on leave, and then after that, he was on medical

5  leave.  And then it wasn't very long that I interacted

6  with him.

7    Q.  When he was there, would you interact with him at

8  all?

9    A.  Not really, no.  He worked in the office where we

10 didn't go.

11   Q.  We heard some testimony about pressure gauges.

12 Where were the pressure gauges located?

13   A.  In the basement of T-1.

14   Q.  Did you ever have to check those?

15   A.  Every morning.

16   Q.  How long would that take you?

17   A.  10, 15 minutes.

18   Q.  Did you ever see Mr. Wells go check the pressure

19 gauges?

20   A.  No, I did not.

21   Q.  What sort of vehicle did Mr. Wells drive?

22   A.  He drove a white Dodge Ram.

23   Q.  Did it have a canopy?

24   A.  Yes.

25   Q.  Did you ever see him drive anything else?

1    A.  I saw him drive his wife's vehicle once or twice.

2    Q.  So you're the new guy at the rigger shop.  You

3  didn't really interact with the defendant very much.

4  When you had a question about how to do something, who

5  would you ask?

6         MR. CAMIEL:  Your Honor, I'm going to object to

7  the leading form of the question.

8         THE COURT:  That's sustained.  Just rephrase.

9  It's fine.

10 BY MS. SHERMAN:

11   Q.  When you had questions in the rigger shop, who

12 would you ask?

13   A.  Usually ET3 Beauford or one of the other

14 non-rates.

15   Q.  Did you ever ask Mr. Belisle how to do things?

16   A.  Not usually.

17   Q.  Can you describe -- you said Mr. Wells drove his

18 wife's vehicle.  Can you describe that vehicle?

19   A.  I believe it was a Honda SUV, but I can't

20 remember.

21   Q.  As the newest non-rate, were you privy to any of

22 the interpersonal relationships within the rigger shop?

23   A.  No, ma'am.

24   Q.  Let's talk about April 11, 2012.  Do you recall

25 any interaction regarding the roof of T-1?

1    A.  No, ma'am.

2    Q.  Did you have a role in that?

3    A.  I was told to bring the ladder.

4    Q.  So did you participate in any other way?

5    A.  No.

6    Q.  Where was the ladder stored?

7    A.  Down in T-2.

8    Q.  Okay.  Let's move to April 12, 2012.  Can you

9    describe for the jury what you did that morning when you

10   woke up?

11   A.  I woke up in my barracks room, got dressed in my

12   uniform, drove to work.  I had been running late for

13   whatever reason that morning.  I don't remember.  So I

14   just parked my car and went straight up to T-1 to get

15   the flags for colors.  And then --

16   Q.  Let me stop you there for a second.  Do you

17   remember what time you arrived at work?

18   A.  I actually don't remember at this time.

19   Q.  Let's show exhibit -- do you remember whose

20   vehicles you saw when you drove in?

21   A.  The vehicles I saw were the government vehicles,

22   Mr. Belisle, and ET1 Hopkins' truck.

23   Q.  Did you see any other vehicles there when you

24   pulled in?

25   A.  I did not.

1    Q.  Let's go ahead and pull up exhibit -- I think

2    it's 45.  If we could bring it up for him first.  It's

3    going to be 44.  Sorry.

4         There should be a laser pointer up there on the

5    table somewhere.  Why don't you use that and point for

6    us up here whose vehicles were there when you pulled in

7    for us.

8    A.  When I pulled in, these two white vehicles were

9    there and then the two blue trucks were there.

10   Q.  Do you recognize those blue trucks?

11   A.  Yes, ma'am.

12   Q.  So let's start with the one closest to the

13   building.  Can you point to that one for us and tell us

14   whose blue truck that was?

15   A.  That was ET1 Hopkins' Dodge.

16   Q.  And then next to it?

17   A.  And then that is Mr. Belisle's Ford.

18   Q.  And then you said the two white vehicles, what

19   are those?

20   A.  Those are the government vehicles.

21   Q.  And then where is your vehicle?

22   A.  The black Jeep.

23   Q.  And then do you recognize whose vehicle is next

24   to yours?

25   A.  That is -- at the time, that was Seaman Henry's.

1    Q.  Was she there when you got there?

2    A.  No, she was not.

3    Q.  You didn't see Mr. Beauford's vehicle that

4  morning?

5    A.  No.

6    Q.  Did you know if he was at work when you pulled

7  in?

8    A.  I did not.

9    Q.  Did you -- when you -- we can take that down,

10  Blair.

11       When you arrived, did you expect to see another

12  vehicle there that morning?

13   A.  Not necessarily.

14   Q.  What do you mean by that?

15   A.  I mean, I just showed up.  I didn't usually

16  expect vehicles to be there, I mean other than the usual

17  ones.  I mean I didn't expect people to be there.  I

18  mean it wasn't my job to expect people to be there.

19   Q.  Do you know where Nate Pacheco was on April 12th?

20   A.  If I remember right, he wasn't on the island.

21   Q.  So not on the island, do you know where he was?

22   A.  He was in Shemya, I believe.

23   Q.  Did you go to Shemya that year?

24   A.  No, I don't believe so.

25   Q.  You can pull the mic a little closer.  We'll both

1    do it so we're both a little louder.

2        A.   Sorry.

3        Q.   That's okay.

4             I'm going to have you look at an exhibit, and

5    we're not going to move it in through you, but I do want

6    to have you identify some things on there.

7             Let's pull up for Mr. Coggins Exhibit No. 105.

8             Do you recognize this?

9        A.   Yes.

10       Q.   What is it?

11       A.   It's a list of vehicles that were there.

12       Q.   All right.  Did you review the video from T-1 and

13   T-2 cameras and identify some of the vehicles you saw?

14       A.   Yes.

15       Q.   And did you do -- did you mark your initials and

16   indicate those vehicles that you recognized?

17       A.   Yes.

18       Q.   Let's go through, if we can -- why don't we start

19   with the first vehicle that you identified.

20            Blair, could we blow up just the top half perhaps

21   since we're not displaying it to the jury.  It hasn't

22   been admitted.

23            Okay.  Is that easier for you to see?

24       A.   Yes, ma'am.

25       Q.   Why don't you tell us on this list the first

1   vehicle you identified, the time, the type of vehicle

2   and who you identified the owner as.

3       A.   The first one would be the dark Land Rover at

4   6:55.

5       Q.   And whose was that?

6       A.   OS3 Ashley Whitten.

7       Q.   And did you initial next to that one?

8       A.   Yes.

9       Q.   And your initials, do you use your middle

10  initial?

11      A.   I do not.

12           MR. CAMIEL:  Your Honor, I'm going to object at

13  this point.  There's no foundation.  He's just reading

14  an exhibit that there is no showing he remembers at all.

15           THE COURT:  I thought he said he did recognize

16  this document.

17           MS. SHERMAN:  I believe that was his testimony.

18           MR. CAMIEL:  There is no indication he

19  recognizes the times or recalls the times that he's

20  reading.

21           THE COURT:  I'll allow his testimony as to what

22  he -- which are his initials and what he intended by

23  initialing them.  So go ahead.

24  BY MS. SHERMAN:

25      Q.   Did you initial another vehicle, next to another

1  vehicle?

2      A.  Yes.

3      Q.  All right.  And did you recognize that vehicle

4  when you made your initials?

5      A.  Yes.

6      Q.  At the time you made this, you had watched a

7  video and did this close in time to watching that video;

8  is that right?

9      A.  Yes.

10          MS. SHERMAN:  At this time, Your Honor, the

11  defense has indicated they wouldn't object to the moving

12  of 105.

13          MR. COLBATH:  Then everyone can see it.

14          MS. SHERMAN:  I was going to wait until

15  everyone had testified.

16          THE COURT:  Government 105 will be admitted.

17  Go ahead.

18          (Exhibit No. 105 admitted.)

19  BY MS. SHERMAN:

20      Q.  So can you just point where you -- the one you

21  already spoke about, that dark Land Rover, where that

22  is?

23      A.  This.

24      Q.  Where are your initials on that line?

25      A.  The blue.

1     Q.   The next vehicle that you identified and the

2   time?

3     A.   At 7, dark truck, blue Ford F150, Richard

4   Belisle.

5     Q.   Is that one of the vehicles you identified in

6   that other photo just a few moments ago?

7     A.   Yes, ma'am.

8     Q.   And the next vehicle down that you identified,

9   what time was that one?

10    A.   7:00, cyan dark sedan, OS3 Carissa King -- wait,

11  no, that's not me.  Sorry.

12    Q.   Look for your initials.

13    A.   7:05, red single cab truck, Ford, OS3 Michael

14  Cage.

15    Q.   And did you recognize another vehicle after that?

16    A.   7:05, silver SUV, SK3 Gainer.

17    Q.   And you're saying SK3 and OS3, that's like ET1?

18    A.   That was their rank, yes.

19    Q.   And then after that, did you recognize another

20  vehicle?

21    A.   Yes.

22    Q.   What was that?

23    A.   7:08, blue four-door Dodge, ET1 James Hopkins.

24    Q.   And is that one of the ones you identified in

25  Exhibit 44?

```
1       A.   Yes.

2       Q.   Did you in this group recognize another vehicle?

3       A.   Yes.

4       Q.   What was that?

5       A.   7:08, blue minivan, OS1 Michael Haselden.

6       Q.   And another vehicle after that?

7       A.   Yes.

8       Q.   What was that?

9       A.   7:09, dark colored SUV, OS3 Amanda Fortier.

10      Q.   And Madam Clerk, if we can go out of that and

11   then highlight the second half of that.

12           We have two lists of the vehicles and two times.

13   Is that -- does that relate to different cameras you

14   observed?

15      A.   Yes.

16      Q.   What's the next -- we had covered Ms. Fortier's

17   vehicle.  What's the next vehicle you observed that you

18   recognized?

19      A.   7:16, light blue Jeep, OS3 Dylan Baker.

20      Q.   And after that?

21      A.   7:19, light four-door truck, ET1 Matt Stone.

22      Q.   And next?

23      A.   7:25, silver SUV, SK3 Gainer.

24      Q.   And the next one?

25      A.   7:31, dark Jeep, and then me, Seaman Coggins.
```

1    Q.  So does that reflect the time that you arrived to

2  work that day then?

3    A.  That sounds right, yes.

4    Q.  After your vehicle, what's the next thing that

5  you recognized on those videos?

6    A.  7:32, Coast Guard member walking up to T-1, and

7  then that was me.

8    Q.  What were you doing?

9    A.  I was walking up to get the flags.

10    Q.  Where were the flags kept?

11    A.  At T-1.

12    Q.  Do you know why they were kept at T-1?

13    A.  I'm assuming because the OSs took them down at

14  night, so they probably kept them up there.

15    Q.  And did you recognize one other vehicle?

16    A.  Yes.  7:34, GMC truck, ET2 Hernando Acosta.  And

17  then ET3 Beauford was also in that truck.

18    Q.  Thank you.

19        You didn't go into the rigger shop beforehand on

20  the morning of April 12th; is that right?

21    A.  That is correct.

22    Q.  Why not?

23    A.  I just thought -- I was running late, so I didn't

24  want to take the time.  I just went up and got the flags

25  first.

1    Q.  And then what did you do?

2    A.  Then I came down the hill and went into the

3  building.

4    Q.  You walked into the building and what did you

5  see?

6    A.  Immediately I saw Petty Officer Beauford standing

7  there, and then he asked me what was going on.  And I

8  didn't know what he was talking, and then he told me

9  what he saw.

10   Q.  When you walked in and saw him, how would you

11 describe his demeanor?

12   A.  He looked shocked.

13   Q.  He described what he saw.  Did he show you what

14 he saw?

15   A.  He told me, and then I went and looked for

16 myself.

17   Q.  What did you see?

18   A.  I saw ET1 Hopkins on the floor in the main

19 bullpen area, and then I saw Mr. Belisle in the office.

20   Q.  And can you describe how you found Mr. Belisle?

21   A.  He was facedown.

22   Q.  What was going through your head at that point?

23   A.  I don't even know.  I was shocked, scared.

24   Q.  Did you notice any smells when you entered?

25   A.  Yes.

```
 1      Q.   What --
 2      A.   At the time, because I was young and naive, I
 3   thought it was fireworks, but looking back at the
 4   situation, that's not what it was.
 5      Q.   Were you able to identify what it was later?
 6      A.   Yes.
 7      Q.   What was it?
 8      A.   It was gunpowder.
 9      Q.   How strong was that smell?
10      A.   Very.
11      Q.   When you -- when did you first notice the smell?
12      A.   As soon as I walked in.
13      Q.   After you walk in and you see Mr. Hopkins and
14   Mr. Belisle, did you have the flags still at that point?
15      A.   I don't remember when I sat them down or if I
16   gave them to anybody.
17      Q.   How would you carry the flags down the hill?
18      A.   Both hands, arms crossed.
19      Q.   If you would have handed them to anybody, who
20   would that have been?
21      A.   It would have been Petty Officer Beauford.  He
22   was the only one there.
23      Q.   What did -- I guess what happened next?
24      A.   Then we called the CWO of the watch, and then
25   they came down.  And I believe they were also the ones
```

1    that called CGPD.

2        Q.   Why were you scared?

3        A.   It was just an uncomfortable situation.

4        Q.   Had you ever seen a dead body before?

5        A.   No, ma'am.

6        Q.   Who was the next person to arrive at the rigger

7    shop or come into the rigger shop?

8        A.   The CWO of the watch, OS1 Haselden.

9        Q.   After he came in, what happened?

10       A.   CGPD showed up shortly thereafter, and then they

11   escorted us out.

12       Q.   Where did you go from there?

13       A.   Myself and Petty Officer Beauford went to CGPD on

14   base.

15       Q.   How did you get there?

16       A.   They took us, I believe.  I think.  I don't

17   remember.

18       Q.   What did you do when you got to CGPD?

19       A.   They put us in a conference room, had us give our

20   written statements, and then we just sat there all day.

21       Q.   Did they interview you at some point?

22       A.   I honestly don't remember.

23       Q.   Was your mind clear that day?  Do you feel like

24   your mind was pretty clear all afternoon?

25       A.   No.

1    Q.   Did you call or text anybody?

2    A.   I believe I texted my parents to let them know I

3  was safe.

4    Q.   Why did you decide to do that?

5    A.   Because we knew that the story had broke and that

6  our families would probably be worried.  So I told them

7  I couldn't say anything but I was safe.

8         MS. SHERMAN:  Those are all my questions.

9         THE COURT:  Mr. Colbath or Mr. Camiel?

10         MR. CAMIEL:  Thank you, Your Honor.

11                   CROSS EXAMINATION

12  BY MR. CAMIEL:

13    Q.   Good morning, Mr. Coggins.

14    A.   Good morning.

15    Q.   So when you arrived to start working at the

16  COMMSTA and T-2, this is around, I think you said right

17  around Thanksgiving of 2011?

18    A.   Yes, sir.

19    Q.   And so for the first several weeks that you

20  worked there, you never saw Mr. Wells because he was

21  gone?

22    A.   That's correct.

23    Q.   In fact, you didn't see him until sometime in

24  January?

25    A.   I don't recall the exact date, but it was a

1  while.

2     Q.  And even after you first saw him, he was then

3  gone again; is that right?

4     A.  Yes, sir.

5     Q.  And he wasn't finally back working full work

6  hours until sometime in the latter part of February,

7  would that be about right?

8     A.  That sounds about correct, yes.

9     Q.  How old were you at the time?

10     A.  I was 19.

11     Q.  And Mr. Wells quite a bit older, in his sixties?

12     A.  Yes, sir.

13     Q.  And you didn't interact with him hardly at all?

14     A.  No, sir.

15     Q.  Were you aware that when he came back to work,

16  when he started working again full-time, he was on light

17  duty because he had had surgery?

18     A.  I did not, no.

19     Q.  Now, when you would get to work in the morning,

20  you told us how you would usually come into the

21  building, say good morning, and then you would do the

22  routine of going up to T-1 to get the colors and bring

23  those down; is that right?

24     A.  Yes, sir.

25     Q.  When you would arrive in the morning, the door

1   that you would go through would not be the keycard door,

2   but the other door, near where the vehicles were parked?

3       A.  Yes.

4       Q.  And that door would be unlocked?

5       A.  Yes.

6       Q.  So you didn't need -- you didn't need a key or a

7   card to access it?

8       A.  I did not, no.

9       Q.  When -- I want to turn your attention to

10  April 12th.  And you talked about how afterwards, after

11  the CGPD had arrived you were taken to their precinct or

12  their station on base?

13      A.  Yes, I was.

14      Q.  And they interviewed you there, but then you were

15  interviewed some more after that?

16      A.  Yes.

17      Q.  And were you, during one of those subsequent

18  interviews, required to sign a nondisclosure agreement

19  indicating that you couldn't talk to anyone else about

20  the investigation?

21      A.  Yes.  Yes, sir.

22      Q.  Do you remember that?

23      A.  Yes, sir.

24      Q.  In fact, you were instructed that if you talked

25  to anyone else about the investigation you could be

1   subject to some kind of discipline?

2       A.  Yes, sir.

3       Q.  And among the people they didn't want you to talk

4   to was anybody representing Mr. Wells?

5       A.  I do not recall them saying anything like that,

6   no.

7       Q.  Well, you were instructed that the only people

8   you could talk to were the law enforcement people,

9   right?

10      A.  Yes.

11      Q.  Now, on April 12th, before you got taken to the

12  CGPD, you were outside the building, this is after law

13  enforcement had first arrived.  You're standing out in

14  the parking area, right?

15      A.  Yes, sir.

16      Q.  And you were talking to law enforcement, right?

17      A.  Yes, sir.

18      Q.  And you were there when -- you saw Chief Reckner

19  arrive?

20      A.  Yes, I did.

21      Q.  And you were there when Mr. Wells arrived?

22      A.  Yes.

23      Q.  And you saw -- right after Mr. Wells arrived, you

24  saw him go up and start talking to Chief Reckner?

25      A.  I believe so, yes.

1    Q.  You heard Chief Reckner tell Mr. Wells that --

2          MS. SHERMAN:  Objection; hearsay.

3          THE COURT:  That does seem to be hearsay.

4          MR. CAMIEL:  Your Honor, it's not offered for

5    the truth of the matter asserted.  It's offered for the

6    effect on the listener.

7          THE COURT:  Well, if you want to make a sidebar

8    offer of proof, you can do so, but otherwise, the

9    objection is sustained.  You want to have a sidebar,

10   that's fine.

11         (Begin bench conference.)

12         THE COURT:  You want to ask him what he heard

13   Reckner say?

14         MR. CAMIEL:  So he heard Chief Reckner tell

15   Mr. Wells that Mr. Belisle and Mr. Hopkins were dead,

16   and I want to ask him what he observed in terms of

17   Mr. Wells' reaction.

18         THE COURT:  So any objection to that?

19         MS. SHERMAN:  No.

20         THE COURT:  Very good.

21         (End bench conference.)

22   BY MR. CAMIEL:

23   Q.  When you were standing outside in the parking

24   area after Chief Reckner had arrived and after Mr. Wells

25   arrived, you saw Mr. Wells and Mr. Reckner together

1  talking, right?

2      A.  Yes, sir.

3      Q.  And you were within earshot and you heard Chief

4  Reckner tell Mr. Wells that Mr. Belisle and Mr. Hopkins

5  were dead?

6      A.  Yes.

7      Q.  And you saw Mr. Wells' reaction?

8      A.  Yes.

9      Q.  And he was shocked like everybody else?

10     A.  Yes.

11     Q.  And that's what you saw on his face, his

12 demeanor?

13     A.  Yes.

14     Q.  Now, the day before on April 11th, you talked

15 about being the guy who had to bring the ladder from T-2

16 up to T-1 so that they could do some work on the roof?

17     A.  That is correct.

18     Q.  And you spent the whole day at work on

19 April 11th, right?

20     A.  Yes.

21     Q.  Interacting with the other members of T-2?

22     A.  Yes.

23     Q.  And it was a good day, wasn't it?

24     A.  As far as I remember, yeah.

25     Q.  In fact, you described it when you were first

1   interviewed after the police first arrived and you were

2   talking to them, you told them it was a good day

3   yesterday?

4       A.  Yes.

5       Q.  Because as far as you could tell, everybody was

6   getting along?

7       A.  Yes.

8       Q.  And everybody was doing their job?

9       A.  Yes, sir.

10      Q.  And you didn't see any arguments or disputes?

11      A.  I did not personally, no.

12      Q.  Now, I just wanted to ask you for a minute about

13  your vehicle.  Your vehicle was a black Jeep Cherokee,

14  right?

15      A.  Yes, sir.

16      Q.  Not a truck?

17      A.  No, sir.

18      Q.  Can we put up Government 44?

19          Can you point for us again which vehicle was

20  yours?  That's where you parked it when you first pulled

21  in?

22      A.  Yes, sir.

23      Q.  And you didn't move it again until much later?

24      A.  Correct.

25      Q.  So your Jeep Cherokee was never parked over by

1  the repair shop doors, was it?

2      A.  No, sir.

3      Q.  Just one more topic I wanted to ask you about.

4  We can take that down and put up the lights.

5          Even though you were one of the new guys at the

6  rigger shop, you knew that it was against the rules for

7  somebody to bring a firearm into the rigger shop?

8      A.  Yes.

9      Q.  But you were there once when Chief Reckner

10 brought in a firearm?

11     A.  Yes.

12     Q.  He brought it in from his car?

13     A.  I'm assuming that's where it was, yes.

14     Q.  He brought it in from outside the building?

15     A.  Yes.

16     Q.  Because he wanted to show it off to everyone?

17     A.  Yes.

18         MR. CAMIEL:  Thank you.  If I could have just a

19 minute.

20         THE COURT:  Certainly.

21         (Pause)

22         MR. CAMIEL:  Nothing else.  Thank you.

23         THE COURT:  Redirect?

24                   REDIRECT EXAMINATION

25 BY MS. SHERMAN:

1    Q.   Do you recall what Seaman Pacheco drove?

2    A.   He drove a Jeep Wrangler.

3    Q.   Did you, when you were driving in to work, did

4    you see any vehicles heading out onto Anton Larsen?

5    A.   At this time, I don't remember.

6    Q.   Did you see anything on Anton Larsen Road that

7    morning that you recall?

8    A.   There was a person walking.

9    Q.   Was that person walking, I guess, away from you

10   or towards you as you were driving in?

11   A.   If I remember correctly, he was walking towards

12   me.

13   Q.   You had told -- you testified that the day before

14   the murders was a good day.  How much of that day did

15   you spend with Mr. Wells, do you recall?

16   A.   Not very long.

17        MS. SHERMAN:  Those are all my questions.

18   Thank you.

19        THE COURT:  Follow-up at all on those?  Thank

20   you, sir, you may be excused.  And he can be excused?

21        MR. CAMIEL:  Yes.

22        MS. SHERMAN:  Yes.

23        (Witness excused)

24        THE COURT:  Your next witness.

25        MR. SKROCKI:  Yes, Your Honor.  We call Don

1    Rudat.

2         THE COURT:  Everybody doing okay?  Anybody need

3    to stand or stretch or anything?

4         (Pause)

5         THE COURT:  Good morning.  If you could come up

6    to the witness stand, please.  When you get up there,

7    remain standing, if you would, and the clerk will

8    administer an oath to you.

9         (Oath administered to the witness)

10        DEPUTY CLERK:  For the record, can you please

11   state your full name and then spell your full name.

12        THE WITNESS:  Donald A. Rudat, R-u-d-a-t.

13   Donald, D-o-n-a-l-d.

14             DONALD RUDAT, GOVERNMENT WITNESS, SWORN

15                     DIRECT EXAMINATION

16   BY MR. SKROCKI:

17      Q.  Good morning, sir.

18      A.  Good morning.

19      Q.  Can you please tell our jury where you live.

20      A.  Good morning.  I'm from Mobile, Alabama.  Work

21   the aviation training center in Mobile.

22      Q.  Aviation training center for who?

23      A.  For the U.S. Coast Guard.

24      Q.  And what kind of work do you do for the U.S.

25   Coast Guard in Mobile, sir?

1    A.  I am the division chief for training radio

2    operators, radar operators, camera operators, all the

3    sensor system on board the Coast Guard aircraft, for

4    standardization search and rescue.

5    Q.  What kind of aircraft are we talking about?

6    A.  All manners of MH-60s; helicopters, 65s; and then

7    130 aircraft and 144 aircraft.

8    Q.  Involving search and rescue equipment?

9    A.  Correct, sir.  Search and rescue, law

10   enforcement, humanitarian relief and coordination and

11   comms relay for hurricane-impacted areas.

12   Q.  Like right now, for example?

13   A.  Yes, sir.

14   Q.  So Mr. Rudat, prior to this work in Mobile, did

15   you have any military service?

16   A.  Yes, sir.  I'm retired U.S. Navy.  Retired in

17   2001.  I first came in the Air Force as an enlisted

18   person.  I worked in security police for approximately

19   five years and then two years of enlisted crewman on

20   board aircraft doing communications relay.  And then was

21   picked up, commissioned in the United States Navy.  I

22   retired from the United States Navy in 2001.

23   Q.  What were you doing in the Navy?

24   A.  I worked as a communications officer, a navigator

25   on board our E-6 aircraft, which is a nice, big, white

    1  airplane that does communications relay to our nuclear

    2  command control functions for missile silos, submarines

    3  and B-52s.

    4     Q.  And you're retired?

    5     A.  Yes, sir.

    6     Q.  And your rank was at retirement, sir?

    7     A.  At retirement my rank was O-4, lieutenant

    8  commander, United States Navy.

    9     Q.  So you are doing work for the Coast Guard even

   10  today?

   11     A.  Correct, sir, as a Coast Guard civilian employee,

   12  GS employee.

   13     Q.  You had occasion to do some work for the Coast

   14  Guard in Kodiak in April of 2012?

   15     A.  Yes, sir, that is correct.

   16     Q.  Could you please tell the jury what the nature of

   17  that work was and what you were doing for them then?

   18     A.  Yes, sir.  During the 2012 April timeframe, I was

   19  part of a three-man crew that came up from Mobile,

   20  Alabama.  I mentioned earlier that we do standardization

   21  and a lot of training, hands-on training for our

   22  communications relay.

   23        For the mission going on up on the North Slope of

   24  Alaska, we were also testing the new satellite system.

   25  It was a prototype we were testing, collecting data to

1  see how viable it was for our aircraft.

2       So I was up here during a two-week period in

3  April conducting testing from the helicopters, and I was

4  at the COMMSTA station monitoring the satellite

5  communications there.

6    Q.  If we could have the lights, please, and I want

7  to show you an exhibit, Mr. Rudat.  Thank you,

8  Madam Clerk.  Blair, 222.

9       Mr. Rudat, in that photograph, do you recognize

10  what's depicted there?

