1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7          Defendant.         )
    _____)
8

9            TRANSCRIPT OF TRIAL BY JURY - DAY 5
      **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10             September 13, 2019; 8:36 a.m.
                    Anchorage, Alaska
11
    **FOR THE GOVERNMENT:**
12          Office of the United States Attorney
            BY:  STEVEN SKROCKI
13          BY:  CHRISTINA M. SHERMAN
            BY:  KELLEY L. STEVENS
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16  **FOR THE DEFENDANT:**
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22  _____

23              **SONJA L. REEVES, RMR-CRR**
                Federal Official Court Reporter
24                222 West 7th Avenue, #4
                 Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

1          I N D E X

2           September 13, 2019, Trial Day 5

3

4    Witnesses:        Direct   Cross    Redirect   Recross

5    Michael Haselden   4       31        67         --

6    Alan Jones         72      85        --         --

7

8              E X H I B I T   I N D E X

9    Exhibit                                          Page

10   63          T-2 at 4/12/12                       11
                 7:00:00-7:30:00
11
     64          T-2 at 4/12/12 Screen Shot           16
12               PowerPoint of T-2 Camera at
                 7:08 a.m.
13
     65          T-2 at 4/12/12 Screen Shot           18
14               PowerPoint of T-2 Camera at
                 7:14 a.m.
15
     66          Back Gate T-1 at 4/12/12             19
16               7:50:00-7:50:28

17   75          Exterior of Screen Door              77

18   226         Map of Kodiak with Red Cloud Ranch   79

19   DE-46       T-2 Photo                            89

20   DE-48       Tire Track on Road                   90

21   DE-261      Video                                58

22   DE-261A     Still Shots from Video               58

23   DE-261B     Still Shots from Video               58

24   DE-261C     Still Shots from Video               58

25   DE-261D     Still Shots from Video               58

| | | | |
|---|---|---|---|
| 1 | DE-261E | Still Shots from Video | 58 |
| 2 | DE-261F | Still Shots from Video | 58 |
| 3 | DE-261G | Still Shots from Video | 58 |
| 4 | DE-262 | Video Clip | 59 |
| 5 | DE-262A | Video Clip | 60 |

```
 1            (Call to Order of the Court at 8:36 a.m.)
 2            (Jury present)
 3            THE COURT:  Good morning, everyone.  Please be
 4    seated.
 5            We are back on record here in *United States*
 6    *versus Wells*.  And I'll remind you you're still under
 7    oath from yesterday's proceeding.
 8            And Ms. Stevens, go ahead, please.
 9                       DIRECT EXAMINATION
10            (Of Michael Haselden Continued)
11    BY MS. STEVENS:
12       Q.  Good morning, Chief.  Welcome back.
13       A.  Good morning.
14       Q.  So yesterday we left off at around this time.
15    Can you just state for the record the date and time you
16    see of this screen shot here just to orient everyone?
17       A.  It's April 12, 2012.  The time is 7:14 a.m.
18       Q.  And just which camera is this?
19       A.  This is the parking lot, T-1 parking lot camera
20    on the side of the perimeter of the fence.
21            MS. STEVENS:  Your Honor, for the record, this
22    is Government Exhibit 62 where we left off yesterday.
23            THE COURT:  Thank you.
24            MS. STEVENS:  So Blair, you can go ahead and
25    start it again, please.
```

```
 1              (Exhibit No. 62 playing in open court.)
 2   BY MS. STEVENS:
 3      Q.   Chief, do you recognize that person walking
 4   through the parking lot there?
 5      A.   I don't.
 6      Q.   How about this individual walking up?
 7      A.   No, ma'am.
 8      Q.   Do you recognize what that person is wearing?
 9      A.   Yes.  He's wearing the Coast Guard Operational
10   Dress Uniform.
11      Q.   What do you see going on back there with that
12   vehicle?
13      A.   The vehicle looks like it's just kind of -- was
14   kind of circling around the parking lot.  It might have
15   departed.  I couldn't quite -- okay.  Looks like he's
16   just circling the parking lot.  Probably waiting for one
17   of the watch standers.
18      Q.   Do you recognize that individual?
19      A.   No, ma'am.
20      Q.   What does the time say down there at the bottom?
21      A.   It's 7:19 a.m.
22      Q.   What do you see happening here?
23      A.   Looks like there's a vehicle approaching the gate
24   and looks like he's about to come in.
25      Q.   Do you recognize that vehicle?
```

1    A.  I do not.

2    Q.  What do you see there?

3    A.  So it looks like there's a truck that's

4    departing.

5    Q.  What time is that?

6    A.  7:21 a.m.

7    Q.  Did you recognize that person?

8    A.  I think that might be Sam Gaynor.

9    Q.  And note the time there.

10   A.  It's 7:25.

11   Q.  Up until Mr. Gaynor or who you think may be

12   Mr. Gaynor walked out there, had there been any activity

13   since that one truck departed?

14   A.  No.

15   Q.  Did you see that?

16   A.  I did.

17   Q.  What was that?

18   A.  Some sort of red vehicle.  And that's at

19   7:25 a.m.

20   Q.  Thank you.  What do you notice there?

21   A.  It looks like Mr. Gaynor is departing with his

22   wife down the ramp.

23   Q.  What do you see there?

24   A.  Looks like it's somebody about to get on his bike

25   and -- to leave.

1     Q.   Do you know who that was, do you remember?

2     A.   I don't remember.

3     Q.   Note the time there, please, Chief.

4     A.   It's 7:30 a.m.

5     Q.   Chief, I want to focus you right here for the

6     next couple seconds.  Did you see that?

7     A.   I did.

8     Q.   Note the time, please.

9     A.   It's 7:31.

10    Q.   And what did you just observe there?

11    A.   Looked like it was a vehicle that pulled in.

12    Q.   Pulled into where?

13    A.   To T-2 parking lot.

14    Q.   Go ahead.

15         And keep your attention in that area for us,

16    please.  What did you see there?

17    A.   Looks like there was a person that just walked

18    away from the T-2 building.

19    Q.   Okay.

20    A.   That's at 7:32 a.m.

21    Q.   Thank you.  And what do you see going on in that

22    same area back there on the screen?

23    A.   Looks like it's a Coast Guard person, he's

24    wearing his ODUs, coming up the hill from T-2.

25    Q.   Go ahead and stay focused down on here for us,

1   please.  Did you notice that?

2       A.  I did.  It's another vehicle pulling in the T-2

3   parking lot at 7:34.

4       Q.  Okay.  Did you notice what this person here did

5   by chance?

6       A.  You know, I was focused on that one.

7       Q.  I did tell you to focus there.  All right.

8           Keep focus back here, please.  Did you see that?

9       A.  I did.  Another vehicle that pulled into the

10  parking lot at 7:34 a.m.

11      Q.  Did you mean 7:34?

12      A.  I did.  Did I say 7:34?  I think I did say 7:34,

13  right.

14      Q.  Does that appear to be the car that just came

15  from T-2?

16      A.  Really can't tell.

17      Q.  Okay.  What do you see there?

18      A.  Looks like there's a vehicle that's departing

19  right now.

20      Q.  Do you know whose car that was?

21      A.  I think that was Jason Bullis'.  But I'm not

22  quite -- I'm not too sure.

23      Q.  And note the time, please.

24      A.  7:35.

25      Q.  Can you describe what's going on there?

1    A.   Yeah.   It looks like there's another Coast Guard

2  personnel arriving to work carrying a cup of coffee.

3    Q.   Cup of coffee.   All right.   Thank you.   So is

4  this time around 7:30 generally when some movement

5  happens at the COMMSTA?

6    A.   Generally.

7    Q.   What would that be?

8    A.   I'm sorry?

9    Q.   So at 7:30 in the morning at the COMMSTA, what

10 was typically happening?

11       MR. CAMIEL:   The video is playing and there's a

12 question about what's going on, but not what's going on

13 in the video.

14       THE COURT:   Can you hold that thought,

15 Ms. Stevens, and come back to it?

16 BY MS. STEVENS:

17   Q.   Can you pause it?

18       So at 7:36, the time of this video, what is

19 generally going on at the COMMSTA?

20   A.   People are just slowly arriving to work, getting

21 ready for the workday.   Not the watch.   The watch leaves

22 probably a little bit earlier, but people start coming,

23 staggering in.

24   Q.   Thank you.

25       (Exhibit No. 62 continues playing in open court.)

BY MS. STEVENS:

Q.   Blair, can you pause it?

     What do you see there?

A.   Again, another Coast Guard person.  Looks like they're walking towards the gate.

Q.   What time?

A.   7:36.

Q.   Do you see that person's arms moving?

A.   I do not.

Q.   Where do the arms appear to be?

A.   They appear to be crossed around his chest.

Q.   Where is that person heading?

A.   He is headed to T-2.

Q.   Can you please note the time?

A.   7:37.

Q.   Okay.  Blair, you can take that one down.  And let's move government Exhibit 63 for foundation.

     Chief, do you recognize this video?

A.   Yes, this is the camera that is at T-2.  It should be located in the front of the building.  It's a pan tilt zoom camera.

Q.   Did you have an opportunity to review this footage?

A.   I did.

Q.   And is it an accurate reflection of the footage

1    as it was captured on April 12th?

2        A.   It is.

3             MS. STEVENS:  Your Honor, at this stage we move

4    for the introduction of 63.

5             THE COURT:  Any objection?

6             MR. CAMIEL:  No.

7             THE COURT:  63 is admitted.

8             (Exhibit No. 63 admitted.)

9             THE COURT:  This one, just so the jury is

10   aware, is how long that you're going to play?

11            MS. STEVENS:  This one is about 30 minutes.

12            THE COURT:  All right.

13            (Exhibit No. 63 playing in open court.)

14   BY MS. STEVENS:

15       Q.   Blair, can you go back, please?

16            So I want you to focus up here for us, Chief.

17       A.   Okay.

18       Q.   What is that green dome?

19       A.   That's the water treatment -- it was part of the

20   water treatment facility out there at the Buskin River.

21       Q.   Did you see what just passed back there?

22       A.   Yeah, looks like there was some headlights.

23       Q.   And now what do you see?

24       A.   Looks like it's a darker color blue or black.  I

25   can't tell from there.  I think it's blue.

1     Q.   Where is that vehicle going?

2     A.   It's going into the T-2 parking lot.

3     Q.   What time?

4     A.   7:00.

5     Q.   Thank you.  Where was that vehicle heading?

6     A.   That vehicle was headed up to the T-1 building.

7     Q.   I want you to focus up here, please.  Did you see

8  that?

9     A.   I did.  It looks like a vehicle, headlights on.

10  It looks like it was white with a camper.

11     Q.   And the time?

12     A.   7:02.

13     Q.   What did you see there?

14          Blair, if you can pause it.

15     A.   Looked like it was another vehicle, headlights

16  on.  I couldn't tell the make.  That's about 7:04.

17     Q.   Great.  Thank you.

18          Blair, can you pause it?

19          And where does that car appear to be heading?

20  Let me -- there you go.  Where does that car --

21     A.   Going to T-1.

22     Q.   What kind of car is that?

23     A.   It's a red truck.  That's at 7:04.

24     Q.   Does it appear to have its headlights on?

25     A.   It does.

1    Q.  Okay.  I want you to keep focused up in there,

2  the water treatment plant.  What do you see there?

3    A.  Another vehicle, headlights on.

4    Q.  Okay.  Pause it.  Where does that car appear to

5  be heading?

6    A.  That's going to T-2.  Headlights are on.  At

7  7:05.

8    Q.  Is it going to T-2?

9    A.  I'm sorry.  T-1.  My apologies.

10    Q.  Did you state the time?

11    A.  Yes, 7:05.

12    Q.  Thank you.  I want to focus your attention up

13  near the treatment plant.  Did you see that there?

14    A.  I did.  Vehicle again, headlights on.  Time is

15  7:08.

16    Q.  And again there?

17    A.  Yes.  Same thing.  And another one.

18    Q.  So how many cars just in sequence there?

19    A.  Three.  All three had their headlights on.

20    Q.  Thank you.  And the time?

21    A.  7:08.

22    Q.  Pause it.

23        Do you recognize that vehicle?

24    A.  I do.  The Dodge I believe belongs to Jim

25  Hopkins.

1    Q.   Where is that car going?

2    A.   That one is going to T-2.

3    Q.   Do you recognize the car behind it?

4    A.   Yes, it's Kevin O'Connor's.  That's going up to

5    T-1.

6    Q.   Go ahead.

7         And do you recognize that vehicle?

8    A.   Yep.  Yep, it's my car.  I'm going up to T-1.

9    That's 7:08.

10   Q.   Can you go back?

11        We're going to go back just a little.  Now I want

12   to focus your attention here.  Do you see that?

13   A.   I did.

14   Q.   And what did that appear to be?

15   A.   Appeared to be some sort of vehicle.  Didn't have

16   its headlights on.

17   Q.   Okay.  Blair, one more time.

18   A.   Some vehicle.  It did not have its headlights on.

19   Q.   Blair, if you can -- if you can try to enlarge

20   it.  I don't know if it will work with video.  All

21   right.  Go ahead and play it.

22        And what do you see right there?

23   A.   It looks like some sort of vehicle.  I guess a

24   truck.

25   Q.   What color is it?

1     A.   Looks like it's white.

2     Q.   Thank you.

3     A.   7:09.

4     Q.   Thank you.  What did you see there?

5     A.   Looked like some sort of SUV-type vehicle that

6   just left coming from T-1.  That was at 7:10.

7     Q.   Keep your attention -- did you just see that?

8     A.   Can you go back, please?

9     Q.   If you want to keep your attention near the water

10  treatment plant, please.  Did you see that?

11    A.   I did.  Looked like some sort of

12  undistinguishable vehicle just going back Anton Larsen

13  Road to the main road.  That's at 7:10.

14    Q.   Chief, go ahead and focus your attention up near

15  the water treatment plant.  What did you see there?

16    A.   Looks like there's another vehicle, headlights

17  on, coming down Anton Larsen.  7:13.

18    Q.   Thank you.  What do you see there?

19    A.   Looks like there's a truck going up to T-1.

20  That's at 7:14.

21    Q.   Is that truck's headlights on?

22    A.   The truck's headlights is on.

23    Q.   Thank you.  Now, I want you to focus back to the

24  treatment plant, please.  Did you see that?

25    A.   I did.  Looked like some sort of vehicle moving

```
1   back down toward -- down Anton Larsen Road towards the
2   main road.
3        Q.  Can you note the time for us, please?
4        A.  7:14.
5        Q.  All right, Blair.  Thank you.  Can you pull up
6   number 64, please, for foundation.
7            Chief, have you seen this exhibit before?
8        A.  I have.
9        Q.  What is it?
10       A.  Looks like a still of vehicles that are -- stills
11  of the camera system showing a vehicle coming in and
12  out.
13       Q.  You've seen this before?
14       A.  I have.
15       Q.  Are these screen shots accurate depictions of the
16  video which they were obtained from?
17       A.  I believe they are.
18           MS. STEVENS:  Your Honor, we move to admit 64.
19           MR. CAMIEL:  No objection.
20           THE COURT:  All right.  64 is admitted.
21           (Exhibit No. 64 admitted.)
22  BY MS. STEVENS:
23       Q.  So first, what I want to do, Blair, is just have
24  you click through all four and then we'll zoom in.
25  Okay?
```

1      Did you see that, Chief?

2    A.  I did.

3    Q.  And explain to the jurors what you saw.

4    A.  Looks like some sort of vehicle that was moving

5  down the road.

6    Q.  Did that vehicle appear to have its lights on?

7    A.  No.

8    Q.  Blair, can you zoom in there.  Let's watch that

9  again.  Let's go ahead and go to -- I'm sorry.  Can you

10  pull that back up real quick.

11      Can you state the date and time at the bottom for

12  the record?

13    A.  Yes.  It's April 12, 2012.  7:08 a.m.

14    Q.  7:08 and --

15    A.  Oh.  7:08 and 51 seconds.

16    Q.  And the next slide here.

17      Again, state the time.

18    A.  It's April 12, 2012, 7:08 and 51 seconds.

19    Q.  And then if you can just read the whole thing.

20    A.  Okay.  7:08:51.562.  7:08:51.717.  And

21  7:08:51.585.

22    Q.  Let me go back to that one.  Read that last part

23  again.

24    A.  7:08:51.858.

25    Q.  And that one?

1    A.   7:08:52.105.

2    Q.   All right.  And let's go ahead and pull up 65 for

3  foundation.

4         Do you recognize this, Chief?

5    A.   I do.  This is a still of -- again, a still of

6  the camera that we have at T-2.

7    Q.   Let's go ahead and scroll through.  Did you have

8  an opportunity to see all those slides?

9    A.   I have.

10   Q.   Did you recognize them?

11   A.   I do.

12   Q.   Are they an accurate depiction of the video?

13   A.   They are.

14        MS. STEVENS:  Your Honor, we move for 65, to

15  admit 65.

16        MR. CAMIEL:  No objection.

17        THE COURT:  All right.  65 is admitted.

18        (Exhibit No. 65 admitted.)

19  BY MS. STEVENS:

20   Q.   All right.  Same thing.  Let's go ahead and

21  scroll through these, Blair.

22        And go ahead and explain to the members what it

23  is you see there.

24   A.   Again, looks like it's a vehicle that's moving

25  through that area of the water treatment facility.  I

1   can't -- it doesn't have headlights on or anything like

2   that that I can tell.

3       Q.  What direction is it heading?

4       A.  Looks like it's heading towards the main road.  I

5   think it's Rezanof is the main road.  Down Anton Larsen.

6       Q.  Let's go ahead and close that out and then look

7   at the times.  So for the first slide, what does the

8   date and time say at the bottom?

9       A.  So date is April 12, 2012.  Time is 7:14:47.328.

10      Q.  And this one?

11      A.  This is 07:14:47.483.  And 7:14:47.640.  And

12  7:14:47.780.

13      Q.  Let's go ahead and take that one down and put 66

14  up for foundation.

15          Chief, do you recognize this video?

16      A.  I do.

17      Q.  How so?

18      A.  That's me running down in that video.

19      Q.  Does this video accurately reflect the footage

20  captured on April 12th?

21      A.  It does.

22          MS. STEVENS:  Your Honor, we move to admit 66.

23          MR. CAMIEL:  No objection.

24          THE COURT:  66 is admitted.

25          (Exhibit No. 66 admitted.)

BY MS. STEVENS:

    Q.  Before -- you can just pause it there, Blair.

        Before we play this, can you go ahead and state the date and time?

    A.  Date is April 12, 2012.  Time is 7:49 a.m.

        (Exhibit No. 66 playing in open court.)

BY MS. STEVENS:

    Q.  Where are you heading?

    A.  I was heading down T-2.

    Q.  Chief, do you usually run that fast?

    A.  No.

    Q.  And why are you running down to T-2?

    A.  Well, I had that time received a report that there was a situation going down at T-2.  I think I outlined my duties yesterday as the officer of the day.  The report was that -- it came from my third-class petty officer.  His name was Jared Andrews.  I was working out.  He said that there's some sort of situation.  One or both, either Rich or Jim Hopkins was hurt, lying in a pool of blood is what was told to me.

    Q.  When you heard that, what was running through your head?

    A.  I didn't know what was running through my head.  I didn't know what to think at that point.  So at that time, I went up to the operations deck to find out some

1  more information of what happened. I spoke to my watch

2  floor supervisor. His name is Kevin O'Connor. And he

3  received a call from at that time Petty Officer

4  Beauford, I believe, and said that there's something

5  that was going on, wanted to know if there was some sort

6  of drill. So really I didn't -- really I had a picture

7  of someone was hurt. I really didn't have an idea of

8  the scope of what was going on at the time.

9  Q. Let's just take a quick step back in time. When

10  you were arriving to work that morning, remind us who

11  you were driving behind.

12  A. Yes. I was driving behind two people. The one

13  up front was Jim Hopkins. And then the other person was

14  Kevin O'Connor.

15  Q. And when you drove past the T-2 shop, did you see

16  anything?

17  A. I did. I saw Jim. He had driven into the

18  parking lot. It looked like he was about to get out. I

19  also saw the other truck, the truck pull into -- at the

20  time I recognized it as Rich Belisle's. And --

21  Q. What were your duties that day?

22  A. Again, I was --

23  Q. Just generally, what were you supposed to do?

24  A. Generally what we do is make a round of the

25  buildings, T-1 and T-2, at that time. I saw that we

had -- Jim and Rich were there, so space was kind of a
small space. So I elected to say, okay, if anything is
going wrong, then Rich or Jim would be able to tell me
if anything was going to happen down there. So I went
ahead and just went back up to T-1 and then proceeded
just to do a round of T-1.

Q. When you do those rounds, generally what are you
looking for?

A. Just safety concerns, security, making sure when
we go in just that the locks are secure, if there's
anything especially hazardous, because we do work with
electronic equipment in some of the areas. We make sure
there's no hazards like that. Just general safety and
security.

Q. Looking for equipment casualties, things of that
nature?

A. Yep.

Q. That morning you did not do the security round at
T-2, correct?

A. Yes, ma'am.

Q. So after seeing Rich and Jim there and deciding
that you weren't going to do the round because they
would tell you --

MR. CAMIEL: Your Honor, I'm going to object
now to leading.

```
 1          MS. STEVENS:  I'll get to a non-leading
 2   question.
 3          THE COURT:  All right.  Thank you.
 4   BY MS. STEVENS:
 5      Q.  So after they told you -- or after you assumed
 6   there was nothing going on, what did you do next?
 7      A.  Went up, relieved the watch.  After that, I
 8   figured I can try and get a quick workout in.
 9      Q.  Where is the gym located?
10      A.  The gym is located at the basement at T-1.
11      Q.  How long were you there before you were
12   interrupted?
13      A.  Probably about 25 minutes.  25, 30 minutes,
14   something like that.
15      Q.  When you finally get down to the rigger shop
16   after running down the hill, what happened when you got
17   down there?
18      A.  I went down there, and I saw Petty Officer
19   Beauford and Aaron Coggins.  They were just kind of
20   right outside the entrance to T-2.  And I was trying to
21   find out what was going on is what --
22      Q.  Blair, can you pull up 13.
23          Chief, I believe there may be a pointer up there
24   still from yesterday.
25      A.  This right here?
```

1    Q.   Yep.

2    A.   Okay.

3    Q.   Okay.  Can you go ahead and point to the location

4  where you encountered Petty Officer Beauford and Seaman

5  Coggins?

6    A.   Yeah.  It was around this area right here towards

7  the entrance.

8    Q.   And after encountering them, what did you do?

9    A.   I asked them, you know, what's going on?  I heard

10  this report.  And then briefly Petty Officer Beauford

11  explained to me what was happening.

12    Q.   Did you enter the building?

13    A.   I did.

14    Q.   Where did you enter through?

15    A.   I entered in right through here.

16    Q.   And how did you get into that door?

17    A.   Well, I just -- I just -- just kind of went in.

18  I scanned -- there's a scan system for after hours, and

19  I'm in the habit of kind of scanning in before I came in

20  there.

21    Q.   After entering through the door, what did you

22  see?  What was the first thing you noticed?

23    A.   The smell.

24    Q.   Describe that.

25    A.   It smelled like gunpowder.  Yeah, gunpowder.

1    Q.   Was the smell strong or subtle?

2    A.   It was pretty strong.

3    Q.   When you smelled the smell of gunpowder, how did

4    you feel?

5    A.   I didn't know what to feel at that time.  I was

6    just kind of -- just trying to figure out what --

7    everything was going on.

8    Q.   What did you do next?

9    A.   Well, I was -- I stepped in here and it's the

10   offices to there, and I saw -- kind of stepped in and I

11   saw -- in there I saw Rich Belisle laying on his belly,

12   I guess you could call it.

13   Q.   Can you tell the jury the position -- get into a

14   little bit more details of his positioning?

15   A.   Yeah.  He was -- his feet was heading toward the

16   entrance.  He was laying kind of on his stomach, head

17   down.

18   Q.   Did you do anything?

19   A.   Yeah.  I shook him, just -- I just kind of --

20   just to see if I can get him awake.

21   Q.   Did you think he was sleeping?

22   A.   No, I didn't think he was sleeping.

23   Q.   What did you think?

24   A.   Well, I definitely thought he was unconscious and

25   more than likely deceased, but at that time, I didn't

1  know what to think.

2      Q.  Did you say anything?

3      A.  Yeah.  I yelled his name, "Rich.  Rich, wake

4  up."

5      Q.  Did you make any conscious efforts to avoid

6  anything in the room?

7      A.  Yeah.  I didn't -- so I didn't want to touch any

8  of the belongings on anything like that.  Looked like he

9  was lying there in some blood.  It looked like he had --

10 I observed a gunshot wound to his torso area.  At least

11 that's what I thought.

12     Q.  And what did you do next?

13     A.  I went into the other room.  I believe it was in

14 this area right here.  May have been right there.

15     Q.  What did you see?

16     A.  I saw Jim Hopkins.

17     Q.  And how did he appear?

18     A.  It looked like he was in sort of a fetal

19 position.  He had a lot of blood around him.

20     Q.  How was he positioned?

21     A.  Kind of like laying on his side in the fetal

22 position, I want to say either towards me -- he was kind

23 of looking towards me, I guess.  It may not be.  I don't

24 recall, but --

25     Q.  And did he appear to be sleeping?

1      A.   No.   No.

2      Q.   How did he appear?

3      A.   He appeared in bad shape.

4      Q.   Tell the members more about that.

5      A.   It looked like he had a gunshot wound to his

6   head.   There was a lot of blood he was in.

7      Q.   And what, if anything, did you do or say to him?

8      A.   I shook him.   And I just yelled his name.   You

9   know, "Jim, wake up."

10     Q.   Chief, had you ever seen a dead body before?

11     A.   No.   Well, I've been to a funeral, but I've never

12   seen anything like that before.

13     Q.   And at some point down there -- let me rephrase

14   that.

15          After encountering both Rich and Jim and

16   understanding the situation, what was running through

17   your head?

18     A.   At that time, I don't know, homicide.   They were

19   killed.   Something happened.   Just --

20     Q.   I'm sorry.

21     A.   No, go ahead.

22     Q.   And emotionally, what was -- what were you

23   feeling?

24     A.   I don't know.   It was -- it was kind of an out of

25   body experience, to be honest with you.   Just to see two

1    guys that you worked around, you've seen them before,

2    and, you know, now they're gone.  It was just surreal.

3        Q.   Did you have an opportunity to observe Cody and

4    Aaron and their demeanor?

5        A.   I did.  I can tell they were -- they were

6    probably in the same state of mind that I was too.

7        Q.   In shock?

8        A.   Yeah.

9        Q.   What happened next?

10       A.   You know, for some reason, I reacted and I said,

11   "Hey, let's get a first-aid kit, let's do something."

12   At that time, Cody said, you know, "I think they're way

13   past that."  So I told him, "All right, everybody just

14   get out of here."  That's my -- at that point kind of

15   snapped, and I thought, okay, is there some sort of

16   active shooter or something like that.  I don't know.

17   We got to get out of there, so I told everybody to

18   leave.

19            And at that time, just to back up, my watch

20   supervisor at the time, Kevin O'Connor, had called up

21   the emergency services, CGPD to get them down here.  So

22   we all left.  I told everybody just to stay behind and

23   let's wait for the police to get there.

24       Q.   Is that what you did?

25       A.   Yes.  Yes.

1    Q.  Eventually that day, did you go up to T-1?

2    A.  I did eventually, yes.

3    Q.  And when you got up to T-1, can you walk us

4    through what you did?

5    A.  Yeah.  You know, I went up.  I happened to see

6    one of my chiefs.  At that time, I was a first class

7    petty officer, but I ended up seeing one of my chiefs

8    that saw me and said something happened.  I said, "I

9    think -- I think there's a homicide," and he couldn't

10   believe I said that.  So we went up and I tried to get

11   back on the watch floor, but I just couldn't.

12   Q.  What do you mean you just couldn't, like you

13   couldn't get in or you just couldn't?

14   A.  I just couldn't stand the watch.  I just was

15   mentally, you know, emotionally, I was just unable to do

16   so.

17   Q.  So someone else stepped into your place to take

18   over the watch?

19   A.  They did.  They did.  It was at the time Jake

20   Gerasimof.

21   Q.  Is that what a Coast Guard member would do for a

22   shipmate in need?

23   A.  Yes.

24   Q.  Did you have the opportunity to observe others

25   from your unit?

1    A.   I did.

2    Q.   How did they appear?

3    A.   They were all pretty distraught.

4    Q.   And did anybody else stand out to you during this

5    emotional time?

6    A.   Yeah.

7    Q.   Who was that?

8    A.   It was Jim Wells.

9    Q.   How so?

10   A.   We were in a conference room and, you know, he

11   just seemed just kind of emotionless, I guess you could

12   say.

13   Q.   Did you have occasion to speak with him that day?

14   A.   I don't recall.

15   Q.   And Chief, last question, had you ever had an

16   opportunity to observe Jim Wells on the ops deck before?

17   A.   I want to say I have.

18        MS. STEVENS:  Okay.  Your Honor, I have no more

19   questions.

20        THE COURT:  All right.  Why don't we take our

21   morning break, and then we'll proceed on.  Please leave

22   your notepads here, ladies and gentlemen.  Remember my

23   admonition not to discuss the case during this break.

24   And we'll take about 10 to 15 minutes.  We'll go off

25   record at this time.

1           (Recessed from 9:51 a.m. to 10:07 a.m.)

2           (Jury present)

3           THE COURT:  Please be seated, everyone.  And go

4    right ahead, Mr. Camiel.

5           MR. CAMIEL:  Thank you, Your Honor.

6                    CROSS EXAMINATION

7    BY MR. CAMIEL:

8       Q.  Good morning, Chief.

9       A.  Good morning.

10      Q.  Could we put up government Exhibit No. 10,

11   please.  Does that appear to be the Communications

12   Station Kodiak organizational chart?

13      A.  It does.

14      Q.  And do you see where you would fall on that

15   chart?

16      A.  Yeah.  I would be under probably one of the watch

17   sections under the operations officer tree.

18      Q.  Could you, using your laser pointer, show us

19   where you are.

20      A.  Sure.  I think I was probably section one or I

21   could have been two.  I don't remember.

22      Q.  All right.  And so you're the chief of that

23   section; is that right?

24      A.  At that time I wasn't.  I was the communications

25   watch officer --

1    Q.  All right.

2    A.  -- of that section.  I was a first class petty

3  officer.

4    Q.  And how many people are in that section or were

5  in that section?

6    A.  Typically five to six people.

7    Q.  All right.  So during a shift, those five to six

8  people would be on duty?

9    A.  That's correct.

10   Q.  And you have got four different watch sections

11 that cover different times or different days?

12   A.  Yes, sir.

13   Q.  And these -- this watch section, this shift is a

14 group of people that are on the ops deck in the T-1

15 building, right?

16   A.  That's correct.

17   Q.  And the T-1 building itself, how many people work

18 in that building during, say, the day shift?

19   A.  Like not including watch, just general people?

20   Q.  Sure.

21   A.  I'd be lying to you if I told you I knew it, but

22 I don't know, probably -- I don't know, probably about

23 20 or 30 people, I guess.

24   Q.  So you got the 20 or 30 people who are not part

25 of the watch section, and then you've got the five or

1   six people that are part of the watch section that you

2   worked?

3        A.   That's correct.

4        Q.   You mentioned a couple other names, and I just

5   wanted to touch on those for a minute.  You mentioned a

6   Kevin O'Connor.  What was his position?

7        A.   Yeah.  He was the watch -- he was in my watch

8   section.  He was the watch supervisor.

9        Q.   Okay.  So we have -- so just to take us through

10  who the members of a watch section are, we have your

11  position.  We have the watch supervisor who was Kevin

12  O'Connor.  And then who were the other members of your

13  watch section at that time?  By "that time," I mean in

14  April of 2012.

15       A.   Watch for that time?  So I think -- let's see.

16  I'm trying to think who was on watch that day.  There

17  was Kevin.  There was Jared Andrews.  There was Carissa

18  King.  I'm trying to remember if there was anybody else.

19  There was Jake Schaeffer, but Schaeffer wasn't there

20  that day.  Those are the ones I can recall, sir.

21       Q.   Would there be a log somewhere that would show

22  who was in your watch section working the morning of

23  April 12th?

24       A.   Yes, sir.

25       Q.   Did the government ask you to look at that?

1    A.   I don't believe so, not that day.

2    Q.   You mentioned another name when we were looking

3    at some video, a Jason Bullis.  Who is he?

4    A.   So he was the off-going section communications

5    watch officer that day.

6    Q.   So when you say the off-going, he worked the

7    night shift?

8    A.   That's correct.

9    Q.   So if I understand correctly, the shift for the

10   watch is different from the shift for the regular Coast

11   Guard members?

12   A.   Yes, sir.

13   Q.   You worked as a watch officer 12-hour shifts.

14   You worked 7 a.m. to 7 p.m., right?

15   A.   At that time, yes.

16   Q.   All right.  And so Jason Bullis would have been

17   working the 7 p.m. to 7 a.m. shift?

18   A.   Yes, sir.

19   Q.   All right.  So when you arrived, you would be

20   relieving him?

21   A.   Yes, sir.

22   Q.   You talked a little bit about your

23   responsibilities as the watch officer.  I want to go

24   through those a little bit.

25        You indicated that your duties were, in part at

```
 1   least, safety and security of the facility, right?
 2       A.   Yes, sir.
 3       Q.   And that includes both the T-2 building and the
 4   T-1 building, right?
 5       A.   Yes, sir.
 6       Q.   And the antennas in the field?
 7       A.   Yes, sir.
 8       Q.   And I want to break that down.  By safety, you
 9   meant safety of the people and safety of the equipment
10   and the structures, right?
11       A.   Yes, sir.
12       Q.   And by security, one of the things you meant was
13   the security of equipment that might -- that might
14   contain confidential information and security of
15   information?
16       A.   That's part of it, yeah.
17       Q.   Because on the -- now, the watch standers, the
18   watch, you guys are in the op deck, right?
19       A.   Yes, sir.
20       Q.   And even though it's in the same building, the
21   T-1 building, it's really a separate deck that's a
22   separate compartment, right?
23       A.   Yes, sir.
24       Q.   And it's secure, right?
25       A.   It's secure.
```

1    Q.  And by secure, what we mean is that there's a

2 locked door that you have to go through to get into the

3 op deck?

4    A.  Yes, sir.

5    Q.  And that door is -- if somebody has clearance,

6 they can use their badge to get through that door,

7 right?

8    A.  They can.

9    Q.  But if somebody doesn't, then they can't get in

10 there, right?  They can't just walk in?

11    A.  They just can't walk in, no.

12    Q.  So if somebody didn't have clearance, for

13 example, they'd have to sign in to a log?

14    A.  Uh-huh.

15    Q.  Is that a yes?

16    A.  Yes, sir.

17    Q.  And that log is kept and maintained by the Coast

18 Guard, right?

19    A.  Yes, sir.

20    Q.  To show everybody who wasn't clear to go on the

21 op deck who signed in or didn't sign in, right?

22    A.  That's right.

23    Q.  And it shows the date and time, right?

24    A.  It should be, yeah.

25    Q.  And it shows the responsible person who was going

1  to accompany them into the op deck, right?

2      A.  Yes, sir.

3      Q.  Because if somebody wasn't cleared to go on the

4  op deck, they couldn't go in unless they had an escort,

5  right?

6      A.  Typically, that's correct.

7      Q.  And the door that separated the op deck from the

8  rest of the interior of the structure, there's actually

9  a camera on that door, right?

10      A.  There is.

11      Q.  And it sees who's at the door, right?

12      A.  That's right.

13      Q.  Now, the op deck is manned 24 hours a day, right?

14      A.  Yes, sir.

15      Q.  Seven days a week?

16      A.  Yes, sir.

17      Q.  And regardless of whether it's in the evening or

18  during the day, there's several people on the op deck at

19  any one time, right?

20      A.  That's right.

21      Q.  Never one person alone there, right?

22      A.  That's right.

23      Q.  In the op deck, there are different stations

24  where people sit; is that correct?

25      A.  That's correct.

1    Q.  In fact, there's a big room and off that big room

2    there are separate rooms; is that right?

3    A.  That's right.

4    Q.  And some -- for example, there's like a

5    classified conference room off the op deck?

6    A.  There is.

7    Q.  And then an unclassified conference room?

8    A.  That's -- the unclassified conference room is not

9    on the op deck.  It's in the general area.

10   Q.  All right.  In the center of the op deck, is

11   there kind of a horseshoe-like structure that people sit

12   around?

13   A.  There is.  They have desks out there, but for

14   different stations that people could sit around there

15   for.

16   Q.  And some of the people in there, what they're

17   doing is they are monitoring communications, right?

18   A.  That's right.

19   Q.  They're communicating with maritime or aircraft,

20   right?

21   A.  In the horseshoe portion, probably not.  Not in

22   the open one, but in the booths they are.

23   Q.  And right out there in the main area of the op

24   deck, up on the wall, there's what looks like a big

25   flat-screen TV that has the feed from all of the

1 different cameras?

2     A.  I believe so.

3     Q.  You talked both yesterday and today about

4 different cameras, and we're going to talk about those.

5     A.  Okay.

6     Q.  But the feed from those cameras comes into the op

7 deck, right?

8     A.  That's right.

9     Q.  Into the secure contained area in building T-1?

10     A.  Yes, sir.

11     Q.  All right.  And the video is shown on a screen,

12 right?

13     A.  That's right.

14     Q.  And you can see the multiple cameras all at once,

15 right?

16     A.  Yes, sir.

17     Q.  And people sitting there in the op deck can look

18 up and see the screens, correct?

19     A.  That's correct.

20     Q.  And at least one of the watch people there is

21 sitting at some kind of a console or computer where they

22 can control the cameras, right?

23     A.  Typically, yes.  That was my position.

24     Q.  That was what you did?

25     A.  Yes.

 1     Q.   And if you weren't doing it, if you got up to do
 2  something else, someone else on the watch would do that,
 3  right?
 4     A.   They could, yes.  They weren't monitoring it
 5  24 -- like if I were to, you know, go off deck, they
 6  didn't typically, you know, sit in my position and
 7  monitor it.
 8     Q.   But they could still see the screen from other
 9  parts of the room, right?
10     A.   I got -- I don't remember that portion right
11  there, sir.  Because some of the feeds were different
12  when I first got there.
13     Q.   Okay.  By the way, did the government, did they
14  ask you to look at or bring in the sign-in log to the op
15  deck?
16     A.   They did not.
17     Q.   So let's talk a little bit about the cameras that
18  you mentioned yesterday.  One of the cameras you talked
19  about was the camera that was on the T-2 building; is
20  that right?
21     A.   Yes, sir.
22     Q.   Could we put up government Exhibit 63 for now.
23  It's a video.
24          (Exhibit No. 63 playing in open court.)
25  BY MR. CAMIEL:

1    Q.  We can stop it.

2        That is the T-2 camera that you looked at just a

3    few minutes ago?

4    A.  Yes, sir.

5    Q.  And that's the camera that's mounted outside the

6    T-2 building?

7    A.  Yes, sir.

8    Q.  And that camera both pans, tilts and zooms,

9    right?

10   A.  Yes, sir.

11   Q.  What that means is that although the view at this

12   time is looking out toward the flagpole, there's about a

13   270-degree range that that camera can be turned, right?

14   A.  About that.

15   Q.  And the controls for that camera is up in the T-1

16   building, not in the T-2 building, right?

17   A.  Yes, sir.

18   Q.  At that time, there was no control, no way to

19   control the camera from inside the T-2 building, right?

20   A.  Yes, sir.

21   Q.  And there was no monitor to watch what was on the

22   camera from inside the T-2 building?

23   A.  No, sir, there wasn't.

24   Q.  So in addition to that camera panning, it can

25   tilt, right?

1      A.   Yes, sir.

2      Q.   It can go up, and it can go down.  And if one of

3 the watch standers up in T-1 on the op deck sees

4 something they think is suspicious, they can turn the

5 camera to get a better view of it, right?

6      A.   Yes, sir.

7      Q.   That's the reason why it can move, right?

8      A.   That's right.

9      Q.   If they see something they're concerned about,

10 they can zoom in?

11     A.   Yes, sir.

12     Q.   Now, you talked about another camera that was in

13 the back portion of the T-1 building.  And that's at the

14 back of the parking lot; is that right?

15     A.   I believe so.

16     Q.   Okay.  And that camera had the same capability,

17 right?  It could be panned?

18     A.   Yes, sir.

19     Q.   And it could tilt up or down?

20     A.   Yes, sir.

21     Q.   And it could zoom?

22     A.   Yes, sir.

23     Q.   And that camera as well was controlled from the

24 op deck in the T-1 building?

25     A.   That's right.

1    Q.   There was no ability to control that camera from
2    the T-2 structure?
3    A.   No, sir.
4    Q.   And there was another camera you mentioned.   We
5    saw a video yesterday that we'll look at again in a few
6    minutes that showed the roof of the T-1 building?
7    A.   Yes, sir.
8    Q.   Where was that camera located?
9    A.   I think I said yesterday it was behind T-1 sort
10   of on the back corner near the loading dock.
11   Q.   All right.   And that camera had the same
12   capabilities.   It could be panned?
13   A.   Yes, sir.
14   Q.   Tilted?
15   A.   Yes, sir.
16   Q.   And zoomed?
17   A.   Yes, sir.
18   Q.   I'm sorry.   Can we go back to 63 for a minute and
19   just put up -- without playing it, just put it up.   If
20   we could just stop it.
21        Chief, there are actually two times on this
22   screen, aren't there?
23   A.   There is.
24   Q.   There's a time at the top.   You see that?
25   A.   Yes, sir.

1    Q.   And can you read what it says at the top?

2    A.   April 12, '12, 07:05:29 a.m.

3    Q.   So at the top it says 7:05:29 a.m., right?

4    A.   Yes, sir.

5    Q.   What's it say at bottom?

6    A.   4-12-2012, 06:59:59.858 a.m.

7    Q.   Which is the time -- do you see both times when

8    you're on the op deck?

9    A.   I do.  We usually went by the bottom time.  The

10   top time I believe was the camera itself.  The bottom

11   was synced up to the actual software, the actual video

12   recording software that was linked up to the server.

13   Q.   One of the things that you mentioned that are

14   part of your duties was to do something you called

15   rounds.

16   A.   Yes, sir.

17   Q.   And what that involved was you actually

18   inspecting the physical structure either of T-2, the

19   rigger shop, or T-1; is that correct?

20   A.   That's right.

21   Q.   And there were two ways that you did that, right?

22   A.   Uh-huh.

23   Q.   Is that a yes?

24   A.   Yes, sir.

25   Q.   One was physical, right?

1    A.   Yes.

2    Q.   Where you would physically walk through -- for

3  example, if we're talking about the T-2 structure, you

4  would physically go in the door and go through that

5  whole building, right?

6    A.   Yes, sir.

7    Q.   Into every room in the building?

8    A.   Yes, sir.

9    Q.   Check every door?

10   A.   Yes, sir.

11   Q.   All right.  And you would walk around the outside

12  of the building as well, correct?

13   A.   Yes, sir.

14   Q.   All right.  And you would do the same thing up at

15  T-1?

16   A.   Yes, sir.

17   Q.   And what you were required to do was at the start

18  of every shift, you were required to do a physical round

19  or inspection of each of the structures, right?

20   A.   Yes, sir.

21   Q.   And at the end of every shift, you were required

22  to do the same thing?

23   A.   Yes, sir.

24   Q.   In addition to the physical inspection, one of

25  the things that you did was at least every four hours,

1    you did an inspection of the perimeter of both

2    structures using the cameras, right?

3        A.  Yes, sir.

4        Q.  And you did that every four hours?

5        A.  Yes, sir.

6        Q.  All right.  So when you came in and you started

7    your shift at 7 a.m., in addition to doing the physical

8    inspection, you would by way of the cameras -- and it's

9    the cameras we've been talking about, right?

10       A.  Yes, sir.

11       Q.  All right.  By way of those cameras, you would

12   look at each camera to make sure that the perimeter and

13   the facility was secure?

14       A.  Yes, sir.

15       Q.  All right.  So for example, the camera on the

16   back parking lot of the T-1 building, you would look at

17   that camera to make sure that it was -- from what you

18   could see there, you could see the drive up -- you could

19   see the drive up to the T-1 building from T-2, right?

20       A.  That's right.

21       Q.  You could see the gate?

22       A.  Uh-huh.

23       Q.  You could see whether the gate was open or

24   closed?

25       A.  Yep.

1      Q.   You could see the parking lot?

2      A.   Uh-huh.

3      Q.   Yes?

4      A.   Yes.

5      Q.   You could see what vehicles were in the parking

6  lot?

7      A.   Yes.

8      Q.   You could see if there were any people walking

9  around?

10      A.   Yes.

11      Q.   All right.  And you would do the same thing with

12  the camera that was -- that showed the roof of the T-1

13  building?

14      A.   Yes, sir.

15      Q.   And in addition, you'd do the same thing with

16  the -- there's another camera on the roof that looks

17  kind of down into the parking lot of the T-1 building,

18  is that right, kind of on the front of the building?

19      A.   You're talking about the one on the antenna

20  structure?

21      Q.   Yes.

22      A.   Yes, sir.

23      Q.   That one -- if I could have just a minute.

24           (Pause)

25  BY MR. CAMIEL:

1    Q.   While we're looking for that one, let me ask you:

2    As you did the rounds by way of the cameras, one of the

3    things you would be checking is not only is the facility

4    secure, but are all the cameras working properly, right?

5    A.   Yes, sir.

6    Q.   Because without the cameras working properly, you

7    can't do your job?

8    A.   That's right.

9    Q.   And so this is -- and if you saw -- when you were

10   doing the rounds with the cameras, if you saw that a

11   camera was not focused or looking where it should, you'd

12   readjust it, right?

13   A.   Yes, sir.

14   Q.   So this is -- what's the exhibit number?  This is

15   Exhibit 55.  This is the one -- this is the camera

16   that's on the small tower in front of the T-1 building;

17   is that right?

18   A.   That's right.

19   Q.   And it shows the front gate?

20   A.   Yes, sir.

21   Q.   It shows the parking lot?

22   A.   Yes, sir.

23   Q.   All right.  And so this is one of the cameras

24   that you would need to look at every four hours to make

25   sure that the facility was secure, right?

1     A.   Yes, sir.

2     Q.   And this was a particularly important camera

3  because it shows the actual front gate?

4     A.   Yes, sir.

5     Q.   Let me ask you about April 11th.  You were on

6  duty that day, right?

7     A.   Yes, sir.

8     Q.   Working your regular 7 a.m. to 7 p.m. shift?

9     A.   Yes, sir.

10    Q.   And when you arrived that morning on April 11th,

11 before you drove up to the T-1 building, you stopped and

12 you did your rounds at the T-2 building?

13    A.   I believe so.

14    Q.   All right.  Because that's what your usual

15 practice would be, right?

16    A.   That's correct.

17    Q.   That would have meant you would have entered the

18 building, walked through it and then done a perimeter

19 inspection as well?

20    A.   Yes, sir.

21    Q.   How about on April 10th, were you working that

22 day?

23    A.   I don't recall.

24    Q.   If you were, you would have stopped at the T-1

25 build -- T-2 structure before you went up to the T-1

1  building?

2      A.  Yes, sir.

3      Q.  And done the rounds?

4      A.  Yes, sir.

5      Q.  Because that was your usual practice, right?

6      A.  Yes, sir.

7      Q.  And the only time you can recall deviating from

8  that usual practice was on April 12th, right?

9      A.  Yes, sir.

10      Q.  Because every other time you showed up for work,

11  you would -- right about the time you would show up for

12  work, right around 7:05, you would go into the building

13  and do your rounds?

14      A.  Well, it was -- the time had changed at that

15  time, but usually it was at 6:00, but then we deviated

16  to 7:00 later on, but yes.

17      Q.  But that was your pattern, right?

18      A.  Yes, sir.

19      Q.  And you're required to do that.  That was part of

20  your job duty?

21      A.  Yes, sir.

22      Q.  Now, on April 11th, when you were working, after

23  you would have done your rounds down at the T-2

24  building, you went up to the T-1 building, right, and

25  started your shift?

1    A.  Yes, sir.

2    Q.  And when you take over, you would have been

3 taking over from Jason Bullis, you mentioned?

4    A.  Yes, sir.

5    Q.  Would he brief you about anything that happened

6 during his shift so that you would be aware of it?

7    A.  Yes, sir.

8    Q.  Particularly if there was anything unusual?

9    A.  Yes, sir.

10    Q.  So for example, when you showed up for work --

11 let's move to April 12th.  We saw on the video you

12 showed up.  You drove your blue minivan, was it?

13    A.  Yes, sir.

14    Q.  Inside the gate.  You arrived I think around

15 7:05; is that right?

16    A.  Yes, sir.

17    Q.  And then you would have gone into the building,

18 and before you went and did your workout, you would have

19 consulted with Mr. Bullis to receive kind of a briefing

20 about if anything had happened on his shift you needed

21 to know about?

22    A.  Yes, sir.

23    Q.  In addition, since it was the start of your

24 shift, you would have done your inspection of the

25 cameras?

1    A.   Yes, sir.

2    Q.   Then you would go down and do your workout?

3    A.   Yes, sir.

4    Q.   Now, that morning, when you arrived and you met

5  with Mr. Bullis, did he tell you anything about a white

6  truck that had driven into the parking area of the T-2

7  building at about 10:30 that night --

8           MS. STEVENS:  Objection, Your Honor.  Hearsay.

9           MR. CAMIEL:  I'm asking --

10           THE COURT:  No, that's sustained.  It is

11  hearsay.

12  BY MR. CAMIEL:

13    Q.   Did he tell you anything about a white truck?

14           MS. STEVENS:  Again, objection, hearsay.

15           THE COURT:  And I'll sustain.

16  BY MR. CAMIEL:

17    Q.   Were you briefed about anything unusual that

18  happened on the earlier shift, on Mr. Bullis' shift?

19    A.   Not that I can recall.

20    Q.   Did you review any logs that Mr. Bullis kept that

21  would have described anything that happened on his

22  shift?

23           MS. STEVENS:  Again, Your Honor, I'm not sure

24  where counsel is going with this, but if he's asking him

25  about a log written by somebody else --

```
 1          THE COURT:  The question, did you review any
 2    logs, I'll permit.  So that's fine.
 3    BY MR. CAMIEL:
 4       Q.  Did you review the log that Mr. Bullis would have
 5    filled out from his shift?
 6       A.  I don't think I did that day.
 7       Q.  You talked about driving up to work, driving up
 8    to the COMMSTA on the morning of April 12th and you were
 9    kind of in a three-vehicle caravan.  There were three
10    vehicles kind of all traveling at the same time; is that
11    right?
12       A.  Yes, sir.
13       Q.  Who was the first vehicle?
14       A.  The first vehicle was Jim Hopkins.
15       Q.  What did he drive?
16       A.  He drove a blue -- I want to say it was -- I
17    think it was a black Dodge.
18       Q.  Are you sure it was black and not blue?
19       A.  I think so.
20       Q.  Who was the second person?
21       A.  The second one was Kevin O'Connor.
22       Q.  What did he drive?
23       A.  He drove a green Tahoe.
24       Q.  And then you?
25       A.  Then me.
```

1    Q.  And when you drove past the T-2 building, you saw

2    Rich Belisle's truck?

3    A.  Yes, sir.

4    Q.  What did he drive?

5    A.  He drove a -- I want to say it was a blue truck,

6    Ford.

7    Q.  Okay.  Can we go to government Exhibit 60?

8        That's the view from the back camera on T-1; is

9    that right?

10   A.  Yes, sir.  It's back camera, front parking lot.

11   Q.  And if you'd take a look at the T-2 building, the

12   way the camera is stationed, you can't see any of Anton

13   Larsen Bay Road; is that right?

14   A.  Yes, sir, that's correct.

15   Q.  We can take that one down.

16       Go to government Exhibit 61.  By the way, the

17   reason you can't see any of Anton Larsen Bay Road on the

18   one we just looked at is because that camera can move,

19   right?

20   A.  Yes, sir.

21   Q.  And either you or somebody on the watch may have

22   moved it, right?

23   A.  That's correct.

24   Q.  Now, this is the view from the back of the T-1

25   building; is that right?

1      A.   Yes, sir.

2      Q.   Can we play this?

3           THE COURT:   What exhibit is this, Mr. Camiel?

4           MR. CAMIEL:   61.

5           (Exhibit No. 61 playing in open court.)

6  BY MR. CAMIEL:

7      Q.   Do you recognize who that is?

8      A.   Yes, sir.

9      Q.   The first person?

10     A.   Yes, sir.

11     Q.   Who is it?

12     A.   It's Jim Wells.

13     Q.   Who is walking up behind him?

14     A.   It's Rich Belisle.

15     Q.   And if we could stop it for just a minute.

16          You can kind of pick out Mr. Belisle and

17 Mr. Wells because they're civilians, right?

18     A.   Yes, sir.

19     Q.   So they're not in uniform.   If we could run it.

20          Do you know where -- if we could stop for a

21 minute.

22          Do you know how they would have got on the roof?

23     A.   I believe there was a -- I believe there was a

24 hatch somewhere on the -- there in T-1.   I'm not quite

25 sure.   I don't remember, to be honest with you.   But I

1    know there was a way there, either on the transmitter

2    deck to gain access to it, I believe.

3        Q.  If we could continue the video.

4            (Exhibit No. 61 continues playing in open court.)

5    BY MR. CAMIEL:

6        Q.  Can you tell who the third person -- if we could

7    stop it.

8            Can you tell who the third person is in the

9    uniform?

10       A.  I can't tell.

11       Q.  I want to have you look at some additional

12   videos.  And let's start -- you already looked at

13   yesterday and today, part of today Exhibit 62, that's

14   the 40-minute video from the T-1.  Let's just put that

15   up for a second.

16           (Exhibit No. 62 playing in open court.)

17   BY MR. CAMIEL:

18       Q.  If we could stop that.

19           So this is Exhibit 62.  And this is the video we

20   were watching yesterday and today from April 12th, is

21   that right, starting at 6:59 a.m.?

22       A.  Yes, sir.

23       Q.  Now, I want to show you just for foundational

24   purposes first, a clip from that video.  It's DE-261.

25           If we could stop it right there.

1        When vehicles would come up the drive from the --

2   down where the T-2 building is, when they pulled off

3   Anton Larsen Bay Road to drive up to the T-1 building,

4   those vehicles would block the view of Anton Larsen Bay

5   Road; isn't that right?

6        MS. STEVENS:  Objection, Your Honor.

7   Foundation.

8        THE COURT:  Well, I don't know about

9   foundation, but I will sustain the objection the way it

10  was phrased.  So try that again, Mr. Camiel.

11  BY MR. CAMIEL:

12     Q.  You see the truck in the video that's driving up

13  with the headlights on?

14     A.  Yes, sir.

15     Q.  All right.  If we could back it up.  Back the

16  video up about ten seconds or so.

17        Okay.  You see the view that you have before the

18  truck comes into view?

19     A.  Yes, sir.

20     Q.  Now, let's let the video run.  Let's just stop it

21  for a minute.  Does this appear to be -- does DE-261

22  appear to be a clip from government Exhibit 62 that we

23  were watching before?

24     A.  Yes, sir, it appears to be.

25        MR. CAMIEL:  I would offer DE-261.

```
 1          MS. STEVENS:  No objection.

 2          THE COURT:  All right.  It's admitted.  Go

 3  ahead.

 4          (Defense Exhibit No. DE-261 admitted.)

 5          (Defense Exhibit No. DE-261 playing in open

 6  court.)

 7  BY MR. CAMIEL:

 8     Q.  Now, sir, I'd like to show you again for

 9  foundational purposes DE-261A through G, which are some

10  still photos from the video you just watched.

11          Did those appear to be stills that were taken

12  from the video that you just watched?

13     A.  Yes, sir.

14          MR. CAMIEL:  I would offer 261A through 261G.

15          MS. STEVENS:  No objection.

16          THE COURT:  Those will all be admitted.

17          (Defense Exhibit No. DE-261A - G admitted.)

18  BY MR. CAMIEL:

19     Q.  Start with 261A.  261B.  261C.  261D.  261E.

20  261F.  And 261G.

21          Now, I'd like to -- I'd like to show you again

22  for foundational purposes a short video clip, Defense

23  Exhibit No. 262.  Just have you look at it and I'll ask

24  you about it.

25          (Defense Exhibit No. 262 being shown to witness.)
```

BY MR. CAMIEL:

    Q.  Does that appear to be a clip from the government Exhibit 62, the April 12th video that you looked at earlier?

    A.  Yes, sir.

        MR. CAMIEL:  I would offer Defendant's 262.

        THE COURT:  Ms. Stevens?

        MS. STEVENS:  No objection.

        THE COURT:  All right.  Defense 262 is admitted.

        (Defense Exhibit No. 262 admitted.)

        (Defense Exhibit No. 262 playing in open court.)

BY MR. CAMIEL:

    Q.  Now, I'd like to have you look, sir, for foundational purposes, at Defense Exhibit No. 262A. Does that appear to be a still from the video clip you just looked at?

    A.  Yes, sir.

    Q.  The time on this is 7:14:20 hours; is that right?

    A.  Yes, sir.

    Q.  On April 12th?

    A.  Yes, sir.

        MR. CAMIEL:  I would offer Defense Exhibit 262A.

1            MS. STEVENS:  No objection.

2            THE COURT:  That will be admitted.

3            (Defense Exhibit No. 262A admitted.)

4    BY MR. CAMIEL:

5       Q.  Now, I'd like to have you look at for foundation

6    purposes Defense Exhibit No. 129.  Does that appear to

7    be another still from the video you just looked at?

8       A.  Yes, sir.

9            MR. CAMIEL:  I would offer Defense Exhibit

10   No. 129.

11           MS. STEVENS:  Just a second, Your Honor.  Could

12   we have a sidebar, please.

13           THE COURT:  Certainly.

14           (Begin bench conference.)

15           MS. STEVENS:  So we got these on a disc this

16   morning in court.  So we haven't had an opportunity to

17   review them.  Looking at them on the screen now, they

18   appear to be enhanced.  This one has different coloring.

19   So I'm not sure what the solution is, whether we take a

20   break and we look at it.

21           THE COURT:  Why don't we do that.

22           MS. STEVENS:  It's just they look significantly

23   different.

24           MR. SKROCKI:  We'd like to revisit the other

25   ones that came in as well.

 1          THE COURT:  Why don't we take a break, and then

 2    let me know when you're ready.

 3          (End bench conference)

 4          THE COURT:  Ladies and gentlemen, we're going

 5    to take a short recess with you so we can sort out some

 6    issues.  Please leave your notepads here.  Remember my

 7    admonition not to discuss the case.  We're ending no

 8    later than noon today.  So we'll go off record.

 9          (Recessed from 10:51 a.m. to 11:02 a.m.)

10          (Jury absent)

11          DEPUTY CLERK:  All rise.  Her Honor, the Court,

12    the United States District Court is again in session.

13          THE COURT:  All right.  Please be seated,

14    everyone.  So what's our update, Ms. Stevens?

15          MS. STEVENS:  So it seems that we've come to an

16    agreement on how to move forward with this particular

17    exhibit.  We're going to allow defense to lead the

18    witness with a question that will I think solve the

19    problem without an objection from us.

20          THE COURT:  This is with regard to which

21    exhibit?

22          MS. STEVENS:  129.

23          MR. CAMIEL:  DE-129.

24          MS. STEVENS:  And then they're going to reserve

25    that exhibit for later if they can make some changes

1    maybe.

2                THE COURT:  Is that correct?

3                MR. CAMIEL:  Yes.  So I'm -- so the Court

4    understands, I'm going to ask him a leading question

5    about the view from these exhibits.

6                THE COURT:  From 129?

7                MR. CAMIEL:  From 129 and the other series of

8    exhibits we just introduced that show that when a

9    vehicle is coming up, it blocks part of the view of

10   Anton Larsen Bay Road.

11               THE COURT:  And then move on?

12               MR. CAMIEL:  Right.

13               THE COURT:  All right.  Are we ready to bring

14   the jury?  Yes?  Very good.

15               (Jury present)

16               THE COURT:  All right.  Welcome back.  Please

17   be seated.  Go ahead, Mr. Camiel.  Thank you.

18   BY MR. CAMIEL:

19       Q.   Thank you, Your Honor.

20            The series of exhibits we just looked at showed

21   vehicles that were coming up and partially blocking or

22   completely blocking the view of the T-1, the back T-1

23   camera from showing any of Anton Larsen Bay Road,

24   correct?

25       A.   Yes, sir.

1    Q.  Now, you gave some testimony about going down to

2  T-2 after you got the report of what had happened down

3  there, and then you went back up to the T-1 -- to the

4  T-1 building, right?

5    A.  I did.

6    Q.  After you got back up there, one of the things

7  you did was you directed Kevin O'Connor to call everyone

8  in the unit, right?

9    A.  I don't know if it was me, but it might have

10  been.

11    Q.  Do you recall that he was tasked with calling

12  everyone in the unit?

13    A.  I do remember him being tasked.  I don't remember

14  if I was the one that gave him direction or not.

15    Q.  He was tasked with telling people there had been

16  an incident at the T-2 building?

17    A.  Correct.

18    Q.  And one of the people he was directed to call was

19  Mr. Wells?

20    A.  Yes, sir.

21    Q.  As far as you know, he did that?

22    A.  He did.

23    Q.  You talked a little bit about Mr. Wells'

24  demeanor, what he looked like up in the T-1 building

25  later that day when you saw him, right?

 1    A.  Yes, sir.

 2    Q.  Basically, the unit was asked to stay up at the

 3 T-1 building for many, many hours, right?

 4    A.  That's correct.

 5    Q.  What, 12, 13 hours before you were let go to go

 6 home?

 7    A.  Something like that.

 8    Q.  You hadn't had much contact with Mr. Wells since

 9 he returned from being sick, right?

10    A.  No, sir.

11    Q.  You knew that he'd been gone for a long time?

12    A.  I honestly didn't know.

13    Q.  And you described your demeanor.  You were

14 extremely distraught, right?

15    A.  Yes, sir.

16    Q.  Couldn't even continue your shift?

17    A.  Yes, sir.

18    Q.  Made it difficult for you to concentrate or to do

19 your job?

20    A.  Yes, sir.

21    Q.  And Mr. Wells was quiet?

22    A.  Yes, sir.

23    Q.  Did you ever listen to the recording of Cody

24 Beauford when he called up to report the incident at the

25 T-2 building?

1      A.   No, sir.

2      Q.   Now, sometimes on the op deck, there would be

3  unit musters there; is that right?

4      A.   Sometimes, yes, sir.

5      Q.   That's where everybody would gather for a

6  meeting?

7      A.   That's correct.

8      Q.   And that was an approved type of meeting where

9  even people who didn't have clearance could come in?

10     A.   That's correct.

11     Q.   When you did that, you would sanitize the room,

12 right?

13     A.   Yes, sir.

14     Q.   Now, what that means is you'd shut down monitors

15 or cover up any sensitive materials, right?

16     A.   Yes, sir.

17     Q.   And when those happened, there would be several

18 people at a time?

19     A.   Yes, sir.

20     Q.   For example, you had seen Rich Belisle on the op

21 deck?

22     A.   Yes, sir.

23     Q.   Or Chief Reckner?

24     A.   Yes, sir.

25     Q.   Or Mr. Hopkins?

1    A.   Uh-huh.

2    Q.   Or other members of the rigger shop?

3    A.   Yes, sir.

4    Q.   After April 12th, you became aware that the FBI

5  arrived and they became involved in the investigation of

6  the homicides that occurred; is that right?

7    A.   Yes, sir.

8    Q.   And in fact, the FBI set up shop in the T-1

9  building?

10   A.   Yes, sir.

11   Q.   On the ops deck?

12   A.   I don't know if it was on the ops deck.  At least

13 I don't remember it being on the ops deck.

14   Q.   But you knew they set up shop there?

15   A.   Yes, sir.

16   Q.   And you could see them going in and out?

17   A.   Yes, sir.

18   Q.   And you could overhear some of the things they

19 were talking about?

20   A.   I never personally overheard anything they were

21 talking about.

22   Q.   You were aware they were there?

23   A.   But I was aware they were there, yeah.

24   Q.   They were bringing in people to interview right

25 there in the T-1 building?

1    A.   Yes, sir.

2    Q.   And they were there for a few weeks?

3    A.   Yes, sir.

4         MR. CAMIEL:  Your Honor, that's all I have.

5         THE COURT:  All right.  Redirect, Ms. Stevens.

6         MS. STEVENS:  Yes.

7                    REDIRECT EXAMINATION

8    BY MS. STEVENS:

9    Q.   Chief, can you explain what the force protection

10   status is for a base?

11   A.   Yes.  So it's a security continuum that we have

12   in the armed services where if there's a perceived

13   threat in the area, then we -- our security posture

14   changes.  So --

15   Q.   Do you remember what the status was for April 12,

16   2012?

17   A.   I can't recall for that day, ma'am.

18   Q.   How often would random people wander up and

19   loiter around the rigger shop?

20   A.   We would see them every once in a while quite a

21   few times.

22   Q.   What would they be doing?

23   A.   Just kind of coming in and out.  Sometimes you

24   would see, you know, significant others coming through

25   that area.  Sometimes you would have, you know -- Kodiak

```
 1    obviously has a lot of visitors for fishing.  They would

 2    come out and just check it out or they would have, you

 3    know, just kind of random folks just kind of go in

 4    around the road.

 5        Q.  Did they come up to the rigger shop and try to

 6    open the doors?

 7        A.  Not that I can recall.

 8        Q.  Did they poke around the back?

 9        A.  Not that I -- of the building?

10        Q.  You don't recall?

11        A.  Not that I recall.

12        Q.  So you mentioned you were on the watch deck.  One

13    of your roles was monitoring the cameras.  Were you

14    glued to those cameras?

15        A.  I wouldn't say I was glued, no.

16        Q.  And defense showed you two separate times.  And

17    Blair, if you can go ahead and pull up government

18    Exhibit -- sorry -- 67.

19            (Exhibit No. 67 playing in open court.)

20            MR. CAMIEL:  Your Honor, we never showed that

21    one.  This is beyond the scope of cross.

22            THE COURT:  I'll allow it, but then allow you

23    to follow up as well.  Go ahead, please.

24            MS. STEVENS:  That's fine.  We can just move

25    on.
```

1    THE COURT:  All right.

2    BY MS. STEVENS:

3    Q.  The defense showed you some footage with time

4    differences --

5    A.  Yes, ma'am.

6    Q.  -- between -- from the T-2 camera.  There was a

7    time at the top and a time at the bottom.  Can you tell

8    me which was the accurate time?

9    A.  We always went by the -- we always went by the

10   time on the server, that big number right there that

11   was --

12   Q.  The one located at the bottom?

13   A.  Correct.  That's the one that's kind of tied in

14   with the software.  So we typically went with that one.

15   The other one was one for the camera, I believe.  And no

16   way kind of to know for certain if that one was a

17   correct time or not.

18   Q.  So you went according to the bottom one that was

19   attached to the server, correct?

20   A.  Yes, ma'am.

21   Q.  The defense also showed you some vehicles

22   blocking Anton Larsen Bay Road from the T-1 camera

23   looking down and then asked you a question about how

24   certain videos in certain positions may hinder a clear

25   view of that road.  Do you remember that?

1    A.  I do.

2    Q.  Was there another camera that looked onto Anton

3  Larsen Bay Road that captured incoming traffic?

4    A.  Yeah.  The front camera --

5    Q.  Okay.

6    A.  -- up there at T-1, that would capture traffic as

7  well.

8    Q.  You talked about the all-hands on the ops deck.

9  Can you just generally describe what an all-hands is for

10  us non-military folks?

11    A.  Yeah.  So something for the commanding officer of

12  any of the bases or anywhere in the armed services, they

13  want to just kind of get face-to-face time, just kind of

14  give either recognition for one of our sailors or if

15  they want to just pass some good information to the

16  whole crew, and also just give him some face time just

17  to do all of that, that's something we would do.  So

18  we'd just gather everybody together in one place.

19    Q.  So it's an opportunity for the commanding officer

20  to address the entire unit?

21    A.  Yes.

22    Q.  If the unit is sitting prior to the commanding

23  officer coming into the room, what happens when the

24  commanding officer enters the room?

25         MR. CAMIEL:  Your Honor, this is beyond the

1  scope.

2          THE COURT:  That is sustained.  It is beyond

3  the scope.

4  BY MS. STEVENS:

5     Q.  So had you done the round that morning, where

6  would you have been?

7     A.  I would have been at T-2.

8     Q.  Thank you.

9          THE COURT:  Anything at all?

10          MR. CAMIEL:  No.

11          THE COURT:  Thank you, sir.  You may be excused

12  and released, right, Counsel?

13          MS. SHERMAN:  We believe he can be released.

14          MR. COLBATH:  Yes.

15          THE COURT:  You may be excused, sir.  Thank

16  you.

17          (Witness excused)

18          THE COURT:  Next witness.

19          MS. STEVENS:  Your Honor, we call Alan Jones.

20          (Pause)

21          THE COURT:  Good morning.  If you could come

22  all the way forward, please, to the witness chair over

23  here.  When you get up there, remain standing just a

24  moment and the clerk will administer an oath to you.

25          (Oath administered to the witness)

1          DEPUTY CLERK:  For the record, can you please

2     state your full name and then spell your full name.

3          THE WITNESS:  Alan Warren Jones, A-l-a-n,

4     W-a-r-r-e-n, J-o-n-e-s.

5                ALAN JONES, GOVERNMENT WITNESS, SWORN

6                        DIRECT EXAMINATION

7     BY MS. STEVENS:

8     Q.  Good morning, Mr. Jones.  Where do you currently

9     work?

10    A.  I'm retired.

11    Q.  How long have you been retired?

12    A.  Since July 31st of last year.

13    Q.  And tell the jury where you retired from.

14    A.  I was an Alaska Wildlife Trooper in Kodiak,

15    Alaska for about 20 years.

16    Q.  Did you work anywhere else before working for the

17    Alaska Wildlife Troopers?

18    A.  I was an aircraft mechanic in Ketchikan for about

19    20 years.

20    Q.  Did you retire in Kodiak?

21    A.  I did.

22    Q.  Do you currently live there?

23    A.  No, I don't.  We retired back to the East Coast.

24    Q.  And have you been back to Kodiak at all?

25    A.  Yes.

1    Q.  And when you were an Alaska Wildlife Trooper, can

2    you tell the members of the jury what type of jobs and

3    tasks you conducted?

4    A.  I was the post pilot at the wildlife troopers,

5    Kodiak post, so I was in charge of flying mostly blue

6    shirt troopers around to the different villages and

7    whatnot, and doing aircraft patrol of the fisheries and

8    of game patrols and whatnot.

9    Q.  Do you like planes?

10   A.  I have been involved with aviation for quite a

11   while now, yes.

12   Q.  Do you recall participating in any sort of

13   investigation on the 12th of April in 2012?

14   A.  I do.

15   Q.  Tell the members what that role you played was

16   that day?

17   A.  I was requested by Trooper Dupras to come out to

18   the Coast Guard base, the COMMSTA area, and to aid him

19   in whatever the situation was out there.

20   Q.  Did you have an idea of what the situation was?

21   A.  Initially not.  I was just going by what the

22   dispatcher told me, Trooper Dupras requested that I

23   should get out there.

24   Q.  Do you recall what time you arrived?

25   A.  It was after 8:00.  Probably 8:15, 8:20.

1    Q.  Let's pull up government Exhibit 67, please,

2  Blair.

3        Mr. Jones, do you see your vehicle in this screen

4  shot?

5    A.  Yes, I do.

6    Q.  And there should be a laser pointer up there

7  still.  Can you go ahead and identify your vehicle,

8  please?

9    A.  It is a pickup parked behind the Coast Guard

10  pickup and whatever that is.

11    Q.  Okay.  Go ahead and play it.

12        (Exhibit No. 67 playing in open court.)

13  BY MS. STEVENS:

14    Q.  Go ahead and pause it.

15        So do you recognize who that person is?

16    A.  It could be me getting out of the vehicle.

17    Q.  Go ahead.

18    A.  Or getting back into the vehicle, I guess is what

19  was going on.

20    Q.  What's the time?

21    A.  8:24 and 20 seconds.

22    Q.  Do you remember what you were getting out of your

23  truck?

24    A.  I do not.

25    Q.  Okay.  So after showing up that day, what did you

1   end up doing?

2     A.  Trooper Dupras requested that I walk around the

3   building to secure it and then to document it with video

4   or with still photos.

5     Q.  Did that include taking any photos of the

6   interior?

7     A.  No, I never did go inside.

8     Q.  Walk us through your perimeter assessment of the

9   scene.

10     A.  I went in a counterclockwise direction from the

11   parking lot around the side of the building closest to

12   the road that we were just looking at.

13       I noticed that there were two doors on the back

14   of the building.  One looked like a furnace room door

15   because it had vents on the top and bottom, and it was a

16   metal door.  And then one was a, I call it an arctic

17   entryway door that had a screen door on it.

18       Both the furnace room door and the screen door on

19   the arctic entry was ajar just slightly.  At that point

20   when I saw that, the Coast Guard MPs around, I requested

21   that they keep an eye on the doors, don't let anybody

22   touch them.  I was thinking more along the lines of

23   fingerprints or whatever.

24     Q.  Did you take this photograph?

25     A.  Very possibly, yes.

1    Q.   What's the angle?

2    A.   After going around the building the first time, I

3    went around a second time taking pictures of things.

4    And I climbed up on the bank behind the building.

5    Q.   Can you describe that bank?

6    A.   Fairly steep.  I believe the pad for the building

7    itself is probably excavated, so they cut back the dirt

8    to get a flat pad, so just typical construction-type

9    angle to the grade.

10         THE COURT:  I'm not clear if you said what

11   exhibit this is, Ms. Stevens, on the record.

12         MS. STEVENS:  73.

13         THE COURT:  Okay.  Thank you.

14   BY MS. STEVENS:

15   Q.   And do you remember the conditions that morning

16   as you were walking around?

17   A.   Yes.  The evening before apparently had a heavy

18   freeze.  All the snow was a dirty spring snow.  The

19   frost on the grass and on the snow and everything was

20   hard enough that even my walking on the grass around

21   there wasn't leaving any noticeable footprints on the

22   grass or on the snow or anything.  It was just a cold

23   spring morning.

24   Q.   Okay.  After photographing the building and

25   walking around -- Oh, I'm sorry.  You mentioned an

1    arctic entry.

2            Blair, can you pull up for foundation 75.

3            Mr. Jones, do you see that in front of you?

4       A.  Yes, I do.

5       Q.  Is that an accurate depiction of the entry door

6    the day of April 12th?

7       A.  Yes, it is.

8            MS. STEVENS:  Your Honor, we move for 75, to

9    admit 75.

10           MR. CAMIEL:  No objection.

11           THE COURT:  75 is admitted.

12           (Exhibit No. 75 admitted.)

13   BY MS. STEVENS:

14      Q.  So you would describe that as that arctic entry

15   in the back?

16      A.  Yes, I would.

17      Q.  Did you open that door, that screen door?

18      A.  I did not.

19      Q.  You didn't check to see if there was any door on

20   the other side of that?

21      A.  I did not.

22      Q.  Could you also pull up 74, please?

23           Did you pull open this door?

24      A.  I did not.

25      Q.  Did you arrive after Coast Guard PD or mil pol?

1      A.   Yes, they were there before I -- as I pulled in,
2   there were a number of vehicles there.
3      Q.   When you did your walk around the building, did
4   you walk anywhere else?  Did you canvass any other areas
5   around the crime scene?
6      A.   Yes, I did.
7      Q.   Can you tell the members about that.
8      A.   Once I got things situated around the building
9   taking the photos that I wanted to, I went ahead and
10   walked both towards the golf course approximately a half
11   a mile on both sides of the road looking for any
12   footprints or tire tracks or anything that might have
13   been discarded.
14         I walked back down the road to the rigger
15   station, rigger building, whatever it was called, and
16   then I continued on past to the filtration plant, which
17   is about another half mile down the road the opposite
18   direction, and came back, all the time not noticing
19   anything of any significance I didn't think.
20      Q.   Blair, for foundation, 226.
21         Mr. Jones, do you recognize this?
22      A.   Yes, I do.
23      Q.   What is it?
24      A.   It's almost like a Google Earth picture of the
25   road system around the COMMSTA.

1    Q.   Is it an accurate depiction of that road system?

2    A.   I would say so, yes.

3         MS. STEVENS:  Your Honor, we move to admit 226.

4         MR. CAMIEL:  No objection.

5         THE COURT:  226 is admitted.

6         (Exhibit No. 226 admitted.)

7  BY MS. STEVENS:

8    Q.   So you mentioned you walked up towards the golf

9  course, didn't see anything of particular --

10        MR. CAMIEL:  Objection to restating testimony.

11        THE COURT:  I'm sorry.

12 BY MS. STEVENS:

13   Q.   Did you find anything of evidentiary note as you

14 walked up towards the golf course?

15   A.   I did not.

16   Q.   When you went down to the water treatment plant?

17   A.   Again, I saw nothing.

18   Q.   Was anybody at work there?

19   A.   Filtration plant, yes, there was, numerous cars

20 parked there.

21   Q.   Were they working that morning?

22   A.   Yes, they were.

23   Q.   Did you notice whether it was noisy there or not?

24   A.   I don't recall one way or the other.  It wasn't

25 overwhelmingly noisy, no.

1    Q.  In your time as a wildlife trooper, did you have

2  occasion to go up Anton Larsen Bay Road?

3    A.  Yes, I did.

4    Q.  Where did that road go to?

5    A.  It dead-ended about ten miles from town or from

6  the COMMSTA, I guess, and Anton Larsen Bay.

7    Q.  What else is back there?

8    A.  There is a boat launch and a dock there.  Once

9  you get to the end of the road, there is numerous

10  parcels of private property and people with remote

11  cabins.

12    Q.  Can you describe the condition of the road, what

13  kind of road it was?

14    A.  At that time, it was probably paved to the golf

15  course.  From there, it was a normal typical Alaska

16  gravel road, depending on the time of the year and

17  maintenance done to it.

18    Q.  Now, some of us have been here a little less time

19  than you.  What would you consider a typical Alaska

20  unpaved road?

21    A.  It was a gravel road but varied, potholes,

22  numerous potholes.

23    Q.  Was it easy or difficult to traverse?

24    A.  You would have to slow down or you would wind up

25  tearing up your vehicle.  Constant chuckholes wouldn't

1    be good.

2        Q.   What's a "chuckle"?

3        A.   Chuckholes.

4        Q.   And did the weather conditions ever impact the

5    road?

6        A.   Yes.  That Anton Larsen Bay dock was used by the

7    people from Port Lions.  They would just bring their

8    boats across and maybe a 15-minute trip get to Anton

9    Larsen.  They would do that, and then they would have

10   cars parked by the boat dock.

11           So DOT did try to keep it open in the wintertime

12   to allow Port Lions people that access to town.

13       Q.   Tell the members who those folks were that were

14   living over there in Port Lions.

15       A.   Basically, it was a Native village with a little

16   bit of a twist to it, but either retired people, fishing

17   lodges, just a Native village.

18       Q.   What would they use that boat launch for?

19       A.   To moor their boats.  On their trips to town,

20   they would park their boat at the boat launch dock, take

21   their vehicle into town, do their shopping or do

22   whatever errands they had, go back out Anton Larsen,

23   park their car, get in their boat and go back to the

24   village.

25       Q.   Did you have occasion to visit Port Lions?

1    A.   Yes, as a trooper.

2    Q.   Did they have grocery stores out there?

3    A.   They have had small ones off and on throughout

4    the course of my 20 years in Kodiak, but it would have

5    been a village-type store if there was one.

6    Q.   The cars parked at the boat launch there, did you

7    come to -- did you come to learn how many of those cars

8    would be typically for the residents of Port Lions?

9    A.   I never took a scientific study on trying to

10   figure that out, but I'm sure numerous ones, if not

11   90 percent of them would be.

12   Q.   When you walked down -- I'm sorry.  Were there

13   any other communities that may have utilized that?

14   A.   Yes.

15   Q.   Okay.  Who is that?

16   A.   There is a Russian village probably a 20-,

17   25-minute boat ride from Anton Larsen dock.

18   Q.   Did you ever have occasion to go out to the

19   Russian village?

20   A.   Yes, on probably three occasions that I can

21   remember.

22   Q.   Did one of those occasions include in support of

23   this case?

24   A.   It did.

25   Q.   Explain that to the jury.

1    A.   I don't remember the timeframe, but probably two

2   or three months later from the original date, I was

3   requested by the FBI to transport two of their people

4   out via float plane to the Russian village.

5    Q.   What did you do while you were there?

6    A.   They had a dock, a boat dock there, so I stayed

7   with the airplane while the two agents did whatever they

8   were going to do.

9        While I was there, I noticed two small children,

10  Russian village children sticking their heads through

11  the bushes kind of looking at me like I was a Martian or

12  something.

13   Q.   Any more children show up?

14   A.   Finally by the time that the agents were down

15  there, it was probably a dozen kids down on the dock.  I

16  was showing them the airplane, letting them sit up in

17  the flying room and whatnot.

18   Q.   How many families would you say lived in that

19  village?

20   A.   I think I can recall maybe 12 houses, so there

21  were 12 households.

22   Q.   And did you ever encounter these residents on

23  other occasions during your tenure with the troopers?

24   A.   I would say 99 percent of their income would have

25  been from fishing, so being a wildlife trooper, I had

1    contacted them throughout the course during their

2    commercial fishing, whether it was salmon or Pacific cod

3    or whatever the fishery was.

4        Q.  How would you describe their overall demeanor?

5        A.  Very nice, very mellow.

6        Q.  Also on this map, are you familiar with this

7    property?

8        A.  Yes, I am.  I believe it belonged to Wanda and

9    DeWitt Fields owned it.  They have owned it for a long

10   time.

11       Q.  Did you have occasion to either drive by or visit

12   it during your course of patrolling?

13       A.  Yes.

14       Q.  Can you do 223 for foundation?

15           Do you recognize this photo?

16       A.  Yes, it's of buildings at Red Cloud Ranch.

17       Q.  Does it accurately represent the property around

18   the time it was captured?  Is it an accurate

19   representation of the Red Cloud Ranch?

20       A.  Yes.  There is various stages of dilapidation

21   over the years, but, yes, that looks like Red Cloud

22   Ranch.

23       Q.  Is this generally what it looked like in 2012?

24       A.  Sure.  I don't really remember one way or the

25   other what 2012 looked like.

1          MS. STEVENS:  Your Honor, we move to admit 223.

2          MR. CAMIEL:  I think there is a lack of

3     foundation at this point.

4          THE COURT:  I would sustain as to the lack of

5     foundation.

6          MS. STEVENS:  Your Honor, I have no more

7     questions.

8          THE COURT:  Mr. Camiel, go ahead.

9                     CROSS EXAMINATION

10    BY MR. CAMIEL:

11       Q.  Good morning.

12       A.  Good morning, sir.

13       Q.  So on April 12th, you get the call and you show

14    up at the COMMSTA at the rigger shop, right?

15       A.  That is correct.

16       Q.  And you never went inside the building?  You were

17    asked to walk around the building, the perimeter of the

18    building?

19       A.  That is correct.

20       Q.  And that's when you saw the two doors in the back

21    we just looked at that you noticed -- the outer doors

22    for each one of them appeared to be ajar?

23       A.  That is correct.

24       Q.  And by ajar, you mean they weren't seated?  It

25    was just a little bit open?

1    A.   Correct.

2    Q.   And you didn't touch those doors because you

3    wanted to preserve any fingerprints that might be on

4    those doors?

5    A.   That is correct.

6    Q.   And if we could go to government Exhibit 73.

7         That's one of photos you took from up on the

8    hill?

9    A.   I believe it is, yes.

10   Q.   And it shows the two doors that you were just

11   talking about?

12   A.   Yes.

13   Q.   In addition to noticing that those doors were

14   ajar, one of the other other things you noticed when you

15   were walking around the perimeter of the rigger shop,

16   which is the T-2 building, was you saw some tire marks

17   by the second driveway, didn't you?

18   A.   Yes, I did.

19   Q.   And those tire marks looked fresh?

20   A.   Yes.

21   Q.   Looked like a vehicle accelerating?

22   A.   Yes.

23   Q.   And did you point that out to Trooper Dupras?

24   A.   I believe I did, yes.

25   Q.   Did you take pictures of those?

1    A.  Yes.

2    Q.  Now, you only walked up as far -- you walked

3  north up Anton Larsen Bay Road, you said up as far as

4  the golf course?

5    A.  No, sir.

6    Q.  How far?

7    A.  About a half mile up to an antenna field that has

8  a building labeled Helix (phonetic).

9    Q.  Did Trooper Dupras or anyone else ask you to go

10  any further up the road?

11    A.  No, sir.

12    Q.  And then you said you walked back down toward the

13  water treatment plant, and when you got there, you saw

14  that there were several employees working?

15    A.  Yes, sir.

16    Q.  Could you tell what kind of work they appeared to

17  be doing?

18    A.  Something in and around the building.  I don't

19  recall.

20    Q.  Did they have heavy equipment?

21    A.  I don't recall.

22    Q.  Did you talk to any of the employees there?

23    A.  One of them, or one or two, I don't know,

24  hollered over, "What's going on?"  They were curious

25  about what all the commotion was up at the rigger shop.

1    Q.  Did you take statements from any of the folks who
2  were working there?
3    A.  I did not.
4    Q.  Did you ever go back to the water treatment plant
5  as a part of the investigation in this case?
6    A.  I did not.
7    Q.  Could we have the witness look at -- this is for
8  foundation -- Defense Exhibit 45.
9        Do you see that photograph in front of you?
10    A.  Yes, I do.
11    Q.  Does that look like a photo that you may have
12  taken on April 12th?
13    A.  I don't believe so.  I think it's of the wrong
14  driveway.
15    Q.  Have him look at Defense Exhibit 46.
16        Do you recognize that photo?
17    A.  I recognize the building, and I don't know if I
18  took it or not.  I may have.  I don't remember.
19    Q.  Do you see anything that looks like tire tracks
20  in that photo?
21    A.  Yes, I do.
22    Q.  Does that look anything like the tire tracks you
23  noticed on the morning of April 12th?
24    A.  Yes.
25    Q.  Does it look to be in the same area where you

 1   noticed them?

 2       A.  Yes.

 3       Q.  Does the background, the vehicles that are

 4   present, look to be the way you saw things when you were

 5   taking the photographs on April 12th?

 6       A.  Yes.

 7       Q.  Do you believe this is a picture you may have

 8   taken?

 9       A.  I believe it is.  I don't recall distinctly.

10       Q.  But you believe it is?

11       A.  I believe it is.

12       Q.  Is it -- does this picture fairly and accurately

13   depict what you saw on the morning of April 12th from

14   that vantage point?

15       A.  Yes, it does.

16           MR. CAMIEL:  I would offer Defense Exhibit 46.

17           MS. STEVENS:  No objection.

18           THE COURT:  Defense 46 is admitted.

19           (Defense Exhibit No. 46 admitted.)

20   BY MR. CAMIEL:

21       Q.  And there is a laser pointer.  If you could --

22   sure.  If you could point out where the tire tracks are

23   that you noticed.

24           If we could, for foundational purposes, take a

25   look at Defense Exhibit 48.

1          Did you take any measurements of anything on

2    April 12th?

3        A.   I believe of the one photograph or of the one

4    tire track that I thought was of rapid acceleration.

5        Q.   And did you take a photograph of the measurement

6    that you were taking?

7        A.   Yes.

8        Q.   Does this -- does Defense Exhibit 48 look like a

9    photograph that you took on that morning?

10       A.   Yes, it does.  It's got my initials on it.

11            MR. CAMIEL:  I would offer Defense Exhibit 48.

12            THE COURT:  Any objection to 48?

13            MS. STEVENS:  No objection.

14            THE COURT:  48 is admitted.

15            (Defense Exhibit No. 48 admitted.)

16   BY MR. CAMIEL:

17       Q.   This is on the -- this is on the road on Anton

18   Larsen Bay Road out in front of the rigger shop; is that

19   right?

20       A.   Yes, it is.

21       Q.   This is a continuation of the tracks that you saw

22   in Defense Exhibit 47?

23            MS. STEVENS:  Objection.  I don't think that

24   was --

25            THE COURT:  Well, that was a question.

1          MS. STEVENS:  Is he referencing an exhibit that

2    wasn't admitted?

3          MR. CAMIEL:  47 was admitted.

4          THE COURT:  47 was not admitted.  That's

5    correct.  Thank you.  That's sustained.

6    BY MR. CAMIEL:

7      Q.  Does this photograph appear to be a -- can we put

8    up 46?  Can we put them side by side for the witness?

9          So in 46, Defense Exhibit 46, those are the

10   tracks you saw that appeared to be leading away from the

11   rigger shop out onto Anton Larsen Bay Road; is that

12   right?

13     A.  No.

14     Q.  Where --

15     A.  Those are just tracks in the grass near the

16   parking lot of the rigger shop.  I don't know what

17   direction those tracks are going.  They have nothing to

18   do with the fast acceleration.

19     Q.  This is different than the fast acceleration

20   track that you saw?

21     A.  That is correct.

22     Q.  And where were those located?

23     A.  There is three driveways going into the rigger

24   shop.  They were on the center driveway.

25     Q.  And when you say the center, so if the first

1    driveway is the driveway that you could also take up to

2    the T-1 building --

3         A.   The COMMSTA building?

4         Q.   Yes.

5         A.   That would be the first driveway.

6         Q.   Okay.  So heading toward the golf course, the

7    tracks you saw were the second driveway?

8         A.   That is correct.  The one single track that I

9    saw.

10        Q.   All right.  Were you ever asked to -- strike

11   that.

12             All right.  If you can take a look at government

13   Exhibit No. 5.

14        A.   Okay.

15        Q.   Can you show us which driveway from this picture

16   you saw the tracks that you have been talking about?

17        A.   Where those orange cones are, it was coming out

18   of there, a single inside track going from there towards

19   town.

20             MR. CAMIEL:  Thank you.

21             THE COURT:  Ms. Stevens?

22             MS. STEVENS:  No redirect.

23             THE COURT:  All right.  This witness can be

24   excused, counsel?

25             MR. CAMIEL:  Yes.

1          THE COURT:  Thank you, sir.  You may be
2    excused.  It's quarter until 12:00.  What's the thought,
3    Mr. Skrocki?
4          MR. SKROCKI:  It would be a good time to stop
5    for the day.
6          THE COURT:  Would it?
7          MR. SKROCKI:  We have covered a lot of ground.
8          THE COURT:  So I think, ladies and gentlemen,
9    in an abundance of caution, I will have you come at
10   9:00 on Monday, because it's a long time between now and
11   then and the lawyers I know are going to come up with
12   perhaps some additional issues that we can take up
13   Monday morning before you arrive.
14         I wanted to remind you to heed my admonition
15   not to communicate with anyone in any way about this
16   case and not to let anyone else communicate with you
17   about the merits of this case or anything to do with it,
18   and that includes discussing the case in person, in
19   writing, by phone or electronic means and via e-mail,
20   text messaging or any internet chat room.
21         And so that is my admonition.  I do wish you
22   all a pleasant weekend.  I remind you also not to do any
23   research about the case.
24         Thank you all for your careful listening and
25   we'll see you all Monday at 9:00.

1          (Jury absent)

2          THE COURT:  All right.  Please be seated,

3    everyone.

4          So Mr. Skrocki, can you give me a heads-up on

5    where we are in terms of where you had hoped to be at

6    this point versus where we are in terms of the

7    witnesses.

8          MR. SKROCKI:  Pretty close on schedule, Judge.

9    Sometimes the directs seem to go a little longer than we

10   think, sometimes cross, but I think we're all trying to

11   make this go as quickly as possible without trying to

12   rush through, so I think we're on schedule.

13         We're moving people around and trying to keep

14   things moving.  I think next week for sure is a full

15   week.  After we get done with that, we'll have to see.

16   Experts are going to start coming on board.

17         THE COURT:  Are there any experts intended for

18   Monday?

19         MS. SHERMAN:  Possibly two.  Those would be --

20   we have a binder of reports we'll get you this

21   afternoon.  Those would be potentially Neil Schmidt and

22   then Steven Becker for Monday.

23         And I did have a question for the Court about

24   experts.  The Court has made determination on

25   qualifications on several, but we have not objected to

some of the defense, they have not objected to some of
our experts, so if we get through the qualifications,
does the Court want us to take a sidebar for the Court
to make that finding, or should we just --

THE COURT:  I want to go back and look at the
Ninth Circuit cases that are cited in the model
instruction on that and I'll give you directions on it
Monday morning.

MS. SHERMAN:  Okay.

THE COURT:  Thank you.  Any other issues from
the government?

MS. SHERMAN:  I have two more.

THE COURT:  Mr. Colbath, you'll get a turn too.

MS. SHERMAN:  We have a stipulation of facts we
plan to enter Monday and then request the Court read
2.4.  Since I haven't done a trial in front of you, I'm
not sure if the Court would like us to read the
stipulation of fact, move it in as an exhibit, if the
Court wants to read it.

THE COURT:  Typically, I've read them and then
the 2.4 with it.  If the parties stipulate to a
different approach, that's fine.  Otherwise, that would
be my intent.

Anything else?

MS. SHERMAN:  One last issue I have is I

anticipate Annette Ecret will testify hopefully Monday.
The Court ordered us to turn over some items regarding
*Henthorn*.  The defense has not made an application.  I
would like to be able to tell her whether they are going
to move to discuss those things, so I'm not sure if that
application could be made now as to why that would be
relevant.  It was incidents from 2016.

THE COURT:  Do you plan to explore those topics
with Ms. Ecret?

MR. COLBATH:  No, Your Honor.

THE COURT:  Very good.

MR. COLBATH:  Your Honor, following a little
bit of Ms. Sherman's discussion, I was going to ask the
Court, I had thought more about the whole expert
situation and I didn't know if the Court had intended to
read or modify, because the Ninth Circuit pattern uses
the terminology "expert witness," I think.

THE COURT:  It might be different in the civil
versus the criminal.

MR. COLBATH:  Anyway, I want to be sure as
experts start that we revisit, and we can do it Monday
morning, that we revisit the language that the Court
wants us to use so I don't inadvertently refer -- I want
to make sure if we're going to use that language, I'll
have it down and we'll square it up in the instructions.

1          THE COURT:  I always hesitate to say things

2     when I'm on record and I don't have the paperwork in

3     front of me, but it may be that the expert instruction

4     of concern cites more to a law review article than Ninth

5     Circuit authority, in which event may well be fine.

6          MS. SHERMAN:  4.14 just references "opinion is

7     allowed because of the education and experience of the

8     witness."  There is no reference to the word "expert" in

9     that.

10          THE COURT:  What does the comment say?  That's

11     what I wanted to look at.  I can do so, and I will.

12          MS. SHERMAN:  There is quite a few comments.

13     It does say, "This instruction avoids labeling the

14     witness as an expert."

15          THE COURT:  So let's all take a look at 4.14

16     and if there are proposed modifications to it.  I do see

17     the Court, as I understand the controlling law, has the

18     responsibility to make a finding that the person can

19     give an opinion.  And I don't see that that -- in any

20     event, that is my intent to do so.

21          And whether or not -- does the government

22     object to the use of the term "expert" or no?  Do you

23     want to ponder?

24          MS. SHERMAN:  We don't object to that.

25          MR. COLBATH:  I would like to think about it a

1    little bit.  I would like to review those comments.

2            THE COURT:  We'll take it up on Monday morning.

3            MR. COLBATH:  Your Honor, if we're going to be

4    getting into -- I didn't anticipate potentially Monday

5    getting into the video experts from the government.  We

6    may have, and I guess I don't know where in the day it

7    will happen for the government, but we may have some

8    additional objections, some matters to take up with the

9    Court prior to the experts starting, the video experts

10   starting.  We have got some objections to the exhibits

11   unless they change, things like that.

12           So when we get to that point, if we're going to

13   launch into that, we're probably going to need a little

14   break to be able to address things.

15           THE COURT:  What are the exhibits that you

16   would intend to admit through Mr. Schmidt and

17   Mr. Becker?  If you don't have those now you can send

18   them to Emily, an e-mail.

19           MS. SHERMAN:  I just need the numbers.  I can

20   send them via e-mail, the numbers.  The Court already

21   has those exhibits.

22           THE COURT:  I would assume I did.  That might

23   help us going forward.

24           MR. COLBATH:  To the extent that I can -- well,

25   if I have anything to file or if I can even send an

1    e-mail to Emily maybe and the government giving a

2    heads-up or just a general outline of what our

3    objections are going to be, assuming -- I don't know

4    quite until it gets there and propose how we're going to

5    object, but I'll certainly send any heads-up over the

6    weekend if I can to alert the Court to what we need to

7    discuss at the appropriate time.

8              THE COURT:  That sounds good.  Anything else

9    from the defense to take up today?

10             MR. COLBATH:  I don't think so, Your Honor.

11             THE COURT:  Nothing else either?  I'll see you

12   Monday at 8:30 and we'll go off record.

13             DEPUTY CLERK:  All rise.  This matter is now in

14   recess until Monday at 8:30 a.m.

15             (Recessed at 11:54 a.m.)

16

17                      CERTIFICATE

18       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
19   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20   original stenographic record in the above-entitled
     matter and that the transcript page format is in
21   conformance with the regulations of the Judicial
     Conference of the United States.
22
         Dated this 6th day of May, 2020.
23

24
                         /s/ Sonja L. Reeves
25                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER