1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA,  )
                               )
4           Plaintiff,         )
                               )
5   vs.                        )   CASE NO. 3:13-cr-00008-SLG
                               )
6   JAMES MICHAEL WELLS,       )
                               )
7           Defendant.         )
    _____)
8

9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 6
                  (Public Proceedings)
10   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                September 16, 2019; 8:33 a.m.
11                    Anchorage, Alaska

12  **FOR THE GOVERNMENT:**
            Office of the United States Attorney
13          BY:  STEVEN SKROCKI
            BY:  CHRISTINA M. SHERMAN
14          BY:  KELLEY L. STEVENS
            222 West 7th Avenue, #9
15          Anchorage, Alaska 99513
            (907) 271-5071
16

    **FOR THE DEFENDANT:**
17          Office of the Federal Public Defender
            BY:  GARY GEORGE COLBATH
18          601 West 5th Avenue, Suite 800
            Anchorage, Alaska 99501
19          (907) 646-3400

20          Camiel & Chaney, P.S.
            BY:  PETER A. CAMIEL
21          520 Pike Street, Suite 2500
            Seattle, Washington 98101
22          (206) 624-1551

23  _____

            **SONJA L. REEVES, RMR-CRR**
24           Federal Official Court Reporter
              222 West 7th Avenue, #4
25             Anchorage, Alaska 99513
        Transcript Produced from the Stenographic Record

I N D E X

September 16, 2019, Trial Day 6

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Timothy Tilley | 11 | 14 | -- | -- |
| Denise Andersen | 16 | 33 | 59 | 64 |
| Vance Newby | 65 | 83 | 93 | 94 |
| Dennis Dupras | 96 | 128 | -- | -- |
| Holly Steeves | 137 | -- | -- | -- |
| Charlene Bell | 148 | 154 | -- | -- |
| Annette Ecret | 155 | 162 | -- | -- |
| Amanda Sanford | 164 | 173 | 175 | -- |
| Sean Bottary | 177 | 189 | 221 | -- |
| Para Upchurch | 224 | 252 | -- | -- |

E X H I B I T   I N D E X

| Exhibit | | Page |
|---|---|---|
| 68 | Back Gate T-1 at 4/12/12 8:26:52-8:28:32 | 78 |
| 69 | Tires from Wells' Truck | 114 |
| 70 | Tires in Back of Wells' White Truck | 115 |
| 71 | Detailed Vehicle Record Wells' Truck | 272 |
| 72 | Tire | 116 |
| 76 | Arrival/Departure Times 4.2-4.12 | 20 |

| 77 | Main Gate Camera Video Wells Going East Towards COMMSTA | 27 |
| 77A | Screen Shot of Wells' Truck Going East Towards COMMSTA | 27 |
| 82 | Main Gate Camera Video Wells Going West Towards Bells Flats | 27 |
| 82A | Screen Shot of Wells' Truck Going West Towards Bells Flats | 27 |
| 83 | Screen Shot of Wells' Truck Going Towards COMMSTA Second Time | 27 |
| 84 | Voicemail from Wells Left on Hopkins' Desk Phone | 186 |
| 85 | Diagram of Bells Flats of where Ecret saw Wells on 4/12/12 | 161 |
| 90 | Aerial Photo of Kodiak Airport | 110 |
| 92 | Aerial Photo of Kodiak Airport Zoomed In | 110 |
| 248 | Interior of Wells' Truck | 188 |
| DE-33 | SW Wells' Residence - Septic Tank | 204 |
| DE-34 | SW Wells' Residence - Septic Tank | 204 |
| DE-155 | Wells' Residence | 219 |
| DE-182A | Vehicle Questionnaire Samples | 55 |
| DE-239 | Other Honda CR-V at Airport Questionnaire, with Redactions | 39 |

```
1              (Call to Order of the Court at 8:33 a.m.)

2              (Jury absent)

3              DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court for the District of

5    Alaska is now in session, the Honorable Sharon L.

6    Gleason presiding.

7              Please be seated.

8              THE COURT:  All right.  Good morning.  We're

9    back on record here in United States versus Wells with

10   the parties present.  And my clerk, Emily, just brought

11   me this motion.  I haven't read it.

12             Mr. Skrocki, were you up at 3:30 or whenever it

13   was filed?

14             MR. SKROCKI:  No, ma'am, I was not.

15             THE COURT:  Have you read it?

16             MR. SKROCKI:  Just once.  We were prepping

17   witnesses this morning ourselves.  We don't expect to

18   get to Mr. Becker for 12 or 13 more witnesses, highly

19   unlikely today.  If you can give us some time to digest

20   this, we would appreciate that.

21             THE COURT:  Any issues to take up from the

22   government perspective?

23             MS. SHERMAN:  Your Honor, we added to your

24   binder Holly Steeves.  She works for the FBI CART team.

25   She will be actually our first expert.  There hasn't
```

1   been motion work on her.  Her report is now in there and

2   we neglected to include that on Friday.  It's short.  I

3   believe it's three pages.

4           THE COURT:  And then the IT people came to me

5   on Friday to talk about you have someone by video today.

6           MS. STEVENS:  Your Honor, most likely we'll get

7   to him tomorrow.

8           THE COURT:  Okay.  What I discussed with them,

9   and make sure everybody is okay with this, is putting

10  the TV essentially right in front of the bench here.  I

11  don't need to see it.  Then the jury and everybody else

12  can see it.  And then having the witness's camera

13  focused on the podium.

14          And then the clerk, when she administers the

15  oath, I'll have her go over to the podium.  That was

16  what seemed to me to make the most sense, but I'm open

17  to other suggestions.

18          MS. STEVENS:  I have no objection to that.

19          MR. CAMIEL:  That sounds fine.

20          THE COURT:  All right.  Very good.  We'll do

21  that in due course, but you think that's tomorrow as

22  well?

23          MS. STEVENS:  Yes, ma'am.

24          THE COURT:  Very good.

25          Mr. Colbath, anything to take up apart from

```
1   your motion?
2           MR. COLBATH:  No, Your Honor.  We anticipated
3   sort of what Mr. Skrocki indicated was that the video
4   stuff was -- it looked to be -- we were still at a full
5   day at least away from it, so we didn't anticipate
6   taking up the motion today or anything, or at least this
7   morning.  Assuming the government will respond, the
8   Court would need to look at it, so we don't have other
9   issues.
10          THE COURT:  No issues with regard to
11  Ms. Steeves' testimony that you -- certainly object
12  along the way, but in terms of --
13          MR. COLBATH:  Not anything of significance.
14  She's unrelated to any of the video stuff is my
15  understanding.
16          THE COURT:  And then the other, the Honda
17  person I have already ruled on.  So that we should be
18  all set on.  Correct?  I mean your objections are
19  certainly preserved, but that -- there is no --
20          MR. COLBATH:  Potentially.  Yeah, I mean I
21  assume -- well, yeah.  I assume we'll have some
22  discussions before we get to the Honda person, but I
23  guess I don't --
24          MR. SKROCKI:  About what?
25          THE COURT:  What would we be discussing?
```

```
 1         MR. COLBATH:  Well, Mr. Schmidt reviewed at
 2    least the 4-19 video and the other videos in formulating
 3    his opinion, and so I didn't know at what point the
 4    Court was going to rule on the issue of conditional
 5    relevance.  I mean if he testifies I have to ask him
 6    about the 4-19 video.
 7         THE COURT:  All right.
 8         MR. COLBATH:  Or at least I may have to ask
 9    him, because I don't know what he's going to say or how
10    he's going to describe things.
11         THE COURT:  Are we going to have testimony on
12    the Honda, the Wells' Honda prior to the Honda person?
13    The Wells' Honda at the airport on April 12th, to be
14    more precise.
15         MR. SKROCKI:  We have had that already through
16    Mr. Ellis.
17         THE COURT:  Oh, that's correct.
18         MR. SKROCKI:  I wasn't going to, for the
19    Court's order and our own discussions, inquire of
20    Mr. Schmidt with respect to the April 19th video.
21         THE COURT:  Then that solves that.
22         MR. SKROCKI:  We have said that all along.
23         THE COURT:  Well, then I guess what you want to
24    do is cross him on the fact that --
25         MR. COLBATH:  It's convenient not to talk to
```

him about what underlies his opinion and just get the opinion out, but it's a little hard to cross examine him on how he got to his opinion if I can't ask him about all the things that were shown to him.

That's a little bit of a setup for me I feel because I don't have any ability, you know, just because they don't go there it doesn't mean it wasn't some percentage of how he formed his opinion. And so I don't know how I even broach the subject or cross him on it, I guess.

THE COURT: Well, I'll leave you to figure that out, but the ruling stands on the video, and if there is an application outside the presence of the jury with regard to the conditional relevance, I'll take that up. Isn't that the way I left the order?

MR. SKROCKI: Yes, ma'am, our understanding.

THE COURT: I suppose either side could make that application as warranted. So that clarifies that, I hope.

And with regard to experts, I did go and read those opinions and look at that. And I think the Court has Juror No. 8 needs to leave by 3:30 on Wednesday. I was just handed a note. This is the house person. Okay.

All right. In any event, I hope we can

accommodate that.  So as I read it, I think the Court

has a lot of discretion on whether or not to use the

word "expert," but I will follow the opinion.  I did

look at the article by the judge.  I don't know if you

saw that that was referenced in the comment to the

pattern.

And I do see that the qualification that is

required for the Court to make before the expert opines

is whether this person has the experience, background or

education such that he or she can give an opinion on a

certain topic.  That is the way we'll do it.

There was an instruction, I think it was in the

article by the judge that is referenced in the comment,

about lay witness opinions as well, so if they talked

about who can give opinions, and there was one paragraph

that focused on -- I'll see if I can find that -- one

paragraph that focused on experts giving an opinion and

another paragraph that talked about a lay witness

opinion that I thought would be helpful to a jury if lay

witnesses were giving opinions.  I'll find that this

morning and get you that.

MR. SKROCKI:  Clarification?

THE COURT:  Questions on that?

MR. SKROCKI:  One for me and maybe for

Ms. Sherman since she has the first expert.  If we do

1    the magic incantation for you and state that, "We submit

2    this witness has the experience, background and

3    education to give an opinion on this topic"?

4         THE COURT:  Correct, and then I'll say, "Yes,

5    the Court so finds."

6         MR. SKROCKI:  Done.

7         THE COURT:  And that covers that.  So we would

8    avoid the word "expert," and that's what the pattern

9    seems to intimate.  And I didn't see any express ruling

10   one way or the other by the circuit, but the pattern

11   instruction, it doesn't use the term "has been approved"

12   by the circuit.

13        MR. SKROCKI:  Excellent.  Thank you, Judge.

14        THE COURT:  Mr. Colbath, questions or

15   clarification on that?

16        MR. COLBATH:  I don't think so.

17        THE COURT:  So nothing else except this topic

18   that we can take up in due course.  Very good.  We'll go

19   off record and when the jury is all here we'll be ready

20   to resume.

21        DEPUTY CLERK:  All rise.  Court stands in a

22   brief recess.

23        (Recessed from 8:41 a.m. to 9:01 a.m.)

24        (Jury present)

25        THE COURT:  Good morning, everyone.  Please be

seated.  And I received the note about Juror No. 8 about

Wednesday at 3:30.  Yes, that should work fine.

          And are we ready for your next witness?

          MS. SHERMAN:  We are, Your Honor.  The

government calls Tim Tilley.

          THE COURT:  All right.  Good morning.  If you

could come all the way forward to the witness stand,

and, when you get up there, remain standing, if you

would, and the clerk will administer an oath to you.

          (Oath administered to the witness)

          DEPUTY CLERK:  For the record, can you please

state your full name and then spell your full name.

          THE WITNESS:  Timothy Tilley, T-i-m-o-t-h-y,

T-i-l-l-e-y.

          TIMOTHY TILLEY, GOVERNMENT WITNESS, SWORN

                    DIRECT EXAMINATION

BY MS. SHERMAN:

    Q.  Mr. Tilley, where do you live?

    A.  I live in Kodiak, Alaska.

    Q.  What do you do in Kodiak?

    A.  I'm an Alaska State Trooper.

    Q.  How long have you been with the troopers?

    A.  Six years.

    Q.  What did you do before being a trooper?

    A.  I was Active duty with the United States Coast

1    Guard.

2        Q.   What did you do for the Coast Guard?

3        A.   In Seward, I was on a boat doing navigation, and

4    then I transferred to Kodiak as a military police

5    officer.

6        Q.   Can you describe for the jury what being a

7    military police officer involved?

8        A.   It's a mix of working in dispatch, answering

9    phone calls, and then working as a patrol officer

10   responding to calls for service, looking for things out

11   of the ordinary, that kind of stuff.

12       Q.   Did you have an opportunity to observe video

13   cameras that were on the main base?

14       A.   I did.

15       Q.   Can you describe, as you're going into the base,

16   where that first camera would be?

17       A.   The camera is -- I can't remember exactly, but

18   it's on the main gate, kind of shows vehicles pulling

19   in.

20       Q.   Do you recall if that camera is motion activated?

21       A.   I can't recall.

22       Q.   How often would you be assigned to monitor that

23   main base gate camera?

24       A.   Typically, lower rank personnel would have to sit

25   anywhere from three to four hours of dispatch, answering

phones, filling out logs, and then we had the camera

monitor up there to the right, just kind of glance at it

as we go along.  Certainly if there is something that --

like a call that came in and we needed to review footage

for a specific area, we would go and kind of look at it

then as well.

Q.  Are the cameras noting the time on the main base

gate camera, is that a correct time?

A.  Typically, no.

Q.  Why would that be?

A.  The Coast Guard Police Department down in the

dispatch center has frequent power surges or brownouts

that alter the time.

Q.  Then how would you know what the actual time

would be on that camera?

A.  You have to look at what the current time was and

then go back, and if you're looking for something

specific, try and look and see -- normal, that's what

happened throughout the day that are on a scheduled

time, such as colors happening in the morning, kind of

go and extrapolate that data.

Q.  That time difference, is that something you would

keep track of when you were on dispatch and kind of

watching that camera?

A.  Well, that's just every dispatcher would have an

idea or keep it in their mind that, yes, the time is
going to be off.  Any time that we reset the time on it,
it would be off within days because of power surges, but
we didn't keep an actual written log of the time being
off or things like that, but just it was a known fact.

Q.  In April 2012, what was the time difference on
that camera?

A.  18 minutes.

Q.  Was that 18 minutes fast or 18 minutes slow?

A.  18 minutes ahead of Alaska standard time.

Q.  How did you know that?

A.  Based on just looking at the time compared to
Alaska standard time and then going back and reviewing
when specific events happened at a regularly scheduled
time.

        MS. SHERMAN:  Those are all my questions.
Thank you.

        THE COURT:  Questions for this witness?

        MR. COLBATH:  Just a couple, Your Honor.

                    CROSS EXAMINATION
BY MR. COLBATH:

Q.  Good morning, Mr. Tilley.

A.  Good morning, sir.

Q.  So you just said that on April 12, 2012, the
clock was, on the main gate camera, was 18 minutes fast?

1      A.   Correct.

2      Q.   And you said you knew that by just looking at the

3  time and extrapolating that?

4      A.   More or less, yes.  It's not an exact science.

5      Q.   So what time were you looking at?  What were you

6  using as the accurate standard to measure against this

7  inaccurate camera?

8      A.   Computers, cell phones, that kind of thing.

9      Q.   Okay.  And did you do any calibration or checking

10  between devices to see if your cell phone matched your

11  computer, matched the clock on the wall, matched

12  whatever you were using?

13     A.   They are more or less the same time.

14     Q.   More or less?

15     A.   More or less.

16     Q.   Okay.  And the 18 minutes is exact, is a rough

17  estimate, it's about 18 minutes?

18     A.   I can't recall if it's exactly 18 minutes or if

19  it's roughly 18 minutes.

20     Q.   Sure.  All right.  Well, I don't have any other

21  questions for you.

22          MS. SHERMAN:  No redirect.

23          THE COURT:  Thank you, sir.  You may be

24  excused.  This witness released?

25          MS. SHERMAN:  Yes.

1       MR. COLBATH:  No problem.

2           (Witness excused)

3       MS. STEVENS:  Your Honor, the government calls

4   Denise Andersen.

5       THE COURT:  All right.  Good morning.  If you

6   could come all the way up to the witness stand, please.

7   When you get up there, remain standing, and the clerk

8   will administer an oath to you.

9           (Oath administered to the witness)

10      DEPUTY CLERK:  For the record, can you please

11  state your full name and then spell your full name.

12      THE WITNESS:  My name is Denise Andersen,

13  D-e-n-i-s-e, A-n-d-e-r-s-e-n.

14      DENISE ANDERSEN, GOVERNMENT WITNESS, SWORN

15                  DIRECT EXAMINATION

16  BY MS. STEVENS:

17  Q.  Good morning, Ms. Andersen.

18  A.  Good morning, ma'am.

19  Q.  Who do you work for?

20  A.  I work for the Coast Guard Investigative Service

21  as a special agent criminal investigator.

22  Q.  And how long have you worked for them?

23  A.  I've worked for them since 2007.

24  Q.  How long have you been with the Coast Guard?

25  A.  27 years.

1    Q.  And where is your current assignment?

2    A.  I am stationed in Chesapeake, Virginia at our

3    Portsmouth office.

4    Q.  Did you guys fare all right with the hurricane

5    there?

6    A.  I did.

7    Q.  What do you do?

8    A.  I am a criminal investigator special agent and

9    also a digital media collector and forensic examiner.

10   Q.  And what kind of training have you received?

11   A.  I attended the criminal investigator training

12   program at FLETC, which is the Federal Law Enforcement

13   Training Center in Glynco, Georgia.

14       And in addition to that, the special agent basic

15   training program through NCIS.

16   Q.  Back in 2012, were you with CGIS then?

17   A.  I was, at our Anchorage office.

18   Q.  And were you involved in an investigation into

19   the murders of James Hopkins and Rich Belisle?

20   A.  I was.

21   Q.  What role did you play?

22   A.  On April 12th, I was contacted in the morning

23   over in Anchorage and told to get ready and get on a

24   C-130 and fly over to Kodiak, which we did.  I conducted

25   interviews, surveillance, search warrants, reviewed

video footage, things of that nature.

Q.   Do you remember what time you arrived in Kodiak?

A.   I think it was by noon, but I'm not positive of that.

Q.   And do you recall why the defendant wasn't at work that morning?

A.   We later learned through the --

MR. COLBATH:  Your Honor, I'm going to object as to foundation.

THE COURT:  That's sustained.

BY MS. STEVENS:

Q.   When you arrived at noon that day, what kind of investigatory tasks did you conduct?

A.   We immediately started interviewing all the employees and personnel on scene to try and find out what the normal daily operations were, what the relationships were like, what the workplace was like.

Q.   What did you learn?

A.   We learned that Mr. Wells was late for work that day and we learned that he had a flat tire and had some issues and had to return home so he showed up after, I think, 8:23.

Q.   Did you come, during the course of your investigation, to learn what time he typically arrived for work?

1    A.  I did.  I did a review of the rigger shop video

2  surveillance for a nine-day period to look at what the

3  normal schedule was like for the employees that showed

4  up.

5    Q.  And did that establish a pattern?

6    A.  It did.  It established that Mr. Wells and

7  Mr. Belisle generally showed up by 7:00, sometimes late,

8  7:01, but they were there anywhere from 6:56 to 7:01

9  each morning, followed by ET1 James Hopkins, who showed

10  up after 7:00.

11    Q.  And do you recall about when you reviewed this

12  video footage to establish this pattern?

13    A.  That was later in 2013.  I think in July of 2013.

14    Q.  All right.  Blair, can you pull up for

15  foundational purposes Government Exhibit No. 76?

16      Ms. Andersen, I'm going to ask you -- or Special

17  Agent Andersen, I'm going to ask you to look at this.

18  Do you see that?

19    A.  I do.

20    Q.  Do you recognize this?

21    A.  I do.

22    Q.  How so?

23    A.  I created it.

24    Q.  What does this exhibit contain?

25    A.  It's a schedule of -- it's a schedule from

1    April 2nd through the 12th of the arrivals and

2    departures of Rich Belisle, James Wells and Jim Hopkins.

3        Q.   And the summarized information in here

4    corresponds to the video that you reviewed; is that

5    correct?

6        A.   That is correct.

7        Q.   And this is an accurate depiction of those times

8    that you observed them arriving and departing?

9        A.   It is.

10           MS. STEVENS:  Your Honor, at this time, the

11   government moves to admit Government Exhibit No. 76.

12           MR. COLBATH:  No objection.

13           THE COURT:  76 is admitted.

14           (Exhibit No. 76 admitted.)

15   BY MS. STEVENS:

16       Q.   And Special Agent Andersen, there should be a

17   pointer up there, a laser pointer.  Yep.

18       A.   If I can get it open.  Okay.

19       Q.   So for the two weeks leading up to the murders,

20   who typically arrived first and where is that documented

21   in this summary chart?

22       A.   So it was either Rich Belisle or James Wells who

23   showed up first.  Their schedule was generally 7:00 a.m.

24   until 3:00.  So this column right here is Rich Belisle's

25   arrivals, anywhere from 6:56 up there, 6:58, 7:00 and

1    one late day.  I think that's his, 7:10.

2         And then James Wells was out these three days,

3    but generally he showed up 6:58, 7:00, 6:59, 6:56, 7:00,

4    And then the one late date on April 12th at 8:23.

5        Q.  How about Mr. Hopkins?

6        A.  Mr. Hopkins we learned his normal workday I

7    believe was 8:00, but he was supervisor in the shop so

8    he would show up earlier.  We have 7:12, 7:14, 7:29,

9    7:10, 7:05, 7:15, 7:12.  7:46 was a late day.  And then

10   7:08 on the day of the incident.

11       Q.  Do you recall why on -- how he arrived to work on

12   April 11th at that 7:46 timeframe?

13       A.  I'm not sure if it was through this two weeks,

14   but he may have been dropped off by his wife on that

15   day.

16       Q.  Did you come to learn whether or not the Hopkins

17   family owned one or two vehicles, or one or more

18   vehicles?

19       A.  They had one vehicle at the time.

20       Q.  And you indicated you conducted interviews

21   throughout the course of this investigation; is that

22   correct?

23       A.  Yes, ma'am.

24       Q.  And who did you and your colleagues interview

25   first, what group?

1    A.   Generally, all the people that were on scene.  We

2    interviewed everybody that worked in the building,

3    people that were initially on scene, the supervisors of

4    the shop of COMMSTA, Coast Guard personnel and

5    civilians.

6    Q.   Why would you start there?

7    A.   It's to get a normal routine for the workplace,

8    find out what times people show up to work, what times

9    they leave, what the workplace climate was like,

10   behaviors, if there are any behavioral issues with

11   anybody, and basically what the relationships were like

12   between everyone.

13   Q.   Did you rule out most of the folks from the

14   COMMSTA as suspects?

15   A.   We did.

16        MR. COLBATH:  Your Honor, I'm going to object

17   as to foundation.

18        THE COURT:  As to foundation?  I'll overrule

19   that.  I'll allow that question.

20   BY MS. STEVENS:

21   Q.   Did you rule out all of those individuals as

22   suspects?

23   A.   We did.

24   Q.   Did your colleagues only focus -- did you and

25   your colleagues only focus on Mr. Wells?

1    A.   No.   We looked -- we had the blue vehicle on the

2    video, what we thought was blue.   I would say we

3    interviewed half of Kodiak during this investigation.

4    Q.   Can you walk us through how you did that?

5    A.   There was video footage of a vehicle driving up

6    behind the rigger shop and it had the appearance of a

7    Honda CR-V, blue, but in order to rule that out, we had

8    to look at all vehicles of the same size, shape and

9    color of the vehicle that was on the video.

10         So DMV provided a list of all owners, registered

11   owners in Kodiak of vehicles that could be the same

12   size, shape and color, which it included, I think, Ford

13   Escapes, CR-Vs, RAV4s, gray, green, dark green, blue,

14   and I think maybe another color, but basically we went

15   around Kodiak and accounted for all those vehicles,

16   interviewed all the individuals who were registered

17   owners to find out where they were, what they were

18   doing.   And then many of them were no longer on the

19   island, so --

20   Q.   After you conducted this piece of the

21   investigation, what, if anything, did you learn?

22   A.   We didn't find anybody else that was in the area

23   other than the potential blue CR-V that belonged to

24   Nancy Wells.

25   Q.   Did you conduct any other review of cameras in

1  this case?

2     A.  I conducted a review of the main gate camera of

3  Base Support Unit Kodiak.  During that first day of the

4  investigation, as we learned everybody's schedule, and

5  we had learned that Mr. Wells had driven to the airport

6  and then back home and then back to work, I went to Base

7  Support and looked at the video footage of their main

8  gate in hopes that it would capture a vehicle driving

9  by.

10    Q.  Did it capture Mr. Wells' vehicle driving by?

11    A.  It did.  It captured him driving, I don't know if

12 it's north or south, but towards the airport from his

13 residence, back towards his residence, and then again

14 back towards work or the airport.

15    Q.  And how did you know what kind of vehicle he

16 drove?

17    A.  We knew by that time.  We knew he drove a Dodge

18 2002, I believe, 2500, and it was distinctive because it

19 had a cab topper on it with angled windows on the back.

20    Q.  Did you see this car actually in person?

21    A.  I did.

22    Q.  And where did you see it in person?

23    A.  I saw it at COMMSTA, in video footage.

24    Q.  And can you describe briefly for the jury the

25 front base camera, where it's located?

1     A.  The front base camera is attached to the main

2   gate, and there is a T basically on the highway.  You

3   can drive past the highway, and the gate is facing the

4   highway.  So when members assigned to the unit pull in,

5   the camera will activate generally, and it just captures

6   the vehicles driving on to the base.

7     Q.  So it's motion sensored?

8     A.  It's motion sensored, that's where there were

9   concerns that it may or may not get the cars driving by.

10    Q.  Do you recall where the system for that camera is

11  maintained?

12    A.  It's in the Coast Guard Police Department, which

13  is the first building as you're driving in on the right.

14    Q.  Blair, for foundation, let's pull up 77.

15        So it's quick, so you were just pouring your

16  water.  I'll have Blair play that again for you.

17        Do you recognize that?

18    A.  I do.

19    Q.  Is that an accurate representation of the video

20  you saw that day when you were reviewing it?

21    A.  It is.

22    Q.  And let's pull up 77A.  Do you recognize that?

23    A.  Yes, ma'am, that's the capture, photograph I took

24  of the still image of the vehicle.

25    Q.  Is it an accurate representation?

1      A.   It is.

2      Q.   Blair, 82 for foundation.

3           And do you recognize that?

4      A.   I do.

5      Q.   How do you recognize it?

6      A.   It is the same vehicle going the opposite

7  direction.

8      Q.   And is that an accurate representation of the

9  video you observed that day?

10     A.   It is.

11     Q.   82A, Blair.

12          Do you recognize that?

13     A.   Yes, ma'am.

14     Q.   How do you recognize it?

15     A.   That's the image I captured of that video.

16     Q.   The previous one that we just saw?

17     A.   Yes, ma'am.

18     Q.   Is it an accurate representation?

19     A.   It is.

20     Q.   And lastly, Blair, please pull up 83.

21          And do you recognize that?

22     A.   I do.

23     Q.   What is that?

24     A.   That is another image I captured of the vehicle

25  traveling the opposite way back towards the airport.

1    Q.  Is it an accurate representation of what you saw

2  that day?

3    A.  It is.

4        MS. STEVENS:  Your Honor, we move at this point

5  to introduce 77, 77A, 82, 82A and 83.

6        THE COURT:  Any objection?

7        MR. COLBATH:  No.

8        THE COURT:  All right.  Those will all be

9  admitted.

10       (Exhibit Nos. 77, 77A, 82, 82A and 83

11  admitted.)

12  BY MS. STEVENS:

13   Q.  Let's start first with 77.

14       Describe to the jury what that video showed?

15   A.  That is the white Dodge, I believe 2500, 2002

16  with a cab topper driving towards the airport.

17   Q.  And let's pull up 77A.

18       And with your laser pointer, to the best that you

19  can -- let me rephrase that.

20       Did you come to learn of a time discrepancy

21  related to the video footage?

22   A.  We did.

23   Q.  Can you explain what that was to the jury?

24   A.  So right here is the time that's displayed, so

25  initially when I took this photograph I thought he was

passing the camera, and it says 7:06. We later learned that there was a discrepancy in the camera time, so once we determined that, it was I think 17 minutes and 47 seconds faster than what the actual time was.

Then we had to do the math to try and figure out what actual time it was when he passed the camera. And then up here -- well, up here is the time that the photo was actually taken.

Q. That's a little hard to see. Blair, can you zoom in on that for Special Agent Andersen? Let's take that down.

Okay. And so did you eventually do the math to figure out what time he first passed the gate?

A. I believe many of us did. We did the math, and it turned out to be roughly 6:48 -- 7:07, 6:48.

Q. And let's pull up 78, please, Blair. I'm sorry, 82.

And did you recognize that?

A. I did.

Q. Explain to the jury what that was?

A. That is the same vehicle, 2002 white Dodge 2500 driving the opposite way towards Bells Flats or --

Q. And let's pull up 82A, please.

What is that?

A. So this is the still image captured off of that

1  video, and again down here says, I think, 7:40, which

2  after doing the math we figured was 7:22.

3      Q.  And then 83, please.

4          And explain what this is to the jury.

5      A.  This is a still capture of the video of the

6  vehicle traveling back towards the airport or COMMSTA,

7  and on the time here, I believe it says 8:34, which once

8  we did the math, I believe was 8:16 was the actual time.

9      Q.  Did you also participate to some extent in a

10  search of the Wells' residence?

11     A.  I did.

12     Q.  Do you recall what date that was?

13     A.  April 14th.

14     Q.  And what was your role?

15     A.  Initially, myself and Special Agent Helena Chavez

16  escorted Ms. Nancy Wells into her residence to collect

17  some items so that she could get some clothes and

18  medications while we searched the residence.

19     Q.  Who were those clothes and medications for?

20     A.  For Mr. Wells and I believe herself.

21     Q.  Can you just walk the jury through that.

22     A.  So Ms. Nancy Wells walked us into the house, and

23  she initially walked to the kitchen counter where she

24  picked up approximately three pill bottles.  And then

25  she walked to the refrigerator and grabbed some -- what

```
 1   I believed was insulin out of the refrigerator, and all
 2   the while saying that she believed --
 3           MR. COLBATH:  Your Honor, I'm going to object
 4   to hearsay statements.
 5           THE COURT:  Would you agree?
 6           MS. STEVENS:  Yes.
 7           THE COURT:  That's sustained.
 8   BY MS. STEVENS:
 9     Q.  So after going into the refrigerator and getting
10   the insulin, what did you guys do next?
11     A.  She walked towards the laundry room and said that
12   she had to get some --
13           MR. COLBATH:  Your Honor, again, I'm going to
14   object to hearsay.
15           THE COURT:  Okay.  I will --
16   BY MS. STEVENS:
17     Q.  So without saying what she said, just what you
18   observed, after entering the laundry room, what did you
19   observe?
20     A.  She opened the dryer to get some clothes out of
21   it.  She seemed to take a double-take into the dryer
22   expecting to see clothes in there.
23           MR. COLBATH:  Your Honor, I'm going to object
24   as to what Mrs. Wells might have been expecting or not
25   expecting.  This witness has no way to know what's in
```

1    her mind.

2              MS. STEVENS:  This goes towards the observation

3    of Mrs. Wells' reaction when she opened the dryer.

4              THE COURT:  She can describe the reaction, but

5    not what she believes the person was thinking.

6    BY MS. STEVENS:

7        Q.  Do you understand that?

8        A.  Yes, ma'am.  She opened the dryer, took a

9    double-take.  I visualized towels in the dryer.  She

10   looked in the dryer, looked around the laundry room, and

11   then pulled a shirt off of a hanger that was Mr. Wells'

12   shirt, and then she proceeded upstairs.  She said that

13   -- I'm sorry.

14             THE COURT:  That's all right.  We have these

15   evidence rules.  It's all good.  Go ahead.

16       A.  She proceeded to show us where the weapons were

17   in the house.  She went to one bedroom from the stairs,

18   opened the closet, pointed to I think a silver case up

19   there, and then she pointed us to another bedroom where

20   there was a gun safe, which I checked out, and there was

21   a gun safe in the room.

22             And then she continued on to her master bedroom

23   where she collected some Carhartt pants, I believe they

24   were Carhartt pants, from Mr. Wells' dresser, and went

25   into the bathroom and collected more medication and then

stored it all in a white Glad trash bag and then exited

the residence.

Q.   While escorting Mrs. Wells throughout the

residence and throughout the bedrooms, did you observe

anything -- did you observe any bags of clothing

anywhere on the floor?

A.   I did not.

Q.   And while in the master bedroom, did it smell any

particular way?

A.   No.

Q.   Okay.  And going back briefly to the laundry

room, you mentioned you visualized towels in there.  Can

you just explain what you meant by visualize?  Like you

saw towels in there?

A.   I did see towels in the dryer.

Q.   How many do you remember seeing?

A.   There may have been three.

Q.   What kind of towels were they?

A.   They were like body towels, not the big sheet

body towels but just --

Q.   Bath towels?

A.   Bath towels.

        MS. STEVENS:  I have no more questions, Your

Honor.

        THE COURT:  Mr. Colbath?

```
 1                    CROSS EXAMINATION
 2   BY MR. COLBATH:
 3       Q.   Ms. Andersen, you indicated that as part of your
 4   investigative work you focused on the arrival times of
 5   the -- of Mr. Wells, Mr. Belisle and Mr. Hopkins during
 6   the time surrounding the murders?
 7       A.   Yes, sir.
 8       Q.   So I'm going to have -- we're going to look at
 9   Exhibit No. 76.  I think you said that was the exhibit
10   that you prepared.  I just had a few questions about
11   that.
12            First of all, I note that Mr. Wells, the week
13   prior to the murders, Mr. Wells was gone on April 2nd,
14   3rd and 4th from work, correct?
15       A.   Yes, sir.
16       Q.   And you learned as part of your investigation
17   that he was in Anchorage, he wasn't even on Kodiak
18   Island those three days, he was in Anchorage for medical
19   appointments?
20       A.   Yes, sir, off from work.
21       Q.   Right.  And then the day he got back, the 5th,
22   Mr. Belisle came in at 7:10, Mr. Wells was there a few
23   minutes before 7:00, and Mr. Hopkins came in at 7:10?
24       A.   Correct.
25       Q.   The next day, Mr. Belisle and Mr. Wells walked in
```

1   together looks like, just four seconds apart?

2       A.   Yes, sir.

3       Q.   And earlier in that week, Mr. Hopkins, he arrived

4   at almost 7:30 there, 7:29 and 40 seconds?

5       A.   On the 4th?

6       Q.   Correct.

7       A.   Yes, sir.

8       Q.   And so just within that week, he was anywhere

9   from an earliest, Mr. Hopkins that is, the earliest of

10  7:05, to the latest of the 7:29 and 40 seconds?

11      A.   Yes, sir.

12      Q.   All right.  That next week, it looked like both

13  Mr. Hopkins and Mr. Belisle ran pretty consistent, they

14  were both there just within minutes of 7:00, but again

15  Mr. Hopkins was 7:15, all the way ranging down to

16  7:46 on the 11th?

17      A.   Correct.

18      Q.   All right.  You can take that down.

19           I wanted to ask you about some of the

20  investigation that was done and many of the interviews.

21  Almost within -- well, less than 48 hours after the

22  investigative team began doing interviews surrounding

23  the murders, a questionnaire was developed -- well, a

24  number of questionnaires were developed for law

25  enforcement's use in talking with witnesses, weren't

1   they?

2       A.   I do recall certain questions that had to be

3   asked of everyone, yes.  I don't remember what those

4   questions were.

5       Q.   Okay.  So you don't remember that every one of

6   the questionnaires developed -- had questions regarding

7   Mr. Wells?

8       A.   I would have to see it.  I don't recall what was

9   on the form.

10      Q.   Okay.  Well, there were a number of forms,

11  weren't there?  There were questions for Coast Guard

12  witnesses, there were questions for car owners, there

13  were separate questionnaires for lay witnesses?

14      A.   You do ask people different questions based on

15  their knowledge of the circumstances.

16      Q.   Right.  And depending on -- regardless of which

17  class they fell in, everybody was asked about Mr. Wells,

18  weren't they?

19      A.   I would not say directly about Mr. Wells, but

20  about the relationships among the crew.

21      Q.   Okay.  Well, even civilians that didn't have

22  anything to do with the rigger shop, they were asked if

23  they knew Jim Wells, if they knew Nancy Wells, if they

24  knew their cars, things like that?  You recall that

25  surely from all the interviews you did?

1    A.  I'm sure that was one of the questions.  I don't

2   remember specifically asking it, but it would make sense

3   that that would be a question.

4    Q.  Well, tell me all of the questionnaires that were

5   developed in your case, and certainly in the dozens of

6   interviews you did, where citizens were asked about, by

7   name, any other suspect in the case?

8    A.  I know that we ruled out other suspects.

9   Everyone that, you know, potentially owned a vehicle of

10   the same shape, size and tonality of the vehicle seen on

11   the video surveillance footage, we interviewed every one

12   of those.  We did rule out an individual that was known

13   in Kodiak to be an undesirable.

14    Q.  Ma'am, let me ask you my question again.

15    Tell me about interviews you did with non-rigger

16   shop employees where you asked civilians, other law

17   enforcement -- well, not law enforcement, but other

18   Coast Guard folks, folks away from the rigger shop about

19   specific suspects, other than Mr. Wells?

20    A.  You're going to have to show me a list of the

21   questions so I can answer the question.  I don't recall

22   six or seven years ago on the exact questions I asked

23   everyone.

24    Q.  Sure.  Well, I will tell you that I was unable to

25   find any, and I don't recall seeing any --

1          MS. STEVENS:  Your Honor, objection.

2          THE COURT:  That's sustained.

3          MS. STEVENS:  Can we have a sidebar, please?

4          THE COURT:  Let's just hear the next -- I will

5    remind everybody that whatever a lawyer says is not

6    evidence.

7          Go ahead, please, Mr. Colbath.

8          MR. COLBATH:  Thank you, Your Honor.

9    BY MR. COLBATH:

10   Q.  Because that was my question, ma'am.  I was

11   wondering if you were aware of any or if you could find

12   any, but you're telling me without me showing you

13   something, you're unable to recall one today?

14   A.  You're going to have to repeat the question,

15   please.

16   Q.  Let's just look at some different things.  How

17   about we pull up -- we'll just use one example.  Let's

18   pull up DE-239 just for foundation.

19          Now, Ms. Andersen, you indicated that one of the

20   things you did or the team did was interview folks that

21   had similar looking cars to the blue car that you saw in

22   the surveillance video, right?

23   A.  Yes, sir.

24   Q.  Okay.  And does this exhibit, Defense Exhibit

25   239, first of all, is that something that you would be

1  familiar with?

2      A.  That is my handwriting, yes, sir.

3      Q.  The form in general, before we get to the details

4  of this particular form, just the form itself, you are

5  familiar with that?

6      A.  I do notice the form, yes, sir.

7      Q.  And this would have been something you prepared

8  in the normal course of the investigation in

9  investigating vehicles as you've just described?

10     A.  This is a form that was provided based on the

11  list of the vehicles that we had to go out and interview

12  everybody, so this is pertaining to one specific

13  vehicle.

14     Q.  Okay.  Yeah.  And sure.  There was dozens of

15  these done, correct?

16     A.  I think about 350 or 351.

17     Q.  So we're not going to go through 351.  I'm just

18  using one as an example here.

19         MR. COLBATH:  I will move, Your Honor, 239,

20  Defense 239.

21         MS. STEVENS:  We do have some concerns because

22  there is PII contained in this exhibit.  If the defense

23  can redact out the PII, we would have no objection.

24         MR. COLBATH:  Your Honor, I would be happy to

25  submit a redacted copy for the record when we ultimately

1  put the exhibits into the record.

2          THE COURT:  All right.  Please do so.  And then

3  with that, no objection to its admission?

4          MS. STEVENS:  Correct.

5          THE COURT:  DE-239 is admitted.

6          (Exhibit No. DE-239 admitted.)

7  BY MR. COLBATH:

8     Q.  Let's just look at this.  And so first of all,

9  Ms. Andersen, this is an exhibit of what -- or excuse

10  me.

11          This is an investigation done related to what

12  type of vehicle?

13     A.  Honda CR-V, green.

14     Q.  Shown up here in the top left-hand corner?

15     A.  Correct.

16     Q.  You were able to determine the owner through, I

17  think you said you had a DMV printout or information

18  from the DMV?

19     A.  I believe it was from the DMV, yes.

20     Q.  You physically went out and you talked to the

21  owner of this car and went through, ran through the

22  questions regarding the location and whereabouts of the

23  vehicle generally, right?

24     A.  Yes, sir.  We either -- I see up here -- either

25  called them on the phone or went to a residence, yes,

1   sir.

2     Q.  Here, in conducting your investigation of this

3   car --

4         First of all, do you know when you might have

5   done this?

6     A.  I think up top it says December 11th.

7     Q.  Okay.  And ultimately, it looks like you talked

8   to somebody, because --

9     A.  It has, "Called at 1120, December 11th, no

10  answer."

11    Q.  Right.  So let's -- I think that will make more

12  sense if we look at this.  Can you pull that first

13  question up there?

14        So the first thing you asked people was where

15  were you at between 7:00 and 8:00 on the morning of

16  April 12, 2012 where the homicides took place, right?

17    A.  Correct.

18    Q.  And here you were told -- you must have been

19  talking to the gentleman of the -- there is a gentleman

20  and a lady listed as the owners of this vehicle.

21        You must have talked to the gentleman because he

22  says his wife works at UAA.  That's the university

23  campus there in Kodiak.  She's the one that drives the

24  car, but on the day you interviewed him, she was not

25  present there in the house to explain where she and the

1   car was, she was in the state of Iowa, right?

2       A.  Correct.

3       Q.  So you can take that down.  And then he confirmed

4   that in the next question -- it says, "Were you in

5   possession of the vehicle," and he said, well, his wife

6   was --

7       A.  Yes.

8       Q.  -- at the time.  Now, that's on April 12th,

9   right?

10      A.  Yes.

11      Q.  Okay.  Just clear this so I get my marks off

12  there.

13          If we flip to the second page, go to -- just

14  highlight those top three questions.  And in one

15  question, it's asked if you know the family members of

16  Richard Belisle or James Hopkins.

17          And then the following two questions are about

18  Mr. Wells and his family.  You asked all of these people

19  who owned cars about those three folks, correct?

20      A.  Correct.

21      Q.  Now, there is no questions, back to the earlier

22  question I asked you, there is no questions on the

23  questionnaire and there wasn't on any of the 350 of them

24  that asked by name about any other individual --

25              MS. STEVENS:  Objection, Your Honor; hearsay.

1      Q.   -- person, was there?

2           MS. STEVENS:  Form of the question.

3           THE COURT:  The question was:  There is no

4    questions on any of the questionnaires that asked about

5    by name any other individual?  What's the objection

6    there, Ms. Stevens?

7           MS. STEVENS:  So he's referencing all 350, and

8    right now we're just looking at this one, so the

9    question is incorporating something that there is no

10   foundation that's been laid for it.

11          THE COURT:  Why don't you lay a foundation with

12   regard --

13   BY MR. COLBATH:

14     Q.   You used the same questionnaire -- when you used

15   the questionnaire, you used the same questionnaire for

16   all the interviews, correct?

17     A.   I did about I think 50 of them, so I used the

18   same questionnaire.

19     Q.   And for the other ones that were done, you're not

20   aware of any of your other fellow law enforcement

21   officers developing their own questionnaire or using

22   something different, are you?

23     A.   I don't know that.

24     Q.   Of the questionnaires that you personally used or

25   the other ones that you may have seen or been involved

1  with, none of them that you saw asked questions about

2  anybody else by name other than Mr. Belisle, Mr. Hopkins

3  or Mr. Wells, did they?

4      A.  Can you repeat that?

5      Q.  Sure.  I'll just have it read back.

6          (Requested portion of transcript was read back

7  by the realtime reporter.)

8      A.  Of the ones I did, using this form, they didn't

9  ask any other questions but what's on this form.

10     Q.  Let's back up to the first page of this.  Now,

11 the point was, in locating and determining information

12 about these vehicles, was to see if they might have been

13 able to be involved in the homicides, correct?

14     A.  Correct, to rule them out as the vehicle going up

15 Anton Larsen.

16     Q.  Well, there was no information that the vehicle

17 that went up Anton Larsen ever stopped at T-2 that you

18 saw on any video, was there?

19     A.  On the video we saw it drive up and back behind

20 to the rigger shop, not directly behind, but it passed

21 the video footage where it was continuing past the

22 rigger shop.

23     Q.  Right.  And so you couldn't even be sure that it

24 stopped at the rigger shop or had anything to do with

25 the murders, right?

1    A.  Correct, we only know what we saw on the video.

2    Q.  So back to the investigation of the vehicles,

3 were you investigating vehicles that could have been

4 that particular vehicle, or investigating vehicles that

5 might have been related to the murder in some way?

6    A.  I would say both.  You're investigating people

7 that go up that road who may or may not have been

8 involved in the homicide.

9    Q.  You had some information about the Wells' CR-V,

10 correct?

11    A.  Correct.

12    Q.  And its location on April 12th?

13    A.  We did, yes.

14    Q.  And what you knew about it was that it was parked

15 at the Kodiak airport?

16    A.  We did learn that, yes.

17    Q.  And that was relevant in your investigative

18 theory that it might be -- it might have been able to be

19 involved in the homicide because of its location?

20    A.  Yes, that was a belief.

21    Q.  So highlight the top left corner of this.

22    So this is a CR-V, a Honda CR-V.  Do you see the

23 license plate number there?

24    A.  Yes.

25    Q.  And that's FMP 321, correct?

1    A.  Correct.

2    Q.  So you can take that down.  Now, this individual,

3    when you talked to this person, he said his wife had the

4    car and he wasn't sure of its whereabouts.  And then it

5    does not appear to me from any information on the form

6    that you followed up to determine where she was

7    ultimately?

8    A.  I would have to look at later forms, but not on

9    this form, no.

10   Q.  Let's look at -- well, flip to the second page

11   for me.  So the last part there is, "The car was not

12   there because a friend was borrowing it," so you

13   couldn't take pictures of the car, right?

14   A.  Correct.

15   Q.  And December 11th there we saw that -- you read

16   your notation from the day before, you made a phone call

17   on December 11th but got no answer?

18       You might want to show her that on the first

19   page.  It's the top right-hand.  You tried to make a

20   call and follow up on December 11th and you got no

21   answer?

22   A.  Correct.  And then above that it says, "Tonight

23   or tomorrow call."

24   Q.  And you don't have any other notes about

25   following up on that?

1      A.   Not on this form, no.

2      Q.   Okay.  So let's look at -- let's look at Defense

3   -- let's look at Defense Exhibit No. 250.  It's been

4   admitted, I believe, 250, Defense Exhibit No. 250?

5           THE COURT:  That's correct.

6      Q.   Ma'am, I'm going to show you this.  This is a

7   photo that last week a law enforcement officer,

8   Mr. Ellis, testified that he took on April 12, 2012, the

9   day of the murders, at the Kodiak airport.

10          And could you just highlight that, blow that up

11   for us?  Can you get it any bigger?

12          Can you read the license plate there?

13     A.   I can't really.  It's blurry.  It looks like 321

14   is the last three.

15     Q.   Would you agree with me that it's -- that it

16   could be FMP 321?

17     A.   Maybe, yes.  Oh, I can look at it better up

18   there.

19     Q.   It's bigger up there on the huge screen.  Can you

20   put that side by side with the 239 that we just looked

21   at.  It doesn't need to be blown up.

22          So that's the same car.  You see the license

23   plate there on the right-hand side of the -- would you

24   agree with me that that's the same car?

25     A.   Yes, sir.

1    Q.  So law enforcement knew on April 12th that that

2  Honda CR-V was at the airport on the day of the murders,

3  and months later there was an interview of the owners

4  asking where their car was.

5       Did you know when you went out there that the car

6  was at the airport?

7    A.  He did not tell me it was at the airport, no.  He

8  told me his wife was in Iowa.

9    Q.  No, my question was:  Did you know before you

10 went and interviewed these folks, I mean, that the car

11 you were investigating was one of the seven or eight

12 cars that law enforcement took pictures of on the day of

13 the murders at the airport that potentially could have

14 been involved?

15   A.  No, I did not.

16   Q.  That was part of the investigation that was not

17 shared with you prior to your interviews?

18   A.  I did not know that car was parked at the

19 airport.

20   Q.  What did you do then to rule out the involvement

21 of this particular CR-V in the homicides after your

22 interview here?

23   A.  I didn't do anything.  I didn't know it was at

24 the airport, so I didn't check to see if it was moved

25 during the time or if it remained in the spot, but if

1  the owner is telling me his wife is in Iowa and the car

2  is parked at the airport --

3      Q.  Well, what he was telling you in the

4  questionnaire, ma'am, was his wife was in Iowa at the

5  time of the questionnaire, so she couldn't answer your

6  questions.

7      A.  Yes, sir.

8      Q.  And this was I thought you said months and months

9  later.  The questionnaire was --

10     A.  April 12th until December 11th.

11     Q.  Okay.  You can take those down.  Thank you.

12         There were a number of folks you looked for,

13 other folks to interview in your car quest to try to

14 rule things out that you were unable to talk to, right?

15     A.  Correct, there were some that we could not

16 contact.

17     Q.  So those left -- those were just left sort of

18 indeterminate or undetermined because of lack of

19 contact?

20     A.  We were either unable to contact them or they

21 moved off the island or their car was no longer here.

22         MR. COLBATH:  If I could just have a second,

23 Your Honor.

24         (Pause)

25 BY MR. COLBATH:

1    Q.  Can you show her 182, defense Exhibit No. 182 for

2    foundation?

3         MR. COLBATH:  Your Honor, could I approach?

4    This exhibit contains a number of pages.  Rather than go

5    one by one on the computer, can I hand her a copy so she

6    could look to see if she's familiar with it.

7         THE COURT:  That's fine, yes.  This is Defense

8    Exhibit No. 182?

9         MR. COLBATH:  Correct.

10        (Mr. Colbath approaches witness.)

11   BY MR. COLBATH:

12   Q.  Ms. Andersen, we're looking at it on the computer

13   screen.  You can just thumb through the pages of that

14   and ask -- I'll ask if you would be familiar with those

15   as part of the --

16   A.  Yes.

17   Q.  And do you believe that those are additional,

18   some of the additional questionnaires similar to what

19   you and I just talked about, the one that we talked

20   about consistent with the interviews that law

21   enforcement was doing with folks at the -- on the island

22   related to vehicles you all were interested in

23   investigating?

24   A.  Yes.

25        MR. COLBATH:  Okay.  Your Honor, I'm going to

1    move 182.

2            MS. STEVENS:  So Your Honor, I'm sorry, I just

3    don't know if these are from her or who they are from,

4    so at this point we would object, because I'm not sure

5    it's a document -- a document that she created.  Like

6    this one says different agent's name.

7            THE COURT:  All right.  So that's sustained

8    based on the foundation that you have laid.

9            MS. STEVENS:  Again, a lot of this also has

10   PII.

11           THE COURT:  That's fine.  We can address that

12   in due course.

13   BY MR. COLBATH:

14      Q.  Can you -- are any of those questionnaires that

15   you completed, Ms. Andersen?

16           MR. SKROCKI:  Can you slow down for us, please?

17      A.  I see two in here that I did.

18      Q.  Can you separate those for me?

19           MR. COLBATH:  May I approach, Your Honor, to

20   get those from her?

21           THE COURT:  That's fine.

22           (Mr. Colbath approaches witness.)

23      A.  These are the two I did.

24      Q.  I don't want to get them mixed up.

25           MR. COLBATH:  Those are the two that she said she

did.  Your Honor, what I'm going to do is I certainly
don't want to ask her about what she didn't fill out, so
I'm just going to mark the two questionnaires that she
did as Defense Exhibit No. 182A, and I'll just move the
admission of that limited portion of it without the
balance.

THE COURT:  Any objection to that?

MS. STEVENS:  I'm sorry, Your Honor.  I just
need a second to go over these.

THE COURT:  Take a moment.  That's fine.

MS. STEVENS:  It's a little confusing.

(Pause)

MS. STEVENS:  Your Honor, we don't have any
objection to these two from --

THE COURT:  If you could read the numbers in
the lower right into the record, the page, so we know
which pages of this exhibit.

MS. STEVENS:  Page 19 and 20, I believe.  Is
that right?  Because I don't think we have the exhibit.

THE COURT:  I am sensing it's time for a
morning break and let these lawyers sort that out.

MR. COLBATH:  That's what you get when you let
me run the paperwork.

THE COURT:  That's fine.  Let's take a short
break.  Please leave your notepads here.  Remember my

1   admonition not to discuss the case.  Let's take about

2   15 minutes here and we'll go off record.

3           (Jury absent)

4           (Recessed from 10:01 a.m. to 10:16 a.m.)

5           (Jury absent)

6           THE COURT:  Please be seated.  So what's the

7   update?

8           MS. STEVENS:  Okay.  So let me see if I have it

9   right here.  Defense Exhibit No. 239 -- sorry, 182A,

10  which is Bates 4406, is that right, Gary?

11          MR. COLBATH:  It's four pages, and the Bates on

12  the four pages first to last are 44406, 44407.

13          MS. STEVENS:  For 44406 --

14          THE COURT:  I thought there were four pages.

15          MR. COLBATH:  There are.  And 44557 and 44558.

16          MS. STEVENS:  For 4406 and 4407, which

17  references a Ford Escape, we have no objection but for

18  the improper character evidence that it alludes to on

19  the second page we would request that that be redacted.

20  Otherwise, we have no objection.

21          It says, "Do you know James Wells?"  "Yes.

22  He's Santa for the kids."  We would object to that.

23          On the second one, which is Bates 44557 and

24  44558, we have no objection.

25          THE COURT:  All right.

1        MR. COLBATH:  Your Honor, I will redact the

2   personal -- like with the other one, I'll certainly --

3   the copy that we submit, we'll redact the address and

4   mailing address and residence address.

5        THE COURT:  The "Santa for kids," do you agree

6   to redact that before it's presented to the jury?

7        MR. COLBATH:  Well, I guess I don't know that

8   that's character evidence.  It's an observation if this

9   person saw him as Santa, but if the Court will receive

10  it unredacted, that's how I have offered it.  If it only

11  will be received through redaction, then when I redact

12  the other information out, I can certainly redact that.

13  I'm not going to ask her about that.

14       MS. STEVENS:  So it's irrelevant, and even if

15  he doesn't ask her about it, it's evidence that they can

16  take back.  So it's character evidence that he's Santa

17  for the kids.  It implies that he's this good guy.  If

18  that's the case, then I think we get down the slope of

19  opening the door to some additional --

20       THE COURT:  You're seeking to have it redacted

21  and not presented to the jury?

22       MS. STEVENS:  Yes.

23       MR. COLBATH:  I'll redact those three words,

24  "Santa for kids."

25       THE COURT:  Is that the government's request?

```
 1             MS. STEVENS:  Yes, ma'am.
 2             THE COURT:  And keep in the "yes"?
 3             MS. STEVENS:  I don't care if the "yes" is in
 4   there.
 5             THE COURT:  Before it's published to the jury,
 6   that needs to be redacted.
 7             MR. COLBATH:  Sure.  What I'll do --
 8             THE COURT:  If you intend to publish that page
 9   to the jury.
10             MR. COLBATH:  What I'll do is I'll just only
11   ask -- I won't ask about that page, and then before we
12   submit anything, I'll provide a redacted copy.
13             THE COURT:  So you're not going to publish that
14   page?
15             MR. COLBATH:  I won't publish that page at all
16   so that it's not --
17             THE COURT:  So then with that, no objection to
18   the admission of those four pages with that one
19   redaction and we'll address the personal information as
20   well in due course?
21             MR. COLBATH:  Sure.
22             THE COURT:  Am I correct there, Ms. Stevens, no
23   objection?
24             MS. STEVENS:  Yes, ma'am.
25             THE COURT:  182A is admitted, those four pages
```

as identified.

(Defense Exhibit No. 182A admitted.)

THE COURT:  Are we ready to bring back in the jury?

MR. COLBATH:  We are ready, Your Honor.

THE COURT:  Very good.

(Jury present)

THE COURT:  Please be seated, everyone. Welcome back, ladies and gentlemen.  We sorted out the exhibit and it's been admitted.  So go ahead, please, Mr. Colbath.

MR. COLBATH:  Thank you, Your Honor.

BY MR. COLBATH:

Q.  Ms. Andersen, you straightened out for me these couple of questionnaires that were additional ones you completed, and so those two are Exhibit No. 182A.  And I'm just going to ask you, I don't want to belabor the point, I'm going to ask you about the second one here.

Could you show her page -- the third page of 182A?

So this was a blue Ford Escape vehicle that you were following up on, correct?

A.  Correct.

Q.  And here you learned that the information provided from the DMV, the owner -- who you thought was

1    the owner had in fact previously sold the car?

2        A.   Yes, sir.

3        Q.   And you're not aware of -- you didn't locate the

4    car or do a follow-up interview in this scenario, did

5    you?

6        A.   Not that I know of.  It's not written on this

7    form, no, sir.

8        Q.   Sure.  Also, the information that you got from

9    the DMV, that wouldn't have necessarily captured or

10   included vehicles owned by Coast Guard members who

11   weren't required to register their vehicles when they

12   appeared?

13            MS. STEVENS:  Your Honor, objection; lack of

14   foundation.

15            THE COURT:  I'll overrule that.  I'll allow

16   that.

17       A.   Can you repeat that?

18       Q.   Sure.  The information provided to you from the

19   DMV would have not necessarily captured all of the

20   vehicles owned by Coast Guard members who didn't have to

21   register their vehicles when they were temporarily

22   stationed on Kodiak?

23       A.   I'm not sure what the answer to that is.  I don't

24   remember the list, if there were other states'

25   registration on it.  I don't think so, no.

 1     Q.   Because you got it from the Alaska Department of

 2   Motor Vehicles?

 3     A.   Correct.

 4     Q.   For licensed vehicles in Alaska?

 5     A.   Yes, sir.

 6     Q.   I want to back up.  You can take that off our

 7   screen.  I don't want to distract her with that.

 8         I want to back up to your testimony about

 9   recording the times that Mr. Belisle and Hopkins and Mr.

10   Wells came to the rigger shop.  Okay?

11     A.   Yes, sir.

12     Q.   And you said that you watched -- to get those

13   times, you physically watched the cameras and observed

14   them coming and going?

15     A.   Between April 2nd and April 12th you're referring

16   to?

17     Q.   And part of your initial interviews and part of

18   that process, you were learning the routine, I think you

19   said, at the rigger shop?

20     A.   During the initial interviews, yes.

21     Q.   And as part of the routine, you learned that

22   shortly after 7:00 each morning, a watch officer would

23   make rounds at the rigger shop and at the COMMSTA

24   building up the hill?

25     A.   I don't remember that.  I'm sure we learned that,

1  but I don't remember that.  That wasn't something I

2  interviewed and learned.

3      Q.  And you said in your testimony earlier, and I

4  think you probably just misspoke, that the car on Anton

5  Larsen Bay on the 12th that went by, that that was

6  Mrs. Wells' Honda CR-V, and that's not something you had

7  any witnesses that told you that, did you?

8          MS. STEVENS:  Your Honor, I'm going to object

9  to -- that's clearly argumentative.  "I'm sure you

10  misspoke."

11          THE COURT:  That's sustained.

12  BY MR. COLBATH:

13      Q.  You were unaware, law enforcement was unaware

14  what vehicle went by on the road out on Anton Larsen

15  Bay, this blue vehicle you were looking for, correct?

16      A.  Initially, we were not positive who it could be.

17  We knew it was a blue, looked like a mini SUV vehicle,

18  and then through the investigation later learned that

19  the car was parked at the airport and appeared to move.

20      Q.  My question was:  You didn't know -- you weren't

21  aware of what vehicle went by the road or went by on the

22  roadway?

23      A.  Not when we initially viewed the video footage,

24  no.

25      Q.  And that's why you were doing these interviews?

1     A.   Which interviews?

2     Q.   The interviews of people who owned all different

3 vehicles.

4     A.   That was in an abundance of caution.  That's

5 later in December after --

6     Q.   Months later?

7     A.   Months later.

8     Q.   Okay.  And nowhere did you ever interview a

9 person that said they saw Mr. Wells' blue Honda CR-V on

10 Anton Larsen Bay on April 12th, did you?

11     A.   I did not.

12     Q.   And you don't know of any law enforcement officer

13 who interviewed any person who said they saw Mr. Wells'

14 vehicle, the blue Honda CR-V, on Anton Larsen Bay Road

15 on April 12th?

16     A.   I don't know what other law enforcement officers

17 learned, but I did not hear about that.

18     Q.   All right.  Thank you.

19         THE COURT:  Ms. Stevens, go ahead, please.

20                   REDIRECT EXAMINATION

21 BY MS. STEVENS:

22     Q.   Special Agent Andersen, why would asking about

23 the Wells' blue SUV in these questionnaires be

24 important?

25     A.   Because that's the vehicle we believed was going

1  up Anton Larsen based on the investigation up until that

2  point.

3      Q.  And what was the purpose of this questionnaire?

4      A.  To rule out any other possible subjects that went

5  up that road.

6      Q.  And did you, at least you, you can't speak to the

7  other agents, but did you expand on any of these

8  questions when asked?  Was it just a black and white,

9  "Where were you, just answer the questions," or did you

10  ask follow-up questions when they gave you an answer?

11     A.  Generally, I will, if it's required, but with

12  these, we just asked the questions and got the answers

13  to them.

14     Q.  Can you pull up what I think is 182, Defense

15  Exhibit No. 182, Blair.  Yep.

16         So do you see that?  Can you publish it?

17         MS. STEVENS:  Whichever one this was.  I'm not

18  sure which one this is.

19         MR. COLBATH:  That's 182A.

20         MS. STEVENS:  Okay.  Thanks.

21  BY MS. STEVENS:

22     Q.  We're only going to focus on page one, and I'm

23  going to have you focus on this right here.  Blair, if

24  you can zoom in on that.

25         So can you read that question to the members,

1   please?

2       A.   "Where were you between 7:00 a.m. and 8:00 a.m.

3   on April 12, 2012 when the homicides occurred?"

4       Q.   So if there is something written underneath that

5   question, then that would be a response to that specific

6   question?

7       A.   Correct.

8       Q.   Not a response to where they were on the day that

9   you were interviewing them?

10      A.   That's their response right there.

11      Q.   Okay.  And then can you get rid of that.  And

12  then let me just -- sorry.  Can you focus on the second

13  one, please, Blair.

14           And then can you read that question, please?

15      A.   "Were you in possession of your vehicle or know

16  where it was at the time?"

17      Q.   And again, the response would be --

18      A.   "Home and driveway if she was away."

19      Q.   So that would be where they were on April 12th,

20  not at the time of the interview, correct?

21      A.   Correct.

22      Q.   And then can you go down to the fourth question,

23  please?  Can you read that question?

24      A.   "How often do you drive past the COMMSTA?"

25  "Rarely, not that day."

```
1       Q.   And then go up to the top, please, Blair.  And

2   can you highlight the make and model, just the make and

3   model.

4            And what kind of make and model was that vehicle?

5       A.   That is a Ford Escape, color blue.

6       Q.   And then can you go to page --

7            MS. STEVENS:  I just want to confirm with you

8   guys.  This is page three of 182A?

9            MR. COLBATH:  I believe it is, so it would not

10  be that page.

11  BY MS. STEVENS:

12      Q.   Page three, please, Bates number 44557.  You can

13  just take it down.  I'll just refer to it here.

14            MR. COLBATH:  You can use the camera.

15            MS. STEVENS:  That's a good idea.  Can you pull

16  up the Elmo?

17  BY MS. STEVENS:

18      Q.   All right.  So this car, which is -- I'm showing

19  now Defense Exhibit No. 239.

20            At the top, what kind of car was it?

21      A.   That's a Honda CR-V.

22      Q.   What color was it?

23      A.   Green.

24      Q.   What color of car did you see in the vehicle --

25  I'm sorry.  What color car did you see in the video?
```

1    A.  Blue.

2    Q.  And then the first question there, when you asked

3  them, "Where were you between 7:00 a.m. and 8:00 a.m. on

4  4-12-2012," what was their answer?

5    A.  "Wife works at UAA Kodiak."

6    Q.  Keep going.

7    A.  "She drives car, but she's not here now, in

8  Iowa."

9    Q.  And the "not here now," is that in regards in

10 4-12-2012?

11    A.  No, that's not here now at the time when I was

12 interviewing.

13    Q.  And when it says, "Were you in possession of your

14 vehicle or know where it was at the time," what did they

15 respond?

16    A.  It was with his wife, yes.

17    Q.  So do you know how many or approximately how many

18 leads involving similar dark color cars law enforcement

19 followed up on?

20    A.  I believe it's 351.  It might be 350.  It was

21 roughly around that number.

22          MS. STEVENS:  I don't have any more questions.

23          THE COURT:  Any follow-up at all?

24          MR. COLBATH:  Just a single question.

25          THE COURT:  Go ahead.

```
 1                    RECROSS EXAMINATION
 2  BY MR. COLBATH:
 3     Q.  Ma'am, when somebody gave an answer like they
 4  were at home or they weren't sure where they were or
 5  something like that, after leaving them, did you do
 6  anything to verify any of their answers they had
 7  provided on their questionnaire, check their whereabouts
 8  or anything like that?
 9     A.  I don't recall doing any follow-up on that.  It
10  was December 11th and the incident was from April 12th.
11     Q.  Sure.  Thank you, ma'am.
12          THE COURT:  This person can be released,
13  counsel?
14          MR. COLBATH:  Released from me.
15          MS. STEVENS:  Yes, Your Honor.
16          THE COURT:  Thank you, ma'am.  You may be
17  excused.
18          (Witness excused)
19          THE COURT:  Your next witness.
20          MS. STEVENS:  The government calls Vance Newby.
21          (Pause)
22          THE COURT:  Good morning.  If you could come up
23  to the witness stand, and when you get up there, remain
24  standing, if you would, and the clerk will administer an
25  oath to you.
```

```
 1            (Oath administered to the witness)
 2            DEPUTY CLERK:  For the record, can you please
 3     state your full name and then spell your full name.
 4            THE WITNESS:  Vance Newby, V-a-n-c-e,
 5     N-e-w-b-y.
 6            VANCY NEWBY, GOVERNMENT WITNESS, SWORN
 7                      DIRECT EXAMINATION
 8     BY MS. STEVENS:
 9        Q.  Good morning.
10        A.  Good morning, ma'am.
11        Q.  Mr. Newby, where do you currently work?
12        A.  U.S. Coast Guard.
13        Q.  Where specifically?
14        A.  Humbolt, ESD Humbolt.
15        Q.  What does ESD mean?
16        A.  Electronic Service Detachment.
17        Q.  What do your job duties include?
18        A.  I maintain all of the phone switches, computer
19     servers and associated software.
20        Q.  For the Coast Guard unit there?
21        A.  For the northern part of California.
22        Q.  And before your current assignment, where were
23     you?
24        A.  Before my current assignment, the previous one
25     was ESD Coos Bay, southern Oregon coast.
```

1    Q.   Same type of job there?

2    A.   Yes, ma'am.

3    Q.   Before that?

4    A.   Before that, COMMSTA Kodiak.

5    Q.   What years were you at COMMSTA Kodiak?

6    A.   I was there for three and a half years starting

7  in 2010, fall of 2010, 2011.

8    Q.   And when you were assigned to COMMSTA Kodiak,

9  what was your role there?

10    A.   I was the IT II, so I maintained all of the

11  camera systems, computers, servers, the digital voice

12  logger that records the SAR cases.

13    Q.   Tell the jury what it means to be an IT II.

14    A.   They are the guys who are usually hands-on most

15  of the equipment.

16    Q.   What does "IT" stand for?

17    A.   Information systems technician.

18    Q.   And the II?

19    A.   Is a second class, E-5.

20    Q.   Petty officer?

21    A.   Yes, ma'am.

22    Q.   And when you were assigned to COMMSTA Kodiak,

23  where did you reside?

24    A.   In the T-1 building up the hill.

25    Q.   I'm sorry.  Where did you reside?  Where did you

1 live?

2     A.  I lived in the barracks on base.

3     Q.  Did your family live in the barracks with you?

4     A.  No.  I was a geographical bachelor.  My family

5 was not able to come to Kodiak.

6     Q.  I think you just briefly touched upon it.  You

7 said T-1, is that where you worked?

8     A.  Yes, ma'am.

9     Q.  Okay.  How long would it take you to get to work

10 from the barracks to the T-1 building?

11     A.  Eight, ten minutes.

12     Q.  And did you happen to advance in rank while you

13 were assigned to the COMMSTA?

14     A.  Yes, ma'am.

15     Q.  So what did you advance to?

16     A.  First class.

17     Q.  Who did you work for at the COMMSTA?

18     A.  Chief Scott Reckner.

19     Q.  And how was it working for Chief Reckner?

20     A.  It was good.  He was a good chief.

21     Q.  And up at T-1, where was your office physically

22 located in the building?

23     A.  I was right outside the command master chief on

24 the engineering deck.

25     Q.  And is it the same location as the operation deck

1  or the communication deck?

2      A.  No, ma'am.

3      Q.  Can you tell the jury how those two spaces were

4  different?

5      A.  So the operation deck is a secured space, no

6  phones, you have to be rung in or escorted while you go

7  to that space.  Whereas the engineering deck, once you

8  get in the T-1 building were all the people who actually

9  work on the equipment work.

10     Q.  Did the ops deck have a camera that looked at the

11 interior door that would lead into the ops deck space?

12     A.  Yes, ma'am.

13     Q.  Did that camera actually record?

14     A.  I don't believe that one recorded, no.

15     Q.  How many folks worked up there in the engineering

16 department?

17     A.  There is I believe 12 to 13 ETs, electronic

18 technicians, and then three ITs.

19     Q.  And did the rigger shop fall within that subsect

20 of the COMMSTA?

21     A.  Yes, ma'am.

22     Q.  How would you describe the rigger shop in

23 relation to the engineering department?  Were they fully

24 integrated or separate and distinct?

25     A.  They were kind of separate and distinct because

they were down the hill, so they worked together more

often.

     Q.   Tell the jury a little bit more about that.

     A.   So the rigger shop would maintain all of the

grounds for the communication towers, cutting down

trees, cutting back brush, that sort of work, and

climbing towers.

     Q.   And did they come and visit you guys frequently

up in T-1?

     A.   Any time there was an all hands, if the

commanding officer needed to pass something to the crew,

they would come up the hill for that.

     Q.   Do you remember where those all hands took place?

     A.   We either did them on the ops deck occasionally,

if there was like an advancement or award to be given

out, or sometimes we did them in the basement.

     Q.   So even folks without clearance would go onto the

ops deck during those all hands?

          MR. COLBATH:  Your Honor, I'm going to object

as to leading.

          THE COURT:  That's sustained.

BY MS. STEVENS:

     Q.   Who would go onto the ops deck during those all

hands?

     A.   Everyone.

1    Q.   Did that include folks without clearances?

2    A.   Yes, ma'am.

3    Q.   How often would you go down to the rigger shop?

4    A.   Fairly often because my chief worked down there,

5    so I would go to pass work information to him or see the

6    guys in the rigger shop.

7    Q.   Okay.  And do you know why your chief worked down

8    there?

9        MR. COLBATH:  Your Honor, I'm going to object

10   as to foundation or speculation.

11       THE COURT:  That's sustained actually.

12   A.   I believe he's down there to --

13       THE COURT:  When I sustain, then she's going to

14   ask a different question.  Go ahead.

15   BY MS. STEVENS:

16   Q.   So did -- do you know if your chief ever worked

17   up in T-1?

18   A.   Yes, ma'am.

19   Q.   Do you know if he moved his office down to T-2?

20   A.   Yes, ma'am.

21   Q.   Do you know why he moved his office down to T-2?

22       MR. COLBATH:  Same objection.

23       THE COURT:  That does seem to be calling for

24   hearsay.

25       MS. STEVENS:  Got it.

BY MS. STEVENS:

    Q.  So when you would go down to T-2 to touch base
with your chief, did you interact with any folks down
there?

    A.  Yes, ma'am.

    Q.  Who did you interact with?

    A.  Just about everyone down there.

    Q.  And did you ever interact with ET1 Hopkins?

    A.  I did, yes, ma'am.

    Q.  Can you tell the jury what your interactions were
like.

    A.  He was a great guy to work with.  He was --
always had a good sense of humor, was jovial, good to
work with.

    Q.  Did you have knowledge of his work quality?  Was
he a good worker?

    A.  I believe he was a very good worker, yes, ma'am.

    Q.  Did you have knowledge of whether he received any
accolades or awards?

    A.  I believe he got Sailor of the Year.

    Q.  In layman's terms, is that -- how would you
describe that to the jury?

    A.  It's a very big deal because you're competing
with a lot of other Coasties who are all doing their
best at their job, and to get Sailor of the Year is a

1  very, very big deal.

2      Q.  What about Mr. Belisle, did you interact with

3  him?

4      A.  Yes, ma'am.

5      Q.  Can you describe those interactions to the jury,

6  please?

7      A.  Rich was great.  He was a fantastic supervisor.

8  He was a mentor to all of us.  He was prior boatswain's

9  mate, so a lot of us would seek his experience with all

10  kinds of things, life in general, our jobs, our roles as

11  supervisors or fledgling supervisors, we would seek his

12  experience and go talk to him.

13      Q.  Did you have occasion to also interact with

14  Mr. Wells?

15      A.  Yes, ma'am.

16      Q.  Can you explain those encounters to the jury,

17  please.

18      A.  Those were different.  They were -- nobody talked

19  to him much, nobody sought him out to seek anything from

20  him.

21      Q.  And that included you?

22      A.  Yes, ma'am.

23      Q.  How come?

24      A.  Didn't enjoy working with him.  He was cold and

25  aloof.

1          MR. COLBATH:  Your Honor, I'm going to object

2     as to the character nature of the evidence and beyond

3     the Court's order.

4          THE COURT:  Why don't we have a sidebar here.

5          (Begin bench conference.)

6          MS. STEVENS:  My next question was going to be,

7     "Did you have an opportunity to observe him in the fall

8     of 2011?"

9          THE COURT:  Any objection to that?

10         MR. COLBATH:  Well, no, but I'd ask the last

11    answer be stricken.  We had a specific order or motion

12    on character, neither the characterization of being cold

13    or the characterization of being aloof was elicited last

14    time.  I don't believe this witness testified about any

15    of the specific items of character evidence that was

16    challenged.  I certainly had no idea until he brought it

17    out that it was coming.

18         THE COURT:  Well, as I recall the character

19    orders that were entered, this didn't come up, correct,

20    in this particular individual?  I will allow evidence of

21    workplace relationships, and I'm not going to strike

22    that.  And then you can move on to your question.  I

23    will -- the workplace relationships in 2011, 2012 I have

24    ruled are admissible.

25              So without getting into -- I can pull back out

1   the order where we went through all those items, but

2   that is the ruling.  I'm not striking it.  You can move

3   on and ask about the fall of 2012.  Questions on that?

4           MR. COLBATH:  Not in addition to the record I

5   made.

6           THE COURT:  Very good.

7           (End bench conference.)

8   BY MS. STEVENS:

9       Q.  Did you have an opportunity to observe Mr. Wells

10  at work in the fall of 2011?

11      A.  Yes, ma'am.

12      Q.  How did he appear?

13      A.  Fine.

14      Q.  Did you ever observe him in the bathroom up in

15  T-1?

16      A.  No, ma'am.

17      Q.  Were you qualified to work on the towers, the

18  antenna towers?

19      A.  Yes, ma'am.

20      Q.  And can you walk the jury through just what it

21  entails to climb a tower and conduct work up on a

22  300-foot tower.

23      A.  So depending upon what you're doing, if you're

24  swapping out lights or cameras or whatever you're

25  climbing the tower for, you wear a full body harness.

1  You have a Y lanyard attached to your back, which has

2  big clips on the end so you can maintain connection to

3  the tower at all times.  And then you also either have a

4  fall or resting device attached to your chest, which can

5  clip on to the ladder and can help you climb so you

6  don't have to constantly adjust those clips on the Y

7  lanyard as you're climbing.

8        You also have a positioning lanyard, which is

9  usually worn by your hip so can you take breaks and rest

10 your arms and hands, because it gets tired climbing

11 300 feet up.

12   Q.  Blair, can you put 252 up, if it's already been

13 introduced.

14        Do you recognize this photo, Petty Officer Newby?

15   A.  Yes, ma'am.

16   Q.  Tell the jury what you see there.

17   A.  This is during some tower rescue training that we

18 were conducting at the COMMSTA.  This is of the tower

19 just outside of T-1.  This is Chief Scott Reckner

20 performing a rescue to me, and Rich Belisle in the

21 background.

22   Q.  Who was conducting that training?

23   A.  Rich.

24   Q.  How did you get qualified?

25   A.  I originally got tower qualified in District 13,

1    which is Washington and Oregon, in 2005.  This training

2    was continuing on with that training.  This is more

3    rescue-type training to learn to be an instructor, train

4    the trainer.

5        Q.  How long would you say it would get -- it would

6    take for you to get, in your experience, to the top of a

7    300-foot tower?

8        A.  It would take quite a while.  300 feet, you're

9    climbing 30 stories, two hours.

10       Q.  What would you do if you needed to use the

11   bathroom?

12       A.  You would go before you climbed the tower.

13       Q.  And can we put up for foundation 105, please.

14           This has actually been introduced, so if you can

15   take a look at this exhibit.  This is 105.

16       A.  Yes, ma'am.

17       Q.  I would like to direct your attention to the

18   bottom there, and could you tell the jury what it is

19   that you did with regard to this chart?

20       A.  So this is a few of us going over the video

21   camera footage.  The far left-hand column is the time.

22   The next column over is what type of vehicle it is.

23   Middle column I can't read the top one on what that is.

24   It's a different camera or different location.  And then

25   two camera vehicles.

1     Q.   Were you able to identify a certain vehicle in

2  the camera footage?

3     A.   Yes, ma'am.

4     Q.   And whose was that?

5     A.   The bottom signature is the one I identified, and

6  it was Hernando Acosta and Cody Beauford coming into

7  work.

8     Q.   That was on what date?

9     A.   It was on April 12th.

10    Q.   You can take that down, Blair.

11         You also mentioned part of your duties were with

12 maintaining the camera system; is that correct?

13    A.   Yes, ma'am.

14    Q.   And let's go ahead and put for foundation,

15 please, Blair, Government Exhibit 68.  So you can -- do

16 you recognize this video?

17    A.   Yes, ma'am.

18    Q.   And do you recognize where it was taken from?

19    A.   Yes, ma'am.  It's a full mounted camera outside

20 of T-1.

21    Q.   How is it that you recognize this video?

22    A.   It was one of the cameras off the -- that is

23 recorded up at T-1.

24    Q.   Was part of your job maintaining this camera

25 system?

1    A.   Yes, ma'am.

2    Q.   Does this video accurately portray what it

3  captured the day of April 12, 2012?

4    A.   Yes, ma'am.

5         MS. STEVENS:  Your Honor, the government moves

6  to admit 68.

7         THE COURT:  Any objection?

8         MR. COLBATH:  No.

9         THE COURT:  All right.  Government 68 is

10  admitted.

11         (Exhibit No. 68 admitted.)

12  BY MS. STEVENS:

13    Q.   Petty Officer Newby, did you know what kind of

14  vehicle Mr. Wells would drive into work?

15    A.   Yes, ma'am.

16    Q.   What kind was that?

17    A.   It was a white Dodge pickup.

18         (Exhibit No. 68 playing in open court.)

19    Q.   Do you recognize that vehicle?

20    A.   Yes, ma'am.

21    Q.   Whose vehicle was it?

22    A.   Jim Wells.

23    Q.   Petty Officer Newby, if you can read the time at

24  the bottom for the record.

25    A.   8:27 and 22 seconds.

1    Q.  Can you pause it, please.  Do you recognize that

2  individual?

3    A.  Yes, ma'am.

4    Q.  Who is that?

5    A.  Jim Wells.

6         (Exhibit No. 68 continues playing in open

7  court.)

8  BY MS. STEVENS:

9    Q.  Pause it.  And what did he appear to be doing

10  just then?

11    A.  Looking back down the hill.

12    Q.  Can you state the time for the record?

13    A.  8:28 and 20 seconds.

14    Q.  Can you explain to the jury what you were doing

15  the morning of April 12, 2012.

16    A.  Going into work.

17    Q.  Tell them about that.

18    A.  I was kind of late that day.  As I was driving up

19  the hill, I saw OS1 Haselden running down the hill,

20  which I thought was a little odd, so I went on to the

21  ops decks to see what was going on when I first got into

22  work.

23    Q.  Why did you go to the ops deck?

24    A.  Because there's a camera system there, and

25  usually the operators, if anything is going on at the

1  COMMSTA, know what's going on, so I went to talk to
2  them.
3      Q.  Did you come to learn of anything?
4      A.  Yes, ma'am.
5      Q.  What was that?
6      A.  That there had been an incident at the rigger
7  shop.
8      Q.  And after you learned that there was an incident,
9  what happened next with your day?
10     A.  From there, all kinds of officers and things
11 showed up.  They had us there at the COMMSTA for quite a
12 while.  It was a pretty long day.  We all stayed there.
13 They did an all hands in the basement where we met in
14 the basement and the CO came and talked to us to tell us
15 a little bit what was going on.
16     Q.  What, if anything, did the Coast Guard do for the
17 members sort of confined to COMMSTA that day?
18     A.  They brought us food.
19     Q.  And when you were in the basement, where were you
20 for the all hands?
21     A.  We had the all hands in the basement that day.
22     Q.  What happens when the CO typically walks into a
23 room?
24     A.  Everyone stands up.
25     Q.  Do you remember who you sat next to during the

1    all hands?

2       A.  I do.

3       Q.  Who was that?

4       A.  Jim Wells.

5       Q.  Did you observe anything?

6       A.  I noticed his shoes were untied and he wasn't

7    wearing his normal rigger climbing shoes.

8       Q.  And did you observe others from the COMMSTA?

9       A.  Yes, ma'am.

10      Q.  And can you tell the jury what you observed some

11   of the other people from the COMMSTA doing?

12      A.  Most people were crying, pretty upset.

13      Q.  Did you observe Mr. Wells?

14      A.  Yes, ma'am.

15      Q.  His demeanor.  Can you explain what his demeanor

16   was to the jury?

17      A.  He was calm, quiet.

18      Q.  Did you ever call Chief Reckner "Scott"?

19      A.  Never, ma'am.

20      Q.  Why not?

21      A.  Because he was my chief.

22      Q.  After the all hands, do you remember what

23   happened next?

24      A.  After the all hands, we were still confined to

25   the COMMSTA, but we could move about.  A lot of the

1   rigger shop personnel were hanging out in the conference

2   room.

3       Q.  And what did you do?

4       A.  I don't remember a lot of it.  Walked around the

5   COMMSTA.

6       Q.  Did you visit the conference room?

7       A.  Yes, ma'am.

8       Q.  Did you observe anything in there?

9       A.  Jim Wells was reading a book in there.

10      Q.  Do you remember what kind of book it was?

11      A.  It was a paperback romance novel.

12      Q.  Did you assist investigators with retrieving

13  voicemails?

14      A.  Yes, ma'am.

15      Q.  Why were you involved with that?

16      A.  Because everyone has passwords to get into their

17  voicemail and and if the member is not there to unlock

18  the password, the administrator can unlock the password

19  and allow people access to it.  We can reset the

20  password.

21      Q.  Were you the administrator?

22      A.  Yes, ma'am.

23      Q.  And were you able to get investigators into some

24  voicemail boxes?

25      A.  Yes, ma'am.

1    Q.   Do you recall whose?

2    A.   Hopkins' and Belisle's.

3         MS. STEVENS:  Your Honor, no more questions.

4         THE COURT:  All right.  Questions for this

5    witness, Mr. Colbath?

6         MR. COLBATH:  Some, Your Honor, yes.

7         THE COURT:  Go right ahead.

8                       CROSS EXAMINATION

9    BY MR. COLBATH:

10   Q.   Sir, I'll start where Ms. Stevens left off there.

11   You said that -- I'm sorry.  I got to get the computer

12   thing going.

13        You said that on April 12th up at T-1 your

14   observations of Mr. Wells, or part of your observations

15   was he was calm and quiet?

16   A.   Yes, sir.

17   Q.   And that was consistent with the 2011 description

18   you gave, I mean you had always found him to be sort of

19   non-communicative like that or cold, didn't talk much?

20   That's how you had always known Jim Wells?

21   A.   Yes, sir.

22   Q.   And if I back up to a couple things here.  Well,

23   also, right there at the end you were asked about

24   retrieving voicemails for Mr. Hopkins and Mr. Belisle.

25   Do you recall that?

1    A.   Yes, sir.

2    Q.   I noticed we had one last week, somebody put in a

3 voicemail into our evidence, so the jury, we have heard

4 that.  And when the voicemail starts it talks about a

5 time.

6         Do you know how the time is calculated or how the

7 time on the COMMSTA phone system was set or what it was

8 set to?

9    A.   Yes, sir.

10   Q.   How does that work?

11   A.   It's set by the administrator.

12   Q.   So that would have been you?

13   A.   Yes, sir.

14   Q.   So how did it work?

15   A.   The phone switch keeps its own internal clock and

16 provides the time to all of the phones, so when you look

17 at your phone switch, it's got a digital display that

18 displays the time.

19   Q.   Is that something you change, you monitor, you

20 alter, or does it -- is there some mechanical function

21 that it sort of runs itself?

22   A.   It runs itself.

23   Q.   Okay.  And we have heard other testimony from

24 folks about -- relative not to the phone but to the

25 camera that when there is power outages or other things

1    occur, the times get screwed up.

2         Like for instance on the camera, they have a

3    power outage, the system stops recording time and then

4    the power is restored and the time picks back up, and so

5    it's wrong compared to what the real time is.

6         Is it similar with the phone system as it is to

7    the camera system?

8    A.   So the times at the COMMSTA are all set by the

9    administrator and they are all very accurate all of the

10   time because the operators handle SAR cases, search and

11   rescue cases, and they need to have the same time when

12   they look at the phone as is on the big clock that's

13   displayed, so the SAR cases, they have everything the

14   same.  So it was my job to make sure those times were

15   correct.

16   Q.   But all the systems aren't always correct or

17   always the same, are they?

18   A.   They are pretty close, sir.

19   Q.   Well, try to pull up -- try to pull up

20   Exhibit 62, see if I remember correctly.  Can you put it

21   on my screen before we --

22             DEPUTY CLERK:  Defense or --

23             MR. COLBATH:  Government Exhibit 62.  That's

24   not the one I was thinking of.  Let's try Exhibit 63.

25   Maybe I was one off.  Yeah, that's fine.

1    BY MR. COLBATH:

2        Q.  So Mr. Newby, I'm going to show you yesterday --

3    or what we saw last week, the jury and I, a camera view

4    here.  It's Government Exhibit 63.

5        A.  Yes, sir.

6        Q.  Okay.  First of all, you're familiar with the

7    camera systems at the COMMSTA?

8        A.  Yes, sir.

9        Q.  And you're familiar with this particular camera

10   view?

11       A.  Yes, sir.

12       Q.  And this would have been a camera located where?

13       A.  This is down the rigger shop above the door.

14       Q.  All right.  And it's viewing out to the general

15   direction of the flag pole it looks like?

16       A.  Yes, sir.

17       Q.  Now, I see on the video that -- you see the

18   timestamp down there on the bottom.  Read that one for

19   me.

20       A.  That one was 7:00.

21       Q.  And a few thousandths of a second, but almost

22   dead on as we're looking at it 7:00, right?

23       A.  Yes, sir.

24       Q.  Read up in the top left-hand corner there.

25       A.  The top left-hand corner is a feed from the

camera itself. The Panasonics keep their own little
internal clock. We turn it off on most of them, but
sometimes when we install or move a camera, you will
forget to turn that feature off, so that's from the
little Panasonic camera above the door. The time at the
bottom is from the computer system.

Q. And so they -- one was off here by five minutes.
The main system was tracking the time, that's the
bottom.

A. Yes, sir.

Q. The camera at some point had developed -- maybe
it always started five minutes ahead of schedule, I
don't know. Do you know?

A. We don't typically set those times because the
time we go off of is the one that's kept by the computer
time at the bottom.

Q. And you were the administrator just down at the
COMMSTA or were you the administrator -- I mean were you
in charge of these kind of things for Kodiak base, main
base as well?

A. No, main base has their own administrators.

Q. Can we put up the -- I want to ask about -- can
we put up, I think it is Government Exhibit No. 252, the
picture.

        Mr. Newby, you were asked about -- I see in this

1    exhibit another camera.

2        A.   Yes, sir.

3        Q.   Are you familiar with that camera?

4        A.   Yes, sir.

5        Q.   Okay.  And that camera is located on this.  This

6    is a training tower.  That's why you all are doing

7    training on it, right?

8        A.   It's got equipment on it as well, but yes.

9        Q.   And it's located right, if I was standing looking

10   at the COMMSTA building, T-1, it's just off to the left

11   there?

12       A.   It's right in front of the building, yes, sir.

13       Q.   And that camera, one of the functions of that

14   camera is -- well, strike that.

15            Let's see another exhibit.  Let's look at one of

16   the aerial photos.  Try Government Exhibit No. 6.

17            We don't have T-1 in there.  Try Government

18   Exhibit No. 5 for me.  There we go.

19            So you're familiar with what's depicted in this

20   exhibit, right?

21       A.   Yes, sir.

22       Q.   And if we zoom in on that T-1 there, that little

23   tower here, that's the tower you and I were just talking

24   about?

25       A.   Yes, sir.

1    Q.  Take that off if you would.  Leave the picture.

2  Yeah, that's good.

3        Now, we see a number of the other communications

4  towers in this photo, right?  They almost form a square

5  around T-1?

6    A.  Yes, sir.

7    Q.  Now, the COMMSTA was in charge of far more than

8  just these, just on this property more than these

9  towers, correct?

10   A.  Yes, sir.

11   Q.  And you're familiar with one of those towers is

12  antenna 15?

13   A.  I'm sure, yes.

14   Q.  Okay.  Well, you know which one I'm talking

15  about, right?

16   A.  I don't recall which one 15 is, no, sir.

17   Q.  Well, do you know that you had a tower there at

18  the COMMSTA, do you recall you had a tower that had a

19  rotational device on it or was rotational?

20        MS. STEVENS:  Your Honor, objection.  This is

21  -- he's testifying.

22        THE COURT:  Let him finish his question before

23  you object.  That's fine.  Let's hear it now.

24        MS. STEVENS:  He's just testifying, facts not

25  in evidence.  He's bringing in evidence to lead the

     witness.

THE COURT: He gets to do some leading on cross, but the "do you know that you had a tower," I will sustain the wording there as objectionable. So go ahead.

BY MR. COLBATH:

Q. Were you aware whether or not there was a tower that had -- that was a rotational tower?

A. An RLPA?

Q. Yes.

A. Yes, sir.

Q. Were you aware of, from the front of the COMMSTA, where generally that tower was located?

A. I don't recall, no, sir.

Q. Okay. We just looked at that -- you recall the picture of the training tower there, you and Mr. Reckner and Mr. Belisle? That tower, you know which one I'm talking about, the one here in front of COMMSTA?

A. Yes, sir.

Q. And the camera on that, you recall that?

A. Yes, sir.

Q. Now, one of the uses that the folks in COMMSTA had for that camera was to monitor this antenna 15, the one with the rotational thing on it; is that true?

A. I'm sure they did, yes, sir.

1    Q.  Because they needed to see which way the antenna

     2  was rotating or which way it was pointed?

     3    A.  Okay.

     4    Q.  Is that true?

     5    A.  I don't -- so my job as an administrator on those

     6  camera systems is to fix the cameras when they break.  I

     7  don't adjust where they are pointed.  That's the

     8  operators would adjust where they are pointed.

     9    Q.  Let's do it this way:  You testified at a

    10  previous hearing in this case I think --

    11    A.  Yes, sir.

    12    Q.  -- at one point?

    13    A.  Yes, sir.

    14    Q.  Do you recall that?

    15    A.  Yes, sir.

    16    Q.  Do we have a transcript that I can -- Mr. Newby,

    17  I'm going to get you a transcript and just show you a

    18  little bit of it to see if it doesn't refresh your

    19  recollection about this antenna.

    20    A.  That would be great.  Thank you, sir.

    21         MR. COLBATH:  Your Honor, may I approach to give

    22  Mr. Newby a copy of this transcript.

    23              THE COURT:  Yes.

    24         MR. COLBATH:  Thank you.

    25              (Mr. Colbath approaches the witness.)

```
 1          MR. COLBATH:  Your Honor, I'm going to refer

 2   him to page 1719.

 3          THE COURT:  All right.

 4   BY MR. COLBATH:

 5      Q.  Review that page just to yourself.

 6          (Pause)

 7      Q.  Sir, I'll ask you if reviewing the prior

 8   questions and answers there help refresh your

 9   recollection about the use of that camera and antenna

10   15?

11      A.  A little bit.

12      Q.  Okay.  That's fine.  Well, let me just do it this

13   way.  Let me ask you again, is it true that one of the

14   uses out there for the camera out in front of T-1, the

15   one you and I looked at in the picture on Exhibit

16   No. 252, one of its uses was monitor antenna 15 out

17   there to see its rotation?

18      A.  Yes, sir.

19      Q.  Okay.  Not April 12, 2011, but the day before, or

20   excuse me.

21          Not April 12, 2012, but the day before,

22   April 11th, was that a workday for you?

23      A.  I believe so, sir.

24      Q.  There was not an all hands or where one of those,

25   I think that's what you called it, an all hands where
```

```
 1   everybody was summoned up on the operations deck on that
 2   day, was there?
 3       A.  I don't recall an all hands from 2012, sir.
 4       Q.  On April 12, 2012, you said your drive in to
 5   work, you were a little late.  What was your normal work
 6   shift?
 7       A.  I think we started at 8:00.
 8       Q.  Do you recall why you were running late that
 9   morning?
10       A.  I don't, sir, no.
11           MR. COLBATH:  I'll just retrieve that
12   transcript, Your Honor, and I don't have any more
13   questions.
14           THE COURT:  Any redirect?
15           MS. STEVENS:  Yes, Your Honor.
16           THE COURT:  Thank you, Mr. Colbath.
17                   REDIRECT EXAMINATION
18   BY MS. STEVENS:
19       Q.  For the record, we are publishing 252.
20           THE COURT:  All right.
21       Q.  Petty Officer Newby, do you see what I just
22   circled there?
23       A.  Yes, ma'am.
24       Q.  What is that?
25       A.  That is an abandoned camera that is no longer
```

1    being used.

2        Q.  Was it operational on April 12th?

3        A.  I don't believe so, ma'am.

4        Q.  Do you know what kind of operational camera was

5    on this antenna tower?

6        A.  Our external cameras that were pan, tilt, zoom

7    were Panasonics.

8        Q.  Not talking about the system, which my

9    understanding is you maintained.  Do you know who

10   maintained the actual cameras like when they broke?

11       A.  I did, and the rigger shop sometimes assisted if

12   I needed to swap a camera out that was on a tower

13   because you need more than one guy to climb.

14       Q.  Would that include Mr. Wells?

15       A.  Sometimes, yes, ma'am.

16           MS. STEVENS:  Thank you.  No more questions.

17           THE COURT:  Follow-up at all on that topic?

18           MR. COLBATH:  Just about that picture.

19                       RECROSS EXAMINATION

20   BY MR. COLBATH:

21       Q.  Is the rotational -- is the pan, tilt, zoom,

22   rotational camera, is that what's almost right there by

23   Chief Reckner's face there, or do we not see it in this

24   picture?

25       A.  I don't know if that's the one or not.  It could

1   be the one.  It could be an RLP.  They are usually in a

2   little housing like that.  They look like an upside down

3   R2-D2 unit.

4      Q.  Has black on the bottom, and that's where the

5   camera sits and can spin?

6      A.  Yes, sir.

7      Q.  Even if the big one wasn't working, there was one

8   of those on that tower, as far as you know?

9      A.  A working camera on the tower?

10      Q.  Yeah.

11      A.  Yes, sir.

12          MR. COLBATH:  Okay.  That's all the follow-up.

13          THE COURT:  Thank you.  This witness can be

14   released, counsel?

15          MS. STEVENS:  Yes, Your Honor.

16          MR. COLBATH:  Yes.

17          THE COURT:  Sir, you may be excused.  Thank

18   you.

19          (Witness excused)

20          THE COURT:  Your next witness?

21          MS. SHERMAN:  The government calls Dennis

22   Dupras.

23          (Pause)

24          THE COURT:  Everybody doing okay?  Stand and

25   stretch or anything?  All right.  Very good.

1          (Pause)

2          THE COURT:  Good morning.  If you could come up

3    to the witness stand here, sir.  When you get up there,

4    remain standing and the clerk will administer an oath to

5    you.

6          (Oath administered to the witness)

7          DEPUTY CLERK:  For the record, can you please

8    state your full name and then spell your full name.

9          THE WITNESS:  My name is Dennis Dupras,

10   D-e-n-n-i-s, D-u-p-r-a-s.

11        DENNIS DUPRAS, GOVERNMENT WITNESS, SWORN

12                    DIRECT EXAMINATION

13   BY MS. SHERMAN:

14     Q.  Mr. Dupras, where do you work?

15     A.  Right now, I work for the Alaska Bureau of

16   Investigations with the Alaska State Troopers here in

17   Anchorage.

18     Q.  How long have you been with the Alaska State

19   Troopers?

20     A.  Over 20 years.

21     Q.  Can you take us through the types of locations

22   you have been with the Alaska State Troopers.

23     A.  After the academy, I was assigned in Fairbanks at

24   the FTO, field training officer program in Fairbanks.

25   Served about two to two and a half years in Fairbanks.

1    And then I was in Glennallen, which is a crossroads post

2    between Valdez and Fairbanks and Palmer.

3         And then from Fairbanks -- from Glennallen, I

4    went to Kodiak Island.  And then from Kodiak, I got

5    transferred here.

6    Q.  How long were you stationed in Kodiak?

7    A.  I was in Kodiak from 2003 to 2014.

8    Q.  Can you describe for the jury the geography of

9    Kodiak?

10   A.  Kodiak is -- the whole place is an archipelago, a

11   series of islands.  It's mountainous more or less in the

12   center and rocky to the coastline.

13        The city of Kodiak is in the northeast quadrant

14   of the island, and the road system is centered around

15   the city of Kodiak and it stretches down to a place

16   called Chiniak and Pasagshak.

17        On the other side of the island there's a road

18   called Anton Larsen Bay Road that goes across the pass.

19   Q.  Can you describe the population of Kodiak,

20   describe for the jury?

21   A.  Kodiak has probably, at least when I was there,

22   about maybe 12,000 to 14,000 people, maybe 15,000 in the

23   summer.  About half of that is Coast Guard personnel and

24   dependents.  Most of those people are centered in

25   Kodiak, the borough, and then there is a series of

1  villages also associated with Kodiak.  And the villages,

2  probably less than a 1,000 total, all the villages.

3      Q.  Why don't we bring up Exhibit No. 221.  It's

4  already been admitted.

5          Can you tell us, do you recognize this area of

6  Kodiak?

7      A.  Yes, ma'am.

8      Q.  What is it?

9      A.  That is the Bells Flats area of Kodiak.

10     Q.  How would you describe the Bells Flats area?

11     A.  It's a subdivision.  It's on the far side of the

12 Coast Guard base.  It comes off -- you access it off the

13 Chiniak Highway or Rezanof Drive.

14     Q.  Is that an area you would patrol?

15     A.  Yes, ma'am.

16     Q.  As a trooper -- we can take that down.

17         As a trooper in Kodiak, what were your duties?

18     A.  Criminal enforcement, work with the court system,

19 investigate crimes, felonies, search and rescue.

20     Q.  How many troopers in 2012 were on Kodiak?

21     A.  Blue shirts or brown shirts or both?

22     Q.  Why don't you tell us what the difference is.

23     A.  Blue shirts, patrol troopers, they would go by

24 the -- you will term the shirt colors, the blue shirt is

25 the guy who does the most criminal enforcement, traffic,

1    and the brown shirts specialize in wildlife enforcement.

2         As I recall, there are nine wildlife troopers

3    assigned to the Kodiak post, and there should be four

4    patrol guys and one sergeant.  Usually it's three patrol

5    and one sergeant on Kodiak.

6    Q.   And you were what color shirt?

7    A.   I was a blue shirt.  I was regular criminal

8    enforcement.

9    Q.   Can you describe in your trooper career up until

10   2012 what sort of cases you had investigated?

11   A.   A gamut of cases from beginning to then.

12   Burglaries, thefts, domestic violence, accidents,

13   accidental deaths, natural deaths.  I assisted with some

14   homicides in Fairbanks.

15   Q.   Let's go through a few maps.  Exhibit -- can we

16   pull up Exhibit No. 1.

17        Can you tell us what we're seeing here?

18   A.   Yes, ma'am.  That's the Coast Guard base, the air

19   station, and the state -- it's a combination, it's a

20   state airport, the Benny Benson state airport.

21   Q.   And what is this area here?

22   A.   That is housing.  That's -- there is a name for

23   that, specific name, and I cannot remember at the

24   moment.

25   Q.   Who would live there?

1    A.   That would be Coast Guard dependents, Coast Guard

2    members and dependents.

3    Q.   Is that a location you would patrol?

4    A.   I would go up there on occasion.  Mil pol would

5    usually normally patrol it, but I would go up there.

6    Q.   Let's go to Exhibit No. 4 if we could.

7         Can you tell us what we are seeing in Exhibit

8    No. 4?

9    A.   That is -- this is Anton Larsen Road, leads out

10   to the state airport.  And the lower left would be the

11   COMMSTA for the Coast Guard.

12   Q.   Let's talk about Anton Larsen Road.  What is out

13   past the COMMSTA?

14   A.   If you continue on Anton Larsen Road past the

15   communication station, there is a series of storage

16   areas for the Coast Guard.  They used to be old ammo

17   storage bunkers I believe when the Navy had the base.

18        There is a golf course.  And then as you go

19   farther north or across on Anton Larsen, you go up into

20   a pass.  There is the ski chalet area.  And then you go

21   down to the other side and there is a place called Red

22   Cloud Ranch.  And you follow it out and there is a

23   public boat launch, and then the road ends.  That's

24   where people park their cars and go to village islands.

25   Q.   Let's bring up 226.

1          Does this map, 226, describe what you were just

2    mentioning out past the COMMSTA?

3        A.  Yes, ma'am.

4        Q.  Now, the Red Cloud Ranch, was it like a dude

5    ranch?  Did people go visit there?

6        A.  No, not like a hotel or I don't know what you

7    call it, a lodge or nothing like that, no, ma'am.

8        Q.  Can you describe the Red Cloud Ranch as you

9    recall?

10       A.  There is one I call it the primary residence, a

11   large two-story building.  I think it's white with green

12   trim.  There is other outbuildings around it.  There is

13   old fencing or pens for cattle.  And at some point I

14   believe some people used to rent some space or store

15   vehicles or trailers or boats out there.

16       Q.  You mentioned the Anton Larsen Bay dock.  Did you

17   patrol out this road?

18       A.  Yes, ma'am.

19       Q.  And when you would patrol out to Anton Larsen,

20   you indicated there would be vehicles out there.  Were

21   you aware who those vehicles belonged to?

22       A.  They belonged to all kinds of different people,

23   ma'am.  It's a public boat launch, so you can launch

24   your boat to go out fishing or whatever you want to do.

25          Traditionally or historically, I have known

people that have vehicles parked out there.  They could

be some Port Lions people, that's one of the other

villages, some people from Raspberry Island, that's a

community of Old Believers there, and then there is

another area farther up, it's not a dock, road just ends

and some people park out there too that live remotely.

Q.  When you would patrol this road, was it

maintained?

A.  DOT maintains it, and they had a sign on the road

until they can't maintain it.  It's not supposed to be

open year round.  If the snow gets too high, they stop

maintaining it until the springtime.

Q.  And was it paved the whole way out to the dock?

A.  No, ma'am.

Q.  Can you tell on here about where the pavement

would end?

A.  The pavement ends, as I recall, unless they have

done more work, it ends a little bit past the golf

course.

Q.  So in this area here?

A.  Yes, ma'am.  I think before that Z switchback

there, it ends before there.

Q.  You indicated Z switchback?

A.  That switchback.

Q.  And it's a little difficult to tell here.  Can

1  you describe the terrain between the golf course and the

2  Red Cloud Ranch?

3     A.  Mountainous.  It's steep mountainous.  There is

4  treeline and then there is also -- when you see the

5  grass here, it tends to be very tall, thick grass.

6     Q.  Let's go to Exhibit No. 5, if we could.

7        Do you recognize this?

8     A.  Yes, ma'am, it's the COMMSTA.

9     Q.  Are you familiar with one or more of these

10  buildings?

11    A.  I have been there.  Prior to this incident, I

12  have been to the main building, which is up on top of

13  the COMMSTA.

14    Q.  You should have a laser pointer up there.  Why

15  don't you point to the building you're familiar with in

16  Exhibit No. 5.

17    A.  I'm more familiar with this building.  That's the

18  main COMMSTA, the headquarters up there.  I had gone

19  there a couple of times.

20    Q.  Why would you go there?

21    A.  I got called there to serve some paperwork, and I

22  got called there to talk to one of the Coast Guard

23  members about a dog, an animal complaint.

24    Q.  Prior to April 12, 2012, had you ever been to

25  this building, the rigger shop?

1  A. No, ma'am.

2  Q. Do you recall April 12, 2012?

3  A. I do.

4  Q. What were you doing that day?

5  A. I had come to work early.  I was supposed to go

6 to grand jury.  And we were at the time, and still are,

7 I believe, in Kodiak, we were dispatched out of

8 Fairbanks, the Fairbanks AST post.  And they called and

9 said they got a 911 call about two deceased individuals

10 in a puddle of blood at the COMMSTA.

11  Q. Did you respond to the COMMSTA then?

12  A. I did, ma'am.  I ran code there.

13  Q. In terms of individuals arriving at the COMMSTA

14 on April 12, how many troopers arrived before you?

15  A. None.  I was the first trooper on scene.

16  Q. Can you describe what you saw when you arrived?

17  A. When I arrived, the Coast Guard, we called them

18 at the time the military police, mil pol.  I think their

19 title has changed.  They were on scene and the Coast

20 Guard Fire Department was on scene.

21  Q. Did you enter the building?

22  A. I did.  When I pulled up, the assistant fire

23 chief, he gave me a signal that -- he made an indication

24 that both subjects were deceased.  I went in there.  The

25 EMTs -- EMS was still in there from the fire department.

I talked to them really quick, asked them did they move

the deceased.  They said yes, said they are both dead,

and I had them leave.

Q.  Why did you do that?

A.  I wanted to preserve as much evidence as

possible.

Q.  Why don't we pull up Exhibit -- how about Exhibit

No. 14, if we can.

Do you recognize this?

A.  That looks like it's a schematic for the rigger

shop.

Q.  Do you see on here the door you entered to go in

when you first showed up at the rigger shop?  We can go

to a different exhibit that's a little bigger.

How about we go to Exhibit No. 13.

Can you tell from here which door you entered?

A.  Yes, ma'am.  I believe I entered -- I'm going to

use the laser pointer.

Q.  Yes, please.

A.  Would have been this door.

Q.  And who did you see first in terms of the

victims?

A.  The Coastguardsman Hopkins.

Q.  Where was he?  Hold onto that laser pointer.  I'm

going to have you point a few things out.

1    A.  He would have been in the break room.  I saw him
2  right in here.
3    Q.  Were you able to determine anything about his
4  injuries, observe anything of his injuries?
5    A.  I saw -- there was obviously a lot of blood.
6  Looked like he had at least one gunshot wound to the arm
7  and another to the face.
8    Q.  Let's move on to the other person.  Who did you
9  observe next?
10    A.  Mr. Belisle.
11    Q.  Where was that?
12    A.  Mr. Belisle would have been in this office area.
13    Q.  And what, if anything, were you able to determine
14  about his injuries?
15    A.  He was lying flat on the floor facing out, and he
16  had what appeared to be gunshot wounds to his torso.
17    Q.  Did you notice any weapon in the building at all?
18    A.  No, ma'am.
19    Q.  Let me ask you this:  Was it easy for you to
20  maneuver through this building when you were there?
21    A.  It was my first time in the building and it's
22  shaped kind of odd.  It doesn't -- the door I went
23  through didn't flow.  Like naturally you walk through a
24  building and there's a hallway and offices or
25  classrooms.

1          It was a little different when you came in.  I
2    didn't know exactly where to go.  I walked in and then I
3    saw some of the people on the floor.  That's how I knew.
4      Q.  Did you notice, when you were in the building,
5    any indication that any items had been disturbed that
6    you could tell?
7      A.  Not that I could tell, ma'am, no.
8      Q.  After you observed the scene, what did you do?
9      A.  We secured the scene.  I checked with mil pol,
10   made sure the whole building was searched.  I called,
11   said I needed to get the Coast Guard Investigative
12   Service.  I called my sergeant there and called to get
13   ABI support.
14     Q.  What's ABI?
15     A.  The Alaska Bureau of Investigations.  They are
16   the investigators.  That's what I do now.
17     Q.  At some point, did it become your understanding
18   the FBI would be taking lead on the case?
19     A.  Yes, ma'am.  At some point, I was on a conference
20   call, and I was notified of that.
21     Q.  Can you tell us what -- after you secured the
22   scene and you're on the scene, tell us what sort of
23   things you did the rest of that day.
24     A.  It was a long day.  I interviewed some people at
25   the scene, two Coastguardsmen and the commanding

officer.  At some point during the day, I made the

family notifications.  My sergeant went to Chief

Hopkins' and I notified the Belisle family.  I met the

Coast Guard -- not the Coast Guard.  I met the FBI when

they arrived.  I briefed them what we had so far, what

was known, and then I assisted the FBI the rest of the

day.

  Q.  Did you write a report of your actions that day?

  A.  I did not, ma'am.

  Q.  What were you doing or what did you do to

preserve your recollection of the events?

  A.  I recorded the interviews I did, that I

conducted, and I took notes.  And I photographed -- I

photographed the scene when I arrived.

  Q.  Did you provide all of those things to the FBI?

  A.  Yes, ma'am.

  Q.  I want to turn your attention to the Kodiak

airport.  Was the Kodiak airport an area you patrolled?

  A.  Yes, ma'am.

  Q.  How often would you drive through there?

  A.  If I was patrolling out that way, I would

probably drive through the airport once a day.

  Q.  Can you tell us how the Kodiak airport in terms

of patrolling and security kind of compares to Anchorage

airport?

1    A.  It's a state -- they are both technically state

2  airports.  I would say the security level at the

3  Anchorage airport is a lot higher than it is at the

4  Kodiak airport.  You go through TSA in both places if

5  you're going to fly on Alaska Airlines or a jet, but if

6  you pull up to the Anchorage airport at departures, you

7  can't park a vehicle.

8       They don't want that at the state airport either,

9  but it's not strictly enforced either.  And parking is

10  -- I mean you could park there, but we don't normally

11  ticket people there.

12    Q.  So someone could park at the airport in a place

13  they shouldn't and wouldn't be ticketed necessarily?

14    A.  Normally, if there is an issue -- as I recall,

15  the DOT runs the airport.  They call us, we'll run the

16  vehicle, and they will get one of the local tow

17  companies to come get it if they are going to impound

18  it.

19    Q.  Let's take a look at exhibit -- why don't I have

20  you look at Exhibit 90 and 92 for foundation.  I believe

21  91 is already admitted.  Then could we show him 92 as

22  well.

23       Do you recognize those?

24    A.  Yes, ma'am.  That's the Benny Benson state

25  airport, the terminal area.

1    Q.  Fair and accurate depiction -- well, let me ask

2    you this:  Are these photos different from the airport

3    as it was back in 2012 in terms of pavement I guess?

4    A.  The pavement -- well, since then, it's been

5    improved.  They resurfaced the whole area.  When this

6    occurred, the surface area, the parking area was pretty

7    bad.

8    Q.  Other than that, are the buildings in the same

9    locations?

10    A.  Yes, ma'am.

11         MS. SHERMAN:  I move for the admission of 90

12    and 92.

13         MR. CAMIEL:  No objection.

14         THE COURT:  Those will be admitted.

15         (Exhibit Nos. 90 and 92 admitted.)

16    BY MS. SHERMAN:

17    Q.  Go ahead and put up Exhibit 90.  Why don't you

18    show us or explain to us what is this road right here?

19    A.  That is Chiniak Highway or Rezanof Drive.  It's

20    called both.  Most commonly, once you get past Bells

21    Flats, everybody calls it Chiniak Highway, but some

22    people still call this Rezanof.  And that goes into

23    town.

24    Q.  Okay.  And what airlines flew out of the terminal

25    at the Kodiak airport?

1    A.   Commercial air service is Alaska Airlines, and

2  often there is two jets a day.  And Ravn or Era, and

3  they fly Dash 8s.  There is some other local air

4  carriers that take you to the villages, or there is some

5  tour aircraft that will take you over to Katmai, but

6  normal air traffic, unless you charter an aircraft, is

7  Alaska Airlines or Ravn, or Era at the time, I think.

8    Q.   Let's go to Exhibit No. 92.  Can you tell us what

9  is this building?

10    A.   That is the hotel.  That is the -- not the Best

11  Western, the Econo Lodge or something or Motel 6.  I

12  forget the chain at the moment now, but that's the

13  hotel.

14    Q.   Do you recall in 2012 whether it was the Comfort

15  Inn?

16    A.   That sounds about right.

17    Q.   Okay.  And why don't we actually go to Exhibit

18  No. 91, and I'm going to have you indicate some

19  buildings on Exhibit No. 91.

20         Can you tell us what this building was?

21    A.   That's Island Air.

22    Q.   And what did Island Air do?

23    A.   Island Air is a local air carrier.  You can see

24  the hangar doors right there.  I think that's one of

25  their older birds.  They fly to the villages.  They have

several twin engine Norman Island Commanders that they
fly to the villages.

Q.   And this building?

A.   That's the main terminal.

Q.   So who would fly out of there?

A.   That would be Alaska Airlines and Ravn or Era.

Q.   And then this building?

A.   Those buildings, now it's a -- not a hotel.  It's
a bar/restaurant.  At the time, I don't believe it was
even occupied.

Q.   What about this?

A.   That would have been Servant or Paklook Air.
They also fly to the villages.  You see some of their
aircraft on the other side right there.

Q.   And this parking area?

A.   That's a combination of rental vehicles and
long-term parking.

Q.   And then this area here?

A.   That would be short-term parking.

Q.   So if someone would have parked in this area in
2012 for several days, you said short-term, would they
have been ticketed?

A.   My experience, no.

Q.   We can take those down.

     As a blue shirt trooper on the island of Kodiak,

1  were you familiar with stolen vehicles and stolen

2  vehicle reports?

3      A.  Yes, ma'am.

4      Q.  Do you recall if there had been any stolen

5  vehicles reported on April 12, 2012?

6      A.  No, ma'am.

7      Q.  You don't recall or there hadn't been?

8      A.  There hadn't been.

9      Q.  At some point after you first responded to the

10  rigger shop, you assisted the FBI in a search; do you

11  recall that?

12      A.  Yes, ma'am.

13      Q.  What did you search?

14      A.  Which particular search are you talking about?

15      Q.  Did you have occasion to assist in a search of

16  the defendant's truck?

17      A.  Yes, ma'am.  His truck was, along with another

18  vehicle, was impounded and brought to the trooper post.

19      Q.  Okay.  And do you recall the date that you

20  participated in that search?

21      A.  I think it's the 18th of April.

22      Q.  And what did you take out of that search?

23      A.  We photographed tires that were on the vehicle

24  and in the back of the vehicle, and we took tires out of

25  the back of the vehicle.

1     Q.  Let's for foundation have you look at Exhibit No.

2  69.  Do you recognize this?

3     A.  Yes, ma'am.

4     Q.  What is depicted in Exhibit 69?

5     A.  It is a Dodge pickup with Alaska plate Victor

6  Charlie Golf 520, and you can see tires in the back of

7  the bed.  It's got a cap on it.

8     Q.  Fair and accurate depiction of what you saw on

9  April 18th?

10    A.  Yes, ma'am.

11         MS. SHERMAN:  Move for the admission of

12  Exhibit 69.

13         MR. CAMIEL:  No objection.

14         THE COURT:  69 is admitted.

15         (Exhibit No. 69 admitted.)

16  BY MS. SHERMAN:

17    Q.  Can we display that?

18         What are we seeing here?

19    A.  That's the pickup.  That's the tailgate and the

20  tires in the back.

21    Q.  Can we see in this photo the tire you actually

22  seized?

23    A.  I believe it's that one right there.

24    Q.  Right here in the front?

25    A.  Yes, ma'am.

1    Q.   And if we could show him for foundational

2    purposes Exhibit 70.

3         Do you recognize this?

4    A.   That's the back of the pickup, ma'am.

5    Q.   Fair and accurate depiction of what you saw?

6    A.   Yes, ma'am.

7         MS. SHERMAN:   I would move for the admission of

8    Exhibit 70.

9         MR. CAMIEL:   No objection.

10         THE COURT:   70 is admitted.

11         (Exhibit No. 70 admitted.)

12   BY MS. SHERMAN:

13   Q.   And do you recall the exact number of tires that

14   were in the back of that vehicle?

15   A.   I do not.

16   Q.   You indicated you seized that tire.

17         We can take that exhibit down.  I would like to

18   have you look at Exhibit 72.

19         MS. SHERMAN:   The best way to do that may be

20   have him come into the well, Your Honor, if that's

21   permissible.

22         THE COURT:   That's fine.

23   BY MS. SHERMAN:

24   Q.   We'll have Agent Allison assist you.  If you can

25   come down and look at this box, please.

1          MS. SHERMAN:  Madam clerk, if we could have the

2    lights.  Thank you.

3          (Witness goes to well of courtroom.)

4    BY MS. SHERMAN:

5      Q.  You may need to give him a microphone near you.

6          Can you tell us if you recognize what that is?

7      A.  It's a tire, ma'am.

8      Q.  Is that the tire you seized on April 18th?

9      A.  Yes, ma'am.  Want me to take it out?

10     Q.  Why don't you go ahead and take it out.  Maybe if

11   we could, set it up on this table so the jury can see

12   it.

13         Okay.  That's the tire that you seized out of the

14   back of Mr. Wells' truck?

15     A.  Yes, ma'am.  I would say the FBI seized it.  I

16   helped them.

17     Q.  That's the exact tire though?

18     A.  Yes, ma'am.

19         MS. SHERMAN:  I think I'm going to move the

20   admission of Exhibit 72.

21         MR. CAMIEL:  No objection.

22         THE COURT:  72 is admitted.

23         (Exhibit No. 72 admitted.)

24     Q.  Can we set it nicely flat on that.  I'll have you

25   take the stand again and ask you some more questions.

1          Sir, are you familiar with APSIN?

2     A.   Yes, ma'am.

3     Q.   What is APSIN?

4     A.   It's the Alaska Public Safety Information Network

5 is what it stands for.

6     Q.   Does APSIN contain records of vehicles?

7     A.   Yes, ma'am.

8     Q.   I'm going to have you look at Exhibit 71 for

9 foundation.

10         Now, fair to say you didn't run this, but do you

11 see that this is a certified vehicle record?

12    A.   Yes, ma'am.

13         MS. SHERMAN:  Your Honor, this is

14 self-authenticating.  At this point, I would move for

15 the admission of Exhibit 71.

16         THE COURT:  Any objection to 71?

17         MR. CAMIEL:  No.

18         THE COURT:  It's admitted.

19 BY MS. SHERMAN:

20    Q.   And perhaps we could zoom in on just the top

21 portion.  Can you tell us who -- well, let's start --

22 this is the wrong -- I think we have uploaded the wrong

23 exhibit.

24         THE COURT:  Did you mean to admit 71 at this

25 time?

1            MS. SHERMAN:  Your Honor, I think that was the

2    Honda CR-V, and I believe we admitted that as a

3    different number.  Perhaps we have the wrong exhibit

4    uploaded for 71.

5            THE COURT:  All right.  Oh, I see, yes.  Okay.

6            MS. SHERMAN:  Does the Court have a corrected

7    version of 71?

8            THE COURT:  I don't.  The one I have in my

9    notebook is the Honda.  So maybe after the lunch hour

10   you could come back to this.

11           MS. SHERMAN:  Absolutely, Your Honor.

12           THE COURT:  That's fine.  So right now, I won't

13   admit 71.  I will vacate that, and then you can make

14   application when you get the right document.

15           MS. SHERMAN:  Thank you, Your Honor.

16   BY MS. SHERMAN:

17      Q.  Did you determine the tire pressure of this tire,

18   Exhibit 72, when you seized it?

19      A.  Yes, ma'am.  We took the tire pressure of all the

20   tires on the vehicle and all the tires, I believe.

21      Q.  And what was the tire pressure on Exhibit 72?

22      A.  I recall at about 25 psi.

23      Q.  Did you note anything about the tire when you

24   seized it?

25      A.  There was a nail in it.

1    Q.   Can you tell on here where that nail was?

2    A.   There is a yellow circle where the nail was.

3    Q.   Okay.  Were all the tires on Mr. Wells' truck the

4    same brand of tire?

5    A.   As I recall, they were not.

6    Q.   Do you recall which tire was different?

7    A.   One of them was -- they were either Goodrich or

8    Commercial, and the one tire that was different was I

9    think a Commercial tire.

10   Q.   Do you know which of the four tires that

11   Commercial tire was?

12   A.   I cannot recall at the moment, ma'am.  Sorry.

13   Q.   You indicated you had taken some notes?

14   A.   Yes, ma'am.

15   Q.   Would looking at those notes assist you?

16   A.   Probably, yes, ma'am.

17        MS. SHERMAN:  I only have one copy, counsel, if

18   you want to take a look at that.

19        (Pause)

20        MS. SHERMAN:  Your Honor, may I approach?

21        THE COURT:  Certainly.

22        (Ms. Sherman approaches witness.)

23   BY MS. SHERMAN:

24   Q.   Do you recognize what I have handed you?

25   A.   Yes, ma'am.

1     Q.   And what is that?

2     A.   There are notes on the tires for Victor Charlie

3 Golf 520.

4     Q.   Whose vehicle was that?

5     A.   That belongs to Mr. Wells.

6     Q.   Why don't you review your notes and then I'm

7 going to ask you a question about which tire was

8 different.

9     A.   Okay, ma'am.

10    Q.   Does that refresh your recollection?

11    A.   Yes, ma'am.

12    Q.   Okay.  What tire of the four tires on Mr. Wells'

13 vehicle was different?

14    A.   The Goodrich tire.

15    Q.   Okay.

16    A.   On the passenger rear side.

17    Q.   Passenger rear --

18    A.   Well, there's two different tires.  There's a

19 Bridgestone Dueler AT, the passenger side front.

20 Driver's side front, Commercial TA.  Passenger rear, BF

21 Goodrich.  And then driver's side rear, Commercial TA.

22    Q.   What was the psi range of the tires on Mr. Wells'

23 vehicle?

24    A.   They were all normal like at 75 psi.

25         MS. SHERMAN:  Those are all my questions.

1          THE COURT:  All right.  Can you, so the record

2     is complete, identify the Bates page, maybe the witness

3     can, of what he used to refresh his recollection.

4          MS. SHERMAN:  Yes, Your Honor.  Could you read

5     that number in the bottom?

6          THE WITNESS:  Wells 18 underscore 006744, one

7     of three, two of three, three of three.

8          THE COURT:  Are you ready to proceed now,

9     Mr. Camiel, or wait until after lunch?  Your choice.

10         MR. CAMIEL:  Maybe we do lunch now so we can

11    review the notes.

12         THE COURT:  Let's do that then.  We'll take our

13    lunch break now.  We'll have you back at 1:00, ladies

14    and gentlemen.

15         Please remember my admonition not to discuss

16    the case or do any research.  Leave your notepads here.

17    Have a pleasant lunch and we'll see you later.

18         (Jury absent)

19         THE COURT:  All right.  Please be seated,

20    everyone.  Sir, we'll see you back here at 1:00.  You

21    can be excused.

22         Anything to take up from the government?

23         MR. SKROCKI:  No, Your Honor.

24         THE COURT:  Mr. Colbath, Mr. Camiel?

25         MR. COLBATH:  No, Your Honor.

```
 1          THE COURT:  I did go back and look at the order
 2  on the character evidence at Docket 1074, and I do see
 3  that the witness's testimony, Mr. Newby, that was
 4  objected to, is permitting that -- I see as consistent
 5  with the Court's order at 1074, even though I understand
 6  that this witness did not testify to that.
 7          So the issue was not addressed in the character
 8  order, but I do see, in the Court's view, it's a
 9  consistent ruling.
10          All right.  I have been giving some thought to
11  this issue on the motion, but maybe we can take it up at
12  the end of the day.  I understand the government has
13  other activities going on during the day.  It might be
14  first thing in the morning.  In any event, I look
15  forward to your response on it.
16          MR. SKROCKI:  Yes, Your Honor.
17          THE COURT:  We'll take our break.  We'll be
18  back at 1:00.
19          DEPUTY CLERK:  All rise.  Court stands in
20  recess until 1:00 p.m.
21          (Recessed from 11:49 a.m. to 1:04 p.m.)
22          (Jury absent)
23          DEPUTY CLERK:  All rise.  Her Honor, the Court,
24  the United States District Court is again in session.
25          Please be seated.
```

1          THE COURT:  All right.  I see there is

2   something you want to take up.  Mr. Camiel, go ahead.

3          MR. CAMIEL:  Your Honor, I wanted to take this

4   up now before I get into cross examining Trooper Dupras.

5   The government has put into evidence the implication

6   that on April 11th, Mr. Wells couldn't be found and he

7   was up to something nefarious.

8          And on April 12th, Trooper Dupras interviewed

9   Mrs. Belisle late in the afternoon.  And what I handed

10  the Court and I already gave to counsel was the

11  transcript of that interview where she related to the

12  trooper that on the 11th, her husband had told her where

13  Mr. Wells was, that he was -- he said, "Nobody could

14  find Jim.  He was up the hill at T-2 -- T-1 in the

15  bathroom for like two hours.  Then he came down and went

16  in the bathroom in T-2 for hours.  And then he left and

17  went home."

18         And normally -- that's hearsay, clearly.  But

19  we believe that under Federal Rule of Evidence 807, the

20  residual exception would apply.  It's a statement that

21  has the equivalent certain guarantees of

22  trustworthiness.  It's a statement that Mr. Belisle made

23  to his wife.  He certainly had no reason to not tell her

24  the truth about that.

25         It's offered as evidence of a material fact.

1    The government has put into issue where Mr. Wells was on

2    the morning of April 11th.  It's more probative on the

3    point for which it's offered than any other evidence

4    that the proponent can obtain through reasonable

5    efforts.

6            We don't have any other way to put this in.

7    The declarant is not available clearly, and admitting it

8    will best serve the purposes of these rules and the

9    interest of justice.

10           Now, the government chose to put into evidence

11   the question about where Mr. Wells was.  And when Chief

12   Reckner testified, he claimed he had no idea he was in

13   the bathroom, he didn't know, when clearly, at least

14   according to Mr. Belisle, that's exactly where he was

15   both up at T-2 and at T-1.

16           Now, I suppose I could have tried to get this

17   in through Ms. Belisle, but she was clearly distraught

18   on the witness stand.  We could recall her to do that,

19   but the trooper is the one who recorded the interview

20   and so he has a record of the interview and when it

21   occurred and the time it occurred.

22           And so we believe that under 807, it's

23   admissible under this exception.  Now, clearly it's a

24   limited exception, but this is one of those

25   circumstances where we have no other way to get this

into evidence, and there is no indication that it isn't

a reliable statement, given the circumstances in which

it was made and given the fact that Mrs. Belisle thought

it was important enough to tell the trooper on the very

afternoon that her husband was murdered.

THE COURT:  All right.  Thank you.  I'll hear

from the government here in a moment, but let me just

observe we were done this morning I'm thinking 8:40 or

8:45, and this has been sitting out there, this

transcript for seven years, and bringing it up at 1:05

when the jury is waiting is unacceptable.

Having said that, what's the government's view?

MS. SHERMAN:  Your Honor, I think it's actually

double hearsay.  What Mr. Belisle came home and vented

to his wife is one thing.  That's one level of hearsay.

What Nicola Belisle in an interview tells Trooper Dupras

is a second level of hearsay.

I don't think the residual exception applies at

all, and so I think that the defense should not be

allowed to ask Trooper Dupras about a hearsay statement

from Nicola Belisle relaying information from Rich

Belisle.

THE COURT:  I concur with the government.  I

don't find the residual exception applicable, and in

part because there is no ability to discern the basis

1  for Mr. Belisle's view of where Mr. Wells may have been,

2  and as the government notes, it is double hearsay if

3  brought in through this witness with respect to

4  Ms. Belisle's statements.  But in any event, I don't

5  find that the 807 exception should apply to this

6  particular statement.  I don't see that it has

7  equivalent circumstantial guarantees of trustworthiness

8  akin to the other provisions in the 800s of the evidence

9  rules.

10          It is offered as evidence of a material fact.

11  I understand that, but I don't see it is more probative

12  of a point than can be offered through reasonable, other

13  reasonable efforts with regard to where Mr. Wells may or

14  may not have been during that time.  And I don't see

15  that admitting it would serve the interests of justice

16  in these circumstances.

17          I can only think when Ms. Belisle was

18  testifying that there are many hearsay statements of her

19  -- of Mr. Belisle that she would have liked very much to

20  get into the record as well, but the hearsay rules

21  precluded those as well and I find the exception doesn't

22  apply.

23          So questions or clarification on that ruling

24  from the government?

25          MS. SHERMAN:  No, Your Honor.

1          MR. CAMIEL:  No, Your Honor.  I would only add

2    that because the Court -- one of the bases for the

3    Court's ruling is double hearsay.  We could recall Mrs.

4    Belisle.  I understand the Court's ruling is the same.

5          THE COURT:  The Court's ruling is the same.

6    That is noted that, Mr. Camiel, that yes, Ms. Belisle

7    could have been recalled and queried on that component

8    of the hearsay, but the ruling does stand and is based

9    on the reasons stated.

10          Are we ready to bring in the jury?

11          MS. SHERMAN:  From the government's

12    perspective, yes.

13          THE COURT:  Mr. Camiel, ready to proceed?

14          MR. CAMIEL:  Yes.

15          THE COURT:  Let's go and do so.  I do

16    appreciate you bringing it up though before we started.

17          MR. CAMIEL:  As the Court knows, we had a long

18    day yesterday.

19          THE COURT:  I suspected the case.

20          MR. CAMIEL:  In re-reading the transcript,

21    that's where we found it.

22          THE COURT:  Fair enough, Mr. Camiel.  I know

23    you all have a lot on your plate.

24          (Jury present)

25          THE COURT:  Welcome back, ladies and gentlemen.

1    Please be seated, everyone.

2            Mr. Camiel, whenever you're ready, go ahead.

3                         CROSS EXAMINATION

4    BY MR. CAMIEL:

5        Q.  Good afternoon.

6        A.  Good afternoon, sir.

7        Q.  Could we put up Government Exhibit No. 226.

8            Sir, you testified about the Anton Larsen Bay

9    Road that runs really from the Kodiak airport all the

10   way up to the Anton Larsen Bay dock?

11       A.  It goes beyond the dock, sir.

12       Q.  It goes beyond the dock and then finally ends?

13       A.  I might have the mile wrong, but mile 11, mile

14   12, it literally just ends by a bay, and some people

15   keep their skiffs in that bay.

16       Q.  On April 12th, after you first went to the rigger

17   shop and encountered the scene there, did you ever go up

18   Anton Larsen Bay Road to investigate?

19       A.  To the end of the road, no, sir.

20       Q.  Did you go as far as the golf course?

21       A.  No, sir.

22       Q.  Did you -- so you didn't go up to Red Cloud

23   Ranch, I take it, or to the dock, because you didn't

24   even go to the golf course?

25       A.  No, sir.  No.

1      Q.   When you went to the rigger shop, that's

2   essentially an L-shaped building, right?

3      A.   The rigger shop?

4      Q.   Yeah.  Put up Government's 13.

5      A.   Yes, sir.

6      Q.   So it's an L-shaped?

7      A.   L-shaped or V-shaped.

8      Q.   You had never been in there before?

9      A.   No, sir.

10      Q.   So when you walked in, you didn't know what to

11   expect?

12      A.   No, sir.

13      Q.   You had no idea what the interior would look

14   like?

15      A.   No, sir.

16      Q.   When you were in that area at the rigger shop,

17   did you ever go down to the water treatment plant?

18      A.   Across the street?

19      Q.   Yes.

20      A.   No, sir, not that day.

21      Q.   So if I understand correctly, you were present on

22   the evening of April 12th up at the T-1 building; is

23   that right?

24      A.   Yes, sir, that evening.  Yes, sir.

25      Q.   Meeting with the FBI and interviews were taking

```
 1   place?
 2       A.   I wasn't taking -- I didn't take part in most of
 3   the interviews, no, sir.
 4       Q.   But you were there?
 5       A.   I was at the T-1 building and going back and
 6   forth to different parts of the island for different
 7   things, to the airport.
 8       Q.   You were aware that on the evening of April 12th,
 9   Mr. Wells was there?
10       A.   Yes, sir.  Yeah.  As I recall, the day this
11   occurred, that day, the Coast Guard kept everybody at
12   the base, at their facility.
13       Q.   And you were aware that on the evening of
14   April 12th, Mr. Wells consented to the search of his
15   truck?
16       A.   Yes, sir.
17       Q.   And he actually signed a consent form?
18       A.   I believe so, sir.  Yes, sir.
19       Q.   And then I don't know if you were involved, but
20   agents and maybe you, you will tell us, went out and
21   actually looked in the back of his truck?
22       A.   Yes, sir.
23       Q.   And looked in the cab of his truck?
24       A.   I don't recall searching the cab of his truck,
25   sir.
```

1    Q.  But you do remember looking in the back?

2    A.  Yes, sir.

3    Q.  And Exhibit 72 was there at that time?

4    A.  Yes, sir.

5    Q.  But you didn't take it out at that time?

6    A.  I believe we took that tire out, sir.

7    Q.  On the 12th?

8    A.  Not on the 12th, no, sir.

9    Q.  I'm talking about on the 12th, the night that he

10   consented to the search of his truck.

11   A.  Sir, I didn't even look at his truck on the 12th.

12   Q.  But you knew that that was the day he consented

13   to the search?

14   A.  That I don't know, sir.  I didn't know that.

15   Q.  Well, you did know that the next day when

16   Mr. Wells came back to the T-1 building, his truck was

17   seized, so he didn't get to take it home?

18   A.  Yes, sir.

19   Q.  And then from the point his truck was seized, it

20   was impounded and taken to the location where you

21   eventually were involved in the search on the 18th?

22   A.  Yes, sir.  It was the FBI impounded it and it

23   went to the trooper post.

24   Q.  And at the trooper post, that's when you seized

25   Exhibit 72?

1    A.   I assisted the FBI in seizing it, yes, sir.

2    Q.   You were there when they actually opened the

3 tailgate of the truck and started pulling things out,

4 including Exhibit 72?

5    A.   Yes, sir.

6    Q.   And I think it was an FBI Agent Espeland who was

7 involved with that.  Do you remember that?

8    A.   When I went through the truck, I don't remember

9 Espeland being there, no, sir.

10    Q.   Do you remember watching one of the agents pull

11 the tire out of the truck?

12    A.   I thought I pulled the tire out of the truck.

13    Q.   When you pulled it out, you dropped it on the

14 ground?

15    A.   I put it on the floor, yes, sir.

16    Q.   You didn't just put it; you actually let it

17 bounce, right?

18    A.   It did bounce, sir.

19    Q.   You did that on purpose to see if there was any

20 air in there?

21    A.   I knew there was air in the tire because the bead

22 was still there.

23    Q.   Right, but when you later took the pressure of

24 the tire, it was at 20 psi, right?

25    A.   It was 25.

1    Q.  All right.  But rather than the normal pressure

2  of what, 65, 70?

3    A.  All the other tires on the vehicle were like 75,

4  74 or 72, somewhere in that range, which I think is

5  probably normal for a truck that size.

6    Q.  The truck that you pulled out of the bed was way

7  below normal, the pressure?

8    A.  Yes, sir.

9    Q.  You talked about there being different brands of

10 tires on the truck.  All of those tires were the same

11 size though, right?

12   A.  They were.  They were all the same size.  The

13 only difference is one didn't have studs.  They were all

14 studded tires except for one.

15   Q.  The one that didn't have studs was the front

16 passenger tire?

17   A.  That is correct, sir.

18   Q.  In the bed of the truck there were actually nine

19 tires, right?

20   A.  There were numerous tires in the back of the

21 truck, sir.

22   Q.  The only one that was the size that would fit the

23 truck was Exhibit 72, right?

24   A.  That I don't recall, sir, but probably.

25   Q.  Do you still have your notes in front of you?

1    A.  No.

2         MR. CAMIEL:  Your Honor, if I could approach

3    the witness.

4         THE COURT:  Certainly.

5         (Mr. Camiel approaches the witness.)

6    A.  Yes, sir.  They appear to be a different size

7    tire.

8    Q.  The other eight were 70-R15 size tires, right?

9    A.  Yes, sir.

10   Q.  The size that would fit a small SUV?

11   A.  Smaller car, I would imagine, yes, sir.

12   Q.  Like a Honda CR-V?

13   A.  Yes, sir.

14   Q.  And four of them were brand-new?

15   A.  Yes, sir.

16   Q.  And four were older, worn?

17   A.  Yeah, I have noticed that they looked worn and

18   four are in very good shape.

19   Q.  So four of them were mounted on rims and four

20   weren't?

21   A.  That I don't recall.  It could be.

22   Q.  Why don't you take a look at your notes to see if

23   that will help you.

24   A.  Yes, sir.  Bridgestone on the rim, I have it

25   marked on rim.  That's correct, sir.

1    Q.   So four of them were on rims?

2    A.   Yes, sir.

3    Q.   Can you take a look at -- let's first go with

4    Government Exhibit 69.  That's a photo before you

5    removed any tires from the truck; is that right?

6    A.   Yes, sir.

7    Q.   And Exhibit 72 is the one that's closest to the

8    camera?

9    A.   The tailgate, yes, sir.  I believe so, yes.

10   Q.   Let's look at Government Exhibit 70.  Now you

11   have taken the tailgate down and that's showing us the

12   tires in the bed of the truck?

13   A.   Yes, sir.

14   Q.   Were you the one taking pictures?

15   A.   I took some pictures, yes, sir.

16   Q.   Did you take any pictures that showed the nail in

17   the tire?

18   A.   No, sir, I don't think I did.

19   Q.   Well, you saw that there was a nail in the tire,

20   right?

21   A.   I did, sir.

22   Q.   Wouldn't you think it would be important to take

23   a picture of that at the time you removed the tire from

24   the truck?

25   A.   Yes, sir, it is.

1    Q.  It would have been important to do that?

2    A.  Would have been.

3    Q.  To show where that nail was exactly when you

4  removed it from the truck?

5    A.  Yes, sir.

6    Q.  And you neglected to do that?

7    A.  That's true, sir, yes, I did.

8    Q.  So we still got Exhibit 70 up on the screen.  And

9  the tire is in the back right there.  Those are the new

10  ones, right, right here?

11    A.  Yes, sir.

12    Q.  And here?

13    A.  I believe so.

14        MR. CAMIEL:  All right.  That's all.  Thank

15  you.

16        THE COURT:  Redirect?

17        MS. SHERMAN:  No, Your Honor.  I have no

18  further questions.

19        THE COURT:  Can this witness be released?

20        MS. SHERMAN:  From the government's

21  perspective.

22        THE COURT:  Thank you, sir.  You may be

23  excused.

24        (Witness excused)

25        THE COURT:  And your next witness?

 1                MS. SHERMAN:  Holly Steeves.

 2                (Pause)

 3                THE COURT:  Good afternoon.  If you could come

 4     all the way up to the witness stand here.  When you get

 5     there, remain standing, and the clerk will administer an

 6     oath to you.

 7                (Oath administered to the witness)

 8                DEPUTY CLERK:  For the record, can you please

 9     state your full name and then spell your full name.

10                THE WITNESS:  Holly Steeves, H-o-l-l-y,

11     S-t-e-e-v-e-s.

12                HOLLY STEEVES, GOVERNMENT WITNESS, SWORN

13                          DIRECT EXAMINATION

14     BY MS. SHERMAN:

15          Q.  Ms. Steeves, where do you work?

16          A.  I work for the Federal Bureau of Investigation.

17          Q.  Do you have a particular title?

18          A.  I am a special agent forensic examiner.

19          Q.  How long have you been with the FBI?

20          A.  Almost 24 years.

21          Q.  When you -- what do you do specifically now for

22     the FBI?

23          A.  I examine digital media, phones, computers,

24     cameras, that kind of thing.

25          Q.  I want to talk about how you got to that

1  position.  Tell us about your education.

2     A.  With the FBI?

3     Q.  No.  Starting back -- did you go to college?

4     A.  I went to college.  I have a bachelor's degree

5  and a master's degree.

6     Q.  What's your bachelor's degree in?

7     A.  I have a bachelor's in business administration

8  and a master's in tax law.

9     Q.  How did you go from a master's in tax to the FBI?

10 Tell us about how that kind of progressed.

11    A.  I am not really sure.  I was looking for

12 something different and the FBI was recruiting.

13    Q.  And when did you join the FBI?

14    A.  In 1995.

15    Q.  When you started with the FBI, what was your

16 position?

17    A.  I was a special agent in the field in Los

18 Angeles.

19    Q.  Did you go to the FBI academy?

20    A.  Yes.

21    Q.  Tell us about that.  How long is it?

22    A.  It's a little over four months at the academy.

23    Q.  Where is that located?

24    A.  In Quantico, Virginia.

25    Q.  And when you first start as a special agent you

1    said in Los Angeles?

2        A.   Yes.

3        Q.   What sort of investigations were you doing?

4        A.   In Los Angeles, I was doing mostly financial

5    investigations of high-dollar amounts in excess of

6    $250,000 or greater.

7        Q.   Did you at some point leave the Los Angeles

8    office?

9        A.   I did.  I transferred from the Los Angeles office

10   to the Boston division to what's called a resident

11   agency.  It's kind of like a branch at a bank, and that

12   was located in Providence, Rhode Island.

13       Q.   What did you do there as an FBI agent?

14       A.   There I did -- I worked almost all violations.  I

15   still focused on white collar initially and then moved

16   into computer intrusions and child exploitation.

17       Q.   From Boston, where did you go?

18       A.   Then from Boston, I came here to Anchorage.

19       Q.   What year did you arrive in Anchorage?

20       A.   2003, I believe.

21       Q.   And what sort of cases and investigations were

22   you doing when you arrived here in Alaska?

23       A.   Mostly white collar financial institution fraud,

24   some healthcare fraud, and then I moved into again

25   computer intrusions and some child exploitation.

1    Q.  Have you had -- you're a member of a team.  Is

2  there an acronym for that team?

3    A.  Yes.

4    Q.  What is that?

5    A.  The acronym is CART.  It stands for Computer

6  Analysis Response Team.

7    Q.  What does the Computer Analysis Response Team do?

8    A.  CART, the Computer Analysis Response Team, is

9  where the forensic examiners, the digital forensic

10  examiners work.

11    Q.  When you moved into the CART, did you have any

12  training that you received?

13    A.  Yes, the training is extensive.  It takes

14  approximately two years to get your initial

15  certification to work on just Windows systems.

16    Q.  And when did you do that training, do you recall?

17    A.  That was in 2006, '07, '08.

18    Q.  Did you receive that initial certification?

19    A.  Yes, I did.

20    Q.  What other trainings have you had in relation to

21  forensic examinations of computers and cell phones?

22    A.  I have had trainings nearly every year since

23  then, but I have additional certifications in McIntosh

24  systems, cameras, flash media, GPS systems.

25    Q.  I'm sorry.

1    A.   I can't think of anything else at the moment.

2    Q.   Where did those trainings take place?

3    A.   They took place in different locations.  Some

4    were back at Quantico at headquarters in our operational

5    technology division, but a lot of them are with vendors,

6    outside companies, technology companies.

7    Q.   Can you describe that more?  You say vendors.

8    What sort of vendor would provide training to the FBI?

9    A.   Vendors that specialize in particular areas such

10   as black bag technologies, which specializes just in

11   McIntosh systems.  Their focus is specifically on

12   forensics of Apple machines or McIntosh machines.

13   Q.   Can you tell us how many forensic examinations

14   you have done of computers or cell phones over the

15   years?

16   A.   Hundreds to thousands.  I don't have an exact

17   number.

18        MS. SHERMAN:  Your Honor, at this point, I

19   would request the Court find that this witness has

20   experience, background, education to give an opinion in

21   the area of forensic computer and cell phone

22   examination.

23        THE COURT:  Any objection or voir dire?

24        MR. CAMIEL:  No.

25        THE COURT:  Then I will so find.  Go right

 1  ahead.

 2  BY MS. SHERMAN:

 3      Q.  I'm going to start generally.  When you're going

 4  to do an analysis of a computer profile, how do you go

 5  about doing that?

 6      A.  Of a computer profile or of a computer?

 7      Q.  Of a computer.  I'm sorry.

 8      A.  Of a computer, generally we're going to open the

 9  machine, the box itself and we're going to see what we

10  have inside.  It used to be that we might have one hard

11  drive about that big in size.

12          Nowadays, we will have usually one or two, and

13  the hard drives can be more flash media, SD sticks, if

14  you have heard of that name, that are smaller.

15      Q.  So once you have looked inside the computer, what

16  do you do next?

17      A.  We will pull those out of the computer and we

18  will put them behind a physical write blocker and then

19  we will take a forensic image, which is a bit for bit

20  copy of that data.

21          We then get a hash verification of the original

22  data and compare it to the one that we have on the

23  image, and we verify that we have an exact copy that

24  way.

25      Q.  I'm going to break that down a little bit.  So

1    you said you use a write blocker.  What is the purpose

2    of that?

3        A.   The write blocker keeps data from going back onto

4    the original piece of media, the original hard drive in

5    this case.

6        Q.   And then you said hash value.

7        A.   Hash value is a mathematical algorithm that's

8    like a digital fingerprint so that we know that data is

9    the same.

10       Q.   After you have done that, is there a term for

11   when you've copied a computer?  Is that called a

12   forensic image?

13       A.   We call it a forensic image, yes.

14       Q.   So when you're doing your analysis, do you work

15   off of the original machine or do you work off of the

16   forensic image?

17       A.   We work off the forensic image.

18       Q.   I want to talk to you about some of the things

19   you were asked to review in this case.  Can you tell us

20   what you were asked to review?

21       A.   I was asked to see what computer activity took

22   place on the morning of April 12, 2012, and in doing so

23   I reviewed the computer hard drives of two machines, one

24   of Mr. Richard Belisle and the other of Mr. James

25   Hopkins.

1      I also reviewed the profile of Mr. Richard

2  Belisle and also the e-mail, his e-mail account, as well

3  as some computer access card logs.

4      Q.  Let's start with Mr. Hopkins.  From your review,

5  was there any indication -- I guess what did you review

6  in regards to Mr. Hopkins and what were you able to tell

7  from that data?

8      A.  There was no activity, interaction human activity

9  noted on that morning on his hard drive, nor was there a

10  logon for him in the computer access card logs.

11      Q.  Let's talk about Mr. Belisle.  Did you review his

12  computer activity from the morning of April 12th?

13      A.  Yes.

14      Q.  And what did you learn about his activities that

15  morning?

16      A.  So initially, Mr. Belisle logged on with his

17  computer access card at approximately 7:02 a.m. on

18  April 12th.  The logs reflect that at 3:02 p.m. in UTC

19  time, which is coordinated universal time.  It is a

20  24-hour standard that's precisely kept with atomic

21  clocks and the earth's rotation so that computers can be

22  on an exact precise timeframe whether they are on the

23  East Coast, West Coast that kind of thing.

24      When you translate that to Alaska daylight

25  savings time, it translates to 7:02 a.m. on April 12th

1  of 2012.

2    Q.  After there was login information from

3  Mr. Belisle's computer, could you tell if he opened any

4  programs?

5    A.  So after that initial logon at approximately

6  7:02, he then launched three programs, Internet

7  Explorer, Microsoft Outlook and Adobe Acrobat.

8    Q.  Can you tell from your analysis when the last

9  interaction an individual had with Mr. Belisle's profile

10  in the morning of April 12th?

11    A.  I saw interaction in his e-mail account, and then

12  there is a small amount of temporary files that are

13  cached in his profile, and that time is 7:10.  That's

14  the last indication I could find of any data that

15  referenced any human interaction that morning.

16    Q.  Was there information that came into the computer

17  after 7:10 a.m. and what could you tell about that?

18    A.  Two e-mails come in to his e-mail account, one at

19  7:32 a.m. and I believe the other one at 7:46 a.m.

20  Those are marked as unread.

21    Q.  As a forensic examiner, what does that mean to

22  you?

23    A.  It simply references that that data has not been

24  changed since that time when it came in to the machine.

25    Q.  Let me ask it this way:  If someone had read that

1  e-mail, would that have been noted?

2      A.  If someone had read that e-mail or clicked on

3  that e-mail, it should have been flagged as read.

4      Q.  Were you also asked to analyze some cell phone

5  data in this case?

6      A.  Yes.

7      Q.  And were you able to determine from the forensic

8  image or the data you looked at whose cell phone

9  information you were reviewing?

10      A.  As I recall, there was an e-mail account on the

11  cell phone for a "jimwells69@hotmail.com."

12      Q.  Ask you a few questions about the data.  Could

13  you tell when the first incoming call to that cell phone

14  was?

15      A.  On April 12th?

16      Q.  Yes.

17      A.  I believe the first incoming call was at 8:10.

18      Q.  And when was the first outgoing call?

19      A.  At 8:12.

20      Q.  Do you recall the duration of those calls?

21      A.  I do not.

22      Q.  Did you also review the location services and GPS

23  on that cell phone?

24      A.  Yes.

25      Q.  Can you tell the jury when the last GPS data was

1   captured on the defendant's cell phone?

2       A.   The last data, GPS data that was captured on that

3   cell phone was dated October 31st of 2011.

4       Q.   And from your analysis, could you tell if GPS

5   tracking was on and able to track the movements of that

6   cell phone on April 12, 2012?

7       A.   GPS was toggled off, as well as the fact that

8   that date, the last GPS data on the phone, is also the

9   last date of a ping to a cell phone tower.  Those

10  components together certainly make it reasonable that

11  that was the last time location services was used was

12  October 31st of 2011.

13      Q.   Was there anything you could do in your forensic

14  examination to determine where that cell phone was

15  located on the morning of April 12, 2012?

16      A.   No, because that data is not stored on the cell

17  phone.

18              MS. SHERMAN:  Those are all my questions.

19              THE COURT:  Questions for this witness?

20              MR. CAMIEL:  Just one --

21              THE COURT:  Certainly, take a moment.

22              (Pause)

23              MR. CAMIEL:  No questions.

24              THE COURT:  No questions.  This witness can be

25  released, counsel?

```
 1              MS. SHERMAN:  Yes, Your Honor.

 2              THE COURT:  Thank you, ma'am.  You may be

 3    excused.

 4              (Witness excused)

 5              THE COURT:  Your next witness.

 6              MS. SHERMAN:  I believe it's Ms. Bell, but let

 7    me double-check.  Yes, the government's next witness is

 8    Charlene Bell.

 9              THE COURT:  All right.  Good afternoon.  If you

10    could come all the way up to the witness stand over

11    here.  When you get up there, remain standing just a

12    moment, and our courtroom deputy will administer an oath

13    to you.

14              (Oath administered to the witness)

15              DEPUTY CLERK:  For the record, can you please

16    state your full name and then spell your full name.

17              THE WITNESS:  Charlene Ann Bell,

18    C-h-a-r-l-e-n-e, A-n-n, B-e-l-l.

19            CHARLENE BELL, GOVERNMENT WITNESS, SWORN

20                        DIRECT EXAMINATION

21    BY MS. SHERMAN:

22       Q.  Ms. Bell, where do you live?

23       A.  Right now, I'm in Tampa, Florida area.

24       Q.  Where were you living in 2012?

25       A.  Kodiak.
```

1    Q.  How long did you live on Kodiak?

2    A.  I got back to Kodiak in 2002, so from then until

3    2014.

4    Q.  What area of Kodiak did you live in?

5    A.  Bells Flats.

6    Q.  I'm going to show you an aerial map of Exhibit

7    No. 3.

8        Do you recognize this?

9    A.  Yes.

10   Q.  What is this?

11   A.  It appears to be a map of the Bells Flats area.

12   Q.  Okay.  And actually, let's go to 222.  That might

13   be an easier one for you to describe for us.

14       What is the main -- sorry, moving quicker than

15   Blair.  221, I'm sorry.

16       Do you recognize this?

17   A.  Yes.

18   Q.  And what is the main road that you take to get

19   into Bells Flats?

20   A.  Rezanof Drive or Chiniak Highway, whichever.

21   Q.  And what road -- to get into the flats, did

22   everyone have to take the same road in?

23   A.  Yes.

24   Q.  What was that road?

25   A.  The Rezanof Drive.

1    Q.   Okay.  Can you show us on this -- there should be

2    a laser pointer up there for you.  It's in a fancy case.

3    Yes, ma'am.

4    A.   How do you turn it on?

5    Q.   There should be just a button.

6    A.   Oh, a button.  You want me to point up there?

7    Q.   Why don't you point up there and show us what

8    road you would take to get into the flats.

9    A.   I'm shaking.  This one.

10   Q.   Can you see your house on here where you lived?

11   A.   Yes.

12   Q.   Where is it?

13   A.   It would be right about there.

14   Q.   Okay.  And how long did you live in Bells Flats?

15   A.   From 2002 until I left in 2014.

16   Q.   Were you able to identify your neighbors by the

17   vehicles they drove?

18   A.   Yes, ma'am.

19   Q.   Did you know what vehicle Jim Wells drove?

20   A.   Yes.

21   Q.   What was that?

22   A.   White Dodge pickup.

23   Q.   How about Nancy Wells, did you know what vehicle

24   she drove?

25   A.   She had a blue SUV, a Honda, I believe.

1    Q.   You said you knew what Mr. Wells drove.  Did you

2    know the Wells family, spend any time with them?

3    A.   No.

4    Q.   What were you doing for work back in 2012?

5    A.   I was the secretary for the legal department on

6    base.

7    Q.   So can you show us what route you would take to

8    head to work?

9    A.   So I would leave my house there, come up Lake

10   Orbin and then turn on Salmonberry, but I would end up

11   on Sargent Creek Road there.  There is a stop sign there

12   before the highway.

13   Q.   Was that pretty routine, you'd do that every day?

14   A.   Yes.

15   Q.   What time did you go to work?

16   A.   I usually tried to leave the house by 7:15, 7:20.

17   Q.   And why was that?

18   A.   Because I had to go feed the horses at the

19   fairgrounds before I showed up to work.

20   Q.   Anything else coming into the flats that might

21   slow you down if you left after that?

22   A.   The school buses.

23   Q.   Do you remember what time the school buses would

24   come into Bells Flats?

25   A.   About 7:25, between 7:25 and 7:30.

```
 1      Q.   I want to talk to you about April 12, 2012.  Do
 2   you recall that day?
 3      A.   Yes.
 4      Q.   What time did you leave for work that day?
 5      A.   My clock on my truck said 7:22.
 6      Q.   Did you see Mr. Wells that morning?
 7      A.   I did.
 8      Q.   And where did you see him?
 9      A.   At the intersection before I got on the highway
10   to go to the fairgrounds.
11      Q.   Can you display that on 222 for us?
12           So you saw him at this intersection?
13      A.   Yes.
14      Q.   Which direction were you going?
15      A.   I was heading out onto the highway.  I turn left
16   onto the highway.
17      Q.   Which direction was he going?
18      A.   He was coming back into the flats, so he was
19   turning right onto Sargent Creek Road.
20      Q.   What was he driving?
21      A.   His pickup.
22      Q.   Can you describe that?
23      A.   A white Dodge pickup with a shell.
24      Q.   So you were heading out of the flats and he was
25   heading into the flats.  Did that strike you as unusual?
```

1     A.   Yes.

2     Q.   Why?

3     A.   Because it was morning.

4     Q.   Would you see him in the flats on other mornings

5     when you were heading to work?

6     A.   Not in the morning, no.

7     Q.   Did you know his work schedule?

8     A.   I didn't know what his work schedule was, but I

9     knew it was early and then he would get off in the

10    evening and head back home once he was done with work,

11    just like everybody.

12    Q.   Can you tell us about your interaction when you

13    saw him?  Did you make eye contact with him?

14    A.   Yes, we did.

15    Q.   Was there any sort of other gesture?

16    A.   I don't recall.

17    Q.   Did you notice the passenger side of his vehicle?

18    A.   I didn't notice anything remarkable about it.

19    Q.   Did it appear to be driving poorly?

20    A.   No.

21    Q.   Do you think you would have noticed if it had

22    been driving poorly?

23    A.   Yes, ma'am.

24    Q.   And about what time did you see him there?

25    A.   Probably about 7:23, 7:24.

```
 1         MS. SHERMAN:  Thank you.  Those are all my
 2   questions.
 3                    CROSS EXAMINATION
 4   BY MR. CAMIEL:
 5      Q.  Good afternoon, ma'am.
 6      A.  Good afternoon.
 7      Q.  So how long does it take generally to get from
 8   the base, the Coast Guard base main gate to the
 9   intersection where you saw Mr. Wells on the morning of
10   April 12th?
11      A.  I really couldn't tell you because I have never
12   timed it.
13      Q.  And on the morning of April 12th when you saw
14   Mr. Wells, if I understand correctly, he's making a
15   right turn and you're making a left turn?
16      A.  Yes.
17      Q.  And you're passing driver's side to driver's
18   side?
19      A.  Yes, eventually.
20      Q.  And so he has to slow down to make that turn,
21   right?
22      A.  Yes.
23      Q.  And you're waiting at the stop sign?
24      A.  Yes.
25         THE COURT:  Anything further?
```

```
 1              MR. CAMIEL:  No.
 2              MS. SHERMAN:  No, Your Honor.  Thank you.
 3              THE COURT:  Thank you.  Can we release this
 4    witness, Mr. Colbath?
 5              MR. COLBATH:  Yes.
 6              MS. SHERMAN:  Yes.
 7              THE COURT:  Thank you, ma'am.  You may be
 8    excused.
 9              (Witness excused)
10              THE COURT:  Your next witness?
11              MS. SHERMAN:  Annette Ecret.
12              THE COURT:  Good afternoon.  If you could come
13    up to the witness stand, please.  When you get there,
14    remain standing if you would and the clerk will
15    administer an oath to you.
16              (Oath administered to the witness)
17              DEPUTY CLERK:  For the record, can you please
18    state your full name and then spell your full name.
19              THE WITNESS:  My first name is Annette,
20    A-n-n-e-t-t-e, and my last name is Ecret, E-c-r-e-t.
21          ANNETTE ECRET, GOVERNMENT WITNESS, SWORN
22                      DIRECT EXAMINATION
23    BY MS. SHERMAN:
24      Q.  Ms. Ecret, where do you live?
25      A.  Kodiak.
```

1     Q.   How long have you lived on Kodiak?

2     A.   Since 1997.

3     Q.   And what area of Kodiak do you live in?

4     A.   Bells Flats.

5     Q.   Have you always lived there?

6     A.   No, not when we first reported on board we

7  didn't.

8     Q.   About what year did you move to Bells Flats?

9     A.   I want to say 2000, the summer of 2000.

10    Q.   I'm going to show you a map.  It's been

11 introduced as Exhibit No. 221.

12         Can you tell us if you recognize this?

13    A.   I do.  This is my neighborhood.

14    Q.   And what is the name of your neighborhood?

15    A.   Bells Flats or the Light Side.

16    Q.   What is the main road that you get off of to get

17 into Bells Flats?

18    A.   I take Sargent Creek and then come in.

19    Q.   And why don't you show us on Exhibit No. 221,

20 there should be a laser pointer up there, and there

21 should be a button on it, why don't you point for us

22 where your home was.

23    A.   Sorry you guys if this makes you sick because I'm

24 a little shaky.  My house is further down in here.  It's

25 not really visible on the map.

1    Q.  What was the name of the street you lived on?

2    A.  Bells Flats Road.

3    Q.  Is that this road here?

4    A.  Yes, it is.

5    Q.  So what would be your path to get out of the

6    flats?

7    A.  How I typically travel to work is I come down my

8    driveway and go to the right, so I would come out of my

9    driveway and then go this way and then travel up Middle

10   Bay Road up a hill and then take this road -- sorry you

11   guys if I'm making you sick -- take that road right

12   there.

13   Q.  You would take this road?

14   A.  Middle Bay, yes.

15   Q.  And then once you got to Lake Orbin, which

16   direction would you go?

17   A.  I would round Lake Orbin and then take the little

18   road right beside it and then cut off to get out to

19   Sargent Creek to the main highway just like that.

20   Q.  You lived on Bells Flats Road.  Why wouldn't you

21   just take Bells Flats Road out?

22   A.  Because it's gravel and it's bumpy.

23   Q.  Do you know the defendant, James Wells?

24   A.  I do.

25   Q.  How long did you know him?

 1    A.  I met Jim I want to say -- I started working for

 2  the Coast Guard in May of '98, so it was pretty soon

 3  after that is when I had met him, because I worked in

 4  the facilities engineering department originally and if

 5  Jim had stuff with the COMMSTA or something, he would

 6  come to the facilities.  That's how I met him.

 7    Q.  Would you ever socialize outside of work with

 8  Mr. Wells?

 9    A.  No.  I mean I seen him occasionally like when he

10  was traveling and stuff, but, no, not outside of work we

11  didn't hang out.

12    Q.  Did you know what he drove?

13    A.  I did.

14    Q.  What did he drive?

15    A.  He drove a Dodge pickup truck.

16    Q.  What color was it?

17    A.  It was white.

18    Q.  Did it have a canopy on it?

19    A.  It did, and the canopy was a little higher.  Like

20  most canopies it's kind of just even with or parallel

21  with the cab of the truck.  His was raised a little back

22  in the back.

23    Q.  Did you know what Mrs. Wells drove?

24    A.  No.  Like I wouldn't be able to point her out

25  recognizable with her car as much.

1    Q.   What time did you normally start your workday?

2    A.   I started anywhere between 0700 and 0730.  I

3    liked to arrive no later than 0730.

4    Q.   What time would you leave your house on Bells

5    Flats then normally?

6    A.   Typically, I would try not to leave no later than

7    0715.  That particular morning I was running a little

8    behind.  I don't think I even left the flats until like

9    0725 or 26 after.

10    Q.   You said "that morning," are we talking about

11    April 12, 2012?

12    A.   April 12, 2012.  Sorry.

13    Q.   Did you see the defendant that morning?

14    A.   I did.  I passed Jim.  Jim was coming into the

15    flats and I passed as I was going out.  Just after I had

16    rounded Lake Orbin, I had passed him right about there.

17    Q.   So right about there is where you indicated?

18    A.   Yes.  I waved.

19    Q.   Did he wave back?

20    A.   He did.

21    Q.   And you were headed in which direction?

22    A.   I was headed toward the Coast Guard base, so I

23    was traveling this way and Jim was traveling that way.

24    Q.   All right.  Was that unusual to see him there

25    that time of day?

```
 1      A.   Yes, it was.  Yes, it is at that time of day,
 2   yes.  I assumed --
 3           MR. CAMIEL:  Your Honor, I'm going to have to
 4   object.
 5           THE COURT:  That's sustained.
 6           THE WITNESS:  Is that good or bad?
 7           THE COURT:  She's going to ask you another
 8   question.
 9           THE WITNESS:  Sorry.
10   BY MS. SHERMAN:
11      Q.   When you saw Mr. Wells near Lake Orbin, what was
12   your first thought?
13      A.   Good for him; he took the day off because the sun
14   was out.  I was like he traveled into work, said the sun
15   is out, I'm going to drop a chit and head home.
16      Q.   What's a chit?
17      A.   A leave chit to go home for the day.
18      Q.   Would that happen in your experience on Kodiak
19   when it would be a nice day?
20      A.   Yes.
21      Q.   I'm going to show you for foundation purposes
22   Exhibit 85.
23           Would you tell us if you recognize that.
24      A.   I do.
25      Q.   And what is that?
```

1    A.   That's the same type of map.  It's just the one
2  you would get from the borough without all the greenery
3  and just lot size and stuff.
4    Q.   Is that your signature on the bottom?
5    A.   It is.
6    Q.   And is that a fair and accurate depiction of this
7  map that you saw on the date that you signed it?
8    A.   Yes, it is.
9         MS. SHERMAN:  I'm going to move for the
10 admission of 85.
11         MR. CAMIEL:  No objection.
12         THE COURT:  85 is admitted.
13         (Exhibit No. 85 admitted.)
14 BY MS. SHERMAN:
15   Q.   And can we actually put 221 up alongside it.  I
16 think it was 221.
17        Is the angle a little different on 85?
18   A.   It is.  So you can see how this map I rounded
19 Lake Orbin and passed him right here, and on this map
20 you can see Lake Orbin is right here and it shows I
21 passed him right there, so it's just the way they're
22 laid out.
23   Q.   At the bottom you indicated -- we see there an X
24 with a circle around that.  What did you mean to
25 indicate there?

1    A.   That's where I passed him.

2    Q.   And the X?

3    A.   Is where we both were whenever I saw him that

4    morning.

5         MS. SHERMAN:  Okay.  Those are all the

6    questions I have for this witness.

7         THE COURT:  Thank you.  Cross?

8                        CROSS EXAMINATION

9    BY MR. CAMIEL:

10   Q.   Good afternoon, ma'am.

11   A.   Hey.  Good afternoon.

12   Q.   "Hey" is fine.

13        When you saw Mr. Wells that morning, you both

14   waved at each other?

15   A.   Uh-huh.

16   Q.   And smiled?

17   A.   Jim never looks happy, so he didn't smile, he

18   waved.

19   Q.   But he waved?

20   A.   He waved.

21   Q.   But he never looks happy?

22   A.   Never.

23   Q.   How long does it take for you to get from your

24   home -- you work on the main base?

25   A.   I do, or I did.

1    Q.  You would have to go in that main gate?

2    A.  Uh-huh.

3    Q.  How long does it take for you to get from your

4    home to the main gate?

5    A.  So from my driveway to the front -- to my

6    building where I worked was exactly five miles, so

7    depends on how late I was running.  I could do it in

8    five or seven minutes, or I could take ten minutes to

9    get there.

10    Q.  Depending on traffic?

11    A.  Yes, traffic, but traffic is not that bad, so

12   it's just depending on how late I am, if I want to do 55

13   to work or not.

14           MR. CAMIEL:  Thank you.

15           MS. SHERMAN:  No further questions.

16           THE COURT:  Release this witness?

17           MS. SHERMAN:  Yes.

18           MR. CAMIEL:  Yes.

19           THE COURT:  Thank you.  You may be excused.

20           (Witness excused)

21           THE COURT:  Your next witness?

22           MS. SHERMAN:  The government's next witness is

23   Amanda Sanford.

24           (Pause)

25           THE COURT:  Good afternoon.  If you could come

1    up to the witness stand, please, and when you get up

2    there, remain standing and the clerk will administer an

3    oath to you.

4              (Oath administered to the witness)

5              DEPUTY CLERK:  For the record, can you please

6    state your full name and then spell your full name.

7              THE WITNESS:  Sure.  Amanda Sanford,

8    A-m-a-n-d-a, S-a-n-f-o-r-d.

9         AMANDA SANFORD, GOVERNMENT WITNESS, SWORN

10                  DIRECT EXAMINATION

11   BY MS. SHERMAN:

12      Q.   Ms. Sanford, where do you live?

13      A.   In Kodiak, Alaska.

14      Q.   How long have you lived in Kodiak?

15      A.   I moved there in '87, 1987.  Left for college and

16   have been back there full-time since about 2001 or 2002.

17      Q.   Where do you live on Kodiak?  Do you live in a

18   particular neighborhood?

19      A.   I currently live in the Spruce Cape neighborhood.

20      Q.   Where were you working in 2012?

21      A.   At Kodiak Area Native Association.

22      Q.   What were you doing for them?

23      A.   I worked for the infant learning program.  I was

24   a family service coordinator or developmental specialist

25   for that program.

1    Q.  And what did that entail?

2    A.  It entailed doing screenings and assessments on

3    children birth to three who may have a disability or

4    developmental delay, and also providing services if they

5    were found to be eligible in their homes or in the

6    community.

7    Q.  Do you know Nancy Wells?

8    A.  I do.

9    Q.  How long did you work with Nancy Wells?

10   A.  I believe it was approximately 10 or 11 years.

11   Q.  I want to talk about April 2012, specifically

12   April 12, 2012.  Where were you on April 12, 2012?

13   A.  In Anchorage.

14   Q.  What were you doing in Anchorage?

15   A.  We had a conference that we were attending as

16   part of our job.  I don't remember the name of the

17   conference.

18   Q.  Do you remember what day the conference started?

19   A.  No, I don't know if it was that day or the day

20   before.  I can't remember exactly which date.

21   Q.  Would these conferences come up quickly, or did

22   you have advance notice that you would be traveling?

23   A.  For the most part, we had advance notice.

24   Q.  How long was the conference?

25   A.  It was I think supposed to run three days.

1    Q.   Do you know what day it was supposed to end on?

2    A.   Normally they would run like mid -- like at the

3    middle of the week and end on a Friday or a Saturday,

4    but I can't remember the exact details of that

5    conference.  I have been to a lot so I can't recall.

6    Q.   How did you get to the airport the night that you

7    left?

8    A.   Nancy picked me up at my apartment and then drove

9    me to the airport.

10   Q.   What was she driving?

11   A.   Her Honda, like a CR-V I believe it was.

12   Q.   Do you know what color it was?

13   A.   Bluish purple.

14   Q.   When she picked you up, did you stop anywhere?

15   A.   Not that I recall.

16   Q.   When you got in the vehicle, was there anything

17   on the front seat?

18   A.   Not that I recall.

19   Q.   If there had been something on the front seat,

20   would you have sat on it or moved it?

21   A.   No, I would have definitely moved it had it been

22   there.

23   Q.   When you and Mrs. Wells arrived to the airport in

24   the blue CR-V, where did you park?

25   A.   To the best of my knowledge, we were in the

general area in front of the terminal where it's not the
paid parking that you have to cross the main road that
comes into the airport, so that to the left side was
kind of more longer term.  So we were somewhere on the
right-hand side of the parking area when you first come
into the airport area.

Q.   And what airlines were you flying on, do you
recall?

A.   Either Era or Alaska Airlines.  I don't remember
which one it was.

Q.   Were they in the same terminal?

A.   Yes.

Q.   Why don't we look at, for foundation purposes,
Exhibit 86.

Do you recognize this?

A.   Yes.

Q.   And is this a fair and accurate depiction of the
document -- well, let me ask you this first:  Is that
your signature and date at the bottom?

A.   Correct.

Q.   And is this a fair and accurate depiction of the
document that you signed?

A.   It is the document I signed.

Q.   I'm asking you special lawyer words.

A.   Sorry.

```
 1          MS. SHERMAN:  At this point, I'll move for the
 2    admission of Exhibit 86.
 3          MR. CAMIEL:  I object.  It's hearsay.
 4          THE COURT:  Well --
 5          MR. CAMIEL:  Used to refresh her recollection.
 6          THE COURT:  That's fine.  I will sustain the
 7    objection and go forward.
 8    BY MS. SHERMAN:
 9      Q.  Then let's go to Exhibit -- I believe it's the
10    airport exhibit, which is 92 perhaps, 91.  I think 91.
11          Do you recognize this?
12      A.  Yes.
13      Q.  Okay.  There is a laser pointer there.  Why don't
14    you point out for us the terminal that you flew out of.
15      A.  So we would have flown out of this terminal here.
16      Q.  Oh, can you point that laser pointer up here?
17      A.  Sorry.
18      Q.  Technology is not that advanced yet.
19      A.  This would have been the terminal that we would
20    have flown out of there.
21      Q.  What was the normal route when you would come
22    into the airport?
23      A.  The route has changed since this picture was
24    taken, so I believe that it would have been straight in,
25    but I can't recall if you were able to take that road at
```

1    that time.  That's the road we take now, so that's what

2    I'm remembering in my brain.

3         But likely, if this was before all of that change

4    happened, we would have likely come in straight here.

5    Q.  When you would -- how many times did you travel

6    with Mrs. Wells driving you?

7    A.  I don't recall the number of times with her

8    driving me.  I have traveled with her several times over

9    the 10 or 11 years.  We went to a conference every year,

10   so I can't recall the number of times that she would

11   have taken me out there, but it probably was more than

12   the one time, I'm assuming.  I just don't know exactly

13   how many.

14   Q.  You said you would park near -- I believe your

15   testimony was you would park not in the long-term

16   parking, right?

17   A.  Correct.  I think of this as long-term parking

18   over here, and I recall parking in this area here.

19   Q.  Okay.  I'm going to show you -- you said in the

20   broader -- in the broader portion you said this entire

21   area?

22   A.  Correct.  I don't recall an exact location of

23   where we parked that day.

24   Q.  And you saw the last exhibit that you signed,

25   correct?

1    A.  Correct.

2    Q.  And in that, that was a smaller circle, wasn't

3  it?

4    A.  Correct.

5    Q.  I want to show you -- it has not been admitted,

6  so only you'll be able to see it -- Exhibit No. 172.

7  I'm sorry.  I should get the number correct.  176.  I

8  apologize.

9        Do you remember looking at this photo at some

10  point?

11    A.  Vaguely, yes.

12    Q.  Do you recall looking at it with an investigator?

13    A.  No, I can't recall which point in time I have

14  seen this picture.  Yeah.

15    Q.  Do you recall testifying in a prior hearing?

16    A.  Yes.

17    Q.  And in that prior hearing, you were -- do you

18  recall being asked about if the vehicle was parked to

19  the left of that photo, do you recall that?

20    A.  Do you mean off to like past this way to the left

21  that way?

22    Q.  Yes, there is an orange cone there.  Do you

23  recall being asked about that?

24    A.  Yes.

25    Q.  Do you recall what your response was?

1      A.   I don't recall it being -- yeah, I said I don't

2   believe that it was past to the right that way.  To me,

3   that's the long-term parking over there and this is the

4   parking area in front of those two buildings.

5      Q.   Okay.  So just to be clear, you -- well, I'm a

6   little confused about what you just said.  So in Exhibit

7   No. 176, and I understand the jury can't see it, we'll

8   see it later, there is an orange cone.

9      A.   Okay.

10     Q.   And you recall testifying before.  Do you recall

11  telling the jury -- or excuse me --

12          MR. CAMIEL:  Your Honor, I object.

13          THE COURT:  I'll sustain that.

14  BY MS. SHERMAN:

15     Q.   Do you recall when you were looking at that photo

16  before indicating that that --

17          MR. CAMIEL:  Your Honor, I'm going to object to

18  the leading form of the question.

19          THE COURT:  It is a leading form.

20  BY MS. SHERMAN:

21     Q.   Let me back up.

22          Looking at 176, there's an orange cone.  Do you

23  see that?

24     A.   Yes.

25     Q.   Was Mrs. Wells, did Mrs. Wells park --

```
 1          MR. CAMIEL:  Objection; leading.
 2          THE COURT:  I haven't heard the whole question.
 3  Go ahead.  Let's hear the question, Ms. Sherman.
 4  BY MS. SHERMAN:
 5     Q.  That orange cone, was that where you parked when
 6  you arrived?
 7     A.  I don't recall the exact location of where I
 8  parked.  I recall previous conversations of it was not
 9  to the other -- like to the left of that side.  It was
10  in this general area.
11     Q.  Okay.
12     A.  That's what I recall.
13     Q.  So at this point, you can't be specific as to the
14  exact parking spot; is that right?
15     A.  No, I don't feel like I have ever been able to be
16  specific to that exact location.
17     Q.  We can take that down.
18          When you got to the conference, how many of your
19  colleagues were there, do you recall?
20     A.  I don't remember.  I know it was Nancy and I.  We
21  normally would take like our developmental specialists,
22  so I believe at that time it was Margaret Kavanaugh and
23  myself, and then Nancy.  I don't recall if there were
24  more than us.
25          That was kind of our base unit.  I think we had
```

our program assistant that was still back in Kodiak that
would not have traveled to those conferences, so I
believe it was Nancy and Margaret and myself from
Kodiak.

Q.  Do you recall I guess the rooming arrangements?
Did you each get your own room?

A.  We did, yes.

Q.  When you got back to Kodiak, do you recall --
well, first of all, how did you get home?

A.  From the airport?  My husband picked me up.

Q.  At that point, were you looking to see where
other people had parked or where Mrs. Wells was going?

A.  No, it had no relevance really.

Q.  Do you recall on the day that you left if anyone
met Mrs. Wells at the airport?

A.  I recall Jim coming out to the airport.

Q.  While you were still there?

A.  Yes.

        MS. SHERMAN:  Thank you.  I have no further
questions.

        THE COURT:  Mr. Camiel, go ahead, please.

                    CROSS EXAMINATION
BY MR. CAMIEL:

Q.  Good afternoon.

A.  Hello.

1    Q.  So you have lived on Kodiak for what, over

2  30 years?

3    A.  Yes, minus a few years for college, but --

4    Q.  How many times do you think you have been to

5  Kodiak airport?

6    A.  Probably hundreds of times.

7    Q.  How many times do you think you have parked at

8  the airport?

9    A.  Most of those times, yeah.

10   Q.  Back in 2012, did you have to worry about being

11 ticketed if you parked in the short-term area?

12   A.  No.  I recall back then that, you know, you kind

13 of could park there and it didn't really matter, like

14 nobody really worried about it.

15   Q.  Can we put up Government Exhibit No. 91?

16       You described two areas of the airport when you

17 were talking about where people parked.  Let me ask you

18 first:  When you are talking about long-term parking,

19 the area that I just circled, is that the area you would

20 be talking about?

21   A.  Yes.

22   Q.  And then when you say short-term, that's in this

23 area?

24   A.  Yes.

25   Q.  All right.  And if I understand your testimony,

it's been a long time, but the best you remember is that
when you went to the airport with Ms. Wells, you parked
somewhere in the short-term area?

    A.  Correct.

    Q.  But you can't remember exactly where?

    A.  I do not remember exactly where.

    Q.  Can we show Government Exhibit 88?

        Could this be where Nancy Wells parked when she
took you to the airport?

    A.  Seeing that's in that short-term parking area,
yes.

    Q.  Now, how many years did you work with Nancy
Wells?

    A.  Again, I believe 10 or 11 years.

    Q.  What did she do?

    A.  She was the program coordinator for the infant
learning program that I worked for, so she was my boss
there.

            MR. CAMIEL:  That's all I have.  Thank you.

            THE COURT:  Follow-up?

            MS. SHERMAN:  Sure.

                      REDIRECT EXAMINATION
BY MS. SHERMAN:

    Q.  Fair to say you have never really felt
comfortable pinning down where that SUV was?

1    A.   Yeah.  I recall -- and I have been able to see

2  multiple things that you guys have shown me of times

3  when I have had to converse with people, and from within

4  days after this incident happened to November to more

5  questioning to, you know, years later.  I have always

6  been very clear it was in the short-term area, not

7  across the street in the long-term parking, and that's

8  been consistent the whole time I feel.

9    Q.   And today you simply just don't recall the exact

10 location?

11   A.   Correct.

12        MS. SHERMAN:  All right.  Thank you.

13        THE COURT:  Nothing further?

14        MR. CAMIEL:  No.

15        THE COURT:  Can this witness be released?

16        MR. CAMIEL:  Yes.

17        THE COURT:  Thank you, ma'am.  You may be

18 excused.

19        (Witness excused)

20        THE COURT:  Your next witness?

21        MS. STEVENS:  Your Honor, the government calls

22 Sean Bottary.

23        THE COURT:  Good afternoon.  If you could come

24 up to the witness stand, sir.  When you get there, if

25 you would remain standing, the clerk will administer an

```
 1   oath to you.
 2              (Oath administered to the witness)
 3              DEPUTY CLERK:  For the record, can you please
 4   state your full name and then spell your full name.
 5              THE WITNESS:  Sean M. Bottary, B-o-t-t-a-r-y.
 6              THE COURT:  Could you spell your first name for
 7   us too, please?
 8              THE WITNESS:  S-e-a-n.
 9              SEAN BOTTARY, GOVERNMENT WITNESS, SWORN
10                      DIRECT EXAMINATION
11   BY MS. STEVENS:
12      Q.  With whom are you currently employed?
13      A.  U.S. Agency for International Development, Office
14   of the Inspector General.
15      Q.  What's your official title?
16      A.  My official title is special agent.  My position
17   is criminal investigator.
18      Q.  How long have you been a special agent with --
19   what was the agency?
20      A.  USAID.  Four months.
21      Q.  For some of us who may not know what that
22   organization does, that agency does, can you tell us
23   what you do for them?
24      A.  Sure.  So USAID is a humanitarian and development
25   assistance organization that assists foreign
```

governments.  The best way to put them is if you think

of FEMA, the Federal Emergency Management Agency, that

assists during, we'll say like Hurricane Katrina, USAID

will do the same thing for foreign countries.  Best

example would be Hurricane Dorian, which just went

through the Bahamas, and USAID went in to provide food,

water, medical supplies, shelter, those sorts of things.

And my job is to investigate the frauds in association

with those programs.

     Q.   How long have you been with them?

     A.   Approximately four months.

     Q.   And prior to being a special agent with them,

where were you employed?

     A.   Coast Guard Investigative Service.

     Q.   How long?

     A.   I was with the Coast Guard Investigative Service

for approximately 13 years.  Total service in the Coast

Guard was 22 years prior to retirement.

     Q.   And you mentioned Coast Guard Investigative

Service, what did you do for them?

     A.   I was a special agent, criminal investigator as

well.

     Q.   What kind of tasks did you perform as a special

agent?

     A.   A special agent performs anything, interviews,

 1   search warrants, things of that nature.  Pretty much

 2   typical cop stuff.  That's about the best way to put it.

 3       Q.  Did you receive special training to do that cop

 4   stuff?

 5       A.  Yes.  So criminal investigator training program

 6   is held at the federal law enforcement training center

 7   in Glynco, Georgia, and I attended and graduated in

 8   September of 2006.

 9       Q.  And did you become involved in the investigation

10   into the murders of Rich Belisle and Jim Hopkins in

11   Kodiak in 2012?

12       A.  Yes, ma'am.

13       Q.  Can you tell the jury how you got involved with

14   that, please?

15       A.  I was stationed up here in Alaska from 2009 to

16   2013.  I was attached to the FBI's joint terrorism task

17   force.

18           A little bit after 8:00 a.m. that morning, I

19   received a call from my boss, who was in Seattle,

20   Washington, telling us -- or telling me that there was a

21   homicide in Kodiak and I needed to get down there.

22       Q.  When did you arrive?

23       A.  We arrived approximately five hours later after

24   that call, so around 1:00 to 2:00 p.m.-ish.

25       Q.  And what kind of things did you do when you got

1  on island?

2      A.   The first thing is we got a brief from the agent

3  that was on the ground, the state troopers, the police

4  forces that were involved, Coast Guard Police

5  Department, and then we set up a post at the COMMSTA for

6  our investigators to be able to start doing their work.

7      Q.   What kind of work did that entail?

8      A.   That entailed, like I said, talking to the local

9  law enforcement down there, the state, the local, the

10  Coast Guard Police Department, determining who needed to

11  be talked to at the COMMSTA, setting up a room so that

12  we could actually talk to them, going through lists of

13  questions that we wanted to ask them about what had

14  happened.

15      Q.   And you participated in some of those interviews?

16  Did you do anything else in regards to this

17  investigation?

18      A.   Yes.  It was interviews, surveillance, execution

19  of search warrants, things of that nature.

20      Q.   Let's talk about surveillance.  What does that

21  entail?

22      A.   So surveillance is a cop term for observation

23  essentially.  It's a way for us to look at folks,

24  establish patterns of life.  We all have our habits.  We

25  all have our things that we do on a regular basis, and

1    we're simply observing to see what happens, essentially

2    what happens next, watching people to see what they do.

3        Q.   And what did you surveil in this case?

4        A.   The residence of the defendant.

5        Q.   Can you tell the jury a little bit about that,

6    please?

7        A.   Yes.  So we set up surveillance at the residence

8    of the defendant.  The surveillance point was across the

9    street approximately 100 yards from the front door in a

10   little bit of an elevated position, and it was a

11   two-person surveillance, so there was always two

12   officers or two agents on at the time.

13       Q.   Blair, can you pull up 221, please.

14            Special Agent Bottary, there should be a pointer

15   up there by your chair.  If you can -- you have seen

16   this before?

17       A.   I have.

18       Q.   Can you identify the location where you posted

19   yourself to conduct surveillance?

20       A.   Right about here.  Right about here.

21       Q.   And explain the vantage point that you had.

22       A.   Like I said, the vantage point was around

23   100 yards.  We didn't have an exact figure for that.

24   And it was a slightly elevated position, so we were

25   above where we were looking down, so we were looking

1    down on the property.

2        Q.   And from that position, what area of the property

3    could you see?

4        A.   We could see the front of the house very well,

5    most of the southern facing side, and then not so much

6    of the rest.  We could not see the back of the house as

7    well.

8        Q.   Were there any trees or any other objects that

9    obstructed your view?

10       A.   No, it was actually pretty unobstructed to the

11   front of the house.

12       Q.   And do you recall doing surveillance on May 1st

13   of 2012?

14       A.   Yes, I do.

15       Q.   Do you remember what time that was?

16       A.   We were posted on the 12:00 noon to 4:00 p.m.

17   shift.  They were in four-hour increments.

18       Q.   And Alaska has weird daylight and stuff

19   throughout the year.  At that time, what was the

20   daylight like?

21       A.   It was enough daylight sufficient to be able to

22   see to the front of the house.

23       Q.   And tell the jury what you observed, if anything.

24       A.   So we took the shift at 12:00 noon.  It was

25   myself and Special Agent Kirsten Wise of the FBI.  We

were watching the front door.  We saw the defendant come

outside of the residence and go to his truck.  He moved

his truck closer into the garage area of the home.  He

ended up going back inside the house, and then when he

came back out, back to the truck, he began to change the

tires on the vehicle.

Q.  And did you -- did you observe how he was able to

change those tires?

A.  He used a jack and a pneumatic impact wrench.

Q.  So for those of us that aren't very savvy with

tools, can you explain what that is?

A.  So a pneumatic impact wrench is essentially

powered by air.  If you're used to different power tools

in your home, most of them are electric.  This is

powered by air.

If you have ever watched NASCAR and you hear the

sounds, the zinging, "zing, zing, zing," that's kind of

how it works, unless it gets stuck, and then you will

hear a lot of clicking until is actually goes and zings

and does what it's supposed to do.

Q.  And during this time, describe how he utilized

that tool and what he did with it.

A.  So he changed three of the four tires.  It was

both rear tires of the truck it was the driver front.

He would jack the truck up and he would change the

1  tires.

2       Although I'm a little bit unclear whether or not

3  he jacked up the rear completely or he jacked up one

4  side, but I do know that all three tires were changed.

5       Q.  When you say he jacked up the truck, can you walk

6  us through what that entailed?

7       A.  Sure.  So if you have ever been around jacks,

8  most of them come in a vehicle.  There is various types.

9  There is ones that are scissors and you turn it and it

10 moves up.  Or there is some where you push the lever

11 down and it jacks itself up.

12      So there is a couple ways you can do it.  You can

13 either jack up the rear of the truck all together and

14 change both tires, or you can go to one or either side

15 of the vehicle, a point in the center, and then jack up

16 the entire vehicle and then maybe change those tires.

17      There is a couple of different ways to do it.

18 Like I said, I don't recall exactly which methodology he

19 used.

20      Q.  And when he was doing this, did you take note of

21 anything?

22      A.  I did.  We took surveillance logs.

23      Q.  Did you indicate the time?

24      A.  We did.  The approximate amount -- the amount of

25 time logged that it took to change all three tires was

1  14 minutes.

2     Q.  Did you have an opportunity to observe the

3  physical nature of the defendant at the time?  Did he

4  seem capable or incapable physically?

5     A.  No.  He seemed very capable of being able to

6  change the tires.

7     Q.  All right.  Let's move on to some of the other

8  investigatory tasks you conducted related to this case.

9        Did you recover any voicemails in this case?

10    A.  Yes.  I reviewed the voicemails at the COMMSTA

11 for the mailboxes of the deceased, ET1 Hopkins and Rich

12 Belisle.

13    Q.  And tell the jury how it was you were able to do

14 that.

15    A.  So using the assistance of one of the folks at

16 the COMMSTA that was very good at being able to get into

17 those mailboxes, he was able to essentially reset the

18 password so that I could go in and manipulate it to be

19 able to listen to any voicemails that were present in

20 both boxes.

21    Q.  And after the assistance from the administrator,

22 were you able to get into ET1 Hopkins' voicemail?

23    A.  Yes.

24    Q.  Did you listen to any voicemails that were left

25 on the morning of April 12, 2012?

1    A.   Yes, I did.

2    Q.   Who left a voicemail?

3    A.   The defendant.

4    Q.   Can we pull up for foundation, Blair, 84.

5         Special Agent Bottary, did you listen to that

6    voicemail prior to today?

7    A.   Yes.

8    Q.   And the voicemail that you listened to prior to

9    today, was it the same and accurate as the time that you

10   listened to it on the date that you first got into the

11   voicemail?

12   A.   Yes, it was.

13        MS. STEVENS:  Your Honor, we would move for the

14   introduction of 84.

15        THE COURT:  Any objection to 84?

16        MR. CAMIEL:  No.

17        THE COURT:  Then 84 is admitted.

18        (Exhibit No. 84 admitted.)

19        (Exhibit No. 84 being played in open court.)

20   BY MS. STEVENS:

21   Q.   And sorry to just cut off a little bit.

22        What was the time of that message?

23   A.   7:30 a.m.

24   Q.   Do you recognize the voice of the person that

25   left that message?

1    A.   Yes, I do.

2    Q.   Who was it?

3    A.   The defendant.

4    Q.   Did you listen to any other voicemails?

5    A.   I listened to the voicemail box of Rich Belisle.

6    Q.   Did anybody leave a message for him that morning?

7    A.   Yes, they did.

8    Q.   Who was that?

9    A.   His wife, Nicola.

10   Q.   And how did she sound?

11        MR. COLBATH:  Your Honor, I'm going to object

12   as to relevance, as well as hearsay, I guess.  If we're

13   talking about something --

14        MS. STEVENS:  It's an observation, not a

15   statement.

16        THE COURT:  If you're not getting in the

17   statement and it's simply how did she sound, I'll allow

18   that.

19   BY MS. STEVENS:

20   Q.   How did she sound?

21   A.   She sounded anxious.

22   Q.   Do you recall the date that you retrieved those

23   voicemails?

24   A.   The date of retrieval was the 15th of April.

25   Q.   And did you participate in any searches in this

1   case?

2       A.   Yes, I did.

3       Q.   And tell the jury about that.

4       A.   Participated in a consent search of the

5   defendant's vehicle, the white Dodge Ram pickup truck at

6   the communication station.

7       Q.   Do you recall the date of that?

8       A.   That was the 12th of April.

9       Q.   And I'm showing you now for identification 248,

10  please, Blair.

11          Special Agent Bottary, do you recognize this

12  photo?

13      A.   Yes, ma'am.

14      Q.   And how do you recognize it?

15      A.   I recognize it as the defendant's truck.

16      Q.   And is it an accurate depiction of his vehicle

17  and the date that you guys conducted the consensual

18  search?

19      A.   Yes, it is.

20          MS. STEVENS:  Your Honor, I move to introduce

21  248.

22          MR. COLBATH:  No objection.

23          THE COURT:  248 is admitted.

24          (Exhibit No. 248 admitted.)

25          MS. STEVENS:  Madam Clerk, can you dim the

1  lights?  Thank you.

2  BY MS. STEVENS:

3      Q.  Special Agent Bottary, what items of note do you

4  see here in this photograph?

5      A.  There is a blue pair of earmuffs for protecting

6  your ears as well as just above that a box of -- a red

7  box of blue what appears to be latex gloves.

8      Q.  And do you notice anything about the driver's

9  seat?

10     A.  There is a small tear, and it's clean.

11     Q.  And do you recall during this search if you

12  smelled any odors?

13     A.  I don't recall, no.

14     Q.  Did the seat appear to have been recently

15  cleaned?

16     A.  No, it did not.

17         MS. STEVENS:  Your Honor, I have no more

18  questions at the moment.

19         THE COURT:  All right.  Mr. Colbath?

20                     CROSS EXAMINATION

21  BY MR. COLBATH:

22     Q.  Officer, I want to start with that voicemail, ask

23  you some questions about that.

24         You pulled that up -- or you listened to that

25  after one of the employees there at the COMMSTA pulled

1   that up?

2      A.  That's correct.

3      Q.  And I think it was Mr. Newby, correct?

4      A.  Yes.

5      Q.  Okay.  And the -- he was the systems

6   administrator, so he could bypass the password and get

7   into the e-mail or the voicemail?

8          MS. STEVENS:  I'm sorry, Your Honor.  There is

9   a lack of foundation for this questioning.  I mean it

10  sounds like -- we didn't cover this in direct.

11         THE COURT:  I'll allow the question.

12     A.  Yes.

13     Q.  That's how -- as far as you observed him, you saw

14  him get into the voicemail?

15     A.  That's correct.

16     Q.  And you noticed the time said 7:30 on the

17  voicemail?

18     A.  Yes.

19     Q.  And were you aware that the camera system had,

20  due to power outages, had problems tracking the time?

21         MS. STEVENS:  Objection; that's not in evidence

22  for the COMMSTA.  That was --

23         MR. COLBATH:  I asked if he was aware.

24         MS. STEVENS:  The prior evidence was for the

25  base.  There is nothing in evidence about the COMMSTA

```
 1   having power outages.
 2           THE COURT:  That's sustained.
 3   BY MR. COLBATH:
 4      Q.  Did you know anything about the time system at
 5   the COMMSTA?
 6      A.  No.
 7      Q.  Did you know anything about the voicemail system
 8   and the accuracy of the timestamps on the voicemail
 9   system at the COMMSTA?
10      A.  No.
11      Q.  You just relied on what the machine said because
12   you had no way to know when the voicemail was actually
13   received, did you?
14      A.  That's correct.
15      Q.  Okay.  So I want to back up a little bit and just
16   run through chronologically some of the things you did
17   in your investigation here starting with your arrival on
18   COMMSTA was -- or at the COMMSTA area was mid-afternoon
19   on April 12th?
20      A.  Yes.
21      Q.  And first you were asked some questions about
22   surveillance, or you were asked some questions about
23   surveillance.  That process actually began the following
24   day, sometime April 13th, didn't it?
25      A.  I don't recall.
```

1    Q.   Okay.  You don't recall being assigned beginning

2  April 13th to surveillance shifts with another agent

3  surveilling Mr. Wells beginning April 13th?

4    A.   No, I don't recall that.

5    Q.   Could that have been the date where surveillance

6  started and you're just not recalling it?

7    A.   It's possible.

8    Q.   Okay.  And do you recall going to not only the

9  hill across from his house, but other locations

10  surveilling him on the 14th?

11    A.   I don't recall that.

12    Q.   When is the first time -- first of all, how many

13  shifts did you run surveilling Mr. Wells?

14    A.   I don't recall exactly.  At least half a dozen.

15    Q.   Okay.  And do you recall they began -- well, when

16  do you recall they began?

17    A.   For me, approximately one week after we arrived

18  on the island.

19    Q.   So one week is April 19th?

20    A.   Approximately, yes.

21    Q.   You were still surveilling him in May of 2012?

22    A.   Those were the orders, yes.

23    Q.   Nobody else was ever -- agents were never

24  assigned to run surveillance on any other individual

25  relative to this investigation, were they, that you're

1  aware of?

2      A.  Not that I'm aware of, no.

3      Q.  So let's talk about this tire change incident.

4  Now, when you all sat up there on the hill, even though

5  you were 100 yards away, you had binoculars?

6      A.  Correct.

7      Q.  You had set up a graph of the house and numbered

8  the windows to make notes on what you saw in different

9  locations?

10     A.  I personally don't recall that, unless other

11  agents did that for themselves.

12     Q.  You had a camera there, a video camera or video

13  camera recording equipment in case there was anything

14  you wanted to capture on video?

15     A.  There was a camera up there.  I don't remember

16  when it was installed.

17     Q.  As well as separate optics that you could use for

18  seeing the action better?

19     A.  I'm only aware of handheld binoculars that I

20  used.

21     Q.  Those would be optics, right?

22     A.  Sure.

23     Q.  And you weren't hiding there across from

24  Mr. Wells' house, right?

25     A.  No.

1    Q.   The view was unobstructed?

2    A.   That's correct.

3    Q.   It's only the length of a football field, so he

4  could stand in his driveway and look over at you guys on

5  the hill and you him?

6    A.   Absolutely.

7    Q.   You were aware that he and his wife were aware

8  that you all were there on the hill watching him, right?

9    A.   Sure.  Yes.

10    Q.   Now, on this tire change day, it was middle of

11  the day, noon-ish, something, just after you took over

12  around noon?

13    A.   That's correct.

14    Q.   And you said Mr. Wells moved his truck from a

15  parking spot somewhere up close to the garage?

16    A.   That's correct.

17    Q.   And you couldn't see from your angle whether the

18  garage door was open, could you?

19    A.   I don't recall whether the garage door was open.

20    Q.   Okay.  Before he moved the truck up there, you

21  could see the front of the house, right?

22    A.   That's correct.

23    Q.   And the tires, the three tires that he put on the

24  truck, they were staged already out in front of the

25  house?  They were sitting right there in the driveway in

1    front of the house.  You recall that, right?

2        A.  No, I do not.

3        Q.  Do you recall seeing -- let's not talk about that

4    day, May 2nd.  Do you recall seeing them sitting there

5    for many days prior to that?

6        A.  Through observation.  I mean we watched him, yes.

7        Q.  Did you recall that those three tires had been

8    sitting there?

9        A.  No, I didn't recall.

10       Q.  So when Mr. Wells moved his truck up there, you

11   said then he went back in the house?

12       A.  That's correct.

13       Q.  And the garage is underneath part of the house,

14   so it's all connected; do you remember that?

15       A.  Yes.

16       Q.  It's not a detached garage?  He was not at a shop

17   building or somewhere else?

18       A.  No.

19       Q.  And how long did it take him to make sure that he

20   had the jack out and the pneumatic tools and the other

21   things necessary to change the three tires?

22       A.  I don't recall that.

23       Q.  That wasn't part of your 14-minute calculation

24   though?

25       A.  No.

1    Q.   Okay.  And how about change clothes into whatever

2 or do whatever he was doing in the house before he came

3 out to start, to get ready, how long was he in the house

4 before he came out to begin the tire change process?

5 Did you make a note of that?

6    A.   He went up into the house after moving the truck.

7 It was about three to four minutes.

8    Q.   Okay.  And so the 14 minutes you're talking about

9 is to jack the middle rear up and remove those two

10 tires, put the two new ones that were on there, and then

11 move around and do just the driver's side front tire,

12 right?

13    A.   It was driver front and then both rear.

14    Q.   Yeah.  He didn't have to do anything with the

15 front tire on the passenger side, or you didn't see him

16 do anything with the passenger front?

17    A.   I don't recall seeing him doing anything with the

18 passenger front.

19    Q.   Well, you would have made note of it if he did,

20 right?

21    A.   That's correct.

22    Q.   Did you ever follow Mr. Wells away from his house

23 into any area outside the Bells Flats community during

24 surveillance?

25    A.   Yes, I did.

1    Q.   Where did you follow him to?

2    A.   It was to a freight forwarding company on the

3    other side of town.  I believe it was Pacific Air

4    Freight.

5    Q.   And for instance, when you were doing that kind

6    of surveillance, after he left the building, you would

7    go in -- you or the agent with you would go in and check

8    out what he had been doing at the building, correct?

9    A.   At the freight forwarding?  I don't understand

10   what you're asking.

11   Q.   Sure.  You followed him there because you were

12   monitoring his activities, right?

13   A.   That's correct.  We were surveilling him.

14   Q.   And you saw him go into the freight

15   establishment?

16   A.   That's correct.

17   Q.   And then eventually you saw him come out?

18   A.   Right.

19   Q.   And then after he came out, you or another agent

20   would go in and attempt to determine what his activity

21   had been inside by either talking to the people,

22   obtaining documents, learning what you could learn about

23   his activities?

24   A.   I don't recall doing that on that particular

25   instance.

1    Q.  You're aware that agents were routinely doing

2    that, that was part of the surveillance detail?

3    A.  I would imagine so, yes.

4    Q.  And so let's back up to April 13th.  You don't

5    remember starting surveillance, but on April 12th I

6    guess, even before we get to the 13th, you were aware

7    Mr. Wells was up at COMMSTA, right?

8    A.  That's correct.

9    Q.  And you were aware that he was interviewed

10   because you were part of one or more of those

11   interviews?

12   A.  That's correct.

13   Q.  And as part of one of those interviews, Mr. Wells

14   was asked if his truck was there and if agents could

15   look in his truck?

16   A.  That's correct.

17   Q.  And he agreed to that, signed a form that you all

18   had allowing that, right?

19   A.  Yes.

20   Q.  And you went out and looked both in the passenger

21   compartment and the rear of the truck?

22   A.  That's correct.

23   Q.  Were able to take photos, move things around, do

24   whatever you wanted to do because he didn't put any

25   restrictions on the consent or tell you you could or

1    couldn't do anything, right?

2        A.   That's correct.

3        Q.   The photograph that we saw, which was 252, can

4    you pull that up?  248, let's look at that one.

5            So some of this material here, the things on the

6    driver's floorboard, those were actually under the seat

7    before this picture was taken and they were pulled out

8    to be able to be photographed; do you recall that?

9        A.   No, I do not.

10       Q.   You don't recall them being out where you put

11   your feet when you first opened the truck door, do you?

12       A.   I don't recall whether we pulled them out or not.

13       Q.   And how about the center console over there, do

14   you recall opening that up so you could take pictures of

15   all the stuff in there?

16       A.   No, I do not.

17       Q.   All right.  Now, part of your surveillance

18   detail, a number of times you saw either Mr. or

19   Mrs. Wells, they would come outside the house to get

20   firewood; do you remember that?

21       A.   Yes.

22       Q.   Also, you saw Mr. Wells operate a chain saw and

23   cut firewood?

24       A.   Yes, I did.

25       Q.   And you saw him wearing those blue earmuffs when

1  he was cutting firewood or hearing protection similar to
2  that; do you recall that?
3      A.  No, I do not.
4      Q.  You're not saying he didn't; you're just saying
5  you don't recall?
6      A.  I'm just saying I do not recall.
7      Q.  That's fine.  We don't need to see that one
8  anymore.
9          After the search, the review of the truck there
10  on the 12th, Mr. Wells eventually, like all the other
11  employees, sometime pretty late in the evening left
12  COMMSTA and went home for the night?
13      A.  That's correct.
14      Q.  And agents went and checked on him and checked
15  out what was going on in his house that night, didn't
16  they?
17      A.  I don't recall whether they did that or not.
18      Q.  Somebody had went to the airport and found his
19  wife's car; do you recall that?
20      A.  I recall somebody finding the vehicle, yes.
21      Q.  Do you recall other agents going -- do you know
22  who found the car?
23      A.  No, I do not.
24      Q.  Does a wildlife trooper by the name of Willard
25  Ellis, does that ring a bell?

1          MS. STEVENS:  Objection; he said he doesn't

2     remember.

3          THE COURT:  Well, I'll allow the question.

4     Does the name Willard Ellis ring a bell?

5     A.  No, it does not.

6     Q.  All right.  Were you one of any group of agents

7     that were assigned to go to the airport that night, the

8     night of April 12th, and do surveillance on the blue

9     CR-V, Mrs. Wells' blue CR-V?

10    A.  I don't recall if I was or not.

11    Q.  Okay.  So the next day, on April 13th -- get my

12    chronology straight.

13         You don't recall any of your investigative

14    activities on the 13th, do you, specifically?

15    A.  We reinterviewed Mr. Wells on that day.

16    Q.  So you were part of a group of agents that

17    interviewed Mr. Wells when he came back to COMMSTA?

18    A.  Yes.

19    Q.  How about outside the COMMSTA, did you do any

20    additional investigation or additional work with

21    Mr. Wells?

22    A.  Directly with Mr. Wells, I don't recall that.

23    Q.  How about with anybody else?

24    A.  Participating in the search warrant of his home.

25    Q.  Let me ask you about that.  There was a big team

```
 1    of agents, you included, that went and served the search
 2    warrant actually April 14th on the Wells' residence at
 3    365 Pavloff Circle, right?
 4        A.   I believe so.
 5        Q.   There was probably -- well, there was more than
 6    eight of you that went there, correct?
 7        A.   I don't recall the specific number.
 8        Q.   Okay.  Now, when you got there, Mr. and
 9    Mrs. Wells weren't there, were they?
10        A.   I don't recall that.
11        Q.   The residence had been secured by law enforcement
12    and cordoned off so that the Wells couldn't be there; do
13    you recall that?
14        A.   No, I do not.  I believe my role at the search
15    was after the home had already been entered by the other
16    agents.
17        Q.   Okay.  You didn't see Mr. or Mrs. Wells in the
18    house while you were performing your functions there?
19        A.   No.
20        Q.   You know that a lot of evidence -- well, first of
21    all, the home, the garage, the surroundings, the
22    curtilage of the home were all searched very thoroughly?
23        A.   I would like to think so, yes.
24        Q.   The search continued all the way to the 16th, the
25    13th, the 14th and into the 16th?
```

1      A.   It was very long, yes.

2      Q.   And all kinds of evidence taken, lots of evidence

3 taken?

4      A.   Evidence was taken, yes.

5      Q.   Guns, ammunition, clothes, everything down to the

6 trap out of the sink; do you recall that?

7      A.   I don't recall that specific item, no.

8      Q.   Guns, you recall guns?

9      A.   I do recall some firearms, yes.

10     Q.   Ammunition?

11     A.   Yes, I recall ammunition.

12     Q.   Little different pieces of household goods that

13 thought might contain blood or hair or some kind of

14 forensic evidence that might be relevant to you all's

15 investigation?

16     A.   I don't recall the specific items.

17     Q.   Okay.  So after the 16th, going forward a couple

18 of days to the 19th, you participated in a search with

19 Mr. Allison?  You know Mr. Allison here, Daryl Allison.

20 He's an FBI agent.  You know him, right?

21     A.   Yes, I do know him.

22     Q.   On the 19th, you and him and some other agents

23 went out and searched Mr. Wells' septic tank, right?

24     A.   I recall searching the septic tank, yes.

25     Q.   Let me -- can you bring up DE -33 and 34 and just

1    show Mr. Bottary those pictures, see if he recalls those

2    pictures.

3           Now, during your time there on those three days

4    at the Wells' house, did you have occasion to look in or

5    go in the backyard?

6       A.  I did not go in the backyard, no.

7       Q.  How about look out there?

8       A.  I don't believe I looked out in the backyard, no.

9       Q.  Do you recognize what's depicted in 33, Defense

10   Exhibit 33 and 34?

11      A.  It looks like his septic tank.

12      Q.  So let me also have you see Defense Exhibit

13   No. 131.  Now, do you recognize what that is?

14      A.  No, I do not.

15           MR. COLBATH:  I'm going to move the admission

16   of 33 and 34.

17           THE COURT:  Any objection?

18           MS. STEVENS:  No.

19           THE COURT:  All right.  Then Defense 33 and 34

20   are admitted.

21           (Defense Exhibit Nos. 33 and 34 admitted.)

22   BY MR. COLBATH:

23      Q.  Let's do 33 there first.  So this is behind the

24   house that you sat and did surveillance on, right, the

25   Wells' house, behind it, his area there?

1     A.   I don't recall the exact location of where the

2   septic tank was.

3     Q.   Near to the home?

4     A.   It was within close proximity to the home.

5     Q.   Can we show Exhibit 34.

6          Now, the tank there in the ground is below the

7   ground level, you see that?  Even the pipe sticking up

8   is a little below ground level?

9     A.   Yes.

10    Q.   And when you all went out there to search it, was

11  it in this location?  Did you have to take that lid off

12  that's depicted in Defense 34 to get in there, or was

13  the tank out of the ground?

14    A.   I believe we had to remove the lid from the tank.

15    Q.   All right.  And you learned as part of this

16  process that just -- well, first of all, the tank was

17  basically empty when you got there, wasn't it?

18    A.   I believe so.

19    Q.   It had been -- part of your investigation

20  revealed that it had been actually pumped the night

21  before the murders, April 11th?

22    A.   I don't recall the exact date of the pumping.  I

23  do understand that the tank was not functional --

24    Q.   It wasn't pumped --

25    A.   -- from my recollection.

1    Q.  It wasn't pumped after April 12th, after the

2  murders, because that would have been significant to

3  you, right, that maybe evidence had been removed if it

4  had been after April 12th?

5    A.  It could have been, yes.

6    Q.  That's not what your investigation showed, was

7  it?

8    A.  I'm sorry.  I don't understand what you're

9  asking.

10    Q.  You didn't have any evidence that the tank was

11  pumped after April 12th or on April 12th?

12    A.  I don't know exactly when the tank was pumped.

13    Q.  You didn't find any evidence one way or the other

14  on April 19th, the day that you and Mr. Allison and the

15  other folks searched the septic tank?

16    A.  We did not seize any items, no.

17    Q.  So a couple days after that, you were part of the

18  search team, on April 23rd, you went out to a residence

19  out on the Chiniak Highway, not in the direction of

20  Kodiak, but in the direction past Bells Flats away from

21  Kodiak; do you recall that?

22    A.  I do recall that, yes.

23    Q.  And that was at a residence located out at 36641

24  Chiniak Highway, the residence of a man named Hank

25  Pennington; do you recall that?

1     A.   Not specifically, no.

2     Q.   Do you recall that it was one of Mr. Wells'

3  friends' house?

4     A.   Yes.

5     Q.   And why were you out there?  Why were you

6  searching one of Mr. Wells' friends' house?

7     A.   That was on the search warrant.  That's where I

8  was told to go.

9     Q.   And what was also on the search warrant, what you

10  were told to look for was firearms and ammunition and

11  other things of evidentiary value?

12     A.   Correct.

13     Q.   And in fact, you found a bunch of firearms, at

14  least three .44 magnums; do you recall that?

15     A.   Not specific numbers, no.

16     Q.   Over 1,000 rounds of either empty or live .44

17  ammunition?

18     A.   Ammunition was recovered, yes.

19     Q.   And all those guns were taken by law enforcement

20  to be tested?

21     A.   They were seized pursuant to the warrant, yes.

22          MS. STEVENS:  Your Honor, I'm sorry.  Could we

23  have a quick sidebar, please.

24          THE COURT:  Why don't we take our break in fact

25  at this point.  Ladies and gentlemen, we'll have you

1    back at 3:05.

2              Please remember my admonition not to discuss

3    the case and leave your notepads here.  We'll see you at

4    five after the hour.

5              (Jury absent)

6         THE COURT:  Please be seated, everyone.  We'll

7    see you back.  You can be excused now.  We'll see you

8    back at five after the hour.

9         MS. STEVENS:  So the defense has ventured well

10   outside the scope of direct, and we're being reasonable

11   and not objecting, understanding that this is going to

12   save Special Agent Bottary from coming back, but we

13   would ask, now that we've ventured outside of direct,

14   that the form of the question be open-ended and not

15   leading, because now at this stage it's just Mr. Colbath

16   testifying and the witness just --

17        THE COURT:  Mr. Colbath, any objection to

18   non-leading questions?

19        MR. COLBATH:  Yes, Your Honor.  I will try not

20   to lead to some extent, but I would seek permission from

21   the Court to use, to some extent, leading questions.

22   One, so I can get us to the right area, but more

23   importantly, because I think Mr. Bottary, no offense to

24   him, would be considered a hostile witness.

25             He is one of the two lead Coast Guard

investigators.  He is one of the two people that
interrogated on multiple occasions Mr. Wells and led or
was part of the key search teams to collect evidence to
prosecute Mr. Wells.  So he's certainly an adverse
witness and a law enforcement person that I don't have
normally a chance to sit down and prepare with or work
with to get ready and call in my case in chief.

THE COURT:  Well, for now, I'm going to have
the questions non-leading.  And the problem I'm having,
and I ascribe it more just to the time factor, it's been
several years, is that the witness doesn't recall
things, but you're asking him things that you clearly
recall because you have done the investigative work that
everybody here has done, but from the jury's
perspective, they are hearing you say, "And you recall
that the sky was blue," and the witness says, "I don't
recall."

It's a hard task for these jurors to not hear
your statements as evidence, and it's for that reason
that I will direct the questions that venture to new
topics to be non-leading so that if the witness doesn't
recall we're not having them hear all these things.

So let's give that a try.  And we'll have you
back at five after.  Anything else to take up?

MS. STEVENS:  No, Your Honor.

1          THE COURT:  Anything else, Mr. Colbath?

2          MR. COLBATH:  No.

3          MR. SKROCKI:  I do.

4          THE COURT:  Mr. Skrocki, that's fine.

5          MR. SKROCKI:  After Mr. Bottary, we're going to

6  call Mr. Schmidt.  And prior to Mr. Schmidt, we would

7  like to make application and argument as to conditional

8  relevance because part of his testimony was based, not a

9  lot, but part of his analysis was based on the

10  April 19th video and then leave the remaining aspects of

11  the defense brief until later in the day or as the Court

12  requires.

13          And then also before Mr. Schmidt starts, I

14  would like to read the stipulation that was crafted by

15  the parties as to various jurisdictional elements.

16          THE COURT:  So you have got a stipulation you

17  want to read before Mr. Schmidt?

18          MR. SKROCKI:  In between the witnesses.  Once

19  Mr. Bottary is done, before Mr. Schmidt takes the stand.

20          THE COURT:  Why don't we take our break now.  I

21  appreciate the heads-up.  So after this witness is

22  concluded, it sounds like we'll need another break to

23  take up that application.  That's fine.  If you wanted

24  to do the stipulation before that, that's fine.

25          DEPUTY CLERK:  All rise.  This matter stands in

1    a brief recess.

2              (Recessed from 2:52 p.m. to 3:04 p.m.)

3              (Jury absent)

4              DEPUTY CLERK:  All rise.  Her Honor, the Court,

5    the United States District Court is again in session.

6              THE COURT:  Are we ready for the jury?

7              MR. SKROCKI:  Yes, in a moment.  I wanted to

8    give you advance notice that we just changed our witness

9    order, so I wanted you to be prepared.  We have two

10   shorter witnesses before Mr. Schmidt, so Para Upchurch

11   and Leah Henry will be testifying first.  I will read

12   the stipulation once Mr. Bottary is off the stand.

13             THE COURT:  Thank you, Mr. Skrocki.  All right.

14   We're ready.

15             (Jury present)

16             THE COURT:  Please be seated, everyone.

17   Whenever you're ready, Mr. Colbath.

18             MR. COLBATH:  Thank you, Your Honor.

19   BY MR. COLBATH:

20     Q.  Mr. Bottary, just a couple more things here for

21   you.  I neglected to ask when -- I was trying to do

22   chronology, but I keep missing things.

23          You said to Ms. Stevens that when you first

24   arrived on the 12th and got to COMMSTA, you sort of set

25   up a, you called it a post at COMMSTA to operate from.

1   Where was that at on the COMMSTA facility?

2       A.   They had a conference room that we used.

3       Q.   That would be up in the T-1 building or the main

4   communications building?

5       A.   That's correct, the upper level building.

6       Q.   And I have been told that there was -- well, was

7   it in a secure area or an unsecured area?

8       A.   I'm not sure what you mean by secure and

9   unsecured.

10      Q.   That's a fair question.  Were you aware of

11  whether or not there was an area within the inside of

12  the T-1 that was like a high security area or a

13  clearance only area or something like that, that not

14  even the regular T-1 employees came and went from that

15  area?

16      A.   I don't recall that specific area.

17      Q.   Okay.  Where you set up your post, describe that

18  surrounding for me.

19      A.   It was a conference room with a table and chairs

20  and maybe a few windows.

21      Q.   You didn't have to -- to get to that, other than

22  the front door, did you have to go through a security

23  door or badge in or have somebody get you into the

24  conference room that you recall?

25      A.   No, I don't recall the specific operations.

1    Q.  That's okay.  On the 16th, a couple of days after

2    that first search at Mr. Wells' house, the one that took

3    several days, did you have occasion to go to the Kodiak

4    airport and interview or talk to a bunch of folks?

5    A.  I don't recall those interviews.

6    Q.  All right.  Sometimes as you work through things

7    you'd keep notes, right?

8    A.  Sometimes, yes.

9         MR. COLBATH:  I'm going to show him, counsel, I

10   only have one page, but this page.

11        Your Honor, I have a page of Mr. Bottary's

12   notes that I want to show him when Ms. Stevens is done.

13   I only have one copy.  So when she's done looking at it

14   if I could approach him, I'll show it to him.

15        THE COURT:  Certainly.

16        (Pause)

17        (Mr. Colbath approaches the witness.)

18   BY MR. COLBATH:

19   Q.  Just let me know, sir, when you're done reviewing

20   those to yourself.

21   A.  I'm done.

22   Q.  All right.  Does it appear that you -- or does

23   that help refresh your recollection as to whether or not

24   you may have been at the Kodiak airport doing some

25   interviews or contacts with people on April 16th?

1    A.  It's possible, yes, that I was there.

2    Q.  Okay.  Did you interview folks or attempt to

3    contact folks at a couple of different car rental

4    places?

5    A.  I don't recall exactly whether or not they were

6    part of the car rentals or generic to the airport.  This

7    is not my handwriting, so --

8    Q.  Okay.  How about -- those aren't your notes?

9    A.  No, they are not my notes, they are not my

10   handwriting.

11   Q.  Your name is there and the date is there?

12   A.  That's correct.  I presume that the other agent

13   denoted that.

14   Q.  Okay.  Do you recall talking to anybody at other

15   businesses at the airport, for instance, a coffee shop

16   or another air service, anything like that?

17   A.  I don't recall specifically, no.

18   Q.  I'll take that back from you.

19        MR. COLBATH:  Is that okay, Your Honor?

20        THE COURT:  Certainly.

21        (Mr. Colbath approaches witness.)

22   BY MR. COLBATH:

23   Q.  If we get away from the Kodiak airport and we

24   talk about the area out by COMMSTA, do you recall

25   whether or not there are -- there were other Coast Guard

1    properties out around the rigger shop and the COMMSTA

2    facility?

3        A.   I'm not aware of what specific properties or

4    equities the Coast Guard has in the area other than the

5    COMMSTA, T-1, T-2 building, rigger shop.

6        Q.   Can we see Government Exhibit No. 6?  Let's try

7    No. 6.

8             Do you see, sir, the circle there?

9        A.   Yes.

10       Q.   All right.  And for the record, that's in the

11   kind of center right-hand side of this photograph,

12   Government No. 6, right?

13       A.   It's pretty accurate, yes.

14       Q.   And the building I just drew a line underneath on

15   Government Exhibit No. 6, do you recognize what that

16   building is?

17       A.   Yes, I do.

18       Q.   What is that?

19       A.   The rigger shop.

20       Q.   And then the one I drew a circle around, what's

21   that?

22       A.   I couldn't tell you.

23       Q.   Okay.  Could you highlight that for me, Deatrich?

24   That's good.  Does blowing it up help you at all or no?

25       A.   No, I don't know what that facility is.

Q.  All righty.  On April 16th, at any time, besides being at the Kodiak airport, were you at a water filtration plant, do you recall that?

A.  No, I do not.

Q.  Okay.  After that first search at Mr. Wells' property, the one -- you answered questions before our break about April 14th to April 16th, do you recall going back there about ten days later on April 24th?

A.  I do recall going back to his property, yes.

Q.  Were you part of a -- that would have been for what purpose when you went back there?

A.  To execute another search warrant.

Q.  Was part of the subsequent trip there, do you recall being involved in a search warrant where canines were used?

A.  Not specifically, no.

Q.  Does that mean that you're not remembering that canines were used or that they were not used?

A.  I don't recall whether we used canines.

Q.  That's an investigative option -- is that an investigative option that you all had to utilize if you wanted to use a canine?

A.  Yes.

Q.  And what were those canines trained, if you used one in a search, what were they trained for, do you

1   know?

2          MS. STEVENS:  Your Honor, objection.  He said

3   that he doesn't remember if there were canines, and now

4   we're kind of getting into irrelevant questions, leading

5   as well.

6          THE COURT:  Well, I'll allow a few more

7   questions on this topic.

8          MR. COLBATH:  I just have that one, Your Honor.

9          THE COURT:  That's fine.  I'll allow that.

10    A.  Could you repeat it?

11    Q.  Sure.  If you wanted to use canines, or if you

12  all used canines in your investigative process, what

13  would they have been used for?

14    A.  Canines are used for narcotics, explosives,

15  cadavers, that's what canines are used for.

16    Q.  Both physical and biological search for evidence?

17    A.  I believe so.  I don't really know the

18  intricacies of canines and how they operate.

19    Q.  Could you pull up Defendant 155, just for

20  foundation, please.  I don't think that's admitted.

21          MR. COLBATH:  155, I don't think it is.

22          THE COURT:  No.

23  BY MR. COLBATH:

24    Q.  Mr. Bottary, do you recognize what's on the

25  screen there as 155?

1     A.  Yes, I do.

2     Q.  And would that -- does that appear to be an

3   accurate representation of the Wells' residence that you

4   have described conducting surveillance on?

5     A.  Yes.

6     Q.  And this is generally -- is this generally part

7   of the area that you would have been able to observe in

8   your surveillance?

9     A.  Yes.

10        MR. COLBATH:  I'm going to move the admission

11   of 155.

12        THE COURT:  Any objection?

13        MS. STEVENS:  No.  I would just request that

14   counsel maybe follow up on the date range of this

15   photograph before we agree to admit it.

16        THE COURT:  Can you lay the foundation for the

17   date?

18        MR. COLBATH:  I can try, Your Honor.

19   BY MR. COLBATH:

20     Q.  Well, first of all, do you know -- you don't know

21   who took the picture?

22     A.  No.

23     Q.  Or when?

24     A.  I couldn't tell you, no.

25     Q.  Does it appear to you that the home looks

1  substantially in the condition and location and

2  everything else as to where it was at the date and time

3  you conducted surveillance?

4     A.  It looks like the home, yes.  It looks like the

5  residence of the defendant.

6          MR. COLBATH:  All right.  I would move that,

7  Your Honor.

8          MS. STEVENS:  We have no objection.

9          THE COURT:  155 Defense is admitted.

10         (Defense Exhibit No. 155 admitted.)

11 BY MR. COLBATH:

12    Q.  And can you see, sir -- can we see in this

13 picture the location where you described Mr. Wells

14 changed the tires?

15    A.  The garage area, yes.

16    Q.  That would be the car -- the truck was not in the

17 garage?

18    A.  It wasn't in the garage, no.

19    Q.  Parked here where I have drawn the blue line in

20 front of the garage?

21    A.  Approximately, yes.

22         MR. COLBATH:  That's all I have.  Well, give me

23 just one minute.

24         THE COURT:  Certainly.

25         (Pause)

BY MR. COLBATH:

Q. Government 141 is not admitted. We'll just use 155. Go ahead. Put that back up there. Can you blow up that garage door area? That's good.

Sir, you testified about the pneumatic tool. Does this appear to be an air compressor there to you in the picture?

A. Yes.

Q. And the hoses there running off of that, could you see in your surveillance whether or not those were the hoses that that pneumatic tool you described was attached to?

A. I know the hose was blue. That's the only thing I do remember.

Q. We see a blue hose there. I have circled on Exhibit --

THE COURT: It's not overhead.

Q. I'm sorry. They should all be able to see. Let's start over.

Now, this is that same photo I just showed you, sir, so it's in evidence. It's Defense Exhibit No. 155. And I said is this an air compressor, and you and I were the only ones that could see it, so that's what you were referring to?

A. Yes, that's the air compressor.

1    Q.  And then you remember the blue hoses on the

2  pneumatics coming off of that?

3    A.  I remember blue hoses, yes.

4    Q.  And then blow up the other half over there.

5  Yeah, that's good.

6        And do you remember seeing the tires here that I

7  have circled the blue hose runs to there?

8    A.  I don't specifically recall the tires, no.

9        MR. COLBATH:  That's all I have for you, sir.

10  Thank you.

11        THE COURT:  Redirect?

12                  REDIRECT EXAMINATION

13  BY MS. STEVENS:

14    Q.  Special Agent Bottary, who was running this

15  investigation?

16    A.  Lead agent was Daryl Allison of the FBI.

17    Q.  Where were you getting your tasking from?

18    A.  The tasking would have been run through him.

19    Q.  Before you execute a search warrant, who approves

20  it?

21    A.  A judge.

22        MS. STEVENS:  No more questions.

23        THE COURT:  All right.  Nothing on that?

24        MR. COLBATH:  No, I don't have any follow-up to

25  that.

THE COURT:  Sir, you may be excused.  And this witness can be released?  Yes.

MS. STEVENS:  Yes, from the government.

MR. COLBATH:  Yeah, I think we can, Your Honor.

THE COURT:  Thank you.  You may be excused.

(Witness excused)

THE COURT:  All right.  The government's -- you're going to read a stipulation now.

Ladies and gentlemen, you may recall when I did the introductory instructions to you I indicated that there is certain evidence, is what the witnesses testify to, the documents that are admitted and stipulations of the parties, and so the parties have reached a stipulation.  Mr. Skrocki is going to read that into the record and you can accept these facts as true.

MR. SKROCKI:  Thank you.  Want to put it up on the overhead?

THE COURT:  All right.

MR. SKROCKI:  We marked this as Exhibit 256, but it does say "Stipulations of Facts" on the header, Your Honor.

Stipulation, members of the jury, reads as follows:  The Kodiak Communication Station, COMMSTA, which included the property of T-1 and the rigger shop, T-2, was located on federal property.  At the time of

his death, James Hopkins was an employee of the federal
government, specifically the United States Coast Guard.

At the time of his death, Richard Belisle was
an employee of the federal government, specifically the
United States Coast Guard.

James Wells' home phone number was (907)
487-2415.  James Wells' cell phone number was (907)
942-4844.

That concludes the reading of the stipulation.

THE COURT:  Thank you, Mr. Skrocki.  All right.
Are we ready for the government's next witness?

MS. STEVENS:  We are, Your Honor, and the
government calls Para Upchurch.

THE COURT:  All right.

(Pause)

THE COURT:  Hello.  Good afternoon.  If you
could come all the way forward up to the witness stand,
please.  When you get up there, remain standing and the
clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please
state your full name and then spell your full name.

THE WITNESS:  My full name is Para Danielle
Upchurch, P-a-r-a, D-a-n-i-e-l-l-e, U-p-c-h-u-r-c-h.

PARA UPCHURCH, GOVERNMENT WITNESS, SWORN

```
 1                     DIRECT EXAMINATION
 2   BY MS. STEVENS:
 3       Q.   Petty Officer Upchurch, where do you work
 4   currently?
 5       A.   Currently, I work at Sector Anchorage.
 6       Q.   What do you do there?
 7       A.   I work in the prevention department, and I'm a
 8   marine science technician.
 9       Q.   So I'm pretty sure that the jury probably didn't
10   know what you were talking about, so let's explain what
11   a prevention department is and your specific rating,
12   okay?
13       A.   Okay.  So in the Coast Guard one of the jobs that
14   you can have is be a marine science technician, and
15   there is two sides to being a marine science technician.
16   There is prevention, which is the department I'm in, and
17   there is response.
18           So prevention is -- my main focus is to prevent a
19   fuel or oil spill or a loss of life.  And then the
20   response department would be they would respond to that
21   oil spill or that HAZMAT spill or loss of life incident.
22       Q.   So what is your current rate and rank?
23       A.   So I'm an E-5, which is MST II.
24       Q.   How long have you been in the Coast Guard?
25       A.   I have been in for ten years.
```

1    Q.   And before being assigned to Sector Anchorage,
2    where were you assigned?
3    A.   Right before Sector Anchorage, I was stationed in
4    Sector San Francisco as a third class petty officer.
5    Q.   Doing the same type of work?
6    A.   Right.  I was an MST.
7    Q.   Before Sector San Francisco, where were you?
8    A.   Before San Francisco, I went to Yorktown to MST A
9    school.  That's where I learned how to do my job.  But
10   before that, I was stationed at COMMSTA Kodiak.
11   Q.   And do you recall what years you were at COMMSTA
12   Kodiak?
13   A.   Yeah.  I was there December -- I arrived in
14   December of 2009 and then I left in September of 2012.
15   Q.   And was that your first job in the Coast Guard?
16   A.   Yes.  So I joined the Coast Guard in September of
17   2009 and I went to boot camp.  And then right after boot
18   camp, they said, "You're going to COMMSTA Kodiak," so
19   that was my first place I ever went to with the Coast
20   Guard.
21   Q.   How old were you when you joined?
22   A.   I was 27.  I was old -- older.
23   Q.   When you arrived in COMMSTA, who was your
24   supervisor, your direct supervisor?
25   A.   When I arrived at the COMMSTA?  Okay.  When I

arrived at the COMMSTA -- I was there three years.  But
when I first got there, my direct supervisor was --
there was a Imperatrust (phonetic).  Imperatrust was
like ET3.  I can't remember if he was a third or a
second.  I think he was a third.  His name was
Imperatrust.

Q.  And who supervised you after him, after he
rotated out?

A.  So it was ET3 Beauford.

Q.  And how old was he?

A.  He was 19.  Yeah.

Q.  So what was it like being managed by a
19-year-old?

A.  It was -- Beauford was young.  He was 17 when he
joined the Coast Guard I think.  He came -- he was like
a baby.  I mean he cooked everything in the microwave.
I'm serious.  No, I had to teach him how to make food.
I would give him rides.  And he didn't really cuss at
all, and I was like, "Oh, please stay good," you know.

That's how -- I mean it was cool.  He would be
like, "Hey, Upchurch, sweep the floor," and I would be
like, "Okay," and I would just like sweep the floor or
whatever.

Q.  Were those the type of tasks that you did as a
non-rate there, sweeping and stuff?

A.  Well, I mean, it was cooler than cleaning, but we
did a lot of cleaning, but we did a lot of other stuff
too.  Yeah.

Q.  And did you ever -- were you ever supervised by
ET1 Hopkins?

A.  Yes.

Q.  And how was he with regard to managing ET3
Beauford from your observation?

A.  I mean I'm just going to be super honest.  I'm
going to sound -- he's dead, right, so I'm going to
sound bad.  I'm going to say bad things about a dead
guy, but he wasn't a good leader at all.  He wasn't a
good supervisor.  He wasn't nice to people.

Q.  Okay.  And with regard to how he managed
Beauford, Cody Beauford, do you recall a conversation
you had yesterday or the day before or maybe it was
Friday about how he managed Cody?

A.  Yeah, I do.  So I know it's really important as a
third class petty officer to learn how to be a leader,
and then you actually get we call it marks.  You get
marked in the Coast Guard.  It's a job evaluation on a
lot of categories.

And one of those categories is how you manage
your subordinates.  And as a non-rate -- I was a
non-rate.  I don't have subordinates.  I'm the lowest

1    person in the Coast Guard.

2         So when you move up to third class petty officer

3    this is your first opportunity to have a subordinate.

4    So you're getting a job evaluation on how well you do

5    that.  And so ET1 Hopkins, he would tell Beauford, "Hey,

6    have the non-rates do whatever," you know, like clean

7    the rigger shop or whatever.  And so then Beauford would

8    come to us and it was his job to tell us what to do.  He

9    was trying to teach him how to be a leader.

10   Q.   And were you -- while you were down at the

11   COMMSTA, did you ever get qualified to climb?

12   A.   I did, yeah.

13   Q.   And how high were you qualified?

14   A.   So I was --

15   Q.   How high of a tower could you climb?

16   A.   Up to 600 feet.

17   Q.   Okay.  And can you walk the jury through what it

18   entailed to climb, let's just say a 300-foot tower?

19   A.   How to be qualified or how to do it?

20   Q.   How to climb it, yeah.

21   A.   Okay.  Well, first, you had to be qualified.

22   There is no way they are going to let you do it if you

23   didn't get the okay to do it.  But usually we would know

24   in advance like, okay, tomorrow we're going to climb the

25   300-footer.

1          So we would have to -- first of all, the weather

2     has to be good.  It can't be super windy.  We have to

3     know the job, like why are we doing it.  We would always

4     have safety brief or whatever.  We would talk about --

5     you know, it has to be safe.  And then we had equipment

6     that we would wear, harnesses, and we would put on all

7     our equipment and then we would go, we would climb the

8     tower.

9     Q.  And how long would it take you to get to the top

10    of a 300-foot tower?

11    A.  Okay.  Honestly, I can't remember exactly how

12    long it takes to get to the top.  I never timed myself

13    to climb the tower.  And then we would always take a

14    break halfway up, because once you get halfway up, there

15    is a small little take-a-break platform area.

16         So I like taking a break halfway up.  And then we

17    would be up there maybe five minutes, however long, take

18    a break, and then we'd start back up.  So I think you

19    could do it in like 30 minutes.  It depends how good of

20    a climber you are too.

21    Q.  So the break was for -- what was the break for?

22    A.  Well, I think the break was for like me, like the

23    junior non-experienced climber to like give my legs a

24    break, yeah.

25    Q.  So can you describe the physical nature of

1  climbing a tower?  Is it challenging?

2      A.   It is challenging.  You know, even if you do it

3  properly, there is a proper way to do it, you know, it's

4  still not easy.  You're climbing straight up.  There is

5  no -- you're going straight up a ladder.  So it's not

6  easy.

7      Q.   Who taught you how to climb?

8      A.   Jim Wells and Rich Belisle.

9      Q.   And how often would you say you were climbing

10  with either one of those gentlemen?  Was it every time

11  or did you climb with other people?

12     A.   No.  I don't -- I have never climbed without

13  them.  Yeah, I wouldn't ever want to climb without them.

14  I don't think we were allowed to.  I mean they were in

15  charge of tower climbing.

16     Q.   And describe your relationship with the

17  defendant.

18     A.   With --

19     Q.   With Mr. Wells.

20     A.   Okay.  Jim -- Jim was really good to me when I

21  showed up to -- okay, look, you go to your unit, you're

22  a non-rate, you're new.  You're scared in the Coast

23  Guard, you know, so you don't want to get in trouble,

24  you don't want to make waves, you just want to do your

25  job, you want to do it good.

1      When I got to the rigger shop, I didn't know what

2 an antenna field was.  I don't know anything about

3 antennas.  I know tools a little bit, but I'm not

4 professional with tools, you know.  But when I got to

5 the rigger shop, I had a lot to learn.  And most -- I

6 will say most of the stuff that I learned for my job I

7 learned from Jim Wells.  He's not the only person I

8 learned from.  I learned from Rich Belisle a lot too,

9 but Jim helped me a lot.

10     Q.  Did he share stuff with you, information?

11     A.  Oh, yeah.  Yeah.

12     Q.  And how -- were you able to observe him interact

13 with others down in the rigger shop?

14     A.  Yeah.  The rigger shop is small.  I mean we all

15 worked together.

16     Q.  What were those observations?  How did he

17 interact with the other folks down there?

18     A.  He interacted -- I mean he was Jim.  We went to

19 Jim for tons of stuff.  We would go ask him questions

20 and he would answer questions and help us.

21     Q.  How did he interact with his supervisory chain?

22     A.  Like who do you mean?

23     Q.  So my understanding is that ET1 Hopkins was his

24 direct supervisor.

25     A.  Okay.

1    Q.   And then above that was Chief Reckner.

2    A.   Right.

3    Q.   So the question is:  How did he interact with his

4    supervisory chain?

5    A.   I never observed -- work was work, right.  I

6    worked outside a lot, but I never saw anything that was

7    bad.  Well, ET1 Hopkins was grumpy all the time.  I know

8    this isn't a question, but I'm telling you, like ET1 was

9    hard to get along with.

10        ET1 Hopkins was like -- I tried to stay away from

11   him as much as possible.  And I can't speak for Jim.  I

12   don't know if he -- like everybody kind of tried to like

13   give him his space and stay away from him, so I can't

14   really say.

15        I mean Jim was at work.  I would wait until I

16   could find Jim alone to like ask my questions, because I

17   felt -- I would be like waiting to like ask Jim tons of

18   questions for ET1 to be like gone.

19   Q.   So you had a pretty close relationship with

20   Mr. Wells seems like?

21   A.   Yeah.

22   Q.   Okay.  Would you visit with him and his family at

23   their home?

24   A.   Yeah, I would.

25   Q.   How frequently did you visit?

1    A.  I would go over to Jim and Nancy's house any time
2  they would ask me to go over to their house, which would
3  be -- it could vary.  It could be once a week.  It could
4  be once every two weeks.  It could be once a month.  You
5  know, stuff happens in life, but it would be like once a
6  week or twice a week or once every two weeks or
7  whatever, but pretty regularly.
8    Q.  And what were the visits like?
9    A.  Well, I mean, the main part of me going over
10  there was to visit, but to eat too.  Like I would go
11  over for dinner mostly.  I would go over to have dinner.
12    Q.  And did that include visiting him in the fall of
13  2011?
14    A.  In the fall -- I mean, for almost the two --
15  well, I was there almost three years, but in the two and
16  a half years that I went to their house, I went over to
17  eat.
18    Q.  Okay.  So did you eat at their house in the fall
19  of 2011?
20    A.  Oh, yeah, I'm sure I did.  I might have even had
21  Thanksgiving at their house in the fall of 2011.
22    Q.  And did you observe him missing work during this
23  time?
24    A.  Yeah.
25    Q.  Okay.  When he was missing work, did you observe

```
 1    anybody else in the rigger shop step into his position?

 2        A.   When Jim was gone, I mean, Rich Belisle was the

 3    next rigger person that was -- I mean, yeah, so Rich

 4    Belisle and then ET1 Hopkins, they both had to make more

 5    choices with Jim's absence.

 6        Q.   Okay.  And in the time that you visited him at

 7    his house and worked with him, did he appear to be a

 8    physically capable individual?

 9        A.   Yes.

10        Q.   Did he have any trouble climbing towers?

11        A.   No, he was good at it.

12        Q.   And did you have an opportunity to observe which

13    restroom he would use when he had to go to the bathroom

14    at work?

15        A.   Well, we had one bathroom in the rigger shop so

16    we all used the same bathroom, which was close to my

17    desk, so --

18        Q.   Okay.  And when -- going back just a little.

19    When you would have dinner over at his house fairly

20    frequently, did Seaman Coggins ever go with you?

21        A.   I don't recall ever having dinner with Seaman

22    Coggins.

23        Q.   What about ET3 Beauford?

24        A.   I don't think Beauford had dinner either.

25        Q.   Seaman Pacheco?
```

1      A.   I don't remember having dinner with Pacheco at

2  Jim's house.  Maybe once.

3      Q.   Did you ever observe him go up to T-1 to use the

4  bathroom?

5      A.   Well, no.  But if he did, I don't think he would

6  tell me, I don't think.

7      Q.   Did you ever assist the Wells family with taking

8  them to the airport or doing anything with their vehicle

9  when they went on trips?

10     A.   Yeah, I would help them.

11     Q.   Just explain to the jury what it was that you

12  would do.

13     A.   Okay.  So in Kodiak if you park at the airport,

14  you have to pay.  And say, for me, I don't want to pay

15  to leave my car at the airport if I don't have to.  So

16  Jim and Nancy, when I would go out of town, they would

17  drive me and drop me off and I would leave my truck at

18  their house or at the rigger shop, but I would do the

19  same for them.

20          So if they went out of town, so they didn't have

21  to pay to park their vehicles at the airport, I would

22  drop them off in their vehicle and then go back to like

23  their house and get my truck or stuff like that.

24     Q.   Where do you live compared to the COMMSTA?

25     A.   So I lived closer to town, so Kodiak town.  Do

1    they know about like -- I don't know if you guys were

2    explained Kodiak and what Kodiak looks like.  There is

3    town and then there is base, so I lived in town.

4        Q.  How long would it take for you to get from where

5    you lived in town to the COMMSTA?

6        A.  Anywhere from 10 to 15 minutes.

7        Q.  Okay.  And do you remember what time you got in

8    to work on the morning of April 12, 2012?

9        A.  Yeah, it was 7:40.

10       Q.  When you arrived that morning, did you observe

11   anything?

12       A.  When I got to work, it was just -- I parked --

13   the only thing I observed was just when I came into the

14   parking lot the vehicles that were there and just

15   parked.

16       Q.  Do you remember which vehicles those were?

17       A.  Yeah, I do.

18       Q.  What were they?

19       A.  There was ET1 Hopkins' truck and then there was

20   Rich Belisle's truck.  And then we had two government

21   vehicles that stay there all night.  They're our work

22   trucks.  They were there.

23           And then Seaman Coggins, his vehicle was parked

24   next in the row, and then I pulled in next to Seaman

25   Coggins.

1    Q.  What kind of car did you pull in?

2    A.  I drove a Toyota Tacoma.

3    Q.  And did you park there in the COMMSTA parking lot

4    or did you park -- did you park down in T-2 or up at

5    T-1?

6    A.  No, I pulled into the rigger shop at T-2.

7    Q.  After you pulled in and got out, what did you do

8    next?

9    A.  I went into the building, because -- yeah, I went

10   inside.

11   Q.  Tell the members of the jury what you observed

12   when you got into the building.

13   A.  Okay.  So I went in the building, you know,

14   normal day.  But when I went in, instantly it smelled

15   really bad in there.  And I didn't know what the smell

16   was, but it smelled like really bad overflowed toilet,

17   so I thought that one of the guys overflowed the toilet.

18   I was kind of mad about it.

19        But I started to kind of walk to my desk, and I

20   always walked a certain way to my desk.  And when I got

21   -- I started to go around the corner to my desk, ET3

22   Beauford and Seaman Coggins were standing -- I must have

23   walked right into them.  They were kind of right on the

24   corner, and that was unusual.

25        And they were like, "Para" -- Beauford said to

me, he's like, "Para, I don't think you want to go in

there."  And I was like, "Why not," you know, thinking

there was like poop all over the floor or something.  I

don't know, because the smell was really bad.

And he said, "They're down."  And I'm like, "What

do you mean they're down?  What are you trying to say?"

He wasn't making sense to me really.  He said, "They're

down on the floor."  I was like, "Who?"  And he said,

"ET1 and Rich."

And I was just like -- I didn't know what to say.

I was confused.  So I think I was kind of mad too.  I

can remember I was like, "Bullshit," or something.  I

said that to them, and I turned around and I walked

outside because I didn't know what was going on.  It was

weird, and it smelled really bad in the building.

Nobody followed me outside at all.  I was just

standing there and I felt kind of -- I was like I don't

know what's going on, and so -- because ET1's truck was

parked right there and Rich's truck was parked right

there, I was confused.  And so I thought have they been

there all night or did they just get to work?

Like we all probably just got to work, so I felt

the fronts of their trucks to see if they were warm, and

they were.  I was like they just got here, so is it a

joke?  I thought they were playing on a joke on me or

something.

So I went back inside, and Beauford and Coggins
were just standing right there, right when I came in the
door, they were just in front of me.  I said, "You guys,
what's going on?"  And Beauford said, "I think they are
dead."  And I was like, "What?"  And he's like, "Look
for yourself."

So I went around Beauford the opposite direction
I went the first time, I went the other way, and I
looked into the room.  And I saw a lot of blood all over
the floor, and it was ET1 Hopkins.  He was laying on the
floor.  And that's -- that's instantly when I knew it
wasn't a joke, because I knew ET1 Hopkins would never
lay on the floor.

And I got really scared.  I was like, "Oh, my
God."  And I said, "People" -- I think Beauford had told
me, "I think they're shot.  I think they're dead or
something," because I remember -- I said out loud, I
said, "You guys, what are you doing just standing here?
If people are getting shot, you know, why are you
standing here?"  And I said, "I'm leaving.  I'm not
staying here."

And Beauford, he was my supervisor, he's like,
"Okay, go up to the COMMSTA."  I'm like, "You don't have
to tell me, I'm leaving," and I left then.

1    Q.   Para, do you know what the smell of gunpowder is

2 like?

3    A.   Well, I do now.

4    Q.   Okay.  And just real quick before we get back

5 into that morning, going back to the airport.

6         When Nancy would go out of town, what would the

7 practice be for their vehicle during a situation like

8 that?

9         MR. COLBATH:  Your Honor, I'm going to object

10 as to foundation.

11         MS. STEVENS:  She already testified about how

12 she moves the vehicle.

13         THE COURT:  What would her practice be?

14         MR. COLBATH:  She asked Ms. Wells' practice.

15         THE COURT:  Ms. Wells' practice?

16         MS. STEVENS:  The Wells' practice.

17         THE COURT:  Well, it's sustained as to

18 foundation at this time, so if you want to inquire more.

19         MS. STEVENS:  All right.

20 BY MS. STEVENS:

21    Q.   When you -- when Mr. and Mrs. Wells went out of

22 town, you would move their vehicle, correct?

23         MR. COLBATH:  Your Honor, I'm going to object

24 as to leading.

25         MS. STEVENS:  This is what she already

1    testified to.

2              THE COURT:  Let's just hear -- let's hear the

3    next question.

4    BY MS. STEVENS:

5       Q.  What was your understanding of why you would do

6    that?

7       A.  So that they wouldn't have to pay to leave their

8    vehicle at the airport.

9       Q.  And when Nancy would go out of town or when Jim

10   would go out of town, what would their practice be with

11   the vehicle?

12             MR. COLBATH:  Your Honor --

13             THE COURT:  That's sustained.

14   BY MS. STEVENS:

15      Q.  So that morning after you run into Coggins and

16   you run into Beauford, what do you do next after you

17   encounter the crime scene?  What do you do next?

18      A.  So I did leave.  I went outside and I got in my

19   truck.  And I drove my truck up to the COMMSTA, the main

20   building, and I parked right in front of the building.

21   I'm not supposed to park there, but I didn't care.  I

22   just parked in the best first spot I could find and I

23   went inside the building.

24      Q.  And where did you go?

25      A.  I went straight to the -- there is a conference

1    room.  I went straight to the conference room.

2         Q.  What were you guys supposed to do at work that

3    day?

4         A.  We were going to climb a tower that day.

5         Q.  Who were you going to climb with?

6         A.  I think everybody -- not ET1 Hopkins, but I think

7    -- I'm pretty sure it was going to be Jim, Rich, and

8    Pacheco.  And I don't know about Leah.  I can't remember

9    if Leah was going to climb.

10        Q.  And your understanding was that Mr. Wells was

11   going to climb that day?

12        A.  I thought he was.

13        Q.  Why did you think that?

14        A.  Because I had just -- I had just seen him over

15   the weekend.  It was -- it was Easter.  We had Easter

16   Sunday, like dinner, with Nancy and Leah.  And we -- I'm

17   pretty sure we discussed it.  Like I knew that's

18   something that was going to happen.

19        Q.  When you observed him at Easter dinner, did he

20   appear to be well?

21        A.  Yeah, he did.

22        Q.  So after you -- when you saw Cody and you saw

23   Coggins in the building, can you describe how they

24   appeared, physically how they looked?

25        A.  Yeah.  So when I walked in the building and I --

I came to the corner and they were standing there, they seemed very shocked. They weren't making sense. Well, Coggins didn't say a word. Beauford didn't make sense at all.

Q. I'm sorry to interrupt. How did they physically look?

A. Oh, they looked like they had seen a ghost.

Q. And then you got to the conference room. What happened after you got to the conference room? Did you observe anything?

A. I did. I was there by myself, and I noticed Petty Officer Haselden run past the window. He was running down to the rigger shop.

Q. How did he appear?

A. He was running. He was moving. I mean he looked like he had a real sense of urgency. He was going.

Q. When you were sitting in the conference room, did you do anything next?

A. I did.

Q. What was that?

A. Well, I cried, but I was -- I cried. And then I thought where is Jim, and I tried to call him. But my phone didn't have service so it didn't work. So I just sat back down at the table by myself.

Q. Did anybody eventually come in?

1    A.   Yes.  So I sat there until Leah came.  She came

2    behind -- she came in -- I don't know how long it was,

3    but it wasn't too long.  She came in and she was

4    freaking out.

5    Q.   How did she appear physically?  What did you

6    observe?

7    A.   She was crying and she was grabbing onto my arm,

8    which she never -- she was just grabbing my arm and

9    crying and she was freaking out.

10   Q.   Without saying what you said, did you guys start

11   to talk about the incident?

12   A.   Yeah, we did.

13   Q.   And once Leah got there, did you make any phone

14   calls with her phone?

15   A.   Yeah.  So she -- I don't know how long after she

16   got there, but it wasn't too long, but I was like,

17   "Leah, do you have cell service?"  And so we checked her

18   phone, and she had a different carrier than me, so she

19   had a few more bars than I did.  And I used her phone to

20   call Jim.

21   Q.   Explain that conversation to the jury, please.

22   A.   So it was short.  I called, he answered.  And I

23   said, "Jim, where are you?"  And he said, "I'm at home.

24   I have a flat tire."  And then he said, "What's going

25   on?"

1      And I said, "Something really bad happened at the

2  COMMSTA."  And he said that he would be there -- he's

3  like, "I'll be there shortly or soon."  And I was like,

4  "All right," and I hung up.

5      Q.  And did he eventually arrive?

6      A.  He did.

7      Q.  Walk us through what happens when he gets there.

8      A.  So Leah and I were just sitting at the table, and

9  I just -- I don't know how long it was after I called

10  him, I mean, but we were just sitting there.  And then

11  Jim came into the conference room and he was there.

12      Q.  What were your thoughts when he had told you he

13  had a flat tire?

14      A.  Well, on the phone, on the phone call, when he

15  told me right away, when he's like, "I have a flat

16  tire," I was just like, "Oh, that's bad."

17      Q.  Why was it bad?

18      A.  I mean it was just -- it just sounded bad, like

19  it just was bad.  I was just like, "Oh, no," like.  I

20  would rather he said he was like at a medical

21  appointment in Anchorage or something.

22      Q.  And did you have any other concerns about the

23  morning involving Mr. Wells?

24      A.  No.

25      Q.  Did you observe him doing anything with his ears

1   that morning?

2     A.  Yeah, I did.  That was -- I don't know how long

3   after -- we were in that room all day.  So we were there

4   -- I mean we sat there all day, me, Leah, Jim, people

5   would come in and out periodically, ask us if we want

6   anything.  So I don't know how long into the day, but at

7   one point I did see Jim with his finger in his ear.

8     Q.  What was he doing?

9     A.  He was just kind of holding his finger like

10   wiggling maybe a little bit in his ear.

11     Q.  Did you have a conversation?

12     A.  I just asked him something about like -- I can't

13   remember exactly what I asked him, just like, "What's up

14   with your ear," or "What's going on," something.  I was

15   just -- I have been asking Jim questions periodically

16   throughout the day, but I asked him and he said his ear

17   was ringing.

18     Q.  When you asked him the questions periodically

19   throughout the day, what were his responses?

20     A.  I mean a lot of the stuff I would ask him, "Jim,

21   who do you think could have did it?"  He is like, "I

22   don't know," or, you know, he didn't say a lot through

23   the day.

24     Q.  Have you ever done any firing practice, shooting

25   practice with the Coast Guard?

```
 1      A.  Well, we -- so I was qualified in boot camp, but
 2   after that, I didn't do any real shooting with the Coast
 3   Guard, but we did have morale day shooting events.
 4      Q.  During those morale events, what kind of
 5   protections would you take before firing a firearm?
 6      A.  Oh, like hearing protection, definitely.  Yeah,
 7   we would --
 8      Q.  After the murders, did you have an opportunity to
 9   talk to the defendant at his home?
10      A.  After the murder -- yeah, I did, yeah.
11      Q.  And do you remember what you guys talked about
12   when you went over to his house?
13          MR. COLBATH:  Your Honor, I'm going to ask that
14   we have a timeframe here.
15          THE COURT:  That's sustained, when the visit
16   was to the house.
17          MS. STEVENS:  Sure.
18   BY MS. STEVENS:
19      Q.  Do you recall when you visited Mr. Wells after
20   the murders?
21      A.  Yes.  I went to his house the very last day that
22   I had in Kodiak.  I was going to leave.
23      Q.  When was that?
24      A.  I don't remember the date.
25      Q.  Do you remember the month and --
```

1    A.   I think it was September.

2    Q.   Okay.

3    A.   It was my very last day to be in Kodiak.  I was

4    leaving to go to A school.

5    Q.   And do you remember what conversation you had

6    with him at his house?

7    A.   Yes.

8    Q.   And did you have any discussion about the

9    murders?

10   A.   I mean we talked a little bit about -- we talked

11   about how things were going at work.  We talked a little

12   bit about -- I don't know, that they didn't --

13   Q.   Did he express concern about the fact that the

14   rigger shop mowed Mrs. Belisle's lawn?

15         MR. COLBATH:  Your Honor, I'm going to object

16   as to leading.

17         THE COURT:  That's sustained.

18   BY MS. STEVENS:

19   Q.   Do you remember talking about -- do you remember

20   asking -- you know what, maybe we just need to refresh

21   our recollection, so give me one moment, Your Honor.

22         THE COURT:  All right.

23         (Pause)

24         THE COURT:  Do we need to take a short break?

25         MS. STEVENS:  I have it right here.  Sorry.

1    Actually, Your Honor, I'm going to take you up on that.

2              THE COURT:  Let's do that.  We'll take about 5

3    to 10 minutes.  Please leave your notepads here, ladies

4    and gentlemen.  Remember my admonition not to discuss

5    the case and we'll go off record.

6              (Recessed from 3:59 p.m. to 4:14 p.m.)

7              (Jury present)

8              THE COURT:  Please be seated, everyone.  And

9    we're back on record here.  And ready to proceed?

10             MS. STEVENS:  Yes, ma'am.

11             THE COURT:  Go right ahead.

12   BY MS. STEVENS:

13      Q.  So we left off, Petty Officer Upchurch, you were

14   talking about being over at Mr. Wells' house right

15   before you were leaving the island and you were having a

16   conversation with him.

17             Do you remember having that conversation with him

18   and it involving the general overall investigation and

19   him as a suspect?

20      A.  Sorry.  Will you ask the question again?

21      Q.  When you were at his house right before you left,

22   do you remember having a conversation with Mr. Wells

23   about his involvement, if any, in the murders and the

24   investigation involving him?

25      A.  Yeah, I remember talking to him.

1    Q.   Okay.  Do you remember what you said to him and

2  his response?  And if you don't remember, that's fine,

3  if you don't remember.

4    A.   I mean I remember a lot of stuff.  It's just hard

5  for me -- I mean I could talk forever about going to his

6  house and when I was there kind of what we talked about.

7       I mean I even -- I even read the whole thing, so

8  I know everything we talked about.  I just don't know

9  where to start.  I think that's my problem.

10         MS. STEVENS:  Your Honor, permission to lead?

11         THE COURT:  Any objection?

12         MR. COLBATH:  Absolutely, Your Honor.

13         THE COURT:  Then that's not granted.  Can she

14  refresh her recollection with a document?

15         MS. STEVENS:  That would be my next request is

16  to approach her to refresh her recollection.

17         THE COURT:  That's fine.

18         (Ms. Steven approaches witness.)

19  BY MS. STEVENS:

20    Q.   I'll direct your attention to the bottom, line 21

21  of page 50 of that prior hearing transcript.

22         THE COURT:  Read it to yourself.

23         THE WITNESS:  Okay.

24  BY MS. STEVENS:

25    Q.   50, starting at line 21.  Just go ahead and read

1    it and don't read it out loud.

2              MR. COLBATH:  Your Honor, this is not a

3    transcript of a prior hearing.

4              MS. STEVENS:  My apologies.

5       A.  Okay.

6       Q.  Has your recollection been refreshed?

7       A.  Yeah.  I remember talking to Jim.  I remember the

8    whole visit.  It's not -- I just didn't know like where

9    -- we talked about a lot of stuff.  I was there for a

10   little while.  So about the investigation --

11             MR. COLBATH:  Excuse me, Ms. Upchurch.  I'm

12   going to object at this point.  The question was:  Was

13   your recollection refreshed?

14             THE COURT:  Right.  Let's hear the next

15   question.

16   BY MS. STEVENS:

17      Q.  After having your recollection refreshed, do you

18   remember having a conversation or part of the

19   conversation involving your feelings about his

20   involvement in the murders?

21      A.  Yes.

22      Q.  Okay.  And can you tell the jury just generally

23   what you said.

24      A.  Yeah.  So when I was going to leave, one of the

25   last things -- I mean I was there to say bye to Jim

1  really and return furniture and stuff, but one of the

2  last things I said to him was I just said, "Jim," I

3  said, "I don't want it to be you."

4     Q.  And what was his response?

5     A.  He said -- he just looked at me and he said, "No

6  worries."

7        MS. STEVENS:  Thank you.  I don't have any more

8  questions, Your Honor.

9        THE COURT:  All right.  Mr. Colbath, go ahead,

10 please.

11       MR. COLBATH:  Sure.  Thanks.

12                  CROSS EXAMINATION

13 BY MR. COLBATH:

14    Q.  Ms. Upchurch, let me talk more about that

15 conversation, because it was right at the end of --

16 well, you had a long conversation.  This whole

17 conversation you said you read it again before today,

18 right?

19    A.  I did.

20    Q.  And that was at the very end, you were saying

21 goodbye to Jim?

22    A.  Yeah, I was.

23    Q.  Goodbye, you're leaving the island?

24    A.  Right.

25    Q.  It was difficult for you to even -- well, first,

1    it was difficult to say goodbye?

2        A.   Yeah.   I mean, yeah, it was difficult, I guess,

3    to leave Kodiak.

4        Q.   It was difficult to even say to him -- because he

5    wasn't charged.   That was September of 2012?

6        A.   Right.

7            MS. STEVENS:   Your Honor, I would object to

8    foundation at this point.

9            MR. COLBATH:   She said that's when it was.

10           THE COURT:   I think she did say something close

11   to that.

12           MS. STEVENS:   Yeah, but he's talking about when

13   he was charged, when he wasn't charged.   There is no

14   foundation for that.

15   BY MR. COLBATH:

16       Q.   The conversation was in September, right?

17       A.   Right.

18       Q.   And the murders had happened in April?

19       A.   Right.

20       Q.   And Mr. Wells was at his house.   This

21   conversation took place at his house, you went there to

22   return furniture and say goodbye?

23       A.   Right.

24       Q.   And he wasn't charged at that point?

25       A.   Not that I know of, no.

1    Q.  Okay.  And at the end of this conversation, up

2  until then, he hadn't really talked about any details of

3  anything that was going on with regard to the murders,

4  right?

5    A.  I didn't talk to Jim in a very long time.

6    Q.  Okay.  And at the end of this conversation, it

7  was difficult for you to even figure out how to say to

8  him like, "I don't want this to be you.  I don't want"

9  -- you felt bad for him?

10    A.  Well, I said everything I wanted to say to him.

11  You know, I went there.  It was hard for me to go there,

12  but I did go there because I wanted to, and I said what

13  I wanted to say to him.

14    Q.  Okay.  And he said -- he told you, "No worries,

15  don't worry about it"?

16    A.  He said, "No worries."

17    Q.  Okay.  And he thanked you -- first, right after

18  that, you thanked him for all that he and Nancy had

19  done?

20    A.  I did, and Nancy wasn't there.  And I was hoping

21  that she would be there so I could tell her to her face

22  thank you.

23    Q.  Sure.

24    A.  So I made sure to tell him to tell her thank you,

25  because they did -- they did a lot of stuff for me.

```
 1    Nancy taught me how to make jelly.  I ate a lot of her
 2    jelly.  She taught me how to make pie.  They did a lot
 3    of stuff for me, so yeah, I did, I said thank you.
 4        Q.  And he told you it was his pleasure?
 5            MS. STEVENS:  Objection; this is hearsay.
 6            THE COURT:  That's sustained.
 7    BY MR. COLBATH:
 8        Q.  Let's back way up to some of the beginning things
 9    of your testimony.  I just have some questions to
10    clarify some of the things you said.  Okay?
11        A.  Uh-huh.
12        Q.  Let's talk about the folks at the rigger shop.
13    You said that, first of all, ET1, Mr. Hopkins, not a
14    good supervisor?
15        A.  Right, he wasn't a good supervisor.  That's my
16    opinion.
17        Q.  How would he talk to you non-rates?
18            MS. STEVENS:  Objection, Your Honor; this is
19    hearsay as well.
20            THE COURT:  Do you want to get the tone or the
21    content?
22    BY MR. COLBATH:
23        Q.  How about this, without using any specific words
24    or language, was he vulgar with you guys?
25        A.  Yeah, he was vulgar from time to time.
```

1    Q.   Okay.  How regularly?

2    A.   Daily or every other day.  He was grumpy.  He was

3  very grumpy.

4    Q.   Now, Jim, you found that when you wanted

5  something from Jim, you were able to talk to him?

6    A.   Yeah.

7    Q.   Same with Rich Belisle?

8    A.   Oh, yeah.  Rich and Jim were preferred.

9    Q.   All right.  And you remember having conversation

10 -- well, you remember socializing with the Belisles at

11 all outside the rigger shop?

12   A.   Yeah.  Okay.  As a non-rate in the Coast Guard,

13 when you join, you're like -- you're new.  You don't

14 have any family, you have nobody.  And honestly, like

15 the Belisles and the Wells, they were like my Coast

16 Guard family in Kodiak.

17       Maybe I went to Jim's house more times than

18 Rich's house to eat and stuff, but I went to their house

19 too, and it was nice.

20   Q.   Did you see them associate or socialize with each

21 other?  Like was the Belisles' social life the same as

22 the Wells' social life?

23   A.   No.

24   Q.   Okay.  Well, first, let's --

25   A.   They were both nice.  They were all nice people,

1    like super nice people.  The personalities are
2    different.
3        Q.  And so did Jim, for instance, socialize a lot out
4    in the community and with all you non-rates and other
5    things that you observed?
6        A.  Jim is different.
7        Q.  What do you mean by different?
8        A.  He liked to do -- he didn't like go to the bars.
9    He didn't drink.  He liked to do home chores.  He liked
10   to chop wood.  He liked to read his books.  He's more of
11   a home person.  That's what -- that's the answer.  I
12   mean, Jim likes to do his Jim stuff like at home.
13       Q.  And so then Mr. Belisle, was he the same, was he
14   different?
15       A.  He was different.
16       Q.  How so?
17       A.  Rich was awesome.  Rich was awesome.  He was
18   really awesome and he was fun.  He liked to -- he liked
19   to fish.  Well, I mean everybody likes to fish, right,
20   but I mean he took me fishing on his boat.  He liked to
21   go to the Rendezvous, he liked to play a round a little
22   more.
23       Q.  What's the Rendezvous?
24       A.  The Rendezvous in Kodiak was a bar/restaurant.
25   Sometimes they have like music and stuff like that.

1    Q.  So they were different outside of work, but at

2  the rigger shop and work, were Jim and Rich together a

3  lot there?

4    A.  Yes.

5    Q.  And did you ever see any problems between the two

6  of them or hear them complain about each other to each

7  other?

8    A.  For a very long time, like almost the whole time

9  I worked there I thought it was like -- we were like a

10  team.  I thought we were a team.  I thought we were

11  close.  I never experienced anything super negative with

12  Jim and Rich ever.

13       I only heard one time Rich say one thing about he

14  didn't want to go eat with Jim, and I was like, "What do

15  you mean you don't want to eat with Jim?  What are you

16  talking about?"

17    Q.  Other than eating -- do you remember when that

18  was?

19    A.  No, I don't remember when that was.

20    Q.  And how about you, would you complain about ET1

21  to Rich and Jim?

22    A.  Yes.

23    Q.  Did they stand up for you or did you feel like

24  they heard your complaints?

25    A.  Yeah, I do.

```
 1          MS. STEVENS:  Your Honor, this is -- now we're
 2   outside the scope of relevancy here.  This is not
 3   relevant.
 4          MR. COLBATH:  Workplace environment.
 5          THE COURT:  I will allow it.  I will.
 6   BY MR. COLBATH:
 7     Q.  Did they listen to your complaints?
 8     A.  They did.
 9     Q.  Were you aware of whether Jim or Rich ever tried
10   to take that up with the chain of command on behalf of
11   you non-rates?
12     A.  I can't say like a specific thing.  I know -- I
13   can't say a specific thing --
14     Q.  I don't want you to say --
15          MR. COLBATH:  I'm sorry, Sonja.  I don't mean
16   to talk over her.
17     Q.  I don't want you to say anything.  I just
18   wondered if you were aware if they talked to the chain
19   of command about it.
20     A.  Yes.  I know one instance, and I -- and so I feel
21   like really honestly I feel like Jim and Rich saved us.
22     Q.  Okay.
23     A.  I think -- but now I have a specific instance
24   because you asked me about the chain, about the chain of
25   command with Jim.  And he did -- one time we had a
```

1    really big problem in the rigger shop, and it was

2    painful for me because I had broken my finger and one of

3    my primary duties was to use a chain saw --

4             MS. STEVENS:  I'm sorry.  I'm not sure what

5    question she's answering.

6             THE COURT:  That's sustained.

7             MR. COLBATH:  That's fine.

8    BY MR. COLBATH:

9        Q.  Let's talk about -- Ms. Upchurch, let's talk

10   about the climbing a little bit.

11            Now, first of all, do you remember when it was

12   that Jim first became ill and started missing work real

13   regular?

14       A.  No.

15       Q.  Can you pull that up for me, 168.

16            So Ms. Upchurch, I'm going to show you a calendar

17   that we have that's an exhibit, a work calendar that I

18   actually went through with Chief Reckner.

19            MS. STEVENS:  Your Honor, so I understand --

20            THE COURT:  That's sustained to say what you

21   did with it.

22            MS. STEVENS:  Also, I would object to this line

23   of questioning.  So this is an employee work calendar.

24   She doesn't deal with civilian employees.  I don't see

25   how anything related to this calendar is relevant at all

1    to Petty Officer Upchurch and her interaction with the
2    defendant.
3            THE COURT:  Well, are you seeking to use it to
4    refresh her recollection?
5            MR. COLBATH:  It's an admitted exhibit and I'm
6    going to ask her some questions about her memory of
7    Mr. Wells' attendance at work.
8            THE COURT:  I'll allow that.
9    BY MR. COLBATH:
10       Q.  So Ms. Upchurch, were you working at the rigger
11   shop in the summer of 2011?
12       A.  Yes.
13       Q.  Were you part of the project where a bunch of the
14   rigger crew went out to Shemya?
15       A.  Yes.
16       Q.  Do you remember when that was, like what months?
17       A.  Fukushima happened when we were there and I
18   looked -- yeah, I think that was April.
19       Q.  Okay.  Of 2011?
20       A.  Of 2011.
21       Q.  Do you remember any of it going on during what
22   I'll call the summer months like June, July or August?
23       A.  There were multiple trips to Shemya, and I went
24   twice.  And I can't remember the dates.
25       Q.  Did you go at all in the fall of 2011?  And

1    that's okay if you don't remember.

2        A.   I don't remember.

3        Q.   Did you go on any trips where Mr. Wells went?

4        A.   I did, yeah.

5        Q.   I'm sorry.  You did or didn't?

6        A.   Yes, I did.

7        Q.   You said you went twice.  Did he go on both the

8    trips that you were on?

9        A.   I can't remember.

10       Q.   Okay.  If I show you Exhibit No. 168 here and ask

11   you for, beginning in October of 2011, do you remember

12   Jim being gone a bunch from work?

13       A.   In October of 2011?

14       Q.   Right.

15       A.   I don't remember.

16       Q.   Okay.  How about November or December?

17       A.   I can't remember dates.  I remember -- I'll tell

18   you what I remember.  I remember Jim being gone.  I

19   remember why he was gone, but I don't remember when it

20   was.

21       Q.   Let's do it that way then because I don't want to

22   hold you to any dates.  You remember the fact that he

23   was gone?

24       A.   I do.

25       Q.   And how -- do you have any concept of how long of

1  a period that was?

2      A.  No.  It was a while.  I know he was gone for a

3  while.  I don't know how long honestly.  I can't say.

4      Q.  By a while, are we talking a few days, a few

5  weeks, a few months?  Can you put any time range?

6      A.  I would say it was definitely like weeks he was

7  gone.  It might have been a month.

8      Q.  You said you know why?

9      A.  Right.

10      Q.  Which was?

11      A.  He was sick.  He got really sick, and then he had

12  surgery, so he was gone.

13      Q.  Then you remember that after -- so you remember a

14  surgery he had, right?

15      A.  I do.

16      Q.  After that surgery, do you remember him coming

17  back to work?

18      A.  I do.

19      Q.  And there wasn't any climbing from when he came

20  back to work until the plan to climb for April 12th,

21  right?

22      A.  I don't remember climbing at all.  I don't

23  remember climbing when he was gone.  Well, I don't know.

24  Actually, I can't say.  It's so hard to remember.

25      Q.  Okay.

```
1     A.  We had -- I remember a climbing evolution.  It
2  was a training evolution that Rich headed and Jim wasn't
3  there.  I can't remember when that happened, but it
4  wasn't a work evolution.  It was a training only
5  evolution to get new people qualified.
6     Q.  Okay.  Let's talk a little bit about April 12th.
7  Okay.  Now, that morning you were supposed to work at
8  the rigger shop, correct?
9     A.  Yes.
10    Q.  And you were living where at the time?
11    A.  In Kodiak.
12    Q.  In the city of Kodiak?
13    A.  Right.
14    Q.  And by yourself?
15    A.  I had my dog.
16    Q.  Okay.  And that morning when you got up, what did
17 you do before work?
18    A.  I took my dog out and I fed my dog, and then I
19 fed myself.
20    Q.  And you came to work alone?
21    A.  I did.
22    Q.  And you were alone from the time you left your
23 apartment until you got to out to the COMMSTA?
24    A.  That's right.
25    Q.  All right.  So after the things went on down at
```

1  T-1 and you saw what you told us about with you and

2  Mr. Coggins and Mr. Beauford and all of that, you went

3  up and stayed up at T-1 with everybody else, right?

4      A.  I went to the conference room, right.

5      Q.  That was in T-1?

6      A.  In T-1, right.

7      Q.  And one of your concerns was that Mr. Wells --

8  where Mr. Wells was, because you hadn't seen him at

9  work?

10     A.  Yeah, I was wondering where he was at.

11     Q.  Normally, he would have been there?

12     A.  I thought he was going to be there that day.

13     Q.  It confused you a little bit to see Jim Hopkins'

14  truck where Jim Wells usually parks, so you didn't know

15  what was going on?

16     A.  Right.

17     Q.  So you tried to call, but your cell phone didn't

18  have service?

19     A.  Yes.

20     Q.  And then eventually Leah showed up, that's Seaman

21  Henry, she showed up and you were able to use her phone?

22     A.  That's right.

23     Q.  Okay.  And Ms. Stevens asked you about this call

24  you had with Jim.  You called and asked Jim where he

25  was?

1    A.   I did.

2    Q.   And he said he had a flat tire?

3    A.   Right.

4    Q.   And you described that as you thought that was

5    bad.  Do you remember that?  Do you remember telling her

6    that?

7    A.   Yeah.

8    Q.   And the reason you thought it was bad is, oh, he

9    should have been here and he's not here, he's going to

10   have to explain that?

11   A.   I thought it was the worst excuse ever.  Like,

12   I'm not saying I thought he did it, because I wasn't

13   thinking that.  Don't get me wrong, but I was like

14   that's a really bad -- that's bad.

15   Q.   Like bad coincidence?

16   A.   Bad.  Yeah, bad.  I wasn't thinking about that,

17   no.  I just thought it was horrible.

18   Q.   You said in one of your earlier interviews like

19   you were worried that you had been alone all that

20   morning and nobody could vouch for you before you got to

21   COMMSTA?

22   A.   Yeah, because I was like I hope they don't -- we

23   were all suspects at one point for a few months after.

24   I was worried, yeah, because they were asking me a bunch

25   of questions.  And yeah, I was like I have nobody to say

where I was at.  And then -- whatever, I'm not going to

say more.

    Q.  No, that's fine.  I was just asking you about the

phone call.  So he told you he would be there soon

though, he was on his way?

    A.  Right.

    Q.  And you just told him, you know, that something

really bad happened at work?

    A.  Right.

    Q.  But you didn't tell him any of the details?

    A.  No, I didn't.

    Q.  And do you know whether he tried to call you back

or call back at all to you or Leah's phone?

    A.  No, I don't.

    Q.  You didn't talk to him?

    A.  I didn't talk to him again.

    Q.  All right.  And you said after a while he showed

up there and he was in the conference room with the rest

of you guys?

    A.  He was.

    Q.  Quiet?

    A.  Yes.

    Q.  That's how Jim -- you said Jim being Jim.  That's

kind of how you always knew him to be, a man of few

words?

1    A.  Yes.  Jim sticks to himself mostly.  He's pretty

2  quiet.  To get info out of him about -- I mean just

3  sometimes, you know, he'll just like -- he doesn't talk

4  a lot about stuff.  He's private.

5    Q.  You said he was also reading a book at the

6  conference room up there?

7    A.  I don't remember if he read a book.

8    Q.  Oh.

9    A.  I may have said that, but I don't remember.  I

10  don't know.  I don't remember that.

11    Q.  How about just as a general practice, did you

12  know Jim to oftentimes have a book at work with him or

13  be carrying around a paperback?

14    A.  Yeah, Jim is a reader.  He liked to read.

15    Q.  The weekend before April 12th was Easter that

16  year, right?

17    A.  That's right.

18    Q.  And you and some other people from T-2 spent

19  Easter there at the Wells'?

20    A.  We had Easter, but not at the Wells' house.

21    Q.  Why not at the -- the plan was to have it at the

22  Wells' house?

23    A.  That's right.

24    Q.  Why didn't it end up being at the Wells' house?

25    A.  Because their bathroom was out of order.  Their

1    septic system was messed up, so we went to Leah's house

2    and had Easter at her house.

3        Q.   The Wells included?

4        A.   They came.

5        Q.   Yeah.  Okay.  Now, at the point that the murders

6    happened on Thursday, the 12th, you didn't know --

7    before any of that went on, you didn't realize Nancy was

8    out of town at that time, did you?

9        A.   No, I didn't know she was out of town on the day

10   the murders happened.

11       Q.   So as far as any of her travel plans or any of

12   what went on with the two of them that week, you didn't

13   even know about it until after the fact, true?

14       A.   You know, at Easter she may have said like she

15   had class or she had something.  I feel bad if she told

16   me and I didn't listen good.  I don't know.  I was

17   surprised that day when I found out she was gone.

18       Q.   Because you hadn't seen her or anything from

19   Easter up until April 12th?  I mean you didn't see her

20   on April 12th?

21       A.   No, I didn't.

22       Q.   All right.

23            MR. COLBATH:  If I could just have one minute,

24   Your Honor.  I want to check a transcript here.  I don't

25   think I'll be as long.

1              (Pause)

2          MR. COLBATH:  Your Honor, I think at this point

3    I don't have any other questions for Ms. Upchurch.

4          THE COURT:  All right.

5          MS. STEVENS:  No questions, Your Honor.

6          THE COURT:  Can this witness be released?

7          MR. COLBATH:  Actually not, Your Honor, because

8    of a couple of issues, I may need Ms. Upchurch again.  I

9    just don't know what other witnesses we have, so I would

10   ask that she remain under subpoena.

11         MS. STEVENS:  Your Honor, the government would

12   release her, so the defense can subpoena her.

13         THE COURT:  Very good then.  So noted.  And you

14   can be excused today and go on your way.  Thank you.

15         All right.  Do we have time for one more

16   witness or no?  I know we have to take up some topics.

17             (Witness excused)

18         MR. SKROCKI:  It may be best to release the

19   jury and we can maneuver our way into that other

20   discussion.

21         THE COURT:  How about 8:45 tomorrow, ladies and

22   gentlemen, would that work for everyone's schedule?

23   Let's do that.  And please leave your notepads here.

24   Remember my admonition not to discuss the case.

25             Hope you have a pleasant evening, and we'll see

1  you in the morning.

2          (Jury absent)

3          THE COURT:  Please be seated, everyone.  And

4  back on record here with the jury out.

5          With regard to this stipulation, did you see

6  having that an exhibit that goes to the jury or simply

7  read in, because you had it marked as an exhibit and the

8  courtroom deputy inquired.

9          MR. SKROCKI:  That's the way I have always done

10  it historically with other judges, Your Honor.

11          THE COURT:  And have it go to the jury?

12          MR. SKROCKI:  Yeah.  It's force of habit.

13          MR. COLBATH:  Your Honor, I have actually had

14  the opposite experience.  I have had them read in or

15  shown to the jury and read to the jury, so that those

16  facts aren't treated any different than other facts or

17  singled out any different, they are not evidence, they

18  are factual matters, I have not had them go back, so

19  that they are not unnecessarily highlighted.

20          THE COURT:  All right.  Let me ponder that and

21  we'll come back to it.  You prefer it go back is what

22  I'm hearing?

23          MR. SKROCKI:  Strong feelings I don't, but I

24  think it would be helpful because we're going to be

25  arguing and then putting it up on the PowerPoint.  It's

```
 1   going to be what the lawyers say isn't evidence, but
 2   then you will have an instruction about the stipulation.
 3              THE COURT:  There is a pattern that deals with
 4   stipulations, so they will have that.
 5              MR. SKROCKI:  I don't think it's any error to
 6   have it back as an exhibit.
 7              THE COURT:  I'll look at that issue and we have
 8   got some time to sort that out.
 9              There was a DMV exhibit you were going to
10   correct.  I vacated the order moving it in.
11              MS. SHERMAN:  It was my mistake, Your Honor.
12   That was the second page of 71, and the first page we
13   had already admitted at Exhibit No. 93, so there is the
14   single page for the white truck that's now 71.
15              I would move the admission of that.  It's the
16   APSIN printout of the truck.
17              THE COURT:  Any objection to 71 being for the
18   truck?
19              MS. SHERMAN:  It's self-authenticating as well.
20              MR. COLBATH:  No, Your Honor.
21              THE COURT:  So 71 is then admitted.  And that
22   takes care of that.
23              (Exhibit No. 71 admitted.)
24              MR. COLBATH:  I think ours was wrong in our
25   book too.
```

        MS. SHERMAN:  We replaced.  I believe you have
new copies.

        THE COURT:  Just FYI, tomorrow at 11:00 I have
a conference call.  I will probably do just 15 minutes,
but let's plan for a break at that time.

        All right.  Those were my points.  So the
government, Mr. Skrocki, go ahead.

        MR. SKROCKI:  Yes, Your Honor.  Your Honor, we
make application to the Court on the issue of
conditional relevance of the Wells' Honda CR-V being the
vehicle in question on April 12th captured by the video
at the Communication Station Kodiak.

        Up to this point in the trial we have had
testimony from I have got at least close to a dozen
witnesses, Mr. Reckner, Ms. Andersen, Mr. Beauford,
Coggins, Ellis, Bell, Rudat, Holly Steeves, Haselden,
Sanford and Upchurch with respect to a couple of things,
and I'll summarize those.

        One of those being the nature and time of the
murders in question.  Ms. Andersen testified -- sorry,
Mr. Rudat testified as to the sound coming from the
shop.  That's a fact the Court can look at in terms of
when the murders occurred.  The video showing the
vehicle coming before or after Mr. Rudat and leaving
after the shot was heard.  And then additionally, the

testimony of Ms. Andersen, which shows the elimination
of other suspect vehicles.  Mr. Reckner identified
Ms. Wells' blue SUV as one that she would use.  He
identified the motives with respect to the evidence in
this case, the jury has got that limiting instruction,
for Mr. Wells committing these murders.

Mr. Ellis testified about the car and the mail
of the vehicle in the airport, that there was mail in
the front seat of the Wells' vehicle with his name and
address on it.  Ms. Steeves identified the time of the
murders as being after 7:10.  We have Mr. Wells' truck
going to the communication station before 7:00 a.m.  We
have it going back 36 minutes afterwards, which provides
sufficient time for the jury to infer, and I'll get to
the standard in a moment, that Mr. Wells had the
opportunity, given that his wife was out of town, to go
to the airport, jump into the blue SUV, drive to the
communication station and commit the murders that he's
charged with.

By 7:10 to 7:14 is when the murders occurred.
And by even witness testimony of Ms. Ecret today and
Ms. Bell, Mr. Wells was identified and placed back in
his neighborhood at 7:25.  By 7:30, he makes the phone
calls to Mr. Belisle and Mr. Reckner and establishes his
alibi.

1          There is overwhelming evidence at this point
2     that is beyond the standard which the Court has to
3     consider is a fact beyond a preponderance in this case.
4     Can the jury reasonably find the conditional fact by a
5     preponderance of the evidence that this was the Wells'
6     vehicle?  And at this point in the trial, given the
7     number of witnesses that we have here, that burden is
8     easily met.
9          THE COURT:  All right.  Thank you.
10         Who am I going to hear from?  Mr. Colbath, go
11    ahead, please.
12         MR. COLBATH:  Thank you, Your Honor.  We would
13    resist that.  And under the standard and under the
14    particular issue before the Court regarding conditional
15    relevance, we would certainly disagree.  The Court is --
16    the inquiry for the Court and the determination here is:
17    Is the demonstrative evidence of the police-created
18    April 19th video relevant for the jury to see?
19         And so it is not overall evidence -- well, it's
20    not any evidence of Mr. Wells' guilt in a general sense,
21    but the question relates to is information about the
22    blue Honda CR-V particularly relevant or conditionally
23    relevant?  And so here the Court should -- it's our
24    position that the Court should focus on not just is
25    there any inferences or could the jury at this point by

a preponderance of evidence as to where we are in the
case reach a decision that Mr. Wells might have
committed the crimes, but the question is could they
believe that Mr. Wells accessed the Honda CR-V, used the
Honda CR-V in some fashion to commit the crimes.

And the evidence related to that is, first of
all, no witnesses testified that Mr. Wells was at the
airport at all.  No witness has -- the evidence is he
passed the main gate some miles from the airport going
in one direction and then later passed the main gate
going back a number of -- 30-some minutes later.

No witness has testified that Mr. Wells' Honda
was anything other than placed at the airport by Nancy
Wells on April 10th and parked in that location where it
was later found presumably where it was supposed to be
on April 12th by Officer Ellis.

Officer Ellis testified that he was looking for
a minivan or some other blue car.  He photographed a
number of them.  They are in evidence.  And really there
is no other witness that testified at all about
Mr. Wells' access to the car, the car moving, seeing the
car.  The government has presented no evidence
whatsoever that not only did nobody see Mr. Wells at the
airport, if you flip that around, nobody saw the blue
car leave the airport.  Nobody saw the blue car near the

1  main gate.  Nobody saw the blue car on Anton Larsen Bay

2  Road.

3          You just have the April 12th video as being one

4  of many cars that went by.  Thus far we have a white

5  pickup that went by a few minutes before in each

6  direction, a few minutes before the blue car arrived, a

7  few minutes after the blue car left, and there has been

8  very little testimony about that car.  It was not a car

9  associated with T-2.

10         There is a red pickup that went by like the

11  blue car that just traveled on Anton Larsen Bay Road.

12  There is really quite a paucity of evidence of whether

13  the blue car even had anything to do with the murders.

14  It's not been shown by any witness that the blue car

15  even stopped at the T-2 rigger shop.  So no witness has

16  said Mr. Wells accessed the car.  No witness has said

17  Mr. Wells went to the airport and was near the car.  No

18  witness has said that the car left the airport.

19         And so now to spend substantial additional time

20  evidencing the law enforcement theory that here is how

21  that could be, while it promotes the government's

22  theory, it's not relevant unless and until somebody says

23  that car was the car out at T-2, or the blue Honda left

24  the airport or the unknown blue vehicle out on the road

25  was tied somehow to the murders.  So that's our

1   position.

2           THE COURT:  All right.  Thank you.

3           Last word on this, Mr. Skrocki.

4           MR. SKROCKI:  Yes.  Thank you.  Just to correct

5   one thing.  Ms. Sanford testified that Mr. Wells came to

6   the airport to see his wife off, so he knew where the

7   vehicle was parked.  He knew that she was leaving town,

8   knew where the car was parked and could have used it.

9           In addition, just to add one more piece to

10  that, Officer Ellis found mail in the front seat, just

11  for the record.  Ms. Sanford testified, "Had there been

12  something in the front seat, I would not have sat in

13  it."  All of these facts that we alluded to in the

14  opening part of the argument here the jury could infer

15  reasonably, and every inference is drawn in favor of

16  that inference, that Mr. Wells used that vehicle to

17  commit these murders on April 12th.

18          THE COURT:  Every inference is drawn in favor

19  of that inference.

20          MR. SKROCKI:  Every fact -- the standard is

21  reasonableness.  We're not talking about beyond a

22  reasonable doubt here.  And so is it reasonable for the

23  jury to infer that Mr. Wells was in that vehicle and

24  committed those murders at the time in question.  The

25  answer -- again, the facts overwhelmingly support the

1    answer is yes.

2         THE COURT:  I'm going to take about five

3    minutes, organize my thoughts.  I'll give you a ruling

4    on that and then we should be able to conclude for the

5    day.

6         DEPUTY CLERK:  All rise.  Court stands in a

7    brief recess.

8         (Recessed from 4:53 p.m. to 4:58 p.m.)

9         (Jury absent)

10        DEPUTY CLERK:  All rise.  Her Honor, the Court,

11   the United States District Court is again in session.

12        Please be seated.

13        THE COURT:  All right.  Back on record here.

14   And I have listened to the evidence that the government

15   has presented on this topic with regard to the vehicle

16   that was in the April 12 video, and I do find that a

17   jury could reasonably find by a preponderance of the

18   evidence that the vehicle that's been presented at this

19   time, that the vehicle seen in the April 12th video is

20   Ms. Wells' vehicle.

21        And I reach that based on the testimony that

22   was outlined by the government.  And I found

23   particularly -- well, it's not my finding, but I'm

24   saying a jury could reasonably find it, but the Court

25   did look to the testimony of Ms. Andersen this morning

1  that basically, from her perspective, all of the other
2  vehicles in the Kodiak area that would match or could
3  match were excluded.  I certainly acknowledge the
4  defense's cross examination on that topic, but
5  nonetheless I do find that the preponderance of the
6  evidence combined with the other individuals that have
7  testified regarding the vehicle is sufficient to support
8  a jury that could reasonably find that.
9          So that would allow the government to play the
10 April 19th video, which is of the Wells' vehicle,
11 subject to the Court addressing the motion that
12 Mr. Colbath filed that seeks to restrict the
13 government's use of that video.
14         What I haven't done today is look at -- the
15 second half of the defense motion identified a number of
16 pages of the exhibits, and I will do that.  That's my
17 plan this evening, to be able to address that.
18         I will say that on that motion, and I haven't
19 of course heard from the government on it and I will in
20 the morning, but at some level there is a 403 issue too
21 that could come into play with regard to showing 100 or
22 200 or however many.  That PowerPoint was really
23 lengthy, the one I looked at.  I have given thought as
24 to at what point does it become cumulative under 403 or
25 that it substantially outweighs the probative value of a

video that is a recreation and not the evidence from the
date of the crime.

So that is kind of a sneak preview,
Mr. Skrocki, of my thoughts on that motion, admittedly
without having the benefit of the government's position.
Those are the thoughts I had on it today, and I think
that might help you frame your thoughts on it as well.

Anything else we can take up?  Since we have
got to address that tomorrow morning, or is that --

MR. SKROCKI.  We would like to, because we have
witnesses here and witnesses in transit based on these
rulings, and so we're hoping maybe 8:15 to address --

THE COURT:  After they were walking out, I
thought, oh, no, we're going to be taking this up in the
morning, so 8:15 sounds fine.  Can the defense do 8:15
as well so we don't leave them waiting?  I should have
said 9:00, but I didn't.

MR. SKROCKI:  We hear the Court's concern about
403, but I do have to state for the record I have got a
long list of dates and rulings and opportunities time
and time again, and to do this defensive retreat action,
every time the Court does something they come up with
something else.  We have got a jury impaneled.  You ask
the defense every morning about do they have something
to raise with this Court and the answer is absolute

1    silence.

2           So you know, we're trying to work with this and

3    we'll make a good faith effort tonight to see maybe

4    where we could trim some of this.  I understand that,

5    but, boy, Judge, this is becoming very problematic.  We

6    have witnesses in transit and this could have been

7    brought up.  I have suspicions.  It was done at 3:45

8    last night.  This is a 12-page brief, very detailed.

9    This could have been raised after the hearing in July.

10          We are really strapped.  We will comply with

11   the Court's order, as we have always done, but it does

12   put us in a real problematic situation because there is

13   three of us, we get that, there are a lot of bodies

14   here.  We all have different --

15          THE COURT:  Four.  Don't forget Blair.

16          MR. SKROCKI:  I meant no disrespect, Blair, but

17   dealing with these experts can be difficult.

18          THE COURT:  I know that.  If we need to --

19   we'll take the time for both sides to get this issue

20   fully addressed.

21          MR. SKROCKI:  Last thing.  I have asked defense

22   to give us all of their exhibits.  We keep running into

23   issues where we're not getting exhibits.  We may have a

24   list and have asked to have them here tonight or

25   tomorrow morning.  I would like that on the record.  If

1    we don't get all of our exhibits by tomorrow morning,

2    I'm going to ask for a stay or something from the Court

3    until we get what we're entitled to get.

4            THE COURT:  What are you missing?

5            MR. SKROCKI:  I don't know what we're missing

6    until we get it.  That's part of the problem.

7            182 to 200.  202 to 208.  211 to 216.  218 to

8    246.  There is 30 right there.  250 to 260.  There is

9    another 60.  265 plus.

10           THE COURT:  I don't have 250.  I mean I stop at

11   250.

12           MR. SKROCKI:  Okay.

13           THE COURT:  So what are you missing?

14           MR. SKROCKI:  182 to 200.

15           THE COURT:  All right.

16           MR. SKROCKI:  202 to 208.  211 to 216.  218 to

17   246.

18           THE COURT:  My thought is this:  I have these

19   exhibits here, I believe, and I haven't marked them at

20   all.  And if the government wanted to stay here right

21   now and mark down the Bates pages so you know what these

22   exhibits are, that's fine, because those are in the

23   Court's binder, the additional exhibits that I received,

24   I believe, late last week.

25           MR. SKROCKI:  I guess that's part of a

1   solution, but, Judge, we're entitled to more than that.

2   They have got a huge staff here.

3           THE COURT:  They have three back -- four

4   counting Mr. Johnson.

5           MR. SKROCKI:  I don't understand what the

6   problem is.

7           THE COURT:  What's the problem, Mr. Colbath?

8   Why do I have the exhibits and the government does not?

9           MR. COLBATH:  Well, a couple of things on the

10  exhibit issue.  First of all, the government has all of

11  the exhibits that we have produced as far as anything to

12  do with our witnesses, anything that's an original

13  defense creation, anything that we believe they have not

14  seen before.  So that's number one.

15          Out of the hundred or so thousand pages of

16  Bated discovery that the government gave us, we tried to

17  pick as best we could, once we saw their witness list,

18  documents that we might need, although some we included

19  out of an abundance of caution and some, as is the

20  nature of the defense case every single time, we hear

21  new things all the time from the witness stand or

22  somebody suddenly says something that I think while I'm

23  standing here, you know, we might have a picture that

24  relates to that and we pull up a government Bates number

25  and now I've got an exhibit that I asked somebody about.

I agree, I haven't given them that ahead of time.

THE COURT:  Are these intended for impeachment only?

MR. COLBATH:  Sometimes they are impeachment.  Sometimes they are asked about.  We don't know whether they are going to be asked about.  And then if they get asked about a subject or the witness talks about a subject, they talk about a call log or a telephone calls, and I know, oh, I have the call log that they might talk about marked as an exhibit, but I have no intention of offering it.  I have no intention of using it.  I have no intention of talking about it unless and until I see the witness talk about it or hear the witness talk about it.

But we're just talking about government Bated things.  And so I'm not giving them anything that they don't say, oh, I have never seen this before, I don't know what this is, I don't know, to the best that I can control.  And so to some extent if I knew that there was exhibits that might be talked about, we marked them ahead of time or we included them in the Court's book.

I don't think we have any discovery obligation to give the government back, to sort through their discovery that they gave to us and say, "Here is all the stuff that we think we will probably use so that you can

1   be better prepared to convict my client."

2           THE COURT:  I had this exact discussion with

3   Judge Hunt in the late eighties where she ordered me to

4   give all of my impeachment to the other side, and I was

5   irked.  And the next day she said I misunderstood her

6   ruling and I didn't have to.  Of course by then I had

7   already given them all.

8           MR. COLBATH:  You understand my concern.

9   Here's what I will do though:  The list that Mr. Skrocki

10  just read is helpful.  And we will sit down -- some of

11  those things we have intended to try to do.  I will tell

12  the Court we're operating remotely and the people that I

13  would normally send a text to to, hey, put this together

14  and get Blair a digital copy or get us paper copies or

15  whatnot, if I text them, they are all sitting right here

16  and so they can't.

17          We will try to remedy some of this.  Some of

18  those -- there is about -- from about 190 to the early

19  200s, we just left a gap.  There is nothing there.

20  They're just placeholders for that very reason, things

21  come up during the defense case and we go, oh, we now

22  know we want to talk about this and we mark it and use

23  it, but we're not going to show, to the best we can

24  control, we will not be using anything that's not Bated.

25          I will certainly look at that list.  We will

try to remedy by the time we get here in the morning
digital and paper copies of everything I believe that is
appropriate for us to give over, as many of those
numbers as we can.  I don't want to delay this any more
than anybody else.  It's cumbersome for us to do it that
way.  I would rather be able to pull it right out of a
book and hand it to somebody.

          The government's case functions far different
from the defense case from preparation and the handling
of all of this.

          THE COURT:  We made some progress.  We can take
it up again in the morning.  I am of the view that if
it's a document that's been produced in discovery and
the defense is intending to use it solely to impeach
that that is not required to be provided as an exhibit
at this time.

          But it sounds like there may be others that are
in this batch that don't fall within that, and those
ones should be produced.

          Questions on that, Mr. Skrocki?

          MR. SKROCKI:  No, Judge.

          MR. COLBATH:  Your Honor, I have two other
things, if Mr. Skrocki was done with whatever you were
talking to the government about.

          THE COURT:  Thank you.  Other points at this

1  time?

2          MR. SKROCKI:  No, ma'am.

3          THE COURT:  Very good.  Go ahead.

4          MR. COLBATH:  So as to our motion that was

5  recently filed, I don't think I could have taken it up

6  in July as suggested because the Court's orders that my

7  motion directly seeks clarification of and relates to

8  was issued --

9          (Earthquake occurring.)

10          THE COURT:  We'll go off record.

11          (Pause off record.)

12          THE COURT:  All right.  Let's go back on

13  record.  At least we didn't have a jury.  Mr. Colbath?

14          MR. COLBATH:  Your order was dated

15  September 4th.

16          THE COURT:  I'm well aware of that.

17          MR. COLBATH:  So very recently.  We all

18  understand the time constraints we're under.

19          I do have one other brief ex parte matter to

20  take up with the Court that will take five minutes now

21  or five minutes between 8:00 and 8:15 tomorrow.

22          THE COURT:  We can take that up.  Is it

23  something that would be better heard by Magistrate Judge

24  Smith?

25          MR. COLBATH:  No.

1           THE COURT:  All right.

2           MR. COLBATH:  It's really just a logistical

3   thing quite honestly.

4           THE COURT:  That's fine.  Anything else then?

5           MR. SKROCKI:  What time would you like us here

6   tomorrow?

7           THE COURT:  8:15.  We can take up your matter

8   right now.  We can go off record.  I'll stay with the

9   defense here for a bit.  We'll see you at 8:15 in the

10  morning.

11          Mr. Skrocki, I will say too while we're still

12  here on record that if you don't have sufficient time to

13  address that motion tomorrow morning, we can take a

14  pause in the trial to make sure that it's fully

15  addressed.

16          MR. SKROCKI:  We'll do our best to get it done

17  tonight.

18              (Public proceedings recessed at 5:12 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATE

2          I, Sonja L. Reeves, Federal Official Court Reporter
      in and for the United States District Court of the
3      District of Alaska, do hereby certify that the foregoing
      transcript is a true and accurate transcript from the
4      original stenographic record in the above-entitled
      matter and that the transcript page format is in
5      conformance with the regulations of the Judicial
      Conference of the United States.
6
          Dated this 15th day of May, 2020.
7

8
                             /s/ Sonja L. Reeves
9                         SONJA L. REEVES, RMR-CRR
                          FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25