```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7          Defendant.         )
     _____)
 8

 9               TRANSCRIPT OF TRIAL BY JURY - DAY 7
          BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10               September 17, 2019; 8:17 a.m.
                      Anchorage, Alaska
11
     FOR THE GOVERNMENT:
12          Office of the United States Attorney
            BY:  STEVEN SKROCKI
13          BY:  CHRISTINA M. SHERMAN
            BY:  KELLEY L. STEVENS
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16   FOR THE DEFENDANT:
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22   _____

23                   SONJA L. REEVES, RMR-CRR
                   Federal Official Court Reporter
24                    222 West 7th Avenue, #4
                      Anchorage, Alaska 99513
25          Transcript Produced from the Stenographic Record
```

1                    I N D E X

2          September 17, 2019, Trial Day 7

3

4    Witnesses:        Direct    Cross    Redirect    Recross

5    Leah Henry          36        57        75          75

6    Joseph Sturgis      77       129       159          --

7    Neil Schmidt       161       183        --          --

8    Steven Becker      221       232        --          --
     (*Daubert* Hearing)
9
     Steven Becker      250        --        --          --
10

11                 E X H I B I T   I N D E X

12   Exhibit                                           Page

13   78         Main Base Gate Camera Showing           91
                Cell Phone
14
     79         Main Base Gate Camera Showing           91
15              Time Difference on Cell Phone

16   80         Time Difference on Main Base            89
                Gate Camera
17
     81         Metadata on Main Base Gate              93
18              Camera with Wells' Vehicle

19   91A        Aerial Photo of Kodiak Airport         126
                Showing Servant Air and Island
20              Air

21   94         Honda CR-V Specs                       180

22   172        Map Showing Drive Times from           102
                Wells' Residence to Rigger
23              Shop

24   174        Front of Servant Air Showing           111
                Orange Cone
25

| | | |
|---|---|---|
| 175 | Airport with Cone in Far Distance | 111 |
| 176 | Orange Cone Showing Alaska Airlines Terminal in Background | 111 |
| 177 | Orange Cone Showing where CR-V was Parked | 111 |
| 178 | Servant Air Side of Building | 111 |
| DE-158B | CD AK Air Cargo video | 150 |
| DE-195 | Photo of Airport | 153 |
| DE-195A | Photo of Airport 4/20/12 | 154 |
| DE-196 | Still of 4/12/12 Video | 140 |
| DE-198 | Video | 138 |
| DE-200 | Henry Non-Disclosure Agreement | 72 |

1          (Call to Order of the Court at 8:17 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court for the District of

5    Alaska is now in session, the Honorable Sharon L.

6    Gleason presiding.

7          Please be seated.

8          THE COURT:  All right.  Good morning.  Here we

9    are back on record.

10         And Mr. Skrocki, what's the status of the

11   government's response to this motion?

12         MR. SKROCKI:  That's relatively easy, Your

13   Honor.  They should all stay intact and no slides should

14   be removed, so that's our position.  I would like to

15   know, just to get started, if the Court has looked at

16   all of the PowerPoints.

17         THE COURT:  I have.

18         MR. SKROCKI:  Have you looked at them on a

19   screen or on paper?  That's important.

20         THE COURT:  Paper.  So some I really couldn't

21   tell what they were.

22         MR. SKROCKI:  And that's one of the things we

23   were thinking about last night.  We were here for a

24   while debating this amongst ourselves, and thought it

25   would behoove us all to see how they would actually look

on the screen.  I think that would be important for your
determination and for our position.  So we can go
through them relatively quickly and will not take much
time.

THE COURT:  That's fine.  I will say I gave
thought to the language that I put -- it doesn't seem
entirely accurate.  "This is image is an experiment that
does not depict actual events."  Well, it does depict an
actual event.

MR. SKROCKI:  True.  We can work on that
collectively.

THE COURT:  I see Ms. Sherman looks horrified
because you have got all of your exhibits.

MR. SKROCKI:  She does that a lot, Your Honor.

THE COURT:  That's fine.  I was doing this
order long distance, and I took that from another case,
I believe, that it didn't depict actual events, but here
it does, so I leave that for you all to ponder.

MR. SKROCKI:  We'll work on that as the day
progresses.

THE COURT:  In any event, if you wanted to show
me these, that's fine.

MR. SKROCKI:  I'm going to start with
Mr. Toglia's, which is Exhibit No. 181.  What I did last
night too, which was a lot of fun because I'm not a real

numbers guy or a spreadsheet person, is I went through

the exhibits that they wanted to remove under various

theories, 403, which, again, is not a new issue.

THE COURT:  Slides you mean?

MR. SKROCKI:  Yes.  And then under what are not

real events, as they describe them.  And by the time you

get done going through their listing of exhibits in this

PowerPoint to remove, we're left with 45.  And of those

45, they are really just screen captures so they don't

really add much to the expert's opinion.

So I would just like to have the Court keep

that in mind.  As to these 181 slides, 37 of those

slides used April 19th, so that's roughly 28 percent.

So his -- the basis for his opinion is that the vehicle

on April 19th and April 12th are consistent by 3D

photogrammetry and photo modeling.

That's the basis for his testimony and this is

the supporting evidence.  As we go further, just so we

cover the basis for all three, these are all not going

-- none of them are going back to the jury, nor is the

April 19th video, so we all should keep that in mind.

THE COURT:  Before you begin, anything to say

at this point, Mr. Colbath?

MR. COLBATH:  Well, not --

THE COURT:  Not now?

 1          MR. COLBATH:  Not until I hear what they have

 2    to say.

 3          THE COURT:  Go right ahead.

 4          MR. SKROCKI:  If we could have the lights,

 5    Madam Clerk.

 6          This is an aerial photograph, nothing

 7    contestable here.

 8          These are field of views of the cameras of the

 9    T-1, which is relevant for all of us.

10          And the T-2 field of view, which is, again,

11    relevant for the investigation and for the case,

12    especially with the line of defense, the inadequacy of

13    the government investigation.

14          And this is part of what Mr. Toglia is going to

15    testify about in terms of the views with respect to the

16    field of views of the cameras.

17          And this is setting up the basis for his

18    comparison.  It's a site survey.  And then this is a

19    blank photograph of April 12th.  So that shows the guide

20    points that he used to make these analyses.

21          THE COURT:  This is the first one they objected

22    to?

23          MR. SKROCKI:  Yes.  This is necessary for the

24    basis to form his opinion.

25          THE COURT:  No, it was ten, not nine.

1        MR. SKROCKI:  Ten is the next one, which is

2   just computer modeling, which is going to be

3   instrumental.  He goes from this slide to this slide.

4        THE COURT:  So do you object to putting on a

5   disclaimer of some sort on ten?

6        MR. SKROCKI:  Again, it's not going back to the

7   jury, and so --

8        THE COURT:  Well, it's pretty obvious that it's

9   not an actual photo.

10       MR. SKROCKI:  Correct.  I think it speaks for

11  itself and he can testify about that.

12       THE COURT:  That was the first one on the list

13  here that I see that there was a specific objection to.

14       MR. SKROCKI:  As Ms. Sherman points out, this

15  has nothing to do with April 19th.  This is forming the

16  basis for his opinion of what he did with the technology

17  for photogrammetry.

18       I'm not sure if this is objected to.

19       THE COURT:  No, the next one is 23.

20       MR. SKROCKI:  Should I go right to those?

21       THE COURT:  Might as well, yes.

22       MR. SKROCKI:  23 is an overlay of a Honda CR-V

23  on the April 12th video.

24       THE COURT:  And I think --

25       MR. SKROCKI:  Let me just march through this

1   briefly so we keep doing the same thing.

2           The April 12th is admitted.  It's not part of

3   the Court's order.

4           THE COURT:  Well, it's the overlay I think that

5   is troubling to the defense.

6           MR. SKROCKI:  Certainly, they can cross examine

7   as to the overlay and the basis of the overlay.  He got

8   the data from Honda and put it into his calculations.

9   That's why they do these things.  This is basic

10  photogrammetry.

11          35 is not -- must be objected to.  Yes, it is.

12          And 36 is objected to.  Those are a series of

13  frames of photo overlays from April 12th.

14          37 does not --

15          THE COURT:  Just so I understand the overlay,

16  is it taking the image from the 19th and sticking it in

17  the 12th, or it's a totally different image?

18          MR. SKROCKI:  Totally different analysis.  Do

19  you want to elaborate on that?

20          MS. SHERMAN:  Sure, Your Honor.  What he does

21  is he takes the video from the 12th, he does the outline

22  of that vehicle, and then he overlays a 3D image of that

23  vehicle, of the Honda CR-V, for the jury to see whether

24  or not it's similar, whether it fills the same sort of

25  space is my understanding of what his testimony will be.

1          THE COURT:  Where did the CR-V photo come from,

2     from the 19th?

3          MS. SHERMAN:  No, I believe it comes from some

4     database that these individuals have of all vehicles

5     ever, and so that's the model he used.

6          MR. SKROCKI:  There is no cut and paste from

7     one to the other.

8          THE COURT:  That's what I didn't understand.

9     That's helpful.

10          MR. SKROCKI:  By my read, I'm sure defense will

11     correct me, next one objection to 38 and 39.  You have

12     seen that before in hard copy many times, which is the

13     overlay as you have seen before.  I'm going to back up

14     with that vehicle that obstructs it, so there is just a

15     gray shading there.

16          And 39 is again a gray shading and shows that

17     vehicle outline with respect to the vehicle in question

18     on the 12th.

19          40 is not objected to because it's clear.  41

20     through 45 are objected to.  We'll walk through those

21     briefly.

22          What this shows, Your Honor, you're going to

23     see the overlay vehicle again we have talked about, so

24     those are the ones that were present on the earlier

25     exhibits.  This is going to move back and show the

progression of this vehicle this direction from right to
left in the cutout of that frame. So what it shows is
what it looks like from this perspective here, upper
left, counsel, and from the camera view there.

THE COURT: All right.

MR. SKROCKI: That's what he's showing.

And then we have just the tail end of that in
45, which is reflected up there.

46 is not objected to. 47, nothing is being
done with those.

Now we're at 50.

THE COURT: 51 is the next one I see.

MR. SKROCKI: 51 is objected to because of the
overlay. Same series of progressions. Again, this is
still April 12th with the generated overlay showing the
outline of a Honda CR-V and the full overlay of the
vehicle itself as the diagram and then the outline.

We keep going. 62 by my list is not objected
to.

60 and 61 are objected to under 403. Again,
it's an enlargement and a still of the vehicle going the
other direction on April 12th with this overlay, the
blockage from a vehicle that's present in front of the
car. It's just a reverse of the ones you saw before
going in, the reverse is going out. And the same thing

1   with this segment of video or clips.

2            66, I'm assuming 66 is objected to.  I don't

3   have it on my list, but I'm assuming it is.  Mr. Camiel

4   says yes.

5            THE COURT:  No, it's not actually.

6            MR. COLBATH:  It should be.

7            MR. SKROCKI:  We understand.  It's the same.

8            THE COURT:  Yeah, there is another place where

9   it is, that it's listed, yes.

10            MR. SKROCKI:  Under 403.  So again, it shows

11   the vehicle returning, just a reverse of what was done

12   in the earlier slides.

13            70 is not objected to.

14            Now, this next series of slides are objected

15   to.  I don't really understand the basis for it.  We

16   have heard testimony already about vehicles, what was

17   eliminated and what was not.  These are comparisons of

18   other vehicles of similar size, contour, et cetera, to

19   establish the basis for his testimony that the vehicles

20   are consistent as they are CR-Vs.

21            So Dodge Durango, this is not objected to.

22   This is objected to.  This is a Dodge Durango as

23   comparison.  These are completely foundational and

24   supportive of his opinion as to why the vehicles are

25   consistent.  Even goes to the extent of looking at a

1  sedan.

2          Again, we have the Honda CR-V with the

3  obstruction in 79, a sedan to show it's not consistent.

4          Honda Accord.  I don't know if 83 -- 83 doesn't

5  seem to be objected to.  84 must be.

6          THE COURT:  It is.

7          MR. SKROCKI:  85 must be.  86, yes, under 403,

8  all the way to 95.

9          Now, I don't understand, and sometimes I guess

10  I'm called limited because I don't understand the

11  defense's arguments, but we have a comparison between

12  vehicles in question.

13          This is completely relevant for the jury to

14  understand is this a Honda CR-V or not compared to other

15  vehicles.  It forms the basis of his opinion.  Why we

16  couldn't put up an exhibit like this to show one model

17  versus another, it's completely relevant.

18          There is no 403 prejudice angle to this

19  whatsoever.  It's completely probative.  It helps the

20  jury understand a fact in issue.

21          That would be -- is that a RAV4, Santa Fe?  Let

22  me back up.

23          THE COURT:  I have some issue -- if you could

24  back up one slide, Mr. Skrocki, because saying "day of

25  incident" up at the top, I realize that's the photo, but

I don't see that as a completely accurate statement when you have an overlay on it.

MR. SKROCKI: How about if we do "subject vehicle"?

THE COURT: Subject vehicle?

MR. SKROCKI: "Vehicle of interest"?

THE COURT: Yeah, something that would simply not have that "day of incident." I understand the rationale behind it, but I think it's --

MS. SHERMAN: And Your Honor, he could simply -- we can just say 4-12. That's the date of the video. We can delete "day of incident," if that's concerning to the Court. I think he will testify this image came from the 4-12 video.

THE COURT: I think I'm fine with that. It's the --

MS. SHERMAN: The jury knows that that's the day.

MR. SKROCKI: We'll make those changes. A lot of times -- I appreciate this. Sometimes we try to be sensitive to what experts put on their charts to avoid objections, and so this is valid and we'll make that change for sure.

So Ford Escape, which is actually already in evidence. The defense has produced a couple exhibits

about Ford Escapes and another CR-V. So I think these comparisons are completely relevant to his opinion and form the basis of why it's consistent.

Santa Fe. And 95, 96. I don't see 96 -- well, it's clear, so it's not objectionable.

97 is objected to under 403. Same with 98. They are just vehicle outlines. I'm going back to 97, forward to 98.

THE COURT: What's the point of showing these different vehicles on 4-19?

MR. SKROCKI: This is going to show that his diagram or overlay we'll call it of a Honda CR-V is consistent with the Honda -- with the known Honda CR-V.

THE COURT: All right.

MR. SKROCKI: He's showing the match is what he's showing. And then there is the outline on top of that.

THE COURT: All right.

MR. SKROCKI: And 101, again, the outline.

100 to 114 are objected to under 403. So on 4-19, what we're doing is scrolling through showing the consistency of overlay on the known Honda CR-V, the Wells', and then going back the other way.

There is an enlargement, again showing the basis for his opinion of consistency.

 1          And 119.  We're all the way to 127.  These are

 2     all objected to under 403.

 3          128.  Counsel, I don't see 128 being objected

 4     to.  Am I correct?

 5          MR. CAMIEL:  We objected to the 4-19 in total,

 6     but --

 7          THE COURT:  All right.  Yes.

 8          MR. SKROCKI:  That's Mr. Toglia's PowerPoint.

 9     Now, the argument the defense makes in their brief,

10     there are many points and small points with respect to

11     their objection to 4-19.

12          One of them was that by this analysis we're

13     just sort of flipping through cards and showing the

14     entire 4-19 video.  As you can see here, that's not what

15     we're doing.  Frankly, 4-12s aren't objected to, but the

16     4-19s are only being shown for demonstrative purposes in

17     connection with what's coming up behind it for

18     comparison purposes, so there is no attempt to

19     subterfuge the Court's order.

20          This PowerPoint has been in place since 2018.

21     There has been no change.  And there is no attempt by

22     the government here to subvert the Court's ruling on the

23     4-19 video.

24          Sorry, 2014.

25          MS. SHERMAN:  It was the identical one admitted

1    last time.

2         MR. SKROCKI:  From the first trial, so there

3    has been no change to it.  We're not trying to subvert

4    the Court's order, but it is certainly appropriate and

5    relevant for Mr. Toglia to do all of these things,

6    because if he doesn't have the opportunity, for example,

7    to show the other vehicles were excluded, then that's

8    subject for cross examination, or it leaves the jury

9    questioning down the road, either by inference, by

10   argument by defense or otherwise, if he's precluded from

11   doing that, "Mr. Toglia didn't do X, Mr. Toglia didn't

12   do Y."

13        Like the defense argument is he just narrowly

14   tunnel-visioned his view on this one vehicle and nothing

15   else.  So I think that's fair and appropriate.  It's not

16   prejudicial.  It's certainly more probative than not.

17        Do you have anything else about Toglia?

18        Let's move on to Mr. Becker's.  And Blair,

19   that's going to be Exhibit 95.

20        Going back to the math, Judge, and again I'm

21   not a numbers guy, but the math on this one is there is

22   26 slides, 12 of them are from the 19th, so it's

23   46 percent.  Mr. Becker's testimony is showing that the

24   vehicles are consistent by color, size, angle, features

25   and characteristics.

1              THE COURT:  Which one is this; 95 or 219?

2              MR. SKROCKI:  95.

3              THE COURT:  So the only one, apart from the

4     global objection, is page -- is the one with the green

5     image on page nine that I see on -- in the defense

6     motion.

7              MR. SKROCKI:  Could you repeat that, Judge?

8              THE COURT:  Page nine of the exhibit, the

9     blurry green image is taken from the April 19th video,

10    but is not labeled as such.  I'm reading from Docket

11    1240 at page ten.

12             MR. SKROCKI:  We can certainly fix that.

13    That's easy.

14             MS. SHERMAN:  I also think that green image

15    shows up in the 4-12 video.  If you go back, it's right

16    at the gate.  And so it's right there.

17             THE COURT:  Do we know whether that came

18    from --

19             MS. SHERMAN:  I don't know, but because it's

20    stationary, doesn't move, I don't know if it necessarily

21    matters which it came from because it's zoomed in to the

22    green box.  That box doesn't move.  It's not part of an

23    experiment.  It's just there.

24             And he uses it as a demonstration to explain

25    how he does a color analysis, a known and a photograph

```
 1    of it, and so he's using it as an explanation.  There is

 2    no experiment done at all in relation to the green box.

 3            THE COURT:  That's helpful.  Thank you.  I

 4    think that was the only one, apart from the global

 5    objection, on 95.  So what about 219?

 6            MR. SKROCKI:  219 is Mr. Vorder Bruegge's.

 7    Again, this has not been changed since 2014.  His

 8    analysis is measurements and size.  13 of the 49 slides,

 9    so roughly 26 percent, come from the April 19th video.

10            THE COURT:  So the first one I see is 23.  This

11    one I didn't see page numbers on, but I counted in 23

12    pages.

13            MR. SKROCKI:  23 for Vorder Bruegge?  Is that

14    the one you have got?

15            THE COURT:  That's the one.

16            MR. SKROCKI:  Okay.

17            THE COURT:  That's counting in 23 pages, so I

18    didn't know if there was something that activates this

19    or if this is just a heading?

20            MR. SKROCKI:  No.  I mean, I can't quite figure

21    out what the objection is to the heading.  Counsel, you

22    want to enlighten us on that?

23            MR. COLBATH:  It's just the overlays, Your

24    Honor, the series of overlays.

25            THE COURT:  All right.
```

1          MR. SKROCKI:  Let's go through those.

2          THE COURT:  23, 26, 41 and 44, not labeled

3    consistent with the Court's prior order.  I'm just

4    reading from the motion.

5          MR. SKROCKI:  These are tough.  They don't have

6    page -- can you read those again for me, Your Honor?

7          THE COURT:  23, 26, 41 and 44.  I think it is

8    these sheets.

9          MR. COLBATH:  Yeah, because they do not --

10   because they are talking about overlays.  They do not --

11   they have been manipulated, and so that should be

12   explained.

13         MR. SKROCKI:  We can certainly do that.  If

14   there is an issue with the word "overlay," we just

15   remove that and call it "comparison."  We can certainly

16   do that too.

17         THE COURT:  Perhaps that would solve that,

18   yeah.  All right.  Thank you.

19         MR. SKROCKI:  Yes.  I think that covers --

20         THE COURT:  I think it does, yeah.

21         MR. SKROCKI:  All right.  Anything else from

22   us, Your Honor?

23         THE COURT:  I guess my other question is -- and

24   I'm recalling back to the defense expert this summer on

25   the videos.

1          MR. SKROCKI:  Mr. Hoerricks?

2          THE COURT:  Yes, who as I recall testified that

3    you couldn't make any comparison between the two videos,

4    that you couldn't draw any conclusion from the

5    April 12th.  And I'm paraphrasing.

6          And so I query, and this gets back to this kind

7    of underlying *Daubert* issue that was not directly

8    addressed in the original motion work that we've had on

9    these videos, whether it would be warranted for the

10   Court to have a hearing outside the presence of the jury

11   prior to any of these people offering these opinions to

12   establish that they disagree and can make opinions from

13   comparing the two videos.

14         MR. SKROCKI:  The distinction here is that

15   Mr. Hoerricks' opinion is based on a very detailed

16   scientific analysis.  He wants to spend a significant

17   amount of time with data points, set the thing up as a

18   scientific experiment, and that's not what was done

19   here.

20         As -- without -- if you recall, I inquired of

21   him, "Taking off your scientist hat, were you able to

22   see, is there a vehicle depicted in that image?"

23         "Yes."

24         "Was there a vehicle -- was it a color blue?"

25         And he says, "Yes."

1          What we have here is not a scientific analysis,

2     but we have a comparison of these vehicles done for

3     demonstrative purposes.  So it's not -- we keep getting

4     wrapped around, from the defense, with what's

5     substantive and what's demonstrative, and they use that

6     interchangeably wherever it fits.

7          THE COURT:  Case law does too, in fairness, as

8     best I can tell.

9          MR. SKROCKI:  Maybe in fairness, but in actual

10    practicality, these aren't going back to the jury.

11         THE COURT:  I guess I still read the Ninth

12    Circuit authority to require a finding by the Court in a

13    gatekeeping function that, whether or not you attach a

14    scientific label to it, that these conclusions can be

15    reliably drawn.

16         MR. SKROCKI:  We'll do that.  We don't oppose.

17         THE COURT:  All right.  Thank you.

18         Mr. Colbath, then why don't I hear from you on

19    these issues, or Mr. Camiel, whoever.  It was Mr. Camiel

20    who filed the motion at 3:43 in the morning.

21         MR. CAMIEL:  I just filed it.

22         MR. COLBATH:  Your Honor, in light of the --

23    I'll start sort of where you and Mr. Skrocki ended, and

24    that is we think it is entirely appropriate to have an

25    out-of-the-presence hearing in front of the jury to

address *Daubert* to determine, as a threshold matter,
just what the witnesses can and can't do and what
process is required for them to formulate these
consistency opinions.

         And so I won't belabor the argument at this
point regarding that until we get there and the Court
hears that, if that's okay.

         The only thing I will note is Mr. Hoerricks
just -- he wants to talk scientific details and a lot of
data points and things, sort of like the 200 data points
that were used by Mr. Toglia to create his
non-scientific examination.  That is the point.

         But if we get to a point in the analysis where
the Court determines that these can be presented, first
of all, our objections are twofold.

         Number one, anything that's going to be shown
to the jury, if it involves either depictions from 4-19
or something on the screen that's not real, so even if
it's a photograph of a 4-12, if it has a cartoon or
animated picture of a CR-V overlaid on it, that is not a
real event.

         Because later in the PowerPoint, they go to
great extents.  The last almost 30 slides are, as
Mr. Skrocki described them, this is to show the accuracy
of the overlay with the Wells' vehicle.  So now you have

got a 4-12 slide and they say, "We clipped a Honda cartoon image or animated image from a known databank, like a Honda databank or automotive industry databank. Here it is.  We know this is the Wells' car, and it's the Wells' car."

Then any time they put that or an outline of that on top of a 4-12 video, that's not a real event.  A real event is something that a person, had they been standing there where the camera was, instead of seeing it in a picture, that's what they would have seen or could have seen.

And nobody could have seen a blue outline around anything driving down the road.  Nobody could have seen an animated car over the top of whatever else was behind it driving down the road.  So those things, first of all, if they are going to be admitted, they need to be labeled.

THE COURT:  Presented.

MR. COLBATH:  This is theory of what or this is an example or this is -- because it's the expert's demonstration.  This is what he's seen or his computer program is attempting to show, not what the real event was.  That's first.

THE COURT:  "This image is an experiment that does not depict an actual event."  Or, "This image

contains" -- part of it is -- well, let's do this: I do
intend to do the *Daubert* hearing, and assuming that I'm
satisfied that it can be presented to the jury, I would
be inclined to add some language to the ones that -- the
April 12th that have the overlay on it, that it's
similar to the language that I came up with for the
April 19th, so that is -- I'll leave you to ponder --

          MR. SKROCKI: I have a response, but after
defense leaves the podium.

          THE COURT: Go ahead.

          MR. COLBATH: And then in addition to just the
labeling, Your Honor, as I said, for any slides that the
Court finds admissible, but we also -- the secondary
part of the objection is to 403 because if it is a
demonstration -- first of all, I would note that if the
Court allows this for demonstrative purposes, at some
point, the demonstration subsumes or overshadows the
substance of the testimony.

          And to have repeated overlays, I mean in each
direction every single one is overlaid going back and
forth, and back and forth, and at some point, there is
very little -- there is only a few screens in each of
them that show the actual -- the actual video.

          So there is very little commentary by the
experts on just the actual video. It's all sequential

overlays back and forth.  And at some point, it's our
position that the cumulativeness of that, the
repetitiveness, the frame by frame by frame by frame
overlay by overlay by overlay becomes prejudicial.

Because it's only theoretically, at least we'll
see how the Court rules ultimately I guess, but if it's
found to be appropriate demonstrative evidence, there
should be substantive testimony and an explanation and
then here is how I demonstrate that.  It shouldn't be --
the prejudice just becomes the repetitiveness of it, I
guess.  And so we have a 403 problem we think as well.

THE COURT:  All right.  Thank you.

Mr. Skrocki, go ahead.

MR. SKROCKI:  Yes, Judge.  Here is the real
issue with the videos.  I know the Court has not read
all of the prior trial transcript.  We all have,
probably too many times.

In closing, the argument was if you cannot
unanimously agree that was Jim Wells' vehicle on
April 12th, you must acquit.  That's not the state of
the law.  Maybe it's a factual obvious point to make.  I
expect we'll hear that and we'll hear a lot of things
about the lack of what the government's investigation
revealed.

Why this isn't 403 is because -- you notice

1  they changed their argument about the cards and the
2  slides and all of that because we do this all the time.
3  I call it defense whack a mole; it pops up, we knock it
4  down, and they shift on to something else.  That's part
5  of the game here.
6          But it's important because showing the vehicle
7  going to and past the COMMSTA at the time it did, at
8  7:08, connected to the testimony of Holly Steeves
9  yesterday with when Mr. Belisle's computer was not used
10 any further at 7:08 and Mr. Rudat, other evidence that's
11 coming, along with the false alibi, those things are
12 critical to the government's case.  The timing of it is
13 critical.
14         So the coming and going to show that is the
15 vehicle coming and that is the vehicle departing on
16 April 12th is critical, and it's just as critical that
17 April 19th shows the same thing.  And so it's not this
18 cumulative playing of the video by segments or
19 installments.
20         I mean these have been crafted very carefully
21 to establish beyond any doubt that that vehicle has the
22 same characteristics on the 19th as on the 12th.
23 Therefore, they can infer, and we will argue to them
24 that they can find beyond any doubt, that that was the
25 Wells' vehicle and he was driving it.

1      So you add to that the slides about excluding

2   of other vehicles, that's also part of the defense

3   strategy that we didn't exclude other types of vehicles

4   that other people didn't look at.  You could have looked

5   at other types of vehicles, things of that nature.

6      So these are all very, very critical in terms

7   of the government's argument and the government's theory

8   of the case.  At this stage, you know, we don't mind the

9   *Daubert* hearing.

10      I'm going to tell you right now Mr. Vorder

11   Bruegge has gone under photogrammetry *Daubert* hearings

12   all over.

13      THE COURT:  Mr. Hoerricks I don't think had any

14   issues with that witness.

15      MR. SKROCKI:  No, he likes him, he thinks he's

16   great.

17      THE COURT:  I recall that.

18      MR. SKROCKI:  So that's good.  Now, the

19   limiting instruction.  Pretty soon, as my colleague is

20   cleaning up, we're going to be watering down these

21   slides to the point of non-application with these

22   titles.

23      The Court -- in our view what the Court should

24   do is craft a limiting instruction that you're going to

25   hear from a person qualified to render an opinion, not

the "E" word, and they created these slides, and you're
going to see through testimony that certain things were
done with these slides to assist you in understanding
their opinion.

That's much better than beating the jury over
the head with every slide and diluting it saying this is
not an actual event. This is not a commercial here.
We're in a court of law. And the Court has the power
and the authority to instruct the jury in a very clear
way that, hey, this is what this expert did, this is
what you're supposed to do with it.

And you can do it as many times as you want. I
really don't have a problem with that.

THE COURT: Why don't you write one up that you
would propose that would address the April 12th, but
going forward this morning, is the Honda person expected
to testify?

MR. SKROCKI: Mr. Schmidt, yes, he's here.

THE COURT: I have issued the ruling that found
the conditional relevance was established. Is there
anything else we need to take up with regard to that
person before we proceed from the defense perspective?

MR. COLBATH: Not other than, Your Honor, I'm
going to be able to simply inquire whether or not he
was, in formulating his opinion, he saw the April 19th

1  video.

2          THE COURT:  That would be fine.

3          MR. SKROCKI:  No problem.  I'm not even going

4  to play it with him.  I'm going to say, "Did you examine

5  another video?"

6          "Yes, I did."

7          And so Mr. Colbath is free to do certainly

8  whatever he wishes with respect to that video.  It's not

9  in evidence yet.  I don't intend to introduce it through

10 him.  I don't think Mr. Colbath will try and introduce

11 it through him either, are you?

12         THE COURT:  Well, we'll find out.

13         MR. SKOROCKI:  Just checking.

14         THE COURT:  Very good.  Anything further?

15         MR. SKROCKI:  We'll work on that instruction

16 for the Court.

17         THE COURT:  Thank you.  We can take this up

18 further at lunch.  Are any of these other three planned

19 for this afternoon?

20         MS. SHERMAN:  Mr. Becker is scheduled to

21 testify today.

22         THE COURT:  He is 95?

23         MS. SHERMAN:  Yes.

24         THE COURT:  So the only really issue we need to

25 address is the green box there.  First, let me say on

the motion at 1240, I did intend to permit the
government to pick out from any of the slides, and not
only the slides, from the two visuals, and so I'll
clarify to that extent, but deny the request in the
motion to limit the government to only those two
passthroughs.

I think when I wrote that order I was not -- I
think I learned later that in the first trial the video
was never even played to the jury, so I was operating
without that understanding, but in any event, that was
my intent to -- but I do see a potential 403 issue with
regard to the number of slides.

I think at this point I'm not -- for example,
let me say that if a witness with regard to this exhibit
at 181 were to testify for five minutes on each slide,
you clearly get into -- and I don't anticipate that, but
I could see that there would be a very likely 403
problem.

And if they were gone through very quickly,
then that would be a different view. And I think I'll
be in a much better position to assess the 403 on those
after I hear from the witness who will testify with
regard to 95, Mr. Becker, so that will be helpful.

With regard to the green image, is the defense
position that this came from the 19th or the 12th, or

1    you don't know?

2           MR. COLBATH:  Well, since none of the slides

3    are identified by Mr. Becker or Mr. Toglia as to where

4    in the video they came from, or in that particular case,

5    the green box, which video it came from, we don't know.

6           THE COURT:  All right.

7           MR. COLBATH:  And so at least a label on that

8    needs to be required.  And it does make a difference

9    where it's a stationary object or whether it's not.  If

10   it came from the 4-19 video, it's a stationary object,

11   it's at a different camera location and camera angle

12   than it was on 4-12.

13          But it's not being -- in that respect, it's not

14   being compared to 4-12 because it's being compared to a

15   photograph not from either video.  That's what the one

16   on the left is, a photograph apparently, if I read

17   Mr. Becker's report right, that's not on either video.

18          THE COURT:  Before this slide, number nine is

19   presented, let's have a brief hearing outside the

20   presence of the jury with Mr. Becker where I can ask him

21   about it.  I think that's the best way to address this,

22   and so can counsel.

23          Anything else for --

24          MS. SHERMAN:  Well, so, Your Honor, we were

25   going to put Mr. Sturgis on this morning.  He would

introduce the 4-19 video.  To record those videos and to

have the disclaimers the Court wants those have to be

done in real time, so I don't think we will have time

before his testimony to take out "this is not an actual

event."

THE COURT:  How about if we leave it in, and I

can say, "Ladies and gentlemen, the Court requested that

the government put this in the exhibit," because I just

don't think it's the most artful.  I'll take

responsibility for it, the language.  Is that agreeable?

MS. SHERMAN:  If the Court wants to explain,

obviously, this is a real thing, an actual event, that's

fine.

THE COURT:  I was just staring at it last night

thinking this really is not --

MS. SHERMAN:  I think in terms of the two

videos, and they're demonstrative as well, we would not,

unlike the PowerPoint, simply not have time today

without huge delay.

THE COURT:  That's what we could do then is

simply the Court make that statement.  Any objection to

that approach noting the overall objections,

Mr. Colbath, that the Court simply say that this

language was added at the Court's direction to help the

jury understand what these images are.  They do depict

 1   something actual, but not the events of April 12th.

 2          MR. CAMIEL:  Your Honor, something that's going

 3   to come up though with Mr. Sturgis is that if they

 4   introduce the April 19th video through him, in terms of

 5   cross examining him, we need to, as we did at the

 6   evidentiary hearing, show the differences between the

 7   two, and so we may refer to a still from the April 19th

 8   video taken from one of the government's exhibits that

 9   -- it's just -- it doesn't have the overlays or anything

10   like that, but so we can show the jury that when they

11   made this, there were these differences, like the cars

12   in the parking lot or the snow.  By doing that, we're

13   not --

14          THE COURT:  Any objection?

15          MS. SHERMAN:  No.

16          MR. CAMIEL:  We're not waiving our objection.

17          THE COURT:  So noted.  That's fine.

18          Mr. Colbath, with regard to that language that

19   this language that's in these documents was added at the

20   Court's direction.

21          MR. COLBATH:  Well, you know, my thought is

22   that what it depicts -- it depicts a demonstration.  And

23   I know it says, "This image is an experiment that does

24   not depict actual events."  What it is is it's an image

25   -- the image is an experiment that depicts a

demonstration by law enforcement and only depicts an
opinion on what may have happened, or a demonstration by
-- or just maybe a demonstration.

It depicts only a demonstration and only an
opinion of what may have happened, not --

THE COURT:  "It depicts a demonstration, not an
event that occurred on or about April 12th."

MS. SHERMAN:  That's fine.

THE COURT:  How about that?

MR. SKROCKI:  Yes.

THE COURT:  Mr. Colbath?

MR. COLBATH:  It's hard -- well, whatever the
Court settles on, because, you know, we object to the
process.

THE COURT:  I understand that.  I do.  All
right.  So that result then is the 1240 is denied
without prejudice though to this 403 issue that I
identified and to the Court having a *Daubert* hearing
with regard to the experts that were not addressed in
the order on the experts that I issued in the summer.

And we'll take up slide nine of Mr. Becker
outside the presence of the jury as well.

All right.  Anything further?

MR. SKROCKI:  No, Your Honor.  Thank you.

THE COURT:  Anything further?

1          MR. COLBATH:  No.

2          THE COURT:  Let's take about three minutes and

3    then we'll come back on record.

4          (Recessed from 9:03 a.m. to 9:13 a.m.)

5          (Jury present)

6          DEPUTY CLERK:  Court is again in session.

7          THE COURT:  All right.  Good morning, everyone.

8    Please be seated.

9          We were still on record when there was that

10   little earthquake yesterday.  You had all gone home.  So

11   anyway, here we are back for another day.

12         Mr. Skrocki, what's the plan here?

13         MS. STEVENS:  Your Honor, the government calls

14   Leah Henry as our first witness for the morning.

15         THE COURT:  All right.  Very good.

16         Good morning.  If you could come up to the

17   witness stand, please.  When you get up there, remain

18   standing and the clerk will administer an oath to you.

19         (Oath administered to the witness)

20         DEPUTY CLERK:  For the record, can you please

21   state your full name and then spell your full name.

22         THE WITNESS:  Leah Henry, L-e-a-h, H-e-n-r-y.

23         LEAH HENRY, GOVERNMENT WITNESS, SWORN

24                    DIRECT EXAMINATION

25   BY MS. STEVENS:

1    Q.   Good morning, Petty Officer Henry.

2    A.   Good morning.

3    Q.   Where do you currently work?

4    A.   I am currently stationed at Sector Columbia River

5    in Warrenton, Oregon.

6    Q.   What do you do there?

7    A.   I am a yeoman.  It's an administrative role,

8    Coast Guard military personnel.

9    Q.   Explain that a little bit more to the jury what

10   that means.

11   A.   I take care of all military issues.  Mainly pay

12   is a huge part of my job.  Anything in an administrative

13   role really.

14   Q.   And how long have you been employed by the Coast

15   Guard?

16   A.   Almost ten years.

17   Q.   Before Sector Columbia River, where were you

18   assigned?

19   A.   I was at Base Seattle as a yeoman as well.

20   Q.   Before Base Seattle?

21   A.   I was at Station Seattle as a boatswain's mate.

22   Q.   Explain to the jury what you did as boatswain's

23   mate.

24   A.   I was on small boat station, so a lot of small

25   boat operations and navigation.

1      Q.  And so you were boatswain's mate, and then you

2  changed over to the yeoman rating?

3      A.  I did.

4      Q.  Can you explain how it was you were able to do

5  that?

6      A.  I had to go back through a secondary school and

7  went to boatswain's mate primary school, and then they

8  allowed me to go back through yeoman school.

9      Q.  Why did you decide to change ratings?

10     A.  My daughter had cancer and it was tough as a

11  single parent, and so the yeoman rating gave me more

12  flexibility.

13     Q.  How is your daughter doing now?

14     A.  She's doing wonderful.

15     Q.  That's good to hear.

16         And then before Station Seattle, where were you

17  assigned?

18     A.  I was at Base Kodiak at the MWR.  It's a morale

19  and recreation division of the Coast Guard.  So I worked

20  at a small boat -- we provided small boats for morale

21  purposes for military personnel.

22     Q.  Like for people to rent, basically?

23     A.  Yes.

24     Q.  And did you have your rating as a boatswain's

25  mate, or were you a non-rate?

1    A.  I did.

2    Q.  Okay.  Great.  And before MWR, where were you?

3    A.  I was at the Communications Station in Kodiak.

4    Q.  Do you recall the dates that you were there?

5    A.  I was there from April 2010 or May, I believe,

6    2010 to 2013 sometime.

7    Q.  It's been a while, so -- what did you do for the

8    COMMSTA?

9    A.  I was a non-rate there, so we did a lot of

10    antenna field maintenance, a lot of chain sawing, weed

11    whacking, cutting grass was a huge part of the job.

12    Q.  Can you describe the structure of the overall

13    COMMSTA, the difference between the respective buildings

14    that were there?

15    A.  I worked in the rigger shop, which was a separate

16    building.  We called it T-2 or the rigger shop.  And

17    then up the hill there was T-1 which was kind of the

18    command center.

19    Q.  And what department did the rigger shop

20    technically fall under if you can remember?

21    A.  Can you ask me that again?

22    Q.  Sure.  What department did the rigger shop fall

23    under?  Was it the ops or engineering department?

24    A.  The engineering department.

25    Q.  And who was your direct supervisor when you were

1   attached to the rigger shop?

2       A.  My first supervisor there was ET3 Imperatres

3   (phonetic), and then after that, it was ET3 Beauford.

4       Q.  And can you describe ET3 Beauford to the members,

5   how he was as a supervisor?

6       A.  He was young.  And he was a good supervisor.  I

7   gave him kind of a hard time because I was a lot older.

8   And we taught him a lot I think while he was there.

9       Q.  All right.  And who else worked down there?

10      A.  I worked with Seaman Upchurch at the time, Seaman

11  Pacheco, ET3 Beauford, Seaman Coggins, and then

12  ET1 Hopkins, Jim Wells and Rich Belisle.

13      Q.  And who was the next in line of the supervisory

14  chain for you?

15      A.  That would have been ET1 Hopkins.

16      Q.  And how would you describe your interactions with

17  ET1 Hopkins?

18      A.  Not the greatest.  He was really disgruntled.  He

19  didn't give very clear instructions.  It was hard to get

20  answers out of him on tasking.

21      Q.  Okay.  Who else did you interact with there at

22  the rigger shop?

23      A.  We interacted with the civilians, Jim Wells and

24  Rich Belisle, quite a bit.

25      Q.  How would you describe Mr. Belisle?

1      A.  He was awesome.  He was my mentor.  He was always

2  willing to help if you had a question.  He liked to

3  teach.

4      Q.  And what about Mr. Wells?

5      A.  I went to Mr. Wells as well a lot, and he was

6  also willing to teach.  I think both the civilians took

7  us under their wings and helped us significantly in our

8  time there.

9      Q.  And did you have an opportunity to observe

10 Mr. Wells interact with his supervisors?

11     A.  On occasion.

12     Q.  Okay.  And can you describe what you observed,

13 how he acted with his supervisors at times?

14     A.  I think that -- give me a minute.

15         (Pause)

16     A.  I think the hierarchy of the rigger shop is you

17 had the two civilians who had a huge knowledge base and

18 then you had ET1 Hopkins that didn't seem to have a big

19 knowledge base for what we were doing.  And so when they

20 would interact, when Jim would interact, he was very

21 knowledgeable and I think that could sometimes be seen

22 as dismissive of his supervisors.

23     Q.  Okay.  And did you ever observe him challenge the

24 decisions of his supervisors?

25     A.  Not necessarily.

1     Q.  Yesterday we spoke.  Do you remember the

2  conversation we had?  Was it yesterday or the day

3  before?  On Sunday we spoke.  Do you remember that

4  conversation?

5     A.  Uh-huh.

6     Q.  Do you recall indicating that --

7         MR. COLBATH:  Your Honor, I'm going to object

8  as to leading.

9         THE COURT:  It is leading.

10  BY MS. STEVENS:

11     Q.  Was he respectful?

12     A.  Not always.

13     Q.  Okay.  Would he refer to Chief Reckner as Scott?

14     A.  Yes.

15     Q.  How would you describe that?

16     A.  Disrespectful.  That's his immediate supervisor.

17     Q.  And can you describe your social relationship, if

18  any, with Mr. Wells?

19     A.  I did.  I went to his house a lot.  His wife and

20  him would invite us over for dinner.  And at that time,

21  it was my support system when I was in Kodiak.

22  Especially after I had my daughter.  So that was kind of

23  the extent of my time over there.  We spent a lot of

24  time over for holidays.

25     Q.  And you mentioned "us" and "we."  Who are you

1  referring to?

2      A.  Seaman Upchurch and myself.

3      Q.  Did any of the other folks from the rigger shop

4  ever join you with those social events at the house?

5  Seaman Coggins?

6      A.  Not that I can remember.

7      Q.  Seaman Pacheco?

8      A.  No.

9      Q.  Cody Beauford?

10     A.  No.

11     Q.  What about ET1 Hopkins?

12     A.  No.

13     Q.  Rich Belisle?

14     A.  No.

15     Q.  Now, were you down in T-2 the whole time that you

16 were there?

17     A.  I was not.  I was sent up to T-1 when I was about

18 five months pregnant, just given the nature of the work

19 that we did.

20     Q.  Do you remember more or less the timeframe that

21 you went up to T-1?

22     A.  I was up there from about June 2011 to

23 October 2011.

24     Q.  Now, before you went up to T-1, do you ever

25 recall random people, people in the community just

1   coming into the T-2 building?

2     A.  No.

3     Q.  Going back to 2011, 2012, do you recall if there

4   were any specific threats made against the Coast Guard

5   or Coast Guard men and women there in Kodiak?

6     A.  Not that I recall.

7     Q.  Now, how would you describe T-2, the rigger shop,

8   in comparison to the T-1 as a whole, the building up at

9   T-1?

10     A.  We were our own little entity down there for

11   sure.

12     Q.  So let's move to the morning of April 12, 2012.

13   Do you remember that morning?

14     A.  I do.

15     Q.  Okay.  Describe to the jury what you observed --

16   let's start first, where did you live?

17     A.  I lived in Bells Flats.

18     Q.  And how long would it take for you to get to work

19   commuting from Bells Flats?

20     A.  I want to say about 15 minutes or so.

21     Q.  Do you remember what time you arrived that

22   morning?

23     A.  I arrived around 7:45 a.m.

24     Q.  Now, walk the jury through what happened once you

25   arrived.

1    A.  I pulled into the T-2 parking lot.  As I was

2  doing that, OS1 Haselden was running down the hill.  And

3  I pulled in.  I parked.  I got my stuff out.  I didn't

4  think too much of him running.  He was a little odd and

5  it just didn't ring a bell.

6       I got my stuff out of the car.  I walked into the

7  building, and I immediately smelled something.  I

8  thought just off the top of my head it was a gas leak or

9  something.  ET3 Beauford and OS1 Haselden was

10  standing -- they were standing kind of obstructing the

11  view into our kitchen area, I guess if you want to call

12  it.  It's kind of where the non-rates spent our time.

13       ET3 Beauford was just kind of in shock.  He

14  wasn't saying anything.  He was just kind of staring.

15  And OS1 Haselden was yelling at me profusely to get out.

16  He just said, "Get out, get out, get out."

17      At that point, I turned around and I walked out.

18  Seaman Coggins, I don't remember seeing him when I

19  walked in initially, but he followed me out, and he said

20  something along the lines of, "They're down."  And I

21  think I asked him if there was a gas leak.  And he said,

22  "They're down, they're down."  And I said, "Who's down?"

23  And he said, "ET1 and Rich."  He said, "They're dead or

24  they've been shot."

25      And at that point, the first military police unit

pulled into the parking lot.  She got out of the car,
asked what was going on.  I directed her inside.  And at
that point, more fire trucks were coming in.  They were
asking what's going on.  I directed them inside.

I did not see Seaman Upchurch.  So she was -- she
is my best friend.  Naturally, I was worried about her,
so I was calling her.  I was walking back to my car.  I
don't think I knew exactly what I was doing at the time.

And then our SK1 at the time, Petty Officer
Cartier, was pulling up.  He was on the main road going
from the rigger shop to T-1.  I flagged him down, told
him something had happened, and he asked me to get in
his truck and we went up to T-1, to the main building.

Q.  At this point, the government is going to post
for publication government Exhibit No. 13.

Can you take a look at that?  And there should be
a pointer up there, a laser pointer up there, Petty
Officer Upchurch [sic].  Can you just point out to the
jury which door you went through that morning?

A.  That one right there.

Q.  Okay.  And where did you encounter Petty Officer
Beauford?

A.  Right there.

Q.  What area is that listed up there on that
exhibit?  Can you read that?

1    A.  The locker room.

2    Q.  And when you saw Petty Officer Beauford, how did

3 he appear?

4    A.  He was very pale, just shocked is the best way I

5 could describe it.

6    Q.  And eventually, you mentioned you saw Petty

7 Officer Coggins.  How did he appear?

8    A.  He was obviously talking, but he was also just

9 very kind of glazed over.

10   Q.  And then lastly, you mentioned you observed Petty

11 Officer Haselden running down the hill and then you had

12 an opportunity to observe him as well?

13   A.  Uh-huh.

14   Q.  How did he -- how did he look?

15   A.  He was extremely panicked and sweaty.  He was

16 yelling.

17   Q.  And do you recall which vehicles were there in

18 the parking lot when you arrived?

19   A.  That morning, closest to that entry, that door,

20 was ET1 Hopkins' truck.  And then Rich Belisle's truck

21 was next to it.  Then we had two work trucks parked.

22 And then there was the dumpster, and that's kind of --

23 we parked to the side of the dumpster.  So at that

24 point, I remember seeing Seaman Coggins' Jeep was there.

25 I don't remember seeing ET3 Beauford's car.

1    Q.   What kind of vehicle did you drive into work in?

2    A.   I had a Nissan Xterra, silver.

3    Q.   So you hitch a ride up to T-1 with SK1 Cartier.

4    Can you describe what an SK is to the jury?

5    A.   They handle procurement for anything needed

6    within our unit.

7    Q.   So he was a first class petty officer?

8    A.   He was.

9    Q.   What happened after you got up to T-1?  What did

10   you do next?

11   A.   I went to the ET deck where the ETs were.  I

12   don't remember who all was on that deck, but I asked

13   them if they had seen Seaman Upchurch, and someone had

14   directed me to the conference room and that's where I

15   went.

16   Q.   And when you got into the conference room, what

17   did you do next?

18   A.   I saw Para, Seaman Upchurch.  It's a little fuzzy

19   on what exactly happened or what took place.  At some

20   point, she had called Jim Wells and had asked him where

21   he was at.  And he said he had a flat tire.  And I think

22   he had mentioned that the ops deck had called him and

23   informed him there was an incident and Para had said,

24   "Okay, I'll see you when you get here."

25   Q.   Why was that -- the conference room, why was that

1  fuzzy for you?  Why is it fuzzy for you?

2     A.  Oh, I just -- I don't remember like what I was

3  talking to Para about when I first got in there.

4     Q.  And so after -- can you tell for the record what

5  was your phone number at the time?

6     A.  It was 916-607-3401.

7     Q.  Do you recall whether anybody used your phone

8  that morning?

9     A.  Para had used my phone, because she didn't have

10  very good reception in the conference room and I did.

11     Q.  And after Para had that conversation with

12  Mr. Wells, what happened next?

13     A.  I believe Chief Reckner had come into the

14  conference room and maybe a couple other people.  We

15  were just instructed to stay in the conference room.

16     Q.  What was running through your mind after that

17  conversation with Para and Mr. Wells?

18     A.  Naturally, it was just a really odd thing that on

19  a day like that he had a flat tire.

20     Q.  And how would you describe Mr. Wells'

21  relationship, we'll start with Mr. Belisle?

22     A.  I always viewed them as working well together as

23  the civilians.  They headed most of the big evolutions

24  that we did involving antennas.  I had learned later in

25  a kind of a joking manner, you know, Rich, I think I had

1  said something and asked him a question of like, "Oh,

2  Rich, what, you don't like Jim or whatever and" --

3          MR. COLBATH:  Your Honor, I'm going to object

4  as to hearsay.  Sounds like she's relating a

5  conversation with Mr. Belisle.

6          THE COURT:  Would you agree?

7          MS. STEVENS:  Yeah.

8  BY MS. STEVENS:

9    Q.  So I'll guide you in a different direction here,

10 Leah.  Did you remember observing anything of their

11 working relationship changing in any way prior to the

12 murders?

13   A.  Rich had started heading more of the projects

14 that maybe Jim had done previously.  That was the shift

15 in that.

16   Q.  Did you have an observation about the command's

17 direction with regard to the civilians?

18   A.  As far as -- can you clarify?

19   Q.  As far as their jobs?

20   A.  I don't, no.

21   Q.  And how would you describe the relationship

22 between the defendant and Mr. Hopkins?

23   A.  Jim Wells did not like ET1 Hopkins.  He viewed

24 him as being very incompetent.

25   Q.  And can you expand on that further?

1    A.   I don't think that they really interacted a whole

2    lot in terms of evolutions.   ET1 Hopkins seemed to kind

3    of take the back seat when that stuff would arise.

4    Q.   Did Mr. Wells articulate his feelings to you?

5    Was he vocal about it?

6    A.   We would have conversations about it when we'd

7    have dinner over at his house.

8    Q.   Did you have an opportunity that morning to

9    observe Mr. Wells?

10   A.   In the conference room?

11   Q.   Uh-huh.

12   A.   Yes.

13   Q.   And can you describe that observation to the

14   jury, please?

15   A.   There wasn't -- he kept to himself a lot.   At one

16   point he had given me a hug or put his hands on my

17   shoulders and had given me a handkerchief.   And other

18   than that, he sat across the table from I believe where

19   I was sitting.   And there just wasn't a whole lot of

20   emotion.

21   Q.   Did he appear worried at all?

22   A.   No.

23   Q.   Or scared for his safety?

24   A.   No.

25   Q.   Did you appear -- did you observe him doing

1    anything physically with his hands?

2        A.   He was rubbing his ears, and either Para or I had

3    asked him what was wrong and he said his ears were

4    ringing.

5        Q.   And when that occurred, what was your impression?

6    What were your thoughts?

7        A.   Honestly, I mean, considering what had just

8    happened, it was just another thing that didn't make

9    sense.

10       Q.   And on April 11th, 2012, did you work that day,

11   the day before?

12       A.   Yes.

13       Q.   And do you recall if you were back down in the

14   rigger shop at that time?

15       A.   I was.

16       Q.   And do you recall observing anything that stood

17   out to you on the 11th?

18       A.   I was in the kitchen area and we had a back room,

19   we called it the boiler room.  We had a locker in there

20   where ET3 Beauford would put his uniforms as well as

21   like a janitorial closet, toilet paper, all of that kind

22   of stuff in it.

23            It had a doorway that went in from where I was

24   sitting into the boiler room, and then there was a door

25   going outside of that room.  And Jim had gone in there

1    and closed it behind him.  And he was in there anywhere

2    from 10 to 30 minutes.

3        Q.  Did him closing the door leave an impression on

4    you?

5        A.  It caught my eye because it was just really

6    unusual.

7        Q.  Shifting gears just a little bit.  When Mr. Wells

8    would use the restroom, where would he go?

9        A.  In the rigger shop, T-2.

10       Q.  And would he spend a lot of time in there or a

11   short -- how would you describe the time he spent in

12   there?

13       A.  Yeah, it was a long time.

14       Q.  What did the other members have -- members of the

15   rigger shop have to do if he was in there for a long

16   time?

17       A.  We would go up to T-1.

18       Q.  Did it bother you guys at all, him taking all

19   that time in the bathroom?

20       A.  There were others that would do that too, but

21   yeah, it was annoying.

22       Q.  Did he ever complain to you about having any

23   bowel issues?

24       A.  I cannot recall having a conversation with him

25   about that.

1    Q.  Do you recall whether or not he would ever go up

2  to the bathroom in T-1?

3    A.  I don't.

4    Q.  Do you remember who checked the gauges in the

5  basement in T-1?  Who was responsible for that

6  generally?

7    A.  The non-rates, so myself, Seaman Coggins, Seaman

8  Pacheco and Seaman Upchurch.

9    Q.  During your -- you personally checking the

10  gauges, how long would it take you to do it?

11    A.  Under five minutes.

12    Q.  Is there any reason why Mr. Wells would spend two

13  and a half to three hours up in T-1 on a given workday?

14        MR. COLBATH:  Your Honor, I'm going to object

15  as to speculation.

16        THE COURT:  Why don't you lay a little more

17  foundation.

18  BY MS. STEVENS:

19    Q.  Would Mr. Wells or anybody else from the rigger

20  shop go up to T-1 for extended periods of time?

21    A.  Unless they were meeting with a command or if

22  there was maintenance, we had two generators up there,

23  unless there was maintenance being done, but I can't --

24  that wasn't something that would happen often.

25    Q.  And are you familiar with the warehouse?

1    A.  I am.

2    Q.  COMMSTA.  Were you aware of a project, a specific

3    project that was being conducted with regards to the

4    warehouse?

5    A.  Yes.  I believe the direction came from the

6    command or Chief Reckner to clean out the warehouse.  We

7    had a lot of equipment that was really outdated, just

8    not being used.  So that was what we were tasked with.

9    Q.  And did you participate in that?

10   A.  I did.

11   Q.  Who seemed to be in charge or sort of the boots

12   on the ground for that warehouse project leading all the

13   folks involved on a day-to-day basis?

14   A.  That was Rich Belisle.

15   Q.  Did Mr. Wells participate in that?

16   A.  No.

17   Q.  Did that leave an impression on you?

18   A.  It did.

19   Q.  Can you explain that to the jury?

20   A.  Jim was a part of all of our -- everything that

21   we did, all of our evolutions for the most part, and so

22   the fact that he was not participating, it just kind of

23   set a tone that things were shifting.

24   Q.  Explain that a little more.  "Things were

25   shifting," explain that a little more.

1    A.  Rich was kind of coming into that position I

2  think that Jim had held for a really long time.  I don't

3  know how else to --

4    Q.  That's fine.  Other than, you know, Rich coming

5  into Jim's position, were there any other potential

6  shifts or anybody leaving or --

7    A.  Jim had a lot of knowledge, you know, of the

8  COMMSTA and the equipment.  So he was just really

9  involved.  And for him to not be involved in something

10  was strange.

11      And kind of his shift in his personality.

12  Usually he really liked to be a part of things, and at

13  that time, you know, he would just kind of sit in his

14  office and kick his feet up and read a book, which was

15  really uncharacteristic of him.

16    Q.  What do you mean kick his feet up?

17    A.  On his desk.  That was something I observed.

18    Q.  Put his feet up on the desk?

19    A.  Uh-huh.

20    Q.  You mentioned previously an evolution.  Just for

21  clarity of the record, what do you mean by an evolution?

22    A.  Just a project.

23    Q.  When you came back down to the rigger shop, do

24  you recall what month that was after maternity leave?

25    A.  I believe I came back on March 1st.

1    Q.  And did you have an opportunity in the month of

2    March to observe Mr. Wells?

3    A.  I did.

4    Q.  How did he appear physically?

5    A.  Physically, I didn't see any changes.  I was

6    under the impression that he had been going through a

7    lot of medical stuff, but just really not a part of our

8    shop.

9    Q.  Okay.  So that kind of describes some of the

10   things you had testified to previously.  But looking at

11   him visually, physically, did he appear well or unwell?

12   A.  Well.

13   Q.  Okay.  And then the last question:  Do you

14   remember the windows in the T-2 building?

15   A.  I do.

16   Q.  Can you describe those to the jury and whether or

17   not you guys actually utilized those windows at all?

18   A.  No, they were far too high for us to open or

19   close them, so we would just open doors for air.

20   Q.  Thank you, Petty Officer Henry.  I have no more

21   questions at this time.

22            THE COURT:  Mr. Colbath, Mr. Camiel.

23            MR. COLBATH:  Thank you, Your Honor.

24                    CROSS EXAMINATION

25   BY MR. COLBATH:

1    Q.  Good morning, ma'am.

2    A.  Good morning.

3    Q.  You described the Wells as sort of your Coast

4  Guard family?

5    A.  I did.

6    Q.  Did I hear you right?  So as a non-rate, they

7  were somebody -- you were single at the time?

8    A.  I was.

9    Q.  Didn't have other family on Kodiak?

10   A.  Correct.

11   Q.  And so they -- besides working with Jim, they

12  sort of took you into their home or invited you

13  regularly to their home to socialize with them?

14   A.  Yes.

15   Q.  And that was true with your best friend, Para, it

16  sounds like as well?

17   A.  Uh-huh.

18   Q.  And so that got -- allowed you the opportunity to

19  sort of know Mr. Wells at work as well as know Jim at

20  home a little bit?

21   A.  Yes.

22   Q.  And you characterized him as a quiet person, just

23  generally, a man of few words sort of?

24   A.  Yeah.  It wasn't unusual for him to kind of be in

25  his own world, I guess.

1    Q.   Okay.  Well, compare that to you also spent a lot

2    of time and knew -- with Rich Belisle, right?

3    A.   Uh-huh.

4    Q.   Rich was much more outgoing, much more personable

5    or sociable maybe?

6    A.   Yes.

7    Q.   Okay.  Would you say Mr. Wells was a private man,

8    sort of stay-at-home, keep to himself kind of guy?

9    A.   I think both Rich and Jim kept their personal

10   lives at home, yes.

11   Q.   Okay.  You've described Jim as a man's man that

12   wouldn't really talk about his feelings.  I mean, he

13   wasn't going to share with you, somebody much younger

14   and female, his feelings about things, personal

15   feelings?

16   A.   We spoke of personal feelings while at dinners.

17   Q.   Well, you described him as -- am I right, you

18   described him as a man's man that was not going to

19   outwardly talk about his feelings?

20   A.   Yeah.  We had approached him, a lot of those

21   conversations were based around kind of our struggles

22   with ET1 Hopkins.  That was something that we could talk

23   to him about.

24   Q.   Sure.  And you and Para both talked about the

25   difficulties you had with Jim Hopkins and his

1   supervision of you and sort of his behaviors?

2      A.  Yes.

3      Q.  Mr. Wells listened to that, Rich listened to

4   that?

5      A.  Uh-huh.  Yes.

6      Q.  They in fact tried to help you guys with command

7   and other issues to try to rectify some of that

8   toughness that was going on?

9      A.  Yeah.  I don't know if anything was ever done,

10  but it was, yes, portrayed to us that they would kind of

11  speak up.

12     Q.  They said they would try to do something for you.

13  Whether it happened or not, you weren't aware?

14     A.  Yes.

15     Q.  The manner in which Mr. Hopkins supervised you

16  non-rates and his behaviors in the rigger shop, that was

17  something that you saw Jim didn't approve of.  Rich

18  didn't think it was appropriate either.  Right?

19     A.  Correct.

20     Q.  So you worked down in T-2 in the spring and early

21  summer of 2011 and then moved up to T-1 for your duties?

22     A.  Correct.

23     Q.  It would have been about June?

24     A.  Uh-huh.

25     Q.  Now, during that time we've heard other testimony

1    about a project that the rigger shop was doing out on

2    the island of Shemya?

3        A.   Yes.

4        Q.   Was that a project that you went out and traveled

5    to, or did you stay back because of your pregnancy?

6        A.   During that time I did not go.

7        Q.   Now, Jim was out on that project, you're aware of

8    that, right, on the Shemya project?

9        A.   Yes.

10       Q.   And that was before he got sick or before he had

11   been having medical problems that you were aware of,

12   wasn't it?

13       A.   Yes.

14       Q.   And then there came a time when you were either

15   up at T-1 and getting close to the birth of your child

16   or on maternity leave that Jim became pretty sick.  You

17   were aware of that?

18       A.   Yes.  I was told while I was gone.

19       Q.   Did you see them outside of work, see Jim outside

20   of work any during that time and have occasion to visit

21   with them?

22       A.   I don't recall any times of seeing him.  I was in

23   Anchorage at the hospital for a few months.  I had

24   Easter dinner with him and Nancy the week before the

25   shootings.

 1    Q.  Okay.  So let's -- I want to back up a little
 2   further than that, and we'll get to that in a minute.
 3   You were out for maternity leave, gone from the whole
 4   COMMSTA facility for how long?
 5    A.  From October 2011 to March 1st, 2012.
 6    Q.  So you didn't know how much -- other than to have
 7   other people tell you about it, you didn't know how much
 8   Jim was out at that time?
 9    A.  No.
10    Q.  But you were aware that he -- fairly close in
11   time to when you were gone, he ended up having
12   gallbladder surgery and a hernia surgery?
13    A.  Yes.
14    Q.  It would have been after you came back March 1st,
15   and by then, when you came back, he was back from his
16   surgery?
17    A.  He was.
18    Q.  And were you aware that he had just gotten back,
19   he had been back for a period of time?  Did you know how
20   long he had been back?
21    A.  I don't recall.
22    Q.  All right.  Did you know that he was on light
23   duty at that time, you know, easing back into work?
24        MS. STEVENS:  Your Honor, objection, lack of
25   foundation for this particular witness.

1          MR. COLBATH:  I was asking her if she knew.

2          THE COURT:  Whether or not she knew, that's

3   fine.  I'll allow it.

4     A.  I don't know.

5     Q.  Okay.  You said sort of at that time frame, that

6   would have been -- the time period after you got back

7   from maternity leave up until the time of the shootings

8   is about a six-week time period, right?

9     A.  Correct.

10    Q.  It was in that time that the warehouse project

11  was going on?

12    A.  Yes.

13    Q.  And it was odd that before his sickness and

14  before his surgeries, pretty much throughout that whole

15  time before that that you had been at the rigger shop,

16  if there was something going on, Jim was involved?

17    A.  Yes, generally.

18    Q.  And sharing knowledge and being an active

19  participant in the work and doing those types of things?

20    A.  Yes.

21    Q.  Okay.  But then -- now you're back and he's back,

22  and it was odd that he wasn't down there participating

23  in the warehouse, right?

24    A.  Yes.

25    Q.  You didn't hear him complain about the warehouse

1   or refuse to do it, he just wasn't there, right?

2       A.   Yes.

3       Q.   Okay.  It was during that time that you saw him,

4   he spent more time at his desk reading a book.  You said

5   one time you even saw him with his feet up on his desk

6   reading a book?

7       A.   Uh-huh.

8       Q.   Less interactive, less resistant to things or

9   communicative about things?

10      A.   Yeah.  He didn't seem to care too much about what

11  was going on in the COMMSTA.

12      Q.   Did I write it down that you said he was kind of

13  off in his own little world?

14      A.   Yes.

15      Q.   All right.  Let me ask you about some of that --

16  the day before the shootings.  On April 11th, did you

17  actually -- when you saw Jim go in the boiler room at

18  some point, did you go in there or have occasion to

19  observe him reading in there?

20      A.   No.

21      Q.   Okay.  Did you go in there at all?

22      A.   No.  That day?

23      Q.   Yeah.

24      A.   No.

25      Q.   And he came back out of the boiler room you said

1  maybe 15 to 30 minutes -- or 10 to 30 minutes he was in

2  there.  He went in, closed the door, came back out?

3      A.  Yes.

4      Q.  And there was, besides the boiler, a pressure

5  washer and some other just general maintenance equipment

6  for the rigger shop in there, right?  I guess mechanical

7  systems for the rigger shop probably?

8      A.  I don't really recall what else was in there.

9      Q.  Okay.  Mr. Beauford, he kept his -- he had a

10  space in there where he would change clothes?

11      A.  Correct.

12      Q.  Do you recall there being a couple of stools in

13  there, areas where you could just sit?

14      A.  I think I recall a stool in there.

15      Q.  Let me see if I can find a picture maybe.  We'll

16  see if we can find that and I'll ask you about that.

17          You said that Mr. Wells would frequently use the

18  bathroom for extended periods of time.  You observed

19  that?

20      A.  Yes.

21      Q.  And that -- fair to say that was recent in time

22  or after his surgeries or in that same timeframe that

23  you and I were just talking about, the March 1st to the

24  April?

25      A.  Yes.

1    Q.   And sometimes it would be long enough that if

2   others needed a bathroom, they might have to go up to

3   T-1?

4    A.   Correct.

5    Q.   And are you aware that -- of the other guys in

6   the shop, Mr. Wells, were people cognizant of that of

7   not tying up the bathroom or going to use the bathroom

8   other places if they needed to --

9    A.   Yes.

10   Q.   -- because eight of you had to share the

11  bathroom?

12   A.   Uh-huh.

13   Q.   So certainly it was always an option for anybody

14  in the shop, especially if they needed to use the

15  bathroom for a long period of time, to go up to T-1 and

16  use the bathrooms up there?

17   A.   Yeah.  We didn't -- I mean, we didn't do that

18  very often, but it was an option.

19   Q.   You didn't do that very often.  The bathrooms up

20  in T-1, there were multiple bathrooms and the bathrooms

21  had -- well, at least the ones that you used had

22  multiple stalls.  It wasn't like the rigger shop with

23  just a single-use bathroom?

24   A.   Correct.

25   Q.   So let's talk about for a minute April 12th.

1  Your -- you, it sounds like, arrived about the time that
2  Mr. Haselden was running down the hill?
3      A.  Yes.
4      Q.  And you were still collecting your things, hadn't
5  made it physically to the shop building by the time
6  Haselden got around the corner and got in there?
7      A.  Correct.
8      Q.  So he was ahead of you.  That made three people
9  in the building when you went in:  Mr. Beauford, Coggins
10 and then Haselden?
11     A.  Yes.
12     Q.  And Ms. Stevens asked you about your observations
13 of those folks.  Mr. Beauford, you said he was just
14 standing there not saying a word, just kind of looked in
15 shock, just glazed over, just no reaction really or just
16 a shocked silence?
17     A.  That's what I recall.
18     Q.  Okay.  And Coggins was talkative, but he -- or
19 was at least saying something, but still you said he was
20 kind of glazed over or not really -- also in shock, I
21 guess is the way you described it?
22     A.  Correct.
23     Q.  Well, Mr. Haselden, he was much different.  He
24 was, instead of being shocked, appeared to you far more
25 panicked, yelling, flush, as opposed to pale.  He had

1    almost sounds like the opposite reaction or on the other

2    end of the spectrum from Beauford?

3         A.   Yes.

4         Q.   And it wasn't long after that -- after Haselden

5    told you you needed to get out of the building that you

6    saw Mr. Cartier and went up the hill to T-1?

7         A.   Yes.

8         Q.   All right.  And when you let Ms. Upchurch use

9    your phone to call Mr. Wells, you were right there, you

10   could hear the conversation?

11        A.   Yes.

12        Q.   That's how you heard -- that's how you heard

13   Mr. Wells say there was -- that the ops deck had called

14   him and told him there was some incident and that he

15   wasn't there because he had a flat tire?

16        A.   Yes.

17        Q.   Later when he did show up, I wasn't sure -- you

18   said he sat -- he stayed off by himself, but you said he

19   was sitting at a table across from you?

20        A.   There was a large conference table.

21        Q.   You were sitting at the table?

22        A.   Yes.

23        Q.   And Para was sitting at the table?

24        A.   I think so.

25        Q.   Okay.  Jim was sitting somewhere at the table?

1    A.   Yes.

2    Q.   At times, Chief Reckner would come in, other

3 folks came in and out, correct?

4    A.   I believe the three of us were in there, just the

5 three of us for a given time, and then people started to

6 come in.

7    Q.   Okay.  Jim had a book with him.  That was

8 something that was a pretty regular occurrence, it

9 sounds like, that he carried a book with him?

10    A.   I don't remember that.

11    Q.   Okay.  Do you remember him -- I thought -- maybe

12 I wrote it down wrong, that he was at -- sometime up

13 there in the conference room, he was reading?

14    A.   I don't remember that.

15    Q.   Okay.  So after the shootings and things sort of

16 started to unfold, the law enforcement set up their

17 investigation up there in T-1, correct?

18    A.   Yes.

19    Q.   There were agents around from April 12th for a

20 number of weeks, around the COMMSTA area?

21    A.   I knew when I had an interview that they were

22 there.  I wasn't aware of their daily presence there.

23    Q.   Over the period of that day and the following

24 days and weeks, you were interviewed a number of times,

25 correct?

1      A.  I was.

2      Q.  And during the interview with law enforcement,

3  you were asked to sign a form that instructed you you

4  were not to talk about the investigation with anybody

5  and that you could be in trouble if you did?

6      A.  Correct.

7      Q.  I want to ask you just -- I don't want to switch

8  subjects, but I'm going to show you this photograph just

9  for foundation and ask if you have seen that before or

10  if it looks familiar to you.

11      A.  It looks like the boiler room, but I don't

12  remember -- there was a large hole in the ground which

13  I'm not seeing, so --

14      Q.  It might not be a view of the whole room, but it

15  appears to be a partial picture, a picture of part of

16  the T-2 boiler room?

17      A.  Yes.

18          MR. COLBATH:  Okay.  Your Honor, I'm going to

19  move DE-127.

20          MS. STEVENS:  No objection.

21          THE COURT:  It will be admitted.

22          MR. COLBATH:  Oh, I'm sorry.  It's

23  government 127.

24          THE COURT:  Government 127, sorry.

25          MS. STEVENS:  I think it's already admitted.

1          THE COURT:  Already admitted.

2          MR. COLBATH:  You didn't have to guess about

3    it.  I could have just showed it to you.

4    BY MR. COLBATH:

5       Q.  So this has been admitted already as a photo of

6    part of the boiler room at T-2.  You said you thought

7    you remembered a stool in there that you could sit on.

8    Do you see that?

9       A.  Yes.

10      Q.  And there was also -- we can see I think the seat

11   of a chair there, the wheels of a chair that rolls

12   around.  Can you see that?

13      A.  I can see that, yes.

14      Q.  And so there was places to sit in there, change

15   clothes in there and then the equipment that we see here

16   or the mechanical systems that we see here, right?

17      A.  Uh-huh.

18      Q.  All right.  So I'm going to show you for

19   foundation purposes a document here.  It's defense

20   Exhibit, Your Honor, 200.

21          THE COURT:  All right.

22   BY MR. COLBATH:

23      Q.  And just ask that you review that, Ms. Henry, if

24   you can.  Is it legible there on your screen?

25      A.  Yes.

 1    Q.  And I'll ask you if your signature appears on

 2  that.

 3    A.  Yes, it is.

 4    Q.  Is that the form that we were just talking about

 5  when I was asking you about your interviews and that you

 6  signed a form indicating not to talk to anybody?

 7    A.  Yes.

 8    Q.  Okay.

 9         MR. COLBATH:  Your Honor, I'm going to move

10  this Defense Exhibit No. 200 into evidence.

11         THE COURT:  Any objection there?

12         MS. STEVENS:  One second, Your Honor.

13         THE COURT:  Sure, take a moment.

14         (Pause)

15         MS. STEVENS:  No objection.

16         THE COURT:  All right.  Then Defense 200 is

17  admitted.

18         (Defense Exhibit No. 200 admitted.)

19  BY MR. COLBATH:

20    Q.  And can you just -- well, highlight the top of

21  that there.  The top box, yeah.  That's good.

22         So this was an interview of you done regarding

23  the death investigation, right?

24    A.  Uh-huh.

25    Q.  And then the middle section there.  When talking

```
 1   to you, the agent had you read these statements and then
 2   initial them?
 3       A.  Yes.
 4       Q.  Could you just read those two boxes that you
 5   initialed for us?
 6       A.  "I have been advised and understand the
 7   following:  This is an ongoing investigation.  As such I
 8   understand that I am not to discuss this investigation
 9   or any other information regarding aspects of this
10   investigation with any persons outside of the Coast
11   Guard Investigative Service and/or appropriate legal
12   counsel.  I understand that failure to comply with this
13   order may result in a trial by court martial,
14   non-judicial proceeding, administrative proceeding or
15   trial in a civilian court."
16       Q.  All right.  And then they asked you to sign that,
17   which you did, and -- during the interview?
18       A.  Yes.
19       Q.  So in the days following and certainly weeks
20   following the murders, despite warnings like that, there
21   were lots of rumors going around about what might have
22   happened in -- with the shootings, right?
23       A.  Of course.
24       Q.  And it was certainly well-known very quickly that
25   Mr. Wells was the suspect or somebody that they were
```

1   looking for?

2     A.  Yes.

3     Q.  Okay.  That was talked about amongst people?

4     A.  I don't really recall.

5     Q.  Do you recall seeing information in the Kodiak

6   paper about it?

7     A.  The only thing I'm recalling is when he was

8   arrested.  I don't remember anything prior.

9     Q.  The other folks at the rigger shop -- well, first

10  of all, Jim never came back to work, wasn't allowed to

11  come back to work after April 12th, correct?

12     A.  He was there the following day with us, on

13  Friday.

14     Q.  And then I guess after April 13th was not back at

15  the rigger shop?

16     A.  I did not see him.

17     Q.  So he wasn't part of the discussions at the

18  rigger shop or any of those discussions about what might

19  have happened?

20     A.  No.

21         MR. COLBATH:  If I could just have one minute,

22  Your Honor.

23         THE COURT:  Certainly.

24         (Pause)

25         MR. COLBATH:  That's all the questions I have

for Ms. Henry at this point.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. STEVENS:

Q. Hi again.

A. Hi.

Q. Just to follow up on some of the questions from defense counsel. Did Mr. Wells care about hogging the bathroom down in T-2?

A. Didn't appear that way.

Q. And then that morning you saw a number of people in shock, right? Did Mr. Wells appear to be in shock?

A. No.

Q. In preparation for trial, were you ever ordered by anyone to not talk to the defense, their investigators or the defense team?

A. No.

Q. Thank you. No more questions.

THE COURT: Anything on those topics at all?

MR. COLBATH: Just one question, Your Honor.

THE COURT: Go right ahead.

RECROSS EXAMINATION

BY MR. COLBATH:

Q. Ms. Henry, with regard to how Jim appeared in the conference room on April 12th, later in the day on

April 12th, you described him, at times he looked maybe
not in shock, but in disbelief?  You said that before,
right?

    A.  I think I said emotionless is what I referred to.

    Q.  Did you describe him during one of your
interviews as -- to an investigator as he at times
looked like he was in disbelief?

    A.  I don't remember.

    Q.  Okay.

         MR. COLBATH:  That's fine, Your Honor.

         THE COURT:  All right.  Thank you.  You may be
excused.  Can this witness be released?

         MS. STEVENS:  Yes, Your Honor.

         MR. COLBATH:  Yes.

         THE COURT:  Very good.

         (Witness excused)

         THE COURT:  Take a break or call your next
witness?

         MS. SHERMAN:  We're ready.

         THE COURT:  Why don't you do that, call your
next witness.  I told the lawyers yesterday and I'll
tell you, ladies and gentlemen, at 11:00, I have to take
a break, about a 15-minute break and do a conference
call.  We'll do that, take a break then, and maybe that
would be a good time in lieu of things here.

1           MS. SHERMAN:  The government will call Joe

2     Sturgis.

3           (Pause)

4           THE COURT:  If you could come up to the witness

5     stand here.  When you get up there, remain standing and

6     the clerk will administer an oath to you.

7           (Oath administered to the witness)

8           DEPUTY CLERK:  For the record, can you please

9     state your full name and then spell your full name.

10          THE WITNESS:  Joseph Michael Sturgis,

11    J-o-s-e-p-h, M-i-c-h-a-e-l, S-t-u-r-g-i-s.

12          JOSEPH STURGIS, GOVERNMENT WITNESS, SWORN

13                    DIRECT EXAMINATION

14    BY MS. SHERMAN:

15    Q.  Mr. Sturgis, what's your current occupation?

16    A.  I am a chief warrant officer in the United States

17    Coast Guard.

18    Q.  What does a chief warrant officer do?

19    A.  In my field, I do aviation maintenance

20    management.

21    Q.  How long have you been doing that?

22    A.  About a year.

23    Q.  What did you do before that?

24    A.  I was an aviation electrical technician chief.

25    Q.  And who is your employer?

1    A.  The United States Coast Guard.

2    Q.  Prior to that, what were you doing?

3    A.  I was a criminal investigator with the Coast

4  Guard Investigative Service.

5    Q.  And where were you located?

6    A.  Resident agent office in Kodiak, Alaska.

7    Q.  How long did you serve as a -- do you refer to

8  that as a CGIS agent?

9    A.  I do, yes.

10    Q.  How long did you serve as CGIS agent?

11    A.  I served for three years.

12    Q.  And were all three of those years on Kodiak?

13    A.  Yes, it was.

14    Q.  Where was your office physically located on

15  Kodiak?

16    A.  The office was located next to the military

17  police and the main administrative building on the main

18  base of Kodiak.

19    Q.  Do you recall when you reported to Kodiak?

20    A.  I do.

21    Q.  When was that?

22    A.  I originally reported to Kodiak on -- it was in

23  June 2011.

24    Q.  And were you there from June 2011 into 2012, or

25  did you leave for a period of time?

1    A.   I left for a short period of time for extended

2  training.

3    Q.   Where was that training?

4    A.   It was the Federal Law Enforcement Training

5  course over in Glynco, Georgia.

6    Q.   I want to turn your attention to April 12th.  Can

7  you tell us -- April 12, 2012.  Can you tell us how that

8  day began?

9    A.   I started the day showing up to work right around

10  7:00 in the morning, which was pretty normal for me.  I

11  got a knock at the door.  I answered the door.  I was

12  told there was an issue over at the COMMSTA where they

13  found two people down, is the way it was explained, and

14  that I needed to go and check the scene out.

15    Q.   So what did you do?

16    A.   I grabbed some essential gear and I drove out to

17  the T-2 building at COMMSTA.

18    Q.   Were you the first -- let me ask you this:  On

19  April 12, 2012, how many CGIS agents were working in

20  your office?

21    A.   I was the only CGIS agent.

22    Q.   Were there other CGIS agents assigned?

23    A.   Yes, there were.

24    Q.   Where were they?

25    A.   I believe he was at training.

1    Q.  So you drive out to the COMMSTA to the rigger

2    shop, what do you see when you first arrive?

3    A.  When I pull up on scene, I see multiple vehicles

4    in the drive, Coast Guard Fire Department, Coast Guard

5    Military Police and Alaska State Troopers.

6    Q.  Did you make contact with any of them?

7    A.  I walked up and made contact with the Alaska

8    State Troopers.

9    Q.  And who was that?

10   A.  Dennis Dupras.

11   Q.  And were you familiar with him?

12   A.  I was, yes.

13   Q.  How did you know Trooper Dupras?

14   A.  Just introductions in passing.

15   Q.  After you met up with Trooper Dupras, what did

16   you do?

17   A.  Trooper Dupras kind of gave me a breakdown of the

18   scene that he had viewed and he kind of briefed me

19   saying that he had made some initial photographs and

20   that he was -- we were going to walk in and review and

21   take a look and see what we could see.

22   Q.  At the beginning, what was your understanding of

23   who would have jurisdiction over this case?

24   A.  I assumed, since the incident was on an active

25   Coast Guard base, that I would have jurisdiction.  I

1  also knew that Alaska State Troopers also had

2  jurisdiction, and I assumed that we would work it

3  jointly.

4      Q.  Was that something that CGIS and the troopers

5  would do on Kodiak?

6      A.  Yes, it was.

7      Q.  Why was that?

8      A.  Just limited resources, limited personnel, very

9  few law enforcement available, so we used each other to

10  accomplish large tasks.

11     Q.  I want to turn your attention from there up to

12  T-1.  At some point, did you go up to T-1?

13     A.  I did, yes.

14     Q.  And the time you were up there, was that on

15  April 12, 2012?

16     A.  Yes, it was.

17     Q.  On the time you were up in T-1 on April 12, did

18  you have an occasion to observe members of the rigger

19  shop?

20     A.  Yes, I did.

21     Q.  And where was that at?

22     A.  It was inside the T-1 building where the ET area

23  OSs worked.  It was a normal workspace.

24     Q.  Tell us what you observed.

25     A.  They were, you know, multiple people in that

1    area, obviously distraught, head in hands, tears,

2    consoling, that type of stuff.

3        Q.  Did you have occasion at that time to observe the

4    defendant, Mr. Wells?

5        A.  Yes, I did.

6        Q.  What did you observe of Mr. Wells?

7        A.  He didn't display the same -- he wasn't showing

8    signs of tears or distraught.  He seemed calm and

9    relaxed.  He was sitting alone.  He was by himself while

10   others were kind of grouped together.  And just struck

11   me as different than what I had seen others do.

12       Q.  Did you note anything about how he was sitting?

13       A.  He was kind of in a reclined state with his arms

14   crossed and his feet out in front of him.

15       Q.  I want to turn -- you participated in the course

16   of this investigation, right?

17       A.  Yes, ma'am, I did.

18       Q.  Did you have -- you collected different evidence

19   and observed different things throughout the course of

20   that investigation?

21       A.  Yes, ma'am.

22       Q.  We're going to go through a few of those.  I want

23   to turn your attention to the defendant's truck.  Could

24   you describe the defendant's truck?

25       A.  It was a white Dodge extended cab with a distinct

1    cap on the back of it.

2        Q.  Did you have opportunity to observe that vehicle

3    at the COMMSTA?

4        A.  Yes, I did.

5        Q.  I'm going to have you look at, for foundation,

6    Exhibits 231 and 234, if we could.

7            Do you recognize those photos?

8        A.  Yes, I do.

9        Q.  What do they depict?

10       A.  They depict Mr. Wells' truck.

11       Q.  Fair and accurate depiction of his vehicle as you

12   observed it at the COMMSTA?

13       A.  Yes, ma'am.

14           MS. SHERMAN:  I would move for the admission of

15   231 and 234.

16           MR. CAMIEL:  No objection.

17           THE COURT:  Those two will be admitted.

18           (Exhibit Nos. 231 and 234 admitted.)

19   BY MS. SHERMAN:

20       Q.  If we could display 231.

21           Can you tell us -- describe for the jury what

22   we're seeing in 231.

23       A.  You're seeing the driver's side of Mr. Wells'

24   vehicle.

25       Q.  And let's move to 234.

1           What are we seeing in 234?

2      A.   You're seeing the passenger side of Mr. Wells'

3  vehicle.

4      Q.   All right.  We can take those down.

5           I wanted to back up a little bit.  On April 12th,

6  when you were heading to the COMMSTA, did you notice any

7  vehicles on Anton Larsen Road that day?

8      A.   The morning of, I did notice a vehicle along

9  Anton Larsen Bay Road.

10     Q.   Let's put up Exhibit No. 4, which has already

11 been admitted, if we could.  There should be a laser

12 pointer up there perhaps.

13     A.   Yes.

14     Q.   And do you recognize Exhibit No. 4?

15     A.   I do, yes.  It's an aerial of the COMMSTA and

16 Anton Larsen Bay.

17     Q.   Where did you observe this vehicle?

18     A.   It was by a pull-off area off of Bridge 6.

19     Q.   Can you show us where that is on Exhibit No. 4?

20     A.   It's in this area.

21     Q.   So in this general area you indicated?

22     A.   Correct.

23     Q.   And what did that vehicle appear to be that you

24 saw?

25     A.   It was a black Dodge Dakota with a black cap.

1    Q.  How was it parked?

2    A.  It was pulled off the road there.  It looked to

3  be broke down, from what I could tell, but I'm not --

4    Q.  How did you know it was a Dodge Dakota?

5    A.  I used to own one similar.

6    Q.  What time was it that you observed that vehicle?

7    A.  On my initial drive in.

8    Q.  Do you recall what time that was?

9    A.  It was somewhere around -- after 8:00.

10    Q.  Fair to say you reviewed some video in this case?

11    A.  I did, yes.

12    Q.  How many hours of video did you review?

13    A.  Many.  I couldn't really put a number on it.

14    Q.  Was that a big part of your role in this case was

15  reviewing video?

16    A.  Yes, ma'am.

17    Q.  In reviewing the video, did you watch the video

18  that's taken from the T-1 back gate looking down towards

19  the rigger shop?

20    A.  Yes, ma'am, I did.

21    Q.  In your review of the video, in relation to

22  April 12th, did you ever see that vehicle you saw that

23  morning on that video?

24    A.  No, I have not.

25    Q.  Did you interview people in this case?

1    A.  Yes, I did.

2    Q.  Did you ever have anybody sign a nondisclosure?

3    A.  Yes, ma'am.

4    Q.  What is the purpose of a nondisclosure as part of

5   a Coast Guard investigation?

6    A.  Typically, the nondisclosure agreement is to try

7   to keep the information with the person instead of, you

8   know, spreading of rumors or passing of information

9   between people.  That way we can not get that

10  information confused between one person and the other.

11   Q.  Okay.  Did you, in providing a nondisclosure,

12  indicate whether people were allowed to speak with legal

13  counsel?

14   A.  We typically would give, you know, an

15  understanding of, yes, you can speak with any legal

16  representatives.  We're talking more along -- between

17  your shipmates or what Coast Guard people call each

18  other, shipmates, you know, just to try to keep that

19  information contained.

20   Q.  Did you ever tell any Coast Guard witnesses,

21  Coast Guard employees in this case not to talk to the

22  defense investigator or defense team, defense attorneys?

23   A.  No, I did not.

24   Q.  I want to talk about the main base gate camera.

25  Are you familiar with that camera?

1    A.   Yes, ma'am, I am.

2    Q.   Do you know how that camera operates?

3    A.   Yes, ma'am.

4    Q.   Can you describe that to the jury?

5    A.   It's a constant camera.  It's always on, but it

6    records due to motion.  So when something goes by, it

7    will record a small snippet of time.  That way it can

8    keep that recording for longer periods of time.

9    Q.   Did you go down to -- well, first of all, where

10   is that camera located?

11   A.   That camera is located pointing towards Rezanof

12   drive from the front gate base security shack.

13   Q.   Where did you go to review that video?

14   A.   Inside military police on the base there was a

15   viewing recorded area where you could sit down and look

16   at the video that was recorded.

17   Q.   At some point you reviewed the video.  Did you

18   determine whether the time was accurate?

19   A.   Yes, ma'am, I did.

20   Q.   Was it accurate?

21   A.   It was not accurate.

22   Q.   Do you recall the time difference?

23   A.   18 minutes.

24   Q.   Did you do some things -- utilize some methods to

25   document that time difference?

1      A.   Yes, ma'am.

2      Q.   Why don't we take a look at Exhibit 80 for

3   foundation.  Do you recognize what this is?

4      A.   Yes, ma'am, I do.

5      Q.   What is it?

6      A.   It is one of the recorded screens that the same

7   front gate camera system operated from.  And it's at the

8   military police area.  If you look -- I'm sorry.

9      Q.   That's okay.

10      A.   I didn't know it was --

11      Q.   I'll stop you there.  I think you have described

12   it.  We'll have you describe it further in a moment.

13          Was this a fair and accurate depiction of the

14   image that is displayed?

15      A.   Yes, ma'am, it is.

16           MS. SHERMAN:  I move for the admission of

17   Exhibit 80.

18           MR. CAMIEL:  Your Honor, could I voir dire

19   briefly?

20           THE COURT:  Yes.

21           MR. CAMIEL:  Mr. Sturgis, what was the date

22   that you took this picture?

23           THE WITNESS:  It would show it there at the top

24   when the actual date was.

25           MR. CAMIEL:  Do you know?

1          THE WITNESS:  March 21, 2013.

2          MR. CAMIEL:  Thank you.  No objection with

3    that.

4          THE COURT:  I'm sorry?

5          MR. CAMIEL:  No objection.

6          THE COURT:  Then 80 is admitted.

7          (Exhibit No. 80 admitted.)

8    BY MS. SHERMAN:

9      Q.  So you were describing what this picture depicts.

10   Why don't you go ahead and do that now that the jury can

11   see it.

12     A.  Yes, ma'am.  The picture is a view of behind

13   military police desk at the Base Kodiak admin building,

14   the main building there.  What it's showing circled in

15   red is a reversed reflection of the actual clock on the

16   wall.

17     Q.  Can you zoom in on that?  Okay.  And then we can

18   put that down.  All right.

19          And then there is another red circle.  What are

20   you doing there?

21     A.  That red circle is indicating what time of day

22   that recording is from and the date.

23     Q.  Okay.  And what is that time and date?  Can you

24   zoom in on that?

25     A.  April 12, 2012, and the time indicated, 5:36:39.

1    Q.   We can zoom out.  I want to make something clear.

2         You had indicated when the photo was taken?

3    A.   Yes.

4    Q.   When was that?

5    A.   The date that shows in the top right corner is

6    when the actual running video was.

7    Q.   Okay.  And when we're talking about the running

8    video, this image of the clock, can you tell us if that

9    image of the clock, what date and time that is?

10   A.   Yes.  The date would be 4-12-2012.  And the time

11   would be -- and it's reverse, so 5:43, I believe.

12   Q.   Let's move to -- we can put that down.

13        Were there other ways, in addition to this image

14   with the reverse clock, that you tried to verify the

15   time?

16   A.   Yes.

17   Q.   The exact time of that camera?

18   A.   Yes.

19   Q.   Let's talk about -- well, give me another example

20   of one of the ways you tried to do that.

21   A.   We used an iPhone with the satellite link and

22   pulled it up in front of the screen and took a

23   photograph of it showing the difference in the time.

24   Q.   Let's show you Exhibit 78 for foundation.

25        And do you recognize this?

 1     A.  Yes, ma'am, I do.

 2     Q.  Let's also, while we're at it, show him

 3  Exhibit 79.  Do you recognize this?

 4     A.  Yes, ma'am, I do.

 5     Q.  What is it or what does 78 and 79 depict?

 6     A.  It depicts the iPhone in front of the video

 7  screen.

 8     Q.  And fair and accurate depiction of what you did

 9  and what you saw?

10     A.  Yes, ma'am, it is.

11     Q.  And what date did you take this photo?

12     A.  April 18th.

13     Q.  Of what year?

14     A.  2012.  I apologize.

15     Q.  That's okay.

16          MS. SHERMAN:  Your Honor, at this point I would

17  move the admission of 78 and 79.

18          THE COURT:  Any objection?

19          MR. CAMIEL:  No.

20          THE COURT:  All right.  Those will be admitted.

21          (Exhibit Nos. 78 and 79 admitted.)

22  BY MS. SHERMAN:

23     Q.  What don't we display 78 first.  Can you tell us

24  what the time is on the cell phone?

25     A.  The time is 10:36 on the cell phone.

1    Q.  What is the time on the computer system at the

2  main base gate?

3    A.  The time is 10:54:15.

4    Q.  And then why don't we go to 79.

5      Is that a little clearer for you?

6    A.  Yes, ma'am, it is.

7    Q.  What is the time difference?

8    A.  18 minutes.

9    Q.  We can take that down.

10     And did you do one other way of trying to verify

11  the time?

12   A.  We did review the same camera system based upon

13  the raising of the flag.  Typically, on a military

14  establishment, you raise the flag at 0800.  We looked at

15  the video the same way and determined that it was

16  18 minutes off of the normal everyday raising of the

17  flag.

18   Q.  And how did you know what time the flag was

19  raised?

20   A.  It's standard.  It's a standard time that we use.

21   Q.  What time is that normally?

22   A.  0800.

23   Q.  Did you look at any metadata?

24   A.  I did, yes.

25   Q.  I'm going to have you look at Exhibit 81 for

1  foundation.

2      Can you tell us if you recognize this?

3  A.  Yes, ma'am, I do.

4  Q.  And what are we seeing here?

5  A.  You're looking at the time/date stamp from the

6  metadata and the time/date stamp from the security

7  footage.

8      MS. SHERMAN:  And I'm going to move the

9  admission of Exhibit 81.

10      MR. CAMIEL:  No objection.

11      THE COURT:  81 is admitted.

12      (Exhibit No. 81 admitted.)

13  BY MS. SHERMAN:

14  Q.  What are we seeing here?

15  A.  The lower red circle is metadata time/date stamp,

16  and the top corner is the displayed time.

17  Q.  Okay.  Let's move on to another area.

18      Did you observe the defendant's truck on the main

19  base gate camera?

20  A.  Yes, I did.

21  Q.  And let's -- do you recall what time you observed

22  him there?

23  A.  On the front gate camera?

24  Q.  Uh-huh.  Why don't we take a look at -- I think

25  it's 77A.  It's already been admitted.

1          Did you observe this at the main base gate?

2     A.  Yes, ma'am, I did.

3     Q.  Okay.  And the time displayed, can you tell us

4  what that is?

5     A.  Yes, ma'am.  The display time is April 12, 2012,

6  at 7:06:23.

7     Q.  And based on what you had done with the cell

8  phone and trying to figure out the actual time, what

9  time would that have actually been?

10          MR. CAMIEL:  Your Honor, I'm going to object.

11  He can talk about his -- he's already testified about

12  the tests that he took, but in terms of what time, it's

13  for the jury to figure out.

14          THE COURT:  Why don't you rephrase the

15  question, Ms. Sherman.

16  BY MS. SHERMAN:

17     Q.  You indicated the time difference between the

18  main base camera and the actual time it was displayed

19  was what?

20     A.  The difference is 18 minutes.

21     Q.  Okay.  And looking at the time here, you

22  indicated it was 7:06?

23     A.  Correct, displayed time was 7:06.

24     Q.  And based on your review, what would be the

25  actual time of this image?

1      A.   0648.

2      Q.   And did you look at -- if we could bring up 82.

3           Did you also observe this image on the main base

4   gate camera?

5      A.   Yes, ma'am, I did.

6      Q.   What was the displayed time?

7      A.   7:40:10.

8      Q.   And based on your review of this camera and

9   everything else you did at the main base gate, were you

10  able to determine when this actual image was?

11     A.   Yes, ma'am.

12          MR. CAMIEL:  Again, I'm going to object to the

13  form of the question.

14          THE COURT:  I'll sustain that.

15  BY MS. SHERMAN:

16     Q.   This time 7:40, was that the actual time?

17          MR. CAMIEL:  Objection; form of the question.

18          THE COURT:  Why don't we have a brief sidebar.

19          (Begin bench conference.)

20          THE COURT:  So I agree with defense that it is

21  up to the jury to decide what the actual time was.  You

22  can say what -- if you were to back that up 18 minutes,

23  what would the time be.

24          MS. SHERMAN:  Okay.  I'll ask it that way.

25  Thank you, Your Honor.

1           (End bench conference.)

2    BY MS. SHERMAN:

3       Q.   Mr. Sturgis, if you were back the time up

4    18 minutes, what time would that be?

5       A.   0722.

6       Q.   Okay.  I'm going to have you do some math.  The

7    time difference between 6:48 and 7:22, what would that

8    be?

9       A.   34 minutes.

10      Q.   I would like to move to Exhibit No. 105, if we

11   could.  It's been admitted.

12           Do you recognize this?

13      A.   Yes, ma'am, I do.

14      Q.   And what is it?

15      A.   It is a spreadsheet of a review of two different

16   cameras from the April 12th T-1/T-2 cameras with members

17   of the COMMSTA.

18      Q.   And is this a chart that you did?

19      A.   Yes, ma'am, it is.

20      Q.   If we could just zoom in this much so we can get

21   a closer look.  All right.  That first column, what are

22   we seeing in the first column of this chart that you

23   created?

24      A.   That is the approximate time on the T-1 camera,

25   yes.

 1     Q.   Did you take that approximate time -- where did

 2  you take that approximate time from?

 3     A.   From the camera system itself.

 4     Q.   In the second column, what are we seeing here?

 5     A.   That is the identified vehicles on the T-1

 6  camera.

 7     Q.   Okay.  And the third -- on the T-1 or T-2 camera?

 8     A.   T-1.

 9     Q.   Okay.  And then the third column, what are we

10  seeing?

11     A.   That is the approximate times taken from the T-2

12  camera on the 12th of April.

13     Q.   And then the fourth column?

14     A.   The fourth column is the vehicles listed.

15     Q.   Did you write out the vehicle descriptions?

16     A.   Yes, as per what's on the sheet there.

17     Q.   Let me ask you a question about that before we

18  get to the last column.  Here, we see a description that

19  you wrote, "dark truck," but here we see "blue Ford

20  F-150 single cab."

21         Why would you have noticed those things

22  differently?

23     A.   Just from the view of the camera itself.  If I

24  was able to determine just from review, if it was

25  something that I could make out, I would list it as what

1    I could make it out as.

2        Q.  We can -- and then the last column, what are we

3    seeing?

4        A.  The last column is the person who either owned or

5    was operating the vehicles.

6        Q.  Let me make that clear.  That's the last column

7    in the zoomed-in view, but not the last column on the

8    chart?

9        A.  That's correct.

10       Q.  If we could zoom out again.

11           So we'll go to the second to the last column in

12   yellow.  And what was that column?

13       A.  That was who I was asking to identify and their

14   initials.

15       Q.  The list of people you had identify vehicles,

16   where did many of them come from?

17       A.  They worked at the COMMSTA.

18       Q.  And did you have them initial this chart?

19       A.  Yes.

20       Q.  Did they watch the video with you when they made

21   these identifications?

22       A.  Yes, they did.

23       Q.  We can go ahead and take that down.  I think we

24   can take that down.

25           I want to talk about distances on Kodiak.  Are

1    you familiar with the distances between certain

2    locations in Kodiak?

3        A.   Yes, ma'am.

4        Q.   Did you do some testing, some driving to

5    determine those locations?

6        A.   Yes, ma'am, I did.

7        Q.   I would like you to look at Exhibit No. 172, just

8    you for now.

9            Do you recognize what this is?

10       A.   Yes, ma'am.

11       Q.   Let me ask you, what is it?

12       A.   It's an overview map of the area between Bells

13   Flats to the COMMSTA.

14       Q.   How did you come up with the distances?

15       A.   I took a sample by driving three different

16   vehicles and took the odometer readings off of those

17   vehicles to come up with a good idea of the distance.

18       Q.   Did you drive all three vehicles?

19       A.   I did not, but I --

20       Q.   Who drove the others?

21       A.   Special Agent Aaron Woods.

22       Q.   And the third vehicle?

23       A.   Was also operated by myself.

24       Q.   When you drove those different vehicles, was the

25   distance the same every single time on every vehicle?

1 A. No, ma'am, it wasn't.

2 Q. So in creating this map, this summary map, what

3 distance did you choose?

4 A. I chose the distance that was displayed as the

5 farthest distance.  It was very close between all three

6 vehicles, but I figured to be a fair assessment, I would

7 take the longest distance.

8 Q. And when you were taking that distance, what were

9 you using to measure that distance?  Were you using an

10 external, a tachometer, an odometer?  What were you

11 using to determine what the distance between two points

12 was?

13 A. The tach on the vehicle itself.

14 Q. And then there is also some times displayed on

15 here.  For the times, where did you come up with that

16 time?

17 A. The time-distance was through a time-distance

18 speed calculation.  Based upon identified speed limits

19 and how far it was, you can come up with time that it

20 should take based upon a mathematical equation.

21 Q. You personally did those calculations?

22 A. Yes, I did.

23 Q. Is the times and the distances based on what

24 you've just testified to with the variations, is this a

25 fair and accurate depiction of the time calculations and

          the distances that you came up with in your driving

          test?

             A.  Yes, ma'am.

                     MS. SHERMAN:  I'd move for the admission of

          172.

                     MR. CAMIEL:  Your Honor, could I voir dire with

          a single question?

                     THE COURT:  Yes, go right ahead.

                     MR. CAMIEL:  Sir, when did you do these driving

          and time tests?

                     THE WITNESS:  The actual date?  I did it over

          multiple dates.

                     MR. CAMIEL:  Do you know when?

                     THE WITNESS:  Not exactly.  I don't recall

          exactly what days.

                     MR. CAMIEL:  I would object then to lack of

          foundation.

                     THE COURT:  I will allow 172 to be admitted

          over objection.

                     Well, why don't you clarify.  It was done after

          April 12th?

          BY MS. SHERMAN:

             Q.  Was it done after April 12, 2012?

             A.  Yes, ma'am, it was.

                     THE COURT:  That was implicit, but with that, I

 1  will admit 172.

 2          (Exhibit No. 172 admitted.)

 3  BY MS. SHERMAN:

 4      Q.  If we could display that.

 5          Okay.  You have driven to the defendant's

 6  residence?

 7      A.  Yes, I have.

 8      Q.  So let's -- where was your starting point on 172?

 9      A.  My starting point was the Wells' residence.

10      Q.  And did you indicate that on here, some way to

11  indicate that that was the starting point?

12      A.  Yes, ma'am, Mile 0.

13      Q.  Okay.  And then let's go to the main base gate

14  Kodiak.  What distance was that from your Mile 0, the

15  defendant's residence?

16      A.  5.1 miles.

17      Q.  And then you did a speed calculation.  What was

18  the -- what was the speed limits between the defendant's

19  home and the main base?

20      A.  The speed limit was 45, and then it changed to

21  55 miles an hour.

22      Q.  When you were doing your calculations, did you

23  take into account the change in miles per hour permitted

24  on the roads of Kodiak?

25      A.  Yes, ma'am, I did.

1    Q.  So in your calculation, what was the amount of

2  time driving at the speed limit it would take to go from

3  the defendant's residence to the main base gate Kodiak?

4    A.  Six minutes and nine seconds.

5    Q.  All right.  Then we have -- we see on here the

6  Kodiak airport.  Do you see that?

7    A.  Yes, I do.

8    Q.  What is the distance between the Kodiak airport

9  and the main base gate Kodiak?

10    A.  1.7 miles.

11    Q.  We see something in parenthesis after that.  What

12  is that?

13    A.  That is the 1.7 miles added to the original 5.1

14  from the base.

15    Q.  So would that be the total distance?

16    A.  That is the total distance at that point.

17    Q.  Okay.  And underneath that, you did your -- what

18  was the miles per hour allowed between the main base and

19  Kodiak airport?

20    A.  45 miles an hour.

21    Q.  Your time-distance calculation of how long it

22  would take to go from the main base gate to the Kodiak

23  airport?

24    A.  Correct, that is two minutes and 16 seconds.

25    Q.  And did you then calculate a total time?

1    A.   Yes, ma'am, I did.

2    Q.   What was the total time between, going the speed

3    limit, between the defendant's residence and the Kodiak

4    airport?

5    A.   Eight minutes and 25 seconds.

6    Q.   Did you also do calculations to the rigger shop?

7    A.   Yes, ma'am, I did.

8    Q.   What is the distance from the Kodiak airport to

9    the rigger shop?

10   A.   The distance is two miles.

11   Q.   And that was based on your calculation of the

12   vehicle?

13   A.   Yes, ma'am.

14   Q.   And the total distance between the defendant's

15   home and the rigger shop?

16   A.   8.8 miles.

17   Q.   And the speed limit between the Kodiak airport

18   and the rigger shop?

19   A.   35 miles an hour.

20   Q.   And your time distance calculation at 35 miles an

21   hour, the time it would take to go from the airport to

22   the COMMSTA rigger shop?

23   A.   Three minutes and 26 seconds.

24   Q.   Did you also calculate the total time?

25   A.   Yes, ma'am, I did.

1    Q.  And the total time it would take to drive the

2 speed limit from the defendant's home, or took you to

3 drive from the defendant's home to the COMMSTA rigger

4 shop was what?

5    A.  11 minutes, 51 seconds.

6    Q.  We can take that down.

7         At some point in your investigation, after 2012,

8 did you go to the airport and take some photos?

9    A.  Yes, ma'am.

10    Q.  And what was the purpose of those photos?

11    A.  To capture the area of the airport.

12    Q.  Did you use an orange cone?

13    A.  Yes, I did.  And the purpose was to identify

14 where Mr. Wells' wife's vehicle was located when it was

15 found on April 12th.

16    Q.  Why don't you look at -- we have several.  Why

17 don't we have you look at 174, 175, 176, 177 and 178.

18         Do you recognize all of those?

19    A.  Yes, ma'am, I do.

20    Q.  Are those photos you took?

21    A.  Yes, ma'am, they are.

22    Q.  When did you take those photos?

23         Let's go back.  If we could put one of those up,

24 Madam Clerk.

25         Do you recognize a date on the photo?

1    A.  Yes, ma'am, I do.

2    Q.  Would that be the accurate date on your camera?

3    A.  Yes, ma'am, that was an accurate date.

4    Q.  So what date did you take those photos?

5    A.  February 11, 2014.

6    Q.  And fair and accurate depiction of the airport

7  and where you placed the orange cone in Exhibits 174

8  through 178 in 2014?

9    A.  Yes, ma'am, that is correct.

10        MS. SHERMAN:  I move for the admission of 174

11  through 178.

12        MR. CAMIEL:  Your Honor, I do have an

13  objection.

14        THE COURT:  Let's take that up in a sidebar.

15  That's fine.

16        (Begin bench conference.)

17        THE COURT:  Go ahead, Mr. Camiel.

18        MR. CAMIEL:  Your Honor, they are offering this

19  with the orange cone to represent where they found

20  Mrs. Wells' Honda.  There is no indication that they

21  took any measurements to show that the cone is where the

22  Honda was at the time.  The airport has changed.  There

23  is parking concrete things there that weren't there at

24  the time this was taken a year later.  They have a

25  picture of where they found the car.

1    THE COURT:  That's what I'm wondering, why --

2        MS. SHERMAN:  Your Honor, I think what we

3    intend to do was the only photo shows only a portion of

4    the building.  They utilized that photo to put the

5    orange cone.  My next several questions are going to be

6    about what the difference was in those photos between

7    2014 and 2012, his recollection of the airport.

8        MR. CAMIEL:  So then I don't see the relevance

9    of this if they have --

10       THE COURT:  What is the relevance?

11       MS. SHERMAN:  There is not an overall photo of

12   the airport with the Wells' vehicle in a broader sense.

13   It's that more narrow photo.  I think it's fair for the

14   jury to see where in a broader sense in the airport that

15   vehicle was parked representative of the cone where they

16   placed it based on their review of that photo.

17       THE COURT:  Why don't we do this.  I need to

18   take the break here anyway, but let's send the jury out

19   and then you can voir dire on this topic and then I'll

20   rule on it.

21       (End bench conference.)

22       THE COURT:  Ladies and gentlemen, what we're

23   going to do is send you out a little bit early for your

24   break so I can take up this issue before I do the

25   conference call, so at 11:15 we'll have you back in the

1  courtroom.

2           Please leave your notepads here.  Remember my

3  admonition not to discuss the case.  And we'll see you

4  back here at 11:15.  Thank you.

5           (Jury absent)

6           THE COURT:  Please be seated, everyone.  What

7  we were discussing over there was I'm going to give the

8  defense lawyer an opportunity to ask you some questions

9  about these photographs as well.

10           So Mr. Camiel, whenever you're ready.

11  BY MR. CAMIEL:

12     Q.  Sir, did you -- are you looking at Exhibit

13  No. 87, do you have that in front of you?

14     A.  Yes, sir, I do.

15     Q.  That's where the Wells' car was found in the

16  airport, first found on April 12th of 2012; is that

17  right?

18     A.  I believe so, yes, sir.

19     Q.  Did you see it at the airport on that date?

20     A.  I did see it there.

21     Q.  Do we have 88?  And does that appear to be also

22  from April 12th of 2012 where the Wells' car was found?

23     A.  Yes, sir, I believe that is correct.

24     Q.  And that -- this picture number 88, Exhibit 88

25  shows it in relation to one of the airport buildings?

1    A.   Yes, sir, it does.

2    Q.   And there are aerial view photos of the airport

3    that you have seen; isn't that true?

4    A.   Yes, sir, I have.

5    Q.   And you could use the aerial view to actually put

6    an X and mark where this car is?

7    A.   Potentially.

8    Q.   174, 175, 176, 177, those were all taken over --

9    or those were taken in February of 2014?

10   A.   I would have to see which -- I don't know the

11   exhibit numbers.

12   Q.   If we could put up one of them, February 11th of

13   2014?

14   A.   Yes, sir.

15   Q.   And the airport has changed from back in April of

16   2012; isn't that right?

17   A.   It has, yes, sir.

18   Q.   The asphalt is now paved.  It was torn up in

19   2012?

20   A.   Yes, sir.

21   Q.   The light post is there.  That wasn't there in

22   2012?

23   A.   I don't recall if the light post was there or

24   not.

25   Q.   There are concrete parking devices on the ground

1   that weren't there in 2012?

2      A.   Correct.

3      Q.   When the Wells' car was found in April of 2012,

4   were there any measurements taken of where it was

5   situated in the parking area?

6      A.   I don't recall.

7           MR. CAMIEL:   Your Honor, I don't have any other

8   questions.   I would renew my objection.   I think there

9   is a more accurate way to depict the situation in 2012

10  than a photo like this that --

11          THE COURT:   All right.   My question is:   How

12  did you determine where to place the cone?

13          THE WITNESS:   Just from my general memory of

14  where it was at.

15          THE COURT:   So you saw the car there on

16  April 12th?

17          THE WITNESS:   Yes, ma'am.

18          THE COURT:   And so you were going from your

19  memory of that to put the cone there?

20          THE WITNESS:   Yes, ma'am, it was an

21  approximate, because the parking lot had changed, but

22  from based on the area of where it was found, I put the

23  cone there to identify where it was at.

24          THE COURT:   Any follow-up?

25  BY MS. SHERMAN:

 1    Q.  Did you, in your estimation, before placing that

 2  cone, did you review photos of where that vehicle had

 3  been?

 4    A.  Yes, ma'am.

 5         THE COURT:  You're waiting for me.  No, no,

 6  that's fine.  I'm going to admit these Exhibits 174

 7  through 178 over objection.  I understand the defense

 8  argument that it could be more accurately drawn by an

 9  overhead X marks the spot, and certainly that can be

10  explored on cross or an exhibit of that sort prepared,

11  if defense chose to do so.

12         As I see it, these could be helpful to the

13  trier of fact and have sufficient foundation and have

14  relevance with regard to this witness's perception of

15  approximately where the vehicle was.  And I'll allow

16  each side to explore, as warranted, the differences

17  between how the Kodiak airport looked in 2012 versus how

18  it looks in this photo here, or photos 174 through 178.

19         (Exhibit Nos. 174-178 admitted.)

20         THE COURT:  When we come back from the break

21  here, we can resume with that.  Anything else to take up

22  at this time?

23         MS. SHERMAN:  Your Honor has a couple moments.

24  I wanted to let the Court know Mr. Toglia could be

25  available after 3:30 tomorrow.  We have to leave early

1  for the jury.  We could certainly do his *Daubert* issue

2  then.

3       THE COURT:  Would that work for the defense?

4       MR. COLBATH:  Whenever.

5       THE COURT:  That sounds good.  Let's plan on

6  that, and we'll go off record at this time.

7       MS. STEVENS:  Your Honor, one thing.  Sorry.

8  Would it be permissible for counsel to bring in closed

9  coffee cups?  Can we bring coffee?

10      THE COURT:  Yes.  I thought that's what you had

11  in there.

12      MS. STEVENS:  Oh, I wish.

13      THE COURT:  That's fine.

14      DEPUTY CLERK:  All rise.  Court stands in a

15  brief recess.

16      (Recessed from 10:57 a.m. to 11:15 a.m.)

17      (Jury absent)

18      DEPUTY CLERK:  All rise.

19      THE COURT:  Please be seated.  All right.  I

20  wanted to say one other thing about the exhibits that I

21  admitted, and that is that I also did consider Evidence

22  Rule 403.  And I find that although their probative

23  value may not be as high as the photos from 2012, that

24  it is not substantially outweighed by the prejudice,

25  which I think is minimal or undue prejudice, unfair

1  prejudice associated with them.

2          Having said that, are we ready to bring in the

3  jury?

4          MS. SHERMAN:  Yes, Your Honor.

5          THE COURT:  All right.

6          (Pause)

7          (Jury present)

8          THE COURT:  Welcome back, ladies and gentlemen.

9  Please be seated, everyone.

10         Whenever they get settled go ahead, please,

11  Ms. Sherman.

12  BY MS. SHERMAN:

13    Q.  Why don't we put up Exhibit No. 174, and I

14  believe that's been admitted now.

15         Can you tell us what we are seeing here?

16    A.  Yes, ma'am.  It is a picture of the airport

17  parking lot, and where the cone sits is where Mr. Wells'

18  wife's vehicle was approximately found.

19    Q.  Why don't we also put up 91, because I want to

20  talk for a bit about the airport.  We can put it up next

21  to it.

22         Do you recognize 91?

23    A.  Yes, ma'am, I do.

24    Q.  Can you tell us on 91 where this is, the left --

25  the building in the left of the photo, 174?

1     A.   Yes, ma'am.

2     Q.   Do you know what that building is?

3     A.   That's the Alaska terminal.

4     Q.   Do you recall if that building had -- well, let

5  me ask you this:  Were there outside cameras that

6  covered the entire parking area of the airport?

7     A.   No, ma'am.

8     Q.   In 2012, they weren't there?

9     A.   No, ma'am.

10     Q.   What about inside the Alaska airlines terminal,

11  did the inside of that terminal have cameras?

12     A.   Yes, ma'am, they did.

13     Q.   Now, let's go to the right of the photo, if I can

14  clear it.  Actually, it's more like the center.

15          Do you recognize that building?

16     A.   Yes, ma'am, I do.

17     Q.   What was housed in there?

18     A.   That was, right here, Island Air and then there

19  was a coffee shop.

20     Q.   Do you recall if Island Air had video cameras?

21     A.   I believe they did.

22     Q.   And do you know whether all of these cameras were

23  operational?

24     A.   I don't.  I don't believe they were.

25     Q.   How did you know that there were cameras there?

1      A.   Just going in and seeing them.

2      Q.   There were cameras that were visible to you when

3  you would go into these buildings?

4      A.   Yes, ma'am.

5      Q.   Why don't we go to 175 and 91 if we could, put

6  those two up.  I'm sorry, 175 and 91.  I may have

7  misspoke.

8           Before I ask my questions about 175 in detail, do

9  you recall the condition of the parking lot in 2012?

10     A.   Yes, ma'am, I do.

11     Q.   Can you describe that for the jury?

12     A.   It was in the middle of construction, so it was

13 gravel-ish and some of the normal things you would see

14 in a parking lot, like the parking stops and things had

15 been removed to redo the asphalt.

16     Q.   In 175, what are we seeing in this photo?

17     A.   175 is that Island Air and coffee shop area.  If

18 you look up at the right edge right here, that's about

19 where that cone that I was using to mark approximately.

20     Q.   Why don't we go to 176 and 91, if we could.

21          Did this -- in 176 off to the left, why don't you

22 identify where you put that orange cone first.

23     A.   You can kind of see the cone there, but I put it

24 there based off of where I seen the vehicle parked and

25 recollection of where it was at, and that building is

 1    right here, the one that she has marked in the blue.

 2        Q.   So did that building have any cameras that you

 3    were aware of?

 4        A.   No, ma'am.

 5        Q.   In 2012, was that building used frequently?

 6        A.   I don't recall.

 7        Q.   Let's go to 91 and 177.

 8             In all of these photos, did you move the orange

 9    cone or did you place the cone and take the photos?

10        A.   I placed the cone in its position and then I

11    moved around the parking lot taking different photos

12    from different views.

13        Q.   In 177, we see a building in the background.

14    What building is that?

15        A.   That is Servant Air.

16        Q.   Can you for us identify where that is on 91.

17             So right there.

18             Do you recall if back in 2012 if Servant Air had

19    interior video cameras?

20        A.   They did not.

21        Q.   We can take 177 down and just leave 91.  I can

22    get rid of my little marks.

23             Do you recognize what this building is?

24        A.   Yes, ma'am.

25        Q.   What is that?

1    A.    That's the Comfort Inn hotel.

2    Q.    Do you recall if in 2012 it had video cameras

3    inside?

4    A.    I believe it did.

5    Q.    And have you ever parked at the Comfort Inn?

6    A.    I have, yes.

7    Q.    When you parked at the Comfort Inn, could you see

8    West Rezanof?

9    A.    Yes, you can.

10   Q.    And do you recall the normal traffic pattern if

11   people were flying out on -- we have heard testimony

12   about Era or Alaska Airlines.  If people were flying out

13   on that airline, what the normal traffic pattern would

14   have been based on your experience of living in Kodiak?

15   A.    Yes.  If you were flying out, typically, they

16   would come in off Rezanof Drive, go up the airport and

17   then turn here to come around to the parking area.

18   Q.    We can take that down.

19          I want to talk to you about the defendant's CR-V.

20   Are you familiar with his CR-V?

21   A.    Yes, I am.

22   Q.    On April 19th, did you all do something with the

23   defendant's CR-V?

24   A.    Yes, we did.

25   Q.    What was that?

1      A.  We used the defendant's CR-V to try to get a

2   comparison on the T-1 video camera.  We used that

3   vehicle to drive past at different speeds to try to see

4   if we could determine how fast the vehicle might have

5   been moving back and forth at entry and exit, and if it

6   was compatible with the vehicle that we saw on the

7   original camera.

8      Q.  Were you able to make a speed determination?

9      A.  No, ma'am, I wasn't.

10     Q.  Let's, for foundation, show you 179.

11         Do you recognize this?

12     A.  Yes, ma'am, I do.

13     Q.  Does that appear to be a fair and accurate

14  depiction of the experiment you set up on April 19th?

15     A.  Yes, ma'am, it was.

16     Q.  In 179, the vehicle is driving towards or away

17  from the rigger shop?

18     A.  It was driving towards.

19         MS. SHERMAN:  At this point, Your Honor, I move

20  for the admission of 179.

21         THE COURT:  Subject to prior rulings and

22  objections, correct?

23         MR. CAMIEL:  Yes, but could I ask one voir dire

24  question?

25         THE COURT:  Yes, go right ahead.

            MR. CAMIEL:  The video you just looked at, this

was using the Wells' vehicle that had been seized,

right?

            THE WITNESS:  Yes, sir, that's correct.

            MR. CAMIEL:  What was the speed of the vehicle

in the video?

            THE WITNESS:  Depends upon -- we did a series

of passes.

            THE COURT:  So which one is this?  Do you need

to confer?

            MS. SHERMAN:  Your Honor, I believe we would

have to go look that up.  The exact time is noted.

            THE COURT:  Well, regrettably, I'm going to ask

the jury to leave here shortly.  Why don't I confer

actually over here.

            (Begin bench conference.)

            THE COURT:  If my order wasn't clear, when I

said pick two, have you told the defendant which two you

picked?

            MS. SHERMAN:  We have given them the exhibit.

And I chose the time -- I went to Vorder Bruegge's bench

notes where he took the photos from and I picked those

two because I knew he would be referencing them.

            THE COURT:  We need to know the speed limit.

            MS. SHERMAN:  Okay.

1          THE COURT:  So how fast can you go get that

2    information?

3          MS. SHERMAN:  I would need to go back and

4    review the video.  I can certainly do it during the

5    lunch hour.

6          THE COURT:  Subject to that information, I'll

7    admit it during the lunch hour.  Very good.

8          MS. SHERMAN:  Does the Court need me to

9    introduce that to the jury as well during that timeframe

10   and have Sturgis come back?

11         THE COURT:  I think it would be good.  He has

12   already said there was a series, and I think -- I intend

13   to, when I tell the jury that this is a demonstration

14   and the language at the bottom is what the Court

15   ordered, I also would be inclined to say, "And I have

16   indicated that two clips are being introduced."

17         MS. SHERMAN:  Okay.

18         THE COURT:  One each way.

19         MS. SHERMAN:  We probably won't get done with

20   Mr. Sturgis by noon.

21         THE COURT:  So we'll put that on the record

22   after.

23         MS. SHERMAN:  Absolutely.

24         MR. CAMIEL:  Are you going to finish your

25   direct before noon?  I want that information for cross.

         1          THE COURT:  We'll break for lunch at that
         2    point.
         3          (End bench conference.)
         4          THE COURT:  There is a motion to admit 179?
         5          MS. SHERMAN:  Yes, Your Honor.
         6          THE COURT:  Ladies and gentlemen, I will be
         7    admitting 179 here.  There were, as the witness
         8    testified, a number of different speeds, but the
         9    exhibit, pursuant to the Court's order, consists of one
        10    speed going one way and another speed going the other
        11    way.
        12          And we're going to -- the government will
        13    provide that information as to the speeds after lunch,
        14    but at this point, you will see it and you will also see
        15    when the exhibit is admitted that it has a statement
        16    down at the bottom.
        17          Are you going to publish it now?
        18          MS. SHERMAN:  I was going to, yes.
        19          THE COURT:  Why don't you show it, and it
        20    contains language that the Court also had the government
        21    include on the exhibit that I drafted.  All right.
        22    BY MS. SHERMAN:
        23       Q.  We can go ahead and play that.
        24          (Exhibit 179 playing in open court.)
        25       Q.  Mr. Sturgis, did you see the Wells' vehicle drive

1  by the T-1 camera?

2      A.  Yes, ma'am, I did.

3      Q.  We will follow up with the exact speed of that

4  vehicle.  If you could tell us the exact time that you

5  did this on April 19th.

6          If we could rewind it so we have the time at the

7  beginning for this section just for the record.

8          What was the time?

9      A.  April 19, 2012, at 3:22:44 p.m.

10     Q.  And the camera, who was in the booth with the

11 camera?

12     A.  I was.

13     Q.  And did you set this up to be displaying this

14 area?

15     A.  Yes, ma'am, I did.

16     Q.  Why did you pick this area?

17     A.  I tried to match it as close as I could to the

18 original video for actual view of scope, just tried to

19 get it as close as I possibly could for the review.

20     Q.  All right.  If we could have him look at 179A.

21         Do you recognize this?

22     A.  Yes, ma'am, I do.

23     Q.  And the time noted?

24     A.  Yes, ma'am.

25     Q.  Is this video showing the Wells' vehicle driving

 1  by the T-1 camera at a different time?

 2      A.  Yes.

 3      Q.  Was that time actually earlier than the prior

 4  179?

 5      A.  Yes, it was.

 6      Q.  Fair and accurate depiction of the experiment

 7  that you did on April 19, 2012?

 8      A.  Yes, ma'am, it was.

 9      Q.  Before we play it for the jury, if we could just

10  rewind it one more time and watch it before I move to

11  admit it.

12          MS. SHERMAN:  Your Honor, at this time, subject

13  to the Court's ruling and getting the exact speed of

14  this vehicle, which we will do after lunch, I move for

15  the admission of 179A.

16          THE COURT:  Can I have another very brief

17  sidebar here?

18          (Begin bench conference.)

19          THE COURT:  I erred in admitting 179.  That was

20  my mistake.  The goal is I'm going to permit it to be

21  displayed to the jury, and so I'll vacate -- I'll vacate

22  as to 179 and then you can move to display this to the

23  jury.

24          MS. SHERMAN:  The Court can just explain that

25  it's a demonstrative video.

1          THE COURT:  Yes.

2          MR. CAMIEL:  Your Honor, I guess maybe your

3     order was unclear to us.  Our understanding was that you

4     were admitting one pass each way.  We understood that to

5     mean like one pass because they have shown -- these are

6     from two different passes.

7          THE COURT:  The order allowed them to pick one

8     pass each way and they could be different speeds.  If I

9     was unclear --

10          MR. CAMIEL:  We didn't understand it that way.

11          THE COURT:  We have done enough motions to

12     clarify.

13          MS. SHERMAN:  Would the Court like me to

14     withdraw the admission?

15          THE COURT:  I can say I did that in error, yes.

16          (End bench conference.)

17          MS. SHERMAN:  Your Honor, at this point, the

18     Court had admitted 179 and that was my mistake.  I meant

19     to publish it to the jury but not admit it.

20          THE COURT:  And that's noted and it is

21     withdrawn.  And the goal, ladies and gentlemen, with

22     regard to this Exhibit No. 179 and 179A is as a

23     demonstrative aid to help understand this witness and

24     perhaps other witnesses testimony in this trial.  So go

25     right ahead.

 1          MS. SHERMAN:  At this point, Your Honor, I

 2    would like to publish 179A.

 3          THE COURT:  Go right ahead.

 4    BY MS. SHERMAN:

 5      Q.  Before we start it, could you note the date and

 6    time?

 7      A.  April 19, 2012, at 3:21:22 p.m.

 8      Q.  We can go ahead and play it.

 9          (Exhibit No. 179A playing in open court.)

10    BY MS. SHERMAN:

11      Q.  Thank you.

12          And you had access to the Wells' vehicle.  Was

13    that pursuant to a search warrant?

14      A.  Yes, ma'am.

15      Q.  Do you recall the date the defendant was

16    arrested?

17      A.  Yes, ma'am, I do.

18      Q.  What date was that?

19      A.  February 15, 2013.

20      Q.  Actually, I want to go back and do something.

21    You indicated -- if we could put up 91 again.

22          You indicated on here -- or could you indicate on

23    here again where, from your recollection, the photos you

24    reviewed, where the Wells' blue Honda CR-V was seized

25    from?

1    A.  Approximately where that silver car is right

2    there.

3         MS. SHERMAN:  Okay.  Your Honor, I would like

4    him to mark that on 91A.

5         THE COURT:  All right.

6         MS. SHERMAN:  May I approach?

7         THE COURT:  Yes.

8         (Ms. Sherman approaches witness.)

9    BY MS. SHERMAN:

10   Q.  I'm approaching you also with a Sharpie.  Why

11   don't you mark that on 91 for us, if you could.

12   A.  Would you like an X?

13   Q.  Sure, an X would be great.  How about you initial

14   nearby.  Okay.

15   A.  With a date?

16   Q.  No, that's fine.  I will take that back from you

17   and show it to Mr. Camiel.

18        MS. SHERMAN:  And at this point, I would move

19   for the physical 91A to be admitted.

20        THE COURT:  91A.  Any objection?

21        MR. CAMIEL:  No.

22        THE COURT:  91A is admitted.

23        (Exhibit No. 91A admitted.)

24        MS. SHERMAN:  Subject to me providing -- having

25   the witness provide that information on the videos,

 1  those are all my questions.

 2          THE COURT:  All right.  Very good.  We're going

 3  to take the lunch break now so we can get that

 4  information sorted out.  That's what we'll do, ladies

 5  and gentlemen, a little bit early here, but that's the

 6  plan.

 7          We'll have you back -- counsel, can we do

 8  12:30 or 12:45?  12:45, ladies and gentlemen.  And

 9  please remember my admonition not to discuss the case

10  during this break.  Leave your notepads here.  Hope you

11  have a pleasant lunch.  I think it's taco Tuesday

12  downstairs.

13          (Jury absent)

14          THE COURT:  Please be seated, everyone.

15          Sir, you can be excused.  We'll see you back at

16  12:45.

17          Anything at all to take up before you sort out

18  the speeds?

19          MS. SHERMAN:  No, not in regards to that.  The

20  next witness will be Mr. Schmidt, and after that is

21  Mr. Becker, so we'll likely to have take another break.

22          THE COURT:  So Schmidt, Mr. Schmidt I issued

23  the ruling on, so we're set to go there, and I reread

24  that again.

25          And then Mr. Becker, we need to take up the

```
 1   green slide?
 2            MS. SHERMAN:  Yes.
 3            MR. COLBATH:  As well as the *Daubert*.
 4            MS. SHERMAN:  For the Court's information, I
 5   believe it's in his actual report.  He took it from the
 6   4-12 video.  It's noted on that photo in his report.
 7            THE COURT:  I'll go and look at that.  Then
 8   let's get through the next witness, and Mr. Sturgis'
 9   cross, and then we'll take a break to address the next
10   witness, Mr. Becker.
11            Very good.  We'll go off record.
12            DEPUTY CLERK:  All rise.  Court stands in
13   recess until 12:45 p.m.
14            (Recessed from 11:40 a.m. to 12:51 p.m.)
15            (Jury present)
16            THE COURT:  All right.  Welcome back, ladies
17   and gentlemen.  Please be seated, everyone.
18            And ready to proceed?
19            MS. SHERMAN:  Yes, Your Honor.
20   BY MS. SHERMAN:
21      Q.  I want to follow up on the speeds in those videos
22   we reviewed.  Exhibit No. 179, the vehicle heading
23   towards the rigger shop, do you recall that?
24      A.  Yes, ma'am, I do.
25      Q.  Did you review some things over lunch that told
```

 1    you what the speed of that vehicle in the 4-19 video

 2    was?

 3         A.   Yes, ma'am, I did.

 4         Q.   And what was it?

 5         A.   20-mile-an-hour pass.

 6         Q.   And 179A, heading away from the rigger shop, did

 7    you review something over lunch that assisted in

 8    determining what that speed was?

 9         A.   Yes, ma'am, I did.

10         Q.   What was the speed?

11         A.   15-mile-an-hour pass.

12         Q.   Thank you.

13              THE COURT:   Thank you.

14              Mr. Camiel, go ahead, please.

15                        CROSS EXAMINATION

16    BY MR. CAMIEL:

17         Q.   So Mr. Sturgis, you were just asked about this

18    attempted experiment that you were doing on April 19th,

19    right?

20         A.   Yes, sir.

21         Q.   And the speed limit on the Anton Larsen Bay Road

22    in that stretch is 35 miles an hour; is that right?

23         A.   Yes, sir, it is.

24         Q.   And so one of the passes, the one from left to

25    right in front of the camera was at 20 miles an hour?

1  You just told us that.

2      A.  Yes, sir, left to right, correct.

3      Q.  And then right to left, 15 miles an hour?

4      A.  Yes, sir, that is correct.

5      Q.  So the Wells' Honda had been seized by

6  April 13th; is that right?

7      A.  I believe so, sir.  Yes, sir.

8      Q.  So you had it in your possession and you decided

9  to set up this experiment using the Wells' car, right?

10      A.  Yes, sir, that's correct.

11      Q.  You didn't run one of these experiments with a

12  Ford Escape, a blue Ford Escape?

13      A.  No, sir, we didn't.

14      Q.  Or a RAV4?

15      A.  No, sir.

16      Q.  Hyundai Santa Fe?

17      A.  No, sir.

18      Q.  Or anybody else's Honda CR-V?

19      A.  No, sir.

20      Q.  Or any minivans?

21      A.  No, sir.

22      Q.  Or any other vehicle at all?

23      A.  No, sir.

24      Q.  And the way you set this up was you went into the

25  T-1 building onto the ops deck; is that right?

1    A.   That is correct.

2    Q.   And that's the secure area within the T-1

3 building?

4    A.   Yes, sir, it is.

5    Q.   And you got set up at the joystick to control the

6 camera; is that right?

7    A.   Yes, sir.

8    Q.   And you can't actually see the -- there's not

9 like a window where you can see the road from where

10 you're sitting?

11    A.   There is not a window.

12    Q.   So you're looking at the monitor, right?

13    A.   That is correct.

14    Q.   And the camera is outside the building up on a

15 pole?

16    A.   Yes, sir, that's correct.

17    Q.   And you had never used that camera before?

18    A.   No, sir, I had not.

19    Q.   And never used the control device that controlled

20 the camera?

21    A.   No, sir, I did not.

22    Q.   So somebody, one of the crewmen who worked up on

23 the ops deck had to show you how to use that; is that

24 right?

25    A.   Yes, sir, that's correct.

1    Q.  And what you found was that that particular

2  camera, it could be panned from side to side, right?

3    A.  Yes, it could.

4    Q.  And it could zoom in and zoom out?

5    A.  Yes, sir.

6    Q.  And it could tilt up and down?

7    A.  Yes, sir, that's correct.

8    Q.  And they showed you how to do it?

9    A.  They did.

10    Q.  When you went in there on April 19th, did they

11  provide you with the settings that were on the camera on

12  the morning of April 12th?

13    A.  No, sir, they did not.

14    Q.  Okay.  So you don't know exactly what the

15  particular settings were on the camera at the time that

16  the April 12th video was recorded, do you?

17    A.  No, sir, I do not.

18    Q.  So you're just kind of eyeballing it?

19    A.  That is correct, yes.

20    Q.  And did you have any training in forensic video

21  analysis?

22    A.  No, sir, I have not.

23    Q.  Did you have anybody there when you were doing

24  this experiment that had any such training?

25    A.  No, sir.

1    Q.  Had you or anyone who was there and involved in

2    this experiment consulted with anybody, for example, at

3    the FBI forensic image unit to see if you could get some

4    direction from them about how to do this?

5    A.  No, sir.

6    Q.  And if I understand correctly, when you did this

7    on April 19th, you started at about 3:00 p.m. in the

8    afternoon?

9    A.  Approximately around there.

10   Q.  Even though the April 12th video was at about

11   7:00 in the morning?

12   A.  Yes, sir, that's correct.

13   Q.  So the April 12th video, it's a little bit after

14   sunup; is that right?

15   A.  Yes, sir, that's correct.

16   Q.  And you all chose to do this in the middle of the

17   day?

18   A.  That is correct, yes, sir.

19   Q.  Before you started doing this experiment, you

20   looked at the April 12th video?

21   A.  That is correct.

22   Q.  And did you determine the frame rate of the

23   camera, how many frames per second that particular

24   camera would capture if a vehicle went past a camera?

25   A.  No, sir, I did not.

1    Q.  Would you agree that, just as a matter of common

2    sense, the faster a vehicle went past the camera the

3    fewer the frames?

4    A.  Yes, sir.

5    Q.  And if you slow the vehicle down, you're going to

6    have more frames because the vehicle is within the range

7    of the camera for a longer period of time?

8    A.  Yes, sir, that's correct.

9    Q.  And you said one of the questions you were asked

10   to answer was the speed of the vehicle on April 12th,

11   right?

12   A.  We were attempting to see if it was consistent.

13   Q.  Well, I guess wasn't one of the questions you

14   were trying to figure out, how fast was that vehicle

15   going?

16   A.  With the experiment?

17   Q.  Yeah.

18   A.  Yes, we were trying to determine if a consistent

19   speed would be with what we saw and we were unable to

20   determine that.

21   Q.  All right.  Now, when you looked at the

22   April 12th video, did you determine the length of period

23   of time that the vehicle was in front of the camera?

24   A.  Could you restate the question?  I'm sorry.

25   Q.  Okay.  You're looking at the April 12th video and

1  you see a vehicle come into view and then pass in front

2  of the camera and then pass by the building, right?

3      A.  That is correct, yes.

4      Q.  What was the length of time that the vehicle was

5  in front of the camera?

6      A.  Did I determine that?  I did not.

7      Q.  Would it be fair to say it was about a second?

8      A.  It was not very long, that's correct.

9      Q.  About one second, right?

10     A.  Approximately, yes, sir.

11     Q.  And going in the other direction, it seemed to be

12 about the same speed?

13     A.  I couldn't determine the speed.

14     Q.  Now, you watched that April 12th video many

15 times, didn't you?

16     A.  Yes, sir.

17     Q.  And when you watched it, you never actually saw

18 the vehicle you were watching stop and turn into the T-2

19 parking area, did you?

20     A.  No, sir, I did not.

21     Q.  It just passed by the building out of camera

22 view?

23     A.  That is correct.

24     Q.  And then it came back the other way, and you

25 couldn't see where it was coming from?

1    A.   That is correct.

2    Q.   Now, the camera that you -- excuse me, the

3  controller to the camera that you were using on

4  April 19th, you have already said that it zoomed and it

5  panned and it tilted.  And you did that yourself, you

6  manipulated the camera, didn't you?

7    A.   I did with help, yes.

8    Q.   Do you remember who it was there that was helping

9  you do this?

10   A.   I don't recall.  I do remember several people

11  going through the area while I was attempting to set

12  things up, but I don't recall the actual person.

13   Q.   And then the people outside, there was somebody

14  who was driving the Wells' car, right?

15   A.   That is correct.

16   Q.   Who was that?

17   A.   I believe -- I don't recall exactly.

18   Q.   Do you know who else was out there involved with

19  this?

20   A.   Yeah, we had several agents, and I'm -- I would

21  need to see my document to be sure.  I know Special

22  Agent Sean Bottary was there.  I believe Special Agent

23  Doran was there from the FBI, but I'm -- I would need to

24  see the document.

25   Q.   Did you actually write a report about this

1    yourself?

2        A.   No, sir, I did not.

3        Q.   Could we bring up for foundation purposes Exhibit

4    No. 158B, Defendant's 158B?

5            I'm sorry, 198.  Yeah, 198.  Excuse me.  I'm

6    sorry.

7            Let's just freeze it for a minute.  Do you see

8    that in front of you?

9        A.   Yes, sir, I do.

10       Q.   That appears to be the April 9th -- April 19th

11   video that you were involved in making; is that right?

12       A.   Yes, sir, it looks like video footage from the

13   April 19th around 3:00.

14       Q.   About 3:02?

15       A.   Yes, 3:02:53.

16       Q.   So this is several minutes before the two clips

17   that we saw a little while ago in your direct testimony?

18       A.   Yes, sir.

19           MR. CAMIEL:  Your Honor, I would offer

20   Defendant's 198.

21           MS. SHERMAN:  I would just like to know how

22   long it is.

23           MR. CAMIEL:  It's about one minute.

24           MS. SHERMAN:  Okay.  I have no objection.

25           THE COURT:  Then 198 is admitted.

1              (Defense Exhibit No. 198 admitted.)

2    BY MR. CAMIEL:

3       Q.   Could we play that, please?

4              (Defense Exhibit No. 198 playing in open

5    court.)

6    BY MR. CAMIEL:

7       Q.   Could we stop it for a minute.

8            Now, you're at the controls at this point, right?

9       A.   I don't recall if I was making the changes at

10   this point or not.

11      Q.   Well, somebody is using the zoom feature on the

12   camera and zooming in, right?

13      A.   That's what it appears, yes, sir.

14      Q.   Let's keep going.

15             (Defense Exhibit No. 198 continues playing in

16   open court.)

17   BY MR. CAMIEL:

18      Q.   If we could stop it again.

19            Now, that's the pan feature, panning over to the

20   left; is that right?

21      A.   Yes, sir.

22      Q.   And do you recall if you were the one in control

23   at this point?

24      A.   I don't recall.

25      Q.   Do you know how long it took to set up before you

1    did the first pass?

2        A.  I don't recall exactly.  I know we had made

3    several adjustments.

4        Q.  And by adjustments, you mean you were moving the

5    camera around?

6        A.  That is correct.

7        Q.  Zooming it in, tilting it and panning it, right?

8        A.  Yes, sir, that's correct.

9        Q.  If we could continue with the video.

10           (Defense Exhibit No. 198 continues playing in

11   open court.)

12   BY MR. CAMIEL:

13       Q.  Thank you.

14           Now, if we could put up Defendant's 196 for

15   foundation.

16           You have seen this before, haven't you?

17       A.  Yes, sir, I have.

18       Q.  That's a still from the April 12, 2012 video,

19   right?

20       A.  Yes, sir, that is.

21       Q.  It's a still of the unknown vehicle going from

22   right to left?

23       A.  Correct.

24           MR. CAMIEL:  I would offer Defendant's 196.

25           THE COURT:  Any objection?

1          MS. SHERMAN:  No.

2          THE COURT:  Then it's admitted.

3          (Defense Exhibit No. 196 admitted.)

4    BY MR. CAMIEL:

5       Q.  And in this still, we can see some things.  I

6    wanted to point out some things for you.

7          Over here you can see the fire hydrant; is that

8    right?

9       A.  That is correct.

10      Q.  You can see there is snow around the fire

11   hydrant?

12      A.  Yes, sir, that's correct.

13      Q.  And you can see out toward Anton Larsen Road.

14   It's looks like there are three or four vehicles kind of

15   blocking part of Anton Larsen Road and blocking part of

16   the view of that unknown vehicle; is that right?

17      A.  That is correct.

18      Q.  And then in front of that unknown vehicle, you

19   can see there is snow on the ground there and there.

20   You see that?

21      A.  Yes, sir.

22      Q.  Then if we could take that one down and put up

23   Defendant's 199.

24          That appears to be a still from the April 19th

25   video that you were involved in making; is that right?

 1    A.   Yes, sir, that is correct.

 2    Q.   And again, showing -- this time this is the

 3 Wells' vehicle going from right to left; is that right?

 4    A.   Yes, sir, that is correct.

 5    Q.   With one of the agents driving the vehicle?

 6    A.   Yes, sir, that is correct.

 7         MR. CAMIEL:  I would offer Defendant's 199.

 8         MS. SHERMAN:  Your Honor, I think -- I don't

 9 object to it being published, but since the videos were

10 not admitted.

11         THE COURT:  Why don't we have a brief sidebar.

12         (Begin bench conference.)

13         THE COURT:  I thought my order was pretty clear

14 that the video was not going to be introduced into

15 evidence, and I didn't say that the defense could

16 introduce it either.

17         MR. CAMIEL:  I'm not going to use the video.  I

18 just want to show the differences in the --

19         THE COURT:  I understand that, so as I

20 understood the government's position was go ahead and

21 show that, but it's not going to go to the jury.

22         MR. CAMIEL:  Demonstrative?

23         THE COURT:  Yes.  We can do the same with the

24 clips that you admitted, withdraw those, is that agreed?

25         MS. SHERMAN:  What he admitted was from the

1    12th.

2           THE COURT:  There was a clip from the 19th that

3    was admitted.

4           MS. SHERMAN:  It was not part of the

5    experiment.

6           MR. CAMIEL:  It's pre-experiment.

7           THE COURT:  So there is no objection?

8           MS. SHERMAN:  No objection.

9           THE COURT:  We're good there.  All right.

10          (End bench conference.)

11          MR. CAMIEL:  I guess I would re-offer

12   Defendant's 199 for demonstrative purposes only.

13          THE COURT:  Publish to the jury, that's fine.

14   BY MR. CAMIEL:

15      Q.  So Mr. Sturgis, what we're looking at now is a

16   still taken from the April 19th video that you were

17   involved in making; is that right?

18      A.  Yes, sir, that is correct.

19      Q.  And if we look over here by the fire hydrants,

20   we're a week later now and there is no snow there,

21   right?

22      A.  That is correct, yes, sir.

23      Q.  And over here on the road near the vehicle, you

24   don't see any snow on the ground?

25      A.  No, sir, I don't.

1    Q.  And there is only one car here, no other cars

2  blocking the view of Anton Larsen Road?

3    A.  Yes, sir, that's correct.

4    Q.  Were you involved -- when you set this up, was

5  there a decision made to do this at a time when there

6  wouldn't be vehicles blocking part of the road?

7    A.  No, sir, I don't think that came into play for

8  this.

9    Q.  Well, you were trying to do a video that was

10  consistent with what you saw on April 12th, right?

11    A.  We were trying to make a determination using the

12  video on the speed and if the vehicle was consistent

13  with what we saw on the original video.

14    Q.  I understand.  And to see if the vehicle is

15  consistent, you would want to set up the same conditions

16  so that it was a fair comparison, right?

17    A.  Yes, sir, we did set it up for view as best as

18  possible, but we didn't dictate putting cars or people's

19  movements.

20    Q.  But you had -- you had the Wells' vehicle.  It

21  had been seized pursuant to a search warrant, right?

22    A.  Yes, sir.

23    Q.  And that search warrant didn't limit how long you

24  could hold on to the car at that point, did it?

25    A.  I don't recall.

1    Q.  You could have picked the time and the day to do

2  your experiment, right?

3    A.  I'm sure if we would have set it up that way it

4  would have -- we could have, yes.

5    Q.  So you could have -- for example, you could have

6  done this at 7:00 in the morning, same as on April 12th,

7  so it would be similar conditions, right?

8    A.  I'm sure we could have, yes, sir.

9    Q.  But you chose to do it in the afternoon?

10    A.  Yes, sir, we chose to do it.

11    Q.  And you could have done it when there were cars

12  parked that partially blocked the view of Anton Larsen

13  Bay Road, same as there were on April 12th, right?

14    A.  We could have put cars there, yes, sir.

15    Q.  So there was a decision made not to do that?

16    A.  I don't think there was a decision for or against

17  at that point.

18    Q.  How about the decision to put a blue car in the

19  foreground of this particular experiment?

20    A.  I do not believe that was done for any reason.  I

21  believe that vehicle was there for when we set up the

22  zoom.

23    Q.  There was -- there is an object right here on the

24  road.  What is that?

25    A.  I believe it to be a cone.

 1     Q.  All right.  And that was something that was put

 2   there by one of the people involved in the experiment?

 3     A.  Yes, sir, it was.

 4     Q.  Can we put up one -- Defendant's 199 and 196.

 5   Can we put those up side by side.  Can we make them the

 6   same size, if it's possible.  That's all right.

 7         You can see both of those photos now?

 8     A.  Yes, sir, I can.

 9     Q.  So the one on the left is the April 19th

10   experiment, right?

11         THE COURT:  You intend to publish this to the

12   jury?

13         MR. CAMIEL:  Yes, please.

14         THE COURT:  There you go.

15   BY MR. CAMIEL:

16     Q.  So the picture on the left is from your

17   experiment?

18     A.  That is correct, yes, sir.

19     Q.  And you can see that you have the camera zoomed

20   in a little more than on the right; isn't that true?

21     A.  It looks -- it appears to be a little bit

22   different, yes.

23     Q.  And the vehicle, as shown in your experiment, is

24   more clear, right?

25     A.  Yes, sir, that's correct.

1     Q.   And you can see more of the vehicle because there

2 aren't any cars obstructing the view like there are on

3 April 12th?

4     A.   Yes, sir, that is correct.

5     Q.   Did you consult with anybody or talk to anybody

6 about what might be the effect of snow in terms of

7 reflection and color?

8     A.   No, sir, I did not.

9     Q.   Did you consult with anybody in terms of whether

10 it would make a difference whether the road was wet or

11 dry?

12     A.   No, sir, I did not.

13     Q.   On the 19th, it was wet, it had been raining,

14 right?

15     A.   I believe so, yes, that morning.

16     Q.   And it was dry on the 12th, right?

17     A.   It was also wet due to the snow melt.

18     Q.   So if I understand correctly, you talked about

19 doing, I think, seven passes each way, right?

20     A.   That is correct, yes, sir.

21     Q.   So you started at five miles an hour?

22     A.   That is correct, yes.

23     Q.   And the next one at 10, 15, 20, all the way up to

24 35?

25     A.   Yes, sir, that is correct.

1    Q.   And the two that were shown to the jury were at

2    15 miles an hour and at 20 miles an hour, right?

3    A.   Yes, sir, I believe so.

4    Q.   So 15 miles an hour, that would be less than half

5    the speed limit on the road, right, because you said

6    that was 35?

7    A.   That is correct, yes, sir.

8    Q.   And so you would expect if somebody was going

9    15 miles an hour, like you were in the video clip that

10   was shown to the jury, there would be a much clearer

11   view of the vehicle than if it had been going 35?

12   A.   Potentially, yes.

13   Q.   You talked about -- I want to switch subjects

14   now.

15        You talked about going to the airport and looking

16   for video cameras?

17   A.   Yes, sir, that is correct.

18   Q.   And seeing where there might be cameras that

19   might have some recording that could be used to see if

20   there is anything on there that's of any evidentiary

21   value, right?

22   A.   Yes, sir, that is correct.

23   Q.   I think you indicated that the Alaska Airlines

24   air cargo terminal had a video camera?

25   A.   Yes, sir, that's correct.

1    Q.  That showed part of the parking lot?

2    A.  If I recall correctly, it showed the window and

3  you could see a small portion through the window.

4    Q.  And did you review that video?

5    A.  Yes, sir, I did.

6    Q.  Could we bring up Defendant's 158B, just for

7  foundation.

8         Just having you look at that, is that the video

9  that we're talking about?

10    A.  Yes, sir.

11    Q.  And did you review that entire video for

12  April 12th?

13    A.  Yes, sir, I did.

14    Q.  For the whole day?

15    A.  Not for the entire day, no.

16    Q.  From when to when?

17    A.  If I recall, for just the majority of that

18  morning timeframe.

19    Q.  From when in the morning until when?

20    A.  I reviewed this many different times, so I don't

21  recall exactly when to when.

22         MR. CAMIEL:  Can we -- Your Honor, I want to

23  offer 158B.

24         THE COURT:  Any objection?

25         MS. SHERMAN:  There hasn't been established

1    what timeframe this actually is.

2           MR. CAMIEL:  At this point, I wasn't going to

3    play the whole thing, but I just wanted to offer it so I

4    could show him and show the jury the view from the

5    camera.

6           MS. SHERMAN:  I just want to know the

7    timeframe, how long this clip is.

8           THE COURT:  Can you discern the timeframe?

9    Maybe it's on there somewhere.

10          MR. CAMIEL:  Your Honor, my understanding is

11   that it runs an hour from 6:30 in the morning until

12   7:30.

13          THE COURT:  Is there agreement on that or --

14          MS. SHERMAN:  If it's an hour, sure.

15          THE COURT:  All right.

16          MR. CAMIEL:  I don't intend to play it at this

17   point.

18          THE COURT:  You want to play portions of it; is

19   that correct?

20          MR. CAMIEL:  Just a little clip just to have

21   him point something out in the video.

22          THE COURT:  Are you seeking to have the entire

23   recording admitted or the clip, or what's the --

24          MR. CAMIEL:  We would like the entire thing

25   admitted, but I don't intend to play it now.

1          THE COURT:  Any objection?

2          MS. SHERMAN:  No.

3          THE COURT:  This was exhibit what, Mr. Camiel?

4          MR. CAMIEL:  It is 158B.

5          THE COURT:  All right.  Then that exhibit will

6    be admitted.

7          (Defense Exhibit No. 158B admitted.)

8    BY MR. CAMIEL:

9      Q.  So if we could stop it for just a minute.

10   Mr. Sturgis, you have a laser pointer in front of you.

11         Can you tell us what we're looking at there?

12     A.  Looks like the door into the -- that's the door

13   right there.  There's the window.  And it looks like the

14   terminals and the weigher, the scale, I'm sorry.

15     Q.  So as you would watch this, you could see through

16   the window into the parking lot; is that right?

17     A.  Somewhat, yes, sir.

18     Q.  And it looks like it's pretty dark here, but as

19   it got lighter, you would get a better view out into the

20   parking lot?

21     A.  Yes, sir, that's correct.

22     Q.  And so that big window would look out toward

23   where you could see cars going by?

24     A.  Correct.

25     Q.  And you watched that entire -- you watched the

1  whole morning of that April 12th video, right?

2      A.  At some point over my investigation, yes, sir, I

3  watched the entirety of it.

4      Q.  And at no point did you see Mr. Wells' white

5  Dodge truck pass by that camera?

6      A.  Not that I can recall, no, sir.

7      Q.  Nor did you see Nancy Wells' Honda SUV go by that

8  camera?

9      A.  Not that I can recall.

10      Q.  If we could take that down.  If we could put up

11  Government Exhibit No. 91A.

12          That's the one that was offered a little bit

13  earlier and, Mr. Sturgis, you made a mark on that one?

14      A.  Yes, sir.

15      Q.  How about 91?

16          THE COURT:  This is 91?

17          MR. CAMIEL:  Yes.

18  BY MR. CAMIEL:

19      Q.  I think I heard you talk about the traffic flow

20  back on April 12th of 2012 into the airport.  Can you

21  show us again what you believe the traffic flow was at

22  that time?

23      A.  Yes, sir.  The traffic flow, the normal traffic

24  flow when people would come in, they would cut through

25  this little shortcut area and they would park.

1    Q.  All right.  And did you actually check on that on

2    April 12th to see if you could actually drive that way?

3    A.  I don't recall going and checking that route

4    through there.

5    Q.  While we've got that one up, can you point with a

6    laser pointer to where the air cargo, the window is that

7    we were just looking at?

8    A.  Yes, sir.  It's right there, I think.

9    Q.  Thank you.  So that's about -- that's on the

10   right side of the exhibit about a third of the way down

11   the page?

12   A.  Yes, so right where I just pointed.  Right up in

13   this area right here.

14   Q.  If we could take that one down, and for

15   foundation purposes, bring up Defendant's 195.

16        Do you see -- does that appear to be more of a

17   close-up of the area of the parking lot that you were

18   just talking about?

19   A.  Yes, sir.

20   Q.  And could we zoom in on this area here.

21        Does it look like the lane that you described as

22   being able to drive through the airport appears to be in

23   fact blocked at that time?

24   A.  Yes, sir, it is.

25             MR. CAMIEL:  Your Honor, I would offer

1  Defendant's 195.

2          THE COURT:  Any objection?

3          MS. SHERMAN:  No.

4          THE COURT:  195 is admitted.

5          (Defense Exhibit No. 195 admitted.)

6  BY MR. CAMIEL:

7      Q.  If we could then zoom in on the center portion of

8  that exhibit.  This is where you told us you could drive

9  through before, but in fact, it looks like there is a

10  light pole there that's been blocked; is that right?

11     A.  Yes, sir.

12     Q.  If we could put up -- take this one down and put

13  up Defendant's 195A.

14         You're familiar with what metadata is, aren't

15  you, Mr. Sturgis?

16     A.  Slightly.

17     Q.  And this appears -- 195A appears to be the same

18  photograph that you were just looking at of the airport?

19     A.  Yes, sir.

20     Q.  With the metadata included?

21     A.  Yes, sir.

22     Q.  Indicating that that photo was taken on

23  April 20th of 2012?

24     A.  Yes, sir.

25          MR. CAMIEL:  I would offer 195A.

1          MS. SHERMAN:  No objection.

2          THE COURT:  195A is admitted, Defendant's 195A.

3          (Defense Exhibit No. 195A admitted.)

4    BY MR. CAMIEL:

5      Q.  So again if we could blow up that same area that

6    we were looking at before.

7          So at least as of April 12th, you couldn't drive

8    through the airport parking lot in the manner that you

9    suggested?

10     A.  That picture was April 20th.

11     Q.  April 20th?

12     A.  Yes, sir.

13     Q.  I want to switch subjects again and back up a

14   little bit.

15         You gave some testimony about some driving

16   distances and driving times?

17     A.  Yes, sir.

18     Q.  And if I understand what you -- what you were

19   telling us, you indicated that you were using an

20   odometer -- you had three different vehicles do this,

21   right?

22     A.  Correct, yes, sir.

23     Q.  And you had used the vehicle's odometer to figure

24   out the distance?

25     A.  That is correct, yes, sir.

1    Q.  And you would have, either you or whoever else

2  was doing it, drive at the speed limit --

3    A.  Yes, sir.

4    Q.  -- to reach a certain point?  And for example,

5  when you reached the airport, you would see what the

6  odometer showed in terms of the distance?

7    A.  It didn't matter how fast someone drove.  It

8  would be the same distance.

9    Q.  I understand.  But to do this, what you did was

10  you made sure that each vehicle drove at the posted

11  speed limit in whatever area they were driving, right?

12    A.  It didn't matter what the speed limit was, sir.

13  The point was to gather how far distance was.

14    Q.  I know, but your chart also showed times, right?

15    A.  It does show times via a calculation.

16    Q.  And the calculation you made was knowing what the

17  speed limit was, right?

18    A.  Yes, sir.

19    Q.  And what the distance was.  Then you did your

20  calculation using those two numbers?

21    A.  Yes, sir.

22    Q.  What you didn't do was actually time how long it

23  would take you to get from any one point to another on

24  your chart.  In other words, you didn't look at your

25  watch and say, "Okay, we're leaving at 3:00," when you

1   get to the airport, "What time is it and how long did it

2   take us to get here"?

3       A.  I didn't put that on the chart, that's correct.

4       Q.  Because there are too many variables.  You could

5   run into traffic, right?

6       A.  Yes, sir, that's exactly why.

7       Q.  All kinds of things could slow you down, so that

8   wasn't a part of any of your calculations when you

9   created that chart?

10      A.  No, sir, it wasn't.

11      Q.  You talked about April 12th and you got the call

12  from your office on the main base to drive up to the

13  COMMSTA, and as you were driving up there, you talked

14  about seeing a vehicle parked near a Bridge 6; is that

15  right?

16      A.  Yes, sir.

17      Q.  A vehicle that you recalled being a Dodge

18  Durango?

19      A.  No, sir, a Dodge Dakota.

20      Q.  Sorry.  And you previously testified at an

21  earlier hearing about seeing that vehicle, right?

22      A.  I believe so, yes, sir.

23      Q.  And you were called to testify at that hearing

24  after a man named Wilton Nelson had described seeing a

25  vehicle at the same spot, right?

 1     A.   I don't recall what Mr. -- what did you say,

 2  Wilson?

 3     Q.   Nelson.

 4     A.   I wasn't in here for that, so I don't recall

 5  that.

 6     Q.   Well, do you recall that when you testified at an

 7  earlier time you didn't describe the vehicle you saw as

 8  being black?

 9     A.   I don't recall that, no.

10     Q.   Did you ever describe the vehicle as being blue?

11     A.   No, sir, not that I can recall.

12     Q.   So you saw that vehicle and then you drove up to

13  the COMMSTA and you determined that there had been a

14  homicide, right?

15     A.   Yes, sir.

16     Q.   Two homicides.  So did you ever write a report

17  documenting your observation of that vehicle by Bridge

18  6?

19     A.   No, sir.

20     Q.   Did you ever tell the Alaska State Troopers that

21  you encountered about the vehicle that you saw so he

22  could go check on it?

23     A.   I believe I did bring it up to someone in the

24  team, but I don't recall exactly who I told it to.  I

25  was pretty busy that morning.

1    Q.  I understand.  Did you ever go back down the road

2  to check on that vehicle to see if it had any

3  involvement in what happened up at the COMMSTA?

4    A.  I believe I handed it off to someone else.

5    Q.  Do you know who?

6    A.  I don't recall that, no, sir.

7    Q.  You didn't write a report, so you didn't document

8  who you handed it off to?

9    A.  Correct, because I didn't further investigate it.

10  I passed it to someone else on the team.

11    Q.  Were you also involved -- you were involved in

12  some searches in this case, weren't you?

13    A.  Yes, sir, I was.

14    Q.  And one of the things you were involved in was

15  the search of the Buskin River?

16    A.  No, sir, I was not.

17    Q.  Were you present when that happened?

18    A.  I was there dropping some tools off at some

19  point, yes, sir.

20    Q.  And what was going on was that there were divers

21  who had been engaged to look in the river to see if they

22  could find any evidence?

23    A.  Yes, sir, there were people looking pretty much

24  everywhere along that area trying to establish if there

25  was something there or anything that they could find in

1    regards to the investigation of the case.

2        Q.  And one of the areas that you know they were

3    looking in the river was near Bridge 6, right?

4        A.  The area that I remember was down by the Comfort

5    Inn area, the bridge on Rezanoff and I'm not -- I can't

6    recall what number that one is.

7        Q.  You are aware that there were searches conducted

8    basically from the area of Mr. Wells' house along the

9    road on both sides of the road all the way back up to

10   the COMMSTA, right?

11       A.  Yes, sir, there were searches conducted many

12   different areas, but, yes, those areas were also part of

13   that.

14       Q.  And no evidence was found that was collected to

15   be used in this case?

16       A.  No evidence was collected.

17            MR. CAMIEL:  That's all I have.  Thank you.

18            THE COURT:  Redirect?

19            MS. SHERMAN:  Yes, Your Honor, just a few

20   questions.

21                    REDIRECT EXAMINATION

22   BY MS. SHERMAN:

23       Q.  I want to talk about -- well, I want to talk

24   about the weather in Kodiak in April.  Can you describe

25   that for the jury?

A.  Kodiak weather is hard to predict.  You just -- I
mean you utilize the times when you can when it's not
raining or snowy or icy or whatever else Mother Nature
wants to throw at us.

Q.  Did you recall on April 19th why you selected
that time and that date to do the experiment?

A.  I believe it was just availability.  We could use
the T-1 area, and then we had access to the vehicle, so
we just -- we had decent weather and we were going to
utilize it during the weather.

Q.  You saw some comparisons between the 12th and the
19th.  When you were either directing or moving the
camera, what were you trying to do to set the frame up?

A.  I was trying to just set it up as close as I
could based -- you know, visual, visual reference, just
looked at the camera, and from memory, just about where
it was at and I tried to get it as close as I could.

We did set up some cones to try to ensure that we
got that part of the road in there, but that's basically
all I had to go from was visual reference.

MS. SHERMAN:  Thank you.  No further questions.

THE COURT:  Any follow-up at all, Mr. Camiel?

MR. CAMIEL:  No.

THE COURT:  Can this witness be released?

MS. SHERMAN:  Yes, Your Honor.

```
 1              THE COURT:  Mr. Camiel?

 2              MR. CAMIEL:  Yes.

 3              THE COURT:  Thank you, sir.  You may be

 4   excused.

 5              (Witness excused)

 6              THE COURT:  Your next witness?

 7              MR. SKROCKI:  Yes, Judge, we call Neil Schmidt.

 8              THE COURT:  All right.

 9              (Pause)

10              THE COURT:  Good afternoon.  If you could come

11   up to the witness stand, please.  When you get there,

12   remain standing and the clerk will administer an oath to

13   you.

14              (Oath administered to the witness)

15              DEPUTY CLERK:  For the record, can you please

16   state your full name and then spell your full name.

17              THE WITNESS:  My name is Neil J. Schmidt,

18   N-e-i-l, J, S-c-h-m-i-d-t.

19              NEIL SCHMIDT, GOVERNMENT WITNESS, SWORN

20                        DIRECT EXAMINATION

21   BY MR. SKROCKI:

22      Q.  Good afternoon, Mr. Schmidt.

23      A.  Good afternoon.

24      Q.  Sir, where is home for you?

25      A.  Currently new home is Las Vegas, Nevada.
```

1    Q.  Las Vegas, so there's a little bit of a weather

2    change for you?

3    A.  A little bit.  We're dipping down below 100

4    there, so it is cooling off.

5    Q.  Did you feel the earthquake yesterday?

6    A.  I did not.

7    Q.  We did.

8         So Mr. Schmidt, what do you do for a living, sir?

9    A.  I have recently retired.

10   Q.  Congratulations.  Who did you work for before you

11   retired?

12   A.  I spent 25 years with American Honda.

13   Q.  If you could tell the jury please your career

14   track with American Honda from beginning up to your

15   retirement?

16   A.  Beginning, so 1994, when I went there, I started

17   out, even though I was a degreed engineer, I started out

18   as a shop technician to gain more experience working on

19   Honda cars, more hands-on experience.  I had worked on

20   my own vehicles, but not on the whole Honda line of

21   products.  So I did that for year and a half.

22        Spent a year and a half on -- they have a tech

23   line, which is a 1-800 number that technicians can call

24   from a dealership to get help fixing cars.  So you work

25   with the technician over the phone, help them solve

1   problems, cars that they are having difficulties with.

2   So I did that for a while.

3        And then I was promoted to model engineer, and

4   that's what I spent -- from '97 or so until 2005, I was

5   a model engineer.

6   Q.  Let me interrupt you there.  Could you expand on

7   what model engineer is for the jury, please?

8   A.  Sure.  A model engineer, you're the technical

9   guru for the company on a particular model.  So any kind

10  of technical questions, any issues, you're supposed to

11  be the person that knows the most about that vehicle

12  bumper to bumper, top to bottom, inside and out.  You

13  need to know it so if anything comes up, you're the guy

14  they go to for answers.

15  Q.  Did you have a specific model you were assigned

16  when you were model engineer?

17  A.  I had a number of vehicles.  Initially, I had the

18  Honda Prelude.  And then I had the Accura TL briefly.  I

19  had the CR-V for probably the longest amount of time.

20  And then I had the Honda Element as well, which was kind

21  of -- it wasn't built off the CR-V, but it was very

22  similar to the CR-V.  So those are main models I worked

23  on.

24  Q.  Going back to the phrase you used of model

25  engineer, could you explain to the jury what other

things besides what you explained previously you would

look at while you were the model engineer for the CR-V,

for example?

A.   Sure.  One of the big things we did was you're in

charge of everything that -- reporting any problems that

happen when the car is in the market, so if someone has

a problem with the CR-V, it goes to the dealer, you get

the parts back, and then you try and understand what

happened and why.

     And you look at all the data that would come in

from all the dealerships.  You look at the data from the

tech line that I worked on before.  You look at parts

that got returned to try and solve and analyze problems

and get fixes back into the market quickly.

Q.   And did that include driving the vehicle as well,

sir?

A.   Oh, yeah.  When you're a model engineer, we had a

fleet of vehicles, and typically you were assigned the

model you were working on, so I spent a lot of time

driving the CR-Vs and Elements.

Q.   How long were you the model engineer for the CR-V

line?

A.   From 1997 through 2005.

Q.   '97 through 2005.  We have heard a lot of the

phrase "CR-V," and we're probably very curious to know,

1   from Honda's perspective, what does CR-V stand for?

2      A.   I wouldn't say -- there's a bunch of guesses.

3   The official one that I heard was "comfortable runabout

4   vehicle."

5      Q.   Did you have occasion while you were model

6   engineer for Honda to also examine, pay attention to

7   and/or study the competitors' lines of similar products?

8      A.   Yes.   I mean we -- since I was on the technical

9   side, we weren't concerned about sales, but we would

10  always look at sales and see how our product was doing

11  relative to the competition.

12         The other thing we did was we -- if consumers

13  were having problems with the car, if they wanted a

14  feature, for example, that maybe we didn't have that

15  someone else had, we would work the teams working on the

16  vehicle to try and get that feature incorporated.   So

17  we're always looking at the competition to see how we're

18  doing relative to them.

19     Q.   Have you always been a car person, Mr. Schmidt?

20     A.   Pretty much, yeah.   Since my early teens, since

21  probably junior high.

22     Q.   That's a while back for both of us?

23     A.   Yes.

24     Q.   Now, with respect to the bits, pieces and parts

25  of the Honda CR-V that you're a model engineer for those

1  years, '97 to 2005, were you also familiar with the

2  inside pieces, the plastics as well as the exterior

3  pieces?

4     A.  Yes.  One thing we did as part of my job, when

5  the car comes out, the dealer gets -- the dealership

6  gets the service manual, the big book on how to fix the

7  car.  What we would do is before the car comes out we

8  would take the draft of that book, go to the factory, in

9  this case it was Japan where the car was built, get some

10  early cars off the production line and essentially make

11  sure the book is right.

12        So we'd have to take the car apart, see if step A

13  happens before step B, or did we get it backwards, or is

14  that wire red instead of green, oops, we have to fix

15  that.  So we'd go through essentially the car, the whole

16  car and take it all the way apart, put it back together.

17  Yeah, I had to know everything, you know, about the

18  whole car.

19     Q.  And did they send you to Japan for some of this

20  work as well?

21     A.  Yes.

22     Q.  How many times?

23     A.  Oh, I probably went five or six times.

24     Q.  How about in the model vehicle year '97-2005,

25  including 2001/2002, did you have occasion to do road

1  trips with the vehicles?

2      A.   Yes.   So the other we would do -- Honda calls it

3  caravan testing, so you get a caravan of Honda cars.

4  First one I did was with the initial CR-V.   This was

5  before it went on sale.

6          We had two Japanese CR-Vs, so the steering wheel

7  was on the other side of the car.   And we had a Toyota

8  RAV4 for comparison, and it was myself and probably six

9  or seven Japanese staff that had come over from Japan.

10  We drove from California.   We went through Death Valley,

11  so we did hot weather and low altitude.   And then drove

12  through Colorado, and I forgot the highest paved road.

13  It's Mount Washington or Mount -- I think might be Mount

14  Washington or Mount Franklin.

15          So we drove on the lowest and highest paved roads

16  in the U.S., switching back and forth between the cars

17  comparing things so we made sure the cars -- everything

18  is right, everything works, it works in the U.S. market.

19          And we did that -- I know I did that on the next

20  generation CR-V in 2002.   I know I did it with the

21  Element as well.

22      Q.   Are you familiar with the term "model refresh"?

23      A.   Yes.

24      Q.   What does that mean?

25      A.   Well, in Honda language, there is two versions of

1    that.  There's a minor model change, which is --

2          MR. COLBATH:  Your Honor -- excuse me

3    Mr. Schmidt.  Could we approach?

4          THE COURT:  Sure.  That's fine.

5          Stand and stretch if you'd like, ladies and

6    gentlemen.

7          (Begin bench conference.)

8          MR. COLBATH:  I wasn't sure where Mr. Skrocki

9    was going.  That's not a term -- I don't think he

10   testified about that last time.  Mr. Schmidt didn't do a

11   report, so I don't have an expert report.  All I have, I

12   guess, is the scope of his testimony last time.

13         MR. SKROCKI:  The reports from the FBI.

14         MR. COLBATH:  Right, I have FBI agents'

15   interviews, but Mr. Schmidt, in the traditional expert

16   sense, he didn't author a report like Mr. Becker, for

17   instance.  And so he's starting to talk about things

18   that I haven't heard of before.  And --

19         THE COURT:  Are you going --

20         MR. SKROCKI:  It's foundation for are you

21   familiar with the model changes.  That's all I'm going

22   to get into.

23         MR. COLBATH:  You said model --

24         MR. SKROCKI:  Model refresh.  It's foundation

25   to show his knowledge.

 1          THE COURT:  I think it's fine.

 2          MR. SKROCKI:  I'm about to move on.

 3          MR. COLBATH:  As long as we don't start getting

 4    into technical things that they are certainly not in the

 5    302s.  I just didn't hear that kind of questioning in my

 6    review of his testimony, so I wasn't sure where he was

 7    going.

 8          MR. SKROCKI:  It's foundation.  I'm about to

 9    move to qualify him.

10          THE COURT:  Very good.

11          (End bench conference.)

12    BY MR. SKROCKI:

13    Q.  I asked you a question about model refresh.  Just

14    in a general sense, what does that mean in Honda

15    language?

16    A.  In Honda language, that's when you essentially

17    redesign the car so it looks different than it did

18    before.  We call it a generation of vehicle, so you

19    essentially redesign the entire car.

20    Q.  Is part of your job then as model engineer to

21    keep up with those changes?

22    A.  Yes.

23          MR. SKROCKI:  Your Honor, I ask the Court to

24    find Mr. Schmidt has the experience, background,

25    education and training to give an opinion on this topic

 1    and the matter inquired upon.

 2              THE COURT:  What topic?

 3              MR. SKROCKI:  The identification of a 2001/2002

 4    Honda CR-V on April 12th.

 5              THE COURT:  Any objection?

 6              MR. COLBATH:  No, Your Honor.

 7              THE COURT:  Then I'll find so qualified.

 8              MR. COLBATH:  Actually, consistent I guess with

 9    the prior record that we've made.

10              THE COURT:  All right.  Then I will allow the

11    witness to testify on that topic.  Go ahead.

12    BY MR. SKROCKI:

13       Q.  Mr. Schmidt, were you visited by the FBI in

14    2012/2013?

15       A.  Yes.

16       Q.  Do you recall the first visit?

17       A.  First visit was towards the end of November in

18    2012.

19       Q.  And they came to you for what purpose, sir?

20       A.  They contacted Honda looking for someone who was

21    familiar with the Honda CR-V to see if they could

22    identify a vehicle that was on videotape.

23       Q.  And ultimately, did they come to you?

24       A.  Yes.

25       Q.  Do you recall who that was?

1      A.   It was an Agent Matthews, I think, in the Long

2    Beach office.

3      Q.   And what were you asked to do?

4      A.   He showed me a videotape to see if I could

5    identify that as a Honda CR-V.

6      Q.   If we could have the lights, please.  And Blair,

7    if you could pull up Exhibit 62, which has been admitted

8    by my records.

9           THE COURT:  62 admitted, Madam Clerk?  Yes.

10   All right.  Thank you.

11   BY MR. SKROCKI:

12     Q.   Blair, if you can just put the opening frame up,

13   that would be fine.

14          Mr. Schmidt, you reviewed a videotape prior to

15   testifying here today, correct?

16     A.   Yes.

17     Q.   Is this the opening frames of the video you were

18   asked to look at by the FBI when they first contacted

19   you?

20     A.   Yes.

21     Q.   Are you able to see the animal there at the

22   bottom?

23     A.   Yes.

24     Q.   Do you recall that from your viewing back in

25   2013?

1      A.   I didn't.  I don't recall that from back then.

2      Q.   Didn't see the deer?

3      A.   I didn't notice the deer at that time.  I was

4  looking at the cars.

5      Q.   Fair enough.  This video, you reviewed the entire

6  thing prior to coming to court to testify?

7      A.   I don't know if I went through the -- I don't

8  know how long the video lasts.  There were certain time

9  periods that I reviewed.

10     Q.   How many times did you review the certain

11 timeframes in question?

12     A.   Probably 20 or 30 times.

13     Q.   If we could go to 709, Blair.  Can you get us

14 there, please?  709.  Thank you.  If you could play

15 that.

16          (Exhibit No. 709 playing in open court.)

17 BY MR. SKROCKI:

18     Q.   If you could turn your attention on the upper

19 left-hand side there, Mr. Schmidt.  Okay.

20          Is this a segment of the film you spent or the

21 video you spent a lot of time on, Mr. Schmidt?

22     A.   Yes.

23     Q.   And if we can go to 714, please.  Hold that

24 there.

25          (Exhibit No. 714 playing in open court.)

BY MR. SKROCKI:

Q.  Was that the other segment of the video you looked at?

A.  Yes.

Q.  Okay.  When they came -- the FBI came to you, Mr. Schmidt, what information were you conveyed about what they wanted you to do?  What information did they share with you?

A.  Again, basically they were -- they wanted me to look at the video and see if I could identify that as a Honda CR-V.

Q.  During the course of your working relationship with the FBI, what other information did they provide you with respect to this particular subject vehicle in this video?

A.  They did provide me with a VIN or the vehicle identification number.

Q.  When did they do that, do you recall?

A.  The first visit.

Q.  The first visit?

A.  Yes.

MR. COLBATH:  Your Honor, I'm going to object to the characterization of this vehicle.  I don't think they provided the VIN number of that vehicle.

THE COURT:  Fair enough.  I'll sustain that.

1  Rephrase.

2  BY MR. SKROCKI:

3    Q.  Did they provide you a VIN number of a particular

4  vehicle?

5    A.  Yes.

6    Q.  What did that VIN number come back to in terms of

7  Honda records?

8    A.  That was a VIN for a 2001 Honda CR-V.  It was a

9  B95 or B96P, which is a blue electron pearl.

10   Q.  What do you mean by blue electron pearl?

11   A.  The blue electron pearl, that's the name of the

12  color.  Honda always comes up with a name for colors,

13  but the color code, the B95 or B96, I don't remember

14  which one, identifies the color composition, so the body

15  color.

16   Q.  With respect to these two clips we showed you,

17  were you able to come to an opinion about what type of

18  vehicle was depicted in those two transits we saw from

19  left to right and right to left in Exhibit No. 62?

20   A.  Yes.

21   Q.  What's that opinion, sir?

22   A.  In my opinion, I have about a 70 percent -- I'm

23  about 70 percent sure that that is a Honda CR-V of 2000

24  or 2001.

25   Q.  Now, while it's still up there on the screen, I

 1  want to explore some aspects of why you came to that

 2  conclusion or that opinion.  And could you tell the jury

 3  what led you to reach that 70 percent conclusion?

 4      A.  Well, there is a number of factors.  The color is

 5  one factor.  It's a relatively bright blue.  It's almost

 6  a purple in this image.

 7          A bright blue is not a typical color you see on

 8  an SUV.  Most SUVs are, I wouldn't say bland colors, but

 9  you don't get many bright colors.  And I know Honda was

10  one the companies that we had a bright blue that we used

11  in 2000 and 2001, so that catches my eye.

12          The other things I'm looking at are the overall

13  proportions of the vehicle, the size of the vehicle, the

14  shape, and by the shape, there is a lot of things that

15  go into the shape:  The length of the hood, the length

16  of the roof, the amount of overhang in front of the

17  front wheels, the amount of car behind the back wheels.

18          Where you can see any details as far as

19  headlights, taillights, the location of things, the

20  color of things, so there is a number of factors that go

21  into my assessment of the vehicle.

22      Q.  Are there some aspects of the taillights that you

23  were relying upon?

24      A.  Yes.  I think when the vehicle is going the other

25  way you can see some reflections above the -- consistent

1    with the windows at that height of the car.  And the

2    CR-V is relatively unique in that the taillights are all

3    -- they still are to this day -- they are all above the

4    window line.  I think Volvo is probably the only other

5    company that has lights that go up that high, but I

6    guess Cadillac is doing it now and some other SUVs.

7         Anyway, the CR-V has lights that go up from the

8    bottom of the windows to the top of the windows.  The

9    taillights are up in that area.

10   Q.  How about the -- is there anything about the

11   height of the vehicle that helped in your determination?

12   A.  Well, the overall height, the ride height.  If it

13   was lower to the ground, it wouldn't be an SUV.  It

14   would be more like a minivan.  The overall height gives

15   you a factor of the size.  Is it a smaller or larger

16   vehicle.

17   Q.  You mentioned that electron blue pearl.  I

18   apologize if you have already answered the question.

19   How many years was that in production with Honda CR-Vs?

20   A.  On the CR-V, it was only in 2000 and 2001.

21   Q.  You mentioned 70 percent certainty as to your

22   opinion?

23   A.  Yes.

24   Q.  How long did it take you to get that 70 percent,

25   and if you could tell the jury how much time?

1   A.  I mean initially the first time I looked at it, I

2   knew it was not 100 percent the first time I looked at

3   the video because there is just not enough detail.

4       To get to the 70 percent, at some point, I think

5   that -- I think the FBI asked me can I throw a number on

6   it, and it took me a while to think about that.  It's

7   more than 50/50 because I'm more positive than less

8   positive that it is a CR-V.  It's more likely than not

9   to me that it's a CR-V, so I'm more than 50 percent, but

10  I'm not 100 percent, so I'm somewhere between 50 and

11  100.

12      The color I think, since it's a relatively rare

13  color, that kicks me up above a little higher.  Again,

14  and the size, so it's a smaller SUV that's that color,

15  the positions of the various features on the vehicle is

16  how I get to the 70 percent.

17  Q.  When you got to the 70 percent, what information

18  did you have from the FBI when you reached that number,

19  sir?

20  A.  By then, I'm pretty sure I had the -- at some

21  point, they provided me with a list of vehicles to

22  compare the video to.

23  Q.  We'll get to that.  Anything else?

24  A.  I can't think of anything else they had provided

25  by that point.

1    Q.  When you reached your 70 percent assessment, had

2  you had occasion to look at another video?

3    A.  Yes.

4    Q.  Was that a factor into your 70 percent

5  conclusion?

6    A.  No.  No.

7    Q.  So let's go back and talk about the other

8  information that FBI provided you.  What did they

9  provide you?

10    A.  They gave me a spreadsheet with a list of

11  vehicles, models, years, and photographs, and it had I

12  think 425 different vehicles on it.

13    Q.  425?

14    A.  425.  It was -- yeah, I printed it out once, and

15  that was mistake.

16    Q.  How did you feel about getting that kind of data?

17    A.  It was a lot to look through and I wasn't looking

18  forward to it.

19    Q.  Did you look through all of it?

20    A.  Yes.

21    Q.  With respect to your -- so you factor those 425

22  other vehicles into your 70 percent opinion

23  determination?

24    A.  Eventually, yes.  It was part of the calculus,

25  yes.

Q.   There are other competitor vehicles of similar characteristics, size, with respect to the 2001, 2002 range, or even further forward or back.  What would those be?

A.   The most similar vehicles in size and shape are the Toyota RAV4, Ford Escape, and the Hyundai Santa Fe. They are from that generation, from that time period was about the same.

Q.   How come they didn't factor into your conclusion, or did they?

A.   They did to some degree.  Again, there is a few little things that are different.  The CR-V and the RAV4 have the spare tire mounted on the outside of the vehicle.  It's an external spare tire.  I don't think the Escape has it outside.

I know again Honda had this brighter blue. Toyota had a brighter blue at that time.  Those are the three closest.  And again, the size and shape of that generation, this is a relatively square-looking vehicle. SUVs today are much more sleek and rounded because they are going for better fuel economy, but the ones that are more square, so, again, the earlier generations of vehicles are that size and that shape.

Q.   If we could take that down, Blair.  If you could pull for identification Exhibit No. 94.  Mr. Schmidt,

1  just for foundational purposes, does Honda have a spec

2  sheet or specifications for the Honda CR-V for

3  2001/2002?

4      A.  Yes.

5      Q.  Did you provide these to the FBI in connection

6  with your work?

7      A.  Yes, I did.

8      Q.  If we could look at the first page of 94.  And

9  then the second page of 94.

10         Are those accurate as to specifications from

11  Honda Motor Company concerning the Honda CR-V for

12  2001/2002?

13     A.  Can you back up one page?  Yes.

14             MR. SKROCKI:  Move for the admission of 94.

15             MR. COLBATH:  No objection.

16             THE COURT:  94 is admitted.

17             (Exhibit No. 94 admitted.)

18  BY MR. SKROCKI:

19     Q.  Just briefly, Mr. Schmidt, we'll just look at

20  these quickly.  The first page gives you height and

21  width for the vehicle and track length or track width?

22     A.  Yes, height, width, length, wheel base, track

23  width.  So that's the '97 through 2001 CR-V depicted

24  there.

25     Q.  The next one.  Next page I mean.

1          That is for what model year, sir?

2     A.   So that's starting 2002, so that would be 2002

3    through '06, I think.   2002 through 2006.

4     Q.   The VIN number provided by the FBI came back to

5    what year?

6     A.   2001.

7     Q.   Were there other things that the FBI provided you

8    to examine in connection with your review?

9     A.   Besides the videos and the spreadsheet, they

10   provided the VIN.

11    Q.   Any photographs?

12    A.   I think I had two or three still photographs.

13    Q.   If we could have lights again, Madam Clerk.

14   Sorry about that.   If we could pull up 88.

15         Is this one of the photographs you were provided?

16    A.   I don't recall seeing that one way back in the

17   day.

18    Q.   88.   These are all admitted.

19         How about that one?

20    A.   It's the same one.

21    Q.   87.   Sorry.

22    A.   Yes.   I remember this one, yes.

23    Q.   So Mr. Schmidt, what characteristics that you

24   spoke about that you saw on the video are reflected here

25   on this Exhibit No. 87 with this vehicle in question?

1    A.   Well, again, this seems to be a first-generation

2    Honda CR-V, the bright blue electron pearl.  This one

3    has no wheel covers, so the wheels are all black.  There

4    is a bra over the front, what we call a bra, protective

5    bra over the front.  Again, the shape of the headlights.

6    The appearance -- you can barely see the taillights in

7    the back.  Ride height of the vehicle.  That type of

8    thing.

9    Q.   Let's move to 89.

10        Is that another image that you were provided by

11   the FBI, Mr. Schmidt?

12   A.   Yes.

13   Q.   So you were talking about taillights quite a bit.

14   Can you take a look at that.

15        Is that what you're talking about in connection

16   with the taillights of that vehicle?

17   A.   Yes.  Those lights are essentially even with the

18   windows of the vehicle.  They run from the roof down to

19   the bottom of the windows.

20   Q.   And that was something novel for the Honda line?

21   A.   It was novel, I wouldn't say in general, but for

22   Honda, yes.

23        MR. SKROCKI:  Thank you, Mr. Schmidt.  Those

24   are all the questions I have.

25        THE COURT:  Thank you.

1          Go ahead, Mr. Colbath.

2                    CROSS EXAMINATION

3     BY MR. COLBATH:

4          Q.   Good afternoon, Mr. Schmidt.

5          A.   Good afternoon.

6          Q.   It sounds to me like, sir, your entire career in

7     the automotive field has been with Honda?

8          A.   That's correct.

9          Q.   So you're exclusively a Honda guy?

10         A.   Pretty much, yes.

11         Q.   It sounds like in the -- once you got through

12    some of the initial stages and you were into the design

13    and you were into the engineering part, it was eat,

14    sleep and breathe those models that you worked on?

15         A.   Yes, pretty much.

16         Q.   Right down to taking them completely apart and

17    completely back together?

18         A.   Yes.

19         Q.   So it was probably no surprise to you when

20    somebody at Honda came to you and said, "The FBI is here

21    with questions about a CR-V," that you were the person

22    that got picked to answer CR-V questions?

23         A.   No surprise at all, no.

24         Q.   And when the FBI sat down with you, they told you

25    that they had a videotape and they believe it depicted a

1    Honda CR-V and they wanted to see if you could identify
2    it as such?
3        A.   I don't know what they believed at the time, but
4    they wanted to see if I could identify the vehicle as a
5    CR-V.
6        Q.   As a CR-V.  Okay.  Well, you understood that
7    that's what they were looking for?  I mean that's what
8    they thought?
9        A.   Again, I don't know what they thought.
10       Q.   Well, what did they tell you?
11       A.   They wanted to -- again, they wanted to see if I
12   could identify the vehicle in the video as a Honda CR-V.
13       Q.   Okay.  So this initial meeting was November 20,
14   2012, right?
15       A.   Yes.
16       Q.   And how many generations of CR-Vs had there been
17   since that time, since it started beginning when?
18       A.   The first generation was '97 through '01.  Second
19   generation was '02 through '06.  And then '07 through --
20   I mean I wouldn't say I lost track.  We switched to five
21   years, so '07 through '11.  And then '12.  So the '12s
22   were probably out by that point.
23       Q.   There were five or six generations by 2012?
24       A.   At least four.  The fifth may have just been out.
25       Q.   Okay.  And your meeting was November -- your

1    first meeting November 20, 2012; does that sound right?

2        A.   Yes.

3        Q.   And you were asked to make basically a make --

4    identify the make of the car on the video?

5        A.   Yes.

6        Q.   And the model?

7        A.   Yes.   If possible, yes.

8        Q.   And not just as any generation.   You understood

9    they -- well, let's do it this way:   They gave you -- in

10   addition to asking you about the video, they gave you

11   those photos Mr. Skrocki showed you?

12       A.   They may have.   I don't remember where in the

13   meet -- which meeting the photos showed up.

14       Q.   Well, it would have been helpful to you to have

15   photos, I assume?

16       A.   At some point, yes.

17       Q.   Okay.   So they gave -- they gave you the VIN

18   number of a vehicle?

19       A.   Yes.

20       Q.   Now, you -- they didn't tell you it was the

21   vehicle in the video?

22       A.   No.

23       Q.   You were able to run the VIN?

24       A.   Yes.

25       Q.   And by running the VIN, you knew at least the

1    year of the car the FBI was asking about or associated

2    to the VIN?

3        A.   Yes.

4        Q.   You knew the make?

5        A.   Yes.

6        Q.   You knew the model?

7        A.   Yes.

8        Q.   You knew the color?  You identified it by some

9    code, right?

10       A.   Yes.

11       Q.   And you could tell that right from the VIN?

12       A.   Well, when I enter the VIN into a database, it

13   gives me information like that, yes.

14       Q.   You even knew it had been -- that particular car

15   had been sold in Fairbanks, Alaska?

16       A.   Yes.

17       Q.   So when they sat you down and had you look at the

18   this video, did the FBI tell you prior or at some time

19   there in this initial meeting that they had already had

20   analysts from their own, the FBI's forensic audio/video

21   image analysis unit look at the video?

22            MR. SKROCKI:  Objection; irrelevant, and

23   foundation.

24            THE COURT:  Foundation?  What is the

25   foundation?

1          MR. COLBATH:  Well, I'm trying to establish

2     that.  I want to know if he was provided that

3     information, if it came into his equation in his

4     analysis of the video.

5          MR. SKROCKI:  I'll add a hearsay objection as

6     well.  It does go to the truth of the matter asserted.

7          THE COURT:  Mr. Colbath, would you agree?

8          MR. COLBATH:  What I would like to do is I

9     think -- rather than argue it, could we approach for a

10    minute?

11         THE COURT:  Certainly.

12         (Begin bench conference.)

13         MR. COLBATH:  Number one, he's an expert so

14    he's entitled to rely on hearsay.

15         THE COURT:  I guess my question is:  Does it

16    say in the report that he was provided that information?

17    Do you have a basis for thinking that he was told that?

18         MR. COLBATH:  I know that he was initially

19    approached by the FBI, and sequentially, I can't tell

20    because they had some initial evaluations in April, but

21    they had some reevaluations later closer in time.

22         THE COURT:  Does he indicate that he was

23    provided --

24         MR. COLBATH:  He doesn't say they discussed it

25    with him.

1          THE COURT:  Well, that's where it gets into

2     this issue that's come up before where I don't want the

3     jury to think that that's evidence when it's not

4     evidence.

5          MR. COLBATH:  Well, I certainly have a good

6     faith basis to know that the jury will hear that

7     evidence during this trial.

8          THE COURT:  You do?

9          MR. COLBATH:  Absolutely.  I'm going to call --

10    well, just so I'm clear on the record, I don't have

11    evidence because this is the first time I have talked to

12    Mr. Schmidt about whether or not they told him about it.

13         THE COURT:  But you have evidence that it

14    happened?

15         MR. COLBATH:  Oh, that, yes.  I'm calling --

16         MR. SKROCKI:  I would like to know what that

17    evidence is.

18         MR. COLBATH:  I'm calling Mr. Iber as a witness

19    to say that he was approached and asked make/model.

20         MR. SKROCKI:  You can ask Mr. Iber.  That's not

21    Mr. Schmidt.

22         THE COURT:  Mr. Iber is from the FBI?

23         MR. COLBATH:  Yes, he's an FBI analyst, as is

24    Mr. Vorder Bruegge.

25         MR. SKROCKI:  He's trying to get this witness

-- he's trying his defense through this witness. This witness was never approached. If you need to have a proffer, he was never approached about this. He was never asked that question, as far as I know. It's not in the reports. The other thing, it's hearsay.

THE COURT: Maybe the thing to do is to have a discussion outside the presence of the jury where you can make this offer and see what he says. All right.

MR. COLBATH: Sure.

THE COURT: Let's do that.

(End bench conference.)

THE COURT: Ladies and gentlemen, we're going to take a short break here and sort this issue out. Please leave your notepads here in the courtroom and remember my admonition not to discuss the case.

We'll see you shortly. And we'll stay on record here.

(Jury absent)

THE COURT: Please be seated, everyone.

All right. So what we discussed, sir, just so you're in the loop on this, is the defense lawyer is going to ask you some questions here without the jury present, and then, depending on those answers, we'll decide what is presented to the jury, or I'll decide that.

 1          Go ahead, Mr. Colbath.

 2   BY MR. COLBATH:

 3       Q.   So my question was, Mr. Schmidt:  In the meeting

 4   with the FBI agent, did the agent or anybody -- was it

 5   just a singular agent that met with you?

 6       A.   The first meeting was one agent, yes.

 7       Q.   And then you had a second meeting, and was that

 8   also one agent?

 9       A.   Second meeting was one agent and I believe two

10   people from the attorney's office, U.S. attorney's

11   office.

12       Q.   From the U.S. attorney's office?

13       A.   Yes, excuse me.

14       Q.   And then some more communication with a different

15   FBI agent in a third meeting?

16       A.   Yes.

17       Q.   And then the last communication was the

18   spreadsheet information?

19       A.   Yes.

20       Q.   Were you told in the process here of arriving at

21   your opinion and related to your testimony here, that

22   prior to consulting you that the FBI had had members of

23   their own forensic audio/video and image analysis unit

24   review this same video and try to make the same

25   determination as to what the make and model was of the

1　car that was depicted?

2　　A.　I don't recall being told that particular

3　information, no.

4　　Q.　Okay.　Do you recall the names either Chris Iber

5　or Richard Vorder Bruegge or Gerald Richards, all

6　examiners?

7　　A.　No.

8　　　　MR. COLBATH:　Those are the questions I would

9　have asked, Your Honor.

10　　　　THE COURT:　All right.　So you have made the

11　proffer.　What's your position now on presenting that to

12　the jury in light of the witness's response?

13　　　　MR. COLBATH:　My position is that the

14　government has proffered Mr. Schmidt as an expert.　They

15　have already elicited what information the FBI provided

16　him.　I think it's fair for me to inquire if there could

17　have been relevant things or information that we believe

18　may have added to or detracted from his expert analysis.

19　　　　I think it's fair to inquire whether or not the

20　FBI provided him all the information they could or

21　information that might have swayed his confidence one

22　way or the other in his determination.

23　　　　THE COURT:　All right.　Thank you.

24　　　　MR. COLBATH:　I think it could have made a

25　difference if he had known other people had conducted

1  the same thing.

2        THE COURT:  All right.  Mr. Skrocki?

3        MR. SKROCKI:  No change in our objection.

4  There is no foundation.

5        THE COURT:  Well --

6        MR. SKROCKI:  And it's hearsay.

7        THE COURT:  Well, you can under the -- what

8  evidence rule is it -- 703 have information that is

9  hearsay come in with the expert.

10        But in any event, I will allow the inquiry onto

11  this topic based on the theory that was articulated that

12  this information may have been of use to the expert and

13  wasn't provided to him.  And then either side can ask

14  whether it may have made any difference.  I don't know.

15        But in any event, I do see that there is going

16  to be a sufficient foundation based on the

17  representations of counsel.

18        And with regard to what we were discussing at

19  the sidebar, a good faith basis, that there would be

20  evidence that there was this additional testing.  So I

21  will allow the inquiry.  It was helpful to have it taken

22  up outside the presence of the jury.

23        So questions or clarifications on that ruling?

24        MR. COLBATH:  No, Your Honor.

25        THE COURT:  Mr. Skrocki?

1          MR. SKROCKI:  Yes.  I think it needs to be

2    limited to that question alone.  I can tell you what's

3    going to happen is we're going to inquire with this

4    witness about did you know that these world-renowned

5    experts couldn't make a conclusion about what's on the

6    video.

7          Now, they are going to call those people and

8    they can come in, but to explore this in-depth with this

9    witness is improper.

10          THE COURT:  Mr. Colbath, would you concur, to

11    limit it to not the results of testing, but that they

12    had done testing that was inconclusive, as I understand

13    it, and leave it at that?

14          MR. COLBATH:  I'm sorry.  That last part?

15          THE COURT:  As I understand it, these experts

16    would say they had done testing and it was inconclusive.

17          MR. COLBATH:  Actually, their testing was they

18    were not able to make a make/model or characteristic

19    determination.

20          THE COURT:  All right.  And would you agree

21    that's going to be their testimony?

22          MR. SKROCKI:  Except Vorder Bruegge was able

23    to.

24          THE COURT:  That's what I thought when I looked

25    at his report a while back.

1          MR. SKROCKI:  So it's just those two.  That

2     would be the end of the question.  And then we would

3     move on.

4          MR. COLBATH:  Yes, I'm not going to go into

5     their reports or belabor any of their information.

6     Mr. Schmidt wasn't shown that, so I'm not going to go

7     into any of that.

8          THE COURT:  But you're not going to represent

9     -- would you agree with Mr. Skrocki's representation of

10    Mr. Vorder Bruegge's conclusion?

11         MR. COLBATH:  He said he was unable to exclude

12    and unable to include the vehicle, which meant he could

13    not make a make or model determination.

14         MR. SKROCKI:  Now we're just getting more

15    complicated.  We've got layer upon layer upon layer of

16    qualifications as to what's appropriate and what's not,

17    which is why it's not appropriate to inquire of this

18    witness.

19         THE COURT:  I would say, "Were you informed of

20    any of the results of the FBI," and leave it at that,

21    not what the results were, just, "Were you informed of

22    any of those results."

23         MR. COLBATH:  That's fine.

24         THE COURT:  With that, thank you.

25         MR. COLBATH:  Your Honor, with the jury out,

1    could we have just a five-minute comfort break?

2              THE COURT:  That's fine.  Let's go off record

3    briefly.

4              DEPUTY CLERK:  All rise.  Court stands in a

5    brief recess.

6              (Recessed from 2:16 p.m. to 2:26 p.m.)

7              (Jury present)

8              THE COURT:  Please be seated, everyone.  Back

9    on record here.

10             Mr. Colbath, whenever you're ready, go ahead,

11   please.

12             MR. COLBATH:  Thank you, Your Honor.

13   BY MR. COLBATH:

14       Q.  I think, Mr. Schmidt, where I left off was that

15   we were talking about the initial meeting that you had

16   on November 20th of 2012, and I was asking whether or

17   not the FBI agent who was there visiting with you for

18   the first time had told you that his colleagues at the

19   FBI forensic audio and video and image analysis had

20   previously been asked to do the same viewing of the

21   video that you had?

22       A.  I believe that's where we were, and I don't

23   recall being told that someone else had previously

24   reviewed the video.

25       Q.  Did he mention, in case you were familiar with

1   the names, either the name Chris Iber or Gerald Richards

2   or Richard Vorder Bruegge?

3       A.   Not that I recall, no.

4       Q.   All right.  So before we talk about your viewing

5   of the video and whatnot, I wanted to make sure I

6   understood, I guess, your training and your experience

7   here.

8           You have been an engineer and a design person

9   with Honda -- that was the status of where you were with

10  Honda at the time the FBI came to you, right?

11      A.   I just want to correct, I wasn't really on the

12  design side, it was on the service side, but we worked

13  with the design teams.

14      Q.   All right.  Now, did any part of your work on the

15  service side of Honda involve video image analysis?

16      A.   No.

17      Q.   And do you have any training in forensic video

18  analysis?

19      A.   No.

20      Q.   Any training in what's called video

21  photogrammetry?

22      A.   No.

23      Q.   How about video comparative analysis where you

24  compare one to the other?

25      A.   No training, no.

1    Q.   All right.  How about any familiarity with

2    analysis or work with digital closed caption television

3    systems?

4    A.   No.

5    Q.   Training in statistics?

6    A.   Yes.

7    Q.   That was part of your engineering degree, I bet?

8    A.   Yes.

9    Q.   Statistics as it relates to digital image

10   processing?

11   A.   No.

12   Q.   All right.  And how about just generally

13   photography beyond just taking pictures yourself?  Any

14   special training in photography?

15   A.   No.

16   Q.   Okay.  So when you looked at this video for the

17   first time, you viewed it, as Mr. Skrocki showed it you,

18   I think it was Exhibit 62, did you just view it on a

19   computer or was there some other device you looked at it

20   on?

21   A.   First time, I'm sure it was on the computer, on

22   somebody's laptop, whether it was mine or the FBI

23   agent's.

24   Q.   And did you do anything to the video to be able

25   to get still frames or to manipulate it any way to look

1    at it like picture by picture, or was it just repetitive

2    viewing of the video?

3        A.   They provided me with the software program so I

4    could stop it and freeze frame it and go backwards and

5    forwards.

6        Q.   So you were able to watch it, not so much in a --

7    well, first, you could watch it just as a video like we

8    saw it in the courtroom here, you just see the car go

9    by?

10       A.   Yes.

11       Q.   But the software they gave you -- you didn't have

12   any training on running that software other than them

13   showing you how to manipulate it, I assume?

14       A.   That's correct.

15       Q.   But you knew enough about it to be able to just

16   slow the video down enough that you could go frame by

17   frame?

18       A.   I think you could do frame by frame.  I know you

19   could stop it and freeze frame it.  I could go --

20   essentially the frames that showed the vehicle, I could

21   look at those individually.  I don't know if I could

22   play it at different speeds or not.

23       Q.   You did that, right?  You looked at it both in

24   motion and frame by frame or freeze framed a number of

25   frames?

1    A.   Yes.

2    Q.   And you saw in the video that on this April 12th

3    video there were obstructions that obstructed most of

4    the roadway so you couldn't see the bottom of the

5    vehicle as it went through because of the cars in the

6    foreground?  Did you notice that?

7    A.   Yes.

8    Q.   Now, were you able in this software program they

9    gave you to blow up the video or zoom it in?

10    A.   I don't recall if you could zoom in -- how much

11    you could zoom in, other than taking a screen shot and

12    putting it into -- you know, whether I put it into

13    PowerPoint or something else to try and blow up the

14    image.  I don't recall the original software program,

15    whether it could zoom or not.

16    Q.   Did you do that?

17    A.   Yes.

18    Q.   So you put -- you took frames and then you tried

19    to blow them up and look at more detail?

20    A.   Yes.

21    Q.   Do you know what a pixel is?

22    A.   Yes.

23    Q.   What's your understanding of that, what a pixel

24    is?

25    A.   It's a -- I wouldn't say a geometric, but it's a

1  unit of measurement of screen resolution.  Or video

2  resolution, I should say.

3      Q.  And so on a video, the screen, the picture on the

4  screen is made up of pixels, these little geometric

5  elements that you described.  They are basically little

6  color blocks?

7      A.  Little -- yes, I don't know if they are color,

8  but they are image blocks, yes.

9      Q.  You referred to resolution.  What's your

10 understanding of nominal resolution?  What is that?

11     A.  I don't know what you mean by "nominal."

12     Q.  Well, how about just resolution?  What is

13 resolution?

14     A.  To me, resolution is the -- it would be the

15 amount of -- not the amount of detail, but it's a

16 measurement of the number of pixels, typically

17 horizontally and vertically, but it will give you the

18 resolution of that image.

19     Q.  Would you agree that resolution is the width and

20 the height of the image and the number of pixels that

21 make that up?

22     A.  I'm okay with that.

23     Q.  All right.  And do you know how far away the

24 unknown vehicle was from the camera?

25     A.  No, I don't.

1      Q.  Do you agree that the -- first of all, the camera

2   controls -- a camera controls its resolution?  It's like

3   our TVs, they are either high definition or low, they

4   have a resolution to them?

5          MR. SKROCKI:  I'm going to object; outside the

6   scope of direct, and outside the scope of his testimony.

7          THE COURT:  Mr. Colbath?  Why don't we have a

8   brief sidebar.

9          (Begin bench conference.)

10          MR. COLBATH:  So in the -- first of all, just

11   so the record is really, really clear, Mr. Schmidt wrote

12   no report.

13          THE COURT:  I understand that.

14          MR. COLBATH:  What I have is FBI 302s.  Nowhere

15   in the 302s does it say that they gave him a software

16   program, they left the ability with him to play and

17   freeze frame and apparently take images out.  I have

18   just learned this during my questions because I

19   inquired, and then he has now said that he took them

20   out, took pictures out, and in formulating his opinion

21   blew up pictures.

22          None of that was in his former testimony.  None

23   of that was in any of that 302s.  So if he's -- if

24   that's how he got his opinion, I'm trying to get his --

25   where I'm going with this is when you blow up the

pictures, it changes the resolution and makes them more
pixelated.  That's common knowledge.  You can even do it
on your iPhone and it becomes pixelated.  There is going
to be lots of testimony about that.  I'm trying to get
his understanding of it.  And I have to ask him about
these things.

I had no idea he even did it to get to his
opinion.  I think that's all fair inquiry.  It's the
analysis, but that's where I'm going.

MR. SKROCKI:  It's not relevant.  Pixels and
calculations and what resolution means at this point is
not relevant to his opinion of how he came to the
70 percent.  Now we're going into the basis of
photography and photogrammetry, how far away the camera
was, things of that nature.  And you know what's coming
up.  This is not appropriate to inquire.

THE COURT:  With this witness what I would like
you to do, ask him first if he relied on the blown-up
images in forming his opinion.  If he did, then I'll
allow the questions.

MR. COLBATH:  I'm not going too far into it.

(End bench conference.)

BY MR. COLBATH:

Q.  Mr. Schmidt, as part of your initial analysis in
trying to arrive at your 70 percent confidence in being

1   able to identify the vehicle, was your process that you

2   and I were just talking about, about watching the video

3   slowly, blowing up some of the pictures, looking at the

4   individual frames, did those help you in arriving at

5   that determination, your 70 percent determination?

6       A.  Yes.

7       Q.  Okay.  So that's the process you went through --

8   I mean part of the process you went through to be able

9   to see some of those things you said that led you to

10  your 70 percent belief that you were looking at a Honda

11  CR-V?

12      A.  Yes.

13      Q.  And so I just want to make sure that -- did you

14  experience, when you blew them up, they become even more

15  pixelated than they already are on the video, right, you

16  saw that?

17      A.  Yes.

18      Q.  And you are probably generally aware of that, or

19  are you generally aware that the farther away from the

20  camera that an item is, the less pixels there are in it

21  on an image?

22      A.  Depending on the size of the object, yes.

23      Q.  Depending on the size of the object and how much

24  space it takes up in the picture, the smaller it is, the

25  smaller the pixels?

1      A.   The fewer pixels, yes.

2      Q.   Excuse me, not the smaller the pixels, but the

3   fewer number of pixels?

4      A.   Correct.

5      Q.   A pixel is always the same size, it's in the

6   image?

7      A.   Yes.

8      Q.   And so was your software program that the FBI

9   gave you and that you were using to blow these up and

10  look at this, did it account for the motion in there,

11  the blur that is caused by the motion?  Did you adjust

12  anything for that?

13     A.   No, I didn't adjust anything for that.

14     Q.   But certainly watching the video you saw the

15  blur?  I mean you saw it because of the motion that

16  there was some blur?

17     A.   Yes.

18     Q.   And again, that was related to the speed that it

19  was ran at as well as the distance?

20     A.   The speed the vehicle was going, the number of

21  frames per second the camera can process and the

22  distance, yes.

23     Q.   Now, during this first meeting on November 20th,

24  what you told the agent after making an initial

25  assessment was you couldn't be 100 percent sure it was a

1    CR-V, but you did not share with him at that point, he

2    didn't ask you to put a number on it?

3        A.   Correct.

4        Q.   And then it was about probably a week, a week

5    later, you talked to the agent, and was it the second

6    interview where you had the attorneys with him?

7        A.   The second in-person interview had the attorneys.

8    I don't know if there was a phone conversation in

9    between the first and the second.

10       Q.   But in the second one, besides asking you about

11   the possibility of this being the Honda CR-V, the 2001

12   Honda CR-V that matched the VIN, they asked you about

13   whether it might be a Ford Escape?

14       A.   At some point that came up in a conversation,

15   yes.

16       Q.   You told them at least proportionately a Ford

17   Escape would be similar in height, similar in overall

18   proportion size?

19       A.   Yes.

20       Q.   And at that time, you were unsure about the

21   Hyundai models, the Kia models, some of those less

22   popular models, correct?

23       A.   Correct.

24       Q.   And again, they started -- that was the first

25   conversation with them about possible other models

1  beyond the Honda CR-V that was only talked about in the

2  first conversation?

3      A.  I believe so, yes.

4      Q.  Okay.  Then I think it was December 17th of 2012,

5  the FBI agent came back with some of the government

6  attorneys.  You said two government attorneys came with

7  him at that point?

8      A.  Yes.

9      Q.  And it was at that point you were asked to put a

10  number on it and you were also shown this additional

11  video or some additional videos?

12     A.  Yes.

13     Q.  And I thought I heard you tell Mr. Skrocki that

14  in his questions watching the additional video did not

15  change your opinion or did not weigh into your

16  70 percent confidence?

17     A.  That was my answer, correct.

18     Q.  And so I want to make sure we understand that.

19  You still had the video from April 12th where the

20  vehicle you didn't know -- they didn't know what it was.

21  That the one you were asked to identify?

22     A.  Correct.

23     Q.  This other video -- they actually showed you a

24  couple other videos.  Those were videos that you

25  understood the government had made using the same CR-V

```
1    with the VIN number they brought you, right?
2       A.  I don't know if it was the exact same, the exact
3    same VIN, but they had driven a CR-V, yes.
4       Q.  That was one they had created?  It was one they
5    knew what it was?  It wasn't one that there was any
6    question about?
7            MR. SKROCKI:  Objection; speculation as to what
8    the people knew creating the video.
9            THE COURT:  That's sustained.
10           MR. COLBATH:  Sure.
11   BY MR. COLBATH:
12      Q.  You understood in looking at these other videos,
13   it was a known CR-V?  You were actually watching a CR-V,
14   you didn't have to guess at that one?
15      A.  Correct.
16      Q.  And those videos were clearer in your mind or --
17   well, they were clearer than the first one you were
18   shown, the April 12th one?
19      A.  Yes, I believe I noticed the lighting conditions
20   and the weather conditions were different, so there was
21   more -- yeah, they were clearer.
22      Q.  Okay.  But despite being clearer, you had sort of
23   settled on 70 percent, and that number didn't really
24   change for you, that was your confidence of where you
25   were at?
```

1    A.  Yes.

2    Q.  Now, one of the things I heard you say about the

3    characteristics that made this possibly a Honda CR-V in

4    your mind was with regard to the wheelbase.  What's the

5    wheelbase on a first-generation Honda?

6    A.  I don't remember off the top of my head.

7    Q.  So can you pull up -- the specification sheet

8    might be -- I didn't write down the exhibit number.  94.

9    If we could pull up 94.

10    It's on there, right, that specification sheet?

11    A.  Yes.

12    Q.  I think it's 103.6 inches.

13    A.  Wheelbase looks like 103.2 to me.

14    Q.  I was close, 103.2.  Okay.  By wheelbase, you're

15    talking about the distance between, on a profile view, a

16    side view, the distance between the center of the two

17    tires?

18    A.  Yes.

19    Q.  All right.  And the wheelbase of a Ford Escape,

20    do you know what that is?

21    A.  No.

22    Q.  How about a RAV4?

23    A.  I don't know off the top of my head.

24    Q.  Honda Santa Fe?

25    A.  Do you mean Hyundai Santa Fe?

1    Q.   Excuse me.  Hyundai, yes, Santa Fe.

2    A.   I don't know off the top of my head.

3    Q.   All of the compact SUV models, I mean certainly

4    you know, sir, that they are all within a range of less

5    than ten inches approximately?

6    A.   Probably, yes.

7    Q.   And so that means for either wheel we're talking

8    if you move it four to five inches, we have got the

9    range of probably all of those similarly proportioned

10   vehicles?

11   A.   Not having the numbers in front of me, but that's

12   probably close.

13   Q.   Sure.  Now, you're not saying that you can tell

14   by just looking at the video, even if you freeze frame

15   it, what the wheelbase is on that car in the unknown

16   video, are you?

17   A.   No.

18   Q.   And you said -- you mentioned the -- did you use

19   the term overhang?

20   A.   Yes.

21   Q.   And overhang is what?

22   A.   The amount of the vehicle that sticks out in

23   front of the front wheel and it sticks out behind the

24   back wheel, so it's front overhang and rear overhang.

25   Q.   Again, when you look at those on the video, even

the stopped frames, you can't tell how many inches are

in front of the wheel or behind the wheel in that video

surely?

    A.  I can't measure the exact number of inches, but

you can get a feel for the proportions relative to other

parts of the vehicle.

    Q.  So you're looking at proportionally, not that you

have some ability to tell how many inches that is?

    A.  Yes.  It's relative to the rest of the vehicle,

the rest of the image.

    Q.  And you base your proportions on where you

believe it looks like with the pixels where the wheel

begins and where the bumper ends, for instance, on the

front -- well, or on the back, from the edge of the tire

or the bumper going either direction?

    A.  Yes.

    Q.  And do you have any way of knowing what the

resolution of that camera, sir, about how much each

individual pixel, how big in inches where the car is on

the road, how big each pixel would be?

    A.  No, I don't know.

    Q.  In blowing the pictures up, you didn't try to run

any calculations or do any mathematical things on the

pictures, you were eyeballing those proportions?

    A.  Correct.

1    Q.  I assume your intimate and longstanding knowledge

2    of the CR-V and familiarities with Hondas is something

3    that you relied on in doing that?

4    A.  Doing what?

5    Q.  Your analysis of trying to figure out what you

6    were looking at?

7    A.  Yes.

8    Q.  Okay.  And at the time in 2012 when you did that

9    work, you came -- you had been done with the Honda CR-V

10   model.  What model were you working on or primarily

11   responsible for in 2012?

12   A.  2012, I had changed divisions and I was working

13   in the law division.

14   Q.  Okay.  So you had left the service department

15   sort of altogether, the regular work you had been doing

16   in the service area?

17   A.  Yes.

18   Q.  Okay.  So what kind of precautions did you take,

19   sir, or things did you consider to try and keep your

20   sort of intimate familiarity with Hondas and almost

21   exclusive work with Hondas from sort of predisposing you

22   to see a Honda instead of some other make or model of a

23   vehicle?

24   A.  Well, again, being familiar with the other

25   competitor vehicles in that class.  I mean we have

talked about how that's a small SUV.  What other small

SUVs are out there?  I'm certainly aware of those.  And

what other SUV could it be?  What other ones fit in what

I see in the video?

Q.  Right, but your experience and your day-to-day

activities certainly made you intimate -- exponentially

more familiar with the Honda CR-V and the Honda models

than any other models?  That was true, wasn't it?

A.  Sure.

Q.  Well, would you agree there probably was not

anything you could do, other than to try to consider

other models, to balance that out?

A.  Well, I mean the spreadsheet that I was provided

had photos of all the other vehicles.

Q.  Okay.  It's a big spreadsheet, isn't it?

A.  Yes.

Q.  You were right, it had a lot of data points.

We'll talk about those in a minute.

         When you watched the video, what you said one of

the things that stood out to you was the color?

A.  Yes.

Q.  And you felt it was -- you thought it was a

brighter blue?

A.  Yes.

Q.  Now, did you do anything with your computer

software or were you aware of anything being done with
the camera system or the computer software to affect the
color that you were seeing?

      MR. SKROCKI:  Objection as to camera system and
foundation.

      THE COURT:  That's sustained.

      MR. COLBATH:  Let me rephrase that if I could,
Your Honor.  Thank you.  It was a bad question anyway.

BY MR. COLBATH:

   Q.  Did you do anything with the video that you had
or the software you were running to adjust the color or
do anything to the color on the pictures that you looked
at?

   A.  No.

   Q.  And you said, I think in your earlier testimony,
that you were aware that the color is affected by
lighting and reflection?

   A.  I don't know if I said that about the color.  I
don't recall saying that.

   Q.  Maybe you were referring to the video, the other
video that you saw, you said it -- the light was better
and the --

   A.  Yeah, I said for the later videos, the lighting
was different, whether it was due to the position of the
sun or weather conditions, so it appeared different.

1    Q.   It actually made the color of the vehicle appear

2  somewhat different, didn't it?

3    A.   Yes.

4    Q.   Okay.  And so depending on the conditions, it

5  sounds like, of the video system's capture of the

6  vehicle, you could have the vehicle's colors changing?

7    A.   Maybe the appearance.  I don't think the actual

8  colors changing, but the appearance maybe changing, yes.

9    Q.   The vehicles might not have been the same color

10  as well, of course?

11    A.   Of course.

12    Q.   I want to ask you about -- see if you could list

13  for me again the characteristics about the vehicle that

14  helped you evaluate or form your opinion of 70 percent

15  confidence.

16    A.   So I talked about -- we talked about the overhang

17  already, the front and rear overhang, distance between

18  the wheels or the wheelbase, the angle of the

19  windshield, angle of the front, angle of the rear,

20  length of the hood, length of the roof, height of the

21  green house, height of the vehicle above the road,

22  position of lighting, spare tire.  What else did we talk

23  about?

24    Q.   Okay.  So we have talked about the overhang.

25  With the -- again, with the length of the roof or the

length of the hood, you're not able to determine those
from either still frames or video, are you?

A.  If you're talking about determining the actual
length, no, but again I'm looking at the proportions
relative to the rest of the vehicle.

Q.  Okay.  And the angles of the moving vehicle, or
the angles as a still frame sits there depend on --
you're talking about, for instance, the A post is called
that piece of metal that goes from the tire up to or the
hood up along the front door along the edge of the
windshield?

A.  The A pillar?

Q.  Pillar.  I'm sorry.

A.  Yes.

Q.  So at what angle that sits depends on where you
start taking your measurement and the two points that
you connect, right?

A.  Yes.

Q.  And so if those are off at all, the angles
change?

A.  Yes.

Q.  And again, you're just looking proportionally
because you don't have any way to make that up-close
determination, like you would of a photo right next to
the vehicle?

1    A.  Correct.

2    Q.  And you didn't -- you noticed in the, I assume --

3  did you notice in the April 12th video, the original

4  video of the car that they don't know what it is, there

5  were never --

6         MR. SKROCKI:  Objection; form of the question,

7  Your Honor.

8         THE COURT:  That's sustained.

9  BY MR. COLBATH:

10    Q.  Were there ever brake lights operating?

11    A.  Not that I could detect.

12    Q.  And were there lights on, either headlights or

13  taillights?

14    A.  I don't recall.  I know I talked about lights

15  with the FBI, but I don't recall whether the lights were

16  on or off.

17    Q.  You felt somehow like you could see the

18  taillights to know that they may be above the midline of

19  the car?

20    A.  There appeared to be some brighter sections up

21  near the window area, which would be where the lights

22  would be on the CR-V.  Those lights are also reflectors.

23    Q.  By brightness you mean on the video or on a still

24  frame, a white or lighter area, not bright red?  You

25  didn't see red on there, did you?

1    A.   I did not see red.

2    Q.   Didn't see orange?

3    A.   I don't recall seeing orange.

4    Q.   And then the only other reflector color in a

5    Honda CR-V taillight would be clear or white for the

6    reverse light, I assume?

7    A.   Right.  I'm looking at that versus blue, which

8    would be the body color if there were no lights there.

9    Q.   Or bright -- reflection off, for instance, the

10   rear glass of the hatchback of whatever the rear window

11   might be, that could be a bright spot?

12   A.   Yes.

13   Q.   Okay.  So let's talk about, sir, this spreadsheet

14   for a minute.  So eventually, during the fourth time

15   that -- the fourth meeting that the FBI agents came back

16   to you, that would have been in February of the

17   following year roughly, February 13th?

18   A.   Yes.

19   Q.   And they had this big long list of vehicles and

20   they had makes and models and photos as well?

21   A.   Yes.

22   Q.   And did you look through page after page, all 400

23   -- I forget -- all 425 vehicle models that Mr. Skrocki

24   asked you about?

25   A.   Yes.

1          MR. SKROCKI:  Are you going to admit that?

2          MR. COLBATH:  No.

3          MR. SKROCKI:  It's being published for the jury

4    for them to see without it being admitted as an exhibit.

5    On that basis, I have an objection.  If he wants to

6    admit it, we're happy to have it admitted into evidence

7    if he wants to do it that way.

8          THE COURT:  Mr. Colbath, if it's not going to

9    be admitted, please don't display it.

10          MR. COLBATH:  That's fine.  We can admit it.

11          THE COURT:  What's the exhibit number?

12          MR. COLBATH:  Well, I didn't intend to admit

13   it, so I don't have another copy, and I certainly don't

14   have it marked as an exhibit.  I just have two more

15   questions about it, so I'll just do it that way, Your

16   Honor.  I would be happy to, but that's all I have got

17   right there.

18   BY MR. COLBATH:

19     Q.  So there was roughly 425 vehicle makes and models

20   in there?

21     A.  Yes.

22     Q.  And then I think after the fact they may have

23   called you back and added a few additional ones, but you

24   looked at them, all that they asked you to, over 400?

25     A.  Yes.

Q.  And there was -- if we are talking about size and proportion of a vehicle and those types of things, there was 169 different makes and models that you were able to find that you could not exclude as fitting within the same size proportions as the one you saw in the video, correct?

A.  I think that was one of the numbers, yes.

Q.  They actually had a chart -- a space on the spreadsheet they sent you where you could say, "No, it's excluded because," and you could give a reason, "too big, too small," or "could not exclude," so that means it would fit?  You marked the sheet, didn't you?

MR. SKROCKI:  Objection, Your Honor, it's not in evidence.  He's describing it in detail.  Either we admit it or we move on.

MR. COLBATH:  I could rephrase my question.

THE COURT:  All right.  Thank you.

BY MR. COLBATH:

Q.  Did you mark for the FBI which ones you could exclude or include?

A.  Yes.

Q.  All right.  And it was around 160-plus different models that fit the right size and proportion to what you saw in the video?

A.  At some point, I think that might have been the

1    number.  I know at one point I got down to 22 as well.

2              MR. COLBATH:  That's all the questions I have

3    for you, sir.

4              THE COURT:  Go ahead, Mr. Skrocki.

5              MR. SKROCKI:  We have no redirect, Judge.

6              THE COURT:  All right.  We can release this

7    witness, counsel?

8              MR. COLBATH:  We can from my perspective.

9              MR. SKROCKI:  Yes, ma'am.

10             THE COURT:  Thank you, sir.  You may be

11   excused.

12             (Witness excused)

13             THE COURT:  We need to take up a topic here

14   before the government's next witness?

15             MR. SKROCKI:  Yes, Your Honor.

16             THE COURT:  All right.  Ladies and gentlemen,

17   there is a topic I need to address with the lawyers

18   before the next witness.  I'm going to attempt to do so

19   as promptly as feasible and we'll get you back in here

20   as soon as feasible.

21             Please leave your notepads here.  Remember my

22   admonition not to discuss the case, and we'll see you as

23   quickly as possible.

24             (Jury absent)

25             THE COURT:  All right.  So we have Mr. -- is it

 1    Becker?

 2              MS. SHERMAN:  Let me make sure he's on his way

 3    in.

 4              THE COURT:  Great.  Thank you.

 5              (Pause)

 6              THE COURT:  Good afternoon.  If you could come

 7    up to the witness stand, please, and we wanted to take

 8    up a few topics with you first.  If Madam Clerk could go

 9    ahead and administer an oath.

10              (Jury absent)

11              (Oath administered to the witness)

12              DEPUTY CLERK:  For the record, can you please

13    state your full name and then spell your full name.

14              THE WITNESS:  Steven Becker, S-t-e-v-e-n,

15    B-e-c-k-e-r.

16         STEVEN BECKER, GOVERNMENT WITNESS, SWORN

17                      DIRECT EXAMINATION

18                      (*Daubert* Hearing)

19    BY MS. SHERMAN:

20       Q.  And the first thing I wanted to ask you, in your

21    report and in the PowerPoint, there is a green box

22    image; do you recall that?

23       A.  Yes.

24       Q.  And the one -- there are two.  Can you describe

25    where you took those from?

       A.  Sure.  The darker green one, so to speak, is from
a police photograph, the ones from the listing, and the
other one is from the incident video.  It's a snip from
a portion of the still frame when the vehicle was
visible.

              THE COURT:  So April 12th?

              THE WITNESS:  April 12th when the incident
vehicle was visible.

BY MS. SHERMAN:

       Q.  Let's go through your background.  Why don't you
tell the judge about your education.

       A.  Sure.  I have a bachelor of science in mechanical
engineering from Worcester Polytechnic Institute in
Massachusetts.

       Q.  What year was that?

       A.  That was '92.

       Q.  Do you have another degree?

       A.  Yes.  A master's in business administration from
Syracuse University, and a certificate in traffic crash
reconstruction I, II and III from Northwestern
University.

       Q.  Let's talk about your career as a mechanical
engineer.  Tell us about what you were doing when you
first began in that career.

       A.  If I could start with college.

1    Q.  Okay.  What were you doing during college in

2    relation to that?

3    A.  Yeah.  So first job when I was in college was

4    with Alliant Mini Supercomputers.  I was with Alliant

5    for three years.  There I was a systems admin and then a

6    network engineer designing, working with the software

7    systems for mini supercomputers.  I did the network

8    systems for the raster graphics group.

9    Q.  What's raster graphics?

10   A.  The raster graphics was when we were moving into

11   processing 3D graphics, so they were taking various

12   images and working them with 3D softwares and other

13   things and then processing them on our hardware.

14   Q.  And you were doing that at the beginning of

15   raster graphics, starting to do that?

16   A.  As far as our company goes, yeah.

17            THE COURT:  Let me try to focus us here, if I

18   can.  Is there a dispute about this witness's

19   qualifications, or is it more the reliability of the

20   opinion?  And it's fine if there is, but we may not need

21   this testimony at this time if that is not a topic in

22   dispute.  Mr. Colbath?

23            MR. COLBATH:  Your Honor, just because I'm

24   unfamiliar with Mr. Becker and he did not testify at the

25   last trial, I think I would prefer the government to do

1  the qualifications.

2          THE COURT:  All right.  Go right ahead.

3  BY MS. SHERMAN:

4     Q.  At some point, you left that position?

5     A.  Yes.

6     Q.  Where did you go?

7     A.  While in college, my senior project was with the

8  Naval Air Development Center working with delta wing

9  aircraft.  For that, we had designed and developed a new

10 method of augmenting the vortexes over the delta wings

11 and testing that in a water tunnel.  We used flow

12 visualization for doing that analysis.

13    Q.  When you say "flow visualization," was that done

14 with a computer?

15    A.  Both with photography as well as video analysis.

16 So we set up a scale in the water tunnel and entrained

17 different color dyes to look at how the vortexes formed

18 over the delta wings and then processed those and the

19 images.

20    Q.  Where did you go from there?

21    A.  From there, I went to, let's see --

22    Q.  Are you reviewing your CV?

23    A.  I just want to make sure I have the right

24 corporation.  CEI Corporation at New Venture Gear in

25 Syracuse.

1    Q.   What did you do there?

2    A.   There I was working with the design, development

3    of gearing and transmissions and performing noise and

4    vibration testing.

5    Q.   And after that?

6    A.   That's for automotive vehicles.  After that, I

7    went to work for modern engineering at Chrysler, so I

8    was physically located in Chrysler there doing, again,

9    similar type of work, design, development of vehicles

10   testing and redesign.

11        There we would use various sensors, including

12   cameras and everything else, for measuring how the

13   vehicles moved or how subcomponents moved in relation to

14   other components on the vehicle.  We would make a

15   variety of measurements based on those.

16   Q.   Would that be using photogrammetry?

17   A.   Yes.

18   Q.   After that, what did you do?

19   A.   Then I went to work for -- this one is a little

20   more convoluted.  I went to work back for New Venture

21   Gear directly, and then a few years later New Venture

22   Gear reverted -- they were a venture between General

23   Motors and Chrysler, and then they reverted back to

24   Chrysler, so then I was a Chrysler employee for a few

25   years.  And then they were finally bought out by Magna

1    Powertrain.

2        Q.   What were you doing for them?

3        A.   For them, I started out in the quality department

4    doing end of line testing.  We had sensors and cameras

5    and end of line system for recording each test of every

6    product that was going through the assembly line.  And

7    then we had areas where I noticed we couldn't improve

8    the quality any further, so I started working some of

9    the redesign and moved into the engineering design

10   development tests as a garage -- as the manager there.

11       There we had about eight test cells in

12   production.  I was still designing and developing all of

13   the end of line test machines.  We had probably 20 to 30

14   end of line test machines.  In all of those, as well as

15   in the development cells, we had surveillance video

16   systems set up as one of our sensors for making

17   measurements.

18       For example, like in a durability test cell, we

19   would measure the movement of the prop on the output

20   shaft relative to the system to see when the bearings

21   were getting looser prior to the whole thing exploding.

22       Q.   And when you were doing that, you indicated you

23   were doing it with surveillance.  Did that involve, that

24   analysis involve photogrammetry?

25       A.   Yeah.  Most of that was high-speed

photogrammetry, so we were using high-speed cameras.
Some of it was with general surveillance systems though.

Q. What year -- timeframe was that?

A. '97 to 2009.

Q. After that, what did you do?

A. And then another portion of that was still over
the road vehicle testing. When we were doing that, we
were setting up cameras in the front and rear sensors on
the vehicle as well as GPS for looking at how the
vehicle moved relative to the roadway or relative to the
off road track we were testing on.

    After that, they were closing my facility down,
and I was going to move to Michigan with them for the
relocation, but instead opted to move to Robson
Forensic.

Q. How long have you been Robson Forensic?

A. Since 2009.

Q. And what have you done for Robson Forensic?

A. At Robson, we have sort of two kind of groups,
which we drop our work into. One is litigation-based
work, and that's the Robson forensic work. And then we
have Fournier Robson for consulting and design
engineering, non-litigation based work.

    So in that capacity, I have designed machines for
removing snow off the roofs of tractor-trailers, done

1  acoustical testing, environmental testing, pump noise

2  testing, et cetera, crash testing.

3       And then on the Robson side -- and that's about,

4  depending on the year, 10 to 15 percent of my work.  On

5  the Robson side, I do testimony to try and resolve

6  litigation, primarily based in automotive, so whether

7  it's automotive products, automotive video analysis,

8  photography or crash reconstruction.

9     Q.  How many years have you been doing video

10 analysis, particularly photogrammetry?

11    A.  Since 1992, so that would be a lot.

12    Q.  Okay.  As part of photogrammetry, do you involve

13 the use of color analysis when you're talking about

14 vehicle identification?

15    A.  Sure.

16    Q.  Okay.  How long have you been using color

17 analysis?

18    A.  Again, since '92-ish.

19    Q.  So in your experience, it's kind of -- it's part

20 and parcel together in your analysis?

21    A.  Well, sure.  Every pixel -- it goes back to

22 what's called digital image processing.  Digital image

23 processing is the concept of taking an image and making

24 it digital instead of like film or how it used to be in

25 the olden days.

1          And digital image processing is the numeratizing

2   of each individual pixel.  That's done through the RGB

3   color scheme.  That's been done since digital image

4   processing has been created in the 1960s.

5       Q.  Do you use -- when you do color analysis, do you

6   use that RGB?  Sorry, is it RBG, RGB?

7       A.  RGB, red, green, blue.

8       Q.  Red, green, blue.  Do you use that scale or chart

9   or whatever in your color analysis?

10      A.  Yes.

11      Q.  And in terms of color analysis, can you describe

12  for the judge the standards you followed when you were

13  being asked to do a vehicle -- well, let me stop there.

14          How many times have you been asked to do a video

15  analysis, whether it be comparison or something else?

16      A.  100 to 200 times.

17      Q.  Have you ever been asked to do a vehicle

18  identification?

19      A.  Yes.

20      Q.  How many times?

21      A.  Identification, probably about 50.

22      Q.  Okay.  And each of those have included the piece

23  of color analysis as well?

24      A.  Depending, yeah.  I mean, in the nighttime ones,

25  sometimes color is not too viable.  They still ask for

1    it, but it's just not a viable option.

2        Q.   So in daytime ones, it's involved in all of them?

3        A.   Yes.

4        Q.   Have you ever testified in court before in

5    regards to photogrammetry, including color analysis?

6        A.   Yes.

7        Q.   How many times?

8        A.   Probably 10-ish.

9        Q.   And was that state court or federal court?

10       A.   Both.  Federal court the one that jumps out is

11   Hobbs, Cohen in Syracuse, New York.  In state court, I

12   was in trial just back in May.

13       Q.   Let's talk about the standards you use in color

14   analysis.  Can you describe for the judge whether you

15   use industry standards in terms of color analysis?

16       A.   Yeah.  I mean the RGB color scheme originated in

17   the 1800s, 1860s by a guy name Helmholtz.  They used a

18   color wheel and they would spin that wheel so that you

19   would see color for their imaging.

20            And then that concept has been applied throughout

21   the whole eons of digital analysis.  There is no real

22   other digital quantification of color except for RGB,

23   hue, luminance and saturation.

24       Q.   And in terms of photogrammetry, are you familiar

25   with, I guess maybe the industry standard isn't the

right word, how photogrammetry processing works and the

standards by which you undertake that process?

    A.  Yes.

    Q.  And can you tell the judge a little bit about, in

general, how that process works?

    A.  Sure.  Basic photogrammetry is understanding

objects relative to other objects inside digital images.

So of that you have to first understand how the digital

image is processed or acquired, and that all begins with

the physics of light.

       So everyone in the room is familiar with sort of

the mirage effect.  When you're looking out at a long

horizon line you don't see the ground, you then see a

mirage.  You're not really seeing a mirage.  What you're

seeing is the reflection of the sky.

       So that's based on your observer's angle of

incidence for the object you're viewing, as well as

where the light source is.  And that's really the two

key characteristics for any photograph analysis, you

start there, you understand where the light source is

coming from.  So that tells you about shadows.  It tells

you about your color composition, whether you've got

flat light, bright light, background light, top light,

whatever you're looking at.

       And then you move on to characteristics of

objects or sizing. Depends on what you're doing.
Sometimes I'm not too keen on the specific
characteristics. I just want to make some measurements.
Other times, I'm not too keen on measurement. I just
want to look at the various characteristics of objects.

So you follow those sort of pathways depending on
what your final purpose is. Everything begins with a
scientific method. You start out with a hypothesis or a
question you want answered, and then you let your
investigation lead you to what you can ultimately
conclude. And then you test your hypothesis to
determine whether or not that hypothesis was met by your
investigation.

So in this case, I had sort of two hypotheses.
One was to determine the make and model of the vehicle,
and the other was to determine if it was consistent with
Wells' vehicle. So that led me down the rest of the
path that I can explain later.

MS. SHERMAN: Okay. I think those are all my
questions, Your Honor.

THE COURT: All right. Mr. Colbath, go ahead,
please.

CROSS EXAMINATION

BY MR. COLBATH:

Q. Sir, there are no industry standards, published

1  industry standards for the industry known as

2  photogrammetry, video analysis, are there?

3      A.  No, there is.

4      Q.  What are they?

5      A.  Well, there is one from the scientific working

6  group from the FBI digital -- one second -- digital

7  evidence.  They call it best practices for forensic use

8  of photogrammetry.

9          And then there is a number of companies out there

10  that teach photogrammetry, and those are widely accepted

11  and accepted in courts.  There is a number of cases.

12      Q.  Widely accepted by who?

13      A.  The court.  There is a software called

14  PhotoModeler.  There is software called PC Crash.  There

15  is a whole number of them, Faro Scene.  Everybody and

16  their brother now is doing 3D laser scanning.  The

17  reason many times they are doing the 3D laser scanning,

18  which has also been accepted in court, is that you want

19  to use that to match or create an inverse camera

20  projection.

21      Q.  And --

22          THE COURT:  Can I interrupt?  Going back to

23  those standards from the FBI, did you apply those

24  standards in doing the work in this case?

25          THE WITNESS:  Yes.  Actually, I only mentioned

1    one of them, the photogrammetry one, but there is also

2    another one for photo comparisons, which I also applied.

3              THE COURT:  Thank you.  Go ahead, please.

4    BY MR. COLBATH:

5        Q.  And do you happen to have -- I know I saw you

6    referring up there, referring to something.  Do you have

7    the standard operating procedure, the FAVU standard

8    operating procedure on photogrammetry there with you?

9        A.  I do.

10       Q.  When did you get that?

11       A.  About 2016, '15.

12       Q.  Okay.  Does it have a number?  Those things are

13   usually referred to by number.

14       A.  The one I printed out is version one.  There is a

15   date on it.  September 29, 2015.

16       Q.  September 5th --

17       A.  September 29th.

18       Q.  2015?

19       A.  Yes.

20       Q.  And that is the FAVU standard operating procedure

21   on photogrammetry?

22       A.  I don't know what FAVU is, but it's the

23   scientific working group on digital evidence.

24       Q.  Scientific working group.  Okay.  So let's be

25   sure.  Scientific working group.  That is their

1  photogrammetry standard within the industry or best

2  practices?  Is it one or the other?

3     A.  It's a best practice.

4     Q.  And that working group, sir, you're aware has

5  been disbanded, they finished their work after

6  developing the best practices?

7     A.  I haven't seen an update since then.

8     Q.  Okay.  And then you referred to there is another

9  -- there is another one that deals with photo comparison

10  and you also applied that?

11     A.  Yes.

12     Q.  What is the -- what version do you have there of

13  that?

14     A.  I didn't print that one out.

15     Q.  Do you recall the number or the title of it?  Was

16  it again from this scientific working group?

17     A.  Yeah.  It would have been best practices for

18  photographic comparison or something of that nature.  I

19  might have referenced it in my report.

20     Q.  And those software companies, the PhotoModeler or

21  the other companies you listed there, what they develop

22  are standards and best practices or standards and

23  practices for utilizing their software products, their

24  programs?

25     A.  Sort of.  It's actually a process that can be

applied across a lot of products.  You don't need to use

just their software.  In other words, when you go to the

training class, like I just had a refresher on PC Crash

last month, and that's the same process as what I had

used when I went to the Faro training.  And it's the

same process I had learned when I had taken the

PhotoModeler training.

Q.  While the processes are the same though, there is

no collective body that within the photogrammetry

community, if you will, that has published a singular

set of standards that are peer reviewed and tested that

say "when conducting photogrammetry, these are the

industry standards that you follow," or is that what the

group you were referring to was?

A.  No.  Neither is correct.

Q.  Okay.

A.  The scientific working group has a good practice

that's consistent with everyone else's understanding in

the industry that I'm familiar with, but there is a

number of published articles from SAE, Society of

Automotive Engineers, on how to do various practices

with both photogrammetry and reverse projection.

THE COURT:  You cited them in your report.

A.  One of them is cited in my report.  Another is a

book, Handbook of Digital Forensics, by Hogue and Boone

1  (phonetic), and then people are very familiar with the

2  process in our field.

3      Q.  So, sir, I want to -- and in following those

4  industry standards and arriving at the opinions you

5  arrived at, to what standard or to what degree of

6  certainty did you arrive at your opinions?

7      A.  Reasonable degree of professional and scientific

8  certainty.

9      Q.  And it was in fact then, in your estimation,

10 scientific analysis and processes that you applied per

11 those industry standards that you followed to allow you

12 to reach and ultimately make your conclusions?

13     A.  Yeah, I mean overall it's the scientific method

14 in general.  Those are some of the investigative tools.

15     Q.  Can you just share with us then an outline of the

16 basic methodology?  First, you talked really about

17 having two pieces of your work; first, a make/model

18 determination, the video analysis, and then a "is it

19 consistent with the Wells' vehicle" photo comparison.

20 Did I get those right?

21     A.  Yes, basically.

22     Q.  So, first, with the make/model determination,

23 what was the methodology you used there?

24          THE COURT:  I'm going to interrupt here,

25 because this report has been out for quite some time and

1  I am interested in you focusing not on an entire cross

2  exam of this witness, which we're going to have in front

3  of a jury, I hope, this afternoon. I would like you to

4  focus on the part of the methodology, or maybe you could

5  articulate for me the part of the methodology that you

6  find does not meet *Daubert*.

7          MR. COLBATH: Sure. Thank you, Your Honor.

8  BY MR. COLBATH:

9      Q. Sir, in order -- first of all, I did not see in

10 your report that you made that you conducted a

11 make/model determination, the first of the two

12 hypotheses that you described. Did I miss that in your

13 report or is there a section you can point me to where

14 that is conducted?

15     A. Sure. I'll reference my report. From page 23 to

16 28. Well, I'm sorry. To 27, not 28. And then the

17 finding -- there is multiple findings, but the one,

18 finding number three in particular, that the vehicle

19 make/model -- I didn't say "make," I just said "model,"

20 "consistent with the blue of the vehicle of interest is

21 a 2000 or 2001 model year Honda CR-V or a '95 to '98 and

22 2001 to 2004 Isuzu Rodeo. The vehicle would have to be

23 medium blue in color, have a front vehicle protector bra

24 that extends beyond the headlights, non-tinted side

25 windows, dark rims or wheel covers and dark non-body

1    colored bumpers and a dark non-body colored spare tire."

2        Q.   In performing that analysis, sir, just in a

3    general sense, without going through all the details so

4    we don't get bogged down in this, but first of all, did

5    you use from pages 23 to that opinion both of the videos

6    provided by the government?

7        A.   I don't know what you mean by both of the videos

8    that were -- are you talking about -- sorry.  The

9    April 12th and you're talking about the April 19th?

10       Q.   Correct.

11       A.   The April 12th is what's used for the specifics

12   of the make and model.

13       Q.   Okay.

14       A.   The April 19th is for the comparison to the

15   Wells' vehicle and for the make and model, because with

16   both of them you're able to further identify

17   characteristics.

18       Q.   So did you run, for instance, a color analysis on

19   the images from, or some of the images from the

20   April 19th video?

21       A.   No.

22       Q.   There were not -- those are not depicted on --

23       A.   Not for the make and model determination.

24       Q.   For any of your -- for either determination?  It

25   appears that's what it looks like you did on page 12 and

page 13 of the report.  I see there is color comparison

analysis, graphs, some kind of generated graphs for both

the vehicle of interest as well as the Wells' Honda

CR-V.

    A.  Right, and that's not for the make/model

determination.  That's for the comparison on Wells.

    Q.  In order to make the make/model determination it

looks like, if I go back to page 23, which was the first

page that you said, in doing an angular comparison, it

looks like you utilized both a 3D model, the April 12th

video and the April 19th video, which you have labeled

as the Wells' CR-V in the bottom of the three figures

there?

    A.  Yes.  Again, that was for the comparison to the

Wells' vehicle.

    Q.  Okay.

    A.  Not for the model determination.  Well, for the

3D model and the one above of course.

    Q.  Any analysis, testing or determination from using

the April 19th video go into the makeup of the make and

model determination?

    A.  Yes.  In that analysis, in that video,

comparative characteristics were identified.

    Q.  And so you couldn't have made -- for instance,

you couldn't have made -- you could have made

comparative characteristics -- you couldn't have
identified those comparative characteristics without the
April 19th video, could you?  Let's use the bra is
probably the best example.

A.   No, I wouldn't quite say that because the bra is
visible as a disturbance behind the headlights in both
videos, so that would have been noted as a
characteristic.  There is also the geometry behind the
vehicle for the spare tire carrier.  That was noted
either with or without the video.

The video, the April 19th video added to the
corroboration of the identification of the key
characteristics because they were known attributes from
a known vehicle in the video.  But I also used other
vehicles from the April 12th for other characteristics.

Q.   So I guess, sir, my point is this:  I did not see
anywhere in your report where you took the April 12th
video, the unidentified, unknown video and did an
independent analysis that did not incorporate in some
way, shape or form some attributes or some aspects of
things you took from the Wells' CR-V or the April 19th
video.

There was not two separate processes here.  It
sounds like one added to the other, if I heard you
right.

 1    A.  One was corroborative of the other.  In other
 2  words, the vehicle make and model determination could
 3  run completely independent of the April 19th video, but
 4  it didn't have to because I had the April 19th video
 5  with known characteristics, so on any given
 6  identification characteristic, it was then consistent
 7  with.
 8    Q.  So the April 19th video informed your work on the
 9  April 12th video because you had it to identify, know
10  what it was?
11    A.  Sure.  Yeah.  Like in a general analysis, like,
12  say we have a picture of this courtroom and I can't see
13  all of the size of that door, but if there is some other
14  video that shows that door better, I can then use that
15  for the comparison.
16         THE COURT:  Is that approach recognized in the
17  field in which you practice?
18         THE WITNESS:  Yes.
19         THE COURT:  So Mr. Colbath, can you wrap up
20  here?
21         MR. COLBATH:  I can, Your Honor.  I'm prepared
22  to make my argument at this point without asking any
23  further questions.
24         THE COURT:  Very good.  You can be excused.
25         Ms. Sherman, why don't I hear from you first.

Well, actually I think it would be more helpful if I
heard from the defense as to what elements of the test
under *Daubert* have not been met from the defense
perspective.

MR. COLBATH: Your Honor, could I ask that
Mr. Becker step out?

THE COURT: Yes. Mr. Becker, can you step out
for us. Thank you, sir.

(Mr. Becker exits courtroom.)

MR. COLBATH: Your Honor, it is our position,
and it's been our position all along, that the 4-19
video, because of the way it was created and not --
first of all, I guess I take issue with that there has
been proof that his methods and the photogrammetry
process in general has been accepted or sufficient to
provide testimony of this nature.

But respective of that, our position all along
has been that what Mr. Becker is trying to do, what the
government is trying to do through Mr. Becker and
Mr. Toglia is to offer substantive evidence that is in
part law enforcement created. The Court has already
heard, and we don't have to back all through
Mr. Sturgis' testimony from the prior hearing where the
video was not scientifically created, so it was just a
demonstration, but yet Mr. Becker just said that he

could have run the make/model determination
independently, but I believe his words were, "but I
didn't have to because already I had the April 19th
video and the known CR-V and the known attributes, and
so I could easily make the comparison and I could
corroborate one to the other."

            And his whole analysis, one is subsumed by the
other or they are worked off each other to ultimately,
and in some circumstances that might be correct, not
this case, because of the way the April 19th video was
created.  Had he went out and done some scientific
process on his own and followed industry standards in
creating a true photogrammetry video recreation himself
and then came in and established to you, "I
appropriately set this all up correctly and now I'm
using it to compare to the unknown video," that would be
one thing, but here that wasn't done.

            That would have never been done, I think, with
the Wells' vehicle under the circumstances.  But he's
using both of them together substantively.  It is not
that he is saying, "I conducted a 4-12 analysis.  I
looked at everything.  Here is the only things I looked
at.  The only color I analyzed was from the 4-12.  The
only angles I analyzed was from the 4-12.  The only
attributes I analyzed was from the 4-12.  Then later, to

1  demonstrate that, I also see it here in 4-19."

2      Instead he says, "I am identifying both."  Just

3  like the door example, "Where I can't see the door in

4  April 12th's picture, I see it in 4-19 so I can use that

5  part of it from 4-19."  Well, that becomes substantive.

6  That means his opinions are based on a collection of

7  evidence drawn from both videos, yet the one video is

8  not substantive, it is not evidence, it is a law

9  enforcement demonstration.

10      And so it's our position that through his

11  presentation, he's going to make the 4-19 video

12  evidence, and once he says it's evidence and describes

13  it as evidence and describes how he used it as

14  substantive evidence, even if the Court doesn't send his

15  report back there or the slideshow back there, the jury

16  is going to have seen it and had it explained and

17  understand it and treat it as evidence.

18      I don't think there is any way they can get it

19  out of their head to not, and there is no limiting

20  instruction that could stop it.  That's our position is

21  the way these experts used it, it's subsumed in their

22  evaluations and their analysis.  He explained it quite

23  well really.  "Where I can't see it in one, I just see

24  it in the other, I put them together and got my

25  comparison."

1          THE COURT:  Thank you.  Ms. Sherman, briefly,

2    please.

3          MS. SHERMAN:  Sure, Your Honor.  That's not

4    what I heard him say.  I heard him say it corroborated

5    his view, in his testimony and his PowerPoint -- his

6    PowerPoint is drawn just from the photos and his report,

7    and in there, he goes through step by step what he

8    looked at, the key characteristics of the vehicle.

9          And then he also looked at those on the Wells'

10   vehicle, and he talked about how he applied the best

11   practices and photogrammetry and photo analysis.  And so

12   he, in his testimony, I proffer is going to talk about

13   lens distortion and zooming in and all these things that

14   they are worried about about this 4-19 video, I believe

15   he will testify about those and how that doesn't --

16         THE COURT:  Are you talking 4-19 or 4-12?

17         MS. SHERMAN:  4-19, how they were different,

18   the overall view, because he zoomed in on the cars, and

19   those views were not different.

20         In terms of *Daubert*, he talked about the

21   theories he used, the scientific method, the best

22   practices for photogrammetry and photo analysis.  They

23   have been published.  It has general acceptance in the

24   applicable field.  I mean that's the standard for

25   *Daubert*, not what I just heard.  So that's my position.

1          THE COURT:  Thank you.  I will allow this

2    witness to testify first with regard to the explanation

3    on page nine of the PowerPoint.  I found that that

4    addressed the concern that was raised about the origin

5    of that particular slide and the green item on it.

6          I find with regard to *Daubert* that the motion

7    -- well, in any event, I find that the theory that this

8    witness indicated he applied is one that he indicated

9    without, as I understood it, real impeachment that it's

10   been peer reviewed and published and it enjoys general

11   acceptance in the community in which he is performing

12   this work.

13         So I do find, considering the factors there,

14   that it can be applied.  As to this distinction between

15   substantive versus demonstrative, as I said on the

16   record earlier, I believe today, maybe yesterday, there

17   is, in my mind, not the most amount of clarity as to the

18   distinction between substantive versus demonstrative.

19         I'm not sure that I really need to sort that

20   out.  I do acknowledge that my rulings will permit

21   inquiry as to the April 19th video.  Rather than using

22   those terms of substantive and demonstrative, one way to

23   look at this is by precluding the admission of the

24   April 19th exhibit was in a way a 403 issue, which is to

25   say not to confuse the jury, not to put the balance on

an exhibit that is not directly related to April 12th.

          And so however you view it from an evidentiary
standard, I will allow the comparisons to be made,
consistent with the prior rulings that this witness is
intending to do and not have that April 19th go back to
the jury, although there are pictures of the vehicle
that have been admitted in evidence, of the Wells'
vehicle, and that's fine.

          So questions or clarifications on that ruling?

          MS. SHERMAN:  No, Your Honor.

          THE COURT:  Mr. Colbath, questions or
clarifications?

          MR. COLBATH:  No.

          THE COURT:  All right.  Do we need about five
minutes?

          MS. SHERMAN:  Yes, please.

          THE COURT:  Let's take about five minutes.

          DEPUTY CLERK:  All rise.  Court stands in a
brief recess.

          (Recessed from 3:39 p.m. to 3:49 p.m.)

          (Jury absent)

          DEPUTY CLERK:  All rise.  Her Honor, the Court,
the United States District Court is again in session.

          THE COURT:  Please be seated.  And I haven't
had the jury brought in yet because it seemed to be

helpful to have the report identified for the record not

as an exhibit to be admitted, but to be part of the

record, so ID'ed.  What number would be your next in

line?  Same with the PowerPoint.

MS. SHERMAN:  Well, that's 95.  It will be 259.

THE COURT:  259.

MS. SHERMAN:  I can provide a clean copy in the

morning.

THE COURT:  I don't need a clean copy.  I just

wanted it as part of the record.  It's a government --

defense had the same sheet, he was using the same

exhibit.

MS. SHERMAN:  He has a chart.

MR. COLBATH:  So what I gave you has nothing to

do with Mr. Becker.  Somebody told me to give you -- to

identify something different.  This is not my --

THE COURT:  This is the Becker report is 259

for ID only.

Ready to proceed?

MS. SHERMAN:  I believe so.

(Pause)

(Jury present)

THE COURT:  All right.  And welcome back once

again, ladies and gentlemen.  Please be seated,

everyone.  That took a little longer than anticipated,

but we will not go past 5:00 in any event today, ladies
and gentlemen.

So are we ready for your next witness?

MS. SHERMAN:  The government's next witness is
Steven Becker.

THE COURT:  Sir, if you would come forward.
After you get settled in there, I'll ask the clerk to
administer an oath to you.

(Jury present)

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please
state your full name and then spell your full name.

THE WITNESS:  It's Steven Becker, S-t-e-v-e-n,
B-e-c-k-e-r.

STEVEN BECKER, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SHERMAN:

Q.  Mr. Becker, what do you do for a living?

A.  I'm an engineer.  I work for Robson Forensic.

Q.  How long have you been an engineer?

A.  Since 1992, although I guess I was an engineer
while I was in school.

Q.  You mentioned school.  Why don't you tell the
jury about your education.

A.  I have a bachelor of science in mechanical

engineering with aerospace from Worcester Polytechnic
Institute in Massachusetts.  I also have a master's in
business administration from Syracuse University, and a
certificate in crash reconstruction I, II and III from
Northwestern University.

Q.  Why don't you take us through your career as a
mechanical engineer.  You're pulling out a binder.  Why
don't you tell us what you're referring to.

A.  I'm setting it on my lap.  This part I know.
It's not really a memory test.  I started working for
Alliant Mini Supercomputers in '90 or '89.  There I was
a system administrator as well as a network engineer
processing data for raster images and rasterized
graphics.

From there, when I graduated with my degree in
mechanical engineering, I moved on to New Venture Gear
through the CEI Corporation working as an engineer
designing transmission gearing, transmission components,
doing testing over the road to make cars and trucks
quieter.

Then I moved to working at Chrysler through
modern engineering in Detroit.  I was working for
Chrysler designing components for the Dodge Viper, the
minivan, the Jeep Grand Cherokee, PT Cruiser, Dodge
Neon, all variety of structural as well as engine

subcomponents.

From there, I went back to New Venture Gear as a quality engineer working in the end of line test machines using sensors as well as video cameras for looking at how the parts move relative to each other. I noticed that some of the quality things that I couldn't fix were just design issues, so I started taking over more of the design aspect, and they moved me up to the engineering services manager in the front garage.

There I managed a fleet of vehicles and mechanics and test machines and test cells for both durability testing as well as noise testing. There we would use surveillance cameras or high speed photography or specialized cameras for flow visualization studies, durability failures, looking at how like the prop shaft moved relative to the component for when a bearing started wearing out and things of that nature.

Then they were going to close my plant. Well, they did close the plant. And I was going to move back to Michigan, which was kind of a shoe-in because my wife is from there, but we decided to jump ship and try something a little different. I moved to Robson Forensic.

It turned out it wasn't much different. It was all the same physics, the same equations, the same type

of analyses.  At Robson, I do probably about 65 percent
plaintiff, 35 percent defense work in support of
litigation, whether it's crash reconstruction from a
motor vehicle accident or a product defect or a repair
issue or just an in general photo or video analysis
case.

We also have a consulting group where we do
non-litigation based engineering where I design or
perform testing for customers and clients.

Q.  Let me ask you, you mentioned photo or video
analysis.  When did you start doing photo or video
analysis in your career?

A.  Back in college.  One of my main projects or
senior project was working with the Naval Air
Development Center to redesign delta wing aircraft.  We
were augmenting the vortex flow over the wing and we
decided we were going to put it in a water tunnel for
flow visualization studies to determine the
effectiveness of it.

There we were running different color dyes and we
were taking photographs and video and then measuring how
the dyes were moving relative to the new designs.  So
that was '91, '92.

Q.  Let me ask you another question.  Can you tell us
whether you have -- First of all, let me ask you this:

1    What is photogrammetry?

2      A.   Sure.   Photogrammetry is really the study of

3    objects in -- well, nowadays in digital image

4    processing.   In the old days, it used to be of just

5    images.

6      Q.   Have you taken trainings in relation to

7    photogrammetry?

8      A.   Yes, several.

9      Q.   Can you describe those, please?

10     A.   Yep.   One was with the software company for

11   PhotoModeler.   They take software to apply to image

12   processing so you can determine sizes and shapes and

13   relative positions of various objects.

14         Others have been with PC Crash for taking 3D

15   laser scans of areas and then performing camera matching

16   on various images so that we can then run simulations of

17   vehicles through basically photographs.

18         Then a lot of it goes back to college working

19   with physics for the optics and how light moves and

20   reacts with digital image processing and then a lot of

21   my software background.

22     Q.   Have you been asked to do vehicle identifications

23   before?

24     A.   Yes.

25     Q.   And when you do those analyses, do you use

1  photogrammetry?

2      A.  Many times, not always.

3      Q.  And when you use photogrammetry, do you also

4  include an analysis of color?

5      A.  Yes, as long as we can.  Certain nighttime images

6  you're not going to have any color available, but if

7  color is available, that's definitely a key component.

8      Q.  What sort of method do you use when you are asked

9  to do a comparison analysis or a color analysis?

10     A.  Sure.  It all starts with what we call the

11  scientific method.  So you start out with a hypothesis

12  or a question you want answered.  You then perform an

13  investigation.  In photogrammetry and photo analysis,

14  you're going to be comparing either key characteristics

15  or colors, shapes, sizes, whatever happens to be of

16  interest or available in the images, and then testing

17  that hypothesis to see if you satisfied or came to a

18  conclusion that's either positive or negative, and then

19  reporting that back to your client.

20     Q.  Were you asked to answer a few questions in this

21  case, to render a few opinions?

22     A.  Yes.  I had two hypotheses in this case.  One was

23  to determine the make and model of a vehicle of interest

24  in a video.  The other was to see if that vehicle was

25  consistent with a known Honda CR-V owned by Wells.

1    Q.  And did you apply that scientific method in

2 answering those questions?

3    A.  Yes.

4    Q.  Okay.  And have you testified in court before on

5 photogrammetry?

6    A.  Yes.  Yeah, just a few months ago.

7    Q.  And other times as well?

8    A.  Definitely.

9    Q.  Sure.

10        MS. SHERMAN:  Your Honor, at this time, I would

11 request the Court find this witness has the experience,

12 background and education to give an opinion in regard to

13 photogrammetry, including color analysis.

14        THE COURT:  Based on my prior rulings, I will

15 so find.  Go ahead.  Any objections are preserved.

16        MR. COLBATH:  No additional objections, Your

17 Honor, other than the objections I have already made.

18 Thank you.

19        THE COURT:  Thank you.  Go ahead, please.

20 BY MS. SHERMAN:

21    Q.  I want to start by talking about your approach to

22 this case.  You had been asked two questions.  How did

23 you approach your task?

24    A.  Sure.  So there is this April 12th video.  The

25 first thing you do is you analyze the video itself for

the content, the date and timing, and ascertain where
the light is coming from in the video.

All imagery is basically a reflection of light.
Like none of you actually see me right now. You only
see the reflection of light from me back to your eyes,
if that makes sense. The camera is doing basically the
same thing.

So in this case, we have a low frame rate. We
have a four frame per second video with 680 by 480P,
pixels. So pixels are what make up the digital image,
because, of course, we can't store a color in
electronics. You store numbers. So we quantify those
individual pixels. Each one gets a series of numbers
applied to it to define its color and then where it is
in a raster graphic.

The raster graphic just means that we're making a
grid of little tiny points wide and high, and then that
is how we define the digital image.

Q. Did you -- you had some photos. Did those end up
in a PowerPoint that might assist in the illustration of
your testimony today?

A. Yes. All video is made up of still images, so in
other words, it's a series of still images that are
repeatedly shown and a frame rate. As long as the frame
rate is fast enough, it looks like continuous motion.

1   If the frame rate is slower, then you see sort of that

2   stop motion, jerkiness of like some surveillance videos.

3       Q.   Did you use still images in the PowerPoint

4   illustrating your testimony?

5       A.   Yes.  First thing we did was capture the still

6   images.

7       Q.   Hold on.

8            MS. SHERMAN:  If we could display Exhibit 95.

9   I recognize it's demonstrative and won't go back to the

10  jury.

11           THE COURT:  Yes, based on the prior rulings, go

12  ahead.

13  BY MS. SHERMAN:

14      Q.   Can you tell us what we are seeing here and what

15  role this played in the beginning of your analysis?

16      A.   This is a Google Earth overhead image, so now

17  there is two Google Earths, the one that you guys often

18  see on the internet and then there is Google Earth you

19  can download.

20           When you download the Google Earth, it allows you

21  to have this scale that's in the lower right -- lower

22  left corner.  In that I was able to identify there was a

23  T-2 building, a T-1 building.  There is Anton Larsen

24  Road that goes in front of T-2 building sort of

25  generally oriented north-south.

1        And then from the video, I was able to identify

2    the geography and the position of where the camera was

3    and what it was viewing.  We can see that the camera was

4    viewing basically west.  It had a portion of the T-2

5    building visible, this parking lot, a fence partially

6    around T-1 building.

7    Q.  Let's go to the next slide.  Before I have you

8    explain it, I wanted to ask you a few things.  You

9    mentioned frame rate.  Can you tell the jury what a

10   frame rate is?

11   A.  Yeah.  Like in your typical movie, et cetera,

12   it's going to be 30 frames per second, because the human

13   eye perceives motion constant when it's above 15 frames

14   per second.  And a frame is how many still images per

15   second.  You know, it's kind of straightforward.  The

16   camera is basically taking rapid snapshots.

17   Q.  So let's talk about the surveillance video -- the

18   videos that you reviewed.  Can you tell us, tell the

19   jury what lens distortion is.

20   A.  Sure.  Lens distortion, there is kind of two

21   facets to that.  Your typical lens, anyone who has ever

22   seen a pair of glasses or a camera lens, et cetera, you

23   know it's slightly curved.  In that curvature that means

24   that the outer quadrant of the image in each corner is

25   going to be distorted, or, in other words, there is a

little bit of curvature to that.

It's really most easily seen when you're looking at a photograph of the side of a building with a bunch of uniformed size windows.  You will see a couple of them are actually a little distorted.  That's sort of the classic image distortion.

Other things could be damage to the camera or damage to the image.  Those things also can occur.

Q.  In the images you reviewed, were there -- was there a lens distortion that impacted your analysis?

MR. COLBATH:  Your Honor, I'm sorry.  I have an objection to this.  Can we approach?

THE COURT:  All right.  Yes.

(Begin bench conference.)

MR. COLBATH:  Well, my objection is I don't recall anything in his report about lens distortion. And I didn't object when it was initially asked just because I thought, well, maybe it's just a general camera explanation, but now we're moving into how did lens distortion affect your analysis.

THE COURT:  Is it in the report?

MS. SHERMAN:  I don't believe that lens distortion is.  I'm going to have him talk about resolution.  That was my next question.

THE COURT:  So we're done with lens --

1          MS. SHERMAN:  Yes.

2            (End bench conference.)

3    BY MS. SHERMAN:

4      Q.  Let's talk about resolution for a moment.  How is

5    resolution determined?

6      A.  Resolution goes back to those number of pixels I

7    was discussing earlier.  As I said, this one is 640 by

8    480P.  Some people refer to it as 480P.  Other ones are

9    higher resolution, 720P, 1080P, et cetera.  The higher

10   the resolution, the better the detail in the image.  And

11   what that really means is how much you can zoom in and

12   still have a clear image, because you don't have

13   infinite zoom capability.  Otherwise, you get what's

14   called pixelated view.

15     Q.  Let me ask you about this surveillance that's

16   done from 2012.  Is 640 by 480, is that considered a

17   good resolution?

18     A.  For the timeframe of 2012, it's not a bad

19   resolution.  Everybody and their brother is familiar

20   with modern cell phones.  They are running up to 4K now.

21   And that doesn't mean 4,000 pixels, by the way.

22            So this isn't what you would call like high

23   definition.  It's the one just below that.

24     Q.  When you look at these images, what sort of

25   computer are you using?

1      A.   I use my laptop as well as a monitor, depending.

2      Q.   Did it have higher resolution than 640, 480, or

3  is that impacted by the computer you look at?

4      A.   Yeah.  My system is a high resolution system, so

5  there is what's called sub-pixel viewing.  So in other

6  words, when you take an image, as you guys see it up

7  here on the screen, it's whatever the resolution is of

8  the projector regardless of the resolution it was taken

9  at.

10          So when I look at it on my screen, I look at it

11  in the original format.  Also, this is a snipped image,

12  so it's not actually the player of the actual original

13  video.  A snipped image is an image that's been exported

14  and saved as a video -- as a singular image file.

15          All of those things sort of change the

16  characteristic of an image a little bit compared to when

17  you go back to the original.

18      Q.   I want to ask you about the number of frames that

19  you saw from April -- the April 12th video.  How many

20  frames did you observe from, I guess, left to right?

21  Would you describe that as northbound?

22      A.   Sure.  First I'm going to start off with what

23  she's talking about.  In this video, you can see a

24  vehicle traveling on Anton Larsen Bay Road, and on this

25  image, it's currently traveling northbound.

1          So in the northbound travel direction, the
2     vehicle at -- I know it says the timestamp, 9:21, but
3     it's actually 7:09 in the morning, because this
4     timestamp doesn't account for Alaska time.
5          Q.   So how many frames did you capture?
6          A.   I'm sorry.
7          Q.   How many frames did you capture northbound?
8          A.   So northbound, there were five frames.
9          Q.   Did you also look at images southbound?
10         A.   And then southbound at 7:14, there were four
11    frames where the vehicle was visible.
12         Q.   Can we go to the next slide, please.
13         Did you isolate those frames and do further
14    analysis on those frames specifically?
15         A.   Correct.
16         Q.   Okay.  Let's talk about -- you said one of the
17    questions you were asked was to see if the Wells' CR-V
18    was consistent.  Did you look at photos of the Wells'
19    CR-V?
20         A.   Yes.
21         Q.   Can we go to the next slide.
22         Now, I want to ask you about features of
23    vehicles.  What features did you know in looking at the
24    Wells' CR-V that came into your analysis?
25         A.   The first thing we do is we look at just the

facts that are available in the case.  In this image of
a vehicle, we notice that it's basically a compact SUV.
It's of a certain length.  It's got a front-end bra
cover.  In other words, what a bra cover is is this
black leather cover that's covering a portion of the
fender as well as the hood.

Some bra covers only cover a portion of the hood.
This one wraps onto the fender.  It has bumpers that are
not consistent with the body color, but are dark.  The
wheels don't have a chrome or aluminum polished type of
center rim portion.  There is a rear spare tire carrier.
There is the angles of course of what's called an A
pillar, B pillar, C pillar and D pillar.

A pillar is the support for the roof that's up by
the windshield.  And then we kind of work our way back.
On like a sedan, you of course don't have a D pillar.
You have a B pillar between the doors, which you
wouldn't have in a coup, then a C pillar for the rear
door to the rear area, and then a D pillar where the
rear window is.

You can also notice the color of the vehicle.  I
think everybody in the room kind of generally sees that
this is sort of a medium blue, but if you really look at
the vehicle in detail, you can see the hood doesn't look
blue, right, because the hood is still blue, but, again,

1   you're looking at it in a very low angle.

2           MR. COLBATH:  Your Honor, I'm going to object

3   to the narrative.  He's moved onto color from

4   characteristics.

5           THE COURT:  Why don't you ask your next

6   question.

7   BY MS. SHERMAN:

8       Q.  In addition to characteristics, did you look at

9   the color of the vehicle?

10      A.  Sure.  Color is one of characteristics of any

11  given vehicle because we paint them all different

12  colors.  In this vehicle, it's blue.  And as I was

13  saying, what you notice is down in the very low area,

14  it's not blue, it's dark.

15          That's because it's reflecting the ground.  You

16  can kind of tell the color when you see the portions of

17  it that are reflected back toward the camera at sort of

18  what we call the normal angle.

19          So portions of the vehicle that are angled

20  upwards or have a shallow angle reflect the sky and they

21  don't reflect the actual color of the vehicle.  Of

22  course, if the photographer was standing right next to

23  the vehicle, you would see his colors of the clothes he

24  was wearing.  And in the low portions that are angled

25  toward the ground, you see ground color.

1     Q.   Before I move to the next slide, I want to ask

2  you, did you take the frames from the April 12th video

3  and zoom in on them before you did your analysis?

4     A.   I did, but there was some more characteristics.

5     Q.   I'm sorry.  So we talked about color.  We talked

6  about the bra and the tire.  What other characteristics

7  did you note on the Wells' vehicle?

8     A.   There is also the headlights.  One of the things

9  we look at in all vehicle IDs is the shape and position

10  of the headlights.  These headlights wrap around into

11  the fender, meaning that they are not just up on the

12  front of the vehicle like in some models of vehicles.

13  There is also a reflector on the side, a yellow one in

14  the front and a red one toward the rear.

15          And then there is some non-body colored trim

16  molding.  There is no chrome around the windows.  And

17  the windows are all fairly translucent, they are not

18  dark tinted.  You also have a non-body colored side view

19  mirror.

20     Q.   Any other characteristics?

21     A.   Non-body colored handles.

22     Q.   Did you isolate the images of the northbound view

23  of the vehicle and zoom in on those?

24     A.   Yes.

25     Q.   Did you enhance them?

1    A.   No.

2    Q.   Is that possible?

3    A.   Well, depends on what you mean by enhancing.

4  Sometimes enhancing is taking a still image of a moving

5  video and zooming in on it.  What I think she's

6  referring to is enhancing like something you see on CSI

7  TV show, et cetera, where you can suddenly make out

8  details that weren't visible in the video prior.

9        That's actually not possible.  You can do some

10  sharpening.  You can adjust light and things of that

11  nature, but you can't enhance something to make it

12  suddenly visible like a face suddenly appears inside a

13  window or in a reflection of some guy's eyeball or

14  something like that.

15    Q.   Let's talk about those images you isolated.  Can

16  we go to the next slide.  Can you tell us what we are

17  seeing here?

18    A.   These are the five frames of the vehicle

19  traveling northbound.  Starting in the upper left corner

20  would be the first frame.  Second frame left to right.

21  Third frame.  Then you go down to the bottom, the

22  fourth.  And then the fifth one, it's moving behind the

23  building T-2.

24    Q.   Did you isolate images of the vehicle of interest

25  southbound as well?

1    A.   Yes.

2    Q.   Can we go to the next slide.  Can you tell us

3  what we're seeing here?

4    A.   These are the four frames of the vehicle

5  traveling southbound.  It's in kind of opposite order.

6  You can see the lower right is when the vehicle first

7  emerges from behind the building.  Then the next frame

8  to the left of it.  Then the upper right and then the

9  upper left.

10    Q.   Okay.  And then did you do the same sort of zoom

11  and collage with images from the 4-19 video, the Wells'

12  CR-V?

13    A.   Yes.

14    Q.   How about we go to the next slide.  Can you tell

15  us what we're seeing here?

16    A.   Yes.  So this is the 4-19 video where they drove

17  Mr. Wells' CR-V through the same site, and we have five

18  frames captured traveling northbound starting with the

19  upper left moving left to right.  And then the bottom

20  right where it's moving to behind the T-2 building.

21    Q.   Then did you do the same thing with the Wells'

22  CR-V southbound?

23    A.   Yes.

24    Q.   Can we go to the next slide.  Can you describe

25  what we're seeing here?

1      A.  This one I put in the same correct order,

2   unfortunately.  So again in the upper left is where you

3   see it emerging from the building.  Then moving left to

4   right.  And then it was just disappearing in the lower

5   right.

6      Q.  Let me ask you a question about you indicated you

7   zoomed.  Did you zoom to the same distance?

8      A.  Not exactly.

9      Q.  Okay.

10     A.  These images are zoomed just about the same.  The

11  image itself is zoomed into the same, but the position

12  in the image is slightly different between the 4-12 and

13  the 4-19 video.

14     Q.  So where the vehicle appears is -- make sure I

15  understand what you're saying.  Where the vehicle

16  appears is different in that image, but it's the same --

17          MR. COLBATH:  Your Honor, I'll object as to

18  leading.

19          THE COURT:  That is leading.

20  BY MS. SHERMAN:

21     Q.  Let me restate it.  Let me ask a different

22  question.

23          You took the 12 video, the April 12th video and

24  the April 19th video?

25     A.  Yes.

1    Q.  Did you then zoom in on these images so they

2    were, I guess, similar?

3    A.  These images aren't necessarily zoomed in.  They

4    are enlarged.  So they are snipped out of the exact same

5    camera position and camera zoom just around the area of

6    the vehicle and then enlarged for your benefit to see

7    them on the screen.

8    Q.  After you have isolated and enlarged those

9    images, what is the next step -- where do you start your

10   actual analysis?

11   A.  In this case, I started with color.

12   Q.  Did you take an example of, not relating to any

13   vehicles, to kind of illustrate what you're talking

14   about in regards to color?

15   A.  Sure.  As I mentioned earlier, color is a little

16   bit confusing in the digital world to the general

17   layperson.  So I took a known object of a known color

18   and did a photo comparison of the color for the green

19   box that is the electrical box that operates the gate

20   both in the video and in a police photograph.

21   Q.  Let's go to the next slide.  Why don't you

22   describe for the jury the different aspects of color.

23   A.  Sure.  Color in digital images is described in

24   the RGB scale, red, green, blue.  Up on the screen you

25   will see that there is the words red, green, blue in the

1     lower right in both of the two sort of color wheels.

2            Even though it's square, we still refer to it as

3     a color wheel because that's where it originally came

4     from.  There is a few other aspects called hue,

5     luminance and saturation.  Everybody remembers back in

6     elementary school mixing colors of paint together.

7            In various combinations of red, green and blue,

8     we can come out with 16 million different colors, and

9     that's because we store them in digital images as

10    numbers, 0 to 256.  So you take those combinations and

11    you can create all the variety of colors that are used

12    for depicting any digital image.

13           So hue -- you can see there is some arrows going

14    left to right.  And hue generally describes the

15    combination of those colors.  If you have any given red,

16    green and blue, you can define sort of a column of this

17    is basically red or this is basically blue or green or

18    whatever.

19           Saturation is going to be how crisp or muted that

20    color is.  So the more pure the color, the better the

21    saturation.  It gets muted as it moves down in the image

22    or in the color pallet.

23           And then lastly, we have luminance.  Luminance is

24    sort of the brightness or the white to gray scale of any

25    given color.  So some colors appear darker, they have a

lower luminance value. Whiter colors have a higher
luminance value.

And then what we see up on the screen is the
green box on the left taken with a pretty decent police
camera and then the surveillance video from the day of
the incident on the right. And what I have done is I
have selected a point in the middle and center of the
green box.

The reason I do that is because we know,
obviously, it's a green box, right. But when you look
at sort of the color splotch, anyone who's been paint
shopping for their house before knows color splotches,
they can be a little mind numbing what the differences
actually are. Well, in digital color analysis, we can
tell you what the actual differences are in the colors
and whether they are from the same sort of color family.

What you see here is you have a comparison of the
two. The red values and the blue values are both lower
than the green values for the RGB, but the green values
aren't the same. One is 87 on the left and one is 162
on the right.

Q. Why don't you grab that laser pointer and point
to where you're talking about those values, please.

A. So the red value in the image here is 17, and
over here it's 78. The green is 87. The blue is 50.

1  Over here it's 162 and this one is 89.

2          Just at a first glance, that's a huge difference.

3  We know this is still the same green box.  Why are they

4  so different?  They have different lighting conditions,

5  different cameras, different CMOS sensors in the cameras

6  that causes the digital image to be stored as a

7  different color.

8          But on the left you have hue, saturation and

9  luminance.  And when you look at the hue, we're talking

10  about the vertical color.  We have got this little sort

11  of dot in the center here.  That dot is defining where

12  that color actually is for this.  Even though it looks

13  like it's a little washed out in this image, that's

14  because it has a higher saturation, a lower -- sorry, a

15  lower luminance value, but it's in the same green

16  column.

17          So the hue of 99 and the hue of 85 both describe

18  the same green box.  And the takeaway is that you can

19  define sort of general families of colors by the hue and

20  if those two hue values are somewhat consistent.

21      Q.  Did you look at color in relation to the vehicle

22  of interest from the 12th in comparison to the Wells'

23  CR-V from the 19th on video?

24      A.  Yes.

25      Q.  Why don't we go to the next slide.  Can you tell

us -- we see some circles there.  Why don't you start
with what those are.

    A.  Yes.  So the circles just represent the geography
on the car where I took the snip of color.  And then
these color splotches actually display the color pulled
from that area of the vehicle.  You have one from the
front fender or quarter panel, one from the door area,
and one from the rear quarter panel.

        The rear quarter panel one is up higher, and then
they get progressively lower as they move forward toward
the car.  And that's because the car has varied
curvatures on it.  You can see that none of them are
identical in the color splotch, but looking at the hue
value, we see that all the hue values, we got 154, 153,
156, 156, 151, 157.  They are all in the same blue
family.

        Also, you look at the luminance, they are all
similar luminance values.  In other words, it's not like
we're looking at one really dark blue car and one ultra
light blue car.  You're looking at basically a light
medium blue car.

    Q.  Did you do that same analysis for the images, the
southbound images?

    A.  Right.  Actually, yeah, I did the exact same
analysis for the southbound images.

1    Q.  Let's go to the next slide and you can tell us

2    what we're seeing here.

3    A.  So here we have got the same three type of points

4    moving from higher to lower, from the rear quarter panel

5    to the rear door into the front quarter panel.  And then

6    again we've got the same type of hues, within the range

7    of 150 to 160.

8    Q.  What did you do -- after you did this color

9    comparison, what did you do next?

10   A.  After the color comparison, I started looking at

11   other things that are affected by light, so in other

12   words, some of where the shadowing is on the vehicle,

13   which turned into sort of a feature comparison.

14   Q.  What is a feature?

15   A.  A feature is any unique identifier, and it

16   doesn't have to be unique.  It just has to be consistent

17   with a given model or vehicle type.

18   Q.  Let's move to the next slide.  Can you tell us

19   what we're seeing here about features between the

20   vehicle of interest and the Wells' Honda CR-V?

21   A.  Yep.  So again we're looking at northbound, and

22   the northbound we have the vehicle of interest on top

23   and the Wells' vehicle below, and then a good image of

24   the Wells' vehicle on the bottom.

25        Here you're able to see that there is an object

protruding off the rear of the vehicle of interest, and
it shows as a dark area.  And then you can also see in
the front above the wheel well on the fender behind the
headlight there is another dark area.

That's just in the center image.  You can't see
it in the first or the third.  Then when they ran Wells'
Honda CR-V, you can see the dark in the rear consistent
with the rear spare tire carrier, and the dark in the
front behind the headlights consistent with the front
bra.

Q.  Those are the features that you saw in the
northbound vehicle of interest and the Wells' CR-V?

MR. COLBATH:  I'll object as to leading.

THE COURT:  That's sustained.  Go ahead.

BY MS. SHERMAN:

Q.  Did you do, in relation to those specific
features, anything else on the northbound only in
relation to this slide?

A.  Not in relation to this slide, no.

Q.  Let's move to the next slide.  What are we seeing
here?

A.  Now we are seeing the southbound.  Same type of
analysis, looking for other visible characteristics.  So
again I talked about how light is traveling and giving
us various shadowing.

        You guys probably can't see it right now, but
because these lights are off, these tables are creating
a shadow line on the floor in front of the tables.
That's because the light source is behind them and it's
casting that shadow in that direction.

        We know during this testing the light is
generally from the south and east in one and south and
slightly west in the other.  So the front of the vehicle
traveling southbound is not in the shade, so it should
be illuminated similarly to the rest of the vehicle, but
yet in the Wells' vehicle we see the front bumper is
dark, as well as in the vehicle of interest the front
bumper is dark.

        That tells me that the front bumper in both those
vehicles is not consistent with the body color and is
darker than the body color.  Also you can see that same
characteristic behind the wheel well of the sort of bump
and dark off of the wheel well to the headlight.  Again,
that feature being consistent with the front bra,
because ordinarily there wouldn't be a dark area behind
the headlight.

    Q.  Did you look at any other features in relation to
the southbound vehicle of interest in relation to this
slide?

    A.  Not in relation to this slide.

1    Q.   After looking at those features, what did you

2  look at next?

3    A.   Next I looked at general size of the vehicle, and

4  shape.

5    Q.   Okay.  Why don't we go to the next slide and tell

6  us what we're seeing here.

7    A.   Yep.  Here you have two kinds of things being

8  visible.  This is the original image on the right for

9  both northbound on top and southbound on the bottom.

10  And then what I did is I took the same scale, so in

11  other words, looking at the size of the T-2 building

12  relative to the car, I took a snip of the 4-19 known

13  Wells' vehicle and ghosted it over the top of the image

14  of the 4-12 vehicle.

15        And ghosting is a process where you apply an

16  image and then you make it partially translucent so you

17  can see sort of edges.  And that's why you see some

18  squareness over the top of this.  That's part of the

19  snip that was not part of the vehicle.

20        So the known vehicle of a certain size and shape

21  of Wells' Honda CR-V is in this image superimposed on

22  top of the vehicle of interest.  And what we see is that

23  in the northbound and the southbound images, the Wells'

24  vehicle occupies the same general shape and space as the

25  vehicle of interest.

1    Q.  Did you do your own measurements or rely on

2   someone else's measurements in relation to your

3   analysis?

4    A.  No, I didn't do further measurements.  I relied

5   on the other -- the other people who performed analysis

6   on this.

7    Q.  Can we go to the next slide.  Did you look at the

8   original -- the specs for a Honda CR-V, the size?

9    A.  Yes.  Yeah.  The listed specs for the Honda CR-V

10  are 177.6 inches in total length and 65.9 inches in

11  total height.

12   Q.  Let's move on to the next.  After size, did you

13  look at anything in relation to how the sun may impact

14  the view of the vehicles in this case?

15   A.  Yeah.  Moving further with the sun analysis, I

16  took a look at some of the other vehicles that were

17  visible in the same incident video.  If you go into the

18  parking lot prior to the roadway, you had a couple of

19  parked cars there, quite a pile of them.

20       You can see how the effects of the shadows work

21  out on this lightly colored sedan.  You can see that the

22  front of the car, the very front is in shade and it's

23  shadowed, but yet you can still see the color of the

24  bumper.  You can see the brightness of the rim.  In

25  other words, this vehicle has aluminum or chrome rims,

1    and because of the angle of the light that reflects back

2    to the camera, with the same lighting conditions as the

3    vehicle of interest.

4         One of the other features you then see is the

5    reflections on this SUV.  Going back to the concept

6    everybody likes to know what a mirage -- why a mirage

7    actually occurs.  What's happening is you're looking at

8    a low angle of incidence to the ground, and because of

9    the angle of the light and the angle you're looking at

10   the object on the ground, you're seeing a reflection of

11   the sky.  The same thing as that mirage on the hood and

12   roof of this vehicle, you're seeing very, very light

13   colors, you're seeing the reflections of the sky or the

14   clouds in this case.  And that's why the vehicle appears

15   basically white even though it's not a white vehicle.

16   Q.  Let's talk about in relation to the northbound

17   vehicle of interest did you look at those sorts of

18   characteristics, reflection, rims and shadow?

19   A.  Correct.

20   Q.  Let's go to the next slide, please.  Can you tell

21   us what we're seeing here?

22   A.  Yeah.  So this is all just the vehicle of

23   interest, the five slides of it traveling northbound.

24   And we're looking at how those characteristics relative

25   to light reflect back to the camera.  And what you don't

see is you don't see a bright rim.  You don't see bright

rims in any of the images.

You see translucent windows, so in other words,

they are not showing up as highly tinted.  And then you

see this dark area in the rear when the light is shining

from the rear, so if it was not a dark object, it

wouldn't appear dark.

Q.  Did you look at the same thing northbound?

A.  Southbound you mean?

Q.  Southbound.

A.  Correct.

Q.  Okay.  This is the northbound.  Let's go to the

southbound slide if we could.

A.  So southbound we have the same type of things.

Again, the translucent windows in two of the images, and

then you have this front area being dark even though the

light is low in the sky and from the front.  And then

the dark area above the rim again, and then the

non-reflective rims.

Q.  Did you look at the same sort of rims, windows,

and the dark areas in relation to the Wells' CR-V?

A.  I did.

Q.  Let's go to the next slide.

A.  So here it is northbound, and you have the same

type of appearance or features.  You have the

1  translucent appearing windows.  You have the

2  non-reflective or dark appearing rims, and then this

3  rear dark area.

4      Q.  And same thing for the southbound Wells' vehicle?

5      A.  Yes.

6      Q.  Next slide.

7      A.  Again, you have that dark front area and then the

8  dark area behind the headlight visible in multiple

9  files.  You have the translucent windows and the

10 non-reflective rims.

11     Q.  Did you review an image to determine what a

12 non-translucent, a tinted window would look like on the

13 T-1 camera?

14     A.  I did, if that's the next one.

15     Q.  Okay.  Let's go to the next slide.

16     A.  Yeah.

17     Q.  Can you describe what we're seeing here?

18     A.  Sure.  This is looking at two different features.

19 At the bottom, we're looking at those translucent

20 windows.  You can see that they are not really dark.

21 There was a white pickup truck that had passed a little

22 earlier in the day, and it had a black -- it had a cap

23 on the back.  And the back cap must have been a darkly

24 tinted window or a black feature, and that black feature

25 shows up very prominently as dark, indicating that the

conclusion of the translucent windows is consistent and
are not deeply tinted.

Q.  Did you look at photographs of other vehicles and
what tinted windows would look like?

A.  I did, but there is more on this screen.

Q.  I'm sorry.

A.  This also shows the --

MR. COLBATH:  Your Honor, I would ask that a
question be asked.  He should answer and she should ask.

THE COURT:  Excuse me.  Go ahead and ask if
there is anything else on this slide.

BY MS. SHERMAN:

Q.  Is there anything else on this slide?

A.  There is.  There is -- that same white pickup
truck has a brightly colored front wheel rim indicating
it had either a white reflective or aluminum polished
front rim versus the Wells' vehicle versus the incident
vehicle.

Q.  Anything else on this slide?

A.  No.

Q.  Let's talk about the other tinted windows and
what those tend to appear like on the next slide.

A.  This is a broader picture of that white pickup
truck.  Again, you can see those features of the window
and the rim.  Then there is photographs, of course, of a

1  different quality showing two other vehicles, a Durango

2  and a Jeep.

3       In the Jeep you can see the rear windows that are

4  tinted are dark.  The front window that's translucent is

5  not.  Same thing with the Durango.

6     Q.  After reviewing color, characteristics, features,

7  size, the way the light plays in the video, did you look

8  at anything else in relation to your analysis in this

9  case?

10    A.  Yes.

11    Q.  What was that?

12    A.  This goes back to shape again.  So I was looking

13  at the angles of the pillars of the vehicle.  And, of

14  course, you can't identify every single pillar in a

15  vehicle, but you can identify the A pillar and the D

16  pillar, the front and rear.

17       So in the A pillar, on the 3D model, so this is

18  not one of the images, of course, this is a 3D

19  representation that was prepared by one of the experts

20  for the defense, and I measured the angles of the D

21  pillar and the A pillar to be 42 degrees on the A pillar

22  and 67 on the rear.

23       When I compared them to the incident vehicle,

24  they were consistent.  And then when I compared them to

25  the Wells' vehicle, they were consistent.  I then also

1  compared those to some other vehicles that were

2  evaluated, and one of them here is a Toyota RAV4.

3      Q.  And where is the RAV4 on here?

4      A.  The RAV4 is on the right.  And the D pillar is

5  actually steeper than this, but because there is more

6  sort of vehicle steel or the same body colored material,

7  you're going to get variation into how that would view

8  on any given image.

9          On the A pillar, you're going to see a

10  significant difference.  You're going to see a 34-degree

11  angle versus a 42-degree angle for a RAV4.

12          MS. SHERMAN:  Your Honor, this may be a good

13  time.  We're a little early, but this may be a good time

14  to end for the day before we get into the next section.

15          THE COURT:  Any disagreement?

16          MR. COLBATH:  We haven't been very fast today.

17          THE COURT:  We haven't.  I think we could all

18  agree on that.

19          MR. COLBATH:  I'm just trying.

20          THE COURT:  In any event, can you do one more

21  slide and then call it a day?

22          MS. SHERMAN:  I think that gets into the

23  winnowing down of everything he looked at, so that's all

24  kind of tied in together.

25          THE COURT:  Let's make this our breaking point

for the day, and I'll direct you, ladies and gentlemen, to please leave your notepads here in the courtroom. Remember my admonition not to discuss the case or do any research.

I have the note about Juror No. 8 for tomorrow so we'll conclude at 3:30, use that time to take up our issues.

8:45 for the jury, counsel?

MS. SHERMAN:  Yes.

MR. COLBATH:  8:45 should work, Your Honor.

THE COURT:  Very good.  Let's do that.  Have a pleasant evening, ladies and gentlemen.  Thank you for your careful attention.

(Jury absent)

THE COURT:  Please be seated, everyone.

Sir, you can be excused.  See you tomorrow morning.

So from the government, Mr. Skrocki, anything to take up?

MR. SKROCKI:  I think not, Your Honor.  Thank you.

THE COURT:  Mr. Colbath?

MR. COLBATH:  Not at this time, Your Honor.

THE COURT:  Dare we try 8:30?

MR. SKROCKI:  Yes.

1          MR. COLBATH:  8:30 for us and 8:45 for the

2    jury?

3          THE COURT:  Yes.

4          MR. COLBATH:  Sure.

5          THE COURT:  Very good.  Let's do that.  We'll

6    see you all in the morning.  We'll go off record.

7          DEPUTY CLERK:  All rise.  Court stands in

8    recess until 8:30 a.m. tomorrow morning.

9          (Recessed at 4:45 p.m.)

10

11                      CERTIFICATE

12       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
13   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
14   original stenographic record in the above-entitled
     matter and that the transcript page format is in
15   conformance with the regulations of the Judicial
     Conference of the United States.
16
         Dated this 20th day of May, 2020.
17

18
                         /s/ Sonja L. Reeves
19                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25