```
 1                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4           Plaintiff,        )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7           Defendant.        )
     _____)
 8
```

```
 9              TRANSCRIPT OF TRIAL BY JURY - DAY 8
        BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10               September 18, 2019; 8:35 a.m.
                      Anchorage, Alaska
11

     FOR THE GOVERNMENT:
12           Office of the United States Attorney
             BY:  STEVEN SKROCKI
13           BY:  CHRISTINA M. SHERMAN
             BY:  KELLEY L. STEVENS
14           222 West 7th Avenue, #9
             Anchorage, Alaska 99513
15           (907) 271-5071

16   FOR THE DEFENDANT:
             Office of the Federal Public Defender
17           BY:  GARY GEORGE COLBATH
             601 West 5th Avenue, Suite 800
18           Anchorage, Alaska 99501
             (907) 646-3400
19
             Camiel & Chaney, P.S.
20           BY:  PETER A. CAMIEL
             520 Pike Street, Suite 2500
21           Seattle, Washington 98101
             (206) 624-1551
22   _____

23                SONJA L. REEVES, RMR-CRR
                Federal Official Court Reporter
24                222 West 7th Avenue, #4
                  Anchorage, Alaska 99513
25        Transcript Produced from the Stenographic Record
```

1                        I N D E X

2              September 18, 2019, Trial Day 8

3

4    Witnesses:          Direct    Cross    Redirect    Recross

5    Steven Becker        7         14        --          --

6    Jason Bullis        74         82        103         109

7    Vicki Grimes       114        122        --          --

8    Nathaniel          134        151        --          --
     Pacheco
9
     Hernando Acosta 167           175        --          --
10
     Kirk Oberlander 178           --         --          --
11
     Angelo Toglia,  206           208        216         --
12   Jr.
     (*Daubert* Hearing)
13

14                  E X H I B I T   I N D E X

15   Exhibit                                              Page

16   98          Wells' Interview Part 1                  195

17   183         Hopkins' Wallet                          117

18   185         Money and Pocketknife from               118
                 Belisle
19
20   186         Money from Belisle's Pocket              118

21   187         Projectile from Belisle's                119
                 Neck
22
     237         Bullet from Belisle's Neck               120
23               1B199, E5123389, Item 62

24   258         Video April 12th                         172

25   DE-22       SW Wells' Residence                      131

```
1   DE-23        SW Wells' Residence          131

2   DE-24        SW Wells' Residence          131

3   DE-36        SW Landfill                  128

4   DE-134       Photo Dumpsters              125

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Call to Order of the Court at 8:35 a.m.)
 2                    (Jury absent)
 3                    DEPUTY CLERK:  All rise.  Her Honor, the Court,
 4       the United States District Court for the District of
 5       Alaska is now in session, the Honorable Sharon L.
 6       Gleason presiding.
 7                    Please be seated.
 8                    THE COURT:  Good morning, everyone.  Please be
 9       seated.  We are back on record.
10                    Mr. Skrocki, what's the update from the
11       government's perspective, any topics at all?
12                    MR. SKROCKI:  I sent the proposed --
13                    THE COURT:  I saw that.  I meant to bring that
14       in.
15                    MR. SKROCKI:  Would you like a hard copy?
16                    THE COURT:  I had one.
17                    MR. SKROCKI:  I can walk one to you.
18                    THE COURT:  That's fine, yes.
19                    MR. SKROCKI:  If I may approach.
20                    THE COURT:  Yes.
21                    Mr. Colbath, have you looked at this?
22                    MR. COLBATH:  We have, Your Honor.
23                    THE COURT:  Any objection?
24                    MR. COLBATH:  We don't have any objection.  We
25       would ask the Court read it prior to or after each of
```

1    the -- each person that presents demonstrative evidence.

2            MR. SKROCKI:  No objection to that.

3            THE COURT:  All right.  And that's fine.  I

4    think that's appropriate.  I'm just looking at the

5    "during the trial," that phrase.  So I guess what I

6    would propose, if I'm going to read it after each

7    witness, which I will, is:  "You have heard testimony

8    from 'witness blank,' who was permitted to state

9    opinions and reasons for his opinions.  During his

10   testimony certain presentations were made by him and

11   shown to you."

12           MR. SKROCKI:  Fine, yes.

13           THE COURT:  See what I'm saying, Mr. Colbath,

14   make it specific to the witness?

15           MR. COLBATH:  Sure.

16           THE COURT:  Okay.  Anything from the defense to

17   take up?

18           MR. COLBATH:  Not new issues, Your Honor, I

19   don't think.

20           THE COURT:  All right.  Are there old issues

21   that are unresolved?

22           MR. COLBATH:  Only amongst myself.

23           THE COURT:  Very good.  Fair enough.  What's

24   the government's plan today, who do you plan to call?

25           MS. SHERMAN:  Your Honor, we streamlined

1    Mr. Becker's testimony this morning, so that will -- I

2    will finish relatively quickly as compared to what I had

3    planned to do yesterday.  Assuming cross ends before

4    11:00 a.m., when Mr. Bullis is supposed to be ready to

5    testify, we have Nathan Pacheco and Hernando Acosta, who

6    both worked at the COMMSTA; we have an FBI person, Vicki

7    Grimes; and then Mr. Bullis will testify as close to

8    11:00 as possible.

9             Then we will get into Mr. Oberlander and the

10   statements of the defendant.  That will be a long

11   witness.

12            THE COURT:  And then at 3:30, we'll adjourn

13   with the jury and take up Mr. Toglia; is that the plan?

14            MS. SHERMAN:  Yes.

15            THE COURT:  Anything to add on that?

16            MR. COLBATH:  Not from us.

17            THE COURT:  Very good.  Then let's take until

18   we get the jury here.  We'll go off record briefly.

19            DEPUTY CLERK:  All rise.  Court stands in a

20   brief recess.

21            (Recessed from 8:38 a.m. to 8:53 a.m.)

22            (Jury present)

23            THE COURT:  All right.  Good morning, ladies

24   and gentlemen.  Please be seated, everyone.  Welcome

25   back.

```
1          And I'll remind you, sir, you're still under
2  oath from yesterday's proceeding.  Okay.
3          THE WITNESS:  Yes.
4                    DIRECT EXAMINATION
5              (Continued of Steven Becker)
6  BY MS. SHERMAN:
7    Q.  When we left off, we were talking about angles,
8  so if we can put the PowerPoint back up.
9          MS. SHERMAN:  I think we're having an issue
10 with the projector.  Now it's in the right color.  It
11 was all pink about a minute ago.
12         THE COURT:  I have been told it's not the
13 court.
14         MS. SHERMAN:  That's quite possible.  Is the
15 projector on?  It doesn't appear the projector is on.
16 It worked earlier.  We can talk about -- we can talk
17 about this while it's warming up.
18         THE COURT:  That sounds great.
19         MS. SHERMAN:  We'll let it warm up and we'll
20 talk about angles.
21 BY MS. SHERMAN:
22   Q.  I would like to talk about the angle of the
23 pillars of the CR-V in comparison to the angles of the
24 pillar of a RAV4.  Can you go ahead and describe whether
25 those are similar or different for us?
```

1    A.   Sure.   The CR-V angles, I might have mentioned

2    this yesterday, at the D pillar because the D pillar is

3    a little wider, the perceivable angle could be a few

4    more degrees than you would normally expect for the

5    observable difference in the angle there.

6         On the A pillar, it's a fairly tight pillar.   So

7    the angle differences are within a degree or two for a

8    noticeable change.   On the Toyota RAV4, that difference

9    is 8 to 9 degrees and definitely would have been

10   noticeably different.

11   Q.   Blair, we can take that down from the jury before

12   we go to the next slide.

13        So after you have reviewed class characteristics,

14   features, colors, all of the things we talked about

15   yesterday, were you able to narrow down the vehicle from

16   the video from 4-12 from all of the vehicles out there?

17   A.   Yes.

18   Q.   And what was the first thing you used to kind of

19   winnow down that list?

20   A.   Sure.   Basically, you know, you start with the

21   most observable characteristics.   That's going to be the

22   overall size and body style.   So the first thing you do

23   is you're eliminating sedans, you're eliminating pickup

24   trucks.   That actually takes care of most of the on-road

25   vehicle market.

1          Pickup trucks are the most sold vehicle on the

2    road today.  Sedans encompass quite a variety of sedans,

3    sports cars, et cetera.  None of those are available

4    options.  So we're down to a sort of compact-size SUV.

5    And I have a list of vehicles that met that sort of size

6    and general shape characteristic.

7         Q.  Did you memorize that list?

8         A.  Of course not.

9         Q.  Is it in your report?

10        A.  Yes.

11        Q.  Would reviewing your report assist you in naming

12   off the vehicles that you narrowed based on size and

13   body type down to?

14        A.  Yes.

15        Q.  Go ahead and look at your report and tell us that

16   list of vehicles.  What page are you on in your report?

17        A.  Pages 23, carried over to 24, last paragraph.

18        Q.  All right.  Go ahead.

19        A.  So it starts out with --

20            MR. COLBATH:  Your Honor, I'm going to object

21   to him reading from his report.  He can certainly

22   refresh his recollection.

23            THE COURT:  Let me look here.  I'll allow the

24   witness to read those into the record.  You're just

25   going on -- the bottom of page 23 to the top of page 24.

1    Go ahead.  That's fine.

2       A.  The vehicles that were consistent in general

3    shape is Volvo XC60; an XC90, also a Volvo; Subaru

4    Forester; Nissan Pathfinder; Mercedes-Benz ML320; Mazda

5    MVP; Lexus RX300; Kia Soul; Kia Sportage; Jeep Grand

6    Cherokee; Hyundai Tucson; Honda Santa Fe; Ford Escape;

7    BMW X3; BMW X5; Suzuki Grand Vitara; Suzuki XL7; Jeep

8    Liberty; Isuzu Rodeo; Honda Passport; Chevy S10 Blazer;

9    Toyota RAV4; Honda CR-V.

10          It looks like one didn't make it on the list.

11   That was the Jeep Wrangler Unlimited is of the same

12   size.

13      Q.  Were you able to further narrow down that list by

14   looking at features of those vehicles?

15      A.  Correct.

16      Q.  Of those vehicles, were you able to eliminate

17   some?

18      A.  Most, yes.

19      Q.  Do you have that list memorized?

20      A.  Sure.

21      Q.  You have that list memorized?  Okay.  Tell the

22   jury what vehicles you were able to eliminate based on

23   features and how that came about.

24      A.  So of the features, again before, I was talking

25   about the headlights.  Like a Jeep Wrangler, everybody

1    knows, you know, it's got the classic Jeep headlights in

2    the front.  They don't wrap around to the side.  That

3    feature eliminates a number of vehicles.

4         The spare tire carrier on the rear eliminates a

5    number of vehicles.  Then heading the option for a

6    non-body colored front and rear bumper is another

7    feature that eliminates a number of vehicles.  So when

8    it comes down to it, you end up with Isuzu Rodeo, Honda

9    Passport and Honda CR-V as possible matching vehicles.

10   Q.  We can put up that next slide.  Why don't you

11   take us through why you were able to exclude these

12   vehicles?

13   A.  Sure.  Like on the Santa Fe, the Jeep Grand

14   Cherokee, the Pathfinder, and the newer CR-Vs, you don't

15   have rear spare tire carriers.  Same thing with the

16   Escape.  On the S10 Blazer, you can have a rear spare

17   tire carrier, only on the two-wheel-drive model, and the

18   two-wheel-drive model only comes with tinted windows in

19   the back and it doesn't have the -- sort of that same

20   type of shape in the back of the vehicle.  Those

21   features would have been noticeable.

22   Q.  Were you further able to eliminate some vehicles

23   based on color?

24   A.  Yes.  So then when you take those last few

25   numbers of vehicles, I went and reviewed the available

1  paint colors for the various model years that those

2  vehicles were available.

3      Q.  And what vehicles were you -- why don't we go to

4  the next slide.

5      Can you tell us what we're seeing here?

6      A.  Yes.  In the upper left, we have a Honda

7  Passport.  A Honda Passport is basically a clone of the

8  Isuzu Rodeo badged under Honda.  They do have a rear

9  spare tire carrier, but the Passport only came in Canal

10  Blue and Indigo Blue.  Those are both extremely dark

11  blue colors, and they would not be consistent with the

12  medium blue color.

13      In the lower portion, we have the Isuzu Rodeo in

14  three different colors, Trooper Blue, Midnight Blue and

15  Clipper Blue.  The Trooper Blue being the darker color

16  up top, which would not have been consistent, and then

17  the other two colors, which are potentially consistent,

18  even though the one is fairly dark.  I thought that that

19  might be a potential match if the lighting was right.

20      Q.  And then if we could go to the next slide.

21      A.  Now, here we have the CR-V.  The CR-V had

22  different colors depending on the model year available.

23  So up top you have the Eternal Blue Pearl and Super

24  Marine Blue.  Those again are both very dark navy colors

25  that would not have been consistent.  And then at the

bottom, you have Electron Blue Metallic and Electron
Blue Pearl.  Both of those colors would have been
consistent.

Q.  We can take that down.

Did you review a list of the registered vehicles
in Kodiak?

A.  Yes.

Q.  Of that list, were you able to narrow it down to
how many of the vehicles registered in Kodiak would be
consistent with the vehicle that you observed in the
4-12 video?

A.  Yes.

Q.  How many was that?

A.  It was nine.

Q.  What did they include?

A.  So the total list was 32,000 vehicles listed for
Kodiak.  And they tell you the make, model, and a
general color name.  So it doesn't tell you whether it's
dark blue or light blue.  It just says blue.

So of that, the nine vehicles, included a couple
of Rodeos, one, two, three, four, five.  And then four
Honda CR-Vs, one of which was Wells' vehicle.

MS. SHERMAN:  Thank you.  I have no further
questions.

THE COURT:  Mr. Colbath, go ahead, please.

1          MR. COLBATH:  Thank you.

2                    CROSS EXAMINATION

3   BY MR. COLBATH:

4       Q.  Mr. Becker, while we're getting set up here, you

5   didn't look at any one of those 32,000-plus vehicles

6   from Kodiak except Mr. Wells' vehicle, did you?

7       A.  You mean physically look at them?  I only saw

8   photographs of Mr. Wells' vehicle.

9       Q.  And you didn't see even a photograph of any of

10  the other 32,000?

11      A.  Correct.  That wasn't part of my analysis.

12      Q.  It appears to me, sir, from your CV that your

13  work primarily focuses on civil litigation, accident

14  reconstruction and other design-type testimony, largely

15  centered around the automotive industry?

16      A.  Yeah.  Most of my work centered around the

17  automotive industry.  Some of my work of course in the

18  photogrammetry realm has been completely non-automotive

19  related, like a trial a few months ago was a photograph

20  of a container office building with some pipes nearby,

21  making measurements on that.

22      Q.  It appears to me that other than our case, you've

23  only testified in two criminal cases?

24      A.  Yeah, two others.  I thought there were more,

25  but --

1    Q.  You haven't -- your testimony is listed in your

2    CV, right?

3    A.  Yes.  I have the last four years per the federal

4    rule, but there's of course been more testimony than

5    that.

6    Q.  And neither of those prior cases, the criminal

7    cases, at least the ones listed, those didn't deal with

8    video image analysis?

9    A.  No, they both dealt with video image analysis of

10   motor vehicles.

11   Q.  Sir, one of them was a murder case where you

12   testified about speeds of a vehicle and a collision that

13   occurred, right?

14   A.  Yes.  And then there was also a video.

15   Q.  And you weren't asked to perform or offer any --

16   your testimony wasn't accepted as -- any testimony

17   regarding video analysis in that case, was it?

18   A.  No, I don't think that was part of the question

19   in the end.  The part of my testimony in that case was

20   for the vehicle data and how the collision occurred.

21   Q.  Now, you testified -- I saw one of the cases you

22   had listed was *Sivak versus Cody Rides*.  That was a

23   federal court case from last year, right?  Do you recall

24   that case?

25   A.  Yes.

1    Q.  There your testimony was offered in the District

2    of Minnesota, federal court in Minnesota?

3    A.  Yes.

4    Q.  You did testify in -- about a couple of different

5    opinions in that case dealing with a couple of different

6    areas of testimony, right?

7    A.  Yeah.  There was video analysis because they had

8    video of an amusement ride that had ejected a few

9    passengers, and there was analysis of the ride and its

10   maintenance records.

11   Q.  The carnival ride?

12   A.  Correct.

13   Q.  And the district court in that case reviewed your

14   testimony and reviewed your qualifications.  You recall

15   that?

16   A.  Not specifically.  It was a deposition, I

17   believe.

18   Q.  Well, when your testimony was submitted, the

19   district court found that you weren't qualified to

20   testify in video imaging analysis; isn't that true?

21   A.  That was never presented to me.

22   Q.  You've not reviewed the opinion where the Court

23   found that your testimony was inadmissible because you

24   had no training in video image analysis?

25   A.  I have never seen a document related to that or

1    had a conversation related to that.

2        Q.   Would you like to see it, sir?

3        A.   It's unrelated.  I provided testimony for

4    deposition in that case.

5              (Mr. Colbath approaches the witness)

6              MR. COLBATH:  It's page four, Counsel.

7    BY MR. COLBATH:

8        Q.   Sir, I would refer you to -- well, first of all,

9    on the first page, you recognize the caption of the

10   case.  That's the case we were talking about, the one

11   cited in your CV?

12       A.   Yes.  *Sivak versus Cody Rides*.

13       Q.   I refer you to page four, the first full

14   paragraph.  Once you have had a chance to review that, I

15   just have another question for you, sir.

16       A.   Sure.  I never saw this before.

17       Q.   And that was going to be my question.  Nobody

18   shared with you, sir, that the Court had found you were

19   not qualified to offer an opinion about video security

20   images because you had no training in video analysis?

21       A.   Yeah.  Otherwise, I would have been able to

22   respond and address that type of issue.

23       Q.   In looking at your CV, sir, I don't see that you

24   have specific training in video image analysis, forensic

25   video image analysis, correct?

1    A.  No, that's incorrect.

2    Q.  Can you tell me about a specific forensic imaging

3  analysis training that you've had?

4    A.  Sure.  My Faro laser scanning training, my

5  PhotoModeler training, PC Crash software training.  And

6  it also is an aspect that's come up in the Northwestern

7  crash reconstruction courses.

8    Q.  So those are all training in photogrammetry,

9  correct?

10    A.  Photo and video analysis.  In other words, in a

11  lot of the cases related to crash, we have to identify

12  various characteristics just based on the police

13  photographs of the scene.  So there's training of course

14  for the police to have proper documentation of the

15  scene, but that doesn't always occur.  So a lot of times

16  we have to make analyses based just on photographs when

17  evidence is no longer available.

18    Q.  Now, I was following on your CV here, all of

19  those were courses and training that it appears you took

20  before that case we talked about where your testimony

21  was rejected last year.  You don't have any training

22  since then, just in the last, say, 12 months on forensic

23  video image analysis?

24    A.  No.  Actually, there's another update to PC Crash

25  that I took just last month that's not on here yet.

1    Q.  An automobile crash analysis training?

2    A.  No.  It was primarily based on integrating laser

3    scan data with photographs and doing photo matching.

4    Q.  Sure.  You didn't use any laser scanned

5    insertions or information into any of your report in

6    this case, did you?

7    A.  Yeah.  The other experts -- the other analysts

8    did that work.

9    Q.  In fact, you didn't do photogrammetry here.  You

10   didn't take any laser scanning?

11   A.  No, I did photogrammetry, just not with laser

12   scanning.

13   Q.  Well, sir, isn't photogrammetry

14   mathematically-based scientific -- taking

15   mathematically-based scientific principles and

16   dimensional information and putting it into an image

17   reconstruction that allows you to then determine certain

18   characteristics about an unknown object?

19   A.  Yeah.  That's a pretty good summarization.

20   Q.  You testified on direct examination, and I read

21   your report thoroughly, you didn't take any measurements

22   in this case.  You didn't yourself conduct any

23   measurements, did you?

24   A.  That's incorrect.

25   Q.  List for me the measurements that you took.

1    A.   Sure.  The measurements of the various angles of

2    the vehicle, and then I also took the overlay image for

3    comparison of size in comparison with the -- let me get

4    the right phrase, the other analysts' work of the size

5    of the vehicle.

6    Q.   What did you measure with respect to the angles?

7    You were just talking about you drew a line on the paper

8    and determined what angle that that line sat at from a

9    perpendicular degree?

10   A.   Exactly, yeah.  That's considered a measurement.

11   So you're measuring an angle.

12   Q.   Those were photos you took from somebody else's

13   report, and you simply measured what, to verify the

14   angles?

15   A.   It was from the images of the actual video, the

16   incident video, the images of the 4-19 video, as well as

17   the 3D models from the defense's analyst.

18   Q.   And you talked about another group of

19   measurements, measurements related to the overlay.  What

20   did you measure in respect to making your overlays?

21   A.   There between the 4-12 video and the 4-19 video,

22   I scaled the buildings to make sure -- certain my

23   movement of the ghosted image over top of the other

24   image were consistent in size.

25   Q.   So any other measurements or imaging

1  measurements, calculations, mathematical calculations

2  that you did?

3      A.   Yeah.   One more based on the overhead view from

4  Google Earth determining the distance of the roadway

5  from the approximate location of the camera.

6      Q.   What did you determine there, by the way?

7      A.   It's about 1,000 feet.

8      Q.   So up until now, your testimony here, how much

9  has your company's total billings been to the government

10 for preparation of your work in this case, your report,

11 your testimony here?

12     A.   I don't have the final value or an exact figure

13 for either of those.

14     Q.   Okay.

15     A.   I know it was budgeted somewhere around 30K.

16     Q.   I saw a bill from beginning of August that --

17          MS. SHERMAN:   Your Honor, he's testifying.

18          THE COURT:   That's sustained.

19          MR. COLBATH:   Sure.

20 BY MR. COLBATH:

21     Q.   Could it be higher than $47,000 prior to your

22 travel here to Alaska or any of the billing for the

23 testimony here?

24     A.   I don't know.   I don't see the bills like that.

25     Q.   Okay.

1     A.   I just have to approve my time and hours.

2     Q.   Nobody asked you to review that information or

3   keep track of that information, did they?

4     A.   That's kept track in my system.  I just didn't

5   print that out.

6     Q.   Okay.  So the purpose of your investigation here

7   was, as you wrote it down, "To analyze the surveillance

8   videos to determine the make and model of the vehicle of

9   interest and see if it was consistent with the Wells'

10  2001 Honda CR-V."  Correct?

11    A.   That's a general summary, yes.

12    Q.   Well, that's how you summarized it in your

13  report, right?

14    A.   You added a few words.  Otherwise, yes.

15    Q.   To analyze the surveillance videos, first of all,

16  there was just one surveillance video in this case,

17  right?

18    A.   Of the incident vehicle, correct, there's one

19  surveillance video and then there -- well, there's two

20  surveillance videos of the day of the incident, one of

21  the different angle that didn't capture the vehicle of

22  interest.  And then there's the vehicle of interest

23  video, and then there's the 4-19 video.

24    Q.   And the 4-19 video isn't surveillance at all.

25  That's the police taking Mr. Wells' car and driving back

1  and forth on Anton Larsen Bay Road?

2     A.   It's still surveillance video because it comes

3  from the same surveillance system.

4     Q.   The police were surveilling themselves.  They had

5  a policeman sitting on one end of the controls of the

6  camera watching a police officer drive the car on the

7  other end.  In your terminology, that's also

8  surveillance?

9     A.   Of course.

10    Q.   Okay.  Now, prior to going out there and

11 conducting that second surveillance video, you were --

12 well, that was all done before you were involved in the

13 case, wasn't it?

14    A.   Yes.

15    Q.   So that wasn't anything law enforcement consulted

16 with you about, how -- the best ways to do that,

17 parameters to use, anything like that?

18    A.   Exactly.

19    Q.   And you've not been to the COMMSTA or been to

20 Kodiak or the area where these videos were taken, have

21 you?

22    A.   No, I had no need to go to the site.

23    Q.   In conducting your work and beginning the

24 process, you indicated it was important to review all

25 the facts.  And the facts that you had prior to

1    determining anything were the 4-12 video, the April 12th

2    actual surveillance video, right?

3        A.  Yeah.  I mean, the materials available for review

4    are listed in my report.

5        Q.  I understand.  These ladies and gentlemen don't

6    have your report, so I'm asking you about that, sir.

7    You had the 4-12 video?

8        A.  Yes.

9        Q.  And you had the 4-19 video, which you knew was a

10   law enforcement video using Mr. Wells' car?

11       A.  Yes.

12       Q.  And you had a picture of Mr. Wells' car?

13       A.  Yes.

14       Q.  And then you had the work and the materials done

15   by other analysts and similar video analysis from the

16   government, you had some other people's reports?

17       A.  Yeah.  I had one defense report and an e-mail

18   from one of the investigators, as well as a couple

19   reports from other investigators.

20       Q.  And so in looking at it, you said it's important

21   to start with the facts.  And what you did was you

22   reviewed both videos, and you reviewed in detail

23   photographs of Mr. Wells' car?

24       A.  Yeah.  These were all the facts in the start of

25   the case, the start of my analysis of the case.

1    Q.  So prior -- prior to trying to determine what the

2  unknown vehicle was or make any independent standalone

3  assessment of what that vehicle might have been, you

4  reviewed and had lots of information about the car you

5  were looking for?

6    A.  Yeah.  What the attorney is alluding towards is

7  informational bias.

8            MS. COLBATH:  Your Honor, I'm going to --

9            THE COURT:  That's sustained.

10            MR. COLBATH:  -- object and have it stricken as

11  nonresponsive.

12            THE COURT:  Just let's hear your next question.

13            MR. COLBATH:  Well, I would like --

14            THE COURT:  I will strike that.  That's fine.

15  Go ahead.

16            MR. COLBATH:  And so can I have that question

17  read back?  I would like an answer to that question.

18            THE COURT:  That's fine.  Yes.

19            Let's hear that question again.  Madam Court

20  Reporter, can you read that back.

21            COURT REPORTER:  Prior to trying to determine

22  what the unknown vehicle was or make any independent

23  standalone assessment of what that vehicle might have

24  been, you reviewed and had lots of information about the

25  car you were looking for?

1        A.   Yes.

2        Q.   And you talked a little bit about resolution and

3    the surveillance video.  Now, the April 12th video,

4    while the -- the camera that took both of these videos,

5    that's a low resolution camera, isn't it?

6        A.   It's 480P.

7        Q.   And the 480P refers to 640 pixels by 480, which

8    is just the pixel grid that that camera projects or

9    captures from any video, right?

10       A.   Correct.

11       Q.   And it actually -- that's the maximized

12   resolution that that camera is capable of, that's its

13   capability, but it actually functions in this capacity

14   with a much lower resolution than that.  It doesn't even

15   capture four -- 640 by 480, does it?

16       A.   No.  It was 640 by 480.

17       Q.   Well, do you know what the camera's nominal

18   resolution is?  Do you know what nominal resolution is,

19   first?  Let's start there.

20       A.   I do.

21       Q.   And what's that?

22       A.   That's the resolution before you perform a zoom.

23       Q.   And do you know in this camera system

24   configuration how many cameras are there in the camera

25   system that captures data that includes the one that

1   captured the 4-12 video?

2       A.   I'm only aware of the two cameras.

3       Q.   And do you know how it is that when those cameras

4   record images, those images are stored or collected?

5       A.   No.  I was only given the output.

6       Q.   And so, first of all, if there were more cameras

7   and all of the information from all the cameras were

8   reduced down and stored on one device, the device that

9   stores them in the computer, the hard drive, it has to

10  download all that data, all that resolution to store

11  those images, doesn't it?

12      A.   Yeah, it downloads each camera's data.

13      Q.   And the more cameras there are and the more data

14  there is to download, the more that that system has to

15  compress that data in order to store it, because motion

16  takes up a lot of data?

17      A.   Not necessarily.  The systems are generally

18  capacitized to acquire all of the cameras that the

19  system is capable of acquiring generally at full

20  resolution.  When they downsize it is an elected option.

21      Q.   And so you don't have any idea about how much

22  compression went on or how much loss in resolution there

23  was in this system because of all the cameras on the

24  system.  You weren't asked to look at that?

25      A.   The exported information I had was 640 by 480.

1    Q.  But you don't have a way to test the nominal

2  resolution.  You don't have a way to know whether this

3  is capturing full resolution or whether it's something

4  less due to compression.  You didn't do anything to make

5  any of that determination?

6    A.  No.

7    Q.  You weren't provided any of the information about

8  the cameras' settings when it captured the April 12th

9  video, were you?

10    A.  The cameras' settings are embedded in the

11  metadata for the video.  So I had the video.  That's all

12  I needed.

13    Q.  Okay.  And so what was the focal point of the

14  zoom on the 4-12 video at the time the image was

15  captured?  Because you said zoom affects resolution.

16    A.  Yes.  What they do with zoom is there is both

17  digital and mechanical zoom.  If you do digital zoom,

18  you can affect your resolution.  If you do mechanical

19  zoom, it does not affect the resolution.  I didn't

20  investigate that because I took the video as I received

21  it.

22    Q.  Okay.  So I guess my point, sir, is you don't

23  know what the nominal resolution is.  You don't know

24  that we were even capturing the low resolution of 480P?

25    A.  All I can tell you is the video I had was 480P.

     Q.  You were aware as you started your work and
started your analysis from reviewing the reports that
you had that the FBI's Forensic Audio, Video, and Image
Analysis Unit had conducted similar evaluation prior to
your involvement, right?

     A.  If you name the person, I could either agree or
disagree with it.

     Q.  Sure.  You saw work from or information from
analyst -- forensic analyst Chris Iber?

     A.  I saw an e-mail from him, correct.

     Q.  You saw a report and analysis from Richard Vorder
Bruegge?

     A.  Correct.

     Q.  In fact, Mr. Vorder Bruegge's report, you used
one of his slides, some of his measurements and
calculations, you incorporated that into your work?

     A.  Yes.

     Q.  And Mr. Iber, Mr. Vorder Bruegge, they determined
they could not make any conclusion about the identity or
the characteristics of the vehicle in the 4-12 video due
to a lack of --

          MS. SHERMAN:  Your Honor, I'm going to object.

          THE COURT:  Let's hear the rest of the
question.

BY MR. COLBATH:

     Q.  -- due to a lack of or because of poor image
resolution?

          MS. SHERMAN:  I think that mischaracterizes
Mr. Vorder Bruegge's report.

          THE COURT:  I'll overrule the objection.  The
witness can answer if he agrees or not.

     A.  I know in the Iber e-mail, he said he could not
determine the make or model of the vehicle and said
maybe others could.  I don't recall the conclusion from
Vorder Bruegge exactly.

     Q.  The end analysis that you conducted was really an
observational assessment between what you saw on the
4-12 video and what you saw on the 4-19 video, wasn't
it?

     A.  The 4-19 video is a confirmation of what I saw on
the 4-12 video.  Because the process we typically
attempt to use is to get a known object in the same
geography as the object we're trying to identify.  So
any known object would have worked.  In this case, it
happened to be Wells' vehicle.

     Q.  Any known object would have worked.  So they
could have drove any vehicle in front of there?

     A.  Sure.  Well, as long as I knew what vehicle it
was.

     Q.  The 4-12 video, you talked about frame rate

1 and -- frame rate of the camera, which you agree is

2 about four frames per second, right?

3     A.  Correct.

4     Q.  And the April 12th video, the surveillance video,

5 based on your observation of that, the unknown vehicle

6 is in front of the camera about one second going

7 northbound and one second going southbound?

8     A.  Yeah, about a second and a quarter northbound and

9 about a second southbound.

10     Q.  On the frames really there's a partial view of

11 the vehicle going southbound.  The first time it comes

12 past on Anton Larsen Bay, you see a portion of the

13 vehicle three full frames and a portion of the vehicle,

14 so the two halves it's about four?  Are you referring to

15 something there, sir?

16     A.  I'm just confirming what you're saying or denying

17 it just by looking at the collage I have of the frames

18 of the vehicle traveling northbound.

19     Q.  Yeah.  Sure, if you want to look it's page five

20 of your slides there that we saw.

21     A.  Yep.  Yeah, that's correct.  There's a portion of

22 the vehicle in the first frame and a portion of the

23 vehicle in the last frame.

24     Q.  On the way back, there's, southbound when it

25 comes back down Anton Larsen Bay Road, four, right?

1    A.   Again, in that I guess it would be less than four

2    because there's a portion of the vehicle in the first

3    frame and a portion of the vehicle in the last frame.

4    Q.   And the images that you used, the ones you showed

5    in the 4-12 video with the jury here, did you extract

6    those from the video?

7    A.   Yes.

8    Q.   And how did you do that?  What process did you go

9    through to extract those?

10   A.   It would be in my notes on the -- actually, it

11   would be in the metadata for the exports.  So I don't

12   recall if those were using the Windows snip tool or if

13   they were from an export feature in the VideoCommander

14   software.

15   Q.   You didn't --

16   A.   It was one of those two.

17   Q.   You didn't just take those from one of the other

18   reports you looked at?

19   A.   No.

20   Q.   And so the ones you and I were just talking

21   about, the four or five going one direction and four

22   going the other, it was nine total anyway that you say

23   you exported?

24   A.   Correct.

25   Q.   And then on the 4-19 video, you showed a lot of

1  pictures and comparisons from the 4-19 video.  Who

2  extracted those?

3      A.  I did as well.

4      Q.  Okay.  And so on the 4-12 video, you took all the

5  frames, right, all nine, that's all there was of the

6  unknown vehicle?  You pulled out every one that you

7  could pull out?

8      A.  Yes.

9      Q.  And on the 4-19 video, first of all, you were

10 aware that the -- I'm sorry, Sonja.  Strike that

11 question.  Let me ask you one more about 4-12.

12         You don't know what the speed of the vehicle is

13 as it traveled down Anton Larsen Bay Road southbound and

14 whether it was that vehicle or another coming back by,

15 you don't know the speed in either direction, right?

16     A.  I didn't calculate the exact speed.

17     Q.  Do you have an estimated speed?

18     A.  No, just a comparative speed with fewer frames

19 departing versus arriving.  The departing traveling the

20 same distance would have been traveling slightly faster.

21     Q.  But as to -- I didn't ask you for a difference in

22 speed.  I asked for an estimation of speed, total speed.

23     A.  I thought you just said, do you know -- how do

24 you know -- what I know about speed.  That's what I know

25 about speed.

1    Q.  All right.  So just so I'm clear, because maybe

2    my question was unclear, you don't know or have an

3    estimation of the speed of the vehicle traveling

4    southbound?

5    A.  No, I didn't measure the speed of the vehicle

6    southbound or northbound specifically.  Only relative to

7    each other.

8    Q.  Okay.  Now, I'll go to my questions on the 4-19

9    video about the frames.  You were aware that the police

10   drove Mr. Wells' car down Anton Larsen Bay and back down

11   Anton Larsen Bay on April 19th a whole bunch of times,

12   not just one northbound and one southbound, but actually

13   seven northbounds and seven southbounds, right?

14   A.  Right.  Yeah, there were multiple.

15   Q.  So they also drove it at different speeds.  You

16   knew that?

17   A.  Yeah, I think so.  I think some of the other,

18   whatchamacallit, travels had different number of frames

19   for how long the vehicle was viewable.

20   Q.  So they -- the video started at a very, very slow

21   speed, didn't it, five miles per hour or many, many

22   frames as it traveled across southbound and many, many

23   frames as it traveled slowly back northbound.  Do you

24   recall that from your review?

25   A.  Yeah, not the five miles an hour specifically,

1    but that there were multiple frames, in excess of five.

2        Q.   And then the next time, a few less frames but

3    still far more than the April 12th and back across and

4    so on for each pass all the way up through the seven.

5    You recall that?

6        A.   All I specifically recall is that one of the

7    travels was five frames in each direction.

8        Q.   Okay.  Now, which images -- you were able to look

9    at all those frames in all the different passes, the

10   clarity of them, the vehicle's position relative to the

11   camera in all of those and select the frames you want,

12   correct?

13       A.   No.  I just selected the one route that had five

14   frames in each direction.  That was -- it was up and

15   then back at the same time.  Not the same time, but you

16   know what I mean, sequentially.

17       Q.   Which one was that, do you recall, the first one,

18   the second one, the third one?

19       A.   No, I didn't note the -- like pass number.

20       Q.   Okay.  And again, you had no idea then of the

21   speed of the vehicle?

22       A.   I was not calculating the vehicle speed.

23       Q.   And so you're saying that all the images that you

24   showed us in your report here came from one singular

25   pass -- one singular -- one northbound and one

1    southbound pass?

2        A.   Exactly, yeah.

3        Q.   And did you record at all in your notes or in

4    anything in your report about the time on the video

5    where those were taken so that if somebody wanted to

6    look or wanted to verify that information they could?

7        A.   I would have to review the metadata.  I don't

8    know that I did record the time at which I recorded the

9    4-19 video.

10       Q.   Now, you're aware that the 4-12 video, the

11   April 12th -- or are you aware the April 12th video was

12   recorded at around 7 a.m. in the morning?

13       A.   Yes.  7:09 and 7:14.

14       Q.   And the weather as it appears on the video and

15   the weather that day in Kodiak was dry and mostly sunny,

16   although it's just after sunrise, 7 a.m.?

17       A.   The light was flat at the time, indicating that

18   it was cloudy.

19       Q.   Or dawn?

20       A.   Well, at that time, it was reflecting white light

21   from the sky, so that's clouds.

22       Q.   It was also reflecting substantial white light

23   because Kodiak at that point had a considerable snow

24   cover, especially in the area around Anton Larsen Bay

25   Road and the video capture, didn't it?

1    A.   We're referring to two different types of

2    reflections.  Snow is reflected directly from the areas

3    in the fields and things of that nature.  The reflection

4    I'm talking about is like the roofs of the vehicles, et

5    cetera.  They weren't showing like a blue sky.  They

6    were showing a cloudy sky.

7    Q.   Here the -- both of those reflections were going

8    on, correct, the sky and the snow reflections?

9    A.   Yeah.  There wasn't really reflections of the

10   snow.  It was the snow that's being reflected back to

11   the camera.

12   Q.   Sure.  On both sides of the vehicle, near --

13   between the camera and the vehicle, which was

14   1,000 feet, and on the other side of the vehicle where

15   there was a complete snow field and a frozen lake?

16   A.   Yeah.  There were some trees and snow on the far

17   side of the vehicle.

18   Q.   And on the April 19th video of course, that was

19   taken at 3:00 in the afternoon.  Were you aware of that?

20   A.   Yes, it was between 3:00 and 4:00.

21   Q.   That was on a day where it was in fact cloudy and

22   rainy?

23   A.   It was definitely cloudy.  I don't have any

24   confirmation of the actual like rainfall.

25   Q.   Okay.  You noticed the puddles in the parking lot

1   on the video, the water present in the images, I assume?

2       A.  Yes.

3       Q.  And just like with the 4-12 video, you had no

4   idea, no way to know what the camera settings were or

5   the zoom was on the -- when the April 19th video was

6   taken?

7       A.  Well, actually, the field of view gives you an

8   assessment as to where the camera is pointing.  So on

9   the 4-19 video, the field of view was tipped slightly

10  downward relative to the 4-12 video and slightly to the

11  right.  But the scaling of the T-2 building, the far

12  building near where the Anton Larsen Bay Road is was

13  similar between the two videos.

14      Q.  And you made no adjustment for -- well, you knew

15  the cameras were -- first, they could tilt.  You were

16  aware of that?

17      A.  Yes.  It's a mechanical camera.  They can be

18  panned and tilted.

19      Q.  And the tilt was different on 4-19 than the

20  comparison video of 4-12.  The tilt -- let's just stay

21  on that function, tilt.  That was different between the

22  two videos?

23      A.  Yeah.  If you look at the images between the two

24  videos, you'll see a little bit more pine tree top on

25  the 4-12 video versus the 4-19 video.  But the general

```
 1    geography of where the roadway is is pretty similar
 2    between the two images.
 3        Q.  The trees that you -- well, let's not let people
 4    guess about this.  Could you pull up for me maybe slide
 5    No. 2 of Exhibit 95.  And then could you pull up --
 6    what's the exhibit number for the screen capture of the
 7    4-19 that we looked at?  Try one -- defense exhibit
 8    maybe -- sir, that one that we're looking at there, that
 9    is page two I think of your PowerPoint presentation
10    there, right, page two of your demonstrative Exhibit 95?
11        A.  Yes.
12        Q.  And my list doesn't have -- try Defense Exhibit
13    No. 197.  Okay.  That's --
14            MR. COLBATH:  Has that been admitted, Your
15    Honor?
16            THE COURT:  No, it has not.
17            MR. COLBATH:  Defense Exhibit No. 197.
18            DEPUTY CLERK:  That has not been offered or
19    admitted.
20            MS. SHERMAN:  Your Honor, I wouldn't object to
21    it being shown, because it's demonstrative.
22            THE COURT:  Go ahead and display it.
23            MR. COLBATH:  All I'm going to do is a
24    demonstration or demonstrative purposes only, Your
25    Honor.
```

BY MR. COLBATH:

Q.   So the picture on the right is -- I'll let you look at it, but see if you agree, it's just a screen capture from -- you see that it appears to be the same video camera view, correct?

A.   Yes.  Yeah, that's the 4-19 video.

Q.   And well, shoot, we've got that time up in the corner.  But you were just referring to some trees.  We were talking about the tilt function, and those were the trees that you were referring to, right?

A.   No.  Actually, I was referring to this pine tree and the view of this pine tree as well.

Q.   Okay.

A.   You can't see that one so well because of the timestamp.

Q.   Sure.  But here in the one that I've circled, we can see the whole trees, correct?

A.   In this image?

Q.   Yeah.

A.   You're talking about that tree back there?

Q.   Yes, sir.

A.   Yes.

Q.   And that's all the way -- that's again on the other side of the lake right over the top of the unidentified vehicle on Anton Larsen Bay Road?

1    A.   Right.

2    Q.   And you can -- I agree with you it's hard to see

3    there with the timestamp, but you can see the camera now

4    basically cuts off right through the middle of those

5    trees?

6    A.   Yeah.  You can see a portion of the tree or

7    something.  I think it might be the tree right there.  I

8    can't confirm that.

9    Q.   The camera -- even though those are way out there

10   that far away and tall trees like this other one, the

11   camera is tilted enough that we now lose all the ground

12   behind them and part of the trees themselves?

13   A.   Yeah.  Because you're talking about perspective,

14   so the further away from the camera, the greater the

15   change will be relative to small angle changes of the

16   camera.  If you'll look at the fence line you see the

17   difference is pretty small because that's close to the

18   camera.

19   Q.   Sure.  What you're talking about here is -- now,

20   this is just feet away from the camera, right?  The

21   fence runs right below the camera.  You're familiar with

22   that from your very first page that showed the outline

23   of the buildings?

24   A.   Correct.

25   Q.   And in these ten-foot fence sections here, do you

1    know how big the fence sections on a standard chain link

2    fence are?

3        A.   I don't know that that's a standard chain link

4    fence or the length of that specific section.

5        Q.   But in that section right there, we can see all

6    of the cross bracing and starting past this post,

7    correct?

8        A.   Exactly.

9        Q.   And here right at the source of the camera, we

10   lose several feet of the cross brace?

11       A.   There's a difference.  I'm not going to quantify

12   the number of feet.

13       Q.   Okay.  So if it's right at the source of the

14   camera, how many feet do we lose in perspective at

15   1,000 feet away where that car is sitting on the road?

16       A.   Zero.  It's still 1,000 feet away.

17       Q.   I understand, but here we've lost some view of

18   the fence in the foreground.  We've lost view of the

19   trees all the way at the other end of the photograph.

20   And so I'm asking, how much of the vehicle is different

21   or do we lose in the middle?

22       A.   Zero.

23       Q.   Besides being able to tilt, the camera can zoom,

24   correct?

25       A.   Yes.

1    Q.  And just like the tilt function, this camera was

2  zoomed in to a different zoom on April 12th compared to

3  April 19th?

4    A.  If there was a difference, it was extremely

5  small.  So there's means of doing those comparisons, and

6  that's what I applied when I did my analysis.

7    Q.  Say that again for me.

8    A.  If there was a difference in zoom, it was very

9  small, because I measured several features, which I can

10  point out to you if you wish.

11    Q.  Just tell me about the measurements you took.

12    A.  Sure.  The T-2 building, I made measures of the

13  roof line that's visible and the height from the roof

14  line to the roadway and then compared that to the T-2

15  building in the other video to make certain that those

16  were -- they were within my measurement error.

17    Q.  I didn't see those in your report.  Did you list

18  measurements?  And you didn't tell me -- just a minute

19  ago when I asked you about all the measurements you

20  took, you didn't tell me about measuring the T-2 roof or

21  measuring the height of the T-2 building.  You neglected

22  -- you didn't remember that?

23    A.  No, I did remember that.  That's what I had

24  stated when I said I made measurements of the T-2

25  building to make my overlay, my ghosting of the vehicle.

1    Q.  You didn't include the measurement calculations

2 or the information about that in the report?

3    A.  No, of course not.  Why would that be material?

4    Q.  And did not do any measurement, actual

5 measurement of the vehicle of interest?

6    A.  Again, just the ghosting comparison.

7    Q.  While we're talking about the measurements -- I

8 think we can take that down for a minute.  I have some

9 other questions about measurements as long as we're

10 talking about that.

11        You're aware, sir, of the pixel size in your

12 images, correct, that are extracted from both videos?

13    A.  That can be a feature, yes.

14    Q.  Well, in this case, the pixels at 1,000 feet,

15 given the resolution of this camera, the pixel

16 measurement is approximately five inches per pixel, or

17 each pixel in that camera representation is represented

18 by a real world value of about five inches; isn't that

19 correct?

20    A.  Yeah, about five inches.

21    Q.  So what that means is if we took that -- even if

22 we assume the resolution, the full resolution that you

23 say that the camera was capable of and had, there's 480

24 of those pixels running up and down and 640 across.  So

25 it's like a screen, like a window screen of little

1   squares, isn't it?

2       A.   Yeah.   I believe it was explained by the defense

3   expert, DiTallo.

4       Q.   And if we put that screen, those little pixels

5   over the top of a photograph, each one of the little

6   boxes in the screen, like a window screen or a sieve,

7   each one of those out at 1,000 feet where that car is is

8   five inches, maybe the width of my hand?

9       A.   Yeah, it's an approximate estimation.

10      Q.   Well, you know that other people who reviewed

11  this, including Mr. Vorder Bruegge who you've already

12  said you reviewed his work, he did the math and

13  calculated that out and came up with that valuation,

14  approximately five inches per pixel?

15      A.   Yeah, Vorder Bruegge had said about 4.8.

16      Q.   That was consistent with others or actually the

17  lowest size estimate of other reports that you reviewed,

18  wasn't it?

19      A.   Yeah.   I don't recall anybody else except for

20  DiTallo who had said it was about five.

21      Q.   You did not do any of your own pixel size

22  calculations, did you?

23      A.   No, because I was using sub-pixel marking.

24      Q.   What do you mean by sub-pixel markings?

25      A.   Sure.   If you are looking at an image, and if you

go back to my images of the green box, when you zoom
out, you can have an approximation as to where an object
is.  If you can mark on that at a sub-pixel rate where
an object is, you can get a better marking than if you
just identify a specific singular pixel.  And that's
called sub-pixel marking.

So that allows you to then zoom in to the
individual pixels, and they get kind of blurry as to
like what might be one pixel versus the next pixel, so
in your tolerance, you know your range of error.  Part
of the scientific method is knowing your range of error.
So when I had outlined the broader size of the vehicle,
I had used a bandwidth of I think 20 inches, so 167 to
187 inches.

Q.  There was a whole bunch of information there,
sir.  I want to break some of that down so that me and
the jury follow that.

A pixel is a five-inch, roughly, square at
1,000 feet out there?

A.  Sure.

Q.  And when the camera captures that, that's one
color?  A pixel can only be recorded as one color?

A.  Right.

Q.  And our eyes perceive all those pixels put
together as whatever image or form of an image we see as

1    the camera puts those pixels together to form the image?

2        A.  Sort of, yes.

3        Q.  Okay.  And you're saying when you looked at spots

4    out on the vehicles on the roadway on Anton Larsen Bay,

5    you were able to not only isolate pixels, but then

6    isolate spots within pixels?

7        A.  No.  You don't isolate spots within the pixels.

8    You make the measurement from the further view so that

9    you can see the edges more clearly.  Then when you go in

10   to zoom into that measurement, your measurement is not

11   bound by where the pixels are.  Your measurement is

12   bound by the CAD system or whatever you're using as a

13   ruler.  So you can make sub-pixel markings that are

14   going to be finer in resolution than the actual pixels

15   themselves.

16       Q.  You didn't put any of that in your report, did

17   you?

18       A.  No, it wasn't necessary.  I didn't do any

19   measurement of the length except for the comparison

20   measurements and the knowledge of what the range of

21   error could be.

22       Q.  What's the range of error you determined?

23       A.  As I mentioned, I used a size of the vehicle from

24   potentially 167 to 187 inches.

25       Q.  So that means when we're talking about a vehicle

1  being -- for instance, we know that a Honda CR-V, a real

2  Honda CR-V is 177.6 inches long, correct?

3      A.   Right.

4      Q.   And so your estimation of the -- with your margin

5  of error on size, the vehicle of interest is somewhere

6  between 167 and 187, a 20-inch difference, right?

7      A.   Yeah.  That's for narrowing the pool down of the

8  vehicles when looking at length, overall length.  So

9  that's why you can look at a Jeep Wrangler or a Jeep

10 Liberty as well as a Mercedes even though they're

11 significantly different in length.  It doesn't mean

12 they're going to match.  It just means that's what a

13 limiting factor is.

14     Q.   But my question was -- we'll get to the vehicle

15 exclusion or inclusion.  Just when we're talking about

16 what you can see and what you can't see, the best

17 distance calculation you can get, size calculation for

18 length is only narrowed down to 20 inches, a 20-inch

19 range, right?

20     A.   I didn't review the other expert's opinions as to

21 their actual range.  When I did my size comparison, it

22 was a ghosting overlay.  It wasn't an actual specific

23 measurement.

24     Q.   Just a minute ago, sir, you said you did

25 measurements and you developed a rate of error and your

1  rate of error was 167 to 187.  So was that accurate that

2  you did measurements, you had an error range and it was

3  167 to 187?

4      A.  Yeah.  That's for a different analysis.  That's

5  for the vehicle inclusion or exclusion.  So if you want

6  to talk -- did you want me to separate or you just want

7  like all lumped into one?

8      Q.  Well, you talked about them all in one.  So yeah,

9  I want to separate.  First, I just want to talk about

10  the length.  Okay?  Not even the length, just the

11  measurement of the pixels.

12      A.  Yeah.  If you're using my ghosting comparison,

13  then it would be a tighter range than that.  For my

14  exclusion, it's a wider range than that.  Because in the

15  comparison, you have a known size vehicle and it

16  overlays with the vehicle of interest.  So you know that

17  your comparison is very similar in that there's not a

18  specific error rate because it's just a comparison.

19          When I did the exclusion, I looked at the whole

20  range of potential measurements that were available for

21  that vehicle.

22      Q.  Let's not get to the exclusion.  Let's keep

23  talking about the measurements you took because the

24  measurements --

25      A.  Two seconds ago you said you wanted it all in one

1    answer.

2        Q.  Well, let's stay on the measurements for a

3    minute.  Okay?  All of the pictures that you -- or all

4    of the images that you analyzed were of moving vehicles,

5    correct?  They were still images taken from moving

6    vehicles?

7        A.  Right.

8        Q.  And at 1,000 feet, well, really or at any range,

9    there is motion blur when a camera captures a still

10   image of a moving vehicle?

11       A.  Yes.  There can be captured pixels to the rear of

12   the vehicle, not in front of the vehicle, but to the

13   rear of the vehicle with motion blur.

14       Q.  And one of the things that happens when you have

15   motion blur is things look longer or larger than they

16   are because of that blur.  The camera has pixels

17   actually going behind the vehicle where there aren't any

18   vehicles, but yet it's perceive -- the camera is

19   perceiving it because it's motion blur?

20       A.  Yeah.  It depends on the speed of the vehicle.

21       Q.  And we already talked about you don't know the

22   speed, did not know the speed of any of the vehicles for

23   the frame captures you used?

24       A.  I didn't calculate the speed.

25       Q.  And here you didn't calculate the motion blur

that might have been affecting the pixel change for any
of your images, did you?

A.  No, that was not one of my concerns because I
could see the rear of the vehicle separate from other
portions of the roadway.

Q.  Okay.  And others did.  You reviewed the others'
work, including Mr. Vorder Bruegge again, let's just
stay with him, from the FBI there.  He calculated motion
blur as well, didn't he?  Do you recall that?

A.  No, I don't specifically recall the motion blur
calculation.

Q.  Would you be surprised then or disagree with a
motion blur range of plus or minus two pixels?

A.  In total, that's consistent.

Q.  Okay.  So what plus or minus two pixels means is
we already talked about how big a pixel is, five inches,
plus or minus means two pixels is ten inches, right?

A.  Right.

Q.  And so from your example, something might be
longer or you might see something at the rear.  That
means just for the motion, not accounting for the
resolution problems with the pixels, just from motion,
the motion of the vehicle can add two extra pixels or
ten extra inches on any given spot.  It doesn't have to
be on the rear of the vehicle, right?  You'd see the

1    same motion blur on a mirror or on a tire or on a

2    window, all of that sliding by ten inches?

3        A.   If those features were wider than intended, they

4    would be up to that greater size, yes.

5        Q.   If the features were wider than --

6        A.   See, you got to talk about how an object's moving

7    through space.  So if it's moving forward and you have a

8    narrow feature, it can blur behind it.  Of course.

9    Makes sense.  It can't blur in front of it.  So leading

10   edge objects are still crisp.  Trailing edge objects can

11   be blurred.

12       Q.   Okay.  And so the back side of all your features

13   are blurred?

14       A.   Can be blurred.  Depends on the speed.

15       Q.   And so again, at higher speeds, more blur; lower

16   speeds, less blur?

17       A.   Correct.

18       Q.   And you don't know that the vehicles that you

19   compared were going the same speed, because you don't

20   know the speed of either to start with?

21       A.   Just used consistent frame rates.  So the number

22   of frames dictates the speed.  To normally calculate

23   speed, as you asked me, you would take the frame rate,

24   the amount of time, and the distance and that gives you

25   velocity.

1    Q.   And what did you do, sir, to account for motion

2    blur in any of your selection of spots of comparison?

3    A.   Yeah.  That went into that overall 167- to

4    187-inch vehicle range length.

5    Q.   But with respect to any given spot, you didn't do

6    anything to account for or adjust for motion blur, did

7    you?

8    A.   Any given spot?  I don't know what you're

9    referring to.

10   Q.   Well, let's just talk about that.  Let's look

11   at -- let's pull up page 13 of Exhibit 95.  So sir, this

12   is just one of the random pages from your report there.

13   The 13th slide.

14        So when I say any given spot, I'm referring to

15   the spots you made, the circles you made on here.  Those

16   are all different spots on the different vehicles,

17   right?

18   A.   Yeah.  Those are leading edge spots.  Well, the

19   front bumper is a leading edge spot, so that's not

20   subject to motion blur.  The bra is subject to motion

21   blur, which would make the bra wider, but it's behind

22   the headlight and the headlight would appear whiter, so

23   there would be white blurred rearward from the

24   headlight, not black.

25   Q.   Sir, my question was, those were spots you picked

1    on the vehicle, right, different spots?

2        A.   You asked me why I did those spots, yes.

3        Q.   And what tool did you use or what mechanism did

4    you use to put those red circles on the pictures?

5        A.   PowerPoint, I think.

6        Q.   Just the standard PowerPoint software that comes

7    with the Microsoft package?

8        A.   Yeah, those just outline geography on an image.

9        Q.   Sure.  And how many pixels on any one of those

10   five images, not the car down below, Mr. Wells' CR-V

11   down below, how many pixels are contained within just

12   one of those spots?

13       A.   I didn't analyze that.

14       Q.   So --

15       A.   The size wasn't -- the size of the red circle is

16   just a general highlight.

17       Q.   Just a general highlight?

18       A.   Correct.

19       Q.   It's the area within the circle that you're

20   comparing one to the other, though, right?

21       A.   Yes.

22       Q.   And -- well, would you agree with me that there's

23   somewhere between three and four pixels, that's a three

24   and four pixel width in each side of the circle?

25       A.   Width?  Again, I don't have any specific

1  knowledge of that.

2      Q.  Sure.  Well, and height?

3      A.  As I said, the circles were just PowerPoint

4  circles to highlight the area.

5      Q.  Right.

6      A.  I believe all the circles are the same size.

7      Q.  They are all the same size, right?

8      A.  I believe so.

9      Q.  Okay.  Well, you would want them to be, you're

10  comparing point to point, so you'd want to have the same

11  points of comparison, correct?

12      A.  No.  The circles didn't have anything to do with

13  the comparison.  You make a comparison by looking at the

14  image.  Then you put the circle there so that other

15  people know what you're looking at.

16      Q.  And you tried to circle the point at which you're

17  looking at?

18      A.  The area, yes.

19      Q.  And the area in each of these is in the real

20  world, not on this screen, but in the real world as

21  you're looking at it, had you been standing in the -- at

22  the location of the camera and looking at that car

23  1,000 feet away, each of those circles is about 15 to

24  20 inches around if it's three to four pixels?

25      A.  No.  That's not proper.

1    Q.  Well, we already talked about each pixel at

2    1,000 feet is five inches.  And if that circle -- for

3    instance, the one on the front bumper is three or four

4    pixels wide, out there it's five -- it's the size of a

5    pizza pan.  It's 20 inches wide.

6    A.  A better comparison would be that that size of

7    that circle is greater than the size of the tire, and

8    you can see that that's not the case.

9    Q.  Well, the tires are much -- the rims alone are

10   16 inches?

11   A.  Right.  That's what I'm saying.  So if that

12   represents 20 inches, that would encompass more than the

13   rim and most of the tire.

14   Q.  Do you have one where you put it on the rim?

15   A.  No, but I mean it's PowerPoint.  Things can be

16   moved.

17   Q.  So the circle, you'd agree with me, is roughly

18   the center of the size of the rim?

19   A.  No.  I would say it's smaller than that.

20   Q.  So it's a five, an eight -- an eight-inch

21   difference?

22   A.  Maybe if you included the outer portion of the

23   circle, it's the size of the tire and rim.  I can't make

24   a good judgment call of that because it's not on the

25   rim.  But when you look at it from the Wells' Honda CR-V

center image, if I just juxtapose -- juxtaposition the
circle, it does not look like it encompasses the width
of the entire tire and rim.

Q.  Well, it's right below it.  The tire's right
below it and it's -- well, I guess everyone can see it
whether it's the size of the rim or not the size of the
rim.

       But the point, sir, is you don't know where
within that large area you're comparing.  You don't know
the specific point within that that you're comparing?

A.  It's a visual comparison of objects.  It's not a
singular point.  I'm not talking about -- I identified
this one pixel and these images as being the dark spot.

Q.  Well, a visual comparison requires you to compare
comparable things, correct?  You know, you have to look
at the same point on two objects to see if they're
comparable.  Do you agree with that general premise
before we talk about these cars?

A.  It's not the same point.  It's the same general
area on the object of interest.  If you're looking at a
singular point you can be misled because of the objects
which you just discussed, such as motion blur, or pixel
movement.  So you look at the image as a whole, and you
zoom in to the areas of interest.  When I put the
circles on there that was to look at an area of

1   interest.  It's actually more difficult to look at those

2   areas of interest even with the circles on it.

3      Q.  And you have no way to know, sir, for instance,

4   as you're identifying -- well, the protocol is to first

5   identify individual areas of interest, so go one by one?

6      A.  Right.  Yeah.  The protocol is to use pointers to

7   identify the areas which you're calling out as a feature

8   or geography of interest in a given --

9      Q.  Let's pick one of those.  Let's pick an

10  individual characteristic like a taillight.  The

11  taillights, the side profile view of a taillight here is

12  less than five inches wide.  Do you agree with that?

13     A.  Yes.

14     Q.  And it's out there at 1,000 feet, and you're

15  going to decide to compare, well, I want to see if this

16  vehicle has two taillights that are similar.  The first

17  thing you have to do is know that for both of them,

18  you're looking at the taillight, right?

19     A.  Right.

20     Q.  And if it's less than five inches wide, and

21  the -- you can't get any closer than a ten-inch area of

22  motion blur tolerance, and then you can't pinpoint it

23  down to the pixel, you might not even -- you might be

24  looking at the taillight on one and a reflection or

25  another spot 10, 12 inches away on another.  So you

1   wouldn't be even comparing the same spot on the car, car

2   to car, before you decide if what you're looking at is

3   the same, right?

4       A.  Dealing with just taillight in this type of

5   imagery, no.

6       Q.  Well, the same would hold true if we compared

7   side-view mirrors?

8       A.  How about headlights?  Because you can see the

9   headlights.  You can't see the side-view mirror because

10  of the color blur.  In other words, the gray of the

11  side-view mirror isn't distinguishable while the vehicle

12  is moving at that distance.

13      Q.  The side-view mirror --

14      A.  But the headlight is white, and the headlight's

15  whiteness can be seen relative to the black of the bra

16  or it would have been visible relative to the color of

17  the vehicle.

18      Q.  Now, with the ten-inch difference of course, the

19  black of the bra could easily be the black of the bumper

20  in one direction or the black of the tire in the other

21  direction?

22      A.  No.  It's above the tire, so it wouldn't be the

23  tire.  The bumper, again, it's above the bumper so it

24  wouldn't be the bumper.

25      Q.  If we take --

 1      A.   Blur doesn't move vertically.  Blur only moves
 2  laterally in the direction of travel.
 3      Q.   Sure.  But you said you weren't getting down to
 4  the level of evaluating a pixel, and if we have a margin
 5  of error of -- even in length of 20 inches, and you're
 6  not down to the pixel point, you might not be looking
 7  the -- if you're a pixel or two off, you're on the tire,
 8  you're not on the bra.  There isn't a bra because the
 9  black that you're seeing is the tire.
10      A.   That's a misrepresentation as to how motion blur
11  occurs.  Because motion blur is linear.  It doesn't
12  occur vertically unless you have vertical motion.  So
13  you're not going to see a tire appear in the upper
14  portion of a fender.  You're not going to see a bra
15  appear in the middle of a hood, because that motion blur
16  is going to be in one direction, as long as that
17  direction is one direction relative to your camera.
18      Q.   And sir, maybe I confused concepts there, and I
19  don't want the jury to be confused.  I'm not talking
20  about motion blur.  There is pixel margin of error both
21  vertically and horizontally here.  That's true, isn't
22  it?
23      A.   That's for making measurements and determining
24  edges, not for evaluating shapes.
25      Q.   So say that again.

1    A.   Sure.  If you look at a shape and something

2    appears round, in all likelihood, it's round.  So the

3    measurement of the width of that circle can have issues,

4    and if there was motion involved, the roundness can look

5    a little oblong, but the height is still going to be the

6    same.  The measurement is going to have error, but your

7    general shape understanding is still that it's round.

8    Q.   You saw the calculations not only for -- that

9    others did for the length of the vehicle, but the height

10   of the vehicle, you have at least a one -- plus or minus

11   one pixel range of error in height, too, correct?

12   A.   Yeah.  And that's going to come in edge picking,

13   so when you're selecting the edge for where the bottom

14   of the vehicle is and the top of the vehicle.

15   Q.   But there's a plus or minus one pixel.  So you

16   can be anywhere you have -- you can't say that a

17   vehicle, for instance, or anything, a building, whatever

18   it is, you can't say at that range, that 1,000 feet, at

19   the 1,000 feet range something is this high, it's

20   60 inches high.  You're plus or minus one pixel, so you

21   have a ten-inch margin on height, a 20-inch margin on

22   width?

23   A.   Unless you have something also moving through the

24   image at the same speed as the object you're evaluating

25   and you know the size of that object and you place that

1   object over the other object.  Then you can say that

2   your actual known variation is lower than your pixel

3   smear.

4       Q.  You didn't do any height, independent height

5   measurement or height calculation, did you?

6       A.  Again, I did the overlay comparison that they

7   occupy the same space.

8       Q.  And that had a margin of error, has a margin of

9   error, just like the length, the height has a margin of

10  error?

11      A.  Yeah, there's going to be some sort of operator

12  ability to match those edges.

13      Q.  And what was your margin of error here, more than

14  one pixel, two, three?

15      A.  No, no.  Again, it wasn't to the pixel, it was to

16  the occupation of the space by the color.  So that's

17  already taking into account the motion blur and those

18  pixel smears.  So it's not -- it doesn't work that way.

19      Q.  Well, I'm not talking about motion blur.  You

20  said motion doesn't go up and down.  I want to know the

21  error of height rate, because I was talking to you

22  earlier about height of things.

23      A.  Sure.

24      Q.  Well, let's do it this way.  Others have

25  calculated it to be a minimum of one pixel.  Do you

1    agree that it's at least that, or was yours more?

2        A.  No, it's typically about a pixel.

3        Q.  And so a pixel is five inches, right?

4        A.  Yes.

5        Q.  We've already talked about that.  So when we're

6    looking at any given spot, if you're not isolating it

7    down to the pixel and you just happen to be looking at

8    two spots that are one pixel off and then you have a

9    rate of error of another pixel at least, you can be

10   looking both vertically or horizontally at something

11   that's a minimum of ten inches away, one car to the

12   other?

13       A.  No.  Because the car is not made up of a single

14   pixel.  So when you align two cars, you're aligning

15   hundreds of features.  You do that instantaneously with

16   your eyeball.

17           If you're looking for a mole on a person's face,

18   and you move it a pixel, yeah, it's going to be off by

19   whatever your range of error is, because that's a single

20   point on a person's face.

21           When you're looking at a car, you have a number

22   of geometry features which you're aligning, which is

23   both the roadway, the tires, the roof line, the front

24   A pillar, the front-end and the rear end.  So no, your

25   actual range of error is more likely going to be less

1   when you have a similarly sized object or a known sized

2   object to which you can compare.

3       Q.  Sir, you weren't comparing car to car.  You were

4   comparing video image to video image, correct?

5       A.  Of a car to a car.

6       Q.  The video images were made up of pixels, correct?

7       A.  Yes, they are.

8       Q.  To align them one to the other and have it be

9   accurate, like you want these people to believe, at

10  1,000 feet, you have to line it up pixel to pixel,

11  because there is so much range of error that if you're

12  just off that minutely, slightly, you have tremendous

13  differences in where you're looking at on car to car;

14  isn't that true?

15      A.  No, that's not true.  It's evidenced by the

16  imagery of the other vehicles that have traveled down

17  that path that you can identify.  For example, the white

18  pickup truck, it is not similar in size, shape or most

19  of the angles relative to this SUV.  Those types of

20  comparison are easily made without relation to one pixel

21  point potential error.

22      Q.  Right.  You were able without getting down to the

23  pixel level to tell that nothing on this screen is a

24  white pickup with a camper on it?

25      A.  Cab, yes.

1    Q.  Cab on it.  Okay.  Let's put that one down.

2         Let's talk about color for a minute.  I think I

3    understood you.  Basically, the vehicles were in the

4    same blue color family, medium blue?

5    A.  Yes.

6    Q.  And that's as detailed of a color analysis as you

7    did?

8    A.  Yeah.  They're all within the same hue and lumens

9    range.

10   Q.  Let's talk about -- and maybe I belabored the

11   point, but the last thing I want to talk to you about is

12   the angles here.  I think it's page 23 of your

13   PowerPoint.  Can we put that up, please?

14        First off, sir, you say that to draw that line,

15   you can locate within this where on the front of the

16   vehicle, like in this one, you have window, pillar,

17   reflection from the windshield?

18   A.  Yeah.  What you see in this zoomed-in image is

19   that the image blurs when you zoom in a lot.  You zoom

20   back out, you take the same angles that you measured

21   from the 3D model, you overlay them, and then you go

22   back and then you zoom in to create this image.

23   Q.  None of that --

24   A.  This is also distorted by our overhead projector.

25   Q.  None of that -- oh, so you say it's better than

```
1    what we see.  You didn't capture it in any medium that
2    could show us that was that good.  It's just -- for you
3    it was better at some point than what we could see here?
4        A.  Yeah.  I mean, overhead projectors are never as
5    clear as actual computer screens.  They're designed for
6    that type of work.
7        Q.  You got your -- do you have this PowerPoint up
8    there?
9        A.  Yes.
10       Q.  It's no better or no different in paper, is it?
11       A.  In paper, no.  Printing is even worse.  Printing
12   is usually 300 DPI, or dots per inch.
13       Q.  If we do the -- let's call it the A pillar.
14       A.  Yes.
15       Q.  That one I circled.  On the Toyota RAV4, that's
16   about four inches, 4.4 inches wide.  Do you know that?
17       A.  The overall A pillar?
18       Q.  Yeah.
19       A.  I think he's talking about the painted portion is
20   about four inches wide.
21       Q.  And what is there that makes up the A pillar in
22   addition to the painted portion?
23       A.  Well, there's also the attachment to the black,
24   to the windshield.  There's going to be the attachment
25   to the door frame.  There's going to be a number of
```

1    other components as part of the A pillar as seen by the

2    observer.  You can see that better in the photograph of

3    the vehicle.

4        Q.  So it's roughly five inches then maybe.  You

5    would agree with me about that?

6        A.  Yeah, ballpark.

7        Q.  Similar to a Honda CR-V, about five inches?

8        A.  Oh, between the CR-V and the Toyota RAV4?

9        Q.  Right.  They both have about a five-inch-wide

10   A pillar?

11       A.  Yes.

12       Q.  And so as we've talked about, that's one of those

13   little dots, one pixel out at 1,000 feet, the whole

14   entirety of the A pillar is represented by one pixel?

15       A.  No, not at all.

16       Q.  Well, the width of it is represented by one

17   pixel, five inches?

18       A.  Sure.  Yeah, the width of a given point on the

19   overall line is five inches.

20       Q.  And so in order to get your angle correct, you

21   have to have a starting point and an ending point to

22   connect the two dots; is that fair?

23       A.  Yeah, except you don't just connect two dots.

24   You connect all of the dots.  If you only connected two

25   then you would have that same single point issue you

were describing before.  But instead what you do is you
connect all of the dots on the leading edge.

     Q.  But you don't -- you have to start somewhere,
correct?

     A.  No, I don't think you do.  I mean, when you're
lining up any given line, if you're just drawing a line
you start out with one point.  In this case, I started
out with a point that wasn't even actually on the
vehicle.  So my starting point is not actually related
to the vehicle.

     Q.  And so to calculate angle, if you're incorrect or
if any of your points are off just a little bit, if
where you started, that wasn't on the vehicle, it was
off by a pixel, your entire angle becomes severely
skewed, doesn't it?

     A.  No.  I think the observer would throw out any
given one point that was skewed.  Because you're looking
at multiple points in succession.  You're looking at a
line instead of a single point.  You're looking at that
relative to any given horizontal object.  So you can
move that horizontal object up and down.  That won't
change the angle at all.  So the like sort of
intersection point isn't very critical.  It's the sum of
the points that makes up the line that defines your
angle.

1      Q.   Sure.   But the problem here, sir, is you're

2   talking about something 1,000 feet away.   So in front of

3   you, up close, a little bit of -- a one-degree angle,

4   that doesn't make much difference.   But where you are,

5   if you're off just -- where we're looking at these

6   vehicles, if you're off just a little bit, you might not

7   be anywhere close to the A pillar with your angle?

8      A.   That would be incorrect.

9      Q.   Let me try an example.   Have you -- are you

10   familiar with at all -- with shooting firearms or

11   shooting archery, either one of those?

12      A.   Both.

13      Q.   So if I shoot at my target and it's 15 feet away

14   and I'm just a hair off the bull's-eye at 15 feet, my

15   scope is off just a little bit, it's a minor adjustment.

16   I'm only a degree off, but I'm still relatively close to

17   the bull's-eye, right?

18         But if I go out to 1,000 feet, that minor

19   adjustment now causes me to miss by 10 or 12 inches and

20   it's the same minor adjustment because distance affects

21   angle in a drastic way?

22      A.   No.   The analogy is actually improper, because

23   what he's talking about is angle of incidence from the

24   viewer.   So remember we were talking about the tilt pan

25   of the camera.   He wanted to point out the tree that's

1    really far away.  Now it's differently viewed.  Because

2    that's really, really far away, you see a greater

3    difference, of course.  But the angle of that tree is

4    still the same.

5         So it's the angle of the object of interest, not

6    the angle of incidence like shooting a gun or shooting

7    an arrow, unless you're shooting that gun and arrow at a

8    line somewhere.  Then that line is still going to be the

9    same line.

10   Q.   And sir, that was my point.  That's why I asked

11   you, you have to start somewhere.  You said you started

12   these -- these are the lines.  You started somewhere.

13   I'm not talking about the view from the camera to there

14   that your angle would be off like this.  I'm talking

15   about your angle down there.

16        Your incidence from the top of the line to the

17   bottom requires a point on either end, and you're saying

18   that those points all match up, all of that matches.

19   And at that distance, you can't tell if your line is

20   starting in the correct spot, if it's tracking the

21   correct spot, matching top of the pillar to the bottom

22   of the pillar.  That's what I was talking about in

23   angle.

24   A.   Yeah.  You don't just match the top and the

25   bottom of the pillar.  He keeps wanting to assign it to

two points, but it's the sum of the points that makes up any given line.

Q.   Sure.  The Ford Escape, that has an A pillar of a similar angle?

A.   Yes.

Q.   The Honda Santa Fe?

A.   I don't recall.

Q.   The Isuzu Rodeo?

A.   Yes.

Q.   Honda Passport?

A.   Yes.

Q.   You can take that down.

In doing your analysis, I want to end up where we started, sir.  The vehicles that you say that you were able to distill down to nine on Kodiak, none of those vehicles did you look at again except the Wells' vehicle?

A.   No, that's outside my scope.

Q.   Well, you testified about it.  You said you were able to say that on Kodiak Island, of the 32,000-plus vehicles that law enforcement told you about, only nine of them could be consistent with the Wells' CR-V.  So you testified about that.  But those were all vehicles you did not look at except the Wells' vehicle?

A.   Right.  So I guess I have to qualify that.  For

them to be consistent, they then also have to have dark
rims.  They have to have the dark spare tire carrier.
They have to have the front bra.  There's a number of
qualifiers that somebody else will have to investigate
as to how consistent they are.

Q.  Right, because you --

A.  But just overall by the registry itself, they are
consistent.

Q.  Because you didn't look at any of the other
vehicles to try to include them or exclude them.  You
looked at one, the Wells' vehicle?

A.  One was provided, yes.

          MR. COLBATH:  All right.  That's all I have.

          THE COURT:  All right.  Redirect?

          MS. SHERMAN:  I have no questions.

          THE COURT:  Then ladies and gentlemen, why
don't we take our break now.  This person can be
released, correct?

          MS. SHERMAN:  Yes.

          MR. COLBATH:  Certainly.

          (Witness excused)

          THE COURT:  Leave your notepads here.  Let's
take 15 minutes.  Please remember my admonition not to
discuss the case.

          And thank you, sir.  You may be excused, and

1    we'll go off record.

2              (Recessed from 10:26 a.m. to  10:49 a.m.)

3              (Jury present)

4              THE COURT:  Please be seated, everyone.  So as

5    you might have surmised, ladies and gentlemen, we are

6    going to have a witness on videoconference here.

7              All right.  I won't see the witness.  Can he

8    see me?

9              THE WITNESS:  I cannot.

10             THE COURT:  Sir, can you see me now?

11             THE WITNESS:  I can now.

12             THE COURT:  All right.  Very good.  We have you

13   on record here in a courtroom in Anchorage, Alaska.  You

14   have been called to testify as a witness in this case.

15   And the lawyers are going to be at the podium and ask

16   you questions from there.

17             And I'm going to have the clerk here administer

18   an oath to you.  Any question about all of that, sir?

19             THE WITNESS:  No, ma'am.

20             THE COURT:  All right.  Madam Clerk, go right

21   ahead.

22             (Oath administered to the witness)

23             DEPUTY CLERK:  For the record, can you please

24   state your full name and then spell your full name.

25             THE WITNESS:  Sure.  It's Jason Anthony Bullis,

```
 1   J-a-s-o-n, A-n-t-h-o-n-y, B-u-l-l-i-s.
 2            THE COURT:  Ms. Stevens, go ahead, please.
 3        JASON ANTHONY BULLIS, GOVERNMENT WITNESS, SWORN
 4                        DIRECT EXAMINATION
 5   BY MS. STEVENS:
 6      Q.  Good morning, Petty Officer Bullis.  Can you hear
 7   me okay?
 8      A.  Yes, ma'am.
 9      Q.  So where are you right now?
10      A.  Right now, I'm outside of Miami, Florida.
11      Q.  And let's give the jury an idea of why it is you
12   couldn't come here today.  Can you explain briefly your
13   situation?
14      A.  Sure.  So I have a back injury to my L5-S1
15   vertebrae where the L5 vertebra, there is no disc in
16   between the two vertebrae anymore, so it's, in Alaska
17   terms, grinding down my S1 vertebra like a glacier in
18   the ocean.
19      Q.  Sounds a little uncomfortable, so if you need to
20   get up and move around, just let me know and we'll
21   request that from the judge.  Okay?
22      A.  Yes, ma'am.
23      Q.  Petty Officer Bullis, did you get any sleep last
24   night?
25      A.  Yes.
```

1    Q.  And how are you feeling right now?

2    A.  It's a little uncomfortable, but I'm okay.

3    Q.  Just briefly, what do you do for your pain

4 management?

5    A.  Right now, I'm on about 1,000 milligrams of

6 Tylenol and 525 milligrams of Aleve.

7    Q.  Who do you currently work for?

8    A.  I work for Coast Guard Sector Miami Beach,

9 Florida.

10    Q.  And are you currently on limited duty?

11    A.  Yes, ma'am, I'm basically on medical leave.

12    Q.  Prior to going on medical leave, what did you do?

13    A.  I was a search and rescue coordinator.

14    Q.  Where was that?

15    A.  At Miami Beach.

16    Q.  Go ahead.  Sorry.

17    A.  And before that, in Mobile, Alabama.

18    Q.  And what did you do before Mobile?

19    A.  I was at COMMSTA Kodiak.

20    Q.  What did you do while at COMMSTA?

21    A.  I was the communications watch officer and OOD.

22    Q.  Did you know Mr. Rich Belisle?

23    A.  I did.

24    Q.  How did you know him?

25    A.  He works down at the rigger shop down at T-2.

1    Q.  And what was his demeanor?

2    A.  He seemed like he always was happy.  He always

3  had a smile on his face.

4    Q.  Did you know ET1 Hopkins?

5    A.  I did.

6    Q.  What was he like?

7    A.  He was a very nice guy.  He had a very infectious

8  laugh.

9    Q.  How would you describe it?

10   A.  It was just very robust and loud.

11   Q.  You mentioned you were the CWO and OOD; is that

12  correct?

13   A.  Yes, ma'am.

14   Q.  Were you working in one of those roles on the

15  evening of the 11th and morning of the 12th of April,

16  2012?

17   A.  Yes, ma'am.

18   Q.  What did you do during that work evolution?

19   A.  I was the watch officer and officer of the day.

20   Q.  Did you conduct any rounds?

21   A.  Yes, ma'am.

22   Q.  Can you explain to the members of the jury what

23  you did with regards to those rounds.

24   A.  So you do rounds before you take the watch or

25  assume the duties of the position, and that's when you

first arrive, you start down at the T-2 building, you go

through the T-2 building, make sure it's secure, and

then you would go up to the T-1 building up the hill and

get in contact with the previous watch officer and do a

pass down and talk about what happened during the day

and what's going to happen.

Q.  Do you recall conducting the round in T-2 that

evening when you were oncoming?

A.  Yes, I did.

Q.  Let's walk through that.  What door of T-2 did

you enter through?

A.  So it's basically the main door.  It's the door

that leads into the big room, I guess you would call it,

that has the -- it's like a stepdown, and then you go

through a blue door and you're in this big room.

Q.  What did you have to do to get through that door?

A.  You have to have a badge and you would badge

swipe and it would -- the light would turn from red to

green and then you could open the door.

Q.  While inside the building, did you conduct a

round inside?

A.  I'm sorry, ma'am.  You broke up.

Q.  I apologize.  Let me restate the question.

When you were in the building, did you conduct a

round inside the building?

A.   Yes, ma'am.

Q.   What rooms did you go into?

A.   I went into the main room when you enter, and
then as you enter the building, on the left-hand side is
a garage where four-wheelers and bigger equipment were
stored, along with a paint locker.

     You go into that building, you check that one.
And then directly across from the door you enter is
another door that leads to like a mudroom, and you check
that door and you check the mudroom, because usually
there is a little sump that's in there to drain water,
it drains off the hillside into there, so you check
that.  And then you check to make sure that that door
has a dead bolt lock in it.

     And then you head out of the main right to your
right is going to be a ramp.  You go up the ramp, and
then on your left-hand side is some offices.  And then
after you pass the offices, you go in there, just kind
of -- they had a coffee pot in there, and sometimes it
would get left on, you want to turn it off.  And
sometimes they left the lights on too, you'd turn those
off.

     And then you come up, or you come out of there,
and then on your right-hand side is a like a break room
and a locker room, and you check in there because

there's a coffee pot in there too, just to make sure
it's kind of tidy.

        And then to the left of the break room, you have
got the head or the bathroom, and you would check in
there to make sure the toilet isn't flooding.  On the
other side -- so there is a door to the bathroom, and
then if you're looking at the bathroom, just to your
left-hand side is another door that leads into the
boiler room.

        You go into the boiler room, look down, there is
another sump down in there.  It's kind of like a small
little well.  You look down in there to make sure that,
like, the water isn't really high.  The sump should turn
on automatically.  You just make sure the water is low.

        And then there is another door behind the boilers
that leads outside in the boiler room, so you check that
door.  You come back out.  You relock the boiler room
door with -- it's got a funky kind of dead bolt on it.

        You head back through the break room and the
locker room to the wood shop.  I'm sorry.  There is an
outside door that leads from the locker room outside
that you check to make sure is locked too.

        And then you go through the locker room into the
wood shop, and you just kind of check the wood shop to
make sure nothing was left on and it's not a total mess.

1    Then there is another door from the wood shop
2  that leads outside.  You just make sure it's shut as
3  well, and it's a badge-swipe door.
4    So you continue on through there.  And then
5  there's another garage at the other side that usually
6  has like the Bobcat, like a little -- looked like a
7  small, like a little dumper for picking up dirt and
8  stuff like that and snow.
9    Then you close that door, make sure the garage is
10  shut and locked.  Come back through, make sure all the
11  doors -- basically you do the exact opposite.  You make
12  sure all the doors you opened are shut.  And you walk
13  back out of the building and then drive up to T-1.
14    Q.  Do you recall that night if you left any lights
15  on?
16    A.  I don't recall, but it wouldn't -- it wouldn't be
17  abnormal for the lights to be on.
18    Q.  Let's focus your attention on the boiler room.
19  When you got down there that evening and you approached
20  that door from the interior, did you notice anything
21  about the lock?
22    A.  It was locked.
23    Q.  Okay.  And then when you went inside the boiler
24  room, can you describe what you observed for the
25  exterior door?

1    A.  So the exterior door, I went up to it and pressed

2    on it to make sure it was seated in the doorjamb.

3    Q.  Was it seated?

4    A.  Yes, ma'am.  Made sure it was seated in the

5    doorjamb, and then turned and walked back out of the

6    boiler room.

7    Q.  What was the last thing you did with regard to

8    the boiler room?

9    A.  I re-dead bolted the interior door to the boiler

10   room.

11   Q.  Have you received Government Exhibit No. 126?

12   Did you get that via e-mail?

13   A.  Yes, ma'am, 126.

14   Q.  Okay.  And what is that a picture of?

15   A.  That is a picture of the boiler room door from

16   the interior of like the break room area.

17          MS. STEVENS:  Your Honor, for the record, we're

18   publishing to the jury Government Exhibit No. 126, which

19   the witness has a copy of.

20          THE COURT:  All right.

21   BY MS. STEVENS:

22   Q.  And that, sir, is the boiler room door that you

23   just testified to having locked that night?

24   A.  Yes, it is.

25          MS. STEVENS:  Your Honor, I have no more

1    questions.

2            THE COURT:  Mr. Colbath, Mr. Camiel, who am I

3    going to hear from?

4            MR. COLBATH:  Mr. Camiel, Your Honor.

5            THE COURT:  All right.  Thank you.

6                        CROSS EXAMINATION

7    BY MR. CAMIEL:

8        Q.  Mr. Bullis, can you hear me?

9        A.  You're breaking up, sir, sort of.

10       Q.  All right.  How is this?

11       A.  Better.

12       Q.  All right.  I think there is a little bit of a

13   delay so I'll go slowly so that we don't talk over each

14   other.

15       A.  Sounds good.

16       Q.  So back in 2012, you were working basically the

17   7:00 p.m. to 7:00 a.m. shift; is that right?

18       A.  Yes, sir.

19       Q.  And you worked up on the ops deck in the T-1

20   building?

21       A.  Yes, sir.

22       Q.  That's a secure area in the T-1 building where

23   you can, among other things, you can monitor the

24   surveillance cameras that show various areas outside the

25   building?

                MS. STEVENS:  Your Honor, at this point -- hold
on, Petty Officer Bullis.  At this point, we would just
request for any questions outside the scope of direct
that they be asked in a non-leading manner,
understanding that the defense probably wants to call
this witness out of efficiency, not having to recall
him, but for those not covered during direct, we would
ask that they be asked in a non-leading way.

                THE COURT:  Any objection?

                MR. CAMIEL:  I do object, Your Honor.  The
government called this witness and asked him about his
activities on the evening of April 11th and they asked
him about his duties, and I think I'm entitled to go
into that on cross examination.

                THE COURT:  Go ahead.

                MS. STEVENS:  So we asked about what he did
that night as the CWO, and then we went into his rounds
that night, so for camera-related questions, other
related questions, we would just ask that they be asked
in a non-leading manner.

                THE COURT:  I will adhere -- I will grant that
request, but if it turns out that things break down,
then you may make application to lead.  So go right
ahead.

BY MR. CAMIEL:

1    Q.  So Mr. Bullis, you worked on the op deck; is that

2  right?

3    A.  Yes, sir.

4    Q.  And can you tell us about the surveillance

5  cameras that were on the op deck that you could monitor

6  from there?

7    A.  You had cameras set up throughout the COMMSTA

8  property.

9    Q.  And what areas did they monitor?

10    A.  You monitored the internal T-1.  They monitored

11  external T-1.  And then they also monitored on the

12  external of T-2 and on the external and internal of R-2.

13    Q.  Were part of your duties as the watch officer and

14  the OOD, did part of your duties entail monitoring those

15  cameras?

16    A.  Yes, sir.

17    Q.  I want to ask you, you told us that when you

18  started your shift -- do you need a break?

19    A.  No, sir.  You're breaking up.

20    Q.  All right.  When you started your shift on the

21  evening of April 11th, you told us the first thing you

22  did was you did your rounds down at T-2?

23    A.  Yes, sir.

24    Q.  And did you do that at the start of every shift

25  when you were working in the position that you were

1 working?

2     A.   Yes, sir.

3     Q.   Would that be the same for anyone who was working

4 in your position, at the start of their shift, when they

5 came to the COMMSTA, the first thing they would do is do

6 the rounds at T-2 before they went up the hill to T-1?

7     A.   Personally, I would, yes.

8     Q.   That's what you did?

9     A.   Yes.

10     Q.   All right.  And that included not only walking

11 around the exterior of the building, but it sounded like

12 you went through every place inside the building where

13 there might be -- where anybody could be?

14     A.   Inside, yes.

15     Q.   One of the things you talked about was checking

16 the doors, right?

17     A.   Yes, sir.

18     Q.   You learned later on on April 12th that the

19 boiler room exterior door had been found unlocked,

20 right?

21     A.   Yes, sir.

22     Q.   And that's something that you have indicated has

23 really haunted you for a long time?

24     A.   Yes, sir.

25     Q.   Because although you checked to see if that door

was seated on that particular night, you never checked
to see if it was locked?

A.   Correct.   To check it to make sure it was locked,
you would have to open it, reach outside and check that
doorknob to make sure it was locked.

Q.   And on this one occasion, you just forgot to do
that?

A.   Yes, sir.

Q.   On the evening of April 11th, while you were on
duty, did you observe a white truck that was picked up
on the surveillance cameras?

          MS. STEVENS:   Objection again; form of the
question.

          THE COURT:   That's sustained.

BY MR. CAMIEL:

Q.   Did you see anything unusual that night on the
surveillance cameras?

A.   Yes, sir.

Q.   What did you see?

A.   I saw a white truck make an odd turn in front of
the building.   It's not abnormal for people to turn in
the COMMSTA T-2 parking lot if they get lost or they
realize they have gone too far, something like that.   So
it's not totally abnormal for them to come into the
parking lot, turn around and get their bearings and

1  figure out where they are going.

2      This one was kind of odd because instead of going

3  into the T-2 parking lot, it stopped in front of the

4  flagpole, which is a few feet from the entrance to the

5  T-2 parking lot.  And it kind of did like a four-,

6  five-, six-point turn to turn around on the road.

7      Q.  What time did you observe that?

8      A.  I believe it was around 10:30.

9      Q.  Did you see that vehicle come back?

10     A.  I saw it again, yes.

11     Q.  About how much later after you first saw it do

12  that odd turn?

13     A.  I believe it was ten minutes.  It wasn't very

14  long.

15     Q.  Was this something that you ended up noting in

16  your log?

17     A.  That, sir, I do not recall.

18     Q.  The next morning after you found out about the

19  homicides when you were contacted and you were

20  interviewed, is this something that you brought up with

21  the investigators?

22     A.  Yes.

23     Q.  Did you tell them about the same observations you

24  just told us?

25     A.  Yes.

1    Q.  Were you asked to look at any video to see if you

2  could identify the truck that you had seen on the

3  evening of April 11th?

4    A.  Sir, I think I might have lost you.

5    Q.  All right.  Were you asked to look at any

6  surveillance video from the T-1 camera regarding the

7  white truck that you had seen on the evening of

8  April 11th?

9    A.  In 2012?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And did you see that the video captured the truck

13  that you had seen?

14   A.  Yes.

15   Q.  And did you see both -- did you see on the video

16  both times --

17        MS. STEVENS:  Your Honor, objection.

18        THE COURT:  I'm going to allow it though.

19  That's okay.

20  BY MR. CAMIEL:

21   Q.  Did you see on the video both times where you saw

22  the truck, the first time when it came in by the

23  flagpole and the second time when it reappeared?

24   A.  Did I see the truck both -- yes.

25   Q.  You saw that on video?

1    A.  Yes.

2    Q.  All right.  And did you receive a copy of the

3  video to review that we sent you yesterday?

4    A.  Sir, you didn't send me that video.

5    Q.  Did you get that from the government?

6    A.  It was -- hold on.  I have the -- it was -- you

7  guys sent me Defense 165.

8    Q.  Did you also receive a video that showed the

9  white truck that we have been talking about?

10   A.  No, sir.

11   Q.  I want to talk to you some more about your

12  activities on the night of April 11th.  In addition to

13  seeing that white truck, did you note any other vehicles

14  that came up toward the COMMSTA that night?

15   A.  Yes, sir.

16   Q.  What was that?

17   A.  It was a smaller car, like Honda Civic, something

18  like that, small compact car, around I believe 2:30,

19  2:00, 2:30, somewhere around there in the morning.

20   Q.  Is this something you saw from the video camera

21  or did you see this actually from your own eyes?

22   A.  I believe I saw it with my own eyes.

23   Q.  You had stepped outside the building?

24   A.  Yes, sir.

25   Q.  What did this car that you saw do?

1    A.  It drove the road across the bridge and then kept

2  on going toward Anton Larsen Bay.

3    Q.  Was there anything unusual about the way the car

4  was being driven?

5    A.  It was, in my opinion, driving a little faster

6  than probably should have been at that time of night.

7    Q.  Is that why you remember it?

8    A.  Yeah.  Yes.

9    Q.  And did that -- do you know if that car was

10  captured on the T-1 video camera?

11    A.  I do not.

12    Q.  Now, you were -- you are familiar with Mr. Wells'

13  white truck, right?

14    A.  Yes, sir.

15    Q.  And the white truck that you saw on the evening

16  of April 11th wasn't his truck, was it?

17    A.  Correct.

18    Q.  Correct, it was not his truck?

19    A.  It was not.

20    Q.  Thank you.

21        What time did your shift end that April 12th?

22    A.  I believe I got relieved around 7:15 in the

23  morning.

24    Q.  Do you remember who it was that relieved you?

25    A.  It was Petty Officer Haselden.

1      Q.   Did you brief him about your observations from

2 the night before?

3      A.   If I told him -- I don't recall, but if I did, it

4 was -- it was more of a, "Hey, if you want to see

5 something odd, go back to 10:30 last night and watch

6 this guy do a bunch of turns, or try to turn around in

7 the road."

8      Q.   So after you were relieved by Mr. Haselden, you

9 left to head home; is that right?

10      A.   I stayed around for a little while to talk to

11 Petty Officer Haselden and to wait for the rest of my

12 section to be relieved, my duty section to be relieved.

13      Q.   And then after there was the passdown and all of

14 your section had been relieved, then what did you do?

15      A.   Sir, I believe you just asked me if everyone got

16 relieved that I left?

17      Q.   All right.  What kind of vehicle did you have?

18      A.   I can't hear you.

19      Q.   What kind of vehicle were you driving?

20      A.   I was driving a Toyota Tundra.  It was a maroon

21 Toyota Tundra.

22      Q.   When you left, did you drive down the hill toward

23 the T-2 building?

24      A.   I drove down the road from T-1 that passes T-2,

25 yes.

1    Q.  When you drove down there, did you look over at

2    the T-2 building?

3    A.  Yes, sir.

4    Q.  Did you observe a vehicle?

5    A.  I observed several vehicles, sir.

6    Q.  Was there one vehicle in particular that you have

7    been questioned about a number of times?

8    A.  Yes.

9    Q.  Where did you see that vehicle?

10   A.  It was to the -- if you're looking from the road

11   at T-2, it would be to the left of the dumpster.

12   Q.  So we sent you -- I think you received yesterday

13   a diagram that you had prepared many years ago about

14   where you saw this vehicle; is that right?

15   A.  Yes, sir.  Let me see if I can find it real

16   quick.

17   Q.  It's got the number DE-224 on it.

18   A.  Yes.

19   Q.  And that's something that you yourself drew; is

20   that right?

21   A.  Yes, sir.

22   Q.  You're smiling because you're not really proud of

23   your artwork?

24   A.  No, sir.

25   Q.  All right.  And what you were trying to draw

 1   there, that was the T-2 building, and part of the

 2   drawing showed the way you did your rounds that night;

 3   is that right?

 4       A.  Yes, sir.

 5       Q.  And also on the drawing, you drew a little box --

 6           MS. STEVENS:  Your Honor, I'm sorry.  Again,

 7   form of the question, it's leading.  It's also in

 8   regards to a document that is hearsay, so he's

 9   essentially bringing in a document that's hearsay by his

10   leading form of questioning.

11           THE COURT:  That's sustained.

12   BY MR. CAMIEL:

13       Q.  Did you write on the diagram?  Did you draw any

14   vehicles?

15       A.  Yes.

16       Q.  What you were trying to do was to explain what

17   you had seen on the morning of April 12th; is that

18   right?

19       A.  Yes, sir.

20       Q.  You told us you saw a vehicle.  What kind of

21   vehicle did you see that you --

22       A.  It was a black older model like Jeep or truck.

23       Q.  Now, you have been asked about this particular

24   vehicle many times, right?

25       A.  Yes, sir.

1    Q.  Now, where did you see it parked in relation to

2    the rollup doors on the repair shop of the T-2 building?

3    A.  It would have been -- the picture on your exhibit

4    doesn't quite do it justice.  It would have been more

5    forward of that, closer to the dumpster, but still on

6    that left-hand side, yeah.

7    Q.  Now, the normal place that you were used to

8    seeing employees park, was that on the left side of the

9    dumpster or the right side of the dumpster?

10   A.  Usually people parked on the right side of the

11   dumpster, but there was also never enough parking for

12   all the people that worked down there.

13   Q.  All right.  How did you find out about the

14   homicides?

15   A.  I was awoken by one of my junior petty officers,

16   Petty Officer Baker.  I think it was 11:00 or 11:30 the

17   morning of the 12th.  He came to my house and banged on

18   the door and woke me up.

19   Q.  And at some point, did you head up to the T-1

20   building?

21   A.  I'm sorry, sir.  You broke up again.

22   Q.  At some point after you were told about the

23   incident, did you go up to the T-1 building?

24   A.  One more time, sir.  I'm sorry.

25   Q.  Sure.  After you were told about the incident,

1  did you go up to the COMMSTA?

2      A.  No.

3      Q.  When did you go up there?

4      A.  So after Petty Officer Baker woke me up, I

5  checked my phone, which had been -- I had received text

6  messages and phone calls.  And after sorting everything

7  out, I was basically told to not come to the COMMSTA

8  until my watch.

9      Q.  Did you go up for your watch?

10     A.  Yes, sir.

11     Q.  And at that time, were you questioned by

12 investigators?

13         MS. STEVENS:  Your Honor, I would just ask that

14 that be qualified with when that was, because otherwise

15 it's --

16         THE COURT:  All right.  In any event, can you

17 clarify the time?

18 BY MR. CAMIEL:

19     Q.  So you went up -- you went up your regular watch

20 time, which would have started at 7:00 p.m.; is that

21 right?

22     A.  Yes, sir.

23     Q.  When you went up there -- this would have been

24 April 12th, the evening of April 12th; is that right?

25     A.  Yes, sir.

 1     Q.   Were you questioned by investigators about your

 2   observations the night before?

 3     A.   Briefly.

 4     Q.   Did you tell them about your observations of the

 5   black truck?

 6          MS. STEVENS:  Your Honor, again, I would object

 7   to the form of the question.  That's not what the

 8   witness said.  He said a Jeep, truck.

 9          THE COURT:  Well, black vehicle, how about

10   that.

11   BY MR. CAMIEL:

12     Q.   Did you tell them about your observations of a

13   black vehicle?

14     A.   Yes, sir.

15     Q.   Why did you feel it was important to tell them

16   about that vehicle?

17     A.   Just I guess I was just aware of where it was

18   parked, it was odd.

19     Q.   Who did you tell?

20     A.   I think initially I told my chain of command, so

21   my operations officer, Mr. Jordinelli, and also I

22   believe in the room was Chief Reckner as well.

23     Q.   And when you mentioned the truck to Chief

24   Reckner, did he say anything in response?

25          MS. STEVENS:  Hearsay, Your Honor.

```
 1                THE COURT:  That's sustained.

 2                MR. CAMIEL:  It's for the effect on the

 3     listener.

 4                THE COURT:  No.  You can ask --

 5                MR. CAMIEL:  Can I have a sidebar?

 6                THE COURT:  Yes, you can.  We can have a brief

 7     sidebar.  Can you tell the witness?

 8                MS. STEVENS:  Petty Officer Bullis, stand by.

 9                (Begin bench conference.)

10                MR. CAMIEL:  So the way I understand it, he

11     told Chief Reckner that he saw this black truck and

12     Chief Reckner said don't worry about it, it was

13     Mr. Pacheco's truck.

14                And so based on that, he alleviated any

15     concerns he had.  That's the effect on him.  What's

16     going to come out through the next witness is

17     Mr. Pacheco wasn't even on the island at the time so it

18     couldn't have been his truck.

19                THE COURT:  The effect on the listener, why is

20     this relevant?

21                MR. CAMIEL:  Because he was worried about the

22     truck.  When they told him whose it was, which turned

23     out not to be true, he learned later wasn't true --

24                MS. STEVENS:  This should have come in through

25     Reckner.  He was the person.  And furthermore, in his
```

1 interview, which was given shortly after, he indicated

2 that it was either Pacheco or Coggins, and so --

3        THE COURT:  I'm not going to allow it in.  I

4 don't see the effect on the listener is relevant here.

5 I'm not going to -- you have made your record.

6        MR. CAMIEL:  While we're here I wanted to bring

7 up the next --

8        THE COURT:  Thank you.

9        MR. CAMIEL:  So this witness has been

10 interviewed and basically confronted many times by the

11 government where they tried to convince him that the

12 vehicle he saw was Mr. Coggins'.  As late as two days

13 ago, Ms. Stevens interviewed him, and he sent back an

14 e-mail saying, "I know you want me to say it was

15 Coggins' truck, but it wasn't."  I'm going to go into

16 that.  If I need to lead, I have a right to lead.

17        MS. STEVENS:  Okay.  If that's the case, we

18 have an agent that can testify to that conversation and

19 we would ask for voir dire before that to have that

20 agent come and testify about it before allowing the

21 defense to go into that in front of the members.

22        MR. CAMIEL:  They can impeach him.

23        THE COURT:  He can ask it and you can call this

24 person too if need be.  I'll allow that.

25        MS. STEVENS:  Additionally, before defense

1  goes, we also have a lengthy investigation interview

2  from them where they offered a lot of information, so I

3  think it's only fair that the government would be able

4  to go into that with him as well in a leading format.

5          THE COURT:  All right.

6          (End bench conference.)

7  BY MR. CAMIEL:

8     Q.  Sir, the black vehicle that you saw when you were

9  leaving the COMMSTA on the morning of April 12th was not

10  Seaman Coggins' truck, was it?

11     A.  No, it was not.

12     Q.  Government agents and government attorneys have

13  shown you a number of pictures of Seaman Coggins'

14  vehicle; isn't that right?

15     A.  Yes.

16     Q.  And he had a black Jeep Cherokee?

17     A.  Yes, I believe it was.

18     Q.  And you have repeatedly told them that that's not

19  the vehicle you saw?

20     A.  Correct.

21     Q.  You were interviewed by Ms. Stevens and an agent

22  just a couple days ago on September 13th, right?

23     A.  I believe so, yes.

24     Q.  And at that time, you were again shown pictures

25  of Mr. Coggins' Jeep Cherokee, right?

1      A.   Yes.

2      Q.   And you told them it wasn't Seaman Coggins' Jeep

3   Cherokee that you saw, right?

4      A.   Correct.

5      Q.   You also told them that the vehicle you saw might

6   have been a Chevy K10 truck, right?

7      A.   Correct.

8      Q.   And you thought that it might have been Cody

9   Beauford's truck?

10      A.   Yes.

11      Q.   But the government agent told you that

12   Mr. Beauford's truck at that time was being -- it was in

13   the repair shop so it couldn't have been his truck?

14      A.   Correct.

15      Q.   And after that September 13th interview with

16   Ms. Stevens, you sent her back an e-mail on

17   September 15th, right?

18      A.   Correct.

19      Q.   And in that e-mail, you described new information

20   that the government had given you when they interviewed

21   you on the 13th?

22      A.   Correct.

23      Q.   And what you described was that they had told you

24   that Cody Beauford's truck wasn't there on the 12th

25   because it was being worked on.  That was one of the

1    things they told you, right?

2        A.   Correct.

3        Q.   And they told you that Mr. Beauford had got a

4    ride with a Mr. Acosta that morning, right?

5        A.   Correct.

6        Q.   And what you wrote was, "I would really like to

7    tell you it's Seaman Coggins' Jeep, but it isn't."

8        A.   Correct.

9        Q.   Because they were trying to get you to agree that

10   it was Seaman Coggins' Jeep; isn't that true?

11            MS. STEVENS:   Your Honor, objection.

12            THE COURT:   That's sustained.

13   BY MR. CAMIEL:

14       Q.   Have you been given any photos from the T-2 area

15   that would show where you saw that unidentified truck on

16   the morning of April 12th?

17       A.   Sir, I think you asked if I have seen any photos

18   that would show where that truck would be?

19       Q.   Yes.

20       A.   Stand by one second.

21            (Pause)

22       A.   So Government Exhibit 18 or Government

23   Exhibit 19.

24       Q.   So those are things you were e-mailed by the

25   government?

1    A.  Yes, sir.

2    Q.  Did the government ask you to mark on either one

3    of those exhibits where you saw the unidentified

4    vehicle?

5    A.  No, sir.

6         MR. CAMIEL:  Your Honor, I believe these have

7    been admitted.  Could we put up Government Exhibit 18?

8         THE COURT:  Yes.

9    BY MR. CAMIEL:

10   Q.  Now, Mr. Bullis, we have the exhibit in front of

11   us, and I think you have that same exhibit in front of

12   you; is that right?

13   A.  18, sir?

14   Q.  Yes.

15   A.  Yes, I do.

16   Q.  And that exhibit, does that show the dumpster

17   area that you were talking about?

18   A.  Yes, sir.

19   Q.  And it shows the rollup doors to go to the repair

20   shop?

21   A.  Yes, sir.

22   Q.  So the vehicle that you saw, the unidentified

23   vehicle on the morning of April 12th, was it to the

24   right of the silver Xterra that's at the end of the row?

25   A.  To the --

1    Q.  I'm sorry, to the left.

2    A.  It would have been -- yes, sir.

3    Q.  So it was to the left of the silver Xterra?

4    A.  Looking at this picture, yes, to the left.

5    Q.  Do you know which way that vehicle was facing?

6    A.  It would have been the front of the vehicle

7    toward the -- it would have been the same direction as

8    the Xterra.

9    Q.  When you met with the government attorneys and

10   agents, did you explain to them where you saw that

11   vehicle?

12   A.  Yes.

13       MR. CAMIEL:  That's all I have.  Thank you.

14       THE COURT:  All right.  Ms. Stevens, go ahead.

15                  REDIRECT EXAMINATION

16   BY MS. STEVENS:

17   Q.  So do you know whose truck it was that you saw?

18   A.  At the time, ma'am, I believed it was Seaman

19   Pacheco or Seaman Coggins.

20   Q.  Did you make that assessment independent of

21   anybody telling you anything?

22   A.  No.

23   Q.  So explain that.  How did you come to that

24   conclusion?

25   A.  Yes, ma'am.  So the day after -- or on the 12th,

 1    when I came in for watch that night, we were -- I was

 2    asked, you know, did you see anything odd or out of the

 3    normal, so I brought up the white vehicle, the white

 4    truck.  And then I also said something about a black

 5    truck or black vehicle.  I described it, and Chief

 6    Reckner was there at the time and he said --

 7              THE COURT:  I don't want to have him make

 8    statements.

 9    BY MS. STEVENS:

10        Q.  Let me ask you this:  Did you remember seeing

11    anybody walking up the hill that morning?

12        A.  Yes, ma'am.

13        Q.  Who was that?

14        A.  It was Seaman Coggins.

15        Q.  Based on observing him, did it lead you to make

16    any conclusion about the cars parked in the parking lot?

17        A.  No, ma'am.

18        Q.  So when you -- do you remember having a

19    conversation with the government -- I'm sorry.  Do you

20    remember having a conversation with law enforcement on

21    the 13th?

22        A.  On April 13th?

23        Q.  Did you review the recording of your interview

24    that you gave to law enforcement?

25        A.  Yes, ma'am.

1    Q.  And --

2           MR. CAMIEL:  Your Honor, I would object.  Could

3    we have a sidebar?

4           THE COURT:  Yes, we can do that.  Please tell

5    the witness.

6           MS. STEVENS:  Petty Officer Bullis, stand by.

7           (Begin bench conference.)

8           MR. CAMIEL:  This is the first we have heard it

9    was recorded.  We haven't received any recording.

10           THE COURT:  Was this recorded?

11           MS. STEVENS:  It was recorded and it was

12    disclosed to the defense.

13           MR. CAMIEL:  When?

14           MR. SKROCKI:  We'll be happy to get that for

15    you.

16           MS. STEVENS:  At the same time that the

17    recordings went over to them, so I would say in either

18    July of 2018 or December.

19           MR. CAMIEL:  I thought you were talking about

20    September 13th.  That's the one you just did.

21           MS. STEVENS:  I'm talking about the one that

22    was the day after the murders.

23           MR. CAMIEL:  I have that.  I thought she was

24    referring to the one you just did.

25           MS. STEVENS:  We said the 13th.  I'm referring

```
 1    to the 13th, the day after the murders.
 2              THE COURT:  You have that?
 3              MR. CAMIEL:  We have that.  I thought she was
 4    referring to this interview.
 5              MS. STEVENS:  No.
 6              THE COURT:  All right.  Very good.  You didn't
 7    say April.
 8              MS. STEVENS:  It was the same day.
 9              (End bench conference.)
10    BY MS. STEVENS:
11        Q.  Are you okay?  Feeling all right?
12        A.  Yes, ma'am.
13        Q.  Okay.  So on April 13th of 2012, when you spoke
14    to investigators, do you remember that interview being
15    recorded?
16        A.  Yes.
17        Q.  Did you have an opportunity to listen to that
18    interview?
19        A.  I have.
20        Q.  And do you remember whether you mentioned --
21              MR. CAMIEL:  Your Honor, I'm going to object to
22    leading.
23              THE COURT:  It is sustained.  Rephrase.  I'll
24    give you some leeway.  Go ahead.
25              MS. STEVENS:  The only thing I would say to
```

```
 1   that, Your Honor, is because this was outside the scope

 2   of our original --

 3          THE COURT:  I'll give you some leeway is what I

 4   said.

 5   BY MS. STEVENS:

 6      Q.  Do you remember indicating that it was probably

 7   either Pacheco or Coggins' vehicle?

 8      A.  Yes, ma'am.

 9      Q.  Do you remember indicating that you saw Coggins

10   walking up the hill?

11      A.  Yes, ma'am.

12      Q.  Do you remember saying it was --

13          MR. CAMIEL:  Your Honor, at this point, I'm

14   going to object to leading.

15          MS. STEVENS:  I'll rephrase.

16   BY MS. STEVENS:

17      Q.  So did you review the video that the defense sent

18   you, the exhibit -- I believe it was -- what was the

19   video, 165, did you review that prior to today?

20      A.  Yes, ma'am.

21      Q.  Okay.  Do you recall what time you observed your

22   vehicle on that video leaving?

23      A.  Approximately 7:35.

24      Q.  Is that in close proximity in time to when you

25   would have passed T-2?
```

1    A.  That camera is taken from T-2 for that video.

2    Q.  So it would have been close in time?

3    A.  Almost exact.

4    Q.  Let me rephrase.

5        Would you have passed T-2 at approximately 7:35?

6    A.  Yes, ma'am.

7    Q.  With regard to the white truck, did you see it

8    loiter, the one the night before?

9    A.  Ma'am, you broke up.  I'm sorry.  I couldn't hear

10   you.

11   Q.  That's okay.  I'm sorry.

12       The white truck the night before, did you see

13   that truck loiter?

14   A.  Loiter, no, it did not.

15   Q.  Did it try to avoid the cameras?

16   A.  No.

17   Q.  Did anybody get out of the car?

18   A.  Not that I saw.

19   Q.  Had your colleagues not been murdered the next

20   day, would that --

21           MR. CAMIEL:  Objection; leading.

22           THE COURT:  Why don't you rephrase.

23   BY MS. STEVENS:

24   Q.  Had the incident not happened that morning, would

25   that have been --

1          MR. CAMIEL:  Objection; leading.

2          THE COURT:  Let's hear the entire question.  Go

3   ahead.

4   BY MS. STEVENS:

5      Q.  Had that incident not happened that morning,

6   would that truck have been odd or otherwise suspicious

7   to you?

8      A.  No, ma'am.

9      Q.  You mentioned that you observed the black

10  Jeep/truck facing T-2, correct?

11     A.  It would have been the tailgate toward the road

12  that runs past T-2, yes.

13     Q.  What direction would that car have had to enter

14  the parking lot, coming from where?

15         MR. CAMIEL:  Objection; calls for speculation.

16         THE COURT:  Well, if he can answer it, go

17  ahead.

18     A.  It would have had to come from Anton Larsen Road.

19     Q.  Which direction?

20     A.  I guess from right across the bridge.

21         MS. STEVENS:  Thank you.

22         THE COURT:  Mr. Camiel, anything further?

23         MR. CAMIEL:  Yes, Your Honor, if I could.

24         THE COURT:  Yes, certainly.

25                    RECROSS EXAMINATION

1    BY MR. CAMIEL:

2       Q.  When you -- Mr. Bullis, you were asked about the

3    initial interview that you gave on April 13th of 2012.

4    Government counsel just asked you about that, right?  I

5    want to ask you a couple questions about that.

6       A.  Yes.

7       Q.  When you speculated at that time that it might be

8    Mr. Pacheco's truck, why did you say that?

9               MS. STEVENS:  Calls for hearsay.

10              THE COURT:  Excuse me.  Are you seeking to

11   elicit hearsay?

12              MR. CAMIEL:  Well, she --

13              THE COURT:  I'm not allowing it.

14   BY MR. CAMIEL:

15      Q.  Let me ask it this way:  It wasn't Mr. Pacheco's

16   truck, was it?

17      A.  Not that I know of.

18      Q.  And it wasn't Seaman Coggins' truck or Jeep?

19      A.  Correct.

20      Q.  And no matter how many times anybody asks you

21   about it, those are the answers you're going to give,

22   right?

23      A.  Yes, sir.

24              THE COURT:  All right.  Anything further?  Then

25   this witness can be excused.  Thank you, Mr. Bullis.

```
 1              (Witness excused)

 2              THE COURT:  It is about quarter of here.

 3    Should we take our lunch break now, counsel?  Let us do

 4    that and resume with the jury at 1:00.  I know we're

 5    ending at 3:30 today with the jury, so we'll do that.

 6              Leave your notepads here.  Remember my

 7    admonition not to discuss the case or do any research.

 8    We'll see you back here at 1:00.  Have a pleasant lunch.

 9              (Jury absent)

10              THE COURT:  All right.  Please be seated,

11    everyone.  Anything we need to take up before the lunch

12    break from the government?

13              MR. SKROCKI:  Nothing from us.

14              THE COURT:  Mr. Colbath?

15              MR. COLBATH:  No.  Same from us, Your Honor.

16              THE COURT:  Very good.  We'll see you at 1:00.

17    We'll go off record.

18              DEPUTY CLERK:  Court stands in recess until

19    1:00 p.m.

20              (Recessed from 11:47 a.m. to 12:58 p.m.)

21              (Jury absent)

22              DEPUTY CLERK:  All rise.  Her Honor, the Court,

23    the United States District Court is again in session.

24              THE COURT:  All right.  Please be seated

25    everyone.  I understand there is a topic to take up?
```

          MR. COLBATH:  Your Honor, yes.  I was just
wondering if the Court -- I neglected to ask at the
conclusion of Mr. Becker's testimony to read our
limiting instruction.  Before we get too far removed --

          THE COURT:  I will do that.  I totally
neglected to.  Thank you for the reminder.

          MR. COLBATH:  My fault as well.  I should've
asked.  You were just going to retool the language to be
witness specific.

          THE COURT:  I have done that.

          MR. COLBATH:  I was going to suggest that
before we start up a new witness, ask that that be read
relative to Mr. Becker's testimony.  Then we're ready to
move forward.

          THE COURT:  I assume no objection to that?

          MS. SHERMAN:  No.

          THE COURT:  All right.  Caroline just told me
that one of the jurors has a relative getting an award
Friday early morning and would like to start no later --
no earlier than 8:45, which I think should be fine.
That's more or less consistent with what we have been
doing.

          I think we're ready to bring in the jury.

          (Jury present)

          THE COURT:  Please be seated, everyone.

Welcome back, ladies and gentlemen.  I understand there
is a juror who seeks to start a little bit -- well, no
sooner than 8:45 on Friday.  I don't know who that is,
but my sources told me, and we can do that certainly.
Thanks for the heads-up.

Ladies and gentlemen, I neglected to read an
instruction that I intended to read immediately after
Steven Becker's testimony was concluded, and I will read
it to you now.

You have heard testimony from Steven Becker
who, because of his education and/or experience, was
permitted to state opinions and the reason for his
opinions.  During his testimony, certain presentations
were made by this witness and were shown to you in order
to help explain the evidence in the case and the basis
for the witness's opinions.

These presentations were not admitted in
evidence and will not go to the jury room with you.
Various slides in some of the presentation were marked
with disclaimers as directed by the Court.  The
presentations are not themselves evidence nor proof of
any facts.

If the presentations in whole or in part do not
correctly reflect the facts shown by the evidence in
this case, you should disregard these presentations and

1   determine the facts from the underlying evidence.

2           I suspect, ladies and gentlemen, you may hear

3   this instruction several times with regard to other

4   witnesses who may testify later in this case.

5           With that said --

6           MS. SHERMAN:  The government's next witness is

7   Vicki Grimes.

8           THE COURT:  All right.  Very good.

9           (Pause)

10          THE COURT:  Good afternoon.  If you could come

11  up to the witness stand, please.  When you get up there,

12  if you would remain standing, the clerk will administer

13  an oath to you.

14          (Oath administered to the witness)

15          DEPUTY CLERK:  For the record, can you please

16  state your full name and then spell your full name.

17          THE WITNESS:  Vicki June Grimes, V-i-c-k-i,

18  J-u-n-e, G-r-i-m-e-s.

19          VICKI GRIMES, GOVERNMENT WITNESS, SWORN

20                  DIRECT EXAMINATION

21  BY MS. SHERMAN:

22  Q.  Good afternoon, Ms. Grimes.  Where do you work?

23  A.  For the Federal Bureau of Investigation.

24  Q.  How long have you been with the FBI?

25  A.  28 years.

1    Q.   What do you do at the FBI?

2    A.   I'm a supervisory administrative specialist.   I

3  supervise different programs within the bureau.

4    Q.   Are you an agent?  Do you investigate cases?

5    A.   I'm not an agent.  I'm support staff.

6    Q.   What is ERT?

7    A.   It's our evidence response team.

8    Q.   Have you ever been a part of ERT?

9    A.   I have.

10   Q.   Can you describe how you became a part of ERT?

11   A.   So I came from the Dallas office.  When I was in

12  the Dallas office, we had four different ERT teams.   And

13  my first callout was the Columbia Shuttle disaster.   We

14  were down in Hemphill, Texas for about three weeks

15  recovering astronauts.

16   Q.   What sort of evidence have you had experience in

17  collecting?

18   A.   Just about everything.  Drugs, valuables, I have

19  been to autopsies, we recover bodies.  Just about

20  anything with a crime scene.

21   Q.   Can you describe the type of training you've

22  received to be a part of ERT?

23   A.   There is a basic class that every member goes

24  through.  It's two weeks long, and we learn about the

25  process of collecting the evidence and preserving it and

1    admitting it into evidence, and photography, all those

2    kinds of things.

3        Q.   Did you go to Kodiak on April 12, 2012?

4        A.   I'm not sure of the date.

5        Q.   Okay.  When the FBI first responded in this case,

6    did you go with that team?

7        A.   No, I did not.

8        Q.   Where were you?

9        A.   I was here in our office.

10       Q.   Why didn't you go right away?

11       A.   I wasn't feeling well and I didn't feel up to

12   going and I didn't want to get any other members sick

13   during this process.

14       Q.   Did you participate in an event the following

15   day?

16       A.   I did.

17       Q.   What was that?

18       A.   I attended the two autopsies of Mr. Hopkins and

19   Mr. Belisle.

20       Q.   As part of attending an autopsy, what sort of

21   things did you do there?

22       A.   We took pictures.  We basically followed the

23   medical examiner, and as they took their pictures, then

24   we took our pictures and collected the evidence from the

25   two individuals.

1    Q.  I would like to show you for identification

2  Exhibit No. 183.  Do you recognize what this is?

3    A.  I do.

4    Q.  What is it?

5    A.  It's a brown wallet that we recovered from

6  Mr. Hopkins.

7    Q.  Fair and accurate depiction of the wallet you saw

8  that day?

9    A.  Yes.

10        MS. SHERMAN:  I move for the admission of 183.

11        MR. COLBATH:  That's fine.

12        THE COURT:  183 is admitted.

13        (Exhibit No. 183 admitted.)

14  BY MS. SHERMAN:

15    Q.  Were you able to determine how much money was in

16  that wallet?

17    A.  We did.

18    Q.  How much money was in Mr. Hopkins' wallet?

19    A.  It was a total of $60.  There was three $20

20  bills.

21    Q.  I would like to show you for foundation -- and we

22  could do two together -- 185 and 186, or just

23  consecutive.  Do you recognize those?

24    A.  I do.

25        MS. SHERMAN:  Counsel doesn't indicate he has

1    an objection, so if we could move those into admission,

2    185 and 186.

3              THE COURT:  Those are admitted.

4              (Exhibit Nos. 185 and 186 admitted.)

5    BY MS. SHERMAN:

6         Q.  We'll start with 185.  What are we seeing here?

7         A.  This was money and the knife I believe that was

8    taken from Mr. Belisle.

9         Q.  And if we could go to 186.

10        A.  Again, that's the money from Mr. Belisle.

11        Q.  How much money did he have?

12        A.  It was $66.51, I believe.

13        Q.  Did you take -- we can put that down.

14             Did you take other items when you were at the

15   autopsy?

16        A.  We did.

17        Q.  What sort of other items did you take?

18        A.  We took clothing.  We took, of course, their

19   personal effects.  They had bagged the hands for

20   transport, we took those items, and then the body bags.

21        Q.  Did you take anything that was recovered from any

22   of the victims inside their body?

23        A.  Yes.

24        Q.  Why don't we have you look at Exhibit No. 187.

25             Do you recognize what that is?

```
 1      A.  I do.

 2      Q.  What is it?

 3      A.  It was metal projectile that we took from

 4   Mr. Belisle.

 5      Q.  And is that a fair and accurate depiction of what

 6   you saw on April 13, 2012?

 7      A.  Yes.

 8          MS. SHERMAN:  I'd move for the admission of

 9   Exhibit 187.

10          MR. COLBATH:  I have no objection.

11          THE COURT:  187 is admitted.

12          (Exhibit No. 187 admitted.)

13   BY MS. SHERMAN:

14      Q.  We can go ahead and publish that.

15          You indicate you seized this projectile?

16      A.  Yes, we did.

17      Q.  We could take that down.

18          When you seize something, how is it stored at the

19   FBI?

20      A.  We package it according to what it is, and then

21   we take a transport to the office and it goes directly

22   into our evidence vault.

23      Q.  Is it given a particular number?

24      A.  It is.  When we're on scene, we collect

25   numerically one through however many items that we
```

1    collect.  When it gets to the office and gets put into

2    that case, it becomes a 1B number.  That's how we track

3    it.

4              MS. SHERMAN:  So, Your Honor, at this point, I

5    would like to approach her with Government's Exhibit

6    No. 237 from 1B 199.  I have shown that to Mr. Colbath.

7              THE COURT:  All right.  Go ahead.

8              (Ms. Sherman approaches the witness.)

9    BY MS. SHERMAN:

10      Q.  If you could open that envelope up and pull out

11   that piece of evidence for us.

12           Can you tell us what 237 is?

13      A.  It's the projectile from the neck, item number 1B

14   199.

15      Q.  Is that the same item we saw in the last photo,

16   the last exhibit?

17      A.  Yes.

18              MS. SHERMAN:  At this point, I would move for

19   the admission of 237.

20              THE COURT:  Any objection?

21              MR. COLBATH:  No, that one is fine as well,

22   Your Honor.

23              THE COURT:  237 is admitted.

24              (Exhibit No. 237 admitted.)

25   BY MS. SHERMAN:

1    Q.  Did you participate -- did you eventually go to

2  Kodiak?

3    A.  I did.

4    Q.  Did you participate in some searches there?

5    A.  I did.

6    Q.  Did you participate in a search of the landfill?

7    A.  I did.

8    Q.  What were you looking for in the landfill?

9    A.  We were looking for any evidence that might be

10  relevant to the case, clothing or weapons or anything

11  that would tie into this case.

12    Q.  And how long did that search take?

13    A.  I believe it was most of the day.  I don't really

14  recall the length of time.  It was pretty extensive.

15    Q.  And did you find any weapons?

16    A.  We did not find any weapons.

17    Q.  Did you find other things that could possibly be

18  related to the case?

19    A.  I believe we took some clothing that could

20  possibly be related.

21    Q.  Then did you participate in a search in relation

22  to a septic tank?

23    A.  I did.

24    Q.  And tell us about where that septic tank was.

25    A.  That septic tank was at the house of Mr. Wells,

and it had been partially drained.  And so we had a
truck come out and drain the rest of the septic tank to
see if there was anything hidden in that tank.

Q.  Did you find anything?

A.  We did not.

MS. SHERMAN:  Those are all my questions.

THE COURT:  All right.  Mr. Colbath?

MR. COLBATH:  Thank you.

CROSS EXAMINATION

BY MR. COLBATH:

Q.  Good morning, ma'am.  Well, good afternoon.

A.  Good afternoon.

Q.  It's all running together for me, unfortunately.

A.  Yes, sir.

Q.  I want to ask you just briefly about the last
topic Ms. Sherman asked you about, the search at the
septic tank there.

A.  Okay.

Q.  There were several agents there with you working
on that search and you were taking photos, as I
understand it?

A.  Yes, sir.

Q.  Could we show her Exhibit -- Defense Exhibit No.
-- well, wait a minute -- Defense Exhibit 33 and 34,
just for foundation.

1      Have those been admitted?  Those two are

2  admitted.  Let's show them to her then.

3      So that would have been one of the photos you

4  took there, ma'am, in the backyard?  The dug up area is

5  the septic tank?

6      A.  Yes, sir.

7      Q.  And then 34.  Can we show her for foundation

8  Defense Exhibit No. 131.

9      Ma'am, did you take that photo?  Are you familiar

10  with that one as well?

11      A.  I'm not familiar with that one.

12      Q.  Okay.  Then that's fine.

13      Can you -- were you involved at all or did you

14  know as part of the evidence response team that the

15  septic tank that you all searched was ultimately removed

16  from Mr. Wells' backyard and taken to the landfill?

17      A.  I did not know that.

18      Q.  Can we -- let's talk about that landfill search.

19  Can you show her Exhibit -- Defense Exhibit No. 134.

20      Ma'am, you were familiar -- first of all, you

21  were involved with some searches ultimately -- were you

22  at the Wells' residence up in Bells Flats at some point?

23      A.  Yes.

24      Q.  And prior to -- I mean prior to the septic

25  search, septic tank search, were you up at the Bells

1    Flats residence at all?

2         A.   I don't remember being there before that search.

3    I can't remember the timeline exactly.

4         Q.   All right.  That search was, if I told you I

5    think it was the search of the septic tank, April 19th,

6    about a week after the homicides, does that sound about

7    right?

8         A.   Yes, sir.

9         Q.   Then it was a few days later that the search of

10   the landfill occurred, correct?

11        A.   I believe so.

12        Q.   And did you become aware from your evidence

13   collection process there that down the hill from the

14   Wells', there were these dumpsters that garbage from the

15   neighborhood was dumped in and those were taken to the

16   landfill?

17        A.   Yes, sir.

18        Q.   That's what led you all, the evidence response

19   team, to follow that through to the landfill to search?

20        A.   Yes, sir.

21        Q.   And does Exhibit No. 134, does that appear to be

22   the dumpster area in Bells Flats?

23        A.   I believe so, yes, sir.

24             MR. COLBATH:  I'm going to move the admission

25   of 134.

```
 1          MS. SHERMAN:  No objection.
 2          THE COURT:  134 is admitted, Defense.
 3          (Defense Exhibit No. 134 admitted.)
 4  BY MR. COLBATH:
 5     Q.  Ma'am, did part of the search crew or the
 6  evidence collection crew go to this area first and
 7  search through these containers or in this area for
 8  evidence?
 9     A.  I'm not sure.  I remember being at that area, and
10  I'm not sure if we -- I wasn't a part of it if we did.
11     Q.  Sure.  But you at least remember being there?
12  That was looked at first, but ultimately you ended up,
13  it sounds like, at the actual landfill?
14     A.  Yes, sir.
15     Q.  You can take that down.  Do we have -- one of
16  those government exhibits was Bells Flats, aerial photo
17  of Bells Flats.  Do you know which one?  Let me just
18  find -- there is too many pictures.
19          MR. SKROCKI:  We'll get it.
20  BY MR. COLBATH:
21     Q.  Let's try Government Exhibit No. 3.  Thank you.
22          And could you get me to the landfill area or zoom
23  us in a little bit and see.
24          Ma'am, do you recognize what's on the screen
25  there, that area?
```

1          Hold on.  Just generally, the neighborhood there

2    in Kodiak or the area?

3        A.   Possibly.  I never saw it from this view, so I

4    couldn't be certain.  It looks similar.

5        Q.   All right.  Don't get too -- there is -- do you

6    see the landfill area anywhere near this lake or

7    anywhere in this blown-up area that you searched, or are

8    you unfamiliar enough with the picture that you can't

9    say for sure?

10       A.   I'm unfamiliar.  I couldn't say for sure.

11       Q.   Okay.  Could it be either of these areas here?

12       A.   Yes, sir.

13       Q.   It wasn't far from the Wells' home?

14       A.   Right, it was not.

15       Q.   Let's take that down.

16           Now, when you went out there as part of the

17   collection or search, there was, first of all, a team of

18   FBI agents?

19       A.   Yes, sir.

20       Q.   Well, and not just agents, but --

21       A.   Support.

22       Q.   -- support, a whole support team from the FBI,

23   and then maybe another two to three dozen people, Coast

24   Guard and otherwise, as a larger team helping sort

25   through a large volume of stuff?

1    A.   Yes, sir.

2    Q.   Also had some canines there, dogs there that had

3  special training or abilities to help with the search.

4  Do you recall them?

5    A.   I don't recall the dogs at the landfill.

6    Q.   Would you all have used something in addition

7  called bloodhounds or bloodhound something?

8    A.   That's a chemical that you can put on items that

9  will help determine stains, you know, like if there were

10 blood or that sort of thing.

11   Q.   And so if somebody referred to that, that's

12 something that makes blood or other bodily fluids

13 luminesce, glow?

14   A.   Yes, sir.

15   Q.   And as part of the evidence collection team, you

16 have access to all of those types of things that either

17 help identify evidence or enhance evidence or help you

18 look for evidence or things that might be evidence?

19   A.   Yes, sir.

20   Q.   And can we look at maybe Defense Exhibit 36.

21        Before I ask you about this picture, ma'am, there

22 was an attempt made to try to isolate all the trash that

23 had been collected out of those dumpsters we first saw

24 and get it out from just the general volume of garbage

25 in the landfill, right?

1    A.  Yes, sir.

2    Q.  And then once that was isolated out, that was

3   separated out and searched more particularly?

4    A.  Yes, sir.

5    Q.  And did you take this photo, this defense --

6    A.  I believe I did.  I took photos at the landfill

7   search.

8    Q.  It certainly looks familiar to you?

9    A.  Yes, sir.

10            MR. COLBATH:  I'm going to move 36, Your Honor.

11            MS. SHERMAN:  No objection.

12            THE COURT:  Defense No. 36 is admitted.

13            (Defense Exhibit No. 36 admitted.)

14   BY MR. COLBATH:

15    Q.  So this would have been all hand-sifted through

16   and looked at with whatever tools and abilities you all

17   had?

18    A.  Yes, sir.

19    Q.  You can take that down.  Thank you.

20            In addition, after leaving the landfill, a few

21   days after that, did you have occasion to go out, sort

22   of out of the Bells Flats, the housing area where

23   Mr. Wells and the landfill was, and go to a residence

24   some distance down the highway and be involved in a

25   search there?

1    A.  Yes, sir.

2    Q.  And there was a number -- they were looking for

3 -- you all were looking to collect firearms and

4 ammunition, and I suppose anything that you could

5 determine might be of evidentiary value?

6    A.  Yes, sir.

7    Q.  Again, you had those tools that could identify

8 prints and bodily fluids and all of those things, so you

9 took stuff that might relate to that?

10   A.  Yes, sir.

11   Q.  And did you have something that would allow you

12 to later test things or process things that had human

13 scent -- even down to human scent on them?

14   A.  Yes, sir.

15   Q.  And you collected samples of different items to

16 later test?

17   A.  We did.  I was not involved in the collection of

18 that, but I was -- another person actually did that.

19   Q.  But you saw that go on as part of your trip out

20 there?

21   A.  Yes, sir.

22   Q.  Do you know why -- what that residence was

23 thought to be related to or why you were out there?

24   A.  I believe it was a friend of Mr. Wells, his

25 residence.

1    Q.  And there was a number of firearms and a bunch of

2  ammunition, a bunch of different things seized from

3  there?

4    A.  Yes, sir, we did collect, I think, four weapons

5  and some ammunition.

6    Q.  Okay.  Just one minute.  And then, ma'am, was

7  there a time maybe a few weeks after that that you were

8  back up at the Wells' residence when some additional

9  searching was going on outside, sort of like the septic

10  tank search, of an outside area?

11    A.  Yes, sir.

12    Q.  And that would have been maybe the following

13  month in September?

14    A.  Probably.  I don't remember the exact date.

15    Q.  It was sometime quite a ways removed from the --

16  weeks later from the homicides?

17    A.  Yes, sir.

18    Q.  All right.  Again, there was a search team of a

19  number of folks?

20    A.  Yes, sir.

21    Q.  And describe for us the area in that particular

22  search, just generally.  If I was standing looking at

23  the Wells' house, where was the focus of the search on

24  this occasion?

25    A.  So there was a hill to the right of his house.

1    If you're facing the house, it was to the right, and it

2    was my understanding that -- well, what we did was we

3    rappelled down that and dug out metal fragments,

4    bullets, that sort of thing out of that hill.

5        Q.  I'm going to show you a series on your screen

6    there of three photos.  They are Defense Exhibit 22, 23

7    and 24, and see if those might be photos you recognize

8    and/or took.

9        A.  Okay.

10       Q.  That's 22.  And 23.  And 24.

11       A.  Yes, sir.

12            MR. COLBATH:  And so I would move the admission

13    of 22, 23 and 24.

14            MS. SHERMAN:  I don't object.

15            THE COURT:  Those will be admitted.

16            (Defense Exhibit Nos. 22, 23 and 24 admitted.)

17    BY MR. COLBATH:

18       Q.  Actually, I want to start the other direction.  I

19    want to start with 24, if I could.  So this was in

20    September, sometime in September, a month or so after

21    the homicides, right?

22       A.  I believe so.

23       Q.  Okay.  And the house in the background is what?

24       A.  It's the Wells' residence.

25       Q.  And in the foreground here we see -- you said

1    people rappelled down the hillside.  That's what these

2    people in the foreground, this gentleman and this

3    gentleman, that's what they are doing?

4        A.  Yes, sir.

5        Q.  What do we have in this front, the closest

6    gentleman's hands there?

7        A.  It's a metal detector.

8        Q.  On the house, the windows are all blacked out.

9    Is that something to do with the search or the Wells, or

10   do you know what's going on there?

11       A.  I don't.

12       Q.  Okay.  Let's try the picture before this, 23.

13           That's just another view of the folks searching,

14   correct?

15       A.  Yes, sir.

16       Q.  And these little orange flags, are those

17   something involved with the search or were those already

18   on the hillside?

19       A.  No, sir.  Those would be where we -- if we would

20   find something, we would flag it.

21       Q.  That would be if the metal detector noted

22   something or got some kind of hit?

23       A.  Yes, sir.

24       Q.  And then maybe 23 -- or 22, excuse me.

25           That's a broader view of the search it looks

1  like, search area?

2      A.  Yes, sir.

3      Q.  And were -- you can take that down.  Thank you.

4          Were in fact items recovered?

5      A.  Yes, sir.

6      Q.  Several?

7      A.  Yes, sir.

8      Q.  And that area was searched because somebody had

9  information that maybe Mr. Wells had been shooting or

10 people had been shooting, target shooting into that

11 hillside?

12     A.  That's correct.

13     Q.  So the search was for metal or bullets or any

14 type of items that help in evidence?

15     A.  Yes, sir.

16     Q.  Just give me one second, ma'am.  I think that's

17 all.  Thank you, ma'am.

18          MR. COLBATH:  I think, Your Honor, that's all

19 the questions I have.

20          MS. SHERMAN:  I have no more questions.

21          THE COURT:  Thank you.  This person can be

22 released?  Thank you, ma'am.  You may be excused.

23          (Witness excused)

24          THE COURT:  And your next witness?

25          MR. SKROCKI:  Yes, Your Honor.  Nathaniel

```
 1   Pacheco.
 2            THE COURT:  Good afternoon.  If you could come
 3   all the way up to the witness stand, please.  When you
 4   get up there, remain standing just a moment and the
 5   clerk will administer an oath to you.
 6            (Oath administered to the witness)
 7            DEPUTY CLERK:  For the record, can you please
 8   state your full name and then spell your full name.
 9            THE WITNESS:  My name is Nathaniel Wesley
10   Pacheco, N-a-t-h-a-n-i-e-l, W-e-s-l-e-y, P-a-c-h-e-c-o.
11           NATHANIEL PACHECO, GOVERNMENT WITNESS, SWORN
12                         DIRECT EXAMINATION
13   BY MR. SKROCKI:
14       Q.  Good afternoon.
15       A.  Good afternoon.
16       Q.  Can you tell the judge where you live, please.
17       A.  I live in Taos, New Mexico.
18       Q.  How long have you lived in Taos?
19       A.  I've been there a little over two years now.
20       Q.  Please tell the jury what you do for a living in
21   Taos?
22       A.  I just started an apprenticeship with a solar
23   company there.
24       Q.  And prior to that?
25       A.  I was a manager of a maintenance department at a
```

1    hotel for two years.

2        Q.   At some point back in time, Mr. Pacheco, were you

3    a member of the United States Coast Guard?

4        A.   Yes, I was.

5        Q.   When was that, please?

6        A.   From 2009 to January 1st, 2013.

7        Q.   During that period of time, were you ever

8    stationed in Alaska?

9        A.   Yes.

10       Q.   What period of time was that?

11       A.   From 2009 to 2013, except for boot camp.

12       Q.   The whole time except for boot camp?

13       A.   Yes.

14       Q.   Where were you stationed?

15       A.   I was stationed at Communication Station in

16   Kodiak.

17       Q.   Could you please explain to the jury what your

18   role was at Communication Station Kodiak while you were

19   there?

20       A.   I worked in the rigger shop while I was there.

21   The whole time I was there I was in the rigger shop.  I

22   was a non-rate, so kind of your junior enlisted

23   personnel, do whatever you're told.

24           There are a lot of grounds, clear cutting of

25   brush, working on towers and antennas, anything.

1    Q.   Were you qualified to climb during that time?

2    A.   Yes.

3    Q.   How high were you qualified to climb?

4    A.   600 feet was my qualifying climb.

5    Q.   Had you ever climbed before you came to

6    Communication Station Kodiak?

7    A.   Never.

8    Q.   You still climb?

9    A.   Just rock climbing now.

10   Q.   What's your highest achievement?

11   A.   El Capitan, 3,000 feet.

12   Q.   In Yosemite?

13   A.   Yes.

14   Q.   That's quite an achievement.  With ropes or

15   without?

16   A.   With, of course.

17   Q.   Probably why you're still here with us.

18        Okay.  Mr. Pacheco, so you were in the rigger

19   shop.  Who was direct supervisor there?

20   A.   My direct supervisor was ET3 Cody Beauford.

21   Q.   Do you recall who Mr. Beauford's supervisor was?

22   A.   That would've been ET1 James Hopkins.

23   Q.   Did you have occasion to interact with

24   Mr. Hopkins while you were at the communication station

25   from 2009 to 2012?

1    A.  Yes, every day.

2    Q.  Every day.  And in sort of what capacity?

3    A.  Generally we would have a morning meeting or

4   something, you know, briefing on what we were going to

5   do in the day, what we were going to accomplish.  We'd

6   see each other all day throughout the day coming and

7   going around the shop or at times we'd work together all

8   day.

9    Q.  And if you could give the jury your assessment of

10   Mr. Hopkins as a supervisor at the time you knew him

11   while you were there.

12   A.  He was a knowledgeable person, well organized and

13   ability to like -- great ability to like adapt to the

14   situation.

15   Q.  Were there other individuals you worked with

16   beside Mr. Hopkins and Mr. Beauford?

17   A.  Yes.

18   Q.  If you could list those other individuals for the

19   jury, please.

20   A.  So then myself, at the time Scott Reckner could

21   be in the shop, he was the shop chief, Jim Wells,

22   Richard Belisle, Hopkins, Beauford, Para Upchurch, Leah

23   Henry, Aaron Coggins.  I believe that was it at that

24   time.

25   Q.  And who were the people at your level, at the

1    non-rate level of those you just mentioned?

2        A.   That would have been myself, Henry, Coggins and

3    Upchurch.

4        Q.   Were there civilian employees working in the

5    rigger shop as well while you were there?

6        A.   Yes.

7        Q.   Who would those civilians have been?

8        A.   That would have been Rich Belisle and James

9    Wells.

10       Q.   From the period of 2009 when you started to, I'll

11   take you to April of 2012, did you have any work

12   interaction with Mr. Belisle?

13       A.   Yes, frequently.

14       Q.   Frequently.  Can you explain some of the work

15   interactions you had with Mr. Belisle?

16       A.   If we were actually working together, we would be

17   working out in the field doing -- working on towers and

18   antennas, lighting replacement was a pretty common one

19   while I was there.

20            So it would be hoisting new lights or lowering

21   new lights from the top of antennas down to the ground.

22   It would be the whole shop participating together in

23   that event.

24       Q.   You can help yourself to some water if you want.

25   It's free.  Take your time.

1    So you were talking about Mr. Belisle. Did you

2 have occasion to ever work with him in a mentorship

3 capacity?

4    A.  Yes, I learned a lot from him, learned a lot of

5 rope skills and sort of kind of rigging and lifting,

6 crane work, things of that nature.

7    Q.  How about Mr. Wells, do you remember Mr. Wells?

8    A.  Yes.

9    Q.  Do you see him in court here today?

10    A.  Yes.

11    Q.  Where do you see him?

12    A.  Seated over right there in the blue shirt.

13    Q.  In the blue shirt?

14    What kind of interaction did you have with Mr.

15 Wells while you were there as a non-rate up to 2012?

16    A.  Similar.  We would see each other every day at

17 work there, and oftentimes work in the field together as

18 well.

19    Q.  Can you describe for the jury your understanding

20 or assessment of Mr. Wells' experience and knowledge

21 with respect to the rigger shop and the jobs that you

22 all did.

23    A.  Extensive knowledge of the antennas, the antenna

24 field, electrical knowledge, radios.

25    Q.  Anything else?

1    A.   Basically, that's about it.

2    Q.   Did you have an understanding about how long he

3 was at the rigger shop?

4    A.   I couldn't say exact years.  I know he had been

5 there a long time.  I believe he had been stationed

6 there on active duty as well and had been there for

7 quite some time.  He knew the place better than anybody

8 else.

9    Q.   In terms of the overall management structure of

10 the rigger shop, who was in charge?

11    A.   That would have been ET1 Hopkins would have been

12 in charge technically of the shop.

13    Q.   Do you have an assessment or an understanding of

14 the degree of knowledge of Mr. Hopkins as it relates to

15 Mr. Wells' knowledge back then, in the 2012 timeframe?

16    A.   I couldn't say, no.

17    Q.   Did Mr. Hopkins have the same amount of knowledge

18 that Mr. Wells had?

19    A.   It would appear that Mr. Wells had more

20 antenna-specific knowledge.

21    Q.   At some point in time when you were there,

22 Mr. Pacheco, we'll point you towards the 2012 timeframe,

23 do you recall during that period of time whether Mr.

24 Wells was ill or not?

25    A.   Yes.

1     Q.   Do you know what his illnesses were concerning?

2     A.   I believe I remember his gallbladder or something

3   of that nature.  I'm not entirely sure.

4     Q.   Do you have a recollection as to Mr. Wells'

5   either absences or appearances during that timeframe,

6   and, if so, what were they?

7     A.   I couldn't say specifically when he was gone or

8   how long, but it would have been like trips back and

9   forth between the hospital or between the doctor and

10  being -- it seemed frequent, trips back and forth to the

11  doctor, being absent from work.

12    Q.   Were there things that you observed during that

13  time with respect to the employees of the rigger shop

14  that changed due to his absence?

15    A.   Yes, of course.

16    Q.   Please tell the jury what you observed.

17    A.   We had to adapt to the situation, losing a person

18  that had a lot of the knowledge and was part of the

19  day-to-day operations.  The mission has to continue.  We

20  have to maintain communications.  And so other people

21  had to step into roles and get the work done and keep

22  comms up.

23    Q.   Were there people who made those sort of changes

24  in the workflow?

25    A.   It would have been ET1 Hopkins.

1    Q.  I want to ask you some questions about the rigger

2    shop itself.  Do you have any understanding as to

3    whether individuals could do private, personal work on

4    their own vehicles in the rigger shop?

5    A.  Yes, we could.

6    Q.  Could you explain that to the jury and if you

7    yourself were afforded that and did that yourself?

8    A.  Yes.  We were allowed, once you're done with work

9    for the day, or even on an off day, you could come in,

10   check with the watch officer, and then you could go down

11   to the rigger shop, get access, go into the garage and

12   use the tools and equipment and clean up after yourself.

13        I worked in there several times myself.  I've

14   changed transmission in the shop, changed shocks, tie

15   rods and lots of things.  Broke my Jeep a lot, so I was

16   always in there.

17   Q.  Were you off-roading while you were in Kodiak?

18   A.  That I was.

19   Q.  That's what happens, doesn't it?

20        How about tires, did you ever afford yourself a

21   chance to swap tires out?

22   A.  Definitely, especially between summer and winter

23   tires, changing out to putting the studded tires on, you

24   go in there and change them.

25   Q.  What, do you recall, tools or other things were

1    available for tire swaps in the rigger shop?

2        A.   Yes.  We had floor jacks, pneumatic impact gun.

3    That's all you really need.

4        Q.   What about air?

5        A.   Yes.  Yes, we had a large air compressor and

6    there is air available at almost every door.

7        Q.   Did you find it to be a good place to work?

8        A.   Yes.

9        Q.   Why is that?

10       A.   Challenging, new and interesting work for me.

11       Q.   Did there come a point in time when you were

12   afforded an opportunity to perform work outside of the

13   rigger shop outside of Kodiak?

14       A.   Yes.  I did travel to remote sites.

15       Q.   Can you tell the jury when your travel to remote

16   sites happened and for what kind of work?  About what

17   timeframe, if you recall?

18       A.   I traveled to Shemya, Alaska.  And when was that?

19   It's been a while.  That would be 2011, traveled to

20   Shemya.  We had to build a new site there essentially.

21   We had to build two towers there because Attu being

22   decommissioned, and we spent -- I believe my first trip

23   there was about two weeks and we returned home.

24           It was in preparation for the next trip, which

25   would have been the actual construction of the towers,

1    and that trip was about five weeks in Shemya we spent

2    there working on building these towers.

3        Q.   Did there come a time where you were sent back to

4    Shemya by yourself to do some work?

5        A.   Yes, I was.  I was sent back to Shemya April 11,

6    2012.  I went to Shemya for a repair.

7        Q.   Who was with you?

8        A.   I believe it was Jared Lawrence went with me for

9    the repair, and that was it.  We had another

10   communication station member fly with us, but he wasn't

11   for the repair.

12       Q.   So just the two of you?

13       A.   Yes.

14       Q.   Who made the decision to send you down there to

15   do that work?

16       A.   ET1 Hopkins and Scott Reckner would have been the

17   people that made that decision.

18       Q.   Were you in charge?

19       A.   Yes.

20       Q.   What rank did you have at the time?

21       A.   E3.

22       Q.   E3.  Is that a non-rate?

23       A.   That's a non-rate.

24       Q.   So you were on Shemya on April 11, 2012, doing

25   this work on your own?

1    A.   Correct.

2    Q.   Or as the leader of this.  Did you have occasion

3  to speak with Mr. Wells about this assignment before you

4  left for Shemya?

5    A.   I had spoke with him, I believe, after work right

6  before I left.

7    Q.   Relay that conversation to the jury, please.

8    A.   I'm not sure initially how it started.  I just

9  know he had asked me -- it came up in conversation.  I

10  can't remember the specifics or word for word to quote

11  it.  He seemed surprised that I was being sent because I

12  was an E3 being sent to go to do a repair at a remote

13  site, which would be uncommon.

14   Q.   Again, who made that decision to send you?

15   A.   ET1 Hopkins and Scott Reckner.

16   Q.   How did you feel about that decision being a

17  non-rate?

18   A.   I felt proud that I could be trusted to be sent

19  out there.  I had been doing that work for a while and

20  it seemed -- it was a good feeling to be able to know

21  that they could trust me to go to a remote site and do

22  work out there.

23   Q.   Did you feel ready for that?

24   A.   I did.

25   Q.   Did you do a good job?

1    A.  I did.

2    Q.  So in April -- on April 11, 2012, you were in

3  Shemya.  I want to turn your attention to April 12,

4  2012.  Did you get some information from Kodiak to do

5  something?

6    A.  Can you repeat that?

7    Q.  Sure.  My apologies.

8        On April 12, 2012, were you ordered to do

9  something by the Coast Guard?

10   A.  On April 12, 2012?

11   Q.  11th.

12   A.  11th.

13   Q.  My apologies.

14   A.  When I was in Shemya?

15   Q.  Yeah.

16   A.  I flew home on the 12th.

17   Q.  Okay.  So you were flying home on the 12th?

18   A.  Yes.

19   Q.  That was the time you were supposed to go back

20  anyway?

21   A.  Yes.  I was scheduled to fly home that morning of

22  of the 12th.

23   Q.  So did you go back to Kodiak?

24   A.  Yes.

25   Q.  Could you take the jury through what happened

1    when you arrived in Kodiak, what happened next?

2        A.   I got on the plane from Shemya on a C-130, flew

3    to Kodiak.  And part of the way there, we were told not

4    to have our phones out, to secure our phones, put them

5    away in our bags.  Had to remain that way for the rest

6    of the flight.

7            Once we landed, we were met at the runway by the

8    chaplain, taken into the hangar, and we were briefed

9    there on what had happened.

10       Q.   And what was your understanding as to what

11   happened?

12       A.   We were told that ET1 Hopkins and Richard Belisle

13   had been killed, and they weren't sure on any details

14   yet.

15       Q.   What was your reaction to that news, Mr. Pacheco?

16       A.   I was sad and shocked, because really hard to

17   believe that that happened.  You know, scared.

18       Q.   Where did you spend your day?

19       A.   The rest of that day, I didn't go back to the

20   communication station.  Everyone had been released by

21   the time my plane had landed.  I went to my girlfriend

22   at the time's house.

23       Q.   Did you end up going back to the communication

24   station at some point?

25       A.   I did, the next morning reported at normal time.

1    Q.   What occurred the next morning when you got to

2  work?

3    A.   We were -- I was there briefly, and then we were

4  immediately taken to what's called crisis intervention,

5  stress management.  It's kind of like a group meeting we

6  had with the core individuals that were in the rigger

7  shop and the core individuals that were close to the

8  incident were all brought together to a meeting.

9    Q.   Who was -- were you present during one of those

10  meetings?

11   A.   Yes.

12   Q.   Who was part -- who else was there with you?

13   A.   Myself, Mr. Wells.  I'm trying to -- Upchurch,

14  Henry.  I'm trying to remember the specifics.  I believe

15  Haselden was there.  I'm trying to -- those are the

16  people I remember specifically seeing there.

17   Q.   Do you recall what their various emotional states

18  were like during this meeting?

19   A.   Everybody was pretty shocked and sad, and, you

20  know, for the most part that's the emotions there.

21   Q.   How about Mr. Wells, do you recall anything about

22  his reaction, his emotional state during the meeting?

23   A.   Yes, he seemed sad as well.

24   Q.   Mr. Pacheco, you mentioned your vehicle.  What

25  kind of vehicle did you drive back then in Kodiak when

1    you were working on it all the time?

2        A.   At the time, I drove a '97 Jeep Wrangler.

3        Q.   What color was it?

4        A.   Dark blue.

5        Q.   Were you aware of a structure, a warehouse that

6    was used for the rigger shop or for the communication

7    station to store items?

8        A.   Yes.  Yes, we did have a warehouse.

9        Q.   Are you aware of a project concerning that

10   warehouse that occurred in maybe 2011/2012?

11       A.   Yes.

12       Q.   What's your understanding of what that project

13   was and your recollection of it?

14       A.   We had a large clean-out and organization.  I

15   wouldn't say reorganization.  I would just say

16   organizing all the parts and pieces of equipment that

17   were inside the warehouse.

18       Q.   What was the -- in terms of the items in there,

19   was there a movement or some direction to take care of

20   some of that equipment?

21       A.   Yes, a lot of -- we would clear out some of the

22   trash.  A lot of it was kind of organized so we could

23   better find the parts and equipment for all of our gear,

24   a little bit labeling, location, and things of that

25   nature.

1    Q.   Who was in charge of that operation?

2    A.   I believe it was ET1 Hopkins.

3    Q.   Did you receive specific directions to do certain

4    work on the warehouse, and, if so, what was it?

5    A.   Yes, we were -- we had a fairly large crew that

6    was there moving stuff out.  A lot of it was destroying

7    property that needed to be properly destroyed before it

8    could be disposed of, lots of cleaning, organizing and

9    moving things around.

10        It was a large warehouse, so moving with a

11   forklift and getting the place in order.

12   Q.   Did you participate in that?

13   A.   Yes, I did.

14   Q.   How about the other non-rates you spoke about,

15   did they participate in that?

16   A.   Yes, they did.

17   Q.   What about Mr. Wells, did he participate in that?

18   A.   I don't recall his participation.  I don't

19   believe he did.

20   Q.   Were you ever invited over to Mr. Wells' house

21   for dinner?

22   A.   No, I never was.

23        MR. SKROCKI:  Thank you, Mr. Pacheco.  Your

24   Honor, that's all the questions I have.

25        THE COURT:  All right.  Counsel?

                    CROSS EXAMINATION

BY MR. CAMIEL:

    Q.  Good afternoon, Mr. Pacheco.

    A.  Hi.  Good afternoon.

    Q.  When you were working -- let's just say the year
2012, how old were you then?

    A.  You're going to make me do math?

    Q.  Yeah.

    A.  Seven years ago, 23.

    Q.  And Mr. Wells, how old did he appear to be?

    A.  That I couldn't tell you how old he was.

    Q.  He's quite a bit older than you?

    A.  Yes.

    Q.  Probably in his sixties?

    A.  I would say about there.

    Q.  In terms of working at the rigger shop, you
talked about your qualification to climb.

    A.  Yes.

    Q.  And I take it the climbing primarily took place
in the spring and summer; is that right?

    A.  Yes.  It could take place in parts of the winter
as well, but more on an emergency situation that fit
within our risk assessment.

    Q.  So if there was an emergency in the winter, you
might climb, but, otherwise, you would do other kind of

1    maintenance work on the ground and then --

2        A.   Correct.

3        Q.   -- do the climbing in spring and summer when the

4    weather was better?

5        A.   That's correct.

6        Q.   Where were you living in 2012?

7        A.   Kodiak.

8        Q.   Where?

9        A.   I believe I was living -- I was living in town at

10   that time, in the town of Kodiak.

11       Q.   And renting a place?

12       A.   I'm trying to -- I lived in a few different

13   apartments and things there, so, yes, I would have been

14   renting for sure.

15       Q.   All right.  And so you probably didn't have a

16   place to work on your Jeep at the apartment you were

17   renting?

18       A.   No.  No.

19       Q.   Didn't have the tools or equipment you might

20   need?

21       A.   No, sir.

22       Q.   To do things like the transmission or the other

23   things you did with your Jeep?

24       A.   That's correct.

25       Q.   But you had that available up at the rigger shop?

1    A.  That's correct.

2    Q.  And you were allowed to do that kind of work, but

3  it had to be on off hours; is that right?

4    A.  Yes, that's correct.

5    Q.  You talked about the trip to Shemya that was in

6  like the spring and summer that you started in 2011 with

7  the trips to Shemya?

8    A.  Yes.

9    Q.  And you talked about a first trip that was a

10  couple weeks?

11    A.  Yes.

12    Q.  And Mr. Wells was on that trip?

13    A.  Correct.

14    Q.  And then you talked about a much longer trip, I

15  think you said about five weeks after -- sometime after

16  that?

17    A.  That's correct.

18    Q.  And Mr. Wells was there for that trip?

19    A.  Yes.

20    Q.  And then you talked about this trip that you took

21  on April -- I think you said April 11th, or was it

22  before then?

23    A.  I was in Shemya on April 11th.

24    Q.  How long had you been there?

25    A.  I believe I only stayed the one night, so I think

1    I got there on April 11th and left on the 12th.

2         Q.   And when you came back on the 12th, your C-130

3    that landed back in Kodiak, that was in the evening; is

4    that right?

5         A.   Yes, evening, afternoon time for sure.

6         Q.   How did you get to the airport on the 11th to get

7    to Shemya?

8         A.   I believe I drove.  It wasn't the airport.  It

9    was the air station.

10        Q.   Air station.  So you drove your vehicle and left

11   it at the air station?

12        A.   Yes, I believe so.  I couldn't say that for sure

13   actually.  I'm trying to recall back.  I don't remember

14   anybody picking me up, so I'm pretty sure I drove.

15        Q.   And that's -- it was when you returned that you

16   found out about the homicides that had taken place

17   earlier when you were gone?

18        A.   That's correct.  We weren't completely informed

19   it was a homicide or what had taken place.  We were just

20   told that they had been killed and that was it.

21        Q.   No other details at that time?

22        A.   None.

23        Q.   In the latter part of 2011, October, November,

24   December, during that time period, is that the period

25   where Mr. Wells seemed to be sick and frequently missing

1  work?

2      A.  Could you ask that one more time?

3      Q.  Sure.  Yeah.  The latter part of 2011, say --

4  let's say October, November, December, during that time

5  period, does that appear to be the time period when Mr.

6  Wells was missing a lot of work due to his illness?

7      A.  It could be part of the time.  I couldn't

8  remember specific times, honestly.

9      Q.  Do you remember when Mr. Wells was gone, was he

10 also gone in the first part of 2012, beginning of 2012?

11     A.  I believe so, yes.

12     Q.  Do you remember doing any climbing when he was

13 gone?

14     A.  I don't really remember the specific -- a lot of

15 the specific repairs and things there.  They all kind of

16 blend together after a while.

17     Q.  That would have been, let's say from November,

18 December, January, February, that would be the winter

19 period, and you have already said it would be unusual to

20 climb then.  Do you remember doing any climbs when he

21 was gone?

22     A.  I believe -- I think it was that winter we had a

23 repair on a rotatable antenna that had lost its chain at

24 our receive site.  I couldn't say I was 100 percent, but

25 I believe that was that winter, yeah.

1    Q.  You have been interviewed a number of times about

2    your work at the rigger shop and about the relationships

3    of the people there?

4    A.  That's correct.

5    Q.  And your observation was everybody seemed to get

6    along pretty well?

7    A.  I don't know if I said that.

8    Q.  Do you remember at one point saying it was kind

9    of just a big family?

10   A.  I guess I don't remember saying that, but at

11   times it could seem like family.  I would go over to

12   Mr. Belisle's house the day after Christmas and we would

13   celebrate Boxing Day with his family.

14   Q.  While you were working there, you learned a lot

15   from Mr. Belisle.  You talked about learning about ropes

16   and rigging?

17   A.  Yes.  Correct.

18   Q.  And you learned things from Mr. Wells?

19   A.  Yes.  Correct.

20   Q.  And not just things related to work, other

21   things, like he helped you at one point with your Jeep?

22   A.  Yes.

23   Q.  You couldn't figure --

24   A.  Alignment issue, I think, or maybe it was a

25   steering issue.  Something in the front end.

 1      Q.  You couldn't figure out what the problem was and
 2  you sought his help and he was able to figure it out?
 3      A.  Correct.
 4      Q.  Now, while you were working at the rigger shop,
 5  you also were aware of the fact that there was a
 6  regulation that nobody was supposed to bring a firearm
 7  into the building, right?
 8      A.  That's correct.
 9      Q.  But in fact, you saw some people bring firearms
10  in the building?
11      A.  Yes.
12          MR. SKROCKI:  I'll just note it's outside the
13  scope of direct and he shouldn't be leading the witness.
14          THE COURT:  That is outside the scope, the
15  firearms, so you can lead -- I mean not lead.
16          MR. CAMIEL:  I'm happy to do either, Your
17  Honor.
18          THE COURT:  Thank you.
19  BY MR. CAMIEL:
20      Q.  Who did you see bring firearms into the building?
21      A.  Most of the people that worked there at some
22  point.  I'm trying to remember specifics.  I couldn't
23  recall like specifically who brought what into the
24  building, but gun culture is definitely different there.
25      Q.  You never saw Mr. Wells bring a firearm into the

1   building?

2       A.  Not that I recall, no.

3       Q.  Do you recall whether or not you saw Mr. Belisle

4   bring a firearm into the building?

5       A.  I can't recall him.  I can recall ET1 Hopkins

6   bringing a brand-new-in-a-case gun that he had bought.

7       Q.  So even though it was against regulations, the

8   supervisor of the shop was bringing in a firearm?

9       A.  Yes.

10      Q.  How about Mr. Reckner?

11      A.  I couldn't recall him specifically either.

12      Q.  How about you?

13      A.  I did once as well.

14      Q.  Now, the routine at the rigger shop in terms of

15  how the day would start, who would usually get there

16  first?

17      A.  That's a tough one at this point.  I couldn't

18  really answer that question right now.  Before I

19  definitely remembered, but --

20      Q.  Would you be one of first people there?

21      A.  Could be at times.  Normally, ET1 Hopkins would

22  beat me there.  He would be one of the first people

23  there for sure.

24      Q.  How about the civilians, Mr. Wells or

25  Mr. Belisle?

1      A.   I can't recall exactly what time that they would

2   typically report in.

3      Q.   Was there a routine in terms of whether or not --

4   let me strike that.

5           Was there a routine in terms of anybody unlocking

6   -- the first person there unlocking the door?

7      A.   Typically, yes.  Somebody -- people would come

8   in -- normally, I mean a lot of times I would unlock the

9   -- it's like one of those latches that slide on the

10  door, come in, unlock that, because when I would get in

11  I had like rounds to do, so we'd go through and kind of

12  get everything set for the day, go up the hill and do

13  our rounds.

14     Q.   When you would unlock the door then, other

15  employees didn't have to badge in or use a key, they

16  could just open the unlocked door?

17              MR. SKROCKI:  Leading.

18              THE COURT:  I'll allow this to be cross.  I

19  think this was fairly within the scope of the direct, so

20  go ahead.

21  BY MR. CAMIEL:

22     Q.   You would unlock the door so that the next people

23  to arrive wouldn't -- it would just be more convenient

24  for them, they wouldn't have to badge in or use a key?

25     A.   Correct.

```
 1            MR. CAMIEL:  That's all I have.  Thank you.
 2            THE COURT:  Redirect, Mr. Skrocki?
 3            MR. SKROCKI:  Yes.  I need to see you for a
 4   brief matter from cross.
 5            THE COURT:  All right.
 6            MR. SKROCKI:  It will take just a moment.
 7            THE COURT:  That's fine.  Please stand and
 8   stretch.
 9            (Begin bench conference.)
10            MR. SKROCKI:  Mr. Camiel inquired of
11   Mr. Pacheco, "The rigger shop is one big happy family,"
12   remember that question?
13            THE COURT:  Uh-huh.
14            MR. SKROCKI:  Maybe one or two of them.  That
15   opens the door for me to inquire of Mr. Pacheco of the
16   shoving by Mr. Wells.
17            THE COURT:  The warehouse incident?
18            MR. SKROCKI:  It was in the rigger shop.
19            THE COURT:  Why did I think there was something
20   related to the warehouse?
21            MR. SKROCKI:  In the rigger shop.
22            MR. CAMIEL:  That was before.  That was years
23   before.  That was way before the fuel card incident.
24            MR. SKROCKI:  It was in 2011.  I would have to
25   ask him for specifics.
```

1          MR. COLBATH:  It happened in 2010.

2          MR. SKROCKI:  If they didn't have "one big

3    happy family" when this guy was shoved by that man, a

4    complete mischaracterization of the rigger shop.

5          MR. CAMIEL:  Mr. Skrocki asked about

6    relationships, and actually when I asked Mr. Pacheco was

7    it one big happy family he didn't say yes.  He said,

8    well, he went over to the Belisle's.

9          THE COURT:  I'm interested when this alleged

10   shoving incident took place.

11         MR. SKROCKI:  I would have to ask him, not on

12   the record.

13         THE COURT:  Why don't we have the jury --

14         MR. SKROCKI:  I can take him out.

15         THE COURT:  Why don't we take our break right

16   now.  We'll take about a ten-minute break and you can

17   ask him.

18         MR. SKROCKI:  Want me to ask on the record?

19         THE COURT:  On the record.  We'll just take a

20   break now.

21         (End bench conference.)

22         THE COURT:  All right.  We're going to take our

23   afternoon break now with you all.  I know we're ending

24   at 3:30 p.m.  We'll have you back here at 2:15.

25         Please leave your notepads here, remember my

1    admonition not to discuss the case, and we'll see you

2    shortly.

3              (Jury absent)

4              THE COURT:  Please be seated, everyone.  Sir,

5    there was a question the lawyers didn't know the answer

6    to that we hope you do.  What's the question?

7              MR. SKROCKI:  Sure.  Mr. Pacheco, remember we

8    spoke a while back and I prepped you for trial not to

9    speak about this in front of the jury with the shoving

10   incident with Mr. Wells?

11             THE WITNESS:  Yes.

12             MR. SKROCKI:  That was in the T-2 building,

13   correct?

14             THE WITNESS:  Correct.

15             MR. SKROCKI:  In the rigger shop?

16             THE WITNESS:  Yes.

17             MR. SKROCKI:  And just in case we get there,

18   you were instructed by Mr. Hopkins to organize the

19   tools?

20             THE WITNESS:  Yes.

21             MR. SKROCKI:  And Mr. Wells came and confronted

22   you about that or talked to you about that?

23             THE WITNESS:  Yes.

24             MR. SKROCKI:  What did he say?

25             THE WITNESS:  I couldn't remember specifically

1 like word for word what he said, but he was upset that

2 things had been moved, that things were not left where

3 they were, that he couldn't find the tools that he

4 wanted.

5      MR. SKROCKI:  Who gave you the direction to

6 organize the tools?

7      THE WITNESS:  ET1 Hopkins.

8      MR. SKROCKI:  Did you tell that to Mr. Wells?

9      THE WITNESS:  Yes.

10      MR. SKROCKI:  And his reaction to that was?

11      THE WITNESS:  He was angry that things had been

12 moved, just angry.

13      MR. SKROCKI:  And afterwards, did you have

14 occasion to see Mr. Wells on that same day within a

15 short period of time?

16      THE WITNESS:  Yes.  That day, the reason he was

17 looking for the tools, we were getting ready to perform

18 some work in the antenna field and we would have a

19 briefing before each one of these operations.

20      And when we went to have the briefing, he came

21 out with either a whiteboard or a drawing board in his

22 hands, and I was leaning against my desk and he shoved

23 me out of the way and put his board where I had been

24 standing, just walked up and shoved me and placed his

25 board where I had been and then --

         1          MR. SKROCKI:  Let me ask you about the shove.
         2   How hard of a shove was it?
         3          THE WITNESS:  Good enough that I stumbled back.
         4   I took steps away.
         5          MR. SKROCKI:  So it knocked you off your
         6   balance?
         7          THE WITNESS:  Yes.
         8          MR. SKROCKI:  So forceful?
         9          THE WITNESS:  Yes.
        10          MR. SKROCKI:  Now, just for the record and to
        11   be clear, was Mr. Hopkins in charge of the rigger shop
        12   at that time?
        13          THE WITNESS:  Yes.
        14          MR. SKROCKI:  He was.  Okay.  Can you give the
        15   Court -- this is sort of the question.  Can you give the
        16   Court your best recollection as to the timeframe of when
        17   this occurred?
        18          THE WITNESS:  It would had to have been summer
        19   -- I don't know.
        20          THE COURT:  Was it before or after Shemya?
        21          THE WITNESS:  Oh, it was before.  Before.
        22          THE COURT:  Any follow-up?  I'm not going to
        23   allow the topic.  Consistent with my prior rulings, I
        24   have the demarcation line of the fuel card incident.
        25          I don't mean to preclude questions by either

1    side as to -- I guess Mr. Camiel's question about being

2    a family, like a family did not seem to me to open the

3    door to specific acts of conduct being admissible,

4    because there are many families that are less harmonious

5    than others.

6              On that observation, we'll take a short break.

7    We'll be back at 2:15.

8              MR. SKROCKI:  I will inquire about this family

9    matter on redirect.

10             THE COURT:  That's what I don't mean to

11   preclude is that there are many dysfunctional families

12   in this world, and I say that nothing about the rigger

13   shop.  That's partly the reason for the ruling that it

14   didn't open the door to specific acts.

15             MR. SKROCKI:  I don't want to draw objections

16   or do something that you don't want me to do.  I will

17   inquire as to this family matter Shemya forward.  Okay.

18   I may --

19             THE COURT:  June, July.

20             MR. SKROCKI:  Yes, ma'am.  Within close to the

21   timeframe of the murders, yes.

22             MR. CAMIEL:  I would just want to make sure the

23   witness understands the limitations in terms of what he

24   answers.

25             THE COURT:  Questions about any of that?  We

have this whole book of rules.  And I don't want you to
testify about specific events that occurred.  You can
talk about day-to-day how things were, general
character, reputation, how people got along, but not
specific acts.  That's why I'm not allowing the shove
incident to be testified about.

        Thank you.  Let's take a short break.  We'll go
off record.

        DEPUTY CLERK:  All rise.  Court stands in a
brief recess.

        (Recessed from 2:07 p.m. to 2:23 p.m.)

        (Jury present)

        DEPUTY CLERK:  Court is reconvened.

        THE COURT:  Please be seated, everyone.  We're
back on record here.

        Mr. Skrocki, whenever you're ready.

        MR. SKROCKI:  We have no further questions.

        THE COURT:  Any recross at all?

        MR. CAMIEL:  No.

        THE COURT:  This person can be released?

        MR. SKROCKI:  Yes.

        THE COURT:  Very good.  You may be excused.

        (Witness excused)

        THE COURT:  Your next witness?

        MS. SHERMAN:  The government calls Hernando

Acosta.

THE COURT:  Good afternoon.  If you could come all the way up to the witness stand, please.  When you get there, remain standing and the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please state your full name and then spell your full name.

THE WITNESS:  My full name is Hernando Acosta, H-e-r-n-a-n-d-o, A-c-o-s-t-a.

HERNANDO ACOSTA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SHERMAN:

Q.  Mr. Acosta, where do you work?

A.  I work at currently in Norfolk, Virginia, administration.

Q.  You work for who?

A.  I work under Chief Petty Officer Woodard and Mrs. Gregg.

Q.  In the Coast Guard?

A.  Yes.

Q.  How long have you been with the Coast Guard?

A.  13 years.

Q.  Do you recall being stationed in Kodiak?

A.  I was stationed in Kodiak from July 2010 to

1    June 2012.

2         Q.   Where were you living in 2012 physically on the

3    island?

4         A.   I lived -- well, it's in the town of Kodiak.  I

5    don't remember exactly the place, but it was in town.

6         Q.   In the city of Kodiak?

7         A.   In the city of Kodiak, correct.

8         Q.   Who did you live with?

9         A.   I lived with Cody Beauford and Jacob Schaeffer.

10        Q.   Where did you work when you lived in Kodiak?

11        A.   I worked at the T-1 building.  I was one of the

12   technicians.

13        Q.   And what level technician were you?

14        A.   So I was an electronics technician second class

15   at the time, basically working the transmitter and

16   receivers.  We went to different remote sites to work on

17   them as well.

18        Q.   Did you and OS Schaeffer and Mr. Beauford all

19   work the same shift?

20        A.   No, we did not.  OS2 Schaeffer had a different

21   shift than us.

22        Q.   Did you and Cody Beauford work the same shift?

23        A.   Close, but he worked in a different shop, so

24   sometimes his schedule changed.

25        Q.   Where did he work?

1    A.   He worked in the rigger shop.

2    Q.   How would you get to work in the mornings?

3    A.   So I usually -- I usually drove my truck.

4    Q.   What kind of truck did you have?

5    A.   I had GMC Sierra at the time.

6    Q.   What color was it?

7    A.   Burgundy.

8    Q.   Do you remember what kind of vehicle Mr. Beauford

9  had?

10   A.   It was an old truck, black truck.  I don't

11 remember.  It's been quite a while.

12   Q.   Do you recall April 12, 2012?

13   A.   Yes, I recall -- I remember it specifically,

14 because -- well, aside from the incidents, that morning

15 we left super early the house, so instead of going

16 straight to the COMMSTA, we decided to go to Harbor Side

17 Coffee, get some coffee up there.

18   Q.   Harbor Side Coffee, where is that in Kodiak?

19   A.   Close to downtown by the harbor.

20   Q.   After you got coffee, where did you go?

21   A.   We stayed there for a couple of minutes, chatted,

22 and then we decided to go back -- go to work.

23   Q.   Were you wearing civilian clothes or your uniform

24 at the time?

25   A.   Civilian clothes.

1    Q.  And do you recall what Mr. Beauford was wearing?

2    A.  I do not.

3    Q.  Tell me about your normal day.  What time did

4 your shift start?

5    A.  Usually started around 0800.  The schedule

6 changed every now and then, but that day it was 0800.

7    Q.  What time would you normally get to work?

8    A.  Usually around 30 minutes prior, because I'm one

9 of those persons I don't like to be late and I like to

10 go change and be comfortable, drink my coffee, check the

11 computer, stuff like that before I actually had to get

12 my hands on transmitters and stuff.

13    Q.  When you headed to the COMMSTA the morning of

14 April 12th, did you notice anything unusual on your way

15 in?

16    A.  Not that I recall.  I don't remember a whole lot

17 different from any other day.

18    Q.  Do you remember seeing anyone on the road that

19 morning?

20    A.  I don't remember seeing anybody on the road that

21 day.

22    Q.  Not a jogger or a walker or anything like that?

23    A.  Yes, I think I saw a jogger at the time.  Yeah, I

24 think somebody was running around that time, but again,

25 nothing to be concerned about.

1    Q.  So it wasn't suspicious to you?  You just saw

2    someone?

3    A.  Yeah.

4    Q.  Do you recall the exact time you got to the

5    COMMSTA?

6    A.  Around 7:30.  I think it was between 7:27 and

7    7:30.  It was something like that.  Around 7:30.

8    Q.  How about we have you look at Exhibit No. 258.

9    If we could start that.

10        Tell me if you recognize this video.

11   A.  Yes.

12   Q.  Have you reviewed this before?

13   A.  Yes.

14   Q.  Okay.  What does this video depict?

15   A.  This is Seaman Coggins' Jeep.  I recognized it as

16   soon as I saw it.

17   Q.  You have watched this entire thing before?

18   A.  Up until a point where I left the COMMSTA and it

19   cut off.

20   Q.  Your vehicle appears on this video?

21   A.  Yes, it does.

22   Q.  We can stop that.

23        Fair and accurate depiction of you driving by the

24   COMMSTA on the morning of April 12th?

25   A.  Yeah.

1       Q.   Is it?

2       A.   What happened?

3       Q.   That's okay.  Let me ask you this way:  This

4    video you watched, do you see your truck on that video?

5       A.   Yes.

6       Q.   Does that show what you did that day?

7       A.   Yes.

8            MS. SHERMAN:  I'm going to move for the

9    admission of Exhibit No. 258.

10           MR. CAMIEL:  No objection.

11           THE COURT:  258 is admitted.

12           (Exhibit No. 258 admitted.)

13   BY MS. SHERMAN:

14      Q.   We'll rewind it and we'll watch it.  We can go

15   ahead and start it.

16           (Exhibit No. 258 playing in open court.)

17   BY MS. SHERMAN:

18      Q.   Can you tell us for the record what time it is on

19   that video.

20      A.   7:31.

21      Q.   And what do you see here?

22      A.   I see Seaman Coggins pulling in.

23      Q.   Do you recognize who that is at 7:32?

24      A.   Yes, that is Seaman Coggins.

25      Q.   Can we pause it.

1           Do you recognize that vehicle?

2      A.   Yes, that is my vehicle at the top.

3      Q.   And if we can go ahead and play it.

4           (Exhibit No. 258 continues playing in open

5  court.)

6  BY MS. SHERMAN:

7      Q.   Can we pause it.

8           Can you tell us why you're backing up there?

9      A.   Because I was in autopilot and I forgot I had a

10 passenger that I had to drop off.

11     Q.   You can go ahead and play it.

12          (Exhibit No. 258 continues playing in open

13 court.)

14 BY MR. SHERMAN:

15     Q.   We can pause it there.

16          What's happening here where your vehicle is

17 partially out of frame?

18     A.   I am dropping him off, and I set myself like in a

19 position where I can just make a U-turn right away and

20 go up there to park the car.

21     Q.   We can go ahead and finish it.  Sorry, finish the

22 video.  Thank you.

23          (Exhibit No. 258 continues playing in open

24 court.)

25 BY MS. SHERMAN:

1    Q.  At some point during that day, did you learn what

2    had happened down in the rigger shop?

3    A.  Yes.  Hours later, we got gathered in the

4    conference room in T-1, and that's when they told us.

5    Q.  Do you recall who told you?

6    A.  Yes, our XO, Mr. Pizzurro.

7    Q.  Could you describe his emotional state when he

8    was telling you what happened?

9    A.  He was crying.  Well, he had teary eyes.  At that

10   point, he was really emotional.  Everybody was pretty

11   emotional at that time, and like he started crying, but

12   he left.  He just told us what happened, not a whole lot

13   of information was given at that time.  He just stepped

14   out and then everybody was worried, crying.  A lot of

15   people were crying and stuff.

16   Q.  In the conference room, was there anyone who was

17   not crying?

18   A.  Yes, that would be Mr. Wells.

19   Q.  What was he doing?

20   A.  He was sleeping at that time.

21   Q.  Do you recall when that was?  Was that later in

22   the evening?

23   A.  No, that was in the morning, and I recall it

24   because I will never forget seeing the two seamen.  We

25   have Leah Killingsworth at the time and Para Upchurch.

They were crying like really loud, like crying really
emotional.  You can see everybody is worried, but I
remember Mr. Wells was sleeping.

           MS. SHERMAN:  Those are all my questions.
Thank you.

           THE COURT:  Mr. Camiel?

                      CROSS EXAMINATION

BY MR. CAMIEL:

    Q.  Good afternoon, sir.

    A.  Good afternoon.

    Q.  On April 12th, the day you were just talking
about, the reason you gave your roommate, Cody Beauford,
a ride was that his vehicle was in the shop being worked
on?

    A.  No.  His vehicle wasn't in the shop.  His vehicle
was at the house.  He usually worked -- because it was a
really old truck, it broke down all the time, so that
was normal for me to give him a ride.

    Q.  And when you were driving up to the rigger shop,
you came up Anton Larsen Bay Road?

    A.  Yes.

    Q.  And that's where you saw the jogger?

    A.  Yes.

    Q.  You didn't see a blue SUV coming back the other
way, no recollection of that?

1    A.   I don't recollect that.

2    Q.   And after you got to work, after you backed up

3  and dropped off Cody Beauford, you drove up to near the

4  T-1 building?

5    A.   To the parking area of the T-1 building.

6    Q.   Did you park outside the fence in the lower

7  parking area?

8    A.   Yes, in the lower parking area.  Only command

9  personnel was able to park inside the fence.

10   Q.   And might have been a little hard to tell on the

11  video, but the color of your truck is kind of a maroon

12  color?

13   A.   Burgundy.

14   Q.   Burgundy.  Okay.  And after you started work,

15  then you learned about what happened down in the rigger

16  shop, right?

17   A.   Yes.

18   Q.   And you folks were held -- you had to stay at the

19  T-1 building, you couldn't end at the time your regular

20  shift was over, right?

21   A.   Yes.  We didn't leave until late afternoon.

22   Q.   You ended up being there like 13 hours, something

23  like that?

24   A.   Yes.  Yes.  13 hours probably, not more.

25   Q.   Did you have any information that Mr. Wells had

1  been sick earlier in the year?

2  A.  No, not that I remember.  I don't remember, to be

3  honest.

4  Q.  When you saw everybody in the conference room,

5  some people were very emotional and crying very loudly?

6  A.  Yes.

7  Q.  And other people were more quiet?

8  A.  Yes.

9  Q.  And Mr. Wells had his eyes closed?

10  A.  He was straight up sleeping.

11  Q.  At some point, he appeared to be sleeping to you,

12  right?

13  A.  Yes.

14  Q.  All right.  How long were you in the conference

15  room with Mr. Wells and the rest of the people?

16  A.  I do not remember the time.  I don't remember the

17  exact times because a lot of things happened at that

18  time.

19          MR. CAMIEL:  That's all I have.

20          THE COURT:  Redirect?

21          MS. SHERMAN:  No further questions.

22          THE COURT:  This person can be released,

23  counsel?

24          MR. CAMIEL:  Yes.

25          MS. SHERMAN:  Yes, please.

```
 1            THE COURT:  Thank you.  You may be excused.

 2            (Witness excused)

 3            THE COURT:  Your next witness?

 4            MR. SKROCKI:  We call Kirk Oberlander.

 5            THE COURT:  All right.

 6            MR. SKROCKI:  May I confer with counsel briefly

 7    before Mr. Oberlander testifies?

 8            THE COURT:  Certainly, if you need a minute.

 9            MR. SKROCKI:  Just a minute.

10            THE COURT:  Why don't you come on forward, sir.

11    The lawyers are going to chat for a minute.  When they

12    are done, we'll have the clerk administer an oath to

13    you.  Thank you.

14            (Pause)

15            (Oath administered to the witness)

16            DEPUTY CLERK:  For the record, can you please

17    state your full name and then spell your full name.

18            THE WITNESS:  Kirk Oberlander, K-i-r-k,

19    O-b-e-r-l-a-n-d-e-r.

20          KIRK OBERLANDER, GOVERNMENT WITNESS, SWORN

21                      DIRECT EXAMINATION

22    BY MR. SKROCKI:

23       Q.  Thank you, Your Honor.

24           Mr. Oberlander, could you tell the jury who you

25    work for, sir?
```

1    A.   I'm a Special Agent with the FBI.

2    Q.   How long have you been with the FBI?

3    A.   Coming up on 11 years.

4    Q.   Before working for the FBI, where did you work?

5    A.   I was active duty with the U.S. Coast Guard for

6    eight years.

7    Q.   And your education prior to becoming active duty?

8    A.   I'm a graduate of the United States Coast Guard

9    Academy, bachelor of science in civil engineering.

10   Q.   Your Coast Guard experience, sir, was what?

11   A.   I was primarily a cutterman, which is a seagoing

12   officer on the high seas conducting search and rescue,

13   law enforcement, migrant interdiction on the high seas.

14   Q.   How long did you do that work?

15   A.   For six years on ships, and then I taught at the

16   Naval Academy for my last two years on active duty.

17   Q.   U.S. Naval Academy?

18   A.   Yes.

19   Q.   Competing organization?

20   A.   We are the heart and nucleus about which the Navy

21   forms in time of war.

22   Q.   Indeed.  From the Coast Guard, Mr. Oberlander,

23   did you have occasion to switch careers?

24   A.   I did.

25   Q.   Where did you go?

1    A.   I went to the FBI.

2    Q.   The FBI from -- did you go to basic training?

3    A.   Yes.  There was -- I'm sorry.  With the FBI?

4    Q.   When you joined the FBI, what did you do?

5    A.   Yes.  There is about a five-and-a-half month

6    academy at Quantico, Virginia teaching basic criminal

7    law, tactics, constitutional issues, things like that.

8    Q.   Your first assignment was where?

9    A.   Here in Anchorage, Alaska.

10   Q.   During the course of your assignment in

11   Anchorage, how many varieties of cases have you had

12   occasion to work?

13   A.   I started out on the violent crime squad, worked

14   violent crimes and gangs for about two years.  Then went

15   to cyber national security investigations.  And then

16   came to white collar squad about six years ago working

17   civil rights, public corruption and fraud-type

18   investigations.

19   Q.   I want to turn your attention to April of 2012.

20   Did you receive an assignment from the FBI during that

21   month?

22   A.   Yes, sir.

23   Q.   Around what time, what date?

24   A.   April 12, 2012, about 9:30 a.m. I was called to

25   the management area of the FBI building.  They told me

1    to pack my bags, there was a double homicide, what

2    appeared to be a double homicide in Kodiak, and the

3    Coast Guard Investigative Service was asking for our

4    assistance.

5         Q.  Did you pack your bags?

6         A.  I did.

7         Q.  Did you go to Kodiak?

8         A.  Yes.

9         Q.  How did you get to Kodiak?

10        A.  We were told that a Coast Guard C-130 was going

11   to meet us on Joint Base Elmendorf-Richardson and we

12   would take a Coast Guard C-130 over.  So we got to the

13   airport probably about 11:00 a.m. that morning, loaded

14   up, were on the -- I think airborne about 11:30.  We

15   landed about 1:00 p.m. Kodiak.

16        Q.  Do you recall where you landed in Kodiak?

17        A.  At the main airport, but then we taxied over to

18   the Coast Guard taxiway over to the Coast Guard tarmac.

19        Q.  Do you recall how many agents were with you on

20   this run to Kodiak?

21        A.  There was eight agents.

22        Q.  Special Agent Oberlander, did you have occasion

23   to be on Kodiak prior to this?

24        A.  Yes.

25        Q.  Explain to the jury about in what capacity.

A.   Yes.   When I was on active duty Coast Guard, I was stationed in San Diego on a cutter there, and the cutter was a large cutter and we patrolled much of the Pacific, to include the Bering Sea and Gulf of Alaska.

One of our port calls on an Alaska patrol was Kodiak, so I had been there on active duty a couple different times.   But then also my casework, once I came to Anchorage as a special agent, had taken me there a couple times for interviews and things.

Q.   So you were familiar with the layout of Kodiak, the road system at least?

A.   Yes.

Q.   You mentioned you landed and taxied to the main base station Kodiak.   What did you do after that?

A.   We were briefed by the responding trooper and we went over to the main base administrative building that housed the Coast Guard Police Department.   And we set up in the conference room there at the main admin building, received that brief.

Q.   At some point in time, did you move locations?

A.   Yes.

Q.   Where did you go from there?

A.   We felt that we needed to get closer to the scene because that's where most of the interviews needed to take place, so we were able to work with the Coast Guard

1   to get a conference room at the communication station.

2       Q.  Special Agent Oberlander, can you explain to the

3   jury in terms of the FBI's management role in a case

4   like this and how you understood your role to be and

5   sort of the supervisory hierarchy on the ground in

6   Kodiak at this point in time.

7       A.  Daryl Allison was assigned as the case agent, and

8   we would report back to our management, but I was kind

9   of a co-case agent or assistant.  I was assisting the

10  case agent at that point.

11      Q.  Do you see Mr. Allison here in the room today?

12      A.  I do.

13      Q.  Where is he?

14      A.  Tan jacket, blue shirt, kind of purple tie.

15      Q.  All right.  So he was the lead agent?

16      A.  Yes.

17      Q.  And you had a role to do that day?

18      A.  Yes.

19      Q.  What was your understanding of what your role was

20  to be?

21      A.  Leads were coming in, which means there were

22  different avenues for us to follow up on as a logical

23  investigation, and we were following leads on what might

24  have happened or what led to the incident, the murders

25  at the base, and so we were following up on those.

1    Q.  Do you recall what time you ultimately made it to

2  the communication station?

3    A.  I would estimate around 2:30 that afternoon.

4  Maybe 3:00.

5    Q.  If we could have the lights please and Exhibit

6  No. 222, which has been admitted.

7       If I could direct your attention either to the

8  screen in front of you, Agent Oberlander, or the

9  overhead screen.  Do you recall the buildings depicted

10  in that photograph?

11    A.  Yes.

12    Q.  Did you spend some time in either one of those

13  buildings on April 12, 2012?

14    A.  I spent time in the building on the right.  I did

15  not go in the building on the left.

16    Q.  I want to circle the building on the right.

17    A.  Yes.

18    Q.  Would that be true for the 13th of April as well

19  that you spent time in that building?

20    A.  Yes.

21    Q.  When you -- if we could take that down -- thank

22  you -- and have the lights up.

23       When you began your work in this building here

24  you circled, the white long building, did you have --

25  did you become aware of a name that was associated with

1   that building?

2       A.  Yes, T-1 or COMMSTA, the communication station.

3   All of those are kind of synonymous.

4       Q.  So in terms of the white building, which we're

5   calling T-1, did you spend most of your time there

6   interviewing individuals on the 12th?

7       A.  Yes.

8       Q.  When you got there, could you describe the

9   emotional state or state of people that you saw who you

10  were going to interview, those that you saw?

11      A.  Yes.  Most of the people were fairly distraught,

12  kind of a -- many people were crying, but many people

13  just kind of had that thousand-yard stare, like can't

14  believe what was happening type of look.

15          There were, like I said, a few people that were

16  visibly crying or it appeared that they had recently

17  been crying.

18      Q.  Did you -- do you remember who the first person

19  was that you interviewed?

20      A.  I believe it was Cody Beauford.

21      Q.  Do you recall people you interviewed that day,

22  Mr. Beauford and anybody else?

23      A.  Scott Reckner and Mr. Wells.

24      Q.  So with respect to Mr. Beauford, what was his

25  emotional state?

 1    A.  He was -- he kept himself together, but could

 2   tell he had seen things that day that most people don't

 3   see in their life, and so it caught him -- he was not

 4   super emotional about it, but he was kind of

 5   disconnected from it, I think is the best I can describe

 6   him.

 7    Q.  Do you recall where you interviewed Mr. Beauford?

 8    A.  I do not.  I think it was at the Coast Guard

 9   administrative building, but I don't recall

10   specifically.

11    Q.  How about Mr. Reckner?

12    A.  Mr. Reckner was at T-1, I believe.

13    Q.  What was his emotional state during his interview

14   with you?

15    A.  He was, again, distraught.  He wasn't physically

16   crying, but he was holding back tears.  I could see

17   tears in his eyes, frustration that he didn't know more,

18   didn't have more answers, but emotional.

19    Q.  Was Mr. Beauford's interview recorded?

20    A.  Yes.

21    Q.  Mr. Reckner's?

22    A.  Yes.

23    Q.  How long did you spend, if you recall,

24   interviewing Mr. Reckner?

25    A.  There were a couple different interviews with

him.  I think it was about a half an hour was the first one, and then a shorter one to record some voicemails.

    Q.   Did you record a voicemail that day?

    A.   Yes.

    Q.   Do you recall where you got that voicemail from?

    A.   It was from Scott Reckner's phone, work phone, his desk phone.

    Q.   If we could have Exhibit 33, which I believe is admitted.

        THE COURT:  That's correct.

    Q.   I want to play Exhibit 33 for you, Agent Oberlander, and have you listen to that while we play it.

        (Exhibit No. 33 playing in open court.)

BY MR. SKROCKI:

    Q.   Thank you, Blair.

        At the end of that recording, Agent Oberlander, you say "1841"?

    A.   Yes.

    Q.   What time of day is that?

    A.   It's the evening, 6:41 p.m.

    Q.   6:41 p.m.  That was your voice on the audio?

    A.   Yes.

    Q.   Without -- let me try it this way:  Who directed you to that voicemail?

1    A.   Scott Reckner.

2    Q.   Where did the information about that voicemail

3    come to your attention?

4    A.   I think it was first briefed to me by Trooper

5    Dupras, who got the information from Scott Reckner.

6    Q.   And was that information relayed to you by

7    Mr. Reckner?

8    A.   Yes.

9    Q.   So what did you do when you heard that

10   information?  What did you do next?

11   A.   I'm sorry.

12   Q.   When Mr. Reckner advised you of this voicemail,

13   what did you go do?

14   A.   We attempted to recover it or record it, which we

15   did.

16   Q.   Did you do anything with respect to the

17   information you heard on that voicemail?

18   A.   Yes.

19   Q.   What did you do?

20   A.   We tried to verify it with Mr. Wells and through

21   other investigative steps as well.

22   Q.   Did you relay the information that you heard on

23   the e-mail to anybody?

24   A.   Yes.

25   Q.   To who?

1    A.  The lead agent, Agent Allison.

2    Q.  At some point in time in that evening after you

3  heard that voicemail, was there a discussion or an

4  investigative plan created with respect with what to do

5  next?

6    A.  Yes.

7    Q.  What was that?

8    A.  We would need to interview Mr. Wells to get his

9  explanation of what happened that morning.

10   Q.  And who was making those decisions of what to do

11 next?

12   A.  I mean there was discussion about it, but

13 ultimately the decision was Daryl Allison's.

14   Q.  And did you have occasion to interview Mr. Wells

15 that evening?

16   A.  I did.

17   Q.  Was there anybody with you when you did those

18 interviews?

19   A.  Yes.

20   Q.  Who was with you?

21   A.  Special Agent Sean Bottary with Coast Guard

22 Investigative Service.

23   Q.  Did you record those interviews?

24   A.  We did.

25   Q.  Do you recall contacting Mr. Wells prior to the

1    interview about these interviews?

2        Bad question.

3        Do you recall contacting Mr. Wells about seeing

4    if he was amenable to an interview?

5    A.   Yes.

6    Q.   If we could have Exhibit 17, please, which I

7    believe has been admitted.

8            THE COURT:  Yes.

9    Q.   Thank you.

10       Is that how Mr. Wells appeared during these

11   interviews on April 12, 2012?

12   A.   Yes, very close.  Probably different clothes, but

13   same facial features, facial hair and length of hair.

14   Q.   Thank you.  Thank you, Madam Clerk.

15       Agent Oberlander, why so late in the afternoon

16   before you got to Mr. Wells?

17   A.   Like I said, there were many investigative leads

18   that we started with when we got there.  We landed at

19   about 1:00.  The briefing took probably an hour.  Did

20   some other interviews.  And we were just trying to go as

21   fast as we could.

22       It was very -- I don't want to say chaotic, but

23   very intense time period trying to figure out what was

24   needed -- what needed to be a priority.  And we were

25   trying to get as much information as we could as quickly

```
 1   as we could.  The crew was at T-1, so all the
 2   communication station crew was at T-1 and we were trying
 3   to figure out which people were the priority to
 4   interview that might have the most information to help
 5   us move forward.
 6           MR. SKROCKI:  Okay.  Judge, the first recording
 7   that we have -- we prepared transcripts for the jury of
 8   all the recordings.  I don't know if there is any
 9   objection to them being handed to the jury.
10           THE COURT:  I believe we discussed this at some
11   point and agreed on this procedure.  Have you seen the
12   transcripts, I assume?
13           MR. COLBATH:  I have, Your Honor.  I can't
14   remember whether the Court has an instruction related to
15   it.
16           MR. SKROCKI:  Here is -- I apologize, but we're
17   breaking at 3:30, so the first one is 30 minutes.
18           THE COURT:  There is an instruction.  It's
19   going to take me a moment to find it.
20           MR. SKROCKI:  Maybe while you do that, we can
21   hand out the transcripts and save a few seconds.
22           THE COURT:  Maybe not.
23           MR. SKROCKI:  Yes, ma'am.
24           THE COURT:  I'm not sure, unfortunately, if I
25   have this one here, but let me see.  I am going to need
```

1    to print this from the pattern on transcripts, so why

2    don't we do this ladies and gentlemen:  That's going to

3    take me about five minutes and we will come back.  I

4    know you need to leave at 3:30.

5            MR. SKROCKI:  We'll break when you're ready,

6    maybe 25 after.  That's not a problem.

7            THE COURT:  Very good.

8            DEPUTY CLERK:  Court stands in a brief recess.

9            (Recessed from 3:01 p.m. to 3:04 p.m.)

10            (Jury absent)

11            THE COURT:  Please take a look at these.  I

12    also printed out 4.1 for your consideration.

13            Mr. Skrocki, these are the two that I would

14    plan on giving.  We didn't discuss statements by

15    defendant, but that would also appear to be appropriate.

16            MR. COLBATH:  The Court will just modify 4.1 to

17    say "you're about to hear"?

18            THE COURT:  Yes, and then same with the

19    transcripts.  "You are about to hear a transcript," yes.

20    "Please listen to it very carefully as an option," it's

21    bracketed.  Any preference?  Seems an odd thing to say.

22    We want them to listen to everything very carefully.

23            MR. SKROCKI:  I think that's understood.

24            THE COURT:  So delete is your proposal?

25    Mr. Camiel or Mr. Colbath?

1          MR. COLBATH:  That can be certainly deleted.  I

2    don't know if the Court is going to read it each time we

3    play a recording.

4          THE COURT:  No, I will make it plural.  You

5    agree with that?

6          MR. SKROCKI:  Yes.  Just in terms of mechanics,

7    we hoped to do this all in one day.

8          THE COURT:  So I might read it again in the

9    morning.

10          MR. SKROCKI:  That's fine.  No problem, Judge.

11    The transcript book has got all the transcripts in it,

12    so just advise them don't read ahead.  It will be hard

13    enough for them to keep up.

14          THE COURT:  I will do that.  Very good.  I

15    think we're ready to bring them in then.

16          MR. SKROCKI:  Yes, ma'am.

17          THE COURT:  Just so it's clear, what I was

18    reading from, it's the criminal model jury instructions

19    2.7 and 4.1.

20          MR. SKROCKI:  Your Honor, when you're ready,

21    we'll authenticate the audio, go through the transcript

22    process, authentication, and then would you like us to

23    hand them to the jury after that?

24          THE COURT:  Yes.  Whenever you're ready to play

25    it, we'll hand it out right before then.

1          MR. SKROCKI:  Yes, ma'am.

2          THE COURT:  Very good.

3          (Jury present)

4          THE COURT:  Please be seated, everyone.  I

5   found our instruction.  Go ahead, Mr. Skrocki.

6          MR. SKROCKI:  Yes, Your Honor.  Thank you.

7   BY MR. SKROCKI:

8     Q.  Agent Oberlander, you interviewed Mr. Wells

9   several times on April 12th, correct?

10    A.  Correct.

11    Q.  The first one we have marked as Exhibit 98.  This

12   was your first interview with him?

13    A.  Yes.

14    Q.  Who participated in that interview with you and

15   Mr. Wells?

16    A.  Sean Bottary, Special Agent Sean Bottary.

17    Q.  What was Mr. Bottary's role with respect to this

18   interview process?

19    A.  He was also an interviewer.

20    Q.  With respect to Exhibit 98, have you had occasion

21   to listen to that entire audio file?

22    A.  I have.

23    Q.  Is that accurate as to what you recorded with

24   your first interview with Mr. Wells on April 12, 2012,

25   in the evening?

1    A.  Yes.

2    Q.  Have you also had occasion to compare the audio

3  recording with a transcript?

4    A.  Yes.

5    Q.  Did you make corrections to authenticate the

6  transcript as being accurate as to the audio recording

7  and the words spoken on Exhibit 98?

8    A.  Yes, I did.

9        MR. SKROCKI:  Your Honor, we'd move for the

10  admission of Exhibit 98, and then for publication of the

11  transcript would be 98T, as in Tom.

12        THE COURT:  All right.

13        (Exhibit No. 98 admitted.)

14        THE COURT:  And the Court has previously

15  addressed this, so that ruling stands.  Anything else to

16  add on the record?

17        MR. COLBATH:  Not to add on the record, other

18  than, Your Honor, it's my understanding the transcript

19  after the playing of the recording, the transcripts will

20  be received.  It's the audio recording that's the

21  evidence.

22        THE COURT:  You're taking the wind out of my

23  sails.  That's my instruction.

24        MR. COLBATH:  With that understanding, then no

25  further issue there.

1          THE COURT:  Very good.  So are you ready to

2   then play this?  So before he does, I'm going to read

3   you two different instructions.

4          First, ladies and gentlemen, you are about to

5   hear several recordings.  First recording at Exhibit 98

6   that this one has been received in evidence.  Each of

7   you will be given a transcript of the recording to help

8   you identify the speakers and as a guide to help you

9   listen to the recording.

10          However, please bear in mind that the recording

11  is the evidence, not the transcript.  If you hear

12  something different from what appears in the transcript,

13  what you hear is controlling.  And after the recording

14  has been played, the transcript will be taken away from

15  you.  What will be the evidence is the actual recording.

16          Also, the government informed me that all the

17  different transcripts are in one notebook, and I would

18  ask you all not to read ahead, but to stay along with

19  the exhibit that's being played.

20          And finally, this testimony you have heard is

21  that the defendant has made certain statements.  It's

22  for you to decide, one, whether the defendant made the

23  statement, and, two, if so, how much weight to give it.

24  In making those decisions, you should consider all the

25  evidence about the statement, including the

1  circumstances under which the defendant may have made

2  it.

3        With that, please hand out the transcripts if

4  you'd like.

5        MR. SKROCKI:  Thank you, Judge.

6        (Transcripts handed out to jury.)

7        MR. SKROCKI:  What we plan to do with almost

8  all of this exhibit, if not all of them, is play them

9  straight through without interruption.

10        THE COURT:  All right.

11        MR. SKROCKI:  Everybody have a copy?  Yours is

12  behind you, Special Agent.

13        THE COURT:  All right.  Very good.

14        MR. SKROCKI:  Let the agent catch up.  It will

15  be 98T, as in Tom.  All set.  Please.

16        (Exhibit 98 playing in open court.)

17  BY MR. SKROCKI:

18     Q.  Blair, can we stop.

19        Just briefly, Agent Oberlander, with respect to

20  this discussion here about the watch calling, what was

21  Mr. Wells doing during this part of the discussion?

22     A.  He had his cell phone out and was kind of going

23  through his call log to get those specific times.

24     Q.  Okay.  Thank you.

25        MR. SKROCKI:  We'll stop at 25 after.

1          THE COURT:  That sounds fine.  25 after or

2     3:30?

3          JUROR NO. 8:  Either one.

4          THE COURT:  All right.  You pick, Mr. Skrocki.

5     Somewhere in that range.

6          JUROR NO. 8:  25 after.

7          MR. SKROCKI:  Okay, Blair.  Go ahead.

8          (Exhibit No. 98 continues playing in open

9     court.)

10          MR. SKROCKI:  25 after.

11          THE COURT:  All right.  Very good.  Ladies and

12     gentlemen, please leave your notepads here.  Remember my

13     admonition not to discuss the case, not to do any

14     research.

15          What time tomorrow, counsel, would you propose?

16          MS. SHERMAN:  I thought someone said -- that's

17     Friday.

18          THE COURT:  That's Friday.

19          MR. SKROCKI:  We're happy to get here early and

20     get started, Judge.  Whatever you wish.

21          THE COURT:  Maybe 8:45 and be here at 8:40.

22     That seems to work pretty well for us.

23          We'll have you at 8:45.  Leave your notepads

24     here.  Hope you have a pleasant evening.  Hope the house

25     closing goes well for you, sir, and we'll see you all in

1 the morning.

2          (Jury absent)

3          THE COURT:  Please be seated, everyone.

4          Sir, we can have you back tomorrow at 8:45,

5 please.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  What's our plan of action, a short

8 break and then we're going to hear from one of the

9 government witnesses?

10          MS. SHERMAN:  Mr. Toglia.  Does the Court want

11 us to collect the transcripts or leave them there

12 overnight?

13          DEPUTY CLERK:  They can leave them there and

14 I'll put them with the jury notebooks.

15          THE COURT:  All right.  Very good.  Let's take

16 about five to ten minutes here and then come back and

17 take up this issue.  I might need the exhibit number

18 again, but we'll do that later.

19          DEPUTY CLERK:  All rise.  Court stands in a

20 brief recess.

21          (Recessed from 3:27 p.m. to 3:40 p.m.)

22          (Jury absent)

23          DEPUTY CLERK:  All rise.  Her Honor, the Court,

24 the United States District Court is again in session.

25          Please be seated.

1          THE COURT:  We are back on record here without

2     the jury.

3          MS. SHERMAN:  Mr. Toglia is here.

4          THE COURT:  Good afternoon.  If you could --

5     before we call the witness, go ahead and have a seat, if

6     you would be so kind.

7          I would like to hear what the focus of the

8     defendant's issue on this witness is that has not been

9     addressed by a prior court order, because I think that

10    can help streamline where we are here.

11         So go ahead, Mr. Colbath.

12         MR. COLBATH:  Thank you, Your Honor.  Our focus

13    with this is similar to and raised in or continued to be

14    raised in the most recent, the motion for clarification

15    that we filed.

16         The focus is this:  It is the defense's

17    position that the April 19th video is being used, and

18    still frames from that, are being used to be subsumed

19    within and utilized by this witness as part and parcel

20    of his both --

21         THE COURT:  Would you like the witness excused

22    while you --

23         MR. COLBATH:  That's okay -- analysis as well

24    as the formulation of the opinions.  In that respect,

25    based on the earlier hearing that we had and the Court's

1    earlier finding and the things that have already been of

2    record, that to that extent, because the testimony

3    substantively incorporates that, that it should be

4    excluded because of the way the April 19th video was

5    created or the lack of foundation for it, scientific --

6              THE COURT:  Are you asserting he's not

7    qualified to give an opinion on these topics?

8              MR. COLBATH:  Well, I'm not sure yet.

9              THE COURT:  Because I will say I ruled on the

10   April 19 video, and that's clearly coming in, at least

11   as a demonstrative aid to witness's testimony, so we're

12   not revisiting that.  I understand objection is well

13   preserved on that.

14             The question is on what basis -- the Court has

15   a gatekeeping function, Ninth Circuit has made that very

16   clear, and cannot allow or should not allow expert

17   testimony to be presented to a jury without determining

18   that it's sufficiently reliable to assist the trier of

19   fact.

20             There is an option of letting it in, and I

21   think I wrote about this in one of these orders, and

22   then telling the jury to disregard it, that's not the

23   preferred approach.

24             So what is it that you seek to elicit in this

25   testimony that would cause the Court to exclude this

1  evidence?

2         MR. COLBATH:  Depending upon -- it's certainly

3  the defense's position that the area of photogrammetry

4  is one specialty for which the Court may find that

5  somebody could be qualified or not qualified, or may

6  find that that is an appropriate area of professional

7  testimony that I think is different from forensic

8  photographic and video analysis.

9         And the qualifications I think could be

10 different, and that could be a separate area, in our

11 estimation.  The experts here in this trial have often

12 been asked to perform cross functions or more than one

13 function.

14        THE COURT:  You have his report, so is there

15 something -- I say that because is there something that

16 you're asserting -- I don't intend to, let me be clear,

17 to allow either side a first round of an evidentiary

18 presentation of each expert witness in this case, and

19 that's not going to happen.

20        But if you stand up and say, "Judge, I looked

21 at his qualifications and this opinion on page seven

22 he's not qualified to give because it's far afield of

23 his expertise," I'm open to that, but I'm not hearing

24 that.  I'm hearing a different argument.

25        MR. COLBATH:  I have questions for -- well, I'm

not -- I am not sure that I even understand, despite my
study of his report, what specific opinions he'll be
offering about video analysis as compared to some
photogrammetry presentation, and so my questions would
only be specific to that.

        THE COURT:  To video analysis?

        MR. COLBATH:  Yes.

        THE COURT:  So the photogrammetry you're not --

        MR. COLBATH:  I object to that -- we object to
that as a science and say that -- well, it's our
position that the Court should not accept that, but I
think that you --

        THE COURT:  I have already ruled on that, and
you acknowledge that?

        MR. COLBATH:  Correct.

        THE COURT:  I have accepted the photogrammetry,
so it's video analysis to the extent that it's distinct
from photogrammetry that you --

        MR. COLBATH:  Correct.

        THE COURT:  And what is it about in his report
-- or do you find that the entire field of video
analysis should be prohibited?

        MR. COLBATH:  No.  I certainly think that's a
recognized scientific field, it's relevant.  It's
certainly relevant in this case.  That's what many

1    experts were asked to do.

2         THE COURT:  Are you saying this witness is not

3    qualified to do video analysis based on his CV?

4         MR. COLBATH:  I did not see from his CV and

5    from his prior testimony that that was specifically -- I

6    did not see that from his CV, and I did not see that

7    that was specifically delineated out within his prior

8    testimony.

9         And so it would only be limited to, "Do you

10   have an ultimate opinion in that area so I'm clear on

11   it," because I'm not clear from the report.  And then

12   questions about his qualifications and things in that

13   realm, limited to that realm.

14        THE COURT:  Video analysis as distinct from

15   photogrammetry?

16        MR. COLBATH:  Yes, Your Honor.

17        THE COURT:  What opinions, if any, are based on

18   video analysis, as distinct from --

19        MR. COLBATH:  Photogrammetry.  That's all.  And

20   before I sit down, the government is -- primarily Mr.

21   Toglia's PowerPoint presentation is Exhibit No. 181.

22   That's the one we have been talking about.  He does have

23   -- there is two additional -- it's like 181A and B are

24   some kind of poster boards or something that we haven't

25   seen yet.  I presume they are something out of the

```
1    PowerPoint.  I have probably physically seen the slides
2    or whatnot, but I haven't seen the poster boards.  Then
3    follow that, there is Exhibit No. 182, which is a --
4              THE COURT:  Fly-in of COMMSTA it says.
5              MR. COLBATH:  It's an animation, and we do have
6    an objection to that.  It will be self-evident when the
7    Court watches it or if the Court sees it, but we do have
8    an objection to 182 based on 403, based on its
9    cumulative nature and based on the same substantive
10   objections we raised earlier in the 4-19 motion.
11             THE COURT:  So from the government's
12   perspective, would it be more efficient to simply have
13   Mr. Colbath explore this video analysis topic or do you
14   seek --
15             MS. SHERMAN:  I have some questions I would
16   like to ask first.
17             THE COURT:  That's fine.  I think we're ready
18   to proceed then.
19             MS. SHERMAN:  We'll play that 182 for the Court
20   so you can review it now.  It's brief.
21             THE COURT:  Very good.
22             Sir, if you could come forward now.  Thank you.
23   Up to our witness stand, when you get there, remain
24   standing just a moment and the clerk will administer an
25   oath to you.
```

1           (Oath administered to the witness)

2           DEPUTY CLERK:  For the record, can you please

3    state your full name and then spell your full name.

4           THE WITNESS:  Angelo Toglia, Jr.  A-n-g-e-l-o.

5    Last name T-o-g-l-i-a.

6        ANGELO TOGLIA, JR., GOVERNMENT WITNESS, SWORN

7                      DIRECT EXAMINATION

8                       (*Daubert* Hearing)

9    BY MS. SHERMAN:

10       Q.  Can you tell us the difference between video

11   analysis and photogrammetry in your field?

12       A.  Certainly as I apply it on almost a daily basis,

13   they are very -- I don't think you can separate the two,

14   they are very interwoven.

15       Q.  So when you do video analysis, that automatically

16   includes photogrammetry?

17       A.  I think in every case that I have performed that

18   analysis, yes, that's true.

19       Q.  In performing those, you have had training in

20   photogrammetry?

21       A.  Absolutely.

22       Q.  And that includes -- that training on

23   photogrammetry includes the use of video analysis?

24       A.  Yes.

25       Q.  And in terms of publications, have you made

1  publications on photogrammetry?

2      A.   Yes, I have two publications dealing with the

3  science of photogrammetry.

4      Q.   Are they peer reviewed?

5      A.   Yes.

6      Q.   In those publications, do they involve

7  photogrammetry as it's related to video analysis?

8      A.   Both of those publications I believe dealt with

9  photogrammetry as it relates to image analysis in

10  general, so if you recognize that a video is a series of

11  still images such that when you extract an image from

12  the video you are performing an image on the -- of the

13  video, so just to distinguish that video analysis is not

14  really different than just an image analysis.

15      Q.   In your video analysis in this case, did you do

16  video analysis or did you break them down to the

17  individual stills and utilize photogrammetry for the

18  analysis?

19      A.   I extracted the individual frames and performed

20  the analysis on those frames.

21      Q.   Was your methodology used in this case in

22  accordance with your understanding of the best practices

23  in your field of photogrammetry video analysis?

24      A.   Yes.

25            MS. SHERMAN:  All right.  Your Honor, those are

 1   my questions.

 2           THE COURT:  Mr. Colbath, go ahead, please.

 3           MR. COLBATH:  Thank you.

 4                   CROSS EXAMINATION

 5   BY MR. COLBATH:

 6       Q.  Sir, I did not see listed on your CV any of the

 7   -- first of all, any training or specific education

 8   related to video analysis, video or photographic

 9   analysis.

10       A.  Certainly my education, background and training

11   in engineering and with the software programs that

12   employ photogrammetry fall into that category.

13       Q.  Well, but I'm talking about -- well, you don't --

14   you're trained to use software that can do things to

15   videos and images, correct?

16       A.  That can analyze images, yes.

17       Q.  Okay.  Because that is what your photogrammetry

18   work requires you to do?  It's done with software

19   applications?

20       A.  Typically, yes.

21       Q.  And so I guess back to my question:  Well, was it

22   your education as a mechanical engineer that provided

23   the work on forensic video analysis?

24       A.  Certainly that education provided the

25   mathematical background and the understanding of where

1 that -- where the photogrammetry analysis comes from.

2     Q.   Okay.  But I don't want to -- Judge Gleason has

3 already ruled on photogrammetry, so I want to focus on

4 -- well, strike that.

5          Let me back up, first of all.

6          You're familiar with the Scientific Working Group

7 on Image Technology?

8     A.   There are several groups out there, yes.

9     Q.   Well, that specific one, that's a specific name,

10 the Scientific Working Group on Imaging Technology.  Are

11 you familiar with them?

12     A.   I am somewhat familiar with that group.

13     Q.   They in fact were a group with -- a collaborative

14 group coordinated by the FBI and other imaging bodies or

15 imaging -- forensic imaging technology bodies to develop

16 best practices in the field, right?

17     A.   I don't know the history of that group, but I'm

18 willing to accept your representation.

19     Q.   Okay.  Do you know of some of the other working

20 groups similar to that that would have developed

21 standards in the field?

22     A.   Well, I was actually part of a group that years

23 ago was a subcommittee of the society of automotive

24 engineers that dealt with photogrammetry.  I was part of

25 a photogrammetry subcommittee.

1    Q.  These groups separate out and develop best

2    practices and standards separate from photogrammetry for

3    photographic comparisons as well as video image

4    analysis, don't they?

5    A.  I'm not aware of that, no.

6    Q.  And so when you go about an exercise or a project

7    like you did in this case, you follow what set of best

8    practices or industry standards, excuse me?

9    A.  The best practices that have been taught to me

10   over the years of working at collision research.

11   Q.  You're not specifically working from a single --

12   a single document or a single collection from a group,

13   single set of standards?

14   A.  That's correct.

15   Q.  And you apply the ones as you understand them

16   that relate to your field, photogrammetry, which you

17   assume or you have concluded includes video imaging

18   analysis?

19        You don't treat those as separate or you don't

20   have a separate set of standards for imaging analysis?

21   A.  My work with image analysis, which includes video

22   analysis, as I stated, almost always incorporates

23   photogrammetry, so it's a little difficult for me to

24   separate the two.

25   Q.  Besides your mechanical engineering that provided

some mathematical or statistical background, what other

specific educational things have you attended, degrees,

courses, that relate specifically to forensic video

imaging or analysis?

    A.   As part of my professional engineering

classification, I am required to take or continue to

take continuing education courses annually, and as such,

I attend conferences, which frequently have

presentations dedicated to photogrammetry, most usually

as related to accident reconstruction.

    Q.   What are the -- you said you are required to

attend that annually.  Who has that requirement or where

does that requirement come from?

    A.   The requirement for the continuing education

comes due to the fact that I'm a registered professional

engineer.

    Q.   Okay.  So you have a certain amount of continuing

education credits yearly to maintain your license?

    A.   Correct.

    Q.   And it's licensing in mechanical engineering, not

specific to, certainly not specific to forensic video or

image analysis or photogrammetry, it sounds like?

    A.   That's correct.  I'm licensed as a mechanical

engineer, which incorporates lots of areas within that.

    Q.   Besides a generalized yearly or at times during

1    the year continuing education for your engineering

2    degree, can you provide any specific training that you

3    have attended or specific coursework, things in the

4    field of forensic video imaging and analysis?

5        A.   In terms of a specific course, no, but, again,

6    the work that I have done at my current job incorporates

7    the learning of those techniques and the development of

8    those techniques as evident from my publications.

9        Q.   And the publications you mentioned were two that

10   are listed in your CV, Applications of PhotoModeler in

11   Accident Reconstruction, that was one, correct?

12       A.   Correct.

13       Q.   And PhotoModeler is a photogrammetry software

14   program, correct?

15       A.   That's correct.

16       Q.   Did that publication specifically deal with the

17   process outside of photogrammetry forensic video

18   analysis or forensic image analysis, images taken from

19   videos?

20       A.   No, it did not.

21       Q.   That was related to specifically accident

22   reconstruction it sounds like?

23       A.   Yes, which includes on occasion locating vehicles

24   within a scene.

25       Q.   And then the other publication was Head Excursion

of Seat Belted Cadaver, Volunteers, and Hybrid ATD in a

Dynamic Static Rollover Fixture.  Did I get all that

right?

    A.  Yes, but that one does not have to do with

photogrammetry.

    Q.  Okay.  The one above it must be the other

photogrammetry one, Four-Point Planar Homography

Algorithm for Rectification Photogrammetry?

    A.  Correct.

    Q.  Again, not separately dealing with forensic video

or image analysis, dealing with photogrammetry?

    A.  That's correct.

    Q.  And that was a publication dealing with the

developments and applications of particular aspects of

photogrammetry?

    A.  Correct.

    Q.  Do you have any publications, any peer-reviewed

work that is specific to video image analysis?

    A.  No, I don't believe so.

    Q.  Okay.  And your opinion here, the ultimate -- the

ultimate opinion or opinions, I guess, that you're going

to offer in your testimony, are those based exclusively

on your photogrammetry analysis?

        In other words, do you have any opinions that

you're going to offer that are not derived from, at

1    least in part, your photogrammetry analysis work done

2    here?

3        A.   No, I don't think so.  The photogrammetry was a

4    building block for several of the -- several aspects of

5    the work that I performed.

6        Q.   So you didn't do an independent, just standalone

7    video analysis, say, of one video, but you know we have

8    one evidence video here, the April 12th unknown

9    surveillance video, you're aware of that?

10       A.   Yes.

11       Q.   And you didn't perform a non-photogrammetry

12   analysis or just something like that separate from the

13   photogrammetry work that you're going to talk about?

14       A.   Correct, I did not.

15            MR. COLBATH:  Okay.  I think that's all the

16   questions I have, Your Honor.  And I guess --

17            THE COURT:  I can hear argument, but I guess I

18   had a question for this witness.

19            I'm looking at your -- I think -- I'm looking

20   at the report, which we should mark for identification

21   as an exhibit next in line.

22            MS. SHERMAN:  260.

23            THE COURT:  260.  Great.

24            (Exhibit No. 260 admitted.)

25            THE COURT:  I'm looking at certain slides, and

1    these might be the same slides as 189.  Up at the top it

2    says "Video Analysis" on the slides on, say, page three.

3    Why does the heading say "Video Analysis"?

4              THE WITNESS:  Only because the images were

5    extracted from a video as opposed to being a single

6    still image.

7              THE COURT:  I will -- before I rule on this,

8    I'll hear argument, but I also intend to read your

9    testimony from the first trial, which I have not done,

10   in full disclosure here.

11             What's the analysis, because I haven't read

12   that, that would go with where it says "Video Analysis"?

13             THE WITNESS:  The analysis is the whole process

14   that I'll describe about placing the vehicle and the

15   three-dimensional scene and lining it up with the

16   two-dimensional image and figuring out where all of that

17   goes.

18             THE COURT:  Do you use photogrammetry

19   techniques to do that?

20             THE WITNESS:  Yes.

21             THE COURT:  Thank you.  I think I can hear

22   argument of counsel, beginning with perhaps the defense.

23             Can we excuse the witness or did you have any

24   follow-up?

25             MS. SHERMAN:  No.

 1          THE COURT:  Thank you, sir.  Anything you think
 2    we didn't cover?  That's an open-ended question.
 3          THE WITNESS:  I was going to say at the end
 4    when you asked about the title to the slides, that slide
 5    could easily be titled "Image Analysis," and that
 6    doesn't change my opinions or what was done.  The video
 7    really just refers to the fact that they came from a
 8    video as opposed to a still camera.
 9          MS. SHERMAN:  Does the Court want to look at
10    182 while he's here in case the Court has questions
11    about what it shows?
12          MR. COLBATH:  Your Honor, I think that may not
13    be a bad idea.
14          MS. SHERMAN:  It's less than two minutes.
15          THE COURT:  Yes, I do want to see 182.  Thank
16    you for reminding me.
17          (Exhibit No. 182 playing in open court.)
18          MS. SHERMAN:  I think that's it.  So if I could
19    just ask a couple questions.
20                      REDIRECT EXAMINATION
21    BY MS. SHERMAN:
22       Q.  That was what is considered a 3D model?
23       A.  Yes.
24       Q.  And did you do that from measurements you
25    actually took on Kodiak?

1    A.  Yes, combined with some additional information

2    that was either provided to me or that I acquired.

3    Q.  And the purpose is to show where that camera is

4    and show the fly-around and match the 3D model to that

5    camera image basically?

6    A.  Yes.

7              THE COURT:  There is no blue vehicle in there.

8              MS. SHERMAN:  There is.  It is the 12th video.

9              MR. CAMIEL:  There is an overlay over it.

10             THE COURT:  Give me another pass at that.

11             MS. SHERMAN:  Just the end once we start to

12   zoom in to that.

13             (Exhibit No. 182 playing in open court.)

14             THE COURT:  Okay.

15             MR. COLBATH:  When we played it before, the

16   video stopped.

17             THE COURT:  Thank you.

18             MR. COLBATH:  I think we better back way up.

19             (Exhibit No. 182 playing in open court.)

20             MS. SHERMAN:  Your Honor, my intention would

21   be -- and we'll clip this.  My intention was to stop

22   this video here.

23             I have watched several videos.  My intention is

24   to stop it before the outline shows up where it shows

25   the blue car, but is the video from the 12th.

1          THE COURT:  All right.  So stop it here and not

2    show --

3          MS. SHERMAN:  Not show the blue car and further

4    zooming in on this.

5          THE COURT:  Not show this?

6          MS. SHERMAN:  No.  We can provide a clip to --

7    he's likely not going to make it to the stand tomorrow,

8    which he doesn't know until just now, but I can provide

9    the Court and counsel a copy.  My intention is to stop

10   when we get to the blue vehicle before the outline pops

11   up.  Just show --

12         THE COURT:  You want to have it stop with the

13   April 12th overlay?

14         MS. SHERMAN:  No overlay, just it going from 3D

15   model to here and then right there where it shows the

16   vehicle and it's shifted from right before that.

17         THE COURT:  That is from the April --

18         MS. SHERMAN:  April 12th.  All those vehicles

19   are there.  That would be my intention to give the jury

20   an overview of the scene in a 3D model and then show

21   that camera angle I think in more detail since they

22   can't go to Kodiak.

23         THE COURT:  Thank you.  Anything about that you

24   had questions for this witness before we send him on his

25   way?

1          MR. COLBATH:  No further questions for

2     Mr. Toglia.

3          THE COURT:  Thank you, sir.  We'll see you in

4     due course, I guess.

5          (Witness excused)

6          THE COURT:  All right.  Why don't I hear from

7     the defense with regard to Exhibit No. 182 as well with

8     the deletion that the government is proposing.  So just

9     up to the, as I understand it, up to the ending on the

10    photo -- still from the April 12, 2012 video.

11         MR. COLBATH:  Thank you, Your Honor.  Part of

12    my confusion I guess was between his -- there was so

13    much in the report and then in this PowerPoint I had.

14    There are some slides that were labeled photogrammetry

15    analysis, some video analysis, some differences.  That's

16    why I said I couldn't tell if we were talking about two

17    different things or whatnot.

18         It's our position that -- well, it's our

19    position that his work, as he said, the video

20    extraction, the video analysis, those things we don't

21    think that outside of running the photogrammetry program

22    that he is capable of doing a standalone video analysis.

23    I guess --

24         THE COURT:  What is the analysis that he's done

25    that you are disputing or taking issue with?

 1          MR. COLBATH:  I was just going to say I guess
 2   it sounds like he is not going to offer any kind of
 3   standalone opinion or any kind of separate video
 4   analysis of just the 4-12 video that's not some
 5   photogrammetry derived opinion of consistency.  If
 6   that's the case, I think the Court has already ruled on
 7   that.  We have an objection to the photogrammetry
 8   science and that, and the Court has already ruled on
 9   that, that you would admit that.
10          So if he does not offer, as he's indicated now,
11   any kind of separate standalone opinion or anything like
12   that, I don't have any further objection.  If I believe
13   that that's what happens or if I think that he strays or
14   offers a separate opinion, then I'll just state a very
15   simple objection at the time, but it will be based on
16   this record having been made, because I don't think that
17   -- there are separate practices.  There are separate
18   methodologies.  There are separate recognizable ways you
19   do a photogrammetry analysis, ways you do a separate
20   video comparison or video image analysis and video
21   comparison.
22          THE COURT:  Where is that in the record to
23   educate me on that?
24          MR. COLBATH:  I guess I asked him if --
25          THE COURT:  I heard his testimony.  That's

1   true.  He equates them as one in the same.  I don't want

2   to put words in his mouth.

3           MR. COLBATH:  He does, Your Honor.  I mean, I

4   have --

5           THE COURT:  If you feel that there is something

6   that is separate video analysis that's impermissible,

7   then it would not, in the Court's view, be sufficient to

8   simply state an objection and preserve it for the

9   record.  I need to resolve that issue either now or

10  then.

11          MR. COLBATH:  I will try to provide to the

12  Court --

13          THE COURT:  I don't want that.  That's why we

14  had this hearing.  You know, if your assertion is that

15  he is presenting video analysis and he is not qualified

16  to do so, that's why we set aside this afternoon.

17          MR. COLBATH:  Well, I have the standards here

18  with me, but because he wasn't familiar with them,

19  didn't recognize them separate, I didn't feel I could

20  offer them through him.

21          I didn't have my expert here yet, and I didn't

22  feel I could -- I wasn't going to show him something and

23  him say, "I've never seen that, I'm not familiar with

24  that."  I think if he -- based on what he said here and

25  based on my reading of his report, I suspect if he

1    begins to offer anything like that, it's going to be

2    outside his report or it's going to be different than

3    what he says in his report.

4            THE COURT:  Then you can object, that's fine.

5            MR. COLBATH:  I will approach it that way.

6            As respects the modified 182, I have much less

7    of an objection as it's modified.  I don't know that the

8    fly-around camera orientation is better than, for

9    instance, already in the record, number one, are

10   multiple, multiple actual pictures as opposed to

11   animations of the buildings, the location of the camera,

12   the camera views, those things.

13           And then of course most recently Mr. Becker had

14   as his first slide essentially the same thing, showed

15   the building, showed the camera, showed the camera view,

16   so it's cumulative and it's an animation rather than

17   actual photos that are already in evidence, but beyond

18   that, if it's modified, my concern was later on the

19   overlays and the different misrepresentations or

20   representations in there.

21           THE COURT:  If it stops where Ms. Sherman

22   showed today, I'm hearing not a strong objection?

23           MR. COLBATH:  A cumulative and relevance

24   objection.

25           THE COURT:  All right.  I think at some level

1    it might be -- it is helpful to the jury.  You intend

2    this solely as a demonstrative?

3             MS. SHERMAN:  Yes, Your Honor.  He's going to

4    talk about how he went to the scene and we're going to

5    introduce that first.  This is the fly-around, this is

6    the scene that he 3D modeled based on his visit and then

7    move into his analysis, wholly demonstrative.

8             THE COURT:  I will allow 182 stopping at the

9    place indicated today on the record with the Apri 12

10   photo or still from the video.  And I do think it could

11   have some benefit to some jurors that have difficultly

12   perhaps with the depth perception issue on the Google

13   Earth, and he did testify that it was prepared based on

14   his measurements.

15            I do see it's substantially similar, albeit an

16   animation, but substantially similar to my understanding

17   from the photographs to the topography and the layout

18   that is there or was there.  So I will allow 182 as a

19   demonstrative to be shown to the jury.

20            And I will read the report -- I mean the

21   testimony from before.  And I do find again, as I did

22   before, based both on this expert, but also from the

23   expert yesterday, Mr. Becker, that photogrammetry is a

24   tested theory that has been peer reviewed and published,

25   and that although I have not been provided with

information about its error rate, although there was
actually testimony from Mr. Becker through Mr. Colbath
about the pixel variations and the blurring and all of
that, so there is an error that is to some degree
quantifiable that is helpful when looking at *Daubert*,
and it appears to enjoy general acceptance in the
applicable scientific community.  So I will allow the
photogrammetry.

        To the extent that the defense believes that
this witness strays outside of that and into a different
area that is not covered in his report, then certainly
we'll take up objections along the way.

        I do have concern, and I think I alluded to
this the other day, as to the -- how long --

        MS. SHERMAN:  We discussed that this morning,
Your Honor.  If you were to look at his prior testimony,
it's the same PowerPoint.  It's short.  It's about an
hour for an expert, but with Mr. Becker that's kind of
where we ended up.

        My intention is to say, "In these next series
of slides, what did you do?"

        "I put this little car in there and we moved it
across the screen."

        "Let's go through those slides."

        And so we will not be lingering, other than to

explain in the first slide what occurred pretty quickly.

        THE COURT:  I did notice that in the testimony
that was provided to me with the expert report.

        MS. SHERMAN:  It was not as long as this
PowerPoint if you printed every slide.

        THE COURT:  Mr. Colbath, last point we can
cover on this?

        MR. COLBATH:  Yes, Your Honor.  If it's
prejudicial evidence, it doesn't make it less
prejudicial if you go through it fast than if you linger
on it.  The lingering extends the prejudice, but if it's
prejudicial and cumulative, which we think it is, it's
prejudicial, and so that's our position on 403.

        I would specifically note, and now that we have
talked about 182, I would specifically have the Court
refer to pages 41 through 45, I think.

        THE COURT:  Of 181 now?

        MR. COLBATH:  Of the PowerPoint.  41 through 45
and then 66 through 69.  Those contain not only a big
screen, but the little screen I believe are --

        THE COURT:  From the --

        MR. COLBATH:  They are clips from the
fly-around, and that little screen shows some sort of
animated view from -- there is no camera view, not in
the 4-19 video, not in the 4-12 video that shows the

1    jury -- there is nothing that would show the jury

2    evidentiary-wise --

3              THE COURT:  I'm sorry.  It's those that pull

4    the portion of 182 that is not going to be presented and

5    insert it.  Any objection to deleting those?

6              MS. SHERMAN:  Yes, Your Honor, because I think

7    the point of this is to show he's showing the vehicle on

8    the road.  Part of what he does in photogrammetry is

9    determine where objects were.

10             And so his analysis is that object is on the

11   road, it's moving, it's moving past this driveway, and I

12   think that that's fair for the jury to see.  It is

13   demonstrative.  The Court has given an instruction on

14   that.  The Court has given the limiting instruction.

15             And so I think that he did that as part of his

16   analysis in his 3D modeling, and I think it's fair in

17   his analysis and it's in -- I believe it's in his report

18   in what he did.  So I think that -- yeah, I mean it's in

19   his report, and I think that his analysis is -- it's

20   integral to what he did to determine that car is on the

21   road and you can tell it's on the road because when you

22   go from this 3D model and you rotate it around, that

23   object is filling those spaces.

24             So I think those are fair slides.  We will

25   click through them just as quickly as we clicked through

the other ones.  I believe the Court has already ruled
on the PowerPoint in general in terms of not being
cumulative because the Court's instruction was don't
linger.

THE COURT:  Well, no, I think that was more of
an observation than a ruling on the -- I know I left
open the 403 issue when I ruled on this.

I am inclined to exclude the testimony on 41
through -- or to have the presentation of these slides
on 41 through 45 and 66 through 69.  I do see -- I don't
see any problem, from the Court's perspective, in having
this witness show on one of the many maps that we have
where the vehicle was on the map relative to that, but I
do see that in the context of a 129-page PowerPoint,
that these several slides are the most prejudicial and
unfairly so insofar as they -- there is not -- well, in
the Court's mind, there is an unfairness to creating
this model and putting it there given the fact that
there is no actual evidence of anything along the lines
of that particular angle of view.

So I do see that those are the ones that should
be deleted.  But like I say, I don't see a basis to
dispute the presence of the -- pointing out on the road
where they were could well be helpful to the jury.

All right.  Questions about that?

1          MR. COLBATH:  Not questions about that, Your

2     Honor.  I have one last issue with the PowerPoint and

3     that's it.  If the Court looks --

4          THE COURT:  Ms. Sherman, questions about that?

5          MS. SHERMAN:  No, Your Honor.  I believe Blair

6     has deleted them as you ruled.

7          THE COURT:  Blair, thank you.

8          Go right ahead.

9          MR. COLBATH:  When we originally had discussed

10    this in my motion for clarification, part of my

11    objection -- there was slides I objected to for 403

12    purposes, and I guess I have heard that the Court has

13    ruled on that.

14         THE COURT:  On those slides that you identified

15    here, to the extent, remember we had the discussion

16    about 1240, a portion being deferred.  Now I have ruled

17    on it as to those slides.

18         MR. COLBATH:  There was a portion of the

19    objection that, separate from the 4-12, and if the Court

20    will turn to page 79, that's a good example of it.

21         THE COURT:  All right.

22         MR. COLBATH:  I understand from Ms. Sherman, so

23    the video -- the portion of this that's video

24    representation is apparently from the 4-12 video, but

25    obviously that does not depict real events.  Somebody

has put on top of it a blue Honda CR-V and a windshield,
and so I think that these slides -- there is one in here
that has a Dodge Durango overlaid on it but it does not
have any notification to the jury.  While it might be
self-evident to the jury that there was at no time a
cartoon in the blowup or an animated car in the
blowup --

THE COURT:  It's the fact that it says "day of
incident" at the top?

MR. COLBATH:  It says "day of incident."  It
says "4-12."  And most importantly, it shows a model
Honda CR-V on top the evidence.  And so to that
extent, if the Court is not going to keep it out, the
jury at least needs to be told that this is an
experiment or represents the witness's opinion or the
disclaimer, whatever the disclaimer language is.

MS. SHERMAN:  Your Honor, I think perhaps he
doesn't have the updated one.  I think everyone should.
We took out "date of incident."

THE COURT:  I don't have that, the updated.

MS. SHERMAN:  Not yet because we were not
getting to him today.  We were working on it this
morning.  Now it says "4-12."  That's where that still
image is taken from.  I think that's fair.

In terms of it is self-evident and that's why

1    we had this conversation yesterday.  That's why the

2    Court asked us to draft an instruction to read.  I think

3    that --

4              THE COURT:  Your point is it's obvious that

5    this is --

6              MS. SHERMAN:  Yeah.  No one is saying this is

7    Mr. Wells' or anyone else's CR-V.  It obviously is a

8    cartoon, and the purpose of the blocking it is to block,

9    instead of having that whole car there, is to block the

10   portions of the vehicle in his analysis.

11             THE COURT:  I understand that.

12             MS. SHERMAN:  And in relation to the Durango

13   and the other vehicles, part of his analysis, he was

14   asked to see if he could determine what sort of vehicle

15   this was and placing those vehicles in does the same

16   thing, whether it fills the same space.

17             THE COURT:  What's the difference between 79

18   and 84 of the PowerPoint?

19             MS. SHERMAN:  The difference is the -- I

20   believe the difference is the vehicle, because it goes

21   from CR-V to Accord and then it goes to Escape.  It's a

22   Ford Escape.

23             THE COURT:  All right.

24             MS. SHERMAN:  They have indicated it could be

25   an Escape.  They crossed Mr. Becker on it.  I think it's

part of his analysis.  These other vehicles that the
defense experts have filed and indicated it's one of
these, I think he's permitted to say, "I have looked at
this vehicle and it's not."

MR. COLBATH:  Your Honor, I think those --

THE COURT:  Those sure look identical to me.

MR. COLBATH:  It's not a Ford Escape, because
it has taillights above the mid-range.

THE COURT:  79 versus -- so which ones are you
proposing?

MS. SHERMAN:  The Court can see it here.

MS. STEVENS:  That's 79.  That's 84.

MR. COLBATH:  The next, 85 is the Ford.  Well,
is a different vehicle.

THE COURT:  So Mr. Colbath, is your concern
addressed -- what are you proposing with regard to
these?

MR. COLBATH:  First of all, we totally
disagree.  I thought the point of the witness's
testimony was to say that that was either a CR-V or
Mr. Wells' CR-V or certainly consistent with his and
inconsistent with other -- his car and inconsistent with
others, which is at least the inference is it's a CR-V.

Our simple proposal was for anything that's not
a 4-12 picture, a 4-12 blowup of something that

represents something that the jury has in evidence, that whether it's an overlay, cartoon character or whatnot, it have the disclaimer that this is a theory or this is the --

THE COURT:  The language, let's say, on 96.

MR. COLBATH:  I don't want to use the wrong language.

THE COURT:  How about, "This image contains an experiment," as opposed to "is."

MS. SHERMAN:  It's not an experiment.  I think on those slides it's the basis of his testimony of the comparison, and so I don't think it's saying it is an experiment.  I think if the Court wants us to say anything to allay any confusion by the jury, "This image involves a 3D model of a vehicle."  I mean that's what those images have.  It's not a theory.  It's not an experiment.

He, in his analysis, was looking at an image, he placed a 3D image over it, and then he placed a different size vehicle and a different type vehicle, and he went through vehicles that the defense, and I expect the defense expert will say, "It must have been this sort of vehicle."  So I don't think --

THE COURT:  I think your point that's it's not an experiment has some merit, unlike the 4-19, which

1    really was an experiment.

2           MS. SHERMAN:  That's fair, and we put that on

3    all those images.

4           THE COURT:  What's your proposal on the 4-12

5    overlay?

6           MR. SKROCKI:  Can we have just a moment?

7           THE COURT:  Yes.

8           (Pause)

9           MS. SHERMAN:  Your Honor, two things.  One, I

10   would note that all of these different vehicles that

11   show up in there, the 3D models, those form the basis of

12   his opinion.  His ultimate opinion is that the vehicle

13   is consistent with the Wells' CR-V, so that's the first

14   point.

15          The second point is for the ones that show a 3D

16   model of a vehicle, I think we are willing to write at

17   the bottom, "This image contains a 3D model of the

18   vehicle."  That way there can be no confusion.  Frankly,

19   I think it's unnecessary because it's obvious it

20   contains a 3D model.  No one is looking at that going

21   that's a real car.

22          THE COURT:  I can take the responsibility for

23   that.

24          MS. SHERMAN:  That's fine.  If the Court wants

25   to include that and tell them that you wanted

 1  disclaimers or whatever descriptions, that's fine.
 2          THE COURT:  The day of incident, 4-12-12, what
 3  have you changed on that?
 4          MS. SHERMAN:  It says "4-12-12," because that's
 5  where that image comes from.  It will look like this.
 6          MR. SKROCKI:  On the screen.
 7          THE COURT:  Thank you.
 8          MS. SHERMAN:  So we removed "date of incident"
 9  from every page it was on.  I did that this morning.
10          THE COURT:  Mr. Colbath?
11          MR. COLBATH:  If the Court feels that that's
12  sufficient to overrule our objection, then we will --
13          THE COURT:  Well, partially grant.
14          MR. COLBATH:  Yes.
15          THE COURT:  I would say.
16          MR. COLBATH:  If that's --
17          THE COURT:  Trying to balance the --
18          MR. COLBATH:  It's progress, I agree.
19          THE COURT:  It's a 403 issue and I have
20  considered each side and there is a prejudice.  Is it
21  unfair?  I think to a large degree it's unnecessary for
22  these jurors to have in the language that I am going to
23  order be added, but it's nice, in the Court's view, it
24  adds a -- it fits in well with the language that's added
25  on all the 4-19.

1          There is something extra, and so then -- I
2    think it helps in the jury's assessment of what is
3    substantive evidence and what is demonstrative to try to
4    help the jury understand the substantive evidence.  So I
5    will make that change.  The "day of incident" will be
6    deleted, and you can put that down at the bottom like
7    you have done with all the other ones where it says
8    "this is an experiment," that generally I saw across the
9    bottom, and that would be fine.
10         MS. SHERMAN:  "This image contains a 3D model."
11         THE COURT:  "A 3D model of a vehicle," I
12   believe.
13         MS. SHERMAN:  3D model of a vehicle.
14         THE COURT:  The language you proposed before
15   was, "This image contains a three-dimensional model of a
16   vehicle."  And does that adequately address the gray, I
17   guess is the question?
18         MS. SHERMAN:  I think he can explain the gray.
19         MR. COLBATH:  The gray -- it's the vehicle I'm
20   concerned with.  He'll explain that that's the placement
21   of it.
22         THE COURT:  "This image contains a
23   three-dimensional model of a vehicle" can be down at the
24   bottom of each of these pages that contain that, and
25   there are several beginning at 79.  And that should --

```
 1          MR. COLBATH:  The PowerPoint kind of has it
 2   throughout, Your Honor.
 3          MS. SHERMAN:  We will put them on every one.
 4          THE COURT:  That is the Court's ruling with
 5   regard to the 403 issues on the PowerPoint, subject to
 6   defense interposing objections on the video analysis or
 7   otherwise.
 8          I will still read the individual's testimony
 9   before he testifies so I can understand the PowerPoint
10   if objections come up along the way.
11          Other topics to take up from the government
12   this afternoon?
13          MR. SKROCKI:  If I can get the transcripts from
14   Madam Clerk when she picks them up to make that one-page
15   correction.  We found the error on the last page.  What
16   was the word, Blair?  I don't want to go and get --
17          THE COURT:  She'll help you out with that.
18          MR. SKROCKI:  The last page of the transcript
19   we're on right now, it says "clarks and leaps," or
20   something.  It sounds like a pub, but it should be
21   "approximately."  We made the correction, but it din't
22   get inserted.  We want to insert a one-page correction
23   into the stack.
24          THE COURT:  Caroline can help.
25          MR. SKROCKI:  That's all we have, Your Honor.
```

 1          THE COURT:  And the other question was, that

 2     the defense had, was there were two excerpts, one A and

 3     B.

 4          MS. SHERMAN:  We're not going to introduce

 5     those.  We had prepared them.  We were not sure what the

 6     Court's ruling was going to be on still images or

 7     demonstrative versus being admitted.

 8          Since the Court is not admitting them, they

 9     won't go back to the jury anyway, so those giant poster

10     boards we created for no good reason.

11          THE COURT:  Anything else from the defense this

12     afternoon?

13          MR. COLBATH:  Not at this point.

14          THE COURT:  I'll see you all at 8:30.  We'll go

15     off record at this time.

16          DEPUTY CLERK:  All rise.  This matter is now in

17     recess until 8:30 a.m. tomorrow morning.

18          (Recessed at 4:34 p.m.)

19

20

21

22

23

24

25

1                        CERTIFICATE

2        I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
3    District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
4    original stenographic record in the above-entitled
   matter and that the transcript page format is in
5    conformance with the regulations of the Judicial
   Conference of the United States.

6
       Dated this 25th day of May, 2020.
7

8
                              /s/ Sonja L. Reeves
9                           SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25