UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )
vs.                       )   CASE NO. 3:13-cr-00008-SLG
                          )
JAMES MICHAEL WELLS,      )
                          )
        Defendant.        )
_____)

TRANSCRIPT OF TRIAL BY JURY - DAY 9
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
September 19, 2019; 8:35 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
        Office of the United States Attorney
        BY:  STEVEN SKROCKI
        BY:  CHRISTINA M. SHERMAN
        BY:  KELLEY L. STEVENS
        222 West 7th Avenue, #9
        Anchorage, Alaska 99513
        (907) 271-5071

**FOR THE DEFENDANT:**
        Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
        601 West 5th Avenue, Suite 800
        Anchorage, Alaska 99501
        (907) 646-3400

        Camiel & Chaney, P.S.
        BY:  PETER A. CAMIEL
        520 Pike Street, Suite 2500
        Seattle, Washington 98101
        (206) 624-1551

_____

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

1                          I N D E X

2                 September 19, 2019, Trial Day 9

3

4   Witnesses:          Direct   Cross    Redirect    Recross

5   Kirk Oberlander      10       53        --          --

6   Peter Van Ness      143      164        192         --

7

8                   E X H I B I T   I N D E X

9   Exhibit                                            Page

10  99          Wells' Interview - Part 2               3

11  100         Wells' Interview - Part 3               3

12  101         Wells' Interview - Part 4               3

13  102         Wells' Interview - Part 5               3

14  103         Wells' Interview - Part 6               3

15  104         Wells' Hand Drawing of Rigger          38
16              Shop

    104A        Wells' Hand Drawing of Rigger          38
17              Shop

18  DE-116      Reed - pg 7                            190

19  DE-117      Fillion - pg 7                         188

20

21

22

23

24

25

1          (Call to Order of the Court at 8:35 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4  the United States District Court for the District of

5  Alaska is now in session, the Honorable Sharon L.

6  Gleason presiding.

7          Please be seated.

8          THE COURT:  Good morning.  We're back on record

9  here.

10          Mr. Skrocki, anything to take up from the

11  government's perspective?

12          MR. SKROCKI:  Just a couple things.  The

13  streamlining matter, spoke with defense counsel, and we

14  would like to move the remaining recordings into

15  evidence, which would be 99 to 103.

16          THE COURT:  99 to 103.  Any objection there?

17          MR. COLBATH:  No, Your Honor.

18          THE COURT:  Then those will all be admitted.

19          (Exhibit Nos. 99 - 103 admitted.)

20          MR. SKROCKI:  And I guess I'll just still do

21  the magic words about the transcripts as to all of them

22  just so the jury knows that Agent Oberlander has

23  reviewed them for accuracy, things of that nature.

24          The next part on the transcripts and the

25  recordings is we were not going to use Exhibit No. 103,

which is the last recording. The defense requested that
they wanted to use it, so we have agreed, for continuity
purposes, that we'd play it with Mr. Oberlander -- Agent
Oberlander and go through it that way.

We have also agreed -- actually, defense
suggested how much they wanted to play for Exhibit
No. 103 and where the termination point is. I would
like that on the record that this was at their request
and they were in control of the point of termination of
that interview.

THE COURT: Who are you proposing inform the
jury about 103?

MR. SKROCKI: They don't need to know that. I
just want it for the record that the defense made that
request for appeal purposes.

THE COURT: So the jury doesn't need to be told
who is offering 103; is that the government's position?

MR. SKROCKI: I don't believe so.

THE COURT: Okay. Mr. Colbath?

MR. COLBATH: It was our request. If the
government didn't play it, we were going to play it.
And it's fine -- Mr. Skrocki's suggestion was fine, that
for continuity and while Agent Oberlander was on the
stand, like we have been doing direct and cross and
crossover things, you know, that was fine.

1          And it was our request, and I did consult with
2    him about where we felt it should be stopped.  The
3    government agreed.  We have -- he accurately represented
4    how that all transpired on the record.  We agree with
5    that.
6          THE COURT:  Do you agree that the jury does not
7    need to be informed that the defense is offering 103,
8    they can just hear it?
9          MR. COLBATH:  That's fine.  They can just be
10   told that these are the recordings and they're all --
11         THE COURT:  All right.  Incidentally, I thought
12   too, I indicated yesterday that the motion at -- I don't
13   remember the number, but the one that ended in a 40 was
14   resolved, which was the motion the defense filed at 3:00
15   in the morning.
16         There was one more expert where you had some
17   403 issues, and I haven't addressed those yet.
18         MR. COLBATH:  Right.
19         THE COURT:  So that's still pending.
20         MR. COLBATH:  We'll take that up, sure.
21         THE COURT:  Do you know what I'm referring to?
22         MS. SHERMAN:  Mr. Vorder Bruegge?  He's not
23   here until next week.
24         THE COURT:  That is still pending and we can
25   take it up in due course.

1     In any event, anything else from the
2  government?
3     MR. SKROCKI:  Yes.  It came to us yesterday
4  from court security at some level that Mrs. Wells
5  brought into court a small recording device.  I don't
6  know -- we had heard -- it came to me fourth or fifth
7  hand.
8     THE COURT:  I hadn't heard.
9     MR. SKROCKI:  I'm not quite sure the purpose of
10  that, but we would ask the Court to issue an order
11  restricting any recording devices.  The recording of the
12  court process is available in public.  Nobody knows what
13  the purpose of it is or if we're being recorded while
14  the court is out of session while we're here at table.
15  We just don't know, so we would ask the Court to
16  preclude that.
17     THE COURT:  I would preclude that for all
18  spectators, that there be no recording, and that is
19  consistent with our local rules.  And everybody -- I
20  would like to see all the spectators nod that they
21  understand that that is the rule that applies to all of
22  them.  And I see everybody nodding affirmatively.  Thank
23  you.
24     MR. SKROCKI:  That's all I have.
25     MR. COLBATH:  We don't have any additional

 1    issues at this point, Your Honor.

 2            THE COURT:  What's the plan for today,

 3    Mr. Skrocki, from the government?

 4            MR. SKROCKI:  Yes.  Continue with Agent

 5    Oberlander.  We have approximately two hours to go.  I

 6    don't intend to interrupt him all that much during the

 7    course of the recordings, let them play and speak for

 8    themselves.

 9            We have cross examination.  And then we have --

10    who else?  Captain Van Ness from the communication

11    station follows.

12            MS. SHERMAN:  Our lineup would be Mr. Gerasimof

13    and Anderson, Jordinelli, all from the COMMSTA, and then

14    two FBI agents and some crime scene photos.  And I think

15    that will likely round out the day.

16            THE COURT:  Very good.

17            MR. SKROCKI:  Last night we had a nice meeting

18    that continued into this morning about possibly removing

19    witnesses to streamline some things and avoid

20    redundancy, so we're working on strategic decisions to

21    move this faster.

22            THE COURT:  Very good.  Let's take a few

23    minutes until the jury arrives.  We'll go off record.

24            DEPUTY CLERK:  All rise.  Court stands in a

25    brief recess.

1          (Recessed from 8:41 a.m. to 8:47 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court is again in session.

5          THE COURT:  Please be seated.

6          And Mr. Colbath, I hear there is one more item.

7          MR. COLBATH:  Yes, Your Honor.  I just didn't

8    know until after we broke there, but apparently over the

9    course of yesterday sometime and into last night, the

10   jail changed Mr. Wells' medication here this week and

11   it's causing him both some stomach and issues that just

12   may require fairly short notice on bathroom break.

13         THE COURT:  That's fine.

14         MR. COLBATH:  So if I suddenly stand up and ask

15   to interrupt or ask for a comfort break, that's what it

16   will be related to.

17         THE COURT:  That's fine.  I appreciate the

18   heads-up.  We can accommodate that.

19         MR. SKROCKI:  Judge, if we can neutralize the

20   basis.

21         THE COURT:  I expect Mr. Colbath to stand up

22   and say, "Can we take a short break."  That's what I

23   understood.

24         MR. COLBATH:  That was my intention.  "Your

25   Honor, I'm sorry.  Is there anyway we can take a

```
 1    five-minute comfort break?"
 2             THE COURT:  Without naming the person who's --
 3             MR. COLBATH:  I'll say it's me.  Fine.
 4             THE COURT:  I don't want any false
 5    representation.
 6             MR. COLBATH:  We'll say it's a comfort break.
 7    I'll use it.
 8             THE COURT:  Thank you.  Are we ready to proceed
 9    with that understanding?
10             MR. SKROCKI:  Yes, ma'am.
11             THE COURT:  Very good.  Let's go ahead.
12             (Pause)
13             (Jury present)
14             THE COURT:  Please be seated, everyone.  Good
15    morning.  The clerk was just informing me that the
16    Friday "start no earlier than 8:45" is next Friday, so
17    thanks for the heads-up.
18             I will confer with the parties at some point
19    today so that we can get you a more -- an up-to-date
20    assessment on the status of the case at some point later
21    today or tomorrow.
22             Very good.  I remind you, sir, you're still
23    under oath from yesterday's proceeding.  I don't
24    re-administer the oath unless it's a new week.
25             And I think we're ready to proceed.
```

1    Mr. Skrocki or Ms. Sherman, wherever we left off.

2           MR. SKROCKI:  Judge, pursuant to our earlier

3    discussion this morning, we would move into evidence

4    Exhibits 99 through 103.

5           THE COURT:  All right.  And I understand the

6    parties have agreed that those will all be admitted.

7           MR. COLBATH:  Correct, Your Honor, we are in

8    agreement with that.

9           THE COURT:  Those will all be admitted.

10                     DIRECT EXAMINATION

11              (Continued of Kirk Oberlander)

12   BY MR. SKROCKI:

13     Q.  Agent Oberlander, just briefly for some

14   housekeeping matters.  You had occasion to review all

15   the transcripts in this case, all the recordings that

16   you had done in connection with Mr. Wells' interview?

17     A.  I did.

18     Q.  Were the transcripts accurate as to the

19   recordings and as you listened to them?

20     A.  They are.

21     Q.  Did you correct any errors you may have noticed

22   through several go-arounds?

23     A.  I did.

24     Q.  And were those corrected?

25     A.  Yes.

1    Q.  Agent Oberlander, I want to go back a little bit

2  to yesterday's interview.  And you were -- you and Agent

3  Bottary were speaking with Mr. Wells and a question was

4  asked concerning where the flat tire was first noticed.

5        Do you recall that question?

6    A.  I do.

7    Q.  And do you recall Mr. Wells' answer?

8    A.  Roughly, yes.

9    Q.  What was his answer?

10   A.  He did not know.  He could not give us any

11  specifics as to where his tire went flat or where he

12  noticed it was low.

13   Q.  With respect to the remainder of these interviews

14  you had with the defendant, did you ever receive any

15  further specifics?

16   A.  No.

17   Q.  We're going to pick up after a question you asked

18  concerning whether Mr. Wells had any idea who may have

19  done this, or the response to a question of who may have

20  done this.

21   A.  Yes.

22   Q.  His answer was what?

23   A.  "No."

24   Q.  So that's where we're going to start.

25        THE COURT:  Which page is that, Mr. Skrocki?

1          MR. SKROCKI:  We're going to be on page 16 at

2     the top.

3          THE COURT:  Page 16?

4          MR. SKROCKI:  Of Exhibit 98.

5          THE COURT:  98.  Thank you.

6     BY MR. SKROCKI:

7        Q.  Everybody set?  Okay.  Blair, if you could

8     proceed.

9          (Exhibit No. 98 playing in open court.)

10    BY MR. SKROCKI:

11       Q.  Can we stop that for a moment.

12          During this point of the interview, Agent

13    Oberlander, is Mr. Wells looking at something?

14       A.  Yes.  He's looking at his phone looking at the

15    call log to see when his wife called.

16       Q.  Thank you.

17          (Exhibit No. 98 continues playing in open

18    court.)

19    BY MR. SKROCKI:

20       Q.  Agent Oberlander, the transcript at the bottom

21    says, "stopping at crooks and lead."  That sounds like a

22    pub, but is that not accurate?

23       A.  I think we made the corrections.  It's at

24    "approximately."  We made the correction.

25       Q.  So it says "approximately," correct?

1    A.  Yes.

2    Q.  A couple of questions.  You asked Mr. Wells about

3  medications?

4    A.  Yes.

5    Q.  And food and things of that nature.  Can you

6  please explain to the jury why you did that?

7    A.  It had been a long day for everyone and we wanted

8  to make sure he was certainly comfortable and able to

9  continue not only safely, because we just became aware

10  of his medication issues, but also just want to make

11  sure he had what he needed.

12    Q.  And you asked him questions about other

13  medications?

14    A.  Yes.

15    Q.  And he responded in what way?

16    A.  He said he did have other medications, but none

17  that we needed to be concerned with.

18    Q.  No description on what those would be?

19    A.  Correct.

20    Q.  He was able to remember specific calibers of

21  firearms?

22    A.  Yes.

23    Q.  And individuals who may have brought firearms

24  into the building?

25    A.  Yes.

Q.   And he was able to remember things that went back years in terms of firearms and bears and things of that nature?

A.   Correct.

Q.   Was he able to remember any specifics about his whereabouts concerning the tire and where it went flat?

A.   No.

Q.   How about where he turned around to go back home during the course of any of these interviews?

A.   No.

Q.   You recall asking him some questions about other individuals who may have showed up at the rigger shop?

A.   Yes.

Q.   Why did you ask those lines of questions?

A.   One, it was to see who else may have information that we may not be aware of and be able to talk to them to see what information we don't know at this point.

It is also potential suspects, you know, who could have been there, who should have been there, who wasn't there.  We were just trying to get a full picture of, one, the normal course of business that routinely takes place, but then anything that was out of the ordinary that stood out to him, he being -- Mr. Wells being the kind of subject matter expert having been there so long.

1    Q.  By the time you started this first interview with

2  Mr. Wells in the early evening if I'm correct, what was

3  your understanding about his whereabouts the morning of

4  the murders?

5    A.  I knew -- I had heard the voicemail that he had

6  left with Chief Reckner at that point.  There was -- we

7  had heard from several people that Mr. Wells was

8  normally there during the early morning, and then -- but

9  he had a flat tire or a low tire and was running late to

10  work that morning.

11         MR. SKROCKI:  May I just have one quick moment?

12         THE COURT:  Certainly.

13         (Pause)

14  BY MR. SKROCKI:

15    Q.  When you were finished with this interview, did

16  you go speak with somebody?

17    A.  Yes.

18    Q.  Who did you speak with?

19    A.  Daryl Allison and Sean Bottary, and there may

20  have been another agent there that I don't recall.

21    Q.  What was the point of you speaking with the

22  agent, with Mr. Allison?

23    A.  Well, we had the new information about his

24  diabetes.  The medication certainly was a concern for

25  us.  We wanted to pass along what we had found so far

through the interview and relay the story that Mr. Wells

was giving us, and also the lack of information that

he's giving us.  We felt that he was being very evasive,

and we wanted to pass that along to the case agent and

see if there was any other information that he had

received while we were in the interview that may be

helpful in a different line of questioning to help us

get more information.

Q.  During this time, was the investigation in

contact with attorneys from the U.S. attorney's office

in Anchorage?

A.  Yes.

Q.  Anybody here at this table?

A.  No, sir.

Q.  Without saying what he said, did Special Agent

Allison relay information he had collected from other

interviews and convey that to you?

A.  Yes.

Q.  Did you then go back in and speak with Mr. Wells

again?

A.  Yes.

Q.  Who was with you?

A.  Sean Bottary.

Q.  And if we could have you turn to Exhibit 99T for

the transcript.  That's -- if you could look at the top

1    page it shows a time there.  Do you see the time?

2        A.  Yes.

3        Q.  What time is that in local time?

4        A.  2004 would be 8:04 p.m.

5        Q.  8:04 p.m.?

6        A.  Yes.

7        Q.  If we could begin the recording, please,

8    Exhibit 99.

9            (Exhibit No. 99 playing in open court.)

10   BY MR. SKROCKI:

11       Q.  2015 is 8:15, Agent Oberlander?

12       A.  Yes, sir.

13       Q.  So Mr. Wells gave consent to search his iPhone?

14       A.  He did.

15       Q.  To your knowledge, was that iPhone searched later

16   on?

17       A.  Yes.

18       Q.  He gave consent to search his truck?

19       A.  Correct.

20       Q.  And was the truck searched that evening as well?

21       A.  Yes.

22       Q.  When you asked him about consent to search the

23   truck, his response was, "Knock yourself out"?

24       A.  Correct.

25       Q.  And you also recall stating in the recording

1    about the low or flat tire?

2        A.  I'm sorry.  Say it again.

3        Q.  Do you recall yourself mentioning about the low

4    or flat tire that's in the truck?

5        A.  Correct.

6        Q.  Prior to that, or at any time prior to the end of

7    this transcript, what did Mr. Wells tell you about his

8    knowledge of the cause of the low or the flat tire?

9        A.  There was no cause at that point.

10       Q.  At some point after the termination of this

11   interview at 2015 or 8:15, did you have occasion to

12   search Mr. Wells' truck?

13       A.  I did.

14       Q.  And who went with you?

15       A.  It was Sean Bottary, Mr. Wells himself, and then

16   there was another agent that came out, maybe two other

17   agents at some point.  I don't recall who that was.

18       Q.  And how long did that search take, do you recall?

19       A.  Less than 45 minutes.

20       Q.  Did you have a role or an area that you were

21   doing during the course of that search?

22       A.  The majority of my time I spent in the cab area

23   of the vehicle.

24       Q.  Was anything seized by you?

25       A.  No.

1    Q.  Please tell the jury what you were looking for

2   when you were doing your search.

3    A.  We were searching for evidence of the crime, so

4   that would be maybe bloody clothes, shoes, any weapon.

5   I think at this point we were given indication that it

6   was a pistol round, high-caliber pistol that had killed

7   the deceased, so we were looking for a high-caliber

8   pistol such as a .44 magnum or something in that regard.

9        So bloody clothes, weapon and evidence of the

10  crime, anything that was immediately apparent as

11  evidence of the crime.

12   Q.  Did you find anything of that nature during your

13  search?

14   A.  No.

15   Q.  Were people also searching the back of the truck?

16   A.  Correct.

17   Q.  And same question:  Was anything of the nature

18  you just described discovered and/or seized from the

19  search of the truck?

20   A.  No.  I do remember there was a tire in the back,

21  but I wasn't intimately involved in that discussion that

22  I can recall.

23   Q.  You don't recall, or not being a part of the

24  issue with the tire in the back of the truck?

25   A.  No, sir.

1    Q.  Was this search recorded?

2    A.  It was not recorded by me.

3    Q.  Was it recorded, audio recorded by anybody else?

4    A.  It was not audio recorded, no.

5    Q.  Do you know why that would be as far as you're

6    concerned?

7    A.  As far as we were concerned, we weren't asking

8    Mr. Wells any questions at that point.  He was there to

9    observe what we were doing.  It wasn't -- we weren't

10   interviewing him while we were out there, so we didn't

11   feel it necessary to record the interaction.

12   Q.  You mentioned it lasted about 45 minutes?

13   A.  Less than.

14   Q.  Less than.  Was Mr. Wells present during the

15   entire time?

16   A.  Yes.

17   Q.  Could you tell the jury then what happened next

18   after you searched his truck?

19   A.  After we searched the truck, there was a

20   discussion between the case agent and Mr. Bottary and

21   myself trying to figure out kind of the next steps

22   forward.

23        We had discussions with the attorney from the

24   U.S. attorney's office on kind of what we found or

25   hadn't found at that point, also discussed the need or

1   the urgency or potential urgency of medication for Mr.

2   Wells.

3       Q.   During the prior two segments of these

4   interviews, you offered him food?

5       A.   Correct.

6       Q.   Did he ever take you up on that offer?

7       A.   No.

8       Q.   You were aware of his medication?

9       A.   He told us that he was on medication, but did not

10  necessarily say what the specific medication was.

11      Q.   Was there also -- please describe for the jury,

12  as a law enforcement officer, investigator, what your

13  thought process was or the directions you received

14  concerning the desire to interview Mr. Wells more?

15      A.   So as investigators, we were still concerned

16  about public safety.  Obviously, two people had just

17  been murdered in a small town and we were trying to

18  figure out who that was, so our number one priority was

19  public safety.

20           Then it was trying to figure out -- you know,

21  gather evidence as best as we could, preserve evidence,

22  and keep the integrity of the investigation going

23  forward.  Our concern also was for Mr. Wells to get the

24  medication that he needed, so we were trying to figure

25  out how we can get the medication, but still continue

1    the interview, because there was a lot of unanswered
2    questions that we had at this point still.
3           So we wanted to continue the interview, but we
4    were trying to balance the timing.  It was getting late
5    into the evening at this point.  Mr. Wells had the
6    medication issues, but we also wanted to move the
7    investigation forward.
8       Q.  Did you have occasion to speak with him again
9    that evening?
10      A.  I did.
11      Q.  If we could look at Exhibit No. 100.
12           Just to sort of jump ahead briefly, at the top of
13   the page, Agent Oberlander, you see a time referenced on
14   that transcript?
15      A.  Yes.
16      Q.  That would be 2105?
17      A.  Yes.
18      Q.  Is that the next interview, time of the next
19   interview?
20      A.  Yes.
21      Q.  What time would that be for the rest of us?
22      A.  9:05 p.m.
23      Q.  Thank you.
24      A.  That was about 40 minutes after the conclusion of
25   the last interview, or I guess 50 minutes from the

1    conclusion of the last interview.

2        Q.   Would that 40 minutes include the time spent

3    searching the truck?

4        A.   Correct.

5        Q.   Blair, go ahead.

6            (Exhibit No. 100 playing in open court.)

7    BY MR. SKROCKI:

8        Q.   Agent Oberlander, at the beginning of the

9    interview you have sort of a preamble paragraph and that

10   you want to ask some more questions, but I want to take

11   Mr. Wells home, and what was his response?

12       A.   "What questions do you have?"  He wanted to -- it

13   seemed like he just wanted to push forward with the

14   questions.

15       Q.   In terms of the investigation, you were asking

16   him or telling him you were going to take him back to

17   his home.  Was there an investigative reason for that?

18       A.   Yes.  Well, one, we were truly concerned that we

19   didn't want it to turn into a medical issue, right, so

20   that was one of the issues.

21            But also investigatively, if we are able to take

22   him to his house, there may be an opportunity to

23   preserve evidence at that time if anything were in plain

24   view.

25       Q.   If he would have let you in his home?

1    A.  Correct.

2    Q.  There was a possibility he would not have let you

3    in his home?

4    A.  Correct.

5    Q.  With respect to these segments of the interviews

6    we have heard already, 98, 99 and 100, could you

7    describe the setting of the interview, the room,

8    locations of yourself and Agent Bottary as well as Mr.

9    Wells, please?

10   A.  Sure.  We were in a small office.  There was a

11   desk.  I was seated behind the desk.  Mr. Wells was to

12   my left.  The desk was facing the door.  Mr. Bottary was

13   kind of in the corner to my right.  And Mr. Wells was

14   seated in front of the door, so the door opened up kind

15   of where his chair was.

16       It was probably 10 feet by 12 feet room with a

17   large desk and three chairs, so it was fairly small and

18   tight.

19   Q.  Was Mr. Wells ever blocked by you or Mr. Bottary?

20   A.  No.

21   Q.  You were carrying your sidearm?

22   A.  I was.

23   Q.  Visible, of course?

24   A.  No, it was covered by a vest.  I think I was

25   wearing a green kind of button-up shirt with khaki cargo

1  pants and a black vest.

2     Q.  Were there agents walking around the area with

3  visible firearms that you recall?

4     A.  I don't think so.  Normally, we have our firearms

5  concealed, but it's possible.

6     Q.  You had another occasion soon thereafter to

7  interview Mr. Wells and conduct another investigative

8  technique; do you recall that?

9     A.  Yes.

10    Q.  Can you tell the jury what you did and why?

11    A.  So after we concluded this last interview, we

12  went back out, and there was continued discussion

13  between the attorney in Anchorage, the investigative

14  team, and it was very dynamic.

15       We were trying to figure out what the next step

16  was and how we can go forward without, one, compromising

17  the investigation or compromising evidence, so we wanted

18  to -- we wanted to talk through some of those issues.

19       Sorry.  What was the question again?  I want to

20  make sure I answer it completely.

21    Q.  Tell them why you did what you did.

22    A.  Okay.  So again, we were trying to -- we wanted

23  to continue the interview to get some of the questions

24  answered that we hadn't been able to get answered to

25  this point, so we were trying to figure out the best way

1   of doing that.

2          And it was -- we talked about doing a ruse to try

3   to see -- or judge a reaction from Mr. Wells to see how

4   he would, one, react, not only physically, but see what

5   words he might use.

6       Q.  When you mean a ruse, can you explain to the jury

7   what that is?

8       A.  Sorry.  Yes.  A ruse is kind of a made-up

9   scenario, so as an example --

10      Q.  Use this example.

11      A.  Okay.  So this example, we used a technique that

12  isn't really being used anymore called a gunshot residue

13  test, so we were going to take swabs of his hands and

14  tell him that those swabs would be sent off to a lab.

15         That technique wasn't really in practice anymore,

16  but we wanted to get a sense of what his reaction would

17  be to that.

18      Q.  And so you did that?

19      A.  Yes.

20      Q.  Do you know why that technique is no longer used?

21          MR. COLBATH:  Your Honor, I'm going to object

22  as to foundation.

23          MR. SKROCKI:  Fair enough.

24  BY MR. SKROCKI:

25      Q.  And that decision was made in consultation with

1  Special Agent Allison and others?

2      A.  Yes.

3      Q.  If we could take a look at Exhibit No. 101.

4          There is, again, just for expediency purposes,

5  there's a timestamp on the transcript of 101T.  Do you

6  see that, Agent Oberlander?

7      A.  Yes.

8      Q.  What's the time reference there?

9      A.  2122 is 9:22 p.m.

10     Q.  And will we be hearing another agent in this

11  conversation?

12     A.  Yes, Special Agent Angela Strause.  She was a

13  member of our evidence response team.  She was enlisted

14  to help with the ruse.

15          (Exhibit No. 101 playing in open court.)

16  BY MR. SKROCKI:

17     Q.  I don't think that's on the recording.

18     A.  It is.  My cell phone was too close to the

19  recorder, I believe.

20     Q.  Let's try to work through that.

21          MR. SKROCKI:  Can we go off record so I can

22  consult with Blair briefly?

23          THE COURT:  Yes.

24          (Pause off record)

25  BY MR. SKROCKI:

1     Q.  What we're going to do is drop the volume a

2  little bit.  The transcripts are still here.  We'll try

3  to work our way through that.

4          Blair, work your magic and see how it goes.

5              (Exhibit No. 101 continues playing in open

6  court.)

7  BY MR. SKROCKI:

8     Q.  Stop that.

9          What are we hearing?

10     A.  It's basically the bag being sealed up with the

11  -- Angela taking the gauze pads, put them into a paper

12  bag.  She's folding that bag up and putting evidence

13  tape around the top of it.

14     Q.  Thank you.  Go ahead.

15              (Exhibit No. 101 continues playing in open

16  court.)

17  BY MR. SKROCKI:

18     Q.  Agent Oberlander, 2130 is what time?

19     A.  9:30 p.m.

20     Q.  A couple questions about this exchange.  You

21  advised Mr. Wells about what you were going to do?

22     A.  Yes.

23     Q.  What did he say in response to what you told him

24  you were going to do?

25     A.  "Sure."  He agreed to us swabbing his hands.

1    Q.  No objection from him?

2    A.  Correct.

3    Q.  You asked him if he had fired a weapon; do you

4  recall that?

5    A.  Yes.

6    Q.  Did he ever provide an answer?

7    A.  No.

8    Q.  Who provided him an answer?

9    A.  Mr. Bottary.

10    Q.  As to reloading, you asked him if he had

11  reloaded.  What did he say to reloading?

12    A.  No.

13    Q.  After this exchange, ruse as you called it at

14  9:30, what happened next with your engagement with Mr.

15  Wells?

16    A.  The plan was to -- as we left that room -- as we

17  entered the room and left that room, the plan was to

18  take him back to his house.  When we came out of the

19  room, the interview room, there was discussion between

20  the case agent and the attorney and us, the

21  interviewers, that we need to let Mr. Wells go, so he

22  went home on his own that evening after this interview.

23    Q.  So he was released and he went home?

24    A.  Yes.  Well, I don't know where exactly he went,

25  but he left.

1    Q.   You just released him and off he went?

2    A.   Yes.

3    Q.   During this process with the hand swiping, the

4    swabbing, whatever you want to call it, did you have a

5    chance to observe Mr. Wells' demeanor?

6    A.   I did.

7    Q.   Was that something you wanted to pay particular

8    attention to?

9    A.   Yes.

10   Q.   Did you do that?

11   A.   I did.

12   Q.   Please tell the jury what you observed with

13   respect to his demeanor.

14   A.   So again, Mr. Wells was to my left.  Mr. Bottary

15   was to my right.  I was behind the desk.  And

16   Ms. Strause was just on the other side of the desk from

17   me.

18        I think I left the room for just a minute because

19   there was an issue -- we only had one gauze pad we

20   thought, so I went to get another gauze pad, came back

21   in.  When I came back in, Ms. Strause was -- his hands

22   were out kind of in front of him flat like this, and

23   then his hands were a little bit shaky, but it didn't

24   seem like it was anything out of the ordinary.

25        After Ms. Strause swabbed the hands and was

putting the swabs into the paper bag, I was watching his

eyes and where they were, and he was laser focused on

the desk, the paper bag.  It didn't -- I don't remember

him blinking.  It was just he was super focused on that

bag and what she was doing with that bag.

Q.  Did you have occasion to interview Mr. Wells

again the following day?

A.  I did.

MR. SKROCKI:  Judge, just for time management

purposes, this next interview is lengthy.  It's about an

hour and 25, so if you want -- I'm happy to go until

like 10:15.

THE COURT:  So now might be a good time for a

break is what you're suggesting?

MR. SKROCKI:  I'm just letting you know.  If

the jury wants to take a break, we can.

THE COURT:  Go about 15 minutes, ladies and

gentlemen?  Everyone doing okay?

MR. SKROCKI:  Keep going?

THE COURT:  Yes.

BY MR. SKROCKI:

Q.  Agent Oberlander, let me turn your attention to

April 13th.  How much sleep did you get that night of

the 12th to the 13th?

A.  About ten minutes.

1    Q.  What else were you doing that evening before
2  sunrise?
3    A.  I believe we were working on search warrant
4  affidavits.  We were continuing to review video from the
5  surveillance cameras at T-1 and T-2.  We were talking
6  with the evidence response team that was down on the
7  scene.  We were continuing the investigation.
8    Q.  Sounds like you were busy?
9    A.  Very.
10    Q.  Do you recall when you had the next interview
11  session with Mr. Wells, about what time?
12    A.  Yes, it was about 11:20 the next morning.  I
13  guess just to continue, one other thing that we did that
14  night is we were trying to coordinate an interview with
15  Mrs. Wells in Anchorage.  I do remember that.
16    Q.  And was that interview done, to your
17  understanding?
18    A.  Yes.
19    Q.  Thank you for that.
20        If we can go to 102, please.
21        (Exhibit No. 102 playing in open court.)
22  BY MR. SKROCKI:
23    Q.  Mr. Wells started the conversation by asking you
24  questions about why his wife was interviewed by the FBI?
25    A.  Correct.

1    Q.  Did you recall advising him about that the day

2  before?

3    A.  We had mentioned to him in previous interviews

4  that we were going to be reaching out to her; one, to

5  put her in contact with any victim specialist that may

6  be needed, services available, but also to corroborate.

7  We did tell him we would be talking with her.

8    Q.  We can proceed, Blair.

9      (Exhibit No. 102 continues playing in open

10  court.)

11  BY MR. SKROCKI:

12    Q.  Agent Oberlander, in this exchange Mr. Wells is

13  speaking to you about you may not be aware of what's

14  missing or what's not or otherwise in the rigger shop,

15  correct?

16    A.  Correct.

17    Q.  And so you didn't take him up on an offer to go

18  look?

19    A.  No, we did not.

20    Q.  Explain to the jury why you did not.

21    A.  It would be a very rare occasion that we would

22  open the crime scene to somebody that wasn't immediately

23  involved in the investigation.  I hadn't even been to

24  the crime scene at this point.  There were only, I

25  think, four agents, four or five agents who had been to

1  the crime scene, so it would be extremely odd to take

2  someone else there.

3      Q.  What was your impression about the nature of Mr.

4  Wells' questions to you about that?

5          MR. COLBATH:  Your Honor, I'm going to object

6  to that, form of that question and/or the relevance, I

7  guess.  His interpretation of Mr. Wells' reasoning for

8  Mr. Wells' questions.

9          THE COURT:  I'll allow him to testify as to his

10  impression of the nature of the question.  I'll allow

11  that.  Go ahead.

12     A.  It struck me as odd that someone as close to the

13  deceased would want to see the blood, the gore that was

14  present down there, and it struck me as odd.

15     Q.  How many times did he discuss law enforcement not

16  knowing what may be down there and missing and things of

17  that nature?

18     A.  There were multiple.

19     Q.  If we can pick it back up again, Blair, please.

20          (Exhibit No. 102 continues playing in open

21  court.)

22          MR. SKROCKI:  This will be a good time for a

23  break, Judge.

24          THE COURT:  Please leave your notepads in the

25  courtroom and we'll be back on record at 10:30.  We'll

1   go off record.

2           (Recessed from 10:14 a.m. to 10:33 a.m.)

3           (Jury present)

4           DEPUTY CLERK:  Court is again in session.

5           THE COURT:  All right.  Please be seated,

6   everyone.  Whenever you're ready, Mr. Skrocki, go ahead,

7   please.

8           MR. SKROCKI:  Thank you, Your Honor.

9           Just to reorient everybody, we're on page ten

10  of the transcript, about halfway down the page.

11          THE COURT:  Of 102?

12          MR. SKROCKI:  Exhibit No. 102, yes, ma'am.

13          THE COURT:  Very good.

14  BY MR. SKROCKI:

15      Q.  A couple of questions, Agent Oberlander, before

16  we get to the playing of the recording further.  With

17  respect to this interview here, this one is a lengthy

18  one?

19      A.  Correct.

20      Q.  Approximately how long, sir?

21      A.  About an hour and 25 minutes.

22      Q.  Where was the location for this interview?

23      A.  So we were in the same building, but a different

24  office.  We had moved to a larger office.  It was the

25  master -- the senior enlisted advisor of the COMMSTA, it

1    was his office.

2         Q.   Before this interview began, did you and Agent

3    Bottary have occasion to coordinate with Agent Allison

4    as to other aspects of evidence collected during the

5    investigation?

6         A.   Yes.

7         Q.   Was that information amassed and collected in

8    terms of presenting it to Mr. Wells during this

9    interview?

10        A.   Yes.

11        Q.   Was there one thing in particular that the

12   investigation was focused on presenting to Mr. Wells?

13        A.   We had had a much -- we were focused on the

14   timeline.  We were able to gather, over the evening and

15   through the night, more video of the area and the

16   surrounding areas.

17        Q.   Can I interrupt you?  When you say "timeline,"

18   what do you mean by that?

19        A.   Specific times at which things occurred,

20   specifically locations of vehicles throughout the

21   morning of the murders.

22        Q.   What about with respect to Mr. Wells' activities

23   in the morning, the morning of the murders?

24        A.   So the timeline that we were able to build showed

25   Mr. Wells' vehicle heading past the main gate of the

Coast Guard base, then going towards the COMMSTA. And
then it was seen going back the other direction back
towards his house sometime later, and then back towards
the COMMSTA again.

So we had specific timestamps on when those
occurred, so we were trying -- the goal of this
interview was to get his version of the timeline and see
how closely or how different it was from what we had
established through video timestamps.

Q.  We're going to hear that when we play this audio
here?

A.  Correct.

Q.  Blair, if you could go ahead for us.

(Exhibit No. 102 continues playing in open
court.)

BY MR. SKROCKI:

Q.  If we could stop here, Blair.  What's Mr. Wells
doing at this point when you're recording?

A.  He is drawing on a notepad, basically a layout of
the T-2 building, the rigger shop.

Q.  Okay.  Go ahead.

(Exhibit No. 102 continues playing in open
court.)

BY MR. SKROCKI:

Q.  Blair, can we stop that, please.

     1        Agent Oberlander, did Mr. Wells, during this

     2   time, do anything with respect to marking what he's

     3   talking about?

     4     A.  Yes.

     5     Q.  If we could have a look for Mr. Oberlander of

     6   104.

     7           MR. SKROCKI:  If I might approach.

     8           THE COURT:  Certainly.

     9           (Mr. Skrocki approaches witness.)

    10   BY MR. SKROCKI:

    11     Q.  If you could pull that item out of the bag, Agent

    12   Oberlander.  Do you recognize that?

    13     A.  I do.

    14     Q.  Is that the diagram Mr. Wells was drawing while

    15   you were interviewing him, as reflected on the

    16   recording?

    17     A.  Yes.

    18     Q.  Yes?

    19     A.  Yes.

    20           MR. SKROCKI:  Move for the admission of 104,

    21   and the screen edition is 104A, which is a duplicate?

    22           THE COURT:  Any objection?

    23           MR. COLBATH:  No.

    24           THE COURT:  They will be admitted.

    25           (Exhibit Nos. 104 and 104A admitted.)

1    BY MR. SKROCKI:

2        Q.   If we could publish, please.

3             Tricky.  Can we play while this is still up?  You

4    don't know.

5             Let's do this, before we get started, Agent

6    Oberlander, this is the diagram Mr. Wells drew for you,

7    Exhibit No. 104A?

8        A.   Correct.

9        Q.   And you're familiar with the further aspects of

10   this conversation between you and Mr. Wells and

11   Mr. Bottary --

12       A.   Yes.

13       Q.   -- and what comes next.  I want to turn your

14   attention to those divergent lines there at the bottom.

15       A.   Yes.

16       Q.   You see those?

17       A.   Yes.

18       Q.   What are those referencing that we're going to

19   hear coming up in the recording?

20       A.   The view of the camera that was positioned at

21   T-2.

22       Q.   Okay.  And I'm going to make life more difficult

23   for you, Blair.  When we're done, we're going to take

24   this down and just go back to the recording.  We don't

25   need it the whole time.  Is that okay?

1    Great.  Thank you.

2    So, again, Agent Oberlander, these two lines down

3    here are referencing the camera at the bottom of T-2?

4    A.  Yes, that's the field of view he described as the

5    camera at T-2.

6    Q.  All right.  Go ahead, Blair.  Thank you.

7    (Exhibit No. 102 continues playing in open

8    court with Exhibit No. 104A being projected on overhead

9    screen.)

10   BY MR. SKROCKI:

11   Q.  Can we stop it there, Blair.

12   And that's where those two lines are being drawn?

13   A.  That's where he drew the lines out from the

14   garage area looking out.

15   Q.  Those two lines I circled?

16   A.  Yes.

17   Q.  If we can keep going, please.

18   (Exhibit No. 102 continues playing in open

19   court with Exhibit No. 104A being displayed on the

20   overhead screen.)

21   BY MR. SKROCKI:

22   Q.  Can we stop that.

23   So Mr. Wells is still working on the diagram,

24   Agent Oberlander?

25   A.  Correct.

     Q.  And based on your interview with him, he
mentioned there was no camera behind the T-2 building?
     A.  Correct.
     Q.  But the chief was talking about putting one in?
     A.  Correct.
          (Exhibit No. 102 continues playing in open
court.)
BY MR. SKROCKI:
     Q.  Can you stop that, please.
          If we could take the exhibit down and have the
lights, Madam Clerk.  We have moved on.
          Okay, Blair.  Go ahead.
          (Exhibit No. 102 continues playing in open
court.)
BY MR. SKROCKI:
     Q.  Can you stop there.
          Agent Oberlander, what's the Eagle?
     A.  The Eagle is a three-masted sailing vessel.  It's
295 feet long.  It's a training vessel for the Coast
Guard Academy and also leadership training for the
Officer Candidate School, but it's, like I said, a
three-masted vessel that has 147 feet of tall rigging
that you climb up to set the sails.
          It's a square rigger like on a pirate ship.  It
was a German war prize in World War II.

1    Q.  Did you go aloft?

2    A.  I did.

3    Q.  Fun?

4    A.  "Arrr."  It was neat.

5    Q.  Fair enough.  So they know what we're talking

6   about when you're referencing the Eagle.

7            (Exhibit No. 102 continues playing in open

8   court.)

9   BY MR. SKROCKI:

10    Q.  Can we stop there, Blair.

11            MR. SKROCKI:  Can we have like a minute stretch

12   break for everybody, Judge?

13            THE COURT:  Sure, that sounds great.  Everybody

14   stand and stretch, ladies and gentlemen.

15            (Pause)

16            THE COURT:  Everybody ready?  All right.  Very

17   good.

18            MR. SKROCKI:  With the Court's permission, we

19   would take this up to the noon hour, and we should have

20   a little bit of direct after the noon hour.

21            THE COURT:  That sounds very good.  All right.

22   Everybody doing okay, ladies and gentlemen?

23            MR. SKROCKI:  Thank you.

24   BY MR. SKROCKI:

25    Q.  Agent Oberlander, when we broke, you and

Mr. Bottary were asking Mr. Wells about disciplinary
problems and whether he wanted to talk about that, with
management.  What was his answer?

    A.  No, he didn't want to talk about it, and he told
us we could ask management about it.

    Q.  Okay, Blair, if you can go ahead.

        (Exhibit No. 102 continues playing in open
court.)

BY MR. SKROCKI:

    Q.  What's he showing you?

    A.  He took out his wallet and showed a picture of
his military retirement ID, I believe, that had a
picture of him clean-shaven.

    Q.  That's what you are referring to on the
recording?

    A.  Yes.

    Q.  When you say, "Who is that guy?"

    A.  Yes.

    Q.  Okay.  Go ahead.

        (Exhibit No. 102 continues playing in open
court.)

BY MR. SKROCKI:

    Q.  Stop the recording.

        Agent Oberlander, you asked Mr. Wells when his
wife left.  You said Tuesday?

1    A.   Yes.

2    Q.   His response was?

3    A.   "Yeah, I think so."

4    Q.   What day was this interview?

5    A.   Friday.

6    Q.   Go ahead.

7         (Exhibit No. 102 continues playing in open

8    court.)

9         THE COURT:  Can we stop for a moment,

10   Mr. Skrocki?  Does everybody have page 65?  I don't.

11   You all do.  Very good.

12        MR. SKROCKI:  Would you like a 65?

13        THE COURT:  If available.

14        MR. SKROCKI:  I just marked mine.

15        THE COURT:  I'm fine.  I wanted to make sure

16   the jurors all had it.

17        MR. SKROCKI:  You want us to go back so you can

18   catch up?

19        THE COURT:  No, I'm fine.  Go right ahead.

20   BY MR. SKROCKI:

21   Q.   Why are you asking this level of detail?

22   A.   Because we haven't gotten it to this point.

23   Q.   And this interview was on what day of the week?

24   A.   It was Friday.

25   Q.   And the day of the murders?

1        A.   Was Thursday.

2        Q.   And no details?

3        A.   We have pieced together details through video

4   cameras and things like that, but we haven't gotten it

5   from Mr. Wells yet.

6        Q.   Okay, Blair.

7             (Exhibit No. 102 continues playing in open

8   court.)

9   BY MR. SKROCKI:

10       Q.   Can we stop there.  Again, we're dealing with

11  what day of the week?

12       A.   Friday.

13       Q.   And the alleged tire change was what day of the

14  week?

15       A.   Thursday.

16       Q.   The day before?

17       A.   Yes.

18       Q.   All right.

19            (Exhibit No. 102 continues playing in open

20  court.)

21  BY MR. SKROCKI:

22       Q.   Can we stop that, Blair.

23            Agent Oberlander, you've reviewed this recording

24  several times?

25       A.   Yes.

 1     Q.  How long of a time gap was there between your

 2   question and Mr. Wells' answer?

 3     A.  It was about 15 seconds, 15, 18, seconds,

 4   something like that.

 5           (Exhibit No. 102 continues playing in open

 6   court.)

 7           MR. SKROCKI:  This would be a good time to take

 8   a break for lunch.

 9           THE COURT:  Ladies and gentlemen, please leave

10   your notepads here in the courtroom.  Remember my

11   admonition not to discuss the case or do any research.

12           Let's have you back at 1:10, please.  Have a

13   pleasant lunch.

14           (Jury absent)

15           THE COURT:  All right.  Please be seated,

16   everyone.

17           Sir, you can be excused.  We'll see you this

18   afternoon.

19           Anything to take up?  When you asked for the

20   break, was a juror sleeping that you saw?

21           MR. SKROCKI:  No.  I just felt we were in it

22   for 45 or 50 minutes.

23           THE COURT:  I just wanted to make sure

24   everybody was awake.  It appeared to me that they were.

25           MR. SKROCKI:  Nothing like that, Judge.

```
 1          THE COURT:  Anything else?

 2          MR. COLBATH:  No.

 3          THE COURT:  Was that a no?

 4          MR. COLBATH:  No.

 5          THE COURT:  I didn't hear you.

 6          DEPUTY CLERK:  All rise.  We're in recess until

 7   1:10 p.m.

 8          (Recessed from 11:58 a.m. to 1:14 p.m.)

 9          (Jury absent)

10          DEPUTY CLERK:  All rise.  Her Honor, the Court,

11   the United States District Court is again in session.

12          THE COURT:  Please be seated.  Before we bring

13   in the jury, I wanted to bring up the scheduling.  The

14   jurors were asking are we on track or behind schedule or

15   ahead.

16          MR. SKROCKI:  We're on track, and I will be

17   confirming the reduction of several witnesses with

18   Mr. Colbath and Mr. Camiel this afternoon.  I will wait

19   until cross examination is over.  That will take up

20   almost a half a day at least of some things.

21          THE COURT:  I think what they are wondering is

22   can they plan to conclude the case in five weeks?

23          MR. SKROCKI:  Yeah, I think so.

24          THE COURT:  Mr. Colbath, you have travel plans

25   the following week?
```

1          MR. COLBATH:  I do.

2          MS. SHERMAN:  We told Mr. Colbath yesterday and

3   let them know that we anticipate we would rest next

4   Wednesday or Thursday.  And that's taking --

5          THE COURT:  No more than five weeks I could

6   say; is that a fair statement?

7          MS. SHERMAN:  Dependent on cross.  I just don't

8   see that happening.

9          MR. COLBATH:  How this all falls on me, I don't

10  understand.  Everyone says "cross," but only looks at

11  me, and I object.

12         THE COURT:  So noted.

13         MR. COLBATH:  Your Honor, if they rest any time

14  next week, I believe that the evidence will be concluded

15  by the end of the following week, subject to we are

16  starting the witness scramble to get our people here.

17  As soon as Ms. Sherman told me that yesterday,

18  Mr. Johnson spent almost all night and he's been on his

19  phone this morning trying to coordinate witnesses.

20         Barring running into a big problem, if they

21  conclude next week and we get any amount of time in, we

22  are thinking, and maybe with some stipulations or a few

23  depending on who they have got and don't got, the

24  evidence will be done the next week.

25         THE COURT:  So safe enough to tell the jury not

more than five weeks at this point, and then we can
revisit that middle of next week and see where we are.

MS. SHERMAN:  We should not promise four.

THE COURT:  We all agree on that.  With that
said, I'll inform them of that.

Anything else to take up?

MR. SKROCKI:  No, Your Honor.

MR. COLBATH:  Your Honor, we talked about this
yesterday at the close and then it went by.  You were
going to read the defendant's statement and transcript
instruction again as we began.

And I just thought maybe rather than when they
come in right now read it, if you just modify the
language a little bit and reread it at the end.

THE COURT:  That was my intent to do it at the
end.  If I said I was going to do it at the beginning of
the day --

MR. COLBATH:  I might have misheard you.

THE COURT:  I was thinking of doing it at the
end of all the recordings.  I need to find those two
instructions.

MR. COLBATH:  As long as it gets read at some
point.

THE COURT:  Thank you.  We're ready.

(Pause)

1          (Jury present)

2          THE COURT:  Welcome back, ladies and gentlemen.

3   Please be seated, everyone.  Back on record here.

4          Mr. Skrocki, whenever you're ready, go ahead,

5   please.

6          MR. SKROCKI:  Thank you, Your Honor.

7   BY MR. SKROCKI:

8      Q.  Agent Oberlander, at the end of this lengthy

9   interview, Exhibit No. 102, with Mr. Wells, and in

10  connection with earlier comments you made, you showed

11  him a timeline, explained the timeline to him?

12     A.  Yes, we explained the timeline that we were

13  working with and trying to fill details in on.

14     Q.  Did he have an explanation for the 34-minute gap

15  you explained to him in that timeline?

16     A.  No, he did not.

17     Q.  You attempted -- did he have any other

18  explanation to you about his whereabouts that morning

19  with respect to that timeline?

20     A.  No, he did not.

21     Q.  After concluding that interview, what did you and

22  Agent Bottary do next?

23     A.  We consulted with the case agent, Agent Allison,

24  and tried to figure out a path forward.  Mr. Wells --

25     Q.  Let me stop you for just a moment.

1    A.   Sure.

2    Q.   So a path forward meaning what?

3    A.   We weren't getting answers to some of the

4  questions that we were looking to get answered, so we

5  were trying to figure out a different way of approaching

6  it, but also with that, we thought we might take a

7  different tack.

8    Q.   Before you had another interview with him, did

9  you consult with anybody?

10   A.   Yes.

11   Q.   Who did you consult with?

12   A.   Agent Allison and also the AUSA that was

13 assigned.

14   Q.   Where was that AUSA; not in Kodiak?

15   A.   I believe he might have been at that time, but it

16 may have been on the phone.  I can't remember exactly

17 when we got there.

18   Q.   So someone from the U.S. attorney's office at the

19 time you were consulting with as well?

20   A.   Yes.

21   Q.   And after those conversations, did you have

22 occasion to speak with Mr. Wells again?

23   A.   Yes.

24   Q.   Who was with you this time?

25   A.   Sean Bottary, the other agent that I was

1    interviewing with.

2        Q.   Roughly, do you recall, how much time transpired

3    from the interview we just heard in 102 to the interview

4    in 103?

5        A.   About 53 minutes.

6        Q.   And if we could -- the same room, same location?

7        A.   Yes, same location.  It was in the master chief's

8    office.

9        Q.   Same setup as the other interview prior that

10   morning?

11       A.   Yes.

12       Q.   Blair, go ahead.

13            (Exhibit No. 103 playing in open court.)

14   BY MR. SKROCKI:

15       Q.   Did you leave the room after that, Agent

16   Oberlander?

17       A.   We did.

18            MR. SKROCKI:  Those are all the questions we

19   have for Agent Oberlander.

20            THE COURT:  Before we proceed to cross, ladies

21   and gentlemen, I'm going to read you the same two

22   instructions that I read to you yesterday, only now they

23   will be in the past tense.

24            As I do so, Madam Clerk, can you collect the

25   notebooks and the transcripts?

1          Are you going to want those in cross,
2    Mr. Colbath?  Should we keep the transcripts with the
3    jury now?
4          MR. COLBATH:  Yes.
5          THE COURT:  So maybe I should read the
6    instruction later on if you're going to go back.
7          MR. COLBATH:  Yeah, we could, Your Honor.  That
8    might be okay.
9          THE COURT:  Yeah, that's fine.  Hold that
10   thought, we'll come back to that.
11         MR. COLBATH:  I'm going to try not to replay
12   anything, Your Honor, or any of it as necessary, but I
13   do want to go back through.
14         THE COURT:  That's fine.
15                    CROSS EXAMINATION
16   BY MR. COLBATH:
17     Q.  Agent Oberlander, I'm going to start right where
18   that left off.
19         In that last colloquy with Mr. Wells, you lied to
20   him, right?
21     A.  Yes.
22     Q.  And part of telling that lie was telling him you
23   told him the truth, you had been truthful with him?  And
24   in fact, you hadn't been truthful with him?
25     A.  I was not completely truthful with him during our

1    interactions, correct.

2        Q.  But yet you were telling him -- so you were lying

3    about not lying?

4            You told him you told him the truth?

5            MR. SKROCKI:  Objection; there is a question

6    posed.

7            THE COURT:  That's fine.  I'll allow the

8    witness to answer.  Go ahead, sir.

9        A.  I lied to him in the course of the interview and

10   I then again told him -- I lied to him when I told him I

11   was telling him the truth.

12       Q.  So I want to back up to the beginning then and

13   see if I can clarify some things, and this is my only

14   chance to talk to you about all of the interviews so I'm

15   going to have to go back through.

16           MR. SKROCKI:  Objection as to the commentary.

17           THE COURT:  Let's just hear -- go ahead, Mr.

18   Colbath.

19           MR. COLBATH:  Sure.  Thank you, Your Honor.

20   BY MR. COLBATH:

21       Q.  Prior to the first recorded interview that we

22   heard, had you talked to Mr. Wells or had there been an

23   interview of Mr. Wells?

24       A.  I don't recall talking to him before that, no.

25       Q.  Okay.  And when you became an FBI agent, you got

1  training now at, you said a five-and-a-half-month-long

2  academy?

3      A.  Correct.

4      Q.  And part of the training that you received was

5  doing interviews, witness and suspect interviews?

6      A.  Correct.

7      Q.  Interrogations?

8      A.  Correct.

9      Q.  And by the time you started interviewing Mr.

10 Wells, he was a suspect?

11     A.  Correct.

12     Q.  And part of your training is to, when you're

13 doing suspect interviews, have two interviews in the

14 room with one -- two interviewers in the room with one

15 suspect?

16     A.  If possible, that's typically how it's done, yes,

17 two interviewers and one suspect.

18     Q.  And that is for a -- there are a number of

19 investigative purposes or interrogation purposes for

20 having two of you there?

21     A.  Yes.

22     Q.  Okay.  Some of those include one person can be

23 audibly talking and the other person can be observing?

24     A.  Correct.

25     Q.  And one person can ask one question and if there

1 is an opportunity to interject or add more information

2 or direct the suspect, then the other agent can add to

3 the conversation?

4    A. Correct.

5    Q. And at times, you can both work off each other to

6 try to get the answers to the questions you're posing?

7    A. Correct.

8    Q. And if you need to take a break, that is, the

9 agents need to take a break and consult amongst

10 yourselves or get outside information from, say, a case

11 agent, attorneys, any of those kind of things, you're in

12 control of stopping the interview and going and

13 accessing that information?

14    A. We are, but also the suspect could potentially

15 ask for that. At this point, it was a voluntary

16 interview and he was free to leave at any point.

17    Q. Right, but Mr. Wells didn't have a team of folks

18 outside the room or on the other end of the phone that

19 you knew of that he could just say, "Hold on a minute, I

20 want to talk to somebody, I want to visit with some

21 people before we go on"? You weren't aware that he had

22 those resources?

23    A. I don't know what resources he had available to

24 him.

25    Q. But as to your resources, you had both agents,

1  including the case agent and the assistant case agent,

2  on scene, as well as access to the U.S. attorney's

3  office, and you utilized those throughout this process?

4      A.  Yes.

5      Q.  And as you started the first interview, you went

6  through with Mr. Wells -- just it was more general

7  information and some background things, correct?

8      A.  Correct.

9      Q.  Just to clear something up, pretty close to the

10  beginning, you sort of paused in the interview and said,

11  "I see you have a knife.  Can I check that out."

12          He had like a folding work knife I guess, if you

13  will, or just a folding -- one of those clip knives that

14  clips on.  You could visibly see that on him?

15      A.  Yes.  I believe he had like carpenter's pants on.

16  There was a knife on the side of his leg or on the side

17  of his pants pocket that I saw, and, for officer safety,

18  wanted to make sure that it was -- that wasn't the only

19  thing that he had on him.

20      Q.  And once he told you he didn't have anything

21  else, you just left the knife there; it wasn't a concern

22  once it was explained?

23      A.  Correct.

24      Q.  I just wanted to make sure.

25          Now, Mr. Wells -- there is a discussion that goes

1    on where Mr. Wells is asked about his flat tire and it's

2    during -- he's describing the route that he took and

3    about where he stopped at the airport or about where he

4    was on the way to the airport when the flat tire was

5    first noticed.  Do you recall that part of the

6    discussion?

7        A.  Yes.

8        Q.  And Agent Bottary -- you were asking him about

9    the route and about where he might have realized he got

10   the flat tire; you remember that?

11       A.  I don't remember if it was me or Mr. Bottary that

12   asked that specific question.  You can -- if you have a

13   page number you could point me to, I could more

14   specifically answer that if you'd like.

15       Q.  All right.  Let me see if I can find that real

16   quick.  I tried to write down pages.

17            If you would go to page ten of --

18            MR. COLBATH:  I apologize, Your Honor.  I

19   didn't write down -- Counsel, what's the first -- 98T?

20            MS. STEVENS:  98T.

21   BY MR. COLBATH:

22       Q.  Page ten.

23       A.  Page ten?

24       Q.  Yeah, page ten.

25            I apologize.  It looks like it was Agent Bottary

1    that was talking to him.  And you see in about the
2    middle of the page, he's -- Agent Bottary says, "You
3    know, you left at 6:50, got to the airport, had a bit of
4    of a low tire there," and Mr. Wells told him he had, and
5    asked him if he had a rock trapped or something, and he
6    said he didn't really look at it to see what was wrong,
7    it was low.
8         There were -- Agent Bottary had referred to him
9    about -- they were talking about when he got to the
10   airport?
11       A.  I'm sorry.  I missed the question.
12       Q.  Do you see the answer --
13       A.  Yes, I see that.
14       Q.  You see where Mr. Bottary asked him, "I mean, did
15   you trap a rock or something or a nail," and Mr. Wells
16   said he didn't look at it?
17       A.  Yes, I see that.
18       Q.  But it was low.  And immediately preceding that,
19   they were talking about what was happening at the
20   airport.  You see that in the middle of the page?
21       A.  I don't see anything about what's happening at
22   the airport.  I see that it says, "got about to the
23   airport," but I don't see any discussion about what's
24   happening at the airport.
25       Q.  They were talking about his route, wherever he

1  was; he got to about the airport, realized what

2  happened?

3      A.  Yes.

4      Q.  All right.  And they continue -- on the next page

5  there is -- Mr. Bottary is talking about that same

6  timeframe, asking Mr. Wells, "Well, what did you think

7  or what did you do first?"  And he says he got back in

8  the truck, headed back to the house?

9      A.  Yes.

10     Q.  And then once they are back at the house, he

11 starts talking to Mr. Wells about changing the tire,

12 right?

13     A.  From what I recall and what I'm reading, it

14 wasn't clear to Mr. Wells what he did first or the

15 timing of that.  He says specifically, "Shit, I don't

16 remember."

17     Q.  Whether he started to change the tire first or

18 made the telephone calls first?

19     A.  Correct.

20     Q.  And it was during that very first interview that

21 Mr. Wells had told you about that he did have the tire

22 with him?

23     A.  Yes.

24     Q.  And one of the things that happened then during

25 that interview was you ultimately made the decision or

1    decided that you wanted to search the truck?

2         A.   I think the decision was made in between the

3    interviews, the first and the second interview.  After

4    we had kind of finished that first session, we went out

5    and talked with the case agent.  And I think the

6    decision was that we would go back in and request to

7    search the vehicle.

8         Q.   Okay.  Now, during this first interview before

9    you concluded and went to talk about whether you were

10   going to search the truck, you asked Mr. Wells about

11   many of the people down at the shop, right, about

12   Mr. Belisle, about Mr. Hopkins, about a number of other

13   individuals down there, correct?

14        A.   Yes.

15        Q.   He didn't have any real negative comments about

16   Mr. Belisle, Mr. Hopkins, really about anybody down at

17   the shop, did he?

18        A.   No, he didn't.

19        Q.   You asked him about whether specifically any of

20   those individuals were having problems in their life

21   that he knew of that could relate to something like

22   their murder, and he didn't offer any real information

23   on that?

24        A.   Correct.

25        Q.   You asked him about others that he might think --

1    be able to think about who might be responsible, other

2    than himself, about other people who he -- you tried to

3    get to theorize on who might be the murderer, right?

4    Might anybody have any enemies or anything like that?

5        A.  Are we talking specifically in this first

6    interview, or are we talking in general over the six

7    audiotapes?

8        Q.  I think still in the first interview, but

9    certainly generally that was the conversation?

10       A.  Generally, yes.  I don't recall if it was

11   specifically in the first one or not.  If you give me a

12   minute, I can look specifically.

13            (Pause)

14       A.  Yes.  I believe on page 15 we started talking

15   about infidelities and financial issues, things like

16   that that could be motivation for such a crime.

17       Q.  And he didn't try to say that any of that was

18   going on or that he felt he had knowledge that would

19   justify somebody else doing anything?

20       A.  Correct.

21       Q.  You asked him about, in this first interview, his

22   knowledge of guns both on the COMMSTA property generally

23   and specifically down at the rigger shop?

24       A.  Yes.

25       Q.  And first of all, he told you that it was not his

1    practice to carry guns, whether it was for protection or

2    just general reasons or that kind of thing?

3       A.  Correct.

4       Q.  And you didn't have any information or evidence

5    to the contrary that he was lying to you about that?

6    You didn't have any knowledge that he had been a person

7    who carried guns?

8       A.  Correct.  The line of questioning along those

9    lines is we didn't know what the evidence response team

10    was going to find down at the scene, so we wanted to try

11    to establish a pattern of behavior if they did find a

12    weapon, if it would be something that would be expected

13    or unexpected.

14       Q.  My question was:  You didn't have any evidence

15    that Mr. Wells in the past had ever carried guns to

16    work?

17       A.  Correct.

18       Q.  But Mr. Wells did tell you about other folks,

19    knowledge he had of other people bringing guns to work,

20    other circumstances generally?

21       A.  Correct.

22       Q.  But again, he didn't link that to any real

23    misbehavior on people's part or anything that related to

24    violence by anybody, just some people had brought guns

25    in?

1    A.  Correct.

2    Q.  That included the areas of the antenna field,

3 bear protection, all those kind of things?

4    A.  Correct.

5    Q.  During this conversation, this first

6 conversation, you talked to him about people's arrivals

7 and the general routine at the shop from a time

8 standpoint of how people arrived at work and the order

9 and what happened, correct?

10    A.  Correct.

11    Q.  And it was very apparent to you that Mr. Wells

12 had a general idea of how the shop personnel arrived,

13 but also knew that there was a regular watch by the

14 folks, the watch standers up at T-1?

15    A.  Correct.

16    Q.  He described for you how the watch standers would

17 come down and do rounds between 7:00 and 7:30, sometimes

18 they badged in, sometimes they used that door that was

19 already open?

20    A.  Correct.

21    Q.  And some of your discussions then, as you all

22 tried to pin down times, there were many times that he

23 was not sure of when you asked him about it, right?

24    A.  Correct.

25    Q.  He didn't know what time he had originally got to

1  T-2 that day or got onto the property that day?

2       A.   Correct.

3       Q.   Didn't know when he had left for work, gave you

4  an estimate?

5       A.   Correct.

6       Q.   Didn't have a great appreciation for how long his

7  travel going or coming at any of those times was?

8       A.   Correct.

9       Q.   When you got to things where he felt that he

10 could give you a specific time or he had something that

11 he was able to verify the time, he stopped and tried to

12 verify the time for you, correct?

13      A.   There were instances where he was able to provide

14 specific information, yes.

15      Q.   And as far as time goes, when he was able to do

16 that, he scrolled back through his phone to try and get

17 you an exact time, for instance, when the watch had

18 called him to let him know there was an incident or when

19 he had received a phone call from his wife, those kind

20 of things?

21      A.   Correct.

22      Q.   And then you concluded that first interview,

23 knowing he had his cell phone with him, knowing he had

24 his truck with him, knowing he hadn't been home since

25 arriving at T-1 that morning?

1    A.  Correct.

2    Q.  And I did want to ask you about one other thing

3    in that first interview.  I'll ask you and if you don't

4    recall it, we'll see if we can find it.

5        Do you recall asking him, or maybe it was Agent

6    Bottary that asked him, about, "What would be your

7    reaction -- or what do you think would be the reaction

8    to something like this happening?"

9    A.  Can you point me to specifically --

10   Q.  Well, I can try.

11   A.  -- what you're referring to?

12   Q.  That's why I couldn't find it, so it's in the

13   second interview.  So I'm going to get there.  I just

14   couldn't tell in my notes.  I'm sorry.

15       Prior to starting that second interview, you

16   stopped and stepped out, Mr. Wells stayed in that -- on

17   this first day, there was a smaller office you all were

18   talking in?

19   A.  Correct.

20   Q.  And Mr. Wells stayed in there in that room, and

21   you stepped out with Agent Bottary, stepped out to

22   consult Mr. Allison and the other folks?

23   A.  I don't specifically remember if there were --

24   there was at least one time in between interviews that

25   he went back to the, I think called the ET space or the

1  ET deck, and I don't recall specifically if it was --

2  which intermission he did that.

3      Q.  All right.  Needless to say though, you

4  ultimately -- first of all, you consulted with the other

5  agents and the attorney, and the decision was made to

6  see if Mr. Wells would agree to a search of his truck

7  and a search of his phone, right?

8      A.  Correct.

9      Q.  And so you got back together with him in that

10  same room, you same three people; he, you and Agent

11  Bottary?

12      A.  Correct.

13      Q.  And it was right at the outset -- on page two,

14  you asked him about -- I guess it starts at the -- I

15  guess it starts right at the beginning at the bottom --

16  middle, bottom of page one.

17          You heard Agent Bottary ask -- you were asking a

18  question, and then Agent Bottary asked, "What do you

19  think should happen to the person that did that down

20  there?"  You recall that being asked?

21      A.  Yes.

22      Q.  And Mr. Wells said -- it was a two-part answer.

23  One was the system should take care of it.

24      A.  Yes.

25      Q.  And then the other one he didn't really want to

1  say, he knew you guys were recording.  He made some

2  comment about, "I know you guys are recording the

3  interviews"?

4      A.  Correct.

5      Q.  By the way, there was no secret to Mr. Wells

6  throughout any of these interviews, he knew you guys

7  were recording his every word, right?  You did not hide

8  -- that was one of the things you did not hide from him?

9      A.  Correct.  The recorder was right on the desk in

10  front of him.

11      Q.  So as he said whatever he said throughout this

12  entire process, he knew it was going to be there in your

13  hands on a recording to use however law enforcement

14  chose to use it?

15      A.  I don't know what he knew, but that was -- our

16  intention was to let him know that the interview was

17  being recorded.

18      Q.  You did know he knew that because you told him?

19      A.  Correct.

20      Q.  And so he made a reference to not wanting to say

21  anything on tape, and you asked him if he meant

22  incriminate himself, and he clarified no, what he was

23  talking about is it would be like, you know, somebody

24  hurting one of your family members.  Wouldn't you want

25  to take matters into your own hands, correct?  You see

1  that on the bottom of page two?

2      A.  Yes.

3      Q.  And so he was referring to the rigger shop, the

4  folks that had got harmed at T-2, as one of his family

5  members?

6      A.  That's what I understood, yes.

7      Q.  And Mr. Wells, when you asked about him

8  consenting to a search of the truck, he gave that to you

9  freely, didn't he?

10     A.  He gave it to us.

11     Q.  He didn't pause.  There was not an inordinate

12 amount of pause when you asked if he would consent?

13     A.  He gave us consent.

14     Q.  He signed the form.  He didn't have to spend a

15 bunch of time reading it over a second time after you

16 read it to him, anything like that?

17     A.  No, sir.

18     Q.  And even though you all had talked about the tire

19 and the tire being in the back of the truck, the form

20 clearly said and the consent was for the whole truck,

21 any part of it, wasn't it?

22     A.  Correct.  He did not limit the consent.

23     Q.  And then you -- when you referred to the phone,

24 it was the same circumstance, you asked if he would

25 consent to the search of the phone and he agreed?

1    A.   He did.

2    Q.   Again, without hesitation?  He didn't put

3    qualifications or limitations on it?

4    A.   Correct.

5    Q.   In trying to get details of the phone, he

6    couldn't even get the case off of it for you, could he?

7    A.   No, he could not.

8    Q.   While I'm thinking about it and the issue of

9    recording, how many agents came with you again to the

10   island for the investigation?

11   A.   I believe there were eight agents that flew down

12   on the C-130.

13   Q.   And then you had Coast Guard agents and their

14   facilities there on the island, they were also involved?

15   A.   There were -- I think at that time there were two

16   Coast Guard Investigative Service agents that were

17   stationed on the island, so that would have been in

18   addition to the eight that we brought down.

19   Q.   And they had their own office there?  The two had

20   their own office there, so they had their own regular

21   tools?  I mean they were there full-time, as far as you

22   knew, I guess?

23   A.   They had an office there and they had their

24   normal resources there.  I can't speak to what those

25   were.

1    Q.  You had -- also, you had Alaska State Troopers

2    involved?

3    A.  I believe there were two troopers that were

4    stationed there at the time.

5    Q.  And wildlife troopers, both blue shirts and brown

6    shirts there?

7    A.  There was one brown shirt that I was aware of.

8    Q.  And in addition to audio recording these

9    interviews, at least when you're dealing with a suspect

10   in the double homicide, if you wanted to also video

11   record, you could have, couldn't you?

12   A.  Can you ask that question again?  I'm sorry.

13   Q.  If you would have wanted to videotape Mr. Wells'

14   interviews, you could have videotaped them, couldn't

15   you?

16   A.  We didn't have those resources available that I

17   was aware of.  I'm sure somewhere on the island there

18   was a videocamera that could have been used, but it

19   wasn't immediately available and we did not bring one

20   with us, no.

21   Q.  If it had been important to you and the team of

22   agents you had with you, you certainly could have

23   videotaped the interview to both watch and hear?

24   A.  Yes.

25   Q.  After the signing of the two consents, Mr. Wells

1  had told you that the keys, the truck was unlocked, keys

2  were in the ignition, you had free access and use to do

3  whatever you needed to do in the search?

4      A.  Yes.

5      Q.  And the phone had no pass code or there was

6  nothing special you needed to know about also searching

7  that, you could do whatever you needed to do in that

8  search?

9      A.  Yes.

10     Q.  And then you took a break, and you and who else

11 went out to the truck to search?

12     A.  Mr. Wells, myself, and Sean Bottary, and there

13 was another agent or two that came out while we were

14 there, but I don't recall who that was.

15     Q.  And Mr. Wells went outside, right?

16     A.  Yes.

17     Q.  And he did not -- he was not actively involved in

18 the search, was he?

19     A.  Can you define "actively involved"?  I mean he

20 was there and was observing what happened.

21     Q.  All right.  He did not try to interfere or

22 prevent you from doing anything that you wanted to do

23 during the process?

24     A.  Correct.

25     Q.  You did ask a few things or a few minor questions

about either how to open something or access something

or what something was; do you recall that?

    A.   Not specifically, no.   I mean it's reasonable

that that's what we did, but I don't specifically recall

that.

    Q.   Reasonable that there was some amount of

conversation, not specific interviewing-type stuff, but

some amount of conversation?

    A.   That's possible, yes.

    Q.   Certainly, if you had found something you

couldn't identify or had a question about, Mr. Wells was

standing right there?

    A.   Yes.

    Q.   And you don't recall asking him about anything or

any circumstance where you tried to get information from

him and he didn't give it to you?

    A.   No, sir.

    Q.   And in addition to searching -- well, first of

all, can we -- you searched -- you said you spent most

of your time on the cab of the vehicle?

    A.   Yes, sir.

    Q.   And it was quite full?

    A.   Yes.

    Q.   The backseat was packed with all kinds of stuff?

    A.   Yes.

1    Q.  The center console was almost completely full to

2    the top?

3    A.  I just remember it being very packed with old

4    mail, clothes, garbage.  It was very disheveled and --

5    Q.  I'm looking for a picture so that we can have a

6    look at it, but --

7    A.  But it was a mess.

8    Q.  Okay.  And you tried to sort through that mess --

9    I mean you took about 45 minutes to do the search, and

10   so you tried to sort through that and find anything of

11   evidentiary value that you could, correct?

12   A.  Yes.

13   Q.  Although you didn't seize anything or ask anybody

14   else to seize anything -- well, you didn't ask anybody

15   else to seize anything?

16   A.  No.

17   Q.  I'm going to show you what we have had marked as

18   Exhibit No. 248.  This doesn't show the back of the

19   truck, but this shows us sort of the cab.  You see the

20   center console there?

21   A.  Yes.

22   Q.  Now everybody can see it.  The center console is

23   full?

24   A.  Yes.

25   Q.  And garbage there and mail sort of tucked

1  underneath the center console?

2      A.  I can't identify what's under the center console,

3  but there's something.

4      Q.  Can you identify that?  Would you agree with me

5  that that is a handicapped parking sticker?

6      A.  I can't -- it looks like something that hangs in

7  a rearview mirror to me, but I don't know specifically

8  what that is.

9      Q.  Mr. Wells had his work hardhat on the passenger

10  seat?

11      A.  Is that a question?

12      Q.  Yes.  Did Mr. Wells have his work hardhat on the

13  passenger seat?

14      A.  It's possible.  I don't recall.

15      Q.  The items on the driver floorboard here that are

16  in front of the pedals, did you pull those items out

17  from underneath the driver's seat?

18      A.  I don't know.  I don't recall.

19      Q.  That could have been where those were when you

20  originally opened the truck door, was underneath the

21  driver's seat?

22      A.  That's possible.

23      Q.  And did you take this picture or did somebody

24  else?

25      A.  I don't recall taking it.  It's possible that I

did, but I don't recall.

Q.  And the back of the truck, I don't think I have a photo handy, but the back of the truck was much fuller and much messier than this even, as you recall?

A.  I didn't spend much time there.  I do remember looking through the back window and seeing a tire back there, but I don't specifically remember the condition of the back.

Q.  I'm sorry.  I wasn't clear in my question.  The backseat.  This was -- we see the front seat here in 248.

Well, let's try a different picture because I might have it.

Can you take this down and put up 159.  Has that been admitted?

MR. SKROCKI:  No objection.

MR. COLBATH:  Your Honor, I'm going to --

BY MR. COLBATH:

Q.  Agent, does that appear to be a picture of Mr. Wells' truck?  It's not at the location where you searched it, but a picture of Mr. Wells' truck?

A.  Yes.

Q.  In a general sense, do you have a memory of that's what the backseat looked like -- the cab of the truck looked like?

1    A.   I don't remember there being that much gear in

2    the back when I searched it, but I mean it was

3    definitely loaded with stuff, but it seemed more trash

4    to me.

5         MR. COLBATH:  Okay.  Your Honor, I'm going to

6    move 159.

7         MR. SKROCKI:  We don't object.

8         THE COURT:  Defense [sic] 159 is admitted.

9         (Exhibit No. 159 admitted.)

10   BY MR. COLBATH:

11   Q.   You can see, Agent, where I circled there that's

12   the same ripped seat that we saw in the last view.

13   There is no doubt that's Mr. Wells' truck, right?

14   A.   It appears to me to be Mr. Wells' truck, yes.

15   Q.   You can see that box of rubber gloves is now

16   pushed back underneath the seats there?

17   A.   That's what it appears to be, yes.

18   Q.   That same blue thing you said hangs from the

19   rearview mirror is there underneath the console where we

20   talked about it last time?

21   A.   Yes.

22   Q.   You went around and at least briefly looked in

23   the bed of the truck or at the tires that were there?

24   A.   I remember a tire, not specifically multiple

25   tires.  I remember a tire and a bucket.

1    Q.  And do you remember Mr. Wells telling you about

2 the bucket that was -- that was the bucket that you

3 later end up talking with him about, the poop bucket

4 that he took down to the dump?

5    A.  Yes.

6    Q.  I heard you refer to, and we'll get to that

7 later, but in one of the later interviews, he mentions

8 that bucket and you say, "Oh, you told me about that

9 earlier, we talked about that earlier."

10       It was out at the truck that he pointed out the

11 bucket or you asked him about the bucket apparently?

12    A.  I believe that's the case, yes.

13    Q.  Because I didn't hear it anywhere else on the

14 tape so I assumed it was out in the parking lot, and

15 you're saying that makes sense to you?

16    A.  I think that's a safe assumption, yes.

17    Q.  The one tire that you did see out there, you not

18 only saw the tire, you or another agent took it out of

19 the truck and put it down on the ground?

20    A.  I don't have a specific memory of that, but I

21 think that happened, yes.

22    Q.  You or somebody inspected it enough to see that

23 there was a nail in it?

24    A.  Yes.

25    Q.  All right.  After the search was done of the

1    truck, do you know where Mr. Wells went?

2        A.   After the search of the truck, I believe he went

3    back into the ET space back in the T-1.

4        Q.   Okay.  Where did you -- well, while you were

5    searching the truck, other people had Mr. Wells' phone

6    and was -- they were going through that, call logs and

7    -- they were going through that.  I suppose you don't

8    know at that point what they were doing?

9        A.   Correct.  I know I handed the phone off to

10   somebody else.  I don't recall who that was.  That was

11   the intent was to look through the call logs and text

12   messages and that sort of thing to kind of get an idea

13   of who he may have been communicating with that morning

14   and throughout the day even.

15       Q.   Okay.  And as Mr. Wells went back to the ET space

16   then, your team talked and decided -- again decided what

17   to do?

18       A.   Correct.

19       Q.   And there was -- you had Mr. Wells back in and

20   there was a discussion about potentially going home or

21   taking him home?

22       A.   Correct.

23       Q.   And you had two simultaneous -- I think you

24   testified that you had two simultaneous things going on.

25   One, there was Mr. Wells' medical condition?

1    A.  Correct.

2    Q.  But also you had -- he was your suspect and you

3 have an investigative purpose to these interviews, you

4 were moving through or making a law enforcement plan

5 going forward?

6    A.  Correct.

7    Q.  And as part of that law enforcement plan, your

8 thought was to use his medical condition as a means of

9 getting law enforcement officers into the house to try

10 and observe anything that might be evidence in plain

11 view?

12    A.  Correct.

13    Q.  And also try to see and gauge Mr. Wells' reaction

14 of law enforcement traveling home with him or going home

15 with him?

16    A.  Yes.

17    Q.  And when you asked or when you told him that was

18 sort of the plan, his first reaction was, "Well, if you

19 need me to stay, can you just ask me more questions?"

20 That was his first reaction?

21    A.  Something along those lines, yes.

22    Q.  Now, Agent Bottary, do you remember, sort of gave

23 a long explanation of how things take a long time and

24 there is teams all over investigating and it would

25 really be better for Mr. Wells to go and come back

1    because the process was not going to be quick?

2        A.   That seems accurate, yes.

3        Q.   And so Mr. Wells agreed.  He said, "Well, all

4    right.  We're going to go."

5        A.   Yes.

6        Q.   And then you left him there, you and Agent

7    Bottary left him there in the room with the impression

8    that somebody was going to take him home and go get his

9    medication, and you went again back outside to consult

10   with Agent Allison and other agents, right?

11       A.   Yes.

12       Q.   And a prosecutor, a federal prosecutor, like from

13   Mr. Skrocki's office?

14       A.   From the U.S. attorney's office, yes.

15       Q.   And that's Mr. Skrocki's office?

16       A.   I believe it's Mr. Schroder's office.

17       Q.   That's a very tactful answer.  That's

18   Mr. Skrocki's office where he works, but it's probably

19   his boss's office?

20       A.   Correct.

21       Q.   But you're calling the same place, not

22   Mr. Skrocki, but that's who you're consulting with?

23       A.   Yes.

24       Q.   The people that would ultimately prosecute or are

25   ultimately prosecuting Mr. Wells?

1    A.   Yes.

2    Q.   So you had both, and maybe they're the same, but

3    an investigative track, a law enforcement investigative

4    track in mind, but you were making sure you had the

5    legal track in mind as well so that you -- so those work

6    together?

7    A.   I think the law enforcement track is the legal

8    track, but --

9    Q.   Okay.

10    A.   Yes, we work together as law enforcement with the

11    attorneys to make sure that we are consistent with the

12    law.

13    Q.   And in between where you left Mr. Wells in the

14    room with the impression that agents were going to take

15    him home and get medication and the time you came back

16    in the room, the plan changed, as I understand it?

17    A.   Can you ask that again?  I'm sorry.  I missed the

18    first part.

19    Q.   Sure.  Just to back up where we were.  At the

20    conclusion of the third interview, you and Mr. Bottary

21    left the room, and the last discussion was you told Mr.

22    Wells, "Well, we're just going to go home -- we'll take

23    you home, or somebody is going to take you home and get

24    your medication."  He said, "All right," and then you

25    went out.  That concluded the third interview, right?

1    A.  Correct.

2    Q.  Was that -- at that point, was that a real thing?

3    Were you lying to him that somebody was going to take

4    him home and get his medication, or in your mind had

5    that been a realistic thing you were going to do?

6    A.  In my mind, that's what I thought we were going

7    to do is get his medical issue taken care of, get him

8    his medication, and then continue the interview.

9    Q.  Okay.  So now my question was:  After you went

10   out of the room and consulted the team, the plan

11   changed?

12   A.  Yes.

13   Q.  And it changed in two respects.  Number one,

14   nobody was going to go with Mr. Wells to his house that

15   night?

16   A.  No.  We were still planning on doing that.  We

17   were going to try to do this tactic first with the

18   gunshot residue, but we were still intending, even after

19   that fourth recording, to go to his house with him.

20        When I came out of the interview after the

21   gunshot residue, that's when I was informed that we

22   would not be going to his house that evening.

23   Q.  So initially between the third and fourth

24   interview, the only change in the plan is before we go

25   to the house, we are going to pull this -- "ruse" was

1   the word you used?

2     A.  Correct.

3     Q.  But that's really go in and tell Mr. Wells a lie?

4     A.  Yes.

5     Q.  And again, that was with the intention that you

6   were not going to use the evidence that you told Mr.

7   Wells you were trying to collect; it was just to gauge

8   his reaction?

9     A.  Correct.

10     Q.  And both his reaction to the question, "Will you

11   do this test," and then his reaction, if the test

12   ultimately was accomplished, how that went?

13     A.  Correct.

14     Q.  And up until this point in the process, you had

15   not advised Mr. Wells at all that you all could do that

16   to him, that you could lie to him, right?

17     A.  No, I had not.

18     Q.  And so the first part of the lie was to tell him

19   that you were going -- you were just collecting

20   evidence, because in your mind, you weren't collecting

21   evidence?

22     A.  We told him we were collecting evidence to

23   potentially eliminate suspects or find evidence, but

24   that wasn't our actual intention, no.

25     Q.  The words you used was, "We're just trying to

1  rule you out," and you weren't trying to rule him out,

2  were you?

3      A.  We were, but not by that method.

4      Q.  Well, getting evidence of his -- first of all, if

5  he had no reaction to the test other than, "Oh, sure,

6  you can do this," everything appeared 100 percent

7  normal, so no negative reaction, you wouldn't have used

8  that as anything to rule him out as a suspect, that

9  would have been fairly trivial, I assume?

10     A.  It's all part of the puzzle.  I mean, no one

11 thing I think would have ruled him out, I mean, in or

12 out at that point other than a confession.  It was a

13 tactic that I was told to employ so we could try to

14 gather more information.

15     Q.  This was clear:  You had no intentions of

16 actually running a gunshot residue test and using

17 results that you obtained to eliminate Mr. Wells as a

18 suspect?

19     A.  Correct.  We had no intention to send those

20 samples to a lab for analysis.

21     Q.  But you had him there and you could have

22 collected not only gunshot residue from his hands, but

23 you could have swabbed or taken samples from that long

24 beard you talked to him about, or Ms. Strause could have

25 taken those?

1    A.   We could have, yes.

2    Q.   And/or from any part of his clothing or shoes or

3 head, hair?  You could have taken anything from him,

4 right?

5    A.   With his consent we could have, yes.

6    Q.   And so far, he had consented to everything you

7 had asked him to consent to?

8    A.   Correct.

9    Q.   Including, when you got in there, the ruse?

10    A.   Correct.

11    Q.   And the only -- as you went through that, the

12 only reaction that was other than normal that you could

13 observe was once the test was taken and Ms. Strause was

14 going through that long rumbling and crumbling we heard

15 that Mr. Skrocki asked you about on the tape, Mr. Wells

16 watched her pretty intently as she bagged that up or

17 taped that up, that is quite a process?

18    A.   Correct.

19    Q.   And again, when that -- well, I want to ask you

20 something about that interview.  It is T3.  So it's the

21 third interview.  It's 100, if you have it up there.

22         I'm sorry.  I'm sorry.  It's the fourth interview

23 where the test is actually taken.  I apologize.  Got my

24 numbers mixed up here.

25         And as the whole setup was beginning, if you see

1   down there at the bottom --

2       A.   I'm sorry.  What page are we on?

3       Q.   Just the very beginning, page one.  Down at the

4   bottom Ms. Strause is explaining to Mr. Wells -- she put

5   rubber gloves on to take the test?

6       A.   She put --

7       Q.   She says, "I just got to get my gloves on real

8   quick."  You saw her put on either nitrile gloves or

9   latex gloves?

10      A.   Yeah, some protective equipment.

11      Q.   So it was a full-fledged ruse.  I mean she really

12  made it look like she was really collecting evidence and

13  really going to plan to do a test?

14      A.   Correct.

15      Q.   You wanted Mr. Wells to believe that that's

16  actually what was going on, you were collecting evidence

17  to help rule him out as a suspect?

18      A.   Correct.

19      Q.   So as she stood in front of him and put those

20  gloves on and told him that it won't take very long, you

21  saw -- Mr. Skrocki asked you about this -- Agent Bottary

22  asked when is -- this is how it reads:  "When is you

23  actually fired a weapon?"

24           "Just for the record, when is you actually fired

25  a weapon?"  There is a dot-dot-dot.  Do you see the

1  dot-dot-dot right there?  It's at the bottom of page

2  one.

3      A.   Yes.

4      Q.   I think on the recording there was a pause.  And

5  Mr. Skrocki asked you who provided the answer, and you

6  said Agent Bottary.

7          Now, Mr. Wells -- the dot-dot-dot was Mr. Wells

8  was thinking about -- you saw him think about when the

9  last time he fired a weapon was?

10     A.   Yes.

11     Q.   Or think in response to the question?

12     A.   There was a long pause.  I don't know what he was

13 thinking, but it appeared he was thinking about trying

14 to find an answer to that question.

15     Q.   And Agent Bottary did not answer the question for

16 him, he asked him another question, didn't he?  Agent

17 Bottary said, "More than a week," and Mr. Wells

18 answered, "Oh, yeah, yeah."

19         And he asked again, "More than a week," and Mr.

20 Wells answered the same again, "Oh, yeah"?

21         Correct?  We can go back and listen to it if you

22 want to.

23     A.   I understand.  And I think what we're reading is

24 accurate.  It's just what was -- the question that was

25 asked, we didn't allow him to answer the question before

answering (as spoken) another question.  And that second question gave him an answer to the first question.  And he agreed with the second question.

So I don't think he ever answered the first question.  The second question answered the first question for him.  So in my mind, he never answered the first question.

Q.  So he didn't tell you it was October 21st of last fall or December 13th of 2011 or three and a half weeks ago?  Before he could come up with an answer, Agent Bottary said, "More than a week," and what he did say is, "Yes, it's been more than a week," but he did not provide a specific date or the exact answer to, "When was the last time you fired a weapon"?

A.  Correct.

Q.  Okay.  And if it had been -- well, Agent Bottary didn't go back and say -- ask him to specify or ask him to pin it down to an exact date, did he?  He switched topics, he asked him if he does any reloading?

A.  Correct.

Q.  And of course, if this would have been a real gunshot residue scenario and you were trying to get gunshot residue, it would be unlikely -- if the last time had been more than a week, there wasn't certainly going to be any remnants of gunshot residue on Mr.

1  Wells' hands from more than a week ago?  That would be

2  highly unlikely?

3     A.  I don't have any specific training in that, so I

4  wouldn't be able to comment on what the technique is.

5     Q.  Now, Mr. Wells told you that he had washed his

6  hands three or four times throughout the day?

7     A.  Correct.

8     Q.  He was asked that.  I mean, he didn't volunteer

9  that until somebody asked him?

10    A.  Correct.

11    Q.  As a matter of fact -- and when he was asked to

12 do the test, he didn't give any -- well, he didn't give

13 any indication that, oh, he had washed his hands or that

14 it wouldn't be any good or any suggestion as to what you

15 might find or not find as part of the test; he just

16 agreed to do the test?

17    A.  Correct.

18    Q.  But when he was asked about washing his hands, he

19 said, "Yeah, I have probably washed them a couple, three

20 times, three or four times today"?

21    A.  Correct.

22    Q.  And he had been there -- at this point, we were

23 after 9:30, so he was 13 hours in, because you knew he

24 arrived around 8:30 that morning?

25    A.  Correct.

1    Q.  And that interview, the fourth interview was 2122

2  by your watch, that's 9:22 in the evening, 13 and a half

3  hours roughly after he got to work?

4    A.  13 hours, yes.

5    Q.  Okay.  So again, after the ruse and Mr. Wells --

6  you left the room and Ms. Strause left the room and

7  Agent Bottary left of the room, leaving Mr. Wells there

8  with the continued impression that agents are going to

9  go to the house?

10        MR. SKROCKI:  Objection as to speculation on

11  what Mr. Wells thought.

12        THE COURT:  That's sustained.  You can

13  rephrase.

14  BY MR. COLBATH:

15    Q.  Sure.  Thank you, Your Honor.

16        You left the room with the impression that you or

17  somebody else was going to take Mr. Wells to his house?

18    A.  Correct.

19    Q.  And you hadn't done anything to give him any

20  other impression that you were going to do anything but

21  what was the plan before the ruse?

22    A.  Not that I know of, no.

23    Q.  And then you went back out in the hallway and

24  again consulted the team of agents, the attorneys, all

25  the people you had been working with and talking to

1   going along through this process?

2       A.   Correct.

3       Q.   And throughout all of your interviews that day

4   with Mr. Wells, he, as far as you were aware, did not

5   consult with attorneys of his own?

6       A.   Not that I'm aware of, no.

7       Q.   Or consult with anybody about decisions or the

8   investigation that was going on?

9       A.   Not that I'm aware of, no.

10      Q.   All right.  And when the plan changed to let Mr.

11  Wells go home at that point, you went in and advised him

12  of that and he was allowed to leave?

13      A.   I think it happened in the hallway.  He was out

14  in the hallway at that point waiting for us, and I

15  believe the conversation in the hall went something

16  like, you know, "You're going to be free to go tonight.

17  We're going to try to pick this up tomorrow if that's

18  all right.  I know you have the CISM training at 9:00,

19  so check in with your command and see what time they

20  want you in," something along those lines.

21      Q.   And that night agents did in fact go out and

22  check on Mr. Wells' house, correct?

23      A.   I don't know.

24      Q.   Okay.  You don't know that that did not happen,

25  you just weren't involved in it?

1    A.  Correct.

2    Q.  So at the beginning of the following interview

3    the next day when he asks about whether it was law

4    enforcement in the driveway, because he says, "Did you

5    guys come out in the driveway or turn around in my

6    driveway or come to my house or any of that," you

7    couldn't tell him that was you guys or tell him not

8    because you are saying you're not aware?

9    A.  It was definitely not me.  I know there was

10   surveillance at some point put on him, but I don't know

11   specifically when that was.  I know it wasn't in place

12   when he left that evening.  I don't know when that

13   surveillance was put in.

14        And normally, surveillance wouldn't go into a

15   driveway of the person you're surveilling, but --

16   Q.  They would sit -- like later the surveillance --

17   you were involved in the surveillance later, right?

18   A.  Correct.

19   Q.  And you all sat on a hill across the street from

20   -- well, kind of across the little valley from his

21   place?

22   A.  And other places, yes.

23   Q.  The surveillance wasn't really surreptitious, was

24   it?  It wasn't secretive?  He knew he was being

25   surveilled?

1    A.   I don't know what he knew, but we weren't covert

2  about it.

3    Q.   But that night you don't know -- at some point

4  after he left, you don't when that surveillance started,

5  but it started soon?

6    A.   I don't know.

7    Q.   You do know that his wife's car at the airport

8  was already under surveillance before he left T-2, don't

9  you?

10    A.   I don't remember exactly when that was started,

11  but we knew the vehicle was there and I wasn't involved

12  in that decision-making process.  I was trying to focus

13  on this interview.

14    Q.   Okay.  That was not part of the law enforcement

15  discussions in between meetings with Mr. Wells?  That

16  didn't come up that you guys had the car and were

17  sitting on the car at the airport?

18    A.   It may have been, but that doesn't stand out in

19  my mind.  I was again trying to focus on what we were

20  doing there at T-1 with Mr. Wells.

21    Q.   Okay.  One of the things I noticed up until this

22  point -- that concluded your contacting or your

23  conversations with Mr. Wells on April 12th, right?

24    A.   Yes.

25    Q.   And one of the things throughout all those

interviews I noticed was that you did not ask him

anything about his activities the day before, did you?

    A.   On the 11th?

    Q.   Right.

    A.   Correct.

    Q.   And nor the evening of the 11th, the evening

before the murders, about what might have been going on

or what the situation was?

    A.   Correct.

    Q.   So Mr. Wells came back to work the next day you

know and he reported as he was supposed to -- there was

a meeting, and you just called it something a minute

ago.

    A.   CISM is critical incident stress management.

They had counselors or some resources that came in to

talk to people and give them opportunities to talk about

the murders.

    Q.   Okay.  And when you -- when you -- so then after

that, Mr. Wells was again up at T-1 just waiting in sort

of a room area or some kind of office area to wait to be

told what to do?

    A.   I think this training got over about 11:00, is my

recollection, and we started the interview about

20 minutes later, from what I can remember.  It was

about 11:20 when we started the interview, and the

training started at 9:00, so I'm not sure where he was
in between the completion of the training and the start
of our interview.

Q. Sure. But it wasn't very long after that
training that -- it was a priority for you guys to find
him, and as soon as he was available, get started again?

A. Correct.

Q. And you and Agent Bottary and the whole team had
pretty much worked almost nonstop from the time you left
him at 9:30 the night before until then collecting
evidence, putting things together, doing the
investigation?

A. Correct. I believe I was still wearing the same
clothes.

Q. In fact, Mr. Wells told you he had only got a
couple nights' [sic] sleep; do you recall that --

A. A couple hours.

Q. -- as you started that interview?

A. Correct. He said he got a couple hours of sleep,
I believe.

Q. When that second interview -- or excuse me, that
first interview now on the 13th started, before you
really started questioning, Mr. Wells had some questions
for you guys. We talked about one of them about the
driveway?

1     A.   Correct.

2     Q.   And he was concerned about a phone call he had

3 got from his wife.  He asked you about that?

4     A.   He did ask us about that.

5     Q.   Now, when you had talked to him earlier about

6 reaching out to his wife -- first of all, he told you

7 who his wife was and where she was that week?

8     A.   Correct.

9     Q.   And when you indicated you were going to reach

10 out to her, it was in the context of making sure she had

11 resources, somebody with her to talk to?

12     A.   Correct.

13     Q.   And also to get information, but really no -- it

14 wasn't detailed any more than that?

15     A.   Yeah, I don't think we detailed specifically what

16 we were going to be talking to her about, but I do

17 remember talking about the victim specialist.

18     Q.   And the call to Nancy Wells that night, did you

19 make that call later on either yet on the 12th after

20 your interviews with Mr. Wells or sometime in the early

21 morning hours of the 13th?

22     A.   I contacted an agent in Anchorage, and that agent

23 found the hotel she was at and went and spoke with her

24 in person.

25     Q.   And that was extremely late in the night, wasn't

1  it?

2      A.   Yes.   I think it was probably around 11:00 or

3  11:30 by the time they got there, if I remember right.

4      Q.   All right.   And they found her sleeping in her

5  hotel room?

6          MR. SKROCKI:   Objection; foundation.

7          THE COURT:   That's sustained.

8  BY MR. COLBATH:

9      Q.   You know that they found -- you said you believe

10 it was 11:30 when they found her?

11     A.   That's what I remember is it was about -- it was

12 late in the evening, around 11:00, 11:30 when agents

13 talked to her.

14     Q.   They did a full interview with her, or the

15 interview they wanted to do.

16          MR. SKROCKI:   Objection; foundation, relevance.

17          THE COURT:   That's sustained as to foundation.

18 BY MR. COLBATH:

19     Q.   Well, were you aware of whether or not they were

20 able to interview her?

21          MR. SKROCKI:   Same objection, and it's

22 irrelevant.

23          THE COURT:   Well, in any event, I'll sustain

24 the objection on foundation.

25 BY MR. COLBATH:

1    Q.   When Mr. Wells -- back to your interview with Mr.

2    Wells, the discussion.  What Mr. Wells relayed to you

3    was his wife had called late the night before upset by

4    an interview she had in Anchorage, right?

5    A.   I believe she called that morning.  "She didn't

6    call me last night, but" -- this is page one about

7    halfway down.  "She didn't call me last night, but she

8    called me -- well, I don't know, 6:30 this morning."

9    Q.   So that's what he was asking about is what

10   happened?

11   A.   It appears that way, yes.

12   Q.   And then other than asking you if you guys had

13   been the ones around his neighborhood there, those were

14   the two questions he had for you, those two areas,

15   correct?

16   A.   Those are the explicit questions he had for us,

17   yes.

18   Q.   And then you told him at that point you needed to

19   switch to some procedural things.  Let's see if that is

20   you.

21        On top of page seven is just where I'm referring

22   to, but you indicated that you needed to take care of

23   some procedural things that you had just neglected to do

24   the day before and wanted to talk to him about this

25   form, FD-395?

1     A.   Correct.

2     Q.   And in fact, that was not true that you had

3   neglected to do it the day before?

4     A.   I think I said, "We probably should have done

5   this before," but in all reality, it wasn't required.

6     Q.   And it wasn't required the day before because you

7   weren't intending on accusing Mr. Wells of anything or

8   doing a direct confrontation with him, it was an

9   informational session, right?

10    A.   It wasn't really required as of right now either.

11  He wasn't in custody.  He was free to go.  But I was

12  told to read him his rights prior to interviewing him

13  again the second day.

14    Q.   And that is because the plan now, armed with much

15  more information, you and Agent Bottary armed with much

16  more information, you were going to present that

17  information to Mr. Wells, you were going to try to get

18  incriminating information -- explicitly try to get

19  incriminating information from him?

20    A.   We were still interviewing him at this point,

21  seeking information.  Whether it was incriminating or

22  not, we still wanted to know what the timeline was and

23  what his explanation was for the gaps in that timeline.

24  We were seeking information.

25         It wasn't until the last interview that --

actually, I consider an interrogation is where we were
confronting him and accusing him, it's more of a
confrontational setting.  The first interview that day
was, again, an interview seeking information, trying to
get his explanation for the timeline and also possible
other motives or suspects.

Q.  Your thought at this fifth interview was that it
was an interview, not an accusation; is that what I just
heard?

A.  At 11:25 that morning, we were interviewing him,
yes.  It wasn't until the sixth recording that it became
an interrogation.

Q.  So in this one, 11:25, you weren't accusing him?
The plan was not to accuse him?

A.  Correct.

Q.  But it would be better legally for you guys, you
knew that, that if you had Advice of Rights form signed?

A.  I was directed to advise him of his rights prior
to beginning the questioning in this interview that
morning.

Q.  So the procedure you explained to him was we got
this -- it's like another form, because he had filled
out the consent forms the day before, so this was
another form called an Advice of Rights, and you started
to explain that, right?

1     A.  Correct.

2     Q.  And his first reaction was that, he said, "Well,

3  I'm a little concerned now."  You remember him saying

4  that?

5     A.  I do.

6     Q.  And almost instantly -- well, you started

7  talking, and Agent Bottary interrupted you and he

8  started talking, and the two of you both tried to

9  explain I guess in -- well, explain the form?

10     A.  Yes.  It certainly wasn't the smoothest

11  explanation of the form, but, again, we were both going

12  on very little sleep.

13     Q.  And part of explaining the form was to downplay

14  it?

15     A.  Correct.

16     Q.  And downplay the significance?  You didn't want

17  -- you didn't want him to be so concerned that he said,

18  "Oh, I don't want to talk to you.  You guys have scared

19  me off."  You weren't trying to scare him off.  You

20  wanted to continue an interview?

21     A.  Correct.  We wanted to, again, get his

22  explanation for what his -- what his whereabouts were

23  that morning of the murders.

24     Q.  And I'm just looking at the page eight now.  See

25  if I make sure I get this right.  Part of the, I guess,

1    reassurance that you gave to him, or I guess it was

2    Mr. Bottary that gave to him, you actually told him you

3    weren't -- "We're not accusing you, we just want to

4    cover the form"?

5        A.  In not so many words.  I don't think it was

6    specific, but that was the gist of it.

7        Q.  Well, let me make sure I get it right.  So go to

8    page seven and go up to your -- you see the paragraph

9    that has the name of the form, the FD-395?

10       A.  Yes.

11       Q.  You say, "This is an FD-395.  It's another form

12   like we talked about yesterday.  It's called an Advice

13   of Rights form.  And again, we (as spoken) not accusing

14   you, we just need to make you aware of your rights."

15           So I was right, it was in so many words; you

16   point blank told him you're not accusing him?

17       A.  Correct.

18       Q.  And then on the next page, Agent Bottary, and you

19   may have added to this, but you told Mr. Wells that he

20   was sort of essential to your investigation or he was

21   important to your investigation?

22       A.  He was, yes.  I did say that.

23       Q.  You told him -- in fact, a number of times you

24   referred to him as "you're our expertise here," or

25   "you're our expertise on the things we need to know"?

1    A.   Correct.

2    Q.   And that is one of those -- to get him to

3  continue to talk and visit with you, that's one of those

4  interrogation techniques or interview techniques that

5  you learned about as far as building a rapport or giving

6  the person a reason to talk to you?

7    A.   Correct.

8    Q.   Ultimately, after the assurances and the

9  conversation went on, Mr. Wells signed the form and felt

10  -- well, Mr. Wells signed the form?

11    A.   Correct.

12    Q.   Continued the interview?

13    A.   Correct.

14    Q.   And resumed talking to you guys?

15    A.   Correct.

16    Q.   So you went back to -- even though it had been

17  discussed some the day before, you went back to talking

18  to him about his feelings about Jim Hopkins.  First, you

19  remember asking him about Jim Hopkins?

20    A.   Do you have a specific page that you're looking

21  at that would help me?

22    Q.   Well, I can try to find -- there was a fair

23  amount of discussion first I think about the layout of

24  the building, because that's when Mr. Wells -- let's

25  talk about that first.  Strike the question about

1    Mr. Hopkins.

2         One of the things you had Mr. Wells do is draw --

3    I think it's Exhibit No. 104.  Can we put that up?  I

4    think it's government 104.  Maybe I have that wrong.

5    104A, yeah.

6         Armed with all you had, you didn't have a full

7    sheet of paper apparently.  This is -- Mr. Bottary had

8    only a little notepad, right?

9       A.   Correct.

10      Q.   But Mr. Wells, you asked him to draw out a

11   diagram and explain as he was drawing?  He did that for

12   you?

13      A.   Yes.

14      Q.   And he pointed out different things, where things

15   were located, those kind of things?

16      A.   Yes.

17      Q.   And you know one of the things you had asked him

18   up to this point a number of times, maybe it was Agent

19   Bottary, but one of you, I think more than once, asked

20   Mr. Wells about what he might have thought happened as

21   far as a reason for the crime, correct, or a motive for

22   the crime?

23      A.   Correct.

24      Q.   And there was some discussion about potentially a

25   robbery or things missing or things like that?

1    A.  Correct.

2    Q.  And one of the things Mr. Wells had said was,

3  well, until we get in there -- you don't know what's

4  missing until you get in there, we got a lot of stuff?

5    A.  Correct.

6    Q.  And so Mr. Wells was -- you were asking him to

7  help, right, help with the investigation, provide

8  information?

9    A.  Correct.

10   Q.  And he was telling you one of the things he could

11 do was identify things as far as tools or whatnot, but

12 that specific things would be hard to do without being

13 in there to go through things?

14   A.  How I understood it is he was inviting himself

15 down to the crime scene to see what was down there.  It

16 didn't necessarily come across the way you're posing it

17 to me.

18   Q.  He did not at any time suggest that he needed to

19 go down and see where Mr. Belisle was located?

20   A.  Correct.

21   Q.  Didn't suggest that he needed to go down and see

22 where Mr. Hopkins was located?

23   A.  Correct.

24   Q.  Or see what there was or wasn't for evidence

25 specifically?

1    A.  It was more the lack of -- yeah, tools and things

2  like that, or placement of things, correct.

3    Q.  Okay.  In fact, he had told you people were

4  talking about apparently where Jim and Rich were found,

5  because the guys who found them were there for some

6  portion of this, or that was already discussed by other

7  rigger shop people?

8         MR. SKROCKI:  Objection as to foundation for

9  the question and its hearsay response.

10         THE COURT:  "He had told you that people were

11  talking about apparently where they were found," I will

12  allow, and then the rest of the -- you can ask that

13  question.

14  BY MR. COLBATH:

15    Q.  Okay.  Mr. Wells at one point shared with you,

16  because he kind of marked or it was when you were making

17  this diagram, he shared with you that he had heard where

18  Mr. Belisle was found by his desk and Mr. Hopkins was

19  found by some water fountain or something?

20    A.  He did share with us, yes, some of the

21  discussions that he had had about location of the

22  bodies, yes.

23    Q.  And he told you he had learned that from others?

24    A.  Yes.

25    Q.  So back to drawing this -- going through this

document.  One of the things he talked to you about --
he drew -- told you about -- you asked him questions
about the camera, right?

A.  Yes.

Q.  And he knew it was a pan-tilt-zoom camera, how
the camera worked?

A.  Correct.

Q.  And showed you sort of generally where it was
trained?

A.  Correct.

Q.  And when you asked him about if it was possible
that somebody could get in the building without being on
that camera, he gave you two explanations, right?

A.  Can you point me to where --

Q.  Maybe.  I think if you -- it starts on page 16 --
well, it starts on page 17.  And you asked him about
where the camera is trained and he -- first of all, we
have talked about he tells you he's aware it's a pan and
tilt and zoom control?  You see that down towards the
bottom of page 17?

A.  I'm not seeing that on 17.

Q.  Okay.  Right at the bottom of 17.  At least --
well, maybe I might have a different pagination.

          THE COURT:  I believe you do.

Q.  I know a page of something got corrected and it

threw my pages off.  So maybe the top of page -- top of page 18 there where it says -- Mr. Bottary asked, "Is it a pan-tilt-zoom," and he says, "Yes, pan and tilt."  And you say, "Zoom," and he says, "I think so."

A.  Yes, I see that.

Q.  And he also says -- he told you that as far as where it might have specifically been pointed, that was controlled up the hill.  Mr. Wells was not able to tell you whether or not it would have captured whoever was in the building because it depended on where it was pointed from up the hill?

Right before the pan-tilt-zoom question, it says, "It depends.  They may have control of it up here in the office."

"Up here," you guys were at T-1, right?

A.  Correct.

Q.  And then if you move forward to about page 21, I think, Mr. Bottary asks him a long question about, you know, you guys were using his expertise to figure things out and wanted to know his thoughts about where anybody could have -- might have got in, and I said he gave two answers.  He said the back wall or the -- along the back wall or the side, right?

A.  That's what it says, yes.

Q.  Okay.  And then it was right after that that

Mr. Bottary asked him would they have been -- actually,
it was you that asked him could they have snuck under
the camera -- or you didn't use the word sneak, but
could they have got under the camera if they came around
the back side.

     And Mr. Wells told you he didn't really know
because the camera was controlled up the hill, it
depended on where the watch officers were to point the
camera?

     A.   Correct.

     Q.   So he didn't try to speculate on somebody -- how
they got in or whether they avoided the cameras, did he?

     A.   On page 21:  "I mean how would you do that?  How
would someone do that?  I mean what are your thoughts on
that?"

     And he answers:  Anywhere along the back wall or
the side is what he said would be the best route.

     Q.   And then it was right after that that you asked,
"Could they get under the camera," and he said, "Don't
know because depending on how -- what their zoom and
focus is."  And then you say, "Okay."  And he says, "So
I couldn't say, couldn't say."

     A.   With regard to the camera, but he did speculate
as the best method or approach as being along the back
wall or the side.

1    Q.    Which was what Agent Bottary had asked him?

2    A.    Oh, the question was:  "How would you work that

3    out or work without, you know, without drawing attention

4    to yourself," and that's when he says, "Go along the

5    back wall or the side."

6    Q.    Okay.  So moving forward right after that

7    discussion -- and you can take 104 down I think for now

8    -- Agent Bottary asked him a question and said -- told

9    Mr. Wells that the two of you -- and this is on, I think

10   it's page 22 or so -- but it's a big long question by

11   Mr. Bottary, might be on 22 or 23 -- 22-ish.

12        He asked a long question and part of the question

13   was he said you and him were trying to figure things out

14   and he told Mr. Wells that, "We haven't seen any of the

15   footage because the evidence response techs are down

16   there and so we're just trying to piece all this

17   together," right?

18   A.    Yes, that's similar to what he said, yes.

19   Q.    But he specifically said, "We haven't seen any of

20   the footage"?

21   A.    We haven't seen any of the footage, correct.

22   Q.    And that of course was not true, that was a lie.

23   Both you and Agent Bottary had seen footage.  That's

24   part of what the investigation was the night before

25   between the time Mr. Wells left and this interview had

1   happened?

2      A.   There is some footage that I know I hadn't seen

3   at this point.  I don't know specifically what footage

4   we're talking about here.  I think that was pointing in

5   the direction that would -- so I don't think I had

6   actually seen the footage of T-2 at that point.  I had

7   seen some footage.  I don't recall what footage I had

8   seen and not seen at that point, but --

9      Q.   But the representation here was, "Now we haven't

10  seen any of the footage"?

11     A.   Okay.  That would be inaccurate, correct.

12     Q.   And this interview that we're looking at,

13  interview number five, this is the one that was 11:25 in

14  the morning and ran for about an hour and 25 minutes,

15  correct?

16     A.   Correct.

17     Q.   And at no time did you or Agent Bottary leave the

18  room, and at no time did Mr. Wells leave the room during

19  this interview number five?

20     A.   Correct.

21     Q.   And part of the discussion, in addition to sort

22  of the geographical things, location of furniture and

23  the outline in 104, you asked in this interview

24  generally about Mr. Belisle, about Mr. Hopkins, you went

25  back over those things, right?

 1     A.  Correct.

 2     Q.  And Mr. Wells didn't have bad things to say about

 3  Mr. Hopkins, maybe other than he said he's gruff and he

 4  uses the "F" word too much?

 5     A.  Correct.

 6     Q.  But couldn't identify for you that he had any

 7  personal animosity against him and couldn't identify

 8  anybody else that had any real animosity against him?

 9     A.  Correct.

10     Q.  And he had even less complaints about

11  Mr. Belisle?  He indicated that he and Mr. Belisle

12  pretty much had no disagreements?

13     A.  Is there a specific page you're referring to

14  again?  I'm sorry, generally speaking, I would say yes.

15     Q.  Or that they worked things out maybe, I guess is

16  what I wrote in my note.  And I don't have a specific

17  spot for you.

18         Generally, he didn't say bad things about

19  Mr. Belisle.  You don't recall that, do you?

20     A.  There was one instance that I recall he

21  mentioned, "Most of the time we worked things out," and

22  that did stand out in my mind, but I can't recall --

23     Q.  All right.  Well, I get to listen to it again.  I

24  want to ask you also about -- now, while I'm thinking

25  about it, would you say that you and Agent Bottary tried

1 to be pretty informal for, at least up to where we're

2 discussing right now, all of these interviews?

3  A. Yes.

4  Q. Tried to be conversational?

5  A. Yes.

6  Q. Tried to be friendly?

7  A. Yes.

8  Q. Tried to keep everything cordial and

9 professional?

10  A. Yes.

11  Q. But more on the conversational side as opposed to

12 formal side -- when I say "professional," respectful,

13 but conversational?

14  A. Correct.

15  Q. And again, that is -- that was by design or by

16 purpose in order to facilitate the interview?

17  A. Correct.

18  Q. And that included the discussion of Mr. Wells'

19 beard, and he was -- he didn't look anything like he

20 looks as he sits here today, did he?

21  A. No, sir.

22  Q. And you would agree that certainly on that day --

23 that was your first meeting of him, April 12th?

24  A. Yes.

25  Q. And he was pretty recognizable, would you say?

1    A.  Yes.

2    Q.  I think you may have used the word "distinct."

3 Is that true?

4    A.  I may have.  I don't specifically remember that

5 word, but it would be accurate.  He was very distinct,

6 but I don't recall using that word specifically, no.

7    Q.  Besides Mr. Hopkins and Mr. Belisle, asking him

8 about them, either you or Agent Bottary kind of ran down

9 the list of folks in the rigger shop and got Mr. Wells'

10 thoughts about each of them, right?

11       You started, I believe, with Mr. Beauford, what

12 about him?

13    A.  Yes.

14    Q.  And for really -- as you ran through the men

15 first, Mr. Beauford and then the young men Coggins and

16 Mr. Pacheco, Mr. Wells didn't have any real information

17 to offer you that would implicate -- that he was trying

18 to implicate any of those guys as being viable suspects?

19    A.  Correct.

20    Q.  In fact, at one point, you asked him, you know,

21 if he thought it could be them, and he was saying, "No,

22 I'm not thinking it could be any of them guys"?

23    A.  Something along those lines, correct.

24    Q.  When you got to the ladies in the shop, the

25 female seamen, Ms. Upchurch and Ms. Henry, he had better

```
 1   things to say about them and even less feelings that it
 2   could have -- they could have had anything to do with
 3   it?
 4      A.   I don't specifically remember Ms. Henry, but I do
 5   recall Ms. Upchurch.
 6           THE COURT:  Mr. Colbath, is this a good place
 7   for a break?
 8           MR. COLBATH:  Probably it is, Your Honor.  I
 9   don't have a ton more, but I do have enough that it's a
10   fine spot for a break.
11           THE COURT:  Let's do that, ladies and
12   gentlemen.  We'll take about 15 minutes here.  Please
13   leave your notepads here.  Remember my admonition not to
14   discuss the case and we'll go off record at this time.
15           (Recessed from 2:55 p.m. to 3:11 p.m.)
16           (Jury present)
17           DEPUTY CLERK:  Court is again in session.
18           THE COURT:  All right.  Please be seated,
19   everyone.  We're back on record here.
20           Mr. Colbath, whenever you're ready, go ahead,
21   please.
22           MR. COLBATH:  I apologize, Your Honor.  Somehow
23   I got ahold of a transcript that was a page off and it
24   was throwing me off and I tried to remedy that.
25   BY MR. COLBATH:
```

1    Q.  Agent, we were talking about your discussions and

2  Agent Bottary's discussions with Mr. Wells about each of

3  the rigger shop folks.  You recall that?

4    A.  Yes.

5    Q.  And near the end of that discussion about him not

6  thinking it could be -- none of those people were

7  suspects, he really described to you that the rigger

8  shop was a good place to work?

9    A.  Correct.

10    Q.  And it was when you were talking about

11  Mr. Beauford and he had got news apparently that he was

12  going to be reassigned up to T-2, Mr. Wells posited I

13  guess that could be a reason for Mr. Beauford to be mad?

14    A.  I believe it was T-1, from T-2 to T-1.

15    Q.  Thank you for correcting me on that.  He said

16  nobody wants that, nobody wants to go from T-2 up to

17  T-1?  Nobody wants to go up the hill?

18    A.  Correct.

19    Q.  He described the rigger shop as the breakaway

20  republic of T-2?

21    A.  Correct.

22    Q.  And at one point, when you were discussing all of

23  the different people and how he referred to folks, he

24  explained to you -- he basically referred to all of

25  those people by their name, not by designation, except

1  for ET1 Hopkins, he did refer to him as ET1?  Just

2  generally did -- do you recall he referred --

3     A.  That's accurate.  That seems accurate to me.

4     Q.  In fact, you remember Mr. Wells explaining to you

5  that, even though he was a prior chief, he wanted

6  everybody to call him just "Jim," not "Chief" or not

7  "Mr. Wells" or none of that, and he called everybody by

8  -- for that reason, he called everybody by their first

9  name?

10    A.  Yes.

11    Q.  And he was a former chief, as was Mr. Belisle?

12    A.  Yes.

13    Q.  But he didn't like to be referred to as that, he

14  had been a civilian for 20 years; that's what he told

15  you?

16    A.  That's what he told me, yes.

17    Q.  So as the interview progresses and gets closer to

18  the end, had you and Agent Bottary talked about the

19  sequence of how you were going to broach this whole

20  subject with Mr. Wells about the time, the times of

21  things and the investigation you had learned during the

22  intervening night between your interviews?

23    A.  I remember we talked about trying to get into

24  some of the motive first and then we would go into the

25  timeline towards the end if we weren't getting much

information about the other motives and things like
that.  So there was discussion about kind of the
progression of the interview prior to, but I don't
specifically remember specific discussion on how the
timeline was going to be presented or not.

Q.  Okay.  So there was not a written out sequence of
events, but there was definitely a general plan?

A.  Correct.

Q.  So you got near the end of -- or you got through
all that motive stuff, and there was really not a lot of
consequence as far as Mr. Wells implicating anybody else
or offering theories on anything up until that point
really?

A.  Correct.

Q.  And so near the end, prior to telling Mr. Wells
about the things that you guys had learned, you start
walking him back through "let's go over the notes of
looking through your timeframe, Mr. Wells," right,
that's where you started?

A.  Correct.

Q.  And he had told you about when he was at his
house that he put on rain pants in changing the tire?
That he had went inside first of all at some point?  He
told you about going inside?

A.  Correct.

1    Q.  And he told you about making the telephone calls
2  and who he made the telephone calls to?
3    A.  Can you point me to a specific page --
4    Q.  Sure.
5    A.  -- if you could.  If I could refer to something,
6  it would help.
7    Q.  Yep.  Well, I think in this interview --
8  actually, you had talked about the telephone calls the
9  day before.  You had talked to Mr. Wells about the
10  calls, because you had asked him did he make the calls
11  before he changed the tire or after.  Do you remember
12  asking him about that?
13    A.  I do remember asking him about that.  I don't
14  specifically, without reference, recall which interview
15  that was in.
16    Q.  Okay.  Well, it wasn't in the last interview,
17  because no details got talked about?
18    A.  Correct.
19    Q.  So it was probably at some point prior to this
20  end of the second to last interview or during that time.
21  It was sometime prior.  You knew about the telephone
22  calls?
23    A.  Correct.
24    Q.  And in fact, you knew he was telling you the
25  truth about at least one of the telephone calls because

1    you had listened to -- did I hear you say you had

2    listened to one of the voicemails?

3        A.   I listened to a voicemail that was left by Mr.

4    Wells on Chief Reckner's phone.

5        Q.   Okay.  And during one of these interviews, he had

6    told you he had called and left a message for the chief

7    telling him about the flat tire?

8        A.   Correct.

9        Q.   So back to my questioning.  He told you about

10   going inside the house and using the bathroom?  If you

11   want to look at page 69.

12       A.   69?

13       Q.   Uh-huh, 69, in the fifth interview.

14       A.   He mentioned using a bucket, I do remember that.

15   "We were using a bucket at that point."

16       Q.   Actually, it starts -- I mean it starts -- why

17   don't I back you up to page 67.  You're at page 67?

18       A.   I am.

19       Q.   Okay.  And up towards the top, Mr. Bottary says,

20   "I remember we talked yesterday.  You made the call

21   first or did you change the tire first?"  So there is a

22   reference for you that you had talked about it sometime

23   on April 12th?

24       A.   Correct.

25       Q.   The calls, yeah.

1    A.  Correct.

2    Q.  And so he told you about the calls, and obviously

3  told you that he had a flat tire.  Right after that, you

4  see he tells you about going to the bathroom?

5    A.  Correct.

6    Q.  He tells you about changing, he put on -- at some

7  point he put on some rain pants because at his house to

8  change the tire you would kneel in the dirt, he didn't

9  have a concrete driveway.

10    A.  Correct.

11    Q.  Did you know at that point -- had you been to his

12  house or seen his house to know that he had just kind of

13  a gravel pad and sloped driveway?

14    A.  I don't think I had been to his house at this

15  point.  It had been relayed to me probably by this point

16  kind of what his house or driveway looked like, but I

17  don't think I had been there.

18    Q.  Told you that he had to get a jack, used a jack

19  to change the tire?

20    A.  Yes.

21    Q.  And then as the -- he told you -- at some point

22  you clarified with him, now, this bathroom use, was that

23  number one or number two, and it was number two?

24    A.  Correct.

25    Q.  And Agent Bottary -- you all kind of laughed, but

I mean that was not a joking question, that was serious, you were trying to track this in detail?

    A.  Correct.

    Q.  And at that point, as you all laughed, you said, "Well, that adds time."  It's longer, probably longer for number two than number one; is that what you were referring to?

    A.  Yes.

    Q.  Agent Bottary said, "We don't have to go into that."  You see where he says that?

    A.  Yes.

    Q.  And then Mr. Wells tells you they were using a bucket at that time, because you guys -- you reminded him, "Oh, yeah, you mentioned that yesterday."

    A.  Yes.

    Q.  You and I had talked about -- that wasn't a surprise to you, because, again, that sort of made sense based on your conversation you had with Mr. Wells searching the truck the day before?  You in fact saw the bucket you thought he was referring to?

    A.  Yes.

    Q.  And he told you that, on his way back after leaving his house, he told you his route because he said he went from the house to the dumpsters?

    A.  Yes.

1    Q.  And that he dumped the poop bucket and that
2  ultimately he also had some trash bags while he was at
3  the dumpster, that he dumped those?
4    A.  Yes, and I guess what I'm thinking at this point
5  as we're trying to -- we have narrowed down this
6  timeline, it appears that he's adding detail to me to
7  increase the amount of time that he's spending there.
8  That's what my thought process is at the time, is these
9  details --
10   Q.  Agent, hold on a minute.  I didn't ask you about
11 your thought process.  I asked you about he told you he
12 went to the dumpster and dumped the poop bucket?
13   A.  Yes, he did.
14   Q.  And ultimately he clarified that he also had some
15 trash bags, so it took a couple minutes?
16   A.  He said some plastic bags, I think, yes.
17   Q.  Plastic bags, okay.  He told you the location of
18 the dumpsters.  He said, "No, it's down in Bells Flats."
19 You asked him where's the dumpster?
20   A.  In the flats, yes.
21   Q.  And you asked if he made any other stops on the
22 way back, and he did not add any other stops or tell you
23 that he went anywhere from the dumpsters back to T-2?
24   A.  Correct.
25   Q.  And if you go to page 70, it was -- you were

1    walking through this timeline with him and you said, "So

2    it's 6:50." You were referring to when he originally

3    left the house?

4        A.  Correct.

5        Q.  "Come back around, got back to the house 7:30,

6    30 minutes," that's what you asked him?

7        A.  Uh-huh.

8        Q.  And he said yeah, he agreed with that, 6:50, you

9    go back around, got back to the house at 7:30, takes --

10   he said, "Yeah." And then you said, "Do all that," all

11   those things he just described to you.

12           And you asked him to clarify, "How long, you

13   know, at the dumpsters." Do you see all that

14   discussion?

15       A.  Yes.

16       Q.  He wasn't disagreeing with your timeline at that

17   point?

18       A.  No.

19       Q.  And then Agent Bottary interjected after that,

20   and Agent Bottary said that, "Well, they have different

21   camera points," and Agent Bottary told him that you two

22   had looked at the footage and you had looked at

23   different footage and now there was some anomalies and

24   there was some problems. You see that in the middle of

25   page 71?

1        A.   Yes.

2        Q.   And so even though Agent Bottary had earlier in

3   the same interview represented that you guys hadn't seen

4   any footage, the plan changed and Agent Bottary said,

5   "We have looked at the footage, Jim, and there's a

6   problem"?

7        A.   Again, I think when we said we hadn't seen any of

8   the footage, I think that was referring to the T-2

9   footage, because that's where the evidence response team

10  was.  Even though it was housed in T-1, that video

11  footage, we hadn't necessarily seen all of the footage,

12  I think was the reference, any of the footage at T-2 at

13  that time is what -- even if we had, I think we were

14  referring to T-2 specifically.

15         These cameras that we're referring to here are on

16  the main gate base, the main gate of the base that is

17  away from T-1 and T-2.  That's a completely separate

18  system.  So those are the discrepancies that we're

19  talking about and the anomalies in the timeline that we

20  hadn't known the day before.

21       Q.   And of course, you and Agent Bottary knew which

22  cameras you had looked at and which cameras you hadn't

23  looked at?

24       A.   Correct.  Well, we didn't know all the cameras we

25  hadn't looked at yet because we were still searching for

cameras around the island, so we knew which ones we had
looked at.

Q.   But you certainly knew -- you knew what you
hadn't seen.  You didn't know if it existed maybe, but
you knew what you had seen?

A.   Correct.

Q.   And that was all done in between the last
interview on April 12th and this interview on
April 13th?

A.   Correct.

Q.   Mr. Wells would have had no way to know what you
really looked at and what you didn't look at?

A.   Correct.

Q.   And then as Agent Bottary explained the main gate
camera, and, you know, he said he wasn't sure if it was
exactly on time, but it looked like there was a
34-minute gap, that was the discrepancy that he was
describing there?

A.   Yes.

Q.   And Mr. Wells didn't know if there was a
34-minute gap.  He said, "Yeah, not at the moment"?

        MR. SKROCKI:  Objection; speculation as to what
Mr. Wells knew.

        THE COURT:  That's sustained as to what he knew
or didn't know.

 1   BY MR. COLBATH:

 2      Q.  Mr. Wells answer was, "Yeah, I -- not at the

 3   moment.  I mean I just I can't think of why there would

 4   be a discrepancy."

 5      A.  So he's indicating that he didn't know, but I

 6   don't know what he knew or not.

 7      Q.  And then Agent Bottary started right there on the

 8   middle of page 72, and although there is an interruption

 9   where Mr. Wells just says the word, "Yes," it's not in

10   response to a question, Agent Bottary goes on for quite

11   a while and he basically at that point tells Mr. Wells

12   your law enforcement theory of what you know and what

13   you have been able to piece together about how you think

14   the crime happened?

15           MR. SKROCKI:  Objection as to the form of the

16   question as to how the crime happened.

17           THE COURT:  That's fair.  I will sustain that

18   objection.  You can rephrase.

19   BY MR. COLBATH:

20      Q.  Sure.

21           After asking Mr. Wells about this discrepancy,

22   Agent Bottary provides a long explanation or a long

23   statement to Mr. Wells that includes a whole bunch of

24   details that law enforcement had learned from the last

25   interview to this one?

1    A.  Correct.

2    Q.  And you tell Mr. Wells about -- Agent Bottary

3 tells him that you have learned when Mr. Belisle

4 arrived?

5    A.  Correct.

6    Q.  And that there was a witness that was jogging by

7 and heard some noise, or going by and heard some noise?

8    A.  Correct.

9    Q.  And that you have learned that ET1 Hopkins got

10 there at 7:08?

11    A.  Correct.

12    Q.  Now, you're referring to T-2 camera footage.  We

13 have got footage of a car going by at 7:15, leaving the

14 scene?

15    A.  Correct.

16    Q.  So it's clear --

17    A.  Although I believe the vehicle leaving at 7:15

18 was captured on the T-1 camera, not the T-2 camera.

19    Q.  Right, but it's of T-2.  I mean it pictures the

20 rigger shop building down there.

21    A.  But it is a separate camera than the one that's

22 at T-2.

23    Q.  Right.  It's certainly not the main gate camera

24 you're referring to.  He's not explaining anything about

25 the main gate camera in that discussion?

1    A.  In that long discussion that you're referencing,

2  he is referring to the main gate camera.  I believe at

3  7:22, 6:45, there is talk of the main gate camera back

4  on page 72.

5    Q.  Right.

6    A.  "So 6:48, which coincides with your time.  You

7  leave about 6:45.  On the way back, it's date/time

8  stamped," that's all the main gate.

9    Q.  And we have talked about that.  I read Mr. Wells'

10  answer.  "Yeah, not at the moment.  I mean I can't think

11  of why there would be a time discrepancy."

12       And now we're talking about what Mr. Bottary does

13  next, and what he does next is, in this discussion, he

14  tells him about we know when Rich got there and we know

15  when ET1 got there.

16    A.  Okay.

17    Q.  And we know about a jogger, right?

18    A.  Okay.  Yep.

19    Q.  We know about a car leaving at 7:15, and that's

20  not a reference to a camera view of the main gate, he's

21  talking about the T-1 camera, the car leaving the scene?

22    A.  Correct.

23    Q.  And the scene is the rigger shop?

24    A.  Correct.

25    Q.  And after laying all those pieces out, he ends

with a question, "Can you help us out with trying to figure this out," and Mr. Wells says, "I don't have a reasonable explanation for it."  Is that an accurate -- did I read Mr. Wells' answer accurately?

A.  What's not pictured in the text there is the long pause between the question and the answer, but, yes, you read it accurately.

Q.  And so after the question, "Can you help us out with trying to figure that out," Mr. Wells thought about it or was silent for a minute?  You were watching him closely at this point I'm sure.

A.  Correct.

Q.  And did he appear to be contemplating something?  Although I know you don't know what could be in his mind.  You said there was a long pause?

A.  So if memory serves --

Q.  You said there was a long pause?

A.  There was a long pause.  And at this point, so he had been sucking on a sucker throughout the interview, and while we were talking, he's like just spinning it, and that spinning and spinning got faster and faster the more we went through this timeline.

And I believe I put it in my notes there was like at 1:20 or 1:24 in the interview, he became very agitated and broke that stick, that sucker stick.  So I

believe it was consistent with about this timeframe that
that happened, so I was watching him very closely and I
was watching him get very agitated as this line of
questioning went on. And that's when he -- the spinning
got faster and the stick broke in his hand. So I do
remember that as part of this line of questioning.

Q. Now, again, you didn't videotape any of this?

A. I did not.

Q. Certainly could have so we could all see that,
could have seen that?

A. If we videotaped it, yes, you could have seen
that.

Q. And we don't hear a stick snap? You didn't hear
a stick snap on the recording at this point, did you?

A. I did not.

Q. You didn't hear a sucker fall under the table?

A. He held on to it, but no.

Q. He had a sucker because of the sugar value of it
because you were an hour and a half interview and with
his diabetes?

A. I don't know why he had it. They were there on
the table that was between he and I. And we offered --
well, I don't know if it was offered, but it was
understood that he could have one.

Q. So that it was captured on this audio recording

1   that both he knew and you knew was going on, you didn't

2   ask him why he was upset or why he was agitated?

3     A.  No, I did not ask him that, no.

4     Q.  Didn't point any of that out or ask him if he

5   wanted to take a break?

6     A.  We were trying to --

7     Q.  My question, sir, was:  Did you ask him if he

8   wanted to take a break?

9     A.  I did not, no.

10     Q.  Okay.  And so what happened was Agent Bottary

11   then asked him a question, "Do you have a theory,"

12   right?

13     A.  Yes.

14     Q.  And Mr. Wells wanted to know -- he said -- well,

15   he said, "A theory, what are you suggesting," correct?

16     A.  Correct.

17     Q.  And you told him that you were baffled?

18     A.  Correct.

19     Q.  That wasn't true?  You weren't baffled?

20     A.  There were things that I was baffled about, yes,

21   but specifically, I had my own theory of what happened

22   at that time, yes.

23     Q.  What you wanted was for him to say something to

24   corroborate your theory; that would have been ideal?

25     A.  The truth would have been ideal.

1    Q.  What he said was, "So am I."  I mean to your

2  question, "We're baffled," he said, "Well, so am I."

3    A.  Correct.

4    Q.  And the fact of the matter, sir, is, as long as

5  we're talking about the truth, is you didn't know what

6  the truth was because you weren't on Kodiak Island on

7  April 12th of 2012, were you?

8           MR. SKROCKI:  Objection; argumentative.

9           THE COURT:  That's sustained.

10  BY MR. COLBATH:

11    Q.  Well, you didn't know what the truth was, did

12  you?

13           MR. SKROCKI:  Objection; argumentative.

14           THE COURT:  Excuse me.  I will sustain that

15  question.  You can ask about was he present.

16           MR. COLBATH:  Your Honor, I would ask that his

17  earlier answer then be -- where he said "the truth would

18  be nice" would be stricken.

19           MR. SKROCKI:  Sidebar on that if you need it.

20           THE COURT:  Just a moment.  Let me go back and

21  read this.

22           (Bench conference begins.)

23           THE COURT:  Why don't you read back the

24  question, please.

25           (Question read back by realtime reporter.)

1          THE COURT:  I will allow that question to stand

2     and the answer.  I mean the question I think was

3     argumentative.  There was no objection.  The answer will

4     stand to that.

5          Then following up, what's the next thing you

6     want to the ask?

7          MR. COLBATH:  Well, I'm sorry.  The question

8     that I asked that got sustained or --

9          THE COURT:  That question was not objected to,

10    correct?

11         MR. COLBATH:  Right.

12         THE COURT:  I'm going to allow that.  To the

13    extent you're seeking to strike that, I'm not going to

14    strike it.

15         MR. COLBATH:  He said the truth would have been

16    ideal.  My follow-up question to that is:  Well, sir,

17    you didn't know what the truth was, did you?

18         THE COURT:  His question was with regard to the

19    truth at the time of the conversation.  For you to ask

20    the truth of who did the killing, I mean --

21         MR. COLBATH:  I'm asking in that context.  He

22    said, "I would have liked to have heard the truth," and

23    I'm just simply pointing out you didn't know what the

24    truth was, so you didn't know if what you were hearing

25    was the truth or if you hadn't yet heard it.

1          THE COURT:  So an objection to that?

2          MR. SKROCKI:  To your ruling?

3          THE COURT:  No, to that question.

4          MR. SKROCKI:  Absolutely.  He walked right into

5     that.

6          THE COURT:  He did walk into it.

7          MR. SKROCKI:  He's arguing with the witness.

8     He should have known better.  He was starting to get fun

9     with him, for lack of a better phrase, his voice starts

10    to raise, and he walked right into it.  I didn't object.

11    That's a fair response.

12         THE COURT:  I think if you move on, the

13    objection I will sustain as to argumentative, and that

14    was a fair response he gave.

15         MR. COLBATH:  It has come to my attention, and

16    I don't -- I had no way to know it because I don't know

17    any of the people, but that the executive officer from

18    the COMMSTA, Mr. Pizzurro, and one of the former chiefs,

19    Mr. Reed, William Reed, have both apparently been in the

20    courtroom for much of the afternoon and they are both

21    not only listed on the government's general witness

22    list, but actually Mr. Reed is listed as a witness on

23    the list I got last night from Ms. Sherman.

24         MR. SKROCKI:  They have been released.  We

25    prepped them last night and we released them.

1          MR. COLBATH:  Well, a couple of things I guess.

2     We weren't aware of that and I thought we had --

3          THE COURT:  Would you intend to call them?

4          MR. COLBATH:  Well --

5          THE COURT:  Do we need to take this up outside

6     the presence of the jury.

7          MR. COLBATH:  I would just like more --

8          MR. SKROCKI:  We can excuse them.

9          MR. COLBATH:  My request would be at least

10    until I have five minutes to think about that.  I'm in

11    the middle of my cross examination.  I absolutely may --

12    I would have to consult with Mr. Camiel.

13         THE COURT:  Get them out and we'll take it up

14    later.

15         (End bench conference.)

16    BY MR. COLBATH:

17      Q.  Agent, I'll try to get back to where I was.

18         So Mr. Bottary had asked him, "Do you have a

19    theory," and I think we talked about where you said you

20    were baffled.

21      A.  Correct.

22      Q.  And you went back and forth a couple of times on

23    that with Mr. Wells and the interview stopped.  There

24    was less than maybe a minute of conversation after that?

25      A.  Correct.

Q.  And the plan was you took -- it was a break, but
not a conclusion of the interview?

A.  I think we had kind of considered that Mr. Wells
was invoking his right to silence at that point and we
concluded that portion of the interview.

Q.  Okay.  And you stepped out, and, again, like the
last breaks that you had had, you consulted with
Mr. Allison and other portions of the team?

A.  Correct.

Q.  And it was at this point that you and Agent
Bottary, and I don't know if anybody else was involved,
but at least you and Agent Bottary switched from
interview to interrogation?  Mr. Wells was -- well, you
switched from interview to interrogation?

A.  Correct.

Q.  Which means an interrogation is a subject trying
to directly confront a suspect with incriminating
evidence to see what their response is generally?

A.  The object of an interrogation is to elicit a
confession.

Q.  Okay.  And so when you went -- you let Mr. Wells
sit in that room maybe 40, 45 minutes while you guys had
those conversations.  Was it that long?

A.  I think it was about 53 minutes, if memory
serves.

1    Q.  That's pretty precise.  That's a good memory.

2  But you started the next interview at 1343, the last

3  interview?

4    A.  1343, yes, 1:43 p.m.

5    Q.  And as that interview started, really through

6  that whole first page, it was a little bit of you and

7  mostly Mr. Bottary again laying out the circumstances

8  for Mr. Wells?

9    A.  Yes.

10    Q.  And one of the things that Mr. Bottary told him

11  was -- let me see if I can find -- well, that you wanted

12  to talk about things more or that you would -- well,

13  that he -- he would love Jim to talk about it?  It's at

14  the very end -- on the first page at the very end of

15  Mr. Bottary's colloquy.  "I would love to hear you talk

16  about it."  Do you see that?

17    A.  Yes.

18    Q.  And Mr. Wells said, "Talk about what?"  And

19  Mr. Bottary told him, "Talk about what happened."

20    A.  I don't have anything beyond page one.

21    Q.  Oh, I got it here.  It's only two pages, and the

22  next one --

23        MR. SKROCKI:  Can we approach?  I can give him

24  ours.

25        THE COURT:  Yes.

1          (Government paralegal approaches the witness.)

2   BY MR. COLBATH:

3      Q.  Mr. Wells said, "Talk about what?"  And then on

4   the next page, Agent Bottary said, "Talk about what

5   happened"?

6      A.  Correct.

7      Q.  And you also jumped in at that point and provided

8   a little bit of information, and Mr. Wells sort of

9   interrupted you, it looks like, because it trails off

10  there, and asked directly at that point if you were

11  accusing him?

12     A.  Correct.

13     Q.  And you assumed he meant accusing him of the

14  double homicide?

15     A.  Correct.

16     Q.  And you then provided a long explanation, and

17  part of that explanation said, "We have been truthful

18  with you, Jim, and like Sean was saying," and you went

19  on, but you hadn't been truthful with him, had you?

20     A.  There were aspects that we had been very open

21  with him and very truthful, but there were aspects where

22  we were not, we were less than truthful, correct.

23     Q.  Untruthful?

24     A.  Yes.

25     Q.  And at the end of that whole colloquy of what you

1    had to say, when you let him know, "Now, yes,

2    absolutely, this is an accusation," then he did not want

3    to talk to you anymore?

4        A.   Correct.

5            MR. COLBATH:  That's all I have for you, sir.

6            THE COURT:  Thank you, Mr. Colbath.

7            Mr. Skrocki, go ahead, please.

8            SKROCKI:  No redirect.

9            THE COURT:  All right.  Can this person can be

10   released?

11           MR. SKROCKI:  Yes.

12           MR. COLBATH:  Yes.

13           THE COURT:  Thank you, sir.  You may be

14   excused.

15           (Witness excused)

16           THE COURT:  Ready to proceed with your next

17   witness?

18           MR. SKROCKI:  Yes.  We call Peter Van Ness.

19           (Pause)

20           THE COURT:  Before we bring him up, was not I

21   going to read the instruction again?  Wasn't that the

22   agreement?

23           MR. SKROCKI:  Yes, ma'am.

24           MR. COLBATH:  It was.

25           THE COURT:  Sir, if you could wait just a

moment and let me read these things.

Like I said, these are the same two
instructions I gave you yesterday, except now in the
past tense.

You have heard recordings that have been
received into evidence.  Each of you was given a
transcript of the recording to help you identify the
speakers and as a guide to help you listen to the
recordings.

However, bear in mind that the recordings are
the evidence, not the transcript.  If you heard
something different from what appeared in the
transcript, what you heard is controlling.

After that, now that the recordings have been
played, the transcript will be taken from you.

Thank you.

The other one is:  Ladies and gentlemen, you
have heard testimony that the defendant made certain
statements.  It's for you to decide:  One, whether the
defendant made the statement, and, two, if so, how much
weight to give to it.  In making those decisions, you
should consider all the evidence about the statements,
including the circumstances under which the defendant
may have made it.

And with that, we'll give Caroline just a

1    moment before we bring the witness up here.

2              (Pause)

3              THE COURT:  Nobody made any notations or

4    anything in their transcripts?  Very good.

5              Sir, if you could come forward please.  When

6    you get up there, if you would remain standing, the

7    clerk will administer an oath to you.

8              (Oath administered to the witness)

9              DEPUTY CLERK:  For the record, can you please

10   state your full name and then spell your full name.

11             THE WITNESS:  Peter Russell Van Ness,

12   P-e-t-e-r, R-u-s-s-e-l-l, V-a-n, N-e-s-s.

13             PETER VAN NESS, GOVERNMENT WITNESS, SWORN

14                    DIRECT EXAMINATION

15   BY MR. SKROCKI:

16     Q.  Good afternoon, Mr. Van Ness.

17     A.  Good afternoon.

18     Q.  Could you tell the jury where you reside, sir.

19     A.  I currently live in Alexandria, Virginia.

20     Q.  And what do you do there currently?

21     A.  So I am a retired Coast Guard officer.  I retired

22   September 1st and just took a new job with SAVA

23   Solutions.  They are an IT service company, and I am the

24   program manager for IT operations for the DEA.

25     Q.  You didn't take any time off between the end of

1  your career and this job?

2     A.  I did take some terminal leave, yes.

3     Q.  Good enough.

4        Sir, before this job you just described, what

5  were you doing for a career?

6     A.  I was a Coast Guard officer for 24 years.

7     Q.  And at some point in time were you assigned to

8  the Communication Station Kodiak?

9     A.  I was.  From 2009 until 2012, I was the

10 commanding officer at the Communication Station.

11    Q.  You had some individuals working underneath you

12 at that point in time?

13    A.  I did.

14    Q.  Who was your executive officer?

15    A.  My executive officer was David Pizzurro.

16    Q.  If you could just briefly walk the jury

17 downstream from you, down from Mr. Pizzurro, who would

18 be next in line beneath you?

19    A.  Normal command structure at the Communication

20 Station was commanding officer, myself.  David Pizzurro

21 was the executive officer.  Second in charge under David

22 would be the operations officer, Phil Jordinelli.  And

23 the engineering officer, William Reed.

24        And then I also had a command master chief, so he

25 was a senior enlisted advisor for the members of the

crew that were enlisted and an advisor to me as the
commanding officer.  And then under each of the
operations officer and the engineering officer they had
a staff that provided operations and engineering support
to the command.

Q.  Can you tell the jury, was this your first
assignment as communication station commander?

A.  It was my first assignment to the Communication
Station, yes.

Q.  Prior to that, did you have any communication
experience?

A.  Yes, I did.  Actually, immediately prior to that,
I did presidential support.  I worked at the White House
communication agency, spent two and a half years
supporting President Bush and six months with President
Obama.

Q.  Interesting work?

A.  Very.  Traveled all over the world, 26 different
countries.

Q.  Cool.

If we could have Exhibit No. 222, please, and the
lights, Madam Clerk.

Mr. Van Ness, are you a photographer?

A.  Not professional, but I do take a lot of photos.

Q.  Did you take this one?

1     A.   I did.

2     Q.   Is that your station?

3     A.   That is.

4     Q.   If you could describe for the jury just briefly

5  the building to the right, what do you recall that

6  building to be?

7     A.   So the large building in the center is what

8  you're asking?

9     Q.   Yes, I was calling it to the right.  I'll just

10 circle it.

11    A.   Yes.  That would be T-2.  The T stands for

12 transmit.  That's the transmit facility for the

13 Communication Station.  That's our primary building.

14 That was the command offices, the administrative

15 offices.

16         The electronic technicians had offices in there.

17 The transmitters themselves were in that building and

18 then the operations deck, which was a secure space where

19 our operations specialists stood watch, were in that

20 building.

21    Q.   You called this one T-2?

22    A.   T-1.

23    Q.   T-1.  Okay.  How about this one here to the left?

24 I'm circling the white building to the left.

25    A.   Designated T-2, again, for transmitter site.  And

 1   we also called that the rigger shop.  So that was a

 2   garage and workshop for the staff that maintained the

 3   antennas and the grounds that supported the antennas.

 4       Q.  We can take that down, Blair.  Thank you.

 5           If you can recall roughly the month and year when

 6   you arrived to take command of the Communication

 7   Station.

 8       A.  I believe it was July of 2009.

 9       Q.  And before taking command, were you apprised of

10   the general nature of the command and how things were

11   run or not run?

12       A.  I was.  So it's normal for a new commanding

13   officer to come in and spend about a week before you

14   assume command with the senior members of the crew, get

15   a briefing on various aspects of the command, both on

16   the engineering and operations side, and then do a tour

17   of the grounds, do a tour of the facility and visit some

18   of the other commands in the local area to become

19   familiar with the command you're taking charge of.

20       Q.  Is it Captain Van Ness when you retired finally?

21       A.  Correct.

22       Q.  Captain.  I'll just go with Captain.  Captain Van

23   Ness, you're not that far out of the Coast Guard.  When

24   you arrived, did you have a philosophy or a practice you

25   were going to implement when you became commander of the

1  Communication Station?

2    A.  I don't know that I had a formal philosophy, but

3  I did have experience.  It was my third command.  I had

4  commanded two cutters prior to taking command of the

5  Communication Station, so I had some experience being in

6  command.

7        And I did set some expectations for the crew, but

8  it's also kind of expected of a new leader to come in

9  and assess for about the first month, 30 days before you

10 make any major changes, so I did take advantage of that

11 also.

12   Q.  Where was your undergraduate?

13   A.  I have an undergraduate degree from the Coast

14 Guard Academy.

15   Q.  Did you staff your subordinate positions with

16 those you felt could implement your policies in terms of

17 management?

18   A.  No.  In fact, I had very little control over my

19 staff.  They are assigned by the military, by the Coast

20 Guard.  So as I was in command, I definitely have some

21 influence with the assignment officers and having

22 discussion of what kind of skills and individuals we

23 need, but no direct -- I didn't come in as a new CO and

24 choose who worked for me.

25   Q.  Did you have also command over the rigger shop,

1  the T-2 building?

2      A.  Yes, that's correct.

3      Q.  And those inside?

4      A.  Yes.

5      Q.  And do you recall a man named Jim Wells?

6      A.  Yes.

7      Q.  Do you see him here in court today?

8      A.  Yes.  He's sitting at the table right here.

9      Q.  With respect to Mr. Wells, at the time you knew

10  him when you were in Kodiak, who was his supervisor?

11      A.  Direct shop supervisor would have been Jim

12  Hopkins, and that's by nature of the civilian positions

13  were not supervisory positions, so a military member was

14  put in charge of the entire shop.

15          And then Scott Reckner, Chief Reckner was overall

16  in charge from a higher command level.

17      Q.  And at some point in time as his commanding

18  officer, were you made aware of issues with respect to

19  Mr. Wells' conduct in the rigger shop as a civilian

20  employee?

21      A.  Yes.  There had been some challenges with work in

22  the shop.

23      Q.  Which one of those challenges that rose to your

24  level do you recall?

25      A.  The first one that I was advised of by the staff

down there, in particular Mr. Reckner, was an issue with

tree collaring, which is basically you wrap the bottom

of a tree or cut the bottom of a tree so it kills it, it

dies, and it needs to be taken down because it could

become a hazard.

Q. That didn't rise to your level for any kind of

disciplinary matters, did it?

A. Only that I was advised that it had been

addressed.

Q. Did there come a time when another matter

involving Mr. Wells did come to your direct attention?

A. Yes. So very late in my tour, my three years,

probably about the two and a half year mark, there was

an issue with improper use of the government fuel card

that we -- the command had a card that was used to fuel

the government vehicles and it had been improperly used

to fill a personal vehicle.

And so I convened an investigation, asked the

executive officer to assign an investigating officer,

which is usually a member of the command. They go out

and they gather the facts and then present that back to

the executive officer, and then he provides a

recommendation to me based on those findings. And those

findings basically included a recommendation that Jim

Wells -- the facts supported that Jim Wells --

1           MR. COLBATH:  Your Honor -- excuse me, Mr. Van

2    Ness -- could we approach?

3           THE COURT:  Yes, let's do that briefly.

4           (Begin bench conference.)

5           MR. COLBATH:  Your Honor, I believe this came

6    up during Chief Reckner's testimony as well.  The

7    Court's order precluded the government from offering

8    evidence directly because the investigation was

9    inclusive.  There was a letter of caution issued.  The

10   Court's order I think --

11          THE COURT:  Definitive was the word I used.  He

12   is not to say that.

13          MR. COLBATH:  I believe that's exactly where

14   we're at, about that point.

15          MR. SKROCKI:  I'll explain.  I just want to get

16   some background.

17          THE COURT:  Have you explained the Court's

18   order not to say definitively he was responsible?

19          MR. SKROCKI:  Yes.  Can I lead him for a couple

20   of questions?

21          MR. COLBATH:  That's what we did with

22   Mr. Reckner.

23          THE COURT:  Let's do that.

24          (End bench conference.)

25   BY MR. SKROCKI:

1     Q.  Captain Van Ness, just to get to the point here,

2  there was an investigation that was conducted, and you

3  developed a memorandum of caution for Mr. Wells,

4  correct?

5     A.  That's correct.

6     Q.  And did you have occasion to sit down and give

7  that letter of caution to Mr. Wells?

8     A.  I did.

9     Q.  I want to focus on that meeting.  Okay?

10     A.  Yes.

11     Q.  And so can you tell the jury when you had that

12  meeting who was present in the room and what your

13  intentions were.

14     A.  To the best of my recollection, it was my

15  executive officer.  It was the -- so David Pizzurro, my

16  executive officer; William Reed, the engineering

17  officer; and Scott Reckner, the supervisor for the

18  rigger shop, as well as Jim Wells.

19     Q.  And did you have occasion to speak with Mr. Wells

20  about the contents of the letter of caution?

21     A.  Yes.

22     Q.  And did you explain the letter to him?

23     A.  Yes.

24     Q.  And did you ask him for his signature on the

25  letter?

1    A.  I did.

2    Q.  Can you tell the jury what happened with respect

3 to whether Mr. Wells signed the letter of caution or

4 not?

5    A.  So initially he did not want to sign the letter.

6 And I talked to him some more.  It was a fairly short

7 meeting, about ten minutes.  But then when he didn't

8 sign the letter, we ended up talking about it some more.

9 I eventually stood up and said that if he did not want

10 to sign it that I would go back to the civilian

11 management support that we had in Kodiak at the Coast

12 Guard base and we would discuss where to move -- how to

13 move forward from here.  And at that point, he did sign

14 it and then pushed it across the table back to me.

15    Q.  Like across the table, just shoved it back, or

16 how did that go?

17    A.  Just slid it.  It was a glass table, so slid it

18 back across the glass table.

19    Q.  A couple other questions for you on a different

20 topic.

21       As the commanding officer, if there were any

22 threats made to the Communication Station, would they

23 rise to your level?

24    A.  Absolutely.

25    Q.  Were any made during your tenure there to the

1    Communication Station that you are aware of?

2        A.   Are you speaking like a bomb threat?

3        Q.   Any kind of threat whatsoever that rose to your

4    attention.

5        A.   Not that I remember.

6        Q.   Okay.  I want to ask you a couple other questions

7    about some other individuals that were in the T-1

8    building that you were supervising or that were under

9    your command, and that would be William Reed.  Do you

10   know who Mr. Reed is?

11       A.   Yes.  William Reed was my engineering officer.

12       Q.   And how about Mr. Ray Fillion?

13       A.   Yes, so he was the senior electronics technician.

14       Q.   Are you aware of any kind of interaction in a

15   negative fashion between Mr. Fillion and Mr. Reed during

16   your tenure?

17       A.   Yes.  So they definitely had some personality and

18   professional conflicts.  There were some challenges on

19   both sides.  William Reed was getting ready to retire,

20   had submitted his retirement letter and was in the last

21   six months or less than a year of his service, 28,

22   29 years, I'm not sure exactly what he retired, but a

23   long service.

24            But I was concerned, a little disappointed in him

25   that he was not, in my mind, providing enough leadership

to his team.  He was spending a lot of time in his
office and not engaged enough.  And then we had issues
with Ray Fillion who worked directly for him.

     At that time, Ray Fillion had been promoted.
They were both senior chiefs so they were of the same
rank, but William Reed was the engineering officer, so
he was in charge of the engineering department.  And
they had a lot of disagreements about how it should be
run.

     Some of that came from not enough engagement on
William Reed's part.  In my opinion, a lot of it also
came from Ray Fillion being overbearing, not very
respectful of the people that worked for him, and
ultimately ended up in a shouting match between the two
at some point.

     Q.  Did you say shouting match?

     A.  A shouting match, yes.

     Q.  That came to your attention?

     A.  It did.  I did not observe it, but it was brought
to my attention.

     Q.  Did you take any administrative action against
these two individuals?

     A.  I did. I took --

     Q.  Hold on, sir.  Captain, I'm in charge.

          THE COURT:  No, I am.  Go right ahead,

Mr. Skrocki.

MR. SKROCKI:  I thought I had a good one.  I really did.  Thank you for that, Your Honor.  And that's on the record.

BY MR. SKROCKI:

Q.  Captain, did you take any administrative action with respect to the shouting match between these two individuals and their other conduct?

A.  Yes, I did.

Q.  Please tell the jury what you did.

A.  So I basically wrote up official remarks that go in their personnel record that addressed both -- addressed the conduct that I felt was inappropriate and set expectations for what I expected to see from both of them.

Q.  Did that settle the matter between the two?

A.  I think it addressed that specific situation.  In my mind, it addressed the issues I was having with William Reed, but I continued to have some problems with Ray Fillion.  He was just -- he was a difficult person to work for and a very difficult person to manage.

Q.  And these instances we're talking about, where did they occur, what building?

A.  In T-1.

Q.  Any spillover into the T-2 building at all?

 1     A.   Not that I'm aware of.

 2     Q.   You mentioned the word respectful.  I want to

 3   take you back to the meeting you had with Mr. Wells.

 4   When you stood up to call the end of the meeting, did

 5   everybody else stand up as well?

 6     A.   Everyone but Mr. Wells.

 7     Q.   If we could have the lights, please, and

 8   Exhibit 67.

 9          Mr. Van Ness, in preparation for your testimony,

10   we met before, correct?

11     A.   Yes.

12     Q.   We showed you a video which we're going to put up

13   on the screen here.  It's been admitted.  Just go to the

14   first -- just open up the first frame.

15          Do you recall seeing this video, Mr. Van Ness?

16     A.   Yes, I do.

17     Q.   If you could go ahead and play that, Blair.

18          (Exhibit No. 67 playing in open court.)

19     Q.   Do you recognize that truck coming from right to

20   left, sir?

21     A.   Yes.  That's Jim Wells' truck.

22     Q.   Then right behind.  If we could stop that, Blair.

23     A.   The red truck that pulled in on the right-hand

24   side there is my truck.

25     Q.   That's your truck there?

1     A.   Correct.

2     Q.   And let's go ahead and keep going while we have

3  it up, Blair.

4         (Exhibit No. 67 continues playing in open

5  court.)

6     Q.   This person here in the red jacket, who is that?

7     A.   That's me.

8     Q.   Who were you approaching?

9         If we could stop, Blair.

10    A.   That's Scott Reckner.  He has his back to me.

11  Right there.  He's facing the white truck.

12    Q.   Do you recall what his emotional state was at the

13  time?

14    A.   He was crying.

15    Q.   Blair, keep going, please.

16        (Exhibit No. 67 continues playing in open

17  court.)

18    Q.   What do you do there?

19    A.   I put my arm on his, like on his shoulder.

20    Q.   Let's stop there, Blair.

21        Who is here in the orange shirt?

22    A.   That's Jim Wells.

23    Q.   And is there a point in time you had a -- let me

24  rephrase that.

25        Were you there with Mr. Wells for a period of

1  time, the three of you?

2      A.  Very short period of time, but yes.

3      Q.  Do you recall Mr. Wells saying anything during

4  that period of time?

5      A.  The conversation I recall was that Scott Reckner,

6  you saw him put his hands on his knees, he said,

7  "Someone shot Jim and Rich."  And then Jim Wells said

8  something along the lines of, "Oh, God.  Oh, my

9  goodness.  Oh, no," or something like that, but, "I had

10  a flat tire."

11      Q.  "I had a flat tire"?  What was your reaction to

12  that?

13      A.  I didn't address it directly, but I guess my

14  thought was so what, what does that have to do with the

15  issue we're having here.  This is a huge problem.  We

16  have people who have been shot and we're talking about a

17  flat tire.

18      Q.  Did you actually follow Mr. Wells into the

19  Communication Station?

20      A.  I did.  I followed him down Anton Larsen Road,

21  which is the road that approaches the Communication

22  Station from the main road that runs across Kodiak.

23      Q.  If we can have the lights, please, and you can

24  take that down, Blair.

25          I'm going to maybe walk you back a little bit

before this.  How did you find out about an issue at the
Communication Station that morning?

    A.   So my family had been sick, kids, then wife.  I
woke up not feeling well.  I don't remember whether I
left a voicemail or sent e-mail, but I notified my
executive officer that I wouldn't be in right away that
morning, I was going to go by the clinic on base and see
the doctor.  And while was in the bathroom, a call came
in to my phone.  I came out of the bathroom, I picked it
up, there was a voicemail.  It was from the watch at the
Communication Station saying that, at this point, seven
years later, but basically there was someone injured
and there was a lot of blood, was the gist of the
message.

        I called them back.  The watch officer didn't
have a lot of info other than someone had been hurt down
in T-1, and, again, there was a lot of blood.  So I
said, "Okay.  I don't need anything else right now.
I'll be right in."

        I may have asked if the police were on the way.
I'll be honest, at this point, I don't remember a lot of
that conversation, but the gist was, okay, thank you,
I'll be right there, because I only lived about two and
a half miles from the Communication Station.

    Q.   Where were you living at the time?

1    A.   I lived on the Coast Guard base in Kodiak.

2    Q.   So that was only two and a half miles away?

3    A.   Yes.

4    Q.   How long did it take you to make that drive to

5    the Communication Station on a normal day?

6    A.   Five to ten minutes, depending on traffic.

7    Q.   You still remember that, five to ten minutes?

8    A.   Roughly, yeah.

9    Q.   Okay.  So proceed with what happened with the

10   rest of your morning after you got that phone call.

11   A.   So I got in the car.  I'm driving in.  My phone

12   rang again when I was on Rezanof, which is the main road

13   there in Kodiak.  I stopped because it was the XO.  I

14   answered.  He told me two people had been shot.  I said,

15   "Okay.  I'm on my way.  Meet me when I get in there.

16   I'll meet you at T-1 and we'll figure out what's going

17   on," and then I proceeded in.

18   Q.   At some point in time, did you see a vehicle you

19   recognized ahead of you?

20   A.   Yes.

21   Q.   Whose vehicle was that?

22   A.   Jim Wells' truck was ahead of me on -- so off

23   Rezanof, you come out of the base, take a right on

24   Rezanof, drive less than a mile, maybe a half mile down

25   and take a left onto Anton Larsen, which is the road

1    that goes out to the Communication Station.  So his

2    truck was ahead of me on Anton Larsen.

3        Q.  You seem to remember all these details pretty

4    well?

5        A.  Yes.  Well, it was my commute every day for three

6    years.

7        Q.  Only three years?

8        A.  Yeah.

9        Q.  Okay.  And you saw Mr. Wells' vehicle ahead of

10   you?

11       A.  Yes.

12       Q.  And you followed him in?

13       A.  Yes.

14       Q.  You were the commander?

15       A.  Correct.

16       Q.  We saw you in the video putting your arm around

17   Mr. Reckner.  You had your discussion.  Mr. Wells tells

18   you about the flat tire.  As commander of the base, what

19   did you do next?

20       A.  So at some point right after I arrived, right

21   after that conversation, I ended up talking to one of

22   the officers.  He asked me some questions, wanted to see

23   my identification.  I explained I was the commanding

24   officer.  And then I believe I made my way up to T-1,

25   left my truck down there but walked up.

1    Q.  At that first couple of minutes, what's your

2  primary mission, concern about your mission at that

3  time?

4    A.  Well, so I was concerned primarily about two

5  things.  One was security.  So we have had people that

6  have been shot.  I don't have any details.  I have

7  police there.  But safety of the crew.

8        And then we have a mission.  We support aircraft

9  flying and we -- the two big concerns I had were

10  aircraft that we support.  They are out doing missions.

11  We maintain their radio guard.  And then we maintain the

12  search and rescue guard for Northern Pacific and Bering

13  Sea.

14        So wanted to make sure that we were still doing

15  our job, and, if not, that we had shifted that job to

16  someone else who could do it for us.  Those were the two

17  things on my mind.

18    Q.  The two men who were murdered that day, who were

19  they?

20    A.  Jim Hopkins and Rich Belisle.

21    Q.  Did you have occasion to submit something to the

22  Coast Guard Alaska with respect to Mr. Hopkins?

23    A.  Yes.

24    Q.  Explain to the jury what that was and what it was

25  for.

     A.   Okay.   Jim Hopkins was recognized as our sailor
of the year for 2011.   So in January of 2012, he was the
sailor of the year for our unit and we nominated him to
the overall Alaska Coast Guard command.

          All the units would send their sailors of the
year, which is equivalent to employee of the year that
you might do at your own place of employment, and then
he would complete at that level.   At then at the
national level eventually there are some significant
rewards for being recognized at the national level.   He
was recognized by our unit as a high performing,
dedicated member of the crew.

     Q.   Did you put your name to that application, to
that nomination?

     A.   Yes, I signed it.

     Q.   Okay.   As commander of the Coast Guard
Communication Station Kodiak, did you have to take a
role that day in notifying anybody about the deaths of
Mr. Belisle and Mr. Hopkins?

     A.   Yes.   I had to notify both wives that they had
lost their husbands.

          MR. SKROCKI:   That's all I have.   Thank you,
sir.

          THE COURT:   Mr. Colbath, go ahead, please.
                         CROSS EXAMINATION

BY MR. COLBATH:

Q.  Mr. Van Ness, Mr. Hopkins was the COMMSTA -- your command, your unit's employee of the year 2011 then?

A.  Correct.

Q.  And then he competed with the others at the general base but didn't go on to that national level, he remained your COMMSTA employee of the year as I understand it?

A.  Not exactly.  So the Coast Guard command for Alaska for District 17 is in Juneau, and so all of the subordinate commands that work for that command in Juneau would submit.

Q.  And he was your submission?

A.  He was our nomination, yes.

Q.  And then one sailor, not Mr. Hopkins, was picked for the greater Coast Guard to go on to the nationals?

A.  Yes, that's correct.

Q.  Okay.  Now, when you arrived in 2009 at the COMMSTA, from an antenna standpoint, you understood Jim Wells to be sort of the go-to guy on antennas and antenna maintenance, construction, those kind of things?

A.  That's correct, he was our subject matter expert.

Q.  And that was part of -- you probably acquired that information as part of that sort of pre-takeover briefing where you learned about the different roles and

1  the different folks?

2      A.  Absolutely, yes.

3      Q.  Was it also during that time that you had learned

4  Mr. Wells had been both 20 years military active duty

5  like yourself and then additionally in a civilian

6  capacity for 20 or more years?

7      A.  Yes.  That's correct.  I'm not sure I knew the

8  exact number of years, but I was aware that he had been

9  active duty, retired, and then had been with the Coast

10 Guard as a civilian for quite a long time.

11     Q.  The Coast Guard had, as it were under your

12 command -- well, for each of the places you commanded

13 I'm sure -- but lots of rules and regulations and

14 policies?

15     A.  Yes.

16     Q.  As the commander then within COMMSTA, you were

17 required to or ultimately responsible for making sure

18 that those were complied with?

19     A.  That's correct.  Yes.

20     Q.  And one of the rules for COMMSTA -- now, COMMSTA

21 was separate and apart from the main base Kodiak?  You

22 were your own command and your own section over at T-1

23 and T-2?

24     A.  Yes, that's correct.

25     Q.  Did you adopt though or were there already in

place general regulations that applied not only to the
base as well as to COMMSTA?

A.  So as the Communication Station my superior
command, by boss was actually in California.  I did not
work for the base.  However, it was good practice to
follow many of the rules that the base established, the
policies the base established, to have consistent policy
on the island.

Q.  One of the consistent policies you had at COMMSTA
from main base was to not permit personal firearms at
COMMSTA?

A.  Not permit -- yes.  So it's Kodiak, and it's not
Virginia, it's not Washington, DC.  So I had to be
realistic about that.  But my expectation was that you
would not have a firearm at work.

If you drive a truck and it was in your truck and
it's locked up and it's parked at T-2, that's fine.  T-1
was a secure area with a secure fence.  We didn't bring
weapons into T-1.  That was the general expectation I
set.  And certainly not in the buildings.

Q.  So the rules, at a minimum, the rules were no
firearms in the buildings?

A.  That's correct.

Q.  Personal or otherwise.  There were only probably
authorized law enforcement folks that could rightfully

1   have a gun?

2      A.   Correct.

3      Q.   And were you aware that employees were bringing

4   guns into the T-2 rigger shop?

5      A.   I am now based on prior proceedings, but I was

6   not aware at the time, no.

7      Q.   Based on -- during the investigation of this case

8   you learned that?

9      A.   Correct.

10     Q.   And were you aware that in fact maybe guns had

11  been sold between employees or others inside the rigger

12  shop?

13     A.   No.  In fact, that's the first time I've heard

14  that.

15     Q.   That certainly would have been a violation as

16  well and would have been a problem had it been brought

17  to your attention?

18     A.   The possession of firearms in the workshop, yes.

19     Q.   I want to ask you first a little bit about

20  April 12th, the video that you just saw.  It sounds like

21  coincidentally that had started out as a day where you

22  weren't going to be at work?

23     A.   I had intended to go to work, but I was going by

24  the clinic first.

25     Q.   What were your normal hours?

1    A.  I usually arrived between 7:30 and 8:00, and left

2    around 4:00.

3    Q.  On this day, you didn't get there until 8:30.  I

4    didn't -- I was trying to watch the time on the video,

5    but it was sometime 8:20 to 8:30.

6    A.  I didn't see the time on the video and I honestly

7    don't remember at this point.

8    Q.  Suffice it to say you were late and not planning

9    to be there between 7:30 and 8:00, the normal time,

10   because of your detour to the clinic?

11   A.  Correct.

12   Q.  But the phone call and the news of the incident

13   at T-2 disrupted that and you made your way directly

14   there?

15   A.  Correct.

16   Q.  And this conversation -- well, at that point,

17   this was near the end of your command, not the

18   beginning, right?

19   A.  Yes.  This actually happened in the last three

20   months.

21   Q.  And you were aware that the civilian employees at

22   the rigger shop, Mr. Wells, Mr. Belisle, they had

23   different hours than the Coast Guard, they actually

24   started their workday generally at 7:00?

25   A.  Yes.

1    Q.  And so when you approached Scott Reckner and Mr.

2  Wells was there and got out of his truck, his first

3  reaction when Mr. Reckner told -- in your presence, told

4  you -- was he telling you that the men had been shot or

5  was he telling Mr. Wells that the men had been shot, or

6  was he just sort of saying it, if you recall?

7    A.  He said it as I put my hand on his shoulder.  It

8  appeared that he was talking to me.

9    Q.  But Mr. Wells was close enough to also hear

10 apparently that conversation?

11   A.  I don't think Mr. Wells had gotten out of the car

12 yet, but I honestly don't remember.

13   Q.  Then when Mr. Wells walked up, did Mr. Reckner

14 say that again to Mr. Wells or did you relay that

15 information to Mr. Wells, do you remember?

16   A.  I don't remember specifically, but having said

17 that, it would make sense that we were all three

18 standing there when that conversation took place.

19   Q.  Because you heard Mr. Wells' first reaction was,

20 I think you said something along the lines of, "Oh, my

21 goodness," or, "Oh, God," or that was the first thing he

22 said?

23   A.  Yes.

24   Q.  Then he said, "I had a flat tire."

25   A.  Yes.

1    Q.  He should have been at work at 7:00 that morning

2    and here it is 8:30 and he's just gotten out of his

3    truck?

4    A.  If that was the time, yes.

5    Q.  It's long after 7:00?

6    A.  I don't know the time, but yes.

7    Q.  Okay.  Let's back up from that, back up from

8    April 12th and talk about this fuel card incident.

9         First of all, you said you were advised about

10   some tree collaring.  That wasn't anything that you got

11   into any investigative level or anything, you had just

12   heard of a practice called tree collaring that had went

13   on?

14   A.  Correct.  I was advised, as the commanding

15   officer, it was a concern, it had been addressed and

16   they just wanted me to be aware of it.

17   Q.  It was no more than informational to you?  You

18   were satisfied if it had been addressed it was fine?

19   A.  Yes.

20   Q.  By addressed, you certainly didn't understand

21   that any disciplinary actions had been taken or things

22   like that?  The practice had been discussed and

23   terminated, or did you even know to that level?

24   A.  I honestly -- I don't remember if we even

25   discussed if any disciplinary action had been taken.

1    Q.  It's nothing today certainly that stands out in

2  your mind, even looking back at the significance of

3  this?

4    A.  It was an issue that my leadership that

5  supervised that shop advised me there was a problem, we

6  addressed it, and that's what they told me.

7    Q.  Sure.  So this issue with the fuel card, that did

8  result in you deciding to issue this letter of caution

9  to Mr. Wells?

10    A.  Correct.

11    Q.  And you drafted that letter?

12    A.  Well, normally that type of letter there would be

13  an investigative report drafted by whoever was assigned

14  to gather the facts.  That would be turned into a letter

15  of caution, but between my XO and the civilian support,

16  civilian management folks on the base, and then given to

17  me.

18        And then I would likely do some minor edits to

19  put it in what I felt was more my approach, my voice.

20  So I wouldn't be the primary drafter, but I would

21  definitely have influence on what it said.

22    Q.  Not the primary drafter, but certainly the last

23  word on the subject?

24    A.  Yes, I signed it.

25    Q.  It was not a disciplinary action, it was a letter

1    of caution.  In fact -- and I can show you if you need

2    to refresh.  We have already got it in evidence.  It

3    said right in it, "This is not a disciplinary action,"

4    didn't it?

5        A.   That word "disciplinary" is based on several

6    levels of action that can be taken against civilian

7    employees of the government, of the Coast Guard.  So

8    there is disciplinary as we all think of disciplinary

9    how we might discipline our kids.  We wouldn't -- we

10   could say we spoke harshly to them and corrected them

11   and call it disciplinary.  There are very formal

12   definitions in Coast Guard civilian management for

13   different levels of addressing problems.

14       Q.   Sure.  Let's just pull up Exhibit 37, government

15   37.  Can we go to the second page.  If you want to do --

16   just highlight, yeah, six for me.

17            So can you just read that, Mr. Van Ness?

18       A.   "This letter is non-disciplinary and will not be

19   placed in your official personnel record.  However, it

20   will be retained in your supervisor's employee working

21   folder and may be relied upon if future action is

22   necessary."

23       Q.   And you can take that down, not the whole letter,

24   just that box.  And go to the second page for me, and

25   the one right above it.  Can you do number five?

1       Mr. Wells was told at this meeting by you that, I

2  guess, that this was a letter of caution.  I mean that

3  was one of the things he was told?

4     A.  Yes.

5     Q.  And certainly he was not advised that he was

6  being terminated or fired or anything like that?  In

7  fact, it was stressed to him that the desire was to keep

8  him on as a civilian employee?

9     A.  I told him something along the lines of, "I need

10  you to go back down to the rigger shop and do your job

11  and prove that you're a valued employee and I can trust

12  you."

13     Q.  And, in fact, you told him during the meeting

14  that he was a valued employee, but now he was going to

15  have to prove that or reprove that to you?

16     A.  I honestly don't know if I said those exact

17  words.  That was seven years ago.  I don't know.

18     Q.  And he was advised here if he needed -- had any

19  needs or counseling, anything like that, resources were

20  -- you were making resources available to him?

21     A.  Yes, that's a standard paragraph that's put in

22  every personnel action letter.  If this is a result of

23  some other issue, there is help available to you from

24  the Employee Assistance Program to get assistance.

25     Q.  You can take that down.

         And then ultimately there was a place for him to
sign the letter?

    A.   That's correct.

    Q.   I don't need that anymore.

         And when you gave this letter to Mr. Wells, fair
to say that his overall reaction was one of sadness?

    A.   Sadness, disappointment, yes.

    Q.   I think I saw that you -- well, you had described
it at one point as sort of he just slumped back in his
chair like a child that had been scolded or chastised?

    A.   I may have described it that way.

    Q.   Sort of like you just described in one of your
answers here just a few minutes ago about we all think
about disciplining our child or whatnot, and that's how
this seemed during that meeting as you watched
Mr. Wells?

    A.   Well, I would not say that having this
conversation with Mr. Wells was like disciplining one of
my children.  He was a respected subject matter expert
that I felt I had to hold accountable for something that
I did not think I would need to hold someone who had
almost 40 years of experience in the Coast Guard
accountable for.

    Q.   Right, but his reaction that you observed was he
sort of acted like a child being disciplined, or at

1 least that's how you described it before, right?

2    A.  Yes.

3    Q.  And when at first he didn't sign the letter, he

4 was -- you had put it across the glass table to him and

5 asked him to sign it, and he just sat there staring at

6 it.  He didn't sign it.  There was discussion but there

7 was a long period where he just wasn't going to sign it?

8    A.  Correct.

9    Q.  When you stood up, the other gentlemen in the

10 room stood up.  Mr. Wells still hadn't signed the

11 letter, so he didn't stand up, did he?

12    A.  So normally in any meeting with the commanding

13 officer, when the commanding officer stands, that's the

14 signal that's the end of the meeting, people stand and

15 leave.  He sat at the table while the rest of my folks

16 got up and started to leave the room.

17    Q.  And they in fact left the room?

18    A.  Yes.

19    Q.  But Mr. Wells didn't leave the room?

20    A.  Correct.

21    Q.  And so you sat back down with him?

22    A.  I honestly don't remember whether I sat down or

23 remained standing.  I don't know.

24    Q.  I heard you say that more conversation went on,

25 and as that more conversation went on, then Mr. Wells

1  signed the letter, slid it back over to you?

2      A.  Correct.

3      Q.  After that -- well, the date on that letter was

4  February 24, 2012, do you recall that?

5      A.  I don't.  I can look at it, but that sounds about

6  right.

7      Q.  Okay.  And Mr. Wells signed it the day you gave

8  it to him, it was within that meeting.  If that's the

9  date it was signed, that's the date of the meeting?

10     A.  Yes.  I would have to look at it to make sure

11 those are the dates.

12     Q.  Just pull it up real quick to make sure I'm not

13 wrong.  That certainly happens.  There we go.  Page two.

14 24 February '12?

15     A.  The first page would have the date that I signed

16 it.

17     Q.  Okay.

18     A.  I actually signed it January 4th.

19     Q.  But my question was -- go to page two.  24

20 February '12, the date Mr. Wells signed it would have

21 also been the date of the meeting?

22     A.  That's correct, yes.

23     Q.  Thank you.

24         So after the -- well, prior to that meeting, Mr.

25 Wells had been out for a considerable period of time

1    sick, right?

2        A.  Yes, that's correct.

3        Q.  And so that's probably in part the reason why you

4    signed in early January and he signed in late February?

5        A.  Yes.  I had also been doing some traveling, so it

6    was a matter of syncing our two schedules.  And I wanted

7    to address it personally with him, so it took some time

8    to get to that point where we could both sit down.

9        Q.  Sure.  Were you aware that actually 24

10   February 2012, that was the first day he had been back

11   from a medical leave where he had had surgery?

12       A.  I knew he was on medical leave and I know he had

13   surgery.  Whether that was the exact day, I don't

14   remember at this point, but, yes, he was out on medical

15   leave.

16       Q.  Prior to that time, your travel and his being

17   gone for quite a bit, Mr. Wells had, during your period

18   of command, come up and talked to you about various

19   different issues, at least occasionally, and had some

20   communications with you?

21       A.  Yes.

22       Q.  After February 24th, this meeting, this letter,

23   really until the day of the homicides, April 12th, when

24   Mr. Wells wasn't back at the command or at the shop

25   after that, in that window, he stopped coming up to see

1  you, didn't he?

2      A.  I'll be honest, I just don't remember.  I don't

3  know whether I sat down and talked between February 24th

4  and when the murders took place.

5      Q.  Nothing stands out as you sit here today in your

6  memory?

7      A.  No.

8      Q.  Now, although you wanted to address it personally

9  with Mr. Wells, it sounds like it's fair to say that you

10  certainly had bigger problems in the unit than this

11  issue with Mr. Wells that had the February 24th meeting?

12      A.  What do you mean by bigger problems?

13      Q.  Well, you had more significant personnel issues

14  or had had?

15          MR. SKROCKI:  Objection as to vagueness.

16          THE COURT:  That's sustained.

17  BY MR. COLBATH:

18      Q.  Well, let's talk about the issues with William

19  Reed and Ray Fillion.  Mr. Skrocki asked you about that?

20      A.  Yes.

21      Q.  The time period that that went on, the behaviors

22  that led to your addressing that situation as you

23  described, those were certainly, from a command issue,

24  more significant than this issue with Mr. Wells, the

25  civilian employee from the rigger shop?

1      A.   No, I don't agree.   May I elaborate?

2           THE COURT:   Mr. Skrocki may give you an

3  opportunity.

4  BY MR. COLBATH:

5      Q.   First of all, sir, I think you were here before

6  and testified at a previous hearing that we had, right?

7      A.   Yes, that's correct.

8      Q.   Okay.   Let me just see if we have -- do we have a

9  transcript by chance?

10          Sir, you have characterized this matter with Mr.

11 Wells, this meeting and fuel card incident as pretty

12 minor, correct?

13     A.   No, that's not correct.   It was theft.   It was

14 improper.   It was buying fuel for a personal vehicle.

15          MR. COLBATH:   Your Honor, I'm going to ask that

16 this witness -- that answer be stricken as nonresponsive

17 as well as beyond the scope of our -- or in violation of

18 the Court's order.

19          THE COURT:   In any event, what I will do is

20 strike that now and before redirect we can have a

21 sidebar and address these topics.

22          MR. COLBATH:   Okay.   Thank you.

23          THE COURT:   You can be heard on it in due

24 course.   I'm striking it now, but we'll take it up in

25 the redirect as warranted.

1          MR. SKROCKI:  Yes, Your Honor.  Thank you.

2          MR. COLBATH:  Your Honor, I would like to -- I

3     believe I can conclude with Mr. Van Ness, but I do want

4     to show him a portion of his transcript that I don't

5     believe -- that I need just a moment to make a copy of,

6     I think.

7          THE COURT:  That's fine.

8          MR. COLBATH:  Could we just take a brief break?

9          THE COURT:  Like five minutes?

10         MR. COLBATH:  I can try to accomplish it in

11    five minutes.

12         THE COURT:  Let's take about five minutes.

13    Please leave your notepads here.  Remember my admonition

14    not to discuss the case.  And we'll come back and we'll

15    conclude by 5:00.

16         (Recessed from 4:36 p.m. to 4:44 p.m.)

17         (Jury present)

18         DEPUTY CLERK:  Court is in session.

19         THE COURT:  All right.  Please be seated,

20    everyone.

21         And ready to proceed, Mr. Colbath?

22         MR. COLBATH:  I am, Your Honor.  Thank you for

23    allowing me to take that break.

24    BY MR. COLBATH:

25      Q.  Sir, rather than go back and try to find these

1    things or whatnot, I think I can expedite us here

2    because we are almost at the end of the day.

3         I'm going to show you what's been marked as

4    Defense Exhibit No. 117.  And sir, just for -- I'll ask

5    you if you will review that and see if you're familiar

6    with that.

7         A.  I can't read that.

8         Q.  Let's see if we can't somehow highlight it or

9    make it more -- yeah, that's good.

10        A.  I can manage that.  That's fine.  Okay.

11        Q.  Sir, are you familiar with that document?

12        A.  Yes.

13        Q.  Mr. Skrocki mentioned in his original questioning

14   of you an individual named Raymond Fillion.  Does this

15   document relate to Mr. Fillion and it's from a timeframe

16   during while he was under your command?

17        A.  Correct.

18        Q.  Is this a document that you would have put

19   together with your executive officer and other members

20   underneath the command to address that situation that

21   you described on direct examination?

22        A.  Yes, correct.

23             MR. COLBATH:  Your Honor, I'm going to move the

24   admission of 117, Defense Exhibit No. 117.

25             MR. SKROCKI:  Voir dire the witness.

 1          THE COURT:  Yes.

 2          MR. SKROCKI:  Captain, is this thing signed?

 3          THE WITNESS:  It's not.

 4          MR. SKROCKI:  There is another blank above that

 5   for a contact point.  That's not filled in either, is

 6   it?

 7          THE WITNESS:  This looks like it's probably a

 8   draft.  It's not signed.

 9          MR. SKROCKI:  It's not really an official

10   document because it's not signed by you, is it?

11          THE WITNESS:  No, it is not.

12          MR. SKROCKI:  It's not signed by Mr. Fillion,

13   is it?

14          THE WITNESS:  No, it is not.

15          MR. SKROCKI:  Objection.

16          THE COURT:  That's sustained.

17   BY MR. COLBATH:

18      Q.  Mr. Van Ness, was a final draft of this ever

19   prepared?

20      A.  Yes.

21      Q.  And did you sign the final draft?

22      A.  I did.

23      Q.  Was it presented to Mr. Fillion?

24      A.  It was.

25      Q.  And was it -- he received it and was he asked to

1  sign it?

2      A.  Yes.

3      Q.  Did he?

4      A.  I believe so, yes.

5      Q.  Okay.  And you have reviewed this one, the one we

6  have here, 117?

7      A.  Yes.

8      Q.  Was anything changed before you signed that?

9      A.  I can't answer that.  I can tell you the general

10  message is the same, but can't tell you seven years

11  later whether it's exactly the same.

12      Q.  Sure.  Certainly a draft would have been

13  something -- well, this also would have been something

14  kept in the file or kept as a record, we have it here,

15  although certainly we couldn't tell if this was the

16  version presented to Mr. Fillion?

17      A.  Correct.  This is not the official record.  It's

18  not signed.

19      Q.  But it does contain a draft of the message that

20  you ultimately conveyed to Mr. Fillion?

21      A.  Yes.

22          MR. COLBATH:  Your Honor, I'm going to move it

23  again and/or ask to approach.

24          THE COURT:  All right.  You can approach here

25  and we'll take that up.

1          (Begin bench conference.)

2          MR. SKROCKI:  Just conferring with colleagues

3     about --

4          THE COURT:  Do we have a signed version?

5          MR. SKROCKI:  That's what I was conferring

6     about.  We are pretty sure we discovered the signed

7     version.  I mean if he wants to inquire --

8          MR. CAMIEL:  If we had a signed one that's what

9     we --

10         MR. COLBATH:  The one that I have there is the

11    Bates stamped only one that I got.  That's the one I

12    received as part of the *Henthorn* material.  To my

13    knowledge, that's all I have ever seen.  I certainly

14    wouldn't have offered an unsigned one.

15         THE COURT:  Right.  Can we have this witness

16    come back in the morning and take up that issue?

17         MR. COLBATH:  I know he's trying to leave.  I'm

18    going to introduce this and confirm that he signed it.

19    I have the one from Mr. Reed.  I'm basically going to do

20    the same and I'm done.

21         MR. SKROCKI:  We conferred with --

22         THE COURT:  How about if this is admitted.  Can

23    the parties stipulate now if the signed one is presented

24    that it's replaced?

25         MR. SKROCKI:  Yes, let's do that.  Let's just

1    do that and avoid the issue.

2            THE COURT:  Yours is admitted, and if the

3    government can find the signed version, then I can take

4    up an application to put the signed one in place of the

5    unsigned.

6            MR. COLBATH:  That's fine with me.

7            MR. SKROCKI:  While we're here, do you want to

8    the talk about the fuel card?

9            THE COURT:  Yes.  The letter is inconclusive.

10           MR. SKROCKI:  Yeah.  His answer was cut off and

11   he --

12           THE COURT:  What would you seek to ask him?

13           MR. SKROCKI:  Leading that Mr. Colbath asked

14   you questions about whether this was minor or not.  What

15   would your response be, and that would be totally fair.

16   The letter was inconclusive as to Mr. Wells using the

17   card.  Was this a significant infraction as far as were

18   you concerned as the commanding officer.

19           THE COURT:  By someone?

20           MR. SKROCKI:  By someone.

21           THE COURT:  It seems to me the best way to go

22   forward, and you could confer with him privately if need

23   be, is, yes, it's fair to say that occurred, but he

24   couldn't conclusively say Mr. Wells committed petty

25   theft of government property.

     1          MR. SKROCKI:  We have already gone over this

     2     part anyway.

     3          THE COURT:  So okay with that?

     4          MR. COLBATH:  Well, I'm not okay with it, Your

     5     Honor, to the extent that I asked him is it fair to say

     6     this was a minor thing, and he said no and he started to

     7     give an additional answer.  And I said, "Hold on a

     8     minute.  Did you say," and that's where we got broke

     9     down with the transcript.

    10          I said, "I'll just cut to the chase and move

    11     on."  So I certainly did not belabor it or go any more

    12     into it than that.  He did answer the question I asked.

    13     I agree he didn't give the additional explanation.  I

    14     don't know how much time Mr. Skrocki plans to further

    15     inquire.

    16          MR. SKROCKI:  Just what I said.  I believe his

    17     answer was cut off and I think the questioning was

    18     marginalizing the impact of that letter of caution and

    19     he had a fair response to it.

    20          THE COURT:  I'll allow the response in the

    21     manner I articulated, which was his answer was it was a

    22     serious issue to him, but he couldn't conclusively say

    23     it was Mr. Wells.

    24          MR. SKROCKI:  I have to write that down but

    25     yes, I will do that.

1          (End bench conference.)

2          THE COURT:  All right.  Mr. Colbath, go ahead,

3    please.

4          MR. COLBATH:  Thank you, Your Honor.  I'm going

5    to offer, at least for now until I can find a signed

6    one, I'm going to reoffer Exhibit No. 117 and try to

7    work with this one.

8          MR. SKROCKI:  Our objections are noted.

9          THE COURT:  I will admit it.  I think there is

10   going to be an effort made to try to find the signed

11   version.  I'll admit this one which is defense Exhibit

12   No. 117.  I will admit, and then if it's amended, we'll

13   bring that to your attention, ladies and gentlemen.  Go

14   ahead, please, Mr. Colbath.

15          (Defense Exhibit No. 117 admitted.)

16   BY MR. COLBATH:

17     Q.  If you could just highlight that top starting

18   with the date there, that paragraph.

19          And do you know ultimately from a timeframe

20   standpoint -- well, first of all, is the date

21   February -- 8 February 2012 when this was drafted?

22     A.  That would make sense, yes.  I'm not sure that's

23   the date I signed it.  That date would be updated

24   whenever I signed it, but it's roughly correct, yes.

25     Q.  And just read maybe those first two sentences.

1    A.  "Your workplace conduct and personal behavior

2  continue to fail to meet my expectations and Coast Guard

3  standards.  Your behavior on 6 February was

4  unacceptable."

5          THE COURT:  Mr. Colbath, we have five minutes

6  here to conclude.

7          MR. COLBATH:  Yes, Your Honor, I understand.

8  BY MR. COLBATH:

9    Q.  And just the next sentence?

10   A.  "Blatant insubordination and disrespect by

11  screaming and swearing at the engineering department

12  head, including slamming your door repeatedly, is not

13  appropriate for any member of my crew and particularly

14  disturbing from a senior chief petty officer."

15   Q.  So you addressed -- the incident that you're

16  addressing was 6 February and this was drafted probably

17  8 February, a couple of days later?

18   A.  Yes.

19   Q.  Then would it have been presented to Mr. Fillion

20  fairly shortly after that?

21   A.  I don't remember the exact date, but, yes, within

22  a reasonable timeframe, and I directly one on one

23  addressed it with him.

24   Q.  Defense exhibit, if you could show just the

25  witness for foundation, Defense Exhibit No. 116.  Blow

1    that up so that it's less fuzzy, if you would.

2         I'll ask you if this is one you recognize?

3    A.   Yes, I recognize this one.

4    Q.   Okay.  That one is signed?

5    A.   Yes.

6    Q.   With your signature?

7    A.   Yes.

8    Q.   And like the last documents we have seen was it

9    either drafted by you or with your executive officer and

10   others but ultimately approved by you and your

11   signature?

12   A.   Yes, finalized and signed by me.

13   Q.   This one relates to not Mr. Fillion, but the

14   other person you individually spoke of, William Reed?

15   A.   Correct.

16        MR. COLBATH:  I'll move 116, Your Honor.

17        MR. SKROCKI:  No objection.

18        THE COURT:  116 is admitted.

19        (Defense Exhibit No. 116 admitted.)

20   BY MR. COLBATH:

21   Q.   Again, can we have that first paragraph?

22        And the date on this one is what, sir?

23   A.   9 February.

24   Q.   And if I can go down to the middle paragraph

25   where it -- well, or the middle of the paragraph or

1    roughly the middle where it starts with "unprofessional

2    behavior."  Can you read that sentence for me?

3        A.  "Unprofessional behavior, poor attitudes,

4    lethargy and inadequate teamwork have a negative impact

5    on the unit."

6        Q.  Then the next sentence?

7        A.  "Feedback to the command master chief, HSWLS,"

8    which is health, safety, work-life staff, "and medical

9    staff indicates your department has symptoms of a

10   hostile, high stress and unproductive work environment."

11       Q.  The health, safety, work-life staff and medical

12   staff, those would have been entities that were located

13   on the main base outside of COMMSTA?

14       A.  Correct, not medical, but yes.

15       Q.  You can take that down.  Thank you.

16           Just highlight the bottom there.

17           Can we tell from the bottom, sir, when this was

18   presented to Mr. Reed?  Now, you presented this one to

19   him directly as well?  You had the conversation?

20       A.  Yes.

21       Q.  And can we tell from that when it was presented?

22       A.  No, unfortunately we can't.  It wasn't dated, but

23   right before that colon there would normally be a date.

24   He signed it, but my recollection is I signed it and had

25   him come in and talk to me, so it was the same day, so

1  it should be the same date as my signature.

2      Q.  Let's put that down.  And that date -- so

3  February 9th, fairly contemporaneous and a day after the

4  one with Mr. Fillion?

5      A.  Correct.

6          MR. COLBATH:  Sir, that's all the questions I

7  have for you.  Thank you.

8          THE COURT:  Mr. Skrocki, go ahead, please.

9                    REDIRECT EXAMINATION

10 BY MR. SKROCKI:

11     Q.  Captain Van Ness, during the cross examination

12 Mr. Colbath described Mr. Wells as slumped in his chair,

13 child-like, disappointed type.  Do you recall those

14 questions?

15     A.  Yes.

16     Q.  During that meeting, did you tell Mr. Wells you

17 no longer trusted him?

18     A.  I believe the conversation was along the lines of

19 he asked me, "Does this mean you do not trust me," and I

20 said, "Yes, I do not trust you.  You need to prove to me

21 that I can trust you again."

22     Q.  You were asked some questions about the fuel card

23 and I want to be clear about that, that the letter of

24 caution to Mr. Wells did not conclusively prove that he

25 used the card, correct?

1      A.  So there is multiple levels --

2      Q.  Is that what the letter says?

3      A.  Could you repeat the question?

4      Q.  That the letter of caution to Mr. Wells did not

5 conclusively state that he took the card?

6      A.  Yes, that's correct.

7      Q.  Okay.  And you were asked some questions by

8 Mr. Colbath about the seriousness of Mr. Wells' conduct.

9 Do you consider theft a serious offense as the commander

10 of the COMMSTA?

11      A.  Yes.

12          MR. SKROCKI:  That's all I have for this

13 witness, Your Honor.

14          THE COURT:  Anything else, Mr. Colbath?

15          MR. COLBATH:  No.

16          THE COURT:  Thank you, sir.  You may be

17 released and excused.

18          (Witness excused)

19          THE COURT:  Ladies and gentlemen, I did confer

20 with the lawyers about the estimation of the length of

21 trial and was assured by both sides that the estimate I

22 gave you for up to five weeks remains accurate.  So they

23 are not looking at it being any longer than that.  I

24 thought I had word from Caroline you might seek that.

25          Counsel, 8:30 tomorrow can we have the jury, or

1  8:45?

2          MR. SKROCKI:  That would be great, Judge.

3          MR. COLBATH:  8:30.

4          THE COURT:  We're going to end at noon at the

5  latest tomorrow.  I do want to remind you all again,

6  because you will receive all the evidence and legal

7  instruction you properly may consider to return a

8  verdict here in the courtroom, do not read, watch or

9  listen to any news or media accounts or commentary about

10  the case or anything to do with it.  And do not do any

11  research such as consulting dictionaries, searching the

12  internet or using other reference materials.

13          And I wanted to remind you of that again, and

14  not to discuss the case with family or friends.  Leave

15  your notepads here.  And we'll see you tomorrow at 8:30.

16  Have a pleasant evening.

17          (Jury absent)

18          THE COURT:  All right.  Please be seated,

19  everyone.

20          And I wanted to tell you all that I was

21  informed that there was a call by somebody in the media,

22  and I don't even know who, to the court today, which is

23  why I gave the extra instruction.  I instructed the

24  staff to inform the person that was interested in the

25  proceedings how to get on to Pacer and left it at that.

1          So Mr. Skrocki -- oh, Mr. Skrocki, I was hoping

2   that when you are releasing people from the witness list

3   for the government that you inform the defense so that

4   we can get that squared away.  Are there any names that

5   you can indicate here today or do that tomorrow morning

6   in any event?

7          MR. SKROCKI:  We can do it right now.  We made

8   that decision last night.

9          THE COURT:  That's fine.

10          MR. SKROCKI:  Primarily because they were

11  redundant and didn't add more to the discussion.  So

12  it's going to be William Reed, who you just heard about.

13  David Pizzurro.  Steven Cartier.

14          And then we are not going to call in our case

15  in chief Mr. Morton.  You may recall him from pretrial

16  motion practice.  Maybe we'll save him for rebuttal, but

17  not in our case in chief.

18          Mr. Wyant, who you will recall from pretrial

19  motion practice, we are not calling him in case in chief

20  and may reserve for rebuttal.

21          THE COURT:  The others you're not planning on

22  calling at all?  At the current time, you're not

23  planning to call Mr. Cartier, Mr. Pizzurro or Mr. Reed?

24          MR. SKROCKI:  Correct.  That's five witnesses

25  off our list.

1          THE COURT:  Very good.  Mr. Colbath, any

2    questions on that?

3          MR. COLBATH:  No, I mean -- no.

4          THE COURT:  Anything else to take up?

5          MR. SKROCKI:  No, ma'am.

6          THE COURT:  Mr. Colbath, anything further from

7    the defense?

8          MR. COLBATH:  Not at this point.

9          THE COURT:  We'll see you all at 8:30 a.m.

10          DEPUTY CLERK:  All rise.  This matter is in

11    recess until tomorrow at 8:30 a.m.

12          (Recessed at 5:04 p.m.)

13

14                    CERTIFICATE

15     I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
16    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
17    original stenographic record in the above-entitled
     matter and that the transcript page format is in
18    conformance with the regulations of the Judicial
     Conference of the United States.
19
        Dated this 29th day of May, 2020.
20

21
                         /s/ Sonja L. Reeves
22                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
23

24

25