1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA

2

3  UNITED STATES OF AMERICA, )
                          )

4        Plaintiff,     )
                          )

5  vs.                )   CASE NO. 3:13-cr-00008-SLG
                          )

6  JAMES MICHAEL WELLS,    )
                          )

7        Defendant.     )
  _____)

8

9             TRANSCRIPT OF TRIAL BY JURY - DAY 10
    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**

10             September 20, 2019; 8:38 a.m.
                Anchorage, Alaska

11
  **FOR THE GOVERNMENT:**

12        Office of the United States Attorney
        BY:  STEVEN SKROCKI

13        BY:  CHRISTINA M. SHERMAN
        BY:  KELLEY L. STEVENS

14        222 West 7th Avenue, #9
        Anchorage, Alaska 99513

15        (907) 271-5071

16  **FOR THE DEFENDANT:**
        Office of the Federal Public Defender

17        BY:  GARY GEORGE COLBATH
        601 West 5th Avenue, Suite 800

18        Anchorage, Alaska 99501
        (907) 646-3400

19
        Camiel & Chaney, P.S.

20        BY:  PETER A. CAMIEL
        520 Pike Street, Suite 2500

21        Seattle, Washington 98101
        (206) 624-1551

22 _____

23              **SONJA L. REEVES, RMR-CRR**
           Federal Official Court Reporter

24            222 West 7th Avenue, #4
           Anchorage, Alaska 99513

25    Transcript Produced from the Stenographic Record

1                        I N D E X

2               September 20, 2019, Trial Day 10

3

4    Witnesses:          Direct    Cross    Redirect    Recross

5    Jacob Gerasimof         4       20         --          --

6    John Stein             38       52         74          75

7    Terrence Stein         78       --         --          --

8    James Encinas          81       89         --          --

9    Phillip Jordinelli     96      108         --          --

10   Troy Lowdermilk       116      122         --          --

11

12                E X H I B I T   I N D E X

13   Exhibit                                            Page

14   249          Ceremonial Award                       50

15   250          Japanese Sword with 19-Inch            50
16                Blade

     251          Japanese Sword with 29-Inch            50
17                Blade

18   257          Photo                                  11

19   DE-122       Photos of T-1 Camera Room              35
                  (First two slides only)
20
     DE-192       Limited Power of Attorney              72
21                Document

22   DE-232       Stein Affidavit Regarding Lost         68
                  Gun (first two pages only)
23
     DE-232A      Stein Affidavit Regarding Lost         77
24                Gun (Page 4 of DE-232)

25

1            (Call to Order of the Court at 8:38 a.m.)

2            (Jury present)

3            DEPUTY CLERK:  Court is again in session.

4            THE COURT:  Good morning, ladies and gentlemen.

5     Please be seated, everyone.

6            And I understand Mr. Skrocki is not present,

7     but you're ready to proceed.

8            MS. SHERMAN:  We are ready to proceed.  He'll

9     be here soon.

10           THE COURT:  All right.  Very good.

11           And ready to proceed, Mr. Colbath?

12           MR. COLBATH:  Yes, Your Honor.  Thank you.

13           THE COURT:  Your next witness?

14           MS. STEVENS:  Your Honor, the government calls

15    Jacob Gerasimof.

16           THE COURT:  All right.  Very good.

17           (Pause)

18           THE COURT:  Good morning.  If you could come

19    all the way forward.  When you get up there, sir, if you

20    would remain standing, the clerk will administer an oath

21    to you.

22           (Oath administered to the witness)

23           DEPUTY CLERK:  For the record, can you please

24    state your full name and then spell your full name.

25           THE WITNESS:  Jacob Scott Gerasimof.  It's

1  J-a-c-o-b.  Scott is S-c-o-t-t.  Gerasimof,

2  G-e-r-a-s-i-m-o-f.

3          THE COURT:  Thank you.  Go ahead, please.

4          MS. STEVENS:  Thank you, Your Honor.

5          JACOB GERASIMOF, GOVERNMENT WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MS. STEVENS:

8      Q.  Good morning, Mr. Gerasimof.

9      A.  Good morning.

10      Q.  Did I say that right?

11      A.  Yes.

12      Q.  Gerasimof?

13      A.  Yes.

14      Q.  Okay.  Are you currently employed anywhere?

15      A.  I am currently a pastor down in Homer, Alaska.

16      Q.  Okay.  And how many folks are in your

17  congregation?

18      A.  Between 40 and 45.

19      Q.  And how did you get down to -- to Homer, Alaska?

20  How did you become a pastor down there?

21      A.  Well, I did a career in the Coast Guard, retired

22  as a Coast Guard member and while I was in the Coast

23  Guard, I pursued education in theology, got a degree.

24  And just from there then I retired.  I was in

25  Philadelphia, Pennsylvania.  And just under the counsel

1  of my pastor there, just the Lord led me down to Homer,

2  and -- and that's where we ended up becoming a -- well,

3  I became a pastor and -- but a lot of it was through my

4  time in Alaska.  Fell in love with Alaska when I was

5  stationed in Kodiak, and it was a place where I desired

6  to go back to and serve in the ministry.

7      Q.  And when did you live in Kodiak?

8      A.  2010, June of 2010 through June of 2014.

9      Q.  Where were you assigned while you were there?

10     A.  Communications Station Kodiak.

11     Q.  And can you tell the members of the jury what job

12  you had while assigned there?

13     A.  I was a chief operations specialist, and while I

14  was there, I worked on the operation, in the operations

15  department as a communication watch officer.  And also,

16  I was a supervisor of a watch section.  So what that

17  entailed was when I was on watch, I was overseeing the

18  communications and the long-range communications for the

19  Bering Sea, Gulf of Alaska.

20         But also as the chief petty officer, had four or

21  five, six enlisted members in which I was their direct

22  supervisor.  So that's primarily what I did at

23  Communications Station Kodiak.

24     Q.  Okay.  You mentioned you were a chief supervising

25  some petty officers.  As a chief, what kind of role did

1   you play mentoring folks?

2       A.   Well, in Kodiak, a lot of the mentoring was you

3   get junior members.  At that point, you know, I was

4   midway through my career, a little bit further than

5   midway through my career.  You were getting a lot of

6   junior members that had just joined the Coast Guard.  A

7   lot of them were single.

8           So with Kodiak being at times a bit challenging

9   for a young person from the Lower 48, just, you know,

10  mentoring them and helping them get trained and

11  qualified and -- and really just adjusting to Kodiak and

12  the unit and just your regular leadership

13  responsibilities as a chief petty officer for the junior

14  enlisted members there.

15      Q.   Okay.  And you mentioned you were in the

16  operations section of the COMMSTA.  Can you briefly just

17  explain some of the other departments that comprised the

18  COMMSTA?

19      A.   Okay.  So operation, it's broken down.  You had

20  the operations department, which was the rate that I --

21  I was a part of is operation specialist, handling the

22  communications for Alaska, for the Coast Guard, which

23  was basically at that point was listening for distress

24  calls from mariners out on the water and also holding

25  radio guards for the air station aircraft and the boats

1    in Alaska.

2         You had the engineering department, which was

3    made up of electronic technicians who worked on our

4    equipment, our radios, our receivers.  And also made up

5    of IT personnel who worked on our computers.  And so

6    they were the technicians.  We were the operators.

7         And then you had the rigger shop, which was a

8    part of the engineering department, but was a subset

9    under there.  And it was made up of -- it was a small

10   group of personnel, some enlisted and civilians.  They

11   were located down in the rigger shop, which was separate

12   from the operation deck.  But -- but they worked on --

13   they were actually out in the field working on the

14   antennas and was one of their main functions there at

15   Communications Station Kodiak.

16   Q.  Did the folks down in T-2 spend a lot of time

17   interacting with the folks up in T-1?

18   A.  There was not -- as an operations specialist on

19   the ops deck, there was not a lot of interaction between

20   us and the rigger shop.  For the watch stander, my

21   interactions would be if something broke, there's people

22   that I would call and say, hey, this antenna is broke,

23   you know, and that would get the ball rolling as far as

24   them getting out there and fixing it.

25        And then also, the other interaction would have

1   been for if we had all hands or training unit, all hands

2   or training, you know, we would see them and we would be

3   a part of that, because it would be an all-unit thing.

4   But other than that, there wasn't a lot of interaction

5   between the folks on the operation deck and the folks

6   down at T-2 or the rigger shop.

7       Q.  You mentioned when things would break, you

8   would -- you would call them, particularly with the

9   antennas.  Did that include any cameras that were

10  located on towers or poles?

11      A.  Yes.  Yes.  We had -- there -- we had -- we

12  had -- from the operations deck, we had cameras, which

13  we could pan and look into the antenna fields and see

14  different antennas.  And so we had one in particular

15  which was rotatable which you could -- you could rotate

16  from the operation deck.  And there were times where you

17  would use the camera to see if it was broke.

18          So if the rotatable wasn't working, there's a

19  couple things that could have happened.  You know, the

20  wind could have knocked it over.  So you would span over

21  there and look at it to see if that would be the

22  situation.  So we had that ability.  So we would use the

23  camera to look into the antenna field for certain things

24  if -- if there was problems with any of the antennas.

25      Q.  Okay.  And would the folks from T-2 ever request

1   that you rotate cameras a certain direction to look at

2   the antennas?

3       A.  I'm just refreshing my memory back -- back to

4   that time.

5       Q.  Yeah.

6       A.  I mean, there was -- there was -- I can't imagine

7   that there wasn't times, but to pinpoint an exact time

8   where they would have done that, I'm not recalling a

9   specific time that that had happened, but it seems to

10  me, looking back on it, that it would be reasonable for

11  that to be the case.

12      Q.  And after you had -- after you would move the

13  camera to assess an antenna, what would you typically do

14  with it?

15      A.  We would move it back to the location, because

16  the cameras, the ones that could rotate, we had a pretty

17  set place where we wanted them, mainly for security

18  reasons.  And we had certain places, because the rigger

19  shop not being manned, and as the guy in charge of the

20  watch after hours, we had the ability to look down

21  there.  And so -- and on the road.

22          And so the practice was not to keep it out in the

23  antenna field, because it made no sense.  The practice

24  was to keep it on the road system and on the -- down

25  there at T-2.  For security reasons.

1     Q.  Can you explain, if you recall, to the jury which

2  particular camera looked down at the road leading up to

3  T-2?

4     A.  Yeah.  It was -- it was -- so with -- there was

5  one that was on a -- I think it was a pole it was on.

6  And it was right along the fence line and so T-1, the

7  operation deck, T-1, that building was enclosed within a

8  fence.  And kind of in the back there, there's a pole

9  and there was the -- the antenna would have been on that

10  pole.

11        But I can't remember if it would have been -- I

12  guess in my mind -- I can't say north/south, which --  I

13  think it was -- I would be guessing which corner it was

14  in, but it was on a pole and it would -- they could look

15  down towards the road and towards the bridge.  And at

16  the same time, it could then be moved to go and look at

17  that rotatable antenna or the antenna field.  Does that

18  help?  It's hard to --

19     Q.  So for foundation, do you recognize this picture

20  at all?

21     A.  Yeah.  Yep.  Yep.  That -- that refreshes the

22  memory.

23     Q.  Okay.  And is this an accurate depiction of

24  what's in this photograph as back in 2012?

25     A.  Yes.  Yes, ma'am.

1          MS. STEVENS:  Your Honor, we move to introduce

2     257.

3          THE COURT:  Any objection to 257?

4          MR. COLBATH:  No, Your Honor.

5          THE COURT:  All right.  257 is admitted.

6          (Exhibit No. 257 admitted.)

7     BY MS. STEVENS:

8     Q.  Let's briefly talk about some of the cameras on

9     this tower.  So there's two cameras right here?

10    A.  Uh-huh.

11    Q.  Were those cameras in use in 2012?

12    A.  I believe so.  I don't think those were the ones

13    that moved necessarily.

14    Q.  And then -- sorry.  Do you recall this camera?

15    A.  Yes.

16    Q.  Okay.  And do you remember the direction in which

17    this camera typically looked, the direction in which it

18    was facing?

19    A.  Yeah.  It was facing down to Anton Larsen Road

20    down towards the bridge.  And I can't -- down in that

21    general area, so you could see the road leading up to

22    the Communication Station.

23    Q.  We can take that down.

24         Do you recall as part of your duties in the

25    ops -- ops deck conducting rounds?

1     A.   Yes.  Yes, ma'am.

2     Q.   And can you explain to the members of the jury

3 just the morning round and the process for doing that?

4     A.   Yes.  So the morning round, so for example, I'll

5 just kind of run through how the round would go.  We --

6 you'd arrive as the communication watch officer, and the

7 first thing you would do coming to the Communication

8 Station would be to stop down at the T-2 building, the

9 rigger shop, and conduct a round of that building.

10          You'd go in, make sure the doors were secure,

11 make sure there was nothing out of the ordinary, mainly

12 security, but also looking at some of the equipment,

13 generators, different things like that, make sure

14 there's no leaks and everything was in working -- you

15 know, was -- nothing was disturbed.  So it was a basic

16 security round.  So you would check doors, and then you

17 would depart.  That would only take a few minutes.  You

18 would go through it.

19          And then you would at that point drive up to T-1,

20 the operation deck.  And also, that whole building, and

21 you'd do a round of that whole building and looking at

22 equipment, but also checking security, making sure doors

23 are shut and different things like that.  And then at

24 that point -- so those were the rounds that you would do

25 at that point.

1      Then you'd go on to the operations deck and begin

2  your pass down from the watchstander in which you were

3  about to relieve.  And that would consist of any things

4  going on at the building, but also any operational --

5  anything operational, whether you had radio guards,

6  whether there's a search and rescue case going on.  And

7  you would get that information.

8      And the round between T-2 and T-1 and getting

9  that brief would take anywhere between 20 to 30 minutes

10  of pass down, so...

11  Q.  And do you recall whether the watch times -- do

12  you remember what the watch time was on April 12, 2012?

13  A.  Yes.  7:00.  So typically -- yeah, typically you

14  would -- as the watchstander, you would show up a little

15  bit before then, do your rounds with the goal of having

16  your relief out of there about 7:15.  So 7:00 was the

17  time that you were shooting for.

18  Q.  And were you aware of any practices of others or

19  yourself where if folks were down at T-2, whether or not

20  a round would --

21      MR. COLBATH:  Your Honor --

22  Q.  I'll rephrase it.

23      Did you have any -- did you have any knowledge of

24  the practices of watchstanders with regard to conducting

25  the round down in T-1 in the morning?

 1             MR. COLBATH:  Your Honor, I'm going to object
 2    as to I guess calling for hearsay or a lack of
 3    foundation.
 4             THE COURT:  Well, I'll sustain as to foundation
 5    at this time.
 6    BY MS. STEVENS:
 7       Q.  Okay.  So you're familiar with the round down in
 8    T-1?
 9       A.  Yes.
10       Q.  And did other folks conduct that round as well?
11       A.  Yes.
12       Q.  It wasn't just you, right?
13       A.  Yes.  Yes, other watchstanders.
14       Q.  And were you aware of the practices either of
15    yourself or of others in conducting that round?
16             MR. COLBATH:  Your Honor, I'll continue to
17    object as to foundation and compound question, himself
18    and others.
19             THE COURT:  That's sustained.
20    BY MS. STEVENS:
21       Q.  Were you aware of others and how they conducted
22    that round?
23             MR. COLBATH:  Same foundational objection.
24             THE COURT:  Why don't we have a sidebar here.
25             (Begin bench conference.)

         1          THE COURT:  Mr. Colbath, as I understand it,
         2     the objection is foundation.
         3          MR. COLBATH:  Yes, Your Honor.
         4          THE COURT:  How do you plan to get -- it seems
         5     like the only way he would have this knowledge is
         6     through hearsay.
         7          MS. STEVENS:  So if he had observations of it,
         8     I guess I could ask him, did you ever observe people on
         9     the cameras.
        10          THE COURT:  That's a reasonable -- I don't
        11     imagine there would be an objection to that.
        12          MR. COLBATH:  If he's seen others do it?
        13          THE COURT:  Yes.
        14          MS. STEVENS:  That's why I asked observation,
        15     so --
        16          THE COURT:  Anyway, observations is fine.
        17          (End bench conference.)
        18     BY MS. STEVENS:
        19        Q.  So again, did you have the opportunity to observe
        20     others in conducting that round in the morning?
        21        A.  To observe others?
        22        Q.  Correct.
        23        A.  Physically see them?
        24        Q.  Right, like either in person or on the cameras?
        25        A.  Yes.

1    Q.   And did you observe whether or not -- let me ask

2  you this:   What do you observe some of the other

3  watchstanders do with regard to conducting that morning

4  round?

5    A.   So I -- the practice that I knew that was being

6  done was if someone was in the building in the morning,

7  there was not -- that the round would not get done.

8    Q.   And -- okay.  Thank you.  When you conducted the

9  round down there, did you ever observe any security

10  concerns in your time there?

11    A.   No.

12    Q.   Okay.  While standing watch, did you ever observe

13  individuals loitering around the T-2 building that

14  should not have been there?

15    A.   No.

16    Q.   You mentioned all hands.  Did those all hands

17  ever -- where did those all hands occur?

18    A.   A couple places.  Operations deck.  Sometimes

19  they would occur on the space outside the operation deck

20  where the electronic technicians' office space was.

21  So -- and sometimes in the basement.  So you had had

22  three different locations where all hands could be or

23  training was typically held during my time at the

24  COMMSTA.

25    Q.   When members of the command were inside the ops

1    deck for all hands, would the footage from the cameras

2    being sanitized or removed?

3        A.   No.

4        Q.   And do you recall what you were doing on the

5    morning of April 12, 2012?

6        A.   I do.

7        Q.   Can you walk the members through that morning?

8        A.   So that morning, I got up probably around 5:30, I

9    think it was.  Typically do my -- read the scriptures,

10   the word of God, drink some coffee, have breakfast, get

11   my kids up and going for the day.  They were little at

12   that time, five, six, seven, eight, somewhere around

13   there.  And so got them moving.

14          And that morning, I was -- so 5:30.  I went to

15   leave for work around 7:30.  And I live relatively close

16   to the Communication Station.  I live probably about

17   five minutes at most.  And when I went out to get in my

18   Jeep, I heard sirens going.

19          And it typically -- when I'd hear sirens, I could

20   tell if it was going up Anton Larsen Road.  You know, I

21   heard the sirens and I thought, well, I thought maybe it

22   was a fire alarm at the Communication Station, because

23   that had happened in the past.

24          Hopped in the Jeep, then kind of went up the road

25   and was behind the emergency vehicles.  Again, just

thinking, oh, there must be a fire alarm.  So I got

there and I saw the vehicles parked at the T-2 in the

driveway there.  I pulled up, parked my Jeep on the

little hill outside that parking lot.

And I -- I was the supervisor, the chief

supervisor for the watch section that was on that

morning.  And I saw Petty Officer Haselden, who I was

his direct supervisor, coming out of T-2.  And I had a

conversation with him about what he had -- what was

going on in the building.  And he didn't -- he mentioned

to me that --

MR. COLBATH:  Your Honor, I guess I'm going to

object as to hearsay at this point.

THE COURT:  That's sustained.

BY MS. STEVENS:

Q.  When you observed Petty Officer Haselden, how did

he appear?

A.  Upset.

Q.  Can you expand on that?

A.  I mean, he -- he was -- obviously, you could tell

something -- I mean initially, I could tell something

more than a fire alarm was going on.  And so he was

upset.  And -- and he then went on to explain to me what

was -- what he had saw when he went into the rigger

shop.

1    Q.   And after that encounter with Petty Officer

2  Haselden, what did you do next?

3    A.   At that time, I went ahead -- knowing the

4  situation, I went ahead and parked my Jeep up inside the

5  fenced area by T-1 and then came back down the hill to

6  the rigger shop and had more conversations with Petty

7  Officer Haselden.

8        And at that point I think we ended up going back

9  up into T-1 and -- with the idea of securing the

10  facility, shutting the gate, getting the count for

11  people.  And at that point I put him to -- not put him

12  to the side, but said, hey, I got the watch now.  Took

13  the watch floor for him.  Because he was -- because of

14  him being upset, he was not able -- it just seemed like

15  it was best for me to go ahead and take the watch from

16  him, because of his -- where he was at emotionally, I

17  guess.

18    Q.   Okay.  So after you took over the watch, do you

19  recall what you did next?

20    A.   You know, at that point, whether I did it before

21  or after, had them shut the gate.  Went and I talked to

22  certain petty officers and said, hey, get a count for

23  people so we know where everybody is at.  And then at

24  that point I went and made some phone calls, looking to

25  call Mr. Van Ness, the commanding officer of the

1  Communication Station.  And so that's what my next

2  actions were.

3      Q.  Did you end up calling him next?

4      A.  So when I made the first phone call, we have a

5  recall list, and at that point, Mr. Van Ness's -- and I

6  did not talk to him first because I accidentally

7  contacted Jim Wells and -- and had a short conversation

8  with him about -- about what was going on, but it was an

9  accidental dial as their names were next to each other

10 on the recall list.

11     Q.  And do you recall any part of that conversation?

12     A.  What I recall is him mentioning that he was late

13 and that he was going to be in, and I kind of briefly

14 explained -- I possibly, briefly explained what was

15 going on and then the short -- the phone call was short.

16 And I hung up.  But yeah, that was it.

17          MS. STEVENS:  Your Honor, I have no more

18 questions.

19          THE COURT:  All right.  Mr. Colbath, go ahead,

20 please.

21          MR. COLBATH:  Sure.  Thank you, Your Honor.

22                    CROSS EXAMINATION

23 BY MR. COLBATH:

24     Q.  Good morning, sir.

25     A.  Good morning, sir.

1    Q.  Just to continue right where you were there at

2  the end and then we'll back up a little bit.  When you

3  took over the watch, you said just before you were

4  making the calls yourself, you had tasked a petty

5  officer to get a count of individuals?

6    A.  Yes.

7    Q.  And was that Petty Officer O'Connor, do you

8  remember?

9    A.  It would -- he was the supervisor there

10  underneath -- when I say supervisor, it's not like he's

11  supervising the watch.  He's second in the chain of

12  command on the watch floor underneath Petty Officer

13  Haselden.  So he would have been one of them that --

14  that -- I don't think I specifically tasked him to get a

15  count for people, because he was on the watch floor.

16       What I would have tasked him with was to --

17  because we had a watch that continued to run, to make

18  sure the watchstanders are taken care of and that the

19  watch continues to go and not so much focus on the

20  situation of what was going down at the rigger shop.

21  That was something that I was taking the responsibility

22  for.  So -- so -- so just trying to manage the watch,

23  because we still had operational stuff going on.

24    Q.  Sure.  The -- the -- the taking count of people

25  was physically figuring out who was at the COMMSTA as

well as some of those other folks were going to call --
the folks below you were going to call people that
should be there if they can't be accounted for or try to
locate everybody, right?

A.  That's the goal, yes.

Q.  As for phone calls you personally were going to
do, that was just Commander Van Ness and probably the
XO?

A.  I recall it being Commander Van Ness.  I don't
recall whether I had spoken with -- it wouldn't have
been the XO, because the XO was already at the COMMSTA.

Q.  Okay.  All right.  Let's back up a little bit and
talk about some of these cameras that you -- that you
talked about.  Now, I want to ask you about the -- the
camera that -- I think it was 257.  You remember -- and
we don't need to show the picture again, but the picture
of the folks on the tower there?  That's the training
tower out in front of COMMSTA, right, right in front of
T-1?

A.  The training tower?

Q.  Right.  The picture we just showed you.

A.  Oh, for the rigger -- rigger shop?

Q.  Yeah.  Well, let's show that picture again.

A.  I wasn't a part of the rigger shop, so whether
that was a training -- a training tower or not, it's

1  something I don't necessarily recall.

2      Q.  Let's pull this up.  And that's okay.  I only

3  know that because that's what other people called it,

4  but that's not really my question.  My question is:

5  This camera here that you were asked about -- now, you

6  do know that this picture, this location is by the T-1

7  building, right?

8      A.  Yes.

9      Q.  And this camera could -- this is the camera I

10  have some questions about.  Okay?

11      A.  Yes.

12      Q.  And if I was standing on -- you can take that

13  down now.  So if we were standing on the steps at T-1 of

14  the COMMSTA.

15      A.  Yes.

16      Q.  Right?  So we're looking out at the -- we're

17  looking out at the parking lot and -- and where the cars

18  are parked.  You had talked about there was one antenna

19  that you used that camera for that you could pan out to

20  the antenna field and look at this rotatable

21  communications tower antenna to see how the thing was

22  rotating or if it might be broke, something like that?

23      A.  That's right.

24      Q.  If we were standing in front of the COMMSTA,

25  where would that rotatable antenna be?

1    A.  So if you come out the door, I mean it was up on

2    a hill and --

3    Q.  Right out in front of you, right?

4    A.  I can't recall exactly if it was right out in

5    front of me or if it was a little to the right of me,

6    but it was in that general direction.  It wasn't off to

7    the side or down by the road.  It was out in the antenna

8    field on the hill.

9    Q.  So that camera, and because it sat on that tower

10   right out in front of T-1, was the camera to use.  You

11   could -- instead of focused on the parking lot or the

12   roadway there, you just rotate it out to that antenna

13   field and you'd see that antenna somewhere out there?

14   A.  Yes.

15   Q.  Okay.  Can we pull up -- I got a note somewhere.

16   I think -- just pull up Government Exhibit 56.  Let me

17   see if that's right.  Okay.  Yeah.  Let's just -- that's

18   been admitted.

19        So, sir, I'm going to pull up a video.  I'm not

20   going to -- I don't need -- we don't need you to watch

21   the video.  I just want to show you this original

22   picture.  So does this appear to be, sir, to you a

23   camera view of where that camera we were just talking

24   about -- this is where it normally sits, right?

25   A.  Right.

1    Q.  Correct?

2    A.  Yes, sir.

3    Q.  Because you said it primarily was used for

4 security purposes and looking at the road, and it looks

5 to me like it's focused here pretty much on the gate.

6    A.  It is on the gate.

7    Q.  And then we see up here in the corner the water

8 treatment plant.  So out through the trees there is

9 Anton Larsen Bay, but here you can monitor the gate, the

10 parking lot.  We don't see the rigger shop though, do

11 we?

12    A.  No.

13    Q.  But it could be turned down towards the rigger

14 shop, I assume?

15    A.  If it -- I mean it's been -- been a while since I

16 operated these -- those cameras.  We had the capability

17 of -- of seeing the rigger shop.  We had cameras.  This

18 one in particular, I mean just going back to my memory

19 seven years -- you know, five years ago, I believe it

20 could be rotated -- rotated in that direction.

21    Q.  The view we just saw though was sort of the

22 primary spot, that was that center area?

23    A.  I feel like at times -- you know, I don't know if

24 I could zoom it out or not, but yeah, primarily there

25 for security.

1    Q.  Okay.  So you talked about the rounds that were

2    normally done.  If -- and we can have the lights if we

3    could.

4        The -- the practice for the rounds, watches ran

5    in 12-hour shifts?

6    A.  Yes, sir.

7    Q.  And when the oncoming shift came on at 7:00, the

8    goal you said was to get your relief out of there by

9    about 7:15, between 7:00 and 7:30?

10   A.  Yes.  Yes, sir.

11   Q.  And so -- as you were coming on, it was during

12   that time, 7:00 to 7:30 that your round was supposed to

13   be done so you could make sure everything was a go, and

14   then the person you relieved, they got out -- out of

15   there?

16   A.  It wasn't necessarily -- the practice for a lot

17   of the watchstanders was to come a little bit before

18   7:00 and conduct the round down at T-2, which would

19   then -- then you would come into T-1 and you'd do the

20   round in that building.  It wasn't that it started at

21   7:00.  It started a little bit before then typically.

22   Q.  Okay.

23   A.  So it would be more -- I -- you know, it would be

24   more 6:45 to 7:15, 7:20.  Just depending on how

25   operations and things were going on, it obviously could

1    take it down to 7:30.

2        Q.  So there's probably an arrival and a T-2 round

3    at, say, the middle of that, 7:00.  So somewhere a

4    little bit either side of 7:00, then up the hill to T-1,

5    do your round, check in with your replacement and off

6    the night shift goes?

7        A.  My practice was doing a round at T-2 before 7:00,

8    6:45, 6:50.

9        Q.  And you said that there was not -- not a lot of

10   interaction between you folks up on the ops deck and the

11   T-2 other than related to repairs?

12       A.  Primarily.

13       Q.  A group?

14       A.  I mean there's times repairs -- like I can recall

15   a couple times speaking to the riggers down there about

16   training, asking them to do some training for us,

17   different things like that.  But just like at any unit,

18   you know, you have the ones that you're working around

19   on a constant basis as operation specialists.  That's

20   who you're closest to.  So there wasn't a lot of

21   interaction, especially the fact they were down the

22   hill.

23       Q.  You don't recall there being an all hands meeting

24   on the operations deck on either April 11th, 2012, or

25   April 12th, 2012, do you?

1    A.  April 12th?

2    Q.  Or the day before?

3    A.  Well, I did not work on April 11th.

4    Q.  Okay.  Well, then I don't want you to tell me

5 about April 11th.

6       And certainly, the day of the incident here,

7 there wouldn't have been an all hands.  Everybody was

8 sent up to T-1 anyway to stage there while --

9    A.  Yeah, I mean it wasn't -- it was all hands in the

10 fact we were all there, but it wasn't our typical all

11 hands obviously.

12    Q.  Sure.  And it certainly wasn't all hands on the

13 operations deck.  There was business going on on the

14 operations deck?

15    A.  I believe that would be correct.

16    Q.  All right.  I want to show you defense Exhibit

17 No. 122 just for foundation and ask, sir, if you

18 recognize what that is.

19    A.  Yes.  That's a -- one of the work stations at

20 the -- the CWO desk, the communication watch officer

21 desk.

22    Q.  Would that have been a desk you manned or sat at

23 or worked at at times?

24    A.  Yes.

25    Q.  And so you're familiar with the equipment that's

1  pictured there generally?

2      A.  I'm familiar.  It's been five years, but yes.

3      Q.  Sure.

4          MR. COLBATH:  Your Honor, I'm going to move

5  defense 122.

6          MS. STEVENS:  Voir dire, please.

7          THE COURT:  All right.

8          MS. STEVENS:  Do you see the date down at the

9  bottom there?  It's kind of covered by a sticker, but do

10 you see that?

11         THE WITNESS:  Yes.  The October 4th, 2019.

12         MS. STEVENS:  And were you assigned down in the

13 ops deck on that date?

14         THE WITNESS:  No.

15         MS. STEVENS:  Wait.  That's not even happened

16 yet.  So fair to say you weren't there?

17         THE WITNESS:  I hope not.

18         MS. STEVENS:  Your Honor, we do have some --

19 does that actually reflect what it looked like in 2012,

20 not in the future?

21         THE WITNESS:  I mean, it looks pretty similar.

22         MS. STEVENS:  Okay.  Thanks.

23         THE COURT:  No objection?

24         MS. STEVENS:  No objection.

25         THE COURT:  All right.  Then I will admit

```
 1   defense -- what number was that?
 2           MR. COLBATH:  Your Honor, I apologize.  I am
 3   told that there is more than one page here, so I want
 4   him to --
 5           THE COURT:  Oh, all right.
 6           MR. COLBATH:  I thought it was just a singular
 7   picture.  Can you page to the next one to show him.
 8   BY MR. COLBATH:
 9   Q.  Do you recognize that, sir?
10   A.  Yes.
11   Q.  Okay.  And is that where from -- from the last
12   picture, where is that located?
13   A.  I believe it's --
14   Q.  Just to the left, to the right and front?
15   A.  That's to the right.
16   Q.  Okay.  And that's a -- that's a television screen
17   that depicts generally the camera monitor displays?
18   A.  That's correct.
19   Q.  Is there another picture, or is it just these
20   two?  That's the same screen?
21   A.  That's the same screen.
22   Q.  Okay.  And the next one.  Same screen?
23   A.  Yes.  Yes.
24   Q.  All right.
25           MR. COLBATH:  With that, Your Honor, I would --
```

1    I would move the admission of 122.

2            MS. STEVENS:  So we don't object to the first

3    one.  Can you go to the second one, please?  And then

4    just quick voir dire?

5            THE COURT:  Sure.  Go ahead.

6            MS. STEVENS:  Was that the screen as it was in

7    2012?  Do you remember?

8            THE WITNESS:  What do you mean the screen?  The

9    video feeds or that screen in particular?

10           MS. STEVENS:  Well, the video feeds.  Was it

11   the same back then?

12           THE WITNESS:  I mean that was -- that's exactly

13   right.  You could -- you could view multiple video feeds

14   on the screen.

15           MS. STEVENS:  On one screen?

16           THE WITNESS:  Yeah, that's right.

17           MS. STEVENS:  So Your Honor, we don't object to

18   the first and second photos.  We would object to the

19   remainder though.

20           THE COURT:  On what basis?

21           MS. STEVENS:  So my understanding is that the

22   remaining photos were from cameras that didn't exist at

23   the time.

24           MR. COLBATH:  I don't think -- go to the next

25   one, please.  That's the T-2 camera.  The next one.  T-2

1  camera.

2           THE COURT:  Well, all right.

3           MR. COLBATH:  They're all the T-2.

4           THE COURT:  Can you ask this witness what it

5  is?

6           MR. COLBATH:  Sure.

7  BY MR. COLBATH:

8     Q.  Sir, do you -- that one right there, do you

9  recognize that camera view?  Do you recognize the fence

10 in the foreground and the driveway?

11    A.  From the video feed, or do I recognize it as

12 that's --

13    Q.  From what you're looking at, the video feed, do

14 you recognize what that video feed is -- what camera

15 that would have been taken from?

16    A.  My memory on each video camera I would say is not

17 great.

18    Q.  Well, do you remember there being colors done

19 each morning?

20    A.  That's -- that's correct, yes.

21    Q.  And where were the colors done?

22    A.  At the flagpole.

23    Q.  Do you see the flagpole in this screen?

24    A.  Yes.  Yes, sir.

25    Q.  And does that help you identify which camera

1    this -- where was the flagpole located, in front of what

2    building?

3        A.   The rigger shop.

4        Q.   And so do you recognize where this camera view

5    may be from?

6        A.   Yeah.  I recognize it's from the rigger shop

7    and -- and I -- and so yes, I do recall being able to

8    see the flagpole from the camera down there.

9        Q.   Go to that next screen.  Next picture.

10            That's -- you see that same fence in the

11   foreground there?

12       A.   Yes.

13       Q.   So same camera?

14       A.   I believe so.

15       Q.   Okay.  Go to that next one.

16            Same?

17       A.   Whether it's the same camera or not, I don't

18   remember.

19       Q.   Back up one.

20            You see the fence in the foreground?

21       A.   Yep.

22       Q.   And the can right there?

23       A.   Uh-huh.

24       Q.   Okay.  Go to the next one.

25            It's just moved a little bit.  It's the same

1   camera, it's just panning, right?  All the cameras

2   panned and zoomed?

3       A.   I don't recall that.

4       Q.   Okay.

5       A.   Whether -- I'm pretty confident not every camera

6   had that function from our desk.

7       Q.   Sure.  Same camera though here?  You see that

8   same driveway and garbage can depicted?

9       A.   Yes, but I see that it moved or panned.  And

10  again, I don't recall whether -- I don't recall whether

11  that's something that we could have moved.  So whether

12  that's the same camera or not -- I mean I know it's the

13  same location, and it's looking relatively the same

14  place.  I can say yes for sure.  But like I said, again,

15  I don't recall whether you could move it or you could

16  zoom it out.

17      Q.   Just back up one.

18           MR. COLBATH:  Your Honor, I'm fine to limit it

19  to these first three screens.

20           THE COURT:  First three.  Any objection?

21           MS. STEVENS:  We're good with the first two.

22  We would still object to the one with the fence in it.

23  And if I can --

24           THE COURT:  Can I see the third one?  Is this

25  the third one?

```
 1          All right.  So what's the basis of the
 2   objection?
 3          MS. STEVENS:  So my understanding is that the
 4   camera system changed after the day of the murders.  And
 5   so whether this is the same camera system and captured
 6   the same area is -- he hasn't laid that foundation for
 7   that.
 8          THE COURT:  That's sustained as to the third.
 9   I'll allow in the first two.  If you can establish when
10   this was taken through this witness -- do you want to
11   take a break here, Mr. Colbath?
12          MR. COLBATH:  No, no, no.  That's fine, Your
13   Honor.
14          THE COURT:  The first two of defense 122 are
15   admitted.
16          (Exhibit No. 122 admitted.)
17          THE COURT:  The first two slides.
18   BY MR. COLBATH:
19     Q.  All right.  Can we back up?  One.  There we go.
20   All right.  Let's show that one.
21          So, sir, when you ran the camera system, you
22   would sit at a desk to do that and be able to both
23   monitor and move the cameras?
24     A.  Yes.
25     Q.  And did you have to log onto this system in order
```

1  to be able to move cameras?

2      A.  Yes.

3      Q.  And that was each individual had a log-on?

4      A.  I don't think so.

5      Q.  Okay.  So the people tasked with monitoring and

6  functioning the cameras had the log-on?

7      A.  The only time I can ever -- the only time you

8  would ever have to log on to the computer to manipulate

9  the cameras is if you shut it down, which very rarely

10 happened.  So it happened very infrequently, but like if

11 there was a power outage or you shut it down for

12 whatever reason, for some kind of maintenance and you

13 had to bring it back up, then you would have to

14 administer the password, so -- and it happened very

15 infrequently.

16     Q.  Sir, the morning you came into work, 4-12, as you

17 were following the emergency vehicles in up by Anton

18 Larsen Bay Road, you saw an individual standing along

19 the road, do you recall that?

20     A.  I do.

21     Q.  And about where was that person located along

22 Anton Larsen Bay?

23     A.  Across the street from the water treatment

24 facility.

25     Q.  Okay.  And was it a Coast Guard person that you

1    could identify?

2        A.   No.

3        Q.   It wasn't Jim Wells?  You knew at least what

4    Mr. Wells looked like at that time?

5        A.   I would -- the man that I saw was in some rain

6    gear.  I didn't look at him closely.

7        Q.   Okay.

8        A.   So he didn't appear to me to be a Coast Guard

9    personnel.

10       Q.   Okay.  Or anybody you recognized from the

11   COMMSTA?

12       A.   Again, I didn't -- I didn't really look at him

13   that closely, so -- but no.  I did not recognize him,

14   but I saw him wave.  I saw other folks at the water

15   treatment facility across the street that he was

16   walking -- like I saw vehicles over there and activity.

17           MR. COLBATH:  Then that's all I have for you,

18   sir.

19           THE COURT:  Redirect?

20           MS. STEVENS:  No, Your Honor.

21           THE COURT:  This person can be excused,

22   Mr. Colbath?

23           MR. COLBATH:  Yes.

24           THE COURT:  Then, sir, thank you.

25           (Witness excused)

```
1           THE COURT:  Your next witness.

2           MR. SKROCKI:  Yes, Your Honor.  We call John

3  Stein.

4           THE COURT:  All right.  Very good.

5           (Pause)

6           THE COURT:  Good morning, sir.  If you can come

7  all the way up here to the witness stand.  If you could

8  remain standing for a moment the clerk will administer

9  an oath to you.

10           (Oath administered to the witness)

11           DEPUTY CLERK:  For the record, can you please

12  state your full name and then spell your full name?

13           THE WITNESS:  John Stein, S-t-e-i-n.  First

14  name, John, J-o-h-n.

15           THE COURT:  Thank you, sir.

16           Go ahead, please, Mr. Skrocki.

17           MR. SKROCKI:  Thank you, Your Honor.

18            JOHN STEIN, GOVERNMENT WITNESS, SWORN

19                     DIRECT EXAMINATION

20  BY MR. SKROCKI:

21     Q.  Hello, Mr. Stein.  Good morning.  How are you

22  today, sir?

23     A.  Pretty good so far.

24     Q.  Okay.  Will you please tell the jury where you

25  live, Mr. Stein?
```

1    A.  I live in Tacoma, Washington.

2    Q.  And sir, how old are you?

3    A.  79.

4    Q.  Do you have any experience with the U.S. Coast

5  Guard in Kodiak, Alaska?

6    A.  Yes, sir.  I've been stationed there several

7  times.

8    Q.  And can you tell the jury when you were stationed

9  in Kodiak with the Coast Guard?

10    A.  Say the question again.

11    Q.  Sure.  Can you tell the jury when you were

12  stationed in Kodiak with the Coast Guard?

13    A.  I was stationed there several times starting in

14  1981 and a couple, two or three times.

15    Q.  And what positions did you hold with the Coast

16  Guard while you were in Kodiak?

17    A.  I was the electronics officer for the

18  Communication Station.

19    Q.  How long did you work at the Communication

20  Station, Mr. Stein?

21    A.  I was stationed there like twice or three times.

22  All together about five or six years.

23    Q.  And while you were there, did you know a Jim

24  Wells?

25    A.  Did I?

1    Q.  Did you know Jim Wells?

2    A.  Oh, yes.

3    Q.  Can you please tell the jury how you knew

4    Mr. Wells?

5    A.  He was the senior technician at our receiver

6    site.

7    Q.  And were you --

8         THE COURT:  Mr. Skrocki, I'm going to

9    interrupt.  If you wanted to ask the witness if he'd

10   like to try our hearing assistive devices, that's fine.

11        MR. SKROCKI:  Would that help you hear us

12   better?

13        THE COURT:  We have these devices that help

14   amplify the sound.  Would you like to try those?

15        THE WITNESS:  I have hearing aids.  They work

16   fine.

17        THE COURT:  Okay.  Very good.  Go right ahead.

18   BY MR. SKROCKI:

19   Q.  And were you Mr. Wells' supervisor?

20   A.  Yes, I was.

21   Q.  How long were you his supervisor?

22   A.  Three years.

23   Q.  And did you work with him daily?

24   A.  Pretty much, yeah.  He was a senior technician at

25   the receiver site.  We communicated pretty much daily.

1    Q.  And Mr. Stein, if I could have you grab the
2  microphone and just bring it a little close -- perfect.
3  Yeah.  There you go, sir.  Okay.  Thank you so much.
4        And so you worked with him daily.  Did he do good
5  work for you?
6    A.  Yeah, he did excellent work.  In fact, I wrote
7  him up for an achievement medal.
8    Q.  Are you a gun collector, sir?
9    A.  A what?
10   Q.  A gun collector?
11   A.  Yeah, I guess so.
12   Q.  Do you -- did you have a gun collection?
13   A.  Yes, uh-huh.
14   Q.  And do you still have a gun collection?
15   A.  Yes, I do.
16   Q.  Did you have that gun collection with you while
17 you were in Kodiak working for the Coast Guard?
18   A.  Yes, I did.
19   Q.  At some point in time, did you and Mr. Wells do
20 something with your gun collection?
21   A.  Yeah.  I left it with him for I think about a
22 year while I traveled.
23   Q.  And could you tell the jury about that, what you
24 left with him and what condition and where you left it
25 and what you left?  Just describe it.

1    A.   Well, we moved the gun collection into his house

2   in a gun safe.

3    Q.   Do you remember where in the house?

4    A.   Did I --

5    Q.   Do you remember where in the house you moved it,

6   where the gun safe was located in Mr. Wells' house?

7    A.   Did I know where it is, or what -- what was the

8   question?

9    Q.   Yeah.   Maybe I'm -- let me rephrase.

10    A.   We moved it into his house up on the second

11   floor.

12    Q.   Okay.   And how many guns were in the collection?

13    A.   You know, I really don't know.   25 maybe.

14    Q.   And you left it with Mr. Wells.   And did you

15   travel after that?

16    A.   Yes, uh-huh.

17    Q.   And did you have a home before you left for your

18   travels?

19    A.   I can't remember when I sold the house, but it

20   was up for sale I think when I left.

21    Q.   And did Jim and Nancy Wells do anything for you

22   with respect to your house before you sold it?

23    A.   Yeah, they -- Jim and Nancy cleaned the house for

24   me.

25    Q.   Did you ask them to do it?

1     A.   You know, I can't recall if I did or not.   I
2   don't know how that happened.
3     Q.   Okay.   At some point in time after Jim and Nancy
4   Wells cleaned your home, did you notice something
5   missing with respect to some personal items?
6     A.   Yeah.   I had three swords in a closet and they
7   disappeared.
8     Q.   And how long did Mr. Wells have your gun safe?
9     A.   I think it was just about a year.
10    Q.   Did you leave him the combination to the gun
11  safe?
12    A.   Yes.
13    Q.   And did you come back at some point in time and
14  see the gun safe in Mr. Wells' home?
15    A.   Yes, uh-huh.
16    Q.   Can you tell the jury what you noticed when you
17  came back to see your gun safe?
18    A.   Well, I noticed right away that the door to the
19  safe was open.
20    Q.   And did you do an inventory with respect to the
21  guns that were in the safe that you left with Mr. Wells?
22    A.   Not a formal inventory, but I just noticed that
23  one of my guns was missing.
24    Q.   Please describe for the jury what gun you noticed
25  was missing from the gun safe.

1    A.  It was a Smith & Wesson model 629 .44 Magnum.

2    Q.  A .44 Magnum.  Do you recall the barrel length,

3 sir?

4    A.  Six-inch barrel.

5    Q.  And the color?

6    A.  Stainless steel.

7    Q.  Did you have a discussion with Mr. Wells about

8 the location of that .44 Magnum?

9    A.  Yeah.  I asked him if he knew anything about it,

10 and he said no.

11    Q.  Have you ever found that pistol, sir?

12    A.  Not to this day.

13    Q.  And what kind of a pistol is it?  Is it an

14 automatic or a revolver type?

15    A.  No, it's a revolver.

16    Q.  Are you a member of any gun ownership or gun

17 organizations, sir?

18    A.  Yes, I'm a member of the NRA.

19    Q.  How long have you been a member of the NRA?

20    A.  Say again.

21    Q.  How long have you been a member of the NRA?

22    A.  Since I was a kid.

23    Q.  That's a long time.

24    A.  Yeah.

25    Q.  And with respect to this missing .44 Smith &

Wesson revolver, what did you do about that with respect

to authorities?

    A.  Well, after I reinventoried my collection and I

determined that the gun absolutely was missing, and so I

wrote a letter to the Kodiak troopers.

    Q.  And what did you tell the Kodiak troopers in your

letter?

    A.  I just told them that I had lost a gun in the

Kodiak area.

    Q.  Did you give them a point of contact?

    A.  Yes, I mentioned Jim Wells.

    Q.  For them to contact Jim Wells?

    A.  Did they contact him?

    Q.  I'm sorry.  Can you explain why you put Jim

Wells' name on the letter?

    A.  Well, it disappeared while he had custody of the

gun.  So if there's any question about it, they could

talk to him.

    Q.  And why did you feel necessary that it was -- I'm

sorry.  Why did you feel that it was necessary to report

the missing revolver to the troopers?

    A.  Well, I was afraid that the gun might be used in

a crime and it would reflect poorly on me if they

tracked the gun down to me.

    Q.  Again, you've never had that gun returned to you,

1  have you?

2      A.  No.

3      Q.  At some point in time, did that gun safe and the

4  guns get shipped someplace else?

5      A.  Yeah.  I shipped them down to Wisconsin to my

6  brother.

7      Q.  And what did your brother do when he received the

8  gun safe?

9      A.  Well, he tried to move the safe into his house,

10 but it was too heavy.  So he put it in the garage.

11     Q.  How old is your brother?

12     A.  Where is he?

13     Q.  How old is your brother?

14     A.  I think he's ten years younger than me, so he

15 would be about 70.

16     Q.  And the safe was too big to move into his home?

17     A.  Yeah.  The company, what do you call it, shipping

18 company, they weighed the safe and it weighed

19 600 pounds.

20     Q.  Okay.  Mr. Stein, in connection with your work

21 with the Coast Guard, did you have occasion to travel to

22 the South Pacific?

23     A.  Yeah.  I was stationed in the Pacific twice.

24     Q.  In what location, sir?

25     A.  First time was Okinawa, and the second time was

1  Yap Island.

2      Q.  Let's focus on Okinawa.  When you were in

3  Okinawa, did you buy some souvenirs?

4      A.  Yeah, I bought a couple of Japanese swords.

5      Q.  And can you -- like what kind of Japanese swords?

6      A.  I call them a Samurai sword, you know, and the

7  other one was a -- like a Samurai, but shorter.

8      Q.  One was longer than the other?

9      A.  Yeah, right.

10     Q.  While you were in the Coast Guard, you achieved a

11  certain rank at your retirement.  What rank was that,

12  Mr. Stein?

13     A.  CWO3, chief warrant officer.

14     Q.  So you were an officer, a commissioned officer?

15     A.  Right.

16     Q.  And as part of that commissioning as an officer,

17  did you have occasion to purchase something ceremonial?

18     A.  Yeah.  I bought -- I had to buy a Coast Guard

19  sword.

20     Q.  And did that Coast Guard sword go missing at some

21  point?

22     A.  Yeah.  Along with the two Japanese swords and the

23  Coast Guard ceremonial sword all disappeared at the same

24  time.

25     Q.  And what time would that roughly be, Mr. Stein?

 1      A.   About the time I was selling the house when Jim

 2   and Nancy cleaned it out.

 3            MR. SKROCKI:  And Your Honor, if we could -- we

 4   have three exhibits here that we're going to show

 5   Mr. Stein, which are 250, 251 and 249.  We have advised

 6   the marshals they're -- they are swords.  They're going

 7   to be in a box.  We're only going to take one of them

 8   out of the box.  Just a minute.

 9            THE COURT:  No objection, I assume.

10            MR. COLBATH:  Your Honor, I made previous

11   objections, and so I would preserve those.

12            THE COURT:  And those are preserved certainly.

13   BY MR. SKROCKI:

14      Q.   And roughly, Mr. Stein, what year was it that

15   these -- if you recall, roughly, that these swords went

16   missing?

17      A.   Somewhere around -- I can't recall exactly.

18      Q.   Okay.  But you associated it with the time you

19   moved and the Wells were cleaning your home?

20      A.   Right.

21            MR. SKROCKI:  Agent Woods, if you could, let's

22   do -- show Mr. Stein first, without showing it to the

23   jury, 251.

24      Q.   Mr. Stein, I'm going to ask a series of questions

25   about these at once.  So we're going to show you 251.

1          And then Agent Woods, if you could show us 250,

2    please.  Show Mr. Stein 250.

3          (Agent approaches witness.)

4    BY MR. SKROCKI:

5       Q.  Do you recognize that, sir?

6       A.  Yeah.

7       Q.  All right.

8          And then Agent Woods, if you could show 249.

9          (Agent approaches witness.)

10          AGENT WOODS:  In the case or out?

11      Q.  You observed this exhibit before coming into

12    court today, Mr. Stein?

13      A.  Uh-huh.

14      Q.  Right now it's in a case, correct?

15      A.  Right.

16      Q.  Are those your initials on the outside of that

17    case?

18      A.  Yes.

19      Q.  And do you recognize those as your initials?

20      A.  Yes.

21      Q.  And there's an item inside.  We showed you that

22    this morning before coming into court.  Did you

23    recognize the item inside?

24      A.  Yes.

25          MR. SKROCKI:  Move for the admission of 249,

1   250 and 251.  Agent Woods, stay right there, please.

2           THE COURT:  Those will be admitted based on

3   prior rulings.  Go ahead.

4           (Exhibit Nos. 249, 250 and 251 admitted.)

5           MR. SKROCKI:  Agent Woods, if you could just

6   display for the jury from that position.  Let's start

7   with, in sequence, 250.  Lift it up so they can all see

8   it.  And then please show it to Mr. Stein.

9   Q.  Mr. Stein, do you recognize that item?

10  A.  Yes.

11  Q.  Is that one of your swords that went missing?

12  A.  Yes.

13  Q.  And that next one would be 251.  If you could

14  show Mr. Stein, Agent Woods.

15          Mr. Stein, is that one of the other swords that

16  went missing?

17  A.  Yeah, uh-huh.

18  Q.  Agent Woods, if you could approach Mr. Stein,

19  please, with 249.

20          And Mr. Stein, we showed you that this morning

21  before coming to court, correct?  You landed last night,

22  didn't you?

23  A.  Pardon me?

24  Q.  You landed in Anchorage last night, didn't you?

25  A.  Yeah.

 1     Q.  So this morning we showed you the sword.

 2          And, Agent Woods, if you could take it just out

 3     there a little bit.  Take it out about a foot if you

 4     could, please.  And take it out of its protective

 5     wrapping.

 6          Mr. Stein, do you see your name on that sword,

 7     sir?

 8     A.  Yeah.

 9     Q.  Do you recall buying that sword for yourself?

10     A.  Yes.

11     Q.  Why did you do that?

12     A.  Well, as an officer you're supposed to have a

13     ceremonial sword, you know.

14     Q.  That's the one you bought?

15     A.  Yeah.

16     Q.  Is it good to see that again?

17     A.  Yes.

18          MR. SKROCKI:  One moment, Judge.

19          THE COURT:  Certainly.

20          (Pause)

21          MR. SKROCKI:  Thank you very much, Mr. Stein.

22          Your Honor, that's all the questions I have.

23          THE COURT:  All right.  Thank you, Mr. Skrocki.

24          Mr. Colbath, go ahead, please.

25                    CROSS EXAMINATION

1   BY MR. COLBATH:

2       Q.   Good morning, Mr. Stein.

3       A.   Good morning.

4       Q.   My name is Gary Colbath.  You and I have never

5   met, have we?

6       A.   No.

7       Q.   I have a few questions about these things

8   Mr. Skrocki has been asking you about.  As I understand

9   it, sir, your time on Kodiak Island with the Coast

10  Guard, you retired in 1989; is that correct?

11      A.   I think so, yeah.

12      Q.   And you were still living there, had your house

13  then?

14      A.   Right.

15      Q.   Stayed on the island about another five or

16  six years until around 1995?

17      A.   I think so, uh-huh.

18      Q.   Okay.  And in 1995, you made the wonderful

19  decision, it sounds like, to start traveling, it sounds

20  like around the world almost?

21      A.   Right.

22      Q.   Many, many places, many, many countries?

23      A.   Right.

24      Q.   Your intention at that point, 1995 when you

25  started these world travels, as I understand it, you

1    traveled for about altogether like a five- or six-year

2    period?

3        A.   Right.

4        Q.   And so your plan was to sell your home there on

5    Kodiak and at the end of your travels relocate somewhere

6    else?

7        A.   Right.

8        Q.   And now, besides working together, after you

9    retired, you remained friends with Jim and Nancy Wells,

10   right?

11       A.   Sure.

12       Q.   You and Mr. Wells fished together, hunted

13   together, similar interests?

14       A.   Sure.

15       Q.   And when you anticipated or thought about selling

16   your property and getting ready for these travels, you

17   sold off a large share of your household goods and just

18   things you weren't going to need to travel with, right?

19       A.   Right.

20       Q.   And you gave away some things to different people

21   that you didn't need or couldn't sell?

22       A.   Right.

23       Q.   I saw somewhere where you had intended to put

24   these swords in that gun safe that you moved over to Jim

25   and Nancy's, but you ended up forgetting to do that or

1   not doing that at the time you moved the safe to Jim's?

2       A.   Right.

3       Q.   So the swords got left behind in the house?

4       A.   Right.

5       Q.   But -- and you -- ultimately you put the house up

6   for sale?

7       A.   Uh-huh.

8       Q.   Okay.  And at the time you put the house up for

9   sale, you had gotten rid of most of the things that you

10  wanted to get rid of and -- but there were still a few

11  things left in the house, odds and ends, things you

12  weren't able to sell?

13      A.   Just -- just the swords, that's all.

14      Q.   Okay.  No other -- you don't remember any other

15  miscellaneous household items?

16      A.   No, everything went, either sold or given away.

17      Q.   And you were going to -- you were going to take

18  everything else with you, except the gun collection was

19  going to stay with Jim?

20      A.   Right.

21      Q.   Until you could get back to the island and make

22  further arrangements and get it shipped down to your

23  brother?

24      A.   Yeah.

25      Q.   And so when you left on your first set of travels

1  there and left the island, Jim and Nancy agreed to

2  monitor the house until it ultimately got sold and take

3  care of that for you?

4      A.  Yeah.  Jim had power of attorney to sell the

5  house.

6      Q.  So you actually trusted him enough that you

7  signed over power of attorney to him so you wouldn't

8  have to come back for the real estate closing or to show

9  the house or any of that business.  He could just do the

10  paperwork and have the money sent to you?

11     A.  Right.

12     Q.  If the house -- so Jim and Nancy, they cleaned up

13  the house, got all of every last belonging out of there.

14  And ultimately it did sell, and Jim took care of the

15  transaction?

16     A.  Uh-huh.

17     Q.  And they shipped you the money and everything.

18  Or maybe the title company did.  I don't know.

19     A.  Yeah.

20     Q.  Somebody shipped you the money for the house, I

21  assume?

22     A.  One way or another.

23     Q.  All right.  And after travel, six months or a

24  year out, you -- now, do you remember telling Jim and

25  Nancy that -- when you left the island that -- asking

1    them specifically to take care of the house, clean it

2    out, make sure it's ready to go for the buyer?

3        A.   I don't think so.

4        Q.   Okay.  You just don't remember that?

5        A.   I don't think I did tell them to do anything.

6            MR. SKROCKI:  Objection.

7        Q.   Okay.

8        A.   I had a real estate agent.  Place was, you know,

9    ready to be sold.  There was nothing for them to do

10   really.

11       Q.   Okay.  And --

12           MR. SKROCKI:  Can we have a sidebar.

13           THE COURT:  Certainly.

14           (Begin bench conference.)

15           MR. SKROCKI:  I have an objection.  Ms. Wells

16   is back there laughing loudly enough for our table to

17   hear, and she's shaking her head.  She's been doing this

18   through the trial.  I would like the Court to instruct

19   her on the record that she is to stop doing that or

20   she's going to be removed.

21           THE COURT:  Mr. Colbath.

22           MR. COLBATH:  I didn't see it.  I mean I was at

23   the podium and I didn't hear it.  But then quite

24   honestly, I'm facing directly --

25           MR. SKROCKI:  It's not a reflection on him, but

I confirmed that with Ms. Sherman before I made the request.  I said, "Is she back there laughing," and she said yes.  I heard her distinctly.  This is not the first time that's happened.

        THE COURT:  Why don't we take our morning break.

        (End bench conference.)

        THE COURT:  Very good.  Ladies and gentlemen, we're going to take our morning break, get a couple items sorted out.  Please leave your notepads in the courtroom.  Remember my admonition not to discuss the case.  We'll be back in about 15 minutes.  And go off record at this time.

        (Jury absent)

        THE COURT:  Sir, you can be excused at this time too.  We'll have you back in 15 minutes.

        Please be seated, everyone.  Mr. Skrocki, did you want to make an application here on the open court?

        MR. SKROCKI:  Yes.  In this last exchange, Your Honor, I distinctly heard Ms. Nancy Wells laughing or making some sort of gesture with her voice.  It sounded to me like a laugh or exclamation of disbelief.  I noticed as I came up for the sidebar that she's shaking her head back and forth no.  Our table has heard Ms. Wells laughing during experts during this time.

1          We'd like an order from the Court either

2   excluding her because of this activity or that she be

3   ordered by the Court to keep it quiet, keep a straight

4   face and just knock it off.  It's not acceptable.

5          THE COURT:  Mr. Colbath?

6          MR. COLBATH:  Your Honor, I have not observed

7   those things.  I mean I have certainly observed

8   spectators and the jurors, and we've had a number of,

9   oddly enough, funny moments and other things I guess

10  occur.  And I've only made general observations about

11  folks.

12          I mean I'm sitting right here, but I'm also

13  paying pretty close attention or trying to, to things

14  happening within the well of the courtroom and not

15  outside.  And certainly there were witnesses in here

16  yesterday apparently for hours that I didn't notice,

17  so...

18          MR. SKROCKI:  That's irrelevant.

19          MR. COLBATH:  So I have not made the same

20  observations, so I can't comment one way or the other.

21  I certainly agree with Mr. Skrocki it's inappropriate

22  for any of our spectators to be making gestures that

23  could be interpreted as positive or negative comments on

24  the testimony or the proceedings that are going on.

25          And certainly everyone in the courtroom needs

to be quiet such that the proceedings are not
interrupted in any way, shape or form.  That's obviously
the ultimate goal for all of us.  So to that extent, you
know, I -- I --

        THE COURT:  All right.  Well, here is what
we're going to do.  Thank you, Mr. Colbath.  I have not
made observations, but I clearly appreciate both
counsels acknowledgement that gestures or audible noises
of any sort, apart from when there's a general chuckle
if some issue happens maybe on occasion, but other than
that, that is unacceptable.

        I am going to be keeping an eye on Ms. Wells,
and if I notice anything I will -- or if either side
seeks to bring any further activity to my attention, I
will address it.  A person that continues or that begins
gestures in the courtroom and cannot heed this order is
subject to being sent out of the courtroom.  And I hope
that that possibility is sufficient to cure any audible
gestures or any noise that is occurring that is
unacceptable.

        And I saw Ms. Wells acknowledge that she heard
me, and we'll go forward from there.  And anything
further on this subject at this time, Mr. Skrocki?

        MR. SKROCKI:  Tangentially, we would like some
sort of an idea from the defense whether or not they're

```
 1    going to be calling Nancy Wells as a witness at this
 2    time.  It was left open.
 3            THE COURT:  We've had the witness exclusion
 4    rule, so I assume that Ms. Wells is not being called as
 5    a witness because that was invoked at the very outset of
 6    this trial.  And I see defense counsel nodding
 7    affirmatively.  So I have assumed that pursuant to the
 8    invocation of the evidence rule that Ms. Wells is not
 9    going to be testifying in this case.  Mr. Colbath, is
10    that a correct assumption?
11            MR. COLBATH:  It is, Your Honor.
12            THE COURT:  Very good.  Let's take a short
13    break.
14            DEPUTY CLERK:  All rise.  Court stands in a
15    brief recess.
16            (Recessed from 9:56 a.m. to 10:11 a.m.)
17            (Jury present)
18            DEPUTY CLERK:  Court is in session.
19            THE COURT:  Welcome back, ladies and gentlemen.
20    Please be seated, everyone.
21            Mr. Colbath.
22            MR. COLBATH:  Thank you, Your Honor.
23    BY MR. COLBATH:
24       Q.  Mr. Stein, I think when we took our break there,
25    I was asking you questions about the house sale, and I
```

1    want to back up a little bit.  When you first left
2    before the house had sold, do you remember that your
3    bedroom set was still in that house and that was one of
4    the things that got moved over to Jim and Nancy's?
5        A.  A bed?
6        Q.  Yeah, a bed, bedroom set, dresser?
7        A.  That might have happened.  I really don't
8    remember.
9        Q.  Okay.  You know, after you had made that -- you
10   traveled about six months or a year, and then you came
11   back and actually stayed with Jim and Nancy for a period
12   of time, right?
13       A.  Yeah.  About a week, I guess, week or two.
14       Q.  And you remember your bedroom set was still
15   there.  They had got it out of the house after you left,
16   and it was there now at their house, but Nancy got it
17   sold.  Do you remember any of that?
18       A.  No.
19       Q.  Okay.  You say it might have went over there.
20   That's not just something you remember today?
21       A.  The fact that I stayed there?
22       Q.  The fact about the bedroom set being there?
23       A.  That's a total blank.  I don't know anything
24   about that.
25       Q.  All right.  So let's talk about this gun for a

minute that came up missing.  Well, first of all, when
you were collecting your guns at your house getting --
your gun collection there at the house, where were the
different places at your house that you kept your guns?
Did you keep any out for protection?

    A.   No.

    Q.   Keep any in your vehicles?

    A.   No.

    Q.   Everything was stored in your safe?

    A.   Right.

    Q.   Mostly handguns?

    A.   No.  Well, a lot of handguns but also rifles and
shotguns.

    Q.   Some long guns as well.  All right.  And I think
I heard you say that when you first moved out of the
house, you and Jim moved the safe over to his place,
right?

    A.   Yeah.

    Q.   And you didn't take an inventory when you moved
the safe, that was the official inventory you took down
at your brother's place or during the shipping?

    A.   No.  I had -- I had the inventory for years
before.

    Q.   Right.  So you had a list of your guns for years?

    A.   Right.

1    Q.  You actually had a firearm's license to be able

2  to sell guns, an FFL?

3    A.  Right.

4    Q.  You had had that for years?

5    A.  Yeah.

6    Q.  And you kept a list of all your guns and all the

7  guns you acquired and sold?

8    A.  Right.

9    Q.  But as far as going through the safe, when you

10  and Jim moved it, you didn't do that, you did that only

11  in preparation later for it to be shipped to the Lower

12  48?

13    A.  If I understand your question right, I think

14  that's right.

15    Q.  Okay.  Now, this model 629 Smith & Wesson, do you

16  know when the last time you shot it was?

17    A.  I couldn't say.

18    Q.  Yeah.  Was it one that you used regularly or shot

19  frequently?

20    A.  Yes.

21    Q.  You went to -- did they have a shooting range

22  there at Kodiak?

23    A.  What's the name?

24    Q.  Did they have a shooting range there that you

25  would go to at Kodiak?

1    A.  Right, uh-huh.

2    Q.  And that particular one, you don't remember then

3  when the last time you would have used it, the last time

4  you would have saw it?

5    A.  No.  I couldn't say.

6    Q.  All right.  You said it was stainless steel.  It

7  had -- I understand you put on your bigger caliber guns

8  black, those plastic grips to let you hold on to those

9  calibers better?

10    A.  Rubber.

11    Q.  Oh, rubber, not plastic.  Okay.  And that's

12  something you preferred on your guns?

13    A.  On the heavy kickers, yeah.

14    Q.  Okay.  .44 would have been a heavy kicker.  When

15  you got -- when you got back to the Wells' and you

16  realized that this gun was missing, you also couldn't

17  find a rifle scope, not that was on a rifle but a loose

18  rifle scope, right?

19    A.  Exactly.

20    Q.  And that was never -- that was never located.

21  You didn't -- you haven't been able to find that?

22    A.  Right.

23    Q.  So there was a couple things missing.  These

24  swords hadn't made it into the safe.  They didn't even

25  get to Jim and Nancy's, and then a scope and a pistol?

1          MR. SKROCKI:  Object to form of the question.

2     It's testimonial.

3          THE COURT:  That's sustained.

4     BY MR. COLBATH:

5       Q.  Are the things that were missing, Mr. Stein, you

6     were missing the swords, right?

7       A.  Right.

8       Q.  And then a rifle scope?

9       A.  Right.

10      Q.  And then a pistol?

11      A.  Right.

12      Q.  And you discovered all of that in 1995, about

13    the end -- sometime in 1995 before you left the island

14    for the rest of your travels?

15      A.  Regarding the swords?

16      Q.  Well, regarding -- first regarding the pistol and

17    the rifle scope, it was about 1995 when you discovered

18    that, that they were missing?

19      A.  Yeah, but I went over there to pick up my gun

20    collection, and I noticed those things were missing.

21      Q.  I want to show you, sir -- and I don't know if it

22    would be easier to look at this on the video screen or I

23    also have a paper copy of it.  But there's a computer

24    screen there right next to you.  If you look at that,

25    I'm going to pull up a couple of documents.

1        They're defense Exhibit No. 232, if I could have

2   that.  Could you blow the part with the writing on it

3   up?

4        Could you look at that there, Mr. Stein, and see

5   if that looks like something you're familiar with.

6       A.  Yeah.

7       Q.  Now, you testified that you had sent a report to

8   the Kodiak troopers once you discovered things were

9   missing?

10      A.  Right.

11      Q.  So take that down.  There's another couple pages

12   to this.  Go to the next page.

13        Now, that first page was a fax communication,

14   right, something sent by fax?

15      A.  Yes.

16      Q.  When you sent your information to the troopers,

17   you were already gone from Kodiak, you weren't there and

18   hand-deliver it?

19      A.  Right.  This was written in Wisconsin.

20      Q.  Okay.  So blow up this next one here.

21        And -- and that one, that one, you're familiar

22   with?

23      A.  Yes.

24      Q.  That's your signature down there at the bottom?

25      A.  Yeah.

1    Q.   Okay.  And then the next page of it.

2         And that one, you recognize your handwriting

3    there or is that your handwriting?

4    A.   I guess it's my writing, but I couldn't say for

5    sure.

6    Q.   Sure.  And then the last page.  Should have went

7    the other way.  There you are.

8         How about that?

9    A.   Right.

10   Q.   Okay.  Would that have been the document

11   information you sent to the troopers that you talked

12   about to report the gun missing?

13   A.   The typewritten thing you showed me at the first?

14   Q.   Yes.

15   A.   That's mine, yeah.  Uh-huh.

16   Q.   All right.

17        MR. COLBATH:  I'm going to remove those second

18   two pages, the handwritten pages.

19        MR. SKROCKI:  No objection.  Great.  Thanks.

20        MR. COLBATH:  Your Honor, I'm going to take --

21   I realized I have got two extra pages here that probably

22   aren't necessary.  I'm going to move defense 232, but

23   it's going to be the first two pages, the two that

24   Mr. Stein identified.

25        THE COURT:  Agree to the first two pages of

1    232?

2            MR. SKROCKI:  Yes, Your Honor.

3            THE COURT:  Defense 232, the first two pages

4    will be admitted.

5            (Defense Exhibit No. 232 admitted.)

6    BY MR. COLBATH:

7       Q.  Can you show that first page.

8            So Mr. Stein, everybody can see this.

9            Just blow that top part up.

10           And you said you were down in Wisconsin when you

11   sent this back up to the troopers?

12      A.  Right.

13      Q.  And that was done it looks like in August of

14   1997?

15      A.  Correct.

16      Q.  And it was several months prior that you had been

17   in Kodiak and discovered the things missing, and then

18   when your travels brought you down to Wisconsin, when

19   you got back down there, you reported the gun gone to

20   the Kodiak folks?

21      A.  Right.

22      Q.  All right.  Let's just go to that next page.  And

23   let's blow up 5, -- 5, 6 and 7 there.

24           And this is the gun that you reported missing

25   here, number five, the lost -- you said the lost firearm

     is a Smith & Wesson 629.  That's the same one we've been
     talking about, isn't it?
         A.  Right.
         Q.  And then you told -- you told the police there,
     for further information, they could talk to Jim.  You
     gave Jim a power of attorney to deal with this gun issue
     just like the house issue, right?
         A.  The gun?
         Q.  Yeah.
         A.  No.
         Q.  Once you reported that it was missing, you had
     given Jim a power of attorney so that if he needed to
     deal with the police or handle anything that he could do
     that.  Do you recall that?
         A.  No, I did not do that.
         Q.  Okay.
             MR. COLBATH:  Counsel, I'm going to show him
     Bates number 80782.
             Actually, could you put that back up there,
     that one we were just looking at.  32, second page,
     highlight paragraph five.
     BY MR. COLBATH:
         Q.  Now, Mr. Stein, the gun we're talking about is --
     you knew the serial -- from your records, you knew the
     serial number, right?

1    A.   Okay.

2    Q.   You see it there?  Would that have been -- it

3    says serial number AJL.  And I know you don't remember

4    it today, but back then you had the serial number,

5    right?

6    A.   Yes, on my inventory.

7    Q.   Okay.  So let's just clear that.

8         MR. COLBATH:  Your Honor, might I approach

9    Mr. Stein?  I want to show him a document.

10        THE COURT:  Yes.  Can you mark it as the next

11   in line on your exhibits?

12        MR. COLBATH:  I can.  I'll mark it as defense

13   Exhibit No. 192.

14        THE COURT:  All right.  Thank you.

15        MR. COLBATH:  I don't have a sticker yet.

16        (Pause)

17        (Government reviewing document.)

18        THE COURT:  Are you going to show it to the

19   witness first?

20        MR. COLBATH:  Sure.  Let me walk up there, if I

21   can, Your Honor.

22   BY MR. COLBATH:

23   Q.   Mr. Stein, I want to show you a piece of paper

24   here and just see if you might recognize that as

25   either -- as your handwriting and signature or anything

1     that you think you've seen.

2               (Mr. Colbath approaches witness.)

3          A.   So what's your question?

4          Q.   Well, first of all, sir, do you think you filled

5     out that document?

6          A.   Looks like my handwriting, yeah.

7          Q.   All right.  Look like your signature on there?

8          A.   Yeah.

9          Q.   Okay.

10              MR. COLBATH:  Your Honor, before I ask him any

11    more questions about it, I'm going to move the admission

12    of 192.

13         Q.   I want to make sure, Mr. Stein, before I ask you

14    any more about it that you've had a chance to read it.

15    Just make sure -- is it in good enough condition that

16    you can read it?

17         A.   I think so.

18         Q.   Okay.  Just take a minute there, because I want

19    to make sure you've had a chance to see the whole thing.

20              (Pause)

21         Q.   Okay?  All right.  These wonderful people can put

22    that up on the computer so we can all see it and --

23              THE COURT:  Wait.  Has it been admitted?  It's

24    not been admitted.

25              MR. COLBATH:  I'm sorry.  Your Honor, I'm going

1    to move again defense 192.

2              MR. SKROCKI:  We don't object.

3              THE COURT:  All right.  192 is admitted.

4              (Defense Exhibit No. 192 admitted.)

5    BY MR. COLBATH:

6       Q.  So just do that top half there.  We don't need

7    the notary.

8              So Mr. Stein, this is -- is this a limited power

9    of attorney from you over to Mr. Wells or -- or excuse

10   me, to your brother regarding this power of attorney?

11      A.  Yes.

12      Q.  And this is to let your brother deal with the gun

13   if it's discovered and shipped down to him?

14      A.  Right.

15      Q.  Okay.  And you're going to be -- you were going

16   to be traveling?

17      A.  Right.

18      Q.  Okay.  And when again was this signed?  I think

19   it's the same time, August 25th, right?

20      A.  Okay.

21      Q.  And that's about the same time you did this,

22   about the same time you sent the documents up to the

23   trooper.  Does that sound about right?

24              You can take that down.

25              That's okay if you don't remember the dates.

1    A.  Okay.

2    Q.  All right.

3    A.  I thought it was '95 when I wrote to the

4  troopers.

5    Q.  Can we put page 2 of Exhibit No. 232 back up.

6       I thought there was another date on there,

7  Mr. Stein, that could help us figure that out.

8       Now, the rifle scope that went missing, that was

9  never found either?

10    A.  Right.

11    Q.  Okay.  And the additional property, do you

12  remember getting some money for the rest of the things

13  that got sold after you left Kodiak?  Do you remember

14  getting some money from Jim and Nancy for the rest of

15  the property?

16    A.  No, I don't remember that.

17    Q.  Okay.

18       MR. COLBATH:  Right now, sir, that's all the

19  questions that I have for you.  Thank you.

20       THE COURT:  Any redirect, Ms. Stevens --

21  Mr. Skrocki?  I'm sorry.

22       MR. SKROCKI:  Just a few.

23       THE COURT:  Go right ahead.

24                REDIRECT EXAMINATION

25  BY MR. SKROCKI:

1    Q.  Hello again, Mr. Stein.  Did Mr. Wells ever tell

2  you that he had your three swords we showed you here in

3  court?

4    A.  No, never.

5    Q.  Mr. Colbath asked you a question about whether

6  you gave Mr. Wells a power of attorney for this missing

7  Smith & Wesson .44-caliber stainless steel revolver.  Do

8  you recall that question?

9    A.  Yes.  And --

10   Q.  And your answer is?

11   A.  Of course I did not give him --

12   Q.  You did not?

13   A.  No.

14   Q.  Mr. Colbath showed you an exhibit of power of

15  attorney, but that was for your brother?

16   A.  Right.

17   Q.  Okay.  And then Mr. Colbath showed you a letter

18  that you had typed up to give to the Alaska State

19  Troopers?

20   A.  Right.

21   Q.  Because you felt the missing revolver was a very

22  serious matter?

23   A.  Right.

24   Q.  And you reported it --

25        MR. COLBATH:  Your Honor, I'm going to object

1   to the leading.

2              THE COURT:  It is sustained.

3   BY MR. SKROCKI:

4      Q.  Why did you send that information to the

5   troopers?

6      A.  Well, I was worried it might be used in a crime,

7   and it would reflect poorly on me if it was.

8              MR. SKROCKI:  That's all I have for Mr. Stein.

9   Thank you, Mr. Stein.

10             THE COURT:  Nothing further?

11             MR. COLBATH:  Just one.

12             THE COURT:  Go ahead.

13                       RECROSS EXAMINATION

14  BY MR. COLBATH:

15     Q.  Mr. Stein, while I was showing you that -- the

16  letter that you sent to the troopers, I forgot to ask

17  you.  Now, you sent a copy of that letter also to Jim

18  and Nancy, right, so they would know it had been

19  reported because the police might come to talk to them

20  about it?

21     A.  I can't recall if I did that or not.

22     Q.  Okay.  Mr. Stein, I'm just going to show you a

23  page of that again, that typewritten thing, and see if

24  this refreshes your memory about whether you sent it to

25  Jim and Nancy, okay?

```
 1          THE COURT:  So what page are you showing him
 2   now?
 3          MR. COLBATH:  It's page two.
 4          THE COURT:  Okay.  Of 192?  Let's identify what
 5   you're showing the witness.
 6          MR. COLBATH:  232 -- not the power of attorney.
 7   The power of attorney was the one I just marked.
 8          THE COURT:  So page 2 of 232?  No, it's not.  I
 9   don't think that's correct.  No, it's page 4.
10          MR. SKROCKI:  We're not going to object to it.
11   We're happy to admit it.  We just need to know what the
12   magic number is.
13          MR. COLBATH:  Apparently, we have two pages of
14   the same -- that are -- Mr. Stein typed -- we have two
15   pages -- two copies of the same letter.  So I'm going to
16   mark this as defense Exhibit No. 232A.
17          THE COURT:  All right.  And the government does
18   not object to its admission?
19          MR. SKROCKI:  No, we don't.
20          THE COURT:  Which is page 4 of the original
21   232.
22          MR. COLBATH:  Yes.
23          THE COURT:  All right.
24          MR. COLBATH:  That we didn't admit.
25          THE COURT:  All right.  Very good.
```

1          MR. COLBATH:  I apologize.

2          THE COURT:  So 232A is admitted.

3          MR. COLBATH:  And may I approach Mr. Stein?

4          THE COURT:  Yes.  Or put it on the overhead,

5     whichever.

6          MR. COLBATH:  Yeah.  We'll put it on the

7     overhead.

8          (Exhibit No. 232A admitted.)

9     BY MR. COLBATH:

10    Q.  So if you'll look on your computer screen there,

11    it's right in front of you, Mr. Stein.  Or you can look

12    up here.  But this is the letter we just looked at a

13    minute ago that got sent to the troopers, right?

14    A.  Yeah.

15    Q.  And just highlight that top where the writing is,

16    the top half of the letter.

17         And I had asked you if you sent that up to Jim

18    and Nancy, Mr. Stein.  Do you see -- does that look like

19    your notes where you had sent it for Nancy and wrote,

20    "Jim, here's your copy"?

21    A.  Right.

22    Q.  Okay.  All right.

23         MR. COLBATH:  Then that was the only follow-up

24    question I had, Your Honor.

25         THE COURT:  All right.  Thank you.  This

1   witness can be excused?

2           MR. COLBATH:  He can from our side.

3           MR. SKROCKI:  Yes.

4           THE COURT:  Thank you, sir.  You may be

5   excused.

6           (Witness excused)

7           THE COURT:  And the government's next witness.

8           MR. SKROCKI:  We call Terry Stein.

9           THE COURT:  All right.  Very good.

10          Good morning.  If you could come to our witness

11  stand, please.  When you get there, remain standing for

12  just a moment and the clerk will administer an oath to

13  you.

14          (Oath administered to the witness)

15          DEPUTY CLERK:  For the record, can you please

16  state your full name and then spell your full name.

17          THE WITNESS:  It's Terrence L. Lee Stein.

18  That's T-e-r-r-e-n-c-e, L-e-e, S-t-e-i-n.

19          THE COURT:  Thank you.  Go ahead, please.

20          TERRENCE STEIN, GOVERNMENT WITNESS, SWORN

21                     DIRECT EXAMINATION

22  BY MR. SKROCKI:

23     Q.  Good morning, Mr. Stein.

24     A.  Good morning.

25     Q.  Sir, can you tell the jury where you live?

1    A.   In Milwaukee, Wisconsin.

2    Q.   And are you the brother of John Stein?

3    A.   I am.

4    Q.   Are you the older brother?

5    A.   No, he's the older brother.

6    Q.   Good.  Sir, how old are you?

7    A.   69.

8    Q.   At some point in time, do you recall receiving

9    something from your brother from Alaska?

10   A.   Oh, yes, I do.

11   Q.   Can you tell the jury what you received from your

12   brother?

13   A.   It was a gun safe, a big one, with several

14   firearms in it.

15   Q.   Sir, are you a member of any gun rights

16   association or ownership?

17   A.   I am.  I am an NRA member.

18   Q.   How long?

19   A.   Oh, I'm a lifetime member.  Probably 30 years.

20   Q.   And so you received that gun safe from your

21   brother?

22   A.   Yes.

23   Q.   Do you recall what year that was approximately?

24   A.   Do I remember what?

25   Q.   What year that was approximately?

1    A.   I'm thinking '96.

2    Q.   Okay.

3    A.   Around there.

4    Q.   Around there.  And when you received it, did you

5    do an inventory of the guns that were in the gun safe?

6    A.   I did.  I inventoried them all and wrote down

7    their make, model, caliber and the serial numbers.

8    Q.   And when you did the inventory, did you have

9    occasion to find a Smith & Wesson revolver, stainless

10   six-inch barrel, model 629?

11   A.   Negative.  It was not there.

12   Q.   Did you relay that information to your brother?

13   A.   No, because I didn't expect to have one.  I

14   didn't know that one existed.  So there's no reason to

15   let him know something was missing when I didn't know he

16   had it.

17   Q.   Okay.

18        MR. SKROCKI:  That's all I have for Mr. Stein.

19   Thank you, sir.

20        THE COURT:  Mr. Colbath, questions for this

21   witness?

22        MR. COLBATH:  No.

23        THE COURT:  All right.  Thank you, sir.  You

24   may be excused.

25        THE WITNESS:  Thank you.

1          (Witness excused)

2          THE COURT:  Your next witness?

3          MR. SKROCKI:  James Encinas, Your Honor.

4          THE COURT:  Okay.

5          (Pause)

6          THE COURT:  Good morning.  If you could come

7  all the way up to the witness stand, please.  When you

8  get up there, if you'd remain standing the clerk will

9  administer an oath to you.

10          (Oath administered to the witness)

11          DEPUTY CLERK:  For the record, can you please

12  state your full name and then spell your full name.

13          THE WITNESS:  James Encinas, E-n-c-i-n-a-s.

14          THE COURT:  Go ahead, please.

15          JAMES ENCINAS, GOVERNMENT WITNESS, SWORN

16                    DIRECT EXAMINATION

17  BY MR. SKROCKI:

18     Q.  Good morning, Mr. Encinas.

19     A.  Good morning, sir.

20     Q.  Could you please tell the jury here who you work

21  for?

22     A.  Currently?

23     Q.  Currently.

24     A.  I'm in the Coast Guard, Coast Guard Cutter Paul

25  Clark.

1    Q.   And where are you stationed, sir?

2    A.   Miami Beach.

3    Q.   And did you have occasion in your career with the

4    Coast Guard to work in the Communication Station Kodiak?

5    A.   Yes, sir.

6    Q.   Can you please tell the jury when that was?

7    A.   It was from May 2009 to July 2012.

8    Q.   And what rank did you have when you were there,

9    and what was your occupation at the Communication

10   Station?

11   A.   My rank was E-4.  And I was a petty officer third

12   class, electronics technician.

13   Q.   Electronics technician?

14   A.   Yes.

15   Q.   Okay.  And your answers are -- at the end will

16   fade, fading on the -- so if you could just move the mic

17   a little closer to you.  Thank you.

18        So electronics technician?

19   A.   Yes, sir.

20   Q.   Where were you primarily based in the

21   Communication Station?

22   A.   The main building, T-1.

23   Q.   T-1?

24   A.   Yes.

25   Q.   Did you ever have occasion to go to T-2?

1    A.   Yes.

2    Q.   What would you be doing down at T-2?

3    A.   You go check in, and then if you were on duty you

4    would go down there and do a round.

5    Q.   And when you say do a round, what do you mean by

6    that?

7    A.   Just check the security of the -- of -- make sure

8    all the doors were locked.

9    Q.   So a security sweep in essence?

10   A.   Yes, sir.

11   Q.   And generally the rounds you would do, those

12   would be what time?

13   A.   In the mornings or when you went home for the

14   day.

15   Q.   Did you have occasion, Mr. Encinas, to associate

16   with or become familiar with Mr. Jim Belisle -- Rich

17   Belisle, excuse me.

18   A.   Yes.

19   Q.   Can you tell the jury about that?  How was that

20   relationship with him?

21   A.   It was good.  It was a work relationship.  And if

22   we saw each other in town, we would speak and -- we went

23   to the same bar a few times.

24   Q.   And the name of the bar was what?

25   A.   The Rendezvous.

1    Q.  Go down there, have a few drinks, things like
2  that?
3    A.  Yes, sir.
4    Q.  And then how about Mr. Jim Hopkins; did you have
5  occasion to associate with him at all?
6    A.  Yes.
7    Q.  In what capacity?
8    A.  I was there before he got to the unit and helped
9  him check in and helped him get qualified.
10    Q.  Qualified to do what?
11    A.  Just basic maintenance, get him familiar with all
12  the equipment and just helped him out any way he needed
13  since he was new to the unit.
14    Q.  Are you aware of a facility called the warehouse
15  in connection with the Communication Station?
16    A.  Yes, sir.
17    Q.  And are you familiar with some work that was done
18  in the warehouse in 2012, 2011/2012 timeframe?
19    A.  Yes, sir.
20    Q.  Can you explain to the jury what you know about
21  the warehouse and the work that was being done there?
22    A.  We were doing a cleanup, and they wanted us to
23  put a bunch of nuts and bolts that were in excess into a
24  giant bin.
25    Q.  And were you familiar with the inside of the

1    warehouse and what was stored in there, Mr. Encinas?

2        A.   Yes, sir.

3        Q.   Can you describe to the jury what the warehouse

4    was used for and what you noticed inside?

5        A.   It was used for storage.  A bunch of parts,

6    antenna parts, equipment, anything in excess that we

7    couldn't store at the main building or in T-2.

8        Q.   Who ordered the clean-out?

9        A.   It was SK1 Cartier and my supervisor.

10       Q.   Who was your supervisor?

11       A.   Arthur Gross.

12       Q.   And did you participate in the clean-out?

13       A.   I did, sir.

14       Q.   About how many times?

15       A.   All week.  So it was about a week process.

16       Q.   A week process?

17       A.   Yes, sir.

18       Q.   And with respect to the equipment that was there,

19   what was being done with it?

20       A.   I believe it was getting recycled.

21       Q.   And do you know Jim Wells?

22       A.   Yes, sir.

23       Q.   How do you know Jim Wells?

24       A.   He worked in the T-2.

25       Q.   Did you have any occasion to do any direct work

with Mr. Wells while you were there at the Communication
Station?

    A.   Just he would give helpful advice on antennas and
what was where and stuff like that.

    Q.   Did he seem pretty knowledgeable to you about
that?

    A.   Absolutely.

    Q.   Would you ask him questions about that?

    A.   Absolutely.

    Q.   And how long do you, to your knowledge, know
Mr. Wells had been at the Communication Station?

    A.   As long as the building was standing.  That's the
running joke.  Yes.

    Q.  A long time?

    A.   Yes.

    Q.   Do you see Mr. Wells here in court today?

    A.   I do.

    Q.   Did there come a time where you saw Mr. Wells in
connection with this warehouse clean-out?

    A.   Yes.  He walked in as we were dumping this -- the
screws and nuts and bolts and whatnot into the bin, and
he had them separated and sorted, and so it was
upsetting to him.

    Q.   And what did you observe him do?

    A.   He just asked what we were doing and we told him,

1    and then he just was like -- (indicating sound) -- and

2    he proceeded to leave after that.

3        Q.   And did you have -- what was your impression of

4    the -- (indicating sound)?

5        A.   Upset, very -- like upsetting, like he did

6    organize all of that.

7        Q.   Okay.  Can you describe to the jury what you saw

8    Mr. Wells do physically?

9        A.   Just -- (indicating sound) -- like.

10       Q.   Did you see him do anything else?

11       A.   No.  He just -- he proceeded to leave after that.

12       Q.   I want to turn your attention to April 12th.  Do

13   you recall that day, Mr. Encinas?

14       A.   Yes, sir.

15       Q.   How did you find out about the murders of

16   Mr. Belisle and Mr. Hopkins?

17       A.   Just going into -- just going in like every day,

18   and it was kind of chaotic.  I honestly can't remember

19   how it was told, but they eventually told us.

20       Q.   Okay.  And on that day did you have occasion to

21   see individuals in the -- in the area and what their

22   emotional state was like?

23       A.   Yes.  We were all sitting on the deck where we

24   worked, and there was a big conference table in there.

25   We were all sitting, and I know Leah and Para were

1    extremely upset and crying and...

2        Q.   What was Mr. Wells doing?

3        A.   At that time, he was asleep in the chair.

4        Q.   Okay.  Did you have occasion to see Mr. Wells the

5    next day?

6        A.   I do not recall.

7        Q.   Okay.  And after the murders, did you have

8    occasion to see Mr. Wells and make comment -- reflect

9    upon any changes in his appearance?

10       A.   The day that it happened, much -- much cleaner

11   than normal.

12       Q.   What do you mean by much cleaner than normal?

13       A.   Just clean outfit, hair combed.

14       Q.   Okay.  Did you have occasion to be down in T-2

15   when Mr. Wells was down there?

16       A.   A few times, yes.

17       Q.   Did you have occasion to be near his desk at one

18   point in time?

19       A.   Yes.

20       Q.   Is there something happened with respect to you

21   and Mr. Wells and some items on his desk?

22       A.   I just moved a stapler from one spot to the other

23   after I used it, and it upset him.

24       Q.   Can you explain to the jury what you mean by it

25   upset him?

1      A.   I just moved it from one place to the other, and

2   he just was upset that I was touching his things on his

3   desk.

4      Q.   How upset on the range of upset are you talking

5   about?

6      A.   His voice got -- he like raised his voice, and I

7   just apologized and moved it back.

8      Q.   What did he say to you?

9      A.   Why are you touching the stuff on my desk?  So...

10     Q.   Did you put the stapler back?

11     A.   I did.

12          MR. SKROCKI:  That's all the questions I have

13   for Mr. Encinas.  Thank you.

14          THE COURT:  Mr. Camiel, go ahead, please.

15                    CROSS EXAMINATION

16   BY MR. CAMIEL:

17     Q.   Good morning, sir.

18     A.   Good morning.

19     Q.   When you first arrived to work at the

20   Communications Station Kodiak, did you have to go

21   through some kind of an orientation process down at the

22   T-2, at the rigger shop?

23     A.   Yes, sir.

24     Q.   What was that?

25     A.   It was to get familiar with the antennas in the

1    antenna field and then watch the video, a safety video.

2        Q.  A safety video about bear awareness?

3        A.  Yes, sir.

4        Q.  And who did that initiation or orientation?

5        A.  Christopher Sheldon and Rich Belisle.

6        Q.  And then you'd also get down to the T-2 building

7    you said sometimes to do your rounds?

8        A.  Yes, sir.

9        Q.  And what time would you do rounds?

10       A.  When you took duty -- when you took duty in the

11   morning and then at the end of the workday.

12       Q.  All right.  So what was your shift?

13       A.  It would be from 8 to 4 when you had duty.

14       Q.  And so when you started your shift, you'd do

15   rounds and then when you finished your shift you'd do

16   them again?

17       A.  Yes, sir.

18       Q.  And the watch officers who started their shift at

19   7:00, did they do the same thing?

20       A.  I don't know what you're -- watch officers?

21       Q.  We've -- we've heard from some witnesses that

22   they had shifts from 7:00 a.m. to 7:00 p.m.

23       A.  The operation specialists?

24       Q.  Yes.

25       A.  I'm not a part of them, so I wouldn't know if

1    they were doing rounds or not, sir.

2    Q.  All right.  So that was separate from -- if they

3    did rounds, what you're talking about is completely

4    separate rounds?

5    A.  Yeah, it's the electronics duty part of it.  So

6    when you're on duty, we just -- you could be called in

7    to fix any electronics, communication casualty that the

8    operation specialists had.

9    Q.  All right.  So the people who worked at -- the

10   watch officers who worked on the ops deck, that's

11   different from where you worked?

12   A.  Yes, sir.

13   Q.  All right.  And they had rounds that they did,

14   and then if you had the duty from where you worked,

15   you'd also do rounds?

16   A.  I don't -- I can't speak to what they did,

17   because I didn't work with them, but just from the

18   electronic technicians side, that's when we did our

19   rounds.

20   Q.  Let's talk for a minute about the warehouse you

21   were talking about.  That was in -- around February or

22   March of 2012; is that right?

23   A.  I do not recall when it was, sir.

24   Q.  You said you worked there about a week, but that

25   project had been under way for a longer period of time;

1   is that right?

2       A.   It could have been.  That's when I was tasked to

3   start helping, sir.

4       Q.   All right.  So -- but when you went down there to

5   do the week that you worked, you could see that other

6   people had already been doing some work down there?

7       A.   Yes.

8       Q.   And so on the occasion that you just told us

9   about, when you went in there, there were all these nuts

10  and bolts that had been separated by size and organized,

11  right?

12      A.   Yes, sir.

13      Q.   All right.  And what you were doing was taking

14  all of these things that were organized and dumping them

15  all into just one bin, so basically just mixing them all

16  up?

17      A.   Yes, sir.

18      Q.   And that was when Mr. Wells showed up and saw

19  what you guys were doing?

20      A.   Yes, sir.

21      Q.   And that's when he just -- he shook his head and

22  gestured and just walked off?

23      A.   Yes, sir.

24      Q.   Didn't say anything?

25      A.   Not that I could like hear.

1    Q.  Certainly didn't raise his voice?

2    A.  Didn't say anything, sir.

3    Q.  Didn't try to stop you from throwing all these

4    things in the bin?

5    A.  No, sir.

6    Q.  Didn't go over and yell at anybody?

7    A.  No, sir.

8    Q.  That was it, just shook his head, said something

9    that you don't remember and walked off?

10   A.  Yes, sir.

11   Q.  Now, on the morning of April 12th, you were a

12   little late to work that morning; is that right?

13   A.  Yes, sir.

14   Q.  You didn't get to work until about 8:30?

15   A.  Yes, sir.

16   Q.  So by the time you got there, there were already

17   people who were told to gather up in the T-1 building?

18   A.  Yes, sir.

19   Q.  So for example, the crew that worked down in T-2,

20   as well as other people who worked in the T-1 building,

21   were all told to just stay up there, right?

22   A.  Yes, sir.

23   Q.  And it was a long day, people had to stay up

24   there for over 12 hours?

25   A.  Yes, sir.

1    Q.  And it was at some point during that day that you

2  saw Mr. Wells in a chair, he appeared to be asleep?

3    A.  Yes, sir.

4    Q.  And because -- by the way, why were you late that

5  morning?

6    A.  My son was extremely ill, and I was cleaning up

7  vomit.

8    Q.  All right.  I've been there.  You were asked

9  about how long Mr. Wells had been at the COMMSTA, and

10  you said the running joke was he had been there as long

11  as the building had been standing?

12    A.  Yes, sir.

13    Q.  Because he was kind of known as, you know, the

14  old guy there?

15    A.  Yes, sir.

16    Q.  Kind of -- people would refer to him as Father

17  Time?

18    A.  Father Time, yes.

19    Q.  Now, you talked about Mr. Wells' appearance on

20  April 12th.  And of course, because he worked in the T-2

21  building, none of the people in the T-2 building

22  actually did their job that day, because they all had to

23  go up to T-1 and stay there all day, right?

24    A.  Yes.

25    Q.  Usually the people down at T-2 were either

working on equipment or they were out in the antenna

field chain-sawing things or cutting grass or doing

other kind of physical work, right?

    A.  Yes, sir.

    Q.  But on this day it was different because they

didn't get to do their jobs?

    A.  Correct.

         MR. CAMIEL:  That's all I have.

         THE COURT:  All right.  Any follow-up?

         MR. SKROCKI:  No, ma'am.

         THE COURT:  All right.  Thank you, sir.  You

may be excused.

         (Witness excused)

         MR. SKROCKI:  We call Phillip Jordinelli.

         THE COURT:  All right.

         MR. SKROCKI:  And just for timing purposes,

Judge, we have one more witness after Mr. Jordinelli and

then we're out of witnesses for the day.

         THE COURT:  All right.

         MR. SKROCKI:  We should get close to 12.

         THE COURT:  All right.  That's fine.

         Good morning.  If you could come up to the

witness stand, please, and when you get there remain

standing and the clerk will administer an oath to you.

         (Oath administered to the witness)

         DEPUTY CLERK:  For the record, can you please
state your full name and then spell your full name.

         THE WITNESS:  My name is Phillip Jordinelli.
And it's P-h-i-l-l-i-p.  Last name is
J-o-r-d-i-n-e-l-l-i.

         THE COURT:  Go ahead, please.

         MR. SKROCKI:  Thank you, Your Honor.

      PHILLIP JORDINELLI, GOVERNMENT WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. SKROCKI:

   Q.  Good morning, Mr. Jordinelli.

   A.  Good morning.

   Q.  Could you please tell the jury what you do for a
living and where you live?

   A.  I currently live in Kodiak, Alaska.  And I work
at the Native Association, Kodiak Area Native
Association, which is like a medical provider.

   Q.  And prior to that, sir, what did you do for a
living?

   A.  I was in the Coast Guard from 1990 to 2015.  I
retired in 2015.

   Q.  And during that time in the Coast Guard, where
were you stationed?

   A.  In my time in the Coast Guard?

   Q.  Well, let's -- let's focus on Kodiak.

1     A.   Okay.   So I was transferred to Kodiak in 2008,

2   and I retired in 2015.

3     Q.   And during that time did you have occasion to

4   know Jim Wells?

5     A.   I did.

6     Q.   In what capacity?

7     A.   I knew him professionally.   I knew him prior to

8   going to the COMMSTA.   I was stationed in Kodiak at the

9   COMMSTA from 1996 to 2000, and I knew him as a person

10  who worked in the rigger shop.

11    Q.   While you were in Kodiak, what were your

12  responsibilities at the Communication Station?

13    A.   I was the operations officer.   So I was

14  responsible for maintaining the communications watch at

15  the Communication Station, which was an HF broadcasting

16  radio station and we provided communications to the

17  Coast Guard aviation fleet, the cutters that were

18  deployed out there, and we did search and rescue cases

19  for the mariners.

20    Q.   So that was your area of responsibility?

21    A.   Yeah.   I was ensuring that the watches were being

22  manned and that they were following Coast Guard

23  procedures when they received like search and rescue

24  cases or medical cases and stuff like that over the

25  radio.

1    Q.  So this was about broadcast and reception of

2 communication?

3    A.  Yes.

4    Q.  As part of that job, were you familiar with how

5 the power systems were in place for the broadcast and

6 receiving of those messages?

7    A.  Yes.  I was very --

8    Q.  And were there backups to those communication

9 systems for the Communication Station in the event of a

10 power outage?

11   A.  Yes, we -- yes, there was.

12   Q.  What kind of backups were there?

13   A.  We had a -- so the COMMSTA was powered by

14 commercial power.  We had a backup generator.  It was a

15 huge diesel engine that was in the -- behind the

16 transmitter deck, and it was able to provide power to

17 the entire Communication Station in case we had -- in

18 case we lost power from commercially.

19   Q.  Would that have been the case in 2012?

20   A.  Yes.  Uh-huh.

21   Q.  And when you were there in 2012, back us up when

22 you got back to Kodiak.  Like in other words, prior to

23 2012, when did you get back to Kodiak to start your work

24 there?

25   A.  2008.

1    Q.  So '08 to 2012?

2    A.  Yeah.  I was there from 2008 to 2015.

3    Q.  Sorry.  My fault.  Thank you.

4        As part of your area of responsibility, were you

5    aware of the maintenance that was being done on the

6    various antenna fields on Kodiak?

7    A.  Yes.  We had daily briefs.

8    Q.  Who was in charge of the daily maintenance in

9    2012 of the antennas and the antenna fields?

10   A.  So there was an engineering officer who would

11   report.  And then the rigger shop, the antennas, that

12   would be -- there was a chief, Chief Reckner, was in

13   charge of the rigger shop.  And then he would delegate.

14   If there was a casualty to the antennas, if there was a

15   problem, then he would delegate it to his crew, which

16   was the two civilians and the petty officers and the

17   non-rates at the rigger shop.

18   Q.  Do you remember some of the names of those

19   individuals?

20   A.  Yeah.  There was -- there was -- the chief was

21   Chief Reckner.  And then there was Jim Hopkins, which

22   was the petty officer.  He was first class.  There was

23   Jim Wells and Rich Belisle who were the civilians.  And

24   then there was the two non-rates.  There was like three

25   or four non-rates.  And then there was a couple petty

officers.  Beauford was a petty officer.  Upchurch was a
non-rate.  Leah, I forgot her last name.  Was -- Henry
was her last name I believe.

Q.  Uh-huh.

A.  And then there was -- and it would rotate, so
they would rotate petty officers all the time from the
T-1 deck to the T-2 deck.

Q.  All right.  And if you could describe Mr. Wells'
knowledge of the antenna fields and the maintenance and
such.  How would you describe that?

A.  He was -- he was the subject matter expert.  So
he was -- he was the main person who -- he had been
there for 20 years.  So he had -- and had the same job
running the antennas, so he was the person that was the
most versed at the time.

Q.  Did there come a point in time in the 2011/2012
timeframe in your position with respect to the antenna
fields and the antennas and communications thereof about
maintenance with the antennas?

A.  Yes.

Q.  Could you explain to the jury what that is or
was?

A.  The process of it?

Q.  No.  Problems was the word --

A.  Oh, yeah.  So we had like -- we had like 30-plus

antennas, and there was receiver antennas and there's
transmit antennas and then there's long range, short
range, directional, omnidirectional.

So when -- when the watchstander is doing his
radio communications and he's trying to connect with
a -- with a vessel or an aircraft, he has to select what
antenna to use.  There's a switchboard and there's all
these computer programs, so he selects an antenna.  So
any time an antenna would go out, it would cause it to
fault.

Q.  So let me -- let me stop you there.  Were
there -- was there a problem with the antennas in the
2011/2012 timeframe in terms of maintenance?

A.  Oh, yeah.  Periodically, yes.

Q.  They require maintenance over time, don't they?

A.  They do, yeah.

Q.  Okay.  Was that maintenance getting done?

A.  To my knowledge, it was, yeah.

Q.  Okay.  And towards the end of -- early 2012, did
you have occasion to understand -- do you know about
Mr. Wells' medical conditions?

A.  I knew that he was on a leave of absence because
of medical issues, and he was going up to Anchorage to
the VA and that he was gone for I would say a couple
months maybe, a month, two months.

1    Q.   In terms of maintenance of the antennas and the

2  antenna fields while Mr. Wells was gone, was that work

3  being conducted and kept up to -- were they being

4  repaired?

5    A.   Yes, they were.

6    Q.   And who was -- who was doing that work?

7    A.   That was the rest of the staff, Jim Hopkins and

8  Chief Reckner and Rich Belisle and then the crew that

9  were down there.  They were -- they were a very

10  competent crew.

11    Q.   Were they making any improvements to the antenna

12  field while Mr. Wells was gone in terms of maintenance?

13    A.   In terms of not just maintenance but fixing

14  antennas.  So I mean things that were down for years

15  were getting fixed.  So these antennas were very old,

16  and they were doing a lot of good progress, not only at

17  the -- in Kodiak, but they would go out and maintenance

18  all the remote antennas as well throughout Alaska.

19        So yes, they were on top of -- our casualty list

20  of all the antennas was -- was not -- was actually

21  pretty good at the time.  We had like an 80 to

22  90 percent rate of our antennas that we could use on a

23  regular basis.

24    Q.   So that improved?

25    A.   Yeah, it was -- it was better than I had ever

1  seen it.

2      Q.  And that would have been the case the day of the

3  murders?

4      A.  I would say yes, because in the time of murders

5  they were actually working on an antenna, antenna 15,

6  which was a directional.  And they were actually getting

7  that antenna to start to move on its own.  So yeah, they

8  were doing a lot of good progress on these antennas.

9      Q.  Okay.  If I can turn your attention,

10  Mr. Jordinelli, to April 12th of 2012.

11      A.  Uh-huh.

12      Q.  Do you recall how you started your morning that

13  morning?

14      A.  Yeah.  I was getting ready for work and I was --

15  it was like 7:30 or 7:15 or something like that in the

16  morning.  And I was getting my kids ready for school,

17  and my wife was going to work.  And then I got a call

18  from the watch saying there was two people that was

19  injured at T-2.

20      Q.  Did you go into work right after that?

21      A.  I changed and then I drove right to work, yeah.

22      Q.  At some point that morning, were you advised

23  about the deaths of Mr. Hopkins and Mr. Belisle?

24      A.  I was told by the watchstander when he called

25  that there was two people that were injured.  And then I

said, Did you call medical?  And they said they believed

that they were dead.  So I -- they didn't say they were

shot or anything.  They said they were in a pool of

blood.  So I didn't know what the situation was, what

happened, but I knew when I got to the COMMSTA that it

was pretty serious.

Q.  Did you have occasion to see Mr. Wells on

April 12th?

A.  Yes.

Q.  Can you please tell the jury about that contact

with him?

A.  I saw Mr. Wells after I arrived.  He showed up

not long after I got there.  And he pulled up in the

same place as we all pulled up in front of T-2 by the

flagpole.  Because there was all police.  They weren't

letting anybody go into the buildings until they checked

in.  So when I showed up, he was -- I think he showed up

shortly after I did.  And then I saw him through the

course of the day.

Q.  Okay.  And did you have occasion to speak with

him during the course of the 12th?

A.  Yes, I did.

Q.  Can you tell the jury about those times you spoke

to Mr. Wells?

A.  So we had all the rigger shop people in the

conference room on the ET deck.  And I came up and I
asked him if he was doing okay.  And he said something
like, how am I supposed to feel or something like that,
how am I supposed to feel.  And he was, you know, kind
of like I would say not in shock, just kind of like
not -- I would say maybe in shock.  I don't know.  Just
kind of calm.  But under the circumstances, everybody
was reacting differently.

Q.   Did you have occasion to see him that evening?

A.   I saw him once when we -- we stepped outside.  I
think we all went outside to the porch -- I mean to the
front of the building and we were -- he was talking to
an investigator about -- I don't know if was about the
weather, because we had really good weather that day.
It was just some side conversations I heard him say.

MR. SKROCKI:  If we could have the lights,
please, and Exhibit No. 105, which I believe has been
admitted.

THE COURT:  Yes.  Thank you.

BY MR. SKROCKI:

Q.   Mr. Jordinelli, we showed you this chart before
your testimony here this morning?

A.   Yes.

Q.   Do you recall seeing that?

A.   I do.

1    Q.  And there should be a laser pointer on the table

2  there.  It may be in a very -- is it out of the box?

3    A.  I got it.

4    Q.  Okay.  And do you -- did you have occasion to

5  look at that chart and be present when it was created?

6    A.  I did, yes.

7    Q.  And did you make some initials on that chart with

8  respect to some vehicles that were there --

9    A.  Yes, I did.

10    Q.  -- on the T-1 camera?

11    A.  Yes.

12    Q.  Can you show the jury where you initialed?

13    A.  Let's see.  So CW Jordinelli right there.  And

14  it's that little PJ thing.  This one, yeah.

15    Q.  That one there?

16    A.  Yeah.

17    Q.  That looks like a B to me.

18    A.  Yes.  It's a PJ.  Together it looks like a B.

19  And then that right here, I believe -- I think -- oh,

20  yeah, we double initialed.  That's right.  So that's

21  someone else's initial, and then if I confirm that I

22  would initial next to it.

23    Q.  Okay.

24    A.  So that's why my name's next to that other

25  initial.

1    Q.  All right.  Do you see any other of your initials

2  there on that chart?

3    A.  I -- no, I think there's three I initialed.

4    Q.  Okay.  And show those to -- I think I've missed

5  one myself.  I apologize.  So show me the three.

6    A.  This one.

7    Q.  Okay.

8    A.  That one.

9    Q.  I got it now.

10    A.  And I'm not sure if that's me or not.

11    Q.  Can you go up about three more blocks?

12    A.  Oh, yeah.  That one's me too, yep.

13    Q.  Okay.

14    A.  Yep.

15    Q.  All right.

16        MR. SKROCKI:  Can we have the lights, Madam

17  Clerk.  And Blair, if you can take that down.

18        And sir, those are all the questions I have for

19  you this morning.

20        THE WITNESS:  Okay.  Thank you.

21        THE COURT:  Mr. Colbath, go ahead, please.

22        MR. COLBATH:  Thank you.

23                CROSS EXAMINATION

24  BY MR. COLBATH:

25    Q.  Good morning, sir.

1    A.   Good morning.

2    Q.   The antenna field maintenance, that was probably

3    an -- given the volume of antennas and -- and the

4    spread-out nature of your antenna fields, that was a --

5    an ongoing, just a regular project that occurred?

6    A.   Yes.

7    Q.   All right.  And it sounds like 2011 and into

8    2012, progress was being made?

9    A.   Yes.

10   Q.   Okay.  And you were aware probably of the big

11   project that went on there in the summer of 2011 out on

12   the island of Shemya.  You had -- you had some new

13   antennas and some maintenance of things out there,

14   right?

15   A.   Yeah.  They -- they transplanted an antenna from

16   Attu to Shemya, yes.  I was aware of that.

17   Q.   And it was -- that was part of the process of

18   things getting on line or getting -- getting better and

19   better?

20   A.   Yes.  Uh-huh.

21   Q.   All right.  The -- as -- were you -- on the ops

22   deck, would you have been the person in charge on the

23   ops deck or was there command that was above you that

24   was regularly on the ops deck?

25   A.   So my office was not on the ops deck.  I had a

```
 1    chief.  I had three chiefs that were on the ops deck
 2    that were there, but the ultimate responsibility was the
 3    watch officer.
 4        Q.  Okay.
 5        A.  So there was a watch officer, and then there was
 6    chiefs.
 7             MR. COLBATH:  Blair, could you pull up Exhibit
 8    No. 10 -- Government Exhibit No. 10.  Yeah, please.
 9        Q.  This, sir, has been -- okay.  And you're here,
10    right?
11        A.  Yes.
12        Q.  And if it's easier to see it's on that screen
13    next to you as well, but -- and then --
14             THE COURT:  It's not on that screen.
15             MR. COLBATH:  Oh, I'm sorry.  Exhibit No. 10 is
16    admitted.
17             THE COURT:  Yeah, no, it is.  It's just not on
18    the witness's screen.  I'm not sure why that's not
19    working.
20             MR. COLBATH:  Well, I apologize.  I thought it
21    was -- I thought it was working, but maybe --
22             THE COURT:  It was, until just now.
23             MR. COLBATH:  Till I needed it, till I said
24    something about it.
25             THE WITNESS:  I see it now.
```

1           THE COURT:  Well, it's good we have someone

2    with experience in electronics.

3           THE WITNESS:  It was the o-f-f button, on/off.

4           MR. COLBATH:  You were a communication

5    specialist.

6           THE WITNESS:  I'm just an operator.  I don't

7    fix things.

8    BY MR. COLBATH:

9       Q.  So where I circled there, that's you?

10      A.  Yes, that's me.

11      Q.  And then underneath it just says "person in

12   charge," but it doesn't tell me who that was, who that

13   was.

14      A.  Well, actually --

15      Q.  Who was that?  Excuse me.

16      A.  So at the time, I did not have an OS master

17   chief, an OSCM, an operation specialist in charge.  That

18   was -- Master Chief Lowdermilk was the silver badge, so

19   his position was no longer -- he wasn't the master chief

20   in charge of the -- of the ops deck.  Does that make

21   sense?  Like he wasn't in the chain -- my chain of

22   command anymore.  He was in -- he was under Van Ness and

23   Lieutenant Pizzurro.  But I had an OSIC, like a chief,

24   that I would put in that position, which was Chief

25   Gerasimof at the time.

 1    Q.   Okay.

 2    A.   But he was an E-7.  He wasn't a master chief.

 3    Q.   Then even though -- and then the rigger shop, you

 4  said Chief Reckner and the rigger shop, they were over

 5  here?

 6    A.   Yes.

 7    Q.   And at the chief level, who was over here?

 8    A.   Oh.  So that's an ET, so that's the ET chief.

 9  That was -- that was Fillion, I think, Ray Fillion.

10    Q.   Oh.  We heard that name.  Ray Fillion.

11    A.   Yeah.

12    Q.   So you said there were three chiefs under you.

13  It's not this, right, because you're over on the --

14    A.   Yeah.  You see it says -- it says OSC?

15    Q.   Uh-huh.

16    A.   So there's -- this is an old PAL, so I'm not sure

17  how this came up with that but -- so the OSCs are

18  chiefs.  So there's four chiefs and one day worker

19  underneath me.

20    Q.   Okay.

21    A.   And then there's an EKMS manager who was usually

22  a first class.  So those were day workers.  So those

23  guys came in Monday through Friday, and they were -- and

24  then each chief had a watch section.  So you see

25  underneath it, it says, watch section 1, 2, 3, 4?

1    Q.  Ah.

2    A.  So each chief was responsible for like four to

3 seven people.

4    Q.  So in the -- where it says "watch section" here

5 on our --

6    A.  Yeah.

7    Q.  -- where it says "watch section," that's actually

8 a group of people --

9    A.  Yeah.

10    Q.  -- the guys doing the watch and doing the rounds

11 and that kind of thing?

12    A.  Correct.

13    Q.  Ah.  Okay.  I was -- you can take that down,

14 Blair.  Thank you so much.

15       That's what confused me is we've heard from a

16 number of people who said they were watch and they were

17 doing rounds but I --

18        MR. SKROCKI:  Objection; testimony.

19        THE COURT:  That -- go ahead, Mr. Colbath.

20 BY MR. COLBATH:

21    Q.  Now, what -- what would have been then your

22 normal work hours or work schedule there?

23    A.  I was there from like 8 to 4.

24    Q.  Okay.  And on the -- on April 12th, when -- when

25 did you get to work that day, the day of the incident?

1       A.  I got -- I was early because of the phone call,
2   so I got there a little -- around 8 or maybe before 8.
3       Q.  Okay.  And then it sounds like in fairly short
4   order after being stopped at -- down by T-2, you made
5   your way up to --
6       A.  Yes.
7       Q.  -- T-1?
8       A.  Uh-huh.  Yeah.
9       Q.  And then were you there with the rest of the
10  crew, T-1 and T-2 crew, for well into the evening for
11  the long haul of things?
12      A.  I was in my office.  So I had gone to my office,
13  and I was talking to Coast Guard command, because they
14  were calling and they wanted to talk to somebody on the
15  scene.
16      Q.  Okay.
17      A.  And the CO and XO were out -- were out with
18  troopers or doing next of kin notifications and stuff
19  like that.
20      Q.  But did you stay there throughout the day?
21      A.  I did.  I was there until 10:00 at night.
22      Q.  In -- it sounds like in and out of your office,
23  because you did have occasion to speak to Mr. Wells at
24  times?
25      A.  I was in and out with the crew, yeah.

1    Q.   Okay.   And I just wanted to make sure I heard

2   what you said he said when you asked about how he was

3   doing.

4    A.   Yeah.

5    Q.   You couldn't quite read the emotion, but he said

6   he didn't know how to feel?

7    A.   Yes.

8    Q.   Okay.   You probably saw all kinds of different

9   reactions from all kinds of different people that day?

10    A.   I did, yes.

11    Q.   Now, had -- had you worked the day before, do you

12   remember?

13    A.   Yes, it was a -- yeah, the incident happened on a

14   Thursday and I was there on Wednesday, yeah, the day

15   before.

16    Q.   And the day after?

17    A.   Yes.

18    Q.   That was your -- I mean it was a normal workweek

19   for you?

20    A.   Yeah, Monday through Friday, yeah.

21    Q.   Okay.

22         MR. COLBATH:   If I can have just one second,

23   Your Honor.

24         THE COURT:   Certainly.

25         (Pause)

```
 1              MR. COLBATH:  If I could have just one second,
 2    Your Honor.  I need to find a piece of paper here.
 3              THE COURT:  That's fine.  Take a moment.
 4              (Pause)
 5              MR. COLBATH:  That's -- you know what, Your
 6    Honor, that's all I have.
 7              THE COURT:  All right.  Any redirect?
 8              MR. SKROCKI:  Nothing from us, Your Honor.
 9              THE COURT:  All right.  Thank you, sir.  You
10    may be excused.
11              (Witness excused)
12              THE COURT:  And you have one more witness this
13    morning?
14              MR. SKROCKI:  We do.
15              THE COURT:  All right.  Very good.
16              MR. SKROCKI:  We call Troy Lowdermilk, Your
17    Honor.
18              THE COURT:  All right.
19              (Pause)
20              THE COURT:  Good morning.  If you could come up
21    to the witness stand, please, sir, and when you get
22    there, the clerk will administer an oath to you.
23              (Oath administered to the witness)
24              DEPUTY CLERK:  For the record, can you please
25    state your full name and then spell your full name.
```

         1          THE WITNESS:  Certainly.  Troy Edward
         2   Lowdermilk, T-r-o-y, E-d-w-a-r-d, L-o-w-d-e-r-m-i-l-k.
         3          THE COURT:  Go ahead, please.
         4          MR. SKROCKI:  Thank you, Your Honor.
         5          TROY LOWDERMILK, GOVERNMENT WITNESS, SWORN
         6                   DIRECT EXAMINATION
         7   BY MR. SKROCKI:
         8     Q.  Good morning, Mr. Lowdermilk.
         9     A.  Good morning, sir.
        10     Q.  Sir, could you tell the jury where you work?
        11     A.  Now?
        12     Q.  Yeah.
        13     A.  Oh.  I'm currently a full-time dad and student at
        14   Washington State University.
        15     Q.  Sounds like you're busy.
        16     A.  I am.
        17     Q.  Prior to that, sir, who was your employer?
        18     A.  My employer was the United States Coast Guard.  I
        19   retired February 2013.
        20     Q.  And prior to your retirement in 2013, did you
        21   have occasion to work at the Communication Station on
        22   Kodiak?
        23     A.  I did.  I was the command master chief at
        24   Communication Station Kodiak from the summer 2010 until
        25   December of 2012.

1    Q.   And what building did you have your office in?

2    A.   My office was in T-2, the main building.

3    Q.   T-2 or T-1?

4    A.   Oh, I may have that got wrong.  The bigger

5    building, T-1.  My mistake.

6    Q.   The bigger one?

7    A.   The bigger one.

8    Q.   Fair enough.  What was your area of

9    responsibility, Mr. Lowdermilk?

10   A.   As command master chief, my job was to report

11   directly to my principal, who was the commanding

12   officer.  I only answered to the commanding officer.

13   That makes me in the chain of command but not in the

14   chain of command.

15        I had access to the whole unit, so I could solve

16   problems, put out fires, not -- little fires, but things

17   that come up with personnel, whether it be training

18   needs, outside unit needs.  Say they were having

19   problems with their home life or landlord or anything, I

20   pretty much handled any of those kind of problems

21   whenever possible so the command could do their job and

22   run the unit.

23   Q.   Would people come talk to you because of that

24   position?

25   A.   Oh, certainly.

1     Q.  And did you have occasion to be familiar with the

2   people who worked in the rigger shop or the smaller

3   building?

4     A.  Certainly, yeah, down the road at T-2.  I would

5   commonly walk down there to visit, you know, have a cup

6   of coffee, talk to -- try to get them comfortable,

7   especially a lot of the junior personnel.

8          You're the highest enlisted rank as far as you

9   can go.  You're the last person they usually want to

10  talk to, because you're also associated with

11  disciplinary action.  So you try to as best as possible

12  become almost a parental figure.

13         I always said I was their weird uncle.  But

14  they -- it made it more comfortable.  I'd even have

15  chocolate in my office, really my Swiss chocolates, to

16  get them to come in.  And the deal was if you came to

17  get some, you had to talk to me.

18    Q.  Did that work?

19    A.  Oh, extremely.

20    Q.  Okay.  Just for practical purposes down the line.

21         So people would come talk to you about various

22  issues they had, the employees?

23    A.  Certainly.

24    Q.  I want to direct your attention to April 12,

25  2012.  Do you recall what you were doing that morning?

1     A.  Actually I was getting ready for work.  I was

2  just waking up, and -- and I got a phone call about the

3  incident.  It -- I didn't have my -- two men down,

4  that's all I heard.

5     Q.  Did you come into work after hearing about this

6  incident?

7     A.  Right away.

8     Q.  And where did you go?

9     A.  As I came in, I was passing T-2, the XO, David

10  Pizzurro, was helping direct traffic.  And I stopped,

11  and that's where I got more info.  And then I proceeded

12  up to T-1, put my car in my parking space and went right

13  on into the building.

14     Q.  When you got into the building, what was -- what

15  did you notice about the employees who were present that

16  you observed?

17     A.  A very different atmosphere overall.  Not of

18  course a typical day.  A lot of people on the verge of

19  tears, in tears.  Your typical trauma response is pretty

20  much across the board.

21     Q.  Did you have occasion to see people in your

22  office that day, Mr. Lowdermilk?

23     A.  Yes, I did.  Several.

24     Q.  And do you know Jim Wells?

25     A.  Yes, I do.

1    Q.   How well do you know Mr. Wells?

2    A.   Not very well.  I should have known him better as

3  one of the personnel, but he was one of the personnel

4  that was very hesitant to even speak to me.

5    Q.   So he was never one to come into your office to

6  speak with you?

7    A.   Only one occasion.

8    Q.   What occasion was that?  Please tell the jury.

9    A.   That was on -- on the morning of the incident, I

10  went to my office.  I was making rounds constantly.  I

11  went to my office to check messages and such because

12  everything was lighting up.  And I had a couch across

13  from my desk where people would come and sit.  And

14  Mr. Wells came and sat.  And I --

15    Q.   Did he say anything when he came and sat?

16    A.   Not a word.

17    Q.   Keep going.  Please tell the jury.

18    A.   So not a word.  He stared at me without

19  flinching.  No movement.  I tried speaking to him

20  several times.  It got -- it was very concerning.  I had

21  no idea what was going on.

22    Q.   How long did this exchange -- or how long did

23  this --

24    A.   10 to 12 minutes of me trying to pry something

25  out of him.

1    Q.  What did you ask him?

2    A.  Do you need help?  What's wrong?  Why are you

3 here?  The typical questions.

4    Q.  Did you ever get an answer?

5    A.  Not once.

6    Q.  And what did you ultimately do?

7    A.  Ultimately, I left.  There were other personnel

8 that needed tending to, around 60 people I had to take

9 care of, including the command, trying to keep them so

10 they could do their jobs.  And put on my best game face

11 and kind of keep everyone calm.  So I left.  And I can't

12 remember who I spoke to, but I said, hey, you know, Jim

13 is in my office and he needs help.

14    Q.  Did you tell Mr. Wells you were leaving?

15    A.  Yes.  I -- basically, I have to go take of care

16 things.

17    Q.  Did he say anything when you told him that?

18    A.  Not a word.

19    Q.  How were you feeling about that exchange with

20 Mr. Wells then?

21    A.  I wouldn't say intimidated, but it was very

22 concerning.

23    Q.  And ultimately did you come back to your office?

24    A.  I did.  After mentioning it, came back, and he

25 wasn't there anymore.

1          MR. SKROCKI:  That's all the questions I have

2    for Mr. Lowdermilk.  Thank you.

3          THE COURT:  Mr. Camiel, go ahead, please.

4                    CROSS EXAMINATION

5    BY MR. CAMIEL:

6      Q.  Good morning, sir.

7      A.  Good morning.

8      Q.  I think I heard you say you're a student at

9    Washington State University?

10     A.  Yes, I am.

11     Q.  So you're a Coug?

12     A.  I sure am.

13     Q.  I want to talk to you.  First, right around the

14   time of April 12th -- well, when did you retire?

15     A.  My actual retirement date was February 1st, 2013.

16     Q.  When did you put in the paperwork for your

17   retirement?

18     A.  Oh, I can't recall.  Sometime in the spring of

19   2012.  It look a long time, because it was an unusual

20   retirement date.  They like you to retire in the summer.

21     Q.  All right.  So first, let's focus on April 12th.

22   You described your position.  You're almost like the

23   command counselor to the crew?

24     A.  Yes, to a point.  I wasn't a professional

25   psychiatrist counselor, so if I couldn't handle it

1    myself, I knew where to direct them.

2        Q.  But the crew understood that you were -- if they

3    needed to talk, they could go to you?

4        A.  Oh, yes.

5        Q.  If something was upsetting them, you'd be a

6    person they could come talk to?

7        A.  Certainly.  Any time, day or night.

8        Q.  And on the 12th when Jim Wells came into your

9    office, you described him sitting down, not saying a

10   word, just -- just staring?

11       A.  That's correct.

12       Q.  Would it be fair to say he seemed like he was at

13   a loss for words?

14       A.  I wouldn't say loss for words.  It was almost a

15   trance, in my opinion.

16       Q.  Now, you -- you understood by that time what had

17   happened down at -- at T-2?

18       A.  Yes, I did.

19       Q.  That two of the crewmen had been killed?

20       A.  Yes.

21       Q.  And you also understood that had Mr. Wells shown

22   up to work on time, he might have been the third victim

23   down there?

24              MR. SKROCKI:  Objection.

25              THE COURT:  That's sustained.

BY MR. CAMIEL:

    Q.  Did you understand what Mr. Wells' work schedule
was?

    A.  To a point.  The rigger shop had an unusual
schedule because of all the maintenance, tower climbing,
traveling, you know, so they -- they almost worked as
needed.

    Q.  You -- you understood from your experience there
that usually Mr. Wells came in about the same time as
Mr. Belisle?

            MR. SKROCKI:  Objection; foundation.

            THE COURT:  Well, that's a question.  If you
know.  Do you know?

            THE WITNESS:  No, I don't.  I would know who
was there usually by -- you know, I drove by it.
There's so-and-so's car, there's so-and-so's car.
BY MR. CAMIEL:

    Q.  And what time would you come to work?

    A.  It varied.  As command master chief, I pretty had
a -- like an open -- what would you call it, open door
policy.  So if I was, say, up at 3:00 in the morning
speaking with a crew member for some problem, then I'd
sleep in and come in late.

    Q.  Would you ever come in a little after 7:00?

    A.  I'm sure there were times.

         Q.   And do you ever recall seeing Mr. Belisle's truck
when you came in down at T-2?

         A.   Probably several times.

         Q.   And Mr. Wells' truck there?

         A.   Yes.  Yeah.

         Q.   So the whole time Mr. Wells is in your office,
you're thinking he may need some help?

         A.   That's correct.

         Q.   Because he appeared to be under some kind of
distress?

         A.   Yes, like everyone.

         Q.   And -- and you saw a whole range of emotions that
day when you were walking through T-1 and looking at the
different crew members?

         A.   Yes.  The typical emotions that come with trauma,
and everyone sort of has their own.

         Q.   But you understood that Mr. Wells might have had
his own way of -- of expressing the trauma he was going
through?

              MR. SKROCKI:  Objection; speculation.

              THE COURT:  Well, I'll allow that question.

         A.   Yes.  I mean, that -- that was one of the things
that came into my mind.  But it was -- it was more
extreme than anything I had seen.

         Q.   I understand.  Now, I want to go back to the

1   discussion about your retirement.

2          After you put in for your retirement, did you get

3   a communication from Mr. Hopkins about retiring?

4          MR. SKROCKI:  Objection; hearsay.

5          THE COURT:  That is sustained.

6   BY MR. CAMIEL:

7      Q.  In response -- did you -- did you -- well, in

8   response to an e-mail from Mr. Hopkins in April of 2012,

9   did you send him anything?

10     A.  I had received e-mails from him.  Don't remember

11  the date.  I mean I don't know when it was, but yes,

12  I -- I had sent Jim Hopkins a form letter of a --

13  standardized form for retirement.

14     Q.  And -- and why did you send that to him?

15     A.  He knew I had already put in my retirement, and

16  he was unsure of the format.  The writing memos and such

17  was not probably not his forte.  So I said, I'll -- I'll

18  send you mine, just change the names, change the dates,

19  and there you go.

20     Q.  I'd ask the witness for foundational purposes to

21  look at DE-188.

22         MR. SKROCKI:  Objection; relevance.

23         THE COURT:  Just a moment.  Let me look at it.

24  Yes.  Let's have a sidebar.

25              (Begin bench conference)

 1          MR. CAMIEL:  So the government -- what's been
 2     put in issue right now is whether Mr. Hopkins was
 3     planning to retire.  Because the government's theory is
 4     that Mr. Wells didn't want -- as I understand the
 5     government's motive theory, it's that Mr. Wells was
 6     being pushed out.

 7          In fact, there's evidence that everybody knew
 8     Mr. Hopkins said he had been planning to retire.
 9     There's already been some testimony about that.  This is
10     showing that he even requested retirement paperwork and
11     that Mr. Lowdermilk sent him retirement forms.

12          THE COURT:  Well, you've gotten that in.  But
13     are you seeking to admit this?

14          MR. CAMIEL:  Well, I want to show this to the
15     witness to remind him of the dates of when this exchange
16     occurred, because it's very close to the relevant time
17     period.

18          MR. SKROCKI:  It's completely irrelevant.
19     We've not put in the issue of Mr. Hopkins' retirement or
20     that there was a plan to push Mr. Wells out anywhere.
21     It's completely void in this record.  The relevancy of
22     whether a man who's been murdered was going to retire or
23     not, I just fail to see -- I've always failed to see
24     what the relevance is.  There is none.

25          MR. CAMIEL:  Well, if I could just respond, the

government put in that he had this unlimited enlistment. They brought that in.

MR. SKROCKI:  Unlimited what?

MR. CAMIEL:  That he was -- I can't remember the name of the form, but it was an unlimited enlistment.  I can't remember the name of the exhibit.

MR. SKROCKI:  I don't remember that.

THE COURT:  That doesn't ring a bell for me either, but I could have overlooked it.  But --

MR. CAMIEL:  It was an open-ended -- it was an open-ended -- that he had an open-ended enlistment they brought out through a witness.

THE COURT:  I think the fact that somebody is going to retire has some relevance to workplace relationships, so I do see that.  But I don't see -- any other objections?

MR. SKROCKI:  To the letter itself, the e-mail itself, yes, it's hearsay.

MR. CAMIEL:  If I can use it to refresh his recollection as to the dates.

THE COURT:  As to the dates.

MR. SKROCKI:  Why don't you give him the date and lead him as opposed to walking up there and refreshing his recollection?  Say do you recall this date?

1          THE COURT:  To me, you've already gotten there.

2     There was some discussion.  But if you wanted to do

3     that, would that address your concern?

4          MR. CAMIEL:  Yes.

5          THE COURT:  All right.

6          (End bench conference.)

7          THE COURT:  Go ahead, Mr. Camiel.

8     BY MR. CAMIEL:

9       Q.  So Mr. Lowdermilk, isn't it true that on

10    April 4th of 2012, you had this exchange with

11    Mr. Hopkins and sent him the information about how to

12    upload the retirement forms?

13      A.  I can't recall the date.

14          MR. CAMIEL:  If we could just show the witness

15    the DE-188, Your Honor.

16          THE COURT:  Any objection?

17          MR. SKROCKI:  Just showing it, no.  Showing the

18    witness.

19          THE WITNESS:  Here?

20          MR. CAMIEL:  Yes.

21          THE WITNESS:  Is there a way to clean it up?

22          MR. CAMIEL:  If we could blow up the upper half

23    for him.  Just the first -- well, we need the date in

24    there.  If you go a little higher.

25          MR. SKROCKI:  Just the date, please.  Thank

1    you.

2        A.   Yes.  April 4th.

3        Q.   Of what year?

4        A.   2012.

5        Q.   Thank you.

6            MR. CAMIEL:  Your Honor, that's all I have.

7            THE COURT:  All right.  Redirect, Mr. Skrocki?

8            MR. SKROCKI:  We don't have any redirect, Your

9    Honor.

10           THE COURT:  All right.  Thank you, sir.  You

11   may be excused.

12           THE WITNESS:  Thank you, Your Honor.

13           (Witness excused)

14           THE COURT:  All right.  And so as I understand

15   it, there are no additional witnesses that the

16   government plans to call this morning.

17           MR. SKROCKI:  That's correct, Your Honor.  A

18   little ahead of schedule.

19           THE COURT:  Well, that's good news I guess.

20           Ladies and gentlemen, I am going to send you

21   off for the weekend then.  Please leave your notepads

22   here.  Remember my admonition not to do any research or

23   discuss the case with family or friends, and avoid any

24   contact where there might be -- or public information

25   about this case.  It's really critical to both sides, to

1    our adversary system, that the individuals with the

2    responsibility that you have decide a case solely on the

3    evidence that's presented in the courtroom.

4            And with that, I'm thinking as with last

5    weekend, it's a long time for the lawyers to come up

6    with new issues.  So let's do 9:00 a.m. on Monday for

7    you all so I can have them here at 8:30 and solve

8    anything.  Have a pleasant weekend, and we'll see you

9    all on Monday.

10           (Jury absent)

11           THE COURT:  All right.  Please be seated.

12           Why don't we try that again.  Please be seated.

13           Mr. Skrocki, anything else to take up?

14           MR. SKROCKI:  Yes.  Mr. Colbath will tell you

15   about that right now.

16           THE COURT:  All right.

17           MR. SKROCKI:  Nothing from us.

18           MR. COLBATH:  I wanted to make sure they knew

19   about it before I sprung it.

20           THE COURT:  If you need to confer that's

21   absolutely fine.

22           MR. COLBATH:  Well, I was just telling

23   Mr. Skrocki that when -- when we heard Ms. Sherman

24   indicate yesterday that the government was looking at

25   next Wednesday or Thursday, we started making witness

1   calls.  And two of the witnesses on our list, Indira

2   (phonetic) Gainer and Amanda Fortier, I think both --

3   former, maybe still in the Coast Guard or former Coast

4   Guard members, part of the T-1, T-2 COMMSTA staff, both

5   of those individuals live in the Lower 48.  They are

6   both, as I understand it, single mothers with children

7   under five.

8           And so they were concerned about their travel

9   and having to be stuck here or travel with children or

10  have daycare issues.  And so we are going to try to time

11  their testimony and do it -- they're both very short,

12  like -- similar to some of the witnesses we have heard

13  this morning from the Coast Guard.  And so we were going

14  to try to see if we could arrange to have those by

15  video.

16          And I just wanted to get -- I wanted to, first

17  of all, see if the government would have any objection

18  to that, and then if not, just alert the Court that

19  we'll try to make arrangements.  There's usually about a

20  week's notice to do that.  But we'll start in the

21  arrangement process if it's okay.

22          I anticipate at this point from what we know of

23  our list, those would be the only two folks.  And for

24  maybe IT purposes, we were just going to try -- they're

25  not in the same place, but we would try to do them an

1    hour apart on the same day so that we got it done and
2    out of the way.
3         We were maybe even thinking about lining it up
4    for next Friday morning.  I figured that would give a
5    whole day's run over.  Or at least if we got to it
6    Friday morning we could do it as time specific.
7         THE COURT:  Did the TV work good?  Could
8    everybody see this one?
9         MR. SKROCKI:  We don't have any objection,
10   Judge.
11        THE COURT:  Oh, you don't.  All right.  Well,
12   that solves that.  And so --
13        MR. COLBATH:  So we'll start those
14   arrangements.
15        THE COURT:  All right.
16        MR. COLBATH:  And then when we get -- when
17   Mr. Johnson gets it lined up or as we get it lined up,
18   I'll let the Court know and let counsel know what we get
19   for arrangements.  As of now, that was all we had.
20        THE COURT:  All right.  What's the plan for
21   Monday?  Have you sorted that out?
22        MS. SHERMAN:  Partially.  I think we will get
23   to Mr. Toglia's testimony preferably in the morning.  We
24   have one witness that is flying up just for the day, so
25   we'll try and take that one.  He's up from Kodiak I

1    believe.  Mr. Pletnikoff.

2           And then we have an array of witnesses we

3    haven't fully decided.  The other expert the Court

4    should probably review would be Gary Bolden.  My hope is

5    that we get to him.  I think we will likely get to Derek

6    Espeland who did a lot of crime scene and search photos.

7    So that would take up a portion as well.  There may be

8    some smaller witnesses in there.

9           THE COURT:  All right.  Very good.  That's

10   helpful.

11          All right.  With that said, then 8:30 on

12   Monday, we'll resume proceedings.  We'll go off record

13   at this time.

14          DEPUTY CLERK:  All rise.  This matter is now in

15   recess until Monday at 8:30 a.m.

16          (Recessed at 11:41 a.m.)

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2      I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the

3  District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the

4  original stenographic record in the above-entitled
matter and that the transcript page format is in

5  conformance with the regulations of the Judicial
Conference of the United States.

6

     Dated this 29th day of May, 2020.

7

8
                              /s/ Sonja L. Reeves

9                               SONJA L. REEVES, RMR-CRR
                              FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25