```
 1                  UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
 2


 3   UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,     )
                              )
 7          Defendant.        )
     _____)
 8

 9             TRANSCRIPT OF TRIAL BY JURY - DAY 11
        BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10               September 23, 2019; 8:33 a.m.
                       Anchorage, Alaska
11
     FOR THE GOVERNMENT:
12          Office of the United States Attorney
            BY:  STEVEN SKROCKI
13          BY:  CHRISTINA M. SHERMAN
            BY:  KELLEY L. STEVENS
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16   FOR THE DEFENDANT:
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22   _____

23                  SONJA L. REEVES, RMR-CRR
                  Federal Official Court Reporter
24                   222 West 7th Avenue, #4
                     Anchorage, Alaska 99513
25        Transcript Produced from the Stenographic Record
```

I N D E X

September 23, 2019, Trial Day 11

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Luke Robinson | 9 | 11 | -- | -- |
| Matthew Judy | 14 | 28 | 38 | -- |
| Kelvin Skonberg | 39 | 54 | 70 | 72 |
| Angelo Toglia, Jr. | 74 | 108 | -- | -- |
| Arthur Bors | 135 | 138 | -- | -- |
| Robert Pletnikoff | 144 | 149 | 152 | -- |
| Olivia Terry | 153 | 164 | 169 | -- |
| Helena Chavez | 170 | 188 | -- | -- |
| Angela Strause | 192 | 203 | 219 | -- |
| Gary Bolden | 221 | -- | -- | -- |


E X H I B I T   I N D E X

| Exhibit | | Page |
|---|---|---|
| 142 | Gun Case Behind Door in Wells' House | 200 |
| 143 | Open Gun Case in Wells' House | 200 |
| 144 | Ceremonial Sword and Bag | 200 |
| 145 | Ceremonial Swords Found in Wells' House | 200 |
| 153 | Cabinet with Ammo and Charges | 197 |

| | | |
|---|---|---|
| 154 | Closer View of Cabinet with Nail Gun Charges | 197 |
| 155 | Strip Nail Gun Charges | 197 |
| 156 | Strip Nail Gun Charges | 198 |
| 161 | Wells' Truck Tire on Ground | 233 |
| 203 | Tire Showing Clock Markings | 236 |
| 204 | Back Side of Tire | 236 |
| 206 | Close-up of Nail in Tire with Yellow Circle | 236 |
| 207 | Close-up of Nail in Tire | 236 |
| 208 | Inside of Tire Showing Nail | 236 |
| 216 | Interior of Servant Air | 45 |
| 217 | Bathroom in Servant Air | 45 |
| 238 | Island Air Lobby Zoom | 23 |
| 239 | Island Air Outside of Restroom | 23 |
| 240 | Island Air Lobby Overview | 23 |
| 241 | Island Air Lobby Showing Camera | 23 |
| 247 | Safe with Swords in Wells' House | 200 |
| 263 | Photo | 23 |
| 264 | Photo | 23 |
| DE-19 | Kodiak Airport Lot | 164 |
| DE-49 | Photo of Servant Air | 56 |
| DE-50 | Photo of Servant Air | 56 |
| DE-51A | Sketch of Servant Air (DE-51 with corrections) | 65 |
| DE-180 | Servant Air Flight Manifest | 66 |

1    DE-218         Boot Print on Boiler Room Door        216

2    DE-219         Boot Print on Boiler Room Door        216
                    (Close-up)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to Order of the Court at 8:33 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4   the United States District Court for the District of

5   Alaska is now in session, the Honorable Sharon L.

6   Gleason presiding.

7          Please be seated.

8          THE COURT:  Good morning.  Please be seated,

9   everyone.  We are back on record here.

10         And good morning, Mr. Skrocki.  What's the

11  update from the government, anything to take up?

12         MR. SKROCKI:  Not at present, Your Honor.

13  Maybe sometime close to the noon hour, but remember

14  Olivia Terry, she'll be testifying today.  I spoke with

15  Mr. Colbath, so we have a lot of witnesses before her.

16  We figure just get the morning started and we'll address

17  her before she takes the stand.

18         THE COURT:  That sounds fine.

19         Anything to take up, Mr. Colbath?

20         MR. COLBATH:  Your Honor, I wanted to put on

21  the record, I have talked to counsel about this, last

22  week as we were talking through scheduling, the

23  government had given a list to the Court and us, a list

24  of a few witnesses they had decided not to call.  One of

25  them is Robert Morton, Mr. Morton, from the FBI.  He was

primarily, as the Court might recall, their crime scene
analyst person.

Anticipating that we would start our case this
week, we started making travel -- final travel
arrangements and lining things out.  Our expert,
Dr. Dietz, was only available this week.  He has to be
in Washington, DC at actually an FBI function I think
early the following week, and then he's back to back to
back trials and is not again available until like
October 13th.

His testimony was primarily related to
addressing and, to some extent, rebutting Mr. Morton's
testimony.  If the government is not going to call
Mr. Morton, we are not going to call Dr. Dietz.  I
either buy him a plane ticket and have him here this
week or I release him today.

So it sounds like the government confirmed to
me this morning that they are not going to call
Mr. Morton, so I'm going to release Dr. Dietz.  But I
just wanted everybody to know if all of a sudden if
Mr. Morton shows up later in the case and I need to get
Dr. Dietz, that's going to be a problem for us.  I don't
anticipate it from the sounds of the way things are
going to go.

THE COURT:  So you're relying on the

government's representation that they are not calling
Mr. Morton?

        MR. COLBATH:  Correct.  And over the noon hour
today, Mr. Johnson is going to contact Dr. Dietz's
office and say it appears we're not going to need you
and go ahead with your other travel plans and your other
arrangements and not be here this week.

        Other than that, we didn't --

        THE COURT:  That's helpful.

        MR. COLBATH:  -- have any other issues.

        THE COURT:  Mr. Skrocki, can you confirm the
status of Mr. Morton?

        MR. SKROCKI:  For our case in chief, we are not
going to call Mr. Morton.  We made that assessment last
week.  I believe the defense is still calling Mr. Kish
as an expert.

        MR. CAMIEL:  He's still on our list.

        MR. SKROCKI:  Depending what he says, Morton
may be in rebuttal, but I can't make that call at this
point.

        THE COURT:  You're not calling him in your case
in chief?

        MR. SKROCKI:  Totally correct, we're not going
to call him in our case in chief, he's been released.

        THE COURT:  So noted.  Can you remind me again

1 about what we're going to take up with the witness.

2     MR. SKROCKI: Ms. Terry is the witness who

3 testified in the prior trial. She did not know Mr.

4 Wells. In preparation for this trial here, she admitted

5 that she did know Mr. Wells.

6     THE COURT: There was a motion on this?

7     MR. SKROCKI: Yes.

8     THE COURT: What's the docket number of the

9 order that relates to Ms. Terry? I'll go back and

10 review that.

11     MR. SKROCKI: We'll start looking for that.

12     THE COURT: I can find it too. That's fine.

13 That's great.

14     When the jury gets here, we'll begin

15 proceedings. We'll go off record at this time.

16     DEPUTY CLERK: All rise. Court stands in a

17 brief recess.

18     (Recessed from 8:37 a.m. to 9:08 a.m.)

19     (Jury present)

20     THE COURT: Good morning, everyone. Welcome

21 back. Please be seated, everyone.

22     We're back on record here in *United States*

23 *versus Wells.* And Mr. Skrocki, are we ready for the

24 government's next witness?

25     MR. SKROCKI: Yes, we are, Your Honor.

1          MS. SHERMAN:  Next witness is Luke Robinson.

2          THE COURT:  All right.  Very good.

3          (Pause)

4          THE COURT:  Good morning.  If you could come up

5    all the way to the witness stand here.  When you get

6    there, remain standing, if you would, please, and the

7    clerk will administer an oath to you.

8          (Oath administered to the witness)

9          DEPUTY CLERK:  For the record, can you please

10   state your full name and then spell your full name.

11         THE WITNESS:  Luke Paul Robinson, L-u-k-e,

12   P-a-u-l, R-o-b-i-n-s-o-n.

13            LUKE ROBINSON, GOVERNMENT WITNESS, SWORN

14                     DIRECT EXAMINATION

15   BY MS. SHERMAN:

16      Q.  Mr. Robinson, where do you live?

17      A.  St. Cloud, Minnesota.

18      Q.  What do you do for a living?

19      A.  I'm the director of retail dining for St. Cloud

20   State University.

21      Q.  Where did you grow up?

22      A.  Kodiak.

23      Q.  How long did you live in Kodiak?

24      A.  20-something years.  22 years.

25      Q.  When did you leave?

1    A.   2000.

2    Q.   Did you attend high school there?

3    A.   I did.

4    Q.   Do you know the defendant, Mr. Wells?

5    A.   Yes.

6    Q.   And how do you know him?

7    A.   He was father to one of my friends.

8    Q.   Who was your friend?

9    A.   Matt Wells.

10   Q.   How often would you spend time with Matt Wells in

11   high school?

12   A.   Every other weekend, something like that.

13   Q.   Did you go to his house?

14   A.   Yes.

15   Q.   I'm going to talk about firearms for a moment.

16   Did you grow up around firearms?

17   A.   Yes.

18   Q.   What kind?

19   A.   My dad had some guns, pistols and rifles, and

20   things like that.

21   Q.   Are you familiar with revolvers?

22   A.   My dad had some, yes.

23   Q.   Did you ever see any firearms at Mr. Wells' home?

24   A.   Yes, on one occasion.

25   Q.   Can you describe that occasion to the jury?

     1      A.  Yeah.  They had just come back from a hunting

     2   trip and there was some rifles and guns out on a table

     3   and we walked by them on the way up to Matt's room.

     4      Q.  Did you see any revolvers in that group?

     5      A.  Yeah, there was a silver handgun on the table.

     6      Q.  When you say "handgun," was it a pistol with a

     7   magazine or a revolver with a dial?

     8      A.  With the cylindrical dial thing.

     9      Q.  And what color was it?

    10      A.  Silver.

    11      Q.  Do you recall what year that was?

    12      A.  Offhand, between '97 and '98.

    13          MS. SHERMAN:  Those are all the questions I

    14   have.

    15          THE COURT:  Mr. Colbath, go ahead, please.

    16          MR. COLBATH:  Thank you, Your Honor.

    17                     CROSS EXAMINATION

    18   BY MR. COLBATH:

    19      Q.  Good morning, Mr. Robinson.

    20      A.  Good morning.

    21      Q.  Now, you knew Mr. Wells in addition to being --

    22   you spent some time with Mr. Wells, Jim Wells in

    23   addition to just your relationship with his son, Matt,

    24   right?

    25      A.  Yes.

1    Q.  How so was that?

2    A.  He was my baseball coach growing up, and I just

3  -- otherwise, he was Matt's dad.  We hung out all the

4  time, so.

5    Q.  So regular experience not only with Matt Wells,

6  his son, but sort of the family group?

7    A.  Absolutely, yeah.

8    Q.  And this -- first of all, during any of your

9  times with the Wells family, did you go hunting with

10  them or use firearms at all?

11    A.  No.

12    Q.  Okay.  So it was more the baseball and the other

13  activities than the hunting?

14    A.  Absolutely.

15    Q.  So let's talk about this one incident.  Now you

16  graduated high school in '98?

17    A.  Correct.

18    Q.  And this would have been a year or more prior to

19  that that you think -- this occasion where you and Matt

20  were going through the house and you saw the guns?

21    A.  Yeah.

22    Q.  So sometime '97 back?

23    A.  Yes.  Yep.

24    Q.  And nobody was using the guns, handling the guns,

25  around the guns, they were just on a table in the living

1    room or kitchen area?

2        A.   Right.  Everybody was outside in the garage with

3    the -- they had deer hanging up in the garage

4    downstairs.

5        Q.   Do you know who had been on the hunting trip?

6        A.   I don't, no.

7        Q.   So it was something that had occurred prior to

8    the day you and Matt were there going through the house?

9        A.   Correct.

10       Q.   Besides Matt being around, was his younger

11   brother, as you recall, his younger brother, Caleb, was

12   he around the house on that occasion?

13       A.   I'm not sure.  I'm not sure.

14       Q.   Mr. Wells, was he around?

15       A.   Yeah.  Yep.

16       Q.   How about any of -- anybody else, any other

17   adults friends of Mr. Wells or other people that may

18   have been on the hunting trip or in the hunting party?

19       A.   I didn't talk to anybody, but there were a couple

20   of people down in the garage looking at the deer.

21       Q.   And this gun that you -- this revolver that you

22   saw, you had no idea what make or model or kind of gun,

23   just recognized it to be a revolver?

24       A.   Correct.

25            MR. COLBATH:  Okay, sir.  I think that's all I

1  have for you.  Thank you.

2          THE COURT:  Redirect?

3          MS. SHERMAN:  I don't have any redirect.

4          Sir, you may be excused.  Thank you.

5          (Witness excused)

6          THE COURT:  Your next witness?

7          MS. STEVENS:  The government calls Matt Judy.

8          THE COURT:  Good morning.  If you could come up

9  to the witness stand, please.  When you get there,

10 remain standing, if you would, and the clerk will

11 administer an oath to you.

12         (Oath administered to the witness)

13         DEPUTY CLERK:  For the record, can you please

14 state your full name and then spell your full name.

15         THE WITNESS:  Yes.  It's Matthew B. Judy,

16 M-a-t-t-h-e-w, B, J-u-d-y.

17         MATTHEW JUDY, GOVERNMENT WITNESS, SWORN

18                    DIRECT EXAMINATION

19 BY MS. STEVENS:

20    Q.  Good morning, Special Agent Judy.  Who do you

21 work for?

22    A.  I'm a Special Agent with the FBI.

23    Q.  Where do you work?

24    A.  I'm currently assigned to the general resident

25 agency in Juneau, Alaska.

1    Q.   What kind of tasks do you do for the FBI?

2    A.   Currently assigned to investigate all criminal

3    violations under the FBI's jurisdiction.

4    Q.   How long have you been working for the FBI?

5    A.   Since 2004.

6    Q.   And just briefly can you tell the jury what kind

7    of training you received?

8    A.   Yes.  Initially, I went through the FBI's basic

9    agent training in Quantico, Virginia.  And then I

10   received on-the-job training while I was on probation,

11   and then continuing education through my career.

12   Q.   And were you involved in an investigation in

13   Kodiak, Alaska back in 2012, a murder investigation?

14   A.   Yes, I was.

15   Q.   Can you tell the jury how you got involved in

16   that?

17   A.   Yes.  I was assigned to the Juneau resident

18   agency at the time.  I received a call on the morning of

19   April 12th to catch a commercial flight to Kodiak,

20   Alaska, where I flew and arrived in Kodiak late

21   afternoon, early evening on the 12th of April.

22       I was involved with interviews, primarily

23   surveillance, and other interviews after the

24   surveillance.

25   Q.   So you arrived late in the evening.  Can you tell

1  the jury what you did once you got there?

2      A.  Yes.  I initially went to the Communication

3  Station at the Coast Guard where the FBI had set up a

4  command post, where I waited to find out what my duties

5  would be while I was there.

6          I initially assisted an Alaska State Trooper with

7  reviewing some video footage, and then I assisted the

8  Coast Guard Investigative Service with a few interviews,

9  interviewed some Coast Guard members, and then was

10  tasked with going to the Kodiak airport where I

11  conducted surveillance on a blue Honda CR-V.

12      Q.  Do you recall what time you arrived at the

13  airport to conduct that surveillance?

14      A.  Yes, it was about 11:00 p.m. on April 12th.

15      Q.  And do you recall whether or not -- were you with

16  someone else while you were doing surveillance?

17      A.  Yes, I was.  I was with another FBI special

18  agent.

19      Q.  Do you recall whether or not the lead agent or

20  anybody else tasked anybody else with conducting

21  surveillance that evening?

22      A.  Yes.  We relieved an Alaska State Trooper when we

23  arrived at the airport.

24      Q.  So was your team the only team doing surveillance

25  for this case that night?

1      A.   We were -- once we relieved the trooper, we were

2   the only ones at the airport.

3      Q.   So you -- you say you started around 11:00; is

4   that accurate?

5      A.   That is correct.

6      Q.   And walk us through what you did when you got

7   there.

8      A.   When we arrived, we were told which car was the

9   car we were to be watching.  And then myself and the

10  other agent sat in the car and we just watched the car

11  throughout the night and the next day.

12     Q.   So what did you do to, like, stay awake and

13  stuff?

14     A.   We took turns taking naps and sleeping throughout

15  the night, and then I believe we brought coffee and

16  other food with us when we went to the airport.

17     Q.   Anything exciting happen that evening?

18     A.   Nothing.

19     Q.   So what about the next day?

20     A.   The next day, at approximately 8:45 a.m., we were

21  relieved by an FBI team.  We took about an hour to go

22  eat breakfast, and then we returned to the airport and

23  resumed our duties to watch that same exact car.

24     Q.   What time was that?

25     A.   About 8:45 is when we left, and it took us about

1    an hour.

2        Q.   You returned at 9:45?

3        A.   Approximately.  I don't recall what time we

4    returned.

5        Q.   And you commenced with watching the car.

6    Anything of note that afternoon?

7        A.   Nothing until approximately 6:30 p.m. that

8    evening.

9        Q.   And go ahead and tell the jury what it was you

10   saw that was of note.

11       A.   At 6:30 p.m., we observed a red Ford Ranger.  We

12   had been advised that James Wells would be driving a car

13   that matched that description.  It arrived in an

14   alternate route that I was not expecting.  It drove

15   through a rocky parking lot that was parallel to the

16   main airport parking lot, where it ended up parking in a

17   parking spot that was between the Alaska Airlines

18   terminal and then there was another building where there

19   is a company called Island Air Service, and so he parked

20   in between those two buildings.

21           He exited the Ford Ranger he was driving, walked

22   over to a coffee shop that's attached to that air

23   service.  It looked like he tried to go into the coffee

24   shop, but it was closed at the time.  He then walked

25   into the Island Air Service, which was connected to that

coffee shop.  He was in there for a short time, exited

the air service, returned to that same red Ford Ranger

and drove through the parking lot to another air

service.

It was called Servant Air, where he walked inside

of that building as well, was inside for a short time,

returned to the red Ford Ranger and drove back to the

parking area between Alaska Airlines and Island Air

Service where he parked.

He exited the truck, walked into the Alaska

Airlines terminal.  That whole time period was about

13 minutes from when he arrived at the airport to when

he walked into Alaska Airlines.

At this time, I exited the vehicle that I was

sitting in and walked into the Alaska Airlines terminal,

and Mr. Wells was not inside when I first walked in, so

I went to the bathroom and located him inside there, in

the bathroom.

Q.   Let's break some of that down.  Let's start first

with his arrival.

So I'm going to have Blair bring up Government

Exhibit No. 92, please.

This has been admitted, right?  I believe so.

And you should have a laser pointer up there.

A.   I do.

1     Q.   Great.  And what I would like for you to do,

2  Blair, is if you can, zoom in just right there.  Okay.

3        So if you can, can you show the jury what you

4  just testified to of how he entered into the airport?

5     A.   Yes.  In the center of the photograph is the main

6  road that comes into the airport area.  The road that I

7  expected to see a vehicle come was this -- there is a

8  worn area in the main parking lot going from left to

9  right here where the laser pointer is in the center.

10       I first observed the Ford Ranger at approximately

11  this area in the center of the photograph.  There is a

12  triangular parking area.  And I first observed the Ford

13  Ranger approximately in this area in the center of the

14  photograph behind about where that white vehicle is.

15       I observed the Ranger come through this parking

16  lot.  And I don't see it in this photograph.  Somewhere

17  over here is -- near where the UPS truck is parked in

18  the center of the photograph, there is an area where you

19  can go through from one parking lot to the other where

20  the truck parked.

21       The building in the far upper right corner is the

22  Alaska Airlines terminal.  And then the building

23  directly across, the blue building, is that Island Air

24  Service building.

25       And the red Ford Ranger parked approximately in

1   this area between the two buildings, right between those

2   two.

3       Q.  You mentioned there were -- you were expecting

4   the vehicle to go --

5           MR. CAMIEL:  I'm going to object to the form of

6   the question.

7           THE COURT:  Go ahead.  Please rephrase.  Let's

8   hear the next question.

9   BY MS. STEVENS:

10      Q.  So the traffic pattern of the defendant that

11  morning, would you describe -- how would you describe

12  that?

13      A.  It was not consistent with what we had seen from

14  other vehicles parking at Alaska Airlines.  Most

15  vehicles had been driving in the main road, coming

16  around this -- there is a green side in the upper

17  left-hand side of this triangular parking area where the

18  cars would curve around and then park in the area

19  between all of the buildings.

20      Q.  So like this?

21      A.  That is correct.

22      Q.  Okay.  So I am going to -- can we split the

23  screen, Blair, with 92 and 88?

24          Do you recognize that vehicle?

25      A.  Yes.  I recognize that as the blue Honda CR-V we

1    were tasked to watch throughout the night.

2        Q.   Do you recognize where it is located?

3        A.   I do.  It is at the Kodiak airport in the parking

4    lot.

5        Q.   And using your laser pointer, can you reflect on

6    the aerial photo where that vehicle was parked?

7        A.   Yes.  Over in the center of the photograph there

8    is a -- looks like a red pickup truck.  Yes, directly

9    out from -- there is a big building to the left of the

10   Alaska Airlines terminal I had pointed out.  Directly

11   out the blue CR-V was in this area right next to near

12   where that truck is parked in the photograph.

13       Q.   And this photo here, is that the building you

14   just referenced there?

15       A.   Yes, it is.

16       Q.   Okay.  Thank you.  You can take those down,

17   Blair.

18           So let's talk about Island Air.  You mentioned he

19   went in there first.  So I'm going to show you some

20   photos for foundation.  And there is going to be a

21   couple.  We'll just do them in succession.

22           Can you do 238, 239, 240, 241, 264 and 263.

23           Special Agent Judy, do you recognize those

24   photos?

25       A.   Yes, I do.

1       Q.   How is it that you recognize them?

2       A.   I recognize the building as the Island Air

3    building with the coffee shop that's attached, and then

4    the interior photographs are the interior of the Island

5    Air portion of the building.

6       Q.   Did you have an opportunity to go into the

7    interior of the building to be able to recognize the

8    stuff inside?

9       A.   Yes, I did.

10           MS. STEVENS:  Your Honor, we move to admit 238,

11   239, 240, 241, 263 and 264?

12           MR. CAMIEL:  No objection.

13           THE COURT:  Those will all be admitted.

14           (Exhibit Nos. 238, 239, 240, 241, 263 and 264

15   admitted.)

16   BY MS. STEVENS:

17      Q.   We'll start with 263, please.  And can you put up

18   92 as well side by side?  Thank you.

19           Okay.  So using that laser pointer, can you

20   please point out where the building on the left of the

21   screen is on the aerial photo on the right?

22      A.   Yes.  It's the blue building directly across from

23   the Alaska Airlines terminal.

24      Q.   Thank you.  Take those down, please.

25           So after he went into that building, do you

1    recall how long he was in there?

2        A.   I don't remember the exact amount of time, but I

3    would estimate it to be less than five minutes.

4        Q.   Okay.  And you mentioned next he went to Servant

5    Air.  Can you tell the jury what your observations were

6    of him while he was over at Servant Air?

7        A.   I observed him park in the parking lot of Servant

8    Air and then walk into one of the front doors of the

9    building.

10       Q.   Do you remember where that front door was?  Was

11   it on the first floor or the second floor?

12       A.   It was on the first floor.

13       Q.   Do you recall how long he was in there for?

14       A.   I don't recall the exact amount of time, but my

15   estimate is less than five minutes.

16       Q.   And then after that, you mentioned he went and

17   parked right back out front of Alaska Airlines terminal?

18       A.   That is correct.  He returned and parked very

19   close to where he was parked the first time he arrived.

20       Q.   Moving then to the Alaska terminal observations,

21   when he entered the bathroom, walk us through how you

22   were able to observe him in there.

23       A.   I walked into the main terminal.  Again, did not

24   observe him right away.  And my first thought was to

25   check the bathroom.  Walked in there, and I could see

     1    shoes that appeared to be Mr. Wells' shoes.  I then

     2    exited the bathroom and then did spot checks on the

     3    bathroom occasionally.

     4       Q.  How long was he in the bathroom for?

     5       A.  It was approximately 13 to 15 minutes.

     6       Q.  What happened next?

     7       A.  After he was in the bathroom, he exited the

     8    bathroom.  His wife had arrived on a flight and she

     9    walked in from the tarmac area of the airport, where he

    10    met quickly with her.  They had a quick embrace and then

    11    interacted with other passengers and people that were in

    12    the terminal.

    13       Q.  Can you describe that embrace to the jury?

    14       A.  It was a quick embrace, very short.

    15       Q.  Any other observations you made of their

    16    encounter?

    17       A.  It just -- it seemed very brief and it was not

    18    what I expected from --

    19            MR. CAMIEL:  I'm going to object to lack of

    20    foundation, speculation.

    21            THE COURT:  I'll sustain as to that.

    22    BY MS. STEVENS:

    23       Q.  So in describing your observations without

    24    speculating into what you would have expected, can you

    25    just tell the jury what it was that you observed?

1    A.   I observed a very short embrace, not a full hug.

2    Q.   Okay.  And did either of them appear -- how did

3 they appear?  What was their demeanor?

4    A.   Their demeanor seemed normal, just interacting

5 with other people, visiting while waiting for bags.

6    Q.   What happened next?

7    A.   They then walked out of the Alaska Airlines

8 terminal, entered into that same red Ford Ranger where

9 they drove away from the airport.

10    Q.   And after they drove away, what steps, if any,

11 did you take to follow up on some of the actions of Mr.

12 Wells that evening?

13    A.   I walked into the Alaska Airlines bathroom and

14 checked all the garbage cans, anywhere that looked like

15 there could be a hiding spot inside that bathroom.  I

16 did not find anything of note.

17         I then exited the Alaska Airlines terminal and

18 went to the Island Air Service building where I met and

19 spoke with two employees of the company, and then I

20 looked around inside of that building.  And the

21 employees gave me permission to search their garbage

22 cans, which I did not find anything.

23    Q.   What did you observe, if anything, while you were

24 inside Island Air?

25    A.   I observed some security cameras, which I

 1  inquired about and was told that they did not --

 2          MR. CAMIEL:  Objection.

 3          THE COURT:  That's sustained.

 4  BY MS. STEVENS:

 5     Q.  Let's pull up Government Exhibit No. 238, please.

 6          And what does this picture depict?

 7     A.  This is the front desk to the Island Air Service.

 8     Q.  Let's pull up 239.

 9          And what about this picture?

10     A.  This is in that same building right around the

11  corner from that front desk and it's the restrooms.

12     Q.  Next picture, 240, please.

13          Okay.  What about this photo?

14     A.  This is also inside of the Island Air Service.

15  It's looking at that same front desk, and then also the

16  waiting area of their building.

17     Q.  Okay.  And can you, Blair, zoom in here, please.

18  Let me just get that marking off for you.

19          And what is that?

20     A.  That is a security camera.

21     Q.  Thank you.  And then 241, please.

22          And where does this door go to?

23     A.  That is the door that passes between the Island

24  Air Service and the coffee shop that's attached in the

25  same building.

1    Q.  Was that the coffee shop you observed the
2  defendant attempt to enter from the outside?
3    A.  It is the same coffee shop.
4    Q.  And what else do you notice in this picture?
5    A.  There is also a security camera on the center top
6  corner of that building.
7    Q.  Is that what you were referring to?
8    A.  Yes, it is.
9        MS. STEVENS:  Thank you, Special Agent Judy.
10  No more questions for me.
11        THE COURT:  Mr. Camiel, go ahead, please.
12                   CROSS EXAMINATION
13  BY MR. CAMIEL:
14    Q.  Good morning.
15    A.  Good morning.
16    Q.  So you arrived on Kodiak as a part of this
17  investigation on April 12th in the latter part of the
18  afternoon; is that right?
19    A.  That is correct.
20    Q.  And had you been to the Kodiak airport before?
21    A.  I had.
22    Q.  Had you ever met or seen Mr. Wells before
23  April 12th?
24    A.  On April 12th was the first time.
25    Q.  And you knew -- when you were down doing your

1   surveillance at the Kodiak airport, you knew that Mr.

2   Wells' white Dodge truck had been seized?

3      A.   I don't know if it was at that time.

4      Q.   You knew that he was going to be driving a red

5   Ford Ranger because his truck wasn't available to him?

6      A.   I was told he was driving a red Ford Ranger.

7      Q.   Right, that a friend had lent him the vehicle

8   because his truck had been seized?

9      A.   I'm not sure who owned that truck.

10     Q.   So throughout the night of April 12th, you and a

11  partner are sitting at the Kodiak airport watching this

12  blue SUV, taking turns napping and watching, right?

13     A.   That is correct.

14     Q.   And you understood that that night other agents

15  were out watching Mr. Wells?

16     A.   I do not recall if there were any agents watching

17  Mr. Wells that night.

18     Q.   You weren't part of that at least?

19     A.   I was not.

20     Q.   Nobody approached the blue SUV throughout the

21  entire night of the 12th?

22     A.   That is correct.

23     Q.   Could we put up Government Exhibit No. 92?

24         Special Agent Judy, could you show us where you

25  and your partner were parked that night?

1    A.  Yes.  We were parked very close to the blue CR-V

2   in approximately this area in the center of the

3   photograph.

4    Q.  And you -- did you notice that the airport

5   parking lot was under some kind of construction at the

6   time you were there?

7    A.  I don't recall any construction.

8    Q.  Do you recall the asphalt being torn up?

9    A.  I don't remember the condition of the asphalt.

10    Q.  Can we put up Government Exhibit 88?

11       You see the asphalt in front of the blue SUV?

12    A.  Yes, I do.

13    Q.  Is that the condition that it looked like when

14   you were there on April 12th?

15    A.  That looks like where the car was parked when we

16   were there on the 12th.

17    Q.  Now, you get relieved on the morning of the 13th

18   and you're back at the airport again later in the day on

19   the 13th, and that's when Mr. Wells pulls up?

20    A.  Yes.  Mr. Wells pulled up at approximately

21   6:30 p.m.  We returned from breakfast earlier in the

22   morning.

23    Q.  You already knew that his wife was on a flight

24   from Anchorage that was going to arrive around 7:00

25   p.m.?

1    A.   We were told that she would be arriving, correct.

2    Q.   So it wasn't a surprise to see Mr. Wells show up

3    at the airport to pick up his wife?

4    A.   No, it was not.

5    Q.   In fact, you were looking for him because you

6    expected him to come there?

7    A.   That is correct.

8    Q.   So when he first gets there, the first thing he

9    does is he parks near Island Air and he attempts to

10   enter the Gear Up coffee shop only to find that he can't

11   get in that door because they appear to be -- he

12   couldn't get in that door?

13   A.   That is correct.

14   Q.   Now, the Gear Up coffee shop and Island Air are

15   in the same building, right?

16   A.   That is correct.

17   Q.   And you went into that building later on?

18   A.   The Island Air?

19   Q.   Yes.

20   A.   Yes, that's correct.

21   Q.   And they kind of share a lobby, right?

22   A.   That is correct.

23   Q.   And so if you go in the Island Air entrance and

24   you look to your right, you can see the door to the Gear

25   Up coffee shop?

1    A.  Yes, you can.

2    Q.  If we could look at -- let's see.  I think it is

3  Government 240.  Sorry.  Let's try 241.  Okay.

4    Q.  So where that green t-shirt is hanging, that's

5  the door to the coffee shop, right?

6    A.  That is correct.

7    Q.  So Mr. Wells is only in Island Air for a few

8  minutes?

9    A.  Correct.

10   Q.  And then he gets back in the truck and heads over

11 to Servant Air and goes into that building?

12   A.  That is correct.

13   Q.  He's there for a few minutes and he gets out and

14 he goes and drives his truck closer to the terminal; is

15 that right?

16   A.  That is correct.

17   Q.  He gets out, he goes into the terminal, and when

18 you walk into the terminal you don't see him, so you go

19 into the bathroom?

20   A.  Correct.

21   Q.  And you actually timed how long he was in the

22 bathroom, right?

23   A.  Correct.

24   Q.  13 minutes?

25   A.  It was between 13 and 15.

1    Q.   And you went in the bathroom and you're looking

2    under stalls to see if you can see feet?

3    A.   Correct.

4    Q.   And you see a pair of feet pointing out as if

5    somebody is using the toilet?

6    A.   That is correct.

7    Q.   And you stood there and you watched and you

8    listened for a while?

9    A.   For a very short time.

10   Q.   And then you were going in and out while he's

11   using the bathroom?

12   A.   That is correct.

13   Q.   And then after he uses the bathroom, you go in

14   and you check the garbage cans and you check around to

15   see if anything could have been disposed of, and you

16   didn't find anything?

17   A.   That is correct.

18   Q.   Had you ever seen Nancy Wells before?

19   A.   I had seen a photograph, but never in person.

20   Q.   And you had never seen Jim and Nancy interact

21   before?

22   A.   I never had.

23   Q.   When he first encounters his wife, he gives her a

24   quick hug?

25   A.   That is correct.

1    Q.  Do you know how long they had been married?

2    A.  I do not.

3    Q.  Now, this wasn't the only time you surveilled Mr.

4 Wells, right?

5    A.  No, it was not.

6    Q.  In fact, you watched him on April 14th, the very

7 next day?

8    A.  That is correct.

9    Q.  He and his wife were staying at the Comfort Inn

10 by the airport?

11    A.  Correct.

12    Q.  Because their house had been -- pursuant to a

13 search warrant, they couldn't go to their house because

14 it was being searched?

15    A.  I believe that is why.

16    Q.  And then on the 15th, you watched him again?

17    A.  Yes, I did.

18    Q.  Followed him all over Kodiak?

19    A.  Yes, I did.

20       MS. STEVENS:  Your Honor, I would just ask,

21 since we're now venturing into some new areas, that the

22 attorney not lead.

23       THE COURT:  All right.  That's sustained.

24 BY MR. CAMIEL:

25    Q.  Let me go back -- before I go further with the

surveillance, let me go back to your observations at the
airport.

        The entire time you were at the airport on the
12th and 13th sitting in the parking lot, you didn't see
any police or airport security ticketing cars, did you?

    A.  I don't remember seeing anybody being ticketed.

    Q.  And did you go into the Servant Air building and
talk to the folks in there later on?

    A.  I did not.

    Q.  All right.  So you did go into Island Air?

    A.  Yes, I did.

    Q.  And talked to those folks?

    A.  Yes, I did.

    Q.  And searched in there?

    A.  That is correct.

    Q.  But you didn't go into Servant Air?

    A.  I did not.

    Q.  So going back to the surveillance, you followed
Mr. Wells and his wife around on the 15th?

    A.  Yes.

        THE COURT:  The objection of leading I
sustained with regard to this area.  Go ahead.
BY MR. CAMIEL:

    Q.  Where did you follow them to on the 15th?

    A.  On the 15th, we followed him throughout Kodiak.

1    I remember him going to someone's house.  I believe that

2    was the day they sat on the side of the road and were

3    reading some books near the Russian River.  I believe

4    that day we also followed them to the library.  And to

5    be more specific, I would have to refer to my notes to

6    give more detail.

7        Q.  And this is when they were staying at the Comfort

8    Inn?

9        A.  That is correct.

10       Q.  Was their house still being searched?

11       A.  I know they weren't going home, but I don't know

12   if it was still being searched.

13       Q.  You weren't surveilling -- I take it you weren't

14   surveilling Mr. Wells 24 hours?  You personally weren't

15   surveilling him 24 hours a day?

16       A.  I was not.

17       Q.  Were there different shifts of agents?

18       A.  There were different shifts.

19       Q.  Were you trying to be covert or were you being

20   obvious in the fact that you were watching him?

21       A.  We were not being covert.

22       Q.  And after the 15th, did you watch Mr. Wells and

23   his wife again?

24       A.  Yes.  I was involved with surveillance through at

25   least the 19th.

1     Q.  Of April?

2     A.  Of April, correct.

3     Q.  And then were you also involved in surveillance

4  of Mr. Wells and his wife when they flew to Juneau?

5     A.  Yes, I was.

6     Q.  Do you remember when that was?

7     A.  I would have to refer to my notes.  It was

8  sometime later, I believe, in May of 2016.

9     Q.  During the time that you were involved in

10 surveillance of Mr. Wells, to your knowledge, was it

11 24-hour surveillance every day?

12    A.  When I was in Kodiak, it was 24 hours every day.

13    Q.  Even after they returned to their home?

14    A.  Yes, after they returned to their home.

15    Q.  Where did you watch them from when they returned

16 to their home?

17    A.  When I was watching, it was from a hillside

18 directly across a small valley from the house.

19    Q.  And were you using anything to assist your

20 observations?

21    A.  Binoculars.

22    Q.  When you were, for example, when you were sitting

23 in the Kodiak airport on the 13th and you saw Mr. Wells,

24 were you using binoculars then as well?

25    A.  I don't believe I used binoculars that day.

```
 1      Q.  Did you take any photographs while you were
 2   surveilling him?
 3      A.  I did not.
 4           MR. CAMIEL:  That's all I have.  Thank you.
 5           THE COURT:  Redirect?
 6           MS. STEVENS:  I just have one question to
 7   clarify something.
 8           THE COURT:  Go ahead.
 9                    REDIRECT EXAMINATION
10   BY MS. STEVENS:
11      Q.  Special Agent Judy, you mentioned surveillance in
12   Juneau.  What was the date of that again?
13      A.  I don't remember the exact date.
14      Q.  What about the year?
15      A.  I believe it was -- correction, 2013.
16      Q.  Thanks.
17           THE COURT:  All right.  Thank you.  You may be
18   excused, sir.
19           (Witness excused)
20           THE COURT:  Your next witness?
21           MR. SKROCKI:  Yes, Your Honor.  Kelvin
22   Skonberg.
23           THE COURT:  Good morning.  If you could come
24   all the way, please, sir, up to the witness stand.  When
25   you get there, remain standing and the clerk will
```

1    administer an oath to you.

2              (Oath administered to the witness)

3              DEPUTY CLERK:  For the record, can you please

4    state your full name and then spell your full name.

5              THE WITNESS:  Kelvin Skonberg, K-e-l-v-i-n,

6    S-k-o-n-b-e-r-g.

7         KELVIN SKONBERG, GOVERNMENT WITNESS, SWORN

8                     DIRECT EXAMINATION

9    BY MR. SKROCKI:

10   Q.  Mr. Skonberg, good morning.

11   A.  Good morning.

12   Q.  Could you please tell the jury where you live,

13   sir?

14   A.  In Kodiak.

15   Q.  How long have you lived in Kodiak?

16   A.  50 years.

17   Q.  Sir, tell them what you do for a living.

18   A.  I dispatch for -- it used to be Servant Air, now

19   Island Air.

20   Q.  How long have you worked for Island Air?

21   A.  For the last two and a half years.

22   Q.  Prior to working at Island Air the last two and a

23   half years, where did you work?

24   A.  Servant Air.

25   Q.  If you could --

1     A.   I did that for about 12 years.

2     Q.   12 years?

3     A.   Yeah.

4     Q.   What did you do for Servant Air during those

5  12 years?

6     A.   Dispatched.

7     Q.   Could you tell the jury what dispatch involves?

8     A.   Coordinating flights going out for a day.

9     Q.   Ordinarily, when you were working for Servant

10 Air, what time did you start your workday?

11    A.   7:00 a.m.

12    Q.   Mr. Skonberg, do you know Jim Wells?

13    A.   Yeah.

14    Q.   Can you tell the jury when you first met Mr.

15 Wells?

16    A.   Probably 20-some years ago.

17    Q.   The occasion that you met him, how did you become

18 aware this was Jim Wells?

19    A.   I met him at a Christmas party.

20    Q.   And who was with him?

21    A.   His wife.

22    Q.   Could you turn your attention please to April 12,

23 2012.  And who were you employed with on that day, sir?

24    A.   Servant Air.

25    Q.   Do you recall what you were doing that morning

1   with Servant Air?

2       A.   I went to work early that morning because we were

3   going to have a busy day so I could get the flights all

4   lined out for the day.

5       Q.   When you say you went to work early, what time

6   was your arrival?

7       A.   7:00 a.m.

8       Q.   Mr. Skonberg, during the day of April 12, 2012,

9   did you see Jim Wells in the offices or facilities,

10  areas of Servant Air whatsoever?

11      A.   No.

12      Q.   If we could have the lights, please.  I have a

13  number of exhibits I would like to show Mr. Skonberg.

14          Let's begin with Exhibit 90, which I believe is

15  admitted.

16          Sir, there should be a laser pointer there.

17  There is a button on the top.

18          Could you -- Exhibit 90, do you recognize what

19  that depicts?

20      A.   Yeah, that's the airport.

21      Q.   Do you see where the building of Servant Air is

22  located on that exhibit?

23      A.   Yes.

24      Q.   Could you highlight that for the jury with the

25  laser pointer?

1       A.   Right there.

2       Q.   In the center.

3            Blair, if we could move to Exhibit No. 91.

4            Mr. Skonberg, when you were working at Servant

5     Air, what was the route you would take to get to the

6     Servant Air building?

7       A.   I would do the center main road, drive up and

8     then park right there.

9       Q.   Okay.  If you could again highlight the Servant

10    Air building for the jury.

11      A.   Right there.

12      Q.   And your laser pointer hit --

13           Blair, could we enlarge the Servant Air building?

14    We'll get to another one in a moment.

15           Mr. Skonberg, could you describe for the jury

16    what this brown structure is?

17      A.   That's like an arctic entry corridor.

18      Q.   There are entries to Servant Air with respect to

19    this --

20      A.   Just that one area.

21      Q.   If you could show the jury with the laser pointer

22    where the entrance to your building would be.

23      A.   The door open would be in this end right there.

24      Q.   Were there any other doors?

25      A.   There is a double door, double-sided.  There's

1    two doors on this side also, but nobody ever opens them.

2       Q.   Okay.  If we could just leave it up for a moment,

3    Blair.

4            Mr. Skonberg, there is vehicles parked here?

5       A.   Uh-huh.

6       Q.   Is that parking for Servant Air?

7       A.   Yes.  That's mainly where employees park.

8       Q.   And there is -- what's that door there with the

9    driveway in front?

10      A.   That's a garage door for people to back up and

11   unload freight.

12      Q.   You guys do freight work as well?

13      A.   Yes.

14      Q.   How about over here on this side to the, I guess

15   it would be our right of that building there is some

16   vehicles there.  Do you see those?

17      A.   Yeah, that's where customers park and then there

18   is a door right inside by that truck right there.

19      Q.   Where would you park to start your day, sir?

20      A.   Right about in here somewhere.

21      Q.   You had preferred parking being up front?

22      A.   First one there gets closest parking.

23      Q.   There you go.

24           All right.  If we could have that taken down,

25   Blair?

1         If we could have Defense 147 for identification.

2         And without telling us what this photo depicts in

3    Defense 147, do you recognize that building, Mr.

4    Skonberg?

5         A.   Yes.

6         Q.   Is that the Servant Air building?

7         A.   Yes.

8         Q.   Blair, if we could move forward to the following

9    exhibits:   253.

10        Do you recognize what's depicted in that

11   building?

12            THE COURT:   So this is Government 253?

13            MR. SKROCKI:   Yes, Government 253.

14        Q.   That's the front of Servant Air, Mr. Skonberg?

15        A.   Yes.

16        Q.   Then if we can go to Government 178.

17        The outside of Servant Air?

18        A.   Yes.

19        Q.   And Government 216.

20        That's the inside of the Servant Air building,

21   sir?

22        A.   Yes.

23        Q.   And the last one in the series is 217, Government

24   217.

25        Again, is that something that's inside the

1   Servant Air building?

2      A.  Yes.

3          MR. SKROCKI:  Move for the admission of Defense

4   147, Government 253, Government 178, 216 and 217.

5          DEPUTY CLERK:  253 and 178 are already

6   admitted.

7          THE COURT:  Any objection to the admission of

8   Defense 147 and Government 216 and 217?

9          MR. COLBATH:  No, Your Honor.

10         THE COURT:  Those will be admitted.

11         (Defense Exhibit No. 147 and Government

12   Exhibits Nos. 216 and 217 admitted.)

13   BY MR. SKROCKI:

14     Q.  If we could have Defense Exhibit No. 147, Blair.

15         Directing your attention to Defense 147,

16   Mr. Skonberg.  This is the outbuilding or the entry we

17   were talking about earlier?

18     A.  Yes.

19     Q.  If you could show the jury where the entrance is

20   with your laser pointer.

21     A.  There's a double door right there.  I open the

22   doors in the morning there.

23     Q.  There is another entrance on the other side?

24     A.  Yeah, over here, yeah.  It's like double doors on

25   both sides.

1    Q.   Okay.  We should probably call that a Kodiak

2   entry as opposed to an arctic entry.

3    A.   Yeah.

4    Q.   Coverup from the rain.

5       Let's focus on this side, Blair, if we could,

6   please, the right-hand side.

7       And Mr. Skonberg, I'm going to have you take a

8   look at that and I want to focus your attention through

9   the windows of the van.  You see a door there?

10    A.   Yes.

11    Q.   What's that door, sir?

12    A.   That's the door we open up when we get to the

13   office for customers to go in.

14    Q.   Is that where you began your workday?

15    A.   No.  I began my workday in the arctic entry.

16   That's where I started from.  Then I go inside, make a

17   pot of coffee, and then open that other door.

18    Q.   You would start over here to the left?

19    A.   Yes.

20    Q.   Make the coffee and then open up this door there?

21    A.   Yes.

22    Q.   And if we could leave that up, please.

23       And then I want to focus your attention on this

24   structure on the outside of the building, sir.  Do you

25   see that?

1    A.   Yes.

2    Q.   Could you please tell the jury what that is?

3    A.   It's a stairway up to the upper office.

4    Q.   Upper office?

5    A.   Yeah.

6    Q.   And are you familiar with that stairway?

7    A.   Yes.

8    Q.   Can you tell the jury what the stairs are made

9  of?

10    A.   Steel.  Steel stairs.

11    Q.   I'm sorry?

12    A.   Steel stairs.

13    Q.   There's a door here?

14    A.   Correct.

15    Q.   Can you please tell the jury about the security

16  aspect of that door?

17    A.   It's always locked.  I don't even have a key for

18  that one.  Just the boss did.

19    Q.   Is that something that would be open to the

20  public every day?

21    A.   No.

22    Q.   Back then?

23    A.   No.

24    Q.   And with respect to this building here -- we have

25  one more we can talk about in a minute.  Where along the

1  side of this building here was your office -- I'm sorry,

2  your place where you worked, Mr. Skonberg?

3      A.  Right there.  There is a window and then there is

4  a door, and I'm like four feet, five feet from that.

5      Q.  In the course of your employment, including

6  April 12, 2012, would you have the ability to hear

7  anybody coming up these mental stairs while you were

8  working?

9      A.  Yes.  I could see them because you had to park in

10  our parking lot right there.  I would have to see who

11  was there.

12      Q.  Could you see and hear if you wished?

13      A.  Yes.

14      Q.  We can go to 253, please.

15          This is again another picture of the Kodiak

16  entry, as I'm going to call it.  This is the front of

17  the Servant Air building, Mr. Skonberg?

18      A.  Correct.

19      Q.  And to the right-hand side, is that where the one

20  door opening would be that you accessed every day?

21      A.  Yes.

22      Q.  And then off picture to the left is the other

23  side?

24      A.  Yes, sir.

25      Q.  Mr. Skonberg, if you went into -- this will be

1   tricky -- either side, if you went in from one door to

2   the right or the left, where would that take an

3   individual coming into your office space?

4       A.  You come in through the double door to our lobby.

5       Q.  If we could have 178, please.  Remember that

6   image --

7           Blair, if you could put up Defense 147.  If we

8   could merge those, please.

9           Okay.  Mr. Skonberg, do you see Defense 147 to

10  your right?

11      A.  Uh-huh.

12      Q.  And Government's 178 to your left?

13      A.  Yes.

14      Q.  Do you see that?

15      A.  Uh-huh.

16      Q.  In 147 I'm going to circle this structure here

17  that looks like metal.  What is that structure?

18      A.  Those a post for that deck that's going right

19  there, the outer end post.

20      Q.  Okay.  It's holding up the staircase on the

21  right-hand side?

22      A.  Yes, it's holding up the platform.

23      Q.  147.  All right.

24          Now, if you could look at 178.

25          Where was your workplace where you spent your day

1    working?

2       A.   I would say right inside that door, four or five

3    feet inside there there is a counter and then my desk.

4       Q.   Okay.

5       A.   Where I work like the corner here.

6       Q.   How far away from that window would you be?

7       A.   Five, six feet.

8       Q.   Did you hear anybody access these stairs on

9    April 12, 2012 in the morning, Mr. Skonberg?

10      A.   No.

11      Q.   Were you in a position to hear it the entire

12   morning and the day?

13      A.   Yes, because right after this door here, there is

14   another window right over here, so if anybody even tried

15   to go upstairs, I would have saw them.

16      Q.   And your testimony is that didn't happen?

17      A.   Didn't happen.  It was pretty quiet early in the

18   morning.

19      Q.   If we can now move on to 216.  And why don't you

20   put up 217 just to save us a little bit of time.

21           Those are the inside of the Servant Air offices,

22   Mr. Skonberg?

23      A.   Yes.

24      Q.   So I want to ask you who shot that caribou?

25      A.   I did.

1    Q.  Nice.

2         And this is your lobby, sir?

3    A.  Yes.

4    Q.  Could you show on 216 where your work station

5    would be?

6    A.  It's not really showing, but the scale here, and

7    there's a corner right here where it goes down the other

8    way, and I sit right at that corner so I can face both

9    doors, you know.

10   Q.  You mentioned there is a scale down here?

11   A.  Yes, there's a scale right here and I'm just

12   sitting on the other side of that scale.

13   Q.  It's for weighing baggage of customers and

14   things?

15   A.  Yes.

16   Q.  Right here in the recessed area, what is that,

17   sir?

18   A.  That's the men's bathroom.

19   Q.  On 217, that's an enlarged version of that

20   photograph?

21   A.  Yes.

22   Q.  Did you see Jim Wells come into your building

23   that morning at any time during the day and use that

24   bathroom?

25   A.  No.

1    Q.  Now, if we -- Blair, if we could take down 217,

2    just keep 216 up.

3         Mr. Skonberg, if you go from image right to left,

4    keep going that way, where does that go?

5    A.  That goes to the other main door, the double

6    door.

7    Q.  Is there -- are there other entrances to the

8    upstairs going this direction?

9    A.  There is one.  When you go inside the corridor,

10   there is a single door that goes upstairs.

11   Q.  Uh-huh.  How do you get upstairs?

12   A.  You have to unlock the door and then you can go

13   up.

14   Q.  What are those stairs made of?

15   A.  Wood.

16   Q.  They are made of wood?

17   A.  Yes.

18   Q.  In the course of your employment with Servant Air

19   while there and on April 12, could you hear people go up

20   those stairs?

21   A.  You could hear, and I never heard nobody that

22   day.

23   Q.  How could you hear?

24   A.  Because they are wooden stairs and they are

25   pretty creaky and noisy.

1    Q.  Did you hear anybody on April 12 access the

2    stairs to the bathroom upstairs?

3    A.  No.

4    Q.  On April 12, 2012, did you hear anybody upstairs

5    walking around?

6    A.  No.

7    Q.  On April 12, 2012, did you hear anybody upstairs

8    using the toilet facilities?

9    A.  No.

10   Q.  Would you have heard the toilet flush had they

11   done so?

12   A.  Yes.

13   Q.  You could hear it through the --

14   A.  Yeah, because it ain't a soundproof building.

15   Q.  On April 12, 2012, had you heard someone

16   upstairs, what would you have done?

17   A.  Went and seen who it was because there shouldn't

18   have been nobody there.

19   Q.  If we can go back to 91, please, Blair.

20        So Mr. Skonberg, your building is here?

21   A.  Uh-huh.

22   Q.  Correct?

23   A.  Yes.

24   Q.  And what building is this here?

25   A.  That's Island Air.

 1      Q.  All right.  On April 12, 2012, Mr. Skonberg, did
 2  your building have any surveillance cameras inside of
 3  it?
 4      A.  No.
 5          MR. SKROCKI:  Thank you, sir.
 6          Your Honor, that's all the questions I have.
 7          THE COURT:  Mr. Colbath, go ahead, please.
 8          MR. COLBATH:  If I can have just a minute here,
 9  Your Honor.
10          THE COURT:  Certainly.
11          (Pause)
12                      CROSS EXAMINATION
13  BY MR. COLBATH:
14      Q.  Mr. Skonberg, good morning, sir.
15          When you got to work at 7:00 a.m. -- you said you
16  came in early on April 12, 2012, because it was -- you
17  anticipated it being a busy day?
18      A.  Yes.
19      Q.  And it was in fact a busy day?  You all had a
20  number of flights go in and out that day, a number of
21  the different villages picking up passengers in both
22  directions as it turned out?
23      A.  Yes.
24      Q.  Were you the one primarily responsible for making
25  sure that the freight orders that were scheduled to go

1  out got on the planes and went out as well as passengers

2  that were scheduled to come and go got checked in?

3     A.  Yes, the weight and balance on the planes.

4     Q.  You also checked in the passengers and made sure

5  everybody was on their right flights and you had the

6  crew that you needed to have?

7     A.  Yes.

8     Q.  Now, other than being a busy day, Thursday,

9  April 12, 2012, was a normal workday for you?  There

10 wasn't anything special going on that day, right?

11    A.  Just I knew it was going to be busy so I went in

12 a little over an hour early just to get my workday

13 wrapped around my head.

14    Q.  Let me show you, sir, a few other -- a few other

15 exhibits here.

16        If we could show him for foundation Defense 49,

17 50.

18        You recognize that one, Mr. Skonberg, I take it?

19    A.  Yes.

20    Q.  And then this one?

21    A.  Yes.

22    Q.  Okay.  And are those also interior shots of

23 Servant Air?

24    A.  Yes.

25    Q.  Back at the time -- I mean they look fairly

1    contemporaneous to back in 2012 when you worked there?

2      A.   Close, yeah.

3           MR. COLBATH:   Your Honor, I want to move

4    Defense 49 and 50.

5           MR. SKROCKI:   No objection, Judge.

6           THE COURT:   Those will be admitted.

7           (Defense Exhibit Nos. 49 and 50 admitted.)

8    BY MR. COLBATH:

9      Q.   What we see here, Mr. Skonberg, in 50, if we're

10   looking at these double doors in the center of the

11   photograph, that's the double doors that you walked

12   through when you got to work that morning?

13          You said you walked in and turned on the coffee,

14   which is right there, and then headed to basically where

15   this picture is being taken from?  Your desk is out of

16   the picture, but where the camera view is, right?

17     A.   There is another set of double doors that open

18   the arctic entry.  I got to unlock those, and then I

19   have to unlock these to get into the building.

20     Q.   And that's how you normally came in because you

21   parked right there by the arctic entry?

22     A.   Yeah.

23     Q.   Then once you unlock those, those remained

24   unlocked for the workday?

25     A.   For the day, yeah.

1    Q.  And right here by the Dall sheep there, that's

2    the men's room?

3    A.  Correct.

4    Q.  Now, I understand that where you parked, where

5    you showed us that you parked along that arctic entry,

6    that was sort of the employee parking?

7    A.  Correct.

8    Q.  And around the side of the building over here on

9    the side where the deer is, that's where that metal

10   staircase and the customer parking was?

11   A.  Correct.

12   Q.  And do we see here in this picture, Defense

13   Exhibit 49, on the left-hand side where my blue X is, do

14   we see the doorway or is it kind of back behind where we

15   would be?

16   A.  It's back probably alongside that blue chair here

17   there should be a door.

18   Q.  When people showed up for flights and whatnot,

19   check-in and that kind of thing, that's normally where

20   they would park, drop off passengers or passengers would

21   come in and out?

22   A.  Correct.

23   Q.  And let's look at -- let's see.  Let's look at --

24   first of all, could we show him for foundation Defense

25   Exhibit 51.

1      I was one picture short, Mr. Skonberg, so I want

2  to see if you recognize generally that.

3      A.   Okay.  Yeah.

4      Q.   Does that look about like -- it's obviously

5  probably not to scale, but the general lobby and your

6  work area of Servant Air?

7      A.   Kind of.  Your arctic entry thing there is off.

8      Q.   Let's just blow it up a little bit for you.  And

9  the arctic entry, how is that off?

10     A.   Because the double doors you have the arrows on

11  right now, that should be farther to the right.  Right

12  where those double doors are at there should be a single

13  door going upstairs.  And then farther left than that

14  there is another door with a punch code key to get to

15  the hangar.

16     Q.   How about the interior of the building, does that

17  show the general kind of layout of where things were?

18     A.   Yes.

19          MR. COLBATH:  Your Honor, with Mr. Skonberg's I

20  guess description there, I'm going to move 151, Defense

21  51.

22          THE COURT:  Any objection?

23          MR. SKROCKI:  I guess not really, but if he has

24  some additions or corrections to make to it that would

25  make it more accurate for the jury's purposes.

1   Interlineation or however they want to do it I think
2   would be the most preferred way to do that.
3           THE COURT:  Any objection to that, Mr. Colbath?
4           MR. COLBATH:  I'm sorry.  To --
5           THE COURT:  As I understood it, it's to admit
6   the exhibit, but then have the witness make corrections
7   to it.
8           MR. COLBATH:  Sure.
9           THE COURT:  No objection to that?
10          MR. COLBATH:  No.
11          THE COURT:  What's the number of this one?
12          MR. COLBATH:  Defense 51.
13          THE COURT:  So 51 will be admitted with that
14  understanding.  Go ahead, if you would like to approach.
15          (Defense Exhibit No. 51 admitted.)
16          MR. SKROCKI:  If I may voir dire?
17          THE COURT:  Sure.
18          MR. SKROCKI:  Mr. Skonberg, just to voir dire
19  briefly.
20          The four walls and interior, are those accurate
21  as to April 12, 2012?
22          THE WITNESS:  They're close.
23          MR. SKROCKI:  So you will make whatever
24  additions you can to make it accurate.
25          THE WITNESS:  The only thing that's way off is

1    the corridor entryway.

2            MR. SKROCKI:  Fair enough.  Thank you.

3            THE COURT:  With that understanding, go ahead.

4            MR. COLBATH:  Thank you.

5    BY MR. COLBATH:

6        Q.  Can we put 51 up there, if that's okay, Your

7    Honor, because I want to make that arctic entry correct.

8            I have got a paper copy here, Mr. Skonberg.  I

9    have it marked as Defense Exhibit 51A.  I'm going to

10   walk up there, with the judge's permission, and give

11   this to you and just have you sort of draw on the arctic

12   entry for me what additional doors aren't depicted on

13   here.

14       A.  Okay.

15       Q.  Just to make it accurate.

16           MR. COLBATH:  Can I approach, Your Honor?

17           THE COURT:  Certainly.

18           (Mr. Colbath approaches witness.)

19           (Pause)

20       A.  There is your double door.  There should be a

21   single door there and a single door here.

22       Q.  You and I will explain that, sir.  All right.  So

23   can we try the lights, Madam Clerk, and see if -- it's

24   not too much better, but -- okay.

25           So Mr. Skonberg, on Exhibit No. 151A [sic], we

 1   still have the arctic entry down here at the bottom,

 2   right?

 3       A.   Yes.

 4       Q.   And I'm going to go -- starting at the doors that

 5   face into the building, we'll start with the right-hand

 6   one that you drew those three sets of doors.

 7           So point with your laser pointer the ones -- the

 8   double doors that we looked at that walk into your

 9   business, Servant Air.

10       A.   Right there.

11       Q.   That's those first ones?

12       A.   Yes.

13       Q.   And those are the ones that you unlock and you

14   walk in, and where it says "vending" there, you would

15   turn the coffee on and then --

16       A.   Go over to my desk, get my computer going, and

17   then go over and unlock this door.

18       Q.   While we're talking about that, right in the

19   corner of that L-shaped counter, it says "KS."  I assume

20   that would be --

21       A.   That's the corner I sit at.

22       Q.   That's your initials, Kelvin Skonberg?

23       A.   Yes.

24       Q.   You had a desk there with a computer.  Is that

25   how you monitored your patrons and traffic?

1     A.   Yes.

2     Q.   And then radios as well to talk to pilots and

3 whatnot?

4     A.   Yes.

5     Q.   And right past you there it says "back office"

6 back here?

7     A.   Yeah.

8     Q.   Okay.  And I'll show you a picture in a minute.

9          DEPUTY CLERK:  Mr. Colbath, just for

10 clarification, you said Defense Exhibit No. 151A.  Do

11 you mean 51A?

12          MR. COLBATH:  51A.  I'm sorry.  Thank you.

13 BY MR. COLBATH:

14     Q.   And so we have talked about these doors.  So now

15 let's go to the ones right next to those.

16     A.   This one here was a single door that you unlocked

17 and you go up the stairs to the second floor.

18     Q.   If you go in that single door, that's the one you

19 described to Mr. Skrocki that went up the wooden stairs?

20     A.   The wooden stairs, yes.

21     Q.   There was offices, as I understand it, in Servant

22 Air upstairs?

23     A.   Yes.  That's for like if a pilot wanted to stay

24 there, one of our training pilots, you know, had a place

25 to stay.

1    Q.   Are you familiar with a business called Brechan

2  Enterprises?

3    A.   Yes.

4    Q.   What was Brechan Enterprises?

5    A.   Construction company.

6    Q.   And did they share some of the office space up

7  above Servant?

8    A.   I think they were at the time, yeah, but they

9  weren't there that morning yet.

10    Q.   Okay.  Do you know an individual named Jamie

11  Furor (phonetic)?

12    A.   Yes.

13    Q.   And what did Jamie do for Brechan?

14    A.   I think he's one of the main guys there.

15    Q.   All right.  How about Cliff Terwilliger?

16    A.   No, I don't know him.

17    Q.   Joel Hostetler?

18    A.   No.

19    Q.   Jascha Zbitnoff?

20    A.   The last name sounds familiar, so if I saw him, I

21  would probably know it.

22    Q.   They had a number of folks that worked at the

23  construction company there that would come and go from

24  those offices?

25    A.   Yes.

1    Q.  And you didn't happen to talk to any of them on

2  April 12th or visit with any of them coming and going?

3    A.  No, there was nobody there yet.

4    Q.  Not that you saw or remembered, right?

5    A.  No.

6    Q.  And then -- so this door went upstairs?

7    A.  Uh-huh.

8    Q.  And then there is another door here.  Where did

9  that door go?

10    A.  To the hangar.

11    Q.  Okay.  So it actually -- the arctic entry must

12  have extended past the edge of your building, because

13  you didn't have to go in the Servant Air lobby and then

14  over to the hangar, you could go right into the hangar?

15    A.  If you slid this thing over more to the right

16  where it should be, there would be those two garage

17  doors over here that go into the hangar, and plus this

18  door that goes into the hangar.

19    Q.  Okay.  So most of your employees would come in

20  over here and then this is the customer entry on the

21  right-hand side of the diagram?

22    A.  Yeah.

23    Q.  Okay.  We can take that one down.  Thank you.

24        MR. COLBATH:  And I would move, Your Honor,

25  with Mr. Skonberg's corrections or additions, I guess, I

1  would move 51A, Defense 51A.

2          MR. SKROCKI:  No objection.

3          THE COURT:  That will be admitted.

4          (Defense Exhibit No. 51A admitted.)

5  BY MR. COLBATH:

6    Q.  And Mr. Skonberg, I'm going to show you what's

7  been marked as Defense Exhibit No. 180 just for

8  foundation, if we could.  Could you blow that up?  Our

9  screen is a little fuzzy to read anyway.

10          Do you recognize that, Mr. Skonberg?

11    A.  Yes.

12    Q.  And would that be a listing or printout of the

13  Servant Air flight schedule and passenger schedule for

14  April 12, 2012?

15    A.  Yes.

16    Q.  Is that something that you provided as part of --

17  to probably a number of different folks as part of the

18  investigation in this case?

19    A.  Correct.

20    Q.  You didn't provide it on April 12, 2012?

21    A.  I didn't provide any of that, actually.  Wes did,

22  the owner.

23    Q.  But you're familiar with it?  That would have

24  been the crew that you were working with your busy day?

25    A.  Yes.

1    MR. COLBATH:  Your Honor, I'm going to move the

2    admission of Defense 180.

3         MR. SKROCKI:  We agreed to foundation prior to

4    trial, Your Honor, so no objection.

5         THE COURT:  180 is admitted.

6         (Defense Exhibit No. 180 admitted.)

7    BY MR. COLBATH:

8    Q.  Could you leave that blown up so it will be

9    easier to read that way if we could.

10        So Mr. Skonberg, here it looks like, if I go to

11   the second flight down, Flight 600, this one, looks like

12   that would have been the first flight going out for the

13   day.  It went at 7:45 a.m.?

14   A.  Correct.

15   Q.  With just cargo, no passengers, but it brought

16   back some passengers from a couple of the villages, from

17   Ozinki and Port Lions?

18   A.  Correct.

19   Q.  Then shortly after that, ten minutes later, you

20   had another one going also to Ozinki and picking up some

21   folks in several villages?  Three flights in that first

22   hour once you got rolling for the day?

23   A.  Correct.

24   Q.  So you had passengers coming and going starting

25   fairly soon that morning?

1    A.  I had passengers coming in.  I had nobody going

2  out in the morning.

3    Q.  All right.  We can take that down.

4       Now, you were first interviewed about this case,

5  Mr. Skonberg, around May 24th or 25th of 2012, probably

6  about a month, six weeks after the incident on the 12th;

7  do you recall that?

8    A.  No.  I remember.  I don't know when.

9    Q.  Does that seem about right?

10    A.  Yeah.

11    Q.  And at the time, you told law enforcement agents

12  the same thing that you're telling us here today, you

13  don't remember seeing Jim Wells at any time on

14  April 12th enter Servant Air?

15    A.  Correct.

16    Q.  You don't remember Jim Wells coming into Servant

17  Air the next day, April 13th?  You didn't see him the

18  next day?

19    A.  No.

20    Q.  When you talked to law enforcement, whenever it

21  was, a month later, you hadn't seen Mr. Wells in there

22  at all?

23    A.  At all.

24    Q.  Ever?

25    A.  No, no.

1    Q.  Okay.  When they interviewed you, they showed you

2    a picture of him and his vehicles and asked if you had

3    seen him or his vehicles parked out there when you

4    parked, right?

5    A.  Correct.

6    Q.  And you had not?

7    A.  I had not.

8         MR. COLBATH:  Just one minute, Your Honor.

9    Make sure I got --

10        (Pause)

11   Q.  When you're at your counter there and you're

12   preparing for a busy day and the multiple flights like

13   you had, what are you doing to do that?

14   A.  I'm on the computer making sure -- some people

15   are picky about who they fly with, so I want to make

16   sure that they are with their requested pilots that they

17   feel safe with.

18   Q.  Kodiak can be rough flying sometimes, I bet?

19   A.  Just a little bit.

20   Q.  And you had a lot of regular customers coming and

21   going from -- a lot of the villages you served are only

22   either boat or air accessible, not on the road system?

23   A.  Correct.

24   Q.  And if we could have just -- could you pull up

25   for me, Deatrich, Defense Exhibit 50 and Defense 51A?

1  Could you split screen those?

2       One last question for you, Mr. Skonberg, so we

3  understand.  We'll look at a picture here, Defense

4  Exhibit 50.

5       And that one is what?

6  A.  It's the back office where the pilots sit around

7  once in a while.  You go a little farther, there is

8  another door that goes to the hangar.

9  Q.  Are we out in the lobby area looking back at the

10  office or is the lobby area through those doors?

11  A.  No, you are right by that one main metal door

12  where the customers come in once in a while.

13  Q.  Pull up 51.  We'll use that one for now, because

14  we have it in the system.

15       So the picture here where it says "back office,"

16  we're looking at kind of that doorway?

17  A.  Yes.  You're standing -- we're probably about

18  here somewhere because there is the door -- because I'm

19  sitting up over here somewhere at the end of the

20  counter.

21  Q.  And what time on a morning like when the flights

22  start at 7:45, roughly like they did on this morning,

23  what time do your pilots start showing up?

24  A.  Me and him both showed up that one time at 7:00

25  in the morning, but they usually don't get there until

about a half hour before their flight because all they
got to do is warm up and go.

Q.  On a cargo flight where there is no passengers
going out, you would make sure to coordinate, I assume,
with the pilot to make sure that he had the appropriate
cargo on his plane?

A.  Yeah, I would have a ground crew guy there.  I
would give them the list and then they go load the
plane.

Q.  This back office that we're looking at here, if
we go back through those doors, that's a place for
pilots, ground crew guys to be, and also get you out
into the hangar?

A.  Hangar, correct.

Q.  You had how many aircraft in service at that
time, do you remember?

A.  Probably about five.

Q.  Okay.  You can take those down.

MR. COLBATH:  I think that's all I have for
you, Mr. Skonberg.  Thank you.

THE COURT:  Any redirect?

MR. SKROCKI:  I do.

THE COURT:  All right.  Go ahead.

REDIRECT EXAMINATION

BY MR. SKROCKI:

1    Q.  A couple of questions.  Deatrich, if we could

2  have Defense 49, please.  And the lights, Madam Clerk.

3       Just one question about this, Mr. Skonberg.  Do

4  you see the dates of these photographs?

5    A.  Yeah.

6    Q.  What's the date on that?

7    A.  7-16-2018.

8    Q.  So was there a little bit of change from 2012 to

9  2018?

10   A.  Yes.

11   Q.  Six years, right?

12   A.  Yeah, I think where that picture is taken there

13  is no more counter there anymore.

14   Q.  You were asked some questions about Brechan

15  Enterprises?

16   A.  Uh-huh.

17   Q.  I believe I heard you say they hadn't shown up

18  for work?

19   A.  They weren't there that early.

20   Q.  Not that early?

21   A.  No.

22   Q.  So nobody upstairs?

23   A.  No.

24   Q.  If we could have, was it Defense 188, the newest

25  one, the itinerary?  180.  Just a few questions.

 1          The 6:00 a.m. flight, Flight 600, no passengers
 2    going out that flight?
 3        A.   No.
 4        Q.   They were coming back in, correct?
 5        A.   Correct.
 6        Q.   And so that one came in at what time?
 7        A.   That one there probably got back by 8:20 and
 8    8:30.
 9        Q.   So were there any outbound passengers in the
10    lobby going out that morning?
11        A.   No.
12        Q.   So it was just you --
13        A.   Yes.
14        Q.   -- in Servant Air that morning?
15        A.   And my ground crew that was in the hangar.
16             MR. SKROCKI:  That's all I have.  Thank you.
17             THE COURT:  Follow-up at all?
18             MR. COLBATH:  Just two.
19                        RECROSS EXAMINATION
20    BY MR. COLBATH:
21        Q.   If you could just leave that one there.
22             On the next flight, 601, it looks like passenger
23    Charity Clarion flew out with you, Kodiak, just a little
24    before 8:00 out to Ozinki, and then the pilot picked up
25    three folks?

1      A.   Yes.

2      Q.   So she would have been your first passenger at

3   7:56?

4      A.   Correct.

5      Q.   And then the pictures, Mr. Skrocki asked you

6   about the dates.  The doorway in from the arctic entry

7   into the lobby and where the bathrooms were, that's not

8   been changed?

9      A.   No.

10          MR. COLBATH:  Okay.  That's the only follow-up

11   I had.

12          THE COURT:  Thank you, sir.  You may be

13   excused.

14          (Witness excused)

15          THE COURT:  Why don't we take our morning break

16   here.  Please leave your notepads here and remember my

17   admonition not to discuss the case.  We'll go off

18   record.

19          (Recessed from 10:27 a.m. to 10:45 a.m.)

20          (Jury present)

21          DEPUTY CLERK:  Court is again in session.

22          THE COURT:  Please be seated, everyone.  Are we

23   ready for the government's next witness?

24          MS. SHERMAN:  We are.  The government's next

25   witness is Angelo Toglia.

1          THE COURT:  All right.  Good morning.  If you

2    could come forward to the witness stand, please.  That's

3    fine right there.  Go ahead.

4          (Oath administered to the witness)

5          DEPUTY CLERK:  For the record, can you please

6    state your full name and then spell your full name.

7          THE WITNESS:  Angelo Toglia, Jr., A-n-g-e-l-o,

8    T-o-g-l-i-a.

9          ANGELO TOGLIA, GOVERNMENT WITNESS, SWORN

10                   DIRECT EXAMINATION

11   BY MS. SHERMAN:

12      Q.  Good morning, Mr. Toglia.  Where do you work?

13      A.  Good morning.  At Collision Research & Analysis

14   in Gig Harbor, Washington.

15      Q.  And what do you do for Collision Research?

16      A.  I primarily do automobile accident

17   reconstruction, also reconstruct industrial accidents

18   and analyze digital photographs and video.

19      Q.  How long have you been with Collision Research?

20      A.  I've been with them approximately 18 years.

21      Q.  How many accidents have you investigated for

22   Collision Research?

23      A.  It would be hard to put a number on it, but

24   definitely many, many hundreds of accidents.

25      Q.  Where did you work prior to Collision Research?

1     A.   At a company called Exponent performing

2  full-scale crash tests at their test facility.

3     Q.   Does Collision Research sometimes get involved in

4  matters outside accident reconstruction?

5     A.   Yes, we do.

6     Q.   And does that include specifically digital image

7  analysis?

8     A.   Yes, it does.

9     Q.   Come back to that in a moment.  Take us through

10  your educational background.  Did you go to college?

11     A.   Yes, I did.

12     Q.   Tell us where and what you got a degree in.

13     A.   I received both a bachelor's and master's degree

14  in mechanical engineering from the University of Arizona

15  in Tucson.

16     Q.   Are you a certified professional engineer?

17     A.   Yes.  I'm a licensed professional engineer in

18  four states.

19     Q.   What are those, what states?

20     A.   Washington, Alabama, Mississippi and Arizona.

21     Q.   And have you received specialized training while

22  at Collision Research?

23     A.   Yes, I have.

24     Q.   What sort of training?  Tell the jury.

25     A.   Generally speaking, training associated with

1    reconstructing automobile accidents, but specifically

2    the photogrammetry work that is involved in analyzing

3    photographs and video.

4        Q.  Is photogrammetry a big part of what you do at

5    Collision Research?

6        A.  Yes, it is.  There's hardly a case that goes by

7    now where we're not using some type of photogrammetry

8    analysis.

9        Q.  Have you been trained in the use of computer

10   tools that help you in doing that analysis?

11       A.  Yes, I have.

12       Q.  Can you tell the jury what sort of tools you use

13   on a day-to-day basis in your 3D imaging and

14   photogrammetry analysis?

15       A.  There are different software programs that allow

16   you to do the -- the photogrammetry analysis that we're

17   going to be talking about involves a lot of math, and so

18   there are computer programs that solve the equations for

19   you and allow you to process that data so you don't have

20   to do it by hand anymore.

21           There also three-dimensional viewing programs

22   that allow you to create models and scenes within the

23   computer such that you can look at them from my angle.

24       Q.  Have you published papers relating to

25   photogrammetry?

1     A.   Yes, I have.

2     Q.   What are those?

3     A.   I published two papers directly related to

4  photogrammetry.

5     Q.   Were those peer reviewed?

6     A.   Yes, they were.

7     Q.   What does it mean to have a paper peer reviewed?

8     A.   When a paper is peer reviewed, it means there are

9  other experts or people that are knowledgeable in the

10  field that review the paper and usually give feedback

11  and make sure that it's respectable and appropriate to

12  be published and it's not just kind of junk science.

13     Q.   What is photogrammetry?

14     A.   Photogrammetry is the process of extracting

15  reliable dimensional information from imagery.  And the

16  image can be a still photograph, or it can be an image

17  of a video.

18     Q.   Have you testified in court on topics of computer

19  modeling and photogrammetry?

20     A.   Yes, I have.

21      MS. SHERMAN:  Your Honor, the government

22  requests the Court find Mr. Toglia has the requisite

23  training, experience and education to render an opinion

24  in the areas of computer modeling and photogrammetry

25  including video analysis.

1          THE COURT:  Anything to add on that?

2          MR. COLBATH:  Nothing in addition to the

3    motions work and objections we previously filed.

4          THE COURT:  Very good.  Then I will find the

5    witness so qualified.  Go ahead.

6    BY MS. SHERMAN:

7      Q.  You briefly talked about collision research.

8    What sort of products do you make for your clients?

9      A.  Certainly written reports with respect to the

10   work that's performed on a given case.  But with regard

11   to a more traditional accident reconstruction, it's

12   typically a three-dimensional model showing what

13   happened in the crash and sometimes we actually make

14   actual scale models that we can show to a jury or the

15   client, an actual physical three-dimensional model.

16     Q.  Do you do more physical models now or more

17   computer models these days?

18     A.  The physical models are a little more old-school

19   technique.  Nowadays we're doing everything in the

20   computer, so I'll generate a three-dimensional scene,

21   I'll put three-dimensional vehicles in the scene and

22   even animate the vehicles to show what happened and

23   where they ended up and things like that.

24     Q.  I want to turn to your work in this case.  Did

25   you do a 3D computer-generated model of the scene at the

1    COMMSTA?

2        A.   Yes, I did.

3        Q.   How do you go about doing something like that?

4        A.   The first step in generating a three-dimensional

5    scene is, if at all possible, you get out to the site.

6    So I did visit the COMMSTA site back in I think it was

7    February of 2013 if I remember correctly.

8            While I was out at the site, I documented the

9    landmarks, the surrounding terrain, all of the geometry

10   of the buildings with a piece of equipment called a

11   total station, which is a professional piece of

12   surveying equipment.

13       Q.   How long does that process take to survey a scene

14   like this?

15       A.   It definitely depends on how large the scene is

16   and the detail to which you want to document it.  I was

17   there for a couple of days.  The surveying took at least

18   half a day I would say.  Probably the better part of a

19   day.

20       Q.   So once you've surveyed that, the scene with

21   total station, what do you do with that data?

22       A.   The data I get from that scene is a

23   three-dimensional wire frame model.  So when I go, I

24   digitized points, for example, around the corners of the

25   building, and then I can connect them in a software

1    program.  So I now have kind of a wire-frame model of

2    what that scene looks like.  But it is in three

3    dimensions, and it's highly accurate.

4        Q.  Did you -- you indicated you had done that in

5    this case?

6        A.  Yes, I did.

7        Q.  Can we pull up 182 just for Mr. Toglia to take a

8    look.  If we could just start that for him.

9            Is this that 3D model you did for this case?

10       A.  Yeah.  Can I go ahead and stop it?

11       Q.  You recognize this as what you did?

12       A.  Yes.  This is the three-dimensional model that I

13   generated of the COMMSTA site.

14           MS. SHERMAN:  I move for the admission of 182.

15           We can -- Blair, if you want to -- that's the

16   end.

17           MR. COLBATH:  That's fine, Your Honor.  I have

18   no -- subject to our earlier discussion, 182 is fine.

19           THE COURT:  All right.  Then 182 is admitted.

20           (Exhibit No. 182 admitted)

21   BY MS. SHERMAN:

22       Q.  So we'll go ahead and just publish that for the

23   jury.

24           And if we need to stop as we go through it, you

25   can let me know.

1    A.   Okay.  We're going to want to stop it after it

2    starts to turn a little bit.  Pretty quickly into it.

3    Q.   So we can go ahead and hit play.

4         (Exhibit No. 182 playing in open court)

5    A.   Go ahead and stop it there, please.  Thank you.

6    Q.   So what are we seeing here?

7    A.   So this is the 3D model of the COMMSTA site.  And

8    what you're looking at is an aerial photograph.  If you

9    can see down in the lower right-hand corner here, this

10    is a Google Earth aerial photograph that's been what's

11    called draped down to the 3D terrain.

12         This is the T-1 building over here.  This is the

13    T-2 building.  This is Anton Larsen Bay Road right

14    there.  And what you're looking at in terms of the

15    surrounding terrain, you can see there's some data out

16    in this area as well.  All of that terrain is generated

17    based on U.S. Geological Survey.  So I didn't survey

18    data this far out.

19         As you'll see in the exhibits I'll show you

20    shortly, I documented this area here between the T-1 and

21    the T-2 buildings and also the roadway out in this area.

22    Q.   Go ahead, please.

23         (Exhibit No. 182 continues playing)

24    A.   And because this is a three-dimensional model in

25    the computer, we can look at it from any angle.  You

1  have to go ahead and stop it there.  Great.

2      What you can see over here in the right side of

3  this image is the location of the T-1 camera that's

4  looking generally westbound towards Anton Larsen Bay

5  Road.

6      Q.  Okay.  When you were out at the site at the

7  COMMSTA, did you actually go under that camera and take

8  a view from that camera of what you could see?

9      A.  Yes.  I did several things.  First of all, I

10  actually surveyed or documented the location of that

11  camera.  The camera sits on top of a utility pole.  And

12  I surveyed that location so I know precisely where the

13  actual camera is located.

14      In addition, as you just mentioned, I actually

15  got up on a fire truck and kind of took some pictures

16  from that actual perspective as well.

17      Q.  We can go ahead.

18          (Exhibit No. 182 continues playing)

19      A.  So as we play through this video, what you'll see

20  here is that we're going to move around to different

21  locations.  We're going to come down to Anton Larsen Bay

22  Road.  If we could pause it there for a second.

23      Q.  What are we seeing here?

24      A.  This is Anton Larsen Bay Road in the foreground.

25  This is the T-2 building right here.  You can see a

       1    little bit of the T-1 building in the background behind

       2    this hill.  And this is the camera at the top of the

       3    utility pole right there.

       4        Q.  Go ahead.

       5            (Exhibit No. 182 continues playing)

       6        A.  Now, again, because we're in three dimensions, we

       7    can look at this from any angle.  So we're going to kind

       8    of pan through and move through the scene here to get a

       9    different perspective.

      10            We're going to come behind the camera, so now

      11    we're looking generally westbound.  And now what we're

      12    going to do is fly into that little yellow ball there

      13    which is representative of a camera.  And we're going to

      14    actually look at the three-dimensional scene from the

      15    perspective of the camera.  If you can hold it right

      16    there.

      17        Q.  What are we seeing here?

      18        A.  So this again is a three-dimensional model of the

      19    terrain and the landmarks that are out at the COMMSTA

      20    site.  And just like a normal camera that you have where

      21    you can zoom in and out, because this is now -- this is

      22    a virtual camera in this three-dimensional world, I can

      23    zoom in and out to give you different perspectives.

      24            If you play it, you'll see that we're going to

      25    zoom in a little bit here.  And then I'll ask you to

1    stop it when it's right -- a little more.  Right there.

2         And so what we're looking at now is we've zoomed

3    in to the perspective such that this model here is

4    overlaying the -- what we see in the image.  So you can

5    see up here in the upper left-hand corner of this view,

6    this is an image from the surveillance video that has

7    now been superimposed and aligned with this three-

8    dimensional model.  We're going to talk to you about how

9    that was actually done, but that is showing you how

10   everything aligns.

11        And then if you go ahead and play it, we're going

12   to fade out the data so you can see how the

13   three-dimensional world actually aligns with the image

14   that was extracted from that surveillance video.

15   Q.  Take that down.  I want to talk about what you

16   were just mentioning about lining up this 3D image and

17   the actual images from the scene.  Does that process

18   have a title?

19   A.  Yes, that's the photogrammetry that I mentioned.

20   Q.  Okay.  Did you -- I'm going to talk about, before

21   we get into it, some work you did in addition to this 3D

22   model.  Did you go through and look at some images of

23   the blue vehicle in the video?

24   A.  Yes, I did.

25   Q.  Did you compare those to other vehicles?

1    A.   Yes.

2    Q.   Generally, tell us how that process, how that

3  works.  Just an overview for us.

4    A.   Of the modeling or just the comparison part?

5    Q.   The modeling, do you use a 3D model?

6    A.   Yes.

7    Q.   If you could describe that.

8    A.   I took a three-dimensional model of different

9  vehicles and imported those models into the scene.  I

10  can move the model around, up and down, left and right,

11  anywhere I want in the scene.  What I do is align that

12  three-dimensional model, which is geometrically

13  accurate, I make sure of that, and align that to the

14  image we have in the -- the image of the pixels we have

15  in the image from the surveillance camera.  I move it

16  around until it lines up and I see where that places me

17  in the scene.

18    Q.   Did you do a PowerPoint that will assist the jury

19  and further describe your testimony?

20    A.   Yes.

21    Q.   Why don't we take a look at 181.  Just for

22  Mr. Toglia for foundation.  Is this the PowerPoint you

23  created to assist the jury in understanding your

24  testimony?

25    A.   Yes, it is.

1          MS. SHERMAN:  Your Honor, I once again made a

2    mistake.  I believe 182 should have been published to

3    the jury but not actually admitted, so I would withdraw

4    that.  They are allowed to see it, but it won't go back

5    with them.

6          THE COURT:  It is withdrawn.  Thank you.

7          (Exhibit No. 182 withdrawn)

8          MS. SHERMAN:  At this time, I'm going to

9    request that 181 be published to the jury but not

10   admitted under the same sort of circumstances.

11         THE COURT:  Very good.  I will do so based on

12   prior rulings.  And I could read again the instruction.

13         MS. SHERMAN:  Sure.

14         THE COURT:  Is that the request?

15         MR. COLBATH:  It is, Your Honor.

16         THE COURT:  So ladies and gentlemen, you'll be

17   hearing testimony from this witness who, because of his

18   education and/or experience, will be permitted to state

19   opinions and the reasons for his opinions.  And during

20   his testimony, certain presentations will be made by

21   this witness and will be shown to you in order to help

22   explain the evidence in the case and the basis for the

23   witness's opinion.

24         These presentations are not admitted into

25   evidence and will not go into the jury room with you.

Various slides and some of the presentations will be
marked with disclaimers as directed by the Court.  And
the presentations are not themselves evidence, nor proof
of any facts.

        And if the presentations in whole or in part do
not correctly reflect the facts shown by the evidence in
this case, then you should disregard these presentations
and determine the facts from the underlying evidence.

        Go right ahead, please.  Thank you,
Ms. Sherman.

BY MS. SHERMAN:

    Q.  We can go ahead and publish that.

        So let's go to -- actually, it might be easier
for you to take us through these slides.

        Your Honor, may I approach with --

            THE COURT:  Certainly.

            (Ms. Sherman approaches witness)

BY MS. SHERMAN:

    Q.  I'll just make sure it works and advance to the
next one.  So let's start with this aerial photograph.
Where did you get this, and what are we seeing here?

    A.  As I mentioned previously, this photograph was
taken from Google Earth, which is publicly available.

    Q.  Is this the image that you overlaid in that 3D
model?

1    A.  Yes, it is.

2    Q.  Why don't we go to the next slide.

3        What are we seeing here?

4    A.  This is that same image, and I've located

5    camera over here at the top of the utility pole.  The

6    T-1 camera is located right there.  So what this exhibit

7    is showing is the field of view that is associated with

8    that camera.

9        So this pink box down here is a full frame from

10   the surveillance video, and that pink box, the view in

11   that pink photograph corresponds to these pink lines

12   right here.  There's a little bit of a -- or there's a

13   dash line here because due to the berm here, you can't

14   actually see what's behind that.  But just in terms of

15   the angular perspective, that's what the pink box shows.

16   Q.  And then the yellow?

17   A.  The yellow box is a zoomed-in portion.  So if we

18   zoom into this section of the image and enlarge it over

19   here, you can see that that then becomes a smaller angle

20   field of view.  And then if we zoom in a little more to

21   the green box over here, just to the left of the T-2

22   building, you can see the perspective that the camera

23   has of that on this aerial.

24   Q.  And I want to -- before we move on, you zoomed

25   in.  Did you do anything else to enhance any of these

1   images that you looked at?

2     A.  No.  None of the images that I analyzed were

3   enhanced in any way.  They were only enlarged so you can

4   see them a little better.

5     Q.  Why don't we go to the next -- the next slide.

6        What are we seeing here?

7     A.  This is the same thing, but we're looking at the

8   T-2 camera now, which is mounted on the corner of this

9   building.  It shows the perspective of that camera

10   that's given in that view right there.

11     Q.  We see dotted lines again.  What is that for?

12     A.  Yes.  So the terrain -- because this is a

13   two-dimensional view, the rays here just show a general

14   angle, but because of the terrain you don't actually see

15   past that portion over there.

16     Q.  Let me ask you a question about this T-2 camera.

17   In your analysis, were you able to tell if someone could

18   walk along the edge of T-2 under that camera?

19     A.  Yes, I was able to determine that.

20     Q.  And what was your -- well, what's your opinion on

21   that, I guess?

22     A.  I determined that based on the location of the

23   camera, the height of the camera off the ground and its

24   field of view that somebody could walk underneath that

25   camera without being seen by a camera.

1      Q.   Why don't we go to the next slide.  It's titled

2   "Scene Generation."  What are you doing when you start

3   to generate the scene?

4      A.   So what I'm going to walk through now are the

5   steps I used to create the three-dimensional model that

6   we saw in the fly-around video.

7      Q.   Take us to the next one.  What are those yellow

8   lines?

9      A.   The yellow lines here, keeping in mind that we're

10  looking down, so this a two-dimensional perspective, but

11  the yellow lines are the actual survey data that I

12  acquired while I was out at the COMMSTA site.  So you're

13  again looking at a top-down view, so they look like just

14  lines.

15      But when you look at this from a different

16  perspective that I'll show you in just a second, you'll

17  see that this is actually three-dimensional data that is

18  documenting the geometry of the building, the parking

19  lot and various landmarks.

20      Q.   And the next slide.

21      What are these additional pink lines?

22      A.   The pink lines are a set of data that was

23  provided to me by COMMSTA.  They had done their own

24  survey, and so I utilized that, if you actually go back

25  one slide here.

1           The total station, the surveying piece of

2    equipment is a line-of-sight instrument.  And this is a

3    large distance here.  So I had multiple locations where

4    I surveyed and acquired the data.  But if you notice,

5    for example, on the -- sorry, my pointer keeps going

6    out.

7           On this part of the building here and this part

8    of the T-2 building, depending on where I located my

9    total station, I can't see the back of the buildings.

10   So something that was useful to me is this COMMSTA site,

11   which you can see generally overlays my data very well.

12   It was useful to me in that they had surveyed around the

13   entire building.  So when it came time to generate the

14   three-dimensional model and show you that fly-around

15   video, I had that data that was provided to me by

16   COMMSTA.

17   Q.   And have you relied on site survey data before in

18   generating these sort of 3D images?

19   A.   Certainly the data that I've acquired myself and

20   other experts, yes.

21   Q.   Let's go to the next slide.

22          Here we have photogrammetry mentioned.  What is

23   the first step you take when you're doing a

24   photogrammetry analysis?

25   A.   So now that I've got my three-dimensional data of

1    the scene, I'm going to align this photograph, this

2    image with that three-dimensional data.

3        Q.   Go to the next one.  It's a lot of white.  What

4    are we seeing here?

5        A.   So the way I do that is this doesn't start off

6    looking like this.  This is the end product.  So what

7    you're looking at, the white lines are the actual survey

8    points that I documented.  So as I described, those are

9    actual three-dimensional data.

10           So off on a different screen or a different

11   window, if you notice all of these little triangles over

12   here, these green triangles, I picked those points in my

13   three-dimensional survey and I mark them on this

14   photograph.  Here, here, all these little triangles I

15   physically, manually mark those points.

16           Then what the software is able to do, the

17   photogrammetry software, is because I'm telling it the

18   three-dimensional location of those points, the software

19   is able to crunch the math and figure out the

20   perspective that this camera was taken from and the

21   parameters associated with that camera.

22           What that allows the software then to do is align

23   my three-dimensional data with this scene.  And so you

24   can see the roof lines here are lined up.  This fence

25   line is lined up.  There's actually -- I'll go back a

```
 1   slide, and you can see there is a little kink in the
 2   fence right there.  You can see how that actually shows
 3   up in the survey data as well.
 4        There are some terrain lines over here.  These
 5   dots are parking stripes.  So all of that data is used
 6   to align the image with the three-dimensional data.
 7   Q.   So we can go to the next slide.
 8        When you align the data that you collected with
 9   the image, is that camera matching?
10   A.   Yes.
11   Q.   Can you describe in detail the process of camera
12   matching?
13   A.   Well, that's the process that I just described in
14   terms of marking the three-dimensional points on the
15   two-dimensional photograph.  That's the photogrammetry
16   part.  That's what the software does, and that allows me
17   to then match the camera to my three-dimensional scene.
18        And so what we're doing in going from this view
19   on slide 9 to 10 is instead of overlaying just the
20   three-dimensional wire-frame model that was the survey
21   data, this is the completed model that had been
22   generated in terms of putting in the buildings, putting
23   in the terrain and things like that.
24   Q.   Let's go to the next slide.
25        What are we seeing here?
```

1    A.   This is going -- this is the fly-around.

2    Q.   Okay.  Let's go to the next slide.

3         What -- we're going to talk about several slides

4    together.  Did you isolate some frames from the video?

5    A.   Yes.  From that April 12th video, there were five

6    frames that showed a vehicle traveling northbound on

7    Anton Larsen Bay Road and I extracted those frames.

8    Q.   Okay.  And if we can go ahead and go through

9    those.

10   A.   So these will be five frames off on the left

11   here.  You'll start to see the vehicle, or there's a

12   vehicle there.  As I step through these frames, there's

13   number three, number four, and number five.  So those

14   are the five frames from April 12th that I analyzed with

15   the vehicle traveling in the northbound direction.

16   Q.   Did you look at some images from the 4-19 video?

17   A.   Yes, I did.

18   Q.   And did you do -- I'm going to talk about what

19   you did before we go to that series.  What you did with

20   the vehicle in the 4-19 video, tell us about that.

21   A.   Yes.  So as I briefly described before, with the

22   video and the image now aligned to the three-dimensional

23   scene, I took a three-dimensional -- an accurate

24   three-dimensional model of various vehicles -- and the

25   first one that we'll show will be the Honda CR-V -- and

1    placed it in the scene so it aligned with the pixels

2    that are visible on the image.

3    Q.  So why don't we go through -- and this is from

4    the 4-19?

5    A.  Yes.  The first example here we'll show is from

6    the 4-19 footage.

7    Q.  We can go through that series.

8    A.  So we're going to zoom in to an image from 4-19.

9    In this case, we know that the vehicle that's depicted

10   here is a blue Honda CR-V.  So all I've done -- again,

11   we haven't enhanced or changed the image at all.  We're

12   just zooming in so you can see things a little better.

13        So I'll fade in the three-dimensional model of

14   the vehicle.  So this is a model again that's accurate

15   in terms of height and length and width, and I'm placing

16   that in the actual model.

17   Q.  Okay.  Then what did you do?

18   A.  So if I flip back and forth here, you can see

19   that the image, the pixel images, the blue pixels align

20   with the three-dimensional model.  So it's important to

21   understand that I'm working in three dimensions here.

22   So just like in the real world, when something gets

23   closer, it gets bigger.  When you move it farther away,

24   it gets smaller.

25        I can take the three-dimensional model of that

1  vehicle, and if I move it closer to the camera, it gets

2  bigger and if I move it farther away, it gets smaller.

3  So I move it in and out and left and right.  I don't

4  have to move it up and down so much because I know the

5  vehicle's wheels are on the ground, so there's not too

6  much adjustment there.  But I move it around back and

7  forth until it lines up with those images that you see

8  in the -- or the pixels that you see in that image.

9     Q.  Let's go to the next slide.  What are we seeing

10  here, this outline?

11     A.  This outline is just kind of an aid to help you

12  make the comparison.  So once I've got this

13  three-dimensional model aligned, I traced the outline of

14  it so that I can remove the model and you can see the

15  pixels behind it.

16         So I think it's important to understand that this

17  outline here is not made from this image.  I didn't look

18  at this image and draw this outline.  You don't have

19  that much detail there.  But this outline is traced from

20  that model so that I can then remove the model and you

21  can see the pixels behind it.

22     Q.  Let's go to the next one.

23     A.  Then I just fade that away again for comparison

24  purposes.

25     Q.  The next slide.

1       And then did you do this as the vehicle in
2  relation to the 4-12?
3     A.   Yes.
4     Q.   Okay.  And before we go through them, because
5  we'll go through them quickly, what -- did you go
6  through the same process, a 3D image over the blue
7  vehicle on the 4-12 video?
8     A.   Yes.  That's exactly the same process.
9     Q.   You did that for each of the images going across
10  the screen?
11     A.   Yes.
12     Q.   Then faded out with the outline as well?
13     A.   Yes.
14     Q.   We're going to talk about several vehicles you
15  did that with, right?
16     A.   Correct.
17     Q.   The first one is the CR-V, though?
18     A.   Yes.
19     Q.   Let's go ahead and click through the next several
20  slides.
21     A.   Okay.  So this is the series of five slides with
22  the three-dimensional model overlay.  Here's the first
23  one with the model.  And then the model will fade out,
24  and you can see the outline there.  I'll just kind of
25  step through these fairly quickly.  It will be the same

1  thing repeated.

2  Here's the model, the outline, and then we

3  advance to the next slide, or the next frame I should

4  say. The model, the outline. And then here's the last

5  one. The back end of the model and then the outline.

6  Q. Just one moment to catch up.

7  And then when doing this, did you isolate an

8  image from the northbound to compare with that 3D model?

9  A. Yes. I did that for all of the images, but what

10  we're going to do here is take a closer look using the

11  image that shows the largest portion of the vehicle.

12  Q. So let's go to the next slide.

13  A. So this is the third image. So you've already

14  seen this model overlay, but we're zooming in here. On

15  4-12 you can see there were some vehicles in the

16  foreground here that are partially blocking the model or

17  the vehicle out on Anton Larsen Bay Road. And that's

18  what this gray area here is showing.

19  Q. Okay. Then did you do that outline as well?

20  A. Yes. So here's that outline of the vehicle and

21  how it compares to the pixels from the 4-12 image.

22  Q. And then the next image. Did you do something,

23  this similar process for images going southbound?

24  A. Yes.

25  Q. Let's go to the next slide. How many images did

1  you isolate going southbound?

2      A.  Southbound there were four images that I

3  analyzed.

4      Q.  Let's click through those.

5      A.  You can see the vehicle to the left of the T-2

6  building here proceeding southbound.  And then --

7      Q.  And then you did the same process with the 3D

8  model and then the outline?

9      A.  Exactly the same process.

10     Q.  Let's go through those.

11     A.  So here's the model and then the outline, the

12  model and the outline.  And there's something I forgot

13  to mention.  When I placed this 3D model in the screen,

14  and as I described, I move it back and forth left and

15  right, when I did that and saw that to the extent it

16  aligned with the pixels, the vehicle ended up in the

17  middle of either the northbound lane or the southbound

18  lane, depending on which way the vehicle was going.  So

19  that was kind of what we call a sanity check in that

20  things were making sense.

21     Q.  So it was clear that vehicle was on the road

22  going in the lane of travel it should be if it's going

23  in that direction?

24         MR. COLBATH:  Your Honor, I'm going to object

25  as to leading.

1          THE COURT:  It's sustained.

2    BY MS. SHERMAN:

3      Q.  You indicated it was on the road.  When it was

4    going northbound, tell us about what lane it was in.

5      A.  So for example, as I move the vehicle closer to

6    the camera and farther away to match the size of the

7    pixels, if when I do that and I match that size, I then

8    look at my model and the vehicle is in the dirt, that

9    tells me that something is not right, because I know the

10   vehicle is not traveling in the dirt.

11          So for the northbound images that I analyzed,

12   after I put the model on top of the pixels, I looked at

13   where it is in the three-dimensional scene, and the

14   vehicle was in the middle of the northbound lane.

15          Similarly, for the images that were showing the

16   vehicle traveling southbound, once I placed the

17   three-dimensional model on top of those images, I look

18   at where they are in the scene, and the vehicle was in

19   the southbound lane headed in the correct direction.

20     Q.  Let's continue to click through these southbound

21   images.

22     A.  There's the model, the outline.  And then the

23   last one heading southbound on 4-12, the model and the

24   outline.

25     Q.  Did you do the same thing on the southbound image

1  with the model and the overlay of the additional

2  vehicles?

3      A.  Yes.  So again, this is just a close-up view,

4  because it's obviously pretty small on the full-size

5  images.  So here is the three-dimensional model overlaid

6  again with the gray area depicting the portion of the

7  vehicle that you can't see because of vehicles in the

8  foreground.

9      Q.  Okay.  And then did you do the outline?

10      A.  Here's the outline.

11      Q.  Okay.  And then just the image as well?

12      A.  Right.  You can see how well the outline fits the

13  overall shape of the -- the size and shape of the

14  vehicle.  And then we fade that away.

15      Q.  So let's go to the next slide if we could.  And

16  then you indicated before you did some additional

17  vehicles.  What vehicle did you start with?

18      A.  The first one that I'm going to show you is a

19  Dodge Durango.

20      Q.  Why did you decide to use a Dodge Durango?

21      A.  The Dodge is a vehicle that's substantially

22  bigger than the Honda CR-V.

23      Q.  Did you have a Dodge Durango that you were able

24  to take photos of out -- when you were out in Kodiak?

25      A.  Yes.

1    Q.  Okay.  Let's go through your analysis using the

2    Dodge Durango, if we can click through those slides.

3    A.  So this is the same exact process now.  But

4    instead of using a three-dimensional model of the

5    Honda CR-V, I obtained an accurate three-dimensional

6    model of a Dodge Durango and lined up the front wheel of

7    the Dodge Durango with the front wheels of the Honda

8    CR-V.

9         So I'm not matching the pixels now, and you'll

10   see in just a moment that it's different, but I'm

11   putting the front wheels of whatever the alternate

12   vehicle is at the same location as the CR-V was.

13   Q.  Okay.

14   A.  And now we're going to zoom in and show you this

15   is the same image we've been looking at first with the

16   CR-V that I showed you before, and now here's a

17   three-dimensional model of the Dodge Durango.

18   Q.  All right.  We can go to the next slide.

19   A.  As I did with the CR-V, I then traced the outline

20   so you could see how it compared to the pixels behind

21   once I removed the model.  What you can see here is that

22   there is definitely not a good fit of this outline or

23   this Dodge Durango with the vehicle image as depicted.

24   Q.  Did you do a comparison of a 3D image of a Dodge

25   Durango and another vehicle?

1    A.   Yes.

2    Q.   Okay.  Let's go to the next slide.

3    A.   It's not surprising that this image here, that

4    outline doesn't fit, because when you take a look at the

5    Dodge Durango compared to a Honda CR-V, the Durango is a

6    lot bigger.

7    Q.   All right.  Did you use another vehicle?

8    A.   Yes, I did.

9    Q.   What was that?

10   A.   The next one is a Honda Accord.

11   Q.   Let's go through that.

12   A.   So here is the Honda Accord placed at the same

13   location matching the -- again, it's a different vehicle

14   with different dimensions, so by same location, I'm

15   lining up the front wheels.  And we'll zoom in as we did

16   before first showing the Honda CR-V and then putting the

17   model of the Honda Accord there and with the outline.

18        And again, as with the Durango, you can see that

19   this outline does not match those images very well --

20   sorry, those pixels very well.

21   Q.   And did you do the 3D overlay image as well?

22   A.   Yes.  Again, it's not surprising, the geometry of

23   the Accord, which is a four-door sedan, is much

24   different than the CR-V, which is a sport utility-type

25   vehicle.

1    Q.  Did you do this analysis using 3D models of other

2    SUVs, though?

3    A.  Yes, I did.

4    Q.  Let's go to the next slide.  These are the SUVs

5    you utilized?

6    A.  Yes.  These models were chosen specifically

7    because they were similar in size and shape to the Honda

8    CR-V.

9    Q.  Okay.  Let's go through -- I think the Escape is

10   first?

11   A.  Yes.

12   Q.  All right.

13   A.  So we'll start -- again, we'll kind of go through

14   these faster and faster.  It's the same thing again and

15   again.  So here's the Honda, and then I'll fade out the

16   Honda and go to the Ford Escape.  And then there's the

17   outline, and you can see that there's a pretty good fit.

18   And that's not a surprise because of when you compare

19   the geometry of the two vehicle, the Ford Escape and

20   Honda CR-V are very similar.

21   Q.  Okay.

22   A.  And just to clarify what I'm showing here, this

23   is a white Ford Escape that I've made kind of

24   semitransparent so you can sort of see through it and

25   see the similarities with the CR-V there behind it.

1    Q.   The Ford Escape didn't have a -- the 3D model

2   didn't have a rear wheel carrier?

3    A.   Correct.  The 3D model did not have a

4   rear-mounted spare tire because the Ford Escape in real

5   life does not have a rear-mounted spare tire.

6    Q.   And then did you do the same thing with the Santa

7   Fe?

8    A.   Yes.

9    Q.   Let's go through that.

10    A.   So here's the CR-V, Hyundai Santa Fe.  There's

11   the outline.  Again, a pretty good fit and again, not

12   surprising given the similarity and geometry between

13   those vehicles.

14    Q.   And then the RAV4?

15    A.   First the Honda, then the RAV4.  The outline and

16   the comparison of the models.

17    Q.   Okay.  And then you can go to the next slide, and

18   we'll talk about the images from the 4-19 video.  Did

19   you do the same sort of overlay and outline on those

20   images?

21    A.   Yes.  That's exactly the same process on the

22   video that was acquired on April 19.

23    Q.   Let's go through those.

24    A.   So this is one image where the vehicle is kind of

25   centered in that space between the edge of the image and

the T-2 building here.  There's the model, and there's

the outline.  We'll zoom in just to show the same thing.

There's the model of the CR-V.  There's the outline.

And again, in this case, we know that the pixels of that

vehicle are in fact a Honda CR-V.  There we go.

Q.  Then you did the same thing with it moving

across?

A.  Yes.  So I analyzed in this case, on April 19,

the vehicle was traveling at a different speed, and so

there are I think 13 images.  I'll step through, and you

can get a sense of the vehicle.  Now, the pixels are

behind the model.  I'm showing the three-dimensional

model overlaid there as it progresses through that

image.

Q.  And then did you do the same thing southbound?

A.  Exactly same thing for the southbound images.

Q.  Then can we go through that series of images?

A.  Here's the full view, the outline, and then

zoomed in, the 3D model of the CR-V again with the

outline.  You can see how well that matches the pixels.

And then again stepping through in the southbound

direction.

Q.  And then did you take images of the vehicle in

similar locations from the 12th and 19th for a visual

comparison?

1    A.  Yes, I did.

2    Q.  We can look at the next slide.  Did you enhance

3  these in any way?

4    A.  No.  Again, the only thing that I did here was

5  zoom in to provide the same size image for you to make

6  the comparison.

7    Q.  And then the same thing with southbound as well?

8    A.  Yes.

9    Q.  And if we can go ahead and take that down.

10       And you had shown the Santa Fe before.  Does the

11  Santa Fe have a rear-mounted spare tire?

12    A.  No, it does not.

13    Q.  So in your analysis, you looked at several types

14  of vehicles.  In your opinion, is the Wells' CR-V

15  consistent with the blue vehicle from the 4-12 video?

16    A.  Yes, it is.

17    Q.  Were you able to completely rule out those other

18  SUVs that we looked at?

19    A.  Yes.  Not only the SUVs, but any vehicle that's

20  significantly larger or smaller or has a different

21  shape, like the Accord that we saw, which was a sedan.

22  Or pickup trucks, anything like that, that is very

23  different, you can rule that out.

24       MS. SHERMAN:  Those are my questions.  Thank

25  you.

1          THE COURT:  Mr. Colbath, go ahead, please.

2                    CROSS EXAMINATION

3    BY MR. COLBATH:

4        Q.  Mr. Toglia, the similar vehicles, the RAV4s the

5    Ford Escapes, those you can't rule out because the

6    geometry of the small SUV classes are the same?

7        A.  That's correct, except that a couple of those

8    vehicles did not have a rear-mounted spare tire.

9        Q.  Right.  And of course you didn't analyze -- you

10   picked three other small SUV models.  You didn't analyze

11   all the small SUV models on the market?

12       A.  Correct.

13       Q.  So let's back up.  I wanted to make sure and

14   clarify that last point.

15            Your business, Collision Research Analysis, is

16   essentially -- or excuse me -- yeah, Collision Research

17   Analysis, that's right?

18       A.  That's correct.

19       Q.  You guys primarily -- there's a number of

20   engineers and folks that work with you primarily

21   specializing in accident reconstruction?

22       A.  That's correct.

23       Q.  And how many -- you said you had provided

24   testimony in other cases.  How many criminal cases

25   besides our case here do you recall testifying in,

1   criminal cases?

2       A.  If it's criminal cases, I think it's probably one

3   or two.

4       Q.  The lion's share of your work would be automobile

5   accident, automobile-related civil litigation?

6       A.  Yes, correct.

7       Q.  And your training and experience, besides your

8   mechanical engineering, of course, education, but with

9   your work with Collision Research Analysis, that is

10  primarily training based on these photogrammetry

11  processes and the photogrammetry software?

12      A.  The portion of my accident reconstruction

13  training that's relevant to this case is largely the

14  photogrammetry work, yes.

15      Q.  And that's working with the software programs and

16  the equipment utilized to capture the measurement data

17  to put into the software programs, those types of

18  things?

19      A.  Yes.

20      Q.  Learning how to take either a video or a still

21  image and make sure that you get it imported into --

22  along with the other data, into your computer program

23  for it to provide the images that we saw?

24      A.  Yes.

25      Q.  I don't see that you have done work in the past

1   without photogrammetry but just based on forensic video

2   image analysis, or identification of vehicles, just from

3   looking at it forensically, looking at a video?

4       A.  Well, certainly the video analysis involves the

5   photogrammetry.  I'm not sure that they're separate.

6       Q.  So you don't see -- you're not involved in the

7   process of trying to do a photo analysis or a video

8   analysis that does not involve in part your

9   photogrammetry work?

10      A.  Well, as part of my reconstruction work, I'm

11  analyzing photographs all the time, whether it be of

12  accident scenes, trying to figure out what's there in

13  terms of physical evidence in the form of skid marks or

14  gouges or looking at the vehicle, trying to figure out

15  what components are damaged.  So I certainly analyze

16  photographs on a daily basis as part of my normal

17  reconstruction work.

18      Q.  Your -- do you know what your -- how much you've

19  been paid for your work here, up to date here so far for

20  your work in this case?

21      A.  To date I do not.

22      Q.  Would it be fair to say that it exceeds $80,000?

23      A.  It might.

24      Q.  Typically, the work that you do with the

25  photogrammetry and in the accident reconstruction

business, you're usually identifying known things and known parameters or aspects of an accident scene to try to capture that and recreate the accident?

A.   If -- by known, do you mean things that exist currently?

Q.   Yes.

A.   That is absolutely not the case.  Because one of the biggest advantages of photogrammetry is that it lets me as a reconstructionist recreate data that is no longer there.  So when I go out to an accident scene, it's typically years after the accident has happened and the tire marks are gone, the gouges are gone.  Maybe the roadway has been repaved.

But using the tools of photogrammetry and the process that I've described here, that allows me to recreate where the vehicles came to rest, where the tire marks were and all sorts of physical evidence like that.

Q.   So when you began your analysis in this case, you knew prior to beginning the analysis that the vehicle involved, the unknown vehicle involved in the April 12th surveillance video, law enforcement believed to be a blue Honda CR-V?

A.   Yes, that's correct.

Q.   Because when you were provided the April 12th video, the unknown surveillance video, law enforcement

1    also gave you a video they had made on April 19th using

2    Mr. Wells' blue Honda CR-V?

3        A.   Yes.

4        Q.   And you had photos of a blue Honda CR-V from this

5    case?

6        A.   Yes.

7        Q.   And so the reason you picked the blue Honda CR-V

8    as your initial computer model and your initial vehicle

9    with which to make your comparisons was because that was

10   the suspected vehicle?

11       A.   Yes.  That was the question I was asked to

12   investigate is whether or not I could determine if it

13   was the Honda CR-V.

14       Q.   And of course at the end of the day, what your

15   analysis can determine only is that the vehicle is

16   consistent in geometry with a blue Honda CR-V?

17       A.   In size and geometry and color, yes.

18       Q.   Well, let's -- I'm glad you brought up color.

19   Let's just talk about color for a minute.

20            With respect to color, you didn't do any photo

21   enhancements, right?

22       A.   That's correct.

23       Q.   So you didn't perform any color -- formal color

24   analysis on the photographs?

25       A.   Correct.

1     Q.  Didn't -- didn't use a software program,

2  photogrammetry or otherwise, to do color correction or

3  color alteration of the images?

4     A.  Correct.

5     Q.  Didn't attempt to take color casts from the

6  photos from -- either from video to video or video to

7  still image, anything like that?

8     A.  No, I did not.

9     Q.  Generally, when you say, well, the vehicles are

10  consistent in color, you mean they both appear to be

11  from a blue -- the medium blue family or generally

12  appear similar in color?

13     A.  Yes, bluish purple-ish is how I described it.

14     Q.  Now, the April 12th video, the video with the

15  unknown vehicle, you would agree with me that that is --

16  the camera that captured that is a low resolution

17  camera?

18     A.  Yes.

19     Q.  And the spacial resolution on that, how many

20  pixels, you referred to pixels, that are captured in

21  that are 640 by 480?

22     A.  That sounds correct.

23     Q.  And you didn't do anything as far as -- or your

24  photogrammetry software didn't measure for you the size

25  of pixels or the exact number of pixels that, for

1    instance, in any given still frame the vehicle took up,

2    anything like that, right?

3        A.   That's correct.  I wasn't asked to count the

4    pixels.

5        Q.   You're just -- when you get your model, you're

6    just looking at what you can see for pixels as to the

7    appropriate location and trying to place the model as

8    best it does line up with the pixels?

9        A.   That's correct.

10       Q.   And then you said the process where you made

11   sure -- first for up and down, you made sure that it

12   appeared like it was on the roadway to you, that the

13   tires, the black or dark tires matched or met at an

14   appropriate height the black or dark roadway?

15       A.   Actually, the way I made sure the vehicle was on

16   the road is in the three-dimensional model.  So I put

17   the three-dimensional model of the vehicle on the

18   roadway surface, which I have in my three-dimensional

19   scene, the fly-around that you saw, and then I move it

20   around left and right and back and forth.  And like I

21   said, I can't really move it up and down because I don't

22   want to take the wheels off the ground.

23           So I just want to make it clear that by aligning

24   the vehicle's wheels with the ground, I'm not doing that

25   based on the pixels, I'm doing that by keeping the 3D

model of the vehicle on the ground in the 3D model.

Q.   And then the left and right, you line up with the pixels?

A.   Left and right and in and out.  In and out is very important also.  That's what gives you the three-dimensional perspective.

Q.   And while we're talking about the in and out, you said, you know, when you did your model, it turned out that it was in the middle of the roadway, right?

A.   That's correct.

Q.   Because -- and that helped you know that you were in the right space because, for instance, you weren't on the shoulder of the road or in the dirt?

A.   Correct.

Q.   But of course on the April 12th video, you have no way to know whether that vehicle was in fact centering, traveling down the center of the road, traveling on the shoulder, traveling in the middle of the lane, you don't know where exactly the vehicle was?

A.   Well, actually, based on the analysis that I did, I know it's pretty close to the center of the lane.

Q.   Because of your looking at the model -- looking at the pixels and feeling that you had it lined up correctly?

A.   Yes.

1    Q.  Now, in constructing your model, you determined

2  the distance between the camera and the roadway at

3  approximately 1100 feet?

4    A.  That's correct.

5    Q.  And sir, you know that -- or would you agree with

6  me that at that distance, at 1100 feet with the

7  resolution of that camera, that each one of those pixels

8  you're lining up in the real world would represent about

9  a five-inch square?

10    A.  I've read that in other expert reports, correct.

11    Q.  Because you weren't asked to measure those types

12  of things, you don't have any reason to disagree with

13  that?

14    A.  Correct, I do not.

15    Q.  And in figuring out how to line things up,

16  because of the resolution of the camera, you know that

17  there's about a plus- or minus-two pixel error, there

18  can be, or error range in sizing, right?

19    A.  I don't know about the two pixel error.  You can

20  see -- when you're doing this analysis, you can see when

21  you start to move it just a little bit to the left or a

22  little bit closer, there's a noticeable difference.

23    Q.  Okay.  And of course you pulled out still frames

24  from the video and used your lineup on each of the still

25  frames, right?  You didn't try to -- you clicked through

1  still frames, but you didn't try to line up a true

2  movement?

3       A.   Well, the first part of the question is correct.

4  Yes, I analyzed the individual frames of the video.  And

5  as you probably know, a video is just a compilation of

6  still images that you show sequentially.  So you got

7  that sensation or depiction of movement of the vehicle

8  going through the scene as I was flipping through those

9  individual frames.

10      Q.   And because the still images are captured of a

11 moving vehicle, there's some motion blur, depending on

12 how fast the vehicle is going.  The faster the vehicle,

13 the more blur there can be.  You're aware of that?

14      A.   Yes.  There may be a little bit of that, but

15 here's where the distance from the camera actually works

16 in your favor a little bit, because since it's so far

17 away, that blur is going to be a little less than if it

18 were right in front of you going the same speed, it

19 would be real blurry.

20      Q.   Well, the blur at that distance is at least a

21 couple of pixels, meaning that if they're five inches,

22 we can have ten or more inches of blur, correct?

23      A.   I haven't analyzed what the blur is in terms of

24 pixels, but it was pretty readily evident what the area

25 of pixels that were associated with the vehicle were.

Q. Which if we have just say that ten inches on either side of a vehicle, that's why vehicles that aren't exactly the same width could -- or length could fit within the same parameters, is we could be off by ten inches and at 1100 hundred feet, very, very difficult to depict -- or detect?  Excuse me.

A. I'm not sure about ten inches because the Durango was about two feet larger, and that was obviously much, much bigger.  So ten inches being half of that, I think maybe you could still tell that difference.  But I did agree that vehicles that are comparable in size and geometry would be difficult to distinguish.

Q. And you're aware, sir, that the camera, now, it pans and tilts and zooms, it does all of those things, right?

A. Yes, it does.

Q. As was the camera that you were asked to look at, the other camera, the T-2 camera, that looks at the building, the one that you talked about somebody walking under?

A. I believe that one tilts and moves and zooms as well.

Q. Of course, you said that it appeared to you somebody could walk under that, but that was in direction if it was pointed at that flagpole out in

1    front of it?

2        A.   Given the field of view that was presented to me

3    on the April 12th video, I was able to analyze that

4    view.

5        Q.   Of course, if the camera was moved or the view

6    was changed, you wouldn't know what it could capture or

7    who could walk where in a different view?  You weren't

8    asked to analyze that?

9        A.   Strictly speaking, yes.  But given that the

10   camera is mounted, you could probably change the angle a

11   little bit and still be able to walk under it to some

12   extent.  But given the field of view that was presented

13   on the 4-12 analysis, yes, you could walk underneath it.

14       Q.   Now, the April 19th video, the video the police

15   made driving Mr. Wells' car back and forth, you had a

16   number of still images to choose from in picking out

17   which ones you were going to use for comparison value,

18   right?

19       A.   Yes.

20       Q.   More than just the nine or so frames you had on

21   the surveillance video, the April 12th video?

22       A.   Well, both the video from 4-12 and 4-19 are

23   surveillance videos.  The 4-12 video in the northbound

24   direction, there were five frames.  And on the 4-19,

25   there were I think 13 frames.

1     Q.   Okay.   Well, in fact, there were -- you had video

2   that had going -- going northbound on the 4-19 video --

3   first of all, that wasn't surveillance that -- well,

4   that was a police officer at one end of the camera

5   surveilling another police officer driving the Wells'

6   vehicle across the camera screen, right?

7     A.   Right.

8     Q.   You knew that?

9     A.   Yes.

10    Q.   And because they drove it past there a number of

11  times -- you saw that in the video they made?

12    A.   Yes.

13    Q.   -- each time it made different frames?

14    A.   Given the speed of the camera, depending on the

15  speed of the vehicle, you will get a different number of

16  images that capture the vehicle in view, yes.

17    Q.   And you picked one where there was 13 frames

18  instead of five, so the car was going at least two and a

19  half times-ish slower or it created two and a half times

20  more frames, 13 instead of five?

21    A.   That's correct.

22    Q.   Which makes that blurring less, probably?

23    A.   Theoretically.  But actually, I was going to make

24  the point that if you look at those two images, even

25  given the difference in vehicle speed, I think they're

1   pretty -- they're very similar.  So I was going to make

2   the point that I don't think the blurring was very

3   significant.

4       Q.  The 4-19 is clearer.  You would agree with that?

5       A.  Theoretically, yes, but I think when you compare

6   the two, it may not be noticeably clearer.

7       Q.  Well, I wasn't asking theoretically.  I'm asking

8   in reality, do you agree with me or do you not agree

9   with me that the 4-19 video was clearer?  As you

10  observed it, did you think it looked clearer?

11      A.  I don't think it was significantly clearer.

12      Q.  All right.  Now, with respect to talking about

13  the pixels, you said, again, just to be clear, that you

14  didn't do anything to enhance or change the images,

15  correct?

16      A.  That's correct.

17      Q.  And when you extracted the -- when you took --

18  extracting means you had a video and you took each frame

19  out of that and made them or isolated them into a still

20  picture?

21      A.  Yes.

22      Q.  And you have -- of course the camera on 4-12, the

23  camera, as it was recording, it was capturing those

24  pictures that you later took out and looked at, right?

25      A.  Yes.

1    Q.   And in the process of capturing those and putting

2    them into the computer or the DVR or whatever that it's

3    saving those pictures, you don't know anything about

4    that downloading process as far as data retention, do

5    you?

6    A.   No.   I don't think there's any type of

7    compression or anything like that.

8    Q.   Well, how do you know -- well, first of all,

9    what's compression?

10   A.   Compression is when you take a large amount of

11   data and make it something smaller.

12   Q.   How many cameras were on that camera system?

13   A.   That, I don't recall.

14   Q.   Okay.   And in order to store video -- first of

15   all, as a general matter, video contains lots of data

16   for a computer to capture or a camera system to capture,

17   correct?

18   A.   Yes.

19   Q.   Okay.   And you don't -- the process of

20   compression means that when the camera has all this

21   data, it needs to try to save it and store it onto

22   whatever system it's saving it.   Oftentimes, the camera

23   compresses or skips some of the data.   When it downloads

24   it, it only saves a portion to save on space and its

25   ability to capture the images, right?

1    A.   Generally speaking, I think that's a possibility,

2  yes.

3    Q.   And when it goes through compression, what that

4  means is if, for instance, a camera is recording the

5  blue wall there, and all those pixels look pretty

6  similar, it may capture that picture and just skip some

7  pixels, because they all seem to be the same pattern.

8  So it doesn't have to save them all.  It gets a

9  representative portion and saves that, saves on space?

10    A.   That's a certain type of compression, yes.

11    Q.   And then when it's pulled back up, the system has

12  an algorithm that fills back in those pixels?

13    A.   I believe so, yes.

14    Q.   And you don't know on this system whether that

15  process happened, would have happened before you ever

16  got the video and looked at it?

17    A.   That's correct.  I'm not aware of that.  I had

18  asked for and it's my understanding that the images or

19  the video that was provided to me was the most original

20  version of the video that was available.

21    Q.   Right.  Whatever was saved onto the DVR system,

22  the original that was saved onto the system?

23    A.   Correct.

24    Q.   And one of the things that a system can do

25  besides compressing the images to save on data is it can

1    only capture a low frame rate, say, four frames per

2    second instead of 12 or 24?

3      A.  That's correct.

4      Q.  And for our eyes, human eyes to perceive fluid

5    motion, like a television, is typically 24 frames per

6    second?

7      A.  24 or 30, yes.

8      Q.  And so this is -- this camera is not trying to

9    record anything that's close to that kind of quality of

10   image, because it would be six times more data to get 24

11   frames every second instead of four frames every second?

12     A.  Well, first of all, it's not the quality of the

13   image.  The quality of the image is whatever it is

14   regardless of the frame rate.  But you're correct, the

15   frame rate is not meant to capture what we would call

16   realtime video.

17     Q.  And in -- once that system has whatever data it

18   has from what it records, when you pull that back up,

19   the filling in of those pixels, that if any are lost in

20   compression, those create artifacts on the picture,

21   don't they?

22     A.  I think that's possible, depending on the system,

23   yes.

24     Q.  And you were working and placing your model

25   wherever you placed it, you were working with the pixels

1    that you had on the images you pulled out of the video?

2        A.   Correct.

3        Q.   In addition to the Ford Escape, that was one of

4    them you found to be similar geometry, correct?

5        A.   Yes.

6        Q.   As well as the Honda Santa Fe and the Toyota

7    RAV4?

8        A.   That's correct.

9        Q.   Did you compare at all or did you use, for

10   instance, the Jeep Grand Cherokee, say, the mid-nineties

11   to early 2000s Jeep Grand Cherokee?

12       A.   I did not.

13       Q.   Now, these models that you get, you just take

14   those off a national auto database or you have a number

15   of internet-accessible tools where you can pull up a

16   Ford Escape and get the accurate dimension, size, get a

17   computer-generated model?

18       A.   Right.  There are several sources that I use to

19   get these 3D models.  And when I do get them, I make

20   sure that the geometry, that the measurements are all

21   valid, that it's an accurate model.

22       Q.   So you didn't use or compare like the Chevy S10

23   Blazer, say, again, mid-nineties to mid-2000s?

24       A.   Correct.  I did not.

25       Q.   And you know that the Blazer comes with a rear --

 1  or did you know that the Blazer comes with a rear tire

 2  mount?

 3      A.  That sounds right.

 4      Q.  How about a Nissan Pathfinder, again, same years,

 5  timeframes.  Did you compare one of those?

 6      A.  No, I did not.

 7      Q.  Isuzu Rodeo?

 8      A.  No.

 9      Q.  How about either the Subaru Forester or the

10  Outback wagon, any Subarus?

11      A.  No, I did not.

12      Q.  Do you know the prevalence of either of those

13  models, Subaru Foresters or Subaru Outbacks in Alaska?

14      A.  I do not.

15      Q.  The last thing I want to do, I want to go back to

16  one spot on your PowerPoint here.  Could we --

17          MR. COLBATH:  I'm told -- can you get it up,

18  Blair?  We're having technical difficulties.  It only

19  breaks when I need it.

20          THE COURT:  Could you use the Elmo?

21          MR. COLBATH:  Well, it's the actual DEPS

22  apparently -- but Mr. Johnson is just going to try to

23  reset it here.

24          THE COURT:  Well, if we need to take our lunch

25  break now.  Would that be helpful and get IT in here?

1          MR. COLBATH:  I have two questions, and I think

2     the reboot just made it work.  It just got tired of me

3     talking here.

4     BY MR. COLBATH:

5        Q.  If we could look at your PowerPoint, Mr. Toglia,

6     there.  I'm going to pull up page three of that

7     demonstrative, the 181.

8          And so this box down here, where we see the

9     yellow square with the small green square within it,

10    correct?

11       A.  Correct.

12       Q.  Am I right in understanding that the green box in

13    the blowup is depicting what's between the pink line --

14    at least as far as the view down on the road, is

15    depicting what's between the green line and the pink

16    line down there?

17       A.  Exactly.

18       Q.  Okay.  And so -- now, you were out there at the

19    scene, and you have the geometry here.  Can we back up

20    one page?  So the view actually extends past this

21    driveway into the T-2 structure, correct?

22       A.  I'm sorry.  Are you asking me if the view of the

23    camera -- yeah, because you can see Anton Larsen Bay

24    Road, yes.

25       Q.  And flip to the next page and see if my mark

1 stays in the same spot.  No.  The view, you see the

2 driveway in this one now that we've got the box.  The

3 driveway is right here, right?

4    A.  Yes.

5    Q.  And the camera, where we see the vehicle down

6 here it's -- on the roadway, it's just going out of the

7 screen, which is -- it's just crossing the green line,

8 so it's definitely not turning into that driveway.  It's

9 traveling on Anton Larsen Bay Road at five frames a

10 second past that driveway?

11    A.  Well, it's traveling on Anton Larsen Bay Road,

12 yes.

13    Q.  Right.  And that's the last frame that it's went

14 through.  It goes out of view after that, because the

15 building is obstructing?

16    A.  Correct.

17    Q.  That's what I had for you, sir.  Thank you.  You

18 can take that down.

19         THE COURT:  Redirect?

20         MS. SHERMAN:  No redirect.

21         THE COURT:  Thank you, sir.  You may be

22 excused.

23         (Witness excused)

24         THE COURT:  Seems like a good time for our

25 lunch break.  Why don't we take until 1:15 p.m., ladies

1  and gentlemen.  And please leave your notepads here.

2  Remember my admonition not to discuss the case.  Hope

3  you have a pleasant lunch and we'll see you back here at

4  1:15 p.m.

5           (Jury absent)

6           THE COURT:  Please be seated, everyone.  Sir,

7  you may be excused.

8           Can I take up this issue with regard to

9  Ms. Terry maybe at 1:00?

10          MR. SKROCKI:  Yes, ma'am.

11          THE COURT:  Is 15 minutes adequate to get it

12  resolved from your perspective?

13          MR. SKROCKI:  Yes.

14          THE COURT:  Mr. Colbath?

15          MR. COLBATH:  Can I just --

16          THE COURT:  Sure.

17          (Pause)

18          THE COURT:  Let me just -- so 15 minutes you

19  think is enough?

20          MR. COLBATH:  It's pretty straightforward.

21          THE COURT:  Very good.  Then 1:00 p.m.  We'll

22  go off record until then.

23          (Recessed from 11:55 a.m. to 1:04 p.m.)

24          (Jury absent)

25          DEPUTY CLERK:  All rise.  Her Honor, the Court,

the United States District Court is again in session.

1

2          THE COURT:  All right.  Please be seated,
3   everyone.  We're back on record here without the jury to
4   address Ms. Terry.

5          Mr. Skrocki, what's the government's plan here?

6          MR. SKROCKI:  The plan is to keep giving
7   Mr. Colbath his glasses back.

8          THE COURT:  That's a good step.  All right.

9          MR. SKROCKI:  We intend to elicit from
10  Ms. Terry the fact that she was not truthful to the FBI
11  when she was interviewed, and she was not truthful in
12  our prior proceeding.  I have prepped her on that and
13  cautioned her not to talk about the prior trial.

14          And that she did that, the more important
15  reason, she did that because she was afraid of Mr.
16  Wells.  That she was aware of talk in Kodiak, he might
17  have been involved in the murders, and she was very
18  scared for her safety and that's why she --

19          THE COURT:  Have you discussed with her the
20  right against self-incrimination and the right not to --
21  and the crime of lying under oath?

22          MR. SKROCKI:  I have not -- the statute of
23  limitations has passed.

24          THE COURT:  All right.

25          MR. SKROCKI:  That's our position.

1          THE COURT:  Thank you.  That's helpful.

2          Mr. Camiel, go ahead.

3          MR. CAMIEL:  Your Honor, we have no intention

4     of asking Ms. Terry about either lying to the FBI or

5     committing perjury in the courtroom.  And we're just

6     going to ask her about her observations on April 13th,

7     so we don't intend to elicit or go into or try and

8     impeach her or attack her with that, and because we

9     don't intend to go into any of that, there is no

10    relevance for her reasons for not being truthful.

11         It's extremely prejudicial.  Mr. Wells didn't

12    do anything to her, didn't say anything to her.  She

13    hasn't had any prior contact with him where he did any

14    threatening or would make her have any reason to be

15    fearful of him.  It sounds like the only reason she was

16    afraid of him was because of the talk in the community.

17         If we don't go into those two things, that she

18    lied to the agent -- we're not going to impeach her with

19    her prior testimony, for example.  We just want to talk

20    to her about her observations.

21         THE COURT:  If that's what the defense seeks to

22    do --

23         MR. SKROCKI:  Can I have just a moment?

24         THE COURT:  Certainly.  Go ahead.

25         (Pause)

1      MR. SKROCKI:  That would be fine with us, if

2  that's the defense plan.  If I could have just a minute

3  to speak with her about our progress, and if Mr. Camiel

4  would give me a little latitude on leading just to be

5  safe and get her right to it, then I would appreciate

6  that.

7      THE COURT:  So no mention of the prior

8  testimony at all, and then no mention of any fear of Mr.

9  Wells at all by anybody.  If that door gets opened, then

10  the government can seek to revisit that ruling.

11      MR. SKROCKI:  If I sense that she's going that

12  way, I'm going to stop her pretty quick.

13      THE COURT:  That's fine.  And you could also

14  tell her that if she has any concerns, she can always

15  turn to the Court and say, "Can I get something

16  clarified?"

17      MR. SKROCKI:  I can do that.

18      THE COURT:  That would be fine, and then we can

19  get the jury out and sort it out.

20      MR. SKROCKI:  It's almost like a do-over then,

21  so we'll do it that way.

22      THE COURT:  That would solve that.  From the

23  defense perspective, that resolves the issue?

24      MR. CAMIEL:  I think so.

25      THE COURT:  Well, that didn't take 15 minutes.

We have a few more minutes until the jury is back.
Anything else to take up?

      MR. SKROCKI:  No, ma'am.  I'm going to go speak
with her right now.

      MR. COLBATH:  Your Honor, we might potentially
have one other matter.  We have been in contact with
some of the government witnesses from the prior
proceeding, the fingerprint examiner, some of the FBI
folks, and now state crime lab people that testified
previous that we understand the government is not
calling this time, we have been trying to make
arrangements to call.

      We learned this morning from, I guess resident
counsel, Department of Justice counsel in DC that they
would like us to try to arrange with two of the
examiners for video testimony as opposed to taking them
out of the lab for an extended number of days.

      THE COURT:  So who are the two individuals?

      MR. COLBATH:  One is an individual named
Jennifer Raymond and one is an individual named Jessica
Walker.

      THE COURT:  Your proposal is they testify by
videoconference?

      MR. COLBATH:  Yes, potentially.  We got those
communications while we were in court this morning.  I

1    tried to call counsel back over the lunch hour, and he

2    was not available, but that was the gist of the message

3    and the request that I received.

4            Also, there was a reference to Ms. Raymond

5    actually being out of the country, which was not -- that

6    was news to us as of today.  We have been trying to get

7    this lined up for a number of weeks.  And so for right

8    now, we may be asking to arrange that for next

9    Monday-ish, depending on their schedule.

10           We're going to try to make further progress on

11   that yet today or in the morning, just to give everybody

12   the heads-up that we may have that request.  Obviously,

13   it would probably make things as fast or faster rather

14   than slower and keep us on schedule if we can do that

15   and avoid any travel complications by those folks.

16           We're in process on that, but we'll have more

17   for the Court probably in the morning on that.

18           THE COURT:  Mr. Skrocki, any objection to those

19   witnesses appearing by videoconference?

20           MR. SKROCKI:  We don't.

21           THE COURT:  Thank you for the heads-up there.

22   We'll take that up in due course.

23           We'll get back on record when we have the jury.

24   We'll go off record.

25           DEPUTY CLERK:  All rise.  Court stands in a

brief recess.

        (Recessed from 1:10 p.m. to 1:16 p.m.)

        (Jury present)

        DEPUTY CLERK:  Court is again in session.

        THE COURT:  Please be seated, everyone.  And I believe we're ready for the government's next witness.

        MS. SHERMAN:  We are.  The government calls Art Bors.

        THE COURT:  Good afternoon, sir.  If you could go around the corner and step up to the witness stand. When you get up there, remain standing, if you would, and the clerk will administer an oath to you.  Thank you.

        (Oath administered to the witness)

        DEPUTY CLERK:  For the record, can you please state your full name and then spell your full name.

        THE WITNESS:  My name is Arthur Bors, A-r-t-h-u-r, B-o-r-s.

        THE COURT:  Sir, you can push that microphone down a little bit if you would, please.  Thank you.

      ARTHUR BORS, GOVERNMENT WITNESS, SWORN

            DIRECT EXAMINATION

BY MS. SHERMAN:

   Q.  Mr. Bors, are you retired?

   A.  Yes.

1    Q.   Where did you retire from?

2    A.   The golf course on Kodiak Island.

3    Q.   How long did you work at that golf course?

4    A.   20 years.

5    Q.   And how would you get -- what road is the golf

6    course located on?

7    A.   I think it's called Buskin River Road.  It's the

8    one that goes to Anton Larsen Bay.

9    Q.   Okay.  What would you do at the golf course?

10   What was your day-to-day routine?

11   A.   I was a manager, just manager stuff, open the

12   gates and unlock the doors, hang the flag, make the

13   coffee, count the till, that kind of stuff.

14   Q.   How long was a season at the golf course on

15   Kodiak?  When would you open?

16   A.   It varied considerably, depend on the weather.

17   Q.   Was there a particular month that it usually

18   ended up opening?

19   A.   Usually, I would say it usually opened in April.

20   Q.   Do you recall if the golf course was actually

21   open on April 12, 2012?

22   A.   No, I can't recall that.  There would have been

23   workmen there.  We would have been working on the golf

24   course, but I don't know that we had any patrons.

25   Q.   Okay.  What time would you normally go to work?

1    A.   Shortly after 7:00.

2    Q.   And what did you drive back in 2012?

3    A.   What kind of vehicle?

4    Q.   Yeah.

5    A.   It was a Ford Ranger, 1996 Ford Ranger.

6    Q.   What color was it?

7    A.   Red.

8    Q.   I want to show you Exhibit No. 105.

9         I know it's been a few years, but do you remember

10   at some point you looked at a video in relation to that

11   road?  Do you remember that?

12   A.   I'm not sure I understand, but, yeah, I remember

13   talking about it, right.

14   Q.   Let's zoom in, sure, on that area right there.

15        Do you recognize your initials over here?

16   A.   Yes.

17   Q.   Okay.  Did you initial this indicating that that

18   was a red truck heading towards the golf course at 7:25?

19   A.   Yes.

20   Q.   Okay.  Fair to say that was your truck heading to

21   work that morning?

22   A.   Yes.  Given the constraints I was told when they

23   showed me the video, that would have been my truck, yes.

24   Q.   You can take that down.

25        Have you ever been inside the Communication

1  Station, the COMMSTA?

2     A.  No.

3     Q.  Did you know Rich Belisle or Jim Hopkins?

4     A.  No.

5        MS. SHERMAN:  Those are all the questions I

6  have.

7        THE COURT:  Questions for this witness?  Take a

8  moment.

9       (Pause)

10               CROSS EXAMINATION

11 BY MR. COLBATH:

12    Q.  We're probably going to need that, Blair.

13       Good afternoon, sir.  I just have a couple

14 questions for you.  Okay?

15    A.  Sure.

16    Q.  All right.  As the work on the golf course

17 started each April, you had a crew out there I assume

18 that would ready the grounds and try to get the course

19 in condition to open?

20    A.  Correct.

21    Q.  Was the -- now, you had a driving range facility

22 on one side of the road and then golf course on the

23 other?

24    A.  Yes.

25    Q.  Did the driving range open sometimes before the

1 course itself?

2    A.  Usually, yes.

3    Q.  All right.  And I suppose on -- since it's been a

4 number of years, back in 2012, April 2012, you don't

5 recall when either the driving range or the course

6 itself opened?

7    A.  That's right.

8    Q.  But if you saw yourself going to work on that

9 video that day, you were out there at least getting

10 ready, if you weren't open?

11    A.  Yes.

12    Q.  At the time that they showed you that list -- I'm

13 sorry.  What number was that?

14       MS. SHERMAN:  105.

15    Q.  I want to show you that list real quick again.

16 It's 105.

17      At the time they showed you this, when you

18 initialed, you saw a video, right, that they told you

19 was taken that morning?

20    A.  Yes.

21    Q.  All right.  And you said with the constraints,

22 the timing, and what other constraints did they have or

23 say or do you recall when you initialed this?

24    A.  No, it was only time stamped and I think the date

25 was indicated, those two things.  I don't remember if

they specified the fact that that was on Buskin River
Road. I think they said it was from a security camera
on the COMMSTA, which would have made that the Buskin
River Road.

Q. The right road?

A. Yes, the correct road.

Q. That camera then, as you understood what it was,
would have captured your -- you would have drove past
that camera to get out there to the golf course?

A. Yes.

Q. Do you remember the speed limit on that Buskin
River Road out there?

A. Excuse me. Say again.

Q. Sure. Do you remember the speed limit or did
they have a speed limit on that road?

A. I think the speed limit was 35, which was pretty
conservative.

Q. All right. You would typically -- you were able
to travel then at least 35, or even a little bit more if
it was conservative; is that what you're saying?

A. Yes.

Q. All right. I'm going to -- could you pull up
Exhibit 62 and get us to about 7:25 a.m.

Sir, I'm going to have the lights put down and
I'm going to show you about a minute of video here.

1          First of all, before we start it, do you

2    recognize the scene there at all?

3       A.   No.

4       Q.   Okay.  How about -- well, it's frozen, so it's

5    snow covered.  Do you recognize what I circled there in

6    blue at all?

7       A.   I'm guessing that's Buskin River or Buskin Lake,

8    but I'm not sure.

9       Q.   Okay.  Well, let's -- I'm going to have you

10   watch.  Hold on a minute.  I'm going to get that circle

11   out of there.

12          It's hard to see, but there is a road down here,

13   and I'm just going to -- when we get to the spot on the

14   video, I'm going to let it run for about a minute, and

15   you may see some traffic go by there.  And see if this

16   might be the video you were shown.

17          So we'll just watch about a minute of it here.

18   You see that it's April 12th at 7:25 in the morning?

19      A.   Okay.  Yeah.  Yes.

20      Q.   Just watch her there.

21          (Exhibit No. 62 playing in open court.)

22      Q.   Now, were you able to see the vehicle go by

23   there?

24      A.   I saw a vehicle go by, yes.

25      Q.   Okay.  Was it too fast for you to identify for

 1   sure?

 2       A.   Yes.

 3       Q.   Okay.   But if -- could you go back to 105 now for

 4   me.   We can take that down.   And highlight 7:25:16.

 5           If that was Buskin Lake there frozen in the

 6   background, and that was at 7:25:16, that likely would

 7   have been you -- what you're saying is when you

 8   initialed here, that likely would have been you going by

 9   on your way to work?

10       A.   It seems to me that the picture I saw, the video

11   I saw when I identified the truck was much closer, was

12   much clearer and was not a rapid flash across the

13   screen, but it was something that made the truck more

14   identifiable, right.

15       Q.   Okay.   That's all right.   You can take that down.

16       A.   I couldn't say that was my vehicle from looking

17   at this video.

18       Q.   But memory serves you that 7:25, that's about the

19   right time of morning for you to be going out to the

20   golf course?

21       A.   Pretty close, yes.

22       Q.   And you would have no reason to go slow or slow

23   down?   Unless you run into an obstruction, you just

24   drive your normal speed?

25       A.   There is a reason.

1    Q.   What's that?

2    A.   That road crosses the Buskin River right there by

3    COMMSTA, so there is a sharp right turn, and after you

4    get across the bridge, there is a sharp left turn to

5    stay on the road.  The speed limit there is 25.

6    Q.   Okay.  And so after you get through that turn --

7    you need to slow down for that turn, and then you're out

8    to the golf course after that?

9    A.   Yes.  Right.

10             MR. COLBATH:  All right.  That's all I have for

11   you, sir.

12             MS. SHERMAN:  No redirect.

13             THE COURT:  Thank you, sir.  You may be

14   excused.

15             (Witness excused)

16             THE COURT:  Your next witness?

17             MR. SKROCKI:  Yes, Your Honor.  We call Robert

18   Pletnikoff.

19             (Pause)

20             THE COURT:  Good afternoon.  If you could come

21   up to our witness stand, sir.  When you get up there,

22   remain standing, if you would, and the clerk will

23   administer an oath to you.

24             (Oath administered to the witness)

25             DEPUTY CLERK:  For the record, can you please

```
 1   state your full name and then spell your full name.
 2          THE WITNESS:  Robert Mitchell Pletnikoff,
 3   R-o-b-e-r-t, M-i-t-c-h-e-l-l, P-l-e-t-n-i-k-o-f-f.
 4          ROBERT PLETNIKOFF, GOVERNMENT WITNESS, SWORN
 5                     DIRECT EXAMINATION
 6   BY MR. SKROCKI:
 7      Q.  Good afternoon, Mr. Pletnikoff.
 8      A.  Hi.
 9      Q.  Can you tell the jury where you live, sir?
10      A.  Kodiak, Alaska.
11      Q.  What do you do in Kodiak, Mr. Pletnikoff?
12      A.  I am involved in the commercial fishery.
13      Q.  What kind of fishery do you do, sir?
14      A.  I used to halibut fish, salmon fish, but I run a
15   tender boat right now.
16      Q.  How was your season?
17      A.  It was okay.  Actually, it was good.
18      Q.  Good.  That's good news.  If you could pull that
19   mic a little closer to you because you're a little
20   soft-spoken.  That would be great.
21          You had a good season.  That's good news.
22          Mr. Pletnikoff, do you know Jim Wells?
23      A.  Yes, I do.
24      Q.  Can you tell the jury when you first met Mr.
25   Wells?
```

1    A.   Oh, I met Mr. Wells probably 20-some years ago

2   now.  It's probably -- I think it was about 20 years ago

3   last time I was here.

4    Q.   And with respect to -- I'm going to turn your

5   attention to April 2012.

6    A.   20 years.  Around 2012, it was about 20 years.

7    Q.   Did you have occasion to assist Mr. Wells with a

8   hunting trip of some sort?

9    A.   Yes, I did.

10    Q.   Could you please tell the jury how you came

11   across him with respect to this hunting trip?

12    A.   Could you repeat that, please?

13    Q.   Sure.  You mentioned you helped Mr. Wells with a

14   hunting trip?

15    A.   Yes, I did.

16    Q.   How did you help him?

17    A.   He was supposed to rendezvous with me one time on

18   a hunt on the mainland, and his aircraft didn't make it

19   and he landed in one of the bays down there and I picked

20   him up on the way by.

21    Q.   You picked him up.  What were you in when you

22   picked him up?

23    A.   I was fishing at Chignik, Alaska at the time and

24   I was coming back in the fall.  It was September.  And I

25   stopped in at Alinchak Bay and picked him up.

1    Q.  How did you communicate with Mr. Wells?

2    A.  Well, he told me before, you know, that he -- I

3    think he called his wife and told her that he didn't

4    make it down to Chignik and somehow the message got to

5    my wife and she told me where he was.  He had

6    communications, I believe, with a handheld radio.

7    Q.  So did you pick him up in this bay you spoke

8    about?

9    A.  I did.

10   Q.  Did you have a crew member with you at the time?

11   A.  Yes, I did.  I had a guy by the name of Joey

12   Cosgrove with me.  He went ashore and picked him up.

13   Q.  Was Mr. Wells put back on your boat?

14   A.  Yes, he brung him to the boat.

15   Q.  When he came on your boat, did you notice any

16   kind of firearm he had with him?

17   A.  He has his rifle and his handgun.

18   Q.  Can you explain to the jury what handgun you saw

19   Mr. Wells carrying?

20   A.  He had a large revolver of some type, a stainless

21   pistol.  Don't know what size it was or what model it

22   was, but it was a stainless pistol and a rifle.

23   Q.  Where was he carrying the stainless pistol?

24   A.  He had it on his belt.

25   Q.  And do you recall what size it was?

 1      A.   No, I don't.

 2      Q.   How about type of possible caliber?

 3      A.   It was -- it appeared to be a large caliber gun,

 4 maybe a .357 or .44 or something like that.

 5      Q.   And do you have a rough timeframe you can tell

 6 the jury when Mr. Wells was on your boat with this

 7 firearm?

 8      A.   I believe it was late nineties, '97, '98,

 9 something like that.

10      Q.   Is there a reason you have that date anchored in

11 your mind?

12      A.   Yes.  We were coming up the mainland that year.

13 My brother was with me, and he spent the winter in

14 Kodiak.  And that spring, my mother died.  It was '98

15 when she passed away.

16      Q.   Sorry to hear that, sir, but that's how you

17 associate that date?

18      A.   Yes.

19      Q.   There came a time earlier that you were

20 testifying in front of the grand jury about this.  Do

21 you recall that?

22      A.   Yes.

23      Q.   You were asked a lot of questions like we're

24 asking you questions here today?

25      A.   Yes.

Q.   And questions about the type of firearm Mr. Wells was carrying when he came back onto your boat?

A.   Yes.

Q.   And you recall that you had to leave grand jury and then come back in again?

A.   I did.

Q.   And there was testimony back then that was recorded.  Do you recall that?

A.   Yes.

Q.   Can you explain to the jury the reason why you sort of stopped and went back out and came back in again?

A.   I was a little confused at the time because I had several different guys with me hunting in the past, and one guy had a stainless pistol and one guy had a blued gun, and I was little bit confused about who it was at the time.  I had to think it over, and then I could vividly remember Mr. Wells coming aboard my boat with his pistol.

Q.   Why did you want to go out and take a break and figure that out?

A.   I went out and took a break because I was a little confused with one of the guys that I had with me before.

Q.   Are you confused now?

1      A.  Pardon?

2      Q.  Is there any confusion now --

3      A.  No, not at all.

4      Q.  -- about what Mr. Wells was carrying.

5          MR. SKROCKI:  That's all the questions I have

6  for Mr. Pletnikoff.

7          THE COURT:  Go ahead, please, Mr. Colbath.

8                    CROSS EXAMINATION

9  BY MR. COLBATH:

10     Q.  Good afternoon, sir.  This hunting trip in '97 or

11  '98, you and Mr. Wells ended up actually hunting, right,

12  on that trip, or at least one of you did?

13     A.  Yes.

14     Q.  You were hunting for what?

15     A.  Caribou.

16     Q.  Mr. Wells shoot a caribou or did you, or what

17  happened?

18     A.  I think we may have both shot a caribou.

19     Q.  Using your rifles, not handguns, I assume?

20     A.  Correct.

21     Q.  You never saw Mr. Wells' gun out of its holster,

22  correct?

23     A.  No, I haven't.

24     Q.  This holster was one that you would wear on a

25  belt, and then the gun -- kind of like a cowboy one, the

1    gun was a regular secured hip holster?

2        A.   I believe so.

3        Q.   I'm going to show you what's been marked as

4    Defendant's Exhibit No. 193.

5            MR. COLBATH:  And, Your Honor, I'm not sure

6    that the Court has a copy of this.

7            THE COURT:  All right.  That's fine.  Go ahead.

8            (Pause)

9    BY MR. COLBATH:

10       Q.   I'll just ask you to look at the screen there,

11   sir, and ask you if you recognize that potentially to be

12   the holster, the belt-type holster that Mr. Wells might

13   have been wearing?

14       A.   No.

15       Q.   What's different about it?

16       A.   Well, I can't see it very well.  It's dark.

17       Q.   Okay.  Can you blow that up and see if we can

18   pull that out to make it bigger?  Does that help at all?

19       A.   Not really.

20       Q.   Okay.  I know it's been 20 or more years, so hard

21   to remember.  All right.  You're not sure whether that's

22   the holster or not?

23       A.   No, I'm not.  I didn't pay attention to the

24   holster.

25       Q.   Similar style holster in that it had something

1  that held the gun on your hip and held the gun in the

2  holster?

3      A.  I believe so.

4      Q.  Okay.  Concealed the body of the pistol, the --

5      A.  The barrel.

6      Q.  -- barrel and the cylinder and left the handle

7  exposed?

8      A.  I believe so, yeah, and the breach.

9      Q.  Could you show Mr. Pletnikoff 192?

10         Sir, have you seen that before, that firearm

11 before?

12     A.  No.

13     Q.  Okay.  You can take that down.

14         Now, you recall the gun that Mr. Wells was

15 carrying that day on your boat, you were able to see

16 outside the holster, see the handle, correct?

17     A.  Yes.

18     Q.  And the handle was either a black-brown wood or a

19 brown plastic?

20     A.  Correct.

21     Q.  And were you able to see like the hammer of the

22 gun, I assume?

23     A.  Yes.

24     Q.  The metal was stainless you said?

25     A.  Yes.

```
 1      Q.  And you never saw Mr. Wells at any other occasion

 2   with that particular gun that you saw on the caribou

 3   hunt?

 4      A.  I don't remember, no.  I don't remember seeing

 5   him with a gun like that.

 6      Q.  And you associated it with a large caliber like a

 7   bear protection type gun or that kind of gun?

 8      A.  I believe so, yes.

 9      Q.  All right.  But never saw him shoot a gun of that

10   nature either on the caribou trip or on any of your

11   other hunting or fishing excursions?

12      A.  No.

13      Q.  Let me see if I can get a different picture here.

14   Just one second here.

15          (Pause)

16          MR. COLBATH:  I think, sir, that's all I have

17   for you actually.

18          MR. SKROCKI:  One question.

19          THE COURT:  Sure.

20                    REDIRECT EXAMINATION

21   BY MR. SKROCKI:

22      Q.  This firearm was a revolver, correct?

23      A.  Yes.

24          MR. SKROCKI:  That's all I have.

25          THE COURT:  Anything on that?
```

1          MR. COLBATH:  Not on that, Your Honor.

2          THE COURT:  Thank you.  You may be excused.

3          (Witness excused)

4          THE COURT:  Your next witness?

5          MR. SKROCKI:  Yes, Your Honor.  We call Olivia

6    Terry.

7          (Pause)

8          THE COURT:  Good afternoon.  If you could come

9    up to the witness stand here.  Go around the corner,

10   first door there, and when you get up there, if you

11   would remain standing, the clerk will administer an oath

12   to you.

13         (Oath administered to the witness)

14         DEPUTY CLERK:  For the record, can you please

15   state your full name and then spell your full name.

16         THE WITNESS:  Olivia Matsuura Terry,

17   O-l-i-v-i-a, M-a-t-s-u-u-r-a, T-e-r-r-y.

18         OLIVIA TERRY, GOVERNMENT WITNESS, SWORN

19                    DIRECT EXAMINATION

20   BY MR. SKROCKI:

21     Q.  Good afternoon, Ms. Terry.  Help yourself, it's

22   free.

23     A.  Okay.

24     Q.  Take your time.  All set?

25     A.  Yes.

1    Q.   Okay.  Can you please tell the jury where you

2    live?

3    A.   I live in Bemidji, Minnesota.

4    Q.   At some point in time, were you living in Kodiak,

5    Alaska?

6    A.   Yes.

7    Q.   Can you please tell the jury when that was.

8    A.   I moved there November 1989 and moved away

9    August 2014.

10   Q.   And while you were living in Kodiak, in

11   particular 2012, who were you employed by?

12   A.   Island Air Service.

13   Q.   What was your role at Island Air Service?  What

14   did you do for them?

15   A.   I was the general manager and dispatcher.

16   Q.   If we could have the lights, Madam Clerk.  And

17   Blair, Exhibit No. 91, which I believe has been

18   admitted.

19        Do you see that picture on your screen there,

20   Ms. Terry?

21   A.   Yes.

22   Q.   There should be a laser pointer on the table in

23   front of you.  It's silver.  Maybe off to your right.

24   A.   Yes.

25   Q.   It has like a gold button on it.

1     A.   Yes.

2     Q.   If you want to look to the screen here up to the

3  left.  You got it turned on.  Perfect.  So can you go

4  this way.  Just aim right at it.  Now press the button.

5  There you are.  Perfect.

6          So can you show the jury where Island Air is?

7     A.   Right here.

8     Q.   Right there at that blue building?

9     A.   Yes.

10     Q.   Okay.  Thank you.  How long did you work there?

11     A.   From 19 -- November 1989 until December 2013.

12     Q.   So the whole time you were in Kodiak?

13     A.   Yes.

14     Q.   In 2012, what was your position?

15     A.   The same, general manager and dispatching.

16     Q.   What time of day did you usually start work,

17  ma'am?

18     A.   Around 7:30.

19     Q.   And the type of business Island Air did, what did

20  it do for the citizens of Kodiak?

21     A.   We were a scheduled air carrier to the villages

22  and to the remote fishing and camping and hunting sites.

23     Q.   Ma'am, do you know Jim Wells?

24     A.   No, not personally, not friends.

25     Q.   Not personally?

1    A.   No.

2    Q.   How about socially?

3    A.   No.

4    Q.   Do you know who he is?

5    A.   Yes.

6    Q.   How do you know who he is, if you can explain

7    that to the jury, please?

8    A.   Well, one time I was -- I think I was leaving

9    Kodiak for a flight and he was at the airport with his

10   wife, and I knew his wife because of Island Air.  For

11   the company that she worked with, she would travel to

12   the villages.

13        So they -- I think they just returned from a

14   flight or something, and I saw the two of them together,

15   so that's how I know him.

16   Q.   I want to turn your attention to the date of

17   April 12, 2012.  Okay?

18   A.   Yes.

19   Q.   Did Jim Wells come into the offices of Island Air

20   that day?

21   A.   No.

22   Q.   I want to turn your attention to the date of

23   April 13, 2012.  Did Mr. Wells come into your offices at

24   Island Air that day?

25   A.   Yes.

1    Q.  Can you tell the jury what you observed and what

2    time of day was that?

3    A.  Well, it was later in the day, because I was

4    waiting for one of our flights to land.  We were just

5    about ready to close, and I was sitting at my desk,

6    which has a very clear shot of the front door and the

7    front counter.  And I also have a TV monitor next to my

8    desk.

9         And this person came through the door, and I just

10   kind of looked to see.  I thought, oh, here we go, we

11   got a customer, we're closing.  And he --

12   Q.  Let me ask you, who was this person?

13   A.  Mr. Wells.  And he stopped and he looked -- from

14   the front counter I have a surveillance camera up on the

15   beam, and he just stood there and stared up at it, just

16   stared.

17        So I got out from behind my desk, and I went up

18   front and I asked him if I could help him with

19   something.

20   Q.  Let me stop you there for just a moment.

21        So how far did you go from your desk to where Mr.

22   Wells was standing?

23   A.  Several feet.  It's very close from my desk to

24   the front counter.

25   Q.  What did you ask him?

1      A.   I asked him if I could help him with something,

2    did he need -- I asked him if I could help him with

3    something.

4      Q.   Did he respond?

5      A.   No.

6      Q.   How many times did you ask him that question?

7      A.   I asked him one time, and he didn't turn around,

8    he didn't respond, he didn't look at me, he just

9    stared --

10      Q.   In the direction --

11      A.   -- at the monitor, at the surveillance camera.

12      Q.   If we could have the lights, please, and Exhibit

13    No. 238, which I believe has been admitted.

14          Do you recognize what's in that photograph there,

15    ma'am?

16      A.   Yes, that's part of our lobby.

17      Q.   And where is -- there is a desk there to the left

18    right there?

19      A.   Yes.

20      Q.   Where would you be stationed?

21      A.   I'm around the corner out of camera view.

22      Q.   Over here?

23      A.   Is this me?  I'm back this way.

24      Q.   Okay.  Off to the left?

25      A.   Yes.

1    Q.   Outside of camera view?

2    A.   Yes.

3         MR. SKROCKI:  Just to make sure, I'm looking at

4    exhibits coming up, Judge, 239, 240, 241, 264 and 263,

5    which I believe have all been admitted.

6         THE COURT:  That's correct, isn't it?

7         DEPUTY CLERK:  Uh-huh.

8         THE COURT:  Yes.  Thank you.

9    BY MR. SKROCKI:

10   Q.   Blair, if we can go to 239, please.

11        And what's that photograph of, ma'am?

12   A.   Right here is the passenger guest bathroom, and

13   then through the door is the employees' restroom.  And

14   through another door is where we have all of our

15   electronics, and then it continues on into the coffee

16   shop.

17   Q.   Blair, if you can put 238 back up again just

18   quickly in connection with 239.  That's fine.

19        So where we just saw that photograph was around

20   this corner here?

21   A.   Yes.

22   Q.   And 240, please.  With respect to the video

23   surveillance camera you spoke about, is one of those

24   depicted or visible in Exhibit No. 240?

25   A.   Yes, it's right there.

1 Q. Right here?

2 A. Yes.

3 Q. And ma'am, were those cameras the type that

4 recorded or were they video only?

5 A. It was just video only.

6 Q. How did they help you with your job?

7 A. Well, sitting in the back office, I was able to

8 look into the lobby to make sure that when they called

9 the flight that passengers weren't sleeping and not

10 paying attention and missed the pilot calling the

11 flight.  So I would be able to look at the lobby and

12 make sure everything was fine and no one missed the

13 flight.

14 Q. Is this one of the cameras Mr. Wells was staring

15 at?

16 A. Yes.

17 Q. 241, please.

18 Do you recognize what's depicted in this

19 photograph here?

20 A. Yes.  That's the other end of the lobby, and then

21 the doors there lead into the coffee shop.

22 Q. The coffee shop is on this side of those doors?

23 A. Yes.

24 Q. And is that something run by Island Air as well?

25 A. Yes.

1     Q.  I want to turn your attention to this item here

2  in the corner.  Do you see what that is?

3     A.  Yes.

4     Q.  What is that, ma'am?

5     A.  That's the other surveillance camera.

6     Q.  Was that something Mr. Wells was looking at?

7     A.  Yes.

8     Q.  And 264.

9     Doing okay?

10     A.  Yes.

11     Q.  Can you point out those two surveillance cameras,

12  please, in Exhibit No. 264?

13     A.  There is one there and one there.

14     Q.  And again, they don't record?

15     A.  No.

16     Q.  Do you recall whether the coffee shop back

17  through those doors was open at that time or not?

18     A.  Yes, they were open.

19     Q.  Lastly, 263, and we'll move off the exhibits.

20     And do you recognize what's depicted in that

21  photograph?

22     A.  That's the entrance to Island Air.

23     Q.  With respect to how you got to where you were, to

24  where your work station is, would you go through this

25  door here?

1    A.   I actually came in from the back.  I would go in

2  through the back hangar part, but this is the main

3  entrance for passengers.

4    Q.   All right.  Can you explain to the jury where

5  Island Air's offices were and where the coffee shop was?

6    A.   So this is the main entrance, the main lobby, and

7  then right off to this end is where the coffee shop is.

8  And then we're right across the street from Alaska

9  Airlines, same parking lot.

10         MR. SKROCKI:  Your Honor, some permission to

11  lead?

12         THE COURT:  Go ahead.

13  BY MR. SKROCKI:

14    Q.   Mr. Wells was in your office for how long with

15  respect to just you and him when you were asking him

16  questions and he's staring at the video?

17         We can have the lights, please.

18    A.   It seemed like a long time, but it was probably

19  just a matter of minutes.

20    Q.   Did he ever respond back to you?

21    A.   Never.

22    Q.   Did you go get somebody because of Mr. Wells not

23  responding to you?

24    A.   Yes, I did.

25    Q.   Who did you go get?

 1    A.   I went to the back.  One of the pilots was just

 2   finishing up for the evening, and I asked him to come

 3   out front.  I told him there was this person out there

 4   that wasn't answering me, and, you know, kind of scared

 5   me.  I said, "I asked him a question," so he came out

 6   front and said, "Sir, can we" --

 7           MR. CAMIEL:  Your Honor, I'm going to object to

 8   any hearsay.

 9           MR. SKROCKI:  I'll work on this.

10   BY MR. SKROCKI:

11    Q.   Let me ask you this, ma'am:  Did the pilot speak

12   with Mr. Wells?

13    A.   Yes, he asked him a question.

14    Q.   Did the pilot get any response back from Mr.

15   Wells?

16    A.   No.

17    Q.   Did Mr. Wells ever say anything --

18    A.   No.

19    Q.   -- that you recall during that exchange between

20   you and him and then when the pilot came?

21    A.   No, nothing.

22    Q.   So no words were spoken by him that you recall

23   when he was in your offices?

24    A.   No.

25           MR. SKROCKI:  Those are all the questions I

1    have for you.  Thank you, Judge.

2                          CROSS EXAMINATION

3    BY MR. CAMIEL:

4        Q.  Good afternoon, ma'am.

5        A.  Oh, hi.

6        Q.  Could we put up Defense Exhibit 19.  I don't know

7    if this has been admitted or not.

8            Ma'am, could you take a look at the screen in

9    front of you.  Do you recognize what's in that picture?

10       A.  Yes.

11       Q.  What is it?

12       A.  It's the Island Air building and the parking lot.

13       Q.  And does it show the entrance that we just looked

14   at as well as an entrance to the right to the coffee

15   shop?

16       A.  Yes.

17       Q.  Does that look about the way it did back in 2012?

18       A.  Yes.

19           MR. CAMIEL:  Your Honor, I would offer Defense

20   Exhibit 19.

21           MR. SKROCKI:  No objection.

22           THE COURT:  19 is admitted.

23           (Defense Exhibit No. 19 admitted.)

24   BY MR. CAMIEL:

25       Q.  So this is the entrance we were just looking at

1    in the other picture; is that right?

2        A.  Yes.

3        Q.  This is the entrance to the coffee shop?

4        A.  Yes.

5        Q.  Was that coffee shop called the Gear Up?

6        A.  Yes.

7        Q.  And as I understand it, Island Air runs both of

8    those?

9        A.  At that time, yes.

10       Q.  All right.  And I think you said you were waiting

11   for a flight to come in that evening?

12       A.  Yes.

13       Q.  How many flights did you have going in and out

14   that day, do you remember?

15       A.  On average, we would have anywhere between 17 to

16   25 flights.

17       Q.  So that's a pretty busy business?

18       A.  Yes.

19       Q.  And you served the villages as well as hunting

20   lodges and fishing lodges?

21       A.  Yes.

22       Q.  How many planes did Island Air have at that time?

23       A.  I think we had four, one float plane and three

24   wheel planes.

25       Q.  Could we put up Government Exhibit No. 238,

1  please.

2       So if I understand your testimony, this wasn't

3  where you were sitting on the evening of April 12th

4  [sic]; is that right?

5     A.  Yes.

6     Q.  You were further off camera?

7     A.  Around the corner, yes.

8     Q.  Okay.  So for you to see somebody come in, you

9  would see them on the monitor from the surveillance

10  camera?

11     A.  I could see them coming through the front door.

12     Q.  Okay.  But there was nobody sitting right here?

13     A.  No.

14     Q.  At the time that Mr. Wells walked in, there was

15  nobody sitting right here?

16     A.  No.

17     Q.  Do you recall -- now, you said it's your memory

18  that the coffee shop was open?

19     A.  Yes.

20     Q.  All right.  Do you recall Mr. Wells asking about

21  the coffee shop and whether it was open?

22     A.  No.

23     Q.  Do you recall talking to an FBI agent named Matt

24  Judy on that same night, April 13th of 2012, right after

25  Mr. Wells, just shortly after he left the building?

1    A.  I don't recall his name, but someone did come in.

2    Q.  Okay.  And the person who came in identified

3 himself as an FBI agent?

4    A.  Yes.

5    Q.  And he wanted to know what Mr. Wells had been

6 doing in the building?

7    A.  Yes.

8    Q.  And do you recall telling him that Mr. Wells said

9 something about the coffee shop being closed?

10   A.  No.

11   Q.  All right.  When Mr. Wells did come in, you saw

12 him look right up at the surveillance camera, right?

13   A.  Yes.

14   Q.  And then you saw him look at the other one?

15   A.  He stood there, stared at the first surveillance

16 camera.  At that time, there was a garbage can where the

17 plant -- there is a plant in the picture, but there was

18 a garbage can there, and then he looked at the garbage

19 can.

20   Q.  When the agent came in later, the agent asked you

21 if he could look in the garbage can, right?

22   A.  I'm not positive if he asked me that.  I don't --

23   Q.  Do you remember the agent looking in the garbage

24 can?

25   A.  Yes, I think I do.

1    Q.  All right.  And he didn't pull anything out of

2  there?

3    A.  No.  Huh-uh.

4    Q.  And then Mr. Wells, he just walked out of the

5  building, right?

6    A.  No.  He walked past the -- in the lobby, he

7  walked past the couches, and he went to the opposite end

8  where the other surveillance camera was, and he stopped

9  and he just stood and he stared at it.

10    Q.  Can we put up 241, Government's 241?

11        So this is the camera you just mentioned?

12    A.  Yes.

13    Q.  And that's down by the door to the coffee shop?

14    A.  Yes.

15    Q.  All right.  And did he try the door to the coffee

16  shop?

17    A.  No.

18    Q.  He just looked up at the camera?

19    A.  Yes.

20    Q.  After he looked at one camera, he walked down and

21  looked at the other one, right?

22    A.  Yes.

23    Q.  And then he left?

24    A.  Yes.

25        MR. CAMIEL:  That's all I have.  Thank you.

1          THE COURT:  Follow-up?

2          MR. SKROCKI:  Yes.

3                    REDIRECT EXAMINATION

4   BY MR. SKROCKI:

5      Q.  Can I have the last exhibit, the parking lot?  I

6   don't recall the number.

7          MR. CAMIEL:  19.

8      Q.  With respect to the parking lot, Ms. Terry, do

9   you recall if this is what the parking lot looked like

10  in 2012 in terms of paving and everything else?

11     A.  Yes.

12     Q.  Is that how it -- that's how you recall it back

13  in 2012, totally paved over?

14     A.  Yes.

15         MR. SKROCKI:  Okay.  Fair enough.  That's all I

16  have.  Thank you.

17         THE COURT:  All right.  Thank you, ma'am.  You

18  may be excused.

19             (Witness excused)

20         THE COURT:  Your next witness?

21         MS. STEVENS:  Your Honor, we call Special Agent

22  Chavez.  Your Honor, she's going to be moving a little

23  slow.  She has a bum knee.

24         THE COURT:  Is she going to be okay to get in

25  the witness stand?

1          MS. STEVENS:  Oh, yeah.

2          (Pause)

3          THE COURT:  Good afternoon.  If you could come

4   up to the witness stand, please.  When you're there,

5   remain standing, and the clerk will administer an oath

6   to you.

7          (Oath administered to the witness)

8          DEPUTY CLERK:  For the record, can you please

9   state your full name and then spell your full name.

10         THE WITNESS:  Helena Chavez, H-e-l-e-n-a,

11  C-h-a-v-e-z.

12         HELENA CHAVEZ, GOVERNMENT WITNESS, SWORN

13                    DIRECT EXAMINATION

14  BY MS. STEVENS:

15    Q.  Good afternoon, Ms. Chavez.  Are you currently

16  employed?

17    A.  No, I'm not.

18    Q.  Are you retired?

19    A.  I am.

20    Q.  How long have you been retired?

21    A.  A little over a year.

22    Q.  And what agency did you retire from?

23    A.  The Coast Guard Investigative Service.

24    Q.  How long were you with the Coast Guard

25  Investigative Service?

1    A.  About 12 years.

2    Q.  How long were you in the Coast Guard?

3    A.  I wasn't in the Coast Guard.  I was a civilian

4    employee.

5    Q.  Great.  And where were you assigned?

6    A.  Seattle, Washington.

7    Q.  And what was your role down there?

8    A.  I was a special agent criminal investigator.

9    Q.  What kind of training did you receive to become a

10   special agent?

11   A.  I went to the Federal Law Enforcement Training

12   Center in Glynco, Georgia for their criminal

13   investigator school.  I was a special agent with the

14   Office of Inspector General with Department of

15   Transportation before, so I had gone to the Inspector

16   General Academy as well, and then just in-service

17   investigator training.

18   Q.  You said that was in Seattle?

19   A.  Correct.

20   Q.  Did you spend your whole time as a CGIS agent

21   there in Seattle?

22   A.  I did.  I'm sorry.  I transferred from Austin

23   with Department of Transportation to Seattle, worked

24   with them for about a year before I went with the Coast

25   Guard.

1    Q.  Got it.  And did you become involved in the
2  investigation on Kodiak in April 2012 for the two
3  murdered employees?
4    A.  I did.
5    Q.  How did you get involved in that?
6    A.  That morning when I showed up for work, my
7  supervisor at the time received a phone call from the
8  agent that was in Kodiak, and as he was on the phone
9  with Agent Sturgis, he motioned to me to go ahead and
10  pack a bag and get a flight to Kodiak, and so myself and
11  another co-worker did.
12    Q.  When were you able to get on that flight?
13    A.  We were in Kodiak mid-afternoon, so I want to say
14  it was probably about a 10:00 or 10:30 a.m. flight.
15    Q.  You guys move quick.
16        When you arrived on Kodiak, what did you do in
17  regards to this investigation?
18    A.  It was myself and another agent from Seattle.  We
19  met up with some of the agents that had come down from
20  Anchorage from different agencies that were already
21  there and we started interviewing everybody there, kind
22  of trying to determine what was going on.
23        We started organizing things, going out following
24  leads.  Just everything, preliminary investigation stuff
25  that would have occurred at that time.

1    Q.   Did the investigative team set up a command post?

2    A.   We did.

3    Q.   And tell the jurors where that was.

4    A.   That was in the main conference room there at the

5    COMMSTA.

6    Q.   And do you recall at what stage in the

7    investigation you guys were able to set that command

8    post up?

9    A.   It was already established when I got there, so I

10   believe it just kind of became de facto.  It was the

11   largest room that had telephones and boards and stuff,

12   so I think it just kind of evolved.  It was set up into

13   this kind of war room.

14   Q.   You arrived on the 12th of April?

15   A.   I did.

16   Q.   You mentioned you did some interviews, some

17   surveillance, things of that nature.  Did you

18   participate in any searches?

19   A.   I did.

20   Q.   Can you tell the jury what kind of searches you

21   participated in?

22   A.   That day we did some consent searches on the

23   residence.  I think that was that evening.  We did some

24   cell phones of the people that were there.  And then as

25   the investigation kind of progressed, then we had some

1  search warrants that we executed.

2      Q.  Did the search of the cell phones involve any of

3  Mr. Wells' cell phones or electronic devices?

4      A.  Yes.

5      Q.  Why don't we talk about that real quick.  In

6  regard to that role or that aspect of the investigation,

7  what did you do?

8      A.  So we had asked for a consent to go through his

9  cell phone, and so I sat there and pretty much

10 documented what was observed on the cell phone, text

11 messages, phone calls and things like that, took

12 photographs of everything that we could bring up.  It

13 was a consent search.  Mr. Wells agreed to it.

14     Q.  What kind of things did you find?

15     A.  There was text messages.  There were a lot of

16 photographs, phone calls, missed phone calls, phone

17 calls dialed out.

18     Q.  Let's go ahead and pull up 96, Blair, for

19 foundation, please.

20         So do you see that, Special Agent Chavez?

21     A.  Yes.

22     Q.  Do you recognize this?

23     A.  Yes.

24     Q.  How do you recognize it?

25     A.  This was one of the phone logs in the phone.

1    Q.  In whose phone?

2    A.  In Mr. Wells' phone.

3    Q.  And this picture was taken when?

4    A.  On the 12th.

5        MS. STEVENS:  Your Honor, government moves to

6    admit 96.

7        MR. CAMIEL:  No objection.

8        THE COURT:  96 is admitted.

9        (Exhibit No. 96 admitted.)

10   BY MS. STEVENS:

11   Q.  Okay.  So just give the jury a walkthrough of

12   what we're seeing here.

13   A.  So this would have been the phone log for Mr.

14   Wells' phone.  I believe he had an iPhone, and it just

15   shows the phone calls from the previous day leading up

16   until that morning.

17   Q.  And you see here it says -- can you read that?

18   A.  Leah Killingsworth.

19   Q.  And the time?

20   A.  8:16 a.m.

21   Q.  And do you recall what date that 8:16 a.m. was in

22   regard to?

23   A.  This would have been the 12th.

24   Q.  You can take that down.

25       And can you bring up 97, please, Blair, for

1  foundation.

2       And do you see what's in front of you there?

3    A.  Yes.

4    Q.  Do you recognize what you see?

5    A.  Yes.  It's a text record, text image.  It's a

6  photograph of the texts that were on his phone.

7    Q.  And is this picture an accurate representation of

8  how his phone was when you took this photo on the 12th?

9    A.  Yes.

10       MS. STEVENS:  Your Honor, we'd move to admit

11  97.

12       MR. CAMIEL:  I would object as to hearsay.

13       MS. STEVENS:  Your Honor, the hearsay that Mr.

14  Camiel is --

15       MR. CAMIEL:  Your Honor, I would ask we be

16  able --

17       THE COURT:  Let's have a sidebar.

18       (Begin bench conference.)

19       THE COURT:  What part do you object to?

20       MR. CAMIEL:  Anything from Nancy Wells would be

21  hearsay.

22       MS. STEVENS:  My response to that is it's not

23  offered for the truth of the matter asserted, and this

24  -- it's a question.  So we're not trying to prove that

25  it was accidental.

1          THE COURT:  I don't see it as --

2          MR. CAMIEL:  It's spousal communications.

3          MS. STEVENS:  He waived it.  He waived -- he

4   waived that privilege by providing consent.

5          MR. CAMIEL:  I don't know that is --

6          THE COURT:  That I need to ponder.  I don't

7   remember the specifics.  We did briefing on the spousal

8   privilege at some point that I have not looked at

9   recently.  So maybe let's take a break and I'll go and

10  take that up.

11          (End bench conference.)

12          THE COURT:  We're back on record.  Ladies and

13  gentlemen, this is going to take me just a bit longer to

14  sort out, so I'm going to have you take your afternoon

15  break at this time, have you back no later than 2:30,

16  2:25, but we'll go off record at this time.

17          Please leave your notepads here.  Remember my

18  admonition not to discuss the case, and we'll go off

19  record here.

20          (Jury absent)

21          THE COURT:  Please be seated, everyone.  What

22  is the government's position on the spousal privilege

23  applicability to these texts, or do you need a few

24  minutes?  I know there was briefing.  I just can't

25  remember where.  It was some time ago.

1          MR. SKROCKI:  There was lots of briefing.  We

2     had some in our trial brief.  I know they have too, but

3     it was on various issues, mostly about Nancy Wells

4     testifying, not this particular issue.

5          THE COURT:  All right.  Thank you for that

6     heads-up.  I remember reading one about the spousal

7     privilege, but maybe that was focused on testifying.

8          Let's take a short break.  I will --

9     unfortunately, Emily went home sick, so I hope that

10    doesn't mean my staff is going to get sick.  We'll go

11    off record briefly.

12         DEPUTY CLERK:  All rise.  Court stands in a

13    brief recess.

14         (Recessed from 2:12 p.m. to 2:31 p.m.)

15         (Jury absent)

16         DEPUTY CLERK:  All rise.  Her Honor, the Court,

17    the United States District Court is again in session.

18         THE COURT:  Please be seated, everyone.

19         What's the government's perspective on this

20    issue?

21         MS. STEVENS:  Your Honor, we believe that there

22    is two privileges that potentially could apply.  The

23    marital communication privilege.  That protects

24    confidential communications made between spouses.

25    However, those are no longer confidential if they are

1    shared, in which case here the defendant consented to
2    the release of his phone and search by the agents.
3              The second privilege applicable potentially
4    would be the adverse spousal privilege.  That only vests
5    however in the testifying spouse.  In this case, we're
6    not -- Ms. Wells is not sitting --
7              THE COURT:  That doesn't apply.
8              MS. STEVENS:  It doesn't apply.  She is not
9    sitting on the stand, she's not testifying.  We found a
10   similar case where a defendant tried to get out -- tried
11   to limit the recorded phone conversations between him
12   and his spouse arguing that the adverse spousal
13   privilege applied, and the Court did not agree citing
14   two reasons:  One, the introduction of statements is not
15   compulsion of testimony.  And two, the introduction of
16   tapes between spouses is not the same as compelling one
17   spouse to testify against the other.
18             And of course, we did this rather quickly, but
19   that case is *United States versus Tartaglione*.
20             THE COURT:  I don't see that privilege as
21   applying.  That's a testimonial privilege and we're not
22   talking about that.  But on the marital communications,
23   well, why is the fact that Mr. Wells consented does that
24   destroy the confidentiality of the communication?
25             MS. STEVENS:  Yes, I believe so.

1          THE COURT:  I can understand he waived it as to

2    himself, but can you find me a case that would say if

3    one spouse shares the communication that then it doesn't

4    -- it's no longer confidential, because that I'm not --

5    I'm looking at this Ninth Circuit criminal --

6          MS. STEVENS:  So the privilege is held by both

7    spouses.  The Court is correct in that aspect, including

8    the non-testifying spouse.  Neither of them are

9    testifying.

10          It can be asserted even after the marriage

11    ends.  A defendant who wishes to invoke this privilege

12    must show, one, a valid marriage existed at the time.

13    The privilege is being applied only to utterances or

14    expressions intended by one spouse to convey a message

15    to the other.  I'm not quite sure that Ms. Wells --

16          THE COURT:  What's the cite you're giving me

17    for that statement?

18          MS. STEVENS:  This would be -- *Wolfle versus*

19    *United States*, 291 U.S. 7.

20          THE COURT:  All right.

21          MS. STEVENS:  1934.  It's a little old.  But

22    the party asserting that marital communication privilege

23    bears the burden of establishing these elements.  Oh,

24    and that the communication was made in confidence.

25          So when -- I mean when he waives that -- when

he waives that by allowing investigators to see his
communications so that he can establish his timeline for
his alibi and things of that nature, I think it's pretty
evident that the confidential nature of that was waived.

THE COURT: All right. Thank you.

Mr. Camiel?

MR. CAMIEL: Your Honor, a couple things. As
to the privilege, first of all, I don't think there is
any question but that there was a valid marriage and
communications at the time of the marriage.

These text messages aren't going to include
anybody else. It wasn't like they were sent to somebody
outside the marriage. And there has been no indication
that Nancy Wells had anything to do with the consent.

But beyond that, I wanted to point out to the
Court, if you look at the actual texts, and we don't
have an objection to Mr. Wells' texts being admitted,
but if you look at the ones from Nancy Wells, the one
that follows, "Was this accidental?" That's about an
hour later. There is no indication that it was read.
Usually with an iPhone it will indicate "read," so there
is no indication that Mr. Wells received that one or the
next one or the next one that's even a few hours later
than that.

And so those, because there is no indication he

1    received them, I don't know how those are not hearsay.

2    If they are not offering them for the truth of the

3    matter asserted, I'm not sure what the purpose of

4    offering those is.

5            Our position is Mr. Wells' texts, we understand

6    that could be admitted, but anything from Nancy Wells

7    should not.

8            THE COURT:  All right.  Well, based on the --

9    it may be -- I agree it doesn't show on this exhibit

10   that these were ever read, but from the other testimony

11   that's been presented it sounded like the reception was

12   really poor during the time Mr. Wells was at the COMMSTA

13   that day and they could very well have been read later

14   but are not included on this document, but that's

15   neither here nor there.

16           So the one that would come in clearly is the

17   April 12 one.  I have looked at this -- there is a case,

18   *United States versus Vo*, which construes -- I'm quoting

19   -- "construes the marital communications privilege

20   narrowly to promote marriage without thwarting the

21   administration of justice."

22           And I do see these by Ms. Wells as having been

23   intended as a confidential communication.  What I will

24   do is -- I'm inclined, if the government seeks to admit

25   it, to show that there were texts sent by her at these

times, so not the nature of the communication, but that
Ms. Wells texted for whatever -- but I'm not sure that's
really relevant, I guess, would be my thought -- but her
points I don't see that she waived the marital
communication privilege when Mr. Wells gave the phone to
the investigators on that day.

So I'll grant -- I'll sustain the objection to
the admission of the subsequent texts and the preceding
one, but the exhibit could be amended simply to show the
one in green.

Questions about that ruling?

MS. STEVENS:  No questions.

THE COURT:  I just see it as a confidential
communication that was intended.

MS. SHERMAN:  We have modified the exhibit.

THE COURT:  That was fast, Ms. Sherman.

MS. SHERMAN:  We anticipated.

THE COURT:  Very good.

Anything further on that, Mr. Camiel?  Can we
bring in the jury?

MR. CAMIEL:  We're fine.

THE COURT:  Very good.  Let's go ahead.

Ma'am, you can come back up to the witness
stand.  Thank you.

(Pause)

```
 1              (Jury present)
 2              THE COURT:  Welcome back, ladies and gentlemen.
 3    Please be seated, everyone.
 4    BY MS. STEVENS:
 5        Q.  Do you recognize this?
 6        A.  Yes.
 7        Q.  How do you recognize it?
 8        A.  This was a text on Mr. Wells' telephone, cell
 9    phone.
10        Q.  And what's the date and time?
11        A.  April 12, 2012, 8:55 a.m.
12              MS. STEVENS:  Your Honor, we move for the
13    admission of what is Government Exhibit 97.
14              THE COURT:  All right.
15              MR. CAMIEL:  No objection.
16              THE COURT:  97 is admitted.
17              (Exhibit No. 97 admitted.)
18    BY MS. STEVENS:
19        Q.  And can you read what it says?
20        A.  "Rich and Jim are said to be dead.  T-2 lockdown.
21    Will let you know when I know more.  Love you."
22        Q.  Who sent that message?
23        A.  Jim Wells.
24        Q.  Who did he send that to?
25        A.  To his wife.
```

1    Q.  Take that down.

2        So you arrived that day and they set up a

3    conference space for all of you guys, right?

4    A.  Correct.

5    Q.  Can you explain to the jury what was in that

6    conference room, what you guys were doing in there.

7    Just help them understand sort of the ambience and what

8    it was for.

9    A.  It was a command center.  They were keeping lists

10   of who was being interviewed, notes, who was coming in,

11   maps.  Everything that was kind of being gathered at

12   that time, everything that we were doing was being

13   contained in this room.

14   Q.  And what were the agents doing with some of the

15   leads or items of note that they had discovered?  Were

16   they displaying them anywhere?

17   A.  That afternoon, yes, everything was kind of

18   spread out all over the room.  We hadn't had an

19   opportunity to do any kind of like administrative

20   cleanup or filing yet because information was coming in

21   so fast and they were processing things quickly.

22       And so things were just being placed on the

23   table, perhaps a post-it note, things were being put up

24   on boards.

25   Q.  Just so we can step into that room and kind of

understand what it was like, can you give a description
to the jury?

     A.   It's, I don't know, maybe 15-, 20-person
conference room with a long conference table and chairs
all around.  There were white boards.  I believe there
is a some type of overhead system, but that wasn't being
used at the time.

          On the table we had files, papers, notes,
equipment, there was law enforcement equipment.
Everything that we needed, we were basically sustaining
ourselves in that room.

     Q.   And where was the information displayed?

     A.   It was on the table and on the boards.

     Q.   And can you tell the jury who had access to that
room?

     A.   It's not a secure room.  That afternoon, it
wasn't being secured in any type of way.  There was just
a door that opened into a conference room, and so
anybody that worked there would have had access to the
room, but law enforcement was kind of established in
that room.

     Q.   And while spending time in that room, did you
have an opportunity to observe any non-law enforcement
individuals go in there?

     A.   Yes.

Q.  Can you explain that, please?

A.  A couple of people that worked at the COMMSTA walked in.  They didn't walk in.  Because we were in there, and so they would kind of stand at the threshold and just say, "Hey, I have a question.  I need to call my babysitter or I need to make other arrangements, how long are we going to be here or what's going on," that type of thing.

So I did notice Mr. Wells come in a couple of times as well and questioned why he was walking in.

Q.  And help us understand that interaction a little bit more.

A.  Like everyone else, he was concerned about what was going on.  He was asking, you know, "I need to -- how long am I going to be here," looking around, just -- but he actually -- the only reason I thought it was unusual at the time was he crossed the threshold, whereas most people were kind of standing there knowing that they shouldn't come into the room.

Q.  When he crossed the threshold, did you observe him doing anything, looking anywhere or anything?

A.  Just glancing around.

MS. STEVENS:  No more questions, Your Honor.

THE COURT:  All right.  Mr. Camiel?

CROSS EXAMINATION

BY MR. CAMIEL:

    Q.  Good afternoon, ma'am.  So I wanted to get a better understanding of when did you actually physically arrive on the 12th at the COMMSTA?

    A.  I would have to check flights, but it would have been sometime in the afternoon.  Probably maybe 3:00, 4:00.

    Q.  Before you got up to the COMMSTA, did you meet with agents down near where you landed near the airport?

    A.  Yes.  I think an agent picked us up at the airport.  I couldn't tell you who it was.  I don't remember.  I don't recall.

    Q.  And then when you got up to the COMMSTA, you described this conference room.  I take it it wasn't in the secure area.  It wasn't on the ops deck that's the secure area of that building; is that right?

    A.  Correct.

    Q.  And so it was the unsecure conference room?

    A.  Correct.

    Q.  And did you understand that earlier in the day people who worked either at the T-1 building or T-2 building had been told to wait in that room?

    A.  Yes.

    Q.  And then when you all got there, those people were moved somewhere else?

1    A.  When I got there, they had already been moved or

2  they were in the process of moving, and we were kind of

3  taking over the space.

4    Q.  Before you got up to the COMMSTA, did you spend

5  some time down at the CGIS offices first?

6    A.  No.

7    Q.  The room where all the agents were meeting, law

8  enforcement was meeting, I take it the door was open?

9    A.  Yes, it was open initially, and then sometime

10  that evening was when it was closed and then the window

11  was blocked.

12    Q.  So when people -- Mr. Wells and others, you said

13  like other people, people were coming and asking

14  questions, they were coming to an open door?

15    A.  Correct.

16    Q.  And there wasn't a sign on the door saying "Keep

17  out," or anything of that nature at that point?

18    A.  Correct.

19    Q.  And did you have any idea how many hours people

20  had already been waiting?

21    A.  I'm going to go with I got there about 3:00 to

22  4:00, so they had been there since the start of the

23  workday at about 7:00, most of them, 6:30, 7:00, so they

24  had been there eight hours.

25    Q.  When Mr. Wells came in, did you know whether he

1    had already been interviewed?

2        A.   I don't believe he had, or he may have initially.

3        Q.   The jury already heard there were four

4    interviews, that he was talked to four times on

5    April 12th.  So when he came in, it may have been after

6    some of the earlier interviews with him?

7             MS. STEVENS:  Objection, Your Honor;

8    speculation.

9             THE COURT:  That's sustained.

10   BY MR. CAMIEL:

11       Q.   Were you told at one point that agents had talked

12   to Mr. Wells about taking him home to get some

13   medication?

14       A.   I don't recall.

15       Q.   You indicated -- you talked about being able to

16   scroll through Mr. Wells' phone?

17       A.   Yes.

18       Q.   And you understood that was being done based on

19   his consent, there was no warrant?  He didn't require a

20   warrant?

21       A.   Correct.

22       Q.   And he didn't put any limitations, that you're

23   aware of, on looking through his phone?

24       A.   No.

25       Q.   Before the conference room was secured or before

1  the door was closed and some paper was put over the

2  window, do you know how many people, how many crewmen

3  were in the building at the time?

4      A.  No.

5      Q.  I didn't see any reports by you about April 12th

6  or your review of the phone or people coming into the

7  conference room.  Did you document that in a report?

8      A.  Not in a report.  The photo log was submitted

9  with the photographs.

10     Q.  The photo log of the photos of Mr. Wells' phone?

11     A.  Correct.

12     Q.  Did you write a report about your observations of

13 Mr. Wells?

14     A.  No.

15         MR. CAMIEL:  Thank you.

16         THE COURT:  Follow-up?

17         MS. STEVENS:  No questions, Your Honor.

18         THE COURT:  Thank you, ma'am.  You may be

19 excused.

20         (Witness excused)

21         THE COURT:  Your next witness?

22         MS. SHERMAN:  Angela Strause.

23         (Pause)

24         THE COURT:  Good afternoon.  If you can come to

25 our witness stand, please.  Remain standing when you get

1  here and the deputy will administer an oath to you.

2          (Oath administered to the witness)

3          DEPUTY CLERK:  For the record, can you please

4  state your full name and then spell your full name.

5          THE WITNESS:  It's Angela Strause, A-n-g-e-l-a,

6  S-t-r-a-u-s-e.

7          ANGELA STRAUSE, GOVERNMENT WITNESS, SWORN

8                    DIRECT EXAMINATION

9  BY MS. SHERMAN:

10     Q.  Where do you work?

11     A.  The Federal Bureau of Investigation.

12     Q.  Is that here in Anchorage?

13     A.  Currently, no.  I work in the Philadelphia

14  division, but I was assigned to Anchorage.

15     Q.  How long were you assigned to the Anchorage

16  division?

17     A.  For five years, from approximately August of 2010

18  to August of 2015.

19     Q.  And what's your title?

20     A.  Special agent.

21     Q.  What does a special agent at the FBI do?

22     A.  Currently -- well, right now, I investigate

23  matters involving online exploitation of children and

24  human trafficking, but historically, I have worked cases

25  involving drug trafficking, counter terrorism,

1    international terrorism, you know, pretty much
2    everything violent crime related.
3        Q.   What is ERT?
4        A.   ERT is the evidence response team.  It's a
5    collateral duty that I have been working on since about
6    2011.  Basically, we investigate or we would go out on a
7    search warrant.  If there is a crime scene, we would go
8    out.  We would execute search warrants and we would
9    collect and gather evidence in a very systematic way so
10   that it can be presented in court.
11       Q.   And did you take any particular training to be a
12   part of ERT?
13       A.   Yes.  When we go through the academy as an agent,
14   we attend some training for evidence collection.
15   However, if you are a member of the evidence response
16   team, there is specialized training that you would
17   attend, and that is at our main office in Quantico,
18   where they basically set up scenarios, you would do
19   evidence collection and crime scene investigation,
20   photography, fingerprints, all sorts of things like
21   that, so that's about a two-week course.
22           And then if you want to specialize even further,
23   they have additional trainings that you can specialize
24   in in very particular areas of evidence collection.
25       Q.   I want to talk about some of the things you did

1  in this investigation.  Did you go to Kodiak?

2      A.  Yes, I did.

3      Q.  What date did you arrive in Kodiak?

4      A.  I arrived on April 12th of 2012.

5      Q.  How did that call come in, as far as you're

6  aware?

7      A.  The call came into our office.  I believe we had

8  a Coast Guard representative working in our office and

9  he received the call from a counterpart on Kodiak Island

10  basically informing him that there had been a double

11  homicide on the island and they were requesting FBI

12  assistance.

13      Q.  How long did you have to get to ready to go to

14  Kodiak?

15      A.  I think we had a few hours.  We found out in the

16  morning and then we were on a C-130 that afternoon, and

17  we arrived, I believe, around 3:00 p.m., give or take.

18      Q.  We're going to talk about crime scene photos with

19  another witness, but did you assist in reviewing the

20  crime scene in this case?

21      A.  Yes, I did.

22      Q.  And that search was down at T-2.  At some point,

23  did you leave there and go up to T-1?

24      A.  I did, yes.

25      Q.  What was your purpose in going up to T-1?

1    A.   A request came in from the case agent at the time

2   to perform a simulated gunshot residue examination on

3   Mr. Wells, so I removed myself from the crime scene and

4   went to the other building to do that.

5    Q.   You said simulated.  Is gunshot residue testing

6   not something you do as part of ERT?

7    A.   No, it's not a test that the evidence response

8   team performs.

9    Q.   So if you're asked to simulate this test, what

10  did you do to prepare for that?

11   A.   Essentially, I got some gauze pads and some paper

12  bags and evidence tape.  And I was wearing gloves

13  myself, plastic gloves, or the Tyvek gloves, and

14  essentially walked up to Mr. Wells and asked whether --

15  I explained why I was there, and he consented to allow

16  me to swab his hands.

17       So I swabbed each hand and basically put the

18  gauze in an individual bag and sealed it.

19   Q.   Did you gauge his reaction while you were

20  swabbing his hands?

21   A.   Yes, I did.

22   Q.   What did you observe?

23   A.   In my opinion, he appeared flustered.

24   Q.   Do you recall assisting in a search of the

25  defendant's home in February, February 22, 2013?

1    A.   Yes, I do.

2    Q.   Do you remember what you all were looking for at

3 the time?

4    A.   At the time we were looking for items related to

5 either a nail gun, any kind of nail chargers and

6 specifically nails.

7    Q.   Was that search pursuant to a search warrant?

8    A.   It was, yes.

9    Q.   Did you locate some -- did you locate some nail

10 guns?

11    A.   On that search, I believe we did locate some nail

12 guns, yes.

13    Q.   Did you also locate some nail gun charges?

14    A.   Yes, we did.

15    Q.   I'm going to have you take a look at Exhibit

16 No. 153 for foundation.

17    A.   Okay.

18    Q.   Actually, why don't we do 153, 154 and 155.  Do

19 you recognize those?

20    A.   I do, yes.

21    Q.   Did you take those photos?

22    A.   I don't believe I took the photos, no.

23    Q.   Were these items that you personally observed

24 during the search though?

25    A.   Yes.

1    Q.  Fair and accurate depiction of what you observed

2    then?

3    A.  Yes, they were.

4        MS. SHERMAN:  I move for the admission of 153

5    to 155.

6        MR. CAMIEL:  No objection.

7        THE COURT:  Those will be admitted.

8        (Exhibit Nos. 153, 154 and 155 admitted.)

9    BY MS. SHERMAN:

10   Q.  If we could start with 153 and publish.  There

11   should be a laser pointer up there.

12       If you can use that and point us to where we

13   should be looking in here.

14   A.  So on the bottom shelf right here, you will see

15   that the nail gun charges are kind of in that box.

16   Q.  And 154?

17   A.  That's just a closer shot of those so you can get

18   a better view of them.  Typically, when we -- when our

19   photographer takes photo, they will take sort of a

20   medium range and then a close range, and then usually a

21   close with scale.  This looks like it was the close.

22   Q.  And then you seized that strip of charges?

23   A.  Yes, right here.

24   Q.  155 then.

25   A.  And then as I mentioned, we take a close-up with

scale.  A lot of times that's just in case the photos --
if for some reason the evidence gets lost or something
happens, we always have the photos and we know exactly
how large everything was.

        MS. SHERMAN:  Your Honor, if I could approach
with Exhibit No. 156.

        THE COURT:  Go ahead.

        (Ms. Sherman approaches witness.)

BY MS. SHERMAN:

    Q.  I don't need you to open the interior envelope,
but if you can look at that envelope and tell us what is
Exhibit No. 156.

    A.  It's item one of that particular search, which
was dated February 22, 2013.  The location was "sunroom
southeast side of the house in the lower cabinet shelf."
And it's a Hilti booster strip, and there were nine of
ten rounds in the strip.  It was collected by Aaron
Woods and SA Daryl Allison.

        MS. SHERMAN:  I'm going to move for the
admission of 156.

        MR. CAMIEL:  No objection.

        THE COURT:  That's admitted.

        (Exhibit No. 156 admitted.)

BY MS. SHERMAN:

    Q.  We can take 155 down and I'll collect that from

1  you in just a moment.

2          THE COURT:  It was 156, wasn't it?

3          MS. SHERMAN:  156.

4          THE COURT:  Yes.

5          MS. SHERMAN:  Yes.

6  BY MS. SHERMAN:

7      Q.  When you're on ERT, do you have a specific list

8  of things in a search warrant you're allowed to look

9  for?

10     A.  Yes.  It's found on the attachment.  Typically,

11 we will read the search warrant before we enter any

12 residence or any premises so we know exactly the items

13 that we're looking for that's been reviewed by a court

14 and authorized.

15     Q.  So in the course of your search if you see

16 something else that you think might be related, what

17 would you have to do?

18     A.  Typically, we would stop the search, and

19 occasionally we have people that will consent to seizing

20 the item, or if they don't consent, we would go back to

21 the court and get a supplemental warrant that covers the

22 new items.

23     Q.  I want to talk about a search in May 2013.  Did

24 you search the defendant's home?

25     A.  Yes, we did.

1    Q.   What were you looking for at that time?

2    A.   At that time, we were looking for a rifle scope

3    that belonged to an individual that Mr. Wells knew.

4    Q.   Was that search pursuant to a search warrant?

5    A.   Yes, it was.

6    Q.   I want to show you Exhibit 142, and why don't we

7    have you look at 142 through 145, if we could.

8    A.   Okay.

9    Q.   And then 247 as well.  Do you recognize those

10   photos?

11   A.   Yes, I do.

12   Q.   Were they part of that search in May of 2013?

13   A.   Yes.

14   Q.   Fair and accurate depiction of what you saw?

15   A.   Yes.

16        MS. SHERMAN:  I would move for the admission of

17   142, 143, 144, 145 and 247.

18        MR. CAMIEL:  Your Honor, without waiving

19   earlier objections, there is nothing new.

20        THE COURT:  Those will all be admitted.

21        (Exhibit Nos. 142, 143, 144, 145 and 247

22   admitted.)

23   BY MS. SHERMAN:

24   Q.   Let's start with 142.  What are we seeing behind

25   that door in 142?

1   A.   So this is the safe or kind of like a gun

2   cabinet, gun safe.  It's located in one of the upstairs

3   bedrooms behind the door.

4   Q.   And 143, what are we seeing?

5   A.   That's just a close-up of the same thing.

6   Q.   If we could, can we zoom in on that for me,

7   Blair?

8        It's kind of tough to see.  Do you see what's

9   depicted there in that zoomed-in image?

10  A.   I do, yes.  If you look here, it's like kind of a

11  leather sheath and it has the initials "JAS USCG" on it.

12  Q.   Did the initials at the time you conducted the

13  search, the initial "JAS" mean anything to you?

14  A.   They did.  I was -- as part of investigating the

15  case, I had been looking into some things that John

16  Stein had reported missing earlier on.  And those

17  initials just stood out to me because I had been seeing

18  that name and those initials for the last couple weeks,

19  so it just stood out to me.

20  Q.   And then let's go to the next image, 144.

21       Do you recognize this?

22  A.   That's just a close-up of the sheath and then

23  also the sword to the right.

24  Q.   Did you seize the sword and the sheath on that

25  day?

1      A.  We did, but not pursuant to that warrant.  We did

2  in fact get a separate warrant and seized it.

3      Q.  And then 145.

4      A.  That is basically just the sword laid out with

5  the sheath.

6      Q.  Let's go to 247.  In addition to the ceremonial

7  sword, did you seize any other swords?

8      A.  We did.  We seized two other swords.

9      Q.  Okay.  And can you show for us on 247 where those

10 were?

11     A.  They were also inside the bottom section of the

12 same cabinet.

13     Q.  Okay.  Let me ask you -- you can put that down.

14         Fair to say you were involved in quite a few

15 searches in this case?

16     A.  Yes, I was.

17     Q.  In any of those searches did you find a silver

18 .44-caliber Smith & Wesson revolver?

19     A.  I can't recall specifically, but as you said, I

20 was involved in several searches, so --

21     Q.  In any of the searches that you did?

22     A.  I believe we did recover several revolvers from

23 different places.  I can't remember specifics though.

24         MS. SHERMAN:  Okay.  Those are all my

25 questions.

1          THE COURT:  Mr. Camiel?

2                    CROSS EXAMINATION

3    BY MR. CAMIEL:

4        Q.  Good afternoon, ma'am.

5        A.  Good afternoon.

6        Q.  Let's start by talking about this gunshot residue

7    ruse that you did with Mr. Wells.

8        A.  Okay.

9        Q.  So if I understand correctly, you were called up

10   from the T-2 building where you were doing your crime

11   scene response duties to basically pretend that you were

12   going to do a gunshot residue test on Mr. Wells' hands,

13   right?

14       A.  That's correct, yeah.

15       Q.  And the props that you used for this ruse were

16   gloves, gauze, bags, evidence tape, right?

17       A.  That is correct.

18       Q.  And the reason you're doing this is you

19   understood it was to gauge Mr. Wells' reaction?

20       A.  Correct.

21       Q.  Now, you know that there was an audio recording

22   of that interview where you did this ruse with Mr.

23   Wells, right?

24       A.  I don't know that there was, but if you're saying

25   there was, then yes.

1    Q.  Well, do you recall that when Mr. Wells was asked

2  whether he would consent to the test, the gunshot

3  residue test, that he said, "No problem"?

4    A.  I don't recall his exact words.

5        MR. CAMIEL:  If I could have a minute, Your

6  Honor.

7        THE COURT:  Certainly.

8        (Pause)

9  BY MR. CAMIEL:

10   Q.  If we could pull up 101T.

11       THE COURT:  Defense?

12       MR. CAMIEL:  Government.  I'm sorry,

13  Government.

14  BY MR. CAMIEL:

15   Q.  Do you have that in front of you?

16   A.  I do, yes.

17   Q.  And does that appear to be a transcript from

18  April -- the April 12th interview with Mr. Wells that

19  you attended when you were going to do the GSR test?

20   A.  It appears so.  I have never seen this before.

21   Q.  Well, do you see where Mr. Wells was asked, "Are

22  you okay with that," in regard to the GSR test down

23  toward the bottom of the page?

24   A.  I do, yes.

25   Q.  You see the initials "KO," that's for Agent

1    Oberlander?

2        A.   That's correct, yes.

3        Q.   When he says, "You okay with that," do you see

4    how Mr. Wells answered?

5        A.   Yes.

6        Q.   "No problem."  That's what he said, right?

7        A.   Correct.

8        Q.   And then you got involved and you said you just

9    got to get your gloves on, and then you started to do

10   this pretend test?

11       A.   Correct.

12       Q.   So there was audio; you will agree with that now?

13       A.   I agree.

14       Q.   Was there video?

15       A.   No, not that I know of.

16       Q.   Don't you think if you were going to gauge his

17   reaction, it would be a good idea to also have video so

18   there would be a record of his reaction that other

19   people could see?

20       A.   It would have been ideal, but there were three

21   agents in the room where we're all watching his

22   reaction.

23       Q.   Did you have a cell phone with you?

24       A.   No, I didn't.

25       Q.   Do you know if any of the other agents had a cell

1  phone with them?

2      A.  I do not know.

3      Q.  You have used your cell phone to record things

4  before, haven't you?

5      A.  No.

6      Q.  So you put your gloves on, right?

7      A.  Correct.

8      Q.  And you asked Mr. Wells to hold out his hands?

9      A.  Correct.

10     Q.  And he did that?

11     A.  Yes.

12     Q.  And then you took the gauze and you pretended to

13  wipe his hands the way you would with a gunshot residue

14  test?

15     A.  I was never trained in gunshot residue

16  collection, so I just wiped his hands.

17     Q.  You were kind of just thinking about how it might

18  be done and pretending to do it?

19     A.  Correct.

20     Q.  And then you took the gauze, after you wiped his

21  hands, and you put each of the wipes in an individual

22  bag; is that right?

23     A.  Yes.

24     Q.  And then you sealed the bag with evidence tape?

25     A.  That's correct.

1    Q.  And you marked on it the way you would if it was

2  actual evidence?

3    A.  I'm sure I did.

4    Q.  And what did you do with those wipes afterwards?

5    A.  We threw them away.

6    Q.  So while you were at the T-1 on April 12th, who

7  else did you do this ruse with to see what their

8  reaction would be if they were asked to do a gunshot

9  residue test?

10    A.  We didn't do it with anyone else.

11    Q.  You talked about being involved in a number of

12  searches.  Do you know how many different searches you

13  were involved in of the Wells' property?

14    A.  Of the Wells' property, I'm not sure.  Maybe four

15  or five.

16    Q.  Did you ever search anyone else's home?

17    A.  Yes.

18    Q.  Is that a friend of Mr. Wells, the Penningtons?

19    A.  Yes, it was.

20    Q.  Other than the Wells' home that you searched, you

21  were involved in four or five searches, or his friend,

22  the Penningtons, did you search anyone else's homes?

23    A.  No.

24    Q.  Were you involved in the search of any of the

25  Wells' vehicles?

1    A.  Yes, I was.

2    Q.  Both the Honda --

3    A.  Correct.

4    Q.  -- and Mr. Wells' truck?

5    A.  Yes.

6    Q.  Were you involved in the search of anyone else's

7 vehicle?

8    A.  No.

9    Q.  You talked about in May of 2013 going into the

10 Wells' home to look for a particular rifle scope.

11    A.  Yes.

12    Q.  And there was a particular brand and type of

13 scope you were looking for?

14    A.  Yes, that's correct.

15    Q.  And you didn't find that scope in his home, did

16 you?

17    A.  No, we didn't.

18    Q.  Now, you were shown some pictures and you were

19 shown the actual charges that would be used in a nail

20 gun, right?

21    A.  Yes.

22    Q.  And those were -- your understanding was those

23 were submitted to a lab; is that right?

24    A.  If they were, it wasn't me who submitted them so

25 I can't speak to that.

1    Q.  When is the first time you went to the Wells'

2    home?

3    A.  It would have been probably April 14th of 2012.

4    Q.  You were one of what, about 15 or 17 agents who

5    went into the home on that day?

6    A.  It was a combination of agents from the FBI and

7    Coast Guard individuals.  I don't know how many Coast

8    Guard people were there offhand.

9    Q.  Well, all total in terms of the number of law

10   enforcement people who went into the home, would you

11   agree it was more than a dozen?

12   A.  It probably was more than a dozen, yes.

13   Q.  And that search lasted not just on the 14th, but

14   also on the 15th and 16th?

15   A.  Correct.

16   Q.  During that time, Mr. and Mrs. Wells couldn't

17   have access to their home; is that right?

18   A.  Whenever we do a search, if the individuals are

19   present when we arrived, they are allowed to stay on

20   scene, but if they choose to leave, then we can't allow

21   them back in until we release the scene.

22   Q.  When you started the search, the Wells weren't at

23   the home, were they?

24   A.  I don't recall.

25   Q.  Were you there at the initiation of the search?

1    A.   I was.

2    Q.   On that first -- that search that started on

3  April 14th, were you involved in seizing items?

4    A.   We seized items the last day, so we would set

5  aside items and we seized them all probably on the 16th.

6    Q.   There were a couple firearms that were seized?

7    A.   I believe so, yes.

8    Q.   And anything that looked like it might have blood

9  on it?

10    A.   Correct.

11    Q.   Were you doing swabbing for blood?

12    A.   Not on scene necessarily.  Sometimes if it's a

13  such a small amount we don't want to destroy it so we

14  won't swab it.  We will just collect anything that has

15  presumed blood on it and then submit it to the lab for

16  detailed testing.

17    Q.   In terms of the thoroughness of the search,

18  things like the sink trap were removed, right?

19    A.   Yes.

20    Q.   In the bathrooms?

21    A.   Yes, just the one.

22    Q.   The attic was searched?

23    A.   As far as I know, yes.

24    Q.   Basically any drawer, any container was searched?

25    A.   Yes.

1    Q.   Every room?

2    A.   I wasn't in every room to account for that, but

3    everyone was searching, so yes, I'm assuming they looked

4    in all the drawers.

5    Q.   Mattresses turned over?

6    A.   Yes.

7    Q.   Furniture pulled away from the walls?

8    A.   Yes.

9    Q.   Books removed from the shelves?

10   A.   Probably, yes.

11   Q.   There was a garage that was cluttered with all

12   kinds of materials?

13   A.   Yes.

14   Q.   And similar to that, you were involved in the

15   search of the vehicles, right?

16   A.   Correct.

17   Q.   With the blue Honda, you were involved in the

18   search of that vehicle in particular?

19   A.   Yes.

20   Q.   And floor mats were pulled out?

21   A.   Yes.

22   Q.   The steering wheel was swabbed?

23   A.   Yes.

24   Q.   And those swabs are then preserved to be sent to

25   a lab to test for blood or other biological material?

1    A.   Yes.

2    Q.   They even vacuumed out the vehicle?

3    A.   Yes.

4    Q.   Looked under the hood?

5    A.   Yes.

6    Q.   Door panels were pulled off?

7    A.   I don't know that we pulled off the door panels.

8    Q.   Do you remember the tailgate panel being pulled

9    off?

10   A.   It's possible.  I don't remember that

11   specifically though.

12   Q.   Did you seize anything from the Honda CR-V?

13   A.   I believe we seized a number of items.  Mainly it

14   was the vacuum extraction that was done from the

15   passenger side and the driver's side.

16   Q.   And the reason that you vacuum out the vehicle is

17   what?  What's the reason for that?

18   A.   Essentially we're looking for trace evidence.  A

19   lot of times a hair or a fiber that, you know, doesn't

20   necessarily belong to the person who has a reason to be

21   in the vehicle.  So we would typically vacuum that and

22   preserve it in the event that we would develop a suspect

23   that we needed to test it against.

24   Q.   You were also involved in the search of Mr.

25   Wells' truck?

1      A.   Yes.

2      Q.   And you went through the same type of process; is

3  that right?

4      A.   That's correct.

5      Q.   Looked under the hood?

6      A.   Yes.

7      Q.   Contents of the vehicle were all removed?

8      A.   Yes.

9      Q.   Vacuumed out?

10     A.   Yes.

11     Q.   The seats are swabbed to see if anything might

12  have got on the seat?

13     A.   The seats usually are taped like we would do a

14  vacuum or a tape lift.

15     Q.   Steering wheel, there were swabs done of the

16  steering wheel?

17     A.   Yes.

18     Q.   When I'm talking about swabbing a steering wheel,

19  you put some kind of liquid on a --

20     A.   Just water.

21     Q.   And you wipe on the steering wheel, right?

22     A.   Correct.

23     Q.   And then you bag that up in an evidence bag so it

24  can go to the lab and be tested?

25     A.   Yes.

1    Q.  Same thing with the door handles?

2    A.  Yes.

3    Q.  Same thing with the floor mats?

4    A.  Correct.

5    Q.  In the back of the truck, same kind of thing?

6    A.  From what I recall, the back of the truck had

7    mainly tires and some other things in there so we didn't

8    swab any of that.

9    Q.  But the tires were all pulled out of the truck?

10   A.  Correct.

11   Q.  By the time you -- so you reach a point where you

12   have everything, all the contents of the truck are

13   removed, right?

14   A.  Yes.

15   Q.  How long did you spend on the truck?

16   A.  I don't recall the amount of time.

17   Q.  Now, let's go back -- you indicated at the start

18   of your testimony that before you went up to run the

19   ruse on Mr. Wells, you were in the T-2 building?

20   A.  Correct.

21   Q.  And that was as a part of your evidence response

22   team duties; is that right?

23   A.  Yes.

24   Q.  And there were -- basically, the area around

25   where the victims had been located, that was vacuumed,

1    right?

2       A.   No.  Can you be more specific?

3       Q.   There were two rooms where the victims were

4    located, right?

5       A.   Correct.

6       Q.   One was an office and one was like a break room?

7       A.   Correct.

8       Q.   And the area near where the victims were located,

9    wasn't that area vacuumed?

10       A.   No, it wasn't.  We vacuumed the foyer area.  When

11    you're making your initial entry into the T-2 building,

12    we vacuumed the foyer area, but we did not vacuum around

13    the victims' bodies.

14       Q.   One of the things that you noticed when you were

15    going through the T-2 building was there was a boiler

16    room, right?

17       A.   Yes.

18       Q.   And you noticed that inside one of the boiler

19    room doors there was a boot print on the door?

20       A.   Yes.

21       Q.   Could we show the witness Defense Exhibits 218

22    and then 219.

23           First showing you for foundation purposes Defense

24    Exhibit No. 218.

25           Do you recognize that?

1    A.  I do.

2    Q.  What is it?

3    A.  It looks like the boot print on the door.

4    Q.  That's on the door of the boiler room; is that

5    right?

6    A.  Yes.

7    Q.  That's the inside door that would lead into the

8    room where Mr. Hopkins was found?

9    A.  It's the inside of the boiler room, yes.

10   Q.  If we could look at Defense Exhibit No. 219.  Is

11   that another picture of that photograph, the boot print?

12   A.  It's the same print, yes.

13         MR. CAMIEL:  And I would offer Defense Exhibit

14   No. 218 and 219.

15         MS. SHERMAN:  No objection.

16         THE COURT:  Those will be admitted.

17         (Defense Exhibit Nos. 218 and 219 admitted.)

18   Q.  Could we publish 218 first.  So this is -- that's

19   basically the area of the boot print?

20   A.  Yes.

21   Q.  And unlike a fingerprint, you can't lift this in

22   the way you would lift a fingerprint; is that right?

23   A.  Sometimes you can, but in this case it was more

24   of a scuff, so we tried to use traditional methods to

25   lift it from the door and we could not lift it.

1    Q.   So you end up taking a photograph of it?

2    A.   Correct.

3    Q.   And then if we could show 219.

4         Again, this is -- that's the boot print, right?

5    A.   Yes.

6    Q.   And this is the door handle, so it's just a

7    little bit below and to the left of the door handle?

8    A.   Yes.

9    Q.   And you understood when you went into the boiler

10   room that earlier that day the outer door to the boiler

11   room had been found unlocked?

12   A.   We unlocked it to get back there.

13   Q.   Did you hear from anybody before you started your

14   examination that when first responders arrived they

15   found that door unlocked?

16   A.   I did not know that.

17   Q.   When you were in the T-2 building, did you check

18   the windows to see if they were locked?

19   A.   I physically did not check the windows.

20   Q.   Do you know if anyone else did?

21   A.   I don't know.

22   Q.   Do you know if the windows were checked for

23   fingerprints?

24   A.   I know we collected numerous fingerprints

25   throughout the building.  I don't know that we collected

1    any from windows.

2       Q.   Do you know whether they collected fingerprints

3    from the boiler room door where that boot print was

4    located?

5       A.   I believe we tried to collect from there, yes.

6       Q.   Do you know if any lifts were made from that

7    door?

8       A.   I don't recall specifically, but we did dust for

9    fingerprints everywhere that was logical.

10      Q.   Let me ask you a couple more things.  When you

11   were at the Wells' residence and you were describing

12   taking the swords that you saw there, to your knowledge,

13   Mr. Stein had not reported his swords missing?

14      A.   Not initially, until we asked him about them.

15      Q.   When you saw them in the Wells' residence, then

16   you called Mr. Stein?

17      A.   I didn't call him, no, but our team called him,

18   yes.

19      Q.   So when you went in doing your search, you

20   weren't searching for his swords, he hadn't reported

21   those and you didn't have a warrant to go in and look

22   for those?

23      A.   No.   That's why we got the supplemental warrant

24   after the fact.

25      Q.   And you -- again, going back to those charges,

nail gun charges that you found, you didn't find a nail gun that could fire those kind of charges when you went through Mr. Wells' residence?

A.  I know several nail guns were located at some point through some of the searches that were done on the house, but I physically didn't send anything to the lab to be tested.  I don't know the outcome of that.

Q.  Do you have any familiarity with how much force those charges you found would -- how much force when those charges were fired?

A.  I don't know.  I don't understand your question.

Q.  Do you know what those kind of charges are used for?

A.  A propellant to project the nail into a substance.

Q.  Into concrete?

A.  I don't know.  Potentially.

MR. CAMIEL:  Thank you.

REDIRECT EXAMINATION

BY MS. SHERMAN:

Q.  Would you describe the Wells' home as small?

A.  I would say it was a medium to large size home.

Q.  And how many floors did it have, do you recall?

A.  It had two floors and then there was an attic area.

1    Q.  Any garages?

2    A.  Yes, it was a very large garage.

3    Q.  Would you describe it as minimalist and

4    organized?

5    A.  No.  It was extremely cluttered.  There was

6    debris everywhere, mainly in the garage and the crawl

7    space, but also in the house.

8    Q.  When you searched that home, did you consider

9    your search thorough?

10   A.  I believe it was thorough, yes.

11   Q.  Had there been a bag of soiled clothes, would you

12   have been able to locate that in that home?

13   A.  We would have definitely located those, yes.

14       MS. SHERMAN:  Those are all my questions.

15       THE COURT:  Follow-up at all?  No.

16       Thank you ma'am.  You may be excused.

17       (Witness excused)

18       THE COURT:  Your next witness?

19       MS. SHERMAN:  Can we take a quick health and

20   comfort break?

21       THE COURT:  Certainly.  Let's take about five

22   to ten minutes.  We'll go off record.

23       (Jury absent)

24       (Recessed from 3:24 p.m. to 3:37 p.m.)

25       (Jury present)

1          DEPUTY CLERK:  Court is again in session.

2          THE COURT:  Welcome back, ladies and gentlemen.

3    Please be seated, everyone.

4          And we're ready for the government's next

5    witness.

6          MS. STEVENS:  Yes, Your Honor.  As our next

7    witness we call Gary Bolden.

8          THE COURT:  All right.  Good afternoon.  If you

9    could come have a seat -- sorry, remain standing, if you

10   would, up at the witness stand and the clerk will

11   administer an oath to you.

12          (Oath administered to the witness)

13          DEPUTY CLERK:  For the record, can you please

14   state your full name and then spell your full name.

15          THE WITNESS:  My name is Gary Charles Bolden.

16   G-a-r-y, C-h-a-r-l-e-s, B-o-l-d-e-n.

17          THE COURT:  Go right ahead.

18          MS. STEVENS:  Thank you, Your Honor.

19          GARY BOLDEN, GOVERNMENT WITNESS, SWORN

20                    DIRECT EXAMINATION

21   BY MS. STEVENS:

22     Q.  Good afternoon, Mr. Bolden.

23     A.  Good afternoon.

24     Q.  Where are you from?

25     A.  I'm from Massillon, Ohio.

1    Q.  Is that the tire industry capital of the United

2    States?

3    A.  Well, it's very close to that.

4    Q.  Okay.

5    A.  It's just south of Akron, which is considered to

6    be the rubber capital of world.

7    Q.  Sounds exciting.

8        Are you, sir, currently employed?

9    A.  No, I am retired.

10   Q.  And what industry did you retire from?

11   A.  From the tire industry.

12   Q.  How long did you work within the tire industry?

13   A.  I was in the tire industry for a little over

14   46 years.

15   Q.  A long time.  How long have you been retired now?

16   A.  About five.

17   Q.  So while in the tire industry for those 46 years,

18   can you, to the extent you can, briefly, give the jury

19   just an idea of what it was that you did?

20   A.  Well, I began in the tire industry as a quality

21   control inspector.  In that capacity, I was responsible

22   for checking all of the raw materials, the processes in

23   the manufacturing process, the equipment setup, and the

24   finished product, which would be tires.  And I was -- by

25   doing that I was -- became familiar with the entire

1 manufacturing process that's used in the process of

2 making tires.

3      After that, I became -- after I got my degree, I

4 became quality control engineer on the corporate staff.

5 In that position, I drafted a quality control

6 instruction manual on x-ray that is used in the

7 manufacturing process to check the quality of tires.

8      From there, I was transferred to the Kelly

9 Springfield tire plant in Freeport, Illinois.  I was a

10 quality control inspector -- or not inspector but

11 engineer there.  I was responsible for overseeing all of

12 the inspectors' works, the reports they turned in.  I

13 also had responsibility for the testing lab that did

14 dynamic testing of sampling of the tires that were

15 produced in that plant.

16      From there, I transferred to Cumberland,

17 Maryland, the Kelly Springfield corporate headquarters.

18 I was a quality assurance engineer there.  I processed

19 reports that came in from all of the manufacturing

20 plants and processed that for upper management.

21      And then after that, I got involved in the return

22 products, standard warranty claims.  I became familiar

23 with how tires failed, what I would see -- how they

24 would come apart, and I would rule on whether they were

25 actually an adjustable or would qualify for adjustment

1  under the warranty program.

2        Then I got into forensic analysis, which was

3  really the area that I enjoyed the most.  In that, I was

4  responsible for analyzing tires that had been involved

5  in accidents where there was property damage or personal

6  injury.  My purpose was to determine what caused the

7  tires to fail.  I would report on that.  And I would

8  also provide technical counsel for our law department as

9  well.

10        And I stayed in that position for about five

11  years and then transferred to the Goodyear corporate

12  headquarters again.  And in there I worked for about a

13  year as a quality control contact engineer working with

14  original equipment customers, quality issues that they

15  had with the products that we made for them.  I would

16  act as a liaison between the customer and our

17  manufacturing facilities.

18        After that, I went back into the forensic end as

19  a product analysis engineer, and I was in that position

20  for approximately eight years, again, doing the analysis

21  of failed tires involved in personal injury or property

22  damage.

23        And then I left Goodyear.  Went to Standards

24  Testing Labs in Massillon, Ohio, which is an independent

25  test lab.  And in that capacity, I continued to work on

forensic analysis of tires, testifying in court for a variety of customers, including with tire industry, trucking companies, tire dealers, individuals, whoever had a need to have expert analysis.

And then I retired.

Q.  So the last company you worked for was Standard Testing Lab?

A.  Correct.

Q.  And how long did you work for them?

A.  16 years.

Q.  And how much of that time was doing forensic analysis?

A.  The entire time.

Q.  So by my calculation and math, was there -- you've got almost 30 years of forensic analysis under your belt?

A.  Pretty close to that, yes.

Q.  And formal education, I think you mentioned at the beginning you've got a degree.  What was that in again?

A.  My degree is in civil engineering from the University of Akron.

Q.  Do you recall how many cases you've testified in where you've discussed all of your tire knowledge?

A.  I would estimate in excess of 50 times.

1    Q.  Did those include criminal cases?

2    A.  This is the only criminal case that I've actually

3    testified in.  I've done work on other criminal cases,

4    but I did not testify in those.

5    Q.  And your knowledge and experience, in addition to

6    the forensic analysis, does it also include just

7    specialized knowledge about how a tire is made and put

8    together?

9    A.  Yes.  It's very important to know how the tire is

10   manufactured, the various components that are in it.

11   Most people just look at a tire and they just think it's

12   a big rubber donut.  If it were just rubber, it would

13   act like a balloon.  As you apply inflation, pressure,

14   it would just keep expanding and expanding and

15   eventually just pop off the wheel.  So to prevent that,

16   you have to put reinforcing materials in the tire to

17   keep it from expanding.

18        So typically, a passenger or light truck tire has

19   probably over 20 components in it.  There are two steel

20   beads, which is the anchor point for all of the other

21   components.  These beads consist of high tensile steel

22   wire that are wound around a form.  There's probably 30

23   or more strands of wire in each bead.  And that's the

24   part of the tire that actually sits on the wheel or the

25   rim and provides an airtight seal so that the tire

```
 1   doesn't lose air.
 2        Now, in addition to those beads, there are inner
 3   liners, which is a sheet of specially compounded rubber
 4   that's impervious to air --
 5      Q.  Mr. Bolden --
 6      A.  -- so air won't migrate out of the tire.
 7      Q.  Sorry to -- you're jumping ahead just a little --
 8      A.  Okay.
 9      Q.  -- which is -- we'll get there in a second.  I
10   know you're excited.
11        Real quick, though, before I ask the judge a
12   specific question, within your tire analysis, have
13   you -- in your previous experience, did you ever have an
14   opportunity to examine tires that had foreign objects
15   punctured in them?
16      A.  Yes.
17        MS. STEVENS:  Your Honor, at this stage I move
18   for the Court to recognize Mr. Bolden as having
19   specialized knowledge, training, education, and
20   experience in order to make an opinion in the area of
21   tire forensic analysis.
22        THE COURT:  Any objection?
23        MR. COLBATH:  No.
24        THE COURT:  All right.  I'll find the witness
25   so qualified.  Go ahead, please.
```

BY MS. STEVENS:

Q.  So you were just talking about the component of
the tire, which it sounds like there's quite a bit.  I
think you left off at the internal beads and bands.  So
you want to pick up there really quick?

A.  Surely.  The inner liner, which is, as I said, a
sheet of specially compounded rubber to prevent air from
passing through it.  On top of that would be the plies.
This particular tire has two plies.  And the plies
consist of cables of polyester cord.  And these -- each
cable has a number of polyester filaments that are
twisted together, and they're all oriented parallel to
each other in the same direction.  And those polyester
plies are coated with rubber on both sides.  So there
are two of those plies in this tire.

There would also be chafer material which is
applied beside the bead, and when it's -- when the tire
is finally vulcanized, it will prevent chafing of the
rubber against the steel wheel.

There's an apex component that goes on each bead,
on top of each bead, which is located on top of the bead
in the lower sidewall of the tire.  And that is to
stiffen the lower part of the tire so that it flexes
properly when it operates.

On top of that would be sidewall rubber, which is

1  a solid rubber component that goes on top of the

2  sidewall components just to protect it from the

3  elements.  Then on top --

4      Q.  Mr. Bolden --

5      A.  Yeah.

6      Q.  -- quick question for you.  How many components

7  would you say consists of generally a single tire?

8      A.  Over 20.  Typically, 20 to 25, depending on what

9  type of tire it is.

10     Q.  And did you have an opportunity to examine a tire

11 in the instant case?

12     A.  In which case?

13     Q.  In the instant case.

14     A.  Yes, I did.

15     Q.  Great.  And you kind of just pointed up a little

16 bit.  Do you see that tire here?

17     A.  I do.

18     Q.  Can you just point it out?

19     A.  It's the tire that's lying on the table there in

20 front of me.

21         MS. STEVENS:  Your Honor, I'd like the record

22 to reflect that the witness has identified Exhibit 72.

23         THE COURT:  Any disagreement there,

24 Mr. Colbath?

25         MR. COLBATH:  That's the tire.

1          THE COURT:  We all agree that's 72.  So noted.

2    BY MS. STEVENS:

3        Q.   So you were contacted to conduct analysis on this

4    tire.  Who contacted you?

5        A.   The FBI.

6        Q.   And do you recall when they contacted you?

7        A.   It was in I believe May, April or May in 2012.

8        Q.   And so they contacted you.  And eventually, did

9    you receive the tire?

10       A.   I did.

11       Q.   Do you recall the date?

12       A.   Yes.  Let me make sure I get that right.

13       Q.   So before you take a look at those documents, did

14   you draft a report in this case?

15       A.   I did.  Yes.

16       Q.   And is that what you are referring to right now?

17       A.   Well, actually, what I would refer to, I have a

18   summary sheet that's on top of my analysis, tire

19   analysis.

20       Q.   So how about we do this, before you look at the

21   notes that you brought, we have some notes here that we

22   can use to refresh your recollection.

23       A.   Okay.

24          MR. COLBATH:  Your Honor, I would ask the

25   witness not to refer to notes until he's shown them.

1          THE COURT:  Fair enough.

2          MS. STEVENS:  Your Honor, may I approach?

3          THE COURT:  Yes.  Go right ahead.

4          (Ms. Stevens approaches the witness)

5     BY MS. STEVENS:

6     Q.  Were you able to recall the date in which you

7     received it?

8     A.  Yes.  It was 6-4 of 2012.

9     Q.  And prior to receiving it, or when you received

10    it, did any law enforcement agent contact you and speak

11    to you directly?

12    A.  I really don't have a specific recollection of

13    that.

14    Q.  And before examining the tire, did you have any

15    knowledge about the facts surrounding this case?

16    A.  No, I did not.

17    Q.  And when you received the tire, what were you

18    tasked with?

19    A.  Basically to examine the tire and look for any

20    abnormalities that I would see.

21    Q.  So what was the tire packaged in when you

22    received it?

23    A.  It was in a wooden crate.

24    Q.  And what did you do when you received that wooden

25    crate?

A.  I opened the crate up, looked at it, noticed that
there was a nail in the tread.  And at that point, I
checked the air pressure in the tire, because it was
still mounted on the rim.  And the air pressure measured
20 PSI, I believe.

Q.  Can I have 161, please.

Mr. Bolden, I'm showing you what we've marked as
Government Exhibit No. 161 for foundation.  Do you
recognize this?

A.  Yes.

Q.  How is it that you recognize it?

A.  That's the tire that I received and actually
looked at for the first time on 6-22.

MS. STEVENS:  Your Honor, move for the
admission of 161.

MR. COLBATH:  Your Honor, could I ask a couple
of voir dire questions?

THE COURT:  Sure.  Go ahead.

MR. COLBATH:  Sir, this Exhibit No. 161, do you
know who took that photograph?

THE WITNESS:  I do not.

MR. COLBATH:  Is that a picture that was taken
at your facility?

THE WITNESS:  No.

MR. COLBATH:  It's a picture taken of the tire

1  before you received it?

2          THE WITNESS:  I assume so, yes.

3          MR. COLBATH:  Well, okay.  So you're not saying

4  this is one of the photographs that you took or was part

5  of your examination.  It just happens to be a picture of

6  the tire that you ultimately received.

7          THE WITNESS:  Correct.

8          MR. COLBATH:  With that understanding, Your

9  Honor, I don't have an objection to 161.

10         THE COURT:  All right.  Then 161 is admitted.

11         (Exhibit No. 161 admitted)

12         THE COURT:  Go ahead, please.

13 BY MS. STEVENS:

14   Q.  Okay.  Go ahead and publish that.  Thank you.

15       And is this -- after you removed it from the

16 crate, was the tire in a similar condition as what you

17 see here in this photograph?

18   A.  Yes, it was.

19   Q.  Can we put up -- well, don't put up, but just for

20 foundation, 203, please.

21       Do you recognize this?

22   A.  I do.

23   Q.  How do you recognize it?

24   A.  This is a photo that was taken by our staff

25 photographer.

1    Q.  And what is it a photo of?

2    A.  It's a photo of the subject tire.

3    Q.  And is it an accurate representation of the tire

4    when it was photographed by STL?

5    A.  It is.

6    Q.  Can we do 204?

7        Same questions.  Do you recognize this?

8    A.  Yes.  It's the same tire, just the opposite

9    sidewall.

10   Q.  And is it an accurate depiction of the tire on

11   the day the picture was taken by STL?

12   A.  Yes.

13   Q.  206, please, Blair.

14       Do you recognize this?

15   A.  I do.

16   Q.  How do you recognize it?

17   A.  That's also another photo that was taken at STL.

18   Q.  What was -- a photo of what?

19   A.  It's the tread area of the tire showing -- at

20   least on one edge of the photo, you can see where the

21   nail was lodged in the tire.

22   Q.  And then the last one -- and is this an accurate

23   depiction of the tire the date it was photographed?

24   A.  It is.

25   Q.  And then 208, please, Blair.  Do you recognize

1   this?

2       A.  Yes.

3       Q.  How do you recognize it?

4       A.  That is a photo of the subject tire on the

5   interior surface where the nail penetrated through the

6   inner liner.

7       Q.  Is it an accurate reflection of the nail in the

8   tire on the date it was taken?

9       A.  Yes.

10          MS. STEVENS:  Your Honor, at this stage we move

11  to admit 203, 204, 206, 207 and 208.

12          THE COURT:  Did you put up 207?  No.

13          MS. STEVENS:  Did I not put up 207?

14          THE COURT:  I don't believe so.

15  BY MS. STEVENS:

16      Q.  Could you do 207, please.

17          Do you recognize this picture?

18      A.  I do.

19      Q.  How do you recognize it?

20      A.  It's a close-up of the nail that's lodged in the

21  subject tire.

22      Q.  And is it an accurate depiction of the nail on

23  the date the picture was taken?

24      A.  Yes.

25          MS. STEVENS:  Your Honor, we move for the

admission of 203, 204, 206, 207 and 208.

THE COURT:  Mr. Colbath?

MR. COLBATH:  I have no objection to any of those.

THE COURT:  All right.  Those will all be admitted then.

(Exhibit Nos. 203, 204, 206, 207 and 208 admitted)

BY MS. STEVENS:

Q.  Before we publish any of those, you mentioned you took the tire out of the crate and you measured it, you measured its PSI.  And what did you say the PSI was when you received it?

A.  20 PSI.

Q.  And what date did you take that measurement?

A.  6-22 of '12.

Q.  Did you have an initial gut reaction when you saw the tire?

A.  Well, it appeared to be a perfectly good tire. No evidence that it had been abused in any way, other than the fact that it had a nail in the tread.

Q.  So in your experience and training, your time in this field, how would you describe to the jurors what like -- what a flat tire is?

MR. COLBATH:  Your Honor, I'm going to object

 1   as beyond -- outside the opinions previously noted.

 2        THE COURT:  All right.  Ms. Stevens, do you

 3   agree to move on?

 4        MS. STEVENS:  Yeah, I'll move on.

 5        THE COURT:  Very good.

 6   BY MS. STEVENS:

 7   Q.  So after you got it out, you did the PSI.  What

 8   did you do next?

 9   A.  It was dismounted from the rim and -- so that I

10   could examine the interior of the tire.  And that

11   examination revealed the fact that the interior of the

12   tire was pristine.  There was no evidence of the tire

13   ever having been run low or flat.

14   Q.  And did you -- you mentioned you observed

15   something lodged in the tire.  Can you describe what you

16   observed and how it looked?

17   A.  Yes.  The -- as I said, the inner liner was

18   pristine.  There was no evidence of any chafing or flex

19   cracking, which would -- you would anticipate seeing if

20   the tire had been run low or flat.

21   Q.  And in relation to the hole where the object

22   penetrated the tire, can you expand on that?

23   A.  Yes.  The material around the nail shank was

24   compressed tightly against the nail.  There was no

25   evidence of any wear or tearing in the area of the

1    puncture.

2        Q.   Was this notable to you?

3        A.   Yes.  It would indicate that the tire was not

4    used with the nail in it.

5        Q.   So after you examined it visually and took the

6    pressure, what did you do next?

7        A.   We had the tire x-rayed so we could confirm if

8    there was any damage to the interior components of the

9    tire.

10       Q.   Do you recall where on the tire the nail

11   penetrated it?

12       A.   Yes.

13       Q.   Where?

14       A.   It's located in groove number one, which would be

15   the outermost groove of the tire as it was mounted on a

16   vehicle.

17       Q.   Okay.  So let's --

18            MS. STEVENS:  Your Honor, with your permission,

19   can we have the witness approach the tire, Exhibit 72,

20   and point out to the jury essentially what he is

21   referencing?

22            THE COURT:  Sure, that's fine.  Go ahead, sir.

23            THE WITNESS:  Thank you.

24       A.   Okay.  This tire has actually four ribs or sets

25   of lugs and three grooves.  The grooves -- this is

groove number one.  It's the outboard side of the tire

as it was mounted on the vehicle as it would have been

based on how it was mounted on the rim.

So groove number one, and it's at the 3:00

position.  See, I've referenced the number three here.

Using the serial number as the 12:00 position, so it's

like a clock face.  So the serial number would be 12:00

and then 3, 6 and 9, just so we can locate different

reference points on the tire.

Q.  Okay.  Blair, can you pull up -- you can go ahead

and sit down.  Thanks.  203, please.

(Witness returns to witness stand)

BY MS. STEVENS:

Q.  Mr. Bolden, you just mentioned the serial number

with the 12:00 and the 3:00.  Can you explain this

picture to the jury, please?

A.  Yes.  It's a picture of the subject tire with the

clock positions noted on it.  You will also see between

the 9:00 and 12:00 positions, there's a small V, which

is where the valve was located as it was mounted on the

rim.  That way we could remount the tire in its original

position.

THE COURT:  Can you state the exhibit number?

I don't believe you did, Ms. Stevens.

MS. STEVENS:  203.

BY MS. STEVENS:

Q.  Right here is the 3:00 position that you just referenced with Exhibit 72; is that correct?

A.  Yes.

Q.  And so that is about the location where the nail was found?

A.  Correct.

Q.  And did you come to learn of what the maximum -- well, can you tell the jury what maximum rated inflation pressure means?

A.  Yes.  Every tire has a load-carrying capacity. And to operate at that maximum capacity, it also has to be inflated to a specific air pressure.  This particular tire is a Load Range E tire, and it requires 80 PSI to operate at its maximum carrying capacity.

Q.  So is that the pressure that it's normally inflated to?

A.  No.

Q.  What's that?

A.  The operating pressure is determined by the vehicle manufacturer, because they know what loads are anticipated to be encountered on that particular vehicle.  So on this vehicle, the rear inflation pressure was specified to be 80 PSI.  The front pressure was specified to be 55 PSI.

1    Q.  And when you say "this vehicle," do you recall

2    what kind of vehicle that was?

3    A.  Yes.  It was a Dodge Ram pickup truck.

4    Q.  And can you explain why the difference between

5    the recommended PSI for the front and the back tire?

6    A.  You mean the difference between why there's a

7    different pressure for the back versus the front?

8    Q.  Yeah, why there's a different recommendation.

9    A.  Yes.  Well, with a pickup truck, as you load the

10   tire -- or load the truck, the load is carried in the

11   rear of the vehicle.  The front does not carry as much

12   load, so there's not as much inflation pressure

13   required.  So you need the higher pressure on the back

14   to carry the additional load.

15   Q.  And so who determines that?

16   A.  The vehicle manufacturer does.  They know what

17   the balance is between the front and rear axle.

18   Q.  So after you figured out all this information,

19   what was the next step that you took with regard to

20   testing the tire?

21   A.  Well, after we had the x-ray done, we could see

22   no evidence of any structural damage to the interior

23   components.  So we remounted the tire on the wheel and

24   did a static air retention test.

25   Q.  Explain to the jury what that means.

A.   What we did was inflate it to its maximum recommended pressure of 80 PSI and just let it stand at room temperature and measured it daily for a period of I think 13 days and measured the amount of air that was lost over that timeframe.

Q.   And do you recall the amount of air that was lost?  So I notice that you are again referring to your report for the record.  So just go ahead and refresh your recollection, and then when you're done just look up, please.

A.   Yes.  It lost 7 PSI over a period of 13 days.

Q.   So for us non-tire people, how would you -- how would you describe that in layman's terms?

A.   Well, it's a very, very slow leak.  It amounted to .5 PSI per day.  Of course the tire was not loaded.  It was just resting on the floor at room temperature, and it was not loaded in any way.

Q.   So did you do anything after that?

A.   After that, we did a dynamic air retention test.

Q.   What is that?

A.   Well, with the dynamic test, we actually put the tire on a piece of equipment called a dynamometer.  And that enables us to operate the tire and it simulates actual surface conditions.  So we can regulate the speed that it runs, and we can also regulate the amount of

1    load that's on the tire.

2        Q.  And can you explain the machine to the jury, like

3    what does it look like, how does it operate, things like

4    that?

5        A.  Yes.  The dynamometer is a piece of equipment

6    that's used throughout the tire industry for just that

7    purpose, to test tires, simulating actual usage

8    conditions.  It consists of a 67-inch diameter steel

9    wheel that has a smooth steel surface on it.  And

10   typically, there are two test positions, one on either

11   side of the wheel, of the steel wheel.

12           And it can be loaded either hydraulically or

13   pneumatically or with dead weights.  And it pushes --

14   presses against that steel, large steel wheel, and then

15   the steel wheel is driven by an electric motor.  So we

16   can run it at any speed we desire to run it.

17       Q.  Let's pull up 206, please, Blair.

18           When you ran the tire on the dynamometer test,

19   what did you do with the nail, if anything?

20       A.  We didn't do anything with the nail.

21       Q.  Okay.  So the nail remained lodged in the tire?

22       A.  Yes, it did.

23       Q.  And this exhibit -- when was this photograph

24   taken, before or after the test was conducted?

25       A.  It was taken after the test.

1    Q.  And there's little -- these little things.  You

2  see those?

3    A.  Yes.

4    Q.  Can you tell the jury what those are?

5    A.  Yes.  Those are studs.  They are steel that have

6  a tungsten carbide tip, and they are used in

7  applications where you would encounter ice on the roads.

8  It provides extra traction for the tire.

9    Q.  Did the dynamometer -- did running this tire on

10  the dynamometer impact the tire in any way with the

11  studs in it?

12    A.  Well, you can see there's a -- like a

13  discoloration band on either shoulder of the tire, kind

14  of a light gray appearance.  And that's a result of the

15  residue, the wear residue of the tungsten studs as they

16  were run over the steel wheel.  Two very hard surfaces,

17  so it creates wear.

18    Q.  And I believe you've got a little pointer up

19  there.  So your description was relatively clear, but

20  just in case, can you identify those strips that you're

21  referring to with the pointer?

22    A.  Yes.  That would be the top, and that would be

23  the bottom.  And that's the discolorated area.

24    Q.  And I also notice over here there's something.

25  Can you explain what that is?

1    A.   That was the nail that was lodged in the tire

2    when we received it.

3    Q.   Based on your testimony where you raised the --

4    Exhibit 72 for the jury to see, which side of this tire

5    is the front tire that would be exposed to the road?

6    A.   Well, the tire -- the part of the tire that would

7    be outermost on the vehicle --

8    Q.   Yes --

9    A.   -- would be this side right here, which is the

10   serial side as it was mounted on the wheel.

11   Q.   And can you explain what this is again?

12   A.   That is the first groove, groove number one.

13   Q.   So how long did you run the dynamometer test for?

14   A.   It ran -- excuse me.

15        THE COURT:  There's some water there, sir, if

16   you need it.

17        THE WITNESS:  I think I do.

18        (Pause)

19        THE WITNESS:  Sorry.

20   BY MS. STEVENS:

21   Q.   Are you okay?

22   A.   Yeah, I'm fine.  Thank you.

23   Q.   So I think my question was, how long did you run

24   it for?

25   A.   24 hours.

1    Q.  And after running it for 24 hours, did you have
2  any observations?
3    A.  Yes.  Well, I should say that that 24-hour period
4  we had, we used what we call a rotary air union so that
5  we could check the air loss periodically over that
6  24-hour period without stopping the dynamometer.  But at
7  the conclusion of the test, the tire had lost 17.2 PSI.
8    Q.  And what was the speed that you ran it at?
9    A.  It was run at I believe -- yeah, 62 miles per
10  hour.
11    Q.  And how come you ran it at that speed?
12    A.  Well, there was another tire being tested on that
13  dynamometer, and the specified speed for that test was
14  62 miles an hour.  And there was an available test
15  position open, so we just put the subject tire on that
16  available position, so it ran at the same speed.
17    Q.  So that begs the question then, what impact at
18  all does a higher rate of speed have on the testing
19  results?
20    A.  Well, the higher the speed, it stresses the tire
21  more.  So it would be as the speed increases, the stress
22  goes up and you would expect to have more leakage
23  because of the additional flexing of the tire.
24    Q.  Okay.  So after running this for 24 hours, do you
25  recall what total mileage that was?

1     A.   Yes.  It was 1488 miles.

2     Q.   Okay.  And again, the overall rate of air loss

3  you said was 17.2?

4     A.   17.2 PSI, yes.

5     Q.   So again, not being a tire expert myself, is that

6  a lot for that time and distance, is it minimal, like

7  how would you describe it?

8     A.   Well, it would be considered a rather slow leak

9  over that distance for certain.  That distance is

10 equivalent to running from Anchorage to Seattle.  And to

11 lose that amount of pressure in that distance would not

12 be considered a tremendous amount of air loss.  Of

13 course you would have to maintain and add air, but it

14 was not catastrophic by any means.

15    Q.   Now, I just want to go back really quick.  You

16 mentioned some x-rays that you conducted at the

17 beginning where -- do you recall that?

18    A.   Yes.

19    Q.   Did those x-rays reveal anything?

20    A.   They revealed that there was really no structural

21 damage to the components.  The nail shank actually

22 passed between the steel cables, so the steel belts.

23 And so the only abnormality would have been the fact

24 that it had the nail in it.

25    Q.   And the puncture hole around the nail, did you

1  have an opportunity to observe the interior of that?

2     A.  Yes.

3     Q.  Can you explain that to the jury, please?

4     A.  Well, I think we saw a photo of that previously.

5     Q.  Let's pull up 208, please, Blair.

6     A.  So you can see the rubber material of the inner

7  liner is tightly compressed against the shank of the

8  nail.  And there's no tearing or rounding off of any of

9  the rubber material in that puncture.

10    Q.  So why -- when you mention no tearing or rubbing

11 off, where would that come from?

12    A.  Well, that would come from the fact that the tire

13 would be flexing as it's being used.  And over time,

14 that flexing will cause the nail to actually move or

15 wallow in its position, and it will actually eventually

16 chafe away material, rub it off and the hole enlarge,

17 and the leak will -- the leak rate will increase.

18    Q.  So are you able to form an opinion by looking at

19 this picture of this tire and nail?

20    A.  Yes.

21    Q.  What was that?

22    A.  Well, it had not done any wearing at all, and my

23 conclusion is that the tire was not used on the highway

24 with this nail in it.

25    Q.  So there's also a picture of the nail that I'd

1    like to put up for you.  And that's -- let's see.  207,

2    please.  Let's talk about this really quick.  Can you

3    explain to the jury some of your observations that you

4    made with regard to this nail.

5        A.  Yes.  The nail is an old nail.  It was a nail

6    that had been used sometime previously.  The surface,

7    the surface of the head is what I would call weathered.

8    But there are no indications of pavement striations that

9    you would expect to see if the tire were operated on

10   pavement or gravel or any type of road surface.

11        There's no rust.  There is a little bit of red

12   pigmentation that's -- you can see.  But really no

13   evidence of any highway usage on the nailhead.  The only

14   mark that I did notice was this one linear impression,

15   which is not at all consistent with any kind of road

16   abrasion.

17        Q.  What would you expect to see of a nail that had

18   been traveled on on a road or --

19        A.  Well, you would expect to see all sorts of

20   scratches as if like sandpaper was rubbed on the head of

21   the nail, and they would be kind of in random

22   directions.

23        Q.  Could we pull up 209, please, Blair, for

24   foundation.

25        Do you recognize these photos, Mr. Bolden?

1    A.  Yes.

2    Q.  And what are they of?

3    A.  These are tires that I have taken -- or photos

4  that I've taken from other tire cases from the photo

5  records that we had on file.

6    Q.  And are they accurate representations of those

7  tires and respective nails or objects on the date that

8  you took them?

9    A.  Yes.

10          MS. STEVENS:  Your Honor, we move to admit 209.

11          MR. COLBATH:  Could I ask a question, Your

12  Honor.

13          THE COURT:  Yes, go right ahead.

14          MR. COLBATH:  Sir, the tire depicted in each of

15  those two photos, it's not this tire we have here in the

16  courtroom?

17          THE WITNESS:  That's correct.

18          MR. COLBATH:  And the nails -- I can't tell if

19  that one is a nail.  But the nail in the one on the left

20  and the metal object in the one in the right, those are

21  not the nails from this case?

22          THE WITNESS:  That is correct.

23          MR. COLBATH:  Your Honor, I object as to

24  admission of 209.  If it is offered for demonstrative

25  purposes, if he has something to say about it, I

1  wouldn't object to demonstrative, but --

2          THE COURT:  So you don't object to its

3  publication?

4          MR. COLBATH:  No, that's fine.

5          THE COURT:  Any objection to that?

6          MS. STEVENS:  No, Your Honor.

7          THE COURT:  Then that's what we'll do.  209 is

8  not admitted but may be published to the jury.

9  BY MS. STEVENS:

10     Q.  Mr. Bolden, let's talk about these nails.  The

11  one on the left here, can you explain some of the

12  characteristics that are notable?

13     A.  Well, the purpose of this photo was to show that

14  the head of the nail was flush with the tread surface,

15  which would indicate that that nail was -- that puncture

16  was sustained while it was in service.

17     Q.  So can you explain that a little more?  Why is it

18  being flush with the surface important to you?

19     A.  Well, because if it's picked up on the highway,

20  the force that it takes to push that nail into the tire

21  is provided by the weight of the vehicle pressing

22  against the pavement.  And the pavement cannot extend

23  below the tread surface.  It can't get down into the

24  groove, so it can't push it any farther than the top

25  surface of the tread.

1    Q.  And then to the left here, we have -- to the

2 left -- or I'm sorry.  To the right we have another

3 picture.  Can you explain what that is?

4    A.  Yes.  That's -- it looks like possibly a wire

5 that became embedded in the tire.  And again, it is

6 flush with the top wearing surface of the tread.  And if

7 you can look closely, you can actually see the

8 striations on the tip of that wire.

9         So that would indicate the type of wear that you

10 would see if it was operated on a pavement and also the

11 fact that it is not down below the running surface of

12 the tread.

13    Q.  Is that polished or not polished?

14    A.  It is polished, yes.

15    Q.  Does that give you any basis for forming an

16 opinion?

17    A.  Yes.

18    Q.  What would that be?

19    A.  The fact that it was -- it had pavement contact,

20 so it was operating with that wire in it on the

21 pavement.

22    Q.  Okay.  We can take that down now.

23         Now, going back briefly to the static test,

24 because we had talked about -- we had talked about the

25 maximum pressure for a tire and then the recommended

1    pressure for a tire.  You mentioned that 5 PSI -- I'm

2    sorry, 7 PSI was lost over a course of about 13 days,

3    right?

4        A.   Yes, on the static test.

5        Q.   That static test, you had inflated the tire to

6    80 PSI?

7        A.   Yes.

8        Q.   Can you explain to the jury if that level of leak

9    changes as the internal inflation of the tire changes?

10       A.   Yes.  Yes.  The leakage rate is just basically

11   the gradient.  It's the difference of the amount of

12   pressure that's in a tire versus atmospheric pressure.

13   So you have -- at 80 PSI you have 80 pounds of pressure

14   higher than what's outside the tire.  So as that

15   pressure goes down, the leakage rate decreases over

16   time.  So the higher the pressure, the faster the leak

17   rate.  And as that pressure decreases, the leak rate

18   will also decrease.

19       Q.   When you did the dynamometer testing, what was

20   the temperature of the lab?

21       A.   It was 100 PSI, plus or minus five degrees.

22       Q.   You mean 100 degrees Fahrenheit?

23       A.   Yes.

24       Q.   You're trying to trick me?

25       A.   No, I'm just --

1    Q.   What, if any, importance does that have on the

2   test?

3    A.   Well, it really won't have a great effect on the

4   leak rate of the tire.  The -- more importantly what

5   counts is the actual temperature, operating temperature

6   of the tire.  So as the tire is used in service, the

7   flexing of the tire actually generates heat in the tire.

8   The tire actually warms up.

9        So as the tire warms up, the rubber compounds

10  soften.  And as it softens, it allows -- in this case,

11  it would allow a nail or a puncturing object to move

12  more in the tire as it heats up.

13       The ambient temperature really has very little

14  effect on that, other than the fact that it's, you know,

15  slightly warmer than it would be if it were freezing

16  outside.

17   Q.   And what do you mean by ambient temperature?

18   A.   The air temperature.  In other words, the air

19  temperature, the ambient temperature in here is I would

20  suspect around 70 degrees.

21   Q.   You mentioned this was a slow leak and comparable

22  of driving from Denver to Seattle.  Would the driver

23  notice it?  Explain that to the jury of if this would be

24  something noticeable.

25   A.   Well, the amount of air loss that we experienced

in these tests would not be significant enough to allow
to alert the driver that there was something wrong.  You
have to get down to about 30 percent of what the
recommended pressure of the tire is before you'll notice
a handling change in the vehicle or to even visually see
a larger bulge in the sidewall of the tire that would
alert you that the air pressure is low.

Q.  For -- I'm sorry.  I'm going to make you do some
math.  For a tire that the recommended PSI is 55, what
would be that 35 percent for that type of tire?  And it
may be in a different report that I have up here for
you.

A.  So what was your question again?

MS. STEVENS:  Can you read that back?

(Question was read back by court reporter)

A.  Oh, well, it would have to be 35 percent of 55.

Q.  Again, I'm not doing the math.

A.  Yeah.  So --

Q.  But if you need your memory to be refreshed, I
can provide you your other report to help you out.

A.  That would help.

MS. STEVENS:  Your Honor, may I approach?

THE COURT:  Yes, go right ahead.

(Ms. Stevens approaches the witness)

A.  May I use a calculator?

1    Q.  I don't think I have one.

2    A.  I think I have one.

3    Q.  Mr. Bolden, we'll move on.  I'm not going to make

4  you suffer through a math equation.

5        So let's focus on the nail.  You mentioned it was

6  on the exterior groove, groove number one.  Can you

7  explain the angle that you observed it at?

8    A.  Well, I could not determine what the precise

9  angle was with the nail in the tire.  But judging from

10  the appearance of the shank inside the tire, it appeared

11  to be perpendicular with the interior surface of the

12  tire, which is different than the exterior surface.

13    Q.  And where was the head of the nail in relation to

14  the tread?

15    A.  The nailhead was well below the wearing surface

16  of the tread.  It was pushed down into the groove.

17    Q.  Did that lead you to make an opinion?

18    A.  Yes.

19    Q.  What was that?

20    A.  That the tire was not picked up while the tire

21  was -- the nail was not picked up while it was in

22  service.

23    Q.  Blair, could you pull up 261, please.

24        Did you have an opportunity to review any other

25  reports in this case from other individuals with

1    specialized knowledge, training and experience?

2        A.   I did.

3        Q.   And do you see what's in front of you right now?

4    Do you recognize that?

5        A.   Yes.

6        Q.   And how do you recognize it?

7        A.   That was -- these are photos that were taken by

8    Bruce Curry, who was the defendant's expert.

9        Q.   And what is your understanding of these

10   photographs?

11       A.   Well, when he received --

12            MR. COLBATH:  Your Honor, I'm going to object

13   as to both foundation and speculation.

14            THE COURT:  Let's take a short sidebar.  This

15   is 261?

16            MS. STEVENS:  261.

17            (Begin bench conference)

18            MR. COLBATH:  I would also note that's the

19   third time he's used the word expert.

20            THE COURT:  But it's your expert.

21            MR. COLBATH:  Well, I'm not going to call him

22   that.

23            THE COURT:  Fair enough.  Do you tell your

24   witnesses --

25            MS. STEVENS:  I did.

1            THE COURT:  It's okay.

2            MR. COLBATH:  They are too used to it.

3            THE COURT:  That's what I would assume.

4            MR. COLBATH:  Your Honor, it's not my intent to

5    offer that exhibit with Mr. Curry.  And so again, I

6    guess that is not something that I think is otherwise

7    going to be in evidence.  It's not something that this

8    witness utilized or any demonstration of how that was

9    created.  That was not anything that this witness used.

10   And so if for demonstrative purposes they want to ask

11   him a question about it, that would be fine, but --

12           THE COURT:  You're not going to seek to admit

13   it, are you?

14           MS. STEVENS:  No, it would be for demonstrative

15   purposes.  He did rely on it in his report.

16           THE COURT:  Who?

17           MS. STEVENS:  Mr. Bolden.

18           THE COURT:  Oh, he did?

19           MS. STEVENS:  Yeah.  And actually created

20   additional demonstrative exhibits that sort of counter

21   their expert's opinion.

22           THE COURT:  So coming in as demonstrative or

23   published?

24           MR. COLBATH:  If you want to publish -- if it's

25   published just as --

```
 1          MS. STEVENS:  It doesn't have to go back.
 2          MR. COLBATH:  If it's published just as
 3   demonstrative to ask him you had seen this before, did
 4   you do your own, and then he talks about the creation of
 5   his own, that's fine.
 6          THE COURT:  All right.
 7          MS. STEVENS:  Yeah.
 8          MR. COLBATH:  He doesn't know how this one was
 9   created.
10          MS. STEVENS:  Right.  Essentially, he's going
11   to show how in his opinion he thinks that the angle from
12   the defense supports that it was not inserted normally,
13   through normal driving.
14          THE COURT:  Okay.  I think we can move forward
15   then.  You're not going to seek to admit it, and you're
16   not going to ask what the other side did with the
17   exhibit, you're just going to ask what he did with it?
18          MS. STEVENS:  Right.  How he was able to form
19   his opinion based on it.
20          THE COURT:  All right.  Very good.
21          (End bench conference)
22   BY MS. STEVENS:
23     Q.  Okay.  So are you familiar with the pictures
24   depicted in 261?
25     A.  I am.
```

 1    Q.  And did you use these photographs to do any --

 2   any sort of testing or make an opinion yourself?

 3    A.  I did form an opinion, yes.

 4        MS. STEVENS:  Okay.  So at this stage, Your

 5   Honor, we would move to publish them as a demonstrative

 6   aid.

 7        THE COURT:  All right.

 8        MS. STEVENS:  As 261, Government Exhibit

 9   No. 261, but not to be admitted.

10        THE COURT:  And I understand no objection,

11   correct?

12        MR. COLBATH:  Yeah, as a demonstrative, that's

13   fine.

14        THE COURT:  All right.  Go right ahead.  Then

15   261.

16   BY MS. STEVENS:

17    Q.  Okay.  Mr. Bolden, so the pictures that you see

18   here, when did you review those?

19    A.  Five years ago.

20    Q.  And your understanding of these pictures, what do

21   they depict?

22    A.  Well, they depict the puncture hole with a wire

23   that was inserted into the puncture hole.

24    Q.  The puncture hole of what?

25    A.  The tire.

1      Q.   Okay.  And did you make a conclusion based on the

2    angle that you can share with the jury?

3      A.   Yes.

4      Q.   Go ahead.

5      A.   The angle of the puncture hole is inconsistent

6    with the tire that is picked up in service.  You can see

7    looking from the sidewall, in other words, looking from

8    the side of the tire, the hole is actually perpendicular

9    to the surface of tread.  If you look at the tire, at

10   the tread head on, you can see there's an angle that

11   goes out to the outboard side of the sidewall of the

12   tire.

13         For a nail to be picked up on the highway, it has

14   to go in at an angle.  In other words, not

15   perpendicular, but it would be at an oblique angle.  So

16   this is actually just opposite of what you would

17   anticipate to see in terms of the angle that the nail

18   penetrates the tire.

19     Q.   And you mentioned that the angle and also the

20   location of the nail below the surface led you to an

21   opinion, correct?

22     A.   Yes.

23     Q.   And again, what was that taken together?

24     A.   Together, my conclusion was that the nail was

25   inserted manually in the tire as opposed to being picked

1  up on the highway.

2      Q.  Let's go to this -- we're going to offer this one

3  also as a demonstrative exhibit.

4          THE COURT:  All right.

5          MS. STEVENS:  Mr. Colbath --

6          THE COURT:  What's the exhibit number there?

7          MS. STEVENS:  210, please, Blair.

8  BY MS. STEVENS:

9      Q.  Do you recognize this?

10     A.  I do.

11     Q.  How so?

12     A.  Those are photos that I took of a tire puncture

13  that I sustained on my personal vehicle.

14     Q.  What did you do with it, with that tire?

15     A.  Well, I -- of course I dismounted it.  Whatever

16  punctured the tire was not retained in the tire.  So I

17  was able to take a paper clip and insert it in the

18  puncture hole.  And as you can see --

19     Q.  Well, before you do that, because it's not

20  published yet --

21     A.  Okay.

22     Q.  Are these accurate depictions of the -- of your

23  tire when you received that hole in it?

24     A.  Yes.

25          MS. STEVENS:  So Your Honor, at this stage we

move to admit just as demonstrative Exhibit No. 210.

       THE COURT:  Can be published.  That's fine.

BY MS. STEVENS:

   Q.  You were going to explain it, so go ahead.

   A.  So as you can see, looking head on at the tread, as if the tire was actually rolling towards you, the puncture hole is vertical to the tread surface.  But as you look from the side of the tire, you can see the nail went in at an oblique angle to the tread surface.  This is just exactly opposite to the hole orientation that we have in the subject tire.

   Q.  Can you pull up 261 and do a side by side.

   So this picture here, that view, that angle of it is similar to which of the two photos on the right-hand side?

   A.  This photo.

   Q.  Okay.  And so for the subject tire, it's at an angle, and for your tire it's perpendicular?

       MR. COLBATH:  Your Honor, I'm going to object as to leading.

       THE COURT:  That's sustained.

BY MS. STEVENS:

   Q.  Can you explain the difference?

   A.  Well, the difference is that the nail puncture or the puncture that I sustained in my tire demonstrates

1  that the nail went in at an oblique angle to the tread

2  as viewed from the sidewall.  That's the only way that a

3  nail can go into a tire if it's picked up on the

4  highway.

5      Q.  We can take those down.

6          So overall, after you examined the tire, you

7  conducted the test, you looked at the nail, what was

8  your ultimate conclusion?

9      A.  Well, first, that the tire had not been operated

10 underinflated or flat.  The nail in the tire was located

11 below the tread surface and at an orientation angle that

12 is inconsistent with being picked up on the highway, but

13 is consistent with a manual insertion into the tire.

14 And that the condition of the tire was such that there

15 was no damage to it.  And in fact, the tire as it sits

16 today would be serviceable if you repaired the puncture

17 hole.

18     Q.  And just really quick, what about the head of the

19 nail, did you make a conclusion about the nailhead?

20     A.  Yes.  Aside from the fact it was below the

21 surface of the tread, that's what enabled the tire -- or

22 that's why there was no abrasion on the head of the

23 nail, which would indicate that it was never in service.

24     Q.  Great.  Just one second.

25          THE COURT:  Sure.

```
1              (Pause)
2         MS. STEVENS:  No more questions, Your Honor.
3         THE COURT:  All right.  Thank you.  Is it
4    better to start tomorrow?
5         MR. COLBATH:  Probably, Your Honor.  It's
6    quarter to 5:00, and I have pictures to look at and some
7    questions for Mr. Bolden that I'm sure will take us more
8    than 15 minutes.  It doesn't make much sense to start if
9    that's okay.
10        THE COURT:  8:45, Counsel, is that a good time
11   for the jury tomorrow?
12        MR. COLBATH:  Yeah, I think that is from us,
13   8:45.
14        THE COURT:  Mr. Skrocki, 8:45?
15        MR. SKROCKI:  Certainly.
16        THE COURT:  Ladies and gentlemen, then I'm
17   going to excuse you for the evening.  Please leave your
18   notepads here.  Remember my admonition not to discuss
19   the case with family or friends or do any research, and
20   we'll see you tomorrow morning at 8:45.  Have a pleasant
21   evening.
22             (Jury absent)
23        THE COURT:  Please be seated, everyone.
24   Mr. Bolden, you don't need to be seated.  You can be
25   excused.  We'll see you tomorrow morning at 8:45.
```

1          Mr. Skrocki, anything to take up?  What's the

2    plan for tomorrow?

3          MR. SKROCKI:  Ms. Sherman has that.

4          MS. SHERMAN:  I think we will get to some crime

5    scene photos tomorrow with Special Agent Espeland.  As

6    for experts tomorrow will be Shem, Brett Mills, and then

7    my hope was we could conclude, if we are done with

8    witnesses, conclude early enough to do a *Daubert* hearing

9    if the Court would find necessary on Mr. Vorder Bruegge

10   so he could testify Wednesday morning.

11         And I think if we get through the witnesses we

12   have on tomorrow, we would rest Wednesday after putting

13   Mr. Vorder Bruegge and then the medical examiner and our

14   case agent on.

15         THE COURT:  All right.  Very good.  Thank you

16   for the heads-up.  That's helpful.

17         Mr. Colbath, would you intend to do a *Daubert*

18   inquiry?

19         MR. COLBATH:  If I would, Your Honor, I would

20   think it would be somewhat brief.  I'll look at my notes

21   tonight, but I think it would be somewhat brief.

22   Something that we could do in 30 minutes or less for

23   sure.

24         THE COURT:  There were slides.  There were a

25   few slides you identified.

1          MR. COLBATH:  Correct.  It's Government

2     Exhibit, I believe, 219 is Mr. Vorder Bruegge's, I'm

3     pretty sure if memory serves.  So we would certainly I

4     would think in under 30 minutes with him here be able to

5     cover any *Daubert* questions I had as well as the Court

6     could address 219 and we could get that resolved.  I

7     think that would be pretty feasible.

8          THE COURT:  If we plan to conclude no later

9     than 4:15 and take them up at that time tomorrow.

10          MS. SHERMAN:  That should work.  It might be

11     that we -- well, unlikely based on how we have done

12     lately, but possible we would run out of witnesses

13     sooner than that.

14          Dr. Frank can't travel until tomorrow night.

15     We may conclude a little before that.  We have two

16     experts to put on tomorrow, so I'm not sure of the time.

17     We do have longer witnesses, but shorter ones as well.

18          THE COURT:  Nothing else from the government

19     this evening?

20          MR. SKROCKI:  No, Your Honor.

21          THE COURT:  Mr. Colbath?

22          MR. COLBATH:  No, I don't think we have

23     anything, Your Honor.

24          THE COURT:  Maybe I should have told the jury

25     8:30.  We'll see you all at 8:30 and go back with the

1 jury at 8:45. We'll see you tomorrow and go off record.

2 DEPUTY CLERK: This court stands in recess

3 until 8:30 a.m.

4 (Recessed at 4:50 p.m.)

5

6 CERTIFICATE

7 I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
8 District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
9 original stenographic record in the above-entitled
matter and that the transcript page format is in
10 conformance with the regulations of the Judicial
Conference of the United States.
11

Dated this 1st day of June, 2020.
12

13
                              /s/ Sonja L. Reeves
14                            SONJA L. REEVES, RMR-CRR
                              FEDERAL OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25