UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
Plaintiff, )
vs. ) CASE NO. 3:13-cr-00008-SLG
JAMES MICHAEL WELLS, )
Defendant. )

TRANSCRIPT OF TRIAL BY JURY - DAY 12

**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**

September 24, 2019; 8:32 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**

Office of the United States Attorney
BY: STEVEN SKROCKI
BY: CHRISTINA M. SHERMAN
BY: KELLEY L. STEVENS
222 West 7th Avenue, #9
Anchorage, Alaska 99513
(907) 271-5071

**FOR THE DEFENDANT:**

Office of the Federal Public Defender
BY: GARY GEORGE COLBATH
601 West 5th Avenue, Suite 800
Anchorage, Alaska 99501
(907) 646-3400

Camiel & Chaney, P.S.
BY: PETER A. CAMIEL
520 Pike Street, Suite 2500
Seattle, Washington 98101
(206) 624-1551

---

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513

Transcript Produced from the Stenographic Record

# I N D E X

September 24, 2019, Trial Day 12

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gary Bolden | -- | 8 | 19 | -- |
| James Schilbach | 22 | 28 | -- | -- |
| Derek Espeland | 31 | 62 | 90 | -- |
| Robert Shem | 91 | 102 | -- | -- |
| Brett Mills | 108 | 140 | -- | -- |
| Judy Pletnikoff | 145 | 155 | -- | -- |
| Donald Kiele | 162 | 176 | -- | -- |
| Theresa Kiele | 180 | 187 | -- | -- |
| Richard Vorder Bruegge | 193 | 218 | 240 | 241 |

# E X H I B I T I N D E X

| Exhibit | | Page |
|---|---|---|
| 106 | Diagram of Rigger Shop with Placards | 36 |
| 107 | Belisle on Ground in Office | 38 |
| 108 | Office Showing Floor where Belisle was Found | 38 |
| 109 | Office with Bullet Hole in Floor | 38 |
| 110 | Bullet Under Floor in Office | 38 |
| 111 | Bullet Pulled Out from Floorboard | 38 |
| 112 | Bullet Strike in Floorboard | 38 |

| | | |
|---|---|---|
| 113 | Bullet Fragment in Floorboard | 38 |
| 114 | Hopkins on Ground in Break Room | 38 |
| 115 | Hopkins with Blouse Nearby | 38 |
| 116 | Break Room | 38 |
| 117 | Break Room Facing Boiler Room Door | 38 |
| 119 | Wide View of Placard 7 | 38 |
| 120 | Placard 7, Bullet Fragment | 38 |
| 121 | Placard 8, Blue Blouse | 38 |
| 122 | Placard 9, Bullet Fragment | 38 |
| 123 | Placard 13, Bullet Fragment | 38 |
| 124 | Broken Bowl on Top of Break Room Fridge | 38 |
| 125 | Bullet Strike Near Window | 38 |
| 129 | Inside Office Facing Door | 38 |
| 130 | Wells' Desk | 38 |
| 131 | Wells' Desk Showing Letter of Caution | 38 |
| 132 | Letter of Caution from Wells' Desk | 49 |
| 133 | Aerial View of Wells' House | 56 |
| 134 | Aerial View of Wells' House and Street | 56 |
| 135 | Wells' House Showing Garage and Driveway | 56 |
| 136 | Exterior Front of Wells' House | 56 |
| 137 | Exterior Back of Wells' House | 56 |

| | | |
|---|---|---|
| 138 | Wells' House Showing Stairs and Garage | 56 |
| 139 | Wells' Garage Exterior | 56 |
| 140 | Wells' Garage Interior Near Truck | 56 |
| 141 | Wells' House with Garage Door Closed | 56 |
| 146 | Reloading Equipment from Wells' House | 56 |
| 148 | .44 Caliber Ammo found in Wells' House | 56 |
| 149 | Close-Up of .44 Caliber Ammo from Wells' House | 56 |
| 150 | .44 Caliber Rounds in Camo Bag | 61 |
| 157 | Wells' White Truck - Side View | 51 |
| 158 | Wells' White Truck - Back View | 51 |
| 160 | Wells' Truck Front Passenger Tire | 51 |
| 162 | Wells' Blue CR-V Back Driver's Side Corner | 54 |
| 163 | Wells' Blue CR-V Back View | 54 |
| 164 | Wells' Blue CR-V from Front Driver's Door | 54 |
| 165 | Interior of CR-V from Passenger's Side | 54 |
| 166 | Interior of CR-V from Driver's Side | 54 |
| 167 | Contents of Blue CR-V | 54 |
| 211 | Nail in Tire at Angle with Tread | 126 |

| | | |
|---|---|---|
| 212 | Nail in Tire at Angle with Scale | 126 |
| 213 | Close-Up of Nail in Tire with Scale | 126 |
| 214 | View of Nail from Inside of Tire | 126 |
| 215 | Nail Removed from Tire | 125 |
| 232 | Zoomed View of Tire Under Wells' Vehicle | 51 |
| 233 | Zoomed View of Tire Under Wells' Vehicle | 51 |
| 242 | Bullet from Microwave 1B9 | 43 |
| 243 | Bullet Fragment 1B13 | 42 |
| 244 | Solid Bullet 1B37 | 46 |
| 245 | Bullet Fragment 1B38 | 47 |
| 265 | Photo | 119 |
| 266 | Photo of Firearms | 99 |
| DE-43 | Hopkins Crime Scene Photo | 69 |
| DE-190 | Photo | 77 |
| DE-191 | Photo | 77 |
| DE-193 | Photo Holster | 89 |
| DE-194 | Photo Firearm | 88 |
| DE-275 | Photo | 86 |
| DE-276 | Photo | 86 |
| DE-277 | Photo | 86 |
| DE-278 | Photo | 86 |
| DE-279 | Photo | 86 |
| DE-280 | Photo | 86 |

| | | |
|---|---|---|
| DE-281 | Photo | 86 |
| DE-282 | Photo | 82 |
| DE-283 | Photo | 82 |
| DE-284 | Photo | 82 |
| DE-285 | Photo | 82 |
| DE-286 | Photo | 82 |
| DE-287 | Photo | 82 |
| DE-288 | Photo | 82 |
| DE-289 | Photo | 82 |
| DE-290 | Photo | 75 |
| DE-291 | Photo | 76 |
| DE-292 | Photo | 78 |
| DE-293 | Photo | 78 |
| DE-294 | Photo | 79 |
| DE-296 | Photo | 79 |

(Call to Order of the Court at 8:32 a.m.)

(Jury absent)

DEPUTY CLERK: All rise. Her Honor, the Court, the United States District Court for the District of Alaska is now in session, the Honorable Sharon L. Gleason presiding.

Please be seated.

THE COURT: Good morning. We are back on record -- please be seated -- back on record in *United States versus Wells*.

And what's the update, Mr. Skrocki?

MR. SKROCKI: Nothing from us, Your Honor. And good morning.

THE COURT: Except good morning, that's all good.

MR. COLBATH: The same.

THE COURT: Gosh, we should have started with the jury at 8:30, but time for a little more coffee. That's good too.

We'll be back when the jury is here. We'll go off record.

DEPUTY CLERK: All rise. Court stands in recess.

(Recessed from 8:33 a.m. to 8:44 a.m.)

(Jury present)

DEPUTY CLERK: Court is again in session.

THE COURT: All right. Good morning, ladies and gentlemen. Please be seated, everyone. And we're back on record here.

Mr. Colbath, are you ready to proceed, or do you need a moment?

MR. COLBATH: No, I think I'm ready, Your Honor.

THE COURT: Sir, I'll remind you you're still under oath from yesterday's proceedings. Whenever you're ready.

MR. COLBATH: Okay. Thank you.

GARY BOLDEN, GOVERNMENT WITNESS, PREVIOUSLY SWORN

CROSS EXAMINATION

BY MR. COLBATH:

Q. Good morning, sir.

A. Good morning.

Q. The tire that you had to review, the tire here that we have, I can't recall the exhibit number, but the one that you were sent from the FBI, that arrived with you on June 4th of 2012, I think you told us yesterday?

A. Yes.

Q. And it came packaged in a crate, some sort of box-type structure?

A. Correct.

Q. And it still had -- it didn't look like it looks here today. It was on the rim?

A. That's correct.

Q. And you don't know, first of all, sir, what condition it was in when it was taken into the FBI's custody, you didn't receive any pictures or any information about the tire prior to it coming to you, did you?

A. I did not.

Q. All right. And you didn't take any photos of it still in the crate or as you observed it, just as you opened the lid?

A. No, I did not.

Q. And didn't remove it while still on the rim and take close-ups of the nail or document it before taking it off the rim, as I understand it?

A. That's correct.

Q. And you did an initial test and found in sort of your initial observations and conclusions that the tire was at 20 PSI when you received it. It had 20 pounds of air pressure in it?

A. Yes.

Q. But you don't know how long it had been at 20 PSI or the circumstances under which it got to there, that state of inflation, right?

A. Correct.

Q. So -- and you understood that the tire was taken around April 12th or had last potentially been driven on on April 12th of 2012, that same year?

A. I was not aware of that.

Q. Okay. So you didn't know how long it had been since the tire had been driven on or what air pressure it might have last had when it was actually on a vehicle?

A. Correct.

Q. Now, you talked a little bit yesterday about handling characteristics and what the tire should have been. On a pickup truck, where this tire came from, on the front of a pickup truck, it would have normally been operated at 55 PSI?

A. That would be the recommended pressure, yes.

Q. And somewhere between 55 and well before we got to 20, a driver -- if the tire was going low, a driver would know that or potentially sense that in the vehicle long before it got to 20 PSI, right?

A. I don't know how long before. It would have to get pretty low for him to notice that.

Q. Well, I noticed in your report, one of your conclusions was there would have been a significant deterioration of the vehicle's handling characteristics

before reaching 20 PSI?

A. That is correct.

Q. That was one of your conclusions?

A. Yes.

Q. You can't put -- you can't say, well, when it goes from 55 to 40, then you start noticing it, or 42 or 38 -- somewhere in the range between 55 and 20, you would have expected something to be noticed?

A. Yes.

Q. Certainly some of that would have been probably also related to potentially the type of road you're driving on as well as the driver's familiarity with the vehicle, I suppose?

A. I don't know that the roadway would have anything to do with it. It's essentially the fact that the rolling resistance of the tire will increase as it loses air pressure.

Q. Okay. I want to look at -- could we pull up Exhibit No. 2 -- Government's 207.

Now, sir, this is a photo of the nail, correct?

A. Yes.

Q. As you saw it. And I notice a couple of things here. There appears to be like a crack right there, and I'm going to move that line. You see that line there?

A. I do.

Q. Okay. I'm going to get that back out of the way because I drew over it. That was in the tire obviously as you observed it here, because this is a photo of the nail in place, you haven't done anything to it, right?

A. Correct.

Q. And you see some of this red discoloration? Do you perceive that or did you perceive that as rust on the head of the nail?

A. No.

Q. Okay. You agree that this was an, obvious to you, old, weathered-looking nail?

A. Correct.

Q. In other words, the nail was not a brand-new nail that had been -- punctured this tire and not been out in the weather in -- sometime in its lifetime, I guess?

A. It was not a new nail.

Q. It was bent, had a certain degree bend to it?

A. Once I dismounted it and looked at the interior, I could determine that, yes.

Q. And it had this long mark across, just had kind of a long line across it there. That was -- also had the same weathering in it. Didn't appear to be any kind of new mark to you that you could see?

A. Well, I would say it was certainly newer than the rest of the flat surface of the nail.

Q. Okay. And I noticed that right here along the lug, it looks like the head of the nail, although now it's not in contact with that, you can see the line that it cut into the rubber there. If you look at it close you can see that line, correct?

A. I'm not sure I can see much in this photograph.

Q. Okay. Well, on your visual inspection, did you notice where the nail had actually went down into the lug?

A. I believe so, yes.

Q. All right. And then additionally, I noticed -- it's hard to see of course because the nail is in place as we see it in this picture, but as the tire lays here on the table the nail is not in it, right?

A. Yes.

Q. And the hole where that's in, there's actually a divot. It's actually got a hole, and then around the hole, it almost looks like where the nailhead at one time -- was all --

MS. STEVENS: Your Honor, Mr. Colbath is testifying.

THE COURT: Let's -- why don't you rephrase. I'll sustain that.

MR. COLBATH: Sure. I'll rephrase.

THE COURT: Thank you.

BY MR. COLBATH:

Q.  Did you see, sir, upon your inspection of the tire that where the nail hole is, there's actually a divot around it where it appears that maybe the nailhead or some larger portion of the nail other than the shank left an impression in the tire?

A.  Well, I did not see the tire with the nail removed, so I can't answer that.

Q.  Okay.  While we're talking about this nail, one of your conclusions you made about it was that it was your impression from the things you discussed yesterday that the nail was manually inserted.  That means somebody stuck it in the tire as opposed to it somehow got in there while the tire was rolling around on the roadway?

A.  Correct.

Q.  And how would -- how do you believe that that happened, the manual insertion?

A.  I have no way of knowing what method was used. You could do it with a hammer, but I doubt that a hammer would have been used.  I suspect it was probably a power tool of some sort, either a pneumatic nail gun or a powder-charged gun.

Q.  So a hammer, you could take a vice grip or a set of pliers and just hammer it in there?

A. Correct. And there would be definite markings on the nailhead if that were the case.

Q. Sure. You would expect those same markings with a pneumatic nail gun or a charged nail gun though as well, right?

A. They would not resemble a hammer mark at all.

Q. Right. Those two would be different kind of marks, but each would leave their -- each would leave their respective kind of marks. Do you agree with that?

A. There would be a tool mark, yes.

Q. Those would really be the pliers and hammer or a power tool, really the two ways you could think of that that would happen?

A. Yes.

Q. And then one of the things, sir, let me just find -- one of the observations I think you made after you had the -- again, sticking with the nail. After you had the rim off and you were able to look inside and inspect the inside, one of the things you noticed was the area right around where the nail went through appeared to be a little concave.

And that is the inner liner of the tire adjacent to the nail indicated that it looked like it had actually pulled out some or been repositioned. Do you recall making that observation?

A. No, I don't.

Q. Okay. You didn't say -- well, do you remember both e-mailing and talking on the phone with the case agent, Daryl Allison, the man who sent you the tire?

A. I don't have a specific recollection of that, no.

Q. Okay. Do you remember telling him the curvature of the inner liner of the tire adjacent to the nail indicated the nail had been pulled outward and repositioned?

MS. STEVENS: Your Honor, I'm sorry.

THE COURT: That's sustained.

MS. STEVENS: So if he wants to --

MR. COLBATH: I'm asking if he said that.

THE COURT: You can refresh his recollection, but I would sustain the objection to reading in something without giving the witness and the opposing counsel an opportunity to look at it.

MR. COLBATH: Sure.

THE COURT: Thank you.

MR. COLBATH: It's Bates -- I only have one copy. 43751.

Can I approach, Your Honor?

THE COURT: Certainly.

(Mr. Colbath approaches the witness)

BY MR. COLBATH:

Q. Sir, I'll let you look at that there.

MS. STEVENS: Your Honor, can we just have a minute to read it?

THE COURT: Certainly.

(Pause)

A. Okay.

Q. Hold on a minute.

So, sir, my question is: Does that refresh your recollection at all about a conversation you might have had with Mr. Allison, the gentleman who sent you the tire?

A. Well, I really don't recall that conversation, but I wouldn't dispute the fact if you have a record of it.

Q. Sure. All right. And certainly once the nail is in there, you could -- a person could -- it could be -- well, you could pull a nail out of a tire, right? You've probably done that personally many times?

A. You can.

Q. And how would you go about that?

A. Well, you would have to use -- depending on what the condition of the nail was and how it was situated in the tire, you may have to use pliers or something of that nature.

Q. And once the hole is there, obviously, like we

saw yesterday, you showed you were able to put a wire
back through there or put things -- once the hole is
made, you could position things to determine angles or
rearrange things for demonstration.  So that's possible
once the hole is there, I guess?

A.  Well, I didn't do that, but that is possible.

Q.  You didn't reposition this nail at all, you left
the nail as you found it when it arrived for you
throughout your work on the tire?

A.  That is true.

Q.  Your tests were done -- the machine that you ran
it on that left those little silver marks that wore the
studs on the edge, the nail was in the tire while you
were running it on the machine, correct?

A.  On the dynamometer, yes.  That's true.

Q.  And even though it went the 1400 or 1500 miles on
your machine that it ran, it doesn't appear -- as I look
at it, it doesn't appear that it wore out the inside of
the tire or left chafing, the things you described,
around the nail hole that is there, correct?

A.  Well, I haven't examined the tire since the nail
has been removed, so I can't really say.

Q.  And your conclusion that -- part of the basis of
your conclusion that the nail was not picked up on the
roadway is based on the positioning and angle of the

hole that you found or the orientation of the nail, I
guess would be a better way to say it?

A.  Yes.

Q.  Of course you don't know the driving
circumstances or the conditions under which the nail was
first -- or the hole was first discovered in the tire at
all?  You never saw the tire on Kodiak Island or on the
roadway or on the vehicle, any of those circumstances?

A.  I did not.

Q.  All right.  Then that's all I have for you, sir.

        THE COURT:  Ms. Stevens, any redirect?

        MS. STEVENS:  Just a few, Your Honor.

        THE COURT:  Sure.  Go right ahead.

                    REDIRECT EXAMINATION
BY MS. STEVENS:

Q.  So Mr. Colbath pulled up a photo of the nail.  Do
you recall that, Government's Exhibit No. 207?

A.  Yes.

Q.  We'll pull it up for you.

        MR. COLBATH:  Do you want it again?

        MS. STEVENS:  Yeah, if you don't mind.
BY MS. STEVENS:

Q.  He asked you about that discoloration?

A.  Yes.

Q.  The red color there?

A. Yes.

Q. What does that look like to you?

A. It looks like a red pigment, possibly residue left over from paint.

Q. And how long ago did you conduct the testing in this case?

A. Approximately seven years ago.

Q. And given your 46 years of experience, what's your opinion about the nailhead that we spent some time just now talking about?

A. Well, my conclusion would be that this tire or this nail was never in the tire while the tire was operating on the road.

Q. And how confident are you about that?

A. 100 percent.

Q. Mr. Colbath also pointed your attention to the angle of the nail. What's your opinion about that?

A. Well, the angle of the nail is totally inconsistent with being picked up naturally, but is consistent with a manual insertion.

Q. Mr. Colbath also focused your attention on the puncture hole. You were able to observe it while the nail was still in the tire. Based on that observation, what was your opinion regarding the puncture hole?

A. Well, the nail was situated below the surface of

the tread, which is inconsistent with being picked up
naturally on the road.  And there were actually no
indications on the nailhead of any pavement or roadway
contact.

Q.  And lastly, Mr. Colbath made mention of
conditions in Kodiak, road conditions and other things,
speeds, stuff like that.  Do those conditions change
your opinion in any way?

A.  No, they do not.

Q.  And ultimately, what was that opinion?

A.  Well, the tire was never operated in an
underinflated or flat condition.  There was no damage
noted on the interior of the tire.  The inner liner was
actually pristine as it came from the factory.  The only
problem with this was that there was a nail that had
penetrated the tire.

Q.  I have no more questions.  Thank you.

            THE COURT:  Any follow-up at all, Mr. Colbath?

            MR. COLBATH:  No.

            THE COURT:  Thank you, sir.  You may be
excused.

            (Witness excused)

            THE COURT:  And the government's next witness?

            MS. SHERMAN:  We have one, Your Honor.  Just
let me see who it is.

THE COURT: All right.

MS. SHERMAN: We are going to call James Schilbach next.

(Pause)

MS. SHERMAN: He's stuck in security.

THE COURT: Why don't we take a few minutes, as soon as he's available. We'll take about five or ten minutes here. We'll go off record.

(Recessed from 9:07 a.m. to 9:08 a.m.)

MS. SHERMAN: He's here.

THE COURT: Please be seated, everyone. We're back on record. And your next witness?

MS. SHERMAN: James Schilbach.

THE COURT: Good morning. If you can come up to the witness stand, please. Remain standing and the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: James Richard Schilbach, S-c-h-i-l-b-a-c-h.

JAMES SCHILBACH, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SHERMAN:

Q. Mr. Schilbach, do you work?

A. I'm retired now.

Q. Okay. What were you doing for work before you retired?

A. I worked for Kodiak Support Services on the Coast Guard base.

Q. What did you do at Kodiak Support Services?

A. I was a maintenance guy.

Q. Where was your physical work location?

A. Building 19 on the base.

Q. On the main base?

A. Yep.

Q. How often would you travel up Anton Larsen Road?

A. At least once or twice a week.

Q. And what would be your purpose for going up Anton Larsen Road?

A. The golf course was up there. I would go and check it out, and I would look for bears occasionally.

Q. I'm going to talk about one day in particular, April 12, 2012. Do you recall that day?

A. Yes, I do.

Q. Where were you going that morning?

A. The golf course.

Q. And do you remember if the golf course was open that day?

A. It was not. At that time, it was early in the

morning.

Q.   So why would you go out to the golf course that early in the morning?

A.   Check for snow.

Q.   Were you hoping it was going to open?

A.   Yes.

Q.   How often would you golf out there?

A.   Every day.

Q.   So what time did you have to be at work?

A.   7:45.

Q.   So do you recall about what time you were heading out to the golf course?

A.   7:00.

Q.   What vehicle did you own back then?

A.   I had an extended cab Toyota, 1998 Toyota pickup, white with a cap.

Q.   Had you reviewed some video previously and saw your vehicle on that video?

A.   Yes.

Q.   All right.  Let's look at Exhibit No. 105.

        After watching that video, did you make some notations on this chart indicating you recognized your vehicle?

A.   Yes.

Q.   It's a little blurry.

A. Yes.

Q. Why don't we zoom in to -- there we go. Thank you, Blair.

Do you recognize your initials?

A. Yes.

Q. All right. And can you read what time that was that you identified your vehicle?

A. 7:09. Is that the time I'm reading there? It's blurry.

Q. It's still a little blurry for you? I don't know if we can blow it up a little more for you.

A. Yes.

Q. Does that help?

A. Yep, 7:09.

Q. And then did you identify your vehicle again on that road?

A. Yes.

Q. Looking all over the place. Exit out of there. Hold on a second.

Okay. So then let's go up to here. I think I made a mistake, but we'll correct that here in a moment.

Okay. So do you recognize -- can we go over to the initials? Do the full line, please.

You said you were heading there about 7:00. Do you recognize your initials here?

A. Yes.

Q. And what time does that say?

A. 7:02.

Q. And would that be when you were driving out --

A. Yes.

Q. -- to the golf course?

And then can we go to the next line, the 7:09. Was that the time you were actually coming back?

A. Yes.

Q. Okay. We can put that down.

Had you done work on the COMMSTA before, at the COMMSTA?

A. Yes.

Q. Okay. What sort of work would you do at the COMMSTA?

A. Maintenance work, door closers, windows, whatever it takes. Whatever was broke, I would fix.

Q. Would you do that work during the regular business hours?

A. Yes.

Q. How would you get into the building?

A. You have to go to the steam plant and sign a key out.

Q. Okay. Did you ever have access to that building when it was locked up?

A. Yes, I was on the roof a couple times doing samples. Didn't need a key.

Q. Did you go to that building on April 12, 2012?

A. No.

Q. Did you know Rich Belisle or Jim Hopkins?

A. No, never introduced.

Q. After you drove by that morning, at some point were you contacted by some investigators?

A. That morning?

Q. After you had driven out to the golf course, sometime later, were you interviewed?

A. Not that day, no.

Q. Were you interviewed another day?

A. The next day.

Q. Okay. And were you in your truck at that point?

A. No.

Q. Tell us how that interaction occurred.

A. I was in the break room. It was early in the morning. And they came in and got me, took me outside and asked me if that was my truck.

MS. SHERMAN: Okay. That's all the questions I have.

THE COURT: Mr. Colbath, go ahead please.

MR. COLBATH: Thank you.

CROSS EXAMINATION

BY MR. COLBATH:

Q.  Good morning, sir.

A.  Good morning.

Q.  Say the name again of who you work for.

A.  Kodiak Support Services.

Q.  Support services.  I couldn't write as fast as you were saying it.

And how regular was your work out at the COMMSTA?

A.  No regularity, just once every six months, could be once a week.

Q.  But it sounds like you were down Anton Larsen Bay Road at least a couple of times a week, so that's probably mostly non-work related?

A.  All of it's non-work related.  I have a company truck.

Q.  So when we see in your white Toyota Tundra, it's not work related?

A.  Absolutely.

Q.  There was bears in the area, so some looking for bears or bear viewing?

A.  Yeah.

Q.  Fish out there at all?

A.  Running up the river.

Q.  And then primarily for you golfing when the season was ripe?

A. Absolutely.

Q. All right. And would you say there was a regular group of folks like yourself that you saw out there either bear -- people looking for bears, people regularly golfing?

A. Not so much.

Q. Okay. And did you happen to be on the work crew -- were you out at T-2 working on the boiler on 4-11 --

A. No.

Q. -- with Kodiak Support Services?

A. No. Different departments.

Q. I'm sorry?

A. Different departments.

Q. Boiler repair was not one of the areas that you worked in?

A. No.

Q. When you went out to the golf course that morning, you were just driving the road normal, weren't in a particular hurry, weren't going particularly fast or particularly slow, just trying to get there to check the snow levels?

A. Yes.

Q. And when you got there, do I recall right that the pavement on that road ends or the condition of the road sort of switches right there just past the golf

course parking lot?

A. Yeah.

Q. And you didn't go any further than the golf course, just check the snow areas and what was going on and then right back towards town?

A. Yes.

Q. And did you have anybody with you that morning?

A. No.

Q. When the police came the next day and visited with you about your trip out there, did they look at your truck?

A. I think so. I was inside.

Q. I mean -- no, I'm talking about not did they look at your truck on the video, but did they look at your truck when they came to talk to you?

A. Yes.

Q. And you basically gave them the same information you have given us here today about what you were doing out there?

A. Yes.

Q. And other than driving to the golf course to check snow levels and driving back, you didn't make any particular observations about anything that might have been going on at the COMMSTA or traffic on the roadway that morning, anything like that?

A. No.

MR. COLBATH: That's all I have, Your Honor. Thank you, sir.

THE COURT: Any redirect?

MS. SHERMAN: No, Your Honor.

THE COURT: Thank you, sir. You may be excused.

(Witness excused)

THE COURT: Your next witness?

MS. SHERMAN: Derek Espeland.

THE COURT: Good morning. If you could come up to the witness stand, please, and remain standing and our clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: My name is Derek Espeland. My first name is D-e-r-e-k. My last name is spelled E-s-p-e-l-a-n-d.

DEREK ESPELAND, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SHERMAN:

Q. Where do you work?

A. I'm currently employed with the Federal Bureau of Investigations.

Q. And is that here in Anchorage?

A. Yes. I have been here for 20 years.

Q. What's your title?

A. I'm a special agent.

Q. As a special agent, describe for the jury your responsibilities.

A. My responsibilities are to investigate crimes. I have experience in investigating domestic terrorism, international terrorism, some homicides, violent crimes, bank robberies, things of that nature.

Q. What is ERT?

A. The evidence response team.

Q. Are you a part of that team?

A. Yes, I am.

Q. How long have you been with ERT?

A. It's been over 15 years.

Q. Ever been the lead on ERT?

A. I have been the lead on some searches, yes.

Q. Can you describe for the jury the different types of things members of an ERT team do when you're out on a search?

A. Yes. The first job is -- well, the main job is the team leader is the person who kind of runs the entire search, organizes who is going to do what. There is always a photographer. There is also a person who

does the sketch of the crime scene.  There is an
evidence custodian.  And of course there are a number of
different searchers who conduct the search warrant that
we are doing.

Q.  Did you take any particular training to be a part
of ERT?

A.  Yes.  There is an initial two-week training back
at Quantico, Virginia where they cover a variety of
things that an evidence response team will do, to
include photography, sketching, searching, blood
detection, a lot of photography, different styles of
photography.

Q.  And when you are performing a search, are you
given a list of the things that you're looking for?

A.  Yes.  In the search warrant, there is usually an
attachment that says primarily what we are looking for
in the search.

Q.  I want to talk about this case specifically.  Did
you respond to the murders on the COMMSTA?

A.  Yes, I did.

Q.  How did you get out there?

A.  We flew on -- we drove our Suburban onto a Coast
Guard C-130 and flew out there with the people and the
equipment we needed.

Q.  About how much time did you have to get ready?

A. That morning, I believe. We were notified that morning, and then it was that afternoon when we landed.

Q. As part of ERT, are you also involved in conducting interviews?

A. It can happen, but primarily our job is the search warrant itself.

Q. In this case, did you conduct interviews?

A. I did not, no.

Q. What sort of things do you do to keep track of photos you're taking and evidence you're seizing?

A. We maintain a log of all those things, so every photograph that is taken is written down on a photographic log. There is an evidence log that is maintained. There is a fingerprint log that we maintain. There is an admin log that says who came and when and where they left, typically weather conditions and things like that. So we log a lot of data during these searches.

Q. I want to talk about the search of the rigger shop specifically. How long did that search take?

A. That was a couple days. It was at least two, two and a half days.

Q. Did you do a sketch?

A. Yes, I did.

Q. Let's look at Exhibit No. 13.

And when you did your sketch, did you do it by hand?

A. Yes.

Q. And do you know if that was taken and turned into something like this, Exhibit No. 13?

A. Yes. My sketch was made very pretty and turned into this exhibit.

Q. As part of ERT, do you log where certain evidence is found within a room?

A. Yes, especially with a case like this, it was very important to log specifically where very interesting items were found.

Q. How do you do that?

A. We do measurements. For example, we find very obvious landmarks within this facility, like doorjambs and doorways, and we measure from those areas different angles. So we measure all those things.

For example, when we are measuring where one of the bodies was found, we measured, you know, many different places on that body to and from different locations within that room.

Q. Do you, when you go through a scene, use any sort of markers to indicate evidence that you will want to seize?

A. Yes. Oftentimes we use a plastic placard or some

kind of placard that has a number on it and a scale.

Q. Do you use -- do you note those in your diagram where those placards were located?

A. Yes, in this case, we did.

Q. For foundation, I'm going to have him look at 106. All right. If we could zoom in kind of in the middle there.

Do you recognize this?

A. Yes, I do.

Q. Okay. Does this have those placards you just described?

A. Yes.

Q. Fair and accurate representation, albeit you described as prettier, of the work that you did at the COMMSTA?

A. Yes.

MS. SHERMAN: I move for the admission of 106.

MR. CAMIEL: No objection.

THE COURT: 106 is admitted.

(Exhibit No. 106 admitted.)

BY MS. SHERMAN:

Q. And we can -- we can go out of there. And why don't we zoom into this area here, if possible.

In regards to -- it's sort of difficult to see. There should be a laser pointer up there. Can you

indicate where some of the placards are located?

A. So they are the yellow dots. One is on this table. One is over here on the microwave. There is one on the floor here. There is one over here in this doorway. And then there is -- those aren't evidence placards, but pretty much the little yellow dots represent the yellow markers that we put the crime scene.

MS. SHERMAN: If I can have just a moment to confer with counsel.

(Pause)

BY MS. SHERMAN:

Q. You reviewed all of the photos that have been marked as exhibits in this case that were taken at the COMMSTA; is that right?

A. Yes.

Q. And I provided that list to counsel who has indicated they have reviewed them.

At this point, all of those photos fair and accurate depiction of what you saw at the scene?

A. Yes.

MS. SHERMAN: At this time, I'm going to move for admission of Exhibits 107 to 131.

THE COURT: There is no objection, Mr. Camiel; is that correct?

 MR. CAMIEL: That's correct.

THE COURT: Then those will all be admitted.

(Exhibit Nos. 107 - 131 admitted.)

BY MS. SHERMAN:

Q. If we could, can we leave up -- we can go out of there and leave a zoomed-in version of this up. And then go to -- actually start with 119, if that's possible. We can work -- that's okay. Thank you.

Can you tell us what we are seeing in 119?

A. 119 there is an evidence placard on the floor there in front of I believe -- what we are calling room two is through the doorway.

If I can -- this is room two where one of the victims was. This is evidence placard 7.

Q. Where is that on Exhibit No. 14?

A. That is right there.

Q. And let's go to -- leave up 14 and go to 120.

What are we seeing?

A. That is a close-up photograph with scale of what appears to be a bullet fragment.

Q. Let's move in to the area labeled as break room. Can we put up photo 114.

Do you recognize this?

A. Yes, I do.

Q. And what are we seeing in 114?

A. In the break room is someone who is deceased lying on the floor. That is how we found him when we got there.

Q. And 115.

And these photos were taken before you put placards up; is that correct?

A. Yeah. I think we got some of the placards up, but as we moved into the scene, we take a lot more photographs before we decide what we're going to mark, what seems to be important to us, so this is a medium range photograph of that break room, room two.

Q. And 117.

Can you tell us what we're seeing in 117?

A. This is as we're progressing. I'm shooting from the -- I'm shooting a camera from the other side of the break room towards the bathroom. The table there is blocking the view of where the deceased is.

Q. Let's take a look at Exhibit No. 124. What are we seeing in 124?

A. This is a close-up of a red bowl located on top of the microwave. If you're looking at the sketch to the left, it is item number -- it's up by item number nine in the upper right corner. The bowl appears to be damaged by something.

Q. Let's actually go to placard 9. Let's go to 125.

Actually this isn't placard 9.

What are we seeing in 125?

A. 125 looks to be the window jamb in the vicinity of the refrigerator. I think we had to move the refrigerator back to get there. It looks like there was something that impacted the wall there.

Q. Did you note on the diagram, Exhibit No. 14, where that impact was?

A. It appears to be a blue dot.

Q. Can you point that out?

A. Yes. So this is the refrigerator and the blue dot is right behind it.

Q. Let's move to photo 126. What are we seeing here?

A. This is a closet. There is some rigging gear and some looks like perhaps a mask hanging off a coat rack. There is a door on the left.

Q. Let's go to 123.

Can you tell us what we're seeing at 123?

A. 13 is a close-up photograph with scale of what appears to be a bullet fragment underneath the table in the break room.

Q. So on Exhibit No. 14, where is the placard?

A. It is right here.

Q. So that appears to be on top of the table?

A. Right. It's hard to graphically represent things under a table, so you put them on top so you could read them.

Q. Did you seize what was at placard 13?

A. Yes.

Q. I'm going to approach him with physical Exhibit No. 243.

MS. SHERMAN: Your Honor, may I approach?

THE COURT: Certainly.

(Ms. Sherman approaches witness)

BY MS. SHERMAN:

Q. I'm handing you Exhibit No. 243. We're not going to open that, but if you could pull that out and let us know what 243 is.

A. Okay. Item 243, we have a label on here that says, "Item number four, suspected bullet fragment, room two, under table," as noted on the tracking number so and so.

Q. And that's the bullet fragment depicted in Exhibit No. 123?

A. Yes.

MS. SHERMAN: I move for the admission of Exhibit No. 243.

MR. CAMIEL: No objection.

THE COURT: That will be admitted.

(Exhibit No. 243 admitted.)

BY MS. SHERMAN:

Q. Let's go to photo 122, if we could.

Can you tell us what we're seeing in 122?

A. That is a close-up photograph of item number nine with the scale. Again, there appears to be part of a bullet fragment -- a bullet fragment or part of a bullet there.

Q. Where is that on Exhibit --

A. That is item nine. It's located over here on this -- over on top of the microwave.

Q. I realized for the record I have been referring to it as Exhibit No. 14, but it's actually Exhibit No. 106. I make that correction. I apologize.

THE COURT: Okay.

BY MS. SHERMAN:

Q. Did you seize the bullet fragment at placard number 9?

A. Yes, it was seized.

MS. SHERMAN: May I approach, Your Honor?

THE COURT: Certainly.

BY MS. SHERMAN:

Q. I'm going to approach you with Exhibit No. 242 and have you pull that out and tell us if you recognize it.

     A.  The sticker says again the bullet fragment was on
top of the microwave.  It's saying it's item two on
here, but this is the bullet that was located on the top
of the microwave.
     Q.  When you log items in, they might be listed as
different than the placards?
     A.  Correct.  If I may clarify?
     Q.  Sure, please.
     A.  We label things as we're finding them and the
placards come in numbers, but we may have actually, as
we move through the scene, we may actually seize them
out of order.
               MS. SHERMAN:  I move for the admission of 242.
               MR. CAMIEL:  No objection.
               THE COURT:  242 is admitted.
               (Exhibit No. 242 admitted.)
BY MS. SHERMAN:
     Q.  Can we move to Exhibit No. 121?
          Do you recognize what's in 121?
     A.  Yes.  This is an overall photo.  There is also a
scale there of the military jacket, military-style
jacket the Coast Guard normally wears.
     Q.  Where is placard 8 located in 106?
     A.  It is just above the table here in the middle of
the floor.

Q. Can you tell us -- did you examine that jacket a little closer than this photo?

A. There appears to be some blood on it, and also one of the sleeves is rolled where the other one is not.

Q. Let's move into the office. Give me one second to make sure my numbers are correct.

All right. Let's go to Exhibit No. 129, if we could. We're going to need to move on 106 up to the office, if we could.

What are we seeing in Exhibit No. 129?

A. This is a photo I took from the far wall, so I'll use the pointer. So I was standing about here shooting the photo in this direction. And that is the office that we labeled as room number one. That is another deceased person there in the photograph.

Q. Can we go to Exhibit 107?

Can you tell us what we're seeing in 107?

A. More of a midrange photograph of the deceased and the work space where he was found.

Q. And Exhibit No. 108.

What are we seeing in 108?

A. Again, this is once the body was moved by the medical examiner, then I took photographs of the floor. In about the middle of the photograph, I believe those are two holes in the floor, or at least impacts and a

hole.

Q. Can you show us where that was on 106?

A. From what I can tell, about here.

Q. Okay. On 106, the diagram?

A. Yes, that would be where the two orange dots are.

Q. Did you explore that area more thoroughly?

A. Yes.

Q. Okay. And let's go to Exhibit No. 109.

What are we seeing in 109?

A. That is a close-up with a scale of what appears to be a bullet lodged in the floor.

Q. And Exhibit No. 110.

What are we seeing in 110?

A. This is again another close-up with scale where we have had to chip away the floor a little bit to try to remove the bullet from the floor.

Q. And when you removed the bullet from the floor, did you seize it as evidence?

A. Yes.

MS. SHERMAN: May I approach, Your Honor?

THE COURT: Yes.

(Ms. Sherman approaches witness.)

BY MS. SHERMAN:

Q. I'm approaching you with Government's Exhibit No. 244. You can take a look at that and tell us what

that is.

A. Label is, "Bullet under body in room one," and listed as item number six.

Q. And is that what we're seeing in Exhibit No. 110?

A. Yes.

MS. SHERMAN: I move for the admission of 244.

MR. CAMIEL: No objection.

THE COURT: 244 is admitted.

(Exhibit No. 244 admitted.)

BY MS. SHERMAN:

Q. Let's go to Exhibit No. 112.

What are we seeing here?

A. This appears to be, again, working on the floor in an effort to retrieve the bullet located under the floor.

Q. And Exhibit No. 113?

A. This is the final, when I've removed the floor enough to where I can actually get to it. In the photo in the upper left corner of Exhibit No. 113 is what appears to be a bullet fragment.

Q. Did you seize that bullet fragment?

A. Yes, we did.

MS. SHERMAN: May I approach?

THE COURT: Yes.

(Ms. Sherman approaches witness.)

BY MS. SHERMAN:

   Q.  Approaching you with Exhibit No. 245.  Tell us if you recognize that.

   A.  This is a bullet under the body in room number one collected as item number seven.

   Q.  Is that what we're seeing in 113?

   A.  Yes.

      MS. SHERMAN:  I move for the admission of 245.

      MR. CAMIEL:  No objection.

      THE COURT:  All right.  That's admitted.

      (Exhibit No. 245 admitted.)

BY MS. SHERMAN:

   Q.  Let's go to Exhibit No. 130, if we could.  What are we seeing in Exhibit No. 130?

   A.  Well, again, it's an overall photo of that workspace.  This is after the body has been removed.  We're seeing some -- you can vaguely -- they are very small, but you can see the little scales, the yellow scales on the floor in and around the blood.

   Q.  Do you know whose workspace this is in 130?

   A.  I believe it's -- I may get the name wrong.  I believe it's Mr. Hopkins'.

   Q.  I'm going to have you look at -- did you search Mr. Wells' desk?

   A.  I don't remember searching that desk

specifically.  I was primarily assigned as the
photographer.

Q.  Okay.  Well, let's have you take a look at --
let's look at 131.  Did you take this photo?

A.  Yes.

Q.  And was this taken off of a desk?

A.  I believe so, yes.

Q.  And can you tell who that is addressed to?

A.  It appears in the "to" line, it's "JM Wells."

THE COURT:  I thought she admitted through 131.

DEPUTY CLERK:  I heard 130.

THE COURT:  Didn't you move to admit through
131?

MS. SHERMAN:  Yes.

THE COURT:  That's fine.

BY MS. SHERMAN:

Q.  Did you seize this item?

A.  Yes.

MS. SHERMAN:  May I approach?

THE COURT:  Yes.

(Ms. Sherman approaches witness.)

BY MS. SHERMAN:

Q.  This is Exhibit No. 132.  Can you tell what 132
is?

A.  Yes, it's item number, looks like 32, letter of

caution to JM Wells on Wells' desk in room one.

Q. So on there you identified it from Mr. Wells' desk?

A. Yes.

Q. Is that what we're seeing in 131?

A. I believe so, yes.

Q. We can take -- we can take all the exhibits down.

MS. SHERMAN: I'm going to move for the admission of 132.

THE COURT: Mr. Camiel?

MR. CAMIEL: No objection.

THE COURT: That's admitted.

(Exhibit No. 132 admitted.)

BY MS. SHERMAN:

Q. I'm going to talk about some other things you collected at the scene at the rigger shop. Did you collect fingerprints?

A. Yes, we did.

Q. Vacuumings?

A. Yes.

Q. What's the purpose of collecting vacuumings?

A. As we're moving into a scene, specifically when there has been a homicide, you have very vital evidence that may be hairs and fibers that might be present that the person who committed the crime may have left behind,

so the purpose of the vacuuming was to collect those fibers in a very effective and efficient manner.

We would identify an area that we're going to vacuum, use the forensic vacuum and vacuum those areas, and then document where those vacuumings were taken from.

Q. Did you take any cast impressions?

A. At least one tire impression was taken outside.

Q. Let's go to Exhibit No. 5, which has already been admitted.

Can you tell us where that cast impression was taken from?

A. It's approximately -- so right around here on the corner.

Q. Okay. So you indicated it was here. Did you take any cast impressions from this area?

A. No, we did not.

Q. I want to turn your attention -- we can take that down.

I'm going to turn your attention to Mr. Wells' truck. Did you participate in a search of his truck?

A. Yes, I did.

Q. Do you recall the date of that search?

A. I believe it was April 15th.

Q. Okay. You have looked at Exhibits 157 through

161 and 232 and 233 in relation to that search?

A. Yes.

Q. Were all those photos a fair and accurate depiction of what you observed the day you searched his truck?

A. Yes, they were.

MS. SHERMAN: At this point, I'm going to move for the admission -- counsel, I provided the list earlier -- Exhibit Nos. 157 through 161, 232 and 233?

MR. CAMIEL: I have no objection.

THE COURT: Those will all be admitted.

(Exhibit Nos. 157 - 161, 232 and 233 admitted.)

BY MS. SHERMAN:

Q. Let's start with Exhibit No. 157. What are we seeing here?

A. This is what we would call an entry photo, just the beginning photos of Mr. Wells' white truck located at the Alaska State Troopers.

Q. And why was it at the Alaska State Troopers?

A. It had been seized and was made available for us to search.

Q. Let's look at 158. What are we seeing here?

A. That is the back side or the bed of the truck with the bed gate up.

Q. Okay. And I think 159 was previously admitted,

but let's take a look at that. What are we seeing here?

A. This is a -- this is how we found the inside of Mr. Wells' truck to look when you open up the doors. I would call this an entry photograph documenting what we found before we started searching his truck.

Q. And Exhibit -- let me ask you a question. Did you notice anything on the front seat?

A. There is nothing there but what appears to be a rip that I can see.

Q. Did you notice any particular smell when you opened the truck?

A. We did not.

Q. Exhibit No. 160.

And what are we seeing here?

A. This is a close-up of a tire that tells us how big the tire is and how big the rims are.

Q. Let's go to Exhibit No. 161.

And do you recognize this?

A. Overall photo of a tire.

Q. Is that the tire you seized in this case?

A. Yes.

Q. And let's go to 232, if we could.

What are we seeing in 232?

A. This is one of the tires located -- actually attached to the vehicle.

Q. Did you photograph all the tires?

A. Yes.

Q. Let's look at 233.

What are we seeing here?

A. That is a tire that appears to have been removed from the back of the truck.

Q. Can you tell whose vehicle is in the background?

A. That is Mr. Wells' truck.

Q. Can you tell what we're seeing right there?

A. That is the spare tire located underneath the bed of his truck.

Q. 248 was already -- oh, we don't need to go to 248.

Did you participate in the search of the Wells' Honda CR-V on April 15th?

A. Yes, I did.

Q. Have you reviewed Exhibit Nos. 162 to 167?

A. Yes, I have.

Q. Are they a fair and accurate depiction of photos taken during that search?

A. Yes, they are.

MS. SHERMAN: At this point, I'd move the admission of 162 through 167.

MR. CAMIEL: Your Honor, I have reviewed those before. I have no objection.

THE COURT: Those will be admitted.

(Exhibit Nos. 162 - 167 admitted.)

BY MS. SHERMAN:

Q. Let's start with 162.

What are we seeing here?

A. This is an overall photo of the CR-V belonging to Mr. and Mrs. Wells.

Q. Where was this search done?

A. This search was located at the Kodiak Police Department.

Q. Pursuant to a search warrant?

A. Yes.

Q. 163.

What are we seeing here?

A. The external photo of the back side of the CR-V.

Q. 164.

A. The front.

Q. And 165.

A. This is a photo depicting the interior of the CR-V as looking inside it from the passenger's front side.

Q. And can you tell what is on the front seat there, the passenger seat?

A. There appears to be a bag and some envelopes.

Q. Exhibit No. 166.

Can you tell more clearly what those envelopes might be on 166?

A. They appear to be envelopes addressed to somebody I presume is the Wells.

Q. Okay. How about 167?

A. That is what looks like the contents of the CR-V from what looks to be the passenger -- the front passenger side of the vehicle.

Q. So if I understand correctly, you took things out, you laid them down and took photos of everything from the front part of the vehicle?

A. Yeah, every compartment that we searched, tried to do it in a very organized manner so that -- we know we have to move things from where they are originally found, so we would try to obtain them and then document them appropriately.

Q. We can take that down.

Did you participate in a search of the Wells' residence? I guess we'll call it the first search.

A. Yes.

Q. And have you reviewed Exhibits 133 through 150?

A. Yes, I have.

Q. And were those photos an accurate depiction of what you saw in the days you searched the Wells' home?

A. Yes, they are.

         MS. SHERMAN: At this point, I would move for the admission of 133 to 150.

MR. CAMIEL: No objection.

THE COURT: All right. Those will all be admitted.

MS. SHERMAN: I apologize --

THE COURT: Some are already in.

MS. SHERMAN: And then 150 is actually a physical exhibit, so I would say through 149.

THE COURT: Then those will all be admitted to the extent they weren't previously.

(Exhibit Nos. 133 - 149 admitted.)

Q. Let's start with Exhibit No. 133.

Can you tell us what we're seeing in 133?

A. That is an overhead photograph of the Wells' residence located in Kodiak, Alaska.

Q. Was this an aerial photo taken?

A. Yes.

Q. Not on the day of the search?

A. I don't know exactly when this was taken.

Q. Okay.

A. But it is an aerial photograph of the residence.

Q. And you recognize it?

A. Yes, I do.

Q. So this -- would you describe -- how would you

describe the Wells' home?

A. It's a very large home. I want to say it's well over -- appears to be well over 3,000 square foot. It's got a two-car garage. It's at least a two-story building. It's got prominent decks on the front. Pretty large driveway.

Q. Let's go to 134.

And can you show us on here where the Wells' driveway is?

A. So the Wells' driveway begins about here and goes all the way up there. It's actually a pretty steep hill.

Q. It's a steep hill?

A. Yes.

Q. Let's go to 135.

What are we seeing here?

A. This is again an entry photo once we got there. This is a photo looking from -- I was standing on the deck starting to take pictures working from right to left or left to right. That is a depiction of the garage area at the Wells' residence that day.

Q. Could you describe for us how organized areas like the garage were?

A. I would describe that garage as not being very organized to the casual observer.

Q. Let's go to Exhibit No. 136.

What are we seeing here?

A. This is the back side of the Wells' residence.

Q. And 137.

A. This is -- well, another -- this is kind of the back corner of the residence. The garage is down there on the right side and the house is over there towards the left.

Q. And 138.

What's the vantage point of this photograph?

A. This is the vantage point of looking up the stairs going up the deck I believe to the front door, and you can also see the garage in the background.

Q. Exhibit No. 139.

What are we seeing here?

A. Another representation of what the garage and the immediate area outside the garage looked like the day we searched the house.

Q. Are these items that you pulled out of the garage?

A. I don't recall exactly. It appears that they were like this when we got here. I know that a lot of things were removed from the garage. I just don't know the timeframe of this particular photo.

Q. 140.

What are we seeing here?

A. This is a photograph of the interior of the garage with a vehicle located on kind of the right side of the photograph.

Q. And let's look at Exhibit No. 141. Was this taken a little later?

A. It appears to be, yes. That was just a picture of the front of the house from the vantage point of me standing on the driveway looking up at the house.

Q. We can take that down.

I want to talk about some of the items found in the Wells' residence. I want to talk about -- did you find any ammunition in the Wells' home?

A. Yes.

Q. Let's talk about -- let's put up Exhibit No. 146.

And what are we seeing in Exhibit No. 146?

A. Various -- I would call this probably maybe a reloading kit, but there is Pyrodex Powder in the top portion of the photograph. There are bullets, appear to be bullets in the yellow case on the left side of the photo. There is a CO2 cartridge in the middle. That is what it appears to me.

Q. Let's go to Exhibit No. 147.

What are we seeing in 147?

A. This is an area of the house where we located a

wide variety of ammunition.

Q. Okay. Let me ask you this: Did you find firearms in Mr. Wells' home?

A. Yes, there were.

Q. Did you ever find, in any of the searches that you're familiar with, a silver .44-caliber revolver?

A. No.

Q. Let's go to 148. What are we seeing in Exhibit No. 148?

A. In Exhibit No. 148, there is a camouflage pouch on the lower right corner. It's got ammunition loaded into it. There is a number of .22 long rifle boxes in the background, a .42 Remington Magnum American Eagle ammunition, and then there appears to be some empty casings still in their original packaging in the lower left.

Q. Let's go to 149, Exhibit No. 149.

What are we seeing in 149?

A. This is a more close-up photo of the camouflage pouch with the ammunition, and then there is also a scale in the foreground.

Q. Did you seize this camo pouch and the ammunition in it?

A. Yes.

MS. SHERMAN: Your Honor, may I approach?

THE COURT: Yes.

(Ms. Sherman approaches witness.)

BY MS. SHERMAN:

Q. I'm going to approach you with some scissors as well. Take a look at Exhibit No. 150 and then open it and tell us what it is.

A. Okay. Located inside is a camouflage pouch with ammunition located inside.

Q. Is that what we are seeing in 149?

A. Yes.

MS. SHERMAN: I would move for the admission of 150.

MR. CAMIEL: No objection.

THE COURT: 150 is admitted.

(Exhibit No. 150 admitted.)

BY MS. SHERMAN:

Q. If you could hold that up for the jury to see and then open as well. Okay.

And can you tell what kind of ammunition that is?

A. Let me get my glasses on. This is a .44-caliber Remington Magnum.

Q. We can take that exhibit down.

Would you consider your search of the Wells' home thorough?

A. Yes.

Q. Had there been a bag of soiled clothes in -- first of all, did you search all the bedrooms?

A. Yes, we did.

Q. Had there been a bag of soiled clothing --

MR. CAMIEL: Your Honor, I'm going to object to the leading nature of the question.

THE COURT: That's sustained.

BY MS. SHERMAN:

Q. Did you find a bag of clothing, soiled clothing?

A. No, we did not.

Q. Had there been one, do you think you would have found it?

A. I believe so, yes.

MS. SHERMAN: Those are all my questions.

THE COURT: All right. Mr. Camiel, go ahead, please.

CROSS EXAMINATION

BY MR. CAMIEL:

Q. Good morning.

A. Good morning.

Q. Do you know how many different, separate searches were conducted of the Wells' residence?

A. I know an approximate number. I know the ones that I specifically participated in.

Q. What's the approximate number that you know of?

A. I know that -- well, as far as the residence specifically, it was more than two.

MR. CAMIEL: Your Honor, could I approach the witness for a minute?

THE COURT: Certainly.

(Mr. Camiel approaches witness.)

BY MR. CAMIEL:

Q. Special Agent, I handed you just a -- I'm not going to have this admitted as an exhibit, but it appears to be a search warrant application, does it not?

A. Yes, it does.

Q. At page three, does it start listing the search warrants that were executed on Wells' property and vehicles in this case?

A. Yes, it does.

Q. Can you take a look at that and count how many searches there were of the Wells' residence?

A. The residence? Appears to be nine, to include the Wells' residence septic tank.

Q. Thank you. And you were involved in how many of those?

A. Two.

Q. Now, let's back up and talk for a few minutes about the search of the crime scene. And if we could put up -- let's put up first Government Exhibit No. 106.

And if we could make that a little bit bigger.

So this was based on a sketch that you did. You did a hand sketch and then it was turned into this, a diagram?

A. Yes. By someone else, yes.

Q. I noticed that -- did you notice that one of the victims' vehicles isn't included in the sketch?

A. What do you mean by victims' vehicles?

Q. When you showed up at the T-2 site, there were the two government white pickup trucks that were there, right?

A. I believe so. I don't recall.

Q. Do you recall that there were actually two vehicles parked in this area, this one, and then there was another one right here?

A. If they were there, I would have photographed them, yes.

Q. So you didn't notice that there was just one vehicle in this sketch?

A. I sketched the interior of the rigging station.

Q. And then if we could go to Defense 119. This is -- I'm sorry. That's the wrong number.

Let's try Government 119. That's it.

So this is -- you testified about this earlier. This is a --

DEPUTY CLERK: That's not been admitted.

THE COURT: 119? I thought 119 was admitted.

DEPUTY CLERK: I thought you said defense exhibit.

THE COURT: No, we're back to government.

MR. CAMIEL: I was mistaken. I'm sorry.

BY MR. CAMIEL:

Q. Looking at Government Exhibit No. 119, you have a placard there. You were talking about that earlier.

That was what appeared to be a bullet fragment?

A. That's what it appeared to me, yes.

Q. It's out in the hallway; is that right?

A. Yes.

Q. And in here, that's where Mr. Hopkins was located?

A. Yes.

Q. And then if we could look at Government 120, which I think is just a close-up of that.

Again, that's the same item we were just looking at out in the hallway?

A. Yes.

Q. Now, one of the things you described doing at the rigger shop was vacuuming to try to find hair or fiber that might have been left behind by the suspect; is that right?

A. Correct.

Q. What areas of the building did you do the vacuuming?

A. Well, I did not do the vacuuming, other team members did. I know that around the immediate areas of the deceased was completed, and I believe in the front area of the door, I believe that area was vacuumed. But I would have to refer to the evidence log for that.

Q. All right. And you were talking generally about the crime scene response team or the evidence response team and the different roles that people had. And you mentioned there was the photographer was one of the roles; is that right?

A. Yes.

Q. Did you also have, as a part of the evidence response team, the ability to video if you wanted?

A. That option is available, yes.

Q. So you had the equipment to do that if you had wanted to do that?

A. We had -- I don't believe we had video -- well, I don't believe we had a videocamera with us.

Q. And then you had the person who collects the evidence and logs it in, right?

A. Correct.

Q. And then you had the searchers?

A. Yes.

Q. And you had somebody who kept a log of who came and who went?

A. Yes.

Q. All right. And in addition to -- can we put up Government Exhibit 44?

Does that look like the rigger shop on the day you were there to do the search?

A. That appears to be the rigger shop. I can't tell from that photograph if that picture was taken the day of.

Q. You see the two blue colored vehicles closest to the building?

A. Yes, I do.

Q. And then you can see the two white government vehicles?

A. Yes.

Q. We can take that one down.

You looked for fingerprints while you were at the T-2 building; is that right?

A. Yes.

Q. What areas of the building did you attempt to lift prints?

A. Well, we did a preliminary survey. We were looking for areas where we most likely would find

fingerprints; door handles, surfaces that would retain a fingerprint. Other surfaces, say, like very rough surfaces like concrete or something wouldn't be something that we would find fingerprints on, but we did search doors, door handles. There were I believe some taken from some glass surfaces, I think windows in the door.

Q. Do you know how many fingerprint lifts were taken from the building?

A. I don't recall exactly. The latent print log would tell me that.

Q. In addition to the visible blood, did you have tools available to look for blood that might not be visible to the naked eye?

A. We had different style lighting. We had testing equipment to determine if a stain we thought was blood we could determine if it was.

Q. And did you see those kinds of things being employed during the search of the rigger shop?

A. I may not have seen them. It doesn't mean that they weren't done. I was primarily working as the photographer.

Q. You wanted -- this search at the rigger shop, you had to be very thorough because you really only get one chance at searching a crime scene like that; is that

right?

A. Yes. It's hard to get -- you certainly want to take as much time as humanly possible to conduct a very thorough search of a scene like this.

Q. Can we look at Defense Exhibit 43 for foundational purposes. I don't think it's been admitted.

THE COURT: All right.

BY MR. CAMIEL:

Q. Do you recognize that photo?

A. I do.

Q. Is that one of the photos that you have taken?

A. I'm going to assume it was because I took all the photos during that search.

Q. It looks similar to some that we have already seen, but not cropped. It looks like this is a more full photo than some of them we have seen?

A. Yes.

MR. CAMIEL: Your Honor, I would offer Defense Exhibit 43.

MS. SHERMAN: No objection.

THE COURT: 43 is admitted.

(Defense Exhibit No. 43 admitted.)

BY MR. CAMIEL:

Q. The doorway here, that's the doorway that leads

to a little alcove, and inside here is the door to the boiler room; is that right?

A. I believe so, yes.

Q. And you can see that there is some blood spatter --

A. Yes.

Q. -- toward the boiler room. And up on the lower part of the door?

A. I can't really tell from there, but I think it's safe to say there could be some there.

Q. We can take that one down.

Were you involved in the search of the boiler room and taking photographs within the boiler room?

A. Yes, I was.

Q. Do you recall taking photographs of a boot print on the boiler room door?

A. Yes, I do.

Q. Can we look at Defense 218 and then 219. I think those were admitted yesterday.

THE COURT: Uh-huh, I believe so.

BY MR. CAMIEL:

Q. Does this appear to be one of the -- you're looking at Defense Exhibit No. 218.

Does that look like one of the photos you took from the boiler room door?

A. Yes, it does.
Q. And that appears to be a boot print?
A. Yes, it does.
Q. You have got a scale or some kind of measuring device next to it?
A. Yes.
Q. And then if we could look at 219.
And that's a little bit further back of the same boot print; is that right?
A. That appears to be so, yes.
Q. We can take that one down.
And that door that we just looked at, on the other side of that door was where Mr. Hopkins was found; is that right?
A. If we're talking about the door behind the boiler room, no, because where -- I'm trying to remember the names of the victims as far as to where they were found. If Hopkins was in the break room --
Q. The break room.
A. -- then the boiler room was adjacent from the break room, yes.
Q. If we could put up Government Exhibit No. 13.
And do you see there where Mr. Hopkins -- where you would have found Mr. Hopkins? Would that be in this area here?

A. Yes, I believe so.

Q. All right. And this is the boiler room?

A. Yes.

Q. And the door that the boot print was located on was this door right here; is that right?

A. I believe so, yes.

Q. Thank you. We can take that one down.

You talked about a cast impression. If we could look at Government Exhibit No. 5.

I think you mentioned that there was a tire -- there was some kind of tire print that a cast impression was made from?

A. Yes.

Q. Did you photograph that?

A. Yes.

Q. And I think you described that as being in this area; is that right?

A. Yes.

Q. Do you know what happened -- do you know if that -- other than taking a photograph, was there anything else done to that tire impression?

A. It would have been -- we would have seized it and we would have submitted it to the laboratory for examination.

Q. You also talked about being involved in the

search of Mr. Wells' truck.

Can we put up Government Exhibit No. 160.

That's one of the tires that was taken out of the back of the truck; is that right?

A. It appears to be a tire that's actually on the truck itself.

Q. Do you recall removing a tire from the back of the truck?

A. Yes, I do.

Q. Do you recall that when you pulled it out you kind of dropped it and had it bounce?

A. Yes.

Q. And can we take a look at 161?

Is that the tire that you removed and had bounce on the ground?

A. I believe so, yes.

Q. Did you ever take a photo that showed the nail in the tire?

A. I believe a photo was taken of that, yes.

Q. Do you know where it is?

A. I believe I would have taken it. I don't have the photo log in front of me.

Q. We haven't seen it introduced into evidence so that's why I'm asking.

A. I'm going to presume in the effort of

thoroughness we would have, but I don't have the photo log in front of me to point it out to you.

MR. CAMIEL: If I can have a minute, Your Honor. I have got to check on an exhibit number.

THE COURT: Certainly.

(Pause)

BY MR. CAMIEL:

Q. Can we look at, I think it's Government 233.

You were asked about this photograph that was admitted just a few minutes ago?

A. Yes.

Q. And you were asked some questions about the spare tire that's right here?

A. Yes.

Q. Did you ever see anybody remove the spare tire from the back of the truck?

A. I don't recall if someone did or did not.

Q. Did anybody examine it while it was on the truck to see what the condition of that tire was?

A. I did not, so I don't know if anybody else on the team did.

Q. Do you know if anybody checked on the size of that tire?

A. I don't recall if they did check size.

Q. Do you know if anybody checked on the pressure in

that tire to see if it was fully inflated or not?

A. I know that air pressure readings were taken that day.

Q. Those readings were taken on the tire that had the nail in it, right?

A. I believe so, that one and the other tires on the truck.

Q. All right. But you don't know anything about whether any air pressure readings were taken on the spare tire?

A. I don't recall if they were or were not.

Q. I want to have you look at some additional photos from the search of the truck.

Could we pull up, for foundation only, Defense Exhibit No. 290.

Do you recognize that photo?

A. Yes.

Q. And is that a photo you would have taken?

A. I believe so, yes.

MR. CAMIEL: I would offer Defense Exhibit No. 290.

MS. SHERMAN: No objection.

THE COURT: 290 Defense admitted.

(Defense Exhibit No. 290 admitted.)

BY MR. CAMIEL:

Q. As a part of the search of the truck, you looked in the engine compartment?

A. Yes.

Q. Do you know if any engine components were taken off to further examine the truck?

A. That I do not.

Q. Can we take a look at Defense 291 for foundation only?

Is that just another view of the interior of the truck at the start of the search?

A. I don't know if that's at the start or the end. That photo looks different than the previous photo that I testified to.

Q. This is a photo you would have taken though?

A. Yes.

MR. CAMIEL: I would offer Defense 291.

MS. SHERMAN: No objection.

THE COURT: 291 is admitted.

(Defense Exhibit No. 291 admitted.)

BY MR. CAMIEL:

Q. Can we look at, I think it's Government 190 -- Defense 190. I'm sorry.

Do you recognize what's in that photograph?

A. That would be appear to be items removed from the truck to look through. There is several 12-pack

containers of Diet Coke with lime, some novels, a
hardhat, looks like a power inverter, maybe a window
scraper, and a lot of paper and plastic items.

Q.   I would offer -- is this a photo you would have
taken?

        MS. SHERMAN:  I don't object.

        THE COURT:  All right.

        MR. CAMIEL:  I would offer Defense 190.

        THE COURT:  190 is admitted.

        (Defense Exhibit No. 190 admitted.)

BY MR. CAMIEL:

Q.   Do you know where in the truck these items were
found?

A.   I do not.

Q.   Can we look at Defense Exhibit No. 191 for
foundation?

        MR. CAMIEL:  Your Honor, I'm going to offer
191.  The government indicates no objection.

        THE COURT:  All right.  191 is admitted.

        (Defense Exhibit No. 191 admitted.)

BY MR. CAMIEL:

Q.   Is that another photo that you took during the
course of the search?

A.   Yes.

Q.   And do you know what these are?

A. Those appear to be shop rags.

Q. Okay. Were they examined? Were they examined for blood?

A. I know we looked at them.

Q. Do you know if any of them were seized?

A. Off the top of my head, I do not.

Q. We can take that one down. And put up Defense 292.

MS. SHERMAN: I don't have an objection to this one.

MR. CAMIEL: I would offer Defendant's 292.

THE COURT: 292 is admitted.

(Defense Exhibit No. 292 admitted.)

BY MR. CAMIEL:

Q. This is just another angle looking into the truck; is that right?

A. Yes.

Q. And then if we could look at 293.

MR. CAMIEL: Is there any objection?

MS. SHERMAN: No.

MR. CAMIEL: I would offer 293.

THE COURT: 293 is admitted.

(Defense Exhibit No. 293 admitted.)

BY MR. CAMIEL:

Q. This is before things were removed from the truck

or before everything was removed from the truck?

A. It appears to me this is how we found it, but I can't be certain without checking the photo log.

Q. Do you know how long you folks spent searching the truck?

A. It would have been a couple hours.

Q. Can we look at Defendant's 294?

MR. CAMIEL: I would offer 294.

MS. SHERMAN: No objection.

THE COURT: 294 is admitted.

(Defense Exhibit No. 294 admitted.)

BY MR. CAMIEL:

Q. Some additional contents from the truck; is that right?

A. That's what it appears to be, yes.

Q. And then let's jump to Defense 296.

MR. CAMIEL: Any objection?

MS. SHERMAN: No.

MR. CAMIEL: I would offer 296.

THE COURT: All right. 296 is admitted.

(Defense Exhibit No. 296 admitted.)

BY MR. CAMIEL:

Q. In the course of going through the truck, in addition to looking for physical items and removing things, some testing was done on various parts of the

truck; is that right?

A. I know that there were other forensic samples taken from inside the truck.

Q. Okay. There were -- there was some swabbing of different areas of the truck?

A. I believe so, yes.

Q. And that's for the purpose of looking for blood or biological material?

A. Yes, amongst other things.

Q. Let's switch. I want to ask you some questions about the search of the Honda CR-V.

THE COURT: So maybe we should take our break and then come back with that, Mr. Camiel. Is that all right?

MR. CAMIEL: Sure.

THE COURT: Ladies and gentlemen, please leave your notepads here. Remember my admonition not to discuss the case. And we'll take a 15-minute recess. We'll go off record.

(Recessed from 10:24 a.m. to 10:44 a.m.)

(Jury present)

THE COURT: Please be seated, everyone.

Mr. Camiel, whenever you're ready.

BY MR. CAMIEL:

Q. Special Agent Espeland, I wanted to turn to some

questions about the search of the Honda CR-V.

A. Okay.

Q. Do you know how the Honda CR-V got from the airport to the location where the search took place?

A. I do not. I presume it was towed. I had nothing to do with it being moved.

Q. You're presuming that it was towed, but you don't know that?

A. I don't know that.

Q. Do you know how long you all spent searching that vehicle?

A. It would be probably a couple hours.

Q. Do you know how many agents were involved in the search?

A. I want to say probably five. I would have to look at -- the admin log would say.

MR. CAMIEL: Your Honor, I'm going to be asking questions about Defense Exhibits 282 through 289. I have shown those to the government counsel. I don't think there is any objection.

MS. SHERMAN: I don't have objections to any of those.

THE COURT: To their admission. Then 282 through 289 Defense are admitted.

(Defense Exhibit Nos. 282 - 289 admitted.)

BY MR. CAMIEL:

Q. Can we look at Defense 282?

And that's on the driver's side, back passenger area of that vehicle; is that right?

A. That's what it appears to be, yes.

Q. Does that look like the way you found it before you started searching?

A. If this is an entry photo, then yes, this is what it would look like.

Q. Then if we could look at 283.

The driver's seat with the door open?

A. That's what it appears to be, yes.

Q. That floor mat would have been taken out and examined; is that right?

A. Yes.

Q. And the steering wheel would have been swabbed?

A. I believe the steering wheel was swabbed, but I don't recall exactly.

Q. And the door handle inside and out?

A. As in swabbing?

Q. Yes.

A. I believe so.

Q. And again, the purpose of that is to see if there is any blood, other biological material?

A. Yes, if there was something that appeared to be

that way, then it would be likely that that test would be completed.

Q. And when you're doing the swabbing, are those swabs then put into some kind of an evidence bag and sent to the lab?

A. Yes.

Q. Or are they being tested right there, which is kind of a presumptive test?

A. They would be collected and submitted.

Q. And then if we could look at Defense Exhibit No. 284.

This is on the passenger side backseat; is that right?

A. Yes, that's what it appears to be.

Q. And then Defense Exhibit No. 285.

The engine compartment?

A. Yes.

Q. And then 286.

It's a little dark, but that's kind of the front, the console area and the shift lever?

A. Yes.

Q. And the keys here, look like keys to the vehicle?

A. Yes.

Q. And then 287.

That's the tailgate area; is that right?

A. Yes.

Q. Was the panel removed to look in that area as well?

A. Yes, they were.

Q. Do you know if the door panels were removed on the vehicle to look inside those as well?

A. I don't recall if they were.

Q. And then Defense Exhibit No. 288.

Again, the tailgate area; is that right?

A. Yes.

Q. And you can --

A. Or the cargo area of the back of truck.

Q. And you can see it's been lifted up; is that right?

A. Yes.

Q. That's where the spare tire would be?

A. Presumably, yes.

Q. And then 289.

That's the contents of the CR-V; is that right?

A. Yes. Appears to be the same materials that was in the backseat.

Q. And you -- there was a government exhibit that we looked at earlier that showed the front seat with the mail or the envelopes on it. Do you recall that?

A. Yes.

Q. Do you know if those were seized or sent to the lab or anything was done with those?

A. I would have to look at the evidence log to see if those were seized.

Q. Did you take any close-ups of the paperwork there other than what we saw here?

A. I don't recall if we did or not. Again, I would have to look at the photo log. I took a lot of photos that week.

Q. Let's move on. I want to ask you some questions about the initial search that you were involved in at the Wells' residence in April. I think it started on April 14th of 2012; is that right?

A. It would be that week, yes.

Q. And could we look first at Government Exhibit No. 141?

Does that look like one of the entry photos before you started searching?

A. I would have to look at the photo log to see which number this is, if this was when we got there or if this was after or some other time during the search.

Q. Do you recall the three tires being out front of the house?

A. Well, there are three tires in this photograph. I don't recall whether they were there when we first got

there or --

Q. Okay. Could we look at Defense --

MR. CAMIEL: Your Honor, I believe Defendant's 275, 276 -- let's see, 275 to 281, I think the government has no objection.

MS. SHERMAN: No objection.

THE COURT: Then those will be admitted, 275 to 281.

(Defense Exhibit Nos. 275 - 281 admitted.)

BY MR. CAMIEL:

Q. Could we look at 275?

And this is similar to a view we saw earlier, but this one shows -- well, does this look similar to one of the ones we saw earlier today?

A. It's in the same general direction of a photo we have seen earlier.

Q. And there was a law enforcement vehicle that was blocking the bottom of the driveway; is that right?

A. I believe so.

Q. So during the course of the search, although the Wells were allowed to come retrieve some things like medicine or some clothing, they weren't allowed to be up at the house or in the house when you were searching; is that right?

A. When we conduct search warrants, if the owners of

the residence are there, they're allowed to remain if they stay where we need them to stay, but if they choose to leave, then they are not allowed back.

Q. In this instance when you started searching, the Wells weren't at the house, right?

A. Not that I recall, no.

Q. Can we look at Defense 276?

Again, another view, maybe similar to the one we just saw a while ago?

A. Yes.

Q. And 277.

This is up in the attic of the house; is that right?

A. It appears to be, yes.

Q. So that was another area that you searched?

A. Yes.

Q. 278.

That's some clothing that you separated out during the search of the house and took a photograph of; is that right?

A. Again, I would want to refer to the photo log, but looking at the photograph, it does look like it's inside on some carpet.

Q. And 279.

This is under the deck, area under the deck?

A. It appears to be an external photograph of the outside of the house, yes.

Q. 280 is just another view of the garage; is that right?

A. That's what it appears to be, yes.

Q. And 281, just another view of that area?

A. Yes.

Q. When you searched the house, among the things you found were some firearms; is that right?

A. Yes.

Q. I would like you to take a look at -- I don't know if the government -- first, I'll have you take a look at, just for foundational purposes, Defense Exhibit No. 194.

Does that appear to be a firearm that you found during the search of the house that you photographed?

A. Yes.

MR. CAMIEL: I would offer Defense 194.

MS. SHERMAN: I don't object.

THE COURT: 194 is admitted.

(Defense Exhibit No. 194 admitted.)

BY MR. CAMIEL:

Q. And then if we could look for foundational purposes at Defense Exhibit No. 193.

Does that appear to be a photo that you took of a

belt with a holster?

A. Yes, it does.

MS. SHERMAN: No objection.

MR. CAMIEL: I would offer then 193.

THE COURT: 193 is admitted.

(Defense Exhibit No. 193 admitted.)

BY MR. CAMIEL:

Q. If we could go back to Government Exhibit No. 146.

This is a photo that you took during the search where you laid out these items on a sheet of paper; is that right?

A. Yes.

Q. And that's actually black powder muzzleloading material, isn't it?

A. It is some form of Pyrodex Powder. I can't tell, but it's something that would be commonly found with someone who reloads.

Q. Do you know if it's for muzzleloading?

A. I can't tell from that photo if that is what it is.

MR. CAMIEL: That's all. Thank you.

THE COURT: Redirect?

MS. SHERMAN: Just a couple questions.

REDIRECT EXAMINATION

BY MS. SHERMAN:

Q.   We saw some photos of some shop rags taken out of the Wells' truck?

A.   Correct.

Q.   Did any of those -- did you look at those and see any indication of any feces on those?

A.   I did not.

Q.   No smell?

A.   I didn't observe any odors of that nature during that search.

Q.   What about we saw a photo of a pair of cargo pants laid out on a piece of paper and some carpet behind that?

A.   Yes.

Q.   Any indication of feces on those pants?

A.   Not that I recall, no.

MS. SHERMAN:  Those are all my questions.

THE COURT:  Thank you, sir.  You may be excused.

(Witness excused)

THE COURT:  Your next witness?

MR. SKROCKI:  Yes, Your Honor.  We call Robert Shem.

(Pause)

MR. SKROCKI:  I'm going to go see if someone is

going to get Mr. Shem.

MS. SHERMAN: I'll go look.

THE COURT: Thank you.

(Pause)

THE COURT: Good morning. If you could come up to the witness stand, sir. When you get there, if you remain standing, the courtroom deputy will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: Yes. It's Robert Shem, R-o-b-e-r-t. Last name S-h-e-m.

ROBERT SHEM, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SKROCKI:

Q. Good morning, Mr. Shem.

A. Good morning.

Q. Sir, are you currently employed?

A. I am not.

Q. You're retired?

A. Retired.

Q. Would you please tell the jury where you retired from.

A. Yes. I worked for the State of Alaska crime

laboratory for 30 years.

Q. What did you do for the State of Alaska crime lab for those 30 years, Mr. Shem?

A. I was a forensic firearm and tool mark examiner.

Q. During that -- when did you first start? Do you recall what year that was?

A. I was trained by the Illinois Department of Law Enforcement starting in August of 1980, and I worked for the Illinois system for six years after going through a student instructor training program at their training and applications laboratory.

So I had a two-year training course with Illinois and then about four years on the bench, and then I transferred to Alaska when they opened the laboratory as one of their initial hires.

Q. Did you develop a specialty when you came to Alaska with respect to firearms examination and other things concerning firearms, bullets and things of that nature?

A. Yes. When I got my initial training in Illinois, it was for firearm and tool mark identification. And after that, in order to keep current with the science, then I was involved with some of the forensic associations, such as the Midwestern Association of Forensic Scientists and the Northwest Association of

Forensic Scientists, and also an association known as the Association of Firearm and Tool Mark Examiners, which was examiners in my specialty, their group.

And so basically using these groups for continuing education, going to training seminars, being involved in research and development.

Q. Have you testified in state and federal court in Alaska concerning firearms and tool marks?

A. I have.

Q. And do you have -- have you had occasion to instruct in these areas as well over your career?

A. Yes. For a while, I was certified by the Alaska Police Standards Council on utilization in crime laboratory and collecting and preserving firearm and tool mark evidence.

MR. SKROCKI: Your Honor, we would move to have the Court find that Mr. Shem has the experience, background and education to give an opinion on the topic inquired upon in the area of firearm and tool marks in this case.

MR. CAMIEL: No objection.

THE COURT: I'll find the witness so qualified.

Go ahead, please.

MR. SKROCKI: Thank you.

BY MR. SKROCKI:

Q. Mr. Shem, were you asked to conduct some exams with respect to some bullets and bullet fragments in this case?

A. I was.

Q. Were you also requested to conduct some firearms examinations with respect to certain bullets and fragments that you were provided from law enforcement in this case?

A. Correct.

Q. With respect to those bullets and bullet fragments, were you given five bullet fragments, bullets, essentially two jackets and three bullets --

A. Correct.

Q. -- from law enforcement from the crime scene in this case?

A. Yes, sir.

Q. Did you perform a test on those fragments and those bullets?

A. I did.

Q. Would you please tell the jury what tests you performed and the reason for performing those tests?

A. Yes. I was given some items of evidence, some fired bullets and bullet fragments, and I was asked to see if I could determine the caliber. In addition to determining the caliber of the bullets, they wanted to

see if I could look at the bullets themselves and see what type of rifling was on them so that I could determine possible makes and models of firearms that could have been used to fire those bullets.

Q. Did you come to a conclusion based on your examination of those five bullet fragments?

A. Yes, I did.

Q. Please tell the jury what your conclusion was.

A. What I found was that the bullets are of the .44-caliber class and they have on their surface five lands and grooves with right-hand twist, that is they have the reproduction or the markings from the inside of the gun barrel on the surface of each bullet, which then, looking at the types of marks that are left on there, the so-called class characteristics, that is the rifling characteristics engraved on the bullets, I was able to determine that from using a reference material known as the general rifling characteristics file, I was able to determine that these bullets could have been fired from a Smith & Wesson revolver, a Taurus or a Llama, or any other gun that may have had that type of rifling put in the barrel when it was manufactured.

Q. With respect to the fragments and bullets that you examined, did you render an opinion as to the bullets from the crime scene coming from one particular

gun or another?

A. Yes. In addition to looking at class characteristics, then I placed the bullets that were recovered under the microscope and looked for the individual marks that are left behind by the manufacture process. These are so-called individual characteristics, will show themselves as kind of like a series of strident marks or scratches, which under the microscope with the oblique lighting look a lot like a barcode on a product that you would buy in the store.

And these markings there were able -- were sufficient in quality and quantity that I was able to establish that all of these five bullets and fragments were fired from the same firearm, the same revolver.

Q. All the bullets from the crime scene that you were given came from the same gun, were fired from the same gun?

A. Correct.

Q. And that gun was of what possible type?

A. Well, it's a .44 Magnum with five lands and grooves or right-hand twists, and so the most likely candidate would be a Smith & Wesson revolver. There is also other less common firearms, such as the Taurus and the Llama, which will fall in that group, but knowing the types of guns that are present in Alaska, the Smith

& Wesson Model 29 or the Model 629 are very common bear protection guns, if you will.

Q.  I'm going to ask you to slow down just a little bit for our reporter, Sonja, whose fingers are smoking. You speak faster than I do, so just slow down just a little bit if you could.

Mr. Shem, your conclusion was that these bullets all were fired from the same gun that you examined, correct?

A.  Yes, sir.

Q.  And you talked about three types of firearms: One, the Smith & Wesson and the Llama and the Taurus.

Have you had occasion to fire these firearms yourself?

A.  Yes, I have.

Q.  In terms of the Llama, is that a gun that's prevalent in Alaska, to your knowledge?

A.  Not particularly, no.  I never saw very many in casework.

Q.  How about the Smith & Wesson and the Taurus?

A.  I saw more Taurus than Llama, but the Smith & Wesson by and far is the most popular of the .44s with the five lands and grooves or right-hand twist.

Two guns that are very popular would be the Ruger revolvers, either the Blackhawks or the Redhawks, and

then the Smith & Wesson Model 29 or stainless steel version, Model 629.

Q. Were you given some firearms from law enforcement to examine with respect to determining whether the bullets and bullet fragments from the crime scene were fired from the guns you were given to examine?

A. I was.

Q. And you were given a Ruger Blackhawk to examine?

A. I was.

Q. What else were you given to examine?

A. I received a couple of Smith & Wesson Model 629s, and I believe another semiautomatic pistol.

Q. Okay. And with the guns that you examined, none of those firearms shot the bullets that were found at the crime scene?

A. That's correct. Several of the guns I was able -- that had the same rifling class, I was able to positively eliminate them based on the types of marks that were individual that were left on the bullets. And then several others, I just did not find matching patterns, which suggested to me that we did not have the gun that we were looking for.

Q. And that Ruger Blackhawk came from Mr. Wells' residence?

A. I'm not aware of where it was received.

Q. Okay. One moment.

If we can, Exhibit No. 266 for identification.

And do you see those two photographs, Mr. Shem?

A. I see one of them, yes.

Q. And there's the other?

A. Yes, sir.

Q. Okay. Are those photographs in your report of two .44 Magnum stainless steel revolvers that you examined?

A. They are.

MR. SKROCKI: Before we publish these, Your Honor, I talked to defense counsel prior to. These are not associated with Mr. Wells or seized from his residence. They were seized from another residence.

THE COURT: All right.

MR. SKROCKI: Move to admit 266.

MR. CAMIEL: There is no objection.

THE COURT: That will be admitted.

(Exhibit No. 266 admitted.)

BY MR. SKROCKI:

Q. Mr. Shem, this is one of the firearms you examined?

A. It is.

Q. And what kind of firearm is it?

A. It's a Smith & Wesson Model 629-1.

Q. And what caliber?

A. .44 Magnum.

Q. And what's the barrel length on that firearm?

A. I believe that's a four-inch barrel on that one. 4.1 to be precise.

Q. If you can go to the next photograph in 266.

What type of firearm is that?

A. That's the same model of firearm with a longer barrel.

Q. And are those two of the ones that you examined in connection with this case?

A. Correct.

Q. These were not the firearms that fired the bullets or bullet fragments you were given from law enforcement?

A. That is correct.

Q. How did you make that determination?

A. Well, when you look at both of those firearms, towards the front sight you will see a small, kind of a trapezoidal dark area. That's actually a port. That's known as a magna port, which is a special set of holes, one on each side of the front sight that's been machined into it with electronic machining to help reduce the recoil so when the gun is fired it doesn't kick up as hard.

Those particular ports, when the bullets slide past those ports, they get a nice groove or gouge on each side of the bullets. When I looked at the five bullets that were recovered from the crime scene, none of them had that type of gouging on there, so it was very easy to eliminate these, even though they had the same general rifling characteristics, that is, they were .44 caliber and had the five lands and grooves or the right-hand twist, but because they lacked -- the bullets from the crime scene lacked the gouges from the porting, I was able to eliminate both these guns as being the source.

Q. Okay. Were you able, sir, in the course of your testing to determine what type or manufacture of the bullets that you examined from the crime scene?

A. Yes, to a certain extent, yes. I was able to find some comparabilities to some standards I have.

Q. Could you tell the jury what you found?

A. Yes. I'll have to take a peek of my notes here. I did see -- one second here. I found one -- one of the items, 13A, was comparable in its construction features to a Winchester 240-grain jacketed soft point with a product code Q4240. And item number 37 was the same -- the same characteristics.

Q. That would be one fired bullet, item 37?

A. That's correct. And then item number 38, again, it was comparable to the Winchester 240 jacketed soft point with the same product code. Same goes with item 62. Again, it's comparable to the Winchester 240-grain jacketed soft point. And the same goes for item number nine, that has the same characteristics.

Q. So as to those five bullets you received from the crime scene, they all had similar characteristics as to manufacture?

A. Yes, sir.

Q. What would that be again?

A. That would be the Winchester model -- one second here just to make sure I don't misstate this. The Winchester 240-grain jacketed soft point with the product code Q4240.

MR. SKROCKI: That's all I have for Mr. Shem. Thank you.

THE COURT: All right. Mr. Camiel?

MR. CAMIEL: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CAMIEL:

Q. Good morning, sir.

A. Good morning.

Q. Got to get the equipment squared away here first.

So as a starting point, in addition to the

bullets that you examined that came from the crime scene
or from the victims, and the firearms you just talked
about, you were also presented with several slugs and
metal fragments that you understood had been pulled out
of a hill out of the dirt in Mr. Wells' backyard?

A.   Correct.

Q.   You examined those to see if there was any
comparison that could be done to the bullets from the
crime scene?

A.   Correct.

Q.   And you couldn't find anything that was
consistent from the ones you could examine?

A.   That is correct.

Q.   Now, it sounds like you were presented with a
number of different firearms to look at including Mr.
Wells' Ruger Super Blackhawk; is that right?

A.   Correct.

Q.   That didn't fire the bullets that were found at
the crime scene or in the victims, right?

A.   That's correct.

Q.   And the two Smith & Wessons that you were
presented with, those came from a friend of Mr. Wells',
the Penningtons; is that right?

A.   You know, I'm not aware of the source of them,
but that's -- I believe I heard the prosecutor mention

that.

MR. SKROCKI: We would stipulate to that, Judge.

Q. And those didn't fire the bullets that killed the two victims that were found at the crime scene, right?

A. Correct.

Q. Now, you mentioned that the Smith & Wesson -- the bullets that were found at the crime scene and the fragments, you determined were most probably from either a Smith & Wesson, a Llama or a Taurus .44-caliber firearm, right?

A. Yes, sir.

Q. And there could also be some other types of firearms that would have the same characteristics, the five lands and grooves with a right twist?

A. Correct.

Q. And I think you already mentioned that the Smith & Wesson is one of the most popular .44s up here in Alaska?

A. That is correct.

Q. For bear protection primarily; is that right?

A. Yes, sir.

Q. And you would expect to see quite a lot of those -- quite a number of those on Kodiak, where they have a lot of bears?

A. Yes, sir.

Q. Do you have any idea how many Smith & Wesson .44 Model 29s or 629s have been manufactured by Smith & Wesson, say, between the eighties and 2012?

A. No idea.

Q. Would you agree that it's probably hundreds of thousands?

A. I don't know about hundreds of thousands, but certainly thousands or tens of thousands, but I don't know about hundreds of thousands. That could be possible, but I kind of doubt it, because I don't know if that's as popular of a firearm compared to other ones.

Q. You know that the .44 Magnum became a very popular firearm after the Clint Eastwood movies?

A. That's correct.

Q. You also talked about the type of bullets that were found at the crime scene, and I think you indicated that those might be Winchester brand?

A. Correct.

Q. Which is a very popular commercial brand of ammunition; is that right?

A. That's correct.

Q. So there was nothing particularly unique about those -- that type of ammunition?

A. No, sir.

Q. Were you also given a Taurus firearm to test; do you recall that?

A. I believe there is one there, yes. Let me see. Yes, I received actually two Tauruses. I received a .44 Magnum and a .44 Special caliber bolt Taurus, one model ultralight titanium revolver and just a generic Taurus .44 Special revolver.

Q. Neither one of those fired the bullets that were involved in this case?

A. I couldn't associate them with the bullets.

Q. And you received another firearm from Mr. Wells, a .45-caliber Ruger semiautomatic pistol?

A. There was one submitted, but I'm not certain who they came from. I just received them from the evidence.

Q. It was a .45-caliber, right?

A. I believe there was one, yes. Let me see here real quick. Yes, I received a Model .45 ACP-caliber Ruger Model P345.

Q. And that couldn't have fired these bullets either?

A. No, it's a different caliber.

MR. SKROCKI: Judge, we would again stipulate that came from Mr. Wells' residence.

THE COURT: All right.

BY MR. CAMIEL:

    Q.  Can we look at Government Exhibit No. 146?

       I don't know that you have seen this before, Mr. Shem, but I wanted to ask you whether that looked like muzzleloading equipment?

    A.  Yes, it is.  Some of it is, yes.

          MR. CAMIEL:  Thank you.

          THE COURT:  Any redirect?

          MR. SKROCKI:  Nothing.  Thank you.

          THE COURT:  Thank you, sir.  You may be excused.

          (Witness excused)

          THE COURT:  Your next witness?

          MR. SKROCKI:  We call Brett Mills.

          THE COURT:  Good morning.  If you could come forward to our witness stand, please.  When you get up there, if you would remain standing, the clerk will administer an oath to you.

          (Oath administered to the witness)

          DEPUTY CLERK:  For the record, can you please state your full name and then spell your full name.

          THE WITNESS:  My name is Brett Mills, B-r-e-t-t, M-i-l-l-s.

          BRETT MILLS, GOVERNMENT WITNESS, SWORN

                 DIRECT EXAMINATION

BY MR. SKROCKI:

Q.   Good morning, Mr. Mills.

A.   Good morning, sir.

Q.   Sir, if you could please tell the jury where you work and in what capacity.

A.   I work at the FBI laboratory in Quantico, Virginia.  I am a firearms tool mark examiner.

Q.   If you could just briefly describe to the jury the work you do as a firearms and tool mark examiner.

A.   I receive evidence from federal, state, local, sometimes even international law enforcement agencies, and it could be anything from bullets and firearms, or it could be tools, say a door that was pried open.

But my job is to examine it, see if I can or cannot identify the evidence to each other or if I can exclude them from each other.  And then after that, I'll write a report.  And then if called upon to testify, I will do that.

Q.   You have done this for how long, sir?

A.   I have been in the laboratory for over 30 years, and now qualified, I believe it's 26.

Q.   And with respect to the examinations that you have conducted over the course of your career, what do they include in terms of firearms and tool mark analysis and comparison just by way of example?

A. So mostly it's like you see on the TV. You have a firearm cartridge case is left at a scene, bullets recovered from bodies. The investigator will think it's the gun and so he'll send it to the lab in order for us to do the processing.

For tool marks, it's more of usually your breaking and entering, auto theft, chop shop rings. They use tools to actually chop up the vehicle and sell the parts, so we can compare those and see if those were the tools that were used to commit the crime.

MR. SKROCKI: May I have just a moment, Judge?

THE COURT: Yes.

(Pause)

BY MR. SKROCKI:

Q. With respect to your work, do you also train others with respect to tool mark and firearm analysis?

A. Yes, sir. The laboratory does teach classes in firearms identification, tool mark identification, gunshot residue, serial number restoration, and bullet trajectory reconstruction or shooting incident reconstruction.

Q. Over the course of your career, if you could estimate how many exams you have done in the area of tool mark and firearms analysis?

A. It's well into the thousands easily.

    Q.  And you have been qualified in state and federal
courts with respect to firearms and tool marks analysis
over the course of your career?

    A.  Yes, sir, I have.

    Q.  Including here in Alaska?

    A.  Yes, sir, I have.

            MR. SKROCKI:  Your Honor, we would move to ask
the Court to find that Mr. Mills has the experience and
training, background and education to render opinions on
the topics inquired upon in this case.

            MR. CAMIEL:  No objection.

            THE COURT:  I'll find the witness so qualified.
Go ahead.

BY MR. SKROCKI:

    Q.  Mr. Mills, you were asked to conduct several
exams with respect to this case, yes?

    A.  That is correct.

    Q.  And the first one -- we're going to sort of go
through them subject by subject.  The first we're going
to talk about is clothing.

        Were you sent clothing to examine with respect to
the homicides in this case?

    A.  Yes, sir, I was.

    Q.  In general, what were you asked to look for?

    A.  I was asked to do gunshot residue.  It's not like

you would see from hand swabs. This is from a perspective of the end of the barrel to an object. In this case, it was clothing.

And so when a bullet leaves the end of the barrel, it's not the only thing that leaves. You have gas, you have partially burnt and unburnt gunpowder and you will have vaporous lead and particulate lead.

If the firearm -- and this is usually rule of thumb: Greater than six feet, you usually won't see that pattern because it's very fluid. It will just expand and dissipate real quick, but if it's less than six feet, you can create that pattern. It will catch on the surface of whatever is in between there.

You can chemically process it and then test fire using like ammunition in the gun to determine a distance. So that was the exam that was asked of me, to see if I could do a distance determination.

Q. Were you asked -- were you able to determine whether there was any residue of a gunshot or a firearm shot on the clothing of Mr. Belisle and Mr. Hopkins?

A. On Mr. Belisle, yes, sir. The only thing I could get was it's referred to as bullet wipe. So when a bullet passes through the garment, any vaporous lead or particulate lead that has abraded to the surface, when it passes through, it will transfer to the garment.

When I process it, it will create a purple visual effect. So I believe three of the holes on Mr. Belisle's clothing tested positive for bullet wipe. On Mr. Hopkins, bullet wipe was negative, but I had copper particulate.

Q. And that would come from what, sir, in your experience?

A. From a bullet and a bullet jacket.

Q. Were you asked to conduct an exam with respect to metal fragments in the trash can?

A. Yes, sir, I was.

Q. Did you have any results with respect to that exam?

A. The trash can was chemically tested for lead and copper. One of the holes tested positive for lead. The other hole tested positive for lead and copper. The fragments that were recovered in the trash can were consistent with lead, but there were no marks of value on them.

Q. Were you provided a piece of furniture of that furniture within the crime scene for testing as well?

A. Yes, sir, I received a cabinet door.

Q. And what did you test that for?

A. There was a possible impact on the surface of the door and I was asked to test to see if it would test

positive for either lead or copper. And it did test positive for lead.

Q. But not for copper?

A. No, sir.

Q. Were you provided some of what was described as debris to examine from the crime scene as well that was collected from the investigation?

A. Yes, sir, I believe it was in the foyer. It was a small non-magnetic piece of fragment, but source was unknown and there were no marks of value for comparison purposes on that.

Q. Were you also asked to exam some seized pistol cases and holsters from the investigation sent to you?

A. Cartridge cases, sir?

Q. Pistol, revolver cases.

A. Oh, as the holsters. Yes, sir, I did. There were I believe four holsters and a pistol case that I examined.

Q. With respect to those items you examined, were any of them matching with respect to a Smith & Wesson .44-caliber revolver with a six-inch barrel?

A. No, sir, not that make and model.

Q. Were you asked to conduct any firearms testing?

A. I was requested to do a .44 Magnum Ruger Blackhawk revolver and to examine a .44 Magnum

Winchester carbine.

Q. The results of that -- I'm sorry. Let me rephrase that.

What kind of exam did you do with respect to those firearms?

A. Did basically a simple function to see if the gun fired as designed. There were some cartridge cases that were submitted. Two of them, I believe -- two of them were identified back to having been fired in the Marlin rifle, and I believe two of them were identified as having been fired in the Ruger.

Q. Did you have occasion to examine those firearms with respect to bullets that were sent to you from investigators from the crime scene?

A. Yes, sir, I did.

Q. Was there a match with respect to those or not?

A. No, sir, they were excluded.

Q. Excluded being negative?

A. Yes, sir, the bullets from the scene were not fired by those two weapons.

Q. As part of your work as a firearms tool mark examiner, do you have occasion to compare certain bullets, one bullet to another?

A. Without a gun? Yes, sir.

Q. Without a gun, yeah. Did you do that in this

case?

A. Not bullet to bullet. Are you talking about fired ammunition?

Q. Maybe it's my nomenclature, so let me back up.

Were you asked to compare bullets seized from the crime scene with bullets seized from Mr. Wells' home in this case?

A. There were two bullets and two bullet jacket fragments from the scene. I was given basically close to 400 rounds of ammunition, which is a cartridge itself. The cartridge is what houses the bullet, if that's what you're referring to.

Q. See, it was my nomenclature.

A. Yes, sir.

Q. Were you asked to compare cartridges seized from Mr. Wells' home in a small pouch to bullet fragments and bullets seized from the crime scene?

A. Yes, sir, there was -- it was a camouflage pouch. It had 12 .44 Magnum cartridges in them. Twelve of them were Winchester soft-point bullets, and one Federal hollow-point bullet.

Q. So I think either right in front of you or behind you there is Exhibit No. 150 on the floor. You see that there, Mr. Mills?

A. This one right here?

Q. Yeah. Is there a 150 tag on it?

A. Yes, sir.

Q. Could you open that up and take that out for the jury, please? Do you want gloves for that?

A. No, sir.

Q. Okay. Could you hold up the pouch for the jury to see? And you stated what kind of cartridges are in that pouch?

A. These are .44 Magnum.

Q. And how many are there?

A. Now there are ten.

Q. Okay. When you received them, how many were in there?

A. An even dozen.

Q. And if you could tell the jury -- you examined each one. What types were contained in that pouch?

A. So what I wound up -- from my exams, in order to compare the bullet to bullet, I used a kinetic bullet puller. Basically you just take the kinetic energy and it will literally allow the bullet to come out of the cartridge case and then you can get to the powder, but it doesn't damage the bullet, doesn't create marks or anything on it.

Then I can look at what I refer to as general class characteristics. So when a manufacturer designs

anything, whether it's a bullet, a car, or a firearm, they want it to look a particular way, they want it to perform in a particular way.

So with ammunition, depending on who's their engineer, you could have a hollow point. There has been at least six or seven different types of hollow points. The rule still stays the same, it's a hollow cavity in the nose of the bullet.

The base of the bullet, do they want to facilitate the expansion so that as the bullet travels down the gas doesn't pass by the bullet, you want that tight seal, so they will put a concave shape in the base of it.

All of these are their design characteristics. And normally they will not cross over into other manufacturers unless they are licensed to.

So in this case, the Winchester that I pulled was a soft point. It had actual cannelure. Cannelure is the narrow grooves that are cut around. For revolver ammunition and rifle ammunition, it's basically used to seat the bullet at the proper height. Originally the design was you would lubricate it with a grease or a wax so that it wouldn't foul the barrel as easily.

The Federal -- oh, and it had a concave base. The Federal was a hollow-point bullet and it had a

jacket on it, but it was flattened on the bottom.

Q. So how many -- you mentioned Winchester. What was the grain weight of that?

A. It's a 240-grain bullet.

Q. And there was a Federal bullet in there as well, in that pouch?

A. Yes, sir, it was.

Q. How many Winchester 240-grain soft points and how many Federals in that pouch, Exhibit No. 150?

A. There was 11 Winchester with the soft points and one Federal with a hollow point.

Q. If we could have Exhibit No. 265, please, for identification.

With respect to what you just explained to the jury, Mr. Mills, did you create a photograph to help you explain it more clearly?

A. Yes, sir.

Q. On the -- did you take this photograph?

A. Yes, sir, this is from my notes.

Q. And the one to the right, you took that one as well?

A. Yes, sir, I did.

Q. And with respect to two bullets on the left, one comes from the crime scene, correct?

A. Yes, sir.

Q. And other comes from the pouch?

A. Yes, sir.

Q. All right.

MR. SKROCKI: Move for the admission of 265.

MR. CAMIEL: No objection.

THE COURT: 265 is admitted.

(Exhibit No. 265 admitted.)

BY MR. SKROCKI:

Q. Mr. Mills, you're the expert, so why don't you walk us through the comparisons that you made and what formed the basis of your comparison and your opinion, please.

A. All right, sir. So on the left-hand side, this is a bullet that was recovered from the scene. You can see a land impression and a groove impression. So this bullet has actually been fired.

The one on the right is a bullet that I pulled in my lab suite. And then --

Q. From where?

A. From the ammo pouch. That would be Q45 is on the right. So when you -- so for general class characteristics, I would measure from the base of the bullet to the first -- the bottom of the cannelure.

You look at the design characteristics of the cannelure itself. Then you come up and you have the

soft point, height, and then how much they actually want

to expose.

So these general class characteristics along with

the base of bullet is consistent with Winchester.

Q.  So the one on the left and the one on the right

are Winchester manufactured?

A.  Yes, sir.

Q.  Okay.  And given what you have available in terms

of forensic evidence, is there anything else

forensically you can do to further this association that

you just made?

A.  No, sir.

Q.  Can you explain to the jury why that's where your

science kind of ends?

A.  So the problem with the manufacturer of bullets,

if you just picture a big factory assembly line, they

could just start producing thousands of bullets every

shift.  And as the bullets go down, they get dropped

into a big hopper.  Say the hopper holds 100,000 rounds

of bullets, they take those and they're going to load

those into cartridges.

When the bullets are then loaded, they get dumped

into a hopper, so now say you're running two or three or

four assembly lines going to one central point, then you

have the reloading and then they go to two different

points.

You can see how you're actually going to track one actual cartridge or the tool marks that produce it. Then once they are boxed up, then it has to be shipped out. Who is their buyer? Is it Wal-Mart? Is it Dick's Sporting Goods? Each one has their own way of distributing their own ammunition. Does it go to the individual stores?

So it's statistically impossible for us to track how ammunition is manufactured, sorted, placed in the same box. So we can never say, you know, these bullets came from the exact same box if I had a box of ammunition. It's impossible for us to do it statistically.

Q. Okay. Moving on to the next area. Were you asked to examine a tire and a nail with respect to this investigation?

A. Yes, sir, I was.

Q. All right. If I could have you -- you can put that away. Please do.

If I could have you briefly jump out of the box, Mr. Mills, and have you come take a look at what we have marked as Exhibit 72. Just take a look at that for me and I'll ask you some questions when you get back to the microphone.

(Pause.)

Q. Do you recognize that item?

A. Yes, sir, I do.

Q. What is that, sir, besides being a tire?

A. When it was brought into the laboratory, it was assigned a specimen number. For me it's Q86. I'm not sure what government exhibit it is. It's a truck tire. Looks like it has -- basically a snow tire.

And in the original examination there was a wheel and there was a nail that was sitting -- where you see that yellow circle right there, you could actually see the head of it. So it would be more like a box nail or not like a finished nail.

So because I was going to have to disassemble the tire, we transferred the evidence to our special photo unit. That's a photography unit that does specialized photos for these. They took photos of the nail as the condition it was received in the laboratory. Once we removed the wheel from the tire, they photographed on the inside so that I would have a record of what the nail looked like.

In order for me to perform my examinations, I then had to get the nail out of the tire. The tire is too big for comparisons under a comparison microscope. Comparison microscope are two microscopes that are

joined together by an optic bridge, but most of the specimens we're looking at are probably no greater than two or three inches. So in order for me to do any exams, I actually had to remove it.

Once it was all documented, I tried to push it through with just wearing gloves trying to force it out.

Q. How successful were you with that effort?

A. I wasn't.

Q. Why not?

A. The friction was too great to overcome.

Q. So what did you do?

A. So I just took a two-by-four and used it on the, basically the nose of the nail and pushed it back out and had somebody catch it.

Q. Why did you use a two-by-four?

A. It's a softer material, won't create tool marks.

MR. SKROCKI: If we could have the lights, Madam Clerk. I believe 211 to 215 are admitted.

THE COURT: Is that correct?

DEPUTY CLERK: No.

MR. SKROCKI: No? That's why we check.

BY MR. SKROCKI:

Q. Let's have for identification then 211 through 215 for Mr. Mills. We'll scroll through these briefly.

Take a look at that, Mr. Mills. Is that

something your folks with the cameras took?

A. Yes, sir, that is what I asked them to photograph.

Q. 212 as well?

A. Yes, sir.

Q. 213, please.

A. Yes, sir.

Q. 214?

A. Yes, sir.

Q. And then I have 215 here. Let's take a look at that one real quick. That's physical. Got it.

MR. SKROCKI: And if I may approach just to save a minute.

THE COURT: Certainly.

(Mr. Skrocki approaches witness)

BY MR. SKROCKI:

Q. 215.

A. 215.

Q. Yes. We'll get to that as well, Mr. Mills. That's Exhibit No. 215. You recognize that pouch and item?

A. I recognize this envelope, yes, sir.

Q. And what's contained in the envelope? You can open it if you wish. Do you need scissors?

A. No, sir, it's open.

Q. I'm thinking it's the yellow one.

A. Just in this one?

Q. Yeah, the sealed one.

A. I'm not feeling anything in there, sir. Right here?

Q. Yep. Want scissors?

A. Scissors, yes, sir.

Q. You gave me a little bit of a scare with the empty envelope, Mr. Mills.

A. I didn't mean to, sir. I was a little scared myself because I know I shipped it back.

Q. It's a big envelope with a small item.

A. Okay. Want me to take it out of this one also?

Q. No. Just describe to the jury what you have there in your hand.

A. This is what was removed from the tire. Q86.1 is my specimen number.

Q. Put it down, please. Great.

MR. SKROCKI: Move for the admission of 215 then.

THE COURT: Any objection?

MR. CAMIEL: No.

THE COURT: 215 is admitted.

(Exhibit No. 215 admitted.)

MR. SKROCKI: And the photos as well, 211 and

214.

THE COURT: 211 through 14 or just --

MR. SKROCKI: 211 through 14.

THE COURT: Any objection?

MR. CAMIEL: No.

THE COURT: Those will be all be admitted then.

(Exhibit Nos. 211 through 214 admitted.)

BY MR. SKROCKI:

Q. Mr. Mills, while you have the nail out, if you could describe for the jury the type of nail it is, and then show it to them one more time.

A. This is a 16-penny common nail, about three, three and a half inches long, shaft of about .14 inches. Normally used for old-time framing instead of like all the stick nail guns that you see nowadays.

Q. Is there a bend in the nail?

A. Oh, yes, sir, there is damage to it. The nail is -- has a slight curvature that you see along here along the shaft. There is some abrasion marks that run down the shaft, and then there is marks back up underneath the head itself.

Q. We'll see some of those in these photographs coming up, correct?

A. Yes, sir.

Q. And with the framing nail like that, is it bare

metal, is it another type of nail, can you tell?

A. Oh, do you mean is it coated or anything?

Q. Correct.

A. This was a galvanized nail.

MR. SKROCKI: And thank you, Madam Clerk. If we could have the lights.

BY MR. SKROCKI:

Q. And we'll pull up 211. That's a photo from the lab, sir?

A. Yes, sir.

Q. Okay. And if you could take the laser pointer and if you could point out some of the characteristics you see on the nail head and the tire itself.

A. So this was -- this yellow mark was already drawn on the tire itself to show me what area I was to be looking at. Found this nail inside of here.

The photographers basically captured the moment of what the nail looked like, the positioning as it was received in the laboratory. I don't know if you can zoom in, but actually you can see some abrasion marks along the side of the head across here. It's not greatly in focus. And then you actually see score marks along underneath the head itself.

Q. Okay. And then how about on the tire to the right of the nail head, what do you see there?

A. To the right, you can see where the rubber is -- has a rip or a tear inside of it.

Q. 212, please. You have inserted a ruler?

A. Yes, sir, to give scale.

Q. What does that show the jury?

A. It's showing -- you can actually tell the head of the nail is below the tread surface versus the actual height of the ruler itself with the tread.

Q. So what number should they be focusing on to show where the tread height is and the nail height is with respect to the ruler?

A. They are not directly perpendicular, but the depth is probably about six or seven, if you imagine the ruler being straight up, but the nail itself is probably about two or three.

Q. Okay. And 213. Blair, if you could enlarge that for us, see how that looks.

Mr. Mills, let's start down at the bottom of the nail head here.

A. Yes, sir. So you can see abrasion marks going along the edge of the head of the nail here. I couldn't define the source as to what would have caused that. You can see that there is some red-ish paint or appears to be paint along the surface, and then I guess I would call it a putty.

And then there is a score mark that comes across the surface here. Again, I couldn't identify a source on that one.

Q. Bear with me just a moment. When you say score mark, because it's hard to see, it's above the blue line I have just put there. Can you point your laser pointer on that again?

A. Yes, sir. Basically it runs across the head right here.

Q. Now, does that score mark appear to be straight?

A. Yes, sir.

Q. Okay. Do you have any idea what would have caused that?

A. No, sir. It could have been sawing. It could have been abrading. That's why I couldn't give you a definitive source.

Q. Generally with a tool mark, a harder object struck a softer object to make a scoring something like that?

A. Yes, sir, for our definition of what is a tool and tool marks identification, it's just a harder of two objects. Webster defines a tool as something that provides mechanical advantage. We're just looking to see the harder object striking the softer object.

Q. Is there another item on the top of the nail

itself that you observed concerning tool mark analysis?

A. Yes, sir. I'm not sure if you can see it. The lighting is not that great. But with the shadow line you see this arc coming back up across here.

Q. Please tell the jury what your opinion is with respect to that arc.

A. It's consistent with a piston from an actuated nail gun. It could be either be pneumatic or it could be what's referred to as powder actuated, but it would be the piston coming down and striking it.

Q. We'll talk about that in a little bit more detail in a moment.

If we can go to 214. Blair, if you could blow that up. Thank you.

Is this an accurate photo of how the nail was in the tire when it arrived at your facility?

A. Yes, sir, it was.

Q. Is this the nail you tried to push through with your hands back out through the tire?

A. Yes, sir, I was wearing leather gloves, but I couldn't get it back through the rubber.

Q. Where did you place the two-by-four to push it out of the tire?

A. Oh, I just took the blunt end of the two-by-four and just pushed with downward pressure right on the very

tip.

Q. On the tip?

A. Yes, sir.

Q. If you could pull back out. If we can go back to 213, Blair. I would like to leave this up while we have the remainder of our discussion.

MR. SKROCKI: And, Judge, I think we can finish right close to noon with the direct. I don't think I'll go over. If I do, it won't be for very long.

THE COURT: That sounds fine. Everybody holding up? Very good. All right. Go ahead.

BY MR. SKROCKI:

Q. So Mr. Mills, with respect to the nail gun, or the nailer impression tool mark you saw on the nail, how did you make that determination, sir?

A. Well, with my own personal experience with nail guns themselves doing construction work. There was an arc surface to it. I can't say definitively that it was a piston from that. It's consistent with, meaning it has the same class characteristics. I only had a partial arc.

So there is two types that actually use piston drive. The original powder actuated nail guns were actually just powder driven, there was no piston. It was basically like shooting a bullet and your nail was

the bullet itself.

Then they designed, probably back in the fifties they started using different types of what they call ram sets, which are the actual pistons. Even like with your stapler, you come down, you have that anvil come down and strike it and that drives the nail down and in.

That's why I referred to it as consistent with a nail driver.

Q. Were you given nail guns by investigators in this case to examine in connection with this nail here?

A. Yes, sir, I was.

Q. How many were you given?

A. Five in total.

Q. Okay. Were you able to make any determinations or associations between the five nail guns that you received and the exhibit here where you have the nail we have depicted in Exhibit No. 213?

A. No, sir, no association.

Q. Why is that?

A. The first one was a Brad nailer, totally different type of nail. You can -- depending on -- if you've ever seen a finished nail, it's just a big straight pin.

Then you have the stick nailers. I believe there were two Hitachis that were sent in. The problem with

those is that the nails they use nowadays they are
smaller, thinner and lighter, and the head diameter is
smaller, so the throat where the nail drops in and the
plunger comes down on it is too small for the 16-penny
nail to be actually manually inserted and shot.

Q.   So the nail is too big?

A.   The nail is too big for it, yes, sir.

The fourth was a powder -- Hilti powder actuated
piston drive nail gun.  The problem with that one is the
throat was too small in diameter for the nail to
actually be placed into it.

And then the last one was a JobMaster, and it was
pretty old.  There was no piston system.  It was
basically just shoot a blank cartridge inside of it and
you drive the nail forward.  And that one, because it
wouldn't leave tool marks, I could come to no
conclusion.  I mean the throat is big enough, but it's
not going to leave any tool marks for me to make a
decision.

Q.   This last one, the JobMaster you talked about
would have fit a 16-penny nail in the throat, but since
it's powder actuated, it wouldn't leave a tool mark on
the top of the nail right there?

A.   That is correct, because the gases themselves are
actually the driving force.

Q. What could you do to determine when that nail at some point its life met that nail gun?

A. I can't.

Q. With respect to the nail itself, and we're moving away from the nail gun, did you observe any other kind of score mark or other kind of tool mark on it to indicate other types of use?

A. Just the abrasion on the side. If we're strictly, talking strictly on the head --

Q. Let's go there first and then you can go to the side.

A. So the side of the head right here, you had abrasion marks. If you have ever looked at something -- like a good example would be if you took coarse sandpaper and ran it across metal, you know how you see the scratches and everything, those are the abrasion marks that I'm talking about.

And then across the head was the score mark that was about a third of the way down that went all the way across. I can't tell you what the source would be for either of those.

Q. We can go to 214, Blair.

And similarly with the shaft of the nail, were there other marks you observed consistent with some other types of tooling?

A.   There was score marks that went along perpendicular with the shaft itself almost the full length.  Couldn't tell you what the source of that was, but it was a very hard material in order to score it.

     And then I noted that there was damage to the nose or the tip of the nail itself.  If you have ever messed up, hammered a nail in and you turned a board over and you take your hammer and you tap it you will notice how the tip will get blunted.  That's what I noted on that.

Q.   In conclusion then with respect to the nail guns you examined, that JobMaster, it's possible that that could have shot that nail?

A.   It is possible, yes, sir.

Q.   Just by how mechanically it's set up to do that?

          MR. CAMIEL:  Your Honor, this is all leading.

          THE COURT:  That's sustained.

          MR. SKROCKI:   That's all the questions I have for Mr. Mills, Judge, and it's five until 12:00.

          THE COURT:  Thank you, Mr. Skrocki.  All right.
Ladies and gentlemen, let's take our lunch break now.
Please leave your notepads here.  Remember my admonition not to discuss the case and let's have you back at ten after 1:00.  I hope you have a pleasant lunch.

          (Jury absent)

THE COURT: Please be seated. Sir, you can be excused. We'll see you at ten after 1:00 p.m.

Anything to take up, Mr. Skrocki?

MR. SKROCKI: Scheduling. Mr. Mills' cross and we have one, two, three, four witnesses for the day. I think there is a chance we may get to Mr. Vorder Bruegge today. I don't know if defense wants to do the *Daubert* route with him or not. He's been doing this for 25 years. Qualified in state and federal courts.

THE COURT: Even defense expert this summer said he didn't have an issue with Mr. Vorder Bruegge.

MR. COLBATH: We just have those --

THE COURT: The slides?

MR. COLBATH: Yeah.

MR. SKROCKI: If I might, while I have Your Honor's attention, I went over the slides with Mr. Vorder Bruegge last night. It's going to go very quickly. There is really only four or five, six that have real impact. The rest are leading up to what he does what he does.

THE COURT: So what I read in the defense motion at 1240 is defendant objects to the following pages that are not labeled consistent with the Court's prior order, pages 23, 26, 41 and 44. So is that the only outstanding issue?

MR. COLBATH: Yes, Your Honor. They just contain 4-19 material or reference to 4-19, but no reference to the demonstration. That's all.

MR. SKROCKI: I thought we -- you mean the disclaimer?

THE COURT: Maybe they have been fixed. This was filed September 16, so maybe you fixed that.

MS. SHERMAN: They are the lead-up, so they are just the outline, overlay comparison of question known 4-12 and 4-19. It's a title slide. So it doesn't show any video. The Court should be able to see it.

THE COURT: Let me see if I can find --

MS. SHERMAN: It should be on the screen.

THE COURT: Oh, right there.

MS. SHERMAN: It doesn't show anything from the 19th. It just says the next slide is going to be a comparison.

THE COURT: What are you seeking to have on there, if anything, Mr. Colbath?

MR. COLBATH: I guess back when I put it together, Your Honor, I believe that I was just marking anything that referred to or showed or referred to the 4-19 to make sure that the designation --

MS. SHERMAN: Because the actual 19th does --

THE COURT: If all four of these are simply

lead-in pages without any video on them, as I understand it, then I won't require anything to be added to those pages. That's what I'm hearing, all four -- there is no video of either date?

MR. SKROCKI: There is no video in any of this demonstration at all.

THE COURT: I mean any stills? They are just title slides. Then I won't require anything further there. Does that address all outstanding issues with respect to this witness?

MR. COLBATH: I think so, Your Honor.

THE COURT: Very good. Anything further from the defense to take up?

MR. COLBATH: Not at this point.

THE COURT: Very good. Then we'll take a lunch break and go off record.

DEPUTY CLERK: All rise. Court stands in recess until 1:10 p.m.

(Recessed from 12:01 p.m. to 1:15 p.m.)

(Jury present)

DEPUTY CLERK: Court is in session.

THE COURT: All right. Please be seated, everyone. Back on record here. And Mr. Camiel?

MR. CAMIEL: Yes.

CROSS EXAMINATION

BY MR. CAMIEL:

Q. Good afternoon, Mr. Mills.

A. Good afternoon, sir.

Q. You talked a little bit about doing this gunshot residue test on the victims' clothing; is that right?

A. Yes, sir, that is correct.

Q. And that's different than the gunshot residue test people might be familiar with with wiping of the hands and testing in that way?

A. That is correct.

Q. But you're looking for similar compounds and elements, right?

A. Ours is based upon nitrates, so gunpowder is basically nitrated cellulose that provides the oxygen. So when the gun discharges and it burns, it converts the nitrates to nitrites, so we're looking for a pattern. On the hands, I'm not really sure what they are looking for. I believe they are looking more for elements.

Q. And you did it on the victims' clothing, but it could be on any clothing, right?

A. It could be on clothing. We have worked on cars where a gun has been discharged within a vehicle itself. Sometimes even shooting through glass, if you're close enough, you can actually develop gunshot residue off of it.

Q. And other types of objects?
A. Yes, sir.
Q. And then you gave some testimony about the ammunition. You looked at the ammunition from the crime scene and the victims, and you determined that it was probably Winchester?
A. Yes, sir, it's consistent with Winchester.
Q. And Mr. Wells had some Winchester ammunition that was similar?
A. Whatever was in the camo pouch, yes, sir.
Q. And that's -- Winchester is probably one of the top three selling brands in terms of ammunition?
A. Yes, sir, it is one of the top three.
Q. So you can get that at Wal-Mart or any sporting goods store that sells ammunition?
A. Yes, sir, whoever sells it.
Q. And then I wanted to ask you just a couple questions about the tire. Could we look at Exhibit -- it's Government 211. I think you testified to this. There is kind of a gouge mark here in the rubber, looks like made from the head of the nail.
A. Yes, sir.
Q. So at some point that nail must have been pressing against the rubber there to cause that gouge?
A. It's one possibility, yes, sir.

Q.   Like if it was driven on and it was pressed into
the rubber?

MR. SKROCKI:  Objection; foundation,
speculation.

THE COURT:  Well, I'll allow that question.

A.   It's possible, but I don't have any wear on the
head of the nail and the nail is below the surface of
the tread.

Q.   You said you saw some abrasion marks on the head
of the nail, but you couldn't tell what the source was?

A.   Yes, sir, along the -- right along the edge right
through here.  I'm sorry.  Did you see that?

Q.   Let me clear my --

A.   Basically along the edge right around the sides
right here.

Q.   Sure.  And then you also commented that it
appeared that at some point in its lifetime that nail
had been -- some kind of a nail gun had impacted that
nail?

A.   That is correct.

Q.   But no way to tell when?

A.   No, sir.

Q.   And then you testified that you looked at five
different nailers or nail guns; is that right?

A.   That is correct, sir.

Q. And you couldn't make any association between any of those and the marks on the head of the nail?

A. No, sir, I could exclude four of the nail guns.

Q. All right. And the fifth one -- I think the last one you talked about was the Olin JobMaster?

A. Yes, sir.

Q. That didn't come from Mr. Wells' house, you know that?

A. No, sir, I don't know that. I don't know where the nail guns came from.

Q. And that one you couldn't tell anything because it wouldn't leave a mark?

A. That is correct.

Q. Did you test -- I know you said that the nail in this case that you pulled out of the tire would fit in the throat of that particular nail gun, but did you actually test fire that nail gun using a 16-penny nail?

A. No, sir, because there wasn't a piston in it. It would have just been I guess test firing it would be the only thing I could say, but, no, sir. If I could fit it inside of it though, they will shoot.

Q. Do you know whether that kind of a nailer would in fact damage the head of the nail because that 16-penny nail has a rather thin head?

A. I would disagree. The 16-penny nail has a very

robust head.  The idea for that, when they manufactured

them, is to withstand the blow of 16-ounce or 20-ounce

hammer.  I have even seen people hit them with a sledge

hammer, but you're not going to break the head.

Q.  In any event, in this case, you couldn't tell

anything either way about that particular nailer and

whether it had anything to do with the nail in this

case?

A.  No, sir.

MR. CAMIEL:  Thank you.

THE COURT:  Redirect?

MR. SKROCKI:  No, thank you.

THE COURT:  Thank you, sir.  You may be

excused.

(Witness excused)

THE COURT:  Your next witness?

MR. SKROCKI:  We call Judy Pletnikoff.

(Pause)

THE COURT:  Good afternoon.  If you could come

all the way up to the witness stand, please.  Right

around there.  Around the corner in the first door

there.  When you get up to the witness stand, if you

could remain standing just a moment, our clerk will

administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: My name is Judy Pletnikoff. It's J-u-d-y, P-l-e-t-n-i-k-o-f-f.

THE COURT: Thank you. Go ahead, please.

MR. SKROCKI: Thank you, Your Honor.

JUDY PLETNIKOFF, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SKROCKI:

Q. We always like it nice and loud, so it's not a problem with your volume, Mrs. Pletnikoff.

How are you today?

A. As best as I could be.

Q. Can you please tell the jury where you live, Mrs. Pletnikoff.

A. I live in Kodiak, Alaska. I've lived there since 1988.

Q. Can you tell the jury right now what you do for a living, please?

A. I'm the director of a small nonprofit that supports individuals with disabilities, adults, and also we just put in a behavioral health part that works with children with autism.

Q. Your position that you hold there, Mrs. Pletnikoff?

A. I'm the director.
Q. How many staff do you have underneath you?
A. Well, today it will be seven. We hire a new hire today. We have six.
Q. Does that organization you work for service the Kodiak area or other areas?
A. Only Kodiak.
Q. Just Kodiak. Do you know Jim and Nancy Wells?
A. I do.
Q. How long have you had an acquaintance with them?
A. Since 1992.
Q. And did you have occasion to work with Nancy Wells?
A. I did for many years.
Q. Could you tell the jury what kind of work you did with her?
A. She was the infant learning services coordinator at Kodiak Area Native Association where my -- I have a son with autism, and he got services there. We built what I believe is the first applied behavioral analysis program in the state of Alaska working with someone from the Lovaas Institute, so it was definitely the gold standard.
We traveled around the country to look at other programs in Princeton, New Jersey, and DC and Seal

Beach, California, to study this and build it as best we
could in Kodiak.  I think we did well.

I later -- my husband and I adopted an infant
with fetal alcohol syndrome, and he also was a
beneficiary of the infant learning program.

Q.  You mentioned your husband.  What's your
husband's name?

A.  My husband's name is Robert Pletnikoff.

Q.  And did Nancy Wells help you out with your child
with the issues that you had?

A.  Yes, she was a good infant learning provider.
She knows how to navigate the system, so that allows
parents like me to raise our children, to be a mother to
a disabled child or two, and she navigates the systems
and helps us get the resources that we need.

Q.  Mrs. Pletnikoff, about what timeframe are you
talking about with respect to the help you got from
Nancy Wells?  When did this happen?

A.  Well, we started when my --

Q.  Just what years?  I'm talking about the
timeframe.

A.  Probably 1992 or '93 until they graduated high
school, until 2012.

Q.  2012.  Do you know back in 2012 what Jim Wells
did for a living?

A. I do.

Q. Please tell the jury your understanding of what he did.

A. He was an antenna rigger. He was apparently the top rigger of the antennas in the big antenna fields at Kodiak.

Q. And did you have occasion to speak with him about his work and what he did, how he viewed himself with his job?

A. From time to time. He claimed to be the top antenna man in the country, apparently. He explained that he was in charge of training. He would go to these yearly conferences and do trainings for pretty much everybody in the nation is how he explained it, in these yearly conferences. And he did the training and took care of the antennas on Kodiak Island.

Q. Were these -- from your conversations with him, were these antenna conferences he attended important to him?

A. Tremendously.

Q. And would the failure to attend one --

MR. CAMIEL: Your Honor, I'm going to object to leading.

THE COURT: That's sustained.

BY MR. SKROCKI:

     Q.  In your view, how would he react if he wasn't
able to go to one of these conferences?

     A.  Well, I could say that, because I mean I
witnessed that.  He is just devastated.  It was a very
important part of his job to be able to get like awards
and all these accolades for his antenna work.  I think
it was a big part of his identity.

     Q.  Did there come a time where you became aware of
Mr. Wells traveling to Shemya for work?

     A.  Yes, I was there that summer.  I knew he went out
there.

     Q.  What summer was that, Mrs. Pletnikoff?

     A.  2011.

     Q.  And when he came back, did you have occasion to
observe him when he came back from Shemya?

     A.  From time to time.

     Q.  Can you relay to the jury what you observed?

     A.  He seemed very angry.  Very upset.

     Q.  Did he tell you with respect to who?

     A.  Oh, yes.  There was some fallout at work.  I
believe it was with Rich Belisle.

          MR. CAMIEL:  I'm going to object to what she
believes.

          THE COURT:  Well, that's sustained, but you can
ask what --

BY MR. SKROCKI:

Q. Did Mr. Wells speak to you about that directly?

A. I'm not absolutely certain if he spoke to me directly about that.

Q. Your impression was --

MR. CAMIEL: Your Honor, I'm going to object to leading.

THE COURT: That's sustained.

BY MR. SKROCKI:

Q. Did you have a basis from Mr. Wells as to why he was upset?

A. Yes.

Q. And what did he tell you?

A. Something was wrong at work. Someone did not follow his directions, and I think --

Q. Let me stop you right there before we get into some other area. So about directions at work?

A. Right.

Q. Did you have occasion to be social with Mr. and Mrs. Wells around the 2011, 2012 timeframe?

A. Intermittently.

Q. Did you ever see anybody from the Communications Station come to the Wells' for dinner?

A. Yes.

Q. Who would that have been?

A. Two women. Para and the other lady that worked with her, a young lady.

Q. Anybody else from the Communications Station, just those two women?

A. That's the only ones I saw.

Q. In your relationship with the Wells, did you have occasion to become familiar with their routine of when one would be gone and another one would be in Kodiak, how the car would be -- the cars would be parked?

A. Yes, I did, particularly after all their children had moved away.

Q. If you could tell the jury your understanding or knowledge as to what would happen when Nancy Wells left the island. What would happen to her car?

A. Nancy travels -- traveled quite a bit for work. She was very conscientious about her car, because when she put it in long-term, she had had her windows broken out. So after that she would let me know ahead of time, she would park her car right in front of the doors of Alaska Airlines terminal, and she would instruct me when I was to pick it up. And she would call when she got to Anchorage and make sure I had indeed picked it up. Then I would usually bring it to their house.

Q. What about with Mr. Wells, did he ever participate in moving Nancy Wells' car?

A. If he were in town, but he traveled for work quite a bit too, or traveled for something.

Q. But if he was in town, what would happen?

A. He would take it home.

Q. You're aware of the murders of Mr. Belisle and Mr. Hopkins, Mrs. Pletnikoff?

A. I am.

Q. Did there come a point in time after those murders that you occasioned with the Wells going to the airport?

A. Yes.

Q. Who was doing the driving?

A. I was driving. I picked them up.

Q. Who was in the car with you?

A. Nancy was in the passenger seat, and Jim was in the back seat.

Q. During that drive to the airport, was the FBI mentioned?

A. Yes.

Q. Could you explain the conversation to the jury about the FBI and who -- what Mr. Wells told you and what he did, please?

MR. CAMIEL: Your Honor, this should be limited not to hearsay.

THE COURT: The question was what Mr. Wells

said, not what Ms. Wells said.

MR. SKROCKI: I said Mr. Wells specifically for that reason.

THE COURT: Thank you. Go ahead.

BY MR. SKROCKI:

Q. So this is about what Mr. Wells said and did.

A. So I picked them up at their house and headed to the airport. Jim Wells said, "Did the FBI call you," and I said, "Yes." And he said, "Did you talk to them," and I said, "Yes." And he started yelling at me that he had told me to slam down the phone if the FBI called. And then Nancy started yelling.

THE COURT: Excuse me. So we only want to hear about what Mr. Wells said. Go ahead. If you want to follow up on that, without getting into the content, you can explore that and that's fine, Mr. Skrocki.

BY MR. SKROCKI:

Q. Let's just focus on Mr. Wells first. As the Court instructed, we don't want to ask about what Nancy Wells said, but I'll ask you a couple questions about some other things in a little bit. Okay?

So you're driving the car. Where was Jim?

A. He was behind me. So he started yelling loudly. And then I looked in my rearview mirror, and he was coming up like this at me. It was really scary. I

didn't know what he was going to do. It was pretty scary.

So I rolled all the windows down in the car and got to the airport and out he went, and that was the last time I think I was ever in the same room with them.

Q. How long did this last, Mrs. Pletnikoff?

A. The car ride, probably ten minutes.

Q. Was he screaming at you at whole time?

A. The whole time.

MR. CAMIEL: Objection; leading.

THE COURT: That's sustained.

BY MR. SKROCKI:

Q. What was Mr. Wells doing the whole time during this ten-minute drive to the airport with you?

A. He was yelling at me, and he wasn't even having a seatbelt on and moving up toward me behind my seat.

Q. How did you feel about that?

A. So threatened.

Q. Without saying what she said, what was Nancy Wells doing at this time?

A. She was yelling too. I was looking for her to rein him in maybe.

MR. CAMIEL: Your Honor, I'm going to object. It's beyond the scope of the question.

THE COURT: Let's hear the next question.

BY MR. SKROCKI:

Q.  What were you looking for her to do?

A.  I was hoping she would settle him down a little bit.

MR. CAMIEL:  This isn't relevant in terms of what she's looking for somebody to do.

MR. SKROCKI:  Goes to the nature of their relationship, Your Honor.

THE COURT:  I'll allow the question.

BY MR. SKROCKI:

Q.  So let's rewind just a little bit.  And what were you looking for her to do?

A.  I was hoping she would rein him in, but she was yelling too.

Q.  Thank you, Mrs. Pletnikoff.

MR. SKROCKI:  That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Camiel, go ahead, please.

CROSS EXAMINATION

BY MR. CAMIEL:

Q.  Good afternoon, ma'am.  So --

A.  I'm sorry.  I'm not sure who you are.

Q.  My name is Peter Camiel.  I'm one of Mr. Wells' attorneys.  We haven't met before or talked before?

A.  No.

Q. So you've been friends with the Wells for quite a while?

A. Uh-huh. Yes.

Q. And in fact, after -- right after the murders in this case, when the FBI seized Mr. Wells' car, you lent him a car to use, right?

A. I did.

Q. So that was on April 13th of 2012, right?

A. Okay.

Q. If the murders were on April 12th and he called and told you on April 13th that he was stuck, he didn't have a vehicle --

A. No, sir, that did not happen.

Q. You did lend him a car, though, right?

A. Yes.

Q. It was a Ford Ranger pickup truck?

A. Yes. His wife called and asked me to do that.

Q. And you did that?

A. I did.

Q. And in the days and weeks after the murder, you understood that the FBI was -- and the law enforcement people were looking at Mr. Wells as a suspect in the case, right?

A. You know, I really did not know that immediately afterward, no.

Q. You saw a picture of Nancy's Honda and Jim's truck in the local paper?

A. That wasn't immediately afterward, was it?

Q. But you do recall seeing a picture of their vehicles in the paper?

A. I remember that being explained to me, and I can tell you what that was if you want me to.

Q. No, I'm just asking whether you saw that in the newspaper.

A. Probably.

Q. All right. And you knew from your conversations with Jim and Nancy that their house had been searched several times?

A. I can tell you how that was explained to me.

Q. I'm just asking whether you knew that.

A. Yes.

Q. And you knew that the FBI was following them around everywhere they went?

MR. SKROCKI: Objection. It's going to be hearsay and speculation, foundation, and outside the scope of direct, frankly.

THE COURT: Well, I thought the parties have agreed on some flexibility on that.

MR. SKROCKI: He's going to have to stop leading the witness.

             THE COURT: But in any event, the question that you seek to ask is what, how she knew that the FBI was following them around. It's sustained insofar as you're seeking to elicit hearsay.

BY MR. CAMIEL:

Q. Did you know whether the FBI was following Jim and Nancy around?

MR. SKROCKI: I'm going to say it's going to call for a hearsay objection, a lack of foundation.

THE COURT: No, that's sustained.

BY MR. CAMIEL:

Q. Did Jim Wells express to you feelings of being upset that he was being followed around?

MR. SKROCKI: Objection. It's hearsay from the defendant.

THE COURT: That's sustained.

BY MR. CAMIEL:

Q. You knew that in -- because of your relationship with Nancy, you knew that in 2011, starting in the summer, fall of 2011, Jim was very sick, you knew that?

MR. SKROCKI: Objection; hearsay.

THE COURT: That's sustained.

BY MR. CAMIEL:

Q. Did you know whether Jim Wells was sick in the latter part of 2011?

A. Are you asking me what I believed?

Q. No, I'm asking whether you were aware of that.

A. If I'm aware of it does that mean I believe it?

Q. Well --

A. So that's a kind of tricky question, because I don't know what I can say. Because there were a lot of --

Q. Do you know whether --

MR. SKROCKI: She needs to answer the question.

THE COURT: You asked her whether or not she knew he was sick. She's trying to answer.

A. Idiopathic. There was the word they used. There were a lot of idiopathic, and that was their word, Jim and Nancy, idiopathic illnesses. And those are illness and don't make sense. So was there another idiopathic illness? Maybe.

Q. Did you ever -- did you know that Jim had surgery in early 2012?

A. I think I was aware of that.

Q. And did you know whether he missed a lot of work?

A. I did know he missed a lot of work.

Q. Now, you knew that Jim was a reader. He read a lot of books. You've seen him do that?

A. You mean paperbacks?

Q. Any kind of books.

A. They had a lot of books on a shelf in their house. I don't think I saw him reading a lot of books.

Q. Did the FBI ever come to your house in 2012 to serve Jim with papers?

A. I don't remember that. To my house?

Q. Yes.

A. It's possible.

Q. The FBI also called you to talk about Jim Wells; is that right?

A. Yes.

Q. And your knowledge about him?

A. Yes.

Q. And so based on those calls, you knew that he was being investigated?

MR. SKROCKI: Objection. Judge, if we're going to do direct, we should do direct.

THE COURT: Is your objection leading?

MR. SKROCKI: Yes, ma'am.

THE COURT: That's sustained.

BY MR. CAMIEL:

Q. What was your understanding of why the FBI was calling you about Jim Wells?

MR. SKROCKI: Speculation; objection.

THE COURT: I'll overrule that. You can go ahead and answer that.

A. Could you repeat the question, please.

Q. Sure. Why did you think the FBI was calling you about Jim Wells?

A. Because they might think I have some information they needed.

Q. Did they call you more than once?

A. Yes.

Q. Did they come to your house?

A. Yes.

MR. CAMIEL: Your Honor, that's all I have.

THE COURT: All right. Redirect?

MR. SKROCKI: No, Your Honor. Thank you.

THE COURT: Thank you, ma'am. You may be excused.

(Witness excused)

THE COURT: And your next witness, Mr. Skrocki?

MS. STEVENS: Yes, Your Honor. We are calling Donald Kiele as our next witness.

(Pause)

THE COURT: Good afternoon. If you can come around the corner, there's a door there, the first door in, and come up to the witness stand. If you could remain standing for just a moment, then the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: Donald Cecil Kiele, D-o-n-a-l-d, C-e-c-i-l, K-i-e-l-e.

THE COURT: Thank you. Go ahead, please.

MS. STEVENS: Thank you, Your Honor.

DONALD KIELE, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. STEVENS:

Q. Good afternoon, Mr. Kiele.

A. Hello.

Q. Sir, where are you from?

A. Wenatchee, Washington.

Q. And how long have you lived there?

A. Two years.

Q. Sir, what do you do for work, if anything?

A. I'm retired.

Q. How long have you been retired?

A. Six years. You lose track of these things.

Q. So long you forgot. Fair enough. What did you do before you retired?

A. I was in the shredding business.

Q. Paper or --

A. Paper.

Q. Anything before that?

A. I was in the shredding business for a long time. I was in micrographics before that.

Q. Are you married, sir?

A. I am.

Q. How did you meet your wife?

A. I was in the Air Force. I met a man who eventually became her brother-in-law, introduced us and we ended up married.

Q. So how long have you two been married?

A. 48 years.

Q. Impressive.

And what is your bride's name?

A. Theresa.

Q. Same last name?

A. Kiele, yes.

Q. Do the two of you have children?

A. We do.

Q. And who are they?

A. Our daughter is Kristy. Our son is Brian.

Q. And do you have any other family here in court today?

A. I have -- the defendant, Jim Wells, is my brother-in-law.

Q. And so who is he related to biologically?

A. He's Terry's brother.

Q. So that makes you his brother-in-law?
A. Correct.
Q. To whom is he married, if anyone?
A. He's married to Nancy.
Q. And do you see her in court today?
A. I believe she's over behind you. Yes.
Q. All right. Can you describe the relationship that you and your wife had with Jim and Nancy?
A. We were in-laws and brother-sister on the other side of it. We did see them for years and years. We lived in -- both lived in Washington for a while. He moved up here in the Coast Guard. Came back. So we spent time with them.
Q. And how often would you say you guys visited with each other?
A. Well, we would see them at our house more than -- obviously, we didn't go to Kodiak very often. We only went once. But they would stop and visit with us as they were going through somewhere else. We saw Jim probably more than Nancy because he traveled more than she did.
Q. Do you know why he was traveling through to visit you?
A. When he was by himself, I would say most of the time he was going for meetings, education to do with

tower climbing, teaching classes, that type of thing.

Q. And can you give a rough estimate of how frequent these encounters or visits were per year per se?

A. Well, with both he and Nancy coming through, and himself I would say at least two or three times a year.

Q. And when he traveled for work and traveled through on his way to his final destination, did he ever have any work colleagues with him?

A. Not at our house, no. But I understand, you know, a lot of times when he was going to work situations, he would travel with Rich Belisle.

Q. And did he ever mention Mr. Belisle to you?

A. They worked closely together. They worked together for years, and generally he would show up and Rich was meeting friends, because he used to live in Seattle also, I believe. And then they would get back together at the airport and then travel on.

Q. You mentioned you went to Kodiak one time. Do you recall when that was, sir?

A. You know, it was in the late nineties. I want to say it was '98, but it was either '98 or '99, right in there.

Q. And when you visited Kodiak, where did you stay?

A. We stayed with them.

Q. At their residence?

A. At their house, yes.

Q. How would you describe their house?

A. It was large. They had plenty of room, and they had been building on it. I'm -- it wasn't a brand-new house. It was older. Outside of town a ways. And I'm not sure what you're looking for there.

Q. Well, let me ask you another question. What kind of things did you see in the house?

A. Well, they had the normal things. He also had -- they had or he had done this always, his garage was full of everything but cars. And we all have messy garages, but Jim had a lot of tools in his garage. And he always had lots of tools.

Q. Apart from visiting in person, both, you know, at one trip to Kodiak and then them traveling through and you seeing Mr. Wells two to three times a year, did you have occasion to also speak with them either over the phone or some other way?

A. Yeah. There were phone calls lots of times. It seemed like whenever they were going somewhere they would let us know, but there were just phone calls.

Q. Can you tell us a little bit more about that, when they were going somewhere they would call and let you know? Can you explain to the jury what their routine was?

A. My wife can probably tell you more about that.

MR. COLBATH: Your Honor, excuse me, I'm going to object as to relevance, to historical travel routine.

MS. STEVENS: We can have a sidebar if you'd like.

THE COURT: That sounds fine. Let's do that.

(Begin bench conference)

THE COURT: Go ahead, Ms. Stevens.

MS. STEVENS: Well, he's -- should I let Mr. Colbath go first for the relevance argument?

THE COURT: How is it relevant?

MS. STEVENS: So they would always call -- Jim would always call Don and Terry when they were traveling, and this goes towards the vehicle, because they would tell them, Don and Terry, they would have somebody --

THE COURT: I'll allow the car moving, that's fine, but make sure he understands --

MS. STEVENS: Jim's statements?

THE COURT: Correct.

MR. COLBATH: Well, Your Honor, I'm going to object, because I don't -- first of all, with reference to timeframe, obviously, this is not anything this witness has knowledge of, other than statements. And I don't think it makes -- I think admissibility, it would

have to meet the rules under habit, and I don't think
that does. I don't think this will.

I don't think they can lay the foundation for
that, and I don't think they can show admissibility,
particularly because it sounds like when they would
travel, meaning when Jim and Nancy Wells would travel
together, they did one thing related to their cars.
Obviously, this case does not involve that circumstance;
it involves the circumstance where Nancy Wells traveled
and Jim Wells didn't.

So what Jim Wells did with his cars or didn't
do with his cars while he was traveling is irrelevant.
He didn't travel in this case. He was on Kodiak Island
the entire timeframe surrounding the murders. So what
he may or -- what Wells may or may not have done with
their vehicles historically when the two of them
traveled together, as is described by Mr. Kiele on the
stand, is a completely different scenario and situation
than this case, even if we talk history.

THE COURT: Well, the objection is overruled.
I do see that the government can attempt to prove --
bring in this testimony. It's admission of party
opponent, so it's not hearsay in terms of the habit. I
think that can be explored in cross. And under 403, I
don't see that any unfair prejudice substantially

outweighs what does appear to be fairly limited probative value, but nonetheless, I'll allow it.

MS. STEVENS: And just based on his short response, he did say, you know, it's probably better to ask my wife. For purposes of cumulativeness, I'll just save that question for her, but the same argument we would make.

THE COURT: Okay. And the same objection?

MR. COLBATH: Absolutely.

(End bench conference)

BY MS. STEVENS:

Q. Mr. Kiele, do you recall any regular instances where Mr. Wells would contact you and your wife?

A. He would call and let us know generally when he was coming through town.

Q. And did you come to learn that two people at the Communications Station in Kodiak where your brother-in-law worked had been murdered?

A. Yes, we did.

Q. And what was your reaction when you found out about this?

MR. COLBATH: Your Honor, I'm going to object to relevance.

THE COURT: I'll sustain that.

BY MS. STEVENS:

Q. So after the murders in June of 2012, did you have occasion to visit with the defendant?

A. We did.

Q. And can you tell the jury a little bit about that?

A. He and Nancy were coming through town on their way to California to visit relatives there. And they called and asked if we'd like to meet them for dinner, and we said yes. So we did. And after dinner was over, we decided that we would go back to our house and have a chance to talk a little bit.

Q. Can you tell the jury why it was you decided to have a chat back at your house?

A. It was more private. We didn't talk about anything during dinner or anything of any value. And you know, we were very curious as to what happened. And so when we got back to our house, that's what we wanted to talk about.

Q. Okay. So what happened next when you guys returned to your home?

A. Well, we sat down, my wife, I, Jim, Nancy, and our daughter Kristy. And we -- I asked Jim what happened. And Nancy started to answer, which she does a lot, and I asked her not to. I said, "I really would like to hear from Jim what happened." And so she was

quiet, and he had began telling us what happened that morning.

Q. Okay. What did he say?

A. He said he was on his way to work and had a flat tire, so he pulled over at the airport and didn't have the tools with him to change the flat tire. And so he went back home, and that was pretty much all he said.

And I looked at him, and it was pretty silent for a couple of seconds. And then he said, "Well, okay, I shit myself." "Okay. Then what happened?" "Well, I got cleaned up and -- I went into the airport, got cleaned up." Came back out. And now the tire was low, not flat, and so he drove home to change it, because he didn't have the tools to change the tire.

Q. So let's dissect that just a little bit. When he told you that he didn't have the tools --

A. Yes.

Q. -- based on your just knowing him, how did that statement make you feel?

MR. COLBATH: Your Honor, I'm going to object as to relevance.

THE COURT: That's sustained.

BY MS. STEVENS:

Q. So after he told you this statement that he had a flat tire and then it switched to having a low tire, did

he explain which one it was?

MR. COLBATH: Your Honor, I'm going to object to the form of the question.

THE COURT: That's sustained. You can rephrase.

BY MS. STEVENS:

Q. Sure. The defendant told you two versions, correct?

A. Well, he had a flat tire and then a --

MR. COLBATH: I'm going to object -- excuse me, Mr. Kiele. I'm going to object again as to the form of the question, argumentative.

THE COURT: That's sustained.

BY MS. STEVENS:

Q. Did you ever learn of a reason about the -- did you ever learn the true version -- okay. I'll withdraw.

How did Mr. Wells explain to you -- how did he explain his tire to you?

A. What I've already told you, that he had a flat tire and then he drove home to change it. But it couldn't have been flat if he drove home to change it, so --

Q. What was his explanation about that?

A. There really wasn't an explanation.

Q. And what was his explanation about not having the

tools?

A. He just said he didn't have the tools to do that, to change it.

Q. Did he say where in the airport he changed his soiled pants?

A. He did not.

Q. Did he mention anything else about the soiled clothes?

A. He said he took them home and put them in a plastic bag and put them in the closet.

Q. Did he make mention of his wife's car during this conversation?

A. Later in the conversation, yes, we talked about that.

Q. Okay. Can you tell the jury what he said about the vehicle?

A. He said that Nancy's car was left at the airport with the keys in the ashtray.

Q. Did he say anything else about that?

A. It was Kodiak, you could do that. No one would ever take your car.

Q. Based on your knowledge and your relationship, did you have a reason to believe whether this was common practice for the Wells?

A. To leave --

MR. COLBATH: Your Honor, I would have the same objection as I had.

THE COURT: And that's overruled. Go ahead.

A. Okay. Please repeat.

Q. Did you have reason, any reason to believe whether leaving the keys in the car at the airport was a common practice for the Wells?

A. I would say I have no reason to believe it was common practice. Normally they would drop each other off at the airport, or at least that's what they would say in a phone call and that someone was leaving and "I dropped Jim off this morning." "I dropped Nancy off this morning." So you know, I'm not there. I don't know if they left the car there on multiple occasions or not.

Q. At any point during this visit in June, did the family express condolences to the victims?

A. Yes.

MR. COLBATH: Your Honor, I'm going to object as to calling for hearsay.

THE COURT: That's sustained.

MS. STEVENS: We can have a sidebar on this, if you'd like.

THE COURT: The family expressed condolences.

MS. STEVENS: So there was a member of the

family present that expressed condolences and so --

THE COURT: So it's not for the truth of the matter?

MS. STEVENS: It's not for the truth of the matter, and it's for the effect on the listener.

THE COURT: Do we need to have a sidebar on that?

MR. COLBATH: No. Same objection.

THE COURT: I'll allow that. Go ahead.

BY MS. STEVENS:

Q. So did anybody in your family express condolences to the victims' families?

A. My daughter did. She said, "I am so sorry for your dear friends and their families. How are they doing?"

Q. And what was his response?

A. Unexpected. His response was, "They are not my friends. They were not my friends. I hardly know them." And then he went into a rant of, "They were unqualified to work there. I taught them everything they know. They're not electronic technicians. They're not electricians. They're not anything. Rich was a" -- I mean, this just went on. Rich was a drunk and he didn't like them. They had nothing to do with them. That's pretty much the extent of that.

Q. And what was his physical reaction? How did you observe him physically during this statement?

A. Well, he tensed up. Kind of sat on the edge of the couch and let us have all this information.

Q. Did he express any sadness or empathy?

A. No.

MS. STEVENS: Your Honor, I don't have any more questions.

THE COURT: All right. Mr. Colbath?

MR. COLBATH: Just one minute, Your Honor.

THE COURT: Certainly.

(Pause)

CROSS EXAMINATION

BY MR. COLBATH:

Q. Good afternoon, Mr. Kiele.

A. Yes.

Q. My name is Gary Colbath. I don't think you and I have met or talked, have we, sir?

A. I don't believe so.

Q. Last time you were in Kodiak or you would have visited with Jim and Nancy would have been prior to the year 2000 you think probably?

A. Correct.

Q. And so I guess that is -- is a fair assumption then that as far as firsthand knowledge or anything

about what happened up here 12 years later, in 2012, you don't have any specific knowledge of any of that stuff, right?

A. Correct.

Q. And also, if I understand right, far more of the telephone conversations or contact with both Jim and Nancy were with your wife, Jim's sister, than with you, it sounds like?

A. That's correct.

Q. And I'm sure you got bits and pieces of that through her and then had some less conversations yourself?

A. Very few less conversations myself, yes.

Q. Okay. And this meeting in June would have been June of 2012 where these conversations in person at dinner, after dinner back at your house --

A. Correct.

Q. -- that would have been the first time you had spoke to Jim it sounds like since the occurrence of the murders in 2012?

A. That's not correct.

Q. Okay. You had talked to him on the phone, you personally had talked to him on the phone --

A. Yes.

Q. -- prior to that?

But apparently, you hadn't had the discussion about anything that went on, because you said when you had this meeting, you were curious about what had happened?

A. Correct.

Q. And at that point, June of 2012 -- well, strike that.

Mr. Wells passed through one other time, as I understand it, after June of -- June of 2012?

A. He did.

Q. Were you there then and visit with him or see him at all on that occasion?

A. There were actually two times. One was a little over a week later, I believe it was July 7th, when they came back from California.

Q. Right. But that was part of their same -- that same trip you said on the way down, they were headed to California, Nancy had other relatives there, her mom?

A. Right.

Q. And then on that same trip, they stopped on the way back, but then they went to Kodiak, correct?

A. That's correct.

Q. Then, as I understand it, Jim stopped one other time alone as he traveled through briefly?

A. That's correct.

Q. Did you meet with him on that occasion or have a conversation at all with him on that occasion?

A. Very brief, but yes.

Q. Okay. That's all I have for you, sir.

THE COURT: Redirect?

MS. STEVENS: No, Your Honor.

THE COURT: Thank you, sir. You may be excused.

(Witness excused)

THE COURT: Your next witness?

MS. STEVENS: Your Honor, the government calls Ms. Theresa Kiele next.

THE COURT: All right.

(Pause)

THE COURT: Good afternoon. If you could come around the corner up to the witness stand. When you get there, remain standing, if you would, and the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: Theresa Ann Kiele, T-h-e-r-e-s-a, A-n-n, K-i-e-l-e.

THE COURT: Thank you. Go ahead, please.

THERESA KIELE, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. STEVENS:

Q. Mrs. Kiele, there's a microphone right in front of you. So to the extent you can get close to it to talk in, that would be great. So we just learned that you're married to Donald and you've been married for 48 years?

A. Yes.

Q. And do you know the defendant in this case?

A. Yes.

Q. How do you know him?

A. He's my brother.

Q. And is he your only sibling?

A. No.

Q. And where are you as far as age? Are you close or far apart?

A. Close. One year.

Q. Now, obviously, you're here testifying on behalf of the Government. Is this easy for you today?

A. No.

Q. How are you feeling right now?

A. Okay.

Q. There's water up there, so if you need water feel free to grab it.

So as kids, growing up, were you guys close?

A. Yes.

Q. And growing up, did you observe your brother having any interests, any specific interests as a kid?

A. Yes.

Q. What was that?

A. He liked tools. He liked a lot of -- he liked doing things with them.

Q. And have you remained close as adults?

A. Uh-huh. Yes.

Q. And who is he married to?

A. Nancy Wells.

Q. Did you see them frequently?

A. Fairly frequently. Like a few times a year.

Q. And would your brother ever stop in and visit by himself without his wife?

A. Yes.

Q. And do you recall the occasions for when he would do that?

A. When he was traveling for business, for his job.

Q. Did you know what he did for work?

A. Yes.

Q. Can you tell the jury what he did?

A. He worked on the towers up at the COMMSTA at T-2.

Q. And how did he appear to feel about his job?

A. I think he loved his job.
Q. Would you also talk to him -- or can you tell the jury how often you would talk to him over the phone?
A. A lot of times when they were going to travel, we would talk. Or if there was something going on in one of our families, we would talk. Sometimes I would call him at the building.
Q. Tell the jury a little bit more about when he would call while he was traveling.
A. Just let me know a lot of times that he would be coming through Seattle. And if he had a layover or extra time he would come by, sometimes stay, sometimes not.
Q. And did you ever have occasion to visit him?
A. Once.
Q. Tell the jury about that trip.
A. We flew up to Kodiak or came to Anchorage, then flew over to Kodiak and went and saw them. Took a tour of the island, as much as you can take over there, the roads. And saw their house, and he gave us a tour around Kodiak.
Q. And did you stay at his house?
A. Yes.
Q. Did you observe anything -- a lot of a specific thing at his house?

A. The only thing that I thought was interesting is his garage. It was full to the brim. More stuff than I had ever seen. There was a lot of stuff in there.

Q. What kind of stuff?

A. Some of it I'm sure I couldn't even see. There was just all kinds of things. I think there was tools. There was just stuff all piled up.

Q. As an adult, did he share the same interests he had as a child in tools?

A. I think so.

Q. And did you have an occasion to -- at some point, did you come to learn that there was a murder at his work?

A. Yes.

Q. And after the murders, did your brother and his wife have occasion to visit you in June of 2012?

A. Yes.

Q. Can you tell the jury a little bit about that visit?

A. They had called us from Kodiak, and they were coming down to go to California to see Nancy's family and her mom and wanted to stop and have dinner with us and see us.

Q. What did you guys do next? What did you do?

A. We went to our house after that.

Q. What was the reason for going back to your house?

A. He said he would talk to us. He wanted to talk to us about -- just said he would talk to us when we were there.

Q. Did you have an understanding of what it was he wanted to talk to you about?

A. Not -- we were hope -- well, we were hoping we would hear what happened in Kodiak.

Q. Okay. So when you get back to the house, can you enlighten the jury as to how that conversation took place?

A. We were in our family room. And he and Nancy were on the couch, and my husband and I were sitting in chairs. And my daughter was there. And she was sitting on the floor. And my husband asked to know exactly what happened up there.

Q. What did your brother say?

A. He just started talking about the day of the murders and --

Q. What did he say about it? Did he say where he was?

A. He said that he had driven and stopped at the airport, and he was -- got out and he noticed that he had a low tire or a flat tire. A low tire I thought is what he said and -- but he said he didn't have any tools

for it.

And then he talked about -- we kind of looked at him like, okay, what else, you know, what else was there. And he said he shit his pants. And I think he said he went into the airport and came back out and looked at his tire and decided he was going to head home and change it.

Q. What happened next?

A. Just conversations about that he drove home, changed his tire. I think he was -- I think he said he got a phone call and had to go back to work and put his -- said he put his clothes in a bedroom in a bag, his clothes that were soiled.

Q. And did he later make any comment about that bag of clothes?

A. Yes.

Q. What was that?

A. That the FBI had searched his house and the clothes were in a closet, I believe, and they had never found them or they hadn't seen them. And he said they were there the whole time and --

Q. Did he make any other statements regarding the investigators?

A. Well, I'm not sure what you're referring to.

Q. Did he make any other references to the

capabilities of the investigators?

A. Yes.

MR. COLBATH: Your Honor, I'm going to object as to leading.

THE COURT: I'll allow it. Go ahead.

A. Yes. He didn't care for the investigators. He didn't care for the FBI. He pretty much thought they were inept and they were -- I can't think of anything nice that he actually said about them really.

Q. So what was your reaction to his statement?

MR. COLBATH: Your Honor, I'm going to object as to relevance.

THE COURT: That's sustained.

BY MS. STEVENS:

Q. What was his physical appearance while he was making this statement? How did he look?

A. So far he looked okay. And nothing unusual when he was really talking about the FBI.

Q. So did this conversation into the murders continue?

A. Yes.

Q. Okay. What did you guys talk about next?

A. God, there's so many different things. Well, ended up talking about the two men that had died and --

Q. Tell the jury more about that specific piece.

A. Well, it was asked how he felt about the families
and the victims. And then he got very agitated and
upset about it and got on the edge of the couch and got
very animated in his expressions and hands. Was very,
very angry and just started in telling us about --
because we thought the two men were -- I thought they
were close friends.

     And he said they weren't friends. And then he
said they were -- they didn't know anything about their
jobs. He had trained them. He had taught them
everything. They weren't technicians. They weren't --
didn't know enough about their jobs. My mouth is dry.

     Just had real disdain toward the men. And there
was nothing about them that was anything nice. It was
pretty shocking. Very shocking.

          MS. STEVENS: Your Honor, I don't have any more
questions. Thank you.

          THE COURT: Mr. Colbath?

          MR. COLBATH: Sure. Thank you, Your Honor.
Just finish my note here.

          THE COURT: Take a moment.

          (Pause)

                    CROSS EXAMINATION

BY MR. COLBATH:

     Q. Good afternoon, Mrs. Kiele. You said that you

and Jim had other siblings. How many other siblings do you have?

A. There are seven children, so -- total, so six others.

Q. Seven total?

A. Uh-huh.

Q. And where does Jim fall in range of the seven?

A. He's number three.

Q. And you are one year older or one year younger?

A. One year younger.

Q. And all your other siblings live in the Lower 48, Jim is the only one here in Alaska?

A. Yes.

Q. And you and your husband, Don, have been married 48 years. How long have Jim and Nancy been married?

A. Just right behind us a couple years, I think.

Q. 47, 46?

A. Uh-huh. 46 or 47. I think it's -- might be one year or two at the most.

Q. Runs in the family, apparently.

This conversation that happened in June, that would have been the first time that you had seen Jim since the murders had occurred, right, physically seen him since the murders had occurred?

A. Yes.

Q. And he told you he was going to work that morning and got as far as the airport, and that's when he had this low tire?

A. Uh-huh.

Q. She's typing them down, so you just have to say yes or no.

A. Oh, yes. Uh-huh.

Q. Thank you. And it was while he was out of the car that, as he described it to you, he had shit his pants, that caused him to go into the airport somewhere and clean up and then he came out and made the decision at that point, seeing the low tire, to go back home to change it?

A. Yes.

Q. That was the basic explanation you got?

A. Basically, yes.

Q. And you were certainly aware from even as far back as your trip in 1998 that there was a garage full of tools and all kinds of stuff at home?

A. Yes. Everything in the world in there.

Q. Sure. We've seen pictures of that, so it's no surprise to anybody.

A. Okay.

Q. And then after sort of the discussions about the morning events and that day, it sounds like it was your

daughter that had asked or said something about the men, Mr. Belisle and Mr. Hopkins, who had been shot and their families and things going on. It was her that asked, right?

A. Yes.

Q. And that's when -- that's when Jim became agitated about somebody asking about how those people were doing or the families were doing. Obviously, Mr. Belisle and Mr. Hopkins had been murdered, but --

A. Yes.

Q. -- how the families were doing, right?

A. Yes.

Q. And he had not discussed or had not been asked I guess how he and Nancy were faring with the whole investigation and the whole turmoil on Kodiak. That conversation hadn't made it that far yet, had it, at that point?

A. Not at our house, no.

Q. That was mentioned earlier when you were out to dinner at the --

A. No. It was --

Q. All right. I'll -- let's see.

Now, after that conversation, as I understand it, Jim and Nancy left, would have been that next day, continuing on to go see her mother?

 A. Uh-huh. Yes.

Q. And then stopped back by on their way back through?

A. Yes.

Q. And then Jim stopped briefly one other time while he was traveling alone later in the summer, your husband told us?

A. Yes.

Q. But that was a short trip, short trip through for Jim?

A. Yes.

Q. And no conversation about the events of April 12th or anything to do with the actual events of that day?

A. Not that day. Other --

Q. That's all I have then for you, ma'am. Thank you.

THE COURT: Redirect?

MS. STEVENS: One second, Your Honor.

THE COURT: Take a moment. That's fine.

(Pause)

MS. STEVENS: No questions, Your Honor.

THE COURT: Thank you, ma'am. You may be excused.

(Witness excused)

THE COURT: So one more witness before we take an afternoon break; is that a reasonable plan?

MR. SKROCKI: Sure. Richard Vorder Bruegge. He is our last witness, so it may be a long afternoon break.

THE COURT: Then maybe we should take our break now.

MR. SKROCKI: He's going to be 20 minutes.

THE COURT: Let's do that. Please leave your notepads here. Remember my admonition not to discuss the case and we'll take about 15 minutes here. We'll go off record.

(Recessed from 2:23 p.m. to 2:42 p.m.)

(Jury present)

DEPUTY CLERK: Court is in session.

THE COURT: All right. Welcome back, please be seated, everyone.

And are we ready for your next witness?

MR. SKROCKI: Yes, Your Honor. We call Richard Vorder Bruegge.

THE COURT: All right. Good afternoon. Come up to the witness stand and when you get there remain standing if you would and the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: Yes. My name is Richard, middle initial W, last name is Vorder Bruegge. That's a two-word last name. The first word, Vorder, is spelled capital V, as in Victor, -o-r-d, as in Delta, -e-r. The second word, Bruegge, is spelled capital B, as in Bravo, -r-u-e-g-g-e. I work at the Federal Bureau of Investigation in Quantico, Virginia.

THE COURT: Thank you. Go ahead, please.

MR. SKROCKI: Yes, Your Honor. Thank you.

RICHARD VORDER BRUEGGE, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SKROCKI:

Q. Good afternoon, Mr. Vorder Bruegge.

A. Good afternoon.

Q. And welcome to Alaska.

A. Thank you.

Q. Sir, how long have you worked for the FBI?

A. In January, it will be 25 years.

Q. That's a long time. In what capacity, sir?

A. I was hired as a photographic technologist. I have been in that role as a photographic technologist or a supervisory photographic technologist or a senior photographic technologist for all of that time, except a

year ago the Bureau eliminated the job title photographic technologist. So now instead of being a senior photographic technologist, I am a senior physical scientist. Doing the same job, just at different levels of work.

Q. That was my question.

A. Yes.

Q. Same job, new title?

A. Same job, new title.

Q. If you can tell the jury when you first became involved in the field of photo analysis and the things that you do right now. How did you first get involved with that?

A. So I am engaged in a field called image analysis. And this actually predates my time at the FBI. I have a master's degree and a Ph.D. in geological sciences. I got that degree by conducting geological analyses of radar images of the planet Venus. My field area was a mountain belt on the planet Venus, and I was attempting to determine if the processes that form those mountains on Venus were the same processes that are the ones forming mountains here in Alaska and around the world.

And so I conducted analysis of these radar images using image processing, using techniques of photogrammetry and using comparison processes, comparing

how the mountains on Venus look compared to how the

mountains on the Earth look.  That was work I did in the

late eighties up until 1990s.  And so that was work I

did before I came to work at the FBI in 1995.

Q.  Where were you doing that work involving the

Venusian study?

A.  I'm sorry?

Q.  Where were you doing that work involving the

Venus study?

A.  So the Venus work was in my graduate school at

Brown University at Providence, Rhode Island.

Q.  From there you went to the FBI?

A.  I spent four years as a contractor for NASA

helping plan advanced missions to solar system bodies

like Mars, the moon, asteroids, outer planets.

Q.  And with respect to your role as a senior

physical scientist in image analysis, are there

components to that field?

A.  Yes.  So within the FBI forensic image analysis

group, we do three major things.  One of them is image

comparison.  That is comparing objects and people in

imagery or in videos to known -- or, as sometimes

questioned, unknown image -- people and objects.  We

also conduct authenticity examinations to determine if

something has been manipulated if it's computer

generated.

And the third thing we do is photogrammetry, photogrammetry being the measurement of things in photographs and images. A fourth thing that we do in virtually all of those cases is image processing. Taking a photograph, digital image, analog videotape, a digital videotape, and trying to improve the quality of the images for the purposes of better seeing what's in the image.

Q. Okay. And with respect to these components of image analysis, how long have you been doing that work? And please -- take your time with the water.

A. So I've been doing that work for the FBI since 1995. But the work that I did in my graduate degrees, my graduate work in the 1980s was also involved in comparisons and measurements and image processing.

Q. Do you have occasion to instruct in this field as well, sir?

A. I do.

Q. In what capacity?

A. So I teach an image comparison class several times a year for members of the U.S. government as well as for other governments around the world.

Q. Are there any organizations you belong to or you have in fact chaired with respect to image analysis?

A. So the American Academy of Forensic Sciences is a large forensic science organization. I am a fellow of that group. I am a fellow of the digital and multimedia sciences section of which image analysis is a component of digital and multimedia sciences. I am currently the program chair for next February's annual meeting of the American Academy of Forensic Sciences.

I also serve on the Forensic Science Standards Board of the OSAC. OSAC is Organization of Scientific Area Committees for Forensic Sciences. This is a group that is focused on identifying and developing standards for use in the forensic sciences.

There are currently 25 subcommittees in there. I am on the forensic science standards board because I am the chair of the digital and multimedia scientific area committee which encompasses the four disciplines of digital evidence, facial identification, speaker recognition, and a group that is called video imaging technology analysis, which is the group primarily interested in image analysis.

Q. Have you ever heard of the organization called SWGIT?

A. I have.

Q. Can you explain what the acronym SWGIT is to the jury and how you are involved?

A.   So SWGIT is Scientific Working Group on Imaging
Technology.  It was established by the FBI in 1997.  I
was chair of the SWGIT from 2000 to around 2006.  SWGIT
is focused on developing standards and best practices
for image analysis and imaging technologies, everything
from taking crime scene photographs to retrieving video
evidence.

         A few years ago, the SWGIT was incorporated into
a group called the Scientific Working Group on Digital
Evidence.  You heard me say earlier digital and
multimedia sciences is an area.  This consolidation, if
you will, was done to bring it all together into one
group.

Q.   Okay.  Let me back you up real quick back to your
college days.  Did you say Brown University?

A.   Yes, sir.

Q.   What was your major?

A.   So I had a bachelor of science degree in
engineering.  And in my graduate degree, it was
geological sciences.

Q.   Geological sciences.  When you did the work on
the Venus study, what country were you doing that work?

A.   So the work --

Q.   Just brief, just what's the country?

A.   Well, in the U.S.A. and in the Soviet Union.

Q. Both countries?

A. Yes.

Q. And then after that, did you have any other educational experience with respect to this field?

A. Well, as a part of my training for an FBI image analysis position, I have taken multiple courses related to photography, video processing, photogrammetry, image comparison over the years.

Q. Okay. Very good. We asked you to do some work for this case to show to the jury here, correct?

A. That is correct.

Q. You produced a PowerPoint --

A. I did.

Q. -- slide. And that concerns -- I'm going to use the word overlay. Is that correct?

A. Yes. It used an overlay.

Q. It references images taken from two different video segments from two different dates?

A. Yes, that's right.

Q. April 12, April 19?

A. Correct.

Q. You made a presentation for the jury to show a comparison between April 12 and April 19 by overlay method?

A. That is correct.

MR. SKROCKI: Your Honor, we would ask the Court to find Mr. Vorder Bruegge has the experience, background and education to do the presentation and render an opinion on the topic inquired upon here in court.

THE COURT: Any objection there?

MR. COLBATH: None other than the -- the motion work and the other things I've already preserved, Your Honor.

THE COURT: Very good. Then I'll find the witness so qualified. Go ahead.

BY MR. SKROCKI:

Q. Blair, if you could show Mr. Vorder Bruegge and the Court and counsel Exhibit No. 219.

Mr. Vorder Bruegge, we met last night, correct?

A. Yes, we did.

Q. And over the phone prior to that. Is this the PowerPoint you created to present to the jury here?

A. This first slide appears to be the PowerPoint I prepared.

Q. Let's go through some slides there. Is this the PowerPoint you prepared?

A. Yes, it is.

Q. So let's go back to the first slide. You have a mouse --

A. I do.

Q. -- with a laser.

A. Okay.

Q. So can we have the lights, Madam Clerk?

And Mr. Vorder Bruegge, what I am going to do is for once not talk and have you do the driving with this and you present to the jury, walk them through your PowerPoint. Where you need to break with respect to emphasize certain things back and forth, please go ahead and do that. If I find the need to break it up I'll do that in an appropriate form.

A. Yes, sir.

Q. So what did we task you to do? We'll start with that. Then you can go ahead.

A. So I was asked to conduct a comparison between a vehicle that passed from left to right on April 12th to a known vehicle that was depicted on April 19th. I was also asked to compare a vehicle that passed from right to left on April 12th with a known vehicle that was depicted on April 19th.

Q. Let me stop you there.

No projector? Madam Clerk, is there an issue with the projector, or is it just over on our side?

DEPUTY CLERK: I think it's over on your side, but I do show that it was --

MR. SKROCKI: So we move to publish.

THE COURT: That's fine. Go ahead.

MR. COLBATH: Your Honor, was the Court going to read --

THE COURT: Oh, yes. I have that out. I'm going to read you an instruction first before we begin here. And that is that you will be hearing testimony from this witness who, because of his education and/or experience, will be permitted to state opinions and the reasons for his opinions.

During his testimony certain presentations will be made by this witness and will be shown to you in order to help explain the evidence in the case and the basis for the witness's opinions. These presentations will not be admitted into evidence and will not go to the jury room with you.

Various slides and the presentations will -- have been marked with disclaimers that you'll see, and those were included as directed by the Court. The presentations are not themselves evidence nor proof of any facts. If the presentations in whole or in part do not correctly reflect the facts shown by the evidence in this case, you should disregard these presentations and determine the facts from the underlying evidence.

With that I think we're ready to proceed. Go

 ahead, please, Mr. Skrocki.

MR. SKROCKI: Thank you, Your Honor.

BY MR. SKROCKI:

Q. Mr. Vorder Bruegge, it's all yours.

A. Your Honor, if I may, just to make sure the jury understands. I testified earlier that I prepared these slides. The disclaimer was put on after I prepared the slides, just so --

Q. By our office.

A. By their office.

THE COURT: Thank you for that clarification.

A. I want to make sure I didn't testify to something I didn't do.

THE COURT: Thank you. All good. Go right ahead.

A. So for purposes of doing the comparison, my analysis first consisted of reviewing the videotape from April 12th to see when the vehicle in question proceeded from left to right and then from right to left.

A number of frames are visible where you see the questioned vehicle proceed from left to right and a number of frames from right to left. I extracted those images from the video recording and am able to view them as still images on the computer monitor.

I then took images from the recording made on

April 19th and located instances where it appeared to me
as though the known vehicle that was depicted in the
April 19th images was in approximately the same
location.

The idea behind that is that by determining if
they are in the same location, I'm going to be able to
see if the physical dimensions, the height, the length,
the various contours of the vehicle are
indistinguishable from one another or see if there are
any differences that would allow me to say that it's not
the same vehicle.

So the purpose of this presentation is to show
you that process of going through this comparison
analysis.

MR. COLBATH:  Your Honor -- excuse me,
Dr. Vorder Bruegge.  At this point I would ask that we
do this question and answer.  It's a direct examination,
not a presentation.

THE COURT:  That's fine.  Go ahead.

BY MR. SKROCKI:

    Q.  What's the first slide going to show us?

    A.  So the first slide, as seen on the screen here,
is a title slide which simply describes the dimensional
analysis through this reverse projection photogrammetry
process.

Q. And go ahead to the next slide. This references the date of April 12.

A. That is correct.

Q. That's the video clip that you removed an image from?

A. Yes.

Q. Okay. Go ahead.

A. So this sequence of images shows the vehicle proceeding from left to right.

Q. Then what did you do?

A. Then I enlarged the area that you can see the vehicle in. The previous set of slides is to show you that I'm giving you the whole picture of everything that was present in the video recording. Now I'm showing you zoomed in on the one particular area.

Q. Same images, right?

A. That is exactly the same images. They have just been cropped so that we're only looking at that one part of the frame, the left-hand side of the frame.

Q. What are you doing now?

A. So now I'm just going to put up a single frame from that sequence showing the questioned vehicle. This is the single frame we're looking at. And we will next see the cropped and enlarged area of interest. AOI stands for area of interest.

Q. Now you're making a switch to April 19?

A. This is correct.

Q. Please tell the jury why you do that.

A. So April 19th is the known vehicle, the known 2001 Honda CR-V vehicle which was placed into the scene and recorded there at 3:23 p.m. as indicated on this slide.

And what is going to be shown next will be the sequence of that vehicle proceeding from left to right. Let me correct myself. This is just the one frame that corresponds to the previous frame that I showed you in terms of location of the questioned vehicle.

Q. Okay. Next?

A. So then we have the cropped and enlarged area. So this is the known vehicle in approximately the same location as the questioned vehicle in the frame that I showed you previously.

Q. Okay. Take us to the next slide, please. Now, we have the words overlay comparison and document alignment of camera. Can you explain to the jury what they're going to see next with respect to this next series?

A. So the next series of slides is intended to demonstrate that the overlay of the camera positions is approximately the same. There is actually a slight

difference in that the camera on April 19th is turned a
little bit to the left, but I have cropped the two
images so that we're only seeing the same area of
overlay.

          And the point of showing the comparison of the
April 12th and April 19th frames is to demonstrate that
the cameras are sufficiently in alignment that we can
conduct an overlay of the two vehicles and have
confidence that the camera is effectively picking up the
same view of the scene.

     Q.   Now, when you say overlay, is it -- sort of for
the record, I've got my right hand and left hand, kind
of doing that?

     A.   That is correct.  By putting an overlay, another
way of thinking about it is in Hollywood, you might see
old shows where they had an enlargement of a
fingerprint, and they'll take an acetate copy of a
fingerprint and lay it over to show where all the
similarities are.  This is just like putting an acetate
layer over the other image.

     Q.   I -- pardon me for being maybe pedestrian about
the work you do.  Is this overly complicated
technologically?

     A.   Technologically, it is not complicated at all.

     Q.   So go ahead and take us through the next series

of slides.

A. So the purpose of this set of slides, as indicated in this title slide, is to document the alignment of the camera. So we have the recording from April 12th, and then we have the recording on April 19th.

If I could, with Your Honor's permission, flip back and forth.

THE COURT: That's fine. Go right ahead.

A. So to demonstrate that the alignment is good, I recommend that you pick out a particular feature. And since we're interested in the far left side of the image, you can look at the building there. You may want to look at the far side of the lake or some of the trees and the fence line.

But as I go back and forth, you will see that there is a pretty good alignment in this case of the images. And in fact, if you look at the top and right side of the image, you will see how the overlay here is not perfect in that there is the blue edge, the bluish-toned edge at the top and bottom that corresponds to the slight offset. And the camera is tilted.

So I testified earlier that the camera had turned to the right. It is actually turned to the left on April 19th, slightly to the left and down, as you can

see by the framing there.

Q. Can you hold that image right there for me, Mr. Vorder Bruegge?

A. Yes.

Q. With your laser -- I believe we have one on there, can you show the jury where the overlay you were speaking about is on the frame with respect to each camera? So which one is that one?

A. So the one -- the bluish tint frame that you see on the right side and at the top is the April 12th recording. The less blue tint is the April 19th frame.

Q. Okay. And if you want to keep going with your -- the next series of slides.

A. So now I simply repeat that process of showing you the overlay, only this time I'm focused entirely on the cropped and enlarged area of interest where the vehicle in question is located.

And we start with the image from April 12th, and then we have April 19th.

Q. Can I ask you, should the jury be focusing on a similar point like you suggested in the other?

A. Yes. So if you focus on the fixed objects in the scene, the buildings, the trees in the background, and as I flip between them, for example, you might look at the window and see there's a little -- if you really

look closely, there might be a tiny little drop. But otherwise, there appears to be a good alignment.

Q. So let's move forward from there. What did you do next?

A. So then for the purposes of placing a value on the degree of the measurement uncertainty in this case, I used the manufacturer's specified length of the known Honda CR-V, which is indicated on the slide here as 177.60 inches, just to establish this is a known dimension.

This is -- the photograph that we are looking at now is from the video of April 19th of the known vehicle. And that arrow is simply there to indicate that the vehicle is at overall length.

Q. Where did you get that data?

A. Off of the internet and from the manufacturer's specifications.

Q. So just to be clear, did you do any kind of an extrapolation of pixels or pixel lengths or any other kind of technological analysis to pull the -- that number, 177.60 inches, from any of these images?

A. No. I am simply using the manufacturer's specified distance to give me some idea of what the individual pixel's dimensions are. I'm using the known vehicle as a scale here.

Q. Okay. Next slide, please.

A. So then we have the questioned image from April 12th with that same arrow corresponding to what it was in the previous image documenting where the vehicle dimensions are from the overlay. So the --

Q. On the April 12th video?

A. On the April 12th video, correct.

Q. Image. So this again is something you put into the PowerPoint slide, just added that data by a box?

A. Correct.

Q. Next slide.

A. So then I'm doing exactly the same thing with the manufacturer's specified height of the vehicle of 65.90 inches. Here we have it on the April 19th image of the known Honda CR-V. And when superimposed on the April 12th image, this is what that looks like.

Q. Thank you. The next slide. What are you doing next?

A. So all of the slides that preceded, we were focused on the vehicle going from left to right. Now we're focused on the vehicle going from right to left on April 12th at 7:14 a.m.

So we have a single image from the April 12th video here. We see the full frame. We enlarge, crop and enlarge that area to the area of interest so that we

see it here. And just to indicate with the laser pointer.

Q. Please do.

A. So then we have the April 19th image at 3:21 p.m. of the known Honda CR-V in approximately the same location. Again, the full frame now. In the next slides, I will show you the cropped and enlarged area of interest. So we have that here. Again, I will indicate with the laser pointer the location of the known Honda CR-V in this frame.

Q. Okay. Going from right to left, you did a couple more slides with respect to a comparison?

A. That is correct.

Q. Based on the overlay. Go ahead.

A. So again, as before, the overlay comparison allowing you to see the April 12th image versus the April 19th image. We start with the April 12th image, and then I flip to the April 19th image. I will go back and forth. So that then completes the overlay demonstration.

Q. Okay. And we have a new slide that says, "Side by Side." That's kind of self-explanatory. So can you tell the jury what you're doing with that?

A. So the point here is that as opposed to an overlay, this allows you to look at the two images right

next to each other side by side so that you can see what
they look like on the same page, if you will.

        We start though again by saying this is the
April 12th image that we are going to be including in
the side-by-side comparison, and then we have the known
Honda CR-V from April 19th.  That is this image.

        So we then go to the side-by-side presentation
here where we have the questioned vehicle on the left
and the known Honda CR-V on the right.

    Q.   That concludes your slide show at least?

    A.   That is correct.

    Q.   Okay.  If we can have the lights.

        A couple more questions, Mr. Vorder Bruegge.  You
said that this was not overly forensically complicated,
or words to that effect?

    A.   That is correct.

    Q.   What you just did?

    A.   That's right.

    Q.   There are other groups and organizations in the
United States that, for lack of a better phrase, take
issue with your work?

    A.   Yes.

    Q.   And challenge the various method and means of the
work that you do?

    A.   That's correct.

Q.  As part of preparing for this, you provided us
with some information about two magazine articles that
took issue with your work?

A.  That's correct.

Q.  From ProPublica?

A.  Yes.

Q.  And could you tell the jury in essence what the
negativity was with respect to the work that you did?
And then we'll get to your explanation of it afterwards.
Let's start with the beginning of negative aspects.

A.  So forensic science has had a lot of criticism in
the last 15 to 20 years, much of it well-founded.  There
is a need for us to constantly improve what we do in
forensics, and those improvements are being made.

     In this particular case, the ProPublica article
raises some questions about the veracity of some of my
testimony and also questions the techniques of forensic
comparison analysis.

Q.  Okay.  And did you -- you've read both those
articles, I take it?

A.  Oh, yes.

Q.  And what's your response to this jury about the
allegations that were made in those articles?

A.  So I could probably talk at length about some of
the problems, but I would characterize it mostly as

incomplete reporting.  For example, there are -- there

is an instance in which the reporter states that I wrote

a report which said that I could not identify a

subject's shirt but that I in fact went into court and

testified that I could identify the shirt.

And the facts that he states are correct.  I did

write a report that said I couldn't identify the shirt,

and I did testify in court that I could identify the

shirt.  And the reason that it is not factually

accurate, what he is conveying, is that he did not

report on the fact that there was a second report.  In

this particular case, there was both video evidence and

film evidence.

The case dates from the 1990s.  And our process

in the 1990s was to rely upon film rather than video.

Because the quality of film imagery was much better for

the most part.

In this particular case, we had asked for the

film, and given the expense of film, there was only one

film camera in the bank.  So a good view of the shirt

wasn't available.  So I wrote a report that from the

film image, I couldn't identify the shirt.

They subsequently sent me the videos, and there

were better views of the shirt that allowed me to say

that I could identify the shirt.  And so the article

that was written made no mention of the fact that there was a second report in which I had written that I could identify the shirt.

In another instance, the reporter has quoted from a filing that was made in the case by a prosecutor regarding a comparison that I had done between a suspect and the questioned individual in the video. And the filing that was made before the Court stated that I would identify the person when in the same case I had written a report that said I can't identify the case.

The reporter did not include any mention of the actual testimony that I gave in that case in which I did not identify the individual. The writing simply implied that what the filing said must have been what happened and did not include a statement about the fact that actually, I corrected the record in that case.

So --

Q. Okay. Are there other groups, organizations that are out there that, appropriately so, continue to strive for precision and scientific precision in things, examples like this?

A. Well, yeah. Actually, in the Organization of Scientific Area Committees, we actively try to seek out all stakeholders. What's unique about the Organization of Scientific Area Committees for Forensic Science is

that it differs from the scientific working groups which were very heavy on practitioners in the field establishing best practices and guidelines for how to do the disciplines.

One of the really groundbreaking things that we've done in the OSAC is we have now introduced legal experts, we have introduced statisticians, we have introduced experts in human factors. Because human judgment is a critical factor of so much that goes on in forensic science that if the mechanism that's going to be used is the brain and the head, we need to make sure we understand what's going on in the brain and take steps to mitigate any effects of things that might happen like bias, and so be aware of those things and improve our processes to avoid those.

That also includes bringing in experts in the field who have different views of what we should and shouldn't be doing to really establish the most rigorous analysis possible.

Q. With respect to the year 2012, are any of these things you spoke about in place?

A. So the Scientific Working Group on Imaging Technology had established best practices and guidelines at the time that I followed at the time that I worked on this case. Yes.

Q. So that was in place?

A. Yes, it was.

Q. In terms of -- did you -- digital forensics, how digitally forensically complicated was what you just did?

A. So for someone that is an expert in this field, this is a relatively simple, straightforward process.

Q. That's all the questions I have for you, Mr. Vorder Bruegge. Thank you.

MR. SKROCKI: Thank you, Judge.

THE COURT: Certainly. Mr. Colbath, go ahead, please.

MR. COLBATH: All right. Thank you, Your Honor.

CROSS EXAMINATION

BY MR. COLBATH:

Q. Good afternoon, sir.

A. Good afternoon.

Q. When you start a forensic photo comparison -- that's what you were doing, a photographic comparison?

A. That is correct.

Q. So when you start that, by its nature, in a case like this, you knew that your comparative, your known was the defendant's vehicle or the police's suspect's vehicle. You probably didn't know it was Jim Wells'

vehicle, but you knew it was the police vehicle that they thought was the suspect one involved?

A. That is correct.

Q. And the goal is to see what you can see about the unknown to know if those things are, number one, they potentially could match, then you would be able to identify this one is that one?

A. No. I'm trying to -- when we do the exams in our laboratory, we are first trying to disprove the idea they are the same. We are looking for differences and trying to establish if there are any differences.

If we can't find any differences, then we look at the similarities and try to determine how significant are those similarities in terms of is it significant enough to being able to say that it's the same vehicle.

Q. Sure. And I was just -- I was going to get there. I was just starting from the other end, but we'll start at your end. That's fine. You look for dissimilarities because, first all, if you see something that is clearly dissimilar, you can say, that is not this one and --

A. Yes.

Q. -- that would be an exclusion. This one, they don't equal?

A. Correct.

Q. Now, if there are similarities, can be a whole range of classes, right? You can have class similarities?

A. That's correct.

Q. And those can be general to more specific, to more specific, sort of a hierarchy of those maybe?

A. Correct.

Q. And then you can have individual characteristics, which are unique to a particular thing?

A. Correct.

Q. If you see some similarities you might say, well, these two things fit in the same class, so I can't say it's excluded, they look like the same class, right?

A. That is absolutely correct.

Q. And if you get enough of the class down to the individual ones, ultimately one of the results you could get to was this one is that one, they're the same?

A. Ultimately, you could, yes.

Q. Here you landed in the middle. You simply found that these two -- that what you saw on the unknown and on April 12th and what you saw in the known one that the police gave you on April 19th was there was some similarities such that you couldn't say they weren't the same and you couldn't say they were the same?

A. That is correct.

Q. Okay. So that's the end result. I want to back up and go through some of this other stuff here.

The April 12th video, the video that has the unknown vehicle, that was a -- a low resolution video, correct?

A. For the road behind the building, it's low resolution. The closer you to get to the camera, the higher resolution.

Q. Do you know how far away the road behind the building was?

A. According to the measurements that were given to me, it's 1,000 feet, roughly.

Q. I think somebody told us yesterday 1100 feet. Could that be --

A. It's possible that it could be 1100 feet.

Q. Much farther away than, say, the parking lot or the fence in the foreground?

A. That is correct.

Q. And certainly we had a low spatial resolution out at 1100 feet or 1000 to 1100 feet?

A. That is correct.

Q. Meaning that the camera is not capturing nearly the detail out there that it is capturing up front?

A. Correct.

Q. And that the unknown image that you're looking at

doesn't occupy nearly the space of the resolution of the camera as it would if it was, for instance, in the parking lot right in front of you?

A. That is correct.

Q. So those are limiting, in fact, factors in either your or any other analyst's comparison work or trying to figure out what it is you're seeing?

A. That is correct.

Q. Did you do anything to figure out just how -- spatially, how much that unknown object took up of the overall screen or view, image view out there?

A. Yes, I did.

Q. And it was less than five percent of the total view, wasn't it?

A. Yes, it was.

Q. And what that means is if we take that whole picture and we drew a little box around anything, a car in the foreground or a tree or the unknown object that we're trying to identify, out of the 100 percent of the picture, we only see that that little box is smaller than five percent of the -- what we're looking for?

A. That's correct.

Q. And in part, that's why when you go through your slide show, you crop that and you enlarge that because otherwise, we're trying to focus on a very small space

of the overall scene?

A. That's correct.

Q. Now, in calculating -- well, in doing your work and looking at the images you had here to work with, one of the things you did was try to use the known measurement that you had and the space that that unknown vehicle occupied and try to determine, and maybe there were other things you used to do this, but you tried to determine what a pixel would look like out there at 1100 feet?

A. Correct.

Q. Maybe more to the point of not what it would look like out there, but how big it would be out there?

A. Exactly.

Q. And so we've had others talk about this, so I hesitate to have you do the explanation again for the jury. But a pixel, that resolution is -- when we talk about that, that picture is just a whole bunch of little, tiny pixels that make up the picture, right?

A. There's a grid in the image that's -- there's rows of pixels and columns of pixels, where I'm indicating rows go from left to right and columns go up and down.

Q. And these ones, the ones, the images you were dealing with had 640 across and 480 up?

A. That's right.

Q. And so -- and of course we've already talked about --

A. I'm sorry. I can't recall if they had 480 in the initial video recording or not or whether they were only 240 and then averaged up to 480. It frequently happens that only one-half of an image is recorded that way. So I don't want to be on the record as saying that it was 480 if it was in fact 240.

THE COURT: All right. Fair enough.

A. When presented vertically -- so it would definitely be 640 across, but whether it was actually 240 or 480 --

Q. Sometimes when these closed camera -- digital closed camera systems capture data and record data and store it, it doesn't record all of the actual resolution, does it? Is that how that -- is that how that number is cut in half, or did I misunderstand you?

A. You misunderstood.

Q. Tell me why sometimes we would only get 240 out of the 480.

A. So traditional standard definition television actually consists of an analog signal, not a digital signal. And the analog signal consists of 480 lines that go from the top to the bottom of the screen every

30 seconds.

In fact, it's not 480 lines at one time, it actually does 240 that are jumped the odd lines, and then the next 240 lines go in and that happens every 60th of a second. So you get an entire picture where the lines are actually interleaved.

And as a way of saving space, some digital recording systems actually record the 640 pixels across and 240 in subsequent frames like that or they may combine them into two.

Q. So this one may have been actually only capturing the lower of that, or some of your images may have had even less of the resolution, the 240?

A. It's possible, but I'm not sure.

Q. All right. It wasn't any more than 640 by 480?

A. No.

Q. And then for pixels related to the object that we're looking at, of the grid, we're looking again then at just less than five percent of the pixels?

A. Yeah. I believe it was on the order of 36 to 37 pixels across.

Q. And in knowing the pixels and the distance and whatnot, you calculated that the pixels were just under about five-inch squares. In real world value if we could see the squares out there on the road from the

camera, it would be a bunch of five-inch squares?

A. That is correct.

Q. And in calculating then, when you had your distance measurement up there, you were able to use your scale of 100 -- the -- what you knew a Honda CR-V to be, right, 177.6?

A. Correct.

Q. You got that off the internet?

A. Yeah.

Q. You didn't run -- like you told Mr. Skrocki, you didn't run a photogrammetry program or a fancy computer software with a bunch of other known dimensions to try and see if what the police showed you on April 19th was a Honda CR-V. You didn't try to figure out if you could calculate it using the picture to be 177.6 inches. You just put the scale on there because you knew it was a Honda CR-V and the manufacturer says 177 inches long is how we make Honda CR-Vs?

A. Yeah. I had the -- used the vehicle as the scale.

Q. And the measurement from the internet as the measurement?

A. That's correct.

Q. And then with that, you could count the -- you could count the pixels that that took up, and that

helped you figure out this -- in part, figure out how big your pixels were, right?

A. So that --

Q. Did I follow your notes correctly?

A. The known dimension of the Honda CR-V was the scale that I used to determine how much distance each -- how big each pixel was.

Q. You made notes on all of this right in your work --

A. Yes.

Q. -- not part of your PowerPoint, but as you went through and kind of looked at all of this, you made notes.

All right. And in determining your size, I saw that when you put it on there, even though Honda told you a CR-V is 177.6 inches, it said approximately on your measurement, right? You added the little squiggly approximate before that?

A. That's correct.

Q. And that's because at that distance, with looking at something in this resolution, there's some error rate?

A. So it's partially related to that, yes.

Q. And certainly if we move over and we try to use the same scale and decide how big the one that you don't

know is a Honda CR-V, that you don't know what vehicle
it is, when we're trying to scale that, there's
certainly some error range there, right, in trying to
determine the size of that vehicle?

A.  So that would be associated with the uncertainty
in the size of the pixels, yes.

Q.  And the error rate that you calculated or the
uncertainty, maybe that's a good word for it, the
uncertainty you determined to be plus or minus two
pixels or plus or minus about ten inches?

A.  That is correct.

Q.  And so there's also something going on in these
pictures, the still frames that you used, with movement,
correct?

A.  That's correct.

Q.  And as the -- now, you would agree that on the
video, when you watched it, the unknown object that you
were trying to identify, it was never stationary at any
time in the video that you were shown?

A.  The April 12th images, the vehicle moves from
frame to frame indicating that it's moving.

Q.  Right.  You didn't have any stills of the
April 12 unknown vehicle to where it was ever captured
to your knowledge not moving?

A.  To -- for me to say that it was possible that it

wasn't moving, I'd have to have two consecutive frames where it didn't move. And I didn't see any two consecutive frames where it didn't move.

Q. So when we're dealing with moving objects, part of what we get is blurriness or blurred -- blurriness in our still frames that the camera captures?

A. That's correct.

Q. And that also creates some problem in exactly figuring out the boundaries or the borders of the object, doesn't it?

A. Correct.

Q. Because again, I don't want to go all the way back through it, but a pixel is one color, isn't it?

A. Each pixel will have one color, yes.

Q. And if we -- if my hand was on a dark background and then I was moving my hand back and forth in front of a camera and all of a sudden the camera captured a still of my hand but it was moving when it captured it, on the dark background, my light-colored skin, on a dark background, somewhere there's going to be a border between the dark background and the light of my hand, correct?

A. Yes.

Q. And if that border happens to fall in the camera, on the middle of a pixel, the camera doesn't know or the

system doesn't know, well, does that pixel record as the dark background, say, a dark blue background, or does it record as the light skin color of my skin. The pixel can only record as one of those two things, right?

MR. SKROCKI: Objection, Your Honor. Compound question. We're now far outside the scope of his project. If he wants to start doing direct exams, he can, but leading for an hour on this is not what we agreed to do.

THE COURT: Mr. Colbath, would you concur?

MR. COLBATH: No.

THE COURT: Let's have a short sidebar.

MR. COLBATH: I can withdraw that example and just ask a more direct question.

THE COURT: Either way. That's fine.

BY MR. COLBATH:

Q. If the image perceives two colors at some sort of edge, the pixel will have -- the system will have to pick one color or the other or it will be that?

A. No. It may average them.

Q. So it may blend them?

A. Blend them together.

Q. Then it would be sort of a third color altogether?

A. That's right.

Q. That can create some uncertainty in trying to directly define the edges of things?

A. Correct.

Q. So why I wanted to ask you about that is I wanted to know if it was the blurriness or the blur factor, the blur, motion blur that contributes to your plus or minus two pixel error rate, or is that in addition to the plus or minus two pixel error rate?

A. So the plus or minus ten inches is based just on the uncertainty of the size of the pixel. Blurring would be an additional factor.

Q. And the blurring would then affect potentially exactly where you might put your scale to make sure you're on the correct pixel that corresponds with the exact edges of the object you're identifying?

A. That's correct.

Q. Now, these -- we talked earlier about the different -- you said there was characteristics that you could look for to see if you could exclude a vehicle or include it as being similar?

A. Yes.

Q. You recall that?

MR. SKROCKI: Outside the scope of the presentation.

THE COURT: Well --

MR. SKROCKI:  We're talking about vehicle
exclusions.  And if he wants to lead him about -- one,
he didn't talk about vehicle exclusions in the
PowerPoint whatsoever.

THE COURT:  So your objection is to the leading
nature of the question?

MR. SKROCKI:  And now we're well outside the
scope.  Even with our agreement, this is being used for
other purposes, not this witness's cross examination.

THE COURT:  All right.  Mr. Colbath?  Do we
need to have a sidebar?  It seems like a good time.

(Begin bench conference)

MR. SKROCKI:  Ready, Gary?

MR. COLBATH:  Uh-huh.

MR. SKROCKI:  The objection is based on he
didn't write a report about the vehicle comparisons.  He
didn't testify about vehicle exclusions.  He talked
about overlay.  That was comparing one April 12 segment
to the April 19 segment, putting them together, coming
and going.

This is cross examination for again further
argument of our witnesses that have testified and/or in
support of defense witnesses that are going to be
testifying soon.  It has no relevance to this.  The jury
has been beat over the head by this already.  I've tried

to be patient with it, but I think it's far outside the scope of cross examination. I don't know what the direct would be because he didn't write a report about this.

THE COURT: All right.

MR. COLBATH: He did write a report about it. But, Your Honor, the jury was just shown a picture of April 19th saying this is the known length of a known car. And then immediately thereafter, we're shown a comparison that says, this is the known length of April 12th.

That seems like this witness is saying those are pretty similar. Now, maybe he didn't use the word similar, but the impression clearly left is I know this one is 177 inches approximately and I know this one is 177 inches. It looks to me like he's saying these are comparable, these are similar, these are the same.

So I'm trying to explore how -- I mean, I have to give some setup to how it is that we got to being able to put this scale that he just looked up on the internet and put on the video, that the police told him was a Honda CR-V on this one and yet calls it known, calls it exactly the same.

THE COURT: Why can't you put this up and say there's nothing known at all about this, instead of --

MR. COLBATH: Well, because -- I can put it up and I was trying to get there, but there's reasons that he doesn't know that. He took measurements. There's a reason --

MR. SKROCKI: He didn't take any measurements.

MR. COLBATH: He did. He made measurements.

MR. SKROCKI: It's not in his report.

THE COURT: Excuse me, Mr. Skrocki.

MR. COLBATH: He made measurement calculations. His bench notes are full of them. And there is --

THE COURT: I don't have those. All I have is like a two-page report.

MR. COLBATH: And there's a reason that he says this is approximately 177. What he really calculated was it's 167 to 187. So I want to ask him that, but I need to at least ask him how he -- it won't make any sense if I just -- because he's not my witness, I can't just jump to the ultimate conclusion because I have no faith that he'll answer it with a yes or no with no explanation.

THE COURT: Here's what I would like. I will allow you to explore these topics.

MR. COLBATH: I will try and move forward.

THE COURT: I would ask you not to ask leading questions when you're exploring topics that -- that go

far beyond what was presented by the government in that
report that I have.  But it sounds like you have notes
that I have not seen.

MR. COLBATH:  Sure.  I can provide them.

THE COURT:  I don't need them, but just follow
that.  I'll -- how much longer would you estimate?

MR. COLBATH:  I'll have to look at my notes,
but I will -- I will try to cut to the chase and be
under 15 minutes.

THE COURT:  Fair enough.

MR. SKROCKI:  Wonderful news.  But you notice
the shift from comparables to this?  He testified this
was an insertion of data from the internet.  He didn't
say, "I calculated it."  So he's not relying on even --
I don't think they are in his bench notes, because I
can't recall seeing them.

But he didn't do any -- I asked him
specifically to avoid this line of inquiry, "Did you do
any internal calculation from the video image itself,"
and he says, "I didn't do that."

So now we've got a jumbled argument about he's
pulled this out of somewhere.  He pulled it off the
internet.

THE COURT:  That was clear.

MR. SKROCKI:  I'm not sure what the cross

examination is.

THE COURT: Let's hear what the questions are and go through that in less than 15 minutes.

(End bench conference)

BY MR. COLBATH:

Q. Let me get to the right page here.

Could we pull up -- Mr. Vorder Bruegge, I want to ask you about a couple of your slides, okay, in your presentation. And so I think it is page 29. Unfortunately, they're not numbered, but I believe I counted right here.

I'll be able to see it here. That one. So let's look at this one real quick. You and I were talking about you taking the known measurement of a CR-V off of the internet to get the calculation, the scale you called it?

A. Yes. The scale.

Q. And that was this slide where you recognized -- do you recognize this to be from the April 19th video?

A. I would have to look at -- oh, it's marked as an experiment, so yeah, it must be the April 19th video.

Q. So you could place -- you were told that was a Honda CR-V so you could place that on there, and you've got your known length, right?

A. Correct.

 Q. And then if we flip forward to the next screen, now, which video do you recognize this as being from?

A. This is the April 12th video.

Q. And I believe you said the cars were in roughly the same position during your direct examination?

A. Correct.

Q. And you determined that visually, just you comparing visually slide to slide?

A. Correct.

Q. And I was asking you earlier about that couple pixel variation. So here when you say known length, the little sign before the 177, that's the sign for approximately, correct?

A. Correct.

Q. And based on your error rate or the variations in what you figured out, you would agree that this really -- the approximate is about ten inches shorter, so 167 inches --

A. Correct.

Q. -- to ten inches longer, 187, that would be the approximate range, about a 20-inch range?

A. With a plus or minus ten at the front and the back, yes.

Q. All right. And then can we go two more? Skip the next slide. No, just to the next slide. I'm sorry.

Back up one.

Now, again, you did the same basic thing for the height of the vehicle, correct?

A. Correct.

Q. And again, did you consult the internet or the manufacturer details --

A. The manufacturer details, yes.

Q. And you determined that this was a CR-V, because we see the language about experiment, right?

A. Yes.

Q. This was April 19th, that was the police with the vehicle there.

So the known height of a CR-V is 65.9 inches. On the height, your error rate was a little bit less, wasn't it? It was plus or minus five inches, not ten inches?

A. Correct.

Q. So if we go to the next one, you recognize that -- now, first of all, there are some obstructions here. So part of your scale actually is obstructed by the vehicles in the foreground?

A. If you're looking at -- yes, the vehicle in the background. You can't see the vehicle in the background because of the obstruction of the vehicles in front.

Q. Okay. But using the scale again, where it says

approximately 65.9, although it says known height, what
you mean here is that could be up to five -- the range
would be up to five inches shorter, so that's
60.9 inches to up to five inches taller, that would be
70.9 inches, somewhere in that ten-inch range?

     A.  Correct.

     Q.  All right.  You can take that one down.

          And were those ranges of height and width and the
comparisons of the areas where they traveled
essentially -- I know you did it going both directions,
but other than looking at it going each direction, were
those basically the comparison components you used to --
in your analysis?

     A.  So the overall measurements but also the
configuration of the vehicle, you know, the slope of the
hood line and a bright mark at the back of the vehicle
as it goes from left to right.

     Q.  And you weren't able -- you found that they
basically shared those similarities?

     A.  Correct.

     Q.  Let me ask you about that.  With the bright mark
in the back, that was maybe a small group of one to
three bright pixels?

     A.  I don't recall how many pixels they were, but it
was a group of pixels, yeah.

Q. And again, those would be pixels that -- in looking at size or how much of a bright spot it is there, those would be affected by the blur as well as have some error rate in sizing them to compare one to the other?

A. Correct.

Q. Overall, sir, you would agree that you can't really see much detail on the vehicles, can you?

A. That's correct.

Q. And that would make an actual identification one to the other impossible?

A. Correct.

Q. Then I don't have any more for you, sir. Thank you.

THE COURT: Redirect.

MR. SKROCKI: Just a couple questions.

REDIRECT EXAMINATION

BY MR. SKROCKI:

Q. Can I have your PowerPoint back up? Can you put it up for me? Thanks.

Do you still have the mouse?

A. I do, yes.

Q. Can you go to the spot where Mr. Colbath mentioned the bright spot?

A. It would be all the way at the end.

Q. Sure. So --

A. I'm sorry.

Q. You can keep doing that. That's helpful.

A. Let me keep going through, because -- there we are.

Q. So is the bright spot there?

A. Yes.

Q. It's on April 12th, right?

A. That is April 12th.

Q. So go to the 19th.

A. Sorry. There it is.

Q. Same spot, same place?

A. There is a bright spot in what appears to be the same place.

Q. Go back to the 12th.

That's all I have. Thank you.

THE COURT: Follow-up at all on that, Mr. Colbath?

RECROSS EXAMINATION

BY MR. COLBATH:

Q. If we leave it right here, there's a fair amount of snow in the background there, correct?

A. Yes.

Q. Can you go back to the other one? And we see less snow here?

A. Yes.

Q. And then this one in your earlier slide you said was taken at 3:00 in the afternoon?

A. Correct.

Q. And the April 12th one I think was at 7:09 in the morning on your slide?

A. 7:09 or -- yeah, 7:09, correct.

Q. All right. That's -- those are --

MR. COLBATH: That's the only thing I had, Your Honor.

THE COURT: Thank you sir. You may be excused.

(Witness excused)

THE COURT: What's the government's plan for the rest of the day?

MR. SKROCKI: We're done for the day. We have two witnesses tomorrow. We should rest before noon.

THE COURT: All right. Very good. So we're ahead of schedule, ladies and gentlemen. And then we'll proceed with the defense case, to the extent that they call witnesses. We'll take that up.

Mr. Colbath, can you be prepared tomorrow afternoon?

MR. COLBATH: We are ahead of schedule. We have people traveling. I do not know the status of things simply because I have mostly been in the

courtroom the last two days.

THE COURT: We know that.

MR. COLBATH: We started the wheels in motion this weekend.

THE COURT: I was just trying to give the jury a heads-up. It's possible we may conclude in midday tomorrow.

MR. COLBATH: I think it would be more likely I have folks arriving tomorrow. It would be very disjointed for me to start. I think there is certainly a few legal issues we could work with the Court to make sure we're set to go Thursday morning. I think it would be safe to plan, if the government is done by noon, that at least as far as our jury is concerned, if the Court will allow, they may have a free afternoon and a little bit of time.

THE COURT: Mr. Skrocki, any disagreement with that assessment?

MR. SKROCKI: None at all.

THE COURT: Very good. So that's the update, ladies and gentlemen. Please leave your notepads here. Remember my admonition not to discuss the case with family and friends or do any research.

Have a pleasant evening. I didn't give you a time. 8:45 a.m. Thank you.

(Jury absent)

THE COURT: All right. Please be seated, everyone.

And I need to tell you all that the clerk's office -- doesn't do you all any good -- but we are going to get two more of those devices so that people don't have to go back and forth.

MR. SKROCKI: We're so used to it now why change?

THE COURT: I watched you the day you had ten witnesses and it went and back forth 30 times, and I went and talked to our acting Clerk of Court and she is going to accommodate that.

MR. COLBATH: Next time around that will be wonderful.

THE COURT: I think it will be very helpful.

Anything we can take up from the government?

MR. SKROCKI: From us, defense case is starting, so we would appreciate the same courtesy with respect to defense witnesses and the lineup. We also make a request for defense *Jencks* for us prior to a witness testifying the night before. We would just appreciate that.

You know, how we have done our discovery, we have been way ahead on those things, so if we can get

that we'd appreciate it.

THE COURT: Mr. Colbath, the lineup and the *Jencks*.

MR. COLBATH: We'll be providing -- Ms. Sherman has been real good about e-mailing us sometime between 5:00 and 6:00, 6:30 or something, and sometimes sooner. As soon as I get back and see my people's travel schedule and whatnot, we'll certainly be doing the same for the government.

To the extent that we have *Jencks* Act statements or discoverable things that are appropriately turned over, we're trying to pull any of that together and we'll do it sooner rather than later.

THE COURT: Do you agree that no later than the day before?

MR. COLBATH: Yes. We don't have anything that we will wait -- that doesn't come the day before.

THE COURT: All right. And then with regard to the estimated length of the defense case? I'm not going to hold you to it. I'm just trying to get a ballpark.

MR. COLBATH: I think we have a week's worth of testimony, which I guess I would inquire of the Court --

THE COURT: I can't be available this Friday afternoon.

MR. COLBATH: Okay.

THE COURT: And then October the 4th we're closed.

MR. COLBATH: I think that we will conclude Wednesday or Thursday, just for the Court to think about. Obviously, if we concluded -- well, I don't know what happens if we conclude Wednesday, if we tried to do closings and get it to the jury right before a three-day break, or if we conclude --

THE COURT: We can table that for today anyway.

MR. COLBATH: I think that certainly if given this Thursday, half a day Friday and four full days next week, we will be able to get our case in for sure, unless I run into travel problems, which so far it does not -- we're structuring and juggling and whatnot.

THE COURT: Very good.

MS. SHERMAN: Did I hear the Court is closed on the 4th?

THE COURT: We're supposed to attend a retreat. And whereas -- it's just when we start adding all the court personnel associated with this, it would be problematic.

MS. SHERMAN: I thought there might be another federal holiday I wasn't aware of.

THE COURT: No, no. It's a retreat for the court that has been in the works, and they already moved

it to accommodate this trial, so that's where we are.

But let's see what we can do and we can evaluate what we need to do in due course next week when we have a better handle on dates.

So maybe we -- what's the government's proposal on how we could spend tomorrow afternoon, if at all?

MR. SKROCKI: I think if we rest, we can do Rule 29 arguments tomorrow. That's probably a big piece.

THE COURT: I haven't looked at the jury instructions, but I know Emily did and seems to be of the view there was substantial agreement to relying on the pattern and it doesn't seem like that's going to take a long time.

MR. SKROCKI: We would agree for the record.

THE COURT: Would you concur?

MR. COLBATH: I would, Your Honor. I think if the Court had a set or even a preliminary set, we could probably have at least an initial discussion about them. And I do anticipate a fair amount of agreement. We don't have a lot of technical legal instruction issues.

THE COURT: All right. Well, I won't be able to get to that by tomorrow, but I will certainly set aside the time we need.

Anything else to take up today?

MR. SKROCKI: No, Your Honor. Thank you.

THE COURT: Anything else?

MR. COLBATH: No. The only other thing I would say, Your Honor, is if given a little extra time tomorrow it will certainly allow us to be -- we will make full use of Thursday and even to rearrange, if we have to rearrange, so that when we start Thursday, we should be able to then go through --

THE COURT: Efficiently?

MR. COLBATH: Yes, we're going to try to be efficient. I would remind the Court that I don't know about the arrangements, but we're planning on having a couple of video witnesses Friday morning. And we tried to orchestrate the calendar so we could work around that and not disrupt that.

THE COURT: All right. Very good. I have a meeting tomorrow right at noon, but it's right down the hall, but I would like to break just a minute or two before noon tomorrow. If we're not done, we'll have to come back after lunch, and that's fine.

Anything further? 8:30 tomorrow for all of us. We'll go off record.

DEPUTY CLERK: All rise. Court stands in recess until 8:30 in the morning.

(Recessed at 3:58 p.m.)

CERTIFICATE

       I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
original stenographic record in the above-entitled
matter and that the transcript page format is in
conformance with the regulations of the Judicial
Conference of the United States.

       Dated this 2nd day of June, 2020.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RMR-CRR
                              FEDERAL OFFICIAL COURT REPORTER