1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3  UNITED STATES OF AMERICA, )
                            )
4       Plaintiff,          )
                            )
5  vs.                      )   CASE NO. 3:13-cr-00008-SLG
                            )
6  JAMES MICHAEL WELLS,     )
                            )
7       Defendant.          )
   _____)
8

9          TRANSCRIPT OF TRIAL BY JURY - DAY 13
   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10           September 25, 2019; 8:33 a.m.
                  Anchorage, Alaska
11

   **FOR THE GOVERNMENT:**
12        Office of the United States Attorney
          BY:  STEVEN SKROCKI
13        BY:  CHRISTINA M. SHERMAN
          BY:  KELLEY L. STEVENS
14        222 West 7th Avenue, #9
          Anchorage, Alaska 99513
15        (907) 271-5071

16 **FOR THE DEFENDANT:**
          Office of the Federal Public Defender
17        BY:  GARY GEORGE COLBATH
          601 West 5th Avenue, Suite 800
18        Anchorage, Alaska 99501
          (907) 646-3400
19
          Camiel & Chaney, P.S.
20        BY:  PETER A. CAMIEL
          520 Pike Street, Suite 2500
21        Seattle, Washington 98101
          (206) 624-1551
22 _____

23            **SONJA L. REEVES, RMR-CRR**
            Federal Official Court Reporter
24            222 West 7th Avenue, #4
              Anchorage, Alaska 99513
25     Transcript Produced from the Stenographic Record

1                        I N D E X

2               September 25, 2019, Trial Day 13

3

4    Witnesses:        Direct    Cross    Redirect    Recross

5    Meredith Frank      5        --         --         --

6    Daryl Allison      23        62         104        --

7

8                    E X H I B I T   I N D E X

9    Exhibit                                          Page

10   151          Bag of Nails at Wells' House         41

11   152          Bucket of Nails at Wells' House      41

12   188          Belisle Medical Examiner             10
                  Injury Diagram
13
     189          Belisle, Upper Body Autopsy          11
14
     190          Belisle, Right Arm Autopsy           11
15
     191          Belisle, Right Underarm Autopsy      11
16
     192          Belisle, Both Abdomen Wounds         11
17                Autopsy

18   193          Belisle, Abdomen Wound Autopsy       11

19   194          Belisle, Right Hand Autopsy          16

20   195          X-ray of Belisle's Neck             11
                  Autopsy
21
     197          Hopkins, Face Autopsy                11
22
     198          X-ray of Hopkins' Head              11
23                Autopsy

24   199          Back of Hopkins' Head Autopsy        11

25

1   200          Hopkins' Overall View Showing       11
                 Injuries Autopsy
2
    267          Photo                               267
3
    DE-2         Newspaper Article Kodiak Daily       63
4                Mirror

5   DE-3         FBI Press Release                    64

6   DE-146       Boat Dock                            72

7   DE-156       Era Flight Manifest                  74

8   DE-157A      AK Air Flight Manifest 47            75
                 and 48 (with PIA redactions)
9
    DE-179       Comfort Inn Guest List               77
10
    DE-182       Vehicle Questionnaire Samples       101
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Call to Order of the Court at 8:33 a.m.)

2           (Jury absent)

3           DEPUTY CLERK:  All rise.  Her Honor, the Court,

4  the United States District Court for the District of

5  Alaska is now in session, the Honorable Sharon L.

6  Gleason presiding.

7           THE COURT:  Good morning.  Please be seated.

8  We're on record.

9           Anything we need to take up, Mr. Skrocki?

10          MR. SKROCKI:  No, Your Honor.

11          THE COURT:  Mr. Colbath?

12          MR. COLBATH:  No, Your Honor.

13          THE COURT:  I'm not 100 percent, but I think we

14  can make it through this morning.  My staff has all been

15  sick and now I'm sick, so we'll go forward, but you're

16  thinking it's less than a full day today?

17          MR. SKROCKI:  We're thinking we'll be done by

18  10:30, but then we have Rule 29.

19          MR. COLBATH:  I had one witness get delayed in

20  Atlanta last night and another witness miss a plane and

21  my other group is arriving at 6:40 tonight.  I don't

22  have witnesses to start in any logical fashion, so I

23  think we'll be done before noon today.

24          THE COURT:  I'm going to hold you to that.

25  Let's take a break until we have the jury.  We'll go off

1    record.

2              (Recessed from 8:34 a.m. to 8:47 a.m.)

3              (Jury present)

4              DEPUTY CLERK:  Court is in session.

5              THE COURT:  Good morning, ladies and gentlemen.

6    Please be seated, everyone.  We're back on record here.

7              Mr. Skrocki, what's the government's next

8    witness?

9              MR. SKROCKI:  Ms. Sherman has the next witness.

10             MS. SHERMAN:  Dr. Meredith Frank.

11             THE COURT:  All right.  Good morning.  If you

12   could come up to the witness stand and remain standing

13   and the clerk will administer an oath to you.

14             (Oath administered to the witness)

15             DEPUTY CLERK:  For the record, can you please

16   state your full name and then spell your full name.

17             THE WITNESS:  My name is Meredith Frank,

18   M-e-r-e-d-i-t-h, F-r-a-n-k.

19        MEREDITH FRANK, GOVERNMENT WITNESS, SWORN

20                    DIRECT EXAMINATION

21   BY MS. SHERMAN:

22        Q.  Dr. Frank, where do you work?

23        A.  I work at the city and county of Denver.

24        Q.  What do you do for them?

25        A.  I'm a forensic pathologist.  My title is

1  assistant medical examiner.

2      Q.  Before you worked in Denver, where did you work?

3      A.  I worked here in Anchorage, Alaska at the State

4  of Alaska medical examiner's office.

5      Q.  How long were you with the medical examiner's

6  office in Alaska?

7      A.  Two years.

8      Q.  And before that?

9      A.  I worked in the Dallas area at the medical

10  examiner's office, which covers much of northeast Texas.

11      Q.  How long have you been a forensic pathologist

12  working in medical examiners' offices?

13      A.  About nine years now.

14      Q.  Did you go to medical school?

15      A.  Yes.

16      Q.  Where was that?

17      A.  I went to University of Texas in San Antonio.

18      Q.  After medical school, what did you do?

19      A.  I completed a one-year preliminary training in

20  internal medicine.  Then I completed a pathology

21  residency in the University of Colorado at Denver.

22      Q.  Have you published any articles in the field of

23  forensic pathology?

24      A.  Yes.  May I also add I completed a fellowship.  I

25  failed to mention I have completed a subspecialization

1    training in the subject of forensic pathology in Dallas,

2    Texas as well.  And I do have several publications,

3    which are peer reviewed in this subject.

4        Q.  Do you also teach forensic pathology?

5        A.  Yes.

6        Q.  Where do you do that?

7        A.  I serve as faculty currently at the University of

8    Colorado in Denver.  I oversee residents as well as

9    medical students, but I also am the director of the

10   fellowship there.

11           MS. SHERMAN:  Your Honor, at this time, the

12   government would request you find Dr. Frank has the

13   requisite education, experience and knowledge to render

14   an opinion in the field of forensic pathology.

15           THE COURT:  Any objection?

16           MR. COLBATH:  No.

17           THE COURT:  All right.  Then I'll find the

18   witness so qualified.  Go ahead, please.

19   BY MS. SHERMAN:

20       Q.  I want to talk first about an autopsy.  Can you

21   give the jury an overview of what you do when you're

22   conducting an autopsy?

23       A.  Certainly.  The first thing I do is review the

24   case.  I obtain some information about the decedent.

25   The actual autopsy, the examination in the morgue starts

1   with the evidence retention phase, meaning we just take

2   any material that may be useful as evidence, including

3   x-rays.

4        And the second portion of the autopsy is then

5   actually viewing the outsides of the body or the

6   external examination portion.

7        The third is our internal examination where I

8   look at all the vital organs, including the brain, chest

9   and abdominal cavities.

10   Q.   When you do an autopsy, do you use some sort of

11   diagram to note any injuries?

12   A.   Yes.

13   Q.   And can you tell us what -- are you familiar with

14   the terms "cause of death" and "manner of death"?

15   A.   Yes.

16   Q.   What is the difference between cause of death and

17   manner of death?

18   A.   The cause of death is listed on the death

19   certificate and it specifies what led to the physiologic

20   abnormality that leads to the stopping of the heart or

21   activities of the body as we know to be death or causing

22   death.  There could be a primary and a secondary or just

23   a primary cause listed on the death certificate.

24   Q.   And manner of death?

25   A.   The manner of death is a classification.  If a

certain cause of death occurs under a certain type of situation, it may allow us to further classify, based on the situation in which an injury has occurred, or if it's a natural death, we can then classify it as such.

Q.  So what are some of the classifications in terms of manner of death?

A.  One, as I mentioned, would be natural.  The other non-natural manners include accident, suicide, homicide, or undetermined.

Q.  Did you conduct the autopsies of Richard Belisle and Jim Hopkins in this case?

A.  Yes.

Q.  I want to start by talking about the autopsy of Richard Belisle.  Before we do that, you indicated you do a document, a diagram marking injuries.  Did you do those in this case?

A.  Yes.

Q.  Let's have Dr. Frank take a look at Exhibit No. 188.  I think it's two pages.

Do you recognize that as those diagrams you did?

A.  Yes.

Q.  When you do a diagram, does it become part of the case file and then maintained by the medical examiner's office?

A.  Yes.

            MS. SHERMAN:  Your Honor, at this time, I would
move for the admission of Exhibit No. 188.

            MR. CAMIEL:  No objection.

            THE COURT:  That will be admitted.

            (Exhibit No. 188 admitted.)

BY MS. SHERMAN:

    Q.  So let's start with Mr. Belisle.  If we could
display page two.

            Can you describe -- we're going to get to some
photos in a moment, but can you describe what these sort
of markings are on this diagram and how you complete
this?

    A.  I use a template of a body diagram, as you see
here, and then I write on the diagram any significant
findings with a key towards the bottom of the diagram.
So the dot with a circle around it, as you can see in
the neck region, that represents where the bullet was
recovered from.

            And then the other symbols, a dot is an entrance
wound and an X is the exit wound that I identified
during the autopsy.

    Q.  Let's start with -- you mentioned the injury to
the neck.  Let's start with that one.  Can you --
actually, let's take that down.  I want to have you
identify some photos and then we'll go through them as a

1   group.  I apologize.

2       Let's have her look at Exhibits -- well, let me

3   ask you this:  You looked at all the autopsy photos that

4   have been marked as exhibits in this case?

5       A.  Yes.

6       Q.  Those are 190, 195, 189, 191, 193, 192, and 197

7   through 199.

8           MS. SHERMAN:  We can go through those, Counsel.

9   Would you like to go through them?

10          MR. CAMIEL:  There is no objection.

11          THE COURT:  No objection.

12          MS. SHERMAN:  Also 267.  I can read those

13  numbers again for the Court if that's helpful.

14          THE COURT:  Go ahead, if you would.

15          MS. SHERMAN:  188 has already been admitted.

16  190, 191, 195, 189, 193, 192, if I missed that one, and

17  then 197, 198, 199, 200 and 267.

18          THE COURT:  Those will all be admitted then.

19          (Exhibit Nos. 190, 191, 195, 189, 193, 192,

20  197, 198, 199, 200 and 267 admitted.)

21  BY MS. SHERMAN:

22      Q.  Let's put up page two of the diagram, if we

23  could, and let's start with the first wound you noted on

24  here is number one.  Let's take a look at Exhibit

25  No. 190 along with 188, page two.

1        Can you tell us what we are seeing in 190 and how

2   that correlates to 188?  There should be a laser pointer

3   up there, if it's helpful to you.

4      A.  Yes.  In the diagram to the left, you will see a

5   number one in the center of the diagram, and that points

6   to a couple of things.  I have already mentioned there

7   was something in the neck region, but let's start -- the

8   entrance wound, which we see on the right photo is

9   representing the dot on the posterior right shoulder of

10  Mr. Belisle.

11     Q.  Okay.  And in your opinion, that's an entrance

12  wound?

13     A.  Yes.

14     Q.  Okay.  And can you tell us about the path of that

15  bullet or that injury?

16     A.  The injury perforates the soft tissues of the

17  right shoulder as we see here.  It then continues

18  through the bone of the right shoulder, the humerus as

19  well as the clavicle on the right side.

20        Then the path involves the soft tissues and

21  vessels of the right side of the neck.  At the end of

22  this path, there was a lot of hemorrhage, meaning

23  bleeding in that area, along with a bullet lodged in the

24  second cervical vertebra.

25     Q.  Did you recover that bullet?

1    A.  Yes.

2    Q.  Let's go to Exhibit No. 195 along with the

3    diagram.

4        What are we seeing in 195?

5    A.  This right side of our view here has an x-ray

6    which was taken at the beginning of the autopsy.  We see

7    a radiodense or white object in the neck on that right

8    side, which is the right side of the decedent, but the

9    left portion of the photo, as circled with the blue

10   image here.

11   Q.  We see some other -- something else, looks like a

12   string or something.  Can you tell what that is?

13   A.  It would be the personal effects or some jewelry

14   that was on Mr. Belisle prior to us taking evidence.

15   Q.  So you do the x-ray before you remove any items

16   from a person's body?

17   A.  Yes.

18   Q.  And did you provide -- you removed that bullet

19   and provided it to law enforcement?

20   A.  Yes.

21   Q.  Let's talk about the second -- we can take down

22   195.  Let's talk about the second wound.  Why don't you

23   describe it using the diagram and then we'll look at

24   some photos.  Wound number two.

25   A.  Yes.  In this diagram we see wound number two in

 1   the trunk region.  The entrance is on the right chest

 2   and the exit is the left anterior abdomen or the front

 3   of the abdomen.

 4        Q.  Can you describe the path of that gunshot wound?

 5        A.  The wound path perforates the right chest wall,

 6   the diaphragm, which is that muscle allowing us to

 7   breathe, on the right side.  The right diaphragm is

 8   involved.  The right edge of the liver is also involved,

 9   as well as the intestines in the abdominal cavity.  The

10   path then ends or terminates on the front of the

11   abdomen, as I mentioned.

12        Q.  And what was the direction of that path?

13        A.  Right to left, downward, and back to front.

14        Q.  Let's bring up Exhibit No. 189 and 191.  We can

15   take the diagram down.

16        Can you show us where that entrance wound is

17   using the laser pointer?

18        A.  Entrance wound for gunshot wound number two is on

19   the posterior lateral right chest, as depicted in both

20   photos.

21        Q.  Where did it exit?

22        A.  The exit is on the anterior left abdomen, which

23   is at the very top of the left photo.

24        Q.  So perhaps we should go to Exhibit No. 193.

25        What are we seeing in 193?

1    A.   Exhibit No. 193 depicts the exit wound of the

2  anterior left abdomen.

3    Q.   Let's go back to the diagram, 188.

4         Okay.  And then can you describe, using the

5  diagram, gunshot wound three, please?

6    A.   Gunshot wound number three also involves the

7  trunk, but it is slightly lower.  The entrance is on the

8  left chest and the exit is on the right abdomen.

9    Q.   And what was the path of that gunshot wound?

10   A.   The path of this wound perforates that left chest

11 wall and soft tissues, the lower edge of the ribcage in

12 that region, as well as possibly some of the small

13 intestines in that area.  It was difficult to identify.

14        I went on to find the rest of the wound track,

15 which is in the very superficial or front of the abdomen

16 on the right side.

17   Q.   And what was the direction of that gunshot wound?

18   A.   The direction of gunshot wound number three was

19 left to right, downward, and back to front.

20   Q.   Let's put up Exhibit No. 192 and 189 together,

21 please.

22        Can you show us the entrance and exit for gunshot

23 wound number three?

24   A.   Yes.  Gunshot wound number three had an entrance

25 of the left chest, as depicted here, with small bruises

1  next to it.  And then on the right photo, there is an

2  exit wound of the right lower abdomen in the gunshot

3  wound number three track.

4      Q.  We can take those down.

5          Did Mr. Belisle have other injuries, particularly

6  to his hand?

7      A.  Yes.

8      Q.  Can you describe those?

9      A.  The back of the right hand had tiny red dots.

10  They looked like abrasions or scrapes of the skin.

11      Q.  Okay.  Did I move for the admission of 194 yet?

12  Can we show Dr. Frank 194?

13          Is that what you were describing?

14      A.  Yes.

15      Q.  Okay.  Was that a photo taken during the course

16  of the autopsy?

17      A.  Yes.

18          MS. SHERMAN:  I would move for the admission of

19  194.

20          MR. CAMIEL:  No objection.

21          THE COURT:  194 is admitted.

22          (Exhibit No. 194 admitted.)

23  BY MS. SHERMAN:

24      Q.  And what did you describe those as in your

25  report?

1    A.   These just tiny punctate red abrasions were

2  described as either stippling or pseudo-stippling

3  injuries of the hand.

4    Q.   What is stippling?

5    A.   Stippling is a term I use when gunshot residue

6  hits the skin and scrapes the skin.  Those tiny

7  particles leave red or red-purple abrasions on the skin.

8    Q.   And you indicated in this case you were not able

9  to determine if that is actual stippling, or I'm

10  assuming pseudo-stippling means something that looks

11  like stippling?

12    A.   Pseudo-stippling or false stippling, if you were

13  to literally consider the term pseudo-stippling is a

14  term I use when I can't tell if it is true gunshot

15  residue hitting the skin or, say, another object that's

16  broken, fragmenting and hitting the skin.

17    Q.   We can take that down.

18       You described three gunshot wounds.  Were you

19  able to determine which one of those was the fatal

20  injury to Mr. Belisle?

21    A.   No.

22    Q.   Were each of those injuries -- could each of

23  those injuries have been fatal in and of themselves?

24    A.   Yes.

25    Q.   Did you reach an opinion as to the cause of death

1    of Mr. Belisle?

2        A.   Yes.

3        Q.   What was that?

4        A.   Gunshot wounds of the neck and trunk.

5        Q.   And were you able to reach an opinion as to the

6    manner of death?

7        A.   Yes.

8        Q.   What was that?

9        A.   Homicide.

10       Q.   Let's move to Mr. Hopkins.  Did you perform his

11   autopsy as well?

12       A.   Yes.

13       Q.   Let's put 188, page one, up again.

14            And can you use the laser pointer and describe

15   how many injuries, gunshot injuries you noted on him?

16       A.   I noted three injuries as well on Mr. Hopkins.

17       Q.   Can you point them out for us using the laser

18   pointer?

19       A.   To clarify, these are all the gunshot wound

20   injuries.  And yes, I can show you gunshot wound number

21   one involves this head region.  Number two, which aren't

22   labeled with numbers, I can go ahead and show you

23   another track involving two wounds of the abdomen here.

24   There is a third, which is on the back of the left arm.

25       Q.   Okay.  Let's start with the gunshot wound to

1  Mr. Hopkins' head.  Can you tell us where the entrance

2  to that injury was?

3      A.  Yes.

4      Q.  What was that?

5      A.  The entrance wound is on the right nasal ala,

6  which is just that curvature on the right side of the

7  nose at the very tip of the nose.

8      Q.  And describe the path for us.

9      A.  The wound track perforated the face on the right

10  side.  There were injuries surrounding the wound track

11  as well in the mouth, teeth, the skull underneath the

12  face, and part of the brain called the cerebellum.

13  There were surrounding injuries in that area including

14  the brainstem and again the skull in the back of the

15  head exiting the scalp.

16      Q.  Why don't we put up 197 and 198 at the same time.

17          Can you describe what we're seeing in 197?

18      A.  On the left side of our view there is a picture

19  of Mr. Hopkins with the entrance wound of the face.

20      Q.  And 198?

21      A.  On the right view we have an x-ray taken from a

22  lateral orientation showing a bit of the white or

23  radiodense material in the head.

24      Q.  And let's move to Exhibit No. 199.

25          What are we seeing in 199?

1    A.  This is a picture of Mr. Hopkins' back of the

2  head showing the exit wound on the right occipital

3  scalp.

4    Q.  We can take that down.

5        Can you tell us the direction of that bullet,

6  that gunshot wound?

7    A.  Yes.  The direction was front to back, left to

8  right, and slightly upward.

9    Q.  Let's talk about the second wound.  You can bring

10 up 188 and Exhibit No. 200 and have you describe the

11 second gunshot wound you spoke of.

12       Tell us what we're seeing in 200 as it relates to

13 the diagram you drew, please.

14   A.  In 200, on the right side of our view, we see the

15 right side of Mr. Hopkins' body, including the right

16 side of the chest and abdomen, which have two gunshot

17 wound defects.

18   Q.  Can you tell which is the entrance wound and

19 which is the exit wound?

20   A.  No.

21   Q.  And if you can't tell that, were you able to

22 determine the direction of that gunshot wound?

23   A.  No.

24   Q.  And then let's go to -- let's leave 188 and go to

25 267, please.

         1         Why don't you tell us about the third gunshot
         2  injury on Mr. Hopkins.
         3     A.   This is the wound, which I mentioned is on the
         4  back of the left arm.  And the picture on the right side
         5  of our view here is showing the back of the left arm
         6  with the left arm lifted with an orientation of the
         7  elbow towards the top of the photo.
         8     Q.   And were you able to determine a direction as to
         9  that wound?
        10     A.   Yes.
        11     Q.   What was that?
        12     A.   Left to right, and without significant deviation
        13  in the frontal or vertical planes.
        14     Q.   What does that mean?
        15     A.   It's just meaning that it's directly left to
        16  right.
        17     Q.   And where is that noted on the diagram?
        18     A.   This line on the back of the arm depicts the
        19  graze wound.
        20     Q.   We can take those down.
        21         Were you able to tell if that wound to the arm
        22  was associated with the wounds on the abdomen?
        23     A.   No.
        24     Q.   Is that a possibility?
        25     A.   Yes.

1    Q.  Let's talk about -- did you note some blunt-force

2    injuries on Mr. Hopkins as well?

3    A.  Yes.

4    Q.  Can you describe those for the jury?

5    A.  There was a bruise of the right side of the face

6    kind of over the cheekbone on the upper right side of

7    the face, and there were a couple of scrapes or

8    abrasions near that.  There was one on the right ear and

9    then the right cheek as well.

10        He also had a small bruise of the left wrist and

11   a couple of abrasions on the abdomen.

12   Q.  Were you able to determine, unlike Mr. Belisle,

13   were you able to determine which one of those wounds

14   that you just discussed was fatal?

15   A.  Yes.

16   Q.  Which one was that?

17   A.  The gunshot wound of the head.

18   Q.  And what was the -- was that also the cause of

19   death then?

20   A.  Yes.

21   Q.  And what was the manner of death for Mr. Hopkins?

22   A.  Homicide.

23        MS. SHERMAN:  Those are all my questions.

24        THE COURT:  Mr. Camiel?

25        MR. CAMIEL:  No questions.

1          THE COURT:  All right.  Thank you, ma'am.  You

2     may be excused.

3          (Witness excused)

4          THE COURT:  And government's next witness?

5          MR. SKROCKI:  Yes, Your Honor.  Daryl Allison.

6          THE COURT:  All right.  Good morning.

7          (Oath administered to the witness)

8          DEPUTY CLERK:  For the record, can you please

9     state your full name and then spell your full name.

10         THE WITNESS:  Daryl Allison, D-a-r-y-l,

11    A-l-l-i-s-o-n.

12              DARYL ALLISON, GOVERNMENT WITNESS, SWORN

13                        DIRECT EXAMINATION

14    BY MR. SKROCKI:

15    Q.  Agent Allison, good morning.

16    A.  Good morning.

17    Q.  Go ahead and pour your water.

18         Okay.  Please tell the jury who you work for,

19    sir.

20    A.  The FBI.

21    Q.  How long have you worked for the FBI?

22    A.  It will be 16 years in October.

23    Q.  And where are you currently stationed?

24    A.  Anchorage office.

25    Q.  Was that the case in April of 2012?

1    A.   Yes.

2    Q.   Prior to beginning your work with the FBI, could

3    you give the jury an idea about your background, your

4    education and other jobs you may have had?

5    A.   I have a degree in accounting.  I was a CPA for

6    three years immediately after I graduated college, and I

7    was a computer programmer for another eight years after

8    that.

9    Q.   And from there, you went to the FBI?

10   A.   Yes, I did.

11   Q.   If I could turn your attention please to April of

12   2012.  Do you recall April 12, 2012?

13   A.   Yes, I do.

14   Q.   Did you get a request to go do some traveling

15   that day?

16   A.   Yes.  About 9:00, 9:30 in the morning, my boss

17   came to me and said there was a double homicide at the

18   Coast Guard base in Kodiak and that we would all be

19   traveling to Kodiak that day, a Coast Guard C-130 would

20   be coming to pick us up.

21   Q.   And did you do that?

22   A.   I did.

23   Q.   Who went with you to Kodiak?

24   A.   There were a number of agents from my office.  A

25   lot of them were on the ERT team.  Some of them

1    testified here this week.  There was some Coast Guard

2    agents as well.

3        Q.  And were you given a particular assignment once

4    you landed in Kodiak?

5        A.  I was the case agent, meaning I was responsible

6    for the overall investigation.

7        Q.  Why is there a need for a case agent?

8        A.  Well, someone has to be responsible.  The

9    investigation has to -- basically, that's it.  I'm

10   overall -- have overall responsibility for the

11   investigation.

12       Q.  When you landed in Kodiak, did you go -- where

13   did you go next?

14       A.  Initially, I went to the Coast Guard police

15   station where they were -- where Cody Beauford was

16   waiting to be interviewed.  I participated in the first

17   interview of him.  Well, not the first interview.  That

18   was the first interview I did there.  And then

19   subsequent to that, we went straight to the T-1

20   building.

21       Q.  The T-1 building at the Communication Station?

22       A.  Yes.

23       Q.  When you got to the T-1 building, what did you

24   first do?

25       A.  Well, the ERT team had already gone straight to

the T-2 building to start processing the crime scene.  I
went to the T-1 building and began basically liaisoning
with the command staff there, Commander Van Ness and
David Pizzurro.

Q.  As the case agent, once you were in the T-1
building, did you have an objective as to coordinating
the investigative activity for the next couple of days?

A.  It was my responsibility to coordinate the
investigation as the case agent, so we initially just
set up a command post in one of the conference rooms
there and took over that conference room and began
assessing what evidence had already been collected by
the troopers and the Coast Guard Investigative Service.

Q.  And did you have occasion -- you had other agents
with you, correct?

A.  Yes.

Q.  And what did you do with respect to those agents
that you had with you in terms of the investigation for
that day on April 12, 2012?

A.  Initially, we reviewed what information we
already had and we prioritized the interviews.

Q.  Okay.  And prior to -- specifically with
application to yourself, you mentioned you talked to
some of the command staff?

A.  Yes, I did.

1    Q.  Why did you do that?

2    A.  Well, we were going to be interviewing everybody

3  at the COMMSTA that day, or not -- I don't know that we

4  were going to interview them all that day, but we were

5  going to need to keep them there, have them available

6  for interviews, so I needed to get with the command

7  staff and make sure that everyone was available when we

8  needed them.

9    Q.  Were there other investigative reasons that you

10  wished to speak with the command staff?

11   A.  Well, we needed to get kind of a lay of the land

12  of the COMMSTA.  We needed to understand how it

13  operated.  We needed to understand the structure of the

14  -- of what went on at the T-2 building basically, the

15  crime scene.  We needed to know who worked there and the

16  command structure at the T-2 building.

17   Q.  Were you aware of the deceaseds' names and

18  occupations at the T-2 building?

19   A.  Yes.

20   Q.  So one of them was a supervisor?

21   A.  Yes, he was.

22   Q.  So did you try to get information with respect to

23  about him and other people involved?

24   A.  Yes.  We went to his immediate supervisor, Chief

25  Scott Reckner.

1    Q.   Was Mr. Reckner interviewed?

2    A.   Yes, he was.  He was one of the first interviews.

3    Q.   Did he provide information to your investigation?

4    A.   He did.

5    Q.   What did you do with that information that you

6    obtained from Mr. Reckner and other members of the

7    command staff?

8    A.   Based on that information we determined that we

9    needed to prioritize the interview of James Wells.

10   Q.   Why is that?

11   A.   Because he had been of the -- well, as you heard

12   here, he had been having difficulties at work,

13   discipline issues.  And in addition, he arrived late to

14   work that day.  He should have been at the T-2 shop when

15   the murders occurred.

16   Q.   Did you assign anybody to undertake the interview

17   of Mr. Wells?

18   A.   Yes, I did.

19   Q.   Who was that?

20   A.   CGIS, Coast Guard Investigative Service, Special

21   Agent Sean Bottary and FBI Agent Kirk Oberlander.

22   Q.   Are you aware of the interview length and breaks

23   with respect to the interview of Mr. Wells on

24   April 12th?

25   A.   Yes.

1    Q.   What was conveyed to you as the case agent with

2  respect to those interviews during that April 12 period?

3    A.   As far as the substance of the interviews?

4    Q.   Correct.

5    A.   That Mr. Wells was being evasive and the

6  information that we were receiving from him was not

7  consistent with what we knew from what I would consider

8  irrefutable sources of information, such as the video

9  from the front gate of the base of the Communication --

10  the main Coast Guard base.

11    Q.   And with respect to the work that was going on,

12  you mentioned the Coast Guard base videos and things of

13  that nature.  Had you had occasion to be briefed on what

14  was being found elsewhere?

15    A.   Yes.

16    Q.   And did that factor into your decision, if any,

17  to continue interviews of Mr. Wells?

18    A.   Yes.

19    Q.   Why is that?

20    A.   Well, like I said, the information he was giving

21  us was not consistent with what we knew to be what I

22  would say would be irrefutable video evidence.

23    Q.   And whose decision was it with respect to the

24  interviews of Mr. Wells to keep going in, going out and

25  then ultimately concluding the interviews for that day?

1     A.   Well, ultimately, the people who were

2   interviewing at the time made the decision to at certain

3   points that they needed to stop the interview, come talk

4   to me in the command post and determine if there was any

5   additional information that we accumulated that they

6   needed to talk to Mr. Wells about and give me the

7   information that Mr. Wells had been giving them.

8     Q.   At some point time, were you aware of consent to

9   search Mr. Wells' vehicle and cell phone?

10    A.   Yes.

11    Q.   Were you involved in that decision in any

12  capacity?

13    A.   I don't recall if the agents asked me ahead of

14  time before asking him, but it's a logical step in the

15  investigation.  And they did come to me afterwards and I

16  approved.  And then after that, they did conduct the

17  searches.

18    Q.   There came a time where a technique was utilized

19  with respect to Mr. Wells and some gunshot residue

20  testing?

21    A.   Yes.

22    Q.   And that was not -- that was done and described

23  here as a ruse?

24    A.   Yes.

25    Q.   Could you explain to the jury the purpose of that

1  and your involvement with it?

2      A.  It was my idea.  I instructed them to do it.

3  Based on the fact that -- a ruse, anything like that

4  when we're dealing with someone that we believe is being

5  intentionally evasive or deceptive, we sometimes have to

6  employ techniques that we wouldn't otherwise employ with

7  someone that we believe is being honest.  So we employed

8  that ruse to see what his reaction would be to having

9  his hands wiped for gunshot residue.

10     Q.  To your knowledge, nothing illegal about that?

11     A.  Absolutely not, and in this situation,

12  appropriate.

13     Q.  And during this period of time, were you

14  communicating with any legal authorities getting legal

15  advice?

16     A.  Yes, with the U.S. Attorney's Office in

17  Anchorage.

18     Q.  Again, not part of this trial team here?

19     A.  No.

20     Q.  Could you speak to the jury about audio recording

21  the interviews of Mr. Wells?

22     A.  At the time, the FBI did not routinely record

23  interviews.  We had to get special permission in this

24  case to audio record interviews.  We asked for blanket

25  authority to record every interview because we believed

```
 1   in this case it was very important to have a very
 2   complete record of what we were doing.
 3           As far as -- well, actually, we really weren't
 4   equipped even to audio record.  I actually had to send
 5   agents to Wal-Mart to buy audio recorders to complete
 6   these recordings.  But we were not equipped to video
 7   record any interviews.
 8   Q.  So you didn't?
 9   A.  No, we did not.
10   Q.  Please tell the jury how long you were in the T-1
11   building on April 12th.
12   A.  I believe about 36 hours.  I don't think I left
13   for 36 hours.
14   Q.  You mentioned earlier on a command post?
15   A.  Yes.  We set up in the conference room that's
16   been discussed here before.
17   Q.  And you were in the command post the 12th?
18   A.  I was.
19   Q.  How about the 13th?
20   A.  Yes.
21   Q.  Did you have occasion to observe Mr. Wells with
22   respect to that command post on either the 12th or the
23   13th?
24   A.  Yes, I did.
25   Q.  Please tell the jury what you observed.
```

     A.   As Helena Chavez has related, Mr. Wells several
times walked into the command post.  The door was open
at the time.  He walked in and was kind of looking
around.  We attempted to ask him if there is something
he needed and kind of ushered him out.

          We were concerned -- we actually did have
firearms in the room, which is one of our main concerns.
They were locked in Pelican cases, but we didn't really
want people walking around in the room.  That behavior
was inconsistent with everyone else at the COMMSTA that
day.  Most of them were very respectful, came to the
door if they needed something and allowed us to address
them first.

          After that happened a couple of times, I closed
the door and taped a folder over the window.  Shortly
thereafter, Mr. Wells burst into the room, and that's
the only way I can describe it, and grabbed something on
the table.  I believe it was food or something like
that.

     Q.   Did you have occasion to discuss or talk to him
when he burst into the room, as you described it?

     A.   I attempted to ask him if he was having medical
issues maybe with his diabetes.  The response I got was
mumble.  I really didn't understand what he said, and we
kind of ushered him out again.

1    Q.  Do you recall other food being present outside of

2  the command center?

3    A.  There was food everywhere.  The main Coast Guard

4  base had sent over box lunches for everyone at the

5  COMMSTA.  It was literally everywhere.  Most of it was

6  unopened and I think ended up getting thrown away.  It

7  was on tables in the hallway.  It was in all the common

8  areas.

9    Q.  When did you, as the case agent, first become

10  aware of the nail in the tire that Mr. Wells brought to

11  the Communication Station in the back of his truck?

12    A.  It was that night when Special Agent Oberlander

13  and Bottary searched Mr. Wells' truck.

14    Q.  At some point on the 12th or the 13th, did you

15  have occasion to instruct in the creation of search

16  warrants?

17    A.  Yes.

18    Q.  With respect to what?

19    A.  We applied for search warrants for Mr. Wells'

20  home and his white truck and his blue SUV.

21    Q.  How did the blue SUV factor into your decision at

22  that time?

23    A.  Well, Mr. Wells had access to that SUV during the

24  time that the murders occurred.  Based on the video from

25  the front gate of the base, we saw his truck headed

 1    toward the airport.  Subsequent to that, we saw the blue

 2    SUV arrive and depart from the T-2 building.  And then

 3    after that happened, we see Mr. Wells' truck again

 4    driving back toward his home.

 5        Q.  As a case agent, FBI agent, have you had occasion

 6    in your career to apply for search warrants?

 7        A.  Many times.

 8        Q.  Can you just give the jury an overview about what

 9    you have to do with respect to applying for a search

10    warrant and who ultimately is the one approving those?

11        A.  We have to write a document called an affidavit.

12    It lays out the facts of the case and attempts to

13    establish to the judge that we have probable cause to

14    believe that evidence will be found in a very specific

15    location.

16          We present that to a judge and he just reviews it

17    to determine if we have probable cause, and if we do,

18    they'll sign it and grant us the search warrant.

19        Q.  And when you make application to the judge for a

20    search warrant, do you have to be precise as to the

21    things you're looking for based on the probable cause

22    you've articulated in the affidavit you mentioned?

23        A.  Yes, you have to be very precise about what

24    you're looking for and where you think you're going to

25    find it.

1     Q.   Sometimes does that -- in this case in

2   particular, did that permit searches of the entire

3   Wells' residence?

4     A.   In this case, yes.

5     Q.   Can you describe for the jury the size of the

6   Wells' residence?  You participated in these warrants,

7   correct?

8     A.   Yes.  I have heard it described here and I

9   believe it's accurate; about 3,000 square feet.  There

10  is a garage with, I guess, an apartment above -- I don't

11  know apartment, but a room above the garage.  The

12  residence basically extends to that room over the

13  garage.

14         There is an upstairs as well where the bedrooms

15  are.  There's a significant amount of crawl space

16  underneath the residence as well.

17    Q.   With respect to Mr. Wells' white Dodge pickup, do

18  you recall when that was seized by the investigation?

19    A.   We seized it on the 13th.

20    Q.   You've heard testimony that there was a concern

21  by Mr. Wells that maybe the FBI was in his driveway the

22  night of 12th.  Was that the case?

23    A.   That's not accurate.  We were not.  To my

24  knowledge, no one drove up in his driveway.

25    Q.   Was he under surveillance at that time?

1    A.   Up until about 3:00 a.m. in the morning we had

2  somebody out on the street in front of his house.

3    Q.   With respect to the work that you were doing as

4  case agent on the 12th and the 13th, did you have

5  specific priorities and/or concerns that you were trying

6  to mitigate?

7    A.   Primarily, it was public safety.  Two people had

8  been murdered, so that was our first concern is public

9  safety to make sure there were no more murders.  I'm

10  sorry.  What was the --

11    Q.   Did those, the public safety aspect, factor into

12  your decision-making process on the 12th and 13th?

13    A.   As far as surveillance?

14    Q.   All of your decisions.

15    A.   Well, yeah, it did.  That was our primary concern

16  was to make sure no one else got killed.

17    Q.   How about in terms of your investigative

18  decisions?  You lost that part.  Let me rephrase it.

19         You mentioned that public safety was your primary

20  concern?

21    A.   Yes.

22    Q.   Did you have investigative concerns with respect

23  to the work that you were doing on 12th and 13th in

24  terms of evidence collection or otherwise?  Still not

25  tracking?

1     A.   No.

2     Q.   I'll move on to something else.

3          Why was Mr. Wells' home put under surveillance?

4     A.   Well, Mr. Wells was put under surveillance

5 initially.

6     Q.   Fair enough.  Please explain, why was that?

7     A.   Well, I mean, based on his evasiveness in the

8 interview, you know, and the facts that we were

9 gathering from the video, the fact that we found his

10 wife's vehicle at the airport, he had access to it

11 during the time of the homicides, he was a logical

12 suspect at the time.

13     Q.   Where was his wife at that time?

14     A.   His wife was in Anchorage.  She had been there

15 since the Tuesday and the homicide occurred on a

16 Thursday, so she flew to Anchorage on Tuesday for a

17 conference.

18     Q.   I want to jump ahead time-wise.  We'll come back

19 to some other things in a moment.

20          Do you recall around what time, what date Mr.

21 Wells was arrested?

22     A.   He was arrested in February of 2013.

23     Q.   February 2013?

24     A.   Yes.

25     Q.   With respect to your investigation, when, in your

1  view, did your investigation cease?

2     A.  All substantive investigative steps were

3  completed by April of 2014.  In preparation for this

4  trial, starting probably a year ago, we began

5  re-interviewing witnesses just to make sure we have

6  consistent statements from them.

7        Occasionally, one of them might say something a

8  little different than they said it before or something

9  new might come up, but all substantive investigation

10 stopped in April of 2014.  The last search warrant we

11 executed was September of 2013.

12    Q.  Let's talk about some of those warrants just

13 briefly.  There was discussion that you know of and

14 heard in court with respect to searching the hillside

15 next to Mr. Wells' home?

16    A.  Yes.

17    Q.  What was that search for and why was it done?

18    A.  We had learned through the investigation that Mr.

19 Wells used to do target practice into the hillside next

20 to his house with his firearms.

21    Q.  So what were you looking for?

22    A.  Bullets.  Bullets that might be able to be

23 matched to the bullets from the crime scene.

24    Q.  None were located, correct?

25    A.  None were located that were suitable for

comparison.  Well, I'm sorry.  There was two that were actually suitable for comparison that were .44 Magnum caliber.  Those two did not match the bullets from the crime scene.

Q.  Overall, the number of warrants for Mr. Wells' home was for how many?

A.  I believe there were nine.  Two of those warrants were actually executed simultaneously.  While we were at the residence executing one of the warrants, we developed probable cause to seize something else.  In this case, it was Mr. Stein's swords.  So there were nine warrants, but two of them were executed at the same time.

Q.  Did each of those, to some extent, have an independent basis to search for something else?

A.  Yes, they did.  As the investigation progressed, we would develop probable cause to look for additional items that we did not know we needed to look for in the previous searches.

Q.  So that's why another warrant was obtained?

A.  Yes.

Q.  Did you yourself participate in some of those searches?

A.  Yes, several.

Q.  I want to talk about one search in particular,

then move on to some other aspects of your investigation

in a general sense.

If we can have the lights, please. If you could

for identification show 151 and 152, Blair.

Do you see Exhibit No. 151, Agent Allison?

A. Yes.

Q. If you can go to 152, Blair.

A. Yes.

Q. Were these two items depicted in 151 or 152

seized by the FBI pursuant to search warrants that you

are aware of and/or conducted?

A. Representative samples of these items were

seized, yes.

Q. Are those photographs accurate depictions of what

was in the home at the time?

A. They are.

MR. SKROCKI: Move for 151 and 152.

MR. COLBATH: I have no objection.

THE COURT: Those are admitted.

(Exhibit No. 151 and No. 152 admitted.)

BY MR. SKROCKI:

Q. If we can publish 151, Blair.

Agent Allison, the photograph of two bags, do you

see those?

A. Yes.

1    Q.   What did they contain?

2    A.   Nails.

3    Q.   Why were those photographed?

4    A.   At the time we were executing a search warrant

5    for nails.  Basically, after we received the analysis

6    from our lab regarding the nail that was in the tire, we

7    went back to search for nails that were similar to the

8    ones that were found in the tire.

9    Q.   152.  The same question, why is that -- why was

10   that photographed?

11   A.   Same reason.  We were there searching for nails

12   that were similar to the one found in Mr. Wells' tire.

13   Q.   Blair, if we could enlarge that section there,

14   please.

15        Those were nails you felt were consistent with

16   the one in the tire?

17   A.   Yes, we took a sample of ones that we felt were

18   consistent.

19   Q.   Thank you, Blair.

20        If we could have Exhibit No. 105, which I believe

21   has been admitted.  Thank you.

22        I want to ask you some questions, Agent Allison,

23   with respect to vehicle identification and/or

24   elimination as we were looking at 105 here.  This is an

25   attempt to do what, sir?

1     A.   To account for all the vehicles seen on the video

2    from the T-1 camera around the time of the homicides.

3     Q.   And there were some questions that were posed to

4    various witnesses about Coast Guard vehicles.  Do you

5    have information as to the work that was done to

6    eliminate Coast Guard vehicles that may not have been

7    registered on Kodiak or elsewhere?

8     A.   Yes.  We depended on the Coast Guard

9    Investigative Service agents that were stationed at the

10    Coast Guard base.  It's the largest Coast Guard base in

11    the country, but it's still very small relative to your

12    average military base.

13        So the Coast Guard Investigative Service agents

14    there were pretty much familiar with most of the

15    vehicles coming in and out of there and they would be

16    able to determine whether there was any similar

17    vehicles.  Over a period of time, they would be able to

18    determine whether there is any similar vehicles on the

19    base.

20     Q.   Did they ever report back to you of any

21    similarities they observed?

22     A.   They did.  The one they found actually, the

23    person had transferred there after the homicide.

24     Q.   We can take that down, Blair.  If we could have

25    the lights.

1        So with respect overall to your investigation,

2   Agent Allison, did you utilize the FBI forensic labs?

3        A.  Yes.

4        Q.  Please tell the jury what divisions you utilized

5   for this investigation.

6        A.  The fingerprint unit, the DNA unit, the

7   mitochondrial DNA unit, the hair and fiber unit.  We

8   utilized the special projects unit for some of the

9   diagrams that you've seen here.

10       Q.  And had they come up --

11       A.  I'm sorry.  The firearms and tool marks unit as

12  well.  Brett Mills testified yesterday from that unit.

13       Q.  If anything in furtherance of your investigation

14  had been discovered, the jury would have heard about

15  that?

16       A.  Yes.

17       Q.  Let's talk about interviews that the

18  investigation conducted.  Are you aware as to the number

19  of interviews and the method, manner and means of the

20  interviews conducted during the course of this

21  investigation?

22       A.  Yes.

23       Q.  Can you please tell the jury the results of that

24  and the number that were conducted?

25       A.  The number was, by my count -- I didn't count

1  them all.  There was too many.  But it was over 700.

2     Q.  How many of those 700 interviews that you

3  conducted -- that the investigation conducted were

4  recorded?

5     A.  About 350.

6     Q.  With respect to vehicles that were looked at

7  and/or identified, how many vehicles were investigated

8  pursuant to this investigation on Kodiak?

9     A.  So we did a search, we began a search looking for

10  similar vehicles.  We limited it to RAV4s, Ford Escapes

11  and Honda CR-Vs.  We obtained a list of all the vehicles

12  registered on Kodiak, which was thousands.

13     We narrowed it down to those three types of

14  vehicles.  And we initially began looking for all of

15  them.  I believe ultimately we ended up interviewing

16  about 350 owners of vehicles to determine where they

17  were that day, if they had any association to the

18  COMMSTA.

19     Subsequent to that, after just talking with Neil

20  Schmidt, who you've heard from, we actually included the

21  Hyundai Santa Fe in that list and went and looked for

22  the owners of those as well.  Ultimately we ended up

23  limiting the scope of the vehicle search to just blue

24  and shades of blue since it was obvious to us that it

25  really, it was a blue vehicle.

1     Initially, the 350 that we -- or the number we

2  initially started with we were looking for everything.

3  It didn't matter what color, but the vehicle is clearly

4  not white, it's not red, so we limited the scope.  And

5  ultimately there was approximately 120 of those, and I

6  think we accounted for all but about four of them.

7     Q.  Now that all was not done overnight, was it?

8     A.  No, it was not.

9     Q.  How long?

10    A.  Oh, we initially -- I and a number of other

11 agents went to Kodiak for a week, maybe two, and we got

12 -- found a lot of them, and then the rest of it went on

13 for months.  I mean occasionally -- months, I guess, we

14 would continue searching.

15    Q.  Was there a questionnaire that factored into this

16 search?

17    A.  There was two, yes.

18    Q.  If we could have the lights, please.  And, Blair,

19 if you could pull up for identification 218.

20        Do you recognize this document, Agent Allison?

21    A.  Yes.

22    Q.  And what is that, just in a general sense?

23    A.  This is actually the questionnaire that we used

24 when interviewing the employees at the COMMSTA.

25    Q.  Okay.  And there were other questionnaires that

1    were submitted by the investigation to other people,

2    correct?

3        A.   There was two other questionnaires that we used

4    during the search for the vehicles to get a -- in order

5    to have some consistency between interviews.

6        Q.   Can you explain that to the jury, please, why

7    that would be important.

8        A.   Well, not everybody knows the case as well as I

9    do or some of the other Coast Guard agents that are

10   working it, so we wanted to give them a consistent set

11   of questions that even if they weren't as familiar with

12   the investigation they would be able -- we would be able

13   to get somewhat the same information, but this

14   questionnaire wasn't really to be limiting.  It was just

15   a starting point, so if something -- the person said

16   something of interest, the agents were free to delve

17   into that and get more information if they thought it

18   was appropriate.

19       Q.   With respect to the questionnaires that you

20   mentioned there were approximately three of them; who

21   was doing the filling out of the form?

22       A.   It was the agents.  The agents were actually

23   doing the interview and filling out the forms.

24       Q.   Is this Exhibit No. 218 an example of one with

25   reference to the COMMSTA?

1      A.  Yes.

2           MR. SKROCKI:  We would move for admission of

3    218.

4           THE COURT:  Any objection?

5           MR. COLBATH:  No.

6           THE COURT:  218 is admitted.

7           (Exhibit No. 218 admitted.)

8    BY MR. SKROCKI:

9      Q.  What was the purpose investigatively for a

10   questionnaire for employees at the Communication

11   Station?

12     A.  Well, the purpose of the questionnaire is to

13   provide consistency between the questions, between the

14   questions we were asking to them, but, obviously, the

15   questions themselves each had their own individual

16   purposes.

17     Q.  Yes.  Were you involved in the drafting of these

18   questionnaires?

19     A.  I approved it and I provided input.  It was my

20   decision whether or not to deploy this questionnaire.

21   This is actually not the first draft.  I rejected some

22   of the questions that were initially brought to me.

23          The first draft of this actually had questions

24   specific to Mr. Wells on it.  I had those removed

25   because I thought it was a little early in the

investigation to be concentrating just on Mr. Wells.  I
wanted to keep a broader scope to the investigation.

     Q.   How come?

     A.   Well, we have to keep an open mind.  Just because
we have some evidence that implicates one person, we
can't rule out everyone else.  We have a duty to be
objective and to continue the investigation, have a
broader scope and try to collect as much information as
we can.

     Q.   Okay.  Can we have the lights for just a few more
minutes.

          A couple of questions with respect to other
aspects of the investigation, Agent Allison.  To your
knowledge, is there any, or was there any at the time,
April 2012, surveillance at the Kodiak airport, video
surveillance of the outside area?

     A.   Outside?  The only video that we could find that
captured anything outside the outside area of the
airport was inside of the Alaska Air cargo terminal.
There was a camera inside that was focused on the front
desk.

          Its purpose was not to capture the outside, but
it did capture a little bit of the parking lot, maybe a
few feet of the parking lot outside the window, but that
wasn't the purpose of the camera.  And depending on

1   lighting, sometimes you couldn't even see out of it.

2   There was a glare out of it.

3       Q.   Your investigation didn't find an omnidirectional

4   camera that captured the entire parking lot?

5       A.   No, there was nothing like that at all.

6       Q.   Did your investigation ever locate the murder

7   weapon?

8       A.   No.

9       Q.   Could you advise the jury about the steps that

10  your investigation took to try to locate the murder

11  weapon?

12      A.   We really didn't have anything indicating where

13  that weapon would be, so there were several just kind of

14  ad hoc searches where we thought, well, maybe it was

15  here, we'll go look there.

16          There was a -- just by chance close to the time

17  of the murder the Coast Guard had organized several

18  clean-up operations for like the side of the road, it

19  was April, the snow had been melting.  So kind of like

20  they do here, they were going to go out and clean up the

21  road, so we sent -- some of the people that organized

22  that search wanted to help so they suggested that they

23  might search for the weapon as well.

24          So we sent agents out with those different groups

25  of people just to be there just in case they found

1    something, but really we didn't have anything directing

2    us to a specific location to look for the weapon.

3        Q.  And with respect to the search of Mr. Wells'

4    home, you didn't find the murder weapon, being a .44

5    Magnum possible Smith & Wesson in his home?

6        A.  No.

7        Q.  I want to go back to something with respect to

8    Mr. Wells' interviews by Agent Bottary and Agent

9    Oberlander briefly.  Do you recall in the interview the

10   request to go back to Mr. Wells' home to get medicine

11   and being driven there by the agents?

12       A.  Yes.

13       Q.  Were you advised of that plan?

14       A.  After they suggested it to Mr. Wells, I was.

15       Q.  Tell the jury what you did once you heard that.

16       A.  I told them we were not doing that.  I thought it

17   was overly intrusive and unlikely to yield anything of

18   value.

19       Q.  Do you know -- I'm going to switch back to the

20   firearm piece real quick.

21           Do you know who the Penningtons are?

22       A.  Yes, I do.

23       Q.  Who are they?

24       A.  Friends of the Wells'.

25       Q.  They provided some assistance to the

1   investigation concerning some firearms?

2      A.   They did.   We learned that Mr. Pennington is very

3   prolific in his acquisition of firearms.   He had quite a

4   few of them.   We also learned that he had several .44

5   Magnums.

6         We requested from Mr. Pennington that he allow us

7   to search his home.   He consented to that.   During that

8   search, we found two Smith & Wesson model 629 revolvers.

9   We had those tested and they did not match the bullet

10  from the crime scene.

11     Q.   You called that a consent search?

12     A.   Yes, it was a consent search.

13     Q.   You asked him and he said yes?

14     A.   Yes.

15     Q.   How did John Stein come to the attention of the

16  investigation?

17     A.   We were conducting what we call a public records

18  database search, which comes from things like phone

19  records, financial records, you know, property records.

20  And during that -- it was just a computer search.   We

21  just go type in the -- I think we just went and typed in

22  the Wells' address.

23         And Mr. Stein came up as someone that had listed

24  the Wells' address as his residence at some point in

25  time.   So I sent a lead to our Tacoma office.   Once I

1    located Mr. Stein, where he was, I sent a lead to our

2    Tacoma office to go interview Mr. Stein.

3        Q.  And that's how the investigation became aware of

4    that missing .44-caliber Smith & Wesson stainless steel

5    revolver?

6        A.  Yes, it is.

7        Q.  I'll turn your attention to some work you did

8    yourself with respect to the Kodiak Coast Guard main

9    base station video camera.  Did you do some work with

10   respect to that camera and the timing of it?

11       A.  Yes, I did.

12       Q.  If we could have Exhibit 80, which I believe has

13   been admitted.

14           Are you familiar with that, Agent Allison?

15       A.  Yes, I am.

16       Q.  If we could also put next to it Exhibit 81,

17   please.  Thank you, Blair.

18           Do you have your laser pointer there, Agent

19   Allison?

20       A.  I do.

21       Q.  Can you explain to the jury the work that you did

22   in connection with the verification of the clock on the

23   main base station Kodiak camera?

24       A.  So it was pretty important to us to determine

25   exactly what the timing difference was on this camera

1  because clearly it was not accurate.  It was -- we

2  determined it was consistent, but not accurate.

3       So the first photo here, this is a screen shot of

4  the video player that I was reviewing footage on.  So in

5  order to determine -- what I believed I needed to

6  determine was the time difference before the first time

7  we see Mr. Wells' truck that day and the time difference

8  after all the events that day had occurred, including

9  Mr. Wells driving back to his home, back to the COMMSTA

10 after the homicides.

11      So as I was reviewing the video from the day of

12 the homicide, April 12, I came across this image here.

13 Now, something I think we need to point out though is

14 there's two times on this video player.  There is a time

15 right up here and there is also a time down here that's

16 circled in red.  What's important to realize is this

17 time here is actually --

18     Q.  Can we enlarge this for you?

19     A.  Please.  This is the current time on the computer

20 that you're looking at the video on.  So I was reviewing

21 this video March 21, 2013 at 4:26 p.m.  So that's what

22 this time is in the upper right-hand corner.  It's

23 always going to be the current time that your computer

24 thinks it is right now.

25     Q.  Can you back out of that, Blair.  Go ahead.

A.   The time down here that's circled in red, that's the timestamp of the video that you're reviewing.  So if you notice this is April 12, the date of the murder, at 5:36 a.m., before the first time we ever see Mr. Wells' truck on the video.

Q.   Okay.  Done now?

A.   No, not quite.

Q.   Go ahead.

A.   I think it's important to realize what this photo is.  This video is just a still of the desk that the Coast Guard police officer who is on duty that day is where they sit.  So it's enclosed in glass.

This door here that you see in the background, that's the front door to the Coast Guard police station. And this is actually the monitor here is the one we're looking at over here.

So what we're looking at here is video from a camera that's behind that officer.  So this is the glass here that separates him from the people coming in.  So also located on that same wall that that video camera is is a lock, which is circled in red here.

So if you notice, it's a reflection, so, obviously, the numbers are going to go counterclockwise in this instance.  This is 12, 1, 2, 3, 4, and between 5 and 6, you will notice the hour hand is between 5 and 6.

So it's between 5:00 and 6:00 a.m., and the minute hand
is between 3 and 4, closer to 4.  It's about 5:18,
according to that clock.

If you go back and you look at this clock here,
the timestamp, that's the time the computer thought it
was, it's 5:36.  That's our 18-minute time difference.
So the computer was 18 minutes ahead of that clock on
the wall.

Q.  Did you take another step to verify the accuracy
of the time you believe it to be?

A.  I did.  So after -- so that was before Mr. Wells'
truck ever passed the front gate.  That was the 5:36 in
the morning, or actually 5:18.  The computer just
thought it was 5:36.

So on the right here what we have is a photo that
Special Agent Andersen took with her iPhone.  This is
again --

Q.  Do you want that one up by itself?

A.  Yes, please.  So again, we have two timestamps.
This one down here is the timestamp of the video we're
reviewing, which in this case is not relevant to the
situation.

What we're trying to determine is, again, how far
off the current time is, and, again, this is the current
time from the computer, the time in the upper

1    right-hand.  So enlarge that.  We could see what that

2    is.  It's 9:07 p.m. on the 12th.

3          Okay.  So now this inside window here -- again, I

4    think it's important to understand what that is.  This

5    is actually a screen shot from my computer at work.  You

6    notice the Windows start bar and all the different

7    programs I have got loaded up here.

8          What's taking up the rest of that frame is that

9    photo from Special Agent Andersen.  If you look at this

10   inset here, what that is I opened that image that we're

11   looking at it in the background and a text editor.  It's

12   Note Pad, it comes with Windows.  What that is showing

13   is that the timestamp that's on the photo -- so any time

14   you take a photo your iPhone or really any digital

15   camera, it embeds information into that photo.  Usually

16   one of the things it embeds, and in this case it was, is

17   the time you took that photo.

18         So Special Agent Andersen took this photo at

19   8:49 p.m. the day of the murder.  And that time -- your

20   phone is probably the most accurate timepiece you have.

21   It gets that time from the cellular network.  And the

22   cell phone providers spend a lot of money making sure

23   that time is accurate because their system functioning

24   depends on that time being accurate.

25         So we can be very certain this is an accurate

 1    time.  If you compare these two times, it's about 17

 2    minutes and 47 seconds difference.  That's how we

 3    established that the time difference before the first

 4    time we see Mr. Wells' truck is approximately 18

 5    minutes.  And we have a very definite -- we're very

 6    definite at this point in time, at 9:00 at night, it's

 7    17 minutes and 47 seconds.

 8        Q.  Can we have the lights, please.

 9            A couple of other things before we conclude here,

10    Agent Allison.  There were some diagrams I believe

11    yesterday and during the trial that were prepared at the

12    Communication Station and that showed one blue truck.

13            Do you remember that diagram?

14        A.  Yes.

15        Q.  And why only one blue truck?

16        A.  I believe what happened, just based on what I

17    know from FBI searches -- well, first of all, I believe

18    that diagram was prepared by our lab, the special

19    projects unit at our lab.  And they prepare those

20    diagrams from different things that we send them, such

21    as photos.

22            So based on what I know from those photos, it

23    appears that the vehicles in that photo were taken from

24    what we call an exit photo from the scene, meaning when

25    we go into a scene we take pictures of everything just

1  to show how it was when we walked in.  When we leave, we

2  take pictures of everything as we left it.  We do that

3  in every search.

4       So what it appears to me happened there is that

5  those vehicles were moved.  Ms. Hopkins -- the Hopkins

6  family has only one vehicle.  She requested before we

7  were done with the crime scene that she be allowed to

8  take that vehicle.

9  Q.  Did you let her do that?

10  A.  We did.  We searched the vehicle and then gave it

11  to back to her.

12  Q.  During April 12th?

13  A.  12th and 13th, before we were probably done with

14  the crime scene.  I know before we were done with the

15  crime scene.

16       The other two vehicle out there belonged to Aaron

17  Coggins and Leah Henry.  They were also moved at some

18  point.  So it appears to me that that diagram was

19  constructed using an exit photo after those vehicles had

20  been moved.

21  Q.  With respect to other aspects of your

22  investigation, what did the investigation do concerning

23  the victims in this case and background work?

24  A.  It's important in a homicide like this that you

25  investigate background of the victims; friends, family,

1    associates were interviewed.  We reviewed financial

2    records looking for any anomalies or any person that

3    might know of somebody that wanted to do harm to these

4    people.

5        Q.   How about electronic information?

6        A.   Their computer profiles at work were looked at as

7    well.

8        Q.   How about e-mails?

9        A.   Yes.

10       Q.   At one point in time during the investigation did

11   you issue a press release?

12       A.   A couple of times, I believe.

13       Q.   For what purpose?

14       A.   The first time was just looking for general

15   information, anybody that had information about the

16   homicides could call the FBI.

17       Q.   And what about canvassing other police

18   departments in the state?

19       A.   Yes.  We sent out requests to all the police

20   departments in the state that if they had come across

21   any .44 Magnums in their investigations to please turn

22   them over so that we could test them to see if the

23   bullets matched the bullets from the crime scene, and

24   none of them did.

25       Q.   Did the investigation request information on .44

```
1   Magnums from retail outlets in the state?

2      A.   Yes, we did.  We got records from all of the

3   major gun retailers in the state, including Wal-Mart,

4   the Post Exchanges on base, a lot of gun stores here in

5   town.  And I honestly don't remember the timeframe in

6   which we looked, but we had a number of Coast Guard

7   agents who pored over these records for weeks looking

8   for any .44 Magnum that was sold within whatever the

9   timeframe was.  It was a long time.  And they would

10  attempt to contact the person that bought that weapon to

11  see if they had any connection with the COMMSTA or they

12  had sold that weapon to someone who may have a

13  connection to COMMSTA or Kodiak.  They spent weeks doing

14  that, and we didn't find anything.

15     Q.   Were those follow-ups done?

16     A.   Pardon?

17     Q.   Were those follow-up interviews done with

18  specifics as to what was found from these retail store

19  disclosures?

20     A.   Yes.  These people were called and requested

21  information from them, yes.

22          MR. SKROCKI:  That's all the questions I have

23  for Agent Allison, Judge.

24          THE COURT:  All right.  Then why don't we take

25  our morning break now and come back in 15 minutes.
```

 1    Please leave your notepads here.  Remember my admonition

 2    not to discuss the case, and we'll go off record at this

 3    time.

 4              (Recessed from 9:58 a.m. to 10:15 a.m.)

 5              (Jury present)

 6              DEPUTY CLERK:  All rise.  Court is again in

 7    session.

 8              THE COURT:  Please be seated, everyone.

 9    Mr. Colbath, whenever you're ready, go ahead, please.

10                        CROSS EXAMINATION

11    BY MR. COLBATH:

12       Q.  Good morning, Mr. Allison.

13       A.  Good morning.

14       Q.  Could we have Defense Exhibit -- Mr. Allison, you

15    mentioned during your testimony there that a couple of

16    press releases were issued during the course of the

17    investigation, correct?

18       A.  Yes.

19       Q.  All right.  And I'm going to show you what has

20    been marked Defense Exhibit No. 2 and ask if you have

21    reviewed that or seen that?

22       A.  I don't know if I saw this one in the Kodiak

23    Daily Mirror.  I definitely knew it was issued.

24              MR. COLBATH:  Your Honor, I'm going to move to

25    admit Defense Exhibit No. 2.

```
 1            MR. SKROCKI:  No objection.

 2            THE COURT:  No. 2 is admitted.

 3            (Defense Exhibit No. 2 admitted.)

 4    BY MR. COLBATH:

 5       Q.  So what's the date on that?

 6       A.  April 23, 2012.

 7       Q.  And the four vehicles depicted belong -- first of

 8    all, actually, that's pictures of two different

 9    vehicles, right, two pictures each?

10       A.  Yes.

11       Q.  Those are the Wells' vehicles?

12       A.  They are.

13       Q.  And those were photos provided to the Kodiak

14    Daily Mirror by the FBI?

15       A.  Yes.

16       Q.  And these were, to your knowledge, the only

17    photos and the only vehicles that the FBI provided to

18    the Kodiak Daily Mirror at any time during the

19    investigation to seek public assistance about it?

20       A.  These were the only two vehicles that we had any

21    reason to believe were involved in the homicides.

22       Q.  My question was:  These are the only two vehicles

23    that you provided pictures of to the Kodiak Daily

24    Mirror?

25       A.  The answer is yes, that's correct.
```

1    Q.  And in addition to this, the FBI issued its own

2  press release, correct?

3    A.  Yes, I believe so.

4    Q.  Okay.  Let's look at Defense Exhibit No. 3.  And

5  maybe blow that up a little bit.  It's hard to read on

6  the screen there.

7        Are you familiar with this, Mr. Allison?

8    A.  I don't know that I saw this before it was

9  issued, but I definitely approved the -- its issuance.

10        MR. COLBATH:  Your Honor, I'm going to move

11  Exhibit No. 3, Defense Exhibit No. 3.

12        MR. SKROCKI:  No objection, Judge.

13        THE COURT:  No. 3 is admitted.

14        (Defense Exhibit No. 3 admitted.)

15  BY MR. COLBATH:

16    Q.  Can we blow up the body of that, the language

17  part of it or the writing part of it.

18        And this was issued -- actually, prior to the

19  other one, this one was issued on April 20th?

20    A.  Yes.

21    Q.  And who is Kevin Donovan or who was Kevin

22  Donovan?

23    A.  He was one of the two assistant special agents in

24  charge of the Anchorage office.

25    Q.  So that would have been a supervisor of yours at

the time in April of 2012?

    A.  My boss's boss.

    Q.  And how was this issued?  In other words, where
was this posted or where was this communicated to the
public?

    A.  This appears to be from our website, the FBI
website.

    Q.  And then if you can take down the blowup part.
Again, those are the same vehicle photos that we saw in
the last exhibit with the Kodiak Daily Mirror?

    A.  Yes, they appear to be.

    Q.  That's fine.  You can take those down.

        I want to talk to you a little bit about this --
the day of April 12th and the work there.

        First of all, when you and the group of agents
were dispatched to Kodiak, you were able to collect all
of the equipment you needed or that you anticipated you
might need and get that out to the Air Force base in
anticipation of your trip to Kodiak, correct?

    A.  We took everything that was available to us that
we thought we would need.

    Q.  Okay.  And that included a vehicle of your own.
I mean, you, all the agents, a vehicle, everything, were
able to drive right onto a C-130 and get down to Kodiak?

    A.  Yes.  We had either a Tahoe or a Suburban that

1   was being used by our evidence response team.  It had a

2   lot of their equipment in it.

3       Q.  And then once you were down at the Communication

4   Station after you spent your time at the -- well, you

5   spent your initial time at the Coast Guard police

6   department it sounds like?

7       A.  It was probably about 30 minutes at the Coast

8   Guard police department.

9       Q.  And they had agents that joined your

10  investigation or you were working jointly with them as

11  the investigation started?

12      A.  The Coast Guard police department was assisting

13  us with security at the crime scene, things like that,

14  but they are not an investigative agency.  The Coast

15  Guard Investigative Service was assisting us with the

16  investigation.

17      Q.  So that's two different groups, Coast Guard

18  Investigative Service as well as the Coast Guard -- the

19  regular Coast Guard police?

20      A.  Yes, those are two separate groups.

21      Q.  And so you had both now manpower and then other

22  resources, if needed, that they could contribute to the

23  investigation?

24      A.  That day, there was about three Coast Guard

25  Investigative Service agents there.  There was only one

 1    that was permanently stationed there that day.  There

 2    was two assigned to that office.  One was out of town.

 3    And I believe two more came with us on the C-130.

 4        Q.  And when you -- after your time at the military

 5    police office, you went up and staged at T-1 building at

 6    the COMMSTA, right?  And that's when the command post

 7    was set up?

 8        A.  Yes, that's correct.

 9        Q.  As the interview processes occurred, it was

10    around 7:00 p.m. in the evening when Mr. Wells was first

11    interviewed, correct?

12        A.  I don't recall the time.

13        Q.  Okay.  It was apparently -- now, during the

14    course of this investigation, how many reports have you

15    written, do you think, Mr. Allison?

16        A.  I have no clue.

17        Q.  Countless?

18        A.  A lot.

19        Q.  Dozens?

20        A.  A lot.

21        Q.  Dozens you would say?

22        A.  Yes.

23        Q.  All right.  It was sometime after Mr. Wells --

24    the first time that Agent Bottary and Agent Oberlander

25    had interviewed Mr. Wells that Mr. Wells entered the

1  conference room and took this food off the table that

2  you described, wasn't it?

3      A.  I'm sorry.  Can you repeat that?

4      Q.  Sure.  It was sometime after that initial evening

5  interview with Mr. Wells that he walked in the

6  conference room and took this food off the table that

7  you described?

8      A.  I believe that's correct, yes.

9      Q.  Because you asked him about his medical

10  condition, and it was during that first interview that

11  he had told agents about his medical condition, so it

12  had to be well into the evening?

13      A.  Yes, that makes sense.  Yes.

14      Q.  And other than to take the food from the room,

15  Mr. Wells did not take anything else from the room,

16  certainly?

17      A.  No, we approached him immediately, because it was

18  so out of the ordinary that he would burst into the room

19  like that, and I wouldn't say confronted him, but asked

20  him about why he was in there and we kind of escorted

21  him out.  We didn't push him, but I think he got the

22  point that he needed to leave.

23      Q.  By then you said you had prioritized an interview

24  on him.  He was at least a partial, a seriously partial

25  focus of your investigation.  Did I hear you right?

1    A.   We prioritized the first interview of him, and

2    yes.

3    Q.   And you didn't make any law enforcement report

4    about him bursting into the conference room or record

5    that in any fashion, in any written fashion, did you?

6    A.   No, I did not write it down, and we did not have

7    a recorder going in the command post at the time, so no.

8    Q.   And you didn't make either a contemporaneous note

9    at the time nor have you from that time, April 12, 2012,

10   until you just said it here this morning, made any kind

11   of agent notes, a 302, which is what you guys call the

12   FBI official reports, any kind of description of that,

13   did you, written description?

14   A.   No, I did not.

15   Q.   As those interviews progressed, there was

16   ultimately the decision to make -- to do the ruse that

17   was described, the gunshot residue ruse, right?

18   A.   Yes, I made that decision.

19   Q.   And, of course, throughout an investigation, and

20   during a process of talking with a subject like Mr.

21   Wells or a witness or anybody, you're allowed as law

22   enforcement officers to provide both accurate

23   information from your investigation as well as

24   inaccuracies to people as you interview them or talk to

25   them, aren't you?  There is nothing illegal per se about

1  that?

2      A.  It's not illegal and we are allowed to.  It's not

3  something we do during the normal course of an interview

4  if we believe someone is being honest with us.

5      Q.  You do it at the agent or the supervisory agent's

6  discretion and you do it when you feel that the

7  circumstances warrant it, regardless of who you're

8  talking to?

9      A.  The agent doing the interview has the discretion,

10  can make that decision.

11      Q.  And in this case, part of the intention of the

12  ruse was to capture Mr. Wells, not only what he said,

13  you were capturing that on audio, but to capture his

14  physical reaction, his looks, his demeanor, his

15  behavior, those kind of things?

16      A.  That's correct.

17      Q.  And, of course, you could have videotaped it?

18      A.  I don't believe we had anything with us to

19  videotape.

20      Q.  Agents -- you all had iPhones or many of you had

21  iPhones or some form of smart phones.  Anybody could

22  have easily recorded that on a cell phone, correct?

23      A.  I actually don't recall what kind of phones we

24  had back then.  The FBI was kind of in the dinosaur age.

25  We had BlackBerrys for a long time.  I don't think those

1  would record.

2        There were some Coast Guard agents that had

3  iPhones.  I don't know if those were their personal

4  phones or not.

5     Q.  Well, you just, right at the end of your

6  testimony, referred to Agent Andersen taking a picture

7  of a computer screen with her iPhone.  She had an

8  iPhone.

9     A.  It could have been her personal phone, but I

10  actually think that probably was her Coast Guard phone.

11     Q.  Of course, Wal-Mart has both smart phones as well

12  as video recorders?

13     A.  I don't have the authority to go spend that much

14  money.

15     Q.  Suffice it to say if the FBI wanted to figure out

16  a way to record Mr. Wells, they could have recorded Mr.

17  Wells?

18     A.  Sure.

19     Q.  You said that one of the things you did was on

20  that first day on April 12th was review the T-1 camera

21  video footage, right?

22     A.  Not me personally, but it was reported back to

23  me.

24     Q.  You know that that T-1 camera does not record the

25  blue vehicle stopping at T-2?

1    A.  No, it does not.

2    Q.  It records it passing by and disappearing behind

3  the building on Anton Larsen Bay Road?

4    A.  Yes, that's correct.

5    Q.  Can we see Defense Exhibit No. 146?

6        Are you familiar with what this depicts, Agent?

7    A.  I have never been on that particular dock, but I

8  believe that's the boat dock near the end of Anton

9  Larsen Bay Road on the west side of the island.

10        MR. SKROCKI:  No objection.

11        MR. COLBATH:  Your Honor, I'll admit 146.

12        THE COURT:  146 is admitted.

13        (Defense Exhibit No. 146 admitted.)

14  BY MR. COLBATH:

15    Q.  Agent Allison, as part of your investigation, you

16  did ultimately drive from the COMMSTA out past the golf

17  course and down Anton Larsen Bay Road, correct?

18    A.  At the time, I did not.  We had an agent do that.

19    Q.  Okay.  And the first time that was done was

20  approximately three days after the murders, on

21  April 15th, right?

22    A.  I don't recall the exact date that was done.

23    Q.  It certainly wasn't done during that first

24  36 hours that you were there, April 12th and April 13th?

25    A.  I don't remember the exact day or time.

1    Q.  Ultimately, you yourself drove out there,
2    correct?
3    A.  Months later probably.
4    Q.  Okay.  At the time the first agents went out
5    there and then later when you went out there, no
6    photographs were taken or vehicle information recorded
7    from anybody that was seen out in that area, were they,
8    that you're aware of?
9    A.  No, we didn't see any vehicles of interest.
10   Q.  And no interviews were done with people that were
11   at this boat dock or vehicles staged at this boat dock?
12   A.  I don't know that there was anybody at the boat
13   dock.
14   Q.  If there were vehicles in the parking area that
15   was described past this or in the parking area along the
16   boat dock, the vehicles, the license plates,
17   information, those weren't recorded that you're aware of
18   in any report?
19   A.  Again, I don't know that there were any vehicles
20   or people at the dock.
21   Q.  That's fine.  You can take that one down.
22       Can we see for foundational purposes Defense 156?
23   If you can just blow the top half of that up.
24       Mr. Allison, as part of the investigation is one
25   of the things that law enforcement collected the flight

manifest of the Era flight that arrived at the Kodiak
airport on April 12th, the morning of April 12th at
around 7:00?

  A.  I believe it was, yes.  I don't remember this
specifically, but I know that we collected information
like that from the airlines.

  Q.  And individuals that may have been at the airport
departing that flight, there was attempts made to
contact them and people that were contacted were
interviewed about any observations they might have made
at the airport that morning?

  A.  Yes, we contacted as many as we could find.

        MR. COLBATH:  Your Honor, I'm going to move
156.

        MR. SKROCKI:  No objection.

        THE COURT:  156 is admitted.

        (Defense Exhibit No. 156 admitted.)

BY MR. COLBATH:

  Q.  And so that morning, the morning of April 12th,
there was an Era flight that arrived around 7:00 at the
airport, 7:00 a.m., or maybe you don't know the time?

  A.  I don't recall, but that sounds about right from
my knowledge of Kodiak.

  Q.  And to the extent that, as you have said, to the
extent that law enforcement could, you looked for the

folks that are listed here and attempted to interview

them to see if any of them made observations about

either Mr. Wells' blue Honda that was known to be at the

airport or might have seen Mr. Wells at the airport,

correct?

    A.  Yes, we did what we could.

    Q.  And then if we could look at 157 and 157A.

That's just the authentication.  I think there is 157A.

Similarly, Mr. Allison, there was also an Alaska

Airlines flight that was arriving that morning, the

morning of April 12th, at the airport.  And you obtained

or law enforcement obtained a manifest from Alaska Air

to try and identify those folks as well, correct?

    A.  Yes, we did.

          MR. COLBATH:  I'll move, Your Honor -- I guess

the only thing that needs to be in probably is 157A.

The first page is just a verification from Alaska

Airlines.

          THE COURT:  157A, any objection?

          MR. SKROCKI:  No objection, save for redaction

of the PII that's on the document.

          THE COURT:  Let's make sure that's done.

          MR. COLBATH:  Sure, Your Honor.

          THE COURT:  157A is admitted.

          (Defense Exhibit No. 157A admitted.)

1          MR. COLBATH:  Can we publish that?

2          THE COURT:  Any objection to publishing it?

3          MR. SKROCKI:  No.

4          THE COURT:  Go right ahead.

5    BY MR. COLBATH:

6      Q.  Again, you had a number of looks like 25-ish

7    people arriving that morning, 7:00, 7:15 on Alaska

8    Airlines, and a number of those folks were looked for

9    and identified and interviewed?

10     A.  Yes.

11     Q.  All right.  Let's take that down, please.

12          Could we see Exhibit No. 179.

13          Now, on April 12, 2012, there was a motel that's

14   been testified about operating, open for business, also

15   located right at the entrance to the grounds of the

16   Kodiak airport, the Comfort Inn.  You recall that,

17   correct?

18     A.  Yes.

19     Q.  And law enforcement went to the Comfort Inn and

20   obtained a list of registered guests and people that

21   would have been registered to be at the Comfort Inn on

22   April 12th.  Do you recall that?

23     A.  Yes.

24     Q.  And so do you recognize Defense Exhibit No. 179

25   as being the information provided by the Comfort Inn to

1    law enforcement?

2        A.   Honestly, I don't remember it, but it appears to

3    be.

4            MR. COLBATH:  Your Honor, I'm going to move,

5    and again to the extent, I don't think there is any

6    personal information here, but to the extent that there

7    is, we would certainly remove identifiers, but otherwise

8    I would move 179.

9            MR. SKROCKI:  We have no objection.

10           THE COURT:  179 is admitted.

11           (Defense Exhibit No. 179 admitted.)

12   BY MR. COLBATH:

13       Q.   And again, Agent Allison, these folks were

14   attempted to be contacted, get ahold of as many as you

15   could and see if they made any observations about Mr.

16   Wells or either of Mr. Wells' vehicles while at the

17   airport on April 12th?

18       A.   Yes.

19       Q.   I want to talk, if we can, a little bit about

20   some of the searches that went on.  Now, one thing you

21   said was at the conclusion of the gunshot residue ruse

22   on the night of April 12th, you were aware there had

23   been discussions about agents physically going with Mr.

24   Wells to his house.  You recall that testimony?

25       A.   I was aware that Special Agent Bottary brought

1   that up in an interview with Mr. Wells, did not ask me

2   about that before he did that.

3       Q.  And then after you learned of that, you said you

4   made the decision that agents would not go to Mr. Wells'

5   house because you weren't ready for that intrusion?

6       A.  That's correct.

7       Q.  Simultaneously though at that time you had

8   already begun the process of putting together search

9   warrant affidavits and had intention of getting a search

10  warrant for Mr. Wells' house?

11      A.  Yes, that's correct.

12      Q.  Let's talk about some of those searches now.

13  During the searches of Mr. Wells' house, a number of

14  items of multimedia or electronics were seized, correct?

15      A.  Yes.

16      Q.  And generally, when we're speaking about search

17  warrants you say you have to be very specific and you

18  have to be detailed in what gets approved to be looked

19  for?

20      A.  Yes, the judge makes sure of that.

21      Q.  But oftentimes your search warrants, while it

22  contains detailed items, they are often detailed classes

23  of items?  So, for instance, if you're looking for

24  something that might be contained on multimedia, photos,

25  videos, those kind of things, your search warrant may

just say any computers, any electronic storage devices,
any hard drives, any -- you know, all multimedia devices
that might be able to capture a picture, if it's a
picture you're looking for, right?

     A.  Yes, that's correct.  We don't have any idea what
multimedia device they may be storing it on, whatever
we're looking for, so yes.

     Q.  It's broad in that sense in that you get a
category of things and then you're allowed to look for
and seize that category of things?

     A.  It can be, unless we can somehow narrow down the
scope of what we are looking for, yes.

     Q.  In this case, taken from Mr. Wells was a computer
from his home, ultimately a Kindle device, a number of
SanDisk cards, media cards or storage devices,
telephones, all of those types of things were taken,
correct?

     A.  I remember phones and computers.  The other
things I don't specifically remember, but it's possible,
yes.

     Q.  And everything that was taken -- all of those
things that were taken were searched and looked through
for photos, videos, evidence of things you were looking
for, correct?

     A.  I believe that they were, yes.

1    Q.   And those could be things such as any e-mail or
2  written-type correspondence that might somehow relate to
3  the investigation?

4    A.   Yes, that's correct.

5    Q.   Could have been photos dating back many, many
6  years of firearms or of some other thing that you might
7  have felt depicted Mr. Wells and tied to the
8  investigation?

9    A.   Yes.

10   Q.   Videos, similar?

11   A.   Yes.

12   Q.   Internet research done or internet activity that
13  you felt might have been related to somehow the planning
14  of a murder or related to some aspect of the
15  investigation?

16   A.   Yes, all of that is possible.

17   Q.   That's -- when you seize those devices, that's
18  the kind of things you're looking for?

19   A.   Yes, that's correct.

20   Q.   Now, you said that the surveillance of Mr. Wells
21  ran on April 12th after he left COMMSTA at about 10:00
22  that evening, you said surveillance ran until about 3:00
23  a.m.?

24   A.   I recall agents being in front of his house until
25  approximately that time.

Q.  Now, did either the Alaska State Troopers or some
facet of the Kodiak folks, either CGIS or base police,
did anybody else pick up the surveillance beginning at
3:00 a.m.?

A.  No, and I don't believe we were actually
surveilling him when he left.  They eventually -- we
eventually put someone in front of his house until
approximately 3:00 a.m., but at that point I called off
the surveillance and I don't believe it was reinitiated
until later in that week.

Q.  Mr. Wells came back the next morning as
instructed on April 13th, came back to T-1, and you
again saw him the next morning?

A.  Yes, that's correct.

Q.  And then it was beginning later that day after he
left on April 13th that surveillance resumed?

A.  Yeah.  I don't believe we surveilled him away
from the COMMSTA.  At some point, we were in front of
his house.  We had agents in front of his house until
approximately 3:00 a.m. the next morning.

Q.  But then later on April 13th you heard --

A.  I just got my dates wrong.  Until approximately
-- that would have been the 13th.  3:00 a.m. on the
13th.

Q.  And then you heard Agent Judy testify that later

1  on the 13th, he was -- that night he was sitting at the

2  airport and they were watching the vehicle, but as Mr.

3  Wells arrived, they then began surveillance of Mr.

4  Wells, followed him to businesses, into the airport, and

5  ultimately began surveillance at that point of Mr.

6  Wells.  You heard that, correct?

7      A.  That's correct.  We did not follow him away from

8  the COMMSTA, but we did have those two agents at the

9  airport watching the vehicle.  And once he arrived

10  there, they did begin to surveil him again.

11      Q.  After he left the airport, you're aware that he

12  and Mrs. Wells -- he was there to pick Mrs. Wells up.

13  They went to their residence and you had already

14  commenced, or the residence was already secured by

15  agents.  They initially weren't allowed back in the

16  house at that point, were they?

17      A.  No, they were not allowed back in.

18      Q.  And they went to the Comfort Inn, and agents

19  began, at some point after they checked in, surveilling

20  them coming and going from the Comfort Inn?

21      A.  Honestly, I would need to see the documentation

22  to make sure of that, but that sounds about right.

23      Q.  You made documentation of that because you were

24  the one ultimately approving the surveillance?

25      A.  All surveillance was documented, yes.

1    Q.   And that continued, that surveillance continued
2  for how long?
3    A.   I don't recall specifically.  It was probably a
4  couple of weeks.
5    Q.   Now, one of the agents testified earlier in the
6  case that on the 8th of May he saw from the hillside
7  across the way he saw Mr. Wells change his tires, so
8  that would have been almost 30 days after the murders.
9  You recall that testimony?
10    A.   I do, yes.  So probably it must have been more
11  than two weeks.
12    Q.   The searches that continued on Mr. Wells' house,
13  when you needed equipment and metal detectors and other
14  things to search that hillside, you were able to line up
15  and access the equipment necessary to do the bullet
16  collection from the hillside, right?
17    A.   I'm sorry.  Can you repeat that?
18    Q.   Sure.  When the decision was made to search the
19  hillside for bullets at Mr. Wells' house, you were able
20  to get the equipment?  We saw equipment in the pictures,
21  get that all lined up and get a team of agents available
22  to go conduct that?
23    A.   Yes.  I'm not exactly sure where that equipment
24  came from.  It might have come from our -- from Quantico
25  where all of our engineering research facility is and a

1    lot of other specialty units are.

2         We did have not agents but personnel come out

3    that were familiar with the rigging aspect of the

4    search, because it was on a hillside, a rather steep

5    hillside, so we had those individuals come out and they

6    may have brought that equipment with them.

7         Q.  The searches that were done looking for the

8    firearms you said were the community based clean-up or

9    in conjunction with the search all up and down Anton

10   Larsen Bay Road from the COMMSTA to Rezanof Drive.  That

11   area was searched?

12        A.  Yes, it was searched by, you know, civilians.  It

13   wasn't really law enforcement doing the search, but yes.

14        Q.  Sort of law enforcement monitored or -- not

15   supervised, but monitored in case you said something was

16   found?

17        A.  Yes, we did have agents with the groups.

18        Q.  There is an area out there, the Berma Road Trail,

19   that area was searched?

20        A.  I don't recall that specifically.

21        Q.  The area from Mr. Wells' house along the route

22   down to the landfill and the dumpsters that we saw

23   pictures of earlier in the case, those areas were

24   searched?

25        A.  Are you referring to the junkyard?

1    Q.  No, well, I was going to ask you about that, but

2    prior to that.

3    A.  The landfill is quite some distance from Bells

4    Flats.

5    Q.  I'm referring to the dumpsters, I guess, that

6    ultimately were emptied and then taken to the landfill.

7    A.  So the question is was that area searched?

8    Q.  Yes.

9    A.  I don't recall specifically that area was

10   searched.

11   Q.  And then there was a junkyard.  Ultimately,

12   Mr. Wells' septic tank, the whole thing had to be

13   replaced.  That was taken out to a junkyard.  You went

14   there and took photos and did some searches?

15   A.  I personally didn't, I don't believe, but it

16   sounds reasonable.

17   Q.  Nobody took -- I noticed nobody took, other than

18   his phone and his car, any photos of Mr. Wells on

19   April 12th, while he was there at the COMMSTA for

20   13 hours, did they?

21   A.  I don't know.  I don't recall.  I don't recall

22   having any in the case file.

23   Q.  In all this time you haven't seen any, that any

24   law enforcement photos, close-ups of him, close-ups of

25   his clothing, his shoes, his jacket, any of that stuff

1    from that day?

2       A.  All we have is what's on the video from the T-2

3    camera.

4       Q.  Okay.  The things, the searches that were

5    conducted and done on April 12th, those were all before

6    you all received any warrants, so that was all consent

7    searches?

8       A.  April 12th was the crime scene, so, yeah, the

9    Coast Guard consented for us to search the T-2 building,

10   I guess you could say.

11      Q.  Well, on April 12th, was Mr. Wells' phone?

12      A.  Yes, I'm sorry.  Mr. Wells' phone and truck was

13   by consent.

14      Q.  And the physical -- the gunshot ruse, he

15   consented to that.  That was something he was told ahead

16   of time he didn't have to consent to, but he did, even

17   though he didn't know you weren't going to use it.  That

18   was also a consent process, I guess?

19      A.  Yes, it was all by consent.

20      Q.  How was -- once Mr. Wells' car was seized at the

21   airport, how was it taken to where those photos were

22   taken at the Alaska State Trooper facility?

23      A.  You know, I don't recall whether we drove it or

24   towed it.

25      Q.  Prior to moving it from the scene there at the

airport, it was not searched at that location, the

search was done at the AST office, correct?

A.  I believe the search of the CR-V was done at the

Kodiak Police Department.

Q.  Okay.  And during that process, there was no

measurements taken between, for instance, the front seat

and the steering wheel to see how the seats were

adjusted, either in the passenger or the driver's seats?

A.  I don't believe there were, no.

Q.  The items in the car, other than the vacuum

sweepings, there was really no evidentiary items

retained from the interior of the car?

A.  Other than photographs of the mail on the front

seat, I don't believe there was anything taken.

Q.  There was nothing particular about that mail that

was, the contents of it, that appeared to be pertinent

to anything to the investigation?

A.  Not the contents, just its location on the front

seat.

Q.  You were asked about the different agencies, FBI

agencies or parts of your agency that were involved in

this, and you listed Mr. Mills, the lab he was from, and

the DNA folks and the fingerprint folks.

One of the agencies you didn't list was the

forensic audio and video image analysis unit.

1    A.   Yes, I did forget about that.  That is where

2  Dr. Vorder Bruegge, who testified yesterday, that is the

3  unit he works in.

4    Q.   And originally you had requested review of the

5  April 12th surveillance video, you had requested that

6  unit to make initial review of the video quite early on

7  in the case, a few days, maybe into that first week of

8  the investigation, correct?

9    A.   Yes, that's correct.

10    Q.   And the forensic analyst who started out doing

11  the analysis was an individual named Chris Iber,

12  correct?

13    A.   Yes.

14    Q.   You communicated with Mr. Iber back and forth as

15  he did his review and came to some preliminary results,

16  and you actually asked him to do a couple of different

17  reviews or processes?

18    A.   Yes.

19    Q.   And then after speaking with Mr. Iber, it was

20  later in the month of November, so several months later,

21  in November, you went down -- or some agents went down

22  and started the communications with Mr. Schmidt from

23  Honda?

24    A.   I don't recall the date, but we did do that.

25    Q.   If I told you I believe that was November -- the

1  first contact with Mr. Schmidt was November 18th, would

2  you have any reason to disagree with that?

3      A.  I can't say.  I don't know when it was.

4      Q.  You made reports of your communications.  You

5  e-mailed back and forth with Mr. Schmidt and

6  communicated with him by phone a number of times?

7      A.  Yes.  If you can show me those reports, I can

8  tell you a more specific date.

9      Q.  Your memory it was near in time -- I can, but it

10  was not near in time to April, it wasn't a week or two

11  from the time you were in Kodiak?

12      A.  No, it was months later.

13      Q.  After speaking with Mr. Schmidt, there was

14  occasion where an individual who had formerly worked for

15  the forensic audio video unit, an individual by the name

16  of Gerald Richards, he was consulted in the case and

17  asked to do basically a review similar to that of

18  Mr. Iber, correct?

19      A.  I'm not really familiar with Mr. Richards.  I

20  never met him myself.  That was something that two of

21  the attorneys that were working on the case at the time

22  did independently.

23      Q.  And you were made aware of that contact through

24  the attorneys and made aware of that process, I assume

25  as case agent, you realized that was going on?

1    A.  I knew that they had contacted him and I knew

2   that they had visited him.

3    Q.  After talking to Mr. Schmidt, back to the

4   forensic audio visual unit, Mr. Vorder Bruegge was then

5   asked to look at it in December?

6    A.  Again, I don't know when.  He was asked to

7   perform a different type of analysis on the photo, or

8   the video, excuse me.

9    Q.  And then it was after speaking with the folks at

10  the forensic audio and visual analysis unit that

11  decisions were made to consult both Mr. Toglia and

12  Mr. Becker, the other witnesses we heard about here?

13  That was done at a later time after the FBI had sort of

14  concluded their forensic work on the process?

15   A.  I seem to remember, if I remember correctly,

16  Mr. Toglia was consulted before Mr. Vorder Bruegge.  I

17  could be wrong about that, but that's my recollection.

18   Q.  All right.  In doing firearms research in this

19  case, one of the things that was focused on in getting

20  all these gun sale records from firearms dealers on

21  Kodiak, you tried to obtain those records and obtained

22  many of them?

23   A.  Yes, we did.

24   Q.  Firearms records from the Anchorage area and

25  southern Alaska here for gun sales of .44 Magnums, you

1    obtained many of those?

2        A.   Yes, we did.

3        Q.   And throughout all of those records, one of the

4    things that you said agents pored over looking for were

5    gun sales to Mr. Wells?

6        A.   No, not specifically.  It was really any sales of

7    any .44 Magnums.  Anybody -- obviously, that would have

8    been of interest to us, but it was sales to anybody.

9    They were trying to contact anybody that bought a .44

10   Magnum and determine where that gun had gone or if that

11   person had any connection to the Communication Station.

12       Q.   And for the folks that were contacted and anybody

13   that was -- the determination was did they still have

14   their firearm, first of all?

15       A.   That was one of the questions we asked.

16       Q.   And then did they have any contact with COMMSTA?

17       A.   We tried to determine their association, if any,

18   with the COMMSTA.  For that particular set of people, we

19   didn't really have a defined set of questions like we

20   did in the other two instances.

21       Q.   And, again, particularly look at anybody --

22   looking for anybody that might have sold a gun to Mr.

23   Wells or other people that you could associate to the

24   COMMSTA or Kodiak area?

25       A.   Yes.

1    Q.   And nothing ever turned up any of that?

2    A.   No, nothing was ever brought to my attention.

3    Q.   Ultimately, though you did turn up maybe a dozen

4    or more actual firearms in the investigation that were

5    tested, none of which had any association to the bullets

6    found at the crime scene?

7    A.   I don't know how many it was honestly, but we did

8    find firearms -- I mean, we -- like I said, we canvassed

9    police departments across the state.  We actually had a

10   Smith & Wesson model 629 that was found on the side of

11   the road in a backpack.  I believe it was Cordova or

12   Soldotna.  We tested that one.  We had a couple others

13   we found that way.  We had Mr. Pennington's model 629s

14   we tested.  I believe we tested Mr. Wells' Ruger

15   Blackhawk .44 as well as his .45.

16   Q.   As it turned out both Mr. Hopkins and Mr. Belisle

17   had owned .44 calibers.  Later Mrs. Belisle brought hers

18   to you and that got turned in and tested as well?

19   A.   That's not correct.  That's not the caliber they

20   were.  Mr. Belisle owned a .44 Special and Mr. Hopkins

21   owned a .460 Magnum.  Neither of them owned .44 Magnums,

22   but the weapons I just mentioned were tested.

23   Q.   Mr. Shem, who you heard from, I think that was

24   yesterday, ended up testing the Taurus model, the .44

25   Special?

1    A.  Yes, I believe so.

2    Q.  And, again, of the firearms found, nothing

3  matched the projectiles at the crime scene?

4    A.  That's correct.  We never found the firearm that

5  was used in the double homicide.

6    Q.  There are, as the process continued and your

7  investigation continued into the summer, there was a

8  time where you obtained a search warrant to get both

9  hair samples and fingerprints and biological samples

10  from Mr. Wells and Mrs. Wells actually, correct?

11    A.  Yes, that's correct.

12    Q.  And that was done in part to allow the testing

13  that you said that the FBI lab did or samples that were

14  ultimately sent for testing to the lab?

15    A.  Yes.

16    Q.  And in order to obtain those samples, you and

17  four other agents determined at one point in August that

18  Mr. and Mrs. Wells would be traveling through Anchorage

19  and you met them at the airport, correct?

20    A.  Yes.  We determined that the safest place to

21  approach Mr. Wells was at the airport after he had

22  already been through metal detectors at the Kodiak state

23  airport, so we do that on occasion, talk to people at

24  the airport or places that we know they have already

25  been screened.

1    Q.  You had been and back and forth to the Wells'

2  house on a number of occasions, both when Mrs. Wells was

3  there, as well as had a number of consent searches by

4  that point done from Mr. Wells?

5    A.  We had the two consent searches the day of the

6  12th, yes, and then subsequent searches were with

7  warrant.

8    Q.  So when Mr. Wells and Mrs. Wells get off the

9  plane here in Anchorage from Kodiak that evening, you

10  hadn't made arrangements ahead of time to meet with them

11  or anything.  Were you just waiting for them as they got

12  off the plane?

13    A.  No.  We had not made arrangements for that,

14  because, in addition to those searches, we actually had

15  a search warrant for the residence as well and we did

16  not want to alert them to the fact we had that warrant,

17  because we did not want -- obviously, we can't tell

18  people before we search the residence because they might

19  destroy evidence.  We did not alert them we had any of

20  these warrants.

21    Q.  Before they got on their next plane to travel in

22  Anchorage, you took them to the airport police station

23  there and head, hair, different hairs and samples from

24  their bodies were taken and collected pursuant to the

25  search warrant that you had?

1    A.   Yes.   Members of the ERT team who have

2  specialized training in collection of those items did

3  that.

4    Q.   They were cooperative, the Wells were cooperative

5  with that?

6    A.   They allowed us to take the samples.  I don't

7  know that I would call them cooperative.

8    Q.   You informed them at that point of the search

9  warrant back at their house, inquired about how you

10 might get in and they told you the garage door is open,

11 it's unlocked, you don't need a key or anything,

12 correct?

13   A.   I don't specifically recall them saying that, but

14 we always ask if we can -- if there is a way in or if we

15 can have a key to the residence because we prefer not to

16 damage any property when we're entering the residence.

17   Q.   Did you go serve the search warrant in Kodiak?

18 Were you part of that?

19   A.   I don't recall that specific warrant.  I'm sorry.

20 I don't recall being there for that specific warrant.  I

21 do recall the warrant.

22        MR. COLBATH:  If I can just have a minute, Your

23 Honor.

24        THE COURT:  Certainly.

25        (Pause)

1    Q.  I apologize, Agent.  I thought I had it right

2  here, but I don't.

3      (Pause)

4    Q.  Agent, I'm just going to have pulled up this

5  Bates number, Counsel, on the screen.  I'll have you

6  look at the screen there and review -- that's not the

7  one I'm looking for.  The airport one.  I'll find it.

8      Suffice it to say after you collected the items

9  you needed to collect at the airport, you were able to

10  go, while the Wells were gone from their house, access

11  the house, that search was conducted?

12    A.  Again, I don't know if it was me, but the search

13  was conducted.

14    Q.  And you're not aware that agents had to break

15  down the door or do any forced entry into the house?

16    A.  No, I don't think we ever actually forced entry

17  into the house.

18    Q.  There was another time that Mr. Wells was --

19  well, strike that.

20      On April 12th, when he turned over his phone, it

21  was searched and reviewed, correct?

22    A.  Yes.  We photographed the phone and reviewed it,

23  yes.

24    Q.  And then after April 12th, within the first

25  couple of weeks of the investigation, there was an

actual search warrant, as you and I have discussed, for
electronics and other items, and the phone was actually
seized pursuant to that search warrant so a full review
could be done?

A.  Yes.  The initial search we just basically just
looked through the phone ourselves.  The search warrant
allowed us to use a more comprehensive method of
searching the phone.

Q.  A forensic tool or computer-type tool to search
that?

A.  Yes.

Q.  And then several months later, again, there was a
second search warrant and Mr. Wells was met, when he was
traveling alone, he was met at the airport and a search
warrant was served where another phone and a Kindle
device was taken from him as he traveled?

A.  Yes.

Q.  And so that would have been -- that wasn't the
same phone, it was a replacement phone or a different
phone, I guess.  You don't know probably what it was,
but a different phone?

A.  Yes.

Q.  And again, Mr. Wells wasn't told that you all
would be waiting for him at the airport, it was done for
those -- at that location for those same reasons you

1    just told us?

2        A.   Yes.  We can't tell people when we're coming to

3    serve a search warrant on them or they might destroy

4    evidence.

5        Q.   The decision to review and interview -- all the

6    car interviews, those started during the course of the

7    summer.  You started with the long 200 to 300 list of

8    people, interviewing people who you determined had

9    similar cars, correct?

10       A.   I have to be honest, I don't remember exactly

11   when we started that.

12       Q.   That was well after you had left Kodiak

13   initially.  You said you and some agents went back for a

14   couple of week period and started that and then it

15   trickled on after you left?

16       A.   Yes.  It wasn't the next trip I made.  I made

17   many trips to Kodiak during this time, and I don't

18   remember which trip it was, but, yes, at some point I

19   did go back with a number of agents and the Coast Guard

20   Investigative Service agents that are stationed in

21   Kodiak assisted with that.

22       Q.   Could we pull up I think it's Government 218.

23   And this was the questionnaire Mr. Skrocki discussed

24   with you.  Do that bottom half.

25            You recall the questionnaire, right?

1    A.  This is the questionnaire used when we talked to

2  the COMMSTA personnel.

3    Q.  Okay.

4    A.  Not the car search.

5    Q.  On this one, with respect to COMMSTA, there was

6  information about Mr. Wells' two vehicles left in your

7  questionnaire as folks were specifically being asked

8  about that morning?

9    A.  You see there on the bottom that is a note to

10 investigators.  That is not something that was discussed

11 with the individuals at the COMMSTA.  The question in

12 bold there is the one that was asked of the individuals

13 working at the COMMSTA.

14   Q.  Right.  And investigators were -- if the person

15 specifically had any observations about either of those

16 two vehicles or similar vehicles, there was a note there

17 to make sure that whichever investigator was talking to

18 the person took special note of that?

19   A.  Yes, if the person we were speaking with brought

20 these vehicles up, then, yes, it was there to alert the

21 investigator doing the interview that those vehicles

22 were of interest, yes.

23   Q.  So you followed a similar process as you did with

24 the COMMSTA employees, use of a questionnaire that is,

25 when you went out to do the questioning of the folks

1  with the vehicles, correct?

2      A.  Yes.

3      Q.  If we could pull up -- let's look at Defense

4  Exhibit No. 182.  This may be a couple of pages.  Is

5  there any more or is it just those two?  Okay.  Will you

6  flip back to the first page.

7          Agent Allison, do you recall or recognize, I

8  should say, this exhibit, Defense Exhibit No. 182?

9      A.  Yes.

10     Q.  And do you need to see the second page or you're

11 okay with that?

12     A.  No.

13         MR. SKROCKI:  I would like to see it, please.

14         MR. COLBATH:  Could you flip to the second

15 page?

16         MR. SKROCKI:  Thank you.

17 BY MR. COLBATH:

18     Q.  Would this have been, Agent Allison, one of the

19 questionnaires from one of the vehicle interviews that

20 you -- this was one that you personally did?

21     A.  It appears so.

22         MR. COLBATH:  I'm going to move the admission,

23 Your Honor, of Exhibit No. 182.

24         MR. SKROCKI:  No objection.

25         THE COURT:  182A was admitted with redactions.

 1    There were just a few pages picked out.

 2            MR. COLBATH:  Correct.  182 is a separate

 3    exhibit from 182A.  They are different.

 4            THE COURT:  Any objection?

 5            MR. SKROCKI:  Just those two pages, no

 6    objection.

 7            THE COURT:  182 is admitted.

 8            (Defense Exhibit No. 182 admitted.)

 9            MR. COLBATH:  This started out as like six

10    pages, Your Honor, so I did 182A were the other pages.

11    These first two pages deal with Mr. Allison.

12    BY MR. COLBATH:

13      Q.  Could you do the top half for me.  Get his name

14    in there.  Thank you.

15            Agent Allison, you recognize this to be one that

16    you participated in because your name is at the top

17    here, and then it's being done it looks like

18    December 11th of 2012?

19      A.  Yes.

20      Q.  And do you recall that most of the interviews

21    were done during the fall of yet that year, 2012?

22      A.  It continued for a while.

23      Q.  Okay.

24      A.  The searches I mean, sorry.

25      Q.  I'm sorry?

1    A.   The searches continued for a while.

2    Q.   And again, this is one done regarding a blue Ford

3    Escape?

4    A.   Yes.

5    Q.   You can take that part down.

6         Now, you and the other agents were using the same

7    questionnaire for all of the car interviews so that you

8    could maintain that consistency or try to get similar

9    information from folks even if the investigation was

10   done by differing agents?

11   A.   Yeah, just to provide a framework for the

12   questioning.

13   Q.   Go to the second page.

14        Now, this one does contain information about, not

15   only Mr. Belisle and Mr. Hopkins, inquiry about whether

16   the person knew either of them, correct?

17   A.   Yes.

18   Q.   And then information about did they know Mr.

19   Wells or Mr. Wells' family?

20   A.   Yes, it includes questions about Mr. Wells.

21   Q.   So unlike the COMMSTA questionnaire that

22   specifically referenced Mr. Wells, or did not -- excuse

23   me, did not specifically reference Mr. Wells, this one

24   did?

25   A.   Yes, at this point, it was months later.  We had

1  collected a significant amount of information regarding

2  Mr. Wells and he was clearly a suspect at the time.

3      Q.  And, of course, the prior one where you're

4  interviewing COMMSTA people and Coast Guard witnesses,

5  you didn't have to specifically identify Mr. Wells,

6  because questions on there were specifically about the

7  rigger shop, the rigger shop employees, the other

8  knowledge of people at COMMSTA, so that included Mr.

9  Wells, you knew he worked there?

10     A.  He was included in the group of people that we

11 were questioning and asking questions about, but we did

12 not specifically mention Mr. Wells.

13     Q.  That's fine.  You can take 182 down.  Thank you.

14         Just a couple more inquiries here, sir.

15         Yesterday we heard from Quantico there from the

16 tool mark lab, Mr. Mills' testimony.  You were here for

17 that, right?

18     A.  I believe most of it, yes.

19     Q.  One of the things he was talking about were some

20 nail guns and there was a powder-actuated nail gun, a

21 real older model he said was one he looked at.  That was

22 taken from the COMMSTA property itself, correct?

23     A.  Yes, it was.

24         MR. COLBATH:  If I could have just a minute.

25         THE COURT:  Certainly.

1          (Pause)

2   BY MR. COLBATH:

3      Q.   Agent Allison, COMMSTA employee Ray Fillion was

4   not at work on April 12, 2012, was he?

5      A.   I don't recall Ray Fillion specifically.  I

6   recall the name.  I don't recall the interviews with

7   him.

8          MR. COLBATH:  Thank you.  I don't have anything

9   further.

10         THE COURT:  All right.  Mr. Skrocki, go ahead.

11                     REDIRECT EXAMINATION

12  BY MR. SKROCKI:

13     Q.   Agent Allison, Mr. Colbath asked you questions

14  about the nail gun seized from the COMMSTA, the old one?

15     A.   Yes.

16     Q.   Why that one?

17     A.   Mr. Wells had access to all of the nail guns in

18  the T-2 building.

19     Q.   It was searched because of that reason?

20     A.   Yes.

21     Q.   And the press release that he showed you about

22  way before at the beginning of the cross examination, do

23  you recall that press release?

24     A.   Yes.

25     Q.   April 20th of 2012?

1     A.   Yes, I recall that.

2     Q.   So by that time had you eliminated suspect --

3   everyone at T-1 and T-2 as suspects in this case?

4     A.   If we hadn't eliminated everybody we were close

5   to eliminating everyone else.

6     Q.   By that time you had also tracked down all the

7   vehicles shown on the video at T-1?

8     A.   We had.

9          MR. SKROCKI:  That's all I have.

10         THE COURT:  Any follow-up on that topic?

11         MR. COLBATH:  Not on that topic.

12         THE COURT:  Thank you, sir.  You may be

13   excused.

14         (Witness excused)

15         THE COURT:  Mr. Skrocki, does the government

16   have additional witnesses?

17         MR. SKROCKI:  We do not.  Your Honor, the

18   government rests.

19         THE COURT:  Ladies and gentlemen, it's a good

20   day for me to not be in court all day.  I'm not feeling

21   very well.  So I'm going to excuse you today.  What

22   counsel said yesterday, the defense lawyer, was that by

23   working together this afternoon, that team will be able

24   to be more efficient tomorrow in presenting evidence on

25   behalf of the defendant.

1          Can we do 8:30, Counsel, or 8:45?

2          MR. SKROCKI:  That's fine, Your Honor, 8:30.

3          MR. COLBATH:  Your Honor, could counsel meet at

4    8:30 and then ready for the jury at 8:45?

5          THE COURT:  Yes.  Please remember my admonition

6    not to discuss the case with family or friends.  We'll

7    have you back tomorrow morning.

8          And the parties are indicating ahead of

9    schedule, so for future planning.  I'll try to get more

10   specific information for you tomorrow.

11         Have a pleasant evening, rest of the afternoon,

12   and we'll see you tomorrow morning at 8:45.

13         (Jury absent)

14         THE COURT:  Please be seated.

15         Mr. Skrocki, anything to take up from the

16   government at this time?

17         MR. SKROCKI:  No, Your Honor.

18         THE COURT:  Mr. Colbath?

19         MR. COLBATH:  Your Honor, I guess at this time,

20   you know, I'm prepared to make a motion to the Court

21   under Rule 29 and ask the Court to enter a judgment of

22   acquittal on behalf of Mr. Wells in and for the reasons

23   that it is the defense's position that based on the

24   presentation of the government, no jury could conclude,

25   no reasonable jury could conclude beyond a reasonable

doubt that the government has presented facts and
evidence sufficient to meet each and every element of
each of the charges presented in the indictment.

Specifically, there is not evidence that puts
Mr. Wells at the scene of the crime at all. Certainly
no evidence of use of a firearm by Mr. Wells under the
counts related to 924(c). No evidence that directly
ties Mr. Wells to the crimes in any way, shape or form
from a physical evidence standpoint.

And based on even taking the evidence as the
Court must I think under the requisite standard with
reasonable inferences drawn for the government and not
for the defense, we don't feel that sufficient evidence
has been presented to establish the elements.

So I would ask the Court under Rule 29 to enter
judgment of acquittal.

THE COURT: All right. I can hear briefly from
the government.

MR. SKROCKI: Ms. Stevens has the argument.

THE COURT: Ms. Stevens?

MS. STEVENS: Good morning, Your Honor. May it
please the Court, so as I'm sure you know, the test for
determining whether to grant Mr. Colbath's motion is
whether the government presented evidence that was
relevant that the jury could reasonably find the

defendant guilty beyond a reasonable doubt.  Of course,
Your Honor, you would view that evidence in the light
most favorable to the government.

Additionally, your analysis must be made while
bearing in mind that the jury retains the exclusive
function for determining witness credibility and any
evidentiary conflicts.

So first, I would like to draw the Court's
attention to the elements of the crime.  First, being
for Counts 1 and 2, that Jim Wells killed Rich Belisle
and James Hopkins.  Second, that the defendant killed
his colleagues with malice aforethought, which is, as
you know, defined as deliberate or intentional or
recklessly with extreme disregard for human life.

Third, that they were premeditated, meaning
that he planned it.  Fourth, and lastly, that it
occurred at the COMMSTA.  The parties have stipulated
that this offense occurred on federal property, so I
won't make argument with regard to that.

With regards to Count 3 and 4, we must prove
those four elements I just discussed as well as the fact
that the two victims were federal employees.  Again, we
stipulated to that.

And then finally, for 5 and 6, we need to prove
the four counts addressed in -- the four elements

addressed in Counts 1 and 2.  And, Your Honor, if we provided enough evidence to prove those elements, then the interstate commerce nexus is met for purposes of Counts 5 and 6.

So starting first with element one.  We know that the victims died in this case.  I won't belabor that point.

For elements two and three, the government has presented the following facts to show that he acted with malice, forethought, and that he intentionally and with premeditation carried out these murders.  I'll talk first about his motive.

James Wells was angry.  His identity as the national antenna expert was stripped from him, and Rich and Belisle (as spoken), they were taking over his spot. We know this because Chief Reckner testified that command was having increased issues with him.  He wasn't following the rules.  He was taking stuff that wasn't his.  He wasn't doing the work that was expected of him.

And it rose to such a heightened level that Chief Reckner even moved his office down into the rigger shop and told the defendant to get with the program or retire.

Reckner also testified that the command made changes to Wells' performance plan for 2011 and 2012.

1   They added two new metrics:  Timeliness and quality of

2   work and communications.  And that's because the

3   defendant wasn't engaging in either of those things.

4            They wanted him to be more accountable.  They

5   wanted him to tell the command when he was going to be

6   gone, where he was going.  And they wanted him to

7   participate, as opposed to refusing to participate in

8   things like he did with the warehouse project.

9            We also know that Wells knew that the command

10  was building a paper trail.  They were building the

11  record.  They had talked to human resources.  He knew

12  they talked to human resources because they told Wells

13  to sign the letter of caution.  Human resources told

14  them that he needed to do it.  So the writing was on the

15  wall, his departure was imminent.

16           But Mr. Wells was not ready to retire.  He told

17  investigators he had a mortgage to pay and why quit when

18  he was having fun.  He said that the day his colleagues

19  were killed.

20           Further, as the Court heard, Wells missed a

21  good deal of work in the months before the murders.  And

22  that was the same time that the COMMSTA was suffering

23  from multiple antenna casualties.  Eight antennas were

24  down.  But the communications and the missions, it went

25  on without him.  The folks in the shop down there

stepped up.

Chief Jordinelli, we heard from him. He described them as a competent crew. They stepped up quickly. They addressed the casualties. And things that hadn't been addressed for years when Mr. Wells was running the shop were getting done.

In fact, the casualty list was better than he had ever seen it. They were more productive without him there.

Additionally, Nathaniel Pacheco, he described the rigger shop changing for the better during his absence. ET1's leadership clearly excelled. He was selected as the enlisted person of the year.

We heard from Cody Beauford. Wells' role was diminished. Everyone got used to him being gone. They were able to cover the work he was supposed to do. And it wasn't just colleagues, Your Honor. It was friends, close family friends.

Judy Pletnikoff, a friend of 20 years, she described Wells as upset, very angry about not being able to attend the NATE conference in February of 2012. He was "devastated," that was her word. This was a very important part of his job to go to the training. Why? Because that's where he gets the accolades, that's where he got the awards. In fact, it was a big part of his

identity.  That's what she said.

But it's not just her that testified about the NATE conference.  In February of 2012, when Wells asked Reckner what the plan is, he tells him he's not going. What was his reaction?  Anger.  He pointed at Jim Hopkins' desk and asked, "Why is he going?"  He tells Wells, "Well, you know, Hopkins was doing a great job. He really stepped up.  He was working on getting qualified.  He got enlisted sailor of the year, and he could use the knowledge at NATE to bring back to others," which wasn't being done when Wells was going.

Wells then pointed to Rich Belisle's chair and said, "Why is he going?  He's just a fucking rigger." Then he pulled Jim Wells' stare-down tactic, glared at Chief Reckner for a long time, making him feel intimidated and uncomfortable.

And, Your Honor, this wasn't the first time in the recent months leading up to the murders that Wells was upset with the command and displayed this type of indignant behavior.  When he was counseled for the fuel card in Commander Van Ness's office, during the course of that meeting, Wells kept repeating, "You guys think I'm a thief.  You guys think I'm a thief.  It just doesn't sit well.  It just doesn't sit well."  He was angry.  Shooting Rich, the man groomed to take his job,

1     and Jim Hopkins, the supervisor, was no accident.

2             Later, when he talks to his brother-in-law, his

3     consciousness of guilt is readily apparent for the jury

4     to take into consideration.  He proclaimed, "They are

5     not my friends.  They aren't electricians.  They're

6     stupid.  They're incompetent.  They're drunk."

7             For someone whose colleagues were gunned down,

8     Your Honor, he showed no empathy, no sadness.  And the

9     jury can readily infer that these comments suggested he

10    believed the victims deserved what they got, again,

11    going towards elements two and three.

12            It was also no accident, Your Honor, that he

13    meant to do this and that it was planned, because he

14    used a high caliber revolver to shoot Mr. Belisle and

15    Jim Hopkins all in just under five minutes.

16            This gun was described as a heavy hitter by

17    Mr. Stein.  And we also know it was the gun that was

18    used to kill the victims, because we found bullets at

19    the scene, and we had Brett Mills and Robert Shem

20    testify that the injuries were inflicted by a firearm.

21            We also know that Wells was tied to a firearm

22    that could have likely been the possible murder weapon.

23    This was Mr. Stein's Smith & Wesson .44-caliber 629

24    stainless steel revolver that went missing at his house.

25            Additionally, Your Honor, this crime was

premeditated and well planned, as evidenced by the
staging of blue Honda CR-V. We know that just two days
before the murder, he saw his wife off at the airport
heading to Anchorage for a work trip, the perfect
opportunity to do this crime undisturbed by his wife.

He saw her off and noted the location of the
car, the jury can infer that. It's also of note that we
established that Judy Pletnikoff, Para Upchurch, friends
of the Wells would move the car and not leave it at the
airport. And if Jim was in town, he would move it,
because Nancy's car had been broken into before and they
didn't want it broken into at the airport.

But they didn't do that this time. So maybe if
only one witness had said it was a routine, it wouldn't
have been that big of a deal, but we had three witnesses
who all corroborated that this was the normal routine.
And they're all independent of each other.

We also have testimony from Amanda Sanford.
She rode with Nancy Wells to the airport on April 10th.
She is the one that told us that Wells was there that
night. And she specifically indicated to investigators
she would have known if she sat on a black bag and mail
addressed to Mr. Wells. She didn't. She also told them
that the car was parked in front of the Alaska terminal
on the right-hand side.

Matt Judy testified he got there that day and
conducted surveillance, the car was on the left side of
the airport in front of a building that was not a
terminal. We know this from a picture of the car
compared to an aerial photo of the airport.

Further, the choice of using his wife's blue
CR-V, that's significant. His white truck is distinct.
Everybody at the COMMSTA recognized it. And so this
fact of switching out the cars also proves preparation
and premeditation.

We also know that folks at the T-2 and T-1
buildings knew where the cameras were and what the
cameras' field of views were, including Mr. Wells, who
participated in all hands, who had access to the ops
deck.

We also know that a white truck would be
readily apparent in the T-2 camera, which remained aimed
at the flagpole and saw the Anton Larsen Road in the
distance.

We saw Mr. Schilbach's white Toyota that
morning. And we could tell it was a white Toyota truck,
even from that distance. So what was needed was a blue,
dark, small SUV with no lights on, and that's what he
did. He picked it up from the airport, swapped out his
car, the keys were already in it. He waited there,

waited for Rich and Jim to drive by, and then got in

line behind Haselden, the CWO for that morning.

And he knew Haselden wasn't down at T-2,

because his car continued on up to T-1, it wasn't parked

there, so there wasn't a watch stander conducting a

round.

Due to the serendipitous circumstance the night

before, the T-1 camera was moved, the T-1 pole camera.

The U.S. Coast Guard was able to capture a segment of

the Anton Larsen Road, and that road caught a blue CR-V

with a black rear, a black front above the wheel well

indicative of a black car bra, and black rims,

characteristics identical to the Wells' CR-V. We have

experts that testified to that, so I won't belabor it.

The schedules as well is something that goes

toward the planning and the preparation of this offense,

Your Honor. Mr. Wells himself told investigators that

Rich and him arrived first, and Jim between 7:10 and

7:30. And he knew where they were coming from. He knew

where they lived. He knew that he could fall in behind

them to confirm that they were there and that nobody

else was there.

And the timing here is important. The T-1

video shows what is easily identifiable by the naked eye

without any discussion of pixels, his small blue SUV

drive past the first driveway at T-2 at 7:09.  And we know there was a Conex box in the back and some other big equipment that he could park behind.

At 7:14, just five minutes after this blue car arrives, it leaves, just minutes before the COMMSTA watch relief up the hill occurs and folks start leaving, just four minutes after Belisle had his last activity and interaction with his computer at 7:10, and just two minutes after Don Rudat, the speed walker, heading south on Anton Larsen Road, heard the loud metal on concrete sound which he testified to definitely came from the rigger shop, not the water treatment plant.

And if that isn't enough, Your Honor, we have his alibi.  It starts off first with, "I had a flat tire.  I had issues getting off the lug nuts."  We know this through the voicemail he left Reckner.  He got a flat tire in the truck, having trouble getting off the lug nuts.

The timing of this voicemail, Your Honor, is important.  He left it at 7:31, just one minute after leaving a voicemail with Hopkins.  To Hopkins he stated, "Jim, it's Jim.  I got a flat tire in the truck.  I'll be in when I get it.  Thanks."

In fact, he would tell everybody he could that morning he had a flat tire.  And he called it a flat

tire, not a low tire, a flat tire.

He tells Para over the phone, "I have a flat. I'm on my way." Then to Reckner in person when he's bent over losing his emotions, "Shit, I had a flat tire. I couldn't get ahold of Jim, but I left you a voicemail. Make sure you check it," because that will confirm that I had a flat tire.

When the CO, Commander Van Ness, arrives and starts to console Chief Reckner and he's advised that Jim and Rich had been shot, Wells responds, "Oh, my goodness. I had a flat tire." Commander Van Ness says, "Why would he tell me that at this moment?" It was bizarre. It was off. It was weird. All evidence that the jury can infer that Jim Wells planned this and carried out this crime.

Naturally, since he was supposed to be there that morning and he wasn't, the FBI interviews him. And his interview, it's not because Reckner said that he's the guy, it's not because of that. It's because Jim Wells drew attention to himself by consistently evading the questions being asked.

He said things like this: "The only reason I wasn't there this morning was because I had a flat tire on my truck." But when they asked him when he noticed his flat, he responds, "Shit, I don't know." In fact,

he says, "Shit, I don't know," or "Shit, I don't
remember," no less than five times when asked about
times and locations, for a road that he traveled for
20 years on a daily basis.

However, he definitely knows where he didn't
change that tire.  When asked if it was anywhere near
the COMMSTA, he is very quick to reply, "No."  He knows
he wasn't anywhere near the COMMSTA, but he can't
provide any details whatsoever about where on that road,
near the airport, near the Comfort Inn, near the base,
near wherever he changed that tire or looked at the tire
or realized the tire was flat.

He goes on, "It was almost at the airport I
turned around."  And then it's a low tire, realizing
that I couldn't drive on a flat tire, so it must -- I
need to tell people that it was low.  In fact, he brings
the tire with him to work to make sure that
investigators can confirm that, yes, here's the tire,
look at the nail, it's in it, it was a flat tire, it was
a low tire.

But, Your Honor, what doesn't add up at any
point in time, in addition to his flat tire alibi, is
the timing in this case.  And the timing here is
critical because there's 34 minutes where we know Jim
Wells passed the front gate camera on the way to the

airport.  That was at 6:48.  And then it comes back in
the way towards Bells Flats at 7:22.

We know it takes about five minutes to get from
the gate to the airport, five minutes to get from the
airport to the gate.  So 10, 15 minutes to, got a flat,
okay, let me turn around and go back.  He was gone for
34 minutes with no explanation.

When asked if he could shed some light on the
time gap, he pauses for about 15 to 18 seconds.  He
responds, "Not at the moment.  I can't think of why
there would be the discrepancy."  So the investigators,
they say, "Well, the window of time we are trying to
account for, can you help us trying to figure this out?"

"No, I don't have a reasonable explanation for
it."  "How about a theory?"  "A theory?  What are you
suggesting?"  "Well, we're baffled."  "So am I."

Investigators go on to say, "Thank God you
weren't in that shop because you could have been one of
the victims as well.  We're accounting for people.
We're trying to get your explanation on how to fill
those holes."  His response, "I don't have a theory at
the moment."  When asked if he has anything else, his
response, "Nope."

So then in June, just a few months after the
murder, he tells his sister and brother-in-law when

asked pointblank what happened, first, that he had a
flat tire.  And when they looked at him quizzically, he
says, "Well, if you must know, I shit myself.  I got
out, went to the airport, cleaned myself.  I noticed the
tire was low, didn't have the tools.  I went home to
change it."

And then he tells them about a bag of soiled
pants that he put upstairs in a closet and then
lambasted the investigators for not finding it during
their eight searches.  But there was no bag.  There was
no diarrhea, Your Honor, and the government has readily
shown that.

Then on the 13th, again, to fix this alibi, it
wasn't adding up, he shows up at the airport to pick up
his wife, but beforehand, 30 minutes beforehand, he goes
to Servant Air -- I'm sorry, he goes to Island Air, he
looks around, doesn't say anything to the workers.
They're intimidated.  He looks up the cameras and
stares.

He leaves, he goes over to Servant Air, goes
inside, he's in there for a few minutes, drives back
over to the Alaska terminal, walks inside and goes to
the bathroom.  And he sits in there.  So we know he knew
where a bathroom was, and that bathroom was in Alaska
Air.

1        We also know that on the 12th he didn't go into

2   Servant Air or Island Air because the employees said,

3   "We didn't see him there that morning."  Mr. Skonberg,

4   he knows Jim.  He's seen him before.  He didn't see him

5   walk up the stairs.  He would have heard it.  He would

6   have seen him.  And if he went up into the other office,

7   he would have gone up there because he knows they're not

8   in at that time and it would have been weird.

9        Plus, he would have heard the toilet flush,

10   because that building, "it ain't soundproof."  That's

11   what he said.

12        So, Your Honor, I know that you're not feeling

13   well and I know that I've been up here for a while.  I

14   have many other facts about his behavior after the

15   crimes, but I think at this point the government has

16   readily proven that we can establish beyond a reasonable

17   doubt the evidence for each element of Counts 1 and 2,

18   and, of course, the additional elements required for 3

19   through 6, two of which have been stipulated to.

20        We presented 59 witnesses, eight experts, and

21   the jury can readily come to a conclusion that the

22   defendant committed these offenses beyond a reasonable

23   doubt.

24        THE COURT:  Thank you.  Mr. Colbath, anything

25   to add on the motion?

```
 1          MR. COLBATH:  No, Your Honor.

 2          THE COURT:  I probably should have said this

 3    beforehand, but I do intend to apply Rule 29(b) and

 4    reserve decision on the motion and proceed with the

 5    trial and submit the case to the jury and decide the

 6    motion in the event that the jury returns a verdict of

 7    guilty or is discharged without having returned a

 8    verdict.

 9          And by reserving under that subdivision, I will

10    decide the motion as needed on the basis of the evidence

11    at the time the ruling was reserved, which is as of now,

12    without consideration of any evidence that may be

13    presented during the defendant's case.

14          Questions on that ruling, Mr. Skrocki?

15          MR. SKROCKI:  No, Your Honor.  Thank you.

16          THE COURT:  I guess it's not really a ruling at

17    all, Mr. Colbath, it's a reservation.

18          MR. COLBATH:  I have no questions about the

19    Court's deferral on the ruling.

20          THE COURT:  Anything else to take up today from

21    the government?

22          MR. SKROCKI:  Not from us.  I hope you get

23    better.  I don't think we're too far behind you.

24          THE COURT:  Mr. Colbath, anything else?

25          MR. COLBATH:  No, Your Honor.
```

1          THE COURT:  So 8:30 we'll be back here and take

2    up the case at that time.  Very good.  We'll go off

3    record.

4          DEPUTY CLERK:  All rise.  Court stands in

5    recess until 8:30 a.m.

6          (Recessed at 11:46 a.m.)

7

8                      CERTIFICATE

9    I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
10   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
11   original stenographic record in the above-entitled
     matter and that the transcript page format is in
12   conformance with the regulations of the Judicial
     Conference of the United States.
13
     Dated this 3rd day of June, 2020.
14

15
                         /s/ Sonja L. Reeves
16                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
17

18

19

20

21

22

23

24

25