```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,     )
                              )
 7          Defendant.        )
     _____)

 8

 9            TRANSCRIPT OF TRIAL BY JURY - DAY 14
        BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10              September 26, 2019; 8:33 a.m.
                     Anchorage, Alaska
11

     FOR THE GOVERNMENT:
12          Office of the United States Attorney
            BY:  STEVEN SKROCKI
13          BY:  CHRISTINA M. SHERMAN
            BY:  KELLEY L. STEVENS
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16   FOR THE DEFENDANT:
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22   _____

23               SONJA L. REEVES, RMR-CRR
              Federal Official Court Reporter
24              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record
```

I N D E X

September 26, 2019, Trial Day 14

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Christopher Iber | 8 | 34 | 37 | -- |
| Gerald Richards | 38 | 65 | 73 | -- |
| Martin Heckerman | 75 | 85 | 90 | -- |
| Wilton Nelson | 91 | 102 | 107 | -- |
| Martin Heckerman (recalled) | 126 | 130 | 133 | -- |
| Steven Beck | 143 | 149 | -- | -- |
| Mark Heinrichs | 166 | -- | -- | -- |

E X H I B I T   I N D E X

| Exhibit | | Page |
|---|---|---|
| DE-39 | Aerial Photo of COMMSTA | 80 |
| DE-136 | Photo Anton Larsen Bay Road | 96 |
| DE-266 | Photo | 169 |
| DE-267 | Photo | 169 |
| DE-268 | Photo | 169 |
| DE-269 | Photo | 169 |
| DE-270 | Photo | 171 |
| DE-271 | Photo | 171 |
| DE-272 | Photo | 171 |
| DE-273 | Photo | 171 |
| DE-274 | Photo | 171 |

| | | | |
|---|---|---|---|
| 1 | DE-301 | Video Clip | 173 |
| 2 | DE-302 | Video Clip | 173 |
| 3 | DE-303 | Video Clip | 173 |
| 4 | DE-304 | Video Clip | 173 |
| 5 | DE-305 | Photo | 173 |
| 6 | DE-307 | Photo | 31 |
| 7 | DE-308 | Video Clip | 168 |
| 8 | DE-309 | Photo | 170 |
| 9 | DE-310 | Photo | 127 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1          (Call to Order of the Court at 8:33 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4     the United States District Court is again in session.

5          THE COURT:  All right.  Good morning.  Please

6     be seated.  I'm feeling a lot better even if I don't

7     sound 100 percent.

8          So Mr. Skrocki, anything to take up?

9          MR. SKROCKI:  I think so.  Mr. Colbath will

10    have some comment as well.  I guess this morning their

11    first witness is Chris Iber, and last night Mr. Colbath

12    e-mailed me and said he was missing some photos from

13    Mr. Iber that were not produced.  And I said, okay,

14    given the late hour, it was like 9:15, 9:30, we would

15    look at it in the morning.

16          So the FBI, Daryl Allison is over at the bureau

17    waiting for the evidence custodian to show up, which is

18    usually 8:15.  So he should be on his way over here

19    shortly with the photos Mr. Colbath is requesting.

20          I would note for the record though, Mr. Iber is

21    their witness, he's not the government's witness.  So

22    we're trying to comply and get them the photos he needs,

23    but I would assume Mr. Iber had them himself, but

24    Mr. Colbath can address that.  So we may take that half

25    hour to 9:00 to get those photos to you so we can get

started.  That's the only thing from our perspective
that we have on the table.  And we're glad you're
feeling better.

THE COURT:  Thank you.

Mr. Colbath?

MR. COLBATH:  Yes, Your Honor.  And Mr. Skrocki
is right, that's the only issue we have.  I was meeting
with Mr. Iber last night.  He did not bring all of his
materials with him, because he had assumed we had them
because he had provided them through the FBI normal
discovery process to Mr. -- or through their evidence
transmission process.

But be that as it may, after he explained to me
through his notes and the workup, it wasn't readily
apparent to me before what was referred to, but after he
explained it to me, I understood, oh, that's something
that we should have and that you should talk about
during your testimony.  I e-mailed Mr. Skrocki.  I think
if Mr. Allison shows up with them and I can make a
photocopy, I'm ready to talk about it and proceed with
it.

THE COURT:  So we just should wait until the
photos arrive?

MR. COLBATH:  Yes.  So as long as we can wait
till the photos to arrive, then there will be no delay

after that save for the amount of time it takes to run
downstairs and make copies of it.  And I'll be --
we'll -- I'll just use the camera as opposed to try to
upload it into the system and mark it as an exhibit.

It will be a page or two.  It's like a photo
comparison, I believe is what I'm going to see.  It will
be a page or two.  I'll mark those as an exhibit, and
we'll be ready to go.  Mr. Iber is out in the hallway.
I've talked to him about it, so he's all prepared for
it.

MR. SKROCKI:  Just for the record, these are
outtakes from a video that's already been produced, so
it's not like these are brand-new.

THE COURT:  No, no, I understand that.  And I
didn't hear the defense assert that this was some
reproduction.

All right.  Very good.  I had one thing -- did
you have anything else?

MR. SKROCKI:  We would just like to know what
you were taking to get rid of your cold.

THE COURT:  I have had a megadose of vitamin C,
the Emergen-C.

There's an outstanding issue with regard to
Dr. Reisberg.  Do you plan to call him in your case in
chief?

1          MR. COLBATH:  We do, Your Honor.

2          THE COURT:  And the issue was whether or not he

3  could testify regarding the risk of jurors being

4  influenced by confirmation bias.  And I thought further

5  about that, and I really -- I've determined that that

6  really invades the province of the judge in instructing

7  the jury.  So I don't intend to allow testimony from a

8  witness as to how to deliberate or what to be thinking

9  about when they deliberate.

10          Having said that, I am open to either side

11  proposing an instruction that would address that

12  concern.  And I'm giving you that heads-up so if you

13  wanted to discuss that and get your expert's -- your

14  person with the qualifications able to give an opinion,

15  get his views on that, in drafting one, to give you that

16  opportunity.

17          MR. SKROCKI:  Thanks, Your Honor.

18          THE COURT:  Questions on that?

19          MR. SKROCKI:  No, not from us.

20          THE COURT:  Questions on that?

21          MR. COLBATH:  No, Your Honor.

22          THE COURT:  Very good.  Then we'll let the

23  clerk know when we're ready to proceed, and we'll go off

24  record at this time.

25          DEPUTY CLERK:  All rise.  Court stands in a

1   brief recess.

2              (Recessed from 8:37 a.m. to 9:05 a.m.)

3              (Jury present)

4              DEPUTY CLERK:  Court is in session.

5              THE COURT:  Good morning, everyone.  Please be

6   seated.  And we're back on record here.

7              Mr. Colbath, are you ready to call the

8   defendant's first witness?

9              MR. COLBATH:  We are, Your Honor.

10             THE COURT:  All right.

11             MR. COLBATH:  We would call Chris Iber to the

12  stand.

13             THE COURT:  All right.  Good morning.  If you

14  could come up to the witness stand, please.  When you

15  get up there, remain standing, if you would, and the

16  clerk will administer an oath to you.

17             (Oath administered to the witness)

18             DEPUTY CLERK:  For the record, can you please

19  state your full name and then spell your full name.

20             THE WITNESS:  My name is Christopher Iber,

21  C-h-r-i-s-t-o-p-h-e-r, I-b-e-r.

22             THE COURT:  Go ahead, please, Mr. Colbath.

23             MR. COLBATH:  Thank you, Your Honor.

24            CHRISTOPHER IBER, DEFENSE WITNESS, SWORN

25                      DIRECT EXAMINATION

BY MR. COLBATH:

Q.  Good morning, Mr. Iber.

A.  Good morning.

Q.  Tell us where you live.  Where did you come here
from?

A.  I live in northern Virginia.

Q.  And what do you do for a living, sir?

A.  I am an examiner, an image examiner for the
Federal Bureau of Investigation.

Q.  And how long have you worked for the FBI?

A.  Nearly 16 and a half years.

Q.  And describe generally what a forensic examiner
is.

A.  Well, forensics means pertaining to law, and then
an examiner is a person who analyzes or looks at
information for the purpose of testifying in court.

Q.  And is there a particular type of information
that you examine or your work focuses on?

A.  Yes.  I am -- my official title is a photographic
technologist.  I'm an examiner of questioned
photographic evidence.  So I do four primary types of
exams at the FBI.

I do comparison analysis.  That is where I
compare anything that's depicted within an image.  It
can be an automobile, person, face, clothing, handgun.

And then I compare that to another image that depicts a known item or person, and I try to see if they are the same or if they're an exclusion, different.

I do photogrammetry. Photogrammetry is simply the science of taking measurements from photographs. Typically that would be height analysis. I can also recreate a crime scene from a photograph, put items back in place in a crime scene or measure objects within the scene.

Authenticity exams. I look at an image, mostly digital images, but also old film images or analog video for if it has been manipulated, has it been changed, and also, did it come from a particular camera.

And then the last type of exam I do is what we call information extraction, which is basically enhancements. That's where I try to pull information that's within the image out to make it look better.

Q. And tell the jury when you first became involved in the field of image analysis or photography work.

A. I have a bachelor of science degree in biomedical photographic communications from RIT, Rochester Institute of Technology, where after I -- while I was there, I did two internships. I did one in the Monroe County medical examiner's office as a photographer, and the other I did at the Monroe County public safety

1    laboratory, which is the forensic lab there in

2    Rochester, New York.

3         After that, I went -- got a job at George

4    Washington University Medical Center as a medical

5    photographer where I photographed operations, also did

6    PR work for the university and many other things,

7    including duplication and anything they needed me to do

8    there.  Then I was hired at the Bureau after that.

9    Q.  And so did some of that educational experience

10   and the photography done during that education involve

11   forensic work before you got to the FBI?

12   A.  The internships at the medical examiner's office

13   and at the laboratory would have been forensics.

14   Q.  And so since joining the FBI 16 years ago, have

15   you received additional training related to the fields

16   of forensic image analysis?

17   A.  So when I was first hired at the FBI, I went into

18   a two-year training program, so it's almost like a

19   master's program in a college.  And that included

20   classroom, it included going to lectures and conferences

21   pertaining to what I'm doing now, as well as reading

22   texts and articles.  And then most importantly, during

23   those two years, I actually worked on forensic casework

24   under the supervision of a senior image examiner.

25   Q.  Who was that senior image examiner?

1  A.  My supervisor at the time was Dr. Vorder Bruegge.

2  Q.  We've heard from him.

3      Are you familiar with the FBI's standard

4  operating procedures and the general body of

5  publications in forensic image analysis and the

6  processes that you follow?

7  A.  Yes.

8  Q.  And do you regularly apply those in your work and

9  in the four types of exams that you do?

10  A.  Yes, as required.

11  Q.  And have you testified previously --

12  A.  Yes, I have.

13  Q.  -- in other cases?

14  A.  Yes, I have.

15  Q.  Federal and state court?

16  A.  And military, yes, sir.

17      MR. COLBATH:  Your Honor, at this point I would

18  ask the Court to find that Mr. Iber has the education,

19  training, experience and qualifications to offer

20  specialized opinions in the field of forensic audio

21  evaluation and analysis.

22      THE COURT:  Audio?

23      MR. COLBATH:  Oh, I'm sorry.  Visual evaluation

24  and analysis.

25      MS. SHERMAN:  To that, I have no objection.

1          THE COURT:  All right.  Very good.  I will find

2     the witness so qualified.

3          MR. COLBATH:  No audio work, correct, Mr. Iber?

4          THE WITNESS:  Correct.

5          MR. COLBATH:  Other than to having to listen to

6     me.

7     BY MR. COLBATH:

8       Q.  So when did you first -- were you -- how did you

9     become involved in this case?

10      A.  So in my unit, in the digital evidence

11    laboratory, we receive requests from the field.  So

12    agents will send in a request asking for analysis in one

13    of those four types of exams that -- that I conduct.

14          So in this case, I received a -- what we call an

15    EC, an electronic communication, our unit did, and it

16    was assigned to me.  And it was a request for what we

17    call a make and model, which would be a comparison exam.

18      Q.  Okay.  And do you know when you received that

19    request?

20      A.  April of 2012, I believe.

21      Q.  Okay.  And so you were asked to do a request for

22    a make and model exam.  What is a make and model exam?

23      A.  So like I had said, it's a comparison exam, but

24    it's not -- earlier when I had mentioned comparison, I

25    talked about taking a questioned image and comparing it

to a known image to see if they're the same.

A make and model, all that I'm trying to do is work out the -- just the make and model. So it's not a specific car, but one of a large group. So when I do a comparison exam, I look at class characteristics and individualizing characteristics.

Class characteristics are things that can put something into a group, so like a baseball cap or a cowboy hat. Individualizing characteristics would be characteristics that are stronger that would be more unique to an object or a person so that I could actually identify that object or that person.

So make and model, all I'm looking for are class characteristics, those features on a vehicle to where I could say that it is a particular make and model and within a generation, so the timeframe that make and model was made.

Q.  And so what information did you receive with this request to try to -- that you were asked to perform your analysis on?

A.  I received a video, a copy of a video on a CD-R disc.

Q.  And that -- that video was the April 12th surveillance video in this case that showed some images of an unknown vehicle?

1      A.  The video was of a pole camera in a parking lot

2  that was pointing toward a building in a parking lot,

3  and I was -- and I was told which images were of

4  interest.  There was a questioned vehicle that was

5  driving down a road in both directions, and so I

6  captured images from that to do the analysis.

7      Q.  So describe the steps for us that you went

8  through.  You've got this -- you said it came on a disc,

9  a CD?

10     A.  Yes, sir.

11     Q.  So describe for us the steps that you then went

12 through to perform your make and model analysis.

13     A.  So we follow our standard operating procedure.

14 So when we receive evidence, we follow those procedures,

15 which include marking and protecting the evidence.  Then

16 we make a copy of that video onto our workstation.  Of

17 course, this is a digital evidence laboratory, so this

18 is all digital evidence.

19         We review the video and look for pertinent images

20 that we can use for our analysis.  We save those images,

21 and then at that point, we do the information

22 extraction.  We do enhancements of those images to try

23 to pull out as much information as we can from those

24 images.

25         Then from there, we go to a comparison analysis.

In the case of a make and model, since I don't have a known vehicle that I'm comparing it to, we have a database of images of known vehicle make and models. It's called the DAIS, the Digital Automotive Image System.

And we also use the internet as well that, obviously, everyone has access to to find known images, known images of particular make and models over the generation when they were created.

Then the comparison, we look at the features of, in this case, a vehicle. So we're looking for window shape, we're looking for grille, headlight shape, taillight shape. We're looking for license plate location. We're looking at how many doors. What kind of vehicle is it? Is it a pickup truck? Is it an SUV? Is it a sedan?

We're trying to get -- we're trying to see these features, any kind of trim that might be on there, so that I can then compare that to the database to try to find something that matches those same features. When enough features match, then I give a conclusion of a make and model.

THE COURT: Sir, can you push that monitor down? I'm thinking Juror No. 1 can't really see you very well. Can you get it lower?

 1          THE WITNESS:  Is that better?  I'll sit up as

 2   well.

 3          THE COURT:  Very good.  Thank you.  Go ahead,

 4   please.

 5          MR. COLBATH:  I have the same problem up here.

 6   BY MR. COLBATH:

 7     Q.  In this case, in performing that, going through

 8   that process with the video you received, were you

 9   working alone?

10     A.  No.  At the time, I was supervising a new

11   photographic technologist, Anthony Imel, so at that

12   point he was considered a tech, so he was going through

13   his two years of training.  And so I was one of the

14   certified examiners, senior certified examiners that was

15   part of that.

16          So he was actually working on the case with me.

17   So he would be the one that would go through those

18   standard operating procedures, and, of course, come to

19   me to show me the images that he worked on.  And we

20   would -- I would make the final decision if they were

21   correct.

22     Q.  So in looking at the -- you keep referring to

23   images, but you started with the video.  You took still

24   images out of that video?

25     A.  So a video is just simply a sequence of still

1    images played back at a rate to kind of fool our mind

2    that there's motion.  So video is just still images.

3         So when we get evidence in that is a video, we

4    are going to break that down into its smallest

5    denominator, which would be a still image.

6    Q.  And once you had the images from the video, you

7    said something about enhancement.  Did you do something

8    to the images in this case to enhance them or change

9    them in any way?

10   A.  So the tech, Anthony Imel, he did some basic

11   contrast enhancements where he changes the levels

12   between the lighter part of the image and the darker

13   part, which makes it a little bit easier to see some of

14   the information within it.  He also did some sharpening,

15   which is a filter that tries to take edges and it tries

16   to enhance the contrast at edges to make edges come out

17   a little bit more, which gives you some more detail as

18   well.

19   Q.  So was it before or after the enhancement process

20   then that you start looking for these characteristics

21   that try to help you make your determination?

22   A.  The comparison would be done after enhancements.

23   Q.  In this case, what was the result of your and

24   Mr. Imel's I guess determination, or what was -- at the

25   end of your comparison, what were you able to come up

1  with for a conclusion?

2     A.   That there was insufficient image detail.   So

3  there were many factors that -- a picture is a

4  two-dimensional copy of a three-dimensional space.   And

5  so the further you go back into an image in the

6  background, you have less information to give you that

7  detail.

8          So the questioned vehicle was pretty far back in

9  the image, and so there was not a lot of detail.   There

10 were a couple other factors as well.   There was some

11 motion blur because the vehicle was moving, and that's

12 just due to the camera, the way it captures an image.

13 If something is moving fast enough -- I'm sure you've

14 seen motion blur before in images.   If something is

15 moving fast enough, you can actually get a little bit of

16 a blur, which gives you less detail, less defined edges.

17         So due to those factors, and that the vehicle was

18 obscured by some parked vehicles in some of the frames

19 that we were using for comparison, I was not able to

20 come to a conclusion.

21    Q.   You mentioned some of the frames.   How many -- do

22 you recall how many images you were able to look at or

23 get from the video to be able to try to perform your

24 work?

25    A.   So in this particular request, there were seven

1    images that we felt were pertinent to a make and model

2    exam.

3        Q.  And did the -- is that a large number, a small

4    number?  Did it matter how many images there were to

5    you?  Did that play into the evaluation?

6        A.  Well, typically, if there's more images, the

7    better.  I've done make and models on single images

8    before.  The more images you have, the more information

9    that you can typically get.

10       Q.  You mentioned the image -- or the object being

11   far away in the image.  Are you talking about -- well,

12   explain that to me, how it can be far away in the image.

13       A.  So it's distance from the camera, so where the

14   camera was placed and recording the image.  So again,

15   it's a two-dimensional -- a picture is two-dimensional,

16   but the space that it was recording is

17   three-dimensional.

18           So think of train tracks.  So train tracks going

19   off in the distance, eventually they look like they

20   meet, but we know they don't.  That's the vanishing

21   point.  So close in the frame the tracks are apart,

22   right?  And then as you look back into the image,

23   because there's less information, there's less of -- so

24   a digital image is made up of pixels, and pixels are the

25   smallest element of that image.  And so as you get

1   further into that image, you have fewer pixels

2   representing the objects that are farther in the image.

3       Q.  And this one, the object you were looking at was

4   far away in the image?

5       A.  Correct.

6       Q.  So once you make a determination here or the

7   determination that you can't make a determination, what

8   do you do?

9       A.  I write a report and send that back to the

10  requester.

11      Q.  And you did that in this case?

12      A.  Yes.

13      Q.  Is there any type of review or checks or balances

14  within the FBI lab or procedure you follow in producing

15  your report and reporting back to whoever asked you to

16  do this work?

17      A.  Based on our standard operating procedures, all

18  of our exams are peered by another certified examiner.

19  So I would have written the report -- I would have done

20  the analysis, written the report, all of the paperwork

21  and information would be given to another certified

22  examiner and they would have to concur with my

23  conclusions and they sign off on that.

24          And then after that, it goes through an

25  administrative review to make sure all the papers are

1   there and evidence has been -- chain of custody and has

2   been shipped correctly back to the requester.

3       Q.  And so in this case, when you and Mr. Imel were

4   done with your work and you wrote up your report,

5   another examiner -- was there another examiner that

6   looked at it prior to it going out of the FBI lab?

7       A.  Yes, it was peered.

8       Q.  And who was that?

9       A.  That would be George Skaluba.

10      Q.  And what is Mr. Skaluba's position within the

11  lab?

12      A.  He is also an image examiner.

13      Q.  Like yourself?

14      A.  Yes.

15      Q.  And who was that material then or your

16  information sent back to?

17      A.  The request came from Special Agent Gaston

18  (phonetic), I believe, and so it would have been

19  returned to him.

20      Q.  And that was an agent working here in Alaska?

21      A.  That's correct.

22      Q.  So did you have an occasion after performing that

23  initial analysis and that initial comparison to work on

24  or look at that video or something with this case again?

25      A.  Yes.

1    Q.   And how did that come about?

2    A.   So one of -- in our standard operating

3  procedures, if we're given a copy of a video or an

4  image, we ask the submitter if we can get an original.

5  Occasionally, with surveillance video, the digital video

6  recording system, the way it records the video is a

7  proprietary format, which means that it uses a

8  particular software to record that.

9     And when you make a copy, rarely, but it does

10  happen, sometimes the copy can have more compression to

11  make the file smaller.  So compression in video is where

12  video takes up a lot of space on a hard drive or on a

13  disc, and so they use compression, which there's

14  different kinds of compression.  There's temporal and

15  spatial.

16     The spatial compression is where they take

17  pixels, the smallest picture element in the images, and

18  ones that are repeated over and over again, they use

19  mathematical formulas to calculate for those and then

20  they drop them out.  And it actually makes the file

21  smaller.  And then on the other end, you decompress it,

22  and that mathematical equation is used to recreate the

23  scene.

24     This can cause artifacts, compression artifacts,

25  depending on the quality of the compression algorithm

1  that you're using.  And in this case, a proprietary

2  software could also change that.  So I asked for the

3  original video from the requester.

4       Q.   What do those artifacts look like if you're just

5  looking at a picture where those exist?  What would we

6  see if we didn't know what we were looking at?

7       A.   Typically, it's blocking.  So if you've ever seen

8  a poor quality digital image and there's a lot of

9  blocking, little eight-by-eight blocks, and that can

10 cause disruption in information in the image.  You can

11 lose detail based on that.

12      Q.   So the video camera put those blocks in?  They

13 weren't really in the picture?

14      A.   So it wouldn't be the video camera.  This would

15 be the actual recording process from the video camera

16 when it's being recorded to save space.  So in the olden

17 days of analog video, you had that VHS tape that you

18 stuck in the recorder, and that could -- there was only

19 so much tape on that, and so you either had to -- when

20 it ran out of tape, you had to stick a new tape in

21 there.

22           Well, people got tired of putting -- taking tapes

23 in and out, so they came up with different ways to get

24 more information on that tape.  Well, when the digital

25 video surveillance came around, it was the same thing.

1    Digital video takes a lot of space.  So if you -- you're

2    talking about millions of pixels per image or thousands

3    of pixels per image, and then you've got thousands of

4    images.  It adds up.  It takes a lot of space, so they

5    use this compression to save space.

6        Q.  So were you able then to get from the office here

7    in Alaska an original video to look at?

8        A.  Yes.  So Special Agent Allison was able to give

9    me a copy of the proprietary video file, which was sent

10   to the laboratory.

11       Q.  And what happened once you received the

12   proprietary or the original video in the case?

13       A.  So I had to figure out what the proprietary file

14   was so that I could get the proper proprietary video

15   player to play it back.  Once I had that, the process is

16   basically the same as doing it from the copy video that

17   was sent.  So the same method, same process going

18   through.

19       Q.  And the video -- so was the video you looked at

20   this second time, it was the same video, just an

21   original, not a copy basically?

22       A.  That's correct.

23       Q.  And then you said you did the same analysis, same

24   steps?

25       A.  I did not do a make and model analysis.  At this

point, I was just trying to see if the copy possibly had
more compression in it, so I was trying to see if the
proprietary video file -- excuse me. I'm a little under
the weather.

Q. That seems to be going around in our system here.

A. So the proprietary -- what I was trying to do
here was I trying to see if the imagery in the
proprietary video had less compression, which would mean
more detail. And hopefully, I would be able to assist
the Anchorage field office by doing that.

Q. Did the video have any more detail, or was it any
better quality to let you do a new make and model
determination?

A. No, it was not. It was equivalent to the copied
video.

Q. So no different decision, no different outcome?

A. Correct.

Q. And once you determined that, what did you do
then, once you determined the original couldn't help you
any more than the past one had been?

A. So a report would have been written. It would
have gone through a peer review and an administrative
review and sent back to the requester.

Q. That would have been Agent Allison again then,
sent back to him?

 1     A.   That's correct.

 2     Q.   Now, that second process that we just talked

 3 about, was that back in 2012 as well?  How far in time

 4 after your first look at it, how far in time was that

 5 second review of the original information?

 6     A.   I believe that request came in in June of 2012.

 7     Q.   So first April, then June?

 8     A.   Correct.

 9     Q.   Did there come a time where you were again

10 contacted relative to this case by Agent Allison or

11 somebody from Alaska to do some additional work in the

12 case?

13     A.   Yes.  There was a request in June of 2018 for a

14 vehicle comparison.

15     Q.   So last year?

16     A.   Yes, sir.

17     Q.   All right.  And were you asked at all about --

18 first of all, did the vehicle comparison involve the

19 same video?

20     A.   No.  It was of the same location but a different

21 camera.

22     Q.   All right.  And was there any part of the inquiry

23 that dealt with the first video that you looked at or

24 the vehicle that you were unable to find detail in?

25     A.   No, this involved a pickup truck that pulled into

1    a parking lot.

2        Q.   Okay.  Had there been any changes in your work,

3    the laboratory, anything from your first work, or would

4    there have been any reason for you to review the work

5    you did before on the -- in the first video?

6        A.   No.

7        Q.   All right.  So I'm going to -- could we show

8    Mr. Iber Exhibit No. 160.  I think it's Defense 160.

9             Mr. Iber, I'm going to have you look at this

10   video, it's been admitted, and see if you recognize it.

11            (Defense Exhibit No. 160 playing in open

12   court.)

13       A.   That's the questioned vehicle that was of

14   interest that they wanted the comparison.

15       Q.   And so last year in 2018 when you received this

16   video, did you receive the video alone or did you

17   receive it with other materials?

18       A.   So they were requesting a make and model.  They

19   were actually requesting a comparison to a known

20   vehicle, so I also received images of a known vehicle.

21       Q.   And say again for me the difference between a

22   make/model determination and a photo comparison.  You

23   treat those as separate or different inquiries?

24       A.   So a make and model is a comparison, but that's

25   only class characteristics, so features that would be

1  found on many different vehicles.  A comparison, I'm

2  looking for features on the vehicles that would be more

3  unique or be more individualized, so that I could make a

4  determination if it's the same vehicle or not the same

5  vehicle.

6      Q.  In the first determination you did, the

7  make/model, when you don't have the detail to -- like

8  you found, you don't have the detail to make that

9  make/model determination, can you do a comparison with

10  that?

11      A.  Typically, no.

12      Q.  Why not?

13      A.  If there's not enough detail to see features to

14  do a class characteristic, such as a make and a model,

15  chances of actually doing a one-to-one comparison to a

16  known would not be beneficial.

17      Q.  In this case though, you received some photos to

18  compare to the video of the white truck we saw?

19      A.  That is correct.

20      Q.  And I'm going to show you -- well, first of all,

21  what steps then did you go through to perform that

22  comparison analysis?

23      A.  So the same steps as with the make and model.

24  The evidence was reviewed, and pertinent images were

25  exported from the video.  So I'm working with still

images again.  Enhancements would have been done.  And
then I would also take the known images, if they need to
be enhanced, they're enhanced as well, and then I do a
side-by-side comparison looking for features that are
similar or dissimilar.

In the process, I generally create a chart
showing any of the features that I found similar or
dissimilar as well.

Q.  Do you have, once you make a determination, the
same review process and those things that's not -- is
that followed as well?

A.  Yes.  So just like the make and model, it would
be reviewed, a peer review by another examiner,
certified examiner, and then go through the admin.  And
then a report would be written, and that would be
returned to the requester.

Q.  And were you able to make a comparison in this
case?

A.  Yes, I was.

Q.  I'm going to show you what is Defense Exhibit
No. 307, and it will be on the screen there in front of
you first, sir.

MR. COLBATH:  Your Honor, I understand that
there's no objection to this Defendant's 307, so before
I have Mr. Iber talk about it, I'm going to move to

1    admit that.

2              MS. SHERMAN:  That's correct.  No objection.

3              THE COURT:  307 is admitted.

4              (Defense Exhibit No. 307 admitted.)

5              MR. COLBATH:  Your Honor, if I could approach,

6    I need to give Mr. Iber the laser pointer here.

7              THE COURT:  Certainly, that's fine.

8              (Mr. Colbath approaches witness.)

9    BY MR. COLBATH:

10       Q.  You won't be the first one to be shaky with it.

11       A.  I'll try to keep my hand as steady as I can.

12       Q.  First of all, before you have to point to

13   anything, Mr. Iber, just tell us what we're looking at

14   here in Defense Exhibit No. 307.

15       A.  So the images on the left are going to be the

16   questioned vehicle that was depicted in the video.  And

17   the images on the right --

18       Q.  Let me interrupt you right there.  So you took --

19   you took those images out of that video?

20       A.  Correct.  So when I exported images for the

21   video, pertinent images that would help with my exam,

22   these are three of the images that I exported.

23       Q.  Okay.

24       A.  And then the images on the right are the supplied

25   known images of a known vehicle.

1    Q.  All right.  And then what did you do?

2    A.  I simply look at features between the vehicles.

3  Now, this is a pickup truck with a cap, and since you

4  can remove a cap from a pickup truck, I was actually

5  looking at the cap separately from the truck.  So In a

6  way, it was almost two comparisons.

7        So if you look at the features on the cap,

8  there's windows on the side and you can see the roof of

9  the cap.  Now, when I do a comparison, I mentioned

10  before I'm looking for class characteristics and

11  individualizing characteristics.

12        One of the things about doing a comparison is

13  that you can eliminate something easier than you can

14  identify something.  If class characteristics don't

15  match, then you can eliminate.  So a baseball cap, if

16  I'm comparing a baseball cap to a cowboy hat, obviously,

17  I don't need any individualizing characteristics.  I

18  know that that can't be the same hat.

19        So to be able to say something is the same thing,

20  I have to have characteristics.  I have to have some

21  kind of feature that would be individualizing to those

22  two objects or vehicles in this case to where I could

23  say they're the same.

24        So the cap here, you can see the window

25  configuration and you can see the top of the cap.  On

the known vehicle, it's a different window configuration
and there's a little bit of a bump-up up here on the
top, so those were differences that I noticed in
features of the cap.

When it comes to the vehicle, the truck has a
crew cab and I did not see the crew cab.  I would expect
to see a larger window area here if that crew cab
existed.  And so that's a difference.

And then there's also this trim here, which is a
decent thickness black trim.  I would expect to see
something here and down here on this side as well, and I
do not.  So those were differences that I noted.  Now,
those are just class characteristics, but because
they're differences, I was able to say that this vehicle
and cap are not the same as that vehicle and cap.

Q.  So that was your ultimate determination was one
is excluded from being the other?

A.  Correct.

Q.  And what did you do then with your findings
relative to this?

We can take that down.  Thank you.  You can just
leave that laser pointer sit there, if you would.

What did you do then once you made that
determination?

A.  So again, a report would be written.  It was peer

reviewed, admin reviewed, and then that, plus the charts
that I created and any enhanced printed images were sent
back to the requester.

Q.   And that was Mr. Allison?

A.   That's correct.

MR. COLBATH:  That's all the questions I have
for Mr. Iber, Your Honor.  Thank you.

THE COURT:  Ms. Sherman, go ahead, please.

CROSS EXAMINATION

BY MS. SHERMAN:

Q.   Good morning, Mr. Iber.

A.   Good morning.

Q.   Fair to say you probably watched that video of
the white truck several times in pulling out those
images?

A.   Yes, ma'am.

Q.   You would agree with me that that truck never
stops in that parking lot?

A.   That's correct.

Q.   Nowhere in your report did you indicate that
Mr. Imel actually assisted you on this, did you?

A.   It would be in the notes.  He would be considered
a tech.

Q.   Back in 2012, what was the resolution of your
computer that you were using to do this analysis?

1    A.  Do you mean the monitor or -- I'm not sure.  It

2  would have been a higher resolution than what the video

3  was.

4    Q.  Okay.  So originally, in April 2012, you get a CD

5  and you're able to extract just seven images, right?

6    A.  We selected seven images.  We could have

7  extracted more, but we selected seven.

8    Q.  And then in June or July, that summer, you

9  actually extracted nine images from the hard drive?

10    A.  That is correct.

11    Q.  And five northbound, right?

12    A.  I believe that's correct.

13    Q.  And four southbound?

14    A.  I believe that's correct.

15    Q.  Okay.  And you would agree those images contained

16  a blue vehicle, right?

17    A.  A blue-tone vehicle, yes.

18    Q.  And you never compared those to any other images

19  of blue vehicles, right?

20    A.  No, I did not.

21    Q.  And then in August of 2012, you sent an e-mail to

22  Special Agent Allison about your -- the reasons you

23  couldn't make a make/model determination, didn't you?

24    A.  That is correct.

25    Q.  And in there you talked about the things you've

mentioned here, low resolution, image quality, pixels, blur, all those things?

A. Yes, ma'am.

Q. And you recall at the end of your e-mail, you indicated you can always show the images to a person, car dealer or mechanic, and they might be able to recognize the make and model, right?

A. So I'm an expert in comparison analysis. I'm not necessarily an expert in all automobiles. There are too many makes and models for me to know -- be considered an expert on all makes and models.

So what I'm an expert on is comparing things that are depicted within imagery. So it can be anything, cars, clothes, guns, anything, faces. So one of the things that we do, sometimes when we have imagery where we're actually able to pull something out of the video, but my method, I have to follow my standard operating procedures and my method on doing comparison.

There wasn't enough information there for me. So sometimes we do recommend to the submitters that they might want to take it to an automobile expert and that they might be able to help them.

Q. Are you familiar with Neil Schmidt from Honda?

A. I am not.

MS. SHERMAN: Thank you.

1            THE COURT:  Redirect?

2            MR. COLBATH:  Just very briefly.

3                    REDIRECT EXAMINATION

4    BY MR. COLBATH:

5        Q.  Mr. Iber, Ms. Sherman first asked you about

6    whether it was a blue vehicle, and you said blue -- blue

7    tone?

8        A.  Yes.

9        Q.  And why -- why the clarification or the caveat of

10    blue tone?

11        A.  Well, with video, there's -- color is not always

12    reliable, and so we typically do not do -- examinations,

13    we do not talk about color.  We'll talk about tonality.

14    The other reasons, just to be more exact, there's so

15    many different varieties of color, so each color has

16    many different hues.

17            So when one person says blue, another person

18    might say cyan or a different color, so we typically

19    stay away from color and we just consider it tone.  So

20    it was a bluish tone.

21            MR. COLBATH:  That was the only follow-up I

22    had, Your Honor.  Thank you.

23            THE COURT:  Thank you, sir.  You may be

24    excused.  I hope you feel better.  I'm struggling with a

25    cold too.

1          (Witness excused)

2          THE COURT:  Your next witness?

3          MR. COLBATH:  We would call Gerald Richards.

4          (Pause)

5          THE COURT:  Good morning.  If you could come

6    forward to the witness stand, please.  If you would

7    remain standing, the clerk will administer an oath to

8    you.

9          (Oath administered to the witness)

10         DEPUTY CLERK:  For the record, can you please

11   state your full name and then spell your full name.

12         THE WITNESS:  I certainly could.  My full name

13   is Gerald B. Richards.  It's Gerald, G-e-r-a-l-d, B,

14   R-i-c-h-a-r-d-s.

15         THE COURT:  Go ahead, please.

16         MR. COLBATH:  Thank you, Your Honor.

17         GERALD RICHARDS, DEFENSE WITNESS, SWORN

18                   DIRECT EXAMINATION

19   BY MR. COLBATH:

20     Q.  Good morning, Mr. Richards.

21     A.  Good morning.

22     Q.  Can you tell us where you are from?

23     A.  I'm from Laurel, Maryland.  My address is

24   15307 Alan Drive, A-l-a-n, in Laurel, Maryland.

25     Q.  Sir, what do you do back in Maryland?

1    A.  Basically I'm currently retired, but for about

2  41 years, I either worked for the FBI or was a private

3  consultant.

4    Q.  Let's start recent and work backwards a little

5  bit if we could.  Prior to your retirement, what did you

6  do most recently?

7    A.  Okay.  Most recently, I was a private consultant

8  in which I provided lectures, examinations, and

9  consultation to different folks under the title of

10  Richards Forensic Services.  That was my most recent,

11  and I did that for about 21 years.

12    Q.  What did Richards Forensic Services, what type of

13  work or type of forensic services did you mostly

14  provide?

15    A.  Really three areas of expertise in there.  The

16  first area was in questioned document examination.

17  Handwriting, typewriting, all the things that go along

18  with that.  The second was in forensic photography.  And

19  the third area is espionage trade craft, which is

20  basically the tools and toys and techniques that spies

21  use in their escapades, so to speak.

22    Q.  And prior to your private consulting work, who

23  did you work for?

24    A.  I worked for the Federal Bureau of Investigation.

25  I was a special agent.  Back in 1970, I joined the FBI

1   and went through a 14-week training period.  Upon the
2   completion of that, I was assigned to the Atlanta
3   division as a field agent conducting investigations in
4   all manners of crimes.
5           I was then transferred to the Baltimore division
6   and also the gambling organized crime, espionage and
7   various types of cases that the FBI handled.
8           After that point, I was transferred to the FBI
9   headquarters as a supervisory special agent and spent
10  the next three years in intensive study to conduct
11  examinations in the area of documents and photographs.
12  Q.  And in your three-year work there in developing
13  this work on examination of photographs, did you
14  obtain -- what types of training and education and work
15  related to the examination of photographs and visual
16  images did you receive?
17  A.  Well, I was under the direct supervision of more
18  experienced agents within the laboratory and worked side
19  by side with them conducting cases on a day-by-day basis
20  of actual photographic cases and document cases that
21  came into the laboratory.  I did that as a trainee for
22  approximately three years until I was allowed to testify
23  at that point.
24          For the next 14 years, I was a bench examiner and
25  did the same basic type of work and conducted

examinations on photographic and document materials,

many, literally thousands of cases.

At that point, I was moved to unit chief of one

of the document units, the document operations and

research unit, and later made unit chief of the special

photographic unit, which handled all the photographic

matters for the FBI at that time. The unit was about 65

people, and we handled all of the examination. I had

five agent examiners under myself. And then we did all

the examinations for the FBI laboratory in addition to

all the operational and equipment needs of the Bureau.

Q. How long did you serve as the unit chief for the

forensic image analysis unit?

A. It was the special photographic unit at the time.

I was unit chief of that for six years until my

retirement from the FBI after 23 years.

Q. And it was at that point that you started

Richards Forensics?

A. Yes, sir. I retired the last day of 1993 and

worked my first case as Richards Forensic Services on

the next Monday.

Q. Not much of a break, sir.

A. No.

Q. Backing up a little bit. Originally what is your

educational background in?

 1    A.  I have a bachelor of science degree in

 2  photography, I have a master of science degree in

 3  education, and I've taken postgraduate courses in law

 4  and document examination and photography over the period

 5  of time at either George Washington University or the

 6  University of Virginia.

 7    Q.  Have you in your career had occasion to teach at

 8  any colleges or universities or within the Bureau?

 9    A.  Yes.  I was actually hired after I left the

10  Bureau for the next five years to come back and teach

11  and provide moot courts in the area of photography and

12  photogrammetry particularly.

13        In addition to that, for ten years, I was an

14  adjunct professor at the George Washington University in

15  Washington, DC.  And then for the following ten years, I

16  was an adjunct professor for the Oklahoma State

17  University and still actually am an adjunct professor at

18  Oklahoma State University.

19    Q.  In the field of forensic image analysis, have you

20  published any papers, articles, writings either

21  academically or related to your work at the Bureau?

22    A.  Yes.  I've published literally dozens of articles

23  on either image analysis, photogrammetry, or forensic

24  science in general as far as it concerns imaging.  One

25  of my specialty areas is infrared ultraviolet imaging

throughout the spectrum.

MR. COLBATH:  Your Honor, at this point I would ask that the Court find that based on his education, training and experience that Mr. Richards is qualified to offer opinions in the field of forensic visual evaluation and analysis.

MS. SHERMAN:  No objection.

THE COURT:  I'll find the witness so qualified.

BY MR. COLBATH:

Q.  Mr. Richards, tell the jury how it was that you became involved in our case -- our case that's at trial here today.

A.  Back in September of 2012, I was contacted by an attorney and asked if I would conduct an investigation on a videotape to try to determine the make and model of a vehicle that was in the image -- in that particular tape.

I received the tape.  I received the examples of the images of the vehicle I was to compare with and then looked at it.  I made a conclusion or a determination and then recontacted the lawyer who contacted me initially.  And at that point --

Q.  Let me stop you right there.  Who -- I guess we don't need the name, but who did that attorney work for?

A.  The U.S. Attorney's Office.  Mr. Cooper from the

 1   U.S. Attorney's Office.

 2       Q.  And that would have been the United States

 3   Attorney's Office, the government here from the District

 4   of Alaska?

 5       A.  Yes, the United States Attorney's Office.

 6       Q.  And ultimately, and we'll get to this in a

 7   moment, but did you have occasion after your work on the

 8   case to meet with Mr. Cooper and another attorney from

 9   his office?

10       A.  Yes, that's correct.  I met with Mr. Cooper,

11   another attorney from his office and a special agent

12   from the Atlanta -- excuse me, the Alaska FBI Bureau up

13   here.  They came --

14       Q.  Now, was that -- that wasn't any of the folks we

15   have here in court today, was it?

16       A.  No, I don't recognize any of them.

17       Q.  Let's back up then.  So you said this is

18   September of 2012 when you had the original contact and

19   they sent you some information.  Tell us what they sent

20   you basically.

21       A.  They sent me the original videotape.  They sent

22   me photographs of a 2001 Honda CR-V.  They also sent me,

23   eventually sent me a -- eventually sent me a program

24   that I could play the tape on.  The tape was a

25   proprietary tape, and you needed a special program to

actually run it on. Even though I had the ability to
see the images by using Photoshop and pulling images off
that, they still sent me the original play tape on that.

     And that was pretty much the information they
sent me for the most part.

     Q.   So you said included in the original information
was an actual photo of a Honda CR-V?

     A.   There were three of them, yes, of a blue Honda
CR-V.

     Q.   All right.  And I think I interrupted you, but
you said after reviewing things and doing your analysis,
which I want to talk to you about in a minute, you had a
chance then to meet with the attorneys and an FBI agent?

     A.   Yes.

     Q.   And had you constructed a report or done anything
official at that point?

     A.   No.  They asked me a series of questions, and I
responded to the questions.

     Q.   Okay.  And what information did you provide them
in summary or general at the inquiry?

     A.   In general, basically, their basic question was
could I determine the make and model of the vehicle that
was in the questioned tape, and the answer was no, I
could not.  The resolution was far too poor to even
attempt to do that.

1          The question they asked was the -- could I tell

2    if the vehicle had basically a spare tire on the back of

3    it or what they called a bra on the front of the

4    vehicle.  And I said again, the tape itself, the images

5    were way too poor to make any type of determination

6    along that line.

7          They also asked me if I could determine the make

8    and model of the vehicle, and I said absolutely not, not

9    based on that particular video.

10   Q.  So after this -- and this meeting, did that take

11   place in 2012?

12   A.  Yes.  This took place I believe in December 2012.

13   Q.  So I want to back up.  It was in between then, in

14   between the contact and getting the material in

15   September and this meeting in December when you did your

16   work in the case?

17   A.  Yes.

18   Q.  And in preparation for your testimony here today,

19   did you prepare a brief PowerPoint demonstration that

20   would assist you in explaining the work you did?

21   A.  Yes, I did.

22        MR. COLBATH:  Your Honor, if we could show

23   Mr. Richards Defense Exhibit No. 297.  I am going to

24   offer this like the other exhibits that have been

25   offered, just demonstratively.  My plan would be to have

1   Mr. Richards discuss it, but this is not anything that

2   I'm going to seek to admit.

3          THE COURT:  Is that agreeable?

4          MS. SHERMAN:  I don't object to it being shown

5   to the jury.

6          THE COURT:  All right.  Very good.  Go ahead

7   then.

8   BY MR. COLBATH:

9      Q.  So Mr. Richards, first of all, right there on the

10  counter in front of you should be a laser pointer.

11     A.  Yes.

12     Q.  So if at some point you need to refer us to

13  something or explain anything as we're going through the

14  slides here, you just use that to illustrate if you

15  would.

16         So tell us what -- this is the first slide that

17  you prepared.  So tell us what we're seeing here and the

18  purpose of this.

19     A.  Yes.  This was provided to me as an overall view

20  of the area of interest there, the area of -- the area

21  in question.  Basically, there is -- if I might use my

22  own pointer, I think it's a little more powerful than

23  this one.  It's a different color too.

24         Basically, the camera in question is at

25  approximately this position in the photograph.  The main

1  gate that we're looking at is right here in this

2  position.  And the vehicle in question is at

3  approximately this position.

4      Q.  You know, I should have asked you before.  Is

5  there any particular concepts or things we need to know

6  or understand before we proceed to understand your

7  analysis about the work that you did, about this make

8  and model determination?

9      A.  Yes.  Basically, the concept is basically you

10  have to -- the material in the photograph is all you

11  have to work with.  And the resolution is extremely

12  important, and that is a result of both the type of

13  camera that's used, how much resolution the camera has

14  and also the distance from the camera to the subject

15  you're looking at.

16     Q.  Okay.  So we're ready for the next slide?

17     A.  Yes.

18     Q.  All right.  Let's do that.

19     A.  This is basically one of the nine frames that

20  were in question.  There were only nine frames of the

21  questioned vehicle that were available, and only six of

22  those really showed enough of the vehicle to be of any

23  value whatsoever.

24         To me, in looking through there, the best image

25  of the group was actually the second image.  First of

1    all, let me back off.  The first five images, the

2    vehicle was going from left to right across the screen.

3    A few minutes later, the vehicle was going from right to

4    left across the screen.  And it was the second image of

5    those four that was probably the best image to make an

6    analysis, because it showed the majority of the vehicle,

7    the majority of the vehicle.  This is a screen shot of

8    that particular view, and we can look at it and see the

9    vehicle right approximately there.

10        Q.  And you have down across the bottom here, sir,

11    original 400 -- excuse me, 640 by 480 pixels.  What's

12    the reference there?

13        A.  Well, the image itself is composed of pixels.

14    We're seeing a picture, but what we're seeing a picture

15    of is really many, many thousands of little dots.  As a

16    matter of fact, they have 640 pixels across the top by

17    480 pixels down the right-hand side.

18            A pixel is a picture element.  That's its real

19    name.  We shorten it to pixel.  All a pixel is is a

20    little square.  It's a little square of information.

21    That little square of information has a color associated

22    with it, a location and a color.  The first pixel over

23    here, its location would be 1, 1.  The next one would be

24    1, 2.

25            So all the pictures we see that are digital have

the same format.  And after that, they'll have three
other numbers.  Those three numbers determine the color
of that particular pixel.

Now, you see this every single day on your
television set.  Whether you realize it or not, if you
take a 10X magnifier and hold it up to your television
set and look at it, you'll see it's made up of little
squares, little teeny squares.  And as you're watching
it, they will change color.

And that's actually the smallest element of that
picture that you can see.  But we normally -- they
integrate so we don't see them.  Even looking at this
picture, it's integrated into a picture.  We can't see
the individual pixels because it's so small.

But actually, 640 pixels by 480 is a very
low-resolution picture.  It's compromised really of
about 307,200 pixels in total.  And that's just
multiplying one after the other.

To give you an example, if you have an iPhone 8
iPhone, that has about a 12 megapixel picture camera in
it and that's about 4,032 by 3,024 or 12 million pixels
just on your iPhone.  So you can see how low a
resolution this particular camera is in relationship to
even your iPhone.

Q.  Is there -- do we go to the next slide now?

1    A.   Yes.

2    Q.   All right.  So what are you depicting here?

3    A.   Here I'm trying to give -- this is a Google map

4    that I've just pulled off of Google just to find out

5    about approximately what the distance is here.  And as

6    can be read down here at the bottom here -- I see you

7    can't read it very well on here.

8    Q.   Hold on.  I think we can enlarge that a little

9    bit better.  There we go.

10   A.   It shows that at 1100 -- this particular one,

11   1101 foot, about -- let's say round it off to 1100 feet.

12   That's about a fifth of a mile away, so it's quite a

13   distance away, particularly for this picture.  This just

14   gives you a relationship.  Can we go to the next one?

15   Q.   Okay.  And so --

16   A.   This picture, what I did here is take the first

17   one that you saw, the first picture is scaled.  It's

18   scaled to 11 by 8 and a half sheet of paper.  Okay?  So

19   that across the top for 11 inches, there are 680 pixels.

20   And if you took a magnifying glass we could have counted

21   them on that first picture all the way across the top.

22   And 480 of course down the side.

23        This one I took a chunk out of that original

24   picture and put it under a, for all practical purposes,

25   a microscope.  It's the same thing as if I had taken a

microscope, taken the original picture and we looked at
it with a 5X, five times enlargement of the area in
question.

        And now all of a sudden, we can start seeing the
pixelation. We can actually see the individual pixels
all throughout the picture that make up the picture
itself.

    Q. So did you do anything to change or enhance the
picture or simply enlarge?

    A. No, that wouldn't have helped any. Any type of
enhancement on here probably wouldn't have been of any
value. Because again, the smallest element we have to
deal with is the pixel, the individual pixel. So any
enhancement would do something to combine or change
those pixels.

        So all this is, is a straight enlargement. When
we look at this, we can see -- you have the ability I
think to see the -- on this particular one, even on the
tires or on the car itself, they're totally pixilated
around the edges. All this is, is a 5X enlargement. If
I had taken a microscope or you take a 5X magnifier, you
would see the same identical thing as that -- from that
first picture.

    Q. So let's see the next one. And what do we --
what do we see here?

1    A.  All right.  Now, this is a 12 times enlargement.

2  The same microscope.  We just use a 12X lens on it.

3  This is 52 pixels across the top by 40 pixels down the

4  side.  Here we can almost count the pixels.  Count

5  along.  But again, remember, it's a scaled to 11-inch

6  piece of paper.  So we're magnifying it.  It's just a

7  magnification.

8        And in here we can still see our vehicle as such.

9  We can recognize it as a vehicle, and that's all we are

10  doing is recognizing it as a vehicle because we have no

11  detail.  Our minds, because we see that picture, we have

12  seen vehicles before, we have a general idea what they

13  look like, we recognize it as a vehicle.  But there's

14  absolutely no detail to tell us that.  We cannot

15  determine that from the picture itself.  We can

16  certainly see the pixelation here.

17        One of the problems is now when I go to measure

18  this particular vehicle, I measured it at approximately

19  30 pixels by 12 pixels high.  But trying to figure out

20  where the vehicle actually starts and stops is extremely

21  difficult.  In the back here, we can see all of these

22  various pixels here, but which one is truly back of the

23  car.  When you miss by one or two pixels, it's about

24  five and a half to six inches a pixel, so we're -- if

25  it's two pixels you're off, it's a foot difference.

1          So it could be a variety of vehicles.  We

2     recognize it as a vehicle.  We recognize these before as

3     tires, even though here you really can't see those as

4     tires.  And so anyhow, that is basically what we are

5     doing.

6          Now, we're not actually seeing it as a vehicle.

7     We are recognizing it because we're used to seeing it as

8     such.  When we actually see the individual pixels by

9     themselves, there's absolutely no detail in it to do an

10    examination from.

11    Q.  So let's go to the next slide.

12    A.  Okay.  To give you maybe a little better example

13    of this, it's a little -- again, you have to understand

14    that when we're doing an examination like this, we're

15    looking for two general things.  We're looking for two

16    specific things.

17         When we look to identify something, the first

18    thing we have to look for is class characteristics.  We

19    all recognize class characteristics.  It has to be a

20    vehicle, first of all.  That's one class characteristic.

21    It has to have some type of shape and some type of form,

22    what we can recognize that with minimal class

23    characteristics.

24         To actually identify something, we need

25    individualizing characteristics, scars, chips, marks on

1    it to actually individualize it to the exclusion of all

2    others.

3         A license plate would do that.  But we have to

4    have enough information in there to actually see that to

5    make a determination.

6    Q.  So is this the image that we saw, that same

7    image, the same frame earlier?

8    A.  This is the original image that we saw, but

9    instead of seeing the vehicle here, what I did, just to

10   show you the difference between recognition and

11   identification or having enough class characteristics to

12   even closely understand what we're seeing, we make

13   assumptions.  We make a lot of assumptions when we see

14   pictures like this.

15        For instance, let's look at -- instead of the

16   vehicle, let's look at this particular set of signs.

17   There's two signs there.  We can all look at that sign,

18   and I'm sure you recognize what that sign is.  Most of

19   you would probably recognize it as a stop sign.

20        But if I told you it isn't a stop sign, it's a

21   red sign that has "Exit" on it, E-x-i-t, would you

22   believe me?  Probably not because you're used to seeing

23   a stop sign.  And when you look close enough in there,

24   you probably see the letters in there S-t-o-p.

25   Q.  We go to the next slide?

1       A.  Next slide.  This one shows the distance from the

2   camera to that.  It's one-third or 380 feet from the

3   camera itself, so it's a third closer, much closer than

4   our vehicle that we're talking about is.  So it's only

5   one-third of the distance away.

6       Q.  Go to the next one, if you would.

7       A.  Here is a five times enlargement of that, the

8   same microscope we're using, five times of the same way,

9   the same way we saw the car.  Now, we actually see the

10  letters, but are they actually S-t-o-p?  It's almost

11  impossible to make that determination.  We see it and we

12  recognize it, so we assume that's it when we have the

13  far distance of it.  We just assume it.

14          When we get up close, we still recognize it, but

15  we really can't even identify the letters that are on

16  there spelling out S-t-o-p.  And the sign next to it

17  that we have no recognition for, we have no clue as to

18  what that says.  None whatsoever.  And remember, it's

19  only a third of the way to the distance of that car.

20          Now, these letters if we could read them,

21  actually read them are supposedly ten inches high.  So

22  those are pretty big letters.

23      Q.  Can we go to the next slide?

24      A.  Yes, please.  Here again we can see that they're

25  totally indecipherable.

1     Q.   And this is how many power?

2     A.   This is approximately nine times.  This is

3     68 pixels across the top by 53 pixels down.  We can

4     actually start counting them as we go along there.

5     Q.   All right.  And the next slide.

6     A.   Now, here's recognition and identification.  Most

7     of you will recognize that particular person.  But do

8     you really recognize who it is?  Is there anything on

9     there that is unique that identifies that as the person

10     you think it is?  The mole on the cheek that he should

11     have.  His eyes, can we even see that they're eyes?  We

12     recognize it, but could it be somebody else who looks

13     something like the person we assume it is?

14     So when we recognize something like this, we can

15     recognize it, but we can't be certain what it is when

16     it's this low a resolution.  This could be an

17     impersonator or it could be the real person or it could

18     just a doppelganger, somebody that looks a lot like the

19     person we think it is.

20     Q.   Let's take that down.  And I want to show

21     Mr. Richards, if we could, for foundation Defense

22     Exhibits 9, 10 and 11.

23     So that's -- Mr. Richards, you recognize that as

24     that same image that you extracted?

25     A.   It appears to be, yes, sir.

1    Q.  And then the next one, number ten, that's a

2    blowup of that, not any different image, just a blowup?

3    A.  No, this is about a 5X enlargement of the vehicle

4    in question there.  It's very similar to the second you

5    saw except I didn't scale it up so it goes across the

6    entire screen.  You're seeing it just lower scale, but

7    it's approximately a 5X enlargement.

8    Q.  And No. 11?

9    A.  This is also that same image that you just saw

10   there, but this is scaled up so we can see it better.

11   And on this --

12   Q.  Hold on because the jury can't see this yet.

13   A.  Oh, I'm sorry.  I was looking at my screen.

14   Q.  That's fine.

15         MR. COLBATH:  Your Honor, I'm going to move to

16   admit Defense Exhibit No. 9, 10 and 11.

17         MS. SHERMAN:  Your Honor, I think I don't

18   object to 9 being admitted.  That's something taken from

19   the video.  His work is 10 and 11, and so those I think

20   can be shown to the jury as demonstrative, but I don't

21   think they are -- should be admitted per the Court's

22   order.

23         THE COURT:  Mr. Colbath?

24         MR. COLBATH:  Your Honor, he's testified that

25   they are actual blowups of this image.

1          THE COURT:  Let's take a short break here, and
2   I'll take this up with the lawyers.  If you would leave
3   your notepads here, ladies and gentlemen.  Remember my
4   admonition not to discuss the case.  We'll get this
5   sorted out and have you back here by 10:30 a.m.
6          (Jury absent)
7          THE COURT:  Please be seated, everyone.  And
8   sir, we can have you back at 10:30 a.m. too.
9          So kind of in the middle in between the video
10  from April 19th and the actual still -- and I suppose,
11  Mr. Colbath, I cut you off.  Did you want to add more on
12  this?
13         MR. COLBATH:  Only, Your Honor, that this is
14  just an actual blowup of what is the evidentiary video,
15  the screen shot from the -- or image extraction from the
16  April 12th video.  So it's not demonstrative or
17  comparable, I don't think, in any sense to the
18  April 19th matters.  I think we're talking about
19  different things here, because those were after-the-fact
20  demonstrations or used as part of demonstrations.
21         I'm just sticking with 4-12 here and just want
22  to illustrate -- I just have a couple more questions for
23  Mr. Richards about his actual points of comparison he
24  tried to make, and it's easier for him to illustrate on
25  a blowup than it is on the faraway picture.  So that was

1     my intention.

2          But I don't have -- I will -- if they can be

3     admitted that's fine.  If they can't be and he needs to

4     do a demonstration, I'll have him do that.  But because

5     it's the actual image that's just blown up, I don't see

6     it as qualitatively different to change its

7     admissibility.

8          THE COURT:  All right.  Anything else to add,

9     Ms. Sherman?

10          MS. SHERMAN:  Yes, Your Honor.  The government

11    had PowerPoints that included a lot of images from the

12    12th zoomed in and highlighted and he has dots on there

13    on the pixels he counted.  None of the expert's work

14    product in this case has been admitted as evidence.  And

15    so the Court didn't admit portions of the government's

16    demonstrations that relate to 4-12 and exclude the 19th.

17    The Court said the whole thing is demonstrative.

18          So the actual image is fine.  But when he's

19    zooming in and he's pixilating and he's printing these

20    images and then marking on them, I think that's the same

21    as the work Mr. Vorder Bruegge did and Mr. Toglia and

22    Mr. Becker.  So I think that it should be demonstrative

23    only.

24          THE COURT:  I'm persuaded by the government's

25    argument on this point.  So 9 can be admitted.  10 and

11, as with all the other manipulation of various stills
can be presented to the jury, but not admitted into
evidence.

MR. COLBATH:  And Your Honor, if I might
because they are original "blowup blowup," and sort of
sequentially made sense to talk about, I'll withdraw my
offer of 9 then because standalone it doesn't do a lot
of good.  I'll just ask Mr. Richards to explain the
three real quickly.

THE COURT:  So you're going to just publish 9,
10 and 11?

MR. COLBATH:  Yes.  I'll just use them as
demonstrative per the Court's order and just not admit
them.

THE COURT:  All right.  That's fine.  Anything
else before we take a short break?

MR. SKROCKI:  Point of clarification.  We have
a disagreement on your ruling on Dr. Reisberg.  Is he
totally precluded, or is he allowed to testify?

THE COURT:  He's allowed to testify on the
other subject that is in the order about the invest- --
as I recall, it's the investigator's confirmation bias
is permissible.  I'll have to go back and read that
order.  It was several weeks ago.

But what I left open was this topic he wanted

```
 1   to discuss about jurors' confirmation bias.  And that's
 2   the extent of the ruling.  And if I wasn't clear, that's
 3   what I intended.
 4          MR. SKROCKI:  I think you were probably clear.
 5   One of us heard it that way, and one did not.  I think
 6   that was probably me.  So I think you were very clear.
 7          THE COURT:  Mr. Colbath, anything else to take
 8   up right now?
 9          MR. COLBATH:  No, not from me, Your Honor.
10          THE COURT:  I wanted to bring up one thing I
11   neglected to mention yesterday.  It's quadruple hearsay.
12   Caroline came to me and said a juror came to her who
13   indicated that one of the Kieles said thank you to
14   jurors that were walking in the hall.
15          So in fairness to those individuals, they were
16   not present here when I instructed on the very first day
17   not to communicate, but I did want to alert the parties
18   to that.  And they're not here today.  And -- anyway,
19   any questions or clarification on that?
20          MR. SKROCKI:  No.
21          THE COURT:  Anything further on that,
22   Mr. Colbath?  I just felt I should bring it to your
23   attention.  And I don't know which juror it was or how
24   many it was said to.  But in any event, I will say I
25   think it's a positive thing that the juror reported it
```

 1    to court staff as instructed to do.  So with that said,

 2    we'll go off record.

 3             DEPUTY CLERK:  All rise.  This court stands in

 4    a brief recess.

 5             (Recessed from 10:20 a.m. to 10:34 a.m.)

 6             (Jury present)

 7             DEPUTY CLERK:  Court is again in session.

 8             THE COURT:  Please be seated, everyone.  We're

 9    back on record here.

10             And Mr. Colbath, whenever you're ready, please.

11             MR. COLBATH:  Thank you, Your Honor.

12    BY MR. COLBATH:

13       Q.  Just a few more questions, sir, for you,

14    Mr. Richards.

15             Could we have Exhibit No. 9, please, to show the

16    jury, here.

17             And -- and that, Mr. Richards, again, that same

18    view from the camera that we looked at earlier?

19       A.  Yes, I believe that is the same view.

20       Q.  And then 10.  And what do we see here?

21       A.  This is an enlargement, like I said, a 5X

22    enlargement that I didn't scale to anything.  I just

23    made an enlargement of it so I could see the

24    pixilization.  But it's approximately five times

25    enlargement.

1     Q.   And what note do we have here?

2     A.   This is -- what I was trying to do was literally

3  count the pixels that made up the vehicle in question

4  lengthwise and widthwise.  And this particular point I

5  counted 31 for its length and 13 for its height.

6     Q.   So let's go to No. 11.  Now, what are we seeing

7  here?

8     A.   Once I blew it up to this size, I counted

9  approximately 30 lengthwise and 12 height-wise, because

10  the pixels were actually bigger and I could actually

11  define them more.  But unfortunately, as we can see with

12  this particular image, on the rear here, which pixel is

13  the end of the car?  This one, the one I put the dot on

14  or this one?  It's a guess.  It's strictly a guess.

15       But each one of those pixels is somewhere between

16  five and a half and six inches.  So it makes a

17  tremendous amount of difference as to a dimension of

18  this car if you wanted to place a dimension on it.

19       I'm not doing photogrammetry here.  This is

20  strictly photo analysis.  This would be what I

21  guesstimate as the front of the car, but again, which

22  pixel is truly the front of the car?  And again, the

23  same thing for the height, the top and the estimated

24  bottom of the car or the bottom of the wheels.

25       So it's very, very difficult when we have such

low-resolution images such as this to do any type of
analysis whatsoever or to do any type of photogrammetry
on it.  I'm actually -- used to belong to the American
Society of Photogrammetry and Remote Sensing, which I
was a certified terrestrial photogrammetrist.

        And I wouldn't attempt to make any accurate types
of measurements on this whatsoever because I just don't
have enough information.  All I can do is really count
the few pixels.  And I'm not really sure if those are
the true pixels of where that image starts and stops
because of the low resolution.

    Q.  And that's what your dots on the --

    A.  That's where the dots were.  I was just trying to
make a count.

        MR. COLBATH:  All right, sir, that's the
questions I have for you.  Thank you.

        THE COURT:  Ms. Sherman, go ahead, please.

                        CROSS EXAMINATION

BY MS. SHERMAN:

    Q.  Good morning, Mr. Richards.

    A.  Good morning.

    Q.  When you retired from the FBI, that was 1993,
right?

    A.  Yes, ma'am.

    Q.  So most of your work at the FBI was on film

1    images, not digital images, right?

2        A.   Most of them, because digital imagery didn't

3    really even start to exist until about 1990.  While I

4    was in the FBI, I bought the very first digital camera

5    we ever had.  And it was the third commercial camera in

6    existence.  It's now probably somewhere in a museum.

7    But that was the beginning of the digital age.

8        Q.   And back then it was about what, $25,000 for a

9    camera?

10       A.   It was $25,000 for that one, yes.  That's exactly

11   what I paid for it.

12       Q.   Did you do any 3D modeling in your work at the

13   FBI?

14       A.   Yes.

15       Q.   Did you use total station?

16       A.   No.  Total station didn't exist at that

17   particular time.  We had some custom-made programs, and

18   we also used one commercial program -- I can't even

19   remember the name of it -- to do that.  But we -- rarely

20   did we do total 3D modeling.  Mostly when we did

21   photogrammetry, it was to determine a specific

22   dimension, such as the height of a bank robber or the

23   distance of an object, let's say, one object from

24   another.

25       Q.   And you didn't do any color analysis in this

case, right?

A.   In this case, no.  Again, the images were so poor

that actually if you go from one image to another and

you try to pick a pixel out and then reproduce that

pixel, you couldn't really reproduce it, because it

changed and, therefore, the color changed to some

degree.

So the only color analysis I did, it was my

opinion that this was some -- either blue or gray in

color.  But to be specific, based on what I had, I could

not be specific.

Q.   You would agree with me that pixels store color

as a number, right?

A.   That's right.  There's actually three numbers.

Four.  When I talked about the pixel have a location of

1, 1, it will also have three numbers after that and

those three numbers will be between 0 and 255.  And each

one of those is representing a color, either red, blue

or green, the three primary colors that are added

together to give you all the colors of the rainbow, for

all practical purposes.

Q.   You didn't go to the scene in this case, right?

A.   No, I did not.

Q.   And you didn't write a report or anything like

that?

1     A.  I was asked not to write a report, no.

2     Q.  You -- we've heard you thought the resolution was

3  poor and you couldn't enhance the image, right?

4     A.  Well, I couldn't enhance -- it depends on what

5  you mean by enhancement.  There's lots of things you can

6  do with the image.  It wouldn't do any -- it wouldn't

7  benefit it any.  It would probably deteriorate it even

8  more.  Enhancement is a relative term.  I used the raw

9  image which gives us the raw data, which is the

10  individual pixel, and you can't get any smaller than the

11  individual pixel.

12     Q.  So you would agree with me that that -- you said

13  blue or gray, but that that was a vehicle, right?

14     A.  Again, we recognize it as a vehicle.  When we get

15  close to it, we can't really be sure, but we recognize

16  it just like we recognize the stop sign as a stop sign

17  until we really see what it's made up of.  So it's more

18  of a recognition.  It is a vehicle of some size.  I

19  wouldn't question that.  As a class characteristic, it's

20  a vehicle, yes.

21     Q.  Okay.  And at some point you had indicated that

22  you thought you could see what might be brake lights

23  high on the D pillar, the back of the vehicle, but you

24  couldn't be 100 percent sure?

25     A.  No, I didn't.  That was a question that was asked

1    of me.

2        Q.  Okay.

3        A.  And I said I couldn't tell if was brake lights or

4    snow in the background or anything else.  It was just

5    some white pixels.

6        Q.  But you could tell that the wheels were dark,

7    that they weren't reflective?

8        A.  It appeared to be the wheels were dark and were

9    not reflective, yes.

10       Q.  Let's talk about your PowerPoint for a second.

11   Let's actually go to slide eight if we could.  This is

12   297 for the record.

13           THE COURT:  Thank you.

14       Q.  Okay.  So when you zoomed in to this level here,

15   you can't tell it's a stop sign, right?

16       A.  Well, you -- we recognize it as a stop sign.

17   What I'm saying is we recognize it as that, but there's

18   no real evidence of that.  What we see is a shape that's

19   similar to it, a color that's similar to it, and letters

20   that we assume are S-t-o-p.

21           But we really can't see enough of the letters to

22   make that determination.  Could they be other letters,

23   absolutely.  There just isn't enough resolution.  Even

24   at a third of the distance away, those are -- most stop

25   signs, those are ten-inch letters -- to actually see the

letter formation.

Q.   You would agree with me that sometimes you can zoom in too far and that completely blurs the image to the point you can't tell anything, right?

A.   Well, yes, absolutely.  Then you don't recognize it anymore.  Again, the whole key to it, if you go too far, you get down to a pixel level and you can't see anything.  But when you back off, what we start doing is losing detail information.

But we start recognizing things because we're just accustomed to seeing it.  It's the same thing, like I said before, if you have a color TV at home, if you have it on low resolution you don't see the fine detail of hair or information on there.  If you get a high resolution image on there, you see tremendous detail.  They just add more pixels to it.

Q.   So let's go back to I think it's slide number two.  You would agree with me in this photo, we can tell that's a stop sign, or do you disagree?

A.   I disagree.  We recognize it as a stop sign.  Because we're used to seeing it -- an image like that.  We're used to seeing a red thing in that shape with those letters across the center.  So we just recognize it as that.

We recognize the vehicle on the left here as a

vehicle, but we really can't see any detail in the

headlights or the license plate on there, which is the

same distance away also. When we enlarge it, there's

just no detail there. There's just a bunch of pixels

that we in our own minds put together and recognize it

as such.

Q. So let's talk about that for a moment. You

mentioned this vehicle here. Do you think the owner of

that vehicle would be able to recognize their vehicle in

that image or no?

A. No.

Q. So a person who owns this vehicle right here

would look at it and go, you know what, I work there, I

drive there every day, I've seen the view from this

camera, but at this resolution, you don't believe they

should be able to tell that's their vehicle?

A. They would recognize it as possibly their

vehicle, but they could not identify it as such.

Q. And if they did, they --

A. It could be another vehicle very, very similar to

theirs, but most of us in life have got into the wrong

vehicle from time to time, our own vehicle. I did it

about a week ago. Went to the wrong vehicle and tried

to open the door because I recognized it as my vehicle,

but it really wasn't.

1    Q.   And there were no pixels there?

2    A.   And there were no pixels there.  That's exactly

3    right.  So yeah, he could recognize it as a vehicle and

4    assume it was his, but in essence, no, he couldn't

5    identify it.

6    Q.   Okay.  So then I want to talk about this last

7    image.  I understand that this is recognition but not

8    identification, but you would agree with me that a

9    person who looks at this image and is familiar with

10    images and using their eyes would identify that this

11    area, this set of dark pixels is most likely that

12    person's eyes, correct?

13    A.   Yeah, it's a class characteristic.  It has eyes.

14    Q.   Okay.  And in class characteristics in this

15    image, you would agree that this area appears to be a

16    beard?

17    A.   Appears to be, yes.

18    Q.   Okay.  So a person who is familiar with images of

19    Abraham Lincoln and looks at those images, they could

20    say this image appears to be consistent with an image of

21    Abraham Lincoln, couldn't they?

22    A.   Again, it has enough general class

23    characteristics that it can be -- it can be Abraham

24    Lincoln.  Can be assumed to be Abraham Lincoln.

25              MS. SHERMAN:  Those are all my questions.

```
 1              THE COURT:  Mr. Colbath, any redirect?
 2              MR. COLBATH:  Just three, I think.
 3              THE COURT:  Go ahead.
 4                    REDIRECT EXAMINATION
 5   BY MR. COLBATH:
 6      Q.  Mr. Richards, you said you didn't write a report.
 7   Who -- why was that again?
 8      A.  Mr. Cooper asked me not to write a report or just
 9   didn't ask me to write a report, I should say, and --
10      Q.  That's the original folks that came to see you?
11      A.  -- asked me to send them a bill.
12      Q.  And I have not asked you to do any other -- have
13   I asked you to do any new analysis?
14      A.  No.
15      Q.  Your conclusion is the same that you had with
16   Mr. Cooper?
17      A.  Identical.
18      Q.  Just that last set of questions about the image
19   that appears to be Abraham Lincoln, you said the eyes,
20   the beard those were class characteristics?
21      A.  Yes.
22      Q.  Which would put it in a class that included
23   Abraham Lincoln?
24      A.  Included Abraham Lincoln, correct.
25      Q.  In looking at the vehicle picture, you were
```

originally asked to look for and you've talked about
here today, did you see any class characteristics that
would let you put it in any particular even class of
vehicles?

A.   No.

Q.   Did it have the details that the Abraham Lincoln
class had?

A.   Well, again, it had -- somewhat class
characteristics.  Had the general shape of the vehicle.
It had what appeared to be possibly wheels on it, even
though when we get close, we really can't see if they're
wheels.  They're just five or six pixels.  Because our
eyes blend those together, we make that assumption in
our minds.

But no, as far as it -- it's a square-ish
vehicle, and we're saying it's a vehicle because, again,
we're assuming that and -- but there isn't enough --
there isn't enough detail in it to see any portion of
it.  In other words, if it had letters on the side of
it, ten-inch letters the same as a stop sign would have,
that says what model or make is on there, we wouldn't
know because we couldn't read them.

MR. COLBATH:  That's all I have for you, sir.

THE COURT:  Follow-up at all?

MS. SHERMAN:  No.

 1          THE COURT:  All right.  Thank you, sir.  You

 2    may be excused.

 3          (Witness excused)

 4          THE COURT:  Mr. Colbath, your next witness,

 5    please?

 6          MR. COLBATH:  We call Martin Heckerman.

 7          (Pause)

 8          THE COURT:  Sir, if you could come all the way

 9    forward, please, up to the witness stand here.  When you

10    get up there, if you could remain standing for just a

11    minute, the clerk will administer an oath to you.

12          (Oath administered to the witness)

13          DEPUTY CLERK:  For the record, can you please

14    state your full name and then spell your full name.

15          THE WITNESS:  Martin Heckerman, M-a-r-t-i-n,

16    H-e-c-k-e-r-m-a-n.

17          MARTIN HECKERMAN, DEFENSE WITNESS, SWORN

18                     DIRECT EXAMINATION

19    BY MR. CAMIEL:

20    Q.  Good morning, Mr. Heckerman.  Can you tell me

21    where do you currently live?

22    A.  Kodiak.

23    Q.  How long have you lived on Kodiak?

24    A.  About 30 years.

25    Q.  And how old are you?

1    A.   31.

2    Q.   And what do you do for a living?

3    A.   Commercial plumber.

4    Q.   Journeyman plumber?

5    A.   Yes.

6    Q.   How long have you been doing that?

7    A.   Nine years.

8    Q.   Were you living -- you were obviously living on

9    Kodiak Island in April of 2012; is that right?

10   A.   Yes.

11   Q.   And at that time, where were you living?

12   A.   In Kodiak.

13   Q.   In the city of Kodiak?

14   A.   Yes.

15   Q.   And what were you doing for work?

16   A.   I was an apprentice plumber at the time.

17   Q.   Do you remember what company you were working

18   for?

19   A.   It was Tundra Plumbing & Heating.

20   Q.   In April of 2012, was your company working on any

21   particular project?

22   A.   Yes, we were working at the water treatment plant

23   for the Coast Guard base.

24   Q.   Do you remember where that was located?

25   A.   It was Anton Larsen Road.

1    Q.  I would like you to look at -- if we could put up
2    Government Exhibit No. 4.  And there's a laser pointer
3    in front of you.  There you go.
4         Are you able to determine from looking at that
5    where the water treatment plant was that you were
6    working at?
7    A.  Yes.
8    Q.  Could you with the laser pointer point that out
9    for us.
10   A.  That right there.
11   Q.  And the road that's running along there to the
12   left of the plant, is that Anton Larsen Bay Road?
13   A.  Yes.
14   Q.  What kind of work was being done out there?
15   A.  We were replacing the filtration tanks with new
16   ones, so during that day we were actually demolishing
17   one of the old filter tanks and hauling it offsite.
18   Q.  These filtration tanks, can you tell us what
19   those looked like, what they were made of, how big they
20   were?
21   A.  They're a 3,000-gallon steel tank, oblong.  So
22   they were a cylinder that laid down on the side.  We
23   were cutting them apart with acetylene torches and
24   hammers and pulling them out of the building with an
25   excavator.

1    Q.  Let me slow you down for a minute, and let's

2  stick with the tanks.  All right.  So they're made of

3  steel?

4    A.  Yes.

5    Q.  Do you have any idea of the thickness of the

6  steel?

7    A.  They're about a quarter-inch thick steel.

8    Q.  And were these sitting on any kind of material?

9    A.  They were sitting on concrete pads.

10   Q.  And so the job that your company was asked to do

11 was what with regard to those tanks?

12   A.  We were to take them out of the building and

13 replace them with new tanks.

14   Q.  And to remove them from the building, could you

15 take them out in one piece or did you have to do

16 something to them?

17   A.  No, we had to cut them in half, longways, to be

18 able to load them on a semitruck.

19   Q.  How long were these tanks?

20   A.  About 20, 25 feet long at least.

21   Q.  In terms of the diameter -- you said they're

22 cylindrical?

23   A.  Yes.

24   Q.  And the diameter of the tanks, any approximation

25 of that?

1     A.   About eight feet diameter.

2     Q.   And you were an apprentice at the time; is that

3 right?

4     A.   Yes.

5     Q.   What size crew were you working with out there?

6     A.   For my company, I believe we had three or four

7 individuals out there.

8     Q.   And so turning to April 12th of 2012, you became

9 aware at some point that there had been murders up at

10 the Communication Station; is that right?

11    A.   Later on that day we did at the time.

12    Q.   So you remember that day?

13    A.   Yeah.

14    Q.   And that day, were you working that day?

15    A.   Yes.

16    Q.   Do you remember what time you showed up for work?

17    A.   I showed up approximately 6:45 in the morning.

18    Q.   Where did you show up to?

19    A.   To the water treatment plant.

20    Q.   So the building we were just looking at?

21    A.   Yes.

22    Q.   Could we also put up Defense Exhibit 39.  I don't

23 know if this has been admitted yet, but for foundation

24 purposes first.

25         On the screen in front of you, do you see the

1    place that you were working back on April 12th?

2        A.  Yes.

3        Q.  Does that appear to be -- does that picture seem

4    to be the same as things were back in 2012?

5        A.  Yes.

6            MR. CAMIEL:  I would offer Defense Exhibit 39.

7            MR. SKROCKI:  No objection.

8            THE COURT:  39 is admitted.

9            (Defense Exhibit No. 39 admitted.)

10   BY MR. CAMIEL:

11       Q.  This is similar to the earlier picture, maybe a

12   little bit closer.  Can you show us again where you were

13   working?

14       A.  Right at the back of the building there.

15       Q.  So that's where the tanks were?

16       A.  Yes.

17       Q.  You indicated you showed up at I think you said

18   6:45?

19       A.  Yes.

20       Q.  When you first showed up, was anybody else there?

21       A.  Yes.  Frank Stearns, my co-worker.

22       Q.  And at 6:45, what's going on?

23       A.  We're standing around discussing what we'll be

24   doing for the day, talking about the job site safety,

25   and warming up the equipment, getting ready.

1     Q.   What kind of equipment did you have to warm up?

2     A.   There was an excavator, a forklift that we would

3 have.   Then we also eventually have to get inside the

4 building and disable the alarm.

5     Q.   We blew up the picture, Defense 39.  Can you show

6 us with it blown up now where those tanks were?

7     A.   They were right here in building.  So those were

8 the new tanks that we had installed, and the old ones

9 sat next to them.

10     Q.   What time did you actually start work that day?

11     A.   Around 7:00 a.m.

12     Q.   And so by starting work -- you said at 6:45 you

13 start warming up the equipment.  So what happens at

14 7:00?

15     A.   We'll get the tools out, get next to the tanks

16 where work was going to happen and start cutting them

17 apart.

18     Q.   And what are you using to cut them apart?

19     A.   Oxygen acetylene torches.

20     Q.   And as you're cutting, do you have to do anything

21 else to the tanks to prepare them to be removed?

22     A.   Yes.  So as we would cut them with a torch, you

23 would have to take a small sledgehammer and hit the tank

24 to break the slag loose on it.  Otherwise, the cut

25 doesn't come apart.

1    Q.  And so how -- so somebody is using the torch to

2    do the cutting; is that right?

3    A.  Yes.

4    Q.  So can you describe kind of the sequence of

5    things as the cutting is going on?

6    A.  So you would use the torch, cut approximately

7    five or six inches and hit it with a hammer to break it.

8    Then you'd skip five or six inches and do that all the

9    way around the tank longways.  And then as we were ready

10   to tear it out, we would finish cutting it completely.

11   Q.  And what -- so to actually tear the metal tank

12   out, you're talking about pulling it off the concrete?

13   A.  Yes.

14   Q.  What kind of equipment is used to do that?

15   A.  An excavator.  We would chain the tank to the

16   excavator and drag it out of the building.

17   Q.  So you're dragging the concrete off the -- excuse

18   me, the metal, the steel off the concrete?

19   A.  Yes.  So you have to tear the top half of the

20   tank off first and then drag the lower half out.

21   Q.  When you tear the top half off, what happens to

22   the top half?

23   A.  We would flip it over on its side and drag it

24   next to the building and load it onto a trailer.

25   Q.  When it was flipped over, what is it landing on?

1    A.   The ground.

2    Q.   And then what are you using to drag it away?

3    A.   The excavator.

4    Q.   And so this started at 7:00 that morning?

5    A.   Approximately.

6    Q.   Okay.  And did you guys work all day?

7    A.   Yes.

8    Q.   At some point, did any police officers arrive to

9    talk to you folks?

10   A.   Yes.

11   Q.   Do you remember when that was?

12   A.   I do not.

13   Q.   You were there when the police came?

14   A.   Yes.

15   Q.   And I don't want to get into the conversation you

16   had with them, but did it have anything to do with what

17   happened up at the Communication Station?

18   A.   Yes.

19   Q.   And whether or not you had observed anything?

20   A.   Yes.

21   Q.   After the police were there -- do you remember

22   how long they were there?

23   A.   Maybe a half hour.

24   Q.   Do you remember how many police officers showed

25   up?

1    A.   At least two, that I remember.

2    Q.   Were they in uniform or plain clothes?

3    A.   Uniform.

4    Q.   Were you one of the people they talked to?

5    A.   Yes.

6    Q.   Do you know if they recorded their conversation

7    with you?

8    A.   Not that I remember.

9    Q.   And after they talked to you folks, do you recall

10   if they ever came back later that day?

11   A.   Not that I remember.

12   Q.   How long did this project take?

13   A.   A couple years.

14   Q.   Was it -- was April 12th the first day, or was

15   this something you had already been working on?

16   A.   Something we had already been working on.

17   Q.   You talked about using these -- you said a

18   smaller sledgehammer.  Could you describe that a little

19   bit or what's being hit?

20   A.   We were hitting the tank itself with the

21   sledgehammer.

22   Q.   Okay.  And that causes what to happen?

23   A.   It breaks the slag loose on the back side from

24   cutting it with the torches.  So the slag is a molten

25   metal that forms on the back side of the cut.

1     Q.   So when it breaks loose, where does it go?

2     A.   Inside the tank.

3          MR. CAMIEL:  That's all I have.  Thank you.

4          THE COURT:  Mr. Skrocki?

5          MR. SKROCKI:  One moment.

6          (Pause)

7                    CROSS EXAMINATION

8   BY MR. SKROCKI:

9     Q.   Hi, Mr. Heckerman.  Good morning.

10    A.   Morning.

11    Q.   We just met out in the hallway for the first

12  time?

13    A.   Yes.

14    Q.   How are you this morning?

15    A.   Good.

16    Q.   You were 31 when this -- I'm sorry.  You're 31

17  now.  Back then, how old were you?  I'll put you on the

18  spot.

19    A.   23, I believe.

20    Q.   23.  And you were an apprentice at the time?

21    A.   Yes.

22    Q.   So you were doing all the hard work?

23    A.   Yes.

24    Q.   We've all been there.

25         I want to ask you a couple questions about that

1    morning and some other people who were there.  Do you

2    remember a guy named Frank Stearns?

3        A.   Yes.

4        Q.   Did he open up the gate to get into the area that

5    we are speaking about here?

6        A.   Yes.

7        Q.   There was an alarm on the building that you had

8    access, correct?

9        A.   Correct.

10       Q.   And was there some issue with the alarm that you

11   recall that morning?

12       A.   Not that I recall, no.

13       Q.   That the alarm didn't go off and you had to fix

14   it?

15       A.   He may have tripped it accidentally.  I don't

16   remember.

17       Q.   And how old was Mr. Stearns back then?  Roughly,

18   if you know?

19       A.   Early fifties, I think.

20       Q.   Okay.  And then you mentioned an excavator?

21       A.   Yes.

22       Q.   Did Mr. Nelson bring that excavator?

23       A.   Yes.

24       Q.   So that came later in the day, didn't it, during

25   the morning?

1    A.  I believe so.

2    Q.  So the excavator wasn't there at the time you

3  began your work around 7:00, was it?

4    A.  Not that I remember, no.

5    Q.  Okay.  So that excavator work with the concrete

6  and the tanks you're working on, that wasn't done until

7  a ways after you started work?

8    A.  It would have happened that morning, I believe,

9  whenever the machine would have arrived.

10    Q.  But not right at 7:00?

11    A.  Probably not, no.

12    Q.  Probably not at 7:30?

13    A.  I don't know.

14    Q.  Okay.  You said a small sledgehammer?

15    A.  Yes.

16    Q.  Are we talking a one-hander?

17    A.  Yes.  About a five-pound sledgehammer.

18    Q.  Was that your job?

19    A.  Yeah.

20    Q.  I figured.

21    A.  One of them.

22    Q.  So that was your job.  So you're just tapping

23  along, you're hitting it, right?

24    A.  Yeah.

25    Q.  Enough to break the seal on the slag so you can

1    break that tank apart?

2        A.  Yes.

3        Q.  So this wasn't a two-hander, it was a one-hander?

4        A.  Correct.

5        Q.  When you -- on that morning, when you started

6    work, did you guys stand around and sort of discuss what

7    the plan was for that day and how the work was going to

8    get done?

9        A.  Yes.

10       Q.  So there was a pre-work meeting?

11       A.  Yeah.

12       Q.  And that's a smart thing to do, right?

13       A.  Yes.

14       Q.  So everybody knows who's doing what?

15       A.  Correct.

16       Q.  And you're very clear where you were on the totem

17   pole, right?

18       A.  Yeah.

19       Q.  Do you recall speaking to Special Agent Allison a

20   week or so ago from the FBI?

21       A.  Yes.

22       Q.  Do you recall telling him that you didn't start

23   work until around 7:20 that morning?

24       A.  Yes.

25       Q.  And do you recall telling him that there was no

 1  striking of the sledgehammer until about 7:45 to

 2  8:00 a.m. that morning?

 3      A.  I don't remember.

 4      Q.  Okay.  Is that possible?

 5      A.  Yes.

 6      Q.  It could have also been a little earlier than

 7  that too?

 8      A.  Correct.

 9      Q.  It was a long time ago.  You were interviewed by

10  the public defender's investigators?

11      A.  Correct.

12      Q.  In July, I believe?

13      A.  I believe that's when it was.

14      Q.  Something like that.  And when you -- you were

15  interviewed with Mr. Stearns?

16      A.  Yes.

17      Q.  Were you guys, two of you interviewed together at

18  the same time?

19      A.  Yes.

20      Q.  Not taken apart?

21      A.  Correct.

22          MR. SKROCKI:  Okay.  Thank you, sir.

23          That's all I have, Your Honor.

24          THE COURT:  All right.  Follow-up?

25          MR. CAMIEL:  Just a couple.

 1              THE COURT:  All right.  Go ahead.

 2                   REDIRECT EXAMINATION

 3    BY MR. CAMIEL:

 4       Q.  Mr. Heckerman, the cutting of the tanks, you

 5    didn't need the excavator to do the cutting of the

 6    tanks, I take it?

 7       A.  No.  There was quite a bit of cutting that had to

 8    be done prior to the actual need of the excavator.

 9       Q.  And also the -- and the knocking off the slag,

10    that's going on while the cutting is going on?

11       A.  Yes.

12       Q.  And did you have other equipment such as a

13    forklift or bulldozer or any other equipment there?

14       A.  We had a forklift on site for moving material

15    around.

16       Q.  And that was there before the excavator arrived?

17       A.  Yes.

18              MR. CAMIEL:  Thank you.  That's all I have.

19              THE COURT:  Follow-up at all?

20              MR. SKROCKI:  Nothing from us.

21              THE COURT:  Thank you.  You may be excused.

22              (Witness excused)

23              Your next witness, Mr. Camiel?

24              MR. CAMIEL:  That will be Wilton Nelson.

25              THE COURT:  Good morning.  If you could come

```
 1   forward, please.  If you can remain standing, the clerk
 2   will administer an oath to you.
 3              (Oath administered to the witness)
 4              DEPUTY CLERK:  For the record, can you please
 5   state your full name and then spell your full name.
 6              THE WITNESS:  Wilton Thomas Nelson,
 7   W-i-l-t-o-n, T-h-o-m-a-s, N-el-s-o-n.
 8              THE COURT:  Sir, if you could get just a bit
 9   closer to that microphone.  Thank you.
10              Go ahead, please, Mr. Camiel.
11              WILTON NELSON, DEFENSE WITNESS, SWORN
12                       DIRECT EXAMINATION
13   BY MR. CAMIEL:
14      Q.  Good morning, Mr. Nelson.
15      A.  Good morning.
16      Q.  Where do you live?
17      A.  Kodiak, Alaska.
18      Q.  How long have you lived on Kodiak?
19      A.  My whole life.
20      Q.  How old are you?
21      A.  36.
22      Q.  And what do you do for a living?
23      A.  I operate heavy equipment.
24      Q.  How long have you been doing that?
25      A.  20-some years.
```

1     Q.  What kind of heavy equipment?

2     A.  Trucks and trailers, cranes, excavators, dozers.

3     Q.  Where do you work now?

4     A.  I work for an oil field company.

5     Q.  So up on the Slope?

6     A.  Uh-huh.

7     Q.  And I want to take you back to April,

8 particularly April 12th of 2012.  Were you living on

9 Kodiak at that time?

10    A.  I was.

11    Q.  Where were you living?

12    A.  I was living on Woodland Drive there in Kodiak.

13    Q.  In the town of Kodiak?

14    A.  Yes.

15    Q.  And where were you working at that time?

16    A.  Anderson Construction, which is a local dirt work

17 outfit.  We grade work, plumbing, utilities, that sort

18 of thing.

19    Q.  What were you doing for them?

20    A.  Equipment, truck driving, so ...

21    Q.  Taking you back to April 12th of 2012, do you

22 remember the work that you were doing that day or the

23 particular work you were doing that day?

24    A.  Yeah.  That day I was driving a lowboy

25 tractor-trailer moving equipment out to the Coast Guard

base water treatment facility there.  There was a job
happening out there.  They were demoing the old tanks
and installing new tanks.  And I was -- there was
another company, not the one I was working for, that the
project and I was hauling their excavator out there to
the site and then hauling the old tank pieces off to the
recycle.

Q.  Let me break that down.  You said you were
driving a lowboy.  Can you describe what that is?

A.  It's a truck and trailer combination that folds
down and you can load equipment onto it and detach it
from the tractor and lay it down, lay the gooseneck of
it down and load equipment on and then haul it.

Q.  Where did you pick up that rig that morning?

A.  It was at the high school there in Kodiak.

Q.  And what were you hauling that day?

A.  It was an excavator.  It was a Case 210
excavator, tracked excavator.

Q.  And so you were going to take that up to the
water treatment plant?

A.  Yes.

Q.  Do you remember what route you drove to get up
there?

A.  I was on Mill Bay from the shop at Anderson
Construction there and then went up by the auto shop

entrance there to the high school, because they were
working on the back parking lot there.  And then I took
that street.  I believe it's Carroll Way that connects
down to Rezanof Hill to go down through downtown and
then took Rezanof all the way out to the Anton Larsen
Drive there.

Q.  Can we put up Government Exhibit No. 4.

And this is Government Exhibit No. 4.  Do you
recognize Anton Larsen Bay Road there?

A.  I do.

Q.  Can you just point it out to us.  There's a laser
pointer right in front of you.

A.  This is the road here that comes in.  This here
is the water treatment plant here where we were working.

Q.  And so which direction were you coming?

A.  From Rezanof out here, I came in to here and
pulled in.

Q.  About what time that day did you pick up the --
your load to head up there?

A.  It was about 7:00 a.m. in the morning.

Q.  And as you were driving along up Rezanof Road --
excuse me, up Anton Larsen Bay Road, did you see
anything that later became something that you reported
to the police?

A.  Yeah.  I noticed there was a vehicle at the first

1    bridge you come to.  It's Bridge No. 7, I believe, is

2    the name of it.  And pulled off on the side of the road

3    there.

4        Q.  And can you describe that vehicle for us that you

5    saw?

6        A.  It was a blue SUV.

7        Q.  And if we could put government Exhibit No. 4 back

8    up for just a minute.

9            Are you able to tell -- I don't know if you can

10   tell from this photo where you saw that vehicle.

11       A.  So that looks like -- right about here I believe

12   is the bridge, and this is that road that it turns off

13   into.

14       Q.  And does that bridge have a name or a number?

15       A.  I believe it's Bridge No. 7.

16       Q.  All right.  And I'm going to ask Mr. Nelson to

17   look at Defendant's Exhibit No. 136, which I don't

18   believe has been admitted.  So this is for foundation.

19   Have we shown you this picture before?

20       A.  Yes.

21       Q.  What area is in this photo?

22       A.  This is Anton Larsen Road, and the road off to

23   the right-hand side there where that vehicle is parked

24   is -- I don't know the name of that road, but it goes up

25   to a lake up there.  Old military roads tie into that.

1    That's Bridge No. 7 there though that is in the picture.

2        Q.   There is a vehicle in this picture.  I take it

3    that's not the vehicle you saw?

4        A.   No, it's not.

5        Q.   Is it --

6        A.   But that's the orientation the vehicle was in

7    roughly.

8        Q.   So the blue vehicle you saw that morning is in

9    the same position as the vehicle in this photo?

10       A.   Correct.

11           MR. CAMIEL:  Your Honor, I'd offer Defendant's

12   136.

13           MR. SKROCKI:  No objection.

14           THE COURT:  136 is admitted.

15           (Defense Exhibit No. 136 admitted.)

16   BY MR. CAMIEL:

17       Q.   So we're looking up Anton Larsen Bay Road in the

18   direction that you were driving; is that right?

19       A.   Yes.

20       Q.   Do you know how fast you were going with your

21   load?

22       A.   Probably 20, 25 miles an hour.  I slow down at

23   intersections, because, you know, considerable amount of

24   time and distance it takes to stop a truck and trailer

25   like that hauling a load and, you know, observe the

1  intersection.  It's a fairly narrow bridge.  I believe

2  it's 35 mile an hour is the speed limit in there, so ...

3      Q.  You described it as a blue SUV.  Can you give any

4  other description of it?

5      A.  I can't.  It was early in the morning.  I simply

6  noticed a vehicle at that location as I was approaching

7  and looking for people or vehicles that may be present

8  at the intersection.

9      Q.  But you noticed that it was blue?

10     A.  Definitely.  That's what stuck in my mind is blue

11  when I saw it.

12     Q.  And as you went further up the road, you went up

13  to the water treatment plant?

14     A.  I did.

15     Q.  What did you do up there?

16     A.  I met with the crew that was working there.  We

17  detached the trailer, offloaded the excavator.  They had

18  one of the first water tanks that was -- they demoed

19  that out.  They had to cut it in half because there's

20  concrete in the bottom half.

21         I took the top half to the recycle yard, scrap

22  yard there.  And then I came back and picked up the

23  other portion of that.  And then there was another tank

24  after that as well, but, you know, so it was an all-day

25  project.

1    Q.   What time do you think you got up there for the

2    first time that morning?

3    A.   It was 7:20, 7:30, you know, in the morning when

4    I got to the water treatment plant, sometime around

5    there.

6    Q.   Was the crew already there working?

7    A.   Yes.  They had already showed up -- they met me

8    at the high school, loaded the excavator on.  Then they

9    drove out in a pickup truck and met me there and got set

10   up and spotted me in the position where they wanted to

11   unload it.

12   Q.   So you talked about making multiple trips out

13   there during the course of the day; is that right?

14   A.   Yes.

15   Q.   When you went back -- after first arriving at the

16   water treatment plant, after you had seen the vehicle

17   parked off near Bridge 7, when you went back down Anton

18   Larsen Bay Road, did you notice that vehicle again?

19   A.   I don't recall seeing it there on my way back

20   out, no.

21   Q.   How about when you went further -- when you came

22   back again?

23   A.   No, I don't recall ever seeing it there again

24   after that.

25   Q.   That Bridge 7 area where you saw the vehicle, are

1  you familiar with that area?

2    A.  I am.

3    Q.  Do you know what people do there?

4    A.  People stop and walk their dogs down that road

5  and stuff, so I didn't really pay much attention to the

6  vehicle.  I simply noted that there was a vehicle there.

7  People go fishing there.  It was April, so it's a little

8  early for salmon to be in the stream.  But I mean, it's

9  not uncommon for there to be traffic there.  That's why

10  I was slowing down.

11    Q.  Did you see any people associated with that car

12  or vehicle?

13    A.  I did not.

14    Q.  When you came back up, after you'd left the water

15  treatment plant and came back up later, did you learn

16  anything about any police activity?

17    A.  Yeah.  The crew that I was working with there,

18  they said that they --

19        MR. SKROCKI:  Objection; hearsay.

20        THE COURT:  That's sustained.

21  BY MR. CAMIEL:

22    Q.  Did you at some point learn that something had

23  happened up at the COMM Station?

24    A.  Yeah.  They said that they had been --

25        THE COURT:  Excuse me.  We have all these

rules, and so what other people said, we're not going to
have you testify to.  Okay?  That's fine, sir.

   Go ahead, Mr. Camiel.

BY MR. CAMIEL:

  Q.  After that day, did you see anything in the paper
that caused you to take any action?

  A.  I did.  I was told by the crew that was
working --

   THE COURT:  Excuse me.

   THE WITNESS:  Oh, okay.

   THE COURT:  That's all right.

   Go ahead, Mr. Camiel.

BY MR. CAMIEL:

  Q.  Did you see anything in the local paper that
caused you to do anything?

  A.  I did.  I was under the --

   THE COURT:  Just say what you did.

  A.  I got ahold of the people that were trying to get
ahold of me or that I was told would be trying to
contact me to let them know what I saw simply because I
didn't know if it would be pertinent information or not.

  Q.  Did you see anything in the newspaper related to
any vehicles?

  A.  I did.

  Q.  First of all, did you ever talk to the police on

1　April 12th?

2　　A.　I did not, no.

3　　Q.　All right.　So what did you see in the paper that

4　caused you to do something?

5　　A.　There was a couple pictures of vehicles, one

6　similar to the vehicle that I saw there, so I thought,

7　well, that might be pertinent.　That might place him

8　either there or not there, you know, when need be.　So

9　it might be a piece of information that could be

10　valuable.

11　　　　So I got ahold of them.　I figured I would be

12　contacted either way because everybody else that was

13　there on the job site was questioned, and I figured they

14　would either track me down eventually or I might as well

15　get ahold of them because I wasn't busy.

16　　Q.　But what triggered your call was what you saw in

17　the paper?

18　　A.　I saw that in the paper, and I was like, I saw a

19　vehicle that may or may not have been that vehicle, but

20　it fit the description.　It jumped out at me and I

21　noticed it.

22　　Q.　So who did you call?

23　　A.　Whatever number was associated with it in the

24　paper.

25　　Q.　Could we look at Defendant's Exhibit No. 2?　If

1    we could flip it over.

2         Does this look like what you might have seen in

3    the paper?

4        A.  Yeah.

5        Q.  Is this what triggered your call to the

6    authorities?

7        A.  Yeah.

8        Q.  After you called them, did they come out and

9    interview you?

10       A.  They did.

11       Q.  And did you tell them what you have told us here

12   today?

13       A.  I did.

14       Q.  Do you know if they recorded the interview with

15   you?

16       A.  I believe so, yeah.

17       Q.  Thank you.

18           MR. CAMIEL:  That's all I have.

19           THE COURT:  Mr. Skrocki, go ahead.

20                     CROSS EXAMINATION

21   BY MR. SKROCKI:

22       Q.  Good morning, Mr. Nelson.

23       A.  Good morning.

24       Q.  So, sir, you're a heavy -- back then, you were

25   driving heavy equipment.  Big load, weighs a lot, right?

1    A.   Yep.

2    Q.   You need braking time, as you told the jury here,

3    obviously, to be safe?

4    A.   Right.

5    Q.   And so could we have Defense 136, please.

6         And so you're familiar with this turnout,

7    Mr. Nelson, right?

8    A.   Yes.

9    Q.   Because you drove this road a lot while you were

10   living in Kodiak?

11   A.   I did.

12   Q.   So you mentioned there were people -- you

13   associated people with this area here, correct?

14   A.   Correct.

15   Q.   Because there's fish and people are walking their

16   dogs?

17   A.   Uh-huh.

18   Q.   So you were already sort of mentally preloaded

19   that morning driving up this road to be aware of what's

20   going on over on the right-hand side?

21   A.   Right.

22   Q.   Correct?  And if we could have USA 4, please.

23        So it wasn't unusual for you to see somebody

24   there at that bridge --

25   A.   No.

1    Q.  -- that you just testified about?

2        And there were other places along from the

3    airport to here where people can park their cars and see

4    traffic going by, aren't there?

5    A.  Right.

6    Q.  There's quite a few, aren't there?

7    A.  Yeah.

8    Q.  So like just cutouts and things like that so

9    people can park their car and see traffic go by up

10   towards the COMMSTA?

11   A.  Right.

12   Q.  Correct?  With respect to the vehicle that you

13   talked about in Exhibit -- Defense 136, do you recall

14   stating that you might have thought it was a blue Dodge

15   Durango-type vehicle?

16   A.  Yeah.  Like a midsize SUV.

17   Q.  That was like your -- I don't want to put words

18   in your mouth.  That was your best estimate as to what

19   it could have been?

20   A.  Yeah, that was just, I guess, size comparison,

21   you know.  It wasn't like a Suburban or anything full

22   size.  It was a midsize.

23   Q.  Okay.  And if we can have Defense -- the article

24   in the paper.  Defense 2, please.

25       So you saw this in the paper?

1    A.   Uh-huh.

2    Q.   Correct?

3    A.   Right.

4    Q.   And then you contacted the authorities yourself?

5    A.   I did.

6    Q.   And you did that because you were trying to help

7    out?

8    A.   Well, I was told that I would also be needed to

9    be interviewed by the other people that were

10   interviewed, around the job site.  And I just -- I was

11   busy.  And I was like, well, if they really need to get

12   ahold of me they will get ahold of me.

13        And after the next couple days, then I saw that

14   and I wasn't as busy as I had been, but my workload was

15   pretty large at the time.  So I figured they would

16   either track me down at probably an inconvenient time,

17   or being as I was not busy, I should probably just call

18   them, because it may or may not be pertinent

19   information.

20   Q.   So when you went to speak -- did you speak with

21   law enforcement officers at the time?

22   A.   Yeah.

23   Q.   And you were honest with them, weren't you?

24   A.   Yeah.

25   Q.   You gave them details about what you did that

1   morning?

2       A.  Yeah.

3       Q.  You could tell with specifics what you did that

4   morning even though it was a couple days later?

5       A.  Right.

6       Q.  You knew exactly a couple days later where you

7   saw that car on that bridge, right?

8       A.  Right.

9       Q.  And you told the police that information?

10      A.  I did.

11      Q.  No memory problems there, right?

12      A.  No.

13      Q.  Even though it was a couple days later?

14      A.  Yes.

15      Q.  And you could have done the same thing that same

16  day, right?  You could have come back and said, hey,

17  here's what I did that morning and given a lot of

18  specifics?

19      A.  Right.

20      Q.  If you wanted to be honest with them, right?

21      A.  (Witness nods head.)

22      Q.  Were you interviewed by the public defenders,

23  sir, in July?  Do you remember being interviewed by

24  Deatrich Sheffield?

25      A.  I believe so, yeah.  It was after the fact.  I

1    don't know exactly what month it was, but yes.

2        Q.  Do you recall telling her that you arrived at the

3    water treatment plant between 7:40 and 7:50 or roughly

4    thereabouts?

5        A.  Yes.

6        Q.  Would that be accurate?

7        A.  Yeah.

8        Q.  Even though it's been so many years?

9        A.  It's been a while, yes, but that's roughly.

10       Q.  Because you were driving careful that morning and

11   you weren't looking to put down any speed?

12       A.  No.

13       Q.  Thank you, sir.  I appreciate it.

14           MR. SKROCKI:  Your Honor, that's all the

15   questions I have.

16           THE COURT:  Go ahead.

17                    REDIRECT EXAMINATION

18   BY MR. CAMIEL:

19       Q.  Mr. Nelson, the vehicle you saw over at the side

20   of the road, it wasn't a black pickup with a topper?

21       A.  It didn't appear to be.  It was kind of at a

22   glance as I drove by, and it appeared to be an SUV, blue

23   in color.  That's what stuck in my mind.  But it was

24   parked in an orientation where I saw the back, so it was

25   like a back of an SUV.

```
 1      Q.   A blue SUV?

 2      A.   Blue, yes.

 3      Q.   Thank you.

 4           THE COURT:  Follow-up?

 5           MR. SKROCKI:  No.

 6           THE COURT:  Thank you, sir.  You may be

 7   excused.

 8           (Witness excused)

 9           THE COURT:  Your next witness?

10           MR. COLBATH:  Thank you, Your Honor.  We would

11   call Steven Beck.

12           MR. SKROCKI:  We need to have a discussion

13   about this.

14           THE COURT:  All right.  Let's do that.  Ladies

15   and gentlemen, if you would leave your notepads here.

16   Please remember my admonition not to discuss the case,

17   and we'll get you back in here pretty soon.  If it's

18   running longer, I'll have Caroline come and tell you and

19   we'll send you off for lunch.  But let's aim to have you

20   back sooner rather than later.

21           (Jury absent)

22           THE COURT:  Please be seated, everyone.

23           Going back to the order on Mr. Beck.

24           MR. SKROCKI:  Mr. Beck is in the courtroom.  Is

25   that -- I think we should --
```

1          THE COURT:  Would you seek to have him

2    excluded?  That's fine.  Mr. Colbath, any objection to

3    that?

4          MR. COLBATH:  Steve, if you could just wait

5    outside.

6          THE COURT:  All right.  Who am I going to hear

7    from first here?

8          MR. SKROCKI:  It's our application.

9          THE COURT:  All right.

10         MR. SKROCKI:  The Court's order.

11         THE COURT:  It's at 1070.

12         MR. SKROCKI:  Yes, ma'am.  I'm going to

13   page 29.

14         THE COURT:  All right.  I'm there.

15         MR. SKROCKI:  It states, "In addition, prior to

16   Mr. Beck testifying about the possible alternate source

17   of the sound, sufficient evidence will need to be

18   admitted on the date and time Mr. Rudat heard the sound

19   construction work consistent with that sound was then

20   being done at the water treatment facility."

21         That has not been established this morning.

22         THE COURT:  Mr. Colbath?

23         MR. COLBATH:  Well, Your Honor, I think that's

24   not true at all.  Mr. Heckerman just testified that he

25   arrived at work sometime at approximately 7:00 a.m.,

that work began that included the warming up of
equipment, the operation of acetylene torches cutting
metal apart, that included banging on those with a
sledgehammer, that an alarm went off there that was shut
down at the beginning of the work, that equipment
arrived at some point later, and then additional loading
and whatnot was done of the tanks.

I don't believe that he at all conclusively
said that that was any time later than 7:00 a.m.  He
suggested that it could have been later, but he arrived
at 6:45 and it started at some point fairly soon
thereafter.  So there's work certainly going on to some
capacity.  I can offer to the Court that we also have
witness Frank Stearns who Mr. Heckerman referenced in
his --

THE COURT:  I'd like to hear from Mr. Stearns
first.

MR. COLBATH:  Well, I was -- Mr. Stearns was
scheduled to testify, and he did not make flight
arrangement -- I mean flight arrangements, we had
complications with those.  And as of this morning, the
marshals were hoping to get him on a plane today so he
could testify tomorrow.

But it may be that he is not -- cannot travel
until over the weekend and get here until Monday.  I

1  have Mr. Beck available and of course don't want to fly

2  him home and fly him back or -- if we can avoid it.

3  Certainly pay to have him stay.

4        I would also note for the Court that Mr. Beck

5  is going to testify generally about -- his report

6  contains testimony that certainly goes to and is made

7  100 percent relevant by simply standalone the testimony

8  of Don Rudat.

9        And that is Mr. Beck is going to provide

10  scientific testimony about the sound and the ambient --

11        THE COURT:  Right.  That, I'm okay with.

12        MR. COLBATH:  -- the ambient sound that a

13  gunshot makes and the ambient sound that, as Mr. Rudat

14  described, what a metal-on-concrete sound would sound

15  like.  And then the propagation or the dynamics of how

16  you hear those two and how they can be heard in an

17  outdoor environment like Mr. Rudat was walking in.

18        So Mr. Beck is not going to offer testimony

19  that some specific sound was located at the water

20  treatment plant or some specific sound was heard.  At

21  best he will say, given the situational circumstances, a

22  building here, a water treatment plant there, a roadway

23  in the middle, and a person, he will simply testify that

24  if sounds were made, it would be possible to hear them

25  and this would be the dynamics of that.  If sounds were

1    made over here, it would be possible to hear them or

2    not.

3          THE COURT:  Well, that's where I'm struggling,

4    Mr. Colbath, is if sounds were made.  And I'm hearing a

5    quarter mile down the road or wherever this water

6    treatment was, there were people working inside using --

7    at that hour.  And so what did I hear in the way of

8    evidence that there was any metal falling on concrete

9    from the water treatment at 7:10 in the morning?

10          MR. COLBATH:  Well, Your Honor, first of all --

11          THE COURT:  That could be heard outside the

12   building.

13          MR. COLBATH:  They were inside but with garage

14   doors open is what they were --

15          THE COURT:  What evidence was presented?

16          MR. COLBATH:  That's what the photos depict

17   where he pointed --

18          THE COURT:  I didn't hear that.

19          MR. COLBATH:  If we could have Exhibit -- I

20   think it's Government Exhibit No. 4 and blow up the

21   water treatment plant.  There may be a better close-up.

22          THE COURT:  I --

23          MR. COLBATH:  Your Honor, Mr. Beck is going to

24   describe simply what is a -- the acoustics of what is --

25   and there's a distinct audio difference between a

metallic sound and a gunshot sound.

THE COURT:  I'm okay with that.  It is trying to ascribe it to the water treatment center.  I don't see that there's evidence of --

MR. COLBATH:  If we can have this exhibit.

THE COURT:  Well, who testified that the door was open at the time that they were working inside in April?

MR. COLBATH:  Well, Mr. Heckerman's testimony was that the tank -- first of all, if we look at the photo, where he pointed, the tanks are eight feet long -- or eight feet around and 25 feet long, and they were cutting it the long way.  So that was not going out a walk door.  That was going out these garage -- they were pulling it right out these garage doors.

And when he showed on the picture, he said it was right there, we were standing cutting that.  And so I took that to mean they were pulling them out -- they had them out those garage doors.  So that's where the work was going on.

THE COURT:  That's not what I heard, but I could be incorrect.  I heard working inside and then later the excavator shows up, and they cart the tank pieces off.  But if I'm incorrect, it would not be the first time.

1          Let's do the following:  I'm concerned about

2     the jury here at 11:35.  And I think it may be when I

3     hear from Mr. Stearns that there would be a sufficient

4     basis but -- and my order -- what I intended was that

5     there would be sufficient evidence from which a jury

6     could conclude that there were loud noises going on, and

7     I didn't hear this witness asked, "Did you drop things,

8     were things crashing."

9          MR. COLBATH:  Sure.  I can visit briefly with

10     Mr. Beck, because of course it is -- he has no firsthand

11     knowledge of what noises went on.  And so his -- I

12     believe I want to confirm with him so I make sure that

13     he doesn't use wording that's different than my

14     representation to the Court.  But I can confirm with

15     him.

16          I believe what he will say is that his

17     testimony is based on the description given by Mr. Rudat

18     and the location of things, not by -- not with specific

19     reference to activity at the water treatment plant.

20          THE COURT:  Well, location of things, what

21     location of what things?

22          MR. COLBATH:  The location of the water

23     treatment plant, the location of the T-2 building, the

24     location of Mr. Rudat on the road.

25          THE COURT:  Well, I'm going back to Docket

1070, page 29.  What I required was that there be
evidence of construction work consistent with a sound of
metal dropping on concrete.  And I am finding at this
point that sufficient evidence has not been admitted,
that on the date and time that Mr. Rudat heard the
sound, construction work consistent with that sound was
then being done at the water treatment facility.

It's consistent with that sound.  It's
certainly presented evidence that they were doing
something there, but I heard more soldering and then
hitting with a small sledgehammer.

So -- and I appreciate, Mr. Colbath, your
witness challenges.  I know that's been for both sides a
challenge.  But I think taking a break here and
pondering this and coming back after lunch and figuring
out where we go with your witnesses might be your best
bet.

MR. COLBATH:  That would be fine.  Let me visit
with Mr. Beck.

THE COURT:  Anything further from the
government?  I'm thinking of telling them 12:45,
Counsel.  Would that work?

MR. SKROCKI:  Give them the time they need.

THE COURT:  Yeah.  12:45 or 1:00?  What's your
preference, Mr. Colbath?

 1          MR. COLBATH:  1:00 may allow me to also check

 2    on travel plans of others and whatnot.

 3          THE COURT:  That sounds great.  Let's do 1:00.

 4          MR. COLBATH:  Just to give the Court a

 5    heads-up, I may not have more than a witness or two

 6    then.  I had travel plans with Mr. Stearns as well as

 7    another person and anticipated an hour's testimony with

 8    Mr. Beck.  And so I'm not --

 9          THE COURT:  Let's see what we can do.  We'll

10    work with that.  We'll go off record at this time and be

11    back at 1:00.

12          DEPUTY CLERK:  All rise.  Court stands in

13    recess until 1:00 p.m.

14          (Recessed from 11:37 a.m. to 1:05 p.m.)

15          (Jury absent)

16          DEPUTY CLERK:  All rise.  Her Honor, the Court,

17    the United States District Court is again in session.

18          THE COURT:  All right.  Please be seated,

19    everyone.  So I've read these transcripts.  What's our

20    update, Mr. Colbath, from your perspective?

21          MR. COLBATH:  I'll let Mr. Camiel start, Your

22    Honor.

23          MR. SKROCKI:  Before we proceed, Mr. Beck is

24    here in the courtroom.  I'd like him excluded.

25          MR. COLBATH:  He is here, Your Honor.  And when

we proceed, I'm going to ask that he be allowed to be
back in to listen to us proceed.

THE COURT: And why is that?

MR. COLBATH: Well, that will become evident as
we explain to the Court our proposal. But he's an
expert witness, and I believe it's permissible for him
to listen to relevant testimony -- testimony that's
relevant related to his opinions, I guess.

THE COURT: Mr. Skrocki?

MR. COLBATH: Any legal arguments that we have
here, if that's a problem, that doesn't matter that he's
sitting here.

MR. SKROCKI: That's generally true, but the
basis of his report is completely inconsistent with the
evidence that we're hearing in the court.

THE COURT: Well, let's get this sorted out.
Mr. Camiel, it sounds like I'm going to hear from you.
Go ahead, please.

MR. CAMIEL: Your Honor, our intention is to
recall Mr. Heckerman. We have a new exhibit. I don't
know if the Court has seen it yet.

THE COURT: No, I haven't. But I have both
sides' questioning of him earlier.

MR. CAMIEL: It's Defense Exhibit No. 310. And
it is a picture we came up with, a better picture of the

water -- of the tanks that they were working on.  And he
would identify the picture showing the tanks.  They
partially go into the building, but it's mostly outside
the building.  We would recall him to introduce this
exhibit and explain that the work was going on partially
inside but mostly outside the building, the cutting and
hammering.

          And so that would be the purpose of recalling
him.  We didn't have this exhibit when we questioned him
before, so these would be different questions than he
was asked before.  We certainly haven't closed our case
yet.

          THE COURT:  So you seek to recall him?

          MR. CAMIEL:  Yes.

          THE COURT:  Any objection?

          MR. SKROCKI:  Yes.  This shouldn't be new news
to anybody.  I think this is just a pretext to get him
to the stand to confuse him and move his timeline back,
because nothing that -- he's already testified work
didn't start until 7:20.

          THE COURT:  I recall he stated to the defense
it started at 7:00 and to the government, he stated
7:20.

          MR. SKROCKI:  The banging, the noises didn't
start until 7:20.

1          THE COURT:  Well, that's -- there were many

2   different statements made, Mr. Skrocki, as I read it.

3   Where does it say in the direct that the banging started

4   at 7:20?

5          MR. SKROCKI:  It doesn't say it in the direct.

6   It says in the cross.

7          THE COURT:  In any event, I'll allow the

8   witness to be recalled and then either side can make

9   application again.  And we'll go from there.

10          MR. CAMIEL:  I'm not going to go back into the

11   timeline.

12          THE COURT:  Well, I'll allow either side to

13   explore it.  And I just can say that based on what's

14   been provided so far through this witness, it is

15   insufficient, but I will allow the witness to be

16   recalled in the interest of justice here.

17          MR. SKROCKI:  Just briefly, we listened to

18   Mr. Stearns' audio recording of his interview.  He

19   claims the alarm was tripped at 7:07 in the morning.  So

20   our position is Mr. Beck can't take the stand until we

21   hear from Mr. Stearns.

22          THE COURT:  That's helpful.

23          MR. COLBATH:  Your Honor, that is precisely why

24   I want Mr. Beck to be able to listen to this additional

25   testimony of Mr. Heckerman.  Because what I'll tell the

Court is it's our position that the Court is either
taking too narrow of a view or a misconstrued view of
the evidence here related to the language, and I'm
referring to the language in your order, because as soon
as Mr. Heckerman is done, and I know -- I couldn't -- I
thought about it over the lunch hour, and I can't come
up with a more efficient way to do it.

But if Mr. Beck is allowed to listen, we'll ask
Mr. Heckerman about what was going on outside the
building and with this tank and the precise activity and
noise going on.

Mr. Beck, I would proffer to the Court, and I
can certainly do this in a proffer immediately after,
just a very narrow proffer immediately after
Mr. Heckerman's testimony, but Mr. Beck will say it
matters not whether the metal hits concrete or some
other object hits the metal. It is the noise of metal,
the resonant noise of metal that is the focus here or
whatnot.

In other words, that the sounds would be
exact -- audibly heard as extremely consistent, whether
concrete hit metal or you took a piece of concrete and
hit at metal or a sledgehammer and hit metal or whatnot.
It's the clattering or clanging or the reverberation of
the metal that creates the sound.

1           So it is our position that if it's -- we'll let

2    the Court listen to Mr. Heckerman, but construction work

3    consistent with the sound, metal hitting concrete,

4    Mr. Beck will tell you that what's being described right

5    here just by Mr. Heckerman is consistent with exactly

6    what you would expect if a piece of metal -- it's no

7    different if it hit the head of a sledgehammer than it

8    hit the ground with concrete.

9           It's the same metallic sound or certainly

10   consistent or similar metallic sounds in certainly a

11   general sense as compared to, you know, an electronic

12   sound or as compared to a -- and relevant to this case,

13   a gunshot or whatnot.  It's the resonance of the metal,

14   regardless of what hits it that makes the noise.

15          And so our position is this is exactly the

16   sound consistent.  And in order to make the offer of

17   proof, rather than me describe it after the fact to

18   Mr. Beck in the hallway, I would just like him to be

19   able to sit here and listen to that so I can offer that

20   to the Court.  And he explains that resonance --

21          THE COURT:  Let me just say the -- I'm trying

22   to find the precise portion of the order that

23   addresses --

24          MR. COLBATH:  Your Honor, it's page 29, the top

25   of page 29 in Document 1070.

1      THE COURT:  1070.  Thank you.  My order may not

2  have been as clear on this as I would have liked, but

3  the point is, as I recall Mr. Rudat, it was at 7:12 or

4  thereabouts that he heard the sound.

5      MR. COLBATH:  Correct.

6      THE COURT:  And so the timeliness issue is a

7  consideration and I believe was at least implicitly

8  articulated.  So I think -- I understand you have an

9  expert that's going to say that Mr. Rudat heard metal on

10  concrete, and if you have metal on concrete you can hear

11  metal on concrete.  The issue is the timing of it.

12  That's what I intended in my order.

13      MR. COLBATH:  But that's not at all what it

14  says.  I mean you could have very well intended that,

15  but it says, "Evidence should be admitted at the date

16  and time Mr. Rudat heard sound, construction work

17  consistent with that sound was being done."  And I agree

18  with the Court's earlier interpretation that --

19      THE COURT:  Date and time, that is the key

20  issue.

21      MR. COLBATH:  Right.  And obviously, the date

22  is no issue.

23      THE COURT:  And the point I guess I'm trying to

24  make is that the fact that a sound expert would say

25  metal falling on concrete sounds like metal falling on

1  concrete is not relevant unless there -- it's a

2  conditional relevance issue, unless there's some

3  evidence in the record to support that there was metal

4  on concrete that was audible where Mr. Rudat was at 7:12

5  in the morning.

6          MR. COLBATH:  And I believe what Mr. Heckerman

7  already said -- the Court's exactly right.  He testified

8  he got there at 6:45.  Mr. Stearns also was there at

9  some point.  That work started at 7:00.  That an alarm

10 in the building went off on 7:07, still five minutes

11 before 7:12.  They shut that off.  And the first thing

12 they were doing was cutting tanks, so --

13         THE COURT:  Maybe that could be further

14 explored by both sides, because that is my point is that

15 there's no relevance to the simple fact that concrete

16 and metal make a sound.  It's the timing that is not

17 clear to me.  And I'm not the factfinder.  I want to

18 make crystal-clear I'm not taking on that role here, but

19 there needs to be sufficient evidence under Rule 104 to

20 allow the opinion testimony to be presented.

21         MR. COLBATH:  And so just so we're clear, the

22 Court is requiring precision to the minute?

23         THE COURT:  Not precision.  But timeframe that

24 is clearer than what has been presented.  And the

25 standard I believe for conditional relevance is

preponderance, and that has not been met.  And I don't

even think my order required preponderance, but some

sufficient evidence that a jury could reasonably

conclude -- well, that's actually too high of a

standard.  It's a preponderance of evidence to support

the relevance of Mr. Rudat's testimony about metal on

concrete sounding like metal on concrete.

All right.  So I misspoke when I said that it

involves a jury making a reasonable determination.  That

is not the standard for this issue.  All right.

Questions or clarification?

MR. SKROCKI:  I know you're not feeling well.

THE COURT:  I'm fine.  I'm loading up on

another dose of vitamin C.

MR. SKROCKI:  We appreciate it.  This man needs

to tell his story.  It's their witness on direct.  They

have to ask direct questions.  That's what I'll be

concerned about.

Mr. Colbath is trying to make some sort of

hybrid exam with Mr. Beck.  When it comes to that, if it

does come to that, we will have an objection on unfair

extrapolation because there's aspects of what

Mr. Colbath said that's not in Mr. Beck's report.

That's a ways down the road, so let's proceed and --

THE COURT:  Well, any objection to Mr. Beck

1    being present in the courtroom?

2          MR. SKROCKI:  Yes.

3          THE COURT:  All right.  Was each side given an

4    opportunity -- defense has interviewed Mr. Heckerman,

5    correct?

6          MR. COLBATH:  Yes.

7          THE COURT:  Then I am going to preclude the

8    witness from being present here, because what I don't

9    allow in this case, or any other case really, is for an

10    expert witness to form an opinion and then come into

11    court and say, "I have listened now to three days of

12    testimony and I can fine-tune my opinions based on

13    everything I've heard for the last three days."

14          I know some judges may allow that.  I see that

15    as inconsistent.  But we can discuss this and take the

16    time needed to get him the transcript if need be if

17    that's the ruling afterward.  But having him hear this

18    where I may not allow him to factor it into his opinions

19    would seem to put him a difficult spot if I rule against

20    him to sort out what he can consider and what he can't.

21          So I will allow Mr. Heckerman to be recalled.

22    Mr. Beck is excluded from this testimony based on the

23    representation that he may seek to rely on the facts

24    that may be elicited.  And then we'll go forward with

25    another sidebar, I anticipate.  Anything further?

```
1          MR. SKROCKI:  Thank you, Your Honor.  No.

2          THE COURT:  Anything further?

3          MR. COLBATH:  I don't think so, Your Honor.

4   I'll just have Mr. Camiel tell Mr. Beck to wait and tell

5   Mr. Heckerman to come in.

6          THE COURT:  That's very good.  Thank you.

7          (Pause)

8          (Jury present)

9          THE COURT:  Please be seated, everyone.

10  Welcome back, ladies and gentlemen.  Mr. Colbath, what's

11  our plan here?

12         MR. COLBATH:  Your Honor, I guess we're going

13  to recall briefly Martin Heckerman, who we heard from

14  this morning.

15         THE COURT:  Mr. Heckerman, if you could come

16  forward, please.  As you make your way forward, I'll

17  remind you you're still under oath from this morning's

18  proceedings.  Okay, sir.  Go ahead and have a seat if

19  you would.

20                    REDIRECT EXAMINATION

21             (Continued of Martin Heckerman)

22  BY MR. CAMIEL:

23     Q.  Mr. Heckerman, we found another picture we wanted

24  to have you look at.  For foundation purposes, I wanted

25  to have you look at Defense Exhibit No. 310.  Do you
```

1    recognize what's in that picture?

2        A.   Yes.

3        Q.   What is it?

4        A.   That is the water treatment plant building.

5        Q.   Is that what it looked like back when you were

6    working on it in April of 2012?

7        A.   Yes.

8        Q.   And does that picture show the tank or one of the

9    tanks you were working on?

10       A.   Yes, it shows one of the old tanks that we

11   demoed.

12       Q.   All right.

13            MR. CAMIEL:  I would offer Defense Exhibit

14   No. 310.

15            MR. SKROCKI:  No objection, Your Honor.

16            THE COURT:  310 is admitted.

17            (Defense Exhibit No. 310 admitted.)

18   BY MR. CAMIEL:

19       Q.   And is this the tank you were talking about?

20       A.   Yes.

21       Q.   And that tank is made of what?

22       A.   Steel.

23       Q.   And is that tank completely outside the building

24   or partly inside the building?

25       A.   Partly inside the building.

1    Q.   More out or in?

2    A.   More out.

3    Q.   And so when you were talking about the torching,

4    cutting it with a torch and banging it with a hammer,

5    where was that taking place?

6    A.   The majority of it was outside the building.

7    Q.   The majority outside?

8    A.   Yes.

9    Q.   Now, let me ask you, when you are hitting that

10   steel tank with the type of hammer you talked about,

11   what kind of sound did it make?

12   A.   It sounds like striking a large bell or gong.

13   Q.   And how many times do you think you would be

14   hitting that in the course of, say, ten minutes?

15   A.   Three or four times possibly.

16   Q.   Now, that morning, you told us earlier when you

17   got to work.  Can you tell us again, when did you first

18   get to the treatment plant?

19   A.   Around 6:45.

20   Q.   And how did you get there?

21   A.   I drove my vehicle.

22   Q.   And you mentioned something about an alarm

23   earlier.  Can you tell us about that again?

24   A.   The inside of that facility has a security alarm.

25   So we -- Frank would open the building up to disable the

alarm.  So we have to have access to the building for
fire detection, fire watch.

Q.  Where did you keep the tools and equipment that
you used?

A.  We had a 40-foot van on site that was outside the
secured area.

Q.  Was that alarmed or was it just the building that
was alarmed?

A.  Just the building.

Q.  So I think you mentioned earlier something about
warming up equipment and getting equipment.  Was that
available before you turned off the alarm?

A.  Yes.

Q.  And what time did you all start work in relation
to when the alarm was turned off?

A.  Within five to ten minutes, roughly.

Q.  And what's the first -- when I say "start work,"
was that the cutting of the tank?

A.  Probably.

Q.  I mean, that was your main job there; is that
right?

A.  Yes.

Q.  And so when you talked earlier about meeting
ahead of time, before you started work, was there
discussion about what the specifics were in terms of

1    what you were going to be doing that day?

2        A.   Yes.

3        Q.   And your role again was what?

4        A.   Apprentice plumber.

5        Q.   In terms of your apprentice plumber work, you

6    were the guy swinging the hammer?

7        A.   Swinging the hammer or retrieving whatever tools

8    were required.

9        Q.   So you mentioned earlier that a truck came with

10   the excavator.  When he arrived, was the first part of

11   the tank already done, already cut for him to pick up?

12       A.   I don't remember.

13            MR. CAMIEL:  That's all I have.  Thank you.

14            THE COURT:  Thank you.  Mr. Skrocki, go ahead,

15   please.

16            MR. SKROCKI:  Just a moment.

17            (Pause)

18                      CROSS EXAMINATION

19   BY MR. SKROCKI:

20       Q.   Hi again, Mr. Heckerman.

21       A.   Hi.

22       Q.   You're no longer an apprentice, right?

23       A.   Correct.

24       Q.   You got apprentices working for you now?

25       A.   Yes.

1    Q.  Cool.  Let me take you back to that morning.  So

2 was there a conversation before you started work that

3 morning?

4    A.  Yes.

5    Q.  And how long did that conversation last?

6    A.  Five, ten minutes maybe.

7    Q.  Okay.  After you arrived?

8    A.  Yes.

9    Q.  Was that after the alarm was tripped that had to

10 be repaired or stopped?

11    A.  It was prior to.

12    Q.  Prior to.  So then the alarm went off.  And then

13 you mentioned that the work started roughly about what

14 time?

15    A.  Probably around after the alarm tripped probably

16 around 7:30 I believe.

17    Q.  7:30 or so?

18    A.  Yeah.

19    Q.  Was the work that you -- I'm not going to lead

20 you.  You tell the jury.  The work that you did, that

21 you first did was what type of work?  Was it the cutting

22 with the torch or the banging, or what kind of work did

23 you first start?

24    A.  Cutting with the torch, but -- cutting the tank

25 apart with the torch and then you hit it with a hammer

 1  at the same time, so you're doing both.

 2      Q.  Got it.  So they're both occurring at the same

 3  time?

 4      A.  Yes.

 5      Q.  So you're making the torch, and you're banging as

 6  you go along?

 7      A.  Correct.

 8      Q.  Right?  Okay.  And that sounded like a large

 9  metal like a bell or a gong you testified to?

10      A.  Correct.

11      Q.  And so that tank, Exhibit No. 310, is pretty

12  large?

13      A.  Correct.

14      Q.  And were you working on that tank for a long time

15  and banging it like a metal gong?

16      A.  Yes.

17      Q.  And then there came a time when there was -- that

18  there was some concrete involved with that tank?

19      A.  Correct.

20      Q.  How far after you started doing the cutting and

21  the banging with the five-pound mallet did the concrete

22  become involved?

23      A.  It would have been several hours afterwards.

24      Q.  Several hours?

25      A.  Yeah.

1      Q.  Okay.

2          THE COURT:  I'm sorry.  Can you ask that again?

3      Q.  Sure.  And apologies if I said it inartfully.

4          When you started your work, you had -- you were

5  cutting and hitting it with that five-pound

6  sledgehammer?

7      A.  Correct.

8      Q.  And then I asked you, that tank is very large?

9      A.  Correct.

10     Q.  At some point during that process, that involved

11  the tank and concrete removal?

12     A.  Correct.

13     Q.  And how long, when you first started that, after

14  you started the cutting with the torch and the hammer

15  did the concrete become involved?

16     A.  It would have been a few hours afterwards.

17     Q.  Okay.

18         MR. SKROCKI:  That's all I have.

19         THE COURT:  Redirect?  Go ahead.

20                   REDIRECT EXAMINATION

21  BY MR. CAMIEL:

22     Q.  The concrete part of it was later, but the

23  cutting with the torch and banging was earlier?

24     A.  Correct.

25     Q.  And could it have been as soon as within five to

1  ten minutes after the alarm was turned off?

2     A.  Possibly.  But after the alarm trips, we

3  typically would delay it, because the military police

4  would typically show up to check on us.

5     Q.  Do you recall them doing that that day?

6     A.  I don't remember.

7     Q.  So it could have been five to ten minutes after

8  the alarm was turned off?

9     A.  Possibly.

10    Q.  Thank you.

11       THE COURT:  Mr. Skrocki, anything on that

12 topic?

13       MR. SKROCKI:  No, Your Honor.  Thank you.

14       THE COURT:  Thank you, sir.  You may be

15 excused.

16       (Witness excused)

17       THE COURT:  Do we need to have another brief

18 discussion here, Counsel?

19       MR. COLBATH:  I think we do, Your Honor.

20       MR. SKROCKI:  Not from our perspective.

21       THE COURT:  That's fine.  Ladies and gentlemen,

22 I need to take up one more issue with the lawyers here.

23 So I apologize.  I hope the chocolate has been

24 resupplied.  We'll get you back in here as soon as

25 practicable.  Please leave your notepads here.  Thank

1    you.

2            (Jury absent)

3            THE COURT:  Please be seated, everyone.

4            Mr. Colbath, go ahead, please.

5            MR. COLBATH:  Thank you, Your Honor.  As I

6    stated earlier, because I anticipated this follow-up

7    testimony from Mr. Heckerman, it's our position that the

8    construction sounds that could be consistent with what

9    Mr. Rudat described -- first of all, I'll just say for

10   the record that the -- although Mr. Rudat described it

11   as metal hitting concrete, the concrete should not be

12   part of the Court's analysis or not determinative.  It

13   would certainly be part of the Court's analysis.  Not be

14   determinative of the Court's analysis, because

15   acoustically, the construction sounds of the hammer

16   hitting the tank and sounding like a big gong or a big

17   bell or something, that's consistent with the same as if

18   you had -- it had been hit with concrete.

19            So the noises are there.  Obviously, Mr. Beck

20   cannot testify to the timing.  That's a separate issue.

21   Mr. Beck has no knowledge of the timing.  And so it's

22   our position that with Mr. Heckerman saying it could

23   have -- the banging on the tank could have began as soon

24   as five to ten minutes after the alarm was tripped,

25   which he earlier said the alarm was reset at 7:07

apparently or just after 7:00, it's our position that
then work could have started and construction noises
could have been heard that are consistent with what
Mr. Rudat described beginning around 7:10 to 7:12, which
would be the exact actually time, just as the work
starting is the exact time Mr. Rudat was down the road
at T-2.

THE COURT:  What evidence is there that a
person standing in front of the rigger shop could hear a
five-pound sledgehammer hitting that tank up at the
water tower?

MR. COLBATH:  What evidence is there of that?

THE COURT:  Yes.

MR. COLBATH:  That's what Mr. Beck is going to
testify.  That's why I have --

THE COURT:  But does he know the distance?
Does he know the tank size?  Where is that in the
report?

MR. COLBATH:  All of those things.

THE COURT:  Is that in the report?  Let me --
that he -- that it's a tank being hit by a five-pound
sledgehammer?  That's not what I recall reading.  I
recall hearing a tank crashing down on concrete making a
huge noise.  But that was several weeks ago, in
fairness.

1          MR. COLBATH:  Mr. Beck's report refers to

2     metallic sounds and acoustical sounds.

3          MR. SKROCKI:  It's heavy machinery hitting a

4     steel tank or concrete.  That's our point.  It's unfair

5     extrapolation at this point.  There's nothing in his

6     report about five-pound sledgehammer, zero.

7          MR. COLBATH:  Your Honor, I can certainly do an

8     offer of proof that it is -- what Mr. Beck will say is

9     the mechanism of the sound comes from the metal, comes

10    from the resonance of the metal.  So certainly a piece

11    of machinery hitting a metal tank causes a noise.

12          What Mr. Beck will say is a sledgehammer

13    hitting it or some other hard object hitting that piece

14    of metal creates the same resonance.  And so -- and

15    that's not any wild extrapolation.  That's not really

16    even extrapolation.  Because he's not talking about

17    the --

18          THE COURT:  So how does he describe -- he's

19    got -- I'm looking at his report, page 14.  Sound level

20    from water treatment plant, 120 decibels.  Is he

21    prepared to testify that a five-pound sledgehammer

22    hitting a metal tank is 120 decibels?

23          MR. COLBATH:  I can go ask him that

24    specifically.  It's why I wanted him to hear --

25          THE COURT:  If the water tank were dropped onto

concrete or bumped by a piece of construction equipment,
the sound could be loud enough to hurt your ears.  As
loud as 120 decibels.

MR. COLBATH:  And so I will ask him would --
would -- and his -- I can certainly ask him.  I can
proffer it right here in front of the Court so that --
you know, I won't have any conversation with him out in
the hallway.

But I would submit to the Court that if he
equates banging on that with a five-pound sledgehammer
would be generally the equivalent of bumping it with a
piece of equipment, he's going to say I believe the
mechanism is no different.  It would be -- could be up
to -- as described, up to 120 decibels.

That's how when I prepared with him -- I hadn't
heard Mr. Heckerman's exact description even when I
talked to Mr. Beck.  I just knew that that tank was
being beat apart and pulled off the building and loaded
onto the thing and that that was the general nature of
the construction noises.

Mr. Heckerman described it slightly different
here than he described it in both his original
interviews to the government and his interviews to us.
But I think that the beating on it with a sledgehammer
is not going to be in any materially way different than

bumping it with a piece of -- you know, the arm of a
fork, the bucket of a Bobcat, some piece of equipment.
I don't think Mr. Beck will say that.

        THE COURT:  You are not the audio expert.

        MR. COLBATH:  That's right.  I'm not the audio
expert.

        THE COURT:  Okay.  Mr. Skrocki?

        MR. SKROCKI:  None of that ever happened.
There's no evidence to show that a piece of equipment
hit this tank.  There's nothing in his report about a
five-pound sledgehammer.  He's their witness.  They
could have spent as much time with him as they wished.

        We interviewed him too, but that's totally
unfair extrapolation to have Beck come in here and say,
"Oh, it possibly could be now a five-pound sledge and
then a gong could be heard that distance."  Frankly, the
whole thing is kind of preposterous.  But for him to get
up here now and say a five-pound sledgehammer hitting a
steel tank will travel 1,000 feet and override, you
know --

        THE COURT:  Is that how far it is, the
distance?

        MR. SKROCKI:  Yeah.  Yes, it's in his report.

        THE COURT:  All right.

        MR. SKROCKI:  Amongst other things.  But yes,

he has it calculated as 1,000 -- I can't read it on my
copy.  1,050 feet from the water treatment facility to
the COMMSTA in front of T-2 is 1,000 feet.

THE COURT:  All right.

MR. SKROCKI:  To T-2.

THE COURT:  So what's your proposal?

MR. SKROCKI:  My proposal is we wait for Frank
Stearns.  I don't think they've provided sufficient
evidence.  Mr. Colbath is just trying to bootstrap
Mr. Beck on here through some sort of unfair
extrapolation.  Again, it's one of these moving targets,
Judge.  We start with one premise of heavy machinery and
concrete, and now we're now over into five-pound
sledges.  There's no way for us to respond to that.  On
top of they haven't met their burden.

THE COURT:  All right.  Just a moment.

MR. SKROCKI:  Now maybe if you could -- my
colleague is suggesting put him in the box and you can
ask him questions yourself.

THE COURT:  Mr. Colbath?

MR. COLBATH:  That would be great.  You know, I
will say for the record that Mr. Rudat testified he
heard metal on concrete, not a gunshot.  And what I'm
trying to do is evidence that that's possible, which is
it is possible, and the government -- you want to talk

1    about a moving target.

2          This is offered so that Mr. Rudat -- they can

3    say he heard a gunshot when it's not at all what he

4    described.  In fact, the last thing he said on the stand

5    was, "I think I'd know the difference."

6          So I'm trying to rebut that moving target and

7    that extrapolation of something that their own witness

8    didn't even say.  We're not refuting Don Rudat.  I'm

9    just saying it's certainly possible that he heard metal

10   noises and they were going on somewhere in the area.

11         THE COURT:  Let's bring him in.  You can ask

12   him questions first and then Mr. Skrocki.  If I have any

13   additional, I'll pose them, but I think we are agreed on

14   that.  I am not going to rule on whose moving target is

15   moving more.  So there.

16         MR. COLBATH:  Fair enough, Your Honor.  And so

17   just for the Court's information, I will do it any way

18   that the Court feels it's necessary to make our

19   determination.  I will go through Mr. Beck's entire

20   testimony to give Mr. Skrocki --

21         THE COURT:  I don't think we need to do that.

22         MR. SKROCKI:  I don't care about that.

23         MR. COLBATH:  Or I will focus right on just

24   this noise --

25         THE COURT:  It's page 14.  It's what he --

1    MR. COLBATH:  Sure.  I will focus in on that.

2    THE COURT:  All right.  Page 14 of his report

3  where he opined that what Mr. Rudat could have heard was

4  from the water tower construction project.  He has a

5  sentence there.  That's what I was reading.  We don't

6  need to go through -- Mr. Skrocki, you concur, we don't

7  need to go through the entire testimony?

8    MR. SKROCKI:  No.

9    THE COURT:  We've already done that.

10    MR. COLBATH:  I'll make my proffer just

11  relative right to that.

12    THE COURT:  Thank you, Mr. Colbath.

13    (Pause)

14    MR. SKROCKI:  I just would note for the record

15  this is taking quite a bit of time.

16    THE COURT:  So noted.

17    (Pause)

18    (Jury absent)

19    THE COURT:  Good afternoon.  If you could come

20  forward up to the witness stand and the clerk will

21  administer an oath to you.  When you testify later this

22  afternoon, she'll administer an oath again.

23    THE WITNESS:  I'm going to bring my notebook.

24    THE COURT:  Yes, if you like, that's fine.

25    (Oath administered to the witness)

1        DEPUTY CLERK:  For the record, can you please

2   state your full name and then spell your full name.

3        THE WITNESS:  My name is Steven Beck,

4   S-t-e-v-e-n, B-e-c-k.

5        THE COURT:  Thank you.  Go ahead, please,

6   Mr. Colbath.

7        MR. COLBATH:  Thank you, Your Honor.

8           STEVEN BECK, DEFENSE WITNESS, SWORN

9                  DIRECT EXAMINATION

10  BY MR. COLBATH:

11     Q.  Mr. Beck, for this portion, because we don't have

12  the jury here, we're actually going to refer directly to

13  your report.  And we're going to give limited testimony,

14  as I just told you in the hallway, to a particular area

15  of your report.  Do you have it there with you?  I would

16  refer you to page 14.

17     A.  Yes, I have my report.

18     Q.  Okay.

19     A.  Page 14.  Yes.

20     Q.  So at top of page 14, you refer to other sounds

21  in the area.  You see where I am on the report?

22     A.  Yes.

23     Q.  And when you were formulating your opinion or

24  making your comparison here, you based it upon heavy

25  machinery cutting and moving a large metal water tank.

1 If the tank were dropped onto concrete, the tank bumped

2 by a piece of construction equipment, the sound could be

3 loud enough to hurt your ears or up to as loud as

4 120 decibels.  You see where I am?

5  A.  Yes.

6  Q.  First of all, when something large or hard, or of

7 any size I guess, hard like concrete, like a piece of

8 construction equipment, something of that nature bumps a

9 metal tank, one of these big metal tanks like is

10 described at the water treatment plant, what is the

11 general characteristics of the noise that's made?

12  A.  Well, when something strikes metal, it is going

13 to excite, you know, vibrational modes, okay, resonances

14 in that metal structure.  And those main vibrational

15 modes are really characteristics of the thickness, the

16 size and the shape of that piece of metal.  So when

17 those start resonating, they produce a sound and it is a

18 very distinct and characteristic sound of that

19 particular piece of metal.

20   Those can be very loud.  I mean, I have been

21 around, you know, like a metal grate dropping on

22 concrete or on some other, you know, hard surface and it

23 has hurt my ears.  And I've been around other very loud

24 sounds, you know, from construction.  And I'm going to

25 make an educated guess based on reading, personal

1  experience that that can be as loud as 120 dB.

2     Q.  Let me give you some facts to assume that are

3  other than what were in your report.

4     A.  Okay.

5     Q.  So assume for me an empty metal tank that is

6  approximately a quarter-inch thick metal.  That it's

7  25 feet long.  That it is eight feet in diameter.  That

8  it has some holes or slits cut in it by a torch.  And

9  that it is struck by something that is the equivalent

10  of, say, a five-pound with the metal head or the head of

11  a hammer, a five-pound metal sledgehammer hits that

12  tank, 25 feet long, eight feet around, quarter-inch

13  diameter -- or excuse me, quarter-inch metal.

14        Explain that noise process and whether that could

15  be, as you describe in your report, up to a hundred --

16  could a sound like that reach up to as loud as 120

17  decibel or how would that be?

18     A.  So a good size sledgehammer, metal sledgehammer,

19  if it is struck against a metal object, like you

20  described, I'm going to assume that it was struck hard

21  enough to try and break something loose, so it would be

22  struck --

23     Q.  Like slag?

24     A.  Yes.  It would be struck very hard, and it is

25  going to excite those modes of vibration in that metal

1    that was struck.  And that ringing sound, like a bell or

2    like a gong or something, is going to be very, very

3    loud.  I mean, just the metal conducts vibration and it

4    conducts it very well, and it can produce sounds as loud

5    as 120 dB.

6         I know a number of reports that I've read that

7    talk about sounds from metal being struck being that

8    loud.  And then personal experience, I've heard sounds

9    that, as I say, have hurt my ears and that -- that

10   threshold of pain, and this is documented in a number of

11   textbooks, and like in Wikipedia, 120 dB is typically

12   considered to be the threshold of pain.

13   Q.  Now, in your report, of course what -- you had no

14   way because your analysis was done long after the fact,

15   you couldn't know the exact decibel of any of this noise

16   unless you were there and measuring it in realtime, I

17   assume?

18   A.  That is correct.

19   Q.  Is your analysis dependent on the sound being

20   exactly 120 decibels or is noise up to 120 decibels, is

21   there a scale there that you're simply trying to

22   quantify or explain?

23   A.  So what I really wanted to know at that time was

24   whether a sound produced in that general vicinity and

25   with that general amount of loudness could travel over,

1  say, 1,000 feet and still be heard.  So --

2    Q.  Hold on a minute.

3        MR. SKROCKI:  I would like to hear the rest of

4  it.

5    Q.  Can you -- in calculating whether that sound

6  could be heard, can you adjust that or certainly can you

7  say if the sound was 120 decibels, it would be heard,

8  you know, 1,000 feet away, it would be about this loud,

9  if it was 110, it would be about this loud?  I mean, you

10 can adjust --

11   A.  Yes.

12   Q.  -- depending on the noise of the sound of the --

13 excuse me, the noise of the -- the loudness of the sound

14 at the source would obviously create a difference at

15 its --

16   A.  In terms of how loud it was perceived.  So the

17 way sound travels is sound, when it is produced, it

18 tends to spread out equally in all directions.  So as it

19 goes further and further, it -- the sound level is

20 reduced.  Okay.  The further away it is, the quieter

21 that sound is.

22        And according to the physics laws of sound

23 propagation, we lose about 60 dB per doubling of the

24 distance, so there is a formula that we could use under

25 that standard spreading law on how loud something will

be at a given distance.

So I measured the distance, as an example, from the water treatment plant to a location -- well, the location that was described to me is where your witness was located when he claimed he heard a sound. And I wanted to find out could a sound generated at the water treatment plant be heard.

So I assumed a loud sound, like a metal, a loud metallic sound, I assumed 120 dB. I made my calculation. And according to spherical spreading law, over 1,000 feet would result in a 50 dB decrease in --

THE COURT: I'm going to interrupt here because I don't think this issue is disputed.

MR. COLBATH: That's fine, Your Honor.

THE COURT: Am I correct? The issue is the 120.

MR. SKROCKI: There's a lot of dispute with what he's talking about.

MR. COLBATH: So my follow-up, Your Honor, would be this.

BY MR. COLBATH:

Q. Mr. Beck, if the sound is -- rather than 120 decibel, it's 110, you just -- it's --

A. It's just subtracted.

Q. It's just subtracted.

1    A.   So it would be 10 dB less if it were 110 dB.

2    Q.   So there would just be an adjustment in noise?

3    A.   Yes.

4    Q.   And at some point, if the source was low enough,

5  it wouldn't be audible, but certainly 120 decibel is

6  just a level at which you started your analysis, not the

7  minimum level that it would take to hear the noise?

8    A.   Yes.  I made an assumption based on my general

9  experience on how loud something would be like a metal

10 grate and it hurts my ears.  So it's got to be in that

11 110 to 120 dB level.

12          MR. COLBATH:  So I think on this issue, Your

13 Honor, I would limit my questions for Mr. Beck to that.

14          THE COURT:  Thank you.  Go ahead, Mr. Skrocki.

15                  CROSS EXAMINATION

16 BY MR. SKROCKI:

17   Q.   Hello, Mr. Beck.

18   A.   Hello.

19   Q.   Welcome to Alaska.

20   A.   Thank you.

21   Q.   First trip?

22   A.   Yes.

23   Q.   Good for you.  Got some good weather.

24   A.   It's about 50 degrees cooler than where I live.

25   Q.   Well, that's good for us, so --

1    A.  Yes.

2    Q.  Anyway, welcome.  I've got a couple questions for

3  you, sir.  Mr. Colbath asked you some questions about a

4  25-foot long, eight-foot diameter metal tank with holes

5  and slits cut by a torch and a five-pound sledge, right?

6    A.  Yes.

7    Q.  None of those facts are in your report, are they?

8    A.  No, they are not.

9    Q.  Let's start with that.  Your report is based on

10  heavy machinery that was cutting and moving a large

11  metal water tank, right?

12    A.  That was according to a description of what may

13  have been happening during that timeframe.

14    Q.  Okay.  And if that wasn't happening, then that

15  just wasn't happening, so that --

16    A.  You mean if a --

17    Q.  It didn't happen?

18    A.  If a metal container was not being bumped or

19  moved or somehow any vibrational modes being excited in

20  that metal tank.

21    Q.  Okay.  So if there was no heavy machinery --

22  there was no evidence that any heavy machinery hit that

23  tank, then you would have nothing to examine, right?

24    A.  That was an example of how these loud modes of

25  vibration could be excited in a metal tank.

1    Q.  So --

2    A.  It could be by a hammer, or it could be by

3    someone throwing another piece of metal and hitting the

4    tank.

5    Q.  We'll get to some of that.  But I'm going to take

6    that answer as yes.  And if there was no tank dropped

7    onto concrete, which is -- your report was based on that

8    too, correct?

9    A.  Again, there are multiple ways of exciting these

10   modes of vibration in metal.

11   Q.  Okay.  Right.  But you based your report on a

12   water tank being dropped on concrete, right?

13   A.  Metal like a water tank.

14   Q.  Look at page 14 of your report for me.  Go to the

15   top where it says "other sounds in the area."

16   A.  Yes.

17   Q.  Do you see that?

18   A.  Yes.

19   Q.  And it says "if the water tank were dropped onto

20   concrete."  Do you see that?

21   A.  Yes.

22   Q.  "Or the tank was bumped by a piece of

23   construction equipment."

24   A.  Yes.

25   Q.  You see that?  The sound would be loud enough to

1  hurt your ears, right?

2      A.  Yes.

3      Q.  That's what you based your analysis on, those two

4  things?

5      A.  Okay.

6      Q.  Did you not?

7      A.  I would consider a hammer or something else a

8  piece of construction equipment, so I said some form of

9  construction equipment.  And it could be a large

10  wrench --

11     Q.  Really?

12     A.  -- could be banging against something.  I would

13  consider a wrench a piece of construction equipment.

14     Q.  What did you do over the noon hour?

15     A.  Over the noon hour today?

16     Q.  Yes.

17     A.  I went and had a salad.

18     Q.  Did you read anything from the hearing that we

19  had before we broke for the day?

20     A.  Did I read anything?

21     Q.  Did you read any transcript of the hearing?

22     A.  No.

23     Q.  Where did you come up with the bell or the gong

24  analysis?

25     A.  The bell or the gong analysis?

1    Q.  You testified that it -- like a bell or a gong?

2    A.  Yes.  That is because those are standard sounds.

3 If you look up the sound of ringing metal, typically

4 most of the image that comes to people's minds is a

5 bell.  Or it could be a gong or it could be sheet metal

6 or it could be a metal grate.

7    Q.  Where is bell or gong in your report?

8    A.  Yes.

9    Q.  Where is that in your report?

10    A.  So we talked about a large metal water tank

11 because that was the activity that was described to me

12 by the defense team when I started this analysis.

13    Q.  Okay.  So you assumed there was a loud sound that

14 hurt your ears, right?  That's what you based your

15 report on?

16    A.  Yes.

17    Q.  And if there was no loud sound, you have nothing

18 to base your report on, do you?

19    A.  If there was no loud sound, no metallic loud

20 sound that could propagate and be heard, well, then,

21 obviously, it would not be heard.

22    Q.  Over 1,000 feet?

23    A.  Yes.

24         MR. SKROCKI:  That's all I have, Judge.

25         THE COURT:  All right.  Thank you.  Any

1   redirect at all, Mr. Colbath, on this topic?

2           MR. COLBATH:  Well, not on this topic.

3           THE COURT:  Thank you, sir.  You may be

4   excused.

5           All right.  As Mr. Beck makes his way out, let

6   me ask you, Mr. Colbath, do you concur with my statement

7   that the applicable standard would be the preponderance

8   of the evidence a jury -- I'm trying to remember the

9   exact wording.  A reasonable jury -- that the Court

10  finds by a preponderance of the evidence that a

11  reasonable jury could find beyond a reasonable doubt

12  that there was a sound there.

13          Is that the standard, or what's your

14  articulation of it for conditional relevance to be

15  satisfied?  And if you need to take a moment --

16          MR. COLBATH:  I don't know if I have my

17  briefing in front of me that would tell me that, but --

18  Your Honor, I don't have my --

19          THE COURT:  All right.

20          MR. COLBATH:  -- conditional relevance brief

21  to -- it's -- certainly I believe I stated the standard

22  from our perspective in our submission.

23          THE COURT:  Right.  And I think we all agreed

24  on the standard is my recollection.

25          MR. SKROCKI:  For the record, I agree with

```
 1   that.
 2            THE COURT:  That we all agreed --
 3            MR. SKROCKI:  Yes, Judge.
 4            THE COURT:  I just need to find the standard,
 5   and I know it's in several of these orders.
 6            MR. COLBATH:  Your Honor stated that a jury
 7   could find by a preponderance of the evidence that there
 8   was --
 9            THE COURT:  No, I -- I -- let me find it,
10   because I just need to find it in here.  I'm trying to
11   remember the witnesses where I made conditional
12   relevance rulings.
13            MR. SKROCKI:  It was the April 19th video in
14   order --
15            THE COURT:  That's it.
16            MS. SHERMAN:  May be Docket 1211, which I think
17   was the order on that video.  I haven't opened it yet.
18            THE COURT:  There's just a lot of burdens of
19   proof in the standard and I want to articulate it
20   carefully here.  "Must introduce evidence that is
21   sufficient to support a finding that the jury could
22   reasonably find by a preponderance of the evidence."  So
23   I misstated it.
24            MR. COLBATH:  Could reasonably find by a
25   preponderance of evidence.
```

1    THE COURT:  That the jury could reasonably find

2  by a preponderance.  So the Court needs to make a

3  finding that's sufficient to support a finding that the

4  jury could reasonably find by a preponderance of the

5  evidence that at or about 7:12, there was a noise.

6    MR. COLBATH:  It would be our position that

7  there a loud metallic noise was made.

8    THE COURT:  All right.  Thank you.

9    MR. COLBATH:  And then it would be up to --

10  then our position would be it's certainly fodder for

11  cross examination that if the noise isn't 120 decibels,

12  but it's less, then it's -- can't be heard as far away.

13  Or if it's even less than that, if it's louder, it's

14  this far, or if it's lesser, it's this far.  If the

15  noise isn't that loud at all, it can't be heard at all.

16    And that's all degrees of Mr. Beck's testimony

17  for cross examination.  But the fact of there being a

18  noise I think is indisputable from Mr. Heckerman's

19  testimony.  He described the noise of banging on that

20  hard enough to knock slag off with a five-pound hammer.

21  And Mr. Beck I think has certainly said that that

22  fits --

23    THE COURT:  Well, what evidence was, and I

24  didn't really get inquiry in this, what's the

25  reliability of the method that was used by this expert

1    to determine that this tank would be 120 decibels?

2            MR. COLBATH:  He's not saying it would be

3    120 decibels.  He's saying it could generate noise --

4    metal generally could generate noise up to -- sounds up

5    to 120 decibels.  He's not -- he has no way -- he didn't

6    -- Judge, the tanks are gone.

7            THE COURT:  Right.

8            MR. COLBATH:  And he wasn't there at the time.

9    I mean, his chart -- Your Honor, the chart at page 12,

10   two pages earlier, of his -- of his --

11           THE COURT:  Oh, I see.  Okay.

12           MR. COLBATH:  So during his testimony, he's

13   going to say, you know, if you have sounds up to

14   120 decibels, a gunshot is actually louder than that.  A

15   gunshot -- he has tests that shows a .44-caliber

16   gunshot's 166 decibels, and all the way down to the

17   rustling of leaves.  So how noise travels and how loud

18   things are all -- are all a matter of how loud it is.

19           Because the tank -- because we weren't sure of

20   any exact sound at the water treatment plant, just a

21   general description of these big metal tanks being cut

22   up.  And certainly Mr. Rudat didn't describe how loud of

23   a sound he heard or any -- he didn't know the mechanism

24   of the sound.  It just sounded like a metal noise on

25   concrete.

1          So metal being hit or hitting something hard,

2    we're not going to purport to have Mr. Beck say it had

3    to be this loud or that loud or not this loud or that

4    loud or that it was this loud or that loud.  Simply that

5    here's the --

6          THE COURT:  That's not what I heard just now.

7    He was ready to opine 120, or maybe I misheard.

8          MR. COLBATH:  Your Honor, what he's going to

9    say is he gave -- he just used that as a measuring

10   stick, that, for instance, if a sound was 120 decibel,

11   that would be equated to the sound -- that would be loud

12   enough to hurt your ears, that would travel over

13   distance.  The metal sound would travel over distance

14   this far.

15         He will say if it was 110, it reduces by this

16   much.  If it was 100, it would reduce by this much.  And

17   he'll say certainly that he has no idea how loud any

18   sound was that was made that morning at the metal -- at

19   the water treatment plant because nobody could.  Those

20   sounds are gone, so --

21         THE COURT:  Okay.

22         MR. COLBATH:  And I did not have him do any

23   testing to try and recreate anything, because we weren't

24   sure of the exact sound being made, simply that --

25         THE COURT:  So what's the evidence that you can

point to by a preponderance on which a jury could
reasonably find that this was at 7:12 as opposed to
later?

MR. COLBATH:  Mr. Heckerman said that the
banging on the tanks could have been as soon as five to
ten minutes after, that he was there at 6:45, that they
staged their equipment and had their little five- to
ten-minute meeting before the alarm, so before 7:07 or
7:00 -- just after 7:00 when the alarm was tripped.

That the work discussion was had, the equipment
was on, the things were ready, and that as soon as
potentially five to ten minutes up to -- as he told
Mr. Skrocki, all the way up to 20 minutes later, at
7:30, they began this cutting and banging.  And that the
cutting and banging went on simultaneous.  One would cut
and one would bang.

Well, if it was five minutes after the 7:07
alarm, that's 7:12.  That's exact.  If it was ten
minutes and he's wrong -- if he's wrong by a minute or
two, one way or the other, you know, it's certainly
noise relevant -- I think it was actually 7:12 and many
seconds -- I'm not sure when Mr. Rudat -- we don't know
exactly when Mr. Rudat heard the noise because he
doesn't know when he was on camera.

We know when he walks by on the camera, but we

don't know that he heard the noise when he was on the
camera.  So we got a few minutes there, and we've
obviously got a few minutes one way or the other with
Mr. Heckerman.  And so, you know, it's not like
Mr. Heckerman said, "We were there and started work at
10:00 that morning."  I would agree.  Or if it was
limited to just the excavator loading the tank much
later, that would be one thing, but it's not.

THE COURT:  Thank you.

Mr. Skrocki, go ahead, please.

MR. SKROCKI:  Mr. Beck sat in that chair,
Judge, and said he based his report on a loud
120-decibel sound that would have hurt his ears like
metal banging on concrete.  That's been the whole
problem with this exam since we briefed it up.

He's saying, "This hurts my ears."  He has --
he needs to extrapolate it off of information provided
to him that it was either machinery hitting it or it was
being dropped on it.  Now we've got this -- now we've
got this spin that, oh, well, I guess construction
equipment does include a five-pound sledge, which is
absolutely ridiculous, and it is an unfair extrapolation
from his report.

There's no way for anybody to validate, you
know, what the basis of a loudness of a sound was.  And

particularly, he's guessing. He's making a personal
assumption that that hurts my ears at 120 dB, so that
must be what happened. And now we're going to go back
to, well, if it was a five-pound sledge and I'll just
adjust my assumption that it's going to carry
1,000 feet. And then it's going to -- I'm going to move
some more. It's going to override what Mr. Rudat is
going to be hearing.

　　　There's no way he can testify without impugning
Mr. Rudat's credibility about what he heard. It just
can't happen. That's going to be the insinuation, and
that's why they're calling this guy. But there's no way
for anybody to validate, let alone say, how do you know
it was 120 decibels. It's not in his report. And now
to come in here at the last day while the jury's waiting
to say now it's a five-pound sledge is -- we're just
making it fit.

　　　THE COURT: All right. Thank you.

　　　MR. SKROCKI: Yes, ma'am.

　　　THE COURT: I see that the SPI level he has for
120 decibels is a jet taking off at 60 meters. And it
is without -- I don't find that an opinion by this
witness, based on what I've heard at this point, that a
five-pound sledge hitting a 25-foot tank would create
100 decibels is based on reliable methodologies based on

1    what I've read in the report.

2            I agree with the government that a fair reading

3    of the report and the focus, at least in the briefing

4    that I recall on Mr. Beck being excluded, was the

5    concrete inner tie and the piece of construction

6    equipment, which I envision to be considerably larger

7    than a five-pound sledgehammer.  And that's how I

8    interpreted Mr. Beck's report.

9            So I don't see that it's based on reliable

10   methods for him to guesstimate the 120-decibel level.

11   And even there, the value of that testimony is limited,

12   because he indicates that if it was 120, then the

13   distance factored in, then it would likely be

14   recognizable over the Adele song noise level.  So there

15   are a number of additional qualifications in his

16   testimony.  But fundamentally, the 120, I don't see is

17   supported by a reliable method here.

18           With regard to the conditional relevance, I

19   think if the evidence were all viewed in the light most

20   favorable to the defense on this, there's some evidence

21   to support a finding that Mr. Heckerman hit the

22   sledgehammer at 7:12.  But when I look at all the

23   evidence that's been presented on this, particularly

24   the -- his kind of last thought about the military

25   police typically come right after the alarm goes off,

1   and it was possible, was all the witness could say, that

2   it would be within five to ten minutes in response to

3   repeated leading questions by the defense on that topic.

4           I don't see that a jury could reasonably find

5   that this noise, even if it were 120 decibels, occurred

6   at 7:12 or within a minute thereof or make that finding

7   by a preponderance of the evidence as required.

8           So that is my ruling on this topic.  The

9   defense can move to reconsider after Mr. Stearns

10  testifies.  But I do see that Mr. Beck's testimony

11  should not include this topic of the volume of the sound

12  that may have been up at the water treatment and the

13  level of whether or not Mr. Rudat could have heard it.

14          Certainly Mr. Beck can testify as to his -- the

15  sound -- the gunshots and how that would have sounded

16  relative to what Mr. Rudat described hearing.  But

17  talking about a potential sound from the water

18  treatment, I will exclude under the expert witness

19  evidence rules for the reasons articulated.

20          I also see under 403 that it should be excluded

21  because whatever probative value it could have, assuming

22  a reasonable jury could make these conclusions, and it

23  could potentially be 120 decibels, is really outweighed

24  by the issue of confusing the jury when the Court has

25  made the findings that it has with regard to the

reliability of that opinion and the lack of evidence to
support the timing, or the minimal amount of evidence to
support the timing of an alleged sledgehammer.

So let's take about five minutes, and then
we'll come back and hear from Mr. Beck.  Is that your
next witness?

MR. COLBATH:  Well, no, Your Honor.  I'm going
to wait now --

THE COURT:  Okay.  Fair enough.

MR. COLBATH:  You know, my plan would be -- at
least on the break what I was told was Mr. Stearns was
somehow en route in a vehicle to -- he was traveling in
the Lower 48 somewhere.  So I was told he was en route
in a vehicle to somewhere down south where the marshals
had secured him a ticket.  And assuming he made it to
the airport on time, he would be here after midnight
tonight so that I could call him as a witness tomorrow.

If I can call him tomorrow, I'm going to have
Mr. Beck stay and I'll make reapplication after
Mr. Stearns's testimony.  If Mr. Beck is allowed to
testify to additional things, he is.  If he's not, I'll
call him on the things that remain after the Court's
order.

THE COURT:  So who are we going to hear from
next?

1          MR. COLBATH:  So between Mr. Stearns and

2     Mr. Beck, I was going to be -- what I had -- I am going

3     to call Mr. Heinrichs then.  I have some --

4          THE COURT:  Take a few minutes.

5          MR. COLBATH:  At some point, I was going to

6     have to put some brief exhibits in, some photos.

7          THE COURT:  Why don't we take about five or ten

8     minutes and go from there.

9          MR. COLBATH:  Yeah, and I'll make sure -- it's

10    a half a dozen photos, and it will be a brief witness,

11    but that's --

12         THE COURT:  That fine.

13         MR. COLBATH:  I'll at least get that much done

14    and move things forward.

15         THE COURT:  That sounds fine.  Let's take about

16    five or ten minutes.  We'll go off record.

17         DEPUTY CLERK:  All rise.  Court stands in a

18    brief recess.

19         (Recessed from 2:12 p.m. to 2:27 p.m.)

20         (Jury present)

21         THE COURT:  Please be seated.  We're back on

22    record.

23         Mr. Colbath, your next witness, please.

24         MR. COLBATH:  Thank you, Your Honor.  I'm

25    actually going to call Mark Heinrichs, real briefly, if

```
 1    I could.
 2              THE COURT:  Certainly.  I don't have to tell
 3    you to remain standing.
 4              THE WITNESS:  No, ma'am.
 5              (Oath administered to the witness)
 6              DEPUTY CLERK:  For the record, can you please
 7    state your full name and then spell your full name.
 8              THE WITNESS:  Mark Heinrichs, M-a-r-k,
 9    H-e-i-n-r-i-c-h-s.
10              THE COURT:  Go ahead, please.
11              MR. COLBATH:  Thank you.
12              MARK HEINRICHS, DEFENSE WITNESS, SWORN
13                        DIRECT EXAMINATION
14    BY MR. COLBATH:
15       Q.  Mr. Heinrichs, where are you currently working?
16       A.  I currently work for the Federal Public Defenders
17    Office.  I'm a paralegal and investigator.
18       Q.  And in your work on this case, are you familiar
19    with what's been admitted for the jury here as
20    Exhibit 62?  That's the April 12th, 2012 long
21    surveillance video of the morning events there.
22       A.  Yes, I am.
23       Q.  And did you -- were you able to look at portions
24    of that video and make some shorter video clips?
25       A.  I did.
```

1    Q.  Can we show Mr. Heinrichs Defendant's Exhibit

2  No. 308.

3        And Mr. Heinrichs, this is part of Exhibit 62,

4  Government Exhibit 62; is that correct?

5    A.  That is correct.

6    Q.  Are you also familiar with the Exhibit --

7  Government Exhibit No. 105, which the jury has seen a

8  number of times?  It's the chart that lists where all

9  the -- many of the cars that were identified.

10   A.  Yes, I am familiar with that.

11   Q.  And is this a video clip that you made from

12 Exhibit 62?

13   A.  Yes, it is.

14   Q.  And is there a vehicle on the chart 105 that

15 corresponds with -- at least as far as the testimony,

16 with the vehicle that we're going to see here in this

17 clip?

18   A.  Yes, there is.

19   Q.  Who has it been testified to that this vehicle

20 represents?

21   A.  That was a white pickup truck, and it was James

22 Schilbach.

23        MR. COLBATH:  Your Honor, I'm going to move

24 DE-308.

25        THE COURT:  Any objection?

1          MS. STEVENS:  Yeah, how long is that clip?

2          THE WITNESS:  Two or three seconds.

3          MS. STEVENS:  No objection.

4          THE COURT:  All right.  Then DE-308 will be

5    admitted.

6          (Defense Exhibit No. 308 admitted.)

7    BY MR. COLBATH:

8     Q.  And so two or three seconds, we better watch

9    fast.  And that's the only vehicle depicted?

10    A.  That is correct.

11    Q.  Okay.  Because -- because the vehicle physically

12   went that fast, did you also create just still images of

13   it?

14    A.  I did.

15    Q.  And how are you able to do that?

16    A.  Quite easily, actually.  There's a program that

17   comes with Windows.  It's a movie and image viewer.  You

18   can just stop the movie as the video, as it's playing

19   along and then just click through individual frames and

20   save a copy of each individual frame.

21    Q.  So I'll show you Defense Exhibit No. 266 through

22   269.  Can you just -- 67, go ahead.  68.  69.  And there

23   is not another, correct?

24          All right.  And are those the still images that

25   you saved from the video?

1     A.  Yes, they are.

2          MR. COLBATH:  Your Honor, I would move 266

3     through 269.

4          MS. STEVENS:  No objection.

5          THE COURT:  Those will all be admitted.  Those

6     are defense, correct, Mr. Colbath?

7          MR. COLBATH:  Correct.  I'm sorry, Your Honor.

8     Defense Exhibit No. 266, 7, 8 and 9.

9          (Defense Exhibit Nos. 266, 267, 268 and 269

10    admitted.)

11    BY MR. COLBATH:

12    Q.  So that's the first -- is that the first screen,

13    Mr. Heinrichs, where you could see that white truck?

14    A.  That is correct.

15    Q.  And then the next one.  The next one.  And

16    there's a last one; is that right?

17    A.  That is correct.  Yes.

18    Q.  And then on the next frame, were you able to see

19    it?

20    A.  After this one?

21    Q.  Yes.

22    A.  No, it disappeared.  It was out of sight.

23    Q.  So now, as you watched Exhibit 62, the big

24    evidence video, did that truck appear after the clip we

25    just saw, does it appear again on the same video?

1      A.   It does appear again on the same video coming

2  down the opposite direction.

3      Q.   And so did you do the exact same process coming

4  back the same direction?

5      A.   Yes, I did.

6      Q.   Or excuse me, I guess the opposite direction?

7      A.   Correct.   Right.

8      Q.   Could you show Mr. Heinrichs 309, Defense Exhibit

9  No. 309.

10          And this one is roughly the same length?

11     A.   Yes, it is.

12     Q.   Same vehicle?

13     A.   Same vehicle.

14     Q.   As the chart indicated?

15     A.   As the chart indicated, it was the same vehicle.

16          MR. COLBATH:   Your Honor, I'd move 309.

17          MS. STEVENS:   No objection, Your Honor.

18          THE COURT:   309 is admitted.

19          (Defense Exhibit No. 309 admitted.)

20  BY MR. COLBATH:

21     Q.   And this one is fast as well?

22     A.   Yes, it is.

23     Q.   All right.   And did you again do the same process

24  then with it so that we could see it slower, do the

25  still images?

1      A.   I did.

2      Q.   And those are --

3           MR. COLBATH:  Your Honor, I'm going to show him

4    Defense Exhibit No. 270 through 274, so 71, 2, 3, 4.

5           THE COURT:  All right.

6           MR. COLBATH:  And I'll move for the admission

7    of those.

8           MS. STEVENS:  No objection.

9           THE COURT:  270 through 274 Defense exhibits

10   will all be admitted.

11          (Defense Exhibit Nos. 270, 271, 272, 273 and

12   274 admitted.)

13   BY MR. COLBATH:

14     Q.   This is the first where the vehicle is at all

15   visible?

16     A.   That's correct.  You can see the nose of it just

17   past the T-2 building protruding.

18     Q.   Okay.  The next one.  Just page through those if

19   you would.

20          And what is the time here, Mr. Heinrichs?

21     A.   7:09:12:46.

22     Q.   And that was also on Exhibit No. 2 -- excuse me,

23   Government Exhibit 62, the original video, that time

24   stamp remained throughout?

25     A.   Yes, that is correct.

         Q.  And you can take that down.  Thank you.  If you
would show Mr. Heinrichs Defense 305.

              Was there another vehicle that you were able to
identify from the chart, Exhibit -- Government Exhibit
No. 105, a red vehicle?

         A.  Yes, there was.  It was a
reddish-maroon-burgundy-ish type of a color.  It was a
pickup truck.

         Q.  All right.  And who was that associated with, at
least on the chart?

         A.  I believe it was Mr. Arthur Bors.

         Q.  Did you do this same process for Mr. Bors -- make
a clip of him driving by and some still images of that?

         A.  Yes, correct, I did.

         Q.  Did you make two of them like you did for
Mr. Schilbach?

         A.  He only went -- Mr. Bors only went in one
direction, so there's just the one video and then the
still images.

         Q.  If you'd look at Defense Exhibit No. 305.
Technical difficulties, potentially.

              We may have to reset the machine here, Your
Honor.

              (Pause)

         Q.  And that is the video you created, sir, or the

1  piece you took of Government Exhibit 62 with Mr. Bors'

2  vehicle?

3      A.  Correct.

4          MR. COLBATH:  Your Honor, I'm going to move

5  Defense 305.

6          MS. STEVENS:  No objection, Your Honor.

7          THE COURT:  305 is admitted.

8          (Defense Exhibit No. 305 admitted.)

9  BY MR. COLBATH:

10     Q.  That's it?

11     A.  That is it.

12     Q.  All right.  And last, Mr. Heinrichs, you said you

13  did that same process of just getting the still images

14  of that as well?

15     A.  Correct.

16     Q.  So if you could show him Defense Exhibit No. 301,

17  2, 3 and 4.  301 through 304.

18          Are those the frames, the relevant frames,

19  Mr. Heinrichs?

20     A.  Yes, they are.

21          MR. COLBATH:  Your Honor, I'm going to move 301

22  through 304.

23          MS. STEVENS:  No objection, Your Honor.

24          THE COURT:  Those are all admitted.

25          (Defense Exhibit Nos. 301, 302, 303 and 304

1  admitted.)

2  BY MR. COLBATH:

3     Q.  If you could just play those through quickly.

4  That's the first.

5     A.  Yes, it is.

6     Q.  Okay.  And again, that tail end there, that's the

7  last screen where it's depicted?

8     A.  Correct, yeah, just that little tail end of the

9  vehicle.

10    Q.  That's Defense Exhibit No. 304.  You can take

11 that one down.

12         MR. COLBATH:  That's all the questions I have

13 for Mr. Heinrichs.

14         MS. STEVENS:  No cross.

15         THE COURT:  All right.  Thank you, sir.  You

16 may be excused.

17         (Witness excused)

18         THE COURT:  And what's our update, Mr. Colbath?

19         MR. COLBATH:  Your Honor, unfortunately, as I

20 informed the Court earlier, my remaining two witnesses

21 for the day, with the travel issues that we had, are

22 going to have to be put back into tomorrow morning.

23         THE COURT:  Okay.

24         MR. COLBATH:  I have one witness that was going

25 to appear by video tomorrow morning that we're making

1  arrangements on, and then we'll recalibrate and have a

2  morning full of witnesses hopefully.

3          THE COURT:  All right.  So 8:30, is that a

4  reasonable starting time?

5          MR. COLBATH:  It is.  Well, we have the video

6  person scheduled at 9:00 so that the IT people could

7  plan a direct time.

8          THE COURT:  Oh, okay.

9          MR. COLBATH:  I could try to get -- a couple of

10  the witnesses are short, and so I could try to get

11  somebody in there.  But we have the video person set up

12  at 9:00 is what I did.

13          MS. SHERMAN:  We have a juror with a 9:00 a.m.

14  issue tomorrow.

15          THE COURT:  We do, yes.

16          MR. COLBATH:  So we need to start no sooner

17  than 9:00?

18          THE COURT:  No, that would be good.  Yes, yes.

19  So that's what we'll do.  I have to do --

20          MR. COLBATH:  For her benefit, I planned it at

21  9:00.

22          THE COURT:  There you go.  That's what we'll

23  do.  We'll end at noon.  I have to do a brief hearing I

24  think in Courtroom 4 at 9:30 in another matter, so I'll

25  head down the hall.  I'll move it down the hall, so it

should be about a ten-minute hearing I need to do in

another matter.  But we'll take a short break at that

time.  But I will do it down the hall.  So I'll just go

to Courtroom 4.

          MR. COLBATH:  I anticipate if we start our

video witness at 9:00, we may actually have two folks,

but that will be concluded by 9:30 if the Court needs to

break for that.

          THE COURT:  That's perfect.  All right.  And

then we'll conclude at noon and resume next week.  Is it

fair to say to the jury that transportation challenges

aside, that both sides anticipate having the evidence

concluded next week instead of the following?  Not to

put you on the spot, Mr. Colbath.

          MR. COLBATH:  I will certainly say we are ahead

of schedule even if -- barring a great storm, we're

ahead of schedule.  It's certainly possible that the

evidence may conclude from us next week.

          THE COURT:  I should say too, next Friday,

we're not going to have court at all, because of a --

the courthouse is going to be closed for -- where the

entire court staff is unavailable.

          MR. COLBATH:  I still expected potentially us

to be done before that, even knowing we're not going to

have court on Friday.  So we're ahead of schedule.

1          THE COURT:  All right.  Mr. Skrocki, any basis

2     to disagree with that?

3          MR. SKROCKI:  No, for once.

4          THE COURT:  Very good.  So ladies and

5     gentlemen, we'll have you at 9:00 tomorrow morning.

6     Please leave your notepads here.  Remember my admonition

7     not to discuss the case with family and friends.  I

8     regret that we were less than efficient today, but we

9     will make that up to you tomorrow morning in any event.

10         Have a good evening, and we'll see you at

11    9:00 a.m.  Thank you all.

12         (Jury absent)

13         THE COURT:  Please be seated, everyone.

14         All right.  So Mr. Skrocki, anything we can

15    take up this afternoon from the government?

16         MR. SKROCKI:  No, just scheduling.  We at this

17    stage don't anticipate a long rebuttal case, if any.  So

18    I would just like to know for calendaring purposes from

19    Mr. Colbath if he's going to wrap it up on Wednesday and

20    how the Court views if we get everything done Wednesday,

21    we do arguments Thursday or is that too much?

22         THE COURT:  No, I think that would be my

23    preference is to do arguments Thursday, realizing there

24    would be that three-day weekend then, but I still think

25    that would be preferable instead of waiting until the

1    following Monday.

2              MR. SKROCKI:  Yeah, it's a long -- it just

3    seems like it was a long wait before we got to it.

4              THE COURT:  Right.  And so, no, that would be

5    my thought assuming that's where we're at.  I mean, so

6    Mr. Colbath, what's your time assessment to the

7    extent -- is that realistic that the defense could

8    conclude by Wednesday?

9              MR. COLBATH:  It's a possibility.  If

10   everything concludes by Wednesday, rebuttal witnesses

11   and the evidence is concluded all by Wednesday, then it

12   would make sense to me if we can argue Thursday morning

13   to do that.  That is certainly possible.  I just don't

14   know how folks will be -- how things will turn out.

15             THE COURT:  Fair enough.  Then that's what

16   we'll look at.  And nothing else to take up from either

17   side I hear?

18             MR. SKROCKI:  No, ma'am.

19             THE COURT:  All right.  Very good.  Then we'll

20   see you, how about 8:45?  Be ready to go then.  We'll

21   make sure the video is all set up as well by then.

22             MR. COLBATH:  We'll do that early, Your Honor.

23             THE COURT:  All right.  Very good.  Then we'll

24   go off record at this time.

25             DEPUTY CLERK:  Court stands in recess until

1   8:45.

2              (Recessed at 2:46 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE

2      I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
3  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
4  original stenographic record in the above-entitled
   matter and that the transcript page format is in
5  conformance with the regulations of the Judicial
   Conference of the United States.

6

       Dated this 4th day of June, 2020.

7

8
                        /s/ Sonja L. Reeves
9                       SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25