```
 1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF ALASKA
 2

 3  UNITED STATES OF AMERICA, )
                             )
 4         Plaintiff,        )
                             )
 5  vs.                      )   CASE NO. 3:13-cr-00008-SLG
                             )
 6  JAMES MICHAEL WELLS,     )
                             )
 7         Defendant.        )
    _____)

 8

 9           TRANSCRIPT OF TRIAL BY JURY - DAY 15
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10             September 27, 2019; 8:47 a.m.
                     Anchorage, Alaska
11

    FOR THE GOVERNMENT:
12         Office of the United States Attorney
           BY:  STEVEN SKROCKI
13         BY:  CHRISTINA M. SHERMAN
           BY:  KELLEY L. STEVENS
14         222 West 7th Avenue, #9
           Anchorage, Alaska 99513
15         (907) 271-5071

16  FOR THE DEFENDANT:
           Office of the Federal Public Defender
17         BY:  GARY GEORGE COLBATH
           601 West 5th Avenue, Suite 800
18         Anchorage, Alaska 99501
           (907) 646-3400
19
           Camiel & Chaney, P.S.
20         BY:  PETER A. CAMIEL
           520 Pike Street, Suite 2500
21         Seattle, Washington 98101
           (206) 624-1551
22  _____

23              SONJA L. REEVES, RMR-CRR
              Federal Official Court Reporter
24               222 West 7th Avenue, #4
                 Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record
```

<u>I N D E X</u>

September 27, 2019, Trial Day 15

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Amanda Morales | 5 | 13 | -- | -- |
| Jarret Andrews | 15 | 22 | -- | -- |
| Frank Stearns | 23 | 35 | 42 | -- |
| Steven Beck (Recalled) | 59 | 100 | 105 | -- |

<u>E X H I B I T   I N D E X</u>

| Exhibit | | Page |
|---|---|---|
| DE-162 | CD T-2 Video Fortier | 8 |
| DE-163 | CD T-2 Video Andrews | 18 |

1          (Call to Order of the Court at 8:47 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court for the District of

5    Alaska is now in session, the Honorable Sharon L.

6    Gleason presiding.

7          THE COURT:  Good morning.  Please be seated.

8    We're on record in *United States versus Wells*.

9          And I was mistaken when I said I had a hearing

10   at 9:30.  It's at 9:00, but I'm going to be in Courtroom

11   4 and it should be approximately ten minutes, so I

12   apologize for that.  It was written on the calendar

13   correctly at 9:00, but then it had the Case Number 3:18,

14   and I saw 9:30.

15         MR. SKROCKI:  Not like any of us haven't been

16   there before.  Nothing from us.

17         THE COURT:  Mr. Colbath?

18         MR. COLBATH:  No as well.

19         THE COURT:  I'll be back as soon as practicable

20   and then we'll go from there and bring the jury in when

21   I'm done with the other proceeding.  Let's go off

22   record.

23         DEPUTY CLERK:  All rise.  Court stands in a

24   brief recess.

25         (Recessed from 8:48 a.m. to 9:16 a.m.)

1          (Jury present)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3    the United States District Court is again in session.

4          THE COURT:  All right.  Good morning, everyone.

5    Please be seated.  We're on record.

6          Do we have our witness here?

7          MR. COLBATH:  She's on, Your Honor.

8          THE COURT:  Very good.  Then Madam Clerk, would

9    you please administer an oath.

10         THE COURT:  Who do we have on the phone?

11         MR. CAMIEL:  Your Honor, it's Amanda Fortier

12   Morales.

13         THE COURT:  Ms. Morales, it's Judge Gleason

14   here.  We have you on video here in an Anchorage

15   courtroom and the clerk is going to administer an oath

16   to you.  We'll be recording your testimony.

17         Any questions about all of that?  Ms. Morales?

18         THE WITNESS:  Yes.

19         THE COURT:  Are you ready to proceed?

20         THE WITNESS:  Yes.

21         (Oath administered to the witness)

22         DEPUTY CLERK:  For the record, can you please

23   state your full name and then spell your full name.

24         THE WITNESS:  Amanda Lynn Fortier Morales,

25   A-m-a-n-d-a, L-y-n-n, F-o-r-t-i-e-r, M-o-r-a-l-e-s.

```
 1              AMANDA MORALES, DEFENSE WITNESS, SWORN
 2                        DIRECT EXAMINATION
 3     BY MR. CAMIEL:
 4         Q.   Good morning ma'am.
 5         A.   Good morning.
 6         Q.   Where are you testifying from?
 7         A.   Washington, DC, Metro.
 8         Q.   And you live in that area now?
 9         A.   Yes, sir.
10         Q.   Was there a time where you lived in Kodiak?
11         A.   Yes, sir.
12         Q.   When was that?
13         A.   From September of 2011 to June 2013.
14         Q.   When you were living in Kodiak, where were you
15     employed?
16         A.   Communication Station Kodiak, U.S. Coast Guard.
17         Q.   How long were you in the Coast Guard, your total
18     Coast Guard career?
19         A.   I had only joined the Coast Guard in January of
20     2011, so I had been a member nine months by the time I
21     reported to COMMSTA.
22         Q.   Are you still in the Coast Guard?
23         A.   I am not.
24         Q.   When did you leave the Coast Guard?
25         A.   July of 2017.
```

1    Q.  I want to ask you about April of 2012, and I

2    wanted to ask you in particular about April 11th of 2012

3    and where you were working at that time.

4    A.  Okay.

5    Q.  So what was your position then?  Where were you

6    working?

7    A.  I was an operation specialist third class.  I was

8    a communications unit watch stander, and I had reported

9    at 1900 hours on April 11th --

10    Q.  So that's --

11    A.  -- to watch.

12    Q.  So that's -- your shift started at 7:00 p.m. on

13    April 11th?

14    A.  7:00 p.m., yes.

15    Q.  And how long was your shift?

16    A.  12 hours.

17    Q.  Where -- so you worked in the T-1 building; is

18    that right?

19    A.  That's correct.

20    Q.  And what part of the building did you work in?

21    A.  On the secure deck.

22    Q.  And I think you mentioned watch stander.  So what

23    does that entail?

24    A.  Listening to radio communications throughout the

25    Alaska area, HF.

1    Q.  Who would -- so who was on duty on your shift

2   that night, if you remember?

3    A.  It was myself; OS3 Dylan Baker; OS3 Samuel

4   Gainer; OS2 Miller, I forget his first name; and then

5   OS1 Jason Bullis.

6    Q.  Who was the supervisor of the shift?

7    A.  OS1 Bullis.

8    Q.  What time did your shift end the next morning?

9    A.  We usually did watch relief somewhere between

10  7:00 and 7:15.  I believe I got relieved around 7:04.

11   Q.  After you were relieved, what did you do?

12   A.  I got into my vehicle and drove home.

13   Q.  What were you driving that day?

14   A.  A 2011 gray Chevy Equinox.

15   Q.  What route did you take -- when you leave the T-1

16  building, what route did you take to head home?

17   A.  I believe it's Anton Buskin, take a left and you

18  go down to the main road, Rezanof, and then I made a

19  left and then continued.  I lived in an apartment just

20  off Rezanof at the time.

21   Q.  We sent you a video to look at.  Did you get

22  that?

23   A.  I did.

24       MR. CAMIEL:  Your Honor, I'm going to offer

25  Defense --

1    BY MR. CAMIEL:

2        Q.   Let me ask you a couple questions.  Does that

3    video show you leaving on the morning of April 12th?

4        A.   Yes, I believe it does.

5        Q.   And where are you in the video when you appear on

6    camera?

7        A.   You don't see me personally, but I would be

8    driving that vehicle.  I would be the only person

9    driving that vehicle.

10       Q.   So we can see your car?

11       A.   That's correct.

12       Q.   That's your Chevy Equinox?

13       A.   That's correct.

14       Q.   What color?

15       A.   Gray.

16           MR. CAMIEL:  Your Honor, I would offer Defense

17   Exhibit No. 162.  We can put it up for foundational

18   purposes first so the government can see it.

19           THE COURT:  All right.  Go ahead.

20           MS. STEVENS:  Your Honor, no objection.

21           THE COURT:  Defense 162 is admitted.

22           (Defense Exhibit No. 162 admitted.)

23   BY MR. CAMIEL:

24       Q.   If we could play that.

25           (Defense Exhibit No. 162 playing in open

1  court.)

2  BY MR. CAMIEL:

3      Q.  Ma'am, when you were leaving the COMMSTA that

4  morning, did you see any fellow Coast Guard members

5  arriving for work?

6      A.  If I did, I didn't note anything out of the

7  ordinary.

8      Q.  As you passed the T-2 rigger shop, did you see

9  anything out of the ordinary?

10     A.  I did not.

11     Q.  Did you notice a blue vehicle there?

12     A.  I can't say that I paid attention to the vehicles

13  at the shop at that time.

14     Q.  When you were headed -- you said you took a left

15  on Anton Larsen Bay Road.  Did you see anyone as you

16  were driving down the road toward Rezanof?

17     A.  Yes, there was a jogger on the road.

18     Q.  And why is it that you remember that?

19     A.  Not something that I had recalled seeing before.

20     Q.  You went home after your shift.  When did you

21  first hear about the murders that had taken place up at

22  the T-2 building?

23     A.  I was awoken approximately 9:30 by multiple text

24  messages from acquaintances I had around the island or

25  throughout the Coast Guard wondering what was going on.

At that point, I still did not know the nature of what had occurred or who was involved, and I would not have that confirmed until I arrived back at work at 7:00 p.m. that night.

Q.  Once you started back to work again in the days following, did you notice whether there were FBI personnel at the T-1 building?

A.  Yes.

Q.  Where were they?

A.  They utilized our conference rooms and some of the staff offices.

Q.  Now, you said you were working on the ops deck. Did you see FBI personnel up on the ops deck?

A.  I did.

Q.  Did you overhear anything that they were doing?

A.  Not from them, no.

Q.  Okay.  Did you hear them listening to anything?

A.  Yes, I did.

Q.  What did you hear?

MS. STEVENS:  Objection, Your Honor; hearsay, calls for hearsay.

THE COURT:  Mr. Camiel?

MR. CAMIEL:  Can we have a brief sidebar?

THE COURT:  That's fine.  Yes.

(Begin bench conference.)

1        MR. CAMIEL:  I believe she's going to say she

2   could overhear them playing and replaying the voice

3   message that Mr. Wells left, so it's not for the truth

4   of the matter asserted, it's for the fact that people

5   working up there could hear this being played.

6        MS. STEVENS:  Well, the content of -- the way

7   that he posed the question was what did --

8        THE COURT:  It asked for hearsay.

9        MR. SKROCKI:  And foundation.

10        MR. CAMIEL:  I'm not going to ask her if it's

11   Mr. Wells' voice.

12        THE COURT:  She can say she heard voices, but

13   not the content.

14        (End bench conference.)

15   BY MR. CAMIEL:

16   Q.  Ma'am, without telling me the content of what you

17   heard, did you hear anything being played?

18   A.  Yes.

19   Q.  And again, without telling me the content, what

20   did it sound like?

21   A.  Phone call recordings.  Part of the equipment we

22   had on the secure deck as required by commandant

23   instruction was that we record all phone calls coming in

24   and out of the operation center.

25   Q.  Did it sound like a voice message?

1    A.   Some appeared to be voice messages and some

2  sounded like conversations.

3    Q.   And where were you in relation to where they were

4  playing the recording?

5    A.   In the radio booth.

6    Q.   So how far away from you were they?  They meaning

7  whoever was cueing up the recording.

8    A.   Across the deck, whatever the length of the deck

9  was, maybe 30 feet.

10    Q.   So you could hear it from 30 feet away?

11    A.   Not -- I could not hear word for word, no.

12    Q.   Were there other people on the deck who -- when

13  you were hearing this being played, were there other

14  people on the deck at the same time, other watch

15  standers or other crew members?

16    A.   Yes.

17    Q.   Do you know how many?

18    A.   The five of us.

19    Q.   Was this just one time that you heard this or did

20  it happen more than once?

21    A.   I'm sorry.  Can you repeat that?

22    Q.   Sure.  Did you hear the playing of this recording

23  or recordings just one time or more than one time?

24    A.   They were played more than one time, but I tried

25  not to listen.  I found the calls disturbing.

1          MR. CAMIEL:  Thank you.  That's all I have.

2          THE COURT:  Go ahead, please, Ms. Stevens.

3                    CROSS EXAMINATION

4   BY MS. STEVENS:

5      Q.  Good morning, Ms. Fortier.

6      A.  Good morning.

7      Q.  When you left that morning -- can you hear me

8   okay?

9      A.  I can.

10     Q.  When you left that morning, do you recall if you

11  were on the phone with your dad?

12     A.  I was.

13     Q.  Were you paying attention that morning as you

14  left?

15     A.  I regret to say I was not.

16     Q.  And you had just worked a 12-hour shift; isn't

17  that right?

18     A.  That's correct.

19     Q.  Were you fairly tired after that shift?

20     A.  Usually one is after staying up all night.

21     Q.  When you left the COMMSTA T-1 building and drove

22  past T-2, did you drive around the back and look behind

23  the back of the building?

24     A.  No, that would have been highly unusual for

25  anybody to do.

1    Q.  Okay.  You mentioned that you tried not to listen

2    in on some of the things that the investigators were

3    doing.  So you were being respectful of their

4    investigation; is that correct?

5    A.  I wouldn't say I was doing it out of respect for

6    the investigation.  More or less the content of the

7    calls were troubling.

8         MS. STEVENS:  I have no more questions.

9         THE COURT:  Follow-up?

10        MR. CAMIEL:  No.

11        THE COURT:  Thank you, ma'am.  You may be

12   excused at this time.

13        (Witness excused)

14        THE COURT:  What's our plan, Mr. Camiel,

15   Mr. Colbath?

16        MR. COLBATH:  Your Honor, if I can check real

17   quick, I think I will call Jarret Andrews.

18        THE COURT:  Take a moment.

19        (Pause)

20        THE COURT:  Good morning.  Come up on the

21   witness stand, please.  When you get up there, remain

22   standing and the clerk will administer an oath to you.

23        (Oath administered to the witness)

24        DEPUTY CLERK:  For the record, can you please

25   state your full name and then spell your full name.

```
 1              THE WITNESS:  Jarret Andrews, J-a-r-r-e-t,
 2    A-n-d-r-e-w-s.
 3              JARRET ANDREWS, DEFENSE WITNESS, SWORN
 4                    DIRECT EXAMINATION
 5    BY MR. COLBATH:
 6       Q.  Good morning, Mr. Andrews.
 7       A.  Good morning.
 8       Q.  Where are you from?
 9       A.  Originally?  Yeah.  Atlanta, Georgia.
10       Q.  Where are you joining us from today?
11       A.  Athens, Georgia.
12       Q.  What do you do back in Athens, Georgia?
13       A.  I'm a full-time graduate student in their MBA
14    program.
15       Q.  Prior to being a student, how were you employed?
16       A.  Coast Guard.
17       Q.  How long were you in the Coast Guard?
18       A.  2010 to 2018.
19              THE COURT:  Sir, can you get just a bit closer
20    to the microphone there.  Thank you.
21    BY MR. COLBATH:
22       Q.  Back in -- let's start back at the beginning of
23    your Coast Guard career.  Where were you stationed?
24       A.  Kodiak.
25       Q.  What was your time of service in Kodiak?
```

1    A.   September 2010 until April of 2012.

2    Q.   Okay.

3    A.   Or May of 2012, yes.

4    Q.   May of 2012?

5    A.   Yeah.

6    Q.   You were still in Kodiak on the island when the

7    murders that this case involves occurred?

8    A.   Yes.

9    Q.   Where did you work within the Coast Guard back at

10   that time?

11   A.   So I worked at the -- inside the Communication

12   Station, inside the secured space, which was the

13   operations deck or the command center.

14   Q.   And that was the secure building up at the top of

15   the hill?

16   A.   Yes.

17   Q.   And what was your position or what did you do

18   there on the operations deck?

19   A.   So I was just a communication specialist, so

20   third class.  Operation specialist was the actual rate,

21   but I worked in communications.

22   Q.   So were you one of the operators that was

23   performing work and operations there on the grounds, or

24   were you listening to communications from outside of the

25   COMMSTA?

     A.   Yeah.   We were listening to communications

outside of the COMMSTA.   We actually had booths set up,

glass booths where we had to keep the door shut and it

was soundproof.   There was three of those in addition to

a rotation out on the actual floor, depending on where

you were at in terms of career advancement.

     Q.   I want to take you back to April 12th of 2012.

Were you working the day that the incident here

occurred?

     A.   Yes.

     Q.   What would have been your shift that day?

     A.   It would have been dayshift, so it's 12 hours.   I

don't recall the exact timeframe I came in, but it's

12-hour shift so I would have been working the dayshift

that day.

     Q.   So you would arrive sometime around 7:00 in the

morning?

     A.   Correct.

     Q.   I'm going to show you -- can we show him Defense

163?

          Sir, you remember the kind of vehicle you had at

that time?

     A.   Yeah, it was a 2000 Ford F-150, green in color,

four-door.

     Q.   I'm going -- if you look at the video screen

 1   there in front of you, I'm going to show you a video

 2   real quick and see if you can identify the vehicle in

 3   this.

 4       A.   Yep, that's it.

 5       Q.   Okay.  And you see the date and time there on the

 6   top?

 7       A.   Correct.

 8            MR. COLBATH:  Your Honor, I'm going to move

 9   into evidence Defense Exhibit No. 163.

10            THE COURT:  Any objection?

11            MS. STEVENS:  No objection.

12            THE COURT:  163 is admitted.

13            (Defense Exhibit No. 163 admitted.)

14   BY MR. COLBATH:

15       Q.   We're going to play that up here so everybody can

16   see it.

17            (Defense Exhibit No. 163 playing in open

18   court.)

19   BY MR. COLBATH:

20       Q.   And so that was your vehicle, Mr. Andrews?

21       A.   That was my vehicle, yes.

22       Q.   And that would have been 7:14, about 7:14:14.

23   That would have been the time you were arriving to start

24   your dayshift that day?

25       A.   Correct.

1    Q.  And do you recognize where this video is taken

2  from or what's depicted here?

3    A.  Looks like it's the entrance to the Communication

4  Station because I can see the flagpole behind it and

5  that's where we -- yeah, it looks like the entrance.

6    Q.  Do you recall on that day as you're driving in at

7  7:14 seeing any activity here in the parking lot or the

8  area of the flagpole?

9    A.  No.

10    Q.  Did you see any vehicles that stood out to you,

11  particularly a small blue SUV?

12    A.  No.

13    Q.  Anything at all that struck you as out of the

14  ordinary or any observations at all I guess?

15    A.  The only thing that I saw was the jogger.  I

16  don't remember which direction he was headed in.

17    Q.  There was a jogger on the road somewhere?

18    A.  Yeah, he was on the road.

19    Q.  And do you remember what that road is called, the

20  road that you would have came to work on?

21    A.  I believe it was Anton Larsen.

22    Q.  Okay.  And so where in relation to, say, the

23  flagpole there that we just saw would this jogger have

24  been?

25    A.  He would have been closer towards the other side,

whatever road that main road is that's perpendicular to
Anton Larsen.  Whatever road that would have been.  He
was not -- he was closer towards the, yeah, that
perpendicular road as opposed to the COMMSTA entrance.

Q.  Back towards the direction of town?

A.  Correct.

Q.  Other than -- why was it that you made note of a
jogger?

A.  I just recall that from looking at my actual
statement, just recall, yeah.

Q.  All right.  You were interviewed and talked to
close in time to the incident back when you were still
in Kodiak I assume?

A.  Correct.

Q.  Let me ask you about -- although you worked up in
the operations desk, did you spend any time down in the
rigger shop or down with the people that worked down the
hill?

A.  Less than around half a dozen times maybe.  It
was all training, specifically upon arrival in 2010.

Q.  How about the gentlemen that were murdered,
Richard Belisle or James Hopkins, did you know them at
all or have any reason to associate with them other than
to see them at work?

A.  I did not.

1    Q.  How about Jim Wells, did you know Mr. Wells?

2    A.  Only had met Mr. Wells two to three weeks prior

3  to the incident.  He gave training in the basement of

4  the actual COMMSTA building.

5    Q.  So two to three weeks prior to April 12th?

6    A.  Correct.

7    Q.  And do you remember what the training was about

8  in the basement there at the COMMSTA that Mr. Wells

9  would have been giving?

10    A.  I do not recall.  It would have been professional

11  development of some sort in terms of antenna, how they

12  repair and maintenance.

13    Q.  Okay.  And was it -- who else attended from the

14  communications part that you remember, if you remember?

15    A.  Yeah, I do not remember.  It would have been -- I

16  would imagine it would have been all hands-type monthly

17  training or quarterly training, whatever it was at the

18  time, but I don't recall actual names.

19    Q.  And that had been, that occurrence, just a couple

20  weeks before April 12th was the first time you met Mr.

21  Wells?

22    A.  Correct.

23    Q.  And at that time, do you remember how he looked

24  at all?

25    A.  I just remember his beard.  That's the --

1    Q.  Can we show him, I think it's 17 maybe,

2  Government Exhibit 17.

3    A.  Correct.

4    Q.  Easy to remember that?

5    A.  Yeah.  Yeah.

6    Q.  Okay.  Did you ever see Mr. Wells back at the

7  time that you were working on the operations deck

8  physically up on the operations deck?

9    A.  I do not recall, no.

10    Q.  Do not recall seeing him there?

11    A.  No, I do not.

12       MR. COLBATH:  I think that's all the questions

13  I have for Mr. Andrews.

14       THE COURT:  Ms. Stevens?

15                   CROSS EXAMINATION

16  BY MS. STEVENS:

17    Q.  Good morning, Mr. Andrews.

18    A.  Good morning.

19    Q.  You just saw the video of your car driving past

20  T-2.  Did you happen to, outside of that screen, outside

21  of that video, go behind T-2 where the Conex box was?

22    A.  I don't think so.  I would have been in the front

23  parking.

24    Q.  What about the big utility truck there, did you

25  go look at that, see if there was anything over there?

```
 1      A.   No.
 2              MS. STEVENS:  Thank you.
 3              THE COURT:  Nothing further?
 4              MR. COLBATH:  No, I don't have any follow-up to
 5      that.
 6              THE COURT:  Thank you, sir.  You may be
 7      excused.
 8              (Witness excused)
 9              THE COURT:  Your next witness?
10              MR. COLBATH:  I believe we will call Frank
11      Stearns, Your Honor.
12              (Pause)
13              THE COURT:  Good morning, sir.  If you come up
14      to the witness stand.  When you get up there, if you
15      would remain standing, the clerk will administer an oath
16      to you.
17              (Oath administered to the witness)
18              DEPUTY CLERK:  For the record, can you please
19      state your full name and then spell your full name.
20              THE WITNESS:  Frank E. Stearns, S-t-e-a-r-n-s.
21              FRANK STEARNS, DEFENSE WITNESS, SWORN
22                      DIRECT EXAMINATION
23      BY MR. CAMIEL:
24      Q.   Good morning, Mr. Stearns.
25      A.   Good morning.
```

1    Q.   Mr. Stearns, where are you visiting us from?

2    A.   Missouri.

3    Q.   And when did you get here?

4    A.   Last night.

5    Q.   Was there a time where you lived in Kodiak?

6    A.   Yes, sir, for years.

7    Q.   What years did you live there?

8    A.   Last 30 years, 25 years.

9    Q.   When did you leave Kodiak?

10   A.   A couple months ago.  I bought a retirement place

11   in Missouri.

12   Q.   When you were living in Kodiak, how were you

13   employed?

14   A.   Plumber, welder, pipefitter.

15   Q.   How many years have you been doing that kind of

16   work?

17   A.   1972.

18   Q.   I want to turn your attention back to April 12th

19   of 2012.  You were living in Kodiak then?

20   A.   Yes, sir.

21   Q.   And who were you working for then?

22   A.   That would be Tundra Plumbing.

23   Q.   And was there a particular job that you were on

24   on April 12, 2012?

25   A.   The Kodiak Coast Guard water plant.

1    Q.   Where was that located?

2    A.   Up Buskin River Road toward the golf course.

3    Q.   Is it up near the COMM Station?

4    A.   Yes, sir.

5    Q.   What kind of work were you doing up there?

6    A.   Demoing three big steel filter tanks.

7    Q.   And how long a period of time did you guys work

8    on that job?

9    A.   Over two years.

10   Q.   I want to show you a picture that's been admitted

11   as Defense Exhibit No. 310.  I think this was admitted

12   yesterday.

13            THE COURT:  Yes.

14   Q.   Do you see one of the water tanks you were

15   working on?

16   A.   Yes, sir.

17   Q.   Is that this structure right here?

18   A.   Yes, sir.

19   Q.   Can you tell us generally what were you doing to

20   those tanks?

21   A.   There was three of those tanks, I believe, and

22   they were filters for the water plant.  And we demoed

23   those and then put in four big Tonka water filters.

24   Q.   And to demo those, how did you go about doing

25   that?

1    A.   First off, they are full of sand.  We had to pump

2    them all out.   Then the bottom half is full of concrete.

3    And then we skip cut all the way around them.   And then

4    we split the tanks in half.   There is about six, eight

5    feet sticking inside the building, so we split them in

6    half and pulled them out of the building.

7    Q.   I want to talk to you about April 12th, that

8    morning.   All right.   Do you remember that morning?

9    A.   If that's the morning in question, yes.

10   Q.   And you recall that you heard about murders that

11   took place up at the COMM Station?

12   A.   Yes.

13   Q.   So I want to talk about that morning, April 12th.

14   What time did you get to the water treatment plant that

15   morning?

16   A.   In the neighborhood of 6:30.  We always get there

17   half hour for just morning coffee with the boys before

18   we start.

19   Q.   What was your position on the crew?

20   A.   General foreman.

21   Q.   And how many members of the crew did you have up

22   there working?

23   A.   I had five or six at least, if not more.

24   Q.   All right.  Was that, April 12th, going to be a

25   slow day or a busy day or do you remember?

1    A.  No, we had prepped for that day for a week or

2  two.  That was a big day.  We were pulling the tanks

3  that day.

4    Q.  All right.  So you said you got there, what,

5  about 6:30?

6    A.  In that neighborhood, yes, sir.

7    Q.  When you first arrive, are you the first one

8  there?

9    A.  I can't honestly tell you if I was or not.  We

10  all get there about the same time.  I don't know if

11  somebody was there before me or not.  I can't honestly

12  say that.

13    Q.  Now, what do you do when you first get there?

14    A.  Usually, as a rule, we have the keys to the -- I

15  have to open the building.  And then as soon as you open

16  the building inside, there is a keypad like everybody

17  has on their garage door.  I set the keypad, that opens

18  the building.  And then we basically get prepared for

19  the day, just make sure -- you got to check the

20  equipment, just what you do every morning.

21    Q.  Is there some kind of an alarm system on the

22  building?

23    A.  Yes, sir.

24    Q.  What do you have to do with that?

25    A.  As soon as you unlock the key, you got X amount

1  of time to push the code.  I think our code is real

2  easy, like 1234, or something, a construction code.

3      Q.  So that morning when you get there, before you

4  did the code to the alarm, did you do any preparations

5  for work?

6      A.  You have to call, get a burn permit, and then you

7  have to get things going, just get trucks running and

8  welders running.

9      Q.  Tell us what you actually have to do.  What do

10 you have to get running and how do you do that?

11     A.  Well, you got air compressors.  You got a couple

12 welders you got to get running.  You got to check the

13 oils.  Just the guys running the equipment have to check

14 their oils, get their equipment up and running, get

15 everything warmed up, get your safety gear out, make

16 sure you got a burn plan, fire extinguishers, things

17 like that.

18     Q.  That's all stuff that you're doing before you

19 turn off the alarm and start the work?

20     A.  No, I turn off the alarm as soon as I get there

21 because people have to come and go.  And then I call the

22 fire department as soon as I get there, because we were

23 usually, people that have the everyday alarm, that's the

24 ones the fire department does first, and then they come

25 and quiet your alarm.

1    Q.  All right.  That morning, after they quieted the

2    alarm, were you guys up and ready to go?

3    A.  Yes, sir.

4    Q.  What does that mean?  What did you actually start

5    doing right after they turned off the alarm?

6    A.  The idea was to pull tanks as fast as we could.

7    We skip cut them, so then we hook the excavator to them

8    with cables and safeties and all that stuff, and the

9    operator approves it, and then we start cutting it.  And

10   you just start peeling that tank backwards until you got

11   it open.

12   Q.  You mentioned something about skip cut.  Can you

13   tell us what that is?

14   A.  Well, we had been there for three or four days.

15   We got the tanks all ready, so we go around them, draw a

16   line about in the middle of them, then cut six or eight

17   feet and then leave two or three inches, and cut six or

18   eight feet and leave two or three inches for safety so

19   that tank can't roll on nobody or slide.

20   Q.  So you had done all of that before April 12th?

21   A.  Yes, sir.

22   Q.  So on April 12th, when you start work, tell us

23   what you do at that point.

24   A.  Well, basically, once the excavator is hooked up,

25   we start right where the excavator is sitting on the end

1  of the tank.  He's got his hook on there and he's

2  lifting and we just start cutting.  Then there is

3  usually one cutter and one apprentice that you cut and

4  then the guy with the sledge hammer beats it.

5         As you go down the tank, the excavator starts to

6  open up the gap and just walk through the tank that way.

7     Q.  Do you remember how many excavators you were

8  using on that job?

9     A.  If I remember correctly, there was one to pick

10  and one to jack hammer the cement out of the tanks after

11  we got the top off of them.

12     Q.  You had two different excavators then?

13     A.  Yes, sir.

14     Q.  And you mentioned the skip cuts.  And so that

15  morning, if I understand what you're saying, you're

16  going around and you're cutting the sections that hadn't

17  been cut yet?

18     A.  Yes, sir.

19     Q.  And what are you using to cut that?

20     A.  Oxygen acetylene.

21     Q.  You said something about somebody doing something

22  with a hammer.

23     A.  Beats the slag.  When you cut, these are rolled

24  tanks, they got rust inside and the water, the film or

25  whatever you want to call it inside, so as you cut, you

get it hot, sometimes you have to beat it to knock the
slag off the inside so the torch will walk through.

Q. When somebody is beating on that tank with a
sledge -- first of all, what kind of a sledge are they
using?

A. Five-pound, three-pound, whatever, it's up to
their choice. They are good-size sledge hammers. They
are not little hammers. Usually it's a one-handed
hammer where somebody can stand up there and beat on the
tank.

Q. So this is bigger than that, you need two hands?

A. No. I mean, I don't actually remember which
hammer they used that day, but they were three-, four-,
five-pound sledge hammers swinging.

Q. What kind of a sound does it make when that tank
is being beat on with that sledge hammer?

A. Very loud. That tank is empty. It's hollow. It
rings.

Q. Are you all wearing any kind of ear protection --

A. Oh, yes, sir.

Q. -- when you're doing this work?

A. Yes.

Q. What are you wearing?

A. Most of us wear earplugs. Some guys wear muffs.

Q. And so are you trying to -- you're talking about

trying to get the top off the tank.  Were you doing this

work -- are you doing the work inside the building or

outside the building?

    A.  There is very little inside the building.  The

tanks are rounded on the end like you see in the

picture.  It protrudes inside the building just a couple

of feet where the connections for the tank go to the

water plant.  Yes, there is several feet inside the

building, but 99 percent of the tank is outside.

    Q.  All right.  So how soon after the alarm is turned

off do you think it was that somebody was cutting on the

tank and banging on the tank with a hammer?

    A.  I would say instantly, but that's not a real

number.  I mean, as soon as she said, "Yes, you can

burn," I had crews working.  I mean, I can't give a

minute, but when she turned the alarms off, I put the

boys to work.  That I'm sure of.

    Q.  And was there a reason why you wanted to get them

to work right away?

    A.  We were paying Brechan because we were renting

all their equipment that day, and my boss was paying

that bill.

    Q.  What's the equipment that was being rented?

    A.  I believe there was two excavators.  We had a

lowboy to haul the tanks away.  That kind of big

equipment.  We don't own big equipment; we rent from
Brechan.

    Q.  At some point that morning, did police officers
or law enforcement show up to talk to you?

    A.  Yes, sir.

    Q.  And did you talk to them?

    A.  Yes, sir.

    Q.  And did you see them talking to other members of
the crew?

    A.  They basically separated us when they got there.
We had no idea what was going on.  They basically just
came in there and said, "Shut down all work," and kind
of just stand around, not next to each other, not miles
or nothing, just there's a big yard there.  They just
kind of went around and talked to each person.

    Q.  After that, after the police were there, did they
leave and come back?

    A.  Yes, sir.

    Q.  What happened when -- first of all, when did they
come back?

    A.  Like I said, I don't have exact timeframe, but
still within the morning.  I mean, not long after or
long like that.

    Q.  When they came back, what happened?

    A.  He asked us how much noise we were making.  You

 1   know, we told him, and he said, "Can you repeat," or I

 2   forget the exact word, but, "Can you make that noise

 3   again?"  I said, "Yeah, I got two more tanks to come

 4   out.  Yes, I can repeat the noise."

 5       Q.  All right.  And so what did you do to repeat the

 6   noise?

 7       A.  We kept working and he listened, I mean, because

 8   we were beating on the tanks and cutting them, and we

 9   did exactly what we were doing on the first tank.

10       Q.  All right.  When you were doing that, what did

11   you see the police officer do?

12       A.  This one was talking on the radio.  Of course, by

13   then the rumors were flying.  We all kind of figured he

14   was trying to figure if they could hear us.  We had no

15   idea where anything had happened yet.

16           MR. SKROCKI:  Objection; speculation.

17           THE COURT:  That's sustained.  Go ahead.

18   That's fine.  He'll ask the next question.

19   BY MR. CAMIEL:

20       Q.  Without telling us what anybody said, did you see

21   a police officer using the radio while you were

22   replicating the sounds that you had made earlier that

23   morning?

24       A.  I would say yes.

25       Q.  How long were the police there that second time

to have you go through this demonstration of the noise
that you made earlier?

    A.  He was talking to us four or five minutes,
something like that, but they were in and out all day
that day.

        MR. CAMIEL:  That's all I have for you.  Thank
you, sir.  I think the government attorney will have
some questions for you.

        THE COURT:  Go ahead, please, Mr. Skrocki.

CROSS EXAMINATION

BY MR. SKROCKI:

    Q.  Good morning, Mr. Stearns.

    A.  Good morning.

    Q.  I'm Steve Skrocki with the U.S. Attorney's
Office.  How are you?

    A.  Good.

    Q.  Okay.  You're from Missouri?

    A.  Yeah, just bought a retirement home there.  I
still work in Alaska, but I'm getting that set up.

    Q.  Congratulations.

        I'm going to take you back to April 12th.  You
seem to be a professional at what you do, sir?

    A.  Yes, sir.

    Q.  Okay.  And you had a big job you were going to do
in Kodiak with respect to these water filters?

1     A.  I couldn't hear you, sir.

2     Q.  You have a big job you were going to do with

3     respect to these water filters at the Communication

4     Station?

5     A.  Yes, sir.

6     Q.  You mentioned that you were aware of what had

7     gone on that morning?

8     A.  We had no idea what had happened.

9     Q.  Later on?

10    A.  All of a sudden the troopers showed up.  We had

11    no idea.

12    Q.  Sure, but later on you knew that two people had

13    been murdered at the Communication Station?

14    A.  Yeah, rumor mill was flying shortly after that.

15    Q.  Sure.  You were asked a lot of sort of broad

16    questions about work being started and things, and I

17    want to focus you on what happened that particular

18    morning, if you recall.  Okay?

19    A.  Yes, sir.

20    Q.  So did you trip the alarm in that water treatment

21    plant that morning?

22    A.  No, we never tripped it.  When I listened to your

23    tape, I'm calling to get the fire alarm shut off, which

24    has to be -- I can't burn until I have a burn permit and

25    I can't have a burn permit until they secure the

1  building and the fire department knows that that

2  building is off.

3      Q.  Okay.  So you mentioned the tapes.  You were

4  interviewed by the FBI, right?

5      A.  Yeah, I think so, yes.

6      Q.  Your interview was recorded?

7      A.  Yes.

8      Q.  Sure.  I'm just --

9      A.  I don't want to use the wrong word, but, yeah,

10  that's what I think.

11     Q.  Nobody wants you to do that.  That's not a

12  problem.  But you listened to your recording this

13  morning before coming into court?

14     A.  Yes, sir.

15     Q.  And so maybe I'm under a misimpression, but the

16  alarm -- you had to call in to somebody to get

17  permission to start work?

18     A.  You have to call in to have the fire alarm shut

19  off every day.  You have to have it turned on every

20  night when you leave.

21     Q.  So you have to call in and then they turn off the

22  alarm and then you go in to start your work?

23     A.  They show up at the job and silence the alarm,

24  yes, sir.

25     Q.  Do you recall what time that happened that

morning when you called in and they turned off the alarm

for you to start your work?

A.  Not exact time, but according to the tape -- it

was on the tape.  I think I heard it.

Q.  What do you recall -- what do you recall that

was?

A.  I think 7-7 or something it said this morning, or

7:00, something like that.

Q.  Does that jibe with your recollection?

A.  Yeah, they are pretty good about being there at

7:00, so 7-7, we wouldn't call that late.  They have

other things to do too.

Q.  You mentioned that these tanks were pretty large

and you had already precut around them to some extent?

A.  I don't understand.

Q.  You mentioned these tanks, to remove bits and

pieces of them, you had already cut them with a torch?

A.  Yes.  We skip cut, yes.

Q.  Skip cut.  That's not something I have ever done

in my life, so I don't know your language.  So you skip

cut them.

     And if I understand you right, the point of the

skip cut was to get an excavator and pull them apart?

A.  It's for safety so that we get 90 percent of the

work done before we're paying for the excavator.

1    Q.   During this work, you want to wear hearing
2    protection, right?
3    A.   Yes, sir.
4    Q.   Is that mandated by law or is it just a smart
5    thing to do?
6    A.   By OSHA it is, yes, sir.
7    Q.   All right.  Do you know Mr. Wilton Nelson?  Do
8    you remember him?
9    A.   I don't know if I do or not.  I meet a lot of
10   guys and work with them.
11   Q.   And do you recall what time the excavator showed
12   up that morning to begin this work?
13   A.   I think the first excavator was there the day
14   before and then the second one I think came in on the
15   lowboy that took the tank out, the first tank when we
16   got done.
17   Q.   And did any of the excavators get fired up before
18   7:30?
19   A.   Yeah, Chris Dietz was running them, and he fires
20   up as soon as he gets there.  He's got to get everything
21   warmed up and check oils.
22   Q.   But did any actual work on the tanks by an
23   excavator begin before 7:30 or around there?
24   A.   As soon as she gave me the burn permit -- I'm
25   sure we were hooked up waiting for her.  And then once I

had the burn permit, I'm sure I went to work, which I
can't honestly say what time that was.

Q.   Because, yeah, I mean you can't say honestly what
time you started work?

         MR. CAMIEL:  Argumentative.

         THE COURT:  Let's hear the question.  Go ahead.

BY MR. SKROCKI:

Q.   Can you honestly tell the jury here what time the
pounding work began that morning on April 12th?

A.   As soon as I got the burn permit, we went to
work.  On your tape it said what time I got the burn
permit, I think, and I'm sure once she gave me my burn
permit, I said go and we started.

Q.   That was 7:10?

         MR. CAMIEL:  Your Honor, object; he's
misstating the evidence.

         THE COURT:  That's sustained.

         MR. SKROCKI:  I'm not misstating any evidence.

         THE COURT:  Excuse me, Counsel.  I said the
objection was sustained.  Let's hear your next question.

         MR. SKROCKI:  Yes, Your Honor.

BY MR. SKROCKI:

Q.   Do you have any independent memory of when you
obtained the burn permit, sir?

A.   No, other than -- I wouldn't even have thought

1   about it.  Until I heard that tape this morning, I

2   wouldn't even have thought about it because it's

3   something we do every day.

4       Q.  Do you have any independent memory of actually

5   when specifically the work on those tanks started that

6   morning?

7       A.  Just the fact that I would have gone to work as

8   soon as I got it.  I mean I got a whole crew sitting

9   there standing by.

10      Q.  I think I understand.  Do you remember Martin

11  Heckerman?

12      A.  Oh, yeah, Marty, yeah.

13      Q.  What was his job that day?

14      A.  He was an apprentice back then.

15      Q.  Do you remember him as being a good guy?

16      A.  Oh, yeah.  I have known Marty for years.

17      Q.  Would you have any reason to disagree with him if

18  he testified --

19          MR. CAMIEL:  Your Honor, I'm going to object.

20          THE COURT:  That's sustained.

21  BY MR. SKROCKI:

22      Q.  You were interviewed by the public defenders in

23  this case, correct?  Do you remember that, an

24  investigator from the public defenders?

25      A.  When they came to Kodiak a couple months ago?

1     Q.   Yeah.

2     A.   Yes, sir.

3     Q.   You were interviewed with Marty Heckerman; do you

4  remember that?

5     A.   Yes, sir, me and Marty were working at the

6  airport together when they showed up.

7     Q.   They interviewed you at the same time, didn't

8  they?

9     A.   Once again, I would say I think so.

10     Q.   When the police came the morning of April 12th,

11  were you all interviewed separately?

12     A.   Yes, sir, he took -- you know, not real separate,

13  but he kind of stood everybody -- yes.

14         MR. SKROCKI:  That's all I have for

15  Mr. Stearns.  Thank you, sir.

16         THE COURT:  Redirect?

17              REDIRECT EXAMINATION

18  BY MR. CAMIEL:

19     Q.   Mr. Stearns, did the FBI show up at your hotel

20  room this morning?

21     A.   Yes, sir.

22     Q.   Was it a surprise?

23     A.   No, because I had a text last night when I came

24  in that they wanted to talk to me here because I told

25  them you were picking me up, or I was supposed to meet

1  you here.  I don't know who I talked to, but they were

2  going to give me a ride, and I told that to those

3  gentlemen and they showed up and let me hear that tape.

4     Q.  Did they show you a transcript of the recording?

5     A.  No, sir.

6     Q.  Do you remember hearing a time in the recording

7  of when the tape was turned off -- excuse me, the alarm

8  was turned off?

9     A.  I think that's where I got the 7:10 or 7-7 from

10  you.  I think I did hear that.

11         MR. CAMIEL:  Your Honor, I'm going to ask to be

12  able to show the witness something to refresh his

13  memory.

14         THE COURT:  I thought he just -- what does he

15  not remember, Mr. Camiel?

16         MR. CAMIEL:  He said 7:07 or 7:10, and I wanted

17  to show him the transcript from the recording.

18         THE COURT:  Okay.

19         (Mr. Camiel approaches witness)

20  BY MR. CAMIEL:

21     Q.  Does that -- Mr. Stearns, does that look like a

22  page -- in looking at that, does that look like part of

23  the transcript of the recording they played for you this

24  morning?

25     A.  Except I can't turn the fire alarms off.  I can

```
 1   turn -- I can turn the burglar alarm, whatever the word
 2   would be, but I can't touch the fire alarms.
 3       Q.  Is there a time there that helps you remember
 4   what time the alarm was turned off?
 5       A.  7:07.
 6            MR. CAMIEL:  Thank you.  I don't have any other
 7   questions.
 8            THE COURT:  All right.  Anything further?
 9            MR. SKROCKI:  No, Your Honor.
10            THE COURT:  Thank you, sir.  You may be
11   excused.
12            (Witness excused)
13            THE COURT:  Your next witness, Mr. Colbath?
14            MR. COLBATH:  Your Honor, could we have a brief
15   sidebar about my next witness?
16            THE COURT:  Yes.  Ladies and gentlemen, why
17   don't we have you take your break right now so I can
18   take up some issues here.
19            If you would leave your notepads in the
20   courtroom and remember my admonition not to discuss the
21   case and we'll see you shortly.
22            (Jury absent)
23            THE COURT:  All right.  Please be seated.
24            Mr. Colbath, go ahead, please.
25            MR. COLBATH:  Thank you, Your Honor.  I just
```

1    wanted to alert the Court that my next witness is

2    Mr. Beck, and so given the updated testimony or the

3    additional testimony of Mr. Stearns in conjunction with

4    the testimony that was offered yesterday, before I had

5    indicated that I could make application to have Mr. Beck

6    talk about not only the matters of the gunshots and the

7    difference of gunshot and metal noise and matters from

8    T-2, but also from potentially noises emanating from the

9    water treatment plant.

10           It's our position that in light of Mr. Stearns'

11   additional testimony, he testified work began

12   immediately after the alarms were shut off, he testified

13   that was 7:07, that crews were prepared and standing by.

14   I think it is also -- I would ask the Court to consider

15   that under Mr. Stearns' testimony, law enforcement came

16   back that morning and asked them specifically about the

17   noises that were made there and asked them to replicate

18   or go back and to continue with those noises and

19   apparently had some concern.

20           We don't have any law enforcement reports on

21   that.  We learned about that from Mr. Stearns, but at

22   least there appeared to be some concern about the noise

23   by law enforcement itself in the investigation that

24   morning.  And so we believe there is at least sufficient

25   evidence at this point to meet the conditional relevance

1   standard that the jury could believe starting any time

2   7:07 and beyond that loud noises could be made from or

3   heard from the water treatment plant, potentially heard

4   from the water treatment plant.

5          Of course, it will be up to them whether they

6   determine any noises were heard from that.  I wanted to

7   make that application and get that clarification from

8   the Court before I called Mr. Beck.

9          THE COURT:  Thank you.

10         Mr. Skrocki?

11         MR. SKROCKI:  Yes.  First, apologies to you and

12  Mr. Camiel for my response.  I've got this head cold.  I

13  thought -- I understand where my error was.  I thought

14  it was -- I said 7:10, but I wanted to say 7:07, so my

15  apologies.

16         THE COURT:  That's all right.

17         MR. SKROCKI:  The issue here is twofold.

18  Mr. Stearns' testimony is contradicted by Mr. Heckerman

19  to some extent with the excavator contradicted by

20  Mr. Nelson.  He doesn't seem to have a real clear

21  recollection of what happened.

22         I know he's trying the best he can, but as to

23  his information, it is contradicted by Mr. Heckerman

24  clearly.  The bigger issue though, as you focused on

25  yesterday, was methodology.  There is no methodology to

1   Mr. Beck's analysis as to the decibel level of the

2   sound, and I think that's the more critical focus that

3   you have not heard anything to rebut that at this stage.

4         So we would request his testimony as to the

5   sounds emanating from the water treatment plant be

6   excluded per your order yesterday.

7         THE COURT:  Mr. Colbath?

8         MR. COLBATH:  Well, Your Honor, I didn't put on

9   -- Mr. Beck has -- I mean his report contains the

10   algorithms, the calculations, how metallic sounds

11   propagate, how they lose by decibel over distance.

12         THE COURT:  What evidence has there been in the

13   record that a sound as loud as 120 -- I mean 120, a jet

14   60 meters away -- I'm just struggling, Mr. Colbath with

15   this individual's expertise to say yes, based on the

16   fact that there was construction 1,000 feet away I can

17   say, if it was 120, he would have heard it.  There needs

18   to be some --

19         MR. COLBATH:  Your Honor, if the Court looks at

20   the chart that Mr. -- in Mr. Beck's report.

21         THE COURT:  I have it right here.

22         MR. COLBATH:  And if you note, immediately

23   below that at 110 decibels is construction noise at

24   16 meters away.  Mr. Beck is not going to say that the

25   noises emanating from the water treatment plant were

120 decibels.  What he's going to say -- the 120-decibel
figure is simply he has to pick some volume of sound
from which to start the measurement.  And of course,
it's impossible without anybody --

THE COURT:  What I heard him opine yesterday --
and I'm sorry to cut you off.  We're just I know limited
on time here.  But what I heard him say yesterday is,
"Oh, yes," and I'm paraphrasing, "if you hit a sledge
hammer on this tank, it could be 120."  And what's the
basis for that conclusion?  That's the issue I'm
struggling with.

MR. COLBATH:  Well, I can certainly have him
not say that.  I mean, that is not --

THE COURT:  Because I just don't see a basis
for that.

MR. COLBATH:  I can instruct him absolutely.
That's not at all critical to his testimony.  What his
testimony --

THE COURT:  As I understand his testimony, if
it's at 120, then it would likely be recognizable over
the Adele song noise level to Mr. Rudat.  That's what
I'm hearing is his opinion on the water tower.

MR. COLBATH:  That's correct.  I will certainly
ask him, because he has no way to know what it started
out being, so I will certainly have him say -- he will

say, "I simply picked 120.  That's a representative

relatively loud noise."  I will have him say, "If it's

less than that, 110, here is how that is.  If it's 100,

here's how it dissipates.  It dissipates -- as the

distance doubles, it goes down by 6 decibels."

THE COURT:  Where is that in his report, the 6

decibels?  It may be in another part.  I'm looking at

page 14.  It's not there.  No, it's not there.

Well, what I directed was that there be some

evidence to support a jury concluding that there was

120 decibels of noise somewhere, and that's what I

recall the order as saying, but I'm paraphrasing it.

Let me get that out.

It was 1140, I believe.  What's the number of

the order?

MR. SKROCKI:  1070, Your Honor, page 29, and it

backs up from there to 28.

THE COURT:  "Construction work consistent with

that sound which was then being done at the water

treatment facility."  So in fairness, he did not say

120 decibels of sound was being generated there.

So what's your proposal here, Mr. Colbath?

MR. COLBATH:  I will certainly have Mr. Beck --

I will tell Mr. Beck he is not to opine in any way,

shape or form -- well, because he has no way to know --

1           THE COURT:  How loud it got.

2           MR. COLBATH:  -- the precise decibel level or

3    the exact or even an approximate --

4           THE COURT:  Well, he went pretty far opining on

5    that yesterday, that he would be -- I would cut him off

6    in front of the jury if he --

7           MR. COLBATH:  That will be fine.  That's easy

8    enough to do.  I will simply ask him, "For purposes of

9    evaluation, what number did you use to start your

10   calculations," and have him generically describe, "I

11   started them at 120."

12          THE COURT:  That's all he did.  The only

13   calculation he did was 120, and that one he determined

14   to be likely recognizable over the Adele song.  That's

15   what I see.

16          MR. COLBATH:  Certainly, Your Honor, because he

17   put -- the reason he put the chart in is to show the

18   varying degrees.  That's on the top of page 12.

19          THE COURT:  That relates to the shots, not the

20   water tower, but I understand it's relevant to --

21          MR. COLBATH:  That chart is a representative

22   chart starting with 120 at the top and going all the way

23   down to the rustling of leaves as a reference for any

24   time he talks about decibel levels.

25          THE COURT:  Is he going to testify that at 110

it would likely be recognizable, because his opinion
does not say that?

MR. COLBATH:  What he will say is that -- what
he said yesterday is that under the calculations, under
the same equations, which he used to calculate 120, it
would be over the distance that it is, 1,050 feet
distance.

At the top of page 14 where the Court has been
referring, he says, "The propagation loss of 1,050 feet
distance, 320 meters, is 50 decibel."  Using that very
calculation, what he will say is as the distance
doubles, it's 6 decibels less, so the farther you go
away, you will reach a point -- you will reach a point
that it's less, but what --

THE COURT:  My question was:  Is he intending
to testify that is also likely to be recognizable at
110?

MR. COLBATH:  I can certainly ask him that.

THE COURT:  I would not ask him that.  That's
not in his opinion.

MR. COLBATH:  Well, but the formula, Your
Honor, is there.  So if the noise -- let's say, "The
noise -- Mr. Beck, the noise was not as loud as 120, it
would only be 110," he would take out 120 and the
calculation would be how much less, how much less would

it be at 110, how much less would it be at 100.  There
is certainly -- I mean all he's doing is providing the
identical analysis, the identical formula.  He's just
changing the loudness of the sound, because we don't
know the loudness of the sound.  It's up to the jury to
decide how loud that noise may have been or whether it's
possible with what's been described.

        And I think it's entirely appropriate for
Mr. Beck to say, "Well, I don't know what the noises
were, but what I can tell you is here is an example of
what would be a 120-decibel noise, and at 1,000 feet,
you could hear that.  Here is an example of what would
be an 110-decibel noise.  At 1,000 feet, you could hear
that. I don't know what the noises were that were out
there, but over distance, this is how that noise
travels."

        I could have him explain it without a specific
reference to anything to the water treatment plant other
than simply the distance away.  I mean that's the only
-- he needs to know the distance to calculate whether
you could hear it, but that's it.  I can certainly not
have him associate the noise to that.

        THE COURT:  Thank you.

        Mr. Skrocki, go ahead.

        MR. SKROCKI:  This is the same problem, Judge,

1    that we've had since I filed this motion in June or

2    whenever it was, is that he's picked this number.  We

3    have mixed facts about whether any sound actually

4    happened or occurred.  We have a sound that he says

5    yesterday I picked this part because it hurts my ears,

6    just my own personal experience.  And now I don't know

7    where in the report it says distance it drops down,

8    unless I missed that in the discussion a few seconds

9    ago.

10           THE COURT:  There is a propagation loss on the

11   top of page 14 that gets you the 50-decibel, but I

12   didn't hear about -- you referenced 6, Mr. Colbath, I

13   don't see that here.

14           MR. SKROCKI:  Again, he focuses on

15   120 decibels, but there wasn't even an attempt to tell

16   us or the jury what kind of machinery or noises

17   construction machinery makes at 120 decibels.  Is it a

18   pile driver?  Is it something else?  We have no idea.

19   Is it a backhoe scooping up earthen material?

20           For us, it's an impossibility to even try to

21   figure out where the basis and methodology of this comes

22   from.  Even though Mr. Colbath can say, "I'm not going

23   to do this, I'm not going to do that," it's impossible

24   to figure out where he's getting this data from in doing

25   these calculations.

1          THE COURT:  Go ahead.

2          MR. SKROCKI:  And we're trying to jack this

3    into something that doesn't fit.  I get what they are

4    trying to do here, but this isn't the methodology and a

5    way for it to be done.  There was no testing.  We have

6    no basis to say where this comes from except from a

7    reference.

8          He does reference number nine in his

9    references, which is just the science of sound from a

10   publication in 1990, so that's where that table comes

11   from.  It doesn't bear any relationship whatsoever to

12   what may have or may not have occurred at the water

13   treatment plant.  I don't think there is any real

14   curative way of making that work.

15         THE COURT:  I don't recall that being a subject

16   of your motion on Mr. Rudat, but I could be incorrect.

17         MR. SKROCKI:  What part?

18         THE COURT:  A discussion of the issue that

19   really the Court focused on, which was the methodology

20   used to arrive at the 120.

21         MR. SKROCKI:  It was not -- the methodology

22   part wasn't there, but the part -- our objection was

23   that this is all just a bunch of numbers thrown in to

24   make it fit, and we couldn't understand it.  And I was

25   taken to task by defense for being thick, and I still

1    don't understand.  That's part of the problem.

2            THE COURT:  In any event, I am going to do the

3    following:  I will allow the expert to testify with

4    limitations that I have indicated, which is to say that,

5    although in the Court's view the evidence with regard to

6    the construction activities between 7:09 and 7:14 is

7    murky at best, even though both sides had the

8    opportunity to call these individuals and discuss it,

9    there was sufficient evidence presented, particularly

10   viewed from defense perspective, for purposes of whether

11   the testimony could be presented to allow there to be --

12   to have Mr. Beck testify.

13           But I want to make it crystal clear we all have

14   worked with experts over the years and some experts are

15   easier to follow instructions than others, and I would

16   like to have Mr. Beck come in here so I can explain to

17   him what this ruling is and he clearly understands it,

18   unless you're certain, Mr. Colbath, that that's

19   unnecessary.

20           MR. COLBATH:  No, that's fine, Your Honor.

21   This is the only case I have ever worked with Mr. Beck

22   in, and so I don't have experience handling him on the

23   stand or whatnot.  He's certainly been very responsive

24   to me.

25           If I could step out and use the restroom and

1  tell -- I'm happy to convey it to Mr. Beck and have him

2  come in and --

3          THE COURT:  Let's do that.

4          MR. COLBATH:  -- make sure that the Court --

5  that I have correctly conveyed it to him and that the

6  Court expresses everything that need be expressed.

7          And quite frankly, when we get to that, which

8  is going to be only a limited portion of his testimony,

9  if I perceive that there is still any problem, I will

10 absolutely interrupt, because I don't want to make a bad

11 record.  I don't want to create any blowup or any

12 problem any worse than anybody else in this courtroom.

13         THE COURT:  Basically he cannot opine as to how

14 loud the noise was.

15         MR. COLBATH:  I will just have him --

16         THE COURT:  And then it's a fair subject to

17 explore in cross.  It was not presented by the

18 government as a component of the objection with regard

19 to this.  I do understand the objection that was raised

20 with regard to the calculation.  I could go on record

21 and say I don't understand it either, and I look forward

22 to being educated both by the defense and the government

23 during Mr. Beck's direct and cross.

24         Having said that, let's take a short break, and

25 then we'll come back in about five or ten minutes.

1          DEPUTY CLERK:  All rise.  Court stands in a

2   brief recess.

3          (Recessed from 10:22 a.m. to  10:34 a.m.)

4          (Jury absent)

5          DEPUTY CLERK:  All rise.  Her Honor, the Court,

6   the United States District Court is again in session.

7          THE COURT:  Please be seated, everyone.  We are

8   back on record.

9          Mr. Colbath, what's the update?

10          MR. COLBATH:  Your Honor, I have Mr. Beck here.

11   I simply told him, and calculated that the Court's

12   ruling we could not associate any of the described

13   noises or any kind of noises attributed to the water

14   treatment plant to any decibel level whatsoever, that

15   for purposes of offering his opinion, we will just --

16   it's appropriate that he's just going to say he took a

17   loud noise from the table on chart 12 as 120 decibel and

18   wanted to calculate how would that propagate at what he

19   knew the distance to be from the water treatment plant,

20   how would it propagate from inside, how would it

21   propagate at that distance outside, and leave it at

22   that.

23          I told him that's the Court's ruling, that he's

24   not to opine in any way, shape or form, not to attribute

25   a noise level at all to any potential noise at the water

1    treatment plant.

2           THE COURT:  Mr. Beck, do you understand all of

3    that, sir?

4           MR. BECK:  Yes, I do.

5           THE COURT:  So that means not even to say, "I

6    understand that on the day of the incident at this hour

7    there were loud noises and so I did the study."  You

8    understand that is prohibited?

9           MR. BECK:  Yes.

10          THE COURT:  You do that I'm going to interrupt

11   and direct you not to continue, which I am anticipating

12   would not happen.

13          Very good.  Anything further?

14          MR. COLBATH:  Not at this point, Your Honor.

15   We can bring in the jury and I'll call Mr. Beck.

16          THE COURT:  Thank you.

17          (Pause)

18          (Jury present)

19          THE COURT:  Welcome back, ladies and gentlemen.

20   Please be seated.

21          Your next witness, Mr. Colbath?

22          MR. COLBATH:  Thank you, Your Honor.  We would

23   call Steven Beck.

24          THE COURT:  All right.  Sir, if you would come

25   forward, please.  If you could come up here to the

witness stand.  When you get there, I'll ask the clerk
to administer an oath to you.

THE WITNESS:  I am bringing my notebook that
has copies of my reports.

THE COURT:  Very good.  Thank you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please
state your full name and then spell your full name.

THE WITNESS:  My name is Steven Beck,
S-t-e-v-e-n, B-e-c-k.

STEVEN BECK, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. COLBATH:

Q.  Mr. Beck, where do you live?

A.  I live in Austin, Texas.

Q.  What do you do for a living in Austin, Texas?

A.  I have a full-time job at a company where I'm
employed as chief scientist and chief technology officer
for a small engineering firm, and I also have my own
forensic audio business.

Q.  All right.  First of all, with respect to the
full-time job that you have, tell us about that.  What's
the nature of that employment and what generally do you
do there?

A.  It is an engineering firm that does scientific

1  and engineering analysis and systems primarily related

2  to radar countermeasures and ladar, but we also do some

3  acoustic work, so I work in all of those areas.

4       Q.  And maybe before we go into your own forensic

5  business, let's back up a little bit and tell the jury

6  what your education is in and about your educational

7  background.

8       A.  I have a bachelor's degree in science in

9  electrical engineering with a minor in physics, and that

10  physics concentrated on the area of acoustics.  I also

11  have a master's in electrical engineering where I

12  concentrated on signal processing, which is doing

13  analysis on signals like acoustic signals or radar

14  signals or anything that can be represented as a signal.

15       Q.  And how long -- well, where did you start after

16  school employment-wise in the engineering field?

17       A.  I started working for Ford Communications and

18  Aerospace Company in Palo Alto, California.  I worked

19  there for two years.

20            Then moved to Austin, Texas, where I joined

21  Tracor, which is a company in Austin, Texas.  That

22  company got bought out by BAE Systems in 1999.  I was

23  elected an engineering fellow of BAE Systems, and was

24  also principal scientist for BAE Systems.  I worked

25  there until 2013, when I elected to join a small company

1    called Systems Processes and Engineering Corporation,

2    also in Austin, Texas.  And at that time, I also formed

3    my company, Beck Audio Forensics.

4        Q.  What primarily is the focus of and what do you do

5    at Beck Audio Forensics?

6        A.  I primarily analyze both audio signals and also

7    acoustic situations, which can include psychoacoustics,

8    which is how people interpret and understand sound.

9        Q.  Has any of your work history or the work with the

10   companies that you've mentioned, or Beck Forensics, your

11   own company, been with the United States military?

12       A.  So I have done a lot of contract work with both

13   the U.S. Army and the U.S. Navy in the area of sound

14   detection, sound classification, you know, direction of

15   arrival of sound in those areas.

16           I have at least 30 years of experience working in

17   those areas contracting work for U.S. Navy, U.S. Army

18   and also DARPA, which is the Defense Advanced Research

19   Project Agency.

20       Q.  How about with law enforcement agencies, has your

21   work at all, contract work, given you experience with

22   either the Federal Bureau of Investigation or other

23   federal law enforcement agencies?

24       A.  Yes.  I did contract work for the Federal Bureau

25   of Investigation for 16 years.  I was their gunshot

expert.  I designed experiments.  I collected and
analyzed gunshot data.  And I wrote papers.  And I have
written what is considered to be the fundamental paper
on forensic gunshot acoustics.

I have also done a lot of work with speech
recognition, and I have done that work also for the
Federal Bureau of Investigation.  And I was co-author on
the very first paper on forensic speech recognition.

MR. COLBATH:  Your Honor, at this point I would
ask the Court to find that Mr. Beck has the education,
training and experience to offer specialized opinions in
the field of forensic audio evaluation and analysis.

THE COURT:  Any objection?

MR. SKROCKI:  We don't object.

THE COURT:  All right.  I'll find the witness
so qualified.

BY MR. COLBATH:

Q.  Mr. Beck, were you asked to do some analysis and
evaluation related to this case?

A.  Yes, I was.

Q.  When were you -- generally, what timeframe were
you first contacted?

A.  I would have to refer to my report.

Q.  Okay.  Well, was it -- can you put a year on it
for us?

1    A.   Yes.  It was this year, 2019.

2    Q.   And that was by my office, the Federal Public

3 Defender's office?

4    A.   Yes, it was.

5    Q.   And so did you become involved and perform some

6 analysis on the different acoustical matters related to

7 the area where these murders took place?

8    A.   Yes, I did.

9    Q.   Prior to discussing that, I want to ask you a few

10 questions about you mentioned gunshot analysis.  And so

11 could you describe for the jury just the components and

12 the -- acoustical components or the sound of a gunshot

13 and what it's made up of?

14    A.   Yes.  A gunshot is made up primarily of four

15 sounds, what most people are familiar with.  The primary

16 sound is what is called the muzzle blast, and that

17 muzzle blast is the result of high pressure inside the

18 muzzle barrel as it drives the bullet through that

19 muzzle and as the bullet exits that gas under very high

20 pressure, expands very suddenly creating a very loud and

21 very sharp sound.

22    Q.   The general direction of the muzzle blast, what

23 effect does that have on the acoustics or what is that

24 determinative of anything?

25    A.   So I mentioned that I had done experiments, done

data collections and written papers.  And one of the
aspects that we studied was both the loudness of the
muzzle blast, but also the directionality.

So we put microphones in front and all around the
horizontal plane so that we could measure front, side,
back, so that we could measure the differences in
loudness.  So what we discovered is that it is loudest
in front, so it is a directional sound, but we also get
loud sounds, but maybe -- measured over quite a number
of firearms we got about a drop in sound pressure level
of 8 dB off to the side.  At about 120 degrees from the
direction of fire, we got about 10 dB.  And directly
behind we got about 14 dB -- no, no, I'm sorry -- 20 dB
drop directly behind.

Q.  You're saying "dB."

A.  Yes.

Q.  And that means?

A.  Decibels.  Okay.  And --

Q.  That's a measure of sound?

A.  It is a measure of sound pressure level.  And
what I would like to say is every time we mention sound
pressure level and dB in that context, we are talking
about relative, what we call relative to 20
micropascals, which is the threshold of hearing.

So dB needs to be relative to something.  So

1   we'll talk about this later.  I have a table so that we

2   can understand different loudnesses relative to those dB

3   readings.

4      Q.  So you said that muzzle blast was the first

5   component of a gunshot?

6      A.  Yes.

7      Q.  What is the second?

8      A.  The second component, and this is a property of

9   the bullet, so if the bullet, when it exits the muzzle,

10   if it is supersonic -- and supersonic, by that I mean it

11   has a speed faster than the speed of sound -- it will

12   create a shockwave.  And that shockwave is only

13   detectable in front and at a very narrow miss distance

14   from that line of fire.

15      In other words, you're not going to hear that

16   shockwave unless you're being fired at.  And I have

17   measurements --

18      Q.  That's fine.  What's the next component of a --

19      A.  A typical gunshot?

20      Q.  -- of a typical gunshot?

21      A.  That would be the terminal or impact ballistics.

22   That is when a bullet hits something and it creates a

23   sound.  So if it hits dirt, it might create a thud

24   sound.  If it hits wood, it would create a louder thud

25   sound.  If it hits metal, it could ring that metal and

1    you would hear maybe a plink or a clang or some metallic

2    sound of the property of that particular metal that it

3    hit.

4        Q.  And then what is the fourth component of a

5    gunshot?

6        A.  Okay.  This one is really a property of a gunshot

7    inside a room, because on that initial impulse, okay,

8    that very sharp loud blast from the muzzle blast

9    propagates out or it travels out, it encounters walls

10   inside a building.  And we get reflections.  And those

11   reflections come back, and I'll say if you have a

12   receiver or somebody listening, the very thing that they

13   will hear is that initial impulse and then they will

14   hear reflections as that impulse hits the wall and

15   reflects back.  A reflection is an echo.

16       Q.  So for purposes of the analysis you did here and

17   explaining what you determined, did you prepare some

18   PowerPoint slides or some photos that would help you

19   explain your work and your analysis?

20       A.  Yes, I did.

21       Q.  If we could show Mr. Beck Defense Exhibit

22   No. 300.

23           MR. COLBATH:  Your Honor, it is not my

24   intention to -- these will just allow Mr. Beck to

25   explain his testimony, like we have seen with some other

witnesses.  It is not my intent to introduce this as
anything other than a demonstrative exhibit during
Mr. Beck's testimony.

            THE COURT:  Any objection to its publication?

            MR. SKROCKI:  No objection.

            THE COURT:  Go ahead, please.

BY MR. COLBATH:

    Q.  So Mr. Beck, I'm just going to have you walk us
through this, and I'll have questions as we go through
each slide to -- does this sequentially explain sort of
the analysis that you did and the findings that you
made?

    A.  Yes, this is in the order that I put them in my
report.

    Q.  So tell us what we see here first, what the
purpose of -- what we're seeing here relative to your
work.

    A.  So first of all, this picture, just the roads and
the buildings and what appear to be vehicles, is part of
the case downloads that the defense team supplied to me
in order to help me understand the geometries and the
distances involved.

            So after reading the material and going through
what I was told by the defense team, I knew that there
were two bodies located inside the building at the

1  approximate locations where I put an X.  And I

2  identified them as "body one location" and "body two

3  location."  And I also identified where I thought the

4  earwitness location was, and I measured that to be

5  280 feet.  And I used Google Earth for that measurement.

6    Q.  Can we go to the next slide here?

7    A.  This is a just a blowup of that so that I could

8  place the body locations a little more accurately.

9    Q.  The next slide?

10    A.  Again, this is when I went to Google Earth and I

11  brought up that location, and this was the actual Google

12  Earth measurement from COMM Station building T-2 to

13  where I had understood the earwitness was located at the

14  time that he made a statement about.

15    Q.  And that's just your approximation from your

16  understanding?

17    A.  Yes.

18    Q.  So we see the next slide.  And so what was the

19  purpose of this slide?

20    A.  Again, I was told that the earwitness had walked

21  along a road.  He left the Comfort Inn and walked along

22  Anton Larsen Road, I believe, up to the COMM Station,

23  building T-2.  And I just wanted to find out the general

24  distance because we're talking about acoustics and I

25  like to know -- I have a very good understanding of how

1   sound travels and I wanted to know could sounds from,

2   you know, that -- I guess it's the town, Kodiak, but

3   there appears to be possible activity.  I wanted to know

4   if there could be background sounds as far away as that

5   town.

6       Q.   So you wanted to know how far away things were?

7       A.   Yes.

8       Q.   What's the next slide here?

9       A.   Okay.  Now, this slide, I was told that there was

10  a water treatment plant in the vicinity and actually

11  along the road that the earwitness had walked along.  So

12  I wanted to know approximately how far that water

13  treatment plant was from the earwitness location when he

14  heard a sound.

15      Q.   Again, sir, this is the -- you took this distance

16  from Google Earth?

17      A.   Yes, I did.  So this is a Google Earth -- I just

18  got this straight off of Google Earth, copied it.

19      Q.   What was the distance from the general area of

20  the building to the water treatment plant to the roadway

21  in front of T-2?  What was the general distance?

22      A.   If I can read that correctly.

23      Q.   It's also on the screen right in front of you.

24      A.   I'm going to use feet.  So it is 1,050 feet was

25  -- and this is the actual Google Earth measurement.

1    Q.  So let's see the next slide.

2    A.  Well, hold on.

3    Q.  All right.

4    A.  I also wanted to show again the actual Google

5    Earth measurement to COMM station, building T-2.  And

6    the other important thing that I wanted to see was the

7    angles.  Okay.  So somebody standing here or walking

8    here, what were the angles that the sound would travel

9    so that I could understand what he might hear.  So that

10   was the purpose of making these measurements and showing

11   this on that slide.

12   Q.  Can we look at the next slide?

13   A.  Yes.

14   Q.  All right.  First, I understand that the first

15   part of your analysis was to do some analysis relative

16   to the rigger shop, the T-2 building; is that correct?

17   A.  Yes.

18   Q.  And you were aware that the individuals that were

19   shot inside were shot and shot with a .44-caliber

20   weapon?

21   A.  Yes, there were .44-caliber bullets that were

22   recovered.  There were no shells that were recovered, so

23   it was reasonable to assume that it was a .44 revolver.

24   Q.  Okay.  And so tell us what we're looking at here

25   and describe the purposes of the markings.

1    A.  Okay.  So I talked a little bit about the muzzle

2  blast, and the muzzle blast is the primary source of

3  sound that we are going to be concerned with, especially

4  relative to this slide.  So I wanted to know if a .44

5  revolver was fired inside the building what potentially

6  could be heard at the earwitness location at a distance

7  of 280 feet.

8        So it was very important for me to understand how

9  the sound traveled from that muzzle blast to the wall

10  and then out through the wall and finally traveling to

11  the earwitness location.

12    Q.  Let me stop you right there, Mr. Beck.

13        MR. COLBATH:  Your Honor, I apologize.  Could

14  we briefly have a sidebar.  I just want to inquire of

15  the Court about a question.

16        THE COURT:  That's fine.

17        (Begin bench conference.)

18        MR. COLBATH:  I don't have any concern about

19  where we're at right now.  Two things occurred as I was

20  listening to Mr. Beck.  He's referred a couple of times

21  of "I was told" or this, that or the other thing.  I

22  would prefer that he just not base things on necessarily

23  -- obviously, all his analysis is based on information

24  that was provided, but I didn't want to have trouble

25  with hearsay-type things.

1          And my bigger concern was, even though I had

2  discussed with him prior to his arrival in Alaska not to

3  reference the last trial, he was provided Mr. Rudat's

4  testimony from prior and a number of other testimonies.

5  And I'm concerned, unless I remind him, when we get --

6          THE COURT:  You haven't reminded him today?

7          MR. COLBATH:  I haven't reminded him today

8  about the reference to a prior trial, so at some point I

9  just wanted to --

10         THE COURT:  Maybe we should take a short break

11 and remind him.  Any objection to that?

12         MR. SKROCKI:  No, I don't.

13         MR. COLBATH:  My only concern is that he blurt

14 that out.

15         THE COURT:  I appreciate that.  We'll take a

16 very short break.

17         (End bench conference.)

18         THE COURT:  Ladies and gentlemen, we need to

19 take about a two-minute break here to address one very

20 minor issue.  I hope we can come right back when we get

21 this issue resolved, but I would excuse you all for just

22 a moment here.  We'll get you right back in just a

23 couple minutes.

24         Leave your notepads here.  We'll see you soon.

25         (Jury absent)

1          THE COURT:  Please be seated, everyone.

2          MR. COLBATH:  Can I just approach, Your Honor?

3          THE COURT:  Sure.  Go right ahead.  It's

4   nothing you have done or said.  It's just a point that

5   we wanted to make sure was clear to you.

6          (Pause)

7          THE COURT:  Any questions about that, Mr. Beck?

8          THE WITNESS:  No, I believe I understand.

9          THE COURT:  The word "trial" is one that we

10  don't really say here.  Very good.  "Prior proceeding?"

11         MR. COLBATH:  Yeah.  You know, I have just

12  asked Mr. Beck when he's referring to things that his

13  analysis was based on if he can just say "based on

14  information that I reviewed" or "that was provided to

15  me," and leave it generic, then he doesn't have to refer

16  to a prior transcript or a proceeding or anything.

17         "Based on information provided to me for my

18  review," and he can walk through his analysis.  That way

19  we don't get into anything in a prior case.

20         THE COURT:  I appreciate you taking the break

21  to do that.  Are the last two slides -- I was looking at

22  the slides here -- ones that you're seeking to present

23  today?  Do we need to take that up?  The last two slides

24  in the PowerPoint.

25         I don't know if I have the same -- I have a

1   PowerPoint that was attached to the report, which

2   appears to be identical to what is up there on the

3   screen.  "Metal trash can, metal clung."

4           THE WITNESS:  Yes, those are the last two.

5           THE COURT:  If there is an issue, now seemed

6   like a good time to take it up.

7           MR. COLBATH:  Your Honor, I can tell the Court,

8   and I'm sure Mr. Beck will correct me if I'm wrong, but

9   essentially he just used a spectrograph knowing -- it's

10  a -- he randomly used a metal trash can.  He randomly

11  used a metallic noise.  It's not going to be associated

12  to any specific item of evidence or testimony.

13          THE COURT:  So it's unrelated to the water

14  tower -- water treatment center?

15          MR. COLBATH:  Right.  It will not be described.

16  The metal clung will just be a metallic noise of this

17  level shows this resonance, just a general metallic

18  noise, just a hollow trash can, metal trash can, this

19  noise; a .44 Magnum, this noise.  It will not be tied to

20  any specific piece of evidence.

21          THE COURT:  I just thought I would ask now

22  while the jury is out.

23          MR. SKROCKI:  Real quick while we're here.  Are

24  we past the water treatment plant now?  No more

25  questions about water treatment plant?

         MR. COLBATH:  No, Your Honor.  There is -- if
we go -- can you go forward for me?  In talking about --
he's going to talk about inside sound propagation.  And
then --

         THE WITNESS:  This is transmission loss through
the walls.

         MR. COLBATH:  Oh, we already saw the distance.
We have already talked about that.  The only other
references, Your Honor, to the water treatment plant
will be when we talk about the propagation of sound,
he's going to talk about how sound would travel over
distance from the T-2 building.  He'll talk generally
about how sound would travel over a distance of
1,050 feet as compared to 280 feet, just generally how
sound would travel from that location, no specific
sounds, not tie it, as the Court has instructed, not tie
it to any specific noise.

         Other than he'll just say from his chart he
picked the loudest noise on his chart.  If it's a loud
noise, it travels at this, and this is how it dissipates
as it travels.  Whether that loud noise of 120 decibels
was from the T-2 building to that spot on the roadway,
whether that was from the water treatment plant, this is
how it would dissipate and be heard.

         MR. SKROCKI:  I'm trying to figure out what's

1    the ultimate opinion then.

2              THE COURT:  The ultimate opinion, as I

3    understand it, is consistent with what's on page 14

4    without finding that there was a sound from there, but

5    if there was, then here is --

6              MR. COLBATH:  That it could be heard.

7              THE WITNESS:  Any sound at that level, yes.

8              THE COURT:  And I will allow that, as I have

9    indicated, without saying that there was such a sound,

10   based on the parties' questioning of these individuals

11   and the fact that the record contains some indication

12   that there may have been a sound during the operative

13   time.

14             So go ahead and get the jury, please.

15             (Pause)

16             THE COURT:  Mr. Colbath, are we going to be

17   able to conclude with this witness today?

18             MR. COLBATH:  I hope so, Your Honor.  That

19   clock gives me trouble.

20             THE COURT:  It's really hard.  I have one here.

21   It's 11:05.

22             MR. COLBATH:  The Court needs to break right at

23   noon?

24             THE COURT:  Pretty much.

25             MR. COLBATH:  I will try to expedite Mr. Beck.

1    It would be certainly my preference.  He has flights

2    this afternoon.  It would be my preference to get his

3    testimony concluded.

4              (Jury present)

5              THE COURT:  Welcome back, ladies and gentlemen.

6    Please be seated.  We did pretty good there in holding

7    to fewer minutes than some of our breaks.  In any event,

8    go ahead.

9    BY MR. COLBATH:

10     Q.  Mr. Beck, when we broke you said that in this

11   slide you wanted to know or you were attempting to

12   determine if gunshots from the .44 Magnum were done

13   inside the building how the noises from those gunshots

14   would react.  So explain to us what we're looking at or

15   what your analysis was.

16     A.  Okay.  So first of all, I have made measurements

17   of a .44 Magnum revolver.  And we made these

18   measurements in a carefully controlled, scientifically

19   controlled situation so we know exactly how loud the

20   sound of a muzzle blast is from a .44 Magnum.

21              And that is before it encounters any

22   environmental issues, before it encounters walls or

23   anything else, so we know the fundamental loudness of

24   such a firearm.

25     Q.  And it is what?

1    A.   What we measured to be in front, okay, at a

2    distance of one meter, and this is the standard method

3    of measuring loudness, would be 166 dB or decibels.

4    Q.   So knowing your 166 number, tell us what we're

5    seeing.

6    A.   So what happens when that muzzle blast exits the

7    barrel and begins to travel, it travels in all

8    directions.  And as I mentioned, it is strongest in

9    front and it is weakest behind.

10         So the fact that it did have to travel some

11   distance to hit the wall, and, again, based on the

12   location of these bodies, we know that if the shooter

13   was -- let me try and get this more steady -- was about

14   here and shot in this direction, toward body two, the

15   direction back to the earwitness was about 180 degrees,

16   so very close to directly behind.

17         And from my measurements, we know that is about

18   20 dB lower than the sound in front at one meter.  So

19   what I made a calculation of is by the time that sound

20   hit the inside of this wall, okay, in the direction of

21   the earwitness, that sound level would be approximately

22   146, that is 166, minus 20, is 146 dB.  That is still

23   very loud.

24         Now, we also know that he shot body one.  Okay.

25   And the direction of sound there might be closer to 90

dB, but it encountered another wall before it hit the
outside wall, and it also had to travel longer in this
direction.  So I don't know the construction of this
wall, but it is going to attenuate that sound even more.

So if I assume 90 dB -- I'm sorry -- at
90 degrees, we have a 10 dB drop, and I believe it is
entirely reasonable, in fact extremely conservative, to
say that the sound would drop another 10 dB going
through this wall here.  And that is an extremely
conservative number.

By the time it reached this wall it would also --
it would probably be less than 146.

Q.  Okay.  So do we move from this slide?

A.  No, let me continue.  So what I want to point out
is that is the sound pressure level as it strikes the
inside of the wall.  Now, three things are going to
happen at that point.

Q.  What's the first of those?

A.  A lot of that energy is going to be reflected,
and I talked a little bit about reflections.  We'll talk
more about it, but a large portion of that energy will
be reflected back into the building.

So as it propagates out, and I have shown these
circles here showing that it starts here and it moves
out and it moves out in a circular direction, and it

1  hits that wall, some of it is going to bounce back, some

2  of it is going to be absorbed by the wall, and some of

3  it is going to transmit through the wall and could

4  actually be heard on the outside of the wall.

5      Q.  And that's true of both shots?

6      A.  Yes.

7      Q.  All right.  Can we move to the next slide?

8      A.  Uh-huh.

9      Q.  And so you talked about -- first of all, you

10  talked about reflections --

11      A.  Yes.

12      Q.  -- and transmission.  So what are --

13      A.  So I wanted to show visually what a reflection

14  actually looks like.  So if we have a source, and this

15  is any acoustic source, it could be a gunshot, it could

16  be your voice, it could be any acoustic source, and as

17  that sound propagates, and, again, shows these kind of

18  circular arcs, okay, as it travels, and eventually it

19  hits a hard surface.

20          What happens then for a reflection is it hits

21  that wall and it bounces back, what we call an echo.

22  And that echo you can see is going to be at a reduced

23  sound pressure level, but it eventually will come back

24  to this source location or wherever the receiver is.

25      Q.  What are we talking about on the other side?

1    A.  On the other side what I want to show is the

2    effect of reflections inside a, you know, a building

3    with hard surfaces.

4    Q.  Hard surfaces would be like walls of the

5    building?

6    A.  Yes, uh-huh.  So what we have here is sound

7    energy, okay.  And the further up you go along this

8    axis, the louder, okay, that sound is.

9         So a gunshot I have described as being a very

10   short and sharp sound and what a scientist would call an

11   impulse.  Okay.  Just a very short sharp sound.

12        And in fact, we know through measurements that

13   the duration of a gunshot impulse is, for a small

14   firearm, what I mean not a military-grade weapon, would

15   be less than one millisecond, that is one one-thousandth

16   of a second, so it's very short, very sharp.

17        Now, as that sound travels, it hits a wall, it

18   reflects, and you may get another impulse that is the

19   echo.  Now, in this situation, there were hard ceilings,

20   hard floors and hard walls all around, so we get lots of

21   what I call primary reflections.

22        In fact, you can get one off of each of the

23   surfaces I just mentioned, so there could be possibly

24   six of these green primary reflections.  And those

25   reflections will continue to travel, they will bounce

1  off of other walls and ceiling and floors and continue

2  to bounce around inside that building.  Each time they

3  bounce, they lose energy, so they gradually decay over

4  time.  And that is what --

5  Q.  Do any of those sounds as they bounce around

6  inside, they are then lost in the building or --

7  A.  Every time they hit a wall, they do those same

8  three things:  Some of the energy is reflected, some is

9  absorbed and some is transmitted.

10  Q.  Explain then the reverberation and we'll go to

11  the next slide.

12  A.  So the reverberation is just that bouncing all

13  around.  Every time any of those hits a wall, it

14  continues to be reflected and lose energy.  It will

15  travel, hit another wall, lose energy, be reflected and

16  continue to do that until all of the energy is basically

17  dissipated.

18  Q.  Not all of the sound is lost inside though, some

19  of it travels to the outside of the building?

20  A.  Yes.

21  Q.  And so explain what we see here.

22  A.  Okay.  So what we wanted to understand, so I have

23  given an analysis showing that when that gunshot impulse

24  hits the inside of the wall the very first time, it's

25  going to have a sound pressure level of 146 dB right at

1  that point.  Okay.  The reflected energy, and I have

2  shown in the arrow going the other direction, is going

3  to have -- it's going to be less loud.  It will have

4  lost energy.  So I have shown it to be not as broad as

5  the initial impulse.

6       Okay.  So what happens to the rest of that

7  energy?  Okay.  This was -- through reviewing the

8  material that I was sent, this was concrete.  Okay.  The

9  side of the building where that very first impulse hit

10 in the direction of the earwitness was a ten-inch

11 concrete wall.

12      Okay.  So that sound had to travel through ten

13 inches of concrete before it came to the outside of that

14 wall.  So I did analysis and I used standard textbook

15 analysis and this is in multiple textbooks.

16 Q.  What was your conclusion?

17 A.  My conclusion was that that would absorb 60 dB

18 sound pressure level going through that concrete.

19 Q.  And if we look at the next slide, it just shows

20 the --

21 A.  So this is a table that came out of my textbook

22 that I studied out of at the university.  I believe that

23 textbook was Kinsler and Frey Fundamentals of Acoustics.

24 Also, these same numbers are in another textbook, David

25 Blackstock's Physical Acoustics.  And they had different

1    materials, different thicknesses, and the eventual

2    transmission loss.

3        Q.   So this is just where you drew your numbers from?

4        A.   Yes.  Right.  So these are engineering

5    measurements, okay, that have been made and are in

6    published textbooks that have been around since the

7    1950s.

8        Q.   Can we go to the next slide?

9        A.   Could I continue just a little bit?

10       Q.   Sure.  Let's back up.  Did I miss something with

11   the measurements?

12       A.   Yes.  So primarily I was concerned with the

13   concrete because that was the direct path back to the

14   earwitness.  In the textbook, it used a thickness of

15   four inches, but we had ten inches.

16           So there are formulas, and I used the most

17   conservative formula that I could indicating not just

18   the direct path, but also it might not be exactly, you

19   know, what I would call perpendicular, but it could be

20   of a slight angle, so I tried to use a very conservative

21   formula to say -- to calculate a ten-inch thickness what

22   would be the transmission loss.

23           So in my report, I used the equations out of

24   these textbooks to find out that instead of 45 dB for

25   four inches thickness, a ten-inch thickness would be 60

dB, and that's where that 60 dB number came from.  It is textbook calculations.

Q.  Let's go to the next slide.

A.  Okay.

Q.  Very briefly, can you explain this chart?

A.  Again, this comes out of another textbook.  I believe this is out of Rossing's, what is it, Science of Sound, I think was the name of the textbook.  But what this table indicates is different sound pressure level loudness, okay, and it is measured in dB relative to the 20 micropascals.

And it has a typical sound source.  Okay.  So these are not to be -- these are -- I mean other sounds could -- other sources could make sounds at these levels, but these are example sounds, and also the psychological perception.

So at 120 dB, which is a very loud sound, still much less than what a gunshot typically would be, but, say, a jet taking off at 60 meters away, so not even too close, would be at the threshold of pain.  So I typically will use this as a very loud sound.

And then I have other sound levels, construction, a shout, a heavy truck, urban street level.

Q.  For instance, if we go down to the normal conversations, is that the levels we're speaking here?

1    A.   Yes.

2    Q.   These form a basis, if I understand -- to move

3    forward to the analysis part, these form the general

4    basis for sounds of noise?

5    A.   For how loud someone would perceive sound to be.

6    Q.   So with respect to a .44 gunshot, you would get

7    -- you can explain some of the characteristics of that

8    166-decibel sound that you had told us about, correct?

9    A.   Yes.

10   Q.   So let's see that next slide.

11   A.   Okay.  So actually, this is getting into the next

12   set of characteristics.  And I would like to calculate,

13   okay, and explain the calculation of how loud that sound

14   would be at the earwitness location.

15        So can I go back to the previous slide?

16   Q.   Sure.  Sure.

17   A.   Okay.  We calculated 146 dB at the interior of

18   the wall and then we subtracted 60 dB.

19   Q.   For the thickness?

20   A.   Yes.  So if you were standing at the outside of

21   that wall and listening, you would hear a sound that

22   would be 146 minus 60, which I believe is 86 dB.  That

23   is still a pretty loud sound.  That's with cars and

24   trucks and everything, what we call very loud.  Okay.

25   That is our perception of 86 dB.

1    Q.   Do you have a way to account for going from the

2    distance of standing right next to the building and

3    hearing something out to, for instance, the roadway?

4    A.   Yes.   There is a standard formula for the sound

5    loss as sound travels a certain distance.   And --

6    Q.   What is that term called, the traveling of sound

7    or the movement of sound?

8    A.   That is called propagation loss.   That is a

9    physics term.

10   Q.   So tell us, using your analysis and calculations,

11   about the sound propagation or the sound loss of this

12   gunshot noise.

13   A.   So from the outside of the wall to the earwitness

14   location was 280 feet.   And using the standard physics

15   formula for sound propagation in an outdoor unimpeded

16   environment, the sound level that someone would hear at

17   that point, there would be a transmission loss of 38 dB,

18   okay, resulting in, if we take one -- 86 was the sound

19   pressure level on the outside of the building.   If we

20   subtract 38 from that, we wind up with 48 dB as the

21   sound level that would be at the location of the

22   earwitness.

23        So 48 is a moderately quiet level.   Okay.   Living

24   room, office, classroom, about that loud.

25   Q.   That would be something you could certainly hear?

1    A.  You could hear that and it is very

2 understandable.  It's very easy at that level to hear

3 the characteristics of that sound.

4    Q.  And again, a gunshot would have what kind of

5 characteristics?

6    A.  So that -- if we can go to the next slide.

7    Q.  Okay.

8    A.  So the next slide shows a recording of a .44

9 Magnum revolver from inside a building.  So I talked

10 about that primary impulse being very short, very sharp,

11 about a millisecond in duration.  So here is what

12 happens as it encounters all these hard surfaces and

13 reflects and it slowly decays over time.

14        But that initial impulse -- and again, this is a

15 recording on a not very good system.  This very first

16 impulse there is going to be the loudest sound, and then

17 it continues to decay.

18        And I -- so this is what I call the amplitude or

19 kind of the relative loudness of the sound.  Here is

20 just the energy, you know, how much energy is in this

21 sound so that we can understand how it changes over

22 time.  It's just another way of looking at the energy

23 level or the loudness level.

24        But what I really want to talk about here is my

25 spectrogram.  I would like to explain to everybody what

a spectrogram is.  It is a common representation that analysts and signal processing people use to explain the energy as a function of frequency and also as a function of time.

So what I want to show here, all of these are functions of time.  FET is file elapsed time, because it came from a recorded audio setting.

Q.  How long --

A.  This is in seconds.  So if this started at about a half a second into the recording, and it starts to really decay at about one second later, at 1.5, and then by three seconds it's already down almost to the ambient level.

What we see here in the spectrogram is also the same time as we saw up here, but this, instead of being loudness level, is frequency.  Okay.  And in order to explain frequency, you might think of this as keys on the piano keyboard.  So this is low frequency, so this might be the low end on the piano, and this is high frequency that might be the high end.  So we're really talking about pitch, low pitch, high pitch.

And the color here represents loudness.  So blue and green is going to be very quiet.  Yellow, orange, red are going to be very loud.  And what I want to point out is that this looks like just a mass of energy.

1    Okay.  There is no really identifying

2    characteristics, and from the way we perceive sound, we

3    want to see a line.  We want to see a solid line in

4    frequency, say, something at maybe 2,000 that would go

5    straight across and be stronger than its immediate

6    surroundings.

7        You see that this looks like a giant block, and

8    what that means, okay, is that in a gunshot nothing is

9    resonating.  A resonance, or a mechanical vibration,

10   will create a strong peak that will be at a constant

11   frequency.  There is none of that.

12   Q.  Let me stop you right there, Mr. Beck.  So

13   explain that to me, because in less scientific terms,

14   you described earlier that a gunshot was sort of a

15   singular sharp sound or a loud sharp sound?

16   A.  Yes.

17   Q.  Is that what we're showing or is that what you're

18   explaining to us here?

19   A.  So typically the very short sharp part would be

20   just this very first line when this energy first goes

21   high.  And then what we see here is all the

22   reverberation.

23       But what this allows us to look for is are there

24   resonances, and resonances are the key acoustic

25   properties by which we recognize, identify and

1  discriminate sounds, different frequencies.

2     Q.  So how does our ears recognize something like a

3  gunshot that does not have resonance?

4     A.  So what you would hear, first of all, there is

5  nothing, it's just very quiet.  Then you would hear a

6  loud pop.  Okay.  When that pressure goes from very low

7  to extremely high, it sounds like a loud pop.

8        And then as this decays, it would sound almost

9  like wind.  Most people have heard gunshots on

10 television and they hear like a sharp bang followed by a

11 sound that is decaying, but it's almost like static.

12 Okay.  There is no total properties, no musical property

13 to that sound.

14    Q.  So I want to ask you one other question before we

15 leave this and the reference to the gunshot.

16    A.  Okay.

17    Q.  What effect would it have on -- you said it was

18 approximately 48 decibels at the roadway?

19    A.  Yes.

20    Q.  And so the noise that would have been heard out

21 there, what would have ultimately the sound have sounded

22 like if you had heard a gunshot?

23    A.  You would have heard a quiet popping sound.

24    Q.  Okay.  And could that be further affected or is

25 it at all further affected if a person is wearing any

1    type of earphones or obstructions to their ears?  Does

2    that change anything, first of all, in the loudness or

3    quietness of the noise?

4        A.  Yes, it does, because anything that blocks sound

5    is going to attenuate or lower the energy, lower the

6    sound pressure level of that sound.  And I have studies

7    -- in fact, there are standards that have gone through

8    and looked at how much lower those sounds would be.  A

9    lot of them are 10 dB level.

10            MR. SKROCKI:  Objection.  Can we have a quick

11   sidebar on this issue?

12            THE COURT:  Yes.

13            MR. COLBATH:  I can actually move on.  I can

14   withdraw that part of it.  I don't need Mr. Beck to get

15   into studies or degrees.

16   BY MR. COLBATH:

17       Q.  There would be some further degradation?

18       A.  Yes.

19       Q.  Would it change how the sound -- just the

20   obstruction, would it change how the sound is heard

21   though or perceived, the pop?

22            MR. SKROCKI:  Same objection, Judge.  May I

23   confer with counsel for a moment?

24            THE COURT:  Certainly.  Take a moment.

25            (Pause)

BY MR. COLBATH:

Q.  I want and try and move forward, Mr. Beck.  So
tell me the next part -- knowing that you could hear
this quiet pop that you said on the roadway, having
determined that, what is the next thing you tried to do
in your analysis or next question you tried to answer?

A.  So that is a very unique sound, okay, the sound
of a gunshot.

Q.  Let me do this:  Let me move -- I apologize for
interrupting.  Let me move you to this.

So that gunshot is a unique sound, a sharp sound.
Let's compare that with a general -- something that has
a different resonance or a different type of sound.
Would the next slide help us do that?

A.  Yes.

Q.  So let's do that.

A.  I wanted to look at the sounds that you might
hear in an environment, sounds that could propagate and
be heard, okay, that may be generated from some other
source so that we can compare and show how unique the
sound of a gunshot is.

So I found the sound of a metal trash can and I
analyzed that.  And what I want to show in the
spectrogram is that there are very identifiable
frequencies.  Okay.  There is one set up at the high

1    frequency region.  There is a few others here in the

2    mid-frequency region, and then some fairly strong ones

3    here down in the little bit lower frequency region.  And

4    what those are, those are resonances.  Those are the

5    fundamental characteristics of the vibrations in that

6    metal trash can.

7         And I have shown the frequencies over here and

8    some amplitude showing those actual resonances at those

9    frequencies.  That is what we hear and that is what

10   enables us to hear that sound and say, "That sounds like

11   a trash can."  Those are the identifiable

12   characteristics of a sound.

13   Q.  And the characteristics of this metal trash can,

14   much different than the characteristics of the gunshot?

15   A.  It looks very different, yes.

16   Q.  Let's look at the next slide.  Did you try to

17   analyze just general louder noise?

18   A.  Yes, I did.

19   Q.  What do we see here?

20   A.  I just chose a large metal clung sound.  Okay.  I

21   don't know what generated this.  I don't know what that

22   metal structure was.

23        What I wanted to show is, again, there is a sharp

24   impulse at the beginning and then it quickly decays off

25   as those vibrations decrease.  If we look at the

spectrogram, boy, you see some very strong spectral
lines, those resonances, and that makes that have a very
identifiable characteristic.

Q.   When you say "identifiable," do you mean
identifiable to our ears?

A.   Yes, and also the ability to discriminate from
other sounds.

Q.   So are sounds such as the metal trash can or the
metal clung, clang, whatever, comparative to the popping
of a gunshot?

MR. SKROCKI:  Objection; leading.

THE COURT:  Why don't you rephrase.

BY MR. COLBATH:

Q.   Sure.  Do we hear the sounds that you have
described the same or different?

A.   What I would like to point out is that the metal
trash can and this metal clung sound are common to
metal, you get mechanical resonances, okay, which are
these strong spectral lines, and that is common to
almost every metal that gets struck or somehow excites
these modes of vibration.  There are no resonances in a
gunshot.  That is the --

Q.   What does that mean?

A.   That means that there is no resonances, there are
no strong frequencies that are identifiable tones that

1   you would hear.  So that makes that sound, that popping

2   sound of a gunshot very, very different from this tonal

3   structure, these resonances that a metal might produce.

4       Q.   Okay.  The last area of things that I want to

5   talk to you about, Mr. Beck, are did you do any further

6   determination of how sounds might travel outside?

7       A.   Yes, I did.  So we talked about how sound

8   traveled from the outside of a building --

9       Q.   Right.

10      A.   -- at a distance of 280 feet.  And I used this

11  standard spreading formula available in almost any

12  textbook on acoustics.

13      Q.   That's how you determined the 38-decibel loss?

14      A.   Over 280 feet.  So then --

15      Q.   Hold on, Mr. Beck.  I will try not to talk over

16  you, you try not to talk over me, because, otherwise,

17  Ms. Reeves has an extremely hard time typing those

18  things, and I don't want her to have that difficulty.

19           I interrupted you, so you calculated the

20  280 feet.  And then what did you do?

21      A.   I also wanted to know what the transmission loss

22  over that 1,000 feet would be.

23      Q.   So can we pull the PowerPoint back up?  Can we

24  back up to the fifth slide?

25           So you showed us this earlier, and you said using

1  Google Earth you calculated the distance from the water

2  treatment plant --

3      A.   Yes.

4      Q.   -- to that same area on the roadway to be

5  1,050 feet.  That's the number you're referring to?

6      A.   Yes.

7      Q.   So you ran a calculation to or tried to do an

8  analysis of how sound could travel over that distance?

9      A.   Yes, so sound traveling over this 280 feet gave a

10 38 dB sound propagation loss.  The sound propagation

11 loss over this 1,050 feet I calculated to be 50 dB, so

12 it is more.

13        However, we also need to factor in the loss

14 through the concrete wall, which -- and through the

15 earbuds, which my calculations gave to a total of 101 dB

16 from the inside of the wall to the earwitness location,

17 the total sound propagation loss was 101, whereas over

18 this distance, was only 50.

19     Q.   Because there is no walls to go through?

20     A.   Yes.

21     Q.   Okay.  And so would the same noise be perceptible

22 over that distance?

23     A.   Same noise, yes.

24     Q.   Okay.

25     A.   At that same level, yes.

1    Q.   And what did you use as far as a sound level to

2    make the determination of what could be heard?

3    A.   So --

4    Q.   What sound level did you pick?

5    A.   Right.   So the gunshot sound was really too loud,

6    okay, because that sound level could really only be

7    produced by some kind of an explosion.

8    Q.   Hold on just a minute and I think we'll get

9    there.   Yes, that.

10   A.   If we go back to my table, I took the loudest

11   sound out of that table, which is the threshold of pain

12   at 120 dB.   So I used that --

13   Q.   We can take that down.

14   A.   I used my same calculation.   If that sound at 120

15   dB, that loud threshold of pain, generated inside the

16   building, if that had a loss of 101, that would result

17   at the earwitness location of 19 dB.   19 dB at a level

18   in an outdoor location would not be heard.

19        Okay.   That would be just so low, if you even

20   thought you heard something, you would not be able to

21   identify it at all.

22   Q.   So even at 200 -- let me make sure I understood

23   what you just said.   At 280 feet away, standing on the

24   road, if a 120-decibel sound happened in the building,

25   with the loss that you calculated, it would not really

1  be perceivable out at the roadway?

2      A.  No, it would not.

3      Q.  And that's because of the factors that you have

4  explained, the reflections and the walls and those

5  things?

6      A.  Yes.

7      Q.  Is that right?

8      A.  That includes also the earbuds, but with no sound

9  from the earbuds.  It's just the blockage from the

10  earbuds.

11      Q.  So is it the same result from a noise that's

12  outside the building as opposed to inside the building?

13      A.  Well, you don't get the transmission loss through

14  the building.

15      Q.  Okay.  So if you simply use that same 120-decibel

16  noise as a benchmark, what were you able to calculate

17  over that 1,000-feet difference, would you -- what was

18  the end result on the roadway?

19      A.  So if we took 120 dB and we subtracted the 50 dB

20  transmission loss, what we call the propagation loss,

21  that would result in 70 dB.  And so --

22      Q.  Is 70 decibels audible to us standing on the

23  roadway?

24      A.  Yes.  That is a loud conversation level.  That's

25  louder than normal conversation level, according to my

 1  table.

 2      Q.  Again, would there be enough loss or loss through

 3  the use of earphones to make the sound go away?

 4      A.  No.

 5      Q.  Some further degradation?

 6      A.  Maybe 3 dB, very small.

 7          MR. COLBATH:  Okay.  All right.  I think that's

 8  the questions I have for you, sir.

 9          THE COURT:  Thank you.

10          Mr. Skrocki, go ahead, please.

11          MR. SKROCKI:  Yes.

12                        CROSS EXAMINATION

13  BY MR. SKROCKI:

14      Q.  Hello, Mr. Beck.

15      A.  Hi.

16      Q.  I would like to get you back to Austin, so I'm

17  going to go through this pretty quick.

18      A.  Okay.

19      Q.  If I could have Exhibit No. 13, Blair.

20          Mr. Beck, were you provided this by the defense

21  in preparing your testimony here today?

22      A.  I believe so.

23      Q.  Do you know what that is?

24      A.  That looks like the inside map of COMM Station

25  building T-2.

1    Q.  Your diagram, sir, appeared to be concrete walls

2    all around, correct?

3    A.  As far as I could tell, there were concrete walls

4    in the direction in the main path going from the

5    acoustic source to the earwitness location.

6    Q.  Okay.  If I represented to you these are rolling

7    steel doors, you would be okay with that, would you

8    accept that representation?

9    A.  I have no information about that.

10   Q.  So you don't know what kind of material those

11   doors are made out of?

12   A.  No.

13   Q.  And I'm going to circle here and here and here.

14   Do you have any information from the defense as to what

15   these items I circled here in the bottom left are?

16   A.  I could guess, but I don't have any absolute

17   knowledge of that.

18   Q.  Okay.  So if this isn't solid concrete and these

19   are windows made of glass, they have different

20   transmission rates for sound than concrete, ten-inch

21   concrete, right?

22   A.  Yes.

23   Q.  And if I could have Government 7A, and I have in

24   my notes, Blair, Defense 300.  Can you put those up

25   together?

1    Okay.  Mr. Beck, I know you weren't here for

2 trial earlier, but I'll represent that this is where

3 Mr. Rudat positions himself with respect to when he

4 heard the noise.

5    A.  Okay.

6    Q.  Coming from, I'll just say for right now, from

7 this direction, without getting more specific.  Okay.

8 So if I just do this, that's where he positions himself.

9 Do you see that?

10   A.  Yes.

11   Q.  You have him positioned, I want to say -- correct

12 me if I'm wrong.  I don't want to misstate this -- right

13 about there.  Is that about right?  A little over to the

14 right?

15   A.  That could be.

16   Q.  I can go over to the right some more if you want

17 me to.

18   A.  That's probably close enough.

19   Q.  So you had that sound coming this way, about like

20 that?

21   A.  That appears to be close enough.

22   Q.  Fair enough.  Thank you.  So that's different

23 from where Mr. Rudat says he heard the sound, isn't it?

24   A.  I have no knowledge of what he said.

25   Q.  Okay.  And so let's look at that photo again.  So

1  there are two windows there in the front of the

2  building.  Do you see that, right there in front of T-2?

3      A.  I do see what appear to be windows, but I can't

4  tell for sure.

5      Q.  Fair enough.  And additionally, then there is

6  some doors here in front of T-2.  You see that, those

7  two gray things?

8      A.  Yes.

9      Q.  You don't know what they are made of, do you?

10     A.  I have no knowledge of that.

11     Q.  Okay.  Your chart in your report showed a jet at

12  a certain decibel level, and I apologize I can't

13  remember what the number was.

14     A.  120 dB.

15     Q.  Thank you.  120.  I think I recall a .44, that

16  would be 168?

17     A.  At a specific location, yes.

18     Q.  Right.  And have you ever shot one of those

19  before yourself?

20     A.  Yes.

21     Q.  And so they are a big kicker, aren't they?

22     A.  Yes.

23     Q.  You used ear protection when you did that?

24     A.  Absolutely.

25     Q.  Because you don't want to do it without ear

1    protection, do you?

2        A.  No, I would not.

3        Q.  If you shot a .44 inside this building five

4    times, there is going to be all those three or four

5    things you talked about.  There is going to be a blast

6    and echo and all that?

7        A.  Yes.

8        Q.  If you're not wearing hearing protection, it is

9    really, really, really, really going to hurt, isn't it?

10       A.  It would hurt your ears.

11       Q.  One would hurt your ears, wouldn't it?

12       A.  Yes.

13       Q.  Two would hurt your ears?

14       A.  So it takes a little while to recover.

15       Q.  It does, doesn't it?

16       A.  Yes.  It would continue to impinge on that

17   eardrum, which is already very tightened up because of

18   the pain.

19       Q.  Yep.  Yeah.  And so it's going to hurt for a long

20   time, huh?

21       A.  I can't tell you how long.  I don't study that

22   physiological aspect, but it will be -- it will not be

23   an instantaneous recovery.

24           MR. SKROCKI:  Okay.  That's all I have for

25   Mr. Beck, Judge.

1          THE COURT:  Any follow-up?

2          MR. COLBATH:  Just one, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. COLBATH:

5       Q.  Blair, could you give me the map one.  I think it

6    was 7.  7A, that's fine.

7          Mr. Beck, Mr. Skrocki asked you about the

8    locations here.  And would sound -- if sound was heard

9    somewhere on this road, would you hear it from a

10   different direction depending on where -- first of all,

11   would it depend on where the -- where on the road you

12   were here or here to -- from the directionality of the

13   sound?

14         How would you perceive where the sound was, I

15   guess, different if you were in one place or the other?

16      A.  From the directionality.  So if someone were

17   facing along the road and if he were located at the

18   right-hand most blue area versus the other blue area,

19   would the direction of sound be perceived as different?

20      Q.  I'm just asking you when a person is out there on

21   the road, does where they are -- I want to make sure

22   your analysis -- if this matters to your analysis.

23         Does where they are -- how does where the person

24   is relate at all, if it does, to where they hear the

25   sound from, or where they perceive they hear the sound

1    from?

2        A.  So we really have to look at where the sound was

3    generated and then the direct path to where they were

4    when they heard the sound.

5        Q.  Okay.  And --

6        A.  That can affect the level, depending on any

7    obstructions in the way.  The difference between those

8    two --

9            MR. SKROCKI:  Your Honor, I'm going to object.

10   We're outside the scope of direct and now we're into

11   some new area.  This is going to force me to cross.

12           THE COURT:  Mr. Colbath?

13           MR. COLBATH:  I thought he was asked if it made

14   a difference to be down here.  That was what I was

15   trying --

16           THE COURT:  I don't know if he asked that.  I

17   think he pointed out where the witness -- where the

18   earwitness was.

19           MR. COLBATH:  I was just trying to see if that

20   would make a difference in where the sound could be

21   perceived from.  That was my only question.  I didn't

22   intend that to be outside other than the change of

23   location.

24       A.  Someone might --

25           THE COURT:  Excuse me.  Simply a yes or no

1   would be fine without an explanation.

2   BY MR. COLBATH:

3       Q.  Does where the sound comes from compared to where

4   you are on the road matter?

5       A.  It can.  It depends on that direct path.

6       Q.  Okay.

7       A.  But in general, there is not enough difference in

8   distance to make an appreciable -- from the sound

9   propagating outside, that distance is not enough that

10  somebody would be able to hear a difference in level.

11      Q.  All right.

12          THE COURT:  Follow-up on that topic?

13          MR. SKROCKI:  Thank you.  No, Your Honor.

14          THE COURT:  All right.  Very good.  Thank you,

15  sir.  You may be excused.

16          (Witness excused)

17          THE COURT:  It's just before 12:00.  Ladies and

18  gentlemen, I'm going to excuse you at this time, have

19  you back at 8:45 on Monday.

20          I can't recall if I told you all that we're not

21  going at all next Friday, but we're going a full day the

22  rest of the week, as needed.

23          I hope you have a pleasant weekend and the

24  weather stays okay, and that you remember my admonition

25  not to discuss the case or do any research.  We'll see

1  you all at 8:45 on Monday.

2          (Jury absent)

3          THE COURT:  Please be seated, everyone.  Sir,

4  you may be excused.  Thank you.

5          Mr. Skrocki, well, first of all, Emily

6  indicated she e-mailed everyone a draft of the jury

7  instructions, so did you all receive those?

8          MR. SKROCKI:  We have received them.

9          THE COURT:  I have not looked at them.  I

10 looked at them briefly so we can take them up in due

11 course, but it really did look as if there was

12 substantial agreement.

13         I'm disinclined to give the instruction on

14 impeachment, but we can take that up next week.  I kept

15 it in there so we are sure to discuss it.

16         Mr. Skrocki, anything else to take up this

17 week?

18         MR. SKROCKI:  No, Your Honor.  Thank you again

19 and have a good weekend.

20         THE COURT:  You too.

21         Mr. Colbath, anything else to take up?

22         MR. COLBATH:  I don't think so, Your Honor.  We

23 may have like one additional instruction.  We'll work on

24 those.  I glanced through them as well, so we'll be

25 prepared to do that.

1          I have some video -- I'm just checking here.

2     We do have a video witness or two lined up for Monday

3     morning.  I think I will call one live witness first and

4     then --

5          THE COURT:  We should have it ready to go.

6          MR. COLBATH:  Yes.  I believe the IT folks have

7     been at least talked to or they are working right now

8     with the court in whatever location the witnesses are

9     at.

10         THE COURT:  That sounds fine.  And then what's

11    the plan in terms of going forward for the full week?

12         MR. COLBATH:  My witness list hasn't changed,

13    and so it's just a matter of how -- we had about 25 or

14    27 witnesses, and we're through nine of them in this day

15    and a half.

16         THE COURT:  We may get this case to the jury in

17    the middle of the week?

18         MR. COLBATH:  I could not see me being done

19    before Wednesday, and recognizing we don't work on

20    Friday.  We may be done with evidence on Wednesday, and

21    if there was no rebuttal case or a real limited rebuttal

22    case, the evidence could be concluded on Wednesday.  I

23    don't anticipate it being sooner than that.

24         THE COURT:  That's helpful.  Are there any

25    experts on Monday that I should take a look at their

1　reports?

2　　　　　MR. COLBATH:  There are, Your Honor.  I'll

3　check.  Assuming he arrives over the weekend, our hope

4　was to have Mr. McCrary testify on Monday, and then a

5　number of -- we're calling them, I guess from our

6　context as fact witnesses, so I don't know if the Court

7　wants their reports.  And quite honestly --

8　　　　　THE COURT:  If you're calling them as -- no.

9　　　　　MR. COLBATH:  Just a couple of government

10　analysts, the DNA -- the lady who did the DNA analysis,

11　the scientist who did some of the trace evidence, those

12　things, but there is not going to be controversy over

13　their methodologies or reports I don't anticipate.

14　　　　　That's part of what we're lining up on the

15　video.  We hope to have some of that Monday.  I think

16　Mr. McCrary would be the only expert with our travel

17　plans at this point.

18　　　　　THE COURT:  Very good.  Then we'll go off

19　record.  We'll be back here at 8:30 a.m. on Monday

20　morning.

21　　　　　DEPUTY CLERK:  All rise.  Court is in recess

22　until 8:30 a.m. Monday morning.

23　　　　　(Recessed at 11:57 a.m.)

24

25

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of May, 2020.


/s/ Sonja L. Reeves
SONJA L. REEVES, RMR-CRR
FEDERAL OFFICIAL COURT REPORTER