1           UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4        Plaintiff,           )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7        Defendant.           )
    _____)
8

9           TRANSCRIPT OF TRIAL BY JURY - DAY 16
      **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10            September 30, 2019; 8:39 a.m.
                   Anchorage, Alaska
11

    **FOR THE GOVERNMENT:**
12        Office of the United States Attorney
          BY:  STEVEN SKROCKI
13        BY:  CHRISTINA M. SHERMAN
          BY:  KELLEY L. STEVENS
14        222 West 7th Avenue, #9
          Anchorage, Alaska 99513
15        (907) 271-5071

16  **FOR THE DEFENDANT:**
          Office of the Federal Public Defender
17        BY:  GARY GEORGE COLBATH
          601 West 5th Avenue, Suite 800
18        Anchorage, Alaska 99501
          (907) 646-3400
19
          Camiel & Chaney, P.S.
20        BY:  PETER A. CAMIEL
          520 Pike Street, Suite 2500
21        Seattle, Washington 98101
          (206) 624-1551
22  _____

23            **SONJA L. REEVES, RMR-CRR**
             Federal Official Court Reporter
24              222 West 7th Avenue, #4
               Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

1                    I N D E X

2            September 30, 2019, Trial Day 16

3    Witnesses:          Direct    Cross    Redirect    Recross

4    Indrea Gainer         18       31        --          --

5    Carl Blain            33       44        48          --

6    Kristin Small         49       57        59          --

7    Para Upchurch         60       77        --          --

8    Joseph Hostetler      79       --        --          --

9    Gregg McCrary         96      130       144          --

10   Bruce Johnson        153      185       188          --

11               E X H I B I T   I N D E X

     Exhibit                                          Page
12
     DE-12       Photo Kodiak MWR Auto Hobby           36
13
     DE-13       Photo Kodiak MWR Auto Hobby           36
14
     DE-14       Photo Kodiak MWR Auto Hobby           37
15
     DE-122A     Photos of T-1 Camera Room            162
16
     DE-123      T-2 Camera Still Shots               168
17
     DE-137      Anton Larsen Bay Road Bridge 6       173
18
     DE-138      Anton Larsen Bay Road Bridge 6       173
19
     DE-144      Boat Dock                            177
20
     DE-145      Boat Dock                            177
21
     DE-152      Water Treatment Plant                181
22
     DE-154      Anton Larsen Bay Road                182
23
     DE-157B     CD AK Air Terminal 1 Video           184
24
     DE-187      CD Indrea Gainer T-1 Video            23
25               Clip

1          (Call to to Order of the Court at 8:39 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4   the United States District Court is again in session.

5          THE COURT:  All right.  Good morning.  Please

6   be seated.  And I hope everyone is feeling a little bit

7   better.  I am.

8          So Mr. Skrocki, what's up?

9          MR. SKROCKI:  Just a couple things, Judge.

10  With respect to the e-mail exchange over the weekend,

11  just briefly, we don't oppose a court order for all

12  parties not to disclose information to witnesses outside

13  the court who haven't testified yet.  Did you see those?

14          THE COURT:  No.

15          MR. SKROCKI:  Good for you.  Do you want to go

16  first since you started the e-mail exchange?

17          MR. COLBATH:  I certainly will.

18          THE COURT:  Go right ahead, please.

19          MR. COLBATH:  Thank you, Your Honor.  I sent

20  the Court -- I sent it to Emily, it was late in the day

21  on Friday, an e-mail that I felt was necessary after

22  getting further information from defense witness Frank

23  Stearns.  The Court might recall Mr. Stearns was one of

24  the individuals in the water treatment plant.

25          We had interviewed Mr. Stearns and subpoenaed

1   him to testify maybe July.  And so we had him coming,

2   although his travel -- between then and trial, he left

3   Kodiak.  And so it took some logistical finding to find

4   him down in the Lower 48 and get him up here.  We had

5   him under subpoena for many months.  He had been

6   identified earlier.

7          Friday, when he arrived at the courthouse to

8   testify, in meeting with him, he had indicated, and it

9   came out actually during the testimony, that FBI agents

10  unidentified to us -- I mean, we don't know who ended up

11  talking to him, but somebody had arrived at his hotel

12  early Friday morning, talked with him.

13         And at least what he relayed to Mr. Camiel, who

14  was visiting with him, and then after the fact to me was

15  that the FBI had told him, well, the defense is saying

16  this or that about you.  And it was information that it

17  sure sounded to us like were representations we had made

18  during the out-of-presence hearing the day before

19  regarding Mr. Beck.  It was almost verbatim

20  representations of arguments we were making in

21  furtherance of his testimony.

22         And he was not all too happy with us about

23  those representations.  They happened to be inaccurate.

24  And so we told him, no, no, that we're calling you for

25  the same reasons we were going to call you all along.

These are the issues. And he said, oh, okay, fine. And
then he ended up testifying and whatnot.

But it was bothersome to us that he was
approached just as he was. Certainly all the parties
have the right to contact witnesses and do follow-up
interviews or whatnot. But it sure appeared like
information was conveyed to him from -- related to
either the testimony of Mr. Heckerman, who was working
under him, that had occurred the day before and/or
in-court information from the trial.

Well, I -- that could probably only be passed
along. It didn't sound like he had talked to any
attorneys. So I presume that it came either through
Agent Allison or Agent Woods who have been in the
courtroom throughout and watching. Or it came to
them -- came to him secondhand through them and another
agent. We didn't know, because, as I say, it didn't
dawn on me to ask him if he knew who talked to him.

But anyway, that was a concern to us that
people in the courtroom were conveying almost real time
to witnesses who were going to be testifying information
from in the courtroom.

So my e-mail simply concluded, basically laid
that out and indicated that I would be asking the court
to provide some direction to case agents, to people in

the courtroom that that's obviously a violation of the

sequestration order.  I think the Court made a comment

about Mr. Beck, that it's inappropriate for an expert to

sit in the courtroom and listen to other testimony and

then tailor their testimony to that.

It would be certainly inappropriate for any

case agents or investigators, otherwise people in the

courtroom, to do that and then either change their own

testimony in light of it or, more importantly, influence

witnesses who have yet to testify.

So that was the nature of my e-mail.  And then

Mr. Skrocki responded, which I'll let him go through,

and concluded with essentially concurring in the

ultimate request that I made.  And that is that it's

appropriate that the Court let anybody know that

in-court information should not be passed along to

witnesses who have yet to testify.

THE COURT:  Thank you.

MR. COLBATH:  So that was -- and that was the

singular issue that I raised or that we had from the

defense perspective over the weekend, other than I would

also let the Court know that my first witness was going

to be Dr. Gan today.  She has not showed up.

And we are working -- that's why Mr. Johnson is

not in the courtroom here.  We're working with trying to

reach the folks at the -- at the VA Medical Center where
she works and see what the delay or the problem is to
try to get her here.  So that threw us a little loop.

We're -- our next witness was going to be our
video witness.  And so we're also trying to see if that
person is already staged at the courthouse where she is
and we're ready, we'll likely just ask the Court to take
a little -- a minute or two to make sure we have the
video lined up.  And we'll start with the video because
that will get that limited.  We had anticipated calling
two witnesses by video, and we may not now so we can get
the video testimony done and out of the way.

But we've got one other witness that did not
arrive.  So we've got two witnesses that we anticipated
today that did not arrive and one that -- two that we
have elected not to call.  So we have some -- despite a
whole weekend to be organized in anticipation of being
organized, we're not.  But we'll do as much as we can
today for sure.

THE COURT:  All right.  Mr. Skrocki, go ahead,
please.

MR. SKROCKI:  Good morning, Your Honor.  I
encourage the Court to read the e-mail traffic --

THE COURT:  I'll go track it down.

MR. SKROCKI:  Yeah.  Track it down if you

could.  We took it very seriously.  Mr. Colbath fired a

shot across the bow claiming that the agents had somehow

interfered with Mr. Stearns.  Mr. Stearns was on the

defense witness list I'm sure, but he was not really

called to testify until the day before and he was rushed

on a plane to land here Friday.

In the process, Agent Allison contacted him.

The point of the interview was this, is that his -- he

had a recorded statement, as you heard that stated they

started work at 7:10.  When the agents interviewed

Mr. Stearns, he indicated the investigator wanted him to

say work started prior to that time.

And so with that recorded interview, we thought

it was important for him to have that prior to him

taking the stand.  We took Mr. Colbath's e-mail very

seriously.  We spent a lot of the weekend constructing a

response.  I requested a report of investigation by the

agents.  They provided that.  That's attached to our

e-mail response, so you can read that.  And no

information in court was exchanged.  That's the bottom

line from our perspective.  We didn't --

THE COURT:  Well, I don't operate well with

e-mails, which is to say if there's a motion it should

be in the public record or filed under seal.  I don't

know if -- I know I've had Emily send draft jury

```
1    instructions, that sort of thing to counsel.  But if
2    there's a motion, and I heard an oral motion to direct
3    participants here in the courtroom not to share
4    testimony that has been presented in court with any
5    other prospective witnesses.  Does the government object
6    to that?
7              MR. SKROCKI:  As applied to all the parties.
8              THE COURT:  Correct.
9              MR. SKROCKI:  Mr. Colbath's was directed to the
10   government exclusively.  We thought that was a little
11   bit limiting, so we requested that it be applied to all
12   the parties in this case.
13             THE COURT:  All right.
14             MR. SKROCKI:  I think that will take care of
15   the issue.
16             THE COURT:  All right.  And then withdraw your
17   request that I read all these e-mails?
18             MR. SKROCKI:  There's only two.
19             THE COURT:  And attachments.  I mean, if
20   there's a motion that's fine, but --
21             MR. SKROCKI:  That's fine, Judge.
22             THE COURT:  -- it should be part of the record.
23             MR. SKROCKI:  If you're satisfied that order
24   will take care of this matter, then we can move on.
25             THE COURT:  I'm hearing I don't need to resolve
```

1    the dispute about what may have been conveyed to the

2    witness.

3            MR. SKROCKI:  I think that's clear.

4            THE COURT:  All right.  Very good.

5            MR. COLBATH:  I agree.

6            THE COURT:  I don't sound like I'm shirking my

7    responsibilities.  If there's a motion it should be

8    therefore reviewed.

9            All right.  Mr. Colbath, any objection to

10   having this order applied to all parties, all

11   spectators?

12           MR. COLBATH:  Yeah, obviously, it would be

13   appropriate for all parties.  Nobody should be conveying

14   information from the courtroom to witnesses who have not

15   testified.

16           THE COURT:  All right.  Well, then anything

17   else to add?

18           MR. SKROCKI:  Just two things.  Add to that,

19   no.  I have two more things to request.

20           We're getting to the stage where defense

21   experts will be called.  Today I've been advised

22   Mr. McCrary is going to testify.  We would request that

23   with all defense experts that are subject to the Court's

24   pretrial ruling that the Court instruct the witness as

25   to the parameters of the testimony.

1          I ask that only because of maybe an inadvertent
2    slip by the witness or something else that may come out
3    without prompting from either side that would require us
4    to either open the door to something we don't want to go
5    into or a motion to strike and to instruct the jury not
6    to pay attention to what was said.  I think that would
7    make sense prior to anybody testifying.
8          THE COURT:  What would be helpful in that
9    regard is if you could point me to where in the docket
10   is any order regarding a specific expert.
11         MR. COLBATH:  Your Honor.
12         THE COURT:  Then I'll take that up with the
13   defense of course first.
14         MR. SKROCKI:  Sure.  But Mr. McCrary, for
15   example, just for today, it would be Docket 1070.
16         THE COURT:  Okay.
17         MR. CAMIEL:  Your Honor, I can tell you we met
18   with Mr. McCrary yesterday, and we gave him the section
19   of your order and went over it with him yesterday --
20         THE COURT:  All right.
21         MR. CAMIEL:  -- that pertains to him.
22         THE COURT:  And did you discuss with him as
23   well the need to not mention that there was a prior
24   trial?
25         MR. CAMIEL:  We did.

1          THE COURT:  Okay.  Which page of 1070 is it?

2          MR. SKROCKI:  It's going to be page 33.

3          THE COURT:  All right.  So this was the

4   individual that didn't reference this case at all,

5   right?

6          MR. CAMIEL:  That's right.

7          MR. SKROCKI:  He wrote a generic 14-page

8   letter.

9          THE COURT:  Right.

10         MR. SKROCKI:  Just so he has that in mind.

11         Then the last piece is defense has been kind

12  enough to give us their witness list today, and that

13  includes Para Upchurch.  So we're trying to figure

14  out -- we would request a proffer from the defense as to

15  why they're calling Ms. Upchurch as opposed to having

16  her recite testimony from prior to or some other

17  matters.  We're just trying to figure out the point of

18  it so we don't get into areas where there's either --

19  there's some issue that we just can't anticipate.  We

20  just don't have any idea of why they're calling her.

21         And so I think it would make some sense like a

22  proffer as to the subject matter of her testimony so as

23  not to object in front of the jury.  Or if the Court

24  prefers just to put her on and we can take a sidebar, we

25  can do that.  That's the concern.

     1          THE COURT:  Who can I hear from with regard to

     2     Ms. Upchurch?

     3          MR. COLBATH:  Your Honor, Ms. Upchurch is going

     4     to be my witness.  I guess I don't know of any rule that

     5     requires me to do an ahead-of-time proffer.  I'm not

     6     going to call her for matters that have already been

     7     covered by the government.  And there was no -- there's

     8     been no motions or rulings other than general issues,

     9     mostly defense motions related to limiting testimony.

    10     I'm certainly not going to get into anything that the

    11     Court has otherwise prohibited.

    12          There were just some areas -- she was

    13     interviewed seven, eight times by the government.  I

    14     have four or five transcripts of things, 302s related to

    15     her.  There were a number of questions related to sort

    16     of areas of investigation and interviews with her that

    17     were done that didn't -- they weren't really neat

    18     follow-ups or didn't fit within, as I saw it, the direct

    19     examination that was originally elicited by the

    20     government.

    21          She was called fairly early on in the

    22     government's case, and I wasn't sure of what other

    23     rigger shop people would say, other COMMSTA employees

    24     would say.  And so I didn't get into a few of these

    25     areas, just not knowing what the other testimony would

1    be.  And then after having heard all the government's

2    evidence, there are just a few more things I wanted to

3    ask her on direct examination.

4         So I don't anticipate it being long.  I don't

5    anticipate replowing any ground that the government has

6    already covered.  There were a few contacts she had with

7    law enforcement and things she said in interviews that I

8    want to ask her about.  And that's it.

9         THE COURT:  All right.

10        MR. COLBATH:  I mean, it will be fairly short

11   and straightforward.  It's certainly not anything the

12   government wouldn't be aware of, as it all comes from

13   government reports.

14        THE COURT:  I thought the plan was to have each

15   witness generally testify just once.  And --

16        MR. COLBATH:  It was, Your Honor.

17        THE COURT:  So I guess my question is, is she

18   the only person that's getting recalled or is there

19   going to be --

20        MR. COLBATH:  No.  So far, this is the only

21   witness I've been able to identify that additional

22   information looked like it might be helpful.  So I don't

23   anticipate -- like I say, first of all, her testimony

24   will be 30 minutes or less.  And yeah, she's the only

25   one so far that we've been able to determine, oh, there

1  were some additional things that now seem relevant or

2  now we want to ask her about.

3          THE COURT:  I'm not going to require the

4  defense to make a proffer with regard to Ms. Upchurch.

5  But certainly the government can object to the extent

6  that it reopens a prior area.  If you seek a break after

7  the direct in order to prepare the cross, I would

8  certainly consider that as well if you need to find

9  statements or the like to be able to respond.

10         MR. SKROCKI:  Yes, Your Honor.  Thank you.

11         THE COURT:  All right.  With regard to

12 Mr. McCrary, Mr. Camiel, you're going to be presenting

13 that witness?

14         MR. CAMIEL:  Yes.

15         THE COURT:  What's your thought on having the

16 Court instruct him on the scope of the order?

17         MR. CAMIEL:  I don't have any objection to it.

18 I just wanted the Court to know that we've already

19 talked to him about that and given him a copy of your --

20 the section of your order that deals with him.  But I

21 don't object to that.

22         THE COURT:  All right.  Then I will grant that

23 request, and we'll do that before he testifies.

24         And with regard to the original topic that came

25 up here, I would direct all the spectators here in the

courtroom, including the FBI agents, not to share any
testimony with individuals that may be called to
testify.  And that's really a key part of our process.
Whether or not that occurred, I'm not going to decide,
but simply direct that to not be sharing testimony or
other evidence that's been presented here in the
courtroom with prospective witnesses.

        All right.  Anything else to take up?

        MR. SKROCKI:  No, ma'am.  Thank you.

        THE COURT:  Anything else?

        MR. COLBATH:  No, Your Honor.  If we can just
have a few minutes to see if by chance my witness
arrived while we were in here.  If she didn't we'll make
sure we have the video witness to start with and kind of
see where we're at people-wise.

        THE COURT:  All right.  Very good.  And when is
Mr. McCrary anticipated today?

        MR. COLBATH:  Probably third or fourth-ish --
fourth or fifth witness.

        THE COURT:  Is he here now?

        MR. COLBATH:  So late morning, just after
lunch.

        THE COURT:  Maybe at the lunch break then, I
could take up inquiry with him?  Mid-morning.  I'm
sorry.

1          MR. CAMIEL:  He's expected to be in the
2     courthouse by 11:00.
3          THE COURT:  All right.  We'll figure that out,
4     then.  We'll go off record.
5          DEPUTY CLERK:  All rise.  Court stands in a
6     brief recess.
7          (Recessed from 8:57 a.m. to 9:42 a.m.)
8          (Jury present)
9          DEPUTY CLERK:  Court is again in session.
10          THE COURT:  All right.  Good morning, everyone.
11     Please be seated, ladies and gentlemen.  Welcome back.
12          Are we ready for your next witness?
13          MR. COLBATH:  We are at this point, Your Honor.
14     I apologize to all for the wait.
15          THE COURT:  Well, we've solved the logistical
16     issues.
17          MR. COLBATH:  We've solved our logistical
18     issues at least to get us started.
19          THE COURT:  All right.  And who do we have here
20     on the video?
21          MR. COLBATH:  Your Honor, our first witness
22     will be Indrea Gainer.
23          THE COURT:  Ms. Gainer, it's Judge Gleason.
24     Can you hear me?
25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  You've been called as a witness in

2    *United States versus Wells*.  We're here in a courtroom

3    in Anchorage, Alaska, and we'll be recording your

4    testimony.  I'm going to have the clerk here administer

5    an oath to you.

6          (Oath administered to the witness)

7          DEPUTY CLERK:  Can you please state your full

8    name for the record and then spell your full name.

9          THE WITNESS:  Indrea Annive Monice Gainer,

10   I-n-d-r-e-a, A-n-n-i-v-e, M-o-n-i-c-e, G-a-i-n-e-r.

11         THE COURT:  Go ahead, please, Mr. Colbath.

12         MR. COLBATH:  Thank you, Your Honor.

13            INDREA GAINER, DEFENSE WITNESS, SWORN

14                      DIRECT EXAMINATION

15   BY MR. COLBATH:

16     Q.  Good morning, Ms. Gainer.  Where are you

17   currently located?

18     A.  I am located in New Albany, Indiana.

19     Q.  And you reside in Indiana?

20     A.  Yes, sir.

21     Q.  And what do you currently do for a living?

22     A.  I am unemployed as of now.

23     Q.  All right.  Where were you -- was there a time

24   where you were in the United States Coast Guard?

25     A.  Yes, sir.

1    Q.  And what time period was that?

2    A.  I served in the military from 2006 to 2017.

3    Q.  And where were you -- was a portion of that

4    service, were you stationed in Kodiak, Alaska?

5    A.  Yes, sir.

6    Q.  What years were you in Kodiak?

7    A.  From 2011 June to March of 2014.

8    Q.  And what was your work in the Coast Guard?  What

9    was your position relative to your time in Kodiak?

10   A.  I was a storekeeper.

11   Q.  All right.  And did you work on the main base, or

12   did you work at another location?

13   A.  I worked on the main base.

14   Q.  Okay.  Were you married at the time?

15   A.  Yes, sir.

16   Q.  And was your husband also in the Coast Guard?

17   A.  Yes, sir.

18   Q.  Where did he work?

19   A.  He worked at the communication center.

20   Q.  So that would have been the communication center

21   that was located off main base and out in a more rural

22   area of the island?

23   A.  Yes, sir.

24   Q.  You're familiar with that -- had you -- or are

25   you familiar with that?  Had you been to the

1    Communication Station?

2       A.   Several times.

3       Q.   All right.  So I want to take you back to

4    April 12th of 2012.  It's a day that involves the matter

5    that this trial relates to.  First of all, were you

6    working that day?

7       A.   Yes, sir.

8       Q.   So you would have been working at your job on

9    main base?

10       A.   Yes, sir.

11       Q.   And was your husband working that day at his job

12    at the Communication Station?

13       A.   Yes, sir.

14       Q.   Was he -- what shift had he been working?

15       A.   He had worked the night shift.

16       Q.   So during the overnight from April 11th into the

17    morning hours of April 12th, he worked, or would it have

18    been the night of April 12th into the next morning?

19       A.   The night of April 11th to the morning of

20    April 12th.

21       Q.   All right.  Did you have occasion on the morning

22    of April 12th to be out at the Communication Station?

23       A.   Yes, sir.

24       Q.   And what was the circumstances that led you to be

25    out there?

1       A.  I had to pick my husband up from work that day so

2   he could drop me off at work.  We had only one car that

3   day.

4       Q.  And what was the car that you had, do you recall?

5       A.  It was a 2009 Ford Flex, silver.

6       Q.  Silver Ford Flex.  All right.  What time would it

7   have been in the morning roughly that you made your way

8   out to the COMMSTA?

9       A.  I can't be certain, but around 7:00 in the

10  morning.

11      Q.  Okay.  Where were you living at the time?

12      A.  We were living off base, in off-base housing.

13  Or --

14      Q.  Was that in the town of Kodiak?

15      A.  Yes, sir.

16      Q.  And so where would you have been coming from as

17  you went out to the Communication Station to pick your

18  husband up and, if you remember, what route would you

19  have traveled?

20      A.  I would have taken the main road from the town.

21  I can't recall the name of it.

22      Q.  Okay.  And then at some point, do you turn off

23  that main road and go up any different streets or roads

24  that lead to the Communication Station?

25      A.  Yes, sir.

1    Q.  And do you recall the name of that road that led

2 up to the Communication Station?

3    A.  I do not, sir.

4    Q.  All right.  But you followed that normal route,

5 the same route that you always took from town out to the

6 Communication Station in the many times that you had

7 been there?

8    A.  Yes, sir.

9    Q.  All right.  And was there -- well, what I would

10 like to do is I'm going to have our camera turn off of

11 me and onto a video screen and have you watch a short

12 video to see if you can identify your vehicle in the

13 video and the timing of this.

14       Your Honor, what I'm going to do is I'm going to

15 show Ms. Gainer defense Exhibit No. 187.

16          THE COURT:  All right.

17          MR. COLBATH:  I'm going to move for its

18 admission.  It's a short video clip from government's

19 Exhibit 62 that is already in.  It's just an amount

20 limited to this witness.

21          THE COURT:  Any objection?

22          MS. STEVENS:  No, Your Honor.

23          THE COURT:  All right.  And this was 187,

24 Defense?

25          MR. COLBATH:  It is Defense 187.

 1          So Ms. Gainer, we're going to turn this camera

 2   so it's on our movie screen.

 3          (Defense Exhibit No. 187 admitted.)

 4          MR. COLBATH:  And you just watch this short

 5   video, and then I'll have some short questions about it.

 6   BY MR. COLBATH:

 7      Q.  You're able to see that, ma'am.  It hasn't

 8   started yet, but you're able to see that screen?

 9      A.  Yes, sir.

10      Q.  Okay.  So we'll watch the video.

11          (Defense Exhibit No. 187 playing in open court.)

12   BY MR. COLBATH:

13      Q.  So if I leave the video on there and you look at

14   that screen, can you recognize your car or do you see a

15   portion of your car in the video?

16      A.  Yes, sir, I do.

17      Q.  All right.  And you said that it was a silver

18   Ford Flex.  I don't know if you can see my circle on the

19   video, but does that appear -- is that the car you're

20   talking about?

21      A.  Yes, sir, that is where I parked.

22      Q.  Okay.  And if we can take that part down.

23          Ms. Gainer, you see on the video that the time

24   shows it's the morning of April 12th at about 7:06 a.m.

25   in the morning.  Does that seem to be with your

1    recollection about the time you would have arrived to

2    pick your husband up?

3        A.  Yes, sir.

4        Q.  And how long did you wait -- okay.  We can take

5    that down if you can.

6            How long did you wait there for your husband to

7    come out of the Communication Station?

8        A.  I'm uncertain but probably about 20 to

9    30 minutes.

10       Q.  All right.  Before we talk about that 20 to

11   30 minutes, as you were traveling from town out that

12   roadway that you talked about and getting to the

13   COMMSTA, did you observe any either people on the

14   roadway or vehicle activity that you thought was unusual

15   at all?

16       A.  Yes, sir.  There was a man walking toward the

17   communication center.

18       Q.  Okay.  Do you recall along the roadway where you

19   would have seen this person?

20       A.  It was closer to the COMMSTA where I seen him.

21       Q.  As compared to town, he was farther out towards

22   the COMMSTA than he was closer to town?

23       A.  Yes, sir, he was walking toward the communication

24   center.

25       Q.  Can you describe him for us, anything you

1  remember about him or what this person might have looked

2  like?

3      A.   I just remember he was a white male.

4      Q.   All right.  Remember anything about the clothing

5  that he was wearing or anything else about what he was

6  -- if he was doing anything other than just walking

7  along the road?

8      A.   I can't recall his clothing, but only thing he

9  was doing was just walking.

10     Q.   Okay.  And ultimately, then once -- any other

11 vehicles of note, either parked along the road or that

12 stuck out to you that might have passed you in any

13 directions?

14     A.   No, sir.

15     Q.   Once you got up to the parking lot there at 7:06

16 and waited for your husband -- what time was your

17 husband supposed to get off work?

18     A.   7:00.

19     Q.   All right.  And as you waited there, did you ever

20 see the man who was walking again?

21     A.   No, sir.  My focus was on my children.

22     Q.   All right.  What did you have for children, who

23 did you have for children along?

24     A.   My son and my daughter.

25     Q.   All right.  And as you waited for your husband,

1  did you see people leaving work that morning?  Or

2  describe anybody you recall seeing or just the amount of

3  folks that you saw either coming or going to work.

4      A.  I don't recall.

5      Q.  Okay.  Do you recall that it was busy at all or

6  not busy at all?

7      A.  It was not busy.

8      Q.  Okay.  And did there come a time where you had to

9  leave the parking lot or move the car for any reason

10  before your husband came out?

11      A.  No, sir.

12      Q.  Okay.  And so ultimately, as you sat there, was

13  your attention drawn to any noises or any people or

14  activities in the parking lot that you remember,

15  anything out of the ordinary prior to your husband

16  arriving?

17      A.  No, sir.  We were watching the television in the

18  car.

19      Q.  Okay.  Ultimately, when your husband came out,

20  what happened?

21      A.  He came out and he got in the driver's seat and I

22  walked over and got in the passenger seat, and we drove

23  off base and he dropped me off at work.

24      Q.  All right.  And as you traveled down -- you

25  traveled out of the parking area down that same roadway

1   and back the route you had come to work?

2       A.   No, sir.  We drove out of the parking lot and we

3   drove the opposite direction of where we came to drop me

4   off at the main building.

5       Q.   So you drove -- did you travel down the road that

6   you saw the gentleman walking on back toward town?

7       A.   Yes, sir.

8       Q.   And you didn't see the gentleman at that point?

9       A.   We did.

10      Q.   Where was he at that stage?

11      A.   He was walking back the opposite direction of he

12  was walking before, and he was -- I can't recall where

13  he was, but he was still close to the communication

14  center.

15      Q.   All right.

16      A.   Not close though, but he was close.

17      Q.   Okay.  He had already -- he was -- do you recall

18  there being a water treatment facility out there or some

19  type of water plant?

20      A.   Yes, sir.  I believe it was a yellow building.

21      Q.   Okay.  And so the walker was back -- was he past

22  that, away from the Communication Station?

23      A.   He was around there.  I can't recall if he was

24  past it or not, but I know he was around that, in that

25  vicinity.

1      Q.   That yellow building?

2      A.   Yes, sir.

3      Q.   All right.  Other than seeing him walking back

4  towards town, as you went down the roadway again, was

5  there any other people that drew your attention or

6  vehicles that you recall standing out at all?

7      A.   No, sir.  He stood out because no one normally

8  walks on that road.

9      Q.   Sure.  In the times that you had been out there

10 in the past, you hadn't seen people walking up and down

11 the road?

12     A.   That is correct.

13     Q.   All right.  Just one moment, ma'am.

14          (Pause)

15     Q.   Ma'am, I have one more brief clip, brief video

16 clip which I'm trying to get up -- back up on our screen

17 that I'd like you to look at if I can just get my number

18 here.  Hold on a minute.

19          (Pause)

20     Q.   I'm going to show you, Ms. Gainer -- we're

21 getting our video loaded on our computer screen here.

22 I'll show you one more clip and ask you if you recognize

23 your vehicle in this or traveling in this as well.  It's

24 a part of a larger video, Ms. Gainer.

25          Your Honor, I'm going to show her just a portion

1   of government Exhibit 62 that relates to her vehicle.

2   We'll get it to that spot since the video is 30-some

3   minutes long.

4           (Portion of government Exhibit 62 playing in open

5   court.)

6       Q.   So Ms. Gainer, again, that was your vehicle?

7       A.   Yes, sir.

8       Q.   All right.  And the time here is 7:25:50, so does

9   that seem to be with your recollection about the time

10  you would have spent there in the COMMSTA parking lot,

11  7:06 to 7:25, does that match your --

12      A.   Yes, sir.

13      Q.   -- recollection?  Okay.  And so in between those

14  two times, there was a brief period.  I'm going to show

15  you one more portion of that video.

16          Again, Your Honor, this will be a clip from

17  government Exhibit 62.

18              THE COURT:  All right.

19      Q.   Ms. Gainer, you indicated that your husband was

20  driving when you left?

21      A.   I believe so, yes, sir.

22      Q.   Okay.  I'm going to have you look at one more

23  brief portion of our video.

24          (Portion of government Exhibit 62 playing in open

25  court.)

 1     Q.  Okay.  We'll have you watch this.  So Ms. Gainer,

 2   do you recall at all -- well, first of all, there was

 3   a -- there was an individual that walked at the

 4   beginning of the video there.  It looked like somebody

 5   with gear and whatnot walking into the communications

 6   building.  Do you recall other folks arriving at work

 7   that morning while you were waiting there?

 8     A.  Yes, sir.  Arriving and leaving.

 9     Q.  All right.  And then we saw your car sort of pull

10   out and loop around and then back into the same

11   position.  Do you recall what was going on then?

12     A.  There was a car trying to get out and I was

13   blocking its way.

14     Q.  So you were just moving for -- well, somebody had

15   arrived and then you were moving for somebody that was

16   leaving, but you got yourself back to essentially the

17   same parking spot to wait?

18     A.  Yes, sir.

19     Q.  All right.  And that was at 7:16, so that's about

20   the middle of the -- the middle of the time that you

21   were there with people coming and going?

22     A.  Yes, sir.

23     Q.  All right.

24         MR. COLBATH:  Thank you, ma'am.  I don't have

25   any other questions for you.  We have also government

```
 1    counsel here, and so they may have some questions.
 2             THE COURT:  Go ahead, Ms. Stevens.
 3             MS. STEVENS:  Thank you, Your Honor.
 4                      CROSS EXAMINATION
 5    BY MS. STEVENS:
 6        Q.  Good morning, Ms. Gainer.  Can you hear me?
 7        A.  Yes, ma'am.
 8        Q.  I guess maybe it's afternoon for you guys.
 9        A.  Yes, ma'am.
10        Q.  Okay.  So that morning you had mentioned you had
11    your children in the car with you and were watching a
12    show.  Do you remember what show it was?
13        A.  It was "Your Baby Can Read."
14        Q.  Okay.  And were you guys talking about that show?
15        A.  Yes, ma'am.
16        Q.  So a lot of the -- a lot of attention focused on
17    your kids that morning?
18        A.  Yes, ma'am.
19        Q.  Okay.  Let's see.  You also discussed the
20    gentleman that you saw walking and mentioned that that
21    was a little abnormal because you didn't see a lot of
22    people -- foot traffic on that road; isn't that right?
23        A.  That's correct.
24        Q.  Okay.  Do you recall when you -- when you passed
25    the water treatment plant if you heard any noises?
```

1    A.  No, ma'am.

2    Q.  Okay.

3         MS. STEVENS:  Your Honor, I don't have any more

4    questions.

5         THE COURT:  Any follow-up?

6         MR. COLBATH:  Not to that, Your Honor.

7         THE COURT:  Thank you.

8         MR. COLBATH:  Ms. Gainer can be released.

9         THE COURT:  All right.  Very good.  Ms. Gainer,

10   you can be excused at this time.  Thank you.

11        MR. COLBATH:  Thank you, Ms. Gainer.  You're

12   released from the subpoena we had sent you, and we won't

13   need you any further.  Thank you so much.

14        THE WITNESS:  Thank you.

15        (Witness excused)

16        MR. CAMIEL:  Our next witness is going to be

17   David Blain.

18        THE COURT:  And is this by video as well?

19        MR. CAMIEL:  No.

20        THE COURT:  All right.

21        MR. COLBATH:  And Your Honor, we will not have

22   any other video witnesses today.

23        THE COURT:  Okay.  Very good.

24        MR. COLBATH:  So I don't know if the Court

25   wants to remove the equipment before we --

1          THE COURT:  We'll get it at the next break, but

2     thank you for your help.

3          (Pause)

4          THE COURT:  Good morning.  If you could come to

5     the witness stand, please.  And when you get up there

6     remain standing if you would and the clerk will

7     administer an oath to you.

8          (Oath administered to the witness)

9          DEPUTY CLERK:  For the record, can you please

10    state your full name and then spell your full name.

11         THE WITNESS:  Carl David Blain, C-a-r-l,

12    D-a-v-i-d, B-l-a-i-n.

13              CARL BLAIN, DEFENSE WITNESS, SWORN

14                      DIRECT EXAMINATION

15    BY MR. CAMIEL:

16       Q.  Good morning, Mr. Blain.

17         THE COURT:  Oh, sir, can you get that

18    microphone just a little bit closer.  Thank you.  You

19    can push it down too if that's -- very good.  All right.

20    Go ahead, please, Mr. Camiel.

21    BY MR. CAMIEL:

22       Q.  Mr. Blain, where do you currently live?

23       A.  Kodiak.

24       Q.  How long have you lived in Kodiak?

25       A.  Since 2002.

1    Q.  Have you -- were you formerly with the Coast

2  Guard?

3    A.  Correct.

4    Q.  What years were you with the Coast Guard?

5    A.  '74 to '96.

6    Q.  What do you currently do in terms of occupation?

7    A.  I'm a civilian employee with the Coast Guard.

8    Q.  Do you run a particular business or maintain a

9  particular business?

10    A.  Auto hobby shop.

11    Q.  Can you tell the jury what that is?

12    A.  It's a facility for the -- anyone authorized to

13  use mechanical work on their cars, change oils, tires,

14  whatever, so they won't have to pay the high cost of

15  a -- the expense in town.

16    Q.  Where's the hobby shop located?

17    A.  It's on the base.

18    Q.  On the main base?

19    A.  Yes.

20    Q.  And when is it open?

21    A.  It's open Thursday, Friday, Saturdays and

22  Sundays.

23    Q.  What are the hours?

24    A.  Thursday and Friday, it's 11:30 to 2200.

25  Saturday, it's 10:00 a.m. to 10:00 p.m.  And Sunday,

1  it's 1300 to 2000.

2    Q.  And it's open for who to use?

3    A.  Anyone that's authorized to -- you know,

4  dependents, military dependents, civilian employees,

5  active duty personnel.

6    Q.  So how would they go about using it?  If somebody

7  wanted to do some work on their car, how would they go

8  about doing that?

9    A.  They would just walk in the facility and sign in,

10 and we assign them a place for whatever they're going to

11 do.

12   Q.  I'm going to have you take a look first for

13 foundation at defense Exhibit No. 12.  Do you recognize

14 what's on the screen?

15   A.  Yes.

16   Q.  And is that the hobby shop that you've been

17 telling us about?

18   A.  Correct.

19   Q.  Obviously the date's not correct since we haven't

20 hit November of 2019 yet, but other than that, does it

21 appear to be the way it looked, say, back in 2012?

22   A.  Yes.

23        MR. CAMIEL:  I would offer defense Exhibit

24 No. 12.

25        MS. STEVENS:  No objection.

1           THE COURT:  All right.  12 is admitted.

2           (Defense Exhibit No. 12 admitted.)

3   BY MR. CAMIEL:

4       Q.  Can we put up Defense 12.

5           So that's the entrance that folks would drive in

6   when they want to work on their vehicles?

7       A.  Yes.

8       Q.  And if we take that one down and have Mr. Blain

9   look at defense Exhibit No. 13.

10          And do you recognize that photograph?

11      A.  Yes.

12      Q.  And what is that?

13      A.  It's the interior of the shop.

14      Q.  What do you have -- tell us what you have in the

15  shop, what kinds of things.

16      A.  It's just bays where people -- assigned bays,

17  they're numbered bays.  And you come in and we assign

18  you a bay depending on what you want to do to your

19  vehicle.

20          MR. CAMIEL:  I would offer Defense 13.

21          THE COURT:  Any objection to 13?

22          MS. STEVENS:  No, Your Honor.

23          THE COURT:  All right.  13 is admitted.

24          (Defense Exhibit No. 13 admitted.)

25  BY MR. CAMIEL:

1    Q.  So we're looking at some of the bays where people

2    can work on their cars?

3    A.  Correct.

4    Q.  And in addition to having these bays, did you

5    have any tire machines where people could change their

6    tires?

7    A.  Yes, seven.

8    Q.  Seven.  And so that's -- if somebody wanted to

9    change their tires from -- take them off the rim and,

10   for example, change out their summer tires to their

11   winter tires, they could do it there?

12   A.  Correct.

13   Q.  Was that something common that people from the

14   base would do at the hobby shop?

15   A.  Correct.

16   Q.  Can I have Mr. Blain look at Defendant's 14.

17       Is that another picture of the inside of the

18   hobby shop showing a couple of your tire machines?

19   A.  Correct.

20       MR. CAMIEL:  I would offer Defendant's 14.

21       MS. STEVENS:  No objection.

22       THE COURT:  All right.  14 is admitted.

23       (Defense Exhibit No. 14 admitted.)

24   BY MR. CAMIEL:

25   Q.  In addition to having the bays and the tire

1  machines, did you have other types of equipment that
2  people could use to work on their cars?
3      A.  Yes, automotive lifts.
4      Q.  Did you have jacks?
5      A.  Yes.
6      Q.  Tools?
7      A.  Yes.
8      Q.  And so if somebody -- how -- how much did it cost
9  to go in and work on your car?
10     A.  $7 an hour for a bay.  It's $2 to change a tire
11 and $6 to balance a tire.
12     Q.  Quite a bit cheaper than going to a commercial
13 place?
14     A.  Yes.
15     Q.  Mr. Blain, back in 2012, at some point you
16 probably heard about the murders that happened up on the
17 COMMSTA; is that right?
18     A.  Yes.
19     Q.  Sometime after that were you contacted by law
20 enforcement?
21     A.  Yes.
22     Q.  Did they want to talk to you about a firearm?
23     A.  Yes.
24     Q.  Can you tell us about that?
25     A.  They showed up at my house.

```
 1          MS. STEVENS:  Objection, Your Honor.  That's
 2  hearsay.
 3          MR. CAMIEL:  I haven't heard any hearsay yet.
 4  He just said they showed up at his house.
 5          THE COURT:  All right.  We don't want to hear
 6  what anybody said to you, but you can describe that
 7  people came to your home.  I have a whole book of
 8  evidence rules that I'm applying here.
 9          Let's hear the next question.
10  BY MR. CAMIEL:
11     Q.  Did law enforcement come to your house?
12     A.  Yes.
13     Q.  And what kind of a firearm did you have that they
14  wanted to look at?
15     A.  I had a Taurus 44-Magnum.
16     Q.  How long had you that?
17     A.  Probably a year, year and a half, maybe two.  I
18  don't know.
19     Q.  And where did that come from?  Do you know where
20  it was purchased?
21     A.  It was purchased at the exchange, and I got it
22  for Christmas from my wife.
23     Q.  And did you show it to the law enforcement
24  people?
25     A.  Yes, I believe I did.
```

1    Q.   Did they take it from you to go have it tested,

2    or did they just look at it in your presence?

3    A.   No, they didn't take it.

4    Q.   All right.  Did they take any numbers off of it?

5    A.   I believe I recall them writing the serial

6    numbers down or matching them with a piece of paper or

7    something.

8    Q.   But when they left, you still had your Taurus,

9    they didn't take it with them?

10   A.   I don't think they did, yeah.  I can't recall,

11   but yeah, I still had it.

12   Q.   Now, do you recall on April 12th of 2012 what you

13   did that day?

14   A.   Yeah.

15   Q.   What did you do?

16   A.   I had just purchased a new ATV, and I was going

17   to go ride it and see how I liked it and --

18   Q.   Where did you go first to test it out?

19   A.   A place called Burma Road.  It's across from the

20   state airport.  It's a little turn-in off the side of

21   the road.  I unloaded it out of my truck there and road

22   it down Burma Road.  And the creek -- there was a --

23   there's a creek that's washed out, so I turned around,

24   came back and loaded it in my truck.

25   Q.   Let me stop you there for a minute.  So the --

when you went out to Burma Road to -- to unload and ride

your vehicle, about what time of day was that?

    A.  That was probably 7:30 maybe, somewhere around

there, when I got there, yeah.

    Q.  And this first -- what you just described, riding

it out on Burma Road, about how long were you riding?

    A.  Probably -- let's see.  20 minutes maybe.

    Q.  Okay.  And you said you ran into a creek that

blocked you from going any further?

    A.  There was a creek that -- an old bridge that was

back up from the war or the military back in the '40s,

and it was washed out.

    Q.  So what did you do?

    A.  I turned around.

    Q.  Okay.  And then where did you go?

    A.  I went back and loaded my bike in the truck.

    Q.  And from there did you go somewhere else?

    A.  I went to the ski chalet.

    Q.  Where is the ski chalet?

    A.  It's -- I think it's about ten miles out on Anton

Larsen Road.

    Q.  So you -- Burma Road where you had been is near

the airport?

    A.  Yes.

    Q.  And so you drove up Anton Larsen Bay Road?

1    A.   Yes.

2    Q.   And so is the ski chalet -- you have to pass the

3    Communication Station on the way to the ski chalet?

4    A.   Correct.

5    Q.   How about the golf course, did you have to go

6    past the golf course?

7    A.   Correct.

8    Q.   What were you driving that morning that you were

9    carrying your four-wheeler in?

10    A.   It was an old, worn, brown Chevy pickup or gold

11    Chevy pickup.

12    Q.   So you drove -- about what time do you think you

13    drove out to the ski chalet?

14    A.   Probably I'm thinking around 8:30.  I think it

15    was around 8:30, yeah, something like that.

16    Q.   About what time do you think you got up to the

17    ski chalet?

18    A.   Maybe 8:45.

19    Q.   And you were able to drive all the way out there

20    without any trouble?

21    A.   Yeah.

22    Q.   When you got up there, did you notice whether any

23    other vehicles or people were up there?

24    A.   There was a man and a woman up there going hiking

25    up, I guess, the backside -- there's a hiking trail on

1 the backside of Pyramid Mountain.

2     Q.  Did you notice any vehicles that they seemed to

3 be associated with?

4     A.  They were -- they just had a small SUV.

5     Q.  And where was that small SUV parked?

6     A.  It's in the parking lot across from the ski

7 chalet.  There's a big parking lot.

8     Q.  Do you remember the make or model of that SUV?

9     A.  No, not really.

10     Q.  Or the color?

11     A.  No.

12     Q.  Okay.  But it was smaller as compared to a full

13 size?

14     A.  Yeah.

15     Q.  You mentioned this Burma Road area where you

16 first went.  Are you familiar with any trails or old

17 roads that run back behind the COMMSTA?

18     A.  Off of the old -- from when I was first stationed

19 there in '74, there was some old roads.  I don't know

20 what the name of the road is, but it's been blocked off

21 with big boulders.

22     Q.  So it's been blocked so nobody can take a vehicle

23 back there anymore?

24     A.  Right.

25     Q.  But could somebody still hike through there if

1  they wanted?

2      A.   Probably.

3      Q.   When the police came to see you and talk to you

4  about your firearm, did you tell them that you had been

5  out up at the ski chalet on April 12th four-wheeling?

6      A.   I think so, yeah.

7          MR. CAMIEL:  Thank you.  That's all I have.

8          THE COURT:  Ms. Stevens, go ahead, please.

9                      CROSS EXAMINATION

10 BY MS. STEVENS:

11     Q.   Good morning, Mr. Blain.  How are you?

12     A.   Good.

13     Q.   Just a few questions for you, sir.

14          So when you -- were you interviewed by the

15 defense team recently?

16     A.   In July.

17     Q.   Okay.  Did you have an opportunity at that point

18 to listen to your recording that you made with law

19 enforcement back near the time of your first interview?

20     A.   No.

21     Q.   Okay.  Would that have been helpful in

22 remembering some of these details?

23     A.   I don't -- I don't know.

24     Q.   Okay.  Do you remember telling law enforcement

25 that the reason why you turned around was because your

1  new four-wheeler was getting stuck in the snow?

2      A.  No.

3      Q.  Okay.

4      A.  I know I turned around.

5      Q.  Okay.

6      A.  I don't even know -- I don't think it was

7  snowing.  I don't know.  The roads were clean.  I'm not

8  sure.

9      Q.  Do you remember calling OS1 Haselden to ask him

10  where you could go take your off-roader where it wasn't

11  as snowy?  Do you remember that?

12      A.  Who?

13      Q.  OS1 Haselden.

14      A.  No.

15      Q.  He was -- he worked at the COMMSTA.

16      A.  No.

17      Q.  He was Coast Guard.

18      A.  No.

19      Q.  Okay.

20      A.  I usually don't call anybody.  I just go.

21      Q.  Okay.  So you don't remember -- do you remember

22  seeing emergency vehicles and things of that nature up

23  by the COMMSTA?

24      A.  Yes.

25      Q.  Do you also remember telling law enforcement that

1    it wasn't until about 10:00 that morning that you went

2    up past the COMMSTA?

3         A.   No, I don't remember that.

4         Q.   Okay.  Is it possible you could have gone at

5    10:00?

6         A.   I don't recall.  I thought it was earlier.

7         Q.   Would listening to your prior audio recording be

8    helpful to you to answer some of these questions?

9         A.   Maybe.

10        Q.   We'll try to do this without refreshing your

11   recollection.

12             So do you remember -- do you remember telling law

13   enforcement that the area behind -- I think you said it

14   was Boma Road; is that correct?  Boma Road?

15        A.   Burma.

16        Q.   Burma Road.  Do you remember telling them that it

17   was really wooded back there?

18        A.   No, that wasn't Burma Road.  That was behind the

19   beaver pond.

20        Q.   Do you remember telling them it's been years

21   actually since you've been back past -- okay.

22        A.   Yeah.

23        Q.   And do you remember telling them you couldn't go

24   biking or four-wheeling up on those roads?

25        A.   Correct.

1    Q.   Do you also remember that you told law

2    enforcement that you didn't see any tracks or people

3    that had walked back there in the snow --

4    A.   No.

5    Q.   -- when you were four-wheeling?

6         Mr. Blain, were you aware that the rigger shop

7    had jacks and pneumatic air pumps?

8    A.   No.

9    Q.   Had you ever been into the rigger shop before?

10   A.   Maybe once while I was active duty, but that's --

11   Q.   Were you aware that the -- I'm sorry.  I didn't

12   mean to interrupt you.  Go ahead.  I'm sorry.

13        Were you aware that the members there assigned to

14   the rigger shop had access to tools to change their

15   tires and put air in their tires?

16        MR. CAMIEL:  Your Honor, I'm going to object.

17   Counsel is testifying at this point.

18        THE COURT:  That's sustained.  Please rephrase.

19   BY MS. STEVENS:

20   Q.   Do you have any knowledge of whether people would

21   use the tools in the rigger shop to change their tires

22   or --

23   A.   No.

24   Q.   -- put air in their tires?

25        Did you have any knowledge whether people were

1    charged to use those tools?

2        A.   No.

3        Q.   Okay.  Do you know Mr. Wells?

4        A.   No.

5        Q.   What about the -- what about Mr. Belisle or

6    Mr. Hopkins, did you know either of them?

7        A.   No, ma'am.

8            MS. STEVENS:  Thank you, Mr. Blain.  I don't

9    have any more questions.  Thank you.

10           MR. CAMIEL:  One question.

11           THE COURT:  Yes, go ahead.

12                        REDIRECT EXAMINATION

13   BY MR. CAMIEL:

14       Q.   Mr. Blain, on April 12th when you were driving

15   out to the ski chalet past the COMMSTA or when you were

16   driving back, either time, were you stopped by law

17   enforcement to check to see who you were?

18       A.   No.  I don't think so -- I don't recall being

19   stopped, no.  I know going out, the -- I saw the

20   troopers were at the building and the military police

21   was at the entrance by the highway.

22       Q.   And you still saw them there when you came back?

23       A.   I believe so, yes.

24       Q.   But they didn't stop you?

25       A.   No.

```
1              MR. CAMIEL:  That's all I have.  Thank you.
2              THE COURT:  Follow-up on that topic?
3              MS. STEVENS:  No, Your Honor.
4              THE COURT:  Thank you, sir.  You may be
5    excused.
6              (Witness excused)
7              THE COURT:  Your next witness.
8              MR. COLBATH:  Thank you, Your Honor.  I'll
9    check.  I believe we'll call Kristin Small.
10             THE COURT:  All right.  Very good.
11             (Pause)
12             THE COURT:  Good morning.  If you could come
13   all the way up here to the witness stand, please.  If
14   you would remain standing just a moment, the clerk will
15   administer an oath to you.
16             (Oath administered to the witness)
17             DEPUTY CLERK:  And for the record, can you
18   please state your full name and then spell your full
19   name.
20             THE WITNESS:  Kristin Alyssa Small,
21   K-r-i-s-t-i-n, A-l-y-s-s-a, S-m-a-l-l.
22             KRISTIN SMALL, DEFENSE WITNESS, SWORN
23                     DIRECT EXAMINATION
24   BY MR. CAMIEL:
25     Q.  Good morning, ma'am.
```

1      A.   Good morning.

2      Q.   Back in 2012, were you using a different last

3  name?

4      A.   Yes, I was.

5      Q.   What was your name then?

6      A.   Swearingen, S-w-e-a-r-i-n-g-e-n, my maiden name.

7      Q.   Where did you travel from to be here today?

8      A.   Oregon.

9      Q.   What do you do in Oregon?

10     A.   I work for a tech company in the semiconductor

11  industry.

12     Q.   In the Portland area?

13     A.   Right outside.

14     Q.   Were you previously in the Coast Guard?

15     A.   Yes, I was.

16     Q.   For what years?

17     A.   2007 to 2014.

18     Q.   Can I ask you to pull the -- get a little closer

19  to the microphone.

20     A.   From 2007 to 2014.

21     Q.   Thank you.  And for a period of that time, were

22  you stationed in Kodiak?

23     A.   Yes, I was.

24     Q.   What years were you in Kodiak?

25     A.   2011 to 2013.

 1    Q.  When you were in Kodiak, what was your

 2  assignment?

 3    A.  CGPD, Coast Guard Police Department.

 4    Q.  What did you do for the Coast Guard Police

 5  Department?

 6    A.  I was an officer.

 7    Q.  Did you have a -- when you were out there, did

 8  you have a particular shift that you worked or did that

 9  change?

10    A.  It started, when I first got there, it was

11  midnight to noon and we swapped back and forth from days

12  to nights, I think three on, three off.  And then it was

13  10:00 to 10:00 before I left -- there was only midnights

14  for like a few months.  They switched it to 10:00 to

15  10:00 and I think four sets of nights, four sets of

16  days.

17    Q.  I want to turn your attention to April 12th of

18  2012.  So on April 11th, so that would be the night

19  before, what shift would you have been working?

20    A.  Night shift.  I would have gone in that night at

21  10:00 p.m.

22    Q.  And so your shift would run from 10:00 p.m. on

23  the 11th until 10:00 p.m. on the -- 10:00 a.m. on the

24  12th?

25    A.  Yes, sir.

1    Q.  At some point on the morning of the 12th, did you

2    get a call-out to go somewhere?

3    A.  Yes, sir.

4    Q.  Can you tell us about that?

5    A.  I was standing in the window -- the dispatch

6    area, and ME3 O'Connor took a call.  Thought it was a

7    medical emergency or a two persons unconscious with

8    blood in the area.  And he toned it out, which is like

9    the emergency signal that goes out on our radios.  And

10   as -- I saw ME2 Elizondo sitting in our training room

11   and I motioned to him to come with me, and we got in the

12   truck and we went to the COMMSTA.

13   Q.  Where is the Coast Guard Police Department in

14   relation to the COMMSTA?

15   A.  Just kind of like around the corner, I guess.

16   Q.  How long do you think it took you to get from the

17   police department to the COMMSTA?

18   A.  We were running code, so I don't know, maybe five

19   minutes or less.

20   Q.  When you got there, what did you see?

21   A.  Our vehicle there was driven by Kelly Kolodzik

22   was parked at the -- kind of the door.  It was like a U,

23   the driveway.

24   Q.  Just -- so Ms. Kolodzik, she's another member of

25   the Coast Guard Police Department?

A.   Yes.  I think she was ME3 at the time.  She's in
warrant now.

Q.   So she was already there, her vehicle was already
there when you got there?

A.   Yes, her vehicle was there.

Q.   So as you arrived, can you tell us what you saw?

A.   Just her vehicle outside.  That's all I saw.

Q.   All right.  And were there other people there at
that point?

A.   No.

Q.   What did you do after first arriving?

A.   Pulled the truck up and, like I said, we thought
it was a medical emergency.  So ME2 Elizondo got out
with his gear bag and his first-aid kit, and he went
inside.  And then since we already had two people inside
and we -- I figured that the ambulance was probably on
the way, because that would be kind of procedure, SOP to
alert the medics, I would have set up for traffic
enforcement to allow them to come in and not be blocked
by any other traffic or people getting in the way.

Q.   Okay.

A.   And so I moved my vehicle to start setting up
traffic enforcement.

Q.   Now, at some point after that, did you learn it
was no longer a medical emergency, that it was a police

1   matter?

2       A.   Yes.  I heard on the radio the gunshot wounds, so

3   at that point I decided, you know, to block the entire

4   area, because now it's a crime scene.  Shortly after I

5   did that, or I was getting ready to do that, the state

6   trooper pulled up and he also asked me to go ahead and

7   block off the road and get a crime scene.

8       Q.   All right.  At some point while you were there

9   that morning, did somebody who you learned was Chief

10  Reckner arrive?

11      A.   Yes.

12      Q.   Can you tell us about that?

13      A.   That was later on after the state troopers were

14  there, fire department was there and ambulance was

15  there.  We had officially set up crime scene.  Kelly and

16  I were securing the perimeter.

17      Q.   When you say Kelly, that's --

18      A.   Kolodzik.  Sorry.

19      Q.   That's fine.

20      A.   ME3 Kolodzik and I were securing the area.  ME2

21  was taking statements.  Alaska State Troopers were

22  talking to people.  And that's when the chief came.  And

23  he pulled his truck kind of across the street from where

24  I was standing.  Not really across the street but like

25  the driveway.  And he tried to come into the crime

scene, and we wouldn't let him.

And so we started talking to him.  He was obviously, you know, pretty upset, trying to find out -- I mean, that was his work area and people that worked there under him.

So he was asking, you know, where his people were, and I couldn't really give him too much information, so I asked how many people were supposed to be in there and I asked him for their names.  And I let him know that those weren't names that I recognized and that there had just been a call for muster and that maybe his people were there at the muster at the basement of the COMMSTA, I think.

Q.  At some point, did Chief Reckner mention Mr. Wells?

A.  Yes, he did.

Q.  What did he say about Mr. Wells?

A.  He mentioned, when we were talking about who was supposed to be in there, he said that there were two civilian employees and one of them that usually shows up pretty early around 7:30, that he didn't see his truck in the parking lot, and that was Jim Wells.

Q.  Did he say anything else about Mr. Wells?

A.  Yes.  He said that he had been a -- he started asking, where is James Wells, where is James Wells -- or

1  Jim Wells.  And he seemed like it was pretty important.

2  So we asked, you know, what is the importance.  And he

3  said that this is the only way this could have happened.

4  And we said, why.  You know, he said because he had been

5  a bad employee and making bad -- can I reference my

6  statement?  I don't want to --

7       Q.  Do you have your statement with you?

8       A.  I don't.

9       Q.  I could show it to you if --

10          THE COURT:  Any objection?

11          MS. SHERMAN:  No.

12          THE COURT:  Go right ahead.

13          (Pause)

14          (Mr. Camiel approaches witness)

15      A.  Bad work environment.  That's what I wanted to

16  see, just the wording for that.  He said it had been a

17  bad work environment and he had been a bad employee and

18  he was having a hard time at work.

19      Q.  And he said this was the only way this could have

20  happened?

21      A.  Yes.

22      Q.  With reference to Mr. Wells?

23      A.  Yes.

24          MR. CAMIEL:  That's all I have.  Thank you.

25          THE COURT:  Go ahead, please, Ms. Sherman.

CROSS EXAMINATION

BY MS. SHERMAN:

Q.   Good morning.

A.   Good morning.

Q.   You mentioned Kelly Kolodzik.  Do you know if her last name has changed?

A.   I know she got married.  I'm not sure if she changed her name.

Q.   Okay.  So you don't know if her name is now Kelly Brockett?

A.   It could be.  I think that's the last name of the person she married.

Q.   She showed up first, before you, right?

A.   Yes.

Q.   Do you know how many minutes she was there before you got there?

A.   I don't.  I was focused -- I was driving, and when you're driving at code, you're really paying attention to the road and people around you and traffic.

Q.   Didn't see anything on the road that day on your way out there?

A.   Nothing out of the ordinary.

Q.   And you actually moved Kelly Kolodzik's -- her patrol vehicle to help block, right?

A.   Yes, I did.

1     Q.  At that point how many investigations had you

2  done, do you know?

3     A.  By investigations, do you mean showing up to

4  calls and trying to find out what's going on at the

5  call?

6     Q.  Yeah, showing up to calls.  How often did you end

7  up going there and it would require some more

8  investigation other than just a traffic accident or

9  something?

10    A.  I mean I did not keep track.  But I mean I think

11 at that point I had been there a year.  We get calls for

12 domestic violence and somebody locked their kid in the

13 bathroom.  I mean, there's always something.

14    Q.  Everything?

15    A.  It's not just traffic enforcement.

16    Q.  When you saw Mr. Reckner, you had to physically

17 restrain him from trying to get in that building, right?

18    A.  We did have to kind of push him back for a

19 second.  But I mean he didn't try again.

20    Q.  He seemed very upset?

21    A.  Yes, he was.

22    Q.  And when you learned that someone was supposed to

23 be there that morning and wasn't, in the course of

24 investigations following up on that, was that something

25 that mattered to you?

 1    A.  Yes, because he kept asking, you know, where was

 2  Jim Wells, and so it just -- it seemed important that we

 3  find out why is he worried about James Wells.

 4    Q.  Okay.  Thank you.

 5         THE COURT:  Follow-up?

 6         MR. CAMIEL:  Just one question.

 7                  REDIRECT EXAMINATION

 8  BY MR. CAMIEL:

 9    Q.  Ms. Small, you have the report in front of you

10  that you wrote about your response that morning.  Was

11  your -- and was your -- was your department, was it

12  particularly important with your department that you

13  write reports?

14    A.  Yes, sir.

15    Q.  Was your chief pretty strict about making sure

16  you wrote careful reports?

17    A.  Yes, sir.

18         MR. CAMIEL:  Thank you.  That's all I have.

19         THE COURT:  Anything further?

20         MS. SHERMAN:  No.

21         THE COURT:  Thank you, ma'am.  You may be

22  excused.

23         (Witness excused)

24         THE COURT:  And your next witness?

25         MR. COLBATH:  I'll check who I have, Your

1   Honor, but I believe we will call Para Upchurch.

2              THE COURT:  All right.  Take a moment.

3              (Pause)

4              THE COURT:  Good morning.  If you can come back

5   up to the witness stand and I'll have the clerk

6   administer an oath to you.  When it's a new week, it's a

7   new oath.

8              (Oath administered to the witness)

9              DEPUTY CLERK:  For the record, can you please

10  state your full name and then spell your full name.

11             THE WITNESS:  Okay.  Para Danielle Upchurch,

12  P-a-r-a, D-a-n-i-e-l-l-e, U-p-c-h-u-r-c-h.

13            PARA UPCHURCH, DEFENSE WITNESS, SWORN

14                     DIRECT EXAMINATION

15  BY MR. COLBATH:

16     Q.  Welcome back, Ms. Upchurch.  I just have some

17  questions to follow up I guess the testimony you

18  provided earlier in the case.  Remind us where it is

19  that you're currently working.

20     A.  I work at Sector Anchorage.

21     Q.  So still employed full-time for the Coast Guard

22  here in the -- at Sector Anchorage?

23     A.  Yes.

24     Q.  All right.  I want to go back to your time on

25  Kodiak Island just so the jury remembers, because we

sort of heard from a lot of COMMSTA employees.  What
were the dates that you were on Kodiak and working at
COMMSTA?

    A.  I arrived in Kodiak December of 2009, and then I
left in August of 2012.

    Q.  Where did you live -- in 2012, where were you
living before you left Kodiak?

    A.  I lived in town, in town Kodiak, behind the
Wal-Mart on Cove Drive.

    Q.  Okay.  At the time you lived in -- that was a
house or an apartment, or what was it?

    A.  It was a small -- it was a cabin.

    Q.  Did you have prior to leaving the island any
belongings or things that belonged to Jim and Nancy
Wells?

    A.  I did.

    Q.  And what did you have?

    A.  They loaned me furniture.  They loaned me a bed
frame, and they loaned me a table with some chairs.

    Q.  Okay.  When it came time to leave Kodiak Island,
what were the circumstances under which you were going
to leave the island?  Why was it that you were leaving?

    A.  So I was a non-rate, and I was about to go to
"A" School for training, so it was almost my turn for
training.  But I left a month early.

1    Q.   And you said again that that was in August of

2    2012?

3    A.   Yeah, it was August of 2012.

4    Q.   All right.  Prior to leaving the island,

5    immediately prior to leaving the island, did you have

6    occasion to meet with investigators at the Coast Guard

7    investigation service office?

8    A.   Yes.

9    Q.   And tell us how that came about.  Why were you

10   meeting with investigators at that time?

11   A.   So right before I left, I called them.

12   Q.   Okay.  For what purpose?

13   A.   So I was told -- I was told to not have

14   communication with Jim by my command.  And I called -- I

15   called them because I knew I had the furniture, I had

16   Jim and Nancy's furniture and I wanted to return it to

17   them.  And the only way that I would be able to do that

18   is if I coordinated through the command and CGIS.

19   Q.   So did you end up just talking to CGIS on the

20   phone, or did you go to their office or how did that

21   work?

22   A.   It was both.  I talked to them on the phone, and

23   I went to the office.

24   Q.   And what happened when you got to the office?

25   A.   I told them that I wanted to go return the

1   furniture, and they said okay.

2      Q.   Okay.  And so did you make contact before you

3   went -- before you went to return the furniture, did you

4   make contact with either Jim or Nancy Wells?

5      A.   I did.

6      Q.   How did you do that?

7      A.   I called.

8      Q.   Where did you call from?

9      A.   I called from my cell phone.

10     Q.   Where were you physically located when you

11  called?

12     A.   In the CGIS office.

13     Q.   And was there a -- were you alone or was there a

14  criminal -- or a, excuse me, a Coast Guard investigation

15  service agent with you?

16     A.   There was an agent.

17     Q.   And did they have occasion to listen to your call

18  with Mr. Wells?

19     A.   I don't remember that.

20     Q.   Okay.

21     A.   I don't remember that.

22     Q.   How about recording the call, did they record the

23  call?

24     A.   I don't remember that either.

25     Q.   Okay.

1      A.   I mean maybe.  I don't remember, honestly.

2      Q.   Well, that's fine.  Let me show you something

3 that refreshes -- see if it refreshes your recollection.

4           (Pause)

5           MR. COLBATH:  I'm sorry, Your Honor.  May I

6 approach?

7               THE COURT:  That's fine.

8               (Mr. Colbath approaches witness)

9 BY MR. COLBATH:

10     Q.   Just tell me when you've reviewed it, please.

11          (Pause)

12     A.   Okay.  All right.

13     Q.   So Ms. Upchurch, does reviewing that help you

14 recall whether or not the telephone call was recorded?

15     A.   Yes.

16     Q.   And was it?

17     A.   It was.

18     Q.   After -- and who was it, remind me who it was

19 that you called, Jim or Nancy?

20     A.   I called Jim.

21     Q.   And after speaking with Mr. Wells, were you able

22 to make arrangements to be able to go to his house that

23 day?

24     A.   Yes.

25     Q.   And so prior to going to the house that day, did

```
 1    you make the Coast Guard investigators aware that
 2    arrangements were made that you were going to go over
 3    there?
 4        A.   What's your question?  I'm sorry.
 5        Q.   Sure.  Did the Coast Guard officers -- they were
 6    recording the call.
 7        A.   Uh-huh.
 8        Q.   Were they -- did you tell them that you were
 9    going to go -- actually go to return the furniture or go
10    to Jim's house?
11        A.   I was pretty much getting permission from them to
12    go.
13        Q.   Okay.
14        A.   That's how I felt.
15        Q.   That was the point of -- part of the point of you
16    going there was to get that permission?
17             MS. STEVENS:  Your Honor.  This is direct
18    examination.
19             THE COURT:  Sustained.
20    BY MR. COLBATH:
21        Q.   What was the point of going to the office that
22    morning, the Coast Guard Investigative Service?
23        A.   I didn't want to get in trouble for doing
24    something I was told not to do.  As an active duty
25    person, I have to listen to my command.
```

     1    Q.   Were you granted permission to go see Mr. Wells?

     2    A.   Yes.

     3    Q.   Did you end up going to see Mr. Wells?

     4    A.   Yes.

     5    Q.   Before you went to see Mr. Wells, did any

     6   arrangements or anything special happen with the Coast

     7   Guard investigative officers after the phone call?

     8    A.   Yes.

     9    Q.   And what were those arrangements or what

    10   happened?

    11    A.   They said that if I was going to go to Jim's

    12   house that --

    13         MS. STEVENS:  Your Honor, one, objection and,

    14   two, can we have a sidebar?

    15         (Begin bench conference.)

    16         MS. STEVENS:  So one, hearsay.  But we are

    17   fearful that we're going into an area where they are

    18   going to inquire about whether she knew he was

    19   represented by counsel or not.  And so that is our

    20   concern, about an issue that has been litigated in the

    21   previous trial and not brought up.

    22         MR. SKROCKI:  She was wearing a recording

    23   device.

    24         MS. STEVENS:  Right.

    25         THE COURT:  Exploring this --

 1          MR. COLBATH:  Hadn't even crossed my mind in

 2     any way, shape or form.  First of all, I don't really

 3     care that she -- I had planned to do my questioning

 4     around specifically what the investigators told her,

 5     although to the extent that they communicated to her the

 6     setup of the recording, where did it go.

 7          THE COURT:  Seems like hearsay.

 8          MR. COLBATH:  Well, it would be hearsay,

 9     although I'm not offering it for the truth of what they

10     said.  I'm offering it for the effect of why she wore a

11     wire when she went there.  I'm just trying to get it

12     straight.  Like I said, if I have to do it with what did

13     she do next, what were her actions, that's fine.  But

14     I'm not trying to elicit -- there are no surprise

15     statements that are going to be troublesome.

16          THE COURT:  And we're not going to go --

17          MR. COLBATH:  I had -- it had not contemplated

18     in my mind.  I'm not -- I'm not making a motion with

19     that regard.  I'm not going to ask her anything about

20     lawyers.  I'm not later going to ask about lawyers.  The

21     purpose is simply to show that she was asked to go see

22     Mr. Wells, or once she got permission to go see Mr.

23     Wells, that they had her wear a wire to do that, that

24     she did in fact go visit him.  There was a conversation,

25     a visit took place.

1          THE COURT:  A lot of this was done before, the

2    conversation, the visit.  So the only thing -- we're not

3    going to revisit that.

4          MR. COLBATH:  No, I'm not going to go through

5    the conversation.  Simply did she wear a wire, was there

6    a visit.  At the end of the visit, did she go back to

7    the agents and give them back the wire so that they

8    had -- because I don't think they were -- it was not

9    such a circumstance where they could listen.  They had

10   to get the recording back so they could have the

11   information.  I'm just showing the process, not hashing

12   through the conversation.

13         MS. STEVENS:  So just for your awareness, Your

14   Honor, this witness is, one, concerned about the fact

15   that she wore a wire coming out for fear of what could

16   happen having this information in public knowledge.  And

17   so the government specifically did not elicit that

18   information during her cross examination.

19         If defense wants to go, did you assist the

20   investigators, fine, but we specifically avoided that

21   area to respect her concerns about her fearfulness and

22   things like that.  I think that if this comes out then

23   the government has the right and opportunity to cross

24   her on her fearfulness.  So I know the defense has

25   been --

1          MR. COLBATH:  It's not fearfulness of

2    Mr. Wells.  We have the transcript.  She knows we have

3    the transcript.

4          THE COURT:  There was reference, whether it was

5    this or a week or two ago, to it being recorded.

6    Because I think it came up in impeachment.

7          MR. COLBATH:  She had a transcript.

8          MR. SKROCKI:  Mr. Colbath be permitted to lead,

9    were you directed -- did you bring a recording device to

10   your conversation with Mr. Wells.  Did you give it back

11   to them when you returned and move on.

12         THE COURT:  Would that be sufficient and we

13   could move off this?

14         MR. COLBATH:  Well, I would like to make sure

15   it's a little clearer than that, but it would definitely

16   assist me to lead to keep her from straying into the

17   conversations.

18         THE COURT:  And then we'll come back to your

19   topic.  But I will allow that.

20         MS. STEVENS:  I think the more appropriate

21   witness to ask about the recording device apart from

22   what Mr. Skrocki brought up would be the investigators

23   who arranged it.

24         THE COURT:  You're going to have an opportunity

25   for rebuttal.

```
 1            (End bench conference)
 2            THE COURT:  All right.  Go ahead, Mr. Colbath.
 3            So we don't want to hear what people told you,
 4   and Mr. Colbath will ask you some questions.  So go
 5   ahead.
 6   BY MR. COLBATH:
 7     Q.  All right, Ms. Upchurch.  So when you left the
 8   office, the criminal investigation office to go see
 9   Mr. Wells, the Coast Guard service, the agents there,
10   had given you a recording device to wear, correct?
11     A.  Yes.
12     Q.  And so you wore that and they had turned it on so
13   that during your meeting with Mr. Wells, whatever
14   conversation happened, that would be recorded?
15     A.  Yep.
16     Q.  Did you end up going to Mr. Wells' house and
17   making arrangements to see him?
18     A.  Yes.
19     Q.  And you were there -- did that take place at his
20   residence?
21     A.  Yes.
22     Q.  And was he alone there, or was Mrs. Wells also
23   there?
24     A.  He was alone.
25     Q.  And you and him met and talked, and he made you a
```

1   meal?

2     A.  Yes.

3     Q.  And were you able to get the furniture or the

4   belongings back to him?

5     A.  Yes.

6        MS. STEVENS:  Your Honor, I think we have

7   established what we needed to establish.

8        THE COURT:  Sustained.  I'm not going to

9   revisit this from last time.

10        MR. COLBATH:  No, I understand, Your Honor.

11        THE COURT:  All right.  Go ahead.

12  BY MR. COLBATH:

13     Q.  After giving Mr. Wells his furniture back and the

14   conclusion of --

15        MS. STEVENS:  So Your Honor, I'm sorry.  If

16  that's the case, then I would just request that he move

17  on then to direct forms of questions instead of leading.

18        THE COURT:  Let's cover this topic and move on.

19        MR. COLBATH:  Sure, Your Honor, and that's what

20  I was trying to do.

21  BY MR. COLBATH:

22     Q.  At the conclusion of the interview, did you go

23  back and meet with the CGIS officers or somebody from

24  law enforcement?

25     A.  Yes.

1    Q.   Did you give them back the recording stuff that
2    they had given you?
3    A.   Yes.
4    Q.   And after that, that day, meeting with Mr. Wells
5    that day, what did you do next, or what happened with
6    you after that?
7    A.   The very next day I left Kodiak.
8    Q.   And were you just leaving for the day, or you
9    mean you permanently left?
10   A.   Oh, I moved.  I moved out of Kodiak.
11   Q.   Okay.  And that's when you relocated up to work
12   at Sector Anchorage up here, or did you go somewhere
13   else?
14   A.   I went to Sector Anchorage for one month, and
15   then I went to training.
16   Q.   And while you were here in Anchorage, prior to
17   your training, did you have occasion to meet up with law
18   enforcement again?
19   A.   Yes, I did.
20   Q.   Do you know when that was roughly?
21   A.   It was in September.  In September.
22   Q.   Okay.  The following month.  You left in August,
23   so it's the following month, September?
24   A.   It's hard for me to remember how everything
25   happened, but I know I came back to Anchorage for one

```
1    month and during that month I met with law enforcement.
2        Q.   Where did you meet with them?
3        A.   At the FBI building.
4        Q.   Do you remember by name who you met with at all,
5    who the FBI person or whoever at the FBI office you
6    might have met with?
7             MS. STEVENS:  Your Honor, why -- we're confused
8    about -- objection, relevance.  This is --
9             THE COURT:  That's overruled.  I'll allow this.
10   BY MR. COLBATH:
11       Q.   Do you remember who it was you met with?
12       A.   Yeah, I do.
13       Q.   Okay.
14       A.   It's hard for me to remember whole names, but I
15   know faces.
16       Q.   Is the person you met with here in court?
17       A.   Yes.
18       Q.   And where is he?
19       A.   He's seated right there.
20       Q.   Okay.
21       A.   Yeah.  I don't want to say the wrong name.  I
22   think it's Mr. Allison, but I don't want to say the
23   wrong name and look stupid.
24       Q.   I think you got it right.  He raised his hand,
25   so --
```

1    A.  Okay.

2    Q.  The jury has heard from him as well,

3 Ms. Upchurch.

4    A.  Okay.

5    Q.  That's okay.  So without telling me anything that

6 Mr. Allison said, because this is your testimony,

7 what -- what happened when you met with Mr. Allison?

8 What did you do?

9    A.  Talked just a little bit.

10   Q.  Did you have your phone with you?

11   A.  Yes.

12   Q.  Did you use it at all during the meeting?

13   A.  At one -- at one point I did.

14   Q.  Okay.  And tell us about that.  What did you do

15 with your phone?

16   A.  They wanted me to call Jim.

17   Q.  Did you call -- Jim Wells, Mr. Wells?

18   A.  Right.

19   Q.  And did you?

20   A.  Yeah, at one point I did.

21   Q.  Was Mr. Allison there or listening?

22   A.  Yes.

23   Q.  Was it recorded?

24   A.  Yes.

25   Q.  Were you able to get through to Mr. Wells and

1  have an actual conversation?

2      A.  Yes.

3      Q.  Do you remember how long you would have been at

4  the FBI that day?

5      A.  No.

6      Q.  After that occasion, did you end up going off to

7  "A" School?

8      A.  I did.

9      Q.  Meet with Mr. Allison or any other

10  investigators --

11          MS. STEVENS:  Your Honor, again, leading.

12          THE COURT:  That's sustained.

13      Q.  Well, I said, did you meet with Mr. Allison or

14  any other investigators after the "A" School?

15      A.  Oh, I don't think so.

16      Q.  Okay.  Nothing beyond the September that you just

17  told me about?

18      A.  Not until the next trial or the trial.

19      Q.  To get ready for our proceedings?

20      A.  Right.

21          MR. COLBATH:  Then that's all I have for

22  Ms. Upchurch.

23          THE COURT:  All right.  Ms. Stevens.

24          MS. STEVENS:  Yes, Your Honor.  Just can we

25  request a quick --

1          THE COURT:  Why don't we take our morning break

2    right now.  Yeah, that's fine.

3          We'll take 15 minutes.  Leave your notepads

4    here, ladies and gentlemen.  Remember my admonition not

5    to discuss the case.

6          (Jury absent)

7          THE COURT:  Please be seated, everyone.

8    Anything we need to take up here?

9          MS. STEVENS:  Not from the government.

10          THE COURT:  Mr. Colbath?

11          MR. COLBATH:  I'm sorry, Your Honor?

12          THE COURT:  Nothing to take up here?

13          MR. COLBATH:  No issues, not from me.

14          THE COURT:  Ms. Upchurch, it's very

15    important -- this jury is -- we don't discuss the prior

16    trial.  So when you talked about having a prior trial,

17    and actually didn't exactly say that, and I thought

18    Mr. Colbath did a remarkable job of redirecting the

19    answer.  But please don't reference the prior proceeding

20    at all.

21          THE WITNESS:  Okay.

22          THE COURT:  Very good.  Let's take a short

23    break.  We'll go off record.

24          DEPUTY CLERK:  All rise.  Court stands in a

25    brief recess.

1          (Recessed from 10:59 a.m. to 11:20 a.m.)

2          (Jury present)

3          DEPUTY CLERK:  Court is again in session.

4          THE COURT:  All right.  Please be seated,

5     everyone.  Welcome back, ladies and gentlemen.

6          And Ms. Stevens, whenever you're ready, go

7     ahead, please.

8          MS. STEVENS:  Thank you.

9                    CROSS EXAMINATION

10    BY MS. STEVENS:

11    Q.  Good morning, Petty Officer Upchurch.

12    A.  Good morning.

13    Q.  Welcome back.  So it was a difficult decision for

14    you, right, to -- to record the conversation you had

15    with Mr. Wells?

16    A.  Yeah, it was.

17    Q.  Wasn't one that you took lightly?

18    A.  No.

19    Q.  The investigators recognized that, they gave you

20    some time to think about it?

21    A.  They did.  I had a long time to think about it.

22    Q.  They didn't force you to do it?

23    A.  No, they didn't force me to do it.

24    Q.  And you could have changed your mind if you had

25    wanted to?

1       A.  I could have, yeah.

2             MS. STEVENS:  Your Honor, I don't have any more

3    questions.  Thanks.

4             THE COURT:  Anything further?

5             MR. COLBATH:  No follow-up on that, no, Your

6    Honor.

7             THE COURT:  Thank you.  You may be excused.

8             (Witness excused)

9             THE COURT:  Mr. Colbath, your next witness.

10            MR. COLBATH:  I think I'm going to call Joseph

11   Hostetler, which is a little bit out of order, Your

12   Honor, so let me check and make sure.

13            THE COURT:  All right.

14            (Pause)

15            THE COURT:  Good morning.  If you could come

16   forward to the witness stand, please, sir.  When you get

17   up there, remain standing if you would and the clerk

18   will administer an oath to you.

19            (Oath administered to the witness)

20            DEPUTY CLERK:  For the record, can you please

21   state your full name and then spell your full name.

22            THE WITNESS:  My name is Joseph Daniel

23   Hostetler, J-o-s-e-p-h, D-a-n-i-e-l, H-o-s-t-e-t-l-e-r.

24            THE COURT:  Go ahead, please.

25            MR. COLBATH:  Thank you, Your Honor.

1          JOSEPH HOSTETLER, DEFENSE WITNESS, SWORN

2                      DIRECT EXAMINATION

3    BY MR. COLBATH:

4        Q.   Good morning, Mr. Hostetler.  Can you tell us

5    where you -- what town you currently reside in?

6        A.   I'm in Anchorage.

7        Q.   All right.  And what do you do for living, sir?

8        A.   I'm retired.

9        Q.   Good for you.

10            I want to back you up to calendar year 2012.

11   Where were you living in 2012?

12       A.   In Kodiak.

13       Q.   How long had you been in Kodiak, Alaska?

14       A.   I was in Kodiak for two summers working.  So 2012

15   would have been the summer before and then that summer.

16       Q.   All right.  And who were you working for?

17       A.   Brechan.

18       Q.   And Brechan is a construction company or a --

19   what type of company?

20       A.   Yeah, they're civil, civil construction.

21       Q.   All right.  And what was your role at Brechan

22   Construction in the summer -- well, first of all, when

23   do you think you got to Kodiak in 2012?

24       A.   I probably arrived there in the end of March or

25   early April.

1    Q.  All right.  And what was your role with Brechan
2  Construction that summer?
3    A.  I was a superintendent on a DOT job resurfacing
4  two of the three runways at the airport.
5    Q.  At the Kodiak airport?
6    A.  At the Kodiak airport.
7    Q.  And did the project also involve the -- any
8  construction work or resurfacing work on the parking
9  areas or any parking areas in addition to the runways?
10    A.  It did.
11    Q.  And as far as your work, sir, did you have or did
12  the company have an office that it utilized during the
13  construction phases at the airport?
14    A.  It did.
15    Q.  Where was the office located?
16    A.  It was in the upstairs of the Servant Air
17  building.
18    Q.  That was one of the air taxi services?
19    A.  Yes, it's an air taxi service for Kodiak.  There
20  was two main ones in the area, Island and Servant.
21    Q.  And you said the Brechan office was in the
22  upstairs of the building?
23    A.  That's correct.
24    Q.  And how would you access the office?
25    A.  The office had two accesses.  One was from the

 1    parking area.

 2        Q.   Okay.

 3        A.   And one was the main entrance to Brechan -- oh,

 4    no, to Servant.  And then there was a stairwell that

 5    went up to my office.  And the other doors went into

 6    Servant.

 7        Q.   Can we show Mr. Hostetler -- let's use

 8    government -- I'm not sure which one is going to show us

 9    the best.  Let's use government Exhibit 90, if we

10    could -- or whichever one is closer, I think.

11             Sir, do you recognize the photo that's on your

12    screen there?

13             And this, Your Honor, is government Exhibit

14    No. 91.

15             THE COURT:  All right.

16        Q.   Do you recognize the airport generally there?

17        A.   Yes, I do.  I'm trying to position myself to

18    understand where Servant was at on it, so --

19        Q.   Well, let's -- there's been some other testimony

20    about that, so I'm going to blow up -- we'll blow up the

21    top half of the --

22             MR. SKROCKI:  Wait.

23             THE COURT:  Excuse me.

24             MR. SKROCKI:  I have an objection to that.

25             THE COURT:  That's sustained.

BY MR. COLBATH:

    Q.  All right.  That's fine.  I'm just going to give

you a little bit of time with that, Mr. Hostetler, and

ask if you can orient yourself and see if you recall

where your Servant Air offices were.

    A.  Okay.  So this -- this is the main --

    Q.  I'm not sure if we have a laser pointer up there.

           THE COURT:  We should have a laser pointer

there for you, sir, and you can point on the screen --

    Q.  Point on our big screen up here if you will so

that we can all see what you're pointing at.  First of

all, do you see the runways where your resurfacing would

have been?

    A.  That's seven right there, right?

    Q.  Okay.

    A.  And so this is the tarmac where -- that would be

the main -- or one of these two is the main -- or the

main, what do you call, terminal.

    Q.  Okay.

    A.  And so main terminal.  It's kind of difficult.

This is the road in.  This is the main terminal.  So

this -- I think -- is that Servant?

    Q.  That's all right.

    A.  Yeah, that's it, because this is the little

parking, right?  Is that a stairwell right there?

```
 1          THE COURT:  Actually, the lawyer asks the
 2   questions, and you answer them.
 3          THE WITNESS:  Okay.
 4      Q.  That's all right.
 5      A.  It's been seven or eight years ago.
 6      Q.  Suffice it to say it's been seven years?
 7      A.  Yeah.
 8      Q.  That's okay.  Do you recall -- do you recall how
 9   it was that you accessed the building?
10      A.  Yes, I do.  I recall that we had -- is that the
11   main -- at the bottom of the screen?
12          THE COURT:  Mr. Hostetler.
13      Q.  The judge is going to make me ask you questions
14   and you answer questions.  So I'm going to see if we can
15   find some different pictures for you to look at.  But
16   that's okay.  Let's just -- your memory was certainly
17   your office was upstairs in the Servant Air building?
18      A.  That's correct.
19      Q.  And back on the -- back on the morning of
20   April 12th of 2012 -- well, first of all, as the project
21   proceeded, when would you go into work?
22      A.  I'm usually there by 6:00, 6:30.
23      Q.  Okay.  And in your office, the upstairs office
24   that you were speaking of, or did you go somewhere else
25   when you --
```

```
 1       A.   No, I'd open the office up in the morning.

 2       Q.   All right.  And what was the office utilized for?

 3       A.   Well, we had our weekly meetings upstairs and I

 4  had an administrator, and that's where we started our

 5  workday, right from there.

 6       Q.   And about how long would you remain in the office

 7  until actual construction activities got going?

 8       A.   Well, depending on the day, I actually had like

 9  foremen and other superintendents that were on the job

10  site, like I was -- there was three superintendents.  I

11  was the main guy.  So they would go out on the job and

12  get it going.  And Sundays I would go out early, but

13  the -- normally, I would stay in the office probably

14  until 7:30, 8:00 every day, and maybe even as late as

15  9:00 or 10:00 depending on the day, but that's the

16  normal.

17       Q.   All right.  I'm going to have you -- I'm going to

18  show you government Exhibit No. 283 -- 253.  I'm sorry,

19  253.

20            Can we also put up on the screen -- I think it's

21  been admitted.  Is that 278?  I'm sorry, 178, not two.

22  Those appear to be the same ones.

23            Okay.  Mr. Hostetler, do either of those pictures

24  look familiar?

25       A.   Yes, it does.
```

1    Q.   Okay.  And 178, what is that?

2    A.   Okay.  That's the door into Servant Air, and that

3  beam you see going up --

4    Q.   Uh-huh.

5    A.   -- that's the support beam for the upstairs

6  entrance of my office.

7    Q.   Okay.

8         THE COURT:  Do you want to show this on the

9  overhead?

10         MR. COLBATH:  Oh, yes.  I'm sorry, Your Honor.

11  I believe both of these have been admitted.

12         THE COURT:  I believe so.

13  BY MR. COLBATH:

14    Q.   So you said the beam is the support for the

15  stairs?

16    A.   That's correct.

17    Q.   And so your office would have been up those

18  stairs?

19    A.   That's correct.

20    Q.   And then how about the picture to the right, do

21  you recognize that?

22    A.   Yes, sort of.  You know, there's an outside -- if

23  you look at this part of the building --

24    Q.   Uh-huh.

25    A.   -- there's another entrance that comes in.

1    Q.   Around the corner?

2    A.   Around the corner.  And that doesn't look like

3    the door.  It was like that door might be right here,

4    but I don't recall that part of it.

5    Q.   Okay.  That's fine.  Was there a way -- you can

6    take those down.  Thank you.

7        Was there a way, sir, that -- not the stair --

8    not the beam, the staircase that you saw, but the other

9    entrance to the building, was there a way to get up to

10   the Brechan offices through that?

11   A.   Yes.

12   Q.   And how did that work?

13   A.   Well, there was like a doorway, like an arctic

14   entrance.  Okay.  You walk in the arctic entrance, and

15   then there was a door that went into Servant's mechanics

16   area, like the shop --

17   Q.   Okay.

18   A.   -- and a door that went into Servant Air.  And

19   then there was a door that went upstairs.  I had my --

20   it's a joint entrance for the three things.  And the

21   stairs went up to me.  The one to the right went into

22   Servant Air, and the one to the left went into the

23   mechanics shop for Servant.

24   Q.   Okay.  So were you interviewed by law enforcement

25   regarding our matter here today?

1    A.  Yes.

2    Q.  And first of all, do you know Jim Wells?

3    A.  No.

4    Q.  Do you know Rich Belisle?

5    A.  No.

6    Q.  And how about James Hopkins?

7    A.  No.

8    Q.  When you were -- back on April 12th of 2012, your

9  project would have been going on that day and would you

10 have been using your offices at Servant Air that day?

11   A.  Yes.

12   Q.  And any time between your arrival at 6:00 or

13 6:20, whatever you described when you get to work, and

14 throughout the day that day, did you see Mr. Wells, Jim

15 Wells or anybody that you didn't recognize come into the

16 building and up the stairs?

17   A.  No.

18   Q.  Anybody utilize the -- was there a -- bathroom

19 facilities upstairs?

20   A.  No.

21   Q.  And nobody wandered around or walked around and

22 talked to you -- well, did anybody wander around or come

23 upstairs that you don't -- couldn't identify as being

24 part of your construction?

25   A.  No.

1    Q.  Did you have other superintendents or

2  construction people, subcontractors, any of those types

3  of folks that would come upstairs, visit with you,

4  access the building?

5    A.  Daily.

6    Q.  Beginning how early?

7    A.  As early as 7:00.

8    Q.  Okay.

9       MR. COLBATH:  I think that's all the questions

10  I have for you, sir.

11       THE COURT:  Mr. Skrocki, go ahead, please.

12       MR. SKROCKI:  Yes.  We have no questions for

13  Mr. Hostetler.

14       THE COURT:  Thank you, sir.  You may be

15  excused.

16       (Witness excused)

17       THE COURT:  Your next witness?

18       MR. COLBATH:  Could we just have a very brief

19  sidebar, please?

20       THE COURT:  Sure.

21       (Begin bench conference)

22       THE COURT:  Mr. McCrary?

23       MR. COLBATH:  It is, Your Honor.  We had -- I

24  had one more witness not show up.  So I have -- we have

25  Mr. McCrary.  I had Mr. Johnson that I'm going to call

```
 1    to put in some photos and some sort of miscellaneous
 2    exhibits, because I'm out of witnesses.  And I don't
 3    want to -- we released one other witness that we
 4    determined we're not going to call.
 5           So we just have Mr. McCrary and Mr. Johnson
 6    unfortunately left.  I'm going to make some calls over
 7    the noon hour.  The only other witness I have in town is
 8    the doctor from the VA who did not show up this morning.
 9    We've now been in touch with her legal counsel.  We're
10    trying to get her here today.  They already said she
11    could come first thing in the morning, but I'm going to
12    try and see if I can get her here today because she was
13    under subpoena.  We had it all prearranged.  If I don't
14    have her show up --
15           THE COURT:  Should we take our lunch break?
16           MR. COLBATH:  So what I was thinking rather
17    than take a break and then come back for ten minutes,
18    if --
19           THE COURT:  He's here.
20           MR. COLBATH:  He's waiting.
21           THE COURT:  Why don't we take our lunch break,
22    and I'll address Mr. McCrary and then we'll take our
23    break.
24           (End bench conference)
25           MR. COLBATH:  So, Your Honor, if we could take
```

1    up that matter before the lunch break.

2              THE COURT:  Right.  We have a short matter

3    we're going to take up, but we figured we might as well

4    give you your lunch break now while we take it up and

5    then come back at 12:45, how about -- or 1:00, Counsel?

6              12:45, how does that work, ladies and

7    gentlemen?  Leave your notepads here.  Remember my

8    admonition not to discuss the case.  Have a pleasant

9    lunch.  We'll see you at 12:45 p.m.

10             (Jury absent)

11             THE COURT:  Please be seated, everyone.  And we

12   have him here, but we don't have the courtroom deputy to

13   administer the oath, so let's take just a moment here.

14   Actually, I don't need to administer an oath to the

15   person at this time.

16             Sir, welcome to Anchorage.

17             THE WITNESS:  Thank you.

18             THE COURT:  The only point the government

19   lawyers asked that I address with you -- well, there are

20   two really.  First of all, we don't discuss at all the

21   fact that there was a prior trial in this case, so --

22   but more importantly in your case, I wrote an order that

23   addressed you and many other experts.  Have you had a

24   chance to review that?

25             THE WITNESS:  Yes, ma'am.

1        THE COURT:  So as I recall your report, it was

2   a generalized discussion of criminal investigative

3   techniques and did not have anything specific with

4   regard to this particular case.

5        THE WITNESS:  Exactly.

6        THE COURT:  And the point was I think the

7   government wanted me to make sure that you understood

8   that and would not allude at all to this particular

9   case.

10        THE WITNESS:  Understood.

11        THE COURT:  Very good.  Then that was what --

12   Mr. Skrocki, does that address your concern?

13        MR. SKROCKI:  It does.

14        THE COURT:  Very good.  Mr. Colbath?

15        MR. COLBATH:  I don't think we have anything

16   more at this point, Your Honor.  We'll be ready to go

17   right after lunch.

18        THE COURT:  Very good.  Let's take our lunch

19   break.  We'll go off record.

20        DEPUTY CLERK:  All rise.  Court stands in

21   recess.

22        (Recessed from 11:39 a.m. to 12:46 p.m.)

23        (Jury absent)

24        DEPUTY CLERK:  All rise.  Her Honor, the Court,

25   the United States District Court is again in session.

1          THE COURT:  Please be seated, everyone.

2          I understand there's a topic to address.

3  Mr. Skrocki, go ahead, please.

4          MR. SKROCKI:  Thank you, Your Honor.  Good

5  afternoon.

6          We were discussing over lunch by our list from

7  defense counsel, they have roughly 23 witnesses left

8  including several experts.  Gan, Ditallo, Curry, and

9  possibly the defendant, who we don't know about that

10  part yet.  At the current rate, we're going at about six

11  witnesses a day.  If we have 23 left by our count, that

12  takes us into Friday, which we don't have.

13          We have witnesses we're trying to recall in our

14  rebuttal case, and a lot of them are not here.  They are

15  a long ways from now.  So what I'm trying to sort of

16  figure out is we need an assessment from defense counsel

17  about whether they're going to go into Thursday with

18  their case.  That would be great because we can tell our

19  folks they won't have to spend the weekend here waiting

20  from Thursday -- some are flying a long way.

21          THE COURT:  All right.

22          MR. SKROCKI:  We can have them ready for

23  Monday.  That would be great because it's going to be

24  horribly expensive and time-consuming to bring up

25  witnesses and have them sit.  Some of them are coming in

tomorrow or today in anticipation of the defense case to
be resting on Thursday.  So we don't want to have any
gap.

         We've been pretty diligent.  We've put on close
to 60 witnesses in two and a half weeks without a break,
any delays.  And so we're just trying to make this as
efficient as possible.  So I would like some idea from
defense counsel about what we could do to make this a
more orderly process.

         THE COURT:  All right.  Fair enough.

         Mr. Colbath?

         MR. COLBATH:  Well, Your Honor is aware of the
problems we've had today.  In light of that -- we were
not able to reach Dr. Gan, so we are going to proceed
with her in the morning.

         We have lots of witnesses en route.  We've
looked at the list and are going to revisit the list
given that we are -- ran out of folks today, we're going
to revisit the list.  But I'm looking at now today and
anticipate shortening it again by a witness or two.

         Subject to a phone call this afternoon, we may
eliminate expert witness Michael Ditallo.  So that would
be -- he was along the lines of the government's witness
Mr. Toglia, Mr. Becker, so his -- he had a presentation
and that would be a good couple hours of testimony that

1    we would eliminate.

2         I think that we are still on course to get our

3    case in by the end of -- if the next two days are more

4    productive and stay on track, which we hope to be, than

5    today, we're on course to end our witnesses by the

6    conclusion of Wednesday.

7         Many of the witnesses that we have left on our

8    list, save for a few experts, are folks like the other

9    folks that testified here this morning, 10 minutes,

10   20 minutes, something of that, which we think are pretty

11   short cross.

12        So I suppose if things ran slower, there's a

13   chance we could spill into Thursday morning, but I do

14   not anticipate -- I anticipate our case being in by the

15   end of Wednesday or maybe a witness or two into Thursday

16   morning, done before noon.

17        So if the government has -- we understood there

18   wasn't going to be a large rebuttal case, but if the

19   government has some rebuttal witnesses and they're

20   available Thursday, I would think the evidence could be

21   concluded.  We're still on track for that for sure.

22        THE COURT:  Okay.

23        MR. COLBATH:  And we'll provide a better

24   list -- I'll actually -- we'll try to make the decisions

25   of who we're going to call, except, you know, it's

1  always Mr. Wells' decision if and when and where he

2  testifies, but other than that, we'll try to by --

3  assuming we break early today, which it looks like we're

4  going to, by close of business today at 5:00, we'll try

5  to get an outlined list to the government of who -- how

6  we're going to go for the next two days straight to the

7  end of the case.

8          THE COURT:  All right.  Is that helpful?

9          MR. SKROCKI:  Well, based on that

10 representation, we'll have people ready here Thursday.

11         THE COURT:  All right.  Very good.  Then we

12 ready to bring the jury?  Yes.  All right.  Thank you.

13         (Pause)

14         (Jury present)

15         THE COURT:  Welcome back, ladies and gentlemen.

16 Please be seated, everyone.

17         And Mr. Camiel, the defense's next witness?

18         MR. CAMIEL:  Gregg McCrary.

19         THE COURT:  Good afternoon, sir.  If you could

20 come forward, please.  If you can make your way up to

21 the witness stand.  Remain standing when you're there,

22 and the clerk will administer an oath to you.

23         (Oath administered to the witness)

24         DEPUTY CLERK:  And for the record, can you

25 please state your full name and then spell your full

1    name.

2              THE WITNESS:  Yes.  My name is Gregg,

3    G-r-e-g-g, McCrary, M-c-C-r-a-r-y.

4              THE COURT:  Thank you.  Go ahead, please.

5            GREGG McCRARY, DEFENSE WITNESS, SWORN

6                     DIRECT EXAMINATION

7    BY MR. CAMIEL:

8      Q.   Good afternoon, Mr. McCrary.  Where did you

9    travel from to be with us today?

10     A.   From Virginia.

11     Q.   And what do you do in terms of an occupation in

12    Virginia?

13     A.   Now I run my own consulting business called

14    Behavioral Criminology International.  It's a small

15    consulting business.  I have just a couple of full-time

16    employees.  And basically my job outside of the business

17    stuff is doing a number of different things, including

18    testimony in court.  I do presentations and workshops on

19    issues related to violent crime, violent crime analysis,

20    train law enforcement folks, as well as prosecutors,

21    defense attorneys.  I teach a course in the forensic and

22    legal psychology program, a graduate level course in

23    forensic psychology at Marymount University in

24    Arlington.  And that's -- those are the highlights.

25    Probably a few other things, but those are the main

1  things I do.

2     Q.  Let me back you up.  Do you have a law

3  enforcement background?

4     A.  Yes.

5     Q.  And when did you first get into law enforcement?

6     A.  Oh, back in 1969.

7     Q.  Could you run us through and tell the jury about

8  your law enforcement career.

9     A.  Yes.  I entered on duty as an FBI agent in 1969.

10 I had a little over 25 years with the bureau.  I had

11 about 17 years roughly in the field as a field agent.  I

12 did a number of different things in the field.  I had

13 different offices where I was assigned over the course

14 of my time in the field.

15      It was primarily related to violent crime

16 activities.  I worked organized crime in New York City

17 for a number of years, what you think of as the Mafia,

18 La Cosa Nostra.  Then I said I worked disorganized crime

19 in Detroit with bank robberies, kidnappings, extortions,

20 that sort of thing.

21      Then upstate New York, I was assigned to the

22 office in Buffalo for a number of years.  I was -- I did

23 some undercover work.  I was cross-trained with DEA.  I

24 did undercover drug work and undercover work in

25 different areas.  I was on a SWAT team for nine years.

I was team leader for seven of the nine years.

       And then I was promoted and transferred down to
the FBI Academy in Quantico with the behavioral science
unit and was in the operational wing of the unit, which
was -- well, people think of it as profiling.  So I was
down there in the early days when we were establishing
the unit and beginning to research and so forth that
continues through today.  As I said, I was in the
operational wing, so most of the time -- most of my time
was spent consulting on ongoing cases in the United
States and abroad as well.

       And then training law enforcement agencies
throughout the United States, North America, Europe.
The last couple years I spent a lot of time in Europe
working with law enforcement agencies over there on
different violent crime issues, either providing
training or operational support on ongoing cases.  And
that is a quick overview of 25 years.

   Q.  You mentioned that for a period of time, you were
a field agent.  What's a field agent?

   A.  It's I think what people typically think of as an
FBI agent.  You're actually in the field.  You're
assigned to a field office typically and to a squad that
has certain investigative responsibilities.

       As I mentioned, I was in New York and we had a

division which was several squads that worked organized crime. I had -- I was on a squad that had a particular organized crime family was what we were assigned to.

So -- and then in different areas, when I was in Buffalo, upstate New York, I worked different cases there. It was a smaller office, but mostly violent crime related work, so actually out in the field doing interviews. And like I said, with the SWAT team, obviously, we were out making arrests and doing the daily work that FBI agents do to bring cases.

Q. Have you also been a supervisory Special Agent?

A. Yes. That -- that was when I was promoted and transferred down to the academy, then that was -- worked there as a supervisory Special Agent. Not to get too much into the all the bureaucracy, but I was a program manager, which meant I was reviewing the work of other agents and running their performance evaluations and kind of supervising other agents while I was at Quantico.

Q. And have you been involved in the investigation of homicide cases?

A. Yes, many, many cases.

Q. And when you say many, do you have any kind of an estimate?

A. I would say around a thousand probably. I've

1    been retired now 25 years.  About 50 years I guess I've

2    been doing this stuff.  So yeah, a number of those --

3    yeah, yes, I would say a thousand roughly.

4        Q.  And you talked about being involved in training

5    and teaching.  Has that been just with the FBI or with

6    other kinds of law enforcement agencies?

7        A.  Well, I certainly did training within the bureau,

8    and I still do.  I was back at the FBI Academy -- I go

9    about once a year typically and do occasional

10   presentations for the bureau at the academy.

11          Then I also do presentations to other law

12   enforcement agents and agencies.  I spoke to a bunch of

13   prosecutors and law enforcement in Texas a while ago.  I

14   was in Sweden doing training for the Swedish National

15   Police a couple years ago now.

16          So yeah, it varies.  The training and the

17   presentations, the workshops continue.

18       Q.  And is there a particular area or subject matter

19   that you're involved in with your training?

20       A.  Well, recently over the last number of years,

21   it's been in the area of investigative failures.  In

22   other words, what do we know about how investigations go

23   wrong.  And so to -- and there's a lot of research now

24   that's being done in that area, which I'm involved in

25   some of that, about how this happens, how do we get a

wrongful conviction or wrongful arrest or even how does
the case end up unsolved.  That could be considered an
investigative failure as well if we don't solve the
case.

So it's not just me, the Department of Justice,
the -- their research arm, the National Institute of
Justice, has started a -- they call it a sentinel event
review initiative where they're looking at this very
issue of investigative failures.  And the criminal
justice system is a little bit behind the medical
community and the aviation community.

MR. SKROCKI:  I'm going to object.  Outside the
scope of the question.

BY MR. CAMIEL:

Q.  Let me ask you another question and we'll get
back into that.  Mr. McCrary, have you done any -- have
you published at all in the area of investigative
failures?

A.  I contributed a chapter to a book entitled
"Criminal Investigative Failures."  It was an edited
book by a guy named Kim Rossmo, who's a former police
officer and a researcher now at Texas State University.
I've also consulted with Kim.  Kim has a grant from the
National Institute of Justice.

MR. SKROCKI:  Objection, nonresponsive.

1          THE COURT:  That's sustained.

2    BY MR. CAMIEL:

3       Q.  Have you consulted in the area of investigative

4    failures and publications in that area?

5       A.  Yes.

6          MR. CAMIEL:  Your Honor, I'd ask that the Court

7    find, based on Mr. McCrary's training, experience and

8    background, that he's qualified to give opinions in the

9    area of investigative best practices, investigative

10   failures and ways to guard against investigative

11   failures.

12          THE COURT:  All right.

13          MR. SKROCKI:  I don't oppose --

14          THE COURT:  Subject to the prior ruling?

15          MR. SKROCKI:  Yes, Judge.  I don't know about

16   best practices as being part of his report, but I

17   guess -- maybe it was a slip.  I just don't know.

18          THE COURT:  Are you seeking to go beyond what's

19   in the report?

20          MR. CAMIEL:  No.

21          THE COURT:  All right.  Then with that

22   understanding, I'll find the witness so qualified.

23          MR. CAMIEL:  Thank you, Your Honor.

24   BY MR. CAMIEL:

25       Q.  Mr. McCrary, you've already used the term

1  investigative failures.  And I think as a starting

2  point, we should probably have you define the term so

3  the jury understands what you're talking about.

4     A.  Yes.  It's -- I just touched on it a minute ago.

5  Investigative failures could be a number of things.  It

6  could be -- the most egregious example would be a

7  wrongful conviction or a wrongful arrest, or an unsolved

8  case could be considered an investigative failure.

9        Lots of other things in the criminal justice

10 system could be considered investigative failures.  If a

11 prisoner is wrongfully let out when they shouldn't have

12 been let out of prison, how did that happen.

13       So there could be a number of these things, but

14 primarily, I'm looking at it from the investigative

15 perspective, from the law enforcement perspective, what

16 are we doing as investigators that we could do better or

17 what are the mistakes or the errors that we're

18 vulnerable to that lead us in investigation into the

19 wrong area.

20    Q.  In conducting an investigation into investigative

21 failures, have you and others in your field drawn on

22 other professional disciplines to use as models for

23 investigating these kinds of failures?

24    A.  Yes.  Yes.  We're looking at other professional

25 areas such as in medicine or aviation, who have been

1    studying this for a long time, why do we have airplane

2    crashes or why in the medical profession does a surgeon

3    end up amputating the wrong leg or operating on the

4    wrong patient, how does that happen.

5          And they're sort of ahead of the criminal justice

6    system in their research, but we've been modeling the

7    efforts that they have established to do this in order

8    to take a look at how things happen in the criminal

9    justice system.  Same sort of idea.

10   Q.   Is the -- is the criminal justice system looking

11   into investigative failures in a formal sense?  Is that

12   something new or something that's been going on for a

13   while?

14   A.   It's been going on for a while.  The first

15   articles that I recall, say, in the law enforcement

16   community in the FBI was in the FBI bulletin.  We put

17   out a law enforcement bulletin that deals with

18   investigative issues.  I say "we," the FBI does.  And

19   that was back in 2006.  And there had been some work

20   done before that.

21         There's a lot of work in related areas that we

22   don't need to get into on false confessions and other

23   things.  But it all goes to how do we -- how do we end

24   up with these problems.  So it's been going on for a

25   while and continues to be pursued.

Q. And having you focus I think for this afternoon in terms of investigative failures on your review of the research and work that's been done in investigative failures involving wrongful convictions, first of all, how is that research conducted?

A. It's --

MR. SKROCKI: I'm going to object. It's outside his report, I believe.

THE COURT: I'm sorry. Outside what?

MR. SKROCKI: Outside of his report, I believe.

MR. CAMIEL: Your Honor, I think it's a reasonable extrapolation to explain his opinions.

THE COURT: How is research conducted with regard to investigative failure? I will allow that. Go ahead.

MR. SKROCKI: I'm sorry, Judge. Could you read back the question for me?

(Question read back by realtime reporter.)

MR. SKROCKI: The emphasis was on wrongful convictions. We understand and that's fine with investigative failures, but I don't believe -- if I'm in error, I'm in error. But I don't believe that --

THE COURT: Well, take a moment. I'm looking specifically at page four, last paragraph.

MR. SKROCKI: Got it. Understood. Withdrawn.

```
1    Thank you.
2            THE COURT:  All right.  Go ahead.
3    BY MR. CAMIEL:
4       Q.  So I was asking about how law enforcement or
5    people like yourself go about researching wrongful
6    convictions.
7       A.  There are a number of ways.  And as I cited in
8    the report, there's been studies done of wrongful
9    convictions based on DNA evidence where we know the
10   person is factually innocent.  They didn't do the crime.
11   Someone else had been identified.  So there's no doubt.
12   This isn't a legal technicality or anything like that.
13   We just know the person absolutely didn't do it but got
14   convicted of that.
15          The National Academy of Science did a study on
16   that very issue looking at death row convictions and
17   exonerations, and their best estimate as far as defining
18   the problem is about four percent, a little over four
19   percent of the folks convicted and sent to death row
20   were factually innocent.  It's the best estimate that I
21   think that we have as far as getting a sense of the
22   scope of the problem.
23          There have been other estimates as well, but I
24   think the one by National Academy of Science is probably
25   as accurate an estimate as we have at this point.
```

 1    Q.   Is that -- I mean four percent doesn't sound like

 2   a very big number in terms of the overall number of

 3   convictions.  So why would they be still looking at this

 4   if it's just four percent?

 5    A.   Well --

 6         MR. SKROCKI:  I'm going to object, Your Honor.

 7   I looked at the third paragraph.  It's just one

 8   paragraph out of a 13-page report, and there's no talk

 9   about DNA exonerations and numbers and percentages.

10         MR. CAMIEL:  Well, Your Honor, I'm looking at a

11   couple different sections of his report.

12         THE COURT:  I'm looking at page three.

13         MR. CAMIEL:  Page three.

14         THE COURT:  I believe that's fairly encompassed

15   within the witness's report.  So I'll allow that.  But

16   what's the question that's pending here?  Why would you

17   be looking at this if it's just four percent --

18         MR. CAMIEL:  Right.

19         THE COURT:  -- is the question.  All right.  Go

20   ahead.  I'll allow it.

21    A.   Well, for the people who are wrongfully

22   convicted, it's 100 percent.  We need -- can we do

23   better?  The question is can we do better than the four

24   percent.  And you know, we think we can do better

25   overall on this than -- we can cut down the four

percent.  We can do better if we pay attention to how

these things happen, we think we can do better than just

saying, oh, that's close enough.  It's -- you know, it's

not good enough.  We would like to get close to

100 percent if we could, obviously.

Q.  And in looking -- so you mentioned using DNA and

studying cases where there were DNA exonerations because

there, if I understand your testimony, you've got a

certainty that it was a wrongful conviction?

A.  Yes, sir.

Q.  So in looking at those cases, what does an

investigator who's looking back at cases like that, what

do they actually look at?

A.  How did we get there?  How did this happen?  And

we're finding there is sort of a pattern that's emerged.

And I'm talking about mostly here, from my perspective,

what I'm interested in is from the investigative

perspective not so much what happens in the courtrooms

or later, because it begins with us.

     And that's where we see the thing get off track

initially is at the very beginning where certain errors

in thinking called cognitive biases, which is just a

fancy way of saying we're not thinking clearly or

accurately about what we're seeing and what we're

investigating.

1       And when that happens, then we tend to get on the

2   wrong trajectory, which it's sort of like if you shoot a

3   firearm at a target, if you're just -- the sights are

4   off just a little bit here, the further down range that

5   round goes, the farther off target it is.

6       It's the same with a criminal investigation.  If

7   we get off on the wrong trajectory early on, as that

8   investigation proceeds down the road through the courts

9   and the criminal justice system, it's going to get

10  further and further off track.  So if we can get it

11  right at the beginning, you know, like a good shot, be

12  accurate right from the beginning, then we're going to

13  have a very good chance of having a good justice outcome

14  on that particular case.

15  Q.  And so going back to my question about how these

16  are investigated.  What's actually looked at to see how

17  the case started off?

18  A.  Uh-huh.  Well, that's what we find.  We find that

19  the majority of these cases, where they go bad, as

20  documented in these studies, is at the very beginning

21  when investigators think they know the identity of the

22  suspect or the offender before they've completed a

23  thorough investigation and sometimes before they've

24  conducted any investigation at all.

25      And what happens is that sets it out on this

1  trajectory that is errant.  Because then they move

2  prematurely or improperly from an evidence-based

3  investigation to a suspect-based investigation.  And it

4  should be the other way around.  We should be conducting

5  an evidence-based investigation, and then once all

6  evidence is in and the investigation reaches sort of a

7  conclusion, hopefully that evidence will lead us to a

8  suspect.

9      Q.  Let me stop you for a minute and have you define

10  a couple terms.  You used two different -- you used the

11  term evidence-based investigation and suspect-based

12  investigation.  And I want to have you define each one

13  of these so we understand what you mean by those things.

14      A.  Evidence-based investigation is pretty much just

15  what it sounds like.  You're just looking at the

16  evidence and following the evidence as to where it leads

17  objectively, open-mindedly, dispassionately and looking

18  at all the different ways we could interpret a

19  particular piece of evidence.  Think of it as

20  exploratory thinking, which is an even-handed approach

21  to considering alternate ways of looking at situations.

22          As opposed to a confirmatory thought, which is

23  you're looking at this thing to try and rationalize a

24  particular point of view rather than open-mindedly.

25  That's where these things go wrong.

When you have a suspect-based investigation, it's much more likely to involve confirmatory thinking. In other words, we think we know who did it. Now you're working backward to try to find evidence that that person did it. Rather than looking at the evidence to lead you to the suspect, you start with the suspect and work backwards.

That's where things go south. When we have an investigation that focuses on the suspect first without having all the evidence in, then there's a tendency, we lose our objectivity and we begin to try to figure out -- create a narrative how this offender must have done it and then go out and try to find the evidence that would prove that he did it.

We're no longer open-minded. We're not longer objective. We're trying to confirm this hypothesis that this person did it prior to conducting a full investigation.

Q. You mentioned that when investigators like yourself started looking at what you called investigative failures, you saw some patterns that appeared.

A. Uh-huh.

Q. Actually, before I get to that, though, did you find that investigative failures happened in -- were

1    there certain pre-conditions or certain types of cases

2    where they seem to be more frequent?

3        A.   Yes.   In high-profile cases, cases with a lot of

4    publicity where there's a lot of pressure to solve that

5    case, a lot of public pressure.   There can be pressure

6    within the law enforcement community.   And certainly the

7    pressure investigators put on themselves, which is

8    probably as intense as any pressure.   As an

9    investigator, you want to solve the case.   It's a big

10   case.   It's important.   You want to solve that.

11        And we know that pressure is a very common

12   pre-condition for these things to go bad, because they

13   tend to move quickly and they want to get a quick answer

14   to this thing, kind of get the monkey off your back and

15   get this thing solved and so forth.

16        So as opposed to other investigations which don't

17   get a lot of public notoriety and you work methodically

18   through those things.   There's no real pressure to solve

19   it.   You just work routinely.   But the ones with all the

20   big publicity and a lot of public notoriety are the ones

21   that -- that's a very common pre-condition when these

22   things go -- go bad.

23        Q.   So you mentioned high-profile cases and cases

24   with lots of publicity.   So what has been found to be

25   the root causes of these kinds of failures?

      A.  Yeah, the root cause is how investigators think
and errors in thinking, which I mentioned these sort of
cognitive biases.  We don't think clearly about these
things.  So that's -- and there's a number of those
things, tunnel vision, confirmation bias, premature
closure.  These things are things that we see almost
case after case after case.
      Q.  Let me stop you because you've used now a couple
of -- three different terms.  You started with tunnel
vision.  Can you tell us how you're using that term with
regard to investigating criminal cases?
      A.  Yes.  Tunnel vision sets in when you think you
know what happened or how to classify the crime or who
did it.  You get a restricted view, say, if you have a
suspect of an investigation, you get tunnel vision on
that suspect.  And then once we think we know the
answer, we tend to lose our curiosity about other
suspects.  And that seems to be our guide.
      And then what happens inadvertently -- and again,
this isn't because investigators are necessarily stupid
or have the wrong -- have an evil mindset or something.
These are honest errors that people -- that just happen
to us because we're human beings.  They get tunnel
vision on a given suspect, they stay focused on it and
they begin to not pay attention to other potential

suspects, they don't interview witnesses maybe as
thoroughly or they interview them with the idea of can
they help me prove this guy did it as opposed to anybody
else.  And then you get a constricted view of what may
have happened or who did it.

     And when that happens, that's what we see when we
end up with these cases of wrongful convictions or
wrongful arrests.  They started out with the wrong
suspect in mind and tried to retrofit the evidence to
prove that this guy did it.

     Q.  You used another term, premature closure.

     A.  Yes.  Premature closure is that.  It's like, oh,
we got the solution right off the go.  We know who did
it, okay.  And that happens -- it's premature because
they hadn't completed the investigation yet.  Many times
they just start it and they get some conjecture or a
suspect jumps up and they jump on that suspect to the
exclusion of others.

     And that's what we're talking about, about
premature closure.  They sort of close the case down.
As far as looking for suspects, they get the suspect
identified.  Then they just start targeting that
particular suspect and go down that road and not look
even-handedly and objectively at other suspects that may
or may not arise.

1      Q.   And you also used the term confirmation bias.

2      A.   Uh-huh.  Confirmation bias occurs when we seek to

3  confirm something we already believe.  In these cases

4  we're talking about, well, we think this guy did it.  So

5  then you look for information.  You limit yourself, and

6  again it can be very unconsciously, looking for

7  information that this person did it.  And things that

8  confirm that are accepted almost at face value, and

9  things that disconfirm that, we tend to be very

10 skeptical of.

11      So sort of a one-sided skepticism.  Those things

12 that confirm what we want to believe, we just accept

13 because, oh, yeah, that makes sense because that's what

14 happened.  And things that disconfirm it, we try to find

15 a way either to explain it away or we don't even look

16 for disconfirming things because we're so sure we had

17 the answer even before we've conducted a complete

18 investigation.

19      Q.   In your report you talk about exploratory thought

20 versus confirmatory thought.  Is that in the same vein

21 as confirmation bias, or is that something else?

22      A.   Yeah, it's very similar.  Exploratory thought, as

23 I think I mentioned a moment ago, is an even-handed

24 approach, even-handed consideration of what you're

25 looking at of alternate explanations.

1        And confirmatory thought is a one-sided approach

2   where you're trying to rationalize a particular point of

3   view.  You've got a point of view, and you're just

4   looking to confirm it.

5        So our default position always needs to be

6   exploratory thought.  We need to be exploratory

7   thinkers.  We need to be looking openly and objectively

8   at everything that comes along and not looking at it to

9   try to prove a singular point of view.

10   Q.  What's the importance of evidence interpretation

11   as it relates to these terms you've been talking about?

12   A.  Very commonly you have situations you'll come

13   across that may or may not be evidence.  And what the

14   confirmation bias does is you tend to interpret those

15   things -- when they may have more than one

16   interpretation, you just take the one interpretation

17   that fits what you already believe, rather than look at

18   it openly, objectively and looking at alternative

19   explanations for the same behavior or the same action or

20   the same information.

21   Q.  So is there a difference between -- when you're

22   talking about interpretation of evidence, between

23   interpreting something as evidence versus as a

24   coincidence?

25   A.  Right.  What we find is the suspect-driven

```
 1   investigations are vulnerable to what we call errors of
 2   coincidence where we look at coincidences rather than
 3   just products of chance, which they are.
 4           MR. SKROCKI:  I apologize.  I object.  I'm
 5   looking through the report and I'm trying to find it,
 6   and I don't see it.  If counsel can tell me where errors
 7   of coincidence are, that would be great.
 8           THE COURT:  Mr. Camiel, take a moment.
 9           MR. CAMIEL:  Sure.
10           THE COURT:  I see a discussion on page nine.
11           MR. CAMIEL:  And also page ten.
12           MR. SKROCKI:  Got it.
13           THE COURT:  Go ahead, please.
14   BY MR. CAMIEL:
15       Q.  You were beginning to tell us about the role of
16   coincidences in these investigative failures.
17       A.  Right.  Coincidences, when we have a
18   suspect-driven investigation, they're prone to these
19   errors of coincidences where we tend to see coincidences
20   as a pattern when none really exists.  What are the
21   chances that this and that happen.  And it's not --
22   anything other than proof of guilt.
23           In fact, there could be many alternate
24   explanations.  They could just be coincidences.  And so
25   we have to be careful to not mistake coincidences as
```

1    evidence, as some sort of pattern of some sort because

2    it really -- really they're not.  They're are just

3    coincidences.

4           But again, with a suspect-driven investigation,

5    the tendency is to look at those things as confirming

6    what you already want to believe.  You see it in a light

7    that sustains the belief you have that this guy did it

8    rather than being open and objective about looking for

9    other explanations as to, you know, just strange things

10   happen.

11     Q.  You used an example in your report of the -- what

12   appear to be a pattern between the assassinations of

13   President Kennedy and President Lincoln.

14     A.  Right.

15     Q.  If you could use that as an example.

16     A.  Sure.  Now, this is kind of a famous example.  I

17   mean when we look at this thing, Lincoln was elected in

18   1860 and Kennedy in 1960.  They both were concerned with

19   civil rights violations.  Both lost a child when they

20   were in the White House.  Both were assassinated on a

21   Friday.  Both were shot in the head.  Both assassins

22   went by three names.

23           John Wilkes Booth ran from a theater and was

24   caught in a warehouse.  Lee Harvey Oswald ran from a

25   warehouse and was caught in a theatre.  Both men were

1    assassinated before they could be tried.  Both

2    presidents were succeeded by a Southerner named Johnson.

3    And it goes on.  There's probably more of it.

4           So what do all of these remarkable coincidences

5    mean.  The answer is absolutely nothing.  They don't

6    mean anything at all.  They're just products of chance.

7    They're just random things that happen.  When we do

8    that, we're cherry-picking certain things that we look

9    at and try to fit into a pattern.

10           And if we looked at those two guys, there are

11   many more dissimilarities between Lincoln and Kennedy

12   than there are similarities.  But by just choosing to

13   look at things we can connect and make some coincidental

14   connection, it begins to look like there's some pattern

15   here we're trying to decipher.  In fact, they're just a

16   product of chance.  Just nothing more than random

17   events.

18     Q.  One of the things you talk about in your report

19   that you found was something you called group think.

20   And how does that play into investigative failures?

21     A.  Group think is a pattern that was first

22   articulated by -- I won't get into that.  It's been a

23   while.  It's been around.  And it's -- we may have all

24   had these examples.  You may well have had this in

25   your -- your everyday life.

1          At work or wherever you get a group together and

2     you're discussing a problem or issue, and you got to

3     figure out how you're going to handle this.  And

4     somebody has an idea, and you begin moving in a

5     particular direction.  Yeah, that's it, that's what we

6     need to do, and everybody is jumping in, oh, yeah,

7     that's right, yeah, we need to do this and do that.

8          Then from the back of the room, you know, the guy

9     raises a hand and he goes, you know, I'm not so sure

10    that, you know, that's right.  You know, what happens to

11    that guy?  He gets mocked.  He gets vilified.  You know,

12    hey, we need some coffee.  Why don't you go get us some

13    coffee?  We got a good thing going here.  That's what

14    happens.

15         And that's -- that's -- that's what happens.  So

16    we have to guard against that because that's a common

17    thing.  Again, we get a suspect-driven investigation and

18    it comes together.  They say, oh, yeah, that's our guy

19    because of this and that and the other thing and, oh,

20    yeah, yeah, yeah.

21         And then you begin moving.  You have this

22    organizational momentum that begins moving in that

23    direction that that's our guy.  And there's a tendency

24    to disregard anybody that wants to raise a little

25    caution and say, maybe not -- not so fast on that.

1       So that's another common feature we see.  When we

2    talk about bad decision-making, they get off on the

3    wrong track and they don't want to listen to outside --

4    they don't seek outside experts and they don't listen to

5    people who voice a little bit of caution.  They tend to

6    steamroll right over that.

7    Q.  Has there been any finding or when looking at

8    these kinds of cases, these investigative failure cases,

9    of what happens when law enforcement public -- makes

10   public the person they think is the suspect before

11   they've completed the investigation?

12   A.  Not just in law enforcement, but certainly there,

13   any time we take a public stance where you offer an

14   opinion in public, then -- that we tend to defend that

15   and push back against that, and it creates kind of a,

16   like I say, momentum or organizational momentum, because

17   we don't want to appear wrong.

18       Everyday example, suppose again you're sitting in

19   a meeting and you have an idea or I have an idea that

20   I'm going to bring forth.  And as the meeting goes on,

21   someone else has a better idea, and I think to myself,

22   oh, yeah, that's better.  So I don't even bring mine up.

23       But if I were in that meeting and then I brought

24   up my idea first and then somebody else had a better

25   idea, the tendency, the normal tendency is to push back

and defend the idea I put out there because I don't want
to look stupid or I want to save face or I want to
defend this.  But if I don't say it publicly, there's no
harm.  It's very easy.  So it's about ego and self
preservation of your image and that sort of thing.

So when law enforcement goes public with
suspects' information, it's very hard to move back from
that once you've -- you know, once -- you know, once
they've -- once they've done that.

Q.  You've talked about the things that have been
found that are the causes of investigative failures.
Has there been research and studies into how you guard
against investigative failures?

A.  Yes.

Q.  Can you tell us about those?

A.  Sure.  And once you understand what those
problems are, then you can figure out ways to avoid
them.  That's the whole purpose of the research is, one,
identify the problems, how they happen, and then how can
we avoid those patterns and those issues.  So there's
been -- there's certainly been work on that.

An example, we're talking about group think, the
way to prevent that is have a manager or somebody in
charge assign a strong team member to be the devil's
advocate.  Assign somebody on that team to say, show us

why we're wrong.  We're heading a particular direction,
say, in a criminal investigation, we think this guy did
it, and they assign a strong team member to come back
and present to everybody why that's wrong.  What other
information is out there that disconfirms what we're
thinking.

        And if you have enough resources you could assign
a team.  It's typically called red team.  You could have
a red team to go out and investigate everything, you
know, every other alternative.  And that's the way of
check and balancing so that we don't get this
organizational momentum that carries us off track.  We
can have a counterbalance to this.

        And certainly the manager or whoever's in charge
needs to remain neutral and needs to be pushing back
against that dominant theory and asking for
disconfirming information as we go along.  It's just a
check to make sure we're not running down the rabbit
hole here and that we're headed in the right direction.
So that's one way.

    Q.  And I want to get back to that, but let me ask
about a couple other things.  First of all, I had asked
you a minute ago about when law enforcement goes public
with a suspect.  Is there a way for law enforcement to
do that, to seek public assistance without committing to

a suspect and running into the danger that that
involves?

A.    Yes.   Sure.   I mean, and you probably see it
routinely.   They will say there's been a crime and
simply ask anybody -- any information about that issue
or anything suspicious or anything that they're
concerned about to report it without divulging what
we're thinking or where we're headed with the
investigation.

Because once we've put out, you know, suspect
information, which is different than offender
information, offender information we put out.  It might
be, for example -- and I'm sure you've probably seen
these.  It's a photo from a convenience store robbery or
a bank robbery or something.  That's not suspect
information.  That's offender information.  That's the
guy actually robbing the bank or robbing the convenience
store.  Any information you have about that guy, they
want to know.  But he isn't a suspect.  That's the guy
actually in the course of committing the crime.  So
there's a difference.

So we have to be careful about putting out
suspect information and be -- it's like conducting a
good interview and interrogation.  You don't ask leading
questions.  You don't ask, did you see a red car to a

witness.  You say, just tell me what you saw.  That way

you haven't contaminated any of the information that

people might -- because if I say, have you seen a red

car, they say, oh, they're looking for a red car.  Oh, I

think I did see a red car, you know.  And that might

block out something that you actually saw that may be of

more importance.

Q.  So going back to ways to guard against these

traps that you've talked about that have been found

investigative failures, you used the term team manager.

Is that the same as, say, a case agent?

A.  It could be.  The case agent in charge, certainly

in the bureau, we're a hierarchical bureaucracy.  I mean

over the case agent would be a squad supervisor.  He

could be a manager overseeing this, but somebody sort of

up the food chain a little bit that isn't involved

necessarily in the day-to-day work to take a look and be

informed as to what's going on and then push back.  But

certainly the case agent could play that role as well.

But somebody has to assume that role of being a

manager and being neutral and pushing back against the

dominant theory.  It's using the scientific approach,

which is you have a hypothesis which is something you

believe but you have yet to prove, and pushing back

against that dominant hypothesis, which is what the

scientific approach is, is trying to disprove rather
than prove what your hypothesis is.  So somebody needs
to play that role.

    Q.  So in terms of using this kind of a scientific
method of investigation, have you heard or are you
familiar with the phrase alternative competing
hypothesis?

    A.  Yes, exactly.  And that's what one needs to
develop.  These hypotheses I mentioned are maybe what
happened or who did it, this guy did it, that guy did
it, another guy did it or this was a robbery or this was
a burglary, or this was a personal cause homicide or
whatever it might be.

        You develop -- especially at the beginning, you
have to have multiple, we call it ACH, alternative
competing hypotheses.  Multiple theories.  And then you
stack up the evidence and see which is supported by the
evidence.  And a way to do that is to create like a
graph or a chart, you put the hypotheses across the top
and then the evidence down the side, and then you
compare that evidence to --

        MR. SKROCKI:  I'm going to object.  Outside the
scope of his report.

        THE COURT:  I'm looking at the top of page 13.
I think it falls fairly within what's there in that part

```
1  of the report.
2            MR. SKROCKI:  I won't disagree, Judge.
3            THE COURT:  I'm sorry?
4            MR. SKROCKI:  I won't disagree.
5            THE COURT:  All right.  I thought you said you
6  do disagree.
7            MR. SKROCKI:  The "won't" got stuck.
8            THE COURT:  Go ahead, please, Mr. Camiel.
9            MR. CAMIEL:  It was hard for him to say
10 "won't," but --
11 BY MR. CAMIEL:
12   Q.  So you were talking about alternative competing
13 hypotheses.
14   A.  Yes.  In other words, it's just the idea of
15 keeping an open mind and not getting a constrictive view
16 about what happened or who did it.  And it could be an
17 alternative competing hypothesis could be what happened.
18 It could be who did it.  It could be all of those
19 things.
20        And then you conduct this investigation to
21 develop the evidence and then let the evidence support,
22 confirm or disconfirm those hypotheses.  A lot of these
23 will disappear.  The evidence just doesn't support one
24 thing or another.  And hopefully what you get in an
25 evidence-driven investigation at end of the day, the
```

1  evidence supports one hypothesis or points you to a

2  particular suspect or narrows the field of suspects, so

3  then you can continue from there.

4       But the problem comes, as I said, when we do it

5  the other way around, when you start with a suspect and

6  then go out to try to find evidence that that guy did

7  it.  That's what we find is a common characteristic in

8  these investigative failures, these wrongful

9  convictions.

10  Q.  Another term that you used in your report that I

11  wanted to ask you about is hindsight bias.  What is

12  that?

13  A.  It's after -- when we think we know the answer or

14  when we do know the answer or we think we know the

15  answer, we tend to look back and say, oh, yeah, that was

16  obvious all along, or yeah, once you know it, you begin

17  to look for things for what it is you think you know.

18       It's sort of like a confirmation bias.  When you

19  look back on it -- when you think you know who did it

20  and you begin to look at the evidence, you begin to

21  interpret in a way that supports that theory in

22  hindsight that he did it when in fact that might not be

23  it at all.  So it's another error in thinking.

24  Q.  So these things that you've been talking about

25  today that you talked to the jury about, the ways to

1  avoid investigative failures, are these the kinds of

2  things that you've been lecturing on and teaching at

3  various police agencies?

4      A.   Yes.

5      Q.   And you've been doing that again for how long?

6      A.   Well, investigative failures specifically,

7  probably for the last maybe -- well, since 2005, 2006.

8  So 13, 14 years now, I guess.

9      Q.   How many different police agencies do you think

10 you've been involved in training or lecturing in this

11 area?

12     A.   It's hard to say.  I did a lecture in Tennessee

13 where we had agencies from 13 different states.  I have

14 no idea how many specific police agencies were there.

15 It was a huge group of -- and some are for individual --

16 well, the entire Swedish National Police.  You know, I

17 don't know.  You know, there -- you know, those.

18          I did a thing in -- actually several

19 presentations down in Texas for prosecutors and law

20 enforcement.  I don't know how many different agencies

21 were in attendance there as well, but a number of

22 agencies.

23              MR. CAMIEL:  Thank you, Mr. McCrary.

24              THE COURT:  Ready to proceed?

25              MR. SKROCKI:  Yes.

1          THE COURT:  All right.  Very good.  Go ahead.

2                    CROSS EXAMINATION

3     BY MR. SKROCKI:

4          Q.  Hello, Mr. McCrary.

5          A.  Yes, sir.

6          Q.  Thank you for your work as an FBI agent.

7          A.  It was a privilege.  Thank you.

8          Q.  Indeed.  Sir, when was the last time you worked a

9     case as a field agent for the FBI?

10         A.  As a field agent?

11         Q.  Yes.

12         A.  Oh, yeah, a long time -- well, let's see.  That

13    would be probably around 1987.

14         Q.  Okay.  And you were working you said LCN, right,

15    La Cosa Nostra?

16         A.  Yes.

17         Q.  Which may not be a phrase most people hear

18    anymore.  I'm old enough to remember.  Right, Mafia?

19         A.  Yeah.

20         Q.  These were hard cases, weren't they?

21         A.  Yeah, they could be, absolutely, yeah.

22         Q.  When an agent is conducting an investigation,

23    they routinely interview people, don't they?

24         A.  Yes.

25         Q.  And they routinely interview suspects?

1    A.  Yes.

2    Q.  They routinely interviews subjects too, because

3  there's a difference, right?

4    A.  Yes.

5    Q.  And whether it's a suspect or a subject or a

6  witness, you would agree with me that the agent is

7  interested in the credibility and the details that

8  people provide in determining what to do next?

9    A.  Yes.

10    Q.  So it's important for an agent to take an

11  assessment if they're interviewing somebody who may be a

12  subject of any kind of crime to think if they're telling

13  them the truth?

14    A.  As we teach our new agents and remind our old

15  agents, our job as an investigator isn't to believe or

16  disbelieve anybody.  It's to find the facts.

17    Q.  Yeah.

18    A.  So we're interested in finding facts.

19    Q.  And so in a case where someone is vague about the

20  facts, the agent naturally would want to go further and

21  investigate whether those facts that are being told or

22  not are true or not, right?

23    A.  Whether they're vague or whether they're, you

24  know, very, you know, solid in their -- we don't know

25  whether they're telling the truth or not.  Again, we

1    have to go and drill down and find out, you know,

2    absolutely was or wasn't involved in that or was or

3    wasn't here.  They could be vague about it or they could

4    be very specific about it, but we want to gather

5    information that we can verify or validate

6    independently.  That's what we want to do.

7        Q.  Uh-huh.  Sure.  So nothing wrong with that, is

8    there?

9        A.  No.

10        Q.  Okay.  And back when you were doing your cases as

11    a field agent, the FBI wasn't recording anybody

12    electronically during their interviews, were they?

13        A.  Not commonly.  It would be unusual, yeah.

14        Q.  Be unusual, yeah, because --

15        A.  Well, unusual as far as routine interviews or

16    interrogations.  It wouldn't be common in those days.

17        Q.  Back in -- when you left as a field agent, the

18    FBI wasn't routinely recording, audio recording witness

19    interviews?

20        A.  Correct.

21        Q.  Okay.  It just wasn't happening, was it?

22        A.  That's right.

23        Q.  And you mentioned that in some respects, the

24    speed of an investigation is important to you in the

25    area you're talking about, in terms of this bias and

1    improper convictions, right?

2       A.   Well, an investigation can go over a long period

3    of time.  It depends.  If you move prematurely to a

4    suspect-based investigation, that's the problem.  We

5    have to be careful we don't confuse the quantity of

6    investigation with a quality.

7          You can have a long investigation with a lot of

8    interviews and stuff that if they're done superficially

9    isn't very good.  So it's not necessarily the speed as

10   much as the pressure or how much evidence, I mean, do

11   you have.  If you just develop a suspect without a lot

12   of evidence, that's the dangerous part, regardless of

13   when that occurs.

14      Q.   Sure.  And part of the ways of figuring out

15   investigative failures, when you interview somebody, you

16   ask somebody, tell me what you did, right?

17      A.   Yes.

18      Q.   So you want some specific details about what they

19   did, correct?

20      A.   Yes.

21      Q.   Especially if you're talking to somebody in the

22   evening, you want -- and you're asking questions about

23   what did you do that morning, you would expect some

24   pretty precise answers, wouldn't you?

25      A.   Yes.

1    Q.  Okay.

2    A.  In general.

3    Q.  In general.  All right.  I want to talk to you

4  about your report if we could.

5    A.  Sure.

6    Q.  So this is a 14-page report, right?

7    A.  Yeah, I believe so.

8    Q.  Please take a look at it if you wish.

9    A.  I have it as 14 pages, yes, sir.

10   Q.  Okay.  Great.  And my understanding from the

11 public defenders is you charged $24,000 for that 14-page

12 report?

13   A.  I'm not sure.  Is that right?  I don't --

14   Q.  If you don't know you don't know.

15   A.  I don't think so.  At least --

16   Q.  You don't know?

17   A.  I would be very surprised if that was it.  I

18 don't know.  We set a -- it was like so much for a

19 report, and so I don't think it was $24,000.

20   Q.  A little high?

21   A.  Yeah.

22   Q.  Fair enough.  Fair enough.  I want to turn your

23 attention to page -- that would be page 13.

24   A.  Right.

25   Q.  You want to be accurate when you make this report

1  for us and for the defense, right?

2      A.  I try, but again, I'm human, so I'm prone to

3  error like everyone else.

4      Q.  You're getting ahead of me.

5      A.  Okay.

6      Q.  So yes, we all make -- I make mistakes, you make

7  mistakes, we all make mistakes.  So you made a mistake

8  on page 12, didn't you?

9      A.  I make -- let's see.  If it's --

10      Q.  Is it fair to say -- mine has page 12.  Right

11  above the conclusion.

12      A.  Oh, yeah, where that partial sentence was there,

13  right?

14      Q.  Yeah, it's just like a hanging sentence.

15      A.  Yeah.  Actually, I took the benefit of having the

16  correct one here.  Yeah, that's correct.  I had taken

17  that out.  And then when I printed it, I printed the

18  wrong one with --

19      Q.  Is there more information under Psychological?

20      A.  No, that's it.

21      Q.  You just took it out?

22      A.  I just took it out because it was just hanging

23  there and -- from another part of the draft that I had

24  written.  So that was an error that I made.  It's a

25  partial sentence in the report, and I had redacted it

```
 1   and then made the mistake of sending out the final copy
 2   with it in there.
 3       Q.   Okay.
 4       A.   My bad.  I own the error.  My error.
 5       Q.   Copy from my colleagues.  I want to ask you about
 6   another error that you did with respect to a case out of
 7   California.
 8       A.   Error?
 9       Q.   Do you remember writing a letter in a case in
10   California --
11       A.   Oh, I do.
12       Q.   -- concerning an FBI agent?
13       A.   Yes.
14       Q.   And that letter was against a female FBI agent
15   who was testifying for the defense?
16       A.   Correct.
17       Q.   And that -- you wrote a letter to an organization
18   you belonged to, if I recall correctly?
19       A.   Yes.
20       Q.   What was the name of that organization?
21       A.   The International Criminal Investigative Analyst
22   Fellowship.
23       Q.   Right.  And you wrote a letter against this -- it
24   was a female FBI agent testifying for the defense?
25       A.   Yes.
```

1      Q.  And you made some errors and misstatements in

2   that letter that you wrote?

3      A.  I did not.

4      Q.  Have you looked at the Court of Appeals from the

5   State of California, the Ninth Circuit Court of Appeals

6   letter finding to the contrary?

7      A.  Yes.

8      Q.  And I want to have you look at that.  The case is

9   Tuite is it, T-u-i-t-e?

10     A.  Tuite.

11     Q.  Tuite.  Thank you.

12         If I might approach, Judge?

13         THE COURT:  Certainly.

14         (Mr. Skrocki approaches witness.)

15         MR. SKROCKI:  I was going to give you a copy,

16   Judge.

17         THE COURT:  All right.  Thank you.

18         MR. SKROCKI:  Actually, would you like a copy?

19         THE WITNESS:  Sure.

20   BY MR. SKROCKI:

21     Q.  Are you familiar with that, sir?

22     A.  Yes, I've seen this.

23     Q.  Okay.  I'd like to turn your attention to the

24   bottom of page three of the opinion.  You see the

25   last -- there was a double star and number three?

1     A.  Yes.

2     Q.  Do you see that?  It says, "At the time McCrary

3  admitted that he had not spoken to anyone from the

4  sheriff's office.  He also admitted that no one had

5  accused O'Toole of obstructing justice or undermining

6  Tuite's prosecution."  You see that?

7     A.  Yes.

8     Q.  Are those familiar to you?

9     A.  Yes.

10    Q.  And you're saying that's in error?

11    A.  Yes.  Because here's what happened.  I'm glad you

12 brought this up.

13    Q.  Sure.  I bet you are.

14    A.  Yeah.  No, I am.  The back story is this:  We

15 belong to this fellowship organization of crime

16 analysts, and we have ethical rules and -- like the bar

17 association or whatever.

18    Q.  Understood.

19    A.  If you have a problem, if someone has violated

20 the rule of ethics, then you make that known.  This was

21 a case where this analyst had written a report and had

22 ignored -- had done a crime and crime scene report but

23 ignored very important evidence, which included DNA,

24 blood evidence on the suspect, Mr. Tuite.

25         It dealt with a stabbing of a 12-year old girl.

1    Tuite was a stranger.  He was trying to -- he was a

2    mentally disordered offender, schizophrenic.  He had

3    been trying to enter houses that night.  Had actually

4    entered some.  There had been half a dozen 911 calls to

5    the police department that evening.  The last one was

6    from the house next door to the house where the murder

7    occurred.  That's where he was last seen.  The police

8    roll up and they don't see this homeless guy.  They

9    don't see Mr. Tuite around.  And they leave the area.

10         That evening that girl was stabbed to death.  The

11   next morning the police arrest Mr. Tuite.  And he has

12   the little girl's blood spattered on his shirt and his

13   undershirt.  But they don't notice that.  They let him

14   go.  It's a great case, because it's an example of what

15   I'm talking about here.

16     Q.  Sure.  Let me -- let me ask you a couple of

17   questions.  If I don't get to -- if I don't get to what

18   you want to do --

19         MR. CAMIEL:  I think he's cutting off the

20   witness's answer.  He asked a question and he's not

21   letting the witness answer.

22         MR. SKROCKI:  Well, that's not true.  I'm happy

23   to have him explain it.  And Mr. Camiel -- right of

24   response, Mr. Camiel can ask him follow-ups if he

25   wishes, but this is becoming a narrative.

```
 1          THE COURT:  It is becoming a narrative, and
 2   I'll sustain it and Mr. Camiel can follow up in redirect
 3   as warranted.  So go ahead.
 4   BY MR. SKROCKI:
 5      Q.  So there was -- there was a letter you wrote,
 6   correct?
 7      A.  Yes.
 8      Q.  And this letter was against this FBI agent, Emily
 9   O'Toole, correct?
10      A.  Mary Ellen O'Toole.
11      Q.  Mary Ellen O'Toole, right?
12      A.  Yes, yes.
13      Q.  And your letter stated that "Both agencies are
14   shocked and dismayed that Mary Ellen O'Toole, a
15   representative of both the FBI and the ICIAF, has
16   injected herself into this case in what they view as an
17   attempt to obstruct justice and undermine the successful
18   prosecution of Richard Tuite."
19      A.  Yes.
20      Q.  That's what you wrote?
21      A.  Yes, it is.
22      Q.  Now, the court of appeals found that was not
23   true, didn't they?
24      A.  They did.  Pardon?
25      Q.  They did?
```

1    A.   They did.  They found that it was true.  But --

2    Q.   And you admitted at a hearing, sir, that what you

3  wrote was not true?

4    A.   No.  What I --

5    Q.   It says down here at the bottom, do you see it,

6  bottom of page three?

7    A.   I admitted that -- it says, "He had not spoken to

8  anyone in the sheriff's office."  Now, what's wrong here

9  is "He also admitted no one had accused O'Toole of

10  obstructing justice."  Let me tell you what happened.

11    Q.   So what the matter is --

12         MR. CAMIEL:  Again, Your Honor --

13         THE COURT:  Excuse me.  Why don't we -- I'm

14  going to allow you to follow up.  I'd like you to answer

15  his question.  You'll have an opportunity to explain

16  this in due course.

17  BY MR. SKROCKI:

18    Q.   And the court of appeals found you omitted that

19  infor- -- you didn't speak to anybody, didn't they?

20    A.   That's what they found, yes.

21    Q.   Very good.  Thank you.

22         You had a couple of sections in your report and

23  discussion with Mr. Camiel about the right trajectory of

24  a case?

25    A.   Yes.

1    Q.  So that would include -- and you can base this on

2    your own experience as a field agent for some many

3    years, right?

4    A.  Sure.

5    Q.  That that would include interviewing people, as

6    many as possible, right?

7    A.  Well, again, like I say, we don't want to confuse

8    the quantity with the quality of investigation.  You can

9    interview many people, but you want to make sure there's

10   a reason you're doing that and you do the interviews the

11   correct way.

12   Q.  Sure.  For maybe suspect elimination or subject

13   elimination?

14   A.  Sure.

15   Q.  And if they did that, that's not a bad thing, is

16   it?

17   A.  If they did it professionally and -- then no,

18   it's not a bad thing.

19   Q.  And you want to know in certain kinds of

20   situations or cases, if there are victims involved, you

21   want to do a background investigation on the victims?

22   A.  Yes.

23   Q.  Okay.  And you want to do a background

24   investigation on the people who may have known the

25   victims?

1    A.  Yes.

2    Q.  And the people certainly who had worked with the

3 victims?

4    A.  Yes.

5    Q.  Those would be important, wouldn't they?

6    A.  Yes.

7    Q.  How about the victims' finances and their

8 relationship with other people, those would be important

9 too, right?

10   A.  Yes.  It's under the rubric of victimology, yes.

11   Q.  Okay.  And so if there's issues of -- you talked

12 about like cameras and things about perpetrators and

13 catching things on camera.  You want to validate or try

14 to verify what's being seen on the camera, right?

15   A.  If possible, yes.

16   Q.  And sometimes that may take a lot of different

17 things, wouldn't it, to validate what you see on a

18 camera?

19   A.  It may, yes.

20   Q.  And follow-up is important too, isn't it,

21 follow-up of leads that you get?

22   A.  Yes.

23   Q.  And then if you get leads that take you one

24 direction, sometimes you'll get that lead, then you move

25 another level and another level after that, right, in a

    1   progressive way?

    2       A.  You may, yes.

    3       Q.  So there's nothing wrong with that?

    4       A.  No, if it's done logically, then yes, that's

    5   fine.

    6       Q.  Okay.

    7           MR. SKROCKI:  One moment, Judge.

    8           THE COURT:  Certainly.

    9           (Pause)

   10   BY MR. SKROCKI:

   11       Q.  Could you get a copy of that completed report to

   12   your attorney so I could have a copy later without

   13   the --

   14       A.  Certainly.  Yeah, it's the same, just the hanging

   15   sentence is gone.  I'll make sure you get it.

   16       Q.  Thanks.

   17       A.  You're very welcome.

   18           MR. SKROCKI:  That's all I have.

   19           THE COURT:  All right.  Mr. Camiel, go ahead,

   20   please.

   21                   REDIRECT EXAMINATION

   22   BY MR. CAMIEL:

   23       Q.  Let me first start, Mr. McCrary, you were cut off

   24   in your answer about your involvement in the *Tuite*

   25   *versus Martel* case.

     A.   Correct.

     Q.   The case that was in front of the Ninth Circuit
Court of Appeals that Mr. Skrocki was talking about,
what was your role in that case?

     A.   It's a little bit complicated.  I'll try to keep
it straightforward here.  I was initially retained in a
civil case, and that is where somebody was suing
somebody.  In that case, three boys who were innocent
had been exonerated from those murders were suing the
police department and the prosecutors because they had
been arrested and charged and indicted for those
murders.

     And they were totally innocent and had been
exonerated, and they were suing them.  So I was writing
a report for the attorney representing those boys
dealing with the same issues we're talking about today,
how this investigation went wrong.

     That was even more egregious because the reason
they got the indictment was that the lead attorney had
lied to the grand jury.  Lied under oath about evidence
that didn't exist.  He said there was blood on a knife
when there wasn't.  He said there was blood in the drain
when there wasn't.  And he had a lab report saying that
their -- the tests were negative, yet he went to the
grand jury and testified they were positive.  So the

1    grand jury indicted these three innocent teens.

2         So a lot of wrongdoing.  That was not an honest

3    error.  I was talking about honest errors earlier.  We

4    have some people who do just that, who commit perjury,

5    who lie to try to lock up innocent people.  Not common

6    fortunately, but it goes on.

7         So I was writing a report, excuse me, explaining

8    how that investigation went wrong, how certainly I know

9    they don't need me to say that committing perjury was

10   wrong, but it certainly was wrong, and that they had --

11   because they had tunnel vision on these three kids, when

12   they picked up Tuite, who had those blood stains on him,

13   they didn't even look at those blood stains, paid no

14   attention to them, because they were locked onto those

15   three kids as being the perpetrators, which was that

16   12-year-old girl's brother, 14-year-old brother and two

17   of his friends.

18        And so they got tunnel vision on those kids.  And

19   it was a suspect-driven investigation, rather than

20   evidence.  The evidence was the blood, the blood on

21   Tuite's shirt, DNA, the little girl's blood.  And that

22   only came out when they got a very aggressive, very good

23   public defender who -- representing those kids who

24   demanded that that clothing of Tuite be tested.  It

25   hadn't been tested.  They sent it off and, lo and

1  behold, there was the little girl's blood on the shirt

2  and the undershirt.

3        The prosecution and the police tried to explain

4  that away, saying, well, it must be transfer blood, when

5  the photographs of that clothing was taken, they must

6  have used the same tripod from the crime scene that had

7  blood on it and it transferred to the shirt.

8        No, the blood -- the law enforcement analyst from

9  the lab said, no, that's blood in flight, it's

10  elliptical stains, that isn't transfer smears, plus the

11  blood on the -- the undershirt was never photographed,

12  so there's no camera --

13        MR. SKROCKI:  Excuse me.  This is not

14  explaining his conduct in the case here.

15        THE COURT:  Mr. Camiel, can I have a sidebar

16  with counsel.

17        (Begin bench conference)

18        THE COURT:  I'm wondering if we took a short

19  break and you can talk with him.  He has a right to

20  rehabilitate himself, but I'm thinking we're going far

21  afield of the facts in this case and his testimony.  So

22  if we took a short break and you had a chance to confer

23  with him about -- you have every right to rehabilitate,

24  but we don't need a 45-minute dissertation on California

25  murder cases from 20 years ago.

1           MR. CAMIEL:  That's fine.

2           (End bench conference)

3           THE COURT:  All right.  Ladies and gentlemen,

4    what we're going to do is take a short break.  We'll

5    have you back in 15 minutes.  Please leave your notepads

6    here, remember my admonition not to discuss the case,

7    and we'll come back in 15 minutes.  We'll go off record.

8           (Jury absent)

9           (Recessed from 1:59 p.m. to 2:11 p.m.)

10          (Jury present)

11          DEPUTY CLERK:  Court is in session.

12          THE COURT:  All right.  Welcome back, ladies

13   and gentlemen.  Please be seated, everyone.

14          All right.  Mr. Camiel, whenever you're ready,

15   please.

16   BY MR. CAMIEL:

17   Q.  Mr. McCrary, I want to go back just for a minute

18   to the *Tuite* --

19   A.  *Sure.*

20   Q.  -- *versus Martel* case.  It's a little bit

21   complicated.  Initially, who -- which side, who were you

22   involved with?

23   A.  Initially, it was the civil case.  I was hired by

24   the boys who had been wrongfully indicted for the

25   murder.

1    Q.  All right.  And then I take it then there was a
2  criminal case against the person who had the blood on
3  them?

4    A.  Yes.

5    Q.  And in the criminal case, who were you working
6  for at that point?

7    A.  The prosecution, the state attorney general of
8  California prosecuting the guy who had the blood, the
9  little girl's blood on his shirt.

10    Q.  And so you testified on behalf of the prosecution
11  in that case?

12    A.  I did, because the FBI agent testified for the
13  defense.  I was used to rebut her testimony and point
14  out that ignoring the DNA evidence and the perjured
15  testimony was not the way we do crime analysis.

16    Q.  Looking at the decision that Mr. Skrocki put in
17  front of you, I wanted you to look at page five.  About
18  halfway down the page on the left side, could you read
19  what the prosecution said about your involvement in that
20  case?

21    A.  He said, You know Gregg McCrary explained to you
22  when he testified here he does things sometimes pro
23  bono, for no charge, to the extent that he can.  He does
24  have to pay for mortgage.  He does have children and a
25  family and obviously expenses.  And I would submit to

1   you that Gregg McCrary, when he testified in this

2   case --

3           MR. SKROCKI:  Objection, Your Honor.

4       A.  -- was completely --

5           THE COURT:  Excuse me.  Excuse me.

6           What's the basis?

7           MR. SKROCKI:  Objection is relevance and it's

8   hearsay.

9           MR. CAMIEL:  Your Honor, they asked him about

10  parts of this --

11          MR. SKROCKI:  We can go into it on redirect.

12  Then I have leave to go into it --

13          THE COURT:  You can go into the rest of it on

14  recross.  But I'll remind both sides that we're here in

15  Alaska.  Go ahead, Mr. Camiel.

16  BY MR. CAMIEL:

17      Q.  You left off with the "and I would submit."

18      A.  Yeah.  And I submit to you Gregg McCrary, when he

19  testified in this case, was completely credible.  It was

20  an honor to have him in the courtroom.  It was an honor

21  to have him share his knowledge with us, and it was a

22  courageous thing for him do.  He's a lifetime FBI agent.

23      Q.  Mr. McCrary, you were asked about fees that you

24  charged and particularly in this case.  And Mr. Skrocki

25  mentioned some number, I think $24,000.  What did you

1    actually charge to write the report in this case?

2       A.   It was $7,500.

3       Q.   And then there would be additional costs for your

4    travel up here and your time up here to testify?

5       A.   Yes.

6       Q.   You talked -- Mr. Skrocki asked you about

7    investigations, and you said something about the quality

8    of an investigation versus quantity.  Can you tell us

9    about that?

10      A.   Yes.  We can't confuse quantity with quality.

11   You can do a lot of interviews, for example, but if

12   they're cursory and superficial, they're not really

13   worth much.  As we discussed, someone says something, it

14   isn't our job to believe them or disbelieve.  We got to

15   find facts.

16           And so someone says, well, I was here or I wasn't

17   there or whatever, if you just take their word for it,

18   that's not enough.  We really need to drill down and

19   find out.  So you could do a bunch of interviews.  If

20   you just believe what people tell you, it might not be

21   worth much at all.

22      Q.   You were also asked about interviews where a

23   witness or a subject is being interviewed and in the

24   agent's opinion, they appear to be vague.

25      A.   Uh-huh.

1    Q.  Is there any danger in the drawing of assumptions

2  from that?

3    A.  Oh, yes.

4    Q.  What are the dangers?

5    A.  Well, they could be vague.  It doesn't mean

6  they're guilty.  It means -- I've had cases they didn't

7  want to be truthful not because they were guilty but

8  because they were doing something else they didn't want

9  to talk about for whatever reason.  So people are vague

10 for a number of reasons.  Again, you can't just infer

11 that he must be guilty if he's being vague about

12 something.

13           MR. CAMIEL:  Thank you.

14           THE COURT:  Mr. Skrocki, go ahead, please.

15           MR. SKROCKI:  Just for the record, Judge, I was

16 provided the number that Mr. McCrary charged last night

17 by the public defenders office.  So that was the figure

18 I was working off of, so I guess that number was in

19 error, $24,000.

20           THE COURT:  Do you need to confer with

21 Mr. Johnson?  Go ahead.

22           (Pause)

23           MR. SKROCKI:  I was given the total of their

24 maximum.  It was not broken down for me.  I thought that

25 was the cost.  Otherwise, I have no questions for

1    Mr. McCrary.

2            THE COURT:  All right.  Very good.

3            Thank you, sir.  You may be excused.

4            (Witness excused)

5            THE COURT:  Mr. Colbath.

6            MR. COLBATH:  Your Honor, actually, I think

7    while he's up here, I'm going to call Mr. Johnson

8    briefly.

9            THE COURT:  All right.  Well, let's give this

10   witness just a moment.

11           (Pause)

12           THE COURT:  Mr. Johnson, thank you.

13           (Oath administered to the witness)

14           DEPUTY CLERK:  For the record, can you please

15   state your full name and then spell your full name.

16           THE WITNESS:  Bruce Douglas Johnson.  Bruce,

17   B-r-u-c-e, Douglas, D-o-u-g-l-a-s, Johnson,

18   J-o-h-n-s-o-n.

19           THE COURT:  Go ahead, please, Mr. Colbath.

20            BRUCE JOHNSON, DEFENSE WITNESS, SWORN

21                       DIRECT EXAMINATION

22   BY MR. COLBATH:

23      Q.  Mr. Johnson, where do you work?

24      A.  I work for the federal public defenders office

25   here in Anchorage.

1    Q.  And what's your position there?

2    A.  I'm the lead investigator for the public

3 defenders office.

4    Q.  How long have you worked in that capacity, and

5 what is your -- the nature of your job?

6    A.  I've been with the federal public defenders

7 office for 15 years now.  The nature of what I do is I

8 go out to scenes.  I interview witnesses.  I review

9 discovery.  I manage discovery.  I do basically

10 everything that needs to be done to help prepare a case

11 in our office.

12    Q.  Prior to your work with the federal public

13 defenders office, what did you do?

14    A.  Prior to the federal public defenders office, I

15 worked eight years in the Alaska public defenders office

16 out of Palmer as a staff investigator there.

17    Q.  And did you have legal experience prior to

18 Palmer?

19    A.  Yes.  Prior to that I worked as a litigation

20 assistant for the State of Alaska Attorney General's

21 office for approximately three years.  And prior to that

22 I worked as a paralegal for a private law firm doing

23 criminal and civil work in Anchorage.

24    Q.  Besides assisting at the trial of this matter

25 here, as the jury has seen, did you prior to trial

1   engage in some investigative work and work with

2   witnesses related to this matter?

3       A.   Yeah.   I've interviewed multiple witnesses in

4   this case.   I've been out to Kodiak Island multiple

5   times viewing the scene at T-2, T-1, photographed the

6   area, talked to witnesses and so forth.

7       Q.   Have you had occasion during one or more of those

8   trips to be allowed to be on the actual COMMSTA property

9   and worked with the Coast Guard to get access to assist

10  in your investigation?

11      A.   Yeah.   This past July, we were gained -- granted

12  access to the ops deck, which is a secured area of the

13  Coast Guard T-1 COMMSTA station.   And we wanted to go in

14  and view how the cameras and everything worked there on

15  the T-1.

16      Q.   And that was under the supervision of the Coast

17  Guard -- somebody from the Coast Guard?

18      A.   The Coast Guard command, I guess, they had people

19  meet us there.   We were escorted onto the ops deck with

20  escorts the entire time.

21          MR. COLBATH:   Your Honor, I'm going to have

22  Mr. Johnson, for foundation, look at defense Exhibit

23  No. 122A.   122, there was a couple of slides admitted,

24  and there's a number of additional slides in 122A.   So

25  if you could just slowly, so counsel can see those, page

```
 1   through them.
 2       A.  Okay.
 3       Q.  Mr. Johnson, are those photos you took?
 4       A.  They are.
 5       Q.  And they have a date on them that, depending on
 6   how you read it, could be ahead of where we are now.
 7   What's the date on the photos?
 8       A.  The date of this is April 11th, 2019.
 9       Q.  And so was it in fact April of this year that --
10       A.  Yeah, it was April of this year.  Just the way my
11   camera is set up, it says the day, then the month, then
12   the year.
13       Q.  All right.  Did you have occasion to, as you took
14   the photographs, learn and understand -- you were on the
15   operations desk here?
16       A.  I was actually on the operations deck standing at
17   the monitor that monitors the cameras at COMMSTA.
18       Q.  All right.
19           MR. COLBATH:  Your Honor, I'm going to move the
20   admission of 122A.
21           MS. STEVENS:  Mr. Johnson, just a quick
22   question --
23           THE COURT:  You want to do voir dire?
24           MS. STEVENS:  Your Honor, may I voir dire him
25   first?
```

1          THE COURT:  That's fine, Ms. Stevens.

2          MS. STEVENS:  What were the dates of the images

3   contained in this photograph?

4          THE WITNESS:  This was April 11, 2019.

5          MS. STEVENS:  So because we're looking at a

6   screen shot of a screen shot, right?

7          THE WITNESS:  Yes.

8          MS. STEVENS:  So the screen shot within the

9   screen shot, that was in April of 2019?

10          THE WITNESS:  That is correct.

11          MS. STEVENS:  So Your Honor, I think we object

12   to relevance.  I'm not sure this is the same camera

13   system or the same cameras that were there in 2012, so I

14   just don't know how these pictures are relevant to the

15   incident back in April of 2012.

16          MR. COLBATH:  Your Honor, I can ask a few more

17   foundation questions.

18          THE COURT:  Go ahead.

19   BY MR. COLBATH:

20     Q.  Mr. Johnson, at the time you took these

21   photographs, were you familiar with your investigation

22   over the case -- first of all, were you involved in the

23   investigation and handling of this case from the

24   beginning of the case investigation?

25     A.  Yes.

1    Q.  And so all the way back to April of 2012?

2    A.  Yes.

3    Q.  And when you were in Kodiak in April of 2019,

4    this year, taking these photographs, did you have a

5    chance to observe or understand where the camera was

6    located that these screen shots depict?

7    A.  Yes.

8    Q.  And what were you able to determine or what were

9    you aware of as the location of the camera that's

10   depicted on the screen that's depicted in the pictures?

11   A.  My understanding is the location of the camera

12   and the camera itself were the same as they were in

13   2012.

14   Q.  And is that -- where is the camera view -- where

15   is the camera that the view of these pictures is from?

16   A.  In this first picture that I'm looking at that

17   has defense Exhibit DE 0122A, that would have been down

18   at T-2 at the rigger shop over on the -- I guess as

19   you're looking at the rigger shop, on the left-hand side

20   by the two big garage doors.

21   Q.  Okay.  And in this photograph, there's a view of

22   the flagpole.  You see that?

23   A.  Correct.

24   Q.  And is this a camera that you had previously seen

25   at T-2 and seen pictures of and done investigation

1  related to this relative to this case?

2      A.  Correct.  In addition to that, we also had

3  received a forensic image of the camera footage from

4  2012 that had all of these same camera views in it.  I

5  had reviewed all of those when I looked at the forensic

6  image from the hard drive from the secured cameras.

7      Q.  And do these appear to be the same camera and

8  same camera views in 2012 that your photo documented in

9  2019?

10     A.  Yes.

11         MR. COLBATH:  With that additional foundation,

12 Your Honor, I would move the admission of 122A.

13         MS. STEVENS:  Your Honor, as long as he can say

14 the same camera views contained in these pictures are

15 the ones from 2012 as well, then I would have no

16 objection.  But maybe we can just clear that up by each

17 picture.

18         MR. COLBATH:  Sure.

19         THE COURT:  Go ahead.

20 BY MR. COLBATH:

21     Q.  Because it's multiple slides, Mr. Johnson, we'll

22 just page through them again.

23         Well, first of all, with respect to the camera,

24 were you aware through your investigation and

25 understanding from 2012 through 2019 that the camera was

1   moveable?

2       A.   Yes.

3       Q.   In other words, the view could move, not the

4   camera itself?

5       A.   Correct.

6       Q.   And had you reviewed a video and photos -- stills

7   from the original 2012 timeframe that -- of different

8   pictures or different video taken from that camera?

9       A.   I have.

10      Q.   If we can look at the next one.  Is that a view

11  that you are familiar with?

12      A.   Yeah, same camera.  It's just the camera has been

13  moved slightly.

14      Q.   All right.  And again, the next one?

15      A.   Same camera.  I'm just starting to pan.

16  Basically it started out to the left, and now I'm

17  starting to pan right towards Anton Larsen Bay Road.

18      Q.   And the next one.

19      A.   Same camera, just a little bit further.

20      Q.   All right.  And the next one?

21      A.   Same camera, just a little bit further.

22      Q.   And the --

23      A.   Same camera.  Just a little bit further to the

24  right.

25           And that's the same camera with it zoomed towards

```
 1    Anton Larsen Bay Road.

 2          Same camera, that time it's a little bit wider.

 3          Same camera, about as far as we could get it to

 4    turn and it's showing on the right-hand side part of the

 5    corner of the building.

 6      Q.   Which building?

 7      A.   T-2.

 8           MR. COLBATH:  With that, Your Honor, given that

 9    they are all from the same camera at the same

10    timeframe --

11      Q.   Mr. Johnson, I guess last question.  Do you have

12    any information that the camera's location or the

13    camera's ability to move and capture these images had

14    changed from 2012 to when you took the photos in 2019?

15      A.   My understanding is the camera and its ability to

16    move was the same in 2012.

17      Q.   What about either an upgrade to the camera as far

18    as software or an upgrade as to just operating system?

19      A.   My understanding is, is the software is the same

20    type of software, but it was a newer version.

21      Q.   Did that change at all again the camera's ability

22    to move back and forth or --

23      A.   No.

24      Q.   -- change its field of view?

25      A.   No, not that I'm aware of.
```

1          MR. COLBATH:  All right.  Again, Your Honor,

2     I'll offer 122A.

3          MS. STEVENS:  No objection.

4          THE COURT:  122A is admitted.

5          (Defense Exhibit No. 122A admitted.)

6     BY MR. COLBATH:

7       Q.  So Mr. Johnson, first of all, to back up a little

8     bit, where are you when you're taking this photo?

9       A.  This photo was taken on the COMMSTA T-1 building

10    on the ops deck.  And I'm standing behind the control

11    panel where there's a -- what you don't see in this

12    picture is a computer monitor that can actually move the

13    camera.  And right now we're looking at a TV monitor

14    that would have been to my right that would display what

15    I'm seeing on the monitor in front of me.

16         MR. COLBATH:  So I'm going to pull up I believe

17    Exhibit No. 122.  Defense 122 has already been admitted,

18    Your Honor.  We'll try to show the two of those.

19      Q.  So Mr. Johnson, you referred to a computer

20    monitor and some form of control.  Is that what we see

21    here in 122 on the left-hand side?

22      A.  Right.  Right.  That was the monitor that

23    controlled the camera.  And over on the right-hand side

24    in 22A -- 122A, defense Exhibit No. 122A, that was the

25    big screen at which the monitor was being projected as

1  well.

2      Q.  So you can go to just 122A.

3          So as you photographed 122A, did you -- do you

4  recognize the view on the monitor that the camera was

5  fixed on at that point?

6      A.  Yeah.  This particular view was the flagpole that

7  they've talked about quite frequently here.  And so --

8  and that's the camera that was catching the vehicles

9  driving in that morning to T-2.

10     Q.  And in this -- do you recognize, Mr. Johnson,

11 from your --

12     A.  Yeah, so what's being circled right there, that

13 is the road.  That's Anton Larsen Bay Road, and I

14 believe it's called Bridge 7 down the road going towards

15 the water treatment plant.

16     Q.  Can you show us the next screen.

17         And so what do we see in this view?

18     A.  So what we did there is we wanted to show how the

19 camera was moving or it could move, and so we moved the

20 camera slightly further.  And I've actually zoomed in a

21 little bit more, and you can still see part of Anton

22 Larsen Bay Road on the upper left-hand corner of the

23 image and -- but we're getting a little bit more of

24 Anton Larsen Bay Road going to the right.  And you see I

25 guess what I would describe as the entrance number two

1   or the middle entrance to the rigger shop.

2       Q.   This area?

3       A.   That's correct.

4       Q.   And can we still see Bridge 7 on Anton Larsen Bay

5   in this photo?

6       A.   Yeah, you can still see the bridge.  It's almost

7   out of the frame, but you can still see the bridge.

8       Q.   Where would that be in the frame?

9       A.   Right -- hold my hand here.  Right there.

10      Q.   Okay.  So could we see the next frame.

11           What do we see in this frame?

12      A.   This image here is a better picture of the middle

13  drive at the rigger shop, and you see more of Anton

14  Larsen Bay Road.  And now Bridge 7 and the flagpole are

15  out of view.  So the camera, like I said earlier, the

16  camera is panning from left to right.

17      Q.   Starting at the flagpole?

18      A.   Starting at the flagpole left to right.

19      Q.   All right.  Let's see the next view.

20           Is that the same driveway there where the can or

21  whatever that is in the driveway, is that the same

22  driveway?

23      A.   Same driveway, middle drive, and we're moving

24  just more to the right going towards what I would

25  consider the third drive.

1    Q.  Next view.

2         What do we see here?

3    A.  What we're seeing there is now the second

4    driveway is out of view and we're going towards the

5    third entrance into the rigger shop.  And now you don't

6    see any of Bridge 7, and we're panning -- we're just

7    keeping going right as if we were going to the golf

8    course on Anton Larsen Bay Road.

9    Q.  Okay.  Next view.

10        Is that a different view?

11   A.  Yeah.  It's a slightly different view.  I might

12   have panned, zoomed in a little bit more.

13   Q.  Okay.  And the next screen I believe is -- what

14   do we see there?

15   A.  Same thing.  We're still on the same camera, and

16   we're just panning to the right.

17   Q.  I think the last frame.  Oh, no, there must be a

18   couple more.

19        What does this one depict?

20   A.  This one also depicts going to the right towards

21   Anton Larsen Bay Road.

22   Q.  Do you know what the red items in the foreground

23   there are?

24   A.  I can't tell right at the moment.

25   Q.  All right.  And then the next view.

1          What do we see here?

2     A.   This is about as far as we could have them turn

3 the camera to the right.  And so what you're seeing, if

4 you remember, there was two big double door garages --

5 garage doors at the front of T-2 towards the middle and

6 last third drive, and that's the corner of the garage.

7     Q.   On the building?

8     A.   On the building.

9     Q.   Now, were you physically manipulating the camera

10 when you photographed these?

11     A.   I wasn't doing it.  They had somebody doing it,

12 and I was photographing it as it was happening.

13     Q.   All right.  Thank you.

14          You can take 122A down.  And could we show -- for

15 foundation could we show Mr. Johnson defense Exhibit

16 No. 123.

17          And again, this has a number of views.  It's a

18 little fuzzy.

19          But could you back up to the first page.  Just

20 could you blow up the screen so that we can -- so

21 counsel can see the -- yeah.

22          And Mr. Johnson, is this a photograph you took?

23     A.   This is an image that I grabbed from -- remember

24 I was talking about a forensic image that I was -- or a

25 forensic drive that I was given back in 2012.  What I

1    did is I was taking screen shots of the actual video

2    footage from that camera that we just saw just a minute

3    ago.

4        Q.   Okay.   So you're looking at the video from the

5    camera in Exhibit No. 122A, that same camera on the T-2

6    building?

7        A.   That's correct.

8        Q.   And what is the date of the video that you're

9    looking at?

10       A.   The date of this would be April 9, 2012, at

11   approximately 7:09 a.m.

12       Q.   And it's a view from that camera.   This exhibit,

13   defense Exhibit No. 123, has a number of pages, so I'm

14   just going to page through them slowly and ask if each

15   one is the same, a screen shot from that same camera.

16       A.   So this next one is a screen shot.   It's just the

17   next day, same time.

18       Q.   All right.   And the next one?

19       A.   The next one would be on the 11th, same time.

20            Next one is on the 12th, same time.

21            Next one is on the 13th, same time.

22       Q.   And?

23       A.   Next one is on the 14th, same time.

24       Q.   And the last one?

25       A.   And the last one is on the 15th, same time, all

1   April of 2012.

2       Q.  Is there one more?  Oh.  That's also a

3   different --

4       A.  Oh, I'm sorry.  This last one there is the 16th

5   of April 2012.

6           MR. COLBATH:  Your Honor, I'm going to move the

7   admission --

8       Q.  These are all from the same camera?

9       A.  This is all from the same camera view.

10          MR. COLBATH:  I'm going to move defense Exhibit

11  No. 123.

12          MS. STEVENS:  No objection.

13          THE COURT:  123 is admitted.

14          (Defense Exhibit No. 123 admitted.)

15  BY MR. COLBATH:

16      Q.  So Mr. Johnson, you reviewed the T-2 video camera

17  from April of 2012?

18      A.  That's correct.

19      Q.  And on the -- how were you able to -- or explain

20  the right-hand side here, this information to us to know

21  what we're looking at or what you were looking at or

22  for.

23      A.  So the best way to describe that, that is a

24  calendar for the video.  And so what I can do is I can

25  pick a date and pick a time, and it will give me the

1    marker and it will put me right to that date and time

2    and what was going on at that time.

3        Q.   And so what time did you pick to illustrate in

4    defense Exhibit No. 123?

5        A.   I picked 7:09.

6        Q.   And what is the date here that was shown on the

7    software?

8        A.   The date of this is April 9th, 2012, at 7:09 a.m.

9        Q.   And as we are -- do you recognize the foreground,

10   the vehicles in the foreground and the portion of the

11   building that we can see here from your work -- your

12   investigation work in the case?

13       A.   Yeah.  So the two vehicles that are sitting out

14   there are the two vehicles that have been discussed

15   previously.  They are the government vehicles that are

16   parked there generally.  And then you'll see -- to the

17   right of the white government truck, you'll see a picket

18   fence.  That picket fence was the same picket fence that

19   was at T-2 in the photographs that I showed you when I

20   photographed them in April of 2019.

21       Q.   And how about the building on, as we look at it

22   here, the left-hand side, where is that -- what is that

23   depicting?

24       A.   The building on the left-hand side, that's the

25   other corner of the T-2 building, the rigger shop.  And

1   then if you go straight out following the building,

2   you're going to see the flagpole.  That's the same

3   flagpole that was in my photos from the 19th.

4   Q.  All right.  And so can we see the next frame of

5   this.

6           And so is that -- what do we see here?

7   A.  So now it's the very next day.  It's 7:09 on the

8   10th of April 2012.  You can see the camera view has

9   changed.  And so now we don't see the vehicles anymore.

10  You don't see the picket fence.  You can't see part of

11  the T-2 building.  And it's more focused on the flagpole

12  than it is of the parking lot.

13  Q.  You have heard reference to the water treatment

14  plant during the trial.  Can you -- is that depicted in

15  this?

16  A.  Yeah.  So you see that big sphere that's in the

17  background.  It's kind of bluish-gray-looking in the

18  picture.  That's where the water treatment plant --

19  Q.  Can you point with the laser pointer for us?

20  A.  Oh, sure.  Right there.

21  Q.  And the next screen from defendant's Exhibit

22  No. 123.

23          And what's the date and time for this one?

24  A.  So the date and time of this is 7:09 on April 10,

25  2012, same time, a.m.  It's basically the same shot that

1  was the previous day.  So the camera doesn't appear to

2  have move much.

3      Q.  And the date is what here?

4      A.  This is April 10th.

5      Q.  Look at that top corner.

6      A.  Oh, excuse me.  I'm sorry.  April 11th.  My

7  apologies.

8      Q.  I wanted to make sure I was reading that right.

9  Let's see the next page.

10         What do we have for a date here?

11     A.  Okay.  This is April 12th, 2012, at 7:09 a.m.

12  And it doesn't appear that the camera has moved much

13  since then.

14     Q.  Okay.  And I want to point out one thing.  Can we

15  blow that back up while we're here.

16         When you say that it is 7:09, how are you -- how

17  are you selecting that timeframe to tell the video

18  player to get this capture?

19     A.  I'm using the markers over here.  I'm not using

20  this time up here, because my understanding this time

21  here was not accurate.

22     Q.  All right.  So can we see the next screen shot.

23         What's the date on this one?

24     A.  This is April 13th at 7:09 a.m., 2012.  And you

25  can see the camera view has changed.

1    Q.  This would have been then the day after the

2  murders?

3    A.  This is the day after.

4    Q.  All right.  And the next slide.

5        What day do we have here?

6    A.  This date is April 14, 2012, at 7:09 a.m.  It

7  looks like the camera view has gone back to the view

8  that it was when I started I believe on the 9th.

9  Similar to the 9th's view.  You can see the picket fence

10  here in the lower left-hand -- or right-hand corner.

11  You see this truck there, and you see that -- the two

12  government trucks.

13    Q.  All right.  And I'm not sure -- how many days did

14  you do?

15    A.  I believe I did a week's worth.  Let me see.  Ten

16  days maybe.  I went from the 9th, and if I remember

17  correctly, the last one was either the 16th or the 17th.

18    Q.  All right.  Let's see the next view.

19        The date here?

20    A.  That date is the 15th of April 2012 at 7:09 a.m.

21    Q.  And the next one.

22    A.  That is April 16th, 2012, 7:09 a.m.

23    Q.  So from the 9th to the 16th, Monday to Monday,

24  the week of the murders?

25    A.  The week of the -- that's correct.

1    Q.  We can take that down.  And for identification

2  purposes, could you show Mr. Johnson defense Exhibits

3  136, 137 and 138.

4          DEPUTY CLERK:  136 is admitted already.

5          MR. COLBATH:  136 has been admitted already?

6          DEPUTY CLERK:  Yeah.

7  BY MR. COLBATH:

8    Q.  Okay.  Well, let's just start then with 137 and

9  138.

10         Are those photos you took, Mr. Johnson?

11   A.  Those are photographs that I took.

12   Q.  And you're aware of the location at the time and

13  date obviously that you took it?

14   A.  Yeah.  This would have been by Bridge 6 on Anton

15  Larsen Bay Road.

16   Q.  Okay.

17         MR. COLBATH:  Your Honor, I'm going to move to

18  admit Exhibits 137 and 138.

19         MS. STEVENS:  No objection.

20         THE COURT:  All right.  Those will be admitted.

21         (Defense Exhibit Nos. 137 and 138 admitted.)

22  BY MR. COLBATH:

23   Q.  Can we back up and show Mr. Johnson Exhibit

24  No. 136, please.

25         Mr. Johnson, this is already in evidence, but is

 1    this also a photograph you took?

 2        A.   That is correct.  I took that photograph.

 3        Q.   Where are you standing when you took this

 4    photograph?

 5        A.   Well, I'm standing in the road.  But when I took

 6    that picture --

 7        Q.   What road?

 8        A.   I'm on Anton Larsen Bay Road right before

 9    Bridge 6 as you're going towards the COMMSTA.

10        Q.   And so what is behind you in the distance down

11    Anton Larsen Bay?

12        A.   More road going towards Rezanof.

13        Q.   So the town of Kodiak or the airport is behind

14    you?

15        A.   Would be behind me.

16        Q.   And if you went in the direction that the photo

17    is across the bridge and down the road, where would you

18    end up?

19        A.   Just a little bit further down the road, I'm not

20    even sure if it's even a mile about a mile, it might be

21    a little -- about a mile or so down the road, is

22    COMMSTA.

23        Q.   And when we were looking at those previous screen

24    shots from the T-2 building, you referred to a bridge.

25    Is this the same bridge?

1    A.   No.

2    Q.   The bridge by T-2 is what number?

3    A.   That's Bridge 7.

4    Q.   And this is?

5    A.   6.

6    Q.   All right.  And so can we see exhibit -- well,

7    first of all, there's a roadway depicted with a vehicle

8    here.  The road that that vehicle is parked on or near,

9    do you know where that road goes?

10   A.   I do.  The road goes maybe a quarter mile further

11   down, and then it's gated off.  And there's a big area

12   where you can park.  There's a big gravel bar there.  It

13   looks like you can walk upstream.  I was a fisherman.

14   It looked like a place I would go if I wanted to go

15   fishing and get out of the crowd.

16   Q.   From the area where the road is gated off, were

17   there any trails or ability to access what was beyond

18   the gate?

19   A.   Oh, yeah.  You couldn't drive a vehicle past that

20   because it was gated off, but you could certainly go

21   walking back there, biking back there.  You might be

22   able to get a four-wheeler back there.  I didn't do it,

23   but it's -- you could easily access that area.

24   Q.   And the vehicle that's parked here, is that just

25   your vehicle that you --

1      A.   That's just a rental car that I had.

2      Q.   All right.  Can we see defense Exhibit No. 137

3  then.

4           And what is depicted here?

5      A.   So what I was trying to show here is we were

6  right -- this was in July I believe when I took this

7  picture.  It might have been June.  I don't remember the

8  exact date.  But I wanted to show that would be an area

9  if somebody was looking to go fishing, I tend to -- I

10 like to fish by bridges.  There's shadows and things

11 like that for the fish.  And so I wanted to see what was

12 down there.

13     Q.   All right.  What's the next picture, 138, please?

14     A.   And this is actually under that bridge.  This is

15 under Bridge 7.  You can see you can stand down there.

16 It's fairly narrow across to the other side.  And I'm

17 not exactly sure how the water is always, but at that

18 point it was -- I was looking for fish too to see if

19 there was anything in there.

20     Q.   I would ask that you show Mr. Johnson defense

21 Exhibits 144, 145 and 146.

22          DEPUTY CLERK:  146 is admitted.

23     Q.   So just 144 and 145.

24          Are those photos you took, Mr. Johnson?

25     A.   Yes, they are.

1     Q.   And you recognize the area generally depicted in

2   them?

3     A.   Yes, that's the boat launch on Anton Larsen Bay

4   Road parking area.

5     Q.   Now, these photos are not from April 12, 2012, I

6   take it?

7     A.   That is correct.

8     Q.   But do they generally represent and depict the

9   area of the boat ramp as you described at the end of

10  Anton Larsen Bay Road?

11    A.   That is correct.

12         MR. COLBATH:  Your Honor, I'm going to move to

13  admit Exhibits 144 and 145.

14         MS. STEVENS:  No objection.

15         THE COURT:  Then those will be admitted.

16         (Defense Exhibit Nos. 144 and 145 admitted.)

17  BY MR. COLBATH:

18    Q.   Can we show Defense 144 first.

19         Mr. Johnson, in your investigation of the case

20  and your work here, did you have occasion to drive on

21  one or more than one occasion the full length of Anton

22  Larsen Bay Road?

23    A.   I have driven that road multiple times --

24    Q.   And --

25    A.   -- to its end.

Q.  And just describe starting from -- there's been a
lot of discussion up to the COMMSTA.  But from the
COMMSTA to the end of the road, describe the travel
route and what's along the roadway there.

A.  So when you're traveling down Anton Larsen Bay
Road, when you turn off Rezanof, which is the main --
what I would consider the main drag in Kodiak where the
main gate base is, you go to the airport and stuff, when
you turn onto Anton Larsen Bay Road, it's paved all the
way to about the golf course, which is about two miles
down the road.

        After that, as it was described, it turns into an
Alaska road.  It's gravel, and it's gravel all the way
to Anton Larsen Bay Road, which is about 11 miles from
there.  It's a fairly good road.  It's potholey.  You
don't want to be running real fast in the summertime --
or in the wintertime or spring.

        But as you go, there's a ski chalet, there's a
switchback where you go up and go what I would consider
just a short pass, you go down on the other side and you
end up by Anton Larsen Bay and it follows the bay.
There's a boat launch there where you can see people
that leave their boats, leave their vehicles and go into
other parts of Kodiak or out to remote islands.  And
then if you go a little bit past the boat launch, it

1    goes to a dead end.

2        Q.   Have you actually been out there not on

3    April 12th of 2012, but in subsequent years since 2012

4    on April 12th?

5        A.   I've been on that road twice on April 12th.

6        Q.   Of subsequent years?

7        A.   Of subsequent years, that is correct.

8        Q.   So what do we see here in the picture, defense

9    Exhibit No. 144?

10       A.   So what you're seeing here is as you're

11   driving -- this is actually looking back towards Kodiak.

12   So as you're driving into Anton Larsen Bay towards the

13   boat launch, the boat launch would be to my left and --

14   but I'm looking back towards Kodiak.  This is the

15   parking area where people park their cars and their

16   trailers for their boats if they're going out.

17       Q.   And have there been cars, vehicles, boat trailers

18   on each of the occasions when you've had occasion to be

19   at this area?

20       A.   I have never seen that parking lot empty when I

21   was out there.

22       Q.   All right.  What is defense exhibit -- can we see

23   defense Exhibit No. 145?

24            So what's the view from this angle?

25       A.   That's the same view.  I'm kind of standing by

the boat dock right now, but it's just kind of showing
the vehicles that are parked out there on Anton Larsen
Bay that were just there.

    Q.  And how about defense Exhibit No. 146.

        What's the view from this photo?

    A.  That's the actual boat launch there at Anton
Larsen Bay.  As you can see, you can walk down that ramp
and there's -- it's a big enough ramp where you can park
multiple boats down there.  The few times I did, I've
seen people picking up supplies and going out to Anton
Larsen Bay Road, people coming in.

    Q.  Could we show Mr. Johnson what's been marked as
defense Exhibit No. 152?  Caroline, has that been
admitted?  Thank you.  152, defense Exhibit No. 152.

        That's a photograph you took, Mr. Johnson?

    A.  Yes, I took that photograph as well.

        MR. COLBATH:  And Your Honor, I'll move defense
Exhibit No. 152.

        THE COURT:  Any objection there?

        MS. STEVENS:  Quick voir dire, if you don't
mind.

        THE COURT:  That's fine.

        MS. STEVENS:  Just to get my bearings.
Mr. Johnson, was this taken the same time as the other
photos, in July of this year?

1          THE WITNESS:  I've been there multiple times.

2     I don't remember which date I took this particular

3     photograph.  It might have been in July of this year.

4     But that's the water treatment plant.

5          MS. STEVENS:  No objection.

6          THE COURT:  All right.  Then that will be

7     admitted.

8          (Defense Exhibit No. 152 admitted.)

9     BY MR. COLBATH:

10       Q.  Mr. Johnson, describe where in relation to

11    COMMSTA are you standing when you take this photograph?

12       A.  I'm actually in between COMMSTA and the water

13    treatment plant.  I'm just past Bridge 7 on the

14    left-hand side of the road.

15       Q.  Are you on the side of Bridge 7, the water

16    treatment plant side of Bridge 7 or are you on the T-2?

17       A.  I'm on the water treatment plant side of

18    Bridge 7.

19       Q.  Could we see for identification defense Exhibit

20    No. 154.

21           And is that a photo you took at that same time,

22    Mr. Johnson?

23       A.  That's correct.

24       Q.  And across the street but same general --

25       A.  Yeah, I'm across -- it's basically I kind of

1  turned around and went on the other side of the road,

2  and now I'm taking a photograph back towards COMMSTA.

3          MR. COLBATH:  Your Honor, I'll move to admit

4  defense Exhibit No. 154.

5          MS. STEVENS:  No objection.

6          THE COURT:  154 is admitted.

7          (Defense Exhibit No. 154 admitted.)

8  BY MR. COLBATH:

9     Q.   So Mr. Johnson, the road that's depicted in the

10  foreground here is what road?

11    A.   That's Anton Larsen Bay Road.

12    Q.   And the last picture we saw, you were on the

13  other side of the street?

14    A.   That's correct.

15    Q.   Looking at the water treatment plant?

16    A.   Looking at the water treatment plant.

17    Q.   And now, what do we see here that you've done?

18    A.   That's a photo of Bridge 7.  And if you follow

19  Bridge 7 along there, if you look to the right you see

20  in almost dead center in the middle of the photograph

21  is -- I believe that's part of T-2, the rigger shop.

22    Q.   All right.  You can take that down.

23          And the last exhibit, Mr. Johnson, that I would

24  like to show you is defense Exhibit No. 157B.  And

25  before we do that, as part of your work in the case, you

indicated that you helped review and organize discovery

in the case for our office?

    A.   That's correct.

    Q.   And as part of that work, were you able to see

and review the airline manifests and the airline

information?  -- I don't have the exhibit numbers, but

they've been admitted -- the airline traffic information

from April 12th of 2012?

    A.   Yeah, that was part of my -- my duties to review

all that.

    Q.   And I'm going to have you look here at Exhibit

No. 157B.  And just play -- it's a video that's a little

bit lengthy, but just play the entry to this to see if

you can recognize it.  If we just freeze that screen

there.  Do you recognize what this is?

    A.   I do.

    Q.   And is that also a video and part of the

information received and reviewed as part of your

investigation in the case?

    A.   It is.

    Q.   And the date of this video?

    A.   The date of this video is April 12th, 2012.

    Q.   All right.

        MR. COLBATH:  Your Honor, foundationally, I

believe that counsel agreed, but we have a -- I'm going

1    to move to admit 157B.  I may choose to play a portion

2    of it, but I just wanted Mr. Johnson to be able to

3    identify it if I could.

4              THE COURT:  Any objection?

5              MS. STEVENS:  None, Your Honor.

6              THE COURT:  157B is admitted.

7              (Defense Exhibit No. 157B admitted.)

8    BY MR. COLBATH:

9      Q.  All right.  And if we could publish this without

10   playing anything.

11             Mr. Johnson, where is this video taken?

12     A.  This is inside the Alaska Airlines terminal at --

13   on Kodiak, at the Kodiak airport.

14     Q.  And again, how were you able to determine the

15   date and time that is depicted on the video?

16     A.  Again, as part of the evidence that we received,

17   we received computer evidence.  And this is from the

18   security cameras from Alaska Airlines at their terminal

19   in Kodiak.

20     Q.  And does the video evidence reflect a date and

21   time?

22     A.  It does.  It has a date and time of April 12th.

23   It starts at April 12, 2012, at 6:30 a.m. Alaska

24   Standard Time.

25     Q.  And it runs how long, the part that you reviewed?

1      A.   The part that I extracted runs approximately one

2   hour.

3           MR. COLBATH:  Your Honor, I don't have any more

4   questions for -- you can take that down.  Thank you.  I

5   don't have any more questions for Mr. Johnson.

6           THE COURT:  All right.  Thank you.

7           Ms. Stevens, go ahead, please.

8           MS. STEVENS:  Thank you, Your Honor.

9                     CROSS EXAMINATION

10  BY MS. STEVENS:

11     Q.   Hi, Mr. Johnson.

12     A.   Hello.

13     Q.   You were not personally aware of the ops deck

14  camera practices from back in 2012, correct?

15     A.   No, I was not there.

16     Q.   So you can't speak to that?

17     A.   No.

18     Q.   And the camera that we looked at from T-2, the

19  one that you captured in July when you visited the ops

20  deck, you couldn't see underneath the camera, could you?

21     A.   Yes, you can.  The camera will pan down.  It

22  can't go completely down, but it does pan down.

23     Q.   Okay.  So your testimony is that you could walk

24  next to that building, and the camera would capture that

25  person?

 1    A.   I never said that.

 2    Q.   Okay.  So then let me ask you this:  Do you have

 3  knowledge of whether somebody can walk underneath that

 4  camera and not be captured by it?

 5    A.   The camera can move around, and there would be

 6  spots where they would be seen.

 7    Q.   The question was do you have knowledge of whether

 8  someone can walk under that camera and not be captured

 9  by it?

10    A.   I don't move the camera.  I wasn't there.  I only

11  got to see it one time.  So I don't know what they do.

12    Q.   Okay.  So you mentioned you're a fisherman.  You

13  were there in July?

14    A.   I was.

15    Q.   If you had your pole would you have tried to go

16  while you were over there?

17    A.   I would not have.

18    Q.   Did you see any fish, like, in the lake or in the

19  river?

20    A.   I don't recall seeing any.  I might have been in

21  between runs.

22    Q.   So when you were down by Bridge 6 and poking

23  around back there, did you -- you didn't take the trail

24  and see where it goes?

25    A.   We drove -- I drove beyond where -- as far as I

1  could go and parked my vehicle.  I did get out.  I

2  walked around.  When I went there the first time, this

3  was in April, the bears were coming out.  I was unarmed,

4  and I was not going to go walking into the woods because

5  I just wasn't sure where they would be.

6      Q.  So you don't have knowledge that that trail will

7  take you about a mile and a half towards town?

8      A.  That's my understanding, but I don't know

9  personally.

10     Q.  Okay.  When you were there in April, did you see

11  any fish?

12     A.  I did not see the fish.  We did see a fish weir

13  where they started counting to keep track of all the

14  fish that start coming into Buskin Lake from the ocean,

15  but there wasn't many there.

16     Q.  So safe to say that folks are probably doing more

17  fishing in July than in April?

18     A.  I wouldn't necessarily agree with that.  There

19  could be trout and other fish that don't necessarily

20  migrate.

21     Q.  So when you took Anton Larsen Bay Road all the

22  way down in July, there wasn't any snow or ice or

23  anything?

24     A.  Not in July, nor was there in April when I was

25  going there.  There was a little but not a lot.

1    Q.   And that was in April not of 2012?

2    A.   Not 2012.

3    Q.   Your familiarity with this case though allows you

4  to know that there was in fact snow near the COMMSTA in

5  April of 2012?

6    A.   That is correct.

7         MS. STEVENS:  No more questions, Your Honor.

8         Thank you, Mr. Johnson.

9         THE COURT:  Follow-up at all?

10        MR. COLBATH:  Just one very briefly.

11        THE COURT:  Go ahead.

12                     REDIRECT EXAMINATION

13 BY MR. COLBATH:

14   Q.   Mr. Johnson --

15        Could we have defense Exhibit No. 145?

16        You mentioned, Mr. Johnson, this is Bridge 7, the

17 T-2 building?

18   A.   That's correct.

19   Q.   And in your response to one of Ms. Stevens'

20 questions, you mentioned you did see a fish meter or

21 whatnot?

22   A.   That's correct.

23   Q.   Is it depicted in this picture?

24   A.   No.

25   Q.   Where is it in relation to this bridge right

1  here?

2     A.  So if you see where the pavement ends, right to

3  the left of the picture, you'll see kind of a dirt road.

4  That dirt road goes down a couple hundred yards maybe

5  and it ends.  And down there, there's a fish weir, and

6  there's also a little station that Alaska Department of

7  Fish and Game put up.  And it has a fish count of every

8  day.  It just goes back and says how many fish went

9  through the weir at that time.

10    Q.  When you were there, either of the years when you

11  were there on April 12th, did you see either fishermen

12  or photographers on April 12th at the weir?

13    A.  Yeah, there was people down there checking things

14  out and seeing if the fish were starting to come in.

15    Q.  And how about photographers?

16    A.  Oh, yeah.

17         MR. COLBATH:  Nothing further.

18         THE COURT:  Anything on that topic?

19         MS. STEVENS:  No questions.

20         THE COURT:  Thank you, Mr. Johnson.  You may be

21  excused.

22         (Witness excused)

23         THE COURT:  Mr. Colbath.

24         MR. COLBATH:  Your Honor, my witness

25  coordinator is in the hallway.  And if I could have --

1    if we could maybe just have a stand up and stretch, I

2    will check.  I apologize, but I may be out of witnesses

3    due to travel.

4            THE COURT:  Feel free to stand and stretch,

5    ladies and gentlemen.

6            (Pause)

7            MR. COLBATH:  Your Honor, unfortunately, that

8    is the case.  The witnesses I have next, several

9    witnesses are either -- we have a video witness first

10   thing in the morning, a physician that had to be

11   scheduled at a time and other folks that are just

12   logistically traveling and en route.

13           THE COURT:  All right.  So --

14           MR. COLBATH:  So if I could ask for a brief

15   recess or ask for a recess for the day.  We will be

16   prepared with a full day tomorrow and moving forward.

17   We did cover all but two of the witnesses I anticipated

18   today, so I don't think we're off track.  I think we're

19   still on track this week.

20           THE COURT:  All right.  Very good.  Then that's

21   what we'll do, ladies and gentlemen.  What time is your

22   video witness in the morning?

23           MR. COLBATH:  Your Honor, assuming I -- we're

24   actually going to call the physician first, and she's

25   been instructed to be here at 8:30.  So if we could

1  start at 8:45, assuming she's on time, we could

2  certainly be ready for 8:45.  And then we have the video

3  folks on standby immediately thereafter.

4          THE COURT:  All right.  Ladies and gentlemen,

5  8:45 a.m. sounds like the plan.  I would ask you to

6  leave your notepads here in the courtroom.  Remember my

7  admonition not to do any research or discuss the case

8  with family or friends.  And thank you for your careful

9  attention today.  We'll see you all tomorrow morning at

10  8:45 a.m.  Have a pleasant evening.

11          (Jury absent)

12          THE COURT:  Please be seated, everyone.

13          Mr. Skrocki, on behalf of the government,

14  anything you would lake like to take up?

15          MR. SKROCKI:  No, Your Honor.  Thanks.

16          THE COURT:  Mr. Colbath?

17          MR. COLBATH:  No, Your Honor.  I would only ask

18  are we okay to leave many of our things or is the

19  courtroom --

20          THE COURT:  Yes.

21          MR. COLBATH:  -- going to be utilized?

22          THE COURT:  No.  I have a hearing tomorrow at

23  lunch, but are we in courtroom four?  We can do it down

24  the hall.

25          MR. COLBATH:  Are we okay to leave things for

1    this evening?

2            DEPUTY CLERK:  I'll check the calendar.

3            THE COURT:  Oh, no, I don't think anybody else

4    is.

5            MR. COLBATH:  Then no, nothing further from the

6    defense, Your Honor.  We'll be ready tomorrow.

7            THE COURT:  Has anybody has a chance to look at

8    the proposed instructions?

9            MS. SHERMAN:  Yes.  I also -- I filed a motion

10   in limine this morning regarding Mr. Hoerricks.  So at

11   some point before he testifies, we'll need to take that

12   up.  It's brief.

13           MR. COLBATH:  Your Honor, Mr. Hoerricks is

14   supposed to arrive extremely late tonight.  I did not

15   anticipate getting him on tomorrow probably.  But we

16   will -- I will look yet today at that motion.  I have

17   not looked at it.  I will look at it and get a response

18   to the Court so that that could be taken up.

19           THE COURT:  You could make it on the record at

20   8:30 a.m.  If the government needs more time after that,

21   that's fine, but it's a pretty straightforward limited

22   portion that the government sought to exclude.  So I

23   think we can probably resolve it on the record then.

24   Like I say, if the government needs more time after

25   hearing his position, we can do it at lunch as well.

1          All right.  Very good.  Let's go off record.

2     See you in the morning at 8:30.

3          DEPUTY CLERK:  All rise.  Court stands in

4     recess until 8:30.

5          (Recessed at 3:08 p.m.)

6

7                    CERTIFICATE

8     I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
9  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
10 original stenographic record in the above-entitled
   matter and that the transcript page format is in
11 conformance with the regulations of the Judicial
   Conference of the United States.

12
      Dated this 8th day of June, 2020.
13

14
                         /s/ Sonja L. Reeves
15                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25