<pre>
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4         Plaintiff,          )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7         Defendant.          )
     _____)
 8

 9              TRANSCRIPT OF TRIAL BY JURY - DAY 17
        BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10                  October 1, 2019; 8:43 a.m.
                         Anchorage, Alaska
11

     FOR THE GOVERNMENT:
12           Office of the United States Attorney
             BY:  STEVEN SKROCKI
13           BY:  CHRISTINA M. SHERMAN
             BY:  KELLEY L. STEVENS
14           222 West 7th Avenue, #9
             Anchorage, Alaska 99513
15           (907) 271-5071

16   FOR THE DEFENDANT:
             Office of the Federal Public Defender
17           BY:  GARY GEORGE COLBATH
             601 West 5th Avenue, Suite 800
18           Anchorage, Alaska 99501
             (907) 646-3400
19
             Camiel & Chaney, P.S.
20           BY:  PETER A. CAMIEL
             520 Pike Street, Suite 2500
21           Seattle, Washington 98101
             (206) 624-1551
22   _____

23                 SONJA L. REEVES, RMR-CRR
                  Federal Official Court Reporter
24                  222 West 7th Avenue, #4
                    Anchorage, Alaska 99513
25       Transcript Produced from the Stenographic Record
</pre>

1                           I N D E X

2               October 1, 2019, Trial Day 17

3

4   Witnesses:        Direct   Cross    Redirect    Recross

5   Song-Qing Gan       6        17       25/26        26

6   Jennifer Raymond 28         40        --          --

7   Matthew Wells     43        --        --          --

8   James Wells       58       233       241          --

9

10                   E X H I B I T   I N D E X

11  Exhibit                                           Page

12  255         Photo of Tires in Back of            180
                Mr. Wells' Truck
13
    DE-133      Wells' VA Disability Form             10
14
    DE-185      Wells' CG Medical Board               8
15              Disability Diagnosis

16  DE-316      Document Administrative Leave         219

17  DE-317      Document Banning from Property        219

18

19

20

21

22

23

24

25

```
 1          (Call to Order of the Court at 8:43 a.m.)

 2          (Jury absent)

 3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

 4   the United States District Court is again in session.

 5          THE COURT:  Good morning.  What's up,

 6   Mr. Skrocki?

 7          MR. SKROCKI:  Just a couple of things.

 8   Dr. Reisberg is testifying today?  Tomorrow.  We'll put

 9   that one off until tomorrow.  Maybe I can talk to

10   defense about that and move that forward.

11          How about Matt Wells, is he testifying today?

12   Yes.  So Matt Wells is testifying today.  Defense has

13   noticed an alibi to include Servant Air as to where Mr.

14   Wells was the morning of the murders.  Matt Wells was

15   advised --

16          THE COURT:  I'm sorry.  The alibi that I looked

17   at, which was several years ago, didn't reference

18   Servant Air.  Is there a newer one?

19          MR. SKROCKI:  It's the one Mr. Colbath noticed

20   me some time ago.

21          MR. COLBATH:  There is, Your Honor.

22          THE COURT:  I don't have that.

23          MR. SKROCKI:  We'll get it to you.  It's in an

24   e-mail.  And so -- but the issue is that that came from

25   Mr. Wells to Matt Wells, so it's hearsay, so I want to
```

just alert the Court that to that issue that we're going

to object to that.  It's not admissible so I don't even

want the question being uttered, "Didn't your father

stop at Servant Air," or words to that effect, because

that rings the bell that can't be unrung.

So I want to put that on notice that that's

what our position is with respect to those statements by

Jim Wells to his son.

THE COURT:  Who will I hear from on that topic?

MR. COLBATH:  I'll be questioning Matt Wells.

Matt Wells wasn't on the island on April 12th, so he has

no knowledge of any of that.  I'm not going to ask him.

THE COURT:  You're not going to solicit hearsay

from him?

MR. COLBATH:  No.

THE COURT:  Does that address your concern?

MR. SKROCKI:  It does.

THE COURT:  Netflix, what's the defense

position?

MR. COLBATH:  Your Honor, that won't be part of

Mr. Hoerricks' testimony.  I have talked to him about

that and it won't be part of his testimony.

THE COURT:  So the motion then is granted

regarding any references to this *Powell* case, I believe

it was, and the Netflix show that criticized the

1   photogrammetry in it.

2           MR. COLBATH:  Both the television show and

3   *Texas versus Powell* we will not address.

4           THE COURT:  Does that address your concern?

5   That was the motion at 1291 is granted.

6           Anything else to take up?

7           MR. SKROCKI:  Nothing from the government.

8           MR. COLBATH:  Your Honor, our first witness is

9   a live witness and then our second witness will be our

10  video witness.  We'll get that person on.

11          THE COURT:  I think we're ready to go with

12  them.  We're just waiting on the jury.  As soon as they

13  are down here, then we can proceed.  Very good.  Let's

14  go off record.

15          DEPUTY CLERK:  All rise.  Court stands in a

16  brief recess.

17          (Recessed from 8:47 a.m. to 8:56 a.m.)

18          (Jury present)

19          THE COURT:  All right.

20          DEPUTY CLERK:  Court is reconvened.

21          THE COURT:  Good morning, ladies and gentlemen.

22  Please be seated, everyone.  We are back on record.

23          Mr. Colbath, are you ready --

24          MR. COLBATH:  We are, Your Honor.

25          THE COURT:  Mr. Camiel, go ahead, please.

```
 1          MR. CAMIEL:  We're going to be calling Dr. Gan.
 2   She's coming up right now.
 3          THE COURT:  All right.  Very good.  Good
 4   morning.  If you could come around the side there, come
 5   up to the witness stand.  When you get up there, if you
 6   could remain standing just a moment, the clerk will
 7   administer an oath to you.
 8          (Oath administered to the witness)
 9          DEPUTY CLERK:  For the record, can you please
10   state your full name and then spell your full name.
11          THE WITNESS:  Song-Qing Gan, S-o-n-g-Q-i-n-g,
12   G-a-n --
13          DEPUTY CLERK:  If you could just repeat that
14   and pull that microphone a little closer.
15          THE WITNESS:  S-o-n-g-Q-i-n-g, and last name is
16   G-a-n.
17         SONG-QING GAN, DEFENSE WITNESS, SWORN
18                    DIRECT EXAMINATION
19   BY MR. CAMIEL:
20     Q.  Good morning, Dr. Gan.  You're a doctor?  What
21   kind of doctor are you?
22     A.  Internal medicine doctor.
23     Q.  How long have you been a doctor?
24     A.  Oh, over 22 years.
25     Q.  And where do you work?
```

1    A.   I work at Veterans Administration in Anchorage.

2    Q.   How long have you worked there?

3    A.   22 years.

4    Q.   And do you know Jim Wells?

5    A.   Yes.

6    Q.   How do you know him?

7    A.   Well, he was my patient for many, many years, so

8    that's how I met him, through clinic.

9    Q.   So were you his primary care doctor?

10   A.   Yes, I was his primary care doctor.

11   Q.   I want to have you take a look at a couple things

12   that we're going to put up on the screen in front of you

13   for foundational purposes.

14        First, we're going to put up Defendant's Exhibit

15   No. 185.  We'll blow up the top part a little bit to

16   make it easier to read.

17        Is that something you would have seen as a part

18   of your treatment of Mr. Wells?

19   A.   Not normally.

20   Q.   Not normally?  Are you familiar with this type of

21   document that's kept by the military?

22   A.   Yes.

23   Q.   And does this relate to a medical condition of

24   Mr. Wells?

25   A.   Well, basically stated he was in service for

1  20 years.

2           THE COURT:  Just answer his question.  Go

3  ahead.

4           THE WITNESS:  Oh.

5  BY MR. CAMIEL:

6     Q.  Does this document relate to a medical condition

7  that Mr. Wells had that you --

8     A.  Oh, yes.

9     Q.  One of the things that you treated him for?

10    A.  Yes.

11    Q.  What is it that you -- what does this document

12 relate to?

13    A.  Well, relate to two things.  One is he had a

14 diagnosis of seasonal rhinitis, and another one is

15 idiopathic anaphylaxis reaction.

16    Q.  What is idiopathic?

17          THE COURT:  Mr. Camiel, are you moving to admit

18 this?

19          MR. CAMIEL:  I will move to admit it, yes.

20          MS. STEVENS:  No objection.

21          THE COURT:  Then that's admitted.  Go ahead.

22          (Defense Exhibit No. 185 admitted.)

23          MR. CAMIEL:  We can put that up on the screen.

24          MS. STEVENS:  Just one page, right?

25          MR. CAMIEL:  Yes.

1    BY MR. CAMIEL:

2       Q.   Dr. Gan, what is idiopathic anaphylaxis reaction?

3       A.   Well, it typically describes something very

4    serious.  We don't know what's trigger, but the person

5    typically will have severe reaction to something very

6    serious.

7       Q.   Is this like an allergic reaction?

8       A.   Yes, serious allergic reaction to something

9    unknown.

10      Q.   To something unknown?

11      A.   Right.

12      Q.   And is this something you were aware of when you

13   were Mr. Wells' doctor?

14      A.   I believe so, because he often asked for EpiPens

15   and things like that.

16      Q.   Is EpiPen used as a treatment in case somebody

17   has one of these?

18      A.   Yes.

19      Q.   If they don't have EpiPen available, what's the

20   danger when you have this kind of condition?

21      A.   They could die.

22      Q.   And this document indicates that Mr. Wells --

23   this was something that required that he have to be

24   discharged from the military?

25      A.   Right, and require him to carry EpiPen.  If I

1    were his doctor again, that's what I would tell him to

2    do.

3        Q.  I'm going to have you look at another document,

4    first for you to look at, Defense Exhibit No. 133.

5    We'll blow that up just a little bit to help you read

6    it.

7            This is a Veterans -- Department of Veterans

8    Affairs document; is that right?

9        A.  Yes.

10       Q.  Is this something you're familiar with?

11       A.  Well, yes.  Basically, it just says his service

12   connected disability compensation was increased.

13       Q.  Let me stop you for a minute and let me offer

14   this Defense Exhibit No. 133 before we have you talk

15   about it.

16           MS. STEVENS:  No objection.

17           THE COURT:  133 is admitted.

18           (Defense Exhibit No. 133 admitted.)

19   BY MR. CAMIEL:

20       Q.  You started to say this had to do with Mr. Wells'

21   disability compensation from the Coast Guard; is that

22   right?

23       A.  Yeah, from his service, federal service, yeah.

24       Q.  And it lists -- in the middle of the page here it

25   lists three different conditions.  Can you tell us --

can you go through each one of those and tell us what
those are?

   A.  So the first condition was lumbar arthritis with
disc disease; typically, say, something like chronic
pain, lumbar spine arthritis.

      And second one is residual right knee
meniscotomy.  Basically, right knee pain with meniscus
removed from the surgery.

      The third one is tinnitus, ringing in ears.  So
those are the three conditions.

   Q.  All right.  And can you explain to us what -- is
tinnitus -- what kind of a condition is that?

   A.  Well, normally, impaired hearing with noises.

   Q.  And people generally think of that as ringing in
the ears?

   A.  Yes, ringing in the ears.

   Q.  Now, did Mr. Wells also have other medical
conditions?

   A.  Well, yeah.  I recall he has diabetes and several
other medical conditions.

   Q.  For his diabetes, what kind of treatment did he
receive?

   A.  I remembered he was given Metformin and insulin
injection.

   Q.  And so the insulin injections, is that something

1    he would have to do himself?

2        A.   Yes.

3        Q.   How frequently?

4        A.   Well, I remember it was like once every night or

5    something, but I have to look at the record.

6        Q.   And then you mentioned a medication, Metformin.

7    What is that?

8        A.   Well, Metformin is a medication that you treat

9    diabetes, basically to lower your glucose, so yes.

10       Q.   Are there any particular known side effects of

11   Metformin?

12       A.   Well, Metformin does have a few side effects,

13   including GI side effects, such as diarrhea and other

14   side effects, occasionally kidney problems.

15       Q.   Did Mr. Wells ever complain about the Metformin

16   causing him to have diarrhea?

17            MS. STEVENS:   Your Honor, objection; hearsay.

18            MR. CAMIEL:   Your Honor, this goes to her

19   medical treatment of him.

20            THE COURT:   I'll allow it under Evidence Rule

21   803(4) I believe it is.   Go ahead.

22   BY MR. CAMIEL:

23       Q.   You're allowed to answer the question.

24       A.   Well, I mean I remember seeing somewhere in the

25   chart, because I was called in, so I flipped through it.

1    I think somewhere said he had diarrhea, but it's very

2    common, yeah.

3        Q.   It's common from --

4        A.   From taking Metformin.

5        Q.   And does changing the dose of the Metformin, can

6    that affect the frequency or severity of diarrhea?

7        A.   You can do that.  You can change frequency of the

8    medication.  That's I remember how we did it, but

9    nowadays we use a different form of Metformin, like

10   slow-release Metformin, which will help manage the side

11   effects.

12       Q.   It sounds like this different form of Metformin

13   wasn't available when you were treating Mr. Wells?

14       A.   No, I don't remember it was available.

15       Q.   In the -- I want to turn your attention to the

16   fall and winter of 2011.  Do you remember whether you

17   were seeing Mr. Wells for any gastrointestinal problems?

18       A.   Yeah, he complained of dry heaves and nausea and

19   several other symptoms, so I referred him to a

20   gastroenterologist.

21       Q.   You're his primary care physician and you weren't

22   able to determine the cause of those problems?

23       A.   That's right, so we referred him to a specialist.

24       Q.   Are you aware of what the specialist found or

25   diagnosed?

 1      A.  Yes, I do.  They found he had dysfunction of his

 2   gallbladder, so they recommended gallbladder removal

 3   surgery.

 4      Q.  For those of us who don't know, what's the

 5   function of the gallbladder?

 6      A.  Well, I mean the gallbladder function is really

 7   helping your digestive system.  When you eat food, then

 8   your gallbladder will contract and discharge enough

 9   gallbladder juice to digest food, and then you can

10   digest food properly.

11         But if your gallbladder does not contract the way

12   it should or just contract a little bit, like in Mr.

13   Wells' situation, then you will have symptoms associated

14   with food.  Every time you take food and then you have

15   some symptoms, and then found out he had a gallbladder

16   dysfunction.

17      Q.  What kind of symptoms was he complaining about

18   that led to your referral to the specialist?

19      A.  Basically, nausea, just not being able to

20   self-manage, and dry heaves.  And other symptoms,

21   probably have to look at the chart.

22      Q.  And so were you aware that he -- were you aware

23   that in February --

24         MS. STEVENS:  Your Honor, I just request that

25   he do direct examination questions as opposed to

1    leading.

2              THE COURT:  That's sustained.

3    BY MR. CAMIEL:

4        Q.  Do you know whether or not Mr. Wells had his

5    gallbladder removed?

6        A.  Yes, he did.

7        Q.  Do you remember when that was?

8        A.  I thought it was like in January something 2012

9    or something like that.

10       Q.  Did you see him after the gallbladder removal

11   surgery?

12       A.  I don't recall if I actually saw him or not, but

13   I know he saw Dr. Simpson, the surgeon who performed

14   gallbladder removal surgery.

15       Q.  Are you aware of whether or not at the same time

16   that he had the gallbladder removal surgery he had any

17   other kind of surgery?

18       A.  I'm not aware, so we'll have to see operative

19   report.

20       Q.  When people have their gallbladder removed, are

21   there side effects from that kind of surgery that you're

22   aware of?

23       A.  Yes.

24       Q.  What are some of the side effects?

25       A.  Very commonly they have abdominal discomfort,

 1   they can have diarrhea, they can have all kinds of GI

 2   symptoms.  Not common, but it can happen.

 3       Q.  I want to have you look at Defense Exhibit, just

 4   for you to look at, 315.  I'm not going to offer this,

 5   but it's to refresh her recollection.

 6           Do you recall seeing Mr. Wells in January of

 7   2013?

 8       A.  Yes.  This note -- this is November 2012.  Oh,

 9   yes.  The note is from January 3rd, 2013.

10       Q.  Is that a note that you made?

11       A.  Yes.

12       Q.  Do you remember what -- does this help you recall

13   what his complaint was at that time?

14       A.  Well, he complained about --

15           MS. STEVENS:  Objection, Your Honor.  So this

16   document is being used to refresh her recollection, so

17   the question should be yes or no.

18           THE COURT:  Go ahead.  That's sustained.

19   BY MR. CAMIEL:

20       Q.  Does this help you recall what Mr. Wells'

21   complaint was back in January of 2013?

22       A.  Yeah, it is.

23       Q.  What was his complaint back then?

24       A.  Well, he said a couple of things actually:  Skin

25   rash, and also he said Metformin caused him severe

 1  diarrhea.

 2      Q.  Now, you treated Mr. Wells for many years; is

 3  that right?

 4      A.  Yes.

 5      Q.  Was he somebody who seemed to complain a lot or

 6  not?

 7      A.  No, no.  I remembered he was always self-managing

 8  his problem.  He was just always self-sufficient.  And

 9  he follows recommendation.  And he's really one of those

10  good patients I had, yes.  So no, he doesn't complain

11  much at all.

12          MR. CAMIEL:  That's all I have.  Thank you.

13          THE COURT:  Go ahead, please, Ms. Stevens.

14                   CROSS EXAMINATION

15  BY MS. STEVENS:

16      Q.  Good morning, Dr. Gan.

17      A.  Good morning.

18      Q.  Thank you for your service as a medical doctor

19  for veterans.  I'm sure you have seen quite a few

20  patients.

21          Doctor, you would agree that keeping records for

22  a patient is important?

23      A.  Yes.

24      Q.  You see a lot of veterans?

25      A.  Right.

1    Q.  Do you also treat active duty members or just

2  veterans?

3    A.  Just veterans.

4    Q.  Now, the first documented complaint by Mr. Wells

5  of Metformin causing diarrhea is in 2013; isn't that

6  right?

7    A.  According to that paper, yes.

8    Q.  Prior to that, there was no documentation in his

9  record that the Metformin caused diarrhea for him?

10   A.  I don't know.  I have to look at the records, but

11  probably not then.

12   Q.  Okay.

13        MS. STEVENS:  Your Honor, one second.

14        THE COURT:  All right.

15        (Pause)

16        MS. STEVENS:  Your Honor, may I approach?

17        THE COURT:  Certainly, but why don't you show

18  Mr. Camiel first.

19        MS. STEVENS:  This is your exhibit in

20  discovery, Defense 586.

21        (Pause)

22        (Ms. Stevens approaches witness.)

23  BY MS. STEVENS:

24   Q.  Doctor, I would like to direct your attention to

25  page 862.

1          THE COURT:  What exhibit number is that?

2          MS. STEVENS:  This is for purposes of

3   refreshing her recollection.  It hasn't been admitted

4   yet as an exhibit.

5          THE COURT:  What is it?

6          MR. COLBATH:  Your Honor, could we approach?

7          (Begin bench conference.)

8          MR. CAMIEL:  I think these were prior trial

9   exhibits.  I have told Dr. Gan not to mention the prior

10  trial, but I think that's what the number is on there.

11         MS. STEVENS:  It's not a Bates number.

12         MR. CAMIEL:  I don't think so.

13         MS. STEVENS:  I think it is -- I think it's a

14  Bates number, but --

15         MR. SKROCKI:  We can mark it for

16  identification.

17         THE COURT:  We just need some identification.

18         MR. SKROCKI:  Let us get the next number in

19  sequence.

20         MS. STEVENS:  We don't plan on introducing it

21  as an exhibit.  It's just to refresh her recollection.

22  It was a defense exhibit in discovery.  This is what you

23  guys --

24         THE COURT:  In any event, if she can read a

25  Bates number, that's fine.

```
 1          MR. SKROCKI:  Is that okay?

 2          THE COURT:  Yeah, that's fine.

 3          (End bench conference.)

 4  BY MS. STEVENS:

 5     Q.  So if you can just refer to page 862.  And if you

 6  need me to approach to show you where the page is, I can

 7  do that.

 8     A.  Second binder or first binder?

 9          THE COURT:  You can go and approach,

10  Ms. Stevens.

11          (Ms. Stevens approaches witness.)

12  BY MS. STEVENS:

13     Q.  So back in 2001, you prescribed him Metformin;

14  isn't that correct?

15     A.  Yes.  Yes.

16     Q.  Okay.  So he has been essentially on that drug

17  since 2001, right?

18     A.  Well, yes.

19     Q.  And throughout the years, you have increased his

20  dosages of Metformin?

21     A.  Yeah.  We have to review that, but I'm thinking

22  yes.

23     Q.  So I can also direct your attention to page 464.

24     A.  Okay.

25     Q.  Would you agree with me that in July of 2008, you
```

1   increased his dosage to 500 milligrams two times daily?

2      A.   Yes.

3      Q.   And then in fact in December of 2010, you

4   increased his dosage again to 1,000 milligrams?

5      A.   Yes, I believe that.

6      Q.   And that's the amount he was on in April of 2012;

7   isn't that correct?

8      A.   I believe that.

9      Q.   Did you, throughout your time treating Mr. Wells,

10  ever document any statements he made regarding his bowel

11  movements?

12     A.   Well, I don't recall.  It's so long ago.

13     Q.   Sure.  Let's take a look at page 237.

14     A.   Okay.

15     Q.   And would you agree with me that he denied any

16  bowel movement problems in August of 2011?

17     A.   Well, he didn't say anything about it.  He just

18  -- we just said Type II diabetes, continue current

19  treatment.  Let me see.

20     Q.   Maybe at the top of the page.

21     A.   At the top of the page, he talked about his light

22  pain, but with Type II diabetes, we just continued

23  treatment.

24     Q.   So you continued the same treatment that he was

25  on?

1    A.  Yes.

2    Q.  Had he complained of any diarrhea would you have

3 noted it in the record?

4    A.  Well, recordkeeping has always been a challenging

5 issue.  VA converted from paper to CPRs I believe in

6 early 2000.  We always struggle with complete

7 documentations of everything.  So we're getting better,

8 but still not there.

9    Q.  So throughout those pages in front of you, do you

10 have any recollection of noting his issues with chronic

11 diarrhea?

12    A.  Well, it was not in the note from those pages.

13    Q.  Would you agree with me then that there is no

14 mention of diarrhea throughout those documents you have

15 in front of you?

16    A.  Well, there was no mentioning of diarrhea.

17    Q.  And then you mentioned that in -- it was around

18 October of 2011, he started complaining about nausea and

19 dry heaving?

20    A.  Uh-huh.

21    Q.  And that was noted in your records?

22    A.  Yes.

23    Q.  Diarrhea was not noted?

24    A.  Well, I don't know.  I have to look at it.

25    Q.  Okay.  Let me refer you to page 229.

1      A.   229 said "additional gastric problems."  No, was

2 nothing said on that page, just my nurse send me a note

3 and I sign it.

4      Q.   And despite his nausea and his dry heaving, you

5 continue with the Metformin at 1,000 milligrams two

6 times per day?

7      A.   Well, I would agree with that, yeah, we continued

8 the medication.

9      Q.   And you mentioned that you referred him to

10 Dr. Ambasht -- I believe that's his name -- to a GI

11 specialist?

12     A.   Yes.

13     Q.   And in that referral, you mentioned to him that

14 Mr. Wells was suffering from nausea and dry heaving, not

15 associated with diarrhea?

16     A.   Oh, I don't know association, but we did refer

17 him for nausea and dry heaves.

18     Q.   Well, let me refer you to page 1766, and it may

19 be in the other binder.

20     A.   You said 1736?

21     Q.   66.

22     A.   Okay.

23     Q.   Go ahead and take your time to review that and

24 then you can tell me if it was just dry heaving and

25 nausea.

1    A.   Yep.

2    Q.   Okay.  And then you mentioned that in February he

3  has his gallbladder removed, and then you meet him for

4  follow-up.  Do you remember that?

5    A.   Do I meet him for follow-up?  I don't remember

6  that.  I thought it was Dr. Simpson saw him.

7    Q.   And you testified that -- let's see here.

8         Do you remember meeting him on April 2nd, 2012,

9  just ten days before the murders?

10   A.   I don't remember.  I have to see the notes.  Just

11  so long ago.

12   Q.   That would be 196 through 97, probably in the

13  other binder.

14   A.   It ends at 1892.  I don't know.

15         THE COURT:  If you want to go help her find it,

16  that's fine, Ms. Stevens.

17         (Ms. Stevens approaches witness.)

18  BY MS. STEVENS:

19   Q.   So you mention in that note that he is feeling

20  much better than pre-op, no nausea, no dry heaving?

21   A.   No, not -- no.

22   Q.   And the only time he mentions Metformin causing

23  diarrhea is in 2013 after the murders; isn't that right?

24   A.   I don't have a timeline, but it was somewhere

25  documented here.

1    Q.  Last question for you, Dr. Gan, and I appreciate

2  your patience with going through all of that.  Would you

3  agree that someone suffering from some tinnitus would

4  suffer pain and irritation if a .44-caliber gun went off

5  close to them?

6    A.  Say it again.  I don't understand.

7    Q.  Would you agree that somebody suffering from

8  ringing in the ears would suffer increased pain or

9  sensitivity to a firearm, a .44-caliber firearm going

10 off in close proximity?

11   A.  I don't know.

12        MS. STEVENS:  Thank you.  No more questions.

13        MR. CAMIEL:  Just one.

14        THE COURT:  Go ahead, Mr. Camiel.

15                   CROSS EXAMINATION

16 BY MR. CAMIEL:

17   Q.  Dr. Gan, Mr. Wells, he needed to take the

18 Metformin to treat his diabetes, right?

19   A.  Yes.

20   Q.  And he had to take that along with the insulin?

21   A.  Yes.

22   Q.  He couldn't stop taking the Metformin?

23   A.  No.

24        MR. CAMIEL:  Thank you.

25        THE COURT:  Nothing on that?

```
 1              MS. STEVENS:  I have one follow-up question.
 2                        RECROSS EXAMINATION
 3    BY MS. STEVENS:
 4       Q.  Can you refer to page 196 and 97, please?
 5       A.  Okay.  I'm here.
 6       Q.  So my question is:  Was he compliant with his
 7    diabetic treatment?
 8       A.  No, not in that note.
 9              MS. STEVENS:  Thank you, Your Honor.
10              MR. CAMIEL:  Your Honor, could I take a look at
11    that note?
12              THE COURT:  Sure, go ahead.
13              THE WITNESS:  You know, typically we have
14    nursing notes attached to it.  I don't see it here.
15              MR. CAMIEL:  If I can take a look just for a
16    minute.
17              (Mr. Camiel approaches witness.)
18                        REDIRECT EXAMINATION
19    BY MR. CAMIEL:
20       Q.  Dr. Gan, the note that you were just asked about,
21    does it explain why Mr. Wells was noncompliant with the
22    diabetic treatment?
23       A.  Yes.
24       Q.  What does it say?
25       A.  He said after gallbladder surgery he just had not
```

1    been complying with diabetic treatment.

2        Q.   If somebody stopped taking the Metformin and then

3    started up again, could that increase the chance of side

4    effects?

5        A.   Well, side effects will come back, so that's

6    basically --

7                MR. CAMIEL:   Thank you.

8                THE COURT:   Thank you.

9                MS. STEVENS:   No questions.

10               THE COURT:   Thank you, ma'am.   You may be

11   excused.

12               (Witness excused)

13               THE COURT:   Your next witness, Mr. Colbath?

14               MR. COLBATH:   Your Honor, we'll need just a

15   minute.   Our next witness is Jennifer Raymond, and

16   Ms. Raymond is testifying with our video equipment here.

17               THE COURT:   Do you need to excuse the jury here

18   for a couple minutes?

19               MR. COLBATH:   I think just while we have the IT

20   folks assist us.   She is on the other end and ready to

21   testify, but we just need to get that hooked up.

22               THE COURT:   Please leave your notepads in the

23   courtroom.   Remember my admonition not to discuss the

24   case and we'll get you back in here shortly.   We'll go

25   off record.

```
 1                    (Recessed from 9:30 a.m. to 9:37 a.m.)

 2                    (Jury present)

 3               THE COURT:  All right.  Please be seated,

 4     everyone.  And Mr. Colbath, the defendant's next witness

 5     is?

 6               MR. CAMIEL:  Your Honor, the next witness is

 7     Jennifer Raymond and she is on our video screen.

 8               THE COURT:  Ms. Raymond, it's Judge Gleason.

 9     Can you hear me?

10               THE WITNESS:  Yes, ma'am.

11               THE COURT:  We have you on a videocamera here

12     in the courtroom in Anchorage, Alaska.  You have been

13     called as a witness in United States versus Wells.  The

14     clerk is going to administer an oath to you.  We'll be

15     recording your testimony.

16               (Oath administered to the witness)

17               DEPUTY CLERK:  For the record, can you please

18     state your full name and then spell your full name.

19               THE WITNESS:  Jennifer Raymond,

20     J-e-n-n-i-f-e-r, R-a-y-m-o-n-d.

21            JENNIFER RAYMOND, DEFENSE WITNESS, SWORN

22                          DIRECT EXAMINATION

23     BY MR. CAMIEL:

24        Q.  Good morning, Ms. Raymond.

25        A.  Good morning.
```

1    Q.  Where are you testifying from this morning?

2    A.  Huntsville, Alabama.

3    Q.  It looks like you're in a courtroom there?

4    A.  Yes, I'm at the federal courthouse.

5    Q.  Ms. Raymond, where do you work?

6    A.  The Federal Bureau of Investigation in the

7    terroristic explosive device analytical center or TEDAC.

8    Q.  And is that separate from the crime laboratory or

9    is that a part of the crime lab?

10   A.  I'm sorry.  You were cutting out.

11   Q.  Is that part of the FBI crime lab or is that a

12   different --

13   A.  Yes, it is.  It's just a different location.

14   Q.  All right.  Can you tell us a little bit about

15   the training you have had to do the job that you're

16   doing now?

17   A.  Yes.  I received an undergraduate degree from the

18   University of Central Oklahoma in forensic science.  I

19   also completed a two-year training program with the

20   Federal Bureau of Investigation, which included several

21   moot court exercises, comparison exercises, oral boards,

22   numerous written and oral tests, as well as how to

23   conduct cases under the supervision of a mentor, how to

24   write reports and properly document my examinations.

25   Q.  Were you working in the same capacity back in

1  2012?

2      A.  I was working at the lab in Quantico in the

3  latent print operations unit.  I am now working at the

4  laboratory in Huntsville, Alabama, the TEDAC laboratory

5  in the scientific and biometrics analysis unit, but I am

6  still conducting latent print examinations.

7      Q.  For how long have you been doing latent print

8  examinations?

9      A.  Approximately 11 years.

10     Q.  Can you give the jury an overview of fingerprint

11  examinations, what you do and how you do it?

12     A.  On the palm or surfaces of the hands, as well as

13  the soles of the feet there is a specialized form of

14  skin known as friction-ridged skin.  This skin is

15  comprised of raised ridges and valleys or furrows.  When

16  this skin becomes coated with a substance, such as

17  sweat, oil, dirt, grease, and then comes in contact with

18  a surface, there is a chance to leave behind a

19  reproduction of the arrangement of this friction-ridged

20  skin on the item.

21         These chance reproductions are usually

22  fragmentary in nature and require some sort of visual or

23  chemical -- physical or chemical process to be applied

24  in order to be able to visualize these prints.  This is

25  what we refer to as a latent print.

1        A known print is an intentional recording of

2    these friction ridges, and it's when the friction ridges

3    are coated with a substance like black printer's ink and

4    then rolled, if you're taking a fingerprint recording,

5    they're rolled from nail to nail in the fingerprint ink

6    and then rolled from nail to nail on a contrasting

7    background such as a fingerprint card.

8        That is what is referred to as a known

9    fingerprint.  And as part of my job, I compare the

10    latent prints developed on items of evidence to the

11    known prints that are either submitted into our database

12    or submitted as part of a case.

13    Q.   Were you involved in doing some fingerprint work

14    with regard to the April 12, 2012 double homicide that

15    happened on Kodiak Island at the Coast Guard station?

16    A.   Yes, I did receive a case.

17    Q.   And what kind of work were you asked to do in

18    that case?

19    A.   I was asked to develop prints on several items of

20    evidence, as well as look at several latent lifts that

21    were taken from the crime scene and then compare those

22    to numerous individuals.

23    Q.   What's an elimination print?

24    A.   Elimination print is a known print collected from

25    an individual who would have legitimate access to the

1  crime scene.

2      Q.   So that might be, say, a first responder?

3      A.   Absolutely.

4      Q.   Or somebody who worked or had a legitimate reason

5  to be at a particular location?

6      A.   Yes.

7      Q.   Do you know how many lifts you received from the

8  crime scene, the rigger shop, to look at?

9      A.   I believe it was approximately 53.

10     Q.   And were all of those lifts suitable for trying

11 to do a comparison?

12     A.   No.  I believe 28 of them I actually had latents

13 captured on, and I believe 15 of them I actually found

14 latent prints that were suitable for comparison on.

15     Q.   What's the difference between a latent print

16 that's suitable for comparison and one that's not?

17     A.   There needs to be a sufficient quantity and

18 quality of information within that print in order to be

19 able to use it for comparison.  So the information that

20 I'm looking at is all determined in my analysis.  So I

21 look at the latent print and I'm trying to determine how

22 much information is there and how much information is

23 present.

24         I look at three levels of detail.  The first is

25 the overall pattern type or the overall ridge flow of

1    the latent.  I then look for what's called second-level

2    detail, and these are all the little minutia that are

3    occurring along the ridge path.

4         So it can be ending ridges, which are ridges that

5    just flow and then stop.  It could be a dividing ridge,

6    which is a ridge that flows and then divides into two or

7    more ridges.  Or it could be a dot, which is a ridge

8    that looks kind of like the period at the end of a

9    sentence, it's as wide as it is long.

10         So I'm looking for all of these characteristics

11   when I'm doing my analysis.  I'm looking at not only the

12   type, but I'm looking at the direction that it's

13   flowing, its spacial relationship within the print, as

14   well as its location -- its location within the print

15   and its spacial relationship to all the other

16   characteristics that are around it.

17         Once I've looked at all of this information, I'll

18   then determine if the print has enough information to

19   move on to the comparison phase or not.

20   Q.  So if you decide that a print doesn't have enough

21   information, then you don't try to compare it to

22   anything?

23   A.  That is correct.  The analysis is done first.

24   Q.  So if there is not enough information, then you

25   stop right there with that particular print?

1    A.   That is correct.

2    Q.   All right.  In this case then, if I understand --

3 so again, what was the total number of lifts that you

4 received?

5    A.   I believe it was 53.

6    Q.   All right.  And how many of those -- now, were

7 some of those finger and some of those palm prints?

8    A.   Of the ones that I determined were suitable for

9 comparison, yes, there were fingerprints and palm

10 prints.

11   Q.   How many --

12   A.   There was also an impression.

13   Q.   We'll get to that.  How many fingerprints were

14 there that you thought were suitable for comparison?

15   A.   May I refer to my notes?  I would like to get an

16 exact number.

17   Q.   Sure.

18   A.   A total on the lifts, I had 18 prints, it looks

19 like 16 of which were fingerprints, one of which was a

20 palm print, and one impression.

21   Q.   So of those 18 that were suitable for comparison

22 then, did you compare those to elimination prints that

23 you had been provided with?

24   A.   I did.  I compared those to a number of

25 individuals.

1    Q.   Okay.  And did that include the two victims,

2 Mr. Belisle and Mr. Hopkins?

3    A.   Mr. Hopkins and Mr. Belisle were included in the

4 list, yes.

5    Q.   Was Mr. Wells included in that list?

6    A.   I'm sorry.  You cut out.

7    Q.   Was Mr. Wells included in the list of people that

8 you did comparisons to?

9    A.   Yes.

10    Q.   And your understanding was the other people in

11 the list were first responders or other people who

12 worked in the facility?

13    A.   Some of the people that were actually hits from

14 automated searches, but, yes, a large number of those

15 people were also elimination people.

16    Q.   After you went through the comparisons, did you

17 end up with any prints, either palm or fingerprints,

18 that you weren't able to identify to anyone?

19    A.   Yes.

20    Q.   How many?

21    A.   How many?  Four fingerprints, one impression, and

22 then the palm print.

23    Q.   Did you run those prints through any kind of

24 automated system to see if they -- see if anything came

25 up that way?

1    A.   I did.   I ran five of those prints through the

2  automated database.   One was determined not suitable for

3  automated searching.

4    Q.   So as of your -- the status of your notes right

5  now indicate how many of the prints from the -- that you

6  received out of that original 53 are still unidentified?

7    A.   Six.

8    Q.   You talked about some notes that you have?

9    A.   Sorry.

10   Q.   Do your --

11   A.   Yeah, six from the lifts.

12   Q.   Do your notes indicate where those unidentified

13 prints came from, where they were found at the crime

14 scene?

15   A.   Yes.   I actually did compile a table that would

16 assist me in making those connections quicker, if I may

17 use that.

18   Q.   Sure.   Can you tell us where the various

19 unidentified prints were located at the crime scene?

20   A.   Okay.   I had -- one fingerprint was located --

21 these are the descriptions from the back of the lift

22 cards.   One fingerprint was located on the door between

23 the Bobcat garage and workshop, Bobcat garage side.

24        One fingerprint was located on the door between

25 the Bobcat garage and the workshop, wood shop side.

1          The impression was located on the double doors

2    between the wood shop and locker room, wood shop side

3    right door.

4       Q.   Let me stop you just for a minute because you

5    used the term impression and I wanted to have you

6    clarify what you meant by impression.

7       A.   Yes.   The impression is simply a latent print

8    that -- or a section of friction-ridged skin where I

9    cannot determine based on just my analysis if it is a

10   fingerprint or a palm print, so it gets compared to both

11   fingerprints and palm prints until identified.

12      Q.   And where was that impression found?

13      A.   The impression was found on the double doors

14   between the wood shop and the locker room, wood shop

15   side right door.

16      Q.   And then the next unidentified print was found

17   where?

18      A.   The next unidentified print was found -- it was a

19   fingerprint found on the door between the Bobcat garage

20   and workshop or wood shop, wood shop side.

21      Q.   All right.   And the next one?

22      A.   There was another fingerprint on the boiler room

23   door.

24      Q.   Did that lift card indicate which side of the

25   boiler room door, whether it was interior or exterior?

    A.  I do not have that noted here, so I would have to
refer to the lift itself.

    Q.  All right.  And then the next unidentified print?

    A.  The next three are all palm prints.  There was
one on the repair shop north door exterior.  And the
other two palm prints were actually on other items of
evidence that were submitted.

    Q.  All right.  Now, what were those?

    A.  One was on a doorknob from the French doors into
the wood shop that I received at the laboratory.  And
the other one was on a black glove on a ramp that I also
received at the laboratory.

    Q.  Just to be clear now, none of the prints that you
looked at or any of the ones that were suitable for
comparison matched Mr. Wells; is that correct?

    A.  That is correct.  The palm prints however were
not compared to Mr. Wells and the impression was not
compared to the palm prints of Mr. Wells, because I
receive -- I didn't receive any palm prints.

    Q.  Did you also -- were you also asked to look at
some ammunition boxes?

    A.  I was.

    Q.  And did you find any prints on those ammunition
boxes that were suitable for --

    A.  I'm sorry.  You cut out.

1    Q.   I'm sorry.  I got away from the microphone.

2         Did you find any prints on the ammunition boxes

3    that were suitable for comparison?

4    A.   Yes.  There were three prints, two latent

5    fingerprints and a palm print detected.  I have to refer

6    to another case file to tell you exactly what on.  So

7    there is one fingerprint detected on a cartridge, one

8    fingerprint -- or I'm sorry, one palm print detected on

9    a gray box and one fingerprint detected on a cartridge.

10   Q.   Do you know where those items were found?

11   A.   I do not.  I do not know where those were found.

12   Q.   Did you compare those prints that you just

13   mentioned from the cartridge and the box?

14   A.   Were they what?  You cut out again.

15   Q.   Did you do a comparison or attempt to do a

16   comparison with the fingerprints that were found on the

17   cartridge and the box?

18   A.   Yes.  The two fingerprints that were found on the

19   cartridge I did compare.

20   Q.   And what was the results of that?

21   A.   I compared them to the fingerprint card bearing

22   the name James Michael Wells, and they were non-ID, they

23   were excluded.  I did not have any palm prints to

24   compare, so the palm print was not compared.

25            MR. CAMIEL:  Thank you.  That's all I have.

1          THE COURT:  Go ahead, please.

2                    CROSS EXAMINATION

3    BY MS. SHERMAN:

4        Q.  Good morning, Ms. Raymond.  My name is Christina

5    Sherman.  I'm with the U.S. attorney's office.  How are

6    you today?

7        A.  Good morning.  I'm well.  How are you?

8        Q.  Good.  I want to start with generally as an

9    analyst you want every lift that's taken sent in to the

10   FBI lab, even if it may not be suitable for comparison,

11   right?

12       A.  Absolutely.

13       Q.  So of those 53, as an analyst, you know some of

14   them are not going to be suitable for comparison?

15       A.  Absolutely.

16       Q.  You indicated there were -- so 18 were suitable

17   for comparison.  Did I get that amount right?

18       A.  I thought it was 16, but --

19       Q.  16.  So of those 16, you were able to identify

20   prints belonging to individuals who had worked in the

21   rigger shop, right, from elimination?

22       A.  Yes, and I believe there was one automated hit as

23   well.

24       Q.  I want to talk about -- you said there were six

25   unidentified and you mentioned a black glove.  Do you

1  have your June 22nd report?

2      A.   Yes.

3      Q.   June 22, 2012?

4      A.   Yes.

5      Q.   So you would agree with me that an automated

6  search of the glove, the prints in the glove identified

7  those as Pedro Elizondo, right, on page two?

8      A.   Yes, the fingerprints on that glove, due to an

9  automated search, were Pedro Elizondo.

10     Q.   And do you know whether he's employed by the

11 Coast Guard police department?  Did you have that

12 information?

13     A.   I did not at the time of the identification.

14     Q.   Okay.  Now, fingerprints, you would agree, can

15 last a long time, depending on the circumstances in

16 which they are left?

17     A.   Yes.  There are a variety of circumstances that

18 would either lend them to last for a long time or be

19 wiped away immediately.

20     Q.   In your training as an analyst and in your

21 experience, have you come across situations where a

22 print can be left on an item from a manufacturer and

23 it's found years later?

24     A.   I don't know specifically from a manufacturer,

25 but I do know that we have developed prints on items

1    years later.

2       Q.  And you would agree with me you expect to find

3    fingerprints of people who are allowed to be in a

4    particular location within that location, right?

5       A.  Absolutely.  Any time you come into contact with

6    an object, you have the potential to leave behind a

7    latent print.

8       Q.  And would you agree with me that if there is no

9    evidence a suspect were in a particular area, the value

10   of those prints that you might identify would go down?

11          MR. CAMIEL:  Your Honor, I'm going to object to

12   speculation.

13          THE COURT:  I'll sustain that.  Can you

14   rephrase?

15      Q.  You identify prints from whatever is sent in,

16   right?  You're not given full information about the

17   investigation?

18      A.  Correct.

19      Q.  So you identify prints and it doesn't necessarily

20   -- or I guess don't identify prints.  It doesn't -- you

21   don't do the analysis of whether that print would relate

22   to a suspect or the rest of the investigation; is that

23   correct?

24      A.  That's correct.  My only job is to compare the

25   latent prints that are detected or submitted to known

individuals or search them.  It has no bearing on my

examination who the individual is, and most of the time

I don't know.

MS. SHERMAN:  Okay.  Thank you.

MR. CAMIEL:  I have no other questions.

THE COURT:  Thank you, Ms. Raymond.  You may be

excused at this time.

(Witness excused)

THE COURT:  Your next witness, Mr. Colbath?

MR. COLBATH:  Your Honor, I'm going to call

Matthew Wells.

THE COURT:  All right.

(Pause)

THE COURT:  Good morning.  If you can come up

to the witness stand, please.  Remain standing when you

get there and the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please

state your full name and then spell your full name.

THE WITNESS:  Matthew Wells, M-a-t-t-h-e-w,

W-e-l-l-s.

DIRECT EXAMINATION

BY MR. COLBATH:

Q.  Good morning, Mr. Wells.

A.  Good morning.

1    Q.   Where are you joining us from?

2    A.   Basically the Portland area, Portland, Oregon.

3    Q.   What is your relationship to James Wells?

4    A.   That's my father.

5    Q.   What do you do, sir, in Portland?

6    A.   I'm a police officer for the City of Portland.  I

7    have been for the last 16 and a half years.

8    Q.   What are your duties or what type of police

9    officer are you?

10   A.   I am currently assigned to patrol out of north

11   precinct.  I'm also currently a sniper on our version of

12   the SWAT team.

13   Q.   And do you have any other responsibilities or

14   things that go along with your job duties besides normal

15   patrol officer or SWAT detail?

16   A.   Yep.  I'm also a detached instructor for our

17   training division.  I teach basic firearms.  I teach

18   patrol rifle, and also our less lethal program.

19           THE COURT:  Sir, can you pull that microphone

20   just a bit closer to you?  Thank you.

21           Go ahead, please, Mr. Colbath.

22   BY MR. COLBATH:

23   Q.   And sir, do you have a family in Oregon?

24   A.   I do.  I'm married with two kids, two boys.

25   Q.   What does your wife do?

1    A.   My wife is also a police officer for the City of

2    Portland.

3    Q.   Met on the job?

4    A.   Yes, many moons ago.

5    Q.   Besides your own family in Portland, let's talk

6    for a minute about your biological family.  Who is your

7    mother?

8    A.   Nancy Wells.

9    Q.   Where did you grow up?

10   A.   My dad was in the Coast Guard, so I was born in

11   Kodiak.  We transferred down to San Francisco and to

12   Seattle, and then we retired back to Kodiak.

13   Q.   So when did you get back to Kodiak the second

14   time, I guess?

15   A.   I believe it was 1990 is when I moved back.

16   Q.   Roughly what age would you have been then?

17   A.   It was like ten.

18   Q.   Do you have siblings?

19   A.   I do.  I have an older brother and an older

20   sister.

21   Q.   And what's your older brother's name?

22   A.   Cable.

23   Q.   Where is Cable?

24   A.   He's a pilot.  He lives in Prince of Wales Island

25   and flies for a company down there.

1    Q.   How long has he been up in Alaska?

2    A.   His entire -- well, since we moved back in '90.

3    Q.   How much older than you -- is Cable than you?

4    A.   He's four years older than I am.

5    Q.   And then you said you had a sister.  What's your

6    sister's name?

7    A.   Elizabeth.

8    Q.   Where does Elizabeth live?

9    A.   She right now resides in Beaverton, so if you're

10   familiar with the Portland area, it's just a suburb to

11   the west of Portland.  She's down in Beaverton.

12   Q.   So what type of activities -- if we focus on your

13   time back in Kodiak, age ten to -- first of all, how

14   long was it that you stayed from age ten in the Kodiak

15   area?

16   A.   I graduated high school in 1998, and in the fall

17   I went down to Portland for school, so it would be

18   roughly eight years.

19   Q.   So during that time growing up there, your junior

20   and high school years, junior high and high school

21   years, what type of activities did you do?  What type of

22   things did your family participate in?

23   A.   I played baseball, and then my family activities,

24   hunting, fishing, you know, hiking, four-wheeling.

25   Q.   Alaska kind of stuff?

1     A.   Quote-unquote, Alaska stuff.

2     Q.   How about firearms, were firearms a part of those

3  activities?

4     A.   Yes, they were.

5     Q.   How so?

6     A.   We used to skeet shoot.  The layout of our house

7  afforded us the ability, we could shoot off our deck,

8  skeet shoot, shoot other things.  We'd go hunting, just

9  regular target shooting.  And towards the end, we

10  started picking up duck hunting as well.

11     Q.   Now, there has been testimony and evidence in our

12  case that your parents' home was in the Bells Flats

13  area.

14          Sure, go ahead and get some water there.

15          Your parents' home was in the Bells Flats area.

16  Is that the home you grew up in, or did you live in a

17  different area?

18     A.   No, that's the home that we grew up in.

19     Q.   And is that, in relation to the town of Kodiak

20  and as you considered it growing up, was it rural?

21     A.   Relatively rural, yes.  It's about 15 or

22  20 minutes, I guess would be southwest of the main town.

23     Q.   Could you ride the ATVs and walk to be able to

24  hunt or hike or shoot guns right there at your place?

25     A.   That's correct.

1    Q.  Did that kind of thing go on then during your

2  upbringing?

3    A.  Yes, it did.

4    Q.  Are you familiar -- were you familiar generally

5  growing up, and then even as you became an adult, with

6  the type of firearms that your dad owned?

7    A.  Yes, that's correct.

8    Q.  All right.  Would you have occasion to see those

9  guns as they are kept at the house, used them at times,

10  participate in activities when he was using them?

11    A.  Yes.

12    Q.  I want to show you -- well, first of all, let's

13  back up for a minute.

14       Do you know an individual name John Stein?

15    A.  I do.

16    Q.  How do you know Mr. Stein?

17    A.  Mr. Stein was a family friend for a long time.  I

18  believe my dad and he met in the Coast Guard, and then

19  he was a family friend for years before we moved back to

20  Kodiak and while we were there.  He was on Kodiak when

21  we moved back.

22    Q.  Did you participate in any of these activities

23  that you have been describing with Mr. Stein?

24    A.  That's correct yes.

25    Q.  What kind of thing?

1    A.  Mr. Stein had a Thompson submachine gun.  It was

2  kind of the World War II issued ones, so I remember -- I

3  think it was the 4th of July we would always go over

4  there the week prior and just load ammo, spend hours

5  loading ammo, because that was the plan was 4th of July

6  we'd get the Tommy gun out and then shoot it in the

7  hillside.

8         He was set up for all of that.  The reloading

9  equipment was in Mr. Stein's house.  We could go over

10  and reload with him.  He was a member of the VFW.  We

11  would go and shoot at their range in town, and also on

12  occasion we'd go hunting with him as well.

13    Q.  As you observed it, were your father and

14  Mr. Stein pretty good friends?

15    A.  That's correct.

16    Q.  And how would you describe Mr. Stein as far as

17  being involved with firearms or using firearms, having

18  firearms, those kind of things?

19    A.  He was a gun enthusiast, would be the nicest way

20  to put it.  He had guns pouring out of his safe.  He had

21  a lot of guns.

22    Q.  How about compared to the guns at your house or

23  your family, Mr. Stein apparently had more, more of a

24  gun enthusiast?

25    A.  Yes, much more.

1     Q.  Was Mr. Stein, would you characterize him more as

2  a hunting partner or friend of your father's, or maybe

3  more the recreational shooting or that type of friend?

4     A.  More recreational shooting, but we did go on a

5  few hunting trips with him as well.

6     Q.  Did your dad have other friends that he hunted

7  with --

8     A.  Yes.

9     Q.  -- more regularly?

10     A.  Yes.

11     Q.  And who would those have been?

12     A.  We also hunted with Tim Quinton, who was another

13  Coast Guard friend my dad had met who was also back on

14  Kodiak in 1990 when we moved back.  And then later into

15  it, he met Hank Pennington, and Hank became a regular

16  hunting friend.

17     Q.  Did there came a time when Tim moved away and

18  that sort of transitioned?

19     A.  I know when Tim got out of the Coast Guard, I

20  think he moved to Sisters, Oregon.  I'm not 100 percent

21  sure on that, but he did move off the island.

22     Q.  Were you familiar with or were you aware of

23  whether or not your dad owned a handgun that he used for

24  protection purposes, bear protection or hunting purposes

25  that he carried on any regular basis when he was out?

1    A.  Yes, I'm aware of that gun.

2    Q.  What was that gun?

3    A.  It was a Ruger Blackhawk, kind of black in color.

4  That was the only big bore gun I ever knew him to own.

5    Q.  You personally, since what age and through to the

6  present, how would you describe your sort of firearm

7  knowledge, firearm use, firearm awareness?

8    A.  I would say it's pretty proficient.  Basically I

9  shoot for a living now.  Being a member of the SWAT

10  team, every two weeks we go and train.  One of those

11  training days is a dedicated range day for different

12  weapon systems that we have.

13    Q.  At what age did you start getting to shoot guns

14  and be aware of guns and sort of be around and things?

15    A.  It's back on Kodiak when we used to shoot quite a

16  bit.

17    Q.  Starting at age ten?

18    A.  Or thereabouts.  Pretty close to that.

19    Q.  Could we show Mr. Wells Exhibit No. 193 and 194.

20  Maybe put those side by side.  Defense Exhibit No. 193

21  and 194.

22       Sir, first of all, if we look at the one on the

23  left, which is Defense Exhibit No. 194, do you recognize

24  that?

25    A.  On the left, yes, that appears to be my dad's

1  handgun, that aforementioned Ruger Blackhawk.

2     Q.  All right.  How about what's there on the

3  right-hand side of the screen, Defense Exhibit No. 193?

4     A.  It looks like a belt and a holster.  I know -- I

5  don't recognize the belt per se, but the holster looks

6  like the holster that he had for it.

7     Q.  Do you know how long your dad has had this

8  firearm?

9     A.  I believe he had it before I left, but I couldn't

10  put a date on it.

11     Q.  Okay.  And you said -- and that's fine.  We can

12  take those down.

13        You said that -- you called that a big bore

14  firearm.  How is that in comparison to other guns?  What

15  is it -- what do you consider a big bore?

16     A.  The way I would classify it is for Alaska and

17  other -- it's predator defense.  Your .44s, your .454s,

18  even your .357 Magnum, something that you would use kind

19  of if you're getting mauled by something, kind of

20  attempt to defend yourself.

21     Q.  And did you ever have occasion while you were at

22  the house growing up or since you have left and returned

23  back to Kodiak at times, have you ever seen your dad

24  shoot or have in his possession any other big bore

25  handguns?

1    A.  No, I have not.

2    Q.  How about specifically any stainless steel-type

3  as opposed to a blued gun like that, stainless

4  steel-type handguns?

5    A.  I came home, and I don't remember the date.  He

6  had gotten a new .45.  It was a .45 semiautomatic that

7  was in the safe.  I just asked him, because that was new

8  to me, asked him where he got it.  I think he said he

9  got it on the base or bought it.

10    Q.  There was a time where, after you had left, he

11  acquired -- you said it was a .45?

12    A.  Yeah, I believe it was a .45 semiautomatic.

13    Q.  That would have been an automatic pistol as

14  compared to -- what was the one that -- his other big

15  bore gun?

16    A.  The Ruger Blackhawk is a single-action revolver,

17  and then obviously the .45 was, I think it was a chrome

18  or silver semiautomatic, so magazine fed versus having a

19  cylinder on it.

20    Q.  What do you mean by magazine fed?

21    A.  If you're familiar with like the Hollywood guns,

22  just the magazine goes in the bottom of the gun, the

23  slide works on top, and then every time you press the

24  trigger, the gun cycles and it loads a new round out of

25  the magazine.  Versus the single action, once you press

1  the trigger, you actually have to cock the hammer again,

2  rotate the cylinder and bring a fresh round up.

3      Q.  That's the way his Ruger revolver operated?

4      A.  That particular one, yes, it's a single action.

5      Q.  And so other than the single-action revolver and

6  the later .45 automatic, did you ever know your dad to

7  own, have, possess any other big bore guns?

8      A.  No.

9      Q.  Were there also long guns in the house, different

10 types of both shotguns and rifles that he owned?

11     A.  That's correct.

12     Q.  Were those -- how would you describe those,

13 sporting in nature?

14     A.  He had hunting rifles, and then I think there

15 were a couple Remington .870 shotguns.

16     Q.  You said you took up, at some point later on, you

17 took up duck hunting?

18     A.  Correct.

19     Q.  Do you have a recollection of Mr. Stein leaving

20 Kodiak and moving any belongings over to your parents'

21 house?

22     A.  I think the gun safe came over at some point, but

23 I couldn't tell you when that was.  And then whether any

24 of his other belongings came over.  I don't have a clear

25 memory of any of that stuff.

1    Q.  Okay.  But the gun safe came prior to 1998 before

2    you left the island?

3    A.  I believe so.

4    Q.  And even after Mr. Stein's gun safe was at the

5    home, did you have occasion to use or ever see your dad

6    use any of the firearms that belonged to Mr. Stein when

7    Mr. Stein was not present?

8    A.  No, not that I can remember.

9         MR. COLBATH:  If I can just have one second,

10   Your Honor?

11        THE COURT:  Certainly.

12        (Pause)

13        MR. COLBATH:  Sir, that's all the questions I

14   have for you at this point.

15        THE COURT:  All right.  Mr. Skrocki?

16        MR. SKROCKI:  No questions.

17        THE COURT:  Thank you, sir.  You may be

18   excused.

19        (Witness excused)

20        THE COURT:  Your next witness, Mr. Colbath.

21        MR. COLBATH:  Your Honor, I'm going to have to

22   check.  Could I suggest we take a brief comfort break

23   and I'll check and see what I have got available.

24        THE COURT:  Certainly, let's do that.  We'll

25   take until 10:30.  Please leave your notepads here.

1    Remember my admonition not to discuss the case.  We'll

2    go off record.

3           (Recessed from 10:17 a.m. to 10:29 a.m.)

4           (Jury absent)

5           DEPUTY CLERK:  All rise.  Her Honor, the Court,

6    the United States District Court is again in session.

7           THE COURT:  Please be seated.  And I was

8    informed there was an issue to bring up.

9           MR. COLBATH:  Not really an issue, Your Honor.

10   I just simply wanted to advise the Court that witnesses

11   that we're going to call next are apparently not here

12   yet, so what I'm going to do is call Mr. Wells.

13          THE COURT:  All right.

14          MR. COLBATH:  So I didn't know if the marshals

15   needed that advisement, or if anybody needed to move

16   around.

17          THE COURT:  Well, what's --

18          MR. COLBATH:  I don't have any preference.  I

19   just didn't want everybody to jump up if I announced

20   that and shuffle all around.

21          THE COURT:  I appreciate the heads-up.  What's

22   the proposal?

23          U.S. MARSHAL:  Your Honor, we could have Mr.

24   Wells go ahead and take the witness stand for when the

25   jury comes in, he will already be sitting there.

```
 1            THE COURT:  All right.  And then where would
 2   the marshals propose to be seated?
 3            U.S. MARSHAL:  Your Honor, I would be in that
 4   chair right there next to him.
 5            THE COURT:  Any objection?
 6            MR. COLBATH:  However we need to do it, that's
 7   why I brought it up.
 8            THE COURT:  I appreciate it.  So why don't you
 9   and Mr. Wells get in those positions now, and then we
10   can bring the jury in.
11            (Pause)
12            THE COURT:  Go ahead and have a seat, if you
13   would, and then she'll bring in the jury and we'll go
14   from there.
15            (Pause)
16            (Jury present)
17            THE COURT:  Please be seated, everyone.
18            Mr. Wells, if you could remain standing, the
19   clerk will administer an oath to you.
20            (Oath administered to defendant)
21            DEPUTY CLERK:  For the record, can you please
22   state your full name and then spell your full name.
23            THE DEFENDANT:  James Michael Wells, J-a-m-e-s,
24   M-i-c-h-a-e-l, W-e-l-l-s.
25            THE COURT:  Go ahead, please.
```

                    JAMES MICHAEL WELLS, DEFENDANT, SWORN

                         DIRECT EXAMINATION

BY MR. COLBATH:

    Q.  Thank you, Your Honor.  As the Court can see,

Mr. Wells is our next witness.

        Jim, did you shoot Rich Belisle?

    A.  No, I did not.

    Q.  How about Jim Hopkins, did you shoot Jim Hopkins?

    A.  No, I did not.

    Q.  I want to back up to -- let's start when you

began your military career, what -- how did that happen?

    A.  Well, it was -- I thought about it in 1969 after

I graduated from high school.  I started junior college.

Then for some idiotic reason, I enlisted on

December 31st, 1969, New Year's Eve, basically.  So I

joined the Navy is what I did.

    Q.  You joined the Navy.  Now, that would have been

during the Vietnam conflict?

    A.  Yes.

    Q.  And so upon entering the Navy, where did you go?

    A.  I grew up in San Diego, so I went to boot camp in

San Diego, California.

    Q.  How about after boot camp?

    A.  I stayed in San Diego for a six-week preparatory

what they call a beep school.  It was basically

electronics and electric principles.  And after that I
went up to the San Francisco Bay area when at the time
the Navy owned Treasure Island, which is an island in
the middle of San Francisco Bay.  And that was where the
ETA school was.

Q.  As you started your Navy career, did the Army try
to snatch you up?

A.  Yes.  While I was in boot camp, I got my draft
notice.

Q.  So you would have ended up in the military
whether you had signed up or not?

A.  One way or the other, yes.

Q.  You said up in the San Francisco area, that's
where the -- I didn't the hear acronym or the initials,
but the ETA school?

A.  It's electronic technician school.  And it was --
an "A" school is the basic school.

Q.  And did you go to that school?

A.  Yes, I did.

Q.  To do what?

A.  Learn about -- more about electricity,
electronics.

Q.  Growing up as a kid and prior to that time in
your life, had that -- had electronics and those types
of things, mechanical-type things been something you had

1  been interested in?

2      A.  Oh, very much so.

3      Q.  So how long was the ETA school?

4      A.  Originally, or for everybody basic, it's six

5  months.  If you extended your enlistment, they would

6  give you an additional six months.  So my choice was go

7  out into the fleet as an SNET, or a third-class petty

8  officer.  So I extended the additional two years and

9  went the additional six months of school.  So when I

10 graduated from A school, I was a third-class petty

11 officer in the Navy.

12     Q.  So before going out onto the fleet in the normal

13 rotation, you could increase your level or your standing

14 by staying in school?

15     A.  Yes.

16     Q.  And did you successfully complete that, promote

17 through that?

18     A.  Yes, I did.

19     Q.  What happened after that?

20     A.  I got stationed on the USS Mount Katmai, which

21 was an ammunition ship stationed at Port Chicago,

22 California, which was just outside of Concord,

23 California, on the delta where the bay meets the

24 Sacramento River.

25     Q.  And during your time then immediately thereafter

in the Navy, did you have occasion to be involved in the
war and be on ships that were involved in one way or
another in the process there?

A. Well, yeah. After I got my orders to the Mount
Katmai, it was already overseas in the Philippines. So
I flew out of Travis Air Force Base over to the
Philippines to pick up the ship. I was in the
Philippines for a week, and we went up to Japan for a
week of R&R and then we came back across the pond, back
to the San Francisco Bay area where the ship was home
ported.

Q. So ultimately, how many years were you in the
Navy?

A. 7 years, 11 months, 27 days.

Q. Pretty exact?

A. Well, yeah. Not that I was counting, but that's
what it was, yes.

Q. And generally, just from the time you started on
that first ship up until the end of your Navy career,
what types of things did you do or how were you
involved?

A. Well, as electronic technician, we were
responsible for all the radios, the receivers on board,
all the radio transmitters on board, all the sonars on
board and all the radars on board. And in addition to

1 that I was a crypto tech, and so I worked on the

2 cryptologic equipment that basically coded stuff.

3    Q.  So was most of your electronic technician work

4 and work with those other things that you described done

5 on ships or on Naval vessels?

6    A.  Well, no.  I also was stationed on the shore

7 station, so I just worked on electronics wherever they

8 sent me.

9    Q.  All right.  Why leave the Navy after 7 years,

10 11 months and however many days you had counted?

11    A.  The war had ended.  The Vietnam War had ended.

12 There was a surplus of people in the military.  I had --

13 I was a second-class petty officer by that time.  I had

14 taken the first-class petty officer test four different

15 times, and it was -- passed it but not advanced because

16 there just weren't any billets open.  There was a

17 surplus of people, and they weren't advancing anybody.

18      So as I was preparing to get out of the Navy, I

19 attended a career counseling course just -- they were

20 prepping people for getting out of the -- out of the --

21    Q.  Out of service.

22    A.  -- out of the service.  And I was introduced to a

23 Coast Guard chief that had come over on the COMMSTA at

24 Point Race, California, the Coast Guard COMMSTA.  And he

25 was in this class with me, and he basically recruited me

1   to join the Coast Guard.  And --

2       Q.  So was that -- would have been a normal finish

3   time or an -- at the end of that almost eight years,

4   that was a normal transition where it was either

5   reenlist or get out and move on to a new career, that

6   was a normal breaking point?

7       A.  Yes.  And originally I intended to move up to

8   Spokane, Washington.  My sister lived there at the time

9   and find a -- we had property in the area.  So we had

10  planned to move up there and live.

11      Q.  But this Coast Guard gentleman that you met

12  changed your mind?

13      A.  Well, he got me interested.  And then after I

14  talked to the recruiter, he offered me the COMMSTA at

15  New Orleans or he offered me the Coast Guard Cutter

16  Storis on Kodiak, Alaska.

17      Q.  Had you been to Alaska before?

18      A.  No.

19      Q.  How did that sound?

20      A.  I took the job.

21      Q.  All right.  So when did you join the Coast Guard?

22      A.  That would be February of 1978.

23      Q.  Okay.  So your first assignment was the Coast

24  Guard Cutter Storis?

25      A.  Storis.

1    Q.   Storis?

2    A.   Storis.

3    Q.   In Kodiak.  What did you do on the Storis?

4    A.   I was the junior electronics technician on board.

5    There was a first-class petty officer, and I was a

6    second-class petty officer at that time.

7    Q.   Now, at that time did you move your family --

8    were you married at that point?

9    A.   Yes.

10   Q.   To Nancy?

11   A.   To Nancy.

12   Q.   Okay.  How long -- by the way, how long have you

13   guys been married?

14   A.   We got married in January of 1972.

15   Q.   That was a tactical answer as opposed to the

16   number of years.

17   A.   I get in trouble if I try to name the years.

18   Q.   So that's roughly, 1972 to today, 47 years?

19   A.   To today, yes.

20   Q.   So your family moved to Kodiak, and then you were

21   out on the ship, the Storis?

22   A.   Yes.

23   Q.   Was your work on the Storis initially similar to

24   the work that you had done on the Naval vessels?

25   A.   Yes.

1    Q.  So tell us about the Coast Guard.  Tell the jury

2    about your Coast Guard career, sort of how things

3    progressed as you did your work on the Storis.

4    A.  Storis was, you know, again electronics.  We were

5    tasked with patrolling the Bering Sea in the North

6    Atlantic.  Boarding fishing vessels.  Back in those

7    days, the U.S. only had a 12-mile economic zone.  So the

8    fishing vessels that were fishing in the Bering Sea

9    could basically fish up to 12 -- within 12 miles of the

10   shore.  So there were literally hundreds of foreign

11   fishing vessels out there fishing.

12   Q.  Not just locals or American?

13   A.  No, no.  These were Koreans.  These were

14   Russians.  These were Japanese.  These were Taiwanese,

15   just lots of foreign vessels.  There was -- we printed

16   out an FDR, fleet disposition report, every day, and

17   there was usually over 200 ships on that list every day.

18   Q.  Typically commercial vessels?

19   A.  Commercial vessels, yes.

20   Q.  And so was part of your work then monitoring

21   activities of those, dealing with any problems, boarding

22   those vessels, those kind of things?

23   A.  Yes, we boarded a lot of foreign fishing vessels.

24   Q.  Okay.

25   A.  I was a boarding officer, so I participated in

1  those boardings.

2  Q.  All right.  Now, how did that fit in with an

3  electronic technician position or being involved in the

4  electronics and communications?

5  A.  Well, they were looking for bodies to go on

6  boarding parties.  And since I didn't have regularly

7  scheduled duties, I was volunteered to be on the

8  boarding party.

9  Q.  All right.  And so over time, how long were you

10  on the Storis then?

11  A.  I was on the Storis two years.

12  Q.  And what happened after your time on the Storis?

13  A.  I transferred to the Coast Guard Communications

14  Station on Kodiak.

15  Q.  So that's the COMMSTA, T-1 and T-2 that we've

16  been talking about?

17  A.  We had four buildings at that time.  We had the

18  transmitter site, which was T buildings.  We had the

19  receiver site which had four buildings at that time, or

20  three or four buildings at that time, and we also had

21  the tech control station where the command activities

22  were, where the CO and XO and the officers were

23  stationed.

24  Q.  Were all of those things associated with COMMSTA

25  back at that time off main base?

1      A.  Yes.

2      Q.  And where within that conglomeration of buildings

3  did you work then?

4      A.  I started out at the tech control building.  I

5  was the -- they sent me to microwave school.  Then I was

6  responsible for working on the microwave system that the

7  COMMSTA used.

8      Q.  What do you do at microwave school?

9      A.  You learn how to -- you learn how to fix the

10  microwave, that system that we had.

11     Q.  Which is a system that does what?

12     A.  Microwave system, basically, we have

13  line-of-sight antennas so that we would talk from the

14  tech control building to the transmitter site.  We would

15  talk from -- and we had a re- -- microwave reflector up

16  on Heitman Ridge so we could talk to the receiver site,

17  so -- and then we had a microwave shop that went

18  downtown where it received all our off-island

19  information through Alascom.

20     Q.  So how long from that point on your -- your

21  tending to and dealing with the microwave

22  communications -- progress us through your time in the

23  Coast Guard of the assignments that you traveled through

24  following.

25     A.  As I transferred off the Storis, I had made first

class by then.  So I reported to the COMMSTA as a first
class.  Put my required two years in as first class, and
then I made chief in December of 1982.

Q.  How was that as an accomplishment, making chief?

A.  Oh, that was a tremendous accomplishment.  That's
what you strive for as an enlisted person is to make
chief.

Q.  After making chief in 1982, what was the next
phase?

A.  I was transferred to the receiver site as the ET
in charge of operations at the receiver site.

Q.  How long did you run the receiver site or be in
charge of the receiver site?

A.  About a year and a half.

Q.  And then what?

A.  Then I transferred to -- I got orders to COMMSTA
San Francisco.

Q.  So you left Kodiak for a period of time?

A.  Yes.

Q.  How long were you down in San Francisco?

A.  Four years.

Q.  Doing similar work?

A.  Very similar, because it was a COMMSTA, so we
had -- everything that we had in Kodiak we had in San
Francisco, only less of.

1    Q.   Same type of -- you served there in San Francisco

2    as the chief?

3    A.   Yes.  It was actually -- we were actually up

4    north of Marin County in Point Race station.

5    Q.   After San Francisco, you said you were there four

6    years, so it's about 1980 --

7    A.   '87.

8    Q.   '87?

9    A.   Yes.

10   Q.   All right.  What happened then?

11   A.   I got transferred to Seattle.

12   Q.   To another COMMSTA or --

13   A.   To base Seattle at the -- oh, it was -- started

14   out as the ship repair detachment, SRD.  It's changed

15   its name three or four different times while I was

16   there.

17   Q.   How long were you there?

18   A.   Three years.

19   Q.   And during that time, and maybe it's prior, but

20   at some point in that timeframe, you had been in the

21   Coast Guard about at that point 12 years, 10 to

22   12 years?

23   A.   No, at that point it would have been nine years.

24   Q.   Did there come a time where you had some medical

25   episodes or medical incidents that started causing you

1  problems?

2      A.  Yes.  Week after we moved to Seattle area, I had

3  my first anaphylactic attack.

4      Q.  What happened?

5      A.  Well, I didn't know what it was at the time, so I

6  thought it was just normal allergies.  So I laid down in

7  the bedroom, put a warm washcloth over my face to

8  breathe through to filter the air, because that's

9  usually what I do to relieve an allergy attack.  Only it

10  didn't go away.  It got worse.

11      Q.  Ultimately, what happened or what did you --

12      A.  We ended up calling 911.  My wife took me to the

13  closest medical treatment facility, and I got treated

14  for the anaphylaxis.

15      Q.  So over the next year or so, were there episodes?

16  Were there incidents?  Did you try to treat and figure

17  out this condition?

18      A.  Yes.

19      Q.  I want to show you what -- I want -- can we show

20  him Defense Exhibit No. 185.  Blow that top half up.

21          So what happened, Jim, relative to the Coast

22  Guard and the medical condition that you discovered you

23  had?

24      A.  Well, in the summer of 1989, I got orders to the

25  Coast Guard Cutter Polar Sea.  I was on the list to make

E-8.  I was above the cut, so I was going to kind of get
a pass to an E-8.

Q.  That would have moved you from chief to what?

A.  Basically E-7 to E-8.  I'd still be a chief, but
I'd be a senior chief.

Q.  Okay.  So you had received that.  That was in
process, and you were also going to go out to sea?

A.  Yes.

Q.  All right.  And then what happened?

A.  So as part of my reporting on board, I checked in
with the medical department and I handed them my EpiPen
and said, "I need to renew this."  And he looked at me
and he says, "You what?"  And within ten days, I was
transferred off the Polar Sea.

Q.  How did your anaphylactic condition relate to not
being able to go out to sea?

A.  Prudently, the skipper decided he didn't want
somebody that might go into anaphylactic shock on the
ship in the middle of the ocean.

Q.  They might not have had, depending on the
situation, the ability to treat you?

A.  Correct.

Q.  So instead of -- were you reordered, or was there
something --

A.  I was transferred to the base, back to the base

1    Seattle at Pier 36.

2        Q.  Does that start the process then of your exit

3    from the military?

4        A.  Yes, it did.  They started the process, what they

5    call a medical board.

6        Q.  What we were just looking at, that was the end

7    result of the medical board?

8        A.  Yes.

9        Q.  Now, by the time the medical board was complete

10   and you had -- ultimately, that led to a medical

11   discharge?

12       A.  Correct.

13       Q.  And you had what amount of military active

14   service at that time?

15       A.  Fortunately, when they started the medical board,

16   I already had 18 years service in.  So they gave me the

17   option, I put in a letter to request to serve my

18   20 years and retire with 20.

19       Q.  And that request was granted, so you --

20       A.  So I stayed the 20 years.

21       Q.  And you stayed on land or on base during those

22   last couple of years so --

23       A.  Basically, the last 18 months, yes.

24       Q.  So when did you get out of the Coast Guard active

25   duty?

 1      A.   April 24th, 1990.

 2      Q.   Where was your home -- where did you consider

 3 home base, although you were moving around active

 4 military?

 5      A.   Kodiak, Alaska.

 6      Q.   From your prior time on the Storis and then

 7 the -- just stationed at the COMMSTA up there?

 8      A.   Yes.

 9      Q.   Did you still have property up there?

10      A.   No.

11      Q.   So when you get out, down in Seattle, you get out

12 of active duty, where do you go?

13      A.   I went back to Kodiak.

14      Q.   Nancy, your children?

15      A.   Yes.  I had three children by then, so we hopped

16 in a van and took the Alcan back to Alaska.

17      Q.   And what was the plan?

18      A.   I had talked to people that were in Kodiak, and I

19 personally knew the EO of the COMMSTA at that time.  It

20 was a warrant billet at the time.  He used to be my

21 neighbor when I lived on base in Kodiak.  They had a

22 civilian rigger.  He retired in 1988.  And they were

23 having a lot of problems maintaining the antenna, so

24 they were going to readvertise and rehire a civilian to

25 be the antenna mechanic.  So he made me aware of that

1    position, and I thought that was a dream job for me.

2       Q.   Okay.  So did you continue to have or deal with

3    the anaphylactic shock and the allergy condition that

4    you had?

5       A.   Yes.

6       Q.   Did you have -- have you had just medically other

7    historically medical conditions?

8       A.   Well, I had continued problems with my knee.  I

9    had knee surgery in 1978 when I tore the meniscus.  And

10   I've had continuing back problems and --

11      Q.   Can we look at defendant's Exhibit No. 133.  Blow

12   that top half up maybe.

13           As you left active service, did there come a time

14   when you were awarded, because of the conditions you

15   had, some small amount of disability or an amount of

16   disability based on ongoing medical issues?

17      A.   Yes.

18      Q.   And we see here, the top is the back problems?

19      A.   Yes.

20      Q.   Okay.  Have you had knee surgery?

21      A.   Three times, yes.

22      Q.   And then tinnitus, when did that develop?

23      A.   That had developed probably mid-career, in my

24   combination Navy and Coast Guard career.

25      Q.   And is that something that has continued since

1    that time?

2        A.   Yes.

3        Q.   We can take that down.

4            In addition to those conditions, how about other

5    medical more longstanding or chronic-type things you

6    have dealt with?

7        A.   Well, during -- after I retired, I was noticing

8    symptoms of being thirsty and having to urinate

9    frequently, and so I had made an appointment with the VA

10   in Anchorage.  It was there that we basically -- it was

11   decided that I was Type 2 diabetes.

12       Q.   And so how have you managed and how long have you

13   managed your diabetes condition?

14       A.   Initially, very poorly.  I basically ignored it.

15   Conditions got worse, and then I decided, well, I better

16   do something about this, because my health was

17   deteriorating.

18       Q.   So how -- how have you managed it over the years?

19       A.   Basically, I've been fairly faithful in taking my

20   meds and my daily insulin injections.

21       Q.   When you got your -- so when did you start as an

22   antenna mechanic with the COMMSTA?

23       A.   That would be September of 1990.

24       Q.   And you were hired as a civilian at that time.

25   Your medical conditions that kept you out of the Coast

1  Guard or got you out of the Coast Guard apparently did

2  not prohibit you from joining the civilian workforce for

3  the Coast Guard?

4       A.   No, I was unfit for service in the active duty

5  Coast Guard, but I could go anywhere as a civilian, as a

6  Coast Guard civilian.

7       Q.   What does an antenna mechanic do?

8       A.   As pertains to the Kodiak area, I was responsible

9  for the maintenance of the antennas, the antenna field,

10  the erection or dismantling of antennas.  I was also a

11  17th Coast Guard District asset, so I was made available

12  to travel throughout the 17th Coast Guard District to

13  assist in other units maintaining their antennas.

14       Q.   How did your work, the inside communications work

15  or the work on the ships and the electronics work relate

16  to the antenna work?

17       A.   Even on board ship, we were responsible for the

18  radars and the antennas on the ship.  So we would have

19  to climb the mast to work on radars, antennas or the

20  antennas that were mounted on the mast or various

21  portions of the ship.  So I had climbing experience

22  already, because you have to climb the mast in order to

23  work on stuff.  So I was familiar with that.

24            Lots of electronic experience.  So several of our

25  antennas had electronic controls to move them, so they

were rotatable, so I was familiar with that equipment.
I had done cabling work.  Any time you install a new
antenna, then you have to run a cable.  So I was
familiar with running cable and making the connections,
putting the connectors on.

Q.  So lots of crossover or lots of one leads to the
other or works with the other?

A.  Yes.

Q.  How is -- tell the jury how a rigger's job is
different than an antenna mechanic's job.

A.  The rigger's job is basically to assist the
antenna mechanic.  Mainly more ground support than
height support.

Q.  Is climbing done alone ever?

A.  When I first started off, yes, it was.  Okay.
And then through various discussions that I had
throughout the Coast Guard, we decided that we needed to
change the tower manual and require that there be at
least two people available to climb.

Q.  And the rigger's position, that was also a very
active climbing position and --

A.  Yes.

Q.  -- very involved?

A.  Yes.  Part of that job requirement was the
ability to climb.

1    Q.  How many times have you been, say, 100 feet or

2    more in the air working?

3    A.  I would probably -- it's more than over 1,000.

4    Q.  How about 300 feet?

5    A.  That would probably be, say, 500 to 1,000.

6    Q.  Okay.  What's the highest towers you've worked on

7    or served helping the Coast Guard?

8    A.  The highest tower I've climbed would be

9    1,358 feet.  It was a Coast Guard LORAN tower at Port

10   Clarence, Alaska, which is about 75 miles north of Nome.

11   At one point it was the tallest structure in Alaska.

12   Q.  So it was about a quarter mile tall?

13   A.  Yes.

14   Q.  And describe for the jury what it's like to work

15   at the height of 100 or more feet dealing with

16   conditions, with other people, things like that.

17   A.  Well, one of the first things you'll notice when

18   you get above, say, 50 to 75 feet is the wind speed.

19   You can have 0 to 10 miles an hour on the ground, and

20   you get up 100 feet and it can be blowing 30 to 40 miles

21   an hour, and you wouldn't know it by standing on the

22   ground.

23        So one of the things you have to be very --

24   extremely careful about when you're climbing is

25   overexerting yourself.  You have to be very methodical

1    when you're climbing to go slow.  Because what you don't

2    want to do is break a sweat and then when you get to

3    where you're going to do your work, then you're going to

4    be stationary and you're going to cool off and you'll

5    end up getting hypothermic.

6        Q.   How about managing conditions that you don't

7    expect when things -- ropes slip, things break, a wind

8    gust comes, how does all of that work?

9        A.   Well, one of the things that we stress and we

10   practice is you're always attached to the tower, one way

11   or the other.  Normally, the Coast Guard towers, we have

12   a center rail where we have a slider that goes on, and

13   so you're attached to the tower that way.

14            But once you get to the height where you're going

15   to do your work, you basically have a lanyard, a Y

16   lanyard, so you'll unclip your clip on the lanyard,

17   disconnect from the slider, and then you can roam about

18   the tower and do your work.  But you're always attached

19   to the tower.

20       Q.   So as part of your climbing, once you became

21   qualified and worked into the antenna mechanic position,

22   did you become a qualifier and a trainer?

23       A.   Yes.

24       Q.   How many people over the course of your time at

25   the COMMSTA would you say you qualified to climb?

1        A.   It would be approaching the thousands.

2        Q.   And have you had to I guess deal with dangerous

3    situations and others up there or just people that had

4    more difficulty climbing or difficult experiences up at

5    those levels?

6        A.   Well, as part of an initial training purpose to

7    teach somebody to climb, you have to trust your

8    equipment first.  So the first thing we do with a new

9    climber is we have them climb about four or five feet

10   and then we have them let go.  They take their hands and

11   their feet off the tower so they're just hanging by

12   their harness.

13        Still attached to the safety reel, but they need

14   to know that their harness is going to save them.  You

15   have to trust your equipment.  If you don't trust your

16   equipment then you're not going to be a very safe

17   climber.  So that's our first mission is to get

18   everybody to trust your equipment.

19        Q.   So have you had -- have you had people I guess,

20   for lack of a better word, freak out up there or panic?

21        A.   I've only had a couple people panic, but lots of

22   people freak out, yes.

23        Q.   How do you deal with that?  Well, first of all,

24   how did you personally develop to be able to deal with

25   that, just operating at those levels?

1    A.  I've never been afraid of heights.  Never been an

2    issue for me.

3    Q.  When others have issues, how, as the person in

4    charge, do you deal with that?

5    A.  You have to stay calm.  That's the very first

6    thing you must do is be calm, and then you start talking

7    to them and get them to not think about how high they

8    are.

9    Q.  All right.  What would you say is one of the most

10   significant keys to successful safe climbing?

11   A.  Trust.  First --

12   Q.  Trust; how so?

13   A.  First, you're going to trust your equipment, that

14   it's there to protect you and save your life.  And then

15   secondly, if you're climbing with somebody you have to

16   have trust in them also.

17   Q.  Why is that important?

18   A.  The Coast Guard instituted a -- climbing with a

19   buddy.  Any time you're over 100 feet in the air, you

20   must have a climber within 100 feet of you.  So if you

21   go up 100 feet, you can have somebody on the ground.  If

22   you go up 101 feet, then you have to have another person

23   on the tower with you.

24         And so that person is your safety buddy.  If

25   something happens to you, he's the one that's going to

1   rescue you.  And if something happens to him, I would be

2   the one that would rescue him.

3       Q.  So if we focus on your last several years at the

4   COMMSTA, who was that person for you?

5       A.  For me, it was Rich Belisle.

6       Q.  And how did that -- well, let's -- how did that

7   develop or tell us -- tell the jury about that.

8       A.  We had a previous rigger helper who was a retired

9   Coastie and he decided that he didn't want to work in

10  that job any longer, and so we were going to readvertise

11  for that position.  And I had known Rich off and on, you

12  know, because he was stationed on the Storis also and I

13  knew him as -- when he was chief of police or chief in

14  charge of the Coast Guard police in Kodiak.

15      Q.  That would have been while he was still active

16  duty?

17      A.  Yes.

18      Q.  And you were on Kodiak as well?

19      A.  Yes.

20      Q.  All right.  And so what happened?

21      A.  Basically, I knew ahead of time that we were

22  going to advertise for the position.  So I went down

23  where he was working in town, at Cy's Sporting Goods and

24  walked in and said, "Hey, Rich, they're going to

25  advertise the rigger's job.  If you're interested, I'll

1  give you the heads-up, get your application in."

2      Q.  He had left the Coast Guard, left his chief

3  position and retired from the Coast Guard at that point?

4      A.  Yes.

5      Q.  And was working where?

6      A.  He worked various -- a couple different places.

7  I know he worked on a barge unit, I think.  And then he

8  worked at Cy's, at one of the local sporting goods

9  stores.

10     Q.  And he was hired then?

11     A.  Yes.

12     Q.  Once he was hired for the rigger position, how

13 did -- how was that compared to the person he replaced?

14     A.  Rich was much more knowledgeable in the rigging

15 portion of our job.  He had been a retired boatswain's

16 mate chief, so part of his responsibility was working

17 with the deck force on ships.

18     Q.  As he began his work in the -- at T-2 and in the

19 rigger shop, how did you find that your knowledge and

20 your work as an antenna mechanic and his knowledge with

21 the rigging and the rigger position, how did that seem

22 to work?

23     A.  I felt that we complemented ourselves

24 or complemented us very nicely.  We meshed very nicely.

25     Q.  You struggled with a couple of those words.  You

1   have dental issues?

2       A.  Yes, I do.

3       Q.  And what's that -- so what's that cause, I guess?

4       A.  Well, I've had all my teeth removed, and I'm

5   still waiting to receive dentures.

6       Q.  Okay.  So you struggle with some of those --

7       A.  I have trouble forming words.  I have to -- I

8   struggle with it, yes.

9       Q.  Okay.  So you said yours and Rich's knowledge

10  complemented each other.  And how did you find that work

11  as far as solving problems and doing the jobs necessary

12  at the rigger shop?

13      A.  We worked very well together.  And the nice thing

14  about that was I could trust him, even if he wasn't on

15  the tower with me.  We always had problems with having

16  the people on -- the support people on the ground

17  knowing what to do and how to do it.  Because we just

18  had people from the shop to work with, and these were

19  untrained people.  So it was hard to conduct training

20  while we're actually doing the work.

21      Q.  Did you ever have questions about Rich not

22  knowing what he's doing or not trusting what he's doing?

23      A.  I won't say not knowing what he was doing, but he

24  was inexperienced in several areas.  So it was just a

25  question of him learning.  They're new experiences, so

1    he had to learn from them.

2        Q.    The antenna --

3        A.    There was never a question of not trusting him,

4    no.

5        Q.    Okay.  And he became a regular climber?

6        A.    Yes.

7        Q.    And somebody that also qualified people and

8    trained people with you?

9        A.    Yeah, eventually, he got his certification as a

10   trainer.

11       Q.    And you and he climbed regularly?

12       A.    Yes.

13       Q.    And what was that -- well, what other activities

14   regularly as part of the job were you engaged in with

15   him?

16       A.    We traveled to different areas throughout the

17   Coast Guard doing training or doing antenna inspections.

18       Q.    And that was over how many years or what period

19   of time?

20       A.    Basically, after he got hired, I mean, I had

21   always traveled to other units to do work, and then once

22   he got hired and he -- he would travel with me.

23       Q.    And how did you find that the two of you -- was

24   your work -- when you were away and either training or

25   working on other facilities and locations, same

1  relationship and same working together as it was working

2  at the COMMSTA?

3      A.  Yes.

4      Q.  While we're talking about people at the rigger

5  shop, let's just talk about the other folks that you

6  worked with.  How about -- how about let's talk about

7  Mr. Hopkins next.  When did you -- did you know Jim

8  Hopkins before he came to work at COMMSTA?

9      A.  No.

10     Q.  You hadn't had any either Coast Guard or personal

11  experience with him?

12     A.  No.

13     Q.  You know, before I leave Mr. Hopkins, I want

14  to -- I want to think about Mr. Belisle for a minute and

15  ask you one more thing.

16         Did you and him outside of work socialize

17  together?

18     A.  No.

19     Q.  If you had the trust and close working

20  relationship, why not have the outside --

21     A.  We had different lifestyles.  He still had

22  children living at home with him.  Mine were, you know,

23  out of the house, not even in Kodiak anymore.  I'm not a

24  big socializer.  I have -- you know, don't go out and go

25  to clubs or bars or anything like that to meet friends

1    or anything like that.  So I had a select -- select

2    friends that I dealt with.

3        Q.  A couple of close hunting and fishing buddies

4    mostly?

5        A.  Yes.

6        Q.  And not much more than that?

7        A.  No.

8        Q.  So just different social circles, no other

9    reasons to not be together?

10       A.  No.

11       Q.  But at a work environment, was he a work friend,

12   a work -- a co-worker, an important co-worker?

13       A.  Extremely important co-worker.

14       Q.  Mr. Hopkins, I asked you about him.  You had not

15   known him before he came to the rigger shop?

16       A.  No.

17       Q.  And he came in as the -- for the active-duty

18   folks there, the shop supervisor right at the beginning

19   of his -- that's where he started within the rigger

20   shop?

21       A.  Yes.

22       Q.  And as you met and got to know him, did he have

23   similar-type experience that either you or that Rich had

24   in dealing with the things that the rigger shop dealt

25   with?

```
 1      A.   I don't think he had any experience with -- or

 2   very little experience with antennas before.  He used to

 3   be -- if memory serves me correctly, he was a sonar man.

 4   And then when they did away with that rate, he converted

 5   to an ET.  So his background was different than the

 6   normal electronics technician.

 7      Q.   And had that position, the position he moved

 8   into -- do you remember when that was?

 9      A.   Oh, 2010.

10      Q.   And prior to 2010, had that -- had you had other

11   folks in that position at different times?

12      A.   Yes.

13      Q.   How many, while you had been at the rigger shop?

14      A.   Well, that would have been close to 20 years by

15   then, 19 years.  There were a number.

16      Q.   Okay.  And when Mr. Hopkins came in, how did you

17   find him as a co-worker or to work with?

18      A.   He was good to work with.  His management style I

19   thought at times was a little gruff.

20      Q.   Okay.  How so?

21      A.   He tended to treat the non-rates as -- oh, he

22   just treated them different than, say -- than petty

23   officers.

24      Q.   If you had to say your biggest disagreement with

25   Jim Hopkins, what was that generally?
```

1    A.   Generally, his language around -- in the shop.

2    Q.   And why was that -- it was my word disagreement.

3  But what about the language --

4    A.   Well, he swore a lot.

5    Q.   And when -- other work-related issues with Jim?

6    A.   Not really, no.

7    Q.   Okay.  He was how old compared to you?

8    A.   Maybe 15 years younger.

9    Q.   Kids at home?

10   A.   He had one son at home.

11   Q.   So did you and him develop away from work

12  interests together or any activities outside of work?

13   A.   Just the occasional COMMSTA, you know, morale

14  gatherings that we would attend.

15   Q.   But again, those were sort of put on by the Coast

16  Guard or work-related functions?

17   A.   Yes.  But no, no socializing other than, you

18  know, through that or at work.

19   Q.   Okay.  In 2012, the 2012 timeframe after

20  Mr. Hopkins had been there for a couple of years, did

21  you have any awareness of what his plans were after

22  COMMSTA?

23   A.   He planned to retire.

24   Q.   How was it that you were aware of that?

25          MS. STEVENS:  Objection, Your Honor.

1          THE COURT:  Mr. Colbath?  It sounds like you're

2    seeking -- are you seeking hearsay?

3          MR. COLBATH:  Well, let me ask you a different

4    question, and I'll try to avoid that.

5          THE COURT:  Go ahead.  Rephrase.

6    BY MR. COLBATH:

7    Q.  Obviously, Mr. Wells, you've been here throughout

8    the testimony in the case.  Do you recall Master

9    Sergeant -- well --

10   A.  Master Chief Lowdermilk.

11   Q.  Master Chief Lowdermilk.  That's who I was

12   looking for.  I don't have my Coast Guard -- despite all

13   of this study, I don't have my Coast Guard hierarchy

14   correct.

15        Did you hear Mr. Lowdermilk discuss an e-mail

16   exchange he had with Mr. Hopkins about a retirement

17   letter or something along those lines?

18   A.  Yes.

19   Q.  And were you aware of those things going on?

20   A.  Yes.

21   Q.  And that was April of 2012?

22   A.  Yes.

23   Q.  Were you aware of whether or not Mr. Hopkins had

24   bought, purchased any vehicles or anything in

25   anticipation of leaving the Coast Guard?

1    A.  Yes.

2    Q.  And that had occurred by April --

3    A.  Yes.

4    Q.  -- to the best of your recollection.  Okay.

5        Let's talk about some of the other folks in the

6  shop.  We've heard from all of these folks that

7  testified, but how about Mr. Beauford, what was your

8  working relationship with him or what do you remember

9  about Cody Beauford?

10   A.  He was younger than my kids.  And he was -- he

11  was very young.

12   Q.  All right.  Anything particular stand out to you

13  about him, other than this young, you know, young age

14  and I suppose very green?

15   A.  Very green.  He was a little goofy, but that just

16  added laughter in the shop.

17   Q.  How regular throughout the -- you were at the

18  COMMSTA how many years?

19   A.  As a civilian?

20   Q.  Yeah.

21   A.  22.

22   Q.  And how many non-rates and 19-year-olds had you

23  dealt with during that time?

24   A.  Hundreds.

25   Q.  All right.  And did you find -- did Mr. Beauford

1  particularly stand out, any reason or not?

2      A.   No.

3      Q.   How about -- we've heard from some of these other

4  folks, how about Ms. Upchurch, she recently -- she's

5  testified with us here the last day or two?

6      A.   Yes.

7      Q.   What was your relationship with her while she was

8  at COMMSTA?

9      A.   We were friends outside of work.  She was an

10 older non-rate, and she was eager to learn.  You could

11 point her in a direction and tell her to do something

12 and she would -- you didn't have to worry about it after

13 that.  If she didn't know something she would ask

14 questions.  Always eager to learn.

15     Q.   How did it come to be that you developed a

16 relationship with her outside of work?  Did she have

17 family on Kodiak?

18     A.   No, she did not.

19     Q.   How did it come to be that you -- was it just you

20 or your family or who?

21     A.   That was -- well, it was my wife and I, because

22 we were the only ones living at the house.  She was very

23 active outdoors-wise, so we would travel out to

24 Pasagshak.  We would be out there on the seashore

25 collecting stuff.  So we would see her out there.  We

1 got to be friends outside of work.

2     Q.  Okay.  How about Ms. Henry, Leah Henry, we've

3 heard from her.  She was a non-rate, right?

4     A.  Yes.

5     Q.  And how did you find working with her?

6     A.  She was good to work with.

7     Q.  Develop any bonds, relationships with her?

8     A.  Again, we had a social relationship outside of

9 work.  She and Para hung out a lot.  So we would see

10 them together outside of work areas.

11     Q.  The relationship with Para, that fostered or

12 helped with the relationship with Ms. Henry?

13     A.  Yes.

14     Q.  Did you have the two of them to your house?

15     A.  Several different times.

16     Q.  Over the years, had you and Nancy provided

17 assistance to young non-rates that didn't have family on

18 the island, cook for people, loan them things, help them

19 with things?

20     A.  Yes.

21     Q.  Is that a fair characterization of these two

22 young ladies?

23     A.  Yes.

24     Q.  How about Mr. Pacheco, we heard from Nate

25 Pacheco.  He was a non-rate at the time.  Do you recall,

    1    is there anything that stands out about Mr. Pacheco?

    2        A.  He was very good mechanically.  He had prior

    3    experience working on automobiles and doing mechanical

    4    things, so if something was broken and needed to be

    5    fixed, then he would usually want to take first shot at

    6    it.

    7        Q.  And although -- well, did you and him sort of

    8    connect in that way, or did you spend any time with him

    9    on mechanical things?

   10        A.  Well, we worked on stuff at the shop, yes.

   11        Q.  How about outside of work, did you develop

   12    anything with him there?

   13        A.  No.  He was much younger, and he had friends in

   14    town that he would go socialize with.

   15        Q.  Would he periodically bring vehicles to the shop

   16    and work there at T-2?

   17        A.  Yes.

   18        Q.  Were you ever involved in that?

   19        A.  I helped him I think on a couple different

   20    occasions on some problems he had with his Jeep, because

   21    I had previously owned Jeeps.

   22        Q.  How about Mr. Coggins, I think he told us he had

   23    not been there very long and was the new guy?

   24        A.  He was the new guy.  I didn't even know his first

   25    name.  It was either Coggins or new guy.

1    Q.  So not much interaction with him.  He was another

2  non-rate passing through?

3    A.  Yes.

4    Q.  As a civilian, did you supervise anybody?

5    A.  Not directly, no.

6    Q.  And how about Mr. Belisle, did he supervise

7  anybody directly?

8    A.  Not directly, no.

9    Q.  That was the non-rates and the people that were

10  below you.  Now, above Mr. Hopkins was Mr. Reckner.  How

11  about him, we've heard from him as a witness.  What was

12  your relationship with Scott Reckner?

13    A.  I thought it was amicable.

14    Q.  Okay.

15    A.  He had just reported to COMMSTA after having made

16  chief.  He was what we call a new chief.

17    Q.  All right.

18    A.  And so he was basically getting his feet wet, you

19  know, being recently attached to the COMMSTA.

20    Q.  Okay.  And was that an experience you had been

21  through before, having a new chief or having a chief

22  that hadn't -- wasn't something that moved up within

23  COMMSTA, but somebody that came from outside COMMSTA?

24    A.  Yes.

25    Q.  Adjustments there to be made?

1    A.   Yes.

2    Q.   Were there adjustments with Mr. Reckner like

3  there were adjustments in the past?

4    A.   Yes.

5    Q.   How would you describe that?

6    A.   Expectations.

7    Q.   Expectations by who, by him or by you?

8    A.   By both.

9    Q.   All right.  Both sides always live up to those

10  expectations?

11    A.   Hopefully.

12    Q.   Bumps along the road or growing pains?

13    A.   Certainly.

14    Q.   Was that a new experience?

15    A.   No.

16    Q.   Let's move forward -- I want to talk to you real

17  briefly.  There's been testimony about a big -- go

18  ahead.  Get a drink.  There was quite a Coast Guard

19  project on the island of Shemya in 2011.  Do you recall

20  that?

21    A.   Yes.

22    Q.   And did you do work with other rigger shop

23  members and other Coast Guard folks on Shemya in 2011?

24    A.   Yes.

25    Q.   How many times were you out there?

1     A.   In 2001, I went there in March, March 8th through

2    March 16th, and then we went out again in the summer

3    from June 6th to June 14th -- or excuse me, July 14th, I

4    believe it was.

5     Q.   Have you looked at -- back at some of your travel

6    paperwork and travel orders?

7     A.   Yes.  And then in 2010, I made two additional

8    trips out to Shemya.

9     Q.   Okay.  Did there come a time -- that was over the

10   spring and summer, right, those trips?

11    A.   In 2011, yeah, March 2011, and June and July of

12   the same year.

13    Q.   Did there come a time in September when the folks

14   at the rigger shop or many folks went back out to Shemya

15   and you didn't go?

16    A.   Yes.

17    Q.   And why was it that you didn't make that

18   September trip?

19    A.   I had planned on a medical appointment in

20   Anchorage.

21    Q.   Was it a regular checkup, or had you been having

22   problems or what was going on?

23    A.   No.  I was starting to feel the symptoms of being

24   ill.

25    Q.   All right.  Now, in September of 2011, did you

1     travel off the island on the ferry at all?

2         A.   No, I did not.

3         Q.   How did you go -- how did you attend those

4     medical appointments?

5         A.   Air travel.

6         Q.   All right.  Did you -- what happened with the

7     medical condition?  What was going on that you said you

8     were starting to feel the effects of being sick?

9         A.   I was starting to get nauseous and having the dry

10    heaves.

11        Q.   And what was happening or how were you dealing

12    with that?  What effects was it having?

13        A.   There were times when I couldn't work.  Any type

14    of physical exertion would cause me to get the dry

15    heaves.  And I would start coughing and I would start

16    dry heaving, and I just couldn't do any work.

17        Q.   At the time, did you understand what was going

18    on?

19        A.   No.

20        Q.   Did you associate it with eating food or taking

21    food at all?

22        A.   Yeah.  It seemed -- you know, it would --

23    symptoms would increase after I ate.

24        Q.   Can we show Mr. Wells Defense Exhibit No. 168.

25             So did you -- you said that was September, really

that first trip up to Anchorage to begin dealing with

your medical condition.  And did things appear to get

worse?

A.  Yes.

Q.  And so in -- when did -- when did things really I

guess pick up in the fall as far as dealing with the

nausea and the dry heaves, the missing of work?

A.  Well, it got worse in October, continued through

November and December.

Q.  All right.  If we look at this, this is Exhibit

No. 168A, this calendar.  And first let's -- the month

of October it looks like -- or the first couple of

weeks -- let's blow those up.  For the first couple of

weeks here, you were gone all but one day and then in

that second week, only there a couple or three days, the

next week, a couple of days.

Are those mostly illness-related things?

A.  Yes.

Q.  Okay.  And how was it -- going through this had

you had problems that severe at any time in your recent

history before that?

A.  No.

Q.  How about prior to that illness, dealing with

your diabetes and the medications you took for that, had

you had prior dry heave or nauseous problems prior to

1  that?

2     A.  No.

3     Q.  Any other complications?

4     A.  The complications I had with the diabetes

5  medicine was diarrhea.

6     Q.  Other effects on either processing food or

7  gastrointestinal?

8     A.  No, just taking the medicine would cause the

9  runs.

10     Q.  Okay.  And could you manage it by -- over what

11  period of time did that go on?

12     A.  Oh, that was several years.  I had discussed with

13  Dr. Gan, because I know we had a major problem when I

14  went from 500 to 750, because that was just -- that was

15  night and day as far as causing stomach problems.

16     Q.  Was there an adjustment period for you?

17     A.  Usually, yes, any time you change doses.

18     Q.  And did you change how you took the medication or

19  how regularly you took it when those things occurred?

20     A.  Yes.  Sometimes I would omit taking the Metformin

21  just to relieve having diarrhea.

22     Q.  Generally, could you manage it?

23     A.  Generally, yes.

24     Q.  So when this started going on in October, was

25  that -- were those -- was that part of the symptoms, or

1   was this different?

2       A.  No.  I always had a continuous problem with the

3   diabetic medicine, but this was completely different.

4       Q.  Okay.  Did you treat at the VA for it?

5       A.  Yes.

6       Q.  This new condition that was happening starting in

7   October, did the doctors know what was wrong?

8       A.  Dr. Gan didn't, so she referred me to a GI

9   doctor, Dr. Ambasht.  So we started a series of

10  different tests to try and find out what was going on.

11      Q.  Initially were they able to figure out what was

12  going on?

13      A.  Well, not initially, no.  They ran several

14  different tests just to try and narrow it down.

15      Q.  And you continued to treat your diabetes as a

16  separate situation?

17      A.  Yes.

18      Q.  After being gone much of October, there was a

19  meeting that's been testified about, a meeting that you

20  had with Mr. Reckner on November 2nd.  Do you recall

21  that meeting?

22      A.  Vaguely.

23      Q.  Let's do -- see government's Exhibit 35 first.

24          So first of all, Mr. Wells, this is a letter

25  that's been admitted, and it's dated 29 April.  And the

front says it's to Rich Belisle, but if we go to the

second page, it's dated November 2nd and signed by you.

Do you recognize that as your signature?

A. That's my signature, yes.

Q. And you recognize that as a letter that

Mr. Reckner would have given you?

A. Yes.

Q. Now, I want to back up before we talk about this

letter, and although you signed this in November, had

you actually talked to Mr. Reckner before even your

October absences and at sometime earlier about what was

in this?

A. Yes.

Q. So we'll talk about the contents and we'll talk

about what it says here, but is that something you knew

about before November 2nd before you -- the day you

signed the letter?

A. Yes.

Q. Can we go back to the first page.

And first of all, when Mr. Reckner came to you,

do you know when it was that you and he had the actual

discussion about this?

A. Probably sometime in August.

Q. Okay. And so that was a discussion he had with

you?

1    A.  Yes.

2    Q.  And was Mr. Belisle there?  Was Rich there, as

3  you recall?

4    A.  I don't recall.

5    Q.  Were you aware of whether or not Rich had had a

6  similar discussion with Mr. Reckner?

7    A.  Yes.

8    Q.  When you had that discussion with him in August,

9  was this one of the -- this letter dated from April, was

10  this one of the things he talked to you about?

11    A.  Yes.

12    Q.  This was from -- we see it's from WT Reed.  Who

13  was Mr. Reed?

14    A.  He was the engineering officer.

15    Q.  So that would have been somebody -- that would

16  have been Mr. Reckner's supervisor?

17    A.  Yes.

18    Q.  And then also of course in the chain of command

19  well above you?

20    A.  Yes.

21    Q.  And Mr. Reed had authored this, but Mr. Reckner

22  went through it with you, didn't he?

23    A.  Correct.

24    Q.  And it's an EO expectations/clarifications.  What

25  did you understand it to be, the document to be?

1    A.   Basically, they were listing expectations of my

2 work performance.

3    Q.   Okay.  Yours particularly, the civilian job

4 position or --

5    A.   Yeah, it was -- because it was both Rich and I,

6 so it was the civilian jobs at the COMMSTA.

7    Q.   Did the Coast Guard have as you -- were you aware

8 of whether the Coast Guard had its own set of rules and

9 regulations for the enlisted folks to follow?

10    A.   Yes.

11    Q.   Was there a separate set of regulations, like a

12 similar policy manual for civilians?

13    A.   There was a -- there was a civilian policy

14 manual, but it wouldn't have dealt with any of these

15 situations.

16    Q.   Okay.  So here if we can just go to that first

17 section A.

18         So there was a process to identify sick and

19 vacation-type leave?

20    A.   Correct.

21    Q.   Was that a new policy or something new that a big

22 change was made in?

23    A.   No.  That was always the policy, to try and keep

24 your supervisors informed.

25    Q.   And was there a written thing, documentation you

1  had to do to get sick or vacation leave approved?

2      A.  Well, for vacation time, you're usually required

3  to submit it in advance.  Sick leave wasn't always

4  possible to do it in advance, but upon your return, you

5  would, you know, give them the proper paperwork.

6      Q.  So was this a surprise to you at all or

7  information that you hadn't previously had in some

8  respect?

9      A.  No.

10      Q.  The next section I think maybe deals with travel.

11  Now, you indicated you and -- particularly you and

12  Mr. Belisle traveled pretty regular.  Was there a

13  process you went through when you traveled for Coast

14  Guard purposes?

15      A.  Yes.

16      Q.  And what was that, just generally?

17      A.  Generally, there -- a need -- a need would come

18  up, okay, for our service.  Generally, then someone

19  would usually call the XO to inform that they would

20  require our services.  Then the question of who was

21  going to pay for it would come up.

22          And so once that was decided, then a TONO number

23  would be issued.  A travel order number is what that

24  stands for.  So that created the accounting string, so

25  who was going to pay for it.  And then once that was

1    done, a set of orders would be issued.

2       Q.  So sometimes main base would pay for things for

3    COMMSTA?

4       A.  It wouldn't be main base Kodiak.  It would be

5    Juneau or it could be headquarters or, you know, Hawaii

6    or somebody -- you know, just somebody else other than

7    the COMMSTA.

8       Q.  And sometimes the COMMSTA would pay for things?

9       A.  Yes.

10      Q.  All right.  So was this policy of justifying

11   expect to articulate the value of travel to the Coast

12   Guard and permission or approval by the EO, those things

13   new information to you?  Was this new when Mr. Reckner

14   explained this process to you?

15      A.  I won't say it was new, but it was articulated on

16   a piece of paper.  Let's put it that way.

17      Q.  Just do the bottom three there.

18         And this lets you know, that paragraph C,

19   Mr. Hopkins was the shop supervisor and that was

20   generally --

21         MS. SHERMAN:  Objection; leading.

22         THE COURT:  That's sustained.

23   BY MR. COLBATH:

24      Q.  Who was generally the shop supervisor?

25      A.  ET1 Hopkins.

1    Q.  And did anything about Mr. Reckner's letter

2   change that in your mind?

3    A.  No.

4    Q.  Was it a question before you met with -- and went

5   over this with Mr. Reckner?

6    A.  No.

7    Q.  The next paragraph talks about trees dropped

8   during the workday.  And tell the jury about the cutting

9   of trees and how that related to the rigger shop's

10   function.

11    A.  We had -- when the COMMSTA was originally

12   designed, it was pretty much treeless back in the 1940s

13   when it was built.  So over the years, trees have, you

14   know, crept in.  It's happened all over the island.  So

15   we're having trees growing up inside the antenna field.

16          So we need to clear them out, because a lot of

17   times when the wind -- in the winter we get windstorms

18   and they knock the trees over.  So we try and clear out

19   areas where that could happen and remove that threat.

20    Q.  And has that been a process throughout -- was

21   that a process throughout your time at COMMSTA?

22    A.  Yes.

23    Q.  And as the COMMSTA expanded or there was new

24   development, who would be responsible for clearing sites

25   or developing areas where cables would run, things like

1  that?

2       A.   The rigger shop was.

3       Q.   You -- over the years, were you involved in that?

4       A.   Yes.

5       Q.   And so over the time -- as trees were taken from

6  the island or dropped, what was the general practice

7  over the years at COMMSTA?

8       A.   The practice was people could come in after hours

9  and remove wood.  The issue that we had with people is

10 they would take the rigger shop chain saws out without

11 being qualified to use them.  Any piece of equipment

12 that we had, we had a qualification sheet that people

13 had to sign off on.  Okay.

14      So we would have untrained people or unqualified

15 people checking out our chain saws.  So that was the

16 issue that we had with people just taking the chain saws

17 and going out and cutting wood.  It wasn't taking the

18 wood.  It was just using the chain saws without being

19 qualified.

20      Q.   How did you heat your house primarily or at least

21 partially on Kodiak?

22      A.   I had a wood-burning stove, and I also had two

23 oil heaters.

24      Q.   So you used firewood?

25      A.   Yes.

1    Q.  And did you acquire some of that wood from

2  COMMSTA?

3    A.  Yes.

4    Q.  Did you have other places you got wood?

5    A.  Yes.

6    Q.  Where?

7    A.  I had friends that I cut on their property.

8  There was a logging operation going on out at Chiniak

9  and they were hauling logs, and then they were cutting

10  off the tops of them so you could purchase firewood from

11  the logging company.

12    Q.  Okay.  So the letter from Mr. Reckner referred

13  to -- or excuse me, from Mr. Reed, was there anything --

14  any change I guess in the tree availability policy?

15    A.  No.

16    Q.  Had that ever been -- that's okay.  Strike that.

17        Can we see the second page of that, I'm sorry,

18  Exhibit 35.

19        And the information relayed there, Mr. Wells, did

20  the information relayed to you about Mr. Hopkins, your

21  involvement with him, was that of concern to you?

22    A.  No, because over the years, you know, we have

23  mentored, you know, everybody in the shop, whether it

24  was an ET1 or ET2 as the shop supervisor down to the

25  non-rates.

1    Q.   Now, you say "we."  Who do you mean by "we"?

2    A.   Well, me before Rich joined, and then once Rich

3    joined, we continued that mentoring process.

4    Q.   Was Mr. Belisle also a former chief?

5    A.   Yes, he was.

6    Q.   Did you -- you were aware of that?

7    A.   Yes.

8    Q.   And did you see him, physically see him mentor

9    others and work with others?

10   A.   Yes.

11   Q.   That's fine.  We can take that down.

12        Now, during that same meeting, Mr. Reckner also

13   had -- can we see Exhibit 36.

14        Also, during the same meeting, did Mr. Reckner

15   talk to you about this memorandum which was from him,

16   not Chief -- Senior Chief Reed?

17   A.   Yes.

18   Q.   This deals more with trees.  If we could look at

19   that first paragraph.  Now, what was -- you talked about

20   the dropping of trees.  But was there a practice of tree

21   collaring --

22   A.   Yes.

23   Q.   -- on the island?

24        So tell the jury about that, how that developed

25   or how long that had been.

1    A.  I don't know how long it developed, but Rich and

2  I both would collar trees.  They had to come down

3  because they were in the way.  They weren't always

4  necessarily in the antenna field.  We did the same thing

5  along roads that we traveled to widen the path,

6  especially from driving the big line truck, because the

7  overhead would crash into the crane and the derrick.  So

8  we would widen the road at times too.

9    Q.  Okay.  And did Mr. Reckner during the meeting

10  discuss his familiarity or unfamiliarity with tree

11  collaring during this meeting?

12    A.  Yes.

13    Q.  And were you advised of this policy --

14        MS. SHERMAN:  Objection; leading.

15        THE COURT:  That's sustained.  Go ahead.

16  BY MR. COLBATH:

17    Q.  Did you get any information from Mr. Reckner at

18  the meeting about his expectations about tree collaring?

19    A.  Yes.

20    Q.  And what was it?

21    A.  That the practice would cease.

22    Q.  This would have been sometime in August of 2011,

23  right?

24    A.  Yes.

25    Q.  And what happened, at least as far as you're

concerned, with the practice of tree collaring after you

talked to Mr. Reckner about this and received this

Government Exhibit 36?

A.  It didn't happen again.

Q.  Okay.  Could trees still be removed without being

collared?

A.  Yes.

Q.  So was this changing of that practice going to

cause any problems with maintenance or rigger shop work?

A.  No.

Q.  Did you have any particular feelings about the

change in policy or the change in practice?

A.  No.

Q.  And then if we could look at the bottom part,

number three.  More information there.  Was any of those

sections -- I'll just have you review that, Mr. Wells.

Any of the more defined policy here that Mr. Reckner

talked to you about a problem at all in your eyes?

A.  No.

Q.  Anything there that would have affected the

rigger shop's work negatively or prevented you from

doing the things that you and Mr. Belisle and the others

needed to do?

A.  No.

Q.  All right.  I want to ask you about something on

page two of this.  That first -- the first line under D
there.  Do you recall -- I'll just have you review that
section D.  Do you recall Mr. Reckner visiting with you
about that?

    A.  I don't recall it, but since it's in the letter,
then it -- then it happened.

    Q.  Do you recall ever -- now, this refers to you
drafting or submitting a policy.  Do you recall ever
drafting or submitting a policy about tree removal for
COMMSTA?

    A.  No, I did not.

    Q.  And why not?

    A.  I was sick.  And it totally slipped my mind that
I was required to do that.

    Q.  The meeting was in August you said?

    A.  Yeah.

    Q.  And the policy here was supposed to be submitted
by when?

    A.  1 December.

    Q.  All right.  We can take that down.

        So these two letters that Mr. Reckner initially
went over with you, you didn't sign or anything at that
August meeting?

    A.  No.

    Q.  When he -- when he contacted you or talked to you

1  again about these things in November then and had you

2  sign them, was there any new or different information

3  that you recall from your perspective?

4      A.  No.

5      Q.  Anything particularly concerning about signing

6  the letters on November 2nd?

7      A.  No.

8      Q.  How did you feel about the information that

9  either he passed along to you about the policies or

10  about having them now written down?

11     A.  Repeat the question, please.

12     Q.  Sure.  How did you feel about any of the

13  information that he passed along to you or having these

14  things now written down?

15     A.  Well, I can't say I had any particular feelings.

16  It was just the policies were now outlined and I would

17  follow the policies.

18     Q.  Well, was there -- was this a change in your eyes

19  of things being different?

20     A.  Only in as much as they were now written down.

21     Q.  And was the tree collaring, I guess was that

22  different?

23     A.  I'm not sure of the question.

24     Q.  Sure.  There had been tree collaring going on and

25  there had never been discussion or a policy about that,

1  right?

2      A.  Correct.

3      Q.  But now there was, so that was going to be

4  different?

5      A.  Yes.

6      Q.  Was your personal ability to get firewood or

7  access going to be changed by that tree collaring

8  change?

9      A.  No, because I had several other sources to

10  acquire firewood.

11      Q.  So after having these discussions with

12  Mr. Reckner, what was your intention with regard to

13  submitting leave requests or sick leave requests or

14  vacation requests?  Those were covered in there.  What

15  happened with those?

16      A.  I always tried to be timely with them.

17      Q.  Okay.  What was your intention about tree

18  collaring?  I think you answered that, but what happened

19  after the meetings?

20      A.  It wouldn't and didn't occur again.

21      Q.  How about what was your intention about

22  communicating with either somebody at the shop or

23  Mr. Reckner if you weren't going to be there because of

24  your illness or for some other reason?

25      A.  Well, I try and let people know my whereabouts.

1    Q.   What -- what was your usual practice in that if
2    you weren't going to be at the shop, say, some morning?
3    A.   I would usually call Rich because I knew he would
4    be there.  And so -- and 99 percent of the time I would
5    get ahold of him and say, "Hey, I'm not feeling well, I
6    won't be in that morning."  Let people know what's going
7    on.
8    Q.   All right.  Could we go back briefly to
9    defendant's Exhibit No. 168A, that calendar.  Blow those
10   three months up.
11        It looks like, Mr. Wells, other than the middle
12   week here in November, that you were away from work; is
13   that correct?
14   A.   Yes.
15   Q.   During -- and November of 2011.  Where did you
16   spend the Thanksgiving holiday -- I think the underline
17   is the 24th.  Where did you spend Thanksgiving 2011?
18   A.   That was at home.
19   Q.   Why was -- anything special about that?
20   A.   Well, I was too sick to travel, so we had -- all
21   the kids flew in for Thanksgiving that year.
22   Q.   It looks like from that Thanksgiving week, can
23   you see if -- did you return to work at all for the rest
24   of that year?
25   A.   It doesn't appear that I did.

1    Q.  And so how about the Christmas holiday, where did

2    you spend the Christmas holiday of 2011?

3    A.  At my son and daughter-in-law's and my

4    grandchild.

5    Q.  Was that Matthew --

6    A.  No, it was my oldest son, Cable.  They were

7    living at that time in Gustavus.

8    Q.  So you traveled to southeast Alaska here?

9    A.  Yes.

10   Q.  Nancy go with you?

11   A.  Yes.

12   Q.  Were you feeling well enough to travel then?

13   A.  I think by that time, they had me on some

14   heavy-duty nausea medication, so it was -- it was

15   better.

16   Q.  Okay.  Had your medical problem been diagnosed at

17   that point or figured out?

18   A.  Not -- I don't think by that point, no.

19   Q.  So did you spend the entire Christmas holiday in

20   southeast with your oldest son --

21   A.  Yes.

22   Q.  -- and his family?

23   A.  Yes.

24   Q.  That would have included Christmas Eve, Christmas

25   Day, Boxing Day, the next day?

1    A.   Yes.

2    Q.   Do you remember how long you were there?

3    A.   Probably -- at least a week, I think.

4    Q.   And then from southeast, ultimately back to

5  Kodiak?

6    A.   Yes.

7         MR. COLBATH:  Your Honor, I note it is just a

8  few minutes before 12.  It may be --

9         THE COURT:  Is this a good spot?

10        MR. COLBATH:  -- just a normal breaking point

11  before I start a new discussion about January of 2012.

12        THE COURT:  Let's take our lunch break, ladies

13  and gentlemen.  We'll have you back at about 1:05.

14  Leave your notepads here and remember my admonition not

15  to discuss the case.  We'll see you back here.  Have a

16  pleasant lunch.

17        (Jury absent)

18        THE COURT:  All right.  Please be seated,

19  everyone.

20        And Mr. Wells, you can return to counsel table.

21  And anything we need to take up?

22        MR. SKROCKI:  Nothing from us.

23        MR. COLBATH:  Nothing from us, Your Honor.

24  Other than I was looking at my note, and maybe the Court

25  didn't say it yet.  I didn't hear what you said about

1  when we would come back.

2         THE COURT:  1:05 p.m.  Very good.  We'll go off

3  record.

4         DEPUTY CLERK:  All rise.  The court stands in a

5  brief recess.

6         (Recessed 11:54 a.m. to 1:09 p.m.)

7         (Jury present)

8         DEPUTY CLERK:  Court is in session.

9         THE COURT:  Please be seated, everyone.

10  Welcome back, ladies and gentlemen.

11         Mr. Colbath, ready to proceed?

12         MR. COLBATH:  I am, Your Honor.

13         THE COURT:  All right.  Go right ahead.

14  BY MR. COLBATH:

15     Q.  Mr. Wells, I'm going to start by having

16  defendant's Exhibit No. 168A back up.  That's the

17  calendar.  I'm going to show page two of it, Counsel.

18         After being off the month of December, did you

19  continue to be gone in early January?

20     A.  Yes.

21     Q.  Can we blow just that two-months' period there?

22  And so looks like you worked on the 6th and the 20th,

23  back in January.  When you returned to work, did there

24  come a time that you recall talking to Mr. Reckner about

25  upcoming travels or potential upcoming travels?

1    A.  Yes.

2    Q.  All right.  And you can go ahead and take that

3  down.

4         And tell us about that conversation.  Did you

5  inquire of Mr. Reckner, or did he inquire of you?

6    A.  I believe I inquired with Mr. Reckner.

7    Q.  What did you ask him about?

8    A.  The NATE conference.

9    Q.  And I know the jury has heard some about that,

10  but tell the jury what the NATE conference was, just

11  briefly.

12    A.  Well, NATE stands for National Association of

13  Tower Erectors.  And they hold a yearly meeting in

14  various different cities.  Basically it's a collection

15  of commercial vendors having to deal with the tower

16  industry, and they also have a series of educational

17  classes dealing with tower issues.

18    Q.  Did you in the past, prior to 2012, attend that

19  conference?

20    A.  Yes.

21    Q.  How many years?

22    A.  Probably ten.

23    Q.  How about Mr. Belisle, had he attended before?

24    A.  I believe he attended since he was hired.

25    Q.  I'm sorry.  Since he was hired?

1    A.   Yes.

2    Q.   And so would the two of you go together then to

3    that conference?

4    A.   Yes.

5    Q.   In light of your absence in November and

6    December, why were you asking about the conference in

7    January when you returned and talked to Mr. Reckner?

8    A.   Well, I was curious, because I had entertained

9    thoughts of attending.

10   Q.   All right.  Now, had you made any plans at that

11   point to attend?

12   A.   No.

13   Q.   And what were -- what was the normal process,

14   normally -- well, like the year before, who had went?

15   A.   The previous year, myself, Rich Belisle and Chief

16   Reckner attended.

17   Q.   Okay.  So when you asked Mr. Reckner about this

18   year, what did you -- what was the conversation, what

19   did you ask him?

20   A.   Basically who was going to go.

21   Q.   Okay.  And what did you find out?

22   A.   He said that he was attending, Rich was attending

23   and he was going to send Jim Hopkins to go.

24   Q.   Okay.  And what did you think about that?

25   A.   Well, Rich was going to go no matter what,

1  because that was basically part of his job to attend

2  this conference.  Chief Reckner went last year, so I had

3  assumed he was going to go this year.  And the only

4  question I had was why Jim Hopkins was going to attend.

5      Q.  And did you -- you said that's the only question

6  you had.  Was that a question you asked Mr. Reckner?

7      A.  Yes.

8      Q.  Okay.  And why was that a question for you?

9      A.  Well, he wasn't a climber.  He --

10     Q.  Well, let me stop you there.  Pardon my

11 interruption, Mr. Wells.  I neglected to ask you when we

12 were talking about Mr. Hopkins, had you or somebody else

13 qualified him to climb when he came to the COMMSTA in

14 2010?

15     A.  No.  He expressed no desire to climb.

16     Q.  Could he perform his duties as shop supervisor

17 without the necessity of having to climb?

18     A.  Yes.

19     Q.  But during the time that he was there, had

20 Mr. Hopkins climbed or participated in active climbing?

21     A.  No.

22     Q.  So I'm sorry I interrupted you.  You said you

23 were saying to Mr. Reckner about Mr. Hopkins going.

24     A.  Yes.  He had put his retirement letter in.  He

25 had told me about that the previous week.  So he was

 1    intending to get out of the Coast Guard.  He didn't

 2    climb.  And I didn't see the necessity for him attending

 3    when he had no interest in the activities involved.

 4        Q.  And so what was -- what do you recall

 5    Mr. Reckner's explanation to you about why he would be

 6    going?

 7        A.  He didn't really give explanation.  He said, "You

 8    aren't going to go, so we're going to send Hopkins."

 9        Q.  First of all, how did you feel about you not

10    going, having attended the ten previous years?

11        A.  Well, I didn't expect to go because by that time

12    I already had my operation scheduled.

13        Q.  All right.  Do you know whether it was that first

14    Friday -- do you know what day in January you were back

15    to work when this conversation happened?

16        A.  I don't recall, no.

17        Q.  Okay.  And when was the NATE conference typically

18    held?

19        A.  Usually in the second week of February.

20        Q.  All right.  And when was your surgery planned?

21        A.  It was planned for the 8th of February.

22        Q.  And when -- when Mr. Reckner told you that you

23    weren't going to go, regardless of whether you had

24    medical issues, how did you feel about not being allowed

25    to attend?  I mean, did you have any concerns about

1  that?

2     A.  I didn't have any concerns.  I was disappointed

3  that I was going to miss it, but there weren't any

4  concerns because I wasn't going to be able to attend.

5     Q.  Did you know who had made the decision that you

6  weren't going to go?

7     A.  I believe Chief Reckner said he made the

8  decision.

9     Q.  How did you feel about -- you questioned it, so

10 did you have any concerns about Jim Hopkins going?

11    A.  Well, the concerns I had is the benefit for Jim

12 and the Coast Guard as a whole as to, you know, somebody

13 going to a conference that they -- for practical purpose

14 they would have no use for.

15    Q.  Were you mad at Chief Reckner about the decision?

16    A.  No.

17    Q.  Were you mad at Jim Hopkins about the decision?

18    A.  No.  In his place if I got a free trip to, you

19 know, San Antonio, I probably would have taken the trip.

20    Q.  Did you ever discuss it at all with Jim Hopkins?

21    A.  Well, I just told him, I questioned why he would

22 go is --

23    Q.  I'm not talking about a discussion with

24 Mr. Reckner.

25    A.  Oh.

1    Q.   Later after you found out, oh, Mr. Hopkins is

2    going, and you're not --

3    A.   I misheard the question.

4    Q.   So did you ever even end up talking to

5    Mr. Hopkins about it?

6    A.   No.

7    Q.   You said that it was a given that Rich was going

8    to go.  Did you question Mr. Reckner about why Rich was

9    going?

10   A.   No.

11   Q.   Did you call -- did you call Rich an F'ing rigger

12   or a name something to that effect?

13   A.   No, I did not.

14   Q.   Any discussion or concern by you expressed to

15   Mr. Reckner about Rich going?

16   A.   No.

17   Q.   Why not?

18   A.   It was a given he would go.  It was part of his

19   job.

20   Q.   Well, what if it -- did you understand there was

21   only a limited number of spots that could go?

22   A.   Yeah, generally what happened is headquarters

23   would pay for two billets, so that was usually Rich and

24   I.  And then the previous year, the COMMSTA had paid for

25   Chief Reckner to attend.

1    Q.  Well, if Mr. Hopkins was going to go and

2  Mr. Reckner was going to go, would it have been your

3  desire to replace Rich then and -- maybe if only one of

4  you can go, you over him?

5    A.  Well, I wasn't attending, so it wasn't an issue.

6    Q.  During January and into the beginning of the

7  year, is there -- well, first of all, is that NATE

8  conference typically the same timeframe roughly each

9  year?

10    A.  Yes.

11    Q.  And is there another sort of annual tower event?

12    A.  Yeah.  The Coast Guard civil engineering group

13  usually conducted a tower -- tall tower conference where

14  we'd select a Coast Guard site that had a tower and then

15  we would conduct usually an inspection of that antenna

16  and then conduct training and have, you know, seminars

17  and training involved also.

18    Q.  Was that NATE conference exclusive to the Coast

19  Guard?  Did only Coast Guard people attend that?

20    A.  No, it was a nationwide commercial endeavor.

21    Q.  How about this tall tower training, was that

22  exclusive to the Coast Guard?

23    A.  Yes.

24    Q.  And did you attend each year the tall tower

25  training conference?

1     A.   Yes, I did.

2     Q.   And how long had you been attending that?

3     A.   I think 2000 was the first year -- or 1999 I

4  think was the first year I attended.

5     Q.   12 or 13 years then?

6     A.   Yes.

7     Q.   Each year?

8     A.   Yes.

9     Q.   And how about Mr. Belisle, did Rich attend that?

10    A.   Once he was hired, yes.

11    Q.   And besides attending the event, did you or you

12 and he actively participate in sort of the curriculum

13 there at the tall tower training?

14    A.   Yes.  We would often teach portions of the

15 classes, and then we would also lead teams as far as we

16 divide up into teams to do certain aspects of a tower

17 inspection.

18    Q.   And in 2012, was there plans to attend for you,

19 plans to attend that tall tower training?

20    A.   Yes.

21    Q.   And who --

22    A.   Both Rich and I were planning to attend.

23    Q.   Did you know that in January or prior to your

24 February surgery?

25    A.   Yes.

1    Q.   When was the training going to be?

2    A.   It was going to be in later April, down in New

3    Orleans, at the COMMSTA New Orleans.

4    Q.   Time enough for you to recover from surgery?

5    A.   Hopefully, yes.

6    Q.   And who had coordinated or approved the plans to

7    attend the tall tower training?

8    A.   That was headed up by people back at

9    headquarters, and I think CEU, the civil engineering

10   unit out of Miami was also heading that up, because

11   New Orleans was part of their responsibility.

12   Q.   But within COMMSTA, did Mr. Reckner know that you

13   and Rich were going?

14   A.   Yes.

15   Q.   Would Mr. Reckner have attended that as well?

16   A.   Not necessarily.

17   Q.   So did you end up having the surgery that you

18   were -- can we put 168A back up there.

19        Did you end up having the surgery you were

20   scheduled for?

21   A.   Yes.

22   Q.   When was it?

23   A.   February 8th, I believe, 2012.

24   Q.   Okay.  And when did -- when did you -- well,

25   first of all, what was the surgery for?  What exactly

1    did the doctors do to you?

2        A.   It was gallbladder removal and a hernia.

3        Q.   Both surgical processes in one surgery, or was it

4    two surgeries?

5        A.   One surgery, it was a two for one.

6        Q.   Done where?

7        A.   It was done at the Elmendorf Air Force Base in

8    their operating area.

9        Q.   And you said the surgery was February 8th.  How

10   long were you gone from work then?

11       A.   Well, from work, I came back from surgery and

12   still didn't go to work.

13       Q.   So there was some time spent recovering?

14       A.   Yes.

15       Q.   Do you recall your first day back at work?  You

16   can look at the calendar there.

17       A.   That would be February 24th.

18       Q.   Okay.  Now, that's about two weeks and two days

19   after your surgery.  We can take that down.

20            Were you ready to come back to work, physically?

21       A.   No.

22       Q.   Were you having complications from the surgery?

23       A.   Yes.

24       Q.   What were those?

25       A.   Well, I still had painful muscles in my stomach

from the hernia surgery.  The gallbladder surgery was an arthroscopic procedure, so it was very -- just a small hole in the stomach, so that wasn't uncomfortable, but the hernia surgery still was.  I had had three or four previous hernia surgeries, so I knew what to expect on that.

Q.  How about side effects at all?

A.  Side effects from the gallbladder operation was severe diarrhea.

Q.  So if you were not ready to come back to work, why did you come back to work on February 24th?

A.  Well, I was out of leave.  I was already 40 days in the hole as far as sick leave goes.  And I didn't have any regular leave left, I don't believe.

Q.  All right.  When you went back to work, did you go on any kind of restrictions?

A.  Well, limited or light duty, because I couldn't lift anything.

Q.  And how about throughout the process of the surgery, the recovery, did you continue to treat or monitor your diabetes?

A.  Yes.

Q.  When you got back to the -- I want to back up for a minute to a prior discussion, prior to February 24th that you would have had with Mr. Reckner about some of

1    those letters.  Do you recall a prior discussion with

2    him or meetings with him about those letters of

3    expectation?

4        A.   Not any others than previously discussed, no.

5        Q.   Okay.  Well, did there come a time prior to your

6    surgery and prior to returning to work on February 24th

7    where he had talked to you about a meeting that he

8    expected to happen with the commander?

9        A.   Yeah.  I recall vaguely saying that we needed to

10   meet with the skipper concerning the fuel card issue.

11       Q.   And were you aware that -- whether or not you

12   were going to receive anything at this meeting with --

13   the skipper is what you called the commander?

14       A.   Yes, the CO.

15       Q.   Were you aware about any documentation that was

16   going to happen at the meeting?

17       A.   There was going to be a letter, but that's pretty

18   much the extent that I remember the discussion.

19       Q.   Did Mr. Reckner tell you whether or not to be --

20   what to expect, I guess, for lack of a better

21   expectation?

22       A.   Just that it was going to be a letter from the

23   commanding officer concerning the fuel card and it

24   wasn't going to be a disciplinary action.

25       Q.   Okay.  How did you feel about that?

1      A.   I wasn't concerned.

2      Q.   Okay.  Did he say or give you any reason to be

3  concerned?

4           MS. SHERMAN:  Objection; hearsay.

5           THE COURT:  Did he give you any reason, you're

6  not asking for what he said?

7           MR. COLBATH:  No, no, no.

8  BY MR. COLBATH:

9      Q.   Don't tell me anything specific he said.  But in

10  light of the conversation, did you leave there feeling

11  any concern about whenever this upcoming meeting might

12  be?

13      A.   No.

14      Q.   All right.  So when you got back on

15  February 24th, you got back from surgery, was there in

16  fact a meeting that day?

17      A.   Yes, there was.

18      Q.   And maybe we could pull up Government Exhibit 37.

19           Where was the meeting at?

20      A.   The meeting was in the commanding officer's

21  office.

22      Q.   All right.  And who all was there, as you recall?

23      A.   The CO, XO, the EO, I want to say the command

24  master chief and Chief Reckner.

25      Q.   And yourself?

1    A.   And myself, yes.

2    Q.   All right.  And you've seen during the trial here

3  and you heard the commander, that was -- the commander

4  was Mr. Van Ness?

5    A.   Yes.

6    Q.   Who testified here.  You heard him testify about

7  this letter?

8    A.   Correct.

9    Q.   And if we could flip to the second page real

10 quick.  You recognize your signature, and that's the day

11 you received the letter?

12   A.   Yes.

13   Q.   And going into the discussion -- if we can go

14 back to the first page.  Going into the discussion -- or

15 into the meeting, did you have some idea about what the

16 discussion was going to be about?

17   A.   Other than it was concerning the fuel card, that

18 was it.

19   Q.   You didn't know the details?

20   A.   No.

21   Q.   And as the meeting transpired, who did most of

22 the talking?

23   A.   The skipper, the CO.

24   Q.   All right.  And did there come a time when he had

25 given you this letter and allowed you to review it,

1  asked you to sign it?

2      A.  Yes.

3      Q.  And was everybody still present in the room?

4      A.  Yes.

5      Q.  Discussions going on about the letter?

6          MS. SHERMAN:  Objection; leading.

7          THE COURT:  Sustained.

8  BY MR. COLBATH:

9      Q.  Was there discussions going on about the letter?

10     A.  There was some discussion about the letter.

11     Q.  All right.  Did there come a time when, before

12 you had signed it, the meeting got over or the

13 meeting -- some people left?

14     A.  Yes.

15     Q.  When anybody left, was -- first of all, was the

16 meeting over?

17     A.  No.

18     Q.  Well, what happened to cause people to leave?

19     A.  The CO stood up.

20     Q.  Did you stand up?

21     A.  No, I don't believe I did.

22     Q.  And why not?

23     A.  I was still looking at the letter and thinking

24 about it.

25     Q.  All right.  What happened then when the CO had

1  stood up and the other folks stood up?

2      A.   The other folks left the room.

3      Q.   Okay.  Commander Van Ness stay in the room?

4      A.   Yes, he did.

5      Q.   Did he remain standing?

6      A.   No, he sat back down at the table, and we had a

7  discussion.

8      Q.   How long do you think the two of you remained in

9  there discussing the letter?

10      A.   Not more than ten minutes.

11      Q.   What happened at the end?

12      A.   I ended up signing the letter.

13      Q.   Do you recall him -- his testimony and his

14  telling you that he had lost his trust in you?

15      A.   Yes.

16      Q.   Is that something that you remember him sharing

17  during that discussion?

18      A.   I believe he shared that when the rest of the

19  group was there and afterwards, both times.

20      Q.   And how did that make you feel?

21      A.   I was very sad and disappointed.

22      Q.   And why so?

23      A.   For one thing, I didn't take the fuel.  The other

24  thing is it just bothered me that I had lost their

25  trust.

1   Q.   Okay.  Had you spent any amount of time with

2   Commander Van Ness or had any regular contact with him?

3   He was obviously at the top of the COMMSTA chain of

4   command?

5   A.   Yes.

6   Q.   And so do you recall -- well, when you and he

7   were done with the discussion, did you take the letter?

8   Did you sign the letter?

9   A.   I signed the letter and got a copy of it.

10   Q.   Okay.  And did he give you any instructions as

11   you left with the letter?

12   A.   No, not any instructions per se.

13   Q.   Okay.  What was your intention in leaving his

14   office?  What did you plan to do as a result of this

15   meeting with him and the information, the things he told

16   you?

17   A.   Well, I would have to work hard to regain his

18   trust.

19   Q.   All right.  And what was your plan in that

20   regard?

21   A.   I don't say that I had a specific plan, but I

22   would just have to make sure that what I did would not

23   further erode his trust in me.

24   Q.   Did you feel like that he was disciplining you or

25   this was a negative employment mark for you, if that's

1   the right word?

2      A.  Well, it was a letter of caution, so it just --

3   but that was detailing the use of the fuel card.

4      Q.  But did you feel it was disciplinary?

5      A.  Not -- no.  It was cautionary.

6      Q.  Were you mad at Commander Van Ness?

7      A.  No, because obviously, something had happened

8   with the fuel card, so we needed to take better measures

9   to make sure that it didn't happen in the future.

10     Q.  In the -- so you continued -- from February 24th

11  moving forward, you were at work pretty regular or were

12  you at work pretty regular?

13     A.  I believe so.

14     Q.  All right.  You were out of leave?

15     A.  Yes.

16     Q.  All right.  And when you came back to work on

17  February 24th, was there a project going on to clean out

18  the --

19          MS. SHERMAN:  Objection; leading.

20          THE COURT:  That's sustained.  Let him finish

21  his whole -- why don't you state the whole question

22  before the government interposes an objection.

23  BY MR. COLBATH:

24     Q.  When you returned on February 24th, was there any

25  project related to the rigger shop warehouse going on

1  that you were aware of?

2      A.  Yes.

3      Q.  And prior to having left from surgery, were you

4  aware of the warehouse project?

5      A.  No.

6      Q.  Had you been asked by Mr. Reckner or anybody else

7  prior to February to be involved in the cleanup?

8      A.  I don't recollect that, no.

9      Q.  What were you aware of then once you got back to

10  work on February 24th, about the warehouse, that is?

11      A.  That they were cleaning it out and rearranging it

12  and straightening it out.

13      Q.  Now, had you been to that warehouse before?

14      A.  Many, many times.

15      Q.  And what was its uses?

16      A.  It was used for storage, dry storage.

17      Q.  For who?

18      A.  For everybody at the COMMSTA.  So there would be

19  furniture from usually up the hill that was either

20  broken or obsolete that they would store down there.

21  There was old transmitters.  We had done a transmitter

22  swap-out, so a lot of the old transmitter carcasses were

23  still stored down there, waiting to be disposed of.  We

24  had -- the rigger shop had a lot of stuff stored down

25  there.  People had personal stuff stored down there.

1    Q.   Who had personal stuff stored down there?

2    A.   Oh, lots of different people.

3    Q.   How about you?

4    A.   I had a bunch of concrete sacks stored down

5    there.  People stored tires down there.  People stored

6    boats in there.  People stored -- you know, just -- I've

7    seen household goods stored in there.  Just lots of

8    different stuff over the years.

9    Q.   When you came back then, who was involved in the

10   warehouse clean-out project that you understood?

11   A.   Well, Rich, Beauford, the non-rates, and they

12   were using people from up the hill.

13   Q.   You say up the hill, that's --

14   A.   That's T-1.

15   Q.   All right.

16   A.   So they would be using some of the ETs from up

17   the hill.

18   Q.   Did you take an active role in that?

19   A.   No, I did not.

20   Q.   Why not?

21   A.   I wasn't physically able to really perform any

22   duties down there.

23   Q.   And did you go over there at all?

24   A.   Yes, I did.

25   Q.   For what purpose?

1     A.   Somebody had mentioned a bunch of nuts and bolts

2   that they needed me to look at.  So I drove my vehicle

3   down to the warehouse and took a look.

4     Q.   And what happened in that regard?

5     A.   Well, they had about a four-foot by four-foot

6   wooden crate, probably about two feet deep, and what

7   somebody had done is that we had stored a bunch of nuts

8   and bolts, and mostly stainless steel nuts and bolts

9   that we used for various repairs on the antennas, and

10  they were stored in labels in different boxes in the

11  Vidmars, drawers.  Vidmars is just a commercial name for

12  a cabinet.  And they had taken them all out of the

13  Vidmars and dumped them in this box.

14    Q.   And what was your thought about that?

15    A.   I couldn't understand why they would do that.

16  There are thousands of dollars worth of stainless steel

17  nuts and bolts in there, and they'd all -- you know, we

18  had -- that were previously sorted and arranged in the

19  Vidmars and now they were all mixed together.

20    Q.   Were you mad about it?

21    A.   I was irked about it.  I won't say I was mad

22  about it.

23    Q.   So did you have any more involvement in that

24  process or the discussions that day?

25    A.   No.

 1    Q.  Were you asked to make arrangements with regard
 2  to those sacks of concrete?
 3    A.  I was.
 4    Q.  What was -- generally, what was your plan with
 5  those, or what were you supposed to do?
 6    A.  I had to move them out of the warehouse.  At that
 7  particular point in time, I wasn't physically able to do
 8  that.
 9    Q.  Was there any time restriction or time limits
10  placed on you?
11    A.  No.
12    Q.  Do you recall there being training at the COMMSTA
13  going on, say, in late March or early April of 2012?
14    A.  Yes.
15    Q.  And would that have been down at the rigger shop
16  or up at T-1?
17    A.  No.  We conducted training in the basement of
18  T-1.
19    Q.  And had that been something you were involved in
20  in the past?
21    A.  Yes.
22    Q.  And what do you recall that was going on in late
23  March, early April of 2012?
24    A.  We were basically instructing the OSs, the
25  operation specialists from the ops deck on radio wave

1　propagation and antenna use.

2　　Q.　And who was doing that training?

3　　A.　I gave that training.

4　　Q.　How did things like that get arranged up at the

5　COMMSTA?

6　　A.　The operations officer, Mr. Jordinelli, basically

7　said he wanted some training done for their operators.

8　　Q.　How frequently, say, on a calendar year would

9　there be training of some kind up at T-2?

10　　A.　Well, there was usually monthly training

11　scheduled whether from the -- for the ETs, there was a

12　training schedule made out, so various people would

13　instruct on various topics.

14　　Q.　And had you instructed before?

15　　A.　Yes, I had.

16　　Q.　And attended -- had you attended trainings where

17　others were instructing?

18　　A.　Yes.

19　　Q.　Did you have any reason in early -- late March or

20　early April of 2012 to believe you wouldn't continue to

21　attend those trainings?

22　　A.　No.

23　　Q.　Or be asked to instruct?

24　　A.　No.

25　　Q.　I want to go to April 11th of 2012.　The morning

1   of April 11th, do you recall having -- well, first of

2   all, where were you at on the morning of April 11th?

3       A.   April 11th, in the morning I was at my house.

4       Q.   Did you go to work that day?

5       A.   I did.

6       Q.   Normal time?

7       A.   Yes.

8       Q.   Which was?

9       A.   I would leave the house anywhere from 20 until

10  7:00, 6:40 to 6:50, just depending on when I left out

11  the door.

12      Q.   And where did you go when you first got to work

13  that morning on April 11th?

14      A.   T-2.

15      Q.   Do you recall having any discussion with

16  Mr. Reckner at some point or going anywhere leaving the

17  T-2 building?

18      A.   I believe that morning I said I was going up the

19  hill to go to use the bathroom.

20      Q.   Have you seen the videotape here of you walking

21  up the hill to T-1?

22      A.   Yes.

23      Q.   Was that something you had ever done prior to

24  April 11th, and that is walk from T-2 up the hill to use

25  the restrooms?

1    A.  Yes.

2    Q.  Why was that?

3    A.  We only had one restroom facility in T-2, and it

4    didn't do to tie it up for lengthy amounts of time,

5    because other people needed to use it.

6    Q.  What was the restroom situation up at T-1?

7    A.  There was a men's and a women's bathroom, and in

8    the men's bathroom, there was two urinals and I believe

9    three toilet stalls.

10   Q.  So did you -- when you were up at T-1, just what

11   activities did you do up there that morning?

12   A.  I went up and used the facilities, and then I

13   went down into the basement to do a further check on the

14   airflow or we have -- we have airflow meters to gauge

15   the air pressure and the flow rate in all of our

16   transmission lines going out to the antennas.  Because

17   all of our cables are pressurized with dry air.

18   Q.  What's the process of checking the pressure

19   rates?

20   A.  Well, the non-rates would do a daily air round.

21   Okay.  And all they would do is write the figures down.

22   But without interpreting those figures, it didn't do any

23   good to write them down.  So what we would do, we would

24   compare the rate of airflow and air pressure from the

25   previous day or the previous week.

1    Q.  You say "we."  Who was "we"?

2    A.  I would do that normally, and Rich would also do

3    that, because that's how we would find out if we had a

4    problem with the cable.  The issues we were having is

5    the bears like to bite the cable, which we had an

6    inch-and-five-eighths and we had three-inch-diameter

7    cables that we ran our antennas.  And so for some

8    particular reason, they could sense energy flow through

9    those cables, so they liked to bite it.

10    Q.  Did you have bears out in April of 2012?

11    A.  That would be when they would start to come out,

12    and they would have a tendency to bite the cables early

13    April.

14    Q.  Was there any unusual activities going on up at

15    T-1 or more activity than normal on April 11th?

16    A.  That week, and I believe the previous week, we

17    had some people from off island that were working on

18    installing a -- oh, some antennas and some satellite

19    tracking equipment or communications -- not tracking but

20    communications.

21    Q.  Was there any meetings planned or work planned

22    relative to that in the afternoon of April 11th?

23    A.  Yeah.  We were going to go on the roof of T-1 and

24    look about, think about siting these temporary antennas

25    they planned on putting up.

1    Q.   Backing up before that meeting to the morning, in

2    addition to that pressure checking, was there anything

3    relative to those antennas or those people that happened

4    or that was scheduled to happen?

5    A.   We had had a few meetings before that, either

6    that week or the week before, about how we were going to

7    route the antenna run.

8    Q.   Okay.

9    A.   And there were a couple of issues involved in

10   that thinking.

11   Q.   Okay.  And did you do anything related to that

12   the morning of April 11th?

13   A.   Yeah.  Well, I was -- between bathroom breaks and

14   the air rounds, I went to the microwave room and looked

15   about penetration through the wall of the building to

16   get a cable through the wall.  We had holes already

17   drilled, but you had to figure out which hole we could

18   use and see if there was available holes to use to run

19   cables external to the building.

20   Q.   Where is the microwave room in T-1?

21   A.   That's in the basement.

22   Q.   And the antenna that was going to be temporarily

23   installed on the roof, where was the -- where was the

24   line going to go from that antenna, either to or from

25   that antenna?

1    A.  Well, it would have to come out of the operations

2  space, and it would have to go through a special room

3  where it had a filter panel.  Go through that and

4  usually run along the cable trays in the basement and

5  then usually through the microwave room, because that's

6  where we had exit holes, and then up the side of the

7  building at T-1.  We already had previous cables that

8  were already installed running up to that tower outside

9  of T-1.

10    Q.  Do you recall after leaving the microwave room or

11  doing those things when it was that you would have went

12  back down to T-2?

13    A.  Probably sometime before lunchtime.  I don't have

14  an exact time for you.

15    Q.  Okay.  Did the meeting that you discussed happen

16  then in the afternoon back up at T-1?

17    A.  Yes.

18    Q.  Could we show Mr. Wells Government Exhibit 61.

19      Mr. Wells, this was already admitted and part

20  of -- can we stop it real quick there.

21      What are we looking at here, just to remind

22  everybody?

23    A.  Well, that's a picture from the camera mounted on

24  a telephone pole, very similar to the one that we seen

25  on the other side of T-1.  This covered the back

entrance to the ops deck.  There's a loading dock there.
But it was -- through that sliding door there is an
emergency exit from the operations deck.

Q.  All right.  And let's play that for a little bit.
And I'll tell you when to stop.

(Exhibit No. 61 playing in open court)

BY MR. COLBATH:

Q.  So did you recognize who that is on the roof?

A.  That looks like me.  Well, and then coming up
would look like Rich.

Q.  Okay.  What are -- in that area of the roof, what
are you doing?

A.  Well, you see a series of vents that are in the
roof.  That roof is actually a false roof.  That --

Q.  Let me interrupt you.  What do you mean false
roof?

A.  The original roof was just a flat concrete
bomb-proof roof.  But it had developed leaks, so they
ended up -- they couldn't find out where all the leaks
were coming from, so they put that roof on top and
extended all the vents up from the original roof.

Q.  Okay.  And so you and Mr. Belisle are there.
What are you looking at again in that area?

A.  There was another older vent that was square and
flat, not like the ones you visibly see there.

1     Q.   Can you continue to play that if you would.

2          (Exhibit No. 61 continues playing in open

3     court)

4     BY MR. COLBATH:

5     Q.   Are you and he having discussions?

6     A.   Yeah.  We're looking at the vent.  They needed --

7     or they're looking for a flat surface to mount the

8     antenna because, as you can see, that roof sloped pretty

9     good, so --

10    Q.   Okay.  Now, there's more people coming up on the

11    roof there.  Who else came -- ultimately came up on the

12    roof?

13    A.   Chief Reckner was up there.  And I don't remember

14    who else was up on the roof -- probably ET3 Beauford

15    would be my guess.

16    Q.   Okay.  If we could stop it there.

17         Let it run for a minute.  There's somebody else

18    coming.  Is that the end?  Okay.

19         That's the end of the video that we have.  But

20    where are you -- where are you relative to the roof, or

21    what's that area?

22    A.   That's probably where one of the square vents

23    was.

24    Q.   All right.  And did you participate in the

25    discussions up there?

1    A.  Yes.

2    Q.  And then ultimately, what happened?

3    A.  Well, we had discussed how we were going to run

4  the cable.  And there was two options introduced.  And

5  they wanted to drill through -- put a hole through the

6  vent and then run the cable along the original roof and

7  then out towards the side of the building.

8        And the issue that I raised with that is it was a

9  temporary antenna and I didn't like drilling holes in

10  perfectly good watertight, you know, equipment for a

11  temporary installation.  It will end up leaking.

12    Q.  Did you have to leave the meeting at some point?

13    A.  Yes, I did.

14    Q.  Where did you go?

15    A.  I went downstairs in the bathroom in T-1.

16    Q.  Then where did you go after that?

17    A.  After that, I went back down the hill to T-2 and

18  probably left for the day.

19    Q.  This was -- the meeting was into the afternoon?

20    A.  Yes.

21    Q.  Did you have any special -- when you left for

22  work the morning of April 11th, did you have any special

23  plans for after work?

24    A.  I was considering changing my tires because it

25  was coming up on the weekend.  I had been trying to get

ahold of the Kodiak Honeywagon because that winter our
septic system froze, so we were --

Q.   What happened with your septic system?

A.   The line froze.

Q.   And what did that result in?

A.   Well, it resulted in that we couldn't -- I had
to -- I basically diverted all of the gray water to run
out down the side of my hill.  So that was basically the
dishwasher, the washing machine, you know, the showers,
all of that, and then we were -- end up using a plastic
bucket to go to the bathroom in, other than --

Q.   How long had that been going on?

A.   Oh, since probably November.

Q.   Could the septic system be repaired prior to the
ground thawing out?

A.   No.

Q.   So what happened on April 11th after work?

A.   I got a phone call from Kodiak Honeywagon, said
they were available to come out and pump my system, my
septic tank.

Q.   So what did you do?

A.   So I got home from work and proceeded to go out
and finish digging out the access to the septic tank.

Q.   Where in relation to your home was the septic
tank?

1     A.   It was probably to the south, southwest out on

2  the lawn area.

3     Q.   Let's look at Exhibit 33 here, which I think has

4  been admitted.

5          What are we seeing here, Mr. Wells?

6     A.   We're seeing the hole where the septic tank is

7  located.  And that white pipe that you see in there,

8  that's the temporary line that I ran to take care of my

9  gray water.

10    Q.   And how was this dug?

11    A.   How was what done?

12    Q.   How was it dug?

13    A.   Oh, dug.  I thought you said done.  I dug it by

14 hand.

15    Q.   What were you digging up?

16    A.   Well, the septic tank was buried a couple feet

17 underneath the normal surface level.  So I had to dig

18 all that dirt out to access the hatch to open it up so

19 it could be pumped out.

20    Q.   And that was the evening of April 11th?

21    A.   Yes.  I had started before that, but I hadn't

22 finished.  So once I knew that the Honeywagon was on its

23 way, then I had to proceed to finish digging that out.

24    Q.   How many septic services was there available to

25 you on Kodiak?

1    A.   There's only one.

2    Q.   Were you able to get it dug out?

3    A.   Yes.

4    Q.   Did the Honeywagon, as you called it, show up

5    that evening?

6    A.   Yes, he did.

7    Q.   All right.  Can I show -- can we quickly show

8    Mr. Wells Defense Exhibit No. 278.  Has that been

9    admitted, Defense 278, Madam Clerk?

10        DEPUTY CLERK:  Yes.

11   BY MR. COLBATH:

12   Q.   What were you wearing when you were digging the

13   septic tank out?

14   A.   Well, I had my clothing that I had worn that day,

15   and I just put a pair of rain pants over my Carhartts

16   that I wear and my boots, and that's what I was wearing.

17   Q.   The pants we see here in this picture?

18   A.   Yes.

19   Q.   That's fine.  You can take that down.

20        So what happened when the septic service showed

21   up?

22   A.   Basically, finished cleaning it up -- scraping

23   the dirt away so we could access the cover, pried the

24   cover off, because I had sealed it every time -- it's

25   been pumped twice before that.  This was the second time

1  that the septic system had froze up.  So pried the cover

2  off and just waited for him to arrive.

3      Q.  Was he able to get the tank pumped out?

4      A.  Yes.

5      Q.  You were there during that time?

6      A.  Yes.

7      Q.  Once that was completed, what did you do?

8      A.  Basically, put the cover back on, put a little --

9  and finished cleaning up around the area.  And then went

10  back inside the house.

11      Q.  All right.  What happened that evening after you

12  were ultimately back in your house?

13      A.  Well, I fixed some dinner, took my meds and went

14  to bed.

15      Q.  Was your wife at home on April 11th?

16      A.  No, she was not.

17      Q.  Where was she?

18      A.  She was in Anchorage.

19      Q.  How long had she been in Anchorage?

20      A.  She had left Tuesday, April 10th.

21      Q.  So you were home alone that night?

22      A.  Yes.

23      Q.  After cleaning up and eating, what did you do?

24      A.  I went to bed.

25      Q.  What was your normal -- well, were you planning

1   on working the next day?

2       A.   Yes.

3       Q.   What was your normal morning routine or process

4   on a workday?

5       A.   Get up and if the wife was home, I would make

6   coffee and come --

7       Q.   Do you drink coffee?

8       A.   I do not drink coffee.

9       Q.   Ever?

10      A.   Never.  I've made thousands of pots of coffee and

11  I have never dranken a cup.

12      Q.   I interrupted you.  If Nancy was home you would

13  make coffee.  And what if she wasn't home?

14      A.   Then coffee wouldn't get made.

15      Q.   What was the normal routine?

16      A.   I would get up, take a shower, come downstairs,

17  make breakfast.

18      Q.   Were you the breakfast cook at your house?

19      A.   Yes, I was.

20      Q.   What was the normal time to get up?

21      A.   Around 6:00.

22      Q.   And did you have a normal breakfast routine,

23  food?

24      A.   Weekdays I alternated between usually three.  It

25  would either be eggs, French toast, or an omelet.

 1     Q.  All right.  And so on the morning of April 12th,

 2   do you have any special reason to know when you got up

 3   that morning?

 4     A.  Normal time, because the alarm was already

 5   preset.  It was just a question of turning it on.

 6     Q.  And what was your activities that morning?

 7     A.  Got up, took a shower, came downstairs, did my

 8   meds, did my blood sugar check, did the appropriate

 9   amount of insulin.  It was on a sliding scale, so --

10     Q.  Was that a routine part of your morning as well,

11   always an insulin check?

12     A.  Yes.

13     Q.  All right.  Did you have breakfast?

14     A.  Fixed breakfast.  Then get ready to go to work.

15     Q.  What do you typically wear to work that time of

16   year?

17     A.  That time -- well, any time of the year, I wear

18   Carhartts.  In the wintertime, they were insulated.

19     Q.  Pants or coveralls?

20     A.  No, pants.

21     Q.  How about on the top half?

22     A.  A T-shirt and a long-sleeve over-shirt and then,

23   depending on the weather, it would depend on what -- how

24   heavy a duty of coat I would wear.

25     Q.  How about your feet?

1    A.   Boots.

2    Q.   What time do you leave the house that morning,

3   April 12th?

4    A.   Somewhere around 6:45, 6:50, just -- I didn't

5   keep track of the time.  I just walked out the door and

6   got in the truck and went to work.

7    Q.   Was your morning schedule and routine pretty

8   regular?

9    A.   Yes.

10   Q.   And was there anything abnormal at that point

11  about the morning of April 12th?

12   A.   No.

13   Q.   Where would you go to go to work?

14   A.   I went to T-2.

15   Q.   Driving what?

16   A.   My truck.

17   Q.   That's your white Dodge --

18   A.   That's my white Dodge.

19   Q.   -- we've seen pictures of?

20   A.   Yes.

21   Q.   And that morning leaving the house, where did you

22  go?

23   A.   Drove down the driveway, you know, normal course

24  of -- the normal course that I drive.

25   Q.   Is that out through your Bells Flats subdivision?

1    A.  Yes.

2    Q.  Did you have again just a normal route or routine

3    that you drove?

4    A.  Yes.

5    Q.  And at some point along the way, did you divert

6    or not make it to T-2?

7    A.  Yes.

8    Q.  Tell the jury about that.  What was going on as

9    you're driving to work, and where were you?

10   A.  Between, say, the Lash Dock and the main gate of

11   the base, I had noticed I was starting to pull to the

12   right.

13   Q.  Let me ask you about --

14   A.  The vehicle.

15   Q.  Let me ask you the Lash Dock.  What's that?

16   A.  Well, that was a commercial enterprise that

17   leases property from the Coast Guard, and there was a

18   dock there that they use for bringing in barges.  There

19   was a logging company that was staged there, their logs

20   for shipment overseas there.  So a big ship would come

21   in and they would load the logs on them.  In the

22   meantime, they just stored them there on the pier.

23   Q.  You said you noticed your vehicle was pulling to

24   the right, you said.  Did you know what was going on?

25   A.  No, other than just it was pulling to the right.

1    Q.   So what did you do?

2    A.   So I continued on.  Noticed that a little more.

3 So I would have to consciously correct the steering.

4    Q.   Did speed affect the severity of it at all?

5    A.   No, I can't say that I varied the speed.

6    Q.   All right.

7    A.   Other than to account for traffic.

8    Q.   Where did you go?

9    A.   Headed towards work, towards the airport and

10 decided I better turn off and see what was going on.

11   Q.   Where did you turn off?

12   A.   Turned off at the airport road.

13   Q.   Entering the airport road, where did you go?

14   A.   I cruised through the Comfort Inn parking lot.

15 It was activity going on there.  So at that point in

16 time, I felt the urge to go to the bathroom.  So I

17 continued on through the parking lot and headed towards

18 the terminal along on that main road.

19   Q.   Back out onto airport road?

20   A.   Yes.

21   Q.   Can we look at -- I think it's Government 91.

22        Do you have the laser pointer there?

23   A.   I do.

24   Q.   Can you -- is the Comfort Inn parking lot where

25 you drove through on that picture?

1    A.  Yeah.  There's an entrance down there that

2  doesn't show.  So I drove in there, along here.  There

3  were a lot more cars that morning.  Drove out of here.

4  Drove down there.  There was a whole lot of activity

5  going on that morning.  So I pulled around through there

6  and parked about there at Servant Air.

7    Q.  All right.  So stay close to the microphone so we

8  can hear.

9    A.  Okay.

10   Q.  So was the tire noticeable or the truck

11  noticeable that --

12        MS. SHERMAN:  Objection; leading.

13        THE COURT:  That's sustained.

14  BY MR. COLBATH:

15   Q.  As you drove, were there any continued problems

16  with your truck?

17   A.  Well, I noticed that, you know, figured that the

18  tire was low.  At that speed it wasn't like it was

19  pulling to the right very much because of the slow

20  speed.

21   Q.  Okay.  So why drive to the Servant Air building?

22   A.  Well, because I knew that the Alaska Airline

23  terminal would be very crowded, and I had to go to the

24  bathroom.  So that's why I chose Servant Air.  I had

25  been in there before.

 1     Q.   How did you know that the Alaska Airline terminal
 2 would be crowded?
 3     A.   Well, because it was in the morning and there's
 4 usually two flights that arrive every morning at the
 5 airport.
 6     Q.   Is that -- had that been in 2012 something that
 7 you had experienced before, regular flights in the
 8 morning at Kodiak airport?
 9     A.   Oh, yes.
10     Q.   Were those scheduled events?
11     A.   Yes.
12     Q.   Had you flown on those flights over the years?
13     A.   Yes.
14     Q.   So you mentioned then Servant Air.  Had you been
15 to Servant Air before?
16     A.   Yes.
17     Q.   Under what circumstances?
18     A.   I had flown out of there before.  I had met my
19 wife, Nancy, and either dropped her off or picked her up
20 or waited for her to get back from a trip to one of the
21 many villages on the island.
22     Q.   Remind me or remind the jury what Nancy's work
23 position was.  Did that have anything to do with the
24 Coast Guard?
25     A.   No, none whatsoever.

1    Q.  What did she do?

2    A.  She was a program -- infant -- she was a program

3    coordinator for the Infant Learning Program.

4    Q.  And did she travel the island regularly for that

5    job?

6    A.  Yes, she did.

7    Q.  And commercial flights?

8    A.  Well, charter flights for the -- you know, either

9    Island Air or Servant Air.

10   Q.  Were those the main charters on the island?

11   A.  Yes.

12   Q.  So I interrupted your story.  Can we blow maybe

13   that top half of the picture there up.  Yeah, that's

14   good.

15       You said again -- do you see in this picture,

16   Mr. Wells, near that Servant Air building a vehicle that

17   would have been in the approximate area where you

18   parked?

19   A.  Yes.

20   Q.  What is that?

21   A.  That's that white vehicle right there.

22   Q.  Okay.  And so once you parked your vehicle, what

23   did you do?

24   A.  I got -- started to get out of the vehicle.  Then

25   that -- my truck is fairly high off the ground, so in

1    stretching to get my leg out the door, I ended up

2    having -- messed my pants.

3        Q.  Okay.  How messy, or how severe?

4        A.  I don't know how to explain that.  Not severe,

5    but not lightly.  I would call it moderate.

6        Q.  And so, well, what happened then?  You got out of

7    your truck?

8        A.  Got out of the truck.  Went around the back of

9    the truck, walked up to the right side passenger tire

10   and looked at it and noticed that it was low.

11       Q.  Had you -- did you look at both side tires on the

12   driver -- or the passenger side of the truck?

13       A.  No, I didn't notice -- pay any attention to the

14   rear right tire.  I just looked at the front tire,

15   because that's where the problem was.

16       Q.  Give it an inspection?

17       A.  I looked at it, but I didn't notice anything.

18       Q.  Was it -- how about its condition?

19       A.  As far as?

20       Q.  Well, what --

21       A.  The tire was low.

22       Q.  Okay.  Flat on the rim?

23       A.  No.  If it was flat on the rim, I wouldn't have

24   been driving on it.

25       Q.  All right.  That time of morning, was it dark out

1    or light out?

2        A.   It was light, but I don't believe that the sun

3    had risen yet.  But it was light enough to see.

4        Q.   All right.  Where -- after inspecting your low

5    tire, where did you go or what happened?

6        A.   I think I went back to the back of the truck,

7    walked in front of it and went into the -- what I would

8    call the arctic entranceway of Servant Air.

9        Q.   Can we see that from here on the photo?

10       A.   Well, it's right at that corner, but you can't

11   see the actual door.

12       Q.   Do you go around the corner of the building, or

13   you just go into the arctic entry?

14       A.   You just go to that face of that entryway there.

15       Q.   Did you find the doors unlocked?

16       A.   Yes, they were unlocked.

17       Q.   What did you do?

18       A.   I went in the -- went in the outside doors, and

19   then there was an inner door.  I entered that and went

20   straight to the bathroom.

21       Q.   All right.  Did you go upstairs at all?

22       A.   No.

23       Q.   Did you --

24       A.   I wasn't aware that there was an upstairs, that

25   the access to the upstairs was there.  Can't say I

1    noticed any other doors.

2        Q.  Did you go in the hangar at all?

3        A.  No.

4        Q.  Had you -- did you find the -- the inside doors

5    to Servant Air unlocked?

6        A.  Yes.

7        Q.  And when you went inside, what did you do?

8        A.  I went straight to the bathroom.

9        Q.  Did you see anybody?

10       A.  No.

11       Q.  Did you look for anybody?

12       A.  No.

13       Q.  What did you do when you got to the bathroom?

14       A.  Dropped my pants, sat on the toilet and finished

15   going to the bathroom.

16       Q.  Is that a bathroom where there's multiple

17   stalls --

18       A.  No.  It's a single stall, door.  So once I

19   entered the door, I locked it and then proceeded to --

20       Q.  What happened in the bathroom?

21       A.  Okay.  I sat down and finished going to the

22   bathroom, wiped myself off, because it was fairly messy.

23   Stood up, got some paper towels and toilet paper,

24   cleaned myself off again.  Then got some wet paper

25   towels and cleaned off my pants.

Had another bout of diarrhea and proceeded to do
that all over again. And eventually got all cleaned up,
you know, washed up, and exited the bathroom.

Q. Any reason to keep track of time during that
process?

A. No.

Q. Okay. And when you exited the bathroom, where
did you go?

A. I went straight back outside and to the truck.

Q. Okay. On your way out the bathroom door and
passing through the lobby there, did you note passengers
around?

A. No, I wasn't looking in that direction. I just
basically beelined out the door.

Q. Could Mr. Skonberg, who testified from Servant
Air, or anybody else been at the counter? Did you talk
to any of them or look for any of them?

A. Didn't look in that direction. Didn't talk to
anybody.

Q. Do you know whether they were there?

A. I couldn't say.

Q. Okay.

A. Somebody obviously was there because the door was
open.

Q. Once you got back out -- well, how did you get

1   back outside as far as entrance or exit for doorways?

2       A.  I went -- exited the same door that I entered

3   through.

4       Q.  Traveled the same route?

5       A.  Yes.

6       Q.  Where did you go -- you got back to your truck,

7   what did you do?

8       A.  I got in the truck and backed out of the driveway

9   and made the decision to go home and change the tire.

10      Q.  Well, let's talk about that decision.  The tire

11  was -- was the tire still drivable --

12      A.  Yes.

13      Q.  -- as you were there?

14      A.  Yes.

15      Q.  And were you sure at that point what was wrong

16  with it, other than appearing low?

17      A.  No.

18      Q.  Why make -- did you have a spare tire with you?

19      A.  There was a spare tire on the truck, but it was

20  the original tire that -- when I bought the vehicle in

21  2002.

22      Q.  Where was it located?

23      A.  It was underneath the bed of the truck, and I had

24  never taken it off.

25      Q.  Since 2002?

     A.   Well, since I bought the truck, it had never -- I
had never used that tire.

     Q.   How was it in relation to -- size-wise in
relation to the tires that were on your vehicle?

     A.   It was a different size.

     Q.   And how did that come to be?

     A.   When I bought snow tires and summer tires, I
bought larger tires, 16 inches, but they were a
different diameter.

     Q.   So why the decision to go home and change the
tire?

     A.   I already had the -- the summer tires were
already there, already parked on the driveway ready to
go.

     Q.   Now, the date was April 12th.  When was -- on
Kodiak Island in 2012, when was the tire changeover date
where you had to take winter tires off?

     A.   April 15th.

     Q.   Did you have winter studded tires on either your
truck or on your Honda?

     A.   Yes.  Both.

     Q.   Had you had in past years?

     A.   Yes.

     Q.   And did you have separate sets of tires for each
vehicle?

1    A.   Yes.

2    Q.   So you made the decision to go back home and

3    change the tire you said?

4    A.   Yes.

5    Q.   Could you have driven to work and just filled it

6    up with air?

7    A.   I could have, yes, but that wouldn't have solved

8    the problem of the tire going low again.

9    Q.   Well, it would have put more air in the tire?

10   A.   It would have put more air in the tire, yes.

11   Q.   Did you have any of your summer tires with you --

12   A.   No.

13   Q.   -- at the airport there?

14   A.   No.

15   Q.   Any of the summer tires at work?

16   A.   No.

17   Q.   There were tools at work?

18   A.   Yes.

19   Q.   Did you have tools at home?

20   A.   Yes.

21   Q.   So you decided to go back to your residence?

22   A.   Yes.

23   Q.   Did you have your cell phone with you?

24   A.   No.

25   Q.   Why?

1    A.   I had often forgot my cell phone at home.

2    Q.   Okay.  So where did you go from Servant Air?

3         Let's put 91 back up there if we could.  I'm

4    sorry.

5    A.   Okay.  So I backed out of the -- backed out of

6    here.  Drove around here and then went to exit the

7    airport way.  At the time of the morning, there were a

8    lot of people leaving the airport.  So there was a line

9    here waiting to turn to go into town in the right-hand

10   turn lane.  And then towards the corner here, then this

11   side of the exit there was a left-hand turn lane to

12   getting on Rezanof.

13   Q.   At the bottom of the exhibit, 91, down here, that

14   goes to -- that just out of view is what street?

15   A.   Rezanof, or Chiniak Highway, depending on what

16   you want to call it.

17   Q.   In this view, if we go to the right, I know it's

18   the opposite on the road, but if you go to the right

19   that's the direction of where?

20   A.   That's towards the main base and out towards

21   Bells Flats and out to Chiniak.

22   Q.   Your house?

23   A.   Yes.

24   Q.   And the other way is?

25   A.   Towards town.

1    Q.  So what route did you take to go home to change

2  the tire?

3    A.  Drove out there, got in the left-hand turn lane

4  and waited for traffic to clear before I could pull out

5  and get on Rezanof.

6    Q.  And where did you go?

7    A.  I went home.

8    Q.  Okay.  Did you see anybody on the way home?

9    A.  I remember seeing Annette Ecret.

10   Q.  That's one of your neighbors.  She came here and

11  testified about seeing you?

12   A.  Yes.

13   Q.  You heard where she said she saw you in the

14  neighborhood.  Do you remember seeing her?

15   A.  I recall seeing her right there at the turnoff at

16  Rezanof and -- I can't remember the name of the street

17  now.  But that's where I remember seeing her.

18   Q.  Regardless, did you recognize her when you saw

19  her?

20   A.  Yes, I did.

21   Q.  Do anything?

22   A.  I believe I waved to her.

23   Q.  Had she waved to you?

24   A.  Yes, I think so.

25   Q.  All right.  Did you have any more problems with

1  the truck driving home?

2     A.  No.

3     Q.  Was it doing -- behaving the same way?

4     A.  Yes, it was.

5     Q.  What did you do when you got to your house?

6     A.  Drove up the driveway, turned in front of the

7  garage side parking and backed into the parking area

8  that was by the foot of the stairs and by the family

9  room.

10     Q.  Did you have any reason to know what time it was

11  when you got home?

12     A.  No.  I wasn't keeping track of time.

13     Q.  All right.  Can we see Government Exhibit

14  No. 141?

15        Does this -- well, that's your house, right?

16     A.  Yes.

17     Q.  Show generally at all where you would have parked

18  to change the tire?

19     A.  No.

20     Q.  Where -- just using the laser pointer, can you

21  use that picture to kind of explain it?

22     A.  There's probably another 20, 25 feet that extends

23  over this way before it gets to a steep hill, and

24  there's a little crick down the side, but I was over in

25  this direction.

1    Q.   Why over there away from your garage?

2    A.   Well, this area all in here was occupied.  Okay.

3  And this line right from the corner of this building,

4  you can't really tell on this picture, but that starts

5  the -- that starts the part of the steep slope down the

6  driveway.

7         So I wouldn't park on a slope to change a tire.

8  Just wouldn't -- I could do it over here by the garage,

9  because that was all flat, but not there because there

10 wasn't any room to park in front of the garage and this

11 is the start of a steep hill.

12   Q.   What are the tires that are pictured there?

13   A.   Those three tires, so this picture was taken

14 after I changed the tire, but those are my summer tires.

15 I had dug them out from underneath the house the

16 previous weekend getting ready to change the tires out.

17   Q.   Where were they normally stored -- whichever off

18 season you had, summer or winter?

19   A.   There's an entrance underneath the -- that's our

20 arctic entranceway and behind there's a family room, but

21 underneath this area was open.  And it's sloped back up

22 towards the back of the house, and so I stored tires

23 underneath there to keep them out of the weather.

24   Q.   For both vehicles?

25   A.   Yeah.  And I had four-wheeler tires back in

1   there.  A lot of different tires back in there.

2      Q.  So when you backed your truck into that area,

3   what did you do?

4      A.  Got out, went over and opened up the garage door,

5   because I had the tools already set to go.  Grabbed my

6   electric impact wrench.

7      Q.  An electric wrench?

8      A.  An electric impact wrench.  That's what I use

9   normally to undo my lug nuts.

10     Q.  Okay.

11     A.  Went over and knelt down on one knee and tried to

12  break free the nuts.  The impact -- the electric impact

13  wrench didn't have enough oomph to break the nuts free.

14     Q.  So what happened?

15     A.  So I sat that down, went up the stairs, went in

16  the house and called Rich.  Couldn't get ahold of him.

17  I called Hopkins' number.  Couldn't get ahold of him.

18  And I called Chief Reckner's number.  Couldn't get ahold

19  of him.

20     Q.  Leave messages though for some of those folks

21  anyway?

22     A.  Yes.

23     Q.  Then what?

24     A.  Came back downstairs.  Got my rain pants on.

25     Q.  Now, is that the rain pants you were wearing out

1    the night before digging out the septic?

2       A.  No.  I had a set of rain pants in the truck.

3       Q.  Let's look at 159 -- I think it's Defense 159

4    maybe.  It might be government.  Try defense.  I'm

5    sorry.  Yeah.  Government.  Is that government one --

6    yes, government.

7          That's your vehicle, Mr. Wells?

8       A.  Yes, it is.

9       Q.  Do we see the rain pants in the --

10      A.  Well, I see them because I know what they look

11   like, but that's them right there, green camouflage.

12     Q.  Green camouflage in the back seat, for the

13   record?

14     A.  Yes.  That's them right there.

15     Q.  Those were in your truck that day?

16     A.  Yes.

17     Q.  So you said you went back outside and put rain

18   pants on.  Was it raining?

19     A.  No, but the ground was probably damp.  And as a

20   matter of course, I always wore rain pants whenever I

21   would be scrounging around on the ground.

22     Q.  What did you do after you put your rain pants on?

23     A.  I went and got the lug wrench out of the garage

24   and an extender bar to go over it.  It was in a T square

25   lug wrench, so there were four different size nuts that

1  I could access the lug nuts.

2      Q.  Did you get the tire off?

3      A.  Well, what I did is I broke all the nuts.  Okay.

4  Then I went around and got my hydraulic jack and jacked

5  up the right front tire and then proceeded with the -- I

6  had sprayed the lug nuts before I went to break them

7  with WD-40 to help loosen them up.  And I went and got

8  the jack, jacked the tire up, got the impact wrench,

9  spun all the nuts off, took the tire off the hub.

10      Q.  Where did you put the tire that was low?

11      A.  The tire I just sat aside, basically leaning up

12  against the passenger side door.

13      Q.  Get the new tire back on?

14      A.  Went over and got the new tire, sprayed the lug

15  nuts again, put the tire on.  Put the lug nuts on.

16  Zipped them all up with the impact wrench a couple

17  different times to make sure they were tight.

18      Q.  Okay.  Then what did you do with the other -- the

19  tire that you had taken off?

20      A.  I looked to see if I could find what was going

21  on, why it was -- it had lost air.

22      Q.  What did you find?

23      A.  A found a nail embedded in the tire.

24      Q.  What did you do?

25      A.  Took my Leatherman and pulled the nail out.

1    Tossed it over -- over into the crick.

2        Q.   Okay.   Were you able to get it out with your

3    Leatherman?

4        A.   Yes, I was.

5        Q.   All right.   Why toss it in the crick?

6        A.   Well, I wasn't going to put it on the ground

7    anywhere.   And you know, out of being irked for a flat

8    tire, a lot of things ended up in that crick at one time

9    or another.

10       Q.   What happened after you did that?

11       A.   Said, ooh, I shouldn't do that because now I

12   won't find the hole, so I went over to one of the

13   landings on the stairs going up.

14       Q.   Let me show you a picture, Mr. Wells.   It's

15   Government 138.

16            DEPUTY CLERK:   It's admitted.

17            MR. COLBATH:   It is admitted.   Okay.

18   BY MR. COLBATH:

19       Q.   So you said you went over to the stair landing.

20       A.   Yeah.   I'm pretty sure that that's the start of

21   the landing.   That might be another stair, but what had

22   happened was these --

23       Q.   Speak into the microphone if you can, Mr. Wells.

24       A.   These stairs were built when we added onto the

25   house in 1991 or '92, and they were starting to rot out.

1    And the lower platform section here did in fact rot out.

2    And so Nancy, my wife, had replaced it.  So she had

3    gotten new wood and replaced all the rotted stuff, and

4    she had pulled a bunch of nails out removing it.

5         And then on that platform, there was a bunch of

6    nails down here.  So I went and picked up one of the

7    nails that was on the platform and reinserted it into

8    the tire.

9    Q.  How did you do that?

10    A.  I took my Leatherman, ripped it up toward the

11    head of the nail and then basically put a thumb on it

12    and guided it in, into the hole and pushed it about

13    halfway down.

14    Q.  What was the purpose of that?

15    A.  Just so I could find the hole again.

16    Q.  What were you going to do with that tire?

17    A.  Probably take it over to the hobby shop and fix

18    it.

19    Q.  Had you repaired your own tires before?

20    A.  Many times.

21    Q.  Changed your own tires?

22    A.  That's usually when I changed -- buy new tires

23    for either winter tires or summer tires, I would go over

24    to the auto hobby shop, you know, change out the tires,

25    get them balanced and then take them back home.

1      Q.   To put on vehicles?

2      A.   Put on vehicles, yes.

3      Q.   Had you done that recently to April 12th?

4      A.   Yes.

5      Q.   Can we see -- there's an exhibit and I'm not sure

6   what it is, but the --

7           Did you have other tires in your truck?

8      A.   Yes, I did.

9      Q.   I think it's -- I apologize, Your Honor.  Give me

10  one second.

11          THE COURT:  That's fine.

12     Q.   Government 255.

13          Mr. Wells, had you recently got new tires for

14  your wife's car?

15     A.   Yes.

16     Q.   Where?

17     A.   In Anchorage.

18     Q.   When?

19     A.   I was -- I took a trip up August, what, 2, 3

20  and -- 2nd, 3rd and 4th, early -- not August, April.

21     Q.   Had you bought tires there in Anchorage?

22     A.   Yeah, I usually bought my tires at Costco.

23     Q.   And, Your Honor, I'm showing Mr. Wells for

24  foundation Government Exhibit No. 255.

25          And do you recognize that, Mr. Wells?

1    A.  Yes.

2    Q.  And are you familiar with what those are?

3    A.  Yes.

4         MR. COLBATH:  I'm going to move 255.

5         THE COURT:  Any objection to 255?

6         MS. SHERMAN:  No.

7         THE COURT:  That's admitted.

8         (Exhibit No. 255 admitted)

9  BY MR. COLBATH:

10   Q.  Where are these tires, Mr. Wells?  Where is this

11  picture depicting?

12   A.  The back of my truck.

13   Q.  And are those tires for your truck or for another

14  car?

15   A.  Well, the tire in the foreground is from my

16  truck, and all the ones in the background are from

17  Nancy's vehicle.

18   Q.  And are those the new tires that you had

19  purchased?

20   A.  Well, there's new and old tires in there.  The

21  new tires would be on the rims, and the old tires would

22  be without rims.

23   Q.  Had you been to the auto hobby shop on base

24  regarding the new and old set of tires depicted there?

25   A.  Yes.

1    Q.  What had you done?

2    A.  I changed them out.

3    Q.  What do you mean changed them out?  Not on the

4  vehicle?

5    A.  No, no.  The tires were loose, so I just took

6  them and one at a time took the old tire off and then

7  would install the new tire.

8    Q.  On the rim?

9    A.  On the rim.  And then I would roll it over to the

10  office there, and then they would balance it.  So I

11  would do one and send it over and start the balancing

12  process, and then I would do another tire and finish

13  that and roll it over and get it balanced and then

14  repeat it four times.

15    Q.  So this tire with the nail, is that the one we

16  see in the foreground here?

17    A.  Yes.

18    Q.  So again, what was your plan with it?

19    A.  Probably go over on the weekend and repair it.

20    Q.  Okay.  After doing the -- putting the tire then

21  in the truck, what did you do?

22    A.  Basically went back upstairs, washed up, repeated

23  the bathroom episode, collected up the waste in the

24  five-gallon container, brought it back downstairs, put

25  it in the back of the truck.

1    Q.  All right.  Where did you go?

2    A.  Went down the driveway, continued on Middle Bay

3    Drive, and if you take that straight through, bypasses

4    the back side of the asphalt plant and ends up at

5    Sergeant Creek Road.  And across that road is where the

6    community dumpster for this side of Bells Flats was

7    located.

8    Q.  Why did you go there?

9    A.  To get rid of the waste.

10   Q.  From the bucket?

11   A.  From the bucket, yes.

12   Q.  Did you travel from there on to work?

13   A.  Yes, I did.

14        MR. COLBATH:  And can we show Mr. Wells

15   Government Exhibit 67.

16        (Exhibit No. 67 playing in open court)

17   BY MR. COLBATH:

18   Q.  Is that you pulling up, Mr. Wells?

19   A.  Yes, it is.

20   Q.  To work that morning at 8:23?

21   A.  Yes.

22   Q.  Do you recall that officer coming up to the car

23   there or that person?

24   A.  Yes, I do.

25   Q.  What did you do?

1    A.   I rolled my window down.

2    Q.   And then?

3    A.   And then he asked me for my license and

4    identification.

5    Q.   Okay.  Did you know what had happened at this

6    point at T-2?

7    A.   Specifically, no.

8    Q.   On the way to work, had you received any phone

9    calls?

10   A.   Yes, I did.

11   Q.   Who was the first one from?

12   A.   I'm not sure of the exact order, but I had a call

13   from somebody up from the ops deck and said that there

14   was an incident at the COMMSTA and they were doing a

15   security check and trying to get ahold of people.

16   Q.   Were you on your way to work at that point?

17   A.   I was.

18   Q.   Did you get any details about the incident at

19   COMMSTA?

20   A.   No.  All they said, it was an incident.  That was

21   all that they said.

22   Q.   Did you have a chance to ask them more details?

23   A.   No.  They basically hung up the phone.  I tried

24   calling back a couple or four times to find out what

25   else was going on, and I never could get anybody to

1  answer.

2      Q.  Did you get another phone call as you traveled?

3      A.  Yes, I did.  Yes, I got a call from Para --

4      Q.  Okay.

5      A.  -- Upchurch.

6      Q.  Did she give you any more detailed information?

7      A.  No.  She just said that something had happened at

8  the COMMSTA and where was I.  I said, "I'm on my way in

9  to work."

10     Q.  So then you arrived here like we see?

11     A.  Yes.

12     Q.  And when you got out, did you hear -- well, how

13  was it that you received these calls driving back?  Did

14  you have your phone?

15     A.  Yeah, I picked up my phone.

16     Q.  And so when you got here, did you have -- who's

17  the first people besides that officer that you really

18  had a conversation with?

19     A.  Scott Reckner.

20     Q.  Okay.  And what did Mr. Reckner tell you,

21  generally?

22     A.  Generally, he said that Rich and Jim were dead.

23     Q.  The commander, Mr. Van Ness, had walked up?

24     A.  Yes.

25     Q.  He was there for that part of the conversation?

1    A.  Maybe not the first part, but then very shortly

2  thereafter.

3    Q.  What was your reaction when Mr. Reckner told you

4  that?

5    A.  I was stunned.

6    Q.  And do you remember what you said?

7    A.  "Oh, God," or some other -- maybe a profanity

8  involved in there.  And then I says, "Well, God, I had a

9  flat tire."

10    Q.  And why did you think about your flat tire, or

11  why was that your explanation?

12    A.  Because I should have been at the COMMSTA at 7:00

13  that morning.

14    Q.  How long did you stay right there?

15    A.  A couple of minutes.

16    Q.  Did you have more conversation with Mr. Reckner?

17    A.  And the CO, yes.

18    Q.  This is that conversation going on that you just

19  told us about?

20    A.  Yes.

21       (Exhibit 67 playing in open court)

22    A.  That's the officer returning my ID back to me.

23    Q.  Is Mr. Van Ness talking to the officer?

24    A.  Yes.  I think the officer asked him for his ID

25  also.

1    Q.   Okay.  Are you and Mr. Reckner talking there?  I

2    don't need to know what you said, but are you having

3    more conversation?

4    A.   Yes.

5    Q.   Do you continue to talk there?

6    A.   Yes.

7    Q.   Eventually -- that's fine.  You can stop there.

8         Where do you go?

9    A.   The officer directed me to proceed up the hill,

10   back up to T-1.

11   Q.   And generally, without going through minute by

12   minute, what happens up the hill over the next several

13   hours at T-1?

14   A.   Oh, a lot of confusion, a lot of wondering what

15   happened.  Nobody knows for sure all the details of what

16   was going on.  There was speculation of what, you know,

17   what had happened, who had done it, how it happened.

18   There was no general -- general information other than

19   rumors and speculation.

20   Q.   Had a few of the people been down to T-2 before

21   the police arrived and seen little bits of it?

22   A.   Yes.

23   Q.   And that was being talked about?

24   A.   Yes.  Para had been down there, so she had talked

25   about it.

1    Q.  Did you eat during the day?

2    A.  Sparingly.

3    Q.  Did you -- how were you -- how were your

4  thoughts?  What were your feelings about the situation?

5    A.  I was stunned and bewildered and in shock and

6  trying to process everything internally as to what was

7  going on.

8    Q.  Why internally?

9    A.  That's how I handle problems.  I internalize

10  things.

11    Q.  And has that always been the case?

12    A.  Always, yes.

13    Q.  Were you sharing in the conversations with

14  people?

15    A.  I was engaging in conversations.  I'm not sure

16  how much I was sharing.

17    Q.  You heard Master Chief Lowdermilk testify about a

18  time during the day when you came in his office and sat

19  on the couch or he said he observed you come in his

20  office and sit on the couch.  What were you doing there?

21    A.  I have no memory of that whatsoever, of doing

22  that.

23    Q.  What you were thinking then?

24    A.  I have no memory of even going into his office.

25    Q.  Okay.  Do you doubt that that could have

1  happened?

2     A.  No.  If he says it, I believe him, but I have

3  absolutely no memory of that ever occurring.

4     Q.  Did you sleep up at T-2 at all that day?

5     A.  I don't believe I was sleeping.  There would be

6  times I would close my eyes and start thinking about

7  things.

8     Q.  Were you tired?

9     A.  I was tired, yes.  It wasn't a time for sleeping.

10  I wouldn't have been sleeping.

11     Q.  How about reading a book?

12     A.  Yes, at some point in time, I went back out to my

13  truck and got a book out of my vehicle.

14     Q.  Did you keep books in your truck?

15     A.  Yes, I did.

16     Q.  Are you a reader?

17     A.  Very much so.

18     Q.  How much very much so?

19     A.  Oh, I have hundreds, if not thousands, of books

20  at the house.  I could read a book in a day or day and a

21  half.

22     Q.  We saw some photos.  I won't pull them up, but

23  the photos in your truck there and there was a whole

24  series of books on the ground there.  Appeared to be by

25  one author.  Who was the author at that time?

1      A.  At that time, it would have been Nora Roberts.

2      Q.  And how many books of hers have you read?

3      A.  I've read everything she has written.

4      Q.  Did you have favorite authors, favorite types of

5  books, what?

6      A.  I have -- my reading appetite varied.  I read

7  lots of different things.  So I did have favorite

8  authors.

9      Q.  When you -- throughout the day, did -- what were

10  you -- what was your understanding of what you were

11  waiting for up there at T-1?

12      A.  We had a meeting where -- I believe it was down

13  in the basement where the skipper came in and said what

14  was going on.  He said we were waiting for

15  investigators, the FBI to come down from Anchorage.  We

16  were all restricted to the COMMSTA until we could be

17  interviewed.  So we were just waiting around for them to

18  show up.

19      Q.  And that happened?

20      A.  Yes.

21      Q.  It was later in the evening when you were first

22  interviewed?

23      A.  Yes.

24      Q.  Had you seen other people come and go being

25  interviewed?

1    A.  I would say I had seen them -- some come, but

2  normally, I can't say I recall them coming back into --

3  you know, into the ET deck where we were waiting to be

4  interviewed.

5    Q.  When you -- when it was your turn to be

6  interviewed, you were interviewed at first by a couple

7  of FBI agents?

8    A.  I believe one FBI agent and one CGIS agent.

9    Q.  Did it seem suspicious or problematic to you at

10  all that it was two agents interviewing you?

11    A.  No.

12    Q.  Did you feel in any way singled out by them?

13    A.  No.  Everybody was being interviewed.

14    Q.  And did you feel like a suspect or a person they

15  were focused on?

16    A.  Not at all.

17    Q.  Why not?

18    A.  I didn't do it.  I wasn't worried about being a

19  suspect.

20    Q.  Did they tell you you were a suspect?

21    A.  No.

22    Q.  And what was the -- from your perspective, what

23  was -- what happened in those -- in that first

24  interview?

25    A.  The first interview was just a general

 1  information gathering.  That's how I interpreted it.

 2      Q.  And they talked to you about you and your events

 3  of the day?

 4      A.  Yes.

 5      Q.  The rigger shop and different people, all those

 6  things that we heard the interview on the tape?

 7      A.  Yes.

 8      Q.  What we didn't hear was a detailed explanation of

 9  your activities at the airport.  Did you share that with

10  them?

11      A.  No.

12      Q.  Did you tell them you had been at the airport

13  that morning with the flat tire?

14      A.  I believe I did.

15      Q.  Why not all the details you're sharing here

16  today?

17      A.  It was very personal and embarrassing.

18      Q.  As far as the information you provided to the

19  agents, did they seem to have other questions or seem to

20  do -- be doing other than collecting information from

21  you?

22      A.  No, they were just asking questions, and I was

23  answering them.

24      Q.  All right.  And did that continue -- they took a

25  break ultimately and then came back and talked to you a

1  second time?

2      A.  Yes.

3      Q.  When they came back the second time, did it feel

4  like there was anything different about it, any

5  different focus by them or change in tone or anything?

6      A.  Not -- no, not to me.

7      Q.  Did the purpose seem any different?

8      A.  No.  Just gathering information.

9      Q.  Did you feel like at that point they were focused

10 in on you for some reason or treating you different than

11 anybody else?

12     A.  Well, I couldn't say how they treated anybody

13 else, because I didn't observe any.  But I didn't feel

14 any different from the -- between the first two

15 interviews, no.

16     Q.  Again, they took a break, and then they came back

17 a third time.  Was it suspicious they came back a third

18 time or did it --

19         MS. SHERMAN:  Objection; leading.

20 BY MR. COLBATH:

21     Q.  Was it suspicious to you?

22     A.  No.

23     Q.  Did you have concern that they were talking to

24 you and then going out of the room and coming back to

25 talk to you?

1    A.   No.

2    Q.   During the third interview, did anything seem out

3    of the ordinary yet?

4    A.   No.

5    Q.   Now, at some point in that third interview, they

6    asked you about -- do you recall looking at your

7    telephone?

8    A.   Yes.

9    Q.   And they asked you to look at your telephone.  Do

10   you recall that?

11   A.   I don't believe they asked me -- oh, I looked at

12   my telephone to confirm some times.  Okay.  And I didn't

13   think anything out of the ordinary about that.  Oh, you

14   mean when they asked me to -- to hand them over the

15   phone to look at it?  Is that your question?

16   Q.   Yeah.  Did that occur?

17   A.   Yes, it did.

18   Q.   Did you do that?

19   A.   Yes, I did.

20   Q.   Did that seem out of the ordinary, or you have

21   concern about that?

22   A.   No.

23   Q.   They also spoke to you about your pickup truck?

24   A.   Yes.

25   Q.   That was -- you had that there parked at T-1 all

1    day?

2        A.   Yes.

3        Q.   Did you have any issues with them searching the

4    truck or going out to look in the truck?

5        A.   No.

6        Q.   Why did you tell them that the tire was out

7    there?

8        A.   Because that was the reason why I detoured to the

9    airport.  So I think that's why I told them the tire was

10   in the back of the truck.

11       Q.   Had you discussed with them specifically at that

12   point how the low tire came to be?

13       A.   No.

14       Q.   And when you went out to -- did you accompany

15   them outside when they took you up on your offer to

16   search the truck?

17       A.   Yes.

18       Q.   And did you have conversations with Agent

19   Oberlander out there about the tire and the truck and

20   things in the truck?

21       A.   I can't say who I had conversations with, but I

22   had conversations, yes.

23       Q.   And was the nail in the tire discussed out there?

24       A.   Yes, it was.

25       Q.   Did they look in the back of the truck?  Did you

1    see them look in the back of the truck at the tires?

2        A.   Yes.

3        Q.   And did you -- where did you stand while they

4    were searching the truck?

5        A.   Generally at the back of the truck, because there

6    were cars parked on either side.

7        Q.   And one agent or more than one agent?

8        A.   Two or three, maybe four.  I don't recall how

9    many there were.

10       Q.   At some point did you go back into T-1?

11       A.   Yes.

12       Q.   And when they came back in, the interviewing

13   continued?

14       A.   Yes.

15       Q.   There had been some discussion about not getting

16   done that night or the agents taking you to your house.

17   Do you recall that?

18       A.   Yes.

19       Q.   Did that seem unusual to you or --

20       A.   Yeah, slightly unusual.  I don't understand the

21   reasoning why they would want to accompany me home, but

22   I didn't give it any really deep thought concerning

23   that.

24       Q.   If that needed to happen, were you going to take

25   them to your house?

1    A.  Yes.

2    Q.  Come back to T-1?

3    A.  If necessary.

4    Q.  All right.  Before that discussion further there

5  was a last interview where a third agent came in.  Do

6  you recall that?

7    A.  Yes.

8    Q.  And did you know prior to her coming in with the

9  other two that she was going to be joining you?

10   A.  No.

11   Q.  When she came in, do you recall them talking to

12  you about this gunshot residue test?

13   A.  Yes.

14   Q.  Did you know what that was?

15   A.  Generally, yes.

16   Q.  How?

17   A.  Oh, I had seen it on various TV shows.

18   Q.  Okay.  Did it -- did you understand it to be a

19  real thing?

20   A.  Yes.

21   Q.  Did they tell you it was a real thing?

22   A.  Well, they said they were going to do a GSR test

23  just for elimination processes or just going to do a GSR

24  test.  So I understood it to be real, yes.

25   Q.  Did that appear that they were serious to you?

1    A.  Very.

2    Q.  Okay.  And was -- now, at that point, did you

3  feel like a suspect or a person that they were focused

4  on?

5    A.  No.

6    Q.  Why?

7    A.  They were eliminating stuff.  I had no issue with

8  having the test performed.

9    Q.  Did you watch Ms. Strause?  Did Ms. Strause have

10  the things she needed to do the test?

11    A.  There was some discussion about having a gauze

12  pad, so I offered -- you know, I said, well, we have

13  plenty of first-aid kits stationed around the COMMSTA.

14  Each one of them would have gauze pads in it.  So I just

15  pointed out where she could find a first-aid kit.

16    Q.  Did she do her test?

17    A.  Yes, she did.

18    Q.  Now, your testimony about you watching her get it

19  all packaged up, did you watch her get it all packaged

20  up?

21    A.  Yes, I did.

22    Q.  Why?

23    A.  Well, I was active duty Coast Guard.  I was a

24  urinalysis technician, I suppose I could call it.

25  Tinkle tech was what the vernacular joke was.  The

1    military does various urinalysis tests for its active

2    duty members.

3         So you're required to escort them into the

4    bathroom and observe them, you know, placing a sample in

5    a cup, and then receiving that sample and sealing it and

6    signing for it.  So I had some interest in comparing

7    that procedure to what I was -- what I had done before.

8    Q.   Okay.  Watching her seal it?

9    A.   Yes.

10   Q.   Sign it?

11   A.   Yes.

12   Q.   After that process occurred, the agents didn't go

13   home with you, but you were allowed to go?

14   A.   Yes.

15   Q.   Where did you go?

16   A.   I went home.

17   Q.   And as you drove home or got to your house that

18   night, had anything about the search of your truck or

19   phone, that test, those interviews, made you feel like

20   the police were after you?

21   A.   No.

22   Q.   They were focused on you?

23   A.   No.

24   Q.   Had you just thought to yourself, Mr. Wells, that

25   because you weren't there that morning, you were a

1  suspect?

2      A.  No.

3      Q.  That didn't cross your mind?

4      A.  No.

5      Q.  Okay.

6          THE COURT:  So, Mr. Colbath, is there a good

7  place we could take an afternoon break here?

8          MR. COLBATH:  If I could have one more

9  question, Your Honor, I'm going to move to the next day.

10          THE COURT:  Sure, yes.

11  BY MR. COLBATH:

12      Q.  That night, Mr. Wells, when you got home the

13  night of April 12th, was there activity at your house or

14  were you worried about anything?

15      A.  I wasn't so much worried, but sometime around

16  11:30 or midnight, there was a car that came partially

17  up the driveway.  So I looked out one of my front

18  windows.

19      Q.  Did you know what it was?

20      A.  I -- no, it was too far down the driveway to

21  identify, plus the light -- it was dark, so couldn't see

22  past the headlights other than it was a vehicle.

23      Q.  It went away?

24      A.  It stayed there for a minute or so and then

25  backed back down the driveway and took off down the

1    road.

2         MR. COLBATH:  Okay.  Before I go on to the next

3    day, Your Honor, that would be fine.  I don't have a ton

4    more.  But it would be a good time for a break.  That's

5    fine.

6         THE COURT:  Let's do that.  Please leave your

7    notepads here.  Remember my admonition not to discuss

8    the case.  We'll take about 15 minutes and go off record

9    at this time.

10        (Recessed from 2:48 p.m. to 3:11 p.m.)

11        (Jury present)

12        DEPUTY CLERK:  Court is again in session.

13        THE COURT:  Please be seated, everyone.  We're

14   back on record here.  Ready to proceed, Mr. Colbath?

15        MR. COLBATH:  I am, Your Honor.  Thank you.

16   BY MR. COLBATH:

17   Q.  Mr. Wells, we had ended, it was the night of

18   April 12th.  So on April 13th, you went back to T-1?

19   A.  Yes.

20   Q.  And did there come a time at some point where you

21   rejoined those two agents to continue your interviews?

22   A.  Yes.

23   Q.  And at the start of the interview, we heard on

24   the tapes them read you some advice or go over a form

25   with you, some kind of advice or rights.  You said you

were concerned about that on the tape.  Do you remember

that?

    A.  Yes, I do.

    Q.  What was going on in your mind?

    A.  Well, any time somebody reads you -- they didn't

call it a Miranda warning, but that's in essence what it

was, you should show some concern.

    Q.  Okay.  You talked to them about that?

    A.  Yes.

    Q.  And after visiting more with them, were you

concerned?

    A.  No, because they said I wasn't a suspect.

    Q.  Okay.  Signed the form and continued to talk to

them?

    A.  Yes.

    Q.  Did that interview go like -- generally like the

ones at the start there, like generally like the ones

the day before, or did it proceed differently?

    A.  No, it was generally the same, just questions and

then information seeking, to my knowledge.

    Q.  Did they provide you details about the events of

the investigation?

    A.  Not then, no.

    Q.  Any specific information --

    A.  No.

1    Q.   -- that they had?

2    A.   Not at that time, no.

3    Q.   And as the interview continued there at the

4    beginning, they had you draw a diagram.  You did that?

5    A.   Yes.

6    Q.   One of the things that you depicted on your

7    diagram was the general camera setup.  You were aware of

8    the cameras around the COMMSTA?

9    A.   Yes.  I installed most all of the outside ones.

10   Q.   And you knew how they operated?

11   A.   Roughly.

12   Q.   Okay.  And what did you know about how they

13   functioned and how they were used?

14   A.   Well, they were used to monitor the outside

15   conditions of the COMMSTA, so they had pan and tilt and

16   zoom and focus abilities.

17   Q.   Who picked the operational -- how they were used?

18   A.   Somebody up at the ops deck.

19   Q.   And had you ever been involved in that, the

20   actual monitoring or use of the cameras?

21   A.   I had looked at the monitor, but I had never

22   actually operated a camera.

23   Q.   And at any given time, any given day, did you

24   know anything about the cameras' use?

25   A.   Didn't give them a thought, because they could

1    point them wherever they wanted to.  We had no knowledge

2    of where they were pointed unless you were looking at

3    the monitor on the ops deck.

4        Q.  Could you tell from looking at the outside

5    camera?

6        A.  If you were extremely close to them, like within

7    three or four feet, then you could see through the dark,

8    you know, the black dome.

9        Q.  At the beginning of that fifth interview there,

10   the first morning interview on the 13th, did the agents

11   at the outset share information with you about the

12   cameras, any details --

13       A.  No.

14       Q.  -- that they had?

15           Okay.  Did they tell you they had looked at them?

16       A.  They said they hadn't viewed any cameras.

17       Q.  Okay.  And as the interview continued, near the

18   end of the interview, did that change?

19       A.  Yes, it did.

20       Q.  How did it change?

21       A.  They started talking about times and camera

22   angles or, you know, talking about times and camera

23   views.

24       Q.  And was there a discussion of the cameras at the

25   main gate?

1    A.  Yes.

2    Q.  And you knew where they were talking about as far

3  as being a different location -- did you know it was a

4  different location than the COMMSTA?

5    A.  Yeah.  They had stated it was the main gate.

6    Q.  Did you have the same familiarity with the

7  cameras at the main gate that you did with the ones at

8  COMMSTA?

9    A.  No.

10   Q.  When they started talking to you about the main

11 gate cameras, what do you recall them saying or what --

12 what was conveyed to you?

13   A.  Well, they had said that there was -- they had

14 seen me go by at 6:48, I think -- I don't remember the

15 exact time.

16   Q.  Okay.

17   A.  And then going one way and then coming back at

18 7:22, I believe.

19   Q.  When they -- then when they were now telling you

20 about these camera times, what did that make you think

21 about them viewing the cameras?

22   A.  I had no clue what they were really talking about

23 because that's the first time they had started talking

24 about the cameras and times.

25   Q.  Hadn't you talked about cameras earlier?  Hadn't

1   they mentioned those earlier?

2       A.   The main gate cameras, no.

3       Q.   Any cameras?

4       A.   Any cameras, no.

5       Q.   That's what I'm asking you.  Had they mentioned

6   anything about cameras earlier?

7       A.   No.

8       Q.   And so when they told you about these times on

9   the cameras and in relation to your travels, do you

10  recall asking them about a discrepancy or trying to

11  explain a discrepancy?

12      A.   Well, I didn't understand what they -- what they

13  were trying to ask me, because all of a sudden, they

14  were talking about cameras with -- you know, I didn't

15  know anything about.

16      Q.   So what -- when that part of the conversation

17  came up and the agents were focused on that main gate

18  camera, what were you trying -- what was your

19  understanding of the context of the conversation at that

20  point, or what was going on in your head when they were

21  talking to you about these cameras?

22      A.   Well, I'm trying to figure out what's real and

23  what's not, because they said they hadn't looked at any

24  cameras, and now all of a sudden they're talking about

25  cameras and times, so I don't know where they're coming

1    from.

2        Q.   Did you have any times that you had kept from the

3    day before?

4        A.   No.

5        Q.   And had you seen any camera either pictures or

6    videos or anything up to that point?

7        A.   No.

8        Q.   Was it concerning to you, this description of the

9    main gate camera?

10       A.   I don't know that it was -- it was concerning,

11   but I didn't understand what they were talking about.

12       Q.   All right.

13       A.   It was a mixed message.

14       Q.   Mixed, how so?

15       A.   Well, they said they hadn't viewed any cameras

16   and all of a sudden now they're talking about camera

17   times.  So I don't know where this was coming from.

18       Q.   After that, the -- Agent Bottary went on, and do

19   you recall him giving you information then about things

20   that had happened up at T-2, times or details up from

21   the COMMSTA?

22       A.   Yes.

23       Q.   And was that information you had known before?

24       A.   No.

25       Q.   What details -- as you sat there on April 13th

with them, what details had you known about what had
happened?

A.   I had known that Rich and Jim had been shot
and --

Q.   Who had you heard that from?

A.   That was general rumor going around.  Probably
heard the shot portion from Para.

Q.   Okay.

A.   Heard that Jim was the first one in the building
that morning.

Q.   Jim --

A.   I mean, excuse me, Rich was the first one in the
building that morning, and that was about all I knew.

Q.   So when Agent Bottary told you about people
arriving or the witness he described on the tape or
noises there, was any of that information you were aware
of?

A.   None of it whatsoever.

Q.   And they asked you if you had a reasonable
explanation or an explanation for those things.  What
were you thinking about trying to explain or they were
asking you to explain?

A.   Well, I had no explanation for what they were
talking about at T-2.  That's the first time I had ever
heard about it.

1    Q.   Heard about what?

2    A.   The events that they were discussing.

3    Q.   Okay.  And were those events, in your mind as he

4    talked to you then about it, related to what he had just

5    talked to you about on the main gate camera?

6    A.   No, no.

7    Q.   Okay.  Agent Bottary said, "Do you have a

8    theory?"  Did you know what type of theory he was

9    looking for?

10   A.   No clue.

11   Q.   Do you know whether it related to the details he

12   gave you about T-2 or the details about the main gate?

13   A.   I had no clue what he was trying to get a theory

14   about.

15   Q.   Did you tell him that?

16   A.   Yes, I did.

17   Q.   Did the -- could you come up with any information

18   to add to their details or help them explain those

19   details they explained to you?

20   A.   No.

21   Q.   That interview stopped, and they stepped out and

22   they left you.  Did you stay in the room?

23   A.   No, I left.

24   Q.   Where did you go?

25   A.   Back to the ET deck.

1    Q.  All right.  And how long -- you had another

2    conversation with them, right?

3    A.  Yes.

4    Q.  During the break, did you think about the details

5    they gave you or the explanation they asked for?

6    A.  Well, I thought about the details, but I had no

7    way to put it in context, because that's the first time

8    I had ever heard it.

9    Q.  Okay.  And did you try to develop a theory about

10   what had happened or anything, anymore than you had

11   before?

12   A.  No.

13   Q.  When you walked out at the end of that fifth

14   interview with those details they gave you and the

15   camera times they gave you, did you -- were you a

16   suspect then in your mind?

17   A.  No.

18   Q.  Still?

19   A.  Still.

20   Q.  Why did you feel that way?

21   A.  Because I wasn't at T-2 that morning.

22   Q.  But did you feel they had implied -- well, had

23   they said that?

24   A.  Said what?

25   Q.  That you were a suspect or that they thought you

 1  were at T-2?

 2      A.  No.

 3      Q.  All right.  So when you went back in the last

 4  time then to talk to them, do you remember them

 5  asking or saying that they wanted to talk about it more?

 6      A.  Yes.

 7      Q.  Do you remember asking them, "Talk about what?"

 8      A.  Yes.

 9      Q.  Did you understand what it was that they wanted

10  to talk about specifically?

11      A.  No.

12      Q.  And did Agent Oberlander begin to explain that to

13  you?

14      A.  Yes.

15      Q.  In his explanation, was there any time during his

16  explanation that you felt he was accusing you then of --

17  or making you the suspect?

18      A.  Yes.

19      Q.  And how was that?

20      A.  Well, he started to say -- I don't remember his

21  exact words, but I believe it was, was it planned or was

22  it heat of the moment.

23      Q.  And had you felt up till this last meeting with

24  them accused by them?

25      A.  No.

1    Q.   I mean accused of the crime?

2    A.   No.

3    Q.   Did that change?

4    A.   Yes.

5    Q.   Did you ask him directly?

6    A.   Yes.

7    Q.   Did he tell you directly at that point?

8    A.   Yes.

9    Q.   And then you guys had no more conversation?

10   A.   Correct.

11   Q.   Were you allowed to leave T-1 shortly after that?

12   A.   Yes.

13   Q.   Did you leave in your truck?

14   A.   No.

15   Q.   Why?

16   A.   They had seized it.

17   Q.   Did you -- were you able to go to -- now, your

18   wife was still out of town?

19   A.   Yes.

20   Q.   And where was her vehicle?

21   A.   At the airport.

22   Q.   Were you able to go to the airport and get her

23   vehicle?

24   A.   No.

25   Q.   Why?

1    A.  They said it was impounded.

2    Q.  Okay.

3    A.  Or words to that effect.

4    Q.  Did you know whether it was actually impounded?

5    A.  No clue.

6    Q.  Were you able to get a ride or a car?

7    A.  Yes.

8    Q.  From who?

9    A.  I called Judy Pletnikoff and told her my

10   situation, and she came out and picked me up, took me

11   back into town to her house and loaned me her son's

12   vehicle.

13   Q.  All right.  And so then once you had a vehicle,

14   where did you go?

15   A.  I stayed in town, got something to eat and I

16   drove out to the house.

17   Q.  Your house?

18   A.  My house.

19   Q.  When you got to your house, where did you park?

20   A.  At the bottom of the driveway.

21   Q.  Why park there?

22   A.  Because there was a state trooper vehicle there,

23   and there were a couple of -- there was a van and other

24   vehicles parked at the house.

25   Q.  So were you able to go up your driveway or access

1   your house?

2       A.  No.

3       Q.  How long did you stay there?

4       A.  I stayed there a couple hours.

5       Q.  What did you do?

6       A.  I just basically -- I talked to the trooper a

7   little bit, read a book and waited around until 6:00-ish

8   or so when I knew my wife was coming -- due in at the

9   airport and I proceeded to go to the airport.

10      Q.  Where did you go when you first got back to the

11  airport?

12      A.  I went to Island Air because I was thirsty, and I

13  went to see if I could get something to drink at the

14  coffee shop.

15      Q.  Coffee?

16      A.  No.

17      Q.  All right.  Was the coffee shop open?

18      A.  No, it was not.

19      Q.  You went to the outside doors --

20      A.  The outside door was closed, yes.

21      Q.  So where did you go?

22      A.  I went around to the entrance to Island Air and

23  then proceeded to go to the coffee shop.

24      Q.  Had you been to Island Air before?

25      A.  Yes.

1    Q.   And the coffee shop before?

2    A.   Yes.

3    Q.   And was the coffee shop open from the inside?

4    A.   It was not.

5    Q.   While you were in Island Air, what happened?

6    A.   I had noticed that the cameras were mounted up on

7    the overhead or the ceiling.

8    Q.   Had you been thinking about your conversation

9    with the Agents Oberlander and Bottary from that

10   morning?

11   A.   Yes.

12   Q.   All right.  So what happened then at Island Air?

13   A.   Coffee shop was closed.  I asked, I want to say,

14   Olivia Terry if the coffee shop was open.  She said it

15   wasn't.  After that, I left the building.

16   Q.   What about -- what about the cameras was

17   significant to you?

18   A.   That they -- that -- just that they were visible.

19   And so thinking of that, and then I had a bunch of

20   questions about cameras and times and whatnot, I decided

21   I would go back over to Servant Air and see if there

22   were cameras there that could back up my -- the events

23   that occurred the previous morning.

24   Q.   Had you ever noticed the cameras in Island Air

25   before?

1      A.   No.

2      Q.   And could you recall as you stood there whether

3   Servant Air had cameras?

4      A.   No, I didn't -- didn't recall whether they did or

5   did not.

6      Q.   Where did you go?

7      A.   I went to Servant Air.

8      Q.   And did you go inside?

9      A.   Yes, I did.

10      Q.   Did you see any cameras?

11      A.   I looked around the lobby and walked toward the

12   front desk and didn't see any cameras.

13      Q.   Talk to any people?

14      A.   Didn't talk to anybody, no.

15      Q.   Okay.  Did you know that the FBI was parked out

16   in the parking lot watching you as you went to the two

17   air traffic -- air service places?

18      A.   I was not aware of that, no.

19      Q.   After you left Servant Air, where did you go?

20      A.   I reparked the vehicle in front or close to the

21   Alaska Airlines terminal and went inside the terminal.

22      Q.   What did you do there?

23      A.   Went to the bathroom again.

24      Q.   Any reason to keep track of the time you were in

25   the bathroom?

1    A.   No.

2    Q.   Did your wife arrive?

3    A.   Yes, she did.

4    Q.   Where did you and her go after leaving the

5    airport?

6    A.   We went out to the house.

7    Q.   Were the officers still there?

8    A.   Yes, they were.

9    Q.   Were you allowed to go in?

10   A.   I was not.

11   Q.   Was she?

12   A.   She was allowed to go in and get clothing and

13   medications.

14   Q.   All right.  While she was doing that, what did

15   you do?

16   A.   Waited down at the base of the hill.

17   Q.   Having conversations with any of the agents or

18   anybody?

19   A.   Not really conversation, just waiting.

20   Q.   And make any phone calls?

21   A.   No.

22   Q.   And leave there with your clothing and your

23   medication, and you and Nancy leave there with those

24   things?

25   A.   We had a conversation with one of the agents, and

```
 1    she asked me for my phone.  She said they were getting a
 2    warrant for it, and so she wanted my phone.
 3        Q.  She didn't give you a warrant?
 4        A.  She did not.
 5        Q.  But did you give her the phone?
 6        A.  I did.
 7        Q.  Where did you guys go then?
 8        A.  Then we went back to the Comfort Inn and checked
 9    in for the evening.
10        Q.  The clothes that you were wearing as you sat
11    there the night of April 13th, how long had you been in
12    those clothes?
13        A.  All week.
14        Q.  What do you mean by that?
15        A.  I put them on Monday and usually changed them on
16    Saturday.
17        Q.  And this would have been Friday, the 13th?
18        A.  Yes.
19        Q.  So you wear the same pants a week at a time?
20        A.  I usually wear the same pants a week at a time.
21    Socks.  I change undershirts or T-shirts every day and
22    sometimes the outer shirt, depending on weather
23    conditions, and the overcoat depending on weather
24    conditions.
25        Q.  So the T-shirt was different, but the rest of
```

```
1  your outfit you had worn each day you worked that week?
2     A.  Yes.
3     Q.  Including the day before, April 12th?
4     A.  Yes.
5     Q.  The day before when you were up on the roof on
6  April 11th?
7     A.  Yes.
8     Q.  You went to the Comfort Inn.  And how long did
9  you stay at the Comfort Inn, you and Nancy?
10    A.  Well, we just booked one evening.
11    Q.  And -- but how long did you ultimately end up
12 staying?
13    A.  Three or four days.
14    Q.  Was there a time when you went and visited the --
15 during those three or four days, visited the
16 Pletnikoffs?
17    A.  Yes.
18    Q.  I'm going to show Mr. Wells for identification
19 Defense Exhibit No. 316 and 17.
20        Mr. Wells, are you familiar with those documents?
21    A.  Yes.
22    Q.  Are these documents that you would have received
23 on April 15th?
24    A.  Yes.
25            MS. SHERMAN:  I don't have an objection.
```

1          MR. COLBATH:  Your Honor, I'm going to move 316

2     and 317.

3          THE COURT:  Did you say no objection?

4          MS. SHERMAN:  No objection.

5          THE COURT:  Then those will both be admitted.

6          (Defense Exhibit Nos. 316 and 317 admitted)

7     BY MR. COLBATH:

8     Q.  And where did you -- where did you receive these

9     documents?

10    A.  I was at Judy Pletnikoff's house.

11    Q.  Who brought them to you?

12    A.  Two agents or three agents.  I'm not sure of the

13    number, but I wasn't sure which particular agents they

14    were.  They could have been FBI or CGIS.  I don't

15    remember exactly.

16    Q.  Had you told them that you were at the

17    Pletnikoffs'?

18    A.  No.

19    Q.  But they found you there?

20    A.  Yes.

21    Q.  And this first document was from the commander.

22    Did it place you on administrative leave?

23    A.  It did.

24    Q.  And then can we see -- that was 316.  Can we see

25    317?  Just blow that paragraph up.  Can we get the

1   signature in there?

2        And is this also a document you got that day?

3   A.   It is.

4   Q.   And what did this document do?

5   A.   Basically banned me from entering any Coast Guard

6   property.

7   Q.   And who was JK Moore?

8   A.   He was the commanding officer of the Kodiak base.

9   Q.   We can take that down.  Thank you.

10        So that was April 15th that you got those at the

11  Pletnikoffs' house?

12  A.   Yes.

13  Q.   And were you able to return then at all to

14  COMMSTA or the base after that?

15  A.   No.

16  Q.   In the days that -- well, were you allowed to go

17  back to your house then?

18  A.   No.

19  Q.   How many days was it, do you recall, before you

20  went back to the house?

21  A.   I believe it was Tuesday.

22  Q.   And as you traveled around and then ultimately

23  returned to the house, did you become aware that the FBI

24  was following you?

25  A.   Yes.

1    Q.   And how was that?

2    A.   Well, Saturday morning we checked out of the

3  Comfort Inn, this would be the 14th of April, and

4  proceeded to head out towards the Flats to go to the

5  house, see what was going on.  Nancy got a phone call on

6  her phone saying, "Where are you going?"  And we said --

7  or she said --

8         MS. SHERMAN:  Objection; hearsay.

9    Q.   Don't repeat what people say.  You had contact

10 with the FBI?

11   A.   We had contact with somebody.  I'm not sure who

12 it was.  And they said we couldn't go out to the house.

13        MS. SHERMAN:  Objection; hearsay.

14        THE COURT:  That's sustained.

15 BY MR. COLBATH:

16   Q.   Don't say what other people say.

17        In the days that followed, did you know the FBI

18 was around?

19   A.   Yes.

20   Q.   Did you see them?

21   A.   Yes.

22   Q.   Did you have periodic contact with them?

23   A.   Yes.

24   Q.   Were they visible, or were they hiding that you

25 could tell?

1    A.   I would say combination of both.  But mostly

2   visible.

3    Q.   Did that continue for a number of weeks or

4   months?

5    A.   Yes.

6    Q.   When you -- as time went on, if you traveled away

7   from your house, did you have communication about that

8   with the FBI?

9    A.   Yes.

10   Q.   What did you do?  Don't tell me anything about

11  anything anybody else said, but what did you generally

12  do?

13   A.   We were requested to inform the FBI of any of our

14  travel plans.

15   Q.   And did you do that?

16   A.   Yes.

17   Q.   Did you have contact with the FBI at the Kodiak

18  airport?

19   A.   Yes.

20   Q.   And what happened then?

21   A.   They served us a search warrant or served me a

22  search warrant.

23   Q.   All right.  And what was being looked for or

24  taken or --

25   A.   Electronics.

1    Q.   What were -- did you have any with you?

2    A.   Yes.

3    Q.   What kind?

4    A.   I had a computer.  I had another cell phone.  I

5    had to buy another cell phone, so I had a new cell

6    phone.  I had a camera.  I had memory cards, a Kindle,

7    various, you know, things like that.

8    Q.   And were those taken?

9    A.   Yes, they were.

10   Q.   Pursuant to that search warrant?

11   A.   Yes.

12   Q.   How about contact in -- that was in Kodiak you

13   said?

14   A.   Yes.  As we drove up and parked the car, they --

15   and we got out of the car to grab the luggage, they

16   walked up and served the search warrant and proceeded to

17   empty my backpack on the pavement and spread everything

18   out to see what they were going to find and then seize.

19   Q.   Okay.  Did you have contact at the Anchorage

20   airport?

21   A.   Yes, we did.

22   Q.   How long after April was that?

23   A.   I believe that was in November.

24   Q.   So many months later?

25   A.   Yes.

1    Q.  Had additional searches -- had they come to your
2  home and done additional searches?
3    A.  Yes.
4    Q.  This contact at the Anchorage airport, did you
5  know that you were going to be meeting with the FBI when
6  you arrived in Anchorage?
7    A.  No.
8    Q.  When you ultimately met with them, did they have
9  a search warrant to collect some things from you?
10   A.  There were five or six agents that met us as we
11 exited the gate.
12   Q.  And what was being searched for in that
13 particular search warrant?
14   A.  Hair samples.
15   Q.  And were those ultimately collected?
16   A.  Yes.
17   Q.  Did you learn at all that there were other search
18 warrants they had that needed to be served?
19   A.  They had said that they were going to search the
20 house again.  And I says, "Well, don't break the door,
21 we'll give you the key," so they wouldn't break the door
22 down to enter the house.
23   Q.  Did you do that?
24   A.  Yes, we did.
25   Q.  In thinking about your house, I want to sort of

divert real quickly, Mr. Wells, for a minute.  What
was -- when did you and John Stein begin having -- begin
knowing each other or being friends?

A.  When I was at the COMMSTA in 1980, he was the
electronics officer.

Q.  Many, many years before 2012?

A.  Yes.

Q.  And how would you describe your friendship?  What
was the basis of it, or what was the commonality?

A.  We were electronic technicians.  He had started
as electronics technician and then made warrant, and he
was the EO at that time at the COMMSTA.

Q.  Did you become social friends?

A.  Yes, we did.

Q.  How about after he left the Coast Guard and you
went into civilian service?

A.  Yes.  He was still living in Kodiak at that time.

Q.  All right.  Around the time that he was getting
ready to move, explain to the jury from your
recollection and your memory how it came to be that his
gun safe and gun collection ended up for a time at your
house.

A.  He wasn't sure what he was going to do.  So he
moved the gun safe or we moved the gun safe to our
house.  He had asked me to sell his car and sell his

1  house.

2      Q.   And he left both of those things before -- he

3  left the island, and you had control of those two

4  things, the car and the house?

5      A.   And the gun safe at my house, yes.

6      Q.   And did you sell the car?

7      A.   Yes.

8      Q.   What was it?

9      A.   It was a Toyota quarter-ton pickup.

10     Q.   What did you do with these proceeds?

11     A.   I believe I deposited -- he still had a checking

12 account or an account there at the local credit union.

13 I deposited it in there.

14     Q.   Did his house get sold?

15     A.   Yes, it did.

16     Q.   Did he leave it in a condition all ready to sell?

17     A.   He did not.

18     Q.   How was it?

19     A.   It was very messy.

20     Q.   Did you get it ready to sell, you individually or

21 you and others?

22     A.   My family did.

23     Q.   And do you know how long after he left town that

24 it took to get the house sold?

25     A.   I don't recall that, no.

1    Q.  And that was -- you had assistance from a

2   realtor?

3    A.  Yes.

4    Q.  And the gun safe at your house, did you ever

5   use -- after John left the island, did you ever use or

6   have any of those firearms out for any reason?

7    A.  No.

8    Q.  And how long was he gone before he came back to

9   the island?

10    A.  I don't recall.

11    Q.  Was it days, weeks, months?

12    A.  No, it was months.

13    Q.  And when he came back, you still had the gun

14   safe.  Did you have the gun safe?

15    A.  I don't remember.

16    Q.  Okay.  If you didn't have the gun safe then,

17   where would it have been?

18    A.  It would have been shipped.

19    Q.  Shipped to where?

20    A.  To his brother's in -- to his brother in

21   Wisconsin.

22    Q.  When Mr. Stein came back after several months, do

23   you recall any discussions with him about --

24         MS. SHERMAN:  Objection; leading.

25         THE COURT:  Any discussions with him about a

```
 1   certain subject?
 2              MR. COLBATH:  Yes, just generally about guns
 3   being missing is what my question was going to be, Your
 4   Honor.
 5              THE COURT:  I'm going to sustain the hearsay
 6   objection.
 7              MR. COLBATH:  Okay.
 8              THE COURT:  Rephrase.
 9   BY MR. COLBATH:
10       Q.  When Mr. Stein came back to the island, did you
11   have any knowledge that he was missing any guns?
12       A.  No.
13       Q.  And did you know that at any time prior to him
14   leaving again?
15       A.  No.
16       Q.  Did you ever know that?
17       A.  Yes.
18       Q.  And where would Mr. Stein have been when you
19   learned that?
20       A.  He came -- he called me from Wisconsin at his --
21       Q.  Don't tell us what he said, but --
22       A.  I know.  I'd just say he called me from
23   Wisconsin.
24       Q.  Okay.  And did you just get general information
25   about a gun being missing?
```

1    A.  Yes.

2    Q.  I want to -- did you know where the gun was?

3    A.  No.

4    Q.  Had you ever particularly seen that particular

5  gun that he was talking about, or did you know what gun

6  he was talking about?

7    A.  He mentioned the gun.

8    Q.  Did you know anything about the location of that

9  gun?

10    A.  No.

11    Q.  Was it with you?

12    A.  It was not.

13    Q.  Was it with anybody in your family or anybody

14  that you knew, to your knowledge?

15    A.  Not to my knowledge, no.

16    Q.  Have you ever seen that gun since Mr. Stein left

17  the island?

18    A.  No.

19    Q.  Had you -- can we show Mr. Wells Exhibit

20  No. 232 -- I'm sorry, 232A.

21       So Mr. Wells, did you get a copy of this letter

22  that Mr. Stein sent to the Alaska State Troopers?

23    A.  Yes.

24    Q.  And did it -- what did this relate to?

25    A.  To his missing gun.

1    Q.  And did you read it when you got it?  Did you

2    read that section that I've circled there, section

3    seven?

4    A.  Yes.

5    Q.  And was that accurate information as it relates

6    to you?

7    A.  Other than the spelling of where I lived, yes.

8    Q.  Did the police ever contact you with reference

9    this gun or anything?

10   A.  I don't believe they did.

11   Q.  Okay.  And did Mr. Stein ever contact you again

12   reference this gun?

13   A.  No.

14   Q.  Did it ever show up or surface, to your

15   knowledge, that you had anything to do with or

16   involvement with?

17   A.  No.

18   Q.  After -- I want to go back to the timeframe where

19   the searches were continuing and the run-ins with the

20   FBI.  Was there a time that you saw the pictures of your

21   vehicles in the paper?

22   A.  Yes.

23   Q.  Were you aware of news coverage about the murders

24   and involving you?

25   A.  Yes.

```
 1      Q.  Describe what it was like to be on Kodiak Island

 2   with all those things going on and all the coverage of

 3   the murders.

 4           MS. SHERMAN:  Objection; relevance.

 5           MR. COLBATH:  Just from his perspective, Your

 6   Honor.

 7           THE COURT:  Well, do you maintain the

 8   objection?

 9           MS. SHERMAN:  Yes.

10           THE COURT:  Let's have a brief sidebar.

11           (Begin bench conference)

12           MR. COLBATH:  So Your Honor, I only have about

13   three questions left.  I'm going to ask Mr. Wells that

14   question about what it was like.

15           THE COURT:  Why is that relevant?

16           MR. COLBATH:  That is relevant because the

17   government has put on evidence from particularly Judy

18   Pletnikoff, as well as Don and Theresa Kiele, about

19   after-the-fact conversations.  And Mr. Wells is going to

20   say that he was -- he felt isolated, he felt persecuted.

21           He was very frustrated with being kicked off of

22   the base and sort of here he is sort of ostracized from

23   the community, and it was very frustrating.  He lost his

24   temper at times.  Things he said, things like that.  I'm

25   not going to go into I guess a bunch of detailed
```

1  conversations.

2          THE COURT:  I think that's fair.  So that's

3  overruled.  All right.

4          (End bench conference)

5          THE COURT:  Mr. Colbath, go right ahead.

6  BY MR. COLBATH:

7     Q.  Mr. Wells, with the ongoing investigation and

8  things continuing and not being allowed to be at the

9  base and things, how did it feel for you?  How was it

10 those many months while this was going on?

11    A.  It was very frustrating.

12    Q.  And how so?

13    A.  Well, we would talk to friends in town or

14 wherever they lived and then --

15    Q.  Don't tell us what people said, though.  Just

16 frustrating from you.

17    A.  Frustrating from me.

18    Q.  But how so?  Describe your feelings and your own

19 activities.

20    A.  Well, I was excluded from the base, so I was

21 denied medical services because I had continually used

22 the base clinic.  I was denied dental services.

23 Couldn't shop at the commissary.  Couldn't go to the

24 exchange.

25          Couldn't go to work.  Was restricted from talking

to friends, co-workers.  Lost contact with a lot of
people that I would normally have daily or weekly
conversations with.

Q.  Was there much of anything in your life that it
didn't change or affect?

A.  No.  It severely affected my life.

Q.  And how was that for you?

A.  Very, very frustrating.

MR. COLBATH:  That's all the questions at this
point I have for Mr. Wells, Your Honor.

THE COURT:  All right.  Ms. Sherman, ready to
proceed?

MS. SHERMAN:  Yes.

THE COURT:  Go right ahead, please.

CROSS EXAMINATION

BY MS. SHERMAN:

Q.  Good afternoon, Mr. Wells.

A.  Good afternoon.

Q.  I want to start by talking about your time at the
Coast Guard.  Your career was very important to you,
wasn't it?

A.  Yes.

Q.  We've heard a lot about your military career
today, specific details about where you were stationed
and the times you were there, right?

1    A.  Correct.

2    Q.  And you remember all these details?

3    A.  Not all the details.  I -- significant details I

4  remember.

5    Q.  And you started in the rigger shop in 1990; isn't

6  that right?

7    A.  Correct.

8    Q.  And you were -- so about that -- by 2012, about

9  22 years working out of the same building?

10   A.  Yes -- well, no.  Originally, when I started, T-2

11  building was occupied by the ESD unit.  We were in the

12  basement of T-1, the rigger shop.

13   Q.  So the rigger shop at T-2, how many years did you

14  specifically work in that building?

15   A.  I don't remember when we moved down there.  It

16  was a couple of years that we were in the basement of

17  T-1.

18   Q.  So close to 20 years then?

19   A.  Yes.

20   Q.  You retired from the Coast Guard as a chief?

21   A.  Yes.

22   Q.  That's the goal, right, becoming a chief?  That's

23  what your testimony was?

24   A.  If you're enlisted, yes.

25   Q.  And as a chief, you get to be in charge of

1    others, right?

2        A.   Normally.

3        Q.   And then you retired and you went to work as a

4    civilian?

5        A.   Correct.

6        Q.   And by your estimation, you were actually doing

7    more work as a civilian than you were as an enlisted

8    member, right?

9        A.   No.  I was doing different work.

10       Q.   Do you recall telling investigators you were

11   doing more work than you had -- as a civilian than you

12   had as enlisted?

13       A.   No.  I was traveling as opposed to being active

14   duty.  I went to more different places.

15       Q.   So that's what you meant?

16       A.   Yes.

17       Q.   But that's not what you said, right?

18       A.   Correct.

19       Q.   In terms of the rigger shop, most people in the

20   antenna field would consider you pretty experienced,

21   right?

22       A.   Yes.

23       Q.   You pretty much knew everything about that rigger

24   shop and the antennas, right?

25       A.   Yes.

1   Q.  In fact, most people would look to you for

2   knowledge and expertise over the years?

3   A.  Yes.

4   Q.  And when you were up on those towers, you're good

5   at staying calm in those stressful situations?

6   A.  Correct.

7   Q.  When you attended the NATE conferences, you were

8   probably more knowledgeable than a lot of your peers at

9   those conferences, weren't you?

10  A.  No.

11  Q.  Were you considered an expert in your field?

12  A.  Yes.

13  Q.  And you had no plans to retire, right?

14  A.  Well, I had plans to retire, but it wasn't going

15  to be for a couple, three more years.

16  Q.  And as of April 12, 2012, you were still having

17  fun working in the rigger shop, right?

18  A.  Yes.

19  Q.  And that's what you told investigators, right?

20  A.  Correct.

21  Q.  And you basically ran the shop, right, as -- I

22  know you were a civilian, but you were basically running

23  the shop?

24  A.  No.

25  Q.  Who was running the shop then?

1    A.  ET1.

2    Q.  You made the decisions on what tower work would

3 happen, right?

4    A.  It was a combination of people that made the

5 decision.

6    Q.  Okay.  Did you have some expectations about how

7 people would treat you based on your knowledge and

8 experience?

9    A.  I don't know what you mean by expectations.

10    Q.  Did you expect to be treated a certain way

11 because you knew how to run the antennas at the COMMSTA?

12    A.  I don't say that I expected to be treated.  I

13 expected to be treated as a human being.

14    Q.  You had a good sense of the routine at the shop,

15 right?

16    A.  Correct.

17    Q.  So let's talk about the routine at the rigger

18 shop at least in April 2012.  Your schedule was 7:00 to

19 3:30, right?

20    A.  Yes.

21    Q.  And the Coast Guard employees started at 8:00?

22    A.  Generally.

23    Q.  And you started at work and Rich started work at

24 7:00?

25    A.  Normally, yes.

1    Q.  And even though the Coast Guard employees didn't

2    actually start until 8:00, they would often show up

3    early, sometimes as early as 7:30?

4    A.  Correct.

5    Q.  And Mr. Hopkins would show up even earlier than

6    that?

7    A.  At times, yes.

8    Q.  So the common practice was you and Rich were

9    always the first ones into the rigger shop?

10   A.  Normally, yes.

11   Q.  Let's take a look at Exhibit 44.

12       So you would normally park in the space closest

13   to the door, right here, right?

14   A.  Correct.

15   Q.  And then Rich would park next to you, right?

16   A.  Correct.

17   Q.  And then ET1 Hopkins would fill in and the

18   non-rates, right?

19   A.  In order of arrival normally.

20   Q.  And Rich, if you beat Rich -- excuse me.  If Rich

21   beat you in, he would park in that second spot and leave

22   that first spot for you still, right?

23   A.  Normally, yes.

24   Q.  And the non-rates wouldn't park in your spot if

25   they beat you to work, right?

1    A.   No.

2    Q.   Hopkins would?

3    A.   Occasionally.

4    Q.   Anyone else park in your spot other than

5    Mr. Hopkins?

6    A.   If somebody didn't know the normal parking or

7    they would be parked, you know, wherever there was a

8    vacant slot.

9    Q.   But essentially, that was your spot, people knew

10   that was your spot?

11   A.   Yes.

12   Q.   Let's talk about how people would get into the

13   building in the morning.  Let's look at Exhibit 25.

14        Whoever came in first, you or Rich, would enter

15   through this door, right?

16   A.   Normally.

17   Q.   Okay.  So on occasion you wouldn't?

18   A.   No, I would usually use a key to go into the

19   normal front door.

20   Q.   Okay.  And there's a CAC card reader there,

21   right?

22   A.   No.

23   Q.   There's not a CAC card on this door?

24   A.   No.  That's a separate COMMSTA identification

25   card.  That's not a CAC card.

1    Q.   So you would use a swipe card then to get in?

2    A.   Yes.

3    Q.   And then you also had a CAC card to get on your

4    computer?

5    A.   Correct.

6    Q.   And as a civilian, Rich also had a CAC -- a swipe

7    card for that door?

8    A.   Correct.  All members of the COMMSTA had a swipe

9    card.

10   Q.   Let's look at Exhibit No. 13.

11        So whoever got there first, you or Rich, most

12   likely would enter through this door, right?

13   A.   Correct.

14   Q.   Then you would go around and you would throw the

15   dead bolt on that door, and that's the other door that

16   the second person and subsequent people would come in,

17   right?

18   A.   I would say 98 percent of the time.  Sometimes we

19   would forget to open the front door.

20   Q.   You forget to open that door and someone is

21   banging on it?

22   A.   They're banging on it, or they will go to the

23   swipe card door and enter that way.

24   Q.   Okay.  But most of the time you or Rich would

25   remember to open that door?

1    A.  Yes.  But it wasn't -- you know, it wasn't 100

2  percent of the time.

3    Q.  So after you come in and -- 98 percent of the

4  time come in, unlock, throw that bolt on the door, then

5  you go to work in the office, right?

6    A.  Yes.  We would normally log in -- I would log in

7  on my computer, yes.

8    Q.  And you know Rich would log in on his computer,

9  right?

10    A.  Yes.

11    Q.  So if you showed up and Rich was already there,

12  he's probably not parked in your spot, right?

13    A.  Correct.

14    Q.  He would go in and unlock the door, and you could

15  go through this door, right?

16    A.  Correct.

17    Q.  And if you were -- on a normal day, you would

18  expect to find him, if you were the second one there,

19  expect to find him on his computer, right?

20    A.  Correct.

21    Q.  And he would expect to find you on your computer

22  if you beat him?

23    A.  Correct.

24    Q.  And this looks like a large building, but T-2 is

25  actually a pretty small building, isn't it?

1    A.   No, it's fairly large.

2    Q.   Okay.  Well, the distance between the office and

3    the break room is pretty small, right?

4    A.   It's 15, 20 feet.

5    Q.   You recall calling it a fairly straight shot from

6    the office to the break room?

7    A.   Well, there is a -- say, a 45-degree angle.

8    Q.   So do you recall telling investigators it was a

9    fairly straight shot?

10   A.   Well, that's still a fairly straight shot, yes.

11   Q.   When you started at the COMMSTA, there was -- at

12   the rigger shop, there wasn't a camera there, right?

13   A.   No.

14   Q.   And you actually helped install the camera that

15   was right there on the wall?

16   A.   Yes.

17   Q.   So you helped install all the cameras, right?

18   A.   No.

19   Q.   Okay.  You helped install the pole camera,

20   correct?

21   A.   All of the outside cameras I helped install.

22   There were a number of interior cameras I did not

23   install.

24   Q.   So let's talk about those outside cameras.  You

25   helped install all the outside cameras?

1    A.   Yes.

2    Q.   And you knew all of them could pan, tilt and

3    zoom?

4    A.   No, I can't say that.  I'm not sure what the ones

5    out at R-2 did.

6    Q.   So let's talk about T-1 and T-2.  Those cameras

7    you knew panned, tilted and zoomed?

8    A.   Yes.

9    Q.   And you knew that the T-2 camera in general would

10   focus out on the lot and then out at the flagpole,

11   right?

12   A.   Normally, yes.

13   Q.   And you knew that that camera on the corner of

14   T-2 is the only camera on the rigger shop, right?

15   A.   Yes.

16   Q.   And when you talked to police, you actually drew

17   a diagram.  Let's bring up 104A.  It's facing the other

18   way, but it's pretty close to Exhibit No. 13, isn't it?

19   A.   No, it doesn't show the -- well, fairly close.

20   Q.   Okay.  And you drew for the investigators what

21   the T-2 camera would normally capture, right?

22   A.   To the best of my knowledge, yes.

23   Q.   And that's what the camera was actually

24   capturing, that view on the morning of April 12th,

25   wasn't it?

1    A.   Yes.

2    Q.   We can take that down.

3         I'm going to talk about your relationships with

4    the people in the rigger shop.  You said that you didn't

5    really socialize with people outside -- from work

6    outside of work, right?  That was your testimony?

7    A.   I did with certain individuals but not everybody

8    in the shop.

9    Q.   So let's talk about that.  You didn't spend time

10   with Hopkins outside of work?

11   A.   I did not.

12   Q.   Didn't spend time with Rich outside of work?

13   A.   That's not true.

14   Q.   Okay.  How often did you spend time with Rich?

15   A.   I don't have a percentage, but I had conversed

16   with him at the Rendezvous, occasionally meeting there.

17   I would see him in town at various other functions and

18   stuff going on.  So it's not like I didn't have contact

19   with him.

20   Q.   Didn't have him to your house, right?

21   A.   He had been to the house before.

22   Q.   You didn't have other -- you didn't have Cody

23   Beauford over to your house, right?

24   A.   I did not.

25   Q.   Didn't have Nate Pacheco to your house, right?

1    A.   I did not.

2    Q.   Didn't have Aaron Coggins to your house, right?

3    A.   I did not.

4    Q.   You had Para Upchurch to your house, right?

5    A.   Correct.

6    Q.   And you had Leah Henry to your house?

7    A.   Correct.

8    Q.   And you knew that Pacheco, Beauford and Coggins,

9    none of them had family on Kodiak either, right?

10   A.   Correct.

11   Q.   I want to go back to early 2011.  The shop was --

12   even though Hopkins was the supervisor, the shop was

13   kind of running itself like it had been, right?

14   A.   I'm not sure when in 2011 you're referring to.

15   Q.   Early.  Let's go back to January or February.

16   The shop is kind of running along, right?

17   A.   Yes.

18   Q.   And Hopkins was the supervisor, wasn't he?

19   A.   Correct.

20   Q.   But he wasn't nearly as experienced as you,

21   right?

22   A.   No.

23   Q.   And Rich Belisle wasn't as experienced as you?

24   A.   No.

25   Q.   But he was learning your job?

1    A.  He was learning his job.

2    Q.  Okay.  He trusted you?

3    A.  Yes.

4    Q.  On the tower, he's trusting you with his life,

5    right?

6    A.  As I did him.

7    Q.  Was it difficult working for Mr. Hopkins since he

8    didn't have the experience in antennas?

9    A.  No.  I won't say it was difficult.

10   Q.  You didn't really like how Hopkins was choosing

11   to lead, though, right?

12   A.  I wouldn't say didn't like.  I just had some

13   issues with his leadership style.

14   Q.  Because he was gruff with the girls?

15   A.  No, he was gruff with all the non-rates and even

16   the third class.

17   Q.  So you dispute their testimony that they thought

18   he was a good leader?

19   A.  I won't say I dispute it.  I just had a different

20   view of it.

21   Q.  Chief Reckner came and moved his desk down to the

22   rigger shop, right?

23   A.  Correct.

24   Q.  And he was keeping an eye on you, wasn't he?

25   A.  He was not, because I wasn't there.

1    Q.  No other chief had ever moved their desk down to

2  the rigger shop, right?

3    A.  No, that's not correct.  We had three different

4  chiefs that had desks down there.

5    Q.  Okay.  Mr. Reckner was keeping an eye to make

6  sure Hopkins was running the shop, right?

7    A.  I can't say what Chief Reckner was doing.

8    Q.  Okay.  You were there, right, during 2011, not

9  before -- before you got sick, you were there?

10   A.  Yes.

11   Q.  Okay.  And --

12   A.  But Chief Reckner wasn't down in the shop then.

13   Q.  He was still the chief?

14   A.  Yes, he was.

15   Q.  And he wanted to make sure Hopkins -- you could

16  tell he was having Hopkins run the shop?

17   A.  Correct.

18   Q.  And some of that involved Hopkins ordering things

19  that you didn't necessarily agree with?

20   A.  Possibly, yes.

21   Q.  So you have a meeting in April 2011 with

22  Chief Reckner, right, the first letter of expectation?

23       Why don't we pull up Exhibit 35?

24   A.  I'm not recalling that date.

25   Q.  Well, how about we zoom in right here?

```
 1      A.   Okay.  That's what it says, then I'll agree with
 2   that.
 3      Q.   Okay.  So on April 29th, you have this meeting
 4   about the letter of expectation, correct?
 5      A.   Correct.
 6      Q.   And part of that letter was to reaffirm that
 7   Mr. Hopkins was in charge, right?
 8      A.   Correct.
 9      Q.   And that you were to report your travel and
10   absences to him, right?
11      A.   Correct.
12      Q.   And when you would travel, you would get per
13   diem, right?
14      A.   Correct.
15      Q.   Earn airline miles, right?
16      A.   Correct.
17      Q.   You'd also get like hotel points?
18      A.   I don't believe I belonged to any hotels that
19   collected points.
20      Q.   You would get comp time for travel?
21      A.   If I worked or traveled overtime status, yes.
22      Q.   And you know traveling from Alaska, everyone is
23   traveling in the evenings, right?
24      A.   Not necessarily.
25      Q.   You were told in this letter that you needed to
```

```
 1   tell your supervisors where you were, right?

 2       A.  Correct.

 3       Q.  And you had to put in leave ahead of time, right?

 4       A.  If it was -- if it was planned far enough

 5   ahead -- leave, yes.

 6       Q.  Right.  And so sick leave, if you knew you were

 7   going to miss work because of a doctor's appointment,

 8   that needed to be put in early too?

 9       A.  Yes.

10       Q.  And you weren't very good before this in keeping

11   people apprised of where you were, right?

12       A.  I don't know about very good, but there were

13   lapses in letting them know, yes.

14       Q.  So there would be lapses and you would actually

15   be in Anchorage, not even on the island, and your

16   supervisors didn't know?

17       A.  No, that would be incorrect.

18       Q.  And so after this, you said you started letting

19   your supervisors know where you were?

20       A.  I attempted to, yes.

21       Q.  You did that by calling Rich, right?

22       A.  Yes.

23       Q.  He was --

24       A.  Sometimes.

25       Q.  But Rich wasn't your supervisor, was he?
```

1    A.   No, but my supervisor wasn't in the office at the
2  time.

3    Q.   He had a voicemail, though, right?

4    A.   Yes.

5    Q.   All right.

6    A.   And there were occasions when I left him
7  voicemails.

8    Q.   You were told in this letter you were supposed to
9  mentor Mr. Hopkins, right?

10    A.   Yes.

11    Q.   And you've heard testimony about how that wasn't
12  happening, right?

13    A.   I wouldn't say that wasn't happening.

14    Q.   Okay.  So you dispute Chief Reckner's testimony?

15    A.   Yes.

16    Q.   And Mr. Hopkins -- ET1 Hopkins, he got credit for
17  work done out on Shemya, right?

18    A.   I assume he did.

19    Q.   You went out to Shemya as well, right?

20    A.   Correct.

21    Q.   And it was ET1 Hopkins who got sailor of the
22  year, right?

23    A.   Yes.

24    Q.   And that related to the work that he did?

25    A.   I can't say.

1    Q.   Okay.  So you did not -- okay.

2         You sat here through Commander Van Ness's

3    testimony, right?

4    A.   Yes.

5    Q.   And he talked about that, didn't he?

6    A.   Well, yeah, but there's normally a list of items

7    that are listed when you're nominated for sailor of the

8    quarter, and I was not aware of any of the criteria that

9    went into that citation.

10   Q.   You weren't nominated for any of your work on

11   Shemya, right?

12   A.   Not to my knowledge.

13   Q.   So on the second page, we know you signed this on

14   November 2nd, 2011, right?

15   A.   Correct.

16   Q.   So several months later, they asked you to sign

17   another letter, they also have you sign this one that

18   you had seen in April?

19   A.   Correct.

20   Q.   You were collaring trees in 2011, right?

21   A.   We were -- yes.

22   Q.   And that causes the tree to dry out so it's

23   easier to drop and use for firewood, right?

24   A.   It's not easier to drop.  It's easier to use for

25   firewood.

1     Q.  You were taking trees that were not an immediate
2  threat to an antenna, right?
3     A.  I wouldn't -- I would dispute that.
4     Q.  So you dispute Chief Reckner's testimony that you
5  were taking trees that weren't anywhere near an antenna?
6     A.  No, I'd take -- they were trees that were along
7  the roads that were collared.
8     Q.  And during this interaction when you're given
9  that letter, you're actually -- you push back on
10 Mr. Reckner, because you were saying they were a threat
11 to the antenna fields, right?
12    A.  They were not necessarily to the antenna fields.
13 They were overgrowing the roads, and so when you drive a
14 vehicle through, especially the big line truck, they
15 would interact with the overhead crane.
16    Q.  That was the argument you had with Chief Reckner
17 when he gave you this --
18    A.  I wouldn't classify it as an argument, but that
19 was a discussion.
20    Q.  He classified it as an argument, so are you
21 disputing that?
22    A.  No, I have a different interpretation of that
23 conversation.
24    Q.  I want to talk about the fuel card.  Okay?  The
25 fuel card was kept in your desk, right?

1    A.  Correct.

2    Q.  On the day everyone else went to Shemya, you were

3  the only one in the rigger shop that day, right?

4    A.  I don't recall.

5    Q.  You don't recall that today?

6    A.  Well, no.  There would have been Leah and Para

7  probably, and Coggins possibly could have been there.

8  So I don't remember who all was in the shop that day.

9    Q.  You weren't going to Shemya, and you testified

10  that was because of a medical appointment?

11    A.  I believe that's the reason why.

12    Q.  You were also going to Denali shortly after that?

13    A.  I was not.

14    Q.  So you didn't travel to Denali in 2011?

15    A.  I did not.

16    Q.  You're aware that that card was used to purchase

17  diesel fuel on the base, right?

18    A.  Correct.

19    Q.  And you drive a diesel truck?

20    A.  I do.

21    Q.  And you were seen on the base camera entering the

22  base just a few minutes before that fuel card was used,

23  right?

24    A.  Yes.

25    Q.  And you told -- your report was that you must

have been filling one of the government vehicles, right?

A.   Due to the amount of fuel that was purchased, the only vehicle that we had that would hold that amount of fuel would be the big line truck.  That's what I stated in my statement.

Q.   You own gas cans, right?

A.   Yes.

Q.   And the investigation ultimately proved inconclusive, right?

A.   Correct.

Q.   But you still received a letter of caution from Commander Van Ness?

A.   Yes.

Q.   In fact, this letter from Commander Van Ness was the third time you received paper from someone in the chain of command within that year, within a year, right?

A.   Correct.

Q.   You were upset they were accusing you of misusing the fuel card, weren't you?

A.   Yes.

Q.   You were -- it didn't sit right with you, right?

A.   Correct.

Q.   And you realized you had lost the command's trust?

A.   Yes.

1     Q.  Commander Van Ness specifically told you that?

2     A.  Yes.

3     Q.  And that letter -- we can pull it up if we need

4  to.  That letter said you could lose your job if there

5  were future problems, right?

6     A.  Correct.

7     Q.  Initially you refused to sign that letter, didn't

8  you?

9     A.  Correct.

10     Q.  And Commander Van Ness stood up, and you know

11  what that means, right, when a commander stands?

12     A.  Normally.

13     Q.  Normally, it means meeting is over, right?

14     A.  Yes.

15     Q.  And you didn't stand up?

16     A.  I did not.

17     Q.  Everyone else stood up?

18     A.  Correct.

19     Q.  You know that it's disrespectful not to stand --

20     A.  I wasn't finished with the discussion with the

21  commander concerning the letter.

22     Q.  You weren't finished?

23     A.  Correct.

24     Q.  But the commander had signaled he was finished,

25  right, by standing?

1    A.   No.   The issue still was on the table that the

2    letter wasn't signed.

3    Q.   And eventually you signed it after he told you he

4    was going to talk to civilian personnel, right?

5    A.   No.   We had further discussion concerning the

6    letter, and then I signed it.

7    Q.   And you put that letter on your desk?

8    A.   Yes.

9    Q.   Down in the rigger shop?

10   A.   Correct.

11   Q.   You have a lot of stuff on your desk in the

12   rigger shop?

13   A.   I do.

14   Q.   And that letter of caution that you signed

15   February 24, 2012, that was still on your desk April 12,

16   2012?

17   A.   I believe it was.

18   Q.   At some point you learned that while you had been

19   gone, work had carried on without you, right?

20   A.   Correct.

21   Q.   The casualty list was at an all-time low, wasn't

22   it?

23   A.   No, it was not.

24   Q.   So you dispute Mr. Jordinelli's testimony?

25   A.   I do.

1    Q.  And you dispute that -- the testimony of

2  Mr. Beauford and Pacheco that said they carried on

3  without you?

4    A.  I don't dispute that.

5    Q.  So we heard what the NATE conference is, the

6  National Association of Tower Erectors, right?

7    A.  Correct.

8    Q.  It was a big deal to go to that conference,

9  wasn't it?  You went every year?

10   A.  I went every year.  I don't consider it a big

11  deal.

12   Q.  Okay.  Prior to 2012, you went in 2011?

13   A.  Correct.

14   Q.  2010?

15   A.  Correct.

16   Q.  2009?

17   A.  Yes.

18   Q.  Every single year for ten years?

19   A.  Approximately.  I'm not sure when I went to the

20  first one.

21   Q.  And you have a conversation with Chief Reckner

22  mid January about that conference, right?

23   A.  Yes.

24   Q.  And you bring it up?

25   A.  Yes.

1    Q.   And you didn't start the conversation with, hey,

2    I have -- I've scheduled a surgery, did you?

3    A.   Well, I didn't schedule the surgery.  The VA

4    clinic scheduled the surgery.

5    Q.   And you're aware in your medical records that the

6    scheduling the surgery happened after that meeting,

7    January 31st, right?

8    A.   No, I'm not.

9    Q.   So you asked, "What are we doing about NATE?"

10   Right?

11   A.   Correct.

12   Q.   And you're informed that you are not going?

13   A.   Correct.

14   Q.   But Hopkins is going?

15   A.   Yes.

16   Q.   And your testimony on direct was that you were

17   concerned because he was getting out of the Coast Guard,

18   right?

19   A.   Correct.

20   Q.   Are you aware that he didn't actually even

21   inquire about a retirement letter until April -- the

22   first week in April?

23   A.   No, he had been talking about it.

24   Q.   But he didn't show you a letter that week, right?

25   A.   Which week?

1    Q.  Well, on direct you said he had shown you his
2    retirement letter, he had put that in.
3    A.  That was in April he showed me the letter, about
4    a week before the murders.
5    Q.  So I misunderstood your direct testimony.  On
6    direct you said he had shown you his retirement letter
7    before you had the conversation about NATE.
8    A.  No.  He had talked about retiring.
9    Q.  So you first asked about Hopkins, right, why is
10   he attending?
11   A.  Correct.
12   Q.  And Chief Reckner tells you he's going to bring
13   back the info, right, he's going to bring back the
14   information to share with others?
15   A.  I don't recall that.
16   Q.  Okay.  And then you point to Belisle's chair, and
17   you want to know why Rich is going, right?
18   A.  I did not.
19   Q.  Okay.  So you dispute the fact that you did that?
20   You dispute Mr. Reckner's testimony?
21   A.  I would not question why Rich would be going.
22   Q.  So you dispute Mr. Reckner's testimony that you
23   said, "Why is he going, he's just an F'ing rigger?"
24   A.  I totally dispute that.
25   Q.  How long did you stare at Mr. Reckner at the end

1    of that conversation?

2        A.   A minute, minute and a half.

3        Q.   So after your surgery, you're not really

4    participating in work discussions or work-related

5    things, right?

6        A.   I would not say I didn't participate in

7    discussions, but I didn't participate in heavy work,

8    yes.

9        Q.   Okay.  You gave your opinions less, right?

10       A.   Pardon?

11       Q.   You gave your opinions on what should be done

12   less?

13       A.   What was the last word?  Did you say less?

14       Q.   Less.

15       A.   I'm not aware of that, no.

16       Q.   So you sat through Mr. Beauford's testimony,

17   right?

18       A.   Yes.

19       Q.   And he said that after you came back from your

20   surgery, you had less input?

21       A.   I won't dispute that.

22       Q.   And in March, Rich led the work cleaning out the

23   warehouse?

24       A.   I'm not aware of when it started.

25       Q.   Well, you knew about it in March?

 1     A.   Yes.

 2     Q.   And they were throwing out some things that you

 3 thought should be kept, right?

 4     A.   No, I knew they should be kept.  There wasn't a

 5 thought.

 6     Q.   It irked you is how you described it?

 7     A.   Exactly.

 8     Q.   You thought it was a waste to get rid of those

 9 items?

10     A.   No, they were valuable stainless steel nuts and

11 bolts that we used for repairing of antennas and various

12 other uses at the COMMSTA.

13     Q.   So command wanting to get rid of those, that

14 upset you?

15     A.   Well, yes, because it was a waste of money.

16     Q.   You're not a fan of throwing things out, right?

17     A.   No, I'm not.

18     Q.   Right.  Keep a lot of things both at work and at

19 home?

20     A.   Correct.

21     Q.   Rich had taken over some of your duties while you

22 were out sick, right?

23     A.   I couldn't say because I was out sick.

24     Q.   When you came back, he was still doing some of

25 your work?

```
 1      A.  I wouldn't classify it as that.  He was doing
 2   work.
 3      Q.  And you were on light duty when you first came
 4   back?
 5      A.  Correct.
 6      Q.  And Rich could have done your job at that point
 7   when you came back, couldn't he?
 8      A.  I wouldn't classify that as being a true
 9   statement.  He had no electronics knowledge whatsoever.
10      Q.  He had picked up some slack while you were gone,
11   right?
12      A.  Yes.
13      Q.  Okay.  And it was expressed to you that he wasn't
14   that far behind you, right?
15      A.  Yes, it was.
16      Q.  Fair to say that made working there a little more
17   difficult?
18      A.  No.
19      Q.  Your wife left for work on Tuesday, April 10th,
20   right?
21      A.  Correct.
22      Q.  You followed her into the airport, right?
23      A.  I did not.
24      Q.  You saw her at the airport?
25      A.  I did.
```

1    Q.  And you actually knew she would be going on this

2    trip, you knew about that end of March, right?

3    A.  I'm not sure when I was aware of it, but I knew

4    she was traveling.

5    Q.  Knew it more than the day before, right?

6    A.  Oh, yes.

7    Q.  So April 11, 2011 -- or excuse me, 2012, you go

8    up to T-1 in the morning, right?

9    A.  Correct.

10   Q.  You indicated you went to the bathroom?

11   A.  Correct.

12   Q.  And then you checked the gauges?

13   A.  Correct.

14   Q.  And that took three hours?

15   A.  It did not.

16   Q.  It took more than two hours?

17   A.  That -- which part?

18   Q.  Checking the gauges.

19   A.  No.

20   Q.  How long did it take you to check the gauges?

21   A.  Could be 15, 20 minutes, half an hour.  I didn't

22   time it.  Didn't keep track of time.

23   Q.  How long were you in the bathroom then?

24   A.  I made several different trips.

25   Q.  You're aware that no one knew where you were?

1    A.  I was not aware of that.  I believe I informed

2  Chief Reckner that I was heading up the hill, so they

3  knew I was at T-1.

4    Q.  He didn't -- he didn't see you in T-1 that day,

5  right?

6    A.  I didn't know that he was looking for me, so I

7  can't say.

8    Q.  So that afternoon, nearly everyone from the

9  rigger shop goes up to T-1 to talk about the antenna on

10  the roof, right?

11    A.  Correct.

12    Q.  You and Rich and Mr. Hopkins were all on the

13  roof?

14    A.  Correct.

15    Q.  And Chief Reckner was up there?

16    A.  Yes.

17    Q.  He decided to take Rich's recommendation and not

18  yours, right?

19    A.  Yes.

20    Q.  Now, the next day was supposed to be a climbing

21  day, wasn't it?

22    A.  Yes.

23    Q.  And you like to climb the towers, right?

24    A.  I do.

25    Q.  And you've climbed over the years even though you

1  have diabetes, right?

2      A.  Correct.

3      Q.  Climbing even though you were taking that

4  medication?

5      A.  Correct.

6      Q.  And when you would climb, you would wear a high

7  visibility color, right?

8      A.  Not necessarily.

9      Q.  In March of 2012, you were feeling much better,

10  right, from having had your surgery?

11     A.  It had corrected the gallbladder problem, yes,

12  but it created others.

13     Q.  Okay.  You told Scott Arsenal in March you were

14  feeling much better, right?

15     A.  Yes.  I wasn't dry heaving every day.

16     Q.  And you were feeling -- you were off light duty

17  in March, right, at some point in March?

18     A.  Yes.  I don't recall the date.

19     Q.  Fair to say you were feeling good enough on

20  April 11th to dig out a septic?

21     A.  It was a necessity.  It wasn't to say I was

22  feeling good, but it had to be done.

23     Q.  It was a big pile of dirt, right?

24     A.  Well, most of that had been previously dug.  I

25  didn't take that all out in one night, believe me.

1    Q.  So you didn't engage in discussions about
2  climbing on April 11th, right?  There was a meeting and
3  talking about climbing?
4    A.  I wasn't aware that there was a meeting on
5  April 11th.
6    Q.  Climbing that day would have netted you extra
7  money, right?  You get extra money when you climb?
8    A.  Yes.
9    Q.  You showed up that morning wearing a bright
10  shirt, right?
11    A.  Correct.
12    Q.  Let's talk about April 12th.  You usually left
13  for work you said 6:40 to 6:50, right?
14    A.  Correct.
15    Q.  And you live about nine miles from the COMMSTA,
16  right?
17    A.  I never measured it.
18    Q.  Okay.  Well, you got up that morning and you left
19  before 6:50, right?
20    A.  Correct.
21    Q.  Okay.  Let's go to Exhibit No. 234.  This is your
22  truck, right?
23    A.  Yes.
24    Q.  So you drive a distinctive truck.  You would
25  agree with me that, right?

1     A.   I don't know whether it would be distinctive, but

2   that's my truck.

3     Q.   So you have a canopy?

4     A.   Yes, I do.

5     Q.   And there's three windows on it?

6     A.   Correct.

7     Q.   And there's this part that's higher than the rest

8   of the truck, right?

9     A.   Yes.

10    Q.   And you're missing some trim here, right?

11    A.   No.

12    Q.   Or there's not trim there?

13    A.   There's not trim there.

14    Q.   Okay.  And that's the same on the other side of

15   the vehicle, the windows and the trim?

16    A.   Correct.

17    Q.   And you knew what everyone else at the rigger

18   shop drove, right?

19    A.   Generally.  I won't say I knew what everyone was

20   driving.

21    Q.   You knew Mr. Hopkins' truck?

22    A.   I did.

23    Q.   You knew Mr. Belisle's truck?

24    A.   I did.

25    Q.   And you had been driving this truck for a while?

1    A.  Yes.

2    Q.  So let's look at Exhibit 77A.

3        And this is your truck, right, passing the main

4    base gate?

5    A.  I believe that is.

6    Q.  We heard testimony that clock on there is

7    18 minutes fast, right?

8    A.  Correct.

9    Q.  So you pass the main base gate at 7:48 a.m. --

10   6:48 a.m.?  Sorry.

11   A.  Correct.

12   Q.  The vehicle, when you passed the main base gate,

13   was driving okay, right?

14   A.  No.

15   Q.  It was pulling to the right?

16   A.  Correct.

17   Q.  But it's not rumbling like a flat tire, right?

18   A.  It wasn't flat.

19   Q.  Okay.  So it wasn't low enough to be rumbling,

20   right?

21   A.  Correct.

22   Q.  So it could have been an alignment issue too,

23   right, as far as you know, as you're driving it?

24   A.  No, because alignment normally wouldn't pull the

25   one direction or another.

1    Q.  So your testimony was that you passed the main

2    gate and you realized that it's pulling to the right,

3    and you decide you're going to pull into the airport?

4    A.  Correct.

5    Q.  Let's look at Exhibit No. 172.  So you pull into

6    the airport.  You would agree that when you pull into

7    the airport, you are closer to the COMMSTA than you are

8    at home, right?

9    A.  Correct.

10   Q.  You would agree that the COMMSTA -- the rigger

11   shop specifically has things to put air in a tire,

12   right?

13   A.  It does.

14   Q.  The air was actually plumbed in, right?

15   A.  Yes.

16   Q.  And you said you left your cell phone at home,

17   right?

18   A.  Correct.

19   Q.  So you know that Chief Reckner and ET1 Hopkins

20   and the commander are keeping an eye on you, right?

21   A.  I don't know whether I classify they're keeping

22   an eye on me.

23   Q.  They've told you you need to let them know where

24   you are?

25   A.  Correct.

1      Q.  And it was only two miles up to the COMMSTA,

2  right?

3      A.  Correct.

4      Q.  So you could have driven up there and put air in

5  your tire, right?

6      A.  I could have.

7      Q.  And you chose not to?

8      A.  That's true.

9      Q.  And you could have when you got up there told

10  them, "I have a low tire," and either asked to do it

11  then or you could have added air and then gone home

12  later, right?

13      A.  I could have.

14      Q.  And your testimony was at the point you were at

15  the Kodiak airport, you didn't know why your tire was

16  low?

17      A.  Correct.

18      Q.  And you would agree that people -- well, let me

19  ask you this.  Have you ever run a vehicle on a spare

20  tire?

21      A.  I'm sure sometime in my driving time I have,

22  but --

23      Q.  Sure.  It's possible to drive a vehicle on a

24  smaller spare, right?

25      A.  It's possible, yes.

1    Q.  And you would have been permitted, you're

2  permitted at the rigger shop to work on tires, right?

3    A.  Correct.

4    Q.  And your co-workers had changed tires there?

5    A.  I have changed tires there.

6    Q.  Okay.  So instead of going to the COMMSTA and

7  filling it with air or changing it there, because you

8  had a spare on the truck, right?

9    A.  I had a spare that I never used.

10    Q.  Okay.  Instead you decided to drive home, right?

11    A.  Correct.

12    Q.  Okay.  And let's look at Exhibit 82A.  Actually,

13  let's hold off on that.

14        You go into the airport, and that's when you said

15  you went to Servant Air, right?

16    A.  Well, I drove into the airport driveway.

17    Q.  Okay.  And you check your tire and then go to

18  Servant Air?

19    A.  Correct.

20    Q.  Now we can go to 82A.

21        So you would agree with me this is your truck,

22  right?

23    A.  Correct.

24    Q.  So at 7:22 you're heading home, right?

25    A.  Correct.

1    Q.  And you actually drive home and see Charlene Bell
2 as you're turning into Bells Flats?
3    A.  My memory serves that I saw Annette Ecret as I
4 was turning into Bells Flats.  That's how I remember it.
5    Q.  And that was 7:25, right?
6    A.  I wasn't aware of what time it was.
7    Q.  So we can take that down.
8        Your testimony was you get home, you get the
9 impact wrench, you run into this issue with the lug
10 nuts, right?
11    A.  Correct.
12    Q.  How long did that take?
13    A.  I don't have a specific timeframe.  I wasn't
14 keeping track of time.
15    Q.  Okay.  And then you go and you make a call?
16    A.  I made three calls.
17    Q.  So after the lug nuts, you go upstairs and make
18 three calls?
19    A.  Correct.
20    Q.  You call Rich?
21    A.  I did.
22    Q.  And he doesn't answer because he's dead, right?
23    A.  I'm not aware of that.
24    Q.  You're not aware of that today?
25    A.  I am now, but I wasn't aware of it then.

1     Q.  Okay.  And then you call Jim Hopkins, right?

2     A.  Correct.

3     Q.  And he didn't answer?

4     A.  Correct.

5     Q.  And you know now that's because he was dead?

6     A.  I know that now, yes.

7     Q.  And you leave him a voicemail?

8     A.  I do.

9     Q.  And in your voicemail, you don't mention the lug

10 nuts to Mr. Hopkins, right?

11    A.  I don't recall.

12    Q.  And then you call Chief Reckner, right?

13    A.  I did.

14    Q.  And you left him a voicemail as well?

15    A.  Correct.

16    Q.  So you have no recollection today of how long it

17 took you from the time you get home until the time you

18 made those calls?

19    A.  Not specifically, no.

20    Q.  Okay.  And then after that, you change the tire,

21 you take the tire off, right?

22    A.  I did.

23    Q.  Your testimony is you find a nail in the tire?

24    A.  I did.

25    Q.  Why don't you describe that nail for us.

1    A.   It was a smaller nail than what I replaced it

2  with.   Probably -- it was no larger than 8-penny nail.

3  May have even been smaller than that.

4    Q.   Your testimony is you replaced it with a 16-penny

5  nail, right?

6    A.   I did, yes.

7    Q.   And you pushed that nail all the way in?

8    A.   I did not.

9    Q.   You pushed it how far in?

10    A.   There was at least an inch and a half or maybe

11  two inches protruding from the tire.

12    Q.   So the photos we've seen of the tire in this case

13  with the nail in it, you didn't push it in that far?

14    A.   I did not.

15    Q.   So you didn't drive on it like that?

16    A.   No.

17    Q.   And when you pushed that nail into the tire,

18  there was still air in the tire, right?

19    A.   There was.

20    Q.   So you -- on direct testimony, you were still

21  wearing your soiled pants when you changed the tire,

22  correct?

23    A.   Yes.

24    Q.   And then you wore them all day?

25    A.   I did.

1    Q.  And then you wore them the next day?

2    A.  I did.

3    Q.  Okay.  So you must have not soiled them super

4    bad, because --

5    A.  Well, no, I had cleaned them very thoroughly in

6    the bathroom at Servant Air.

7    Q.  So you show up back at the COMMSTA at 8:23,

8    right?

9    A.  Yes.

10   Q.  And that's after you threw the nail in the creek?

11   A.  I threw it over the bank.  I'm not sure where it

12   landed.

13   Q.  So you brought the flat tire with you, low tire?

14   A.  It was in the back of the truck, yes.

15   Q.  You didn't describe it as a low tire in those

16   voicemails, did you?

17   A.  I varied between flat and low tire.  To me, they

18   were synonymous.

19   Q.  You said when you called -- let me back up.  You

20   called Hopkins and Reckner and left voicemails, right?

21   A.  Correct.

22   Q.  And in those voicemails, you had a flat in the

23   truck, right?

24   A.  Correct.

25   Q.  That's what you said?

1    A.  Correct.

2    Q.  And at the time you made those calls, you had not

3  actually removed the tire from your truck, right?

4    A.  I had not.

5    Q.  By the time you got to the COMMSTA, nearly

6  everyone else was there who was supposed to be there,

7  right?

8    A.  I can't say whether they were or not.  I believe

9  they were, but I don't know for sure.

10    Q.  Okay.  Everyone else who was supposed to be at

11  the rigger shop that morning was there, right?

12    A.  No.

13    Q.  You saw Cody?

14    A.  I -- yes.

15    Q.  You saw Para and Leah?

16    A.  I did.

17    Q.  Pacheco is not there.  He's out in Shemya, right?

18    A.  Correct.

19    Q.  You saw Aaron Coggins that day?

20    A.  I did.

21    Q.  So who else is left?

22    A.  Well, you said COMMSTA.  You didn't say T-2.

23    Q.  I meant the rigger shop.  I'm sorry.

24    A.  Okay.  Then I saw everybody from the rigger shop

25  with the exception of Pacheco, and I'm not sure I was

1    aware he was in Shemya.

2        Q.   You actually talked to Para about what she saw,

3    right?

4        A.   Yes.

5        Q.   And later that -- half hour or so later, you send

6    a text, right, that says, "Jim and Rich are said to be

7    dead."  Right?

8        A.   I believe so.

9        Q.   And by the time you sent that, everyone at the

10   COMMSTA knew Jim and Rich were dead, didn't they?

11       A.   Yes.

12       Q.   At one point -- well, so you're all in the

13   conference room, right?  You moved from the conference

14   room to the basement and other areas, right?

15       A.   Yeah.  We were outside for a while -- at

16   different points during that day.  We were down in the

17   basement.  We were at the ET shop.  I was on the

18   transmitter deck.  Everybody was wandering around

19   everywhere.

20       Q.   From your perspective or from the perspective --

21   the general perspective of people in the COMMSTA,

22   there's a killer on the loose, right?

23       A.   Yes.

24       Q.   And despite that you fell asleep?

25       A.   I did not.

1    Q.  So you dispute Mr. Acosta's testimony he saw you,

2  quote, straight-up sleeping?

3    A.  Yes.  I had my eyes closed.  That doesn't

4  indicate that I'm sleeping.

5    Q.  You indicated on direct you like to read, right?

6    A.  I do.

7    Q.  Like to read when you're bored, right?

8    A.  Doesn't have to be because I'm bored.  I like to

9  read, period.

10   Q.  So everyone else is crying, right?  Leah and Para

11 are crying?

12   A.  At times during the day, yes.

13   Q.  And you're reading a book, right?

14   A.  I'm -- yes.

15   Q.  After the murders, Para came and talked to you,

16 didn't she, right before she was leaving?

17   A.  Yes.

18   Q.  And she told you that the rigger shop employees

19 had gone down and mowed Nicola Belisle's lawn, right?

20   A.  Correct.

21   Q.  And you had a couple questions about that, didn't

22 you?

23   A.  I did.

24   Q.  And you asked, "Did they use Coast Guard property

25 to do it?"  Right?

1      A.   I may have said that.

2      Q.   And you wanted to know why no one had volunteered

3 to mow your lawn, right?

4      A.   That's correct.

5      Q.   And you went and visited your sister and

6 brother-in-law after the murders, right?

7      A.   A couple different times.

8      Q.   And in June, when they were talking, passing

9 along condolences, you got upset, didn't you?

10      A.   I did.

11      Q.   And you started talking about how Jim and Rich

12 didn't deserve their jobs and they were incompetent?

13      A.   I dispute that conversation.

14      Q.   So you got upset, right?

15      A.   I was upset.

16      Q.   And you said derogatory things about Jim and

17 Rich?

18      A.   I don't believe I did.

19      Q.   So your sister and your brother-in-law who were

20 both there when you had this conversation, you dispute

21 their testimony?

22      A.   Portions of it, yes.

23      Q.   Do you dispute the portion where you said,

24 "They're not my friends"?

25      A.   I don't recall ever saying that.

1    Q.  Do you dispute the portion where you said Rich

2    was a drunk?

3    A.  Yes.

4    Q.  Do you dispute the portion where you said you

5    taught them everything that they knew?

6    A.  I would never say I taught anybody, you know, all

7    that they know.  No, I would never make a statement like

8    that.

9    Q.  Do you dispute the part of that conversation

10   where you said they were unqualified?

11   A.  Yes.

12   Q.  Do you dispute the portion where you said they

13   were incompetent?

14   A.  Yes.

15   Q.  At some point Judy Pletnikoff was taking you to

16   the airport; do you recall that?

17   A.  I recall her testimony.  I don't recall the trip,

18   no.

19   Q.  You don't recall being behind her and yelling at

20   her about slamming down the phone when you talk to the

21   FBI?

22   A.  I recall having a conversation, but it was -- but

23   it wasn't -- I wasn't angry with her.

24   Q.  So that conversation was at this level, this

25   tone?

1    A.  No, it was voices raised, but it wasn't angry.

2    Q.  So you raised your voice?

3    A.  Yes.

4    Q.  And you were behind her?

5    A.  I don't remember where I was seated.

6    Q.  So you dispute the part where she said you yelled

7 at her for minutes?

8    A.  For minutes, yes.

9    Q.  And do you dispute the part where she said you

10 yelled at her?

11   A.  No.

12   Q.  You're not surprised she found that intimidating,

13 right?

14   A.  Yes.

15   Q.  You are surprised?

16   A.  Yes.

17   Q.  You went to the airport on April 10, 2012, right?

18   A.  Yes.

19   Q.  You knew where your wife had parked the car,

20 right?

21   A.  Not until after I had arrived.

22   Q.  After you arrived on April 10th, right?

23   A.  Correct.

24   Q.  And when you would go to the airport, you didn't

25 like to leave vehicles at the airport, right?

A.   It depended on the situations.   There were many times I traveled to Anchorage for the day, I would leave my truck at the airport.

Q.   Nancy's vehicle had been broken into at the airport before?

A.   Yes.

Q.   And she didn't normally leave her vehicle at the airport, right?

A.   Not true.   She made many day trips to the villages, so she would leave her car parked either in front of Island Air, if that's who she was flying with, or she'd leave it parked in front of Servant Air, if that's who she was flying with.

Q.   For the day?

A.   For the day.

Q.   So on a multiple-day trip, she wouldn't leave her car at the airport?

A.   Normally not.

Q.   Normally Para or Judy Pletnikoff or someone else would take that vehicle home if both of you were traveling?

A.   If both of us were traveling, yes.

Q.   If only one of you were traveling, it was up to the other one to handle that, right?

A.   Correct.

 1     Q.  I want to talk about when you were talking to the

 2   investigators.

 3          Fair to say you provided a lot more details today

 4   about the events of April 12, 2012, than you did on

 5   April 12, 2012?

 6     A.  In certain instances, yes.

 7     Q.  Fair to say you didn't provide a lot of detail to

 8   the investigators about your whereabouts that morning,

 9   right?

10     A.  Portions of it, yes.

11     Q.  You know it's important to be honest when police

12   are investigating a crime, right?

13     A.  Correct.

14     Q.  And they asked you questions, you indicated it

15   was fact-finding, right, they were trying to figure out

16   where you were that day?

17     A.  They were looking for information, yes.

18     Q.  That information involved your whereabouts,

19   right?

20     A.  Correct.

21     Q.  And when they asked you where you got the flat,

22   you said, "I don't know."  Right?

23     A.  Well, I don't know where the nail entered the

24   tire, no.

25     Q.  So that's what you told them, "I don't know."

1  Right?

2      A.  Correct.

3      Q.  And when they asked you what time you got home,

4  you said, "I don't know."  Right?

5      A.  Correct.

6      Q.  And when they asked you what time you left your

7  house, you said you didn't know?

8      A.  Approximately, I gave them a time.

9      Q.  Or did they give you a time?

10     A.  No.  The initial question, I believe I said 6:50,

11 but --

12     Q.  When they asked when you left to go back to work,

13 you didn't have a time for them, right?

14     A.  I did not.

15     Q.  And when they asked where you noticed the low

16 tire, flat tire, you said you didn't know, right?

17     A.  It was in an approximate -- approximately

18 where -- I said approximately where I noticed it.

19 Nothing specific.

20     Q.  But when they were to ask you was it near the

21 COMMSTA, you were quick to say no, right?

22     A.  Well, it wasn't near the COMMSTA, because I

23 didn't go to the COMMSTA.

24     Q.  And when you were asked how long you were out of

25 your vehicle at the airport, you said you didn't know,

1  right?

2    A.  I wasn't keeping track of time.

3    Q.  And so that's -- you said you didn't know?

4    A.  I didn't know.

5    Q.  And when asked about what time you arrived at the

6  COMMSTA that morning, you said you didn't know, right?

7    A.  Correct.

8    Q.  You didn't tell the investigators you pulled the

9  nail out, right, of your tire?

10    A.  No.

11    Q.  You didn't even tell them you had seen the nail,

12  right?

13    A.  No.

14    Q.  You didn't tell them you reinserted it with a

15  Leatherman, right?

16    A.  No.

17    Q.  You didn't tell them that you threw the first

18  nail in the creek, did you?

19    A.  Did not.

20    Q.  You didn't explain what you did that day at the

21  airport, right?

22    A.  I did not.

23    Q.  So you weren't completely honest with them,

24  correct?

25    A.  No.  I didn't feel that it was important.  That I

1  was at the airport, that's what I explained to them.  I

2  didn't give a detailed description of what I did at the

3  airport.

4      Q.  Okay.  When they asked you about 34 minutes and

5  the time you passed the main base gate camera, you

6  didn't have a reasonable explanation, right?

7      A.  Because they had started talking about timelines.

8  They said they didn't -- hadn't viewed any film of

9  cameras, and then all of a sudden they're talking about

10  specific times, so I'm getting a mixed message here from

11  them.  Well, did they look at cameras?  Are these times

12  correct?  I had no idea what those times meant.

13      Q.  Okay.  But you did not provide them any

14  information about between 6:48 and 7:22, what you were

15  doing in those 34 minutes, right?

16      A.  I provided some information.  I didn't provide

17  complete information.

18      Q.  So you didn't tell them everything?

19      A.  Correct.

20      Q.  You never told them you had to stop at Servant

21  Air and go to the bathroom?

22      A.  I did not.

23      Q.  And you didn't think that was important, right?

24      A.  At the time, I was at the airport.

25      Q.  It was apparent to you in these interviews,

1  though, they're trying to account for what you did that

2  morning, right?

3      A.  It was not that apparent to me, no.

4      Q.  So when they were asking you, "What did you do

5  this morning," it wasn't clear to you that they were

6  trying to figure out what you did that morning?

7      A.  I was at the airport, and that's what I told

8  them.

9      Q.  You never had to take a bathroom break during

10  your interviews, right?

11      A.  No, but they were fairly short.  So not during

12  the interviews, I did not, no.

13      Q.  You claimed that the fact that you soiled your

14  pants and had to go into Servant Air and use the

15  bathroom, that that was personal and embarrassing,

16  right?

17      A.  It is.

18      Q.  You were too embarrassed to tell them about the

19  fact you soiled your pants?

20      A.  At that time, yes.

21      Q.  I just want to make sure.  You were sitting there

22  and they're asking you questions in a double murder

23  investigation, and you were too embarrassed to tell them

24  that I stopped and went to the bathroom?

25      A.  I told them I was at the airport, and that, to

1   me, fulfilled that answer.

2     Q.  You weren't too embarrassed to talk to them about

3   feces, though, right?

4     A.  I don't believe I talked to them about feces.

5     Q.  You told them you were pooping in a bucket,

6   right?

7     A.  Well, yeah, I said number two or somebody said

8   number two, and I agreed with that.

9     Q.  And you actually volunteered that you took a

10  bucket of poop and dumped it in the dumpster, right?

11    A.  Well, yes.

12    Q.  So you weren't too embarrassed to talk about

13  feces, right?

14    A.  At that time, no.

15    Q.  So in the time they were asking you where were

16  you, you were too embarrassed, but then you volunteered

17  that you --

18    A.  Well, there's a difference between going to the

19  bathroom at your house and then messing your pants.

20    Q.  You provided no information about where you

21  stopped at the airport, right?

22    A.  Correct.

23    Q.  You could have gone to the bathroom at the Alaska

24  Airlines terminal, right?

25    A.  I could have.

1    Q.   But you didn't?

2    A.   It was crowded.

3    Q.   The bathroom was crowded?

4    A.   The airport terminal was crowded.

5    Q.   They have a camera too, right?

6    A.   I have no idea.

7    Q.   But you've seen video from the airport?

8    A.   Now I'm aware of that.  At the time I wasn't

9  aware of that.

10    Q.   You could have gone to Island Air, right, to use

11  their bathroom?

12    A.   I could have.

13    Q.   You didn't?

14    A.   I did not.

15    Q.   And they have a camera, right?

16    A.   I wasn't aware of that at the time.

17    Q.   You weren't aware until you showed up the next

18  day and stood there and looked at it, right?

19    A.   That's correct.

20    Q.   You heard the testimony of Mr. Skonberg, right?

21    A.   I did.

22    Q.   You heard he was there on April 12, 2012, right?

23    A.   Correct.

24    Q.   And he did not see you, right?

25    A.   I did not see him either.

1    Q.  And he testified that he would have seen or heard

2    you in the bathroom, right?

3    A.  Yes.

4    Q.  So your testimony today is that you chose to go

5    to a bathroom in the only building at the airport that

6    didn't have cameras, you managed to get in there without

7    Mr. Skonberg seeing you, you were in there for

8    30 minutes and then left without anyone seeing you?

9         MR. COLBATH:  Your Honor, I'll object to the

10   form of the question as being both argumentative and

11   compound.

12        THE COURT:  Why don't you rephrase.

13   BY MS. SHERMAN:

14   Q.  Sure.  Your testimony is you chose the bathroom

15   at Servant Air, right?

16   A.  Correct.

17   Q.  And you never told the investigators that, right?

18   A.  Correct.

19   Q.  And you know Servant Air doesn't have cameras,

20   right?

21   A.  I wasn't aware at the time that it didn't.  I am

22   now.

23   Q.  And you managed to go in the bathroom without

24   Mr. Skonberg seeing you, right?

25   A.  Correct.

1    Q.  Your testimony today is you were in there for

2  quite some time, right?

3    A.  Correct.

4    Q.  You cleaned up your pants, right?

5    A.  I did.

6    Q.  You went to the bathroom two more times, right?

7    A.  I'm not sure how many times.  I wasn't keeping

8  track.

9    Q.  You were in there for about 30 minutes?

10   A.  I don't know how long I was in there.  I wasn't

11  keeping track of time.

12   Q.  And then you left, right?

13   A.  I did.

14   Q.  And that all occurred without Mr. Skonberg or any

15  passengers at Servant Air seeing you, right?

16   A.  I'm not sure if anybody saw me.

17        MS. SHERMAN:  Those are all my questions.

18        THE COURT:  Redirect?

19        MR. COLBATH:  Just briefly, Your Honor.

20                   REDIRECT EXAMINATION

21  BY MR. COLBATH:

22   Q.  Mr. Wells, on April 12th or 13th, when you talked

23  to the investigators, you were on trial for murder at

24  that time?

25   A.  I was not.

1    Q.  Did the gravity seem more important then than the

2   gravity seems today about being detailed?

3    A.  No.

4    Q.  How does it seem today, the importance?

5    A.  Extremely important.

6    Q.  I want to ask you about just a couple of things.

7   Can we see 235?  I think it's Government 235.

8        You were asked about Shemya and Mr. Hopkins.

9   Remember that picture?

10   A.  Yes.

11   Q.  And you and Mr. Hopkins, Rich are all here,

12  right?

13   A.  ET3 Beauford, Jim Hopkins, Rich Belisle and

14  myself.

15   Q.  And are you supervising here while they do what

16  with a guy --

17   A.  Yeah.  They're beginning to take up tension on a

18  guy wire.

19   Q.  Are you -- were you in 2012 a sailor?

20   A.  I'm not sure what you mean by sailor.

21   Q.  Well, were you in the Coast Guard?

22   A.  I was a civilian employee of the Coast Guard.

23   Q.  As a civilian, were you even eligible to get

24  sailor of the year?

25   A.  I was not.

1    Q.  That was for enlisted people?

2    A.  It was.

3    Q.  Can we see -- can we see maybe Government Exhibit

4    No. 130.

5         And that's your desk on -- as it looked on

6    April 12th?

7    A.  It is.

8    Q.  Can you give me Government Exhibit 32.  Maybe 32

9    is -- yeah.

10        Did your desk typically look like that,

11    Mr. Wells?

12    A.  Typically.  I would have occasions where I would

13    clean it up.

14    Q.  And so the fuel card letter that you were asked

15    about, was it in this pile of mail here?

16    A.  I couldn't say where it was.

17    Q.  Okay.

18    A.  I mean, it was probably -- it was on the desk,

19    let's put it that way.

20    Q.  Along with all your documentation from a lengthy

21    time at work?

22    A.  Yes.

23    Q.  On April 11th, the morning of April 11th when you

24    were in the basement of T-1, how long did it take in the

25    microwave room and inspecting the cable trays and the

exits to the building?

A.   I couldn't say because I wasn't keeping track of time.   I was just looking at possible routes and where we could have egress for the cable.

Q.   Was that in addition to the bathroom and the gauge checking?

A.   Yes.

Q.   Did you plan to climb the tower on April 12th?

A.   Probably not.

Q.   Okay.   Because of your health?

A.   Yes.

Q.   All right.   And on the -- when you met with the investigators and you went through the timeline of things at the airport, how did you not appreciate the significance of each detail of what you did?

A.   I accounted for my time by being at the airport. The specifics I didn't believe pertained to anything other than that I was at the airport.

Q.   Did you lie about being at the airport?

A.   I did not.

Q.   Did you lie about going back home and changing the tire?

A.   I did not.

Q.   Did they ask you specifically about the nail or what happened at the house with regard to the nail or

1  the tire or those things?

2      A.  No, they did not.

3      Q.  Did you lie about any of the process in changing

4  things in your travel route?

5      A.  I did not.

6      Q.  And did your travel -- did you know about the

7  timeline of your travels, in other words, how long

8  everything took?

9      A.  I did not.

10      Q.  But did the start-to-finish travels, did you

11  share all those start-to-finish travels, places you --

12  time amount, whatever it was, that you traveled with the

13  agents?

14      A.  The time that I traveled?

15      Q.  Right.

16      A.  I don't know what times I traveled, so --

17      Q.  But --

18      A.  I'm not sure I understand your question.

19      Q.  -- the areas that you went -- excuse me.  Hold on

20  a minute.  The areas that you went -- and I'm sorry I'm

21  not being clear.  The areas that you went, the route,

22  those things, however long it took, did you share that

23  with the agents, wherever you went?

24      A.  I took the routes.  I didn't share times because

25  I wasn't aware of what the times were.

1    Q.  Did you do your best to answer their questions as

2  you understood what was going on on April 12th?

3    A.  Yes.

4    Q.  April 13th?

5    A.  Yes.

6    Q.  Do you have different understandings today about

7  what was going on?

8    A.  Oh, yeah.  I know all the information now.  I

9  know sequence of events, and I've seen the tapes and the

10 videos, and now I have a lot of knowledge of what

11 happened, but I didn't back then.

12   Q.  That day, April 12th, did you shoot Rich Belisle?

13   A.  I did not.

14   Q.  How about Jim Hopkins?

15   A.  I did not.

16        MR. COLBATH:  All right.  I don't have anything

17 further.

18        THE COURT:  All right.  Recross?

19        MS. SHERMAN:  No.

20        THE COURT:  Thank you, sir.  You may be

21 excused.

22        (Defendant excused from witness stand)

23        THE COURT:  Ladies and gentlemen, can we excuse

24 the jury for the day here then.

25        MR. COLBATH:  Your Honor, absolutely.  It's ten

1   until 5:00.

2          THE COURT:  Let's have you back at 8:45 in the

3   morning, ladies and gentlemen.  Please leave your

4   notepads here.  Remember my admonition not to discuss

5   the case with anybody.  I'm going to get a time

6   accounting from the lawyers right now, and I'll be sure

7   to give you that first thing in the morning where we

8   are.  Have a pleasant evening.

9          (Jury absent)

10          THE COURT:  Please be seated, everyone.

11          Mr. Wells, you can go back to counsel table.

12          Mr. Colbath, why don't I start with you.

13   What's our time assessment in terms of the balance of

14   the defense case?

15          MR. COLBATH:  Well, Your Honor, I had two or

16   three more witnesses ready that I had hoped to get to

17   today, although all of them were short.  I'll certainly

18   have people staged in the morning.

19          THE COURT:  When do you anticipate resting?

20          MR. COLBATH:  I'm going to talk to Mr. Camiel.

21   We may eliminate one or two witnesses, and I might be

22   able to get all of them in tomorrow.  There is a very

23   brief chance that I could -- that we would have to have

24   a witness or two in the morning.

25          Before noon on Thursday for sure.  Absent --

1    well, before noon -- the way crosses have been going,

2    before noon on Thursday for sure.

3         THE COURT:  All right.  If that were the case,

4    then what does the government anticipate on rebuttal,

5    realizing it's a little premature to commit?

6         MR. SKROCKI:  Certainly.  We'll get it done in

7    less than half a day, I guess, for a rebuttal case.  So

8    it's going to take -- I'm thinking we're not going to

9    get to closing by Thursday.

10        THE COURT:  That's kind of what I'm thinking.

11        MR. SKROCKI:  I think that would be not the

12   best route to try to jamb --

13        THE COURT:  To do the closings instead on

14   Monday?

15        MR. SKROCKI:  Yes.

16        THE COURT:  Mr. Colbath, what are your thoughts

17   on that?

18        MR. COLBATH:  Your Honor, I don't think it

19   makes any sense, if the evidence goes into Thursday

20   morning, there would be -- I don't anticipate

21   instructions being long at all as far as discussion, but

22   it would take some time to read the instructions.

23        It will also take counsel, I think, given the

24   volume of exhibits that we have had, a period of time to

25   make sure that we have everything together and going

1    back correctly to the jury.  I just don't see any way

2    that they would get the case before way late in the

3    afternoon, barely have time to talk about anything and

4    then be dismissed for a three-day weekend.

5            THE COURT:  I think it would be more

6    advantageous to the jury to have counsel have three days

7    to focus on preparing a closing that would be more

8    helpful to the jury.  So that's our likely scenario.

9            We'll fit in the jury instructions discussion

10   at some point this week as well.  I did ask Emily to

11   send you -- there was some very minor changes the

12   committee made.  I think she said only one actually

13   impacted --

14           MR. SKROCKI:  We have that by e-mail.

15           THE COURT:  Anything further to take up today,

16   Mr. Skrocki?

17           MR. SKROCKI:  Not today.  Thank you, Judge.

18           THE COURT:  Mr. Colbath?

19           MR. COLBATH:  Not at this point, Your Honor.

20           THE COURT:  8:30, let's aim for that.  And the

21   issues on the experts of the defense we have sorted out?

22           MR. COLBATH:  8:30 for counsel or witnesses as

23   well?

24           THE COURT:  8:45 for witnesses.

25           MR. CAMIEL:  We haven't heard what their issue

1    is with our expert.

2              MR. SKROCKI:  I'll talk to them after we're

3    done.

4              THE COURT:  Thanks.  Then we'll go off record.

5              DEPUTY CLERK:  All rise.  Court stands in

6    recess until 8:30 a.m.

7              (Recessed at 4:56 p.m.)

8

9                        CERTIFICATE

10       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
11   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
12   original stenographic record in the above-entitled
     matter and that the transcript page format is in
13   conformance with the regulations of the Judicial
     Conference of the United States.
14
         Dated this 9th day of June, 2020.
15

16
                        /s/ Sonja L. Reeves
17                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25