UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                         )
        Plaintiff,        )
                         )
vs.                      )    CASE NO. 3:13-cr-00008-SLG
                         )
JAMES MICHAEL WELLS,      )
                         )
        Defendant.        )
_____)


TRANSCRIPT OF TRIAL BY JURY - DAY 18
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
October 2, 2019; 8:34 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
        Office of the United States Attorney
        BY:  STEVEN SKROCKI
        BY:  CHRISTINA M. SHERMAN
        BY:  KELLEY L. STEVENS
        222 West 7th Avenue, #9
        Anchorage, Alaska 99513
        (907) 271-5071

**FOR THE DEFENDANT:**
        Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
        601 West 5th Avenue, Suite 800
        Anchorage, Alaska 99501
        (907) 646-3400

        Camiel & Chaney, P.S.
        BY:  PETER A. CAMIEL
        520 Pike Street, Suite 2500
        Seattle, Washington 98101
        (206) 624-1551

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

1
<u>I N D E X</u>

2
October 2, 2019, Trial Day 18

3

4  | Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
5  | Alex Tschida | 11 | -- | -- | -- |
6  | Jeremy Goode | 16 | -- | -- | -- |
7  | Robert Greene | 21 | -- | -- | -- |
8  | Kenneth Hoerricks | 33 | 69 | 76 | -- |
9  | Daniel Reisberg | 82 | 110 | -- | -- |
10 | Deatrich Sheffield | 117 | -- | -- | -- |
11 | Lori McAbier | 130 | -- | -- | -- |
12 | Nicholas McAbier | 136 | 143 | 145 | -- |

13

14
<u>E X H I B I T   I N D E X</u>

15 | Exhibit | | Page |
|---|---|---|
16 | DE-157B-2 | CD AK Air Terminal 1 Video Clip of DE-157B | 141 |
17 | DE-157B-4 | CD AK Air Terminal 1 Video Clip of DE-157B | 143 |
18 | | | |
19 | DE-318 | Video | 125 |
20 | DE-320 | Photo | 129 |

21

22

23

24

25

```
 1                (Call to Order of the Court at 8:34 a.m.)

 2                (Jury absent)

 3                DEPUTY CLERK:  All rise.  Her Honor, the Court,

 4     the United States District Court is again in session.

 5                THE COURT:  All right.  Good morning.  Please

 6     be seated.  We're back on record.

 7                Mr. Skrocki, what's the update?

 8                MR. SKROCKI:  Good morning, Your Honor.  The

 9     update is our trial team is clear of the cold for the

10     most part.

11                THE COURT:  That's good.  Glad to hear.

12                MR. SKROCKI:  Dr. Reisberg is supposed to

13     testify today, I have been advised, and I'm looking at

14     Docket 1070.

15                THE COURT:  All right.

16                MR. SKROCKI:  And a couple of things.  I did

17     have a quick discussion with Mr. Camiel, and he was kind

18     enough to share with me some parts of Dr. Reisberg's

19     testimony.

20                And I guess first point is I think we have

21     heard enough about confirmation bias from Mr. McCrary,

22     along with other theories espoused in the general sense.

23     I don't think we need to hear a whole lot, if anything,

24     from Dr. Reisberg in terms of the overall confirmation

25     bias.
```

1      I know there probably has to be a little bit of

2  questioning about what it is and what he's focusing on,

3  so that's issue number one.  We object to a full-scale

4  20-minute discussion of what it could possibly be for

5  the jury.  I think it's confusing at this stage, it's

6  not relevant, and they have already heard it.

7      The second point is, with respect to your order

8  is that his testimony is limited to Mr. Toglia and

9  Mr. Schmidt, if I have that correct.  That's as far as

10  the scope of his testimony can go.  And so if that's the

11  case, we would like to have that confirmed, and that

12  it's not going to be impugned to anybody else or to the

13  investigation.

14      Thirdly, if he does get to testify as to this,

15  we would be requesting a limiting instruction from the

16  Court.

17      THE COURT:  Similar to the -- what instruction

18  are you proposing?

19      MR. SKROCKI:  That certain individuals have

20  provided information as to confirmation bias, but in

21  this case, it's limited only to Mr. Toglia and

22  Mr. Schmidt.  "You have heard testimony concerning a

23  theory" -- I have to go back and look.

24      THE COURT:  Go back and if you could find

25  precisely what you're proposing that would be helpful.

1          Mr. Camiel, am I going to hear from you?

2          MR. CAMIEL:  Yes.  Your Honor, with regard to

3     the government's first argument, I think what they are

4     trying to argue is that somehow this testimony would be

5     cumulative, but Mr. McCrary, although he mentioned

6     confirmation bias, that was in the context of conducting

7     an investigation when he was talking about suspect-based

8     versus evidence-based investigations.

9          Dr. Reisberg will be talking about confirmation

10    bias in the context of looking at a video, visual input.

11         THE COURT:  It's only the video that he's going

12    to be addressing, would you agree?

13         MR. CAMIEL:  Yes.  He's -- I would ask him to

14    explain what confirmation bias is and the top-down

15    effect, and then that in the context of the video, the

16    T-1 April 12th video.  And he's not going to address any

17    of the government witnesses except Mr. Toglia and

18    Mr. Schmidt, because those are the only two mentioned in

19    his report, and we'll use those as examples and he'll

20    explain why they may have been susceptible to

21    confirmation bias.

22         Now, the Court indicated in its order that

23    there had to first be sufficient evidence to support the

24    inference that the methods they used could trigger

25    confirmation bias.  I think there is more than enough

evidence of that. Each of these witnesses we've shown the April 12th video, which is the low resolution video input, each of them was being asked to make, to some degree, a subjective judgment about what they saw in the video. And each of them had been provided in advance with information from law enforcement about what law enforcement was interested in.

It's very clear that they were each shown a picture of the Wells' Honda. They were each shown the April 19th video knowing that was the Wells' Honda. I think the methods that were employed would certainly allow an inference that their opinions could have been influenced by confirmation bias, so I think we have met that precondition that the Court set out.

He's not going to talk about the accuracy. He's not going to comment on the accuracy or veracity of either one of those witnesses. That's beyond the scope of what he's allowed to do and he knows that.

THE COURT: And not talk about jurors' perceptions?

MR. CAMIEL: He's not going to talk about jurors or Your Honor.

THE COURT: All right. And so when he talks about the video, it's only with respect to Mr. Toglia and Mr. Schmidt?

1        MR. CAMIEL:  Yes, he's not going to name anyone

2   else in talking about it.  I think to set that up he

3   needs to first explain -- because confirmation bias

4   isn't limited to forensic experts.  It's a general

5   concept.

6        THE COURT:  And that's where -- going back to

7   Mr. McCrary, and I'll try to pick my words carefully,

8   but I felt like some of his evidence or testimony seemed

9   to potentially stray into, although it was never

10  directly stated, but how a jury would process

11  information.  And I would like you to instruct this

12  witness that I am not permitting anybody, expert or

13  otherwise, to instruct the jury as to how they should

14  deliberate.

15       And so when he -- generalities, fine, in the

16  context of this investigation and this video.  Am I

17  making sense on that?

18       MR. CAMIEL:  I understand that.  I would say

19  the other area that I think was addressed in your order

20  that he's allowed to talk about are ways that could have

21  been employed to minimize the risk.

22       THE COURT:  Yes.  I have the order here.  All

23  right.  Thank you.

24       Mr. Skrocki, go ahead.

25       MR. SKROCKI:  Thanks, Judge.  I think that the

ways of employment of minimizing the risk opens the door
to more of a McCrary-type analysis. Really it expands
his testimony to criticisms of the investigation. I
mean if he wants to talk about if you get information
and it goes down top-down from there, that's fine, But
in terms of what are best practices, I don't think
that's relevant at all at this stage.

I do have a proposed instruction, but in
addition, I would also ask that the Court limit the
inquiry as to Mr. Schmidt and Mr. Toglia because our
concern is that this is going to turn into a full-scale
cross examination of those witnesses. "Did you know
they were given this?" "Did you know they were given
that?" And we going for 20 minutes on bad conduct
allegedly by the investigation, and they get to hear
this a second time, if not for a third time.

So I think -- and I can certainly object. I
don't want to be on my feet all morning with this issue,
but I do think there needs to be some curtailing of how
much information is provided by Dr. Reisberg with
respect to what these men had or didn't have.

THE COURT: Do you plan to go in detail into
what they had or didn't have?

MR. CAMIEL: Not the way that Mr. Skrocki
describes it, just that there are three preconditions

1    that Dr. Reisberg observed with each one of those and

2    that was the, as I said, the low visual input, they were

3    asked to make subjective judgments, and that they were

4    provided with advance information of what the government

5    was looking at.

6          And so I wouldn't go much beyond that at all.

7    I wouldn't go into the precise methodology that they

8    used.  That would be beyond what I would be asking

9    Dr. Reisberg.

10         THE COURT:  All right.  Well, the focus should

11   be -- I will allow the testimony about confirmation

12   bias, but I don't want to -- I will grant the

13   government's motion insofar as I will preclude

14   Dr. Reisberg -- is it Reisberg?

15         MR. CAMIEL:  Reisberg.

16         THE COURT:  -- from giving a generalized

17   long-term discussion about what confirmation bias is and

18   instead talk about it and focus on it in the context of

19   the video and Mr. Schmidt and Mr. Toglia.

20         I think that would be -- to the extent it's

21   cumulative, I think the government's concern, as I

22   understand it, is that it could stray into a much larger

23   scale investigation.  I don't see it as cumulative with

24   regard to the specific issue of viewing -- of making

25   determinations about the April 12th video in the context

1    of seeing the April 19th.  That needs to be the focus of

2    his testimony.

3            Questions to clarify that at all, Mr. Camiel,

4    from your perspective?

5            MR. CAMIEL:  I don't think so.  I would ask --

6    in order for him to be able to testify even to these

7    specific witnesses, he initially needs to explain what

8    he's talking about.

9            THE COURT:  Correct.  Correct.  But he can do

10   so in the context of identification of a video as

11   opposed to the generalized concept.  Am I making sense?

12           MR. CAMIEL:  I understand, yeah.

13           THE COURT:  Very good.  Understand -- questions

14   or clarification from the government?

15           MR. SKROCKI:  No, Your Honor.  Thank you.  I

16   understand.  I do have a proposed instruction for you.

17           THE COURT:  Let's hear it.

18           MR. SKROCKI:  "You have heard from Dr. Reisberg

19   in this case.  His testimony is limited to consideration

20   of the April 12th video and Mr. Toglia and Mr. Schmidt,

21   and cannot be considered for any other purpose."

22           THE COURT:  Mr. Camiel, do you need a moment?

23           MR. CAMIEL:  We're going to need to think about

24   that for a little bit, Your Honor.

25           THE COURT:  Let's take a short break and then

1   let me know what your thoughts are.

2          DEPUTY CLERK:  All rise.  Court stands in a

3   brief recess.

4          (Recessed from 8:46 a.m. to 8:56 a.m.)

5          (Jury present)

6          DEPUTY CLERK:  Court is in session.

7          THE COURT:  All right.  Good morning, everyone.

8   Please be seated.  And welcome back, ladies and

9   gentlemen.

10          Mr. Colbath, the defense's next witness?

11          MR. COLBATH:  We would call Alex Tschida.

12          THE COURT:  Good morning.  Come up here, sir.

13   When you get up around the corner, there is a little

14   door.  Get up to the witness stand and then remain

15   standing when you get there, if you would, and the clerk

16   will administer an oath to you.

17          (Oath administered to the witness)

18          DEPUTY CLERK:  For the record, can you please

19   state your full name and then spell your full name.

20          THE WITNESS:  Alex James Tschida, A-l-e-x,

21   J-a-m-e-s, T-s-c-h-i-d-a.

22          ALEX TSCHIDA, DEFENSE WITNESS, SWORN

23                DIRECT EXAMINATION

24   BY MR. COLBATH:

25     Q.  Good morning, Mr. Tschida.  If you just pull that

 1    microphone a little bit towards you there.
 2          Sir, where are you joining us from today?  Where
 3    did you travel up here from?
 4        A.   Kodiak, Alaska.
 5        Q.   And how long have you lived on Kodiak?
 6        A.   On and off, seven years.
 7        Q.   How are you employed?
 8        A.   U.S. Coast Guard.
 9        Q.   What do you do in the U.S. Coast Guard?
10        A.   I'm an information systems technician.
11        Q.   Are you -- what part of the Coast Guard's
12    facilities do you work at on Kodiak?
13        A.   It's called the electronic support detachment.
14        Q.   Is that part of the COMMSTA or a different part
15    of the communications?
16        A.   A different part.  I work for Base Kodiak.
17        Q.   Okay.  Back in -- how long have you been with the
18    Coast Guard?
19        A.   12 years.
20        Q.   Back in 2010, were you in the same position that
21    you hold right now?
22        A.   Similar, yes.  I was a lower rank, but working in
23    the same office.
24        Q.   And did there come a time where you were assigned
25    some temporary work travel to one of the remote islands

1  to work on a Coast Guard facility or Coast Guard matters

2  on the island of Attu?

3      A.  Yes.

4      Q.  What was your purpose for going out to the

5  island?

6      A.  It was to decommission some of the electronics,

7  like the phone system, the computer system, pack it up

8  and get it ready to be shipped out.

9      Q.  Why were things being decommissioned out there?

10     A.  The Coast Guard LORAN stations were being shut

11 down, and that was the one I was assigned to go to.

12     Q.  Were the -- was the entire Coast Guard facility

13 out there being taken down and moved away from the

14 island?

15     A.  As much as could be.

16     Q.  All right.  And were you traveling alone or were

17 you with other Coast Guard members?

18     A.  I was with one other person from the same office

19 I worked in, and there were a few others from the

20 COMMSTA.

21     Q.  First of all, who was your co-worker traveling

22 with you?

23     A.  Petty Officer Jeremy Goode.

24     Q.  How was it you and Mr. Goode got out to Attu

25 Island?

1    A.   We flew on a plane that picked us up at the

2    Kodiak airport.

3    Q.   Who was operating that plane?

4    A.   I think it was -- I think it was Sentinel Air.

5    It was a charter company.  I'm not sure.

6    Q.   Did you fly out of the Servant Air facilities

7    there at the airport?

8    A.   We went to one of the charter facilities.  I'm

9    not sure who ran it.

10   Q.   Okay.  And can we show Mr. Tschida Government

11   Exhibit No. 91.  We have got to wait for our projector

12   here to warm up, I guess.

13        And sir, do you -- there we go.  Do you

14   recognize what that photo depicts?

15   A.   Yeah, that's the Kodiak airport.

16   Q.   Do you see the flight service where you flew out

17   of?

18   A.   I think so.  I think it's -- it's the one top

19   left.

20   Q.   All right.  There may be laying there on the

21   podium in front of you a laser pointer.  You can't see

22   it on that screen, but if everybody can see it.

23   A.   I think it was that one.  I have flown with them

24   before for other things.

25   Q.   Sure.  When you flew on the plane, did you know

an individual named Jim Wells or James Wells from the
COMMSTA?

A.   Mostly by reputation.  I have only ever like
worked with him maybe once.

Q.   And was Mr. Wells on the flight that flew out to
Attu Island with you?

A.   Yes.

Q.   That's all the questions -- and do you know the
date approximately of when the flight was?

A.   Early September, late August, just somewhere in
that timeframe.

Q.   Of what calendar year?

A.   It would had to have been 2010.

MR. COLBATH:  That's all I have for you, sir.
Thank you.

THE COURT:  Questions for this witness?

MR. SKROCKI:  No, Your Honor.  Thank you.

THE COURT:  Thank you, sir.  You may be
excused.

(Witness excused)

THE COURT:  Your next witness, Mr. Colbath?

MR. COLBATH:  Jeremy Goode.

(Pause)

THE COURT:  Good morning.  If you could come up
on the witness stand, please.  When you get up there,

remain standing and the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please state your full name and then spell your full name.

THE WITNESS:  Jeremy Ivan Matos Goode, J-e-r-e-m-y, I-v-a-n, M-a-t-o-s, G-o-o-d-e.

JEREMY GOODE, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. COLBATH:

Q.  Good morning, sir.  Where do you live?

A.  I live in Missouri.

Q.  What do you do there?

A.  I am in IT for the Coast Guard.

Q.  How long have you been in the Coast Guard?

A.  12 years this month.

Q.  Was there -- what is your main job duties or job function down in Missouri?

A.  Well, I lead a team of analysts to support the Coast Guard in any infrastructure, IT, computer, phone issues.

Q.  Was there a time during your Coast Guard career that you were stationed on Kodiak Island, Alaska?

A.  Yes.

Q.  And what timeframe were you at Kodiak?

1    A.  2009 to 2012.

2    Q.  And what were -- where was your job station

3  within the Coast Guard at Kodiak and what were your job

4  duties?

5    A.  I was at the ESD.  I did very much the same

6  thing.  I supported the whole Base Kodiak for any IT

7  issues, phone issues, server maintenance.

8    Q.  And were you stationed there or was your work,

9  day-to-day work offices on main base Kodiak or at the

10  Communication Station?

11    A.  Not at the Communication Station.  The ESD/ESU,

12  it changed its name, was off base in between the COMMSTA

13  and the actual base, but most of my work was actually

14  done on Base Kodiak.

15    Q.  Did there come a time as part of your -- during

16  your time at Kodiak as part of duties that you had to

17  travel to the island of Attu to work on some Coast Guard

18  facilities out there?

19    A.  Yes, sir.

20    Q.  What was the purpose of the trip?

21    A.  We were decommissioning the LORAN station.  They

22  weren't going to support that technology anymore, so we

23  went out there to inventory all the information

24  technology equipment and get them ready for travel back

25  to Coast Guard in Alaska, like Anchorage.

1    Q.   Okay.  And how was it that you got out to Attu?

2    A.   We took a flight from Kodiak.  Bounced along the

3  islands along the way all the way to Attu.

4    Q.   Do you recall what flight service you used?

5    A.   I do not.  It was nine years ago.

6    Q.   Sure.  I'm going to -- we're going to show you a

7  photograph.  If we could show him Exhibit No. 91.

8         Sir, are you familiar with what that depicts?

9    A.   Yes, I am.

10   Q.   Okay.  And do you see -- there is a couple

11 different flight services at the Kodiak airport,

12 correct?

13   A.   Uh-huh.

14   Q.   Do you see just generally the area where you flew

15 out of or the service building that you would have flown

16 out of on there?

17   A.   Not 100 percent, sir.

18   Q.   Did you travel with any of your co-workers?

19   A.   I did.

20   Q.   And we just heard from Mr. Tschida.  Was he --

21 were you working with him at the time?

22   A.   Yes.

23   Q.   And traveled with him on that flight to Attu?

24   A.   Yes, sir.

25   Q.   All right.  And were you -- on the plane with you

```
 1    were there also members of, one or more members of,
 2    Coast Guard members from the COMMSTA?
 3        A.  Yes, there was two.
 4        Q.  All right.  And was Jim Wells or James Wells one
 5    of those members on the plane?
 6        A.  At this point, I can't remember.
 7        Q.  Okay.  Sir, I'm going to show you -- now, back in
 8    time much closer to the incident that this trial is
 9    about you were interviewed by Coast Guard Investigative
10    Services?
11        A.  Correct.
12            MR. COLBATH:  Your Honor, if I can approach, I
13    want to show Mr. Goode his law enforcement interview and
14    see if that refreshes his recollection.
15            THE COURT:  All right.  Why don't you show it
16    first to counsel if you would, Mr. Colbath.
17            MR. COLBATH:  It's just one page, Your Honor.
18            THE COURT:  All right.  Very good.
19            (Mr. Colbath approaches witness.)
20    BY MR. COLBATH:
21        Q.  Review that real quick.  You have had a chance to
22    look at that?
23        A.  Uh-huh.
24        Q.  Okay.  And sir, the date of this interview was
25    the 20th of April 2012, so much closer in time?
```

```
 1    A.  Yes, absolutely.

 2    Q.  And at the time that the Coast Guard investigator

 3  interviewed you, did you recall then what the air

 4  service you flew on was?

 5    A.  Yes, I believe I did.

 6    Q.  And it was what?

 7    A.  I would have to see the paper again.  I'm sorry.

 8         (Mr. Colbath approaches witness.)

 9    A.  Oh, yeah, Servant Air.

10    Q.  And at the time, did you recall whether or not

11  Mr. Wells was on the flight?

12    A.  I did.

13    Q.  And was he?

14    A.  Yes.

15         MR. COLBATH:  I don't have any other questions

16  for Mr. Goode.  Thank you.

17         THE COURT:  Any questions for this witness?

18         MS. STEVENS:  No, Your Honor.

19         THE COURT:  Thank you, sir.  You may be

20  excused.

21         (Witness excused)

22         THE COURT:  Your next witness, Mr. Colbath.

23         MR. COLBATH:  I will go look, but I believe we

24  will call Robert Greene.

25         (Pause)
```

```
 1            THE COURT:  Good morning.  If you could come up
 2   to the witness stand.  When you get up there, remain
 3   standing, if you would, and the clerk will administer an
 4   oath to you.
 5            (Oath administered to the witness)
 6            DEPUTY CLERK:  For the record, can you please
 7   state your full name and then spell your full name.
 8            THE WITNESS:  It's Robert Milton Greene,
 9   R-o-b-e-r-t, M-i-l-t-o-n, G-r-e-e-n-e.
10            ROBERT GREENE, DEFENSE WITNESS, SWORN
11                     DIRECT EXAMINATION
12   BY MR. CAMIEL:
13     Q.  Good morning, Mr. Greene.  Where are you here
14   from today?
15     A.  Kodiak.
16     Q.  How long have you lived on Kodiak?
17     A.  All my life, 54 years.
18     Q.  What do you do for a living?
19     A.  I work for the Alaska Department of
20   Transportation.
21     Q.  How long have you done that?
22     A.  Coming up on 30 years.
23     Q.  What's your position with the Department of
24   Transportation?
25     A.  Currently I am the Kodiak Aleutian district
```

1    superintendent.

2        Q.    How long have you had that position?

3        A.    Five years.

4        Q.    I want to turn your attention back to 2012 and

5    ask -- you're familiar with the Kodiak airport?

6        A.    Yes.

7        Q.    Was there any work or any particular project that

8    was going on at that time at the airport?

9        A.    2012, we started the beginning of a four-year

10   construction project.  First phase was rebuilding two

11   runways, all the runway lighting and the airport parking

12   lot and the access road into the airport from the

13   highway.

14       Q.    Could we put up Government Exhibit No. 91.

15             And in the screen in front of you and also on the

16   big screen is Government Exhibit No. 91.  Do you

17   recognize that photo?

18       A.    Yes.

19       Q.    And is that where this project was taking place?

20       A.    Yes, that was one of the phases.

21       Q.    And you mentioned work both on the runways and on

22   the parking lot?

23       A.    Correct.

24       Q.    Which parking lot was being worked on?

25       A.    So it was the main road coming in, so it would be

the one straight up through the middle there.  And then

the gravel parking area, it's kind of triangular looking

to the right of the main road in, that's the employee

parking lot, and then everything from there to the

Alaska Airlines terminal and all the way over in front

of the Mark Air terminal.

Q.  You have a laser pointer sitting in front of you.

If you could point to the big screen and show us where

the work was being done on the parking lot.

A.  Bear with me.  Okay.  This is the main road in.

And it went from pretty much this area all the way.

This big rectangular place here, this is the employee

parking lot.  This is the two-hour short term parking

lot.  And this is the main road coming in.

Q.  What was being done to the parking lot?

A.  So the parking lot was in pretty sad shape.  It

was a complete rebuild, which we dug in and put in

lighting throughout the parking area, drainage systems,

and then dug out the base, which was about three to four

feet of excavation through that whole area, the employee

parking lot and the short-term parking lot.

Q.  While the work was being done, was the parking

lot open?

A.  Yes.

Q.  So people could still come in and park?

1    A.   Yes.

2    Q.   And in about April of 2012, if you remember, what

3  was the condition of the surface of the parking lot by

4  that time?

5    A.   It was pretty sad shape, and I believe that we

6  had taken it up -- excuse me, the contractor had taken

7  it up, all the asphalt up, and they were going to start

8  the excavation.  And they did surveying through the

9  parking lot, realized that they didn't have good enough

10  grade for what the plan set was to be followed, so they

11  had to stop, come up with a design that -- the engineers

12  and the contractor came up with a design to get drainage

13  into the parking lot better.

14    Q.   You were with the Department of Transportation at

15  that time as well, right?

16    A.   Correct.

17    Q.   What was your role in terms of this project?

18    A.   I was the airport manager from 2001 to 2015, so I

19  worked directly with our state project manager and the

20  state project engineer.  The engineer was on site in

21  Kodiak.  Manager was here in Anchorage.

22        I was making sure our tenants, the leaseholders,

23  all the buildings, any of their needs were met, and I

24  worked with the engineer who oversaw the contractor.

25    Q.   Do you remember who the contractor was or the

1   contractors were that were doing the work?

2       A.   So the contractor, the first phase, the first

3   years was a joint venture.  It was Brechan Construction

4   and Pruhs Construction.  Brechan is out of Kodiak and

5   Pruhs Construction is in Anchorage here, I believe.  It

6   was a joint venture.

7       Q.   Did those companies set up any kind of temporary

8   headquarters or offices at the airport?

9       A.   Yes.  So in the Servant Air -- should I point --

10      Q.   Please, yes.

11      A.   The Servant Air building is to the left of the

12  main road in.  This is the Servant Air.  The left two

13  doors go into their hangar.  This is an enclosed

14  entranceway.  Their terminal downstairs is where they

15  operated out of.

16          The upstairs was never really finished, so they

17  -- the owners of Servant Air made temporary offices up

18  there.  I believe there was four offices, if I remember

19  right.  The contractor is responsible to provide office

20  space to the state engineer as part of the contract.  So

21  I believe the state engineer was up there, his staff,

22  and then I believe one of the offices was the

23  contractor's office.

24      Q.   In terms of the people actually working on the

25  project, the crews that were doing the work, are you

1   aware of what time they would generally arrive for work?

2       A.  Normally, it was 7:00 in the morning.

3       Q.  And would they arrive right at 7:00 or would they

4   arrive any earlier?

5       A.  When I would be there, we would do a weekly

6   meeting.  Usually, it was a little bit early because the

7   meeting was at 7:00, but I don't know on an average day

8   what time.

9       Q.  In terms of the airport itself and kind of the

10  waking up of the airport in the morning, when would that

11  usually begin to happen?

12          MR. SKROCKI:  Can I object?  Can we have a

13  timeframe, please?

14      Q.  During 2012, around April 2012, when this project

15  was going on.

16      A.  So operational for us, we start at 5:00 a.m.

17  That's when the airport is officially open for business.

18  The terminal, the first light is Alaska Airlines, they

19  open at 6:00 a.m.  Their first airline, the Alaska jet

20  in the morning is at 7:00 a.m., so usually by 6:15, it's

21  pretty busy at the Alaska Airlines terminal.

22          And then the smaller guys, Island Air and Servant

23  Air, their first flights are usually 8:00 a.m., so their

24  pilots would come in 7:30-ish timeframe and you would

25  see them bring their planes out and start getting ready

1   for their flights.

2      Q.  In addition to the air charter services and

3   Alaska Air, are there other businesses that operated out

4   of the airport at that time?

5      A.  Yeah.  At that time, there was, at the Island

6   Air, which is the blue building right here, in the front

7   corner over here is a coffee shop.  And if I remember

8   right, I believe they opened at 6:00, I believe, because

9   usually you would see people come from Alaska out over

10  to get coffee after they checked in.

11     Q.  In addition to the Alaska Airlines passenger

12  terminal, did they have any kind of a cargo terminal as

13  well?

14     A.  Yes.

15     Q.  Where was that?

16     A.  So Alaska's cargo at that time was right there,

17  that window you see -- I'm sorry, I'm kind of shaky.

18  The main doors going in were right here and right here,

19  and to the right was the cargo office.

20     Q.  In terms of -- going back to the offices that

21  were upstairs in Servant Air that were being used by the

22  contractor, were you ever up there?

23     A.  Yes.

24     Q.  More than once?

25     A.  Yes.  Like I said, we had a weekly meeting to go

over the projected schedule, the contractor, usually
they would set up, whether it would be for the coming
week or possibly two weeks.

Q.  Were they using these upstairs offices like you
might see a construction trailer where they had the
managers and the foremen-type folks in there?

A.  Yes.

Q.  And would there be crewmen or workmen in and out
of those offices during the course of the day?

A.  Yes, I have seen people.

Q.  I want to ask you -- just changing subjects.  Do
you know Jim Wells?

A.  Yes.

Q.  How do you know him?

A.  My stepson in the early nineties was playing
Kodiak little league baseball and my wife was really
heavily involved with the baseball program.  She was the
secretary.  Jim was a coach and he coached the
All-Stars, I believe.

Q.  Did you also know Jim through his work?

A.  Yes.  Met Jim -- came into our office one time.
My office is on the way to his office on Anton Larsen
Road, so don't remember the exact reason.  It was either
something to do with the road and the antenna field.  I
oversaw in my position all the state highways in Kodiak,

so Anton Larsen Road is a state-maintained road, so him
and Richard Belisle came in one time and there was -- I
don't remember the particulars, but there was something
to do with either they -- their antenna field is -- our
road runs all through their antenna field, so that's how
I first met him and Richard.

Q.  Did he and Mr. Belisle come in more than once
together?

A.  Yeah.  That was -- we started talking, and we
were doing a project on the airport removing the larger
trees for obstruction for Part 77 airspace, and they
came in one time, saw what we were doing, questioned,
asked about getting some firewood, told them, yeah, we
give it to the public.  That kind of started -- they
would stop by just to see what the status was for
firewood here and there.

Q.  They would stop by together?

A.  A couple times together.  Richard and Jim were
usually together, yeah.  Richard never came by by
himself.

Q.  Have you ever been up to the COMMSTA, to the
rigger shop or the T-2 building?

A.  Yeah.

Q.  Can you tell us about that?

A.  The last time I was there was earlier -- I don't

remember if it was end of March or beginning of April of
2012. We had had a car accident at the end of the
runway on the main highway between town and the base.
Myself and one of my employees responded to do traffic
control. Mil pol had to get out of there. It was right
around 7:00 a.m.

Both lanes were stopped, so I went into the
opposing lane with my overheads to go up to start
running traffic, and as I was driving, I clipped a
mirror on a pickup truck. And got up, started doing
traffic, and once I got traffic moving through, when I
saw the truck come up, I stopped the gal and said,
"Didn't mean to tick your mirror with my mirror," but
gave her my card, said, "If there is any damage, have
your husband look at it and let me know."

Q. Who was her husband?

A. Mr. Hopkins.

Q. Hopkins?

A. Hopkins, yeah.

Q. As a result of that, did you end up making a trip
up to the rigger shop?

A. Yeah. I didn't hear from him that day, so in the
afternoon, I ran up to T-2 because she had said he
worked up there, and went up to see if he was there.
And went to the door I'd normally walk in and it was

1    locked, so I went into the side door into the shop on

2    the side, and a guy was standing there, I asked if Jim

3    or Rich were in their office and he said yeah, and went

4    back and talked to Richard.

5       Q.  If I could back you up for a minute.  It sounds

6    like you went to one door and it was locked?

7       A.  Yeah.

8       Q.  And you went to another door and that one wasn't

9    locked?

10      A.  Yeah, the side door on the right.

11      Q.  You just walked right in?

12      A.  Yeah.

13      Q.  And you found Mr. Hopkins?

14      A.  No, no.  So I went into Jim and Rich's office,

15   and Rich was there, told him what happened, he said he

16   had heard about it, said that Mr. Hopkins was not -- he

17   was out in the field, I believe, or something.  I just

18   asked Rich to have him come by and make sure his truck

19   was okay.  We talked for a little bit, just making

20   chitchat.

21      Q.  Had you ever been up to the rigger shop before

22   that?

23      A.  Yeah.

24      Q.  Had you entered the same way?

25      A.  Normally, it was the door right in front that I

1    tried the first time, goes kind of right into their

2    office area.

3        Q.  When you say normally, so in the past, had that

4    door been unlocked for you to just walk in?

5        A.  In the past, yeah.

6        Q.  How many times do you think you had been up to

7    the rigger shop before the last time you went up there?

8        A.  To see Jim, I think it was once.  Growing up,

9    quite a few times, because a friend of mine going

10   through high school his dad work there and that was kind

11   of where they worked on cars.

12       Q.  We're going to put up Government Exhibit No. 13,

13   see if you recognize this.  This has already been

14   admitted as an exhibit.

15          It's a diagram of the rigger shop.  I wanted to

16   see if you might be able to identify which door you

17   walked in that was unlocked.

18       A.  The last time?

19       Q.  Yes.

20       A.  So it was the -- this door right here.

21       Q.  Okay.  Which is the one you tried first?

22       A.  Normally, this door here is where I would go in.

23       Q.  So normally, the one you just pointed to last,

24   normally that door would be unlocked?

25       A.  In the previous times I had been there that was

 1   unlocked.

 2          MR. CAMIEL:  Thank you.  That's all I have.

 3          THE COURT:  Questions for this witness?

 4          MR. SKROCKI:  We don't.  Thank you.

 5          THE COURT:  Thank you, sir.  You may be

 6   excused.

 7          (Witness excused)

 8          THE COURT:  Your next witness?

 9          MR. COLBATH:  Your Honor, I'll call Jim

10   Hoerricks.

11          THE COURT:  All right.  If you could come up to

12   the witness stand, please, and the clerk will administer

13   an oath to you.

14          (Oath administered to the witness)

15          DEPUTY CLERK:  For the record, can you please

16   state your full name and then spell your full name.

17          THE WITNESS:  I am Kenneth James Hoerricks,

18   K-e-n-n-e-t-h, J-a-m-e-s, H-o-e-r-r-i-c-k-s.  I prefer

19   Jim.

20      KENNETH JAMES HOERRICKS, DEFENSE WITNESS, SWORN

21                    DIRECT EXAMINATION

22   BY MR. COLBATH:

23      Q.  Good morning, Mr. Hoerricks.

24      A.  Good morning.

25      Q.  Where do you join us from today?

1      A.   From southern Nevada.

2      Q.   And what do you do in southern Nevada?

3      A.   I'm a forensic scientist, a consultant forensic

4   video analyst.

5      Q.   And I guess present working backwards, let's

6   share with the jury your -- what you do in your current

7   position as a forensic video analyst and scientist and

8   day-to-day work.

9      A.   Day-to-day work.  I began in this profession in

10  police service.  I'm retired from the Los Angeles Police

11  Department.  Worked for them between 2001 and 2016.  It

12  was there that I made the transition from working in

13  surveillance, electronic surveillance and counter

14  surveillance to forensic video analysis when it was kind

15  of a fledging science.

16          Along the way, I worked to develop the standards

17  by which the LAPD handled that type of evidence, the

18  closed circuit television, videos and so on within the

19  department, and then on loan to various federal

20  initiatives to establish standards in that discipline.

21          About almost 11 years ago, I wrote a book called

22  Forensic PhotoShop that laid out a workflow for handling

23  this type of evidence, this video evidence, image-based

24  evidence.

25          I worked on a federal working group to establish

standards for the retrieval of this type of evidence,
and that book was published in 2006, called the Best
Practices for the Retrieval of Video Evidence from
Digital CCTV Systems. I was invited to the facial
imaging scientific working group's first meeting, but my
agency declined to continue to participate because it
was more about machines than manual comparison for
facial images.

   And then for the last five years, I have sat on
the organization of scientific area committees for
forensic science on the video imaging technology and
analysis subcommittee, where I'm the chair of video task
group. So all of those things and casework within
police service, when I retired, I went to work for a
reseller of some software that I used primarily in this
discipline. And then with that software manufacturer
being in Italy and then retreating to Italy and outside
of this market, founded a small consultancy, Apex
Partners Limited, in July of last year. That's what
brings me here today.

  Q.  Backing up to your police service, what were the
years that you were with the Los Angeles Police
Department?

  A.  From 2001 to 2016.

  Q.  And focusing on the time after you transitioned

 1   from surveillance, counter surveillance to forensic

 2   image analysis, just in a practical sense, what were you

 3   doing most of during that timeframe?

 4      A.   Sure.   The job of a surveillance person in

 5   electronic surveillance is to put cameras and bugs in

 6   walls and those types of things.   Because my unit had

 7   recorders and because we were all essentially

 8   electricians, the detectives would rely upon us to come

 9   in with their videotapes and their audiotapes to present

10   still images for court and so on.

11         So that task at first was more of a trial prep

12   function of just printing images.   And then as the

13   questions got more complicated, detectives wanted to

14   know answers to questions:   How tall is this person, how

15   fast is this car going, and so on.

16         So the science over time kind of matured into

17   less of a trial prep function, less of a basic

18   assistance function and more heavy on math and geometry

19   and those types of things.   So somewhere in the

20   neighborhood of 2002 to about 2006, all of this

21   transformation happened pretty much across the world as

22   the VHS went away, as the DVR, the little black box came

23   into being.

24         You know, this complicated matters in trial

25   because of the technology involved, and so my unit,

1    again being electricians and being familiar with

2    recording technologies, was tasked by the chief of

3    detectives to kind of take the lead on figuring out what

4    the department was going to do with this type of

5    evidence.

6        Q.  All right.  Backing up before your police service

7    just real quickly.  What's your educational background?

8        A.  I have a bachelor's in organizational leadership

9    from Woodberry University in Burbank, California.  I

10   also have a master's in organizational leadership from

11   that university.  I have a master's of instructional

12   design from Western Governors University in Salt Lake,

13   and a Ph.D. in education from Trident University in

14   Cyprus, California.

15       Q.  With your Ph.D. in education and then your other

16   technical work, have you done any teaching or training

17   in the areas of forensic science and video analysis?

18       A.  Absolutely.  I think one of the things that the

19   LAPD does right is on your way to mastering a particular

20   task that you have been given, you have to teach it, you

21   have to kind of own that thing that you have been given,

22   and nothing is so panic inspiring as to get in front of

23   your peers and present something overly technical.  It

24   really helps you to hone your skills.

25            At the time when all of this began, there were no

classes, there was no university program, there was no
formal training program.  And one started to emerge in
the early 2000s, and a couple of professional
organizations took the lead on that.  And I began to
teach for them at conferences and so on.  "Them" being
the National Technical Investigators Association as well
the Law Enforcement and Emergency Services Video
Association where I over the years volunteered to teach
product-specific classes or discipline-specific classes
like video analysis authentication and so on.

    Q.  And moving forward, do you continue to teach at
conferences, do presentations, trainings, or teach in
any regular more academic settings?

    A.  Yes.  I'm in front of students at least monthly
on a variety of topics, photographic comparison,
introduction to the discipline, those types of classes.

        Also, in response to the fact that I'm a singular
person and that the market is so huge, initiatives like
the State of Texas's forensic science licensing scheme,
I have created online learning, so I have a class,
Statistics for Forensic Analysts, that I offer online as
micro-learning because you can't be everywhere at once.

    Q.  And has your work, since you have left the LA
Police Department, has your work continued to involve
work with law enforcement agencies, and, if so, what

1    types of law enforcement agencies?

2        A.   I have worked at the national level.  I have

3    trained, for example, the South African police service.

4    I have trained elements of the Mexican state prosecutors

5    office of Nuevo Leon, Mexico, the Royal Canadian Mounted

6    Police, various provincial organizations in Canada as

7    well as federal, state and local in the United States.

8        Q.   What work experience have you either shared or

9    interacted on with the FBI and their forensic unit in

10   Virginia?

11       A.   Working for AMPED Software, my previous employer,

12   I presented them with their product training.

13       Q.   Were they utilizing, that is the FBI forensic

14   unit, were they utilizing the software products and the

15   hardware things that your company provided?

16       A.   Yes.  I think they're spoiled in that they have

17   one of each.  I don't know that it was their predominant

18   tool, but they bought it and they were trained to

19   proficiency in it.

20       Q.   And you provided that training on behalf of that

21   company at that time you worked?

22       A.   Yes.

23       Q.   Have you continued to provide training and other

24   class work to law enforcement, including the FBI, going

25   forward after you have left that company?

1    A.   Absolutely, yes.

2    Q.   And are there particular areas of, I guess,

3  specialization that you see yourself as having?

4    A.   In terms of the discipline of forensic multimedia

5  analysis, there are domains within there.  There is

6  photographic comparison.  There is measurements or

7  photogrammetry.  There is authentication and there is

8  content analysis.

9         I don't necessarily specialize in any one or the

10  other, but I have done work and I've done training and

11  received training in all of those disciplines.  They all

12  have their place in various aspects of the trial

13  process.

14    Q.   So the process depends on the project that you

15  would be working?

16    A.   The project and the questions to be answered,

17  yes.

18         MR. COLBATH:  Your Honor, I'm going to ask that

19  the Court find that based on his training, education,

20  experience and knowledge as presented here that

21  Mr. Hoerricks be allowed to give a specialized opinion

22  in the area of forensic video and photographic analysis.

23         MS. SHERMAN:  Subject to our previous, no

24  objection.

25         THE COURT:  I'll find the witness so qualified.

1    Go ahead, please.

2    BY MR. COLBATH:

3        Q.   Thank you, Your Honor.

4            Mr. Hoerricks, how was it that you became

5    involved in this matter?

6        A.   Through a referral from your office.

7        Q.   And there were a couple of different questions

8    and a couple of different analysis processes that we

9    asked you to do, correct?

10       A.   Yes.

11       Q.   First, with respect to review of an evidence

12   video in this case, I would ask if you -- can we pull up

13   Exhibit No. 62, Government 62.  You can stop it there.

14           So there was an evidence video taken April 12th,

15   a surveillance video from April 12, 2012 at

16   approximately 7:00 to 7:30 in the morning.  Have you

17   looked at that video and analyzed a portion of that

18   video?

19       A.   I have, yes.

20       Q.   We can take that down.

21           How many closed caption surveillance video-type

22   videos, images and systems like this have you reviewed

23   in your career?

24       A.   I would say ballpark over 5,000, under 10,000.

25       Q.   And was this system something that, as it

1 presented and you worked through your review, was a

2 familiar type, or I don't know if there is a routine or

3 standard type closed caption system, but something that

4 looked familiar to you generally?

5 A.  I think it was typical of the first generation of

6 digital CCTV systems, yes.

7 Q.  Just describe, when you approach a project like

8 this and you're looking at a system like this, the

9 importance of the system or the pieces, the tools, what

10 is it that's important to you in developing your

11 analysis?

12 A.  Sure.  In the case management stage, when I

13 receive a case, I generally receive items of evidence

14 and then questions that the investigators want answered.

15 So in this case, I received the proprietary video files.

16 They are video files that you wouldn't be able to run on

17 a Windows or Macintosh computer.  They require a

18 specialized player to play them.

19        What I wanted to determine was:  Is there

20 sufficient quantity of data to answer the questions in

21 this case?  So I analyzed the video data, the

22 proprietary data relative to how it preferred to be

23 played with this player.  I wanted to see if I could use

24 my modern tools or if I would have to revert to

25 something less modern to accommodate this old system.

1       So I began that analysis, documenting my results

2   that there was no quantitative difference between the

3   frames that are exported, the individual still images

4   within the video feed from the proprietary player or

5   ones that I could extract from the data stream using my

6   tools.

7       Documenting my results, I then moved on to try to

8   quantify the amount of data in the area of interest, in

9   this case far down the driveway for a vehicle that might

10  be passing by.

11  Q.  So you could use today's software to look back

12  and do the analysis of this 2012 video?

13  A.  Yes.  Yes.

14  Q.  And in looking at information drawn from a closed

15  caption or a video system like this, does the system's

16  -- I don't know if capacity is the right word, but does

17  the system-capturing information, what does that have to

18  do with or affect your analysis?

19  A.  From a technical standpoint, there is a lot of

20  information that the camera itself gathers and puts down

21  the cable towards the recorder and forms electricity and

22  coded information.

23      In the older generation of computers, the

24  computer itself could not handle that amount of data all

25  coming from multiple cameras at the same time, so it

employs a system called compression.  And compression is
synonymous with loss.  So in order to facilitate the
transport and storage of all of these pictures, about 30
images per second going down these various cables
towards the recording box, the manufacturer has to
choose a way to compress these data streams.

And that generation of recorder, the JPEG, Joint
Picture Experts Group methodology for recording things
was quite popular because each of the video frames is in
and of itself complete.  It doesn't require any kind of
prediction like your iPhone video does these days.  And
so in that way it could capture an adequate amount of
frames of the camera view to give you an overall look
and feel of the scene in front of you, in the recording.

Q.  And so do you have the ability in analyzing this
or looking at this video to figure out as the camera
captures images if there is compression when those
images are stored then on the computer that saves it?

A.  Yes.

Q.  And did you do that?

A.  I did.

Q.  And what were you able to determine about whether
or not the images that were seen by the camera -- how
much of that data was stored on the system for you or
anybody else to later review?

1    A.  Sure.  The basic math behind compression is, if

2  you're familiar with your TV set at home, you have a

3  1080i or 1080p or 4K, and that nomenclature comes from

4  the X and Y dimensions of the height and the width of

5  your television screen.

6       CCTV is no different in that respect.  In this

7  case we started with a resolution of 640 by 480.  And so

8  in that case, I would just multiply those two and I

9  would get a value, about a megabyte.  That's what it

10  should be if it's not compressed.

11       And then I look at what the individual frames

12  happened to be as they were recorded and stored.  The

13  difference between the two after you've done the

14  division is the compression factor.  In this case, it

15  was about 27 times, so in essence --

16    Q.  Let me stop you right there.

17       So explain -- maybe that's where you -- what you

18  were going to say, but so the compression factor means

19  the amount of loss?

20    A.  Yes.

21    Q.  And so what is 27 times or how do we quantify

22  that 27 times?

23    A.  If you started with a $20 bill at the camera, $1

24  is what was stored.  The $19 is what was lost to

25  compression.

1   Q.   It was that significant amount of information, or

2   it was that much information that between the camera and

3   the recorder was lost?

4   A.   Yes.

5   Q.   And so when you start your analysis, do you have

6   any way to get back that breadth of information that was

7   lost in the compression process?

8   A.   In JPEG compression, once it has been compressed,

9   there is no getting anything back.

10   Q.   So when you performed your analysis, you were

11   using -- you were analyzing the $1 bill, not the $20

12   bill?

13   A.   An element within the $1 bill, yes.

14   Q.   And what type of analysis then were you asked to

15   make on the image?

16   A.   I was asked if I could determine the make and

17   model of the vehicle depicted in the surveillance

18   footage.

19   Q.   There was a questioned or unknown vehicle you

20   were asked to focus on?

21   A.   Yes.

22   Q.   What is a make and model determination?

23   A.   A vehicle make/model determination is usually

24   done ahead of a photographic comparison, and that is one

25   side or the other in a trial wants to know what this

unknown vehicle happens to be.  So we begin with the
assumption that it is an automobile.  Then we attempt to
determine if it fits a certain class of automobile.  For
example, a sedan versus a hatchback versus a pickup
versus an SUV and so on.

Having done that, we try to determine based on
the features that are present and visible if it belongs
to a certain manufacturer of automobiles.  And then we
can further narrow down from class to subclass and so
on.  So from make and model to year to trim level and
then down to a specific vehicle.

Q.  All right.  And in going through that process, is
there a standardized method that you or another -- other
analysts doing the same make and model determination
would normally follow?

A.  Yes.

Q.  And how do you know what that is or where is --
where do you -- where is that from, that standardized --

A.  Certainly.  There is a worksheet that is
published by the scientific working group on digital
evidence, a vehicle make/model determination worksheet
that helps you categorize and catalogue all of the
features that you find visible and present in the image
that you're evaluating.

And in that way it helps build this list of

```
 1  features to eventually facilitate a photographic
 2  comparison.
 3      Q.  Okay.  And so in discussing your analysis, did
 4  you do -- did you perform a make and model
 5  determination?
 6      A.  I attempted to.  I began to, but it was not
 7  completed because there was insufficient data.
 8      Q.  In walking us through and sharing with the jury
 9  your work, did you prepare a few slides that would
10  assist you in illustrating the work you did and the
11  ultimate findings that you made?
12      A.  Yes, I did.
13          MR. COLBATH:  Your Honor, I'm going to show
14  Mr. Hoerricks Defense Exhibit No. 319 and ask that we be
15  allowed to publish that to the jury to help illustrate
16  his testimony.  It's just a demonstrative that we're not
17  offering into evidence, will just assist with his
18  testimony.
19          THE COURT:  Any objection?
20          MS. SHERMAN:  No.
21          THE COURT:  Go ahead, please, Mr. Colbath.
22  BY MR. COLBATH:
23      Q.  So Mr. Hoerricks, before we discuss this first
24  slide, or maybe it's part of this discussion, you said
25  you were trying to -- when I asked you, "So you analyzed
```

1   the $1 bill," you said it was a -- you analyzed a
2   subject and a portion of the $1 bill.
3       A.   Yes.
4       Q.   Can you explain that?
5       A.   Relative to this 640 by 480 matrix, what I'm
6   illustrating with this square here is my best attempt to
7   determine the boundaries of the length of the vehicle,
8   and I have determined that that value is about 37 pixels
9   wide.
10          So given the overall size of 640 by 480, that 37
11  by 11 from the ground to the roof and from bumper to
12  bumper is less than 5 percent of the available pixels to
13  work with, so from that dollar, I'm left with a nickel.
14      Q.   So it was -- that square or that box was the
15  relevant, from our scene, portion of the data that you
16  had to work with?
17      A.   Yes.
18      Q.   So starting back at the $20 bill, we're down to
19  the nickel?
20      A.   Yes.
21      Q.   And so what steps then in going through and
22  utilizing the process here, what steps do you go through
23  to try then to do this make and model determination?
24      A.   Certainly.  I don't know yet what class of
25  vehicle this is.  I have made a couple of assumptions.

1    I have referenced the internet sources for the average

2    length for different classes of vehicle; subcompact,

3    compact, SUV, and so on.  And I have taken the average

4    of those values to be my starting point for determining

5    how much each one of those pixels should represent in

6    real life.  And I have come to a value, a median nominal

7    resolution of about 5 inches per pixel.

8         Q.  The regular resolution is what the camera starts

9    with, but nominal is the size of the pixels as they

10   appear on the actual?

11        A.  The size -- the real-world distance represented

12   by each pixel for the area of interest.  So the nominal

13   resolution changes as you move closer or farther away

14   from the lens.

15        Q.  What did you understand the distance here to be?

16        A.  I was told it was between 1,000 and 1,100 feet.

17        Q.  At that real-world distance, using an average

18   size vehicle and the pixels as you determined them to

19   be, you found them to be the real-world size of

20   approximately what?

21        A.  About 5 inches.

22        Q.  That's what we're looking at and working with

23   here?

24        A.  Yes.

25        Q.  Do we need to go to the next slide or next step?

1    A.   Certainly.

2    Q.   And --

3    A.   So for context, the vehicle depicted off into the

4 corner we can see again illustrating the lack of general

5 information.  The way that the JPEG algorithm is

6 designed to operate is to preserve the overall look and

7 feel of the scene in front of it.

8         In order to save space and storage and

9 transmission, it throws away information.  That

10 information are the details that we want in a case like

11 this, but in this instance, I'm merely illustrating

12 where within the context of the frame the area of

13 interest happens to be and how small it is relative to

14 everything else.

15    Q.   What does that matter to you about how small it

16 is relative to everything else?

17    A.   Certainly.  If we can switch slides to the next

18 slide.

19    Q.   All right.

20    A.   When I'm conducting an analysis, attempting to

21 determine objectively what a make and model and trim and

22 year is, this illustration from my checklist, these are

23 the things that we are looking for.  These are the items

24 that we want to see.  We want to see the pillars that

25 support the roof.  We want to see the presence or

absence of sunroofs and these types of thing we can

quantify and catalogue.  These are generally standard

features.  A car will have four wheels.  It may have two

or four doors on the side.  It may have certain

auxiliary windows, quarter windows and so on.  We just

want to document that.

And along the way, to get to trim level, we may

notice that the rearview mirror's forward-facing surface

is body color or black, it might be chrome, and those

types of things help us determine beyond make and model

down to trim level, the presence or absence of

specialized rims or hubcaps and those types of things.

We just work through this checklist in cataloguing these

features.

Q.  So this -- does this represent something specific

to this case analysis or is it more of a generic

automobile checklist?

A.  Generic automobile checklist.

Q.  What do we do next?

A.  Go to the next slide.

Q.  And on the automobile check list, and as you're

identifying features, you said that certainly all

vehicles are going to have tires or wheels of some kind

on them.  So using that as an example, what is the

analysis here or the appropriateness of considering

1    tires?

2        A.   If you consider the size of the tire, this is one

3    of the five most popular tire sizes sold in North

4    America.   If the real-world distance of a pixel is 5

5    inches and the side wall is 5 inches, then the tire's

6    actual rubber surface depicted in the scene will be no

7    more than one pixel.

8            Likewise, for the rim, there will be about three

9    pixels to represent that.   And given the neighborhood

10   compression scheme that the JPEG employs where it pulls

11   information from color and light from neighboring

12   pixels, a lot of that highly detailed stuff about rims

13   and so on is going to be lost.   It's going to be

14   averaged out to an average blue, an average black, an

15   average gray, because of the small sizes that we are

16   dealing with at that distance.

17       Q.   And so how do those averages affect, for

18   instance, whether we're seeing sidewall tire, the black

19   of the sidewall tire compared to in this case the black

20   of the rim or the light color within the spoking or if

21   the rim is dirty?

22       A.   Certainly.   If we can back up two slides, we will

23   illustrate that.   One more slide back, please.

24            So these neighborhood operations, right, we see

25   two very large squares, groupings of pixels.   And we

don't imagine that a vehicle would look like that.  But
at a distance, your eyes probably didn't pick up that
large block of information, but these eight-by-eight
neighborhoods average out the overall color and light of
that area in depicting this overall scene.

Also in the foreground, this very harsh edge, we
don't suppose that the windscreen of the SUV in the
foreground looks like that.  And again, we don't notice
it as it goes by as a video necessarily if we're not
trained to see these things, but these whole areas would
represent more than half the vehicle and it's been
averaged into two blocks.

Q.  All right.  And so that's true whether we're
talking about the wheels of the car, the nose of the
car, the tail end?

A.  The door pillars, the taillights, all of those
things get averaged in.

Q.  What effect does that averaging-in process have
on being able to discern the details within the block?

A.  If I can't discern details, I can't catalogue
them.  If I can't catalogue them, I can't support any
kind of conclusion.

Q.  Can we go forward to the tire screen?

If we look at the next screen, what are we
looking at there?

1    A.  This is just another illustration of the types of

2  glass and door features that might be present on a

3  vehicle that we would want to catalogue.  An SUV may

4  have more than three pillars.  It may have an A, B and C

5  pillar.  There might be two median pillars to support

6  the roof depending on if it's a two-door or four-door

7  and so on.

8         So this is just an attempt to illustrate the

9  different types of glass that might be present, the

10  amount of doors and how they would be represented in a

11  high-resolution image for cataloguing purposes.

12    Q.  In a low-resolution image like the one we have,

13  what, for instance, if you're looking at the front -- it

14  would be the front pillar that holds up the windshield,

15  correct?

16    A.  So this pillar, yes, is where you would affix,

17  along with the roof line and the floor portion, a

18  windscreen and so --

19    Q.  What prevents you from identifying that in the

20  image, not in this screen?

21    A.  The two large squares that occupy the majority of

22  the side of the view are averaging out the information

23  there and averaging away all of these specific details.

24    Q.  Can we go to the next screen?

25         So what are we left with here or looking at here?

1    A.   So this is the view without the screen capture of

2    the interface of my software, but, again, in the

3    foreground we have, I think we can agree, that this is

4    an SUV in the foreground with a very harsh line

5    averaging the windshield, and yet the vehicle, the fore

6    portion of the vehicle in the foreground comes up to

7    that point and then you have elements of the background

8    vehicle kind of blended in those two vehicles.

9         And again, we see, in the vehicle of interest,

10   these very large blocks that are averaging out details.

11   Details are lost because of the way the compression has

12   been employed.

13   Q.   And so were you able then to develop your

14   checklist or your catalogue of things you needed to

15   identify to complete the make and model determination?

16   A.   I was not.

17   Q.   And just explain overall why that is, I guess.

18   A.   I think we can go to the next slide.

19   Q.   All right.

20   A.   So in forming and supporting a conclusion, I want

21   to have that list of items so that I note any

22   similarities.  I note -- you know, I'm going to be doing

23   this determination off of a dataset of known images.

24   The dataset that I have was provided initially by the

25   federal government and it's populated with images from

JD Power, the automobile marketing association, or
whatever JD Power is.  These are known images that I
worked through, two-door versus four-door, presence of
sunroof, elongated hood and those types of things that
help me in my determination, and also so that I'm not
using case information to guide my work.

      And so as I'm going through and I'm cataloguing,
in a typical case cataloguing things, that would lend
more support -- similarities and powerful support
towards an identification would require individualizing
elements of the vehicle like bumper stickers, specific
custom paints and those types of things, which clearly
are not visible in this case.

Q.  And so were you able to derive any
characteristics or enough characteristics to even put it
in a class of vehicles, that is a compact SUV, a
subcompact SUV, a minivan, some type of class?

A.  Well, I think going from class unknown object to
class automobile, we can assume because it's in a
different position in each of the frames of video, so we
can assume that it's auto.  But to go from there,
because of the size of these compression blocks, there
isn't enough information to support any kind of
conclusion compact SUV versus minivan versus sedan.
There just isn't enough data to tie a conclusion to.

1    Q.  All right.  You mentioned then -- so you

2  mentioned earlier that following the make and model

3  determination, it was the first step in making a photo

4  comparison or something that you might do before you did

5  a photo comparison?

6    A.  Certainly.

7    Q.  And just before we discuss that process, what is

8  a -- how does a photo comparison differ from an image

9  analysis like a make and model determination?

10   A.  To do a photographic comparison, you obviously

11 want to compare apples to apples or cars to cars in this

12 case.  And so because the vehicle is not known in the

13 evidence images, we want to find out what it is.  We

14 want to determine what it is in an objective way.

15       This figure here from the scientific working

16 group on imaging technology section 16 supports

17 conclusions in photographic comparison.  We want to

18 again compare apples to apples, so we have to determine

19 that that spherical thing that we see before us is in

20 fact an apple and not an orange.

21       So in this case, I don't have the ability to do

22 that, so a photographic comparison really isn't

23 possible.  A photographic comparison looks at two photos

24 of things or videos of things and says what are the

25 similarities between these two and what are the

1    differences.  And if there are differences, how do we

2    explain?  How do we rule one out or rule the other out?

3          From the facial imaging type stuff, we look at 18

4    different features of the overall head from shape of the

5    chin, shape of the cranial base, all the things about

6    your ears and your nose and all of these things that

7    take you from object is human to object is you.

8          We do the same thing with vehicles.  The generic

9    you and personalizing your automobile do a number of

10   things to those.  You get personalized license plates.

11   You add bumper stickers to it.  You put frames around

12   your license plate.  Perhaps you get a color of vehicle

13   that is rather unique in your area.  These types of

14   things can be used to narrow down the list of

15   possibilities or to do a comparison analysis in this

16   case.

17   Q.  And so how did your make and model determination

18   affect the going to the next step of comparison, doing a

19   photo comparison?

20   A.  I had no data to move forward.

21   Q.  Now, is the overall size of the vehicle, the

22   height or the overall length, is that a characteristic

23   of a vehicle that's important to look at or one of the

24   ones you could consider in trying to make some type of

25   comparison or assessment?

1    A.   It is an item to be catalogued in terms of

2   overall height and length, but it isn't something that's

3   used to identify.  For example, I'm six and a half feet

4   tall.  I'm familiar with Mr. Richards, who is an expert

5   in this case or a witness in this case, and he and I

6   roughly are the same size.  We have roughly the same

7   complexion, but the fact that we are both roughly six

8   and a half feet doesn't individualize either of us.

9        Within the distribution of heights for normal

10  humans in southern Nevada, I'm outside of the normal

11  distribution at my height, but within my family group,

12  I'm actually the small one.  So it's all relative to

13  something else.  And height, again, it's something to be

14  factored, but it isn't something that individualizes

15  necessarily.

16   Q.   Is dimensions alone enough to even get away from

17  individualizing, but put something in a class?

18   A.   It can be.  You can go from subcompact to

19  full-size SUV with a measurement, but I believe, given

20  the other factors in this case, the range of potential

21  values for length somewhere between 168 inches to

22  186 inches or the average of all of the different

23  opinions in this case, you are now somewhere between

24  compact SUV and midsize car.

25   Q.   Well, what is photogrammetry?

1    A.   Photogrammetry is just measurement of items or

2    objects of interest within images or video.

3    Q.   Is it of value here in determining our dimensions

4    or helping us get away from the make and model and do a

5    comparison?

6    A.   In this case, you lack a reference.

7    Photogrammetry involves the measurement in relation to

8    something.  A scale placed in a photograph of a weapon,

9    for example, you have a valid reference.

10         In this case, you have no valid reference of the

11   previous event because there isn't anything that is of

12   known measure near the object of interest that we can

13   use in that case.

14   Q.   Are you familiar with the processes in

15   photogrammetry to try to measure the scene and develop

16   accurate scaling?

17   A.   Certainly, yes, there is several ways of doing

18   that.

19   Q.   And are you familiar with the use of what's

20   called a total station and a laser to measure everything

21   that's at the scene?

22   A.   Yes.

23   Q.   Is it possible then to take it out to where this

24   video was shot and measure everything to get that scale

25   that you talked about that you would need to be able to

1    measure what we're looking for?

2         A.   No, not at all.

3         Q.   Why?

4         A.   Because one of the fundamental principles of

5    science is you can only measure in the now; you can't

6    measure in the then in any direction of time.  That's

7    why we predict the weather, but we measure our weight

8    today.

9              So in this case, years later, we cannot bring a

10   laser system out to document a scene that no longer

11   contains our item of interest.

12        Q.   Does it help us to document the things that do

13   remain at the scene if there is buildings and signs and

14   fences and parking lots?  Can we draw enough from the

15   scene on the day when the laser is there to help us

16   figure out what it would have looked like, including the

17   vehicle, back at the other time to make our

18   measurements?

19        A.   Certainly could add information, yes.

20        Q.   And will it add enough -- well, is that

21   information useful in going back and figuring out the

22   vehicle you're looking for?

23        A.   You remain limited by the nominal resolution of

24   the evidence images.

25        Q.   And what does -- explain that limitation or

1   explain how much of a problem that is or how little of a
2   problem that is.

3       A.   The problem becomes if one pixel of the thing
4   that we're trying to measure is somewhere between 5 and
5   10 inches of real-world measure, the addition of
6   information about the height of the shack or the size of
7   windows and so on isn't entirely helpful because the
8   thing that we are actually trying to measure is depicted
9   and frozen in time in that image at that resolution of
10  somewhere between a pixel equals five inches or a pixel
11  equals 10 inches.

12      Q.   I haven't ask you in any of these processes here,
13  but you mentioned that you could assume this was a
14  vehicle because in each of the frames it's in a
15  different location so it's moving?

16      A.   Yes.

17      Q.   And does that -- does that movement have anything
18  to do with your analysis process of looking at any
19  singular image and trying to figure out what it is
20  you're looking at?

21      A.   It has the potential to introduce blur into the
22  image because of the way the image capture process
23  works, but that wasn't tested.

24      Q.   And why didn't you test blur?

25      A.   To do an accurate test of the creation of blur in

1    the images would require the system itself to be present

2    in place as it was at that date and time, which I

3    understood to not be the case.

4        Q.  So in doing your analysis, did you factor any

5    additional error rate or any additional worsening of the

6    data, I guess, to account for motion, or did you just

7    use it as it is?

8        A.  I didn't assume anything.  I just used it as it

9    was.

10       Q.  So if there were to be additional problems caused

11   by motion, how would that affect the analysis, or I

12   guess the information you have here?

13       A.  The introduction of blur into the recordings

14   would essentially add pixel information kind of

15   extending the length of the object of interest.  I

16   didn't have the ability to prove or disprove, and so I

17   didn't include that information.

18       Q.  If there were blur then the pixels would be

19   bigger or the object could be longer?

20       A.  Essentially, yes.  The way that any camera works

21   and the way the cameras have worked since there have

22   been cameras is the aperture, the opening opens to

23   collect light.  And so at such a far distance and the

24   movements of the vehicle, the amount of distance that

25   the vehicle travels between the time that the aperture

opens and the time the aperture closes as it burns that
image into its recording medium, the positional change
recorded is blur.  It can be blur in a straight line.
It can be blur in a linear but non-straight fashion, but
these are the types of things that need to be tested on
the system to determine if it's actually happening and,
if so, to quantify that value.

Q.   All right.  And do we have one more slide to look
at here?  And so explain when looking at the image and
trying to -- the area that you're trying to look at and
identify, I guess, in the end, the overall effect that
the distance away from the camera had to be or was and
how that affects the ultimate determinations you're able
to make or not make.

A.   The figure that you're looking at here comes from
the United Kingdom.  The British were the first on the
scene with standards and regulations around CCTV.  They
were the first to deploy CCTV in large numbers in urban
centers and so on.

     And so the Home Office Scientific Development
Branch produced guidance in the early 2000s for the
citizens, business owners and so on in deploying CCTV
systems.  And what they have said and what this figure
illustrates is that a camera can really only serve one
purpose, right.  The detect view is akin to the camera

1   that's on top of the Home Depot or the Wal-Mart parking
2   lot to survey the entirety of the parking lot.  In that
3   case, the purpose is to monitor traffic flow, to notice
4   the accumulation of things, the shopping carts and so
5   on, but certainly not to pick out individual things.
6        And these tend to be wide camera angles.  As we
7   narrow that camera angle down, we move through the
8   observational view into the recognized view, and those
9   values there, the percentages are the percentage that
10  the object of interest, the item of interest occupies
11  within the field of view.
12       And so once we get into recognized, someone like
13  myself doing a comparison wouldn't have enough data to
14  support a conclusion, but if you knew the gentleman in
15  the picture, you could say, "Oh, that's so and so,"
16  because your brain kicks in and so on.  In order to do
17  the identification, I need a lot of data to work with to
18  catalogue things.
19       And so that identify view, it is purposeful -- it
20  is purpose built, fit for purpose for that function.  So
21  for example, when you go through a customs entry point
22  in the United States, there is a camera looking full on
23  at your face, and that's all it does, and it's running
24  facial recognition and all of these things around that.
25  It is dedicated for that purpose.

1      At the same time, there are overhead cameras

2  monitoring traffic flow, the accumulation of people and

3  so on.  And so this guidance remains in effect in the

4  UK, and I would say the majority of the western world

5  still references it.

6      Q.  So here, the item of interest would be the

7  person?

8      A.  Yes.

9      Q.  And as far as an amount of data from the camera

10 that you said you would like to have as a scientist

11 trying to identify what the camera is seeing, obviously,

12 you would like 100 percent of the information?

13     A.  Right.  In order to identify, I would need 100.

14 A vehicle make/model determination can be done at the

15 recognized step --

16     Q.  With with 50 percent of the information?

17     A.  -- with 50 percent of the information.  We have

18 had success there.

19     Q.  What would be the problem if we were at the

20 observe, the 25 percent of the information?

21     A.  We would maybe be able to get to make, but not

22 necessarily model.  We may be able to get from class,

23 from sedan to SUV and so on because of that information.

24 But we are actually below the detect threshold with

25 about 3 to 5 percent of the available data dedicated to

1   that object.

2       Q.   So in the evidence video that you had, the

3   unknown blue object that you assumed was a vehicle, you

4   didn't have 10 percent, you had --

5       A.   Somewhere between 3 and 5 percent.

6       Q.   Was there enough data to say -- you observed that

7   there was video images of the unknown blue object going

8   one way.  There was also a few minutes later on the

9   video an unknown object going the other way.

10          Did you have enough data to conclude at least

11  that that was the same object going back and forth?

12      A.   Because of the averaging of the areas and so on,

13  the determination wouldn't be supported either way.

14      Q.   You couldn't see it either way.  Could you tell

15  it was the same one either way?

16      A.   If I don't know what it is, I can't say that it

17  has returned.

18      Q.   You can take that down.

19          MR. COLBATH:  That's all the questions I have

20  for you, sir.

21          THE COURT:  Why don't we take our morning break

22  and then proceed to cross.

23          Ladies and gentlemen, I said I would give you

24  an update.  I spoke with the lawyers yesterday about the

25  status of the trial.  It appears likely, highly likely,

1    I would say, that we'll conclude all of the evidence by

2    tomorrow afternoon.  And then I believe I told you

3    Friday we're having a court workshop, so we're going to

4    be closed, and then have you come back and do the

5    closing arguments on Monday.  So that's our plan is to

6    do that, and excuse the alternates at that point as

7    well.

8            Please leave your notepads here.  Remember my

9    admonition not to discuss the case.  We'll be back at

10   10:30 or thereabouts.

11           (Recessed from 10:17 a.m. to 10:33 a.m.)

12           (Jury present)

13           DEPUTY CLERK:  Court is in session.

14           THE COURT:  All right.  Welcome back, ladies

15   and gentlemen.  Please be seated, everyone.

16           Ms. Sherman, whenever you're ready, go ahead,

17   please.

18                   CROSS EXAMINATION

19   BY MS. SHERMAN:

20   Q.  Good morning, Mr. Hoerricks.

21   A.  Good morning.

22   Q.  You spent some of your time at LAPD making sure

23   people were collecting videos correctly, right,

24   surveillance video?

25   A.  Training detectives and other staff as well as

doing it myself, yes.

Q.   And you also spent some time looking at Photoshop images or images in Photoshop to make sure they weren't doctored, right?

A.   Photoshop isn't a tool for that, but I understand what you mean.

Q.   So you did that, right, to see if images had been doctored?

A.   Authenticating images, yes.

Q.   And you indicated you wrote a back, Forensic Photoshop, right?

A.   I did.

Q.   And that was actually published by Blurb, Inc.?

A.   Yes.

Q.   You're aware Blurb, Inc., holds itself out as a creative publishing service, simple and smart enough to make anyone an author, every blogger, cook, photographer, parent, traveler, poet, pet owner, marketer, everyone, right?

A.   Indeed, yes.

Q.   So you essentially self-published?

A.   Yes, because the narrow market for such a book, no publisher would take it if I couldn't sell 2,500 within the first quarter.  And so in order to get that out to such a small and niche market, I had to choose

1    that avenue.  These days I might choose Amazon

2    Publishing, for example.

3         Q.  You didn't go through a color analysis of the

4    images in this case, right?

5         A.  I did not.

6         Q.  And you know that color includes hue, saturation

7    and luminance, right?

8         A.  Yes.

9         Q.  Those things need to be accounted for?

10        A.  Yes.

11        Q.  In terms of -- I want to talk a little bit about

12   your experience.  We've heard from some other

13   individuals in the area.

14             In terms of your experience, you're sort of on

15   the same level as Mr. Chris Iber, right?

16        A.  Define "level."

17        Q.  Level of experience, level of expertise in the

18   area?

19        A.  We've probably been in business about the same

20   amount of time, yes.

21        Q.  And Mr. Vorder Bruegge, he would probably be a

22   step above, right?

23        A.   In terms of duration, yes.  At the Organization

24   of Scientific Area Committees, Chris and I serve on the

25   same committee together, the same subcommittee, and

1    Richard occupies a level above us, so, yes, it's a fair

2    comparison.

3         Q.  I would like to take a look -- this has

4    previously been published as Exhibit No. 219.  This is

5    Dr. Vorder Bruegge's work.  Can we go to page four.  And

6    then can we go to the next page.  And the next page.

7              Okay.  So you're aware that Mr. Vorder Bruegge

8    extracted nine images, right?

9         A.  Yes.

10        Q.  And you --

11        A.  Generally.

12        Q.  You extracted one, you worked with one image,

13   right?

14        A.  Actually, I extracted the data relative to time

15   and worked with entire minutes of time to determine

16   quantitative values in my report.  I wasn't looking

17   specifically at one better frame than another.  That

18   wasn't in my initial brief.

19        Q.  So we can go back two, if we could.  So when

20   you're looking at this object, will you agree with me

21   that this object is a vehicle?

22        A.  Yes, I think that's a fair assumption.

23        Q.  In your initial report, you said that you

24   couldn't confidently say that this object is actually a

25   vehicle, right?

```
1        A.   There aren't enough quantifiable items that would

2   include or exclude.   I think because it changes position

3   that we can assume.

4        Q.   Okay.   Would you agree with me that it's

5   traveling on Anton Larsen Road?

6        A.   I have been told that's Anton Larsen, so yes.

7        Q.   You watched more than just this.   You watched the

8   video, right?   There were several vehicles?

9        A.   Yeah, I was sent an inordinate amount of data, so

10  I have surveyed different times and different camera

11  views and so on from that system, yes.

12       Q.   So you know what it looked like when a pickup

13  truck or a truck would drive by, right?

14       A.   Different vehicles, yes.

15       Q.   So you would agree with me that this blue vehicle

16  is not a pickup truck?

17       A.   Likely, no, it's not a pickup truck.

18       Q.   And you will agree that it's not a low-riding

19  vehicle, right?

20       A.   I wouldn't agree or disagree.

21       Q.   Would you agree with me that the rims on the

22  tires are non-reflective?

23       A.   I would not have an opinion on that.

24       Q.   Will you agree with me that the windows aren't

25  tinted?
```

1    A.   Again, the data doesn't support a conclusion.

2    Q.   You observed another vehicle drive by, a truck,

3 and it had darker windows; did you observe that?

4    A.   There was a white truck that passed, if that's

5 what we're talking about, and it had a black feature

6 towards the back, so you can make the assumption of

7 perhaps tinted windows on a camper shell.

8    Q.   Okay.

9    A.   But again, that would be an assumption.

10    Q.   You don't like assumptions in your line of work,

11 right?

12    A.   For determination, no.

13    Q.   You would agree -- you talked a lot about

14 compression.  You would agree that everyone in this case

15 who received the hard drive with the video player

16 received the same images or sets of images, right?

17    A.   Yes.

18    Q.   We can take that down.

19         So you have degrees in political science,

20 organizational leadership and education, right?

21    A.   And instructional design, yes.

22    Q.   So no scientific degrees, right?

23    A.   None exist at this current time at the Ph.D.

24 level in my discipline.  So in answering your question

25 completely, the answer is no, but qualified.  In my work

in the Organization of Scientific Area Committees for forensic science, there is the train of thought that says that you should have a degree in the discipline in which you're working. The problem is is that there are none.

There is kind of a survey master's degree at the University of Colorado Denver, but it requires a residency. So the reason for my choices of degree being instructional design and in education is that I have over the course of the years developed a full curriculum for undergraduate education in this discipline. And I have spent the better part of the last eight years in my spare time kind of shopping this curriculum design in a box to various schools hoping to fulfill that mission begun at the OSAC to grow this science at the college level.

Q. You don't have an engineering degree?

A. I do not, no.

Q. Don't have a spatial geometry degree, right?

A. I do not.

Q. You do have a blog though, correct?

A. Yes.

Q. And you actually watch videos on Youtube to see how other forensic analysts testify to see what works and what doesn't work, right?

1    A.   Certainly, yes.

2    Q.   You wrote about that in your blog, right?

3    A.   I have, yes.

4         MS. SHERMAN:  Those are all my questions.

5         THE COURT:  Mr. Camiel?  I'm sorry.

6  Mr. Colbath?

7         MR. COLBATH:  Thank you, Your Honor.  Just very

8  briefly.

9                    REDIRECT EXAMINATION

10  BY MR. COLBATH:

11   Q.   With respect to the question about education,

12  Mr. Hoerricks, so you're trying to in fact not get the

13  degree, but develop a whole degree program in your field

14  at the university level?

15   A.   Absolutely, yes.

16   Q.   In which you would be qualified to teach as

17  opposed to obtain?

18   A.   With a Ph.D. in education with the emphasis of

19  higher education leadership, I would be capable of

20  leading and running that school.

21   Q.   Ms. Sherman asked you about whether you would

22  agree with some of the characteristics, a question about

23  the type of vehicles, and you said you could not agree

24  or disagree.  What did you mean by that?

25   A.   I think from a philosophical sense it's the

1    different between truth and fact.  Truths are things

2    that we know.  Facts are things that we can prove from

3    basic philosophy in college.  So I can look at the video

4    and say blue object in motion, likely we can agree it's

5    a vehicle.

6         Can I prove it?  Without those catalogue of

7    features, proof -- there isn't anything to sustain a

8    conclusion, so I can know it to be true that it's a

9    vehicle.  Can I know that it's vehicle A versus vehicle

10   B?  I can't.  I can't prove that.

11       Q.  Ultimately in your work then what was, I guess,

12   the end-of-the-day opinion of your analysis?  What

13   opinion did you arrive at about the classification of

14   that vehicle?

15       A.  That I have no sustainable opinion.  That no

16   conclusion was possible.  That is the conclusion

17   suggested by the SWGIT Section 16, that figure that we

18   showed about sustainability of conclusions and

19   appropriate conclusions.  No conclusion is possible.

20       Q.  Is it possible through any of those modes, photo

21   comparison, photogrammetry, geometry, any of those

22   things?

23       A.  The data supports no conclusion.

24       Q.  Because you all have the same data to work with?

25       A.  Yes.

1          MR. COLBATH:  That's all I have, Your Honor.

2     Thank you.

3          THE COURT:  Thank you, sir.  You may be

4     excused.

5          (Witness excused)

6          THE COURT:  Mr. Colbath?

7          MR. COLBATH:  Your Honor, we'll call Dr. Dan

8     Reisberg.

9          THE COURT:  Do we need to have a short break

10    here to finish up what we were discussing very early

11    this morning?

12         Ladies and gentlemen, I'm sorry, I'm going to

13    need to excuse you.  I think this will be fairly brief.

14    I would ask you to leave your notepads here.  Remember

15    my admonition not to discuss the case and we'll get you

16    back in here shortly.

17         (Jury absent)

18         THE COURT:  All right.  Please be seated,

19    everyone.

20         Where are we on this instruction?  Mr. Camiel,

21    go ahead.

22         MR. CAMIEL:  Your Honor, we object to the

23    limiting instruction proposed by the government.  While

24    Dr. Reisberg's testimony will be limited to talking

25    about the April 12th T-1 video and limited in terms of

his references to Mr. Toglia and Mr. Schmidt, the jury
shouldn't be limited from considering whether factors
present with those witnesses might also be present in
other parts of the case.

And while Dr. Reisberg won't be addressing or
pointing out other witnesses, the jury should be free to
use the principles that he talks about or the
information that he provides as the jury is free to use
any evidence from any witness, unless it's 404(b)
evidence, it's specifically limited in that way, but
there is no legitimate reason that I can think of why
the jury shouldn't be free to use that evidence or the
principles as they see fit if they see other areas that
they think those things apply.

THE COURT: Mr. Skrocki?

MR. SKROCKI: This is exactly what we were
talking about this morning, which generated our request,
that there is going to be a spillover effect from
Dr. Reisberg's report, which the Court has limited to
Mr. Toglia and Mr. Schmidt. And I can guarantee you
that given the defense nature of this case in closing,
we will have, if this is permitted, a one-two punch
between Reisberg and McCrary that the jury can't believe
anything because this is all confirmation bias.

There is going to be no way to stop that from

happening unless I do it or the Court does it in closing argument. This is exactly why I brought this up this morning because we're going to have this overarching umbrella of confirmation bias through the whole case, which is going to infect the jury's deliberation process. That's why we think the instruction should and must be limited to just Mr. Schmidt and Mr. Toglia because that's what's in the report and that's what's in the Court's order.

THE COURT: I'm not going to do any instruction now that was proposed by the government. I am expecting the witness to remain focused on the topics that we identified and discussed that the Court ruled on this morning and focus on the two experts he's going to criticize, but I'm not going to direct the jury that it can't look at his testimony for any other purpose as was proposed.

However, if Dr. Reisberg strays from my ruling, which I don't anticipate, but if he does, the government can make application at the conclusion of the direct exam and I'll take up whether a limiting instruction would be warranted at that time. For now, I'll allow the evidence to be presented. And I anticipate us having a discussion perhaps about closing arguments before closing arguments to straighten out each side's

perspective, and with the goal, from my perspective, of

minimizing objections by either side to the other side's

closing.  If we can sort out some of that in advance, I

think that would be helpful all around, particularly to

the jury.

Are we ready to proceed?

MR. CAMIEL:  Yes.

THE COURT:  All right.  Then we're ready.

(Pause)

MR. CAMIEL:  Your Honor, should I have

Dr. Reisberg come up?

THE COURT:  Oh, yes.  Good morning.

(Jury present)

THE COURT:  Welcome back.  Didn't take us too

long to get that squared away.

Please have a seat everyone, except our

witness.  If you would remain standing.

Mr. Camiel, who are you calling at this time?

MR. CAMIEL:  Dr. Dan Reisberg.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please

state your full name and then spell your full name.

THE WITNESS:  My name is Daniel Reisberg,

D-a-n-i-e-l, R-e-i-s-b-e-r-g.

THE COURT:  Sir, you can pull that microphone

1    down if you'd like.

2              DANIEL REISBERG, DEFENSE WITNESS, SWORN

3                      DIRECT EXAMINATION

4    BY MR. CAMIEL:

5        Q.   Good morning, Dr. Reisberg.

6        A.   Good morning.

7        Q.   Where did you travel from to be here today?

8        A.   I traveled from Portland, Oregon.

9        Q.   Can you tell us or tell the jury what your

10   profession is?

11       A.   Sure.  I am recently retired from teaching at

12   Reed College in Portland.  I was at Reed for, I guess,

13   33 years.  I'm now working primarily as an author of a

14   number of scientific books and doing some amount of

15   consulting with law enforcement and the legal system.

16       Q.   And more specifically, what's your profession?

17       A.   I am a research psychologist, which means, just

18   to be clear, I'm not a mental health professional.  I

19   don't do therapy.  I don't do diagnosis.  I have

20   scientific training, and for the last 40-plus years have

21   been working on a scientific understanding of how the

22   mind works, specifically how we perceive the world and

23   how we remember what we have perceived.

24       Q.   And how are you trained for that position?

25       A.   I guess start at the beginning.  I have a

bachelor's degree, master's degree and Ph.D.  They are
all in psychology.  The master's and Ph.D. are in what's
called experimental psychology, which labels it as the
scientific research end of the field.  And I have been
working in the scientific community ever since I got my
Ph.D., which was in 1980.

And if you are working in the scientific world,
you are basically required to continue your education to
continue being active.  It's just part of what it means
to be in the sciences.

Q.  And so you mentioned that you're required to
continue your education.  What steps do you take to make
sure that you stay up to date with your training and
keep yourself current in your field?

A.  I guess it's a combination of things.  On the one
side it's certainly expected that I'm going to continue
reading the scientific journals, attending scientific
meetings, that I'm going to continue teaching, but then
it is also important as part of the scientific world's
quality control that I continue to be productive as a
scientist, producing new articles or new books.

And part of the reason for that is that's where
science comes from.  That's how we gain the new
knowledge, but that production is also absolutely
essential for the quality control within the scientific

1   community because it's a way that we keep an eye on each

2   other, and if I or any other scientist says something

3   that's foolish or not well argued or out of step with

4   the available evidence, other scientists are not shy

5   about calling attention to it.  And it's the way

6   scientists make sure that the evidence is solid and that

7   we know what we're talking about.

8       Q.  We're going to have you -- or I'm going to ask

9   you to testify today about an area called confirmation

10  bias.  And before we get into that, I was going to ask

11  you some questions about your background in that area.

12          Have you written in that area articles or books?

13      A.  Yes, I have, a fair amount.

14      Q.  Can you tell us about that?

15      A.  Sure.  Confirmation bias and the associated idea

16  of top-down processing, which I assume very likely to

17  talk about later on, are central ideas when we try to

18  think through how people gather new information, how

19  they think about new information, and so if you write in

20  psychology you're pretty much required to keep on top of

21  those topics.

22          And so in various books I have written, I mean, I

23  guess the book that's called transparently Psychology,

24  there is probably only two or three chapters that

25  discuss confirmation bias.  A book that I'm working on

1   now in its eighth edition probably discusses

2   confirmation bias in three or four chapters.  A book I

3   published in 2014 covers confirmation bias in multiple

4   chapters.  I can give you details if you need them.  I

5   don't know if you need them.

6       Q.  Let me ask you some additional questions.  Have

7   you given any -- have you ever conducted training or

8   seminars or lectured in this area?

9       A.  Yes, I have.

10      Q.  To what kind of audiences?

11      A.  Certainly for my decades of teaching confirmation

12  bias and related ideas were a central part of the course

13  materials I was covering, but I have also done training

14  I mean outside of the academic world for attorneys, for

15  groups of judges, for police officers, for private

16  investigators.  And often in those trainings, I mean

17  we're talking about both what confirmation bias is and

18  also the various steps that you can and perhaps should

19  take to avoid confirmation bias.

20      Q.  And have you previously testified in this area?

21      A.  Yes, I have.

22      Q.  In what types of proceedings?

23      A.  I mean in some cases, the focus has been on the

24  confirmation bias that a police officer might bring into

25  an ID procedure and the various ways to conduct an ID

1    procedure so that the police officer is not in one way

2    or another signaling to a witness or a victim what the

3    answer is supposed to be.  You want the information to

4    come from the witness, not from the police officer.

5         I have also -- so I have testified about

6    confirmation bias in that setting.  I have also talked

7    and testified about confirmation bias in the setting of

8    police interrogations, when police are sitting down with

9    a suspect and how to make sure that the information

10   flows from the suspect to the police officer and not the

11   other way around.

12        I have also testified about --

13        MR. SKROCKI:  I'm going to object, Your Honor.

14   We're getting outside the scope of concerning your

15   ruling this morning.

16        THE COURT:  Let's stay focused on where we're

17   headed.

18        MR. CAMIEL:  Your Honor, I would ask the Court

19   find based on Dr. Reisberg's training, experience and

20   background that he's qualified to offer opinions in the

21   area of confirmation bias, and we'll focus on the areas

22   that we have talked about with regard to the video in

23   this case.

24        THE COURT:  All right.

25        MR. SKROCKI:  With that understanding, pursuant

1    to our earlier discussion, no objection.

2           THE COURT:  Very good.  Then please proceed,

3    Mr. Camiel.  Thank you.

4    BY MR. CAMIEL:

5    Q.  Dr. Reisberg, I want to -- you have already

6    mentioned the phrase confirmation bias, and just

7    generally can you explain to the jury what that is, and

8    when you're talking about what it is, if you could focus

9    on confirmation bias with regard to viewing something

10   like a video, and we'll talk about the video in this

11   case that I know you have seen.

12   A.  Sure.  The term confirmation bias, when

13   scientists use that phrase, actually refers to a broad

14   family of effects concerned with various things people

15   do without meaning to to support and protect beliefs

16   they have so far, and that includes the kinds of

17   information people go looking for.  If they are trying

18   to test an idea, they are much more likely to go looking

19   for information that would strengthen the idea rather

20   than information that would cut into the idea.

21          It also is tied into issues of memory.  People

22   tend to remember information that fits with their ideas

23   rather than information that doesn't fit.  It also fits

24   with -- ties into what people pay attention to in a

25   scene.  People tend to pay attention to information that

1    goes their way and ignore or often distort information

2    that challenges them.

3         But specifically with the focus on a video,

4    certainly one of the many forms of confirmation bias is

5    that if I present you an input, including a video, that

6    is low quality because it's dim or not well focused or

7    heavily pixelated, a bunch of reasons why it could be

8    low quality, the minute there is an issue of

9    interpretation that's where the danger of confirmation

10   bias kicks in because people are very likely to take a

11   low quality input and interpret it in line with

12   basically they see what they are expecting to see or

13   they see what other people suggest to them is likely to

14   be there.

15        But I mean, again, this is just one instance of a

16   much broader pattern, all of which comes in under the

17   heading of confirmation bias.

18   Q.   Is this something that is behavioral or is it

19   biological or a combination?

20   A.   I mean a combination.  Certainly a lot of the

21   evidence for confirmation bias comes from behavioral

22   studies in which, for example, in a laboratory setting

23   you can offer somebody a blurry image or offer somebody

24   a quickly viewed image and see how they interpret it.  A

25   lot of behavioral science works that way.

1      But there is also good and serious biological

2  evidence describing the mechanisms basically tied into

3  the anatomy of the human visual system.  I don't know

4  how much you want me to go into the nuts and bolts, but

5  the processes that feed into confirmation bias are quite

6  literally wired into us.  They are part of the way the

7  visual system is structured.

8      Q.   Now, there is another term that I think you're

9  going to be talking about that has to do with something

10 called the top-down effect?

11     A.   Yes.

12     Q.   What is that?

13     A.   The term top-down is often used alongside of its

14 opposite, which is not surprisingly bottom-up.  Whenever

15 you're talking about how people take in information from

16 the world, some of the information comes from the world

17 and is dependent on exactly what physical energy is

18 hitting our eyeballs or what physical energy is hitting

19 our ears or sound pressure waves in the case of the

20 ears.  That's information coming from the world, coming

21 from the stimulus.  That's referred to as bottom-up

22 processing.

23     Top-down processing is the term used to describe

24 all of the many ways in which based on your ideas and

25 your expectations, you interpret what's coming in and

often add to what's coming in, and sometimes even
distort what's coming in.  In ways that are very easy to
demonstrate, basically 100 percent of our contact with
the world is a mix of bottom-up and top-down.  Sometimes
the mix is primarily bottom-up.  Sometimes it's
primarily top-down, but it's always some sort of mix.

Q.  Now, I want to talk about -- because you have
talked about confirmation bias in general.  And I want
to focus you on talking about whether or not there have
been studies that have found that confirmation bias can
appear or there is a risk of confirmation bias when
we're talking about forensic analysis.

A.  The fast answer is yes, that is an active body of
research.

Q.  And are there components or factors that make it
more likely that this is going to occur?

A.  Oh, certainly, yes.

Q.  And what are those?

A.  Basically, I mean, if you will, the recipe for
getting confirmation bias in forensic analysis or in any
analysis is the recipe has, I guess, three ingredients.
First of all, what you need is an input that's not
terribly clear on its own so that there is room for
interpretation.  And conversely, if the input is crisp
and clear and obvious, then confirmation bias plays a

1    very small role.

2         So a poor quality input is going to be one of the

3    ingredients.  A second ingredient is going to be a

4    process of judgments that maybe start to finish involve

5    some element of subjectivity or maybe just at the very

6    last step requires some element of subjectivity, but you

7    need some interpretation, you need a human observer to

8    be making a judgment call of some sort and not just, oh,

9    I don't know, reading off the output of some meter.  You

10   need a judgment call.

11        And then last but not least, you just need the

12   person to come into the situation with some idea of what

13   they are looking for, some idea of what they are

14   expected to see, what they themselves believe they are

15   going to see, but those are the three ingredients.  I

16   mean a poor quality input, some element of subjectivity

17   and prior knowledge.

18        And that's what happens in the forensic sciences

19   in a variety of research studies that we can discuss if

20   you like.  It's what happens in any instance of

21   confirmation bias.

22     Q.  So I want to turn -- first of all, can you

23   explain, did you get an opportunity to view -- did we

24   send you the April 12th T-1 surveillance video?

25     A.  Yes, you did.

1    Q.   And you have reviewed that?

2    A.   Yes, I have.

3    Q.   And have you also been asked to review materials

4    related to one of the government witnesses, Neil

5    Schmidt?

6    A.   Yes.

7    Q.   And also another government witness, Mr. Toglia?

8    A.   Yes.

9    Q.   And I want to ask you about your review of the

10   video and the information you received related to those

11   two witnesses.

12           First of all, with regard to Mr. Schmidt --

13           MR. SKROCKI:  Can I voir dire the witness

14   briefly?

15           THE COURT:  I'm sorry?

16           MR. SKROCKI:  Voir dire the witness briefly?

17           THE COURT:  On what topic?

18           MR. SKROCKI:  On when he viewed the video.

19           THE COURT:  Why don't you just ask him.

20   BY MR. CAMIEL:

21   Q.   Do you recall when you reviewed the video?

22   A.   Boy, I think the -- I have seen it multiple

23   times.  I think the most --

24           MR. SKROCKI:  Fair enough.  That's fine.  Thank

25   you.

BY MR. CAMIEL:

Q.  Do you recall when you were first retained in
this case?

A.  I don't, although it was many, many months ago,
and that's why it's going to be hard for me to remember,
but it was a long time back.

Q.  In fact, were you even earlier retained at an
earlier time in this case some years ago?

A.  Yeah.  I mean I think -- if I remember correctly,
that may be as far back as 2014.  I mean I hope I'm
remembering that correctly.

Q.  So you reviewed the video back then and you've
reviewed it more recently?

A.  That's right.

Q.  Did you -- when you viewed the video, you talked
about, you know, one of the components or the recipe
that can create the risk of confirmation bias being some
kind of low visual input.

When you reviewed that video, in terms -- did you
find that that was the type of low visual input that
might be involved?

A.  I certainly did, but I think more to the point,
the materials that your office supplied to me made it
clear that a number of experts have looked at that video
and all agreed that it's low quality.

1      Q.  And before I even have you talk about Mr. Schmidt

2  or Mr. Toglia, do you have any training in areas such as

3  forensic video analysis?

4      A.  No, that's not what I do.

5      Q.  Or photogrammetry?

6      A.  I'm not even sure I could define the word.  It's

7  not what I do.

8      Q.  Or accident reconstruction?

9      A.  It's not what I do.

10      Q.  How about any particular specialized training in

11  Honda vehicles?

12      A.  No.

13      Q.  With regard to Mr. Schmidt, what's your

14  understanding of the materials that he received from law

15  enforcement before he -- or when he was doing his review

16  of the April 12th video?

17      A.  I'm not sure I'm going to be able to give you a

18  complete list.  My understanding is that he certainly

19  saw the T-1 video, the video that shows the suspect

20  vehicle and allegedly the same car on a return trip.

21          He had -- that was of course the video he was

22  being asked questions about.  My understanding is that

23  he also was shown the video made by the government

24  showing the defendant's car driving to show what it

25  might have looked like in roughly similar circumstances.

1    My understanding is that he also was shown still
2  photographs, that I believe were excerpted from the
3  government's version of the video.  And he was also
4  certainly involved in a number of conversations, since,
5  if I remember correctly, the government visited him on I
6  believe four occasions, perhaps it was more -- I hope
7  I'm remembering that right -- to discuss with him his
8  opinions and, you know, ask him various questions.
9  Q.  What's the significance of the types of materials
10 that he received related to any concern about
11 confirmation bias?
12 A.  Well, I mean I think there is just no question
13 that we immediately have two of the ingredients that you
14 need to create a danger of confirmation bias, and we can
15 think through whether we have the third ingredient as
16 well.
17    First of all, by my eye and far more important
18 according to multiple experts, everybody seems to agree
19 that the T-1 video is very hard to see, you know, the
20 suspect car.  Perhaps cars go by very quickly, it's low
21 resolution, the lighting is not so great.  So I think we
22 certainly have the ingredient of a low quality input.  I
23 think that's just not open to dispute.
24    The second ingredient is whether Mr. Schmidt knew
25 what was suspected.  By virtue of having been shown the

1    still photographs, the video of the subsequent

2    recreation, if I can call it that, and also the fact

3    that he knew perfectly well he was working at Honda.

4    It's his employer.

5            And so I think it is inconceivable to me that he

6    did not have the understanding that he was being asked

7    basically a yay or nay, yes/no question, "Do you believe

8    this is a Honda," and that sort of setup of creating

9    that sort of expectation is the next ingredient that

10   creates a danger of confirmation bias.

11   Q.   And the third ingredient you talked about was

12   what?

13   A.   The element of subjectivity and his judgment.

14   Q.   What is it that -- what's your understanding of

15   what he was being asked to do?

16   A.   What he was being asked to do, to use the

17   terminology that's common in my field, is an example of

18   pattern matching.  Basically, I mean does the image in

19   the T-1 video match or not match some other pattern,

20   specifically the Wells' Honda CR-V.

21           In ways I'm happy to explain, pattern matching is

22   a judgment call.  I mean it's a moment at which you are

23   being asked -- Schmidt was being asked in his subjective

24   opinion did those two patterns match or not, and there

25   is the third ingredient.  What you have got is a step

1   that hinges on a subjective view of do they match.

2     Q.  When you say that -- when it's your opinion that

3   what he was doing was subjective, why are you saying

4   that as opposed to some objective analysis?

5     A.  I mean, certainly I mean if -- I mean pattern

6   matching, when it's done by a human eye, human brain,

7   whether we're talking about Schmidt or anybody else with

8   a human brain, a human pair of eyeballs, pattern

9   matching requires, I guess, at least two distinct

10   elements, both of which are, you know, totally going on

11   inside the mind of the person who's deciding on the

12   match.  First of all --

13         MR. SKROCKI:  I'm going to object to this, Your

14   Honor.  It's outside the scope of his report and the

15   Court's order.

16         MR. CAMIEL:  Your Honor, I think it's a

17   reasonable extrapolation from his report.

18         THE COURT:  Can you point me to where there is

19   a discussion of pattern matching in the report?

20         MR. CAMIEL:  Your Honor, I don't think he used

21   that exact term, but --

22         THE COURT:  Well, then I'll sustain the

23   objection if it's not discussed.

24         MR. CAMIEL:  That's fine.

25   BY MR. CAMIEL:

1    Q.   With those three ingredients present, then what's

2    the risk, what's the problem?

3    A.   I mean, the problem is that -- I mean if I can

4    phrase this in terms of Mr. Schmidt, I cannot say and

5    will not say that his judgment was somehow changed by

6    confirmation bias, but what you have is a situation that

7    I believe unmistakably has the ingredients that create a

8    danger of confirmation bias, which means in the end of

9    things there is simply no way to know whether his

10   judgment would have been different if he had been asked

11   a neutral question, better question, if steps had been

12   taken to avoid confirmation bias.

13        So what you are left with is, from a scientific

14   perspective, no way to know how much or to what degree

15   his judgment was thrown off course in that way.  And

16   from a scientific point of view, that's the kind of

17   uncertainty about where a judgment is coming from, how a

18   judgment was shaped, that would lead any scientist to

19   claim from a scientific perspective that the judgment

20   cannot be counted as reliable because you don't know if

21   it was compromised or not.

22   Q.   What if Mr. Schmidt gave testimony that he

23   believes he wasn't influenced by the information that he

24   received from law enforcement or from the government?

25        MR. SKROCKI:  Objection; speculation.

1          MR. CAMIEL:  Your Honor, I think that was his

2    testimony.

3          THE COURT:  I'm trying to recall.  Your

4    representation is it was not?  That's your recollection,

5    Mr. Skrocki?

6          MR. SKROCKI:  He's testifying as to the

7    reliability, or Mr. --

8          THE COURT:  Let's have a short sidebar.

9          (Begin bench conference.)

10         THE COURT:  Have you talked to him about the

11   scope of his testimony, getting into reliability?  He

12   does not have the -- I don't want him saying the jury

13   should not give this any weight.

14         MR. CAMIEL:  And I'm not going to ask him that,

15   but where I'm going with this is Mr. Schmidt testified,

16   I know Mr. Colbath questioned him, that he didn't

17   believe that his opinion was influenced by knowing the

18   VIN number.

19         THE COURT:  I just don't recall that testimony

20   one way or the other.

21         MR. CAMIEL:  What I was going to ask

22   Dr. Reisberg was whether or not some -- this is a

23   conscious process where somebody can just consciously

24   basically avoid confirmation bias.

25         THE COURT:  Why don't you ask that question.

1  Any objection to that question?

2        MR. SKROCKI:  Yeah, naturally.  I think he's

3  just trying to backdoor his way into attacking the

4  credibility of this person's opinion based on his claims

5  of confirmation bias.

6        MR. CAMIEL:  I didn't ask --

7        MR. SKROCKI:  That's not the purpose.

8        THE COURT:  Does he understand he's not to

9  testify about --

10        MR. CAMIEL:  Yeah.  I can ask him very

11  directly, "You're not commenting on Mr. Schmidt's

12  credibility or accuracy."  I'm happy to ask that.

13        MR. SKROCKI:  It's still outside -- it's the

14  only -- what Mr. Schmidt testified to and what you think

15  about what Mr. Schmidt testified to --

16        THE COURT:  It's going outside.  I don't want

17  to get into his assessment of what the testimony was if

18  there is disagreement as to what that testimony was.

19  That is for the jury to sort out what Mr. Schmidt said,

20  but I think it's a fair topic for you to explore based

21  on my review of his report that his prior statements

22  here, to explore how it can be an unconscious activity,

23  that even if Mr. Schmidt tried to set it aside, you can

24  have difficulty doing that because there is an

25  unconscious component.  If we could just focus on that.

1    I understand the government's objection, but anything

2    further on that?

3              MR. SKROCKI:  No.

4              THE COURT:  Very good.

5              (End bench conference.)

6    BY MR. CAMIEL:

7       Q.  Dr. Reisberg, this whole concern about

8    confirmation bias, first of all, is this a conscious

9    process or is it an unconscious process?

10      A.  I mean it can be both, but most of the troubling

11   instances of confirmation bias are unconscious.  I say

12   troubling because since they are unconscious, it's

13   utterly pointless to ask the person, "Were you

14   influenced by confirmation bias," because I mean we're

15   talking about processes that happen behind the scenes

16   and there is no way to detect them.

17              And since there is no way to detect them, there

18   is no way that the person can say, "Today I'm not going

19   to fall into that trap," because if you can't see it,

20   you can't control it, and so conscious or unconscious,

21   answer both.

22      Q.  So even if -- and I won't use Mr. Schmidt in

23   particular, but if somebody is aware of the phenomenon

24   of confirmation bias, is simply being aware of it enough

25   to be able to avoid falling into that trap?

A.   I mean the fast answer is you're correct, being aware of it is not enough, and I'm happy to walk through the research examples that make that point.

Q.   Could you tell us a little bit about that?

A.   Sure.  Confirmation bias is something that has been studied in the lab at great lengths in part because it's a troubling pattern because it basically allows people to keep up their biases.  And some of the research has specifically looked at what happens if you teach people a little bit about confirmation bias and in a variety of ways encourage them not to fall into that trap.

And what you find out is when you take those steps, I can walk through the details if you like, but when you take those steps, the pattern is still there.  And I mean at some level that's not surprising because, as I testified earlier, I mean some aspects of confirmation bias are literally wired into the nervous system.  For that matter, literally wired into the eyeball, and, therefore, I think it's no surprise that the research then confirms that telling people, "Do not fall into this trap," basically leaves the trap in place.

Q.   To be clear, you're not testifying as to whether Mr. Schmidt was -- his opinion was or wasn't influenced

1  by confirmation bias?

2      A.  I hope I was clear on that earlier.  That's

3  correct, I will not say he was influenced by

4  confirmation bias.  All I can say is these are

5  circumstances that create a danger, which in turn

6  creates some uncertainty about how to think about his

7  final conclusions.

8      Q.  Another government witness that you were asked

9  about was Mr. Toglia?

10     A.  Uh-huh.

11     Q.  And were you aware of the type of information he

12  received from the government?

13     A.  I believe he was exposed to much the same

14  information.  He obviously saw the T-1 video that was

15  what he was trying to assess.  He also saw the later

16  video created by the government by the so-called

17  reconstruction.

18         I believe he also saw still photos taken from it,

19  and so, again, I think there was just no question that

20  he knew he was being asked whether the car was the

21  Wells' Honda CR-V.

22     Q.  And did you find from your review of the

23  materials related to Mr. Toglia whether or not the

24  factors that you have discussed, the three ingredients,

25  as you've called them, appear to be present as well with

1    Mr. Toglia?

2        A.  I mean, the fast answer is yes, although we do

3    need to add a small qualification.  Certainly the first

4    ingredient, the very poor quality video from the T-1

5    video, I mean that's going to be the starting point for

6    Mr. Toglia, just as it was for Mr. Schmidt.

7            I think, second ingredient, I think it's

8    undeniable that Mr. Toglia knew what the government was

9    asking him, specifically was it a Honda CR-V.

10           The third ingredient about the element of

11   subjectivity is in place, but we need to be careful

12   because Mr. Toglia, as I understand it, did all sorts of

13   fancy and high-tech analyses and adjustments to various

14   images, and all of that looks scientific and objective,

15   but at the end of the day, Mr. Toglia's last step was

16   still that subjective step of pattern matching, does it

17   or does it not --

18           MR. SKROCKI:  Objection; move to withdraw or

19   strike the pattern matching.

20           THE COURT:  That's sustained.

21   BY MR. CAMIEL:

22       Q.  From the information you reviewed, did it appear

23   that some subjectivity was involved in his analysis?

24       A.  Yes.  In the final step after he had done the

25   various sophisticated analyses, his final step of

analysis was a subjective judgment call about whether

the blur he saw in the T-1 video did or did not have

sufficient resemblance to the Wells' CR-V to allow him

to say yes, they matched.

Q.   And again, are you -- I take it you're not

commenting on the reliability of Mr. Toglia's work?

A.   Certainly I have no basis for commenting on the

reliability of all of the things that he did up to that

last step.  Those are steps for which I have no

expertise.  As we agreed not so many minutes ago, I'm

not a video analysis expert, and so I would have no

comment at all on the reliability of all those steps.

     The concern is about the reliability of that last

step making that judgment of is there a match here or is

there sufficient resemblance here to say there is a

match.  And at that point, as I said, I mean, there is

no way that I or any other expert could say he was

vulnerable to confirmation bias -- sorry, was influenced

by confirmation bias.

     What we have is exactly the circumstances that

create a danger of confirmation bias leading at

something we will never know how much or how little he

was influenced by confirmation bias, and, again, leaves

me with the same bottom line as with Mr. Schmidt.  If

there is no way to know whether his judgment was

1  contaminated or not, then there is no way to know how

2  much faith to put in his judgment.

3     Q.  In particular, how does law enforcement, if they

4  end up with a video like we have in this case, are there

5  steps that they can take to present the video to people

6  like Mr. Schmidt or Mr. Toglia and minimize or avoid the

7  risk of confirmation bias?

8     A.  There are easy and straightforward procedures

9  that are already in use by law enforcement to avoid or

10 minimize confirmation bias.  I mean this is not a hard

11 problem to solve.  There are also steps that have been

12 recommended by the National Academy of Sciences, you

13 know, for ways to avoid confirmation bias.

14       There are certainly things one can do.  This is

15 the problem that should just not be a worry for us.  We

16 can fix it easily.

17    Q.  What are some of the steps that could be taken?

18    A.  Certainly the first step that has been

19 recommended by many agencies is simply --

20          MR. SKROCKI:  Can we have a sidebar, Judge?

21          THE COURT:  Yes.

22          (Begin bench conference.)

23          MR. SKROCKI:  I'm trying very hard to give him

24 the latitude he needs, but this is outside the scope of

25 your order, and I think he's done as far as his

testimony goes with respect to these two witnesses.
He's talked about their reliability and now he's talking
about how do we compare this.  This is outside the scope
of your order.  And there is really no way for us to
rebut this in a meaningful fashion.

MR. CAMIEL:  I'm not sure.  I didn't understand
it to be outside the scope of your order at all.

THE COURT:  Does his report go into --

MR. CAMIEL:  Yes.

THE COURT:  Can you point me to -- you can go
get the report if you need to.

MR. CAMIEL:  Right there.

THE COURT:  All right.  I don't want him to get
into other fields, but in a video what could have been
done and allow you to go there.  I am concerned about
his testimony because although he's credibility -- he's
making credibility statements and I wrote some of them
down, it's telling the jury how they should evaluate the
evidence.

If you need a moment to confer with him, I
don't want that coming out anymore.  That's inconsistent
with my order.

MR. CAMIEL:  I understand.

THE COURT:  But this I will allow with this
video that may have mitigated confirmation bias, and

1   then we'll finish, but if you need to confer with him, I

2   don't want those statements, both witnesses, to say

3   don't weigh this, that's not his job.

4           MR. CAMIEL:  I understand.  I'm not going back

5   to that.  So I'm going to finish with this.

6           MR. SKROCKI:  One more thing.  My colleague

7   tells me that Dr. Reisberg is making eye contact with

8   the jury and made a couple comments -- she doesn't know

9   what he said -- during the sidebar, and we'd ask that he

10  stop.

11          THE COURT:  Thank you.

12          (End bench conference.)

13  BY MR. CAMIEL:

14  Q.  Dr. Reisberg, I was asking you about ways that

15  law enforcement could minimize the risk of confirmation

16  bias, and I want to restrict your -- see if you can

17  restrict your answer to:  With this video the kinds of

18  steps that could have been taken to minimize the risk of

19  confirmation bias with this type of evidence.

20  A.  Sure.  I mean it would have been I think quite

21  easy.  I mean the first and really obvious step is to

22  control in essence that first ingredient of how much

23  knowledge Schmidt or Toglia had, and one way to do that

24  is by making sure whoever contacted those gentlemen from

25  law enforcement was somebody who was not involved in the

investigation, who had no way to know what the expected
answer was or the desired answer was.  This is the kind
of procedure that's referred to as double blind
procedure in which you make sure that the person who is
asking the questions doesn't know what the expected
answer is and the person who is receiving the questions
doesn't know what the expected answer is.

This is the procedure used in many lines of
research.  Would have been easy to do, just as a way of
limiting the communication and therefore limiting the
advanced knowledge that Schmidt or Toglia had about the
video.

And then on top of that, it would have been a
much more reliable, much more accurate procedure not to
present just the one option, "Is it a Honda, yes or no,"
which is, in police terminology, an identification
showup in which you're offering one candidate and asking
for a yes or no judgment.  Instead they could have
presented what in police terminology is referred to as a
photo lineup.

I mean show the Honda alongside of five other
plausible choices and ask which one it is based -- which
one, if any, it is, so that you're not drawing attention
to the Honda, you're not singling out the Honda.  This
is standard procedure in many aspects of police work,

would have been easy to do with Toglia.  With Schmidt,
you would have needed some other step, because since he
works at Honda, I mean, obviously would have the
expectation that they were reaching out to him for a
reason.  They weren't reaching out to him at random.

Presumably what you would have had to do with
Schmidt is tell him that law enforcement was reaching
out to multiple specialists at multiple companies, just
as a way of hiding the fact that it was especially Honda
that was of interest.

I mean these are trivial steps to take.  These
are steps that, if I may say so, we drill into
first-year college students when we're teaching them how
to do research.

MR. SKROCKI:  Motion to strike.  We're done
with this answer.

THE COURT:  Excuse me, Mr. Skrocki.  Is that an
objection?

MR. SKROCKI:  That is an objection.

THE COURT:  Mr. Camiel, your next question.

MR. CAMIEL:  Thank you, Dr. Reisberg.  I don't
have any other questions.

THE COURT:  Mr. Skrocki, go ahead, please.

                    CROSS EXAMINATION
BY MR. SKROCKI:

1    Q.  Good morning, sir.

2    A.  Good morning.

3    Q.  Are you aware that the FBI provided Mr. Schmidt

4  435 vehicles to compare?

5    A.  I was not aware of that, no.

6    Q.  You were not aware that he compared 435 vehicles

7  to his assessment of the Honda CR-V?

8    A.  I don't recall seeing that.

9    Q.  They didn't tell you that?

10    A.  I don't know if they told me that or it may have

11  been in the materials and I either overlooked it or

12  forgotten about it.

13    Q.  You just don't know, do you?

14    A.  I just don't remember at this point whether I

15  encountered that fact or not.

16    Q.  Huh.  Okay.

17         Would you agree with me, sir, that to make a

18  comparison you need at least two things to compare?

19    A.  You need at least two, yes, that's right.

20         MR. SKROCKI:  That's all I have for this

21  witness, Judge.

22         THE COURT:  Any follow-up at all?

23         MR. CAMIEL:  No.

24         THE COURT:  Thank you, sir.  You may be

25  excused.

1          (Witness excused)

2          MR. COLBATH:  Your Honor, with my next witness,

3     I have a short video to play and I have a couple of

4     exhibit photos that I realized on our mid-morning break

5     I have to load into the system, so it might be easier or

6     at least it will run smoother if we take our lunch here

7     a little bit ahead of time and I'll get everything

8     loaded in the system and then we'll be able to go right

9     after lunch.

10         THE COURT:  Very good.  Ladies and gentlemen,

11    let's do that.  Please leave your notepads here in the

12    courtroom.  Remember my admonition not to discuss the

13    case.  We'll have you back at 12:45.

14         (Jury absent)

15         THE COURT:  Please be seated.  And I wanted to

16    say to Dr. Reisberg one of the government lawyers

17    indicated that you may have been chatting with the

18    jurors while we were having a sidebar.  I would ask you

19    not to do that.  If there is any -- you're more than

20    welcome to stay here in the courtroom.  I didn't observe

21    anything, but certainly that would apply to everyone

22    here in the back who have all been instructed previously

23    not to communicate with the jury in any way.

24         THE WITNESS:  Your Honor, there was no

25    chatting.  We smiled at each other as we each rose from

```
 1    our chairs, I think agreeing that our backs would be
 2    happier if we were in some other position.
 3            THE COURT:  I have given that admonition to
 4    everyone in the back, and you're welcome to stay, sir,
 5    but wanted to make that clear.
 6            Very good.  Thank you.  Go ahead and be seated.
 7            Mr. Skrocki, anything else to take up?
 8            MR. SKROCKI:  We renew our application for the
 9    limiting instruction given the comments on reliability
10    and credibility of the witnesses spoken about.
11            THE COURT:  I will give some thought to an
12    instruction.  There were two statements he did -- there
13    was -- there were two statements that I found troubling
14    that seem to address that the witness was testifying to
15    the jury that they should not -- that some uncertainty
16    about how to think about his conclusions was one thing I
17    wrote down and the other one was how much faith to put
18    into another witness's judgment, and that would have
19    been Mr. Toglia I think that one came in on.
20            So I'll give some thought to that.  Maybe we
21    can come back at 12:30.  I think it would be not along
22    the lines of the government's request, but along the
23    lines of, "You are the sole determiners of the
24    credibility of each witness.  To the extent that any
25    witness has testified here as to how you should assess
```

1  other witness's credibility, I'm instructing you that

2  you are the sole determiners of witness credibility,"

3  something along those lines.

4          If you wanted to propose something, I'm happy

5  to take a look, but --

6          MR. SKROCKI:  We appreciate the Court's

7  consideration of our request.

8          THE COURT:  Mr. Camiel, anything to weigh in on

9  that?

10         MR. CAMIEL:  Your Honor, we wouldn't object to

11 your proposed instruction.

12         THE COURT:  Then I'll ask Sonja to e-mail it to

13 me so I can have it and fine tune it.  Anything else to

14 take up before the lunch break?

15         MR. SKROCKI:  No, ma'am.

16         MR. COLBATH:  No, Your Honor.  We will -- just

17 so the Court knows, we have got -- I have got -- we'll

18 get our technical issues lined up here, and then I

19 believe I have three witnesses.  And we'll be in a

20 position to rest assuming I get everything.

21         THE COURT:  All right.  And then the government

22 ready to go today or tomorrow?

23         MR. SKROCKI:  Tomorrow, Judge.

24         THE COURT:  Then we might be able to talk about

25 instructions if we finish a little bit early today.

```
 1          MR. SKROCKI:  Sure.

 2          MR. COLBATH:  If we have a short break in

 3   between.

 4          THE COURT:  Why don't we come back at 12:40

 5   then so you can look at this instruction and we'll be

 6   ready to go at 12:45 p.m.

 7          (Recessed from 11:34 a.m. to 12:42 p.m.)

 8          (Jury absent)

 9          DEPUTY CLERK:  All rise.  Her Honor, the Court,

10   the United States District Court is again in session.

11          THE COURT:  Please be seated, everyone.

12          So Mr. Skrocki, go ahead, please.  Anything to

13   add?  You look like you were ready to say something.

14          MR. SKROCKI:  I was speaking with my colleague

15   and it was not directed towards Your Honor.

16          THE COURT:  Anything to take up?

17          MR. CAMIEL:  No, Your Honor.  We looked at the

18   instruction that you proposed, and, as I said, we don't

19   have an objection to it.

20          THE COURT:  So I would read the following:  You

21   are the sole determiners of the credibility of each

22   witness.  To the extent that any witness has testified

23   here as to how you should assess another witness's

24   credibility, I'm instructing you that you are the sole

25   determiners of each witness's credibility.
```

1          MR. CAMIEL:  We would ask that you read that

2    after the close of our case.

3          THE COURT:  Mr. Skrocki?

4          MR. SKROCKI:  I would like to hear it now.

5          THE COURT:  I do intend to read it now, because

6    I, as I indicated, was concerned about the statements

7    that were made about evaluating other witness's

8    testimony, so I will read it now.  But I'm not

9    highlighting it, other than the timing, to be specific

10   as to Dr. Reisberg.

11         So with that said, are we ready to proceed?

12         MR. SKROCKI:  Yes, ma'am.

13         MR. COLBATH:  We are, Your Honor.

14         THE COURT:  All right.  Then let's do so.

15         (Pause)

16         (Jury present)

17         THE COURT:  All right.  Please be seated,

18   everyone.  Good afternoon, ladies and gentlemen.

19         And I have a brief instruction I'm going to

20   read to you before you hear from the next witness that

21   reads as follows:  You are the sole determiners of the

22   credibility of each witness.  To the extent that any

23   witness has testified here as to how you should assess

24   another witness's credibility, I'm instructing you that

25   you are the sole determiners of each witness's

1    credibility.

2              With that, your next witness, Mr. Colbath?

3              MR. COLBATH:  Thank you, Your Honor.  I will

4    call Deatrich Sheffield to the stand.  Your Honor, we

5    did provide the Court, there was one additional photo

6    exhibit.

7              THE COURT:  Yes.

8              (Oath administered to the witness)

9              DEPUTY CLERK:  For the record, can you please

10   state your full name and then spell your full name.

11             THE WITNESS:  Deatrich Margo Sheffield,

12   D-e-a-t-r-i-c-h, S-h-e-f-f-i-e-l-d.

13        DEATRICH SHEFFIELD, DEFENSE WITNESS, SWORN

14                      DIRECT EXAMINATION

15   BY MR. COLBATH:

16      Q.  And although it's probably been apparent, where

17   do you work, Ms. Sheffield?

18      A.  For the Federal Public Defender Agency.

19      Q.  What you do for our office?

20      A.  I'm an investigator.

21      Q.  And generally, as an investigator for the

22   office -- first of all, how long have you been doing

23   that?

24      A.  I have been working for the federal defender

25   agency since 2012, but I have been an investigator since

1   about 2005.

2       Q.   And prior to working for federal public defenders

3   office, where were you an investigator?

4       A.   The state public defender.

5       Q.   And as part of your work at the state public

6   defender office, was there particular areas of the state

7   of Alaska or a particular office as the state covers the

8   statewide system, particular areas that your work took

9   you to?

10      A.   We mainly did Anchorage, because we had

11  investigators in other areas, except there were certain

12  areas where we didn't, and Kodiak was one of the areas

13  where there were no investigators, so we rotated through

14  investigators every couple of months doing the Kodiak

15  calendar.

16      Q.   And were you -- was your work -- were you on that

17  rotation that covered cases on Kodiak Island?

18      A.   Correct.

19      Q.   And how many rotations or how many months in the

20  many years you worked at the state did you serve as an

21  investigator in Kodiak?

22      A.   I would probably say I did about four or five.

23  We would go once a month for a week, and so I did about

24  probably four to five weeks a year there.

25      Q.   For how many -- on Kodiak Island?

1     A.   Yes.

2     Q.   For how many years?

3     A.   From 2005 to 2012.

4     Q.   And then in your work at the federal public

5  defenders office, have you also been transitioned and

6  worked federal cases on Kodiak Island?

7     A.   Correct.

8     Q.   In addition to this?

9     A.   Correct.

10    Q.   I want to show you what has been marked -- or

11 what has been introduced as Defendant's Exhibit

12 No. 158B.  Just pull up the screen, but don't start the

13 video, if you will.

14         We might have to have you come down and run the

15 system too.  It flashed there.  There we go.

16         It's been admitted.  You can put it up, but

17 that's not playing, is it?

18         Ms. Sheffield, are you familiar with --

19    A.   It is playing.

20    Q.   Are you familiar with the video depicted here;

21 158B?

22    A.   Yes.

23    Q.   And where is that camera?

24    A.   It's inside the Alaska Airlines cargo terminal

25 area.

1    Q.   And is that as it existed or the video from the

2    time of when?

3    A.   This video is from 2012, April 12th.

4    Q.   Okay.

5    A.   And it's in the morning, 6:30.

6    Q.   Can you split screen that with Government Exhibit

7    No. 91?

8         Is the laser pointer up there?

9    A.   Yeah.

10   Q.   Okay.  So you see on the video -- the right side,

11   the video for the Alaska cargo video, the window that's

12   depicted and the door that's depicted that we're looking

13   at.  Can you show the jury on Government Exhibit No. 91

14   where those are.

15   A.   It is right there.

16   Q.   And so where -- from there, where is the, like

17   the passenger terminal where passengers are being picked

18   up and dropped off?

19   A.   It is connected to the building, but just to the

20   right of the main area.  Right here is the main terminal

21   area and it's connected to it, but it's right there just

22   beside it.

23   Q.   If you could take 91 down.  I'm just going to --

24   first of all, Ms. Sheffield, do you know how long this

25   video is, Defense Exhibit No. 158B, this clip of this

1  video?

2      A.  It's an hour.  It's from 6:30 a.m. to 7:30 a.m.

3      Q.  On the morning of April 12th?

4      A.  Yes.

5      Q.  I don't want to necessarily show the whole hour

6  here, just maybe an illustration.  But have you reviewed

7  and done some investigation related to this hour video?

8      A.  Yes, I have reviewed the hour and documented

9  anything that I noticed within the camera view as far as

10 people going by, vehicles going by, that sort of thing.

11     Q.  As the video starts here, there is a reflection

12 from the window.  It's dark outside?

13     A.  Correct.

14     Q.  And as you watch the video, does it become light

15 and are you -- were you able to see out the window?

16     A.  Correct.  When the video starts, it's pretty

17 dark, and the glare and reflection you can't see much,

18 but within about 14 to 15 minutes, it starts to get

19 light enough where you're not seeing that reflection or

20 glare anymore and you can see the vehicles outside of

21 the window.

22     Q.  So at approximately what time?

23     A.  Right about 6:44, 6:45, you can start to make out

24 shapes of vehicles and headlights and things like that.

25     Q.  I'm just going to fast-forward to a minute or two

so you can illustrate what you did in the middle of the video.  That's good, Bruce.  Somewhere in there.  About the middle.

So this is how far in?

MR. JOHNSON:  This is 7:08.

Q.  7:08, okay.  Just run that for about a minute or so.

A.  As you can see now it's gotten a little lighter and you can actually kind of see out the window, and as vehicles go by you'll be able to see them.

Q.  Point with the laser pointer where are you looking as you're counting?

A.  Right here.  This is the edge of the parking lot where vehicles are coming around as they come closer to the terminal.  So, for example, you can start to see a vehicle that's pulling around.

Some of the vehicles are closer to the window and some are further, depending on if they were pulling right up to the front or pulling into that middle area.

Q.  That vehicle that just went by, do you know what vehicle that was?

A.  It's the shuttle.

Q.  From?

A.  That takes people over to the Comfort Inn.

Q.  That's good.  That's good.

1          Did you in this -- for this period of time, count

2    the number of vehicles that you could see traveling past

3    the cargo window?

4        A.   Yeah.  From about I would say 6:40 to 7:30,

5    because like I said, the first ten minutes is so dark

6    with the reflection you can't really tell.  So from

7    about 6:40 to 7:30, there were 35 vehicles that went

8    past the window.

9        Q.   Including the shuttle bus?

10       A.   Correct.

11       Q.   Did the shuttle bus come back or go by more than

12   once?

13       A.   No, it stopped for a while, but it didn't come

14   back again within that hour.

15       Q.   We can take that down, if you would.

16           And could we show -- can we show her for

17   identification purposes Defense Exhibit No. 318.

18           Before we get to this video, Ms. Sheffield, as

19   part of your investigation in this work and your work on

20   the case, have you had occasion to go to the COMMSTA?

21       A.   Yes.

22       Q.   Have you become familiar with the video camera

23   systems out there as far as the location of the cameras

24   and the different areas that can be recorded by the

25   camera system out there?

1    A.  Yes.

2    Q.  Have you reviewed several different videos or

3    several different -- videos from several different

4    camera locations and angles relevant to this case?

5    A.  Yes, at various times I have looked at pretty

6    much all of the different video cameras from the COMMSTA

7    area.

8    Q.  And for not only April 12, 2012, but the days

9    surrounding that?

10   A.  Correct.

11   Q.  First of all, Defense Exhibit No. 318 is a video

12   from the camera located where?

13   A.  The camera located on the top of the T-1

14   building, the front of the T-1 building.

15   Q.  Okay.

16   A.  Pointing out generally over the main gate and the

17   T-1 parking.

18   Q.  Is there a tower structure or -- well, a tower

19   structure there that that camera is mounted on?

20   A.  Yes.

21   Q.  And that's not down at the rigger shop, that is

22   up the hill at T-1?

23   A.  Correct.

24   Q.  And the video that we have here is what

25   timeframe?

1       A.   This is on -- I would say early evening about

2   8:00 p.m. on 4-12, April 12, 2012.

3       Q.   From evening time that evening?

4       A.   Correct.

5       Q.   And this video is approximately how long?

6       A.   It's a little less than 15 minutes, I think.

7            MR. COLBATH:  Your Honor, I'm going to move the

8   admission of Defense Exhibit No. 318.

9            THE COURT:  Any objection?

10           MS. SHERMAN:  No.

11           THE COURT:  318 is admitted.

12           (Defense Exhibit No. 318 admitted.)

13  BY MR. COLBATH:

14      Q.   Before you start that -- oh, I just want to bring

15  the screen up.  Just don't start the video.

16           And so to orient us, Ms. Sheffield, what are we

17  looking at here?

18      A.   So you're looking down on the main gate that's

19  coming up to the T-1 COMMSTA building and the parking

20  lot just outside of the main gate up the hill from T-2.

21      Q.   And where would the rigger shop be relative to

22  this photo?

23      A.   It's down the hill to the right out of view of

24  the camera.

25      Q.   And do we see the time that this is?

1    A.  Yes.

2    Q.  And that's when?

3    A.  I think it's about 8:15.

4    Q.  Morning or evening?

5    A.  Evening.

6    Q.  All right.  Go ahead.

7         (Defense Exhibit No. 318 playing in open

8    court.)

9    BY MR. COLBATH:

10   Q.  Can we stop it there.

11        Ms. Sheffield, are you aware of who the three

12   individuals are that are now out in the parking lot?

13   A.  It is Mr. Wells accompanied by two agents going

14   towards his vehicle.

15   Q.  And his vehicle is where?

16   A.  The white truck with the camper top all the way

17   at the far left corner of the parking lot.

18   Q.  Up here?

19   A.  Correct.

20   Q.  All right.  Go ahead.

21        (Defense Exhibit No. 138 continues playing in

22   open court.)

23   BY MR. COLBATH:

24   Q.  Can you stop it there.

25        Ms. Sheffield, can you tell at the rear of the

1    vehicle what's going on there?

2              MS. SHERMAN:  Your Honor, I'm going to object

3    and ask for a sidebar on this line of questioning.

4              (Begin bench conference.)

5              MS. SHERMAN:  My objection is her description

6    of what she thinks she's seeing.  It's rare I get to use

7    the best evidence rule, but the video speaks for itself.

8    All the other witnesses who testified about the video

9    were there observing, they worked there, worked with

10   those people.

11             THE COURT:  I tend to concur.  I have done a

12   whole trial on videos and people playing what they see,

13   not this trial, a different one.  I think what my

14   thought is you can't have somebody saying that wasn't

15   there, here is what I see.  So I do see that as distinct

16   from a person saying, "I see that's George, I recognize

17   him," when they were with George, but this person wasn't

18   there on April 12th, as I understand it.

19             MR. COLBATH:  That's true.

20             THE COURT:  I'll sustain the objection.

21             MR. COLBATH:  I'll have him back it up and play

22   it through.

23             THE COURT:  If you wanted to zoom in, that's

24   fine.

25             MR. COLBATH:  It gets worse.

1           (End bench conference.)

2  BY MR. COLBATH:

3     Q.  Just going to back it up a few seconds, if we

4  can.  Try that.  I'm going to let it replay there.

5           (Defense Exhibit No. 138 continues playing in

6  open court.)

7  BY MR. COLBATH:

8     Q.  Mr. Johnson, if you could take that down and give

9  me Defense Exhibit No. 320, just for identification

10 purposes.

11          Ms. Sheffield, are you familiar with this

12 photograph?

13    A.  Yes.

14    Q.  The vehicle depicted?

15    A.  Yes.

16    Q.  And the location is where?

17    A.  It is the parking lot of the T-1 building, same

18 place that we just saw in the video, but a still photo

19 of the vehicle in the same location.

20    Q.  Of the white pickup?

21    A.  Of Mr. Wells' white pickup truck from the back.

22          MR. COLBATH:  I'm going to move to admit

23 Defense Exhibit No. 320.

24          MS. SHERMAN:  No objection.

25          THE COURT:  320 is admitted.

1           (Defense Exhibit No. 320 admitted.)

2     BY MR. COLBATH:

3        Q.   And so you said that the location of that was

4     where?

5        A.   It's in the far left corner of the parking lot of

6     T-1 building, just outside of the main gate of T-1.

7        Q.   And so that's -- it's sitting in the spot where

8     we were watching?

9        A.   Same location of the video that we were just

10    watching.  It looks like they also took some still

11    photos at that time or near that time.

12       Q.   All right.  We can take that down, Mr. Johnson.

13            MR. COLBATH:  I don't have any more questions

14    for Ms. Sheffield.

15            Ms. Sherman?

16            MS. SHERMAN:  I have no questions.

17            THE COURT:  Thank you, ma'am.  You may be

18    excused.

19            (Witness excused)

20            THE COURT:  Mr. Colbath?

21            MR. COLBATH:  Let me check, Your Honor.  I have

22    got two --

23            THE COURT:  Sure, that's fine.

24            (Pause)

25            THE COURT:  Stand and stretch if you'd like,

1    ladies and gentlemen, or not.

2              (Pause)

3              THE COURT:  Good afternoon.  If you could come

4    up to the witness stand, please.  When you get up there,

5    remain standing just a moment and the clerk will

6    administer an oath to you.

7              (Oath administered to the witness)

8              DEPUTY CLERK:  For the record, can you please

9    state your full name and then spell your full name.

10             THE WITNESS:  Lori Denise McAbier.  L-o-r-i,

11   D-e-n-i-s-e, M-c-A-b-i-e-r.

12                LORI McABIER, DEFENSE WITNESS, SWORN

13                      DIRECT EXAMINATION

14   BY MR. CAMIEL:

15       Q.  Good afternoon, ma'am.

16       A.  Hi.

17       Q.  Where did you travel from to be here today?

18       A.  Ferndale, Washington.

19       Q.  And was there a time that you lived up in Kodiak?

20       A.  Yes.

21       Q.  What years did you live in Kodiak?

22       A.  Gosh.  I think it was from '96 to 2015.

23       Q.  Okay.  And then you moved from there down to the

24   state of Washington?

25       A.  Yes.

1    Q.   Okay.  Do you have a son?

2    A.   I have two.

3    Q.   Okay.  What are your son's names?

4    A.   Christian Reade McAbier and Nicholas Aaron

5    McAbier.

6    Q.   I wanted to take you back to 2012 and ask you

7    about April of 2012.  Did you go on a -- did you go on a

8    trip in April of 2012?

9    A.   We were in Mexico for six months and we came back

10   in April.  We always did that for tax time, to file

11   taxes because we were commercial fishermen, family.

12   Q.   So when you say "we" --

13   A.   My husband and I.

14   Q.   So you and your husband went down to Mexico for

15   six months?

16   A.   Yes.

17   Q.   And do you recall the day that you returned from

18   Mexico?

19   A.   Probably around the 12th.  It's usually --

20   Q.   And what route did you take to get back from

21   Mexico in terms of flying?

22   A.   Alaska Airlines, from La Paz, Mexico, probably

23   flew to to Seattle.

24   Q.   And from there to where?

25   A.   Back home.

1     Q.  All right.

2     A.  Anchorage and then Kodiak.

3     Q.  All right.  When you arrived back in -- now, when

4 you flew from Anchorage to Kodiak on April 12th, did you

5 -- did you have anybody meet you at the airport?

6     A.  Oh, Nicholas, my son.

7     Q.  Your son Nicholas?

8     A.  Yes.

9     Q.  Do you know which flight you came in on?

10     A.  Huh-uh.  It was the morning.

11     Q.  And are you -- you have been to the Kodiak

12 airport I bet many times?

13     A.  Yes.

14     Q.  All right.  And was it the first flight of the

15 day going out, so you were coming in?

16     A.  I don't remember.  I'm sorry.

17     Q.  That's all right.  When your son met you at the

18 airport, was he waiting outside or did he come into the

19 terminal to meet you?

20     A.  Inside.

21     Q.  All right.  Do you remember was the flight about

22 on time?

23     A.  Yes.

24     Q.  It was on time?

25     A.  Yes.

1    Q.   When your son met you, did he meet you in the

2    terminal?

3    A.   Yes.

4    Q.   And what happened when he met you, if you recall?

5    A.   Big hugs.

6    Q.   You had been gone a long time?

7    A.   Six months, yeah.

8    Q.   And did your son accompany you out?

9    A.   Yes.

10   Q.   From the terminal?

11   A.   Yes.

12   Q.   Where did you go when you left the terminal?

13   A.   We got our luggage and just walked out the front

14   doors and out to the parking lot to our car.

15   Q.   Do you know -- do you remember where your son

16   parked?

17   A.   No.

18   Q.   Do you remember whether it was a long distance

19   from the terminal or close?

20   A.   It's a small airport, so there is no such thing

21   as long distance.

22   Q.   All right.  And so after your son picked you up,

23   I take it he took you home?

24   A.   Yes, sir.  We were tired.  There is always a

25   really long layover in Anchorage.  I mean it's grueling.

1  So when I got -- when I get home, I was always

2  exhausted.

3       Q.   Do you recall a few days after you returned being

4  contacted by some people from law enforcement?

5       A.   I don't.

6       Q.   All right.  Do you recall talking to any police

7  officers about anything you might have seen on

8  April 12th when you left the terminal?

9       A.   No.

10            MR. CAMIEL:  Your Honor, I'm going to just show

11  her a transcript that might help remind her of the date

12  and whether she was contacted and see if that refreshes

13  her recollection.

14       A.   Yeah, I don't remember.  It might've happened.

15            MS. SHERMAN:  I don't have a transcript, so I

16  would like a copy.

17            THE COURT:  Take a moment if you need to.

18            (Pause)

19            MR. CAMIEL:  I'm not sure we have another copy.

20            THE COURT:  Well, maybe it's a good time for a

21  short break.  And we'll get that taken care of.

22            Let's take about five minutes, ladies and

23  gentlemen.  Please leave your notepads here.  Remember

24  my admonition not to discuss the case and we'll take a

25  short recess.

```
 1                    (Recessed from 1:39 p.m. to 1:48 p.m.)

 2                    (Jury present)

 3                    THE COURT:  Please be seated, everyone.  We're

 4      back on record here with a transcript, correct?

 5                    MR. CAMIEL:  We do, Your Honor.

 6                    THE COURT:  Very good.  Go right ahead,

 7      Mr. Camiel.

 8      BY MR. CAMIEL:

 9          Q.  Ma'am, I gave you a transcript to look at.  Does

10      that help refresh your recollection about whether or not

11      you were interviewed by law enforcement?

12          A.  Nope.

13          Q.  Okay.

14          A.  I honestly -- I don't remember.  I'm sure I did.

15      I just don't remember it.

16          Q.  Do you remember -- if you look at the date on the

17      transcript, does that help you at all?

18          A.  I did not -- you know, there is this vague --

19      it's so vague, this memory of Nicholas and I being

20      interviewed together at some point, and that's it.  And

21      I -- that was just from reading this.

22          Q.  Okay.  That's fine.  That's all right.

23                    MR. CAMIEL:  I don't have any other questions.

24      Thank you.

25                    THE COURT:  Any questions for this witness?
```

```
 1                 MS. SHERMAN:  No.
 2                 THE COURT:  All right.  Thank you, ma'am.  You
 3       may be excused.
 4                 (Witness excused)
 5                 THE COURT:  Mr. Colbath, do we have additional
 6       witnesses?
 7                 MR. COLBATH:  We do have a next witness, Your
 8       Honor.
 9                 THE COURT:  All right.  Very good.  Good
10       afternoon.  If you could come up to the witness stand,
11       please.  When you get there, remain standing, if you
12       would, and the clerk will administer an oath to you.
13                 (Oath administered to the witness)
14                 DEPUTY CLERK:  For the record, can you please
15       state your full name and then spell your full name.
16                 THE WITNESS:  Nicholas Aaron McAbier,
17       N-i-c-h-o-l-a-s, A-a-r-o-n, M-c-A-b-i-e-r.
18              NICHOLAS McABIER, DEFENSE WITNESS, SWORN
19                           DIRECT EXAMINATION
20       BY MR. CAMIEL:
21          Q.  Good afternoon.  Are you related to the woman who
22       just left the courtroom?
23          A.  Yes, she is my mother.
24          Q.  Where are you here from today?
25          A.  I came from Washington.
```

1    Q.  All right.  And did you -- what do you do in

2  Washington?

3    A.  I own a pest control business down there.

4    Q.  How long have you lived in Washington?

5    A.  Oh, probably about six years.

6    Q.  Where did you live before that?

7    A.  I lived in Kodiak, Alaska.

8    Q.  How long did you live in Kodiak?

9    A.  Off and on, for about 16 years.

10    Q.  How old are you?

11    A.  I am 29.

12    Q.  I want to take you back to 2012, April 12, 2012.

13  Were you in Kodiak on that day?

14    A.  Yes.

15    Q.  What were you doing that day?

16    A.  I was picking up my parents from the airport as

17  they came in from Mexico.

18    Q.  Which flight did they come in on?

19    A.  The first flight in.

20    Q.  Do you remember what time that flight arrived?

21    A.  I believe it was around 7:00.  I arrived there

22  just shortly prior.

23    Q.  How did you get to the airport?

24    A.  I drove my stepfather's Expedition.

25    Q.  When you got to the airport -- where had your

1    parents been?

2        A.   They were not arrived yet, so I parked out front

3    and I believe I waited there for a few minutes as they

4    arrived.

5        Q.   Where were your parents coming back from?

6        A.   Mexico.

7        Q.   When you say you parked out front, where did you

8    park in relation to the terminal?

9        A.   There is a staircase and a ramp leading into the

10   main entrance, and I parked right in front of that.

11       Q.   Why did you park right out front?

12       A.   It's easy access.

13       Q.   And so you parked, and did you wait in your

14   vehicle for them to arrive or did you go into the

15   terminal?

16       A.   I waited for a few minutes, and then I went in

17   and waited for them to arrive as it got closer to the

18   flight arrival time.

19       Q.   Do you recall the flight arriving on time?

20       A.   I believe it did.

21       Q.   So you met your parents in the terminal?

22       A.   Yes.

23       Q.   What happened in the terminal?

24       A.   I greeted them, and then we got their bags and

25   left.

 1    Q.  As you left the terminal and were driving away --
 2  you drove away from the terminal?
 3    A.  Yes.
 4    Q.  And you were driving?
 5    A.  Yes.
 6    Q.  When you left the terminal, did you see any
 7  vehicles that you were later asked about?
 8    A.  Yes, I saw a, I believe it was a blue Honda CR-V,
 9  an older model.  The only thing I really noticed was the
10  taillights.
11    Q.  And do you remember a few days later being asked
12  about that vehicle?
13    A.  Yes, the Coast Guard came and asked me to give a
14  statement.
15    Q.  Do you know how it was that the Coast Guard came
16  to talk to you?
17    A.  I'm sorry.  Could you rephrase that?
18    Q.  Sure.  Do you know how it was that the Coast
19  Guard got your name to talk to you?
20    A.  Oh, I do not know.
21    Q.  Did they talk to your mother as well?
22    A.  Yes, they did.
23    Q.  Where did they come talk to you?
24    A.  At our place, house.  It was up on a hill.
25    Q.  Okay.  When they came to talk to you, did the --

were these like law enforcement Coast Guard people?

A.   I believe so.

Q.   Did they show you anything?

A.   I don't recall.  I'm sure they did, but I just don't recall.

Q.   Did they ask about any vehicles?

A.   The only thing they asked about was the car that I might have seen.

Q.   What did you tell them?

A.   That I wasn't sure if it was the vehicle that they were looking for, but I did notice an older Honda CR-V as we exited the area.

Q.   Do you remember what color that older Honda CR-V was?

A.   I believe it was blue.

Q.   Where did you see that vehicle parked?

A.   It was like a row in, and, like I said, the only thing I saw was the taillights as we exited.

Q.   Now, I want to have you take a look at something. If we could put up for identification purposes Exhibit No. 157B.  There is going to be a video on the screen in front of you.

A.   Yeah.

Q.   If you look to your left.  Down.  The monitor. There you go.  I'm just going to have this run for just

a couple minutes for you to look at to see if you
recognize anything.

First of all, do you recognize what this camera
is showing?

A.   Yes, it's the airport.

Q.   Is it outside or inside?

A.   Inside the terminal.

Q.   So we're going to show you -- actually going to
show you 157B2, which is a clip from that video.

A.   Okay.

DEPUTY CLERK:  What was the exhibit number?

MR. CAMIEL:  157B2.

THE COURT:  It hasn't been admitted.

BY MR. CAMIEL:

Q.   If we could stop it.  Do you see anyone you
recognize in the video?

A.   Yes, I see myself and my mother.

MR. CAMIEL:  I would offer 157B2.

MS. SHERMAN:  It's a clip from what's already
been admitted.  No objection.

THE COURT:  It's admitted then.  Go ahead.

(Defense Exhibit No. 157B2 admitted.)

BY MR. CAMIEL:

Q.   Before we start to play it, what are we looking
at here in the video?

1     A.   You're looking at the people just coming off the

2   flight and gathering their bags.

3     Q.   Let's -- and actually, before we start running

4   it, can you see the date and time on the video up at the

5   top?

6     A.   Yes.

7     Q.   And what's the date?

8     A.   The 12th of 2012.

9     Q.   Can you see the time?

10    A.   Yes, 7:09 a.m.

11    Q.   Then if we can run the video.

12         (Defense Exhibit 157B2 playing in open court.)

13  BY MR. CAMIEL:

14    Q.   Let's stop it right there.  And there is a laser

15  pointer sitting on the counter in front of you.  If you

16  could -- yes.  If you could point up at the screen and

17  show us where you are and where your mother is.

18    A.   I'm right there, and my mom is right in front of

19  me carrying out the dog.

20    Q.   At this point, where are you headed?

21    A.   We are heading to the vehicle.

22    Q.   Let's just let it run.

23         (Defense Exhibit No. 157B2 continues playing in

24  open court.)

25  BY MR. CAMIEL:

```
 1      Q.   Okay.  That's good.

 2           And then if we could just look at for

 3  foundational purposes 157B4, which is just a still from

 4  that same video.

 5           MS. SHERMAN:  No objection.

 6           MR. CAMIEL:  I would offer 157B4.

 7           THE COURT:  All right.  That's admitted.

 8           (Defense Exhibit No. 157B4 admitted.)

 9  BY MR. CAMIEL:

10      Q.   And does that appear to just be a still shot from

11  the same video?

12      A.   Yes.

13      Q.   When you left the terminal with your parents, did

14  you go directly to your car or the car you were using?

15      A.   Yes.

16      Q.   And from there, did you drive directly out of the

17  airport?

18      A.   Yes.

19      Q.   And was it while you were leaving the airport

20  that you saw the blue SUV?

21      A.   Yes.

22           MR. CAMIEL:  I don't have anything further.

23           THE COURT:  Ms. Sherman, go ahead, please.

24                      CROSS EXAMINATION

25  BY MS. SHERMAN:
```

```
 1      Q.   Good afternoon.   Do you recall making a statement
 2   back in April 2012 about this?
 3      A.   Yes, I do.
 4      Q.   Have you had an opportunity to review that
 5   statement or a transcript from that statement?
 6      A.   Yes.
 7      Q.   Do you recall telling the investigators at that
 8   time it was on the far left side when you were driving
 9   into the airport?
10      A.   That's where it would have been located at.
11      Q.   Did you ever tell the investigators that you saw
12   it as you were you leaving?
13      A.   I don't recall.
14      Q.   Would you like to review the transcript?
15      A.   I can if that helps.
16      Q.   You never told the investigators on April 20,
17   2012, that you saw it when you were on your way out,
18   right?
19      A.   I don't believe so.
20      Q.   Okay.   And you never told anybody since then that
21   you saw it on the way out, right?
22      A.   I believe I told Mark the last time we talked.
23      Q.   Who is Mark?
24      A.   The defense attorney, I believe.
25      Q.   Okay.   Never told the FBI, never called the
```

1    investigators back and were like, "Hey, I saw it on the

2    way out, not the way in," right?

3        A.  I don't believe so.

4        Q.  At the time you talked to the investigators, you

5    also said you weren't sure it was even the CR-V they

6    were looking for, right?

7        A.  Yes.  I only said that it was similar looking.

8            MS. SHERMAN:  Thanks.

9                        REDIRECT EXAMINATION

10   BY MR. CAMIEL:

11       Q.  If we could look at Government 91.  Do you

12   recognize what's in that photograph?

13       A.  Yes.

14       Q.  What is it?

15       A.  It is the airport parking lot.

16       Q.  Can you see where the Alaska Airlines terminal

17   is?

18       A.  Yes.

19       Q.  Can you use the pointer to show us?

20       A.  The terminal is over here.

21       Q.  Okay.  And where did you park?

22       A.  I parked right there.

23       Q.  So right in front?

24       A.  Yep.

25       Q.  And which direction did you leave?

1     A.   Going out that direction.

2     Q.   Okay.  And where did you see the blue SUV that --

3     A.   It would have been around this area, I believe.

4     Q.   After you were interviewed by the agents a few

5  days after April 12th, did they ever contact you again?

6     A.   I don't believe so.

7     Q.   When you were talking to the agents about what

8  you had seen -- first of all, did they show you a

9  picture?

10    A.   Yes, they did.

11    Q.   Of the blue SUV?

12    A.   Yes.

13    Q.   And is that what triggered you telling them what

14  you had seen?

15    A.   No.

16    Q.   Okay.  When you told the agents that you had seen

17  it on the left side, are you describing where in the

18  parking lot it was?

19    A.   Yes.

20    Q.   All right.

21    A.   As relation to me driving out.

22    Q.   Okay.  You're sure that you saw it as you were

23  leaving?

24    A.   I'm pretty positive.

25         MR. CAMIEL:  That's all.  Thank you.

1          THE COURT:  Ms. Sherman, anything further?

2          MS. SHERMAN:  No questions.

3          THE COURT:  All right.  Thank you, sir.  You

4   may be excused.

5          (Witness excused)

6          THE COURT:  Your next witness, Mr. Colbath?

7          MR. COLBATH:  Your Honor, I think the defense

8   is prepared to rest and not call any more witnesses, I

9   guess subject what happens in rebuttal and any

10  application to the Court.

11         THE COURT:  Then the defense rests is what I

12  hear.  As I understand it, the government will have some

13  rebuttal evidence tomorrow morning.  Is that the plan?

14         MR. SKROCKI:  Yes.  We have three short

15  witnesses to present.

16         THE COURT:  All right.  Very good.

17         MR. SKROCKI:  Maybe four, pending a discussion

18  we're having right now.

19         THE COURT:  Then what we'll do, ladies and

20  gentlemen, is I'm going to work with the lawyers this

21  afternoon to get the jury instructions in order.  It's

22  possible we may have closing arguments tomorrow, but it

23  may well be Monday.

24         Please leave your notepads here.  Remember my

25  admonition not to discuss the case or do any research or

any investigation.  I heard indirectly somebody wanted

to travel to Kodiak for work on Friday.  I don't know

who that is, but that's totally fine, but just,

obviously, don't do any investigation if you are in

Kodiak or elsewhere.

All right.  With that said, have a pleasant

evening.  We'll see you all tomorrow at 8:45 a.m.  Thank

you.

(Jury absent)

THE COURT:  Please be seated, everyone.  And

what's the plan with regard to rebuttal?  You indicate

three short witnesses?

MR. SKROCKI:  Three witnesses, yes.

THE COURT:  So timeframe?

MR. SKROCKI:  Timeframe?

THE COURT:  I'm just wondering if we can do the

closings tomorrow.  I can understand if counsel would

prefer Monday, but my sense is the jury would not, would

very much like to conclude their service.

MR. SKROCKI:  Right.

THE COURT:  We have taken a lot of downtime

from their perspective.  One thing I thought about is

the potential to have the rebuttal, any surrebuttal, the

instructions in the morning.

I'm going to split the instructions, that was

probably evident.  The bulk I will read prior to closing
and just a very few afterward.

MR. SKROCKI:  Our rebuttal case, I'll just tell
defense, we have Brett Mills, tool mark guy is flying in
as I speak, Mr. Rudat briefly, and Mr. Skonberg from
Servant Air briefly.  Neither one of those is of any
long duration.

So I'm sympathetic to the Court's concerns.  I
have a little bit of a concern if we do closing on
Thursday and they feel compelled to rush to verdict
before a three-day weekend.  That's just hanging out
there, Judge.  I know it's difficult --

THE COURT:  How long do you anticipate for the
government's closing?  I wouldn't anticipate that we
would have a verdict on Thursday.  I simply think that
-- I have been instructing them not to talk about the
case.

MR. SKROCKI:  Sure.  We would like hour and 45.

THE COURT:  All right.  Total?

MR. SKROCKI:  Yes.

THE COURT:  Mr. Colbath, what are your thoughts
on all this?

MR. COLBATH:  We're not sure, I guess, Your
Honor, what the nature of the rebuttal would be, and so
I'm not sure -- it doesn't sound long.  And if it's

1    short, I can't believe we would have that long of a

2    cross.  Certainly that appears that we would get that in

3    the morning.  If those are the three witnesses, I'll

4    have to think about that.

5            We may have -- ask for some kind of proffer or

6    something.  As long as it's rebuttal and we get through

7    that, I think we will have the instructions settled yet

8    today.  It would take counsel a little bit of time, I

9    think, to make sure we have got all our exhibits and

10   everything is ready to go.  I was thinking the same-ish

11   time.

12           THE COURT:  So most of the afternoon?

13           MR. COLBATH:  Certainly between an hour and a

14   half and two hours for closing.  I mean I assume the

15   defense gets the same time as the government total?

16           THE COURT:  Correct.

17           MR. COLBATH:  If we're both an hour-45, with a

18   break in between, we have got four hours of closing.

19   Even if we started at 11:00, best case scenario, the

20   jury gets the case after 3:00.  I am of the exact same

21   mindset as Mr. Skrocki is, number one, in anticipation

22   of a three-day weekend, they may very well think, boy,

23   if we could get this done in a couple hours, we're all

24   free to go.  That would concern me for both sides

25   getting a fair trial.

1          The other thing is if they have heard and

2   received everything and really not had a chance to

3   discuss it collectively and then spend alone a three-day

4   weekend, I'm afraid we're going to get folks that

5   formulate an opinion on their -- a stronger opinion or

6   evaluation on their own, also may do I guess some work

7   on their own over the weekend, but then when they get

8   back together, that just may not be advantageous to

9   think like they are starting to -- that they have heard

10  everything when they leave here.

11         So for everybody's interest, it just seems more

12  sensible to argue Monday morning, unless you were going

13  to allow them to deliberate on Friday.

14         THE COURT:  Which we really can't do,

15  unfortunately.

16         MR. SKROCKI:  One thing I just thought of, they

17  are going to be here Monday anyway?

18         THE COURT:  Correct.

19         MR. SKROCKI:  So that seems to be --

20         THE COURT:  Can you assure me there will be

21  more cogent and efficient closing arguments if you have

22  all weekend to prepare?

23         SKROCKI:  Absolutely.

24         MR. COLBATH:  Efficient.

25         THE COURT:  Fair enough.  I think -- I didn't

1   realize each side would be requesting that long.  I

2   think that's reasonable that you do so though for

3   closing given the length of the proceedings and the

4   amount of evidence.  So that's fine.

5          Then what I am inclined to do is take about an

6   hour break here, then come back on record and discuss

7   these jury instructions today, and then finalize them as

8   needed tomorrow.  But basically -- well, in an hour can

9   you identify any issues that you have?

10          MR. SKROCKI:  Yes, ma'am.

11          MS. SHERMAN:  We have reviewed them.

12          THE COURT:  Mr. Colbath, if you had an hour to

13   review these --

14          MR. COLBATH:  If we had an hour, we could do

15   that.

16          THE COURT:  3:10 we'll come back on record and

17   take up the instructions, and go off record at this

18   time.

19          DEPUTY CLERK:  All rise.  Court stands in a

20   brief recess.

21          (Recessed from 2:11 p.m. to 3:12 p.m.)

22          (Jury absent)

23          DEPUTY CLERK:  All rise.  Her Honor, the Court,

24   the United States District Court is again in session.

25          COURT:  All right.  Please be seated.  Back on

1    record here to take up these jury instructions.  Emily

2    is here, which is great.

3              From the government's perspective, are there

4    any that you would identify as to which you have

5    substantive objection?

6              MS. SHERMAN:  Your Honor, there are a few.  The

7    first would be 4.8.  That's the impeachment one.  I

8    don't know if we necessarily had any impeachment

9    specifically.

10             THE COURT:  I was disinclined to give that.  I

11   stuck it in because somebody must have asked for it and

12   we could discuss it.

13             MS. SHERMAN:  That was my first one.

14             MR. COLBATH:  4.8?

15             MS. SHERMAN:  It's the impeachment one.

16             THE COURT:  I guess what I saw is that we would

17   have extensive discussion as to who to list there and

18   disagreements, and I'm not sure that the Court ruling on

19   what constitutes impeachment or not is my role anyway.

20   Having said that, go ahead.

21             MS. SHERMAN:  So the next one is the specific

22   intent, 5.4.  There is only a comment there, and I think

23   other instructions clearly mention the mens rea

24   necessary.  And because this isn't an intent, I don't

25   think there needs to be a specific discussion on

1    specific and general intent.  I think the other patterns

2    about the counts actually cover that.

3           THE COURT:  So you would propose to delete

4    that.

5           MS. SHERMAN:  And then the last -- I believe I

6    have one more.  So the last one I have an objection to

7    is 6.0.

8           THE COURT:  Is that at the end?

9           MS. SHERMAN:  Yes.  So the comment on 6.0,

10   there is no pattern, is that a defendant is entitled to

11   have an instruction on the theory of their defense.  Our

12   position is that they have that in 6.1.  They are given

13   a specific instruction, the alibi instruction.

14           I think what they have drafted here is

15   argumentative.  It's his position that persons other

16   than him have committed the crime, and I think that that

17   actually gives two instructions on the theory of their

18   defense.  They have the alibi instruction at 6.1, which

19   should be sufficient to describe that, and the

20   commentary from -- and I only have the ones from I think

21   it was this summer, that there is a conflict at the

22   Ninth Circuit about giving it, but when someone asks for

23   an alibi instruction, the Court should give it.  The

24   Court should certainly give 6.1, but I think 6.0 is not

25   necessary.

1          THE COURT:  Thank you.  Any other objections or

2     observations or stylistic or anything?

3          MS. SHERMAN:  No.  We're fine with the closing

4     instructions and the verdict forms as well.

5          THE COURT:  Mr. Colbath, go ahead, please.

6          MR. COLBATH:  Thank you, Your Honor.  First of

7     all, with respect to 4.8, I agree.  I think impeachment

8     gets us off track and does more harm than good.

9          Backing up, I would have the Court look at 4.3.

10         THE COURT:  All right.

11         MR. COLBATH:  And I would ask the Court to only

12    make a change in the first sentence to say, "You have

13    heard evidence that the defendant may have committed

14    other acts not charged here."

15         THE COURT:  So "may have" is your proposal?

16         MR. COLBATH:  "May have" is my proposal.

17         THE COURT:  That's actually a valid point.

18         MS. SHERMAN:  That's fine.

19         THE COURT:  In fact, I might go back to the

20    committee on that one.  I think that's a very valid

21    point.

22         MR. COLBATH:  Especially in our case, because I

23    presume that at least one act they could certainly be

24    focused on was the fuel card, and there was testimony

25    about, wait, it was inconclusive and then there were

1    other witnesses that suggested it was committed.

2             THE COURT:  No, I think that's a very good

3    change.

4             MR. COLBATH:  I didn't know if we wanted to

5    modify also the first sentence of the third paragraph,

6    "The defendant is not on trial for committing any other

7    acts.  You may not consider these other acts as a

8    substitute for" -- I mean it says somewhere else that

9    the defendant is only on trial for the crimes charged in

10   the indictment and it would not be any other acts that

11   he's on trial for.

12            I'm less concerned about the third paragraph

13   than I am the first, but I would encourage "may have."

14            THE COURT:  So change these to any other acts,

15   apart from those charged in the indictment is what I

16   would --

17            MS. SHERMAN:  If the Court includes the

18   language on the indictment, we would agree with that.

19            THE COURT:  "The defendant is not on trial for

20   committing any other acts apart from those charged in

21   the indictment."

22            MR. COLBATH:  Right.

23            THE COURT:  All right.  We can make that

24   change.

25            Did you get that, Emily?

1          MS. ELISON:  Yes.

2          THE COURT:  Very good.  Other changes from the

3    defense?

4          MR. COLBATH:  As to the specific intent, 5.4, I

5    agree with Ms. Sherman, I don't think that 5.4 is

6    necessary at this point.

7          THE COURT:  Then we'll delete that.

8          MR. COLBATH:  With respect to our theory of

9    defense as well as the alibi, they are separate and

10   distinct, because it is, first and foremost, Mr. Wells'

11   position, the defense position, that someone other than

12   him committed the murders.  He did not commit the

13   murders.

14         Irrespective of whether he had an alibi and/or

15   the jury considered him to be somewhere other than the

16   scene of the murders, he is not guilty because somebody

17   else did it.  That is a separate and distinct thing from

18   also there is evidence that you could find that he was

19   at another place at the date and time identified in the

20   indictment where the murder was committed.

21         And so we don't see them as repetitive or as

22   one subsumed in the other.  I believe the status of the

23   law and the status of the instruction comments were that

24   if it is an accurate statement of the law and an

25   accurate -- not an unfair commentary on the facts and

1    otherwise accurate under the evidence that a theory of
2    defense instruction can be appropriate.  And so --
3            THE COURT:  I guess I can hear from the
4    government on that again too, but what I would be
5    inclined to do is delete the second portion of the
6    instruction at 6.0 that begins with, "If after
7    considering all of the evidence."
8            Seems like that occurs earlier on and it's
9    unnecessary to have there, but --
10           MR. COLBATH:  "If after considering"?
11           THE COURT:  Yes, "If after considering all of
12   the evidence, including any other evidence that" -- it
13   seems --
14           MR. COLBATH:  I may have drawn that from
15   another pattern which the Court has otherwise included
16   and not knowing it was going to be included.
17           THE COURT:  I can double-check, but that's -- I
18   think that might be in the definition of reasonable
19   doubt or something substantially similar to that.
20           MS. SHERMAN:  3.5.
21           THE COURT:  What about this proposal to have it
22   simply the first two sentences, Ms. Sherman, of 6.0?  I
23   think there is some merit to the defense perspective
24   that this is a distinct issue, albeit related to the
25   alibi.

1          MS. SHERMAN:  That's fine with just the first

2    two sentences.

3          THE COURT:  Take it out where it begins "if

4    after considering all of the evidence."  Then that's

5    fine.

6          Other changes from the defense?

7          MR. COLBATH:  We'll look, Your Honor.  I don't

8    think I had --

9          THE COURT:  The verdict form?

10          MR. COLBATH:  I'll look at the "final" finals.

11    I inadvertently grabbed both sets.  I had notes on both

12    sets.

13          THE COURT:  Take a moment.  That's fine.

14          MR. COLBATH:  Yeah, I think that's -- I don't

15    think we have anything else, Your Honor.

16          THE COURT:  All right.  Very good.  That was

17    straightforward.

18          Then what we'll do is the following, is get a

19    clean final set for you tomorrow, and after we break for

20    the day, I'll give you whatever time you request to just

21    come back and say these are good to go, so if we need

22    15 minutes for you to do the final review, just -- but I

23    don't plan to make any other changes apart from the ones

24    that we discussed here this afternoon.

25          We'll get that so that we can get them all

1    copied Thursday afternoon and be ready to go on Monday.

2              All right.  That was good.  Anything further?

3              MS. SHERMAN:  No.

4              THE COURT:  Anything further, Mr. Colbath?

5              MR. COLBATH:  Your Honor, you're going to have

6    the jury here at 8:45 in the morning.  You will have us

7    here at 8:15?

8              THE COURT:  8:30 I was thinking.

9              MR. COLBATH:  We have requested a transcript of

10   one of the government's witnesses and we want to review

11   it.  We don't know if we have an issue or not.  We may

12   have a short objection for the Court.  We'll see.

13             THE COURT:  I'll have extra coffee,

14   Mr. Colbath.

15             MR. COLBATH:  We'll take it up at 8:30.  I

16   understand it's short, so I understand it won't be long

17   one way or the other.

18             THE COURT:  All right.  Can you give them a

19   heads-up which witness it is?

20             MR. COLBATH:  Mr. Rudat.  We didn't have a

21   transcript of his testimony.

22             THE COURT:  Very good.  Then we'll go off

23   record.

24             DEPUTY CLERK:  All rise.  This matter is

25   adjourned until tomorrow at 8:30 a.m.

1          (Recessed at 3:26 p.m.)

2

3                    CERTIFICATE

4     I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
5 District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
6 original stenographic record in the above-entitled
matter and that the transcript page format is in
7 conformance with the regulations of the Judicial
Conference of the United States.

8
     Dated this 18th day of June, 2020.
9

10
                         /s/ Sonja L. Reeves
11                  SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25