```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,     )
                              )
 7          Defendant.        )
     _____)
 8
```

```
 9              TRANSCRIPT OF TRIAL BY JURY - DAY 19
        BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10                 October 3, 2019; 8:34 a.m.
                        Anchorage, Alaska
11
     FOR THE GOVERNMENT:
12          Office of the United States Attorney
            BY:  STEVEN SKROCKI
13          BY:  CHRISTINA M. SHERMAN
            BY:  KELLEY L. STEVENS
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16   FOR THE DEFENDANT:
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22   _____

23              SONJA L. REEVES, RMR-CRR
               Federal Official Court Reporter
24                 222 West 7th Avenue, #4
                  Anchorage, Alaska 99513
25       Transcript Produced from the Stenographic Record
```

```
1                          I N D E X

2               October 3, 2019, Trial Day 19

3

4     Witnesses:        Direct   Cross    Redirect   Recross

5     Brandon Trappett  18        25        29         --

6     Kelvin Skonberg   30        33        --         --

7     Brett Mills       37        41        47         --

8

9                    E X H I B I T   I N D E X

10    Exhibit                                          Page

11    277        Medical Record                         23

12    DE-321        Photo                                45

13    DE-322        Photo                                45

14    DE-323        Photo                                45

15    DE-324        Photo                                45

16    DE-325        Photo                                45

17    DE-326        Photo                                45

18    DE-327        Photo                                45

19    DE-330     Medical Record                          28

20

21

22

23

24

25
```

1          (Call to Order of the Court at 8:34 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court,

4    the United States District Court is again in session.

5          THE COURT:  Good morning.  Please be seated.

6    We're back on record here.

7          And I have a couple of jury instruction

8    queries, but anything to take up, Mr. Skrocki?

9          MR. SKROCKI:  Yes.  It's up to you, Your Honor.

10   It concerns sort of the testimony of our rebuttal

11   witnesses this morning.  So if you want -- it's all up

12   to you on how you want to proceed.  I want to provide

13   you with a proffer about what they are going to testify

14   to in advance.

15         THE COURT:  Let's hear the proffer.  That's

16   fine.

17         MR. SKROCKI:  We are going to call four

18   witnesses.  One is a witness custodian with respect to

19   Mr. Wells' claim of when his surgery was scheduled with

20   respect to the NATE conference, and Ms. Stevens can talk

21   more about that if we need to in a moment.  The record

22   we're providing is a self-authenticating document.  We

23   have given it to the defense.

24         We're calling Mr. Rudat back for testimony with

25   respect to when he went past the water treatment plant

whether he heard any sounds, specifically a bell or a gong-type sound and the timing of that and why that timing in his mind is accurate. The Court has heard testimony about that before. He was on the clock essentially when he was taking his walk.

We're calling back Mr. Skonberg from Servant Air, particularly because of Mr. Wells' testimony, and we'll be inquiring with him about the bathroom, anybody being in there between the hour of 7:00 and 8:00, things of that nature.

More particularly, we're calling back Brett Mills. He was on the plane yesterday. He landed last night at 10:30. He is going to testify as to the absence of any gripping tool tool marks on the nail of any type. And we have done some research into this area, and I'm going to ask him questions about, general questions, just a few questions about gripping tool-type devices and if one was used why or why it would not leave a tool mark on any aspect of the nail. This is in particular to Mr. Wells' testimony with respect to what he did with the nail, reinserting that nail into that tire.

The reason we're doing that is I believe on Monday the defense gave us a 15-person witness list, which included their tire expert. We had no advanced

notice that Mr. Wells, of course, was going to testify about this. And the case law is pretty clear that rebuttal witnesses are allowed to, without any kind of notice at all, provide testimony in response to what occurs in the defense case.

I have some authority on that if you would like it, but I think it's fair to have Mr. Mills discuss why there isn't a tool mark, he didn't find a tool mark. His report indicates what he found, and what he did not find just by not stating so was any kind of tool mark from a gripping tool of the type Mr. Wells said he used to reinsert that nail back into the tire.

So I have a case if you would like, *U.S. versus Hankins*. It's actually a Steve Cooper case from 2013 out of Fairbanks. It is 539 -- I'll just give you a copy.

THE COURT: All right. Thank you.

MR. SKROCKI: I have one other, while I think of it, copy of another case out of Texas. We were able -- may I approach again?

THE COURT: Yes.

MR. SKROCKI: Cut and paste excerpt that we were looking at this morning, just trying to understand the landscape of rebuttal witnesses and what we could do reasonably. We're not trying to create certainly an

1    appeal point at this stage, but we do have a right of

2    fair response that is not controlled by Rule 16.  It is

3    not really controlled by discovery.  It is all based on

4    Mr. Wells' surprise testimony to us on Tuesday, along

5    with us thinking that their tire expert, who has been on

6    the list for months, who stated that this nail was

7    inserted naturally, so we kind of have this one

8    perspective and now we're responding to what he

9    testified to here in court.  That's the landscape of

10   what we anticipate to present this morning.

11              THE COURT:  Thank you.

12              Mr. Colbath?

13              MR. COLBATH:  Thank you, Your Honor.  I'll

14   address a couple of those witnesses, and then I'll let

15   Mr. Camiel address, while he's looking at these cases,

16   address Mr. Mills and the tool mark part of it.

17              First, with respect to Mr. Rudat, we would

18   object and note for the Court that -- or assert to the

19   Court that that's not rebuttal testimony at all.

20   Calling Mr. Rudat back to say what he didn't hear is

21   simply the government trying to take a second

22   opportunity to present what he's already said.

23              I have a transcript of Mr. Rudat's testimony,

24   and at page 19 -- it begins on page 18 really, but the

25   most relevant stuff is on 19.  Mr. Skrocki on direct

examination, before even the cross, identified that
Mr. Rudat had heard the noise he had heard and he's now
walking -- he's past T-2, he's now walking back towards
the direction of Kodiak.  And he -- Mr. Skrocki asked
him to describe what activity you saw or observed when
you walked by that point on the road, so Mr. Rudat
described, "On the way out, I don't recall seeing any
activity in the general vicinity."  He's talking about
the water treatment plant.

And then Mr. Skrocki pointblank asked him, "Do
you recall any other loud objects or noises that
interrupted your phone call while you were making it on
the mobile coming in that direction heading back to the
Comfort Inn?"  Any other loud objects or noises, and
Mr. Rudat said, "No, sir, I don't."

Well, any other loud objects or noises would
certainly cover a loud bang, a loud clang, a loud gong,
a loud bell, a loud anything.  He gave him the
opportunity to say whether he heard anything whatsoever.
He said, "No, I didn't."

So my understanding from the proffer is they
are going to call him to say, "Did you hear a loud bell
or a bang or a gong or whatever," and he's going to say,
"No, I didn't."  That's saying exactly before cross, and
I reconfirmed it on cross examination, but that's what

1    he said already.

2          As to Mr. Skonberg, I really kind of have the

3    same --

4          THE COURT:  The problem I'm having is that, as

5    I recall your expert on this, his report didn't really

6    talk about gongs, but at the end of the day that was the

7    evidence that defendant was talking about.  Your expert

8    had the bumping construction equipment or a different

9    sound totally than a gong.

10          MR. COLBATH:  Well, actually --

11          THE COURT:  As I recall.

12          MR. COLBATH:  Actually, Mr. Beck -- that was

13    when we were having the out-of-the-presence jury in

14    court.  Mr. Beck didn't describe it that way from the

15    witness stand.  That was from the proffer.

16          THE COURT:  That's correct.

17          MR. COLBATH:  Actually, it was Mr. Stearns, the

18    man who was there working on the tank, said something

19    about like a big bell.  I think that was Mr. Stearns'

20    testimony, because of the limitations the Court put on

21    Mr. Beck --

22          THE COURT:  You're absolutely right.

23          MR. COLBATH:  -- he wasn't allowed to say that.

24    And so it was only Mr. Stearns that described it as

25    maybe you're hitting on a big hollow tank, it's like a

bell.

Regardless, Mr. Rudat said, "I didn't hear any loud objects or noises at all." And so we think that covers that, and he shouldn't be allowed to just say what me already said. That's not rebuttal.

Mr. Skonberg the same way. If he's going to testify that between 7:00 and 8:00 a.m. he didn't observe people using the bathroom, there weren't people in there that he didn't know. It was a little less clear to me from Mr. Skrocki's proffer what he was going to say, but clearly Mr. Skonberg already testified, "I was there from 7:00 on. I know who came in my shop. Certainly Mr. Wells didn't come in, but I would have seen anybody who used the bathroom. I didn't see anybody use the bathroom."

I don't have a transcript of his testimony, but the five of us in the courtroom sat down and compared our notes, and that's essentially what he said, so unless he's got new information to offer, we see that as the same thing.

And so again, it's not rebuttal, it's just a chance for the government to emphasize evidence that they feel is important because there's a controversy.

Last, with respect to the new exhibit that we got, although Mr. Skrocki said it's self-authenticating,

1   I just got a singular page of a medical record, so I
2   don't have any kind of --
3            MR. SKROCKI:  We have the witness here.
4            MR. COLBATH:  So I was -- that's okay.  I don't
5   know any more about this other than it's a record.  I do
6   have a single page of medical records that if this is
7   allowed, we would like to offer, but I didn't know -- I
8   don't know the medical records custodian or whatnot.
9            But I guess we would -- if I can't offer it
10  through that person, I would like the opportunity to
11  also offer a singular page of the medical records.
12           THE COURT:  Well, why don't you show that to
13  Mr. Skrocki at some point and see if there is
14  disagreement or agreement on that one.
15           MR. COLBATH:  I might need to get a couple of
16  copies.
17           MS. STEVENS:  Did you guys already give it to
18  us this week?
19           MR. COLBATH:  I'm getting some copies made.
20           MS. STEVENS:  We had some documents from you
21  guys earlier.
22           MR. COLBATH:  I don't know that it's in there.
23  It's something I was just able to acquire.
24           THE COURT:  All right.
25           MR. COLBATH:  And if I could, I would like

1   Mr. Camiel to address Mr. Mills.

2          THE COURT:  Mr. Camiel, go right ahead.

3          MR. CAMIEL:  Your Honor, the only concern with

4   regard to Mr. Mills is that Mr. Skrocki said he did some

5   research on devices.  And I don't know if -- it sounds

6   like research since -- recent research.  I don't know if

7   that's been put into a report or whether it was just him

8   doing some online research or what that involves, but if

9   he's written anything, then I think we should be

10  entitled to it.

11         The only other thing I note is the *Hankins* case

12  that the government provided to the Court, that had to

13  do with the defendant's expert opening some area of

14  inquiry that was subject to rebuttal testimony.

15         We didn't have any expert testify as to the

16  condition of the nail or any such thing about the nail.

17  That's all I would have about that.

18         THE COURT:  Has Mr. Mills prepared any

19  supplemental?

20         MR. SKROCKI:  The research was mine about

21  cases.  It wasn't about devices.  Maybe that was not

22  picked up appropriately.  So no, he has not done

23  anything new with respect to that.

24         *Hankins* is still applicable, as are the cases

25  that we provided you in that sort of paragraph cutout

 1    from a case in Texas, which I provided the defense.

 2              I have to note that with respect to Mr. Rudat,

 3    my recollection is Mr. Beck came in and specifically

 4    mentioned gong or bell in front of this jury, and we had

 5    a lot of information about pounding and noises and

 6    everything else.  And I can guarantee you that when we

 7    get to closing argument, they are going to say this is

 8    what this man heard and not a loud gong or bell coming

 9    out of T-2 or a loud noise coming out of T-2.  That's

10    exactly what's going to happen.

11              THE COURT:  You believe that the gong or bell

12    was presented to the jury?

13              MR. SKROCKI:  I believe so, but even if it

14    wasn't, Judge, it was completely different than what we

15    were led to believe from his report.  We had that big

16    argument that it was about concrete and machinery

17    hitting things.

18              THE COURT:  Right, but that was outside the

19    presence of the jury.

20              MR. SKROCKI:  Mr. Stearns testified as to that,

21    and it was inquired upon heavily by the defense, and it

22    was inquired upon heavily by the defense for that

23    specific reason, that the jury cannot believe this is

24    what Mr. Rudat heard or should be suspect because of

25    this other work going on down the hill.

1        So I think that's a very fair response.  We're

2  not going to elicit anything else with respect to what

3  happened at T-2.  He's going to be on the stand for like

4  two minutes for, "Did you hear anything, see anything

5  consistent with metal clanging or a bell or construction

6  work at that water treatment plant when you walked by

7  it."  That's the point of that.

8        With respect to Mr. Skonberg, yeah, definitely

9  we're going to inquire of some things in response to

10  Mr. Wells' testimony, and that is whether the doors were

11  open when he showed up, because that's what Mr. Wells

12  claimed; whether he moved away from his station between

13  7:00 and 8:00, and if he didn't, why didn't he.

14        And if anybody had come in, would he have

15  noticed that, especially if the bathroom was locked for

16  a half an hour or more.  That's not what we had him

17  testify to on direct, and I think that's fair right of

18  response as well.

19        As to Mr. Mills, we are going to be reasonable.

20  We understand the issue is that if we go outside too

21  far, they will object.  We get that.  We will do our

22  best to keep it reasonably tailored based on us meeting

23  with him this morning for half an hour.  He'll be on --

24  he's our third or fourth witness.  We'll conclude with

25  him.

1      THE COURT:  Let me take just a moment and

2  ponder all of that and then I'll come back and give you

3  a decision with regard to the rebuttal witnesses.  Let's

4  go off record shortly.

5      DEPUTY CLERK:  All rise.  Court stands in a

6  brief recess.

7      (Recessed from 8:49 a.m. to 8:59 a.m.)

8      (Jury absent)

9      DEPUTY CLERK:  All rise.  Her Honor, the Court,

10  the United States District Court is again in session.

11      THE COURT:  Okay.  We are back on record here

12  with regard to the rebuttal.

13      First of all, I appreciate the *Hankins* case,

14  even though it's a memorandum disposition, and I don't

15  see it as limited to only a defense expert, but when the

16  defense case opens up areas of inquiry that were

17  unanticipated, or unknown to the prosecution, then I

18  feel that falls fairly within the scope of permissible

19  rebuttal.

20      Keeping that perspective, I would allow the

21  witness custodian regarding the surgery.  I can take up

22  if there is any issue with regard to what defense seeks

23  to admit from the records, but in any event, I will

24  allow the government to present that.

25      With regard to Mr. Skonberg, I will allow

testimony that does not repeat his prior testimony but
instead focuses on rebuttal of the testimony of Mr.
Wells regarding use of a bathroom in the Servant Air
area.

And with regard to Mr. Mills, I see that the --
I will allow his rebuttal testimony with regard to the
tire, because the defense expert had a different theory
for the tire that the government had, but that expert
didn't testify, instead we had Mr. Wells, and so I will
allow that rebuttal.

Mr. Rudat I am not going to allow.  I feel that
that falls outside the scope of rebuttal.  The
government was on notice through the report of the
defense expert that there were sounds at the water
treatment facility that could have made the noise that
Mr. Rudat heard and in fact explored that topic to some
degree during the government's case in chief, so I won't
allow Mr. Rudat, but I will allow the other three.

Questions or clarification on that, Mr.
Skrocki?

MR. SKROCKI:  No; understood, Your Honor.
Thank you.  We have agreed with Mr. Colbath to admit his
exhibit medical records through our witness.

MR. COLBATH:  Your Honor, with respect to that,
I'm having it scanned in so it can be in the system

1    right now, but it's going to be Defense Exhibit No. 330,

2    and I don't intend to ask any questions about it. I

3    don't intend to ask any questions about it, but simply

4    just offer it at the conclusion of their record

5    custodian person.

6           THE COURT: Very good. All right. Then let's

7    take up -- actually, why don't we do these issues on the

8    jury instructions later on. I had just a few typos or

9    changes that I don't think will be controversial to

10   propose, but we can go over those later.

11          And also on the stipulation document at 256,

12   seems to me that was the one that was read into the

13   record by Mr. Skrocki. That could go to the jury, I

14   think would be helpful, because it has the phone

15   numbers, phone number of Mr. Wells in it, but then there

16   is an instruction of what to do if it goes to the jury,

17   which in a criminal case is do whatever you want with

18   it, it's just evidence. I'm paraphrasing, but that's

19   the gist of it. Anyway, my question is what's the

20   government's position on that?

21          MR. SKROCKI: Submit it, please, would be our

22   position.

23          THE COURT: Take a moment.

24          (Pause)

25          MR. COLBATH: We don't have, I guess, a feeling

1  one way or the other, Your Honor.

2        THE COURT:  We'll go ahead and I'll have the

3  government then submit -- you had it typed up.  I

4  couldn't find mine yesterday, but type that up as an

5  exhibit that will be admitted.  We'll give the

6  appropriate pattern instruction that relates to that.

7        MR. SKROCKI:  Yes, Judge.

8        THE COURT:  Very good.  Anything else to take

9  up from the government at this point?

10        MR. SKROCKI:  No, ma'am.

11        THE COURT:  Anything else, Mr. Colbath?

12        MR. COLBATH:  I don't think so, Your Honor.

13  I'm looking for another photo or two, but it relates to

14  Mr. Mills, so if we come up with another exhibit, it's a

15  discovery one, so it's not anything anybody hasn't seen.

16  If I get that loaded as well, we might have a photo for

17  him, but we won't have, assuming the testimony goes the

18  way Mr. Skrocki described it, we won't have a request

19  for surrebuttal.  I don't think so.

20        THE COURT:  Are we ready for the jury?

21        (Pause)

22        (Jury present)

23        THE COURT:  All right.  Please be seated,

24  everyone.  Welcome back, ladies and gentlemen.  And we

25  are going to proceed to the next stage of trial here,

1    which is the government to present rebuttal.

2            Your first witness, Mr. Skrocki?

3            MS. STEVENS:  Your Honor, we're calling Captain

4    Brandon Trappett from the U.S. Air Force.

5            THE COURT:  All right.  Very good.

6            (Pause)

7            THE COURT:  Good morning.  If you could come up

8    to the witness stand, please.  When you get up there,

9    remain standing, if you would, and the clerk will

10   administer an oath to you.

11           (Oath administered to the witness)

12           DEPUTY CLERK:  For the record, can you please

13   state your full name and then spell your full name.

14           THE WITNESS:  My name is Brandon Trappett,

15   B-r-a-n-d-o-n, T-r-a-p-p-e-t-t.

16         BRANDON TRAPPETT, GOVERNMENT WITNESS, SWORN

17                     DIRECT EXAMINATION

18                        (Rebuttal)

19   BY MS. STEVENS:

20       Q.  Good morning, Captain.

21       A.  Good morning.

22       Q.  Who do you work for?

23       A.  I work for the United States Air Force.

24       Q.  Where are you currently assigned?

25       A.  I'm currently assigned at JBER Medical Center.

1     Q.   Where is that?

2     A.   Just up here in Anchorage.

3     Q.   Tell the jury what JBER stands for.

4     A.   Joint Base Elmendorf-Richardson.  It's a joint

5   base between the Army and the Air Force.

6     Q.   And you mentioned you're assigned to the medical

7   center?

8     A.   Yes.

9     Q.   Tell the members of the jury what it is you do

10  there.

11    A.   I'm a registered nurse.  I work in the operating

12  room.  I'm a circulator.  My current role is I'm the

13  operations officer, so I kind of coordinate how the

14  operational flow happens for the day.

15    Q.   Captain, I'm going to ask you to slow down just a

16  little bit so Sonja can keep up with you.

17         You mentioned you're an operating nurse.  I bet

18  things move quickly in the operating room?

19    A.   They do, yes.

20    Q.   You're a captain in the Air Force.  Explain to

21  the jury, if you know, how that's different from, say, a

22  captain in the Navy or the Coast Guard?

23    A.   The captain in the Navy and Coast Guard is a

24  higher rank.  The officer system -- they are still

25  designated by numbers, 1, 2, 3, 4.  The captain in the

1  Air Force is an 03.  The captain in Navy and the Coast
2  Guard is an 05.
3    Q.  So how do you document operations at the JBER
4  medical facility operating room?
5    A.  So we use two systems, one system we use for
6  scheduling.  One system we use for the actual procedure
7  itself.  Both of those mirror some of the same
8  information, but one sytem, the S3 system that we use
9  schedules.  It's the first system we use to know what
10  case we are doing.  It's a communication tool between
11  the clinics and the doctors and the operating room.
12  That's how we get cases scheduled and booked.
13        Once that case is booked and scheduled, we use a
14  Centrix system that is an intra-op note that has
15  everything in the case, and then we take some of that
16  information and also input that in the S3 for numbers
17  purposes and just documenting in another area.
18    Q.  Explain to the members of the jury the
19  importance, if any, of documenting things.
20    A.  So in the medical field, documentation is
21  extremely important because that's your only recourse if
22  anything was to go wrong between the care of a patient
23  and your medical staff.  The common term is if it wasn't
24  documented, it didn't happen, is very commonly said.
25    Q.  Does JBER medical facility treat veterans as

1  well?

2      A.  We do.

3      Q.  Can you explain to the members how that works.

4      A.  So here at JBER, we have a joint venture hospital

5  so we work very closely with the VA hospital.  We share

6  a lot of services, a lot of medical providers.

7          In the operating room, we have VA staff that come

8  over and do surgeries and provide care also, kind of

9  meld with our staff and add assistance.

10     Q.  You mentioned a scheduling system, S3.  Can you

11 give us an idea of that overall system, please?

12     A.  The S3 is a system that is used between the

13 clinics and the doctors.  They will see a patient, they

14 will determine what the course of action is for whatever

15 condition they may have.  The determination is

16 determined, I assume, for them to have surgery, so they

17 will input that surgery -- or whoever they designate to

18 -- will input that surgical procedure in the S3 system

19 and then that notifies us.

20         We monitor that.  We use that for all our

21 scheduling.  We'll get the case ready, manage our

22 schedules so when the day comes up for the case, we will

23 coordinate with the patient the day before what time

24 their case is and go forward at that point.

25     Q.  What kind of experience do you have with that

1   system?

2       A.   I've worked with the system since I have been an

3   operating nurse, which has been over five years.

4       Q.   Does anybody have access to that system?

5       A.   It's a restricted system, so it's only given by

6   certain members -- or to certain members.

7       Q.   The information contained in that system, is that

8   information kept in the normal course of business?

9       A.   Yes.

10      Q.   When you pull the system up, what is it that you

11  are looking at?  Is it a table, a graph?  Explain what

12  kind of things you're actually seeing when you pull it

13  up.

14      A.   The home page that you look at, it gives you --

15  depending on how you have it set up, but most people

16  have it set up so you have a baby schedule to what your

17  surgical cases are looking at that day, has the number

18  of rooms that you have underneath, the patient names

19  just to kind of keep track of how you're going through

20  that day.

21           On the top field it's got links to a bunch of

22  different features that happen in S3.

23      Q.   Does S3 maintain any archival or historical

24  surgeries as well that JBER was involved in?

25      A.   It does.

1    Q.  Captain, I'm showing you Government Exhibit
2    No. 277 for foundation.  We're going to zoom in so you
3    can see it more clearly.
4        Are you familiar with this?
5    A.  I am.
6    Q.  How are you familiar with it?
7    A.  This is an auto trail for a patient that's out of
8    the S3 system.  This kind of lays out what happened
9    during the course of that S3 record.
10   Q.  This document that you're looking at, you're the
11   one that captured this information; is that correct?
12   A.  Yes.
13   Q.  And again, this information is kept in the normal
14   course of business for JBER?
15   A.  Yes.
16        MS. STEVENS:  Your Honor, at this stage, we'd
17   move to introduce Government Exhibit No. 277.
18        MR. COLBATH:  I don't have an objection to
19   that, Your Honor.
20        THE COURT:  277 is admitted.
21        (Exhibit No. 277 admitted.)
22   BY MS. STEVENS:
23   Q.  I would like to publish it.
24        There is a laser pointer up by you, Captain.
25   Okay.  Can you show us where -- whose document this

1    belongs to, what patient?

2       A.   So this record would be the auto trail up here is

3    for James Wells.   That's the name for the patient.

4       Q.   What other information is contained in this

5    document?

6       A.   So then you have the date of the surgery, which

7    is the date that the surgery actually happened.   This

8    date over here is the date that this record was

9    initiated.   This is the request for the surgical

10   procedure.   And the rest --

11      Q.   Let me stop you there.   Going back to the request

12   for the surgical procedure, what date was that request

13   made on?

14      A.   That is the 1st of February 2012.

15      Q.   Can you just point to where that is up there?

16   Thank you.

17           And then just briefly while I have you up there,

18   what other information does this document contain?

19      A.   This shows that the case actually occurred,

20   because this was all the intra-op information that was

21   entered in for that case.

22      Q.   Did you have an opportunity to review any other

23   business records related to this patient?

24      A.   Yes.

25      Q.   And what date was the consultation for this

1   surgery?

2       A.   If I remember right, it was the 30th of

3   January 2012.

4       Q.   Thank you, Captain.

5           MS. STEVENS:  Your Honor, that's all the

6   questions I have right now.

7           THE COURT:  Mr. Colbath?

8                      CROSS EXAMINATION

9   BY MR. COLBATH:

10      Q.   Good morning, sir.

11      A.   Good morning.

12      Q.   As I understand it, you have been running the

13  system that captures the scheduling and the medical

14  record there for five years, did you say?

15      A.   I have worked with the system for five years.  I

16  have had various experiences with that.  At my previous

17  base, I was one of the schedulers that worked primarily

18  with the system.  At this base, I mostly just utilize it

19  and use the information in it.

20      Q.   So the actual surgery for Mr. Wells back in 2012,

21  you wouldn't have had anything to do with the scheduling

22  or the actual surgical process back in 2012; you just

23  captured the records?

24      A.   For this case, yes.

25      Q.   I want to make sure I understood that, that you

1   were involved at this stage in records, not actual

2   medical procedures.

3       A.   For this case, I wasn't involved in his care.

4   I'm just retrieving information in the system, yes.

5       Q.   I appreciate that.  And Ms. Stevens was right,

6   you were going a little fast for me when you described

7   how the surgery gets from the doctor, if the doctor is

8   not part of the surgical center, to you folks to do an

9   actual surgery.  So I have a couple questions about

10  that.

11       First of all, you work with other agencies other

12  than the Air Force medically?

13      A.   Yes.  We take care of VA and active duty and

14  their dependents, but as far as medical providers, it's

15  only military providers and the VA that we work with.

16      Q.   And with respect to the VA then, if the VA

17  transfers a case to you folks, you take care of the

18  scheduling and the setup of the procedure that's

19  recommended or referred by the VA?

20      A.   Yes.

21      Q.   And the scheduling depends -- the timing of the

22  scheduling depends on what?

23      A.   Basically, it's between the provider and the

24  patient as to when they want that surgery done.  In the

25  case of an urgent medical condition, it would be sooner.

 1    If it's not as urgent, it could be more than a few weeks

 2    away.  So that's a discussion between the patient and

 3    the doctor.

 4        Q.  I'm going to show you Defense Exhibit No. 330, if

 5    we could.  And sir, in this case, is there anything on

 6    the document that you brought us here from your facility

 7    that shows who the doctor was in this case from the VA

 8    that referred the surgery to you all?

 9        A.  Can you repeat the question?

10        Q.  Yes.  Do you have anything from the record that

11    you brought or from your review of the record of this

12    case that identifies the doctor, the provider as you

13    described them?

14            Maybe we want to show him 277 back.  Let's look

15    at the other one first.

16            Is there anything on here that shows us the

17    provider that did the surgery?

18        A.  It doesn't show on here, but I was able to look.

19    When I looked at his record when I pulled this up, I did

20    see -- oh, wait a minute.  No, it doesn't show the

21    surgeon, but I know who the surgeon was from the record

22    I looked at.

23        Q.  Who was it?

24        A.  It was Dr. Simpson.

25        Q.  Do you know who did the referral?

1     A.   According to this, it was Joselyn Anthony that

2     entered in this referral, at least who entered it into

3     the S3 system.

4     Q.   Okay.  That's fine.  I'm going to show you

5     Defense Exhibit No. 233 -- excuse me, 330, Defense 330.

6          And you said in relation to that last -- the

7     scheduling process -- from your end of things, the

8     patient consultation was January 30th of 2011 is when

9     the patient would have been consulted?

10    A.   Uh-huh.

11         MS. STEVENS:  Your Honor, I believe that was a

12    misstatement by the defense.  It was 2012.

13    A.   Well, sorry.  It was 2012.

14    Q.   Yes.  Yes.  You and I were tracking.  I said the

15    wrong thing.  January 30, 2012.  Thank you, sir.

16         MR. COLBATH:  Your Honor, I'm going to move to

17    admit Exhibit No. 330, Defense 330.

18              THE COURT:  Any objection?

19              MS. STEVENS:  No objection.

20              THE COURT:  330 is admitted.

21              (Defense Exhibit No. 330 admitted.)

22    BY MR. COLBATH:

23    Q.   First of all, this is not a medical record from

24    your facility?

25    A.   Not that I can recognize, no.

1     Q.   If we can highlight the top, all of the top

2    there.

3          You see it relates to the same patient, Mr.

4    Wells?

5     A.   Correct.

6     Q.   And just the narrative paragraph, the action

7    taken paragraph.

8          And down here at the very bottom, that's the same

9    surgery that your records relate to and that ultimately

10   occurred at your facility?

11    A.   Yes.

12    Q.   You can take that down.

13         MR. COLBATH:   I don't have any other questions

14   for him.   Thank you.

15         THE COURT:   Anything further?

16         MS. STEVENS:   I have one question.

17                     REDIRECT EXAMINATION

18   BY MS. STEVENS:

19    Q.   Captain, up at the top there on the right-hand

20   side on the second row, fourth column, it says "URG."

21    A.   Okay.

22    Q.   What does that mean?

23    A.   Urgency, so how critical this case would be in

24   the opinion of the provider.

25    Q.   What does "routine" mean?

1     A.   That wasn't anything that couldn't have been put

2   off to a later time, kind of wasn't something that would

3   have caused immediate harm to the patient.

4              MS. STEVENS:   Thank you.   No more questions.

5              THE COURT:   Thank you, sir.   You may be

6   excused.

7              (Witness excused)

8              MR. SKROCKI:   Kelvin Skonberg.

9              THE COURT:   Good morning, Mr. Skonberg.   If you

10   could come back up to the witness stand and the clerk

11   will administer an oath to you.

12              (Oath administered to the witness)

13              DEPUTY CLERK:   For the record, can you please

14   state your full name and then spell your full name.

15              THE WITNESS:   Kelvin Skonberg, K-e-l-v-i-n,

16   S-k-o-n-b-e-r-g.

17          KELVIN SKONBERG, GOVERNMENT WITNESS, SWORN

18                       DIRECT EXAMINATION

19                           (Rebuttal)

20   BY MR. SKROCKI:

21     Q.   Good morning, Mr. Skonberg.   Welcome back.   A

22   couple of questions for you, sir.

23              If I could turn your attention to the morning of

24   April 12, 2012.   Could you tell the jury what time you

25   arrived for work that day?

1      A.   About ten until 7:00.

2      Q.   Were the doors open or did you have to let

3  yourself in by a lock or something like that?

4      A.   I had to unlock them.

5      Q.   You had to unlock them?

6      A.   Yes.

7      Q.   When you came in, did you begin work that

8  morning?

9      A.   Yes.

10     Q.   Did you go -- where did you go to begin your

11 work?

12     A.   To my corner desk.

13     Q.   Okay.  Did you do anything prior to starting

14 work?

15     A.   Unlock doors, turn the lights on, turn the

16 computer on.

17     Q.   Between the hours of, I guess, ten until 7:00 and

18 8:00 a.m. that morning, did you see anybody come in to

19 use the bathroom?

20     A.   No.

21     Q.   The men's bathroom specifically?

22     A.   No.

23     Q.   Were you at your work station that entire

24 morning?

25     A.   Yes.

1    Q.   Why do you stay at your work station like that?

2    A.   Because that's where I work.

3    Q.   And are you -- as part of your work, do you have

4  to keep eyes out for people coming into your office?

5    A.   Yes.

6    Q.   Why is that?

7    A.   To make sure that no stranger or anything can get

8  on the apron, onto the tarmac of the airport.

9    Q.   Why is that a concern?

10   A.   Because the FAA likes to test all of the

11 buildings out there once in a while to make sure that

12 nobody breaches the area.

13   Q.   With respect to the men's restroom in Servant

14 Air, did you hear any flushing coming from the men's

15 bathroom that morning?

16   A.   No.

17   Q.   If it had been flushed two or three times that

18 morning, would you have heard that?

19   A.   Yes.

20   Q.   Is that toilet a loud flusher?

21   A.   Yes.

22   Q.   And do you recall ever hearing any running water

23 or anything else coming from the men's bathroom that

24 morning?

25   A.   No.

1    Q.   Anybody report to you that the men's bathroom was

2    locked and they couldn't get into it for a long period

3    of time that morning of April 12th?

4    A.   No.

5         MR. SKROCKI:  That's all I have for

6    Mr. Skonberg.  Thank you.

7         THE COURT:  Mr. Colbath, go ahead, please.

8                    CROSS EXAMINATION

9    BY MR. COLBATH:

10   Q.   Sir, what do you do when you're at your computer

11   in the morning?

12   A.   Turning it on and getting ready for my day,

13   putting people on certain planes.

14   Q.   So you're doing active scheduling and

15   coordinating?

16   A.   Yeah, kind of like on a computer like you are

17   right there, yeah.

18   Q.   You sit at your desk and you have a computer

19   screen?

20   A.   Uh-huh.

21   Q.   If I recall from your earlier testimony, there's

22   -- when you walk in those double doors, your desk is in

23   a -- like there's a long L counter and your computer is

24   kind of in the corner?

25   A.   In the corner, yes.  I'm facing one door to my

1    left and one door would be ahead.

2        Q.   And sort of the door -- you can see your lobby

3    and your customer entrance as well?

4        A.   Yes.

5        Q.   You said one of the things you're concerned about

6    is make sure no one gets on the apron or the tarmac.

7    You can go right back through your back offices right

8    into the hangar and right out onto where your airplanes

9    are kept, right?

10       A.   If you have the key or the code.  We have to make

11   sure all the doors are locked so you can't get -- you

12   aren't authorized.  People cannot be out there.

13       Q.   Okay.  And so you didn't have passengers that

14   morning coming until close to the 8:00 flight?

15       A.   A little after 8:00, yeah.

16       Q.   You didn't have anybody in there hanging around

17   the lobby or waiting that would have utilized the

18   restroom, from what I understand, right?

19       A.   No.

20       Q.   So there wasn't anybody to worry about it being

21   locked for any period of time?

22       A.   No.

23       Q.   And you got there at ten until 7:00?

24       A.   Ten until 7:00, yeah.

25       Q.   Now, coming from your arctic entry, the way you

came in and through the double doors, pretty much
straight shot from those double doors to the men's room
back out those double doors?  Nobody would be anywhere
close to the tarmac or even the doors that led to the
tarmac from that area, right?

A.   We did have a pilot come early that morning and
was out in the hangar getting his plane ready.

Q.   Right, but I mean let's say I walked into your
building and I walked in the same way that you walked in
that morning, and I just walked to the restroom and then
I walked back out the same door I came in, I didn't go
anywhere near any of the doors that led out to the
tarmac?

A.   No.

Q.   I would have had to get by you to get out there?

A.   Correct.

MR. COLBATH:  That's all I have.

THE COURT:  All right.  Follow-up at all?

MR. SKROCKI:  No further questions.

THE COURT:  Thank you, sir.  You may be
excused.

(Witness excused)

THE COURT:  I wanted to take up one matter very
briefly with counsel, so Mr. Skonberg can go on his way.
I'm going to excuse the jury briefly here and we'll get

1   you back.  Please leave your notepads here.  Remember my

2   admonition not to discuss the case.

3          (Jury absent)

4          THE COURT:  All right.  Please be seated,

5   everyone.

6          I wanted to state part of my ruling with regard

7   to the rebuttal, and that was that Sonja looked,

8   searched for the term "clang" or "loud noise" or "bell"

9   by the expert and Mr. Colbath was correct, or Mr. Camiel

10  I believe was -- Mr. Colbath, give credit where it's

11  due -- there was no mention during the testimony in

12  front of the jury of that topic, only when we were

13  outside the presence of the jury.

14         And I wanted to say that before Mr. Mills was

15  called so that neither side would say, "We had expert --

16  or we had a person have an opinion about a loud noise."

17  This is the tire guy.  I'm sorry.  It was with Mr. Rudat

18  that I was concerned.  Anyway, he's not testifying, but

19  I did want to make clear that that was part of the

20  reason with regard to Mr. Rudat and there was no expert

21  testimony on the clang.

22         MR. SKROCKI:  I understand.  Thank you.

23         THE COURT:  In any event, that would be helpful

24  as well in any closing argument.  Are we ready to have

25  Mr. Mills testify?

```
 1            MR. SKROCKI:  Yes.

 2            THE COURT:  Yes.  Very good.

 3            (Pause)

 4            (Jury present)

 5            THE COURT:  Please be seated, everyone.

 6   Except, sir, if you would stand, the clerk will

 7   administer an oath to you.

 8            (Oath administered to the witness)

 9            DEPUTY CLERK:  For the record, can you please

10   state your full name and then spell your full name.

11            THE WITNESS:  Brett Ashley Mills, B-r-e-t-t,

12   A-s-h-l-e-y, M-i-l-l-s.

13        BRETT ASHLEY MILLS, GOVERNMENT WITNESS, SWORN

14                     DIRECT EXAMINATION

15                        (Rebuttal)

16   BY MR. SKROCKI:

17     Q.  Good morning, Mr. Mills.

18     A.  Good morning, sir.

19     Q.  I want to ask you some questions with respect to

20   the nail you examined and spoke about last week, I

21   believe, in front of the jury.

22     A.  Yes, sir.

23     Q.  You had occasion to examine that nail as part of

24   your investigation into this case, yes?

25     A.  Yes, when it was in the laboratory, I did a full
```

1  examination on the nail and the tire.

2      Q.  And you took photographs of the nail?

3      A.  Yes, sir, I did.

4      Q.  And I want to ask you specifically with respect

5  to the tool marks that you found on the nail.  Can you

6  tell the jury the tool marks that you found pending your

7  examination?

8      A.  So as I examined the nail, I was looking at

9  imperfections on the nail itself, whether it was the

10  head or the shaft of the nail.  I noted what I

11  previously talked about, the arc from what appeared to

12  be a powder-actuated or a pneumatic nail gun, and then

13  there was some abrasion marks on the side of the head

14  and then there was some score marks along the surface of

15  the shaft that ran perpendicular.

16      Q.  Do you recall -- with respect to those score

17  marks, can you describe to the jury what those were?

18      A.  If you could picture in your head a piece of

19  wood, say, a pencil or whatever, and you just take

20  something, a knife or a sharp object and just keep

21  grinding it down and you start creating lines and

22  grooves inside, that's what I refer to as score marks

23  along the surface.

24      Q.  And are you familiar with what multi-tools are,

25  what a multi-tool is?  Like a Gerber or Leatherman, that

 1   type thing?

 2       A.   Yes, sir, I know what they are.

 3       Q.   With respect to the nail you examined, did you

 4   see or have occasion to notice or observe any score

 5   marks consistent with application of a multi-tool or

 6   some sort of gripping device?

 7       A.   The score marks, I couldn't tell you what the

 8   source of it would have been.  A gripping tool would not

 9   create score marks, if that's what you're asking.

10       Q.   Okay.  With respect to a plier-type device, would

11   they leave a mark if it was used on a nail?

12       A.   If someone used it to grip to hold it tight, yes,

13   sir, there would be probably impression marks on the

14   surface, unless they slipped, and then it would

15   basically create striations along the surface somewhere.

16       Q.   Why would that be?

17       A.   Why would there be striations?

18       Q.   Yeah, why would it leave an impression?

19       A.   Oh, so if you -- best analogy, if you picture

20   someone trying to manhandle a doorknob, and they had a

21   pair of Channellocks, those are the adjustable jaw

22   pliers, and they come in and, this is your doorknob, and

23   they grab and they fix.

24            Well, that surface has teeth.  And manufacturers

25   when they -- well, first, let's start out with bar

1  stock, stamp it or mill it.  Then they will cut the

2  teeth into the jaws of the pliers.  And then as the

3  final step, they will heat treat it, and that hardens

4  the metal because you don't want your tools to break or

5  snap while you're working on it.

6      So those marks will be transferred to the surface

7  of that doorknob.  So you would have a negative

8  impression or an impression itself of the teeth left on

9  it because most doorknobs are usually made out of a

10 brass, softer material, or if somebody didn't grip it

11 tight enough and they rotated it the teeth would then

12 create striations on both sides of the doorknob as it

13 was twisted around.

14    Q.  Did you see anything of that nature on this nail?

15    A.  No, sir, I didn't.

16    Q.  Are you familiar with a Leatherman tool?

17    A.  Yes, sir.

18    Q.  Are you familiar with the plier aspects of a

19 Leatherman tool?

20    A.  Yes, sir.

21    Q.  Did you see anything with respect to the

22 application of a Leatherman plier on this nail?

23    A.  As far as gripping marks, no, sir.

24    Q.  How about as far as striation marks or anything

25 else like that?

 1     A.   No, sir, there was nothing on the side of the
 2   head or along the shaft.
 3          MR. SKROCKI:  Those are all the questions I
 4   have for Mr. Mills.
 5          THE COURT:  Mr. Camiel, go ahead, please.
 6                    CROSS EXAMINATION
 7   BY MR. CAMIEL:
 8     Q.   Good morning, Mr. Mills.
 9     A.   Good morning, sir.
10     Q.   You talked to us, I guess it was probably a
11   couple weeks ago now, about seeing marks on the head of
12   the nail that you associated with a nail gun, right?
13     A.   That are consistent with, yes.
14     Q.   Consistent with, right.  You also saw on the
15   shaft of the nail tool marks, didn't you?
16     A.   Along the -- if we're talking about right below
17   the head, yes, sir.
18     Q.   And those tool marks that you saw, you didn't
19   know what the source of those was; is that right?
20     A.   That is correct.
21     Q.   In fact, you couldn't rule in or rule out
22   anything, you just didn't know the source, what made
23   them?
24     A.   That is correct.
25     Q.   Now, in terms of gripping devices, were you

 1   provided with any kind of a gripping device to compare

 2   to the marks that you saw on the nail?

 3       A.   No, sir, I didn't -- well, I wasn't provided any

 4   gripping tools, but I also didn't find any marks that

 5   were consistent with a gripping-type action.

 6       Q.   I understand.  I understand.  But you weren't

 7   provided with anything to use to try to compare to the

 8   marks on the nail; is that right?

 9       A.   Yes, sir.

10       Q.   And you would agree that there are all kinds of

11   different multi-tool devices, Leatherman-type devices,

12   right?

13       A.   Oh, yes, sir, there's a wide variety.

14       Q.   And Leatherman is a brand name, but there are

15   many other brands of similar devices?

16       A.   Yes, sir.  Leatherman is just more popular.

17       Q.   Sure.  And some of them have -- some of the

18   gripping devices have smooth faces; is that right?

19       A.   For Leatherman, no, sir.  Most of your

20   multi-tools will have teeth cut in and then there is

21   usually either serrations for the tip.  Most of your

22   smooth-jawed tools are usually like in the electrician

23   type so that you're not marring the insulation.

24       Q.   Sure.  And some of the multi-tool devices have

25   very fine teeth; is that right?

1     A.   Yes, sir, that's usually at the tip.

2     Q.   And some have deeper teeth that are sharper; is

3  that right?

4     A.   You mean like -- what do you mean sharper, to

5  cut, or are you talking about the angle?

6     Q.   Larger teeth inside the tool.

7     A.   Yes, sir, the teeth placement is a

8  characteristic, so you might have some that are very

9  narrow, and then, say, if you get into a pipe wrench or

10  large Channellocks, you could have a very big gap

11  between the teeth themselves.

12     Q.   The type of mark that a tool might leave on

13  something like a nail in part depends on how the tool is

14  held; is that right?

15     A.   Are you talking about how it's held in

16  relationship to the object?

17     Q.   Yes.

18     A.   Yes, sir.

19     Q.   All right.  You could hold a gripping device so

20  that it was flush, the faces were flush against the

21  nail, right?

22     A.   So are we talking about a shaft?

23     Q.   Sure.

24     A.   So the shaft, yes, sir, you would have two

25  opposable jaws that would come in and grip.

1    Q.  If it was held at an angle one way or the other,
2    it would create a different kind of mark; is that right?
3    A.  You wouldn't -- if I'm catching what you're
4    saying, so if you go look at my fingers and I'm
5    articulating them one sitting higher than the other, you
6    would have -- you wouldn't have the entire surface area
7    coming into contact, but eventually, depending on the
8    pressure, it eventually will try and flatten itself out
9    because that's going to be the least resistance.
10   Q.  Sure.  But at the end of the day, you saw marks
11   on the shaft of the nail that you agree are tool marks,
12   right?
13   A.  Yes, sir.
14   Q.  And by saying that they are tool marks, it means
15   some kind of tool left those marks on the shaft of the
16   nail?
17   A.  That is correct.
18   Q.  You just can't say what it is?
19   A.  No, sir.
20   Q.  I'm going to have you take a look at defense
21   exhibits.  Let's start with 321.  Does that look like a
22   picture of the nail that you examined?
23   A.  Yes, sir, it does.
24        MR. CAMIEL:  I would offer Defendant's 321.
25        MR. SKROCKI:  Brief voir dire.

1          THE COURT:  All right.

2          MR. SKROCKI:  Did you take that photograph?

3          THE WITNESS:  I don't believe I did, no, sir.

4    I don't remember that one.

5          MR. SKROCKI:  Do you want to go through the

6    rest?  If we could stipulate he didn't take the rest of

7    those.

8          MR. CAMIEL:  Sure.

9          MR. SKROCKI:  We would stipulate that Mr. Mills

10   didn't take these photographs.  We otherwise have no

11   objection.

12         THE COURT:  What's the number?

13         MR. CAMIEL:  Defendant's 321, 322, 323, 324,

14   325, 326, and 327.

15         THE COURT:  No objection to those?

16         MR. SKROCKI:  No, ma'am.

17         THE COURT:  Those can all be admitted.

18         (Defense Exhibit No. 321 - No. 327 admitted.)

19   BY MR. CAMIEL:

20     Q.  Why don't we put those up on the screen.

21         So that shows a profile view of both the head and

22   the upper part of the shaft of the nail; is that right?

23     A.  That is correct, yes, sir.

24     Q.  And then if we could go to the next one.  This is

25   322.

1          That's just another view of the same nail; is
2     that right?
3          A.   Yes, sir, it's just moving down the shaft.
4          Q.   All right.  And go to 323.
5               And by the way, these are the marks you have been
6     telling us about?
7          A.   Yes, sir.  Those are the ones that are up near
8     the head of the nail, yes, sir.
9          Q.   And then 324, 325, 326, and 327.  Now, did you
10    take any photos of the profile view of the nail?
11         A.   Yes, sir, I did take one.  It's in my notes.
12         Q.   But just one?
13         A.   Yes, sir.
14         Q.   Okay.  Did you write any reports related to the
15    markings that you saw on the side of the nail that we're
16    looking at here?
17         A.   Yes, sir, that would be the report when I was
18    talking about the score marks.
19         Q.   And in addition to these marks that are near the
20    top, along the shaft of the nail, you saw some -- what
21    you're calling a score mark; is that right?
22         A.   Yes, sir, along the surface.
23         Q.   And you couldn't tell us what caused that either?
24         A.   No, sir.
25              MR. CAMIEL:  That's all I have.  Thank you.

1          THE COURT:  Follow-up, Mr. Skrocki?

2          MR. SKROCKI:  Can we have a brief sidebar just

3    to advance some questions for Court and counsel's

4    consideration?

5          THE COURT:  Certainly.

6          (Begin bench conference.)

7          MR. SKROCKI:  So in response to the questions

8    about, "Were you asked to examine the nail with respect

9    to a tool mark," this only came up with Mr. Wells'

10   testimony, so I want to inquire about when we first

11   asked him to examine that.  A fair response, this came

12   up since Mr. Wells' testimony, so I want to inquire

13   about when we first asked him to examine that.  We had

14   no advance notice of this so no examination was done.  I

15   think that's a fair question.

16         MR. CAMIEL:  So the question would be when was

17   he first asked --

18         MR. SKROCKI:  When was he first asked about

19   whether there was a tool mark, Leatherman tool mark on

20   the nail.

21         MR. CAMIEL:  I don't have any problem with

22   that.  That's fine.

23         THE COURT:  Very good.

24         (End bench conference.)

25                    REDIRECT EXAMINATION

1   BY MR. SKROCKI:

2       Q.  Mr. Mills, you were asked a question about

3   whether you had ever done any exam on that nail with

4   respect to a tool mark from a multi-tool?

5       A.  Yes, sir.

6       Q.  When were you first asked to do that, to -- let

7   me put it this way:  We asked you yesterday or last

8   night to come back and testify with respect to the

9   Leatherman tool mark issue, correct?

10      A.  Correct.

11      Q.  And you just testified that a gripping tool did

12  not cause the tool mark?

13      A.  Which tool mark?

14      Q.  The tool marks on the nail.

15      A.  No, sir, I didn't see anything that was

16  consistent with a gripping tool.

17      Q.  Regardless of the angle?

18      A.  Regardless of the angle.

19          MR. SKROCKI:  That's all I have.  Thank you.

20          THE COURT:  Follow-up at all?

21          MR. CAMIEL:  No, nothing else.

22          THE COURT:  Thank you, sir.  You may be

23  excused.

24          (Witness excused)

25          THE COURT:  All right.  Any additional

1  rebuttal?

2          MR. SKROCKI:  No.  We rest our rebuttal.

3          THE COURT:  Surrebuttal?

4          MR. COLBATH:  No.  No, Your Honor.  In light --

5  no.

6          THE COURT:  Very good.  Then ladies and

7  gentlemen, that concludes the evidence in the case.  And

8  I spoke yesterday with the lawyers because we

9  anticipated that this would occur at about this time.

10 And they agreed and I was persuaded that it would make

11 the most sense for you to have closing arguments on

12 Monday morning.  And the reason why is that each side is

13 going to have up to one hour and 45 minutes for their

14 closing argument, and so if we started now, then you

15 would get the case in the middle of the afternoon and

16 then it would be -- you would begin deliberations and

17 come back in three days.  So the sense was that it makes

18 more sense for them to have closing arguments Monday

19 morning.

20          And they assured me that that would result in

21 their ability to spend these next few days really

22 preparing closing arguments for you that would be more

23 useful than if we proceeded immediately to that.  So I

24 was persuaded.  I hope you are too that that is a wise

25 path for us to follow.  I'm going to finish up the jury

instructions with the lawyers today, so we will be ready
to go at 9:00 on Monday morning.

At that time, we will begin with me reading a
long series of instructions. You will have a set to
read along with while I do that. I'll also have the
clerk hand out the verdict form at that time so you can
see what it is that you are being tasked to complete.
And then we'll have the closing arguments and conclude
those probably shortly after lunch. I'll have a few
more instructions, and then the case will be submitted
to the jury. We'll excuse the alternates at that time
as well.

The good news I have is that the district court
will provide lunch to jurors that are in deliberations,
and I will move up the date to include Monday, so I will
arrange that with our jury clerk and she'll come in and
take an order from you for lunch on that day.

So please remember my admonition not to discuss
the case with family or friends. You are the
individuals tasked with deciding this case. Don't do
any research. Don't read anything about anything that
relates to this case. And have a pleasant weekend.
We'll see you Monday at 9:00 a.m.

(Jury absent)

THE COURT: Please be seated, everyone. I want

```
 1   to take up these instructions.  Does everybody have
 2   their set with them now and I'll point out a couple
 3   things and then we'll get them finalized.
 4           Mr. Colbath?
 5           MR. COLBATH:  Your Honor, I have the
 6   preliminary closings and --
 7           THE COURT:  The final closing and the verdict
 8   form?
 9           MR. COLBATH:  Well, I think so.
10           THE COURT:  Why don't we take just a moment.
11           MR. COLBATH:  I do have the final closings.  So
12   I have the preliminary closings and the final closings
13   with me that are now numbered.
14           THE COURT:  I don't have the verdict form.
15   Let's take a very short break, come back in about five
16   minutes.
17           (Recessed from 9:51 a.m. to 9:58 a.m.)
18           (Jury absent)
19           THE COURT:  All right.  Let's get through these
20   here.  So looking first at the preliminary, it should
21   say 313, not 318, so we'll fix that.
22           Then moving on, I'm just going to tell you what
23   I observed when I went through it to change, most of
24   which I don't think will be controversial.
25           Page five, delete the "and" after one.
```

1          And moving on to page -- it was -- we're going

2    to take out the page numbers on the bottom so it just

3    refers to the instruction up at the top.

4          The next one I was going to tweak was 15, just

5    to get the plural.  "You have heard evidence from

6    several witnesses, who, because of their education

7    and/or experience, were permitted to state opinions and

8    the reasons for their opinions."  That's how I would

9    propose to rewrite that first sentence just to be

10   grammatically improved.

11         Moving on, Instruction 17.  I think Emily may

12   have e-mailed you about this.  I don't know, but I would

13   propose to change the fourth element.  "The killing

14   occurred on federal property," which corresponds to the

15   stipulation.

16         MS. SHERMAN:  Your Honor, that's fine.  I think

17   no matter what they should be consistent between Count 1

18   and Count 2.  I pulled the pattern.  The pattern says

19   the specific federal jurisdiction, so I think federal

20   property is fine or Coast Guard COMMSTA, whatever the

21   Court prefers.

22         THE COURT:  Federal property, any disagreement?

23         MR. COLBATH:  No.  I agree they should be

24   consistent.

25         THE COURT:  So both would then read "federal

1    property," Ms. Sherman?

2            MS. SHERMAN:  Yes.

3            THE COURT:  Very good.

4            Then the next one -- that would be the same

5    then for both 17 and 18.

6            Then moving on, I believe that might be -- oh,

7    the next question was with instruction 21 and 22, the

8    second element.  This is from the indictment, "capable

9    of firing .44-caliber ammunition" is not an element of

10   the offense but it's in the indictment.  Do you see that

11   in the first and second lines?

12           What's the government's position on that?

13           MS. SHERMAN:  I think it should say "knowingly

14   used and carried a firearm during and in relation to

15   that crime."  I think that's consistent with the

16   pattern.

17           THE COURT:  Any disagreement?

18           MR. COLBATH:  No.

19           THE COURT:  So that would be deleted then both

20   on 21 and 22.

21           All right.  And then I believe that was it.

22   Oh, page -- instruction 25, add an "S" to crime on the

23   second line.  "Evidence has been admitted that the

24   defendant was not present at the time and place of the

25   commission of the crimes," instead of crime.  See that?

1          MR. COLBATH:  Yep.

2          MS. SHERMAN:  And then at the end of the

3     paragraph as well.

4          THE COURT:  Yes.  Thank you.  I didn't catch

5     that.  Yes.

6          I debated deleting that last sentence, the last

7     paragraph which is a sentence.

8          MR. COLBATH:  It's part of the pattern.

9          THE COURT:  Is it part of the pattern?

10         MS. SHERMAN:  It is.  I think the Court should

11    change it to "crimes" though.

12         THE COURT:  Keep it in, but add the "S."  Those

13    were the only changes that I had to the preliminary.

14    No changes in the final.

15         We will add 2.3, which is the stipulations

16    instruction.  And that should do -- that should complete

17    the instructions here.

18         So any additional changes that the government

19    would propose?

20         MS. SHERMAN:  No, Your Honor.  Thank you.

21         THE COURT:  Mr. Colbath, any additional

22    changes?

23         MR. COLBATH:  Your Honor, there were -- I

24    didn't have the verdict form with me, but you made no

25    changes or modifications?

1          THE COURT:  I made no changes.  I did review

2    that and no changes.

3          MR. COLBATH:  The defense agrees with the

4    changes noted by the Court and does not have any

5    additional changes, nor additional instructions to

6    propose.

7          THE COURT:  All right.  Very good.  Then we

8    will get you a final set e-mailed this afternoon.  It

9    will have the "draft" deleted, the page numbers at the

10   bottom deleted, but other than that it will have the

11   changes I've put on the record here today and that

12   should be it.

13         Anything else to take up at this time?

14         MS. SHERMAN:  No, Your Honor.

15         THE COURT:  Mr. Skrocki, anything?

16         MR. SKROCKI:  No, Your Honor.  Thank you.

17         MS. SHERMAN:  Does the Court want us here at

18   8:30 Monday with the jury coming at 9:00?

19         THE COURT:  Do you anticipate issues?  I'm

20   thinking we have been through them all.

21         MR. COLBATH:  I don't anticipate anything, Your

22   Honor.  I mean we would obviously alert the Court, but

23   we don't anticipate anything, just doing preparations.

24         THE COURT:  I think 8:45 ready to go would be

25   ample time.

1          THE COURT:  Anything else, Mr. Colbath, from

2    the defense?

3          MR. COLBATH:  No, Your Honor.  I didn't know --

4    I had originally agreed with the government that an hour

5    and 45 was necessary.  We would be willing to do our

6    closing in an hour and a half if it helps or if it's --

7    if it matters.

8          THE COURT:  It doesn't matter to me.  What's

9    the government --

10         MR. SKROCKI:  Leave the amount and if the

11   parties don't need it they don't take it.

12         THE COURT:  That's what we'll do.  See you all

13   Monday morning.  We'll go off record at this time.

14         DEPUTY CLERK:  All rise.  Court is in recess

15   until 8:45 a.m. Monday morning.

16              (Recessed at 10:04 a.m.)

17                       CERTIFICATE

18     I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
19   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20   original stenographic record in the above-entitled
     matter and that the transcript page format is in
21   conformance with the regulations of the Judicial
     Conference of the United States.
22
       Dated this 18th day of June, 2020.
23

24
                         /s/ Sonja L. Reeves
25                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER