```
1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5   vs.                       )    CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7          Defendant.         )
    _____)
8

9              TRANSCRIPT OF TRIAL BY JURY - DAY 20
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10               October 7, 2019; 8:52 a.m.
                      Anchorage, Alaska
11
    FOR THE GOVERNMENT:
12          Office of the United States Attorney
            BY:  STEVEN SKROCKI
13          BY:  CHRISTINA M. SHERMAN
            BY:  KELLEY L. STEVENS
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16  FOR THE DEFENDANT:
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22  _____

23                 SONJA L. REEVES, RMR-CRR
                  Federal Official Court Reporter
24                 222 West 7th Avenue, #4
                   Anchorage, Alaska 99513
25        Transcript Produced from the Stenographic Record
```

I N D E X

October 7, 2019, Trial Day 20

Closing Argument by Government          Page 26

Closing Argument by Defense            Page 73

Rebuttal Closing by Government         Page 159

```
 1              (Call to Order of the Court at 8:52 a.m.)

 2              (Jury absent)

 3              DEPUTY CLERK:  All rise.  Her Honor, the Court,

 4   the United States District Court for the District of

 5   Alaska is now in session, the Honorable Sharon L.

 6   Gleason presiding.

 7              Please be seated.

 8              THE COURT:  Good morning.  Please be seated.

 9   We're on record here in the *Wells* case, and I understand

10   there is some technical issues.  I think IT is --

11              MR. COLBATH:  We think we have got it worked

12   out.

13              THE COURT:  Very good.  Mr. Skrocki, anything

14   to take up?

15              MR. SKROCKI:  Just one matter, Your Honor.

16   From the conversation we had, the limiting instruction

17   from the opening statement, the argument about it taking

18   seven years to get to today we don't think is

19   appropriate or relevant or should be permissible, so we

20   would be asking the Court to issue an order that the

21   length of time -- because of the length of time it has

22   taken to get here due to the conviction and the reversal

23   and the time it's taken to get to this stage is not

24   appropriate for jury to consider and is really

25   irrelevant and also is more detrimental to the
```

1    government at this point than the defense.

2          THE COURT:  Mr. Colbath?

3          MR. COLBATH:  Your Honor, my position is that

4    I'm not going to use the exact seven-year timeframe.  I

5    think it's certainly relevant for me to comment upon the

6    amount of time the government had to do its

7    investigation or has had to do its investigation,

8    especially in light of the fact that much evidence was

9    presented of things that were developed or discovered or

10   investigated within the last couple of years.

11         It's not certainly any kind of theme I'm

12   running.  It's not going to occupy any great portion of

13   anything I have to say, but that's my position.

14         THE COURT:  Mr. Skrocki?

15         MR. SKROCKI:  Well, it goes both ways, Judge.

16   Both sides have had occasion and opportunity to

17   investigate and provide new evidence.  I don't think the

18   bulk of the evidence that we presented here has been

19   newly created.  I think Mr. Becker may have been the

20   only person with knowledge, specialized knowledge.  I'm

21   trying to stay away from the word "expert" and train

22   myself from not doing that anymore.

23         THE COURT:  It's okay.

24         MR. SKROCKI:  Nevertheless, I don't believe

25   that that warrants reference under these circumstances

as to the amount of time.  It's clearly detrimental and
we have really no way of rebutting that besides from
saying -- almost burden shifting that the defense has
their own experts, they could have done their own
investigation on this.  They couldn't have stipulated to
the amounts of time we've had for continuances.

So I really think it's fundamentally unfair to
approach it and it really isn't relevant.

THE COURT:  I will allow -- I mean it is seven
years, and the parties have certainly talked about
events that occurred in 2012.  And so I was of the view
that the emphasis in the opening was excessive on that
point, and I am not going to prohibit, obviously, the
parties talking about the fact that it's been seven
years, but I don't want an emphasis that occurred during
the opening leaving an implication that the government
could and should have been doing investigation for seven
years.  That I think was what was troublesome in the
opening from the Court's perspective, and so that seemed
to be the concern.

So I understand Mr. Colbath plans to talk about
that the government had a seven-year period in which to
investigate.  I'm not going to prohibit that, but I
certainly don't hear and expect it to be emphasized.

Mr. Colbath, questions or clarification on

1  that?

2          MR. COLBATH:  Not at all.

3          THE COURT:  And I do -- it's fair for the

4  government, not to burden shift, but to point out that

5  the defense had that opportunity as well.  That's my

6  understanding of the case law is that it's inappropriate

7  to comment if the defendant had elected to remain silent

8  that cannot be commented on, but the prosecution can

9  comment on the defense as well and the case that was put

10  on.

11          MR. SKROCKI:  We understand.  Thank you.

12          THE COURT:  Very good.  Any other topics?  The

13  instructions, we didn't staple them in an abundance of

14  caution, but I'm hearing we can now staple them.

15  Nothing further to add to the jury instructions?

16          MR. COLBATH:  Not on the instructions.

17          THE COURT:  Mr. Colbath, go ahead.

18          MR. COLBATH:  Your Honor, at this time I would

19  renew the motion that we made at the close of the

20  government's case under Rule 29 in and for the same

21  reasons, with the addition of the evidence presented

22  during the defense's case in chief.

23          We would move for a judgment of acquittal on

24  all counts in and for the same reasons, and that is that

25  we believe that the government has not proven beyond a

reasonable doubt, and to even under the standard under
Rule 29 that insufficient evidence has been presented to
sustain a verdict by any reasonable measure on all the
counts. So I wanted to renew that motion.

THE COURT: And certainly preserved for the
record. I do intend to reserve decision again on the
renewed motion and submit the case to the jury and then
decide the motion in the event that the jury returns a
verdict of guilty or is discharged without having
returned a verdict, as is expressly authorized by
Federal Rule of Criminal Procedure 29(b). So that is
then reserved and should be noted in the minutes that
the motion is reserved.

MR. COLBATH: Thank you, Your Honor.

THE COURT: Anything else before we go further?

MR. SKROCKI: Not from us, Your Honor.

MR. COLBATH: Not from us.

THE COURT: When we begin here, I'll read the
instructions, and then we'll proceed directly to the
government's closing. And Mr. Skrocki, I would ask you
to pick a time that's somewhere between an hour and 15
total, including my instruction reading, for a break for
the jury. Not to go more than -- see what I'm saying?

MR. SKROCKI: I do understand. If I stay
consistent, I should be about an hour-ten, hour-eight,

1   something like that.

2          THE COURT:  That should be right about right

3   then.  I anticipate maybe 15 minutes of reading, 20 at

4   most.  That's excellent.

5          MR. SKROCKI:  We'll keep an eye on it

6   nonetheless.

7          MR. COLBATH:  And then we'll have a break to

8   make sure our technology --

9          THE COURT:  Correct.  We'll have a break before

10  we hear from the defense.

11         We'll go off record.

12         DEPUTY CLERK:  All rise.  Court stands in a

13  brief recess.

14         (Recessed from 8:59 a.m. to 9:10 a.m.)

15         (Jury present)

16         DEPUTY CLERK:  Court is again in session.

17         THE COURT:  All right.  Good morning, everyone.

18  Please be seated.

19         We are back on record here in the *United States*

20  *versus Wells* case.  And ladies and gentlemen, the

21  evidence concluded last week, as you know, and so now at

22  this point I'm going to read you some closing jury

23  instructions.  Madam Clerk will hand those out.  And you

24  will note it says "Preliminary Closing Jury

25  Instructions."  This is the bulk of the instructions

1    that I'm going to read to you now.  There is a small set

2    of final closing jury instructions that I'll give later

3    on today after both sides have concluded their closing

4    arguments.

5         So I hand out these instructions to you.  You

6    can read along with them.  You will have a set.  Each of

7    you will be able to keep a set, take back to the jury

8    room later today.

9         And if it helps to read along, great.  If it's

10   easier to process by listening, that's fine too.

11        We'll begin with Instruction No. 1.  Members of

12   the jury, now that you have heard all the evidence, it's

13   my duty to instruct you on the law that applies to this

14   case.  Each of you will be provided a copy of these

15   instructions in the jury room for you to consult.

16        It's your duty to weigh and to evaluate all the

17   evidence received in the case, and, in that process, to

18   decide the facts.  It's also your duty to apply the law

19   as I give it to you to the facts as you find them,

20   whether you agree with the law or not.

21        You must decide the case solely on the evidence

22   and the law.  Do not allow personal likes or dislikes,

23   sympathy, prejudice, fear or public opinion to influence

24   you.  You should also not be influenced by any person's

25   race, color, religion, national ancestry or gender.  You

will recall that you took an oath promising to do so at
the beginning of the case.

You must follow all of these instructions and
not single out some and ignore others.  They are all
important.  Please do not read into these instructions
or into anything I may have said or done any suggestion
as to what verdict you should return.  That is a matter
entirely up to you.

Instruction No. 2:  The indictment is not
evidence.  The defendant has pleaded not guilty to the
charges.  The defendant is presumed to be innocent
unless and until the government proves the defendant
guilty beyond a reasonable doubt.

In addition, the defendant does not have to
testify or present any evidence.  The defendant does not
have to prove innocence.  The government has the burden
of proving every element of the charges beyond a
reasonable doubt.

Instruction No. 3:  The defendant has
testified.  You should treat this testimony just as you
would the testimony of any other witness.

Instruction No. 4:  Proof beyond a reasonable
doubt is proof that leaves you firmly convinced the
defendant is guilty.  It's not required that the
government prove guilt beyond all possible doubt.

1        A reasonable doubt is a doubt based upon reason
2   and common sense and is not based purely on speculation.
3   It may arise from a careful and impartial consideration
4   of all the evidence or from lack of evidence.

5        If, after a careful and impartial consideration
6   of all the evidence, you are not convinced beyond a
7   reasonable doubt that the defendant is guilty, it is
8   your duty to find the defendant not guilty.

9        On the other hand, if, after a careful and
10  impartial consideration of all the evidence, you are
11  convinced beyond a reasonable doubt that the defendant
12  is guilty, it is your duty to find the defendant guilty.

13       Instruction No. 5:  The evidence you are to
14  consider in deciding what the facts are consists of:

15       One, the sworn testimony of any witness.

16       Two, the exhibits received in evidence.

17       And three, any facts to which the parties have
18  agreed.

19       Instruction No. 6:  The parties have agreed to
20  certain facts that have been placed in evidence as
21  Exhibit No. 256.  You must therefore treat these facts
22  as having been proven.

23       Instruction No. 7:  In reaching your verdict
24  you may consider only the testimony and exhibits
25  received in evidence.  The following things are not

1   evidence and you may not consider them in deciding what
2   the facts are:

3           One, questions, statements, objections and
4   arguments by the lawyers are not evidence.  The lawyers
5   are not witnesses.  Although you must consider a
6   lawyer's questions to understand the answers of a
7   witness, the lawyer's questions are not evidence.

8           Similarly, what the lawyers have said in their
9   opening statements and what they will say in their
10  closing arguments and at other times is intended to help
11  you interpret the evidence, but it is not evidence.  If
12  the facts as you remember them differ from the way the
13  lawyers state them, your memory of them controls.

14          Two, any testimony that I have excluded,
15  stricken or instructed you to disregard is not evidence.
16  In addition, some evidence was received only for a
17  limited purpose.  When I have instructed you to consider
18  certain evidence in a limited way, you must do so.

19          And three, anything you may have seen or heard
20  when the court was not in session is not evidence.  You
21  are to decide the case solely on the evidence received
22  in the trial.

23          Instruction No. 8:  Evidence may be direct or
24  circumstantial.  Direct evidence is direct proof of a
25  fact, such as testimony by a witness about what that

witness personally saw or heard or did.  Circumstantial

evidence is indirect evidence.  That is it is proof of

one or more facts from which you can find another fact.

You are to consider both direct and

circumstantial evidence.  Either can be used to prove

any fact.  The law makes no distinction between the

weight to be given to either direct or circumstantial

evidence.  It is for you to decide how much weight to

give to any evidence.

Instruction No. 9:  In deciding the facts in

this case you may have to decide which testimony to

believe and which testimony not to believe.  You may

believe everything a witness says or part of it or none

of it.

In considering the testimony of any witness you

may take into account:

One, the opportunity and ability of the witness

to see or hear or know the things testified to.

Two, the witness's memory.

Three, the witness's manner while testifying.

Four, the witness's interest in the outcome of

the case, if any.

Five, the witness's bias or prejudice, if any.

Six, whether other evidence contradicted the

witness's testimony.

1          Seven, the reasonableness of the witness's

2     testimony in light of all the evidence.

3          And eight, any other factors that bear on

4     believability.

5          Sometimes a witness may say something that's

6     not consistent with something else he or she said.

7     Sometimes different witnesses will give different

8     versions of what happened.  People often forget things

9     and make mistakes in what they remember.

10          Also, two people may see the same event but

11     remember it differently.  You may consider these

12     differences, but do not decide that testimony is untrue

13     just because it differs from other testimony.

14          However, if you decide that a witness has

15     deliberately testified untruthfully about something

16     important, you may choose not to believe anything that

17     witness said.  On the other hand, if you think the

18     witness testified untruthfully about some things but

19     told the truth about others, you may accept the part you

20     think is true and ignore the rest.

21          The weight of the evidence as to a fact does

22     not necessarily depend on the number of witnesses who

23     testified.  What is important is how believable the

24     witnesses were and how much weight you think their

25     testimony deserves.

1    Instruction 10:  You are here only to determine

2    whether the defendant is guilty or not guilty of the

3    charges in the indictment.  The defendant is not on

4    trial for any other conduct or offense not charged in

5    the indictment.

6    Instruction No. 11:  A separate crime is

7    charged against the defendant in each count.  You must

8    decide each count separately.  Your verdict on one count

9    should not control your verdict on any other count.

10   Instruction No. 12:  You have heard testimony

11   that the defendant made certain statements.  With

12   respect to each statement, it is for you to decide:

13   One, whether the defendant made the statement; and two,

14   if so, how much weight to give it.

15   In making those decisions, you should consider

16   all the evidence about the statement including the

17   circumstances under which the defendant may have made

18   it.

19   Instruction No. 13:  You heard evidence that

20   the defendant may have committed other acts not charged

21   here.  This evidence of other acts was admitted only for

22   limited purposes.  You may consider this evidence only

23   for its bearing, if any, on the question of the

24   defendant's motive and for no other purpose.

25   Of course, it is for you to determine whether

you believe this evidence, and, if you do believe it, whether you accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

The defendant is not on trial for committing any other acts apart from those charged in the indictment. You may not consider the evidence of any other acts as a substitute for proof that the defendant committed the crimes charged. You may not consider this evidence as proof that the defendant has a bad character or any propensity to commit crimes.

Specifically, you may not use this evidence to conclude that because the defendant may have committed the other act, he must also have committed the acts charged in the indictment.

Remember that the defendant is on trial here only for the charges in the indictment, not for any other acts. Do not return a guilty verdict unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

Instruction No. 14: You have heard testimony from law enforcement agents who were involved in the government's investigation in this case. Law enforcement officials may engage in stealth and deception in order to investigate criminal activities.

1    Instruction No. 15:  You have heard testimony

2    from several witnesses, each of whom testified to

3    opinions and the reasons for his or her opinions.  This

4    opinion testimony is allowed because of the education or

5    experience of each of these witnesses.

6         Such opinion testimony should be judged like

7    any other testimony.  You may accept it or reject it and

8    give it as much weight as you think it deserves,

9    considering the witness's education and experience, the

10   reasons given for the opinion, and all of the other

11   evidence in the case.

12        Instruction No. 16:  You have heard evidence

13   from several witnesses, who, because of their education

14   and/or experience, were permitted to state opinions and

15   the reasons for their opinions.  During these witnesses'

16   testimony, certain presentations were made and were

17   shown to you in order to help explain the evidence in

18   the case and the bases for the witnesses' opinions.

19        These presentations were not admitted into

20   evidence and will not go into the jury room with you.

21   Various slides in some of the presentations were marked

22   with disclaimers as directed by the Court.  The

23   presentations are not themselves evidence, nor are they

24   proof of any facts.

25        If the presentations in whole or in part do not

1  correctly reflect the facts shown by the evidence in

2  this case, you should disregard these presentations and

3  determine the facts from the underlying evidence.

4  Instruction No. 17: Certain charts and

5  summaries have been admitted into evidence. Charts and

6  summaries are only as good as the underlying supporting

7  material. You should, therefore, give them only such

8  weight as you think the underlying material deserves.

9  Instruction No. 18: The defendant is charged

10  in Count 1 of the indictment with murder in the first

11  degree in violation of Section 7(3) and Section 1111 of

12  Title 18 of the United States Code.

13  In order for the defendant to be found guilty

14  of that charge, the government must prove each of the

15  following elements beyond a reasonable doubt:

16  First, the defendant unlawfully killed Richard

17  W. Belisle.

18  Second, the defendant killed Richard W. Belisle

19  with malice aforethought.

20  Third, the killing was premeditated.

21  And fourth, the killing occurred on federal

22  property.

23  To kill with malice aforethought means to kill

24  either deliberately and intentionally or recklessly with

25  extreme disregard for human life.

Premeditation means with planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough after forming the intent to kill for the killer to have been fully conscious of the intent and to have considered the killing.

Instruction No. 19: The defendant is charged in Count 2 of the indictment with murder in the first degree in violation of Section 7(3) and section 1111 of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant unlawfully killed James A. Hopkins.

Second, the defendant killed James A. Hopkins with malice aforethought.

Third, the killing was premeditated.

And fourth, the killing occurred on federal property.

To kill with malice aforethought means to kill either deliberately and intentionally or recklessly with extreme disregard for human life.

Premeditation means with planning or

deliberation.  The amount of time needed for premeditation of a killing depends on the person and the circumstances.  It must be long enough after forming the intent to kill for the killer to have been fully conscious of the intent and to have considered the killing.

Instruction No. 20:  The defendant is charged in Count 3 of the indictment with murder in the first degree in violation of Section 1114 and Section 1111 of Title 18 of the United States Code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant unlawfully killed Richard W. Belisle.

Second, the defendant killed Richard W. Belisle with malice aforethought.

Third, the killing was premeditated.

Fourth, Richard W. Belisle was a federal officer or employee.

And fifth, at the time of the killing, Richard W. Belisle was engaged in his official duties or was killed on account of the performance of his official duties.

To kill with malice aforethought means to kill

either deliberately and intentionally or recklessly with extreme disregard for human life.

Premeditation means with planning or deliberation.  The amount of time needed for premeditation of a killing depends on the person and the circumstances.  It must be long enough after forming the intent to kill for the killer to have been fully conscious of the intent and to have considered the killing.

For the victim to have been engaged in his official duties, he must have been acting within the scope of his employment as distinguished from engaging in personal activities of his own.

Instruction No. 21:  The defendant is charged in Count 4 of the indictment with murder in the first degree in violation of Section 1114 and Section 1111 of Title 18 of the United States Code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt.

First, the defendant unlawfully killed James A. Hopkins.

Second, the defendant killed James A. Hopkins with malice aforethought.

Third, the killing was premeditated.

1   Fourth, James A. Hopkins was a federal officer

2   or employee.

3   And fifth, at the time of the killing, James A.

4   Hopkins was engaged in his official duties or was killed

5   on account of the performance of his official duties.

6   To kill with malice aforethought means to kill

7   either deliberately and intentionally or recklessly with

8   extreme disregard for human life.

9   Premeditation means with planning or

10  deliberation.  The amount of time needed for

11  premeditation of a killing depends on the person and the

12  circumstances.  It must be long enough after forming the

13  intent to kill for the killer to have been fully

14  conscious of the intent and to have considered the

15  killing.

16  For the victim to have been engaged in his

17  official duties, he must have been acting within the

18  scope of his employment, as distinguished from engaging

19  in personal activities of his own.

20  Instruction No. 22:  The defendant is charged

21  in Count 5 of the indictment with using and carrying a

22  firearm during and in relation to murder in the first

23  degree in violation of Section 924(c) of Title 18 of the

24  United States Code.  In order for the defendant to be

25  found guilty of that charge, the government must prove

each of the following elements beyond a reasonable
doubt:

First, the defendant committed the crime of
murder in the first degree as charged in Count 2 of the
indictment, which I instruct you is a crime of violence.

Second, the defendant knowingly used and
carried a firearm during and in relation to that crime.
The defendant used a firearm if he actively employed the
firearm during and in relation to murder in the first
degree.  The defendant carried a firearm if he knowingly
possessed it and held, moved, conveyed or transported it
in some manner on his person or in a vehicle.

A defendant used and carried a firearm during
and in relation to the crime if the firearm facilitated
or played a role in the crime.

Instruction No. 23:  The defendant is charged
in Count 6 of the indictment with using and carrying a
firearm during and in relation to murder in the first
degree in violation of Section 924(c) of Title 18 of the
United States Code.  In order for the defendant to be
found guilty of that charge, the government must prove
each of the following elements beyond a reasonable
doubt:

First, the defendant committed the crime of
murder in the first degree as charged in Count 1 of the

indictment, which I instruct you is a crime of violence.

Second, the defendant knowingly used and carried a firearm during and in relation to that crime.

The defendant used a firearm if he actively employed the firearm during and in relation to murder in the first degree. The defendant carried a firearm if he knowingly possessed it and held, moved, conveyed or transported it in some manner on his person or in a vehicle.

A defendant used and carried a firearm during and in relation to the crime if the firearm facilitated or played a role in the crime.

Instruction No. 24: An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake or accident. You may consider evidence of the defendant's words, acts or omissions, along with all the other evidence in deciding whether the defendant acted knowingly.

Instruction No. 25: It is James Wells' position that a person or persons other than him committed the crimes charged. Mr. Wells is not required to prove another person's guilt. It is the government that has the burden of proving Mr. Wells guilty beyond a reasonable doubt.

Instruction No. 26: Evidence has been admitted

that the defendant was not present at the time and place
of the commission of the crimes charged in the
indictment.  The government has the burden of proving
beyond a reasonable doubt that the defendant was present
at that time and place.

The defendant does not have the burden of
proving an alibi defense, nor does the defendant have to
convince you that he was not present at the time and
place of the commission of the crimes.

If, after consideration of all the evidence,
you have a reasonable doubt that the defendant was
present at the time the crimes were committed, you must
find the defendant not guilty.

Finally, at this time, ladies and gentlemen,
Instruction No. 27:  A verdict form has been prepared
for you.  After you have reached unanimous agreement on
each verdict, your foreperson should complete the
verdict form, according to your deliberations, sign and
date it, and advise the clerk that you're ready to
return to the courtroom.

With that, what I'm going to do at this point
is ask our courtroom deputy to hand out to you a verdict
form so you can take a look at that before we hear from
the lawyers in their closing arguments.  And the form
she's going to hand out are white paper.  You will note

these are not the official verdict form.  Is the

official verdict form yellow?  Goldenrod.  The official

verdict form, which you will see later on, is goldenrod,

and that's the only one that you are to complete.  I'm

having our deputy hand these out to you now so that,

like I say, you can get a sense of how the verdict form

will look before you hear from the lawyers.

So take a few minutes, just read through that

silently, and then we'll proceed from there.

(Pause)

THE COURT:  Has everyone had sufficient time?

Very good.  Then I'll ask you to turn your attention to

the lawyers.  Mr. Skrocki, on behalf of the government,

go ahead.

MR. SKROCKI:  Yes, Your Honor.  Thank you.

THE COURT:  Mr. Skrocki, I think, estimates

going just over an hour.  If at any time anyone needs a

break, feel free to raise your hand.  Otherwise, when he

concludes, we'll take our morning break at that time.

CLOSING ARGUMENT BY GOVERNMENT

MR. SKROCKI:  Thank you, Judge.

Everybody hear me okay?

May it please the Court, Judge Gleason,

Counsel, members of the jury, good morning.

One last time.  On April 12, 2012, Rich Belisle

woke up, went to his kitchen, got a cup of coffee for
his wife Nicola, brought it back to her in bed so she
could have it every morning like he's always done, and
he did that one last time.

He showered. Remember her testimony he used
her towel. Got ready for work. On that morning, Rich
Belisle put on his long underwear, his thermal
underwear, because his plan that morning was to climb a
300-foot tower. And you know now he never did.

He also in his long underwear, and as his wife
described his kind of ponchy physique, he did one more
dance move for her one last time, some kind of ballet
move. And he went and loved on his puppy for a little
bit, his chocolate lab.

Kissed his wife goodbye one last time. Went
out the door and knocked on the bathroom window to let
her know he was leaving. He did that one last time.

At the same time that morning, Jim Hopkins was
getting ready for day. Sailor of the year, dutiful,
maybe a little tough on the non-rates, but a duty-bound
man.

He started his day collecting his gear for
work, said goodbye to his wife Debbie and his son
Patrick and left for work in his big Dodge pickup. He
went down the road and turned left on Rezanof Drive to

1    head to the Communication Station to begin his day.

2    There was going to be a climb that day, so he was

3    probably thinking about that.

4         Unbeknownst to him though, his murderer along

5    his route pulled in behind him in a car with the lights

6    out and followed him into work.

7         These men would never see 7:15 a.m. again.

8    Their families were the last persons to see them alive,

9    except for this man here.  Jim Wells, as you know now

10   and we have proven to you, is the last man to have seen

11   Rich Belisle and Jim Hopkins alive, and he saw them from

12   behind the barrel of a .44-caliber revolver.

13        What was Jim Wells doing that morning?  What

14   did he leave his home with?  You know now he left his

15   home with murder on his mind, a loaded .44 revolver, and

16   a plan.  And that plan had to be executed precisely for

17   him to execute his colleagues.

18        It had to be done by the minute, and only a man

19   with 20 years of experience in that shop and knowing the

20   comings and goings of the people who worked there could

21   have pulled that off, and he almost did.

22        He left his home with that plan with murder on

23   his mind, and he's in a murderous race against time.  He

24   did commit these within the space of about six minutes,

25   these two murders.

He left his home in his perfectly operating truck, and if you look at the screen you can see there is that right front tire. It doesn't look too flat, looks round, because there was no flat tire. Because when he left his home, he left his home with his plan and his gun and his fake alibi in his head, and that fake nail in the tire in the back of his truck. That's what Jim Wells left his home with that morning.

He went to the Kodiak airport, because as we have shown you, his wife was out of town, Nancy was not home, but her car was there and he knew her car was there. Instead of taking her to the airport himself, Amanda Sanford drove with Nancy Wells, parked the Honda CR-V, and Jim Wells came to say goodbye. Now he knows where the car was parked. He won't have to waste any time getting out of the white pickup that everybody knows he drives, getting into the blue Honda CR-V, and heading to the airport.

And that's what he does. He knows where it's parked, and that's his vehicle to use in connection with these murders, because no one is going to connect him to that. We'll get into other reasons why that works for him in a moment.

When he gets into that vehicle, he has murder on his mind. All the way to the COMMSTA, he has murder

1    on his mind.

2           We have shown you in the videos during the

3    trial you can see the blue Honda CR-V coming through the

4    woods behind Jim Hopkins' truck.  7:08.  Back up real

5    quick.  He goes by that camera at 6:48.  That's the main

6    base Kodiak camera.  Goes to the airport, switches the

7    car, and by 7:08, he's at the rigger shop.

8           And you know right now that Rich Belisle and

9    Jim Hopkins have about two minutes left to live, because

10   Rich Belisle was working on his computer and his last

11   entry or access on the computer was at 7:10.  After

12   that, there was no activity.

13          This photograph is from the T-1 camera at 7:09,

14   a minute before Rich Belisle stops work on the computer

15   because he's been shot, murdered.  It is important to

16   look at that photograph.  What do you see there?  Okay.

17   You see some cars in the foreground.  But what you see

18   is, number one, a car; number two, it's blue; number

19   three, it's small, it's kind of like an SUV.

20          That's evidence.  Nothing scientific.  Nothing

21   magical.  Nothing fantastical about that.  That's

22   evidence.  That matches the kind of car Nancy Wells has,

23   and it matches the car that he drove when he murdered

24   Rich Hopkins and Jim Belisle.

25          It's a small blue car, so you can start with

1    that.  It doesn't need to be any more technical than

2    that.

3         When Jim Wells entered the Communication

4    Station property, he had a choice.  He could have worked

5    this out.  He could have turned around and gone home.

6    He could have left the gun in the car.  He could have

7    tried to talk people through this.  And he made a

8    choice.  He kept making choices all along the route of

9    death here, folks.

10        He crossed the Buskin River, he had a choice.

11   He went behind and parked the car behind the rigger

12   shop, he still had a choice.  He could have called off

13   and gone home.

14        You know he didn't do that.  He got out of the

15   car behind the rigger shop, he went underneath the

16   camera undetected, as he knew he could.  It doesn't

17   point straight down, and you're going to hear his own

18   voice tell you about what he knows about the area of

19   coverage of that camera on the rigger shop.

20        He knows it's pointed to the flagpole and he

21   knows he can go in there undetected, so he's not going

22   to be caught on camera, or at least he thinks he does.

23   As he goes under that camera, and even as he drove up,

24   he could see his victims' vehicles parked in the parking

25   lot.  He knows who is driving what and he knows that

1  Rich Belisle and Jim Hopkins are at work.  That's

2  irrefutable.  Everybody knows who is parked where.

3        He had a choice between life or death.  When he

4  put his hand around the barrel or the grip of that

5  revolver, he chose death.  He chose it by surprise and

6  by stealth and by violence.  That's the choice Jim Wells

7  makes.  We all make choices in life.  That was his big

8  choice.  He was going to execute these men and try to

9  get away with it.

10        What about the killing and the murders and the

11  shooting?  Rich Belisle was shot in the neck by a .44 at

12  close range.  That wasn't enough.  While he was on the

13  ground, he was shot two more times.

14        Jim Hopkins, this was personal for Jim Hopkins,

15  a .44 in the face, instantly lethal.  That wasn't

16  enough.  He shot Jim Hopkins on the ground too one more

17  time.  You can use that violence and the number of shots

18  as evidence of Jim Wells' rage and his fury with these

19  two men, and his need to execute them to satisfy that

20  rage and fury.  Those are the choices he made too.

21        By 7:12 it was over.  Some sound came out of

22  the rigger shop, the loud metal clanging sound.  That's

23  what Mr. Rudat testified he heard at 7:12, and he's on

24  the clock.  Remember him talking about that?  He timed

25  his walk, turned around, and by 7:12, he hears that

1    sound coming out of the rigger shop.

2            By this time, our murderer needs to go home.

3    He needs to go home for a reason, because of his alibi.

4    His alibi is I wasn't anywhere near the Communication

5    Station.  And it's timed.  I got to get going.  And he

6    leaves.  Again, common sense, folks, on the screen

7    behind me is a blue car, and it's small, and it looks

8    like a Honda CR-V.  You can again start with that.

9    That's evidence.

10            I will submit to you at this time, and maybe

11   I'm getting a little ahead of myself, you don't have to

12   convict Jim Wells based on just that car on that image.

13   All of the evidence in this case tells you that's Jim

14   Wells in that car.  Add it all up.  Motive.

15   Opportunity.  Intent.  Wife is out of town.  The false

16   alibi.

17            You will hear his statements to the FBI in a

18   minute and you can also think about what he told you

19   last Tuesday, this farcical story about going to the

20   bathroom and cleaning up and wearing pants for three

21   days.  We'll get to that too.  Don't just rely on just

22   that image as conviction for Jim Wells.  Everything else

23   tells you that's him in the car.

24            He leaves.  He's heading home.  He's caught in

25   the woods going back beyond the water treatment plant

again, back to the Kodiak airport. Switches cars back
to his truck. And he makes a mistake here, one of
several that we'll talk about.

On the front passenger's seat is mail. Amanda
Sanford testified that, number one, Jim came and saw us
off at the airport, so he knows where the car is.
Number two, there is mail in the front on the passenger
seat, and I would not have sat on that mail in Nancy's
car if it was there on the way to the airport. It
wasn't there. Made a mistake by leaving the mail on the
passenger's seat.

Picks up Nancy's car. 7:22 we're heading back
home. If you remember the earlier slide with the truck
going towards the Communication Station, that's 6:48.
It's going back the other way at 7:22. I'm not a math
guy, but the math number I think is 34 minutes. That's
the number of minutes that that truck went from this
point towards the COMMSTA and back the other way home.
There is a 34-minute gap, and that's going to be very,
very important for you to consider in this case about
what Jim Wells was doing.

When he gets home, we submit he runs into a
problem. Charlene Bell sees him turning the corner.
She's testified I saw nothing wrong with his car, not
driving funny, nothing like that. And then Annette

1    Ecret sees him at 7:25.

2            7:25.  He's got to make some calls and his

3    timing again has to be perfect because by 7:30 you all

4    know from this case what happens, shift change.  The

5    non-rates, the 19-year-olds are all coming down to raise

6    the flag.  So I have got to make a call before that

7    happens.  So I can call in that I'm late.  I can make

8    the call that I never make to my supervisor because I'm

9    coming in late.  I'm not going to do it once, I'm not

10   going to do it twice, but I'm going to do it three

11   times.  I'm going to make that call that I never make

12   because I have to be someplace where I'm not, that's at

13   home or on the road, not at the Communication Station.

14           By 7:30, he makes his calls.  He calls in late.

15   He says he made three.  We don't have any record of the

16   third, but that's what he says.  And he makes one to Jim

17   Hopkins, who he just has murdered.  And he sends the

18   other one to Scott Reckner, Chief Reckner.  Here's the

19   calls that he made.  I have to do this old-school with

20   the mouse so bear with me.

21           (Audio playing in open court.)

22           MR. WELLS:  "Hey, Jim.  It's Jim.  I got a flat

23   tire in the truck.  I'll be in when I get it changed.

24   Thanks."

25           I got a flat tire in the truck.  It's not I got

1   a low tire.  I got a flat tire.  "I got a flat tire in
2   the truck."  There is no flat tire in the truck.  There
3   is a tire with a nail in it in the truck, but there is
4   no flat.
5           A minute later, at 7:31, he leaves this
6   voicemail for Scott Reckner.
7           (Audio playing in open court.)
8           MR. WELLS:  "Hey, Scott.  Jim.  I couldn't get
9   ahold of Rich or Jim.  I got a flat tire in the truck
10  and had trouble getting off the lug nuts.  Anyway, when
11  I get done, I'll be in."
12          Now we have expanded it a little bit to buy
13  more time.  Trouble with the lug nuts.  He knows when he
14  leaves these that investigators will have these, so he
15  is starting to plant his alibi with these two phone
16  calls.
17          And at this point in time, you know there has
18  been the shift change at the rigger shop, so what
19  happens next?  19-year-old Cody Beauford finds the
20  bodies of his bosses on the ground in the rigger shop.
21  He thinks it's a joke.  He spends a lot of time thinking
22  it's a joke.  The kid is 19 years old.  But he does have
23  one thing he remembers clearly, that's the smell of
24  gunpowder in the rigger shop.  He smelled that clearly.
25          He calls up to T-1 and they say, "What's the

problem?"  He says, "There is a problem here and there is a lot of blood."  And you remember the audio, "Are you kidding us?  You better not be kidding."  He says, "No, I'm not kidding."

"What about CPR?"  "No, they are beyond CPR. There is a lot of blood."  You saw on the video.  The alarm starts -- the alarm bells are going off. Mr. Haselden runs as fast as he's ever run in his life down from T-1 to T-2 to figure out what's going on.  He describes this as surreal.  No one expects something like this to happen.  By the time the first responders come, there is nothing they can do.  Mr. Wells took care of that with five pulls of the trigger.

"I had a flat tire in the truck," that's what you heard that man say.  He knows after he makes those phone calls that he's got to go back, he's got to make an appearance, he's got to show himself, and so what does he do?  You remember the video from the morning of April 12th.  He drives his truck right through the center of the action as if nothing is wrong.

But by that time, he's already been told by Para Upchurch there's a problem, something is going on at the rigger shop.  He knows.  He knows because he committed the murders, but he knows because she told him.  And he gets out of the truck like, oh, what's

1   going on.

2          Commander Van Ness and Scott Reckner testified

3   and told you that they told him that Rich and Jim are

4   dead.  He says, "Oh, my God.  I had a flat tire."  Are

5   you seeing a pattern here with the flat tire?  Anybody

6   he runs into, anybody who will listen to him, even in a

7   group setting, a grief counseling session, he spits out,

8   "I had a flat tire."  That would have been on

9   April 13th.

10          But by 8:16, he's got to head back, because he

11  has to engage and he has to make an appearance.  What

12  does he do that day?  You recall virtually everybody

13  from the T-2 shop who are still alive and the T-1 shop,

14  he's reading a book, straight up sleeping, he appeared

15  cleaned up and his hair was wet.  He testified here,

16  "Nope, I wasn't sleeping."  So Mr. Acosta is wrong.

17  Mr. Acosta is pretty certain.  When someone spits out

18  "straight up sleeping, he wasn't with his eyes shut,"

19  that tells you something.

20          His ears were ringing.  Now you know why his

21  ears are ringing.  Five shots from a .44 in a concrete

22  building, it's going to hurt.  He was rubbing them all

23  day, and that's from his friend Leah Henry, Leah and

24  Para, one of the two female non-rates that he would have

25  over to his house for dinner, sort of mentor them or

take care of them, provide the second family for them.

So as you heard by 11:00 or so, FBI is notified. Coast Guard Investigative Services are notified. This is a serious matter. Two men have been murdered and there is a murderer running around Kodiak that they need to find. So the FBI comes in, Coast Guard comes in, they start investigating people.

You have heard that he was interviewed on several installments on the 12th as well as on the 13th. I'm going to play some of those recordings for you. I want you to pay particular attention to what he says. He does this all the time. He did it on the stand. He's going to do it in the recordings. You're going to hear a lot of vagueness and a lot of "probably" and "maybes" or "shit, I don't know," or "I'm not sure." It's like trying to pin down a bubble of mercury, goes all over the place, because he doesn't want to give and he will not give specifics.

And you can look at that as consciousness of guilt, because the specifics will lock him down. You're going to hear these next recordings time and time again. He will not be locked down, even though he's lived in Kodiak for 20 years, he's driven that route for 20 years, and they will ask him, where did you get the flat. His response, "What do you mean by where?" Who

 1  says that?  "Where did you get your flat?"  "Well, I got
 2  it here."  No, we don't get that from him.  "I had a
 3  flat tire."  This is the first interview with James
 4  Wells on the 12th.
 5          (Audio playing in open court.)
 6          MR. WELLS:  My schedule is basically 7:00 to
 7  3:30.  And the only reason I wasn't here this morning at
 8  7:00 was I had a flat tire in my truck.
 9          AGENT:  Where did you get the flat?
10          MR. WELLS:  I don't know.  What do you mean by
11  where?
12          AGENT:  Well, like where did you actually pop
13  the flat?  Was it in your driveway, out for a morning
14  stroll?
15          MR. WELLS:  No, I started to come to work and I
16  noticed the tire was low, so then I turned around and
17  came back.
18          AGENT:  Went back home?
19          MR. WELLS:  Went back home, yeah.
20          AGENT:  About what time?
21          MR. WELLS:  Shit, I don't know.  It was after
22  7:00.
23          AGENT:  Okay.
24          MR. WELLS:  So --
25          AGENT:  What time do you normally get in then?

1        MR. WELLS:  I usually get in right around 7:00.

2        AGENT:  So you were running a little bit late?

3        MR. WELLS:  Yeah, I was running late, and I

4  called down to the shop and didn't get an answer.  So I

5  left a message on ET1's phone, and then I called the

6  chief's phone, Chief Reckner, and left a message for

7  him.

8        So three messages:  Called the shop, ET1 Jim

9  Hopkins and Chief Reckner.  Did anybody ask him what

10  happened to him that morning or did he volunteer, "I had

11  a flat tire," in that recording?  "The only reason I

12  wasn't here, I had a flat tire."

13        You know by now from this investigation and the

14  evidence in this case there was no flat tire, there was

15  no low tire, there was no stop at Servant Air, there was

16  no diarrhea in the bathroom, there was no cleanup of the

17  pants that I wore for the next three days.

18        None of it happened.  It didn't happen because

19  at the time he was committing murder.

20        They asked him, "When did you first notice the

21  flat tire?"

22        (Audio playing in open court.)

23        AGENT:  That's where I recognize that from.

24  Okay.  So you left there about 6:50 from your house.

25  And at what point did you notice that the tire was low?

1          MR. WELLS:  Shit, I don't know.

2          AGENT:  Where on the road?  Like were you

3    almost to the COMMSTA?

4          MR. WELLS:  No.

5          AGENT:  Like just outside your driveway?

6          MR. WELLS:  No, I was almost to the airport I

7    think.

8          AGENT:  Almost to the airport?

9          MR. WELLS:  Yeah.  So then I turned around and

10   came back.

11         AGENT:  Did you -- did you get home and -- I

12   guess just walk us through the timeline there as far as

13   what happened first.  Did you call first?  Did you turn

14   around and make the call on your way?  Did you get home

15   and make the call?

16         MR. WELLS:  No, I called from the house.

17         AGENT:  Okay.

18         MR. WELLS:  So I have no idea what time that

19   was.

20         "It was almost to the airport I think."  It's

21   about as vague as you're ever going to get.  Didn't have

22   his cell phone on purpose so he couldn't have called

23   from the road.  He could've.  Left the cell phone at

24   home.  And I'm not paying attention to tracking time.  I

25   couldn't tell you what time it was, because timing is a

problem with him.  It's tough to beat the clock.  That's
one theme in this case that he is unsuccessful at, or
one piece of evidence and the fact he's unsuccessful at
trying to beat the clock.

          More questions about the tire.  How about what
was wrong with it?  Here is what he says.

          (Audio playing in open court.)

          AGENT:  How low was it?  Did you track a rock
or something?

          MR. WELLS:  I don't know.  I didn't really look
at it to see what was wrong.  It was just it was low.

          AGENT:  Okay.

          "I really didn't check to see what was wrong
with it."  So let's contrast that with what you heard on
Tuesday.  "I pulled the nail out with my Leatherman,
threw it into the crick," or when my colleague Christina
cross-examined him, "I threw it over the berm and then I
grabbed my Leatherman, I reached over and got another
nail and I inserted that one into the tire."  You didn't
hear that here.

          "I didn't look at it," is what he said on
April 12th.  Seven years later talking to you, we have a
few additional facts that he claims to have occurred in
what he did, because of the testimony about the nail in
the tire, that the tire wasn't driven on.  Remember

Mr. Bolden?  The tire wasn't driven on, no damage, the
inside is pristine, it wasn't driven on flat and it
wasn't driven on low and the nail was inserted manually.
By the way, he, Mr. Bolden's testimony, Mr. Mills'
testimony, there was no wear on the top of that nail to
show it had been driven on.

Why is that?  Because it defeats his alibi.
You will see that theme throughout this case, the nail,
tire, the false stories, the bathroom.  Because once a
piece is contradicted by evidence in this case, he's
going to go this way.  And when that piece is
contradicted, he's going to go this way.

And so you have got this series of changing
stories that you can see because the man just isn't
telling you the truth because he can't.  Now they ask
him, okay, what did you do that morning in terms of the
process with the phone calls and everything else.  He
can't be consistent on this either.

(Audio playing in open court.)

MR. WELLS:  I got it in the back of the truck.

AGENT:  All right.  So turn around, went back
to the house, changed the tire -- or made the calls,
changed the tire, or changed the tire and made calls?

MR. WELLS:  Shit, I don't remember.

AGENT:  Do you remember what you did first?

1          Okay.  Let's keep in mind this isn't seven

2     years later; this is ten hours, if that, later.  I don't

3     remember.  I don't know.  Probably.

4          They asked him specific questions, as the agent

5     should, about his knowledge of the T-2 camera and its

6     scope of view, what it looks at, things of that nature,

7     to see if he has some knowledge about that camera, and

8     he does.  Here is what he says.

9          (Audio playing in open court.)

10          AGENT:  That camera that's on there, is it like

11     right at the door area, is it elevated a little bit

12     higher?

13          MR. WELLS:  It's probably just under the

14     roofline, so it's probably 12 feet up.

15          AGENT:  And is its purpose basically to look at

16     this building from down there or what's its purpose?

17          MR. WELLS:  No, to cover the parking lot and

18     look at the flag.

19          AGENT:  Okay.

20          MR. WELLS:  You know --

21          AGENT:  So it kind of looks across the street

22     down there, across the parking lot, across the street to

23     the flagpole?

24          MR. WELLS:  Yeah.  The OSs use it if the flag

25     gets hung up.  If the wind is really whipping, then they

1   will lower the regular flag.

2           His knowledge is the camera is used for looking

3   at the flag and the parking lot, not Anton Larsen.  So

4   he knows the field of view.  That's what he says.  Of

5   course he wasn't expecting to get caught by the T-2

6   camera and wasn't expecting to get caught by the T-1

7   camera either, but he was.

8           On April 13th, he's confronted about the

9   timeline.  The night before you know that he did a

10  consent search for his truck.  No feces on the seat.  No

11  stinky smell on the seat, which is why the pants story

12  just pops up, right.  Bring in people to say we didn't

13  see this so I have got to come up with some other

14  ludicrous idea about what happened, what I did that day.

15          He's confronted about the timeline for specific

16  reasons because by this time they have done overnight

17  work on the investigation and they know that they have

18  got video of him coming and going from the main base

19  camera and the small blue car coming and going from the

20  T-2 building at the time of the murders.

21          When they ask him, "We want to go over this

22  again," you're going to hear him say in about five

23  seconds, "You guys all wrote that down, right?  Didn't

24  you write that stuff down?"  He doesn't want to repeat

25  himself because it will be inconsistent.  Truth is easy;

lies are tough because they change.

        (Audio playing in open court.)

        AGENT:  6:45, and then just kind of walk us through again where -- how -- because you end up going back home at some point and the flat tire and all of that.  Can you just kind of give us your guesstimate on times?

        MR. WELLS:  You wrote all of that stuff down, right?

        They asked him to go through it again.  You're going to hear an inconsistent story again.

        (Audio playing in open court.)

        AGENT:  I remember we talked.  You said you didn't remember whether or not you made the call first or you did the tire first.

        MR. WELLS:  No, I don't.

        AGENT:  Okay.  Now, how long did it take you to change that tire?

        MR. WELLS:  Well, I got -- probably came in the house first and went to the bathroom.  Had to get pants to put on, you know, rain pants, so I could kneel in the dirt.

        Probably.  Probably came into the house first.  No details.  No specifics.  Nothing about pants.  Nothing about the airport.  Nothing about a bout of

diarrhea.  You don't hear any of that during those two days of conversation.

They try to get him to be precise again, and here is what he says.

(Audio playing in open court.)

AGENT:  We'll say four minutes.  I know it took me two at the speed limit, and that's at 45.  So we're looking at two minutes to the airport, a couple minutes on the ground, a couple minutes on the way back.  Just want to make sure we got our timelines right.  Is that jibing for you?

MR. WELLS:  Could be.  It's hard to say.

AGENT:  I mean you have lived here how many years?  20 --

MR. WELLS:  26.

"Could be."  "Hard to say."  No commitment, because commitment is a problem for him that morning. You heard questions from his direct testimony on Tuesday that he was confused about cameras and things.  And these questions they are posing aren't that complicated.

What did you do yesterday morning and what process did you do it, or that day?  What did you do that morning?  Where did you get the tire?  What did you do next -- or the flat tire.  What did you do next?  He won't commit to that.  These aren't very difficult.

```
1        They are going to tell him in this next segment
2   we have got these cameras, and these are the cameras
3   that actually he was aware of from the fuel card
4   incident, the video cameras on the base that caught
5   trucks going back and forth.  These cameras on the base
6   caught you coming and going.  There was a 34-minute gap.
7   Help us understand what that's about.
8            (Audio playing in open court.)
9            AGENT:  If you went past the guard shack a
10  couple minutes up the road to the airport, had the tire
11  issue and then turned around and come right back, we
12  should have seen you come back relatively close, but we
13  have a huge gap of time.  We're wondering if you can
14  kind of maybe shed some light on that.
15           MR. WELLS:  Not at the moment.  I mean I can't
16  think of why there would be the time discrepancy.
17           Roughly 15 seconds, 12, 13 seconds of silence
18  there trying to think of something about why my truck
19  was caught going at 6:48 this way and 7:14 the other
20  way, when I only noticed a flat tire or a low tire and I
21  had to turn around.
22           We should have seen it turn around really
23  quick, and that's not what we saw.  "Can you help us
24  understand that?"  "I don't understand why there is a
25  discrepancy."  It took him 15 seconds to think about
```

1   that, because he knows by now he's got a serious
2   timeline problem.  He can't beat the clock.  No
3   reasonable explanation.  "Help us understand this."
4   "Here is your opportunity."
5           (Audio playing in open court.)
6           AGENT:  You know, we have a huge window of time
7   that we're just trying to account for.  Can you help us
8   out with trying to figure this out?
9           MR. WELLS:  No, I don't have a reasonable
10  explanation for it.
11          AGENT:  Do you have a theory?
12          MR. WELLS:  A theory?  What are you suggesting?
13          15 seconds of silence to explain 34 minutes.
14  "Can you help us understand that?"  "No."
15          Here is a man who has been in the Coast Guard
16  for 20 years, working on ships, and what he's telling
17  you he's too embarrassed to tell the FBI in a double
18  murder investigation when he's being interviewed that
19  here is what happened at Servant Air.  There is a reason
20  Servant Air comes into play in this case and we'll get
21  to that in just a moment, but that was his opportunity,
22  not now, but that was his opportunity to tell everybody
23  what happened and he just didn't do it.  And you know he
24  didn't do it because he had a guilty mind and a guilty
25  conscience and he knew he was in trouble.

1          The end of the interview session Agent
2    Oberlander says, "Yes, Jim, we're accusing you."  What
3    does he do next?  He has to figure out how do I beat the
4    clock?  How do I fill out that 34 minutes, because he's
5    got a timing problem because the timing on the slide
6    shows the 34-minute gap is enough time for him to go to
7    the Communication Station, commit the murders, swap cars
8    and come back.
9          The timing works out almost to the half minute
10   for him to get home and make the first call at 7:29 and
11   7:30 to Reckner and to Hopkins.  It almost works out to
12   the half minute.  That's how close the timing is.  But
13   he can't explain to the FBI and the Coast Guard
14   investigators why his truck went from the base camera,
15   to there and back with a 34-minute gap.  He can't do it.
16         Because in that 34 minutes, members of the
17   jury, he was here committing murder and taking the lives
18   of Jim Hopkins and Rich Belisle.
19         And there's more.  After he's told he has been
20   accused, that afternoon, what does he do?  I have got to
21   start finding out what my alibi is.  This is his quest
22   and mission to make up time.  He goes to Kodiak airport,
23   and as you heard from Olivia Terry, who works at Island
24   Air, right there, that X right there, he comes into
25   Island Air and he stares at the cameras.

1          She knows who he is.  She says, "Hey, can I
2     help you," and he stairs at the cameras and won't
3     respond, because he's looking at the surveillance
4     cameras in the shop.  He knows Alaska Airlines has
5     surveillance cameras in the lobby.  He can't go there
6     either, because what's going to happen?  Because law
7     enforcement is going to pull the audio or the video and
8     it's going to show him there or it's not going to show
9     him there, and he wasn't there.

10          So what does he do?  That was not going to
11     work.  Comfort Inn off the Buskin River there is not
12     going to work, because he says there was something going
13     on out there, I had to go by there, so he didn't go in
14     there either.  The only place he went to is Servant Air
15     right there, the longest one away from the road and the
16     one without surveillance cameras.

17          When he went in there, what did he say to you
18     last Tuesday?  He says, "Oh, I jumped out of my truck.
19     I had diarrhea, medium size.  I ghosted my way in.
20     Mr. Skonberg never saw me.  I was in there for half an
21     hour.  I had to clean myself up.  I had to clean up my
22     pants.  Two more bouts of diarrhea, in there for half an
23     hour, and I ghosted my way back out again because
24     Mr. Skonberg never saw me."

25          Mr. Skonberg came in here twice and said,

"Look, I'm at my station, I have got to pay attention,
this is what we do, never saw the man." The only reason
that is there is another one of these excuses he has to
make up to cover up that 34-minute gap. And it didn't
happen. He didn't go in there and do that. He didn't
have a flat tire or a low tire or a bout of diarrhea or
anything else. That's another fabrication, and it's
ludicrous, it's preposterous, it's outrageous and it's
not credible that all of these things happened to him,
oh, and by the way, on the day that two of his
colleagues were murdered while his wife was out of town,
along with the flat tire or a low tire or whatever else
you want to believe he said about his tire.

Let's talk about the elements of the crime.
Judge Gleason just read to you the jury packet, so those
are your rules and those are the things that we have to
prove beyond a reasonable doubt.

So you're in court and you're seeing all of
these things that we do here and there is rules and
there's hearsay and we object and do all these things.
And then people say all the time, well, it's the
government's burden, the United States' burden, it's our
trial team's burden to prove every element beyond a
reasonable doubt.

Because that's our job. Burden just means we

1    have to collect the facts and present to you all of them

2    beyond a reasonable doubt for each element of each

3    crime.  And that's what we have done here

4    overwhelmingly.

5            Part of that is due to him.  His own statements

6    convict himself.  His lack of statements convict

7    himself.  What he told you last Tuesday convicted

8    himself.  And the investigation, as we'll go through

9    this, convicted him as well.

10           Let's talk about the elements.  Counts 1 and 2

11   concern Mr. Belisle and Mr. Hopkins, as do 3, 4, 5 and

12   6.  Murder on the property of the United States.  He

13   unlawfully killed Rich and Jim.  He did so with malice

14   aforethought.  He did so with premeditation.

15           Premeditation and malice aforethought, there is

16   going to be some overlap.  You can pick one fact for

17   premeditation, carrying the gun to the Communication

18   Station.  Malice aforethought, the plan, the lies, the

19   nail in the tire or the fake tire, putting that in the

20   back of the truck, figuring out the timing.  There is

21   overlap between those two elements.

22           Murder occurred on federal property.  The

23   parties have stipulated or agreed.  We have all agreed

24   that the murder occurred on federal property, so that

25   element has been satisfied.

1          And premeditation, as it says there, is very

2    commonsensical, planning or deliberation.  Putting

3    rounds in a gun, a revolver, is premeditation.  Putting

4    it in your pocket or carrying it with you on the way to

5    murder is premeditation.  Swapping your wife's car, your

6    car for your wife's car is premeditation.  Knowing where

7    it is at the airport is premeditation and deliberation.

8          Malice aforethought, they cover each other.

9    Malice aforethought, again, bringing the gun, pulling

10   the trigger.  Each pull of the trigger, carrying the gun

11   into the building, malice aforethought.  Overwhelmingly

12   satisfied.

13         Counts 3 and 4, murder of federal officials

14   engaged in performance of official duties.  Again, both

15   men unlawfully killed with malice aforethought, with

16   premeditation.  At the time they were federal employees.

17   We have agreed to that as well.  That element has been

18   satisfied by agreement of the parties.

19         And at the time they were engaged in their

20   official duties.  You know that because Rich Belisle

21   clocked in at 7:00, he started work, he was e-mailing,

22   he was at his workplace.  For the last time, Jim Hopkins

23   was rolling up his sleeves to start his day in his

24   uniform.  He was there at work as well.  So all those

25   elements have been satisfied in terms of Counts 3 and 4.

1          Kind of covered this already, malice

2   aforethought, deliberately extreme disregard for human

3   life.  Five pulls of the trigger of a .44 at close range

4   satisfy that, along with other evidence in this case.

5          And premeditation is planning and deliberation.

6   This was a carefully planned and timed execution.  The

7   evidence establishes that overwhelmingly.  Jim Wells'

8   execution of these two men.

9          Counts 5 and 6, what this condenses to is that

10  he used a gun during murder, which is what he did here.

11  But those are the rules and the elements that you need

12  to look at that we submit we have overwhelmingly proven

13  beyond a reasonable doubt.

14         Let's talk about reasonable doubt briefly.  As

15  Judge Gleason instructed you, it doesn't mean beyond all

16  doubt.  It's based on common sense and reason.  And what

17  all of you bring here into court is your sense of common

18  sense and reason.  Like the small blue car.  Looks like

19  a small blue car, it's a small blue car.

20         Does Nancy Wells have a small blue car?  Yes.

21  Was it at the airport?  Yes.  Was she gone?  Yes.  Does

22  he know where it is?  Yes.  Did that show up right

23  before the murders and left right after?  Yes.

24         Common sense tells you that Jim Wells is in

25  that car.  If he drove his white truck, we wouldn't be

having much of a discussion if he used the Dodge because
that would have stuck out like a sore thumb.

Look at all the evidence or the lack of
evidence.  Jim Wells didn't provide any evidence except
lying and evasiveness, and you can look at that in terms
of figuring out what your view of his intent was.

MR. COLBATH:  Your Honor, I'm going to object
to that as a burden-shifting argument, Jim Wells not
providing evidence.

THE COURT:  We can have a short sidebar if we
need to, or are you going to move on?

MR. SKROCKI:  I'm moving on.

THE COURT:  Very good.  Thank you.

MR. SKROCKI:  You can look at direct evidence,
like in this case the rounds that killed Rich and Jim, a
.44 Magnum.  .44 Magnum rounds of similar make were
found in his home.  That's direct evidence.

Robert Pletnikoff seeing that man with a silver
.44 revolver coming back from a hunting trip, that's
direct evidence.  You can use that.

Circumstantial evidence is just as persuasive
and can be used by you just as much as direct evidence.
One piece would lead to another piece.  In this case,
there are over 260 exhibits.  They all amount to a very
clear and overwhelming picture that Jim Wells is a

murderer.

Circumstantial evidence is that who else but Jim Wells could have done this. A man with that timing, with that experience and knowledge and with a motive to do so. So circumstantial can be just as powerful as direct.

You have got three, almost four stories here from this man. The first one was to investigators. "I went home with my low tire, I put a tire in the truck, I have no explanation for my 34 minutes." You have already heard that one.

The second one, June 2012, pay attention to this one. It's to his sister and his brother-in-law. "I had a flat tire." They didn't buy it. He stated, "Okay, the tire in my truck, I pooped my pants, soiled my clothing and I took it home and put it in a black plastic bag and put it in the closet." That's what his sister testified he said.

We said, "Okay." What did we do? We called an FBI agent and said, "Agent Espeland, when you searched that home, did you find a black plastic bag full of soiled poopy pants, clothes that smelled really bad?" "No, we didn't." So that one is not going to work.

So now I got to change my story, along with I didn't have a flat tire or the gear to change my tire,

he's got a flat -- or a spare tire under his truck all
that morning. Version three, this is the one he gave to
you last week. "I had a low tire, which I pulled out a
nail and replaced it with a bigger nail. I threw the
first nail away in the creek to dispose of evidence
apparently, or over the berm. I had a diarrhea episode
and I had to clean off myself in Servant Air."

        And then the most ridiculous piece of all is,
"I wore those pants for three days." Ask yourself why
would he say something like that? And he said something
like that because he told his sister, "I left the pants
in the house in a black plastic bag and the FBI is inept
and they missed it." We call Special Agent Espeland and
we didn't find anything like that, so I got to change
that story again.

        So now we have got three versions of what
happened. None of this explained on April 12th. Why?
Because he's a murderer.

        Let's talk about the investigation. This was a
double murder at the Communication Station. You heard
lots of questions about what the FBI did, what they
didn't do and other things.

        Denise Anderson says we just didn't focus on
Jim Wells, we focused on half of Kodiak. Para Upchurch
came in and testified and said, "We were all suspects."

Remember Cody Beauford and Aaron Coggins, they were ones
who found Rich and Jim.  Where did they end up that
morning?  They ended up down at Base Station Kodiak
downtown at the big main station being interviewed all
day.

What did Cody Beauford want to do at the end of
the day?  "Hey, can I call my mom?  She's going to be
worried."  He's 19 years old.  But they were interviewd.
It wasn't just a complete tunnel vision focus on Jim
Wells, and the reason was is because Jim Wells made
himself a suspect.

Law enforcement inquired, and based on his
evasiveness and his lack of details, which are very
clear to you at this point, yeah, he was a suspect.  But
they just didn't stop there.  There was a fact-based
investigation going alongside with it.  700 interviews,
folks, on Kodiak.  Nine court-approved search warrants.
This wasn't just the FBI running rogue and doing what
they wanted to do.  A judge had to approve the search
warrants for Mr. Wells' residence.  Don't think he's a
victim here because he's not; he's a suspect.  He was
the guy who didn't show up.

And Scott Reckner and other people said, "Yeah,
where is Jim Wells?"  We submit you know what's going on
here, April 12th, Jim Wells didn't even know where he

was based on these answers.  He couldn't tell you
anything specific because he was committing murder.  He
made himself a suspect, but nevertheless the agents in
this case conducted a financial background, other types
of background information on the victims in this case,
like they should have.  They were tracing a gun.  They
went through all the vehicles.  Hundreds and hundreds of
vehicles, including ones on the Coast Guard base.

Specialists, DNA, fingerprint, tool marks,
ballistics, some of which you heard here during this
case.  That was the extent of their investigation, along
with, yes, asking the public for help.  Can you help us
identify what you may have seen, these two cars on the
day of the murder.  Nothing disgusting about that,
nothing crazy, just doing their jobs, because they have
to, fact-based.

These murders were calculated.  Clearly,
because of the timing and the location, it's an inside
job.  It had to be done to the minute.  They did it
within about six minutes.  So wasn't some random
backwoods ninja that jumped into the COMMSTA and shot
these men five times at 7:00 in the morning.  That's not
what happened here.

Nothing was stolen.  Although you remember from
the recordings Jim Wells was almost begging to go down

there and help them look around for something that may
have been missing.  Maybe he took something.  Maybe he
planted something that was missing.  Who knows, but
twice he says, "We need to go down there and help you
guys out," because he's being really, really helpful.

Violent?  The inside of that building as you
heard witness after witness testify to is a maze, but
these two men, seasoned Navy, Coast Guard men were
killed in the space of a couple of seconds, and the
reason why is that because they were ambushed.  They had
no way of knowing what Jim Wells was going to do to them
that morning.

He walked into that building and he shot Rich
Hopkins and he went and spun around and shot -- I'm
sorry.  He shot Rich Belisle, and he went and shot Jim
Hopkins in the face.  And then he went and finished off
Rich in a matter of seconds.

That's not the act of a random burglar, because
nothing was taken.  He defeated the cameras because he
knew about their field of view.  In a remote, isolated,
almost end-of-the-road maintenance shop that nobody pays
attention to.

We talked about the timing.  No threats of any
evidence to the Coast Guard (as spoken).

Let's talk about his motive.  April was a tough

year [sic] for him.  April 11, April 12th, 2012, was a
tough year [sic] for him.  New commander, Peter Van
Ness, academy guy, he's a ship guy.  He says, "We're
going to run this thing top to bottom, so I got my
people, here are my orders.  I want this place squared
away."

So yeah, Rich Belisle and Jim Wells got this
memo of expectation.  You're going to show up, you're
going to tell us when you're not around, stop taking
trees, put in a leave slip, and by the way, Jim Wells,
you're going to mentor Jim Hopkins, because you're a
chief and we expect you to do that and he needs the
help.  That's what we expect you to do in that role,
something he never did.

Judy Pletnikoff, remember her, 20-year family
member from Kodiak.  She wore the blue dress.  She took
Jim Wells to the airport, him and Nancy, and he screamed
at her for ten minutes on the way.  When he came back
from Shemya in June 2011, he was angry.  He was angry
because people weren't doing what he was telling them to
do what.  That's what she testified to.  She's a 20-year
friend of the family.

In November 2011, he gets the tree collaring
memo.  Guess what, no more free wood.  You can't be
cutting trees that don't need to be cut.  Whose

responsibility is this to keep handing out these memos
of expectation and these letters to him?  Scott
Reckner's.

He has the sit-downs, he has the conversations
with him.  He's the one who was explaining things to
him, and he's the one who gauges and sees the reactions.
Prior to the fuel card in January of 2012, Mr. Reckner
does have a sit-down with Mr. Wells and they have a
heated argument.

What's he tell him?  You either retire or get
with it.  He says something really, really important for
you all to understand.  He says, "Rich Belisle is
catching up to you.  He's getting with the program.  He
knows what he's doing."  And that's a threat to Jim
Wells.

It's also a threat that the commander,
Commander Van Ness, doesn't trust him anymore with that
fuel card issue.  They sit down and have a discussion.
Says, "You don't trust me?"  "No, we don't trust you
anymore."

What does Jim Wells say about that meeting?
Everybody else stands up because the meeting is over,
commander stands up, Jim Wells stays seated.  What did
he tell you about that last week?  "Well, it wasn't over
as far as I was concerned."

1          So the disrespect, the arrogance, and the lack

2     of respecting authority shows you a lot as to what's

3     going on through his mind.

4          And he also threatened in that letter, you know

5     what, you mess up again, you're going to get fired.

6     That's real powerful as well because he says, "I'm not

7     going to retire yet, I still have to pay off my

8     mortgage."

9          The NATE conference, this is the one where he

10    and Scott Reckner have a discussion about what are we

11    going to do about NATE.  "You're not going.  I'm going

12    to send Rich and I'm going to send Jim Hopkins."  There

13    is a dispute about who said what, but there is no

14    dispute, because Mr. Wells said so here to you Tuesday,

15    that he sat and glared at or stared at Scott Reckner for

16    a minute to a minute and a half, but he wasn't upset

17    about not going to the NATE conference.

18         Why would you stare at somebody for a minute or

19    a minute and a half if you weren't upset and why would

20    Scott Reckner be making any of this up?

21         Another heated argument like you're not going.

22    And his dismissiveness of Hopkins' and Belisle's work,

23    "He's just a fucking rigger."  Again, Judy Pletnikoff

24    tells you that when he came back from -- excuse me.

25    Judy Pletnikoff tells you that when she saw him about

not going to the NATE conference, she said he was
devastated, because this was a big deal to him.

The warehouse clean-out in March -- by the way,
with this NATE conference, the last witness in our
rebuttal case on Wednesday, I guess it was Wednesday
back already, he scheduled that surgery after he was
told he's not going to the NATE conference.  That's the
point of that exhibit.  He says, "I wasn't going to go
because I scheduled my surgery."  That's not true.  The
surgery was not scheduled until after he was told he's
not going.

The warehouse clean-out, that's another
dismemberment in a deconstruction of his work product.
This is where he stored stuff.  He knew where things
were, and it's another depowering of him.  That's why
that's important.  Did he contribute?  Did he help?  No.
He says he was on light duty.

I ask you to consider the photograph of the
septic tank and how he dug that thing out and consider
whether that's light duty or not, the day or two before
the murders.

Effectively all of these things add up to Jim
Wells being replaced.  He was replaced by Rich Belisle
and Jim Hopkins.  You heard Mr. Jordinelli, Phil
Jordinelli testify that the antennas and what they call

the casualty list, like what parts were down and what
parts needed repair, had never been better with him
being gone.  And why is that?  Because the rigger shop
stepped up, all of them did.

You had a man who was not performing and
keeping information to himself to empower himself.
While he was gone during his surgery, the mission still
had to go on.  This is like the 911 of the Bering Sea.
They had to keep up with their work.

That's not something he could tolerate, because
he had been replaced.  He was angry about being
replaced.  His sister-in-law told you as much.  His
sister and his brother-in-law told you as much.  "They
are not my friends.  Rich is a drunk.  They are not
electronic technicians.  I hardly know them.  They are
not qualified to work there.  And I taught them
everything they knew."

That speaks volumes of what's going on in this
man's head.  I'm better than them.  They don't deserve
what they are getting.

In the end, he figured out a way to take care
of it, as we spent the last hour talking about and you
spent the last month listening to.

Judy Pletnikoff, again, assess her credibility.
She's a 20-year friend.  He describes himself as the top

antenna man in the country.  That's this ego.  20-year
friend.  He was in charge of training at yearly
conferences.  That's what he said.  That's not what
those conferences were for.  He was very angry when he
came back from Shemya in 2011.  Someone wasn't following
his directions.

Ordinarily, when Nancy left town, Jim would
take the car and take it home to avoid having to pay for
parking.  You know that didn't happen this time.  It
didn't happen because he needed that car to murder these
men after finding out where it was parked before she
left.

She also testified that when she said she was
speaking with the FBI, he came literally unglued.  In
the back seat of the car, he wasn't buckled in, he
lunged forward and he was screaming and yelling at her
for how long.  Ten minutes.  So was Nancy Wells.  She
had to roll the windows down it was so loud.  And how
did she feel about that?  Completely threatened.

It's not because the FBI is all over and he's
worried about that.  It's because he committed these
murders.  He's devastated by not being -- not able to go
to the NATE conference.  It was a big part of his
identity.  So all of these things, folks, add up to
motive.

1          Another witness, Leah Henry.  Leah, again,

2    credibility, veracity.  What she's telling as a woman

3    who spent time in Wells' home, he was taking care of

4    her, offering her family away from home.  Wells did not

5    like Hopkins.  He viewed him as incompetent.

6          Rich Belisle led the warehouse project.  He set

7    a tone that things were shifting.  Rich was coming to a

8    position that Jim had held for a very long time.  Rich

9    Belisle was a threat.  He took care of that threat.  He

10   took care of both of those threats.

11         He would call Chief Reckner "Scott,"

12   dismissive, disrespectful.

13         Another important piece, really odd on a day

14   like that he had a flat tire on that day of days.

15         He kept rubbing his ears the day of the murders

16   and said his ears were ringing, and now you know why,

17   because of what he did in that building with that .44.

18         Didn't seem to care about what was going on in

19   the COMMSTA, feet up on his desk reading a book.

20         Again, commonsense comparison of the vehicles.

21   There is one -- there is a vehicle going -- the Honda

22   CR-V going into the rigger shop at 7:09, coming back

23   7:14.  So let's rotate those back and forth.  It's not a

24   sedan.  It's not red.  It's a small blue car, which you

25   now know based on the totality of the evidence it's Jim

1   Wells in that car.

2          What did the investigation do to eliminate

3   other vehicles that came through that day past the T-2

4   building?  Exhibit No. 105, if I got that right,

5   identified the vehicle, people initialed it, and the

6   only vehicle not identified was Wells' CR-V, but

7   everybody else was accounted for.  That's the nature and

8   extent of the investigation and the depth of what they

9   did with respect to identifying that car.

10         So yeah, we have brought in some people with

11  specialized knowledge.  One was them was Mr. Vorder

12  Bruegge.  He did that very simple, low-tech, as he said,

13  overlay to show the similarities and comparison between

14  the cars on April 19th on your right there.  Mr. Vorder

15  Bruegge's slide, and that's from April 12th.  It's a

16  commonsense comparison.  It's the same car.

17         As we know from the investigation and the

18  forensic experts, Mr. Hopkins, Mr. Belisle were killed

19  with one of three firearms, .44s:  Smith & Wesson 629, a

20  Llama or a Taurus.  They were all killed with the same

21  gun.  Ballistics of similar characteristics were found

22  in Mr. Wells' home that matched bullets pulled from the

23  bodies of Mr. Belisle and from the crime scene itself

24  from the floor.  Brett Mills told you about that.

25         John Stein left a .44 with Mr. Wells in his

care prior to leaving.  He reported it missing to the
Alaska State Troopers in 1997.  Luke Robinson saw a
silver revolver in Mr. Wells' home around that time.
Robert Pletnikoff, a family friend of 20 years, hunting
partner, saw Mr. Wells coming back from a hunting trip
with a silver revolver, large caliber, on his hip.

He was very clear about that.  You remember
they asked him, "Are you sure it wasn't this black .44
that he had, the .44 Ruger Super Blackhawk?"  He's like,
"Huh-uh, what I saw was a silver gun on his hip, silver,
large caliber revolver."  That's what he testified to.

Jim Wells doesn't throw anything away.  He
still has Mr. Stein's swords.  He would like to have
them back.  But Mr. Wells had access to a .44-caliber
revolver and was witnessed in possession of one several
times.

This is a quote from his interview.  And I'm
just about done, Judge.  "Why quit while I'm still
having fun?"  This was a day that his two colleagues
were murdered and this is what he says about his future
plans.

So we submit, members of the jury, that this is
sort of the end of my opening closing, that the evidence
in this case has proven Mr. Wells guilty of all counts
beyond a reasonable doubt.

1        So as I mentioned earlier, we have the burden

2   of proving to you all of these things, and because of

3   that, we get two chances to argue, one now, Mr. Colbath

4   is next to argue for the defense, and because it's our

5   burden, we get the rebuttal right.  So when he's done,

6   I'll have a few more minutes to meet with you one last

7   time.

8        And when I do, I'll be asking you, based on the

9   evidence in this case, all of it, to return a verdict of

10  guilty against Mr. Wells for the murders of Jim Hopkins

11  and Rich Belisle.  Thank you.

12            THE COURT:  Thank you, Mr. Skrocki.

13            All right, ladies and gentlemen.  We'll take

14  our morning break here for 15 minutes.  Please leave

15  your notepads and all the jury instructions here in the

16  courtroom.  Remember my admonition not to discuss the

17  case and we'll be back in 15 minutes.

18            (Jury absent)

19            THE COURT:  Please be seated very briefly.

20  Anything at all that we need to take up?

21            MR. SKROCKI:  No, Your Honor.  Thank you.

22            THE COURT:  Very good.  We'll go off record.

23            (Recessed from 10:42 a.m. to 10:58 a.m.)

24            (Jury present)

25            DEPUTY CLERK:  Court is again in session.

1    THE COURT:  Please be seated, everyone.

2  Welcome back, ladies and gentlemen.

3    Mr. Colbath, whenever you're ready, go ahead,

4  please.

5    CLOSING ARGUMENT BY DEFENSE

6    MR. COLBATH:  All right.  Thank you, Your

7  Honor.

8    Counsel, Your Honor, may it please the Court,

9  ladies and gentlemen.  Mr. Skrocki spent about an hour

10  and ten minutes there that in the first 40-plus minutes

11  of that was spent on telling you not about the evidence

12  and not about the proof that the government brought to

13  you, but about a good story about why Jim Wells didn't

14  prove himself innocent.

15    Before I start, I want to talk to you and make

16  sure we're all on the same page here and I want to talk

17  to you about why we're here, because you're only here

18  for one reason.  You're only here for one purpose, and

19  that purpose is to judge the government's case, to

20  determine whether the government has proven beyond a

21  reasonable doubt that Jim Wells committed the crimes

22  charged in the indictment.

23    That's the only thing we're here to do.  That's

24  the only function you as jurors have to perform, and

25  that is to determine did the government meet their

1    burden beyond a reasonable doubt.

2            We're not here, and I know Mr. Skrocki said

3    this, I'm sure he didn't mean to, but we're not here to

4    prove or determine if not Jim Wells then who else or why

5    else or how else.  No, that's never a question involved

6    in your determinations.

7            The question is:  Did the government prove

8    beyond a reasonable doubt each and every element that is

9    contained in the indictment?

10            Now, Mr. Camiel told you in opening statement

11   that what you were going to hear about in this case was

12   a suspect-based investigation, an investigation that was

13   really over before it began.  And that's exactly what

14   was presented to you throughout the four weeks of

15   testimony.

16            He told you that, just like you heard from

17   witness Gregg McCrary, the FBI agent, the former field

18   officer, the undercover DEA operative, the head of the

19   sniper team, the man who spent half his career helping

20   the FBI solve cases, who spent the second half of his

21   career again helping the FBI and law enforcement but in

22   a different capacity.  This time he's trying to help

23   them do a better job, do better investigations.

24            Mr. McCrary told you, see, wrongful convictions

25   happen.  Failed investigations exist.  The studies are

that for each of 100 serious, homicide cases, four or
five innocent men get convicted.  And that's not
tolerable, not for Mr. McCrary as an FBI agent, not for
law enforcement in general.  And so they study those
things.  Mr. McCrary, other professors like him, they
study them and they decide how did we get there, what
happened in a case like something so serious as a
homicide.  How can we get to an innocent man being
convicted?

Well, they've discovered some pretty meaningful
things, and that is there is almost a recipe for it.
There are certain circumstances that exist where when we
look at one of these cases and an innocent person is
wrongfully convicted, we see the same pattern.

We see a number of things, a high profile case.
This was certainly that.  We see a case where there is
almost immediately a lot of pressure on law enforcement
to solve the case.  This was that case.  Double
homicide, small island, small community, isolated
population.

The next thing they see is very telling.  It's
circumstances where almost immediately a single suspect,
to the exclusion of all others, is developed early in
the investigation and the focus remains on that single
suspect as the case moves forward.  That happened here.

 1          We see that there is premature closure of the
 2   case.  That is law enforcement believes the case is
 3   wrapped up before they start, and they make that
 4   publicly known.  Again, you saw that here, the headline
 5   of the Kodiak Daily News, April 20th, just eight days
 6   in, not a single video analysis has been done, not a
 7   single scientific test has been run, not 10 percent of
 8   the interviews done in the case, and Jim Wells, and no
 9   other person, just Jim Wells' vehicles plastered across
10   the Kodiak Daily News.
11          Is there any question that law enforcement drew
12   the line in the sand and committed right away that was
13   their one and only suspect?  No.  All the recipe was
14   right.  The recipe was right for a suspect-based
15   investigation gone wrong, a failed investigation, and
16   that's what we have.
17          Now, Mr. McCrary told you, well, what happens
18   when that's how it starts?  How does that cause it to
19   fail?  It's not because generally law enforcement people
20   are bad.  It's not because somebody had it particularly
21   out to get Jim Wells even though he was innocent.  It
22   happens, Mr. McCrary told you, because law enforcement,
23   like the rest of us, they are human.  And when you get
24   into an investigation like this and you have that
25   singular focus on a suspect, cognitive errors start to

build up, they start to occur, not because we're
conscious of them and just ignore them, but just because
of the way we think, the way we rush to try and figure
this out.

Things like confirmation bias happen.
Confirmation bias is where we have a piece of
information, might not even be evidence, we don't know
it's evidence, it's just a piece of information, but we
interpret it only one way, and that's the only way to
support that suspect-based investigation.

Things like hindsight bias happen. We think
something, we believe something, because it fits our
story, and then later, when we see a piece of
information that might work to corroborate that, we
immediately accept it as true, we immediately apply it
to our circumstance because it helps in hindsight.

Things like tunnel vision happen. We look at
the evidence, and there is a suspect-based
investigation. Well, the things that -- the tunnel that
leads to the suspect, those things are easy for us to
see. Those things are easy for us to find, but we walk
right by, investigators go right by other witnesses,
other evidence, other information, or they ignore things
that don't lead us down that tunnel, that don't relate
to our suspect.

1    There is organizational and there is group

2 thinking.  Everybody is on the same team here.  All law

3 enforcement agree with the theory.  Everybody knows who

4 the suspect is.  Everybody knows what vehicles he

5 drives.  Everybody knows our common goal to get this

6 thing wrapped up quickly and make the public feel safe,

7 so we all support one another.

8    But what happens in that circumstance is there

9 is nobody then to say, hey, hold on, what about him, and

10 what about that, and what about these folks?  Why isn't

11 this evidence here?  The group doesn't think that way,

12 because the group has got the common goal and the common

13 purpose, it's that suspect-driven investigation.

14    And when there is premature closure, when you

15 announce your investigation is pretty much wrapped up,

16 you have got who you want and all you need is the

17 public's help to fill in a few holes, tell us whether

18 you have seen these last few people, once you draw that

19 line -- or these vehicles, once you draw that line in

20 the sand, the investigation just picks up speed and

21 picks up speed and there is really no going back.

22    So now you're forced almost inevitably to

23 ignore evidence as it comes along.  And so did that

24 happen in this case?  Mr. Camiel told you that's what

25 the evidence was going to be, and I submit to you that's

1    exactly what the evidence was.

2           So let's back up, and I apologize right now for

3    how fast I have got to go through this, but I'm going to

4    do try to do in about 90 minutes what it took four weeks

5    to do with you.  So there is a lot of ground to cover,

6    but I want to start with really how he got to that

7    suspect investigation.

8           How did we get there?  Well, it was clear.  Was

9    there any question that this was a suspect-based

10   investigation?  I don't think so.  Mr. Reckner was the

11   very first witness both on April 12th and in this trial.

12   And we asked him, "Did you ever tell anybody that Jim

13   Wells did it?"  He sat on the witness stand after

14   raising his hand and swore under oath, "No, I never

15   did."

16          Well, do we know that that's not true?  Of

17   course we know that's not true because later two of the

18   first five law enforcement officers on the scene, Kelley

19   Brockett, Kirsten Small, both just regular patrol

20   officers with the Coast Guard Police Department, they

21   came, and they didn't have a big role in the

22   investigation, but they made reports that day.  And they

23   made reports about the first folks they talked to.  And

24   Mr. Reckner was one of the very first folks they talked

25   to.  What did he say?  Well, he told Ms. Brockett, he

1   speculated, "Jim Wells is responsible for these

2   shootings."  He told Kirsten Small, "You know, Jim

3   Wells, it's the only way this happened."

4          Well, Ms. Brockett, Ms. Small, they were not

5   experienced law enforcement officers.  And so our

6   experienced law enforcement officer, I saw him here

7   earlier, he was another witness, Trooper Dupras, the

8   first trooper on scene, and they immediately shared that

9   information with him.

10          As investigators arrived, as the C-130 touched

11  off and the FBI showed up, as Joe Sturgis from the Coast

12  Guard Investigative Service showed up, that information

13  just spread and was shared.  By the time the FBI got to

14  Kodiak at 2:00 in the afternoon, Jim Wells was the

15  suspect, the one and only suspect.  Dupras had already

16  went up and started reviewing video to see if he could

17  see anything that might implicate Jim Wells.

18          And we know that the investigation continued

19  that way, because before almost any other witnesses were

20  interviewed, before the videos were determined, before

21  the Wells' car was found, before a scientific test was

22  run, what did Agent Oberlander tell you what happened?

23  What did Mr. Skrocki just selectively parse out and play

24  parts of for you?  Not a simple investigative interview,

25  not a series of quests for the truth or search for just

general information.  Mr. Oberlander, along with his
experienced partner Mr. Bottary, after meeting with the
case agent and conferring on day one, April 12th, they
are on the phone with the United States Attorney's
Office.  These experienced agents haven't done any
investigation really in the case.  It's the day of the
murders.  They haven't been in town 12 hours.  They are
on the phone with the prosecutor plotting to start
interviewing Jim Wells.

            That's what happens.  Now, if that's not a
suspect-based exclusively investigation, I don't know
what is.  And Agent Oberlander told you that was the
deal.  So look at the setup as April 12th starts.
Mr. Skrocki would have you judge Jim Wells' statements
as of today, seven years later, knowing what everybody
-- what he knows, what the investigations have shown,
the lack of evidence, the different statements, but
that's not what happened on April 12th.

            You have to judge what Jim Wells said and
didn't say as a man that's presumed innocent, never
having been in that circumstance or interviewed by law
enforcement in any way, shape or form like that, not
having anything to do with the murders at T-2 that
morning, he's just in the line of Coast Guard people
being interviewed.  That's all he knows.  So that's Jim

1    Wells' perspective.

2          So when you listen to those statements, and

3    don't just listen to the few seconds that Mr. Skrocki

4    thinks helps their case, listen to them all, go back and

5    relisten to them, because I submit to you that they make

6    sense.  There is no evasiveness.  There is no pattern of

7    -- there is certainly less detail then as there is

8    today, but that's because Jim Wells sat there innocent

9    not knowing that he was being set up, not knowing he was

10   being lied to, not knowing that there was a team of

11   people from ground zero, day one, the first minute

12   plotting against him.

13         But Oberlander agreed that that's what was

14   happening.  See, they lied to him from the start.  They

15   told him right out of the chute, "You're not a suspect,"

16   but he was.  They went in there with an orchestrated

17   plan.  They had the case agent, the Coast Guard case

18   agent and then Mr. Oberlander, Mr. Bottary.  They waited

19   and they talked to Jim last after they had a plan.

20         They sent in two agents against one person.

21   Mr. Oberlander told you that's a trained tactic.  They

22   knew what they were going to do with those tactics and

23   he told you what the goal was, see if we can get this

24   guy, who we've already decided did it on day one, to

25   confess.

So what happened?  We went into the first
interview and they eased into it.  They just reassured
Mr. Wells, "You're not a suspect.  We're just trying to
get the lay of the land.  We don't know necessarily
what's going on here."  But they did try to lock him
into a story.  It's not because they needed all the
details.  It's because you would see them over and over
and over get him to try to commit.

"Was it two minutes, Mr. Wells?"  Because if he
says two minutes in the first interview and then we can
say him -- we can get him to say it might be four in the
next interview, aha, it's a lie.  Again, a practiced,
structured, organized interview technique.

But instead Mr. Wells said, "I don't know if it
was two minutes or four.  I was driving to work.  I
wasn't keeping track."  There was no reason to keep
track.  It's a random Thursday morning.  They try to get
him pinned down.  What did Jim Wells do?  He trusted
them.  I'm not a suspect and you just need my help,
fine, I'll tell you what happened.

He provides them information.  And I'll ask you
to relisten to those interviews.  There is no lies
there.  There is no change of story.  There is in the
first interview Mr. Wells not sharing that at 62 years
old he messed his pants getting out of his truck to

check his tire and he spent a little time in the
bathroom because he had diarrhea.  That's the only thing
he left out of that story.  Otherwise, the entire events
of his morning he told them.  He told them when he left.
He told them where he went.  He told them how he got
there.  He told them what he did when he got out with
the tire.  He told them how he got back to the house.
He told them what happened at the house.

He gave them a general description.  Think
about Mr. Wells sitting there.  View it through the lens
of presuming him innocent, like you have to under the
instructions of the Court.  If you'd never been to T-2
that morning, if you never made it to work, if you went
to the airport, you had a low tire, you went home and
changed it, would that seem like enough of an
explanation to explain to the investigators why you
don't need to be considered?  Sure, it would, because
you had no knowledge of what happened at T-2.  You were
never out there.

So he gives them this information.  Well, they
leave him sit in the room and they go out and they
conference and they plan.  Agent Oberlander, Agent
Bottary, Mr. Allison, Mr. Sturgis.  They get back on the
phone with the prosecutor.  Well, what are we going to
do?  How are we going to approach this?

They go back in that interview room.  The first thing they do is they employ another one of those interview tactics, a psychological tactic, they do a little small talk and they say, "Hey, Mr. Wells, what do you think should happen to the person who did this terrible thing?"  Now, if Mr. Wells is the killer, they are expecting him to make some excuses for the situation, to give some explanation, to maybe take responsibility away from the shooter.

Mr. Wells doesn't say that.  Mr. Wells says, "Well, I don't know what should happen.  I guess I have got two thoughts.  Number one, first and foremost, the system should take care of it."  That's the right answer, right.  That's what people get arrested, the system should take care of it.  But then he says, "Look, between you and me, Agents, if somebody did that to somebody in my family, I might take matters into my own hands."

Think about that response.  "If somebody did that to my family," because that's how he saw the rigger shop; his family, not as men he just murdered.  He referred to them, basically the victims, as his family. Well, of course that was not at all the response that Agent Bottary and Agent Oberlander wanted, so they switched tactics.

1          Then they said, "Well, okay, well, let's move

2     on to that.  You know, while we have been talking, you

3     mentioned you had a flat tire and you mentioned you've

4     got your truck here.  Can we go look in your truck?"

5          You know what Jim's response was, "Sure, knock

6     yourself out.  Oh, I have to do some paperwork?"  He

7     signed the consent and said, "The truck is out there,

8     it's unlocked and the keys are in it.  Do what you need

9     to do."  Nothing to hide.  No problem.

10          They said, "Well, while we have been sitting

11    here and we've been trying to pin you down on times,

12    which you obviously don't know, you have at least

13    checked what you could on your telephone, could we see

14    that telephone?"  Jim Wells doesn't know this is a

15    setup.  He says, "Sure, no problem," hands over the

16    phone.  No warrant, no hesitation.  Again, signs the

17    paperwork.

18          Why would he do that?  He trusts them because

19    they have told him, "Look, we're just trying to make

20    sure we understand your story and rule you out."  We

21    know from Agent Oberlander that was another lie.  They

22    weren't trying to rule him out; they were trying to find

23    incriminating evidence on that phone, incriminating

24    evidence in the truck.

25          What did they do?  They broke, they went out.

You saw the search of the truck.  You saw them take the
tires out and put the tires down on the ground.  You saw
them open the doors on all four sides.  Five officers I
counted during that 17-minute search that we played for
you.

Jim Wells stood off to the side.  We learned
from Agent Oberlander that it was while they were
outside that Jim pointed out -- he hadn't mentioned that
he got a nail in the tire.  You know that clip that
Mr. Skrocki played about him not knowing, they just took
the line where he said, "I don't know what happened.  I
didn't look."

Well, the question that led up to that that he
didn't play was, "When you got to the airport, you know,
what did you figure out?"  They were referring to at the
airport, "Did you pick up a rock or a nail or whatever?"
He said, "I didn't look," because he didn't look at the
airport because he got distracted by his whole bathroom
problem.  Of course, he looked when he got home.  He
told you about pulling out the nail.  And it was out
during that search that he pointed that out to the
agents, but think about that, other than being taken out
of context, what sense would it make for him to say in
the interview, "I don't know why my tire went low.  I
don't know why my tire was flat," if according to them

1    he had set up and preconstructed the whole alibi.

2           If that was a whole preconceived thing and he

3    stuck the nail in the tire and then he put the tire in

4    the truck to show him, why would you sit in the

5    interview room and not tell them about the nail?  That

6    was the whole, according to them, key to the fake story.

7    Well, because that's not what they asked.  That's not

8    how he understood it.

9           He was just going along as best he could

10   answering these questions from these agents.  They were

11   talking about what happened at the airport, and so he

12   said, "I don't know.  At that point, I hadn't looked."

13   But outside he pointed out the nail.  Now, they didn't

14   take any pictures of the nail.  They took pictures of

15   the truck out there, but they didn't find anything of

16   any respect in the truck.  They didn't find anything in

17   the phone.

18          So they went inside and they had to regroup.

19   They sent Mr. Wells back into the interview room.  What

20   happened next?  Well, we're going to change tactics.

21   We're going to tell more lies.  Agent Bottary, Agent

22   Oberlander, they meet with the case agent.  They got the

23   prosecutor on the phone.  Look, so far we're not really

24   getting anywhere.  We've made it into his truck, we've

25   made it into his phone, we haven't found anything, so

what do they do?  Well, they tell Jim Wells, "Let's tell him we're going to go home with him back to his house, see what his reaction is to that.

So they go in and they say, "You know, we're concerned, Mr. Wells, about your diabetes.  You've been here a long time, we're concerned for your well-being."  That's not true.  They weren't concerned for his well-being.  Agent Oberlander said, "We were trying to get him to let us go home with him because maybe we would see some evidence in plain view while we were in his house before he had a chance to get back there and change anything."

Again, Jim Wells didn't give them the reaction they wanted.  He said, "Well, can't we just finish answering questions," and they said, "You know, we really think we should go home and get your medicine first just to be safe."  He said, "All right.  Let's go home.  Take me home.  I got nothing to hide there either."

Well, we heard how that worked out, because Agent Oberlander paused at that point and went, "Oh, well, let me just check with the case agent, make sure that's the plan and we'll see what we can do."  He stepped out in the hallway.  And again, isn't that evidence of a man that was just sitting there thinking

these guys are just doing their job, they are just doing
what they need to do and I'm just cooperating, ride
along for whatever they have got planned.  That's what
that is evidence of, if you think about it in the
context of April 12th.

But when he gets out in the hallway, Oberlander
is told by Mr. Allison back there it's a little rushed
here to go to the guy's house, there has got to be
something else we can do.  I know, more lies.

Get Agent Strause, she's with the evidence
response team, let's go in and see how he responds to
this one.  Tell him we're going to do a gunshot residue
test.  Of course, if he was the murderer, he would have
gunshot residue or at least a potential for that, and he
won't know any better.  Those tests are still run.  We
still have the procedure, even if we don't always rely
on it.  Certainly it's a common thing.  He'll understand
that that is significant, so you guys go back in there,
you tell him you're going to take this test and you
watch him close, see what's going to happen.

Now, wouldn't it have been great if we were all
watching that, because then we could gauge, you could
gauge since you have to judge what the true state of the
evidence is.  If the point is we want to capture
somebody's demeanor and physical response to something,

how about we videotape it. Just pull out your cell
phone, one of you three agents, just run the phone.
"Jim, we just want to make sure that our procedure is
followed correctly here so they always have me videotape
that. Is that okay?" Based on the first three
interviews, you know he would've said, "Do whatever you
want to do." And then we could have all seen what his
reaction was, but of course, apparently they couldn't
find or afford a videotape.

They had resources to drive a Suburban full of
people on a C-130, which I'm guessing is not
inexpensive, and fly half the Anchorage agency to Kodiak
Island that day, but they couldn't come up with a cell
phone that would take six minutes of video.

They walked in, they did this gunshot residue.
Was Jim Wells cooperative? First of all, when they
asked for the test, he absolutely, like the phone and
the truck, said, "You bet, let's do it." Then Agent
Strause realized when she got in there I don't even have
all the stuff I need to pretend to make this test real.
And when she couldn't find a piece of gauze, Mr. Wells
helped her out and said, "Well, there's first-aid kits
all over. Just grab one out of there if that will work
for you."

So he's helping them do the test that he

1 thinks, like they've told him, "This is going to clear

2 you, Mr. Wells." They know it's a lie, he doesn't. So

3 he sits there, they do the test.

4        Agent Bottary testified. All three of them who

5 were in the room with Mr. Wells, since none of them

6 recorded it, came in here and told you about what

7 happened. It's audio recorded. Listen to the

8 interview. Just listen. Close your eyes, picture it.

9 Nobody says, "Mr. Wells, you're kind of shaking a little

10 bit. Are you okay? Is your diabetes -- your blood

11 sugar getting low?"

12        Nobody says, "Mr. Wells, you're a little

13 flustered here. Just calm down. This will just take a

14 minute." Nobody contemporaneous says anything. Bottary

15 came in and he testified to you, "I didn't really see

16 any reaction by the guy, he just cooperated." Agent

17 Oberlander said, "Well, I didn't see during the test any

18 reaction, but what I did see is after the test when

19 Ms. Strause put the things together Jim stared very

20 intently at her."

21        And later Mr. Wells told you why that was, he

22 actually did stare pretty intense, he used to be a drug

23 test collector earlier in his Coast Guard days and so he

24 had done that process, sealed up evidence samples many

25 times before, so he was just watching her more out of

curiosity than anything else.  But Agent Strause said,
"Oh, I think he was flustered."  None of us will ever
know because they never preserved any of the true
purpose of the test, capturing Jim's demeanor.

They never preserved anything about the test
because Agent Strause said she went out in the hallway
and threw it away.  Now, is that a suspect-based
investigation or an evidence-based?  The evidence equals
gunshot residue.  The suspect is let's see how the
suspect reacts.

So they sent Jim Wells home that night, and
then he came back the next morning as instructed.  He
served his grief counseling, went to his grief
counseling meeting with all the rest of the crew, and
there they were, Agent Oberlander and Agent Bottary
waiting.  Spent most of night figuring this out, looking
at cameras, piecing together timelines, all things that
Jim Wells had no idea they were doing, all things that
Jim Wells could not anticipate.

But they spent the night plotting that four
interviews, got really no reaction and nothing but trust
and cooperation out of him the night before, we're going
to have to turn this up.  So when he was down with his
counseling, they had Mr. Wells come in, and what do we
know about what happened?  Well, we know just like the

1    four interviews before, it was full of lies and

2    deception, much like the jury instructions say.  And the

3    police can do that.  I'm not saying they can't lie to

4    you.  I'm just saying it's pretty interesting that they

5    want the evidence to be all based on Jim's lack of

6    statements all developed through their lies and

7    deception.

8            So take that into consideration when you're

9    judging this.  But they go in there, and now this time

10   they're going to turn up the heat on Mr. Wells and so

11   they are hoping to get that confession, so they think we

12   better do this advice of rights form and get him to

13   waive his rights, so if he does give a confession, we

14   can make it stick.

15           And so they start with little bit of small talk

16   again, make sure he's comfortable, and then say, "Oh, by

17   the way, we need you to sign this advice of rights," and

18   Mr. Wells balks a little bit.  He says, "Geez, should I

19   be concerned about this?"  And what do they do?  Listen

20   to the tape.

21           They fall over each other, that is

22   Mr. Oberlander and Mr. Bottary, to, "This is just a

23   formality.  It's like those forms we signed yesterday

24   with a consent to the truck and the phone.  You know the

25   government, it's paperwork.  Don't worry about it."  And

they do a couple things. They assure him like they had before. "Look, you're not a suspect. This is just part of the process." And they try to gain that trust that they know they have already had with him, and they say, "We just would like you to sign this and go ahead and keep talking to us, because we need you to help us with our investigation. You're our subject matter expertise down there," is what they say to him.

So he says, "Oh, well, okay. If it will help you guys, I'll waive my rights and continue to talk to you." So he fills out the form and he trusts them that he's not a suspect, that he's actually there to help and they are actually there to listen.

So the interview goes forward, and almost immediately after that, they say one of the most critical things in that long fifth interview. It's an interview that takes almost an hour and a half. They say to him, "You know, we got to go back through this and we got to figure it out, Mr. Wells. We haven't seen any of the cameras yet. We don't know really the details. It's early. I mean we haven't been down here really 24 hours, so we don't know much, but we're trying to piece it together."

They talk about the rigger shop, and then they go through a bunch of tactics again to see and gauge and

judge Mr. Wells' responses.  They talk to him about the

victims.  They suggest, well, what might Mr. Belisle

have done?  What might there be in Jim Hopkins' life

that could have brought this on, hoping that he would

say bad things about either Hopkins or Belisle.  That

maybe if he was the killer, he would show some signs of

evidence of a motive against those two.

He doesn't.  He says, "I don't know anything."

He describes them both in good terms.  Doesn't have a

bad thing to say about Mr. Rich Belisle.  Doesn't have a

bad thing to say about Jim Hopkins.  I mean describes

how their work are, not a bad thing.

So they move on to the shop.  They ask about

what young Cody Beauford, the ET3, how about the

non-rates, and they run through everyone.  Again, hoping

that maybe Mr. Wells will deflect blame onto somebody

else, draw somebody else into question.

What he's do?  He says, "I got to tell you

we're a pretty tight shop."  We're all kind of that

family he had described the day before.  He says, "I

don't think it could be any of those -- any of these

people.  As a matter of fact," he says, "we have got a

joke down there that we're sort of the breakaway

republic of T-2.  Nobody wants to go up the hill.

Everybody wants to come down the hill and work with us.

I think if you guys are looking at somebody in the shop,
that's wrong.  I wouldn't put my finger on any of those
people."

          Again, he doesn't take the bait to blame
anybody else.  Then they say, "What do you think
happened?  I mean, how can you explain how this thing
could have happened," hoping that he'll offer some
explanation that they can later refute.

          But again, none of these tactics work.  What he
says is, "You know, I haven't a clue for that."  Haven't
a clue, that's it.  No blame, no excuses, no finger
pointing, no clue.  So they go forward, and that's when
they have him draw the little diagram.  They talk about
the cameras.  He draws a pretty accurate diagram.  He's
worked in the shop for 20 years.  He's honest about what
he knows about the cameras.  It generally points this
way, although they pan and tilt and zoom anywhere.  And
the guys up the hill run them so you never really know
where they are pointed, but this is what I know about
the logistics.

          And then probably the most interesting change
and the most interesting thing in the interviews
happens, and it happens about ten minutes before the
end.  Because up until now, it's been pretty
conversational.  It's been pretty nonconfrontational.

1   And Jim Wells had been assured in five interviews

2   numerous times you're not a suspect, we're just trying

3   to do an investigation and we're certainly not accusing

4   you.  He's been told in this very interview, look, we

5   need your help because we haven't seen the cameras, we

6   don't know the evidence.

7          And then all a sudden Agent Bottary says, "Let

8   me have you try to figure this out for me, Mr. Wells.

9   We have looked at the main gate camera and we know the

10  times from the main gate camera."

11         Well, what would Jim Wells know at that moment?

12  If you listen to the tape you can almost hear from the

13  pause and the response by Mr. Wells what becomes

14  apparent.  Wait a minute.  I'm not being told the truth.

15  Something is going on.  Just a few minutes ago you told

16  me you hadn't done any investigation or -- you hadn't

17  seen any cameras, but now you're asking me not about

18  things up at T-2 where the murders happened, but you

19  have seen the main gate camera and there are times on

20  there that I don't know anything about.

21         And then there is a -- is there a problem with

22  the times or is there a problem with what I'm seen on

23  the cameras, because they described, "We've got these

24  camera issues."  And what did you hear from the

25  evidence?  The cameras at the main gate the times are

screwed up.  They have power outages -- although I don't
understand this, they have power outages that can cause
the cameras to stop, but somehow when they come on, they
are 18 minutes ahead of schedule.  Well, that's not what
a power outage does.  And they had to do all these
gyrations and look at metadata and figure out and
realign and calculate their cameras.

Anyway, Mr. Wells has no idea as he sits there.
Did these guys really look at cameras or didn't they
really?  That's a pretty mixed message.  Do the cameras
really say those times; is that what they are asking me?
Are the times right?  Are the times real?  Are the times
actual?

So you hear Mr. Wells -- well, you hear that
pause, because that's the first time he's told any
details.  And after that pause, he says, "Well, I don't
know what discrepancy you would be talking about.  I
don't know."  So do they wait and explain it any better?
Do they say, well, look, here is the way we think it
works and stay with the main gate camera, listen to the
tape?  No.  That's not how you get a suspect flustered.
That's not how you get a suspect talking in circles.

They switch gears immediately and they say,
"Well, how about this, let us tell you about what we
know about T-2 because we've looked at those cameras as

well.  We know that Rich Belisle arrived at 7:00.  We
know that Jim Hopkins arrived at 7:08.  There is a
walker pictured on one of the cameras out there.  He
hears a loud noise.  There is a car and we can't
identify the car and the cars went by.  Explain all of
that, Mr. Wells."

        Again, don't judge him sitting here today.  Put
yourself in that chair on April 13, 2012, having never
been at T-2 the day before.  What would you say to that
if you knew none of those details and if you couldn't
even be sure that any of those details were real because
the agent had just told you they hadn't seen it and now
they have got all of these details, what explanation if
you hadn't been there could you offer?

        I submit you'd offer exactly what Jim Wells
offered, and that is none.  "I don't know how to explain
any of that.  I wasn't there."  They say, "We're
baffled."  He says, "I can understand.  I am too."

        "All right.  Well, you think about it.  We're
going to go out and talk."  So they go back and they
confer with Mr. Allison, they confer with the prosecutor
again, and they say, well, none of this is working.
This guy didn't take one of those conversations we had,
take the bait at any time.  We confronted him with some
different versions of different camera times and

different events, he didn't offer an explanation for any
of those details.  He could have made up a bunch of
excuses.  He didn't make up any.  He said, "I don't
understand what you guys are saying and I'm as confused
as you."

That's all he said, boss, so what do we do?  Go
in there and change the game then.  Go in there and tell
him, look, I'm not any longer saying you're not a
suspect.  I'm not any longer saying this is an
investigation.  I'm accusing you of murder, Mr. Wells.

So that's what Agent Bottary did.  They walked
in.  Agent Oberlander started into his big colloquy.  If
you listen to this short interview, it's only a couple
minutes long, you hear the bell, you hear it finally go
off in Mr. Wells' head.  He knows for the first time
what's really happening.

Because as Agent Oberlander starts to talk, Mr.
Wells interrupts him and says, "Are you accusing me of
this?  Are you accusing me of murder?"  And at that
point, Oberlander is honest really with him for the
first time, "Yes, sir, we are accusing you, because it
either probably happened in the heat of passion or it
happened on purpose, but, yes, we're accusing you."

And Jim Wells said, "Oh, then I don't want to
talk about this anymore."  So that's how that unfolded.

1    Don't listen to little snippets and little pieces of

2    these interviews and judge Mr. Wells from today.  If

3    you're going to judge what he said, look at it through

4    the lens of an innocent man sitting in the chair on

5    April 12th and April 13th and see if what he says

6    doesn't make sense.  I submit to you it makes absolute

7    sense.  There is no evasiveness.  He just doesn't commit

8    to things he doesn't know.  That's all that's going on,

9    things he has no way of knowing.

10          What also is important about those interviews?

11   Well, one of the very last witnesses you heard, it was

12   in the government's rebuttal case, Captain Brandon

13   Trappett, the Air Force man who came in.  He was talking

14   about medical records, and, oops, he said this:  He

15   said, "We take meticulous records because if you don't

16   document it, it's like it didn't happen."

17          That's what we know about all those interviews

18   is that while they're recorded, Agent Allison is out in

19   the hallway and we don't know what planning is going on

20   out there because nobody writes a report.  They don't

21   take any videos.  They just want to tell you what they

22   saw and the importance.

23          "Mr. Wells was getting agitated.  He broke his

24   sucker stick in half."  All things that aren't in any

25   report, aren't documented any way, no way for you to see

them.  You just to have trust what they are saying, even though you're listening to them lie.

So knowing that they believe Jim Wells committed the crime, well, now they need to hone in on a time.  And what was the evidence of that?  And Mr. Skrocki sort of changed here in the government's case, because during trial there was a lot of question of what Don Rudat heard.  Don Rudat was the man that was walking right by.  If the murders happened when the government says the murders happened, he should have heard five gunshots as he walked by, because he walked by at about 7:10, turned around just past COMMSTA and was walking back by at 7:12, and he said he heard a loud metallic noise.

In direct examination to Mr. Skrocki's question, he said, "I heard what sounded like sheet metal.  Well, not sheet metal, a metal plate."  It was his description.  He picked this description. Quarter-inch metal plate hitting solid against concrete.

Later in the case, we called Martin Heckerman. That's the young apprentice working just down the road at the water treatment plant.  What did he say he was working on?  He was working on those big 25-foot-long tanks.  What were they?  Look at the description.  Well, they are quarter-inch steel tanks.  Do you suppose

1    that's any kind of coincidence?  No.

2            One man described I heard quarter-inch metal

3    hitting something, and another man described hitting

4    quarter-inch metal.  But is there any question that you

5    could hear it?

6            Well, later Mr. Stearns came, that's

7    Mr. Heckerman's boss, and he said, you know, what's it

8    sound like when you hit one of these quarter-inch steel

9    tanks.  Well, it's loud.  They are empty.  They are

10   hollow.  They ring because we're hitting them with a

11   five-pound sledgehammer.

12           If there is any question that this is what Don

13   Rudat heard, and law enforcement knows it even though

14   they don't want to admit to you, check your notes on Mr.

15   Stearns, because Mr. Stearns said something very

16   interesting after the initial interview he did with law

17   enforcement that happened right there on April 12th.

18           He said a couple officers came up and they

19   talked to us, they kind of separated us all, they asked

20   us if we had seen anything.  We didn't see anything.

21   Then we went back to work, but not very long after that

22   another officer came up and said, "Hey, you guys, can

23   you repeat those noises you were making earlier?"

24   Mr. Stearns said, "Sure, we got two more tanks to cut

25   up," so they went back to work making those noises.  And

what did he see that officer do?  The officer stood there on his radio looking back in the direction of T-2, probably talking to somebody on the other end who was listening.  Then the officer waved and off he went.

What was he doing?  Why was he there?  They had talked to Mr. Rudat and they knew he heard a loud metal noise.  Not gunshots.  Not the timing that they thought. They confirmed it.  They confirmed it the morning of April 12.  Now, the government didn't -- those reports again apparently don't exist.  Nobody documented that. Thank God Mr. Stearns remembers it.

But he was there.  He was cutting those tanks. He was making those noises.  Don Rudat heard those noises.  There should be no doubt about it.  It wasn't a gunshot.  I asked Mr. Rudat, I said, "Is what you heard, it was not a gunshot, was it?  Didn't register to you as a gunshot?"  And he said, "Absolutely, it did not register as a gunshot, no, sir."

I said, "Are you sure?  You say it's a metal noise.  You grew up around those kind of things."  He described hearing those similar things in an airplane hangar.  I said, "Could you have told a metal noise like that from a gunshot?"  Absolute honest response, "Well, sir, I would like to think I could."

So if that's not the gunshots going off, well,

1 maybe we can lock in the time by the vehicle. Now,

2 there was lots of evidence -- well, lots of testimony

3 about what that blue car might have been and what it

4 might not have been. Lots of witnesses about what's it

5 look like.

6       Mr. Skrocki says, "Oh, it's just common sense,

7 it's simple, blue car equals blue car, must be his car."

8 What you didn't hear any of in an hour and ten minutes

9 is the evidence, the actual evidence that that car

10 stopped at T-2. If there was evidence that that car

11 stopped at T-2, first of all, there would be witnesses.

12 You look at the chart, it's Government Exhibit No. 105,

13 it's shift change, there's people coming and going.

14 There's watch standers who are supposed to be paying

15 attention to those buildings and the things in the area.

16       There is not a single witness that sees a blue

17 car out there, that even sees the blue car that is later

18 captured on the video. And there is certainly nobody

19 that sees a blue car at T-2 anywhere.

20       The car drives by, and we know it doesn't go in

21 the first two driveways because the camera view, and

22 I'll show you a picture of the camera view, sees the

23 first two driveways and the car goes right by on Anton

24 Larsen Bay. So if it stops at T-2, it can only come in

25 through the back way. And the government, because

nobody sees it, they try to explain that to you with
zero evidence at all that the reason no one sees it is
somebody drove it in the back, back there by the
equipment, behind the connex.  That must be where it was
parked.

The problem is the vehicle probably just
continued down Anton Larsen Bay, just like two other
vehicles that we know continued down Anton Larsen Bay.
Mr. Schilbach in the white truck, he drives by and the
video shows him about four frames.  That's how fast he
is going.  We don't know the speed, but about four
frames.

Later, Arthur Bors, the golf course manager,
goes by about four frames, because he's going to the
golf course.  The blue car goes by about four frames,
same speed as those cars that are going down the road.
Mr. Schilbach goes down, checks the golf course and
comes back.  He's gone about six minutes.  The blue car
goes by, comes back, it's only gone about five and a
half minutes, five minutes and 14 seconds, about the
same as a trip to the golf course.

The other thing is actually that morning there
was physical evidence that was captured by a law
enforcement officer that I would say directly refutes
the government's story that, despite nobody seeing it,

1    that car went in the third driveway and it drove around

2    and it made its way behind the building.  So let's look

3    at some of that.

4          Well, first of all, that's Mr. Toglia's camera

5    view, the yellow lines, what we're looking at right

6    here, this area.  The car as it goes by there, it's

7    already past the second driveway, so we know it doesn't

8    turn in those first two driveways.  As I told you,

9    Mr. Schilbach, he goes by four frames, the blue car four

10    frames, Mr. Bors four frames.  They are all going in the

11    same direction.  They are all going the same speed.

12    They are all going on the same road.

13          Is that consistent with a car stopping?  Well,

14    we know two didn't.  Why is it any less consistent to

15    assume that the third didn't?  Mr. Schilbach, as I said,

16    takes six minutes and 14 seconds to go down, check out

17    the golf course, come back.

18          The blue car, 5 minutes, 11 seconds; about the

19    same time.  Why is it not entirely consistent that that

20    car went down there, checked out the golf course and

21    went back?  The government would never know.  Not a

22    single law enforcement officer took a ride on Anton

23    Larsen Bay Road.  Why?  Because they didn't think Jim

24    Wells went that way so they ignore that evidence.

25          But here is maybe the most significant evidence

1   I think that should tell you, that really proves that no

2   car came in the third driveway with nobody seeing it,

3   drove in and somehow parked behind there.  Remember

4   Trooper Allen Jones, he's a wildlife trooper.  Normally

5   he's flying the Beaver around Kodiak Island shuttling

6   troopers and other people.

7           He got there, responded to the call.  He wasn't

8   flying that morning.  And somebody gave him a camera and

9   said, "Your job is to walk around and check for tracks,

10  check for -- see if somebody walked in, see if somebody

11  drove out, see what you can find."

12          Kind of a cursory duty, but he walked the

13  perimeter.  Remember he took some tire tracks around

14  this driveway.  We know the blue car didn't come in the

15  second driveway, so those tracks turned out to not match

16  Nancy Wells' car.  They checked anyway, but they turned

17  out to be nothing, but he was that thorough as he was

18  taking pictures of the ground.  And he came around here

19  and he came across here.  He went up on the hill, and

20  this is where he took that picture up on the hill behind

21  T-2 of this area.

22          What else did he tell you?  He told you that

23  night in Kodiak we had a hard freeze.  The ground was

24  froze.  The snow was froze so hard that when I walked up

25  there I didn't really even leave footprints.  What does

that mean about this?  You know what it means?  It means
that all of those puddles that had melted the day
before, because it's April in Kodiak, it's breakup, it's
thawing and freezing each day and night, that means that
all of those puddles, if you look at that -- and these
pictures are in, you can look at the exhibits.  Those
puddles, just like the snow that morning, are all still
froze.

And if you look at the ice, none of them are
broke.  If you look at the tracks, the way the pictures
-- the way the ruts from the road go, a car couldn't get
behind that building without driving over and through
that ice, without leaving tracks through that ice,
breaking that ice, throwing mud up onto the unbroken
ice.  Trooper Jones would have saw all of that, just
like the tire tracks he recorded pictures of and took
casting of.  He would've took pictures.  "Hey, guys,
looks like we got a car coming in the back way here."

He was careful enough that he walked all of
that back there.  Remember he took pictures of the back
door of the boiler room door, but he didn't see any car
access this from behind.  Why?  Because it didn't
happen.  Which fully explains why nobody saw it.  That's
the most sensible reason why nobody saw it is because it
didn't happen.  Trooper Jones just happened to document

 1  it.

 2          So is that enough, the blue car didn't stop?

 3  If it's consistent with going down the road, we have got

 4  nobody that says it stops, would the government take no

 5  for an answer?  Of course not.  What did they do?  Even

 6  though they had their mind made by April 20th, because

 7  the pictures are already in the paper, they contacted

 8  Chris Iber, a witness that they didn't call, an FBI

 9  agent I had to call as a witness.

10          They sent those videos to Mr. Iber and said,

11  "Tell us the make and model of this car."  He said,

12  "Terrible video, low resolution.  I can't make any

13  opinion about the make and model of car."  So they said,

14  "Well, let's talk to a more experienced person, Jerry

15  Richards."  You remember Mr. Richards came in here, a

16  big presence, sat on this stand.  40-plus years,

17  17 years running the photo lab and the video analysis

18  lab for the FBI.  They went to him.  They said, "Tell us

19  the make and model of car."  He said, "I can't even tell

20  you what kind of car it is.  I'm not even sure about the

21  color based on how bad that video is."

22          So they went to Neil Schmidt.  They switched

23  gears.  Let's go to the Honda guy.  After four visits

24  the Honda guy said, "Well, I'm 70 percent sure that it's

25  a Honda, but I really can't be certain."  They showed

him pictures of Wells' car.  They give him the VIN
number from the Wells' car.  "If we give you the answer,
can you tell us for sure?"  "No, 70 percent at best."
Which means, of course, 30 percent of the time I'm
wrong.

          That wasn't enough for them, so they went back
to the FBI.  They went to Mr. Vorder Bruegge, and
Mr. Vorder Bruegge, as Mr. Skrocki said, did the
overlay.  What he said is, "With this terrible video, I
can really get you maybe a 20-inch range going this way
and a 10-inch range going this way, and kind of fits
most SUVs, most minivans, most subcompact cars.  That's
not really going to help you."

          So they switch gears, and we'll talk about
these reconstructionists, because then they, having not
taken no for an answer, started spending money.  But if
I back up, you know, Mr. Iber was important.  16 years
with the FBI, he sat at his desk in Quantico, Virginia
in the FBI lab, he was working with a man named Tony
Imel.  They ran the whole calculation, two of them.
They said, "This is a terrible video.  We can't tell
what it is.  There is not even characteristics to do a
match here of anything."

          They had it looked at independently by a third
examiner, George Skaluba, he signed off they could offer

no opinion.  Chris Iber thought about it and he called

Mr. Allison back and said, you know, maybe if you don't

send me copies, send me the original hard drive, I can

make some sense of it.  They sent him the original hard

drives, and his opinion didn't get better.

So the government, like you do in a suspect

investigation, when it doesn't fit, you ignore it

because it doesn't fit.  So they went to Mr. Richards.

Again, he was very experience, but he gave them the same

bad answer.  Interestingly, very interestingly, what did

they tell him to do?  "Sir, don't write a report and

don't call us, we'll call you."  Only they never did.

Why?  Well, that's how suspect investigations work.

That's how tunnel vision operates.  If it doesn't match

my investigation, then I just don't deal with it.

They went to Neil Schmidt.  We talked about

Mr. Schmidt.  After four visits, he could get to

70 percent, but he also said something pretty

interesting.  Remember I stood at the podium here and I

held that spreadsheet that later Mr. Allison sent him,

and he said even though I'm 70 percent sure it's

probably some kind of a Honda, there is at least 22

other makes and models and other vehicles that it also

could be, which is why I'll be wrong a third of the

time.

1    That wasn't enough for the government, so we

2   went back to the FBI, we talked to Mr. Vorder Bruegge.

3   And I told you about those error rates, told you about

4   the problems with the size range.  And the last question

5   I asked Mr. Vorder Bruegge on the stand, I said, "Sir,

6   really based on how bad the video is and the low

7   resolution and the lack of details, it's impossible to

8   know what that vehicle is, isn't it?"  His answer:

9   "Yes, impossible.  Best I can do is this general

10  geometric shape, which covers almost all ranges of

11  subcompact SUVs and minivans."

12    Not taking no for an answer, then the

13  government decided, well, if we spend some money on this

14  maybe this will work.  They hired Mr. Toglia.  They

15  hired Mr. Becker.  You heard between their two

16  testimonies.  Remember it's nine still frames of video.

17  It's one second this way and one second that way.  And

18  they spent $150,000 for somebody to maybe give them a

19  different answer that six FBI agents were unwilling to

20  give.  "I can't tell you what car it is. "

21    These guys said, oh, yeah, it's simpler than

22  that.  We don't need to consider pixel size and the fact

23  that it's 1,000 feet away and anything that the motion

24  blur does to this.  We'll just line it up, get the

25  laser, put a cartoon car over the top of it and say,

see, it's not that complicated, they match.  I submit to
you that in the end, even they could only say, well,
kind of looks like a Honda, it's consistent in size, but
that's all that evidence does, just supports that a blue
car went down the road, a blue car that likely never
stopped at T-2.

What did Mr. Reisberg tell you?  Remember
witness Daniel Reisberg, a professor that studies things
like confirmation bias, and particularly as it relates
to circumstances where somebody is trying to make one of
these identifications.  He said, well, the recipe for
confirmation bias in a visual situation is you have
something of low quality input.  I think it's a
consensus between all the witnesses that were called, we
got a low quality input.

It's when the person who is making the
identification provided the answer.  Each one of the
government witnesses not only got that unknown video,
but they got a copy of pictures of Mr. Wells' car, so
they knew the answer.  They knew what they were looking
for.

And then there is some kind of subjective
judgment.  How do I place it?  How do I judge it?  How
do I line up my things?  Well, Mr. Reisberg told you
that's the exact recipe for when people see, like in a

1    suspect-based investigation, what they want to see.

2    They make things fit in hindsight what they hope they

3    were going to show all along.

4            We called Jim Hoerricks.  Jim Hoerricks is a

5    video analyst, again, like Mr. Iber, like Mr. Richards,

6    like Mr. Vorder Bruegge, 15-plus years in the LA County

7    PD office specializing in forensic video analysis.  Now

8    runs his own company and travels the world training law

9    enforcement forensic video analysts.

10           And he told you, look, the reason this is such

11   a problem is that video is so bad you can't see any of

12   the characteristics, you can't identify anything about

13   that vehicle, which makes an overlay or this fancy

14   photogrammetry, or even a simple comparison impossible,

15   because apples to apples requires you to start knowing

16   that you're comparing an apple and that we can't do.

17           So I think it's pretty clear that there is no

18   evidence that the car stopped at T-2 and there is no

19   evidence that the car was a Honda CR-V, much less a

20   Honda CR-V driven by Jim Wells.

21           So what do we know about what might have been

22   real evidence as a bunch of video conjecture or

23   assumption that a car stopped?  Well, from the scene.

24   And Mr. Skrocki went through this real fast in their

25   initial closing argument.  Why?  Because it's easy to

1    talk fast about nothing because there is nothing to talk

2    about.

3         But at the scene, this is a diagram that the

4    agents did, and if you look there is -- you will be able

5    to see it better because it kind of fades out with the

6    light, but there is a bunch of yellow dots here, and all

7    those yellow dots represent potential evidence.  They

8    represent blood splatter, because there was that very

9    bloody crime.  They represent gunshot residue.  That's

10   what both the coroner and the DNA person looked at.

11        They represent -- there's shell casings -- or

12   there's no shell casings found, but there is bullet

13   fragments.  There's fingerprints, a whole raft of the

14   fingerprints, 50-plus fingerprints, eight of which to

15   this day remain unidentified.  There's DNA.  They

16   vacuumed the rugs and looked for hair and fiber samples.

17        There's an unidentified boot print on the same

18   door with the unidentified fingerprint.  All of those

19   things have two things in common:  They were found at

20   the scene of this crime and they have no connection to

21   Jim Wells.  They don't link him to this crime in any

22   way.

23        So when the scene didn't help, they moved on to

24   search Jim Wells' car, the same cars they put in the

25   paper, the same cars that they were convinced on day one

must have been driven both on that day by the murderer.

Again, they looked -- they swabbed the steering wheels.  They looked every place they could.  Physical DNA evidence, do we find blood, do we find hair samples, do we find fiber, do we find a murder weapon, do we find shell casings or bullets?  Zero.  You heard that all the forensic testing in the world came up with nothing.

Let's go to his house.  We searched two places in his house inside and outside.  We'll start outside. Was it extensive?  Have you ever read about a case where agents went and dug up somebody's septic tank and crawled in there to see if somebody might have stuffed clothes or a gun in there?  Pretty extensive.  Nobody else's septic tank, because they had only had one suspect.

How about spending four days with almost 40 people, enough people that they brought their own outhouse.  They dug up a whole hillside, flew in metal detectors Agent Oberlander told you from -- might have been Agent Allison -- from back east.  So they had the equipment to search for what they hoped to be one bullet that would match a murder weapon.

They found 40 or 50 bullets, Mr. Shim the firearms guy told us.  You know what again all of these things had in common?  No connection to the murder, no

connection to Jim Wells being the murderer.

So they went inside. Nine different search warrants at his house. Came back multiple times over multiple days. The initial search took three full days with so many agents they had to have a sign-in sheet at the front door.

Jim Wells had been excluded from his house. You heard that he went back there and tried to get in and sat at the bottom of the driveway looking up the hill at all those agents searching his house. He wasn't allowed back in the house.

They searched from the attic to the garage. Again, we're looking for DNA. We're looking for blood. We're taking samples. They emptied out the sink traps.

And all the evidence they found had two things in common: No connection to Jim Wells and no connection to the murder.

So that wasn't enough, nine search warrants at home, several search warrants on the vehicle. They search a raft of other things, but, again, all focused on Jim Wells. Searched his phone records. Nothing. Not a single text message, not one. Not a single phone call that fit the government's theory.

Nothing about Jim's financial records that would show he was having financial problems or there was

some other financial motivation.  Took his computers.

Took his electronics.  No internet searches that related

to how to commit the perfect murder or any other thing.

No lists or writings at work, in his desk, e-mails on

his computers, at home, or at work.  No planning.  No

nothing.

Starting the day after the murders, they

started following him, 24/7, two agents at a time.  If

he went in a store, they went in a store.  If he went to

a house, they talked to the friends when he left.

Surveillance, after months, again, all these things.

One thing in common:  No connection to Jim Wells and the

murders.

He had no history.  They searched his history.

They interviewed everybody they could find.  He doesn't

have a drug or alcohol problem.

MR. SKROCKI:  Objection, Your Honor, facts not

in evidence.

THE COURT:  That's sustained.  You can

rephrase.

MR. COLBATH:  Sure.  There is no negative

history that you heard about in this case.  No history

that's found by Mr. Wells where he had a mental health

problem.

MR. SKROCKI:  Same objection, Your Honor.

1    There is no evidence in the record for this argument.

2            THE COURT:  Well, I think that's his point.

3    There is no evidence to support that, and I'll allow

4    that neither side presented evidence of these issues.

5            MR. COLBATH:  Thank you, Your Honor, because

6    that is exactly my point.  There is no record of Jim

7    Wells threatening anybody.  There is no record of Jim

8    Wells committing violence against anybody in his life.

9    It's just not there.

10           You know that law enforcement looked.  You can

11   assume it's a fair inference they looked.  They looked

12   at everything else related to Jim Wells and what they

13   came up with was nothing.

14           So they looked at firearms, of course, because

15   a murder that's committed with a .44-caliber needs -- we

16   know there is a murder weapon, a murder weapon

17   somewhere.  First of all, the most obvious choice, Jim

18   Wells had a .44-caliber, like about a third of the

19   population of the island of Kodiak I'm going to guess;

20   his was excluded.

21           So did they just randomly start looking for

22   murder weapons?  No, they went to his best friend, his

23   hunting buddy, Hank Pennington.  He happened to have two

24   Smith & Wesson .44s.  Those were excluded.  The best

25   they could do was 20 years ago one of Matt Wells', one

1    of Jim's son's friends was at the house, there was Mr.

2    Wells and another group of guys out in the garage,

3    Mr. Robinson said, that must have just came back from a

4    hunting trip.  And Mr. Robinson remembered there was

5    some rifles and there was a silver handgun on the table,

6    apparently guns related to this hunting party.

7           Does that show Mr. Wells had some kind of

8    revolver?  No, nothing other than the revolver he had.

9    20 years prior does it show any connection to this

10   crime?  Of course not.

11          Matt Wells came here.  16 years on the police

12   force himself, married to a police officer, running a

13   SWAT team down in Oregon.  He told you all growing up

14   dad only had one gun.  Dad only owned one revolver.

15   It's that revolver.  Carried it for bear protection.

16          What do we know about the one other witness

17   that talked about Mr. Wells' gun, Robert Pletnikoff?  He

18   said, like Mr. Robinson, it was 20 years ago I think I

19   saw Jim with it.  He got in my boat one time on a

20   hunting trip.  He was wearing it in a holster, a big

21   holster, a holster like that black holster.  It covered

22   most of the gun, but I could see two things:  I could

23   see brown handles and it looked silver.  Silver like the

24   hammer which would stick out right here on the back of

25   the gun, and handles, which would stick out of the back

1  of the holster that are brown.

2          What did John Stein tell you about his gun?  It

3  was a stainless steel gun and I had black rubber grips

4  on all of them.  Robert Pletnikoff didn't see Jim Wells

5  with John Stein's gun.  He saw him with Jim Wells' gun,

6  the same gun that the FBI found in his house, the same

7  gun that the analyst later excluded.

8          There is no murder weapon that's linked to Jim

9  Wells, because, well, number one, Jim Wells isn't the

10 murderer, and number two, they didn't look in any of the

11 places where the murder weapon might be because they

12 were only looking at their suspect.

13         Now, there was some testimony that they went

14 around and they looked for other guns.  You heard Agent

15 Allison say, "We checked the firearms records for

16 Wal-Mart and Sportman's Warehouse and a whole bunch of

17 places where .44s were sold."  But were they really

18 looking for a gun that was linked to the murders or were

19 they looking for a gun that was linked in this

20 suspect-based investigation?

21         First of all, one more point about Mr. Stein's

22 gun.  What they'd have you believe is -- and this is the

23 nonsensical part of a story that's not supported by

24 evidence I guess -- is John Stein reported his gun lost,

25 not stolen, not taken by his friend Jim Wells, but lost,

because he didn't know the last time he had seen it.  He
reported it lost to the troopers and he sent a copy of
the report to Mr. Wells so that Mr. Wells would know if
the gun is ever found it will be linked to him, that's
where John thought he lost it.

So the government would have you believe that
the one gun that Mr. Wells must have kept around and
then decided to use in the double homicide is a gun that
if it is ever found the first place the police are going
to come looking is back with him, because it's directly
traceable to him right through this letter, paragraph
seven.

But when we think about those gun searchs, I
want you remember witness Carl Blain.  We'll talk about
Mr. Blain in a minute.

Let's talk about this motive for a minute, or
lack of motive, as the case may be.  Mr. Skrocki
described that 2011, April, to 2012, April was a bad
year for Mr. Wells.  I disagree.  I think the evidence
shows otherwise.  What the evidence shows about the
first half of that year was that from April through May,
through June, Mr. Reckner told you about it, because he
was there, he was out on the island of Shemya.  That's
how Mr. Hopkins got awarded sailor of the year, an award
Jim, as a civilian, is not eligible for, but you saw the

picture of Mr. Wells standing on Shemya and that great
project that the riggers did out there.  Mr. Wells was
standing there directing Mr. Belisle, Mr. Hopkins and
Mr. Beauford as they adjusted a wire.  Mr. Wells ran the
gauges to make sure it was working.

The first part of the year went just fine.
They repaired antennas.  They did this great project on
Shemya.  Work was good.

Now, there was a new commander and he wanted to
make sure policies were written and policies were
applied, so they wrote this letter in April that said,
look, we haven't had written policies in the past so we
want you, Mr. Belisle, we want you, Mr. Wells, to
understand our expectations, so you got to turn in leave
slips and you got to let us know where you're going, you
got to keep better track of things and you guys are both
chiefs, so we have got a new supervisor, Mr. Hopkins, in
the shop, we want you to mentor him.

None of that is discipline.  None of that
causes a bad year.  That's just we have now got written
policy.  We had policies all along.  Jim told you it
wasn't much of a change of anything.  They had those
policies.  The letter of expectation happens in April.
And work goes on in Shemya.  And it's a great project,
until the very end for Mr. Wells.

          Mr. Wells gets sick.  He doesn't get to go see
the project through in September because he starts with
his gallbladder issues.  He's always dealt with his
diabetes.  He's always had medication issues, but he
starts really getting sick in September of 2011.  And
that does sort of change things for him, not in a
negative fashion, it just changes how he operates.

          But there is no problem with antennas, there is
no problem with work, and there is certainly no problem
up through September with Jim Wells' work.  Once Jim
Wells leaves, we know from when he's gone that there is
not much work that goes on over the year, and we're
going to look -- over the winter.  We'll look at the
calendar and we'll see what happens -- keep in mind
what's going to happen between September and the end of
February.

          Mr. Skrocki says this NATE conference was a
significant thing.  When Jim comes back after being gone
for those many months, he asks about, hey, what are we
going to do for the NATE conference.  Mr. Reckner didn't
bring it up.  Mr. Reckner didn't come to him and say,
"Jim, I'm glad you're back.  You haven't been a very
good employee.  I'm not going to send you to the
conference."

          Jim inquires, knowing that he's sick, knowing

that he's been gone for months, knowing that, and the
last witness -- I agree with Mr. Skrocki on this one --
the last witness with the medical records, it is
important, because look at the one that we put in next
to the one that they put in.  What it says is throughout
the month of January, Jim had multiple meetings with his
provider and then the provider made him aware that you
are going to have to have surgery and we're going to get
it scheduled with the base and it's going to happen
soon.

The last line on the medical record says,
"Patient was aware."  It's dated June 17th.  Of course,
when he walked into Mr. Reckner's office and inquired
what's going on with the NATE conference, he knew that's
coming up next month and there's going to be no way I'm
going to go because I'm going to be in surgery or I'm
going to be recovering from surgery in the very
immediate future.

That didn't matter.  They had other things
planned.  They had not only the national conference
planned, but they had national Coast Guard training
planned.  And Mr. Wells was scheduled to train in that.
Mr. Belisle was scheduled to train in that.  There was
no hit to Jim Wells' ego or devastation by Mr. Wells.
He was going to miss one conference, one out of the last

ten years, because he was sick, but by April, he would

be recovered and he'd be on to the next conference,

where he was going to teach like he had taught many

years before.

Was Jim Wells devastated? Was he worried that

there was some problem? No. Just two weeks before the

homicide, Jarrett Andrews told you he was up at T-1

doing training, so there was no problem here.

They had the fuel card meeting. Mr. Wells was

disappointed, rightfully so. He had disappointed the

commander. But he knew going in there because

Mr. Reckner told him, "You're not going to get fired."

The letter says it's not even disciplinary. It's not a

problem. You need to get down there -- instead of being

worried about being fired, you need to get down there

and get back to work.

Remember what Mr. Reckner said. Mr. Reckner

said in March, right after Jim got back, big snowstorm,

big ice storm, we had problems, we had eight antennas

down. That was the start of the testimony. Mr. Reckner

said, "We had eight antennas down and I was trying to

talk to Jim about it. I didn't want to fire him. We

needed him more than ever. I had big plans for him in

the summer of 2012. I was trying to bring him back into

the fold, not get rid of him." That was the testimony

1   of the Scott Reckner.  They weren't at 90 percent.  They

2   may have started the year at 90 percent, but by the time

3   Jim Wells was back and they were getting ready for the

4   first climb on April 12th, they had eight out of 22

5   antennas down from ice storms.

6           Jim Wells was needed more than ever.  Jim Wells

7   knew it because Scott Reckner told him so, so there was

8   no problem.

9           What was going on is if you look at this

10  exhibit, Mr. Wells got sick in October, and from October

11  to February 24th, he works 18 days in five months.  He's

12  barely there.  Why would Mr. Reckner move a desk down

13  there in December to watch Jim Wells when Jim Wells

14  hadn't been to work since November 12th?

15          "We moved a desk down there because Jim Wells

16  was gone, because work wasn't getting done."  That's the

17  most logical assumption.  But does it make any sense

18  that Jim Wells was threatened or felt he was being

19  pushed out?  He wasn't there to be pushed out.  He got

20  back and the first thing they told him was, man, with

21  all of these antennas down, we're going to need you.

22  That's what the timing looks like.

23          So there is no motive here. Again, that's the

24  testimony of Scott Reckner.  We had bad weather starting

25  in early winter, we lost somewhere around eight

antennas.  There is no evidence that Jim Wells would be
pushed out.  It's just the opposite.

How do we know it's a suspect-based hindsight
motive?  Well, they picked three pieces of paper over
the course of a year and says that's enough motive to
kill two people that weren't involved in any of the
disputes with Mr. Reckner or meetings with the command.

He had disputes with his chief and meetings
with the commander, so he killed two people that weren't
involved with that?  Well, these came into evidence
pretty quick.  But around the same time in February of
2012, while Mr. Wells was out having surgery, a
different chief in the unit was not just given a
cautionary letter, he was given a performance and
discipline negative letter from the same commander,
Commander Van Ness, because he was allowing there to be
a hostile, high stress, unproductive work environment.
That's Chief Reed.

Did you hear any investigation about the
actions of Mr. Reed or who under him was creating that
environment?  Now, it's February 9th.  We know it's not
Jim Wells.  He has not been there for five months, just
a few weeks in five months.

What do we know more just days later related to
Mr. Reed?  Commander Van Ness, again, performance and

discipline.  This chief also within the unit, Ray

Fillion, who by the way wasn't where he was supposed to

be at work on April 12th, he was admonished for

insubordinate, hostile behavior and poor judgment in the

workplace.  Hostile behavior, violence, a tirade,

slamming doors, chasing his superior officer down the

hall screaming.

That kind of conduct should have raised

eyebrows.  That kind of conduct should have been

investigated.  Look at all your notes, put them all

collectively together, and you know how much evidence

you will have that the government disproved that any of

these people might have had a motive to murder?  None,

because it wasn't investigated.  Why?  They weren't Jim

Wells.  But that's how this suspect investigation works.

They put Jim Wells' cars in the paper, but what

we know is the night before Mr. Bullis recorded two

white trucks on video.  You saw the video.  It's the

same white truck that comes through the parking lot

twice.  It's not Jim Wells' truck.  Chris Iber ruled

that out.  But we don't know why it was casing the

building just hours before the murder.

Mr. Bullis saw a small sedan drive down Anton

Larsen Bay at 2:00 a.m. that night.  Nobody went down

Anton Larsen Bay to investigate it.  Mr. Rudat saw a

single black truck there, and just moments later
Mr. Bullis saw a late model black truck parked in front
of the garage doors, not where any of the employees
park.  Did anybody investigate those, try to determine
those?  No.  Why?  Jim Wells doesn't own a black truck.

Wilton Nelson, the truck driver who came to the
water treatment plant hauling the other excavator, he
said, you know, back there at Brige 7 just down the road
I saw a blue SUV, but it was 7:20 or 7:30, and they
thought Mr. Wells was already gone by then so they
didn't go look at Bridge 7, even though at about 8:00,
Agent Sturgis drove by and said he saw a black vehicle
parked there, a black Dodge Dakota with a cap.

Any of these vehicles investigated?  Not at
all.  Why?  They don't fit the suspect.

The boat ramp.  Look at all the vehicles down
the end of Anton Larsen Bay.  Was the killer down there?
Don't know.  Law enforcement didn't go down there.

Bridge 6, that's where both Sturgis saw a black
vehicle and Nelson saw a blue vehicle.  Was that the
killer?  Was somebody there hiding evidence?  Don't
know.  Law enforcement didn't check.

The day of the murders, Willard Ellis, one of
the troopers, the guy who first found Mr. Wells' wife's
car at the airport, he went and took pictures of seven

vehicles at the airport.  That's one of them.  There are

six others.  Guess how many they investigated?  One,

just the suspect's, Jim Wells'.  Why take pictures of

the license plates of the cars if you're not at least

going to run them and go talk to the people?  Well,

because you have that tunnel vision and it doesn't fit.

        Did they really eliminate people?  Think about

this:  That is a picture taken on April 12th by a law

enforcement officer who went there to try and see

vehicles that were consistent with what was on the video

that they saw.  That's a Honda CR-V, dark in color.  The

license plate is FMP 321.

        Now, I just said they didn't run the license

plate, they didn't investigate it.  Ms. Andersen came in

and said, "We checked all the vehicles on Kodiak.  We

ruled 350 of them out.  We had a questionnaire.  We

talked to all the people.  We ruled them out."

        First of all, they didn't rule them out until

December, but what happened in December?  This is

Ms. Andersen's writing.  She testified about this.  It's

an exhibit in evidence.  They went out and they found

FMP 321.  Now, when Ms. Andersen went out in December,

she asked the first question:  Where was this vehicle on

April 12th?  And the man she talked to said, "I don't

know because it's my wife's vehicle and she's not here.

1    Don't have any idea."

2            She ended up talking to that man for a while,

3    saying she would call back, but basically never followed

4    up and just said, well, that vehicle couldn't be

5    identified or linked to the homicide, so it's

6    eliminated.  She didn't even realize when she went there

7    to talk to these people that police already had a

8    picture of the vehicle and they didn't have to ask where

9    it was, it was at the airport on April 12th right where

10    they say a car that was staged that could have been

11    involved in the murders.

12            Remember what Mr. McCrary told you?  An

13    investigation isn't about quantity, it's about quality.

14    And that is not quality.  That is checking boxes after

15    the fact so that you rule things out that you want to

16    see ruled out because they don't fit your suspect.

17            Same with Mr. Allison.  Here is one of his

18    questionnaires.  Says, "Were you at COMMSTA?  What were

19    you doing that day?"  "I don't know.  I don't remember.

20    I was maybe leaving church."

21            It's a Thursday morning between 7:00 and

22    8:00 a.m.  I guess you could be at church Thursday

23    morning at 7:00 to 8:00 a.m., but is there any question

24    about what church, was anybody with you, could we verify

25    that?  No, just accepted at face value, and because they

1  don't have any tie to COMMSTA, eliminated.

2          Why?  Why are they really eliminated?  They

3  don't know Jim Wells and they can't link him to the

4  murder.

5          Guns eliminated.  What do we know about the

6  guns?  The murder weapon could be a Smith & Wesson,

7  could be a Taurus, could be a Llama or it could be any

8  other custom made gun that had the barrelling to match

9  any of those three.

10          What do we know about the ammunition?  It's

11  Winchester .44.  What does that mean about the gun and

12  the ammunition?  Mr. Shem, the firearm expert, Mr.

13  Mills, the ammunition expert, told you that narrows it

14  right down to tens of thousands of guns and millions of

15  rounds of ammo, because the .44 in Alaska is about one

16  of the most popular calibers there is.

17          Smith & Wesson has been making the 629 since

18  the fifties.  Taurus has several models and have been

19  making them for three decades.  And then you got to

20  include Llamas and other specialty guns.  Winchester,

21  remember Mr. Mills described it, you can't trace them

22  back to the box or you quantify this ammunition because

23  they are making thousands of rounds a day and dumping

24  them in hoppers, and then they got three presses running

25  and those hoppers dump into more hoppers.

1          At the end of the day, a million or so rounds

2     come out of the factory and boxes that go all over the

3     country.  That's how prevalent Winchester ammo is,

4     probably in 25 percent of the households on Kodiak.

5          Are there coincidences or is there evidence?

6     Look at Mr. Schilbach and Mr. Blain.  He's the man that

7     was riding his four-wheeler out there.

8          Mr. Schilbach -- and I'm going to do this quick

9     -- he was near T-2 at the time of the murders.  You saw

10    his white truck on video.  He said he was at the golf

11    course checking it out.  Nobody saw him there.  Nobody

12    can verify that.  We know he wasn't golfing, it was a

13    workday.  He said he was on his way to work.  He was

14    familiar with COMMSTA.  He worked for a company that did

15    the maintenance both at T-1 and T-2.  His agency was at

16    T-2 the day before in the boiler room where the boot

17    print and the fingerprints were found.

18         His prints were never compared.  No one asked

19    Mr. Schilbach about guns.  They never searched his

20    truck, but look at all those circumstances.  He was

21    there at the right time.  He knew the building.  He had

22    been in the buildings before.

23         Why?  Number one, it's not Jim Wells so they

24    didn't care.  And number two, they are likely just

25    coincidences.

1    How about David Blain?  What do we know about

2    him?  That's the man who runs the auto hobby shop.

3    Again, April 12th, the morning of April 12th, he was

4    near T-2 at the time of the murders.  He was riding

5    off-road on a four-wheeler.  He's familiar with COMMSTA

6    because he's 17 years Coast Guard, used to patrol that

7    area when he was mil pol.  He was alone so nobody can

8    provide him an alibi.

9    Why did the police originally talk to him?  He

10   was on the list of people that owns gun.  He owns a

11   Taurus .44 and he had it with him April 12th on the

12   morning of the murders in the area of the murders.  What

13   did he tell you about what the police did with that gun?

14   They asked him, "Do you still have the gun?"  He said,

15   "Yeah," he showed it to them.  They wrote the serial

16   number down and then left his house and eliminated him

17   as a suspect.

18   He was in the area with no alibi carrying a gun

19   that fit the class of guns that met the murder.

20   MR. SKROCKI:  Objection; facts not in evidence

21   for Mr. Blain and the gun.  Our point or collective

22   point is Mr. Blain never testified he had the gun with

23   him at that time.

24   THE COURT:  Well, I'll remind the jury that

25   what is said by the lawyers in closing, both lawyers, is

1    not evidence and it's for you to recall what the

2    evidence was and go by that.

3          Go ahead, Mr. Colbath.

4          MR. COLBATH:  Certainly, ladies and gentlemen,

5    if your notes conflict with my memory, trust your notes.

6    What I say is not evidence.  What I remember Mr. Blain

7    saying is my wife bought the gun for me for Christmas

8    two years prior.  I carry it when I go out in the woods

9    alone, and that morning I was out in the woods alone

10   riding my new four-wheeler carrying the gun.

11         If that's not what your memory is, your memory

12   should certainly be this:  Law enforcement knew he had

13   that gun.  They wrote down the serial number.  They

14   didn't test it.  They didn't question it.  They simply

15   eliminated Mr. Blain.  Why?  Because he didn't match

16   their history.

17         What's the truth in this case?  The truth is

18   this:  Mr. Wells had a low tire.  He went from home to

19   the airport.  He drove through the Comfort Inn.  He went

20   to Servant Air, because while he was at the Comfort Inn

21   looking for a place to park, he knew he had to go to the

22   bathroom.  That suddenly became more pressing than the

23   truck.

24         He got to Servant Air, he parked.  As he got

25   out of the truck, he had a little bit of an accident.

1    He checked the tire.  It in fact was low, there's the

2    problem with the car.  He went in to Servant Air.  He

3    went to the bathroom.  He cleaned himself up.  He used

4    the bathroom.  Came back outside.  Looked at the tire.

5    I can make it home.  My tires are sitting in the

6    driveway.  The tools are ready.  They got to come off

7    the truck by Saturday, changeover day anyway, so he went

8    home.

9             He passed his neighbor, Annette Ecret, waved to

10   her like nothing is going on, no hurry, no look away,

11   just saw his neighbor, waved.

12            Once he got there, the tools and the tires --

13   you saw the picture -- they are in the driveway.  As a

14   matter of fact, let's talk about first at the airport.

15   If you want to know how long it might take at the

16   airport if you're not keeping track, think about what he

17   said about the morning of April 12th.

18            Well, he pulled in the airport with a low tire.

19   He drove through the Comfort Inn.  He went to Servant

20   Air.  Then he went to the bathroom.  Then he came back

21   out and he drove home.

22            And the government says, well, that took

23   34 minutes.  That's crazy that that could take 34

24   minutes.  He must have been committing murders, not

25   spent that amount of time.

Look at his actions the next day.  He was being
followed by the FBI.  Now, he didn't know that he was a
suspect already.  He didn't know he was under
surveillance.  When he went to the airport to pick his
wife up who was coming in that next night, Matt Judy,
Agent Matt Judy and his partner were sitting there
initially watching Mr. Wells' Honda.

But as soon as Mr. Wells' pulled in in the
Pletnikoff pickup, they switched and they began watching
Mr. Wells.  And what did they see?  Instead of driving
to the Comfort Inn, they saw him drive to Island Air, go
in for a few minutes, then drive over to Servant Air, go
in for a few minutes, then go in the terminal to wait
for his wife.  And Mr. Judy followed him into the
bathroom.  That's how intent and focused they were,
followed him into the bathroom, looked under the stall,
made sure he was going to the bathroom and timed him.
Went in and out to make sure he wasn't up to something,
timed him going for over 13, 14 minutes, then watched
him pick up his wife and leave.  About 45 minutes.

Same general four stops, including the stop in
the bathroom as the day before.  Is that an untold
amount of time, an odd timeline to be doing those
activities?  No, not at all.

What about Servant Air?  Well, what do we know

about Kelvin Skonberg?  It was, first of all, a random
Thursday morning.  He said he got there at 10 until
7:00.  How would Jim Wells know that Kelvin was in early
because the day was going to be busy and opened a few
minutes earlier than normal if Jim wasn't there?  How
would Jim know that there wasn't a room full of
passengers that they had maybe a plane going out and
there would've been all kinds of people that would have
saw him if he wasn't there?

How would he know any of those things if he
hadn't in fact walked into Servant Air and went to the
bathroom?  Mr. Skonberg doesn't need to remember that.
Jim didn't see him.  He doesn't see Jim.  It's not any
more complicated than that.

The FBI didn't come talk to Mr. Skonberg until
May 24th, six weeks after.  What they said was, "Hey,
remember six weeks ago on a Tuesday?  Did you hear the
toilet flush?"  Do you suppose he could have missed
something?  We know he missed something.  He said,
"Nobody came into my building that day.  Nobody was
upstairs.  Nobody was in the bathroom.  The stairs are
creaky, the toilet is loud.  I would've heard anybody in
the building."

The problem with that is Joe Hostetler came and
testified.  He's the construction manager for Brechan.

They're the guys that rented the upstairs offices.
Mr. Hostetler said, "I was there before 7:00 a.m. that
morning.  I usually got there before 7:00 a.m. that
morning.  I work in the office until 7:30 or 8:00.  Then
I would go out and check the progress of the
construction.  I went up those creaky stairs.  I sat
upstairs that morning.  Never saw Mr. Skonberg."
Mr. Skonberg never saw him.

Does it mean that Mr. Hostetler came into
court, lied under oath and he wasn't there?  No.  It
means that Kelvin just didn't see him or hear him, just
like Jim Wells.  How do we know that Hostetler wasn't
wrong?  Robert Green, the DOT manager, the airport
manager came in and told you the same thing.

Jim was at Servant Air.  The fact that Kelvin
Skonberg didn't see him take about eight steps from the
door to the bathroom, didn't notice him in the bathroom,
Kelvin didn't say, "I went to the bathroom during that
time.  I was in there.  I tried to get in and the door
was locked."

No.  He said, "I was focused on my computer, at
my computer getting ready for my busy day."  Could he
have had his head down typing in passenger manifests and
itineraries and checking things while Mr. Wells walked
back out the half dozen steps it takes to get out of the

1    building?  Of course we know that could happen.

2          Why did Jim go home?  Well, the tires are right

3    there.  They're in front of his house.  That's a picture

4    that law enforcement took, and three of the four tires

5    are there.  The only one missing is the one he changed

6    and put on his truck that morning.

7          They say the case can't be because of the nail.

8    What do we know about the nail?  Well, they didn't

9    document it when they went out on April 12th and pulled

10   it out of his car.  You see the agents if you watch the

11   video bounce that tire on the ground.  No photos of the

12   nail as it stuck out there.  No photos during the

13   April 12th search.  Pictures of the tire; no pictures of

14   nail.

15         The next day, when they seize the truck,

16   pictures of the tire; no pictures of nail.  When they

17   crate it up and they ship it off to Ohio to Mr. Bolden,

18   no pictures of the crate, no pictures of the tire, no

19   picture of the nail.  Mr. Bolden gets it.  What do we

20   know?  Well, we know some interesting things from Gary

21   Bolden.

22         Number one, he doesn't take pictures until

23   after he runs his tests, after it's been ran on that

24   machine 1400 miles, because these are the marks from

25   running the machine and that's the picture that he

brought us.  What we do know is his first observation
about the nail is it was probably manually inserted.
Well, that's what Jim Wells said to you.  It was
manually inserted.  After he pulled the one that
flattened the tire out and pitched it, he thought, "I
don't have chalk," that Mr. Bolden has, "but I have got
a nail I can mark that so I can take it to tire shop and
fix before I lose that hole."

So he did put it in there.  Interestingly
though, Mr. Bolden, I talked to him about one of the
most substantive parts of his testimony.  I said, "You
remember that e-mail you sent to Case Agent Allison
while you were working on the tire about your
observation?"  He said, "I don't really remember."

You might remember the testimony because I took
the e-mail up and I showed it to Mr. Bolden on the stand
and said, "Does this refresh your recollection?"  He
told Agent Allison, "You know, it looks like to me this
nail has been taken out and repositioned."  Was he
making that up?  Did he have --

MR. SKROCKI:  Objection; facts not in evidence.
I would like a cautionary instruction to the jury again,
please.

THE COURT:  Here again, ladies and gentlemen,
it's your responsibility to determine the facts.  What

is said by the lawyers, each side, in closing is not

evidence, so go by your recollection.

        And please proceed, Mr. Colbath.

        MR. COLBATH:  Remember Mr. Bolden's testimony.

He hadn't heard Mr. Wells say that he put that nail in

there with his Leatherman, but he observed it to be

pulled out and repositioned.

        These are the nails.  Mr. Bolden took that

picture, the one on the left.  It's in a different

position and stuck farther in by the time it gets to

Mr. Mills, the one on the right.

        Mr. Mills says, you know, this has paint, some

kind of stain on it, like a red stain that comes from

the Wells' deck.  Of course it does.  It's the nail that

Mr. Wells picked up off those very stairs and put in

that tire.

        What do we know about tool marks?  Well,

Mr. Mills observed tool marks that he couldn't identify.

Mr. Wells said, "I put it in with a Leatherman."  That's

what those tool marks are right there.  They are not

striations running along; they are gouges in the nail, a

deep gouge.  This is a rusty nail, but the gouge is

silver like it's more fresh, like it's maybe an

electrician's Leatherman.

        Mr. Wells told the agents on April 12th, "I

didn't have a weapon in my car, but I do have my
Leatherman out there. I suppose it has a knife in it."
Mr. Wells was an antenna mechanic. When he was active
duty Coast Guard, he was an ET, an electrician. Does
that make sense? Of course it makes sense. Those were
marks that he put in there.

What doesn't make sense about the government's
case? Well, what they would have you believe is Mr.
Wells planned a murder and committed it with a .44 that
belonged to his friend that was directly traceable to
him. He drove his wife's car out there, a car that
Mr. Reckner testified I saw him three weeks before the
murders drive his wife's car, the blue car, to T-2, so
certainly it was identifiable with that.

You saw Mr. Wells' picture, that long
unmistakable beard, that long straggly hair. If you saw
anybody driving a blue car that looked like that, you
would know immediately it was Mr. Wells. Mr. Encinas
testified that he had seen Mr. Wells in his wife's car.
Mr. Coggins said he had seen in the past Mr. Wells drive
the blue Honda out there, not often, but occasionally.
So there was plenty of people at T-2 that knew that the
Wells' other vehicle was a blue Honda CR-V.

You're telling me that it made more sense to
ditch your truck, that at least in this case we have

seen four or five white pickups with caps on them?  We
have seen one blue Honda CR-V 2001.  Mr. Wells had to
know, just like if the gun was found it's linkable to
him, if anybody sees him in that Honda CR-V, they are
going to know it's him.  If they don't recognize the
beard, they will recognize his wife's car.  Other people
had already seen it.

So it's not the right gun to plan it.  It's not
the right car to plan with and it's the worst time ever.
Why?  Because they have a watch there.  They have
specific people guarding T-1 and T-2.  And it's right at
7:00 when they say he would have planned this that the
watch changes.

What did Mr. Haselden, Mr. Bullis,
Mr. Jordinelli tell you, that right around 7:00, as the
last watch stander is going off and the new guy is
coming on, the guy who arrives does a round.  He often
stops at T-2 and walks through the building.

Well, if he does that just after 7:00 and Jim
Wells knows it, why would Jim Wells plan to be there
shooting somebody at just after 7:00?  That makes
absolutely no sense.  What does he know about the
cameras?  If they are not physically down there doing
the round, he knows that they control the cameras.  The
cameras are pan, tilt and zoom.  They move them every

four hours.

Mr. Haselden said, "If I'm not outside doing a round, about every four hours I'm moving the cameras around looking." There is physical rounds, there is camera rounds. That morning Mr. Haselden said, "I didn't go with my normal practice and stop because I saw Belisle's truck there." But Jim Wells would have had no way to know that. The normal practice, the regular day's events would have put a watch stander in that building between 7:00 and 7:15.

Jim Wells would never plan that if he knew the schedule, and after 20 years, he had a good idea of the schedule. He also knew, look at these exhibits, this is April 9th and April 13th, a couple days either side of the murders, and look at how the camera view changes. It can spin around. And it could have been pointed at the door. If the watch stander said, "I'm not going to run down to T-2, I'll just move the camera over and see what trucks are there and make sure somebody is there and that the door is propped open." That would have depicted anybody running in and out the door, not right below it, but the door.

More importantly, look over here what they can do with the camera view. It's on the flagpole and it's just tilted just a little bit. Any car that comes

around by the water treatment plant is on camera for not
one second, not four frames as it goes by.  All the way
down Anton Larsen Bay, you probably get a close-up of
the license plate.

And the camera doesn't hardly have to be moved
at all, so if the watch stander just bumps it over a
little bit and says, "Hey, I'm going to watch," like Jim
Wells said, "the parking lot and the flagpole," for all
he knows, if he drives down that road, it's going to
record him the whole way down that road.

He has no control over those cameras.  This
perfectly made plan, worst plan ever.  Why?  It doesn't
fit.  But they have got to have some story to tell, not
an evidence-based story, a hindsight suspect-based
story.  Why would he say to his family that months after
the fact, to either a family friend, Judy Pletnikoff, or
Don and Theresa Kiele, the things that they say he said?

First of all, you heard Jim say, "Well, that's
not exactly how the conversation went.  I disagree with
some of the things you said I said."  But what we know
about Judy Pletnikoff, what we know about Don and
Theresa Kiele is the conversations they had with Jim
Wells were months after the murders.  One was in June.
One was later in July.

What we know is Judy Pletnikoff has no

firsthand knowledge of the murders.  And we know that
Don and Theresa Kiele live in the Lower 48 and hadn't
been to Kodiak since the year 2000 when they visited Jim
and Nancy, so they certainly have no knowledge of the
murders.

But they had conversations with Jim.  And first
of all, he told them he got a low tire.  He told them he
went to the airport.  He told them he messed his pants.
He told them he went to Servant Air, well, to a building
and used the bathroom.  He told them he went back home
and changed the tire, because that's where the tires
were that he needed to put on the truck.

They asked him about, well, how are the victims
doing.  What you didn't hear is any conversation about
them asking about, you know, how are you and Nancy
doing.  Imagine months after this conversation, months
after the murders.  Jim Wells is presumed innocent today
and at the time innocent.  That's how you should look at
it.  And he hasn't been charged with anything, but think
of his life.

At Ms. Pletnikoff's house, he's there visiting
three days after the crime, when he's not charged with
anything, he gets those two letters, those are exhibits.
One of them bans him from the base, bans him from all
Coast Guard facilities.  That means no commissary, no

medical treatment on base, no utilizing the officers
club, no going to any of the places where most of your
family and friends go, where you have been able to go
for the last 40 years. We're not charging you with
anything, you're just banned.

The other one, ban you from work, the job you
have done for 40 years. You're suspended indefinitely,
even though you're not charged with anything. The
investigation is only three days old. Is there any
doubt that there was one suspect and only one suspect?
No evidence that anybody else got banned or got these
letters. I mean there hasn't been a test run. They are
still searching the house.

On the 15th, they are only halfway through the
first of nine searches of the house. He's already the
guy. He's already banned. If there's any question
about it, six days later, he's all over the front page.
After that, you heard testimony from Para Upchurch, he's
on the news.

So imagine now months later, after you have
been stopped at the airport; you buy a new phone, they
take the new phone; you buy a new Kindle, they take the
new Kindle; they meet you and your wife in the airport
up here and they pull you off to side and your choices
are we're going to go serve search warrants, we need you

1   to give us head hair samples.  Not charged with

2   anything, but yet life pretty much ruined.

3          You go visit your family and what do they ask

4   about, "How are the victims' families holding up?"  Now,

5   it's a terrible thing for both the Belisle family and

6   the Hopkins family to go through.  Those men didn't

7   deserve to be murdered, but do you suppose that Jim

8   Wells at the time had some frustration?  Was it

9   understandable?  Was it reasonable?

10          Well, think what it would feel like if you were

11  innocent and that was the situation.  All that months

12  and months and months of hassle.  Every one of your

13  friends, every one of your family members contacted.  No

14  work.  I would be frustrated too.

15          I'll leave you with this, ladies and gentlemen,

16  a couple of things.  First of all, there is some things

17  that are refutable and there are some things that are

18  not, and this is not.  At 7:09 on April 12th, the blue

19  car goes that way on Anton Larsen Bay Road.  What do we

20  also know is going on at the Kodiak airport?  That young

21  man, Nick McAbier, is walking out of the airport

22  terminal following his mom, followed by his dad.  He

23  picked them up after six months in Mexico.

24          What does he see?  Well, we know that the

25  police interview him just one week after this.  One week

after this they go interview actually his mom, because
she's on the list of passengers at the airport, and
while they are there, they talk to him and they show him
a picture of that, and he says, "I saw that car.  When I
walked out of the airport at 7:09, I saw that car.  You
know where I saw it?  Right there."  Right there where
the FBI found it on the night of April 12th.

The car cannot be driven by Jim Wells out at
T-2 going down that road pulling in the parking lot at
7:09 when it's at the airport being witnessed by him.
Is there any question that he saw that car?  They didn't
ask him, "Did you see a small blue SUV?"  They didn't
ask him, "Did you see any particular make or model of
car?"

They showed him a picture of that car and they
pressed him on it.  They said, "Why do you think it was
that car that you saw?"  He said, "Well, it was an older
model CR-V.  You know, I drove right behind it and it's
got those taillights, the taillights that sit high."
The very same characteristic that many of the video
analysts described.

He didn't have any way to know that the video
analysts or that Mr. Schmidt, the Honda design guy told
you that the Honda CR-V was unique other than one model
of Volvo, that those taillights are what really

separated it from any other vehicles.  He was just a

21-year-old kid picking up his parents from the airport,

but obviously had a little bit of car knowledge and he

said to the police one week after these murders that car

stuck out to me for the very same reason that

Mr. Schmidt says it's unique.

Did you hear them call him as a witness?  No.

Why?  Doesn't fit the story at all.  Doesn't fit the

suspect investigation.  But it's irrefutable.  It really

is irrefutable.  If Jim Wells drove in the airport,

Mr. Skrocki said it two or three times, he drove down

this road, he pulled in here, he got out of his white

truck, he got in his blue car, he drove his blue car

out, he committed the murders, he drove the blue car in,

he got back in his white truck, he drove out.

He's identifiable.  You saw the picture.  It's

Exhibit 17, his beard.  Look at what's going on at the

airport.  Mr. Greene told us, we know from all the

exhibits in this case, there is 100-plus people in this

area because there is two flights that morning that have

landed.

There is flights at Island Air and workers at

Island Air.  There is three people at Servant Air.

There is 35 cars Ms. Sheffield could count that went by

the cargo window just picking up and dropping people

off.  There is cargo employees.  There is rental car
employees.  There is 50 people at the Comfort Inn.  You
know how many people saw Jim Wells ever drive in there
ever in a blue car, ever get out of a white truck and
switch to a blue car, ever drive a blue car back in
there and switch back to a white truck and drive out of
there?  Zero.  Zero.

What makes the most sense, that 240 people
missed it or that 240 people didn't see it because it
didn't happen?  Nobody saw Jim Wells, but I got to go
back to that young man, because he saw when he walked
out as 7:09, right there, how would he know where to
draw the circle?  How would he know where to point on
that picture if he didn't see the car?

In that map what kind of luck would he have to
have to come before you and circle that red car and that
white car, which happens to be the exact location where
the car was found if he didn't see it there?

Ladies and gentlemen, that car has an alibi
even if they don't like the one that Mr. Wells has.  So
I'll leave you with this:  A lot of people think that
reasonable doubt in a case is a high burden.  It's the
highest burden in our law, and a lot of people think
that's made to protect innocent people.  And in a way it
does, but it's not created to protect people like Jim

1    Wells.

2         It's created for your benefit, your benefit as

3    jurors.  You might have never thought about it like

4    that, but that's really why we have reasonable doubt.

5    That's why it's the highest standard, because before we

6    ask you to find somebody guilty of such a terribly

7    serious crime, and it can't get any more serious, we

8    don't make you pass that judgment unless it is

9    absolutely clear, unless it is beyond all reasonable

10   doubt, unless there is no other explanation.  Then and

11   only then do you have to vote for a guilty verdict.

12   Otherwise, with all other explanations, the law requires

13   you to vote not guilty.

14        The law requires you to follow that burden, and

15   it lets you have that assurance that, look, I don't know

16   what happened, it wasn't my job to solve what happened.

17   It was my job to say did they prove beyond a reasonable

18   doubt that he did anything?  And when they couldn't,

19   when they didn't, I just followed her honor's

20   instructions and said I'm sorry, you can't meet that

21   burden, it's high.  It's really high.

22        This case is a terrible tragedy.  I have --

23   that is one thing that nobody will argue.  Rich Belisle

24   did not deserve at all on April 12th to lose his life.

25   Jim Hopkins did not deserve to lose his life.  That was

1    two innocent men unjustified.

2           What I will tell you is don't let this

3    suspect-based investigation, this singularly focused

4    investigation, the one that Mr. Skrocki in his argument

5    said you see patterns, you see themes, that's the exact

6    -- kind of like the Kennedy-Lincoln example -- the

7    patterns and the themes, that's what they want to rely

8    on.  Don't let that take away the innocence of a third

9    man, because he doesn't deserve that.

10          Now, I have to sit down.  Because it's the

11   government's burden, as Mr. Skrocki explained, he gets

12   one final chance to argue to you.  One final chance.  So

13   just know that I would have something more to say.  You

14   probably figured that out through this trial, but I

15   don't get a chance.

16          So I'll leave you with this:  Have Mr. Skrocki

17   when he gets up here explain to you that, you know, if

18   Don Rudat was walking down the road and he heard

19   gunshots, that the killing was going on at that time,

20   what evidence proves beyond a reasonable doubt that he

21   heard a gunshot when his own testimony was actually that

22   he heard metal dropping on concrete.

23          Have him explain that even though it looks

24   entirely consistent that the blue car went down Anton

25   Larsen Bay and never stopped at T-2 and there is no

evidence that it pulled in and went behind that building
and there is no eyewitnesses that saw it at T-2 at any
time, what proves beyond a reasonable doubt that Jim
Wells drove it there, pulled it in there and used it to
commit the murders?  Have him explain to you why when
the evidence related to motive from them deals with
disputes with Scott Reckner and letters from Commander
Van Ness, what evidence shows beyond a reasonable doubt
that Jim Wells would then have a motive to kill two men
that there is no evidence he had any disputes with.

Have him explain why and what evidence beyond a
reasonable doubt proves that they did all of these
searches, they did all of this looking, they did this
thorough investigation and yet not one single piece of
forensic or physical evidence connects Jim Wells to
these murders.

And last, don't forget to have him explain
that, what evidence proves beyond a reasonable doubt
that Nicholas McAbier, a man who doesn't know Jim and
Nancy Wells, or Rich Belisle or Jim Hopkins, just
picking up his mom and dad at the airport, what evidence
just proves beyond a reasonable doubt that he didn't see
what he told you in court I'm pretty positive I saw, her
blue Honda CR-V parked at the airport at 7:09.

Ladies and gentlemen, I would ask you to find

1    Jim Wells not guilty because there is not evidence that

2    he committed any crimes as charged in the indictment.

3           Thank you.

4           THE COURT:  Thank you, Mr. Colbath.

5           Ladies and gentlemen, your lunch is here.  I

6    was thinking about 45 minutes.  Would that give you

7    enough time to have your lunch?  And then we'll come

8    back and hear from Mr. Skrocki, and then I'll have some

9    additional instructions.

10          Please leave your notepads here.  And this is

11   likely the last time that I will tell you not to discuss

12   the case during your break.  Have a pleasant lunch.

13   We'll see you at 1:30.  We'll go off record.

14          (Recessed from 12:46 p.m. to 1:37 p.m.)

15          (Jury present)

16          DEPUTY CLERK:  Court is again in session.

17          THE COURT:  All right.  Please be seated,

18   everyone.  We're ready to hear from the government,

19   Mr. Skrocki.

20          MR. SKROCKI:  Yes, Your Honor.

21          THE COURT:  All right.  Go right ahead.

22          REBUTTAL CLOSING ARGUMENT FROM GOVERNMENT

23          MR. SKROCKI:  Good afternoon.  A couple of

24   things from defense closing.  As we indicated, it's our

25   burden to prove every element of the crime beyond a

1  reasonable doubt.

2       So those elements are in your instructions.  We

3  don't have to prove every fact beyond a reasonable

4  doubt, just the elements of the crime.  So that's one

5  thing to keep in mind when you go back to your

6  deliberation room.  I think you will be back there in

7  about ten minutes because I won't take up that much more

8  time.

9       Let's talk about a couple of things.  One in

10  particular is the defense made claim that that gun that

11  was Mr. Wells' because of that silver flash or that

12  flash of a flashbulb, flash on the gun handle, trigger

13  could have been what Mr. Pletnikoff saw.  If you recall,

14  they pressed him on that.  They showed him that picture.

15  Pressed him on it three or four times.

16       Is this the gun?  He held steady and he was

17  like, "No, that wasn't the gun that I saw," so that's

18  out the window.

19       The other thing is that in a case like this,

20  it's very easy and common to attack the government,

21  attack the investigation and attack the witnesses.  The

22  reason they're doing that is to have you focus on all of

23  this other white noise that's out there.  They have

24  issues with the investigation, the extent of it, the

25  nature of it, and it's a catch-22 in terms of response,

1  because you do a short thorough investigation, that's

2  not big enough.  McCrary wouldn't have ever agreed with

3  anything in terms of if you do a big investigation,

4  well, it's really a quality issue now.

5         But this investigation started, and we should

6  focus on, I encourage you to do this, play the

7  recordings of what that man said on April 12th.  Bring

8  into your discussions your common sense.  And play the

9  recordings about what that man said on April 13th.

10  "Where did you get the flat tire?"  "Shit, I don't

11  know."

12         Was there any discussion of a nail in those two

13  and a half hours?  I'm sorry we can't play you two and a

14  half hours of that recording to you in closing.  That's

15  not what it's for.  You can go back and deliberate and

16  listen to all of it.  You're not going to hear Jim Wells

17  mention the word nail ever because he wants to stay away

18  from it.  He can't stay away from it because it's

19  radioactive to him, just like being near the COMMSTA is

20  radioactive to him, so he's never going to say anything

21  about the nail.

22         Frankly, okay, the diarrhea stuff, maybe to

23  some of you that may have been kind of embarrassing.

24  What's embarrassing about the nail story?  Why wouldn't

25  you -- that be something you want to tell the FBI?

1        The reason it's not told is because it's not

2   true because it doesn't make any sense.  I got home, I

3   saw a nail.  And the timing doesn't add up either.  But

4   I saw this nail and I pulled it out and I threw it away.

5   And I went oh, shoot, that's a real problem, I got to

6   insert another nail in there.  Okay, why don't you tell

7   them that?  The reason is he never drove on it.

8        He shot that nail in the tire before he

9   murdered these two men and put it in the back to

10  establish his alibi.  He's got to pull that nail out to

11  say, "I dispatched it somehow."  And he only does it

12  after he sees the report of the people who are looking

13  at it, like Mr. Bolden, and he comes up with this story.

14  You know what else he did?

15        I tell you what, you pay attention what

16  Mr. Colbath was talking about.  Remember I talked about

17  the shifting defense theories and the shifting defense

18  stories.  Now we get a new one in closing argument.

19        The nail had these marks on it.  This is the

20  nail that was replaced.  So now it's like, oh, Mr. Wells

21  is an electrician and he had an electrician's

22  Leatherman.  Let's cover up that part of the nail and

23  the story.  So even today in front of you his stories

24  are shifting because they can't even keep it straight.

25        You know what else they can't keep straight?

1    The Kieles.  Mr. Wells testified he disputes everything

2    the Kieles said in that conversation.  His team says,

3    "Oh, he was just frustrated," so they can't keep his

4    story straight either.  That's why when you go back and

5    look at this case, it's important to look at the

6    recordings and what he says and the shifting, changing

7    stories over time.

8            Mr. McAbier.  Mr. McAbier testified that he did

9    not tell the FBI in 2012 what he testified to here, that

10   he saw that car somehow seven years ago at the time he

11   is picking up his mom.  When asked by my colleague,

12   Christina, he says, "No, I only told the defense team,

13   only told Mark that."

14           So on top of that, the recollection of his

15   testimony is he was a little fuzzy about the facts.  He

16   wasn't exactly clearcut about what he saw.

17   Nevertheless, in an investigation like this and the time

18   that has gone by, there is some concern.  Do you have an

19   accurate recollection of that or not?

20           Okay, maybe he was off by a couple minutes.

21   Maybe he saw it when he came in or maybe he saw it when

22   he came out.  That's what his testimony was, "I didn't

23   tell the FBI that back in 2012."  It's not all that

24   solid.

25           Mr. Blain is one of these issues of the FBI

didn't talk to Mr. Blain, he was in the area and he had
a gun. Well, that's not true either. Mr. Blain wasn't
near T-2. He didn't go out in the field until 10:00 in
the morning and he wasn't carrying a gun. That's not
accurate either.

Most every witness and every element or fact of
this case by the defense was taken to task, which is
their -- that's their job. But for you, as jurors, to
look through all the white noise about that, to believe
that, you're going to have to believe that all the
following people either made this up, conspired to make
it up or are lying: Peter Van Ness; Cody Beauford;
Mr. Scott Reckner; Leah Henry, she's critical; Ernesto
Acosta; the Kieles made all this up; Robert and Judy
Pletnikoff; Mr. Pacheco; Mr. Stein; all of the FBI
agents; Troy Lowdermilk, Mr. Jordinelli; Mr. Skonberg.

They are all wrong, lying or in conspiracy with
one another to frame Jim Wells. There are only, folks,
two victims in this case. He is not one of them. The
facts of this case have established he's a murderer, he
was angry, and he timed it perfectly.

Now, we'll never know if he decided to run the
risk he did or what kind of risks he thought he was
running when he did it, but there is nobody on Kodiak
Island, no ninja in the woods, no person that we haven't

looked at in the course of this investigation who murdered those two men except for Jim Wells.  You know why that is?  Because this boils down to two things. Time is one because he can't beat the clock.  The other one is truth.

You keep those things in mind when you're deliberating:  Time and truth.  And when you listen to his recordings and what he said the mornings of the murders and the day after, and the absolute rubbish that he presented to you as testimony here, you're going to find that he's lying, he's lying because he knows he can't beat the clock, because nobody can beat time, and that's what he was trying to do.

He was trying to beat him because he was out of time because Rich Belisle and Jim Hopkins had his number, they had replaced him, he had been made irrelevant, he didn't want to deal with it, he didn't want to go.  So he took them out of the time continuum by murdering them.  Then when he got caught, he had to lie.

Trials, folks, have a way of compressing a lot of information.  There is a lot of information here. It's a month.  You have been here a month.  You push all that together, things come to the surface.  And that's time, that's one, and it's truth.  Nobody else could

have committed these murders but him. And it's not confirmation bias; it's confirmation.

We encourage you to go back and look at everything. It's a serious case. It warrants your scrutiny. You have paid tremendous attention through the course of this trial every day. Do it again. Listen to his recordings. Compare it to what he said here, compare it to what he said to the Kieles, and compare it to what he did and what he didn't do.

And when you do that, it will be crystal-clear that he is guilty of those murders and you will return verdicts of guilty on each and every count of the indictment in this case.

Thank you.

THE COURT: Thank you, Mr. Skrocki. All right. Ladies and gentlemen, I'm going to ask the courtroom deputy to give you the final set of instructions. There are just several more here that I'll read to you at this time.

All right. Everyone ready? Then I will begin with Instruction No. 28, which picks up where we left off.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement, if you can do so. Your verdicts, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself; you should do so only after you've considered all the evidence, discussed it fully with the other jurors and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it's right.

It's important you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry or gender.

It's your duty as jurors to consult with one another and to deliberate with one another with a view toward reaching an agreement if you can do so. During

your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Instruction 29:  Because you must base your verdicts only on the evidence received in this case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing this case with your fellow jurors during your deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This restriction includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any internet chat room, blog, website or other form of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report this contact to the Court.

Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research, such as

consulting dictionaries, searching the internet or using other reference materials.  And do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.

A juror who violates these restrictions jeopardizes the fairness of these proceedings.  So if any juror is exposed to outside information, please notify the Court immediately.

Instruction No. 30:  Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

Instruction No. 31:  The punishment provided by law for these crimes is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

And finally, Instruction No. 32:  If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk signed by any

one or more of you.  No member of the jury should ever
attempt to communicate with me except by a signed
writing.  I'll respond to the jury concerning the case
only in writing or here in open court.

If you send out a question, I'll consult with
the lawyers before answering it, which may take some
time.  You may continue your deliberations while waiting
for the answer to any question.  Remember that you are
not to tell anyone, including me, how the jury stands
numerically or otherwise on any question submitted to
you, including the question of the guilt of the
defendant, until after you have reached a unanimous
verdict or have been discharged.

That concludes the instructions for you, ladies
and gentlemen.  I am about to ask here the courtroom
deputy to draw the names of the four alternates, but
first let me ask, ladies and gentlemen, if there is
anyone among you who feels that they cannot deliberate
in this case.

All right.  I don't see any hands raised.  Then
I would ask Madam Clerk to pull four names.  And I find
this -- you have all been such great listeners
throughout this long process, and it's part of our
system that we have alternates, but in any event, I'm
sorry that we weren't able to fully use the services of

1    four people whose names will called, or numbers.

2            Are you calling original numbers or current

3    numbers?  Their current numbers.  All right.

4            DEPUTY CLERK:  Juror No. 4, who is actually

5    Juror No. 4.

6            Juror No. 10.

7            Juror No. 13.

8            Juror No. 6.

9            THE COURT:  All right.  So the four of you are

10   going to be excused, but I'm not going to discharge you

11   at this time.  What does that mean?  There is a

12   provision in the criminal rules that allows the Court to

13   direct that the alternates remain available to

14   deliberate if, for any reason, I need to replace a juror

15   on the panel of 12.

16           And so what that means is that the order that I

17   just gave or the instruction that I just gave about not

18   discussing the case, not doing any research applies to

19   the four of you.  And oftentimes I walk out the

20   alternate jurors and shake everyone's hand.  I'm not

21   going to do that with you because you remember I also

22   read an instruction not to discuss the matter with the

23   Court as well except through written questions.

24           What that means is that you're going to get a

25   call from one of our jury clerks when I discharge your

peers here upon reaching a verdict or otherwise
discharge the jury. And at that time, I will make sure
that court staff promptly call you, and then the four of
you will be discharged at that time. And at that time,
then you're free to consult or talk about the case or
not, to anyone. And feel free to, like I say, if you're
approached by anyone, to talk about the case. That's
entirely your decision as to whether or not you do so.

So the four of you are, like I said, excused,
but not discharged from the jury at this time with the
thanks of the district court for your participation as
citizens in our democracy as jurors.

So I will excuse 4, 10, 13 and 6 at this time,
and Caroline will meet you there. And thank you all.

(Alternates exit courtroom.)

THE COURT: All right. Please be seated.
Well, you didn't stand, so there you go.

I am going to send all of you out now to go
deliberate. You can take all of your instructions with
you. There will be a delay before the exhibits are
brought to you. The admitted exhibits will be brought
to the jury chambers, but we'll need to go through that
with the parties to make sure we have all the exhibits
in order. It should be later this afternoon that you
will get all of those.

            In terms of starting time for deliberations in
the morning, you can agree among yourselves upon a time.
If you can't all agree, then has Jerri been having you
come at 8:30 pretty much?  Then that would be your
starting time unless you agree on a different time.

            So 8:30 in the morning, then you would resume
deliberations as needed.  So with that, I will excuse
you all at this time.

            (Jury absent)

            THE COURT:  Please be seated, everyone.  And I
meant to discuss with you that I was going to put that
in place from the rule about having them available, but
that's what's set out in Rule 24(c)(3), which seemed
appropriate to do, given the length of the trial.

            So a couple of questions, and that is, first of
all, have you conferred with each other about providing
the jury with a device of some sort to listen to the
tapes and watch videos?

            MR. SKROCKI:  Not with each other.  We have a
laptop for that purpose ready to go.

            THE COURT:  And no internet access on it, I
assume?  Why don't you double-check, Mr. Colbath or
Camiel.  Is that agreeable to the defense?

            MR. COLBATH:  They got to have something.

            THE COURT:  We'll get that to them.  And then

1  we should have asked you to do the exhibits last week.

2  I don't know if you already have with Caroline or you

3  can stay and get that sorted out.

4         MR. SKROCKI:  We're ready to go to discuss that

5  with Madam Clerk.

6         THE COURT:  In terms of readbacks, if there is

7  a request for testimony what's the government's

8  position, do you seek to be present?

9         MR. SKROCKI:  We'll leave it up to the defense.

10  If they want to be present, we'll be present.

11  Otherwise, if they don't, then we won't.

12         THE COURT:  Mr. Colbath?  The alternative is

13  we'll tell you that there is a readback and certainly

14  would call you because we'd get a note, so --

15         MR. COLBATH:  Yeah, I'll just wait to make that

16  determination, Your Honor, depending on what it is.

17         THE COURT:  If there is a readback, we'll

18  contact defense first, find out their plan and then

19  communicate with the government.

20         Obviously, you need to leave some phone numbers

21  with Caroline, if you haven't already done so.

22         From the government's perspective, if there is

23  what I deem to be a strictly administerial question,

24  i.e., can we have a yellow marker, I would be inclined,

25  if both sides agree, to simply answer that myself

1    without getting the parties back and then call up each

2    side and read you the question.

3              MR. SKROCKI:  We agree.

4              THE COURT:  Mr. Colbath?

5              MR. COLBATH:  We do as well.

6              THE COURT:  Those were my notes of the points I

7    wanted to be sure to address at this time.

8              Anything else from the government's

9    perspective?

10             MR. SKROCKI:  No, Your Honor.  Thank you.

11             THE COURT:  All right.

12             MR. COLBATH:  Your Honor, the Court will have

13   the jury deliberate until 5:00 and then discharge them

14   until 8:30 in the morning?

15             THE COURT:  Correct.  And we'll call you when

16   they go home for the day.  And the other point I had was

17   in the event that one of the alternates was called up or

18   that somebody was excused, my intent would be consistent

19   with how I read the rule.  I'm open if the parties agree

20   otherwise, but would be to simply call them up in the

21   order that Caroline drew their number.

22             So it would be No. 4, in that order, if that's

23   agreeable to both sides.  And then I would instruct -- I

24   wouldn't actually instruct the alternates of that,

25   because I'd want to keep them all ready and able to go,

1    but in any event would you agree with that?

2              MR. SKROCKI:  Yes, we do.

3              THE COURT:  Mr. Colbath?

4              MR. COLBATH:  We do as well.

5              THE COURT:  We have that order that you called.

6    Do you understand?

7              DEPUTY CLERK:  Yes.

8              THE COURT:  I just indicated to the clerk as

9    well that to the extent any of the alternates are from

10   out of town that they could go home.  I'm not going to

11   have them remain here in Anchorage.

12             If there were a need to replace a juror, there

13   would be a delay, which is actually in a way beneficial,

14   because under Rule 24(c)(3), it provides if an alternate

15   replaces a juror after deliberations have begun, the

16   Court must instruct the jury to begin its deliberations

17   anew, so that's kind of a good breaking point in any

18   event.

19             Anything else at this time from the government?

20             MR. SKROCKI:  There is not.

21             THE COURT:  Mr. Colbath?

22             MR. COLBATH:  Not at this point, Your Honor.

23             THE COURT:  I really want to commend each side

24   for your excellent advocacy for your respective

25   positions.  You have certainly kept me on my toes with

1　the evidence rules, and I really respect the work you

2　have all done and your support team.  So with that,

3　we'll go off record.

4　　　　　All rise.  Court is in recess.

5　　　　　(Recessed from 2:04 p.m. to 4:41 p.m.)

6　　　　　(Jury absent)

7　　　　　DEPUTY CLERK:  All rise.  Her Honor, the Court,

8　the United States District Court is again in session.

9　　　　　THE COURT:  All right.  Please be seated.  So

10　we have this note here.  Did you get them a copy?

11　　　　　DEPUTY CLERK:  Yes.

12　　　　　THE COURT:  Very good.  Mr. Skrocki, what are

13　your thoughts?

14　　　　　MR. SKROCKI:  I don't disagree with either one,

15　one or two.  I think a larger TV, if possible, is a good

16　idea in this case.

17　　　　　And in terms of a list or an index, I guess

18　what we can do is probably -- we have an index for the

19　exhibit list?  We can provide that, subject to Court

20　review and counsel review, but that's I think as far as

21　we can provide in terms of a list.

22　　　　　THE COURT:  Do you have a TV?

23　　　　　MR. SKROCKI:  Do we have a TV?  We're talking

24　that through.  I thought Madam Clerk may have had

25　another option.

1          THE COURT:  I think our IT person is coming

2     down here to discuss options.  I know one of your

3     colleagues brought a TV into court earlier this year.

4          MR. SKROCKI:  We can look into that.  Right now

5     it's 20 until 5:00.

6          THE COURT:  We can tell them that we can

7     accommodate this in the morning, would be my thought.

8     Mr. Camiel, Mr. Colbath?

9          MR. COLBATH:  We agree.  It certainly makes

10    sense to not make 12 of them huddle around a laptop, and

11    so we have no objection to a TV.  We don't have one, but

12    if somebody can find one, that's fine with us.

13          We can certainly look at, just like

14    Mr. Skrocki's suggestion, we can look at putting

15    together some sort of brief index for the audio or video

16    DVDs that were our part of the exhibits, and subject to

17    the Court approving that and government looking at it,

18    we'll try to --

19          THE COURT:  Maybe we should meet back here at

20    8:30 tomorrow morning, 8:45 and make sure on record that

21    everybody is okay with the list.

22          MR. SKROCKI:  Sure.  What time would you like,

23    Your Honor?

24          THE COURT:  It kind of depends when the jury is

25    planning on coming back.

1              DEPUTY CLERK:  You told them 8:30.

2              THE COURT:  I said unless they agreed

3    otherwise.  How about 8:30?

4              MR. SKROCKI:  That's fine.

5              THE COURT:  Mr. Colbath?

6              MR. COLBATH:  I'll be here.

7              THE COURT:  We'll give an update on the TV here

8    by then to you all, and you could give us any update on

9    your office as well, Mr. Skrocki.

10             MR. SKROCKI:  I was just thinking, on that

11   note, if we find something we can use, we'll e-mail

12   Emily and the defense and let you know.

13             THE COURT:  That sounds good. Anything further?

14             MR. SKROCKI:  No.

15             THE COURT:  So we'll be here at 8:30.  If there

16   is nothing further, we'll go off record.

17             DEPUTY CLERK:  All rise.  Court is in recess

18   until tomorrow at 8:30 a.m.

19                  (Recessed at 4:45 p.m.)

20

21

22

23

24

25

CERTIFICATE

    I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

    Dated this 22nd day of June, 2020.


                    /s/ Sonja L. Reeves
                    SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER