```
1               UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4        Plaintiff,           )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7        Defendant.           )
    _____)
8

9           TRANSCRIPT OF IMPOSITION OF SENTENCE
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10             January 7, 2020; 9:33 a.m.
                    Anchorage, Alaska
11

    FOR THE GOVERNMENT:
12       Office of the United States Attorney
         BY:  STEVEN SKROCKI
13       BY:  CHRISTINA M. SHERMAN
         BY:  KELLEY L. STEVENS
14       222 West 7th Avenue, #9
         Anchorage, Alaska 99513
15       (907) 271-5071

16  FOR THE DEFENDANT:
         Office of the Federal Public Defender
17       BY:  GARY GEORGE COLBATH
         601 West 5th Avenue, Suite 800
18       Anchorage, Alaska 99501
         (907) 646-3400
19
         Camiel & Chaney, P.S.
20       BY:  PETER A. CAMIEL
         520 Pike Street, Suite 2500
21       Seattle, Washington 98101
         (206) 624-1551
22  _____

23              SONJA L. REEVES, RMR-CRR
              Federal Official Court Reporter
24              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
25     Transcript Produced from the Stenographic Record
```

1            (Call to Order of the Court at 9:33 a.m.)

2            DEPUTY CLERK:  All rise.  Her Honor, the Court,

3    the United States District Court for the District of

4    Alaska is now in session, the Honorable Sharon L.

5    Gleason presiding.

6            Please be seated.

7            THE COURT:  Good morning.  We're on record in

8    *United States versus Wells*.  And Mr. Skrocki is here

9    with Ms. Sherman, Ms. Stevens.  And we have Mr. Colbath,

10   Mr. Camiel with Mr. Wells present.  And it's the time

11   time set for sentencing.  Ready to proceed?

12           MR. SKROCKI:  We are, Your Honor.

13           THE COURT:  Ready to proceed, Mr. Colbath?

14           MR. COLBATH:  We are as well, Your Honor.

15           THE COURT:  I understand we have some

16   individuals on the phone.

17           Mr. Skrocki, who all do you anticipate seeking

18   to address the Court today?

19           MS. STEVENS:  Good morning, Your Honor.  So

20   today the government will call -- we will read some

21   victim impact statements and we will have four

22   individuals address the Court in person.

23           Additionally, Your Honor, we have two victims

24   present telephonically, one of whom we were unable to in

25   advance file a motion for her to appear telephonically,

so we would request today, this morning, that she be
allowed to participate telephonically, and that's Debbie
Hopkins.

THE COURT:  Actually, there was a motion filed.
I have it right here.  Moments ago, but I will grant it
at 1352.

MS. STEVENS:  Thank you, Your Honor.

THE COURT:  I have read all of the statements.
Are there additional statements that you seek to read
apart from what's already been filed?

MS. STEVENS:  No, Your Honor.

THE COURT:  All right.  And with regard first
to the presentence report, Mr. Colbath, have you and
Mr. Wells had sufficient time to review that document?

MR. COLBATH:  We have, Your Honor.

THE COURT:  Mr. Wells, would you concur?  Have
you had enough time to look at that?

THE DEFENDANT:  Yes.

THE COURT:  Then with regard to unresolved
objections, Mr. Skrocki, from the government, there are
none at this time, correct?

MS. STEVENS:  That's correct, Your Honor.

THE COURT:  I'm sorry.  I'll address you,
Ms. Stevens, if you're going to be --

MR. SKROCKI:  She has the podium today.

1          THE COURT:  Mr. Colbath, I read the objections

2     that were articulated at page 45 of 1343, and is there

3     -- with regard to 80 and 86 on the obstruction issue, do

4     you seek to make additional remarks on that?

5          MR. COLBATH:  I don't, Your Honor.

6          THE COURT:  I do find that -- let me find the

7     applicable guideline on that topic.  It's 3C1.1.  Just a

8     moment.

9          (Pause)

10          THE COURT:  When I consider the examples of

11     covered conduct that are set out in 3C1.1, and

12     particularly in application note four, I do find that

13     the enhancement is properly applied in this case,

14     looking specifically at example 4(A), "Threatening,

15     intimidating, or unlawfully influencing witnesses."

16          Based on the testimony presented at trial, I do

17     find that that occurred, and "Providing materially false

18     information to a judge, (F), I do find as well based on

19     the Court's finding that Mr. Wells' testimony during the

20     trial was materially false.

21          And I could address several others that I do

22     find also within that, but I do find overall that the

23     enhancement should apply, and so the objection is

24     overruled with regard to 80 and 86, those paragraphs.

25          The other objection related to paragraphs 96

1  and 97, and I can hear from the government on this, but

2  my inclination there was to keep in those two paragraphs

3  but to change the caption up above.  Where it says,

4  "Offense behavior not part of relevant conduct," I see

5  that label as really not directly applicable.

6          I was inclined to say something along the lines

7  of "additional information," or something similar, but I

8  do see that similar to the many paragraphs that have

9  information in defendant's characteristics that it

10  should be included.  It could be helpful to the BOP.

11          So Mr. Colbath, anything further on that?

12          MR. COLBATH:  No, Your Honor.

13          THE COURT:  All right.  Ms. Stevens, on that

14  change?

15          MS. STEVENS:  No objection.

16          THE COURT:  Ms. Hensel?

17          MS. HENSEL:  Yes, Your Honor.

18          THE COURT:  The other issue I had then -- apart

19  from that one change, I will find that all of the

20  statements of fact in the presentence report are

21  supported by a preponderance of reasonably reliable

22  evidence and I'll adopt them and make them findings of

23  fact for this proceeding.

24          I did on the recommendation disagree with the

25  citation on Counts 5 and 6.  I believe that the

sentencing range for each of those charges, which are
the possession and use of a firearm in relation to a
crime of violence is actually ten years to life.  I
think the government had ten years to life on one count
and 25 to life on the second count, but my reading of
the First Step Act is that that has changed and that
stacking of 924 is no longer permissible, and that would
be specifically Section 403 of that Act that was enacted
late last year, I guess over a year ago now.

        Ms. Stevens, any disagreement there?

        MS. STEVENS:  No, Your Honor.

        THE COURT:  All right.  And so, Ms. Hensel, do
you see where on your page you have got Counts 5 and 6
as the statutory provision?

        MS. HENSEL:  I do, Your Honor.

        THE COURT:  It should read ten years to life
and not life.

        MS. HENSEL:  Yes.  I believe the presentence
report should be revised as well.

        THE COURT:  I believe you have a discussion in
there where you have the stacking as well.  I believe I
read that.

        MS. HENSEL:  I think paragraph 135 should be
corrected.

        THE COURT:  135.  Yes.  Yes, that should be

changed as well to reflect what the statutory range is
as articulated.

All right. With that, I would adopt the
guideline calculation as computed by the probation
officer, except for the offense level would default down
to 43, as I read it in the guidelines, specifically
Chapter 5, Part A, Comment Note 2, with the criminal
history category of I. And that would result in a
guideline range for each count of a term of life
imprisonment.

The guideline range on 5 and 6 would remain as
calculated? I did not review that. If we need to take
a few moments --

MS. HENSEL: The guidelines default to the
statutory penalty on Counts 5 and 6, Your Honor.

THE COURT: Meaning ten years to life?

MS. HENSEL: Yes.

THE COURT: All right. Any disagreement there?

MS. STEVENS: No, Your Honor.

THE COURT: So that would be corrected as well.
And then the fine, assuming an ability to pay, would be
$25,000 to $250,000.

Restitution, I do want to address scheduling
further proceedings to address that issue. I understand
from Mr. Colbath's sentencing memorandum the request

```
 1    that Mr. Wells remain in the district here until those

 2    issues are resolved.

 3            And then there is the mandatory special

 4    assessment of $600.  So questions or clarification

 5    regarding the Court's guideline calculations?

 6            MS. STEVENS:  No, Your Honor.

 7            THE COURT:  Mr. Colbath?

 8            MR. COLBATH:  Not from me, Your Honor.  Thank

 9    you.

10            THE COURT:  All right.  Then I believe we're

11    ready to proceed then with the individuals that seek to

12    address the Court.

13            Ms. Stevens, go ahead.

14            MS. STEVENS:  Your Honor, we'll start with

15    co-counsel reading some of the statements that were

16    provided to the Court.

17            MR. SKROCKI:  Good morning, Your Honor.  Thank

18    you.  The first letter I'm going to read is from Steven

19    Salus, and he's here in court this morning.

20            THE COURT:  Can you direct me to where it is in

21    the docket?

22            MR. SKROCKI:  Just a moment.

23            THE COURT:  Take a moment.

24            MR. COLBATH:  It's 1350.

25            MR. SKROCKI:  1350.
```

1          THE COURT:  I see it.  All right.

2          MR. SKROCKI:  I have two letters I'm going to

3     read by request of the victims, Your Honor.

4          THE COURT:  That's fine.  Go right ahead.  I

5     see this at 1350, page 11 and 12, is what it looks like

6     to me.

7          MR. SKROCKI:  I have them printed off from our

8     victim witness coordinator, so I don't have a docket

9     number, but it's victim impact statement from Steven

10    Harold Salus.

11         THE COURT:  Go ahead, please.

12         MR. SKROCKI:  "Judge Gleason, that day Jim

13    Wells committed a horrendous and cowardly act of murder,

14    12 April 2012, changed my life forever.  That day we

15    lost two great men, Richard Belisle and Jim Hopkins.

16    These horrendous and cowardly murders not only

17    devastated two families, it devastated Coast Guard

18    community and it devastated an island community.

19         For me personally, my friendship with Rich and

20    his family goes back years.  Rich and his family moved

21    to Kodiak the same year, month, June of 1997, that my

22    family and I did.  We were first stationed on the Coast

23    Guard Cutter Storis together.  Then we both were

24    transferred to the U.S. Coast Guard Integrated Support

25    Command Kodiak.  Rich was the chief of police and I was

the command chief and served under Captain Robert
Lachowsky.

During this time stationed together, we became
close.  Our families usually spent Thanksgiving at our
house and then Boxing Day at the Belisle house.

It wasn't just our families that were close
though; Rich was my best friend.  Rich and I liked to do
a lot of things:  Hunt, fish, crab.  We did these things
together because we genuinely enjoyed each other's
company.  If I took the boat out on the ocean, he was in
the co-pilot seat.  He would take his skiff to check
crab pots, and he was right next to me while we climbed
the mountainside.

When Rich and I would go hunting, as we
returned to the truck, he would always say, 'I took my
piece of iron for a walk in the woods,' referring to his
rifle shotgun he carried while we were out.  That still
brings a smile to my face.

Rich was the level-headed one of us two.
Something would tick me off and he would always say,
'Let's just think about this a minute and have a beer.'
I could tell him anything.  He was who I vented to when
I was having problems at home.  I didn't have to worry
about Rich running around telling everyone my problems.
I was there for him to vent his frustrations also.

After all, he had three girls.

I look at Rich and Nicola's three daughters, Emily, Amy and Hannah, as my daughters. They know I will always be there for them if or when they need anything. Rich even has a grandson now. I'm going to be there for Henry and tell him about what a great man his grandfather was. I'm not sure how, but I will try to help him understand what happened to his grandfather.

I will never be able to take Rich's place and I would never try, but I'm planning on doing what I can to help his family out. At the end of the day though, I shouldn't have to try to fill his role. Rich should be alive to see his daughters turn into women and meet his grandson.

It is unthinkable that Rich and Jim had their lives stolen from them in a horrendous and cowardly act of murder all over job prestige and jealously. I can't help to think that he could have just retired and these two great men would still be with us and all this hurt that we all have would not have happened.

As if their murder wasn't difficult enough, we have had to relive it through two trials. I was a character witness in the first trial and I stayed to help support Nicola during the rest of that trial. During the second trial, I was there to support her as

1  she once again vividly reexperienced this nightmare.  It

2  was like tearing scabs off of wounds.  It was painful

3  for us to hear all the testimony again, and even some we

4  had not heard before.  Now that Jim Wells has not only

5  been found guilty by 12 of his peers, he has been found

6  guilty by 24 of his peers, this gives me a little piece

7  of closure.

8          When you have a best friend like Rich, it is

9  like having a brother with me all the time.  When I head

10  out on the water or up the mountain, I always think

11  about what Rich would want or do or where he would go.

12  With all this said, there will always be an empty spot

13  in my soul.

14          Respectfully, Steve Salus."

15          The next letter is an impact statement from

16  Brian Gebo.  He's a Captain in the United States Navy

17  (Retired).

18          MS. SHERMAN:  It's docket 1351 beginning at

19  page five.

20          THE COURT:  Thank you.  Go right ahead.

21          MR. SKROCKI:  "Jamie Hopkins, that's what I

22  call United States Coast Guard Electrician's Mate First

23  Class James Hopkins.  That's how he referred to himself

24  when I first met him in the Congregational Church in

25  Vergennes, Vermont in the mid-1970s.  I'm not sure when

it was exactly, just that he was my first memory of a friend.  We attended the same elementary school where we gained more friends.  Between church and school, we gathered Chris Goodyear, Jay Curtis, Eric Jennings and Brian Lalumiere, just to name a few to complete our gang.  Junior high and high school would add many more friends and many more adventures, but Jamie was always my first, my friend, my brother.

        It was never planned, but while I was away in college on an ROTC scholarship with dreams of flying, Jamie enlisted in the Navy.  Along with Chris Goodyear, they started their enlisted Navy careers and were always ready to tell me who did the real work in the Navy. Navy or maritime service, this was another brotherhood that Jamie and I shared.  Many times he had talked about stupid stuff his officers would do, and he would warn me to avoid such nonsense.  Never did a conversation go by that didn't include discussions about what we were going to do after our military service.  It never changed.  We were going to move back to Vergennes to raise our sons. We were going to hunt and fish, at least have Jay Curtis teach us how again, and share these experiences with our sons.  We were going to be active members of local veterans associations and voices for veterans issues. We were going to keep telling Chris Goodyear how much

fun we were having and try to convince him to move home
from Italy.

      I will not say this man's name, but this
individual took an honorable Navy and Coast Guard sailor
away from naval service for his country.  This man took
Jamie away from his family and friends and we'll never
get him back.  While he lives in our memories forever,
we won't hunt, we won't fish, we won't sit on the porch
with Jay, Eric, Chris or Brian and tell lies about our
youth, hoping our kids don't make our same mistakes, but
have even better adventures.

      While I will never say this convicted
murderer's name, I will spend the rest of my life saying
Jamie Hopkins' name.  He was my friend, my advocate and
my hero.

      This man left a hole in my life, but that's
just one of the holes he meticulously chose and planned
to create.  I respectfully request his sentence to
reflect his deliberate and callous decision to end Jamie
Hopkins' life for the sole purpose of making his better.

      Thank you."

      THE COURT:  Thank you, Mr. Skrocki.

      Ms. Stevens?

      MS. STEVENS:  Your Honor, we will hear from
Chief Warrant Officer Scott Reckner.

1          THE COURT:  All right.  Very good.

2          MR. RECKNER:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. RECKNER:  Your Honor, my name is Chief

5    Warrant Officer Scott Reckner.  Thank you for allowing

6    me the opportunity to express to the Court how this case

7    has affected me, my family, my fellow Coast Guard men

8    and women.

9          April 12, 2012 began like any other day.  My

10   wife and I were getting ready for work.  My three

11   teenage children had already left for school, and then

12   the phone rang.  On the other end of the line was SKC

13   Steve Cartier.  He asked me why there were emergency

14   vehicles at the rigger shop.

15          I immediately started to worry about my rigger

16   shop personnel.  I then called the watch, and I was told

17   that ET1 Hopkins and Rich Belisle were found down.

18   Despite me asking for more details, none were given, and

19   I hurriedly ran out the door.

20          As I drove to the COMMSTA, I called ET3

21   Beauford, and that's when I heard the words I will never

22   forget.  He said, "I found ET1 and Rich down.  They are

23   dead.  They are dead, Chief."  That's what he said.

24          I pulled into the COMMSTA minutes later.  I was

25   frantic.  I was confused.  I was worried.  As the shop

chief, I wanted to go to my people, but CGPD stopped me. I wanted to help, but felt helpless. I remember not being able to breathe. I hunched over. I would forcibly exhale trying to get this heavy feeling I felt in me out. It's something I did periodically over the following months, but the heaviness never really left.

Throughout that day and the days that followed, I would sob at the sense of loss I felt, the guilt, the sense of how senseless it was. How could two men, fellow Coasties, men who worked for me, men I was responsible for be dead, killed in our shop. It was unthinkable. These men are families, wives, children the same age as my children.

As I pulled in, I remember seeing Cody Beauford, a young man, only 19 years of age, in the rigger shop parking lot talking to a state trooper. He was visibly upset. I will never forget the look on his face. I remember the CO, Chief Van Ness, running up and me telling him that somebody shot Rich and ET1.

Later, I remember walking into the conference room where Seaman Henry and Seman Upchurch sat, both with red faces and tears in their eyes. I remember Seaman Henry's phone ringing and Nicola Belisle's number flashing up, seeing the anguish on Leah's face. She knew why Nicola was calling, but she couldn't answer it.

1    We were under orders not to talk to anyone outside of

2    the COMMSTA.  It was incredibly heart-wrenching.

3              THE COURT:  Mr. Reckner, at any time if you

4    need to take a break, that's fine, sir.  Just let me

5    know.

6              MR. RECKNER:  Thank you.

7              I can only imagine how frantic Nicola was

8    trying to find out any information about her husband,

9    Rich.

10             I remember ET1 Gross standing at the podium in

11   the conference room.  He was charged with keeping the

12   rigger shop folks in the conference room and everyone

13   else out.  I remember at times he would hunch over,

14   shoulders heaving as he sobbed.  I remember looking out

15   the conference room window down to the rigger shop in

16   disbelief that ET1 Hopkins and Rich were lying in that

17   building dead.

18             Your Honor, everything I just spoke of took

19   place in the first hour or so of the phone call that I

20   received from SKC Cartier.  I mention that because I

21   want to express to you how devastated we were that

22   morning, shock, disbelief, and sadness.

23             Later that night, we were released.  I drove

24   over to ET1 Hopkins' house.  I embraced his wife Debbie,

25   and through tears, I told her how sorry I was.  I then

1  went upstairs and I sat and talked to Patrick Hopkins,

2  ET1 Hopkins' son.  What do you say to a teenage boy who

3  just lost his father, sitting there alone with him and

4  telling him how much I liked his dad, how good of a

5  Coastie I thought he was, all the time it's running

6  through my mind that there's nothing I can say to make

7  it better.  Nothing I could say was going to bring his

8  dad back.

9         To make it worse, he didn't die while on a

10 rescue mission or law enforcement mission or a tower

11 climbing accident.  We accept those risks as Coast Guard

12 men and women.  No, Patrick and Andrew's dad, Emily and

13 Amy and Hannah Belisle's dad were murdered by someone

14 they thought they could trust, James Wells.

15        My wife, Monique, and I made it back to our

16 house around 10:00 p.m.  As we walked in, our three

17 children were sitting in the living room.  We

18 immediately embraced and cried together as a family.  My

19 wife had left work earlier that day, along with two

20 other COMMSTA wives, Jennifer Jordinelli and Sally Reed.

21 They spent the day with Debbie Hopkins.

22        My children spent the entire day in school.

23 Kodiak is a small town and it didn't take long for them

24 to hear that something bad had happened at COMMSTA, that

25 somebody had been killed.  They would meet each other in

the hall between classes asking if either of the others
-- asking if either of the others had heard anything,
all the time worrying it was me that had been hurt or
killed.

Sometime late that morning we were able to get
word to them that I was okay. They went home after
school to an empty house. I was confined to the
COMMSTA. Monique was trying to comfort a new widow.
Those hours wondering if I was lying dead at work stay
with them to this day.

Later that night, after I finally fell asleep,
I woke up and I bolted upright in bed. I had dreams so
real I was certain someone was in my house. I remember
the fear I felt. I remember thinking I could see a
shadow, a silhouette of a person standing in my hallway,
then reaching for my gun on my nightstand.

It was only when Monique touched me and told me
it was okay, just a dream, that I managed to lay back
down. I would go on to have similar nightmares for
months.

Your Honor, everything I talked about to this
point happened on day one, April 12, 2012. In the days
that followed, I would speak at ET1 Hopkins' memorial
service, also act as a pallbearer at Rich Belisle's
memorial service. I would fly to Elmendorf Air Force

Base with both men, who were in flag-draped coffins and
salute each man one more time as a they were carried
from the plane.  As honored as I was to have been asked
by both widows to do those things, I carried the heavy
weight of sadness and feelings of senseless the whole
time.  I constantly asked myself why was this even
necessary, why are we here, why is it that we have to do
these things, what could have been so bad that someone
would kill these two men.  I felt an incredible sense of
responsibility and guilt and anger.

I felt that if I had not brought my concerns
about a problem employee to a command who then held Jim
Wells accountable for his actions he may not have
committed these murders.  In fact, I still feel that way
today.

The guilt and anger I feel over the fact that
ET1 Jim Hopkins and Rich Belisle are dead will never be
gone.  I will live with it for the rest of my life.

Your Honor, the core values of the Coast Guard
are honor, respect, devotion to duty.  Honor, integrity
is our standard.  Respect, we value our workforce.
Devotion to duty, we are professionals, military and
civilian, who seek responsibility and accept
accountability.

The Coast Guard core values are what allows me

to reconcile in my head that the actions I took and that the command took in regards to Jim Wells' behavior were the right course of action. I do take comfort in knowing we did the right thing, the honorable thing when dealing with Mr. Wells, a man without honor or respect, and who was only devoted to himself.

As I stated above, the guilt and anger I feel that two good men are dead is always there, but only Jim Wells is responsible, accountable.

Throughout both trials many Coast Guard men and women have been called upon to testify in court under oath. Many have had their integrity called into question. I myself have been accused of lying, having an agenda and steering the investigation all to accuse and convict one man, James Wells.

Two men are dead, two honorable men who respected our organization. Two of the most dedicated and devoted Coasties I have ever had the privilege of working with are dead. They woke up on April 12, 2012, went to work, went to conduct Coast Guard business and never made it home. It wasn't a work accident. They didn't die at sea or performing a high-risk rescue or taking down drug runners or climbing a 300-foot tower. No, they were killed by one of our own.

The one and only thing that could possibly make

losing these two men harder to take is that a COMMSTA
Kodiak crew member pulled the trigger.  The feeling of
betrayal is unfathomable.  How much hate must one feel
to take a gun and draw down on people you know, your
co-workers, two fellow Coasties, men that you worked
with, traveled with, socially interacted with, you know
their wives, have met their children, and none of that
matters.  You ambush them and shoot them repeatedly, but
that's exactly what happened.

One of us, a fellow Coastie committed this
horrible act for the pettiest of reasons.  I never
wanted it to be Jim Wells, I never did.  I wish it was
some stranger, some random act, some passerby, but it
wasn't.  It was Jim Wells.  He betrayed us.  He killed
them, and it's so senselessly tragic.

A couple years after the murders, the Coast
Guard consolidated COMMSTAs and created U.S. Coast Guard
Communication Command, otherwise known as COMMCOM.  Last
week I called the command's product line manager to ask
them what the plan was in 2012 for the two civilian jobs
at COMMSTA Kodiak and what was to become of those
positions since.  He told me that the plan was to keep
Rich and Wells in Kodiak, but they would fall under the
operational command at COMMCOM on Chesapeake, Virginia.
They would spend their summers in Kodiak working on

COMMSTA Kodiak antennas, but in the winter when the work
in Kodiak slowed, they would do more traveling, spending
the majority of the winter months in the Lower 48 and
Hawaii doing maintenance and training.  And now because
of the murders, their jobs have been permanently
relocated to Chesapeake, Virginia.  There are no antenna
mechanics in Kodiak.

In fact, all the antenna field maintenance that
the rigger shop did is now contracted and two new
antenna mechanics in Virginia are doing the work that
Rich and Wells once did.  Imagine a rigger shop with no
shop chief, no officers up the hill, the only real
oversight thousands of miles and four time zones away.
Imagine all those air miles you could have racked up,
Jim.

I want to convey to you that this has had a
lasting effect on me, my wife, my children.  In the
immediate aftermath of April 12, 2012, I was a mess.  I
drank too much.  I slept too little.  My emotions were
all over the place, but I had to largely keep them in a
box.  I had to keep it together.  I had
responsibilities.

I had a shop largely made up of young non-rates
and petty officers only a few years older than my own
children to take care of.  My CO, XO and EO all left the

island that summer.  I was the face of the promise made
to the widows, the promise that you will always be a
part of the Coast Guard family.  So I helped Debbie
Hopkins sell her and Jim's camper that was brand-new
that they hardly got to use.  I was there when Debbie's
movers arrived and packed up her house as she prepared
to leave the island.

I made sure Nicola's lawn got mowed, driveway
got plowed, firewood got stocked.  There was an active
investigation, there were multiple interviews with law
enforcement, and I testified in front of the grand jury.

I carried a gun everywhere I went because Jim
Wells had not yet been arrested and I feared for my
safety and that of my family.  I could never really
escape it.

I could have left the island.  The Coast Guard
would have sent me anywhere I wanted to go, but if I
did, who would be left on the island to make sure these
things were done, that the widows and my people got the
help and support they needed.  I felt an incredible
sense of responsibility to the widows and those folks
that worked for me.

In 2014, the case went to trial and the jury
got it right.  They came back with a guilty verdict and
Jim Wells was sentenced to life in prison.  I was

finally able to box it up and the strong feelings began to fade.  For once, the murders of these two men, their families and their murderer were not the first things I thought of in the morning and the last thing I thought of at night.

Jim Wells was in a cage and he would never be a free man again.  It was what he deserved, and I was good with that.

Now here we are again, all the emotions, feelings, thoughts, that I, my family, my fellow Coasties felt in 2012 through 2014 all came back.  We were forced to live through it a second time.  Believe me when I say it hurts as much now as it did then.

Your Honor, I doubt I have been successful in accurately expressing how I felt, how those I loved felt as we went through this experience.  The range of emotions I feel for ET1 Hopkins and Rich Belisle, for Nicola and Debbie and their children, feelings of gratitude to my wife, Monique, who is my rock, the love for my children, Rena, Samantha and Tristan.  The profound sadness that I feel for my family that they had to watch me, support me, as I struggled to navigate this event when the root cause of all this was so unnecessary.

I could only use words like fear and sadness

and anger and weight and guilt and responsibility.  And
none of those feel adequate.  It is not possible to
quantify into words.

Your Honor, in closing I say this:  After two
trials, there is no doubt who committed these horrible
crimes.  Two separate juries came to the same
conclusion.  It's impossible to believe anyone but James
Wells is the perpetrator.  He murdered two good men in
cold blood for selfish reasons.

He should now do the honorable thing and stand
up, take responsibility and ask for forgiveness, admit
what he did.  He should do this, but he won't, because
he has no honor.

For the sake of Rich Belisle and ET1 Jim
Hopkins and their families, the COMMSTA Kodiak crew and
their families, our fellow Coast Guard men and women, I
would ask you to punish James Wells to the fullest
extent of the law and send him to the worst facility
this country currently has, a place commensurate with
the crimes he committed.

He deserves the same amount of mercy he showed
Rich and ET1 on the morning of April 12, 2012,
absolutely none.

Thank you.

THE COURT:  Thank you, Mr. Reckner.

1    MS. STEVENS:  Your Honor, we will hear two

2    statements that will be read by my co-counsel.

3    MS. SHERMAN:  Your Honor, beginning Docket 1350

4    starting at page eight.  These are the two individuals

5    that are on the phone.  They identified herself as "AB,"

6    so I'm not going to put her name on the record today,

7    but this is her victim impact statement.

8    "On April 12, 2012, I took the day off work to

9    spend with my family.  We traveled out of cell phone

10   service to a camping area near the creek.  I didn't have

11   cell phone service for hours.  That's such an uncommon

12   thing anymore, people separating themselves from

13   electronics to just enjoy the people around them.

14   At the end of our day, I entered a service area

15   and immediately my phone began to buzz.  I received a

16   voicemail from my grandmother:  'Your father has been

17   shot; call your mom.'  That's all it said.

18   I immediately began to panic.  Mind you at this

19   time I had only been informed that he'd been shot.  Some

20   part of me didn't even recognize that he could be dead.

21   I convinced myself he was in the hospital and I would be

22   talking to him soon.

23   In a matter of seconds, I called my mother.

24   After several attempts, she picked up and was unable to

25   speak to me due to her level of devastation.  A woman,

who I still don't know, got on the phone and told me my dad was dead, he had been shot to death. I lost all composure that day. I broke down. My children were in the car and watched me break down. They too began to cry, full of grief and pain.

That night, I went home and cuddled my nine-month-old son, who was named after his grandfather, and cried. My son was the light of my dad's life. He loved him fiercely from all those miles away. He was never able to meet him. A picture was recovered from his office of my son after the investigation was complete.

I have images burned in my brain of him lying on the floor in his last few moments of life and seeing that photo and being heartbroken knowing he would never meet him.

It's a disturbing situation when you can't remember the happy days with your loved one. You can't see images of them the way you remember them. Instead you constantly see images following the injuries that caused his death. You see him lying in a casket, and you think of all the stuff he could have been thinking right before his passing. It's suffocating, and Jim Wells caused it.

The day of the visitation, I laid near his

casket and cried.  I petted his hair and kissed his
forehead for hours.  Due to the nature of the job, it
had been so long since I had been near him.  I just
wanted to be near him as I remembered him, but Jim Wells
took that.

There are not many people in the world who
would love a child that's not theirs upon first look
without reservation, but Jim did.  There wasn't a moment
in my 21 years that I ever doubted his love for me.

On April 12, 2012, Jim Wells took part of the
person I am.  He took a part of my heart and he took my
ability to be forgiving.  He took a son, husband,
brother, father and grandfather.

I don't wish this emotional pain on his family
as they had no part in his actions and they were just
doing what loved ones would do, but I hope Jim Wells
suffers not being able to go home every night to them as
we have had to suffer for seven years.

I'm not able to tell Jim Wells I forgive him or
say I hope he finds God to carry him through his
incarceration.  He took that from me too.  I'm not that
person anymore.  There is no prison bad enough or dark
enough for Jim Wells.  I hope he thinks of his actions
daily and how they have affected so many lives and I
hope it eats away at him."

1           And then same docket number, page nine.  We'll

2    read the statement of Debbie Hopkins.

3           "Judge Gleason, you heard a little bit about my

4    husband, Jim Hopkins, during trial, but I wanted to take

5    this opportunity to tell you more about who he was.

6           My husband and I met in a bar in Chicago.  He

7    offered to me buy me a drink and I initially turned him

8    down.  He started giving me crap, which I gave right

9    back to him.  From that moment on, we were together.  We

10   got engaged after just three months and were married

11   18 months after meeting.

12          Jim became father to my daughter Angela from a

13   previous relationship.  A lot of men wouldn't date a

14   single mother, but Jim had absolutely no hesitation

15   about this.  In fact, when he met my daughter, it was

16   love at first sight.

17          Two years after we got married, we had our son

18   Patrick.  Jim had such an amazing sense of humor that

19   not a lot of people got to see.  In fact, when he was in

20   the Navy, his nickname was Gabby because Jim was known

21   for not speaking much, but with his family, we saw

22   another side of him.

23          Jim was protective and loved his family more

24   than anything.  Family was everything to him.  Jim was

25   the kind of father every kid would want.  He was very

hands-on.  When he wasn't out on the ship, he took
charge of bath time, getting the kids in their pajamas
and tucking them into bed.  He always told me that I got
to do this when he was gone, so it was his turn when he
was home.

As the kids got older, Jim remained engaged.  I
loved watching him on the floor wrestling with the kids
or kicking me out of the kitchen so they could cook
together.

Jim and I were both very much into the
outdoors.  We frequently went hunting, fishing, camping
and hiking.  Jim always loved the water.  However, he
had a funny quirk:  He would go to the beach.  He loved
walking there, but he absolutely refused to walk on the
sand without his shoes.

From the moment we met -- well, okay, a couple
minutes after since I did turn him down after all -- Jim
was my best friend.  He knew me better than anybody and
we did everything together.  People used to joke that we
were joined at the hip.

All that changed on April 12th, the day Jim
Wells murdered my husband and shattered our lives.  I
remember being home by myself and hearing the doorbell.
When I answered it, I saw Jim's captain, the base
commander and a couple chaplains.  I instantly knew

something horrible had happened, but I didn't want to
hear it, so I slammed the door in their faces.

Obviously, I wasn't able to avoid the horrible
truth that my husband was cold-bloodedly murdered and
that we had lost our rock.  I kept thinking how am I
supposed to tell our children their father is dead and
that Jim was going to miss out on seeing our first
grandchild, who was almost nine months old, grow up.

I became pretty distraught and was sedated.  A
lot of the following days were a blur.  In the
aftermath, life hasn't gotten any easier.  I can't even
begin to describe how unbelievably brutal in April is
every year.

Jim Wells murdered my husband on April 12, five
days before his birthday and eight days before what
would have been our 20th wedding anniversary.  I think
saying April is pure hell would be the most accurate
description I can give.

We now have three grandchildren, eight, six and
four,  but they'll never know their grandpa.  Jim was
such a great father; I know he would have made a hell of
a grandpa.  We keep his memory alive for them and tell
them stories, but it's not the same.

When you build a life with someone, you create
a collection of shared memories and stories.  We were

1    lucky to have so many of those, but I'll never again get

2    to remember those stories with the person I lived them

3    with.  I'll never again get to create new memories with

4    the person who was supposed to be by my side forever.

5           I will never again get to lay in bed together

6    with my husband, just the two of us enjoying the

7    peaceful moments in between the crazy that comes with

8    being a busy, active family.  I will never again to get

9    to go hiking with best friend.  I will never again get

10   kicked out of the kitchen by my husband, all the while

11   giving me his little grin, because he wanted to cook for

12   me.

13          I'll never again have my best friend glued to

14   my side as he was for almost 20 years.  Jim Hopkins was

15   the best damn thing that ever happened to me and when

16   Jim Wells killed my husband he destroyed me, my children

17   and our family.  We were happy and he took that away.

18          He didn't have the right to kill my husband,

19   the father of our children and the grandfather to our

20   grandchildren.

21          Since the death penalty isn't on the table,

22   life in prison is the next best option.  Sincerely,

23   Debbie Hopkins."

24          THE COURT:  Thank you, Ms. Sherman.

25          MS. STEVENS:  Your Honor, we would also like

1  Scott Hopkins to provide a statement.

2          MR. SCOTT HOPKINS:  Judge Gleason, while most

3  people knew him as James or Jim, at home we called him

4  "Jamie."  He was my younger brother by two years.

5          I'm here today to speak to the best of my

6  ability on behalf of myself, my own family, my father,

7  my late mother, and the community of extended family and

8  friends who grieved Jamie's loss alongside of us.  I'm

9  here to honor him and ask that the person who so cruelly

10  and needlessly stole his life be punished accordingly.

11          Personally, I miss every day a brother who in

12  1990 enlisted with the Navy and began a career that took

13  him far away from us for most of his adult life.  In

14  fact, at the time of his death, I had not seen Jamie for

15  almost three years.  Although we didn't see each other

16  often, we kept in touch by phone and e-mail.  I always

17  looked forward to those conversations hearing the

18  details of his various deployments and about what life

19  was like at each of his posts.

20          As I'm known to do, I frequently gave him

21  advice on what I thought he should do, sometimes and

22  quite often when he didn't ask for it.  I hope he knew

23  that I did so because I also wanted the best for him.

24          When he transitioned from the Navy to the Coast

25  Guard, Jamie had a choice of several different

assignments.  While his hope was to one day settle for good back home on the East Coast, he selected Kodiak due to his love of the outdoors and the prospect of hunting and fishing.

His family was his priority, and living and working on Kodiak would give him the time and opportunity to enjoy an active life with them.  It soon became clear to me after so many years of moving and change, Jamie had found a place where he felt connected and fulfilled.

For those of us who have never lived anywhere but the Lower 48, it sounded crazy.  But at the time of his death, Jamie had actually decided to stay, to extend a little longer in the wild place he had grown to love.

The call I received from my father on April 12, 2012 brought the devastating news that changed our family forever.  The shock, the loss, the sickness, the grief, there is just no way to describe it that does it any justice at all.  The violent circumstances of his death made it that much more difficult to comprehend.

How could someone do such a horrific thing to another human being, to a good person, someone's beloved husband, father, son, brother, friend?  What justifiable purpose could such a sick and selfish act serve?  How in the hell did taking my brother's life solve anything at

all?

My father, Bill, who is now 83, was overwhelmed by the situation and to this day still is in many ways. He has borne the grief of tragic loss more than most. With the death of my mother after a short but fierce fight with leukemia in 2002 and Jamie to follow ten years later. His memory fails him now, but dad too was always proud of Jamie, loved traveling to visit him and spend time with Angela and Patrick.

He and I are particularly grateful for the opportunity we had to experience Jamie's life on the USS Abraham Lincoln alongside him sailing from Honolulu to San Francisco on the ship's tiger cruise in 1995.

Needless to say, Jamie's death was a difficult thing to explain to my young son. Even then at age eight, Ryan was old enough to be proud of his uncle and his service to our country. He often wore a Coast Guard T-shirt that his uncle had given him as a gift, and these days on old Navy sweatshirt from Jamie's bedroom closet in Vermont is an integral and cherished part of Ryan's wardrobe.

In recent years, Ryan has become increasingly passionate about the idea of a career in law enforcement or the military. We can't help but think that Jamie's life and legacy had contributed to that.

As part of preparing for today, I asked Ryan to write down a couple of his thoughts, and here is what he had to say: "On April 12, 2012, my dad sat me down and told me about my uncle's death. I was eight years old, but somehow I understood what happened. I was never super close to him because of where he lived, but he visited us periodically in the previous years. I always wanted to spend time with him because he was a cool uncle and he always had stories to tell. Given the opportunity, I would have spent so much more time with him and made so many memories. Those experiences are no longer possible because he was taken from us at such a young age."

Also, I want to take this opportunity to relay sentiments of my extended family, including my cousins, aunts and uncles who also had a very close relationship with Jamie. For them it has been heartbreaking and sad, they miss him a great deal and the pain never seems to go away.

To them, he was a great guy who always made time to stay in touch. He never missed calling on holidays, and when family was gathered, it was always a race to see who could answer the phone first to talk with him. When asked, it was hard for them to even write their feelings, and some could not even convey a

1    message as their anger is still so great.

2            It's still so hard to believe that this has

3    happened, to believe how it happened, and that Jamie is

4    gone from us forever.  We struggle to understand and

5    struggle to find peace.

6            When we were younger, I was often annoyed when

7    Jamie had to have the same things I had or do the same

8    things I was doing, but later in life, I came to

9    understand and appreciate that he was looking up to me

10   as an example.

11           I never did get to tell him that I looked up to

12   him too and was very proud of his military service.  On

13   behalf of my brother and all of us who love him, we ask

14   that you consider this great toll this has taken on all

15   of us as you decide upon the appropriate sentence.

16           Thank you.

17           THE COURT:  Thank you.

18           MS. STEVENS:  The next statement will be from

19   Nicola Belisle.

20           MS. BELISLE:  Your Honor, my name is Nicola

21   Belisle, and I do appreciate this opportunity to address

22   the Court on behalf of my husband, Richard Belisle, who

23   was murdered by James Wells on April 12, 2012.

24           I knew James Wells killed my husband

25   immediately after being notified of Rich's death, and I

know it because after seven and a half years, two federal trials, two independent juries have all found him guilty of cold-blooded murder beyond a reasonable doubt.

Four years ago, I agonized over writing my first victim impact statement, which I hope you have read because I do not want to relive those thoughts and emotions.

THE COURT:  I have read it.

MS. BELISLE:  Thank you.  That statement was excruciatingly painful to write and to read to the Court, and the second one has not been any easier.

Since April 12, 2012, the concept of time has taken on a new meaning, and it's been measured in many painful ways.  I speak in time of before Rich's murder and after.

In opening statements, the defense forcibly stated that Wells had been waiting for seven years, seven.  Your Honor, my family and I have endured the length of time that it took for James Wells to be arrested after he killed my husband, ten months and three days.

The first trial, which began April 1st of 2014, 1 year, 11 months and 20 days after my husband's murder. The appeal hearing in July of 2016 and then the appeal

decision overturning the first conviction and a new
trial was ordered on December 16th of 2016, which was 4
years, 8 months and 4 days since Rich was callously
murdered.

This retrial was fraught with delay after
delay. First he couldn't decide on which public
defender he wanted, and when he finally made his
decision, that lawyer was made a magistrate, so it was
back to square one. The delays continued pushing back
the trial date multiple times.

This living nightmare has continued for 7
years, 8 months and 26 days since Rich was murdered.

Even though the second guilty verdict -- even
though this is the second guilty verdict, it is an
extremely hollow victory, because Rich is still dead. I
know he will appeal this second conviction, and as I
have learned throughout this whole process, guilty
really doesn't mean guilty and we're done until the
appeal is written, submitted to the Ninth Circuit Court
of Appeals. They will then review it, everything that
has been said, not said, admitted into evidence, not
allowed to be admitted into evidence. Last time that
process took just over two years, and so I am
anticipating that it will be at least ten years after my
husband's murder that the criminal justice system will

finally give me and my family some sense of peace and justice.

I have also learned that the criminal justice system is not really for the victims. The system is not designed for us, the people who loved our men that were brutally shot and killed by James Wells. The system is designed for him to make sure that his rights are not trampled on.

Where were my husband's rights on April 12, 2012? Where were his rights to life? Forget liberty and the pursuit of happiness.

I have sat through countless motion hearings, bail hearings, two trials, and an appeal process. I have been asked several times a week for several years as to why he got to have a do-over when everyone knew he was guilty.

Each time for almost eight years now, I have had to live Rich's murder over and over as I sought to explain this to well-meaning people who cared for me and my family.

Through all this time, the man I loved with all my heart and soul, the one person on the face of this earth who I wanted to talk to to be reassured that this would be all right in the end, to be held by, to quiet my nightmare and to take charge of this situation, my

husband, Richard, was dead because James Wells murdered him.

Since April 12, 2012, because of his actions, Rich has missed out on so many momentous occasions and we have been deprived of experiencing those with him. Milestones, my youngest daughter's high school graduation, our twins 21st birthday, our youngest 18th and 21st birthdays, the progression of all three of our daughters' careers, the ups and downs of their relationships, and the everyday life that parents are part of in their young adult children's lives.

Rich wasn't given the opportunity to give his approval or disapproval to the man who wanted to marry our eldest daughter. He wasn't there to walk her down the aisle. And he wasn't there to hold his grandson, who has his eyes, as he came into the world July 4th of this year.

Our daughters have been deprived of the love and guidance of the father they adored and who adored them. They live daily with the horror of knowing that their father was shot three times in cold blood, by James Wells.

We are, as a family, broken beyond belief. I have lost the love and the companionship of my husband, a kind, gentle, respectful, loving man who I adored, the

future we planned together, and the only person on the
face of this earth who could join me in the remember
when as we looked at our three girls.

If James Wells had not murdered Rich, we would
have celebrated our 27th wedding anniversary two days
ago on January 5th.  Rich will never again make me
coffee in the morning or use my towel after a shower.
He won't keep me awake with his snoring and crack bad
dad jokes and laugh at pictures of dogs underwater.

He won't putter in his garage for hours and
still not be able to find anything.  He won't become a
gunsmith, plant his vegetable garden or run for local
political office.

He will never again sit at the bar of the
Rendezvous with best friend Steve and talk about
politics, plan fishing trips and hunting trips, or how
best to intimidate his daughters' boyfriends.

Rich and I will not get a chance to grow old
together because James Wells murdered him.  Rich and I
had so many plans.  We wanted to be able to provide
financial security for our daughters.  That's impossible
now because of the loss of Rich's income, his Coast
Guard retirement and VA benefits.

A couple of weeks after Rich's murder, I
received two letters in the mail, one from the VA

telling me that the deceased is not eligible to receive
benefits in the month that they die, and that federal
law, I was to return April 2012's payment within 30 days
or the VA was authorized by federal law to deduct that
money from the account it was paid into.

The second letter was from the Coast Guard
telling me that because Rich did not pay into the
retirement annuity, his retirement income had been
stopped as of April 12, 2012.  That was within two weeks
of my husband's murder.  We went from a two-income
financially comfortable family to less than one income,
as I was unable to work for a very long time.

I have been trying my best to continue to help
our daughters move into adulthood as Rich and I had
planned, but there is no way I can come anywhere close
to the same level that the two of us provided them.

I have suffered from and continue to endure
panic attacks, flashbacks, crushing depression and
feelings of total isolation and fear.  I had to leave
Kodiak several times as I didn't feel safe, and now
because without Rich, I feel that I really don't belong
there anymore.  In fact, I feel like I really don't
belong anywhere anymore without him.

Through everything my family has endured for 7
years, 8 months, and 26 days, James Wells has still not

admitted his guilt.  He continues to maintain his innocence.  He continues to blame some mystery person who crept into the COMMSTA, killed Rich and Jim Hopkins and thereby making himself a victim.  He has refused to take responsibility for his actions leading up to and on April 12, 2012.  And I am sure he will continue to do so as he and his lawyers will craft yet another appeal, which will continue to victimize our family and friends for many, many years to come.

Time cannot be reversed and we can never get back what we have lost because of him.  Maybe we can after 7 years, 8 months and 26 days get a small sense of justice.

So, Your Honor, on behalf of my husband, who can no longer speak for himself, our three daughters, our grandson and our family and friends, I implore you to impose the maximum sentence allowable by the law upon James Michael Wells for planning and carrying out the cold-blooded murder of my husband, Richard William Belisle.

Thank you.

THE COURT:  Thank you.

MS. STEVENS:  That concludes the victim impact statements.

THE COURT:  All right.  Very good.  Why don't

1    we take about 10 to 15 minutes here.  We'll go off

2    record.

3              DEPUTY CLERK:  All rise.  This matter stands in

4    recess for 15 minutes.

5              (Recessed from 10:35 a.m. to 10:47 a.m.)

6              DEPUTY CLERK:  All rise.  Her Honor, the Court,

7    the United States District Court is again in session.

8              THE COURT:  All right.  Please be seated.

9              We are back on record here.  And Mr. Colbath,

10   does anybody seek to address the Court on behalf of Mr.

11   Wells?  I did read the letter from Ms. Wells.

12             MR. COLBATH:  No, Your Honor, not besides us.

13             THE COURT:  Very good.  Then I'll hear from

14   Ms. Stevens.  Go ahead, please, on the 3553(a) factors.

15             MS. STEVENS:  Good morning, Your Honor, may it

16   please the Court.  The outcome today is not going to be

17   a surprise.  We know that James Wells will spend the

18   rest of his life in prison.

19             The important thing about today was giving the

20   victims here an opportunity to be heard, and so we thank

21   the Court for giving them that opportunity and for

22   listening and reading everything.  They carry a heavy

23   burden.  They carry a heavy weight that will never fully

24   go away.

25             I would like to briefly highlight the reason

why we believe -- the government believes -- why he
should get two consecutive life sentences for Counts 5
and 6, the firearms offenses, and I don't want to
belabor the arguments I made in my memo.  You have that
before you.

The main point I would like to make, Your
Honor, is that 924(c) contemplates a whole spectrum of
firearms offenses from the less serious to the more
severe.  Possession of a firearm being on the lower end,
discharging a firearm in a crime of violence on the
higher end.

Where a mandatory minimum of ten years may be
appropriate for those lesser offenses, it certainly is
not appropriate in this case.  It does not capture the
seriousness of the cold-blooded murder of innocent,
defenseless and unsuspecting servants of the government.

Today we're dealing with coldhearted,
calculated murder, which rests on the far right side of
the spectrum, the most severe side, the side that
warrants the strictest punishment available under the
law:  Life in prison.  And as you know, pursuant to the
statute, those terms must run consecutively.

James Wells committed the ultimate worst
offense he could with a firearm:  Murder.  And that's
the reason why he deserves the more serious term of life

1  in prison.

2        James Wells was convicted beyond a reasonable

3  doubt by a jury of his peers with overwhelming evidence.

4  His crimes reverberated throughout the COMMSTA,

5  throughout Kodiak Island, throughout the state of Alaska

6  and throughout the Coast Guard as a whole.

7        Your Honor, I remember April 12, 2012.  I was

8  halfway across the globe in Puerto Rico, and I remember

9  hearing about this crime.  I remember sitting in my

10  office thinking how could something like this happen in

11  my service at a place of work, in a secure space by a

12  shipmate.

13        James Wells stole the lives of Rich Belisle and

14  James Hopkins.  He stole the future memories of their

15  children's weddings, the birth of grandchildren, hikes

16  with their best friends, memories that all belong to

17  loved ones, friends, and shipmates.  He lied repeatedly

18  the days following crime, and here in this courtroom on

19  the stand under oath.  His lies were obvious, they were

20  desperate, and, as self-serving as they were, ultimately

21  sealed his fate.

22        He deceived everyone making his attack, as

23  Chief Warrant Officer Reckner pointed out, so

24  unbelievably senseless and unnecessary.  Your Honor, you

25  also heard that as Coast Guard members we accept the

1    risks that go along with the mission.  For me, it's like

2    a paper cut.

3           And we know that sometimes when we go out we

4    won't come back, but what we don't expect, Your Honor,

5    is for the risk to be hiding like a snake in the grass

6    amongst us, within the very Coast Guard family we place

7    our safety and security in, our shipmates.

8           James Wells attacked during the most

9    unsuspecting moment in what everyone believed was a safe

10   and secure location, and for the most unnecessary

11   reasons, and he forever damaged the ingrained trust we

12   as Coast Guard members and servants of the government

13   place in our core values of honor and respect and

14   devotion to duty.

15          The shattering of this trust won't go away from

16   any of us.  We have lived through it and we don't forget

17   it and that trust is gone.

18          The heaviness will continue to burden the

19   hearts of those here today.  It won't go away.  Because

20   of James Wells, Debbie Hopkins lost her future memories

21   of her life together with her husband.  You heard that

22   Nicola Belisle is now lost, forever wandering with no

23   place to call her own.  Her place, her home was in the

24   arms of her husband, Rich, and that's gone.

25          The only place that has risen through the

devastation and destruction caused by the defendant's cold, callous, calculated, selfish, and wholly senseless actions is a steel cage with a cold concrete floor in federal prison, the place he will rightfully occupy for the rest of his life.

Your Honor, today we ask that you send James Wells to prison for four consecutive life terms for the murders of Rich and Jim and for the use of a firearm in those murders, so that he may never, ever rob another person of their life, will never, ever rob somebody of their loved ones, or leave another wife forever wandering without the arms of her soulmate to go home to.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Stevens.

Mr. Colbath?

MR. COLBATH:  Thank you, Your Honor.  I won't address any further, I think, the term of imprisonment that the Court is statutorily mandated to impose beyond what I have already done in my sentencing memorandums other than to say that save for a consecutive consideration on Counts 1 and 3 with Counts 2 and 4, it would be our request that the Court impose concurrent sentences.  I think anything beyond that is a legal unnecessity.

1          THE COURT:  You concur that 5 and 6 are

2    mandated to be consecutive?

3          MR. COLBATH:  They are, Your Honor.  Per the

4    statute, I agree.

5          THE COURT:  Correct.

6          MR. COLBATH:  I would ask the Court to include

7    within Mr. Wells' judgment a judicial recommendation for

8    placement at a facility in Oregon or otherwise a West

9    Coast, California perhaps.

10         THE COURT:  Your memo said Sheridan or northern

11   California.

12         MR. COLBATH:  Yes, Your Honor.  Beyond that, I

13   don't have further matters, other than to, as the Court

14   has already indicated, that you would discuss with us a

15   later time and date to work on the restitution aspect of

16   the matter.

17         I would ask the Court, in light of the

18   anticipated restitution, whatever that's going to be,

19   coupled with the sentence that you must give, that the

20   Court find that Mr. Wells doesn't otherwise have the

21   ability to pay a fine over and above the $600 mandatory

22   special assessment that's required.

23         THE COURT:  Have you discussed with Mr. Wells

24   whether or not he seeks to make an allocution?

25         MR. COLBATH:  I have, Your Honor.  I don't

1  believe --

2          THE COURT:  I can ask him.

3          MR. COLBATH:  He may have something very brief

4  to say, but I'll let the Court inquire.

5          THE COURT:  Thank you.

6          Mr. Wells, you do have the right to make a

7  statement today.  You don't need to say anything.  Your

8  lawyer said in the sentencing memorandum you do intend

9  to appeal, which is certainly your right.  Is there

10  anything you sought to say today?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  You can remain seated, sir.  That's

13  fine.

14          THE DEFENDANT:  I still maintain my innocence.

15  I will always maintain my innocence because I know I did

16  not commit these murders.  There has been some talk

17  about accountability and responsibility.

18          The first trial was overturned due to a

19  fundamentally unfair trial.  There was prosecutorial

20  misconduct.  There was unethical behavior.  There was

21  illegal evidence.  The prosecution was responsible for

22  that.  They have not been held accountable for it.

23          We went through a second trial.  Again, there

24  was prosecutorial misconduct.  There was prosecutorial

25  unethical behavior.  There was illegal evidence, so it's

1  part two of the sequel.

2  I am innocent, and I will maintain that until

3  the day I die.  There has not been a day gone by that I

4  have not thought of Rich and Jim.  It is a tragic

5  incident that I did not cause.  We don't know who did

6  it, and that's part of the tragedy is there can be no

7  closure.

8  And that's all I have to say.  Thank you, Your

9  Honor.

10  THE COURT:  Thank you.

11  In determining a sentence, a Court is to impose

12  a sentence that's sufficient but not greater than

13  necessary under the law to comply with the purposes set

14  out in federal law.

15  And I have considered the history and

16  characteristics of Mr. Wells.  I have considered the

17  nature and circumstances of the offense.  I understand

18  Mr. Wells maintains his innocence.  He was found guilty

19  beyond a reasonable doubt by the 12 jurors, who this

20  Court has upheld the sufficiency of the evidence that

21  supports that guilty verdict.

22  This Court, if I were the trier of fact, would

23  have reached the same result, but in any event, I

24  understand the anger and grief that's been expressed

25  today by the victims, the toll that this has had on the

families, the milestones that have been missed for the
families.

As I was thinking about this in the last few
days, I rue the fact that I don't have the degree of
eloquence that I wished I could have to address in some
way and ease that anger and grief, and then I realized I
don't think there is really anything that anybody could
say at this point in time that could do so, but I do
hope that this chapter of the criminal justice system
being closed at this point will be comfort of some
degree to the victims in their remaining lives.

I have considered the need for a sentence to
reflect the seriousness of the offense, afford adequate
deterrence to criminal conduct, protect the public from
further crimes of the defendant.

I don't see that the fourth consideration the
Court is to consider is applicable here about the need
for educational or other correctional treatment.

I have considered the guidelines, which are an
advisory tool, which here revert to the statutory
provisions that apply. And in terms of the factor of
avoiding unwarranted sentencing disparities, the Court
has never -- this Court has never looked at a scenario
where two individuals were shot cold-blooded in their
workplace by a colleague, or who they believed was a

1   colleague.

2          I thought, as I was looking at this case, about

3   the fact that when I select juries, we'll bring in 70

4   people, they are all in the back like many of you here

5   today, and one of the questions I'll ask is who's been

6   the victim of a crime.  And it surprises me, because we

7   all read so much about crime all the time, that usually

8   it's only one or two people, a handful of people that

9   have actually been crime victims.

10          And that's obviously not the case here.  There

11  have been so many people victimized by the loss of

12  Mr. Belisle and Mr. Hopkins.  And I certainly have

13  pondered on that and the ramifications for the community

14  of Kodiak and the Coast Guard and the losses to the

15  community and the organization as well.

16          Pursuant to the Sentencing Reform Act, I do

17  find that a term of four consecutive life sentences is

18  warranted in this case.  I found persuasive the analysis

19  of Ms. Stevens in looking at the range of crime, of

20  types of criminal activity that can fall within 924(c),

21  and do find that that is the appropriate sentence to

22  impose in this case.

23          And that would be Counts 1 and 3 would be

24  concurrent with each other, a life sentence that would

25  be on each count, but concurrent as to those two counts.

Counts 2 and 4 would be concurrent to each other, but
consecutive to Counts 1 and 3.  And Counts 5 and 6 would
each be terms of life imprisonment as well, each to be
consecutive to all of the other counts.

And, therefore, considering the Sentencing
Reform Act, it is the judgment of the Court that the
defendant, James Michael Wells, is hereby committed to
the custody of the Bureau of Prisons to be imprisoned
for a term of life on Counts 1 and 3 to run concurrent;
life on Counts 2 and 4 to run concurrent, but to be
consecutive to Counts 1 and 3; and life on Count 5,
consecutive to all other counts; and life on Count 6,
consecutive to other counts.

I find Mr. Wells does not have the ability to
pay a fine because the Court does intend to award
restitution to the victims in an amount to be
determined.  There is the mandatory special assessment
of $600 that will be included in the judgment.

The Court will include a recommendation to the
Bureau of Prisons for placement in either Sheridan or in
northern California.  The determination of the facility
where Mr. Wells will be housed is the responsibility of
the Bureau of Prisons.

That will be the judgment of the Court.  We'll
discuss the scheduling here of the restitution, but

1  before I address appeal rights, anything further from

2  the government?

3              MR. SKROCKI:  If you could, in your judgment,

4  you mentioned the determination as to the appropriate

5  facility for BOP would be their determination.  Could

6  you include that language in the judgment as well,

7  because I don't believe Sheridan has a classification

8  level high enough to hold Mr. Wells.

9              THE COURT:  I was wondering the same thing.

10  You seek to have where is the facility recommendation an

11  indication that the Court recognizes BOP has the sole

12  discretion to determine?

13              MR. SKROCKI:  Absolutely.

14              THE COURT:  Any objection to that?

15              MR. COLBATH:  No, Your Honor, I think that's

16  the law.

17              THE COURT:  I will include that, Mr. Skrocki,

18  that's fine.  Anything further from the government?

19              MS. STEVENS:  No, Your Honor.  Thank you.

20              THE COURT:  Mr. Colbath, anything further?

21              MR. COLBATH:  Not related to that, no, Your

22  Honor.

23              THE COURT:  Mr. Wells, you do have a right to

24  appeal.  There is a form Mr. Colbath can help you with.

25  There is a strict time limit, and we can proceed in that

 1   regard.

 2          With regard to restitution, Mr. Skrocki or

 3   Ms. Stevens, what's the government's thought on where we

 4   go to get that issue resolved?  I did pull yesterday the

 5   order that Judge Beistline entered quite some time ago

 6   and that was helpful.

 7          MR. SKROCKI:  Yes.  We have reviewed the same.

 8   We have a plan, Your Honor, in place to hire the

 9   economist that did the initial survey and application of

10   the amounts owed.  I spoke with Mr. Colbath about this,

11   but we would like to have her update the figures.  That

12   will take a little bit of time.  We have got a contract

13   in place.  We would like to bring her here to testify

14   briefly, if necessary, and for defense to cross examine,

15   if necessary, in order for -- and for you to make an

16   assessment as to her credibility and reliability and

17   things of that nature for the record.

18          We just don't want a "let's just adopt what

19   happened before," have you agree with it or not and then

20   go up to the court of appeals.  We're trying to keep

21   that in mind.  We think that's the most appropriate

22   procedure.

23          THE COURT:  What's a timeframe that you're

24   proposing?

25          MR. SKROCKI:  I think it's within 60 days of

1   judgment, so middle of February, something like that for

2   a hearing.

3         THE COURT:  All right.  And how long would you

4   envision we need on the Court's calendar?

5         MR. SKROCKI:  Probably less than a day.

6         THE COURT:  How about February 12th?

7         MR. SKROCKI:  That's fine.

8         THE COURT:  Mr. Colbath, does that work for

9   you, 9:00 a.m. on February 12th?

10        MR. COLBATH:  Yes, Your Honor.

11        THE COURT:  All right.  Then that's what we'll

12  do, we'll have a restitution hearing on that day.

13        Will I get the report from her, or what's your

14  proposal in terms of filing in advance?

15        MR. SKROCKI:  I'll file everything the Court

16  and defense counsel need in advance for that

17  determination.  The point of having her testify would be

18  for the Court to assess credibility and ask questions.

19        THE COURT:  So can we get that by February 7th,

20  the Friday prior to?

21        MR. SKROCKI:  I think so.

22        THE COURT:  Mr. Colbath, would that give you

23  enough time, or would you seek additional time?

24        MR. COLBATH:  A little more time than a couple

25  of business days, Your Honor.  I mean I don't anticipate

hiring my own person or doing an assessment in that regard, but a little more time than that.

THE COURT: What's the soonest you could get it if we use that February 12th date? I'm out of district later in the month, that's why I put it then. If you wanted to go into March, we could do that, but that cuts us pretty close then.

MR. SKROCKI: Yes.

THE COURT: If you had it a week in advance, Mr. Colbath, would that be sufficient, if you had it a week in advance?

MR. COLBATH: That should be okay, Your Honor. I mean -- I thought the statute allowed 90 days for restitution, not 60.

THE COURT: I believe it might.

MR. COLBATH: If I have it a week in advance and we have any issue once I see it, I'll just move to continue and we'll have to put it into March and that would be obviously at our request so I don't think we'd have time issue.

I know there is at least at minimum the statute contemplates a good cause ability on your part to provide additional time.

MR. SKROCKI: That's fine. I don't expect a significant change in the figures. We're just going to

1 try to get them updated if they even need to be updated.

2         THE COURT:  So February 5th?

3         MR. SKROCKI:  Sure.

4         THE COURT:  February 5th then is the

5 government's brief on that.  Mr. Colbath, would it be --

6 and the expert report -- would it be helpful for you to

7 file -- I'm thinking it would be helpful to the Court if

8 you filed something by February 10th that I could review

9 so I'd know your position and the government would too

10 two days before the hearing.

11         MR. COLBATH:  I will do that, Your Honor.

12 There were, we believe, not so much miscalculations, but

13 assets misidentified or things contrary to some of the

14 federal statutes.

15         THE COURT:  All right.  Would that give you

16 enough time?

17         MR. SKROCKI:  Yes, ma'am.

18         THE COURT:  Very good.

19         MR. COLBATH:  Your Honor, if I could, I didn't

20 mean to interrupt.

21         MR. SKROCKI:  Go ahead.

22         MR. COLBATH:  As the Court previously noted,

23 you indicated you saw my request, but because of the

24 nature of Mr. Wells' assets and the things that will be

25 considered, I need him to be able to be available to me

1 to consult and/or participate in this phase, so since

2 we're just talking about February here, if we could have

3 him remain in the district and readily accessible to me,

4 that will assist me in meeting these sort of short time

5 deadlines.

6         THE COURT:  I see that the marshals agree that

7 we can do that and keep Mr. Wells here in the state

8 pending an order or the conclusion of proceedings in

9 court on the restitution hearing, which currently is

10 scheduled for February 12th.

11         All right.  Very good.  Anything further?

12         MR. SKROCKI:  Last thing, with respect to the

13 restitution, we would ask that the Court enter an order

14 precluding Mr. Wells or Ms. Wells from transferring,

15 conveying or doing anything with respect to their

16 property at this point in time.

17         THE COURT:  Any objection?

18         MR. COLBATH:  Not with respect to Mr. Wells'

19 property.

20         THE COURT:  All right.

21         MR. SKROCKI:  Well, we don't know who owns what

22 at this stage.

23         THE COURT:  I'll enter an order as to Mr. Wells

24 at this time.  It's effective immediately.  If the

25 government seeks further relief, you can file a written

1    motion and I'll take it up.

2              MR. SKROCKI:  Yes, Your Honor.

3              THE COURT:  Very good.  Anything further?

4              MR. COLBATH:  Not from me, Your Honor.

5              THE COURT:  We'll go off record.

6              DEPUTY CLERK:  All rise.  This matter is now

7    adjourned.  This court now stands adjourned.

8              (Proceedings concluded at 11:10 a.m.)

9

10                        CERTIFICATE

11       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
12   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
13   original stenographic record in the above-entitled
     matter and that the transcript page format is in
14   conformance with the regulations of the Judicial
     Conference of the United States.

15
         Dated this 17th day of May, 2020.
16

17
                            /s/ Sonja L. Reeves
18                          SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25