```
1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4           Plaintiff,        )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7           Defendant.        )
    _____)
8
```

9      TRANSCRIPT OF REMOTE PROCEEDINGS VIA VIDEOCONFERENCE
                        RESTITUTION HEARING
10    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                    January 8, 2021; 12:14 p.m.
11                        Anchorage, Alaska

12

**FOR THE GOVERNMENT:**
13          Office of the United States Attorney
            BY:  STEVEN E. SKROCKI and CHRISTINA M. SHERMAN
14          222 West 7th Avenue, #9
            Anchorage, Alaska 99513
15          (907) 271-5071

16

**FOR THE DEFENDANT:**
17          Office of the Federal Public Defender
            BY:  GARY GEORGE COLBATH
18          425 G Street, Suite 800
            Anchorage, Alaska 99501
19          (907) 646-3400

20          Camiel & Chaney, P.S.
            BY:  PETER A. CAMIEL
21          2815 Elliott Avenue, Suite 100
            Seattle, Washington 98121
22          (206) 636-1725

23  _____

                    **SONJA L. REEVES, RMR-CRR**
24                Federal Official Court Reporter
                    222 West 7th Avenue, #4
25                    Anchorage, Alaska 99513
            Transcript Produced from the Stenographic Record

```
 1                    I N D E X

 2                 January 8, 2021

 3   Witnesses:        Direct    Cross    Redirect       Recross

 4   Laura Taylor        4        24        32             --

 5

 6

 7

 8                 E X H I B I T   I N D E X

 9   Exhibit

10   1411-1     Supporting exhibit and tables
                pages 1 and 2
11
     1411       Supporting document and table
12              pages 16 and 17

13   1435       Letter from Dr. Taylor, two pages

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Call to Order of the Court at 12:14 p.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3     the United States District Court for the District of

4     Alaska is now in session, the Honorable Sharon L.

5     Gleason presiding.

6          THE COURT:  Please be seated.  Good afternoon,

7     everyone.  Well, I thank you to the marshals for coming

8     to the rescue here.  I think we're out of practice in

9     terms of notifying the marshals, so I appreciate that.

10          Ready to proceed, Mr. Skrocki?

11          MR. SKROCKI:  I am, Your Honor.

12          THE COURT:  Mr. Colbath, ready to proceed?

13          MR. COLBATH:  Yes, Your Honor.

14          THE COURT:  All right.  I have read everyone's

15     submissions.  Is the plan to call Dr. Taylor?

16          MR. SKROCKI:  Yes, she's available right now.

17          THE COURT:  Well, I appreciate that, and ready

18     to proceed with that?

19          MR. COLBATH:  Yes.

20          THE COURT:  Madam Clerk, I would ask you to

21     administer an oath to Dr. Taylor.

22          (Oath administered to the witness)

23          DEPUTY CLERK:  For the record, can you please

24     state your full name and then spell your full name.

25          THE WITNESS:  My name is Laura Taylor,

1  L-a-u-r-a, T-a-y-l-o-r.

2          THE COURT:  Go ahead, please.

3          MR. SKROCKI:  Yes, Your Honor.  Permission to

4  remain seated.

5          THE COURT:  Certainly.

6          MR. SKROCKI:  Your Honor, I believe I

7  referenced earlier in terms of docket references, we'll

8  be looking at Dockets 1411-1.

9          THE COURT:  I've got that.

10          MR. SKROCKI:  Pages 1 and 2.  1411-1, pages 16

11  and 17.

12          THE COURT:  Okay.  I have got all of 1411 here.

13          MR. SKROCKI:  Excellent.  And then lastly, a

14  letter dated November 11th at Docket 1445.

15          THE COURT:  I have that as well.  Very good.

16          MR. SKROCKI:  Thank you, Judge.

17          LAURA TAYLOR, GOVERNMENT WITNESS, SWORN

18                  DIRECT EXAMINATION

19  BY MR. SKROCKI:

20     Q.  Dr. Taylor, good afternoon.

21     A.  Good afternoon.

22     Q.  Could you please tell Judge Gleason what you do

23  for a living.

24     A.  Yes, Your Honor.  I am an associate professor of

25  economics at Willamette University, as well as the

associate provost for academic finance at Willamette.  I
have been there since about 2005.

Q.  2005?  And what do you do in terms of working at
Willamette?  What's your area of expertise, Doctor?

A.  My area of expertise is economics, and I teach a
variety of economics courses.  And currently in my role
in the provost office, I work with the deans of our arts
and sciences school, our law school and our school of
business on strategic budgeting and deployment of
resources.

Q.  Do you have another area of work that you
perform?

A.  I do.  In addition to my job as an academic, I
also have a private consulting business that I have been
working in since about 2006, which, similar to the case
at hand, is I'm asked to compute economic damages
analyses in a variety of wrongful death, personal injury
and other types of tort claims.

Q.  And you have been doing that for how long?

A.  Since 2006.

Q.  2006?  And how many, in other words, reports of
this type you have prepared for this case have you done
since 2006?

A.  I don't have an exact number, but it's somewhere
north of 200.

1    Q.  Okay.  And you're familiar with the facts in this

2    case, Dr. Taylor?

3    A.  Yes, I am.

4    Q.  So you testified earlier years ago in the first

5    -- back in the first trial, correct?

6    A.  Yes, I did.

7    Q.  And during the course of this process and

8    engagement with our office this time, we provided you

9    with some information which formed the basis of the

10   reports you created in connection with this case?

11   A.  Yes, I did.

12   Q.  Have you been qualified as an expert in the area

13   of forensic economics in other courts?

14   A.  I have.  I have been qualified in U.S. District

15   Court in Alaska, Hawaii, Oregon and Guam.  And also

16   state court in Alaska, Washington, Oregon and

17   California, as well as in the military courts martial.

18   Q.  If I'm not mistaken, you were born in Fairbanks?

19   A.  I was.  I wasn't born in Fairbanks.  We moved

20   there when I was eight.  I was raised in Fairbanks.

21   Q.  Very good.  So you have some Alaska connection.

22        With respect to Alaska, have you done any work or

23   published materials concerning Alaska in respect to what

24   you're talking about here today?

25   A.  Yes, I've worked on both plaintiff and defense

side in Alaska state court as well as U.S. District

Court in Alaska, and I have also published an article in

the Journal of Forensic Economics about computing

wrongful death and personal injury damages in the state

of Alaska.

MR. SKROCKI:  Your Honor, I move to admit

Dr. Taylor as an expert in forensic economics.

THE COURT:  Want to the voir dire?  Any

objection?

MR. COLBATH:  No, Your Honor.

THE COURT:  Then I will find the witness so

qualified.  Go ahead.

MR. SKROCKI:  Thank you, Your Honor.

BY MR. SKROCKI:

Q.  Dr. Taylor, you mentioned earlier in response to

one of my questions, we provided you some information

with respect to Mr. Hopkins and Mr. Belisle; is that

correct?

A.  That's correct.

Q.  And part of that information you provided to us,

and it concerns an economic analysis as to Mr. Belisle

and Mr. Hopkins with respect to future earnings; is that

correct?

A.  That's correct.

Q.  Could you summarize for the Court in general with

respect to Mr. Hopkins' and Belisle's analysis; in other words, what did you do?  Let the judge know what you did and how you came up to the conclusions with the numerical valuations you came up with.

A.  Similar to civil proceedings where there are claims of economic damages, I was proceeding -- I went -- I sort of engage with the same framework, right, which is look at what the individuals -- what kinds of occupations and employment they were engaged in at the time of death to make some assumptions about what their future employment might look like, to deal with benefits that might be associated with that employment, to subtract any necessary costs or taxes, for example, or personal consumption from that analysis, and then to present the Court with a present value lump sum of the economic damages associated with the wrongful death of these two individuals.

Q.  So in this circumstance, in this questioning, you used the word "economic damages."  Is there components, individual components, to economic damages?

A.  There can be a variety of components.  In this particular case, the two areas of loss were an earnings loss and a household services loss.

Q.  And briefly can you explain those two loss areas to Judge Gleason?

     A.   Yes.   So earnings loss would be the earnings and
benefits associated with the individual's employment.
Household services loss are losses to the survivors of
the care and maintenance that the individual would have
provided in the household, so things like shoveling the
drive or mowing the lawn or doing housework, laundry,
cooking, cleaning, those kinds of things.

          The understanding that it would be -- the
implicit, the implied understanding that those services
would need to be replaced due to the death of the
individual.

     Q.   So those figures as to household can be, if I'm
correct, rather variable, could they not?

     A.   Yeah.   It really depends on the age of the
individual, the sex of the individual, because data
still suggests women do more around the house than men
in a heteronormative marriage.

          It depends on the age most particularly in an
employment status.   So, for example, men who work
full-time will perform less hours of household services
than retired males will.

     Q.   If you can maybe tell Judge Gleason what
parameters you used to ascertain the household value.

     A.   So for household --

     Q.   And I'm sorry.   Is this a common analysis in your

1    line of work?

2        A.   I apologize for interrupting you.

3            For household services, the typical methodology

4    is to use a statistical approach, which takes data from

5    the American Time Use Survey, which is a dataset

6    compiled by the U.S. Census Bureau.  And so I would

7    essentially look at someone with the age and employment

8    status of Mr. Belisle or Petty Officer Hopkins and take

9    them through the analysis as if they represented a

10   statistical -- let me say this clearly.

11           The statistically expected number of hours were

12   representative of what Mr. Belisle or Petty Officer

13   Hopkins would have given to their family or to their

14   household.

15       Q.   And is this one of those types of analysis that

16   are generally accepted in your field to do on a

17   case-by-case basis?

18       A.   It's certainly a very common loss category.

19   Using that kind of statistical methodology, it's also

20   very common.  I know in the past I have seen individuals

21   do it other ways.  I honestly cannot remember the last

22   time I saw analysis that didn't take this approach, but

23   certainly there are probably economists out there who do

24   it other ways if they choose.

25       Q.   Okay.  Thank you.  Anything else you would like

1  to tell the Court about how you came to these

2  conclusions as you did before I move on to Mr. Hopkins'

3  analysis?

4      A.  No.  I would just again remind the Court that

5  this is all reduced to present value as of a scheduled

6  sentencing date.  I would note that the reports that I

7  submitted back in April assumed a May sentencing date

8  and we have been somewhat delayed from that.  That would

9  change the present value analysis a bit, but I don't

10  think it would be -- I don't think it would make a

11  material difference.

12      Q.  Material difference?  Okay.  Thank you.

13          If I could have you turn your attention to

14  Mr. Hopkins' analysis.

15          MR. SKROCKI:  And, Your Honor, this would be

16  Docket 1411-1.

17          COURT REPORTER:  Mr. Skrocki, this is Sonja.

18  Could both the witness and yourself to slow down just a

19  bit?  Over the video, the audio gets somewhat distorted

20  when you speak quickly.

21          MR. SKROCKI:  Apologies.  Yes, ma'am, we'll do

22  that.

23  BY MR. SKROCKI:

24      Q.  So, Dr. Taylor, this is -- I'm looking at your

25  letter of April 16th concerning Mr. Hopkins and then the

1   subsequent table summary of calculations.  Do you have

2   those in front of you?

3       A.  Yes, I do.

4       Q.  And there is two summaries there concerning

5   earnings loss and household loss.  Could you refer the

6   Court to those numbers and how you arrived at them just

7   in general again?

8       A.  Yes.  So for Petty Officer Hopkins, the

9   assumptions I made in my calculations were that he would

10  have continued with his U.S. Coast Guard employment

11  until retirement at 30 years of service.  He would have

12  been age 50.1 at that point.  At that point, I assumed

13  he would enter the private sector for the remainder of

14  what a statistically expected work life is for a man his

15  age, which is to be early 60s, age 61.9.

16      So the earnings loss figure that I provided

17  there, which is just over $760,000, comes from his U.S.

18  Coast Guard employment, his subsequent military

19  retirement and private sector employment.

20      Again, I subtracted out the necessary taxes and

21  also his own personal consumption.

22      Q.  Okay.  And those are supported by, as you

23  reference, on the summary page of Tables 1 and 2 to your

24  report?

25      A.  The summary page, they are supported by Tables 2

1  and 3 in my report.

2      Q.  Correct.  Okay.

3          And if you go down to household service losses.

4      A.  Yes.

5      Q.  Go ahead.

6      A.  So I took Mr. -- excuse me, Petty Officer Hopkins

7  through a statistical methodology, which essentially

8  advances him in age and employment, so assumes a number

9  of weekly hours that are statistically expected of a man

10  working full-time, and then once he hit retirement, a

11  number of weekly hours that are statistically expected

12  of a retired man.

13          I do make some adjustments in the retirement

14  years.  So for example, I decreased them linearly every

15  year to account for the effects of age, that less

16  household services will be provided as an individual

17  ages, and take that through the end of his life

18  expectancy, again, reduced to present value.

19      Q.  Again, the Tables 4 and 5 provide the supporting

20  figures for your calculations?

21      A.  That's correct.  And the household services loss

22  comes to just over $380,000 in present value terms.

23      Q.  A total loss then for Mr. Hopkins concerning your

24  analysis?

25      A.  Is $1.143 million.

1    Q.  Okay.  Is there anything else -- I know I'm going

2 through this quickly, but is there anything else you

3 would like to convey to Judge Gleason with respect to

4 your calculations for Mr. Hopkins?

5    A.  No, I think I have gotten the point across,

6 although I'm certainly happy to answer any questions

7 Your Honor might have.

8         THE COURT:  I did have one question, Doctor,

9 and that is:  If you were to do a present value as of

10 today as opposed to, I believe you said this was as of

11 May 2020, would the number be higher or lower?

12         THE WITNESS:  The number would be slightly

13 higher because interest rates have gone down somewhat

14 since May.

15         THE COURT:  So today's number would be slightly

16 higher than what you calculated?

17         THE WITNESS:  Yeah, it would be slightly

18 higher, but, again, I don't think it would make a

19 material difference.  Interest rates are pretty low.

20         THE COURT:  Thank you.  Go ahead, please.

21 BY MR. SKROCKI:

22    Q.  Would that be the same with Mr. Belisle's

23 calculation, Dr. Taylor?

24    A.  That's correct.  Any decrease in the interest

25 rate would result in a higher present value.

1      Q.   And, Dr. Taylor, if I could turn your attention

2   to your letter of April 17, 2020, concerning

3   Mr. Belisle, and then your table summary of calculations

4   concerning him as well.

5           MR. SKROCKI:  And, Your Honor, that's Docket

6   1411-1, pages 16 and 17.

7           THE COURT:  All right.

8   BY MR. SKROCKI:

9      Q.   Dr. Taylor, if you could turn to your summary of

10  calculations table and just walk us through those

11  calculations concerning earnings loss and household

12  services loss?

13     A.   I assume that Mr. Belisle would have continued in

14  his employment, his civilian employment with the U.S.

15  Coast Guard as a member of the defined benefits, the

16  FERS, defined pension plan until essentially his FERS

17  retirement age.  And then at that point, his earning

18  loss would then come from his FERS retirement.

19          I also assume that up until that point

20  Mr. Belisle would continue with -- he had some small

21  earnings with the Kodiak School District at the time of

22  his death, and so I assumed that part-time employment

23  would continue as well.

24          So for Mr. Belisle, his earnings loss that I

25  summarized here to be just under $467,000, comes from

1   his private sector employment and his FERS retirement.

2       Q.   And those are supported by the information in

3   Tables 2 and 3?

4       A.   They are, and they are also net of any necessary

5   taxes that need to be subtracted as well as his own

6   personal consumption and reduced present value.

7       Q.   How about as to household services for Mr.

8   Belisle?

9       A.   Similar to Petty Officer Hopkins, I took

10  Mr. Belisle through a statistical methodology based on

11  his age and employment status, the number of

12  statistically expected weekly hours he would contribute

13  to the household, and then once he retires the number of

14  statistically expected hours he would be expected to

15  contribute to the household, and then again reduced that

16  linearly over his retirement period to account for the

17  effects of age.

18      Q.   Just briefly, the number -- the total from all

19  sources as to losses is $761,270?

20      A.   Yes.  Uh-huh.

21      Q.   That's lower than Mr. Hopkins' figure.  Why is

22  that?

23      A.   He was older than Mr. Hopkins, so he had fewer

24  years of earning expectancy left.

25      Q.   Okay.  Anything else you would like to relate

```
 1    concerning Mr. Belisle's calculations to Judge Gleason?
 2              MR. SKROCKI:  Or, Your Honor, at this point, if
 3    you have any questions?
 4              THE COURT:  No.
 5    BY MR. SKROCKI:
 6         Q.  Nothing, Dr. Taylor?
 7         A.  No, nothing.
 8         Q.  Thank you.
 9              Let's turn to the summary analysis that you did
10    for Mr. Wells' benefits.
11         A.  Uh-huh.
12              MR. SKROCKI:  And, Your Honor, for your
13    reference, that's Docket 1435-1.
14              THE COURT:  All right.
15              MR. SKROCKI:  It's a two-page letter.
16              THE COURT:  I have that.
17    BY MR. SKROCKI:
18         Q.  Dr. Taylor, when you have that letter in front of
19    you, just let me know.
20         A.  I have it in front of me.
21         Q.  All right.  I'll cut to the chase here.  There is
22    several what I'm calling income streams, for better or
23    for worse because I'm not a numbers guy, but that's what
24    I'm calling them, from various benefits received by
25    Mr. Wells.
```

1          Did you have occasion to examine from our office

2    the underlying information that's generated these income

3    streams?

4          A.   Yes, I did.

5          Q.   Okay.  And you used that information to come to

6    these conclusions as to benefits that Mr. Wells is

7    receiving from the government for retirement and other

8    sources?

9          A.   Yes, I did.

10         Q.   If you could walk us through your findings and

11    your conclusions, please.  Go ahead and do that.

12         A.   Certainly.  It's my understanding that Mr. Wells

13    receives three defined benefit pensions.  Those are a VA

14    disability pension, a U.S. military retirement pension

15    and a civil service retirement pension.

16         So I was able to either calculate or given the

17    current monthly benefits amount, and then it's just a

18    simple matter of assuming that -- increasing that

19    benefit according to some inflationary index and then

20    reducing to present value, under the assumption that the

21    benefits would continue until the end of Mr. Wells'

22    statistically expected life expectancy.

23         There are three of those defined benefit

24    pensions.  Now, I should note that for his VA

25    disability, I calculated two different present values

because there was some question as to whether or not, given the circumstances at hand, Mr. Wells would experience a decrease in his disability rating to 10 percent, so I provided both of those numbers there for the Court.

Q.   Why a 10 percent reduction?

A.   It's my understanding that this may be a question of law that if Mr. Wells is incarcerated, his VA pension may be reduced to 10 percent, but I'm not a legal expert, so I can't opine on whether or not that would happen.

Q.   Right.  So you included that nonetheless?

A.   I did.

Q.   Okay.  Thank you.  And that comes to roughly, as it says here, $227,260?

A.   Yes.  So his VA disability under his current disability rating is just over $227,000.  His U.S. military benefit is just under $347,000.  And his FERS retirement benefit is just under $170,000.

So under the assumption of the VA disability rating being unchanged, his total defined benefit pension comes to $743,599.  I'm just adding those three numbers up.

THE COURT:  Dr. Taylor, I had a question.  What percentage is the current VA rating that resulted in the

1  present value of 227?

2  　　　　THE WITNESS:  If you will give me a moment,

3  Your Honor, I'm going to have to look that up in my

4  notes.

5  　　　　THE COURT:  Take a moment.  That's fine.

6  　　　　(Pause)

7  　　　　THE WITNESS:  My notes indicate that he has a

8  current disability rating of 60 percent.

9  　　　　THE COURT:  All right.  And now I'm reaching

10  back a few years when I did a lot of divorce orders in

11  state court, but my recollection is that if disability

12  was added or a military retiree got disability benefits,

13  it reduced the retirement by a commensurate amount.  Is

14  that your understanding, or is my memory faulty in that

15  regard?

16  　　　　THE WITNESS:  There is a disability offset, a

17  VA offset, and these numbers take that into

18  consideration so that there is no double counting.

19  　　　　THE COURT:  So if there was to be a 10 -- a

20  reduction to 10 percent on the disability, would there

21  be a commensurate increase in paragraph two of the

22  military retirement?

23  　　　　THE WITNESS:  Yes, I see what you're saying.  I

24  feel as if -- if you give me a minute, Your Honor, I

25  believe I have a note on that.

1          THE COURT:  Sure, go right ahead.

2          (Pause)

3          THE WITNESS:  I'm looking at an old email back

4     from 2014 from Robert Tessel (phonetic) to Brian

5     Schroder, who was my -- the original retaining attorney

6     on this, which says that if the disability -- if the VA

7     reduces his payment, the offset will not change.

8          THE COURT:  All right.  So it wouldn't affect

9     paragraph two is your understanding?

10          THE WITNESS:  That's my understanding, yes.

11     Thank you for that time to confirm that.

12          THE COURT:  No, no, that's fine.  My other

13     question was, going back here several years, that the

14     restrictions for former spouses with regard to

15     disability benefits, you could not, a judge could not

16     assign, as I recall, disability benefits to a former

17     spouse versus the military retirement could be divided

18     up 50 percent.

19          Are you aware of similar restrictions or

20     caveats in this context that we're in today?

21          THE WITNESS:  I'm afraid I'm not aware.  I

22     can't speak to that directly.

23          THE COURT:  Fair enough.  Go ahead, please,

24     Mr. Skrocki.

25          MR. SKROCKI:  Yes, Your Honor.  Thank you.

1  BY MR. SKROCKI:

2    Q.  Dr. Taylor, anything else about these three

3  defined benefit streams?

4    A.  No, I would just again remark that I did increase

5  those according to an expected inflation rate of

6  2.4 percent and also reduced it to present value.

7    Q.  Okay.  Just sort of thinking ahead here, if the

8  Court needs or asks us to have you update these to a

9  present date like today or tomorrow or Monday, or

10  whatever the date happens to be, how long would that

11  take you to do that?

12   A.  I could return it within 48 hours.

13   Q.  48 hours?

14   A.  Uh-huh.

15   Q.  Thank you.

16       If you could turn to the Thrift Savings Plan

17  calculus.

18       MR. SKROCKI:  And just bear with me for just a

19  moment, Your Honor.  Before the hearing, Mr. Colbath was

20  good enough to provide me the latest account balance for

21  Mr. Wells' Thrift Savings Plan.

22       THE COURT:  All right.

23       MR. SKROCKI:  That figure is $524,502.44.

24       THE COURT:  Is that after the 125?

25       MR. SKROCKI:  I'm going to have to say yes.

1          MR. COLBATH:  Your Honor, that is close of

2     business yesterday.

3          THE COURT:  All right.  Thank you.

4     BY MR. SKROCKI:

5       Q.  So have you factored that number, Dr. Taylor,

6     into your calculus?  It just shows us the current

7     present value.  Is there anything else you need to add

8     about the Thrift Savings Plan for Judge Gleason?

9       A.  No.  As you pointed out, it fluctuates with

10    market value.  It's a defined contribution, so a

11    401(k)-type plan, and the present value would simply be

12    the market value at whatever date you are looking at the

13    account.  So it sounds to me like it's just under

14    $525,000.

15          MR. SKROCKI:  May I have just a moment, Judge?

16          THE COURT:  Yes.  I actually had a question on

17    that, Dr. Taylor.

18          Do you have any knowledge of the tax

19    consequences?  Is this pre-tax, post-tax money, or do

20    you not know?

21          THE WITNESS:  It's my understanding that this

22    would be pre-tax contributions, which means the

23    withdrawals would be subject to income taxes.

24          THE COURT:  All right.

25          MR. SKROCKI:  I believe that's all I have for

1  you.  Anything else you would like to add for Judge

2  Gleason?

3          THE WITNESS:  No, but I'm happy to answer any

4  questions Your Honor might have.

5          THE COURT:  Not at this time.  Thank you.

6          Mr. Colbath, are you ready to proceed?

7          MR. COLBATH:  I am, Your Honor.

8          THE COURT:  All right.  Very good.

9                    CROSS EXAMINATION

10  BY MR. COLBATH:

11     Q.  Ms. Taylor, if we can back up to your analysis of

12  Mr. Hopkins' benefits.

13          First of all, I guess, with respect to

14  Mr. Hopkins' analysis, as well as Mr. Belisle's

15  analysis, you indicated you used a statistical method

16  and statistical life expectancies.  Did I understand

17  that right?

18     A.  I used statistically expected work life for

19  Mr. Hopkins, as well as statistically expected life

20  expectancies for both Mr. Hopkins and Mr. Belisle.

21     Q.  And so can I assume correctly, or do I assume

22  correctly that your analysis of either their potential

23  future employment history, their potential life

24  expectancy, their future occupational career, none of

25  your evaluation incorporated specific information about

1    their life or their health or details particular to

2    them, save for what they were employed at at the time of

3    their death?

4        A.  No, I don't think that that's -- clearly I

5    absolutely used their actual earnings data to establish

6    their level of earnings at the time of death.  There are

7    certain parameters, such as work life or life

8    expectancy, where I relied on statistical data, but with

9    respect to their occupational history, I had their

10   actual known history available to me.

11       Q.  And so my question was about what the future

12   might be for them.  You assumed, I guess, that they

13   would work at what they were working at at the time of

14   their death into the future for those statistically

15   calculated dates and times?

16       A.  For their current employment, for Petty Officer

17   Hopkins, I assumed that he would remain in that current

18   employment until his 30-year separation date with the

19   Coast Guard.

20           For Mr. Belisle, I assumed that he would remain

21   in that employment until his FERS retirement age.

22       Q.  With respect to Mr. Hopkins, at the time of his

23   death, he was right at approximately the 20 years into a

24   military career, so your assumption continued that for

25   ten years?

1    A.  He was at 22 years, it's my understanding at the

2  time of his death, and my assumption did continue him to

3  his 30-year date.

4    Q.  Did anybody provide you -- anybody from the

5  government provide you information that Mr. Hopkins at

6  the time of his death or shortly before the time of his

7  death was intending to retire from the military?

8    A.  I was not provided with any information about any

9  statements he may have made about his retirement

10  intentions, no.

11    Q.  No documents or other correspondence or any type

12  of written materials as well, I assume, related to that,

13  any intention he had of retiring?

14    A.  It's been some years now, but not that I recall.

15    Q.  Okay.  With respect to Mr. Hopkins' employment

16  continuing both in the military and then in the private

17  sector, what occupation or occupational field did you

18  assume that he would continue to work in?

19    A.  I assumed that he would continue to work in the

20  very broad category, the standard occupational code, the

21  title is radio, cellular and tower equipment installers

22  and repairers.

23    Q.  And that was based purely on -- or was that based

24  purely on his occupation and the description of that

25  occupation at the time of his death?

1    A.  Yes, it was.

2    Q.  And were you aware that at the time of his death

3  or immediately -- how long he had been in that

4  occupation?

5    A.  Well, he had -- excuse me.  Go ahead.

6    Q.  I was going to say -- and I apologize for

7  interrupting -- not with respect to how long he had been

8  in the military, but how long he had been in that

9  particular occupation?

10    A.  I don't know or recall whether I knew exactly how

11  long he had been in that particular posting on Kodiak

12  Island, no.

13    Q.  With respect to the category of household

14  services loss, and this question applies to both

15  individuals, have you adjusted or tried to account in

16  your analysis for -- obviously, we're a number of years

17  later since time of death -- for -- I guess have you

18  reviewed the facts and circumstances of either

19  individual's post-death households to try to adjust

20  these numbers specific to their circumstances?

21    A.  My analysis is based on valuing the replacement

22  value of those lost services.  Whether or not

23  individuals choose to replace the value of those

24  services is not something that I would remark on in my

25  analysis as the economic expert.

1    Q.  So with respect to household services, I think
2  you have said you simply make assumptions based on a
3  person's age, their gender, their employment, whether --
4  for instance, whether that's full-time employment
5  versus, say, retirement, or something in between.

6        Assuming something about each of those factors,
7  you use a standardized rate to calculate how much annual
8  household services are lost by the absence of that
9  person?

10   A.  Yes, so their -- there is survey data that gives
11 me both weekly hours expected as well as the hourly
12 replacement cost, and then you make adjustments for
13 location, so what state they live in, because of cost of
14 living differences.

15   Q.  And so I assume, other than to account for those
16 factors that you identified generally, such as gender,
17 life expectancy, employment, your statistical analysis
18 does not incorporate any of the specific historical
19 details of either one of these gentlemen's actual
20 household or their participation in their household?
21 These are future assumptions?

22   A.  That's correct, yes.

23   Q.  All right.  With respect to -- I want to turn to
24 the analysis you did regarding Mr. Wells' income
25 sources.

1    You were aware at the time of your analysis or

2  had some indication that Mr. Wells' VA disability

3  benefits could or would likely be reduced to a 10

4  percent rating.  What caused you to make that secondary

5  calculation and why did you believe that there was a

6  likelihood or a possibility that that would occur?

7    A.  That information was transmitted to me over email

8  back in 2014 by that Robert Tessel (phonetic), who

9  provided quite a bit of information about Mr. Wells'

10  various benefits.  And he made that note in the email,

11  and that's why I made sure to include those numbers.

12    Q.  Okay.  And just so I understand the numbers here,

13  if I told you that in fact that did occur, Mr. Wells' VA

14  disability benefits have been reduced to 10 percent, do

15  I understand your number here to be as of December 1,

16  2020, so approximately a little more than a month ago,

17  assuming a 10 percent rating disability, the present

18  value is $26,183?

19    A.  That's correct, yes.

20    Q.  And I understood you to say that based on the

21  information provided from the email that you referred to

22  provided from the government agency, although disability

23  has been reduced to 10 percent, the original offset in

24  the retirement, so the paragraph two here calculation,

25  that offset doesn't revert back, even though the

disability is reduced?  So the number in paragraph two
here would be accurate?

     A.   That's correct.

     Q.   With respect to the TSP account, you indicated
those are pre-tax dollars.  Are you aware of the program
requirements or the program regulations that require tax
withholdings when disbursements are made?

     A.   Yes.  So it's my understanding that in
anticipation of an individual having to pay income taxes
on those disbursements that there is an automatic
withholding at the time of disbursement, and then
whether or not that withholding is sufficient to satisfy
the income tax burden would be dependent on the
individual -- would be individualized and dependent on
the individual's tax filing status.

          So there may be additional taxes withheld or if
taxes were -- excuse there.  There may be additional
taxes to be paid, or if taxes were overwithheld, there
could be refund due to the individual.

     Q.   So much like an employment situation, when a
person is paid their wage, a certain amount of taxes are
withheld, and then at the end of the year, depending on
tax brackets, that may be sufficient, may be more than
sufficient or less?  This would be treated in a similar
manner by the TSP program is your understanding?

 1     A.   That's my understanding, yes.

 2     Q.   All right.  And a person's tax liability would be

 3   likely at a minimum their -- they would be in a bracket

 4   attributable or driven, to some extent, by the amount of

 5   the withdrawal, I assume?

 6     A.   It would be as part of their overall tax

 7   liability, yes.  I mean that would be one component in

 8   their overall tax liability for an individual.

 9     Q.   I mean the bracket is based on their income and

10   so it's certainly different if they take out $10,000

11   compared to they take out $300,000 in a single

12   withdrawal?

13     A.   Hypothetically speaking, yes, although every

14   individual's tax circumstances are so personal that it's

15   difficult for me to say, but holding everything else

16   constant, yes, the greater the amount withdrawn in a

17   given year would increase the tax liability to the

18   individual, in terms of would advance them along the

19   marginal tax bracket rate.

20          MR. COLBATH:  Your Honor, I think at this point

21   I don't have any other questions.

22          Thank you, Ms. Taylor.

23          THE COURT:  All right.  Redirect?

24          MR. SKROCKI:  Just a couple questions, Your

25   Honor.

1          THE COURT:  Sure.  Go ahead.

2                    REDIRECT EXAMINATION

3    BY MR. SKROCKI:

4        Q.  Dr. Taylor, Mr. Colbath asked you some questions

5    about Mr. Hopkins and a possible retirement close in

6    time to when he was murdered.  Do you recall those

7    questions?

8        A.  Yes, I do.

9        Q.  And with respect to Mr. Hopkins, how much was he

10   making at the time of his death, do you recall, for a

11   year?

12       A.  He was making just over $43,000.

13       Q.  And given what he was doing, what's your

14   assessment of whether he could make more money in the

15   private sector or not, besides that $40,000?

16       A.  So my calculations suggest that when he entered

17   the private sector, his pay would increase from his pay

18   as a petty officer.

19       Q.  Okay.  And what age was he at the time of his

20   murder?

21       A.  He was 42.

22       Q.  42?

23       A.  Uh-huh.

24       Q.  So if he retired, he would be having to live off

25   of how much money if he wasn't going to work?

1       A.  So at that age, his retirement benefits

2   multiplier would have been about 55 percent, so he and

3   his household would have had to adjust their lifestyle

4   to live on right around half, a little over half of what

5   he was making if he didn't supplement with private

6   sector.

7       Q.  What would be just about half?

8       A.  So we would be looking at the low twenty

9   thousands.

10      Q.  Low twenties?

11      A.  Uh-huh.

12      Q.  That's not very much?

13      A.  Well, depends on the individual, but -- that's a

14  subjective question.  From a quantitative standpoint, it

15  would be in the low twenties.

16      Q.  Lower $20,000 range?

17      A.  I would personally consider that to be not very

18  much to live on, but my brother might have suggested

19  otherwise, so it's the individual.

20      Q.  Indeed.

21          MR. SKROCKI:  That's all the questions I have

22  for Dr. Taylor.

23          THE COURT:  Recross at all?

24          MR. COLBATH:  No, Your Honor.

25          THE COURT:  All right.  Thank you, Dr. Taylor.

1  You can be excused.

2          (Witness excused)

3          THE COURT:  Mr. Skrocki, are you going to seek

4  to admit these exhibits?

5          MR. SKROCKI:  They are part of the record, but

6  I guess for purposes of this hearing -- I want to slow

7  down for Madam Clerk -- let's do that.

8          We would move to admit Docket 1411-1, pages 1

9  and 2, and the supporting exhibits and the tables; same

10  exhibit, Docket 14-11, pages 16 and 17, and the

11  supporting documents and the table; along with the cover

12  letters for both analyses.

13          And then Docket 1435, which is a two-page

14  letter from Dr. Taylor dated November 11th.  I would

15  seek to admit those for purposes of this hearing.

16          THE COURT:  Any objection there, Mr. Colbath?

17          MR. COLBATH:  Your Honor, my objection would be

18  more of a substantive objection as to the speculative

19  nature of the tables, the figures, the calculations.

20          As Mr. Skrocki pointed out, they are already

21  filed as part of the record, and I certainly think they

22  are illustrative of her testimony here today, so to that

23  extent.

24          I just don't want to by not objecting concede

25  to any of the accuracy or underpinnings of the numbers,

but subject to that, I believe they are appropriately
part of the record.

THE COURT:  I will admit them to the extent
that they are filed under seal at 1411, 1435, but also
to discuss, and I do understand the defense position
from the briefing as to what weight, if any, the Court
should give to the testimony.

Dr. Taylor has left.  Does the government plan
to call -- put on any other evidence?

MR. SKROCKI:  That's all we have today, Your
Honor.

THE COURT:  Mr. Colbath, do you plan to put on
evidence?

MR. COLBATH:  Your Honor, I don't plan to put
on additional evidence.  The Court -- I do have an
exhibit from the TSP, just showing an account balance as
of the close of business of yesterday, January 7, 2021,
of the number Mr. Skrocki indicated, $524,502.44.

I noticed that the single page that I have does
not have Mr. Wells' name on it.  It does not have an
account number or anything like that.  I can tell the
Court I believe it's got to be a true and accurate
number, so unless there is a question about that number,
I don't intend to offer an exhibit or anything.  That
number is in the record and that's the best information

I have, but that was the only evidentiary matter that I
wanted to provide to the Court.

THE COURT: Mr. Skrocki, do you stipulate to
the value as stated on the record just now by
Mr. Colbath, $524,502.44 as of yesterday?

MR. SKROCKI: With one condition. Inasmuch as
we've advised the Court, we have a subpoena out to TSP.
If that number comes back substantially different, we'll
provide that to the Court and counsel.

THE COURT: I read that. All right. With that
understanding, I'll go ahead and accept that value,
unless there is a motion filed by the government to
reconsider that based on the subpoena.

All right. Where does that leave us,
Mr. Skrocki, in terms of going forward?

MR. SKROCKI: I think we're ready to argue, if
the Court needs it. I do have probably more comments
related to the stay issue than anything else, but we
would rely on our briefs. If you want to entertain a
brief argument, I can do that. I don't have much to
add.

THE COURT: I did hear that.

I did have a question, Mr. Colbath. You were
talking about Mr. Hopkins' plans at the time of his
death. Are there transcript cites that you can point me

 1    to where this -- I just can't recall the specifics.

 2             MR. COLBATH:  Your Honor, I can tell the Court

 3    that there is a defense exhibit, and I will provide it

 4    later today, there is a defense exhibit that was

 5    admitted, or at least my recollection is that it was

 6    admitted during the testimony of one of, I believe, the

 7    T1 employees, so somebody that worked up at the

 8    communications station as opposed to down at T2.

 9             But there was an exhibit, and the exhibit was

10    an email from this individual -- back and forth an email

11    exchange between Mr. Hopkins and the person who was a

12    witness wherein Mr. Hopkins had asked this person about

13    the retirement paperwork, because this person had

14    recently submitted theirs.  And this person forwarded

15    him the retirement documents.  And they were discussing

16    -- he was discussing getting that applied for or

17    whatnot.

18             And so there was both that exhibit and

19    questioning on that day, obviously, about that.  And I

20    apologize.  I should --

21             THE COURT:  If you wanted --

22             MR. COLBATH:  I should have attached that, but

23    I can get that to you, as I say, because I know I have

24    got the exhibit.

25             THE COURT:  And then there was a question

1    Mr. Skrocki posed to Dr. Taylor about updating

2    Mr. Wells' information.  As I read that, that's as of

3    December 1, 2020, correct?

4             MR. SKROCKI:  Yes.

5             THE COURT:  So I think that -- I understood her

6    testimony with regard to the difference between the

7    April and today on the two decedents.  So I think we're

8    okay.  Are you asking to do that?

9             MR. SKROCKI:  If we're all comfortable with

10   that figure, I don't think it's, as she stated, material

11   enough to warrant further work, but she can turn it

12   around in two days.  I think we would move the Court to

13   let us -- have us do that and then update these figures.

14            THE COURT:  You would like to do that?

15            MR. SKROCKI:  Yes, please.

16            THE COURT:  So can you do that, sounds like by

17   the end of the week then?

18            MR. SKROCKI:  Today being Thursday?

19            THE COURT:  Today is Friday.  It's been a long

20   week.

21            MR. SKROCKI:  Yes, ma'am.  So I think by

22   Wednesday or Thursday, but --

23            THE COURT:  How about next Thursday if she

24   needs a little extra time.

25            MR. SKROCKI:  I doubt she will, but we'll get

1  to that.

2      THE COURT:  Mr. Colbath, how about that same

3  timeframe for you to supplement -- really just to point

4  me to the record on Mr. Hopkins'?

5      MR. COLBATH:  Certainly, Your Honor.

6      THE COURT:  That would be next Thursday.  Very

7  good.  Those were my topics.

8      I would like to hear brief argument, so

9  Mr. Skrocki.

10     MR. SKROCKI:  If I may be heard on the motion

11 Mr. Colbath is working on.  Our recollection from the

12 trial, Your Honor, is that this is one of those times

13 where almost everybody, including myself, says, "I'm

14 having a bad day, I need to pull the plug and retire."

15 And I think there is plenty of other testimony in the

16 trial that we're going to have to research about people

17 saying, "No, Mr. Hopkins wasn't intending to retire."

18     Frankly, I'm not even sure how important that

19 question really is to the overall analysis.

20     THE COURT:  I'm not sure either.

21     MR. SKROCKI:  I would like to file something in

22 response by Thursday as well with respect to whether

23 that's been determined absolutely or to a certain level

24 beyond a preponderance.

25     THE COURT:  All I'm hearing is each side can

cite me to parts of the existing record on that. We're

not going to create anything new on that topic. And

that would be helpful from both sides next Thursday.

MR. SKROCKI: Very good. Thank you.

THE COURT: I guess in my mind, just to give

you heads-up, there's a difference between, say, "I'm

thinking of retiring from the Coast Guard and getting a

job in the private sector," versus, "I'm thinking of

retiring from the Coast Guard and going to live in a

remote cabin."

MR. SKROCKI: Yes.

THE COURT: There you go. Very good. Go

ahead.

MR. SKROCKI: My biggest point on the argument

side of this, Your Honor, is that I think the law is

very clear as to the points we made with respect to the

TSP, the defined benefits stream.

It's the issue of the stay that we find to be

something that the Court really needs to think about and

I'm sure you have.

You know, in closing argument the point I made

to the jury was this case is about time, and it still is

about time. And the time since the murders of these two

men has dragged on and on.

Our office believes, I believe, that the Court

should seriously consider giving the spouses of these
two men these funds, if it agrees to under the law, as
soon as possible.  We make that request because they are
both smart enough and mature enough in a situation like
this where they can elect to do what they wish with
this.

They can put it away in a fund for a grandchild
or they can live off of it, they can bank it, put into
an interest bearing account themselves, with the
understanding that if there is an appeal, they are going
to be responsible for it in one way or another, if that
happens.

I know Judge Beistline, I believe, the last
time did not stay, but I think that a system and the
circumstances are owed to these women, that they waited
long enough.

THE COURT:  Did Judge Beistline, he directed
the funds to be deposited with the court?

MR. SKROCKI:  I may be mistaken.  I looked at
it last night, so I may be mistaken.

THE COURT:  In any event, all right.

MR. SKROCKI:  My proposal is at a minimum
inasmuch as the TSP rules and regulations permit
distribution to victims without concern to appeal -- on
appeal, that that amount be distributed to them upon

1    entry of the Court's judgment.

2           THE COURT:  What's your response on the spousal

3    consent issue?  Did you look at that?

4           MR. SKROCKI:  I did look at that.  A couple of

5    things.  The burden, I believe, in that is on

6    Mr. Colbath.  We don't have any records.  Again, we've

7    subpoenaed the TSP, but they haven't responded yet,

8    which is most frustrating.

9           An annuity is only one component to withdraw

10   the funds or set up under the Thrift Savings Plan.  You

11   can take out a cash withdrawal.  You can do installments

12   and you can do an annuity.  I maybe should know this by

13   now because I'm retirement eligible, so I looked this up

14   last night.

15          My proffer to the Court is, or offer of proof

16   is that there are several ways to do this, and you

17   notice in Mr. Colbath's pleading he doesn't say one

18   exists.  He says she has a right to one.  Now, maybe she

19   has and he doesn't have it.  It's not been provided to

20   us.

21          But the mere fact that she has a right to an

22   annuity that has not yet been materialized or formulated

23   is irrelevant.  It's irrelevant because the *Novak*

24   opinion, along with *Belan* and *Beulke*, which Judge

25   Beistline cited favorably, prescribed a spouse's right

1  to retirement claims.

2          And so I don't think the annuity question

3  carries the day.  And I have to sort of fold this into,

4  even if it did, we would rely on the All Writs Act for

5  the Court to trump that.  The reason we're relying on

6  that probably more heavily now this week than we were

7  earlier on, even though we believe that it's compelling

8  law, is that this $120,000 or $100,000 withdrawal, Your

9  Honor, is extremely concerning and problematic for

10 government and for the spouses of the men who have been

11 murdered.

12         There was no application made to this Court

13 about whether its ruling covered a withdrawal.  There

14 was no communication whatever.  It was done in secrecy.

15 At this point, all we can conclude, inasmuch as it was

16 in secrecy, is it was done because they knew what they

17 were doing was wrong in violation of the Court order.

18         I made a specific application to the Court

19 because I was concerned about this, and that literal

20 contempt of this Court's ruling is something that we're

21 investigating and we're going to keep investigating

22 until we figure out how this happened.

23         I very much doubt that Mr. Wells did this from

24 the seclusion section of the jail, so I have to

25 conclude, based on spousal relationship with his spouse,

1   it was done by Nancy Wells.

2           Now, as you may -- given that $100,000

3   withdrawal that we're missing this amount from the

4   Thrift Savings Plan, we have asked in our pleadings for

5   the Court to direct Social Security to remit that

6   $88,000 overpayment back to this court.

7           THE COURT:  I didn't see a proposed order.  Was

8   there a proposed order?

9           MR. SKROCKI:  I did not attach a proposed

10  order.  I'm more than happy to.  I have been in

11  communication with Social Security several times about

12  how to make this work.  And with respect to, sometimes

13  you may recall dealing with bureaucracies you get

14  bureaucratic responses.

15          I advised them, "I'm going to make application

16  to the Court and get a court order for you," and they

17  said, "Go ahead and do that."

18          THE COURT:  Is next Thursday a reasonable

19  timeframe?

20          MR. SKROCKI:  Absolutely.  That way we could

21  claw that money back.  And that money belongs to the

22  spouses.  What the Wells have done is on them.  I don't

23  believe there is a mechanism, and we discussed this

24  among the trial team members, to recover the funds that

25  were expended on credit cards.  I very much doubt that

any credit card company would be willing to give money
back to the United States government once they have it.

So our proposal would be that prior to the sale
of the house or proceeds disbursed to either Jim or
Nancy Wells, that whatever is remaining of that
withdrawal, whatever amount it is, could be $101,000, I
don't know the ultimate answer, that that be reduced,
that the sale price be reduced -- excuse me.  Whatever
they make on the house be reduced by the remaining money
we don't get back from Social Security.

I thought a lot about this.  Again, I'm not a
real numbers guy, Judge, but I think it's the only
mechanism I'm aware of for them to be made whole because
of this pact in contempt.

So the other defined benefit streams, which
would be retirement, disability, VA, we would request
the Court put into -- have it be directed towards a fund
controlled by the court, and that would provide some
guarantee, if Mr. Wells ultimately succeeded on appeal,
then that money would be there.

But as far as the Thrift Savings Plan, because
of what the law is and how it reads, we believe that
should be disbursed right away, and that's our
application.

Do you have any other questions for me?

1          THE COURT:  Not at this time.  Thank you.

2          Mr. Colbath, go ahead, please.

3          MR. COLBATH:  Thank you, Your Honor.  Much like

4    Mr. Skrocki, I will rely primarily and principally on,

5    at least for legal argument and much of the -- I guess

6    much of the argument on the brief that I have submitted.

7          I don't want any of my -- just so the record is

8    clear, I don't want any of my comments here today to

9    obviate or waive in any way the initial *Apprendi*

10   argument I made for the record.

11         THE COURT:  I saw that.

12         MR. COLBATH:  And that's why that was made.  So

13   assuming the Court is proceeding without recognizing

14   that, or without -- well, following the law that I

15   believe you're currently bound by, without waiving any

16   *Apprendi* issue, Your Honor, I see the issues as this:

17         I agree with Mr. Skrocki that primary

18   consideration for the Court here, I think as far as the

19   law is pretty clear that restitution, unlike much of the

20   work that Dr. Taylor does in the civil realm,

21   restitution cannot be speculative, cannot be, I think,

22   based on assumptions, made on assumptions, that it has

23   to be specific.

24         Here I think that there are far too many

25   assumptions made to support the numbers put forth by the

government.  Assuming ultimately we get to the point
that the Court picks whatever number the Court picks,
then we have the issue of -- or then we're deciding two
things:  How is that number satisfied by the assets
available to the Court that the Wells have and then the
issue of the stay.

So we believe that the Court should find less
of an overall restitution number, because of the
speculative nature and for the arguments already made,
but whatever number you arrive at, it appears to me that
the government would like to have the TSP, leave the
Wells' Kodiak residence to the Wells, save for if there
is some ultimate offset of proceeds there, and then
50 percent of the streams of income, as Mr. Skrocki
referred to them, that being the military retirement and
the civil service retirement.

I'll deal with what I think is the easiest of
those three, and that is the streams of income.  It's
our position that the Court -- and the Court is bound by
the law and the law says you can't take more than
25 percent of those funds.  The government has proposed
that the Court, either disagreeing with the law that I
have cited or in supplementation with the All Writs Act,
take 50 percent of those.

Whatever percentage you take, we don't disagree

that the Court should order the percentage you're going
to order based on the numbers. But assuming the Court
went, just for the sake of this discussion, assuming you
went with the 50 percent number, it seems appropriate to
me that an order be issued directing 50 percent of those
funds to be put in an interest bearing account or escrow
bearing account or some kind of account to be held.

And then I presume the balance or the other
50 percent, or whatever the other remaining percent,
would continue to flow to Mr. Wells. That would be his
portion. There is no reason to escrow 100 percent of
it. He needs a portion to live on. His wife needs a
portion to live on. And there is no claim here that
100 percent of it is ultimately going to be going to
restitution.

So if we need to escrow 50 percent of it, then
-- or 25 percent of it, we don't see any problem with
that. It can be held there. It can be held by the
court, by the government, whoever the Court directs,
away from Mr. Wells' access.

With respect to the house, I think the easy way
to deal with the house is the Court can freeze that
asset and direct that it not be sold, and it will be
there at its value, whatever that might be, after appeal
to be dealt with at that time.

1        With respect to the TSP, I think there are a

2   number of issues, so I'll first talk about spousal

3   consent.  I can tell the Court that I have a TSP account

4   that, although I'm not retirement eligible, so I can't

5   make regular withdrawals, I'm getting close, and so I

6   just inquired online through my own account if I -- as

7   soon as I'm eligible, as I start to make withdrawals,

8   assuming I'm married, is a spousal consent required.  It

9   is.

10       I can tell the Court that a little over a year

11  ago --

12       THE COURT:  For an annuity as opposed to a lump

13  sum payment, or for both?

14       MR. COLBATH:  I did not check for the annuity.

15  I just checked for -- because this context contemplated

16  the government was asking for just a withdrawal.  That's

17  what I checked on.  To make a withdrawal, as a married

18  person, my spouse would have to sign off on that

19  withdrawal.

20       About 24 months ago, I took a loan against my

21  TSP.  I had -- in order for me to just borrow my own

22  money from the TSP, again, they sent me a form, my

23  spouse had to sign in front of a notary, send it back

24  in.  So I couldn't even borrow against it without

25  spousal consent, and the form, as I recall it, basically

1　acknowledged as a married person her right to my TSP

2　account.

3　　　　　So I believe if the government steps into the

4　shoes, as the law says, of Mr. Wells, they are stepping

5　into the shoes of a married person who has an innocent

6　spouse who has right and entitlement to that account.

7　So there is that issue which I think should prohibit the

8　immediate disbursement of the account.

9　　　　　I think the second issue is with regard to the

10　request for immediate disbursement, the rules of the TSP

11　are very, very clear, and that is once the money is

12　taken out, it can't be put back in.  Once that account

13　is withdrawn in lump sum, when the appeal overturns the

14　case and needs to be returned, the Court could order

15　that all day long, it doesn't happen, the TSP says this

16　account is closed, this money -- even if the money was

17　taken, given to the spouses, they just put it in the

18　bank and then returned it later, besides loss of the

19　growth of it, it just can't be resurrected.

20　　　　　And so I would sooner see and ask the Court, it

21　would be our request that the Court simply issue an

22　order to TSP freezing the account or prohibiting

23　withdrawals, because taking it out, even if it's held by

24　the government, is detrimental to everybody.  It's not

25　going to grow.  It's not going -- or it's going to grow

1    minimally.

2           And it triggers, most importantly then, the

3    third sort of TSP issue is the tax issue, and that is

4    under the government's proposal, if they step into

5    Mr. Wells' shoes and the Court orders a lump sum

6    withdrawal, that's going to come with tax consequences

7    today.  And, again, overturned on appeal, those taxes

8    are going to be paid and now that's a whole mess to try

9    and undo taxes and return the -- the money can't be put

10   back in so the money is there, but now it's changed in

11   character to post-tax money.

12          The other thing is, as Dr. Taylor testified,

13   the TSP will withhold a base amount of taxes.  By

14   example, I can tell the Court I have not seen the actual

15   disbursement paperwork, but my understanding is earlier

16   this year there was a request for a $125,000 TSP

17   withdrawal, that $25,000 was withheld for taxes and

18   $100,000 was actually disbursed.

19          So just using that sort of simple math, if five

20   times that amount is requested, I think what's going to

21   happen here is if $525,000 is requested, I don't know if

22   the numbers change -- if they gauge it based on

23   anticipated tax bracket or if it's just a base amount, a

24   base percentage no matter how big the withdrawal.

25          But assuming it's the same, if the whole

account is taken out, roughly $125,000 or $130,000 of it
is going to be withheld for taxes.

As Dr. Taylor said, that may be enough to pay
those taxes.  It might very well create a deficiency,
and the deficiency shouldn't fall on the Wells if they
don't get the money.  If the government gets the money,
because they are able to, by law, step into the shoes of
Mr. Wells, Mr. Wells' shoes right now have tax
consequences, and so that should fall on the government.

Again, that can be avoided, at least today, by
simply freezing the TSP account and not triggering those
tax consequences until any disbursement is necessary.

So our request would be that you order -- you
determine, based on the legal arguments, what you're
going to order as far as an amount of money accessible
from the TSP to be applied towards restitution, but that
you then freeze and freeze by all means the whole
account simply through an order issued to the TSP that
they are not to disburse money from the account until
further order of the Court.

That would freeze the house.  That would freeze
the TSP account.  That would provide 50 percent, or
whatever the percent the Court picks, of the ongoing
retirement moneys directed away from the monthly
payments to Mr. Wells into some other account.  And then

all those moneys would be available to be applied, as
the government suggests, at some point.

Obviously, all of that becomes moot, as it did
last time, following the Ninth Circuit ruling or it's
implemented.

As to timing, I have -- that's the last thing I
want to address, I guess.  I guess the first Ninth
Circuit decision speaks pretty clearly as to why the
case has dragged on so long and why it took so long, and
that's because it was fundamentally unfair the first
time and so it's been overturned and we had to do it all
again.  That wasn't Mr. Wells' fault.

I believe, just based on my review of the old
record compared to where we are today, it took a long
time -- the last appeal took a long time.  There was
almost a year before an initial brief was done in the
case last time.  There was delays in the transcripts,
delays in discovery, delays in the whole process.  It
took a long time, as I recall.

My understanding from Attorney Coleman, Ben
Coleman, who is representing Mr. Wells on the
substantive appeal, is the briefing is due in early
February or in February.  He's on track for that or
close.  All the transcripts are in.  All the materials
have been provided to him.  He's well into the process.

1           And I don't believe thereafter, once that

2      briefing process is actually started and the briefs are

3      filed, I think the timing for a decision from the Ninth

4      Circuit here is going to be much shorter and a much more

5      concise turnaround than last time.

6           So the case has to work through its natural

7      process and has to go forward based on the Ninth Circuit

8      schedule, but I think that the timing is drawing near

9      such that the Court should enter a stay.

10          My understanding of what happened last time is

11     that Judge Beistline did not order a stay, although he

12     did direct that if moneys were to be moved around, that

13     they were to be held in interest bearing accounts or

14     directed to some of those things.

15          As I read the record, the first appellate

16     attorney that represented Mr. Wells, Davena Chen, ended

17     up within a few days of Judge Beistline's ruling not

18     issuing a stay, she filed for an emergency stay with the

19     Ninth Circuit.  That was unopposed by the government at

20     the time.  There was a declaration filed by -- it was

21     not Mr. Schroder.  It was certainly not any of the trial

22     team during this time.

23          At least at the Ninth Circuit level, the

24     government, because the money was being frozen

25     essentially or put into some type of accounts pending

```
 1   appeal, it was unopposed and the Ninth Circuit granted

 2   that and that's how the stay came to be.

 3              THE COURT:  What I'm looking at is an order

 4   from February 17, 2015, by Judge Beistline in this case.

 5   Maybe it's been amended, but what I read he did was deny

 6   the stay, but then state, "The government may proceed

 7   with its collection efforts with the understanding that

 8   any funds obtained will be held in the registry of the

 9   court to be immediately disbursed once the appeal is

10   decided."

11              That's what I'm going off of.  Maybe the

12   circuit entered something after that, but that's what --

13              MR. COLBATH:  And I don't have -- I have the

14   Ninth Circuit pleadings back on my -- the motion, the

15   declaration by the government and the order.  I just

16   didn't bring them with me.

17              THE COURT:  That's fine.

18              MR. COLBATH:  They essentially treated it

19   identical to what you just read, and that was that

20   assets were being held or frozen and so no disbursement

21   of funds was the point, I guess.

22              THE COURT:  All right.

23              MR. COLBATH:  So that's our position on all of

24   the matters, I guess.

25              THE COURT:  Thank you, Mr. Colbath.
```

1          MR. SKROCKI:  Brief rebuttal?

2          THE COURT:  Go ahead.

3          MR. SKROCKI:  Thank you, Your Honor.  Just

4     briefly.

5          Mr. Colbath talked about freezing the sale of

6     the house.  We don't want the sale of the house frozen.

7     Mr. and Mrs. Wells can sell the home whenever they wish.

8     If they do do that, unlike this withdrawal with the TSP,

9     that they notify the parties and the Court by motion

10    practice that they are selling the house.

11         THE COURT:  Well, here is my thoughts on that,

12    and that is that looking to get next Thursday if there

13    is other proposed orders that the government is seeking,

14    that would be helpful with regard to the TSP, with

15    regard to the house.

16         I mean I see a -- I can't recall whether

17    Alaska's lis pendens law would apply to a criminal

18    federal proceeding, so that is what comes to my mind.

19    And then the -- well, any orders at all.

20         Mr. Colbath, if you have seven days from then

21    to file any objections to the proposed orders.  You're

22    preserving all your objections, *Apprendi* and all of

23    that.  It's the form of the orders that I would

24    appreciate your input on in particular.

25         MR. COLBATH:  Yes, Your Honor.  We can

certainly look at those and file any objection.  And I
neglected to mention --

        THE COURT:  Go ahead.

        MR. COLBATH:  The Wells can't sell their house
and/or what's not frozen or tied up here in this court;
there is a pending lawsuit by the victims' families
here, a civil lawsuit.  It's scheduled for trial at the
end of March down in Kodiak, and there is existing
orders tying up the house and other personal property
there subject to whatever award ultimately could get
entered there.

        MR. SKROCKI:  Let's be realistic about this
because it's tied up from the court in Kodiak because
the spouses are suing Mr. Wells for the death of their
husbands, so there is a ways of working this around.

        In the event they want to sell the home, we can
certainly facilitate an agreement between parties that
it can be sold.

        THE COURT:  It sounds like you can talk about
this.  If you have a proposed order with regard to the
house that you're asking this Court to enter, fine.  I'm
unaware what orders, if any, may have been entered by
the Kodiak court.  I am surprised to hear they think
they can do a trial in March.

        MR. SKROCKI:  One more thing about the TSP, I

have been trying to get ahold of a lawyer in that division since December. So I'm going to try harder. I'm going to get a little angrier with them, and if I can get either a witness or an affidavit about this issue with spousal consent, I will do that, because, frankly, it's one thing to be a joint person on a TSP account or two people joined together and then you have to get permission to make a withdrawal. An annuity is a completely different species.

THE COURT: I will have both sides weighing in on that. Certainly, Mr. Colbath, if a declaration is filed, if you feel there is a need to respond to that, I would welcome that as well. We'll sort this out.

Anything further today?

MR. SKROCKI: You probably felt like you're back in state court, Judge.

THE COURT: I love numbers.

MR. SKROCKI: Thank you very much. Good to see you again.

THE COURT: Good to see you.

Mr. Colbath, anything further?

MR. COLBATH: Not for our record here today, Your Honor. Thank you.

THE COURT: Very good. Then we'll go off record at this time.

1          DEPUTY CLERK:  All rise.  This matter is

2    adjourned.  This court now stands adjourned subject to

3    call.

4          (Proceedings concluded at 1:30 p.m.)

5

6                      CERTIFICATE

7       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
8    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
9    original stenographic record in the above-entitled
     matter and that the transcript page format is in
10   conformance with the regulations of the Judicial
     Conference of the United States.
11
        Dated this 23rd day of February, 2021.
12

13
                         /s/ Sonja L. Reeves
14                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25