**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos. 20-30009 |
| | 21-30121 |
| *Plaintiff-Appellee,* | |
| | D.C. Nos. |
| v. | 3:13-cr-00008-SLG-1 |
| | 3:13-cr-00008-SLG |
| JAMES MICHAEL WELLS, | |
| | OPINION |
| *Defendant-Appellant.* | |

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, Chief District Judge, Presiding

Argued and Submitted June 7, 2022
Anchorage, Alaska

Filed December 14, 2022

Before: Andrew D. Hurwitz, Daniel A. Bress, and Holly
A. Thomas, Circuit Judges.

Opinion by Judge Bress

## SUMMARY[*]

### Criminal Law

The panel affirmed James Wells's convictions, vacated the district court's restitution order, and remanded for further proceedings in a case in which Wells, while a Coast Guard employee, shot and killed two co-workers at a Coast Guard station.

Wells contended that under the Fifth Amendment and *Garrity v. New Jersey*, 385 U.S. 493 (1967), statements he made to government investigators should have been suppressed because they were made under threat of loss of employment.

The panel's independent review of the record confirmed that the investigators did not explicitly threaten Wells's job security if he refused to incriminate himself, and Wells did not argue otherwise. Instead, Wells advanced a theory of implicit coercion by virtue of an employment manual, and a letter of caution he received after allegedly using a fuel card for his personal vehicle, which, he argued, operated in the background of his interviews to create "an impermissible penalty situation." The panel held that in the absence of a direct threat of loss of employment, the appropriate framework for the court is to consider both the public employee's subjective belief and the objective reasonableness of that belief to determine

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

whether the employee's statements were improperly coerced; it is only when both elements are satisfied that the employee is, under *Garrity*, entitled to suppression of his statements absent a grant of immunity. The panel rejected Wells's argument that *United States v. Saechao*, 418 F.3d 1073 (2005), controls and sets forth a purely objective test.

Turning to Wells's *Garrity* claim within the proper framework, the panel wrote that the evidence in the record does not suggest that Wells subjectively believed that either the employment manual or the letter of caution required him to answer the investigator's questions or to waive his immunity from self-incrimination; to the contrary, the interview transcripts reveal Wells's affirmative intent to cooperate with the investigation in an apparent effort to make it seem that he had nothing to hide. Having concluded that Wells did not establish a subjective belief that he was required to answer the investigators' questions or suffer an employment consequence, the panel did not need to consider whether, if Wells had held such a belief, it would have been objectively reasonable. Thus, Wells was not implicitly coerced to provide his interview statements, and the Fifth Amendment did not prevent the introduction of his statements at trial.

In ordering Wells to pay \$1,921,640 in restitution pursuant to the Mandatory Victims Restitution Act (MVRA), the district court determined that restitution should be paid using 80% of the monthly payments from his retirement and disability benefits. Wells claimed that under provisions of the Consumer Credit Protection Act, 15 U.S.C. § 1673, that are incorporated into the MVRA, his retirement and disability benefits constitute "earnings," which cannot be garnished more than 25%. The district court concluded it had discretion under the All Writs Act to

4 UNITED STATES V. WELLS

order garnishment of a higher percentage of the monthly payments. The panel held that because the MVRA creates specific statutory requirements for garnishing earnings, the All Writs Act cannot be used to sidestep those requirements. The panel vacated the restitution order and remanded for the district court to determine whether each of Wells's benefit payment streams constituted "earnings" under § 1673; if so, the MVRA limited garnishment of those funds to 25%.

The panel addressed other issues in a concurrently filed memorandum disposition.

## **COUNSEL**

Benjamin L. Coleman (argued), Singleton Schreiber McKenzie & Scott LLP, San Diego, California, for Defendant-Appellant.

Daniel N. Lerman (argued), Attorney, Appellate Section; Lisa H. Miller, Deputy Assistant Attorney General; Kenneth A. Polite Jr, Assistant Attorney General, United States Department of Justice, Criminal Division, Washington, D.C.; Bryan Wilson, Attorney; Stephen L. Corso and Steven E. Skrocki, Assistant United States Attorneys; John E. Kuhn Jr., United States Attorneys; Office of the United States Attorney, Anchorage, Alaska; for Plaintiff-Appellee.

## OPINION

BRESS, Circuit Judge:

On the morning of April 12, 2012, two Coast Guard employees were shot and killed at a Coast Guard station on Kodiak Island, Alaska. A jury found that their co-worker, James Wells, had committed the murders. In this opinion, we primarily address Wells's contention that under the Fifth Amendment, statements he made to government investigators should have been suppressed because they were made under the threat of loss of employment. We hold that Wells's Fifth Amendment self-incrimination challenge fails because he was not coerced to speak with investigators on pain of losing his job.

In this opinion and an accompanying memorandum disposition, we affirm Wells's convictions. But we vacate the district court's restitution order and remand for further proceedings limited to that issue because the district court mistakenly relied on the All Writs Act in determining how certain benefits would be garnished.

## I

### A

James Wells, Richard Belisle, and James Hopkins worked together at the United States Coast Guard Communication Station (COMMSTA) on Kodiak Island, Alaska. COMMSTA is "the 911 of the Bering," fielding calls from mariners in distress and military aircraft passing through the airspace. After a lengthy military career, Wells for over twenty years worked as a civilian COMMSTA mechanic, maintaining the radio antennas used to

communicate with aircraft and vessels. Belisle was the "master rigger" responsible for ensuring that antenna equipment was properly and safely rigged. Hopkins supervised both men.

At 6:48 a.m. on April 12, 2012, surveillance video captured Wells's white pickup truck driving on the main road towards COMMSTA. Wells took this route every morning to get to work. On this particular day, Wells pulled off at the Kodiak airport, which is located on the same road about two miles from COMMSTA.

Wells's wife, Nancy, had left her car, a blue 2001 Honda CR-V, in the airport parking lot while on a business trip. At 7:09 a.m., security footage showed a blue car approaching the COMMSTA antenna maintenance facility (also known as the "rigger shop"), where Hopkins and Belisle were already working. The government's theory was that Wells had swapped his vehicle for Nancy's at the airport and driven it to COMMSTA, where he then shot Hopkins and Belisle.

Surveillance video showed a blue vehicle leaving the rigger shop at 7:14 a.m. By 7:22 a.m., Wells was seen driving his white truck away from the airport towards his residence. Altogether, this amounted to 34 minutes after Wells first arrived at the airport.

At 7:30 a.m., Wells called Hopkins (now deceased) and left a voicemail explaining that he would be late to work because he had a flat tire. Wells, Belisle, and Hopkins usually arrived around 7:00 a.m., while other COMMSTA employees typically came in later. Wells also left voicemails for Belisle (also deceased) and Scott Reckner, a supervisor whom Wells had only "very rarely" called in the past. After leaving these voicemails, Wells arrived at

COMMSTA at about 8:30 a.m., after the murders had been discovered.  When Reckner informed Wells of the murders, Wells responded, "Shit.  I had a flat tire."

COMMSTA authorities instructed all employees to remain at the station so that they would stay safe and be able to assist in the investigation.  Shortly thereafter, the FBI and the Coast Guard Investigative Service (CGIS) arrived and launched an investigation.  The investigators started by interviewing COMMSTA personnel.  We recount the interviews with Wells in some detail because they form the basis for the principal issue that we address in this opinion.

Agents interviewed Wells four times in the evening of April 12 (the day of the murders), and twice more on the morning of April 13.  In the first interview, which began around 7:21 p.m., Wells volunteered that "the only reason I wasn't here this morning at 7:00 was I had [a] flat tire in my truck."  However, Wells admitted that he did not know exactly where or when his tire went flat, and that he did not "really look at it to see what was wrong."  He also answered questions about his background and duties at COMMSTA, the work environment, and his relationships with Belisle and Hopkins.

In the second interview, which began at 8:04 p.m., the agents asked Wells if they could search his truck to "verify" his story about the flat tire, and Wells replied, "Knock yourself out."  The agents told Wells "[t]his is totally voluntary" and "you can refuse this."  Wells reaffirmed his consent.  The agents also asked Wells if they could search his cell phone, and Wells again agreed.  Before both searches, Wells signed acknowledgments of

his rights.  The agents then searched Wells's truck and found in the back a tire that had been punctured by a nail.

Wells was interviewed twice more that evening, but the interviews were brief.  The agents initially told Wells that they had follow-up questions after speaking to other employees, but after only three minutes (and no questions), they stopped the interview because Wells said that he needed to take medication.  In the final session that evening, the investigators conducted a several-minute interview in which they suggested "having [Wells's] hands wiped for gunshot residue" to "see what his reaction would be."  Wells agreed to the test.  Wells would later testify that he had interpreted these interviews as "just . . . general information gathering" and nothing "out of the ordinary."

By the next morning, the agents had reviewed the surveillance footage of the road leading to COMMSTA. The footage showed Wells's truck driving to and from the airport.  The agents decided to interview Wells again. Before initiating the interview, the agents informed Wells of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), emphasizing that "you don't have to talk to us" and "don't have to answer" questions.  Although Wells said he was "a little concerned now," he consented to the interview and signed a *Miranda* waiver.  At one point in the interview, Wells declined to answer questions about his disciplinary issues ("Nope, I'd rather not").  But he otherwise responded to the questioning.

After substantial questioning about the layout, operations, and employees of the rigging shop, the agents turned to the previous day's events.  Wells reiterated that as he was driving to work, he noticed he had a flat tire.  He

then turned into a parking lot by the airport to check the tire, after which he decided to go back home to change it.

The agents informed Wells that the security footage showed a 34-minute gap between Wells's truck driving to and from the airport. When asked to account for that time, Wells said he "d[idn't] have a reasonable explanation for it." One agent told Wells that they were "baffled," to which Wells replied, "Well, so am I." An investigator told Wells that "[t]hings aren't adding up with that story," and Wells simply responded, "I don't have [a] theory at the moment."

Later that day, investigators asked to interview Wells again, explaining that "your stories aren't lining up with the factual time lines that we have." Wells asked, "Are you accusing me?" The agents said "[a]t this point, yes Jim." Wells terminated the interview.

Meanwhile, attempting to locate the blue vehicle they had seen in the security footage, the agents went to the airport, where they found Nancy's blue CR-V. They later learned that the car was parked in a different spot than where Nancy had left it, and there was mail addressed to Wells in the front seat that had not previously been there. After a lengthy process to rule out other suspects—which involved obtaining a list of all vehicles registered in Kodiak, identifying those that potentially matched the one in the video, and interviewing the owners—the investigators came to believe that the vehicle in the video was, in fact, Nancy's blue CR-V.

The agents searched Wells's home. While they did not recover the murder weapon, they did discover the same type of ammunition found at the crime scene. Many

months later, on February 15, 2013, Wells was arrested for the murders of Hopkins and Belisle.

**B**

On February 19, 2013, Wells was indicted on two counts of first-degree murder within the maritime and territorial jurisdiction of the United States, 18 U.S.C. § 1111; two counts of murder of a federal employee, 18 U.S.C. § 1114; and two counts of using a firearm in relation to a crime of violence, 18 U.S.C. § 924(c). A jury returned guilty verdicts on all counts. Wells was sentenced to life in prison and ordered to pay restitution. *See United States v. Wells*, 879 F.3d 900, 907–08 (9th Cir. 2018) (*Wells I*).

Wells appealed. He raised various legal challenges to his conviction and sentence, including that the district court had erred in denying his motion to suppress his interview statements under *Miranda*. We affirmed the denial of the motion to suppress, holding that "Wells was not in custody, and therefore no *Miranda* warnings were required." *United States v. Wells*, 719 F. App'x 587, 590 (9th Cir. 2017). But concluding that the government had engaged in prosecutorial misconduct during trial, we reversed Wells's conviction. *Wells I*, 879 F.3d at 907–08. We also ordered reassignment of the case to a new district court judge. *Id.* at 938.

Before Wells's second trial, he again moved to suppress the statements he made during the interviews. This time, Wells advanced a different theory, claiming that the investigators had violated his Fifth Amendment rights by coercing him to incriminate himself under threat of loss of employment. Wells maintained that the statements should be excluded under *Garrity v. New Jersey*, 385 U.S. 493

(1967), because investigators had not warned Wells that he faced no adverse employment consequences if he declined to answer questions.  The district court denied Wells's motion to suppress.  Audio recordings of Wells's interviews with the investigators were played for the jury during trial.

In its case in chief, the government presented the theory that Wells had been provoked by various workplace incidents leading up to the murders.  Prior to the murders, Wells had been disciplined for misconduct.  In April 2011, Wells received a "letter of expectations" because he frequently missed work without informing his supervisors. Wells received another cautionary letter in January 2012, after he allegedly used a COMMSTA fuel card for his personal vehicle.

Wells's supervisor, Scott Reckner, testified to further difficulties Wells experienced at COMMSTA.  In late 2011, Wells began having health problems and Reckner had to ask Hopkins and Belisle to "step[] up" to cover Wells's responsibilities.  Because of this, Reckner decided to send Hopkins and Belisle to an annual conference that Wells had attended in the past, which angered Wells.  On the day before the murders, Wells and Belisle disagreed over how to install a particular antenna—an issue typically within Wells's purview—and Reckner sided with Belisle, praising Belisle for a "great idea."

The government put on nearly sixty fact witnesses and eight experts.  These included a forensic tire expert who analyzed Wells's tire and determined that it was "pristine," with "no evidence of the tire ever having been run low or flat."  The expert observed that the nail in the tire lacked any surface abrasions, opining that "the nail was inserted

manually in the tire as opposed to being picked up on the highway." The jury was also shown the footage of the blue vehicle driving to the rigger shop immediately before and after the murders, as well as a video reenactment that investigators had staged on April 19, 2012. Multiple experts opined that the car shown in the security footage was consistent with a 2001 Honda CR-V.

Wells testified in his own defense. He maintained that, as he had told the investigators, he pulled into an airport-area parking lot upon realizing that he had a flat tire. But in an attempt to explain the previously unaccounted-for 34-minute gap between his truck arriving at and leaving the airport, Wells now claimed that he had "messed his pants" as he exited his truck at the airport. He testified that he went to use a bathroom in the airport, where he "[h]ad another bout of diarrhea" and took time to clean himself.

Wells claimed he then drove home from the airport to change the tire. He testified that he found a nail embedded in the tire, which he pulled out and "[t]ossed . . . over into the crick." But Wells then realized that "I shouldn't do that because now I won't find the hole," so he claimed he reinserted a different nail in the tire. After this, Wells drove to COMMSTA. Wells testified that he wore his soiled pants that day and the following day, in an attempt to explain why the investigators did not find the pants when they searched his house. Wells also said that he had not disclosed the bathroom incident during the interviews because "[i]t was very personal and embarrassing."

In its closing argument, the government emphasized that Wells's new account did not align with what he told investigators when interviewed on April 12 and 13, 2012. The government also argued that in his interviews with

investigators, Wells was evasive, gave explanations that did not add up, and demonstrated an awareness of his own guilt.

On October 8, 2019, the jury returned guilty verdicts on all counts. The district court sentenced Wells to life in prison and ordered him to pay $1,921,640 in restitution. Wells timely appealed his conviction and restitution order.

In a separate memorandum disposition filed concurrently with this opinion, we reject various of Wells's challenges to his convictions. Here, we address the remaining issues. We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. We review the district court's legal conclusions de novo and its factual determinations for clear error. *See United States v. Gregory*, 322 F.3d 1157, 1160–61 (9th Cir. 2003).

## II

We first address whether Wells's statements to investigators in the April 2012 interviews were obtained in violation of the Fifth Amendment.

## A

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Although the right against self-incrimination is a quintessential "'trial right of criminal defendants,'" its protection has been extended to "bar[] the government from engaging in certain pretrial conduct." *Chavez v. Robinson*, 12 F.4th 978, 985 (9th Cir. 2021) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990)). Relevant here, the Fifth Amendment prohibits the government from

"compelling a person to make incriminating statements (absent a grant of immunity) or punishing a person who refuses to make such statements." *Id.*

Normally, if a person "desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984) (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)). But the Supreme Court has recognized certain exceptions "to the general rule that the Fifth Amendment privilege is not self-executing." *Id.* at 434. The most notable involves custodial interrogations. *See Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Roberts v. United States*, 445 U.S. 552, 560 (1980) ("*Miranda*'s requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed . . . .").

A different exception is at issue here: the Supreme Court has held that the constitutional protection against self-incrimination also applies when a government employer coerces an employee to give up his right against self-incrimination on threat of loss of employment. *Garrity*, 385 U.S. at 496, 500. As we have explained, "public employees cannot be compelled to choose between providing unprotected incriminating testimony or losing their jobs." *Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir. 2007). Such coerced testimony generally cannot be introduced in subsequent criminal proceedings against the employee. *Garrity*, 385 U.S. at 500.

This exception turns not merely on whether the government "compelled an individual to appear and testify," but on whether it "also sought to induce him to forgo the Fifth Amendment privilege by threatening to

impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" *Murphy*, 465 U.S. at 434 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977)). For this reason, if proper immunity is provided to the witness, the government may require that incriminating questions be answered. *See Chavez*, 12 F.4th at 987.

The Fifth Amendment also does not apply to "voluntary" statements, or in situations when "a person does not invoke the privilege against self-incrimination and any pressure to make incriminating statements does not rise to the level of compulsion." *Id.* Indeed, we have confirmed that public employers retain the right "to appropriately question an employee about matters relating to the employee's possible misconduct while on duty," and that such questioning, on its own, does not trigger the Fifth Amendment or require application of the exclusionary rule. *Aguilera*, 510 F.3d at 1171; *see also Gardner v. Broderick*, 392 U.S. 273, 278 (1968) ("If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, . . . the privilege against self-incrimination would not have been a bar to his dismissal."). The ultimate test is compulsion to be a witness against oneself on pain of penalty: "If there is no compulsion . . . then the Self-Incrimination Clause is not implicated." *Chavez*, 12 F.4th at 987; *see also Cunningham*, 431 U.S. at 806 ("[T]he touchstone of the Fifth Amendment is compulsion . . . .").

Compulsion is most obviously present when a public employer directly threatens an employee with the loss of a job (or a comparable penalty) unless the employee gives answers to incriminating questions that could later be used against him in a criminal proceeding. These were the facts

in *Garrity*, the seminal case in which the Supreme Court extended the Fifth Amendment to the public employment context. In that case, New Jersey's Attorney General investigated allegations that local police officers were fixing traffic tickets. 385 U.S. at 494. Before being questioned, each officer was cautioned that "he had the privilege to refuse to answer if the disclosure would tend to incriminate him" but that "if he refused to answer he would be subject to removal from office." *Id.* The officers answered the questions, and their admissions were used in subsequent criminal proceedings against them. *Id.* at 495.

The Supreme Court held that the Attorney General's conduct violated the Fifth Amendment because the officers were "deprived of [the] 'free choice to admit, to deny, or to refuse to answer,'" and, as a result, their statements were "infected by the coercion." *Id.* at 496–97 (quoting *Lisenba v. California*, 314 U.S. 219, 241 (1941)). It was impermissible to put the officers to "[t]he choice . . . between self-incrimination or job forfeiture." *Id.* at 496.

The Supreme Court cases that followed *Garrity* likewise involved direct threats of a penalty or sanction if public employees were to invoke their Fifth Amendment rights. *See Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 282 (1968) (employee was told that if he "refused to testify with respect to his official conduct or that of any other city employee on the grounds of self-incrimination, his employment and eligibility for other city employment would terminate"); *Gardner*, 392 U.S. at 274 (employee was "told that he would be fired if he did not sign" a waiver of his Fifth Amendment rights).

Wells was not subjected to direct coercion. The investigators never threatened Wells's job security or

suggested in any way that his failure to self-incriminate would lead to his firing or any other form of discipline. As we noted in Wells's prior appeal, the April 12 interviews were not "aggressive or accusatory," and Wells was "interviewed[] in the same manner as all other COMMSTA employees." *Wells I*, 719 F. App'x at 589; *see also id.* at 590–91 (noting that Wells was "never physically restrained," "pressured to confess to anything," or "singled out or made to feel like a target of the investigation," and that the April 12 interviews were "'essentially amicable'"). Wells himself described his discussions with investigators as "just . . . general information gathering" and nothing "out of the ordinary." And by April 13, Wells had received *Miranda* warnings, which explicitly informed him that any further cooperation had to be voluntary. Our independent review of the record confirms that the investigators did not explicitly threaten Wells's job security if he refused to incriminate himself, and Wells does not argue otherwise.

**B**

Instead, Wells advances a theory of implicit coercion. In support of this argument, Wells points to a Coast Guard employment manual,[1] which provides that "[a]ll civilian employees are responsible for . . . [p]roviding full and truthful answers during any inquiry or investigation." In a separate provision, the manual lists an employee's failure to "give oral or written statements or testimony or cooperate otherwise in connection with any official inquiry, investigation, or proceeding" as "offenses" that could trigger discipline ranging from "[w]ritten reprimand to

---

[1] We grant Wells's request to take judicial notice of the manual.

removal." Similar consequences could befall an employee who "fail[s] to provide honest and complete information to investigators or display[s] lack of candor in any official inquiry or proceeding; [or] fail[s] to provide material fact or pertinent information." Wells also claims that the letter of caution he received after the fuel card incident required him to incriminate himself or risk losing his job because the letter stated that "any future instances of misconduct may result in disciplinary action being taken against you, up to and including removal from Federal service."

Wells alleges that the employment manual and the letter of caution, either separately or in combination, operated in the background of his interviews to create "an impermissible penalty situation." In his view, these documents constituted an "objective showing" that he faced potential termination or other sufficiently severe adverse employment consequences for failing to answer incriminating questions. This, he asserts, "is all that is required" to trigger the exclusionary rule.

We have previously recognized the possibility that implicit threats in the public employment context may produce unconstitutional coercion in violation of the Fifth Amendment. Our leading case in this area is *Aguilera v. Baca*, 510 F.3d 1161 (9th Cir. 2007). There, a police department investigated a complaint of excessive force against its officers. *Id.* at 1165. Like Wells, the deputies in *Aguilera* operated under certain employment policies that required truthfulness in internal investigations. *Id.* The police department's Manual of Policies and Procedures established "an affirmative duty to cooperate" during investigations, a violation of which could "subject a deputy to administrative discipline." *Id.*

During an internal investigation into police misconduct, the deputies refused to provide statements to an investigator. *Id.* at 1166. While the investigation continued, the deputies were reassigned to different roles and shifts, but no charges were brought, and the deputies were eventually restored to their former roles. *Id.* at 1166–67. Later, the deputies sued under 42 U.S.C. § 1983 alleging, as relevant here, that the investigation violated the deputies' Fifth Amendment rights by putting them to an unconstitutional choice between providing statements that could later be used against them or temporarily losing their preferred job responsibilities. *Id.* at 1171.

We held that the police department did not run afoul of *Garrity*. *Id.* at 1171. The investigator's questioning of the deputies did not violate the Fifth Amendment because "the deputies were not compelled to answer the investigator's questions or to waive their immunity from self-incrimination. Indeed, it appears that the deputies were never even *asked* to waive their immunity." *Id.* at 1172. We agreed that "there may have been some initial coercion to *cooperate and answer* questions." *Id.* at 1172 n.5. But that was not tantamount to "*compelling* the officers to waive their Fifth Amendment rights." *Id.*

**C**

Although the reasoning and result in *Aguilera* point against Wells, *Aguilera* did not articulate a full legal framework for determining when an employer policy or other background condition of employment produces Fifth

Amendment coercion.[2]   Other circuits have broached the question, however, and we find their decisions informative.

In *United States v. Smith*, 821 F.3d 1293 (11th Cir. 2016), for instance, a lieutenant at a state prison was internally investigated in connection with an incident that resulted in an inmate's death.  *Id.* at 1296–97.  Smith prepared a false incident report that absolved him of responsibility, and he repeated the fabricated narrative to investigators.  *Id.* at 1297–99.  The investigators later shared Smith's statements with the FBI.  *Id.* at 1299.

The Eleventh Circuit concluded that *Garrity* allowed the use of Smith's statements at his criminal trial.  The court explained that "[i]n the absence of a direct threat of termination," a *Garrity* violation requires two elements: (1) "the officer must have in fact believed the statements to be compelled on threat of loss of job," and (2) "this belief must have been objectively reasonable."  *Id.* at 1302–03 (quoting *United States v. Vangates*, 287 F.3d 1315, 1321–22 (11th Cir. 2002)).

In *Smith*, both elements were lacking.  First, the court concluded that Smith had "failed to present any evidence"

---

[2] Wells argues that *Aguilera* is inapposite because in that case, the Fifth Amendment claim was brought by the officers in civil proceedings under § 1983.  But *Aguilera* resolved the deputies' claims on the first prong of the qualified immunity analysis, namely, whether there had been a violation of the officers' constitutional rights.  *See Aguilera*, 510 F.3d at 1171–72.  Wells also points out that in *Aguilera*, the officers' statements were not used in subsequent criminal proceedings.  But we offered that as an alternate ground for decision, making clear that the officers' claims would fail regardless for lack of coercion.  *Id.* at 1173–74.

demonstrating a subjective belief that he would lose his job if he failed to provide self-incriminating information. *Id.* at 1303. On the contrary, "Smith's motive to make the written statements more than likely was to deflect suspicion and avoid jail rather than a desire to retain his employment." *Id.* (alterations and quotations omitted). And secondly, while the prison's regulations required Smith to write an incident report and cooperate with the investigation on pain of "progressive disciplinary sanctions," the regulations did not threaten termination, and "the mere possibility of future discipline [was] not enough to trigger *Garrity* protection." *Id.* at 1302. In the Eleventh Circuit's view, "*Garrity* does not stand for the proposition" that a statement is coerced whenever there is a "speculative possibility of termination" if the public employee refuses to answer incriminating questions. *Id.* at 1303 (quotations omitted); *see also United States v. Waldon*, 363 F.3d 1103, 1112–13 (11th Cir. 2004) (per curiam) (applying the subjective-objective test in affirming the denial of a motion to suppress because the regulations in question "reflect only a general expectation that police officers will cooperate and testify").

The test used by the Eleventh Circuit originated in *United States v. Friedrick*, 842 F.2d 382 (D.C. Cir. 1988). *See Vangates*, 287 F.3d at 1322 & n.7 (adopting the test set forth in *Friedrick*). *Friedrick* involved an FBI agent who was interviewed numerous times over the course of several months as part of an internal investigation. *Friedrick*, 842 F.2d at 384–87. Before the first interviews, Friedrick was promised he would be immune from criminal prosecution based on his statements. *Id.* at 385–87. On appeal, he argued that these guarantees implicitly extended to the later interviews, as well. *Id.* at 393–94.

The court concluded that for the Fifth Amendment to apply under *Garrity*, "Friedrick must have in fact believed his January statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *Id.* at 395. Applying this test—and noting that Friedrick had expressly stated during the interview that he thought his statements were immune—the court concluded that *Garrity* prohibited the introduction of Friedrick's statements in subsequent criminal proceedings. *Id.* at 397–401.

We find further support for this subjective-objective approach in *United States v. Palmquist*, 712 F.3d 640 (1st Cir. 2013). In that case, a government employee had filed a fraudulent claim for disability benefits with the Veterans Administration. *Id.* at 642–43. An agency investigator interviewed him concerning this claim. *Id.* at 644. Before the interview, the investigator informed Palmquist of his rights, and Palmquist agreed to cooperate. *Id.*

Palmquist nonetheless later claimed that he had been implicitly coerced by the Veterans Administration Standards of Conduct, which provided that "[e]mployees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters," and that refusal to testify "may be ground for disciplinary action." *Id.* at 645–46. The Standard of Conduct went on to clarify that employees need not provide incriminating testimony. *Id.*

The First Circuit rejected Palmquist's argument. *Id.* at 646. Although the court did not set forth an all-encompassing framework for Fifth Amendment claims in the government employment context, the court relied on both subjective and objective considerations in its analysis.

The court explained that Palmquist had no reason to believe that he would be terminated for refusing to self-incriminate: the Standard of Conduct was "not inherently coercive," and "there [wa]s no indication Palmquist was aware of the regulation at all, let alone that he was selectively presented with the coercive portion of the regulation." *Id.* at 645–46.

The court also clarified that, to the extent that Palmquist's silence gave rise to "potentially unfavorable inferences" that could in turn lead to an adverse employment action, this chain of events was "too conditional" to constitute coercion under *Garrity*. *Id.* at 645, 647; *see also United States v. Stein*, 233 F.3d 6, 16 (1st Cir. 2000) (distinguishing between "the threat of automatic loss of one['s] livelihood and the threat of an inference that might lead to such a loss").

The reasoning in *Palmquist* aligned with earlier First Circuit case law establishing that absent an objectively coercive threat, "the subjective fears of [a] defendant as to what might happen if he refused to answer" cannot trigger *Garrity*'s exclusionary rule. *United States v. Indorato*, 628 F.2d 711, 716 (1st Cir. 1980). In *Indorato*, there was "no overt threat that defendant would be dismissed if he refused to answer the questions asked." *Id.* at 715. Instead, the defendant claimed "such threat was implied because the state police departmental rules . . . provided for the dismissal of any officer who refused to obey the lawful order of superiors." *Id.* The First Circuit rejected this argument because "[t]here is nothing in the record to suggest that the rules have been interpreted to mean that a state police officer who refuses on [F]ifth [A]mendment grounds to comply with an order to provide self-incriminating statements would be dismissed." *Id.* at 716.

**D**

It is apparent that the courts that have addressed *Garrity*'s application to government employment policies (or similar background rules alleged to create implicit coercion in the public employment context) have coalesced around a similar framework. Under this framework, courts consider both the public employee's subjective belief and the objective reasonableness of that belief to determine whether the employee's statements were improperly coerced.

We too conclude that in the absence of a direct threat of loss of employment, this framework is appropriate for assessing whether government employment policies violate the rule in *Garrity*. The core of the Fifth Amendment is the protection against coerced self-incriminating testimony. And for an employee to be coerced, he must both be objectively threatened with a substantial adverse employment consequence for refusing to incriminate himself and be subjectively aware of that penalty. Although assessment of these objective and subjective elements will turn on the facts of each case, it is only when both elements are satisfied that the employee is denied the "free choice to admit, to deny, or to refuse to answer" incriminating questions, and thus entitled to suppression of his statements absent a grant of immunity. *See Garrity*, 385 U.S. at 496 (quotation marks omitted).

Wells resists this framework, urging us to consider only whether the Coast Guard policies on their face violate *Garrity*. Wells argues that our decision in *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), controls and sets forth a purely objective test—one that does not consider whether the employee in fact believed he could lose his job

if he refused to waive his Fifth Amendment rights. That is not correct.

As a threshold matter, *Saechao* involved an allegedly coercive probation condition, not a policy of government employment. *See id.* at 1075. It is true that in both contexts, courts have applied the same high-level principle that "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right." *Murphy*, 465 U.S. at 434 (citing *Cunningham*, 431 U.S. at 805). But we have never suggested that in assessing allegations of implicit coercion, government employees and individuals on probation are identically situated. For example, it may be easier to infer an individual's familiarity with his conditions of probation, given that his probation officer must instruct him as to the court's specified probation conditions and must "provide him with a written statement clearly setting forth all such conditions." 18 U.S.C. § 3603(1). In many cases, moreover, the consequences for violating a probation condition—which can be dire—will be more apparent to an individual on probation than in an analogous situation in the employment context. Perhaps most fundamentally, "[p]robation, like incarceration, is a form of criminal sanction imposed by a court." *United States v. Knights*, 534 U.S. 112, 119 (2001) (quotation marks omitted). Individuals on probation "do not enjoy the absolute liberty to which every citizen is entitled." *Id.* This fact is indeed "[i]nherent in the very nature of probation." *Id.* As a general matter, that context likely creates different assumptions and expectations about probation conditions, as compared to conditions of employment.

Tellingly, we did not even mention *Saechao* in *Aguilera*. *Saechao* found it significant that the probationer

was required to "*answer all* reasonable inquiries," 418 F.3d at 1078. In *Aguilera*, by contrast, we expressly recognized there may have been "some initial coercion to *cooperate and answer* questions," but we held that this initial coercion was not equivalent to "*compelling* the officers to waive their Fifth Amendment rights" when "the deputies were never even *asked* to waive their immunity." 510 F.3d at 1172 & n.5. Given that it arose in the public employment context, the more applicable precedent is *Aguilera*.

In any event, *Saechao* actually supports our conclusion that employees must demonstrate both a subjective belief of an improper penalty and the objective reasonableness of that belief. In *Saechao*, the probationer met with his intake officer "to review the conditions of his probation," including the condition that required him to "promptly and truthfully answer all reasonable inquiries" under threat of "arrest, revocation of probation, or modification of conditions." 418 F.3d at 1075. He also signed a form acknowledging these conditions. *Id.* We specifically noted that the probationer "was instructed on two occasions" as to his probation conditions. *Id.* at 1081.

There was thus no question in *Saechao* as to the probationer's subjective awareness of the probation conditions. And we did not suggest in *Saechao* that an employee's subjective beliefs (which, we note, could be demonstrated through circumstantial evidence) are irrelevant in assessing Fifth Amendment claims under *Garrity*. We therefore reject Wells's contention that *Saechao* requires a purely objective test when evaluating *Garrity* claims based on public employer policies.

**E**

With the proper framework established, we now turn to Wells's *Garrity* claim. We conclude that the district court did not err in admitting Wells's statements from the April 2012 interviews.

The evidence in the record does not suggest that Wells subjectively believed that either the Coast Guard Manual or the letter of caution regarding the fuel card required him "to answer the investigator's questions or to waive [his] immunity from self-incrimination." *Aguilera*, 510 F.3d at 1172. Wells never expressed this belief, either during the interviews or when he testified in his own defense at trial. And there is no basis by which to infer such a subjective belief, either.

To the contrary, the interview transcripts reveal Wells's affirmative intent to cooperate with the investigation in an apparent effort to make it seem that he had nothing to hide. *See Smith*, 821 F.3d at 1303 (similar). At one point, Wells went so far as to say that if the killer were found, he would consider "tak[ing] matters into [his] own hands" because it was "like somebody, you know, hurt one of your family members." At another point, Wells offered that the murders may have been part of a robbery gone bad, emphasizing that the rigger shop contained "lots of stuff in there worth stealing" and that theft had happened in the past.

Except at the end of the last interview, when Wells invoked his *Miranda* rights, the interviews were friendly and non-confrontational. As the district court noted, "[t]hroughout the six interviews, Mr. Wells never expressed concern that his employment would be affected

if he did not participate, even when he and the investigators discussed his long service with the Coast Guard." And when Wells was told that a particular inquiry was voluntary—such as the search of his vehicle, the search of his phone, or his participation in the April 13 interviews— he readily agreed to it. Wells also sometimes volunteered information that went beyond the scope of the questions asked.

Eventually, Wells invoked his *Miranda* rights and terminated the final interview. Although Wells notes that ending the last interview was not necessarily incompatible with a belief that he would face adverse employment consequences as a result, it does tend to suggest that Wells knew he was entitled to draw a line. And there is no indication Wells drew that line based on any perceived threat of losing his job. Indeed, earlier in the April 13 interviews, Wells had no difficulty expressing his unwillingness to answer questions about his own disciplinary issues at COMMSTA, a topic integrally related to his employment.

In addition, although Wells testified about receiving the letter of caution, there is no evidence that he was aware of the Coast Guard employment manual. *See, e.g.*, *Palmquist*, 712 F.3d at 646 (rejecting *Garrity* claim when "there is no indication Palmquist was aware of the regulation at all, let alone that he was selectively presented with the" allegedly problematic portion). Wells did not testify that he had read the manual. As the district court found, "Mr. Wells has not submitted any evidence that he reviewed or was otherwise familiar with this manual or any applicable Coast Guard regulation."

Having concluded that Wells did not establish a subjective belief that he was required to answer the investigators' questions or suffer an employment consequence, we need not consider whether, if Wells had held such a belief, it would have been objectively reasonable. In short, Wells was not implicitly coerced to provide his interview statements, and the Fifth Amendment did not prevent the introduction of his statements at trial. The district court correctly denied Wells's motion to suppress.[3]

## III

We next address Wells's challenge to his restitution order. The district court ordered Wells to pay $1,921,640 in restitution pursuant to the Mandatory Victims Restitution Act (MVRA). The court further determined that restitution should be paid using 80% of the monthly payments from Wells's Thrift Savings Plan, military retirement benefits, civil service retirement benefits, and disability benefits payments.

Wells argues that the district court erred in ordering 80% garnishment of these monthly funds. Wells points out that the MVRA incorporates provisions of the Consumer

---

[3] Wells also urges us to order the suppression of his statements to investigators using our supposed "supervisory powers" over federal employees. Effectively, Wells asks that we create a "non-constitutional" rule of practice that would govern federal government investigations, requiring a "*Garrity* waiver" before any statements by government employees can be introduced at trial. Even assuming we have the power to create such a rule, which is hardly clear, we would decline to do so for the reasons already given.

Credit Protection Act (CCPA), which limits "the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment" to "25 per centum of his disposable earnings for that week." 15 U.S.C. § 1673; *see* 18 U.S.C. § 3613(a)(3) ("[T]he provisions of section 303 of the Consumer Credit Protection Act (15 U.S.C. 1673) shall apply to enforcement of the judgment. . . ."). Wells claims that his retirement and disability benefits constitute "earnings" for purposes of 15 U.S.C. § 1673, and that these funds thus cannot be garnished more than 25%.

The district court acknowledged the "complex" "interface between the MVRA and federal consumer protection laws." But the court declined to decide how the CCPA might apply to Wells's benefits payments because the court concluded that regardless, it had discretion under the All Writs Act to order garnishment of a higher percentage of Wells's monthly payments.

Although a few other district courts have relied on the All Writs Act in similar situations, *see United States v. Greco*, 2013 WL 101931, at *2 (N.D. Ohio Jan. 8, 2013); *United States v. Cunningham*, 866 F. Supp. 2d 1050, 1062 (S.D. Iowa 2012), we find that approach mistaken, and the government does not defend it. The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Act "codifies the courts' inherent authority to 'fashion appropriate modes of procedure' necessary to the exercise of the judicial function." *Perez v. Barr*, 957 F.3d 958, 967 (9th Cir. 2020) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). But because the Act does not enlarge a court's jurisdiction, "'[w]hen a statute specifically

addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling.'" *Id.* (quoting *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985)); *see also Shoop v. Twyford*, 142 S. Ct. 2037, 2044 (2022) ("We have made clear that a petitioner cannot use that Act to circumvent statutory requirements or otherwise binding procedural rules."). Because the MVRA creates specific statutory requirements for garnishing earnings, the All Writs Act cannot be used to sidestep those requirements.**[4]**

Thus, the district court was required to determine whether each of Wells's benefit payment streams constituted "earnings" under 15 U.S.C. § 1673. *See also* 15 U.S.C. § 1672(a) (defining "earnings" as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includ[ing] periodic payments pursuant to a pension or retirement program"). If so, the MVRA limited garnishment of those funds to 25%. Because the district court has not yet considered these questions, and because some of the facts underlying the different benefit payments are unclear, we remand for the district court to consider these issues in the first instance.

---

[4] Wells also argues that the restitution order violated the Fifth and Sixth Amendments because it was based on facts not found by a jury. Our precedent forecloses this argument. *See United States v. Alvarez*, 835 F.3d 1180, 1185 (9th Cir. 2016). Our precedent likewise forecloses Wells's argument that the restitution order violated his Seventh Amendment right to a jury trial. *See United States v. Stanfill El*, 714 F.3d 1150, 1154 (9th Cir. 2013).

\* \* \*

For these reasons and those set forth in our accompanying memorandum disposition, we affirm Wells's convictions but vacate his restitution order and remand for further proceedings on that issue only.

**AFFIRMED in part; VACATED and REMANDED in part.**