11    A.  Yes, sir.

12    Q.  There's a -- just a moment.  Could we have it up

13  on the screen.  Thank you.

14       And on the right-hand side, there's a large,

15  long, white building.  Can you identify what that

16  building is?

17    A.  Yes, sir.  This is the ops, the communications --

18  main communications center where all the operations were

19  run out of.

20    Q.  And when you were here in Kodiak in April 2012

21  doing that work, is that the building you were working

22  out of?

23    A.  Yes, sir.  Right here.

24    Q.  And there's a building to the left.  Do you see

25  that building there?

1    A.   Yes, sir.  Right here?

2    Q.   Yes.  And did you ever go to that building when

3  you were there in April 2012?

4    A.   No, sir.

5    Q.   Have you ever been in that building ever?

6    A.   Never.

7    Q.   Any other occasion while you were doing work in

8  the Coast Guard to be involved with anybody in that

9  building?

10    A.   No, sir.

11    Q.   How long was this trip in April of 2012,

12  Mr. Rudat?

13    A.   That trip was a two-week evolution because we

14  were covering multiple MH-65 aircraft, MH-60 aircraft,

15  in conjunction with testing we were doing on the

16  satellite system.  So I was there for two weeks.

17    Q.   Where were you staying when you were there for

18  two weeks?

19    A.   We were staying at the Comfort Inn right by the

20  airport.  I believe it was Comfort Inn at that time.  I

21  don't know what it is today.

22    Q.   While you were doing your work in Kodiak in April

23  2012 -- I may have mentioned this, I just want to catch

24  up with my notes here -- did you do any work with

25  anybody from the small, white building you saw in

1    Exhibit No. 222?

2        A.   No, sir.

3        Q.   And when you were doing the work in the -- the

4    white building, where were you working?

5        A.   I was working primarily in the ops center.

6        Q.   The ops center.  Can you describe what that

7    looked like for the jury, please?

8        A.   Yes, sir.  It's a controlled access point, a lot

9    of crypto gear, secret information, equipment that has

10   to be protected.  So it was all behind a secured door, a

11   secure entry into the building and into the room itself.

12       Q.   When you were doing your work, were you working

13   with other people?

14       A.   Yes, sir.  They were working in the COMM center.

15   There was one primary point of contact I worked with,

16   that I coordinated with prior to our trip and as well as

17   test teams from the satellite company itself.

18       Q.   Sounds pretty detailed.  Was it?

19       A.   Yes, sir.  We were into scheduling and making

20   sure we had frequencies alignment between all the

21   parties involved for monitoring purposes.

22       Q.   I want to turn your attention to the morning of

23   April 12, 2012.  Do you recall what you were doing that

24   morning?

25       A.   Yes, sir.

1    Q.  Let me ask you real quick.  You used to be a

2    runner?

3    A.  Yes, sir.

4    Q.  Do you still run?

5    A.  No, sir.

6    Q.  Me neither.  What do you do instead?

7    A.  Walk, sir.

8    Q.  You walk.  On April 12th, was that part of your

9    routine?

10   A.  Yes, sir, it was.

11   Q.  Can you tell the jury about the timeframe of how

12   you took your walk that day?

13   A.  All right.  I woke early that morning intending

14   to get out for at least a one-hour walk.  I got held up

15   by some e-mails.  I could reach back over my computer

16   back to my office in Mobile, check e-mails.  I got

17   caught up in e-mail exchange.  It took longer than I

18   originally intended.  I departed the hotel that morning

19   at 6:40 and headed out towards the COMMSTA.

20   Q.  Let me stop you there.  If we could put up

21   Exhibit No. 172 and have the lights, please, Madam

22   Clerk.  Thank you, both.

23        And as to Exhibit No. 172, can you tell roughly,

24   Mr. Rudat, where your hotel was?

25   A.  Yes, sir.  By the middle dot right here where

```
 1   it's labeled Kodiak Airport, the Comfort Inn sits right
 2   here on the main road on the entrance into the airport.
 3            THE COURT:  Mr. Skrocki, this exhibit, I'm not
 4   showing, nor is the clerk, that it's been admitted.  173
 5   was admitted, but not 172.
 6            MR. SKROCKI:  I might have done a typo.  I have
 7   172.  Is 173 admitted?
 8            THE COURT:  Yes.
 9            MR. SKROCKI:  My apologies.
10            MR. CAMIEL:  We have no objection.
11            THE COURT:  173 is admitted.  There is no
12   objection to 172.
13            MR. CAMIEL:  We don't have an objection to 172.
14            THE COURT:  Are you seeking to admit 172?
15            MR. SKROCKI:  Not at this time.  That was a
16   typo in my notes.
17            THE COURT:  That's fine.
18   BY MR. SKROCKI:
19     Q.  So let's go back to 173.  Admitted for the
20   record.  And if you could start us again where the hotel
21   was, Mr. Rudat, and then take us up on your route just
22   briefly and we'll get to it.
23     A.  Yes, sir.  So the hotel is where the -- the
24   orange dot labeled Kodiak Airport, the hotel sits on the
25   same entrance to the airport adjacent to the main road
```

1    there.

2        Q.  And then your route to the communications

3    station?

4        A.  All right.  So across the road, up a bit and then

5    out on the road labeled Anton Larsen Bay Road.

6        Q.  Okay.  And you mentioned there was a time there.

7    If we could take that down, please.  You mentioned a

8    time of departure.  How do you know that?

9        A.  Yes, sir.  I had a screen cap that I saved for

10   the original team that showed my last e-mail that went

11   out at 6:37.  I departed the hotel.  I knew my

12   turnaround time was 7:10.  That's why I'm comfortable

13   with my times.

14       Q.  And why 7:10?

15       A.  That would get me back to the hotel in time to

16   get ready to meet the rest of my team from Mobile, then

17   head into the air station and do our business that day

18   on the air station itself.

19       Q.  What were you using to record your turnaround

20   time for your walk?

21       A.  I was using my iPhone, was my time.  I knew what

22   time I left, so I used that as my point of reference.

23       Q.  Had you taken any walks along that route before?

24       A.  Yes, sir.  I had walked that same route the day

25   prior, so I knew a good estimate of how far I could get

1   out.  I wanted to get at least an hour.  And that was

2   the best I could do that day.

3       Q.  And when you -- so you left the Comfort Inn about

4   what time?

5       A.  I left the Comfort Inn at 6:40, sir.

6       Q.  And you were headed up toward the communications

7   station?

8       A.  Yes, sir.

9       Q.  How long do you think it took for you to get

10  there?

11      A.  It took me 28 minutes to get to the COMMSTA and

12  another two minutes past that point.

13      Q.  And when you would take your walks habitually, do

14  you do anything to entertain yourself?

15      A.  Yes, sir.  I used headphones hooked into my

16  iPhone.

17      Q.  On this date, on the 12th of April of 2012, were

18  you listening to music?

19      A.  Yes, sir, I was.

20      Q.  Please tell the jury who you were listening to

21  that day.

22      A.  Adele.

23      Q.  Who gave you the idea for Adele?

24      A.  My daughter for a Christmas present.

25      Q.  Very nice.  Okay.  When you would take your walks

habitually, sir, could you explain to the jury the various volume levels?  How loud do you play or not your music?

    A.  I'd say the music is kept moderate.  I'm trying to be aware of what's coming from behind me as well as wildlife, especially down in Kodiak area.  So it was not head splitting.  It was a moderate volume level.

    Q.  And if we could pull up Exhibit No. 6, which I believe has been admitted.  Thank you.  If we can have the lights, Madam Clerk.  Thank you.

        Mr. Rudat, do you recognize what's depicted in Exhibit No. 6?

    A.  Yes, sir.

    Q.  And if you could show the jury your route from where you were coming from the Comfort Inn up further.

    A.  All right.  So starting at the top of the screen, this is Anton Larsen Bay Road, I came from the top to the bottom and past this point down here on the bottom of the screen.

    Q.  All right.  And if we could go to exhibit -- you kept walking from the bottom of the screen?

    A.  Yes, sir.

    Q.  If we can go to Exhibit No. 2, which I believe has been admitted.

            THE COURT:  Yes.

1    Q.  Thank you.  And do you recognize what's depicted

2    in that photograph, Mr. Rudat?

3    A.  Yes, sir.

4    Q.  So if you could show again your entire route from

5    the Comfort Inn to your turnaround point that you talked

6    about.

7    A.  All right.  So from the Comfort Inn at the bottom

8    of the screen, this is out this way, and my turnaround

9    point was approximately right in here.

10   Q.  Yeah, there you go.  Right below the gray line in

11   the picture up at the top?

12   A.  Yes, sir.

13   Q.  You knew your turnaround point was where it was

14   by how, by what mechanism?  In other words, how did you

15   determine your turnaround point?

16   A.  Based on time, 7:10.

17   Q.  Looking at your clock?

18   A.  Yes, sir.

19   Q.  If we can move to Exhibit No. 7, which I believe

20   has been admitted.  Do you recognize that building,

21   Mr. Rudat?

22   A.  Yes, sir.

23   Q.  And what is that building?

24   A.  That's the rigger shop, the maintenance facility.

25   Q.  Okay.  And you mentioned you turned around?

 1     A.   Yes, sir.

 2     Q.   Did you come by that rigger shop on your way

 3  back?

 4     A.   Yes, sir, I did.   Traveling from the left of the

 5  screen to the right along this road.

 6     Q.   Okay.   So were you -- what side of the road were

 7  you on when you came back?

 8     A.   Yes, sir.   I was walking against the flow of

 9  traffic, so I'd been on the left-hand side, coming from

10  left to right.

11     Q.   Towards the rigger shop side?

12     A.   Yes, sir.   Correct.

13     Q.   Mr. Rudat, when you came by the rigger shop, did

14  something catch your attention?

15     A.   Yes, sir.

16     Q.   Can you explain to the jury what that is?   Give

17  us all the detail you recall.

18     A.   Yes, sir.   I was walking back along the road.

19  When I got to approximately right here, I heard what

20  sounded to me like sheet metal -- or not sheet metal,

21  but a metal plate, quarter-inch metal plate of -- for

22  example, hitting solid against concrete.   It was a

23  single instance of noise that startled me.   It got my

24  attention.

25          I looked.   I had seen traffic going into the

1   COMMSTA that morning on my way out.  When I looked to

2   the building, there was a personally owned vehicle

3   parked right in here.  When I heard the noise, it

4   startled me, like I said.

5          I looked to the left and at the building, and I

6   saw a truck sitting there.  Knowing that that was the

7   maintenance facility, I figured it was the start of the

8   workday for the maintenance crew.  So it was that quick

9   of a processing in my mind, and I continued on my way.

10         MR. SKROCKI:  If I can approach the witness,

11  Your Honor.  I've showed counsel before we had testimony

12  today what we've marked as Exhibit No. 7A, a hard copy

13  of Exhibit No. 7.  I want to ask Mr. Rudat to mark

14  physically on this exhibit where he was and initial it.

15         THE COURT:  All right.  Very good.

16         (Mr. Skrocki approaches witness)

17  BY MR. SKROCKI:

18     Q.  I'm going to ask you to do more ink.  You want to

19  try a different pen?

20     A.  Yes, sir.

21     Q.  Does that work better?

22     A.  Not quite.  There we go.

23     Q.  Just so it's clear.  Thank you.

24         Blair, if I could have the camera for just a

25  moment.

1          Mr. Rudat, I'll point on Exhibit No. 7A we have

2    marked, this is your initials and that's what you marked

3    when you heard the noise where you were?

4        A.   Yes, sir.

5        Q.   That's the location?

6        A.   Yes, sir.

7             THE COURT:  So are you seeking to admit 7A?

8             MR. SKROCKI:  Yes, we are.

9             THE COURT:  Any objection?

10            MR. COLBATH:  No, that's fine, Your Honor.

11            THE COURT:  Very good.  7A is admitted.

12            (Exhibit No. 7A admitted.)

13   BY MR. SKROCKI:

14       Q.   If we can have Exhibit 19.

15            Mr. Rudat, I want to go back to the noise you

16   just testified you heard.  You were playing music that

17   morning of your walk?

18       A.   Yes, sir.

19       Q.   And could you tell the jury as best you can sort

20   of the relationship between what you heard and the music

21   that was being played?

22       A.   The music, as I mentioned earlier, was not

23   blasting.  I was still sensitive to traffic that was --

24   or possible wildlife in the area coming from behind me.

25   It was loud enough, the noise coming from that, that it

startled me, caused me to look. And as I mentioned

earlier, I processed when I saw the black truck parked

there that maintenance folks had begun their workday.

Q. With respect to the black truck, is that the only

vehicle you saw?

A. Yes, sir.

Q. Can you use the laser pointer and show the jury

where you observed that black truck?

A. Basically right here. It was most -- the closest

to this wing. This was that north-south wing, but it

was parked right here where this truck is.

Q. Any other vehicles -- you mentioned other

vehicles.

A. Yes, sir.

Q. Show the jury where you saw those, as you recall.

A. There were two government white pickups parked

right here right next to it, but the order was the

personally owned vehicle and then the two government

vehicles, and then off to this side here was two snow

tracks or tracked vehicles for snow.

Q. All right. And did you notice any vehicles

parked over here?

A. No, sir.

Q. By your estimation, Mr. Rudat, how far away were

you when you were walking on the road to the rigger shop

1    itself?

2       A.   I think from my left side on the return, I would

3    estimate probably in the area of 250 feet.

4       Q.   If we could have Exhibit No. 6, please.

5            Mr. Rudat, can you pick up from the middle of the

6    road here as you progressed on your walk going back to

7    the Comfort Inn?  So you heard the noise, you testified

8    about that.  What did you do next?

9       A.   Yes, sir.  I continued on down Anton Larsen Bay

10   Road.  I crossed this bridge right here, and

11   approximately right in this vicinity I received a phone

12   call from my ops center back in Mobile, Alabama at 7:14.

13      Q.   So your boss is reaching out to you?

14      A.   Yes, sir.

15      Q.   And I want to focus your attention on this area

16   here.  Were you aware of this structure that I circled

17   on Exhibit No. 6, the green dome-ish-like object as you

18   came up from the Comfort Inn?

19      A.   Yes, sir, I had seen the facility.

20      Q.   And please describe to the jury what activity you

21   saw or observed, if any, when you walked by it on the

22   way up the road.

23      A.   Okay.  So that would -- on the way out, I don't

24   recall seeing any activity in that general vicinity.

25   Most of the cars I had seen had gone past that facility

and on up towards the COMMSTA on my walk out.  So I
didn't see much traffic or activity at all in that area,
to be honest with you.

Q.  Did you observe on your way outbound any work
activity in that area there?

A.  No, sir.  None that I recall.  I was on a phone
call at that point, so I didn't have a lot of focus on
that side of the road as much as I would have probably
normally, but I was looking for oncoming traffic and on
a phone call with the folks back in Mobile.

Q.  How about inbound?

A.  Same, sir.  I didn't see any activity in that
vicinity.

Q.  Do you recall any other loud objects or noises
that interrupted your phone call while you were making
it to Mobile coming that direction, heading back to the
Comfort Inn?

A.  Coming from the --

Q.  From the COMMSTA going back to Comfort Inn.

A.  No, sir.

Q.  At some point, were you contacted by law
enforcement about --

A.  Yes, sir, I was.  I was contacted that evening.

Q.  By who, do you recall?

A.  CGIS agent and an FBI agent.

1    Q.   And what did you tell them?

2    A.   I relayed basically the story of what I just

3    recounted here and my times and our activities after

4    that morning.  Once we had gone into work, the base was

5    shut down, so we were stuck on base there for a while.

6    Q.   Did you have any recollection at the time you

7    were interviewed about some vehicles you may have seen

8    that morning, and, if so, what?

9    A.   The only other vehicle that specifically was

10   mentioned was the red pickup that I passed on the way

11   back to the Comfort Inn.  It was a red pickup with a

12   gentleman with a beard.  Most of the folks I had seen

13   that morning were in Coast Guard uniform, active-duty

14   members.

15        This individual stuck out in my mind because of

16   the beard.  He caught my attention.  And then as the

17   details started to come out, it bugged me that I was

18   concerned that it was one of the individuals that had

19   been murdered that morning.  So yeah, it was in my mind

20   quite a bit.

21   Q.   Where did you see the individual with the beard

22   in the red truck?

23   A.   Coming back -- he was headed out towards the

24   COMMSTA as I was headed back.

25   Q.   I'm sorry.  Can you say that again?

        A.  He was headed out towards the COMMSTA as I was
    headed back towards the Comfort Inn.

        Q.  Okay.  Got it.  At one point in time during that
    day, were you made aware of what had actually happened
    in the rigger shop that morning?

        A.  Yes, sir.

        Q.  When did you become aware of that?

        A.  Approximately 8:20, 8:30 that morning when I was
    on the air station itself.

        Q.  You made it back -- where were you?  Were you at
    T-1?

        A.  No, no.  I had gone actually to the air station,
    correct.

        Q.  And prior to your testimony with law enforcement,
    were you shown any video footage of the morning in
    question concerning your walk?

        A.  Yes, sir.

        Q.  If we could pull up just for Mr. Rudat's review
    and just for identification Exhibit 62.

            Do you recall -- we're running that footage
    now, Mr. Rudat.  Do you see that footage?

        A.  Yes, sir.

        Q.  And is this the footage that we showed you in
    preparation for trial?

        A.  Correct.

1    Q.  Do you during that footage see yourself walking

2    up the road past the rigger shop and then again back

3    down the road?

4    A.  Yes, sir.  It does eventually.

5    Q.  You can stop it there.  Thank you, Blair.

6        Mr. Rudat, with respect to the noise you heard

7    that morning you've just testified about emanating from

8    what you said was from the rigger shop, how certain are

9    you of that?

10   A.  Positive, sir.

11       MR. SKROCKI:  That's all the questions I have,

12   Judge.

13       THE COURT:  All right.  Mr. Colbath, go ahead,

14   please.

15                   CROSS EXAMINATION

16   BY MR. COLBATH:

17   Q.  Good morning, Mr. Rudat.

18   A.  Good morning.

19   Q.  My name is Gary Colbath.  I don't think you and I

20   have ever talked or met before.

21   A.  No, sir.

22   Q.  That last question, I didn't hear you say that

23   the noise was emanating from the building, but what I

24   recalled was you said you had walked and you had seen

25   traffic sort of entering or the COMMSTA area, and the

1  noise emanated from that same direction, which is what

2  drew your attention to the buildings and the parking

3  lot.

4      A.  I'm not sure I understand your question, sir.

5      Q.  Well, I didn't hear you -- Mr. Skrocki in his

6  question said you said that the noise emanated from

7  within the building.  But what I heard you say in your

8  testimony, and so I want to be clear on it, was that

9  when you were walking down the road, you had noticed

10  traffic going up towards the COMMSTA prior to the noise,

11  right?

12      A.  Correct.

13      Q.  And then you were startled by this noise, and so

14  because of where you heard it come from and the traffic

15  you had seen earlier, you looked in that direction and

16  it came from that direction.  Did I understand you

17  right?

18      A.  Yes, sir.

19      Q.  Okay.  And then when you looked, you saw some

20  vehicles, correct?

21      A.  Correct.

22      Q.  All right.  So let's just -- if you could pull up

23  Exhibit No. 7, I think was the one.  Oh, yes.  The same

24  one he drew on, government Exhibit No. 7.

25          You've still got your laser pointer there, right?

1    A.  Yes, sir.

2    Q.  So now, first of all, on the outbound -- when you

3    were still walking out, had you just made any

4    observation about the equipment and the vehicles at the

5    building here?

6    A.  Yes, sir.  The two snowcats right here on the

7    outbound lane, I had seen those.  We had joked to

8    ourselves the day prior or two days prior to that that

9    we would like to borrow them for the weekend.  I saw

10   those that morning I was walking out and --

11   Q.  Because they were sort of fresh in your mind from

12   the day before, they were there.  As to any vehicles,

13   either regular driving vehicles, for instance, the two

14   white pickups or the black pickup that you saw, regular

15   vehicles, not machinery or equipment like that, you

16   don't recall on the outbound taking note of anything?

17   A.  No, sir.

18   Q.  How about the trailer, you see the flatbed

19   trailer there that's sort of out away from everything

20   closer to the road, did you remember seeing that?

21   A.  Not specifically, sir.

22   Q.  All right.  So now on the way back, you're

23   walking and again take note of the snowcats.  They were

24   still there, obviously, and not mobile.

25   A.  Right.

1       Q.  And then you're walking down the road and you

2   hear this noise.  And it came from your left, the noise

3   came from your left?

4       A.  Yes, sir.

5       Q.  And you looked in that direction, and I thought

6   what you said was it was at that time that you observed

7   the vehicles?

8       A.  I observed the black POV.

9       Q.  Okay.  And in this picture, there's -- near the

10  building there, there's -- POV is personal --

11      A.  Personally owned vehicle, correct, sir.

12      Q.  You distinguish that from I bet GOV,

13  government-owned vehicle?

14      A.  Correct, sir.

15      Q.  And if I heard what you told Mr. Skrocki right,

16  the two white vehicles there, did you recognize -- were

17  they there when you looked over after you heard this

18  noise?

19      A.  Yes, sir.

20      Q.  In that location or a different location?

21      A.  In that location, sir.

22      Q.  And you could see a black truck as well, but it

23  was apparently closer to the building?

24      A.  Right in here, sir.

25      Q.  Okay.  Closer than that one is?

1    A.  I don't recall how far offset from the building
2    it was, but the order was the personally owned vehicle
3    and then two government-owned vehicles.
4    Q.  And the white vehicle that we see there away from
5    the other three, that was not there?
6    A.  No, sir.
7    Q.  And there was a single personal -- a single
8    personal vehicle there?
9    A.  Correct.
10   Q.  And if I heard what you said correctly, you said
11   it was because you observed in addition to the
12   government vehicles a personal vehicle there, it made
13   sense to you somebody had arrived for work and was
14   obviously doing something which created the noise that
15   is what you heard?
16   A.  That was my assumption, my processing, yes, sir.
17   Q.  It wasn't necessarily that the noise -- you
18   didn't know if the noise was behind the building, next
19   to the building, in the building, but it must be
20   associated with that direction and likely that personal
21   vehicle?
22   A.  Well, the personally owned vehicle indicating
23   that somebody was there performing work that morning,
24   and the maintenance facility being a maintenance
25   facility, that somebody had dropped what sounded like

metal hitting concrete.

Q.  Sure.  Okay.  You can take that down.  Thank you.

I want to back up to a couple of other things.
It sounded like on your walk, sir, that you're pretty
observant as to the vehicle traffic as you walked up and
down the road?

A.  Correct, sir.  Particularly the vehicles
approaching me head on.

Q.  For your own safety?

A.  Correct, sir.

Q.  Not only -- it sounded like not only observant as
to the vehicle for safety but made note of at least some
generalities about the drivers, because I heard you say,
you know, many people were dressed as Coastguardsmen and
you could recognize them.  And then something about a
man in a red truck, which I'll ask you about as well.
But you paid attention to the vehicle and the people,
right?

A.  That's correct.

Q.  And this red truck I want to ask you about, you
were able to pay enough attention and remember that the
man had a beard?

A.  That's correct.

Q.  And you remembered it was a dark-colored beard,
didn't you?

1    A.   Yes, sir.

2    Q.   Sort of not big and bushy, but fairly well-kept?

3    A.   That's correct.

4    Q.   And that didn't mean much, I assume, to you at

5    the time you were walking, but as you found out later

6    details, you thought it might have been somebody

7    involved?

8    A.   That's correct.

9    Q.   The person was wearing civilian clothes?

10   A.   Yes, sir.

11   Q.   That also stuck in your memory, it wasn't a Coast

12   Guard person in a red truck with a beard, it was a

13   civilian?

14   A.   That's correct.

15   Q.   And do you think as you walked both directions

16   and paid attention to traffic that you saw any other

17   civilians?

18   A.   No, sir.

19   Q.   Would that have stood out to you?  Would that

20   have been something probably in your memory if you had

21   saw that?

22   A.   If I had seen the traffic approaching me head on,

23   yes, sir, definitely.

24   Q.   You don't recall either -- well, you don't recall

25   at any time during your walk seeing a small blue SUV?

1    A.  No, sir.

2    Q.  All right.  Now, the noise that you heard as

3  you're walking back by, you described that as something

4  metal, a heavy piece of metal, the solid drop onto

5  concrete?

6    A.  Correct, sir.

7    Q.  And it was that singular startling noise that

8  drew your attention over to your left, and there was

9  nothing that gave you warning, first of all, that that

10  was going to happen?

11    A.  That's correct.

12    Q.  And after you looked, you didn't see anything

13  going on to your left?

14    A.  No.  There was no activity outside the building.

15    Q.  And nothing beyond on the hill or anywhere around

16  the building that you could see?

17    A.  No, sir.

18    Q.  And no second noise or other audible things that

19  helped you associate what that was?

20    A.  No, sir.  It was a single event.

21    Q.  All right.  Now, were you familiar with -- that's

22  a pretty -- I find that to be a -- that's a specific

23  description, metal on concrete.  Have you been around --

24  do you have construction experience, or do you have

25  experience that helped you associate that?

1    A.   Yes, sir.  I grew up on a farm, and also, the

2  aviation maintenance routine in a hangar, that's a

3  common occurrence is moving grates to cover a drain line

4  or a metal plate to cover up something to move aircraft

5  around it.  So that's -- that was the association I made

6  to it.

7    Q.   You have metal gates, metal fencing on the farm

8  for cattle?

9    A.   Cattle head gates.

10    Q.   Cattle gates.  Okay.  I grew up in South Dakota,

11  so I know exactly what you're saying.

12         How about I thought I heard in your military --

13  in your military experience that you had law enforcement

14  experience?

15    A.   Correct, sir.

16    Q.   Well, first of all, I'm going to guess growing up

17  on a farm, you may have had some familiarity also with

18  firearms?

19    A.   That's correct.

20    Q.   And the noises that firearms make?

21    A.   Rifles, yes, sir.

22    Q.   And then in -- what did you do in the military

23  police or for the military police?

24    A.   Law enforcement.

25    Q.   Did you carry a firearm?

1    A.   Yes, sir.

2    Q.   Were you qualified with it?

3    A.   Yes, sir.

4    Q.   Practiced regularly?

5    A.   Correct.

6    Q.   Train?

7    A.   Qualifying.

8    Q.   Handgun you carried, I assume?

9    A.   Yes, sir.

10   Q.   So you were certainly familiar with the noises

11   that both long guns and handguns made?

12   A.   Right, sir.  From outside.

13   Q.   Sure.  What you heard was not a gunshot, it

14   didn't register with you as a gunshot?

15   A.   It did not register as a gunshot, no, sir.

16   Q.   Do you think you could have told the difference

17   between that metallic noise you're familiar with and a

18   gunshot?

19   A.   Well, sir, I'd like to think I would have.  It

20   had been 22 years at that point since the last time I

21   had been involved with actual firing of a weapon.  And

22   as I mentioned, all my qualification was done on an

23   outdoor range.  So I don't know all the variables that

24   were involved that morning.  Open door, closed door.  I

25   don't know the variables that were involved.  I can only

relate to how I processed it and what it sounded like to me.

Q.   And that was that familiar metal grate on the heavy concrete?

A.   Correct, sir.

Q.   All right.  I want to -- could you pull up for me -- pull up Exhibit 19.

THE COURT:  Government 19?

MR. COLBATH:  Yes, government 19.  I'm sorry, Your Honor.

THE COURT:  That's all right.

BY MR. COLBATH:

Q.   Well, let's use a different one.  Let's try government Exhibit No. 6.  I better ask a question about that first.

Just a couple more things, Mr. Rudat.  Zoom in on the -- I don't know, bridge, water treatment area. Yeah, that's good.  About there.

So as I understand it, when you were on your return trip, headed back towards the Comfort Inn after hearing the noise, there was a period of time where you got a phone call?

A.   Correct, sir.

Q.   So the phone call interrupted your music playing?

A.   Correct.

     Q.  Did you answer the phone -- sometimes I use my
earphones and I can hear okay with that little mic.  Did
your mic have a microphone in the wire?

     A.  Not at that time, sir.  It was still the
old-school iPhone.

     Q.  And so did you have to unplug or shut down the
music and talk with the phone held up to your ear, or
were you able to use it and leave the earphones in?

     A.  If I recall correctly, the headset was still in
and I just talked on speaker.

     Q.  Okay.  And so it was somewhere just between the
bridge and this water facility that's on the right.  Can
you just show me again about where you were when you
think you got that call?

     A.  I would estimate it was right about in here.

     Q.  Do you recall right at that spot those trees on
your left?  It's sort of an uphill or an embankment
there.  The road is higher on that side than it is -- or
the hill is higher on that side than the other side.  Do
you recall that or --

     A.  No, sir.

          MR. SKROCKI:  Objection to the form of the
question.  Counsel is testifying.

          THE COURT:  I'll sustain that.
BY MR. COLBATH:

1    Q.  I'll rephrase that, Your Honor.

2        Do you recall the elevation from what would have

3    been on your right to what would have been on your left?

4    A.  No, sir.

5    Q.  It was the folks at the office back in Mobile?

6    A.  Yes, sir.  Our ops department.

7    Q.  Ops department.  All right.  Do you remember

8    about how long you talked to them?

9    A.  12 minutes, sir.

10   Q.  So you were walking at a fairly -- I was trying

11   to time that and calculate it.  You were walking at a

12   fairly good clip it looked like?

13   A.  Yes, sir.

14   Q.  So you were probably out of this -- well out of

15   this frame before you got off the phone?

16   A.  Correct.

17   Q.  All right.  And as you walked by, you were

18   focused I assume, number one, on your phone call?

19   A.  Correct, sir.

20   Q.  And number two, cognizant, at least for safety

21   purposes as you could, of traffic on the road while

22   keeping track of your phone call?

23   A.  Primarily the traffic coming straight at me, not

24   so much the traffic going away from me.

25   Q.  Okay.  And so if there had been activity, say, up

1    here on the back side of this facility, there certainly

2    could have been activity that you didn't see go on,

3    people up there, vehicles parked, other things

4    happening?

5        A.   Correct, sir.  I didn't see any of that.

6        Q.   Right.  Not that it wasn't there, you're not

7    saying that it wasn't there, you're just saying it was

8    nothing you observed while talking on the phone and

9    watching for oncoming traffic?

10       A.   Correct.  There was nothing that interfered with

11   my phone call.

12       Q.   All right.  You can take that down, I think.

13            MR. COLBATH:  If I can just have one minute.

14            THE COURT:  Certainly.

15            MR. COLBATH:  I think that's all the questions

16   I have for you.  Thank you, Mr. Rudat.

17            THE COURT:  Mr. Skrocki, redirect.

18            MR. SKROCKI:  Briefly.

19                     REDIRECT EXAMINATION

20   BY MR. SKROCKI:

21       Q.   I have a few questions, Mr. Rudat.  When you were

22   heading back to the Comfort Inn, were you paying

23   attention to traffic going past you in the same

24   direction?

25       A.   No, sir.  That's what I was mentioning earlier.

1  Traffic that's coming at me, that's headed towards the
2  COMMSTA as I head back to the Comfort Inn, that's my
3  primary focus.
4      Q.  I want to be clear about the question I asked or
5  what I said to you about that sound from the building --
6  from the area of the building.  Your testimony is that
7  that sound came from where?
8      A.  That building.
9      Q.  From that building?
10     A.  Yes, sir.
11     Q.  All right.  And about 8:30 you realized -- you
12  were told two men were killed in that building?
13     A.  Correct.
14     Q.  If we could pull up Exhibit No. 7A again.  I'm
15  sorry, 7.  Thank you, Blair.
16         Were you able to see, Mr. Rudat, around the back
17  side of that building?
18     A.  No, sir.  I didn't notice anything there.  I
19  couldn't see from -- I mean, my focus was where the
20  black pickup is.
21     Q.  This direction here?
22     A.  Correct.
23     Q.  So this is where you heard that sound come from?
24     A.  Yes, sir.
25     Q.  Thank you.

1          THE COURT:  Anything further?

2          MR. COLBATH:  One.

3          THE COURT:  Go ahead, Mr. Colbath.

4                    RECROSS EXAMINATION

5     BY MR. COLBATH:

6     Q.  And Mr. Rudat, except for the -- except for this

7     white van, those were actually -- I mean, we don't know

8     if they're the same vehicles, but that was the vehicle

9     configuration, three vehicles there, of what you recall

10    observing when you heard the sound and it drew your

11    attention towards the building?

12    A.  The noise is what drew my attention to the

13    building originally.  When I looked at the building, the

14    realization that there was a -- somebody's personally

15    owned vehicle parked there was a follow-on thought that

16    the workday has begun.

17    Q.  All right.  That's all I have for you, sir.

18          THE COURT:  Can this witness be excused?

19          MR. SKROCKI:  Yes, Your Honor.

20          MR. COLBATH:  We would agree with that.

21          THE COURT:  You may be excused.

22          (Witness excused)

23          THE COURT:  Do we have time for another witness

24    before we break for lunch?

25          MS. SHERMAN:  We would not get through the next

 1    witness.

 2              THE COURT:  Should we start?

 3              MS. SHERMAN:  We can start.

 4              THE COURT:  Very good.  Everybody holding up

 5    okay, ladies and gentlemen?  Very good.

 6              Good morning.  It you could come up to the

 7    witness stand, please, and when you get up there, remain

 8    standing and the clerk will administer an oath.

 9              (Oath administered to the witness)

10              DEPUTY CLERK:  For the record, can you please

11    state your full name and then spell your full name.

12              THE WITNESS:  Kelly Brockett, K-e-l-l-y,

13    B-r-o-c-k-e-t-t.

14          KELLY BROCKETT, GOVERNMENT WITNESS, SWORN

15                      DIRECT EXAMINATION

16    BY MS. SHERMAN:

17       Q.  Ms. Brockett, where do you work?

18       A.  I work as a special agent with the Coast Guard

19    Investigative Service in Virginia.

20       Q.  How long have you been in that position?

21       A.  Approximately three months.

22       Q.  Can you tell us what you did before that?

23       A.  I was a maritime enforcement specialist with the

24    United States Coast Guard.

25       Q.  How long were you doing that work?

1     A.   I was employed as a maritime enforcement

2  specialist since 2009.

3     Q.   And what does a maritime enforcement specialist

4  do?

5     A.   We were responsible for maintaining the safety

6  and security of the base at the Coast Guard Police

7  Department.  We would enforce applicable federal laws as

8  well as United States Code of Military Justice.

9     Q.   Were you ever stationed in Kodiak?

10    A.   Yes.

11    Q.   When?

12    A.   From 2009 to 2012.

13    Q.   You left in 2012?

14    A.   Correct.

15    Q.   Did you have a particular role when you were on

16 Kodiak?

17    A.   Yes.  I was a uniform police officer for the

18 Coast Guard Police Department.

19    Q.   Did they have an abbreviation?

20    A.   CGPD.

21    Q.   Ever referred to as mil pol?

22    A.   Sometimes, yes.

23    Q.   As a uniformed officer for CGPD, what sort of

24 tasks would you have?

25    A.   We were responsible for maintaining the safety

1  and security of the base and the outlaying property on

2  Coast Guard property, so we would conduct routine

3  patrols of the facilities and areas that were within our

4  area of responsibility, conduct traffic enforcement,

5  respond to emergency calls.

6      Q.  What sort of -- you said patrols.  What sort of

7  patrols would you do?  Would you do -- let me start

8  over.

9          What sort of patrols would you do off of the main

10  base?  What areas would you patrol?

11     A.  We would patrol anything that fell within Coast

12  Guard property to include Buskin park, the airport up.

13  There were two housing areas off base that we patrolled

14  in addition to facilities off of Anton Larsen Bay Road,

15  the comm station.  There was a golf course, ski chalet.

16     Q.  What sort of training did you have to do that job

17  job?

18     A.  For that job, I was a graduate of the uniformed

19  police training program at the federal law enforcement

20  training center in Glynco, Georgia.

21     Q.  How long -- when you do these routine patrols,

22  how long were your shifts?

23     A.  We work 12-hour shifts.

24     Q.  And when you would do these shifts and you would

25  do these patrols, did you just go to one place every

1    night or how did rounds work, I guess?

2        A.   We conducted several rounds of the entire

3    property line.  We would vary our times, but typically

4    around three complete rounds per shift.

5        Q.   When you would do a round, what sort of things

6    were you doing?  What were you looking for?

7        A.   Looking for anything out of the ordinary, any

8    kind of suspicious activity.  We would be verifying that

9    gates were secured, doors were shut, facilities locked.

10       Q.   Would you go up and do physical inspections?

11       A.   On certain facilities.

12       Q.   How about the COMMSTA?

13       A.   We would verify the gate was locked on the

14   COMMSTA, the T-1 building.

15       Q.   You would not go up and check all the doors on

16   the rigger shop as part of your role?

17       A.   No.

18       Q.   When you said you're looking for things, tell the

19   jury what sort of suspicious things you're looking for.

20       A.   We would typically come across vehicles that

21   might be parked out of place off -- that particular

22   area, off the side of the road.  Usually, I would say

23   the majority of the time, the case we found was two

24   individuals inside a vehicle -- yeah, up to no good.

25       Q.   Anything else that you would see out there, up

1    Anton Larsen Bay Road specifically?

2        A.   We would be looking for roadkill, just vehicular

3    accidents that would happen out there.  It's kind of a

4    rural isolated area.

5        Q.   How far up Anton Larsen would you patrol?

6        A.   We would go all the way up until the ski chalet,

7    if weather permitted and the road conditions allowed us,

8    we would travel all the way up to the ski chalet.

9        Q.   You said if weather permitted.  Were there times

10   of the year where weather would not permit that?

11       A.   Yes.  We did drive vehicles with studded tires,

12   but sometimes it was not a good idea to travel beyond

13   with snow on the road.  They only plowed just so far.

14       Q.   Were you on patrol -- well, let me ask you this:

15   In April of 2012, what type of shift were you working?

16       A.   I was working the night shift.

17       Q.   Do you recall the hours of that?

18       A.   I believe it was 10:00 p.m. to 10:00 a.m.

19       Q.   So do you recall what time you would do the round

20   out near Anton Larsen, or what time you did it on

21   April 12th, the morning of April 12th?

22       A.   That morning I conducted the round at 0600, so

23   6:00 a.m.

24       Q.   Did you notice anything suspicious that morning

25   at 6:00 a.m. when you traveled up Anton Larsen?

1    A.  No.

2    Q.  Did you look at the rigger shop?

3    A.  Yes.  We passed through the parking lot there,

4 nothing out of the ordinary.

5    Q.  After you did rounds that morning around 6:00

6 a.m., where did you go?

7    A.  After patrolling for a short period of time, I

8 ended up doing what we call school zone enforcement.  I

9 was actually stationed outside the -- I post my vehicle

10 outside the schoolhouse just to ensure the traffic

11 slowed down for all the children coming into school that

12 morning.

13    Q.  Where is that school located?

14    A.  It's located off of Dolphin Road.

15    Q.  Near the main base?

16    A.  It's directly adjacent to the main base.

17    Q.  How far is Dolphin Road where you're posted up to

18 the COMMSTA?

19    A.  I would say around a half a mile.

20    Q.  How long would it take you to drive up there?

21    A.  At the speed limit?

22    Q.  Yes.

23    A.  It would take probably five to eight minutes.

24    Q.  The morning of April 12, 2012, did you receive a

25 call that morning or alert of any sort?

1    A.  Yes.  We received what we call a tone-out, and

2  it's an emergency alert across the radio indicating

3  there had been an incident.

4    Q.  You said tone-out.  Is it a sound?

5    A.  Yes, it's a very loud sound that will go out

6  across the radio followed by a broadcast of what the

7  actual situation is.

8    Q.  Do you recall what time you received that alert

9  on April 12th?

10    A.  It was at 7:46 in the morning.

11    Q.  And what was the information that followed that?

12    A.  The information that was passed was there were

13  two individuals found unconscious with a lot of blood at

14  the T-2 building.

15    Q.  Did you respond?

16    A.  Yes.

17    Q.  Do you recall who else was responding?

18    A.  At that point, the other officers that were on

19  duty was Officer Elizondo and Officer Swerengen, and I

20  was the first to arrive on scene.

21    Q.  When you were traveling out to the COMMSTA, did

22  you notice any vehicles on Anton Larsen Road?

23    A.  There were no vehicles on the road.

24    Q.  How do you know that?

25    A.  Because I was traveling at a high rate of speed

1   and being extra cautious of my surroundings as I was

2   responding.

3       Q.   What time did you arrive at the rigger shop?

4       A.   Approximately five minutes later.

5       Q.   What did you see when you arrived?

6       A.   There was a young female standing in the parking

7   lot to the T-2 building.  When I first arrived, I got

8   out of my vehicle and asked her where the emergency was.

9   She didn't seem to know what I was talking about at that

10  time.

11          And immediately following that, I was greeted by

12  OS1 Haselden, who came out of the rigger shop and

13  started to quickly usher me inside telling me the

14  emergency was inside.

15      Q.   Did you go inside?

16      A.   Yes.

17      Q.   Once you were inside, what did you do?

18      A.   I asked him where was the emergency.  He

19  immediately pointed directly across from the entry that

20  I had just come in, and I could see the first victim

21  lying on the ground, which was ET1 Hopkins.

22      Q.   Let's put up Exhibit No. 13 if we could, please.

23          There should be a laser pointer up there.  If you

24  could point on here where -- what door you came in.

25      A.   So I came in through this entry.

```
 1      Q.   And where you said you saw victim one, where was
 2   that?
 3      A.   He was located underneath the water fountain
 4   right here in this lounge area.
 5      Q.   Did you note anything about his position?
 6      A.   Yes.  He was laying on his left side facing away
 7   from the front door.  He had -- his head was up against
 8   a small like wooden case that was directly underneath
 9   the water fountain.  And he is laying in what I would
10   describe as the recovery position, and it's just a
11   position that we use to help people maintain their
12   airways in an emergency, but more or less laying on his
13   left side in something similar to the fetal position.
14      Q.   What did you do next?
15      A.   I asked them where the second victim was and they
16   showed me to an office space to the left.
17      Q.   Can you show us where you went after that?
18      A.   I entered this office right here.
19      Q.   What did you see?
20      A.   I observed Mr. Belisle lying facedown between --
21   his chair was kind of over the top of him and his head
22   was underneath the desk.
23      Q.   Prior to April 12th, had you been in the rigger
24   shop before?
25      A.   No.
```

1    Q.   So you have identified Mr. Hopkins and

2  Mr. Belisle.  Did you know them?

3    A.   No.

4    Q.   After you saw Mr. Belisle, what did you do?

5    A.   At that point, I removed my jacket and I donned a

6  pair of nitrile gloves for scene safety.  There was

7  blood in the area, it's universal precautions.

8    Q.   Why did you take your coat off?

9    A.   Because I was getting ready to perform CPR, if

10  necessary.

11    Q.   After you donned the gloves, what did you do?

12    A.   I walked back into the lounge area where ET1 was

13  lying on the ground and I checked him for a pulse.

14    Q.   After you checked him for a pulse, what did you

15  do?

16    A.   I was unable to locate a pulse.  I returned to

17  Mr. Belisle's office and checked him for a pulse and

18  also was unable to find a pulse.

19    Q.   Did you notice anything else -- well, strike

20  that.

21        When you were checking Mr. Belisle's pulse, had

22  you ever -- did you notice anything about him?

23    A.   He was very rigid and discolored at the time.

24    Q.   Did you think he was dead?

25    A.   Yes.

1    Q.   Why did you think that?

2    A.   Just given the discoloration of his skin.  He did

3    not have what I would describe as a fleshy tone, and

4    again his skin being very rigid.

5    Q.   Had you ever responded to a situation like this

6    before?

7    A.   No.

8    Q.   After you checked his pulse, you indicated --

9    well, where did you go next?

10   A.   I returned to ET1 Hopkins and continued

11   assessment on him.

12   Q.   Where in here did you go?

13   A.   So I came out of this office with Mr. Belisle and

14   returned back to where ET1 Hopkins was located under the

15   watercooler.

16   Q.   Did you enter through that doorway?

17   A.   This entry right here.

18   Q.   Okay.  Why don't we pull up Exhibit No. 118 just

19   for Ms. Brockett to identify.  Do you recognize this?

20   A.   Yes.

21   Q.   Who is depicted in this picture?

22   A.   This is ET1 Hopkins.

23   Q.   Is this similar to where you located him that

24   day?

25   A.   Similar to where he's located, different

position.

Q.   I'm going to have you, once it's admitted, talk about where you were and what you -- how you interacted with him.

          MS. SHERMAN:  So at this time, I'm going to move the admission of 118.

          THE COURT:  Any objection to 118?

          MR. CAMIEL:  No.

          THE COURT:  118 is admitted.

          (Exhibit No. 118 admitted.)

          MS. SHERMAN:  Before we publish, this is a photo of Mr. Hopkins, just so everyone is aware.

BY MS. SHERMAN:

Q.   Go ahead and display that.  Can you tell us -- you said you came in through that doorway.  Can you tell us how you were able to check Mr. Hopkins' pulse from this photo?

A.   At the time when he was laying on his side, although there was a large pool of blood, it wasn't as large at that time.  I was able to squat down on the side of him closest to the door that I entered through and I reached across his body to feel for a pulse.

Q.   We can take that down.

          When you reached across his body to feel a pulse, how were you feeling at that moment?

1    A.   Very nervous.

2    Q.   Why?

3    A.   I had never encountered any kind of situation

4    like this before and I was fairly certain both

5    individuals were deceased, and I had never touched a

6    dead person before.

7    Q.   Okay.  Were you able to easily check for his

8    pulse?

9    A.   Not initially.  My hands were actually shaking.

10   Q.   So what did you do?

11   A.   I took a moment.  I closed my eyes, took a deep

12   breath, had a little internal monologue and was able to

13   steady my hand and attempted to feel for a pulse again.

14   Q.   Did you feel a pulse on Mr. Hopkins?

15   A.   No.

16   Q.   Did you see any weapons or spent shell casings

17   when you were in there?

18   A.   No.

19   Q.   Did you notice anything that might have indicated

20   to you what had happened?

21   A.   When I initially walked in the building, there

22   was a very prominent burning smell that was in the air,

23   and it wasn't until I was assessing ET1 Hopkins,

24   assessing his injuries at that time that I drew the

25   distinction that that burning smell was gunpowder.

1    Q.   After you -- did you do a sweep for security
2 before you checked on either of these men?
3    A.   No.
4    Q.   After you had checked on them and couldn't find a
5 pulse, what did you do?
6    A.   After I checked on them, couldn't find a pulse,
7 and then realizing what had happened, that there had
8 been a shooting, I had three individuals who were
9 standing inside exit the building.  I immediately got on
10 the radio and I called for backup and EMS support.
11    Q.   And who showed up to help you?
12    A.   The first to arrive was Officer Elizondo, and he
13 was followed very shortly by the Coast Guard fire
14 department personnel.
15    Q.   What did you -- did you and Officer Elizondo do
16 anything?
17    A.   Yes.  We conducted a complete security sweep of
18 the building to ensure that the shooter was no longer in
19 the building.
20    Q.   How do you do something like that?
21    A.   It's a very thorough and methodical search of the
22 area with our weapons drawn searching every man-size
23 space.
24    Q.   Do you recall what time you were doing the
25 security sweep?

 1    A.  I don't recall.

 2    Q.  When you were talking about doing a security

 3  sweep, were you doing it just inside the building?

 4    A.  No.  We conducted a security sweep of the

 5  external area of the building to include the vehicles in

 6  the parking lot.

 7    Q.  Let's bring up 13 again.

 8        Why don't you -- did you have any interaction

 9  with Officer Elizondo when he arrived?

10    A.  The first thing when he walked in, I gave him a

11  very, very abbreviated situation report, showed him

12  where the two victims were, and explained to him that I

13  hadn't swept the rest of the building and we needed to

14  conduct a full security sweep.

15    Q.  Did you give him anything else?

16    A.  I provided for him one nitrile glove.  I only had

17  one extra one on my person at the time.  Unfortunately,

18  it wasn't the right size, so he tried to put it on his

19  hand and ended up pulling it off and dropping it on the

20  floor.

21    Q.  So if he's not wearing gloves, what did you

22  decide to do?

23    A.  So I decided to take what we refer to as the

24  point position.  I was the first to enter every building

25  or go through every doorway first because I was the one

1  wearing nitrile gloves, so I was trying to keep the

2  integrity of the crime scene and not put any

3  fingerprints on anything.

4      Q.  And you say nitrile gloves.  Can you describe

5  what those are to us?  I have never heard of nitrile

6  gloves.

7      A.  They are like latex gloves.  They are just not

8  made of latex.  They are used by police and by EMS

9  personnel to protect you from exchange of fluids.

10     Q.  Take us through where you met Officer Elizondo

11  and how you conducted your sweep.

12     A.  Officer Elizondo came in the same entrance that I

13  did.  I met him in the locker room area.  We staged --

14  after EMS had come in, we staged at this door right

15  here, me being in front and him behind me.  We drew our

16  weapons and made entry into the repair shop.

17     Q.  Where did you go from the repair shop?

18     A.  After securing the repair shop, we exited through

19  a back door.  There was several vehicles, large vehicles

20  parked out back.  We conducted a security sweep of them,

21  and then we returned into the building through the

22  boiler room door, which was unsecure.

23     Q.  When you say "unsecure," was it ajar, do you

24  recall?

25     A.  I do not recall.

1    Q.   Okay.  So you entered the boiler room.  What did
2  you do there?
3    A.   Conducted a security sweep of the boiler room and
4  then attempted to make entry through this door, but it
5  had been locked from the inside.
6    Q.   So you could not get through that door?
7    A.   No.
8    Q.   Do you recall the repair shop door to get out of
9  that, did you have to unlock it?
10   A.   I don't recall.
11   Q.   So after you are in the boiler room, where do you
12  go?
13   A.   We had to actually come back out and come around
14  to reenter the building.
15   Q.   Which door did you reenter through?
16   A.   I'm not certain.
17   Q.   All right.  When you were leaving the doors of
18  the repair shop out the back and the boiler room door,
19  were you securing doors behind you?
20   A.   No.
21   Q.   After you searched the boiler room, the repair
22  shop, where else did you search?
23   A.   We searched the parking lot and the garage area,
24  ensured all the areas were completely searched.
25   Q.   So you searched down here in the wood shop and

1  the garage as well?

2     A.  Uh-huh.

3     Q.  What, if anything, did you find suspicious during

4  your sweep?

5     A.  We found nothing out of the ordinary.

6     Q.  What happened next?

7     A.  At some point, Officer Swerengen arrived on

8  scene.  I felt it best not to permit her entry into the

9  crime scene.

10    Q.  Why?

11    A.  I was thinking less feet, less hands, less

12 people, less trace evidence to be left behind.  I gave

13 her the keys to my vehicle and had her move my vehicle

14 to the entrance to the parking lot that was located on

15 Anton Larsen Road to block any traffic from coming in

16 there.

17        And she remained outside the building with the

18 three individuals who were there when I first arrived.

19    Q.  When you called for backup, did you call just for

20 CGPD back up?

21    A.  Yeah.  The way our dispatch works, it's not

22 connected to the 911 system with Kodiak Police

23 Department or Alaska State Troopers.  It has to be an

24 additional phone call made.  I simply just requested

25 backup.  I reported that there had been a shooting and I

1    needed backup on scene.

2         Q.  Did anyone other than CGPD show up?

3         A.  Yes, the Alaska State Troopers, Trooper Dupras

4    was the very next person to arrive after that.

5         Q.  Had you worked with him before?

6         A.  Yes.

7         Q.  So when he arrived on scene, how did you feel?

8         A.  Relieved.

9         Q.  Why?

10        A.  I felt like this was a situation that was very

11   much beyond my current level of experience and he was a

12   veteran Alaska State Trooper so I was very happy to see

13   him.

14        Q.  After he arrived on scene, what did you do?

15        A.  I quickly ushered him into the building.  All the

16   other CGPD officers stayed outside, gave him a quick

17   brief of the situation and asked him what I should do

18   next.

19        Q.  Did you observe when other individuals were

20   showing up, particularly Scott Reckner?

21        A.  Yes.

22        Q.  Can you describe what you observed of Mr. Reckner

23   when he arrived?

24        A.  He was very distraught and panicked.

25        Q.  Did he stay outside willingly?

1      A.   We had to stop him from entering the crime scene.

2              MS. SHERMAN:  Those are all my questions.

3              THE COURT:  All right.  Very good.  Maybe we'll

4      have our lunch break now and do cross after lunch.

5              Ladies and gentlemen, please leave your

6      notepads here.  Remember my admonition not to discuss

7      the case or do any research.  Why don't we have you back

8      at 1:10, just over an hour from now.  Please have a

9      pleasant lunch as well.  We'll see you at 1:10.

10             (Jury absent)

11             THE COURT:  Anything we need to take up at this

12     time?

13             MR. SKROCKI:  Nothing from us, Your Honor.

14             MR. COLBATH:  Nor from us at this point.

15             THE COURT:  Very good.  We'll see you at 1:10.

16     We'll go off record.

17             (Recessed from 12:00 p.m. to 1:14 p.m.)

18             (Jury present)

19             THE COURT:  Good afternoon.  Please be seated,

20     everyone.  And we're back on record here.

21             Ready to proceed, Mr. Camiel?

22             MR. CAMIEL:  Yes, Your Honor.  Could I hand up

23     just in case we need these?

24             THE COURT:  Yes, that's fine.

25             (Mr. Camiel approaches witness.)

                         CROSS EXAMINATION

1

2    BY MR. CAMIEL:

3        Q.   Good afternoon, ma'am.

4        A.   Good afternoon.

5        Q.   One of the things that you told us this morning

6    was about the rounds that you do during the shift that

7    you were on.  And I think you said your shift was 10:00

8    p.m. to 10:00 a.m.; is that right?  Or was back then?

9        A.   Yes, sir.

10       Q.   And one of the responsibilities that you had was

11   the zone that you were covering took you all the way up

12   Anton Larsen Bay Road; is that right?

13       A.   That's correct.

14       Q.   And the responsibilities in terms of the rounds

15   that you did included the side roads off Anton Larsen

16   Bay Road; is that right?

17       A.   That's correct.

18       Q.   Could we put up government Exhibit No. 3.

19            And can you see on government Exhibit No. 3 Anton

20   Larsen Bay Road?  No?  I'm sorry.  Let's look at four.

21   Let's do four.  Sorry.

22            Can you see the COMMSTA in that picture?

23       A.   Yes.

24       Q.   And can you see Anton Larsen Bay Road?

25       A.   Yes.

 1    Q.  And can you see down to the airport kind of at
 2  the top left of the picture?
 3    A.  Yes.
 4    Q.  Do you see the side roads that you also patrolled
 5  off Anton Larsen Bay Road?
 6    A.  Yes.
 7    Q.  I think there is a pointer there.  And maybe if
 8  you can use the laser pointer and point out for the jury
 9  on the big screen where those roads are that you would
10  cover as a part of your rounds.
11    A.  It's a really difficult photo to tell where the
12  roads even are.
13    Q.  If it's too difficult, we won't have you do it.
14  How about if we blow it up a little bit.
15    A.  Well, right here we have -- this was the water
16  treatment facility that was located there.  There was a
17  small road that went through there.
18    Q.  Okay.
19    A.  Other than that, there is various dirt roads off
20  both sides of Anton Larsen.
21    Q.  And so as a part of your rounds, would you drive
22  down those roads?
23    A.  Yes.
24    Q.  How far down?
25    A.  To where the roads ended.

1    Q.  All right.  And the last round that you did on
2  the morning of April 12, 2012 was at 0600, 6:00 a.m.?
3    A.  That's correct.
4    Q.  When you did that round, how far up Anton Larsen
5  Bay Road did you go?
6    A.  I don't recall on that morning how far up the
7  road I went.  Weather permitting, we would have gone all
8  the way to the ski chalet.
9    Q.  How far -- from the COMMSTA, how far is it to the
10 ski chalet?
11   A.  I don't have an exact idea of how far.  It took
12 us probably about 15 minutes to travel the entire way
13 from the COMMSTA to the ski chalet.
14   Q.  Between the ski chalet and the COMMSTA is there a
15 golf course?
16   A.  Yes.
17   Q.  And so how far is the golf course from the
18 COMMSTA?
19   A.  Probably halfway from the ski chalet to the
20 COMMSTA.
21   Q.  And I know that your rounds were during the
22 evening hours, but was it true that sometime in April
23 the golf course would usually open up?
24   A.  I don't recall.
25   Q.  Now, on the morning of April 12th, you told us

```
 1    how you responded.  And you arrived at the COMMSTA again
 2    at what time?
 3        A.  I arrived approximately five minutes from the
 4    time of the call, which was 7:46 a.m., so 7:51.
 5        Q.  And you're the very first law enforcement person
 6    there?
 7        A.  Correct.
 8        Q.  You described for us how you went in and attended
 9    to Mr. Hopkins and Mr. Belisle and attempted to
10    determine their condition, right?
11        A.  Correct.
12        Q.  And then when backup came, I think Mr. Elizondo
13    was one of the two backup people that came, and
14    Ms. Swerengen?
15        A.  That's correct.
16        Q.  You and Mr. Elizondo then started the security
17    sweep?
18        A.  Yes.
19        Q.  You started on the inside of the building; is
20    that right?
21        A.  Correct.
22        Q.  And you went through every room of the building
23    and you said you checked anywhere that a person could
24    fit?
25        A.  That is correct.
```

1    Q.  When you first entered into the building, do you

2    remember what door you came in through?

3    A.  Yes.

4    Q.  And was it open at the time that you showed up?

5    A.  It was being held open by OS1 Haselden.

6    Q.  If we could look at Government Exhibit No. 13.

7        Do you see the door that you entered on that

8    diagram, Government 13?

9    A.  Yes.

10   Q.  Can you point for us with the laser to show us

11   the door that you entered?

12   A.  It was this door.

13   Q.  All right.  Now, after you completed the sweep of

14   the inside of the building, then you and Mr. Elizondo

15   went outside, and the first thing you did was you

16   checked vehicles that were out there, right?

17   A.  That is correct.

18   Q.  Where were the vehicles located?

19   A.  They were located behind the repair shop along

20   the back side of the building.

21   Q.  How about the vehicles that were in the front?

22   A.  We also checked the vehicles in the front.

23   Q.  Did you check those first?

24   A.  I don't recall.

25   Q.  Do you recall that you actually exited out the

1   door you came in and checked the vehicles right in front
2   of the building first before you went around back?
3       A.  I don't recall.
4       Q.  So you may have, it's just been too long?
5       A.  It's been a long time.
6       Q.  All right.  In any event, at some point you
7   worked your way around to the bigger vehicles, the heavy
8   equipment?
9       A.  Yes.
10      Q.  Could we put up DE-249 first, just for
11  foundation.
12          I would like you to take a look at this
13  photograph.  Does that look like kind of the back corner
14  area where you would have walked around to look at the
15  bigger vehicles?
16      A.  Yes.
17      Q.  And do you see there is, looks like a law
18  enforcement vehicle that's parked blocking one of the
19  driveways.  Was that yours?
20      A.  Yes.
21          MR. CAMIEL:  Your Honor, I would offer DE-249.
22          MS. SHERMAN:  No objection.
23          THE COURT:  DE-249 is admitted.
24          (Defense Exhibit No. 249 admitted.)
25  BY MR. CAMIEL:

 1    Q.  Could you point to the jury, point out your

 2 vehicle.  At this point, we don't see any other law

 3 enforcement vehicles?

 4    A.  Not in this photo, no.

 5    Q.  Can you show us the vehicles that you searched

 6 when you went out back, or the equipment that you

 7 searched?  Can you point to each.

 8    A.  This vehicle, this vehicle, searched around this

 9 storage container, these two large vehicles here, this

10 trailer.

11    Q.  And then if we could take that down, and then for

12 foundation DE-248.

13        And does that appear to be another photo of the

14 COMMSTA on the morning of April 12th?

15    A.  Yes.

16    Q.  Is that more of a close-up of the area that you

17 walked around?

18    A.  Yes, it's the corner of the repair shop.

19        MR. CAMIEL:  I would offer DE-248.

20        MS. SHERMAN:  No objection.

21        THE COURT:  That's admitted.

22        (Defense Exhibit No. 248 admitted.)

23 BY MR. CAMIEL:

24    Q.  And so the yellow-ish-orange vehicle, that's the

25 line truck that was in the back of the building; is that

1   right?

2       A.  Correct.

3       Q.  And you looked in there?

4       A.  Yes.

5       Q.  And then we can take that one down, and for

6   foundation put up 247.

7           MR. CAMIEL:  I would offer DE-247.

8           MS. SHERMAN:  No objection.

9           THE COURT:  247 is admitted, Defense 247.

10          (Defense Exhibit No. 247 admitted.)

11      Q.  That's another view from a different angle of the

12  T-2 building; is that right?

13      A.  That is correct.

14      Q.  Is your vehicle still parked there?

15      A.  I can't tell from this photo.

16      Q.  All right.  This is after other law enforcement

17  have obviously arrived?

18      A.  Yes.

19      Q.  If we could take that one down and go to

20  Government 73.

21          Do you recognize that photograph?

22      A.  Yes.  It's the back side of the T-2 building.

23      Q.  All right.  And there are two doors that are

24  shown.  Do you see those?

25      A.  Yes.

1    Q.  And you walked around back there and checked both

2  of those doors?

3    A.  Yes.

4    Q.  Now, the one -- when you are checking them, what

5  you're doing is you're checking to see if they are

6  secure or unsecure; is that right?

7    A.  I was checking to try to make entry through them

8  to clear the rest of the building.

9    Q.  If we could put up 73.

10       MR. CAMIEL:  I'm sorry, Your Honor.  Has 73

11  been admitted?

12       MS. SHERMAN:  It hasn't, but I don't have any

13  objection.

14       THE COURT:  Government 73 is admitted.

15       (Exhibit No. 73 admitted.)

16  BY MR. CAMIEL:

17    Q.  So the door to the right, did you check that door

18  to see if you could make entry, the one that has the

19  arctic entry area?

20    A.  Are you referring to this door?

21    Q.  Yes.

22    A.  Yes.

23    Q.  Was that secure?

24    A.  Yes.

25    Q.  Did you notice that the screen door was ajar when

1  you first came upon that door?

2      A.  No.  I wasn't concerned with it at the time.

3      Q.  That door was secure, right?

4      A.  Yes.

5      Q.  Okay.  So then you went over to the door to the

6  left.  Could you point to that door.  And you tried that

7  door?

8      A.  Yes.

9      Q.  That one wasn't secure; it was unlocked?

10     A.  Correct.

11     Q.  And so you opened that door and walked in?

12     A.  Correct.

13     Q.  Can we take that one down.

14         MR. CAMIEL:  Your Honor, I don't know if 74 has

15  been admitted yet.

16         THE COURT:  No.

17         MS. SHERMAN:  I don't have an objection to

18  admitting 74.

19         THE COURT:  All right.  Seek to have that

20  admitted?

21         MR. CAMIEL:  Please.

22         THE COURT:  Government 74 is admitted.

23         (Exhibit No. 74 admitted.)

24  BY MR. CAMIEL:

25     Q.  That's a close-up of the door that you found

1  unsecured?

2      A.  Correct.

3      Q.  So you went in -- you went in with Mr. Elizondo,

4  into what turned out to be the boiler room, right?

5      A.  That is correct.

6      Q.  And inside the boiler room you didn't find

7  anybody in there?

8      A.  No.

9      Q.  But you did find that there was another door

10 further inside?

11     A.  Yes.

12     Q.  And that door was secure?

13     A.  Yes.

14     Q.  Now, you talked about when you do your rounds, at

15 some of the facilities that you check out, you actually,

16 when you do the rounds, you get out and you check doors

17 to make sure they are secure?

18     A.  Yes.

19     Q.  But you don't do that at the COMMSTA?

20     A.  No.

21     Q.  They are responsible for their own internal

22 security in that way?

23     A.  I couldn't speculate about that.

24     Q.  Pardon?

25     A.  I don't know if they have their own security.

1    Q.  Could we have the witness look -- these haven't

2  been admitted I'm sure, 127.

3          THE COURT:  Government 127?

4          MR. CAMIEL:  Yes.

5          THE COURT:  All right.

6  BY MR. CAMIEL:

7    Q.  Does that look familiar as the boiler room that

8  you walked into?

9    A.  Yes.

10   Q.  Does that look the way it did on April 12th?

11   A.  To the best of my recollection.

12         MR. CAMIEL:  I would offer 127.

13         MS. SHERMAN:  No objection.

14         THE COURT:  127 is admitted.

15         (Exhibit No. 127 admitted.)

16 BY MR. CAMIEL:

17   Q.  And if we could take that one down and have the

18 witness look at Government 128.

19         Does that look to be another photo of the boiler

20 room that you went into on April 12th?

21   A.  Yes.

22   Q.  And the door there, is that the door that you

23 entered through?

24   A.  I don't recall.  It's hard to tell from this

25 photo.

1          MR. CAMIEL:  I would offer 128.

2          MS. SHERMAN:  No objection.

3          THE COURT:  128 is admitted.

4          (Exhibit No. 128 admitted.)

5    BY MR. CAMIEL:

6      Q.  Thank you.  Now, after you did the security

7    sweep, other people started to arrive, and you

8    mentioned, for example, Trooper Dupras?

9      A.  Correct.

10     Q.  And other people who worked at the COMMSTA as

11   well?

12     A.  Yes.

13     Q.  One of the people who arrived was Chief Reckner,

14   somebody you learned to be Chief Reckner?

15     A.  Correct.

16     Q.  And you talked about the fact that he wasn't

17   allowed to go into T-2, the rigger shop?

18     A.  Correct.

19     Q.  You kept him out there.  And while you were out

20   there in the parking lot, this is how long after you had

21   arrived?

22     A.  I don't recall exactly.  15, 20 minutes.

23     Q.  And you have got -- if you wanted to look, I

24   think you have a report in front of you, if you wanted

25   to look at that, if that might help refresh your

 1   recollection as to when Chief Reckner arrived.

 2         You were just looking at a report that you

 3   prepared regarding the things that you did that morning,

 4   right?

 5       A.   Correct.

 6       Q.   And you prepared that report the same day, right?

 7       A.   I drafted it that evening.

 8       Q.   Does it help you recall when Chief Reckner

 9   arrived?

10       A.   Yes.

11       Q.   What time did he arrive?

12       A.   At 8:12 a.m.

13       Q.   When you -- you and Chief Reckner then approached

14   each other, he identified himself, right?

15       A.   Sort of.

16       Q.   Okay.  He indicated that he was responsible for

17   the people -- in other words, he worked with the people

18   who were inside T-2?

19       A.   Yes.  He said, "That's my shop."

20       Q.   And you told him who was in there, who the

21   victims were?

22       A.   Yes.

23       Q.   And he immediately speculated to you that Jim

24   Wells was responsible for the shootings?

25       A.   Yes.

1    Q.  And that was before the FBI had arrived, right?

2    A.  Yes.

3    Q.  Before CGIS had arrived?

4    A.  I don't recall if Agent Sturgis had arrived yet.

5    Q.  As far as you know, it was before any evidence

6    had been collected?

7    A.  Yes.

8    Q.  And before any formal interviews had been done of

9    any witnesses?

10   A.  Yes.

11   Q.  Now, after Trooper Dupras arrived, did he ask you

12   to go somewhere and interview some witnesses or contact

13   some witnesses?

14   A.  Yes.  He suggested we go over to the water

15   treatment facility and interview some witnesses or

16   interview some individuals that were working there at

17   the time.

18   Q.  If we could put up Government Exhibit No. 6.

19       You can see where the T-2 rigger shop is on that

20   picture?

21   A.  Yes.

22   Q.  Can you point out for us where the water

23   treatment plant was?

24   A.  It's located right here.

25   Q.  Do you know what time you went there?

1    A.  I don't recall.

2    Q.  Would you -- would looking at your report help

3 you?

4    A.  Yes.

5    Q.  Go right ahead.  Does that help you in terms of

6 when you went over to the water treatment plant?

7    A.  Yes.

8    Q.  What time was that?

9    A.  It was at 8:58 a.m.

10    Q.  And when you went there, did you find some

11 employees working there?

12    A.  Yes, there were four employees working.

13    Q.  Did they have heavy equipment there that they

14 were working with?

15    A.  Yes.

16    Q.  And did you ask them to stop work for a few

17 minutes so you could talk to them?

18    A.  Yes.

19    Q.  Have them shut down their machines?

20    A.  I don't recall if they shut them down entirely.

21    Q.  Did you indicate to them that you wanted to talk

22 to any employees who had been there before 7:45 in the

23 morning?

24    A.  Yes.

25    Q.  So there were four employees, and did you get the

1    names of the employees that were working there?

2        A.  We did.

3        Q.  And did you determine whether there had been --

4    that there in fact had been employees working there as

5    early as 7:00 a.m.?

6        A.  The first employee to arrive was at 7:05.

7        Q.  Did you take statements from those employees?

8        A.  I don't believe so.

9        Q.  Did you -- where did you go from the water

10   treatment plant?

11       A.  We returned to the Coast Guard Police Department.

12       Q.  While you were at the water treatment plant, I

13   don't want to ask you what people said, but did you ask

14   whether people had seen or heard anything?

15       A.  Yes.

16       Q.  And so you went from there back to the Coast

17   Guard Police Department?

18       A.  Correct.

19       Q.  And then at some point later you prepared your

20   report?

21       A.  Correct.

22       Q.  Did you have any other involvement in the

23   investigation in this case?

24       A.  No.

25               MR. CAMIEL:  Thank you.

1     THE COURT:  Redirect?

2                    REDIRECT EXAMINATION

3  BY MS. SHERMAN:

4     Q.  Just to be clear, we saw the photos of the back

5  of the building.  Did you take those photos?

6     A.  No.

7     Q.  Did you take any photos of the back of that

8  building at all?

9     A.  No.

10    Q.  Did you make sure you seated the door of the

11 boiler room and the screen door as you were exiting?

12    A.  No.

13    Q.  Those statements from Mr. Reckner that you heard,

14 that he had indicated that he thought it was Mr. Wells,

15 when you heard that, what was your response or your

16 thoughts?

17    A.  I asked him why he believed that.

18    Q.  At any point when you were there was Mr. Wells

19 there?

20    A.  I know he arrived on scene from our vehicle logs.

21 We had his vehicle logged, but I never personally

22 observed him.

23    Q.  When you were doing the security sweep, how

24 quickly, how simple was it to navigate that building?

25    A.  It was difficult.

 1     Q.   Why?

 2     A.   There is a lot of machinery located in the space.

 3  I had never been inside that building.  I was not

 4  familiar with the layout, and as well as a lot of

 5  unusual doorways and stairwells and lots of lockers.

 6          MS. SHERMAN:  Those are all my questions.

 7          THE COURT:  No follow-up?  Thank you, ma'am.

 8  You may be excused.  Can she be permanently released?

 9          MS. SHERMAN:  Yes.

10          MR. CAMIEL:  Yes.

11          (Witness excused)

12          THE COURT:  Your next witness.

13          MS. SHERMAN:  Andrew DeVries.

14          THE COURT:  If you could come all the way

15  forward up to this chair here, the witness stand.  When

16  you get up there, remain standing just a moment and the

17  clerk will administer an oath to you.

18          (Oath administered to the witness)

19          DEPUTY CLERK:  For the record, can you please

20  state your full name and then spell your full name.

21          THE WITNESS:  My name is Andrew DeVries.  You

22  spell it, common spelling Andrew, A-n-d-r-e-w,

23  D-e-V-r-i-e-s.

24          ANDREW DEVRIES, GOVERNMENT WITNESS, SWORN

25                    DIRECT EXAMINATION

BY MS. SHERMAN:

Q. Mr. DeVries, where do you live?

A. I live in Kodiak.

Q. And what do you do in Kodiak for work?

A. I work with the Coast Guard Fire and Rescue.

Q. Are you a member of the Coast Guard?

A. I'm a civilian in the Coast Guard.

Q. What is your position in the Coast Guard with the fire crew there?

A. Currently, I'm a captain or lead firefighter.

Q. What were you back in 2012?

A. I was a lead medic.

Q. Did you have training for that?

A. Yes, ma'am.

Q. Back in 2012, how long had you been in that position?

A. I recollect seven or eight years approximately.

Q. Do you recall responding to a call on the morning of April 12, 2012?

A. Yes, ma'am.

Q. Can you tell us how that call came in.

A. We were dispatched out at close to 0744 in the morning for two patients bleeding, I believe was the call.

Q. When you arrived -- where was the call coming

1  from?

2      A.  I'm sorry.  It was T-2.

3      Q.  Had you been in T-2 before?

4      A.  Yes, ma'am.

5      Q.  What were you doing in T-2 before?

6      A.  We go there regularly for fire prevention stuff,

7  extinguishers and life safety inspections.

8      Q.  How often would you have to check fire

9  extinguishers and things like that?

10     A.  We're required to check it once a month, and so

11 different people would be in there.  I was very familiar

12 with the place.

13     Q.  What did you do when you arrived on scene at T-2?

14     A.  We staged to make sure that our responder

15 security was upkept.

16     Q.  I'm going to show you Exhibit No. 13, if we can.

17         Does this look familiar?

18     A.  Yes, ma'am.

19     Q.  Can you tell us what door you -- did you go into

20 T-2 that day?

21     A.  Yes, ma'am.

22     Q.  Show us what door.  There should be a laser

23 pointer up there.  Can you show us what door you entered

24 through?

25     A.  This one by the locker room.

1    Q.   And when you enter a building and there is

2   multiple patients, do you all number them?

3    A.   Typically, we do.

4    Q.   How do you decide who gets what number?

5    A.   We talk about it after the fact when we're doing

6   our documentation.  We'll say we got number one or

7   number two, because a lot of times won't know their

8   names or any identifying characteristics really.

9    Q.   Who was patient one in this case?

10    A.   Mr. Hopkins.

11    Q.   Did you tend to Mr. Hopkins?

12    A.   Yes, ma'am.

13    Q.   Why don't you show us where you located

14   Mr. Hopkins on Exhibit No. 13.

15    A.   So he was right here laying against the wall.

16    Q.   We can take that down.  Can you describe how

17   Mr. Hopkins appeared when you first saw him, how he was

18   laying?

19    A.   Mr. Hopkins was laying in the fetal position on

20   the right side with his right knee bent.  He was

21   slightly up against the magazine rack against the wall

22   there.  His left arm was kind of behind his back and he

23   was slightly hunched against the wall, like I said, and

24   most of his right side was against the ground.

25    Q.   Could you tell -- did you see any blood at that

1  point?

2      A.  Yes, ma'am.  There was a considerable amount of

3  blood.

4      Q.  So what did you do?

5      A.  Immediately checked for a carotid pulse on the

6  neck.

7      Q.  That's where the carotid is?

8      A.  Yes, ma'am.

9      Q.  And did you feel a pulse?

10     A.  No, I did not.

11     Q.  Did you note anything else about Mr. Hopkins?

12     A.  Usually in a primary assessment we would go and

13  consider him sick or not sick at that point, and I

14  considered him not sick.

15     Q.  What does that mean?

16     A.  It means that he needs medical attention.

17     Q.  Okay.  Did you note anything about his injuries?

18     A.  It took us -- we had to go and pull him off the

19  wall and lay him flat to really see the extent of the

20  injuries, so really couldn't do a focused exam until was

21  able to pull him into a laying position where we could

22  possibly do CPR.

23     Q.  So you moved Mr. Hopkins?

24     A.  Yes, ma'am.

25     Q.  If we could bring up Exhibit No. 118.  And this

will be a photo of Mr. Hopkins, just so everyone is
aware.

Do you see that photo in front of you?

A.   Yes, ma'am.

Q.   And is this a fair and accurate depiction of
Mr. Hopkins after you moved him?

A.   Yes.

MS. SHERMAN:  At this point, I'm going to move
for the admission of 118.

THE COURT:  I'm actually showing it admitted.
In any event, no objection?

MR. CAMIEL:  No.

MS. SHERMAN:  We introduced it through Ms.
Brockett I believe actually.

BY MS. SHERMAN:

Q.   If we could display 118.

Can you shows us -- you said he was up against
the magazine rack.  Can you use that laser pointer and
show us where he was before you moved him?

A.   He was underneath the drinking fountain there
with his head kind of pointed laying on the magazine
rack.

Q.   Were his legs like that?

A.   No, ma'am, they weren't.

Q.   How were they?

1    A.   I believe that he was in the fetal position and

2  his right leg was actually bent a little and his left

3  leg was straight, but that's the best of my recollection

4  at this time.

5    Q.   Do you recognize what this is?

6    A.   Yes, ma'am, that's his blouse.

7    Q.   Was it in that position when you first made

8  contact with Mr. Hopkins?

9    A.   No.  We had to move his blouse also.

10    Q.   Where was it when you first saw him?

11    A.   As far as I can remember, it was closer to him

12  and we had to move it because we were moving him

13  straight off the wall.  It would have been in the way.

14    Q.   One other question.  When you were setting up,

15  and we'll get into the details, we don't need to look at

16  the picture for that, where were you -- were you the

17  only one working on him?

18    A.   No, ma'am.  Another medically equal rank as me,

19  EMT III was working.  His name is Rob Mathis.

20    Q.   Where did he set up at to assist Mr. Hopkins?

21    A.   He set up on Mr. Hopkins' right leg there in the

22  picture and I was closer to his left arm.

23    Q.   We can take the picture down as we speak through

24  the rest of this.

25        So you moved his blouse and you assessed him.

1    Did you -- what did you do in terms of his clothing?

2    Did you remove any clothing?

3        A.  Yes, ma'am.  We pulled his shirt up and placed

4    AED pads on his chest.

5        Q.  What's an AED?

6        A.  Auto electric defibrillator pads.

7        Q.  Is it referred to as anything else in your line

8    of work?

9        A.  Well, it's actually a ZOE monitor.  It does quite

10   a few things besides just deliver shocks like an AED you

11   you find on a wall.

12       Q.  What is the purpose of putting AED pads on a

13   patient?

14       A.  For that particular day, we were reconfirming

15   what we had already verified, no carotid pulse.

16       Q.  How do you confirm that with an AED?

17       A.  Well, you can do it two different ways, with a

18   four-lead or the AED would go over and check for any

19   pulse that you would get that would be considered to be

20   shocked.

21       Q.  Which of those options did you all use?

22       A.  For Mr. Hopkins, we used the AED pads.

23       Q.  And what -- so you hook him up to the pads and

24   then what do you do?

25       A.  We don't touch the patient, and so it will

1    analyze any electric activity in the heart.

2         Q.   And was there any electrical activity in Mr.

3    Hopkins' heart at that point?

4         A.   No, ma'am.

5         Q.   Who pronounced Mr. Hopkins dead?

6         A.   Captain Weth did.

7         Q.   Is that in line with protocol?

8         A.   Any one of us can pronounce him dead if there is

9    injuries that are not compatible to life.

10        Q.   Was Mr. Weth the captain that day?

11        A.   He was the captain that day.

12        Q.   After Mr. Hopkins was declared deceased, what did

13   you all do next?

14        A.   We left the AED pads and quickly packed up our

15   stuff and tried to retrace our steps out the door.

16        Q.   Did you track through any blood or get blood on

17   you?

18        A.   If I got any blood on me, it would be just a tiny

19   bit on my exam gloves, but I don't believe I had any

20   blood on me when we checked our soles of our shoes and

21   everything, and tried to avoid any contact with the

22   blood coming in.

23              MS. SHERMAN:  Those are all my questions.

24              MR. CAMIEL:  Just a couple.

25                        CROSS EXAMINATION

1    BY MR. CAMIEL:

2        Q.   Good afternoon.  You talked about the fact that

3    you had been to the rigger shop before for these monthly

4    inspections?

5        A.   Yes, sir.

6        Q.   When you did those, would you enter into the

7    building the same way you came in on April 12th, through

8    that same door?

9        A.   I have used all the doors in that building except

10   for there is a large garage sliding door, and the far

11   one closest to T-1 was typically locked, so I would use

12   all the different doors.

13       Q.   When you showed up to do the monthly inspections,

14   were these announced or unannounced?

15       A.   Unannounced.

16       Q.   And so when you showed up, would you just walk in

17   during the business hours, during the day, obviously?

18       A.   Yes, sir, during the day.

19       Q.   And you'd just walk in?

20       A.   Yes, sir.

21       Q.   You didn't have to have somebody unlock the door

22   for you?

23       A.   Not at that time.

24            MR. CAMIEL:  Thank you.

25            THE COURT:  Any follow-up?

```
 1          MS. SHERMAN:  No, thank you.

 2          THE COURT:  This witness can be excused?

 3          MS. SHERMAN:  Yes.

 4          (Witness excused)

 5          THE COURT:  Your next witness.

 6          MS. SHERMAN:  Daniel Smith.

 7          THE COURT:  Good afternoon.  Come all the way

 8   forward to the witness stand over here.  When you get

 9   there, remain standing, if you would, when you get up

10   there and the clerk will administer an oath to you.

11          (Oath administered to the witness)

12          DEPUTY CLERK:  For the record, can you please

13   state your full name and then spell your full name.

14          THE WITNESS:  Daniel W. Smith, D-a-n-i-e-l, W,

15   S-m-i-t-h.

16          DANIEL SMITH, GOVERNMENT WITNESS, SWORN

17                    DIRECT EXAMINATION

18   BY MS. SHERMAN:

19      Q.  Mr. Smith, where do you live?

20      A.  Spokane, Washington.

21      Q.  What do you do for a living?

22      A.  I work for an environmental emergency response

23   company.

24      Q.  How long have you been there?

25      A.  Just about two years.
```

1    Q.  Did you ever work for the Coast Guard in Kodiak?

2    A.  Uh-huh.

3    Q.  Were you employed by the Coast Guard?

4    A.  Yes.

5    Q.  Were you a Coast Guard member, an enlisted

6 member?

7    A.  No, I was a civilian.

8    Q.  What were you doing as you civilian?

9    A.  I was a firefighter/EMT for the Coast Guard Fire

10 Department in Kodiak.

11    Q.  Where was the fire department located on Kodiak?

12    A.  Adjacent to the airport off of Dolphin Lane.  It

13 would be over by the Peterson School.

14    Q.  And back in 2012, how long had you been an EMT

15 for them?

16    A.  For them, two years.

17    Q.  How long had you been an EMT total?

18    A.  Since 1998.

19    Q.  Do you recall responding to a call for service on

20 April 12, 2012?

21    A.  It was a medical emergency, but yes.

22    Q.  A call for service is something different in your

23 terminology?

24    A.  In my terminology, a call for service would be a

25 non-emergency, "Hey, I have got an odor in my house," or

"I heard something pop and now I see of haze of smoke."

Q.   So the morning of April 12, it came in as something more serious than that?

A.   Yes.

Q.   Are you familiar with the rigger shop on the COMMSTA?

A.   Yes.

Q.   How are you familiar with that building?

A.   We would do extinguisher inspections and building inspections during routine monthly checks.

Q.   Would those occur any time of day or was there a set time that you would do those?

A.   We could -- any time during business hours.

Q.   And how many, I guess, vehicles from the fire department responded that morning?

A.   Three.

Q.   And what vehicle were you on?

A.   I was the driver/operator of the first out fire engine or the pumper.

Q.   In addition to the fire engine, the pumper, what other types of vehicles responded?

A.   The fire chief on duty responded in a chief's vehicle, so like a Ford Expedition, and then the squad, which was a rescue truck, responded as well.

Q.   And who was on the squad?

1    A.   If I remember correctly, it was Dave Monte and

2    Rob Mathis.

3    Q.   I'm going to show you Exhibit No. 13.  And there

4    should be a little laser pointer up there.

5         And why don't you go ahead and do you recognize

6    this diagram?

7    A.   Yes, I do.

8    Q.   Can you tell us when you arrived at the rigger

9    shop what door you entered?

10   A.   I entered through that door right there.

11   Q.   Were you following someone into the building that

12   day?

13   A.   Yes.

14   Q.   Who were you following?

15   A.   Billy Weth.

16   Q.   Who is he?

17   A.   He was the captain on the engine.

18   Q.   So when you all respond to a medical emergency

19   and he's the captain on the engine, who's in charge?

20   A.   The captain of the engine.

21   Q.   So once you're in the building, were you told to

22   go do something?

23   A.   We established that one victim was basically

24   right in the doorway.  I mean we knew that there was a

25   report of multiple victims, so I was charged with going

1   and finding, searching for the other victim, which I

2   found right there.

3        Q.   Okay.  In the office?

4        A.   Yes.

5        Q.   Did you have any interaction with the first

6   victim?

7        A.   No.

8        Q.   Did you -- did the second victim, did he receive

9   a number until he could be identified, a patient number?

10       A.   Victim number two I guess probably the best way

11  to describe it.  We didn't -- just verbally.

12       Q.   When you -- do you know now the identity of

13  patient number two?

14       A.   Yes.

15       Q.   Who is it?

16       A.   Rich Belisle.

17       Q.   When you -- can you please describe for us how

18  you first found Mr. Belisle?

19       A.   Rich was facedown under the desk partly.  His

20  head was under the desk right there.  There was a chair

21  about right there that I moved to get access to him, but

22  he was facedown.

23       Q.   How was he dressed?

24       A.   For work.

25       Q.   You said "Rich."  Did you know Mr. Belisle?

1       A.   No, I did not.

2       Q.   After you moved the chair, what did you do to

3  assess him?

4       A.   Tried to feel for a pulse.  I couldn't feel a

5  pulse, so I elected to roll him over to better assess a

6  pulse and potentially get EEG -- EKG of his heart to see

7  if there was any electrical activity.

8       Q.   Why don't we pull up Exhibit, just for

9  foundation, Exhibit 53.

10           Do you recognize this?

11      A.   Yes, I do.

12      Q.   Did you mark an indication on here of where that

13  chair was you had just spoken about?

14      A.   That's affirmative.  The chair was a red X by

15  Mr. Belisle's head.

16      Q.   And did you sign and date this at the time you

17  made that mark?

18      A.   That's affirmative.

19           MS. SHERMAN:  At this point, I'm going to move

20  Exhibit 53.

21           MR. CAMIEL:  No objection.

22           THE COURT:  53 is admitted.

23           (Exhibit No. 53 admitted.)

24  BY MS. SHERMAN:

25      Q.   And this is Mr. Belisle?

1    A.  Yes, it is.

2    Q.  If we could go ahead and display that briefly.

3        Mr. Belisle was laying facedown you had

4 indicated?

5    A.  Yes.

6    Q.  So this photo was taken after he was rolled over?

7    A.  Yes.  I moved that box right there because it was

8 right in there.  Rich's head was about right there.

9    Q.  And the chair was?

10    A.  Right there.

11    Q.  The red X.  Okay.  We can put that down.

12        Let's move on to, when you first went in there,

13 he was facedown.  Were his legs extended?

14    A.  His legs were, I guess the best way to describe

15 it would be prone.  His legs were laying flat.

16    Q.  Could you see his legs from when you came around

17 the corner into the door of the office?

18    A.  Yes.

19    Q.  Let's put up Exhibit 52, if we could, just for

20 Mr. Smith.

21        And do you recognize what we're seeing here?

22    A.  Yes, I do.

23    Q.  Is there an indication on this photo of where the

24 chair was moved to?

25    A.  Yes.  Originally, I moved the chair more towards

the couch, and then one of the other firefighters, Randy

Evacouzen (phonetic) moved it further into the office

area so that he could get closer to assist me if I

needed assistance rolling the body.

          MS. SHERMAN:  At this point, I would move for

the admission of Exhibit 52.

          MR. CAMIEL:  No objection.

          THE COURT:  Government 52 is admitted.

          (Exhibit No. 52 admitted.)

BY MS. SHERMAN:

   Q.  We can publish that briefly.

          And this photo was taken after Mr. Belisle had

been rolled?

   A.  That's affirmative.

   Q.  Where are we seeing the chair that had been up

near his head in the last photo?

   A.  That chair right there.

   Q.  That blue chair.  When you -- we can take that

down.

          When you rolled Mr. Belisle over, was his shirt

already open?

   A.  No.

   Q.  What did you all do to treat and assess him?

   A.  To assess him, I first reached -- tried to get a

carotid off of his neck.

1    Q.   Were you able to do that?

2    A.   No, ma'am.  So I called for EKG or EEG, basically

3    a heart monitor so that we could assess if his heart had

4    any electrical activity.

5         In order to do that, I had to bare his chest to

6    put the patches on.  And I put three patches on and then

7    attached the electrodes.  Firefighter Monte operated the

8    EEG and obtained a strip.

9    Q.   Obtained a strip, what does that mean?

10   A.   It means a paper recording of the patient's

11   electrical heart activity.  So come up on a screen on

12   the machine itself, but most of the time a doctor won't

13   see our monitor screen, so we print a copy of that

14   electrical activity so that he can see what the heart

15   was doing at the time we did the -- we ran the initial

16   test.

17   Q.   At the time you opened his shirt, did you notice

18   anything about the type of injuries he had sustained?

19   A.   It looked like gunshot wounds.

20   Q.   After you attached the strip and ran the strip --

21   or excuse me, attached the pads and ran the strip, what

22   did it confirm for you?

23   A.   There was zero electrical activity in the heart,

24   so a flat line or a common term is asystole.

25   Q.   After you determined that there was no electrical

1  activity in Mr. Belisle's heart, did you declare him

2  deceased?

3      A.  No, Billy Weth did.

4      Q.  What did you do at that point?

5      A.  About the time that we had the strip done a state

6  trooper informed us that we needed to vacate the site,

7  so we asked if we needed to leave our gear as part of

8  evidence preservation.  He said, "No, pull your gear,

9  pull the leads, but leave the patches and everybody

10  out."

11      Q.  Did you comply with that?

12      A.  Yes.

13      Q.  Did you get blood on you at all?

14      A.  No, ma'am.

15          MS. SHERMAN:  Those are all my questions.

16          THE COURT:  Questions for this witness?

17          MR. CAMIEL:  No.

18          THE COURT:  This person can be released?  Thank

19  you, sir.  You may be excused.

20          (Witness excused)

21          THE COURT:  Your next witness?

22          MS. SHERMAN:  Mr. William Weth.

23          THE COURT:  Good afternoon.  If you could come

24  up to the witness stand, sir.  When you get up there, if

25  you would remain standing, the clerk will administer an

oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please state your full name and then spell your full name.

DEPUTY CLERK:  William Weth, W-i-l-l-i-a-m, W-e-t-h.

WILLIAM WETH, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SHERMAN:

Q.  Mr. Weth, what do you do for a living?

A.  I am a battalion chief with Navy Region Northwest Fire and Emergency Services.

Q.  What do you do in that role?

A.  I am the operations chief for three stations on the eastern side of the Puget Sound.  I'm responsible for responding to emergency incidents as the incident commander and also dealing with the manning for the day.

Q.  How long have you been in that role?

A.  I have been in this role for four years now.

Q.  Were you ever stationed -- did you ever work on Kodiak?

A.  I did work on Kodiak from 2001 until 2015.

Q.  When you were working on Kodiak, were you a Coast Guard member?

A.  No, I was a civilian.

1     Q.   Where were you working April 2012?

2     A.   I was working at the Coast Guard firehouse.

3     Q.   Where is the Coast Guard firehouse?

4     A.   It's located next to Peterson Elementary off the

5  base area next to the airport.

6     Q.   What was your -- what was your title at that

7  time?

8     A.   I was a captain.

9     Q.   What sort of training were you given to be in

10 that position?

11    A.   I went through numerous certifications to obtain

12 skills like my officers to be an officer for the fire

13 department.

14    Q.   Were you trained in both fire suppression and

15 EMT?

16    A.   Yes.

17    Q.   So what sort of calls would you respond to as the

18 captain or with your crew?

19    A.   We respond to everything from simple basic life

20 support, somebody twisted their ankle at the gym, all

21 the way to there was an airfield emergency, aircraft

22 fire, structure fires, technical rescue, hazardous

23 materials, confined space rescue.

24    Q.   Do you recall what percentage of your calls were

25 fire versus medical?

1    A.   Probably 60/40 medical to fire.

2    Q.   And what sort of shifts did you work?

3    A.   We worked 48 hours on/48 hours off, and then

4    every two weeks was four days off.

5    Q.   When you would get a call coming in for a

6    medical, a serious medical emergency that sounded like a

7    serious call to you, who would respond?

8    A.   Usually our standard response would be the

9    assistant chief who would be the incident commander, the

10   engine company, which was is four people, and then our

11   squad company, which was two individuals.

12   Q.   And if it was determined that someone was

13   deceased, who would make that call?

14   A.   Usually, it's the lead medic would make that

15   call, or at the time had to be an EMT III.

16   Q.   Were you working on April 12, 2012?

17   A.   Yes, I was.

18   Q.   Do you recall, did you receive a call from the

19   COMMSTA that morning?

20   A.   Yes, we did.

21   Q.   Can you describe how that came in?

22   A.   Approximately 7:45, we received a dispatch for

23   two people bleeding at the COMMSTA.

24   Q.   Can you tell the jury how you responded to that?

25   A.   What we did is the military police dispatches us.

So our tones went off inside the station letting us know
we had a call to respond to.  We all got onto our trucks
and we all responded out to the COMMSTA which is a few
miles away from the actual firehouse.

Q.  Had you been to the COMMSTA before?

A.  Numerous times.

Q.  Why?

A.  We're required to do building inspections, so we
had to go through, check their fire extinguisher every
single month, so monthly we were out at the COMMSTA.

Q.  When would you go out there?

A.  Normal working hours.

Q.  So you arrived on scene, and what did you do
first?

A.  First thing I did is I noticed there was a lot of
security, military police there.  I got out and made
contact with the military officer by the door and said,
"Hey, what do we have?"  He explained to me that we had
a person inside bleeding and that the scene -- I asked
him if the scene was secure, and he said, "Yes, the
scene is secure."

Q.  Did you, as the captain on scene, did you
instruct your men who to go where?

A.  Yes, I instructed Firefighter DeVries and
Firefighter Mathis to go to the first patient, and I did

Mr. Wilmont, Smith and Ebbinghousing to go to my second patient.

Q.   Did you decide in response to that call who would declare these two gentlemen deceased?

A.   I decided to do it.  Since I was the company officer, I decided to take that responsibility and call them deceased.

Q.   When did you do that?

A.   Once Firefighter DeVries and Mathis went to the first patient, which was the Coastguardsman, I had them hook up a cardiac monitor to verify that the individual was actually deceased, and I also had the other three firefighters do the same thing for the second patient to verify that they were deceased.

Q.   How did you verify that?

A.   I hooked them up to what we call a ZOE, it's a cardiac monitor, it's what we use to see if there is electrical activity in the heart.  We hooked it up to the first patient.  The monitor showed it was asystole or flat lined, which means there is no electrical activity whatsoever in the heart, which means that your patient is dead.

     And the same thing showed up on our second patient, which was Mr. Belisle, he was also showing flat line.

    1      Q.   At that point, was there anything you could have

    2   done to assist?

    3      A.   There was nothing we could do.

    4      Q.   So did you declare both of them deceased?

    5      A.   I did.

    6      Q.   Then what did you do?

    7      A.   After I turned around, there was a trooper

    8   standing next to me and said, "Hey, you guys need to get

    9   out of the building," so instructed my fire personnel to

   10   leave all of the medical -- the pads that we used to

   11   analyze the rhythm on the patient, grab the actual

   12   machine itself and exit the building.

   13      Q.   Did you do anything to make sure that no one on

   14   your team tracked any evidence in or any blood or

   15   anything like that?

   16      A.   Yes.  Prior to making entry, when I got the first

   17   look at the first patient, the Coastguardsman, I knew

   18   there was something not right, so I informed my

   19   personnel going in saying, "Hey, go in one path, go out

   20   the same path you walked in, don't go walking around the

   21   building."

   22           MS. SHERMAN:  Those are all my questions.

   23           THE COURT:  Questions for this witness?

   24           MR. CAMIEL:  None.

   25           THE COURT:  We can excuse this witness?

```
1              MR. CAMIEL:  Yes.

2              MS. SHERMAN:  Yes.

3              THE COURT:  Thank you, sir.  You may be

4    excused.

5              (Witness excused)

6              THE COURT:  Ready for another witness?

7              MS. SHERMAN:  We're moving very quickly, Your

8    Honor, so I'm just looking to see who we're going to

9    call next.

10             THE COURT:  If you want to take a short break,

11   maybe that would be more efficient.

12             MS. SHERMAN:  If we could take a brief break.

13             THE COURT:  Let's take about 10 to 15 minutes

14   here, ladies and gentlemen.  Please leave your notepads

15   here in the courtroom.  Remember my admonition not to

16   discuss the case and we'll go off record for about 10 or

17   15 minutes.

18             (Recessed from 2:09 p.m. to 2:25 p.m.)

19             (Jury present)

20             THE COURT:  Please be seated, everyone.  And

21   are we ready for the next witness?

22             MS. SHERMAN:  The government's next witness is

23   Will Ellis.

24             THE COURT:  Good afternoon.  If you could come

25   forward up to the witness stand, please.  When you get
```

1    up there, if you'd remain standing, the clerk will

2    administer an oath.

3              (Oath administered to the witness)

4              DEPUTY CLERK:  For the record, can you please

5    state your full name and then spell your full name.

6              THE WITNESS:  Willard Samuel Ellis,

7    W-i-l-l-a-r-d, E-l-l-i-s.

8              WILLARD ELLIS, GOVERNMENT WITNESS, SWORN

9                        DIRECT EXAMINATION

10   BY MS. SHERMAN:

11       Q.   Mr. Ellis, where do you work?

12       A.   I work for NOAA's office of law enforcement in

13   Juneau, Alaska.

14       Q.   What is NOAA?

15       A.   The National Oceanic Atmospheric Administration.

16       Q.   How long have you been with NOAA?

17       A.   About five years.

18       Q.   We're taking you a little bit out of order.  I

19   understand you have a training next week out of state?

20       A.   Yes.

21       Q.   What did you do prior to going to work for NOAA?

22       A.   I worked for the Alaska State Troopers and Alaska

23   Wildlife Troopers.

24       Q.   Is there a difference between those two?

25       A.   There is.  They are two divisions.  They are all

state troopers. The Alaska State Troopers, what they
used to call the blue shirts, does your traditional law
enforcement work, public safety. And the Alaska
Wildlife Troopers, their focus would be on natural
resource protection, wildlife crime, stuff like that.

Q. And when you were, I guess you said blue shirt
trooper, a law enforcement trooper, where in Alaska had
you been stationed?

A. I was stationed in Palmer; Cold Bay, Alaska;
Petersburg, Alaska and Juneau, Alaska.

Q. And then as a wildlife trooper, where were you
stationed?

A. I started in Juneau and then to Kodiak.

Q. What years were you in Kodiak?

A. I got there July of 2004 and I left April of
2015.

Q. And in that time, your entire time there you were
a wildlife trooper?

A. Yes.

Q. Were you -- I guess I'm trying to figure out --
were you an investigator or did you have a particular
rank when you were in Kodiak?

A. I was a lieutenant. I was the detachment
commander for what we called C detachment.

Q. As the lieutenant, what was your responsibility?

1    A.  I supervised the various outposts in C
2  detachment, so our largest post was in Kodiak, and then
3  I had a post in Dutch Harbor, Alaska, one in Dillingham,
4  one in King Salmon, Alaska and then one in Iliamna,
5  Alaska.
6    Q.  Did you all have actual dispatch in Kodiak when
7  calls would come in, or was it dispatched out of
8  somewhere else?
9    A.  We had dispatch in Kodiak, and then at some
10 point, it transferred up to Fairbanks.
11   Q.  I'm going to talk about April 12, 2012.  Do you
12 remember that day?
13   A.  Yes, I do.
14   Q.  What were you doing that morning?
15   A.  I was on my way into work, and then I heard on
16 the radio a couple of my officers or troopers were at
17 Coast Guard communication station, and then I heard one
18 of the other troopers calling a 1079, which would mean
19 there is a deceased out there, so I proceeded out to the
20 Coast Guard communication station.
21   Q.  I'm going to stop you there and head back a
22 little.  Where was your office located on Kodiak?
23   A.  So that's located in the town.  It would be in
24 the parking lot across from Wal-Mart.
25   Q.  So when you got the call, what did you decide to

1    do?

2        A.   I went out to the Coast Guard communication

3    station.

4        Q.   What was your path of travel to get there?

5        A.   That would have been out the Chiniak Highway,

6    main highway that runs north and south from town out

7    towards the airport and past.

8        Q.   Does it have another name?

9        A.   Rezanof.

10       Q.   And then from Rezanof, you took what road up to

11   the COMMSTA?

12       A.   I would take the road I referred to as Anton

13   Larsen.

14       Q.   As a trooper, what kind of investigations had you

15   done at that point in your career?

16       A.   I had had a pretty full spectrum of

17   investigations, everything from your basic misdemeanors

18   up to felonies, to include homicide.

19       Q.   You said some other individuals had already

20   headed out.  When you arrived on scene, who from the

21   Alaska State Troopers was already present?

22       A.   So when I got there, there was Sergeant Chris

23   Hill, Trooper Dennis Dupras, Sergeant Paul Fussey and

24   Trooper Alan Jones.

25       Q.   How many of those worked for you?

1    A.   That would have been Sergeant Paul Fussey and

2  Trooper Alan Jones.

3    Q.   What was the first thing you did when you arrived

4  on scene?

5    A.   Asked what was going on.

6    Q.   Did you help secure the scene at all?

7    A.   I did.  So Sergeant Hill and Trooper Dupras told

8  me that there was two men inside the communication

9  station and that they both appeared to have died from

10 gunshot wounds.

11      At that point, we started to work with the Coast

12 Guard Military Police, which we call mil pol, Coast

13 Guard Investigative Service or CGIS was there, and we

14 started to make sure the crime scene got secured down

15 there by what they call the T-2 building, the rigger

16 shack.

17   Q.   Had you ever been to that building?

18   A.   No.

19   Q.   Had you ever been up to T-1?

20   A.   No.

21   Q.   At some point, did you review some video and

22 start I guess kind of trying to analyze how a suspect

23 may have got into the building?

24   A.   Yes, I did.

25   Q.   And what videos -- where did you go to view the

1    videos?

2        A.  So they were up in the T-1 building.  They had

3    like a secured area where they kept security cameras

4    there, and then I went up there and they had a camera

5    that was on T-2 that sort of looks out towards the

6    parking lot, and then the T-1 building, which is the

7    main headquarters building, that looked down on the road

8    towards where T-2 was, so you could see the back of the

9    T-2 building and then the road going in front of it,

10   part of it at least.

11       Q.  When you were watching that camera that was up

12   near T-1 looking down onto the rigger shop, did you note

13   something or did -- what did you view of note?

14       A.  So when I was looking down there, this is around

15   the timeframe of the morning, so it would have been

16   around -- I was looking at the timeframe somewhere right

17   after 7:00 in the morning until probably about 7:15.

18            And it showed -- at first looking back there, it

19   shows like a light coming on in the T-2 building.  Then

20   there was a white pickup truck with a cab that was going

21   past the T-2 building.  And then another vehicle came

22   in, so these are all points when I was looking at, and

23   that was Mr. Hopkins' vehicle.

24            And then what looked like the same white pickup

25   was going back out towards the airport or either towards

town.  And then I saw a blue vehicle that looked like an
SUV, sort of minivan or van, something like that,
driving by.

Q.  Why was that of note to you?

A.  Because the timeframe that it was, in the
morning, that's when the Coast Guard people were
starting to come to work.  And so one of the things when
you're looking at the timeline there whoever was there
that committed the crime, they had to leave the building
before they got caught there.

So if we got Mr. Hopkins' vehicle there, and then
there is a short timeframe where somebody could leave
where they might not be noticed by people coming in,
that vehicle sort of fit within the timeline where that
would have been possible, and so that's why it was of
interest to me.

Q.  At that point, did you know the vehicles owned by
Mr. and Mrs. Wells?

A.  No, I did not.

Q.  Let's talk about the Kodiak airport.  Did you
decide to go to the Kodiak airport?

A.  Yes, I did.

Q.  Why?

A.  So two reasons in my mind.  One was somebody who
committed that crime, they might want to get off the

```
 1   island, so the airport would be a logical area to drive

 2   to try to get off the island if they are going to try to

 3   avoid being apprehended.

 4        And then the other thing was I had a theory that

 5   if the suspect or the defendant had committed it, maybe

 6   they might have done a swap-off of the vehicle at the

 7   airport.

 8        Q.  Had you -- you said you didn't know what vehicle

 9   Ms. Wells drove.  Did you know her status on whether she

10   was on or off the island?

11        A.  I found out that she had left the island.

12        Q.  Let's talk about the Kodiak airport.  Could you

13   describe in 2012 sort of the paving situation of the

14   airport.

15        A.  So the airport has been seems like under constant

16   construction out there.  I don't know.  I was going to

17   say they were in the process of making changes to the

18   parking areas there.

19        The terminal hadn't started going -- it changes

20   there, but it would have been -- they were, probably

21   because of TSA and other stuff, they were starting to

22   make changes to it.

23        Q.  Let's have you take a look at Exhibit No. 91.

24        Do you recognize that?

25        A.  Yes.
```

1    Q.   What are we seeing in 91?

2    A.   So we're seeing the Kodiak airport.

3    Q.   Are the buildings in the same locations they were

4    in 2012?

5    A.   Yes.

6    Q.   Okay.  And you had talked about perhaps parking

7    construction.  Were the general parking rows, maybe the

8    paving different, but the general parking rows the same

9    as they were in 2012?

10   A.   Yes.

11   Q.   Fair and accurate aerial view of the Kodiak

12   airport from the time you worked in Kodiak?

13   A.   Yes, it appears to be.

14        MS. SHERMAN:  I move for the admission of

15   Exhibit 91.

16        MR. COLBATH:  I have no objection.

17        THE COURT:  91 is admitted.

18        (Exhibit No. 91 admitted.)

19   BY MS. SHERMAN:

20   Q.   There should be a laser pointer up there.  If you

21   could, why don't you point -- why don't you take us

22   through where is the terminal, I guess the terminal that

23   most people go to when they get to the airport.

24   A.   So right there would be the terminal.

25   Q.   Okay.  And what airlines operate out of there?

1    A.  So that would be Alaska Airlines, and it was Era

2    Aviation back then, but now it's Ravn Aviation.

3    Q.  Alaska Airlines the only major commercial carrier

4    operating out of there?

5    A.  Well, Era was too.  They were a commercial

6    carrier too.

7    Q.  Not Delta, not Sky West, nothing else like that?

8    A.  No.

9    Q.  And then next to it, what was in, if you recall,

10   what was in those sets of buildings?

11   A.  I can't remember.  I'm not sure what was in

12   there, if they are even occupied there.  Right there

13   they had sort of a little restaurant and pub that was

14   down on the first floor.

15   Q.  And what was over in this building?

16   A.  Over there there is another small air taxi, and

17   then I believe it's FedEx or UPS has their office over

18   there.

19   Q.  And what about this building?

20   A.  That would be Servant Air.

21   Q.  Can you use the laser pointer and direct for us,

22   a person who is coming into the airport and dropping

23   someone off, what is the normal, I guess, route a person

24   would take?

25   A.  Well, sort of the traffic flow, particularly if

1  somebody is going to drop somebody off or pick them up,

2  you will see them come down this way here and then

3  people can unload their stuff there.  If they are going

4  to park a vehicle, they can come back in there or

5  they'll just take off and leave like that.

6      Q.  The parking lot appears split.  What sort of

7  parking was over here?

8      A.  That's now long-term parking.

9      Q.  And was that long-term parking back in 2012?

10     A.  Yes.

11     Q.  And this area here?

12     A.  That would be short-term parking.

13     Q.  Let's talk about -- are you familiar with the

14  Anchorage airport?

15     A.  Somewhat, yes.

16     Q.  Did Kodiak airport have its own police force?

17     A.  No.

18     Q.  Was there enforcement of traffic rules at the

19  airport?

20     A.  I don't know who was doing -- it would have

21  fallen back usually on the state highways, the airport

22  manager running it.  Whether they did it or they

23  contracted it out with a private security firm I'm not

24  sure.

25     Q.  Troopers were not patrolling the airport?

1     A.   No.

2     Q.   Would people, in your experience, at the Kodiak

3   airport, were there times that people would come in this

4   way and go this way, even though that may not be the

5   appropriate way to go?

6          MR. COLBATH:  Your Honor, I'm going to object

7   as to speculation.

8          THE COURT:  If the witness knows, that's fine.

9     A.   Yes.

10     Q.   So when you got down to the airport, you were

11   looking for what?

12     A.   So I was -- when I came down towards the airport,

13   I was looking for any vehicle -- any blue vehicle that

14   resembled like an SUV or a van, minivan I should say.

15     Q.   And you photographed those?

16     A.   Yes, I did.

17     Q.   Can you tell us what this is?

18     A.   That is the Comfort Inn, hotel there.

19     Q.   Just make sure I don't have any more questions

20   before I move this photo.  We can take that down and we

21   can show the witness 253.

22          MS. SHERMAN:  Your Honor, in speaking with

23   counsel, I'll move for the admission of 253.

24          MR. COLBATH:  It's fine, Your Honor.

25          THE COURT:  253 is admitted.

```
 1              (Exhibit No. 253 admitted.)
 2    BY MS. SHERMAN:
 3       Q.   Can you tell us who took this photo?
 4       A.   I did.
 5       Q.   Why did you take this photo?
 6       A.   Because that vehicle there was a minivan.
 7       Q.   And what is that building it's parked in front
 8    of?
 9       A.   I'm not sure what that building was being used
10    for back then, but it's towards the end of the terminal
11    there.
12       Q.   If we could leave that up and go back to 91.
13    Leave them both up.
14            Can you show us on 91 where you took that photo?
15       A.   So it looks like it's right there where the
16    Servant Air hangar is right over behind.
17       Q.   We can take both of those down.
18            You said you took photos of several vehicles.
19    Why don't we have you look at Exhibits 87, 88 and 89.
20    Just go through those quickly for him.
21            Do you recognize those photos?
22       A.   Yes, I do.
23       Q.   And fair and accurate depiction of the vehicle
24    depicted in those photos that you saw on April 12th?
25       A.   Yes.
```

1    MS. SHERMAN:  I move for the admission of 87,

2    88 and 89.

3         MR. COLBATH:  Those are fine.

4         THE COURT:  87, 88 and 89 will be admitted.

5         (Exhibit Nos. 87, 88 and 89 admitted.)

6    BY MS. SHERMAN:

7    Q.  Why don't we put up 88 first, if we could.  If we

8    could bring up Exhibit No. 91 with that, please, Blair.

9         Did you take the photo in Exhibit 88?

10   A.  Yes, I did.

11   Q.  Can you show us where on Exhibit No. 91 you found

12   the vehicle in Exhibit 88?

13   A.  Right there is where you see that red and blue

14   car right in that area there.

15   Q.  So right around here?

16   A.  Yes.

17   Q.  Did anything about this vehicle stand out to you?

18   A.  So at the time, as you can see looking at the

19   picture, it looks like it had just been pulled up there.

20        MR. COLBATH:  Your Honor, I'm going to object

21   as to speculation.  And actually, ask to approach.

22        THE COURT:  That's fine.  Let's do that.  Feel

23   free to stand and stretch, ladies and gentlemen.

24        (Begin bench conference.)

25        MR. COLBATH:  Your Honor, this testimony I

think relates to the motion in limine I filed where I
indicated that it was going to be our objection to law
enforcement witnesses testifying in some expert
capacity.  I'm fine with asking his observation of the
vehicle, but here it's a stationary vehicle that's just
sitting there alone.

At the last trial, he testified as to what he
started to say here, and that was that it looked like
the vehicle had just been pulled up, it looked like
somebody had just gotten out and moved away from the
vehicle, all kinds of observations that you can't tell
from -- I mean it's a stationary vehicle.

He can certainly say where he found it, what it
looked like to him, but his testimony, at least in the
last trial, went on to give impressions of and interpret
not only what the vehicle -- observations of the
vehicle, but observations about what the driver either
did prior to or in the process of parking the vehicle
and did after exiting the vehicle, which, of course,
there is no way to know the circumstances of how it was
parked there.

I mean there is not skid marks leading up to
it, there is not footprints leading away from it, any of
those things.

MR. SKROCKI:  Show us where he says that.

```
 1          MS. SHERMAN:  I know what he's talking about.
 2   My plan is to elicit two things from him.  I plan to
 3   elicit that he thought the tires were angled and that it
 4   was alone.  Those are the only two things.
 5          THE COURT:  Why don't we have her lead through
 6   those.
 7          MR. COLBATH:  The angle and the other?
 8          MS. SHERMAN:  It was off by itself.
 9          MR. COLBATH:  Those would be fine.
10          (End bench conference.)
11   BY MS. SHERMAN:
12      Q.  I'm going to ask you two short questions.
13          Did it catch your attention that the wheels in
14   Exhibit 88 were angled?
15      A.  Yes.
16      Q.  And did it catch your attention that this vehicle
17   did not have other vehicles around it?
18      A.  Yes.
19      Q.  Did you notice anything about what was in the
20   vehicle?
21      A.  So I did get out and do a walk-around of the
22   vehicle, and on the passenger side of the seat I saw
23   mail that was addressed to Jim Wells.
24      Q.  If you could, Blair, why don't we zoom in on the
25   license plate.
```

1          Why don't you for the record tell us what the

2    license plate on that vehicle is.

3        A.   So that's an Alaska license plate, EJR 582.

4        Q.   I'm going to have you look at Exhibit No. 93.

5             MS. SHERMAN:   Your Honor, just for the record,

6    this is a self-authenticating document.   Counsel doesn't

7    object, so we're going to go ahead and move it if the

8    Court would allow.

9             THE COURT:   No objection to 93?

10             MR. COLBATH:   That's correct.

11             THE COURT:   Government 93 is admitted.

12             (Exhibit No. 93 admitted.)

13    BY MS. SHERMAN:

14        Q.   If we could publish that.

15             Why don't we -- well, hold on just a moment.

16             Do you recognize what this is?

17        A.   Yes.   It's an APSIN printout of the vehicle.

18        Q.   And how were those records -- well, you said

19    APSIN.   What is APSIN?

20        A.   Alaska Public Safety Information Network.

21        Q.   And who maintains that?

22        A.   The Department of Public Safety for the State.

23        Q.   Does DMV provide records for that?

24        A.   Yes, they do.

25        Q.   So this is, you said, a vehicle printout.   Can

1    you tell us -- if we could just zoom in on this area.

2        Can you tell us the license number of the

3    vehicle?

4        A.  So on there it lists the license is EJR 582.

5        Q.  And is that the same license number that was on

6    the vehicle you found at the airport?

7        A.  Yes, it was.

8        Q.  And who is the owner of that vehicle?

9        A.  You'd have to scroll down there.

10       Q.  It might be at the tope.

11       A.  Oh, at the top.  James Michael Wells and Nancy

12   Jean Wells.

13       Q.  And what year is that vehicle?

14       A.  2001.

15       Q.  And the make?

16       A.  It is a Honda.

17       Q.  And model?

18       A.  CR-V.

19       Q.  Okay.  And I think those are all the questions I

20   have on that exhibit.  We can bring the lights back up.

21       After you found the Wells' Honda CR-V at the

22   airport, you took photos of a few others?

23       A.  Yes, I did.

24       Q.  And then where did you go?

25       A.  I went back up to the communication station and

1    then shared that information with the FBI.

2       Q.  After you shared that information with the FBI,

3    what did you do?

4       A.  I went back down there and stayed on the vehicle

5    until they sent some other agents down to relieve me and

6    take control of that.

7              MS. SHERMAN:  And, Your Honor, we didn't

8    publish the other two exhibits, the other two photos.  I

9    think they can go back with the jury.  If the Court

10   wants me to publish --

11             THE COURT:  That's fine.  Either side can do so

12   if they seek to do so, but that's fine.

13             MS. SHERMAN:  Those are all the questions I

14   have.

15             THE COURT:  Mr. Colbath, go ahead, please.

16                     CROSS EXAMINATION

17   BY MR. COLBATH:

18      Q.  Good afternoon, Mr. Willis [sic].  I just have a

19   couple questions here.  Excuse me, Mr. Ellis.

20         Your involvement when you arrived that morning,

21   April 12th, at the -- down at the T-2 building was to

22   assist in perimeter security?

23      A.  Yes.

24      Q.  Okay.  Other than learning that from one of the

25   actual troopers there, other than learning that two

gentlemen had been shot inside and that the scene was
basically cleared or secured -- excuse me, secured, was
there any other details of the event that you learned in
that initial contact?

A.   No, just that's basically what was shared with me
by the two troopers there.

Q.   And your assistance would have been in creating
the perimeter, doing some like traffic control or
driveways, cordoning off the area or making sure it was
cordoned off?

A.   Yes.

Q.   And then at some point then Ms. Sherman asked you
about reviewing videos.  That was up the hill at the
COMMSTA building?

A.   Yes, it was.

Q.   How long did you stay down at the T-2 before you
moved up the hill?

A.   Well, so I was there from about 9:00 in the
morning until I left heading out towards the airport,
which would have been somewhere between 9:15, 9:30-ish,
around that time there.

     Initially, I was thinking I was down at the T-2
area for probably about an hour and a half, maybe two
hours, and I remember after the next of kin
notifications were completed, at that point, probably a

1  bit later, I headed up to the T-1 building.

2      Q.  Did you know any of the staff, any of the Coast

3  Guard members or people, civilians that worked at the

4  T-2 building prior to that day?

5      A.  No.

6      Q.  And you understood from the investigation, once

7  you got up to T-1, that the remaining staff folks and

8  the people associated with T-2 were up at the T-1

9  building also?

10     A.  Yes.

11     Q.  And one of those people you met was Chief Scott

12  Reckner?

13     A.  Yes.

14     Q.  You understood him to be the supervisor down

15  there of the building?

16     A.  Yes.

17     Q.  And you had an opportunity, besides viewing these

18  videos, to visit with him and get some information about

19  some of the other folks down at the T-2 building?

20     A.  Yes.

21     Q.  And then you knew that investigators were also --

22  other people besides you were reviewing those videos?

23     A.  Yes, Sergeant Paul Fussey was.

24     Q.  And he was one of your -- he was a wildlife

25  trooper working under you?

1    A.  Yes, sir.

2    Q.  You also knew that the FBI arrived at some point

3    during the day?  CGIS were there, they were starting the

4    interview process of interviewing witnesses?

5    A.  Yes.

6    Q.  And you were communicating then, besides with the

7    witnesses or at least Chief Reckner, you were

8    communicating with the investigators as well?

9    A.  Yes.

10   Q.  And then you reviewed these videos?

11   A.  Yes.

12   Q.  As you looked at the video, I understood you were

13   sort of making a mental note of things and there was

14   five things that came -- significant things that you at

15   least took note of in your initial review, right?

16   A.  Yes.

17   Q.  One was the light coming on for the first time as

18   you could see it down in the T-2 building around 7:01?

19   A.  Yes.

20   Q.  And then shortly after that light comes on, a

21   white pickup with a topper on it goes by?

22   A.  Yes.

23   Q.  And then Mr. Hopkins, who you -- by that point

24   you understood or had been made aware of both who the

25   two victims were as well as what they drove?

1    A.  Yes.

2    Q.  And you actually saw on the video then at 7:08,

3  about six minutes after that white pickup with the

4  topper, Mr. Hopkins arrive at 7:08?

5    A.  Yes.

6    Q.  Then 40 seconds -- 30, 40 seconds later the white

7  pickup that you had saw going -- now it was going out

8  Anton Larsen towards the T-2 building, came from town

9  towards T-2?

10   A.  Yes, the first time.

11   Q.  The first time.  Okay.  Then Mr. Hopkins.  And

12  then 40 seconds later, it comes back on to -- the white

13  truck comes back on the camera.  Now it's headed away

14  from T-2 back towards town?

15   A.  Yes.

16   Q.  And then following, about five minutes behind

17  that from the same direction, from the T-2 going back

18  towards town, either a blue SUV or minivan, you couldn't

19  tell from your review of the video, but a smaller blue

20  SUV, minivan-type vehicle comes going the same

21  direction?

22   A.  Yes.

23   Q.  And then no other vehicles of note really that

24  you picked up on?

25   A.  Correct.

```
 1      Q.  And your review of the video, you didn't see the
 2   pedestrian go by, did you, or at least you didn't make
 3   note of it?
 4      A.  Right, I don't remember it offhand, no.
 5      Q.  That's fine.  So you knew from other
 6   investigators and from -- well, you knew from other
 7   investigators at some point before you left T-1 that Jim
 8   Wells worked at the T-2 building?
 9      A.  Yes.
10      Q.  You knew that Mr. Wells' wife was out of town?
11      A.  Yes.
12      Q.  And you knew that the Wells owned a small blue
13   SUV?
14      A.  No.
15      Q.  Okay.  You didn't know -- did you know how she
16   had got to the airport or whether -- anything about
17   their vehicles?
18      A.  No.  I only knew that Mr. Wells had a white
19   pickup.
20      Q.  So you knew what he drove, but you were unaware
21   of what Mrs. Wells drove?
22      A.  Correct.
23      Q.  And you were unaware of how it was that she had
24   gotten to the airport?
25      A.  Correct.
```

 1    Q.  Okay.  And so how was it -- remind me because I

 2  don't remember from your earlier testimony whether you

 3  said.  How was it that you got out to T-2 and T-1 that

 4  morning?

 5    A.  I drove out there.

 6    Q.  And had you come -- were you in your patrol

 7  vehicle?

 8    A.  Yes.

 9    Q.  And your patrol vehicle has all your standard

10  equipment, your police radio, your gear that you need to

11  be a wildlife officer at the time?

12    A.  So it wasn't a marked patrol vehicle.  It was an

13  unmarked vehicle, sort of a command staff vehicle, so it

14  did have a radio in it and it had what we called a

15  subdued light package in it too.

16    Q.  But not a regular patrol car looking vehicle?

17    A.  No.

18    Q.  So you decided to leave the -- at some point

19  after reviewing all these videos, collecting the

20  information throughout the day, you decided to go do

21  some inspection at the airport for the reasons you told

22  Ms. Sherman?

23    A.  Yes.

24    Q.  And in -- was one of the vehicles you were

25  looking for the Wells' vehicle?

1    A.  It could have been.  I wasn't sure if it would be

2   there or not.

3    Q.  If you didn't know what it was, how did you know

4   what you were looking for?

5    A.  Well, that's why I took pictures of any of the

6   blue vehicles that resembled an SUV or a minivan because

7   it might not have been their vehicle.  Like I said the

8   first time, somebody trying to leave the island would

9   head towards the airport, but it was a theory I had.

10   Q.  Were you looking for the white pickup with the

11  camper on it?

12   A.  No.

13   Q.  Or the topper?

14   A.  No.

15   Q.  How did you know that that wasn't involved?

16  Nobody had talked to that person, had they?

17   A.  I didn't know the status on that, no.

18   Q.  All right.  And between the -- between the

19  COMMSTA and the airport -- now, you were well familiar

20  with the Alaska APSIN system?  That's the DMV record we

21  saw, right?

22   A.  Yes.

23   Q.  And you certainly had the ability between COMMSTA

24  and the airport to just call in James Wells' name on

25  APSIN and see what vehicles were registered to him so

1  you could have known what vehicles were his?

2      A.  I could have, but I didn't.

3      Q.  Okay.  So when you got to the airport, you -- put

4  -- was it 91?

5          MS. SHERMAN:  91 is the airport.

6  BY MR. COLBATH:

7      Q.  Was there a particular area where you started

8  looking for blue SUVs and blue minivans and similar

9  vehicles?

10     A.  So as I came in, I started with the hotel right

11 here.

12     Q.  Drove through the parking lot there?

13     A.  Yeah, and then came on down and then through the

14 long-term parking area.

15     Q.  Okay.

16     A.  And then down and around back to the short term.

17     Q.  Okay.  So you took pictures of a number of

18 vehicles, right?

19     A.  Yes.

20     Q.  All right.  I'm going to show you what is Defense

21 Exhibit No. 28, 29, 30 and 250.

22         I guess that's similar to the one we saw.  I

23 think it's a different angle.  30 as well, please.

24 That's 250, but 30 as well.

25         Are you familiar with all of those?

1    A.  Yes.

2    Q.  Do all of those appear to be pictures of vehicles

3  you took that evening, April 12th, as you made those

4  rounds you just showed me at the airport?

5    A.  Yes.

6         MR. COLBATH:  I would move the admission for

7  Defense 28, 29, 30 and 250?

8         MS. SHERMAN:  I don't object.

9         THE COURT:  Those are all admitted.

10         (Defense Exhibit Nos. 28, 29, 30 and 250

11  admitted.)

12  BY MR. COLBATH:

13    Q.  Let's just start with 28.  Do you know where --

14  can you -- well, without putting the picture of the

15  airport back up there, do you know where that one is?

16    A.  I believe that was from the parking lot of the

17  hotel, the Comfort Inn.

18    Q.  Probably recognizable by the trees?

19    A.  Yes.

20    Q.  And again, that's a blue minivan similar to the

21  one that you saw at Servant Air?

22    A.  Yeah.

23    Q.  And you noted that this could have been a

24  possible vehicle fitting, at least as you had just

25  reviewed the video, the blue vehicle that went by?

```
1    A.  Yes.

2    Q.  Next is 29.

3         MS. SHERMAN:  Your Honor, just for the record I

4    would note that Defense 29 is identical to Government's

5    253.

6         MR. COLBATH:  There was two of those and I

7    wasn't sure if it was the same.

8         THE COURT:  Well, if we need to confirm that

9    and put them side by side, we can.  In any event, they

10   are both admitted.

11   BY MR. COLBATH:

12   Q.  That's the one at Servant Air, sir.

13   A.  Okay.

14   Q.  Right?  Do you agree with me?

15   A.  Yes.

16   Q.  And then 30.

17        Now, the first two were minivans.  This is a

18   blue, dark blue Ford --

19   A.  Looks like a Ford Escape.

20   Q.  Ford Escape?

21   A.  I think so.

22   Q.  Similar more to the blue CR-V, to the Wells' blue

23   CR-V that you talked about, more in shape to that than a

24   minivan?

25   A.  Correct.
```

1    Q.  For any of these three that I have shown you so

2  far, did you get out and do any inspection of the

3  vehicles, look in the windows, run the license plate,

4  anything like that?

5    A.  No.

6    Q.  Okay.  And then 250.

7        And you were taking a picture of the vehicle on

8  the left.  I presume that's under 82, parking space 82,

9  that's a Honda CR-V?

10   A.  Actually, I was focused more on the Ford that

11 looks like Expedition to the right of it.

12   Q.  So that's both a small Honda CR-V on the left and

13 a blue, you think that's an Explorer or Expedition?

14   A.  I think it's an Expedition.  Looks about the size

15 of an Expedition.

16   Q.  It's just slightly bigger than the CR-V there?

17   A.  Yes.

18   Q.  And neither of these vehicles did you get out and

19 look?

20   A.  Correct.

21   Q.  You notice the wheels on the CR-V there are

22 canted pretty hard.  You see that?

23   A.  Yes.

24   Q.  Did that draw your attention at all?

25   A.  No.

Q.  Okay.  Can you read -- I don't know Deatrich, I
don't know if we can get a license plate of that CR-V.

You can look at your screen if it's easier than
that, but do you think you can tell that?

A.  Looks --

Q.  Hold on a minute.  Let's see if we can get
better.

A.  It looks like FMP 321.

Q.  I would agree with you.  FMP 321.

Okay.  And then I apologize if I asked you, these
two, did you get out and do any further inspection?

A.  No.

Q.  And then the last -- that's fine.  You can take
that down and we can have the lights again, Madam Clerk.

Then the last one -- well, those two, where were
those two, the CR-V and the --

A.  Long-term parking.

Q.  Long-term parking.  So the last vehicle you would
have come to then would have been over -- the Wells'
vehicle over in the regular, I guess, the short-term
parking?

A.  Yes.

Q.  And after seeing the mail on the seat, did you
run the license plate or make a determination of whether
that was the Wells' vehicle, or was seeing the mail

1    confirmation enough for you, do you recall?

2        A.  No, I didn't run the vehicle.  The mail -- I just

3    -- yeah.

4        Q.  You just presumed you had found the Wells'

5    vehicle based on seeing Wells' mail in the vehicle?

6        A.  Yes.

7        Q.  You didn't open the doors or get in the vehicle

8    at all?

9        A.  No.

10       Q.  Or do anything with the vehicle?

11       A.  No.

12       Q.  Just drove back and reported to law enforcement?

13       A.  To the FBI, yes.

14       Q.  How long from the time you were there at the

15   vehicle until out to make your report and then back to

16   the vehicle, how long were you gone from it?

17       A.  Probably about 15 minutes.

18       Q.  So you went right out and came right back?

19       A.  Yes.

20       Q.  And then you stayed continuously with the vehicle

21   until other law enforcement agents, as I understand it,

22   came later that night --

23       A.  Yes.

24       Q.  -- and secured the vehicle?

25       A.  Yes.

1    Q.  All right, sir.  If I could check just one minute

2 here.

3        (Pause)

4    Q.  Sir, when you were up at T-1 originally before

5 your trip to the airport, had you visited with any of

6 the Coast Guard employees or any of the investigators

7 about observations they had made from the night before?

8    A.  I'm not sure I understand your question.

9    Q.  Sure.  Let me ask this first:  What was -- the

10 videos that you reviewed, do you remember what the

11 timeframe was, how much video you reviewed, when the

12 time of those videos was?

13   A.  So the first ones I looked at was of the night

14 before on April 11th, and that was of the white pickup

15 they had seen come through there around between 10:00

16 and 10:45, somewhere in there.  There was a timeframe

17 there.  And that's the one Sergeant Fussey had seen and

18 reported to me.

19        When I went up to T-1 to look at the videos, that

20 was the first thing I was looking to.  When I got up

21 there, I saw they had a camera that looked down on T-2,

22 and so I thought, all right, I'm going to take a look at

23 that, because it showed the back of the building there.

24        And so one of the things I wanted to see is there

25 somebody seen exiting the building, is there any lights

or a gunshot flashing on and off in the back that would
sort of give you a timeline. You start to pin down the
timeline with stuff like that. And then I took note of
the vehicles which we have already talked about, and
that's when I saw -- I focused in on the blue vehicle
just because of the timeframe within that timeline.

Q. But there was also a white pickup? There was a
white pickup Mr. Fussey told you about first the night
before?

A. Yes.

Q. The white pickup in the second one, as well as
now add in a blue SUV?

A. Yes.

Q. Could you pull up 159 just so we're clear. It's
Defense, I believe, 159.

MR. COLBATH: Your Honor, I think we have an
agreement that we can admit this. So I can --

MS. SHERMAN: That's fine.

THE COURT: No objection to Defense 159. All
right. That's admitted.

(Defense Exhibit No. 159 admitted.)

BY MR. COLBATH:

Q. Let's just go ahead and publish this.

Mr. Ellis, I would like you to just watch this
and see if it is the first of two videos you watched

1   from the April 11th evening.

2          (Defense Exhibit No. 159 playing in open

3   court.)

4   BY MR. COLBATH:

5      Q.  That was one of them you had seen that Officer

6   Fussey had pointed out to you?

7      A.  Yes, I believe so.

8      Q.  On the video there at the beginning, before you

9   can see the car, you can see the headlights shine on the

10  trees there.

11         Did it appear to you that the car had come from

12  golf course direction going towards town and then turned

13  back towards that flagpole?

14     A.  I think that's what it did, yes.

15     Q.  Then there was a second video that you watched

16  with this same vehicle.

17         MR. COLBATH:  That's Defense Exhibit No. 160,

18  which I would move.

19         THE COURT:  Any objection?

20         MS. SHERMAN:  No objection.

21         THE COURT:  Defense 160 is admitted.

22         (Defense Exhibit No. 160 admitted.)

23         (Defense Exhibit No. 160 playing in open

24  court.)

25  BY MR. COLBATH:

1    Q.  See if those headlights look like they came the

2    same direction again, from the golf course.

3        And that was the other video?

4    A.  Yes, that looks like it came from the same

5    direction as the first video we looked at.

6    Q.  And because of the way the camera sits, as it

7    drove off, it was, I guess, at least heading away from

8    town, but we don't -- you can't tell which driveways it

9    went out or where it went from there?

10   A.  Correct.

11   Q.  And you didn't, for the rest of the evening of or

12   any part of the evening of April 11th, nobody showed you

13   video of relocating that white truck that evening?

14   A.  Say that again, please.

15   Q.  Nobody showed you any more video of that white

16   truck, or it wasn't relocated anywhere to your knowledge

17   that evening?

18   A.  No.

19       MR. COLBATH:  I think that's all I have for

20   you, sir.

21       THE COURT:  Thank you, Mr. Colbath.

22       Redirect?

23              REDIRECT EXAMINATION

24   BY MS. SHERMAN:

25   Q.  You were shown some photos of -- there were two

vehicles.  There was a CR-V and another vehicle, and you were focused on the other vehicle.  Why weren't you focused on that CR-V.  It's tough to tell the exact color, but --

    A.  I think just the Ford stood out to me more there.  The size of it I would say probably.

    Q.  Of all the vehicles you saw at the airport and took photos of, how many of them had a Coast Guard sticker?

    A.  I only noticed it on one vehicle.

    Q.  And what vehicle was that?

    A.  That was the last one I looked at, the blue CR-V Honda.

    Q.  The Wells' CR-V?

    A.  Yes.

        MS. SHERMAN:  Those are my questions.

        MR. COLBATH:  Just one regarding that last.

                        RECROSS EXAMINATION

BY MR. COLBATH:

    Q.  You didn't have any information from the day before when you went to the airport, or from earlier in that day when you went to the airport that you were looking for a vehicle with a Coast Guard sticker, did you?

    A.  Correct.

```
 1      Q.   Okay.  I hadn't heard about the sticker.
 2              MR. COLBATH:  That's all I have, Your Honor.
 3              THE COURT:  All right.  Excused?
 4              MR. COLBATH:  Yes.
 5              MS. SHERMAN:  Yes.
 6              THE COURT:  Thank you, sir.  You may be
 7      excused.
 8              (Witness excused)
 9              THE COURT:  Ready for your next witness.
10              MS. STEVENS:  Your Honor, the government calls
11      Joshua Honour.
12              (Pause)
13              THE COURT:  Good afternoon.  If you can come up
14      to the witness stand here, and when you get up there,
15      remain standing and the clerk will administer an oath to
16      you.
17              (Oath administered to the witness)
18              DEPUTY CLERK:  For the record, can you please
19      state your full name and then spell your full name.
20              THE WITNESS:  Joshua Christian Honour,
21      J-o-s-h-u-a, C-h-r-i-s-t-i-a-n, H-o-n-o-u-r.
22          JOSHUA HONOUR, GOVERNMENT WITNESS, SWORN
23                       DIRECT EXAMINATION
24      BY MS. STEVENS:
25      Q.   Good afternoon, Mr. Honour.  Where do you
```

1   currently work?

2       A.   I currently work with Grand County Sheriff's

3   Office in Moab, Utah.

4       Q.   What do you do for them?

5       A.   I am a patrol deputy.

6       Q.   How long have you worked there?

7       A.   A little over five years.

8       Q.   And what do some of those duties entail?

9       A.   I conduct investigations for crimes, conduct

10  traffic control, issue citations, traffic stops, search

11  and rescue, patrol our area, which is the entire county

12  that we have, and do DUIs and any other kind of

13  investigations we might need.

14      Q.   Before working for them, who did you work for?

15      A.   I worked for the Coast Guard.  It was at the Base

16  Kodiak as a security force with the Coast Guard Police

17  Department.

18      Q.   And what kind of training did you get with the

19  Coast Guard?

20      A.   The Coast Guard, got a lot of law enforcement

21  experience between two units learning firearms tactics,

22  medical, patrol tactics and techniques, first-aid, CPR,

23  EMT, boat handling operations, watch captain and

24  dispatching.

25      Q.   And how long did you do that for?

1      A.   Total of six years, four months, and three of

2   those years were in Kodiak.

3      Q.   I was waiting for the amount of days.

4      A.   Yeah.

5      Q.   You left me hanging.

6           Okay.  Do you recall how long your shifts were?

7      A.   Yes, each shift was 12 hours.

8      Q.   Okay.  And you mentioned you conducted rounds,

9   that was standard?

10      A.   Yes, it was.

11      Q.   Can you describe to the members of the jury just

12   generally what that entailed.

13      A.   Of course.  So what we do, we had specific zones

14   that we had to patrol on base and off base.  For on

15   base, we would be checking buildings, make sure

16   buildings were locked, if it was after hours, there

17   wasn't anybody anywhere they shouldn't be, no like

18   obvious known hazards or unknown hazards, make sure that

19   specific locations were secured, like our fuel farms.

20           Off base was the same.  We would go through all

21   of our property, all land that the Coast Guard had

22   checking buildings, ensuring they were locked, making

23   sure there wasn't anybody that needed assistance or was

24   out there conducting some sort of criminal activity.

25           We would check our housing areas, ensure that it

1  was safe, provide a police presence to the community.

2      Q.  Did you check all buildings during these rounds

3  to make sure that they were locked?

4      A.  Yes, we had a list, and that list showed specific

5  buildings that they wanted us to check.

6      Q.  Did that list include the T-2 rigger shop?

7      A.  That was part of the -- zone six was in there.

8      Q.  Okay.  Let me restate my question.

9          Did you have to ensure that the doors to T-2 were

10  locked during your rounds?

11      A.  Yes, I would check all those.

12      Q.  Okay.  Do you remember conducting a round the

13  evening of the 11th, morning of the 12th of April 2012?

14      A.  Yes, I do.

15      Q.  Can you just tell the jurors basically what you

16  did that night?

17      A.  Of course.  So for the zone that I conducted off

18  base, after I got done with the Lake Louise housing, I

19  went up from Rezanof Highway up Anton Larsen Bay Road.

20  We would check.  There would be a flat area off to your

21  right and to your left where there used to be old

22  barracks for the Coast Guard.  And there would just be

23  like areas where you could drive back in there with a

24  vehicle so you could kind of conceal yourself back

25  there, so I'd check all those little side trails.

1          And then after I got completed with that, I would

2    drive up, and you could check -- there was some other

3    buildings along the way that could be used for storage.

4    We would make sure those were locked and nobody had

5    tampered with those.  Continue up.  There would be some

6    places like Beaver Pond, where you could go and check

7    that, which connected to Lake Louise housing.  There was

8    a gate there.  Make sure the gate was secured, no

9    issues.

10          Continue up and check the magazine area where we

11    stored ammunition, make sure the gate was locked and

12    secured.  Same for the archery range was close by.

13    Along the way we could check the communication station,

14    up that way, make sure those buildings were secured,

15    there was no suspicious activity or obvious criminal

16    activity going through.

17          We could check the Buskin Lake, Buskin Lake pump

18    house, and also the clean water purification water

19    building and 23, and do the same thing, make sure there

20    is no vehicles, personnel back there that shouldn't be

21    back there and no issues.

22          Continue on up, and we could go up to the golf

23    course.  Same thing for that, check all the doors,

24    windows, parking lot off to the side.  And then you

25    could go up as far as the ski chalet and also check all

1   of those buildings.

2       Q.  Did you ever find anything squirrelly going on up

3   in that zone which you referred to as zone six?

4       A.  Yes.  We would at times find people up there that

5   shouldn't be, and they'd be just out doing animal

6   viewing or they could be doing criminal activity of any

7   kind.

8       Q.  And not being shy here, generally speaking, what

9   was that criminal activity you would observe?

10      A.  Often it would be anything involving intimate

11  activities between individuals and also drug use,

12  alcohol use.

13      Q.  Okay.  What about in the T-2 parking lot, did you

14  ever see anything suspicious or out of the ordinary

15  going on there?

16      A.  I don't recall ever finding anything in that

17  parking lot.

18      Q.  Do you remember if that parking lot was well lit?

19      A.  It was.  It had lighting.

20      Q.  If you found something suspicious or unique, what

21  was your practice?

22      A.  We would approach the vehicle, parked vehicle.

23  We would call that information into the dispatcher.  We

24  provide them with our location, description of the

25  vehicle, the vehicle's plate on the registration so they

1   could check and make sure there was no warrants

2   connected to that vehicle, check the vehicle.

3        After providing the information to them, I would

4   get out of my vehicle, approach that vehicle, and also

5   just look around going up to the vehicle, make sure

6   there is no person down and about.  Make contact with

7   the vehicle.  If there is nobody there, it would just be

8   logged in dispatch.

9        If there was somebody, I would make contact with

10  them.  I would ask them what it is they are doing back

11  there, see whether or not there is any criminal activity

12  or other suspicious behavior, get their identification

13  for them, anybody else within the vehicle, and have that

14  -- also have the information checked by our dispatcher

15  to make sure who they were, if they had warrants.

16  Q.   So that night, taking you back to the 11th and

17  then the early morning of the 12th, did you make any

18  reports?

19  A.   No, I did not.  I didn't find anybody up that

20  way.

21  Q.   What other aspect of law enforcement did -- let

22  me rephrase that.

23       What other duties did your job entail during that

24  12-hour shift?

25  A.   For the 12-hour shift, aside from being a

1  patrolman, we also covered dispatch ourselves.  And I

2  was a watch captain, which was the assigned supervisor

3  for that shift.

4      Q.  So did you field any calls during your shift?

5      A.  Yes, I did.

6      Q.  And what call did you -- what time were you

7  acting as a dispatcher?

8      A.  It would have been the last few hours of the

9  shift, so starting around 7:00 a.m., I believe.

10      Q.  And do you recall fielding a call in that hour

11  timeframe?

12      A.  Yes, I do.

13      Q.  Do you remember what time that was?

14      A.  Yes, it was around 7:47 a.m.

15      Q.  Okay.  And what was the information passed?

16      A.  The information that I received was from a Petty

17  Officer O'Connor, I believe.  He advised that two

18  members had found two other members passed out and there

19  was blood in the area.

20          I hadn't received a lot of other information

21  aside from that, except that the two unconscious members

22  were in the rigger shop at the communication station.

23      Q.  And after you received this call, what did you

24  do?

25      A.  I paged or called for medical, fire and for our

1    Coast Guard police officers to respond for medical

2    assistance.

3        Q.   And that morning, was it a hectic morning in the

4    dispatcher call room?

5        A.   Yes, it was.  All the radios, phones were all

6    continuously going off.  I was back there by myself

7    trying to keep up on the logs and phone calls and the

8    radios, communicating with everybody trying to keep it

9    organized.

10        Q.   And like what kind of folks were calling you?

11        A.   It would have been primarily the officer of the

12    day.  It would have been the executive officer.  The

13    base commander would have called.  Maybe some of my

14    other supervisors.

15             And then the main thing was just the radio

16    between the fire department, our fire department and our

17    Coast Guard police officers.

18        Q.   Did you field any calls from the public?

19        A.   Not that I recall.

20        Q.   And then after the incident, after that morning,

21    I assume -- did you get a break?  Did you go home?

22        A.   Yes, I did.

23        Q.   And then what was your work schedule like the

24    week or two following that event?

25        A.   For the next couple weeks we were working

1   24 hours a day, seven days a week, 12-hour shifts for

2   most of the remainder of that, I think it was about a

3   month timeframe maybe.

4          MS. STEVENS:  Great.  Your Honor, I have no

5   further questions.

6          THE COURT:  Questions of this witness?

7          MR. CAMIEL:  Yes.

8                    CROSS EXAMINATION

9   BY MR. CAMIEL:

10      Q.  Good afternoon.

11      A.  Good afternoon.

12      Q.  You described the rounds that you did during the

13  time period around the time of April 12, 2012, and was

14  that zone six?

15      A.  I believe that was zone six, yes, sir.

16      Q.  Did the people who worked for the Coast Guard

17  Police Department have some kind of a number like that

18  you were assigned?

19      A.  Yes, that is correct.

20      Q.  Were you number 253?

21      A.  That's correct.

22      Q.  Do you recall -- you told us that when you did

23  your rounds you would drive all the way up Anton Larsen

24  Bay Road; is that right?

25      A.  Yes, sir.

1    Q.  And you would go all the way up to the ski

2  chalet?

3    A.  Sometimes we would go up to the ski chalet.

4  Sometimes we might stop at the golf course, depending on

5  weather conditions.

6    Q.  How far was the golf course from the COMMSTA?

7    A.  I don't recall.  I think it was maybe a mile or

8  two.  I don't recall.

9    Q.  All right.  Do you recall on April 11th you

10  responded to an alarm up at the pro shop of the golf

11  course?

12    A.  I don't recall that incident.

13    Q.  Could you take a look at -- it's DE-217.  I'm not

14  going to offer it.  I want to use it to refresh his

15  recollection.

16    A.  It's a little bit blurry.

17    Q.  Let's see if we can blow it up so you can see the

18  proportion a little better.

19       Do you see partway down the page 4-11, 64821?

20    A.  Yes, sir, I see it.

21    Q.  Do you see that you were the responding unit?

22    A.  Yes, sir.

23    Q.  Regarding an alarm at the pro shop at the golf

24  course?

25    A.  Yes, sir, I do.

1    Q.  And you went up there, right?

2        THE COURT:  Are you using this to refresh

3 recollection, because then he can read it to himself and

4 ask whether or not it refreshes it.

5        MR. CAMIEL:  Sure.

6    Q.  Does this help you recall going up to the golf

7 course on April 11th?

8    A.  I don't recall making that trip.

9    Q.  Is this a report that you would have generated?

10 Would you have reported in -- if you had gone up there

11 on April 11th to respond to an alarm, would you have

12 then called back in your findings when you went up

13 there?

14    A.  Yes, sir, I would have.

15    Q.  And would that be recorded in the log that you

16 just looked at?

17    A.  Yes, that would be reported in the E911 log with

18 the dispatcher.

19    Q.  And is that a log that's kept in the regular

20 course of business?

21    A.  Yes, sir.

22    Q.  And used to document the calls that you respond

23 to?

24    A.  Yes, sir, it is.

25        MR. CAMIEL:  Your Honor, I would offer the

exhibit as a business record.

1

2          THE COURT:  What's the number again,

3   Mr. Camiel?

4          MR. CAMIEL:  217.

5          MS. STEVENS:  No objection.

6          THE COURT:  No objection.  All right.  I don't

7   have that exhibit, but I'll admit it nonetheless.

8          (Defense Exhibit No. 217 admitted.)

9   BY MR. CAMIEL:

10      Q.  Can we publish it.

11          So you're unit 253?

12      A.  Yes, sir, that's correct.

13      Q.  So could you read to us where it says 65824-253?

14   Could you read that to us?

15      A.  Yes, sir.  "65824-253," which would be my

16   designated number, "reports after making rounds, the

17   building is secured and there are no signs of

18   trespassing or intrusion.  253," being myself again,

19   "suggests the alarm may have been triggered by wildlife

20   in the area."

21      Q.  I take it when you went up there you didn't see

22   anybody up there by the time you got up there?

23      A.  That would probably be accurate.

24      Q.  Do you know where you would have started -- can

25   you tell from this exhibit where you would have started

from when you first got the call to respond to this alarm?

A.  I could suggest that if it was an alarm I would treat it as it could possibly be a potential threat.  If someone is trying to break into the building, I would have parked my vehicle slightly farther away to provide myself reactionary distance between me and any possible threat in the building.

There would be several units, before making the approach to a building, for officer safety purposes where we would approach the building systematically to check to see if we could see any vehicles in the area, other personnel, things like that, any obvious threats come up.

There was lots of windows.  We would be able to view through the windows, follow alongside of the building.  If we didn't observe any obvious signs of forced entry, persons or anything else suspicious, we could go and verify that windows are secured, doors are all secured.  And if they were secured, we report that back.

Q.  I guess my question was where you were when you first got the call to go up to the golf course to check on the alarm.

A.  I could have been at the base or I could have

1  been out on patrol in any portion of the Coast Guard

2  property.

3      Q.  As you were heading up to check on this alarm,

4  did you recall seeing any vehicles coming back down

5  Anton Larsen Bay Road coming in the opposite direction

6  of you as you're heading up to check on an alarm?

7      A.  For this specific call, I don't recall any parts

8  of this incident.

9          MR. CAMIEL:  That's all I have.  Thank you.

10          THE COURT:  Any redirect?

11          MS. STEVENS:  Yes, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MS. STEVENS:

14      Q.  So when I first talked to you, you had mentioned

15  that one of the main reasons folks would be up in that

16  area, zone six, would be wildlife viewing?

17      A.  That's correct.

18      Q.  So is it safe to say that there is a good deal of

19  wildlife up there?

20      A.  Yes, there is.

21      Q.  The report that the defense just showed you

22  indicated that you believed that the alarm was probably

23  triggered by wildlife; is that correct?

24      A.  That's what it looked like, yes.

25      Q.  So understanding that you don't really remember

```
 1    this event, is one of the reasons why you may not
 2    remember it because it just wasn't very suspicious?
 3              MR. CAMIEL:  Leading.
 4              THE COURT:  The objection is?
 5              MR. CAMIEL:  Leading.
 6              THE COURT:  Yes, that's sustained.
 7              MS. STEVENS:  I have no more questions.
 8              THE COURT:  Can we excuse this witness,
 9    counsel?
10              MS. STEVENS:  Yes.
11              THE COURT:  All right.  Thank you, sir.  You
12    may be excused.
13              (Witness excused)
14              THE COURT:  Everybody still okay?  Anybody need
15    a short break?  Are we ready for your next witness?
16              MS. STEVENS:  The government calls Michael
17    Haselden.
18              (Pause)
19              MS. STEVENS:  Your Honor, I envision that he
20    will take a little longer than the rest of the
21    witnesses, or the witnesses we just had, so may I
22    suggest a quick health and comfort break?
23              THE COURT:  That's fine.  So your proposal is
24    about a 10- to 15-minute break?
25              MS. STEVENS:  Yes, ma'am.
```

        THE COURT:  Ladies and gentlemen, let's do
that.  Please leave your notepads here in the courtroom.
Remember my admonition not to discuss the case during
this break.  We'll be back shortly.  We'll go off
record.

            (Recessed from 3:32 p.m. to 3:49 p.m.)

            (Jury present)

        THE COURT:  Please be seated, everyone.  I
believe we're ready for the government's next witness.

        MS. STEVENS:  Yes, Your Honor.  The government
calls Michael Haselden.

        THE COURT:  All right.  Very good.  Good
afternoon.  If you could come forward up to the witness
stand here, and when you get up there, if you would
remain standing, the clerk will administer an oath to
you.

            (Oath administered to the witness)

        DEPUTY CLERK:  For the record, can you please
state your full name and then spell your full name.

        THE WITNESS:  Michael Birch Haselden.
M-i-c-h-a-e-l, B-i-r-c-h, Ha-s-e-l-d-e-n

    MICHAEL HASELDEN, GOVERNMENT WITNESS, SWORN

                    DIRECT EXAMINATION

BY MS. STEVENS:

    Q.  Good afternoon, Mr. Haselden.  Who do you work

1  for?

2      A.  The U.S. Coast Guard.

3      Q.  What's your rank, your current rank?

4      A.  A chief petty officer.

5      Q.  Okay.  And so at work do people typically call

6  you Chief?  Is that what you go by?

7      A.  Yes.

8      Q.  How long have you been with the Coast Guard?

9      A.  About 19 years, 11 months.

10      Q.  Oh, so close to retirement?

11      A.  Yes, ma'am.

12      Q.  Or retirement eligible.  And what do you

13  currently do for the Coast Guard?

14      A.  Currently, I work for the Sector Juneau, Alaska

15  communications.  I'm the communications supervisor for

16  the command center.

17      Q.  Just give the members of the jury an idea of what

18  that job entails.

19      A.  Certainly.  So basically, I dictate a lot of

20  the -- I help write and dictate a lot of policies for

21  communications in the southeast Alaska.  Also, I liaison

22  with our contractors, technical folks, if you will, and

23  we supply support for all our VHF sites.  Also provide

24  support for our subordinate units as well.  Also, I

25  manage probably about close to 15 enlisted personnel

1    that are underneath me.

2        Q.   Prior to your current position, Chief, where were

3    you assigned?

4        A.   You want me to start from the beginning?

5        Q.   Sure.

6        A.   First assignment was at Group Southwest Harbor,

7    Maine.  I was there for about three years.  Then I went

8    to Texas for about seven years, three years on the Coast

9    Guard cutter Dauntless.  It's a 210-foot endurance

10   cutter.  And then four years at Air Station Houston.

11           And then from there, I got assigned to

12   Communications Station Kodiak, Alaska for about five

13   years.  After that I transferred to the District 17

14   office in Juneau, Alaska for four.  And I just currently

15   transferred this summer to the Sector Juneau, Alaska

16   command center.

17       Q.   So it sounds like going on your ninth year here

18   in Alaska?

19       A.   Yes, ma'am, that's right.

20       Q.   Safe to say you like it here?

21       A.   I love Alaska, yes.

22       Q.   And you are currently a chief petty officer?

23       A.   Yes.

24       Q.   Kind of help the jury understand the significance

25   of being a chief petty officer in the Coast Guard.

1    A.   Certainly.  So basically a chief, it's the best

2  way of kind of describing it, is an enlisted person, E6

3  and below, first class petty officers and below, they're

4  sort of a big backbone of the workforce.  Okay.  Once

5  you make E7, you step up into a more senior leadership

6  position in the enlisted ranks, which is a monumental

7  step forward into your career in the Coast Guard.

8         What is that designed with?  Well, basically

9  you're looking at really shaping the enlisted workforce

10  is part of my duties as locally, and then as you get up

11  in the chief ranks, you can manage our workforce in the

12  enlisted ranks from a broad spectrum throughout the

13  Coast Guard, if you will.

14         Also, part of my duties as a chief petty officer,

15  I'm a technical expert in my field.  With that also I

16  mentor junior petty officers as well as junior officers,

17  typically junior officers that are coming into the Coast

18  Guard.  They're coming from the OCS and command -- or

19  the Coast Guard Academy, really don't know much about

20  it.

21         So typically what they have us do when they're

22  being mentored themselves is they ask their chief.  And

23  that's where my part comes in.  So I have a unique role

24  of mentoring not only junior enlisted but junior

25  officers as well.

1    Q.   Great.  So part of your vernacular, I imagine

2    it's a lot of acronyms?

3    A.   Uh-huh.

4    Q.   So you mentioned OCS?

5    A.   So that's the Officer Candidate School.  So it's

6    basically folks that have a degree or they can apply for

7    this school, and from there, they do some like rigorous

8    training, typically like 16 weeks and from there they

9    get a commission as an officer in the United States

10   Coast Guard as well.

11   Q.   So, Chief, is it accurate to say that a chief

12   petty officer is naturally respected by others given

13   their rank as a chief?

14   A.   Absolutely.

15   Q.   You touched upon it a little bit, and I just

16   wanted to spend a little bit more time here.  What's the

17   interplay between the chiefs and the officers, the war

18   room?

19   A.   So basically, for the junior officers, those are

20   typically your O4 and below or lieutenant commander and

21   below, they really lean upon their chief petty officers

22   as technical experts, experts in workforce management

23   and they -- what they call is they glean off their

24   experience that they've had in the field, in the

25   enlisted field, to really dictate policy for United

 1    States Coast Guard locally and broadly as well.  I hope

 2    that kind of --

 3        Q.  Thank you, Chief.  Are you a little nervous

 4    today?

 5        A.  A little bit.

 6        Q.  So when you were assigned to the COMMSTA in

 7    Kodiak, had you put on your anchors yet?  Had you

 8    promoted to chief yet?

 9        A.  I had not when I initially had been assigned

10    there.

11        Q.  Where were you assigned at the COMMSTA?

12        A.  I was assigned to the communications watch floor

13    that's right above -- I guess our main building in T-1,

14    I guess they would call that.

15        Q.  What did you do there?

16        A.  I was communications watch officer.

17        Q.  What did that job entail?

18        A.  Just a couple things.  Number one, you're sort of

19    the officer of the day.  Basically, you're responsible

20    for just looking out for the facilities, making sure if

21    there's like a fire or any sort of emergency that

22    happens, we're supposed to make sure that we call up

23    emergency services to make sure that gets done or we

24    go -- basically, there as the first responder just to

25    see how it goes.

1       We're also responsible for the commanding officer

2  at that time as the officer of the day.  Also, I was

3  also in charge of maintaining -- or rather of making

4  sure all of our communications equipment at COMMSTA

5  Kodiak was running, making sure that we were getting all

6  our -- all our operations complete out there, gets us

7  a -- various things in the communication field.

8      Q.  Did that include the antennas, both the

9  transmitters and receivers?

10     A.  Yes, ma'am.

11     Q.  You mentioned you're up in the T-1 building.

12  Were the folks stationed up in T-1 fairly separate from

13  the rigger shop and the folks in T-2?

14     A.  They were.

15     Q.  Okay.  While acting as a watch officer, did you

16  have an opportunity to become familiar with the cameras

17  in the COMMSTA, in and around the COMMSTA?

18     A.  I was.

19     Q.  And how so?

20     A.  Well, we used it as part of our duties for

21  security, safety and to also monitor our antennas out in

22  the antenna field.

23     Q.  So you would see the cameras on a daily basis and

24  the screens of what they captured?

25     A.  We would.

1    Q.  Was there a standard operating procedure or any

2  written guidance as it related to the cameras?

3    A.  Not that I can specifically remember with the

4  written guidance.

5    Q.  Any general practice with the cameras?

6    A.  Yes.  So our general practice was we would --

7  primary function for the camera would be security, so we

8  would try to keep it at all the entrances of the fenced

9  area for T-1, also monitor T-2 as well.

10   Q.  So we're going back a couple years now.  I know

11 you haven't been there for two tours, but can you to the

12 best that you can explain to the members of the jury the

13 outdoor cameras located on the T-1 building or around

14 the T-1 building?

15   A.  Certainly.  So start with T-1.  So I believe

16 T-1 -- again it's been about, you know, five years since

17 I've been stationed there.  But I believe there was one

18 that was on -- there's like a little antenna structure

19 that was on the front of the building that was a pan

20 tilt zoom that kind of monitored our parking lot, the

21 front gate area.

22     We also had one that was out there towards the

23 back corner of the perimeter fence out in the parking

24 lot.  I would say there's a parking lot right here, and

25 then the camera was on a pole that was right here.

1   Also, we had another -- that was a tilt zoom 360 camera

2   as well.

3           Then we also had one in our back corner of the

4   perimeter fence, the back right corner near the loading

5   gate.  There was a pole out there that we would use for

6   pan tilt zoom 360 as well.  And then down at T-2 we had

7   one camera, I believe that one was right at the front of

8   the building, I think.  I don't remember the position of

9   it, but we did have one at T-2.

10  Q.  And the pan tilt zoom camera you mentioned on the

11  front antenna that looked down at the road and parking

12  lot in front of T-1, did that also capture the water

13  treatment plant in the background?

14  A.  It can, yes.

15  Q.  All right.  And then the T-2 one, did you mention

16  if this was on the front of the T-2 building?

17  A.  Yes, I said it was at the front of the building,

18  I believe.

19  Q.  And that generally looked at what?

20  A.  At the parking lot and then the road area as

21  well.

22  Q.  Did that include the flagpole?

23  A.  It did.

24  Q.  So what have you done, Chief, to prepare yourself

25  for your testimony today?

1    A.   Just looked over my previous statements and we

2    also did look at the video as well.

3    Q.   Okay.  So we're going to be showing you some

4    exhibits for foundational purposes.

5         Blair, let's start with Exhibit 55.

6    BY MS. STEVENS:

7    Q.   So do you remember this video, Chief?

8    A.   I do.

9    Q.   And is this a video captured from the front

10   camera on the T-1 outdoor antenna in the front of the

11   building that you just testified?

12        MR. CAMIEL:  I'm going to object to leading.

13   He should describe the exhibit rather than --

14        THE COURT:  Fair enough.  That's sustained.

15   BY MS. STEVENS:

16   Q.   Do you recognize this video?

17   A.   It's the front camera that should be pointed out

18   near the antenna.  Again, it's a 360.  Typically get

19   that pointing right there at the front gate area.

20   Q.   And the video you just -- you just watched, does

21   that video accurately capture the video at the time it

22   was taken?

23   A.   It does.

24        MS. STEVENS:  Your Honor, we move to admit 55.

25        MR. CAMIEL:  No objection.

```
1              THE COURT:  All right.  55 is admitted.
2              (Exhibit No. 55 admitted.)
3              MS. STEVENS:  Let's go ahead and we'll play
4    this one.
5              (Exhibit No. 55 playing in open court)
6    BY MS. STEVENS:
7      Q.   Chief, as we watch this, what's the date down
8    there?
9      A.   This is 4-11-2012.
10     Q.   The time?
11     A.   It's 09:02 a.m.
12     Q.   And do you recognize that individual walking up?
13     A.   I do.
14     Q.   Blair, you can pause it.
15          Who is that?
16     A.   It looks like Jim Wells.
17     Q.   How do you recognize him?
18     A.   Just by his gait, I guess you would call it.  He
19   had a beard at the time.  He had a flannel.  Always wore
20   a hat.
21     Q.   You can keep playing that.
22          And the next one we're going to look at is 56,
23   Blair, for foundation.
24          Do you recognize this video, Chief?
25     A.   I do.
```

1    Q.   And does it accurately capture what was taken on

2    the date listed there?

3    A.   It does.

4         MS. STEVENS:  Your Honor, we move for the

5    admission of 56.

6         MR. CAMIEL:  No objection.

7         THE COURT:  56 is admitted.

8         (Exhibit No. 56 admitted.)

9         MS. STEVENS:  Let's go ahead and play this.

10        (Exhibit No. 56 playing in open court)

11   BY MS. STEVENS:

12   Q.   What's the date on there?

13        Pause it, Blair.

14   A.   It's 4-11-2012, 9:15 a.m.

15   Q.   Okay.  Go ahead and play it.

16        So can you describe what just happened?

17   A.   The camera was moved from the entrance area to --

18   out to what is facing -- looks like one of our antennas.

19   Q.   What's the general practice after a camera is

20   moved?

21   A.   If they're moved we should move it back to the

22   entrance area.

23   Q.   Now, I'm going to show you for foundation 57.  So

24   this is a still photo.  Do you recognize this?

25   A.   I do.  This is the camera from the back corner of

1  the perimeter -- I would say rather right there in the

2  parking lot.

3      Q.  And what does this camera generally train on?

4  What's it generally looking at?

5      A.  It's generally where it's at right now, the

6  parking lot area.

7      Q.  Is that structure up there in the right-hand

8  corner, do you recognize that?

9      A.  Are you talking about --

10     Q.  The building.

11     A.  Yes.  This one is T-1.

12     Q.  Does this photograph accurately represent the

13 still picture from this camera as it was taken on the

14 11th?

15     A.  It does.

16         MS. STEVENS:  Your Honor, we move for the

17 introduction of 57.

18         MR. CAMIEL:  No objection.

19         THE COURT:  57 is admitted.

20         (Exhibit No. 57 admitted.)

21 BY MS. STEVENS:

22     Q.  You can publish that one, Blair.  Thank you.

23         So let's see here.  This right here, this

24 structure, what's that?

25     A.  That's the little tower.  I think it had a -- it

had another antenna on it, but it also had the camera

system on it as well from the one that faces the gate

that was previously shown.

Q.  And then how about this, what's that?

A.  That one is T-2.

Q.  And as this angle is, do you see any of Anton

Larsen Road?

A.  I do not.

Q.  You can take that one down.  The next one we're

going to show for foundation is 59.

Do you recognize this photo, Chief?

A.  I do.  It's the same camera.

Q.  And just for purposes of the record, explain

which camera this is.

A.  It's the camera from the front parking lot, back

corner perimeter fence.

Q.  Is this an accurate picture of that camera

footage as it was taken in the still photograph on the

date listed there?

A.  It is.

MS. STEVENS:  Your Honor, we move to admit 59.

MR. CAMIEL:  No objection.

THE COURT:  All right.  59 is admitted.

(Exhibit No. 59 admitted.)

BY MS. STEVENS:

1    Q.   And do you recognize who is in this photograph?

2    A.   I do.   It's Jim Wells.

3    Q.   And what time does it say?

4    A.   11:51 a.m.

5    Q.   And the date?

6    A.   It's 4-11-2012.

7    Q.   Blair, you can take that one down.

8         The next one is 60, please, for foundation.   Do

9    you remember this video, Chief?

10   A.   I do.

11   Q.   And does this video -- well, tell us briefly what

12   it's of.

13   A.   It is the camera from the front of the parking

14   lot, T-1, the perimeter fence in the far corner.

15   Q.   Does this video footage accurately represent the

16   video footage that was taken on the date listed there?

17   A.   It does.

18        MS. STEVENS:   Okay.   Your Honor, we move to

19   admit 60.

20        MR. CAMIEL:   No objection.

21        THE COURT:   All right.   60 is admitted.

22        (Exhibit No. 60 admitted.)

23   BY MS. STEVENS:

24   Q.   So we're going to play this video, Chief.   And we

25   may pause it a couple times during it.   I'm going to ask

1  you a couple questions as we go.  Okay?

2      A.  Okay.

3      Q.  So first and foremost -- you can play it.

4  Thanks.

5          (Exhibit No. 60 playing in open court)

6  BY MS. STEVENS:

7      Q.  What date is down at the bottom?

8      A.  It's 4-11-2012 or April 11, 2012.

9      Q.  And the time?

10     A.  It's 1:15 p.m.

11     Q.  What do you see happening there in the back left

12 corner?

13     A.  It looks like there are some -- a group of people

14 that are coming up.

15     Q.  Where are they coming up from?

16     A.  Looks like they're coming up from the ramp,

17 probably from T-2.

18     Q.  And do you recognize what some of those

19 individuals in this footage are wearing?

20     A.  Yeah.  Three -- they are Coast Guard uniforms, so

21 those are probably Coast Guard members.

22     Q.  Okay.  And what kind of uniform are they wearing?

23     A.  It's our operational dress uniform, ODU for

24 short.  They're typically blue in color.

25     Q.  Blair, you can go ahead and pause it.

1          Do you recognize anybody else in this screen
2    shot?
3        A.   Yes.   The one that's not wearing blue was Jim
4    Wells.
5        Q.   How do you recognize him?
6        A.   Again, by just the way he's walking, the flannel
7    uniform he had -- or the flannel that he has, the hat
8    that he wore.
9        Q.   Did he usually wear a flannel?  Is that a common
10   thing that he wore?
11       A.   Typically, yes.
12       Q.   All right.  And Blair, you can finish that one.
13          And in the background coming up the hill, the
14   straggler there, do you recognize that individual?
15       A.   I do.
16       Q.   Who is that?
17       A.   It's Rich Belisle.
18       Q.   How do you recognize him?
19       A.   Just sort of clothes that he used to wear, the
20   way he's walking, used to wear the hat, had a beard.
21   Typically wore hoodies.
22       Q.   And where are they standing?  What building are
23   they in front of?
24       A.   They're standing in front of T-1.
25       Q.   Let's go ahead and pull up government Exhibit 61

1   for foundation.

2        Do you recognize this?

3    A.   I do.   This is the camera on the backside of T-1

4   that typically has -- it's on a pole.   And it's a

5   360 pan tilt zoom camera as well.

6    Q.   And does this footage accurately capture the

7   footage as it was taken on that date?

8    A.   It does.

9        MS. STEVENS:   Your Honor, we move to admit 61.

10       MR. CAMIEL:   No objection.

11       THE COURT:   61 is admitted.

12       (Exhibit No. 61 admitted.)

13       MS. STEVENS:   Blair, if you can go ahead and

14  play that.

15       (Exhibit No. 61 playing in open court)

16       MS. STEVENS:   Go ahead and pause it.

17  BY MS. STEVENS:

18   Q.   All right.   Let's point out a couple things here.

19  So first and foremost, for the record, can you state the

20  date?

21   A.   It's April 11th, 2012.

22   Q.   And the time?

23   A.   1:19 p.m.

24   Q.   And this is a view from where?

25   A.   This is from the top of T-1 building.

1      Q.   That's what we're looking at?

2      A.   Yes, ma'am.

3      Q.   And what is the structure here, for orientation

4   purposes?

5      A.   So that's the antenna that's right at the front

6   of the building where we had the camera, the front

7   camera, that was aiming at the entrance.

8      Q.   The parking lot and the entrance?

9      A.   Yes, ma'am.

10      Q.   Who is this person right here?

11      A.   That's Jim Wells.

12          MS. STEVENS:  And let's play it.

13          (Exhibit No. 61 playing in open court)

14   BY MS. STEVENS:

15      Q.   Pause it, Blair.

16          Do you recognize who this individual is?

17      A.   Yes, Rich Belisle.

18      Q.   All right.  And were you aware of whether they

19   were supposed to be up on the T-1 roof that day, do you

20   remember?

21      A.   I want to say I did, because it was practice to

22   where if they were going aloft they would tell me.

23      Q.   Do you happen to know what they were doing, do

24   you remember?

25      A.   I don't remember.

1    Q.  We can go ahead and keep playing this.

2         The person that just got up on the roof, does

3    that appear to be a civilian or a Coast Guard member?

4    A.  It looks like a Coast Guard member.

5    Q.  Why is that?

6    A.  The uniform.  It looks like it's ODUs that he's

7    wearing.

8    Q.  The next one for foundation is government

9    Exhibit 62, please, Blair.

10        Chief, do you know what this is?

11   A.  I do.

12   Q.  What is it?

13   A.  It is the camera from the front of the parking

14   lot, the perimeter, on the perimeter corner.

15   Q.  Looking down at what?

16   A.  It's looking out at the parking lot, T-1, and

17   parts of T-2 as well.

18   Q.  And does this -- you reviewed this footage

19   before, correct?

20   A.  I did.

21   Q.  Is this accurate footage of the time of when this

22   camera captured what's on here?

23   A.  It is.

24        MS. STEVENS:  Okay.  Your Honor, we move to

25   admit 62.

1          MR. CAMIEL:  No objection.

2          THE COURT:  62 is admitted.

3          (Exhibit No. 62 admitted.)

4    BY MS. STEVENS:

5       Q.  So what we're going to do now, this is a rather

6    lengthy video.  So we're going to go ahead and play it,

7    Chief, and pause it throughout certain times.  I'm just

8    going to ask you some questions as we play it.  It's

9    approximately -- it's about 30 to 40 minutes.

10          THE COURT:  I'm showing by your exhibit list

11   it's about 40.  So we may not be able to complete it

12   today.  We may need to stop it in the middle, just to

13   give you the heads-up because it's 4:20 now.

14          MS. STEVENS:  We'll start it.

15          THE COURT:  All right.  Very good.

16          MS. STEVENS:  So Blair, go ahead and play it.

17          (Exhibit No. 62 playing in open court.)

18   BY MS. STEVENS:

19      Q.  A couple things here, Chief, I want you to point

20   out for us.  So what's this back here?

21      A.  It looks like part of the parking lot for T-2 as

22   well as the road, Anton Larsen Road.

23      Q.  And then there's some little furry critters up in

24   the front.  What are those?

25      A.  Those are Sitka black-tail deer.  I know those

1    quite well.

2        Q.  Do you ever get any bears trying to get through

3    the fence?

4        A.  Oh, yeah.  When I first came in, they tore right

5    through the fence.  It was pretty scary.

6        Q.  Go ahead and just -- what's the date on that?

7        A.  It's April 12, 2012.  Time is -- right now it's

8    7 a.m.

9        Q.  Go ahead and play it.

10        Did you see that, Chief?

11        A.  Oh.

12        Q.  Oh, he was getting water.  Sorry.  Let's back up

13    a little bit.

14        A.  My apologies.

15        Q.  You got to keep your eyes on the screen.

16        A.  I apologize.

17        Q.  That's all right.  We'll back up just a little

18    bit.

19        And whose truck is that?  I'm sorry.  Let me

20    rephrase.  Do you know whose truck that is?

21        A.  Yes.  That looks like it was Rich Belisle's

22    truck.

23        Q.  And the time there?

24        A.  It's 07 a.m.

25        Q.  And where did that truck go?

1     A.   It parked right in the front of the T-2 building.

2     Q.   I want to direct your attention to that right

3 there.  Do you know what that is?

4     A.   Yes.   That's the window that I believe peeks out

5 into the wood shop out there in T-2.

6     Q.   Do you know why that window is that color?

7     A.   It looks like the light is on right now.

8     Q.   You've reviewed this video, correct?

9     A.   I have.

10     Q.   Does that light ever turn off and does anything

11 happen to that light?

12     A.   I don't recall.

13     Q.   Did you see that?

14     A.   Yeah.   I'm sorry.

15     Q.   That's okay.   It looks like we've got someone

16 arriving to work?

17     A.   It is.   Yeah.

18     Q.   And where does it look like this person is going?

19     A.   It looks like they're going to be going to

20 probably -- the time of the day is they're probably

21 going to relieve the watch.

22     Q.   And the gate that they just went through, is

23 that --

24     A.   Yeah.   It's the entrance gate they have.   That's

25 where we typically have -- people are scanned in to go

in there.

Q. Can you explain to the members of the jury what access you needed to get through that gate?

A. Yes. So there was like a particular access machine that we had. It wasn't anything -- any clearance per se, but we were screened and we were given access using cards that we used to generate for our members that worked specifically at the COMMSTA.

Q. Did you see that?

A. I did.

Q. What was that?

A. That looked like some sort of white truck.

Q. Where did that truck appear to go?

A. It looked like it was going down Anton Larsen Road.

Q. What time was that?

A. I didn't catch the time, but right now it's at 0703.

Q. Chief, what time did you normally wake up in the morning?

A. At that time, probably around 5:30 a.m.

Q. What time did you typically get into work?

A. About 7:00.

Q. Do you recall whether you worked the day before, on the 11th?

1    A.  I couldn't recall at the time, no.

2    Q.  Do you now recall whether you worked?

3    A.  I do now.

4    Q.  And what was the answer?

5    A.  Yes.  Yes, I did work.

6    Q.  What was your general routine when you got to

7    work in the morning?

8    A.  Generally, when I got into work, general routine

9    was to do rounds of both buildings, T-2, T-1.  And then

10   after that, just kind of get ready for the workday.

11   Sometimes I would -- if I could squeeze in a workout

12   right before everybody started coming, I liked to do

13   that as well.

14   Q.  When you worked out, where did you do that?

15   A.  We had a gym at the basement of the T-1 is where

16   I would typically work out at.

17   Q.  Is it the same place where the gauges are for the

18   cables for the antennas?

19   A.  It is.

20   Q.  I noticed that the gate, the car gate, the

21   sliding gate is open.  Can you explain why?

22   A.  Yes.  So typically for sort of ease of movement,

23   the watch stander if we know people are just kind of

24   coming in, depending on what our force protection was

25   at, it was kind of -- we had the ability to leave the

1    gate open if we had to.

2       Q.  I want to just focus your attention here for the

3    next couple of seconds.  What do you see there?  What

4    did you just see?

5       A.  It looked like there was a person that was

6    probably either jogging or walking.

7       Q.  And that time, did you note the time there?

8       A.  It was around 7:08 is what I have right now.

9       Q.  Okay.  So walk us through what just happened up

10   here.

11      A.  It looks like there there's a couple cars that

12   just kind of came in.

13      Q.  Do you remember what time you arrived to work

14   that morning?

15      A.  It had to have been around 7:00, between 7:05,

16   7:10, something like that.

17      Q.  Do you remember your drive in that morning?

18      A.  I do.

19      Q.  Tell the members a little bit about what you

20   remember.

21      A.  Yeah.  It was just kind of an icy day.  It was

22   pretty nice just to have a little bit more sun starting

23   to come out after these long Alaska winters, long winter

24   that year.  And right in front of me was a couple of

25   guys I knew that were -- I was driving down the road and

1  there was a couple of vehicles I didn't recognize.

2      Q.  Who was in front of you?

3      A.  Directly in front of me was Petty Officer

4  O'Connor, Kevin O'Connor.  He was one of the people that

5  I worked with.

6      Q.  Do you recall the vehicle he drove?

7      A.  I believe it was like a green SUV.

8      Q.  And was there anybody in front of him?

9      A.  It was.  That was Jim Hopkins.

10     Q.  And so where did Jim Hopkins pull into that

11  morning?

12     A.  He pulled into the T-2 parking lot to get to

13  work.

14     Q.  What kind of car did you drive?

15     A.  A blue 2009 Kia Sedona, minivan.

16     Q.  Who is that coming through the gate?

17     A.  That's me.

18     Q.  Did you see the -- did you see anybody just now

19  pull in?  What was that?  Did you see that?

20     A.  Yeah, that was -- looked like it was a white

21  truck, I think.

22     Q.  Note the time there.

23     A.  That was 7:09.

24     Q.  Okay.  All right.  Did you see that?

25     A.  I did.

1    Q.   What did you see there?

2    A.   Looked like some sort of blue vehicle.

3   Probably -- it's probably too small for a sedan, so it's

4   probably like an SUV-type vehicle.

5    Q.   And the time?

6    A.   That was at 7:09.

7    Q.   So you get there.  That's you, right?

8    A.   It is.

9    Q.   Right there?

10   A.   Yes.

11   Q.   Okay.  Go ahead and play it.

12       Who is that leaving?

13   A.   I can't -- I don't remember.

14   Q.   Chief, I'm going to direct your attention up to

15  that road again.  Keep your eyes on it up there.

16       What do you see there?

17   A.   So it looks like there's a person walking on

18  Anton Larsen Road.

19   Q.   Okay.  When you would drive into work on any

20  given morning, who would you typically see already down

21  at the T-2 rigger shop?

22   A.   Typically, I would see --

23       MR. CAMIEL:  Your Honor, I'm sorry.  I don't

24  mean to interrupt, but while the exhibit is playing,

25  asking questions about other things is distracting.  I

1  think the jury should be able to concentrate on the

2  video, and the questions should be related to the video.

3          THE COURT:  Are you going to tie this into the

4  video?

5          MS. STEVENS:  I'll just save that question for

6  later.

7          THE COURT:  Thank you.

8          MS. STEVENS:  I was just trying to be

9  efficient.

10          THE COURT:  No, no, that's fine.

11  BY MS. STEVENS:

12      Q.  Did you see that, Chief?

13      A.  I did.

14      Q.  What did you see there?

15      A.  It looks like that there was a blue SUV going

16  down Anton Larsen Road.

17      Q.  And note the time?

18      A.  It's 7:14 a.m.

19          MS. STEVENS:  You can pause it.

20          So Your Honor, this would be a logical stopping

21  point.

22          THE COURT:  That's fine.

23          MS. STEVENS:  Even though we're still a little

24  before 5:00 p.m.

25          THE COURT:  That's fine.  Pick up here tomorrow

1   morning?

2          MS. STEVENS:  That would be my suggestion.

3          THE COURT:  That's fine.  8:30, what do you

4   think, Counsel?

5          MS. STEVENS:  Yeah.

6          THE COURT:  Mr. Colbath, Mr. Camiel?

7          MR. CAMIEL:  Your Honor, there's one issue --

8          THE COURT:  Could we take it up now?

9          MR. CAMIEL:  We could.

10         THE COURT:  So tomorrow, ladies and gentlemen,

11  you may recall I said on Fridays, we're going to stop

12  right about noon.  And so plan accordingly.  And is

13  every -- is it convenient for everyone to be here ready

14  to go at 8:30 a.m.?  And then we'll have that extra time

15  in the early part of the day.

16         Seeing no opposition, please leave your

17  notepads here.  Remember my admonition not to discuss

18  the case with family or friends or do any research.

19  Have a pleasant evening.  We'll see you at 8:30 a.m. in

20  the morning.

21         (Jury absent)

22         THE COURT:  Sir, you can be excused and we'll

23  see you back tomorrow morning.

24         I had a couple points before I hear from the

25  defense.  My exhibits, defense exhibits stop at 178.

1          MR. COLBATH:  We're remedying that right now,

2    Your Honor.

3          THE COURT:  Because I had it before and I

4    didn't want to interrupt.  The other request I had was

5    if -- I know the government indicated it was going to

6    provide the names of its witnesses for the next day to

7    the defense.  If you provided me the names when it's an

8    expert, I would like to read the expert reports just so

9    I know if there is dispute about the scope of opinions.

10   And many of them I already have, because of the rulings,

11   but some -- I don't think I have all of them.

12         MR. COLBATH:  Probably not.

13         MS. SHERMAN:  Your Honor, we can provide you a

14   binder of all of our expert reports hopefully in the

15   order they are going to testify.  We don't have any

16   tomorrow.  The first one will not be until Monday,

17   possibly Tuesday.

18         THE COURT:  Very good.  No issues from the

19   government at this time?

20         MS. SHERMAN:  No, Your Honor.

21         THE COURT:  Mr. Colbath or Mr. Camiel?

22         MR. CAMIEL:  Your Honor, this relates to not

23   this witness, but I think the next witness up, Trooper

24   Dupras, Dennis Dupras, who is going to be called, and

25   who, just for context, he was I think the first trooper

1    on the scene.

2            And he didn't write any kind of report and he

3    hasn't been noticed as somebody who is going to give any

4    kind of expert opinions, but at least in the first trial

5    he gave opinions about his impression about the

6    perpetrator.  In fact, he was specifically asked, one of

7    the questions was, "Were you able to make any

8    impressions about the perpetrator from what you saw at

9    the scene?"

10           He talked about things like his impression that

11   the person would have been familiar with the building or

12   that things happened quickly.  He talked about his

13   impression about the activities of the victims, similar

14   to what comes up with Mr. Morton that the Court found to

15   be too speculative.

16           But in this case with Trooper Dupras, we don't

17   even have a report because he didn't write one.  He also

18   wasn't noticed as an expert, and yet he's going to be

19   asked to give opinions, I think the government is going

20   to argue based on his training and experience.  Even if

21   that's the case, if he's going to be asked to be giving

22   those kind of opinions, he wasn't noticed, and the

23   opinions are really too speculative and without any

24   foundation to be allowed.

25           So we would ask, while he can testify to his

observations, for example, whether there were footprints in the blood or where things were located, his impressions about the perpetrator or the activities of the victims or the length of time the crime took or whether the perpetrator had knowledge of the facility are all just pure speculation and without foundation and shouldn't be allowed.

THE COURT:  Who am I going to hear from?

MS. SHERMAN:  Me, Your Honor.  As the Court can see, this case is proceeding differently than the first trial.

THE COURT:  Well, I didn't ever read the entire transcript of the first trial.

MS. SHERMAN:  It is.  It's very different thus far in terms of witnesses and who is introducing exhibits.  It will continue to be that way.

One of those things is I do intend to ask Trooper Dupras his personal impressions of that building.  It was the first time he had been in that building.  And I intend to ask him about observations, whether he appeared to see anything thrown out of desk drawers or rifled through in his observation.

I do not intend to elicit any lay or expert opinions about the perpetrator of the crime.  Based on my understanding of the evidence rules, I plan to have

1    him focus on the facts and his personal impressions of

2    what he saw, not in relation to speculation as to what a

3    perpetrator may have done.

4              THE COURT:  Impressions or observations?

5              MS. SHERMAN:  I guess observations is a better

6    word, what he saw.

7              THE COURT:  What he saw, but not his opinion?

8              MS. SHERMAN:  Right.

9              THE COURT:  Do you intend to ask him what he

10   believed the victims may have been doing, victim

11   activities?

12             MS. SHERMAN:  No.  I plan to ask him where they

13   were and likely elicit, like we did today, that

14   Mr. Hopkins, that there was a blouse nearby, but not

15   what he thought he might have been doing.

16             THE COURT:  All right.  And the length of time

17   that the homicides took, do you intend to ask his

18   opinion on that?  That's what I heard was one of

19   Mr. Colbath's concerns.

20             Like I say, I haven't gone back and looked at

21   his testimony in the first trial, but it sounds as if

22   the defense is indicating that he testified that he

23   thought it was a short period of time in which the

24   homicides took place.

25             MS. SHERMAN:  I believe he will testify that

1    there was a short distance between the two victims and

2    their locations.  I don't plan to ask him about the time

3    or his impression or opinion of the time.

4            THE COURT:  Short distance, any objection

5    there?

6            MR. CAMIEL:  That's just an observation, so

7    that's not objectionable.

8            THE COURT:  All right.  So I'm hearing that the

9    concerns that you have identified are not likely to

10   occur, but I would ask you, Ms. Sherman, to convey to

11   this witness that although he was permitted to testify

12   in that regard in the first trial, he is not going to be

13   permitted, so that he's not taken by surprise if he

14   reviewed his prior testimony, that it's of a more

15   limited scope.

16           And I have to say I gave serious thought to

17   reading that testimony of the first trial and decided

18   that it would probably be more of a detriment to me than

19   a positive, because it's hard to keep all the evidence

20   straight for one trial, and add two, it would perhaps

21   lead to erroneous rulings.  So I did make that decision,

22   but I have gone and looked at specific parts.  It

23   doesn't sound as if I'm going to need to with regard to

24   this witness, at least at this time.

25           MS. SHERMAN:  I don't believe so.

1          THE COURT:  Anything else from the defense
2     today?
3          MR. COLBATH:  Your Honor, I won't do it as
4     quick probably as the government, but certainly before
5     we get to the government -- or the defense case in
6     chief, I will do as Ms. Sherman indicated and get the
7     Court a binder with our expert reports as well for that
8     same reason and same benefit, and then we'll certainly
9     give you a heads-up as our case proceeds.
10         THE COURT:  That sounds very good.  So
11    8:30 tomorrow morning then, and we'll adjourn at around
12    noon.  And hope you have somewhat of a pleasant evening,
13    I guess.
14         MR. COLBATH:  Your Honor, you don't want
15    counsel here any earlier?  We'll just be here prepared.
16         THE COURT:  8:27, Mr. Colbath.
17         MR. COLBATH:  I just want to comply.
18         THE COURT:  We'll go off record.
19         DEPUTY CLERK:  All rise.  This matter is in
20    recess until tomorrow at 8:30 a.m.
21              (Recessed at 4:47 p.m.)
22
23
24
25

CERTIFICATE

     I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
original stenographic record in the above-entitled
matter and that the transcript page format is in
conformance with the regulations of the Judicial
Conference of the United States.

     Dated this 6th day of May, 2020.


                         /s/ Sonja L. Reeves
                         SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER